**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: New York City Policing During Summer 2020 Demonstrations <br> _____ <br><br> This filing is related to:  ALL CASES | 20-cv-8924 (CM) (GWG) |

**DECLARATION OF JOSEPH ALEJANDRO IN**
**SUPPORT OF THE MOTION TO INVERVENE BY THE**
**POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK,**
**INC.**

STATE OF NEW YORK           )
                                     ss.:
COUNTY OF NEW YORK       )

JOSEPH ALEJANDRO, being duly sworn, deposes and says:

1. I am the Second Vice President of the Police Benevolent Association of the City of New York, Inc. ("PBA").  I have held that position since December 3, 2018.  Prior to that I was Treasurer of the PBA from July 1, 1999 until December 3, 2018.  I have been a New York City Police Department ("NYPD") Police Officer since January 4, 1984.

2. I submit this declaration in support of the PBA's Motion to Intervene as a defendant in these actions. I am familiar with the membership, functions and missions of the PBA, and with the facts described in this affidavit.  The matters set

forth below are true and correct to the best of my knowledge, information and belief.

3.      The core mission of the PBA is to advocate for and protect the interests of its members, the front-line police officers of the NYPD.  In particular, PBA's members are responsible for performing day-to-day policing, in accordance with practices and procedures developed by NYPD leadership. It is those practices and procedures that are challenged by the plaintiffs in these actions.

4.      The PBA's members are at the front line of police services in the City; their duties and responsibilities include preserving the public peace, preventing riots, maintaining order on the streets and in other public spaces, detecting and arresting offenders, suppressing crime and public unrest, protecting the rights of persons and property, guarding the public health, preserving order at elections and all public meetings and assemblages, enforcing and preventing the violation of all laws and ordinances in force in the City, and for these purposes arresting people guilty of criminal violations of those laws and ordinances.

5.      While on duty, a police officer is aware of, and inspects, his or her post or sector for conditions requiring police attention, and renders all necessary police service in his or her assigned area, as circumstances require and as directed. Adding to their traditional responsibilities of combating crime and answering an increasing number of calls for police service, police officers have taken on anti-

terrorism responsibilities and other periodic initiatives coming out of city hall.
Police officers bear the principal responsibility of interfacing with the public in
need of police services, effecting arrests, and preparing the reports and other
paperwork required in an increasingly regulated and scrutinized environment.
Police officers are principally responsible for implementing the crime-fighting
policies fashioned by the City's elected leadership.

6.      The PBA is the designated collective bargaining agent for the more than
23,000 police officers employed by the NYPD, out of the NYPD's total uniformed
force of some 34,500 members. The demographic makeup of those officers, as
reported in the Commissioner Shea's recent official report[1], is diverse:

Percentage by Race & Hispanic Origin by Rank

| Rank | White | Black | Hisp | Asian | Other | Total |
|---|---|---|---|---|---|---|
| Police officers | 42.8% | 15.5% | 31.5% | 10.2% | 0.1% | 100.0% |
| Detectives | 52.2% | 15.9% | 27.3% | 4.5% | 0.1% | 100.0% |
| Sergeants | 51.5% | 14.4% | 25.3% | 8.8% | 0.1% | 100.0% |
| All Other Ranks | 60.9% | 12.1% | 18.8% | 8.1% | 0.0% | 100.0% |
| Total Uniformed | 46.4% | 15.2% | 29.3% | 9.1% | 0.1% | 100.0% |

---

[1] Available at:

https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/year-end-2020-enforcement-report.pdf

7.      The PBA negotiates on Police Officers' behalf with the City of New York in matters of policy, terms and conditions of employment, and all matters relating to Police Officers' general welfare.

8.      As it must under the law, the City regularly negotiates with the PBA regarding all matters within the scope of collective bargaining, such as wages, hours, and working conditions.   With respect to labor-management ("LM") issues, the PBA's Collective Bargaining Agreement ("CBA") provides in Article XXVII that a joint LM committee shall consider and recommend to the Police Commissioner changes in the working conditions of employees, including "adequate levels of Police coverage to ensure the safety of employees on duty." Since some of the complaints take issue with the use by officers of safety helmets, it is pertinent to note that the CBA also provides at Article XVI, Section 1, "Safety Helmets", that "The City agrees to furnish a safety helmet and equipment related thereto for each employee.  Such headgear shall conform to Police Department specifications in effect at the time of this Agreement."

9.      In addition, the PBA frequently addresses issues relating to workplace safety in labor-management discussions, and where necessary, via complaints to the Public Employee Safety and Health ("PESH") Bureau (effectively, the public sector OSHA), pursuant to the Public Employee Safety and Health Act (NY Labor Law §27-a).  Within the last few years, for example, the PBA filed such complaints

4

and received favorable findings in relation to the Department's Active Shooter response policy, and the 2018 Chelsea Steam Pipe explosion.

10.     That the City is required to engage in collective bargaining with the PBA reflects the fact that the interests of the City and its elected leaders can and often do diverge from the interests of the PBA's members with respect to all matters as to which such collective bargaining is mandatory.

11.     Many of the practices and procedures challenged in these actions have an impact on the safety of the PBA's members in carrying out their responsibilities and duties, as well as on the training, supervision, monitoring, and discipline of PBA members.  To the extent such matters are at issue, those practices and procedures may appropriately be the subject of collective bargaining between the PBA and City officials.  Thus, if plaintiffs are successful in these actions, the declaratory and injunctive relief requested in their complaints will have a direct impact on the rights and interests of the PBA's members.

12.     For example, the complaints allege that NYPD officers violated the rights of participants in the various protests, demonstrations and riots that engulfed the City from late May 2020 and well into the Summer of 2020, in that those officers used OC spray, batons and other equipment in response to what the complaints describe as "mostly peaceful protests."  While many of the participants in those events conducted themselves peacefully, unfortunately many did not.  Some participants

were clearly intent on engaging in and provoking violence against police officers, and were using the crowds as a hiding place and a safe harbor while they did so.

13.     In responding to those events, the PBA's members were required to deal with the realities on the ground, which were far more chaotic and dangerous than the picture painted by the allegations in the complaints.  As has been reported publicly (see infra ¶17, and particularly subparagraph (v)), more than 400 NYPD officers were assaulted during those events, some suffering severe injuries.

14.     In June 2020, while those events were still unfolding on the streets of the City, the PBA addressed those facts in a submission to the New York Attorney General's office, which had announced an investigation into the protests and the NYPD's response. A copy of that submission is attached as Exhibit A.  The submission contains the following general observations by Patrick Lynch, the PBA's president:

> Based on our own observations during the protests and the police officer testimonials we have received, the PBA rejects the notion that either the peaceful protests or the outbreaks of violence were entirely "leaderless" and organic.
>
> At multiple times and locations, we observed individuals who appeared to be directing crowd movements and activities, including using two-way radios and/or "scouts" on bicycles appearing to relay information about police positions. Police officers who confronted violent agitators also noted a common feature: the agitators would descend on a location in a coordinated fashion, attack police officers and/or engage in other destruction and violence, and then disappear from the scene just as quickly.

Ex. A, p. 11.

15.    In its submission, the PBA detailed many instances of assaults on NYPD officers, which the PBA offered as a non-exhaustive list of examples of the conduct that those officers were faced with during the demonstrations.  *See* Ex. A, pp. 5-8.

16.    Those assaults involved attacks on NYPD officers with bricks thrown at their heads, the use of weapons to hit officers on the head and elsewhere often from behind,  throwing bicycles or other objects at officers, spitting in officers' faces, punching officers, throwing them to the ground and kicking them, and other similar conduct.  While that was happening, other participants in the protests often crowded around the officers, screaming at them from close quarters and interfering with the officers as they tried to maintain some control.

17.    There are many videos and accounts posted on the internet and elsewhere depicting and describing the often chaotic and dangerous conditions faced by PBA members in trying to restore order and maintain the peace during those "mostly peaceful protests," of which these are a sample:

  (i)    http://www.nydailynews.com/new-york/nyc-crime/ny-nypd-lieutenant-brick-george-floyd-protests-20200602-olloiaou3fhkdamq6rjpj7qhbi-story.html

(ii)   https://nypost.com/2020/05/30/nypd-cop-possibly-hit-with-brick-at-protest-shares-gory-photo/

(iii)   https://nypost.com/2020/06/03/nypd-cop-bashed-with-fire-extinguisher-during-mayhem-in-manhattan/

(iv)   https://nypost.com/2020/11/05/woman-charged-with-spitting-in-nypd-cops-face-at-protest/

(v)   Reports from the Department on how many officers injured during protests: https://www.msn.com/en-us/news/crime/472-nypd-officers-injured-during-this-years-protests-department/ar-BB19tSZB

(vi)   photos of police injured by "protestors":

https://nypost.com/2020/07/15/nypd-chief-of-department-injured-during-brooklyn-ptrotest/

(vii)   https://nypost.com/2020/07/26/insurgents-target-nypd-cars-light-fires-in-chaotic-city-scene/

(viii)   https://nypost.com/2020/06/02/video-shows-nypd-officer-being-attacked-in-the-bronx/

18.   There were also incidents of "protestors" throwing Molotov cocktails at police vehicles. Where the perpetrators were identified and arrested, those incidents have resulted in felony indictments pending in the Eastern District of

New York.  *See United States v. Colinford Mattis and Urooj Rahman,* 963 F.3d 285 (2d Cir. 2020) (detailing allegations).  In another case pending in the Eastern District, *United States v. Samantha Shader,* E.D.N.Y. Docket No. 20-CR-202 (DLI),  the defendant has been charged with igniting a Molotov cocktail and throwing it at an NYPD vehicle occupied by four police officers, shattering two of its windows, all of which was captured on a video recorded by a witness.  Police officers pursued Shader as she attempted to flee and apprehended her at the scene.  *See,* Press Release by U.S. Attorney, EDNY, announcing the indictments, available at *https://www.justice.gov/usao-edny/pr/two-brooklyn-residents-and-greene-county-resident-indicted-connection-molotov-cocktail.*

19.     Other disturbing incidents are detailed in the PBA's submission (Exhibit A, pp. 2, 4 and n. 10, 5).

20.     Those "mostly peaceful protests" were carried out without any permits allowing the demonstrators effectively to shut down large sections of the City, thus preventing other citizens from going about their business or using the public streets; and without compliance with any of the 'time, place and manner rules' for large-scale demonstrations in the City.  See, Report of the New York City Department of Investigation into the NYPD Response to the George Floyd Protests

(Dec. 2020)2 at p. 11 ("The Floyd protests generally did not involve the planning, permits, or other process that would have included advanced coordination with the NYPD.").

21.     The protests occurred, moreover, in the middle of the Covid pandemic when there were severe limitations imposed on even small gatherings, let alone mass gatherings that occurred.  Yet it was the NYPD's responsibility to enforce those requirements while at the same time trying to maintain order on the public streets and other spaces so that all citizens could safely, freely and peacefully conduct their lawful affairs.

22.     In light of  public statements of the Mayor and Attorney General and the allegations of the Attorney General's complaint, there is strong reason to doubt that either of these officials intends to offer a fair and even-handed exposition of the NYPD's Officers' actions during the events at issue - let alone adequately defend the interests of the PBA and its members in this litigation.  After the filing of the Attorney General's lawsuit, for example, the Mayor issued a statement saying that

---

[2] Available at:
https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

he had met with the Attorney General and "couldn't agree more that there are pressing reforms that must — and will — be made this year."[3]

23.     The sweeping demands for declaratory and injunctive relief in the complaints in these cases could – and from the allegations in those complaints seem intended to -- encompass restrictions on NYPD officers' ability to use defensive and non-lethal equipment such as helmets, shields, batons and OC spray (to mention only a few), to protect themselves as well as others in future "mostly peaceful protests" that may at times turn into full scale riots. The PBA submission (Exhibit A) discusses the importance of PBA members' right to use their helmets and other non-lethal equipment to protect their own safety in events such as these. *See,* Ex. A, pp.  4-5.  Those issues are subject to collective bargaining between the City and the PBA, and impact the rights and interests of PBA members.

24.     The PBA submission to the Attorney General also details how the statements by the political leaders of the City and the State contributed to the chaos, unrest, violence and destruction unleashed by the "mostly peaceful protests" that the NYPD was tasked with controlling.  As the PBA's submission explains, those political leaders, including the Attorney General and the Mayor, may be seeking to cast the NYPD as the scapegoat for their own errors that added to that chaos,

---

[3] Reported at https://gothamist.com/news/ny-ag-letitia-james-sue-nypd-install-federal-monitor

unrest, violence and destruction.  For that reason, the participation of the PBA in these actions is likely to add a perspective that will aid the Court in reaching a fair and balanced understanding of the events at issue.

25.     The PBA also seeks to intervene to protect the reputations of its members. The complaints paint a picture of NYPD officers as lawless and indiscriminate violators of the rights of peaceful protestors.   But the ability of the NYPD to achieve its mission on behalf of all citizens depends in substantial part on its reputation for integrity, honor and dedication to protecting the rights of all citizens, peaceful protestors included.

26.     For all of these reasons, I respectfully request that the PBA's motion for intervention be granted in all respects.

JOSEPH ALEJANDRO

Sworn to before me this 3rd day of
March, 2021

NOTARY PUBLIC

CHRISTOPHER J MCGRATH
NOTARY PUBLIC STATE OF NEW YORK
NASSAU COUNTY
LIC. #02MC6006082
COMM. EXP. JUNE 1, 2022