# EXHIBIT A



Police Benevolent Association
Of The City Of New York, Inc.

NEW YORK STATE ATTORNEY GENERAL LETITIA JAMES
**Public Hearing Via Video Conference on**
**Police/Public Interactions During Recent Protests**
Wednesday, June 17, 2020

### STATEMENT OF NYC PBA PRESIDENT PATRICK J. LYNCH

The Police Benevolent Association of the City of New York, Inc. ("NYC PBA") and its over 24,000 members, who patrol New York City's streets and do the difficult and dangerous work of protecting every resident, every visitor and every business operating within the five boroughs, submits this statement to provide our union's perspective on the recent protests.  Pursuant to Governor Andrew M. Cuomo's mandate for the Attorney General to review "both police procedures and crowd actions during the protests," we will examine these factors from the viewpoint of the police officers who were assigned police the protests.

There is no dispute that the events of the past few weeks — particularly the major unrest and violence that occurred May 29 through June 2 — are something nobody in our city wants to see repeated.  The images of burning police vehicles, looted storefronts and violent clashes between protesters and police officers will remain etched in our collective memory. They are symbols of a breakdown of our social contract, a failure of the many systems and processes that make up the safe, prosperous city we have all enjoyed for several decades.

An after-action assessment like this hearing is therefore necessary and important.  However, it will only be valuable if it is sufficiently broad in both its scope of inquiry and in its resulting recommendations. In recent days, there has been a great deal of public attention paid to the actions of individual police officers during the protest. Those individual incidents are already under investigation  on a separate track from this inquiry.

If the purpose of this hearing is simply to catalogue and scrutinize individual incidents, it will not only interfere with police officers' due process rights — it will do nothing to prevent a reoccurrence of the citywide failures we saw during this crisis. What is needed now is a comprehensive analysis of the environment in which police officers were acting, encompassing both the actions of protesters (and the violent agitators in their midst) and our city's leadership, from the police supervisors on the ground to the highest levels of City government.

With regard to these broader issues, there are three major deficiencies apparent to us as police officers on the street:

1. Police officers were deployed **without a clear plan** for managing demonstrations that had a clear likelihood of escalating into violence.
2. The NYPD **did not devote sufficient resources** to the early stages of its disorder control effort, nor did it **employ clearly established disorder control protocols**. This failure was particularly glaring in the face of the **complex, coordinated demonstrations** that intermingled peaceful protesters with **agitators bent on inciting violence**.
3. Our city and state's elected leaders did not provide **a clear message of support** for the police officers who were carrying out their directives.

In this statement, we aim to illustrate these deficiencies by referencing the experiences and observations of PBA officials who monitored the demonstration response, as well as testimonials from police officers who were assigned to the protests. With respect to the strategies and tactics employed by NYPD supervisors during the protests, we have consulted with an expert in those areas to propose several lines of inquiry that the Attorney General must pursue in order to fully understand what transpired. Rank-and-file police officers — our members — have no role in determining disorder control strategies and very limited tactical discretion in supervised situations such as these protests. The NYPD's senior leadership and supervisors therefore must answer for their decision-making.

Similarly, protest organizers and leaders should answer for their strategies and tactics in directing protester activity and dealing with the violent agitators in their midst. The PBA has proposed several lines of inquiry that the Attorney General should pursue in that regard.

We will also review the public statements of city and state elected officials during this crisis, especially Mayor Bill de Blasio and Governor Andrew Cuomo, in order to discuss their influence over the way that police officers, protesters and the general public viewed the protests and the police response.

On this point, we must be clear: Our elected leaders' words matter. In our view, their initial failure to forcefully condemn acts of destruction and violence committed by protesters (or those acting under the guise of protest) contributed to further violence. Statements that appeared to exclusively blame *police officers* for the disorder, with no mention of the crowd behavior to which those police officers were responding, encouraged violent agitators to continually push the envelope and incite conflict.

We also cannot overstate the lasting damage that the political rhetoric of the past several weeks has done to police officer morale. To be blunt: New York City police officers are nearing the breaking point. For weeks, we worked tours of 12 hours or more with few days off. We have been bombarded by bottles, bricks and Molotov cocktails. We have seen nearly 400 of our brothers and sisters injured due to these assaults. Meanwhile, the overwhelming message from New York's political class has been an attack on our integrity and the legitimacy of our work.

And yet the same elected leaders continue to send us out, night after night, to protect the First Amendment rights of demonstrators who attack and vilify us. We continue to carry out that mission faithfully. That alone is a testament to the professionalism of every woman and man who wears an NYPD uniform. But there can be no path forward unless our elected leadership stops exploiting anti-police sentiment for political gain.

Our city is facing significant public safety challenges. There are also real and legitimate concerns about police policies and practices. Neither of these issues can be adequately addressed without an honest conversation, rooted in the realities on our streets, rather than ideology and rhetoric. In that spirit, we submit the following perspective on the NYPD's response to the recent protests:

**I.    No Clear Plan: Warning Signs for Violence Ignored**

Beginning with the first significant protests on the evening of May 29, it was clear to the PBA that the NYPD and the de Blasio administration did not have an adequate plan in place to manage very large, citywide demonstrations with a high potential for violence. A review of the timeline of events leading up to May 29 shows that there were multiple warning signs that these demonstrations would be unlike anything our city has witnessed recently.

The event that touched off the protests – the killing of George Floyd by a Minneapolis, Minn., police officer – occurred on Monday, May 25. Over the next two days, Minneapolis experienced significant violence in the vicinity of the city's Third Precinct police station, near where Floyd's killing occurred. Media reports

described a standoff between police officers and thousands of protesters behind "makeshift barricades" who pelted the police with rocks and other projectiles, while police officers responded with tear gas, plastic bullets and concussion grenades. There were also reported instances of arson and looting.[1]

The demonstrations and violence on Tuesday, May 26, and Wednesday, May 27, were not confined to Minneapolis. As far away as Los Angeles, protesters blocked highways and then surrounded and smashed the windows of responding police vehicles.[2] Like the violence at Minneapolis' Third Precinct, these incidents were notable in that police officers and police department property were specifically targeted.

By the evening of Thursday, May 28, the situation in Minneapolis began to deteriorate dramatically. That night, demonstrators in Minneapolis overran and set fire to the Minneapolis Police Department's Third Precinct facility. There were multiple reports of looting and arson, and Minnesota Governor Tim Walz moved to activate the National Guard.[3] Demonstrators were also arrested near the home of the fired Minneapolis police officer accused of killing Floyd.[4]

The protests also reached New York City for the first time on May 28. Although this first night of protests was limited in size and geographic scope, the potential for violent assaults on police officers was immediately realized. A demonstration in Manhattan's Union Square resulted in dozens of arrests for criminal acts including striking a police officer in the head with a garbage can, punching a police officer in the face, carrying a knife and attempting to grab a police supervisors firearm.[5] Five individuals were ultimately charged with felony assaults on police officers.[6]

That same day, the NYPD became aware of more generalized threats of violence against police officers: On May 28, the NYPD Intelligence Bureau Threat Assessment and Protection Unit issued an Officer Safety Alert regarding an individual who stated on social media "Cop killings are gonna be a thing…somebody gotta die."[7]

Against this local and national backdrop, NYPD leaders and de Blasio administration officials should have anticipated that the more extensive protests planned for multiple locations on the afternoon and evening of Friday, May 29, would bring a greater potential for violence.  However, their public statements that day displayed little concern about such escalation.

---

[1] Eric Miller and Nicholas Pfosi, *Protests, looting erupt in Minneapolis over racially charged killing by police,* Reuters (May 27, 2020).  https://www.reuters.com/article/us-minneapolis-police/looting-erupts-during-minneapolis-protests-over-black-mans-killing-by-police-idUSKBN2332G9

[2] Christopher Weber, *Protesters Stop LA Freeway Traffic, Smash Patrol Car Windows,* Associated Press (May 28, 2020). https://hosted.ap.com/berkshireeagle/article/de01149ed0828750e2a41d7c2872a1aa/protesters-stop-la-freeway-traffic-smash-patrol-car-windows

[3] Carlos Barria and Eric Miller, *Civil unrest rages in Minneapolis over racially charged killing by police*, Reuters (May 28, 2020). https://www.reuters.com/article/us-minneapolis-police-investigation/minnesota-calls-in-national-guard-to-quell-unrest-over-black-mans-death-in-police-custody-idUSKBN23423Q

[4] Mary Divine, *Six George Floyd protesters arrested at fired Minneapolis police officer's Oakdale home*, Twin Cities Pioneer Press (May 28, 2020). https://www.twincities.com/2020/05/28/george-floyd-protesters-arrested-at-oakdale-home-belonging-to-minneapolis-police-officer/

[5] Matthew Chayes and Nicole Fuller, *NYC protests, crime threats at Long Island malls, over Floyd arrest video,* Newsday (May 29, 2020). https://www.newsday.com/news/new-york/union-square-protest-george-floyd-1.45033365

[6] Tina Moore, Larry Celona, Alex Taylor and Tamar Lapin, *At least 70 arrested at NYC protest over death of George Floyd,* New York Post (May 28, 2020). *https://nypost.com/2020/05/28/several-arrested-at-nyc-protests-over-death-of-george-floyd/*

[7] Robert Gearty, *NYPD issues officer safety alert after Brooklyn man's 'cop killings' online threat,* Fox News (May 29, 2020). https://www.foxnews.com/us/nypd-issues-officer-safety-alert-after-brooklyn-mans-online-threat

In a Friday morning radio appearance, Mayor de Blasio called for police officers to take a "light touch" in handling protesters, suggesting that their anger – if not the actual acts of violence – was justified: *"The anger out there is real and unfortunately, very justified. I really believe that the NYPD knows how to handle protests and respect whoever is protesting but I want to see a light touch because people are undeniably angry for a reason."*[8]

Similarly, during a Friday morning television appearance, NYPD Chief of Department Terence Monahan sought to distinguish the prior night's violence in Union Square from the majority of "peaceful" demonstrations, presumably including those planned for later that evening: *"This group last night was bent on confronting the police and fighting with the police,"* Monahan said. *"Unlike the 99.9 percent of demonstrations ... which are peaceful and people go out there and try to express their opinions — which we 100 percent support — last night's group was bent on confronting, throwing bottles at the police, throwing garbage cans, throwing highway cones, garbage through the streets, taking over the highway."*[9]

In the absence of more specific guidance — which, to the PBA's knowledge, was not broadly disseminated to police officers in advance of the May 29 demonstrations — these public statements sent police officers who would be assigned to the protests a message of "business as usual."

As we now know, the demonstrations of Friday, May 29 were anything but "business as usual," particularly the massive demonstration that began in front of the Barclays Center and devolved into rolling waves of chaos through the surrounding neighborhoods. Before the end of the night, multiple police vehicles would be sent on fire, including one NYPD van that was firebombed with four police officers inside.[10] The NYPD's 88th Precinct was surrounded and charged by demonstrators attempting to enter the facility, resulting in numerous injuries to police officers.[11] It was clear from very early that evening that NYPD management was taking a purely reactive and defensive approach, and had failed to account for the escalating violence witnessed around the country on previous nights and in New York City the night prior.

One particular issue was emblematic of this dangerous and misguided approach: Early in the evening of May 29, the PBA observed that a significant number of police officers assigned to protest details – particularly at the Barclays Center, which was already the scene of bottles and other debris being thrown at police officers – were not equipped with disorder control helmets.

The dual-purpose disorder control/scooter helmet is standard equipment issued to every New York City police officer. It is usually kept in a precinct locker or secured in a patrol car, to be deployed upon the direction of a supervisor or as circumstances warrant.  The NYPD Patrol Guide dictates that the ranking member on the scene of an incident will determine whether the helmets are to be worn or removed, except in emergencies where there is "a substantial and specific imminent threat to the safety of the member," in which case the police officer may

---

[8] Alejandra O'Connell-Domenech, *Mayor wants NYPD to use 'light touch' with George Floyd protesters,* AMNY (May 29, 2020). https://www.amny.com/news/police-fire-news/mayor-wants-to-see-nypd-use-light-touch-with-george-floyd-protesters/

[9] Amanda Woods and Georgett Roberts, *NYPD removed 'troublemakers' from George Floyd protests in Manhattan,* New York Post (May 29, 2020) https://nypost.com/2020/05/29/nypd-took-troublemakers-out-of-the-group-at-heated-protest/

[10] Elizabeth Keogh and Thomas Tracy, *Two sisters face charges for throwing Molotov cocktail at cops during Brooklyn George Floyd protest,* New York Daily News (May 30, 2020). https://www.nydailynews.com/new-york/nyc-crime/ny-two-sisters-busted-molotov-cocktail-nypd-car-20200530-hi5ho6rcxbekrgbyuwutvquk3m-story.html

[11] Elizabeth Keogh, Michael Elsen-Rooney, Rocco Parascandola, Anna Sanders and Ellen Moynihan, *Violent protesters charge Brooklyn police precinct in day of demonstrations over police killing of black man in Minneapolis,* New York Daily News (May 29, 2020). https://www.nydailynews.com/new-york/ny-protest-police-brutality-george-floyd-20200529-vvmrqd2bqbh67lo4tdgouijqwi-story.html

wear the helmet at his or her discretion. Under all circumstances, individual police officers have discretion to carry their helmets on their duty belts or otherwise secure them near the scene for immediate use.[12]

The fact that a large number of police officers at those early demonstrations were not even *carrying* their helmets — much less wearing them in a situation (i.e., the throwing of bottles and other projectiles) that constitutes a "substantial and specific imminent threat" to their safety — suggests one of two scenarios: either those police officers were specifically directed NOT to carry or wear their helmets by their supervisors, or those supervisors failed to inform them of the obvious risks of their assignment. Neither scenario is acceptable.

The PBA issued an email memo to all members later that night, advising them of their rights to carry/wear helmets and encouraging them to do so. Our subsequent observations that night and in the days that followed suggested that police officers generally heeded that advice. However, any time a labor union is forced to dispense urgent safety guidance to its membership during an unfolding crisis, it is a clear sign that management has failed to do its job.

In the PBA's view, the NYPD leadership's failure to adequately plan for the Friday, May 29, protests – or to adjust to the deteriorating conditions during the nights that followed – was rooted in the assumption that these demonstrations would follow the same norms and behavior patterns as the thousands of other protests that the NYPD handles each year.

The NYPD does, in fact, have well established protocols for managing demonstrators whose only goal is to exercise their First Amendment rights. That includes protocols for managing both fully sanctioned and permitted marches and demonstrations, as well as non-permitted protests where demonstrators are either willing to work within the limitations imposed by the NYPD or plan to engage in organized, peaceful civil disobedience.

These demonstrations, however, had an entirely different dynamic. To illustrate this dynamic, we have summarized testimonials from 17 of the nearly 400 police officers who were injured during the protests. Our conversations with these police officers revealed a situation in which they were given little or no guidance by NYPD leadership regarding their mission and their role in quelling the disorder, alternatively being asked to take action and stand down throughout the ordeal. Many police officers were assigned to mobile response units that would simply run from one emergency to the next without any strategy from supervisors on how to mobilize and restore order. Our officers often found themselves outnumbered and overwhelmed by rioters who did not hesitate to assault police officers, often attacking them from behind with weapons, or launching bricks, rocks and bottles while hiding behind "peaceful protesters." Unfortunately, many of the rioters that assaulted our officers are still at large, and those that were apprehended were often released.

- *On May 29, the officer was assigned to a mobile response unit that had already responded to several incidents in Manhattan and Brooklyn prior to the incident in which she was injured. The unit was ordered to respond to the 88th Precinct, which was being assailed by a large group of rioters who were attempting to take the command. The rioters were already destroying and setting fire to NYPD vehicles. The scene at the command was chaotic, and the officers were ordered to line up and defend the command. Given the large size of the riotous crowd, the officer described the defenders as being "completely overwhelmed." What began as rioters throwing rocks, bricks and bottles at officers quickly turned into a hand-to-hand melee. In the process of attempting to assist an officer in restraining a male rioter, the officer was pulled to the ground and kicked in the head by the rioter, and then was punched and kicked repeatedly by the mob before her fellow police officers pulled her to safety. The officer continued working for several hours before being taken to the emergency room. She was diagnosed with a fracture to her C2 vertebrae. She is believed to have been spared a more significant head injury because she was wearing her helmet. The officer does not know when she will be able to return to service.*

---

[12] *See* NYPD Patrol Guide Procedure 203-05 "Performance on Duty – General"

- *A male officer was at Union Square on May 28 when protests turned violent and the crowd began to overtake him and his fellow officers. The male officer observed one of the demonstrators picking up a trashcan and launching it into the area where officers were standing, striking another officer. The male officer chased the individual who had thrown the trash can. The individual tripped down the subway stairs, and the officer went over the top of him, suffering a fracture to his knee.*

- *A male officer was placing an individual under arrest on May 29 when he felt a pain to his left index finger, which was later diagnosed as fractured. Later that same night, when trying to push a crowd back to secure a station house, the officer was struck in the face by a brick that was thrown from the crowd of demonstrators. The officer was wearing a helmet and the brick bounced off his face shield, hitting his shoulder. He suffered significant inflammation to the area.*

- *The officer was assigned to a mobile response unit that responded to the area around Union Square where many rioters had gathered on May 28. He was instructed by supervisors to leave his helmet in the vehicle, since they would not need them. The crowd was already unruly and soon "airmail" (thrown objects) began to rain down on the officers. Supervisors directed officers to arrest anyone they saw throwing objects. A struggle began when a female rioter tried to take another PO's bike. The officer grabbed the bike and was struggling with the rioters who were trying to take it when the officer was suddenly knocked violently to the ground from behind. The officer was dazed and did not realize until he was told by other officers that he had been hit in the back of the head with a metal trash can. He attempted to continue working but was dazed and confused. A supervisor called an ambulance for him and he was taken to the emergency room. The officer has been diagnosed with a concussion and remains out sick. The long-term neurological consequences of his injury are not yet known. His assailant was arrested by another officer, who was also injured when making the arrest in the nearby subway station where the perpetrator had attempted to flee.*

- *On May 29, a male officer was holding back a barricade that demonstrators were pushing and attempting to breach. The demonstrators were also throwing bottles and rocks at officers. When officers observed that the demonstrators had lit a fire, the officers pushed the barricade back in an attempt to get to the fire and put it out. In the process, a demonstrator kicked the barricade, and the male officer was struck, suffering an injury to his wrist.*

- *A male officer was stationed in front of retail establishment on June 1, attempting to secure it and prevent looters from entering. The officer was struck by a glass bottle filled with an unknown liquid, which was thrown from a crowd of approximately 100 demonstrators. The officer suffered an injury to his finger.*

- *A male officer was assigned to protests in Manhattan, while trying to arrest a female demonstrator who charged toward police on a bicycle. While effecting the arrest, the officer was pelted with various objects thrown from the crowd. A rioter began breaking the windows of the police van that had been brought in to block the crowd and protect the officers on the scene. When the male officer attempted to arrest the individual breaking the van windows he was pulled into the crowd, falling backwards and striking his head on a metal barrier. The officer suffered a concussion and an injury to his knee.*

- *The police officer was working a 78 Precinct patrol sector on May 30 when he was called to respond to a 10-13, officer needs assistance. When he and his partner responded, they could not find the unit that required assistance, but were ambushed by people throwing rocks and other objects that broke the RMPs windows and struck the officer and his partner. The officer received lacerations and muscle injuries and remains out sick. The suspects fled the scene remain at large.*

6

- *A female officer was working on crowd control in Brooklyn on May 29 near the 88 Precinct when demonstrators began pelting officers with bottles and other objects. The officer was hit with a bag containing an unknown object and suffered a corneal abrasion and significant swelling in her eyes.*

- *A male police officer is assigned to the Anti-Crime unit in the 28 Precinct. On May 30, he had responded to various hot spots throughout the city that day, but late that night there was a gathering of protesters and rioters near the command, and the unit was called back to defend the precinct. The officers formed a line outside the building and were at several points pushed back and attacked by rioters. Soon, "airmail" (thrown objects) started to rain down on the officers. The officer, who had been called back from patrol and was not wearing a helmet, was struck on the head with a glass bottle, and injured his knee in the ensuing melee. The officer lost his eyesight for a time after his head injury, which was diagnosed as a concussion. He remains out sick.*

- *A male officer was working on crowd control during demonstrations in the Bronx on June 1 when a large crowd began damaging property and initiating fights with police and with each other. While assisting with breaking up the fights, the officer was struck with a large rock thrown by one of the demonstrators. He suffered a severe concussion and multiple lacerations. The injury came only a day after the same officer was struck by a brick thrown from the crowd while he was working on crowd control during demonstrations in Manhattan near Union Square. At the time, demonstrators had also been throwing hammers, bicycles, and electric scooters at officers.*

- *When responding to looters at a lower Manhattan BestBuy, the officer sprained his ankle chasing after a perpetrator.*

- *A male officer was arresting a looter on June 1 when the subject fled. The officer gave chase and was quickly surrounded by rioters. He was struck in the back of the head by a fire extinguisher and suffered a concussion, receiving seven stitches on the top of his head. The officer remains out sick and is still dealing with concussion symptoms*

- *A female police officers was out on curfew enforcement with a small group of officers on Dawson St. in the Bronx on June 4 and came upon a large group gathered in a local park. The group refused to disperse, and the officer was attacked with a metal chair. The perp struck her in the head with his first strike, and in the arm with his second after she raised her hands to defend herself. The officer was taken to the emergency room where she received 20 stitches to her forehead. She remains out sick, and her assailant is still at large.*

- *A male police officer is assigned to the Cabaret unit at the 67 Precinct. On May 30, he and his unit were tracking a large and unruly group of protesters near Church and Nostrand Avenue in Brooklyn. The protesters confronted the officers, with the "protesters" in the front holding their hands up, and repeating the chant "Hands up, don't shoot." Positioned behind those protesters were rioters throwing bricks, glass bottles, garbage cans and live fireworks. Many of the officers confronting the crowds were struck with projectiles, several in the face and head. This officer was hit in the arm with a brick and sustained a significant injury to his bicep muscle, and he remains out sick with a yet unknown long-term prognosis.*

- *On June 1, the police officer was assigned with several others to patrol around the 6th Precinct and responded to 10-13 (officer needs assistance) and 10-85 (need additional units) calls. While on patrol, they came upon a group of 10 to 15 people breaking into a store. The officers rushed into the store to stop the robbery. As the officer began to chase the perpetrator out of the store, a car pulled up and a looter that the officer was chasing jumped into it. The car then drove straight into the officer and ran him over. While the officer could easily have been killed by the vehicle, he fortunately survived, though he*

*sustained injuries to his back, knee, and hip.  The full extent of his injuries is still unknown. He remains out sick and is unable to stand or sit for more than a few minutes at a time.*

- *On the evening of June 3, the officer was on a scooter, and was one of several police officers following a group of protesters at around 66th Street and Columbus Avenue.  A scuffle broke out between a police supervisor and a protester.  The officer stopped his scooter to assist the supervisor, and, as he dismounted, was hit in the face with a large rock, just under his eye.  He was taken to Mount Sinai hospital by another officer and received stitches on his face.  Thankfully, a CT scan revealed no further damage.  No arrest has been made in his assault.  The officer was out sick for nearly a week but has since returned to service.*

- *This 17-year veteran police officer was assigned to a roving response unit on May 30.  After responding to a number of incidents in Manhattan and Brooklyn, they were called to a respond to a large group of rioters in the confines of the 67 Precinct that was completely out of control, throwing rocks at police and lighting fires throughout the neighborhood.  When the order was given to clear a few blocks of the rioters, they refused to move.  Soon after, a large explosive firework was thrown into the midst of the officers and exploded within a few feet of this officer.  He immediately lost his hearing and balance, while other projectiles continued to rain down on him from the crowd.  In the ensuing melee between the rioters and the police, the officer sustained several more injuries to his neck and back.  He continues to have trouble with his hearing and remains out sick due to his injuries.*

## II.    Falling Behind: Insufficient NYPD Resources & Protocols for Disorder Control

The above first-hand accounts from police officers on the street during the protests capture the scope and severity of the disorder.  What they do not capture, however, is the broader strategic environment, especially the number and type of resources the NYPD devoted to the protest details, as well as any disorder control protocols that NYPD leaders may have implemented during the crisis.

On the question of resources, the limited public information available shows a steady escalation in the NYPD's staffing of the protest details between Saturday, May 30 and Tuesday, June 2:

o   On Saturday, May 30, following the previous night's confrontations at the Barclays Center and surrounding neighborhoods, the NYPD temporarily suspended all solo patrols and posts in recognition of the serious threats to police officer safety.[13] Later that day, the NYPD suspended the police officer duty chart to allow supervisors to reschedule police officers' regular tours without incurring overtime.[14]

o   On Monday, June 1, following significant looting the previous night in Manhattan's Soho shopping district, Mayor de Blasio announced that the details assigned to the protests would be increased from 4,000 police officers to 8,000 police officers.[15] The NYPD also revoked the reasonable accommodations it had afforded to uniformed members at high risk for COVID-19 and ordered those remembers to report for protest duty the next day.[16]

---

[13] *See* NYPD FINEST Message 05/30/2020, 11:29:54, SER# 37636867 "SUBJECT: TEMPORARY SUSPENSIONS OF ALL SOLO PATROL"

[14] *See* NYPD FINEST Message 05/30/2020, 17:29:54, SER# 37637762

[15] Alan Feuer and Edgar Sandoval, *'It Was a Disgrace': De Blasio and Police Chief Faulted Over Looting,* New York Times (June 2, 2020). https://www.nytimes.com/2020/06/02/nyregion/nyc-looting-protests-nypd.html

[16] *See* NYPD FINEST Message 06/01/2020, 16:06:50, SER# 37641376

o  On Tuesday, June 2, following a night of more looting in both Manhattan and the Bronx, the NYPD suspended police officers' regular days off and ordered all police officers to report for twelve-hour tours.[17]

It is now clear that these staffing increases alone failed to prevent the equally steady escalation in property damage and looting. However, the efficacy can only be judged in connection with strategy by which they were deployed.  There is little information in the public record regarding the NYPD and city leaderships' strategic decisions during the crisis, other than the well-documented implementation of a citywide 11pm curfew on Monday, June 1[18], which was moved up to 8pm beginning Tuesday June 2.[19]

For that reason, it is imperative for the Attorney General to thoroughly examine the disorder control protocols and strategies used by the NYPD during the protest period.  Generally speaking, neither rank-and-file police officers nor the PBA would be in a position to have full knowledge of these strategic issues.  For that reason, we have consulted with former NYPD Chief of Department Louis Anemone to provide insight into these matters.

In 1993, Chief Anemone was tasked by then-Police Commissioner Raymond Kelly to report on and design improvements to the NYPD's disorder control capabilities. The resulting Disorder Control Guidelines served as both a field manual and the basis for disorder control training provided to NYPD members of all ranks.

Drawing upon those guidelines, Chief Anemone has proposed the following questions that will help the Attorney General understand the NYPD's performance during this crisis:

**Training and Preparation**
- What was the status of any specialized NYPD equipment used for disorder control?  Where, how and in what quantities was the equipment maintained? How was it distributed/deployed for use?
- When was the last command post training exercise in disorder control held for every Patrol Borough's command staff, including Duty Captains, Inspectors and Deputy and Assistant Chiefs?
- When was the last table-top training exercise in disorder control held for every Captain and above assigned to or performing the duty chart in the Patrol Services Bureau?
- When was the last no-notice mobilization (Red Envelope) drill conducted for every operational and support unit in the NYPD?

**Protest Planning**
- Was a meeting ever held with organizers of these events? If so, did that meeting result in any agreements?
- Did the NYPD issue any parade permits to mobile protest groups?
- How did the NYPD staff the demonstrations and resulting riots?
- Did the NYPD or incident commanders have intelligence about expected criminal behavior?
- Was there a Detail Request submitted by Patrol?
- How many personnel were requested, by rank, for each shift, and each location?

---

[17] *See* NYPD FINEST Message 06/02/2020, 19:37:05, SER# 37644937

[18] *Supra* Note 13

[19] Mayor Bill de Blasio (@NYCMayor): "These protests have power and meaning. But as the night wears on we are seeing groups use them to incite violence and destroy property. Our first priority is keeping people safe, so I'm extending the curfew to Tuesday. It will begin at 8pm." Tweet. (June 1, 2020, 10:21 PM).
https://twitter.com/NYCMayor/status/1267642422194057217

**Incident Command (note that these questions apply discretely to each day/night of the protests in each specific location)**

- Were police officers given instructions verbally or in writing? What were those instructions?
- Were they instructed as per Disorder Control Guidelines in team tactics and specific responsibilities for each type of assignment?
- Were police officers ordered not to enforce the law?
- Were police officers ordered not to deploy riot helmets, batons, or riot shields?
- Was there a command post with an incident commander for each day, each tour and each borough?
- Was a command post log maintained for each location and each tour?
- What entries were made in the command post log re: conditions?
- Did the incident commander utilize tactics of sectoring, linear strategy, strong perimeters, crowd escort duty in appropriate formations, protection of critical and symbolic locations, or assign discrete units for an organized escort system if needed?
- Were protesters authorized to take over streets from sidewalk to sidewalk? If authorized, why and by whom?
- Were streets emptied of civilians and traffic before allowing mobile protest groups to enter blocks?
- Did the incident commander use cordon, double cordon, or flanking units when the protesters went mobile?
- Was the Rapid Mobilization Plan ever utilized during the riots? If so, where, when, by whom, how and why?
- Did Mounted Units, Highway Patrol, and Emergency Service Units respond as per Rapid Mobilization Plan? If not, why not? If so, how were they utilized?

In addition to these questions that Chief Anemone has proposed for NYPD leadership, we believe that the Attorney General should seek to understand the other side of the equation: the strategies and actions of protest organizers and leaders that either sought to minimize the disorder or contributed to it:

**Questions for Protest Organizers/Leaders**

- How were specific protests planned and organized? How and to whom was information about planned protests disseminated?
- How were protest locations and/or marching routes chosen?
- What coordination, if any, took place between groups organizing separate protests?
- What coordination, if any, took place or was attempted between protest organizers and the NYPD and/or other government officials?
- To the extent that any protests arose spontaneously or organically, did any groups or individuals attempt to assume control of the protest and direct protester activities?
- What instructions, if any, were given to protest participants prior to or during the protest? How and by whom were those instructions disseminated?
- Specifically, what instructions if any were given to protest participants about interacting with the police, obeying police orders, and observing traffic regulations and other laws?
- Were protest organizers aware of groups or individuals who were participating in the protest with the intent to incite conflict with the police, physically attack police officers, destroy/vandalize property or engage in other criminal conduct? If so, when and how did the protest organizers become aware of these groups/individuals? What actions were taken in response?
- Specifically, did protest organizers cooperate with or obstruct police efforts to intercept and remove violent agitators form the protest?

Based on our own observations during the protests and the police officer testimonials we have received, the PBA rejects the notion that either the peaceful protests or the outbreaks of violence were entirely "leaderless" and organic.

At multiple times and locations, we observed individuals who appeared to be directing crowd movements and activities, including using two-way radios and/or "scouts" on bicycles appearing to relay information about police positions. Police officers who confronted violent agitators also noted a common feature: the agitators would descend on a location in a coordinated fashion, attack police officers and/or engage in other destruction and violence, and then disappear from the scene just as quickly.

In order to protect the integrity of New York's tradition of largely peaceful protests going forward, the Attorney General strive to identify the groups and individuals who orchestrated violence or destruction, understand their strategy and tactics and assess whether legitimate protest organizers can help prevent this kind of chaos in the future.

### III.    Mornings After: No Support from Elected Leadership

While NYPD strategy and the behavior of protesters both merit serious scrutiny, we stress again that neither operated in a vacuum: both police and protesters moved against a backdrop of highly charged rhetoric from city and state elected officials.

As we noted previously, Mayor Bill de Blasio set the tone with his call for a "light touch" on Monday, May 29.  But in the ensuing days, other elected officials – most notably members of the New York City Council and the New York State Legislature – went further by suggesting that police officers were *solely responsible* for the violent clashes that occurred during the demonstrations.

City Council Speaker Corey Johnson, for example, in a statement characterizing the police use of OC (pepper) spray on demonstrators outside the Barclays Center as "horrifying and unacceptable," made no mention of the numerous object that were hurled at police officers by protesters and no mention of the numerous assaults on police officers that occurred during that same protest.[20] In a subsequent statement, Johnson appeared to put the entire burden of "de-escalation" on the NYPD, regardless of the violent behavior police officers were forced to confront.[21]

As the protests dragged on, Mayor de Blasio would return to engage in an even more pernicious form of rhetoric by rushing to judge and condemn police officers' actions based on incomplete evidence.  On Monday, June 1, for example, Mayor de Blasio opined on a video of a police officer appearing to point his gun at a group of protesters, saying "that officer should have his gun and badge taken away today."[22] The PBA later obtained and disseminated a more complete video of the incident, which showed that the police officer drew and pointed his

[20] NYC Council Speaker Corey Johnson (@NYCSpeakerCoJo): "This is horrifying and unacceptable. The NYPD must respect the right of New Yorkers to make their voices heard as we mourn and demand justice for George Floyd. We knew this protest was happening tonight. We should have been prepared to handle it peacefully." Tweet. (May 29, 2020, 9:03 PM). https://twitter.com/NYCSpeakerCoJo/status/1266535733554065408
[21] Gloria Pazmino (@GloriaPazmino): ""Black men in this country, in our city have been victimized," @NYCSpeakerCoJo says the "NYPD needs to be doing a better job of deescalating, this is not the way to calm the situation here in New York city." Tweet. (May 31, 2020, 12:49 AM). https://twitter.com/GloriaPazmino/status/1266954924656599040
[22] Craig McCarthy, *De Blasio says NYPD cop should lose badge for pulling gun on protesters,* New York Post (June 1, 2020). https://nypost.com/2020/06/01/de-blasio-calls-for-firing-of-cop-who-pulled-gun-on-protesters/

weapon because his supervisor had been struck in the head by a brick thrown at close range just moments before – a potentially fatal attack.[23]

In the PBA's view, these types of statements sent a dangerous dual message: To the agitators intent on steering peaceful demonstrations towards violence, they signaled that such actions would be either ignored or tacitly condoned.  To the police officers confronting that violence, they signaled that any action to defend themselves or the public would be demonized and possibly criminalized.

When combined with the NYPD leadership's failure to adequately plan for or manage the disorder, these statements by elected leaders created a profoundly troubling and dangerous environment that has not yet dissipated.  From the police officers' perspective, these politicians and the violent rioters they inspired to violence will soon return to their normal lives, while our injured sisters and brother will be living with their scars for years to come.  Moreover, every New York City police officer who served during this tumultuous period will remember how we were attacked by the rioters, who were in turn cheered on by the same city and state leaders who rely on the NYPD to protect their constituents but abandon us whenever it is politically expedient.

We hope the foregoing statement will prove useful as you continue this important inquiry.  We reiterate that we share and support the inquiry's ultimate goal: to ensure that the events of the past several weeks are never repeated in our city.  We will remain available to answer any questions regarding this statement

---

[23] Eyewitness News Staff, *Shocking video shows NYPD lieutenant struck on the head with brick during Sunday protests*, WABC-TV News (June 2, 2020). https://abc7ny.com/nypd-lieutenant-attacked-george-floyd-protest-nyc-protests-assaulted/6225940/