# EXHIBIT 1

{00682706-1}

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | |
|---|---|
| In Re: New York City Policing During Summer 2020 Demonstration | Civil Action No.: 20-CV-8924 (CM) (GWG) |

-----------------------------------------------------------------x

| | |
|---|---|
| This filing is related to<br><br>*People v. City of New York, et al.* | Civil Action No.: 21-CV-0322 (CM) (GWG) |

-----------------------------------------------------------------x

## PROPOSED INTERVENOR DECLARATION IN SUPPORT

**PAUL DIGIACOMO**, being duly sworn, declares, pursuant to 28 U.S.C. §1746, under the penalty of perjury, that the following is true and correct:

1. I am currently the President of the Detectives Endowment Association (hereinafter "DEA" or "Union"), the Proposed Intervenor in the above-captioned matter, and have served in this position since January 24, 2020.

2. I am also currently a full-time detective with the New York City Police Department (hereinafter "NYPD") and have been employed as a NYPD police officer for the past 38 years.

3. I was originally hired as a Housing Police Officer in July 1983, was promoted to Detective Investigator in the Brooklyn South Narcotics Division on July 29, 1994, and was subsequently promoted to Detective 2nd Grade assigned to the High Intensity Drug Trafficking Area Regional Task Force on December 24, 2001.

4. Based upon the foregoing, as well as my review of the submissions in connection with the instant matter, I have personal knowledge of the facts contained herein, and make this Declaration in support of the DEA's motion to intervene in the above-captioned matter.

{00682625-1}

5. The DEA is a certified and recognized public employee organization, pursuant to the New York City Collective Bargaining Law (New York City Administrative Code, Title 12, Chapter 3) (hereinafter "NYCCBL") § 12-303(j) and (l), representing employees within the ranks of Detective, Detective Investigator, and Detective Specialist (collectively, "Detectives") employed by the NYPD.

6. Currently, there are 5,061 Detectives in the NYPD, which is a significant decrease in headcount in comparison to the over 7,200 Detectives on the job on September 11, 2001.

7. As the following declaration will detail, I believe that intervention of the DEA in the instant matter is appropriate and will serve to benefit the Court as this litigation unfolds, given that the DEA's membership, along with the members of any other uniformed NYPD union, will have unique, first-hand insight into the matter complained of in this action.

8. As will additionally be explained below, the DEA's participation herein will provide the Union the sole effective avenue to ensure that its members' rights and interests are protected from any deliberate and/or inadvertent diminishment by the Court or the parties hereto.

**NYPD Detectives**

9. Detectives in the NYPD are responsible for performing numerous duties and assignments; it is also the most unique and diverse rank within the NYPD on the bases of race and gender.

10. The members of the Union constitute the majority of NYPD employees in the Detective and Homicide squads throughout the City investigating all manners of crimes from assaults and robberies to rapes and murders, as well as counter-terrorism operations.

11. Additionally, Detectives serve in the NYPD's Emergency Service Unit (hereinafter "ESU"), the Narcotics Division, the Vice Enforcement Division, the Gun Violence

{00682625-1}

Suppression Division, the Intelligence Bureau, and various other critical jobs throughout the NYPD.

12. What is equally unique to the position of Detective is that the NYPD routinely takes DEA members in plain-clothes units, such as the ones listed above, and reassigns them to uniformed details, such as protests, parades, and other events that draw large crowds.

13. Many of the above-stated tasks are often performed under perilous conditions, involving armed perpetrators, assailants, and/or suspects in violent crimes.

14. As such, in order for Detectives to do their job to the best of their respective ability, we must walk a fine line between the safety of ourselves, our families, and our uniformed brothers and sisters in the NYPD, while tirelessly pursuing justice for the benefit of the victims of horrific crimes, and the public in general.

15. With specific regard to the incidents that gives rise to the above-captioned matter, the members of the DEA faithfully complied as required with the orders they were given by the NYPD.

16. As a result of their actions during the protests, DEA members were subjected to physical assaults that resulted in a number of injuries.

17. During the protests, members of the DEA had Molotov cocktails thrown at them, as well as marked NYPD vehicles they were occupying.

18. Additionally, DEA members were pelted with bricks and bottles while attempting to carry out their obligation to protect and serve the public.

19. Further, some individuals who attended the protests filled tennis balls and ice cream cups, seemingly innocuous items, with cement in order to disguise their harmful nature and inflict maximum damage on the membership of the DEA.

20.   As of the date of this declaration, over 400 uniformed members of the NYPD were physically injured; over 350 NYPD vehicles were either incinerated or substantially damaged; and over $1 billion worth of property damage occurred.

21.   The directives given to the Union's membership present at these protests by the NYPD placed DEA members in harm's way.

22.   As such, it is imperative that the Court grant the instant motion by the Union, as the participation of the DEA could only assist the Court in fashioning any remedies in the instant matter.

23.   Ill-conceived, ill-informed, and/or misguided remedies imposed upon us could result in injury or death to ourselves, to our brethren/sistren, or the people of the City, as well as harm our respective families.

### DEA's Contractual and Statutory Rights

24.   In addition to the operational interests expressed above, the DEA also has contractual and statutory rights that may be adversely affected by the outcome of the above-captioned matter.

25.   The collective bargaining agreement by and between the City and DEA covers the time period from April 1, 2012 to March 31, 2019, and is currently in *status quo* (hereinafter "CBA" or "Agreement"). (*See* Declaration of Stephen Mc Quade, dated March 3, 2021,[1] Ex. 2).

26.   One of the main goals of the DEA, and of me as the President, is to ensure the protection of the constitutional, statutory, contractual, and regulatory rights of the Union's membership.[2]

---

[1] Hereinafter, the Declaration of Stephen Mc Quade, dated March 3, 2021, shall be referred to as "Mc Quade Decl."

[2] The DEA is aware that similar motions are being made by the Patrolmen's Benevolent Association and the Sergeants Benevolent Association seeking intervention herein. For the purposes of consistency and ease of
{00682625-1}

27. This goal is achieved through various methods, including but not limited to the initiation of administrative actions before the New York City Board of Collective Bargaining (hereinafter "BCB" or "Board"), such as improper practice petitions and scope of bargaining petitions, the filing grievances and arbitrations, and participation in Labor-Management Committee meetings.

28. The Agreement contains a number of provisions that could be adversely affected by the outcome in this case, whether by this Court or by Plaintiffs and Defendants as part of a settlement agreement.

29. Article XIII § 4 of the CBA states that DEA members who are suspended for more than 30 days without pay may lose their respective health insurance coverage. (*See* Mc Quade Decl., Ex. 2, p. 18).

30. Article XIV § 1(f) of the CBA provides that the City shall remit periodic payments to the Union's civil legal representation fund based upon the number of active duty Detectives. (*See* id., p. 20).

31. Article XVI § 1 of the CBA states that the City shall provide "safety helmet and equipment" for each Detective that "shall conform to Police Department specifications." (Id., p. 21).

32. Article XVI § 5 of the CBA provides that the NYPD will disclose certain departmental information to the Union as part of its obligation to administer the Agreement. (*See* id., p. 22).

---

reference, the instant declaration will only refer to the application being made by the DEA in connection with the above-captioned matter.

33. Article XVI § 11 of the CBA allows for Union members, upon separation from service to receive a lump sum payment for their accrued terminal leave, provided he/she did not have disciplinary charges pending at the time of said separation. (*See* id., p. 24).

34. Article XVI § 16 of the CBA provides that DEA members may be entitled to performance compensation, which is based upon outstanding, exceptional actions taken in connection with their jobs. (*See* id., p. 25).

35. Article XXI § 1 of the CBA defines what a "grievance" is for the purposes of the Agreement and is an integral aspect of all labor-management relations. (*Id.*, p. 28).

36. Article XXVII § 1 of the CBA requires the City and DEA to "jointly maintain and support a labor-management committee." (*Id.*, p. 33).

37. All of these provisions in the Agreement were the result of, at times contentious, negotiations between the New York City Office of Labor Relations (hereinafter "OLR"), on behalf of the City, and the DEA.

38. The Agreement memorializes the arms-length transaction that occurred by and between the City and Union, and during each round of bargaining, OLR is tasked with trying to claw back the gains attained by the DEA.

39. As explained in more detail in the memorandum of law accompanying the DEA's Motion for Intervention, all of the above-stated contractual provisions could be altered or diminished as a result of the outcome of the matter at bar, and as such, the Union could lose out on the benefits it achieved as a result of its bargain with the City and OLR.

40. With respect to the statutory rights of the DEA's membership that could be infringed upon by the outcome of in the above-captioned matter, the Union is obligated, as the exclusive bargaining representative for Detectives, to ensure that its members have the right to

{00682625-1}

participate or refuse to participate in union activity, as codified in the New York City Collective Bargaining Law (New York City Administrative Code, Title 12, Chapter 3) (hereinafter "NYCCBL").

41. NYCCBL § 12-307(a) provides the City and Union must negotiate over "wages . . ., hours . . ., [and] working conditions."

42. In interpreting this provision, the BCB has held that policies and procedures that are promulgated by the employer that are appurtenant to and/or have an effect upon wages, hours, and working conditions shall be deemed mandatory subjects of bargaining.

43. Moreover, there is a strong and sweeping public policy that favors collective bargaining in this State.

44. As explained in the accompanying memorandum of law, resolution in the instant matter will likely impose new processes and procedures upon DEA members, which are mandatory subjects of bargaining.

45. Further, § 12-306(c)(4) of the NYCCBL requires the City to disclose information to unions that are necessary for, *inter alia*, contract administration, the processing of grievances, and the advancement of improper practices.

46. This requirement is additionally codified in Article XVI § 5 of the CBA.

47. However, as a result of the outcome of the above-captioned matter, this Court could restrict the manner in which such information is disseminated to the Union.

48. Such an imposition would violate the NYCCBL's mandate upon employers to disclose relevant information to its unions, as codified in NYCCBL § 12-306(c)(4), as well as recent judicial precedence from this State's highest court.

49. Furthermore, the DEA and its membership has an absolute right to negotiate over managerial decisions that have a practical impact on their respective safety, as set forth NYCCBL § 12-307(b).

50. As a result of the presence of DEA members at the protests that give rise to the instant matter, their respective safety was compromised by some, not all, of the participants there.

51. Specifically, there are documented instances of protesters using Molotov cocktails against uniformed employees of the NYPD, as well as their respective vehicles.

52. There are documented instances of uniformed employees of the NYPD being assaulted with bats and bricks; with being spat upon; and with having to receive stitches and staples to close wounds.

53. Even though the NYCCBL and Board precedent does not require the Union to demonstrate actual injury to properly invoke a practical impact on safety claim, the DEA can do so.

54. As such, this Court should not ignore the dangers and threats to DEA members, nor the injuries they suffered; and accordingly should recognize that the Union and its members have protectable interests in the above-captioned matter.

**No Existing Party Can or Will Protect the Interests of Our Members**

55. The DEA cannot rely on any existing party to protect Detectives, including the City and/or NYPD, because the Union is in the best position, and by law and practice, has represented the interests of the DEA's membership.

56. Moreover, the City and/or NYPD cannot represent our members because they are often in conflict.

57. Members of the DEA may face internal investigations conducted by the NYPD's Internal Affairs Bureau (hereinafter "IAB"), based upon alleged misconduct of Union members.

58. The investigatory findings of IAB may result in disciplinary charges being proffered against DEA members, keeping in mind that the presentation of charges and specifications does not equate to guilt or culpability.

59. In those instances, the NYPD, which is an executive subdivision of the City, would be the "prosecutors", while DEA members are effectively the "defendants."

60. As such, the NYPD would be an adverse party to the DEA and its members in these scenarios; and therefore the NYPD, a named defendant in the above-captioned matter, and its respective interests certainly would not be aligned with the interests of the Union or its membership.

61. Similarly, the members of the DEA may face external investigations that are conducted by the New York City Civilian Complaint Review Board (hereinafter "CCRB").

62. Much like IAB, the CCRB investigates complaints lodged against DEA members from members of the public at large and, after said investigation, issues a recommended finding and penalty resulting therefrom.

63. Here again, the CCRB, a statutorily-created extension of the City, that is a named defendant in the above-captioned matter, serves in the role of "prosecution" while members of the DEA stand as the "accused."

64. As such, the City would be an adverse party to the DEA and its members in these scenarios; and therefore the City and its respective interests certainly would not be aligned with the interests of the Union or its membership.

65. In fact, I know of dozens of instances where DEA members have been questioned/investigated arising out of the events that gave rise to the above-captioned matter, even though to date none have been proffered with any charges and specifications related thereto.

66. Accordingly, it is incongruous that the DEA and its membership could be effectively served by the representation of the City and/or NYPD in the instant matter.

67. Specifically, in the above-described situations, the City and/or NYPD could not adequately represent and protect the interests of the DEA's membership given the potentially adversarial roles they occupy in different legal forums.

**Additional, New Need for Intervention and Participation**

68. A further example of divergent interests and the lack of adequate representation arises from the recent spate of legislation designed to impose personal liability in civil actions against DEA members.

69. As of the date of the instant declaration, there is currently at least one law that affords the public a private right of action against a DEA member who is found to have not administered medical and/or psychological aid to an individual who is in police custody.

70. Moreover, there is currently legislation pending before the City Council, Int. 2220-2021, that creates a private right of action against a DEA member who is found to have deprived an individual of his/her constitutional right against unreasonable searches and seizures.

71. Although this pending legislation places a monetary cap of $25,000 against the DEA member, that is of little solace to Detectives, given that DEA members have countless interactions with the public on a daily basis, all of which could potentially give rise to meritless civil actions against them.

72.  Most notably, this new cause of action would require the DEA member to retain his/her own counsel because he/she could not entrust the City or NYPD to effectively represent his/her interests either during the course of trial or settlement negotiations.

73.  Further, the DEA may be required to provide, subsidize, and/or fund legal representation for its members, which would come from the Union's civil legal representation fund, as set forth in Article XIV § 1(f) of the CBA.

74.  In order to have adequate monetary resources, the Union will, in its subsequent round of negotiations with the City, have to seek increases to these periodic payments.

75.  Seeking such an increase will undoubtedly divert monetary resources from other economic items in the Agreement and dilute any possible, modest gains the Union sought to achieve on behalf of its members during these negotiations.

**Conclusion**

76.  In summary, the Union I lead represents the statutory, contractual, and safety interests of our members, and those interests may be impaired as a result of the instant litigation, and no existing party will adequately protect those imperiled interests.

77.  Therefore, based upon the foregoing, the DEA respectfully requests that the Court grant its Motion for Intervention in the above-captioned matter for the reasons set forth above and in the accompanying memorandum of law.

_____
PAUL DIGIACOMO