EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                :
MARK NUNEZ, et al.,                    :

                Plaintiffs,     :

   - against -                  :

CITY OF NEW YORK, et al.,         :

                Defendants.   :
                                : **11 Civ. 5845 (LTS)(JCF)**
------------------------------------------------------------ X
UNITED STATES OF AMERICA,   :
                                :
             Plaintiff-Intervenor, :

   - against -                  :

CITY OF NEW YORK and NEW YORK CITY :
DEPARTMENT OF CORRECTION,     :
                                :
                Defendants.   :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-21-2015

## CONSENT JUDGMENT

## TABLE OF CONTENTS

                                                                                    Page

I.      Background ........................................................................................................ 1

II.     Jurisdiction, Venue, And Revised Class Definition ......................................... 2

III.    Definitions ......................................................................................................... 2

IV.     Use of Force Policy ........................................................................................... 5

V.      Use of Force Reporting and Tracking ............................................................. 10

VI.     Anonymous Reporting System ........................................................................ 15

VII.    Use of Force Investigations ............................................................................ 15

VIII.   Staff Discipline and Accountability ................................................................ 25

IX.     Video Surveillance .......................................................................................... 28

X.      Risk Management ............................................................................................ 31

XI.     Staff Recruitment and Selection ..................................................................... 33

XII.    Screening and Assignment of Staff ................................................................. 33

XIII.   Training ............................................................................................................ 35

XIV.    Arrests of Inmates ........................................................................................... 40

XV.     Safety and Supervision of Inmates Under the Age of 19 ............................... 40

XVI.    Inmate Discipline ............................................................................................ 44

XVII.   Housing Plan for Inmates Under the Age of 18 .............................................. 46

XVIII.  Implementation ................................................................................................ 47

XIX.    Reporting Requirements and Parties' Right of Access .................................... 47

XX.     Monitoring ....................................................................................................... 51

XXI.    Compliance, Termination, and Construction ................................................... 57

XXII.   Stipulation Pursuant to the Prison Litigation Reform Act, 18 U.S.C. § 3626 ... 58

XXIII.  Release by the Plaintiff Class .......................................................................... 59

XXIV.   Attorneys' Fees, Costs, and Disbursements .................................................... 59

XXV.    Notifications .................................................................................................... 60

I.     BACKGROUND

This Consent Judgment ("Agreement") is entered by and among the Plaintiff Class (as defined herein), Plaintiff the United States of America (the "United States"), and Defendants the City of New York (the "City") and the New York City Department of Correction (the "Department" or "DOC") (the City and the Department are collectively referred to herein as the "Defendants").

WHEREAS, the purpose of this Agreement is to protect the constitutional rights of the inmates confined in jails operated by the Department. The terms and requirements of this Agreement will be interpreted to be consistent with the measures necessary to protect the constitutional rights of inmates and are not meant to expand or contract the constitutional rights of inmates at the jails operated by the Department;

WHEREAS, on or about May 24, 2012, the Amended Complaint was filed, and on or about September 4, 2012, the Second Amended Complaint was filed by four Plaintiff Class representatives and eight individual Plaintiffs (collectively, the "Named Plaintiffs"). The First and Second Amended Complaints alleged that the Department engaged in a pattern and practice of using unnecessary and excessive force against inmates in violation of their rights, and the rights of the members of the Plaintiff Class, under the Eighth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York. The Plaintiff Class representatives sought injunctive and declaratory relief on behalf of themselves and the Plaintiff Class. In addition, the Named Plaintiffs sought monetary damages related to specific incidents allegedly involving the excessive use of force against them;

WHEREAS, by Order dated January 7, 2013, the Court certified the Plaintiff Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1)(A) and 23(b)(2). The certified Plaintiff Class is defined as: "all present and future inmates confined in jails operated by [the Department], except for the Eric M. Taylor Center and the Elmhurst and Bellevue Prison Wards." As set forth in Paragraph 2 of Section II (Jurisdiction, Venue, and Revised Class Definition), for purposes of this Agreement, the certified Plaintiff Class shall be expanded to include all present and future inmates confined in the Eric M. Taylor Center;

WHEREAS, prior to entering this Agreement, the Plaintiff Class and Defendants engaged in extensive discovery, including depositions of numerous Department employees and the production of more than one million pages of documents;

WHEREAS, beginning in 2012, the United States Attorney's Office for the Southern District of New York ("SDNY") conducted an investigation into the treatment of young male inmates, between the ages of 16 and 18, at jails located on Rikers Island pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. §14141. At the time of the investigation, most of these young male inmates were housed at the Robert N. Davoren Complex and the Eric M. Taylor Center;

WHEREAS, on August 4, 2014, the SDNY and the Department of Justice ("DOJ") issued a findings letter pursuant to CRIPA that concluded that young male inmates,

1

between the ages of 16 and 18, were being subjected to unconstitutional conditions of confinement. In particular, the findings letter asserted that the City had engaged in a pattern and practice of: (a) subjecting these inmates to excessive and unnecessary use of force; (b) failing to adequately protect them from violence inflicted by other inmates; and (c) placing them in punitive segregation at an alarming rate and for excessive periods of time;

WHEREAS, on December 18, 2014, the United States filed an unopposed motion to intervene in this action, which was granted by the Court on December 23, 2014; and

WHEREAS, the Plaintiff Class, the United States, and Defendants will jointly petition the Court for approval of this Agreement;

NOW, THEREFORE, the Parties stipulate and agree, and IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

## II.   JURISDICTION, VENUE, AND REVISED CLASS DEFINITION

1.   The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 1345, and 1367. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

2.   Plaintiff Class's Counsel and Defendants agree for purposes of this Agreement that the certified Plaintiff Class shall be expanded to include all present and future inmates confined in the Eric M. Taylor Center. Accordingly, the revised certified Plaintiff Class is defined as "all present and future inmates confined in jails operated by the Department, except for the Elmhurst and Bellevue Prison Wards."

## III.   DEFINITIONS

1.   The term "Anticipated Use of Force" means a situation, including but not limited to cell extractions, in which it is apparent that Staff Members will likely need to use force to address the situation and there is time to prepare a plan of action prior to using force.

2.   The term "Business Day" means a day which is not a Saturday or Sunday or legal holiday on which banks are authorized or required to close in New York, New York.

3.   The term "Class A" refers to a classification used by DOC to describe Use of Force Incidents that require medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid, including Use of Force Incidents resulting in one or more of the following treatments/injuries: multiple abrasions and/or contusions, a chipped or cracked tooth, loss of a tooth, a laceration, a puncture, a fracture, loss of consciousness, a concussion, a suture, internal injuries (e.g., ruptured spleen, perforated eardrum, etc.), or admission to a hospital. Such injuries are referred to as "Class A Injuries" in this Agreement.

2

4. The term "Class B" refers to a classification used by DOC to describe Use of Force Incidents that: (a) do not require hospitalization or medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid (*e.g.*, Use of Force Incidents that result in a superficial bruise, scrape, scratch, or minor swelling); or (b) involve the forcible use of mechanical restraints in a confrontational situation that results in no or minor injury.

5. The term "Class C" refers to a classification used by DOC to describe Use of Force Incidents that result in no injury to Staff Members or Inmates, including but not limited to Use of Force Incidents where the use of Oleoresin Capsicum ("OC") spray results in no injury, beyond irritation that can be addressed through decontamination.

6. The term "Class P" refers to a classification used by DOC to describe Use of Force Incidents that have yet to be classified as Class A, B, or C.

7. The term "Commissioner" means the Commissioner of DOC.

8. The term "Complete Camera Coverage" means fixed camera coverage sufficient to capture the activities and movement of all persons in a given area of a Facility, with the exception of toilets, the interiors of cells, the interiors of shower areas (although there must be fixed camera coverage of the ingress and egress of shower areas), and areas located within clinics and mini-clinics that are used exclusively to provide medical treatment to Inmates and Staff Members in a private setting, such as designated treatment rooms or cubicles (although there must be fixed camera coverage of the ingress and egress of such areas). "Complete Camera Coverage" shall not include small, isolated blind spots caused by technological and/or mechanical limitations or the design of interior spaces.

9. The term "Corrections Health Care Provider" means the agency or entity that is responsible for providing medical and mental health care services to Inmates.

10. "Days" are measured in calendar days; weekend days are included.

11. The "Direct Supervision Model" or "Direct Supervision" means a style of supervising and managing Inmates that includes the following elements: (a) the assigned correction officer is stationed in the dayroom or other congregate area of the unit so that he or she is among the Inmates when they are out of their cells; (b) an emphasis on frequent, informal interactions and communications between the assigned officer and the Inmates; (c) an emphasis on early intervention to avoid potential inmate-on-inmate conflicts or crisis situations; and (d) the assigned officer and front-line supervisor are afforded substantial authority so that they feel responsible for the effective management and supervision of the unit.

12. The term "DOI" means the New York City Department of Investigation.

13. The term "Effective Date" means the date this Agreement is approved and entered by the Court.

3

14.   The term "Facility" means any DOC command or institution.

15.   The term "ICO" means an Integrity Control Officer.

16.   The term "ID" means the Investigation Division of the Department.

17.   To "implement" a policy, procedure, system, or other remedial measure means putting in place the policy, procedure, system, or other remedial measure, including informing, instructing, or training all appropriate personnel as needed or as required by this Agreement, and consistently following, applying, or using the policy, procedure, system, or other remedial measure.

18.   The term "include" or "including" means "include, but is not limited to" or "including, but not limited to."

19.   The term "Inmate" means any individual detained at, or otherwise housed, held, or confined in one of the Facilities.

20.   The term "Isolation" means any type of involuntary confinement in a locked room or cell for at least three consecutive hours during the day (excluding overnight lock-in and other lock-in periods that are applicable to the general population, such as lock-ins for count, shift changes, contraband sweeps, or emergency situations involving security concerns). "Isolation" shall not include suicide watch, the confinement of an Inmate to prevent the spread of disease, or "Seclusion" in compliance with the procedures set forth in 40 NYCRR § 2-06.

21.   The term "Monitor" means the person appointed pursuant to this Agreement who shall be responsible for assessing compliance with this Agreement.

22.   The term "Non-DOC Staff" or "Non-DOC Staff Member" means any person not employed by DOC who is employed by the City or contracted by the City to provide medical and/or mental health care, social services, counseling, or educational services to Inmates.

23.   The term "Parties" shall refer to the Plaintiff Class, the United States, and Defendants, collectively.

24.   The term "Plaintiff Class's Counsel" means the attorneys representing the Plaintiff Class from The Legal Aid Society, Emery Celli Brinckerhoff & Abady, and Ropes & Gray LLP.

25.   The term "Plaintiffs' Counsel" means the United States Attorney's Office for the Southern District of New York, which represents the United States, and Plaintiff Class's Counsel, which represents the Plaintiff Class.

26.   The term "Punitive Segregation" means the segregation of an Inmate from the general population pursuant to a disciplinary sanction imposed after a hearing.

4

27.     The term "RNDC" means the Robert N. Davoren Complex.

28.     The term "Special Unit" means Enhanced Supervision Housing, Transitional Restorative Units, Second Chance Housing, Restrictive Housing Units, and any Punitive Segregation or mental health units.  This term includes any equivalent future units as established by the Department.

29.     The term "Staff" or "Staff Member" means any uniformed individual employed by the Department.

30.     The term "Supervisor" means a Staff Member at the rank of Captain or higher.

31.     The term "Use of Force" means an instance where Staff use their hands or other parts of their body, objects, instruments, chemical agents, electric devices, firearm, or any other physical method to restrain, subdue, or compel an Inmate to act in a particular way, or stop acting in a particular way. This term shall not include moving, escorting, transporting, or applying restraints to a compliant Inmate.

32.     The term "Use of Force Incident" means any incident in which Staff engages in the Use of Force, or is alleged to have engaged in the Use of Force, against an Inmate.

33.     The term "Young Inmate" means any Inmate under the age of 19 years old.

34.     The term "Young Inmate Housing Areas" means all housing areas, including common areas within such housing areas, in Facilities used to house Young Inmates.


IV.     USE OF FORCE POLICY

1.      Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive").  The New Use of Force Directive shall be subject to the approval of the Monitor.

2.      The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

3.      The New Use of Force Directive shall include all of the following:

        a.      A statement at the beginning of the New Use of Force Directive that sets forth the following general principles:  "(i) the force used shall always be the minimum amount necessary, and must be proportional to the resistance or threat encountered; (ii) the use of excessive and unnecessary force is expressly prohibited; (iii) the Department has a zero tolerance policy for excessive and unnecessary force; and (iv) the best and safest way to manage potential Use of Force situations is to prevent or resolve them without physical force."

5

b.    An explicit prohibition on the use of high impact force, including the following statement: "(i) strikes or blows to the head, face, groin, neck, kidneys, and spinal column; (ii) kicks; and (iii) choke holds, carotid restraint holds, and other neck restraints; subject to the following exception: In a situation in which a Staff Member or other person is in imminent danger of death or serious bodily injury, and where lesser means are impractical or ineffective, Staff Members may use any necessary means readily available to stop or control the situation."

c.    An explicit prohibition on the following:

    i.    The Use of Force to punish, discipline, assault, or retaliate against an Inmate.

    ii.    The Use of Force in response to an Inmate's verbal insults, threats, or swearing.

    iii.    The Use of Force after control of an Inmate has been already established.

    iv.    Subjecting an Inmate to harassment or public humiliation.

    v.    The use of racial, ethnic, or homophobic slurs towards Inmates.

    vi.    Provoking Inmates to commit an assault in order to justify the Use of Force.

    vii.    The use of unnecessarily painful escort or restraint techniques.

    viii.    Causing or facilitating inmate-on-inmate violence.

    ix.    Pressuring or coercing Inmates, Staff, or Non-DOC Staff not to report a Use of Force Incident.

d.    An explicit requirement that Staff may use force only when reasonably necessary to:

    i.    "Prevent physical harm to Staff, visitors, Inmates, or other persons, as a last resort and where there is no practical alternative available;

    ii.    Prevent or stop the commission of crimes, including riot, assault, escape, or hostage taking;

    iii.    Enforce Departmental or Facility rules, policies, regulations, and court orders where lesser means have proven ineffective and there is an immediate need for compliance; or

    iv.    Prevent destruction of property that raises a safety or security risk."

e.    An explicit requirement stating that "all force shall cease when control of the Inmate has been established."

6

    f.      A requirement that Staff shall summon a Supervisor to the scene as soon as possible when there is a Use of Force Incident underway or the potential for the Use of Force.

    g.      Clear and adequate direction on when different levels of force and Use of Force techniques are permitted, including but not limited to the following requirements:

          i.    Staff shall start with the minimum amount of force that appears reasonable and may escalate the force used if necessary to stop or control the Inmate. Staff are not obligated to start at the lowest force levels nor to exhaust every lesser level in escalating to an effective level. The level of force used may increase as the situation becomes more dangerous or threatening and decrease as the situation comes under control.

          ii.    The level of force that may be used is determined by the type and amount of resistance exhibited by the Inmate.

          iii.    Staff shall first try to defuse the situation by talking to the Inmate, if time and circumstances permit.

          iv.    In situations where physical force must be used, Staff shall consider using non-contact control techniques, such as hand-held chemical agents or the Electronic Mobilization Shield. If other physical force is necessary, Staff must consider control holds, pain compliance holds, and take down-techniques as the lowest levels of force.

          v.    Only when the options in (g)(iii) and (g)(iv) above are impractical or ineffective to immobilize or neutralize an attack or aggression, and subject to the provisions of Paragraph 3(b) above, Staff may, as a defensive measure, apply a combination of blocks and/or strikes to non-vital areas of the Inmate's body. Blows or strikes shall never be utilized if control holds, grasping, or pushing would be effective in restraining an Inmate.

    h.      A requirement that, where practicable, physical force shall not be used until the following conditions have been met:

          i.    A warning or command has been given, and if practical, repeated.

          ii.    The Inmate has had time to comply with the warning or command.

          iii.    It appears that the Inmate is going to continue to resist the order or the Staff's effort to control the situation.

          iv.    Additional non-force alternatives, including crisis intervention methods and specific defusing techniques, are not reasonably available, or have been unsuccessful, and the situation cannot be reasonably allowed to continue.

i.  A requirement that all Staff and Inmates who used force or upon whom force was used shall receive medical attention as soon as possible following any Use of Force Incident.

j.  A requirement that under normal circumstances no Staff involved in a Use of Force Incident participate in escorting the Inmate away from the scene, including to the medical clinic or holding area. Where practicable, the Staff who escort an Inmate shall be Staff who were least directly involved in the Use of Force Incident.

k.  Clear and adequate direction on how to utilize alternative non-forceful methods of resolving conflicts and confrontations when circumstances do not require immediate physical intervention.

l.  A statement that "all Staff who witness a clearly excessive Use of Force (*e.g.*, force used for the sole purpose of causing harm) are required to attempt to stop or reduce the force being used where practicable and consistent with safety and security."

m.  A statement that "all Staff have a duty to protect Inmates from harm, and have a responsibility to intervene to de-escalate confrontations as soon as it is practicable and reasonably safe to do so."

n.  Clear and adequate direction on how to conduct an Anticipated Use of Force, including but not limited to the following requirements:

   i.  Any Anticipated Use of Force must be under the direction of a Supervisor at the scene, who shall continually assess the well-being of both Staff and Inmates during the Anticipated Use of Force.

   ii.  No Anticipated Use of Force may occur absent approval from the Tour Commander or a higher ranking manager.

   iii.  Staff must utilize appropriate non-force alternatives to attempt to resolve the situation before using force.

   iv.  The first Use of Force shall be the use of chemical agents, unless circumstances dictate otherwise (*e.g.*, an Inmate due to mental impairment is unable to conform to verbal directives). Unless circumstances dictate otherwise, Staff shall wait a minimum of 60 - 120 seconds to allow the chemical agents to take full effect before applying additional chemical agents or initiating some other level of force.

   v.  Prior to the Use of Force, a Supervisor shall confer with a medical care staff member to gather pertinent information about the Inmate's medical condition and mental health status to ensure that there are no issues that contraindicate the application of any specific type of force.

8

vi.    Prior to the Use of Force, a mental health care professional shall be summoned and shall attempt to persuade the Inmate to cooperate. The mental health care professional shall document his or her efforts to resolve the situation without the Use of Force, the extent to which those efforts were successful, and the length of time spent trying to resolve the situation without the Use of Force.

vii.    The Anticipated Use of Force must be videotaped according to specified protocols, and the videotape must be properly secured and maintained.

viii.    Where the Anticipated Use of Force is a cell extraction, the extraction may be conducted only by officers who have been trained on the proper procedures and protocols to ensure inmate and staff safety.

o.    Clear and adequate direction on how to reduce the risk of "positional asphyxia" during Use of Force Incidents, including but not limited to the following:

i.    Staff shall attempt to monitor the breathing of any Inmate placed face down on the floor or ground in order to apply restraints, and, if an Inmate is observed having difficulty breathing, or reports not being able to breathe, Staff shall call for medical assistance immediately.

ii.    As soon as an Inmate is restrained, Staff shall place the Inmate on his or her side on the floor or ground, or sitting up, until the Inmate is moved. Inmates carried by officers or transported by gurney or stretcher shall be placed on their sides if practicable or on their backs as a second choice if necessary.

iii.    If an Inmate is face down on the ground or floor and resisting restraint, Staff shall not compress the Inmate's chest by placing weight on his or her upper back.

iv.    An Inmate's ability to speak does not mean that he or she has adequate oxygen.

p.    Clear and adequate policy guidance on the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, and lethal force, including the limited circumstances when such forms of force may be used and the precautions that must be taken to ensure the safety of Inmates, Staff, and other individuals.

q.    A requirement that Staff may use only equipment issued and authorized by the Department and that Staff must be trained in a particular piece of equipment or instrument of force in order to use that equipment or instrument of force, subject to the following exception: In a situation in which a Staff Member or other person is in imminent danger of death or serious bodily injury, and where Department-authorized types and instruments of force are unavailable or

9

inadequate, Staff Members may use any necessary means readily available to stop or control the situation.

r.    A definition of the term "Use of Force" that includes any instance where Staff use their hands or other parts of their body, objects, instruments, chemical agents, electric devices, firearms, or any other physical methods to restrain, subdue, or compel an Inmate to act in a particular way, or stop acting in a particular way. The term "Use of Force" does not include moving, escorting, transporting, or applying restraints to a compliant Inmate.

s.    The same definitions of Class A, Class B, and Class C Uses of Force included in the Use of Force Directive that existed prior to the Effective Date.

t.    A statement that "any failure to comply with any provision of the New Use of Force Directive may result in discipline up to and including termination."

4.    After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.


## V.    USE OF FORCE REPORTING AND TRACKING

Staff Member Use of Force Reporting

1.    Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs.

2.    Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

3.    All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include the following, to the extent the information is known by the reporting Staff Member:

a.    The date, time, and location of the Use of Force Incident.

b.    The date and time the Use of Force Report was completed.

c.    A list of all Staff Members who used force.

d.    A list of all persons on whom force was used.

e.    A list of all persons, including Non-DOC Staff Members, who were present when the Use of Force Incident occurred.

f.    A detailed description of the Use of Force Incident, the events preceding the Use of Force Incident including any attempts to de-escalate the situation and avoid the

Use of Force, and the reasons for engaging in the Use of Force.  All reports must include a detailed description of the physical resistance exhibited by the Inmate; the type and level of force used by the Staff Member writing the report and by all other Staff who used force; whether any Staff used instruments or weapons, and if so, a description of the circumstances that led to their use; and a descriptions of the nature and extent of any visible or apparent injuries sustained by Inmates, Staff, or others.

g.   As to reports prepared by the Captain and the Staff Member(s) responsible for escorting the Inmate to the clinic, the approximate time the Inmate was transported to receive medical care, and the name of the clinician or medical professional who provided care.

h.   To the extent applicable, the name of any Staff Member who authorized and/or supervised the Use of Force Incident.

4.   Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

5.   Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report.  If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

6.   Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident.  Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action.  Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

7.   Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing.  In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

8.   Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to

11

prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

9.      The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

Non-DOC Staff Use of Force Reporting

10.     The City shall require that Non-DOC Staff Members who witness a Use of Force Incident that results in an apparent injury report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident. The City shall clearly communicate in writing this reporting requirement to all Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents that result in apparent injuries, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.

11.     Medical staff shall report either to the Tour Commander, ID, the ICO, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the medical staff as being the result of a Use of Force. The person to whom such report is made shall be responsible for relaying the information to ID. ID shall immediately open an investigation, to the extent one has not been opened, into the Use of Force Incident and determine why the Use of Force Incident went unreported.

12.     Medical staff shall advise a supervisor whenever they have reason to suspect that a Use of Force Incident was improperly classified, as those classifications are defined in the Department's Use of Force Directive. The medical staff member's supervisor shall then convey this information to the Tour Commander, who shall be responsible for providing the information to the Central Operations Desk ("COD").

13.     Emergency matters involving an imminent threat to an Inmate's safety or well-being may be submitted at any time and shall be referred immediately to a Supervisor, who shall review the emergency matter with the Tour Commander as quickly as possible. If the Tour Commander determines that the safety or well-being of the Inmate may be in danger, the Department shall take any necessary steps to protect the Inmate from harm.

Tracking

14.     Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

        a.      Use of Force Incident identification number.

        b.      Classification level of the Use of Force Incident, including any changes made to the classification level (*i.e.*, Class A, Class B, or Class C).

        c.      Date, time, and location of the Use of Force Incident.

12

    d.     Facility that houses each Inmate upon whom force was used or alleged to have been used.

    e.     Names and identification numbers of all Inmates upon whom force was used or alleged to have been used.

    f.     Names and identification numbers of all Inmates who were present in the area of the Use of Force Incident.

    g.     Names and shield numbers of all Staff Members who used, or are alleged to have used, force.

    h.     Whether the Use of Force Incident was an Anticipated Use of Force.

    i.     Nature of any injuries sustained by Inmates, Staff Members, or anyone else.

    j.     A brief description of the type of force (*e.g.*, chemical agent, single punch to body, control holds, punches to face or head, multiple blows, kicks, use of batons or other instruments, etc.) that was used and by whom.

    k.     Whether force was used while the Inmate was in restraints.

    l.     Whether video footage captured the Use of Force Incident and a brief description of the camera used (*e.g.*, fixed surveillance, handheld, or body-worn).

    m.    Whether any Inmate was arrested as a result of the Use of Force Incident, and if so, a description of the new criminal charges.

    n.     A brief description of the Staff Member's stated reasons for engaging in the Use of Force.

15.    Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

16.    The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and

implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

18. All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

20. Any computerized system used to track the information set forth in Paragraphs 14 – 19 above, including IRS and CMS, shall have the capability to generate aggregate reports. The Department shall utilize these computerized systems and their aggregate reports to determine whether there are ways to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with Use of Force Incidents or inmate-on-inmate fights or assaults, which the Department shall take appropriate steps to address in consultation with the Monitor.

21. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

14

Prompt Medical Attention Following Use of Force Incident

22.     All Staff Members and Inmates upon whom force is used, or who used force, shall
        receive medical attention by medical staff as soon as practicable following a Use of Force
        Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff
        Member shall be asked to sign a form in the presence of medical staff documenting that
        medical care was offered to the individual, that the individual refused the care, and the
        reason given for refusing, if any.

23.     DOC shall record in the Department's Inmate Information System the time when Inmates
        arrive at the medical clinic following a Use of Force Incident, the time they were
        produced to a clinician, and the time treatment was completed. DOC shall record which
        Staff Members were in the area to receive post-incident evaluation or treatment.


## VI.     ANONYMOUS REPORTING SYSTEM

1.      The Department, in consultation with the Monitor, shall establish a centralized system
        pursuant to which Staff Members can anonymously report to ID information that Staff
        Members violated the Department's use of force policies. ID shall initiate a Preliminary
        Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into
        any such allegations within 3 Business Days after receiving the anonymous report.


## VII.     USE OF FORCE INVESTIGATIONS

General Provisions

1.      As set forth below, the Department shall conduct thorough, timely, and objective
        investigations of all Use of Force Incidents to determine whether Staff engaged in the
        excessive or unnecessary Use of Force or otherwise failed to comply with the New Use
        of Force Directive. At the conclusion of the investigation, the Department shall prepare
        complete and detailed reports summarizing the findings of the investigation, the basis for
        these findings, and any recommended disciplinary actions or other remedial measures.
        All investigative steps shall be documented.

2.      *Inmate Interviews.* The Department shall make reasonable efforts to obtain each
        involved Inmate's account of a Use of Force Incident, including Inmates who were the
        subject of the Use of Force and Inmates who witnessed the Use of Force Incident. The
        Department shall not discredit Inmates' accounts without specifying a basis for doing so.

        a.      After an Inmate has been taken for a medical assessment and treatment following
                a Use of Force Incident, an Assistant Deputy Warden shall give the Inmate an
                opportunity to provide an audio recorded statement describing the events that
                transpired, which shall be reviewed as part of the investigation of the incident.

        b.      When requesting an Inmate's statement or interview, the Department shall assure
                the Inmate that the Inmate will not be subject to any form of retaliation for
                providing information in connection with the investigation. Requests for
                statements or interviews shall be made off the living unit and shall not be made

within sight or hearing of other Inmates or Staff involved in the Use of Force Incident. Inmate interviews shall be conducted in a private and confidential setting.

c.      All efforts to obtain Inmate statements shall be documented in the investigation file, and refusals to provide such statements shall be documented as well.

3.      The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

4.      Any Staff Member found to have conducted a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to appropriate discipline, instruction, or counseling.

5.      The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

6.      Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

7.      Preliminary Reviews: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is necessary for the

16

Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below.

a.   The individual responsible for conducting the Preliminary Review ("Preliminary Reviewer") shall review the following: (i) the relevant video footage of the Use of Force Incident, including footage from fixed surveillance cameras and handheld or body-worn cameras; (ii) Use of Force Reports from Staff; (iii) interviews and/or written statements from the Inmate(s) subject to the Use of Force or alleged Use of Force; (iv) interviews and/or written statements from Inmates or civilian staff who witnessed the incident; (v) Injury-to-Inmate Reports; (vi) photographs of Inmates and Staff Members that were taken after the Use of Force Incident; and (vii) reports reflecting any injuries to Staff Members. In the event that the Inmate(s) subject to the Use of Force or alleged Use of Force has declined to provide a statement to the Facility, the Preliminary Reviewer shall attempt to interview the Inmate(s) concerning the Use of Force Incident.

b.   The Preliminary Reviewer shall confirm that the Use of Force Incident is properly classified as a Class A, Class B, or Class C Use of Force.

c.   To the extent any factual inaccuracies in the information required to be maintained under Paragraph 14(a) - (m) of Section V (Use of Force Reporting and Tracking) are identified during the course of the Preliminary Review, the information shall be corrected or updated in IRS.

d.   The Preliminary Reviewer shall document the results of the Preliminary Review.

e.   Under limited circumstances, the Preliminary Reviewer may determine that his or her review is sufficient and it is not necessary to take any additional investigative steps. The Preliminary Reviewer may make this determination only if the following criteria are clearly met and documented, and this determination is reviewed and approved by a supervisor in ID:

  i.    No Staff Member, Inmate, or other person sustained any injury, and the Inmate who was subjected to the Use of Force did not allege any pain.

  ii.   Any resistance by the Inmate was passive.

  iii.  Staff Members had only minimal physical contact with the Inmate, using only soft hand controls.

  iv.   The Use of Force Incident did not involve the use of weapons, including OC spray.

  v.    There was an immediate need for the Inmate to comply with Departmental or Facility rules, policies, regulations, or court orders, and non-force alternatives had proven ineffective.

  vi.   The descriptions of the Use of Force Incident included in the Use of Force Reports submitted by Staff Members were consistent with the affirmative statement by the Inmate who was subjected to the Use of Force and all other evidence.

17

vii.     Based on the Preliminary Review, the Use of Force was minimal,
         reasonably necessary, and clearly consistent with the New Use of Force
         Directive.

Investigation Division

8.     ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force
       Incident that involves:  (a) conduct that is classified as a Class A Use of Force, and any
       complaint or allegation that, if substantiated, would be classified as a Class A Use of
       Force;  (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to
       the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or
       alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member
       who has entered into a negotiated plea agreement or been found guilty before OATH for
       a violation of the Use of Force Policy within 18 months of the date of the Use of Force
       Incident, where the incident at issue involves a Class A or Class B Use of Force or
       otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in
       restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident
       occurred in an area subject to video surveillance but the video camera allegedly
       malfunctioned; (i) any unexplained facts that are not consistent with the materials
       available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another
       reason that similarly warrants a Full ID Investigation.  Such Use of Force Incidents shall
       be referred to ID within two Business Days of the incident.  In the event that information
       is obtained later establishing that a Use of Force Incident falls within the aforementioned
       categories, the Use of Force Incident shall be referred to ID within two days after such
       information is obtained.  ID shall promptly notify the Facility if it is going to conduct a
       Full ID Investigation of a Use of Force Incident, at which time the Facility shall
       document the date and time of this notification and forward any relevant information
       regarding the incident to ID.

9.     All Full ID Investigations shall satisfy the following criteria:

       a.     *Timeliness.*

              i.     Beginning on the Effective Date and for three years following the
                     Effective Date, or until October 1, 2018, whichever is earlier:

                     1.     ID shall complete all Full ID Investigations by no later than 180
                            days from the date the Use of Force Incident was referred to ID
                            ("Referral Date"), absent extenuating circumstances outside the
                            Department's control that warrant an extension of this deadline.
                            Any extension of the 180-day deadline shall be documented and
                            subject to approval by the DCID or a designated Assistant
                            Commissioner.  Any Full ID Investigation commenced after the
                            Effective Date that is open for more than 180 days shall be subject
                            to monthly reviews by the DCID or a designated Assistant
                            Commissioner to determine the status of the investigation and
                            ensure that all reasonable efforts are being made to expeditiously
                            complete the investigation.

18

        2.      The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 180-day time frame set forth in the preceding subparagraph.

    ii.    Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

        1.      ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

        2.      The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

    iii.   In the event that a Use of Force Incident is referred to DOI, or following the further referral by DOI to the District Attorney's Office ("DA") or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the Full ID Investigation shall be tolled while the other agency is investigating the matter or making a decision on immunity. ID shall on at least a monthly basis contact DOI to monitor the status of investigations referred to other law enforcement agencies.

b.    *Video Review.* The assigned ID Investigator ("ID Investigator") shall review all relevant video footage of the Use of Force Incident, including footage from fixed surveillance cameras and handheld or body-worn cameras, and shall summarize the relevant video footage and explain whether the footage is consistent with witness reports. The ID Investigator shall document any non-functioning cameras, any unavailable video footage, or any other barrier to reviewing all relevant video footage. In the event that no or only incomplete video surveillance can be located even though the Use of Force Incident took place at a location under video surveillance, ID shall investigate why no or only incomplete video surveillance can be located, and document its findings.

c.    *Witness Interviews.* The ID Investigator shall interview all relevant witnesses, including the Inmate(s) subject to the alleged Use of Force, Staff alleged to have been involved in the Use of Force Incident, and Inmates, Staff, or civilian staff who witnessed the incident. However, in situations in which there is a large number of witnesses and interviewing all such persons is likely to be duplicative and unduly burdensome, the ID Investigator shall interview a reasonable number

19

of such witnesses. All witness interviews shall be audio recorded or video recorded.

i.   The Inmate(s) who were subject to the alleged Use of Force shall be interviewed within two weeks of the Referral Date, absent unusual circumstances that shall be documented in the investigation file and reviewed by a Supervisor. The ID Investigator shall attempt to interview the Inmate even if the Inmate declined to be interviewed previously, except if the Inmate has been criminally charged in connection with the Use of Force Incident and has declined to be interviewed for that reason.

ii.   All interviews of Staff involved in the Use of Force Incident shall be completed within 30 days of immunity grants from the Trials Division, DOI, or DA, absent unusual circumstances that shall be documented in the file and reviewed by a Supervisor.

iii.   Interviews shall be conducted of any Staff Member who submits a written report stating that he or she did not observe any Use of Force where there is reason to believe the Staff Member was in close proximity to the location of the incident and should have observed what occurred.

iv.   If a decision is made not to interview a witness, the basis for that decision shall be documented in the investigation file.

v.   ID shall conduct its own independent interview of a witness even if the Facility previously interviewed the witness.

d.   *Review of Medical Evidence.* The ID Investigator shall take reasonable steps to obtain in a timely manner relevant medical records for any Inmate or Staff Member injured during a Use of Force Incident. Such steps shall include timely seeking a medical release from the injured person(s). The ID Investigator shall review the medical records to determine whether they are consistent with video surveillance, witness accounts, and other evidence, and take reasonable steps to reconcile any inconsistencies. A report from the New York City Office of Chief Medical Examiner shall be obtained when necessary to determine the cause of an injury or address complex forensic questions.

e.   *Report.* At the conclusion of his or her investigation, the ID Investigator shall prepare a complete and detailed report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures ("ID Closing Memorandum"). The ID Closing Memorandum shall set forth all the evidence gathered during the investigation, state whether Staff engaged in excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive, and explain how any conclusions and recommendations are supported by the evidence. If an Inmate's prior infraction or criminal history, or a Staff Member's Use of Force or disciplinary history, is included in the ID Closing Memorandum, its effect, if any, on the conclusion in the ID Closing Memorandum shall be documented. Where there are inconsistencies between different pieces of

20

evidence such as witness statements, the report shall adequately explain the basis for crediting one source of evidence over another.

    f.    *Supervisory Review.* All ID reports shall be reviewed by the ID Investigator's supervisor to ensure that they comply with the terms of this Agreement and other applicable Department procedures and requirements. The supervisor shall address any aspect of the ID Closing Memorandum or ID Full Investigation that does not comply with the terms of this Agreement and other applicable Department procedures and requirements. The name of the supervisor who conducts this review, the date of the review, and the findings of the review shall be documented in the file.

10.    The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. Those ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date and have been open for more than six months shall be completed within 120 days of the Effective Date. All other ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date shall be completed within 180 days of the Effective Date. These deadlines may not be extended absent extenuating circumstances outside the Department's control.

    a.    Any extension of these deadlines shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. In the event a deadline is extended, the investigation shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

    b.    In the event that the Use of Force Incident that is the subject of an ID Use of Force investigation or review outstanding as of the Effective Date has been or is referred to DOI, or following the further referral by DOI to the DA or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the investigation or review shall be tolled while the other agency is investigating the matter or making a decision on immunity.

11.    The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

12.    Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

Facility Investigations

13.     All Use of Force Incidents not subject to a Full ID Investigation shall be investigated by
        the Facility where the incident is alleged to have occurred or where the Inmate(s) subject
        to the Use of Force is housed.  All investigations conducted by the Facility ("Facility
        Investigations") shall satisfy the following criteria, provided that the Facility may close
        its investigation if the Preliminary Reviewer determines based on the Preliminary Review
        that it is not necessary for the Facility to take any additional investigative steps because
        all of the criteria set forth in Paragraph 7(e) above are satisfied, in which case the
        Preliminary Reviewer's documented determination would serve as a substitute for the
        Facility Report referenced in subparagraph (f) below.

        a.     *Objectivity.* The individual(s) responsible for investigating the Use of Force
               Incident ("Facility Investigator") must be objective.  The Facility Investigator
               must be a Captain (or higher ranking officer) who did not witness the Use of
               Force Incident, participate in the Use of Force Incident, or authorize the Use of
               Force.  In addition, the Facility Investigator may not be someone who directly
               supervises any Staff alleged to have used force during the incident.

        b.     *Timeliness.* The investigation shall be completed within 25 Business Days of the
               date the incident occurred, absent unusual circumstances warranting an extension
               of this deadline.  In the event that such unusual circumstances exist, the Facility
               Investigator shall document the circumstances and this documentation shall be
               reviewed and approved by the Deputy Warden or Warden (or other official of
               higher rank).  Any Facility Investigation commenced after the Effective Date that
               is open for more than 25 Business Days shall be subject to weekly reviews by the
               Deputy Warden (or other official of higher rank) to determine the status of the
               investigation and ensure that all reasonable efforts are being made to
               expeditiously complete the investigation.

        c.     *Video Review.* The Facility Investigator shall collect and review all relevant
               video footage of the Use of Force Incident, including footage from fixed
               surveillance cameras and handheld or body-worn cameras, and shall summarize
               the video footage and explain whether the footage is consistent with witness
               reports.  The Facility Investigator shall document any non-functioning cameras,
               any unavailable video footage, or any other barrier to reviewing all relevant video
               footage.  In the event that no video surveillance can be located even though the
               Use of Force Incident took place at a location under video surveillance, the
               Facility Investigator shall investigate why no video surveillance can be located
               and document his or her findings.

        d.     *Witness Statements.* The Facility Investigator shall obtain written statements from
               all relevant witnesses, including the Inmate(s) subject to the alleged Use of Force,
               Staff alleged to have been involved in the Use of Force Incident, and Inmates,
               Staff, or civilian staff who witnessed the incident.  In the event that Inmates are
               unwilling to provide written statements but are willing to provide information
               verbally, the Facility Investigator shall document whatever information is
               provided verbally.  With the exception of Staff, the Facility Investigator also shall
               seek to interview all relevant witnesses, including Inmates, as soon as practicable

22

after the Use of Force Incident. However, in situations in which there are a large number of witnesses and interviewing all such persons is likely to be duplicative and unduly burdensome, the Facility Investigator shall interview a reasonable number of such witnesses.

e. *Collection and Review of Medical Evidence.* At least four color digital photographs of each Inmate involved in the Use of Force Incident, capturing any visible injuries, shall be taken shortly after the Use of Force Incident, unless the Inmate refuses to be photographed, in which case such refusal shall be documented. Color photographs also shall be taken of Staff Members who sustained injuries during the Use of Force Incident. Injury-to-Inmate Reports shall be completed by medical staff and included in the investigation file. The Facility Investigator shall determine whether the available medical information is consistent with video surveillance, witness accounts, and other evidence, and take reasonable steps to reconcile any inconsistencies. Based on the review of the medical evidence, the Facility Investigator shall confirm that the Use of Force Incident is appropriately classified. To the extent that the Facility Investigator concludes that the Use of Force Incident is misclassified, or that subsequently obtained information warrants a different classification, the Facility Investigator shall notify the Tour Commander, who shall notify COD accordingly. COD shall reclassify the incident promptly upon notification. If the Facility Investigator determines that the Use of Force Incident merits a Class A classification, the Facility Investigator shall note this change in writing and promptly refer the matter to ID.

f. *Report.* At the conclusion of his or her investigation, the Facility Investigator shall prepare a complete and detailed report summarizing the findings of the investigation and the basis for these findings ("Facility Report"). The Facility Report shall set forth all the evidence gathered during the investigation, state whether Staff engaged in excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive, and explain how any conclusions and recommendations are supported by such evidence. If an Inmate's prior infraction or criminal history, or a Staff Member's Use of Force or disciplinary history, is included in the Facility Report, its effect, if any, on the conclusion of the Facility Report shall be documented. Where there are inconsistencies between different pieces of evidence such as witness statements, the Facility Report shall adequately explain the basis for crediting one source of evidence over another or any other way in which inconsistencies have been reconciled.

g. *Supervisory Review.* All Facility Reports shall be reviewed by the Deputy Warden and the Warden to ensure that they comply with the terms of this Agreement and other applicable procedures and requirements. The Deputy Warden and the Warden (or official of higher rank) shall document whether they concur with the conclusions of the Facility Investigator, and whether the Use of Force Incident has been appropriately classified, and shall document in the Facility Report whether they recommend disciplinary actions or other remedial measures.

h.   *Recommended Disciplinary Action.* In the event that the Facility Investigation determines that a Staff Member has engaged in excessive or unnecessary Use of Force or otherwise engaged in a material violation of the New Use of Force Directive, the matter shall be referred to the Trials Division for further action as required by Paragraph 3 of Section VIII (Staff Discipline and Accountability).

i.   *Referral to ID.* In the event that any information is gathered during the course of a Facility Investigation establishing that a Full ID Investigation is required pursuant to Paragraph 8 above, the matter shall be referred to ID within two Business Days.

j.   *Role of Integrity Control Officer.* An ICO from ID shall be assigned to each Facility. For each Facility, the ICO shall be responsible for reviewing all Facility Investigations of Class B Use of Force Incidents, and 20% of Facility Investigations of Class C Use of Force Incidents, to ensure that they are thorough and comply with the criteria set forth in this Paragraph. The ICO's review shall include a determination as to whether the Facility Investigator has collected all relevant material and evidence necessary for the Facility Investigation, and whether the Use of Force Incident was properly classified. The ICO shall also determine whether the Facility Investigator's findings are supported by the evidence, and whether additional investigatory steps are necessary. The ICO shall document the results of his or her review. The Department may assign additional investigators from ID to assist the assigned Facility ICO, as needed.

Investigation of Use of Force Incidents Involving Inmates Under the Age of 18

14.   The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

a.   The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

b.   The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

Policies and Training

15.   Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

16.   The Department shall develop and implement a standardized system and format for organizing the contents of investigation files. Each investigation file shall include at least the following: (a) all Use of Force Reports and witness statements; (b) written summaries, transcripts, and recordings of any witness interviews; (c) copies of any video footage and a written summary of video footage; (d) the Injury-to-Inmate Report; (e) relevant medical records (if applicable); (f) color photographs of any Inmate or Staff injuries; (g) the report summarizing the findings of the investigation, the basis for these

findings, and any recommended disciplinary or other remedial measures, as well as documentation reflecting supervisory review and approval of this report; (h) records reflecting any disciplinary action taken with respect to any Staff Member or Inmate in connection with the incident; and (i) records of any other investigative steps taken.

## VIII.  STAFF DISCIPLINE AND ACCOUNTABILITY

1.     The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

2.     Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized disciplinary guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines.

   a.     The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH and the aggravating and mitigating factors to be taken into account in determining the specific penalty to seek.

   b.     The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH against Supervisors in cases where, as a result of inadequate supervision, Staff Members are found to have engaged in UOF Violations. These penalty ranges shall be consistent with the Department's commitment to hold Supervisors, regardless of their rank, accountable for culpability in the chain of command.

   c.     The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) and (ii) below will result in the Department taking all necessary steps to seek a penalty ranging from, at a minimum either a 30-day suspension without pay (a portion of the 30 days may consist of the loss of accrued vacation days), or a 15-day suspension without pay plus a one-year probation period as agreed to by the Staff Member, up to and including termination. If the penalty imposed is a 15-day suspension without pay plus a one-year probation period, the terms of the probation shall specify that any Use of Force Violation or significant policy violation will result in termination.

25

    i.     Deliberately providing materially false information in a Use of Force Report or during an interview regarding a Use of Force Incident.

    ii.    Deliberately failing to report Use of Force by a Staff Member.

    iii.   The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek such penalties against Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make such a penalty an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.

d.   The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) - (iii) below will result in the Department taking all necessary steps to seek termination of the Staff Member.

    i.     Deliberately striking or using chemical agents on an Inmate in restraints, in a manner that poses a risk of serious injury to the Inmate, except in situations where the Staff Member's actions were objectively reasonable in light of the facts and circumstances confronting the Staff Member.

    ii.    Deliberately striking or kicking an Inmate in the head, face, groin, neck, kidneys, or spinal column, or utilizing choke holds, carotid restraint holds, or other neck restraints, in a manner that is punitive, retaliatory, or designed to inflict pain on an Inmate, and constitutes a needless risk of serious injury to an Inmate.

    iii.   Causing or facilitating an inmate-on-inmate assault or fight, or allowing an inmate-on-inmate assault or fight to continue where it is clearly safe to intervene, in order to punish, discipline, or retaliate against an Inmate or as a means to control or maintain order in any area of a Facility.

    iv.   The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek the termination of Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make termination an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.

e.   If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the

Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

3.    In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

    a.    If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor.

    b.    If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division.

    c.    The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

4.    The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

5.    The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines. Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

## IX.    VIDEO SURVEILLANCE

1.  Stationary Camera Installation

   a.    At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

      i.    At least 25% of these additional cameras shall be installed by July 1, 2016.

      ii.    At least 50% of these additional cameras shall be installed by February 1, 2017.

      iii.    At least 75% of these additional cameras shall be installed by July 1, 2017.

   b.    The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

   c.    The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018.  When determining the schedule for the installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence.  The Department intends to prioritize the installation of cameras as follows:

      i.    First Wave: Robert N. Davoren Complex, George R. Vierno Center, and George Motchan Detention Center.

      ii.    Second Wave: Anna M. Kross Center, Vernon C. Bain Center, Otis Bantum Correctional Center, and Eric M. Taylor Center.

      iii.    Third Wave: Queens Detention Complex, West Facility, North Infirmary Command, Brooklyn Detention Complex, Manhattan Detention Complex, Rose M. Singer Center, and Donald J. Cranston Judicial Center.

      iv.    The Department may revise the order of the Facilities in which the additional stationary, wall-mounted cameras will be installed based on the operational and security needs of the Department.  Any such revisions shall be discussed during the meetings of the Department's internal working group referenced in subparagraph 1(e) below.

   d.    Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time.

   e.    The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities.

2.    Body-worn and Handheld Cameras

      a.    Within one (1) year of the Effective Date, the Department shall institute a pilot project in which 100 body-worn cameras will be worn by Staff Members over all shifts. They shall be worn by Staff Members assigned to the following areas: (i) intake; (ii) mental health observation; (iii) Punitive Segregation units; (iv) Young Inmate Housing Areas; and (v) other areas with a high level of violence or staff-inmate contact, as determined by the Department in consultation with the Monitor.

      b.    The 100 body-worn cameras shall be distributed among officers and first-line Supervisors in a manner to be developed by the Department in consultation with the Monitor.

      c.    The Department, in consultation with the Monitor, shall evaluate the effectiveness and feasibility of the use of body-worn cameras during the first year they are in use and, also in consultation with the Monitor, determine whether the use of such cameras shall be discontinued or expanded, and if expanded, where such cameras shall be used.

      d.    Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall specify:

            i.    Handheld video cameras shall be used in the following situations, except when safety or security concerns require an immediate response that would preclude waiting for recording equipment: (1) responding to a Use of Force Incident; (2) all cell extractions; (3) all probe teams actions; and (4) Facility living quarter searches conducted by the Department's Emergency Services Unit ("ESU"), except Tactical Search Operations ("TSO"), random searches, and strip searches. Inmate resistance during a TSO, random search, or strip search, however, would trigger video recording if it is reasonably believed that a Use of Force or assault on Staff is about to occur or occurs.

            ii.    Handheld video camera operators shall record the following: (1) any attempts made to obtain the Inmate's compliance after the video camera operator has arrived in the area, (2) the Inmate's behavior, and (3) all Uses of Force by Staff.

           iii.    In cell extraction situations, the handheld video camera operator shall record: (1) a statement from the team leader summarizing the situation and the plan for resolution; (2) an introduction by each team member, describing the member's specific responsibilities in the plan for the Use of Force; and (3) a statement from the handheld video camera operator providing his or her name and explaining any impediments to obtaining a clear video recording of the incident.

    iv.     Handheld video camera operators shall receive appropriate training.

    v.      The video recording shall be continuous and any break in video continuity shall be documented and explained by the handheld video camera operator, to the extent the operator knows of such breaks, in an incident report or Use of Force witness report.

    vi.    Compliance with these policies and procedures is the responsibility of the onsite Supervisor, as well as the operator of the handheld video camera.

e.    There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, probe team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator.

f.    When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified.

g.    The Department, in consultation with the Monitor, may re-evaluate and/or adjust the requirements for the use of handheld cameras if the Department determines that body-worn cameras could provide substantially similar coverage.

3.    <u>Maintenance of Stationary Cameras</u>

    a.    The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

    b.    Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

    c.    At least twice a month, the assigned Supervisor shall (i) review a substantial portion of the wall-mounted surveillance cameras in order to determine which cameras are not recording properly, and (ii) review the accuracy of the daily

assessments. The assigned Supervisor shall document the results of these reviews, including which daily assessments, if any, were inaccurate.

d.    Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

4.    <u>Video Preservation</u>

The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

## X.    RISK MANAGEMENT

1.    Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

2.    Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the

31

Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

3.   The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

   a.   The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

   b.   The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.

   c.   The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.

4.   Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

32

5.     The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation.  ID shall review such allegations and determine whether a Full ID Investigation is warranted.

6.     By December 1, 2016, the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members.  The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members.  The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS.  Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS.  CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.


## XI.     STAFF RECRUITMENT AND SELECTION

1.     The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies.  The program shall provide clear guidance and objectives for recruiting Staff Members.

2.     The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations.  The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

3.     The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database.  The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks.  Staff responsible for conducting these background investigations shall receive appropriate training.  The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.


## XII.     SCREENING AND ASSIGNMENT OF STAFF

Promotions

1.     Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the following (collectively the "Review"):

33

a.   The following data regarding the Staff Member's involvement in Use of Force Incidents during the prior 5 years, to the extent such data is electronically maintained by the Department in IRS or any other computerized system: (i) the number of Use of Force Incidents the Staff Member has been involved in, (ii) the type and severity of injuries sustained by Staff and Inmates; (iii) whether the conduct was classified as a Class A, B, or C Use of Force; (iv) whether the Use of Force Incident involved a strike or blow to the head or other vital area of an Inmate, kicking an Inmate, the use of a baton or other instrument of force against an Inmate, the use of a prohibited restraint hold on an Inmate, or an allegation of any such conduct; and (v) whether the Inmate was in restraints prior to the Use of Force incident.

b.   The Staff Member's disciplinary history during the prior five years, including whether the Staff Member has been found guilty or pleaded guilty in connection with charges relating to a Use of Force Incident and any command discipline imposed as a result of the Use of Force.

c.   Any ID Closing Memoranda issued during the prior 2 years for any Use of Force Incident where the Staff Member used or was alleged to have used force.

d.   The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the promotion, which shall become part of the Staff Member's personnel file.

2.   DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

3.   No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

Assignments to Special Units

4.   Prior to assigning any Staff Member to any Special Unit, the Department shall conduct the Review described in Paragraph 1 above. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the

34

qualification of the Staff Member for the assignment, which shall become part of the Staff Member's personnel file.

5.   No Staff Member shall be assigned to any Special Unit while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person.  In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the assignment at that time.

6.   If a Staff Member assigned to a Special Unit is disciplined for misconduct arising from a Use of Force Incident, the Warden, or a person of higher rank, shall promptly conduct an assessment to determine whether the Staff Member should be reassigned to a non-Special Unit.  The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member cannot effectively and safely perform the duties associated with the assignment.  If a determination is made not to re-assign the Staff Member after the discipline, the basis for the determination shall be documented in a report, which shall become part of the Staff Member's personnel file.

Review of Assignments of Staff Disciplined Multiple Times

7.   The Department shall promptly review the assignment of any Staff Member who has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions within a five-year period: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force.  The review shall include an assessment to determine whether the Staff Member should be reassigned to a position with more limited inmate contact. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member should have reduced inmate contact.  The results of the review shall be documented and become part of the Staff Member's personnel file and a copy shall be sent to the Monitor.

## XIII.   TRAINING

1.   Within 60 days of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.  The content of these training programs shall be subject to the approval of the Monitor.

    a.   Use of Force Policy Training: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video

reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

    i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy.

        1.    Within 6 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all Supervisors.

        2.    Within 12 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all other Staff Members.

    ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

b.    <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include initial training for new Staff Members ("Initial Crisis Intervention Training"), in-service training for current Staff Members ("In-Service Crisis Intervention Training"), and refresher training ("Refresher Crisis Intervention Training"), as set forth below.

    i.    The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

    ii.    The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training within 26 months of the Effective Date.

    iii.    The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis

36

Intervention Training or the In-Service Crisis Intervention
Training, and once every two years thereafter.

    c.    Probe Team Training: The Probe Team Training shall cover the proper
procedures and protocols for responding to alarms and emergency situations
in a manner that ensures inmate and staff safety. The Probe Team Training
shall be a minimum of 2 hours, and shall be incorporated into the mandatory
pre-service training at the Academy. Within 12 months of the Effective Date,
the Department shall provide the Probe Team Training to all Staff Members
assigned to work regularly at any Intake Post. Additionally, any Staff member
subsequently assigned to work regularly at an Intake Post shall complete the
Probe Team Training prior to beginning his or her assignment.

2.    Within 60 days of the Effective Date, the Department shall work with the Monitor to
strengthen and improve the effectiveness of the existing training programs, as needed, for
the topics set forth in subparagraphs (a) - (c) below. These training programs shall
include fully developed lesson plans and teaching outlines, examinations, and written
materials, including written scenarios and exercises, to be distributed to students.

    a.    Defensive Tactics Training: Defensive Tactics Training, including any
revisions, shall cover a variety of defense tactics and pain compliance
methods, and shall teach a limited number of techniques to a high level of
proficiency. The Defensive Tactics Training shall be competency- and
scenario-based, utilize video reflecting realistic situations, and include
substantial role playing and demonstrations. The Defensive Tactics Training
shall include initial training ("Initial Defensive Tactics Training") and
refresher training ("Refresher Defensive Tactics Training"), as set forth
below.

        i.    The Initial Defensive Tactics Training shall be a minimum of 24
hours, and shall be incorporated into the mandatory pre-service
training program at the Academy.

        ii.    The Refresher Defensive Tactics Training shall be a minimum of 4
hours, and shall be provided to all Staff Members on an annual
basis.

    b.    Cell Extraction Team Training: The Cell Extraction Team Training, including
any revisions, shall cover those circumstances when a cell extraction may be
necessary and the proper procedures and protocols for executing cell
extractions, and shall include hands-on practice. The Cell Extraction Team
Training shall be a minimum of 4 hours and shall be provided within 12
months of the Effective Date to all Staff Members regularly assigned to
Special Units with cell housing. The Cell Extraction Team Training also shall
be incorporated into the mandatory pre-service training program at the
Academy.

    c.    Investigator Training: There shall be two types of Investigator Training:
ID Investigator Training and the Facility Investigator Training. ID
Investigator Training shall cover investigative procedures, skills, and

techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

    i.    ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

    ii.    The Facility Investigator Training shall be a minimum of 24 hours. Within 9 months of the Effective Date, the Department shall provide such training to all Staff Members who serve as Facility Investigators. Staff Members who begin to serve as Facility Investigators more than nine months after the Effective Date shall complete the Facility Investigator Training prior to conducting Facility Investigations.

3.    The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall include initial training (the "Initial Young Inmate Management Training") and refresher training (the "Refresher Young Inmate Management Training"), as set forth below.

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

    b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them

38

within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

4.  Within 60 days of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

    a.  The Direct Supervision Training shall be a minimum of 32 hours.

    b.  Within 9 months of the Effective Date, the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

5.  Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

    a.  Such re-training must be completed within 60 days of the determination of the violation.

    b.  The completion of such re-training shall be documented in the Staff Member's personnel file.

6.  After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

7.  The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

39

8.  The Department shall maintain training records for all Staff Members in a centralized location.  Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

## XIV.  ARRESTS OF INMATES

1.  The Department shall recommend the arrest of an Inmate in connection with a Use of Force Incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, has reviewed the circumstances warranting the potential arrest and has determined that the recommendation is based on probable cause.

## XV.  SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19

General Provisions

1.  Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm.  Staff shall intervene in a timely manner to prevent inmate-on-inmate fights and assaults, and to de-escalate inmate-on-inmate confrontations, as soon as it is practicable and reasonably safe to do so.

2.  Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure.  The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates.  In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

3.  A Warden or Deputy Warden shall tour all Young Inmate Housing Areas at least once each shift, unless the Warden or Deputy Warden is not in the Facility during that shift, making himself or herself available to respond to questions and concerns from Inmates. The tours shall be documented and any general deficiencies shall be noted.

4.  Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year olds that is sufficient to protect these Inmates from an unreasonable risk of harm.  The classification system shall incorporate factors that are particularly relevant to assessing the needs of adolescents and the security risks they pose.

5.  Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in inmate harm.

6.      The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit, or take other appropriate action to ensure the Inmate's safety, and shall document such action.

7.      The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken.  The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate.  The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

8.      With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

9.      All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

Video Camera Coverage

10.     Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18.  Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

11.     By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds.  By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

Direct Supervision

12.     The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

Staffing

13.     Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas.  Staff assigned to

Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be staffed exclusively by probationary Staff Members.

16. Staffing Levels.

    a.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 15:1 in Young Inmate Housing Area units used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1. The maximum living unit size shall be 15 Inmates.

    b.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates.

    c.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year olds. The maximum living unit size shall be 30 Inmates.

    d.    The maximum inmate-to-staff ratios and living unit sizes set forth in subparagraphs (b) and (c) above may be modified only if the following two conditions are met:

        i.    The Department develops and submits to the Monitor for review a written comprehensive inmate management and housing plan for Young Inmate Housing Areas used for 18-year olds that, among other things, includes staffing levels, an array of appropriate programming, and alternative maximum inmate-to-staff ratio and/or living unit size requirements ("Proposed Housing Management Plan"). The Department shall include in the Proposed Housing Management Plan an explanation of how its implementation is as likely, or more likely, to achieve the goals of protecting Inmates from an unreasonable risk of harm and allowing for the safe operation of the Young Inmate Housing Areas than the maintenance of the maximum inmate-to-staff ratios and living unit sizes set forth in subparagraphs (b) and (c) above.

        ii.    The Monitor makes a written determination that he agrees with the Department's assessment that the Proposed Housing Management Plan is as likely, or more likely, to achieve the goals of protecting Inmates from an unreasonable risk of harm and allowing for the safe operation of the Young Inmate Housing Areas than the maintenance of the maximum

inmate-to-staff ratios and living unit sizes set forth in subparagraphs (b) and (c) above.

e.      In the event the maximum inmate-to-staff ratios and living unit sizes set forth in subparagraphs (b) and (c) above are modified as provided for in subparagraph (d), the alternative maximum inmate-to-staff ratio and living unit size requirements included in the Proposed Housing Management Plan will apply and the Department shall be required to implement the Proposed Housing Management Plan.

      i.      After the Proposed Housing Management Plan has been implemented, the Department may seek to modify it during the duration of the Agreement by submitting to the Monitor for review a written request explaining the proposed modification and how the modification will further the goals of protecting Inmates from an unreasonable risk of harm and allowing for the safe operation of the Young Inmate Housing Areas used for 18-year olds.

      ii.      If the Monitor makes a written determination that he agrees with the Department's assessment that the proposed modification will further the goals of protecting Inmates from an unreasonable risk of harm and allowing for the safe operation of the Young Inmate Housing Areas used for 18-year olds, the modified version of the Proposed Housing Management Plan, including the maximum inmate-to-staff ratio and living unit size requirements included in the modified version, will apply and the Department shall be required to implement the Proposed Housing Management Plan as modified.

17.   The Department shall adopt and implement a staff assignment system under which a team of officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

18.   The Department, in consultation with the Monitor, shall continue to develop and implement measures, including financial incentives, to:  (a) encourage experienced and qualified Staff to work in the Young Inmate Housing Areas that are used for Inmates under the age of 18; and (b) retain qualified Staff in the Young Inmate Housing Areas that are used for Inmates under the age of 18 and limit staff turnover.  The Department shall maintain records sufficient to show the numbers of Staff transferring in and out of the Young Inmate Housing Areas that are used for Inmates under the age of 18, the years of experience with the Department of the Staff regularly assigned to these areas, and the qualifications of Staff regularly assigned to these areas.

43

## XVI.   INMATE DISCIPLINE

Owed Punitive Segregation Time

1.      No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

Inmates Under the Age of 18

2.      The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

3.      Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors.  These systems, policies, and procedures shall be subject to the approval of the Monitor.  Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

4.      Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is:  (a) consistent with their treatment needs; (b) does not deprive them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

18-Year Old Inmates

5.      The Department shall not place 18-year old Inmates with serious mental illnesses in Punitive Segregation or Isolation.  Any 18-year old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

6.      Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year old Inmates.  These systems, policies, and procedures shall be subject to the approval of the Monitor.  Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

7.      The Department shall not place any 18-year old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs.  Such determination shall be documented and signed by the mental health care professional.

44

8.     To the extent that an 18-year old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

9.     The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year old Inmates shall not pose an unreasonable risk to Inmates' safety. This provision does not address issues covered in a separate ongoing lawsuit *Benjamin v. Ponte*, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting, or the sanitation of the units.

De-escalation Confinement

10.    Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with the following procedures when utilizing De-escalation Confinement:

       a.     Prior to the confinement, the Department shall attempt to control the Inmate's behavior through less severe measures, time and circumstances permitting. Such measures shall be documented.

       b.     The Tour Commander of the Facility shall be notified within 30 minutes of the confinement and provided with the circumstances and facts that justify the confinement.

       c.     The Inmate shall remain in confinement for only so long as he or she continues to pose a risk of immediate physical injury to the Inmate or others. A mental health care professional shall assess the Inmate at least once every three hours to determine whether the Inmate continues to pose a risk of immediate physical injury to the Inmate or others. The period of confinement shall not exceed 24 hours, except in extraordinary circumstances which shall be documented, approved in writing by the Warden of the Facility, and approved in writing by the Corrections Health Care Provider supervising psychiatrist or supervising clinical psychologist.

Disciplinary Process Review

11.     Within 120 days of the Effective Date, the Department shall retain a qualified outside
        consultant to conduct an independent review of the Department's infraction processes
        and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are
        afforded due process; and (c) infractions are imposed only where a rule violation is
        supported by a preponderance of the credible evidence. Within 240 days of the Effective
        Date, the outside consultant shall issue a report setting forth the methodology used, the
        findings of the review, the bases for these findings, and any recommendations, which the
        Department shall implement unless the Commissioner determines that doing so would be
        unduly burdensome.

## XVII.   HOUSING PLAN FOR INMATES UNDER THE AGE OF 18

1.      The Department and the Mayor's Office of Criminal Justice shall make best efforts to
        search for and identify an alternative site not located on Rikers Island for the placement
        of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the
        Mayor's Office of Criminal Justice shall consult with the Monitor during the search
        process. The Alternative Housing Site shall be readily accessible by public transportation
        to facilitate visitation between Inmates and their family members, and shall have the
        capacity to be designed and/or modified in a manner that provides: (a) a safe and secure
        environment; (b) access to adequate recreational facilities, including sufficient outdoor
        areas; (c) access to adequate programming, including educational services; (d) the
        capacity to house Inmates in small units; and (e) a physical layout that facilitates
        implementation of the Direct Supervision Model.

2.      The Department shall include in its Compliance Reports a summary of the efforts made
        during the Reporting Period to identify an Alternative Housing Site, a description of any
        site(s) under consideration, the anticipated next steps in the search process, and, if an
        Alternative Housing Site has been identified, the timeline for completion of any
        retrofitting or other work that is necessary before the site may be used to house Inmates.[1]

3.      The Department shall make best efforts to place all Inmates under the age of 18 in an
        Alternative Housing Site, unless, after conducting a diligent search, the Department and
        the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

---

[1] Compliance Reports and Reporting Periods are referenced and defined in Paragraph 1 of
Section XIX (Reporting Requirements and Parties' Right of Access).

XVIII.        IMPLEMENTATION

1.    To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.

2.    The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

3.    The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.


XIX.   REPORTING REQUIREMENTS AND PARTIES' RIGHT OF ACCESS

1.    The Department shall submit periodic compliance reports to the Monitor and Plaintiffs' Counsel ("Compliance Reports"). The Compliance Reports shall be provided to the Monitor and Plaintiffs' Counsel within 30 days after the end of each Reporting Period during the Agreement. The first Reporting Period shall begin on the Effective Date and end four months after the Effective Date. For the first year after the Effective Date, each subsequent Reporting Period shall be a four-month period of time beginning on the day following the end of the previous Reporting Period. Thereafter, the length of the Reporting Period shall be a six-month period of time beginning on the day following the end of the previous Reporting Period.

2.    The Department may redact Staff Member names in the version of the Compliance Report provided to Plaintiffs' Counsel. The version of the Compliance Report provided to the Monitor shall include actual Staff Member names.

3.    The Compliance Reports shall not be admissible against Defendants in any proceeding other than a proceeding related to the enforcement of this Agreement.

4.    Each Compliance Report shall at a minimum include the following:

a.    A description of the actions that the Department has taken during the Reporting Period to comply with each provision of this Agreement. The Compliance Report shall also include a description of any instances during the Reporting Period when the Department was unable to comply with a provision of the Agreement that required compliance during the Reporting Period.

47

b.  The below categories of data, broken down by Facility, for each month, quarter, and year end that falls within the Reporting Period. The data shall be reported separately for: the inmate population overall (where applicable), Inmates under the age of 18, and 18-year old Inmates.

   i.  The number of Use of Force Incidents, by category (*i.e.*, Class A, Class B, or Class C).

   ii.  The average daily inmate population.

   iii.  The average total number of Staff, by rank, assigned to each Facility.

   iv.  The average total number of Staff on probationary status, by rank, assigned on a regular basis to Young Inmate Housing Area units used for Inmates under the age of 18.

   v.  The number of Inmates who were injured in a Use of Force Incident and the number of Inmates who suffered Class A Injuries in a Use of Force Incident.

   vi.  The number of inmate-on-inmate assaults and fights involving Young Inmates, the number of Young Inmates who were injured in such assaults or fights, and the number of Young Inmates who suffered Class A Injuries in such assaults or fights.

   vii.  The number of staff injuries resulting from Use of Force Incidents.

   viii.  The number of cell extractions involving use of chemical agents only and no other Use of Force.

   ix.  The number of cell extractions involving Use of Force other than chemical agents.

   x.  The number of Use of Force Incidents referred to ID for a Full ID Investigation.

   xi.  The number of Full ID Investigations completed.

c.  The following data for the Reporting Period.

   i.  The number of open Full ID Investigations as of the last day of the Reporting Period, and the dates of the underlying Use of Force Incidents.

   ii.  A list of each Use of Force Incident where, during the Reporting Period, a Facility Investigation or ID investigation concluded that a Staff Member engaged in a UOF Violation. The list also shall include and continue to track any Use of Force Incident that had been included in the previous Compliance Report pursuant to this subparagraph, but where the

48

disciplinary process for that incident was still pending in the Trials
Division at the time the previous Compliance Report was submitted.

    1.    The list shall include: the assigned Use of Force Incident
identification number; the date and location of the Use of Force
Incident; the name of the Staff Member who committed the
violation; the date the Use of Force investigation was completed;
the nature of the UOF Violation; the nature of any injuries
sustained by Inmates, Staff Members, or anyone else (if
applicable); and a brief description of any corrective, remedial,
disciplinary, or other actions recommended and/or taken against
the Staff Member who committed the UOF Violation. The list
shall also identify whether any Inmate involved in the Use of Force
Incident was an 18-year old or under the age of 18.

    2.    If the matter was referred to the Trials Division, the list shall also
include: the date the matter was referred to the Trials Division; the
charge(s) brought (if applicable); the date charges were served (if
applicable); the status of the prosecution of the matter (if
applicable); the disciplinary penalty sought at OATH (if
applicable); and the disposition of the charges and the penalty
imposed (if applicable). In the event a decision was made not to
prosecute the matter, the Compliance Report shall set forth the
basis for that decision.

iii.    A list of all Staff Members who participated in Counseling Meetings with
Facility Wardens after engaging in the Use of Force three or more times
during a six-month period, as referenced in Paragraph 2 of Section X
(Risk Management).

iv.    The number of additional video surveillance cameras installed during the
Reporting Period, and the areas covered, by Facility.

v.    A list of those cameras out of service for more than two weeks, and the
length of time that they were out of service, by Facility.

vi.    A list of each Young Inmate placed in Punitive Segregation or Isolation.
For each such Inmate, the Compliance Report shall include the period of
the Inmate's confinement in Punitive Segregation or Isolation, the reason
for the confinement (*i.e.*, the nature of the Inmate's infraction), and
whether the Inmate suffers from a mental illness.

vii.    A summary of the training provided to Staff Members pursuant to this
Agreement, including the name of each training course provided and the
number of Staff who successfully completed the course.

viii.    Any quarterly reports prepared by the UOF Auditor and referenced in
Paragraph 3(c) of Section X (Risk Management).

49

 

           ix.     A list of the names and rank of Staff Members who were assigned to work regularly in Young Inmate Housing Areas on the first day of the Reporting Period, and a list reflecting the same information on the last day of the Reporting Period.

       d.     A summary of the efforts made during the Reporting Period to identify an Alternative Housing Site for Inmates under the age of 18 as set forth in Paragraph 2 of Section XVII (Housing Plan for Inmates Under the Age of 18).

5.     At the end of each month, the Department shall provide the Monitor and Plaintiffs' Counsel with the documented results of all Preliminary Reviews conducted in the preceding month pursuant to Paragraph 7(d) of Section VII (Use of Force Investigations). (For example, the results of Preliminary Reviews concluded in January would be provided at the end of February.)

6.     The Department shall promptly notify the SDNY of any Use of Force Incident where the conduct appears to be criminal in nature.

7.     The Department shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented, including any records required by or developed pursuant to this Agreement.  The Department shall maintain and provide to the Monitor, upon request, all records or other documents relevant to verify that it has taken the actions described in the Compliance Reports (*e.g.*, policies, procedures, protocols, training materials, Use of Force Reports, use of force investigation files, etc.).  The Department shall make any such records available to the Monitor within 14 days of a request; if more time is needed, the Department shall explain when the records can be made available.

8.     If Plaintiffs' Counsel in good faith believe that Defendants may not be in compliance with any obligation under this Agreement, Plaintiffs' Counsel shall have the ability to obtain information and/or documents relevant to Plaintiffs' Counsel's particular concerns regarding Defendants' compliance.  In such circumstance, prior to requesting the information and/or documents from Defendants, Plaintiffs' Counsel shall first seek such information and/or documents from the Monitor.  In the event that the Monitor does not have the requested information and/documents, Plaintiffs' Counsel may direct the request to Defendants, who shall provide the requested information and/or documents to Plaintiffs' Counsel as soon as practicable, subject to Defendants' ability to withhold privileged information.  Defendants may object to any such request on the grounds that it is unduly burdensome.  If Plaintiffs' Counsel continue to believe that Defendants may not be in compliance with any obligation under this Agreement, Plaintiffs' representatives, including their attorneys, consultants, and agents, shall be granted such access to all Facilities, Inmates, Staff Members and contracted staff (subject to the employee's right to representation under certain circumstances as set forth in Section 75 of the New York Civil Service Law and subject to Mayor's Executive Order 16 ("MEO-16")) as is reasonably necessary to assess Plaintiffs' Counsel's particular concerns regarding Defendants' compliance with an obligation of the Agreement.  Plaintiffs' representatives will be accompanied by Department representatives during visits.

## XX.   MONITORING

Selection and Replacement

1.      The Parties agree that Steve J. Martin will serve as the Monitor and shall be responsible for assessing the Department's compliance with this Agreement.

2.      If at any time during the Agreement the Monitor is unable to serve, the Parties shall make a good faith effort to promptly agree on a replacement. In the event the Parties cannot agree on a replacement, the Parties shall recommend candidates to the Court, and the Court shall appoint a new Monitor from the names submitted by the Parties.

3.      The Monitor will be subject to the supervision and Orders of the Court.

4.      The Monitor will not, and is not intended to, replace or assume the duties of the Commissioner, any of his staff, or any other City officials.

Funding and Staff

5.      The City shall bear all reasonable fees, costs, and expenses of the Monitor, including payments to the Monitor's staff. Such fees, costs, and expenses shall be sufficient to allow the Monitor to fulfill his duties pursuant to this Agreement in a reasonable and efficient manner. The Monitor may hire or consult with such additional qualified staff as is reasonably necessary to fulfill his duties pursuant to this Agreement without duplication of effort. The Monitor shall submit an invoice for his services, and the services of his consultants and staff, to the City on a monthly basis. Those invoices will include charges for fees, costs, and expenses. Payment on such invoices will be made within 60 days of receipt. If the City objects to any fees, costs, or expenses as unreasonable, unnecessary, or duplicative, the City shall submit the invoice to the Court for a determination of reasonable fees, costs, and expenses.

6.      The Monitor and his staff shall have appropriate experience and education or training related to the subject matters covered in this Agreement. The Parties reserve the right to object for good cause to any member of the Monitor's staff.

7.      The Monitor shall enter into an appropriate confidentiality agreement. The Monitor's staff shall be subject to the same access rights and confidentiality limitations as the Monitor.

Monitor's Access to Information

8.      In order to perform his responsibilities under this Agreement, the Monitor shall have access to: (a) the buildings and grounds of all Facilities; (b) Department Staff Members, agents, and contractors; (c) Inmates; (d) non-privileged Department documents and records; and (e) all records relating to Inmate injuries sustained as a result of a Use of Force Incident. The Monitor shall have the right to conduct confidential interviews of Inmates, to speak to Staff Members outside the presence of other Staff Members, including Supervisors, and to observe training courses required by this Agreement. The

51

Monitor's ability to interview Staff Members shall be subject to the employee's right to representation under certain circumstances as set forth in Section 75 of the New York Civil Service Law and MEO-16. To the extent that the Monitor discusses an individual Use of Force Incident with an Inmate or Staff Member, the purpose of such interview shall be solely to gather information to allow the Monitor to assess compliance with the Agreement and perform his responsibilities under the Agreement, and not for the purpose of investigating the specific Use of Force Incident.

9.      Defendants shall permit Plaintiffs' Counsel, including their consultants and agents, to accompany the Monitor on site visits. Plaintiffs' Counsel shall confer with the Monitor in advance of the site visit to ensure that their participation will not interfere with the Monitor's ability to effectively conduct the visit.

10.     Upon request to the Monitor, Plaintiffs' Counsel shall have access to information and other materials related to the provisions of this Agreement that have been provided to the Monitor, provided that privileged information shall not be shared with Plaintiffs' Counsel absent Defendants' consent and provided that the provision of this information will not interfere with the Monitor's ability to effectively monitor this Agreement.

11.     Plaintiffs' Counsel shall not disclose the names or other individual-identifying information of Staff Members obtained from the Department or the Monitor pursuant to this Agreement, unless such information is necessary to enforce this Agreement or for any law enforcement purpose. This paragraph does not apply to information that Plaintiffs' Counsel obtains from any other sources.

   a.      Plaintiffs' Counsel, other than the SDNY, shall limit access and use of such information to staff directly assigned to work on this action. Such assigned staff shall not use that information for any purpose other than to enforce the explicit terms of this Agreement.

   b.      Plaintiffs' Counsel shall redact all individual-identifying information with the exception of Staff names from any pleading, motion, or other document to be filed with the Court to enforce this Agreement. Additionally, Plaintiffs' Counsel shall inform Defendants if they intend to include Staff names in any such filing. If Defendants assert a good faith basis for also withholding Staff names from public disclosure, Plaintiffs' Counsel shall either redact Staff names from the filing, or file the pleading, motion, or document under seal. In the event the filing is made under seal, the filing will be unsealed after 10 Business Days unless Defendants submit an application to keep the filing sealed, in which case the filing shall remain sealed pending the Court's resolution of that application. Where possible, only the portions of the filings that contain names of Staff Members shall be filed under seal.

   c.      This Paragraph 11 is not intended to prevent or in any way limit or impair the right of the SDNY or DOJ to disclose to any agency or department of the United States, or any division of any such agency or department, any information obtained from the Monitor or the Defendants pursuant to this Agreement for

purposes of reporting any potential violation of law or regulation, or in any proceeding relating to any potential violation of law or regulation.

    d.    The protective order entered on May 23, 2013 (Dkt. 89) remains in full force and effect. However, the SDNY and DOJ may use any materials designated as confidential pursuant to the Protective Order as is necessary to enforce this Agreement or for any law enforcement purpose.

12.    The Department shall have access to any records relating to inmate injuries sustained as a result of a Use of Force Incident that are provided to the Monitor.

13.    The Department shall encourage all Staff Members to cooperate fully with the Monitor.

Monitoring Plan

14.    Within 30 days of the Effective Date, the Monitor shall provide the Parties with a draft monitoring plan that sets forth the methodology the Monitor intends to use to assess the Department's compliance with the terms of this Agreement ("Monitoring Plan"). The Monitoring Plan shall be provided to the Parties in draft form for comment at least 30 days prior to its issuance. The Monitor shall consider the Parties' comments, and make any changes he or she deems appropriate, before issuing a final Monitoring Plan. The Monitoring Plan may be revised by the Monitor, as needed and after consultation with the Parties, in order to facilitate the Monitor's assessment of the Department's compliance with the terms of the Agreement. Nothing in this Paragraph or in the Monitoring Plan shall in any way limit the scope of the Monitor's access to information, documents, and individuals as otherwise set forth herein.

15.    The Monitor's methodology shall include, but is not limited to, the following:

    a.    Periodic visits and tours of the Facilities.

    b.    Interviews of Inmates, Staff Members, and other persons.

    c.    Periodic meetings with stakeholders, including advocacy groups and employee representatives.

    d.    Development of protocols for sampling and reviewing records relating to Use of Force Incidents to evaluate compliance with the terms of this Agreement, including but not limited to compliance with the New Use of Force Directive, provisions of this Agreement relating to the reporting and investigation of Use of Force Incidents, and provisions of this Agreement relating to staff discipline and accountability.

    e.    Development of protocols for sampling and reviewing records relating to matters referred to the Trials Division as a result of a Use of Force investigation.

    f.    The review of all policies, procedures, protocols, and training curriculum materials adopted by the Department pursuant to this Agreement.

53

g.      Attending a number of the Staff training programs identified in this Agreement to evaluate the programs, and reviewing records reflecting attendance at and completion of such trainings.

h.      The review of the installation, functioning, and maintenance of the wall-mounted, stationary video surveillance cameras required by this Agreement.

i.      The review of complaints from Inmates or their family members, attorneys, or other representatives relating to the subject matters of this Agreement.

j.      Analyses of data relating to the subject matters of this Agreement available from the Department's management and information systems, including any data available on IRS, current legacy databases and reporting systems, and CMS (once it becomes operational).

k.      The review of other Department reports and other documents that are pertinent to monitoring compliance with this Agreement.

Monitor's Report

16.     For each Reporting Period, the Monitor shall file with the Court and provide the Parties a report describing the efforts the Department has taken to implement the requirements of this Agreement and evaluating the extent to which the Department has complied with each substantive provision of this Agreement (the "Monitor Report").

17.     The Monitor shall issue a Monitor Report within 90 days following each Reporting Period. The Monitor Reports shall be provided to the Parties in draft form for comment at least 30 days prior to their issuance, and the Parties shall provide the Monitor with their comments, if any, within 21 days after receipt. The Monitor shall consider the Parties' comments, and make any changes he or she deems appropriate, before issuing the final report. The Monitor Reports shall be written with due regard for the privacy interests of individual Inmates and Staff Members; federal, state and local laws regarding the privacy of such information; and the interest of the Department in protecting against the disclosure of non-public or privileged information. Consistent with such interests and laws, the Monitor shall redact individual-identifying information from Monitor Reports and any documents submitted with those reports, and shall give due consideration to the Department's requests to redact any other information. To the extent the Monitor declines to make redactions requested by the Department, the Monitor Report and any documents submitted with those reports shall be submitted to the Court under seal for the Court to consider the Department's proposed redactions before making the Monitor Report public.

18.     In each Monitor Report, the Monitor shall evaluate the status of compliance with each substantive provision of the Agreement using the following standards:  (a) Substantial Compliance,[2] (b) Partial Compliance,[3] and (c) Non-compliance.[4]  To the extent a

_____

[2] "Substantial Compliance" shall mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.

54

provision includes a deadline that is subsequent to the end of the Reporting Period, the Monitor Report shall not assess the status of compliance with that provision and will instead report on the City's progress towards implementing the provision. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-compliance shall not constitute Substantial Compliance. In order to assess compliance, the Monitor shall follow the methodologies and steps set forth in the Monitoring Plan. The Monitor shall be responsible for independently verifying any representations from the Department regarding its progress toward compliance, including but not limited to any representations included in Compliance Reports, and examining any supporting documentation where applicable. Each Monitor Report shall describe in detail the steps taken by the Monitor and/or the Monitor's staff to assess compliance with each substantive provision of the Agreement, and the factual basis for the Monitor's findings concerning the extent to which the Department has complied with each provision.

19.   The Monitor Report may include recommendations from the Monitor for ways to address areas of Partial Compliance or Non-compliance, such as recommendations to modify policies, procedures, protocols, staffing, and training.

20.   The Monitor Reports filed with the Court shall be public documents. In the event that the Department requests that redactions be made to parts of the filed Monitor Report or any documents attached to the Monitor Report, such material shall not be made public until the Court resolves those redaction requests, as set forth in Paragraph 17 of this section.

21.   The Monitor Report shall not be admissible against Defendants in any proceeding other than a proceeding relating to the enforcement of this Agreement.

Other Monitoring Provisions

22.   The Monitor shall be permitted to initiate and receive *ex parte* communications with all Parties.

23.   No Party, or any employee or agent of any Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations.

24.   The Monitor may provide technical assistance or perform consultative tasks in connection with the implementation of the terms of this Agreement as requested by the Department.

25.   Upon the receipt of written questions from Plaintiffs' Counsel or the Department concerning the Monitor's activities in assessing compliance with this Agreement and/or the Department's compliance with this Agreement, the Monitor shall provide Plaintiffs'

---

[3] "Partial Compliance" shall mean that the Department has achieved compliance on some components of the relevant provision of this Agreement, but significant work remains.
[4] "Non-compliance" shall mean that the Department has not met most or all of the components of the relevant provision of this Agreement.

Counsel or the Department a written response within 30 days, or, if the question is time-sensitive, within a shorter reasonable period of time. The Monitor may decline to answer the question or defer answering the question until submission of the next Monitor Report.

26.    With respect to provisions of this Agreement that require the Monitor's approval, the Monitor's approval shall not be unreasonably withheld. Mere disagreement as to how best to achieve compliance with the terms of the Agreement is not enough to withhold approval; such approval may only be withheld when the Monitor reasonably believes that the Department's proposal is not consistent with the terms of the Agreement or the purpose of the relevant provision(s) and the requirements set forth in such provision(s). The Monitor shall indicate in writing whether the Monitor approves the Department's proposal within 30 days of receiving the Department's proposal.

27.    Except as required or authorized by the terms of this Agreement or by the Parties acting together, the Monitor shall not make any public statements, including statements to the press, with regard to the status of the Department's compliance with this Agreement or any act or omission of the Department or the Department's agents, representatives, or employees. Nor shall the Monitor disclose any non-public information provided to the Monitor pursuant to this Agreement. Any press statement made by the Monitor regarding his employment must first be approved in writing by all Parties.

28.    The Monitor shall not testify in any other litigation or proceeding brought on behalf of or against the Department with regard to any act or omission of the Department or any of the Department's agents, representatives, or employees related to this Agreement, nor testify regarding any matter or subject that he may have learned of as a result of his performance under this Agreement, nor serve as a non-testifying expert regarding any matter or subject that he may have learned as a result of his performance under this Agreement, without the Court's authorization. If the Monitor is subpoenaed or ordered to appear in any other litigation or proceeding, the Monitor shall notify the Court and the Parties immediately.

29.    Unless such conflict is waived by all Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the Department or the Department's officers, agents, or employees.

30.    The Monitor is an agent of the Court and is not a federal, State, or local agency or an agent thereof. Accordingly, the records maintained by the Monitor shall not be deemed public records subject to public inspection, except that nothing in this provision shall be construed as prohibiting public access to the Monitor Reports or any other documents the Monitor files with the Court in accordance with Paragraph 16 of this Section.

## XXI.   COMPLIANCE, TERMINATION, AND CONSTRUCTION

1.      This Court shall have continuing jurisdiction over this action to ensure compliance with
        the terms of this Agreement until the Agreement terminates. The Parties consent to the
        jurisdiction of this Court over any proceedings seeking to enforce the terms of this
        Agreement.

2.      If Plaintiffs' Counsel believe Defendants are not in compliance with any obligation under
        this Agreement, Plaintiffs' Counsel shall, before seeking judicial action, give written
        notice of the failure to Defendants and the Monitor. Within 30 days of receipt of such
        notice, Defendants shall respond in writing to Plaintiffs' Counsel and the Monitor setting
        forth their position with respect to whether they are in compliance with the relevant terms
        of the Agreement and what actions, if any, they propose to take to address the alleged
        lack of compliance. The Parties shall engage in good faith negotiations to attempt to
        resolve the dispute. If, within 45 days of written notice from Plaintiffs' Counsel (or a
        longer period as agreed upon by the Parties), the Parties have been unable to resolve the
        dispute, the Parties may seek relief from the Court. The Parties commit to work in good
        faith to avoid enforcement actions.

3.      In the case of an emergency related to the provisions in this Agreement posing an
        immediate threat to the safety or well-being of Inmates, Plaintiffs' Counsel may seek
        judicial action without regard to the notice and negotiation requirements set forth in
        Paragraph 2 above.

4.      Plaintiffs' Counsel agree not to seek judicial relief in this action for isolated or *de
        minimis* violations of this Agreement.

5.      This Agreement shall terminate only upon a finding by the Court that Defendants have
        achieved Substantial Compliance with the provisions of this Agreement and have
        maintained such Substantial Compliance for a period of twenty-four months. The burden
        shall be on Defendants to demonstrate such compliance by a preponderance of the
        evidence.

6.      Defendants shall implement all reasonable measures to avoid or minimize any failure to
        timely carry out any requirements of this Agreement. If any unforeseen circumstances
        occur that cause such a failure, Defendants shall notify Plaintiffs' Counsel and the
        Monitor in writing within 20 days after Defendants become aware of the unforeseen
        circumstances and their impact on Defendants' ability to comply with a requirement of
        this Agreement. The notice shall describe the cause of the failure to perform and the
        measures taken to prevent or minimize the failure. With respect to any deadlines in
        Sections IV through XVII, if the unforeseen circumstances cause a delay of 14 days or
        fewer, the deadlines shall automatically be extended for the period of the delay. If the
        unforeseen circumstances cause a delay of greater than 14 days, the Parties and the
        Monitor shall meet in good faith to agree upon a reasonable extension of time.

7.    The City shall not be liable for any failure to perform its obligations in connection with any action described in this Agreement if such failure results from an act of God, riot, war, civil unrest, flood, earthquake, fire, or strike.

8.    This Agreement shall constitute the entire integrated Agreement of the Parties.  No prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in this litigation or in any other proceeding.

9.    Paragraph and section headings do not and are not intended to have any effect on the construction of this Agreement.

10.    This Agreement shall be applicable to, and binding upon, all Parties, and their officers, agents, employees, assigns, and successors in office.

11.    Failure by any Party to enforce this entire Agreement or any provision thereof with respect to any deadline or other provision herein shall not be construed as a waiver of the Party's right to enforce other deadlines or provisions of this Agreement.

12.    If any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

13.    The Parties agree to defend any action challenging any provision of this Agreement.  The Parties shall notify each other of any court challenge to this Agreement.  In the event any provision of this Agreement is challenged in any local or state court, removal to federal court shall be sought, to the extent that removal is available under applicable law.

14.    The Parties agree not to assert any challenge to the validity, lawfulness, or enforceability of any provision of this Agreement.

15.    This Agreement may be executed in counterparts, including by signatures delivered by facsimile or scanned signatures.

## XXII.  STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

1.    The Parties stipulate and agree, and the Court finds, that this Agreement complies in all respects with the provisions of 18 U.S.C. § 3626(a).  The Parties further stipulate and agree, and the Court finds, that the prospective relief in this Agreement is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the United States and the Plaintiff Class, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.  Accordingly, the Parties agree and represent that the Agreement complies with the provisions of 18 U.S.C. § 3626(a).  Except to enforce

58

this Agreement, this section shall not be admissible against Defendants in any court for any purpose.

### XXIII.   RELEASE BY THE PLAINTIFF CLASS

1.   As of the Effective Date, all members of the Plaintiff Class hereby release and waive any and all claims for, and any and all rights to pursue, initiate, prosecute, or commence any and all causes of action for, class-wide injunctive and declaratory relief based on the claims that were asserted in the Second Amended Complaint against Defendants and their predecessors, successors, assignees, together with past, present, and future officials, employees, representatives, and agents of the Department.  Provided, however, that this release does not prevent an individual member of the Plaintiff Class from filing or prosecuting a claim or action on his/her own behalf seeking equitable relief tailored to the specific circumstances of that individual or prevent Plaintiff Class's Counsel from enforcing the terms of this Agreement. This release shall remain in effect until this Agreement is terminated.

2.   Nothing in this Agreement resolves or bars any claims for damages or rights of action for damages by or on behalf of any individual(s).

3.   Any release of individual claims or rights of action for monetary damages in connection with any settlement of any Named Plaintiff's claims shall be addressed in separately executed agreement(s).

### XXIV.   ATTORNEYS' FEES, COSTS, AND DISBURSEMENTS

1.   In full satisfaction of any and all claims for attorneys' fees, costs, and disbursements incurred in this action by the Named Plaintiffs and/or Plaintiff Class's Counsel in prosecuting claims for injunctive and declaratory relief on behalf of the Plaintiff Class up to and including the Effective Date, the City shall pay $6,500,000 in attorney time and expenses to Plaintiff Class's Counsel.

59

## XXV. NOTIFICATIONS

1.  Notices and other written communications pursuant to this Agreement shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery, express courier, or email followed by postage prepaid mail, and shall be addressed as follows:

FOR THE UNITED STATES:

Jeffrey K. Powell, Esq.
Lara Eshkenazi, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007
*Telephone*: (212) 637-2706/2758
*Email*: Jeffrey.Powell@usdoj.gov
       Lara.Eshkenazi@usdoj.gov

FOR THE PLAINTIFF CLASS:

Jonathan S. Chasan, Esq.
Mary Lynne Werlwas, Esq.
*Legal Aid Society*
199 Water Street, 3rd Floor
New York, New York 10038
*Telephone*: (212) 577-3530
*Email*: jchasan@legal-aid.org
      mlwerlwas@legal-aid.org

Jonathan S. Abady, Esq.
*Emery Celli Brinckerhoff & Abady LLP*
600 Fifth Avenue, 10th Floor
New York, NY 10020
*Telephone*: (212) 763-5000
*Email*: jabady@ecbalaw.com

FOR DEFENDANTS:

Celeste Koeleveld, Esq.
Arthur G. Larkin, Esq.
Kimberly Joyce, Esq.
*Corporation Counsel of the*
   *City of New York*
100 Church Street
New York, New York 10007
*Telephone*: (212) 356-2300
*Email*: ckoeleve@law.nyc.gov
      alarkin@law.nyc.gov
      kjoyce@law.nyc.gov

Heidi Grossman, Esq.
Brenda Cooke, Esq.
General Counsel
*New York City Department of Correction*
75-20 Astoria Blvd.
East Elmhurst, NY 11370
*Telephone*: (718) 546-0955
*Email*: Heidi.Grossman@doc.nyc.gov
      Brenda.Cooke@doc.nyc.gov

2.  All counsel shall be informed promptly in the event that any substitution is to be made in counsel to receive communications under this Agreement, and the name and contact information for substitute counsel shall be promptly provided.

FOR THE UNITED STATES:

PREET BHARARA
United States Attorney for the
Southern District of New York

By: *Jeffrey Powell*
_____
JEFFREY K. POWELL
EMILY E. DAUGHTRY
LARA K. ESHKENAZI
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone: (212) 637-2706/2777/2758
Email: Jeffrey.Powell@usdoj.gov
        Emily.Daughtry@usdoj.gov
        Lara.Eshkenazi@usdoj.gov

FOR PLAINTIFF CLASS:

ROPES & GRAY LLP

By: _____
    WILLIAM I. SUSSMAN
    CHRISTOPHER P. CONNIFF
    ANNA E. FRIEDBERG
    CHRISTINA G. BUCCI
    1211 Avenue of the Americas
    New York, NY 10036
    Telephone: (212) 569-9000
    Email:    William.Sussman@ropesgray.com
            Christopher.Conniff@ropesgray.com
            Anna.Friedberg@ropesgray.com
            Christina.Bucci@ropesgray.com

THE LEGAL AID SOCIETY

By: _____
    JONATHAN S. CHASAN
    MARY LYNNE WERLWAS
    199 Water Street, 6th Floor
    New York, New York 10038
    Telephone: (212) 577-3530
    Email:    jchasan@legal-aid.org
            mlwerlwas@legal-aid.org

EMERY CELLI BRINCKERHOFF & ABADY LLP

By: _____
    JONATHAN S. ABADY
    600 Fifth Avenue, 10th Floor
    New York, NY 10020
    Telephone: (212) 763-5000
    Email:    jabady@ecbalaw.com

FOR DEFENDANTS CITY OF NEW YORK AND DEPARTMENT OF CORRECTION:

ZACHARY W. CARTER
Corporation Counsel for the City of New York

By:  _____
     CELESTE KOELEVELD
     ARTHUR G. LARKIN
     KIMBERLY JOYCE
     100 Church Street
     New York, New York  10007
     Telephone: (212) 356-2300
     Email: ckoeleve@law.nyc.gov
            alarkin@law.nyc.gov
            kjoyce@law.nyc.gov


SO ORDERED this 21st day of October_____, 2015

_____
LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

63