EXHIBIT 6

{00682706-1}

*UFA*, 3 OCB2d 16 (BCB 2010)

(IP) (Docket No. BCB-2652-07).

*Summary of Decision:* The Union alleged that the assignment of firefighters to respond to an emergency condition following a steam pipe explosion in Manhattan by hosing down buildings that were sprayed with debris created a practical impact on the safety of the firefighters, thereby giving rise to a duty to bargain. The Union further alleged that the FDNY violated NYCCBL § 12-306(a)(1), (4), and (5) because it interfered with the statutory rights of firefighters, was a failure to bargain over the job duties of firefighters and a violation of the *status quo*. The City alleged that this petition should be deferred to arbitration; that the FDNY acted within its managerial prerogative by requiring these firefighters to work at the location; and that the Union failed to demonstrate a practical impact with regard to this work assignment. The Board found that the assignment of firefighters to perform tasks at issue constituted a proper exercise of the FDNY's managerial prerogative, but that a practical impact resulted. Therefore, this Board ordered the parties to bargain over the amelioration of that practical impact on safety, and dismissed all other claims. *(Official decision follows.)*

_____

OFFICE OF COLLECTIVE BARGAINING
BOARD OF COLLECTIVE BARGAINING

In the Matter of the Improper Practice Petition

-between-

UNIFORMED FIREFIGHTERS ASSOCIATION,

*Petitioner,*

-and-

THE CITY OF NEW YORK and THE
NEW YORK CITY FIRE DEPARTMENT,

*Respondents.*

_____

<u>DECISION AND ORDER</u>

On September 24, 2007, the Uniformed Firefighters Association ("UFA" or "Union") filed

a combined verified improper practice and scope of bargaining petition against the City of New York

("City") and the New York City Fire Department ("FDNY") alleging that the FDNY violated New

York City Collective Bargaining Law (City of New York Administrative Code, Title 12, Chapter 3)

("NYCCBL") § 12-306(a)(1), (4), and (5).  The Union claims that the FDNY's assignment of

firefighters to perform certain duties at the site of an emergency interfered these firefighters rights

under NYCCBL § 12-305, violated its duty to bargain in good faith, and unilaterally changed the

*status quo*.  The Union also asserts that the FDNY failed to alleviate the potential hazardous

conditions present at this scene to firefighters and created a practical impact on safety.

The City argues that the petition in the instant matter should be deferred to arbitration

because the Union's claims require interpretation of the parties' collective bargaining agreement

("Agreement").  The City asserts that the FDNY acted within its managerial prerogative since it is

authorized to assign firefighters to various duties during an emergency condition.  Also, the City

argues that the Union failed to demonstrate a practical impact with regard to this work assignment,

and that, assuming *arguendo*, a practical impact on safety is found to have occurred, the City should

be allowed to unilaterally remedy this impact prior to any finding of a violation.

Based upon the extensive record herein, we find that the assignment of firefighters was

within the City's discretion and did not implicate any duty to bargain.  We further find, however, that

the FDNY's failure to uniformly apply and effectively implement the applicable safety regulations

and the orders issued by FDNY's Chief of Department resulted in a practical impact on safety.

Accordingly, we grant, in part, the scope of bargaining portion of UFA's petition and order the

parties to bargain to alleviate the practical impact on safety issues identified herein.  However,

inasmuch as the duty to bargain arises only upon this Board's finding of a practical impact, the

Union's refusal to bargain claim is premature.  Instead, the parties must be afforded an opportunity

to alleviate said impact through collective bargaining.   Therefore, we dismiss as premature the
Union's claim that the FDNY failed to bargain in good faith.


## BACKGROUND

The Trial Examiner held six days of hearing and found that the totality of the record
established the relevant facts to be as follows:

### Applicable Regulations Governing Events Involving Potential Contaminants

On April 11, 2005 the City of New York enacted Executive Order No. 61, entitled Citywide
Incident Management System ("CIMS"), which creates "a standardized incident management system
that complies with federal incident management requirements," establishes "the City's protocol for
responding to and recovering from emergencies or incidents and managing events," and ensures "a
coordinated response among City agencies." (Ans., Ex. 5).   CIMS is coordinated by the New York
City Office of Emergency Management ("OEM").   Logistically, depending upon the specific incident
or emergency, a particular agency is designated as the primary agency based upon the area of
expertise most clearly related to the incident, which authorizes that agency to direct operations and
give tactical direction to the support agencies.

Based upon CIMS's Organizational Chart, the FDNY has "Core Competencies" including
"CBRN [chemical, biological, radiological, and nuclear] and Haz-Mat [hazardous materials] Life
Safety and Mass Decontamination," and the FDNY and the New York City Police Department
("NYPD") are the primary agencies when an incident involving chemical and/or hazardous materials
occurs.   (Ans., Ex. 6).   These two agencies were given these Core Competencies because their
employees receive training regarding hazardous materials and are equipped with the necessary

equipment for managing an incident involving these contaminants. (*Id.*). According the CIMS

Responsibility Chart, in an incident involving hazardous materials, these two agencies have "to make

strategic and tactical decisions regarding the mitigation of the incident, define the Incident

Objectives and determine what resources are required for the incident." (*Id.*). Specifically, the

FDNY is responsible for addressing immediate life safety hazards to the public, searching for and

rescuing injured, and providing pre-hospital emergency medical care and transport.

One type of hazardous material contemplated by the FDNY and covered by CIMS is asbestos

contamination.[1]  The FDNY issued FDNY Regulation DCN: 3.02.18, dated July 20, 1990, entitled

"Asbestos Response Policy," detailing its fire tactics and response procedures concerning hazardous

materials ("FDNY Asbestos Policy"). (Ans., Ex. 7). The stated objective of the FDNY Asbestos

Policy is to "create an awareness of the hazards associated with asbestos, and to modify standard

firefighting practices at incidents of potential asbestos exposure." (*Id.*). The FDNY Asbestos Policy

further provides, in pertinent part:

> **OBJECTIVES**
> To create an awareness of the hazards associated with asbestos, and
> to modify standard firefighting practices at incidents of potential
> asbestos exposure.
>
> **HEALTH HAZARD**
> Asbestos in its natural state or "Asbestos Containing Material"
> (ACM) which when intact does not present a health hazard. The
> hazard is created when the material becomes friable and is allowed
> into the atmosphere and is inhaled or ingested. This occurs when the
> material is distributed during fire or overhaul operations, or flakes off
> from age or deterioration of the protective covering.

---

[1]  Asbestos is a naturally occurring silicate mineral in fiber form and is widely utilized in a
variety of commercial and industrial products.

**ASBESTOS LOCATIONS**

3.5     All asbestos locations cannot be documented.  If asbestos is suspected, precautions outlined in this procedure must be taken.

**OPERATIONS**

4.1     General Tactics

4.1.1   When it is determined that operations involve suspected asbestos contamination, transmit radio signal 1080, specifying asbestos release.

4.1.2   Minimize commitment of forces as conditions permit.  This will expose fewer members and reduce the amount of decontamination necessary.

4.1.3   Strictly enforce mask policy when operating in contaminated area to reduce exposure.

4.1.4   Wet ACM [Asbestos Containing Material] by using a fog or spray stream to prevent fibers from becoming airborne.

4.1.6   Once the ACM is wet, the major concern is cross-contamination caused by tracking asbestos from one area to another on the soles of boots or shoes, or by moving vehicles or equipment.

4.1.7   Isolate members suspected or confirmed to be contaminated to prevent cross-contamination of apparatus or other members. . . . SCBA [Self-Contained Breathing Apparatus] must be used until decon procedures are initiated or member has been washed down.

                                *     *     *

4.3     Exterior Tactics

4.3.1   The health hazard of airborne asbestos fibers at exterior operations is minimized due to dispersal to the atmosphere and the lack on containment.

**DECONTAMINATION**

5.1     If on-site testing is found to be negative, no further action is required and normal operations may resume.

5.2     If on-site testing is found to be positive, begin decontamination immediately to expedite the return of units to service.

**TEMPORARY  FIREFIGHTING  CLOTHING  AND EQUIPMENT**

8.1     Temporary issuance of firefighting clothing is the responsibility of SOC. . . .

> 8.2   The Incident Commander must arrange for replacement of
> contaminated apparatus and equipment to restore units to
> service as soon as possible.

(*Id.*).

## Events Following The Steam Pipe Explosion

Just before 5:56 p.m. on July 18, 2007, a portion of a steam pipe below Lexington Avenue, near Grand Central Terminal exploded. This caused the street above the explosion to collapse, exposing broken and ruptured pipes, spraying debris over the surrounding buildings and area, and causing bodily injury to persons in the vicinity ("Steam Pipe Incident"). Because the FDNY serves as the first responder to fire, public safety and medical emergencies, approximately 250 members of the FDNY responded to the Steam Pipe Incident. Upon arrival, the firefighters performed rescue operations and helped secure the area. In order to limit exposure to the public and to minimize activity to lower the risk of further disturbance of the asbestos fibers that could be on the ground and on buildings, FDNY created a "frozen zone," an area in which there is limited activity and only essential personnel are present,. (Tr. 491-492).[2]

The FDNY's then-Chief of the Department, Salvatore Cassano[3] testified that, as soon as the Steam Pipe Incident occurred, he left his office at the FDNY Headquarters and responded to the site in Midtown Manhattan. This was a six alarm incident and thus, approximately 24 engine companies, approximately 14 ladder companies, the FDNY's Chief of Operations, the FDNY's Chief of Safety, and the Citywide Command Chief, all responded to this site. As per CIMS, a command meeting

---

[2]   "Tr." refers to citations from the hearing transcript.

[3]   Effective January 1, 2010, Chief Salvatore Cassano was appointed as the new Commissioner for the FDNY. In this decision, we refer to him as Chief Cassano as this was the title he held during the relevant time period.

involving OEM, the NYPD, the FDNY, and the New York City Department of Environmental

Protection ("DEP") was convened.  Based upon the FDNY Asbestos Policy, the initial information

received from the scene, and the professional assessments by the respective heads of the agencies

involved, an incident action plan laying out what each agency is responsible for doing within a

specific period of time was established.

As part of this plan, Chief Cassano decided that, after the steam pipe had been shut off,

search and rescue operations had been completed, a frozen zone had been established, and structural

evacuations had been performed, the FDNY would spray down the surrounding buildings that had

been covered in debris.[4]  He testified that the FDNY was the agency best suited to perform these

duties, as it had the equipment and training necessary to do the work.  Furthermore, as part of the

incident action plan, Chief Cassano ordered that all firefighters have proper respiratory protection

and that the firefighters and their rigs be decontaminated when they left the site of the Steam Pipe

Incident.  Also as part of this plan, FDNY personnel were order to wear Tyvek suits.[5]  According to

Chief Cassano, because these suits were disposable, it would be much easier to use and dispose of

them as opposed to decontaminating the firefighters' bunker gear.[6]

---

[4]  On cross-examination, Chief Cassano acknowledged that, after July 19, 2007, the FDNY no longer had to suppress any fires, conduct any search and rescue operations, perform structural evacuations, or provide any pre-hospital emergency medical care.

[5]  Tyvek suits are vinyl-like, plastic composite suits, provide an impermeable barrier to microscopic particles and contaminants, and are a type of protective jumpsuit covering the entire body, except for the face area.  In an incident where asbestos may be present, these suits are utilized in order to prevent this contaminant from soiling the clothes of the workers, which, as discussed in greater detail below, could then pose a serious health.

[6]  In addition, Chief Cassano added that Tyvek suits reduce the cost of decontamination and provide protection from contaminants that bunker gear does not.

Also at the scene immediately after the initial explosion was Michael Gilsenan,[7] who was Assistant Commissioner for DEP's Bureau of Environmental Compliance.[8]  In accordance with CIMS, Assistant Commissioner Gilsenan assessed the situation by speaking with Consolidated Edison Company of New York, Inc. ("Con Ed") to determine what caused the Steam Pipe Incident and what materials were involved.  Using maps depicting all of the locations where steam pipes are covered in asbestos, DEP and Con Ed confirmed that there was asbestos on the section of pipe that exploded.  Thus, DEP's response team members were ordered to collect bulk samples for testing.  Based upon the instant record, the first bulk sample testing occurred at 8:35 p.m. on the day of the Steam Pipe Incident, while the first air sample testing was taken at 9:30 p.m. on that day.

Consistent with Chief Cassano's testimony, Assistant Commissioner Gilsenan testified that, after the establishment of the incident action plan and the implementation of a frozen zone, firefighters were ordered to hose down buildings on Third Avenue, one block away from the explosion site.  Reopening Third Avenue to traffic was a priority and because time was of the essence, the mobilization of private contractors with access to equipment, such as hoses, protective suits and proper respiratory masks, was not feasible.  Therefore, the FDNY assigned its firefighters to clean up this area.  Further, at that time, the results of bulk sampling were coming back negative for asbestos, so DEP, in conjunction with the FDNY, made the determination that washing down the

---

[7] Effective June 19, 2009, Michael Gilsenan was promoted to Acting Deputy Commissioner of DEP.  However, since he held the position of Assistant Commissioner during the relevant facts involved in the instant matter, we refer to him as Assistant Commissioner Gilsenan.

[8] DEP's Bureau of Environmental Compliance "is responsible for . . . the asbestos rules and regulations of the City of New York, and . . . also ha[s] an emergency response team, [and] a hazmat team known as the Division of Emergency Response and Technical Assistance."  (Tr. 539).

buildings would suffice.[9]  According to Assistant Commissioner Gilsenan, firefighters were not exposed to asbestos during their washing down of the buildings because they did not perform this tasks at the site of the explosion, which was being treated as an asbestos site.[10]

The first firefighting units arrived at the scene of the Steam Pipe Incident immediately after the explosion at 5:57 p.m.  Engine Company 26 responded to this site at 5:58 p.m.  According to Firefighter Steven Magnus, a member of Engine Company 26, they arrived at the scene after other companies had already arrived.  Firefighter Magnus testified that other companies had already established a frozen zone, and he saw members from rescue and truck companies searching the storefronts and the building in the immediate vicinity of the steam explosion.  He further testified that Engine Company 26 was ordered "to stand fast" because this scene was a hazardous situation. (Tr. 73).  Around 8:30 p.m., after the steam pipe had been shut off, Firefighter Magnus was ordered to search a building located near the site of the Steam Pipe Incident.  Firefighter Magnus testified that this search took about two hours.  He further testified that, between waiting in the staging area to be assigned an operation and walking around in the vicinity of the Steam Pipe Explosion, the firefighters in Engine Company 26 accumulated a significant amount of dirt and debris on their boots and helmets.

---

[9]  The record before this Board does not establish any indication how much time generally is required to perform bulk and/or air sampling tests in order to ascertain whether the sample contained asbestos or how much time it took for DEP to perform these sampling tests and communicate their results to the FDNY at the site of the Steam Pipe Incident.

[10]  As discussed below in greater detail, DEP sampling tests results indicated that only two positive results out of 79 sampling tests indicated the presence of asbestos containing materials, or ACM, which is the accepted, industry-wide standard for the presence of hazardous levels of asbestos. One of the positive sampling test results was taken adjacent to the crater where the explosion occurred, and the other was taken on East 42nd Street between Lexington and 3rd Avenues.

After Engine Company 26 returned to their quarters at around 11:00 p.m., they informed their superior officers that they were covered in dirt and mud and asked whether they should have been decontaminated.  Later, at 3:00 a.m., the firefighters on duty at Engine Company 26 were recalled to the site of the Steam Pipe Incident to have their rig decontaminated.  Upon arriving there, they were directed to park their rig over "some plastic tarps on the ground" and non-FDNY workers, who were wearing Tyvek suits, proceeded to wash off the rig.  (Tr. 76).  Firefighter Magnus testified that he was in full bunker gear during his initial trip to the site of the Steam Pipe Incident, but he could not recall if he was wearing that same gear when his company returned the second time.  However, he was certain that the bunker gear that they were wearing was, at some later point in time, "bagged up" and "sent out to get decontaminated."  (Tr. 77).

According to Firefighter Magnus, on July 20, 2007 at 6:00 a.m., his company was called to the site a third time.  By that time, "we had heard that there might be asbestos in the air and that there was a major cleanup going on."  (Tr. 79).  According to Firefighter Magnus,  one of the senior guys in Engine Company 26 stated that they should "put on our face pieces with our filters on it," so as not to be exposed to any contaminants at this site.  (*Id.*).  Upon arriving at this scene, an FDNY official approached Firefighter Magnus and told him that "it was overkill" to use the face piece and, instead, they should use these other breathing masks that were being distributed, which only covered their nose and mouth.[11]  (Tr. 80).  At that time, the steam pipe had been shut down, but dirt and mud remained all over the buildings and the streets.

Firefighter Magnus and his company, wearing their complete bunker gear and face pieces,

---

[11]  It is undisputed that the "face piece" covers ones entire face and contain specialized filters that screw into the mask, while the mask that was being handed out the next day at the scene of the explosion was made of a cloth-like substance, and covered only ones nose and mouth.  (Tr. 80).

were ordered to stretch a hose line to wash away the dirt and dust that had accumulated on a building

on Lexington Avenue.  Firefighter Magnus "had the nozzle position," and the use of the water from

the hose washed off all the dirt and mud that was "caked" onto the building.  (Tr. 83).  Due to the

solid stream of water striking the building and spraying back onto these firefighters, along with the

close proximity to the building to which the firefighters were standing, they became "soaking wet,"

and had dirt on their helmets, jackets, pants and boots.  (Tr. 85).  After completing this operation,

Engine Company 26 was ordered to bring their rig back to their quarters, where they would then

perform decontamination of their rig in front of their quarters.

       At 6:11 p.m. on July, 20, 2007, Engine Company 74 relieved another engine company at the

scene of the Steam Pipe Incident.  According to Firefighter Michael Lynch,[12] a member of Engine

Company 74, when he arrived at this scene he observed a couple inches of sediment and colored dust

on the ground and buildings.  Firefighter Lynch began feeding water from the hydrant through a hose

line that had been left there by the previous engine company into their tower ladder company.  Water

was being sprayed onto the buildings via a "fog nozzle" being operated from a bucket on the tower

ladder.  (Tr. 130).   Firefighter Lynch further testified that two firefighters from Engine Company

74 were in the "bucket."  (Tr. 132).  He further observed while he was monitoring the pump panel

on his rig, the water being sprayed onto the buildings was "running down the facade of the building,

onto the sidewalk."  (Tr. 134).  Firefighter Lynch characterized the scene of the Steam Pipe Incident

as solely a cleanuup operation at that point.

---

    [12]  Prior to joining the FDNY in 1997, Firefighter Lynch worked for an excavation company
that contracted with the City of New York to excavate, repair and replace water mains and mainline
sewers, and worked for DEP as Construction Laborer.  Thus he had prior asbestos-related experience
in dealing with broken steam pipes and water mains

Firefighter Lynch further testified that, while at the scene, he wore his regular work-duty uniform, while others in his company were "wearing bunker pants with their work-duty shirt." (Tr. 143). He stated that but he did not observe any firefighter in a Tyvek suit. Approximately three hours later, after their work was completed, Engine Company 74 returned to its quarters. He further testified that "the debris from this site, which had accumulated on the shoes of the firefighters, was tracked back onto the rig." (Tr. 148). It is undisputed that Engine Company 74 was not ordered to perform any decontamination work on their rig or their gear and went back in service.

Firefighter Breen, also a member of Engine Company 74, testified that he was present at the scene of the Steam Pipe Incident on July 20, 2007. Attired in his bunker gear, but with no protective respiratory gear, he was one of the firefighters to attach the hose line to Engine Company 74's rig. With this hose line, he worked the "back-up" position, and the nozzle man sprayed down the streets next to the Hyatt Hotel, which was immediately adjacent to the site of the Steam Pipe Incident. (Tr. 173). Firefighter Breen hosed down the street directing the "debris on the ground . . . "towards the curb so it would go down the sewer." (Tr. 177). When he was asked whether the debris and the water spray back from the hose got "onto [his] bunker gear," Firefighter Breen responded that, because there was a lot of debris on the ground, it got on his boots. (Id.). After three to four hours at the site of the Steam Pipe Incident, Engine Company 74 returned to the firehouse and, to his knowledge, were never ordered to perform "d-con" on either their rig or their gear. (Tr. 181).

In the late evening of July 23, 2009, Firefighter Christopher Berke of Ladder Company 119 arrived at the site of the Steam Pipe Incident. Upon arriving at this site, they were handed Tyvek suits and proper respiratory protection. He observed that there was "a faint dust on the buildings" and plastic covering on the sidewalk "to collect the water that was coming off of the buildings." (Tr.

214).  Ladder Company 119 was ordered to wash down a building using their bucket.  According to Firefighter Berke, he stretched a hose line from the street level directly to the bucket on their rig in order to allow the firefighters to better control the force or stream of water.  Also, the FDNY wanted to avoid the water pressure from blowing out the windows on the buildings.  At the conclusion of their shift at the site of the Steam Pipe Incident, this company removed all of the protective gear they had been given, left their rig at this site for another company to use, and took another rig back to their quarters.

According to Chief Cassano, all firefighters who were assigned to tasks at the site of the Steam Pipe Incident were trained and fully capable of carrying out the task to which they were assigned.  Based on his over 40 years of experience in the FDNY, Chief Cassano stated that some situations require firefighters to aim a stream of water at a building that is not on fire.  Specifically, "we [the FDNY] would put water on a building that is not on fire to keep it cool . . . [and] wet so it would absorb the heat and it wouldn't catch fire from radiational conduction." (Tr. 627).  All the firefighters who testified at the hearing were consistent with their testimony concerning the training they received from the FDNY concerning the tasks and duties they performed at the site of the Steam Pipe Incident.  They each testified that they were trained to stretch line, operate and maintain proper water pressure to the hoses, operate a hose, and aim the stream of water at certain objects.  Only Firefighter Berke testified that he had never before or since stretched a hose line directly from the hydrant to the bucket on his company's rig.  All the firefighters testified that they have never been trained to perform asbestos abatement, and they all characterized the washing down of the buildings

that they performed at that site as asbestos abatement.[13]

On July 23, 2007, UFA President Stephen Cassidy ("Union President") wrote to the FDNY's then-Commissioner, Nicholas Scoppetta ("FDNY Commissioner") with regard to UFA's concerns over the "utilization [of] fire trucks in the asbestos clean-up at [the Steam Pipe Incident]." (Pet., Ex. 1). The Union President requested a meeting with the FDNY Commissioner to discuss the safety implication of the assignment because the job description of firefighter "makes no reference to asbestos, working with asbestos removal, or working with non-uniformed personnel engaged in the aforementioned activities." (Id.).

Shortly after the conclusion of the FDNY's operations at the site of the Steam Pipe Incident, over 60 firefighters filed a CD-73 form, entitled "Non Biological Exposure Report" with the FDNY. These numerous reports were condensed into a single CD-73 by the FDNY, which was then placed it into the personnel file of the respective employees. (Union Ex. 17). The CD-73's state, in pertinent part: "I have been exposed to asbestos fibers that were friable and airborne presenting a health hazard. I was also possibly exposed to other unidentified contaminants due to the nature of the steam pipe explosion." (Id.).

**Scientific and Technical Information Regarding Asbestos**

David Newman, an industrial hygienist employed by the New York Committee for

---

[13] Pursuant to the City of New York's Asbestos Control Program, discussed in greater detail below, "asbestos abatement" is "any and all procedures physically taken to control fiber release from asbestos containing materials . . . includ[ing] removal encapsulation, enclosure and repair." (Union Ex. 14). Abatement is required when there is a disturbance of ACM, which is defined as "any activity that has the potential to release asbestos." (Tr. 268-269). When an abatement project is undertaken, the Asbestos Control Program requires "a comprehensive array of rigorous methods" including providing employees engaged in the abatement to utilize "appropriate respiratory protection." (Tr. 270).

Occupational Safety and Health ("NYCOSH") testified on UFA's behalf with regard to the technical matters involved in the Steam Pipe Incident.[14]  According to Newman, asbestos is a highly toxic substance widely used in insulation, floor and ceiling tiles, roofing shingles.  Exposure to asbestos, which is primarily accomplished through inhalation, is a significant health hazard because asbestos is a "human carcinogen" which can lead to lung cancer, mesothelioma, and asbestosis.[15]  (Tr. 275). He acknowledged that there are a number of regulations governing the installation, maintenance and removal of asbestos, including a ctiywide program, entitled the "Asbestos Control Program," promulgated by the City of New York (Tr. 262; Union Ex. 14).  According to this program, which applies to all asbestos abatement activities occurring within the City of New York, an "emergency asbestos project involves the removal, enclosure, or encapsulation of friable asbestos containing material that was not planned but is undertaken when sudden unexpected event(s) result in a situation in which any delay in abatement would pose an immediate danger to public safety and health."[16]  (Union Ex. 14; Tr. 257).

_____

[14]  Newman was proffered by the Union as an expert dealing with controlling environmental and safety hazards associated with asbestos.  Based upon his resume, including a bachelor's degree in environmental engineering and a master's degree in environmental and occupational health sciences, and various certifications and memberships to relevant professional associations and panels, we find that Newman is, in fact, an expert in this area.  *See, e.g., Guzman v. 4030 Bronx Blvd. Assoc. L.L.C.*, 54 A.D.3d 42, 49,(1st Dept. 2008); *Richardson on Evidence* (*11th Ed. 1995*) at § 7-305, 7-306; Mottla, *New York Evidence* 2d Ed. (Supp. 2009) at § 295, n. 15 & 15.7.

[15]  Both Newman and Director Headley testified that the inhalation of asbestos fibers, whether defined as ACM or not, is the most typical manner of contamination of the human body. Another possible, though unlikely, manner of contamination is ingestion.  In addition, both agreed that scientific data concludes skin contact with asbestos is innocuous, but for the fact that it increases the possibility of inhalation or ingestion.

[16]  Friable asbestos is defined as "any asbestos or . . . asbestos containing material that can be crumbled, pulverized or reduced to powder when dried by hand or other mechanical pressure."
(continued...)

The protocols set forth in the Asbestos Control Program apply when "sampling" by a "licensed asbestos investigator" indicates the presence of Asbestos Containing Material ("ACM"), and is only applicable when the results of the testing results meet a threshold requirement.  As previously referenced, ACM "shall mean asbestos or any material containing more than one percent asbestos" by weight and, according to the City of New York's "Asbestos Control Program," one percent is the used as the demarcation point to establish the presence of ACM.  (Union Ex. 14). However, the Union points out that EPA stated in an advisory memorandum that the one percent threshold concept was related to the limit of detection and that "soil/debris containing significantly less than 1 percent asbestos can release unacceptable air concentrations of all types of asbestos fibers."[17]  (Union Ex. 13).

Sampling can be undertaken using two distinct methods: "bulk sampling" and "air sampling," with air sampling being the primary method to test for ACM during an asbestos abatement operation.  (Tr. 264).  When conducting air sampling, there are two methods to do so; aggressive testing and passive testing.  Newman reasoned that where there is a greater likelihood of outside forces, such as wind, and personal contact, that could create a disturbance of asbestos, aggressive air sampling tests provide the most accurate reading.

Tennyson Headley, the Director of Occupational Safety and Health for the FDNY, who present at the site of the Steam Pipe Incident shortly after the explosion, testified that the Asbestos Control Program employs the passive method, which is the generally accepted, industry-wide

---

[16](...continued)
(Tr. 356).

[17]  Nevertheless, all applicable laws and regulations dictate that, without this positive ACM sampling test result, the Asbestos Control Program is not applicable.

standard for air sampling tests.[18]  Newman and Director Headley agreed that if the sampling test

results are negative for asbestos, that particular location would not be deemed an emergency asbestos

project under the Asbestos Control Program, and "an abatement would not have to proceed." (Tr.

394).

According to the bulk sampling data provided by DEP regarding the levels of asbestos around

the site of the Steam Pipe Incident, only two out of 79 bulk sampling test results indicated the

presence of ACM.  The first bulk positive test result was taken on July 18, 2007 at 8:35 p.m. from

East 41st Street and Lexington Avenue, which was the explosion site, and indicated 8% ACM.  The

second bulk positive test result was taken on July 19, 2007 at 12:30 a.m. from East 42nd Street

between Lexington and Third Avenue and indicated 16% ACM.  In addition to these two results,

there were 28 sampling test results out of the 79 bulk samples tests taken that were positive for

asbestos, but at a level below that 1% threshold for ACM.  These results were scattered throughout

the surrounding area of the steam pipe explosion.[19]  With regard to 238 air sampling test results,

which were taken after the bulk sampling was performed, all of them, which were obtained using

---

[18]   The City proffered Director Headley as an expert witness in environmental engineering
with a focus on hazardous materials management.  Based upon his resume, including a bachelor's
degree in environmental engineering and a master's degree in environmental and occupational health
sciences, and various certifications and memberships to relevant professional associations and
panels, we find that Director Headley is, in fact, an expert in this area. *See, e.g., Guzman v. 4030
Bronx Blvd. Assoc. L.L.C.*, 54 A.D.3d 42, 49 (1st Dept. 2008); *Richardson on Evidence (11th Ed.
1995)* at § 7-305, 7-306; Mottla, *New York Evidence* 2d Ed. (Supp. 2009) at § 295, n. 15 & 15.7.

[19]   According to Newman, the test results provided by the City to the Union were
"characterizations" of the test results because "laboratory data," i.e. actual numbers, were replaced
with words indicating the level of asbestos in each reading. (Tr. 292-293).  Moreover, some of the
results listed on the data provided by the City to the Union merely indicate whether there was
presence of asbestos below the one percent level but above zero presence of asbestos.

the passive testing method, were negative for ACM.[20]  However, the record does not contain any

indications of how much time is required to perform either bulk or air sampling tests, as well as how

much time was required for DEP to communicate those sampling test results to the FDNY at the site

of the Steam Pipe Incident.

According to Director Headley, the Steam Pipe Incident "would have been considered an

abatement job at the point of release, which means that the agency responsible for repairing the pipe

or for maintaining the pipes, they would have to come in and do an abatement there at that point."

(Tr. 441).  However, the cleaning of buildings located blocks away from the explosion site would

not have been considered asbestos abatement because "based upon the sampling, . . . the number of

samples that were found [around those buildings that were cleaned by firefighters] were extremely

low."  (*Id.*).  In fact, although the finding of ACM at a particular area renders that discrete location

to be an emergency asbestos project and there were only two bulk sampling test results at discrete

areas that contained ACM, the evidence in the instant record is undisputed that the four firefighters

who testified were not working within the immediate vicinity of the two positive bulk sampling test

results.  Moreover, the sampling results which were taken near their respective work areas were

negative for ACM.

**Post-Incident Events**

On August, 14, 2007, the Deputy Commissioner for the Division of Environmental Health

for the New York City Department of Health and Mental Hygiene ("DOHMH") wrote to NYCOSH

in response to the steps that were taken by the City's agencies as they related to the clean-up process

---

[20]    Out of the 238 air sampling test results, nine results were inconclusive due to
malfunctioning of the air sampling device.

and protocols used at the site of the Steam Pipe Incident.  DOHMH stated:

> The explosion resulted in dispersion of wet, muddy debris, some of
> which contained asbestos.  Even before sampling results were
> received, the City restricted access to impacted areas and treated all
> debris as potentially contaminated with asbestos.
>
> *     *     *
>
> Because asbestos was detected in some of the blast debris, the City
> required wet cleaning of streets, sidewalks and building exteriors, and
> removal of blast debris by certified asbestos abatement contractors.
> All debris and waste water were collected and handled as asbestos-
> contaminated material.  This work was performed in accordance with
> applicable OSHA, EPA, New York State Department of Labor . . .,
> and DEP regulations.

(Union Ex. 16).

On September 4, 2007, at a regularly scheduled Labor-Management meeting, the Union reiterated their concerns over this type of work being assigned to firefighters, and indicated that it was the responsibility of Con Ed, not the City nor the FDNY to perform this work.  According to UFA's Health and Safety Officer, William Romaka, the FDNY was unnecessarily taking companies out of service to perform the duties of a private entity, thereby exposing firefighters to potential health hazards.  At this meeting, the FDNY articulated that firefighters were assigned to the Steam Pipe Incident because it was an emergency situation and the Union's help was necessary to assist in responding to this situation.

On September 24, 2007, UFA filed the instant scope of bargaining and improper practice petition alleging that the FDNY violated § 12-306(a)(1), (4) and (5) of the NYCCBL because the FDNY's actions of assigning Firefighters to the Steam Pipe Incident and the clean-up process thereafter constituted a refusal to collectively bargain over a mandatory subject of bargaining, interference with the statutory rights of Firefighters under NYCCBL § 12-305, a unilateral change

in the *status quo*, as well as the practical impact the assignment had on firefighter safety.[21]  As a

remedy, the Union requested an order directing the FDNY: to cease and desist from assigning

Firefighters "to perform asbestos abatement and other hazardous duties beyond their job description

in non-emergency situations," to bargain with the Union regarding these types of assignments, to

maintain the *status quo*, and to post notices indicating the same.


## POSITIONS OF THE PARTIES

### Union's Position

The Union contends that the FDNY's initial decision to assign firefighters to perform the

clean-up duties also created a practical impact on the safety of these firefighters, thereby

necessitating the bargaining over the alleviation of said impact as set forth in NYCCBL § 12-

307(b).[22]  The FDNY unilaterally ordered firefighters to spray down the buildings that had been

---

[21]  Although UFA's petition in the instant matter raises a claimed violation of NYCCBL §
12-306(a)(5), a unilateral change of the *status quo*, this claim has not been pursued by the Union.
None of the evidence and argument elicited at the hearing in the instant matter addressed this claim.
Furthermore, the Union's Post-Hearing Brief, dated December 30, 2009, makes no mention of this
claim and focuses on UFA's alleged violation of NYCCBL § 12-306(a)(1) and (4).  Accordingly
since the Union has not pursued this claim, it will not be addressed herein.

[22]  NYCCBL § 12-307(b) states, in pertinent part:
It is the right of the City, or any other public employer, acting through its agencies to
determine the standards of service to be offered by its agencies; . . . direct its employees; take
disciplinary action; . . . maintain the efficiency of governmental operations; determine the
methods, means and personnel by which government operations are to be conducted; . . . and
exercise complete control and discretion over its organization . . . .  Decisions of the city or
any other public employer on those matters are not within the scope of collective bargaining,
nut, notwithstanding the above, questions concerning the practical impact that decisions on
the above matters have on terms and conditions of employment, including, but not limited
to, questions of workload, staffing and employee safety, are within the scope of collective
bargaining.

covered in debris from this explosion that potentially contained asbestos while failing to apprise these employees of the potential health risk to which they were exposed. The FDNY impermissibly expanded the job duties that are within the training, expertise and capability of the firefighters by assigning firefighters to perform these clean-up duties. UFA characterizes these duties as asbestos abatement activities and urges the Board to consider these duties as such.

Although firefighters are typically one of the first agencies to respond to emergencies and are trained to deal with emergency situations such as the Steam Pipe Incident, the FDNY used many of the firefighters assigned to this scene in a clean-up capacity. As demonstrated by the testimony of firefighters who were at the scene of the Steam Pipe Incident after the immediate emergency situation ceased, the FDNY assigned these employees to perform clean-up duties that did not fall within their expertise or qualification. After the eruption had ended and debris stopped falling, the exigency ceased to exist. Accordingly, the FDNY, by assigning the firefighters to perform duties that UFA characterizes as asbestos abatement activities, subjected them to a serious health risk, which had a significant practical impact on the safety on these firefighters.

The Union further argues that the FDNY's assignment of firefighters to perform certain clean-up duties at the site of the Steam Pipe Incident created a practical impact on safety. The site of the Steam Pipe Incident was considered, from the outset, as a possible emergency asbestos project, due to the presence of an asbestos-wrapped pipe that exploded. In spite of that knowledge, firefighters were not provided with proper protective gear, such as Tyvek suits and respiratory protection. Further, in some instances, these firefighters were not instructed to perform decontamination work on their rigs or gear. Thus, the FDNY's failure to implement these safety precautions created a practical impact on safety of these firefighters.

3 OCB2d 16 (BCB 2010)                                                                  22

        With respect to the improper practice portion of the petition in the instant matter, the Union

contends that the FDNY violated NYCCBL § 12-306(a)(1) and (4) by refusing to bargain over the

practical impact on the safety on these firefighters.[23]  UFA, shortly after the Steam Pipe Incident,

communicated to the FDNY of the Union's displeasure with manner in which the FDNY handled

the Steam Pipe Incident.  Specifically, UFA alleged the FDNY improperly assigned firefighters to

perform the clean-up duties, impermissibly expanded the duties of firefighters and failed to bargain

over the amelioration of the practical impact on safety and the assignment of the firefighters to

perform the clean-up duties.  In a labor-management meeting almost three months after this event,

UFA again raised its claims that a practical impact on safety occurred at this site and that the FDNY

improperly assigned firefighters to perform tasks that lay outside their qualification and training.

UFA further renewed its demand to the FDNY to bargain over these issues.  When the FDNY failed

to do so, the Union was forced to initiate the instant petition to seek redress from the Board for this

improper practice.

        Because the City determined that firefighters were the best equipped and best trained agency

_____

        [23] NYCCBL § 12-306(a) provides in pertinent part:
        It shall be an improper practice for a public employer or its agents:
        (1)  to interfere with, restrain or coerce public employees in the exercise of their
        rights granted in section 12-305 of this chapter;
                                    *        *        *
        (4)  to refuse to bargain collectively in good faith on matters within the scope of
        collective bargaining with certified or designated representatives of its public
        employees; . . .

        Further, § 12-305 of the NYCCBL provides, in pertinent part:
        Public employees shall have the right to self-organization, to form, join or assist
        public employee organizations, to bargain collectively through certified employee
        organizations of their own choosing and shall have the right to refrain from any or
        all of such activities. . . .

to deal with the Steam Pipe Incident, the FDNY ordered these firefighters to perform tasks outside the normal and typical manner in which they would be performed.  This is highlighted by the testimony of Firefighter Berke that he and his ladder company were ordered to attach a hose line directly to a bucket. Furthermore, firefighters, rarely use their hoses to spray water at buildings when a conflagration is not present.  Moreover, FDNY was not the best equipped agency for the job because firefighters were not outfitted with the proper safety gear and could have been exposed to massive amounts of asbestos.  Accordingly, firefighters were not the best trained nor the best equipped employees for the job.

The Union further asserts that the City's argument that the site of the Steam Pipe Incident did not present a hazardous condition necessitating collective bargaining of practical impact on safety is incorrect.  The steam pipe that exploded was known to contain asbestos; the site was treated as an emergency asbestos project; and the FDNY inconsistently applied precautions to protect firefighters from potential asbestos exposure.  Additionally, although the City relies on the sampling test results from DEP to demonstrate that ACM was not present at the locations where firefighters were performing clean-up duties, the Union questions the validity of these results.  It further argues that even below-ACM levels of asbestos can pose a potential hazard to the health of the firefighters. Thus, any attempt by the City to argue that no practical impact on safety occurred would be inconsistent with the evidence presented.

**City's Position**[24]

The City argues that the FDNY was within its managerial prerogative, under NYCCBL § 12-307(b), to assign firefighters to perform the tasks they were ordered to do at the site of the Steam Pipe Incident.  Under this provision, the FDNY is permitted to determine appropriate staffing levels and the duties for firefighters during emergencies.  Furthermore, since the Steam Pipe Incident occurred near Grand Central Terminal and posed a safety risk to the general public in that area, the FDNY was authorized by CIMS to assign firefighters to duties the FDNY believed would best resolve the situation and alleviate the health and safety impact on the public.

Furthermore, the City argues that the Union has not demonstrated any practical impact on the safety of the firefighters assigned to work at the site of the Steam Pipe Incident and, therefore cannot support its claim that the FDNY violated the NYCCBL.  This site did not pose a risk to the safety of the firefighters because the bulk and air sampling test results indicated that hazardous levels of asbestos were not present.  In addition, the firefighters working on site were either given proper protective gear, such as Tyvek suits and respirators, or were already equipped with the necessary level of protection, via their bunker gear and face pieces.  As such, UFA has not demonstrated that its members were exposed to safety risks, thereby necessitating a finding against the FDNY and an order mandating collective bargaining on this topic.

Additionally, the City argues that no violation of the NYCCBL's duty to bargain can be found because this Board has not found that a practical impact on safety occurred when the FDNY

---

[24] In the City's Answer, it argued that the petition should be dismissed because the Union's claim should be deferred to arbitration.  The City contended that UFA's petition was essentially an out-of-title grievance which requires the interpretation of the Agreement.  However, the City has not pursued this argument in the City's Post-Hearing Brief, dated December 30, 2009.  Also, the City made no reference to it throughout the six days of hearing held in the instant matter.

assigned firefighters to spray/wash down buildings in the vicinity of the Steam Pipe Incident. When

an employer invokes its managerial prerogative under NYCCBL § 12-307(b) and the union alleges

a practical impact on safety was involved, the Board has held that a duty to bargain does not

immediately arise. Once a determination by the Board has found that a practical impact on safety

has occurred, the employer may act unilaterally to relieve said impact. If the Board further finds that

the impact has not been expeditiously resolved, the Board will order bargaining. Accordingly, no

violation of NYCCBL § 12-306(a)(4) can be found without first allowing the FDNY the opportunity

to ameliorate the practical impact on safety through unilateral action.

The City further argues that § 478(f) of the New York City Charter constitutes a significant

public policy exception that rebuts the NYCCBL's statutory presumption in favor of collective

bargaining.[25] As authorized by this provision, the FDNY Asbestos Policy and CIMS, the FDNY

assigned firefighters to perform tasks at the site of the Steam Pipe Incident that the FDNY deemed

necessary to further the statutory and regulatory goals set forth in these provisions. As such, the

FDNY assigned firefighters to perform tasks that were clearly contemplated by these provisions to

ensure the public health, safety and welfare. Accordingly, the issue of whether the FDNY had to

bargain collectively about the assignment of firefighters to undertake the tasks they performed at the

site of the Steam Pipe Incident should be presumed to be a non-bargainable subject because the

statutory and regulatory provisions at play in the instant matter should prevent this Board from

mandating the FDNY and UFA to bargain over this issue.

--------

[25]   In pertinent part, New York City Charter § 478(f) states that the FDNY "shall have the power and authority to provide general ambulance services, emergency medical services, and other responsive service necessary to preserve public health, safety and welfare, and to perform any functions relating to the provision of such services."

In response to the Union's contention that the firefighters were not the best equipped and trained agency to perform the necessary tasks assigned at the site fo the Steam Pipe Incident, the City contends that the testimony provided at the hearing evinces that firefighters were, in fact, the best equipped and trained employees for the assignments they were given. The testimony demonstrates that the firefighters were trained to stretch hose lines, setup rigs, operates buckets, search for civilians inside of buildings, and regulate the pressure gauges used by the hose systems. The City maintains that the testimony establishes the firefighters had the requisite protective gear, were trained to perform their tasks, and had rigs capable of reaching the heights required for removing the debris from the buildings at the site of the Steam Pipe Incident.

## DISCUSSION

After thorough review of the evidence adduced at the hearings in the instant matter, we find that the assignment of firefighters to the site of the Steam Pipe Incident to perform the duties at issue here constituted a proper exercise of FDNY's managerial prerogative. We further find that the potential exposure of firefighters to asbestos at the Steam Pipe Incident site prior to the receipt of the test sampling results for contaminants created a potential risk to employee safety.[26] On the record before us, we find that the requisite protective measures contained in the FDNY Asbestos Policy, CIMS, and Chief Cassano's orders, had they been universally applied and effectively implemented, would have ameliorated a practical impact on safety. However, we further find that these requisite

_____

[26] The Board recognizes the dangers directly equated with the unprotected exposure to asbestos and other contaminants. Both Newman and Director Headley testified that asbestos is a human carcinogen. Furthermore, there are significant and detailed health risks associated with exposure to asbestos, primarily through inhalation, including lung cancer, mesothelioma, and asbestosis.

procedures and orders were not universally applied and effectively implemented resulting in a practical impact on safety of the firefighters assigned those duties at this site. Accordingly, the duty to bargain over the amelioration of that impact arises in the instant matter, and the parties are directed to bargain for that purpose.

Before this Board can consider the Union's allegations that the FDNY created a practical impact on safety and violated the duty to bargain in good faith, we first must address whether the FDNY's assignment of firefighters to perform clean-up duties at the site of the Steam Pipe Incident was a proper exercise of its statutory managerial prerogative. NYCCBL § 12-307(b) grants employers the right "to direct its employees, maintain efficient governmental operations, and determine the methods, means and personnel by which government operations are to be conducted." *DC 37, L. 1506*, 79 OCB 21, at 23 (BCB 2007); *see also SSEU, L. 371*, 77 OCB 35, at 13 (BCB 2006). "We have held that the City has the right, under the management rights clause contained in § 12-307(b) of the NYCCBL, unilaterally to determine the job assignments of its employees and that its decisions on such matters are not within the scope of collective bargaining." *DC 37, L. 2507 and L. 3621*, 63 OCB 34, at 17 (BCB 1999); *see Committee of Interns and Residents*, 27 OCB 10, at 10-11 (finding that "management's prerogative under § 12-307(b) also extends to its determination of the necessary levels of staffing").

In the instant matter, we find that FDNY's assignment of firefighters to the Steam Pipe Incident was consistent with its rights to direct employees and determine job assignments under the NYCCBL. We further find that Chief Cassano acted within the managerial discretion under the NYCCBL and promulgated orders that were consistent with and in furtherance of CIMS and the FDNY Asbestos Policy. After assessing the situation, Chief Cassano established an incident action

plan that was consistent with CIMS and § 3.5 of the FDNY Asbestos Policy taking into consideration the "suspected" release of asbestos.  In accordance with CIMS and § 4.1.1 of the FDNY Asbestos Policy, Chief Cassano issued orders consistent with suspected asbestos contamination, which were transmitted using radio signal 1080, specifying asbestos release.  These orders instructed firefighters to conduct search and rescue operations, to perform necessary structural evacuations, and to provide any necessary pre-hospital emergency care to the public.  Chief Cassano's unrebutted testimony further establishes that he ordered that firefighters wear Tyvek suits, be equipped with proper respiratory protection, and perform decontaminations on their gear and rig prior to leaving this site. Chief Cassano further ordered the wet method cleaning of buildings and also ordered the establishment of a frozen zone immediately in order limit the exposure of the public to possible contaminants.[27]  Accordingly, we find that the assignment of firefighters to the Steam Pipe Incident was within the FDNY's managerial discretion.

Despite finding that the FDNY and Chief Cassano acted within their managerial prerogative to assign firefighters to perform these clean-up duties, we further find that the requisite protective measures contained in the FDNY Asbestos Policy, CIMS, and Chief Cassano's orders were not universally applied and effectively implemented.[28]  As such, the FDNY failed to ameliorate the

---

[27]   The City argued, in its Post-Hearing Brief, that § 478(f) of the New York City Charter creates a public policy exception to collective bargaining because this provision exempted the FDNY from having to bargain over the assignment of the firefighters to the site of the Steam Pipe Incident. As previously stated, we find that the FDNY was within its statutory right to assign the firefighters to this scene.  Since this argument by the City focuses solely on whether the assignment of firefighters to perform clean-up duties at this scene was proper and we have already found that assignment falls within management's right, we need not consider whether this New York City Charter provision contains any limitation on the policy requiring collective bargaining.

[28]   We note that Chief Cassano's assessment of the Steam Pipe Incident and promulgation
(continued...)

potential risk which resulted in a practical impact on safety of the firefighters assigned those duties

at this site.  In analyzing practical impact on safety cases, we recognize that the City's statutory

managerial prerogative is not an unfettered right.  The statute balances the rights of management and

public employees in stating:

> Decisions of the city or any other public employer on those matters
> are not within the scope of collective bargaining, but, notwithstanding
> the above, questions concerning the practical impact that decisions on
> the above matters have on terms and conditions of employment,
> including, but not limited to, questions of . . . . employee safety, are
> within the scope of collective bargaining.

NYCCBL § 12-307(b); *see also UFA*, 43 OCB 70, at 3 (BCB 1989) (holding that "managerial action

(or inaction) may be challenged . . . on the ground that it allegedly has had a 'practical impact' on

affected employees' safety or workload").  In order to satisfy its burden, the union "must substantiate

with sufficiently specific details, not merely unsupported allegations, the existence of a threat to

safety before we will require the employer to bargain." *EMS Superior Officers Assoc.*, 75 OCB 15,

at 16 (BCB 2005).

　　　　In determining whether a practical impact on safety exists, this Board has considered whether

the employer has adopted measures that offset any potential threat to safety.  *See LBA*, 51 OCB 45,

at 30 (BCB 1993) (holding no practical impact on safety because employer's solo patrol program

incorporated safeguards, including only dispatching solo patrols "as back-up units in emergencies

when no other back-up unit is available"); *UFA*, 43 OCB 70, at 7-8 (BCB 1989) (finding no practical

impact on safety would occur through the FDNY's proposed plan to reduce the minimum staffing

---

[28](...continued)
of orders in accordance with CIMS and the FDNY Asbestos Policy may well have ameliorated the
potential practical safety impact had they been universally implemented.

requirement in some firefighting companies from five to four-person crews, in part, due to adaptive response and revised engine company tactics).

We have also examined whether employees' adherence to management procedures and guidelines would obviate any safety concerns. *See UFA*, 79 OCB 7, at 30 (BCB 2007) (holding, in part, that adherence to the relevant regulations did not preclude employees from taking proper safety precautions while driving vehicles, therefore no practical impact on safety arose); *UFA*, 49 OCB 39, at 38 (BCB 1992) (finding that, even by following the new regulations, a practical impact on safety arose because the relevant employees were still under-trained and incapable of performing the newly assigned tasks). Furthermore, we have considered whether the regulations, procedures, and/or policies in place are properly implemented. *See COBA*, 49 OCB 40, at 16-19 (BCB 1992) (holding that the union met its burden by proving the existence of several hazards to employee safety, resulting in a practical impact, due to failure by the employer to universally and uniformly implement the same "rigorous safety procedures" during all three shifts, and provide proper, operable equipment).

A finding of a practical impact on safety does not require a showing of actual injury. A potential impact arising from exposure to a dangerous condition can be a basis for finding that a practical impact on safety and ordering the parties to bargain over said impact. *See SBA*, 23 OCB 6, at 25 ("While it would be difficult to foresee every factor relating to safety, it seems proper to require that the parties discuss potentially unsafe conditions . . ., and thus relieve the practical impact to the safety of Sergeants and Lieutenants supervising patrol"); *see also UFA*, 79 OCB 7, 31 (BCB 2007) ("the Board does not require a union to show that injuries have actually resulted from management's action in order to demonstrate a practical impact on safety"). Where such concrete

potential for injury has been demonstrated by a union, the record is sufficient to order the parties to bargain over its amelioration.

In the instant matter, the record establishes that the FDNY treated the Steam Pipe Incident as an event that potentially involved the release of asbestos. Consistent with the potential release of contaminants, Chief Cassano created an incident action plan contemplating the potential release of asbestos, and issued his orders. Moreover, Assistant Commissioner Gilsenan, after reviewing with Con Ed the maps of steam pipes, "knew that there was asbestos on that section of pipe" and ordered his response team to collect samples of the bulk debris around the site of the Steam Pipe Incident for sampling tests, the first of which occurred at 8:35 p.m. (Tr. 543). As such, the FDNY followed the FDNY Asbestos Policy, which is designed to "create awareness of the hazards associated with asbestos, and to modify standard firefighting practices at incidents of potential asbestos exposure." (Ans., Ex. 7).

This policy does not distinguish between "asbestos" or "ACM," and the safety measures contained therein are applicable "if asbestos is suspected." (*Id.*). Under § 4.1 of the FDNY Asbestos Policy, once the radio signal 1080 is transmitted, signifying "suspected asbestos contamination," the FDNY is to "minimize commitment of forces" to reduce exposure, "strictly enforce mask policy," mandate the use of "SCBA," use wet method clean-up to prevent asbestos fibers from becoming airborne, isolate firefighters "suspected or confirmed to be contaminated," and decontaminate all gear and rigs to prevent cross-contamination. (*Id.*). These precautionary measures are only to be relaxed when "on-site testing is found to be negative" for asbestos. (*Id.*).

However, the record establishes that the FDNY Asbestos Policy and Chief Cassano's orders were not universally applied and effectively implemented. It is undisputed that Firefighter Magnus

and Engine Company 26, when they arrived at this site at 5:58 p.m., were ordered to stand fast within

the frozen zone before any test sampling had even occurred. Then, around 8:30 p.m., which was also

prior to any sampling tests being taken, the firefighters in this company performed search and rescue

operations within a building adjacent to the site of the Steam Pipe Incident. Firefighter Magnus

undisputably testified that his company was outfitted in bunker gear rather than Tyvek suits, was

never ordered to wear their face pieces or given other proper respiratory protection, did not

decontaminate their rig, and transported their potentially contaminated rig and gear back to their

quarters. Moreover, upon Engine Company 26's third dispatch to the Steam Pipe Incident site on

July 20, 2007, it is unrebutted that Firefighter Magnus and his other firefighters arrived at the scene

wearing their face pieces, but were told by an FDNY superior that face pieces were "overkill." (Tr.

80). That same day, Firefighter Lynch was outfitted in his work-duty uniform, while Firefighter

Breen wore his bunker gear. Both testified that no one in their company, Engine Company 74, were

wearing Tyvek suits and were never ordered to wear their face pieces or given other proper

respiratory protection. They also both testified that they were never ordered to decontaminate their

rig, and, in fact, upon their return to quarters, "went back into service."[29] (Tr. 149).

    In contrast to the other firefighters' testimony, Firefighter Berke provided unrebutted

testimony, that six days after the steam pipe explosion, the FDNY was then adhering to the safety

precautions contained in the FDNY Asbestos Policy. Firefighter Berke, who worked at this site on

July 23, 2007 with his Ladder Company 119, upon his arrival, he was given a complete Tyvek suit

and proper respiratory protection. Upon completion of his shift at this site, his company removed

---

[29]  Based on the record before the Board, there was no indication when the test sampling
results were completed and/or when these results were communicated to the FDNY.

all of the protective gear, left their rig, which potentially could have been contaminated due to its

presence at the scene, and took another company's rig back to quarters.

Although we recognize that none of the four firefighters who testified at the hearing in the

instant matter worked near the discrete locations where DEP found two positive bulk sampling tests

results, the FDNY Asbestos Policy requires, pursuant to § 4.1 of the FDNY Asbestos Policy, that

this policy is to be in effect when an asbestos release is suspected and shall remain in effect until,

as stated in § 5.1 of the FDNY Asbestos Policy, test sampling results are "found to be negative,"

thereby by allowing the resumption of "normal operations."  In other words, the FDNY Asbestos

Policy provides that the precautionary measures sets forth therein are to be implemented until there

are sampling test results indicating the lack of asbestos.  As such, all firefighters on the scene prior

to the receipt of the sampling test results should have been given proper protective gear and

instructed accordingly upon their arrival.  Although no credible evidence was submitted which

placed firefighters in the discrete locations where the positive test sampling results were taken, this

does not obviate or mitigate the mandates contained in the FDNY Asbestos Policy.  Therefore, we

cannot conclude that the FDNY complied with the required safety precautions.  *See COBA*, 49 OCB

40, at 16-19; *see also UFA*, 49 OCB 39, at 39-43 (BCB 1992) (finding that the safety of full duty

firefighters would be compromised by the assignment of light duty firefighters as Division Aides

because light duty firefighters were not adequately trained for this assignment).

The City argues that the FDNY be allowed to alleviate the practical impact on safety through

unilateral action.  We reject this proposal.  In *Civil Service Technical Guild, L. 375*, 25 OCB 41, at

7 (BCB 1980), this Board held that after a finding of a practical impact, "the employer may act

unilaterally to relieve the impact through the exercise of its reserved management rights."  That

decision stated that it is not until this Board "finds that the employer has not expeditiously relieved ths impact is there a duty on the employer to bargain." *Id.*, at 7-8. However, in later cases, we reviewed and modified our application of this standard in cases involving employee safety, finding that "the existence of a clear threat to employee safety . . . warrants the imposition of a duty to bargain over the impact of a management decision." *COBA*, 41 OCB 31, at 21 (BCB 1988). In fact, in *Correction Officer Benevolent Association*, 49 OCB 40, at 18 (BCB 1992), we expressly rejected this proposal. This Board held that "once we find that a safety impact exists, the duty to bargain over alleviation arises immediately." *Id.* Accordingly, we reject the City's argument urging us to allow the FDNY to act unilaterally to ameliorate the practical impact on safety.

In making its determination, the Board is constrained to reject a number of the Union's arguments. It contends that the City implicitly recognized the Steam Pipe Incident as an emergency asbestos project and this recognition should lead to a *de facto* finding of a practical impact on safety. The Union refers to the safety measures utilized by the FDNY which were consistent with an emergency asbestos project, to the letter from DOHMH to NYCOSH, and to the "Non Biological Exposure Reports" filed by approximately 60 firefighters which stated that they had been exposed to asbestos fibers that were friable and airborne. This argument is unpersuasive; the record is clear that only two out of the 79 bulk sample test results were positive for ACM, and none of the 238 air sampling test results were positive for ACM. Furthermore, the Asbestos Control Program is only applicable when the particular site has sampling test results that test positive for ACM. The bulk and air sampling test results indicated that ACM, which is the accepted regulatory standard used to determine whether heightened asbestos-related safety precautions need to be implemented, was not present at the areas where the firefighters who testified in the instant matter worked. As a result, this

site was not be deemed an emergency asbestos project.  The mere facts that FDNY took precautions

prior to having sampling test results, the presence of some asbestos or the recorded statement by the

involved firefighters are not inconsistent with this result, nor do they support a contrary finding.

      Once the Board determines that a practical impact on safety has occurred, the next step in the

analysis in these types of cases is to order bargaining.  Since there can be no duty to bargain arising

out of a claim of practical impact until this Board first makes a determination in a proper proceeding

that a practical impact exists as a result of the exercise of a management prerogative, we reject, as

premature, the Union's claim that the City violated the NYCCBL as premature . *See CWA, L. 1180*,

43 OCB 47, at 20 (BCB 1989); *see also UFA*, 1 OCB 9, at 5 (BCB 1968) (determining "the

existence of practical impact is a condition precedent to determining whether there are any

bargainable issues arising from the practical impact").  If we find that such an impact has occurred,

"we will direct that there be bargaining for its alleviation." *UFA*, 47 OCB 25, 26 (BCB 1991).

      We note that the events that gave rise to the practical impact on safety and the potential

exposure of firefighters to asbestos are not regular occurrences confronting the FDNY.  In reality,

these particular types of large scale emergencies may be rare, thereby highlighting the fact that the

asbestos-related safety precautions contained in the FDNY Asbestos Policy and CIMS may not be

invoked frequently.  Thus, it is especially important that when these procedures and orders are

invoked that the FDNY universally apply and effectively implement them.

3 OCB2d 16 (BCB 2010)                                                    36

## DETERMINATION AND ORDER

Pursuant to the powers vested in the Board of Collective Bargaining by the New York City Collective Bargaining Law, it is hereby

DETERMINED, that the assignment of firefighters to the site of the Steam Pipe Incident, involved a practical impact; it is further

DETERMINED, that the alleviation of said impact must be accomplished through collective bargaining; it is further

ORDERED, that the scope of bargaining portion of the petition filed by the Uniformed Firefighters Association, docketed as BCB-2652-07, and the same hereby is, granted; it is further

DIRECTED, that the Uniformed Firefighters Association and the New York City Fire Department collectively bargain concerning the practical impact on safety set forth herein and schedule bargaining sessions as soon as practicable and mutually agreeable; and it is further

ORDERED, that the improper practice portion of the petition filed by the Uniformed Firefighters Association, docketed as BCB-2652-07, and the same hereby is, dismissed as premature.

Dated: New York, New York
     April 6, 2010

 

MARLENE A. GOLD
CHAIR

GEORGE NICOLAU
MEMBER

CAROL A. WITTENBERG
MEMBER

M. DAVID ZURNDORFER
MEMBER

3 OCB2d 16 (BCB 2010)                                                           37

                                                        PAMELA S. SILVERBLATT
                                                              MEMBER

                                                         PETER PEPPER
                                                              MEMBER