EXHIBIT 7

*Sergeants' Benevolent Ass'n*, 23 OCB 6 (BCB 1979) [Decision No. B-6-79 (IP)], *aff'd, Sergeants' Benevolent Ass'n v. Board  of Collective Bargaining*, No. 11950/79 (Sup. Ct. N.Y. Co. Aug. 7, 1979).

OFFICE OF COLLECTIVE BARGAINING
BOARD OF COLLECTIVE BARGAINING
---------------------------- x
Sergeants' Benevolent
        Association

                    Petitioner

        -and-                                    Decision No. B-6-79
                                                 Docket No. BCB-320-79
Lieutenants' Benevolent
        Association

                    Petitioner-
                    Intervenor

        -and-

City of New York

                    Respondent
---------------------------- x

APPEARANCE:

Kaye, Scholer, Fierman
        Hays & Handler
by Seymour Goldstein, Esq.
        Jay W. Waks, Esq.
for the Sergeants 'Benevolent
Association

O'Donnell & Schwartz
by John F. O'Donnell, Esq.
        Joel C. Glanstein, Esq.
For the Lieutenants' Benevolent
Association

Frances Milberg, Esq.
Associate General Counsel
Office of Municipal Labor Relations

                    <u>DECISION AND ORDER</u>

        This proceeding was commenced by the Sergeants' Benevolent Association April 9, 1979 by the filing of a petition alleging that the City of New York had committed an improper practice by the issuance of Police Department Operations Order #40 dated April 6, 1979.


operations Order #40 instituted solo supervisory patrol for Sergeants and Lieutenants. SBA thereupon initiated Improper Practice and Grievance proceedings before this Board an commenced a proceeding in Supreme Court for an injunction against further implementation of Operations Order #40. Following consultation with the Office of Collective Bargaining, the parties entered into a letter stipulation dated April 13,

Decision No. B-6-79
Docket No. BCB-320-79

1979.[1]

The stipulation provided, in pertinent part, that:

"(4) The Parties jointly agree to submit to the Board of Collective Bargaining in proceeding I to determine the scope of collective bargaining—meaning those proposals for which there is a notice or meet requirement—with respect to Operations Order No. 40 and Lieutenants set forth in Operations Order No. 40 which involves a practical impact upon safety that is required to be bargained. Proceeding I shall be concluded by the decision of the BCB and the parties agree that they will be governed by such decision. If the BCB determines, after hearing arguments with respect to the parties, and evidentiary hearing and testimony of members of the SBA if necessary, and the BCB determines that a practical impact upon safety exists, and the Board determines that collective bargaining will be required to determine the appropriate decision on the impact issue, the parties agree to meet within the deadlines prescribed in the BCB decision over the appropriate and necessary schedule of modification.

"(5) If, in that proceeding to determine the scope of Collective Bargaining the BCB determines that the proposal in Operations Order No. 40 does not involve a practical impact upon safety, the parties agree that the Improper Practice Petition shall be withdrawn

by the SBA; (b) the City and Police Department agree that it shall reactivate and renew its Grievance and Court proceeding for injunctive relief.

"(6) If, in that proceeding to determine the Scope of collective bargaining, the Board of Collective Bargaining determines that the proposed Operations Order No. 40 involves a practical impact upon safety that would be subject to determination by the Court, the parties agree to continue the Grievance and Court proceeding, and (b) the City and the SBA agree that the Grievance Court Proceeding, (c) the Court proceeding, until there is a final requirements to the BCB decision on the BCB proceeding and the BCB decision conforms to the satisfaction of the Board of collective bargaining.

Hearings were held before Eleanor MacDonald, Esq., on April 23, 26 and 27 and on May 1 and 3. The SBA and the City served and filed their briefs on May 11, 1970. The Board of Collective Bargaining heard oral argument on May 14, 1979. At the conclusion of the argument, the Board informed the parties that due to the nature of the case and to certain arguments raised for the first time in the City's brief, it would be impossible to render a decision by May 15, but that the Board would attempt to expedite its decision over the next few weeks.

## Operations Order 85 and Duties of Supervisor

1
The Lieutenants' Benevolent Association formally intervened in these proceedings on April 23, 1979, at that time it signed the stipulation of April 13, 1979.

2

Decision No. B-6-79                                                    3
Docket No. BCB-320-79

    The proceedings in this case relate closely to a finding of the Board in Decision No. B-5-75 issued in February, 1975. In that case, the Board considered an allegation of the Patrolmen's

Benevolent Association that a Police Department Plan for one man radio motor patrol (RMP) cars would have an adverse impact upon the safety of police officers. The Board's decision held:

> " ... if the City's proposal to change the manning of precinct radio motor patrol cars raises questions of practical impact on the employees, then the City must bargain with the Union concerning that practical impact.
>
>    *    *    *
>
> We believe that since issues of safety are "allegedly involved, those issues should be resolved prior to implementation ... ;" "Thus, while the City is free, outside of status quo period, to withdrawal the letter guaranteeing a certain formula for manning of precinct radio motor patrol cars, any particular plan for chancing precinct radio motor patrol car manning must be presented by the City, to the Union. If the proposed change is challenged as a threat to the safety of affected police officers it must, if there is a dispute as to bargainability, be submitted to this Board which, on the basis of the relevant evidence, will determine whether- or not the proposed plan in fact involves  a threat to safety. Should the Board find that the proposed plan involves a practical impact upon safety,
>
> we will direct that there be bargaining for its alleviation. Any such bargaining which fails to produce agreement will be subject to impasse procedures, and if timely completed nay be submitted to the present impasse panel. Our findings herein and the procedures we have described do not in any way preclude the parties from bargaining voluntarily on any proposed plan the City may develop for chances in the manning of precinct radio motor patrol cars nor are the parties barred from submitting such a matter to impasse procedures by mutual consent."

Decision No. B-6-79                                                    4
Docket No. BCB-320-79

After the issuance of BCB-5-75, the PBA and the City discussed the
City's proposed plan and ultimately, by mutual consent of the parties, the
matter of solo RMP cars was submitted to an impasse panel for resolution.[2]
The panel found no safety impact in the City's plan and, neither party having
appealed the panel's findings to the Board, the panel's recommendations became
final and binding.[3]  The solo RMP cars were instituted by gradual phase
beginning in 1977 pursuant to Operations order #85.

Operations Order No. 40, the subject of the instant proceeding, would
institute solo supervisory patrol for Sergeants and Lieutenants in the forty-
three precincts in which police officers have been manning solo RMP cars since
1977, and three additional patrol commands, the Harbor Unit, the Mounted Unit
and the Highway District. It provides for the gradual discontinuance over a
six-week period of the assignment of a police officer to operate RMP cars
assigned to supervisors of patrol in the forty-six patrol commands affected by
the Order.

Operations Order #40 states:
"2.   Supervisors assigned to solo patrol will
perform duties within the scope of their super-
visory function and will not be assigned as the
primary response unit on radio runs by Communication  Section
dispatchers.

3.    To provide for the safety of supervisors
operating solo, the dispatcher will be notified
whenever such member is required to leave his
vehicle.

4. In the event that an unusual condition arises, a commanding
officer may suspend the provisions of this order and assign a
police officer as operator of the supervisor's vehicle on a given
tour. If such condition continues for more than a one week period,
a report, with recommendations, will be forwarded to the Chief of
Patrol.

---

[2]     This was the "Levin" panel.

[3]     NYCCBL §1173-7.0c (4)(a)

Decision No. B-6-79                                                      5
Docket No. BCB-320-79

    5. Any provision of the Department Manual
    or other department directives in conflict
    with this order is suspended."

  This Order applies only to Sergeants and Lieutenants supervising patrol,
although these officers may be assigned to many duties other than supervising
patrol. Order #40, as well as the earlier police officer plan, applies only to
cars assigned to patrol duties. Police cars are used for many purposes other
than patrol of a precinct area. In this connection, it should be noted that
various police duties, including patrol duties, are performed on a solo basis
by police personnel assigned to scooters, motorcycles and horses, and that
foot patrol is often performed on a solo basis.

  The parties presented the instant case in a carefully limited manner.
The Unions contend that the implementation of Operations Order #40 would have
an adverse safety impact on Sergeants and Lieutenants supervising patrol and
they basically limited their proof to a comparison of Operations Order #40
with operations Order #85, the plan now in effect for police officers. At the
hearings before the Trial Examiner, both the Unions and the City used
operations order #85 as a reference point and standard for evaluation of
Operations order #40.

  Under Operations Order #85, in the forty-three precincts in which the
solo RMP plan for police officers is in use, a solo RMP may be sent to patrol
certain predetermined sectors of a precinct depending on the time of the tour,
the number of two-man RMP cars actually operating on the tour and

Decision No. B-6-79                                                    6
Docket No. BCB-320-79

the available number of supervisors of patrol.  When a sufficient number of
two-man cars is made up, the "trigger number"is roached and solo car are sent
to patrol designated sectors of the precinct Although the solo car is
officially assigned to patrol a designated sector, the solo RMP may be
assigned to a job anywhere  in the precinct by the radio dispatcher.[4]

     Pursuant to the plan for solo police officer RMP cars, a solo car nay be
dispatched as the primary response car to specified types of jobs deemed
appropriate for solo assignment anywhere in the precinct. These jobs, 47 out
of a total of 190 recognized dispatch situations, are such as may be handled
safely and effectively by a solo officer. The statistics reflect the relative
safety of the 47 designated solo dispatch assignments; there are few, if any,
line-of-duty injuries to solo RMP officers throughout the City. However,
another feature of the 47 selected assignments is that solo officers have a
lower arrest rate than other police officers: In the 60th Precinct, for
example, from April, 1978, to March, 1979, there were 5 arrests by solo RMP
officers out of a total of 2370 arrests in the entire Precinct.

     A solo car may not be dispatched as the primary response unit to the 143
more difficult jobs, but may be sent as back up to such assignments throughout
the precinct. Further, a solo patrol car may "pick up" any type of job in its
own sector or in transit anywhere in the precinct. Clearly, if a solo RMP

---

     [4]     The solo sectors are so designated because they are  deemed to
have the greatest number of solo jobs and thus are amenable to solo patrol.

Decision No. B-6-79                                                                 7
<u>Docket No. BCB-320-79</u>

is at the scene of, or is asked by a citizen to respond to a dangerous police
matter, the solo patrol will perform the sworn duty of a police officer even
though the job might be a two-man job for purposes of dispatch.

     The testimony established that the trigger numbers are not always
reached. It is not rare for no solo RMP's at all to be made up on a tour
because the required number of two-man cars has not been reached. Indeed, it
has happened that only one, two or three RMP's are made up even though the
tour has a targeted number of 6, 7 or 8 cars.[5]  In a typical 24 hour period,
the average number of RMP's City wide is 1500 to 1600. Of these, 100 to 130
may be solo RMP's.

     Under Operations Order #85, it often happens that the back-up vehicle
arrives at a scene prior to the arrival of the assigned primary response unit.
Frequently, the supervisor responding to a call which he judges to require his
presence will arrive before the police officers who were dispatched to the
job. When this happens, the supervisor performs whatever duties are required
by the particular exigency, and he and his driver work as partners until the
arrival of the assigned vehicle. Union witnesses emphasized the fact that
there could be no difference between the action taken by a first arriving
supervisory car or the officially assigned RMP car; both vehicles

_____

     [5]     Sergeant Richard Windram testified that on the late   tour in the
72 precinct, he was supervisor of patrol on an        occasion where there was
only one RMP car in the entire            precinct.

are, manned by police officers whose sworn duty requires them to take
immediate action, and police practice by no means permits any police officer,
whether supervisory or rank-and-file, to fail to do his utmost because he is
not the primary response vehicle. As graphically stated by one of the
Sergeants, the term "Primary" means "you write the reports. It doesn't mean
first on the scene."  "If the call breaks and it's right near where I am, I
can't park and say I will wait for this fellow to come in three miles."

     The duties of a supervisor of patrol (whether a Sergeant or a
Lieutenant) are those of a "line supervisor" in that they combine elements of
training and supervision with performance of the same duties as those
performed by the rank-and-file. At the beginning, of each tour, the supervisor
of patrol conducts the roll call and inspects the platoon. Then, he goes out
on patrol. Some of his patrol duties consist of visiting police officers on a
fixed post such as a school, and visiting footmen, school crossing guards and
community service assistants to sign their books. Supervisors of patrol are
also required to conduct visits to "cooping-prone" locations and to conduct
brief observations of "violation-prone" locations on each tour. While on
patrol, supervisors typically observe precinct conditions and make notes so
that the next tour as well as the appropriate municipal

Decision No. B-6-79                                                              9
Docket No. BCB-320-79

authority may be apprised of traffic conditions, dangerous abandoned
buildings, the presence of known or suspected criminals and gang members, and
any other significant neighborhood conditions. The supervisor of patrol spends
approximately five to six hours during each tour on the street. In addition to
the duties enumerated above, the supervisor responds to about half of the
radio runs assigned to patrol cars under his supervision and, in case of a
backlog, the supervisor is assigned as either a primary or backup response
vehicle by the radio dispatcher. Further, supervisor often "pick up" jobs on
the street by responding to a citizen request or by observing an incident
which requires police attention.

Four Sergeants with extensive patrol supervision experience in various
precincts in the City of New York testified concerning their duties.
Supervisors of patrol listen to the car radio transmissions for their precinct
and are thus aware of general conditions and of the specific assignments being
dispatched to their men. Whenever an incident arises that seems serious, the
supervisor goes to the scene not only to observe and supervise his men but
also to help then, carry out their duties. On his way to a serious event, the
supervisor will issue instructions telling the assigned RMP cars which routes
to take, thereby avoiding the real danger that two or more cars will collide
on the way

Decision No. B-6-79                                                          10
Docket No. BCB-320-79

to the scene. Also while enroute to such a job, the supervisor will plan for
the disposition of his men and actions to be taken by them, and he will issue
the appropriate instructions for actions at the scene of the incident. If a
fleeing suspect is being pursued, the supervisor will transmit instructions so
that potential routes of escape may be cut off by RMP cars in the precinct.
All four Sergeants who testified emphasized that it would be difficult, if not
impossible, to race to the scene of a disturbance, burglary, bank robbery in
progress, or other similar incident if they had to drive themselves; they
would not have a free hand to press the button which activates the radio
transmitter and they would be too distracted by the effort of driving at high
speeds to be able to think and plan effectively.

        Chief of Operations Patrick J. Murphy testified that, with respect to
the supervisory duties of Sergeants and Lieutenants, "the Sergeant responds
with his men . . . except that the Sergeant is not required, in a sense, to
respond with the type of dispatch that the radio car is required to respond .
. The Sergeant is free to choose which . . . calls he will respond  to. . .
."   Chief Murphy estimated that supervisors of  patrol respond to about half
the jobs handled by radio cars under their supervision, and they respond to
"the most important jobs, or to those jobs that are being handled by perhaps
less experienced men or less competent men."

Decision No. B-6-79                                                    11
Docket No. BCB-320-79

**Operations Order #40**

     The parties presented testimony concerning; the implementation and
effects of Operations Order #40. One of the adjustments made by the Department
in anticipation of the effective date of Operations Order #40 relates to the
SPRINT System for central communications. The SPRINT  System uses  computer
facilities to indicate to the dispatcher which cars are available to be dis-
patched to a particular police job. SPRINT has been programmed in conformity
with Operations Order #40 so that a solo supervisory car will not be
considered available for dispatching as a primary response unit. Instead,
SPRINT will indicate to the dispatcher that a solo supervisory unit may be
dispatched only as a backup to another unit. A solo police officer, by
contrast, may be assigned as the primary response unit to 47 of the 190 coded
dispatch situations.

     The Unions argue that the provision barring solo supervisors from being
dispatched as a primary response is of little practical effect. Frequently, as
described above, a back-up vehicle arrives at the scene of a police incident
before the arrival of the primary vehicle. Further, since supervisors must
respond to the more serious assignments given to their men in all of the 190
coded dispatch situations, and since the supervisor's car will frequently
arrive on the scene prior to the assigned RMP, the Unions contend that Order
#40 offers little true safety to the solo supervisor. The Unions argue that it
will often happen that solo supervisors will respond to calls

Decision No. B-6-79                                                    12
Docket No. BCB-320-79

and work them alone for a time even though the calls, are considered too
dangerous for solo RMP response.

It should be noted that the City has riot diminished the
supervisory duties of Sergeants and Lieutenants. Chief Murphy
testified that Operations Order #40 does not amend the responsibilities of
supervisors of patrol.  There is thus no question here of a management
determination to lower the level of police to the public.

Pursuant to Operations order #40, a solo supervisor must notify the
dispatcher when he leaves his vehicle. This requirement is to "provide for the
safety of supervisors operating solo." The parties disagree strongly whether
safety will in fact be enhanced by such notification. The Unions, contend that
it is often difficult to communicate with the dispatcher and that because a
supervisor may have to respond quickly to an incident, he will be unable to
notify the dispatcher prior to leaving the vehicle. The City contends that on
these occasions, the safety of the supervisor will be fostered by the hand-
held radio which the supervisor is required to carry with him as he performs
his duty. However, the Unions contend that there is a shortage of these
radios,[6] that some of them are defective and

---

[6]      Sgt. Edward F. Matthews, of the 60th precinct testified that on
one occasion he was summoned by citizens to a burning building. While he went
to the eighth floor of the    building, his driver called the Fire Department
on the car     radio and then directed traffic and controlled the crowd that
had gathered to watch. Sgt. Matthews testified that he had no hand-held radio
on this occasion due to a shortage in his precinct.

Decision No. B-6-79                                                  13
Docket No. BCB-320-79

that, in any event, they are useless in structures such as very tall buildings
and hospitals which are constructed with steel beams and heavy concrete.
Further, they may riot be used at all in situations involving bombs.

In response to the Unions' expressed concern on this subject, the City
presented testimony concerning new, improved walkie-talkies to be purchased
for the Department and to be introduced in Brooklyn South in late 1979, and in
the rest of the city by 1964. These new sets have a speaker-receiver which
clips to the shoulder and are said to be superior technically to the sets now
in use.

In presenting testimony concerning Operations order #40 and the plan
instituted in 1977 for police officers of which Operations order #40 is an
"extension," the City stressed that the safety of the men and women involved
was a "primary" factor. Other factors were level of crime on each tour in each
precinct, quality of police services, demographic and economic conditions, and
the recommendations of each Precinct Commanding Officer. The trigger number of
two-man cars required before a solo non-supervisory RMP could be sent out was
determined for each precinct with reference to the factors listed above. The
Unions point out, however, that the trigger number, concededly dictated in
part by safety considerations, does not apply to Sergeants and Lieutenants
supervising patrol. Thus, it is possible that a precinct which has a trigger
number of six or seven two-man

Decision No. B-6-79                                                   14
Docket No. BCB-320-79

car's may actually send out only one, two or three cars on a certain tour and
be unable to make up any solo RMP vehicles, but the precinct will nevertheless
send it a solo supervisor on that tour pursuant to Operations Order #40. The
City contend's that a trigger number is not necessary for solo supervisory
cars because under Operations order #40 they will not be used, as a primary
response unit.

Operations Order #40 provides that in the event of an "unusual
condition" the commanding officer of the precinct nay suspend solo supervisory
patrol and assign a driver to a supervisor "on a given tour." The Department's
I witness stated that the reason for this proviso is that, it permits, the CO
to decide on a case by case basis whether a driver is necessary on a given
tour. Thus, if only one RMP car is on patrol rather than the required trigger
number, the CO would exercise his discretion and would assign a driver to the
Sergeant or Lieutenant. Other examples of "unusual conditions" warranting
suspension of solo supervisory patrol cited by the City were occasions when a
supervisor was "flown in" to cover a precinct with which he was not familiar
and times when a supervisor of patrol was responsible for two or more
precincts at least one of which was not subject to solo RMP patrol.[7] Chief
Murphy conceded that some of these situations had been "overlooked" in the
preparation of the plan.

---

[7]     There are thirty such precincts in the City New York. We note that
a Sergeant testified that he has on occasion been assigned to supervise patrol
for all five precincts in his division.

Decision No. B-6-79                                                      15
Docket No. BCB-320-79

     The Unions pointed out that while police officers had been trained prior
to undertaking solo patrol, the Sergeants and Lieutenants had not been given
specialized training. However, the City contended that many supervisors had
received some solo training in anticipation of their being required to
supervise solo RMP's. In any case, the City's position is that the absence of
a driver does not produce a significant change in the supervisor's function
and therefore does not warrant special training. The Unions also contended
that the average age of Sergeants and Lieutenants is higher than that of
police officers, and that the supervisors were likely to have slower reflexes
and a diminished physical ability to perform solo duties.

**Further Contentions of the Parties[8]**

     The Sergeants' Benevolent Association contends that "the solo issue
before this Board is whether or not the Police Department's proposed plan for
solo patrol by Sergeants set forth in Operations Order #40 involves a
practical impact upon safety." The SBA emphasizes that it recognizes
management's right to conduct government operations pursuant to NYCCBL §1173-
4.3b and that it recognizes that Operations Order #40 is an exercise of
management right, subject to the practical impact provisions of the Statute.

-------------------

          [8]     The Lieutenants' Benevolent Association joined in the position
taken by the Sergeants' Benevolent Association.

Decision No. B-6-79                                                    16
Docket No. BCB-320-79

The SBA Brief states that:

> "While the SBA firmly believes
> that there here exists a bargainable im-
> pact upon safety, the SBA readily concedes
> that these safety contentions do not auto-
> matically create negotiable safety, impact
> issues. . . .    The fact that all police
> work is hazardous and inherently unsafe
> does not automatically mandate bargaining
> upon all standards and methods determined
> by management."

The SBA contends that it has raised "more than, sufficient and serious
_bona_ _fide_ questions of impact" relating to Operations Order #40 and that as a
result "this impact subject and any possible methods for alleviation of such
practical impact upon safety must be the subject of negotiations between SEA
and the City."

The SBA points out that prior to the institution of solo patrol for
police officers, the City and the Union representing police officers
negotiated certain elements of the solo patrol plan and, by mutual consent,
submitted the proposed plan to an impasse panel. The SBA claims that by the
same token, the City is obligated to negotiate solo supervisory patrol with
the representatives of the Sergeants and Lieutenants. The SBA contends that
the practical impact of a plan for solo supervisory patrol is "conclusively
demonstrated" by the fact that the City previously negotiated concerning solo
patrol with the PBA. Stating that a plan analogous to the rank and file plan
"must

Decision No. B-6-79                                                          17
Docket No. BCB-320-79

have at least the same or comparable impact upon safety which is equally
negotiable in the instant case" the SBA concludes that in view of the
different parties involved, "the negotiations may well produce differing
results as to methods of alleviating" the safety impact.

     The SBA points out that Operations Order #40 refers to the safety of
solo supervisors and that the testimony Of City witnesses at the hearing shows
that the Police Department is concerned with the safety of its supervisors.
However, the SBA contends that the Department did not conduct proper surveys
among Commanding officers prior to formulating Operations Order #40. The SBA
contends that the Department gave insufficient consideration to factors such
as the average age of supervisors, lack of specific training, addition of
three patrol commands to the original forty-three, the varying levels of
police activity during different tours of duty, the existence of trigger
points in the solo patrol plan applicable to police officers and the existence
of patrol sectors within each precinct.

     Contending that the exercise of supervisory duties places an additional
burden on supervisors of patrol, the SBA argues that the introduction of solo
patrol cars poses a safety risk to the supervisors and also to the public.

     The provision in Operations Order #40 for suspension of solo supervisory
patrol in the event an "unusual condition" is not sufficient to protect the
safety of supervisors in the view of the SBA, because no standards are
provided for the exercise of the discretion.

The City's Brief argues that the PERB has devised a different procedure for the resolution of safety questions and it urges the Board to abandon the method set forth in B-5-75 and adopt the PERB procedure. The PERB holding relied upon by the City was first enunciated in <u>White Plains PBA and City of White Plains</u>, 9 PERB 3007 (1976), and requires that where a union seeks to negotiate manning requirements based on an alleged safety impact on employees, the matter should be referred to joint labor management safety committee for discussion and resolution. Should the joint committee be unable to resolve the safety issue, binding grievance arbitration would be utilized to break the deadlock. In <u>White Plains</u>, PERB found that general safety demands were mandatorily negotiable to tho extent that they required bargaining for the establishment of a joint committee to consider particular safety issues which might arise between the parties. However, particular demands were negotiable only in so far as they would be discussed and decided by joint committee and grievance arbitration. The rationale for <u>White Plains</u> was stated by PERB to be the lack of administrative feasibility and expedition in any requirement that PERB itself rule on safety impact demands for negotiation on a case by case, issue by issue basis.

Decision No. B-6-79                                                      19
Docket No. BCB-320-79

    The City argues that the plan for solo supervisory patrol has no safety
impact. It argues that Operations Order #40 is merely an extension of the
police officer solo patrol plan
established b Operations Order #85. The City argues that safe-
guards are built into Operations Order #40 sufficient to protect solo
supervisors. These include the limitation of the plan to certain precincts,
the ban on dispatching solo supervisors as a primary response unit, the
requirement that the dispatcher be notified when a solo supervisor leaves his
vehicle and the proviso for suspension of the Order in unusual circumstances.

    The City states that because the roles of supervisors
and police officers are different:

> "it was the Department's judgment that the
> plans need not be identical, as the
> supervisors were not to be used as a
> primary response unit, there was no need
> to analyze which tours should be used nor
> was a trigger mechanism necessary or
> appropriate in Operations Order #40.
> A training program for supervisors was not
> considered to be necessary for a variety
> of reasons: they were trained when the
> 1977 plan was implemented; their function
> was not altered in any appreciable way by
> the solo operation; they are responsible
> for training the police officers who
> operate solo RMP cars and should thus be
> familiar with the Tactical Response Manual
> for Solo Radio Motor Patrol prepared by
> the Police Academy for the 1977 program."

    At the Oral argument, the City stated that was not
"trying to undermine the efficacy of B-5-75 as it relates to
the proceedings which we have just completed," and stated its
belief that it had the responsibility of placing an overview
of recent developments in safety issues before the Board.
Counsel for the City recognized that PERB deals "with a multitude of
jurisdictions whereas the New York City Collective Bargaining Law and the
Office of Collective Bargaining deal with one basic jurisdiction and that may
very well be the reason in the Board'- determination for saying that B-5-75 is
applicable in whole or in part to the [instant case]."

**Discussion**

    We adhere to our Decision No. B-5-75 and to the procedures for resolving
allegations of safety impact described therein because, as the City recognized
at the Oral Argument in this case, the procedures established by the Board in
B-5-75 are best suited to this jurisdiction which has a single major public
employer.

    Based upon actual experience with solo RMP manning for police officers
under Operations Order #85, it is apparent to us that the plan provided for in
that Order is an example of a solo patrol system which has had no safety
impact on the employees concerned within the meaning of NYCCBL §1173-4.3b.
Thus, if we found that the supervisory solo plan represented

Decision No. B-6-79                                          21
Docket No. BCB-320-79

by Operations Order #40 presents no risks to safety beyond those concededly
resent in police work generally and those particularly present in the existing
plan for police officers, we would rule that the Order is not subject to the
practical impact procedures of Decision No. B-5-75. We need not, therefore,
make any initial findings concerning the need for two-man RMP assignments
generally, nor need we inquire into the many considerations which led to the
conclusion that two-man assignments are safer than one-man cars in certain
situations. We accept, for purposes of this case, the conclusion that in cer-
tain circumstances safety requires that a supervisor of patrol must he
assigned a police officer to drive the car and act as a partner in police
work.

     It is, of course, a matter of management prerogative to determine the
level and standard of service to be rendered by agencies of government and the
unilateral determination of levels of manning such as that set forth in
Operations Order #40 is a proper exercise of management rights. Moreover, we
find that in large measure, and particularly to the extent that it parallels
the provisions and effects of Operations Order #85 covering solo RMP
assignments of Police Officers, Operations Order #40 has been designed with
concern for the safety of Sergeants and Lieutenants. We conclude, however,
that Operations Order #40 does have a practical impact upon safety of
supervisors of patrol in that no provision is made therein for consideration
of the two-man RMP trigger number

Decision No. B-6-79                                                          22
Docket No. BCB-320-79

applicable to the various tours in each precinct and with regard to varying
levels of police activity where solo patrol is permitted, nor for situations
where a supervisor is "flown in" to an unfamiliar precinct nor where more than
one precinct including a non-solo precinct is covered by a single supervisor.

The record shows with respect to Order #85 that the trigger number of
two-man cars vas determined for each tour in the forty-three precincts with
reference to crime conditions and the safety of the officers involved. It was
determined that until the trigger number of two-man RMP vehicles was reached,
it was unsafe to make up solo cars for that precinct. However, no such
consideration are apparent in Operations Order #40. The testimony shows that
even if only a fraction of the targeted number of two-man cars is made up and
no solo RMP cars are sent out in a precinct, supervisory patrol under
Operations Order #40 will still be on a solo basis. We note that the
Department contends that precinct commanding officers have discretion to
assign a driver-partner if 1) there are no other cars on patrol during a tour;
2) if the supervisor is unfamiliar with the precinct; or 3) if the supervisor
must cover more than the one precinct and at least one of these is not subject
to solo RMP at any time. We view this Department contention as to the
flexibility of Operations Order #40 as a concession that certain unsafe
conditions may arise which would require two-man supervisory patrol. Moreover,
the Department

Decision No. B-6-79                                                    23
Docket No. BCB-320-79

conceded at the hearing that not all potentially unsafe exigencies had been
considered in the drafting of operations order #40.

    Our view that the trigger number of two-man cars must be considered in
the determination of supervisory safety is based on several factors which, may
arise if the target number of two-man cars is not made up on a certain tour.
It is important to remember that under Order #40 unlike the situation under
Order #85 the solo supervisor is not limited to working only those 47
relatively safer and easier jobs out of the total of 190 coded police
situations in the exercise of his supervisory duties. It is agreed by the
parties that the supervisor has the duty to respond to the most serious
incidents to which his men are assigned and that, in fact, supervisors have
responded to approximately one-half of all dispatch calls in their precincts.
In the absence of the target number of two-ran cars, the assignments to each
car may well be greater and there will be a delay in arrival of the assigned
car to any police incident due to a smaller number of cars being spread over
the entire precinct. Thus, the number of incidents at which the solo
supervisor will arrive before the assigned RMP unit may well be greater with a
correspondingly greater exposure of Sergeants and Lieutenants to the more
serious two-man police jobs.

Decision No. B-6-79                                                    24
Docket No. BCB-320-79

     With fewer cars on the street, the supervisor will fewer cars to serve
as back-up, in any incident which the supervisor encounters as a "pick-up" or
through a citizen request, Long delays in the assignment of a back-up may well
result in solo supervisors handling dangerous situations for long periods of
time due to the unavailability of sufficient two-man cars. Further, although
the solo supervisor may be assigned only as a back-up vehicle by the radio
dispatcher, he can frequently be first on the scene and his sworn duty will
require his immediate action. If the trigger number of two-man cars for a
certain tour has not been reached, fewer cars will be available for dispatch
and the result will be a more frequent, rate of assignment of the supervisor's
car due to an accumulation of back-logged cases. Thus the solo supervisor will
frequently be first on the scene at an incident that more often than not is a
designated two-man assignment.

     We recognize that the Department argues that the trigger number need not
be applied to solo supervisory cars because these cars are not to be
"assigned" as primary response units by the radio dispatcher. However, we
reject this argument because it does not take into account the fact that
supervisors must attend the most serious incidents to which their men are
assigned and that the primary unit-does not necessarily arrive first on the
scene. This argument also does not take into

Decision No. B-6-79                                              25
Docket No. BCB-320-79

account the fact that supervisors pick up jobs on the street and that even
when assigned as back-up they often arrive first on the scene. The absence in
Operations Order #40 of trigger number of two-man cars on the street under
these circumstances must therefore have a safety effect on solo supervisors
just as it would have an effect on the rank and file subject to Operations
Order #85.

    In a plan which purports to make provision for factors which may relate
substantially to operations under the plan and which by its own terms is
concerned with consideration of safety of the affected personnel, we believe
it wrong to leave to chance or to discretion the manner in which such
significant matters as these are to be dealt with. While it would be difficult
to foresee every factor relating to safety, it seems proper to require that
the parties discuss potentially unsafe conditions prior to the implementation
of the Order, especially where a safety measure such as the trigger concept is
already in existence, and thus relieve the practical impact to the safety of
Sergeants and Lieutenants supervising patrol.

    Chief Murphy testified at the hearings in this case that the safety
issue was validly raised in connection with solo supervisory patrol, and he
stated that the safety of Sergeants and Lieutenants had been considered by the
Department.

Decision No. B-6-79                                                          26
Docket No. BCB-320-79

    Indeed, Operations Order #40 refers specifically to the safety of
supervisory officers. Although it is difficult at times to delineate exactly
the line between safety considerations and management rights, the task is not
impossible.[9] As evidence of the feasibility of negotiations on this issue, we
need only refer to Operations Order #85, the plan for solo police officer
patrol, which was the result of negotiations between the City and the
Patrolmen's Benevolent Association.

    We do not refer at length to the SBA allegations concerning age,
training, precinct surveys, the addition of three patrol commands for solo
supervisors, the timing and phasing in of Operations Order #40 and the
additional driving duties of supervisors. These considerations are not
unimportant or
inconsequential but, as presented in the record before us, we
are not persuaded that they rise to the level of a practical
impact. It was not shown by substantial evidence that supervisors were
affected by differences in age, or by different procedures relating to prior
surveys, and the phasing in of Operations Order #40. Further, there was
evidence that many supervisors had sufficient training in and knowledge of
solo

_____

    [9]     "The line of  demarcation between the issue of safety and manpower
and its deployment is razor thin." Firefighters v. Helsby, 399 NYS 2d 337 (3rd
Dept., 1977).

Decision No. B-6-79                                                    27
Docket No. BCB-320-79

patrol procedures. The additional driving duties of supervisors are a question
of operational efficiency but there was no substantial showing of a safety
impact arising out of supervisory driving. Finally, it was not shown that the
three additional. patrol commands were unsafe for purposes of solo supervisory
patrol.

        Concerning the SBA allegations as to sector patrol under Operations
Order #85, we find that the division of a precinct into sectors is not related
to safety but that it is a matter of administrative convenience. Sectors are
designated only for  purposes of patrol but are irrelevant in radio dispatch
assignments. Thus, a sector may be designated for solo RMP vehicles if it has
a statistically greater number of solo jobs over time. However, the solo
sector RMP may be assigned to respond anywhere in the precinct regardless of
sector. The concept is thus not applicable to solo supervisory patrol under
Operations Order #40.

        We do not here establish methods for the alleviation of the safety
impact which we have found herein, nor do we fix a trigger number of two-man
cars for the assignment of solo supervisory patrol by precinct and tour, nor
do we imply that the established trigger numbers for solo RMP are to be
adopted for the supervisors as well. We do not express an opinion as to how
the matter of solo assignment of Sergeants and Lieutenants in precincts with
which they are not familiar or in precincts

Decision No. B-6-79                                                                28
Docket No. BCB-320-79

not subject to solo RMP at any time should be dealt with.  Rather, we find and
direct that the parties are to discuss the
alleviation of the practical impact and through negotiations under the NYCCBL,
an appropriate solution to the specific foregoing items of safety impact which
we have found to exist in Operations Order #40.

     The City's Brief suggests that the Labor-Management Committees are an
appropriate forum for discussions. This suggestion relates to the PERB
holdings discussed above which
endorse a joint safety committee with a grievance arbitration
procedure to resolve specific safety disputes.[10]  While the parties arc free
to adopt jointly a similar mechanism, it is not required under the NYCCBL. The
Board believes that mediation may aid in the resolution of the issues to be
negotiated. Should the parties find such to be the case, the facilities and
services of the OCB will be made fully available to them.

     The parties shall begin negotiations promptly. Based on the record, we
are persuaded that there should be a reasonable but expedited period of
negotiations. Therefore, if no agreement has been reached by July 1, 1979, or
if there is no joint request for extension of time to negotiate, or if an
impasse is reached earlier within the meaning of the NYCCBL, an impasse in
negotiations shall be deemed to exist, and we shall appoint an impasse panel
with instructions to issue a report and recommendations on an expedited basis.

---

[10]     City of Mt. Vernon and UFA, Local 107, 11 PERB 3049   (1978).

Decision No. B-6-79                                                          29
Docket No. BCB-320-79

### DETERMINATION AND ORDER

Pursuant to the powers vested in the Board of Collective Bargaining by the New York City Collective Bargaining Law, it is hereby

DETERMINED, that the City of New York has acted in the proper exercise of its reserved powers as defined in Section 1173-4.3b of the New York City Collective Bargaining Law in issuing Operations Order No. 40 except as set forth below; and it is further

DETERMINED, that the implementation of Operations Order No. 40 would create a practical impact as to safety within the meaning of Section 1173-4.3b of the New York City Collective Bargaining Law in that it fails to define or set standards as to the point at which the reduced number of Radio Motor Patrol cars in operation in a given precinct on a given tour, with due consideration to the varying levels of police activity, would render the use of solo supervisory patrol cars unsafe, and fails to provide for supervisory patrol by Sergeants or Lieutenants unfamiliar with the precinct or covering more than one precinct including a precinct where no solo RMP vehicles are permitted at any time; and it is accordingly

ORDERED, that the parties forthwith commence and undertake good faith collective bargaining in accordance with NYCCBL §1173-4.3 for the purpose of reaching agreement on terms for the alleviation of the said practical impact; to aid in such effort the Office of

Decision No. B-6-79                                                      30
Docket No. BCB-320-79

Collective Bargaining shall make available to the parties mediation Services;
and it is further

     ORDERED, at the request of party upon a showing that good faith
negotiations between the parties have been exhausted, but no later than July
1, 1979 except if there has not been good faith negotiations, unless the
parties jointly, request an extension of time for further negotiations, all
issues unresolved by negotiations between the parties shall be submitted to an
impasse panel which shall be appointed by the Board on an expedited basis and
which shall be instructed by the Board to issue its report and recommendations
within thirty (30) days of its appointment unless further time is jointly
requested of the Board.

New York, N.Y.
24th day of May, 1979


_____        ARVID ANDERSON
                                             CHAIRMAN

                                         WALTER L. EISENBERG
                                             MEMBER

                                         ERIC J. SCHMERTZ
                                             MEMBER

_____        EDWARD J. CLEARY
                                             MEMBER

                                         MARK J. CHERNOFF
                                             MEMBER

Decision No. B-6-79                                                    31
Docket No. BCB-320-79

SERGEANTS' BENEVOLENT ASSOCIATION OF
THE POLICE DEPARTMENT OF THE CITY OF
NEW YORK AND LIEUTENANTS' BENEVOLENT
ASSOCIATION OF THE POLICE DEPARTMENT
OF THE CITY OF NEW YORK,

                                    Petitioners,

              -against-

BOARD OF COLLECTIVE BARGAINING OF THE
OFFICE OF COLLECTIVE BARGAINING OF
THE CITY OF NEW YORK, CITY OF NEW YORK
and POLICE DEPARTMENT OF THE CITY OF
NEW YORK,

                                    Respondents,

FOR JUDGMENT UNDER CPLR ARTICLE 78.
-----------------------------------------x
RICCOBONO, J.:

          This is an Article 78 proceeding brought by the Sergeant's
Benevolent Association ("SBA") and the Lieutenants' Benevolent
Association ("LBA") of the Police Department of the City of New
York for a judgment enjoining the implementation of respondent
Board of Collective Bargaining's ("Board") decision of May 24,
1979 and modifying said decision by deleting certain restrictions
contained therein and requiring respondent Police Department to
bargain with petitioners on all matter which petitioners perceive
as relating to safety.

          On or about April 6, 1979 respondent Police Department issued operations
order #40 requiring sergeants and lieutenants
to be alone in radio patrol cars. Petitioner SBA (later joined
by the LBA) protested this order and filed an improper practice
petition before the Board claiming that the order involved safety

Decision No. B-6-79                                                        32
Docket No. BCB-320-79

issues and therefore should have been the subject of collective bargaining.

    The controlling law is Section 1173-4.3(b) of the New
York City Collective Bargaining Law ("NYCCBL") which provides
in essence that the City has the right, which is not subject to collective
bargaining, to ". ..determine the methods, means and personnel by which
government operations are to be conducted..." and to ". ..exercise complete
control and discretion over its organization and the technology of performing
its work..." but that "...notwithstanding the above, questions concerning the
practical impact that decisions on the above matters have on employees, such
as questions of workload or manning, are within the scope of collective
bargaining." (emphasis added) .

    The City agreed not to implement order #40 pending a determination by
the Board as to whether solo car patrol by Sergeants and lieutenants had a
"practical impact" on their safety.

    In its decision and order #B-6-79 of May 24, 1979, which is the subject
of the instant proceeding, the Board determined that order #40 would create a
practical impact on safety in three areas and ordered the parties to bargain
concerning these areas. The decision stated that "...if no agreement had been
reached by July 1, 1979 ... an impasse in negotiations shall be deemed to
exist..." and an impasse panel shall be appointed.

    Petitioners contend that this determination limiting negotiations to 3
safety matters was arbitrary and capricious and contrary to law. According to
petitioners, numerous other factors, which were rejected by the Board have a
"practical impact" on safety and should therefore be the subject of collective
bargaining. Petitioners claim that the Board's May 24th decision

Decision No. B-6-79                                                    33
<u>Docket No. BCB-320-79</u>

severly and unreasonably constrains the bargaining process by narrowing it to
a few selected issues and wrongfully preempts
the right of the parties to determine the scope of the collective bargaining.
Petitioners also contend that the pre-setting of
July 1, 1979 as an impasse date was unlawful.

     Respondents, in opposition, support the finding of the Board and claim
that petitioners' application is premature because an impasse panel has not
yet been convened and petitioners have therefore failed to exhaust their
administrative remedies.

     In the court's opinion the instant application is not premature. The
Board's May 24th decision limits the scope of bargaining and thus has an
immediate and irreparable impact on petitioners which cannot be addressed or
alleviated by a continuation with the administrative process. The court,
however, disagrees with petitioners' contention that the Board's decision
to limit collective bargaining to three areas was arbitrary, capricious or
unlawful.

     It is the function of the Board to determine whether a
particular matter is within the scope of collective bargaining
(see NYCCBL sect. 1173-5.0[a]). This is the exact function that the Board
performed herein. It determined that three of the numerous situations
presented by petitioner rose to the level of "practical impact" on safety
contemplated by NYCCBL sect.
1173-4.3b and directed the parties to bargain with respect to these matters
only.

     Petitioners by the instant application seek to substitute their
judgment, (that all of the issues they presented have a if practical impact"
on safety),ratified by this court for the judgment of the Board. The Board
reached its decision after 5

Decision No. B-6-79                                                    34
Docket No. BCB-320-79

days of hearings reflected in 685 pages of transcript. The decision itself is
31 pages, comprehensive and well reasoned. Each and every issue raised by
petitioners is thoughtfully and reasonably addressed.

Under these circumstances the court will not and can not
substitute its judgment for that of the Board (see Matter of Sullivan County
Harness Racing Association v Glasser 30 NY2d 269). There is, however, one
problem with the decision. The Board
stated on page 29 that " ... if no agreement has been reached by July 1,
1979... an impasse in negotiations shall be deemed to exist..." and an impasse
panel shall be appointed. In the court's
opinion this pre-determination of an impasse date was improper and unlawful. A
determination that an impasse exists. (See NYCCBL 1173-7-0 c. [2]). It is
highly likely that the Board's pre-determination of an impasse date distorted
the initial bargaining process notwithstanding the fact that the July 1, date
was withdrawn by the Board on June 26th. The Board's error is not, however,
irremediable or fatal since negotiations are ongoing. The court hereby
instructs the Board to make no further determination of impasse except in good
faith and in compliance with law.

In view of the above the court concludes that the Board's determination
to limit collective bargaining to three areas was neither arbitrary nor
unreasonable.

Accordingly, the application is denied and the petition is dismissed.

Settle judgement.

Dated: August 7, 1979.