EXHIBIT 8

*EMS Superior Officers Association*, **79 OCB 7 (BCB 2007)**
[Decision No B-07-2007] (IP) (Docket No.BCB-2456-05)

*Summary of Decision*: Union claimed that FDNY's decision to remove EMT aides from full-time assignment to Deputy Chiefs has resulted in a practical impact on safety. After a hearing was held, the Board found that the entire record failed to demonstrate a practical impact on safety and dismissed the Union's claim. *(Official decision follows.)*

---

## OFFICE OF COLLECTIVE BARGAINING
## BOARD OF COLLECTIVE BARGAINING

**In the Matter of the Improper Practice Proceeding**

*-between-*

**EMS SUPERIOR OFFICERS ASSOCIATION,**

*Petitioner,*

*-and-*

**THE CITY OF NEW YORK AND**
**THE FIRE DEPARTMENT OF THE CITY OF NEW YORK,**

*Respondents.*

---

## DECISION AND ORDER

On February 4, 2005, the City of New York ("City") filed a verified scope of bargaining petition seeking a determination whether a number of demands raised in negotiations between the City and the Emergency Medical Services Superior Officers Association ("Union") were mandatory subjects of bargaining within the meaning of § 12-307 of the New York City Collective Bargaining Law (New York City Administrative Code, Title 12, Chapter 3) ("NYCCBL"). In its response, the Union alleged that one demand was, in part, a claimed practical impact on safety resulting from the removal of aides to Deputy Chiefs in March 2002, an issue that should proceed to a hearing. The City

<u>Decision No. B-07-2007</u>                                                                2

argued that the practical impact claim was untimely and without merit. In *EMS Superior Officers Ass'n*, Decision No. B-15-2005, issued on May 10, 2005, the Board found that the Union's demands were bargainable in part, and ordered that a hearing be held on the Union's practical impact claim. A hearing was held before a Trial Examiner designated by the Board addressing whether a practical impact on safety has resulted from the Fire Department of the City of New York's ("FDNY") decision to remove Emergency Medical Technicians ("EMTs") from assignment as full-time aides to Deputy Chiefs. After reviewing the entire record, this Board finds that the record fails to demonstrate a practical impact on safety. Therefore, there is no duty to bargain and the Union's claim is dismissed.

## **BACKGROUND**

The Trial Examiner found that the totality of the record established the relevant background facts to be as follows.

At the hearing, the Union presented testimony from seven witnesses: Joel Friedman, the Union president, and a Division Chief in FDNY's Emergency Medical Services ("EMS"); Zachary Goldfarb, an emergency management consultant whose clients include government agencies, private industry and other organizations, and a former EMS Deputy Chief and Division Chief; EMS Deputy Chief Toni Lanotte; EMS Deputy Chief Deborah Cali; EMS Deputy Chief Laurie Santo; EMS Division Commander Mark Steffens; and Robert A. McCracken, retired Chief of EMS Operations. The Union also submitted documents including a complaint history report regarding an incident testified to by Santo, an e-mail communication from Goldfarb to the Union regarding the loss of aides, EMS guidelines, as well as pictures depicting external and internal views of the vehicles used by Deputy Chiefs. The City presented testimony from Deputy Assistant Chief of EMS Operations

Jerry Gombo, and Chief of EMS John Peruggia, and submitted documents, including EMS operating guidelines, personnel charts, a combined complaint and unit history report regarding an incident testified to by Goldfarb, and job specifications.

The Union is the certified representative of employees in the title Supervising Emergency Medical Service Specialist ("SEMSS"), detailed as Deputy Chiefs and Division Commanders, pursuant to Board of Certification Decision Nos. 10-2001 and 4-2002. These employees work in EMS, which is part of FDNY.

Prior to 1996, EMS was part of the Health and Hospitals Corporation. In March of 1996, EMS merged with FDNY. EMS operates in five Divisions in New York City that approximately correspond with the five boroughs: Division 1 - Manhattan, Division 2 - Bronx and upper Manhattan, Division 3 - Brooklyn, Division 4 - Queens, and Division 5 - Staten Island and South Brooklyn. Each Division is comprised of, in descending rank, a Division Chief, one to four Deputy Chiefs (depending on the size of the Division), EMS Captains (SEMSS Level II), EMS Lieutenants (SEMSS Level I), and Emergency Medical Specialists serving as EMTs and Paramedics. In addition, there are five other Division Chiefs in EMS, one acting as a covering Division Chief when any of the other Division Chiefs are absent, and four who have operational duties at EMS headquarters. All Division Chiefs have EMT administrative assistants who perform administrative functions and accompany Division Chiefs when responding to multiple casualty incidents.[1]  The Division Chiefs report to two Deputy Assistant Chiefs, who in turn report to the Chief of EMS. As of November 2005, there were 1,971 EMTs, 586 Paramedics, 334 Lieutenants, 71 Captains, 14 Deputy Chiefs and 10 Division Chiefs

---

[1] "Multiple casualty incidents" are those that produce five or more patients, have a history to produce high numbers of patients, present unusual operating circumstances, and/or utilize three or more ambulances.

Decision No. B-07-2007                                                                                          4

employed by EMS.[2]  Of the 14 Deputy Chiefs, ten were appointed after the aides were removed in

2002.

Deputy Chiefs are responsible for supervising and evaluating the operations of the EMS

battalions and ambulance stations, and providing guidance to lower level EMS personnel in the field.

EMS Lieutenants and Captains provide immediate oversight and supervision of EMTs and

Paramedics. An EMS Captain is in charge of each station. EMS Captains, Lieutenants, EMTs and

Paramedics are primarily responsible for responding to 911 emergency calls and providing emergency

care. EMS Captains and Lieutenants perform their duties without aides.

Deputy Chiefs are expected to spend the majority of their time in the field. The duties of the

Deputy Chiefs include visiting stations, meeting with on-duty officers and hospital administrators,

and bringing concerns of or issues raised by employees in the field to the attention of the Division

Commander. They also oversee the voluntary hospitals and contract ambulance units that participate

in the 911 call system. The larger portion of a Deputy Chief's fieldwork consists of monitoring

routine ambulance calls, where they evaluate the quality of care and services delivered in the field,

and overseeing activities of the supervisors. Approximately once every four to seven weeks, the

Deputy Chiefs are called upon to do a citywide overnight tour, from 10 p.m. to 8 a.m., on rotation,

three or four nights in a row. During an overnight tour, the Deputy Chief is usually the only Chief on

duty for EMS, except when shifts overlap. Deputy Chiefs are authorized to have an aide during the

---

[2] There are also approximately 1,000 paramedics and 1,000 EMTs who operate as voluntary
hospital personnel under the 911 call system pursuant to an agreement with the voluntary hospitals.

<u>Decision No. B-07-2007</u>                                                                                5

citywide overnight tours.

    Deputy Chiefs are required to respond in Emergency Mode[3] – when emergency lights

_____

    [3] EMS OGP 107-01, entitled "Operations of Department Vehicles," dated August 15, 2002, provides in pertinent part:

| | |
|---|---|
| 1. | Purpose |
| 1.1 | To set forth policy and procedures for the operation of Department vehicles. * * * |
| 3. | Definitions |
| 3.1 | Emergency Mode – Operating an emergency vehicle that is engaged in an emergency response. |
| 3.2 | Non-Emergency Mode – Operating an emergency vehicle in accordance with traffic controls, posted speed limits and all other traffic regulations. * * * |
| 4. | Policy |
| 4.3 | Ambulances and other appropriately equipped Department response vehicles may respond in Emergency Mode only **when the siren (or other audible warning device) is sounded and emergency lighting has been activated, and only when responding to, operating at, or transporting a patient from an emergency assignment**. (Emphasis in original.) |
| 4.4 | Members operating a Department vehicle at all times other than when engaged in an emergency response in Emergency Mode shall operate the vehicle in Non-Emergency Mode without any emergency lights activated and obey traffic controls, posted speed limits and all other traffic regulations. |

*      *      *

| | | |
|---|---|---|
| 5.1.13 | Obey the following guidelines for operating a Department vehicle in Emergency Mode. | |
| | A. | Emergency warning lights and siren shall be fully engaged immediately upon initiating a response in Emergency Mode, and both must remain activated throughout the response. |

*      *      *

| | | |
|---|---|---|
| | D. | While in Emergency Mode, the driver may proceed past a steady red signal, a flashing red signal or stop sign, but only after slowing down as may be necessary for safe operation. The foregoing provision shall not relieve the driver from the duty to drive with due regard for the safety of all persons, nor shall this protect the driver from the consequences of reckless disregard for the safety of others. |
| 5.1.15 | At a highway or major roadway accident where an EMS Command vehicle is the *only* emergency vehicle on the scene: | |
| | A. | Ensure scene safety. |
| | B. | If the EMS ambulance is the only unit on the scene, notify the dispatcher of the need for additional resources; advise the dispatcher of the condition and reason for the request (e.g., safety, disentaglement, wash down.) |

Decision No. B-07-2007                                                                                        6

and sirens are engaged en route to the incident – to multiple casualty incidents as delineatd in an EMS

incident matrix.[4]  Deputy Chiefs are either assigned to a multiple casualty incident by a dispatcher or

may make a "self-assignment" and inform the dispatcher.  As the highest-ranking officerr at a

multiple casualty incident, the Deputy Chief has ultimate responsibility for that assignment.  At all

other times, except when responding in Emergency Mode, Deputy Chiefs must abide by all traffice

laws.

**Vehicles and equipment operated by Deputy Chiefs**

A Deputy Chief is usually assigned a "Sedan" vehicle to operate, typically a  Ford Crown

---

*NOTE:*         *Under no circumstances shall fewer than two emergency vehicles operate at*
                *an incident on an express highway or other potentially dangerous roadway.*

[4] Bureau of Operations, EMS Command Order 2005-097, entitled "EMS Command Initial
Unit Response To Multiple Casualty Incidents (Revised)," dated June 21, 2005, provides in part:

    1.        General Information
    1.1       The attached EMS Command Initial Unit Response to Multiple Casualty Incidents
          chart provides a signal-by-signal breakdown of unit assignments, in order to maintain
          conistency in EMS Command response to incidents.  The chart shall be used byoth
          EMS Command firld personnel as well as Enmergency Medical Dispatch (EMD)
          personnel, to assign an initial resource compliment to those incidents which can be
          reasonably anticipated to result in the transmission of a multiple casualty incident.

    The chart indicates that Deputy Chiefs are required to respond to any incident with 10 or
more confirmed patients and may include "All Hands Fire," "High Rise Fire," "Hostage Incident,"
and "Power Failure/Blackout."

Victoria. The trunk contains patient care equipment including an oxygen tank and defibrillator. Each vehicle is equipped with a map of New York City. Inside the vehicle, there is a middle console between the front two seats, stretching from the dashboard to midway to the backseat. At the front of the console is a mobile data terminal ("MDT") comprised of a small digital screen that displays information being received from a dispatcher or from other units, as well as a keyboard that controls the MDT. It can be set to an audible tone – a buzz or beep – when it receives new information, and information received by the MDT is stored and can be reviewed or retrieved as a printout. Below the MDT on the console is a panel of switches that controls the vehicle's emergency apparatus, such as emergency lighting. In the middle of the console is a radiohead. Below that is the siren unit. After the siren unit are three other radioheads. Mounted on both sides of the console are four radio microphones, one on the forward right, one in the middle right, one on the forward left, and one in the middle left. The microphones can be moved depending on whether there are available clips on the console. Between the two microphones to the right of the console is a power plug to which the Deputy Chiefs can connect their cellular phones.

The first radiohead, the 400 megahertz radio ("400 radio") receives the primary dispatch channel from FDNY and is the radio a Deputy Chief primarily uses. A Deputy Chief is notified of an emergency or multiple casualty incident by a dispatcher via the 400 radio. The 400 radio also transmits ongoing information about the scene of an incident, including any safety issues. Generally, the same information is transmitted also via the MDT. The second radio is called the Fire radio, and monitors activity at a scene involving fire operations. The third radio is the 800 megahertz radio ("800 radio"), which allows communication among EMS supervisors. Three of the microphones are connected to these three radios by cords. The fourth radio is used to control the data terminal. The

Decision No. B-07-2007                                                           8

fourth microphone is for the public address system and is used to speak over the loudspeaker.

In addition to cellular phones, Deputy Chiefs carry three portable radios during their regular activities and at the scene of a multiple casualty incident, which correspond with the 400, 800, and the Fire radios in the vehicles. Each radio comes with a case, a strap and a microphone. Deputy Chiefs are required to monitor all three radios and to wear them slung over the shoulder at the scene of an incident.

Deputy Chiefs also have a newly assigned portable radio that allows for "interoperability communications" among FDNY, EMS, the New York City Police Department, and the Office of Emergency Management. These frequencies also exist in the 400 portable radios previously issued to EMS officers.

EMS Captains and Lieutenants are usually assigned "Suburban" vehicles that are larger than Sedans. Similar to the Sedans, the Suburbans have a console with a MDT and four radios. EMS Captains and Lieutenants also carry cellphones. Like Deputy Chiefs, they are responsible for monitoring the MDTs and the radios.

**History of safety impact claim**

Prior to March 2002, an EMT was assigned as a full-time aide to each Deputy Chief. In March 2002, these EMTs were reassigned and since that time Deputy Chiefs perform their duties without a full-time aide. At the present time, at the scene of an incident, Deputy Chiefs may assign an EMT to perform the functions previously performed by an aide. Also, Deputy Chief are authorized to take an aide with them during an overnight tour.

On June 4, 2002, Union's counsel sent a letter to FDNY's Commissioner, Nicolas Scoppetta, which stated in part:

Sometime in February 2002, but after the Fire Chiefs and EMS Chiefs [Deputy Chiefs] were told that because of budget cuts the Chiefs' Aides would be reassigned in March 2002, the Aides were removed only from assignment to those EMS Chiefs who are in collective bargaining.

> The removal of the Chiefs' Aides has had a very deleterious effect on the ability of the Chiefs to properly, safely and efficiently perform their jobs. They need to be restored.

> We understand that you have expressed your agreement with the concept of the need of the EMS Chiefs to have aides. A committee would like to meet with you at your earliest convenience to discuss this in further detail. Those attending will be Division Chief Joel Friedman, President of EMS/SOA, Deputy Chief Zach Goldfarb and myself.

> Because the Chiefs feel that this is an urgent situation I would appreciate it if your secretary would call me to schedule a date for the meeting.

Division Chief Friedman, Division 5, testified that after the Union sent the letter, a meeting was scheduled with the Commissioner, which was cancelled. After pursuing the matter, in June 2003, the Union met with the Commissioner. Present at the meeting were: Chief Friedman, Deputy Chief Cali, Division Command Mark Steffens, at the time Chief of EMS Operations Robert A. McCracken, Chief Jerry Gombo, and Union's counsel. Friedman testified that at the meeting, the Commissioner stated that the removal of aides was strictly a fiscal decision, that he was convinced of the need of aides and would reconsider the restitution of the aides when the fiscal picture changed.

After the June 2003 meeting, the Union introduced the issue in their contractual negotiations with the City, and pursued it to Impasse. Friedman testified that after the Board issued EMS Superior Officers Ass'n, Decision No. B-15-2005, Friedman approached management in March 2005 about restoring the aides to the Deputy Chiefs. After a few months, Friedman testified that he was told the Union had the support of the Chief of EMS and other upper-level management but that the Commissioner was "not on board" with restoring the aides at that time. (Tr. at 38.)

**Testimony in support of the Union's Claim of a Practical Impact on Safety**

Goldfarb testified that he advocated against the removal of aides to Deputy Chiefs in 1997 when he first learned of plans to remove the aides. When the aides were removed in 2002, Goldfarb contacted the Union to take action. In his testimony, Goldfarb states that it is his expert opinion, based on standards and studies by national agencies on the importance of having an aide, and on conversations he had with certain Deputy Chiefs prior to 2002, that the single most important issue affecting the safety of Deputy Chiefs is having an aide. Goldfarb indicated that in forming his opinion, he considered studies and standards from the National Fire Protection Association, the National Institute for Occupational Safety and Health on the Rhode Island Fire Department, and the Occupational Safety and Health Administration, that address the use of a chief's aide in the fire service but that do not specifically address EMS Deputy Chiefs or the operations of FDNY. The Union did not introduce the studies and standards into evidence at the hearing. Goldfarb also testified that he taught an incident command and emergency operations course while at EMS. He did not review any accident data for EMS in preparation for the hearing.

According to Goldfarb, while responding in Emergency Mode, the Deputy Chief is expected to operate the vehicle, monitor the MDT and the radios, consult road maps and other documents, and communicate using the radio microphones, cellphone or public address microphone, with sirens on. He stated that if a Deputy Chief operating an EMS vehicle wants to use a radio and adjust controls, he or she must turn attention from a forward-looking view and look downward. Deputy Chiefs may also need to write down information on notepads. When Deputy Chiefs had aides, the aide would be primarily responsible for the safe operation of the vehicle, allowing the Deputy Chief to be focused on "situational awareness" – everything else involved in responding to an incident. (Tr. at 112.)

Once at the scene of an incident, a Deputy Chief needs to decide where to park the vehicle,

assess the scene visually, or by physically walking around it, and speak to the first responder. The Deputy Chief, as the highest-ranking EMS person on the scene, is responsible for managing the incident for EMS purposes and providing leadership even if he or she does not take command. A Deputy Chief will establish a command post to facilitate the decision-making process, if one is not already present. At the scene of an incident, the aides would be "managing the tactical or task-oriented functions, such as communicating with someone on the radio, giving a message . . . documenting a log of activities, tracking accountability for personnel, identifying where they are, knowing what resources are specifically at the scene." (Tr. at 131.)

Goldfarb also testified as to incidents in which he was involved and which purportedly demonstrate the need for aides. During one incident, he was the first to arrive at the scene of an accident on the Grand Central Parkway at 3:00 am. He and his full-time aide positioned the EMS vehicle, set up flares, assessed the patients, and gave medical aid until the ambulance arrived 20 minutes later. Goldfarb stated that it was fortunate that he had an aide to assist him. Goldfarb also testified that at a time when he still had an aide, he was able to devise a strategy for action on the way to the scene of a plane crash in Rockaway because his aide was driving. At the scene, his aide performed certain assignments while Goldfarb dealt with the emergency fire situation at the other side of the scene. Goldfarb provided testimony about the events that occurred during September 11, 2001. He was the citywide Chief on duty and believes that his aide saved his life at least twice that day.

After March 2002, when Goldfarb no longer had an aide, while on an overnight tour,[5] he responded in Emergency Mode to an incident in Brooklyn and testified that while driving he missed

---

[5] Goldfarb did not explain why he did not choose to have an aide with him on the overnight tour although it is undisputed that Deputy Chiefs are permitted to have an aide on the overnight tour.

information transmitted to his MDT that hostages had been taken and a shooting had occurred in a bar. Because Goldfarb had missed information regarding where police had set up a safety zone, he arrived at the wrong side of the scene. Police officers at the scene saw him and told him to get out of the line of fire. Goldfarb stated that the danger was increased because he was alone. Goldfarb testified that although he could have pulled over to read the MDT, he would have had to shut off his lights and sirens, stop somewhere safely and delay his response to the scene. In his view, getting to the scene quickly is more important.

Deputy Chief Lanotte has worked for EMS for 25 years. She became a Deputy Chief in September 2001 and had an aide for about six months. At the time of the hearing, she was on leave due to an injury sustained in January 2005. Lanotte testified that she responds to emergencies sometimes daily, sometimes a few times a week. She explained that it is difficult to see and operate all the equipment in her vehicle. Lanotte stated that Deputy Chiefs are allowed and encouraged to have an aide during the overnight tour. She also stated that EMS personnel are taught that personal safety is a primary concern.

Lanotte explained that as a Deputy Chief, she has a greater scope of responsibility than an EMS Lieutenant, who focuses on a particular area or assignment, or an EMS Captain, who is responsible for a number of battalion areas, sometimes a borough or division. As a Deputy Chief, Lanotte is responsible for her entire division, and sometimes two or three divisions. She may be required to travel long distances to other stations or assignments.

In January 2005, Lanotte was responding to an incident regarding a fire in Queens, and found

it hard to concentrate on driving while trying to gather information about the incident by listening to the radio, monitoring a beeping MDT, and preparing a plan of action. Because of poor radio transmissions coming from the location of the incident, she was also trying to use her Nextel to get more information but it had no signal. Lanotte stated that if she had had an aide with her, the aide would have driven to the incident and Lanotte would have been able to process the information transmitted via the MDT and radios, make notes, and formulate a plan.

Lanotte testified that while she was driving, other cars were moving out of the way but one car "all of a sudden decided to pull back in front of me" causing her seat belt to lock and causing Lanottoe to twist in her seat. (Tr. at 177.) She continued to respond to the incident, although she felt back spasms and had pain and a bruise on her shoulder as a result of her abrupt stop and the seat belt locking. She subsequently had surgery for her back and undertook physical therapy. In addition, Lanotte testified that during an overnight tour in 2001, when Lanotte arrived at the scene of a riot on Rikers Island, her aide was there to "watch her back" while she dealt with the inmates and officers.

Deputy Chief Cali has been with EMS for 22 years. She became a Deputy Chief in May 2001. She testified that she spends over 50% of her time in the field and responds to an emergency at least once a day. The equipment in her vehicle is arranged in a slightly different manner, with two microphones – for the PA system and Fire radio, which she does not regularly use – mounted further back, which makes it difficult for her to reach them. She also does not regularly use the portable Fire and 800 radios that she carries.

Cali testified that once she arrives at the scene of an incident, she is authorized to assign available EMS personnel to monitor these radios. Cali explained that Deputy Chiefs are also authorized to have aides on tours of duty or specific assignments throughout the year including 4th

of July and New Year's Eve operations, and other large EMS operations. She stated that on regular

tours of duty, when Deputy Chiefs do not have aides, situations arise that are just as dangerous as

those on the special tours or the overnight tour. When she had an aide, the aide would routinely

monitor one or two of the radios in the vehicle, allowing Cali to pursue other matters such as devising

a strategy for action. Cali felt that her safety was greatly enhanced when she had an aide and considers

herself lucky not to have been involved in any major incidents that might have jeopardized her safety

since the removal of the aides.

Deputy Chief Santo has been with EMS for 24 years and became a Deputy Chief in 2004. She

testified regarding an incident that occurred in August 2005, while she was on the overnight tour and

had an aide with her. When Santo arrived at the scene of the incident, there was a large crowd on the

street surrounding a car with a man who appeared to be unconscious on its roof. The ambulance had

not yet arrived. She made a safety assessment of the scene and deemed it safe before she approached

the man on the car and began to examine him. He suddenly became violent and tried to punch her.

Santo's aide assisted her by taking any potentially dangerous equipment out of the patient's reach,

while also trying to calm the crowd.

Division Commander Steffens, Division 1, testified about an incident that occurred in 2003

while he was a Deputy Chief assigned to Manhattan. He received a call from a dispatcher regarding

a multiple casualty incident involving a blackout at a nursing home in Brooklyn. Because he felt he

needed to begin his response to the incident immediately, he decided to get directions to the incident

en route. While responding in Emergency Mode – using the FDR Drive – Steffens was monitoring

the MDT, the 400 radio, and the Fire radio, and talking on his cellphone (not hands-free) to the

dispatcher about the best route to the nursing home. He stated that he could have used the 400 radio

to get directions but chose to use his cellphone because he was embarrassed about asking for

directions. Because Steffens' cellphone signal was weak, the dispatcher decided to send information

to his MDT. Steffens took his eyes off the road for a moment to look at the MDT and was involved

in a near-collision when a car pulled in front of him and his right front bumper made contact for a

moment with the left rear bumper of the other car.[6] He stopped his vehicle and gave his card to the

driver of the other car and told her that he was responding to an emergency and that she should call

him if needed. Steffens testified that if an aide had been with him, the aide would have been driving

and Steffens would have focused his attention on the information received through the MDT, the Fire

radio, and on getting directions. He also stated that although one could pull over and stop responding

---

[6] Chief Steffens did not submit an accident report because he believed that the incident did not qualify as an accident under EMS procedures because he did not see any damage to his or the other driver's vehicle.

EMS OGP 107-03, entitled "Department Apparatus Accident Reports," dated June 26, 1998, provides:

| | |
|---|---|
| 1. | Purpose |
| 1.1 | This Bulletin is issued to set forth guidelines for the reporting of motor vehicle accidents/incidents involving FDNY apparatus. |

*      *      *

| | |
|---|---|
| 4.2 | Accident An apparatus accident is defined as any vehicle related event that results in injury or property damage (excluding vandalism), even when damage is minor and may not be repaired, or an injury to a member caused by a fall or being thrown from a moving apparatus. |
| 4.3 | Incident A vehicle related occurrence that results in damage to a Department vehicle when the vehicle is properly parked, or damage that is discovered during routine inspection of the vehicle. Minor injuries, serious injuries or fatal injuries to members while operating on a parked apparatus shall also be defined as an incident. |
| Note 1. | An allegation that a Department vehicle caused damage to a civilian vehicle or property should be treated as an incident. |
| Note 2. | Damage to a civilian vehicle caused by a properly parked apparatus operating at alarms, . . . inspection activities, MUD, should be treated as an incident;. . . |

in emergency mode to read the information on the MDT and get directions, he and the other Deputy

Chiefs believe that pursuant to EMS OGP 107-01, FDNY requires them to respond in the most

expeditious manner without stopping.

Chief McCracken testified that when the aides were removed from assignment to Deputy

Chiefs he lobbied successfully for Deputy Chiefs to be allowed to have an aide during the overnight

tour because of safety concerns such as: the Deputy Chief on an overnight tour is the only Chief on

duty covering all of New York City and required to respond to multiple casualty incidents and unusual

occurrences, and the response time would be delayed because of geographical distances. A Deputy

Chief who is not on an overnight tour may assign lower level EMS personnel but McCracken stated

that entails taking personnel away from treating and  transporting patients. In McCracken's opinion,

there is no difference between the safety concerns a Deputy Chief faces when responding to an

incident or at the scene of an incident during the overnight tour or a regular tour.

Chief McCracken described an incident in November 1995 that further convinced him that

aides were necessary. McCracken was en route to JFK where there was a fire in the cockpit of a plane.

He was driving about a mile behind Deputy Chief Michael Rice who was driving alone in his car.[7]

While driving to the incident, Rice hydroplaned on a puddle and was severely injured, remaining in

a coma for several weeks and did not return to duty.

McCracken also testified that it is necessary to have an aide at the scene of an incident. He

stated that Chief John Peruggia, who was Chief of Operations at the time of the events of September

11, 2001, assigned an EMT to be his aide at the scene, whose assistance helped to prevent many

---

[7] McCracken was told by the civilian complaint unit after the accident that Rice had been
transmitting on the radio, talking on his cellphone, and using the MDT, which may have contributed
to the accident.

Decision No. B-07-2007                                                                                          17

fatalities among EMS personnel. He noted that aides helped save the lives of Deputy Chiefs during

the events of September 11, 2001. He also explained that although Deputy Chiefs may assign any

EMT, Lieutenant or Captain at the scene of an incident to perform tasks that would have been

performed by a full-time aide, it is preferable to have a full-time aide because such aides are selected

based on the breadth of their experience, ability to make decisions, and to identify hazards of which

a Deputy Chief should be aware. The full-time aide was the "eyes and ears" of the Deputy Chiefs. (Tr.

at  437.)[8]

**Testimony in support of the City's claim that no safety impact exists**

      Chief Jerry Gombo, Deputy Assistant Chief of EMS Operations, testified that his primary

responsibility is administrative in nature – he oversees assignments, reviews unusual occurrence

reports, and follows up with those reports.[9]  Gombo also works with other divisions such as budget,

labor relations, personnel, Bureau of Investigations, and the EMS Academy.

      Gombo explained that EMS Lieutenants and Captains in the field operate vehicles that contain

---

[8] Union's counsel made a formal motion for reconsideration of the Trial Examiner's ruling
to exclude Chief Friedman's testimony regarding two incidents in which he was involved as a
Division Chief with an aide because such testimony is not probative of the issue before the Board.
The Trial Examiner sustained the previous ruling, and Union's counsel, continuing to object to that
ruling, made an offer of proof as follows:
      1. Chief Friedman would have testified to an incident that occurred in Chinatown, involving
    a third-alarm fire in which three battalion chiefs were being treated for injuries. Chief
    Friedman did not have his aide with him, and would have testified to the danger to his own
    safety as well as the safety of the battalion chiefs. (Tr. at 406.)
      2. Chief Friedman would have testified to an incident which occurred in Starrett City when
    six firefighters were in cardiac arrest at the scene, and Chief Friedman was "knee deep in
    water and that the aide – he did have an aide with him in that situation – performed many
    essential duties on his behalf." (Tr. at 406.)

[9] An unusual occurrence report must be filed when, for example, an assault occurs during
patient care, there is inappropriate patient care, or equipment failure when administering patient care.

the same equipment as those operated by Deputy Chiefs. EMS Lieutenants and Captains also respond in Emergency Mode when assigned to an incident, or if they request to be assigned.

Gombo testified that since the merger in 1996, he knew of only two motor vehicle accidents involving Deputy Chiefs that resulted in injuries. One occurred in December 1998, and the other in the Summer of 1999. In the accident which occurred in 1999, the Deputy Chief had an aide with him; both were injured. Gombo had no knowledge of a motor vehicle accident pertaining to Chief Lanotte. That incident was not reported because it did not meet the definition of motor vehicle accident under EMS guidelines. Gombo stated that he was not aware of any reported motor vehicle accidents in which a Deputy Chief was injured since the removal of the aides in March 2002.

Gombo also explained that the incident to which Chief Santo testified would not qualify as an unusual occurrence because she was not assaulted during the incident. As to Chief Steffens' testimony, Gombo stated that because there did not appear to have been damage to the vehicle or to any person, it would not have been necessary to file an unusual occurrence report; however, the Deputy Chief may decide to file a report based on whether he or she believes an incident is an unusual occurrence.

Gombo testified that he did not believe that it was a good idea to remove aides from assignment to Deputy Chiefs primarily because it decreased the efficient performance of the Deputy Chiefs' duties. He stated that "with the assignment of aides to deputy chiefs that would allow that senior officer to focus in on the bigger picture as opposed to being involved with minor issues." (Tr. at 507.) On cross-examination, when asked whether the "safety issue" entered into his belief that it was not a good idea to remove the aides, he answered: "To a lesser degree."

Chief Peruggia, Chief of EMS, is the highest-ranking EMS officer in FDNY. He is responsible

for the overall day-to-day operations of the EMS command and of the New York City 911 call system. He explained that to be selected for promotion to Deputy Chief, the candidate needs to have served as EMS Captain for at least 2 years, possess a valid EMT or paramedic certification, have a rating of outstanding on their most recent annual performance evaluation, have no significant pending or past discipline, and submit a recommendation from their Division Chief or other superior. Peruggia stated that the process is highly competitive and that he believes that those selected for promotion are amongst the most qualified and knowledgeable EMS professionals who held the rank of EMS Captain.

Peruggia testified that based on his regular review of the unit histories of the Deputy Chiefs, they do not regularly spend a significant amount of time responding in Emergency Mode – during a six-month period, on average Deputy Chiefs responded to at most two incidents in Emergency Mode per day. He stated that EMS Lieutenants more than any other officer are required to respond to the most number of multiple casualty incidents under the EMS matrix.

Peruggia explained that any important information regarding emergency incidents are transmitted via both the 400 radio and the MDT, including the location of the incident, and any safety issues. He stated that not every message on the MDT requires the Deputy Chiefs' attention, and that any "necessary information they [Deputy Chiefs] need to help guide their response and provide them with information about an incident to which they are going is transmitted via [400] radio." (Tr. at 614.) The MDT stores any transmitted information unless it is erased by the operator of the MDT. He described the MDT system as being a two-way tool that allows Deputy Chiefs, EMS Captains and Lieutenants to receive information about emergency incidents and update their status through the MDT, i.e. by pushing a button or typing in a command that they are responding to an incident and are

en route. They can also request information from the archives of the system, bring up their unit and

call history, or request information on particular ambulances and EMS personnel. Peruggia stated that

it would be highly unlikely for Deputy Chiefs to make a broadcast via the Fire radio and that radio

is used primarily to monitor information regarding certain Fire alarms, depending on what type of

alarms the Deputy Chief has selected to monitor. Peruggia also explained that the EMS 800 radio is

used mainly for administrative communications and during multiple casualty incidents, it can be used

by EMS officers to facilitate communication. He stated that Deputy Chiefs do not regularly use that

radio while operating their vehicles. As to the fourth radio in the vehicles, Peruggia stated that it is

not used for communication.

Peruggia testified that Deputy Chiefs are expected to respond in Emergency Mode while

operating their vehicle and monitoring their equipment in the same way that EMS Captains and

Lieutenants are expected to do so, without the presence of EMT aides. He emphasized that EMS

personnel are trained from the very beginning that safety is of primary concern, and that safety

concerns are reflected in EMS guidelines, including EMS OGP 107-01. He explained that EMS

personnel are instructed to make a scene assessment when they arrive at the scene of an incident, and

that their safety comes first, second that of their patient, and then of others. If a Deputy Chief believes

it is "not safe for them to operate then they should not operate in that environment until additional

assistance arrives." (Tr. at 649.) As to vehicle operations, Peruggia stated that all EMS personnel

undergo an emergency vehicle operators course where they are instructed on an overall defensive

driving program or the safe and prudent operation of EMS vehicles, with a specific emphasis on

Decision No. B-07-2007                                                                21

operating ambulances.[10] He also stated that although Deputy Chiefs are expected to respond promptly

to an incident, there is no prohibition against Deputy Chiefs planning their route to an incident before

responding in Emergency Mode or stopping their vehicle en route to an emergency in order to look

at their MDT, plan an appropriate route, or communicate via radio or phone.[11] Peruggia indicated that

response time is not a critical factor in the evaluation of Deputy Chiefs' performance. He also testified

that there have been times that he responded to an incident without an aide and has pulled to the side

of the road en route to an incident if he was unfamiliar with the location to which he is headed.

Peruggia stated that if a Deputy Chief did not perform certain duties because of safety reasons,

depending on the situation, EMS would conduct an investigation of the incident and if the safety

concerns were substantiated, no action would be taken against the Deputy Chief. He explained that

Deputy Chiefs are encouraged to take an aide on the overnight tour because they are usually the only

Chief on duty, they cover a larger geographic area, and because they may not be used to working

during those hours. It is at the Deputy Chief's discretion to find an EMT to function as his or her aide

during the overnight tour, and they are encouraged to vary their aides in order to develop the EMS

workforce. At the scene of an incident, the Deputy Chief has the authority to assign lower level EMS

personnel to perform duties as an aide.

During the events of September 11, 2001, Peruggia testified that he had assigned an EMT on

---

[10] Ambulances are usually operated by a minimum of two people. There is no specialized training received by Deputy Chiefs for safe driving.

[11] When asked on cross-examination whether a safety hazard would be created by pulling into the traffic or right lane of a New York City highway, Peruggia indicated that while he is not an expert, it could be considered dangerous. When asked whether he was suggesting that the Deputy Chiefs not stop on the right lane of any highway, he responded that if Deputy Chiefs are confused about where they are going and feel it important to read the MDT, when it is safe for them to pull their vehicle aside, including getting out at the nearest exit on a highway, they should do so.

the scene who assisted him in communicating to the command post information regarding the integrity of the World Trade Center towers.

## POSITIONS OF THE PARTIES

### Union's Position

The Union argues that the record demonstrates a practical impact on safety due to FDNY's removal of aides from full-time assignment to the Deputy Chiefs. First, the Union asserts that the amount of equipment that Deputy Chiefs must operate presents a safety impact when responding in Emergency Mode without the assistance of aides. The Union argues that when responding in Emergency Mode, while driving at considerable speed, Deputy Chiefs are required to monitor the MDT, the various radios, and communicate with dispatchers and other units, and give directions to those at the scene, posing a safety risk. When Deputy Chiefs had aides, their safety was enhanced. The aides would drive the vehicle and assist in monitoring the radios, allowing the Deputy Chiefs to receive vital information and determine the best strategy to handle an incident.

Second, the Union submits that the expert opinion of Goldfarb, based on his personal experiences and review of certain studies and standards, shows that having aides is the primary issue affecting the safety of Deputy Chiefs. Goldfarb indicated that driving and operating the equipment in the vehicle presents a complex environment when responding in Emergency Mode that requires the assistance of an aide. For example, when he did have an aide with him on the way to a plane crash in the Rockaways, the aide was driving and allowed him to focus on developing a strategy to manage the incident. In another example, Goldfarb testified that because he did not have an aide when responding to an incident in Brooklyn, he missed vital safety information on his MDT – regarding

hostages being taken, shooting from a bar, and where the police had set up a safety zone – causing him to arrive on the wrong side of the scene and increasing the danger to himself.

Third, the Union asserts that the testimony of its witnesses regarding an alleged history of near-accidents or accidents that occurred before and after the removal of aides establishes that the absence of an aide affects the safety of Deputy Chiefs when responding in Emergency Mode. Lanotte testified that en route to an incident it was hard to concentrate on driving while listening to what was going on at the scene and making a plan of action, when suddenly a car pulled in front of her causing her seat belt to lock. Because of this incident, Lanotte sustained serious injuries for which she had surgery. The Union argues that if Lanotte had had an aide with her, the aide would have been driving while she processed the information on the radio and MDT, made notes and formulated a plan.

Furthermore, the Union asserts that Steffens' testimony regarding a near-collision which occurred because Steffens was talking on his cellphone, monitoring the radios, and took his eyes off the road to check the MDT, shows that the absence of an aide presents a safety impact. If he had had an aide with him, the aide would have been driving while Steffens focused on getting directions and digesting received information. The Union argues that while it is true that one could stop response in emergency mode to pull over, disengage lights and sirens, to read information, the preferred procedure is to proceed in the most expeditious manner. The Union asserts that Steffens, along with the other Deputy Chiefs, believes that FDNY requires Deputy Chiefs to continue in Emergency Mode rather than stop to check the MDT.

In addition, McCracken's testimony regarding Rice's accident in 1995 when he hydroplaned on a puddle while en route to an incident, shows that aides are essential to the safety of the Deputy Chiefs. Because of the accident, Rice sustained serious injuries and never returned to duty.

Decision No. B-07-2007                                                                 24

The Union also argues that the testimony demonstrates that at the scene of an incident, full-time aides are preferable from a safety standpoint to those assigned at the scene. Goldfarb testified that once at the scene of an incident, the aide is an important asset to detect problems that arise and to assist the Deputy Chiefs in managing the scene. For example, at the scene of an accident on the Grand Central Parkway, Goldfarb's aide assisted him in setting up the scene and giving medical assistance to the patients before the ambulance unit arrived. Santo testified that in 2005, during an overnight tour, her aide assisted her in dealing with a patient who had become violent. Lanotte described being at a riot on Rikers Island when she did have an aide with her "to watch her back." McCracken testified that aides play an important role at the scene of an incident because of the multitasking required from the Deputy Chief at the command post. He noted that several chiefs credit their aides with saving their lives on September 11, 2001. The Union asserts that, as McCracken explained, it is preferable to have a full-time aide rather than assign lower level EMS personnel on the scene because such aides have greater breadth of experience and ability to make decisions, and are able to identify hazards to Deputy Chiefs.

The Union claims that the testimony from the City's witnesses did not contradict the testimony from the Union's witnesses as to safety impact when responding in Emergency Mode and being at the scene of an incident without a full-time aide. Indeed, Gombo agreed with McCracken that it was not a good idea to remove the aides from assignment to the Deputy Chiefs, and that safety was a factor in his disagreement with their removal. Similarly, Peruggia's testimony did not contradict the safety concerns raised by the Union's witnesses. Peruggia attempted to minimize the importance of responding to an incident expeditiously by suggesting that a Deputy Chief could stop his vehicle to plan a travel route and by appearing to deny that time is of the essence when in Emergency Mode.

This testimony was negated by his answers on cross-examination when he admitted that it would be dangerous to pull over on the New York City highways, and that a prompt response is expected and taken into consideration in evaluating a Deputy Chief's performance.

Furthermore, the Union argues that the fact that Lieutenants and Captains drive similar vehicles without aides proves nothing because Deputy Chiefs cover a greater geographical area than that assigned to Lieutenants and Captains, and have multiple responsibilities including monitoring several incidents at the same time. In any event, the fact that Lieutenants and Captains also operate in a dangerous environment which could be relieved by an aide does not undermine the Deputy Chiefs' safety need for aides.

Finally, the Union argues that the exact number of emergency assignments to which Deputy Chiefs respond is not significant. Whether they respond to a few emergency assignments per week or per day is not determinative of whether a safety impact exists. One serious accident alone is sufficient to conclude that there is an increased danger when an aide is not present. During the hearing, the Union offered an article regarding a recent and much publicized incident in which several firefighters were killed performing rescues without a working fire escape. Following the public outcry, ropes became standard equipment for firefighters. The Deputy Chiefs in this case should not have to wait for a serious accident to occur before the aides are restored.

**City's Position**

The City argues that the Union has not established a safety impact of any kind over which the City must bargain. The Union's assertion that the removal of aides impacts the safety of the Deputy Chiefs when they are operating EMS vehicles and equipment is not supported by the evidence. Based upon the definition of motor vehicle accident contained in EMS OGP 10703, there have been only

two motor vehicle accidents involving a Deputy Chief while on duty, both of which predate the removal of aides. In fact, in one of the accidents an aide was accompanying the Deputy Chief who was injured. In contrast, there have been no reported motor vehicle accidents in which a Deputy Chief has been injured since the removal of the aides in March 2002. Furthermore, there was no evidence presented that any Deputy Chiefs reported being involved in an unusual occurrence, despite the Union's access to such reports.

The City claims that the Union merely offered anecdotal testimony of only four motor vehicle incidents in which a Deputy Chief was operating an EMS vehicle in emergency mode without an aide. Lanotte and Steffens testified regarding incidents in which the safety risk was not due to the absence of an aide in the vehicle but rather the uncontrollable poor decisions of other drivers. Similarly, McCracken's testimony about an accident involving a Deputy Chief before EMS merged with FDNY simply established that the vehicle hydroplaned on a puddle. The Union did not establish that these third party and environmental risks somehow increase without an aide or that such incidents would not have occurred had an aide been present.

The City also argues that the Board should reject the Union's contention that the complexity and difficulty involved in operating equipment contained in an EMS vehicle make it unsafe for Deputy Chiefs to operate the vehicle in emergency mode without an aide. The testimony revealed that the MDT can be set to make an audible tone when information is received and any pertinent information about an incident to which a Deputy Chief is responding, including safety information, is also broadcast over the 400 radio. Thus, the Deputy Chief is not required to look down at the MDT while driving. Further, all information sent via the MDT is stored and can be accessed once the Deputy Chief arrives safely on the scene. As to other radios in the vehicle, the radio at the rear of the

console is not actively utilized by the driver, and the 800 radio is not commonly utilized unless there is a multiple casualty event. Indeed, Cali and Steffens testified that this radio is infrequently used and is mainly for administrative communications. Steffens testified that the 400 and Fire radio are the most active during emergency operations.

The City asserts that Deputy Chiefs previously served as EMS Captains and Lieutenants driving similar or larger vehicles with the same devices. Moreover, the rank of Deputy Chief is only attained by the most qualified and skilled personnel. The job specification of the lowest rank within EMS – EMT – sets as a typical task the operation of the MDT and monitoring the department radio at all times. Of the current 14 Deputy Chiefs, the years of service within EMS ranges from 20 to 35 years. The City contends that it is implausible that Deputy Chiefs cannot operate an EMS vehicle safely. Indeed, vehicles are equipped with maps and the Deputy Chief should plan a route to get to an incident before engaging the vehicle's lights or sirens. Peruggia testified that Deputy Chiefs are not evaluated based on their response time. He also testified that if a Deputy Chief is having difficulty finding a location, they can stop the vehicle when safe to do so to determine the appropriate route or to perform another function such as reading the MDT. Contrary to Steffens' testimony that a Deputy Chief is not supposed to stop en route to a location in emergency mode, EMS OGP 107-01 emphasizes safety as a primary concern when operating a vehicle in emergency mode.

The City argues that under EMS OGP 107-01, when a Deputy Chief encounters an incident similar to the one described by Goldfarb on the Grand Central Parkway, the Deputy Chief is required to wait until another emergency vehicle has arrived with personnel to assist in securing the area. Similarly, as to the incident on Rikers Island in which Lanotte was involved, although she admitted that EMS personnel are taught that personal safety is a primary concern, she chose to enter a

dangerous situation. Peruggia testified that EMS teaches EMT personnel to always perform a scene

assessment, and not to enter a dangerous or unsafe environment until additional assistance arrives.

He said that no disciplinary action would be taken against an employee who refused to perform an

EMS function because of safety concerns. Although Union's counsel questioned whether there would

be an investigation about such a refusal, the Union did not present any evidence to establish that

Deputy Chiefs have been disciplined or pressured regarding performing unsafe tasks.

Furthermore, the City asserts that of the 14 Deputy Chiefs, ten were appointed after March

2002 and have never performed their duties with the assistance of an aide. Of the remaining four,

Lanotte was appointed in September 2001 and had an aide for approximately six months. Cali was

appointed in May 2001 and was assigned an aide for approximately ten months. The Board should

take note that of the 14 Deputy Chiefs, and after almost four years since the reassignment of aides,

the Union produced only one Deputy Chief to testify about a specific incident while operating an

EMS vehicle in Emergency Mode.

Testimony regarding the events of September 11, 2001, are not probative of the issue before

the Board because it presents the extreme or rare scenario that does not accurately depict the

day-to-day job functions of the Deputy Chief. Furthermore, only a small portion of a Deputy Chief's

time is spent responding in Emergency Mode.

Any impact from the lack of an aide at the scene of an incident is alleviated by the Deputy

Chiefs' authority to assign lower level EMS personnel from an EMT to a Captain to perform any task

that would have been performed by an aide, including monitoring the radios. McCracken conceded

that the Deputy Chiefs have this authority and merely felt that a permanent aide rather than one who

is assigned is preferable. There was no testimony to explain why this is relevant to the safety of the

Deputy Chiefs. McCracken testified regarding how helpful the aides were on September 11, specifically Peruggia's aide, who was an EMT that Peruggia had assigned at the scene and not a full-time aide.

The City asserts that although the Union may rely on the fact that because a Deputy Chief can have an aide during the overnight tour, a full-time aide is necessary, the decision to allow aides on the overnight tour is based on the special circumstances of that tour, such as the larger geographic area to cover, and the greater physical difficulty posed by the tour.

## DISCUSSION

The Union asserts that FDNY's decision to remove EMTs from full-time assignment as aides to the Deputy Chiefs has resulted in a practical impact on safety. This Board finds that on the record herein, the Union has failed to establish a practical impact on safety, and, accordingly, denies the Petition.

Section 12-307(b) of the NYCCBL provides the public employer discretion to act unilaterally in certain enumerated areas outside the scope of bargaining. Such areas include staffing levels, assigning and directing employees and determining their duties during working hours.[12] *Correction*

---

[12] NYCCBL § 12-307 (b) provides, in relevant part: It is the right of the city, or any other public employer, acting through its agencies, to determine the standards of services to be offered by its agencies; . . . direct its employees; . . . determine the methods, means and personnel by which government operations are to be conducted; . . . and exercise complete control and discretion over its organization and the technology of performing its work. Decisions of the city or any other public employer on those matters are not within the scope of collective bargaining, but, notwithstanding the above, questions concerning the practical impact that decisions on the above matters have on terms and conditions of employment, including, but not limited to, questions of workload, staffing and employee safety, are within the scope of collective bargaining.

*Officers Benevolent Ass'n*, Decision No. B-26-99 at 9; *Uniformed Firefighters Association*, Decision No. B-70-89 at 2.

However, pursuant to NYCCBL § 12-307(b), where managerial action involving a non-mandatory subject results in a practical impact on employee safety, the employer is required to negotiate over the alleviation of that impact. *Uniformed Firefighters Ass'n*, Decision No. B-4-89 at 342. Only when either the exercise of a management right or management's inaction in the face of changed circumstances is shown to result in a practical impact does a duty to bargain arise over the means of alleviating that impact. *Uniformed Firefighters Ass'n*, Decision No. B19-2003 at 7. However, a finding by the Board that a practical impact exists is a condition precedent to the imposition of the duty to bargain. Thus, there can be no violation of the NYCCBL by way of a refusal to bargain until the Board has first found that a practical impact has been demonstrated. *Communications Workers of America, Local 1180*, Decision No. B-47-89.

We have consistently stated that the question whether a threat to safety has resulted from the employer's exercise of its management right is a question of fact to be determined by this Board. *Uniformed Firefighters Ass'n*, Decision No. B-39-92 at 37; *Correction Officers' Benevolent Ass'n*, Decision No. B-34-82 at 10. To avail itself of the practical impact protection of the law, the union has the burden to demonstrate that a practical impact on safety exists. *S.E.I.U., Local 621*, Decision No. B-34-93 at 9. The union must substantiate, with more than conclusory statements, the existence of a threat to safety before we will require the employer to bargain. *Id.*

In determining the issue of a practical impact on safety, this Board has taken into consideration, along with other factors, whether employees' adherence to management procedures and guidelines would obviate any safety concerns. *Uniformed Firefighters Ass'n*, Decision No.

B-39-92 at 38. We have also considered whether the employer has adopted measures that offset any

potential threat to safety. *See Lieutenants Benevolent Ass'n*, Decision No. B-45-93 at 2 (holding no

safety impact because employer's solo patrol program incorporated safeguards); (finding FDNY's

proposed plan to reduce the minimum staffing requirement in some firefighting companies from five

to four-man crews, alongside its roster staffing program, would not result in a practical impact on the

safety of firefighters.)[13]

It is important to emphasize, as *Uniformed Firefighters Ass'n*, Decision No. B-39-92 at

42 makes clear, that the Board does not require a union to show that injuries have actually resulted

from management's action in order to demonstrate a practical impact on safety. In that case, the Board

addressed the question of whether the City's program to assign light duty firefighters instead of full

duty firefighters to the position of Division Aide, would have a practical impact on the safety of the

light duty firefighters, full duty firefighters and fire officers.[14] After a hearing, the Board found, even

absent any showing that injuries had resulted, that the light duty program did have a practical impact

on the safety of full duty firefighters and fire officers. In reaching its conclusion, the Board found that

Division Aides played a crucial role in firefighting operations, that light duty firefighters had not been

adequately trained in the duties unique to Division Aides, and that this failure presented an impact

on the safety of full duty firefighters and fire officers working with them at the fire scene. Persuasive

testimony from the highest levels of command established that 1) having to train light duty Division

---

[13] The roster staffing program "provides for the automatic dispatch of additional units when
the initial response to a fire includes engines operating with fewer than five firefighters."*Uniformed
Firefighters Ass'n*, Decision No. B-70-89 at 6.

[14] Firefighers are placed on "light duty" by department medical officers when, for any reason,
they are unable to perform the physically demanding duties of a firefighter.

Aides while at the site would impact the safe performance of the duties of firefighters and fire

officers; 2) while a chief is in charge of a fire operation, the light duty Division Aide would be unable

to accompany the chief into the fire building, or any environment requiring the use of Self-Contained

Breathing Apparatus, functions that are key to the safety of firefighters and fire officers; and 3) that

it would be inadequate to substitute an untrained full duty firefighter on the scene to perform the

functions of a Division Aide. Furthermore, the Board found that no provisions had been made by the

City in consideration of the impact the light duty status of Division Aides would have on firefighting

operations and the safety of full duty firefighters and fire officers. In addition, the Board found that

the measures relied upon by the City, such as calling additional units to the scene, were inadequate

to protect the safety of fire personnel because any delay in their arrival could result in lengthier fire

operations and thus a greater likelihood of injury or death to firefighters and fire officers. However,

the Board held that the light duty program, while having a safety impact on full duty firefighters and

fire officers, did not have a safety impact on light duty Division Aides themselves for if light duty

aides followed the rules and procedures set forth in operating guidelines, their safety would not be

placed in jeopardy.[15]

   In the instant case, unlike full duty firefighters and fire officers considered in *Uniformed*

*Firefighters Ass'n,* Decision No. B-39-92, we find that the evidence does not establish that a practical

impact on safety exists. In support of its claim that FDNY's removal of full-time aides assigned to

Deputy Chiefs resulted in a practical impact on safety, the Union: 1) presented evidence regarding

---

[15] The operating guidelines for light duty firefighters assigned as Division Aides prohibit the performance of the physically demanding duties required of full duty firefighters, both inside and outside the fire structure; and any duties in confined spaces or areas within buildings where toxic substances or oxygen deficiency are present and which require the use of Self-Contained Breathing Apparatus "SCBA".

the amount of equipment Deputy Chiefs must operate when responding in Emergency Mode; 2) offered the expert opinion of Goldfarb, based on his personal experiences and review of certain studies and standards; 3) presented witness testimony regarding an alleged history of near-accidents or accidents that occurred before and after the removal of aides; and 4) offered testimony to show that at the scene of an incident, full-time aides are preferable to those assigned at the scene. Based on the record before us, we are not persuaded that this evidence establishes an impact on safety.

First, we address the Union's argument that the amount of equipment that Deputy Chiefs must operate when responding in Emergency Mode without the assistance of aides presents a safety impact. We find that the evidence did not demonstrate that FDNY's removal of full-time aides has had an impact on the safety of Deputy Chiefs.[16] When responding in Emergency Mode, the record showed that Deputy Chiefs monitor communications in order to gather information in preparation for arrival at an incident. It is undisputed that the 400 radio transmits all pertinent information regarding an incident, including any safety issues, and that the same information is transmitted via the MDT. Furthermore, the MDT stores information transmitted which can be reviewed at a later time – such as upon arrival at the scene – or retrieved as a printout. The record did not show that Deputy Chiefs are required to use the radio microphones or cellphones to communicate regularly while responding in Emergency Mode.

The record also shows that when responding in Emergency Mode, Deputy Chiefs have discretion to stop their vehicles if necessary to process information received via radio or the MDT.

---

[16] Although Deputy Chiefs no longer have aides on full-time assignment, they are authorized and encouraged by FDNY to have an aide during the overnight tour, as well as during special events when Deputy Chiefs are assigned to large EMS operations. Indeed, Santo testified that the aide she had with her during an overnight tour in 2005 assisted her in dealing with a patient who became violent.

There is no evidence to suggest that, even in Emergency Mode, Deputy Chiefs are discouraged from getting directions before beginning their response, or quickly reviewing information once they get to the scene of an incident before exiting their vehicle. Indeed, EMS guidelines, as well as testimony from both the Union and City witnesses, state that FDNY emphasizes that safety is of primary concern both when responding to an incident in Emergency Mode and at the scene of an incident. In addition, Peruggia testified that although FDNY expects Deputy Chiefs to respond promptly, response time is not a critical factor in their performance evaluation. Furthermore, the Union presented no evidence to show that Deputy Chiefs have been disciplined for failing to perform or pressured regarding unsafe tasks.

We also are not persuaded by Goldfarb's testimony based on standards and studies by national agencies. These standards and studies were not offered into evidence, but in his testimony, Goldfarb acknowledges that the standards and studies to which he referred did not address the question of chiefs' aides in the EMS service. Rather, they referenced chief's aides in the fire service, a service whose duties are quite different form those of the EMS service. Therefore, we find that they are not probative of the issues in this case. No standards or studies concerning chiefs' aides in the EMS service were offered by the Union. Because Goldfarb's opinion is not based upon germane standards and studies, and because the basis for his alleged expert opinion was not substantiated in the record, we do not accord his testimony any additional weight as an expert opinion, but limit our consideration to his testimony regarding his direct experiences and observations with EMS. With regard to Goldfarb's testimony that in March 2002 while on an overnight tour,[17] he missed safety information

_____

[17] Goldfarb did not explain why he did not have an aide although he is entitled to assign one on the overnight tour.

transmitted via the MDT, we cannot find that this rises to the level of a safety impact because he

admitted that even though he could have stopped to read the MDT, he chose not to. Goldfarb's

subjective opinion that speed was paramount was also not supported by the record. Furthermore, the

incident described by Goldfarb which occurred on the Grand Central Parkway did not establish a

safety need for an aide as conformity with EMS OGP 107-01 would have dictated that Goldfarb

should have waited for additional EMS personnel to arrive before securing the area.

We further find the Union's testimony concerning accidents or near-accidents that occurred

both before and after the removal of the aides in March 2002 did not establish any safety impact

causally connected to the absence of aides.[18] For example, Steffens testified that a car pulled in front

of him while he was trying to get directions to an incident on his MDT. The record does not

demonstrate that the incident was caused by Steffens' inattention as opposed to the other driver's

erratic driving. The other car could have cut in front of Steffens' vehicle even if an aide were driving.

Moreover, Steffens could have pulled over to view the MDT or used the 400 radio. That he was

embarrassed to ask for directions over the radio was not an adequate reason not to do so.

Similarly, no evidence was presented to show that Lanotte's January 2005 near-accident was

in any way causally connected to the lack of an aide. Even if an aide had been driving, there is no

basis to conclude that the other car would not have pulled in front of Lanotte's vehicle, causing the

same near-accident. Indeed, Lanotte testified that while other cars were moving out of her way, one

car suddenly decided to pull back in front of her. With regard to McCracken's testimony that Rice

was tragically injured because his car hydroplaned on a puddle in 1995, we cannot conclude that this

---

[18] We note once again that a lack of evidence regarding injuries or accidents resulting from management's action is not by itself determinative for finding a practical impact on safety.

weather related accident was causally connected to the absence of an aide. Nothing in the record refutes the conclusion that Rice's car could have hydroplaned on the wet surface regardless of who was driving. In addition, the accident occurred over ten years ago and McCracken based his testimony not on direct observation, but on information provided to him by a dispatcher after the accident.

With regard to testimony from the Union's witnesses that full-time aides are preferable from a safety standpoint to those assigned at the scene, we find that the record presented no evidence to show that aides assigned at the scene have an impact on the safety of Deputy Chiefs. McCracken's testimony that in his opinion full-time aides are preferable and more efficient to those assigned at the scene because of their greater breadth of experience, ability to make decisions and identify hazards to Deputy Chiefs, does not establish that assigning an aide at the scene poses a safety impact. Indeed, McCracken credited an EMT assigned by Peruggia on September 11, 2001, with aiding in preventing EMS fatalities. As to Lanotte's testimony that in 2001 she entered a dangerous or unsafe environment when she was at a riot on Rikers Island and felt safer because her full-time aide was with her, both the City and Union witnesses agreed that EMS teaches Deputy Chiefs to make a scene assessment and that personal safety is a primary concern. Peruggia testified that if Deputy Chiefs feel that their safety is at risk at the scene, it would be appropriate for them to wait until additional assistance arrives.

For the foregoing reasons, we conclude that the record does not establish that FDNY's removal of aides from full-time assignment to Deputy Chiefs has a practical impact on the safety of Deputy Chiefs. Accordingly, we find that the City has no duty to bargain over the removal of aides from full-time assignment to Deputy Chiefs and dismiss the Union's claim of a practical impact on safety.

## ORDER

Pursuant to the powers vested in the Board of Collective Bargaining by the New York City

Collective Bargaining Law, it is hereby

ORDERED, that the Union's claim of a practical impact on safety in BCB-2456-05, be, and

the same hereby is, dismissed.

Dated: February 26, 2007
       New York, New York


_____    MARLENE A. GOLD
_____            CHAIR

_____    GEORGE NICOLAU
_____            MEMBER

_____    CAROL A. WITTENBERG
_____            MEMBER

_____    M. DAVID ZURNDORFER
_____            MEMBER

_____  I dissent.    CHARLES G. MOERDLER
                                                             MEMBER


Note:  Alternate Labor Member Gabrielle Semel recused herself and did not participate in the
decision in this case.

## DISSENTING OPINION OF LABOR MEMBER CHARLES G. MOERDLER

Most recently in *Uniformed Firefighters Association*, Decision No. B-39-2006, Docket No.

BCB-2531-06, I noted my dissent from the majorities' expansive view of an unauthorized and

Decision No. B-07-2007                                                                              38

unlawful managerial prerogative (howsoever phrased). Thus posited, the counter-balancing

practical impact analysis, upon which the majority rests its view, is inappropriate. Accordingly,

I dissent.

February 26, 2007


                                                        CHARLES G. MOERDLER
                                                              MEMBER