# EXHIBIT 10

### *DC 37*, 4 OCB2d 19 (BCB 2011)
(IP) (Docket No. BCB-2648-07)

*Summary of Decision*: The Union claimed that the FDNY violated its duty to bargain by unilaterally changing procedures in the FDNY's substance abuse policy for EMS workers. The City contended that the policy change largely falls outside the scope of mandatory bargaining, and that, to the extent bargaining is required, the City has satisfied its duty to negotiate.  After a hearing, the Board found that unilateral changes were made by the City.  The Board further found that the addition of an alternative testing methodology when a urine sample cannot be obtained falls within the mandatory scope of bargaining.  However, the City's adoption of new testing triggers, definitions of what test results are deemed to constitute positive results, and adoption of a "zero tolerance" policy resulting in termination for a first offense were found to be within management's rights.  Accordingly, the petition is granted in part and denied in part. *(Official decision follows.)*

OFFICE OF COLLECTIVE BARGAINING
BOARD OF COLLECTIVE BARGAINING

In the Matter of the Improper Practice Proceeding

-between-

DISTRICT COUNCIL 37, AFSCME, AFL-CIO,
and ITS AFFILIATED LOCALS 2507 and 3621,

Petitioners,

- and -

THE NEW YORK CITY OFFICE OF LABOR RELATIONS
and the
THE FIRE DEPARTMENT OF THE CITY OF NEW YORK,

Respondents.

### DECISION AND ORDER

On September 14, 2007, District Council 37, AFSCME, AFL-CIO, filed a verified improper practice petition on behalf of itself and its affiliated Locals 2507 and 3621 (collectively, "DC 37" and "Union"), against the New York City Office of Labor Relations ("City") and the Fire

Department of the City of New York ("FDNY").[1]  The Union alleges that the FDNY violated §§

12-306(a)(1) and (4) of the New York City Collective Bargaining Law (New York City

Administrative Code, Title 12, Chapter 3) ("NYCCBL") by, on May 7, 2007, implementing without

bargaining a revision to Chemical Substance Testing Operating Guide Procedure 113-02 ("Revised

Policy").  The Revised Policy, like the previous Operating Guide Procedure ("OGP") 113-02, issued

in 1999 ("Prior Policy"), is applicable to Emergency Medical Service ("EMS") employees in the

titles Emergency Medical Service Specialist-EMT ("EMT"), Emergency Medical Service Specialist

Paramedic ("Paramedic"), and Supervising Emergency Medical Specialist, Levels I and II

("Lieutenant" and "Captain," respectively).  The City argues that no substantive change took place,

and that, in any event, any unresolved issues do not implicate mandatory subjects of bargaining.

After a hearing, the Board finds that unilateral changes were made affecting four different

areas of the policy.  First, the FDNY changed "testing triggers," that is, the basis upon which an

employee is selected for drug or alcohol testing.  Second, the FDNY altered the Policy as to what

test results constitute a positive reading for drugs or impairment by consumption of alcohol.  Third,

the adoption of blood testing as an alternative to urine testing when a urine sample cannot be

obtained represents a change in methodology.  Finally, the adoption of the "zero tolerance" policy

constitutes a change from the prior policy which allowed for the employee to appeal to the discretion

of the employer and seek counseling and treatment instead of termination.  The record establishes

that these changes were not mere clarifications of existing policy, nor were they *de minimis*.

---

[1]  The proceedings in this matter were adjourned at various times, based upon the parties'
request for extensions of time to file responsive pleadings and the pending of the impasse
proceeding, subsequently withdrawn.  Additionally, the case was held in abeyance during the
pendency of litigation relevant to the legal issues herein.

Under the circumstances presented by the record in this case, the Board finds that three of the four areas of change at issue are not mandatory subjects of bargaining. The addition of a new alternative methodology where a urine sample cannot be obtained is a mandatory subject of bargaining and the failure to bargain prior to implementation of it violated the NYCCBL. Accordingly, the petition is granted in part and denied in part.

## BACKGROUND

The Trial Examiner found that the totality of the record established the relevant background facts to be as follows:

The FDNY has been the municipal provider of pre-hospital emergency medical treatment and transport throughout the New York City 911 system since March 1996, when EMS functions were transferred from the Health and Hospitals Corporation to the FDNY.[2] Jerry Gombo, Chief of the FDNY's EMS Operations, testified that EMS employees are required to provide emergency medical services, including but not limited to operating ambulances in emergency mode under conditions which are at times dangerous, such as during inclement weather conditions and occasionally against traffic patterns and signals. He testified that these EMS employees are often required to make life and death decisions regarding patient care under pressured conditions.

EMS employees have been subject to several iterations of City policy pertaining to alcohol and drug testing including policies which precede the one currently at issue. Promulgated in 1994, OGP 102-6 remained in effect for EMS members throughout the merger of the EMS with the FDNY in April 1996. On June 15, 1999, the FDNY issued the Prior Policy, banning the use and possession

---

[2] OLR Commissioner James Hanley testified that EMTs and Paramedics are "absolutely not" considered "uniformed employees " for purposes of collective bargaining. (Tr. 470-471).

of alcohol and drugs in the workplace.  In May 2007,  the Revised Policy giving rise to the instant

improper practice petition was implemented.  According to OLR Commissioner James Hanley,

addressing public and employee safety was the impetus for the Revised Policy.[3]

At issue here is the May 2007 Revised Policy which differs from the Prior Policy in four

ways.  First, the Revised Policy expanded the universe of employees subject to random testing, as

well as expanding the definition of "reasonable suspicion" to include a broader variety of behavior

that would occasion testing.  Second, the Revised Policy amended the levels of alcohol <u>and measure</u>

<u>of</u> drug content that is deemed to constitute a positive test result.  Third, the Revised Policy

supplemented urine testing with blood testing where an employee was unable to complete a urine

test for the purposes of random testing.  Finally, the Revised Policy adopted a "zero tolerance" policy

for drug testing, which the Union asserts eliminated the prior practice of allowing first time offenders

to seek counseling and rehabilitation instead of terminating their employment in every case.

### 1.    Testing Triggers: Reasonable Suspicion and Expanded Testing

Prior to the promulgation of the Prior Policy, the original policy, OGP 102-6, required

chemical substance testing whenever a "reasonable suspicion" existed that the EMS employee was

under the influence of an intoxicating chemical or substance.  *See DC 37*, 57 OCB 16 (BCB 1996)

at 3-4.  Pursuant to OGP 102-6, "reasonable suspicion may be based on, but not limited to, the

following":

---

[3] To demonstrate the effect of illegal substance abuse on workplace performance, the City
offered testimony from the improper practice proceeding docketed as BCB-1723-95 between the
same Union and the City involving the same bargaining unit at issue here.  Although the expert
witness, Marian W. Fischman, Ph.D., was deceased, her testimony which had been subjected to
cross-examination by the Union, was accepted into evidence on June 23, 2010, over the Union's
objection.  *See* CPLR 4517(a)(3)(I); *Haller v. Gacioch*, 68 A.D.3d 1759 (4th Dept. 2009)
(admitting evidence under similar requirements of  CPLR Rule 4517(a)(4)).

> slurred speech, alcohol on breath, glassy eyes, poor coordination,
> appearance, direct observation, irrational behavior or a triggering
> event such as a motor vehicle accident, or other incident which
> suggests that the employee is not fit for duty or suggests that the
> employee is impaired and that the impairment may have an adverse
> effect on the employee's ability to safely and effectively discharge the
> employee's duties.

(*Id.* at 4).

When initially adopted in 1999, the Prior Policy provided for testing of an employee when a supervisor had reasonable suspicion of unfitness for duty and/or impairment. Reasonable suspicion was defined in identical terms. (Ans. Ex. A, § 3.4). However, the Revised Policy added to the reasonable suspicion trigger a section entitled "Possible Signs of Alcohol or Drug Abuse." (Pet. Ex. A, §10). That section details behavior changes reported by a spouse or other family member or observed on the job, such as the following: physical appearance ("sloppy, unkempt, unshaven"; vein inflammation and scarring; "wears sunglasses indoors"; "smells of alcohol or marijuana"; unsteady gait; extremities shake), work related conduct ("suffers injuries when not engaged in emergency operations"); interaction with co-workers and supervisors (slurred speech; "avoids co-workers he/she was once friendly with"; "blames mistakes on others and poor equipment"; "increased talkativeness or hyperactivity"); personal traits (drowsiness; nervousness; tense and withdrawn; depression); personal problems that become evident ("employee receives calls, letters or legal papers from creditors at his or her place of employment"; "employee's paycheck is subject to deductions from creditors or for child support"; "strained personal relationships are observed"; "employee is arrested"). (*Id.*). Moreover, the Revised Policy also expanded reasonable suspicion testing to include testing of EMS employees who are under arrest on charges related to conduct prohibited under the policy, or who have been hospitalized after a major motor vehicle accident involving a

Departmental vehicle.  (Pet. Ex. A § 8.1).

In addition, the Revised Policy specified the duties of employees including supervisory personnel in the reporting and enforcement of a violation of the Revised Policy and penalties for failure to comply: "Every supervisor who observes an employee exhibiting signs of alcohol or drug abuse listed in Section 10 [possible signs of alcohol or drug abuse] of this OGP shall consult with the Counseling Service Unit ("CSU") and may refer the employee to the CSU.  (Id., § 7.4).

Daniel Shacknai, FDNY First Deputy Commissioner, testified about his work on the revised policy when he was Deputy Commissioner for Legal Affairs and General Counsel during the time relevant herein.  He stated that "we wanted to provide guidelines to our officers and supervisors on what would constitute reasonable basis for having someone tested." (Tr. 567).  He characterized the wording in the revised policy as not constituting a new substantive change.  (Tr. 566).

Moreover, for the first time, the Revised Policy incorporated a random drug testing program for all EMS employees (as opposed to the Prior Policy which provided for random testing of employees who previously tested positive under the reasonable-suspicion testing criteria).

## 2.     Definition of Prohibited Conduct

The Revised Policy broadened the threshold of what constitutes a positive test by measuring the presence of a "drug metabolite."  The revisions do not require evidence of any degree of impairment resulting from the metabolite's presence.  It also set a new standard of what would be defined as impairment due to alcohol intoxication, specifically .05 %.

Explaining the FDNY's reasoning behind these changes, Shacknai testified that the FDNY "established levels and cut-offs" to determine what constitutes a positive test result, "objective

findings to determine whether a member is subject to discipline." (Tr. 576). He stated that the levels established under the FDNY's drug-testing policy are "established, scientific levels that correlate with impairment." (Tr. 577). Asked if this were a self-defined standard of impairment, Shacknai testified, "We go by levels. They are established. Everyone knows what they are and that's how we determine whether somebody is subject to the policy or not." (Tr. 578). The exception, he testified, is with alcohol, which subjects the individual found to be under its influence to the FDNY disciplinary process but not the zero tolerance policy. He testified that testing for alcohol impairment is based on grounds of reasonable suspicion, not random testing.

3. **Testing Methodology and Procedures**

Contemporaneous to the promulgation of OGP 102-6 in 1994, the City also issued a command memorandum setting out procedures and protocols for urine collection. The Revised Policy supplemented urine testing with blood testing where an employee was unable to provide a urine sample for random testing. Additionally, the Union asserts, the right of the employee to have Union representation at the time of the testing was eliminated. Nothing in the Prior Policy specifies the right to union representation. However, Dorecia Phillip, Special Assistant Counsel to the FDNY, testified that, since June 2006, she has been responsible for the unit that performs random drug testing for the FDNY. She testified that she did not deny employees union representation but rather informed them of their right to consult their union. (Tr. 549-50). While the City did not stipulate to the provision of representation or acknowledge a right to representation, the Union did not adduce or allege any specifics facts to support the conclusion that union representation has been eliminated or denied. Additionally, Philip was not contradicted on this point and was not challenged on cross-examination.

With respect to random testing of EMS employees, Union President Patrick Bahnken testified

that, under the Revised Policy, the random testing procedures do not assure that employees under

the influence of prohibited substances at the time they are randomly tested will be kept from

administering patient care. He explained that after the testing, an employee received the keys to the

ambulance back and is put back into service; only after three days, when a positive result is received

is the employee restricted from duty.  (Tr. 194).

Witnesses for the City testified that they were aware of this time lag between random testing

and the availability of test results, with an interim period during which the employee continues to

work.  Robert Wallace, Assistant Commissioner for the FDNY's Bureau of Investigation and Trials

("BITS") testified that he was aware of it.[4]  (Tr. 538).  Phillip confirmed Wallace's testimony about

a lag of "approximately five days" between testing for drugs and positive test results "because they

do have to do a confirmation [test]."[5]  (Tr. 543-44).

### 4.      Zero Tolerance

As to discipline, the Prior Policy stated:

> If the test results are positive, the Assistant Commissioner of BITs
> shall notify the employee's Station/Unit Commanding Officer who
> will ensure that the member is relieved of duty and that the
> appropriate Departmental charges are proffered against the member
> by the member's immediate supervisor.

(*Id.*, § 4.5).

The Prior Policy does not provide for counseling of an employee who tests positive.  The

---

[4] In his role with BITS, Wallace is charged with overseeing the performance of substance abuse testing based on reasonable suspicion and with handling FDNY disciplinary proceedings.

[5] She also confirmed that a lag of two days is common for negative test results and that random testing does not include random testing for alcohol.

word "counseling" does not appear in the Prior Policy. The Revised Policy imposes zero tolerance for FDNY employees found to have tested positive for illegal drugs or who refuse to provide a sample. In addition to referencing the range of penalties that the New York State Department of Health is authorized to impose, such as suspension of an EMS certificate pursuant to the New York State Public Health Law, § 12-a, the Revised Policy specifically added the following language about penalties for a positive test sample: "Violation of this policy may result in disciplinary action up to and including termination. . . ." (*Id.*, § 2.7).

Section 9 of the Revised Policy states, in pertinent part, that the penalties for a first drug related offense is termination, whether that offense is a positive test, or a refusal to take a test.[6]

---

[6] This section includes a penalty schedule reading as follows:

9.1 Suspensions:
Pre-Penalty Administrative Action
Employees may be suspended for up to thirty (30) days in the following situations:
*         Any violation of Section 6 or 7 of this policy
*         Positive test results for Illegal Drug or Alcohol (on-duty)
*         Drug or Alcohol Related arrest
*         DWI/DWAI arrest

9.2. Any Violation of Section 6 of this Policy Relating to Alcohol
*First Offense:* Up to 90 days pay, 2 years testing, referral to CSU, final warning for
              substance-related misconduct
*Second Offense:* Up to TERMINATION

9.3. Positive Test Result for Illegal Drug/Refusal to Provide Specimen: Penalties
*First Offense:* TERMINATION

9.4 Drug Related Arrest: Penalties
*First Offense:* UP to TERMINATION

9.5 DWI/DWAI Convictions: Penalties
*First Offense:* (not involving an accident or injuries):
              15-30 days' pay, 1 year of testing, referral to CSU, final warning for
              violations of [*sic*] substance-related misconduct

Shacknai testified about the FDNY's stated purpose in implementing a zero tolerance policy

with regard to drugs in the workplace of EMS employees, saying that random drug testing was

viewed as a deterrent to substance abuse and that random testing supported the Department's core

mission of keeping the public safe and its corollary mission of keeping members of the Department

safe in their work.[7]  Wallace testified for the City that under the Revised Policy, a positive drug test

mandates termination even in the "one or two" cases in which EMS employees with more than 20

years of service were discharged because of positive drug tests.  (Tr. 517-18).

---

*First Offense:*  (involving a motor vehicle accident, any injury or other aggravating
factor(s)):
30-60 days' pay, 2 years of testing, referral to CSU, final warning for
violations of [*sic*] substance-related misconduct
*First Offense:*  (resulting in the serious injury or death of any person):
Up to TERMINATION
*Second Offense:* Up to TERMINATION

9.6  Termination of Probationary EMS Personnel

9.6.1  A probationary employee of the EMS Command shall be terminated under the
following circumstances:
A.       Refusal to cooperate in a required substance test; or
B.       Positive drug test indicating conduct prohibited by this policy.

9.6.2  A probationary employee of the EMS Command may be terminated for any
violation of this policy.

[7]  The Revised Policy states that the "Department reserves the right to depart from these
guidelines as the exacerbating of extenuating circumstances of each individual case requires."
(Pet. Ex A, Ans. Ex G, § 9).  However, the testimony was unequivocal that the policy was
intended to establish a "zero tolerance" policy for drug usage, and to result in termination for a
positive drug test or for refusal to take a drug test as the norm.  (*See, e.g.*, Tr. 517 (Wallace));
563, 581-582, *et seq.* (Shacknai).  Shacknai further testified that this "zero tolerance" policy, as
both parties refer to it, pertains to drugs only, not to alcohol.  Wallace similarly testified that the
zero tolerance policy does not pertain to alcohol abuse while on duty, explaining that alcohol
intoxication is "easier to detect for somebody who's on duty," whereas with drug intoxication,
"it's harder to identify somebody who is under the influence of a substance like cocaine, and
that's the danger." (Tr. 523).

Moreover, the Union asserts that the Revised Policy eliminates a past practice of first allowing employees to seek treatment and counseling upon producing a positive drug test result and subsequently submitting to follow-up testing after rehabilitation before a final penalty was imposed. The Prior Policy did not specifically provide for successful completion of counseling as a grounds for mitigation of disciplinary penalties.  Union President Bahnken testified, however, that he was familiar with the disciplinary cases brought against members of his Local since June 1999 and before the implementation of the Revised Policy in May 2007.  He testified that, during that time period, in some but not all cases (such as where serious injury or criminality warranted a more onerous penalty), there was an unwritten practice of permitting a member of the Department who tested positive for an impermissible substance to receive counseling and that compliance with that counseling could be used to mitigate any ultimate disciplinary penalty.

Bahnken further testified that "a good number" of people who tested positive before the issuance of the Revised Policy were offered opportunities to seek treatment and counseling on a case-by-case basis in return for settlement of the disciplinary case against them.  (Tr. 184-85).  He also testified that, throughout the disciplinary process in practice prior to May 2007, the Union was permitted to offer evidence in those disciplinary proceedings that could mitigate the penalty imposed. Such evidence could include information about work history, elements of stress in the individual's life, and compliance history with counseling recommendations. Supporting Bahnken's testimony, the Union offered redacted stipulations executed prior to May 2007 in which seven Union members had agreed to comply with certain conditions in order to stay on the job after producing positive test results. (Union Ex. 15).

Bahnken testified that common stressors affecting EMTs and Paramedics were the subject

of a five-year research study at the School of Industrial and Labor Relations at Cornell University

prior to the transfer of EMS into the FDNY and that he provided the FDNY with a copy of the study

results.[8] (Union Ex. 17.)  Bahnken testified that, although he does not condone substance abuse and

supports Union-supported counseling programs, "you cannot be exposed to the kind of things that

people are exposed to on this job without having it impact you." (Tr. 239, 246).

There is no dispute that counseling continues to be available for individuals brought to the

FDNY's attention by means other than a positive test, such as an arrest for drunken driving or

assault, as well as for individuals who request counseling to help with either an alcohol or drug

problem. (Tr. 533).  Wallace testified that "[t]he idea is we want people to get help."  (Tr. 533).

Shacknai also testified for the City that "[a] member may avail themselves of that counseling service

at any time and without any disciplinary consequence." (Tr. 570).  Union President Bahnken testified

that he knew of no diminution in the availability of counseling or treatment services since the policy

at issue was implemented.  However, Bahnken distinguished between availability of counseling

services and the use of counseling as mitigation of possible penalties for a positive test result.

**Request to Bargain**

By letter dated February 6, 2006, OLR announced plans to implement a revised version of

the Prior Policy "as soon as possible." (Union Ex.2). By letter dated February 28, 2006, the Union

responded by demanding that the City bargain over the implementation of the proposed revisions <u>to</u>

<u>the</u> policy.  (Union Ex. 3).  By letter dated May 12, 2006, the Union objected to any unilateral

implementation of the policy on grounds that, among other things, it allegedly conflicted with a May

---

[8] The Union offered the Cornell study into evidence regarding the effect of work-related
stressors on EMTs and Paramedics, over the City's objection to it as not probative of the issues at
hearing. The study was received into evidence on April 22, 2010.

28, 1977 agreement between the City and the Union to provide treatment and counseling opportunities without discipline to a cohort of City employees in a safety-sensitive title (commercial motor vehicle operators) who test positive for drugs for the first time.[9]  (Union Ex. 4).

By letter dated August 28, 2006, OLR said that it had reviewed the Union's comments, had made several changes to the proposed policy, and was inviting the Union to schedule another meeting.  (Union Ex. 5).  Having heard nothing in response from the Union for five months, OLR wrote the Union on February 9, 2007, announcing that, effective February 19, 2007, it was prepared to implement the policy as had been described August 28, 2006.  (Union Ex. 6).  By letter dated February 15, 2007, the Union formally requested bargaining and submitted "proposals for discussion and requests for information to enable it to prepare for bargaining." (Union Ex. 7).  On February 23, 2007, the City acknowledged receipt of the Union's February 15 letter.  The parties met again on February 26, 2007, March 16 and March 28.  On March 28, 2007, the City offered to make more modifications.  The Union describes the offered changes as minor and asserts that the City's substantive positions on key terms remained unchanged.  The parties continued to meet, next on

---

[9] In the May 12, 2006, letter, the Union asserted that the commercial drivers performed safety sensitive work, as did EMS employees, and noted that the May 28, 1977 agreement did not cover EMS employees.  The Union, in that letter, asserted that "there is no reason that the same considerations for counseling and treatment should not be applicable to them."  In the May 12, 2006, letter, the Union cited cases, specifically, *DC 37*, 67 OCB 25 (BCB 2001) (elimination of a defense is a change in drug testing procedure for civilian employees of Police Department); *Local 2507, DC 37*, 57 OCB 16 (BCB 1996) (directing evidentiary hearing as to whether drug testing procedures and disciplinary consequences to EMS employees requires bargaining).  The Union also cited case law of the Public Employment Relations Board ("PERB").  *Patchogue-Medford Congress of Teachers v. Bd. of Educ. of the Patchogue Medford Union Free Sch. Dist.*, 70 N.Y.2d 57 (1987) (establishing threshold criteria when analyzing constitutionality of random drug testing); *City of Schenectady*, 34 PERB ¶ 4505 (2001) (applying the balancing of interests tests to determine whether a particular random drug testing program met due process requirements for privacy of test subjects and a mechanism for challenging the results).

April 13, and then on April 30, 2007, when the Union distributed four pages proposing 24 additional

substantive and procedural changes.[10]  Also on April 30, the FDNY complied with the Union's

earlier request for a demonstration of how the random testing procedure worked.

Renee Campion, OLR Associate Commissioner, was actively involved in these discussions

with the Union.  She characterized the April 30 meeting, as well as the others, as "very vigorous,

very interactive discussion" with "a lot of questions on both sides." (Tr. 640-41). She testified that

the Union stated, at the April 30 meeting, that it agreed with all provisions of the proposed policy

except those addressed in its list of 24 proposals.  She testified that, except for those 24 proposals,

she understood the Union to be "agreeing at that time to essentially the rest of the policy." (Tr. 652).

Shacknai, who also attended the discussions with the Union, was asked if he had any recollection

whether the Union agreed to any aspect of the policy at issue.  He testified that the Union made some

"suggestions and proposals that we accepted and we went back and forth a couple of times." (Tr.

612).  He also stated, without specifying, that the parties "reached an accommodation" with the

Union on a "few elements." *Id.*

Bahnken characterized the meetings differently.  He testified that the Union and City

representatives did not exhibit the give-and-take inherent in collective bargaining, adding that the

City representatives at the meetings "made perfectly clear to the Union that . . . they were merely

---

[10] The proposed changes included: alternatives to automatic termination following positive results of random testing, suspension as an alternative to further discipline, suspension upon positive testing following a major motor vehicle accident as well as following other *indicia* of reasonable suspicion, alternatives to discipline upon the off-duty arrest and conviction on drug charges, continuation of medical insurance coverage during suspension in order to facilitate treatment and counseling, consideration of employee's work history and job performance in deciding what if any discipline should be imposed, procedures for ensuring confidentiality and chain of custody integrity with respect to documents involved in this substance testing.  (Ans. Ex. F).

affording us the courtesy of listening to some of our concerns, but that this would not be a

negotiation session at any time." (Tr. 78).

By letter dated May 4, 2007, the City announced that the Revised Policy would be

implemented on May 7, 2007, with random drug testing actually set to begin on June 4, 2007. On

May 7, 2007, the Union asked the City to suspend its plan to implement the Revised Policy on the

scheduled date, pending appointment of an impasse panel to resolve issues relating to the scope of

the testing procedures and any protections that could be afforded to EMS employees who should test

positive. On May 11, 2007, the City informed the Union that it would not suspend implementation

of the policy.[11]

## POSITIONS OF THE PARTIES

### Union's Position

The Union contends that the City's decision to implement the Revised Policy, assertedly

without negotiating in good faith, constitutes a refusal to bargain over mandatory terms and

conditions of employment. Of specific concern to the Union are those items which the Union sought

to incorporate into the Revised Policy when it proposed them at the April 30, 2007, meeting. In its

amended petition, the Union specifies that the Revised Policy changed the Prior Policy in ten ways:

---

[11] On May 22, 2007, the Union filed a formal request for impasse concerning the FDNY's
decision to "unilaterally implement a comprehensive random testing policy for [EMS]
employees" which imposes a "'Zero Tolerance' disciplinary standard" thus memorialized in the
Revised Policy. (Leonard G. Polletta letter, May 22, 2007, OCB Docket No. I-252-07). On an
unspecified date in August 2007, the FDNY began random drug testing. Three Union members
who tested positive were disciplined under the Revised Policy. The City does not deny that three
employees tested positive for prohibited substances. One Union member was suspended for
allegedly testing positive for marijuana use. Neither party has indicated what if any disciplinary
penalties were imposed on the others. By letter dated October 17, 2007, the Union withdrew its
request for the appointment of an impasse panel.

      1. Broadened the definition of reasonable suspicion to encompass factors not previously considered a basis to sustain a decision to test and added criteria, such as but not limited to changes in appearance and behavior, deficiencies in attendance and work related conduct including interaction with co-workers and supervisors;

      2. Rendered random drug testing applicable to a new category of EMS employees not previously subject to random testing;

      3. Eliminated procedural defenses to disciplinary action which defenses had been previously available to EMS employees who tested positive for drugs or alcohol a second time;

      4. Broadened the threshold of what constitutes a positive test by extending a positive determination to include the presence of a drug metabolite without regard to degree of impairment that it actually caused;

      5. Adopted a "zero tolerance" standard mandating employment termination upon testing positive for drugs regardless of the factual circumstances leading to the positive test result;

      6. Established off-duty testing of EMS employees who are under arrest and incarcerated or who have been hospitalized;

      7. Established blood-testing procedures for EMS employees for the first time;

      8. Established a new standard of impairment (.08 [*sic*] blood alcohol level) due to alcohol intoxication;

      9 Denied union representation to EMS employees when randomly tested for drugs and alcohol; and

      10. Eliminated a past practice of first allowing employees to seek treatment and counseling after testing positive for a drug and subsequently submitting to follow-up testing after rehabilitation.

The Union acknowledges five meetings with FDNY representatives, held between February and April 2007, and describes them as meetings "to negotiate," but the Union contends that no bargaining to agreement actually took place.

The Union argues that the City's reliance on *UFOA*, 57 OCB 25 (BCB 1996) is misplaced, as that decision is limited to that phrase, "members of the force," a term of art which means

firefighters, not EMTs, Paramedics, Supervising EMTs and Supervising Paramedics.[12] The Union

cites *Mayor of the City of New York v. Council of the City of New York*, 9 N.Y.3d 23 (2007), for the

proposition that members of Locals 2507 and 3621 are deemed uniformed solely for purposes of

citywide bargaining.

Because the Administrative Code does not give the Fire Commissioner sole discretion to

discipline members of the EMS bargaining unit, the City's citation of *UFOA*, 57 OCB 25, is

inapposite. In that case, the Commissioner's statutory discretion under the Administrative Code to

discipline uniformed members of the force was held to remove discipline of firefighting personnel

from the mandatory scope of bargaining. 57 OCB 25 (BCB 1996). Moreover, the Union argues that

---

[12] The Administrative Code, Title 15 ("Fire Prevention and Control"), provides, in part:

§ 15-113 Discipline of members; removal from force. The commissioner
shall have power, in his or her discretion on conviction of a *member of
the force* of any legal offense or neglect of duty, or violation of
rules, or neglect or disobedience of orders or incapacity, or absence
without leave, or any conduct injurious to the public peace or welfare,
or immoral conduct, or conduct unbecoming an officer or member, or other
breach of discipline, to punish the offending party by reprimand,
forfeiture and withholding of pay for a specified time, or dismissal
from the force; but not more than ten days' pay shall be forfeited and
withheld for any offense. *Officers and members of the uniformed force*
shall be removable only after written charges shall have been preferred
against them, and after the charges shall have been publicly examined
into, upon such reasonable notice of not less than forty-eight hours to
the person charged, and in such manner of examination as the rules and
regulations of the commissioner may prescribe. The examination into such
charges and trial shall be conducted by the commissioner, a deputy
commissioner or other person designated by the commissioner in writing
for that purpose; but no decision shall be final or be enforced until
approved by the commissioner. The rules and regulations for the
uniformed force of the department, as established from time to time by
the commissioner, shall be printed, published and circulated among the
officers and members of such department. (Emphasis added.)

the recent decision of the New York State Court of Appeals overturning the Board's decisions in

*DEA*, 77 OCB 37 (BCB 2006), and *CEA*, 77 OCB 38 (BCB 2006), does not mandate a different

result here. *See Matter of City of New York v. Patrolmen's Benev. Assn.*, 14 N.Y.3d 46 (2009). The

Union asserts that in *Matter of City of New York*, the Court had before it a unilateral change to drug

testing methodology (from urine to hair testing) applicable to police officers as to whom all aspects

of discipline is entrusted by statute to the Police Commissioner and found that public policy

mandated a finding that "drug testing methodology and testing triggers are encompassed within the

Police Commissioner's disciplinary authority and therefore are excluded from collective bargaining

as a matter of policy." 14 N.Y.3d at 59. The Union contends that the Fire Commissioner does not

have similar statutory authority over discipline members of the EMS bargaining unit; therefore, the

items at the heart of the instant petition remain within the mandatory scope of bargaining.

The Union disputes the City's defense that proposals that were within the scope of bargaining

were already bargained in good faith, insisting that the City made only minimal changes to the

proposed policy and that, rather than narrowing the gap, most major aspects of it remained

unresolved. When, on April 30, 2007, the Union sent the City a four-page list of issues which the

Union sought to bargain and incorporate into the policy, the City responded with minimal changes

and an announcement that the policy would be unilaterally implemented on a date certain without

implementing or discussing further the Union's demands. The Union contends that the City's

rejection of the Union's final request for bargaining, on May 7, 2007, violated NYCCBL §

12-306(a)(4), and derivatively, § 12-306(a)(1).

As a remedy, the Union asks the Board to direct the City to rescind the zero tolerance and

random drug testing policy, remove any disciplinary action including records of positive drug tests

from the personnel files of any Union members subject to the Revised Policy, and bargain with the

Union over the implementation of the zero tolerance and random drug testing policy.  The Union

also requests that the Board order the posting of notices as to the finding of a violation of a refusal

to bargain in good faith under NYCCBL § 12-306(a)(4), plus a finding of a derivative violation

under NYCCBL § 12-306(a)(1). The Union also requests such other and further relief as the Board

deems just and proper.

**City's Position**

      The City contends in general that the FDNY has not changed policy and practice as to the

matters over which the Union demands bargaining, but rather that it has merely described in more

detail its previously existing policy and practice.  As to the Union's contention that counseling is no

longer considered in meting out discipline for a positive drug test, the City denies the Union's

contention that policy and practice prior to June 1999 normalized the waiver of discipline in lieu of

treatment.  The City asserts that such never was the practice of the FDNY and, therefore, the policy

espoused in the Revised Policy does not deviate from prior departmental policy.  Moreover, the City

asserts that it has repeatedly informed the Union, in many meetings, that any Union member who

comes forward prior to being selected for testing and who seeks counseling and/or treatment would

not be penalized, thus offering those members with substance abuse problems the opportunity to seek

help before their actions resulted in negative disciplinary consequences.

      The City further asserts that, to the extent that zero tolerance represents a change, it falls

within the scope of management's right, pursuant to NYCCBL §12-307(b), to "take disciplinary

action."  The City cites, among other cases, *UFOA*, 57 OCB 25 (BCB 1996), which held that

bargaining was not required in order to implement a revised substance abuse policy revised to

include new definitions of wrongful conduct and penalties against "uniformed" members of the force. Moreover, separate and apart from this provision, the balancing of interests applied by the Board in determining negotiability dictates a finding that the FDNY's comprehensive program of deterring the use of illegal drugs by EMS workers, including the zero tolerance standard, is a management right, and thus outside the scope of bargaining. In support of this contention, the City cites a series of decisions by the State and Federal courts upholding mandatory drug testing of employees, as against constitutional challenge under the Fourth Amendment to the United States Constitution and Article 1, § 12, of the New York Constitution. The City argued that each of these decisions found the state interest justifying testing to be "substantial" and that this substantial interest in preventing injury or provision of substandard care to New York City residents outweighs the interests asserted by the Union. For all these reasons, the City contends that its decision to implement the Revised Policy is a legitimate exercise of its determination whether or not to impose discipline and thus does not fall within the sphere of mandatory subjects of bargaining.

Even if the Board were to find that the Revised Policy constitutes a change from past practice that must be bargained, the City maintains that its representatives met with Union representatives to discuss the policy on several occasions over a 15-month period and that the City has satisfied any putative duty to bargain, including as to the zero tolerance component requiring termination upon the finding of a positive substance abuse test result. The City asserts that, during those discussions, the Union's representatives were allowed to discuss their concerns, ask questions and provide recommendations during several meetings and that the City's representatives responded to questions and correspondence, accepted and incorporated many of the Union's recommendations into the proposed testing procedures.

The City admits that these meetings did not result in an agreement on the issues; however, the City contends that the process which it used to develop the substance testing policy, including the random testing provisions, resulted over the course of many months of meetings with the Union and revisions made by the City and that the Union has failed to meet its burden of proving that the City did not bargain in good faith. The City concludes that, as there has been no failure to bargain over any mandatory subject of bargaining, no derivative violation of NYCCBL § 12-306(a)(1) can be found.

## DISCUSSION

In this case, we must determine whether the FDNY's Revised Policy relating to the testing of EMS employees drug or alcohol abuse constituted changes to the extant policy and practice, and, if so, to what extent, if any, such changes constitute unilateral changes to mandatory subjects of collective bargaining. We find that the evidence adduced at the hearing establishes that the Revised Policy did include changes to certain aspects of the existing policy and procedures. We further find that, on this record and as to these employees who provide emergency medical assessment, first line treatment and transportation, the revisions to testing triggers are not mandatory subjects of bargaining. Further, we find that the revisions to the definition of a positive test result and the imposition of "zero tolerance" as to these employees to be within management's right to take disciplinary action against employees, and thus outside of the scope of bargaining. However, we find that changes to the methodology involve mandatory subjects of bargaining.

It is an improper practice under NYCCBL § 12-306(a)(4) for a public employer or its agents "to refuse to bargain collectively in good faith on matters within the scope of collective bargaining with certified or designated representatives of its public employees." Under NYCCBL § 12-307(a),

"[t]hese matters include wages, hours, and working conditions and are mandatory subjects of bargaining."[13] *SSEU*, 1 OCB2d 20, at 9 (BCB 2008) (quoting *UFOA*, 1 OCB2d 17, at 9-10 (BCB 2008); *see also DC 37*, 75 OCB 10, at 7 (BCB 2005)).  The duty to negotiate on mandatory subjects of bargaining includes the duty to negotiate until agreement is reached or the statutory impasse procedures are exhausted.  A public employer may not unilaterally implement a change in a mandatory subject of bargaining before bargaining on the subject has been exhausted.  *UMD, L. 333*, 2 OCB2d 44, at 24 (BCB 2009); *see also DC 37*, 77 OCB 34, at 19 (BCB 2006); *COBA*, 63 OCB 26, at 9 (BCB 1999).

In *SSEU*, we summarized the elements of a claim asserting an employer's refusal to bargain in good faith resulting in a unilateral change to a term or condition of employment.  The petitioner must "demonstrate the existence of such a change from the existing policy or practice." *SSEU*, 1 OCB2d 20 at 9, *citing, inter alia, UFOA*, 1 OCB2d 17 at 10 (BCB 2008).  The Union must then establish that the change as to which it seeks to negotiate is or relates to a mandatory subject of bargaining.  *Id.*  Where, as here, the respondent claims that bargaining has taken place, the petitioner must establish that bargaining did not take place as to the terms and conditions affected by the change.  *Id.*

**A.      The Revisions Effected Changes to Policy**

In the instant case, we do not find credible the City's contention that no change took place.

_____

[13]  NYCCBL § 12-307(a) provides, in pertinent part:
[P]ublic employers and certified or designated employee organizations shall have the duty to bargain in good faith on wages (including but not limited to wage rates, pensions, health and welfare benefits, uniform allowances and shift premiums), hours (including but not limited to overtime and time and leave benefits), working conditions . . . .

The preponderance of the evidence establishes that the Revised Policy resulted in changes as to several elements of the Prior Policy.

First, the Revised Policy changed the Prior Policy by mandating termination upon a positive drug test or refusal to take a drug test. (*See ante* at n. 7). This new policy deviated from the Prior Policy which allowed, at a minimum, some regular exercise of discretion in determining whether offenders should be afforded alternative dispositions, including counseling and rehabilitation. The unrebutted evidence submitted by the Union established that, in some cases at least, such non-termination dispositions were available, in the discretion of the Employer. We do not find sufficient evidence to establish that the Prior Policy allowed every first offender an opportunity to obtain treatment and counseling instead of termination. The number of dispositions submitted (7) does not support such a finding of a blanket policy. Neither does Bahnken's testimony establish such a uniform practice. Rather, Bahnken's testimony, and the documentary evidence adduced in support of it, establishes the exercise of discretion on a case-by-case basis. However, the change from a policy that allows for an appeal to discretion for a rehabilitative resolution to a policy with an essentially inflexible termination standard cannot realistically be described as a clarification, or as *de minimis* in nature. *UMD, L. 333*, 2 OCB2d 44, at 21-22 (CBC 2009); *cf. DEA*, 2 OCB2d 11, at 15-18 (BCB 2009) (discussing prior cases); *PBA*, 73 OCB 12, at 16-17 (BCB 2004), *affd., Matter of Patrolmen's Benev. Assn. v. NYC Board of Coll. Barg.*, No. 112687/04 (Sup. Ct. N.Y. Co. Aug. 8, 2005), *affd.*, 38 A.D.3d 482 (1st Dept. 2007).

Similarly, we find that the promulgation of new specific indicia to establish reasonable suspicion likewise represent a change to the Prior Policy. Such changes were made in two ways. First, the Prior Policy does not include subjective criteria (that is, other than arrest or an accident or

similar incidents) giving rise to suspicion which are reported to the supervisor rather than observed directly by the supervisor. Second, the expanded class of grounds triggering suspicion now include behavioral criteria (such as cooling friendships, evidence of personal problems, and wardrobe decisions). These new criteria are more attenuated in their relationship to prohibited conduct than the more obviously work performance and safety related factors detailed in the prior iterations of the policy. Again, a policy change which is calculated to increase employee participation, and to affect more employees than the prior iteration of the policy, with resultant potential costs to those employees in terms of disciplinary consequences is neither a clarification nor *de minimis. UMD, L. 333*, 2 OCB2d 44, at 21-22.

The same reasons mandate a finding that the other expansions to the universe of employees to be tested, testing triggers, or the adoption of more invasive testing techniques, such as the drawing of blood rather than the use of urine testing, all establish a material change. *See DEA*, 77 OCB 37 (BCB 2006), and *CEA*, 77 OCB 38 (BCB 2006), *revd. other grounds, Matter of City of New York v. Patrolmen's Benev. Assn.*, 14 N.Y.3d 46 (2009).[14] However, the City is correct in arguing that the record does not support a finding that a unilateral change took place as to the presence of a Union representative at the time of the drug or alcohol test. The record does not establish that a member has previously been afforded such a right to representation, and in the absence of any such evidence we are unable to find that a unilateral change took place. Nor is it clear from the testimony that representation would be denied under the new policy. Thus, it is not clear that an improper practice

---

[14]  The Court of Appeals found that for employees over whom disciplinary authority is statutorily reposed in the Commissioner, unlike those here, changes to the scope and methodology of drug testing are not mandatory subjects of bargaining. However, the Court recited without disapproval (and the lower court endorsed) our finding that changes similar to those here addressed were not *de minimis* or clarification of prior policy. 14 N.Y.3d at 52-53.

as to this issue has occurred. *DC 37*, 57 OCB 16, at 16-17 (BCB 1996).

**B.      Bargainability**

The principal question presented here is whether the changes at issue involve mandatory

subjects of bargaining.   These changes fall into three categories, (1) testing triggers; (2) testing

standards and methodology; and (3) the adoption of a "zero tolerance" policy, in lieu of allowing the

application of discretion to determine whether a counseling and other non-punitive approaches short

of termination.

*1.      Broadened Testing Triggers*

The Union's arguments regarding the expansion of testing to a broader class of employees,

and the expanded definition of reasonable suspicion involve "circumstances prompting testing,"

which are known in the case law as "testing triggers." *Matter of City of New York*, 14 N.Y.3d at 58.

In an interim decision, *DC 37*, 57 OCB 16, at 15 (BCB 1996), we quoted with approval PERB's

analysis in *County of Nassau*, 27 PERB ¶ 3054 (1994), including its statement that testing triggers

are generally negotiable.

However, in the sixteen years since PERB decided *County of Nassau*, its finding has not been

simply applied as a categorical imperative.   For example, in *County of Erie (Erie Co. Med. Ctr.)*, 39

PERB ¶ 4596 (ALJ 2006), a PERB Administrative Law Judge stated that:

> Determinations as to an employer's bargaining obligations in regard
> to drug testing require a case-by-case balancing of the competing
> interests of the parties, as set forth in the Board's decision in
> *Arlington Central School District*, 25 PERB ¶ 3001 (1992).   In
> addressing a challenge to drug testing imposed on a school bus driver,
> the Board recognized that the employee's interests "lie in her personal
> privacy, reputation and job security," which must be balanced against
> the employer's proven mission-related managerial interests, further
> holding that the employer has no interest in the employee's "off-duty

> use of any drug except and to the extent that her alleged use impaired
> her ability to [perform her duties] safely."

*Id.* at 4706 (footnotes and citations omitted).

In finding that the balance of interests should be resolved in favor of the employees at issue in *County of Erie*, the Administrative Law Judge distinguished them from employees such as those at issue here, comparing them with the subway conductors at issue in *Matter of Dozier v. City of New York*, 130 A.D.2d 128 (2d Dept. 1987), stating that "*Dozier* concerned transportation employees, which have been recognized by the courts as a special class of public employees due to the heightened public safety implications inherent in their jobs." 39 PERB ¶ 4596 at 4706-4707.[15] By contrast, the interests asserted as to the specific employees at issue were less compelling:

> [H]ospital aides and dental assistants perform direct patient care,
> housekeeping attendants clean rooms, senior pharmacy aides handle
> drugs, and others have access to patient medical records. None of
> these responsibilities, however, are so unique or distinct from the
> many other jobs performed by public employees in the various
> operations of government services, so as to set them apart, or to raise
> public safety considerations of the level found . . . to justify drug
> screening without reasonable suspicion.

30 PERB ¶ 4596 at 4707.

*County of Erie* found the testing triggers in that case bargainable and cited *County of Nassau* for the rationale that the employer's asserted "interests relate only, or at least primarily, to the decision to subject employees to a drug test. They are not, however, so related to the implementation of that decision as to render the several separate implementation decisions equally nonmandatory in all respects." *Id.*, at 4707 (quoting *County of Nassau,* at 3119-3120). On that record, PERB found

---

[15] *Dozier* was separately distinguished in *County of Nassau,* independently of the nature of the employees' job functions, by the fact that they were applicants for employment, as to whom no duty to bargain had accrued. *Id.*

that it could not be said that "whatever managerial prerogatives may be associated, for example, with testing methodology, testing triggers . . . so outweigh the employees' collective and individual interests in these areas as to make them negotiable only at the County's option." *Id.*[16] In *Arlington Cent. Sch. Dist.*, also relied upon in *County of Erie*, the employer's reliance on "off-duty drug use [which] is remote from the time at which the employee is called upon to render services" as a testing trigger resulted in a finding that "the balance of competing interests necessarily weighs in favor of the mandatory negotiability of a decision to subject an employee to a urinalysis test for drug use because only the employee's interests are affected." 25 PERB ¶ 3001, at 3005.

Moreover, in *Matter of City of New York*, 14 N.Y.3d at 58-59, the Court of Appeals declined to endorse *County of Nassau* as a categorical rule. Therefore, consistent with PERB's own decisions, both before and after *County of Nassau*, and our decisions, we find that testing triggers are not in every case subject to bargaining, but turn upon a context-specific balancing of the interests of the employees against that of the employer.

As we explained in *CEU*, 2 OCB2d 37, at 14 (BCB 2009), "[s]ince neither the NYCCBL nor the Civil Service Law expressly delineates the nature of 'working conditions,' or 'conditions of employment,' both this Board and PERB determine on a case-by-case basis the extent of the parties' duty to negotiate." *Id.*, quoting *DC 37, L. 1457*, 77 OCB 26, at 12 (BCB 2006); *see also UFOA, L. 854*, 45 OCB 4, at 8 (BCB 1990); *DC 37*, 45 OCB 1, at 7-8 (BCB 1990). This case-by-case determination "takes the form of a balancing test which weighs the interests of" the public employer

---

[16] The opinion in *County of Erie* goes on to quote the other procedural issues held to be mandatory subjects of bargaining by PERB in *County of Nassau*. As set out more fully below, other than as to testing triggers, we adhere to our adoption of *County of Nassau* except where, as noted, the explicit requirements of the NYCCBL require a different result.

and those of the employees at issue "with respect to that subject under the circumstances of the

particular case, an approach also employed by PERB under the cognate provisions of the Taylor

Law." *Id.; citing DC 37*, 75 OCB 8, at 7-8; *see also State of New York (Dept. of Corr. Serv.)*, 38

PERB¶ 3008 (2005).  The New York Court of Appeals has approved the employment of such a

balancing test in determining negotiability by both this Board and by PERB.  *Board of Educ. of the*

*City School Dist. of the City of New York v. Pub. Empl. Rel. Bd.*, 75 N.Y. 2d 660, 670-71 (1990)

(upholding PERB's use of balancing test and finding negotiability as to compulsory financial

disclosure where intrusion on employees' terms and conditions of employment and privacy interests

rationally found to outweigh employer's interest in integrity of its work force); *Matter of Levitt v.*

*Board of Coll. Barg. of the City of New York*, 79 N.Y.2d 120 (1992) (upholding Board's employment

of balancing test, but finding requirement to disclose matters of public record involve non-mandatory

subjects of bargaining); *see also Matter of Lippman v. Pub. Empl. Rel. Bd.*, 296 A.D.2d 199, 208-09

(3d Dept. 2002) (approving PERB's application and result under balancing of interests).

The testing triggers at issue here are not one of the specific subjects which have been

"pre-balanced" by the Legislature and thus require further analysis.  *See DC 37, L. 1457*, 77 OCB

26, at 12, *citing DC 37*, 75 OCB 13, at 8 (BCB 2005); *County of Montgomery*, 18 PERB ¶ 3077, at

3167 (1985).  Nor are they explicitly included within NYCCBL § 12-307(b) as reserved for

managerial discretion, such as the right to direct employees or to maintain the efficiency of

government operations. Therefore, a balancing of the interests is required to resolve the issue before

us. Against the interests in privacy and autonomy asserted by the Union, we find that the employer's

interest in providing safe transportation while also providing emergency medical treatment must

prevail. The relationship between the testing trigger and the mission could not be more direct. The

employees at issue are entrusted with making emergency medical decisions, providing treatment, and

providing emergency transportation, with concomitant license to qualified privilege to disregard

ordinary rules of prudent and responsible driving.  *See* Vehicle and Traffic Law § 1104(e);

*Szczerbiak v. Pilat*, 90 N.Y.2d 553, 556 (1997).  In short, impaired EMS employees can present a

concrete, immediate danger of death or bodily injury to not merely fellow employees, but to patients

who are dependent upon their performance, and the general public.  Under these circumstances, the

balance tips decisively in favor of the employer.  *CEU*, 2 OCB2d 37, at 15-16 (where restrictions on

employees' personal autonomy interests was reasonably related to employer's interest in protecting

security and well-being of City residents reliant on employees, balance favored management);*see

also DC 37*, 45 OCB 1, at 9 (BCB 1990); *UFOA*, 45 OCB 5, at 9 (BCB 1990).   Accordingly, we

find that, under the circumstances presented in this case, the expansion of testing to a broader class

of employees and the expanded definition of reasonable suspicion comprise a nonmandatory subject

of bargaining and that the City is free to make such changes unilaterally.

     2.    *Definition of Prohibited Conduct*

     The Union asserts that the Revised Policy not only establish a new standard of alcohol

intoxication (.05 blood alcohol level) but that it also broadens the threshold of what constitutes a

positive test by extending a positive determination to include the presence of a drug metabolite

without regard to degree of impairment.  The Union asserts that this change is procedural, and thus

subject to bargaining.  We disagree.

     As we explained in *DC 37*, 79 OCB 37, at 10 (BCB 2007), "[w]e have long held that, while

it is an employer's prerogative to take disciplinary action, the procedures necessary for the

administration of discipline are mandatorily negotiable."  Thus, as we explained *DC 37*, 79 OCB 37,

at 10 (BCB 2007):

> NYCCBL § 12-307 (b) reserves to management the right to take disciplinary action against its employees.  But the management prerogative provision of the NYCCBL was not intended to cover the entire area of discipline.  In our view, it is not the intent of the NYCCBL to prohibit bargaining on the methods, means and procedures which may be used in effectuating disciplinary action.
>
> * * *
>
> While the City has the right to make and implement decisions concerning its management prerogatives without bargaining, the procedures for implementing decisions that affect terms and conditions of employment are mandatorily bargainable.  For example, while it is within management's discretion to evaluate its employees' performance, impose discipline, and grant merit pay, the procedures for implementing performance evaluations, imposing and reviewing disciplinary action, and determining eligibility for merit pay are mandatory subjects of bargaining.

*Id.* (citations and quotation marks omitted).  In the instant case, the Union does not seek to bargain over a procedure to determine innocence or guilt or to review the basis for a penalty imposed but rather the decision as to what constitutes the basis for discipline, *i.e.*, the presence of a drug metabolite, or the definition of impairment by alcohol.  We find that this subject, in effect the determination of what constitutes prohibited conduct, falls outside the scope of mandatory bargaining.

3.      *Zero Tolerance*

The City's adoption of a "zero tolerance" approach to positive drug test results marks a change to the prior policy which at least allowed for the appeal to discretion, to allow for counseling and treatment for some first offenders.  However, as was the case with the redefinition of prohibited conduct, we find that this subject also falls within the employer's prerogative to take disciplinary

action under § 12-307 (b). *See generally*, *DC 37*, 79 OCB 37, at 10; *NYSNA*, 51 OCB 20, at 17-18 (1993) (employer did not refuse to bargain in good faith with the Union concerning disciplinary procedures by its "unwillingness to negotiate alternative penalties"). In this instance, the Union seeks to bargain over the appropriate penalty for an employee found to have committed the offense. Under § 12-307 (b), the determination of the appropriate penalty for a specified disciplinary violation as a matter of policy is not a mandatory subject of bargaining. *Id.*[17]

We are not persuaded that our holding in *DC 37*, 67 OCB 25 (BCB 2001), is applicable herein. The Union asserts that, in that case, as here, the effect of the change is to preclude employees from raising a previously valid affirmative defense at a disciplinary hearing. In *DC 37*, we found

---

[17] We do not agree with the dissent that it is clear that PERB would conclude that penalties for illegal drug usage as to the employees here are mandatory subject of bargaining. In *County of Erie*, the management interest in preventing illegal drug usage was deemed especially weighty as to "employees within a class which has been recognized as holding safety-sensitive position." 39 PERB ¶ 4596 at 4706-4707. The PERB cases cited by the dissent to the contrary do not, in our opinion, mandate a different result. *Matter of New York State Transit Authority v. N.Y.S. Pub. Empl. Rel. Bd.*, 276 A.D.2d 702 (2d Dept. 2000), upheld as rational and not contrary to law PERB's determination that a policy change as to disciplinary consequences of criminal "convictions, moving violations, and motor vehicle accidents involving bus drivers" was bargainable. However, that case did not involve the question of drug use and emergency medical care providers who are authorized to disregard traffic laws at issue here; *see also Matter of New York State Transit Authority v. N.Y.S. Pub. Empl. Rel. Bd.*,147 A.D.2d 574 (2d Dept. 1989), *app. den.*, 78 N.Y.2d 1122 (1991). Similarly, in *City of Utica*, 32 PERB ¶ 4570 (1999), an Administrative Law Judge found bargainable, *inter alia*, disciplinary consequences for firefighters failing a required medical examination.

Moreover, even if, on the facts of this case, PERB would reach a different result, we do not believe that this difference in results rises to the level of or otherwise presents a question of "substantial equivalence" under CSL § 212(2). *Id.*; *See Matter of Mayor of City of New York v. Council of City of New York*, 9 N.Y.3d 23, 28-29 (2009). We note that the Court of Appeals has explicitly endorsed and repeatedly applied §12-307(b) and PERB relies upon the concept of and even the phrase "managerial prerogative" in delineating exclusions from the duty to bargain encompassed in the Taylor Law equivalent to those set forth in NYCCBL § 12-307(b). *See UFA*, 4 OCB2d 3, at 9-10 (BCB 2011) (summarizing cases).

that the change in question altered disciplinary procedures relating to drug testing by precluding

"employees from raising a previously valid defense at a disciplinary hearing – that a positive test

result was due to the consumption of legal, commercially available products." *Id*. at 7.   While the

order in question in that case purported to be a re-definition of the substantive offense, we found that

"[e]xpansion of the definition of prohibited substances to include unspecified, legal, commercially

available products, having no known psychoactive effects was merely incidental to the elimination

of the previously valid defense." *DC 37*, 67 OCB at 7.   Indeed, in *DC 37*, we specifically rejected

the "City's contention that the Order only expands the category of prohibited substances, which, if

used, may result in employee discipline," finding that "[t]he NYPD did not add commercially

available products to the category of prohibited substances because of their psychoactive effects or

because the NYPD seeks to proscribe their use as a matter of drug policy." *Id*.   Rather, we found

that "[t]he thrust of the Order is the elimination of a previously available affirmative defense and the

preclusion of evidence that would support such defense." *Id*. at 7-8.   In other words, we found in

*DC 37* that the City's effort to cast as substantive a procedural change, one which altered the rules

relating to the means of proving the innocence or guilt of the accused employee, was unavailing.

Here we have the converse; the Union seeks to cast as procedural a change which alters the substance

of the rule at issue, that is, the determination of the appropriate penalty.   Accordingly, the Union's

invocation of this case's rule on the question of the substantive determination of the appropriate

penalty is inapposite, and does not serve to make that determination bargainable.[18]

---

[18]   Of this Board's prior decisions relied upon by the dissent, only one, our interim
decision in *DC 37*, 57 OCB 16, at 16-17, addresses the question of the bargainability of penalties.
In that case we explicitly "noted" the holding of PERB in *County of Nassau* but did not resolve
the issue, ordering a hearing to resolve the factual disputes as to whether any change to testing
triggers and disciplinary consequences had taken place.   No further decision was issued by the

>    4.    *Testing Methodology*

The addition of blood testing as a means of testing where an employee is unable to provide a urine sample is governed by our prior decisions applying the NYCCBL. In our interim decision in *DC 37*, 57 OCB 16, involving the same employees at issue here, we found that procedures for implementing drug testing, including methodology, choice of laboratory, collection procedures, chain of custody, sample screening, conditions for retesting, and reporting and recording of test results, are mandatory subjects of bargaining. *DC 37*, 57 OCB 16, at 14-15; *see also CWA, L. 1182*, 61 OCB 47, at 7-8 (BCB 1998) (holding that the elimination of a choice of laboratory for retesting positive samples was mandatorily bargainable as a procedure and consequence associated with management's nonbargainable decision to implement a drug testing policy).

As we explained in *DEA*, 77 OCB 37, at 14, "procedures for implementing drug testing, including testing methodology, choice of laboratory, collection procedures, chain of custody, sample screening, conditions for retesting, and reporting and recording of test results, were mandatory

---

Board, and so the issue was never resolved. The other decisions involving this Board cited by the dissent involved the bargainability of drug testing procedures for employees (such as police officers) as to whom discipline is entrusted by local law to the discretion of the Commissioner. *See CEA*, 77 OCB 38, [published as *CBA*, 41 PERB ¶ 8001] (BCB 2006), *revd.*, *Matter of City of New York v. Patrolmen's Benev. Assn. of City of New York, Inc.*, 56 A.D.3d 70, 41 PERB ¶ 7514 (1st Dept. 2008), *revd.*, 14 N.Y.3d 46, 42 PERB ¶ 7511 (2009); *L.854, UFA*, 57 OCB 25 (BCB 1996) (same; firefighter).

The dissent's concern for due process does not, in our opinion, go to the issue of bargainability of penalty. The arbitral and judicial processes, and not an improper practice charge, is the correct form to vindicate such claims, especially where the arbitrators and courts are charged with individualized determinations as to both guilt and appropriateness of penalty. *See Matter of McDougall v. Scoppetta*, 76 A.D.3d 338, 341-343 (1st Dept. 2010) (Article 78 review); *Matter of New York City Transit Authority v. Transport Workers Union of America, Local 100*, 14 N.Y.3d 119 (2010) (under Article 75 review, affirming arbitrator's determination that under collective bargaining agreement "zero tolerance" policy for employee violence, instant case fit within "rarely used...clear injustice" exception to termination as penalty).

subjects of bargaining." *Id.* (*quoting DC 37*, 57 OCB16 (BCB 1996) at 14; *see id.*, 14-15); *County of Nassau*, 27 PERB ¶ 3054, 3119-3120 (testing procedures, including testing methodology, are mandatory subjects of bargaining, as distinguished from the managerial decision to test); *County of Erie (Erie Co. Med. Ctr.)*, 39 PERB 3036 (2006)(same); *DC 37*, 67 OCB 25 (BCB 2001). *Id.* at 6-7, *citing DC 37*, 11 OCB 3 (BCB 1973), at 8-11.[19]

The Revised Policy on its face has changed the testing methodology for certain employees under specified circumstances. Nor can we find this change *de minimis* as to the employees affected. Blood testing is inherently more invasive and requires a greater degree of employee participation than does urine testing, and is thus a change under the NYCCBL, even if only ordered where an employee fails to provide a urine sample. *See Local 1182, CWA*, 67 OCB 26, at 5-6 (BCB 2001) (finding bargainable addition of testing fingernail parings in addition to urine sample where hair sample not available). The City's failure to bargain to agreement or to impasse over this change has violated the NYCCBL's mandate to bargain in good faith.

**C.   The Occurrence of Bargaining**

---

[19] We note that the Court of Appeals' vacatur of *DEA* did not involve its application of principles generally applicable under the NYCCBL, but was limited to the "discrete questions" of testing triggers and methodology of drug testing applicable to employees for whom public policy precludes the negotiability of discipline. *Matter of City v. Patrolmen's Benev. Assn.*, 9 N.Y.3d at 59-60. The City has not contended that the employees at issue here are governed by a similar statute, nor has it claimed that public policy renders discipline of EMS employees non-bargainable. Section 15-113 of the N.Y.C. Administrative Code states, in pertinent part, "The Commissioner shall have power . . . on conviction of a member of the force," to impose discipline, but as the Union has pointed out, the plain language of this section does not include EMS employees as "members of the force." *See generally, Mayor of the City of New York v. Council of the City of New York*, 9 N.Y.3d 23 (2007); *cf. UFOA*, 57 OCB 25 (BCB 1996), at 11 (disciplinary procedures are mandatory subjects of bargaining except when discipline is specifically reserved to the public employer by statute.). Far from contesting this, the City's Commissioner of the Office of Labor Relations testified that the employees at issue here were not members of the uniformed force for purposes of collective bargaining. (Tr. 471).

As to the matters which require bargaining, and contrary to the City's contention, discussions which do not result in either an agreement or impasse proceedings resolving the parties' inability to reach agreement do not constitute bargaining sufficient to legitimize a unilateral change to a mandatory subject of bargaining. *UFA*, 77 OCB 39, at 13-14 (BCB 2006); *DC 37, L. 1457*, 77 OCB 26, at 19-20 (BCB 2006). The City acknowledges that neither agreement nor impasse was reached here on matters which we have identified as requiring bargaining, and thus its contention that the discussions in which it participated somehow discharges its duty to bargain is groundless.

Accordingly, the petition is granted in part and denied in part.

## ORDER

Pursuant to the powers vested in the Board of Collective Bargaining by the New York City Collective Bargaining Law, it is hereby

ORDERED, that the improper practice petition, Docket No. BCB-2648-07, filed by District Council 37 and its affiliated Locals 2507 and 3621, against the New York City Office of Labor Relations and the New York Fire Department, be, and the same hereby is, granted in part and denied in part; and it is further

ORDERED, that the New York City Fire Department rescind the change to testing methodology in May 2007 that provided for a blood test where an employee is unable to provide a urine sample; and cease and desist from implementing that change until such time as the parties negotiate either to agreement or to impasse with respect to such change; and it is further

ORDERED, that the New York Fire Department post the attached notice for no less than thirty days at all locations used by the Department for written communications with employees represented by the Union.

Dated: April 28, 2011
       New York, New York

_____MARLENE A. GOLD_____
CHAIR

_____GEORGE NICOLAU_____
MEMBER

_____CAROL A. WITTENBERG_____
MEMBER

_____M. DAVID ZURNDORFER_____
MEMBER

                                                         __PAMELA S. SILVERBLATT__
                                                                   MEMBER

See dissenting opinion.      __GABRIELLE SEMEL_____
                                                                   MEMBER

I concur on dissent.        __CHARLES G. MOERDLER____
                                                                   MEMBER

NOTICE
TO
ALL EMPLOYEES
PURSUANT TO
THE DECISION AND ORDER OF THE
BOARD OF COLLECTIVE BARGAINING
OF THE CITY OF NEW YORK
and in order to effectuate the policies of the
NEW YORK CITY COLLECTIVE BARGAINING LAW

**We hereby notify:**

**That the Board of Collective Bargaining has issued 4 OCB2d 19 (BCB 2011), in final determination of the improper practice petition between District Council 37, AFL-CIO, And Its Affiliated Locals 2507 And 3621, and the New York City Office of Labor Relations And The Fire Department of the City of New York.**

Pursuant to the powers vested in the Board of Collective Bargaining by the New York City Collective Bargaining Law, it is hereby:

**DETERMINED,** that the New York City Fire Department's unilateral implementation of <u>a</u> change to substance abuse testing methodology and procedures by adding blood testing as an alternative methodology where a urine sample cannot be obtained as implemented in <u>May</u> 2007 is violative of NYCCBL § 12-306(a)(1) and (4); it is further

**ORDERED,** that the New York City Fire Department rescind the change to substance abuse testing methodology by adding blood testin g as an alternative methodology where a urine sample cannot be obtained which it unilaterally implemented in May 2007; it is further

**ORDERED,** that New York City Fire Department cease and desist from unilaterally implementing changes to substance abuse testing methodology without negotiating with the Union; and it is further

**ORDERED**, that New York City Fire Department post appropriate notices detailing the above-stated violations of the NYCCBL.

**DETERMINED**, that the petition filed by District Council 37, AFL–CIO, and its affiliated Locals 2507 and 3621, docketed as BCB-2648-07, is denied in all other respects.

The New York City Fire Department _____
(Department)

Dated:

_____
(Posted By)
(Title)

*This Notice must remain conspicuously posted for 30 consecutive days from the date of posting, and must not be altered, defaced, or covered by any other material.*

I dissent in part and affirm in part.  The majority's decision regarding the unilateral implementation of a "zero tolerance" policy is flawed and in contravention of established case law of both this Board and PERB.  First, disciplinary penalties and/or consequences are mandatory subjects of bargaining.  Prior to the instant case, the only exceptions to this clear rule occurred when there was a statutory authority separate and apart from the Taylor Law or the NYCCBL that gave management discretion to discipline such as the statutory authority contained in N.Y.C. Admin. Code §§ 14-115(a) and 15-113.  Second, even assuming the Board may engage in a balancing test as the majority has done here, in the instant case the Board failed to consider the disciplinary due process rights their decision takes away from affected employees.

The facts in this case are straightforward.  The prior drug testing policy did not enumerate specific penalties/consequences.  While management had the right to seek termination, bargaining unit members could challenge the severity of the penalties at a hearing pursuant to Civil Service Law Section 75 or applicable collective bargaining provisions.  In most instances, first-time offenders entered into stipulations of settlement agreeing to a 30-day suspension and follow-up drug testing.  Now, the unilaterally implemented policy states that termination will result in the first offense if any of the following occurs: (1) a positive drug test, (2) failure to provide a specimen for testing, and (3) a drug related arrest.  This policy has been in place for almost four years.  The result of the policy has been that long-serving EMTs and Paramedics with minimal prior discipline, good patient care records, and no allegation of on the job impairment, are faced with termination for failing a first random drug test.  There is no progressive discipline or opportunity for counseling.

There is clear established precedent both under the Taylor Law and the New York City Collective Bargaining Law (NYCCBL), that penalties and/or consequences for discipline are mandatory subjects of bargaining.  NYCTA v. PERB, 276 A.D.2d 702 (2d Dept. 2009); NYCTA v. PERB, 147 A.D.2d 574 (2 Dept. 1989) app. Denied, 78 N.Y.2d 1122 (1991);  L. 2507 & L. 3621 , 57 OCB 16 (BCB 1996);  Patrolmen's Benevolent Ass'n., 42 PERB 7511 (2009); Captains Benevolent Ass'n., 41 PERB 8001 (2006); County of Erie, 39 PERB 4596 (2006); Patrolmen's Benevolent Ass'n., 41 PERB 7514 (2006);  Utica Firefighters Ass'n., 32 PERB 4570 (1999); County of Nassau (Nassau County Police Dep't.), 27 PERB 3054  (1994)).  In most cases, both this Board and PERB did not engage in a balancing test. In a handful of cases, PERB has engaged in a balancing test, most notably, County of Nassau, which involved police officers. However, prior to the instant case, there is no decision of either PERB or BCB where disciplinary penalties and/or consequences have not been found to be mandatory subjects of bargaining absent clear statutory authority other than the Taylor Law or NYCCBL giving such discretion to management.  (See L.854, UFA v. City, 57 OCB 25 (BCB 1996) citing  Administrative Code of the City of NY §15-113 and  City of New York et al.v. Patrolmen's Benevolent Association of the City of New York, Inc., et al., 14 N.Y.3d 46 (2009) citing NY Charter, §434(a) and Administrative Code of the City of NY, § 14-115(a)).

Further, assuming arguendo that the Board may engage in a balancing test in this matter, the Board failed to consider in any meaningful way the significant due process rights at issue. The United States Supreme Court has held that when there is a property interest at stake, the interest may not be taken away without some procedural due process.  Board of Regents v. Roth, 408 U.S. 564 (1972); Cleveland Board of Education v. Loudermill et. al., 470 U.S. 532 (1985).

2

The New York State Civil Service Law creates a property interest for permanent civil service employees.  N.Y. Civ. S. §75.  Arbitrators and hearing officers consider an employee's length of service and prior disciplinary record when determining the appropriate penalty.  The FDNY's "zero tolerance" policy strips bargaining unit members of this right.


Gabrielle Semel

3