EXHIBIT 12

{00682706-1}

COBA v. DOC, 49 OCB 40 (BCB 1992) [Decision No. B-40-92]

OFFICE OF COLLECTIVE BARGAINING
BOARD OF COLLECTIVE BARGAINING
----------------------------------x

     In the Matter of

CORRECTION OFFICERS BENEVOLENT     DECISION NO.  B-40-92
ASSOCIATION, INC.,

                        DOCKET NO.  BCB-1444-91

          Petitioner,

        -and-

DEPARTMENT OF CORRECTION OF THE
CITY OF NEW YORK,

          Respondent.

----------------------------------x

## DECISION AND ORDER

     On December 20, 1991, the Correction Officers Benevolent Association ("COBA or "the Union") filed a scope of bargaining petition against the New York City Department of Correction ("the Department").  The petition alleges that the Department has refused to repair electronic security equipment in a yard area of the Manhattan Detention Complex, and also that it has refused to staff this yard area on a permanent basis, thereby creating a dangerous working condition.  The Department, appearing by the New York City Office of Labor Relations ("the City"), filed its answer to the petition on January 24, 1992.  The Union filed a reply on March 3, 1992.

     A hearing was scheduled before a Trial Examiner designated by the Office of Collective Bargaining to allow the Union the opportunity to prove the allegations raised in its petition and disputed by the City in its answer. The hearing began on May 26, 1992, continued on May 27, and conditionally concluded on May 28, after the parties' representatives and the Trial Examiner made a physical inspection of the yard area at the facility on that afternoon. The Union reserved the right to reopen the hearing on June 8, 1992, if it chose to submit supplemental documentary evidence that it had not yet evaluated.  On June 3, 1992, the parties notified the Trial Examiner that they both had concluded the presentations of their cases, and that the additional hearing day would not be necessary.  The City and the Union agreed to file

post-hearing briefs on August 7, 1992.  After two mutually requested
extensions of time, the parties filed their briefs on August 25, 1992.
Thereupon, the record was closed.

## Background and Facts

    The Manhattan Detention Complex, formerly known as the Manhattan House
of Detention for Men, occupies a two-block area on the lower east side of New
York City.  The complex consists of a North Tower and a South Tower, and is
bounded by Baxter Street on the east and Centre Street on the west.  White
Street runs between the North Tower and the South Tower.  The Manhattan
Criminal Courts building is located south of the South Tower.  An enclosed
yard area lies between the South Tower and the Criminal Courts building.  It
is this yard area that is the focus of the Union's claims.

    The yard is used to receive and transport both prisoners and
institutional supplies on a twenty-four hour a day basis.  It is protected by
four sets of mechanical gates, two of which are on the Baxter Street side, and
two on the Centre Street side.  Generally, the Centre Street gates are used
for vehicle entrance and the northern-most Baxter Street gate for vehicle
exit.  The southerly Baxter Street gate primarily is used by police to take
prisoners directly into the courts building.  An inner wall separates the
south Baxter Street gate from the yard area.

    The north Baxter Street gate and both Centre Street gates have two
components.  On the street side are solid metal roll-up barriers that descend
mechanically from beneath an overhead bridge or traverse.  The traverse is
constructed of masonry and copper sheathing.  The top of the traverse's
parapet wall is approximately thirty feet above street level.  The gates
themselves are not unlike the familiar solid window guards frequently seen on
storefronts throughout the city, although they are large enough to permit
passage of a prisoner bus or delivery truck.  Separating the outer gates from
the yard area are inner gates made of flexible metal grillwork that also roll

Decision No. B-40-92                                                                    3
Docket No. BCB-1444-91

up and descend mechanically.  The inner gates are suspended from a steel beam.
The Department designates the area between the inner and outer gates as the
"sallyport."

The normal procedure for admitting a vehicle through the Centre Street
gates is as follows:  A vehicle pulls up to one of the outside gates.  An
armed correction officer observes the vehicle and its driver from inside the
outer gate through a small transparent viewing port built into it.  If
admission is authorized, the officer walks to a control booth approximately
fifty feet away between the inner and outer gates, and raises the outer solid
gate by activating an electronic switch.  At this point, the inner gate
already is in the down position.  The vehicle is driven into the sally port
area between the two gates and the officer lowers the outer gate to its full
extent.  If the vehicle contains officers carrying firearms, the gate post
officer secures their weapons in a locked gunbox in the booth.  The inner gate
is then raised, thereby allowing the vehicle to enter the yard area to
complete its delivery.

A duplicate set of electronic controls are located in the South Tower's
central control room, but are non-functional.  Security cameras strategically
placed to monitor the yard from the central control room also are non-
functional.

Under the original design, correction officers manned the Centre Street
gate post on an around-the-clock schedule.  As an officer was finishing a
shift, a relief officer from the oncoming shift would enter the yard from the
South Tower after attending roll call, and replace the departing officer.  The
relief officer would assume possession of the departing officer's weapon
during this exchange.  Thus, there was no occasion for weapons to be left
unattended, or to be taken into the South Tower facility, which would be a
breach of departmental regulations.

Sometime around or before 1986, however, the Department decided to
discontinue staffing the Centre Street gate post between the hours of 11:30

Decision No. B-40-92                                                                          4
Docket No. BCB-1444-91

P.M. and 6:00 A.M., leaving the yard unmanned.  One consequence of this
staffing change is that when a vehicle needs access during the early morning
hours, an officer has to be deployed to the post from elsewhere in the complex
to operate the gates.  This officer normally is unarmed.  After securing the
vehicle occupants' firearms in the gunbox in the booth, the officer admits the
vehicle and returns to his or her post.  A random review of institutional logs
shows that this situation occurs up to six times per shift.

       A second consequence of the staffing change is that members of the off-
going evening shift are required to take their weapons back to the arsenal
located in the North Tower since no one else is present in the yard area to
take custody of them.  Because institutional policy prohibits officers from
bringing firearms into the South Tower, they must exit the yard through one of
the Centre Street gates and walk along the sidewalk past the South Tower to
the arsenal in the North Tower.  To do so, an officer either has to wait for
another officer to be deployed from elsewhere in the facility to operate the
gate, or the officer can set the outer gate in a downward motion from the
control booth and then run to the gate and duck underneath it as it is
descending.  Institutional Memorandum #5/89, dated January 31, 1989, meant for
distribution to all personnel, bans the latter practice.  The memorandum reads
as follows:

              To clarify this Command's Policy on Officers assigned to the
       Yard Posts, the following procedures will be adhered to:

              1. Armed Correction Officers assigned to the Yard posts will
              enter and exit their posts from either Baxter or Centre
              Streets.

              2. The carrying of firearms into [the South Tower] proper,
              while in route to the Yard, is absolutely prohibited.

              3. The practice of staff walking under the Yard gates while
              they are in the process of closing, is prohibited.

              4. Whenever it becomes necessary for an Armed Correction
              Officer to exit the Yard post, when no other staff is
              available to operate the Yard gate, the Officer will contact
              the Control Room Captain and request that a relief Officer
              be assigned temporarily, to operate the Yard gate.

Decision No. B-40-92                                                                5
Docket No. BCB-1444-91

     5. The Control Room Captains will assign a relief Correction
     Officer to operate the Yard gates whenever it becomes
     necessary for an Armed Person to enter or exit the Yard.

According to the Union, the practice of correction officers running
under the gate has continued, despite the prohibition contained in
Institutional Memorandum #5/89.  The Union also contends that the Department
has not made accommodation sufficient to overcome the problem of operating the
gates in a manner different from the way in which the system originally was
designed to operate.

Decision No. B-40-92                                                                              6
Docket No. BCB-1444-91

### The Union's Evidence

In support of its position, the Union presented two witnesses who testified on the staffing and operation of the gate posts in the yard area of the Manhattan Detention Complex.

Correction Officer Patrick Marcune has served at the complex for the past thirteen years. He also holds a union office as COBA's recording secretary. Officer Marcune began by describing the physical plant of the yard area. He said that in about 1985, the security cameras became non-operational and the controls that operated the mechanical gates from the central control room no longer worked. The following year the Department ceased staffing the gate posts during the midnight shift and also eliminated an outside perimeter security post. As a result, an officer must be reassigned temporarily from a post elsewhere in the facility to operate the gates during the early morning hours. In Officer Marcune's personal experience, he had been reassigned to the gate post from a fire watch post in the North Tower. Because the security cameras do not work, the unarmed officer who enters the yard is out of view and out of contact with the jail until he or she reaches the sally port booth, which has a telephone. Due to this lack of communication, according to the witness, "anyone wanting to gain access to the facility on the midnight [tour] would have no problem, just climb a little ten foot wall, there is no one to stop him."

Officer Marcune then recounted a dangerous incident in the yard involving a disturbance by about twenty inmates that happened approximately two years ago. He said that a prisoner van had entered the yard area during the midnight tour. The officer who operated the gates had returned to his primary detail elsewhere in the facility, and a second officer who had been riding in the van was in the receiving room picking up materials when the disturbance started. This left only a female correction officer on board the van with twenty unruly inmates. According to the witness, the female officer

Decision No. B-40-92                                                    7
Docket No. BCB-1444-91

felt threatened and had to take immediate action.  Having no direct
communication with anyone in the complex, her only alternative was to radio
the Transportation Division on Rikers Island for help.  The Transportation
Division, in turn, notified the tour commander in the South Tower via
telephone that there was an inmate disturbance in the yard.  Only then could
the tour commander get assistance to her.  According to the witness, prisoner
vans can hold up to twenty-five inmates.  They generally are handcuffed in
pairs, but the pairs are not chained together.

Officer Marcune's testimony then turned to the problem of relief
encountered by officers assigned to the 3:00 P.M. to 11:00 P.M. shift.  He
acknowledged the existence of the Institutional Memorandum prohibiting
personnel from running out underneath the Centre Street gates, and early in
his testimony the witness said that the practice has stopped.  Later, however,
he said that correction officers have been running under the gate "every day."
He claimed that officers have disregarded the order because when they follow
the order and wait for relief, which arrives past the end of their tour, the
Department refuses to pay them overtime.  According to Officer Marcune, it is
"now incumbent" upon correction officers to start the gate with a down motion
and run out of the yard.

Correction Officer Howie Figueroa, who holds elective position as COBA's
Legislative Chairman, was the Union's second witness.  He stated that besides
his seasonal legislative duties, he deals mainly with contract enforcement.

Officer Figueroa said that he became aware of the Centre Street gate
post problem sometime in 1989 or 1990, when there was a complaint about
overtime.  He claimed that when correction officers assigned to the post had
followed the order of the institution, which was to wait for relief, they did
not receive overtime.  As a result, according to the witness, officers began
to run under the gate despite the departmental order prohibiting the practice:
"The officers weren't willing to sit there and wait for relief and not get
paid for overtime that they would incur. . . .  The officer violates the rule

Decision No. B-40-92                                                    8
Docket No. BCB-1444-91

because he wants to go home."  Furthermore, according to Officer Figueroa, the
Department is aware of this practice and has done nothing to deter it.  When
asked whether the grievance was resolved, he said, "It really wasn't resolved.
It somewhat just went away."


## The City's Evidence

The City called one witness to respond to the Union's allegations.  John
Nichols is an Assistant Deputy Warden at the Manhattan Detention Complex.  He
works under the Deputy Warden of Security and is responsible for security
matters within the facility.

Warden Nichols confirmed that the Center Street and Baxter Street gate
posts are unmanned during the midnight shift.  He explained that the proper
procedure for gate post officers to follow at 11:00 P.M. when going off duty
is to notify the control room that they are ready to be relieved.  The control
room captain then is supposed to assign an officer to the yard to make the
relief.  Warden Nichols said that this procedure has been in effect since
1989.  He expressed surprise that officers were running out under the gate as
it was descending.  According to the witness, such a practice would violate
departmental policy.  He said that "the first time it came to my knowledge was
yesterday at this hearing."

Warden Nichols acknowledged that security cameras covering the yard area
have been out of service for three years or more, and that the gate controls
in the central control room do not work.  In his opinion, however, they would
be of little value even if they were operable.  He explained that it would be
very difficult for an officer inside the control room to verify someone's
identification via a small monitor screen and decide whether to admit that
person into the yard.  He termed this idea a "security nightmare."  Discussing
Officer Marcune's testimony of the incident involving the lone female
correction officer who felt that she was in danger, Warden Nichols said that
there is an intercom near the control room door that she could have used to

Decision No. B-40-92                                                                 9
Docket No. BCB-1444-91

make direct contact with the facility as an alternative to using the radio in
the van.

## Positions of the Parties

### The Union's Position

The Union claims to have shown that the Department's failure to repair
the electronic system for centrally operating and monitoring the Manhattan
Detention Complex's perimeter security gates or to restore staffing at the
gate posts during the midnight tour has resulted in a practical impact on
employees' safety.  The Union points out that the parties do not dispute that
the electronic monitoring and gate control systems installed in the South
Tower's central control room are inoperable.  It contends, however, that
despite the accommodations that it has tried, the Department has not been able
to overcome these equipment deficiencies.

According to the Union, the fire watch officer is the person usually
dispatched to operate the gates during the midnight shift as the need arises.
It maintains that this practice poses several dangers: it endangers the fire
watch officer, who must enter the yard alone, unarmed and unmonitored; it
endangers the rest of the institution, should a fire occur while the fire
watch officer is off post operating the gates; and it endangers officers on
prisoner transport vehicles, who encounter long delays while attempting to
enter or exit the yard and are sometimes left alone and unmonitored with large
numbers of prisoners.  Furthermore, according to the Union, the absence of a
relief officer during the midnight shift has encouraged off-going evening
shift officers to flout the rules by running under the gate as it is
descending.

The Union concludes that it has met its burden of proof demonstrating
the existence of practical impact on employees safety, and that the steps
taken by the Department to eliminate the safety impact are inadequate.

Decision No. B-40-92                                                          10
Docket No. BCB-1444-91

## The City's Position

     The City denies the existence of a practical impact on the safety of
correction officers manning the gate posts or transporting inmates to and from
the Manhattan Detention Complex.  Instead, it claims that the Union is trying
to force the City to bargain over the equipment used to operate the mechanical
security gates and on the staffing of the gate posts.  These matters, it
contends, fall within management's statutory prerogatives and are
nonmandatory.

     The City agrees that, at one time, the Department used an electronic
monitoring and central control system located in the South Tower's control
room to help maintain yard security.  It argues, however, that since November
of 1984, which was prior to the breakdown of central control system, there
have been no officers assigned to gate posts during the midnight tour.  The
only difference since then has been the elimination of the perimeter foot
patrol on the sidewalk outside the complex.  According to the City, this
change was minor, and was not shown to have an impact on the operation of the
yard area or on the safety of officers assigned to the gate post.  Moreover,
to the extent that any safety impact did exist, it argues that the Department
has taken steps to alleviate the impact by reissuing institutional post orders
in April and May of 1992 that assure the presence of an officer when the
mechanical security gates are in use.  Finally, the City contends that the
incident involving the female correction officer and the unruly inmates
described by Officer Marcune took place in the street rather than in the yard,
and it occurred before the gate post orders were reissued.

     With respect to officers running under the Centre Street gate as it
descends, the City notes that the Union is concerned that officers might trip
and fall, and that the gate could crush them.  It also notes that the Union
justifies the practice by claiming that the Department allegedly refuses to
pay overtime.  The City points out, however, that in these circumstances, any
safety impact that might result is not due to managerial action or inaction.

Decision No. B-40-92                                                      11
<u>Docket No. BCB-1444-91</u>

Instead, it is a "defiant response" to management's order that expressly prohibits staff from walking under the yard gates while they are in the process of closing.  The City argues that it can only insure the safety of its employees if they abide by the method, rules and procedures that management implements to protect them.  It also argues that the officers involved did not make a request for overtime, and that the grievance referred to by Officer Figueroa was dismissed due to lack of evidence.

Finally, the City contends that in the event that this Board determines that management's action or inaction has caused a practical impact on the safety of correction officers, the Department has the right to take whatever action is necessary to alleviate the impact unilaterally.  It maintains that the duty to bargain attaches only if management fails to alleviate the impact.

<u>DISCUSSION</u>

Before reaching the merits of the Union's claim, we find it necessary to denote the scope of our decision.  Both parties have attempted to interject collateral issues into this case.  The Union now argues that when a fire watch officer is off post operating the sally port gates, the rest of the institution is endangered, should a fire occur.  We do not know whether such a possibility exists, because COBA's petition only asked us to consider alleged staffing and equipment problems pertaining to mechanical gates in an outside yard area.  The petition made no mention of the fire watch post, and thus neither the City nor we had the chance to evaluate it thoroughly.  The City, for its part, has tried to bolster its defense by referring to procedures that control the operation of the south Baxter Street police gate.  These procedures apply to the transfer of prisoners from police vehicles directly into the criminal courts building through a passageway separated from the yard by a wall.  Although they may be completely adequate and safe, they involve different personnel using a different gate, and have nothing to do with the operation of the gates on the Centre Street side of the yard.

Decision No. B-40-92                                                    12
Docket No. BCB-1444-91

The parties' pleadings, the testimony of their witnesses, and other
evidence, have identified two potential safety concerns that do fall squarely
within the scope of this proceeding:  First, that the evening Centre Street
gate post officer, at the end of the tour, is "compelled" to operate the outer
mechanical gate alone while ducking under it as it descends.  Second, that
several safety hazards are associated with the temporary deployment of
officers to operate the Centre Street gates during the midnight shift.  These
hazards include the problem of sending unarmed officers to man a security post
in apparent contravention of departmental regulations that call for such
officers to be armed; leaving prisoner transport officers unmonitored in the
yard with prisoners, sometimes with a single officer guarding many prisoners;
and leaving firearms unattended in the locked gunbox in the gate post booth.
Although these safety concerns all stem from the elimination of the gate post
officers during the midnight tour, the running under the descending gate
claim, and the temporary deployment of officers to cover the gate post during
the midnight tour claim, are mutually exclusive issues that we shall examine
independently.

Running Under the Descending Gate

Both parties recognize that Section 12-307b. of the New York City
Collective Bargaining Law ("NYCCBL") reserves to management certain rights,
including the right to determine the methods and means by which it conducts
its operations.[1]  In the exercise of this right, the Department of Correction

---

[1]   Section 12-307b. of the NYCCBL provides, in relevant
part, as follows:
       b.  It is the right of the city, or any other
       public employer, acting through its agencies,
       to... maintain the efficiency of governmental
       operations; determine the methods, means and
       personnel by which government operations are to
       be conducted;... and exercise complete control
       and discretion over its organization and the
       technology of performing its work.

Decision No. B-40-92                                              13
Docket No. BCB-1444-91

promulgated Institutional Memorandum #5/89, which sets out the procedures that officers assigned to the yard posts are to follow.  However, when an employer promulgates an order in the exercise of its managerial prerogative, this section of the NYCCBL also

Decision No. B-40-92                                                          14
Docket No. BCB-1444-91

recognizes that a practical impact on matters of employment, including matters
of employee safety, may result.[2]  Thus, under the practical impact provision
of NYCCBL §12-307b., the Union could secure bargaining if it satisfies its
burden of proving that one or more aspects of Memorandum #5/89 create a
practical impact on employees' safety.

The Union argues that the Department is forcing correction officers to
disregard the prohibitions contained in the memorandum and that officers are
"compelled" to flout the rules by running under the gate.  The evidence the
Union gives to support the existence of this "compulsion" is that management
does not provide timely relief for the gate post officer at the end of the
3:00 P.M. to 11:00 P.M. tour, that the Department allegedly refuses to pay
overtime when the off-going officer is held beyond the normal relief time, and
that officers are unwilling to wait for relief because they want to go home.
Institutional Memorandum #5/89 is explicit: no officer will walk under the
yard gates while they are closing.  In our judgment,

---

[2]   NYCCBL §12-307b. further provides that:
      Decisions of the city or any other public employer
      on those matters are not within the scope of
      collective bargaining, but, notwithstanding the
      above, questions concerning the practical impact
      that decisions on the above matters have on
      employees, such as questions of workload or
      manning, are within the scope of collective
      bargaining.

Decision No. B-40-92                                                          15
Docket No. BCB-1444-91

none of the reasons advanced by the Union are adequate to prove that the

Department has created an unsafe condition by forcing the memorandum to be

ignored.  To the contrary, management has promulgated a reasonable work rule

designed to avoid risk of injury to officers operating the yard gates.  It

cannot protect against injury if the officers refuse to abide by the rule.

        Further, we note that Article III, Section 1. of the parties' collective

bargaining agreement provides:

>           All ordered and/or authorized overtime in excess of
>           forty (40) hours in any week or in excess of the hours
>           required of an employee by reason of his regular duty chart
>           if a week's measurement is not appropriate, whether of an
>           emergency nature or of a non-emergency nature, shall be
>           compensated for either by cash payment or compensatory time
>           off, at the rate of time and one-half, at the sole option of
>           the employee.  Such cash payments or compensatory time off
>           shall be computed on the basis of fifteen (15) minute
>           segments.

Thus, the parties seem to have reached a contractual agreement on overtime

entitlement and compensation.  If the Department keeps the evening shift gate

post officers beyond their normal hours and then refuses to pay overtime, the

grievance and arbitration procedure is the appropriate means for seeking

relief.  Union testimony discloses that COBA did, in fact, begin to use this

process "in 1989 or in 1990," but the grievance "somewhat just went away."  If

there is a residual overtime deprivation dispute, a safety impact claim is not

the way to resolve it.

Decision No. B-40-92                                                    16
Docket No. BCB-1444-91


Temporary Deployment of Unarmed Officers to a Security Post

     Institutional Order No. D6.2.0, in effect since November 15, 1984,
pertains to security and yard control at the Centre Street sally port.  Its
procedures section requires that "[t]he officer assigned to the Centre Street
Gate Post on the 0630 to 1501 hours tour" and on the "1430 to 2301 hours tour"
shall obtain the following departmental equipment from the facility arsenal:

               a. one (1) .38 caliber Smith & Wesson revolver
               b. six (6) rounds of ammunition
               c. one (1) belt with holster
               d. one (1) two-way radio
               e. one (1) personal body alarm
               f. Centre Street Gate key ring.

It is unclear whether an officer temporarily deployed to the gate post during
the midnight tour carries a body alarm.  However, Officer Marcune's testimony
that the temporary officer carries neither a firearm nor a two-way radio is
uncontroverted.  Also uncontroverted is the fact that the officer's movements
are unmonitored, inasmuch as the yard security cameras are non-functional.
This stands in stark contrast to security concerns expressed by the Department
during the other two shifts when there are at least two armed officers in the
yard at all times with redundant means of communication.

     With regard to this aspect of the Union's claim, we find that COBA has
met its burden of proving the existence of several hazards to employee safety,
the first of which we have already described: sending an unarmed, unmonitored
correction officer into an empty yard during the midnight shift with no means
of communication until he or she reaches the sally port booth.  We make no
judgment on the Union's assertion that a "terrorist" or other intruder could
scale the outside thirty foot wall and lie in wait to ambush the officer.
Rather, we base our finding on the dichotomy between the rigorous safety
procedures that the Department has seen fit to implement for day shift and
evening shift officers assigned to the gate post, yet inexplicably abandons
when it deploys officers to the gate post temporarily during the midnight

Decision No. B-40-92                                                    17
<u>Docket No. BCB-1444-91</u>

shift.[3]  We also note that the Department apparently was sufficiently
concerned about monitoring the yard that it installed security cameras, but
then permitted the equipment to become inoperable.

    Secondly, we find that the practice of leaving unmonitored
transportation officers alone in the yard with prisoners to be a legitimate
safety concern.  Guarding incarcerated and about-to-be incarcerated prisoners
is inherently dangerous work.  In the event of an outbreak of violence, if an
officer cannot reach the South Tower intercom, he or she must rely on a radio
transmission to Rikers Island and a telephone call from Rikers Island back to
the facility.  While we do not agree with the Union that this technique
automatically creates appreciable delay, we recognize that a two step
communication relay doubles the risk that the chain will be interrupted during
an emergency.

    Finally, we note that while Institution Order No. D6.2.0 provides
elaborate safeguards for securing firearms in the Centre Street sally port
booth while it is manned, the order makes no provision for the secure storage
of firearms when an officer is not in the immediate vicinity of the gate post.
In these circumstances, we find that the practice of leaving firearms
unattended and unmonitored in the sally port booth while prisoners are in the
yard during the midnight shift also raises a serious safety concern.  While
the possibility of someone scaling the outside wall may be remote, the inner
gate is a different matter.  It hangs from a steel beam approximately fourteen
feet off the ground.  Because of its grillwork structure, it could be scaled,
either by an unsecured prisoner or by a person who had gained surreptitious
entry into the yard.  Once in the sally port, the booth could be broken into

_____

    [3]  <u>See</u> Institutional Order No. D6.2.0, which requires armed
correction officers to "maintain strict security for the Centre
Street sallyport area," and to "search all vehicles for
contraband or secreted inmates.  This search shall include, but
not be limited to, passenger(s), trunk, engine and cargo
compartments.  The undercarriage of the vehicle shall also be
inspected."

Decision No. B-40-92                                                    18
<u>Docket No. BCB-1444-91</u>

with an ordinary implement such as a tire iron or pry bar.  Likewise, the gun
boxes, although constructed of steel plate and locked, could be forcibly
opened.

    Therefore, upon careful consideration of the hearing record, together
with the pleadings and the exhibits submitted herein, we find that the Union
has met its burden of establishing parts of its claim, as set forth above.
The record shows that there are elements of danger associated with the
operation of the Centre Street gate post during the midnight tour of duty that
the Department has not addressed adequately.  We agree that, because of these
inadequacies, a practical impact on the safety of correction officers has
resulted.  Accordingly, we will order that the Union be given an opportunity
to bargain over the means to be used and the steps to be taken to alleviate
the safety impact.

    We will not, as the City suggests, delay the bargaining order to give
the Department the opportunity to alleviate the impact unilaterally.  Unlike
the situation in other kinds of practical impact cases that do not involve
safety issues, once we find that a safety impact exists, the duty to bargain
over alleviation arises immediately.  We reiterated this point in Decision No.
B-25-91, where we went to great length to review the development of the
concept of practical impact on safety under the NYCCBL.  In our discussion of
that case, we said:

      THREATS TO EMPLOYEE SAFETY - We have also recognized that a
finding of practical impact may attach to the exercise of a
management prerogative if the exercise of such prerogative results
in a threat to employee safety.  Whether a threat to safety would
result from the employer's exercise of its management right may be
a question of fact to be decided by this Board after a hearing is
held and a record developed. In cases where we determine that
management's exercise of its prerogative would in fact result in a
threat to

Decision No. B-40-92                                                    19
<u>Docket No. BCB-1444-91</u>

    safety we will require bargaining to alleviate the impact at the
time when implementation of the managerial decision is proposed.[4]

If anything, in a case where managerial action has been implemented rather
than proposed, there exists a greater urgency that the parties bargain
immediately to alleviate the safety impact.[5]

<u>ORDER</u>

    Pursuant to the powers vested in the Board of Collective Bargaining by
the New York City Collective Bargaining Law, it is hereby

    DETERMINED, that the manning practices established by the Department of
Correction with respect to the Centre Street gate post at the Manhattan
Detention Complex is a proper exercise of reserved managerial authority, as
defined in Section 12-307b. of the New York City Collective Bargaining Law
except as set forth below; but it is further

    DETERMINED, that the elimination of the gate post during the

---

[4] Citing Decision No. B-41-80.

[5] This is in full accord with our long-standing policy on
bargainability of safety impact matters. <u>See</u>, <u>for</u> <u>example</u>,
Decision No. B-6-79, where we ordered prompt negotiations to
alleviate specific safety impact items resulting from the Police
Department's decision to implement solo patrols for its sergeants
and lieutenants.

Decision No. B-40-92                                                    20
Docket No. BCB-1444-91

midnight tour of duty and the non-functioning of central security equipment

has a practical impact on the safety of Correction Officers, and, therefore,

the alleviation of such practical impact on employees' safety is a matter

within the scope of collective bargaining; and it is accordingly

    ORDERED that, the Department of Correction shall bargain in good faith

concerning the means to be used and the steps to be taken to alleviate the

practical impact on the safety of its employees.


DATED: New York, N.Y.
      September 30, 1992

                                                      MALCOLM D. MACDONALD
                                                        CHAIRMAN

                                                  GEORGE NICOLAU
                                                        MEMBER

                                                  DANIEL G. COLLINS
                                                         MEMBER

                                                  JEROME E. JOSEPH
                                                         MEMBER

                                                  CAROLYN GENTILE
                                                         MEMBER

                                                  DEAN L. SILVERBERG
                                                         MEMBER

                                                  STEVEN H.WRIGHT
                                                  MEMBER