EXHIBIT 13

UFA, L.854, IAFF v. City, 49 OCB 39 (BCB 1992) [Decision No. B-39-92]

OFFICE OF COLLECTIVE BARGAINING
BOARD OF COLLECTIVE BARGAINING
---------------------------------------X
In the Matter of
                                    DECISION NO. B-39-92
UNIFORMED FIREFIGHTERS ASSOCIATION
OF GREATER NEW YORK,                DOCKET NO. BCB-1347-90
                 Petitioner,

         -and-

CITY OF NEW YORK,
                 Respondent.

---------------------------------------X
In the Matter of

UNIFORMED FIRE OFFICERS ASSOCIATION,    DOCKET NO. BCB-1359-91
LOCAL 854, IAFF, AFL-CIO,
                 Petitioner,

         -and-

CITY OF NEW YORK,
                 Respondent.

---------------------------------------X

<u>**DECISION AND ORDER**</u>

On December 12, 1990, the Uniformed Firefighters Association of Greater New York ("UFA" or "petitioner") filed a scope of bargaining petition, docketed as BCB-1347-90, in which it alleged that the unilateral change in assignment of "light duty" firefighters to the position of Division Aide, set forth in Department Order 168, will have a direct, immediate and specific adverse impact on the safety of both "light duty" firefighters assigned as Division Aides and full duty firefighters. As a remedy, the UFA requested that the Board of Collective Bargaining ("Board") issue an order: (1) directing the City of New York ("the City" or "respondent") to bargain over the means to alleviate the practical impact caused by such change; (2) directing the City to rescind Department Order 168, paragraphs 2.3 and 2.4 pending the outcome of the ordered negotiations; and (3) granting such other and further relief as may be deemed just and proper by the Board.

On December 24, 1990, the City, represented by its Office of Labor Relations, filed a motion to dismiss the scope of bargaining petition, and an affidavit in support thereof. The UFA filed an answer to the City's motion on January 4, 1991 and, on January 17, 1991, the City filed a reply.

Decision No. B-39-92                                                    2
Docket Nos. BCB-1347-90
<u>    BCB-1359-91</u>

    In Decision No. B-6-91, the Board held that contrary to the City's assertion in its motion to dismiss, the UFA's scope of bargaining petition was not filed prematurely merely because Department Order 168 was scheduled to go into effect <u>after</u> the scope of bargaining petition was filed.  The Board further held that the UFA had alleged sufficient facts in support of its claim that issuance of Department Order 168 will have a practical impact on the safety of both light duty firefighters assigned as Division Aides and full duty firefighters to withstand the City's motion to dismiss.  Accordingly, the Board denied the City's motion to dismiss the UFA's petition, and directed the City to file its answer thereto.

    On February 11, 1991, the City filed an answer to the UFA's scope of bargaining petition.  The UFA filed its reply on February 22, 1991.

    On January 16, 1991, the Uniformed Fire Officers Association, Local 854, IAFF, AFL-CIO ("UFOA" or "petitioner") filed a scope of bargaining petition, docketed as BCB-1359-91, in which it alleged that the unilateral change in assignment of "light duty" firefighters to the position of Division Aide will have a direct and immediate adverse impact on the safety of members of the UFOA bargaining unit.[1]  As a remedy, the UFOA requested that the Board issue an order: (1) directing the City to bargain over the means to alleviate the practical impact caused by such change; (2) directing the City to rescind Department Order 168, paragraphs 2.3 and 2.4 pending the outcome of the ordered negotiations; and (3) granting such other and further relief as may be deemed just and proper by the Board.

    The City filed an answer to the UFOA's scope of bargaining petition on

_____

  [1] On January 28, 1991, the City filed a motion to dismiss the UFOA's scope of bargaining petition, and an affirmation and memorandum of law in support thereof.  Subsequently, by letter dated February 14, 1991, Richard Bethell, counsel to the UFOA, informed Steven C. DeCosta, Deputy Chairman and General Counsel of the Office of Collective Bargaining, that pursuant to the terms of an agreement between the UFOA and the City, the City had agreed to withdraw its motion to dismiss the scope of bargaining petition, without prejudice to its filing an affirmation and an answer to the petition.

Decision No. B-39-92                                                    3
Docket Nos. BCB-1347-90
      BCB-1359-91

February 26, 1991.  The UFOA filed its reply on March 27, 1991.

     In Interim Decision No. B-25-91, the Board consolidated the scope of
bargaining petitions filed by the UFA and the UFOA, and determined that
contrary to the City's assertions in its answer, a disputed question of fact
exists as to whether Department Order 168 will have a practical impact on the
safety of light duty firefighters assigned to that position, as well as full
duty firefighters and other uniformed Fire Department personnel.  Accordingly,
the Board ordered a hearing for the purpose of establishing a record upon
which it may ascertain whether there exists a practical impact on safety.[2]

     After numerous requests by the parties for adjournments, hearings in
these matters were held on December 2, 1991, January 15, 1992, February 4, 14
and 27, 1992.  On April 15, 1992, the UFOA, with the consent of the UFA and
the City, submitted corrected transcripts of tape recordings introduced into
evidence in the hearings, which were marked as UFOA Exhibits 3 and 4.
Thereafter, on May 15, 1992, the parties filed their post-hearing briefs[3], and
the record in this proceeding was closed.

<u>BACKGROUND</u>

     On November 26, 1990, the Fire Department ("Department") issued
Department Order 168, wherein it announced its intention to staff the position
of Division Aide with light duty firefighters.[4]  Firefighters are placed on

-------------------------------------------

[2] The issue noticed for hearing by the Board was as follows:

> Whether issuance and implementation of New York City Fire
> Department Order No. 168 has resulted in a practical impact on the
> safety of the members of the Uniformed Firefighters Association
> and Uniformed Fire Officers Association.

[3] We note that the parties requested, and were granted, several extensions of time in which to
file their post-hearing briefs.

[4] Department Order 168 states, in relevant part, as follows:

                                                          (continued...)

Decision No. B-39-92                                                                                      4
Docket Nos. BCB-1347-90
<u>         BCB-1359-91</u>

```
light duty by the Medical Officers of the Department when, for any reason,

they are unable to perform the physically demanding duties of a firefighter.

     Department procedures provide that in the event of a fire scene

operation, Battalion Chiefs and their Aides (referred to as Battalion Chief
```

---

[4](...continued)

### 2.3        LIGHT DUTY DIVISION AIDES

Effective January 1, 1991, the position of Division Aide will no longer be classified as a full duty position. All full duty firefighters presently assigned or detailed as Division Aides SHALL be replaced by light duty firefighters. This reduction in full duty headcount is one of the budget reduction measures mandated for this Department.

All light duty firefighters who anticipate remaining on light duty for at least one year are encouraged to apply for assignment as a Division Aide. The Department intends to fill these positions, to the greatest extent possible, with long term light duty personnel. These positions will be considered priority light duty assignments.

Interested members shall forward a report no later than December 10, 1990 to Deputy Chief Edmund P. Cunningham, Bureau of Personnel requesting consideration for such assignment. Report shall include member's name, badge number, assigned unit and present light duty assignment.

The Bureau of Personnel in conjunction with the Bureau of Operation and the Bureau of Health Services shall review all applications and select those long term light duty firefighters most qualified to serve as Division Aides. Selected members shall be assigned, whenever possible, to the Division of their choice. Work schedule shall be in accordance with the established firefighter group chart.

### 2.4        TRANSFER REQUESTS, DIVISION AIDES

Effective January 1, 1991, the position of Division Aide will no longer be a full duty position. Only light duty firefighters will be assigned and/or detailed as Division Aides from that date forward. All presently assigned and/or detailed full duty Division Aides shall be re-assigned effective January 1, 1991. Full duty Aides assigned to Divisions shall forward a Transfer request to the Deputy Chief of Personnel Edmund P. Cunningham before December 19, 1990. Full duty aides who are detailed to Division shall, unless they request a transfer to another unit, return to their assigned unit, effective 0900 hours, January 1, 1991.

Every effort shall be made, to the greatest extent possible, to assure that effected members are transferred to a unit of their choice.

Decision No. B-39-92                                                        5
Docket Nos. BCB-1347-90
_____BCB-1359-91

Aides) are the first level of command to report to the scene.  In the case of
an expanding firefighting operation, Deputy Chiefs and their Aides (referred
to as Division Aides) are dispatched to the scene.  If a multiple alarm is
called, Deputy Assistant Chiefs and their Aides and Assistant Chiefs and their
Aides (referred to as Staff Chief Aides) are dispatched to the scene.
Finally, in the event that a fourth alarm is called, the Chief of Department
and his Aide would be dispatched to the scene.

     At the time Department Order 168 was announced, 305 individuals were
serving as Aides to the various Chiefs.  Of these, 55 were serving as Division
Aides and would be affected by Department Order 168.  The remaining 250
Chief's Aide positions were not affected by Department Order 168, and
continued to be filled by full duty firefighters.

     In general, the role of the Chief's Aides in fire and emergency
operations includes emergency vehicle operation, reconnaissance, intelligence
gathering and communication of this information to the Command Chief, the
Chief in charge of the fire or emergency operation.  They are the Command
Chief's principal communications link to the firefighting unit.  The Command
Chief evaluates the information provided by the Aides and directs the
firefighting operation accordingly.  In order to make these observations,
Aides are often dispatched to advanced positions within the fire structure and
exposure buildings.[5]

     The Chief's Aides also may be called upon to give assistance at the fire
scene if prior to the arrival of the Firefighter Assist Team (also referred to
as the "FAST Team")[6] or Rescue Company the Incident Commander determines that

---

[5] It is not disputed that prior to the issuance of Department Order 168, Division Aides
performed the duties described above.

[6] The FAST Team is composed of an additional engine company that responds on the second
alarm.  Stationed at the Command Post, the job of the FAST Team is to be fully equipped and
ready to respond to any call for assistance from firefighters.

Decision No. B-39-92                                                                6
Docket Nos. BCB-1347-90
       BCB-1359-91

a firefighter is in need of assistance.  This procedure was developed in

response to a citation issued to the Fire Department, on or about July 16,

1989, by the New York State Department of Labor, Division of Public Employee

Safety and Health (PESH) for the violation of Section 1910.134(e)(3)(i) of the

Occupational Health and Safety Act ("OSHA").[7]  Section 1910.134(e)(3)(i)

requires the presence of at least one other person in areas where the wearer

of a respirator could be overcome by a toxic or oxygen deficient atmosphere.

By letter dated December 3, 1990, PESH accepted the Department's proposal to

amend its procedures which provides, _inter alia_, that:

> 6.  If prior to the arrival of the Firefighter Assist Team or
> Rescue Company the Incident Commander determines that a member may
> become in need of assistance, the IC shall designate any of the
> following for assistance or rescue:
>
> 6.1  Companies held in reserve.
>
> 6.2  Companies available for immediate reassignment.
>
> 6.3  Members available for immediate reassignment.  Example: -
> Ladder Company Chauffeur, Roofman, members of Rescue or Squad
> Companies, etc.
>
> 6.4  Uncommitted chauffeurs or **chief's aides**.
>
> > 6.4.1  It is imperative that the IC reassign these
> > members as early as possible in the operation.
> >
> > 6.4.2  These members shall be properly equipped per
> > Department Regulations 11.3.1 and be placed in a
> > stand-by position at the command post or other
> > location designated by the IC.
> >           (Emphasis added)

Accordingly, the citation against the Department was removed.

Prior to the implementation of Department Order 168, on January 4, 1991,

the Department issued All Units Circular No. 290 ("AUC 290"), Operating

Guidelines For Light Duty Division Aides, which limits the duties of light

duty firefighters assigned as

_____

[7] 29 CFR Section 1910.134(e)(3)(i).

Decision No. B-39-92                                                7
Docket Nos. BCB-1347-90
     BCB-1359-91

Division Aides pursuant to Department Order 168 as follows:

    1.  Light duty division aides shall not operate with self
contained breathing apparatus ("SCBA") nor shall they perform any
duties which require members to use a SCBA.  For example, light
duty division aides shall not operate in confined spaces or areas
within buildings where toxic substances or toxic products of
combustion or an oxygen deficiency are present.  <u>See also</u> AUC 220
(Revised) Self-Contained Breathing Apparatus (SCBA) Policy.

    2.  Light duty division aides shall not be assigned to perform
interior structural firefighting operations.  Interior structural
firefighting is defined, as including but not limited to, the
physical activity of fire suppression, rescue or both, inside of
buildings or enclosed structures which are involved in a fire
situation.

    3.  Light duty division aides shall not use the sliding pole in
quarters.  When responding, light duty division aides must only
use the stairway to the apparatus floor.

    4.  Light duty division aides shall not perform any duty as part
of the Firefighter Assist Team either prior or subsequent to the
arrival of the Firefighter Assist Team.

    5.  Light duty division aides shall not perform any physical task
at fire or emergency operations which would normally be performed
only by a <u>full duty</u> firefighter assigned to Staff Officer,
Battalion, Engine Company, Ladder Company, Rescue Company, Squad
Company, Marine Company or Hazmat Unit.  For example, a light duty
division aide could provide a communication link by monitoring
handi-talkie traffic and operating Department radios and could
also maintain the command and control board.  However, a light
duty division aide would not be required to climb a ladder or
assist on a hose stretch.

Thereafter, on or about February 2, 1991, light duty firefighters were

assigned to the position of Division Aide.

Decision No. B-39-92                                                    8
Docket Nos. BCB-1347-90
    BCB-1359-91

## EVIDENCE ADDUCED AT THE HEARING

### The Unions' Evidence

Together, the UFA and the UFOA called eleven witnesses.[8]  William
Feehan, Chief of Department, testified both as a Union witness and a City
witness.  Chief Feehan reported that he, along with former Chief of Department
DeMeo and other Staff Chiefs, formulated a plan to replace full duty Division
Aides with light duty firefighters.  The policy behind the plan was to
restrict the operation of light duty firefighters on the fire ground to
prevent them from being put in a position that might endanger their light duty
condition.

Chief Feehan testified that the term "hazard area" as used in Chief
DeMeo's affidavit dated December 18, 1990, refers to "that area within the
fire grounds where a member would be subject to exposure, to injury, smoke,
toxic fumes, or things of that nature." TR. 30.  According to Chief Feehan,
the boundaries of the hazard area have to be delineated on a case-by-case
basis.   Chief Feehan testified that since Department Order 168 was
implemented, he has received feedback from Deputy Chiefs concerning problems
in administration, _e.g._, "the revolving door syndrome."  Chief Feehan noted
that frequent turnover prevents the development of a close working
relationship between the Deputy Chief and his Aide; and recognized that the
absence of that relationship can result in communication problems which have
an impact on the implementation of the Deputy Chiefs' decisions at the fire
scene.  Chief Feehan stated, however, that now that the program has been in
effect for several months, there is less turnover.

---

[8] William Moore, Vice President of the UFA, testified on behalf of that Union.  Mr. Moore
indicated that prior to going on disability, he was a Battalion Chief's Aide.  Mr. Moore stated,
however, that he was not familiar with AUC 290.  Since no connection was made between the
issue noticed for hearing by the Board and Mr. Moore's prior experience, the City's objection to
the testimony of this witness was sustained.
    With regard to the testimony of Donald J. Burns, Assistant Chief of Operations, called as
a witness by the UFOA, see _infra_ at page 32, note 18.

Decision No. B-39-92                                                                 9
Docket Nos. BCB-1347-90
         BCB-1359-91

Chief Feehan further stated that he has heard numerous complaints from Deputy Chiefs that they were somewhat limited on the fire ground because, given the restrictions of AUC 290, they felt that they could not use their Aides to check a particular condition in a particular portion of the building.

Chief Feehan identified reconnaissance as one of the duties previously performed by full duty Division Aides that light duty firefighters cannot perform, and opined that "[t]hat lack of ability to send him around as another part of your eyes, I think, is probably the most telling loss ... when losing a full duty Aide." Chief Feehan characterized the Chief's Aide as a "vital link in the firefighting force," but stated that he did not know whether the absence of the reconnaissance function poses any safety problems. To answer that question, Chief Feehan indicated that he would need to know whether there was anyone else readily available who could perform the reconnaissance for him; how vital it was that reconnaissance be done in a very short period of time; and whether there was some other way of getting the necessary information by contacting the units by handie-talkie. Chief Feehan noted that additional units can be special called to a fire scene, even before the Chief leaves the firehouse. He acknowledged that while safety could be involved in some cases due to the additional time it takes to special call units, this would not be a factor in all cases.

Chief Feehan noted that under AUC 290, a light duty Division Aide's duties are restricted on the fire ground, whether the fire ground is something they respond to or encounter spontaneously. Chief Feehan asserted that if the use of a SCBA is necessary, the light duty Aide should not be present. The Chief, on the other hand, would be expected to do "whatever he felt it was safe and prudent for him to do under the circumstances. The circumstances being that he was essentially operating alone." TR. 438. Chief Feehan testified that he knows of no written directive of the Department instructing Chiefs and/or their Aides on how to conduct themselves when they encounter a fire spontaneously.

Decision No. B-39-92                                                    10
Docket Nos. BCB-1347-90
        BCB-1359-91

Chief Feehan testified that, generally, the front piece of the Division Aides' helmets identifies them as Division Aides.  Chief Feehan further testified, however, that firefighters are required to purchase their own front pieces and he did not know whether they had in fact made such purchases.

Chief Feehan noted that a formal training course was given to the first group of light duty Aides.  Basically, it concentrated on the Aide's function on the fire ground and fire ground communication.  Thereafter, light duty Aides who came on board after the program was implemented received on-the-job training from the Deputy Chiefs to whom they reported.  In this regard, Chief Feehan indicated that he has observed some light duty Division Aides who did not seem to know what their duties were and, therefore, were not doing an effective job.

With regard to the training manual used in the light duty program, Chief Feehan noted that it covers both full duty Battalion Chief's Aides and light duty Deputy Chief's Aides.  While the City asserted that this manual was revised sometime after implementation of the light duty program, Chief Feehan acknowledged that under its terms, fire ground tactics still contemplate that a Chief's Aide will be required to enter a burning structure.  Chief Feehan attributed this to the fact that most of the material was prepared before there were light duty Aides.  In any event, Chief Feehan stated that "Clearly the sentence says tactics require them in a burning structure -- we do not intend light duty Aides to be in burning structures." TR. 475.

Chief Feehan noted that with the changeover from the 25 to the 24 group chart fire officers and firefighters now work on different schedules.  Thus, there was an interruption in the continuity of the working relationship between Chiefs and their Aides even before implementation of the light duty program.

Decision No. B-39-92                                                    11
Docket Nos. BCB-1347-90
         BCB-1359-91

Chief Feehan indicated that more than 200,000 fire reports[9] are prepared each year.  Of these, he regularly sees about 200 which constitute the fatal fire reports.  Chief Feehan testified that he has not seen any fire report wherein the use of light duty Aides was alleged to have resulted in an unsafe condition.  He acknowledged, however, that unless there were some dire consequences, if an unsafe condition was created by the way a light duty Aide was utilized, or not utilized, it might not go into the fire report.

When asked whether the promulgation of AUC 290 satisfies the concerns raised by the Staff Chiefs in their November 1990 letter to the Mayor, Chief Feehan stated that they satisfy him with regard to the safety of light duty Aides on the fire ground.  Chief Feehan further stated, however, that he is "not entirely convinced that the absence of the full duty Aide could not have a potential impact at some point in some circumstances on other firefighters on the fire grounds." TR. 63.  When called as a witness by the City, Chief Feehan reiterated that he was "convinced that All Units Circular 290 has assured the safety of the light duty Aides." TR. 422-23.  With regard to the safety of other firefighters, Chief Feehan stated that "I can't say unequivocally, without a doubt, there could not be some situations at some time where the only one available would be a light duty Aide ... There may be some hypothetical situation where absent all these other things that the Aide, the light duty Aide would be the only one available...." TR. 423-24.  Chief Feehan explained, however, that he did not think the hypothetical situation likely because, in his experience, most of the time there are other people around, e.g, a reserve company standing by, and these people are trained to do reconnaissance.                     With regard to firefighting procedures in high rise office buildings, Chief Feehan noted that the "Firefighting Procedures -

---

[9] Fire reports are accounts of the fire operation prepared by the Battalion Chief first to arrive on the scene of a fire.  The report specifies what the fire concerns were and the operations performed by each of the units called to the scene.

Decision No. B-39-92                                                    12
Docket Nos. BCB-1347-90
    BCB-1359-91

Fire Operations for High Rise Office Buildings" ("High Rise Bulletin")[10] was
last updated sometime after the light duty program was implemented.  He
testified, however, that a schematic diagram in the bulletin indicates that
the Deputy Chief will have an Aide with him in the Operations Post to monitor
the command channel and complete the Operations Post Log, thus freeing the
Deputy Chief to direct the firefighting operations.[11]  Chief Feehan
acknowledged that according to the schematic diagram, Battalion Chiefs and
their Aides are assigned to specific locations which are different from those
assigned to the Deputy Chief.  Chief Feehan also recognized that fire
conditions can change quickly, making the Operations Post, located on the
floor below the fire, an environment unsuitable for light duty firefighters.
Chief Feehan stated that in his view, the light duty Aide would best be kept
at the Lobby Command Post since any assignment above that area could place the
light duty Aide in jeopardy.  While Chief Feehan noted that the Staff Chief's
Aide would be available to work with the Deputy Chief at the Operations Post,
he recognized that the Staff Chief requires his Aide to perform certain
specific functions for him.  In any event, whether the Staff Chief's Aide was
available to, in effect, be detailed to the Deputy Chief would depend on
whether the Field Communications Unit had arrived on the scene.

    With regard to the medical screening process, Dr. Cyril Jones, Chief
Medical Officer, reported that he and a member of the senior nursing staff
meet and examine the firefighter's chart, from which they assess whether the

---

[10] The High Rise Bulletin sets forth a strategic operating plan and the tactical applications of
that plan.

[11] Generally, the tactical channel is the radio channel used by firefighters to communicate with
one another, while the command channel is used by the Fire Officers.  The procedure is reversed,
however, in high rise office building fires.  In those fires, the Chief in Charge of the Operations
Post operates on the tactical channel, while his Aide operates on the command channel.

    The Operations Post Log is a document normally completed by the Deputy Chief's Aide
at the Operations Post which keeps track of the units operating on the fire floor.

Decision No. B-39-92                                                              13
Docket Nos. BCB-1347-90
      BCB-1359-91

firefighter is medically qualified to perform the duties of a Deputy Chief's Aide. No physical examination is performed. Rather, Dr. Jones testified that they rely on the results of the most recent physical examination included in the chart, which is never more than one or two months old. Dr. Jones further stated that every firefighter on light duty is examined at regular intervals to determine whether there should be a change in duty assignments. According to Dr. Jones, approximately 30-50% of the light duty firefighters screened by him are rejected for the position of Division Aide.

In his testimony, Dr. Jones referred to a letter written to former Chief of Department Homer Bishop, dated December 1, 1982, and explained that he and the other Medical Officers limited their recommendation for full duty status to Staff Chief Aides and Battalion Chief Aides because they were the only titles about which Chief Bishop requested comment.

Eugene Dockter, Assistant Chief, Staten Island Borough Commander, stated that he lost an essential tool at the fire scene by restricting the duties that may be performed by Division Aides. He noted that Aides perform highly skilled functions which take a long time to develop; and asserted that "the criteria for becoming an aide can't be a walking wounded." TR. 105. Chief Dockter likened the need for a full duty Division Aide to a handkerchief that you carry around - "you use it when you need it, when you need life insurance." TR. 99.

In his testimony, Chief Dockter referred to a 4th alarm fire in Brooklyn. He stated that when he arrived as the Command Chief there was chaos in the street. The Deputy Chief was very busy running around trying to get a picture of the units he had working and where they were located. Normally, Chief Dockter stated, the Aide would establish the Command Post[12], and would

---

[12] Although the Field Communications Unit, located in central Brooklyn is responsible for setting up the Command and Control Board at all fires that are second alarm and higher, Chief Dockter noted that there is only one Field Communications Unit for the entire City. Because

(continued...)

Decision No. B-39-92                                                    14
Docket Nos. BCB-1347-90
     BCB-1359-91

draw a diagram of the building and the location of the companies at the fire
scene.  In this case, however, the Aide was removed from the area due to heavy
smoke conditions in the street.  The communication link was weak because the
Chief was trying to do everything himself.  Chief Dockter testified that the
danger in  such situation is that there can be units on opposite sides of the
fire operating against each other, which could result in injuries.  Chief
Dockter noted that when he arrived at this fire there were no uncommitted
firefighters on the scene, although he acknowledged that, generally, when he
arrives as a Staff Chief there are units in the street.

    Chief Dockter opined that the problem with using uncommitted
firefighters as substitutes for full duty Aides is that he must give
instructions to the individual and explain how he wants the task performed.
Chief Dockter stated that "while I'm talking to him and training him on the
scene, I'm not paying attention to the fire.  If I have to train someone at
the scene of the fire, I'm not doing any fire duty, and high rise firefighting
... demands a tremendous amount of juggling and you don't have time to explain
or teach someone what you need." TR.109.

    With regard to communication at the fire scene, Chief Dockter noted that
a radio can only be used for one channel at a time.  When the Deputy Chief
switches to the command channel, the Aide's radio remains on the tactical
channel.  The Chief and the Aide are "married" to one another because if a
"MayDay"[13] is called, it comes over the tactical channel.  Although Chief
Dockter acknowledged that nothing prevents a Deputy Chief from holding two
radios at a time, he explained that it is confusing to do so.  Further, he

---

[12](...continued)
they may be previously committed, or may take a long time to get to a fire located far away from
their post, the Division Aide may be responsible for the command and control function.

[13] "MayDay" is a term used to signal that a life threatening situation has developed, such as 1)
indication of imminent collapse; 2) structural collapse has occurred; 3) a firefighter is
unconscious; 4) a firefighter has suffered a life threatening injury; 5) a member is missing.

Decision No. B-39-92                                                  15
Docket Nos. BCB-1347-90
        BCB-1359-91

stated "I cannot monitor both without saying I'm going to miss a message.  I
listen to the tactical to try to hear what's going on.  But when I'm talking
on the command, the tactical is lost to me, so I could miss messages on the
tactical when I'm on the command." TR. 144.

        Chief Dockter indicated that something is missing in the communication
function if the Aide is not physically located next to the Chief.  To the
extent the ability of the Deputy Chief to communicate is infringed upon by the
absence of his Aide, Chief Dockter stated that in his opinion, a safety
problem may be presented.

        Chief Dockter acknowledged that unlike the present situation, before the
light duty program was instituted the Deputy Chief was able to select his
Aide.  Chief Dockter insisted, however, that this is not the reason that
Deputy Chiefs object to the program.

        Edward Butler, Assistant Chief and Commander of the Manhattan Central
Fire Command, testified about his personal experience under AUC 290.  He
referred to a second alarm fire in November 1991 at the World Trade Center.
When the Deputy Chief arrived, Chief Butler told him where to establish his
position. Because there was trouble with the handie-talkies, Chief Butler
wanted the Deputy Chief's Aide to go upstairs to the fire floor, where the
Deputy Chief was located, and tell him to call on the direct line.  The Aide
reminded Chief Butler, however, that he could not go up to the fire floor
because he was on light duty.  As a result, Chief Butler had to find someone
else to send upstairs to accomplish the task.

        Chief Butler noted that when he was a Battalion Chief and a Deputy
Chief, he wanted to select and train his Aide.  Moreover, Chief Butler noted
that he used his Aide to run on little missions and come back to him with
information needed to fight the fire.  AUC 290 restricts the Deputy Chief's
ability to use the Aide for this purpose in that it prohibits the Division
Aide from going into a toxic or hostile environment.

        When asked if he knew whether the Deputy Chiefs have any safety concerns

Decision No. B-39-92                                                    16
Docket Nos. BCB-1347-90
      BCB-1359-91

related to AUC 290, Chief Butler responded that recently he had asked that

questions of two Deputy Chiefs who indicated that "they did not have any

problem as of yet with the safety aspects of the program." TR. 184.

     John F. McCormack, Acting Deputy Assistant Chief, Queens South Fire

Commander, asserted that the exclusion of light duty Aides from the

reconnaissance function poses an overall safety concern in that they may not

be used to gather and evaluate the information needed by the Incident

Commander to make decisions which effect the firefighters operating at the

scene.  In addition, Chief McCormack claimed that without the help of an Aide,

communication would be hindered.  The Deputy Chief would have to monitor both

the tactical and command channels to know everything that is going on, in

addition to performing all of the duties required generally of the Chief.

Chief McCormack noted that at a non-high rise second alarm fire, there may be

30-40 handie-talkies on the tactical channel, in addition to those on the

command channel.  Thus, the demands on the Deputy Chief are made even greater

when working with a light duty Aide.

     As an example of how AUC 290 has hindered firefighting operations, Chief

McCormack referred to a multiple dwelling fire in Queens South in late June or

early July 1991.  Chief McCormack stated that when he came on the scene the

fire was extending.  He needed information which the Deputy Chief did not have

because he could not get through the handie-talkie traffic.  According to

Chief McCormack, if the Deputy Chief had a full duty Aide, he could have

directed the Aide to get the information he needed.  In this situation,

however, the lack of a full duty Aide delayed the receipt of information,

which in turn delayed Chief McCormack's ability to decide where or when to

send additional backup lines.

     Chief McCormack noted that the way the High Rise Bulletin is written,

Division Aides are required to perform the reconnaissance and command and

control functions previously performed by full duty Aides.  Considering their

light duty status, Chief McCormack stated that he does not know how they are

Decision No. B-39-92                                                17
Docket Nos. BCB-1347-90
      BCB-1359-91

able to complete those tasks.

Chief McCormack indicated that at a second alarm fire there are between 60 and 65 full duty firefighters on the scene.[14]  He stated that depending on the situation, all of these firefighters (except those designated as the FAST team) may be committed, or there may be companies in reserve.  With regard to reserve units, Chief McCormack noted that "[t]he point is fire operations ... can change instantaneously.  I could have a reserve unit there and two minutes later I have to commit them or I could commit the second alarm right away...."  TR. 257.

Chief McCormack stated that it is not realistic to think that you could grab any uncommitted full duty firefighter and use him or her as your Aide.  Indeed, Chief McCormack stated that "one of the most important decisions a Chief makes upon being promoted to Chief is the selection of the Aide, and he makes
that selection based on a number of reasons that he wants that person.  So you just don't grab anyone, because not anyone has been trained and not anyone knows your operating procedures." TR. 285.  Chief McCormack asserted that while it is true that prior to AUC 290 Division Aides went on vacation or occasionally got sick, unlike the present situation, those replacement Aides were full duty firefighters selected by the Chiefs to be trained as substitutes for their regular Aides because it had been determined previously that they could do the job.

With regard to the identification of Division Aides, Chief McCormack stated that in his experience, most firefighters, out of habit, wear the front piece of the unit that they came from. They do not wear a front piece that identifies them as Division Aides.

_____

[14] According to Chief McCormack, the number of full duty firefighters at a second alarm fire varies based on the Department's staffing levels.  Moreover, since implementation of the Roster Staffing Program, there are fewer firefighters generally at second alarm fires than there used to be.

Decision No. B-39-92                                                          18
Docket Nos. BCB-1347-90
       BCB-1359-91

Henry Norum, an Assistant Chief, testified that AUC 290 did not satisfy
his safety concerns because he could no longer use his Aide to do the things
he did previously, e.g., conduct reconnaissance.

Further, Chief Norum testified that when he was a Deputy Chief, he had
on several occasions encountered a fire when returning from another fire or
emergency.  He noted that while his Aide went into the fire structure to
determine whether there was any life hazard on the fire floor in those cases,
under AUC 290 a light duty Aide could not perform this function.  Chief Norum
agreed, however, that "picking up a fire" is an unusual occurrence for a
Deputy Chief.

Anthony DiMartino, a retired member of the Department currently working
as a consultant to law firms on fire related cases, testified that during his
tenure with the Department he spent approximately 4 years as the Chief in
Charge of Personnel.  In that position, he had primary control over the
assignment of light duty firefighters.  Mr. DiMartino acknowledged, however,
that he is not familiar with the medical screening procedures used for light
duty Division Aides; nor is he familiar with the criteria used to accept or
reject a light duty firefighter for the position of Division Aide.  In fact,
Mr. DiMartino reported that he had no direct experience under the light duty
program.

Based upon his experience as a Chief, Mr. DiMartino asserted that the
inability of a Deputy Chief to select his Aide would impact on safety in that
he would not know what the Aide's abilities were.  Mr. DiMartino noted that
when he was a Chief and his regular Aide went on vacation, he had a substitute
who was a full duty firefighter trained for that position.  Mr. DiMartino
distinguished the light duty program from the situation that resulted from the
changeover from the 25 to the 24 group chart.  First, he noted that the
substitute Aides used prior to the light duty program were full duty
firefighters specifically trained to be Aides.  Moreover, Mr. DiMartino
explained, the lack of continuity resulting from the chart change was not as

Decision No. B-39-92                                                    19
Docket Nos. BCB-1347-90
     BCB-1359-91

great as that experienced in the situation herein.

    John J. O'Rourke, retired Chief of Department, currently working as a
fire protection consultant, opined that the assignment of light duty Aides
depletes the overall safety of the operating forces on the fire grounds.  "It
distracts from [the Deputy Chief's] primary function if the first thing he has
to do is provide a safe area outside the hazard area for the Chief's Aide to
operate from."[15] TR. 376.  Moreover, Chief O'Rourke stated, anyone in close
proximity to a fire should be in good health, without injuries or defects.

    Chief O'Rourke detailed his experiences encountering a fire when he was
a Chief.  He noted that under AUC 290, a Deputy Chief working with a light
duty Aide would either have to enter the premises by himself to effect
whatever action was necessary, or await the arrival of other units.  Chief
O'Rourke also testified that there were occasions when he was the first to
arrive at the fire scene.  He explained that under such circumstances it is
not unusual for the Deputy Chief to perform the duties of the Battalion Chief
until the Battalion Chief arrives.  Chief O'Rourke asserted that a light duty
firefighter cannot perform all of the duties required of an Aide by remote
control; and  anything that hinders the transmission of information to the
Chief officer in command of the fire will prolong the duration of the fire
and, thus, have an impact on safety.

    Chief O'Rourke testified that when his Aide went on vacation, he was
replaced by a firefighter from the battalion who was being prepared to become
a Chief's Aide; a firefighter who had expressed a willingness to take on the
added responsibilities of an Aide.  Chief O'Rourke further stated that in
situations where they grabbed anyone who was available to fill in for the
Aide, generally they experienced a loss of function because the person filling
in was not trained for the position.

--------------------------------------------------

[15] With regard to the term "hazard area", Chief O'Rourke stated that he assumed it refers an
undefined area in proximity to the fire building.

Decision No. B-39-92                                                    20
Docket Nos. BCB-1347-90
         BCB-1359-91

Asked if he knows whether there have been any injuries to firefighters as a direct result of the light duty program, Chief O'Rourke referred to some current litigation where, he alleged, one of the claims is that the loss of the full duty Chief's Aide was a factor in a firefighter's death.

Vincent Dunn, Deputy Chief and Commander of the Third Division, noted that he currently works with a light duty Aide. Chief Dunn testified that under AUC 290, he is limited in his ability to use his Aide in that light duty Aides cannot enter any confined space where there may be toxic gases, do any checking, be in any area in proximity to danger or injury, or assist in the rescue of an injured firefighter or civilian. Chief Dunn asserted that if AUC 290 were applied literally, light duty Aides would not be permitted to enter the Lobby Command Post because toxic substances might be brought down by the elevator and, in some cases, a SCBA would be necessary. Further, because the light duty Aide is not allowed to perform any interior structural firefighting operation, which is not limited to the physical activity of fire suppression or rescues, he cannot perform size-ups or assist the Chief in strategy or tactics. Chief Dunn noted that while light duty Aides are not permitted to perform any physical tasks at a fire or emergency that would normally be performed by a full duty firefighter, they are required to set up and maintain the Command Control Board, which weighs 50 pounds.

Chief Dunn testified that the limitations placed on light duty Aides have an impact on the strategy, command and control of a fire, which in turn may have an impact on firefighter safety. For example, if there is smoke in the lobby, the Aide has to be moved outside the building, thereby interfering with the timely establishment of the Command Post and the evaluation of the need for additional resources. Firefighting strategy and tactics also may be affected in that the Chief will not have his Aide beside him monitoring the tactical channel and, therefore, might not hear about a fire spread. Further, Chief Dunn noted that he gives orders through the Aide and, without his Aide in close proximity to the Command Post, the communication flow is interrupted.

Decision No. B-39-92                                                           21
Docket Nos. BCB-1347-90
        BCB-1359-91

        Chief Dunn referred to a fire at the World Trade Center, in November

1991, where he was assigned as a second to the Operations Chief.  He claimed

that AUC 290 limited his ability to function effectively at that fire in that

his light duty Aide could not accompany him to the Operations Post.  As a

result, Chief Dunn claimed that he was forced to act as the Operations Officer

without assistance, monitoring both the command and the tactical channels.

        In his testimony, Chief Dunn focused on the High Rise Bulletin.  He

referred to a schematic diagram set forth therein as the "communication flow

chart" of a high rise building.  He noted that the Bulletin requires that the

Aide be stationed with the Chief at a particular location during high rise

fire operations, whether that be the Lobby Command Post or the Operations

Post.  Chief Dunn explained that because he went to the Operations Post

without an Aide, he and his Aide violated the high rise firefighting

procedure.  Moreover, because his Aide was not present at the Operations Post

and could not monitor the command channel while he was on the tactical

channel, AUC 179 was also violated.[16]

        Chief Dunn reported that since implementation of AUC 290, his Aide has

been able to accompany him into the lobby.  He noted that there have not been

any incidents yet where a smoke condition precluded his Aide's presence; nor

has Chief Dunn needed to help someone down from a fire escape or assist an

injured firefighter while working on his own.  Chief Dunn stated that he

ordered his Aide not to take the Command Board out of the trunk without

assistance because it is too heavy, but this has slowed down the establishment

of the Command Post.

        On cross-examination, Chief Dunn testified that his light duty Aide has

_____

[16] AUC 179, "Instructions for the Utilization of Company Handie-Talkie," states as follows:
"Whenever the Command Channel is placed in use, all Chief Officers subordinate to the Chief in
Charge must have their Aides with them." (AUC 179 at 12.)

Decision No. B-39-92                                                                22
Docket Nos. BCB-1347-90
      BCB-1359-91

been with him since AUC 290 was implemented.  Further, he noted that his Aide
knows fire codes and has never failed to transmit a call or to understand
terminology.  Chief Dunn testified that within the last year he has never had
to send his Aide down the block because of smoke conditions on the street.  In
addition, he stated that there was just one instance where his Aide could not
be by his side because of AUC 290, and that was the high rise fire at the
World Trade Center.  In all other instances, the Aide was able to be in close
proximity to the Chief.

        Chief Dunn noted that at the World Trade Center fire, a Battalion Chief
and Battalion Chief Aide's were present when he assumed the Operations Post.
Moreover, there were a number of engine and ladder companies standing fast.[17]
Although Chief Dunn noted that he was monitoring only the command channel, and
did not know what was being said on the tactical channel, he acknowledged that
there were other firefighters in his vicinity who were on the tactical
channel.  Chief Dunn explained that he did not ask any of those firefighters
to stand by him and monitor the tactical channel because "... there's unity of
command in the fire service and each firefighter and company is assigned to
operate under a certain supervisor and when you start to mix and change the
unity of command, you create an even more dangerous situation.  So I felt that
it was better for me to remain operating alone than to start to change the
command structure of the fire service." TR. 671-72 (48-49).  In any event,
Chief Dunn stated that he sent the Battalion Chief upstairs to check
something; and if the Battalion Chief's Aide did not go with the Battalion
Chief, they  would have been in violation of Department policy.

        Chief Dunn testified that he has complied strictly with the requirements
of AUC 290.  However, in doing so, Chief Dunn claimed that he has violated

---

[17] Units are considered "standing fast" when they remain intact and available for duty as
assigned by the Chief.  Units are also considered "standing fast" when they are held at the staging
area and available immediately for assignment by the Chief.

Decision No. B-39-92                                                    23
Docket Nos. BCB-1347-90
        BCB-1359-91

other Department procedures.  For example, at the World Trade Center fire
Chief Dunn operated without communicating on the tactical channel.  In
addition, he operated on his own as the Company Officer even though OSHA
requires that firefighters operate in pairs when using SCBAs.  **The City's**
**Evidence**

     In addition to Chief Feehan, whose testimony is described at pages 10-
16, _supra_, the City called two witnesses.  Stephen M. Gregory, Assistant
Commissioner for Communications, is responsible for the communications system
for the Department, which encompasses radio, telephone, handie-talkie and
dispatch operations.  Mr. Gregory testified that it is unlikely that handie-
talkie radios would fail in non-high rise fires.  He explained that problems
with handie-talkies may occur at subway and high rise fires because of the
steel structure of the building.  In high rise buildings, to overcome the
problem, the Department uses a "high rise repeater system" wherein a signal is
pumped out of the building to a repeater in the battalion car.  The wattage of
the signal is boosted up and rebroadcast back into the building.

     Mr. Gregory identified the Field Communications Unit as a mobile
communications truck that is assigned to respond to all fires of second alarm
or greater.  Mr. Gregory noted that there is only one Field Communications
Unit to serve the entire City, located in East, New York, and, therefore,
acknowledged that it may take a long time for the Unit to respond.  The Field
Communications Unit sets up field command headquarters, which is staffed by a
uniformed fire officer and a civilian Fire Alarm Dispatcher.  The dispatcher
has the ability to monitor handie-talkie communications.

     Mr. Gregory noted that as the Assistant Commissioner for Communications,
he is mandated to respond to fires that are third alarm and greater every
fourth week.  He indicated that he responds to about a dozen fires a year; and
has responded to fires since implementation of the light duty program.  Mr.
Gregory testified that he has not been made of aware of any problems resulting
from implementation of the light duty program.        With regard to the

Decision No. B-39-92                                                      24
Docket Nos. BCB-1347-90
     BCB-1359-91

special calling of units, Mr. Gregory testified about an incident involving
Battalion 38.  He noted that the Brooklyn Dispatch Operation was aware of
several instances in which the Divisions requested that assignments be filled
out without any of the criteria normally required.  A report on this procedure
was forwarded to Mr. Gregory, who sent a "buck slip" with the report asking
whether there had been a change in policy of which he was not aware.[18]

    Michael Munns, Associate Counsel for the Department, testified that the
FAST team was designed to be a group of properly equipped firefighters held on
stand-by outside the building or contaminated area, ready to effectuate a
rescue if necessary.  According to Mr. Munns, PESH was informed in November
1990 that because of an adjustment in the budget the Division Aide's position
would be changed to light duty and, therefore, Aides assigned to Deputy Chiefs
would not be part of the plan developed by the Department to remedy the
citation issued by PESH.  Thereafter, PESH closed its investigation, adding,
however, that if light duty firefighters are used in the field, the Department
should insure that they comply with all of the OSHA requirements.
Specifically, PESH cautioned the Department that light duty firefighters
should not be used in any job involving interior firefighting.

    On cross-examination, Mr. Munns reported that he was the only person who
had contact with representatives of PESH; and that he interpreted the closing
of the investigation by PESH as approval of the Department's light duty
program, at least insofar as it concerned the FAST team.[19]

_____

[18] Chief Burns was called by the UFOA to identify a "buck slip" that he authorized for
signature, which questioned whether the policy for special calling additional units had been
changed.

[19] During Mr. Munns' testimony, a question was raised concerning a letter written by counsel
for the UFOA to the Department of Labor concerning light duty Division Aides.  In an effort to
clarify the nature and purpose of the letter, Mr. Betheil, counsel for the UFOA, explained that a
letter requesting an injunction was sent to the Department of Labor pursuant to the statute which
requires that a private party seeking a preliminary injunction under the Act notify PESH before
                                                                 (continued...)

Decision No. B-39-92                                                          25
Docket Nos. BCB-1347-90
          BCB-1359-91

<u>**POSITIONS OF THE PARTIES**</u>

<u>**UFA's Position**</u>

    The UFA submits that the record in the instant proceeding supports a
finding that the assignment of light duty firefighters as Division Aides has
resulted in a practical impact on the safety of light duty firefighters
assigned to that position, the firefighting unit as a whole, and fire officers
operating on the fire scene.  Therefore, the Board must order the City to
bargain to alleviate the impact.

    The UFA contends that AUC 290 does not protect light duty Division Aides
from every reasonably foreseeable danger present on the fire ground.  It notes
that while the City claims that a light duty Aide will not be permitted to
operate in the "hazard area," there is no uniform definition of that term.
Thus, the officer in charge of the operation is left to decide where light
duty firefighters may and may not operate on a case-by-case basis.

    The UFA submits that the dangers to which light duty Aides are exposed
are not speculative or hypothetical, but real.  In support of its position,
the UFA notes that under AUC 290 light duty Aides monitor the Command and
Control Board and give instructions to arriving units.  Generally, these
functions are conducted at the Command Post which "necessarily is in proximity
to the fire" and, the UFA argues, can become dangerous suddenly due to
explosions, collapses, smoke inversion and back draft.  Further, the UFA
submits that the evidence presented shows that Chiefs and their Aides may
encounter other fires while responding to or returning from a fire or
emergency.  As in the past, the UFA argues, these situations may necessitate
that Chiefs and their Aides take action prior to the arrival of other
firefighting units.

---

    [19](...continued)
taking action.  Thus, the UFOA made the required request and gave the Department of Labor the
requisite notice.  Without so doing, Mr. Betheil asserted, the court had no jurisdiction to grant the
requested restraining order.

Decision No. B-39-92                                                          26
Docket Nos. BCB-1347-90
        BCB-1359-91

The UFA disputes the City's assertion that the medical screening conducted by the Department will prevent the assignment of light duty firefighters who are unable to perform the duties of a Division Aide.  Indeed, the UFA argues that the testimony of Dr. Cyril Jones shows that he does not have a complete understanding of the duties to be performed by light duty firefighters, or what they are being screened for.  "In these circumstances," the UFA contends, "it is foreseeable that a light-duty firefighter may be inappropriately cleared by Dr. Jones for this position."

The UFA contends that implementation of AUC 290 is further complicated by inconsistencies in Departmental bulletins and other materials.  It argues that to comply with Departmental bulletins light duty firefighters may be required to violate AUC 290, or the requirements of some other Departmental policy or procedure.  In support of its position, the UFA refers to AUC 179 and notes that while Chief Officers are required to have their Aides with them whenever the command and the tactical channels are in place, this may not be possible under AUC 290.      Similarly, with regard to high rise fires, the UFA notes that the High Rise Bulletin requires that each Deputy Chief operating in the Operations Post have an Aide present to complete the High-Rise Check List and the Operations Post Log.  Under AUC 290 as it is presently written, however, the Deputy Chief must decide on a case-by-case basis whether the Aide can safety operate at the Operations Post.  In reaching this decision, the Deputy Chief must weigh the need to insure that the Operations Post Log is completed with the need to protect the safety of light duty Aides.  Given these competing interests, the UFA contends that "a Deputy Chief charged with making a quick judgment call in the heat of the operation may choose to place the light-duty aide in an [O]perations [P]ost which would otherwise be off limits to the light-duty aide."

The UFA further contends that the loss of the full duty Division Aide has virtually eliminated the Division Aide's role in reconnaissance at the fire scene.  The loss of this function, it argues, has a substantial effect on

Decision No. B-39-92                                                                  27
Docket Nos. BCB-1347-90
    BCB-1359-91

the overall efficiency of the fire operation because prompt and efficient
communications are hindered, thereby resulting in more lengthy firefighting
operations and, thus, more injuries.  Moreover, the UFA submits that contrary
to the City's assertion, the evidence presented shows that there may be no
reserve units or uncommitted personnel at a fire scene to recruit to perform
the necessary reconnaissance and intelligence functions.  With regard to the
suggestion that Deputy Chiefs "special call" units to have them in reserve as
substitutes for the full duty Aide, the UFA notes that there are additional
costs and delays associated with that procedure.  Besides, the UFA argues,
such practices have been discouraged by the Department.

        The UFA disputes the City's contention that the restrictions under AUC
290 do not substantially impact on communications or safety because light duty
Aides can operate handie-talkie radios.  To the contrary, the UFA alleges that
the record shows that handie-talkie communication can be ineffective, causing
delays in the transmission of information which, in turn, may lead to danger.
Due to heavy radio traffic, transmissions may be lost thereby making it
necessary to send an Aide into a sector of the fire structure to verify
information.  Indeed, the UFA submits that even the Assistant Commissioner for
Communications noted that during high-rise and subway fires problems with
handie-talkies have been encountered.  The UFA contends that "[t]his alone is
sufficient to overcome the City's contention that handie-talkie communications
are any substitute for a full-duty aide who is able to operate on the fire
grounds without any restriction."

        Finally, the UFA argues that the fact that no serious injuries can be
attributed to the light duty program to date "is more a '... testament to the
aggressiveness of the people operating ...' at the fire, than to the absence
of a safety impact."  In any event, the fact that there have been no
documented firefighter deaths or serious injuries directly attributable to the
presence of light duty Aides cannot be the standard applied by the Board in
safety impact cases where, as in the instant case, the Chief Officers of the

Decision No. B-39-92                                                              28
Docket Nos. BCB-1347-90
    BCB-1359-91

Department testified that the program is unsafe.  Indeed, the UFA contends,
"[e]ven Chief Feehan, the current Chief of Department, is not convinced that
[the light duty program] does not cause a safety impact on firefighters."

**UFOA's Position**

The UFOA contends that the City is required to bargain with the Union
because the assignment of light duty firefighters to the position of Division
Aide has a practical impact on the safety of Fire Officers and, therefore, is
within the scope of collective bargaining.  In support of its position, the
UFOA claims that AUC 290, which is intended to safeguard only light duty
firefighters, effectively removes Division Aides from the command structure at
a fire scene, "thereby crippling Deputy Chiefs in the proper performance of
their duties and threatening the safety of those individuals as well as the
safety of other Firefighters and Fire Officers at the scene and members of the
general public."

The UFOA alleges that since implementation of Department Order 168, the
Division Aides' duties in the area of reconnaissance and intelligence
gathering have been sharply curtailed.  AUC 290 prohibits light duty
firefighters assigned as Division Aides from entering any confined space which
may harbor toxic substances or an oxygen deficiency.  For this reason, Deputy
Chiefs are unable to send their Aides into the fire structure to observe
conditions first-hand and confirm reports heard over the radio.  Thus, the
UFOA argues, the restrictions imposed by AUC 290 will in some cases prevent
the Division Aide from helping the Deputy Chief when assigned to the
Operations Post or the Lobby Command Post.

The UFOA maintains that the use of light duty Division Aides also
adversely affects communications within the firefighting operation.  It notes
that one of the functions of the Division Aide is to monitor the tactical
channel while the Deputy Chief is using the command channel.  In fact,
Department regulations require that the Deputy Chief and his Aide remain
together whenever the command channel is in use.  The UFOA notes, however,

Decision No. B-39-92                                                29
Docket Nos. BCB-1347-90
          BCB-1359-91

that this is not always possible.  For example, when the Deputy Chief is in an
area that requires the use of a SCBA, the Division Aides must be situated far
from the hub of the firefighting operation to avoid being in an oxygen
deficient atmosphere.  Thus, in situations in which the Deputy Chief is the
Incident Commander,[20] the Chief must decide to monitor both the tactical and
command channels himself, or to monitor only one channel.  Either alternative,
the UFOA argues, creates the possibility of delay in the receipt of critical
information by the Chief.

     The UFOA notes that under AUC 290, light duty Division Aides  are
prohibited from performing firefighting and rescue operations when they
encounter emergencies with the Chief.  The UFOA submits that while the Aides
will be left at some safe distance from the danger under the new guidelines,
the Chief will be forced to comply with the regulations and remain with the
Aide out of harm's way, or to enter the structure alone in violation of the
regulations and at his own peril.

     The UFOA maintains that the assignment of light duty firefighters to the
position of Division Aide effectively removes a critical member of the command
structure from all fire ground operations without making any provision for the
performance of the duties previously performed by full duty firefighters
assigned to that position.  As a result, the UFOA argues, functions <u>mandated</u>
by published Departmental policies are not performed.

     Although top officials of the Department repeatedly have recognized the
critical role played by Division Aides in the command structure, the UFOA
submits that their absence from the command structure, and the impact of that
absence on the safety of other Firefighters and Fire Officers, is not in any
way addressed by AUC 290.  To the contrary, the UFOA asserts that "AUC 290
purports to safeguard only the light duty Aides themselves.  It does not

---

[20] A Deputy Chief functions as the Incident Commander both at the "all hands" and "two
alarm" fires, which account for the vast majority of fires fought in the City of New York.

Decision No. B-39-92                                                    30
Docket Nos. BCB-1347-90
           BCB-1359-91

recognize or address the safety impact of the aides' restricted duties on the

other individuals present at a fire scene."  In support of its position, the

UFOA refers to the testimony of the Staff Chiefs who appeared in this

proceeding, and argues that,

> [i]n the opinion of these experts, the change in assignment,
> coupled with the new restrictions placed on light duty Division
> Aides, seriously hindered the Deputy Chief's ability to
> effectively communicate within the command structure, and created
> at every fire the possibility of critical delay in the
> transmission of important, sometimes life-threatening, messages.

Moreover, the UFOA argues, in complying with Department Order 168 and

the limitations imposed by AUC 290, other Department regulations are

implicated and often compromised to the detriment of the safety of full duty

Firefighters, Fire Officers and the public.  In reaching this conclusion, the

UFOA notes that Fire Department personnel are required under the PESH Act to

operate in pairs whenever using SCBAs.  Under AUC 290, however, light duty

Division Aides are not permitted in areas where SCBAs are needed.  Further,

AUC 179 mandates that the Chief and his Aide remain together whenever the

command channel is in use.  The UFOA argues, however, that "removing the Aide

from within the fire lines to monitor the tactical channel at a distance from

the Chief will necessarily violate regulations because the Chief is left to

monitor the command channel without his Aide by his side."  Indeed, the UFOA

submits that the guidelines promulgated by the Department are inherently

contradictory.  On the one hand, Aides are required to stand out of harm's way

to avoid toxic products and oxygen deficient atmospheres; while on the other

hand, Deputy Chiefs are required to operate in pairs when using the command

channel or when entering hazardous areas within the fire structure where they

may be overcome by fumes or otherwise seriously injured.

The UFOA disputes the City's assertion that it is under no obligation to

engage in bargaining because there is no direct evidence that bargaining unit

members have been injured or killed to date as a result of the use of light

duty Division Aides.  The UFOA states that "Not only does that position

Decision No. B-39-92                                                      31
Docket Nos. BCB-1347-90
        BCB-1359-91

suggest - rather outrageously - that the union must wait until unit members
actually sustain injury or even death as a result of the change in assignment
before it can seek to enforce the employer's bargaining obligation, but it is
contrary to the facts and evidence adduced in the hearing." The UFOA urges
that "[i]t cannot be the law that someone's safety must actually be
compromised before the Union can assert the existence of a safety impact."

        In any event, the UFOA asserts that the City has presented no testimony
to refute the evidence submitted by the petitioners on the existence of a
safety impact.  The UFOA submits that the testimony of Stephen Gregory and
Michael Munns is insufficient to rebut factual evidence presented by the Staff
Chiefs in which it was shown that communications have been delayed and fire
operations hindered by the limitations placed on Division Aides.
Finally, the UFOA argues that contrary to the City's assertion, the
transcripts and the tapes of radio transmissions at a fire which occurred on
January 11, 1988 are clearly relevant to the issue of whether the City's
change in assignment has a practical impact on the safety of Fire Officers.
Therefore, the UFOA urges, they should be admitted.  In support of its
position, the UFOA notes that the tapes were introduced to show the "sheer
impossibility" of monitoring both the tactical and command channels
simultaneously; not to give a precise picture of what happens at a fire at any
given moment.  Accordingly, the UFOA suggests that whether the tapes and the
transcripts reflect the precise overlap in communications is not of critical
importance.

**City's Position**

        The City claims that to prevail in this proceeding, the Unions must show
that the light duty program, as implemented, necessarily puts employees at a
significantly higher risk than they had been exposed to prior to its
implementation.  "Not only have petitioners failed to prove even the patent
effect required for the bargaining obligation to attach," the City argues that
"they have failed to prove even any effect on employee safety."

Decision No. B-39-92                                                              32
Docket Nos. BCB-1347-90
        BCB-1359-91

The City asserts that petitioners offered nothing more than the conjecture, speculation and surmise of witnesses, many of whom had no actual knowledge of or experience with the light duty program, to support their case. It notes that while light duty Aides have been used since February 1991, petitioners failed to show a single instance in which the use of these Aides has had <u>any</u> impact on the safety of any member of the Department; or in which all of the firefighters at the fire scene were fully mobilized and committed, and one additional full duty firefighter was necessary.

The City refers to several issues which it claims petitioners identified as areas of concern.  With regard to the special terminology used by Deputy Chiefs, the City notes that light duty Aides can be trained in their "lingo", thereby eliminating any possibility of misunderstanding.  Further, if the Deputy Chief fears a misunderstanding by the Aide, the City submits that it is reasonable to assume that more precise language will be used.

The City also disputes petitioners' claim that light duty Aides are insufficiently knowledgeable about fire codes and communication systems and, therefore, the potential exists for missed calls, the transmission of incorrect information, or general problems with handie-talkie radios.  In support of its position, the City notes that petitioners failed to present any evidence to show that there have been missed communications or signals since the light duty program was implemented in February 1991.  Rather, the City argues that it is reasonable to assume that light duty Aides have not forgotten the fire codes that they knew and used as full duty firefighters merely because they suffered an injury prompting their light duty status.  In any event, the City notes that the Field Communications Unit is sent to all fires that are second alarm or higher, and once that Unit arrives it monitors all communications.  For this reason, there is no danger that a "MayDay" would be missed.

The City contends that contrary to petitioners assertions, Division Aides are not vital to radio communications if they can be sent into the fire

Decision No. B-39-92                                                           33
Docket Nos. BCB-1347-90
    _____BCB-1359-91

building to function as scouts.  The City notes that Chief Dunn, the only
Chief with experience under the light duty program to testify in this
proceeding, was unable to recount any incident in which there was a problem
with radio transmissions due to his light duty Aide's inability to handle the
job.  Rather, the City asserts that the only claim Chief Dunn made was that he
was once in the position of monitoring both the tactical and command channels
because his Aide could not accompany him into the fire building.  The City
submits, however, that Chief Dunn could have ordered another firefighter into
the fire building to monitor the tactical channel.  Moreover, the City notes,
"no firefighter had his/her safety affected as a result of that one incident."

    With regard to the tape recordings and transcripts of the tactical and
command channels submitted by the UFOA, the City notes that petitioners failed
to point out that the recording devices were voice activated.  Therefore, the
City argues, "it was impossible to determine the time lag between the
statements made on the tapes, or to play them together in such a way as to
accurately reflect what was being transmitted."

    The City argues that the OSHA directive cited and relied upon by
. petitioners does not prohibit a firefighter wearing a SCBA from entering a
fire area alone.  Rather, it "requires that a firefighter doing so have
someone watching him/her who is prepared to enter and assist if it becomes
necessary to do so."
The City notes, however, that an Aide is not the only person on the scene who
can accompany the Deputy Chief into the fire building.  Deputy Chiefs have
used Battalion Chiefs or other firefighters as back up and, moreover, may call
as many firefighting units as deemed necessary either before leaving for the
fire or en route thereto.  With this ability to call additional units to the
scene at any time, the City insists that "[t]here is absolutely no reason to
accept [p]etitioners' contention that delays result from using others to
perform tasks that light duty aides, by virtue of this status, cannot
perform."  "Moreover," the City argues, "knowing that their aides are on light

Decision No. B-39-92                                                                    34
Docket Nos. BCB-1347-90
          BCB-1359-91

duty, [Deputy Chiefs] can plan ahead to avoid any delays."

The City maintains that since the inception of the light duty program,
Deputy Chiefs have in fact been requesting more units at fires and have been
requesting them earlier.  Thus, it maintains that "[t]he danger of having no
one available to accompany a [D]eputy [C]hief when he/she enters the building
is so remote as to be non-existent," and does not come within the Board's
standard for a finding of practical impact on safety.  In any event, the City
notes that in the majority of fires, the Deputy Chief acts as the Commander in
Charge and directs the activity from the Command Post, which is normally
outside the fire area.

The City notes that Deputy Chiefs also have the authority to call
additional units to the scene, if necessary, to perform reconnaissance and
intelligence functions.  To the extent such duties are performed outside the
fire building, however, the City submits that "there is no reason to believe
the light duty aides are incapable of going around the block, around the
perimeter of the building, or down alleys to gather information about the
fire."  Indeed, the City claims that "the only way one could find a safety
impact in the elimination of the reconnaissance function is to consider that
the mere fact of having someone else perform the functions constitutes such
impact."

The City asserts that there is no foundation for petitioners allegations
that light duty Aides cannot be distinguished from other Aides.  It notes that
all Deputy Chiefs Aides are required to wear front-pieces on their helmets
which indicate their position.  Besides, the City argues, if a light duty Aide
refused to perform a task because of his light duty status, the Deputy Chief
need only ask someone else to do it.

The City asserts that petitioners' allegation that Deputy Chiefs are at
risk because their Aides would be unable to assist them were they to encounter
a fire is, at best, specious.  It argues that the evidence presented shows
that there is little possibility that a Deputy Chief will encounter a fire

Decision No. B-39-92                                                                    35
Docket Nos. BCB-1347-90
    BCB-1359-91

while alone with his Aide.  Even if he did, however, the City notes that,

> neither the [D]eputy [C]hief nor his/her aide is under any
> obligation to enter fires that they encounter spontaneously, nor
> to attempt to save civilians caught in those blazes.  What
> O'Rourke and his aide did was commendable, but it was not
> required.  Their failure to act would not have had a safety impact
> on <u>employees</u>. (emphasis in original).

Thus, the City argues, for the Board to find a safety impact based on the

employees' violation of Department rules and regulations would be

preposterous.

    With regard to light duty Aides, the City disputes the UFA's claim that

the light duty program subjects them to an increase in risk.  The City asserts

that under AUC 290, the Department has taken steps sufficient to protect light

duty Aides, as demonstrated by the fact that no evidence was presented to show

that implementation of the light duty program has resulted in their injury or

illness.  Thus, the City argues, "[a] bald allegation that light duty aides

are at risk does not meet the [p]etitioners' burden in this case, that of

proving a patent risk to worker safety."

    In conclusion, the City contends that stripping the testimony presented

by petitioners of all speculation, conjecture and surmise, the fact remains

that not one Firefighter, not one Fire Officer, not one light duty Aide has

been injured as a result of the light duty program.  Therefore, the City

argues, "the Board must find that the light duty program has had no practical

impact, and consequently, that the City is not required to bargain over any

aspect of the light duty program."  Were the Board to find an impact in any

discrete area, however, the City requests that the Board indicate that area

with specificity.

**DISCUSSION**

**Standard Applied By The Board**

    The parties do not dispute that the issuance of Department Order 168 and

AUC 290 is within the scope of the City's statutory management prerogative to:

> ... determine the standards of services to be offered by its
> agencies; ... direct its employees; ... maintain the efficiency of

Decision No. B-39-92                                                    36
Docket Nos. BCB-1347-90
          BCB-1359-91

> governmental operations; determine the methods, means and
> personnel by which government operations are to be conducted;
> determine the content of job classifications; ... and exercise
> complete control and discretion over its organization and the
> technology of performing its work ....[21]

The parties also recognize, however, that a decision made by the City in the exercise of its statutory management prerogative may give rise to issues within the scope of collective bargaining concerning the practical impact such decisions have on terms and conditions of employment, including matters pertaining to employee safety.[22]  Therefore, the question presented to us for determination in the case herein is: does the light duty program have a practical impact on the safety of light duty firefighters assigned to the position of Division Aide, full duty firefighters and fire officers, which is greater than the risk to safety that exists generally in firefighting work?

In prior decisions, this Board has held that where a change proposed by the City is challenged by a union as a clear threat to the safety of the affected employees,

> ... it must, if there is a dispute as to bargainability, be
> submitted to the Board which, on the basis of the relevant
> evidence, will determine whether or not the proposed plan in fact
> involves a threat to safety.  Should the Board find that the
> proposed plan in fact involves a practical impact upon safety, we

---

[21] NYCCBL, §12-307b.

Inasmuch as the parties do not dispute the City's statutory authority to issue Department Order 168 and AUC 290, clearly the Board does not have the authority to direct the City to rescind Department Order 168, as requested by the UFA and the UFOA in their scope of bargaining petitions.

[22] NYCCBL §12-307b further provides that:

Decisions of the city or any other public employer on those matters [within the city's statutory management prerogative] are not within the scope of collective bargaining, but, notwithstanding the above, questions concerning the practical impact that decisions on the above matters have on employees, such as questions of workload or manning, are within the scope of collective bargaining.

Decision No. B-39-92                                               37
Docket Nos. BCB-1347-90
          BCB-1359-91

will direct that there be bargaining for its alleviation.[23]
This does not mean, however, that a union need only claim a practical impact
on safety to meet its burden of proving the existence of a threat to employee
safety, thus requiring the employer to bargain.  To the contrary, whether a
threat to safety has resulted from the employer's exercise of its management
right is a question of fact to be decided by this Board, usually after a
hearing is held and full record developed.[24]

The City cites and relies upon Decision No. B-70-89 as setting forth the
appropriate standard to be applied in cases where an impact on safety is
alleged.  Decision No. B-70-89 is distinguishable from other safety impact
cases issued by this Board in that certain words were used to describe the
standard which were not used prior to that decision.  Inasmuch as some
confusion may have arisen as a result of Decision No. B-70-89, we take this
opportunity to clarify the standard.  First, we note that no change in
standard was made or intended as a result of the Board's decision therein.
While a "patent" threat to safety may seem a more stringent standard than a
"clear" threat to safety, we note that the words "patent" and "clear" are in
fact synonymous with one another.  Further, to describe the union's burden of
proof as "heavy" is not in any way meant to change the previously expressed
standard.

This view was affirmed by the New York State Supreme Court in a
proceeding brought by the UFA, pursuant to Article 78 of the Civil Practice
Law and Rules, seeking to annual the determination of the Board in Decision

---

[23] Decision No. B-5-75.

Although the light duty program was already implemented by the Department by the time the Board ordered hearings were held, a factor which distinguishes this case from other cases wherein the Board has found a practical impact on safety, that factor has no bearing on the standard properly applied by the Board in the instant matter.  (See Decision No. B-25-91).

[24] See e.g., Decision Nos. B-38-89; B-6-79.

Decision No. B-39-92                                                    38
Docket Nos. BCB-1347-90
    BCB-1359-91

No. B-70-89.  In <u>Uniformed Firefighters Association of Greater New York v. The</u>
<u>New York City Office of Collective Bargaining, Board of Collective Bargaining</u>,
(Index No. 1065/90, NYLJ 12/20/90, p. 25, col. 4), the court stated that "...
nothing in the BCB determination herein represents a reversal of prior
decisions.  Any minor changes in wording [of the Board's standard] involve no
basic change in the meaning of the phrases used.  Petitioner's contention to
the contrary is rejected."

    Thus, we will continue to follow the standard consistently cited and
relied upon by this Board both prior to and after Decision No. B-70-89 was
issued.[25]

**Light Duty Firefighters**

    After careful consideration of the evidence adduced at the hearings in
this proceeding, as well as the pleadings, exhibits and post-hearing briefs,
we find that the light duty program does not have a practical impact on the
safety of light duty firefighters.  AUC 290 expressly prohibits light duty
firefighters assigned to the position of Division Aide from performing the
physically demanding duties typically required of full duty firefighters, both
inside and outside the fire structure; or from performing any duties which
require the use of a SCBA.  Thus, we find that if light duty firefighters
follow the rules and procedures set forth in AUC 290, their safety will not be
placed in jeopardy.

    In reaching our decision herein, we reject the Unions' conclusory and
speculative allegations that light duty firefighters will violate the
procedures set forth in AUC 290 to rescue civilians and to aid the Deputy
Chief in the event they encounter a fire spontaneously when responding to or
returning from a fire or emergency.  In so finding, we do not mean to imply
that the possibility that this situation will arise is unimportant or

_____

    [25] <u>See</u> <u>e.g.</u>, Decision Nos. B-25-91; B-38-89; B-70-88;
B-5-75; B-6-79.

Decision No. B-39-92                                                    39
Docket Nos. BCB-1347-90
          BCB-1359-91

inconsequential; but rather, as presented in the record before us, we are not persuaded that it rises to the level generally required by this Board for a finding of a practical impact on safety. It was not shown by substantial evidence that in encountering a fire the safety of the light duty Aide will be endangered if the relevant Department procedures, including the guidelines set forth in AUC 290, are followed.

**Full Duty Firefighters And Fire Officers**

We further find, however, that Department Order 168 does have a practical impact on the safety of full duty firefighters and fire officers. Although the record does not refer to any injuries yet experienced as a result of the light duty program, we find that the Unions have met their burden of showing that implementation of the light duty program, as it presently exists, compromises the safety of full duty firefighters and fire officers. In reaching this conclusion, we rely upon the record evidence which establishes that light duty firefighters have not adequately been trained prior to their assignment as Division Aides. The evidence presented shows that only the first group of light duty firefighters assigned as Division Aides attended a specialized training program. Moreover, the manual that was used to train that group of light duty firefighters as Division Aides did not take their light duty status into account.

The City asserts, and we agree, that there is no reason to believe that light duty firefighters will forget fire codes simply because they are on light duty. Thus, as to this aspect of the Division Aides' job, we find it reasonable to conclude that no specialized training of light duty firefighters is necessary. With regard to the duties of Division Aides as members of the Command Team at fire and emergency operations, however, we find that the failure to properly train light duty firefighters in the duties unique to Division Aides has a negative impact on the effectiveness of the fire ground operation and, therefore, the safety of full duty firefighters and fire officers working with them at the fire scene. Indeed, the training manual for

Decision No. B-39-92                                                                40
Docket Nos. BCB-1347-90
         BCB-1359-91

Chiefs' Aides recognizes that there must be a transition from firefighter to
Aide; and an opportunity to become familiar with firefighting tactics from
another point of view.  Moreover, in reaching our decision herein, we are
persuaded by the testimony of Chief Dockter, wherein he notes that if the
Chief is required to train the Division Aide on the job he cannot give his
undivided attention to the firefighting operation and, consequently, the Chief
cannot properly perform the duties required of him.

     In finding that the light duty program has a practical impact on the
safety of full duty firefighters and fire officers, we are also persuaded by
the fact that no provisions have been made in the Department's All Unit
Circulars and Bulletins (e.g., the High Rise Bulletin) to account for the
light duty status of Division Aides.  We find that the Department has not
considered the effect of the light duty program on other facets of its
firefighting operations, which may impact directly on the safety of full duty
firefighters and fire officers.

     In support of our finding, we note that AUC 179 (utilization of handie-
talkie radios) permits Staff Chiefs and Deputy Chiefs to use the command
channel when necessary.  It provides that the command channel "will generally
be placed in use when a Staff Officer takes command of an operation, and he
shall so advise all his subordinate Chiefs.  Depending on the scope of an
operation, a Deputy Chief in Command could find its use advantageous and could
order its use."  AUC 179 further provides that "Whenever this Command Channel
is placed in use, all Chief Officers subordinate to the Chief in Charge must
have their Aides with them" (Emphasis added).  With regard to the Chief in
Charge of an operation utilizing the command channel, AUC 179 states that he
"shall also have his aide or other qualified member in close proximity"
(Emphasis added).

     Thus, while the assignment of light duty firefighters to the position of
Division Aide need not result in a violation of AUC 179 when the Deputy Chief
is functioning as the Chief in Charge of the operation, in situations in which

Decision No. B-39-92                                                          41
Docket Nos. BCB-1347-90
        BCB-1359-91

a Staff Chief is in charge of the operation, such as in the November 1991 fire
at the World Trade Center referred to by Deputy Chief Dunn and Staff Chief
Butler, the Deputy Chief cannot comply with the provisions of AUC 179 without
violating the requirements set forth in AUC 290.  Although AUC 179
contemplates that the Chief in Charge may designate someone other than his
regular Aide to accompany him into the fire building to monitor the tactical
channel, we note that it does not provided a similar alternative when the
Deputy Chief is functioning as a subordinate to the Staff Chief.

        Moreover, the High Rise Bulletin, as presently written, places the
Deputy Chief and his Aide inside the fire building at the Operations Post, an
area referred to by Chief of Department Feehan as unsuitable for light duty
firefighters because fire conditions can change quickly, thus making the use
of a SCBA (prohibited under AUC 290) necessary.  Even if the Deputy Chief were
to "grab" a full duty firefighter to replace his light duty Division Aide, an
option suggested by the City, we note that the replacement Aide would be
inadequately trained to perform the duties required of the position, including
completion of the High-Rise Check List and the Operations Post Log.[26]

        In addition, we find that the record shows that the City has not
adequately addressed the Unions' claim that the change in duties set forth in
AUC 290 exacerbates the immediate threat to the safety of uniformed Department
personnel.  In reaching this conclusion, we note that the City has, in effect,
eliminated a key member of the firefighting team without permanently assigning
any other employees to perform those duties.  Furthermore, the measures that
the City alleges are available as a substitute for the full duty Division
Aide, e.g., grabbing uncommitted firefighters on the scene; using Battalion
Chief's Aides; special calling additional units, are inadequate.

---

[26] We note that the training manual for Chief's Aides devotes a considerable amount of time to the administrative duties of Chief's Aides, including the proper completion of the Operations Post Log.

Decision No. B-39-92
Docket Nos. BCB-1347-90
　　　BCB-1359-91

In so finding, we note that contrary to the City's assertion, it is not clear that full duty firefighters will be available to fill in for light duty Division Aides to perform reconnaissance in the fire building. As noted previously, grabbing someone who is uncommitted and on reserve (assuming there are uncommitted companies held in reserve on the scene) to perform reconnaissance or communication functions in the interior of the fire building is not a viable alternative to a full duty Division Aide if they have not been trained to perform those functions.[27]  In this regard, we note that the Chief's Aide training manual states that:

> In order to assure an effective operation, it is necessary for the aide to be knowledgeable and supportive of his chief's decisions ... The aide has to be able to anticipate the orders of the chief and to deal with other members of the department under the stressful conditions encountered during fire fighting.  His decorum and tactfulness is important while dealing with the public as well.  These tasks are too complicated for just anyone to do. They require the services of an experienced and dedicated individual.

Thus, enlisting the help of any full duty firefighter simply because he is available does not, we find, accomplish the objectives the Department envisioned for Chiefs' Aides in the training manual.

With regard to the "10-76" high rise fire, when the Deputy Chief arrives there are only two Battalion Chiefs on the scene.  Accordingly, there will not be an abundance of people immediately available who are qualified and trained to accompany and work with the Deputy Chief, if necessary, in the fire

---

[27] Although the City claims that light duty firefighters are easily recognized by the front piece on their helmet and, therefore, will not be mistaken for uncommitted full duty firefighters, we note that this may not be a realistic way to distinguish light duty Division Aides from full duty firefighters.  The evidence presented shows that firefighters are responsible for the purchase of the front piece on their helmets.  Since no evidence was presented to demonstrate that light duty firefighters have in fact purchased new front pieces identifying them as Division Aides, we find it reasonable to conclude that some light duty Aides might be wearing front pieces from their former units.  Under these circumstances, it is easy to see how light duty Division Aides could be mistaken for full duty firefighters in the commotion associated with fire and emergency operations.

Decision No. B-39-92                                                        43
Docket Nos. BCB-1347-90
              BCB-1359-91

building.  As to the Deputy Chief's ability to special call additional units
before leaving the firehouse or en route to the fire, we find that contrary to
the City's assertion, it is not clear from the evidence presented in the
record[28] that such a procedure conforms to the well-established policies of
the Department.  Furthermore, we note that the special calling of additional
units once at the scene of a fire or emergency may not provide an adequate
alternative.  Any delay in their arrival can result in a more lengthy
firefighting operation and, consequently, greater likelihood of death or some
other disaster.  Accordingly, we find the measures relied upon by the City
inadequate to protect the safety of full duty firefighters and fire officers
on the scene.    As to the City's reliance on the Field Communications Unit,
the evidence presented shows that since there is only a single unit available
for the entire City, it is unable to respond to each and every fire that it is
called to.  Therefore, the City's reliance on the Field Communications Unit to
relieve the Division Aide of his responsibilities with regard to monitoring
the Command and Control Board is misplaced.  Instead, we find that it is
logical to conclude that the light duty Division Aide will be responsible for
establishing the communications network and monitoring the Command and Control
Board throughout the operation at a significant number of fires and
emergencies.

      Finally, contrary to the City's assertion, we are not persuaded that
PESH has continuously "approved" the light duty program.  Rather, we conclude
that the evidence presented supports a finding that PESH was informed that
some of the members of one of several categories of employees designated to
function as the pre-FAST Team would be prevented from acting in that capacity
due to their light duty status.  PESH's concern at that time was with the

--------------------------------

[28] See e.g., All Borough Circular 5/88 (Revised); January 15, 1992 Memorandum from
Anthony L. Fusco to Stephen M. Gregory regarding Response Assignment Brooklyn Box 1024 -
January 13, 1992 (UFOA Exhibit 1) and Chief Burns' January 22, 1992 buck slip addressed to
Ralph R. Palmer concerning Requests for Additional Engine Companies (UFOA Exhibit 2).

Decision No. B-39-92                                                    44
Docket Nos. BCB-1347-90
        BCB-1359-91

City's plan to correct the citation issued against it for violation of the
OSHA provision requiring the presence of at least one other person in areas
where the wearer of a SCBA could be overcome by a toxic or oxygen deficient
atmosphere; not with the light duty program itself.  Under these
circumstances, we are not persuaded that PESH's action should be construed as
approval of the light duty program in general.

        It is not the purpose of our decision herein to establish methods for
the alleviation of the safety impact which we have identified.  Rather, we
direct the parties to discuss the alleviation of the practical impact found to
exist and formulate, through negotiations under the NYCCBL, an appropriate
solution to the specific items of safety impact resulting from implementation
of Department Order 168 and AUC 290.

Decision No. B-39-92                                                           45
Docket Nos. BCB-1347-90
　　　 BCB-1359-91

**UFOA Exhibit Nos. 3,4,6 And 7 (Transcripts And Tape Recordings)**

We note that in reaching our decision herein we did <u>not</u> rely on UFOA
Exhibit Nos. "6" and "7" (tape recordings of the tactical and command channels
of a fire on January 11, 1988) and UFOA Exhibit Nos. 3 and 4 (transcripts of
those tapes).  In deciding not to give any weight to this evidence, the Board
relies on the fact that it is unclear from the tapes, and the documents
presented in support thereof, whether the recordings representing the tactical
and the command channels consisted of material that was transmitted
simultaneously.  Since this was the reason the UFOA sought to introduce the
tapes and transcripts, we find that the Union's failure conclusively to
demonstrate this fact renders the tapes and the transcripts of little, if any,
probative value to the Board's consideration of the issues presented in this
proceeding.  Therefore, we have not considered those exhibits in reaching our
determination set forth above.

<u>O R D E R</u>

Pursuant to the powers vested in the Board of Collective Bargaining by
the New York City Collective Bargaining Law, it is hereby

DETERMINED, that the issuance and implementation by the Fire Department
of the City of New York of Department Order 168 and All Units Circular 290 is
a proper exercise of its management prerogative, as defined in Section 12-307b
of the New York City Collective Bargaining Law, with regard to light duty
firefighters assigned to the position of Division Aide, and it is further

DETERMINED, that the issuance and implementation by the Fire Department
of the City of New York of Department Order 168 and All Units Circular 290 has
resulted in a practical impact on the safety of full duty firefighters and
fire officers assigned to work with light duty Division Aides within the
meaning of Section 12-307b of the New York City Collective Bargaining Law; and
it is further

ORDERED, that the parties forthwith commence and undertake good faith
collective bargaining in accordance Section 12-307 of the New York City

Decision No. B-39-92                                        46
Docket Nos. BCB-1347-90
      BCB-1359-91

Collective Bargaining Law for the purpose of reaching agreement on terms for

the alleviation of the said practical impact on safety to full duty

firefighters and fire officers.

DATED: New York, New York
       October 27, 1992

                              _____
                                  MALCOLM D. MacDONALD
                                       CHAIRMAN

                              _____
                                  GEORGE NICOLAU
                                       MEMBER

                              _____
                                  DANIEL G. COLLINS
                                       MEMBER

                              _____
                                  CAROLYN GENTILE
                                       MEMBER

                              _____
                                  JEROME E. JOSEPH
                                       MEMBER

                              _____
                                  GEORGE B. DANIELS
                                       MEMBER

                              _____
                                  STEVEN H. WRIGHT
                                       MEMBER