EXHIBIT 15

**Uniformed Firefighters Ass'n, 43 OCB 70 (BCB 1989) [Decision No. B-70-89 (I)], aff'd, Uniformed Firefighters Ass'n v. Office of Collective Bargaining, No. 1065/90 (Sup. Ct. N.Y. Co. Nov. 26, 1990).**

OFFICE OF COLLECTIVE BARGAINING
BOARD OF COLLECTIVE BARGAINING
----------------------------------x

In the Matter of

UNIFORMED FIREFIGHTERS ASSOCIATION          DECISION NO. B-70-89
    OF GREATER NEW YORK,                     DOCKET NO. BCB-1117A-88
                                                 (I-193-88)
            Petitioner,

        -and-

THE CITY OF NEW YORK,

            Respondent.

----------------------------------x


                    <u>DECISION AND ORDER</u>


        During negotiations for a new collective bargaining

agreement between the City of New York and the Uniformed

Firefighters Association, the City announced its intent to delete

a previous contractual requirement that engine companies (with

stated exceptions) be staffed by no fewer than five persons at

the start of each tour.  In the City's view, minimum manning was

not a mandatory subject of bargaining.  The Union, on the

contrary, demanded that the City restore minimum manning in the

seventy-four engine companies that, by agreement in a time of

fiscal crisis, had been less amply staffed than others.

        This Board, by Decision No. B-4-89, sustained the City's

contention that minimum staffing is not in itself a mandatory

subject of bargaining.  At the same time the Board made clear

Decision No. B-70-89                                             2
Docket No. BCB-1117A-88(I-193-88)

that the UFA was not foreclosed from seeking to show the City's
intended personnel plan would adversely affect employees' safety
and workload.[1]

Having found sufficient grounds to warrant inquiring further
into the consequences of the City's proposed actions, the Board
ordered that a fact-finding hearing be conducted to consider
"whether the reduction of minimum manning levels in firefighting
companies from five-man to four-man crews, creates a practical
impact on the safety and workload of firefighters."[2]  If that

_____

[1] The New York City Collective Bargaining Law spells out the
municipal employer's management rights (and their limits) as
follows, in Section 12-306b:

    It is the right of the city, or any other public
    employer, acting through its agencies, to determine the
    standards of services to be offered by its agencies;
    determine the standards of selection for employment;
    direct its employees; take disciplinary action; relieve
    its employees from duty because of lack of work or for
    other legitimate reasons; maintain the efficiency of
    governmental operations; determine the methods, means
    and personnel by which government operations are to be
    conducted; determine the content of job
    classifications; take all necessary actions to carry
    out its mission in emergencies; and exercise complete
    control and discretion over its organization and the
    technology of performing its work.  Decisions of the
    city or any other public employer on those matters are
    not within the scope of collective bargaining, but,
    notwithstanding the above, questions concerning the
    practical impact that decisions on the above matters
    have on employees, such as questions of workload or
    manning, are within the scope of collective bargaining.

[2] We remark that though the hearing notice quoted above
referred to "firefighting companies" generically, the context
makes clear (and the parties fully agree) that the present
controversy relates solely to the staffing of engine companies.
Ladder companies, staffed as they are by at least five
firefighters, are not involved in this proceeding.

Decision No. B-70-89                                          3
<u>Docket No. BCB-1117A-88(I-193-88)</u>

impact were shown to exist, the Board indicated that "the City
will be directed to negotiate over its alleviation."

A qualified hearing officer was duly designated to conduct
this further proceeding and to report to the Board.  Six days of
formal hearings, a massive record of testimony, scores of
exhibits, voluminous briefs, and the hearing officer's report
amply confirm the seriousness, capability, and thoroughness that
characterized both parties' participation in these proceedings
and thus provided the basis for the conclusions now to be stated.


<u>**DISCUSSION**</u>

We indicate at the outset the parameters of our
consideration of the present controversy.

First, our decisions have abundantly established that the
City's managerial prerogative extends to the subject of staffing
levels and to the tactical utilization of available employees.
These are matters beyond the scope of mandatory collective
bargaining.

At the same time, however, this Board has repeatedly held
that managerial action (or inaction) may be challenged before
this Board on the ground that it allegedly has had a "practical
impact" on affected employees' safety or workload.  If the Board
agrees that a practical impact of this nature has been a
consequence of the City's unilateral judgment, the Board may then
direct the City to negotiate, with a view toward alleviating the
deleterious results (existing or threatened) of its managerial

Decision No. B-70-89                                                   4
<u>Docket No. BCB-1117A-88(I-193-88)</u>

act.

Our decisions have emphasized the proposition that a
"practical impact" is far more than simply a change in the way
things are done.  A practical impact exists only when the Board
finds that a given exercise of management prerogative has such
extraordinary and substantial adverse effect upon the working
conditions of employees as to impose, for example, "an unduly
burdensome or unreasonably excessive workload" [3] or to constitute
a patent threat to employee safety. [4]

If City action normally outside the boundaries of mandatory
collective bargaining is nevertheless challenged because
allegedly it does create a "practical impact" of this nature, the
challenger bears a heavy burden of persuasion.  Our Decision No.
B-4-89 ordered that the present proceeding be undertaken
precisely to ascertain whether reducing minimum staffing levels
in some though by no means all engine companies should be deemed,
in the light of what has been said above, to affect safety and
workload so markedly as to warrant this Board's ordering
negotiation between the City and the UFA.

The record of the hearing that followed the Board's order
embodies extensive testimony buttressed by exhaustive researches
reflected in the parties' eighty-four exhibits.  Careful review

_____

[3] Decision No. B-9-68.

[4] Decision No. B-5-75.

Decision No. B-70-89                                                    5
Docket No. BCB-1117A-88(I-193-88)

of that record has left us unpersuaded that the City's plan to
assign four rather than five firefighters to certain engine
companies, considered together with its roster manning program,
adaptive response policy, and the revision of engine company
tactics, will have the objectionable effects the UFA has feared.

We do not suggest that the matter is undebatable.  Highly
qualified witnesses vigorously stated their belief that
existing firefighting practices are preferable to those the City
has designed for deploying its forces.  Throughout, however, the
materials before us reflect conflicting judgments concerning
tactical matters as to which opinions may reasonably differ and
as to which the City has responsibility for making decisive
choices.

A considerable portion of the recorded testimony reflects
opinions sharpened by the witnesses' direct experience.  Drawing
on that experience, witnesses summoned by the UFA tellingly
recounted past firefighting episodes whose outcomes, for good or
ill, were dramatically affected by the presence or absence of a
five-firefighter engine company (rather than, as may occur if the
City's plans remain unaltered, a four-firefighter company).  We
have been moved by the witnesses' sincerity and by their
commendable public service.

Yet we sustain the City's view that plans for responding to
more than 340,000 emergency incidents yearly need not be shaped
by the "worst case scenario."  At some point the City must have
room to exercise a flexible judgment about how best it can

Decision No. B-70-89                                              6
Docket No. BCB-1117A-88(I-193-88)

utilize its firefighters. [5]  Departure from a single pattern
shaped by past usage does not in and of itself suggest that
firefighters' wellbeing has been adversely affected.

In the future as has been true in the past, firefighters'
work will expose them to dangers and stresses.  We are
unpersuaded however, that the staffing patterns the City has in
view -- differentiating among engine companies according to their
location, coupled with a new adaptive response procedure [6]
designed to assure the presence of a numerically adequate
complement of firefighters at the scene of a fire -- are ill
considered or otherwise disregard the interests of those whom the
UFA represents.  The City's speedy provision of a "second-due
engine company" as a matter of routine may reasonably be viewed
as a manpower supplement.  It is plausibly deemed to offset
whatever loss in effectiveness may occur when the initial
response is by a four-firefighter engine company, rather than by
a five-firefighter company as will be commonplace.  Therefore,
without concluding that the City's planning is indisputably

---

[5] In recent years engine companies annually have coped with
more than 70,000 non-structural fires (which, however, frequently
are put out by extinguishers or booster lines and do not require
the use of a hose) and with more than 30,000 potentially
hazardous fires of a structure or its contents (though of these
only about one in five required the use of even a single hose
line and fewer than one in twelve required the use of two hoses).

[6] The adaptive response procedure, part of a "prioritized" manning
program ("roster manning"), provides for the automatic dispatch of additional
units when the initial response to a fire includes engines operating with
fewer than five firefighters.

correct in every detail, we do conclude that the present
proceeding has not demonstrated a "practical impact" on employee
safety and workload within the meaning of the statute.

The Board takes note of a communication addressed to its
hearing officer, well after the close of the hearing in this
case, and of the Union's objections to this belated submission.
We have decided to accept this submission because it represents a
modification of the City's roster manning proposal which
apparently gives greater assurance that personnel shortages will
not interfere with achieving the manning level the City had
projected.

In essence, the City has now <u>guaranteed</u> every firefighter in
its employ (except during the first six months of probationary
status or during final leave) ninety-six hours of overtime
opportunities annually for which the authorized budgetary
headcount will be reduced to 8896.  The scheduling of overtime
for each active firefighter will focus on periods of predictably
low availability, thus assuring the presence of additional
manpower precisely when personnel gaps might otherwise have
aroused fresh concern about the workload or safety of
firefighters on the "backstep."

The City's revised proposal confirms and reinforces this
Board's conclusion that the roster manning program and its
constituent elements, including adaptive response and revised
engine company tactics, are not demonstrably likely to magnify
the dangers or the work burdens inherent in firefighting and,

Decision No. B-70-89                                             8
Docket No. BCB-1117A-88(I-193-88)

accordingly, may be made operative managerially rather than as a
product of negotiation.  The City's overtime guarantee, though
unilaterally given, and the finite reduction in headcount are
regarded by this Board as elements of the record our judgment
reflects.  We wish to emphasize that our decision is based upon
the configuration of elements described by the City and set forth
in the record in this case and that we make no finding with
respect to the practical impact that some other configuration of
elements not presented here may or may not have on the safety or
workload of firefighters in the future.

## DETERMINATION AND ORDER

Pursuant to the powers vested in the Board of Collective
Bargaining by the New York City Collective Bargaining Law, it is
hereby

DETERMINED, that the City's plans to reduce minimum manning
in some engine companies from five-man to four-man crews, which
we have considered together with its plans concerning roster
manning, adaptive response, and engine company tactics, have not
been shown to have a practical impact on employee safety or
workload within the meaning of the statute, and are therefore not
matters as to which the City is obligated to engage in collective
bargaining; and it is hereby

ORDERED, that the petition of the Uniformed Firefighters
Association of Greater New York that the City be directed to
bargain concerning those plans be, and the same hereby is,

Decision No. B-70-89                                                    9
Docket No. BCB-1117A-88(I-193-88)

dismissed.

Dated: New York, N.Y.
        December 18, 1989

                              _____
                                  MALCOLM D. MacDONALD
                                       Chairman

                              _____
                                  DANIEL G. COLLINS
                                        Member

                              _____
                                  DEAN L. SILVERBERG
                                        Member

                              _____
                                  CAROLYN GENTILE
                                        Member

                              _____
                                  EDWARD F. GRAY
                                        Member