# Exhibit A



**GEORGIA M. PESTANA**
*Acting Corporation Counsel*

**THE CITY OF NEW YORK
LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK , NEW YORK 10007

February 26, 2021

**By Email Only**
Counsel in All 5 Related Cases

      Re:    *People of the State of New York v. City of New York, et al.*, 21 Civ. 322 (CM)
              *Jarrett Payne, et al. v. Mayor Bill de Blasio, et al.*, 20 Civ. 8924 (CM)
              *Charles Henry Wood v. City of New York, et al.*, 20 Civ. 10541 (CM)
              *Adama Sow, et al. v. City of New York, et al.* 21 Civ. 533 (CM)
              *Samira Sierra v. City of New York, et al.*, 20 Civ. 8924 (CM)

Counsel:

      We write in accordance with the Court's order at the February 22, 2021 conference, which instructed defendants to provide written notice of any deficiencies in plaintiffs' *Monell* claims by February 26, 2021.[1] *People*, ECF No. 35. We address each case in turn.[2]

### I. General Standard for Municipal Liability.

      To state a claim for municipal liability, a plaintiff must plead: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). To establish the "policy or custom" prong required for municipal liability, a plaintiff must allege: the existence of (1) a formal policy, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); (2) actions taken or decisions made by final municipal policymakers that caused a violation of plaintiff's rights, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-484 (1986); (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact," *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). *See also Aquino v. City of New York.*, No. 16 Civ. 1577 (GHW), 2017 U.S. Dist. LEXIS 10436, at *8 (S.D.N.Y. Jan. 25, 2017).

      Of course, as counsel is undoubtedly aware municipalities can only be liable for "their own illegal acts." *Pembaur*, 475 U.S. at 479 (1986). This is to say, Mayor de Blasio,

---

[1] The Court order dated February 22, 2021 limited this letter to *Monell* only. Therefore, while other claims may be ripe for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the defense does not discuss those claims here.

[2] We reserve the right to raise any additional good faith arguments in our motion to dismiss.

Commissioner Shea, and Chief Monahan cannot be "held liable under § 1983 on a theory of *respondeat superior*." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). Finally, to the extent that plaintiffs in any of these five cases are pursuing *Monell* liability based on any of Monahan's actions as a purported policymaker, they cannot do so. *Gersbacher v. City of New York*, No. 14 Civ. 7600-GHW, 2017 U.S. Dist. LEXIS 162707, at *41 (S.D.N.Y. Oct. 2, 2017) (dismissing a claim on summary judgment against Chief Esposito because to "[w]here the contention is not that the defendants' actions were taken pursuant to a formal policy but rather that they were taken or caused by an official whose decisions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved.")

With resect to the *Monell* claims pled in the cases based on failure to train, the Second Circuit requires plaintiffs to adequately plead three elements to allege the "deliberate indifference" required to sustain a failure-to-train claim: (1) the municipality knows "to a moral certainty" that its employees will confront a given situation, (2) either the situation presents employees with a "difficult choice of the sort that training . . . will make less difficult," or there is a "history of employees mishandling the situation," and (3) the "wrong choice" by the employee will frequently cause a constitutional deprivation. *Walker v. City of N.Y.,* 974 F.2d 293, 297-98 (2d Cir. 1992).

The City and the NYPD as well as its members faced a crisis within a crisis during the summer of 2020 – large scale protests at the height of a global pandemic.  To say that the City knew "to a moral certainty" that officers would face these conditions ignores the unprecedented nature of what they were facing. In the midst of the pandemic, there was extreme civil unrest and rage against the police due to the murder of George Floyd.  There were many disorderly people, looters, and rioters who fought with the police, throwing bottles at them, throwing Molotov cocktails at their vehicles setting several ablaze, throwing bricks at their vehicles, surrounding police vehicles while officers are inside them and attempting to jump on the vehicles, hitting officers with bricks in their heads and bodies, slashing officers' faces.   The complaints fail to show the City knew "to a moral certainty" that officers would face large-scale protests, in the streets, during a pandemic, with thousands of people violating curfew orders, looting, rioting and out to harm the police and the public.

> II.     **Deficiencies in** *People.*

According to the Complaint in *People*, every federal claim is fashioned as a *Monell* claim.  *See People*, Compl. ¶¶241-267. The allegations do not support any claim for municipal liability.  Plaintiff appears to waver between different theories of *Monell*, but the gravamen here seems to be failure to train—where a claim for municipal liability is at its most tenuous[3]. *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359 (2011).  *People*, Compl. ¶¶54-75.

To adequately plead failure to train, plaintiff should have pleaded that a policymaker knows to a moral certainty that her employees will confront a given situation[;] "[s]econd,  the

---

[3] To the extent plaintiff is pursuing any other theory of *Monell*, the pleading is vague.  She does not allege a formal policy, actions by a municipal policymaker that caused a violation of plaintiff's rights or a widespread practice.

plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation[;] [third,] the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (internal quotations and citations omitted); *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009). "[A] city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). Plaintiff must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quotations and citations omitted).

At the outset, there is no *specific* deficiency in the City's training identified or an allegation that any training deficiency caused the injury of which plaintiff complains. *People*, Compl. ¶¶6, 57. First, plaintiffs' reliance on the cited reports is misplaced.. The Corporation Counsel's report clearly states that "although the Law Department is counsel to the City, this report does not reach legal conclusions." The report does, however, dedicate a number of pages to the interplay between the effects of the global pandemic and the nature of the protests, and how that may have impacted the NYPD's performance. It states that "while the Department had previously policed protests spurred by violence against Black people, they had not previously done so in the middle of a global pandemic." *See*, Corp. Counsel's Report, p.27. The report also notes "given the "all hands on deck" nature of [the NYPD's] response, there may have been little the Department could do once the protests were underway. *See*, Corp. Counsel's Report, p.28. Even if the report were some sort of admission, a lack of protest-related after action review is distinct from a failure to train. Moreover, that DOI concluded that the Patrol Guide does not include a specific provision—which plaintiff calls "policy"—that does not mean that there is a failure to train. *People*, Compl. ¶¶6, 58. The Complaint seems to be broadly saying that the City did not adequately train its officers to police protests. But that is a far cry from the specificity required to pursue this sort of claim.

Plaintiff cannot meet any of the three prongs required for a failure to train claim. She does not show that the wrong choice by an employee frequently causes the deprivation of a citizen's constitutional rights. Plaintiff details what she believes to be a history of aggressively policing at protests. *People*, Compl. ¶¶22-29. But these paragraphs are conclusory and do not rise to the level of deliberate indifference. Plaintiff relies on reports and other lawsuits to tell this purported history; however, besides for the cases related to the RNC and *Gersbacher*, a single Occupy Wall Street case—where the jury awarded the plaintiff one penny—there has been no finding of liability related to cases arising from the anti-war demonstrations or Occupy Wall Street movement. In fact, the opposite is true. Courts and juries have routinely rejected plaintiffs' claims, in many of the cases cited in the Complaint. For instance, in *Tardif*, defendants received a full defense verdict on all of plaintiff's claim, including her excessive force claim. In *Brown*, *Caravalho*, and *Pluma*, *Higginbotham*, plaintiffs' claims were dismissed on motions. Thus, evidence that plaintiff attempts to rely on to support her claim does not.

Plaintiff also identifies several purported issues with policing at protests:  using blunt force such as batons and bikes; Compl. ¶¶82-86. indiscriminately pepper-spraying protestors,[4] Compl. ¶¶131-135; unlawfully detaining and arresting people, Compl. ¶¶211-215; arresting curfew exempt individuals and engaging in kettling, Compl. ¶¶216-278, 335-340.  But she does not allege that this is a result of a failure to train or that this is a policy or practice.

### III. Deficiencies in *Payne*.

Contrastingly to *People*, there is no standalone claim for municipal liability pleaded in *Payne*.  Even if there were, that claim would be deficient Plaintiffs have identified several paragraphs as the basis for their purported *Monell* claim.  *See Payne* Complaint, ¶¶2-4, 19-22, 35-39, 164-176, 179-183.  None of those paragraphs support liability against the municipality.

It appears—but is unclear— that plaintiffs are attempting to pursue the second prong for municipal liability:  "actions taken or decisions made by final municipal policymakers that caused a violation of plaintiff's rights." Paragraphs 2 through 4 are conclusory summaries. Paragraphs 19 to 22 refer to defendants Mayor de Blasio, Commissioner Shea, and Chief Monahan as policymakers; but acknowledging their roles does not impute municipal liability. Paragraphs 35 to 39 are under a sub-heading entitled "The City's Deliberately Hostile, Violent Response to Protests and the Mayor and Police Leadership's Explicit Endorsement of that Response."  While statements from Mayor de Blasio and Commissioner Shea are included those statements contain any "endorsement" of deliberate, hostile violence, explicit or otherwise, by any defendant.[5]  The Complaint does not state what actions these individuals took in their policymaking roles that caused plaintiffs to be subjected to the denial of a constitutional right.

But plaintiffs appear to be changing course mid-stream.  Paragraphs 164 to 176, which are under a sub-header entitled "The NYPD Has a Practice of Using Excessive Force and Retaliating Against Protestors Without Justification."  Plaintiffs appear to be attempting to plead the third and fourth prongs for municipal liability: a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers and or failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact. Plaintiffs conflate these two separate prongs.  Even if plaintiff had chosen one or the other (or both), the allegations contained in paragraphs 164 to 176 are conclusory, at best.  There is also no clear articulated policy either:  plaintiff appears to vacillate between "kettling," excessive force based on tight handcuffing and pepper spraying.  Plaintiff also appears to believe that some

---

[4] As she has fashioned it, she appears to be saying that these actions may have violated the Patrol Guide—which cannot serve as the basis for liability, municipal or otherwise.

[5] Paragraph 27 states that Commissioner Shead did not provide evidence that any protestors had thrown bricks at police officers.  Evidence exists.  *See* Thomas Tracy, *'So... my face is a brick magnet': NYPD lieutenant sports bloody face after violent clashes with George Floyd protesters* (May 30, 2020) , https://www.nydailynews.com/new-york/nyc-crime/ny-nypd-lieutenant-brick-magnet-george-floyd-protest-20200530-u7vqbkfjhvaltexkofidnrelgq-story.html.  Thus, any implication that there was no violence directed towards members of NYPD is without merit.

officers may have not worn masks during the protests can form the basis for municipal liability; but this does not even form a cognizable constitutional violation.

Finally, paragraphs 179 to 183 of the Complaint merely list plaintiffs' causes of action. And again, municipal liability is not mentioned in any of these paragraphs.

### IV. Deficiencies in *Wood*.

The allegations in *Wood* are deficient.[6] While plaintiff claims that he has pleaded a claim for municipal liability in "painstaking detail," he has not done what it is required by the Supreme Court of the United States. *Wood*, ECF No. 36 at 2. Indeed, his letter in advance of the conference, plaintiff refined his unwieldy *Monell* claim to the following: "the NYPD adopted a policy of kettling and assaulting peaceful protesters who posed no danger and were not resisting." *Wood*, ECF 36 at 2; Compl.,¶¶ 71, 168. Thus, it is the defense's understanding that plaintiff's *Monell* claim is based on the third prong of *Monell*: saying that practice of kettling and assaulting peaceful protesters that was so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymaker. Besides for being overbroad, plaintiff does not plead that this is a "practice[ ] so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61; *see also An v. City of New York,* 230 F. Supp. 3d 224, 229-30 (S.D.N.Y. 2017). Though plaintiff refers to what he describes as violence at the protests as a "policy choice," in neither his Complaint or his letter does he adequately plead any policy or practice. *Wood*, Compl. ¶43.

Nor does the Complaint describe any constructive knowledge on the part of the policymaker. While plaintiff cites to certain statements by Mayor Bill de Blasio concerning the approval of strategies, plaintiff does not allege that Mayor Bill de Blasio, Comissioner Shea, or Chief Monahan encouraged kettling or assaulting peaceful protesters. Compl., ¶¶92-95. Taking that sort of statement out of context does not impute liability on the municipality. And to the extent that any claim for municipal liability is based on anti-anti-police statements by any of the defendants, that is wholly without merit or support in the law.

### V. Deficiencies in *Sow*.

Plaintiffs' sixth cause of action, their purported *Monell* claim, is wholly deficient. First, the *Sow* plaintiffs purport to allege a failure to train claim. As explained *supra* with respect to *People*, to adequately plead failure to train, plaintiff should have pleaded in accordance with *Jenkins*, but did not. And similarly to *People*, the *Sow* plaintiffs cannot meet any of the three prongs required for a failure to train claim in their complaint, based on the purely conclusory statements regarding training in their complaint. *Sow* Compl. ¶¶416-427.

Also, as in *People*, the *Sow* Complaint cites both the Corporation Counsels' Report and The DOI Report, Compl. ¶¶85-93,428,434,446, which have no persuasive effect. Again, the Corporation Counsel's report clearly states that "although the Law Department is counsel to the

---

[6] To the extent plaintiff in *Wood* relies on the Complaint in *Payne* in support of his *Monell*, defendants refer plaintiff to portion of this letter that discusses *Payne*.

City, this report does not reach legal conclusions." Even if the report were some sort of admission, a lack of protest-related after action review is distinct from a failure to train. Moreover, that DOI concluded that the Patrol Guide does not include a specific provision—which plaintiff calls "policy"— does not mean that there is a failure to train.

The *Sow* complaint further alleges a "Historical Policy and Practice of Violently Disrupting Protected First Amendment Activity." Compl. p. 45  Although the complaint cites a litany of prior lawsuits (Compl. ¶409) and conclusory allegations of "mistreatment" of protestors, it is well settled that mere citing of lawsuits alleging similar acts where none resulted in admission or finding of liability is insufficient to sustain a *Monell* claim. *Walker v. City of New York*, No. 14-cv-808 (ER), 2015 WL 4254026, at *8-9 (S.D.N.Y. July 14, 2014)

Although the *Sow* plaintiffs do a fairly thorough job of explaining the elements of a *Monell* claim, and citing to past allegations of failures within the NYPD, "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Further, the *Sow* plaintiffs, as the complaint stands, will be unable to establish that their claims traceable to the broad policy they allege against defendant City of New York in this case, as they must.

"Only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."  *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)).  Plaintiffs must show that the policymaker's decision "directly caused the violation of [their] [constitutional] rights." *Pembaur*, 475 U.S. at 484.   The *Sow* plaintiffs have named as defendants Mayor DeBlasio, and Police Commissioner Shea, either of whom could be viewed as policymakers for the City with regard to large scale arrests by the police, and Chief Monahan, who is not, in fact, a policymaker. However, plaintiff has failed to allege any facts showing that the Mayor or Police Commissioner (or Chief Monahan) made the specific decisions to authorize the alleged unconstitutional acts plaintiffs complain of.

## VI.     Deficiencies in *Sierra*.

Like *People*, there is no standalone claim for municipal liability pled in *Sierra.*  Instead, plaintiffs merely state that the City is liable pursuant to *Monell* when "the policies, practices, and customs established and/or implemented by the City Officials are the moving force of a constitutional violation." *See Sierra* Complaint, ¶32.  This recitation of case law is not enough alone to make the City liable, and no where else in the Complaint do the plaintiffs reference City policies.  To the extent that plaintiffs are trying to  claim that under the second prong of *Monell*, the Mayor, the Commissioner and Chief Monahan took actions as final policy makers that caused a violation of plaintiffs' rights, their pleadings fail.  Only Chief Monahan is alleged to have personally participated in the protests, but as mentioned above, the Chief of Department is not a final policy maker for the purposes of a *Monell* claim.  This is further demonstrated in paragraphs 26-29 which explicitly designate the Commissioner as the chief executive officer of the police force.  *Id.* ¶28.  However, there are no allegations that either the Mayor or the

Commissioner were personally involved in the Mott Haven protests. The only allegation regarding the Mayor's involvement in any decision regarding the protests in Mott Haven is a single sentence, provided without context, in which he discussed the protests generally. *Id*. ¶37.[7] There is no mention of the Commissioner being involved in any decisions related to the Mott Haven protests. Plaintiffs do include additional selective quotations from the Mayor, the Commissioner and Chief Monahan in paragraphs 120 through 133. These statements do not form a claim, let alone subject the City to liability on the basis of statements made in response to protests.

Plaintiffs also describe several other lawsuits that have been filed regarding the NYPD's response to protests. *Id.* ¶¶112-119. To the extent that plaintiffs are attempting to plead the third prong for municipal liability by these references, these conclusory citations and summaries of other lawsuits do not establish a policy or practice by the City. The mere fact that other lawsuits have alleged a policy or practice cannot support an allegation that there was in fact any such practice. *See Strauss v. City of Chi.*, 760 F.2d 765, 768-69 (7th Cir. 1985) (The "number of complaints filed, without more, indicates nothing. People may file a complaint for many reasons, or for no reason at all. That they filed complaints does not indicate that the policies . . . . exist do in fact exist and did contribute to [plaintiff's] injury.")

.

***

Yours truly,

Brachah Goykadosh
Elissa Jacobs
Dara Weiss
*Senior Counsels*
Special Federal Litigation Division

---

[7] The entire transcript is the Mayor discussing the June 2020 protests as a whole, and includes both support for and criticism of actions taken at the protests. *See* https://www1.nyc.gov/office-of-the-mayor/news/413-20/transcript-mayor-de-blasio-holds-media-availability.