**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

ADAMA SOW, DAVID JAKLEVIC, ALEXANDRA
DE MUCHA PINO, OSCAR RIOS, BARBARA ROSS,
MATTHEW BREDDER, SABRINA ZURKUHLEN,
MARIA SALAZAR, DARA PLUCHINO, and
SAVITRI DURKEE, *on behalf of themselves and others*
*similarly situated,*

                                  Plaintiffs,

      - against -

CITY OF NEW YORK; MAYOR BILL DE BLASIO;
NEW YORK CITY POLICE DEPARTMENT
COMMISSIONER DERMOT SHEA, NEW YORK
CITY POLICE DEPARTMENT CHIEF OF
DEPARTMENT TERENCE MONAHAN; NYPD
DETECTIVE EDWARD CARRASCO (SHIELD NO.
1567); NYPD OFFICER TALHA AHMAD (SHIELD
NO. 21358); NYPD OFFICER KEVIN AGRO
(SHIELD NO. 8054); NYPD OFFICERS JOHN and
JANE DOES # 1- 40,

                                  Defendants.

-------------------------------------------------------------------- X

**CLASS ACTION**
**COMPLAINT**

**JURY DEMAND**

**No. 21-cv-533**

        Plaintiffs, ADAMA SOW, DAVID JAKLEVIC, ALEXANDRA DE MUCHA PINO,

OSCAR RIOS, BARBARA ROSS, MATTHEW BREDDER, SABRINA ZURKUHLEN,

MARIA SALAZAR, DARA PLUCHINO, and SAVITRI DURKEE, (collectively herein

"Plaintiffs" or "Named Plaintiffs"), on behalf of themselves and others similarly situated, by and

through their attorneys, Beldock Levine & Hoffman LLP; Gideon Orion Oliver; Cohen & Green

P.L.L.C.; and Wylie Stecklow PLLC, as and for their Complaint, allege as follows:

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 4

JURISDICTION ...................................................................................................................... 6

VENUE .................................................................................................................................. 6

PARTIES ............................................................................................................................... 6

JURY DEMAND ..................................................................................................................... 9

STATEMENT OF FACTS ....................................................................................................... 10

    Black Lives Matter Protests from May 28, 2020 to June 6, 2020 ................................. 10

    Defendant de Blasio's Curfew Orders and the NYPD's Subsequent Arrests ............... 10

    Protests Continue on June 1, June 2, and June 3, 2020 ................................................. 13

    The NYPD's Unconstitutional Policy of First Amendment Retaliatory Arrests
    Reaches its Apex in Mott Haven on June 4, 2020 .......................................................... 13

    NYPD's Permissive Response to Pro-Police and Other, Similar Demonstrations ........ 15

    Reports and Investigations into the 2020 Protests ......................................................... 16

    The COVID-19 Pandemic in New York City ................................................................. 20

    Named Plaintiffs' Experiences ........................................................................................ 20

        Plaintiff David Jaklevic's May 30th Arrest ............................................................... 20

        Plaintiff Alexandra de Mucha Pino's May 30th Arrest ............................................. 22

        Plaintiff Oscar Rios's June 1st Arrest ....................................................................... 25

        Plaintiff Barbara Ross's June 1st Arrest ................................................................... 28

        Plaintiff Matthew Bredder's June 2nd Arrest ............................................................ 29

        Plaintiff Sabrina Zurkuhlen's June 2nd Arrest .......................................................... 30

        Plaintiff Maria Salazar's June 3rd Arrest .................................................................. 34

        Plaintiff Matthew Bredder is Again Subjected to the NYPD's Unconstitutional
        Policies Resulting in his June 4th Mott Haven Arrest ............................................... 36

        Plaintiff Dara Pluchino's June 4th Arrest .................................................................. 38

Plaintiff Adama Sow's June 4th Arrest .......................................................... 39

Plaintiff Savitri Durkee's June 4th Arrest ...................................................... 42

The NYPD's Historical Policy and Practice of Violently Disrupting Protected
First Amendment Activity .............................................................................. 45

The NYPD's Failure to Train ......................................................................... 52

CLASS ACTION ALLEGATIONS ......................................................................... 58

FIRST CLAIM FOR RELIEF: UNLAWFUL SEIZURE/ FALSE ARREST ............... 65

SECOND CLAIM FOR RELIEF: EXCESSIVE FORCE ......................................... 69

THIRD CLAIM FOR RELIEF: FIRST AMENDMENT INFRINGEMENTS, INCLUDING
FIRST AMENDMENT RETALIATION ................................................................. 72

FOURTH CLAIM FOR RELIEF: DUE PROCESS ................................................. 76

FIFTH CLAIM FOR RELIEF: EQUAL PROTECTION AND SELECTIVE ENFORCEMENT
........................................................................................................................ 81

SIXTH CLAIM FOR RELIEF: MUNICIPAL LIABILITY ....................................... 82

DEMANDS FOR RELIEF .................................................................................... 83

## PRELIMINARY STATEMENT

1.      After the May 25, 2020 police killing of George Floyd, protests against police violence and in support of police accountability and the Black Lives Matter movement spread across the United States and the world, including here in New York City, where thousands exercised their constitutional rights to protest across the City.

2.      In an effort to instill fear and chill the speech of the protestors, the New York Police Department repeatedly corralled protestors into spaces where they could not escape. They beat protestors with batons, sprayed them with pepper spray, and arrested them without lawful justification, all without fair warning. They then physically restrained them with flex-cuffs in such a manner that many reported serious, long-term nerve damage. Protestors were subjected lengthy and unnecessary arrest processing that put them in dangerously close quarters, all in the height of the global COVID-19 pandemic.

3.      In contrast, the same police department has responded to other protests (including, in particular, "Blue Lives Matter" and other pro-police protests) with virtually no arrests at all, let alone such brutality.

4.      Relatedly, as Defendants New York City Mayor Bill de Blasio, New York City Police Commissioner Dermot Shea, and other City policymakers well know, NYPD members receive insufficient training related to policing and use of force in connection with First Amendment assemblies. including because the core training, based on Disorder Control Unit principles, treats protest activities as forms of civil unrest, like riots, and focuses on disrupting and demoralizing protests and protesters, rather than encouraging and facilitating them.

5.      The NYPD's violent assault on protesters in the Mott Haven section of the Bronx on June 4, 2020 exemplified the worst of the NYPD's unconstitutional protest policing tactics and insufficient training.

4

6.     Defendants Shea, along with Defendant Terence Monahan and other decisionmakers, targeted the event based on its perceived message and perceived organizers; strategically trapping protesters, as well as National Lawyers Guild – NYC Chapter Legal Observers, and volunteer medics, for purported violations of Defendant de Blasio's Executive Orders imposing a City-wide curfew so that police would have a *casus belli* to initiate planned violence.

7.     NYPD members held protesters, as well as bystanders, observers, and medics, in place performatively giving the trapped protesters "dispersal orders" that they could not comply with,

8.     NYPD members then attacked protestors, climbing on cars, swinging batons, spraying pepper spray, and arresting anyone and everyone, without regard to probable cause, let alone individualized probable cause.

9.     And yet, Defendants de Blasio and Shea have routinely defended the NYPD's response to the protests – for example, as discussed below, Shea has described the NYPD's conduct in attacking the Mott Haven protest as "executed nearly flawlessly."

10.     Put simply, if such deliberate violence is a flawless execution of New York City policies and reflects the apex of the NYPD's training, then the City must immediately change those policies, and the related training.

11.     The City can, and must, do much better.

12.     Plaintiffs, on their own behalf and on behalf of others similarly situated, seek to hold the NYPD accountable for its unconstitutional policies and practices of violently and disrupting and penalizing peaceful protests.

## JURISDICTION

13.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

14.     The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

15.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief they pray for herein.

16.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## VENUE

17.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

## PARTIES

18.     Plaintiff ADAMA SOW (Mr. Sow; he/him) is a resident of the City of New York, County of Kings, and State of New York.

19.     Plaintiff DAVID JAKLEVIC (Mr. Jaklevic; he/him) is a resident of the City of New York, County of New York, and State of New York.

20.     Plaintiff ALEXANDRA DE MUCHA PINO (Ms. de Mucha Pino; she/her) is a resident of the City of Philadelphia, County Philadelphia, and State of Pennsylvania.

21.     Plaintiff OSCAR RIOS (Mr. Rios; he/him) is a resident of the City of New York, County of Kings and State of New York.

22.     Plaintiff BARBARA ROSS (Ms. Ross; she/her) is a resident of the City of New York, County of New York, and State of New York.

23.     Plaintiff MATTHEW BREDDER (Mr. Bredder; he/him) is a resident of the City of New York, County of New York, and State of New York.

24.     Plaintiff SABRINA ZURKUHLEN (Ms. Zurkuhlen; she/her) is a resident of the City of New York, County of New York, and State of New York.

25.     Plaintiff MARIA SALAZAR (Ms. Salazar; she/her) is a resident of the City of New York, County of Queens, and State of New York.

26.     Plaintiff DARA PLUCHINO (Ms. Pluchino; she/her) is a resident of the City of New York, County of New York, and State of New York.

27.     Plaintiff SAVITRI DURKEE (Ms. Durkee; she/her) is a resident of the City of New York, County of Kings, and State of New York.

28.     Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department, and does maintain the New York Police Department ("NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

29.     Defendant New York City Major BILL DE BLASIO was at all times relevant to this Complaint, and still is, the Mayor of New York City.  As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the "chief executive officer of the city," NYC Charter Section 3, and had final authority to appoint and/or remove the New York City Police Commissioner.

30.     Defendant NYPD Commissioner DERMOT SHEA was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable.

31.     Under the principles of municipal liability for federal civil rights violations, the NYPD Commissioner (or his authorized delegates) has final managerial responsibility for training, instructing, supervising, and disciplining NYPD officers and other employees in his office regarding their conduct, including, but not limited to, their duty to refrain from violating the constitutional rights of protestors.

32.     Defendant NYPD Chief of Department TERENCE MONAHAN was at all times relevant to this Complaint, and still is, the Chief of Department of the NYPD who has policymaking authority over the Department.

33.     Defendants NYPD Detective EDWARD CARRASCO (Shield No. 1567), NYPD Officer TALHA AHMAD (Shield No. 21358), NYPD Officer KEVIN AGRO (Shield No. 8054) and NYPD Officers JOHN and JANE DOES # 1- 40, are NYPD Police Officers who unlawfully used excessive force, arrested, and/or detained Plaintiffs and others similarly situated in violation of their constitutional rights.

34.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

35.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

36.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

37.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

38.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

39.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

40.     Each individual Defendant is sued in her or his individual and official capacities.

41.     At all relevant times, the officer-defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## JURY DEMAND

42.     Plaintiffs demand a trial by jury in this action on each and every one of their claims

9

for which a jury trial is legally available.

## STATEMENT OF FACTS

### Black Lives Matter Protests from May 28, 2020 to June 6, 2020

43.     On May 28, 2020, days after George Floyd's death, protests began across New York City. One protest in Union Square saw a mobilization of hundreds of NYPD officers in response who made several arrests. A group of protestors marched to City Hall where officers kettled them with bicycles, and arrested approximately 75 people.

44.     Protests continued on May 29th at Foley Square and Barclays Center. At Barclay's Center, NYPD officers peppered sprayed and struck protesters with batons.

45.     On May 30th, protests continued in New York City in all five boroughs. The protests were again met with NYPD shows of force including pepper spray, baton strikes, and mass arrests. In the Flatbush area of Brooklyn, a police helicopter flew low overhead swirling debris, trash, and dust into the marchers' faces.

46.     On May 31st, the protests in New York City continued, even garnering support from some officers who knelt in a symbolic allegiance with the cause of the protestors.  While some individuals participated in property crimes, the defendants failed to distinguish among the protestors and other individuals.

### Defendant de Blasio's Curfew Orders and the NYPD's Subsequent Arrests

47.     On June 1, 2020, in the midst of the protests in New York City, Governor Andrew Cuomo and Defendant de Blasio announced that New York City would be subject to an 11:00 p.m. to 5:00 a.m. curfew.[1]

---

[1] *See* https://www.governor.ny.gov/news/governor-cuomo-and-mayor-de-blasio-announce-citywide-curfew-new-york-city-will-take-effect; Emergency Executive Order No. 117, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf.

48.     On the evening of June 1, 2020, Defendant de Blasio announced he would be extending the curfew to the evening of June 2, 2020. [2]

49.     On June 2, 2020, Defendant de Blasio issued Emergency Executive Order No. 119, ordering "a City-wide curfew to be in effect each day from 8:00 p.m. until 5:00 a.m., beginning at 8:00 p.m. on June 3, 2020 and ending at 5:00 a.m. on June 8, 2020" during which "no persons or vehicles" could "be in public."[3]

50.     Under the Curfew Orders[4]: "Failure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor."

51.     The Curfew Orders specifically exempted certain categories of workers that were deemed "essential" workers, including "police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies."

52.     Pursuant to the Curfew Orders, "any person who knowingly violate[d] the provisions in th[e] Order[s] [was] guilty of a Class B misdemeanor" under NYC Administrative Code § 3-108.

53.     NYC Administrative Code § 3-108 contains a knowing intent requirement: "Any knowing violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both."

---

[2] *See, e.g.,* https://twitter.com/NYCMayor/status/1267642422194057217?s=20; Emergency Executive Order No. 118, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf.
[3] *See* Emergency Executive Order No. 119, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-119.pdf.
[4] Hereinafter, we refer to Defendant de Blasio's Emergency Executive Orders related to the curfew collectively as the "Curfew Orders."

54.     Under New York Penal Law § 15.05, "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."

55.     On June 1st, the NYPD Operations Division issued a FINEST message regarding the curfew orders, instructing officers that "[e]nforcement will only be taken after *several* warnings are issued *and* the violator is refusing to comply." (emphasis added).

56.     On June 3rd, another FINEST message omitted the instruction to issue a dispersal order prior to curfew enforcement stating that, for a "person violating the curfew, a C-summons may be issued . . . for violating the Mayoral emergency order."

57.     As seen below, many Plaintiffs other arrestees were arrested in connection with purported violations of the Curfew Orders, under circumstances in which the NYPD members ordering or making the arrests had not given clearly communicated dispersal orders and/or provided meaningful opportunities to disperse.

58.     On June 7, 2020, Defendant de Blasio lifted the Curfew Orders - one day earlier than the last of the orders was to remain in effect.

59.     While the Curfew Orders were in effect, the NYPD arrested approximately 1,350 individuals, disproportionately Black and minority individuals, for allegedly violating the Curfew Orders.

60.     The overwhelming majority, if not all, of the purported charged violations of the Curfew Orders related to the protests that are the subject of this litigation were eventually dismissed.

**Protests Continue on June 1, June 2, and June 3, 2020**

61.     On June 1st, demonstrations continued. Officers continued to fail to distinguish the protesters from individuals taking advantage of the demonstrations to destroy property and steal from businesses.

62.     On June 2nd, police effectuated mass arrests of protesters demonstrating across the City, in some cases shortly after curfew, using excessive force, including in the form of punching, kicking, tackling, and striking them with batons.

63.     For example, around 2,000 protesters were trapped by the NYPD on the Manhattan Bridge for over an hour and a half after officers closed both sides of the bridge and refused to let protesters either proceed into Manhattan or return to Brooklyn.

64.     On June 3rd, protest participation increased, with demonstrations widely dispersed across the City, including at Cadman Plaza in Brooklyn and in front of Gracie Mansion in Manhattan. Officers in both locations kettled protesters and shoved and struck protesters with batons. Officers at Cadman Plaza deployed tear gas.

65.     A federal lawsuit filed on behalf of four attendees of the Cadman Plaza and Barclays Center protests describes this NYPD conduct including, *inter alia*, "kettling," abusive language, and excessive force including of the use of batons, bicycles, chemical irritants, and tightly fastened flex-cuffs and handcuffs. *See Gelbard et al. v. City of New York et al.*, 20-cv-3163 (E.D.N.Y.).

**The NYPD's Unconstitutional Policy of First Amendment Retaliatory Arrests Reaches its Apex in Mott Haven on June 4, 2020**

66.     On June 4th, protests continued across the City, and, in a marked escalation, police made more arrests than the day before.

13

67.     NYPD members arrested protesters after the 8:00 p.m. curfew in Brooklyn and Manhattan, utilizing kettling and wanton force against protesters in Midtown Manhattan and Fort Greene and Williamsburg in Brooklyn.

68.     In an attack on a FTP4 action against, among other things, police misconduct in the Bronx, police in the Mott Haven neighborhood blocked all exits of a protest group on 136th Street *before* 8:00 p.m., prevented protesters from leaving, and then effectuated mass arrests with heavy use of force for purported violations of the Curfew Orders when the time passed 8:00 p.m., including striking protesters with batons, deploying pepper spray, and arresting National Lawyers Guild – New York City Chapter Legal Observers, and medical volunteers along with them.

69.     At some time before 8:00 p.m., NYPD Strategic Response Group officers wearing dark padding or body armor and bicycle helmets formed a line with their bodies and NYPD bicycles at 135th Street and Willis Avenue, causing protesters proceeding south on Willis Avenue to turn east onto 136th Street.

70.     At or around the same time, NYPD officers John and Jane Does 1-20 formed a police blockade ahead of, and downhill from, the protesters on 136th Street and Brook Avenue (the "Brook Avenue Line." As protesters arrived on the 136th Street block between Brown Place (on the west) and Brook Avenue (on the east, downhill), they encountered the Brook Avenue Line.

71.     At or around the same time as protesters encountered the Brook Avenue Line, NYPD Officers John and Jane Does 21-40 (the "Brown Place Does") formed a second police blockade on 136th Street and Brown Place (the "Brown Place Line").

72.     Also, at or around the same time, a third group of NYPD Officers John and Jane Does 41-60 (the "Sidewalk Line Does") formed a third police blockade between the 136th Street roadway and the sidewalks to the north and south of 136th Street (the "Sidewalk Lines"),

effectively preventing people trapped on the roadway between the Brook Avenue Line and the Brown Place Line from going onto the sidewalk, and people trapped on the sidewalk from entering the roadway.

73.    The Brook Avenue Line Does, Brown Place Does, and Sidewalk Line Does formed a police trap or "kettle" from which protesters, including Plaintiffs Bredder, Pluchino, and Sow could not leave – the "Mott Haven Kettle."

74.    NYPD officers failed to issue sufficient dispersal orders allowing for compliance in advance of enforcement On June 4th, protests continued to grow in size across the city.

75.    Other attendees of the June 4, 2020 march in Mott Haven have filed a complaint in this United States District Court for the Southern District of New York. See *Sierra et al. v. City of New York et al.*, 20-cv-10291 (S.D.N.Y.).

76.    In *Sierra*, Plaintiffs describe similar NYPD conduct including, *inter alia*, encirclement or "kettling," abusive language, and excessive force including of the use of batons, bicycles, chemical irritants, and tightly-fastened flex-cuffs and handcuffs.

77.    Protests continued across the City on June 5th and 6th.

**NYPD's Permissive Response to Pro-Police and Other, Similar Demonstrations**

78.    The NYPD's violent response to protests against police brutality was dramatically different from their response to other kinds of protests and rallies in the summer and fall of 2020.

79.     For example, on July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter

protestors against police brutality, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[5]

80.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[6]

81.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[7]

### Reports and Investigations into the 2020 Protests

82.     In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[8]

---

[5] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

[6] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

[7] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[8] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.

83.     The AG Report found that most complaints received by the AG were allegations of excessive force, "kettling," arrest and excessive force against press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

84.     The AG Report also found the pervasive use and misuse of tightly fastened flex-cuffs during arrests, NYPD officers covering their badge numbers, and failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

85.     In December of 2020, the NYC Department of Investigation also issued a report examining the NYPD's conduct in response to the protests ("DOI Report").[9]

86.     The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[10]

87.     In addition to the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[11]

88.     The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to First Amendment expression.

89.     The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

---

[9] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at
https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.
[10]     *Id.*  at 36.
[11] *Id.* at 61.

90.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed the latter during the 2020 protests.

91.     According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[12]

92.     The DOI found that Black arrestees were disproportionately charged with felonies.[13]

93.     According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[14]

94.     In September of 2020, Human Rights Watch issued a detailed analysis of the Mott Haven protest ("HRW Report") describing the preplanned and coordinated disruption of the march by the NYPD, including by Chief Monahan who was present at the NYPD mobilization.[15]

95.     The HRW Report describes the systematic "kettling" of protesters in Mott Haven before the 8:00 p.m. curfew and the subsequent excessive force and mass arrest of the marchers, including National Lawyers Guild – New York City Chapter Legal Observers, as well as medics, all of whom were classified as essential workers exempt from the Mayor's Curfew Orders.

96.     Following the Mott Haven protest, Defendant Shea said the mobilization by the NYPD in Mott Haven was "executed nearly flawlessly."[16]

---

[12] *Id.* at 26.
[13] *Id.* at 27.
[14] *Id.* at 28.
[15] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States ("HRW Report"), Sept. 2020, *available at* https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.
[16] Jake Offenhartz, Nick Pinto, and Gwynne Hogan, "NYPD's Ambush of Peaceful Bronx Protesters Was "Executed Nearly Flawlessly," City Leaders Agree, Gothamist, June 5, 2020, available at *https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree*.

97.     The NYPD sought to justify their Mott Haven mobilization, citing purported intelligence about criminality[17] which was identified as unrelated to the march and significantly distanced from the march.[18]

98.     The NYPD's claims were almost immediately debunked – including, for example, in a June 8, 2020 *New York Post* article by Craig McCarthy entitled "NYPD Commissioner ignores his own 'misinformation' warnings."[19]

99.     Relatedly, the DOI found that "the force required to carry out a mass arrest was disproportionate to the identified threat, placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[20]

100.    The DOI Report, AG Report, and HRW Report, in addition to the lawsuits filed following the 2020 protests, document the NYPD's persisting policy and practice of violently suppressing First Amendment expression using excessive force and mass arrests.

101.    NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests, but failed to adequately prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

102.    Numerous lawsuits arising out of the 2020 arrests have challenged the NYPD's misconduct, including, *Payne* et al. *v. de Blasio* et al. No. 20-cv-08924 (S.D.N.Y.), *Gelbard et al. v. City of New York et al.*, 20-cv-3163 (E.D.N.Y.), *Sierra et al. v. City of New York et al.*, 20-cv-

---

[17]  Office of the Mayor of New York City, Transcript: Mayor de Blasio Holds Media Availability, June 5, 2020, *available at* https://www1.nyc.gov/office-of-the-mayor/news/410-20/transcript-mayor-de-blasio-holds-media-availability.
[18]  HRW Report at 49-51.
[19]  Available online at https://nypost.com/2020/06/08/nypd-commissioner-ignores-his-own-misinformation-warnings/.
[20]  DOI Report at 56.

10291 (S.D.N.Y.), *Jeffrey v. City of New York et al.*, 20-cv-2843 (NGG) (RML), (E.D.N.Y.), and
*People of the State of New York v. City of New York et al.*, 21-cv-0322, (S.D.N.Y.), among others.

### The COVID-19 Pandemic in New York City

103.    As protesters were taking to the streets in the summer of 2020 to speak out against
police brutality and in support of Black lives, the COVID-19 virus raged across the country.

104.    In April 2020, Governor Cuomo ordered civilians to wear protective face masks in
public, to protect themselves and others from the spread of the virus. But many NYPD officers
refused to do so.

105.    As the AG Report documented, many officers who interacted with and arrested
protesters in May and June of 2020 were not wearing face masks, even as the City continued to
record hundreds of new coronavirus cases each week—and, by contrast, most protesters wore
protective face masks—at least until their contacts with NYPD members.

106.    During their arrests, some protesters' masks fell off or were removed. These
protesters were transported in vans and/or buses and placed in holding cells in close indoor contact
with other arrestees whose mask fell off or were removed, and police officers who were not
wearing masks.

### Named Plaintiffs' Experiences

*Plaintiff David Jaklevic's May 30th Arrest*

107.    Plaintiff David Jaklevic is a 41-year-old attorney who has worked for the US
Department of Labor for approximately ten years.

108.    Mr. Jaklevic participated in a protest at and around Union Square on the night of
May 30, 2020.

109.     Mr. Jaklevic wore a protective face covering to protect himself and others from the spread of COVID-19.

110.     When Mr. Jaklevic attempted to leave the protest to return home at approximately 10:15 p.m., NYPD members funneled protesters westward on 13th Street.

111.     With no other way to move, Mr. Jaklevic moved as directed west on 13th Street.

112.     Officers on bicycles then formed a wall across 13th Street in front of protestors, trapping Mr. Jaklevic and the other protesters on the block between Broadway and University Place.

113.     Without any announcements and without making any orders, the officers on bicycles charged forward into the protesters.

114.     At least two officers on bicycles, including Defendant NYPD Officer Kevin Agro (NYPD shield #8054), struck Mr. Jaklevic with their bicycles as they drove into the protesters.

115.     An officer then grabbed Mr. Jaklevic from behind, threw him into the air, and slammed him to the ground.

116.     The officer then pulled Mr. Jaklevic's left wrist, arm, and shoulder forcefully back and up his back at an unnatural angle, causing pain.

117.     An officer then cuffed Mr. Jaklevic with flex-cuffs, pulling Mr. Jaklevic's flex-cuffs as hard as he could and as tight as they would go.

118.     The officer then yanked Mr. Jaklevic off the ground by the flex-cuffs, causing excruciating pain in Mr. Jaklevic's left shoulder and wrists.

119.     Mr. Jaklevic immediately informed the officer that the flex-cuffs were too tight.

120.     Mr. Jaklevic repeatedly pleaded for his flex-cuffs to be loosened or removed.

121.     An officer replied, in sum and substance, "Shut the fuck up and sit down."

122.    Mr. Jaklevic sat down on the curb, which increased the pain to his shoulder and wrists.

123.    Mr. Jaklevic was required to remain on a curb in extremely tight flex-cuffs with an injured shoulder for nearly an hour.

124.    Mr. Jaklevic repeatedly told the officers around him that he had lost feeling in his hands.

125.    Mr. Jaklevic's protective face mask fell around his neck when officers tackled him to the ground.

126.    Officers refused to place Mr. Jaklevic's mask back onto his face.

127.    Officers with whom Mr. Jaklevic interacted with overwhelmingly did not wear masks.

128.    After around 1 hour, an officer approached Mr. Jaklevic and other protesters, and told them that they should not have been arrested and that the officers were under a lot of stress.

129.    An officer then finally removed Mr. Jaklevic's flex-cuffs and released him from custody with no charges.

130.    Mr. Jaklevic asked the officer who had told him to shut up and forced him to sit for his badge number.

131.    The officer refused to give his badge number and told Mr. Jaklevic to leave immediately or he would re-arrest him.

132.    Mr. Jaklevic sustained bruises and scrapes to his right shoulder and elbow, bruising and swelling to his left hand, and numbness, tingling, and nerve damage to his left wrist that has required repeated medical treatment including physical therapy, among other injuries.

*Plaintiff Alexandra de Mucha Pino's May 30th Arrest*

133.    Plaintiff Alexandra de Mucha Pino is a 29-year-old senior program associate at Earthjustice with a B.S. in Environmental Resource Management.

134.    On the evening May 30th, 2020, Ms. de Mucha Pino participated in a march from City Hall across the Brooklyn Bridge.

135.    Ms. de Mucha Pino wore a protective face covering to protect herself and others from the spread of COVID-19.

136.    As the marchers made their way over the Brooklyn Bridge, officers waiting near the Brooklyn end of the bridge formed a wall across the street.

137.    As the marchers exited the bridge, officers charged at them, including Ms. de Mucha Pino.

138.    Officers did not give any orders before charging at the protesters.

139.    Ms. de Mucha Pino turned around and retreated from the charging officers.

140.    Ms. de Mucha Pino looked over her shoulder and saw officers tackle, body slam, and strike protesters with batons.

141.    Ms. de Mucha Pino stood on the sidewalk and began recording the police activity.

142.    Two officers rushed at Ms. de Mucha Pino.

143.     One officer pushed Ms. de Mucha Pino with his baton and told her to move back, but she could not physically move backwards further because of a row of bushes behind her.

144.    The second officer also began pushing Ms. de Mucha Pino.

145.    Ms. de Mucha Pino put her arms in the air.

146.    The two officers ripped a metal cuff bracelet off of Ms. de Mucha Pino's wrist, causing a gash to her left arm that left a permanent scar.

147.    The two officers threw her bracelet to the ground, and she never got it back.

148.    The two officers twisted Plaintiff de Mucha Pino's arms and hands such that one palm was facing inwards and one palm was facing outwards, and then placed flex-cuffs extremely tightly on her in this incorrect position, which caused the flex-cuffs to further cut into her skin.

149.    Officers then forced Ms. de Mucha Pino to wait for approximately thirty minutes in the street.

150.    While she waited, Ms. de Mucha Pino told officers that her flex-cuffs were too tight and were hurting her.

151.    Eventually Ms. de Mucha Pino was loaded into a prisoner transport vehicle, with approximately ten other protesters, many of whom had their personal protective equipment removed by officers.

152.    Ms. de Mucha Pino was held in this extremely hot transport vehicle with the other protesters for over three hours with her hands cuffed behind her, and with no air-conditioning.

153.    When she was finally allowed to exit the vehicle, Ms. de Mucha Pino was forced to wait outside of One Police Plaza in a line for approximately an hour, where Ms. de Mucha Pino's cuffs were finally removed.

154.    Ms. de Mucha Pino then spent approximately four and a half hours in a cell with 2 to 3 other people, which was so small that there was not enough room on the bench in the cell for all four individuals.

155.    Ms. de Mucha Pino's cellmates asked for water, and officers told them that they could not give them water because they did not have cups.

156.    When arrestees asked about food, officers laughed and said in sum and substance "No, you aren't getting any meals."

157. After about 8 and a half hours in custody, Ms. de Mucha Pino was given two summonses for Disorderly Conduct and released from custody.

158. Ms. de Mucha Pino's charges were eventually dismissed.

159. Ms. de Mucha Pino suffered physical and emotional injuries, including, but not limited to, loss of circulation in her wrist and bruising and a cut to her left arm, as well as nightmares and a fear of the police.

160. Ms. de Mucha Pino missed work as a result of this incident.

**Plaintiff Oscar Rios's June 1st Arrest**

161. Plaintiff Oscar Rios is a 29-year-old software developer.

162. On June 1, 2020, Mr. Rios attended a protest that began at Barclay's Center, crossed the Manhattan Bridge, and approached Port Authority.

163. Mr. Rios wore a protective face covering to protect himself and others from the spread of COVID-19.

164. As the protesters approached Port Authority, the NYPD blocked off the forward path with police cars, began intersecting blocks, and pushing in from behind the crowd as well, forcing the crowd to steer in a different direction.

165. When the protest march arrived at Port Authority, Mr. Rios saw hundreds of police officers lined up.

166. NYPD Members did not announce that a curfew was going into effect.

167. Without giving any announcements or any orders to disperse, officers rushed the protesters.

168. An officer tackled Mr. Rios, forced him prostrate on the ground, struck him multiple times with a baton, and then punched him repeatedly.

25

169. One or more officers sat or kneeled on top of Mr. Rios and handcuffed him with flex-cuffs with excessive tightness on the ground, impeding Mr. Rios's breathing.

170. Officers continued to strike Mr. Rios while he was on the ground, causing cuts to his hands and knees, punching him in the stomach, and striking his back with a baton.

171. As Mr. Rios's face was being pressed to the ground while he was wearing a protective face mask, Mr. Rios was having difficulty breathing and an officer that he was struggling to breathe.

172. The officer responded, in sum and substance, "Shut the fuck up," and he then stepped intentionally on Mr. Rios's face, breaking his glasses.

173. Mr. Rios begged officers to let him recover his glasses after officers made him stand up.

174. When officers finally gave Mr. Rios his glasses, they were completely broken, with both arms and lenses snapped off and warped.

175. An officer asked Mr. Rios, in sum and substance, why he was attending the protest.

176. When Mr. Rios responded that he was there to protest police brutality and his arrest was part of that brutality, the officer told him, in sum and substance, "Shut the fuck up."

177. Another officer threatened Mr. Rios was a baton and also told him, in sum and substance, "Shut the fuck up."

178. Mr. Rios complained about the excessive tightness of his handcuffs and the numbness of his hands to officers.

179. Officers informed Mr. Rios that they could not do anything about the tightness of his flex-cuffs.

180.    Officers loaded Mr. Rios into a prisoner transport vehicle with several other protesters.

181.    While in the vehicle, Mr. Rios asked officers for a mask and was denied one.

182.    Another protester in the transport van commented that Mr. Rios's hands had turned purple, and only then did an officer finally remove the flex-cuffs and replace them with a metal pair.

183.    Officers confiscated Mr. Rios's fannypack and phone.

184.    When the transport van arrived at One Police Plaza, Mr. Rios waited outside in line for hours.

185.    During Mr. Rios's approximately 7 hours in custody, the NYPD member assigned as Mr. Rios's arresting officer asked Mr. Rios if he intended to sue him for his arrest.

186.    This officer demanded the email address of Mr. Rios and told him, in sum and substance that if Mr. Rios sued, he would lie and say Mr. Rios had tried to assault him.

187.    After approximately 7 hours in custody, Mr. Rios and the other individuals in the van were led to an area away from the protests, told they would be emailed a summons for breaking curfew, and then released from custody.

188.    Mr. Rios never received his summons and attempts to locate his summons via the New York State Unified Court System Electronic Document Delivery System ("EDDS") returned no filings found.

189.    Mr. Rios suffered physical and emotional injuries, including but not limited to loss of circulation in his wrists, numbness in his left hand, open wounds on his hands and knees, bruising and swelling across his body from baton strikes.

190.     Mr. Rios missed a deadline at work due to the complete numbness in his left hand for three weeks that resulted from the NYPD's actions.

### Plaintiff Barbara Ross's June 1st Assault

191.     On June 1, 2020, Plaintiff Barbara Ross, a 57-year-old woman, wore a protective face covering to protect herself and others from the spread of COVID-19 and attended a march that was moving south through midtown Manhattan.

192.     Ms. Ross proceeded peacefully on her bicycle along with the march down 3rd Avenue in Manhattan.

193.     At approximately 11:50 p.m., roughly one hour after the 11:00 p.m. curfew then in effect in Manhattan, a police presence that had until then been following behind the march began grabbing and arresting protesters.

194.     At approximately 11:56 p.m., Ms. Ross made a right turn on her bicycle onto 59th Street.

195.     Shortly after Ms. Ross turned onto 59th Street, an unknown female NYPD officer abruptly flung open the door of an NYPD van and grabbed the handlebar of the bicycle Ms. Ross was riding as she moved past.

196.     The violent interference with her bicycle threw Ms. Ross to the street and resulted in the fracturing of her foot in two places, and substantial bruising.

197.     Despite her obvious physical pain, the officer did not call for medical assistance.

198.     The NYPD officer released Ms. Ross's bicycle and moved away from Ms. Ross to detain another protester, leaving Ms. Ross in the street with a broken foot.

199.     Ms. Ross was forced to walk on her broken foot with her bicycle down 3rd Avenue in order to return home.

### Plaintiff Matthew Bredder's June 2nd Arrest

200. Plaintiff Matthew Bredder is a PhD student in neuroscience.

201. On June 2nd, 2020, Mr. Bredder attended a protest that began on Christopher Street and moved south along the West Side Highway.

202. Mr. Bredder wore a protective face covering to protect himself and others from the spread of COVID-19.

203. At or around 10:00 p.m., two or more officers slammed Mr. Bredder to the ground and slammed his head against the street.

204. The impact of that slam chipped Mr. Bredder's tooth and cut his chin.

205. Officers pulled Mr. Bredder's arms behind his back and placed flex-cuffs on him.

206. Mr. Bredder was forced to sit in the middle of the street.

207. Mr. Bredder was then placed on the curb of the sidewalk at Fifth Avenue and 14th Street, along with 20 other people.

208. Between sitting in the street and on the curb, Mr. Bredder was kept at the location of his arrest for over an hour.

209. Officers loaded Mr. Bredder into a prisoner transport vehicle.

210. After being loaded in the van, the van did not depart for approximately 45 minutes.

211. The van eventually left, taking Mr. Bredder and approximately 8 protesters to a centralized processing location at 120 Schermerhorn in Brooklyn.

212. Mr. Bredder did not arrive at the central processing location until around 12:30 a.m., two and a half hours after being arrested.

213. Once at the processing location, protesters were kept in a line outside the facility for at least an hour.

29

214.     After a brief period in a crowded cell, protesters, including Mr. Bredder, were lined up in a narrow hallway shoulder-shoulder to have their pictures taken by an officer using a cell phone.

215.     At the processing location, few officers were wearing masks.

216.     After about 7.5 hours in custody, at around 5:30 a.m. on June 3, 2020 Mr. Bredder was issued a summons for curfew violation and finally released from custody.

217.     Mr. Bredder's summons was dismissed.

**Plaintiff Sabrina Zurkuhlen's June 2nd Arrest**

218.     Plaintiff Sabrina Zurkuhlen is a 33-year-old director of athletics for an independent school, with a master's degree from Ohio University.

219.     On June 2, 2020, Ms. Zurkuhlen and her husband attended a protest that began on Christopher Street. and moved south along the West Side Highway.

220.     Ms. Zurkuhlen wore a protective face covering to protect herself and others from the spread of COVID-19.

221.     As the march moved south past Vesey Street, Ms. Zurkuhlen, who was toward the front of the group, saw a group of at least 100 NYPD officers form a line across the entire highway.

222.     The line of officers began to move towards the protesters with their helmets on and batons out.

223.     At no point did Officers give an order to disperse.

224.     Ms. Zurkuhlen walked backwards away from the officers with her hands up, while recording the police.

225.     The line of officers quickened their pace and descended upon the protesters.

226.    Ms. Zurkuhlen saw police kick, punch, and beat with batons the protesters around her.

227.    An officer pointed his drawn baton at Ms. Zurkuhlen, and began to move even faster toward her.

228.    Ms. Zurkuhlen looked to an officer next to the officer who was charging her and asked him, "Can you please help me?," as she continued to walk backwards with her hands up.

229.    The officer with his baton out then lunged at Ms. Zurkuhlen.

230.    The officer forcefully knocked the phone with which she was recording out of Ms. Zurkuhlen's hands.

231.    The officer struck Ms. Zurkuhlen across her chest with his baton.

232.    The officer then began beating Ms. Zurkuhlen on the arms and upper body with his baton, as he tackled her to the ground.

233.    Additional NYPD members descended on Ms. Zurkuhlen and beat her with their batons and kicked her.

234.    One officer kneeled on Ms. Zurkuhlen's legs while another officer sat on her back.

235.    One officer told Ms. Zurkuhlen to stand up, which was impossible as she had two officers on top of her body.

236.    Ms. Zurkuhlen pleaded with officers as they beat her up, repeatedly saying that she was not resisting.

237.    An officer put extremely tight flex-cuffs on Ms. Zurkuhlen.

238.    Eventually, a white-shirt officer said in sum and substance "Ok, that's enough guys, get her up."

239.  Officers then dragged Ms. Zurkuhlen to the side of the road and forced her to sit with other arrested demonstrators for around an hour.

240.  When Ms. Zurkuhlen's husband saw Does 1-4 attack her, he moved towards her and he was then tackled, beaten with batons, and arrested as well.

241.  When Ms. Zurkuhlen asked for her phone back, an officer laughed and responded, in sum and substance, "Yeah, right. That shit is gone."

242.  Ms. Zurkuhlen's cell phone was never returned.

243.  An officer told other officers, in sum and substance, "if your body cam is not on, do not turn it on. Cover your names."

244.  No officers on the scene were wearing masks or any protective face coverings.

245.  Ms. Zurkuhlen's face mask had fallen down during her arrest.

246.  When Ms. Zurkuhlen asked if officers would pull up her mask or keep a safe distance between persons present, the officers laughed, mocked her, and refused.

247.  Ms. Zurkuhlen observed two protesters with purple hands telling officers their hands were numb from the tightness of their flex-cuffs.

248.  Ms. Zurkuhlen explained to the officers that she is a Registered Nurse, and she asked if she could look at protesters' wrists, or if their flex-cuffs could be loosened or removed.

249.  Officers replied that no one knew how to remove the zip-ties, that removing the zip-ties was impossible, and that Ms. Zurkuhlen should, in sum and substance, "shut the fuck up.

250.  Eventually officers loaded Ms. Zurkuhlen into a prisoner transport vehicle filled with approximately 9 other protesters.

251.   Ms. Zurkuhlen was held in the crowded NYPD van for an extended period before the van moved.

252. When the NYPD van finally moved and eventually arrived at a centralized arrest processing location in Brooklyn, officers told Ms. Zurkuhlen and the other protesters that their arresting officers had not yet arrived at the location.

253. Officers continued to drive Ms. Zurkuhlen and the other arrestees around the block in circles for an extended period of time.

254. Ms. Zurkuhlen was then unloaded from the van and forced to wait in an extremely long line outside of the centralized arrest processing location.

255. The officer assigned to Ms. Zurkuhlen's arrest repeatedly remarked that he did not have the tool to remove the tight flex-cuffs, that he was from the Bronx, and that he had no idea what was going on.

256. Only after Ms. Zurkuhlen was inside the building were her tight flex-cuffs finally removed and replaced.

257. Ms. Zurkuhlen was searched.

258. Ms. Zurkuhlen was held in two cells for an additional period of time.

259. Ms. Zurkuhlen asked for a phone call and was denied.

260. Ms. Zurkuhlen asked for water many times, for herself and others held in the cells with her.

261. In response to her pleas for water, officers mocked Ms. Zurkuhlen, telling her, in sum and substance, that she should "shut the fuck up."

262. After about 8.5 hours in custody, around 3:00 a.m. on June 3, 2020, Ms. Zurkuhlen was issued a summons for curfew violation and released from custody.

263. Ms. Zurkuhlen's charges were dismissed.

264.     Ms. Zurkuhlen suffered physical and emotional injuries, including but not limited to substantial bruising from being hit by batons, being thrown onto the street, being pinned by officers, and being kicked by officers.

**Plaintiff Maria Salazar's June 3rd Arrest**

265.     Plaintiff Maria Salazar is a 29-year-old PhD student at the City University of New York Graduate Center in Philosophy and an adjunct lecturer at Queens College.

266.     On June 3rd, 2020, Ms. Salazar participated in a protest, marching downtown from Gracie Mansion.

267.     Ms. Salazar wore a protective face covering to protect herself and others from the spread of COVID-19.

268.     At around 9 p.m., when the march reached the area of 54th Street and 3rd Avenue, NYPD officers on bicycles charged the back of the march.

269.     NYPD members did not make any announcements and did not give any orders to disperse.

270.     As Ms. Salazar stood on the sidewalk, two officers rammed their bicycles into Ms. Salazar.

271.     Ms. Salazar's mask came off when the officers rammed her with their bicycles.

272.      An officer threw her bicycle onto Ms. Salazar.

273.     Officers instructed Ms. Salazar to turn onto 54th Street.

274.     When Ms. Salazar attempted to turn onto 54th Street as directed, she was met with a fleeing crowd of protesters coming back down the street in the opposite direction who informed Ms. Salazar that NYPD officers had just told them to turn back and return the other way, toward

where Ms. Salazar had just been instructed to move away, effectively trapping Ms. Salazar and the other protesters on the block.

275. Officers began arresting protesters and striking them with batons.

276. While on the sidewalk, Ms. Salazar began recording the police activity with her cell phone and continued recording until an officer threw her against a wall, told her she was under arrest, and placed her in plastic flex-cuffs.

277. Ms. Salazar told officers that she had not done anything wrong.

278. An officer replied, in sum and substance, "I know, I am sorry."

279. Ms. Salazar was then forced to sit in the street in the pouring rain for approximately half an hour.

280. Officers repeatedly stated that they could not remove the protestors' overly tight flex-cuffs.

281. Ms. Salazar was placed into a crowded prisoner transport vehicle with approximately nine other protesters, most of whom were not wearing masks.

282. No officers who Ms. Salazar interacted with wore masks.

283. Ms. Salazar was forced to remain in the crowded van, with no ventilation and without a face covering and in the presence of others without face coverings for 3 to 4 hours.

284. Ms. Salazar told officers that she was thirsty and that she was in pain from being handcuffed.

285. Ms. Salazar was finally removed from the van and directed to stand outside the arrest processing location for approximately 45 minutes before officers brought her inside.

286. Ms. Salazar repeatedly asked officers for water and to use the bathroom.

287.     Ms. Salazar was placed in an extremely crowded holding cell with approximately 20 to 25 other arrestees, which only had seating for approximately 14 people.

288.     After approximately 8.5 hours in custody, Ms. Salazar was finally given a summons for curfew violation and released from custody.

289.     Ms. Salazar's charges were dismissed.

290.     Ms. Salazar suffered physical and emotional injuries, including but not limited to sprained and painful wrists and injury to her shoulders.

291.     of the curfew orders, including at the Mott Haven protest, among other protests.

### *Plaintiff Matthew Bredder is Again Subjected to the NYPD's Unconstitutional Policies Resulting in his June 4th Mott Haven Arrest*

292.     On the night of June 4, 2020, Mr. Bredder participated in the protest at Mott Haven.

293.     Mr. Bredder again wore a protective face covering to protect himself and others from the spread of COVID-19.

294.     Before 8:00 p.m., Mr. Bredder was caught in the Mott Haven Kettle on 136th Street between Brown Place and Brook Avenue, when the Brook Avenue Line formed a barricade with their bicycles to prevent passage to Brook Avenue and began pushing the crowd back with their bicycles at the same time the Brown Place Line began pushing the crowd forward from the rear.

295.     Officers in the Brook Avenue Line told Mr. Bredder and others in the front of the march to move back, but there was no room or ability for them to do so due to the pressing forward by the Brown Place Line.

296.     An officer said to Mr. Bredder, in sum and substance, "Fuck you," and punched Mr. Bredder on the chin.

297.     Another officer grabbed Mr. Bredder by the shirt, ripping it partially off.

298. Two more officers then grabbed Mr. Bredder and pulled him into the air so he was in a horizontal position approximately three feet above the ground, with his face towards the ground.

299. While he was in the air, Mr. Bredder told the officers he was not resisting arrest.

300. The officers then intentionally dropped Mr. Bredder onto the ground from three feet up in the air.

301. Mr. Bredder took the majority of the impact from that fall in his right elbow, right knee, and left knee.

302. The fall was enough to rip open the denim of Mr. Bredder's jeans.

303. Mr. Bredder sustained bruises to both knees, a large cut on his right knee, a large cut and bruise on his right elbow, and cuts to his hands, among other injuries.

304. The fall made Mr. Bredder's mask became misaligned on his face.

305. Mr. Bredder was trapped on the ground, surrounded by legs and bicycles.

306. Defendant Edward Carrasco applied flex-cuffs to Mr. Bredder's wrists, oriented in the wrong direction, and with extreme tightness.

307. Mr. Bredder was held in a prisoner transport bus with approximately 16 other individuals for between 3 and 4 hours with his hands cuffed behind him.

308. When they finally arrived at an arrest processing center in Queens, Mr. Bredder was forced to wait in line outside for over 45 minutes.

309. At approximately 2:00 a.m. on June 5, 2020, Mr. Bredder was issued a summons for curfew violation and released from custody.

310. Mr. Bredder suffered physical and emotional injuries, including but not limited to losing feeling in his right palm for over a month, as well as cuts and abrasions.

311. Mr. Bredder's injuries caused him substantial concerns about his work as a neuroscience PhD student, which requires fine motor tasks up to and including brain surgery.

**Plaintiff Dara Pluchino's June 4th Arrest**

312. Plaintiff Dara Pluchino (Ms. Pluchino; she/her) is a 27-year-old master's student at the Columbia School of Social Work.

313. On June 4, 2020, Ms. Pluchino participated in the protest in Mott Haven.

314. Ms. Pluchino was wearing a protective face covering to protect herself and others from the spread of COVID-19.

315. Before 8:00 p.m., Ms. Pluchino was trapped in the Mott Haven Kettle when police officers forced protesters onto 136th Street from Brown Place, where protesters were met with the Brook Avenue Line.

316. As Ms. Pluchino tried to leave via a sidewalk, an NYPD officer applied flex-cuffs to Ms. Pluchino's wrists improperly and with extreme tightness, causing significant pain in both of Ms. Pluchino's hands and wrists.

317. The officer then grabbed Ms. Pluchino and and pulled her to the center of the road by her arm, such that his grip and pulling left a bruise on her left upper arm.

318. The officer also removed Ms. Pluchino's mask.

319. After pulling her into the street, the officer pushed Ms. Pluchino to the ground and forced her to sit in the street for at least an hour, during which time the extremely tight handcuffs caused significant pain in her hands and wrists.

320. Ms. Pluchino was held in an NYPD van with around 10 other arrestees for between 1.5 to 2 hours before departing Mott Haven.

321. Ms. Pluchino was brought to a centralized arrest processing location in Queens, where she was forced to wait in the van for around another hour.

322. Ms. Pluchino was then forced to wait outside of the processing location for around an additional hour.

323. Ms. Pluchino was then forced to wait in a cell for several more hours.

324. At approximately 4:30 a.m. on June 5, 2020, Ms. Pluchino was finally given a summons for curfew violation and released from custody.

325. Ms. Pluchino's charges were dismissed.

326. Ms. Pluchino suffered physical and emotional injuries, including but not limited to pain to both wrists and both hands, fear of police officers, and fear for her own and her family's safety when she attends protests.

### Plaintiff Adama Sow's June 4th Arrest

327. Plaintiff Adama Sow (Mr. Sow; he/him), a 22-year-old nonbinary person, is doula-in-training who moved to the United States from Cameroon in 2016, in order to attend Columbia University.

328. On June 4, 2020, Mr. Sow participated in the protest at Mott Haven.

329. Mr. Sow wore a protective face covering to protect himself and others from the spread of COVID-19.

330. Before 8 p.m., Mr. Sow was trapped in the Mott Haven Kettle between Brown Place and Brook Avenue.

331. Mr. Sow repeatedly asked officers to leave the kettle, but they did not let him leave.

332. An officer sprayed pepper spray into Mr. Sow's left eye.

333. Another officer grabbed Mr. Sow from behind and pushed him against a car.

39

334. Mr. Sow's mask fell from his nose and mouth during this process.

335. When Mr. Sow asked an officer to pull his mask up to cover his nose and mouth, the officer pulled up Mr. Sow's mask so that it covered Mr. Sow's eyes, like a blindfold.

336. Mr. Sow asked for the mask to be removed from his eyes and the officer ignored the request, instead saying in sum and substance, "we'll deal with it when you're down."

337. The officer then shoved Mr. Sow onto the ground.

338. Officers put extremely tight flex-cuffs on Mr. Sow.

339. Mr. Sow was forced to kneel in the street, still blindfolded.

340. Eventually, someone removed the mask from Mr. Sow's eyes.

341. Now able to see, Mr. Sow discovered that he was kneeling in a pool of someone else's blood.

342. Mr. Sow's flex-cuffs were so tight he stopped being able to feel his hands.

343. A nearby friend told Mr. Sow his hands had turned purple.

344. Mr. Sow begged for help with his flex-cuffs for at least 30 minutes.

345. During that period, other protesters also saw that Mr. Sow's hands were turning purple.

346. Those other protesters shouted for help as well.

347. At least two officers directly in from of Mr. Sow heard and ignored his complaints about the tightness of the flex-cuffs and his hands having turned purple.

348. Eventually an officer removed and retied Mr. Sow's flex-cuffs.

349. Before removing the flex-cuffs, however, the officer deliberately squeezed Mr. Sow's wrists and smacked him on his neck, causing significant pain.

350. The replacement flex-cuffs were again extremely tight.

40

351.    Mr. Sow was made to kneel in the street, in overtight flex-cuffs, for 3 hours.

352.    While being detained, Mr. Sow requested medical assistance from Defendant Talha Ahmad for pain in both his wrists and numbness in both hands, but Ahmad refused.

353.    While Officer Ahmad was detaining Mr. Sow, Ahmad spoke suggestively to him, stroked his left forearm, and called Mr. Sow his (Ahmad's) "Boo."

354.    Officer Ahmad held Mr. Sow's forearm for a prolonged period of time, while stroking it.

355.    When Officer Ahmad transported Mr. Sow to a correctional center in Queens, Ahmad made Mr. Sow travel alone with him despite announcements overheard by Mr. Sow telling all officers to bring "two bodies" (that is, protesters).

356.    Rather than issuing Mr. Sow a summons or other legal process on the street, officers loaded Mr. Sow into a prisoner transport vehicle and took Mr. Sow to a centralized arrest location.

357.    Mr. Sow had to wait outside in a line of other protesters for approximately 2 hours while he awaited processing.

358.    While waiting in line, Mr. Sow overheard an officer tell Ahmad, in sum and substance, "I miss the raping days," in response to which Ahmad laughed.

359.    Between this and Ahmad's earlier behavior, Mr. Sow spent the entire night in Ahmad's custody in a state of anxiety, stress, and trauma about sexual assault.

360.    Mr. Sow was placed in an intermediary cell for around ten minutes, then moved to another cell for an hour.

361.    Mr. Sow's belongings were taken while he was in the precinct.

362.    Throughout his time in custody, Mr. Sow repeatedly asked Ahmad for medical attention, stating that his wrists were in pain and both of his hands had gone numb.

41

363.    Ahmad repeatedly said in response to those requests, in sum and substance, "No."

364.    The cells in the centralized arrest location were filthy.

365.    There was a toilet in the cell, but it was not working, there was no toilet paper, and it was covered in feces.

366.    There was urine all over the floor of the cell, flies throughout the cell, and vomit in the corner.

367.    At least 20 to 25 people were crowded into the cell, with no way to keep any social distance.

368.    The temperature in the cell was extremely hot.

369.    After approximately one hour in the second cell, Mr. Sow's belongings were returned to him and he was given a summons for curfew violation and released from custody.

370.    Mr. Sow's charges were dismissed.

### Plaintiff Savitri Durkee's June 4th Arrest

371.    Plaintiff Savitri Durkee is a 48-year-old performing artist at the nonprofit The Immediate Life with a bachelor's degree from the University of Montana.

372.    One June 4, 2020, Ms. Durkee participated in the protest at Mott Haven.

373.    Ms. Durkee wore a protective face covering to protect herself and others from the spread of COVID-19.

374.    Ms. Durkee arrived at the Mott Haven protest at approximately 6:30 p.m. in support of a women-run local organizing group against police brutality, Take Back the Bronx, and listened peacefully to speakers in a park prior to the march.

375.    Ms. Durkee noticed that police presence was very heavy from the moment she stepped off the train.

376.     Between approximately 7:40 p.m. and 8:00 p.m., Ms. Durkee was caught in the Mott Haven Kettle on 136th Street between Brown Place and Brook Avenue when the Brook Avenue Line formed a barricade with their bicycles to prevent passage to Brook Avenue and began pushing the crowd back with their bicycles, at the same time that the Brown Place Line began pushing the crowd forward from the rear and the Sidewalk Lines formed to either side.

377.     Ms. Durkee was near the back of the march when the Brown Place Line rushed the march from behind.

378.     Ms. Durkee witnessed officers beating protesters with batons, arresting protesters, removing glasses from protesters and throwing the glasses to the ground, and opening protester's backpacks and dumping the contents in the street.

379.     NYPD members never gave Ms. Durkee an order to disperse.

380.     Ms. Durkee was so tightly crushed by the police and the protesters attempting to escape them that she could not even move her hands and she became concerned for some of the smaller young women in the crowd, at least one of whom was a teenager.

381.     A helicopter that had been hovering over the protest moved in quickly and so close that Ms. Durkee was buffeted by the wind from it and alarmed by its loudness and proximity.

382.     An officer grabbed Ms. Durkee from behind and threw her to the ground and on top of other women who had been pushed to the street by officers as he said in sum and substance, "Shut the fuck up, shut the fuck up."

383.     The officer grabbed Ms. Durkee's hair and pulled her head back and ripped her mask down.

384.     The officer then put his knee or baton into her back and forced her down on top of the other women.

385.   At no point did Ms. Durkee resist arrest.

386.   The officer applied cuffs to Ms. Durkee by yanking her up roughly and cuffing her arms behind her back.

387.   The officer handed Ms. Durkee off to another officer, who would act as Ms. Durkee's arresting officer.

388.   Both officers had tape over their badges, preventing Ms. Durkee from learning their names or badge numbers.

389.   NYPD Officers making up the kettle deployed pepper spray amid the protesters, causing coughing in Ms. Durkee due to the removal of her mask, and exposing her to coughing of other protesters whose masks had been removed by the NYPD.

390.   An officer forced Ms. Durkee to stand with a number of other protesters while they awaited transportation.

391.   When all officers ignored the arrested protester's requests to have their masks pulled up, the protesters began leaning on one another to help pull each other's masks up with their hands cuffed behind their backs.

392.   Officers loaded Ms. Durkee into a prisoner transport vehicle with 2 other protesters.

393.   Ms. Durkee was held in an NYPD SUV with 2 other protesters for 45 minutes with the windows up and her hands cuffed behind her back.

394.   The SUV traveled first to one local precinct, then another.

395.   After two hours in the second precinct, Ms. Durkee was moved to a centralized arrest processing location in Queens and placed in a holding cell with 25 people, many of whom were unmasked.

396.   Ms. Durkee assisted others in pulling up their masks.

44

397.     At approximately 2:00 in the morning on June 5, 2020, Ms. Durkee was issued a summons for a curfew violation, that was later dismissed.

398.     Ms. Durkee suffered physical and emotional injuries, including but not limited to persistent neck pain, a fear of the police, difficulty sleeping, feelings of trauma, and feelings of nervousness when someone approaches her from behind.

399.     Ms. Durkee experienced a chilling effect from her arrest and detention. Her fear that she was nearly crushed in the kettle has caused her to worry that she should not go to future protests in case she is killed, and her minor daughter is left without a mother.

400.     Ms. Durkee missed two days of work due to her arrest and detention and subsequent recovery, which set her behind on production schedules.

## The NYPD's Historical Policy and Practice of Violently Disrupting Protected First Amendment Activity

401.     The extensive deprivation of constitutional rights during the 2020 protests is directly attributable to the City's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar protests over the past twenty years, at protests including those against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

402.     The NYPD response to the protests in New York City in May and June 2020 was in line with its history of violent and unconstitutional responses to those as other past protests in New York City, including its treatment of First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

403.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray and batons strikes to disperse, and "kettling" to move protestors from specific locations to effectuate mass arrests.[21]

404.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests.[22]

405.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[23]

406.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Laywers Guild – New York City Chapter Legal Observers, as well as "kettling" tactics to move protestors or initiate mass arrests.[24]

407.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

408.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrests and violations of their First Amendment and other, related rights, much in the same manner as have the Plaintiffs in this case.

409.    Indeed, in Plaintiffs' cases, Defendants employed tactics developed and modified over the course of many years by Defendants Shea, Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating

---

[21] *See, e.g.,* N.Y. Civil Liberties Union, *Arresting Protest* (2003), *available at* https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[22] *See, e.g.,* N.Y. Civil Liberties Union, *Rights and Wrongs at the RNC* (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[23] *See, e.g., Callaghan v. City of New York,* 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[24] *See People of the State of New York v. City of New York et al.,* 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a.  *Mandal v. City of New York.,* 02 Civ. 1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02 Civ. 1234 (WHP), 02 Civ. 1367 (WHP), 02 Civ. 6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02 Civ. 1234 (WHP), 02 Civ. 1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.  *Burley v. City of New York*, 03 Civ. 2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier

with DATs for excessive periods of time and denying them for consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as "unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c. *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d. *Haus v. City of New York,* 03 Civ. 4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04 Civ. 0665 (RWS) (S.D.N.Y.);

e. *Kunstler v. City of New York*, 04 Civ. 1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight

48

plastic handcuffs in their arrest. Defendant City of New York settled this litigation with payment in excess of $2,000,000;

f.  *MacNamara v. City of New York*, 04 Civ. 9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05 Civ. 8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04 Civ. 7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04 Civ. 7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz*, 06 Civ. 2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04 Civ. 7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04 Civ. 7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (grating plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass

arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g. *Callaghan v. City of New York,* 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h. *Osterhoudt v. City of New York, et al.*, No. 10 Civ. 3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i. Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[25] there were more than sixty civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14 Civ. 5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing

---

[25] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

by caption and docket numbers of many OWS-related cases as of March 13, 2015).
Some of those cases resulted in judgments and many resulted in substantial
settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y.);

j.      Others have continued through discovery and are awaiting trial, including two cases
involving failure to train claims similar to those at issue in this case, which are
currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.)
(AT); *(Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

k.      The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14 Civ. 9148 (AT)(BCM)
were arrested at an Occupy Wall Street protest and subjected to certain NYPD
large-scale arrest processing rather than being released on the street with a
summons as a result, including *Monell* claims with much in common with many of
those raised herein. *See Case v City of NY*, 233 F Supp 3d 372 (SDNY 2017) ("*Case
I*"); 408 F.Supp.3d 313 (SDNY 2019) ("*Case II*");

l.      Those cases, and several of the OWS-related cases referred to above, included
failure to train *Monell* claims concerning protest activity that are similar to the
*Monell* claims in this litigation;

m.      *Peat v. City of New York,* No. 12 Civ. 08230 (S.D.N.Y.), fifteen OWS plaintiffs
arrested on January 1, 2012, on the sidewalk in the East Village settled a case with
Defendant City of New York for $598,000.  The settled complaint alleged that
plaintiffs were peacefully and lawfully protesting when executive members of the
NYPD blocked their path on the sidewalk[26], encircled them on three sides and a

---

[26] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on
protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and
identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted

building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

n.    The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

o.    *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

### The NYPD's Failure to Train

410.    Since at least the 1990's, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies.

411.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

---

arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

412.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

413.    Upon information and belief, to this day, that document forms the core of today's NYPD protest response-related training.

414.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, such as disorder control formations and making mass arrests.

415.    As seen elsewhere herein, such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of the Named Plaintiffs and Class Members.

416.    Upon information and belief, Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

417.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

418.    For example, upon information and belief, there is virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

419.    Although the above, and related, problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

420.    The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

421.    The SRG has a unit in each of the five boroughs and the Disorder Control Unit has now been incorporated into the SRG.

422.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[27]

423.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

424.    Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, among other places, by CCRB complaints, and in numerous lawsuits.[28]

425.    SRG members are meant to have additional DCU training.

426.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

---

[27] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns*, Gothamist, Jan. 30, 2015, *available at* https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.
[28] Ali Winston, *NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct* Histories, The Appeal, Oct. 15, 2020, *available at* https://theappeal.org/nypd-srg-misconduct/.

427.     However, many of the officers deployed to respond to the protests in 2020, did not even receive *that* training, which was supposedly required of them.

428.     As a result, as a report by the Corporation Counsel for the City of New York ("OCC Report") noted, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."[29]

429.     Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies, as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

430.     Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

431.     For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF

---

[29] New York City Law Department, Corporation Counsel Report (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03 Civ. 2829 (KMW) (GWG) (SDNY).[30]

432.    Those reports praise employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

433.    After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

434.    For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention and until the events of the George Floyd protests.

435.    Nevertheless, upon information and belief, at all times relevant herein, defendants de Blasio, Shea, Monahan, and other defendant City policymakers, routinely received reports regarding arrests made in connection with perceived First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers

---

[30] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

436.　Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing

437.　For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.), the City of New York testified that in regards to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

438.　As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

439.　For example, in a 2017 deposition, Defendant City could identify no impact litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or training.

440.　Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[31]

441.　Defendant de Blasio directed the DOI and the Corporation Counsel to produce the DOI and Corporation Counsel reports referred to herein.

---

[31] OCC Report at 2, 30.

442.    While both City agencies made reports and recommendations that include what may be characterized as critiques of some NYPD protest-related training, neither the DOI nor the Corporation Counsel, nor any other City agency, has released the contents of that training – despite that much of its core contents are already publicly available, including on the public docket in *Case, et al. v. City of New York, et al.*, 14 Civ. 9148 (AT)(BCM).

443.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests - despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years – demonstrates both a history, and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiffs and other similarly injured protesters.

## CLASS ACTION ALLEGATIONS

444.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs ADAMA SOW, DAVID JAKLEVIC, ALEXANDRA DE MUCHA PINO, OSCAR RIOS, BARBARA ROSS, MATTHEW BREDDER, SABRINA ZURKUHLEN, MARIA SALAZAR, DARA PLUCHINO, and SAVITRI DURKEE seek to represent a certified Plaintiff class consisting of (a) all persons who attended the protest marches in opposition to the historic and ongoing systemic violation of constitutional rights of those police encounter in New York City from May 28, 2020 through June 6, 2020 (the "Protests") who were arrested and had their summonses or charges dismissed; (b) all persons who suffered physical and emotional harm as a result of the NYPD's excessive force and mass arrest at and detention after attending the Protests in support; (c) all persons who have been or will be subjected to the NYPD's policy,

practice, and/or custom of intentionally and violently disrupting protests in violation of, *inter alia*, the First, Fourth and Fourteenth Amendments of the United States Constitution, and the New York State Constitution (the "Class" or "Class Members").

445.     The members of each class are so numerous as to render joinder impractical. A report from the NYC Department of Investigation indicates that at least 2,047 individuals were arrested by the NYPD in connection with the Protests.[32] Upon information and belief, hundreds or thousands more suffered physical and emotional harm as a result of the NYPD's actions at the Protests but were not arrested.[33] Individual demonstrations during the Protests sometimes numbered up to 10,000 individuals, and large protest groups were subjected to kettling and use of force, including batons.[34] Given the substantial number of individuals involved with the Protests, the members of the class and any potential future subclasses are so numerous as to render joinder impractical.

446.     In addition, joinder is impractical because, upon information and belief, many members of each class are not aware of the fact that their constitutional and statutory rights have been violated and that they have the right to redress in Court.  Upon information and belief, many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.

447.     Common questions of law and fact predominate over individual ones among class members, including, but not limited to:

---

[32] DOI Report, Dec. 2020, at 30.
[33] *Id.* at 28 (indicating the CCRB received 1,052 protest-related force allegations against the NYPD from May 28 to June 20, 2020).
[34] *Id.* at 22, 20.

a.  Whether the City engages in a policy, practice, and/or custom of violently disrupting protests in violation of protections against First Amendment retaliation and other violations of their First Amendment rights.

b.  Whether the City engages in a policy, practice, and/or custom of arresting perceived protesters under circumstances in which a clearly communicated order and meaningful opportunity to comply, coupled with refusal to comply, are required in order to provide legal justification, when such fair warning was not given and disregarded, including, but not limited to, through the enforcement of the Curfew Orders.

c.  Whether the City engages in a policy, practice, and/or custom of using excessive force on protesters, including, but not limited to, by tightly handcuffing protesters with flex-cuffs and/or failing to loosen and/or remove unduly tight flex-cuffs.

d.  Whether the City engages in a policy, practice, and/or custom of unreasonably prolonging or extending the detention of individuals arrested at protests against police brutality beyond that of otherwise similarly situated arrestees.

e.  Whether the City's treatment of protesters during full-blown, custodial arrests amid the ongoing COVID-19 pandemic amounts to an unreasonable seizure and/or unconstitutional conditions of confinement in violation of the First, Fourth, and/or Fourteenth Amendments to the United States Constitution.

f.  Whether the City, New York City Police Commissioner Dermot Shea, and other supervisory defendants, supervising officials, and/or personnel, have knowingly and deliberately failed to screen, train, supervise, monitor, and discipline officers,

and whether those failures have resulted in and will continue to result in constitutional violations by officers and City employees against Class members.

g.  Whether the City, New York City Police Commissioner Dermot Shea, and other supervisory defendants, supervising officials, and/or personnel, sanctioned and/or deliberately failed to rectify unconstitutional practices and customs, and whether such acts and omissions have resulted in and will continue to result in constitutional violations by officers and City employees against class members.

448.    These common questions of fact and law all flow from the same policies, enacted and implemented by the named and unnamed Defendants.  Defendant City of New York's city-wide policies, practices, and custom with regard to the Protests constitutes a unitary scheme in which the Defendants violate the constitutional rights of Class members. The named Plaintiffs and all class members were and are victimized by these same policies of intentionally and violently disrupting protests in violation of, *inter alia*, the First, Fourth and Fourteenth Amendments of the United States Constitution, and the New York State Constitution, and thus the foregoing common questions of law and fact greatly predominate over any questions affecting only individual members, including legal and factual issues relating to damages.

449.    Defendant the City of New York failed to implement constitutional protest policies city-wide and failed to review and remediate noncompliance with the First, Fourth, and Fourteenth Amendments in the NYPD response to protest activities.

450.    The Named Plaintiffs are adequate class representatives because they were and are directly impacted by the Defendants' intentional and violent disruption of protests, and Plaintiffs are typical of the members of each class. Like other members of both the Injunctive and Damages

Classes, named Plaintiffs were subject to First Amendment Retaliation, excessive use of force, and unconditional conditions of confinement.

451.    Like other members of both the injunctive and damages Classes, named Plaintiffs risk being arrested in the future and/or likely will continue to be subject to the Defendants' unconstitutional conduct.

452.    Plaintiffs are residents of New York City and are susceptible to excessive force and mass arrest at and detention after protests in the same patently impermissible manner should these unconstitutional practices not be enjoined from continuing.

453.    In fact, Plaintiff Bredder was arrested on multiple occasions at the Protests. During each arrest, he was subjected to First Amendment retaliation, excessive force, and unconstitutional conditions of confinement.

454.    The legal theories under which the named Plaintiffs seek relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the named Plaintiffs are typical of the harms suffered by the class members.

455.    The Named Plaintiffs have a strong personal and representational interests in the outcome of this action, have no conflicts of interest with members of either class, and will fairly and adequately protect the interests of each class.  Plaintiffs' interests are not antagonistic to, or in conflict with, the interests of the class as a whole.

456.    As long as the City engages in its policies, practices, and/or customs of intentionally and violently disrupting protests in violation of protections against First Amendment retaliation; tightly handcuffing protesters with flex-cuffs in a reckless manner constituting a deliberate indifference to the risk of actual physical injury; unreasonably prolonging or extending the detention of individuals arrested at protests against police brutality beyond that of otherwise

similarly situated arrestees; and detaining protesters during custodial arrests amid the ongoing COVID-19 pandemic in such a manner as to amount to an unreasonable seizure and/or unconstitutional conditions of confinement in violation of the Fourth and Fourteenth Amendments to the United States Constitution, the named Plaintiffs are and will remain at high risk of having their constitutional rights violated by Defendants.

457.    Plaintiffs are represented by Jonathan C. Moore, David B. Rankin, and Luna Droubi of the law firm Beldock, Levine & Hoffman LLP ("BLH"); Elena L. Cohen and J. Remy Green Cohen&Green P.L.L.C. ("C&G"); Gideon Orion Oliver ("Oliver"); and Wylie Stecklow PLLC ("Stecklow").

458.    BLH attorneys have litigated a number of class action lawsuits including, but not limited to: *Syed v. City of New York*, 16-cv-04789 (S.D.N.Y.); *Elsayed v. City of New York et al.*, 18-cv-10566 (S.D.N.Y.); *Floyd v. City of New York*, 08-cv-1034 (S.D.N.Y.) (currently in the remedial stages); *Daniels v. City of N.Y.*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001) ("Aided by the capable hands of Jonathan C. Moore . . ., class counsel is undoubtedly qualified and experienced to conduct this litigation."); *see also MacNamara v. City of N.Y.*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011).

459.    C&G attorneys have litigated a number of class action and police suits, including, but not limited to: *Jones v. United States Postal Service*, 20-cv-6516 (S.D.N.Y.) (nationwide voting rights class action); *Edrei v. Bratton*, 16-cv-01652 (S.D.N.Y.), *aff'd sub. nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark, precedential decision in challenge to NYPD's use of Long Range Acoustic Device ("LRAD") against Black Lives Matter protesters), *cert. denied Maguire v. Edrei*, 139 S. Ct. 2614 (2019) (with Oliver); *Gallagher v. N.Y. State. Bd. of Elections*, 20-cv-5504 (S.D.N.Y.) (New York State voting rights class action). *See also Yang v. N.Y. State*

63

*Bd. of Elections*, 20-cv-3325 (S.D.N.Y.), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).

460.    Oliver has over 16 years of experience litigating civil rights cases against the NYPD, including hundreds of cases challenging the City's policies, practices, and customs related to protest policing. Oliver has frequently co-counseled with BLH attorneys and C&G attorneys in litigation. For example, in addition to litigating other 2004 RNC-related cases, Oliver was Of Counsel to BLH attorneys at the summary judgment briefing stage of the *MacNamara* RNC 2004 class action litigation. Ever since, Oliver has always maintained a docket including at least dozens of Plaintiffs' protest-policing related cases. One such recent case was *Edrei* (with C&G).

461.    Stecklow has extensive experience litigating civil rights both in New York and elsewhere including Baltimore, Maryland: *Lomax v. O'Ree*, 24-C-16-002313 (Circuit Court, Baltimore City) and Iowa: *Cordero v. World Food Prize*, 17CV0347 (S.D.Iowa).  Stecklow has been litigating NYPD policies and practices for fifteen (15) years, including, but not limited to: *Alford v. City of New York*, 06-cv-2512 (S.D.N.Y.); *Peat v. City of New York*, 12-cv-8230 (S.D.N.Y.); *Gerskovich v. Iocco, City of New York*, 15-cv-7280 (S.D.N.Y.), *Packard v. City of New York*, 15-cv-7130 (S.D.N.Y.); *Nigro v. City of New York*, 19-cv-2369 (S.D.N.Y.); *Monahan v. City of New York*, 20-cv-2610 (S.D.N.Y.).

462.    Plaintiffs counsel's firms have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

463.    The Injunctive Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to

the class, in engaging in the aforementioned practices and failing to correct the aforementioned

unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate.

464.    The Damages Class should be certified pursuant to Rule 23(b)(3) because questions

of law or fact common to the members of the class predominate over any questions affecting only

individual class members and a class action is superior to other available methods for the fair and

efficient adjudication of the controversy. A Class-wide proceeding will generate common answers

to these questions.

**FIRST CLAIM FOR RELIEF**
**Unlawful Seizure / False Arrest**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the
Fourth and Fourteenth Amendments to the United States Constitution*

465.    Plaintiffs incorporate by reference the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

466.    Defendants had no judicial warrant authorizing then to seize any Plaintiff.

467.    Defendants seized Plaintiffs, restricting their freedom of movement, without

privilege or lawful justification.

468.    Plaintiffs were conscious of their confinements by Defendants.

469.    Plaintiffs did not consent to their confinements by Defendants.

470.    It was unreasonable for Defendants to believe that they had lawful cause to seize,

detain, or arrest Plaintiffs.

471.    Thus, Defendants did not have individualized probable cause to seize, detain, or

arrest Plaintiffs.

472.    Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea,

and/or Monahan designed and/or implemented policies and practices pursuant to which those

Defendants who ordered, effected, and otherwise participated in arresting Plaintiffs subjected Plaintiffs to unlawful seizures, false arrests, and/or searches and/or seizures of their persons and/or property.

473.     In many cases, Defendants seized Plaintiffs based on the perception that they were part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff in question based on their own, individual conduct, as opposed to the perceived "group conduct."

474.     In many cases, Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

475.     For example, with respect to Plaintiffs who were arrested in connection with perceived violations of Defendant de Blasio's Curfew Orders, or for perceived violations of New York Penal Law § 240.20(6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order), Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests, and/or ensure that each such arrested Plaintiff had the state of mind required for such arrest.

476.     With respect to Defendant de Blasio's Curfew Orders, the plain language of Defendant de Blasio's Curfew Orders required both (a) a knowing violation of the Executive Order prior to any arrest *and* (b) that any arrest could only follow a dispersal order, a meaningful opportunity to disperse, and a person's refusal to comply with the order.

477.     As pleaded elsewhere herein, Defendants enforced the Curfew Orders by arresting Plaintiffs and other protesters without first ensuring that they had been given dispersal orders,

meaningful opportunities to disperse, and refused to comply, under circumstances in which they had not ensured that arrestees had knowingly violated the Curfew Orders.

478. That enforcement was consistent with official NYPD policy.

479. For example, in a September 16, 2020 letter from NYPD Deputy Commissioner of Legal Matters Ernest F. Hart to Ida Sawyer, Acting Crisis and Conflict Director, Human Rights Watch[35], DCLM Hart stated that officers who merely "observed individuals who were not essential workers in public…[t]hat observation provided officers with probable cause to take, at a minimum, enforcement for Administrative Code § 3-108, Violating a Mayoral Executive Order, a 'B' Misdemeanor."

480. Additionally, in many cases, Defendants enforced other provisions of New York law against Plaintiffs and other perceived protesters without probable cause and/or without first having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

481. For example, with respect to Plaintiffs who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind required for such arrest.

482. By way of further example, with respect to Plaintiffs who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested Plaintiff had notice that they

---

[35] Available online at https://www.hrw.org/sites/default/files/media_2020/09/Annex%20II_0.pdf.

were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

483. In many cases, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiffs and other perceived protesters, without first having given Plaintiffs and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

484. One version of the above-described pushing/corralling/trapping tactic, in which police encircle or otherwise surround a perceived group, is commonly referred to as "kettling."

485. Beyond that, in many cases, Defendants arrested Plaintiffs for alleged offenses in connection with which New York Criminal Procedure Law § 150.20 required that Plaintiffs receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

486. However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Plaintiffs and other arrestees in flex-cuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-scale arrest processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

487.    As a result, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiffs to unreasonably long, onerous, punitive arrest processing, as well as obviously hazardous conditions of confinement given the COVID-19 pandemic.

488.    Additionally, as a result, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiffs to searches of their persons and property, as well as seizures and/or retentions of their property without Due Process.

489.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

## SECOND CLAIM FOR RELIEF
### Excessive Force

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

490.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

491.    Defendants used force against Plaintiffs that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

492.    The types and levels of force Defendants used against Plaintiffs were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

493.     In many cases, Defendants used types and levels of force against Plaintiffs and other protesters that were in contravention of, or inconsistent with, related NYPD policies and/or training.

494.     In many cases, Defendants failed to document, and/or require that fellow Defendants and/or other fellow officers document, uses of force in accordance with related NYPD policies and/or training.

495.     In many cases, Defendants failed to investigate incidents of which they were aware or should have been aware in which NYPD members used excessive force against Plaintiffs and other protesters.

496.     In many cases, failed to discipline NYPD members who used excessive force against Plaintiffs and other protesters.

497.     In many cases, Defendants used force against Plaintiffs based on their position in or proximity to a perceived group, without first having given the perceived group clearly communicated, prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

498.     In many cases, Defendants used types of force, such as by deploying pepper spray, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

499.     Additionally, Plaintiffs and others arrested at the protests that are the subject of this litigation were handcuffed with their wrists together and their hands behind their back with plastic flex-cuffs.

500.    In many cases, Plaintiffs and/or other arrestees complained about the fact that their flex-cuffs were too tight and/or causing them injury.

501.    Specifically, because they were arrested at a protest, Plaintiffs were subjected to flex-cuffing pursuant to Defendants' Protest Arrest Processing Policies, in connection with which Defendant City did not supply Defendants with an adequate numbers of cutting tools with which to loosen or remove flex-cuffs, or *any* flex-cuff pads, which are designed to prevent the very types of injuries Plaintiffs and other arrestees suffered as a result of having flex-cuffs applied to them.

502.    It was no secret to Defendants that using flex-cuffs to restrain protesters – including without providing adequate numbers of cutting tools or any protective padding – would result in injuries to protesters, of the sort that appropriate policies, training, and/or supervision would have avoided.

503.    For example, *Burley v. City of New York*, 03 Civ. 2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) was a class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, the NYPD's then-policy and practice of using plastic flex cuffs as "unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed."

504.    By way of additional example, Plaintiffs in *Kunstler v. City of New York*, 04 Civ. 1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, also raised *Monell* claims around NYPD members' use of extremely tight, plastic handcuffs.

505.    And, as a final, further example, in *MacNamara v. City of New York*, 04 Civ. 9216 (RJS)(JCF) (S.D.N.Y.), the Court certified a "Conditions of Confinement Class, comprising all

RNC arrestees who were handcuffed with plastic flex cuffs." *See MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011).

506. The DOI Report found, "When voicing those concerns to their arresting officers or other officers in the area, arrestees were told that the officers lacked the necessary equipment to remove the flex-cuffs. Arrestees therefore had to wait, oftentimes for long periods, until they got to their respective arrest processing center so that flex-cuffs could be removed."[36]

507. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

**THIRD CLAIM FOR RELIEF**
**First Amendment Infringements, Including First Amendment Retaliation**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

508. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

509. Plaintiffs hereby mount an as-applied, First Amendment-based challenges to the application of NYC Administrative Code § 3-108; PL §§ 240.20(5) and/or 240.20(6); and/or VTL § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

510. Defendants (a) retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or

---

[36] *See, e.g.,* DOI Report at 42. *See also,* AG Report at 29 ("Officers kept the [flex-cuffs] on their wrists even after they were placed in cells, which, for some, cut off their circulation or caused other injuries to their wrists, including cuts and nerve damage.").

conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in falsely arresting Plaintiffs, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, in subjecting Plaintiffs to Defendants' Protest Arrest Processing Policies, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

511. Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

512. Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

513. Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

514. Additionally, as discussed elsewhere herein, Defendants City, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of the First Amendment rights.

515. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims – including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline - with malice.

516. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment retaliation claims – including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline – in response to the perceived viewpoint and/or message expressed by Plaintiffs.

517. Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiffs in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

518. Additionally, the offenses charged against Plaintiffs, which Defendants might argue provided probable cause for Plaintiffs' arrests, were all offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with – for example, VTL § 1156(a), which involves walking along or upon a roadway when an adjacent and usable sidewalk is available – the equivalent of jaywalking, an everyday offense that Defendants all but ignore in the City.

519. Each Plaintiff suffered actual chill in that each Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

520. Additionally, in many cases, Defendants apparently permitted, acquiesced in, and/or facilitated the speech and/or other expressive conduct in which Plaintiffs were engaging, before suddenly using force and/or making arrests, without first having given reasonable notice that such force and/or arrest activity would result if Plaintiffs did not conduct themselves differently and/or disperse, as well as a meaningful opportunity to comply.

521. In addition to being retaliatory, the restrictions Plaintiffs complain of herein, which Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiffs' protected conduct that:

a. Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b. Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiffs' protected expression, including in that Plaintiffs' abilities to communicate effectively were threatened; and/or

c. Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d. Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

522. Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Plaintiffs subjected Plaintiffs to these violations of their First Amendment rights.

523. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

**FOURTH CLAIM FOR RELIEF**
**Due Process**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourteenth Amendment to the United States Constitution*

524.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

525.    Plaintiffs hereby mount an as-applied, Due Process-based challenge to the application of NYC Administrative Code § 3-108; PL §§ 240.20(5) and/or 240.20(6); and/or VTL § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

526.    As described above, Defendants enforced offenses, including the Curfew Orders and NYC Administrative Code § 3-108; PL §§ 240.20(5) and 240.20(6); and VTL § 1156(a), in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights.

527.    For example, Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

528.    For example, with respect to Plaintiffs who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally

significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind that would have been required to authorize such an arrest.

529.    By way of further example, with respect to Plaintiffs who were arrested in connection with perceived violations of P.L. § 240.20(6) (Disorderly Conduct – Failure to Disperse), Defendants failed to ensure that lawful, clearly communicated dispersal orders and meaningful opportunities to disperse were given and that Plaintiffs refused to comply with them, and/or to ensure that each such arrested Plaintiff had the state of mind that would have been required to authorize such an arrest.

530.    For example, with respect to Plaintiffs who were arrested in connection with perceived violations of the Curfew Orders, Defendants failed to ensure that lawful, clearly communicated dispersal orders and meaningful opportunities to disperse were given and that Plaintiffs refused to comply with them, and/or to ensure that each such arrested Plaintiff had the state of mind that would have been required to authorize such an arrest.

531.    By way of further example, with respect to Plaintiffs who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested Plaintiff had notice that they were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

532.    Additionally, as described above, in many cases, Defendants arrested Plaintiffs for alleged offenses in connection with which New York Criminal Procedure Law § 150.20 required that Plaintiffs receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest

contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

533.  However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Plaintiffs and other arrestees in flex-cuffs and removing them from the street to a centralized arrest processing location such as a MAPC, where Defendants subject them to large-scale arrest processing procedures and MAPP rather than issuing them summonses, and releasing them from custody, on the street.

534.  Additionally, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiffs and other arrestees to searches of their persons and property, as well as seizures and/or retentions of their property, without providing Plaintiffs and others situated with adequate pre-or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining their property.

535.  In some cases, Defendants destroyed and/or damaged property belonging to Plaintiffs and other arrestees.

536.  In other cases, Defendants seized and retained property from Plaintiffs and other arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property seized by NYPD members.

537.  In other cases, Defendants seized and retained property without providing Plaintiffs with a meaningful opportunity to retrieve it, for example because the location at which Defendants were retaining the property was closed.

538.    As a result, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiffs to flex-cuffing as well as unreasonably lengthy, onerous arrest processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, particularly given that the confinements took place around the height of the COVID-19 pandemic.

539.    Additionally, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiffs to conditions of confinement that were overcrowded, particularly in the context of the COVID-19 pandemic, and/or filthy and/or unsanitary; and that lacked appropriate access to phone calls, food, water, bathrooms soap and/or hand sanitizer, other hygienic products such as tampons, and/or other basic necessities.

540.    With particular respect to the COVID-19 pandemic, during Plaintiffs' confinements, the State of New York, and Defendant City, had advised people to comply with social distancing, to wear masks, and to engage in practices such as hand-washing; and Defendant City, as well as Defendants Shea, Monahan, and other NYPD members, enforced Executive Orders issued by Mayor de Blasio requiring people to engage in social distancing and/or mask-wearing, all on an emergency basis.

541.    However, as part of Defendants' Protest Arrest Processing Policies and MAPP, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants transported Plaintiffs to a MAPC or other centralized arrest processing location, in close, forced proximity to other arrestees and NYPD members, many of whom were not wearing masks, rendering social distancing impossible.

542. Relatedly, many Defendants and other nearby NYPD members were not wearing masks while arresting and/or using force on and/or detaining Plaintiffs.

543. Also relatedly, Defendants and other NYPD members removed masks many Plaintiffs and other arrestees who had masks at one point prior to or during their arrests or detentions.

544. Also as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiffs and other arrestees to conditions of confinement in which they were unable to wash their hands or otherwise engage in other, similar hygienic practices that the State and City were recommending for public safety.

545. Defendants knew or should have known that, as a result of subjecting Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP, they would deprive Plaintiffs and other arrestees of basic needs, including for example the need to stay safe from COVID-19, as well as unreasonable risks of serious damage to their physical and/or mental health or safety through potential exposure to COVID-19.

546. Defendants acted intentionally to impose those conditions because they subjected Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP.

547. Additionally, Defendants recklessly failed to act with reasonable care to mitigate the risks that the conditions posed even though they knew or should have known that they posed excessive risks to Plaintiffs' physical and/or mental health or safety through potential exposure to COVID-19.

548. Moreover, the risks were obvious and apparent, including based on the State and City policies and practices related to COVID-19 safety, and common sense.

549. Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiffs' property and/or detaining Plaintiffs in the conditions as described subjected Plaintiffs to these violations of their Due Process rights.

550. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

## FIFTH CLAIM FOR RELIEF
### Equal Protection and Selective Enforcement

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourteenth Amendment to the United States Constitution*

551. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

552. Plaintiffs hereby mount an as-applied, Equal Protection-based, selective enforcement challenge to the application of NYC Administrative Code § 3-108; P.L. §§ 240.20(5) and/or 240.20(6); and/or V.T.L. § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

553. Additionally, as described above, in many cases, Defendants arrested Plaintiffs for alleged offenses in connection with which C.P.L. § 150.20 required that Plaintiffs receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken

directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

554.    However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, including Defendants' large-scale arrest processing procedures and MAPP rather than issuing them summonses, and releasing them from custody, on the street.

555.    Defendants did not apply those same Protest Arrest Processing Policies to other similarly situated arrestees.

556.    Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and/or detaining and/or prosecuting Plaintiffs subjected Plaintiffs to the above-described violations of Plaintiffs' Equal Protection rights.

557.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

### SIXTH CLAIM FOR RELIEF
**Municipal Liability**

***Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)
for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth
Amendments to the United States Constitution***
On behalf of Plaintiffs against Defendant City of New York, Defendant Bill de Blasio,
Defendant Dermot Shea, and Defendant Terence Monahan

558.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

559.     All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio, Defendant Shea, and Defendant Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

## DEMANDS FOR RELIEF

**WHEREFORE**, Plaintiffs demand the following relief against the Defendants:

a.     Enter an order certifying this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure in the manner described above herein, with Plaintiffs ADAMA SOW, DAVID JAKLEVIC, ALEXANDRA DE MUCHA PINO, OSCAR RIOS, BARBARA ROSS, MATTHEW BREDDER, SABRINA ZURKUHLEN, MARIA SALAZAR, DARA PLUCHINO, and SAVITRI DURKEE as class representatives;

b.     Issue a class-wide declaratory judgment;

c.     Issue a permanent injunction enjoining Defendant City of New York and the NYPD from violently disrupting protests;

d.     Retain jurisdiction in this case until the unlawful conditions, practice, policies, acts and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

e.     Award Plaintiffs compensatory and punitive damages in amounts that are fair, just and reasonable, to be determined at trial;

f.     Award Plaintiffs, and the members of the class, reasonable attorneys' fees and costs; and

g.     Grant such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: January 21, 2021
      New York, New York

BELDOCK LEVINE & HOFFMAN LLP

By: _____
    Jonathan C. Moore
    David B. Rankin
    Luna Droubi
    Marc Arena
    Deema Azizi
    Rebecca Pattiz
    Katherine "Q" Adams (admission pending)

99 Park Avenue, PH/26th Floor
New York, New York 10016
    t: 212-490-0400
    f: 212-277-5880
    e: jmoore@blhny.com
      drankin@blhny.com
      ldroubi@blhny.com
      marena@blhny.com
      dazizi@blhny.com

GIDEON ORION OLIVER

_____
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

COHEN&GREEN P.L.L.C.

By: _____
    Elena L. Cohen
    J. Remy Green
    Jessica Massimi

1639 Centre Street, Suite 216

84

rpattiz@blhny.com
qadams@blhny.com

WYLIE STECKLOW PLLC

_____

By: Wylie Stecklow
Wylie Stecklow PLLC
231 West 96th Street
Professional Suites 2B3
NYC NY 10025
t: 212 566 8000
Ecf@wylielaw.com

Ridgewood (Queens), NY 11385
t: (929) 888-9480
f: (929) 888-9457
e: elena@femmelaw.com
   remy@femmelaw.com
   jessica@femmelaw.com