**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

SAMIRA SIERRA, AMALI SIERRA,
RICARDO NIGAGLIONI, and ALEX GUTIERREZ,
individually and on behalf of all others similarly
situated,

                      Plaintiffs,

     v.

CITY OF NEW YORK, a municipal entity; BILL DE
BLASIO, in his individual capacity; DERMOT F.
SHEA, in his individual capacity; TERENCE A.
MONAHAN, in his individual capacity; UMID
KARIMOV, in his individual capacity; ALFREDO
JEFF, in his individual capacity; DEBORA MATIAS,
in her individual capacity; and ANDRE
JEANPIERRE, in his individual capacity,

                      Defendants.

-------------------------------------------------------------------- X

No. 20 CV 10291

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.      More than half a century after law enforcement officers attacked civil rights marchers in Selma, Alabama, another peaceful march for racial equality was met with similar police violence in the Mott Haven neighborhood of the Bronx. The Mott Haven protest was one of many that followed the execution of George Floyd at the hands of Minneapolis police. The Bronx marchers were protesting vile acts of police violence against people of color and the role of police in perpetuating systemic racial inequality.

2.      In an operation that evoked the Edmund Pettus Bridge attack, NYPD officers trapped the Mott Haven protesters and attacked them, then arrested them *en masse*. Videos from the June 4th Mott Haven protest show heavily-armored phalanxes of police using batons, bicycles,

and pepper spray to assault mostly Black and Latinx people who were peacefully protesting for racial justice.

3.      This was an intentional and unconstitutional effort to suppress the protesters' message.  The Police Commissioner later said, "we had a plan which was executed nearly flawlessly in the Bronx," echoing the Mayor's acknowledgement that "what happened in Mott Haven . . . is something that the NYPD saw coming."  Nor is there doubt that the NYPD's attack on the protesters was motivated by animus toward their message.  The Police Commissioner put it bluntly when he said the anti-police message "disgusts me to my core."

4.       After the murder of George Floyd, people across the United States marched to demand that Black Lives Matter, and to denounce police violence against people of color and the role of police in maintaining systemic racial inequality.  The protests called for defunding and even abolishing the police.  The protests demanded full and equal protection of the law – the same cause that brought people into the streets of Selma in 1965 and, fifty years later into the streets of Ferguson, Missouri, and starting in late May 2020 to cities and towns across the United States, and across the world.  In places like Minneapolis, Louisville, and New York City, including the South Bronx, they were met with the police brutality they were protesting.

5.      The many protests in New York City were universally critical of the NYPD and its continued policies of targeting and victimizing people of color – echoing protests after the NYPD's unjustified killings of Ramarley Graham, Akai Gurley, Eric Garner, Delrawn Small, Sean Bell, and countless others.  The protests called for reforming and even dismantling the NYPD, and re-directing funds to needed social and civic programs in communities of color.  City officials, particularly Mayor Bill de Blasio, Police Commissioner Dermot F. Shea, and Chief of Department

Terence A. Monahan, openly expressed hostility toward their viewpoint. They moved to suppress the protests with well-orchestrated operations corralling and violently arresting the protesters.

6. The NYPD carried out one such operation against protesters who had gathered in the South Bronx on June 4, 2020. People of the South Bronx have reason to protest racially discriminatory police practices. It was in the South Bronx that Amadou Diallo was gunned down by NYPD officers, as were many others. The South Bronx is the U.S. Congressional district with the highest percentage of people of color of any district in the United States, and the NYPD's now infamous stop-and-frisk program was pervasive in the Bronx. The purpose of stop-and-frisk was, in the words of former Police Commissioner Ray Kelly, "to instill fear in [young Black and Latino] men that every time they left their homes they could be stopped by police."[1] Although stop-and-frisk was declared unconstitutional in 2013, it had been the policy for over a decade and was not easily dismantled. To this day court-ordered remedial efforts are attempting to root out the NYPD's institutionalized practice of racially-biased policing.[2]

7. Human Rights Watch published a video about the NYPD's June 4th operation in Mott Haven, which is publicly available online (https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters). The video report includes witness interviews and video footage recorded at the protest. It shows a peaceful march of protestors, predominantly people of color, exercising their First Amendment rights well-before the Mayor's 8:00 p.m. curfew. It also shows NYPD officers trapping protestors before the curfew went into effect. The officers, overseen personally by Chief of Department Monahan, refused to allow protesters to disperse and engaged in unprovoked violence before and during the arrests of the protesters.

---

[1] Donald F. Tibbs and Tryon P. Woods, *Requiem for Laquan McDonald: Policing as Punishment and Abolishing Reasonable Suspicion*, 89 Temple Law Review 763, 769 (2017) (alteration in original).

[2] Periodic updates about these efforts are posted on the "Official Website of the NYPD Monitor," http://NYPDmonitor.org.

8.     This lawsuit seeks justice for the civil rights violations against the Mott Haven protesters.  Plaintiffs seek a judgment declaring that the NYPD's Mott Haven operation, by targeting non-violent protesters who were largely people of color protesting racially biased policing, and detaining, assaulting, and arresting them, was unconstitutional.  Plaintiffs also seek compensatory and punitive damages for their injuries and the injuries of the other people illegally seized and assaulted by the police during the NYPD's Mott Haven operation.

## JURISDICTION

9.     This Court has jurisdiction over Plaintiffs' civil rights claims brought under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), (4).

10.     Plaintiffs' claim for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202; Rule 57 of the Federal Rules of Civil Procedure; and the Court's inherent equitable authority.

## VENUE

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events alleged herein were committed within this district.

## JURY DEMAND

12.     Plaintiffs demand a jury trial on each and every claim to which they are legally entitled to a jury.

## PARTIES

13.     Plaintiffs SAMIRA SIERRA, AMALI SIERRA, RICARDO NIGAGLIONI, and ALEX GUTIERREZ are citizens and residents of the State of New York and of the United States. At all relevant times, they were residents of the City of New York.  They are referred to collectively herein as "the named plaintiffs."

14.    Defendant CITY OF NEW YORK ("the City") is a municipal entity created and authorized under the laws of the State of New York.

15.    The City is authorized by law to maintain a police department and does maintain the New York City Police Department (referred to herein as "the NYPD"). The NYPD acts as the City's agent and the City assumes the risks incidental to the maintenance of a police department and the employment of police officers.

16.    Defendant BILL DE BLASIO was, at all times relevant to this Complaint, the Mayor of the City of New York. He is sued in his individual capacity.

17.    Defendant DERMOT F. SHEA was, at all times relevant to this Complaint, the Police Commissioner for the NYPD. He is sued in his individual capacity.

18.    Defendant TERENCE A. MONAHAN was, at all times relevant to this Complaint, the Chief of Department for the NYPD. He is sued in his individual capacity.

19.    Defendants DE BLASIO, SHEA, and MONAHAN are referred to collectively as "the City Officials."

20.    Defendants UMID KARIMOV, ALFREDO JEFF, DEBORA MATIAS, and ANDRE JEANPIERRE were, at all times relevant to this Complaint, Police Officers with the NYPD. They are sued in their individual capacities. They are referred to collectively as "the individual officers."

21.    At all times relevant herein, the City Officials and individual officers were employed by the City and acted under color of law in the course and scope of their duties and authority as officers, agents, servants, and employees of the NYPD and the City.

22.    At all relevant times, the City Officials and individual officers violated clearly established rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution of which reasonable officials in their respective circumstances would have known.

23.    At all times relevant to this Complaint, the City Officials were high-level officials of the City of New York who had authority to establish policy for the City and the NYPD.

24.    Section 3 of the New York City Charter provides: "The mayor shall be the chief executive officer of the city."

25.    Section 8 of the City Charter provides that the Mayor "shall exercise all the powers vested in the city" and "shall be responsible for the effectiveness and integrity of city government operations and shall establish and maintain such policies and procedures as are necessary and appropriate to accomplish this responsibility."

26.    Section 431 of the City Charter provides: "There shall be a police department the head of which shall be the police commissioner . . . ."

27.    Section 431 further provides that the Police Commissioner "shall be appointed by the mayor" and "may be removed from office" by the Mayor.

28.    Section 434 of the City Charter provides that the Police Commissioner "shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department."

29.    Section 434 further provides that the Police Commissioner is the "chief executive officer of the police force" and "shall be chargeable with and responsible for the execution of all laws and the rules and regulations of the department."

30. The NYPD Chief of Department is the highest-ranking uniformed officer in the NYPD. All uniformed members of the NYPD are required to follow orders issued by the Chief of Department.

31. The NYPD Chief of Department oversees and supervises all NYPD operations, including patrol operations.

32. The City of New York is liable under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), when the policies, practices, and customs established and/or implemented by the City Officials are the moving force of a constitutional violation.

## STATEMENT OF FACTS

### I. The June 4th Mott Haven Protest

33. On June 4, 2020, at approximately 6:00 p.m., people gathered at The Hub in the South Bronx to participate in the first large demonstration in that borough since police killed George Floyd.

34. The Hub is one of the "most dynamic commercial centers" in the Bronx and has been called "the Times Square of the Bronx."[3] The description is apt for the geographic configuration of The Hub, which is formed by the intersection of East 149th Street and Willis, Melrose, and Third Avenues.

35. The purpose of the June 4th rally was to demand racial justice and accountability for police violence against people of color. The protesters chanted "I can't breathe" – the last words of George Floyd and of Eric Garner, who was killed by an NYPD officer – and other

---

[3] Alison Gregor, "People, Shops and Roads Converge Here," N.Y. Times (June 8, 2012), *available at* https://www.nytimes.com/2012/06/10/realestate/the-hub-the-bronx-living-in-people-shops-and-roads-converge-here.html.

messages critical of the NYPD. The protesters left The Hub and marched through the Mott Haven neighborhood.

## II.   The NYPD's Operation to Corral and Attack the June 4th Mott Haven Marchers

36.   The NYPD orchestrated an operation to intimidate, assault, and arrest the Mott Haven protesters in order to suppress their message.

37.   Defendant de Blasio stated publicly that he "approved the broad strategies and sometimes very specific choices" related to the NYPD's tactics carried out in Mott Haven on June 4 and earlier.

38.   Defendant Monahan was personally present and directed the NYPD's operation in Mott Haven.

39.   Defendants' plan for the June 4th Mott Haven protest was to instill fear in the protesters and others who might join them in further non-violent protests for racial justice and police reform.

40.   At The Hub, NYPD officers on bicycles rode around the protesters in formation and chanted "Hoo-rah, hoo-rah" in unison.

41.   As protesters began peacefully marching down Third Avenue, NYPD officers accompanied them and followed them the entire time.

42.   The march continued through the grounds of the Patterson Houses, a public housing project whose residents are primarily people of color. Residents voiced their support for the protesters' message: some leaned out their windows banging pots and pans.

43.   The march continued peacefully south on Willis Avenue, still accompanied by police. At various times, protesters chanted slogans expressing their anger over the conduct of the NYPD in their community.

44.     At 135th Street and Willis Avenue, the NYPD formed a line of officers and directed the protesters onto East 136th Street, toward Brook Avenue.  The protesters followed the police instructions.

45.     There were no instances of violence by protesters against any police officer, or anyone else, and the protesters were cooperative with police directions.

46.     As the group of protesters proceeded down East 136th Street, NYPD officers blocked the Brook Avenue end of the block.

47.     A squad of bicycle-mounted officers road in to join those officers and used their bicycles as a barricade.

48.     Meanwhile, another squad of officers moved in behind the protesters from the Willis Avenue end of the block, completely encircling and trapping them in a police maneuver known as "kettling."

49.     From that point on, protesters were not permitted to leave and hundreds of people were seized and arrested.

50.     It was well before 8:00 p.m., and the curfew was not yet in effect.

51.     At no time – from when the protesters gathered at The Hub until they were kettled on East 136th Street – did any NYPD officer order the protesters to disperse or instruct them to leave the roadway where they marched.  On the contrary, the police escorted the protesters on the entire march from The Hub to East 136th Street.

52.     As the protesters were held in the kettle, they asked NYPD officers to allow them to leave, and chanted "Let us go, let us go."

53.     The NYPD did not permit protesters to leave the kettle.

54.     With the protesters trapped, the NYPD launched the next phase of its plan.

55.     The phalanx of officers pressed in, pushing the protesters tightly together.

56.     Police officers with batons and shields struck people at the edge of the encircled group, thrust raised bicycles into trapped protesters, and indiscriminately sprayed them with pepper spray.

57.     In some instances, officers pulled down face masks and pulled up face shields to pepper spray protesters directly in the face.

58.     The protesters had committed no acts of violence or resistance that would justify this excessive and unreasonable use of force.

59.     Many protesters were left injured and bleeding.  Some protesters fainted, or lost consciousness and went into convulsions.

60.     Defendant Monahan personally ordered the arrest of one of the organizers and leaders of the protest who was committing no offense and was engaged in protected speech at the very moment he ordered officers to arrest her.  Volunteer medics and legal observers were arrested.

61.     In the next phase of the NYPD's operation, officers began to systematically arrest the kettled protesters.

62.     Many protesters, who had done nothing to the officers and were not resisting arrest, were violently thrown to the ground before they were handcuffed.

63.     Officers pulled protesters out of the kettle and used unnecessary force to bring their arms behind them.  Officers systematically applied zip-tie cuffs that were cinched tighter than necessary.

64.     Many protesters complained that their zip-tie cuffs were too tight and were causing their hands to become numb, and many protesters' hands turned purple.

65.     None of the people arrested on June 4th at the Mott Haven march received a summons at the scene.

66.     Instead, the NYPD held protesters in overly tight zip-tie cuffs and transported them to an arrest processing facility.

67.     Throughout the NYPD's June 4th operation, most of the officers did not wear face masks or face shields to prevent the transmission of the coronavirus.

68.     On June 4, 2020, New York City had suffered more than 280,000 reported cases of COVID-19, and over 1,000 new cases were reported that day.

69.     Unlike the police, most of the protesters *did* wear masks or face shields, but in many instances, officers forcibly removed protesters' masks and face shields, further endangering their safety.

70.      Once arrested, people were unable to re-position their masks to cover their noses and mouths while they were rear-cuffed, and as a result, they were transported to the arrest processing facilities in enclosed vehicles without proper face coverings.  Protesters complained that their faces were left uncovered, but nothing was done to assist them.

71.     The protesters spent from 6 to 20 hours in custody; some were held longer.

72.     During that time, defendant Monahan went to the NYPD arrest-processing facility in Queens.

73.     Protesters detained at the Queens facility asked defendant Monahan to wear a mask, but he refused to do so.

74.     At the Queens facility, defendant Monahan instructed officers to stop issuing summonses and instead, to issue all remaining protesters Desk Appearance Tickets, thus prolonging their detention.

75.     In September 2020, the Bronx District Attorney's Office filed a motion to dismiss all charges against 312 people arrested at the Mott Haven protest on June 4, 2020.

**III.     Experiences of the Named Plaintiffs**

    **A.     Samira Sierra**

76.     Plaintiff Samira Sierra is a Black Dominican woman who is a lifelong resident of the Bronx.  On June 4, 2020, she was 28 years old.  She graduated from the State University of New York at Albany in 2013, and entered the Peace Corps in 2014 where she served in Madagascar for two years.  At the time of her arrest in Mott Haven she was working in business development in the technology sector.

77.     On the afternoon of June 4, 2020, plaintiff Samira Sierra and her sister, plaintiff Amali Sierra, attended the protest at The Hub.  Because of the ongoing COVID epidemic, she and her sister were wearing face masks.

78.     At some point, plaintiff Samira Sierra saw protesters leave The Hub and begin to march down the roadway of Third Avenue.  She and her sister followed them and participated in the roadway march, protesting with the group.  When she arrived on East 136th Street, she and her sister were enclosed in the NYPD kettle.

79.     Plaintiff Samira Sierra asked police officers that she be permitted to leave the encircled group, but was told she could not.

80.     Plaintiff Samira Sierra saw the police using pepper spray on protesters and could smell and feel the pepper spray in the air and on her body and clothes.  She was concerned that the pepper spray could have a bad effect on people's respiratory systems during the COVID-19 epidemic.

81.     After cuffing people closer to the edge of the group, officers got to plaintiff Samira Sierra and her sister.  As plaintiff Amali Sierra was putting a bottle of water in her backpack, she was seized by a group of officers who threw her to the ground.  Both plaintiff Samira Sierra and her sister told the officers that plaintiff Amali Sierra had multiple sclerosis and was disabled.  A police officer said to plaintiff Samira Sierra, in sum and substance, "why would your sister be out here protesting if she's disabled?"

82.     Five or six officers seized plaintiff Samira Sierra and threw her to the ground, causing an injury on her left arm that, as of the date of filing of this Complaint, is still a visible scar.  She was put in zip-tie cuffs that were excessively tight.  She and her sister sat on the pavement, with their hands zip-tie cuffed behind their backs, for a number of hours.

83.     Police Officer Umid Karimov took plaintiff Samira Sierra from her place on the ground to a bus, and when she complained to him that the zip-tie cuffs were too tight, he did nothing to relieve her pain.  She stood in a line of similarly-escorted protesters waiting to be placed on the bus.

84.     Police Officer Alfredo Jeff approached plaintiff Samira Sierra and told her that he was assigned to be her arresting officer.  She and her sister were taken on the bus to an arrest processing location in Queens.

85.     Plaintiff Samira Sierra was placed in a holding cell with her sister and many other women.  Although many of the women in the holding cell requested food and water, none was provided.  There was no toilet paper, and although many women asked for toilet paper, and some women asked for sanitary supplies, none were provided.

86.     Police Officer Alfredo Jeff issued a pink summons to plaintiff Samira Sierra charging her with Violation of Mayor's Executive Order, and she was released from detention during the morning of June 5, 2020.

87.     All charges were dismissed against plaintiff Samira Sierra.

**B.     Amali Sierra**

88.     Plaintiff Amali Sierra is an Afro-Dominican woman who is a lifelong resident of the Bronx.  On June 4, 2020, she was 22 years old.  She graduated from the State University of New York at Albany in 2019; and has pursued a career in fine arts museum curation.  She has multiple sclerosis.

89.     On June 4, 2020, plaintiff Amali Sierra attended the protest at The Hub with her sister, plaintiff Samira Sierra.  She and her sister left The Hub with the other protesters, and she was kettled with the group of protesters on East 136th Street.

90.     Plaintiff Amali Sierra could smell and feel the pepper spray the police were spraying on the kettled protesters, and was concerned that the pepper spray could have a bad effect on people's respiratory systems during the COVID-19 epidemic.

91.     After cuffing people closer to the edge of the group, officers got to plaintiff Amali Sierra and her sister.  As she was putting a bottle of water in her backpack, she was seized by a group of officers and slammed to the ground.  She was brought to her feet and zip-tie cuffed.  The cuffing and violent take-down left bruises on her wrists and arms that were visible for approximately two weeks.

92.     As the officers cuffed plaintiff Amali Sierra, both she and her sister told the officers that she had multiple sclerosis and was disabled.  An officer stated, in sum and substance, "what are you doing out here protesting if you are disabled?"

14

93.     Plaintiff Amali Sierra and her sister were seated on the pavement, with their hands zip-tie cuffed behind their backs, for a number of hours.  She was escorted by a police officer to a bus, where she stood in a line of similarly-escorted protesters waiting to be placed on the bus. Police Officer Alfredo Jeff approached her, and said that he was assigned to be her arresting officer.  She and her sister were taken on the bus to an arrest processing location in Queens.

94.     Police Officer Alfredo Jeff issued a pink summons to plaintiff Amali Sierra charging her with Violation of Mayor's Executive Order, and she was released from detention during the morning of June 5, 2020.

95.     All charges were dismissed against plaintiff Amali Sierra.

**C.     Ricardo Nigaglioni**

96.     Plaintiff Ricardo Nigaglioni is a Black-Latino man who has been a lifelong resident of the Bronx.  On June 4, 2020, he was 30 years old.  He is an R&B and hip-hop singer-songwriter, and is also employed as a teaching artist by various non-profit organizations.

97.     On June 4, 2020, plaintiff Nigaglioni went to the protest at The Hub with plaintiff Gutierrez.  He left The Hub with the other protesters, and was kettled with the group on East 136th Street.  He was wearing a face shield and face mask to protect himself and others from the coronavirus.

98.     Plaintiff Nigaglioni wanted to leave before the 8:00 p.m. curfew, and asked police officers to permit him to do so, but they refused.  A police officer lifted his face shield, pulled down his face mask, and pepper sprayed him in the face, blinding him.  Plaintiff Gutierrez attempted to assist and guide him.  When an officer agreed to their request to leave, they attempted to do so, but plaintiff Nigaglioni was immediately tackled and placed in zip-tie cuffs, and then taken to the middle of the street, where he was seated on the pavement.

15

99.     Plaintiff Nigaglioni experienced pain and irritation in his eyes for approximately six weeks to two months.  He experienced pain in his wrists from tight zip-tie cuffs, which marked his skin and has caused intermittent weakness and discomfort in his wrists when he plays instruments, uses a computer, and participates in other similar activities.

100.    Plaintiff Nigaglioni was also concerned that the pepper spray could have a bad effect on his and others' respiratory systems during the COVID-19 epidemic.

101.    Plaintiff Nigaglioni remained on the ground for a number of hours, and was then escorted to a bus which took him to an arrest processing facility in Queens.  He was placed in a holding cell with many other men.  Although many of the men in the holding cell requested food and water, none was provided.  There was no toilet paper, and although the prisoners requested toilet paper, it was not provided.  His face mask and shield were no longer on his person when he was placed in the holding cell.

102.    Police Officer Debora Matias issued a pink summons to plaintiff Nigaglioni charging him with violation of the curfew, and he was released from detention the morning of June 5, 2020.

103.    All charges were dismissed against plaintiff Nigaglioni.

**D.    Alex Gutierrez**

104.    Plaintiff Alex Gutierrez is an Afro-Latino man who has been a lifelong resident of the Bronx.  On June 4, 2020, he was 29 years old.  He has been an employee of the New York City Department of Education for over ten years, teaching Physical Education to special needs children and coaching baseball, basketball and football.  He is also employed as a coach and teaching artist by various non-profit organizations.

105.    On June 4, 2020, plaintiff Gutierrez went to the protest at The Hub with plaintiff Nigaglioni. He left The Hub with the other protesters, and was kettled with the group of protesters on East 136th Street. He was wearing a face shield and face mask to protect himself and others from the coronavirus.

106.    Plaintiff Gutierrez wanted to leave before the 8:00 p.m. curfew, and asked police officers to permit him to do so, but they refused. He saw plaintiff Nigaglioni get pepper sprayed after his face shield had been lifted and his face mask pulled down.

107.    Plaintiff Gutierrez pleaded with officers to permit him to escort plaintiff Nigaglioni – who was complaining that he could not see -- out of the kettle. As he was guiding plaintiff Nigaglioni by grasping Nigaglioni's arm with his hand, a police officer struck him with a baton on his arm. Pepper spray from more than one police source got into his eyes. He was concerned that the pepper spray could have a bad effect on his and others' respiratory systems during the COVID-19 epidemic.

108.    Plaintiff Gutierrez was forced to the ground, and then taken to the middle of the street. He saw a young woman lose consciousness. He experienced pain in his wrists from tight zip-tie cuffs which cut into his skin, and continues to experience intermittent pain.

109.    Plaintiff Gutierrez remained on the ground for a number of hours, and was then escorted to a bus which took him to an arrest processing facility in Queens. When plaintiff Gutierrez arrived, he was required to stand in a line outdoors in the rain for hours before being taken into the facility. He was placed in a holding cell with many other men. There was no toilet paper, and although the prisoners requested toilet paper, it was not provided.

110.    On June 5, 2020, at approximately 4:00 p.m., Police Officer Andre Jeanpierre issued a Desk Appearance Ticket to plaintiff Gutierrez, and he was released.

111.    The Bronx District Attorney declined to prosecute the charges against plaintiff Gutierrez.

**IV.    The NYPD's Violent Attack on Protesters Critical of the NYPD and Police Practices Targeting Communities of Color.**

112.    The NYPD's June 4th operation in Mott Haven was not unique.

113.    On June 3, 2020, the NYPD had carried out a similar operation in Brooklyn: NYPD officers surrounded non-violent protesters who were critical of the NYPD and its history of racially biased policing; and as they later did in Mott Haven, NYPD officers violently arrested protesters in retaliation for their exercise of free speech.

114.    The circumstances of the NYPD's June 3rd operation in Brooklyn are described in detail in another federal lawsuit filed on July 15, 2020, *Gelbard* et al. *v. City of New York* et al., No. 20 Civ. 3163 (E.D.N.Y.).

115.    The NYPD's June 3rd operation in Brooklyn and the June 4th operation in Mott Haven were similarly violent toward the protesters.

116.    As summarized in the *Gelbard* Complaint:

> The NYPD's brutality toward Plaintiffs is neither accidental nor unique. It is a product of the NYPD's deliberate plan to surround peaceful protesters, charge them with batons, and violently assault them. . . . While the violence inflicted by the NYPD has no justification, it has a clear purpose: to assert police dominance, discourage further protests, and punish expression that the police perceive to be hostile and threatening to their interests.

*Gelbard* Complaint ¶¶ 5, 12.

117.    As described in the *Gelbard* Complaint, the NYPD carried out no less than six other operations between May 29th and June 4th that involved the same tactics deployed during the Mott Haven operation on June 4th, that is, surrounding protesters critical of the NYPD and police

practices that target communities of color, and violently assaulting and arresting protesters. *Gelbard* Complaint ¶¶ 51-75.

118.    Another federal lawsuit, *Payne* et al. *v. de Blasio* et al. No. 20-cv-08924 (S.D.N.Y.), filed by the New York Civil Liberties Union and The Legal Aid Society on October 26, 2020, describes these same NYPD operations and others with the same general tactics as those deployed on June 4th in Mott Haven.  *Payne* Complaint ¶¶ 35-60.

119.    The *Payne* lawsuit states:

> Protesters repeatedly were met with the very pattern of police violence they marched to end. The Mayor of New York and the NYPD's leadership condoned and even promoted that violence. . . . These attacks . . . were undertaken in retaliation for the protesters' message — calling for greater police accountability, a reallocation of funding from away from police departments and into Black and Latinx communities, the end of police brutality, and a recognition that Black Lives Matter.

*Payne* Complaint ¶¶ 1, 3.

## V.    Public Statements by the City Officials Expressing Hostility Toward the Protesters' Message and Support for Unjustified Police Violence Against the Protesters.

120.    In the days leading up to the NYPD's June 4th Mott Haven operation, the City Officials, and other high-level officials in the NYPD, made public statements that were hostile toward the message of the protesters – to defund or abolish the police, and end racially-biased law enforcement practices – and supported the violent response by police officers to the protests.

121.    On June 2, 2020, defendant Chief Monahan publicly made disparaging comments about the message of many protesters to defund or abolish the police.

122.    Before he was promoted to Chief of Department, defendant Monahan served as the Deputy Chief of Department.  In that position, he orchestrated an NYPD operation to kettle a large group of peaceful protesters during the 2004 protests of the Republican National Convention in New York City, and then ordered their arrests.  Then-District Judge Richard Sullivan, now a

Circuit Court Judge of the Second Circuit Court of Appeals, concluded that defendant Monahan's actions were unconstitutional.[4]

123.    On May 30, 2020, in response to a video of an NYPD SUV driving into a crowd of peaceful protesters, defendant Mayor de Blasio said publicly, "I do believe the NYPD has acted appropriately."

124.    A video was widely circulated – and viewed millions of times – of an NYPD officer displaying a "white power" symbol at that same protest.

125.    There was no question what the officer's symbol meant.  NBC News said it was "not publishing or linking to the video to avoid providing a platform to apparent expressions of hate or white supremacy."[5]

126.    While the NYPD said it would investigate the incident, none of the City Officials publicly condemned the officer's conduct.

127.    At a press conference on June 4, 2020, the same day as the NYPD's operation in Mott Haven, defendant Commissioner Shea laid bare his opinion of the message carried by protesters like those in Mott Haven: "You look at the anti-police rhetoric, it disgusts me to my core."

128.    Defendant Mayor de Blasio also spoke at a press conference on June 4, 2020, and claimed, incredibly, that he had not seen any of the many widely-circulated videos of police violence against protesters in Brooklyn on June 3rd.

---

[4] *See Dinler v. City of New York*, No. 04 Civ. 7921 (RJS) (JCF), 2012 U.S. Dist. LEXIS 141851, at *27-39 (S.D.N.Y. Sept. 30, 2012).
[5] Janelle Griffith and Matteo Moschella, "NYPD officer appears to make white power sign at protest, prompting probe," NBC News (June 4, 2020), https://www.nbcnews.com/news/us-news/nypd-officer-appears-make-white-power-sign-protest-prompting-probe-n1224141.

129.     Defendant Mayor de Blasio praised the NYPD's response to the protests and did not disavow the NYPD's use of violence against protesters.

130.     During a June 5, 2020, press conference the day after the NYPD's operation in Mott Haven, defendant Police Commissioner Shea praised the operation and said it was "executed nearly flawlessly."

131.     Defendant Mayor de Blasio said at the June 5th press conference that "observers for City Hall" were at the NYPD's Mott Haven operation, and they reported to the Mayor what they observed.

132.     Defendants de Blasio and Shea have made disparaging public statements about the June 4th Mott Haven protest, claiming that it was intended "to cause mayhem," and have attempted to justify the NYPD's actions with false claims that "people appeared at the protest with weapons and gasoline."

133.     The City Officials and other high-level officials in the NYPD have made other public statements critical of the message of police reform and racial equality in policing.

**CLASS ACTION ALLEGATIONS**

134.     Plaintiffs seek to represent a certified class pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure consisting of all persons who were arrested at the June 4, 2020 Mott Haven protest.

135.     The members of the class are so numerous as to render joinder impracticable.

136.     Upon information and belief, more than three hundred people were seized and arrested on June 4, 2020 at the Mott Haven protest and they are all members of the proposed class.

137.    Upon information and belief, many class members who had their rights violated by the City's unconstitutional policies and practices have not pursued individual claims due to the difficulty of pursuing litigation and fear of retaliation by law enforcement.

138.    The class members' claims share a number of common questions of law and fact, including, but not limited to:

a.    Whether the June 4th Mott Haven protesters were arrested in retaliation for their protected First Amendment speech;

b.    Whether the defendants adopted a policy and/or implemented a practice or custom of arresting the June 4th Mott Haven protesters in retaliation for their protected First Amendment speech;

c.    Whether the June 4th Mott Haven protesters were arrested without probable cause in violation of the Fourth Amendment;

d.    Whether the defendants adopted a policy and/or implemented a practice or custom of arresting the June 4th Mott Haven protesters without probable cause in violation of the Fourth Amendment;

e.    Whether the defendants used excessive force against the June 4th Mott Haven protesters in violation of the Fourth Amendment;

f.    Whether the defendants adopted a policy and/or implemented a practice or custom of using excessive force against the June 4th Mott Haven protesters in violation of the Fourth Amendment;

g.    Whether the June 4th Mott Haven protesters were targeted for law enforcement action on account of their advocacy for racial equality in violation of the Fourteenth Amendment; and

h.    Whether the defendants adopted a policy and/or implemented a practice or custom of targeting the June 4th Mott Haven protesters for law enforcement action on account of their advocacy for racial equality in violation of the Fourteenth Amendment.

139.    The named Plaintiffs' claims are typical of those of the class.  Like the other members of the class, the named Plaintiffs were protesters who were seized and arrested on June 4, 2020, as part of the NYPD's operation in Mott Haven.

140. The legal theories under which Plaintiffs seek declaratory relief are the same or similar to those on which all members of the class will rely, and the harms suffered by Plaintiffs are typical of the harms suffered by the class members.

141. Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the plaintiff class, and will fairly and adequately protect the interests of the class.

142. Plaintiffs are represented by Michael L. Spiegel, Lance A. Clarke, Joshua S. Moskovitz, and Jason Clark. Plaintiffs' counsel are experienced attorneys who have more than 60 years of combined litigation experience.

143. Mr. Moskovitz and Mr. Spiegel have litigated hundreds of § 1983 actions in federal court. Mr. Moskovitz has appeared as class counsel in other class action lawsuits, including a lawsuit concerning the City's response to protests surrounding the 2004 Republican National Convention, and Mr. Spiegel represented hundreds of protesters in the same Consolidated RNC Litigation. Mr. Spiegel is also counsel in a pending putative class action in the EDNY concerning the NYPD.

144. Mr. Clarke and Mr. Clark are partners with the law firm Hamilton Clarke LLP. They are veteran litigators with extensive trial experience.

145. Plaintiffs' counsel have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

146. A damages class should be certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to class members predominate over

any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

147. A declaratory class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory relief appropriate.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 (First Amendment) Against All Defendants**

148. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

149. In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, to deprive plaintiffs of the rights protected by the First Amendment to the United States Constitution by directing the plaintiffs to be targeted for law enforcement action in retaliation for their free speech.

150. As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

151. The unlawful conduct of the City, the City Officials, and the individual officers was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 (Fourth Amendment) Against All Defendants**

152. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

24

153. In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, to deprive plaintiffs of the rights protected by the Fourth Amendment to the United States Constitution.

154. As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

155. The unlawful conduct of the City, the City Officials, and the individual officers was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 (Fourteenth Amendment) Against All Defendants

156. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

157. In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, and deprived plaintiffs of the rights protected by the Fourteenth Amendment to the United States Constitution.

158. As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

159. The unlawful conduct of the City, the City Officials, and the individual officers was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**WHEREFORE**, Plaintiffs, on behalf of themselves and other members of the class they seek to represent, respectfully request that this Court:

      a.     enter an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, for the class described herein with the named plaintiffs as class representatives;

      b.     enter a judgment declaring the defendants' conduct and policies, practices, and/or customs of retaliating against peaceful protesters out of hostility toward their message, arresting protesters without probable cause, using excessive force against the protesters, and targeting protesters for law enforcement action because of their advocacy for racial justice and equality, to be unconstitutional;

      c.     award Plaintiffs, and the members of the class they seek to represent, compensatory damages in an amount that is fair and reasonable, to be determined at trial;

      d.     award Plaintiffs, and the members of the class they seek to represent, punitive damages against the City Officials in an amount to be determined at trial;

      e.     award Plaintiffs, and the members of the class they seek to represent, reasonable attorneys' fees and costs, and interest; and

      f.     grant such other and further relief as this Court may deem appropriate and equitable, including declaratory relief as may be required in the interests of justice.

Dated: New York, New York
      December 7, 2020


_____s/_____

Joshua S. Moskovitz
233 Broadway, Suite 2220
New York, New York 10279
(212) 380-7040
josh@moskovitzlaw.com

_____s/_____

Lance A. Clarke
Jason Clark
HAMILTON CLARKE, LLP
48 Wall Street, Suite 1100
New York, NY 10005
(646) 603-0522
lc@hamiltonclarkellp.com
jc@hamiltonclarkellp.com

_____s/_____

Michael L. Spiegel
11 Park Place, Suite 914
New York, New York 10007
(212) 587-8558
mikespieg@aol.com