UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHARLES HENRY WOOD,

                Plaintiff,

    -against-

CITY OF NEW YORK; Mayor BILL de
BLASIO; NYPD Commissioner DERMOT
SHEA; NYPD Chief of Department TERENCE
MONAHAN; NYPD Police Officer ISMAEL
HERNANDEZ CARPIO (Shield #19759) and
NYPD Members of the Service JOHN and
JANE DOES #1-10,

                Defendants.

No. 20-cv-10541

**COMPLAINT AND
JURY DEMAND**

---

## PRELIMINARY STATEMENT

1.     When peaceful protesters took to the streets of New York City after the murder of George Floyd in the summer of 2020, the NYPD sought to suppress the protests with an organized campaign of police brutality.

2.     A peaceful protest in Mott Haven on June 4, 2020 stands as one of the most egregious examples of the NYPD's excessive response.

3.     It also illustrates the direct responsibility that the leaders of the City and the NYPD bear for the NYPD's conduct.

4.     Before curfew went into effect for the evening, police in riot gear surrounded peaceful protesters and did not give them an opportunity to disperse.

5.     The police then charged the protesters without warning; attacked them indiscriminately with shoves, blows, and baton strikes; handcuffed them with extremely

tight plastic zip ties; and detained them overnight in crowded and unsanitary conditions during the COVID-19 pandemic.

6.     The NYPD's highest-ranking uniformed officer, Chief of Department Terence Monahan, was present at the protest and personally oversaw and directed the NYPD's response.

7.     Police Commissioner Dermot Shea said that the NYPD executed its planned response to the Mott Haven protest "nearly flawlessly."

8.     Mayor Bill de Blasio explained that the protest was "something the NYPD saw coming" and suggested that "observers for City Hall" who were present at the scene updated him on events as they unfolded.

9.     This deliberate campaign of brutality, orchestrated and sanctioned at the highest levels of City government, was unlawful and had no justification.

10.     There was no threat, let alone an imminent one, to the police.  The police were not in danger.  The police *were* the danger.

11.     Plaintiff Henry Wood was one of the NYPD's many victims in Mott Haven on June 4, 2020.

12.     Because Mr. Wood demonstrated peacefully in support of a cause he believed in, the NYPD struck him with a baton, threw him to the ground, kneed him in the back, tied his wrists so tightly that his hand swelled up like a baseball, and kept him overnight without food or water in a crowded cage.

13.     This brutal repression of core political speech offends democratic values and violates the United States Constitution.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

15.     Venue lies in the Southern District of New York under 28 U.S.C.
§ 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims
occurred in the Bronx.

## PARTIES

16.     Plaintiff Charles Henry Wood, who goes by Henry, is a 31-year-old man
who resides in Queens.

17.     Defendant City of New York is a municipal corporation organized under
the laws of New York with its principal place of business in Manhattan.

18.     Defendant Bill de Blasio is the Mayor of the City of New York, whose
workplace is at City Hall in Manhattan.

19.     Defendant Dermot Shea is the Commissioner of the NYPD, a civilian
position, whose workplace is at One Police Plaza in Manhattan.

20.     Defendant Terence Monahan is the Chief of Department of the NYPD, the
department's highest ranking uniformed member of the service, whose workplace is at
One Police Plaza in Manhattan.

21.     Defendant Police Officer Ismael Hernandez Carpio (Shield #19759) is an
NYPD police officer.

22.     Defendants John and Jane Does #1-10 are NYPD uniformed members of
the service whose identities are unknown at this time.

23.     Defendants de Blasio, Shea, Monahan are hereinafter referred to as the
"Supervisory Defendants."

24.     Defendants Hernandez Carpio and John and Jane Does #1-10 are
hereinafter referred to as the "Individual Defendants."

25.     The Supervisory Defendants and the Individual Defendants are sued in their individual capacities.

## JURY DEMAND

26.     Plaintiff demands a jury trial.

## FACTS

### *New Yorkers Take to the Streets to Express Their Outrage at Police Brutality, and the NYPD Responds with Police Brutality*

27.     On May 25, 2020, four Minneapolis police officers murdered George Floyd.  Derek Chauvin held his knee on Mr. Floyd's neck for 8 minutes and 46 seconds as Mr. Floyd suffocated.

28.     Outraged by Mr. Floyd's murder, the recent killings of other Black Americans by police, and a long history of systemic police racism and brutality, protesters took to the streets across the country, including in New York City.

29.     Widespread protests began in New York City on May 29 and continued periodically through the summer of 2020.

30.     The overwhelming majority of protests were entirely peaceful.

31.     In the first few days of protests, some isolated and much-publicized instances of theft and violence also occurred.

32.     The NYPD began using excessive and indiscriminate force against peaceful protesters from the beginning.  By way of illustration and example:

33.     On May 29, Dounya Zayer was standing peacefully on the sidewalk filming police activity during a protest in Brooklyn.

34.     NYPD Officer Vincent D'Andraia called her a "stupid fucking bitch" and forcefully shoved her to the ground, leading to serious injuries requiring hospitalization.

35.    Dozens of NYPD personnel walked by as the violence occurred happened and did nothing to stop Officer D'Andraia or aid Ms. Zayer.

36.    On May 30, a peaceful protester in Queens was standing in front of police with his hands up, wearing a mask in compliance with public health guidance.

37.    For no reason, an NYPD officer pulled down his mask and sprayed him point-blank with pepper spray.

38.    On May 30, New York State Senator Zellnor Myrie and New York State Assemblywoman Diana Richardson were pepper sprayed while peacefully protesting outside the Barclays Center in Downtown Brooklyn.

39.    Sen. Myrie was, at the time, wearing a neon yellow shirt identifying himself and his office.

40.    At approximately 7:00 p.m. on June 1, a group of peaceful protesters walked in front of a line of police cars on a quiet block of Dean Street in Crown Heights.

41.    NYPD members of the service said of the protesters, over the police scanner, "Run them over" and "Shoot those motherfuckers."

42.    Another member of the service said, "Don't put that over the air."

### *The NYPD Employs a Policy of Surrounding, Charging, and Assaulting Peaceful Protesters*

43.    Such violence was not accidental.  It was a policy choice.[1]

_____

[1]    Additional facts concerning the NYPD's policies, practices, and customs in responding to the 2020 George Floyd / Black Lives Matter protests are set forth in the Complaint (Dkt. #1) in *Payne et al. v. de Blasio et al.*, No. 1:20-CV-8924 (S.D.N.Y. Oct. 26, 2020), which Plaintiff hereby incorporates by reference into these pleadings.

44.     At peaceful George Floyd / Black Lives Matter protests throughout the City during the summer of 2020, the NYPD employed a deliberate policy of surrounding, charging, and indiscriminately assaulting protesters.[2]

45.     On **May 29** at around 7:00 pm, a group of protesters peacefully crossed from Manhattan to the **foot of the Brooklyn Bridge** in Brooklyn.

46.     A group of hundreds of NYPD personnel in riot gear stopped the protesters there.

47.     The NYPD charged the protesters without warning, indiscriminately shoved peaceful protesters to the ground, and struck them with batons, including from behind.

48.     On **May 29** at around 9:20 p.m. in the vicinity of **608 Pacific Street, Brooklyn**, a group of approximately 25 peaceful protesters was chanting, among other things, "Hands Up, Don't Shoot."

49.     Without warning, NYPD personnel surrounded the group, as well as approximately ten uninvolved bystanders.

50.     The police charged the peaceful protesters, violently forced protesters against a wall, pushed protesters to the ground, and struck protesters with batons.

51.     On **May 31**, New York State Senator John Liu was with a group of peaceful protesters who crossed the Manhattan Bridge from Brooklyn onto **Canal Street** in Lower Manhattan.

52.     According to Sen. Liu's testimony at a public hearing held by New York Attorney General Letitia James (the "AG Hearing"), the group peacefully marched

---

[2]     Surrounding protesters is also called "kettling" or "corralling" in certain contexts.

6

across Canal Street, turned onto Church Street, and was stopped by police from proceeding further.

53.    After a few minutes in which no violence occurred, police charged the crowd of peaceful protesters and knocked them over, causing injury to several protesters.

54.    The police had no apparent reason to charge the protesters and gave no instructions before doing so.

55.    On **June 2**, in **Midtown East**, a group of young protesters held a dance party on 53rd Street.

56.    A reporter observing the events described it as "the definition of a peaceful protest."

57.    Without warning, police charged the group from behind.

58.    According to the reporter, "[t]hose at the back of the protest were beaten and arrested at random."

59.    Police tackled at least one reporter in the group.

60.    On **June 3**, in the vicinity of Third Avenue and 53rd Street in **Midtown East**, police surrounded a group of peaceful protesters marching downtown from a vigil at Gracie Mansion.

61.    Without warning, police began running at the crowd from behind and tackling peaceful protesters.

62.    When one protester tried to calmly leave the area, an NYPD officer beat her legs with a baton.

63.    Confused about where they were supposed to go and what they were supposed to do, the protesters did their best to move away from the area.

64.     As they did so, the NYPD pushed, hit, and struck them with batons.

65.     On **June 3** in **Cadman Plaza** in Brooklyn, the NYPD surrounded a large group of exclusively peaceful protesters at around 9:00 pm, charged them without warning or provocation, and assaulted them, including with batons.

66.     Peaceful protesters sustained injuries that included broken bones, a head laceration requiring staples, and chipped teeth.[3]

67.     On **June 4**, at the intersection of **Penn and Wythe Streets** in South Williamsburg at around 9:15 pm, the NYPD surrounded a group of peaceful protesters who were chanting "Peaceful protest" and singing.

68.     Without warning, the NYPD charged into the crowd.

69.     The *New York Times* reported on June 5: "In the past several days, New York Times journalists covering the protests have seen officers repeatedly charge at demonstrators after curfew, with seemingly little provocation, shoving them onto sidewalks, striking them with batons, and using other rough tactics."

70.     It is plainly not a coincidence that different NYPD personnel from different precincts in different boroughs, under different conditions on different days, responded to peaceful protests using the same operational tactics.

71.     The NYPD consistently responded in this manner because it adopted a policy, whether express or implicit, of dispersing peaceful protests against police

---

[3]     The facts of the NYPD's response to the June 3 protest in Cadman Plaza are set forth in further detail in the First Amended Complaint (Dkt. #16) in *Gelbard et al. v. City of New York et al.*, No. 1:20-CV-3163-MKB-RER (E.D.N.Y. Nov. 18, 2020), which Plaintiff hereby incorporates by reference into these pleadings.

brutality in the summer of 2020 by surrounding, charging, and assaulting the protesters.

72.     It is foreseeable that police ordered to charge with their batons into a crowd of peaceful protesters against police misconduct will use indiscriminate and unreasonable force.

73.     Moreover, many of the NYPD personnel who carried out the policy of surrounding, charging, and assaulting peaceful protesters taped over their shield numbers with black tape in an open and notorious manner.

74.     The NYPD Patrol Guide requires uniformed members of the service to wear a shield or shield patch over their outermost garment at all times.

75.     The point of requiring police to publicly display their shield numbers is to allow them to be individually identified by the citizens to whom they are ultimately accountable.

76.     On information and belief, many of the NYPD personnel who carried out the policy of surrounding, charging, and assaulting peaceful protesters also deactivated their body-worn cameras while doing so.

77.     The NYPD Patrol Guide requires uniformed members of the service to activate their body-worn cameras when, among other things, engaging in "[p]ublic interactions that escalate and become adversarial," making arrests, or responding to assignments concerning potential crimes.

78.     The pervasive covering of police shield numbers and disabling of body cameras was intended to prevent protesters from identifying which NYPD personnel used excessive force against them, or otherwise engaged in misconduct.

### *The Supervisory Defendants Are Responsible for the NYPD's Policy of Surrounding, Charging, and Assaulting Peaceful Protesters*

79.     Under Chapters 1 and 18 of the New York City Charter, Mayor de Blasio appoints the police commissioner, who reports to the Mayor, serves at the Mayor's pleasure, and can be removed in the Mayor's discretion for any reason.

80.     Under Chapter 18 of the New York City Charter, Commissioner Shea has "cognizance and control of the government, administration, disposition and discipline of the [NYPD], and of the police force."

81.     Commissioner Shea "shall be chargeable with and responsible for the execution of all laws and the rules and regulations of the department."

82.     Commissioner Shea has the legal authority to set departmental policy, including with regard to use of force.

83.     Commissioner Shea was directly involved in establishing the NYPD's strategy for responding to peaceful protests and dispersing protests continuing past curfew.

84.     At a June 4 news conference, for example, Commissioner Shea spoke at length about the NYPD's purported adjustment of its tactics to the specific context of each protest, described in detail events at certain protests the previous night, and explained that the NYPD had recently made a tactical adjustment concerning vehicles.

85.     Defendant Monahan, as Chief of Department, has primary responsibility for NYPD operations—that is, for the police response on the street.

86.     He supervises the various bureaus within the NYPD, including Patrol, as well as specialized tactical units that report directly to him.

87.     Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service are obligated to obey any lawful order given by Chief Monahan.

88.     As a practical matter, Chief Monahan served as the field general for the NYPD's response to protests in New York City.

89.     Chief Monahan was a highly visible presence in the streets observing the protests and giving tactical commands to his subordinates.

90.     The NYPD has a command center at One Police Plaza from which senior departmental officials monitor live surveillance footage of protests, which generally occur in prominent public places with comprehensive camera coverage.

91.     On information and belief, when Chief Monahan was not in the field personally observing the NYPD response to protests, he typically monitored it in real time, either in the command center or by other means.

92.     Mayor de Blasio himself personally approved the strategies developed by Defendants Shea and Monahan.

93.     At a June 7 press availability, Mayor de Blasio was asked: "Did you approve the tactics that we saw at [*sic*] the NYPD using, starting on June 3rd and June 4th?  That's the use of batons, more sort of pushing at protests, that kind of thing?  Did you approve those?"

94.     Mayor de Blasio responded, among other things: "I approved the broad strategies and sometimes very specific choices."

95.     Mayor de Blasio also noted that he "constantly talk[s]" to Commissioner Shea about videos depicting the force used by the NYPD against protesters.

### *Defendants Shea and Monahan Are Openly Hostile*
### *to the Peaceful Protesters' Message*

96.    Defendants Shea and Monahan were open about their disapproval of—indeed, their seething anger toward—the substance of the protesters' message.

97.    In a press briefing on June 4, Commissioner Shea angrily condemned "hateful" rhetoric against the NYPD, including by unspecified politicians, which he blamed for fueling violence against police, including assassinations of police officers.

98.    Commissioner Shea stated: "You look at the anti-police rhetoric, it disgusts me to my core."

99.    He continued (at a press conference, ironically):  "Less press conferences, less tweets, more action, more accountability for your words.  If you don't have something nice to say, keep your mouth closed . . . ."

100.    While not specifying exactly what "rhetoric" he was referring to, Commissioner Shea was referring in context to assertions that the NYPD is institutionally racist, is harmful to communities of color, and should be defunded or abolished.

101.    These messages are legitimate policy criticisms, are plainly protected by the First Amendment, and were widely expressed on placards, by speakers, and in chants at the gatherings at which the NYPD surrounded, charged, and assaulted peaceful protesters throughout the summer of 2020, including at the June 4 Mott Haven protest at which Plaintiff was assaulted.

102.    In a national television interview on June 2, Chief Monahan complained about "outside agitators telling people to go out and cause mayhem in the city, . . . using, I think this movement for an agenda to end policing throughout the country, an

anarchist agenda.  That's what they do.  All the signs that you see is defund policing, no more police."

103.    In Chief Monahan's inaccurate and patronizing view, calls to defund or abolish the police cannot reflect the authentic views of real New Yorkers who believe in democratic governance, but must reflect an "anarchist" agenda artificially "imposed" by "outside agitators."

104.    Other high-ranking NYPD brass have expressed similar sentiments toward protesters.

105.    In the same television segment, while standing in the command center watching live surveillance footage of peaceful protests, Deputy Chief Edward Mullane disparaged the protesters, stating: "This is mob mentality.  This has nothing to do with peaceful protests, trying to right injustice. . . .  We don't like people walking in the middle of the street.  We like the rights of everybody else who wants to drive in Manhattan."

106.    The excessive force the NYPD used against peaceful protesters directly reflected the open animosity and revulsion of Commissioner Shea, Chief Monahan, and their senior colleagues toward the protesters' message.

107.    Notably, Defendant Monahan also has a demonstrated history of similar misconduct concerning other peaceful, nonviolent protests.

108.    In 2004, Defendant Monahan engineered the false arrest of 227 peaceful protesters during the Republican National Convention.

109.    After purporting to negotiate an agreement with protesters to allow them to march on the sidewalk, Defendant Monahan, who was then a Deputy Chief of Department, ordered that the protesters be penned in.

13

110.    After the protesters were unable to disperse from the penned-in area, Defendant Monahan ordered them arrested.

111.    The charges against all 227 were later dismissed, and Judge Richard Sullivan of the Southern District of New York ruled that the arrests were unlawful.

112.    The City spent approximately $18 million to settle lawsuits with protesters as a result of Defendant Monahan's policy of arrests without probable cause.

113.    On information and belief, Defendant Monahan faced no departmental discipline, counseling, or other consequences for ordering the unlawful mass arrest of peaceful protesters.

114.    He has since been promoted to his current position as the NYPD's highest-ranking uniformed member of the service.

### In Mott Haven on June 4, 2020, the NYPD Launches a Police Riot Against Peaceful Protesters Exercising Their First Amendment Rights

115.    Community activists organized a march and rally in the Mott Haven neighborhood of the South Bronx on the evening of June 4, 2020.

116.    The event was entirely peaceful.

117.    As protesters marched through the neighborhood, well before the citywide 8:00 pm curfew that was in effect, police in riot gear began surrounding the protesters on multiple sides and moving toward them, penning the protesters in.

118.    The actions of the police physically trapped the protesters outside before the end of curfew and prevented protesters who intended to comply with the curfew from doing so.

119.    Shortly before 8:00 pm, without warning, police charged the protesters and attacked them.

120.    Police indiscriminately struck protesters with batons, threw them to the ground, and sprayed them with a chemical agent.

121.    Many of the protesters were thrown to the ground, arrested, and handcuffed with extremely tight plastic zip ties.

122.    One reporter present at the scene observed the following:

[D]emonstrators marching down 136th Street in Mott Haven were blocked by a wall of heavily armored police with bicycles. As those cops heaved their bikes into protesters, another group of officers emerged at the top of the street, charging down the hill and pushing protesters into the advancing throngs of bike cops. . . . Over the next hour, cops would handcuff roughly 100 individuals in the group, including several legal observers and medics.  Two people were seen leaving the scene on a stretcher.

123.    Defendant Monahan was physically present at the Mott Haven protest and personally directed NYPD operations on the scene.

124.    On video, Defendant Monahan personally ordered police under his command to arrest one of the protest organizers.

125.    Video footage also shows Defendant Monahan literally looking the other way as police rush peaceful protesters and strike them with batons.

126.    Defendant Shea later justified the NYPD's violent response to the Mott Haven protest on the basis that it had been organized by "outside agitators."

127.    This statement was false.  The protest was organized by longtime Bronx police accountability activists with whom Commissioner Shea was familiar.

128.    Mayor de Blasio justified the violence by claiming: "There was a specific pre-announced threat of violence and then people appeared at the protest with weapons and gasoline . . . .  [I]t is absolutely incumbent upon the police to make sure that does not proceed because we won't tolerate violence."

129.    These statements were also false.

130.    No gasoline was recovered from protesters.

131.    No firearms were recovered from protesters.

132.    A single firearm was recovered hours before the protest began, about a half-mile from the protest site, from an alleged gang member with no apparent connection to the protest.

133.    No justification exists for the brutal and indiscriminate force used against Plaintiff and other peaceful protesters.

### The NYPD Assaults Mr. Wood for Peacefully Exercising His First Amendment Rights

134.    On June 4, 2020, Mr. Wood attended the protest in Mott Haven with several friends.  Mr. Wood believed it was important to exercise his right to peaceful protest to support and amplify the concerns of Bronx residents who were marching in their own community.  Mr. Wood believes that systemic racism and violence on our police institutions urgently needs to change, and on the day in question he decided to speak up for change.

135.    Some time between roughly 7:00 and 7:30 pm, lines of police hemmed in the group of protesters on multiple sides, preventing them from moving.

136.    Shortly before 8:00 pm, without any warning, police rushed into the area where Mr. Wood was standing.

137.    The police started hitting people with batons, discharging chemical spray, and pulling people out of the crowd and arresting them.

138.    As the police did so, people started falling down.

139.    Mr. Wood was standing next to a young Black woman who fell down, screaming that she had hurt her leg and could not put any weight on it.

140.    Mr. Wood huddled over the young woman in an effort to prevent others from falling on her.

141.    As Mr. Wood hunched over in an effort to protect the woman, Defendant John Doe #1 struck Mr. Wood hard in the upper back with a police baton.

142.    Defendants John/Jane Does #2-3, on information and belief, then ripped Mr. Wood away from behind, dragged him away from the crowd, and threw him face-down to the ground.

143.    Mr. Wood's elbow struck the ground hard as he was thrown down.

144.    Police put their knees on Mr. Wood's back.

145.    Mr. Wood was then handcuffed very tightly with a plastic zip tie.

146.    Mr. Wood did not have any weapon in his possession.

147.    Mr. Wood did not actively or passively resist arrest.

148.    Mr. Wood did not engage in any violence toward any NYPD personnel at any time.

149.    Mr. Wood did not use any physical force against any NYPD personnel at any time.

150.    Mr. Wood did not witness any other person engage in any act of violence toward any NYPD personnel on June 4, 2020.

### The NYPD Detains Mr. Wood and Others in Inhumane Conditions While Handcuffed Too Tightly

151.    Large groups of arrested protesters were placed on buses while handcuffed for several hours.

17

152.    Multiple buses, including Mr. Wood's, went to Queens Central Booking in Kew Gardens for processing of the arrests.

153.    After being taken off the buses, the protesters were lined up outside several hours before being processed.

154.    Mr. Wood repeatedly complained to police that the zip ties were too tight and were very painful, as did most of the other arrested protesters on the line.

155.    There were dozens of officers present, but only one captain appeared to have access to cutters that could cut through the plastic zip ties.

156.    Mr. Wood's zip tie was not removed until about three or four hours after he complained about the pain he was experiencing because it was too tight.

157.    The zip tie was so tight that, when it was finally removed, the person removing them had to dig the blade of the cutter into the skin of Mr. Wood's wrist to get it off.

158.    Mr. Wood was held with about 10-12 other people in a cramped cell overnight without food or water.

159.    While he was in custody, Mr. Wood's right hand swelled dramatically like a baseball due to the tightness of the zip tie.

160.    In the late morning of June 5, 2020, Mr. Wood was given a summons for unlawful assembly under Penal Law § 240.10, signed by Defendant Carpio Hernandez as arresting officer.

161.    Mr. Wood was then released from custody.

162.    In the weeks and months after the police assault in Mott Haven, Mr. Wood kept replaying the experience over and over in his mind.

163.    He was traumatized by what happened to him and what he saw happen to others.

164.    Mr. Wood's hand remained swollen for more than a week after the protest.

165.    He continues to experience an usual loss of sensation in his thumb that he had never experienced before being zip tied on June 4.

166.    He still has a mark on his hand where the scissors dug into his skin to remove the zip tie.

167.    The District Attorney dismissed the charge against Mr. Wood.

### *The Supervisory Defendants and Other Senior City Officials Ratify the NYPD's Policy of Surrounding, Charging, and Assaulting Peaceful Protesters*

168.    Regardless of whether the Supervisory Defendants were the architects of the NYPD's policy of surrounding, charging, and assaulting peaceful protesters, they certainly became aware of that policy as it was unfolding on the streets of New York City.

169.    Rather than change the policy or redress it, they ratified and continued it.

170.    To say that the NYPD's tactics against peaceful protesters were the subject of significant, contemporaneous public attention is a massive understatement.

171.    On May 31, Governor Andrew Cuomo described video footage of force used by the NYPD against peaceful protesters as "truly disturbing" and "inexplicable" and tasked Attorney General Letitia James to investigate the NYPD's use of force.

172.    Virtually every New York media outlet covered the protests comprehensively on a daily basis.

173.    The Supervisory Defendants gave numerous media interviews and press briefings, including on national television, concerning the NYPD's use of force against protesters.

19

174.    In addition to the AG Hearings, which lasted two days and were personally presided over by the state's chief law enforcement official, the City Council held hearings into the NYPD's use of force against protesters.

175.    Commissioner Shea publicly acknowledged his awareness of the media coverage of the NYPD's use of force against protesters.

176.    On June 4, he stated: "I've heard a lot about bad videos.  There were some bad videos."

177.    At no time did Defendants Shea or Monahan express any regret or hesitation about the NYPD charging into crowds of peaceful protesters and indiscriminately assaulting them with batons.

178.    To the contrary, a reporter directly asked Defendant Monahan whether he felt the NYPD's use of force at the June 4 protest in Mott Haven was "appropriate."

179.    Defendant Monahan responded: "Yes, I do."

180.    On June 3, Mayor de Blasio was made aware of video footage of the NYPD assaulting peaceful protesters like Mr. Wood with batons through a communication from his close informal advisor Jonathan Rosen.

181.    At a press briefing the following morning, a reporter specifically called Mayor de Blasio's attention to videos of the NYPD using batons against peaceful protesters and asked whether the Mayor "condone[d] that type of police behavior."

182.    Mayor de Blasio denied having seen the video footage but said that the NYPD had acted with "a lot of restraint[] . . . overall" and baselessly and falsely claimed that there were "some in these crowds who are committing violence."

183.    The sum and substance of the Mayor's comments was to endorse and ratify the NYPD's use of unreasonable and indiscriminate force against peaceful protesters.

184.    On information and belief, no NYPD member of the service has been disciplined for striking peaceful protesters with batons or pushing them to the ground while dispersing them.

## CAUSES OF ACTION

### FIRST CLAIM
### 42 U.S.C. § 1983 – Fourth / Fourteenth Amendments – Excessive Force Against Defendants John/Jane Does #1-10

185.    Plaintiff realleges the preceding paragraphs as if set forth here.

186.    Defendants John/Jane Does #1-3 used objectively unreasonable force against Plaintiff, proximately causing injury.

187.    Defendants John/Jane Does #4-10 failed to intervene to prevent the use of objectively unreasonable force against Plaintiff, despite having knowledge of and a reasonable opportunity to prevent its use.

188.    At all relevant times, Defendants John/Jane Does #1-10 were acting under color of state law.

189.    The conduct of Defendants John/Jane Does #1-10 was willful, wanton, and reckless.

### SECOND CLAIM
### 42 U.S.C. § 1983 – First Amendment Retaliation Against Defendants John/Jane Does #1-3

190.    Plaintiff engaged in protected First Amendment activity.

191.    Motivated by Plaintiff's protected activity, Defendants John/Jane Does #1-3 took adverse action against him, proximately causing injury.

192.    At all relevant times, Defendants John/Jane Does #1-3 were acting under color of state law.

193.    The conduct of Defendants John/Jane Does #1-3 was willful, wanton, and reckless.

**THIRD CLAIM**
**42 U.S.C. § 1983 – Fourth / Fourteenth Amendments – Personal**
**Supervisory Involvement**
**Against the Supervisory Defendants**

194.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

195.    The Supervisory Defendants created and/or allowed the continuance of the NYPD's policy of using excessive force against peaceful protesters.

196.    The Supervisory Defendants, after being informed of the use of excessive force against peaceful protesters, failed to remedy the wrong.

197.    The Supervisory Defendants exhibited deliberate indifference to the rights of peaceful protesters not to be subjected to excessive force by police by failing to act on information indicating that the use of such force was occurring.

198.    The conduct of the Supervisory Defendants proximately caused Plaintiff's injuries.

199.    At all relevant times, the Supervisory Defendants were acting under color of state law.

200.    The conduct of the Supervisory Defendants was willful, wanton, and reckless.

**FOURTH CLAIM**
**42 U.S.C. 1983 – First Amendment – Personal Supervisory Involvement**
**Against Defendants Shea and Monahan**

201.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

202.    The NYPD's policy of using excessive force against peaceful protesters was motivated at least in part by the animus of Defendants Shea and Monahan toward perceived anti-police expression.

203.    The conduct of Defendants Shea and Monahan proximately caused Plaintiff's injuries.

204.    At all relevant times, Defendants Shea and Monahan were acting under color of state law.

205.    The conduct of Defendants Shea and Monahan was willful, wanton, and reckless.

**FIFTH CLAIM**
**42 U.S.C. § 1983 – Fourth / Fourteenth Amendments – Municipal Liability**
**Against Defendant City of New York**

206.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

207.    Defendant City of New York has a policy, custom, or usage of using excessive force against peaceful protesters.

208.    That policy, custom, or usage was a moving force behind the violation of Plaintiff's rights.

209.    That policy, custom, or usage proximately caused Plaintiff's injuries.

210.    In addition or in the alternative, Defendant City of New York is liable for the unlawful actions of the Supervisory Defendants in their capacity as municipal policymakers.

### SIXTH CLAIM
### 42 U.S.C. § 1983 – First Amendment – Municipal Liability
### Against Defendant City of New York

211.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

212.    Defendant City of New York has a policy, custom, or usage of retaliating against protesters engaged in perceived anti-police expression by subjecting them to excessive force.

213.    That policy, custom, or usage was a moving force behind the violation of Plaintiff's rights.

214.    That policy, custom, or usage proximately caused Plaintiff's injuries.

215.    In addition or in the alternative, Defendant City of New York is liable for the unlawful actions of the Supervisory Defendants in their capacity as municipal policymakers.

### SEVENTH CLAIM
### 42 U.S.C. § 1983 – Fourth Amendment – Unlawful Seizure
### Against Defendants John Doe #1-3 and Hernandez Carpio

216.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

217.    Defendants John Doe #1-3 and Hernandez Carpio caused Plaintiff to be arrested and imprisoned without probable cause to believe that he had committed any crime or other lawful privilege.

218.   Defendants John Doe #4-10 failed to intervene to prevent Plaintiff from being arrested and imprisoned without probable cause or other lawful privilege, despite having knowledge of it and a reasonable opportunity to prevent it.

219.   At all relevant times, the Individual Defendants were acting under color of state law.

220.   The conduct of the Individual Defendants was willful, wanton, and reckless.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.   Compensatory damages in an amount to be determined at trial;

B.   Punitive damages against all Defendants except the City of New York in an amount to be determined at trial;

C.   Reasonable costs and attorneys' fees under 42 U.S.C. § 1988:

D.   Pre- and post-judgment interest to the fullest extent permitted by law; and

E.   Any additional relief the Court deems just and proper.

Dated:          December 14, 2020
                New York, New York


                                            KAUFMAN LIEB LEBOWITZ
                                            & FRICK LLP


                                            _____/s/_____
                                            Douglas E. Lieb

                                            10 E. 40th Street, Suite 3307
                                            New York, New York 10016
                                            (212) 660-2332
                                            dlieb@kllf-law.com

                                            *Attorney for Plaintiff*