# Exhibit B

Case 1:20-cv-08924-CM   Document 107-2   Filed 03/26/21   Page 2 of 188

March 5, 2021

# NYC Police Reform and Reinvention Collaborative Draft Plan



# Table of Contents

**Executive Summary** .................................................003

**Developing the NYC Police Reform
and Reinvention Collaborative** ..............................007

**The NYC Police Reform and Reinvention
Collaborative Draft Plan** .......................................013

**Background: Laying a Foundation of Reform:
2014–2020** ............................................................032

**Appendices** ........................................................041

# Executive Summary

We envision an NYPD that is the nation's exemplar institution for fair, just, transparent, and accountable policing regardless of race, gender, ethnicity, sexual orientation, religion, immigration or socioeconomic status. This reflects an aspirational, but achievable vision for the City and the Department that is based on concerns communicated by hundreds of members of communities throughout New York City, leaders of nonprofit organizations, clergy, businesspeople, and other stakeholders, as well as members of the police force.

The dire problem of racism in policing has existed in the United States from its origins. Racialized policing in New York City is a tragic part of that larger history of over 400 years of oppression, which runs from slave catching and kidnapping in the 19th century in a direct line through to more contemporary practices of unconstitutional stops and frisks of Black and Brown individuals, and countless assaults and deaths at the hands of police.

Addressing the legacy and harm of racialized policing in New York is a critical step in starting the healing process.  To start that healing, on February 23, 2021, Police Commissioner Dermot Shea acknowledged the following at a Greater Harlem Chamber of Commerce event:

"These many years of racist policies and practices have caused – and continue to cause – immeasurable harm, trauma, discrimination, and injustice for so many in the United States. It exists in all aspects of society, including in policing.

Police have always been an inexorable part of that story. Whether it was arresting runaway slaves or enforcing unjust Jim Crow laws, this has been a stain on law enforcement's history in America. We have to acknowledge this truth – and I do. And we must acknowledge the NYPD's historical role in the mistreatment of communities of color. I am sorry.

Our challenge today is to ensure that we will not participate in, or tolerate, any further inequality or injustice."

This report will outline the ongoing effort of New York City government to confront and combat this legacy. This report and draft plan for new action was born out of the protest movement and renewed calls for police reform across the country that arose following May 25, 2020, when the murder of George Floyd in Minneapolis shocked our national conscience. This draft plan is

also written in recognition of our long and painful history, which includes the deaths of Anthony Baez, Amadou Diallo, Ousmane Zango, Sean Bell, Ramarley Graham, Patrick Dorismond, Akai Gurley, and Eric Garner, amongst others.

Equally important, this report responds to the demands of New Yorkers. A foundation of this report is testimony we took from hundreds of people across the five boroughs, conveying the anxiety and pain they carry with them every waking hour from a lifetime of being stopped and frisked multiple times, the trauma from being abused by the police as children, the destruction brought by a wrongful accusation, and the lasting damage to their prospects of getting a great education and fulfilling career just because they grew up in an over-policed neighborhood.

We present this draft plan in full acknowledgement that it may be received with skepticism by many, including those New Yorkers who bravely contributed to the plan when they spoke to us about their experiences. Like so many of us, these New Yorkers have waited in anguish for lasting solutions to the entrenched problems of our nation. Yet, this draft plan is also presented on the heels of seven years of progress. Seven years that have shown that New Yorkers working together in an ongoing process of reform can change course in the face of history.

On New Year's Day 2014, Mayor de Blasio used his first minutes in office to declare that his new Administration would break an old and painful cycle: "We will reform a broken Stop and Frisk policy," he said, "both to protect the dignity and rights of young men of color, and to give our brave police officers the partnership they need to continue their success in driving down crime. We won't wait. We'll do it now."

There were many who said it couldn't be done, that America's largest city must choose between protecting public safety and respecting dignity and civil rights. But New Yorkers showed it was possible and that these principles go hand-in-hand. Together, we ended the racist policy of Stop and Frisk. Together, we ushered in a new era of Neighborhood Policing. Together, communities and the police who serve them drove crime down to levels not seen in half a century.

New Yorkers have proven we do not have to choose between safety and civil rights. Police enforcement across the board has changed. New York City's rates of incarceration have fallen. The combination of Neighborhood Policing and Precision Policing has offered a renewed confidence that public safety means pursuing

security in partnership with the public. Over the same period, the Administration has taken unprecedented steps to address the root causes of poverty and mental illness through Pre-K for All, affordable housing construction, ThriveNYC and a great deal more. Meanwhile, apart from a national rise in gun violence during the pandemic, major crime has dramatically decreased in New York City. (A fuller, more detailed history of the de Blasio Administration's efforts can be found at the end of this report: Background: Laying a Foundation of Reform: 2014-2020.)

Now, we take a new step forward with this draft plan. We understand that we have not, nor can we, erase a 400-year legacy during one mayoralty, or as the result of one plan. The work of reform never ends, and we won't stop where we are.

We must also note that the process of creating this draft plan reflects its goal. The City of New York has engaged stakeholders and communities, particularly those most affected by police actions, as well as members of service from the NYPD, in creating a shared vision of public safety and rebuilding mutual trust through an inclusive process. To strengthen the police-community relationship, the City convened a wide range of participants for an honest dialogue about the role of the police in our communities.

This draft plan was created by listening to the experiences and insights of hundreds of residents of neighborhoods throughout the five boroughs, in forums of varying size and structure. New Yorkers who shared their insights, include community based organizations (CBOs), advocacy groups, clergy, racial justice advocates, cure violence providers, youth groups and youth voices, ethnic and religious organizations, BIDs and small business owners, non-profits, LGBTQI+ community leaders, the deaf and hard-of-hearing community, people with disabilities, tenants' associations, shelter-based and affordable-housing communities and providers, people involved in the justice system, crime victims, policy experts, prosecutors, oversight bodies, judges, elected officials, academic leaders, and many others. Special attention was paid to voices from those parts of the city that have suffered the most.

To ensure all voices were heard in this process and to solidify the partnership around reform, meetings were also hosted with uniform and civilian members of the NYPD. These meetings paralleled the community meetings, focusing on members assigned to work in the very same highly affected neighborhoods

as the residents who offered testimony.

The New York City Police Reform and Reinvention Collaborative Draft Plan is the result of this work. It envisions an NYPD that stays true to its history of bravery in the service to the public, that maintains its stellar record of driving down crime, while continuing to transform itself into an example of just, transparent, and accountable policing, implemented equitably, without regard to race, gender, ethnicity, sexual orientation, religion, or immigration or socioeconomic status.

The City's draft plan focuses on five goals:

1. Transparency and Accountability to the People of New York City.
2. Community Representation and Partnership.
3. Recognition and Continual Examination of Historical and Modern-Day Racialized Policing in New York City.
4. The Decriminalization of Poverty.
5. A Diverse, Resilient, and Supportive NYPD.

We have ended the era of Stop and Frisk, created the era of Neighborhood Policing, and changed the fundamentals of how New Yorkers are charged, incarcerated, and released under our criminal justice system. We have also taken notice of similar efforts outside of New York City. This report is also built on the work of President Obama's Presidential Task Force on 21st Century Policing, the United States Conference of Mayors Report on police reform and racial justice, and other notable reports addressing the call for reform.

Now, the work of reform in New York City continues. The City offers this report and its 36 proposals for public comment. We are continuing to review and incorporate input from the public and from stakeholder engagement, and will update this report with additional proposals to fundamentally address the problem of racial bias and other areas in policing in New York City. The final report will be issued after feedback has been collected and reviewed.

Based on continuing stakeholder engagement, the New York City Police Reform and Reinvention Collaborative is seeking input on the entire draft plan, as well as proposals and public input on certain additional areas for future public and City Council consideration:

- Fair, effective, credible, and transparent early intervention strategies to identify troubling trends in officer performance and to address them immediately to prevent harm to communities
- A public safety and social service system for all, including our more vulnerable communities such as people with disabilities, immigrant communities, people involved in the sex trade, and people who use drugs
- A citywide biometric technology policy
- Policies designed to increase the number of New York City residents who make up the NYPD

This draft plan, which is responsive to New York State Executive Order 203, is meant to be informed and enhanced as we receive further feedback from the public, and the City Council. This report and its proposals will continue to reflect the demands of today's New Yorkers, based on their experiences in all sections of our complex and diverse city.

The work of reform never ends, and we won't stop where we are.

# Developing the NYC Police Reform and Reinvention Collaborative

The City's Reform and Reinvention Collaborative was convened by the Mayor, and led by the First Deputy Mayor working in partnership with the Police Commissioner, leaders across City Hall, the Mayor's Office of Criminal Justice, Community Affairs Unit, Legislative Affairs Unit, and the Law Department.

## Listening to New Yorkers

The New York City Police Reform and Reinvention Collaborative held more than 85 meetings and town halls, including nine public listening sessions, over several months to get testimony and feedback from a broad range of New Yorkers.

There were meetings with external stakeholders including CBOs, advocacy groups, clergy, racial justice advocates, cure violence providers, youth groups and youth voices, ethnic and religious organizations, BIDs and small business owners, non-profits, LGBTQIA+ community leaders, the deaf and hard-of-hearing community, people with disabilities, tenants' associations, shelter-based and affordable housing communities and providers,

people involved in the justice system, crime victims, policy experts, prosecutors, oversight bodies, judges, elected officials, academic leaders, and many others.

The New York City Police Reform and Reinvention Collaborative hosted meetings with uniform and civilian members of the NYPD. These meetings paralleled the community meetings, focusing on members assigned to work in the very same highly affected neighborhoods as the residents who offered testimony. Uniform and civilian members of all ranks, ages, races, genders, orientations, ethnic backgrounds, and assignments participated, along with leaders from NYPD's police unions and 36 different fraternal organizations. All members of the NYPD, like members of the public, had the opportunity to submit policy proposals for review and consideration.

The New York City Police Reform and Reinvention Collaborative also built on the work of President Obama's Presidential Task Force on 21st Century Policing, the United States Conference of Mayors Report on police reform and racial justice, and other notable reports addressing the call for reform.

The needs and concerns identified through this process were as diverse as New York City itself.

There was near-universal support for building on the success of the CCRB and strengthening and clarifying its role in the disciplinary process.

The City has already announced critical measures to address this need including creating the NYPD Disciplinary System Penalty Guidelines, or Discipline Matrix, and an agreement between the NYPD and the CCRB that will increase accountability, fairness, and consistency in the disciplinary process.

Another area of near-universal support was the urgent need to address the disproportionate law enforcement impact that communities of color experience. While this administration has prioritized policies that directly address such disproportionate enforcement, we must listen to what neighborhood residents are saying – this work is not done, it must be proactive and ongoing.

The Police Reform and Reinvention Collaborative received input concerning the appropriate role of the police as first responders to a wide variety of community concerns, ranging from persons experiencing mental health crises to ensuring student safety in the City's school system. Members of the NYPD likewise said

they feel ill-prepared to provide an appropriate response when the most significant issue is a mental health or social service issue rather than a public safety one.

And finally, New Yorkers in neighborhoods that are most affected by policing, as well as members of the NYPD themselves, expressed frustration about a lack of transparency into departmental operations and decision-making, and the need for greater familiarity between the community and the NYPD.

We received a wide range of feedback, including profound critiques. The following is some of the firsthand testimony received from our fellow New Yorkers on key issues.

***New Yorkers spoke about the need to directly address the bias and discrimination they've experienced:***

"Just having "diversity training" is not going to cut it. If people have deep seeded racist tendencies, they have to be weeded out."

"If we talk about reimagining, with people adversely impacted by justice processes, we have to talk about truth and reconciliation. We have to have accountability about practices today and have to talk about how law enforcement played a structural role in this. Our neighborhoods didn't get here by accident."

"We in the poor disenfranchised Black community have been directly impacted through many forms. Fear tactics, targeting, blatant lies, gang-like behavior, bullying and so much more."

"I've experienced racism within the department. There are a lot of deniers at the top of the chain saying that there is no systemic racism within the NYPD."

"We should be employable. We're coming up through different circumstances; these people haven't done anything bad; they need a second chance."

"When I walk through a deserted South Shore neighborhood at night and see an officer, I feel safe. When one of my Latinx employees does that, she's asked where she's going."

***New Yorkers spoke about the need for transparency and accountability:***

"You continue to hear about accountability, transparency and trust. The chief says that officers were disciplined. The public

has no visibility into it, and so trust is not restored."

"We need more than just website with details, we need to let the community know that you'll publicly make sure that wrongs are being dealt with."

"How do suspensions without pay work when the suspension is over? Is it made public when the officer returns? Transparency on next steps? How are they reintegrated? Cycle of discipline?"

"How does supervision work in the field after people have been trained, to make sure people are following it?"

**New Yorkers spoke about the need to decriminalize poverty and mental illness:**

"The most glaring issue in the Bronx is the mental health challenges. NYPD should be the last resort, not the first."

"Police won't cure poverty What can we give to the community outside of policing? How can we build the community up outside of policing? What does this community need? If they got it do you think the crime rate would go down? I think I would start the conversation with a question, "what do they need?" or "why is this happening?" Understanding the root before curing the branches."

"How are we going to address root causes of violence and crime? It's a public health issue. Start the conversation from that premise, then we can discuss how law enforcement has been used to address social and income inequality, and why people commit crimes or come in contact with the justice system. We need to have an honest conversation about how to address root causes of poverty."

"Communities that are well resourced don't have as many police, but it's because they have resources and don't need them."

"When an officer arrests a youth, find out why they were doing what they were doing."

"We are skipping some steps when police respond to communities – why is the crime occurring? A lack of resources, school system, opportunities, recreation, families, hierarchy of needs not met. What does the community need to excel, move forward?"

**New Yorkers spoke about the need for an NYPD that is of the community:**

"Find people who want to be police officers and put them back in their community."

"There needs to be something that happens with the curriculum that encourages real community engagement – it's not just knowing who the leaders are, but knowing who the indigenous leaders are, the go-to people."

"When commanders change, it goes right back to the beginning, where we started. What we've done to improve relationships go down the drain"

"How do you build a relationship? You have to know who they are where they come from and what their needs are."

**New Yorkers spoke honestly about the difficulty of building trust with police:**

"There is an oppressive relationship between community and law enforcement."

"People who have turned themselves around, done well in classes while incarcerated; then come home and are confronted with NYPD and parole; they can't get back on track and into things we expect upstanding citizens to do (go to work, be engaged with family and community); many come home and want to be engaged citizens but there is an over-policing, over-intrusion in their lives that makes it hard for them to be employed."

"There is a disconnect between what the Department and community believe to be "engagement"; we need to work together to define these. What the community is asking for is cultural competency training; how officers show up to community events; we need understanding on either side so gaps can be identified."

**Members of service spoke about the historical lack of investment in social services infrastructure and the role of NYPD filling these voids and their feelings on being supported in the City and the people they serve:**

"The failure of government at so many levels is left up to the cop on the street. Homelessness, mental health, the school system, no jobs, corrections, poverty – the cop responding to

the scene is the face of a systemic failure of government. We get called for everything. We always show up."

"We need to know what our role is."

"We must interrupt cycles of recidivism and stigma. As a society, we don't rehabilitate."

"How and why we do certain things is just a huge unknown to people."

The New York City Police Reform and Reinvention Collaborative would like to thank the many New Yorkers who bravely spoke about their experiences.

# The NYC Police Reform and Reinvention Collaborative Draft Plan

## I. Transparency and Accountability to the People of New York City.

Transparency and accountability are critical to the legitimacy and credibility of law enforcement. Throughout this process we heard demands for increased transparency and accountability from all groups that participated. From the community at large and stakeholder groups, we heard calls for accountability when officers cause harm, or do not fulfill the Department's motto of "Courtesy. Professionalism. Respect. (C.P.R.)"; and calls for transparency into the disciplinary process, surveillance practices, data collection, and Department policies. From the NYPD's own members, we heard calls for transparency, expediency, and consistency in promotions and in the disciplinary process. A culture of transparency and accountability must be cultivated and nurtured.

To earn the trust of all the City's communities, the NYPD must be transparent while holding members accountable. New York City has an extensive set of internal and external accountability and oversight mechanisms. These include the Commission to Combat Police Corruption (CCPC) to monitor and evaluate anticorruption programs; the Civilian Complaint Review Board (CCRB), to receive, investigate, mediate, hear, make findings and recommend action on complaints against police officers; and the NYPD Inspector General at the Department of Investigation, charged with investigating, reviewing, studying, auditing, and making recommendations related to NYPD. The draft plan proposes strengthening areas and engaging in structural reform of others.

**1. Hold police officers accountable for misconduct through internal NYPD disciplinary decisions that are transparent, consistent, and fair.**

The disciplinary system should be based on five values:

1. Holding officers accountable for misconduct and harm to the public;

2. Keeping a record and recognizing disciplinary actions as vital sources of information about an officer, supervisors, and the department as a whole;

3. Identifying patterns and problems related to policies, training, supervision, and institutional performance rather than mere individual misconduct;

4. Building public trust and community cohesion through timely decision making; and

5. Holding the Police Commissioner accountable for the conduct of those whose serve in the department

In January 2021, the Mayor announced a major police discipline reform: the first NYPD Disciplinary System Penalty Guidelines ("Discipline Matrix"), which provides clear, consistent, and fair guidelines for discipline in instances of officer misconduct and was created with input from the public. The Matrix was also codified by the Council and signed into law by the Mayor. NYPD and CCRB then signed a Memorandum of Understanding related to the use of the Matrix.

The Matrix outlines penalties that may be adjusted up or down in a set window based on aggravating and mitigating factors. Penalties escalate with repeated offenses. This improves:

- Accountability, penalties that are fair and proportional.

- Transparency, both NYPD and community know what discipline to expect.

- Consistency, similar actions are treated similarly.

The City will monitor implementation of the Discipline Matrix. Both CCRB and NYPD have formally agreed to follow the Matrix. The agreement ensures the CCRB has access to NYPD employment history and requires an annual review of whether the agreement is accomplishing the goal of consistent and fair discipline.

### 2. The David Dinkins Plan: Expand and Strengthen CCRB
A true CCRB had been an idea for decades before Mayor David Dinkins made it a reality in 1993. The David Dinkins Plan is the single largest expansion and strengthening of the CCRB since it was established.

#### a. Facilitate timely and necessary access to Body Worn Camera footage and officers' disciplinary histories for CCRB cases.
NYPD will shorten the timeframe for fulfilling CCRB video footage requests. Working with NYPD, CCRB may adjust search terms to ensure responsive footage is being returned.

In addition, CCRB may immediately request Law Department intervention if there are disagreements about search terms.

**b. Give CCRB authority to investigate instances of biased-based policing.**
This authority is currently placed with NYPD. The NYPD, similar to law enforcement entities around the country, has been largely unsuccessful in substantiating allegations of bias-based policing. This is an important step toward building trust and accountability, and ensuring racial bias is eliminated wherever it is found.

**c. Allow CCRB to initiate investigations on its own.**
Currently, CCRB can investigate cases brought to it through a civilian complaint only.

**d. Establish the Patrol Guide Review Committee.**
This will allow reform by identifying policies and practices outlined in the Patrol Guide that need to be changed for the future, even if a specific incident did not constitute misconduct.

**3. Consolidate and strengthen NYPD oversight by expanding the Civilian Complaint Review Board's authority to incorporate the powers of NYC's Department of Investigation Office of the Inspector General for the NYPD and the Commission to Combat Police Corruption.**
Putting all three under one umbrella will allow a new, stronger entity to establish itself as a trusted and robust oversight voice. It will have the combined authority to:

- Investigate complaints and recommend discipline.
- Conduct regular audits of policing, internal discipline, and anti-corruption practices.
- Conduct systemic reviews of NYPD policy and practices, and make recommendations for reform, including publishing regular public reports.

**4. Support a State law change that would broaden access to sealed records for specified entities, including CCRB, charged with investigating police misconduct, especially biased-policing investigations.**
State law restricts the use of sealed records by entities investigating allegations of police misconduct, including abuses of authority. The proposed change in State law would improve the ability of CCRB in particular to investigate misconduct, especially

related to racial profiling and bias-based policing, by permitting appropriate access to and use of relevant documentation or evidence that may be protected by sealing.

**5. Implement public and comprehensive reporting on key police reform metrics.**

In order to increase transparency surrounding discipline in the NYPD, the Department will be launching a website providing information about members' discipline history, including charges, penalties, and trial decisions. The public will have a chance to view a members' training and arrest history. Annual reports will also be issued on the implementation of the discipline matrix. In addition, the new consolidated oversight agency will be tasked with developing a comprehensive data dashboard for key metrics, including use of force metrics and data focused on racial disparities and equity.

## II. Community Representation and Partnership.

In conversations about community engagement, many New Yorkers discussed: perceptions of the police as an occupying force in their community, rather than a partner; frustration about a lack of representation or knowledge about the local communities within the Department; and a desire to see officers who understood the cultural nuances of their community. Officers' awareness of cultural differences and recognition of the unique needs and characteristics of New York's many communities is critical for authentic, productive engagement. Cultural competence and meaningful partnership must be central to the Department's strategies, and can be bolstered through the focused recruitment, hiring, retention and promotion of those from the communities most impacted by policing.

With the implementation of Neighborhood Policing in 2015, the City and the NYPD have made engagement with residents a priority. We must ensure that change is sustained, continually evolves to be responsive to neighborhoods, and becomes embedded in the fiber of the institution.

Improving neighborhood engagement must be a central feature of NYPD's culture, decision-making, and organizational structure. NYPD has been continually enhancing its neighborhood outreach programs, but more work lies ahead.

NYPD must prioritize creating the right policies, training, and accountability measures to truly integrate and embed itself in the neighborhood. Officers must feel like genuine engagement and thoughtful problem-solving is their job, and not a distraction or an add-on.

### 1. Work with communities to implement NYC Joint Force to End Gun Violence.

Reducing gun violence must be done together with the community. Overall crime decreased in 2020 in New York City, but the national surge in gun violence has been felt in far too many of our neighborhoods. Most gun violence is perpetrated by a small group of people. The Joint Force will be focused on addressing these individuals specifically to prevent violence and keep people safe.

The Joint Force will be comprised of members of NYPD, Cure Violence groups, District Attorney offices, the Mayor's Office of Criminal Justice, City agencies, and additional local community groups and law enforcement organizations. It will implement interagency shooting reviews, systematically identify those involved and address underlying dynamics, and create clearer lines of communications between anti-gun violence groups and police.

The Joint Force will also re-energize the NYC Ceasefire program, a homicide prevention strategy that's been shown to lower shootings dramatically in major cities. NYPD will bolster the Joint Force by launching the "Top 100" strategy focused on the 100 blocks that have the highest numbers of shootings, and disproportionate numbers of 311 and 911 calls.

### 2. Incorporate direct community participation in the selection of Precinct Commanders.

Precinct Councils will interview NYPD's proposed candidates for precinct commanders and provide the NYPD with feedback on the candidates. These panels will maintain relationships with commanding officers, and will evaluate their general effectiveness, engagement with the larger neighborhood and responsiveness to issues raised by the residents.

### 3. Involve the community in training and education by expanding the People's Police Academy.

Training should ensure officers are fully immersed in the neighborhood, and are educated by the residents they are

assigned to serve. Beginning this April, New York City will expand the People's Police Academy, a community-led training for local precinct personnel, to five precincts. Learning what public safety means to residents is integral to serving that community.

**4. Immersion of new officers in the neighborhoods they serve.**
All officers who are new to a precinct will undergo an intensive course, including field training, to better understand the neighborhood. They'll meet community leaders, service providers, local small business owners and youth organizations.

**5. Elevate the feedback of the community through CompStat and Enhanced Neighborhood Policing.**
In September 2020, NYPD launched a customer service pilot in East Harlem and South Jamaica that encouraged New Yorkers to provide direct feedback about the services they received or requested. This has been expanded to precincts Citywide and will be rolled out to all Public Service Areas and Transit Districts in Spring 2021. Commanding officers will be required to report customer-service and neighborhood-focused metrics to strengthen and improve bonds of their residents and Officers.

The Department also recently launched the Neighborhood Strategy Meeting, a forum to share best practices across commands and to ensure accountability through customer and neighborhood focused performance metrics, consistently elevating feedback from the community. Commanding Officers will be required to report on various customer performance and community engagement metrics such as customer wait times, response times, how officers handle various public interactions, and other indicators to demonstrate improvement in bonds between officers and communities they serve in the Neighborhood Strategy Meeting, as well as Compstat. The Department will engage community representatives in reviewing customer survey and other data relevant to individual neighborhoods and will use that input to inform new metrics that can be collected and assessed agency-wide.

**6. Launch the Neighborhood Policing App and expand training.**
The NYPD is launching the Neighborhood Policing App, a platform for internal and external collaboration and communication around quality-of-life issues. The Department will determine how best to expand training to ensure steady sector

cops have the same skills as Neighborhood Coordination Officers (NCOs).

### 7. Respect the right to protest and improve policing of this essential civic activity.

In late May 2020, Mayor de Blasio directed the NYC Department of Investigation and the Law Department to conduct independent reviews of the NYPD's response to the protests in the wake of George Floyd's murder. The City accepts the findings and 20 recommendations of the DOI report as well as the 10 recommendations of Corporation Counsel, and commits to implementing all of the recommendations.

### 8. Expand the Precinct Commander's Advisory Councils.

Composed of key community members and precinct executive leadership, the Councils meet bi-monthly to discuss engagement, outreach, and deployment of resources. The program is currently in the 120th, 77th, 25th and 113th precincts.

### 9. Expand Pop Up with a Cop.

The program brings the police directly to under-engaged areas of the precinct. Community Affairs, NCOs, YCOs and other personnel set up tents for approximately 1-2 hours for services such as assistance with police reports, community meeting information, youth services and program locations, and opportunities to provide feedback. This is currently being piloted in the 113th and 25th precincts.

### 10. Support and expand the Citizen's Police Academy.

The Citizens Police Academy is an accelerated civilian training program that informs New Yorkers about NYPD policies, activities and powers, and a key to understanding how and why officers perform their duties. The program will expand, starting by doubling participation in the next year.

### 11. Enhance Youth Leadership Councils.

In partnership with NYC Service, the NYPD will formalize and expand the role of the Youth Leadership Councils (YLC). The YLC's provide forums for young people to advise and share their feedback with the Department, while also gaining educational and enrichment experiences. NYPD values this formal mechanism for regularly receiving input from young people.

The Department is adding 18 precincts and 9 PSAs to the program, bringing the total number of Youth Leadership Councils to 85. There will be a citywide summit where the YLC's will present their recommendations for next steps for their precinct and PSA partners to connect with young people and build mutual trust.

**12. Expand the Law Enforcement Explorers Program.**
The Law Enforcement Explorers program introduces young people ages 14 - 20 to careers in law enforcement or related fields. The program aims to strengthen the relationship between law enforcement officers and the community by establishing positive connections. The NYPD will expand the number of Explorers from 2,200 to 3,000, and will enhance programming.

**13. Transform public space to improve community safety.**
NYPD will invite community input into the planning process for projects like the NYPD Community Center in East New York. Other planned efforts include:

- A partnership between NYPD and NYCHA will rehabilitate NYCHA basketball courts

- NYPD and the Parks Department are working to rehabilitate basketball courts and a soccer pitch at the Colonel Charles Young Park in Harlem. It is anticipated this project will be complete by Summer 2021.

- NYPD, the Department of Youth and Community Development, and other city partner agencies will expand the Saturday Night Lights program to 100 gyms to provide free sports programs for young people across the City beginning Summer 2021.

# III. Recognition and Continual Examination of the Historical and Modern-Day Racialized Policing in New York City.

Racialized policing in New York City has existed since the Department's inception and persists through contemporary police policies and practices. Testimony from New Yorkers gave voice to the legacy of disparate enforcement, aggressive stop and frisk, and over-policing in Black and Brown neighborhoods.

Addressing the legacy and harm of racialized policing in New York will require a critical examination of the policies and practices that perpetuate structural and institutional racism. Race remains the defining characteristic and predictor of heightened police interactions.

Because of the disproportionate enforcement experienced in communities of color, the impacts of use of force are also predominantly felt in these communities. Therefore, a true reckoning with racialized policing requires addressing the harms of force, and reducing its use.

All police practices, and particularly those that allow for high levels of discretion, must be assessed for explicit and implicit bias, and for unintended consequences that may reinforce structures of racism and produce racially disparate outcomes. Members of the public made at least 2,495 complaints of bias policing since the "Racial Profiling and Bias Based Policing" complaint category was created in 2014; the majority (68%) of these complaints included allegations of discriminatory policing based on race, ethnicity, color, or national origin.

### 1. Acknowledge the experiences of communities of color in New York City and begin reconciliation.

Mayor de Blasio is forming a commission that will focus on racial justice and reconciliation. The commission will have a mandate to identify areas of structural racism in New York City and recommend changes that will tear down the barriers toward true equality. With the new commission, New York City can lead the way in America by speaking openly of the wrongs of the past, creating new approaches to right those wrongs, and enshrining this progress into law.

### 2. Eliminate the use of unnecessary force by changing culture through policy, training, accountability, and transparency.

In recent years, NYPD has developed policies and procedures that enable officers to rely primarily on non-force techniques to effectively police, use force only when necessary, and de-escalate the use of force at the earliest possible moment. These reforms related to use of force have produced real results. For example, total officer firearm discharges decreased from 81 in 2013 to 52 in 2019. Firearm discharges in the context of an adversarial conflict, a subset of the total discharges, decreased from 40 to 25 during that same period. To contextualize this, in 2019: there were 6.4 million calls for service, including 64,302

weapons calls, with only 52 firearms discharge incidents, just 25 of which were adversarial.

All of the individual tools of policing—policies, laws, training, accountability, and transparency— must work together in an ongoing process of reform to create a culture that promotes safe alternatives to use of force, and eliminates excessive force.

### 3. Augment racial bias training for NYPD leadership.
In 2018, the NYPD began training all sworn personnel on implicit biases, including racial biases. This training was completed in 2020 and all recruits are now trained while they are in the Academy. Each training specifically addresses how unlawful biased practices, especially racially biased practices, damage NYPD's ability to build trust. The NYPD is now in the process of providing implicit bias training for all civilian members. To ensure it is effective, the training must be reinforced over time. Additionally, the Department will explore providing additional racial bias trainings for all executives in the rank of Captain and above focused on their specific role, in concert with community experts.

### 4. Educate NYPD leadership and NCOs on restorative justice processes, and design processes to repair relationships with communities.
NYPD has worked with the New York Peace Institute to train NCOs in mediation, de-escalation, and conflict resolution skills. This training will continue to ensure all of our NCOs are trained in these important concepts. The City will go further to ensure principles of Restorative Justice and reconciliation are deeply engrained in policing in New York City. Restorative justice practices allow the harmed party and the party who caused the harm to be restored and reintegrated into the social fabric of the community.

The City will partner with a community based organization to work with all NCOs, especially those in the most impacted communities, to institutionalize restorative justice and reconciliation practices to address the harms of force and build mutual trust between police and those communities.

### 5. Train all officers on Active Bystandership in Law Enforcement (ABLE).
The Department is partnering with the ABLE program at the Innovative Policing Program at Georgetown Law, a program that

promotes a culture of duty to intervene, training officers on how to hold one another accountable. ABLE provides practical strategies and tactics to prevent misconduct, reduce officer mistakes, and promote health and wellness. The NYPD plans to train all its officers by the end of 2021. Progress toward building community trust and relationships, and intervening when an officer witnesses misconduct, for instance, need to be reinforced.

**6. Enhance positive reinforcement, formally and informally, to change culture.**

In addition to a number of long-standing programs that reflect the NYPD's commitment to employee recognition, NYPD is developing a new program called "Shout Out a Co-Worker" which will ask members to nominate a fellow co-worker for recent, outstanding work to receive departmental rewards. NYPD will also incorporate this recognition into the formal personnel record.

**7. Consistently assess and improve practices and policies through  accreditation.**

CALEA is a non-profit that improves law enforcement service by creating a national body of standards, assessing law enforcement agency compliance, and facilitating agencies' pursuit of professional excellence.  CALEA accreditation strengthens agency accountability through a continuum of close to 500 standards that clearly define authority, performance, and responsibilities.  With respect to use of force, CALEA standards require policies to emphasize the agency's core values and intent to meet the public's expectations on topics including de-escalation, the use of deadly force, the use of less lethal weapons and policies surrounding intervention and rendering aid.

## IV. The Decriminalization of Poverty.

For far too many New Yorkers, there is an inescapable cycle of disadvantage and criminal justice involvement that requires a coordinated response to analyze and interrupt. Following the death of George Floyd, there were widespread calls – including during the listening sessions and focus groups as a part of this process – to right-size and reimagine the role of police. As the responsibilities of law enforcement officers have ballooned over the past few decades, non-emergency social issues such as homelessness, mental illness, substance abuse, and access to transportation, have been addressed with criminal justice

responses, ultimately criminalizing poverty and related stressors.

For the NYPD to provide service that is fair and just for all New Yorkers, the role of police in responding to non-emergency and non-crime situations is being critically and vigorously reassessed. The City owes not only the communities that have been harmed from current practices and that have expressed the strong desire for law enforcement to discontinue their role as first-line responders in a range of circumstances, but also to not put police officers in situations they are not adequately or appropriately trained to handle. This reality puts community members and law enforcement in an impossible situation that has too often had deadly consequences. Alternative programs and models must be reimagined, developed, piloted, and established to better assist and support individuals, families and communities in crises that are not criminal in nature.

Police have become the default "front door" for many complex social, emotional, and behavioral situations in our society, in part because they are the fastest to arrive and because they simply must respond when called. This pattern is particularly true in low-income and communities of color, which had experienced decades of under-investment in critical services. This unnecessary entanglement with the criminal justice system has real consequences for individuals, their families, and communities, creating for too many a poverty to prison pipeline.

True police reform must also be paired with comprehensive, radical economic justice, or budget justice. Throughout the de Blasio administration, the Mayor has promoted economic justice by investing heavily in neighborhoods that were too often ignored or purposefully underserved for decades, if not centuries. So far in his tenure, Mayor de Blasio has redistributed over $20 billion from the wealthy to New York City's working families through programs like Pre-K for All and NYC Care, and record investments in affordable housing.

Following the COVID-19 pandemic, Mayor de Blasio pledged to grow that number and drive a recovery for all of us. Under the new economic recovery plan, New York City will bend government to fight inequality by making the NYC Taskforce on Racial Inclusion and Equity permanent and launching a new commission focused on racial justice and reconciliation. The City will combat the unemployment crisis in communities of color by directly supporting small businesses with new tax credits and loans, grant more contracts to minority- and women-owned

businesses and push forward community hiring requirements that guarantee construction jobs in low-income communities. This is the social and economic justice required to build a truly inclusive city.

As we invest in building neighborhood resilience, we must constantly examine how safety is created. Police play an essential role in keeping our communities safe, but they cannot do it alone. Communities must be co-creators of public safety along with police. Together, residents and police officers can determine the preferred strategies for reinforcing neighborhood policing, preventing crime, and partnering with community organizations.

### 1. Develop a health-centered response to mental health crises.

In November 2020, the City announced that for the first time we will be launching a health only response to 911 mental health calls in high need communities. B-HEARD (the Behavioral Health Emergency Assistance Response Division) will be a critical step forward in the City's commitment to treat mental health crises as public-health not public-safety issues.

Currently, NYPD officers and FDNY Emergency Medical Services Emergency Medical Technicians (EMTs) respond to nearly all mental health 911 calls, regardless of the severity of health needs, whether a crime is involved, or whether there is an imminent risk of violence. Beginning in Spring 2021 in Northern Manhattan (the 32nd, 25th and 28th precincts in Harlem and East Harlem), the new Mental Health Teams of social workers and FDNY/EMS emergency medical technicians will be the new default response to mental health emergencies. In situations involving a weapon or imminent risk of harm, the NYPD and EMS will respond.

B-HEARD teams will have the experience and expertise to de-escalate crisis situations and respond to a range of behavioral health problems, such as suicidal thinking, substance misuse, and serious mental illness, as well as physical health problems, which can be exacerbated by or mask mental health problems.

The overall number of mental health 911 calls fell by over 8,000 in 2019 and by nearly 10,000 in 2020, the first decline following a decade in which 911 mental health calls increased every year and in every precinct in the city. This decline follows a concerted effort to strengthen how the City prevents and responds to mental health crises, including the introduction of new mobile

intervention and treatment teams over the last several years and other strategies developed by the NYC Crisis Prevention and Response Task Force. B-HEARD will be a critical component of this work.

The City looks forward to significantly and rapidly expanding this program, laying the groundwork for it to become a citywide initiative.

**2. New approaches to safety, outreach and regulation through civilian agencies.**
The City has identified several important areas of daily life, where safety, outreach and regulatory functions should be handled by non-law-enforcement personnel and is in the process of completing these transitions.

Homeless outreach: The City has been shifting primary responsibility for homeless outreach efforts from NYPD to the Department of Homeless Services (DHS), with NYPD transitioning to a more supportive role. DHS and contracted not-for-profit organizations are conducting outreach to individuals experiencing street homelessness without a police presence unless there is a public safety concern.

School Safety Agents: The City has launched a multi-agency Transition Team to move school safety from the NYPD to the DOE, and reimagine our approach to school safety. The Transition Team will work with students, parents, administrators, educators, advocates, labor and others to develop critical aspects of this two-year transition.

Street Vending: On January 15, 2021, enforcement of street vending moved to the Department of Consumer and Worker Protection (DCWP). DCWP is the coordinating agency for all street vending activity, working with other agencies to provide community support, equitable enforcement, and access to resources.

Press Credentialing: Press credentialing is an important process in which journalists receive identification to cross police lines to cover important events. This process is currently run by the NYPD. This function is best suited for the Mayor's Office of Media and Entertainment (MOME), which will ensure the credentialing process is efficient, transparent, and fair.

**3. Interrupt violence through expanded community-based interventions.**

Over the past several years, the de Blasio Administration has tripled the City's funding for Cure Violence programs, and increased their reach significantly.

Currently, Cure Violence programs conduct about 5,000 interventions per year, such as street de-escalations, and mediations, and conduct outreach to more 50,000 people per year through community events. These programs also engage young people and community members through direct services such as mentoring, mediation, referrals to mental health services, linkages to jobs, and referrals to legal services.

The City is committed to expanding the impact of this important work by doubling the size of the current Cure Violence workforce in the upcoming budget.

**4. Expand the Community Solutions Program.**

This program uses Community Based Organizations, city services and NYPD responses to improve the physical environment, connect community members to resources, and provide appropriate police response. It is an engagement strategy designed by the Chief of Patrol Juanita Holmes in November of 2020. The Brownsville Safety Alliance pilot was one of the first to take place under the Community Solutions Program, running from December 8-12th, 2020, bringing together CBOs, NYPD and other City agencies to improve quality-of-life conditions and reduce crime.

While the Brownsville pilot was a success, no two communities are the same. To ensure strategies are developed that are specific to the needs of the neighborhood, the Patrol Services Bureau will employ a Community Solutions approach to listen to and prioritize concerns of communities. Being able to solve local issues in true partnership with the communities we serve is the key to sustainable results that achieve buy-in and trust in the processes that provide for the safety and quality of life for all New Yorkers. These meetings will identify top community concerns using 311/911 data, Compstat data, information from the customer feedback surveys, and other metrics. These issues may range from gun violence to chronic noise, but will be decided by the community who will then work together to design and implement formal plans of action to address the identified concerns.

This program does not require a diversion of police response, but focuses on the targeted deployment of external resources that extend beyond traditional policing measures.

**5. Consolidate the coordination of all crime victim service programs into one agency to better support crime victims.**
The City will move management of the Crime Victims Assistance Program (CVAP) from the NYPD to the Office of Crime Victims Services (OCVS) at the Mayor's Office of Criminal Justice. This will improve coordination with other crime victim services, including crime victim restitution, family assistance programs, domestic violence hotlines, court-based services, community-based services, and the Family Justice Centers. In collaboration with the Mayor's Office to End Domestic and Gender Based Violence (ENDGBV) and ThriveNYC, OCVS can deepen the engagement of community-based organizations and continue to improve the reach of services for victims and survivors of crime.

**6. Strengthen community partnerships with domestic and gender-based violence providers.**
Currently, survivors and advocates report that responses to individual incidents of domestic and gender-based violence vary greatly by borough and by precinct, resulting in an inconsistent response for many survivors, especially those who do not have prior knowledge or external supports to navigate the system and those who hold multiple marginalized identities. NYPD will partner with ENDGBV to create a formalized structure to receive community feedback, enhance transparency and support accountability to survivors and their communities. The meetings would bring in external experts and community representatives to support and provide feedback on NYPD's training completion and implementation of new practices, consistent response to DV/GBV survivors and other survivors who call law enforcement for help, and enforcing orders of protection, amongst other topics.

This group will also work with NYPD to examine its interactions with victims, and reimagine reporting to minimize the number of times that a survivor has to tell their story throughout the course of an investigation.

# V. A diverse, resilient, and supported NYPD.

The City aims to develop the most diverse and resilient law enforcement agency in the nation.

The Department has made a concerted effort to recruit more women and people of color, and aims to have a workforce that mirrors the communities served. There have been important gains in diversity during this administration, the percentage of recruits who are people of color increased from 47% in 2013 to 60% in 2020 and the percentage of female recruits increased from 17% in 2013 to 24% in 2020. Leadership has become more diverse, too—the percentage of uniform personnel who are people of color in the rank of captain and above grew from approximately 18% in 2013 to 32% at present. The percentage of women in positions of captain and above increased from 6.8% in 2013 to 9.8% today. The NYPD is transparent about workforce demographics, demonstrating the rank, title, gender, and race of NYPD employees across all uniform ranks and civilian safety titles in a new interactive dashboard.

Despite these important gains, there is still significant work needed to increase diversity in recruitment, retention and promotion. NYPD's Office of Equity and Inclusion is currently examining the policy and structural barriers that inhibit the Department from building a more diverse workforce, so that these issues can be directly addressed.

The NYPD's Health and Wellness section is dedicated to building a culture that promotes the mental health and wellness of officers, reduces the stigma of seeking help, and promotes stress management. Recruits receive an intensive health and wellness training module in the academy, and first-line supervisors are trained to make referrals to a range of resources.

Members of the Department may also contact the Employee Assistance Unit (EAU) 24 hours a day, 7 days a week to reach EAU Peer Counselors. The EAU peer counseling staff consists of both uniformed and civilian active duty members of the service in a variety of ranks and titles who are trained to recognize when someone needs real help, or just needs to blow off steam. They make appropriate referrals to licensed psychologists or psychiatrists, as well as to union representatives, clergy, financial counselors, and hospice, among others.

In 2019, NYPD partnered with New York-Presbyterian to create Finest Care, which offers uniformed members of service access to free, confidential mental health services.

The City is committed to building upon the Department's evolving culture by increasing supports and opportunities and promoting professionalism and excellence.

### 1. Recruit officers who reflect the communities they serve.

The NYPD should leverage community partnerships to collaborate on effective recruitment strategies. As part of its ongoing diversity, equity, and inclusion efforts, the Department is focused on identifying and addressing barriers in hiring, training, promoting, and retaining employees, particularly people of color and women.

This will include examining the impact of the qualification process on the diversity of recruits, and those qualification requirements that have a disproportionate impact on particular candidates.

Among many areas, NYPD will examine the impact of minor criminal convictions or violations, and the impact of the college credit requirement to determine if more flexibility is needed.

### 2. Reform the discretionary promotions process to center on transparency and fairness.

In the NYPD, uniform members of service are promoted either by taking civil service exams, offered for ranks from Police Officer to Captain, or at the discretion of the Police Commissioner, limited by available vacancies and budget. Once a member of service achieves the rank of Captain, that member may opt-in for further promotional consideration. In practice, the NYPD considers myriad factors, including performance history (evaluations, discipline, and honors), as well as qualitative assessments of leadership, problem solving, competence in supporting the Department's mission, and community or department interactions. However, the criteria for discretionary promotion are informal, and have changed frequently without notice to employees, impacting members' career-planning and confidence in their professional futures, as well as community trust in the selection of their police leaders. The NYPD commits to overhauling the discretionary promotion system, in accordance with best practices across law enforcement and in partnership with experts in diversity, equity, and inclusion, in order to best reflect the City's values, build community trust, and support members' professional development.

**3. Build a culture that encourages use of coping tools, and supports NYPD officers by addressing trauma through the Critical Incident Stress Management Program.**

NYPD will constantly work to create a culture that destigmatizes seeking help. As a next step, the NYPD will expand the Critical Incident Stress Management program, which helps officers who need additional support to address trauma, and connects them to a clinician.

**4. Support professional development through the Commander's Course and leadership development programs.**

The NYPD's Office of Professional Development is developing training courses that will enable members to be more effective managers. These courses will be provided to uniformed and civilian members when they are promoted/appointed to managerial titles. In January 2020, a "commander's course" was piloted to offer management skills and organizational theory training to a selected group of existing commanders. Feedback was collected to inform the development of a pre-commander's course in the future for the next generation of commanders. NYPD held focus groups at the end of 2020 with existing commanders to inform topic areas and subjects.

**5. Commit to an updated Patrol Guide that is more user friendly, less complex for officers, and transparent to the public.**

The Patrol Guide, which contains all the rules that NYPD officers must follow, will be streamlined to make it more user-friendly and easier to navigate. NYPD will review major procedures for clarity, determine outdated and obsolete procedures, and create new sections to address gaps. The Department will also build a mobile app for Department smartphones and tablets to allow easier access to search for information. The overhaul will be informed by focus groups with members to understand the current challenges they have accessing information in the guide and what improvements can be made.

# Background: Laying a Foundation of Reform: 2014-2020

Since Mayor de Blasio took office on January 1, 2014, the de Blasio administration has implemented a sweeping set of wholesale reforms to address over-policing and reduce the overall impact of the criminal justice system, while making the city safer and fairer. The hallmark of the current administration has been a reduced enforcement footprint coupled with a sustained decrease in crime. While many criminal justice systems in the United States continued policies that drive mass incarceration, New York City led an effort to reduce law enforcement focused intervention and incarceration.

The results of these efforts have been historic. Comparing 2020 to 2013, the year before the de Blasio Administration took office, there were approximately:

- 182,000 fewer stop and frisk incidents, a 95% reduction
- 253,000 fewer arrests, a 64% reduction
- 29,000 fewer marijuana arrests, a 98% reduction
- 5,900 fewer people in jail on average per day, a 52% reduction

**Ending the stop and frisk era:**
The Department reformed its stop and frisk policy and training, which has resulted in dramatic changes to the practice. From the height of almost 700,000 stops in 2011, there were fewer than 12,000 encounters in 2020. However, the overwhelming majority of such encounters are still disproportionately Black and Brown New Yorkers.



**Investigative Encounters**
**2010 - 2020**

Investigative encounters **declined by 98.6%** since their peak in 2011.

**Use of force:**

While police are authorized by law to use reasonable force to place subjects under arrest, they are barred by federal, state, and local law, as well as Department policy, from using excessive or unreasonable force to effect arrests or for any other purpose.

In recent years, NYPD has developed policies and procedures that enable officers to rely primarily on non-force techniques to effectively police, use force only when necessary, and de-escalate the use of force at the earliest possible moment. Further, this past summer Mayor de Blasio committed to and fulfilled The Obama Foundation pledge to review and address use of force in policing.

The plan developed to fulfill The Obama Foundation pledge builds off major NYPD reforms undertaken throughout the Mayor's tenure, including overhauling use-of-force policies and publishing an annual comprehensive use-of-force report. The plan recognizes that addressing use of force requires going beyond the four corners of the policy itself, and must include reforming the very culture of policing. Key plan elements included involving community members in developing Department policies and in conducting trainings for officers, and releasing a Disciplinary Matrix for public comment, ensuring that officers who engage

in excessive force would be held accountable in a transparent, consistent and fair way.

In June 2020, the NYPD reformed its disciplinary process for incidents involving substantial bodily injury. The Police Commissioner committed to making an initial determination on whether to place the officer on modified duty or suspension within 48 hours of the incident, and concluding the investigation into such incidents on an expedited basis.

In July 2020, Mayor de Blasio signed a bill making it illegal for officers to use a chokehold under City law. New York State also passed legislation criminalizing officer use of a chokehold. Under the NYPD Disciplinary System Penalty Guideline, released in January 2021, the presumptive penalty for use of a chokehold is termination.

Transparency regarding all aspects of use of force is critical. The NYPD Annual Use of Force Report provides a thorough, annual analysis of all force incidents occurring within a calendar year. The NYPD Force dashboard is the newest, dynamic tool meant for easy public access of data regarding force incidents involving members of the Department.

**Neighborhood Policing:**

In 2015, New York City launched Neighborhood Policing, which has since become the cornerstone of today's NYPD. Neighborhood Policing is a comprehensive public safety strategy built on improved communication and collaboration between local police officers and community residents. Neighborhood Policing greatly increases connectivity and engagement with the community while improving the NYPD's crime-fighting capabilities.

Neighborhood Policing provides off-radio time for the sector officers, so they are not exclusively assigned to answering calls for service. This time is used to engage with neighborhood residents, identify local problems, and find solutions. The sector officer plays the role of a generalist officer who knows and feels responsible for the neighborhood, and who provides the full range of policing services.

**Accountability:**

On June 21, 2018, Police Commissioner James P. O'Neill appointed an Independent Panel to conduct a review of the internal disciplinary system of the NYPD. This blue-ribbon

panel of former prosecutors and judges conducted a review of the department's internal disciplinary system and made recommendations, which NYPD has implemented or is in the final stages of completing.

One of those recommendations was the creation of the NYPD Disciplinary System Penalty Guidelines Discipline Matrix ("Matrix"). NYPD worked with the City's independent Civilian Complaint Review Board (CCRB), the Commission to Combat Police Corruption (CCPC) and many stakeholders to create the Matrix, a guide for penalties for officer misconduct. The Discipline Matrix has been strengthened by a Memorandum of Understanding between NYPD and CCRB committing each Agency to follow the penalties.

Under the de Blasio Administration, in partnership with the City Council, the City has made historic investments in the CCRB. In 2020, the CCRB had a staff of more than 210 and a budget of $19M, up from around 160 staff and $12M budget in 2013, a 30% increase in staff and 60% increase in budget. As part of these investments, the City build out the Administrative Prosecution Unit and Outreach Unit in the CCRB. The result is a more efficient and effective CCRB: the time it takes the CCRB to complete an investigation has decreased, CCRB's community outreach has increased, and CCRB's jurisdiction has expanded.

On February 16, 2021, Mayor de Blasio released a statement hailing the federal Second Circuit Court of Appeals ruling on 50-a of the New York State Civil Rights Law, clearing the way for the City to release police disciplinary records. "For the past seven years, we've fundamentally changed how we police our city, strengthening the bonds between communities and the officers who serve them. Now, we can go even further to restore accountability and trust to the disciplinary process." Since 2016, the Mayor has been calling for State law changes to allow the release of police disciplinary records, and looks forward to releasing this data.

The Department already took a major step forward in disciplinary transparency by publishing the trial calendar, including the date, time, rank, and name of the member of service.

NYPD also established the Force Investigative Division, to investigate all firearms discharges and incidents in which subjects of police use of force have died or are seriously injured and likely to die. All uses of force, from the lowest level to the highest level, are made public in NYPD's annual use of force report and on the

newly launched force dashboard.

In June 2020, the NYPD announced it was disbanding the Anti-Crime Units- plainclothes units that had disproportionate civilian complaints and firearms discharges by the police- to instead focus on strategies that better improve public safety, build trust between officers and communities, and make better use of technology and intelligence without causing harm.

**Social media:**
It is essential to intervene when there are officers expressing bias on social media, as such bias makes them fundamentally unable to fairly and justly police New York City communities. In September of 2020, the NYPD revised their policy on personal social media accounts. The policy bars members from, among other conduct, engaging in any type of social media contact with any individual or organization advocating oppression, or prejudice based on ethnicity, race, religion, gender, gender identity/expression, sexual orientation, and/or disability, and engaging in any type of contact with third parties whose content violates the provisions of the procedure. The policy also prohibits posting, transmission or sharing of any content advocating harassment and violence, and from posting, transmitting or sharing content involving discourteous or disrespectful remarks regarding issues of ethnicity, race, religion, gender/gender identity/expression, sexual orientation or disability. The policy goes on to remind members of service that they are strictly accountable for their conduct at all times, inside or outside of New York City, whether on or off duty, including the use of personal social media accounts.

Per the Disciplinary Matrix, offensive language/disparaging remarks have a presumptive penalty of 20 vacation days, while hate speech, including on personal social media accounts, has a presumptive penalty of termination.

When a member of service is the subject of any Internal Affairs Bureau (IAB) investigation, IAB dedicates specific resources to assess and investigate the member's compliance with the Department's social media policy. In addition, IAB has begun to monitor open source social media to identify members who may be violating the Department's social media policy, including members who are communicating about official department business on unofficial social media accounts, in violation of the updated policy.

**Training and new recruits:**

The NYPD has increased the diversity of its recruits as part of a broader effort to have the police better reflect the communities they serve. Since 2013 there has been an increase in new uniform hires who are people of color, from 47% in 2013 to 60% in 2020. There has also been an increase in female new officers, from 17% in 2013 to 24% in 2020.

Demographics of most recent Police Academy class, November 2020 (920 individuals):

- 40% White
- 35% Hispanic
- 13% Black
- 12% Asian

- 24% Female
- 76% Male

Since 2015, police recruits have been given assignments in the field, where they meet community partners, learn about the neighborhood, and get a controlled experience of police work. All Police Academy graduates are now assigned to precincts where they patrol with seasoned, veteran field training officers who expose them to the full range of police functions and mentor them in developing the interpersonal skills and discretion.

NYPD has made unprecedented investments in new trainings, including instituting annual in-service training for all uniform employees. The training covers critical decision-making skills, basic lifesaving skills, de-escalation tactics, and strategies for using the minimal amount of force necessary, among other areas. In 2018, the Department added training on implicit bias to the in-service training program. All uniform members of service have completed this training.

The administration has also committed to the expansion of restorative justice practices, which are currently used by the NYPD in support of diversion efforts throughout the city. The New York Peace Institute, with support from the JAMS foundation, trains the City's over 1,000 NCOs in mediation, de-escalation, and conflict resolution skills. This program represents the largest police-mediation initiative in the City's history.

**Transparency:**

Body-worn cameras were in use in all precincts by 2018, completing a roll out that began in 2014. Providing body-worn

cameras to all patrol officers increases accountability, allowing the Department to review and improve interactions with the public. More recently, the NYPD also committed to the public release of body-worn camera footage within 30 days of critical incidents.

In 2015, the NYPD Open Data Platform increased transparency by making department data publicly available for examination, review, and research.

**Behavioral health:**
The City has taken major steps to address mental health and substance misuse as it relates to our justice system. The overall number of mental health 911 calls fell by over 8,000 in 2019 and by nearly 10,000 in 2020, the first decline following a decade in which 911 mental health calls increased every year and in every precinct in the city. This follows a concerted effort to strengthen how the City prevents and responds to mental health crises, including the introduction of new mobile intervention and treatment teams over the last several years and other strategies developed by the 2018-2019 NYC Crisis Prevention and Response Task Force.

Other efforts include RxStat, co-led by NYC DOHMH and NYPD, and the Heroin Overdose Prevention and Education Program (HOPE)/Project Clear, launched by NYPD and the District Attorneys. RxStat, a national model public health-public safety partnership, brings together multiple government agencies with the shared goal of reducing drug overdoses and saving lives. The goal of HOPE/Clear is to offer a resource to help people who suffer from a substance use disorder and have intersected with the criminal justice system and divert and connect them to effective drug treatment services. Thousands have participated in this diversion program citywide.

NYPD also developed Crisis Intervention Team training to train officers. NYPD and DOHMH instructors co-teach officers how to better approach and gain voluntary compliance from substance abusers and persons experiences mental health crises.

And to ensure that victims are fully supported, ThriveNYC partners with NYPD to place victim advocates in all 77 precincts and 9 Public Service Areas, which service NYCHA developments. From September 2016 – July 2020, victim services advocates provided support to over 165,000 people.

**School safety:**

The de Blasio Administration has made unprecedented investments to create equity in our school system and excellence in every school with Pre-K and 3-K for All, Computer Science for All, Advanced Placement exams for all and more. Every student deserves a school system where they can thrive.

That's why we've made sweeping investments in social-emotional learning and mental health supports for our students from pre-school to graduation. To address the trauma of COVID-19, in the upcoming school year, K-12 students in the 33 hardest hit neighborhoods will be screened for social emotional learning needs. We're hiring 150 Social workers to ensure students will have the appropriate supports and we're adding 27 new community schools. We're also adding School Response Clinicians and Mental Health specialists to provide direct care to students in crisis through a partnership between DOE, DOHMH, and ThriveNYC.

We have also made school climate and discipline reform central to our policy. The Administration has clarified the role of NYPD in schools, limiting the role of School Safety Agents (SSAs), and making it clear that school officials should handle non-criminal misconduct. The NYPD amended its Patrol Guide to limit arrests in schools to serious incidents. SSAs now undergo extensive training, including conflict resolution and de-escalation. The impact has been significant—in 2019, on-site school arrests decreased 34% from 2018. At the same time, we've expanded restorative justice practices that emphasize conflict resolution and problem solving, and reduced suspensions in our schools. Suspensions are down 19.8% during the first half of the 2019-2020 school year compared to the same period the prior year.

**Justice system reforms:**

The administration launched The Criminal Justice Reform Act in partnership with City Council in 2016, which gave the NYPD and other enforcement agencies the option to file certain summonses at the NYC Office of Administrative Trials and Hearings (OATH) rather than in Criminal Court. Since then, criminal summonses have decreased substantially.

In 2018, the City implemented a policy to reduce unnecessary marijuana arrests to better balance fairness with public safety and quality of life concerns. Marijuana arrests declined 90% from 2014 to 2019 (33,314 vs. 3,231), and the City developed

a comprehensive proposal for a fair and equitable regulatory system through the 2018 Task Force on Cannabis Legalization.

In 2019, the City finalized its plan to replace Rikers with a smaller, safer and fairer borough-based system. This milestone was made possible due to unprecedented investments in reshaping the justice system, including expanding alternatives to incarceration and offering comprehensive reentry programming with transitional jobs. The City also committed to ending punitive segregation in 2021 and has reduced its use by approximately 80%.

Despite the unquestionable successes of vast reductions in overall crime, incarceration, and low level arrests citywide, Black and Brown New Yorkers still bear the overwhelming brunt of contact with the criminal justice system, a status quo we cannot accept and must work urgently and relentlessly to change.

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan – October
2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix I



No. 203

EXECUTIVE ORDER

NEW YORK STATE POLICE REFORM AND REINVENTION COLLABORATIVE

**WHEREAS**, the Constitution of the State of New York obliges the Governor to take care that the laws of New York are faithfully executed; and

**WHEREAS**, I have solemnly sworn, pursuant to Article 13, Section 1 of the Constitution, to support the Constitution and faithfully discharge the duties of the Office of Governor; and

**WHEREAS**, beginning on May 25, 2020, following the police-involved death of George Floyd in Minnesota, protests have taken place daily throughout the nation and in communities across New York State in response to police-involved deaths and racially-biased law enforcement to demand change, action, and accountability; and

**WHEREAS**, there is a long and painful history in New York State of discrimination and mistreatment of black and African-American citizens dating back to the arrival of the first enslaved Africans in America; and

**WHEREAS**, this recent history includes a number of incidents involving the police that have resulted in the deaths of unarmed civilians, predominantly black and African-American men, that have undermined the public's confidence and trust in our system of law enforcement and criminal justice, and such condition is ongoing and urgently needs to be rectified; and

**WHEREAS**, these deaths in New York State include those of Anthony Baez, Amadou Diallo, Ousmane Zongo, Sean Bell, Ramarley Graham, Patrick Dorismond, Akai Gurley, and Eric Garner, amongs others, and, in other states, include Oscar Grant, Trayvon Martin, Michael Brown, Tamir Rice, Laquan McDonald, Walter Scott, Freddie Gray, Philando Castile, Antwon Rose Jr., Ahmaud Arbery, Breonna Taylor, and George Floyd, amongst others,

**WHEREAS**, these needless deaths have led me to sign into law the Say Their Name Agenda which reforms aspects of policing in New York State; and

**WHEREAS**, government has a responsibility to ensure that all of its citizens are treated equally, fairly, and justly before the law; and

**WHEREAS**, recent outpouring of protests and demonstrations which have been manifested in every area of the state have illustrated the depth and breadth of the concern; and

**WHEREAS**, black lives matter; and

**WHEREAS**, the foregoing compels me to conclude that urgent and immediate action is needed to eliminate racial inequities in policing, to modify and modernize policing strategies, policies, procedures, and practices, and to develop practices to better address the particular needs of communities of color to promote public safety, improve community engagement, and foster trust; and

**WHEREAS**, the Division of the Budget is empowered to determine the appropriate use of funds in furtherance of the state laws and New York State Constitution; and

**WHEREAS**, in coordination with the resources of the Division of Criminal Justice Services, the Division of the Budget can increase the effectiveness of the criminal justice system by ensuring that the local police agencies within the state have been actively engaged with stakeholders in the local community and have locally-approved plans for the strategies, policies and procedures of local police agencies; and

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and the Laws of the State of New York, in particular Article IV, section one, I do hereby order and direct as follows:

The director of the Division of the Budget, in consultation with the Division of Criminal Justice Services, shall promulgate guidance to be sent to all local governments directing that:

Each local government entity which has a police agency operating with police officers as defined under 1.20 of the criminal procedure law must perform a comprehensive review of current police force deployments, strategies, policies, procedures, and practices, and develop a plan to improve such deployments, strategies, policies, procedures, and practices, for the purposes of addressing the particular needs of the communities served by such police agency and promote community engagement to foster trust, fairness, and legitimacy, and to address any racial bias and disproportionate policing of communities of color.

Each chief executive of such local government shall convene the head of the local police agency, and stakeholders in the community to develop such plan, which shall consider evidence-based policing strategies, including but not limited to, use of force policies, procedural justice; any studies addressing systemic racial bias or racial justice in policing; implicit bias awareness training; de-escalation training and practices; law enforcement assisted diversion programs; restorative justice practices; community-based outreach and conflict resolution; problem-oriented policing; hot spots policing; focused deterrence; crime prevention through environmental design; violence prevention and reduction interventions; model policies and guidelines promulgated by the New York State Municipal Police Training Council; and standards promulgated by the New York State Law Enforcement Accreditation Program.

The political subdivision, in coordination with its police agency, must consult with stakeholders, including but not limited to membership and leadership of the local police force; members of the community, with emphasis in areas with high numbers of police and community interactions; interested non-profit and faith-based community groups; the local office of the district attorney; the local public defender; and local elected officials, and create a plan to adopt and implement the recommendations resulting from its review and consultation, including any modifications, modernizations, and innovations to its policing deployments, strategies, policies, procedures, and practices, tailored to the specific needs of the community and general promotion of improved police agency and community relationships based on trust, fairness, accountability, and transparency, and which seek to reduce any racial disparities in policing.

Such plan shall be offered for public comment to all citizens in the locality, and after consideration of such comments, shall be presented to the local legislative body in such political subdivision, which shall ratify or adopt such plan by local law or resolution, as appropriate, no later than April 1, 2021; and

Such local government shall transmit a certification to the Director of the Division of the Budget to affirm that such process has been complied with and such local law or resolution has been adopted; and

The Director of the Division of the Budget shall be authorized to condition receipt of future appropriated state or federal funds upon filing of such certification for which such local government would otherwise be eligible; and

The Director is authorized to seek the support and assistance of any state agency in order to effectuate these purposes.

GIVEN under my hand and the Privy Seal of the State in the City of Albany this twelfth day of June in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan – October
2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix II

# Community Engagement

The Reform and Reinvention Collaborative hosted over 85 meetings- public listening sessions, town halls, and roundtable discussions- with a range of groups and organizations.

Between October 2020 and February 2021, the Collaborative engaged New Yorkers from a cross-section of backgrounds, fields, and experiences. Attendees consisted of clergy and religious leaders, police reform advocates, community-based organizations, leaders in restorative justice, alternatives to incarceration and reentry representatives, resident associations, housing providers, business organizations, LGBTQIA+ organizations, groups representing New York City's diverse communities, young people, people with lived experience in communities most affected by policing, thought leaders in public safety, District Attorneys, oversight bodies, NYPD officers and employees and unions, and many others.

## Public Listening Sessions

The Collaborative held nine community listening sessions across the city, in every borough, to hear from New Yorkers and solicit their input for reforms.

## Meetings in Communities Most Affected

The Collaborative also hosted 5 separate sessions to engage those from communities most affected by policing. These meetings consisted of panel discussions and open dialogues with community members to gather their feedback on policing reforms.

## Stakeholder Engagement Meetings

The Reform and Reinvention collaborative hosted dozens of meetings with stakeholder groups and organizations.

## Past Meetings

**February 2021**
- Indo Caribbean/ East Indian Community Groups – February 11, 2021
- "Future of Public Safety" – Conversation with John Jay College of Criminal Justice and NOBLE– February 8, 2021

**January 2021**
- Mayor's Office of People with Disabilities - Community Stakeholders– January 27, 2021
- Minority Business Owners – January 25, 2021
- Adult Continuing Education Group – January 20, 2021

- NYPD Cadets, NYPD Explorers, and Members of the Youth Leadership Council– January 19, 2021
- NYC Office of Neighborhood Safety Partners – January 15, 2021
- Center for Justice Research and Innovation – January 11, 2021
- Center for Policing Equity – Youth Outreach – January 6, 2021

**December 2020**
- Mayor's Action Plan for Neighborhood Safety (MAP) Program Partners – December 29 and December 30, 2020
- CUNY's Black Male Initiative – December 28, 2020
- Interfaith Center of New York – December 22, 2020
- iBelong Program– December 22, 2020
- Pan Asian Community Leaders– December 18, 2020
- Department for the Aging – Community Stakeholders - December 17, 2020
- CCRB Civilian Oversight Panel – December 16, 2020
- Business Owners - (Manhattan/Bronx) – December 16, 2020
- Impacted Community Meeting #5 – December 16, 2020
- 1st Deputy Commissioner's Roundtable on Policy– December 15, 2020
- Business Owners (Brooklyn/Queens/SI) – December 15, 2020
- Impacted Community Meeting #4 – December 14, 2020
- Deaf & Hard of Hearing Community Meeting – December 14, 2020
- Impacted Community Meeting #3 – December 11, 2020
- Impacted Community Meeting #2 – December 9, 2020
- Impacted Community Meeting #1 – December 8, 2020
- NYPD Members (Voluntary Participants)– December 8, 2020
- Shelter Based and Affordable Housing Providers– December 7, 2020
- NYPD – Civilian Complaint Review Board Youth Meeting – December 3, 2020
- NYPD Members -(Voluntary Participants) – December 3, 2020
- NYPD Members - (Voluntary Participants) – December 2, 2020
- LGBTQIA Organizations – December 2, 2020
- Community Activists – December 1, 2020
- NYPD Civilian Members – Safety Titles – December 1, 2020

**November 2020**
- NYPD Civilian Members - Operational Titles – November 30, 2020
- Minority Law Enforcement Organizations – November 25, 2020

- NYPD Members - Precinct Commanders – November 25, 2020
- NYPD Members - Detectives/Investigative Units – November 24, 2020
- Muslim Community Leaders Roundtable – November 23, 2020
- NYPD Members - Frontline Supervisors – November 23, 2020
- NYPD Members - P.O.'s/Detectives- Specialized Units – November 20, 2020
- Commission to Combat Police Corruption – November 20, 2020
- Department of Investigation/Inspector General – November 20, 2020
- Center for Court Innovation - November 20, 2020
- Clergy Members – November 19, 2020
- NAACP – November 18, 2020
- People's Police Academy – November 18, 2020
- NYPD Members - POs/Dets/Specialized Units – November 18, 2020
- District Attorneys – November 16, 2020
- Community Activists (CBOs and Clergy Leaders)– November 16, 2020
- Civilian Complaint Review Board – November 13, 2020
- Federal Monitor Team – November 13, 2020
- Fraternal Organization Leadership – November 13, 2020
- Columbia University Center for Justice– November 11, 2020
- Columbia Univ. Center for Justice Youth Leadership Ambassadors – November 6, 2020
- Columbia University Center for Justice – November 4, 2020
- Harlem Mothers Save – November 2, 2020
- Red Hook Community Justice Center – November 2, 2020

**October 2020**
- Center for Court Innovation – October 30, 2020
- NYPD Union Leadership – October 30, 2020
- Fraternal Organization Leadership – October 28th, 2020
- Greater Harlem Coalition – October 27, 2020
- NYCHA Tenants Associations (Manhattan) - October 26, 2020
- REFORM NYPD Coalition/Union Settlement – October 2, 2020

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan – October
2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

**Appendix III**



New York City Police Department

# Disciplinary System Penalty Guidelines

Effective January 15, 2021

# Table of Contents

Police Commissioner's Letter ...................................................................................................................... 1

Introduction ............................................................................................................................................... 2

   NYPD Values ............................................................................................................................................ 2

   Neighborhood Policing and the Disciplinary System ............................................................................. 2

The Disciplinary System ............................................................................................................................ 3

   Goals of the Disciplinary System ............................................................................................................ 3

   Discipline Generally ................................................................................................................................ 3

   The Investigative Process ........................................................................................................................ 4

   Intersection with the Criminal Justice System ....................................................................................... 5

   Statute of Limitations ............................................................................................................................. 6

   Resolution of Disciplinary Charges ......................................................................................................... 6
      Police Commissioner's Authority ....................................................................................................... 6
      Settlement Agreements ..................................................................................................................... 6
      Department Trials .............................................................................................................................. 6

Penalty Guidelines ..................................................................................................................................... 8

   The Penalty Guidelines Explained ........................................................................................................... 8

   Presumptive Penalties ............................................................................................................................ 8

   Mitigating and Aggravating Factors ........................................................................................................ 9
      Potential Mitigating Factors .............................................................................................................. 9
      Potential Aggravating Factors .......................................................................................................... 10

   The Effect of Rank on Discipline ............................................................................................................ 10

   Prior Disciplinary History ...................................................................................................................... 11
      Progressive Discipline ...................................................................................................................... 11

   Consequences of Disciplinary Action .................................................................................................... 12

   Calculation of Penalties ........................................................................................................................ 12

   Probationary Status .............................................................................................................................. 13

   Effect of Precedent ............................................................................................................................... 14

   Definitions ............................................................................................................................................ 14

   Additional Requirements ...................................................................................................................... 15

Specific Penalty Guidelines by Category ................................................................................................. 17

   Conduct Constituting a Crime Proscribed by State or Federal Law ...................................................... 17
      Presumptive Penalties for Violation of Criminal Statutes ................................................................ 18

   Use of Excessive Force ......................................................................................................................... 20
      Additional Definitions Pertaining to Use of Force ........................................................................... 20
      Presumptive Penalties for Use of Excessive Force ........................................................................... 22

i

Additional Potential Mitigating Factors ............................................................................................24
Additional Potential Aggravating Factors .........................................................................................24

*Abuse of Authority, Discourtesy and Offensive Language* ...................................................................*25*
Additional Definitions ......................................................................................................................25
Presumptive Penalties for Abuse of Authority, Discourtesy, Offensive Language...........................26
Additional Potential Mitigating Factors ............................................................................................28
Additional Potential Aggravating Factors .........................................................................................28

*False, Misleading and Inaccurate Statements* ......................................................................................*29*
Additional Definitions for False, Misleading and Inaccurate Statements ........................................29
Presumptive Penalties for False, Misleading & Inaccurate Statements and Impeding an Investigation...............32
Additional Potential Aggravating Factors .........................................................................................32
Additional Potential Mitigating Factors ............................................................................................32

*Domestic Violence Incidents* ................................................................................................................*33*
Additional Definition for Domestic Violence Incidents ....................................................................33
Presumptive Penalties for Domestic Violence Incidents Involving Family/Household .....................33
Additional Considerations for Domestic Violence Incidents .............................................................34
Unique Aggravating Factors and Additional Presumptive Penalties for Misconduct Involving
Family/Household ............................................................................................................................. 35
Additional Potential Mitigating Factors ............................................................................................36

*Driving While Ability Impaired/Intoxicated Incidents* ...........................................................................*37*
Presumptive Penalties for Driving While Impaired/Intoxicated .......................................................37
Additional Considerations for DWI Incidents....................................................................................37
Unique Aggravating Factors and Additional Presumptive Penalties..................................................38

*Firearm-Related Incidents*......................................................................................................................*39*
Presumptive Penalties for Firearm-Related Incidents ......................................................................39

*Ingesting Controlled Substances, Marihuana/THC, Banned Substances and Excessive/Unexcused Use of Prescription Drugs*
................................................................................................................................................................*41*
Additional Definitions ......................................................................................................................41
Presumptive Penalties for Controlled Substances, Marijuana/THC, Banned Substances and
Excessive/Unexcused Use of Prescription Drugs ............................................................................. 42

*Violations of Department Rules and Regulations*...................................................................................*43*
Presumptive Penalties for Violation of Department Rules and Regulations – Adjudicated by Charges and
Specifications ...................................................................................................................................43

*Off-Duty Misconduct & Prohibited Conduct Generally* ..........................................................................*46*
Presumptive Penalties for Off-Duty Misconduct & Prohibited Conduct...........................................46

*Equal Employment Opportunity Division and the Discipline System* .....................................................*48*
Presumptive Penalties for Equal Employment Opportunity Violations .............................................48
Protected Classes Pursuant to Federal, State, and Local Law (current as of June 16, 2020) ............49
Additional Potential Aggravating Factors .........................................................................................49

**Misconduct Adjudicated by Command Discipline – General Terms** ....................................................... **50**

*Adjudicated by Schedule A Command Discipline*....................................................................................*50*

*Adjudicated by Schedule B Command Discipline*....................................................................................*52*

*Adjudicated by Schedule C Command Discipline*....................................................................................*52*

**Conclusion** ..........................................................................................................................................**54**

ii



**THE POLICE COMMISSIONER**
CITY OF NEW YORK

January 15, 2021

In January 2019, a blue ribbon panel of judges and former prosecutors made 13 recommendations to improve the New York City Police Department's internal discipline process. The department accepted them all, including the recommendation that we consider a discipline penalty matrix to outline the presumptive penalties for a wide variety of possible offenses – both violations of internal department rules and police misconduct during encounters with members of the public. This document, almost two years in the making, is the product of that effort.

Preparing the matrix turned out to be an extremely useful exercise. First, it gives the members of our department and the members of the public a clearer understanding of how penalties will be imposed when officers are found guilty of, or plead guilty to, disciplinary charges. Second, the work of developing the matrix forced the department to take a hard look at our discipline system. Like the blue ribbon panel, we found that the discipline system is generally robust, however, the analysis revealed some inconsistencies and oversights that diminished the system's fairness and efficacy in the eyes of both the public and our own employees. In retrospect, the matrix was long overdue and has proven a very welcome improvement.

The revision process has been a collaborative effort with a wide variety of police oversight entities, public interest groups, elected leaders, and other interested parties. The final product relies heavily on public comments gathered from August to October of last year. In light of those comments, the department strengthened the matrix in several key ways, namely: establishing greater consistency between penalties assessed for violating internal department policies and penalties imposed for police misconduct in public encounters, defining clear escalating penalties for repeat offenders, and delineating more specifically how both mitigating and aggravating factors may affect the ultimate penalties imposed.

In all, I believe this matrix with its detailed presumptive penalties for acts of misconduct will help to ensure that the NYPD discipline system does what it is intended to do: punish officers who have abused their position of trust in a fair manner and apply a consistent approach to both appropriate penalties and, in some instances, provide for remedial education and rehabilitation of offending officers that deters and prevents future wrongdoing. Our goal is to always strive to ensure that our discipline system is as clear and fair as it can be, and we believe that this product is another important step toward achieving that goal. We also recognize that this matrix is a living document, which may, and should, be revised as part of a continuing process of review, assessment, and improvement of the entire disciplinary system in the coming years.

Sincerely,

Dermot Shea
Police Commissioner

1 Police Plaza, New York, NY 10038  ●  646-610-5410  ●  Fax: 646-610-5865
Website: http://nyc.gov/nypd

# Introduction

New York City police officers hold a unique position within our society. They are responsible for the safety and security of all of those who work, live and visit our city. Whether responding to crimes in progress or offering emergency assistance, they are the component of government that civilians most frequently interact with and rely upon in times of need. In order to effectively carry out their duties, police officers are granted vast discretion in how exactly to perform their work. They have the power to seize property, restrict the freedom of individuals, and, under appropriate circumstances, to use force in the course of their duties. With this discretion comes a responsibility to perform their duties using good judgment and exercise their discretion within the bounds of the law and New York City Police Department ("NYPD") policy.

Both the public and police officers must understand and, indeed expect, that when the bounds of the law or Department policy are exceeded, equitable discipline will result. Similarly, it should be expected that any discipline imposed will be fair, consistent and based upon reasonable standards. Fairness within a disciplinary system begins with taking the time to objectively review the totality of the circumstances surrounding any substantiated misconduct. Proportionality of discipline requires that each instance of misconduct is addressed in line with the seriousness of that misconduct, including any aggravating and mitigating circumstances. Lastly, equity within a discipline system means that every officer is held accountable for unacceptable behavior, without regard to rank, title, demographic identity, assignment, or membership in any protected class. It is with these tenets in mind that these Penalty Guidelines ("Guidelines") have been assembled and published.

Nothing in these Guidelines shall be construed to limit the discretion of the Police Commissioner to impose discipline. The Police Commissioner may modify these Guidelines as appropriate to address emerging issues and advance the goals of the disciplinary system described herein. Any such modifications shall be posted on the Department's website, with an accompanying description of the modifications, as needed. No later than January 30, 2022 and by January 30 of each year thereafter, the Department shall post on its website and deliver to the Speaker of the New York City Council a report that includes the number and percentage of instances within the preceding calendar year in which the Police Commissioner imposed a disciplinary penalty that deviates from the penalties enumerated in these Guidelines.[1]

## NYPD Values

The NYPD values provide the foundation for the Department's disciplinary system. Given these values, the standards for professional and personal conduct are high. The Department has pledged that, in partnership with the community, it will:

- Protect the lives and property of our fellow citizens and impartially enforce the law
- Fight crime, both by preventing it and aggressively pursuing violators of the law
- Maintain a higher standard of integrity than is generally expected of others because so much is expected of us
- Value human life, respect the dignity of each individual, and render our services with courtesy and civility

## Neighborhood Policing and the Disciplinary System

Neighborhood Policing is the cornerstone of the NYPD. It is a comprehensive strategy, built on improved communication and collaboration between police officers and community residents. Neighborhood Policing works to accomplish three core goals: reduce crime; promote trust and respect; and solve problems collaboratively, both within the Department and with neighborhood residents. As an integral part of this philosophy, the Department's disciplinary system sets standards of performance and conduct, and establishes fair consequences for failing to adhere to these standards. The Guidelines contained herein, coupled with the annual "Discipline in the NYPD" report[2], help promote trust and respect by providing greater transparency and insight into the disciplinary system. At the same time, it promotes greater confidence in the process among officers who will be able to see the system as fair, proportional, and equitable.

---

[1] See New York City Administrative Code § 14-186.
[2] The annual reports are published on the NYPD website and are available at https://www1.nyc.gov/site/nypd/stats/reports-analysis/discipline.page.

2

# The Disciplinary System

## Goals of the Disciplinary System

As noted, a disciplinary system must be fair and equitable in order to be effective. Discipline must be fairly administered, reasonably consistent, designed to achieve a desired result and premised upon standards that are generally understood Department-wide. The goals of the disciplinary system include:

- Correcting or modifying inappropriate behavior and rehabilitating the member of the service
- Educating personnel and the community regarding agency standards
- Providing reasonable notice of the standards by which conduct will be judged and the likely consequences of the failure to adhere to Department rules and policies
- Resolving disciplinary matters impartially and in a prompt and efficient manner
- Retraining personnel who exhibit a lack of understanding of Department policies and procedures
- Addressing the harm, or risk of harm, arising from misconduct and the effects of misconduct both inside and outside the Department
- Deterring future misconduct
- Imposing appropriate penalties that are fair, proportional and rational
- Ensuring the good order and efficiency of the Department
- Establishing a culture of accountability and individual responsibility
- Listening to community concerns about officer misconduct and implementing improvements to address them

The desired results to be achieved by the imposition of discipline in a particular case are properly dependent on all the facts and circumstances of each case. The final outcomes may vary and are based upon a consideration of numerous factors including, but not limited to, the nature and seriousness of the misconduct, the circumstances under which the misconduct was committed, the harm or prejudice arising from the misconduct, and the existence of any relevant mitigating or aggravating circumstances.

## Discipline Generally

Discipline in the NYPD is broadly defined, encompassing actions designed to remediate inappropriate behavior, and imposed in a variety of ways, largely determined by the seriousness of the substantiated misconduct. The least serious procedural violations may result in "instruction," a method of re-training through which a commanding officer instructs a member of the service on proper procedures, or "reprimand," where members of the service are admonished for low-level violations. The Department may also require members of the service to participate in other forms of training to address deficiencies, at any time. Depending upon the nature of the misconduct, training will be delivered by the appropriate subject matter expert(s) and in a suitable venue. Examples include training delivered at the command by the Training Sergeant, or at the Firearms and Tactics Section, Legal Bureau, Police Academy, or Risk Management Bureau. Successful completion of the training is memorialized as part of the disciplinary case record.

Technical violations of Department procedures may be addressed through discipline imposed at the command level, through a process referred to as "Command Discipline." The Command Discipline procedure allows commanding officers to maintain order in their commands and impose discipline without initiating a disciplinary hearing by means of serving "Charges and Specifications".

The types of violations subject to punishment by Command Discipline are outlined in Patrol Guide procedure 206-03, and include behavior such as improper uniform, reporting late for duty, and loss of Department property. Depending upon the severity of the violation, commanding officers may impose penalties ranging from oral reprimand to forfeiture of up to 10 vacation days or accrued compensatory time.[3] Substantiated allegations of serious misconduct are handled by the Department Advocate's Office ("DAO"). Staffed by civilian attorneys, and augmented by a complement of uniformed and civilian personnel, the DAO evaluates substantiated allegations of

---

[3] There is also a provision that allows for a Command Discipline to be resolved with a penalty of up to the loss of 20 vacation days, however, that procedure involves a formal disciplinary review of the matter and the Command Discipline may only be issued by the Department Advocate's Office.

3

serious misconduct, serves disciplinary "Charges and Specifications" against members of the service, recommends appropriate disciplinary penalties, and prosecutes disciplinary cases in the Department's Trial Room.

In order to enhance transparency and ensure the integrity of internal investigations and adjudications of Departmental disciplinary proceedings, the Department has issued guidelines to members of the service regarding recusal from involvement in disciplinary proceedings or investigations when there is an actual or perceived conflict of interest based on a personal or familial relationship with a subject.[4]

## The Investigative Process

Depending on the nature of a misconduct allegation, the investigation of such allegation may be investigated by either the Department or the Civilian Complaint Review Board ("CCRB").

Civilian complaints against police officers regarding excessive **F**orce, **A**buse of Authority, **D**iscourtesy, and **O**ffensive Language (known collectively as "FADO" complaints) are investigated by the CCRB. The CCRB is an independent city agency[5] authorized under the New York City Charter[6] to investigate FADO complaints with the cooperation of the NYPD. The CCRB submits its findings regarding each allegation of misconduct, as well as its disciplinary recommendations for substantiated complaints, to the Department. Under the terms of a Memorandum of Understanding[7] between the NYPD and the CCRB, prosecutions for the most serious violations within these categories result in the filing of formal disciplinary charges, known as "Charges and Specifications," and are handled and prosecuted by CCRB attorneys assigned to CCRB's Administrative Prosecution Unit ("APU"). The CCRB may also recommend adjudication of some substantiated FADO allegations, based upon their proposed penalty, by means of a Command Discipline.

The Department investigates allegations of corruption and misconduct, as well as non-FADO complaints related to public contact, against members of the service regarding a wide variety of employee behaviors. Complaints are received from the public, as well as from Department personnel who have an obligation to report corruption or other misconduct of which they become aware.

Investigations may also result from media or social media exposure and proactive measures by various investigative entities within the Department itself. Complaints can range from simple violations of Department policies and procedures to more serious allegations of misconduct. The most serious investigations involve allegations of unlawful behavior or criminal conduct. The Department investigates allegations of criminal conduct in conjunction with the appropriate prosecutor's office having jurisdiction over the incident. In these cases, internal disciplinary charges may be levied because the commission of a criminal offense also constitutes a violation of Department policy.

The Department will launch an investigation immediately upon becoming aware of misconduct or an allegation of misconduct. Members of the service may be suspended during the course of a Department investigation prior to a hearing and final determination of the charges.[8] A ranking officer may suspend a member of the service or place a uniformed member of the service on modified assignment (which entails the removal of firearms and assignment to a non-enforcement function) when he or she deems it necessary given the nature of the misconduct alleged and

---

[4] See Interim Order 11 of 2020.

[5] The Conflicts of Interest Board is another independent City agency that enforces violations of Chapter 68 of the New York City Charter, the City's Conflicts of Interest Law, and § 12-110 of the Administrative Code, the City's Annual Disclosure Law. The New York City Department of Investigation conducts investigations into potential violations for the Board. Numerous outside entities also examine policies and procedures of the Department regarding misconduct and discipline. The Commission to Combat Police Corruption performs audits, studies, and analyses of the Department's corruption controls and disciplinary cases. The Inspector General for the New York City Police Department investigates and makes recommendations regarding the operations, policies, programs, and practices of the Department.

[6] See New York City Charter Ch. 18-A § 440.

[7] Available at: https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/apu_mou.pdf

[8] See New York Civil Service Law § 75(3). A member of the service "may be suspended without pay for a period not exceeding thirty days." See also, New York City Administrative Code § 14-123. In cases of criminal allegations or other serious allegations of misconduct, a member of the service may also be suspended with pay during the pendency of the investigation and disciplinary process.

4

because disciplinary action is being taken or contemplated.[9] The ranking officer in charge will make an initial determination as to the member's duty status upon completion of the preliminary investigation which typically occurs within 24 hours of the Department becoming aware of the incident. Given the complexity of some investigations, a duty status determination may be deferred until such time as sufficient evidence is gathered supporting the conclusion to suspend or modify the member concerned.

The Internal Affairs Bureau ("IAB") conducts comprehensive investigations of corruption and misconduct complaints, including criminal conduct, as well as other matters at the direction of the Police Commissioner. IAB uses all available investigative tools, including pattern analysis, surveillance, integrity tests, drug testing, confidential informants, and undercover officers to investigate incoming complaints and to conduct pro-active investigations involving officer misconduct. IAB may assign some misconduct investigations to the bureau/borough investigation units, which function as satellites of IAB and are responsible for the integrity controls within their respective units. These investigation units report their findings through IAB, which retains oversight over the investigations.

The Equal Employment Opportunity Division, within the Department's Office of Equity and Inclusion, investigates allegations of employment discrimination and harassment, as well as proactively trains and advises Department employees on issues of equality and fairness in the workplace.

When an allegation(s) of misconduct against a member of the service is investigated and evidence is found to show that the event did occur, that the member in question engaged in the action, and that the act itself was a violation of Department guidelines, the allegation is deemed by the investigator to be "substantiated." Substantiated allegations of misconduct result in remedial action along a disciplinary continuum.

## Intersection with the Criminal Justice System

To the extent any conduct by Department employees is criminal in nature, New York City District Attorneys, the local prosecutor with jurisdiction over an event occurring outside the city, the United States Attorneys' Offices and/or the New York State Attorney General may also conduct investigations. Once it is ascertained that a member of the service has engaged in possible criminal behavior, the Department works closely with the relevant prosecutorial agencies to coordinate investigative efforts. This may result in both a criminal prosecution and an internal disciplinary proceeding, regardless of the outcome of the criminal matter.

The Department's disciplinary process is not a substitute for the criminal or civil justice systems. When a member of the service is arrested and charged with a crime, he or she is subject to criminal responsibility and potential prosecution in accordance with applicable Federal, state, or local law. The member of the service may also be subject to liability in a civil proceeding. The disciplinary system is an internal administrative process designed to address misconduct with regard to the individual's status as a NYPD employee and operates on a track independent of any criminal and civil proceedings.

When a member of the service is charged with a crime, the Department also files internal disciplinary charges against the member because criminal conduct always constitutes a violation of Department policy. Under appropriate circumstances, the Department's internal disciplinary case may proceed on a parallel track to the criminal case. However, in some cases, the disciplinary case may be deferred until after the criminal prosecution has been fully resolved.

The determination to move ahead with a disciplinary proceeding is fact-specific and will be undertaken if the disciplinary proceeding can be accomplished without compromising the criminal prosecution. In making the decision, the Department will always consult with, but not necessarily defer to, the appropriate prosecutorial authority and will consider any issues or concerns presented.

---

[9] See Patrol Guide procedure 206-07, *Cause for Suspension or Modified Assignment*.

# Statute of Limitations

The statute of limitations ("SOL") applicable to disciplinary proceedings is described in section 75 of the New York Civil Service Law. Disciplinary action must be commenced (e.g. service of charges and specifications, adjudication of a Command Discipline, etc.) within 18 months of the date of occurrence of the misconduct. The SOL does not apply if the misconduct would, if proved in a court of appropriate jurisdiction, constitute a crime.[10]

# Resolution of Disciplinary Charges

### Police Commissioner's Authority

The Police Commissioner, by law, has the sole discretion to determine the final disciplinary disposition and penalty imposed.[11] The Police Commissioner reviews recommendations regarding discipline from the prosecuting authority (either DAO or CCRB) and the administrative trial judge, when applicable. When the final disciplinary decision deviates from any one of these recommendations, the Police Commissioner prepares a memorandum to document the factors that were considered in support of that decision and their application justifying the final determination.[12] Any deviation from a presumptive penalty enumerated below is similarly described in the memorandum.

### Settlement Agreements

Members of the service who face disciplinary charges and specifications for substantiated allegations of misconduct or violations of Department rules, may agree to take responsibility for the charged misconduct and accept a penalty by entering into a settlement agreement negotiated with the Department.

The starting point for any settlement negotiation is the presumptive penalty/penalty range for each enumerated act of misconduct described in these Guidelines. Factors that are likely to impact the ability to sustain a violation on the merits of the case during an administrative trial may be considered when the Department is contemplating a negotiated settlement in a case. Settlement agreements properly take into account such matters as the availability of witnesses and other evidence, the strength of the available proof, and the viability of available defenses. However, in negotiating settlements, the Department will not bargain away readily provable misconduct merely to dispose of a matter promptly, to allow for a more lenient penalty than would be called for under these Guidelines, or to achieve any other result that serves to undermine the goals and purposes of these Guidelines. Cases falling under the jurisdiction of the CCRB may be resolved by a similar settlement process.

### Department Trials

If a member of the service contests the charges, or does not agree to the proposed penalty, he or she has the legal right to a full *de novo* administrative hearing[13] known as a Department Trial, a process overseen by the Deputy Commissioner of Trials. All members of the service are entitled to be represented by counsel, and the trial proceedings are open to the public. At trial, the DAO, or where applicable, the CCRB APU, has the burden of proving the charges by a preponderance of the evidence and is required to present evidence against the member of the service.[14]

---

[10] See New York Civil Service Law § 75(4).

[11] See New York City Charter § 434 and New York City Administrative Code § 14-115.

[12] This final disciplinary authority is not unique among City Commissioners. Compare New York City Charter § 434 with § 387(a) which states, "[t]he heads of mayoral agencies shall supervise the execution and management of all programs and activities of their respective agencies and shall have cognizance and control of the government, administration, and discipline of their agencies."

[13] See New York Civil Service Law § 75(1).

[14] To sustain a charge of misconduct, the DAO or APU prosecutor must establish that the member of the service acted intentionally, recklessly or negligently with respect to engaging in the proscribed conduct. A person acts intentionally with respect to a result or to conduct when his or her conscious objective is to cause such result or to engage in such conduct. A person acts recklessly with respect to a result or to a circumstance when he or she is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person acts with negligence with respect to a result or to a circumstance when he or she fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that

6

The member is entitled to cross-examine prosecution witnesses, present a defense to the charges, and/or present evidence in mitigation of the proposed penalty.[15] Each month, the trial calendar for the upcoming month is published on the Department's website.[16]

The Office of the Deputy Commissioner of Trials conducts Department trials in a fair and impartial manner, consistent with the rules and regulations governing administrative hearings, as well as the due process rights of the Department's members. This includes a prohibition against *ex parte* communications with the judges, even by the Police Commissioner.[17] At the conclusion of a trial, the Trial Commissioner issues a report that includes an analysis of the evidence presented, a determination on witness credibility and a recommendation as to findings on each charge. Where there is a finding of guilt, the Trial Commissioner recommends an appropriate penalty. All parties review the Trial Commissioner's report and are given an opportunity to submit written comments.[18] The Trial Commissioner's report and the written comments of the parties are then submitted for the Police Commissioner's review and final decision.

Regardless of the manner in which a Department disciplinary case is resolved, whether by settlement agreement or Department trial, the Police Commissioner, by law, makes the final disciplinary determination and penalty finding.

---

the failure to perceive it constitutes a careless deviation from the standard of care that a reasonable police officer would observe in the situation.

[15] §§ 75 – 76 of the New York Civil Service Law mandate that permanent, competitive-class employees, including police officers, are entitled to certain rights prior to the imposition of any disciplinary action. These rights include notice of the charges, an opportunity to answer the charges (at a hearing or otherwise), representation at official interviews or disciplinary hearings, and the right to summon witnesses on the accused officer's behalf. See also, Title 38, Chapter 15 of the Rules of the City of New York and § 14-115 of the Administrative Code of the City of New York.

[16] See https://www1.nyc.gov/site/nypd/bureaus/administrative/trials.page.

[17] Title 38, Chapter 15, § 15-04(e)(4) Rules of the City of New York states as follows:
"Except for ministerial matters, and except on consent, or in an emergency, communications with the Deputy Commissioner of Trials concerning a case shall only occur with all parties present. If the Deputy Commissioner of Trials receives an *ex parte* communication concerning the merits of a case to which he or she is assigned, then he or she shall promptly disclose the communication by placing it on the record, in detail, including all written and oral communications and identifying all individuals with whom he or she has communicated. A party desiring to rebut the *ex parte* communication shall be allowed to do so upon request."

[18] See *Fogel v. Board of Education*, 48 A.D.2d 925 (1975).

7

# Penalty Guidelines

## The Penalty Guidelines Explained

The Guidelines are published and may be periodically updated in order to better inform members of the service and the public as to the expectations placed upon members of the Department and to provide greater transparency regarding the disciplinary process.[19] Awareness of the likely consequences associated with violations of Department policy promotes greater efficiency and facilitates the fair and rational application of penalties and the adherence to behavioral standards. The Guidelines are designed to provide notice of the standards upon which disciplinary outcomes are based and to establish expectations for all involved. The Guidelines are organized thematically into 11 different categories: Criminal Conduct; Excessive Force; Abuse of Authority/Discourtesy/Offensive Language; False Statements; Domestic Violence; Driving While Impaired/Intoxicated; Firearm-Related Incidents; Controlled Substance/Marijuana/Banned Substance Use; Department Rule Violations; Off-duty & Prohibited Conduct; and Employment Discrimination. These categories are not mutually exclusive, and proscribed conduct may fall into more than one category.

## Presumptive Penalties

The Guidelines set forth **presumptive penalties** for acts of misconduct and violations of Department policy. A presumptive penalty is the assumed penalty generally deemed appropriate for the first instance of a specific proscribed act and does not constitute a mandatory minimum penalty. The presumptive penalty serves as the starting point for analysis during the penalty phase of a case, which must include consideration of the totality of the circumstances and any aggravating and/or mitigating factors that may be relevant. The Police Commissioner, who is statutorily empowered to adjudicate discipline, makes the final determination and may deviate from the presumptive penalties. That penalty determination, including the rationale for any deviation from the presumptive penalty and/or the recommendation of either a trial judge or CCRB, is memorialized in a memorandum, as part of the final adjudication of the case.

Given the complexity of some events and significant variances in the underlying facts of each case, it is not possible to predetermine the outcome or the relative weights of potential aggravating and mitigating factors for every disciplinary matter. In select areas of misconduct, presumptive penalties for common aggravating factors are delineated, but even in these cases, there may be additional aggravating factors or mitigating factors that bear upon the ultimate penalty recommendation. Presumptive penalties, as well as both aggravating and mitigating circumstances, also apply to negotiated settlements of disciplinary matters.

All disciplinary matters must be evaluated on a case-by-case basis, considering all relevant factors and using this rubric as a guide. As a general rule, Department policies, including these Guidelines, should not be interpreted or applied in a manner that leads to an unjust or unreasonable result, or is otherwise contrary to the goals of the disciplinary system outlined above.

---

[19] New York City Administrative Code § 14-186 requires the Department to publish it's "internal disciplinary matrix", any subsequent revisions to the matrix and an annual report enumerating penalties that deviate from the matrix.

8

# Mitigating and Aggravating Factors

The Guidelines facilitate penalties designed to ensure consistency among similarly situated members of the service while allowing for reasonable degrees of mitigation and aggravation based upon the specific facts and circumstances of each incident. The presumptive penalty identified for each act of misconduct may be increased or decreased depending upon the presence of these individualized factors. Although it is impossible to pre-determine all the mitigating and aggravating factors that could arise in each case, the guidance below includes universal factors to be taken into account when assessing the fairness and proportionality of a penalty.

The presence of mitigating or aggravating factors does not automatically lead to the conclusion that a departure from the presumptive penalty is justified. The factors must be weighed against each other and the facts and circumstances of the misconduct itself. The presence of one or more mitigating circumstances, along with one or more aggravating circumstances, may or may not offset each other.

For some acts of misconduct, presumptive penalty enhancements have already been identified for specific aggravating factors enumerated in the Guidelines. In other categories of misconduct, presumptive penalty ranges for aggravation and mitigation are provided. Additionally, some behavior that is deemed an aggravating factor, if charged and sustained on the merits, may be adjudicated as a separate act of misconduct in and of itself.

If the determination is made that the misconduct is appropriately mitigated or aggravated, the relevant factors, including a description of how the factors were applied, will be documented as part of any recommendations submitted to the Police Commissioner. The ultimate penalty assigned is guided by the penalty ranges between the mitigated and aggravated penalties, as defined in these Guidelines. The Police Commissioner ultimately determines whether the factors are sufficiently significant to justify a decrease or increase in the presumptive penalty/penalty range and documents such in the memorandum prepared when adjudicating the case.

## Potential Mitigating Factors

In considering the totality of the circumstances, potential mitigating factors may include, but are not limited to, the following:

- The reasonably limited or lack of knowledge, training and experience of the member of the service involved that is germane to the incident
- The nature of the event was such that it was unpredictable, volatile or unfolded rapidly not allowing time for deliberate reflection
- The area of law or policy implicated in the matter is novel or complex
- The state of mind of the member of the service, including the absence of intent
- The primary motivation for the action is premised upon emergency response or service
- The member of the service endeavored to de-escalate the encounter
- The voluntary candor and assistance of the member of the service, which goes beyond the mandates of cooperation and truthfulness, and aids the investigation
- The acceptance of responsibility and any mitigating or remedial actions taken by the member of the service
- Positive employment history including any notable accomplishments, Departmental recognition and positive public recognition
- The limited nature and extent of the consequences or harm caused by the violation
- The limited impact of the violation upon the Department and its mission
- The role of the member of the service in the particular event (e.g. member of the service is a subordinate and a supervisor was on the scene)
- Any extraordinary circumstances or hardships that may be relevant
- The potential for rehabilitation

9

**Potential Aggravating Factors**

In considering the totality of the circumstances, potential aggravating factors may include, but are not limited to, the following:

- The presence or reasonable availability of knowledge, training and experience of the member of the service involved that is germane to the incident
- The nature of the event is such that it allowed time for deliberate reflection or action
- The culpable mental state of the member of the service, particularly if the actions evince an intent to engage in proscribed conduct, circumvent a policy, exhibit a reckless disregard of an individual's wellbeing, demonstrate bias or prejudice, or constitute harassment or retaliatory conduct
- The member of the service is motivated by personal interest or gain, or receives a personal benefit from the misconduct
- The member of the service failed or declined to attempt to de-escalate the encounter even though feasible to do so
- Disproportionality of misconduct and harm to the community
- The lack of candor of the member of the service and failure to cooperate with the investigation
- Actions by the member of the service to interfere with the investigation or to influence others to participate in misconduct including to aid in hindering an investigation
- The nature and extent of injury or endangerment to a member of the service or civilian
- The nature and extent of property damage
- The adverse impact upon the Department with regard to its mission, reputation, credibility and relationship with the community, and the impact on public trust
- Any actual or demonstrable legal or financial risk to the Department
- The adverse result of a criminal, administrative or civil proceeding related to the underlying conduct
- Any negative employment history including prior discipline or performance deficiencies
- Conduct demonstrating a pattern of behavior that indicates an inability to adhere to Department rules and standards
- Low probability or limited potential for rehabilitation
- The role of the member of the service in the particular event (e.g. member of the service is a supervisor on the scene of the incident)
- Victim's vulnerability that is related to the act of misconduct (e.g. excessive use force against an elderly person)

## The Effect of Rank on Discipline

An individual member of the service's rank and their particular role in an event are factors to be considered when assessing an appropriate disciplinary penalty. An individual member of the service's status as a supervisor will generally be viewed as an aggravating factor, particularly for on-duty misconduct, which may warrant a penalty higher than the presumptive penalty for the particular violation. Supervisors are expected to lead by example and they are responsible for holding their subordinates accountable. The Department has higher expectations for supervisors, including their ability to exercise sound judgment and to be more deliberate in their actions than subordinate members. Potential mitigating factors described above should be considered as well.

Consistent with this philosophy, the presence or participation of a supervisor in an event may be a mitigating factor when evaluating the culpability of a subordinate. A downward departure from a presumptive penalty may be warranted when a subordinate is acting under the close supervision or direction of a superior and the supervisor is subject to discipline for any misconduct related to the event.

# Prior Disciplinary History

Generally, an individual member of the service's prior disciplinary history will be considered when assessing an appropriate penalty, potentially serving as an aggravating factor to a presumptive penalty. Factors to be considered when determining whether prior disciplinary history should be considered an aggravating factor include:

- The number of prior disciplinary events
- The nature and seriousness of the prior event(s)
- Any similarities between prior and current acts of misconduct
- Any disciplinary history demonstrating an inability or unwillingness to conform to the Department's expectations for the position or successfully rehabilitate

However, a new act of misconduct that is the same as a prior act of misconduct, or carries a presumptive penalty that is equal to or greater than the presumptive penalty of a prior act of misconduct, may instead result in an increase in the disciplinary penalty for the current violation through the application of progressive discipline.

## Progressive Discipline

Progressive discipline may be imposed for repeated acts of applicable misconduct within the timeframes specified below. In determining whether a current act of misconduct should be the subject of progressive discipline, the following framework applies:

- The current act of misconduct is the same as a prior act of misconduct, or
- The current act of misconduct is subject to a presumptive penalty that is equal to or greater than the presumptive penalty of the prior act of misconduct
- If the prior act involved multiple violations arising from a single incident, it will be considered one prior act of misconduct
  - The most severe presumptive penalty associated with the prior violations will be used to determine the time limitation and the commensurate penalty increase relative to the current act
- The current act of misconduct must be committed before the end of the timeframe below to be considered
  - If the current act of misconduct involves multiple violations on separate dates, the date of the first violation chronologically shall be the date upon which the progressive penalty escalation is computed
- Acts of misconduct committed prior to the timeframe or adjudicated through Command Discipline may still be considered an aggravating factor in the calculation of penalties for the current act of misconduct

The presumptive time limitations[20] and penalty progressions[21] are as follows:

- If the prior misconduct resulted in training or instructions:
  - The time limitation is 3 years
  - The second incident involving the same misconduct or misconduct carrying an equal or greater presumptive penalty than the prior act of misconduct, shall result in a penalty increase to 1-3 days
  - The third incident involving the same misconduct or misconduct carrying an equal or greater presumptive penalty than the prior act of misconduct, shall result in a penalty increase to 5 days
- If the prior misconduct resulted in 1 through 5 penalty days:
  - The time limitation will be 3 years
  - The second incident involving the same misconduct or misconduct carrying an equal or greater presumptive penalty than the prior act of misconduct, shall result in a penalty increase to 5-10 days
  - The third incident involving the same misconduct or misconduct carrying an equal or greater presumptive penalty than the prior act of misconduct, shall result in a penalty increase to 10-15 days

---

[20] Calculated from the date that the Police Commissioner approved the imposition of the final penalty for the prior act(s) of misconduct.
[21] The fourth or subsequent incidents of the same misconduct in the specified time frame may result in more severe disciplinary penalties, up to and including termination.

11

- If the prior misconduct resulted in 5 through 15 penalty days:
  - The time limitation will be 5 years
  - The second incident involving the same misconduct or misconduct carrying an equal or greater presumptive penalty than the prior act of misconduct, shall result in a penalty increase to 10-20 days
  - The third incident involving the same misconduct or misconduct carrying an equal or greater presumptive penalty than the prior act of misconduct, shall result in a penalty increase to 15-30 days
- If the prior misconduct resulted in more than 15 penalty days:
  - The time limitation will be 10 years
  - The second incident involving the same misconduct or misconduct carrying an equal or greater presumptive penalty than the prior act of misconduct, shall result in a penalty increase to 20-30 days and Dismissal Probation
  - The third incident involving the same misconduct or misconduct carrying an equal or greater presumptive penalty than the prior act of misconduct, shall result in termination or forced separation
- If the prior misconduct had a presumptive penalty of termination or separation but mitigating factors led to the imposition of a penalty less than separation and/or the prior misconduct resulted in the imposition of Dismissal Probation:
  - There will be no time limitation
  - The second incident involving the same misconduct or misconduct carrying an equal or greater presumptive penalty than the prior act of misconduct, shall result in forced separation or termination

The above time limitations do not apply to prior disciplinary history establishing patterns of misconduct or serious misconduct, including but not limited, to False Statements, Driving While Intoxicated, Domestic Violence, Excessive Force or acts constituting criminal conduct. In addition, a third substantiated incident of excessive force will have a presumptive penalty of termination regardless of the penalties imposed in the first two instances.

## Consequences of Disciplinary Action

Members of the service should be aware that the imposition of disciplinary sanctions may also have an impact on their future status, including but not limited to, assignments and promotions, which may result in a diminution in compensation[22]. The imposition of discipline may have ancillary consequences that are not regarded as part of the disciplinary system or calculated within the context of these Guidelines as included in any disciplinary sanction. The potential future impact of a disciplinary penalty will generally not be considered in determining what the appropriate penalty should be at the time of imposition.

The New York State Division of Criminal Justice Services ("DCJS") maintains a "Police Officer and Peace Officer Registry". This registry includes the identities of police officers who were terminated by the Department as well as those who separated from the Department as a result of a disciplinary proceeding or with a disciplinary matter pending.[23] A member of the service who resigns or retires with charges pending for conduct that, if found guilty, would likely result in a presumed penalty of termination, forced separation or Dismissal Probation under these Guidelines, will be submitted to the registry as a "removal for cause" and may be decertified by DCJS.

## Calculation of Penalties

Separate presumptive penalties, adjusted for relevant aggravating and mitigating factors, are applied to each substantiated act of misconduct for which there has been a finding or acceptance of guilt. These presumptive penalties are then aggregated to address each distinct act of misconduct. If the same underlying act(s) of misconduct support multiple definitions of proscribed conduct or support alternative theories of prosecution, then a single penalty will be applied. Concurrent penalties may be appropriate when misconduct includes minor technical infractions, or when the effort to maintain a balance between punishment, deterrence and remediation is

---

[22] See e.g., Administrative Guide procedure 320-48, Career Advancement Review Board. Members of the service may be denied civil service promotion as a result of certain disciplinary proceedings.
[23] See New York Executive Law § 845.

12

undermined by consecutive penalties. The totality of the circumstances will be considered in order to maintain the efficiency of the disciplinary system and to ensure a just outcome.

For example, a member of the service who has been determined to have operated a motor vehicle while intoxicated was by definition necessarily unfit for duty. Because these potential separate charges result from the same underlying course of conduct, a single penalty will be applied.

Penalties imposed prior to final adjudication (e.g. days forfeited during pre-adjudication suspension) may be applied to any final penalty determination.

In the event that the total number of penalty days is calculated at greater than 90 days, the presumed penalty shall be termination or forced separation.

## Probationary Status

There are different types of probationary status that may affect disciplinary penalties:

**Entry-Level Probation** – When hired, police officers are on entry-level probation for a 2-year period. The member of the service must complete 2 years of full-duty status in order to complete this probationary period. Members on entry-level probation who are the subject of a disciplinary matter can be terminated and the Department may summarily dismiss the member of the service without a formal hearing. If termination is the presumptive penalty for an enumerated act of misconduct, then members on entry-level probation will be dismissed. Members on entry-level probation may also be terminated for offenses that would not generally result in termination for a tenured employee. A recommendation relative to termination or retention of title and service of Charges and Specifications under these circumstances is made to the Police Commissioner by the Risk Management Bureau.

**Promotion Probation** – Uniformed members of the service who achieve a civil service promotion in rank will be on promotion probation. Pursuant to collective bargaining, a member promoted to the rank of Detective is on promotion probation for a 3-year period regardless of duty status. Members promoted to the rank of Sergeant, Lieutenant, or Captain are on promotion probation for a 1-year period. A member must complete 1 year of full-duty status in order to complete this probationary period. Should a member, while on promotion probation, be the subject of a disciplinary matter, they are subject to demotion to their former Civil Service rank at the discretion of the Police Commissioner. A recommendation relative to demotion or retention of rank under these circumstances is made to the Police Commissioner by the Risk Management Bureau. Members of the service serving in the ranks of Deputy Inspector through Chief of Department are designated by the Police Commissioner. As such, these members may be demoted to their civil service rank of Captain at any time.

**Dismissal Probation** – When a member of the service is placed on Dismissal Probation as part of a disciplinary penalty, the member is dismissed from the Police Department, and he or she acknowledges the dismissal in writing. The Department delays the imposition of the dismissal for a 1-year period, during which the member must complete 1 year of full-duty status in order to complete the probationary period. If there is further misconduct during the probationary period, the Department may summarily dismiss the member of the service without a formal hearing, including for offenses that would not ordinarily result in termination for a member not on Dismissal Probation.

**Extension of probation** – Members of the service on entry-level or promotion probation may receive a 6-month extension of their probation if they are the subject of an investigation or disciplinary matter, or for poor performance during such probation period.[24] A member must complete this extension at full-duty status in order to successfully complete this probationary period.

---

[24] Members in the rank of Detective cannot have their promotion probationary period extended.

13

## Effect of Precedent

Situations may arise that are not included in or adequately addressed by the Guidelines. If so, a penalty evaluation will be made based upon the facts and circumstances of the present case considering relevant recent or analogous cases. When considering precedent, similar circumstances may be determined based upon an assessment of the relative degree to which the present case and any prior cases contain the following factors:

- Similar factual situations
- Similar disciplinary histories
- Same or similar aggravating and/or mitigating factors
- Same or substantially similar proscribed conduct

Settlement negotiations may not be accorded the same precedential weight as penalties imposed following trials because factors such as the strength of the evidence may affect the calculation and warrant a lesser penalty.

These Guidelines, while having taken precedent into account, have not been blindly wedded to prior penalties imposed. Cases decided prior to the publication of these Guidelines will not be considered to have precedential value to the extent that these Guidelines have intentionally elevated the presumptive penalties or aggravating presumptive enhancements.

## Definitions

**Presumptive Penalty** – A presumptive penalty is the assumed penalty or penalty range generally deemed appropriate for a specific proscribed act. The presumptive penalty serves as the starting point for analysis during the penalty phase of a case, which must include consideration of the totality of the circumstances and any aggravating and/or mitigating factors. The Police Commissioner, who is statutorily empowered to adjudicate discipline, makes the final determination and may deviate from the presumptive penalties. The penalty determination and the bases for deviations are memorialized as part of the final adjudication of the case.

**Penalty Days** – The term penalty days refers to the forfeiture of vacation days and/or the imposition of suspension without pay for a specified time period[25]. The decision to suspend, deduct vacation days, or impose a combination of both, is based upon the severity of the misconduct along with any relevant aggravating and mitigating factors. For some of the most serious categories of misconduct in these Guidelines, suspension has been identified, in whole or in part, as the presumptive penalty. A member of the service who is found guilty after an administrative hearing may be suspended without pay for a period not exceeding 30 days for any offense.[26] A member of the service may agree to a longer term of suspension as part of a negotiated settlement agreement. If a member of the service was immediately suspended from duty during the pendency of an investigation, the forfeiture of suspension days, imposed prior to the disposition of the case, may be applied as part of the final disciplinary penalty. When the deduction of vacation days is the imposed penalty, a member of the service may elect suspension in lieu of vacation days if consistent with the needs of the Department.

**Dismissal Probation**[27] – As part of a disciplinary penalty that includes the imposition of penalty days, Dismissal Probation requires that the member of the service concerned be dismissed from the Police Department, and he or she acknowledges that dismissal in writing. The Department then delays the imposition of the dismissal for a 1-year period during which the member is placed on Dismissal Probation. During the 1-year probationary period, the member of the service is subject to Monitoring and their conduct is evaluated on an ongoing basis. In addition, the member's commanding officer is required to submit monthly reports assessing the member's conduct. If there is

---

[25] Paid vacation represents a part of a member of the service's total compensation package of salary and benefits which is collectively bargained for between the respective police unions and the New York City Office of Labor Relations. Additionally, police officers perform shift work and are not entitled to holidays or weekends off relying instead on their accrued vacation days to take time off. Contrast suspension which results in an increased financial penalty imposed upon the member of the service but simultaneously reduces Department staffing during the period of suspension.

[26] New York Civil Service Law § 75(3-a) and New York City Administrative Code § 14-115.

[27] Dismissal Probation period will not conclude until a member of the service completed 12 months on full-duty status.

14

further misconduct within the probationary period, the Department may summarily dismiss the member of the service without a formal hearing, including for offenses that would not ordinarily result in termination for a member not on Dismissal Probation. Dismissal Probation is also used to enforce other conditions in disciplinary penalties. For example, when a member of the service has admitted to, or been found guilty of, a domestic violence offense, the member may be required to participate in counseling services. The failure to abide by any condition attached to the disposition of a case may be considered cause to invoke the provisions of Dismissal Probation. If a member of the service successfully completes the year on probation, the dismissal penalty will be waived, and the member returned to a non-probationary status.

**Termination**[28] – The Police Commissioner, upon a finding or admission of wrongdoing in a disciplinary matter, has the authority to dismiss a member of the service from their employment with the Department[29]. Additionally, upon criminal conviction of a felony, or a misdemeanor that constitutes a violation of a member's oath of office, the member vacates their civil service title and is terminated as a matter of law[30]. A member of the service may be entitled to all or part of their accrued pension benefits in accordance with local law and New York State pension laws[31].

**Forced Separation** – The Police Commissioner, upon a finding or admission of wrongdoing in a disciplinary matter, may require that a member of the service separate (resignation, retirement or vested interest retirement) from the Department, in lieu of termination, as part of a negotiated settlement agreement. Forced separation may also include the forfeiture of penalty days, all time and leave balances and any terminal leave to which the member of the service may be entitled. A member of the service who retires may be entitled to all or part of their accrued pension benefits in accordance with local law and New York State pension laws[32].

**Oath of Office Violation** – An Oath of Office violation[33] includes a conviction for any felony offense under State or Federal Law, or a conviction for a misdemeanor when the crime involves knowing and intentional conduct evidencing willful deceit, a calculated disregard for honest dealings, or intentional dishonesty or corruption of purpose. [34] This provision applies to crimes committed on or off-duty. Oath of Office offenses include, but are not necessarily limited to, Official Misconduct and Perjury among other crimes.[35]

## Additional Requirements

In addition to the penalties outlined above, the Department may require a member of the service to participate in counseling or monitoring programs, designed to prevent any future misconduct from occurring by addressing those issues that surfaced in the adjudication of the misconduct.

**Monitoring** – An assessment will be made by the Risk Management Bureau to determine whether the member of the service would benefit from monitoring geared toward assuring that additional misconduct will be avoided.

**Ordered Breath Testing Program** – Any negotiated penalty in a Department disciplinary proceeding involving a member of the service who is determined to have committed a DWI offense, either by operating a motor vehicle while intoxicated or while their ability to operate a vehicle is impaired by the consumption of alcohol or another substance, or other alcohol-related misconduct, shall include a period of Dismissal Probation. Further, any such negotiation shall include the member's agreement to submit to ordered breath testing for the presence of alcohol while on or off-duty, during the period of probation, or other agreed-upon time period. Should the member be found

---

[28] See *Duffy v. Ward*, 81 NY 2d 127 (1993) and *Foley v. Bratton*, 92 NY 2d 781 and 789 (1999).

[29] See New York Civil Service Law § 75(3).

[30] New York Public Officers Law § 30(1)(e).

[31] See New York Retirement and Social Security Law Art. 8 and related case law. See also, New York City Administrative Code § 13-256(1).

[32] Ibid.

[33] New York Public Officers Law § 30(1)(e).

[34] See *Duffy v. Ward*.

[35] The courts have held that the commission of the following crimes, while not exhaustive, constitutes a violation of a public officer's oath of office: Perjury, Official Misconduct, Bribery and related offenses, Aggravated Harassment, Menacing, Assault, Reckless Endangerment, Stalking, Sex Abuse 3rd Degree, Falsifying Business Records, Offering a False Instrument for Filing, and Endangering the Welfare of a Child.

15

to be in violation of the terms of the ordered breath testing agreement, or should the member refuse to submit to ordered breath testing, such refusal will result in additional disciplinary action against the member that may include termination.

**Cooperation with Counseling** – Members of the service are required to cooperate with all counseling as determined by the Department's Counseling Services Unit.

**Ordered Drug Screening Test** – When reasonable suspicion exists that a member of the Department is illegally using drugs or controlled/banned substances, he or she will be directed to submit to testing in which hair and/or urine are collected and tested.

**Forfeiture of Time and Leave Balance** – As part of settlement agreements that include separation from the Department, the member of the service shall be required to forfeit any time and leave balances.  In addition, in cases in which a member of the service is found to have received compensation for duties not actually performed, the member will be required to forfeit the amount of time from his or her time and leave balance.

**Restitution** – In cases in which a member of the service is found to have improperly received compensation, such as for duties that were not performed, return or repayment of the compensation may be required.  Restitution is made payable to the New York City Commissioner of Finance.

**Fine** – A fine not to exceed $100 per charge may be deducted from the salary or wages of a member of the service.[36]

**Additional Terms** – Any terms not expressly defined herein shall have their same meanings as in New York State Law, Departmental procedure or in common parlance.

---

[36] See New York Civil Service Law § 75(3).

16

# Specific Penalty Guidelines by Category

## Conduct Constituting a Crime Proscribed by State or Federal Law[37]

Conduct that is prohibited by criminal statutes or other applicable laws is also prohibited by the Department regardless of whether there is a procedural corollary codified in a Department policy or procedure. [38] Such conduct, in addition to violating Department standards of conduct, may negatively affect an officer's ability to perform his/her job functions. When misconduct by a member of the service also constitutes a crime, he or she is subject to the criminal justice process in addition to the administrative discipline process described herein.

An arrest, charging, or conviction of a criminal offense is not required to find that the member of the service has engaged in conduct that is prohibited by law and/or Department policy. Similarly, a Declination to Prosecute by a prosecutor, a vote of "no true bill" by a grand jury, or a "not guilty" determination by a judge or jury is not dispositive in these matters, as the standard of proof for criminal proceedings ("beyond a reasonable doubt") is a much higher burden of proof than that required in a disciplinary proceeding ("preponderance of the evidence").

When a criminal case has been brought[39], the Department may opt to proceed with the administrative disciplinary case while such criminal case is pending or may await the disposition of the criminal matter before proceeding. In cases when the Department chooses to proceed before the outcome of a criminal case, it will ensure that constitutional safeguards as outlined in *Garrity v. New Jersey*[40], are followed. Many factors may influence the decision to proceed prior to the outcome of a criminal case. This decision will generally be made in consultation with the prosecutor's office. The factors for consideration include, but are not limited to:

- The seriousness of the officer's alleged conduct and/or the nature of charges
- The strength of the evidence
- The amount of additional investigation necessary
- The length of the criminal process
- The potential detrimental effect on the criminal prosecution
- The potential impact on the Department and community

---

[37] The conduct described in this section includes violation of criminal statues proscribed by New York State Law, Federal Law, or an analogous statue of another state.

[38] Some acts described in the other misconduct categories of these guidelines may also satisfy the elements of criminally proscribed conduct.

[39] A member of the service who is arrested should be suspended from duty absent exigent circumstances. See Patrol Guide procedure 206-07, *Cause for Suspension or Modified Assignment*.

[40] 385 U.S. 493 (1967).

17

**Presumptive Penalties for Violation of Criminal Statutes[41]**

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| Conviction of Conduct Proscribed by NYS Law (or analogous statute of another state) or Federal Law that is Classified as a Felony | N/A | Termination | N/A |
| Engaging in Conduct Proscribed by NYS Law (or analogous statute of another state) or Federal Law that is Classified as a Misdemeanor while on Entry-level Probation | N/A | Termination | N/A |
| Conviction of Conduct Proscribed by NYS Law (or analogous statute of another state) or Federal Law that is Classified as a Misdemeanor and Constitutes a Violation of the Member's Oath of Office[42] | N/A | Termination | N/A |
| Conviction of NYS Penal Law Crime of Petit Larceny or Theft Related Offenses (or analogous statute of another state) or Federal Law | Forced Separation | Termination | N/A |
| Engaging in Conduct Proscribed by NYS Law (or analogous statute of another state) or Federal Law that is Classified as a Felony | Forced Separation | Termination | N/A |

---

[41] Any terms not expressly defined herein shall have their same meanings as described or used in New York State Law, Departmental procedure or plain language/common parlance.

[42] See New York Public Officers Law § 30(1)(e). The courts have held that the commission of the following crimes, while not exhaustive, constitutes a violation of a public officer's oath of office: Perjury, Official Misconduct, Bribery and related offenses, Aggravated Harassment, Menacing, Assault, Reckless Endangerment, Stalking, Sex Abuse 3rd Degree, Falsifying Business Records, Offering a False Instrument for Filing, and Endangering the Welfare of a Child.

18

| | | | |
|---|---|---|---|
| Engaging in Conduct Proscribed by NYS Law (or analogous statute of another state) or Federal Law that is Classified as a Petit Larceny | Forced Separation | Termination | N/A |
| Conviction of Conduct Proscribed by the NYS Penal Law (or analogous statute of another state) or Federal Law Constituting Misdemeanor assault[43] Arising out of an On-duty Incident | Forced Separation | Termination | N/A |
| Engaging in Conduct Proscribed by NYS Law (or analogous statute of another state) or Federal Law that is Classified as a Misdemeanor, not Otherwise Covered Above | N/A | 30 Penalty Days | Termination |

---

[43] See New York Penal Law Article 120.

19

# Use of Excessive Force

The use or application of excessive force is strictly prohibited by the Department. Any violation of the NYPD Use-of-Force policy is subject to maximum scrutiny, recognizing the grave impact that excessive force has on the public's trust and confidence in the Department and our officers as well as the increased risk of harm to officers themselves.

The public has every right to expect and demand that the Department and individual officers be held accountable for any and every violation of Department policy. This is especially important for any violation of the Use-of-Force policy. Officers should be aware that, if they are found to have used excessive force after a complete investigation and fair trial or admission of guilt, they will be subject to appropriate discipline commensurate with their level of misconduct. In addition to internal disciplinary charges, the use of excessive force may also result in criminal prosecution and civil litigation against the member of the service in accordance with Federal, state, and local laws.

The primary duty of all members of the service is to protect human life, including the lives of individuals being placed in police custody. This primary duty is reflected in Patrol Guide procedure 221-01, which defines the circumstances under which force may be used: "Force may be used when it is reasonable to ensure the safety of a member of the service or a third person, or otherwise protect life, or when it is reasonable to place a person in custody or to prevent escape from custody."  The reasonableness of the use of force is based upon the totality of the circumstances known by the member of the service at the time of the use of force. The Department assesses the reasonableness of force viewed from the perspective of a member with similar training and experience placed into the same circumstances as the incident under investigation. If the force used is unreasonable under the circumstances, it will be deemed excessive and in violation of Department policy.

When appropriate and consistent with personal safety, members of the service will use de-escalation techniques to safely gain voluntary compliance from a subject to reduce or eliminate the necessity to use force. In situations in which this is not safe and/or appropriate, members of the service will use only the reasonable force necessary to gain control or custody of a subject. All members of the service are responsible and accountable for the proper use of force. The application of force must be consistent with existing law and with the NYPD's policies, even when Department policy is more restrictive than local, state or Federal law.

Failure to intervene in the use of excessive force, report excessive force, or to request and/or ensure timely medical treatment for an individual is serious misconduct that may result in criminal and civil liability and will result in Department discipline, up to and including termination. If a member of the service becomes aware of a use of excessive force or a failure to request or ensure timely medical treatment for an individual, the member must report such misconduct to the IAB Command Center. This report can be made anonymously.

## Additional Definitions Pertaining to Use of Force

**Violation of Department Use-of-Force Policies & Procedures** – Any act by a member of the service that violates the Department Manual, training, or any other policy or rule of the NYPD relating to Use-of-Force.

**De-Escalation**[44] – Taking action in order to stabilize a situation and reduce the immediacy of the threat so that more time, options, and/or resources become available (e.g. tactical communication, requesting a supervisor, additional members of the service and/or resources such as Emergency Service Unit or Hostage Negotiation Team, etc.). The goal is to gain the voluntary compliance of the subject, when appropriate and consistent with personal safety, in order to reduce or eliminate the necessity to use force.

**Active Resisting**[45] – Includes physically evasive movements to defeat a member of the service's attempt at control, including bracing, tensing, pushing or verbally signaling an intention to avoid or prevent being taken into or retained in custody.

**Active Aggression**[46] – Threat or overt act of an assault (through physical or vocal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is imminent.

---

[44] Patrol Guide procedure 221-01, *Force Guidelines*.
[45] Patrol Guide procedure 221-02, *Use of Force*.
[46] Ibid.

20

**Excessive Force**[47] – Use-of-force deemed by the investigating supervisor as greater than that which a reasonable officer, in the same situation, would use under the circumstances that existed and were known to the member of the service at the time force was used.

**Deadly Physical Force** – Physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury (e.g. the use of a deadly weapon, such as discharging a firearm, against a person).[48]

**Non-Deadly Force** – Force not readily capable of causing death or other serious physical injury (e.g. physical force such as employing a takedown technique, and using hand strikes or foot strikes against a person).

**Less Lethal Force/Device** – The application of a significant intermediate use of force option including Oleoresin Capsicum ("O.C.") spray, conducted electrical weapon ("CEW") or impact weapon against a person.[49]

**Physical Illness/Injury** – Impairment of physical condition, and/or substantial protracted pain, including: minor swelling, contusions, lacerations or abrasions.[50]

**Deadly weapon** – Any loaded weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged.

**Dangerous instrument** – Any instrument, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury.

**Serious Physical Injury/Illness** – Physical injury or illness that creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of function of any bodily organ/limb.[51]

**Chokehold**[52] – A chokehold shall include, but is not limited to, any pressure to the throat, carotid artery or windpipe, which may prevent or hinder breathing or reduce intake of air or blood flow.[53]

---

[47] Patrol Guide procedure 221-01, *Force Guidelines*.
[48] New York Penal Law §10.00(11).
[49] See, e.g. Patrol Guide procedure 221-08, *Use of Conducted Electrical Weapons (CEW)*.
[50] Patrol Guide procedure 221-03, *Reporting and Investigation of Force Incident or Injury to Persons During Police Action*.
[51] Ibid.
[52] Patrol Guide procedure 221-01, *Force Guidelines*.
[53] Ibid.

21

**Presumptive Penalties for Use of Excessive Force**

| Misconduct | Mitigated Penalty[54] | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| **Deadly Physical Force (incl. use of a Deadly Weapon or Dangerous Instrument) Against Another – Resulting in:** | | | |
| Death/Serious Physical Injury | N/A | Termination | N/A |
| Physical Injury | Forced Separation | Termination | N/A |
| No Injury | 30 Suspension Days + 30 Penalty Days + Dismissal Probation | Termination | N/A |
| **Less Lethal Force/Device Against Another – Resulting in:** | | | |
| Death/Serious Physical Injury | Forced Separation | Termination | N/A |
| Physical Injury | 15 Suspension Days | 15 Suspension Days + 15 Penalty Days | Termination |
| No Injury | 10 Penalty Days | 20 Penalty Days | Termination |
| **Non-Deadly Force Against Another – Resulting in:** | | | |
| Death/Serious Physical Injury | Forced Separation | Termination | N/A |
| Physical Injury | 10 Suspension Days | 10 Suspension Days + 10 Penalty Days | Termination |
| No Injury | 5 Penalty Days | 10 Penalty Days | Termination |
| **Conviction of a Crime:** | | | |
| Involving Use of a Chokehold or Unlawful Method of Restraint[55] | N/A | Termination | N/A |

---

[54] If a mitigated penalty is listed as "N/A" (Not Applicable), the presumptive penalty cannot be mitigated absent extraordinary circumstances, as determined by the Police Commissioner.

[55] Includes convictions for New York Penal Law § 121.13-a, *Aggravated Strangulation*, New York City Administrative Code § 10-181, *Unlawful Methods of Restraint* or analogous statute.

22

| Chokeholds: | | | |
|---|---|---|---|
| Application of a Chokehold | Forced Separation | Termination | N/A |
| **Application of a Method of Restraint Prohibited by Law Including Sitting, Standing or Kneeling on a Person's Chest or Back[56] – Resulting in:** | | | |
| Death/Serious Physical Injury | N/A | Termination | N/A |
| Physical Injury | 30 Suspension Days + Dismissal Probation | 30 Suspension Days + 30 Penalty Days + Dismissal Probation | Termination |
| No Injury | 10 Penalty Days | 30 Penalty Days | Termination |
| **Failure to Intervene in:** | | | |
| Unauthorized Use of Deadly Physical Force Resulting in Serious Physical Injury or Death | N/A | Termination | N/A |
| Unauthorized Use of Deadly Physical Force Resulting in Physical Injury | 20 Penalty Days | 30 Penalty Days + Dismissal Probation | Termination |
| Unauthorized Use of Deadly Physical Force Not Resulting in Injury | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days + Dismissal Probation |
| Unauthorized Use of Force Resulting in Death/Serious Physical Injury | 30 Penalty Days + Dismissal Probation | 30 Suspension Days + 30 Penalty Days + Dismissal Probation | Termination |
| Unauthorized Use of Force Resulting in Physical Injury | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Unauthorized Use of Force Not Resulting in Injury | 1 Penalty Day | 5 Penalty Days | 10 Penalty Days |

---

[56] See New York City Administrative Code § 10-181, *Unlawful Methods of Restraint,* and Patrol Guide procedure 221-02, *Use of Force.*

23

| Failure/Refusal to Obtain Medical Assistance: | | | |
|---|---|---|---|
| Intentional or Reckless (e.g. injury/illness is readily apparent or visible) | 20 Penalty Days | 30 Penalty Days + Dismissal Probation | Termination |
| Negligent Failure | 1 Penalty Day | 5 Penalty Days | 10 Penalty Days |

**Additional Potential Mitigating Factors**

- Nature and severity of the crime
- Physical actions taken by the subject
- Duration of the action – relatively brief or momentary
- Immediacy and duration of the credible threat or harm to the subject, members of the service, and/or civilians
- Whether the subject engaged in active resistance or exhibited active aggression
- Actual injury to member of the service, other officers or civilians
- Proportionality of force used
- Prohibited force was incidental to an otherwise appropriate use of force and did not result in harm

**Additional Potential Aggravating Factors**

- Inappropriate purpose or motivation such as the use of force to punish, retaliate, coerce or harass a subject for any reason including making a statement
- Conduct results in criminal charges
- Handcuffed or otherwise restrained prisoner
- Prolonged or exaggerated duration of the action
- Use of weapon or instrumentality outside of guidelines/inconsistent with its intended purpose
- Nature and severity of the physical illness or injury

24

# Abuse of Authority, Discourtesy and Offensive Language

The Department prohibits misconduct involving the abuse of authority, discourtesy or use of offensive language, including but not limited to, slurs relating to race, ethnicity, religion, gender, sexual orientation and disability. The Department takes every instance of violating the Abuse of Authority, Discourtesy and Offensive Language guidelines and related procedures seriously. Because of the trust placed in them and, the discretion and authority granted to members of the service, the community has every right to expect and demand the highest level of accountability from the Department, as well as from individual members of the service. This is especially important in any violation of the abuse of authority, discourtesy or use of offensive language guidelines.

## Additional Definitions

**Investigative Encounters** – In accordance with their oath to uphold the law, uniformed members of the service must conduct investigative encounters in a lawful and respectful manner. An investigative encounter is a police interaction with a member of the public for a law enforcement or investigative purpose. The U.S. Supreme Court, in *Terry v. Ohio*, established the authority of police to stop and possibly frisk a person, under certain circumstances. The New York State Court of Appeals, in *People v. DeBour*, established the levels of investigative encounters and the authority of the police at each level, consistent with Federal constitutional standards.

**Stop** – A stop is any encounter between a civilian and a uniformed member of the service in which a reasonable person would not feel free to disregard the officer and walk away.  Whether an encounter amounts to a stop will be judged by the facts and circumstances of the encounter. A stop may be conducted only when an officer has an individualized reasonable suspicion that the person stopped has committed, is committing or is about to commit a felony or Penal Law misdemeanor.

**Frisk** – A frisk is a carefully limited running of the hands over the outside of a person's clothing in order to feel for a deadly weapon or any instrument, article or substance readily capable of causing serious physical injury. A frisk is authorized when the member of the service reasonably suspects the person is armed and dangerous.

**Search** – In the context of investigative encounters, a search occurs when an officer places their hands inside a pocket or other interior portions of a person's clothing or personal property.

**Discourtesy** – Discourtesy may include foul language, acting in a rude or unprofessional manner (such as demeanor or tone), and flashing rude or offensive gestures that is unjustified or unwarranted with no legitimate law enforcement purpose.

> *Example: an officer holding up his middle finger to an individual recording the officer on a cell phone camera, with no legitimate law enforcement purpose.*

**Offensive Language** – Offensive language is more serious conduct than discourtesy and includes slurs based on membership in a protected class such as race, religion, ethnicity, gender, gender identity, sexual orientation, age or disability. Offensive language is distinguished from "Hate Speech" (see below).

> *Example: an officer is aware that a transgender female identifies as a woman yet the officer referred to the complainant as "he," not the complainant's preferred gender pronoun while speaking to her.*

25

**Presumptive Penalties for Abuse of Authority, Discourtesy, Offensive Language**

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| **Sexual Misconduct:** | | | |
| Sexual Proposition/Unwanted Verbal Sexual Advances | N/A | 30 Penalty Days + Dismissal Probation | Termination |
| Sexually Motivated Enforcement Action/Sexual Touching/Sexual Solicitation[57] | 30 Suspension Days + Dismissal Probation | Termination | N/A |
| **Improper/Wrongful:** | | | |
| Stop of Person | Training | 3 Penalty Days | 15 Penalty Days |
| Frisk of Person | Training | 3 Penalty Days | 15 Penalty Days |
| Stop of Vehicle | Training | 3 Penalty Days | 15 Penalty Days |
| Search of Vehicle | Training | 3 Penalty Days | 15 Penalty Days |
| Search/Seizure of Person/Property | Training | 3 Penalty Days | 15 Penalty Days |
| Failure to Cover/Provide Privacy (in a timely manner) to an In-custody Individual's Exposed Intimate Body Parts | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Strip Search (procedural violation) | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Strip Search (unauthorized/unwarranted) | 20 Penalty Days | 20 Suspension Days + Dismissal Probation | Termination |
| Enforcement Action involving Abuse of Discretion or Authority[58] | 10 Penalty Days | 20 Penalty Days | Termination |
| Unlawful Entry Premises (pursuant to a public service/safety function) | N/A | Training | 1 Penalty Day |
| Unlawful Search/Entry Premises (entry involves incidental or *de minimis* physical presence e.g. foot over the threshold) | Training | 3 Penalty Days | 5 Penalty Days |

---

[57] This includes any conduct or solicitation for the purpose of sexual gratification, or sexual abuse or any sexual behavior that a reasonable person would consider to be an abuse of authority.

[58] This includes an enforcement action such as an arrest or summons for which there is a lawful basis, however, but for the officer's improper motive, enforcement action would not have been taken.

26

| | | | |
|---|---|---|---|
| Unlawful Search/Entry Premises (entry involves substantial physical presence and/or remaining on the premises) | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Unlawful Search/Entry Premises (entry is prolonged or includes additional proscribed conduct) | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Threat of Force/Police Enforcement/Notification to Outside Agency/Removal to Hospital - without Justification | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Failure to Process Civilian Complaint | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Retaliatory Action Against Another for Making a Civilian Complaint | 20 Penalty Days | 30 Penalty Days | 40 Penalty Days |
| Failure/Refusal to Provide Name or Shield Number | Training | 3 Penalty Days | 5 Penalty Days |
| Failure/Refusal to Provide Right-to-Know Business Card | Training | 3 Penalty Days | 5 Penalty Days |
| Failure to Comply with the Right-to-Know Act Regarding Consent to Search | Training | 3 Penalty Days | 5 Penalty Days |
| Negligent Failure to Obtain Medical Attention | 1 Penalty Day | 5 Penalty Days | 10 Penalty Days |
| Intentional or Reckless Failure to Obtain Medical Attention (e.g. readily apparent or visible injury/illness) | 20 Penalty Days | 30 Penalty Days + Dismissal Probation | Termination |
| Removal to a Medical Facility without Consent or Public Health Need | Training | 3 Penalty Days | 5 Penalty Days |
| Deletion of Information from a Recording Device | 20 Penalty Days | 30 Penalty Days + Dismissal Probation | Termination |
| Interfere with a Recording/Recording Device | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Discourtesy | 1 Penalty Day | 5 Penalty Days | 10 Penalty Days |
| Offensive Language | 10 Penalty Days | 20 Penalty Days | Termination |

27

*Additional Data: Any misconduct with a penalty of 10 days or less may be eligible for the issuance of a Schedule "B" Command Discipline. Any misconduct with a penalty of 5 days or less may be eligible for the issuance of a Schedule "A" Command Discipline. Training may be included with the imposition of any penalty.*

## Additional Potential Mitigating Factors

- Complexity of legal analysis as applied to the facts
- Level of dangerousness of the encounter or surroundings/urgency involved
- Good faith demonstrated by the member of the service and the absence of an intent to violate procedural or legal standards
- Escalation exhibited by the involved civilian(s)
- Member of the service attempted to de-escalate encounter
- Brief duration of encounter or limited impact upon/inconvenience to a civilian
- Potential for training to correct/rehabilitate behavior

## Additional Potential Aggravating Factors

- Extended duration of encounter or significant interference with a civilian
- Invasiveness of the encounter
- The member of the service exhibited bad faith, intentionally violated procedural or legal standards, or recklessly disregarded those standards
- Use of a Stop/Question/Frisk to humiliate, demean or retaliate against an individual
- The officer's action was biased, gratuitous, retaliatory, intentional or reckless
- Biased, abusive or obscene language
- Distress/injury caused to the civilian
- Failure to explain the reason for a stop
- Failure to report incident or make required activity log entry
- Pretext based on membership in a protected class
- "Heatedness" or escalation of interaction by the member of the service
- Implied threat of force or violence (vocal or physical)
- Damage to property

28

# False, Misleading and Inaccurate Statements

The following serves as guidance to determine the applicable charge(s) when a uniformed member of the service makes a false, misleading or inaccurate statement, written or spoken, during an official investigation. The goal of any internal investigation is to get to the truth. False, misleading and inaccurate official statements are contrary to this goal. The justice system relies on members of the service to provide truthful and accurate information in a wide variety of contexts and circumstances. The functioning of that system, and the public's trust in that system, are both severely undermined by false, misleading and inaccurate statements. Therefore, the penalty for members of the service who are found guilty of making false official statements will be presumed to be termination, absent extraordinary circumstances, as determined by the Police Commissioner on a case by case basis.

Each allegation of a false, misleading or inaccurate statement shall be charged separately. For example, if the investigator believes a statement to be both false and misleading, the investigator will make a charge of false statement and another charge of misleading statement. Also, if the statement includes multiple separate instances of false statements about different facts, each statement shall be charged separately. Instances of multiple statements during the same interview about the same fact may be charged as one.

A statement is false or misleading when the investigator determines the charge is proven by a preponderance of the evidence, including credible witness testimony. All examples provided are for illustrative purposes only and are not exhaustive. Each case is weighed on its own merits after a strong fact-based analysis to determine the appropriate charge(s).

## Additional Definitions for False, Misleading and Inaccurate Statements

**False Statement** – An intentional statement that a member of the service knows to be untrue, which is material to the outcome of an investigation, proceeding, or other matter in connection with which the statement is made.

**Intent** – A statement is an intentionally false statement when it is the conscious objective to make the false statement. Determining intentionality requires a consideration of the relevant factors. Some factors which may be considered include:

- Whether the fact(s) at issue is/are memorable
- The length of time between the event and the statement
- The significance of the fact(s) at the time that the event occurred
- Whether the nature of the event allowed for accurate perception or memory
- The subject's physical, mental, or emotional condition at the time the statement is made[59]
- Whether the investigator gave the subject memory prompts or cues (e.g., memo books, video, arrest reports, etc.) to assist his/her recollection and yet the speaker persisted in making the statement
- Whether the speaker has a motive to lie or deceive or an interest in the outcome of the investigation, proceeding, or other matter in connection with which the statement was made

**Material Fact** – A significant fact that a reasonable person would recognize as relevant to, or affecting the subject matter of the issue at hand, including any foreseeable consequences, or establishment of the elements of some proscribed conduct. It is a fact that is essential to the determination of the issue and where the suppression, omission, or alteration of such fact would reasonably result in a different decision or outcome.

---

[59] For example, a statement is made or elicited in the immediate aftermath of a stressful incident such as an adversarial shooting or other traumatic event before the member has had sufficient opportunity to reflect and recall details of the event.

29

A material fact may be distinguished from an insignificant, trivial, or unimportant detail.

- Materiality is fact-specific and must be evaluated on a case-by-case basis
- Examples of material statements include:
  - When the validity of the search of a vehicle is at issue and an officer states that he/she never opened and searched the trunk of a car during a car stop, but video shows that he/she did in fact open and search the trunk, the officer's statement about their actions is material
  - When a member of the service denies to an investigator that he/she attended a meeting where alleged misconduct occurred, yet independent evidence (e.g., video) indicates the member was in fact present at the meeting, the statement is material

**Denial** – A distinction must be drawn between a procedural denial of a charge or allegation and denial of facts. A general denial of culpability, such as a broad statement of "I didn't do anything wrong" or a "not guilty" plea in a criminal, civil or administrative proceeding, is not to be charged as a false statement. However, if the speaker, after being afforded the opportunity to recollect, intentionally denies specific facts that are proven by credible evidence to have occurred, he or she has made a false statement. An example of denial of the facts that would be appropriate for a charge of false statement: A member of the service states, "I did not take any money from the location," but credible evidence conclusively demonstrates that the member of the service did, in fact, remove money from the location.

**Retraction** – In an investigation or proceeding, if a member of the service intentionally makes a false statement, but then retracts the statement and substitutes a truthful statement during the same interview, deposition, or other session of oral testimony, a charge of false statement is not appropriate if each of the following circumstances is present:

1. The retraction occurs within the same interview or proceeding as the false statement[60]; _and_
2. The member retracts the false statement before the fact-finder has been deceived or misled to the harm and prejudice of the investigation or proceeding (i.e., the false statement is retracted before it has substantially affected the investigation or proceeding); _and_
3. The retraction and substituted truthful statement are made before the member knows or has reason to know that the fact-finder is or will be aware of the false statement. The substituted truthful statement must occur at a time when no reasonable likelihood exists that the member has learned that his or her falsehood has become known to the fact-finder[61].

The purpose of this extremely narrow exception is to foster truthfulness when a member provides information during an investigation or proceeding. It encourages and allows the member, on their own initiative, to correct and retract a false statement before it has the potential to do irreparable harm.

**Misleading Statement** – A statement that is intended to misdirect the fact finder, and materially alter the narrative by:

- Intentionally omitting a material fact or facts, or
- Making repeated claims of "I do not remember" or "I do not know" when a reasonable person under similar circumstances would recall, or have been aware of, such material facts, or
- Altering and/or changing a member's prior statement or account when a member of the service is confronted with independent evidence indicating that an event did not occur as initially described, will generally be considered a misleading statement.

---

[60] This prong may be met if the retraction pertains to a statement made during an interview conducted under the provisions of Patrol Guide procedure 206-13, _Interrogation of Members of the Service_, and occurs within 24 hours of the false statement after the member of the service has had the opportunity to reflect and consult with counsel and/or family. An additional charge or impeding an investigation may still be appropriate however.

[61] Therefore, if the member retracts the statement after he or she is confronted with evidence that demonstrates its falsity, this third prong would not be met.

30

**Omissions** – An omission is a fact material to the investigation that has been intentionally left out of the statement of the member. Not every omission can be considered misleading. The omitted fact(s) must be material and the omission must be intentional[62].

**Failure to Recollect Considerations** – Factors to be considered in determining if a reasonable person would remember or would be aware of the facts include:

- The time that has elapsed between the event and the statement
- How unique or memorable the event is
- The member's overall ability to recall events before and after the event
- The member's continued lack of recollection after efforts are made to refresh their recollection by showing video, photos, memo book entries, or other prompts

**Inaccurate Statement** – A statement that a member of the service knows, or should know, includes incorrect material information. There is no intent to deceive, but rather the member's actions are grossly negligent.

**Mistakes** – Mere clerical errors may not be considered inaccurate statements when the statement error is so minor that it has little, or no effect, on the overall intent of the statement. An error will be considered to be an inaccurate statement when a member of the service does not intend to deceive, but causes a material variation. Erroneous statements, lacking in willful intent, and not so unreasonable as to be considered gross negligence are not a basis for finding misconduct.

**Impeding an Investigation** – An investigation is considered impeded when a member of the service makes false, misleading, and/or inaccurate statements, or engages in impeding actions. A member of the service who impedes or attempts to impede an official investigation will face disciplinary action for conduct prejudicial to the good order, efficiency, or discipline of the Department.

Examples of conduct which impedes an investigation may include:

- Failure to produce documents in a member's possession or control that the member knows or has been informed are necessary and relevant to an investigation
- Intentionally making statements that misdirect or misinform the investigator and/or interfere with or undermine the goals of the investigation
- Tampering with a witness by attempting to, or succeeding in, causing the witness to refuse to cooperate with an investigation or proceeding
- Improperly influencing a witness to make false, misleading, or inaccurate statements during the course of an investigation or proceeding

A charge of impeding an investigation may be appropriate even if the member did not ultimately succeed in impeding the investigation. For example, if the Member intentionally attempts to influence a witness, but the witness resists the efforts, a charge of impeding an investigation may still be appropriate.

---

[62] See the discussion in False Statements for the elements "material" and "intentional".

31

**Presumptive Penalties for False, Misleading & Inaccurate Statements and Impeding an Investigation**

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| Intentionally Making a False Official Statement | Forced Separation | Termination | N/A |
| Intentionally Making a Misleading Official Statement | 20 Penalty Days | 30 Penalty Days + Dismissal Probation | Termination |
| Making an Inaccurate Official Statement, or Causing Same to be Made by Another | 5 Penalty Days | 10 Penalty Days | 15 Penalty Days |
| Impeding an Investigation | 20 Penalty Days | 30 Penalty Days + Dismissal Probation | Termination |

**Additional Potential Aggravating Factors**

- The additional expense in terms of time and resources required to further investigate a matter as a result of a false/misleading/inaccurate statement and impeding  actions
- Adverse impact upon the outcome of the  investigation
- The member's training and experience makes it likely that the member knows or should have known a material fact

**Additional Potential Mitigating Factors**

- Complexity and rapidly changing nature of the underlying incident
- Misconduct itself is not a presumptive termination act and the nature of the statement is such that it was made with the intent to avoid embarrassment (particularly in the context of interpersonal relationships or health conditions)
- The extended length of time that has elapsed between the event and the statement
- The event is relatively routine or not memorable
- The member's inability to recall activities before or after the event
- A member's unique underlying stressors at the time of the statement
- Material facts would not be discovered but for the officer volunteering information

32

# Domestic Violence Incidents

### Additional Definition for Domestic Violence Incidents

**Family/Household**[63] – Family/Household includes persons who are legally married to one another, were formerly legally married to one another, related by marriage (affinity), related by blood (consanguinity), have a child in common regardless of whether such persons have been married or have lived together at any time, not related by consanguinity (blood) or affinity (marriage) and who are, or have been, in an intimate relationship regardless of whether such persons have lived together at any time, currently living together in a family-type relationship, or formerly lived together in a family-type relationship.

### Presumptive Penalties for Domestic Violence Incidents Involving Family/Household

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| Physical Act(s) of Domestic Violence/Family Offense[64] | N/A | 30 Suspension Days + Dismissal Probation + Counseling – 24 week OASAS program[65] | Termination |
| Physical Act(s) of Domestic Violence/Family Offense with[66]:<br><br>• Previous determination by the Department that the member committed physical act(s) of domestic violence[67]; or<br>• Clear and convincing evidence demonstrates that the member of the service previously committed physical act(s) of domestic violence whether or not previously reported and/or substantiated[68]; or<br>• Found guilty in a criminal proceeding for a domestic violence crime[69]; or<br>• The act results in a serious physical injury; or<br>• The act results in significant physical injuries and/or injuries generally indicative of sustained or prolonged physical acts, or<br>• Order of Protection violated. | Forced Separation | Termination | N/A |

---

[63] See Patrol Guide procedure 208-36, *Family Offenses/Domestic Violence*.

[64] See Commission to Combat Police Corruption, Eighteenth Annual Report of the Commission, August 2017 at p. 73.

[65] The 24-week counseling program may be imposed as a condition of probation even if the member of the service previously completed the 4-week or 8-week Domestic Incident Education Program administered by the NYPD Medical Division.

[66] Evidence of discipline for prior domestic violence event(s) will always be considered a relevant factor regardless of the length of time elapsed between the incidents.

[67] See Eighteenth Annual Report at p. 71.

[68] See Commission to Combat Police Corruption, Sixteenth Annual Report of the Commission, October 2014 at p. 53; See also Hon. Mary Jo White, Hon. Robert L. Capers and Hon. Barbara S. Jones, The Report of the Independent Panel on the Disciplinary System of the New York City Police Department, January 2019 at p. 55.

[69] See Eighteenth Annual Report at p. 53.

33

| | | | |
|---|---|---|---|
| Non-physical Act(s) of Domestic Violence/Family Offense[70] | 20 Penalty Days + Other Conditions (e.g. counseling, as deemed appropriate) | 30 Penalty Days + Other Conditions (e.g. counseling, as deemed appropriate) | Termination |
| Non-physical Act(s) of Domestic Violence/Family Offense with:<br><br>• Previous determination by the Department that the member committed an act of domestic violence; or<br>• Alcohol related/involved; or<br>• Weapon of any type (other than firearm) used or threatened; or<br>• Endangering the welfare of a child; or<br>• Other situations deemed appropriate based upon the facts and circumstances (e.g. threats, stalking, etc.). | 30 Penalty Days + Other Conditions (e.g. counseling, as deemed appropriate) | 30 Penalty Days + Dismissal Probation + Other Conditions (e.g. counseling, as deemed appropriate) | Termination |
| Use, Threatened Use, or Menacing with a Firearm | Forced Separation | Termination | N/A |
| Violation of an Order of Protection (first offense) | 20 Penalty Days + Other Conditions (e.g. counseling, as deemed appropriate) | 30 Suspension Days + Other Conditions (e.g. counseling, as deemed appropriate) | Termination |
| Violation of an Order of Protection (second offense) | Forced Separation | Termination | N/A |

**Additional Considerations for Domestic Violence Incidents**

• Settlement agreements for cases involving a physical act of domestic violence shall include the specific acts for which the member of the service is admitting responsibility and accepting discipline[71]
• In reaching settlement agreements, factors such as evidentiary issues, the likelihood of a successful prosecution, cooperation of the victim/witnesses, timeliness of resolution, the severity of any force employed, the nature of the restrictions enumerated in an order of protection and the nature of the exact circumstances of the altercation shall be considered when determining the appropriate penalty including any deviations from the presumptive penalties
• The likelihood of recurrence, the member's role in the altercation (e.g. primary, only, or co-aggressor) and any other relevant factors will also be considered[72]

---

[70] Non-physical acts of domestic violence/family offenses Include, but are not limited to, verbal threats, stalking, harassment, coercion, and destruction of property.

[71] This requirement may be waived if there is an ongoing proceeding in Criminal and or Family Court, or a criminal investigation related to the acts underlying the misconduct being adjudicated.

[72] The Commission to Combat Police Corruption noted that, "subject officers who commit one domestic violence offense, in most circumstances, should be given the opportunity to rehabilitate themselves and conform their behavior to the standards required of law enforcement officers." Eighteenth Annual Report at p. 70.

34

- Medical Division Assessment[73]
  - The Director of the Psychological Evaluation Section will, in each case of a domestic violence allegation, conduct an assessment of the member of the service concerned to determine whether separation on medical and/or fitness for duty grounds should be considered
  - The Director of the Counseling Services Unit will evaluate each case of domestic violence at inception to determine whether the member would benefit from a particular counseling program focusing on domestic violence prevention and/or anger management

## Unique Aggravating Factors and Additional Presumptive Penalties for Misconduct Involving Family/Household

While the presumptive penalties outlined above are significant and reflect the seriousness of domestic violence offenses, certain aggravating factors may lead to additional penalties, over and above the presumptive penalties. The following aggravating factors may impact domestic violence penalties and result in an increase in the total number of penalty days forfeited. These increased penalties may be imposed upon a member of the service who is determined to have committed act(s) of domestic violence whether or not such incident included a physical act. These factors and corresponding penalty enhancements are only a guide. Depending upon the facts and circumstances of the case, actual penalties may vary.

| Aggravating Factor | Presumptive Additional Penalty |
|---|---|
| Alcohol a Factor in the Incident | 10 Penalty Days* |
| Calling or Showing Up at the Victim's Place of Employment | 10 Penalty Days |
| Children Present | 10 Penalty Days |
| Children Present w/Reasonable Risk of Harm to Child | 15 Penalty Days |
| Coerce/Threaten/Intimidate Witness and/or C/W (including threatening third parties) | 10 Penalty Days |
| Confiscating/Damaging Victim's Phone | 15 Penalty Days |
| Damage Property | 15 Penalty Days |
| Enter/Remain Without Permission in Victim's Home/Place of Refuge | 10 Penalty Days |
| Eviction | 15 Penalty Days |
| Failure to Identify Self to Responding Law Enforcement Personnel | 10 Penalty Days |
| Failure to Notify re Service of Order of Protection (member is the named member of the service) | 10 Penalty Days |
| Failure to Report/Notify | 5 Penalty Days |

---

[73] These assessments occur following the incident and do not preclude the later imposition of the 24-week counseling program as a condition of dismissal probation.

35

| | |
|---|---|
| Failure to Safeguard Firearm During a DV Incident | 15 Penalty Days |
| Harassing the Victim/Witness | 10 Penalty Days |
| Harming Animal/Family Pet | 15 Penalty Days |
| Incident While On-Duty | 10 Penalty Days |
| Leaving the Scene (absent exigency) | 5 Penalty Days |
| Menacing | 10 Penalty Days |
| Physical Injury (not constituting Serious Physical Injury) | 10 Suspension Days – Termination (see Force Section) |
| Preventing 911 Calls/Obstructing Seeking Assistance | 15 Penalty Days |
| Preventing Victim from Leaving Premises/Vehicle | 10 Penalty Days |
| Stalking | 20 Penalty Days |
| Vulnerable Victim (elderly, incapacitated, etc.) | 15 Penalty Days |
| Weapon/Instrument Used (other than firearm) | 10 Penalty Days |

*Also includes alcohol counseling and ordered breath testing.*

### Additional Potential Mitigating Factors

- The other party is the primary aggressor in a physical altercation
- Subject member of the service is the victim only and the disciplinary issue is related to other misconduct (e.g. failure to report or alcohol-related infraction)

36

# Driving While Ability Impaired/Intoxicated Incidents

**Presumptive Penalties for Driving While Impaired/Intoxicated**

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| Driving While Ability Impaired/Driving While Intoxicated[74] | N/A | 30 Suspension Days + 20 Penalty Days + Dismissal Probation + Cooperation w/ Counseling + Ordered Breath Testing | Termination |
| Driving While Ability Impaired/Driving While Intoxicated with any of the following:<br>• Member on Entry-Level Probation; or<br>• Felony Criminal Conviction or Conviction of an Oath of Office Violation; or<br>• DWI involving Death or Serious Physical Injury to another person; or<br>• Leaving the scene of a collision involving an injury to another person; or<br>• DWI while On-Duty; or<br>• DWI with Serious Traffic Violation, or Multiple Traffic Violations; or<br>• Prior DWI History; or<br>• DWI while on Dismissal Probation; or<br>• Failure to comply with the Department's Ordered Breath Testing Program; or<br>• Failed test as part of Ordered Breath Testing; or<br>• Any other conduct deemed by the Police Commissioner to be an aggravating factor warranting Dismissal/Forced Separation | Forced Separation | Termination | N/A |
| Refusal to Submit to Breathalyzer or Other Appropriate Test | 15 Penalty Days | 30 Suspension Days + Dismissal Probation | Termination |

## Additional Considerations for DWI Incidents

- Evidence of discipline for prior DWI event(s) will always be considered a relevant factor regardless of the length of time elapsed between the incidents
- When considering the penalty range for refusal or failure to submit to a Breathalyzer or other appropriate test, the impact upon the investigation, Departmental operations and any impact upon civilian victims will be considered

---

[74] See New York Vehicle and Traffic Law, Art. 31 § 1192.

37

- The Director of the Psychological Evaluation Section, in each case of a DWI allegation, conducts an assessment of the member concerned to determine whether separation on medical and/or fitness for duty grounds should be considered
- The Director of the Counseling Services Unit evaluates each case of DWI at inception in order to determine which type of counseling (inpatient versus outpatient) will most benefit the member and/or whether any other type of counseling should be mandated

### Unique Aggravating Factors and Additional Presumptive Penalties

While the presumptive penalties outlined above are significant and reflect the seriousness of Driving While Ability Impaired/Intoxicated, certain aggravating factors may lead to additional penalties, over and above the presumptive penalties. The following aggravating factors may impact Driving While Ability Impaired/Intoxicated penalties and result in an increase in the total number of penalty days. These factors and corresponding penalty enhancements are only a guide. Depending upon the facts and circumstances of the case, actual penalties may vary.

| Aggravating Factor | Presumptive Additional Penalty |
|---|---|
| Any Non-Serious Physical Injury to Another | 5 Suspension Days |
| Collision with Object | 5 Penalty Days |
| Collision with Other Vehicles | 5 Penalty Days |
| DWI while Off-Duty and Driving a Department Vehicle | 10 Suspension Days and Restitution for any Damage to the Vehicle |
| DWI with any Traffic Infraction | 5 Penalty Days |
| DWI with Child in Vehicle | 10 Suspension Days |
| DWI with Open Container of Alcohol in Vehicle | 10 Penalty Days |
| DWI with Passenger in Vehicle | 5 Penalty Days |
| Firearm Lost | 20 Penalty Days |
| Firearm on Person | 5 Penalty Days |
| Firearm Unsecured in Vehicle | 10 Penalty Days |
| Leaving the Scene of a collision | 5 Penalty Days |
| Prior Alcohol Offenses (which occurred within the past 5 years or for which penalty was imposed in the past 5 years) | 10 Suspension Days |
| Resisting Arrest/Aggression with Arresting Officer | 10 Suspension Days |

38

# Firearm-Related Incidents

**Presumptive Penalties for Firearm-Related Incidents**

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| Accidental Firearm Discharge/Negligence on the Part of the Member (with injury to another) | N/A | 30 Suspension Days* + Dismissal Probation | Termination |
| Accidental Firearm Discharge (self-inflicted injury or significant property damage) | N/A | 20 Penalty Days | Termination |
| Accidental Firearm Discharge (no injury and/or minor property damage) | N/A | 15 Penalty Days | 30 Penalty Days + Dismissal Probation |
| Allowing a Civilian to handle Firearm | N/A | 15 Penalty Days | 30 Penalty Days |
| Fail to Notify the Department About Firearm Acquisition | N/A | 5 Penalty Days | 10 Penalty Days |
| Fail to Safeguard Firearm (not resulting in loss) | N/A | 15 Penalty Days | 30 Penalty Days |
| Fail to Safeguard Firearm (resulting in loss or possession by another) | N/A | 20 Penalty Days | 30 Penalty Days + Dismissal Probation |
| Failure to Report Improper Discharge | N/A | 10 Penalty Days | 20 Penalty Days |
| Failure to Report Lost Firearm | N/A | 10 Penalty Days | 20 Penalty Days |
| Firearm Discharge at or from a Moving Vehicle, Outside Department Guidelines not Resulting in Serious Physical Injury | N/A | 20 Penalty Days | 30 Penalty Days + Dismissal Probation |
| Firearm Misconduct Involving Risk to Child | N/A | 30 Penalty Days | Termination |
| Possession/Use of an Unauthorized Firearm | N/A | 10 Penalty Days | 20 Penalty Days |

39

| | | | |
|---|---|---|---|
| Use of Unauthorized Ammunition | N/A | 3 Penalty Days | 6 Penalty Days |
| Use of Unauthorized Holster/Fail to Utilize a Holster | N/A | 3 Penalty Days | 6 Penalty Days |
| Misuse of a Firearm while Unfit for Duty | Forced Separation | Termination | N/A |

*\* The penalty escalates commensurate with the nature and extent of the injury.*

40

# Ingesting Controlled Substances, Marihuana/THC, Banned Substances and Excessive/Unexcused Use of Prescription Drugs[75]

## Additional Definitions

**Controlled Substances[76]:** Drugs that are regulated by state and federal laws that aim to control the danger of addiction, abuse, physical and mental harm, the trafficking by illegal means, and the dangers from actions of those who have used the substances, as follows:

- Schedule I Drugs: Drugs, substances, or chemicals defined as drugs without currently accepted medical use and a high potential for abuse
  - Examples of Schedule 1 Drugs include: Heroin, LSD, Ecstasy, Cocaine, Crack-Cocaine, Marihuana, etc.
- Schedule II Drugs: Drugs, substances, or chemicals defined as drugs with high potential for abuse, with use potentially leading to severe psychological or physical dependence
  - Examples of Schedule II Drugs include: Vicodin, methamphetamine, methadone, oxycodone, etc.
- Schedule III Drugs: Drugs, substances or chemicals defined as drugs with a moderate to low potential for physical and psychological dependence
  - Examples of Schedule III Drugs include: Tylenol with codeine, ketamine, etc.

**Marihuana/Tetrahydrocannabinol ("THC"):** Marihuana is defined under NY Public Health Law § 3302(21) and the Federal Controlled Substances Act 21 U.S.C. § 812.[77] THC is believed to be the primary psychoactive component of marihuana.

**Anabolic Steroids:** Synthetically produced variants of the naturally occurring male hormone testosterone that are abused in an attempt to promote muscle growth, enhance athletic or other physical performance, and improve physical appearance.

- Examples of Anabolic Steroids include: Testosterone, nandrolone, stanozolo, methandienone, boldenone, etc.

**Banned Substances:** Dietary supplements that are prohibited by the Department as listed in Personnel Bureau Memo #44 s.2011, Appendix "A" (Anabolic Steroids and Human Growth Hormone), and any subsequent updates.[78]

---

[75] The NYPD is a drug-free workplace as defined under 41 U.S.C. § 8101 and NYPD employees are prohibited from using controlled substances. Under 41 U.S.C. § 8103, the Department must adhere to these drug-free requirements in order to receive federal grant funding. Additionally, the Federal Gun Control Act, 18 U.S.C. § 922, prohibits anyone who uses a controlled substance, as that term is defined under the Federal Controlled Substances Act, from possessing a firearm.

[76] See the Controlled Substances Act, 21 U.S.C. §§ 808 – 904.

[77] Includes all parts of the plant of the genus Cannabis, whether growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin.

[78] The list of substances in Appendix A is subject to change at any time. See also, www.nsfsport.com.

41

**Presumptive Penalties for Controlled Substances, Marijuana/THC, Banned Substances and Excessive/Unexcused Use of Prescription Drugs**

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| Positive Ordered or Random Drug Screening Test Showing Positive for Use of Schedule I or Schedule II Drugs | N/A | Termination | N/A |
| Positive Ordered or Random Drug Screening Test Showing Use of Schedule III Drug without a Valid, Lawfully Obtained Prescription or with no Legitimate Medical Reason | N/A | Termination | N/A |
| Possession of a Schedule I or Schedule II Drug | N/A | Termination | N/A |
| Refusal to Submit to an Ordered or Random Drug Screening Test | N/A | Termination | N/A |
| Attempt to Alter or Mask an Ordered or Random Screening Test | N/A | Termination | N/A |
| Positive Ordered/Random Drug Screening Test Showing Positive for an Anabolic Steroid without a Valid and Lawfully Obtained Prescription or with no Legitimate Medical Reason | Forced Separation | Termination | N/A |
| Ingestion of a Banned Substance | Forced Separation | Termination | N/A |
| Possession of Drug Paraphernalia (without a positive ordered or random drug screening test result) | 45 Penalty Days + Dismissal Probation + Ordered Drug Screening Tests | 60 Penalty Days + Dismissal Probation + Ordered Drug Screening Tests[79] | Termination |

---

[79] Ordered drug screening tests may be agreed upon in a negotiated settlement. The member of the service may be subject to testing at any time during this period.

42

# Violations of Department Rules and Regulations

Department rules and regulations are codified in the Patrol Guide, Administrative Guide, Detective Guide, DAS Bulletins, Finest Messages, Reference Guides and other publications available to members on the Department's electronic portal under the "Directives & Manuals" section.[80] Members are required to remain cognizant of the Department's rules and regulations. The following chart depicts the presumptive penalties for violations that are commonly adjudicated through Charges and Specifications. This list is not exclusive. For any Rule or Regulation not listed, a determination will be made based upon the facts and circumstances surrounding the incident.

**Presumptive Penalties for Violation of Department Rules and Regulations – Adjudicated by Charges and Specifications[81]**

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| Accessing Confidential Information Without Police Necessity[82] | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Body Worn Camera – Unintentional Failure to Record a Prescribed Event or Commencing/Terminating a Recording at an Improper Time | Instructions | Training | 1 Penalty Day |
| Body Worn Camera - Negligent Failure to Record a Prescribed Event or Commencing/Terminating a Recording at an Improper Time | Training | 1 Penalty Day | 3 Penalty Days |
| Body Worn Camera - Negligent Failure to Record a Prescribed Event or Commencing/Terminating a Recording at an Improper Time AND the Underlying Incident is the Subject of an Investigation | 1 Penalty Day | 3 Penalty Days | 5 Penalty Days |

---

[80] See https://portal.nypd.org/pages/DirectivesAndManuals.aspx

[81] Charges and Specifications is one method suitable for the adjudication of the misconduct listed.  The misconduct specified here may or may not rise to the level of Charges and Specifications as determined by the Department Advocate based upon all of the facts and circumstances surrounding the incident. In such cases, the violations may be addressed as aggravating factors related to other acts of misconduct or may be addressed at the command level if there are no associated acts of misconduct being adjudicated through charges and specifications.

[82] See, Patrol Guide procedure 203-22, *Department Confidentiality Policy*.

43

| | | | |
|---|---|---|---|
| Body Worn Camera - Intentional or Reckless Failure to Record a Prescribed Event or Commencing/Terminating a Recording at an Improper Time | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Conduct Prejudicial to the Good Order and Efficiency of the Department | Training | N/A | Termination |
| Conducting Personal Business While On Duty | 5 Penalty Days | 10 Penalty Days | 15 Penalty Days |
| Criminal Association | 15 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Fail to Comply with a Lawful Order | 15 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Fail to Follow DARP/Vehicle Tow Procedures | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Fail to Invoice Property | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Fail to Prepare a Required Report | 3 Penalty Days | 5 Penalty Days | 10 Penalty Days |
| Fail to Document an Investigative Encounter | 3 Penalty Days | 5 Penalty Days | 10 Penalty Days |
| Fail to Remain Alert | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Fail to Safeguard Prisoner Resulting in Escape | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Fail to Supervise | 15 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Fail to Take Police Action | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Improper Downloading/Disseminating of Department Reports/Data | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Improper Downloading/Disseminating of Offensive Material | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Improper Recording of a Police Incident (using any personal electronic/digital device to record video and/or audio or take photographs during any police encounter) | 15 Penalty Days | 20 Penalty Days | 30 Penalty Days |

44

| | | | |
|---|---|---|---|
| Insubordination | 15 Penalty Days | 20 Penalty Days | 30 Penalty Days |
| Making an Unauthorized Radio Transmission | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Misuse of Computer, Email, or Mobile Digital devices[83] | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Misuse of Time* | N/A | 15+ Penalty Days + Forfeiture of Time & Leave Balance and/or Restitution | N/A |
| Off Post | 3 Penalty Days | 5 Penalty Days | 10 Penalty Days |
| Out of Residence While on Sick Leave | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
| Possess/Acquire/Publish Child Pornography | Forced Separation | Termination | N/A |
| Racial Profiling/Bias-Based Policing[84] | Forced Separation | Termination | N/A |
| Unauthorized Release of Confidential Information to the News Media or other Third Parties[85] | 20 Penalty Days | 30 Penalty Days | 30 Penalty Days + Dismissal Probation |
| Using Department Logo, Letterhead, Personnel, Resources, etc. for Non-Official Purpose/without Permission | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |

*The number of penalty days shall increase based on the amount of time misused or severity of the misuse to reimburse the Department for the improper use of time. The penalty may also include Dismissal Probation or forced separation from the Department.*

---

[83] See, Patrol Guide procedures 219-32, *Department Mobile Digital Devices*, 203-27 *Department Email Policy* and 203-10 *Public Contact – Prohibited Conduct*.
[84] See Patrol Guide procedure 203-25, *Department Policy Prohibiting Racial Profiling and Bias-Based Policing*.
[85] See Patrol Guide procedure 212-77, *Release of Information to News Media*.

45

# Off-Duty Misconduct & Prohibited Conduct Generally

Members of the service are required to maintain the standards established by the Department for their conduct whether on- or off-duty and are held to a higher standard of ethics and integrity. The misconduct described and the presumptive penalties enumerated throughout these guidelines are equally applicable to on- and off-duty deportment and conduct. The following chart provides presumptive penalties for acts of misconduct that typically occur off-duty, however, this does not preclude the application of these penalties if the conduct occurs while on-duty. Committing acts of misconduct described below while on-duty may be an aggravating factor in assessing the appropriate penalty.

**Presumptive Penalties for Off-Duty Misconduct & Prohibited Conduct**

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| Animal Cruelty | N/A | 30 Penalty Days + Dismissal Probation | Termination |
| Consuming Intoxicants While in Uniform | N/A | 30 Penalty Days + Dismissal Probation | Termination |
| Displaying a Weapon While Off-Duty | 10 Penalty Days | 15 Penalty Days | 20 Penalty Days |
| Dispute/Failure to Comply with On-Duty Law Enforcement Officer While Off-Duty | 10 Penalty Days | 15 Penalty Days | 20 Penalty Days |
| Fail to Identify Self to Responding Officers at the Scene of a Police Incident | 5 Penalty Days | 10 Penalty Days | 15 Penalty Days |
| Fail to Remain at the Scene of a Police Incident | 1 Penalty Day | 5 Penalty Days | 10 Penalty Days |
| Fail to Report Incident or Notify the Department of Involvement in a Police Incident | 1 Penalty Day | 5 Penalty Days | 10 Penalty Days |
| Financial Restrictions – Prohibited[86] | 10 Penalty Days + Divesture of Interest | 20 Penalty Days + Divesture of Interest | 30 Penalty Days + Divesture of Interest |
| Hate Speech[87] | Forced Separation | Termination | N/A |

---

[86] See Patrol Guide procedures 203-13 *Financial Restrictions – Prohibited Acts* and 203-14 *Financial Restrictions – Prohibited Interests.*
[87] Such misconduct may apply to activity covered by the following Patrol Guide procedures: 203-32, *Personal Social Media Accounts and Policy*, 203-28, *Department Social Media Accounts and Policy*, 203-10, *Public Contact – Prohibited Conduct,* and *205-36, Employment Discrimination.*

46

| | | | |
|---|---|---|---|
| Misrepresentations Regarding Contractual or Financial Matters (e.g. Military Duty Status, Housing, Mortgages, etc.) | N/A | 30 Suspension Days + Dismissal Probation | Termination |
| Off-Duty Employment – Prohibited Employment or Application Denied | 10 Penalty Days | 15 Penalty Days | 25 Penalty Days |
| Off-Duty Employment – Unauthorized/Authorization Denied or Expired | 5 Penalty Days | 10 Penalty Days | 15 Penalty Days |
| Operating a Vehicle in a Reckless Manner | 15 Penalty Days | 20 Penalty Days | 30 Penalty Days + Dismissal Probation |
| Public Assistance – Apply for or Obtain Benefits Without Justification or Qualification | Forced Separation | Termination | N/A |
| Unfit for Duty | N/A | 30 Penalty Days + Dismissal Probation + Ordered Breath Testing + Cooperation with Counseling | Termination |
| Vehicle Insurance – Causing the Incorrect Rate to be Applied | 5 Penalty Days | 10 Penalty Days | 15 Penalty Days |
| Vehicle Identification Plate/Placard Misuse[88] | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |

**Definition of Hate Speech:**

Speech or other form of expression that is intended to intimidate, attack, or threaten/incite violence against a person or group on the basis of national origin, ethnicity, color, religion, gender, gender identity, sexual orientation, disability or other protected class. Hate Speech is more egregious than "Offensive Language" and may not be language that merely offends or insults an individual or is considered rude, distasteful or offensive but rather shocks the conscience. A charge of Hate Speech will only be sustained when the language so clearly damages the employee's ability to continue to perform their job responsibilities, damages the ability of co-workers to perform their own duties or has such an effect on good order and discipline that it damages the credibility of the Department or the Department's ability to provide services and fulfill its mission.

---

[88] Examples of placard abuse not covered in the sections on Command Discipline may include, but is not limited to, misconduct such as duplicating a placard for another's use (e.g. family member) or using/creating an unauthorized placard when one is not assigned to the member of the service.

47

# Equal Employment Opportunity Division and the Discipline System

Since the enactment of Title VII of the Civil Rights Act, a number of categories that are considered employment discrimination have been established under U.S. law: disparate treatment, disparate impact, harassment and retaliation. The NYPD Office of Equity and Inclusion ("OEI") promotes a fair, safe, inclusive and accommodating work environment for all members of the NYPD. OEI is responsible for ensuring that our employees are treated with dignity and respect in the workplace, identifying and addressing obstacles to success, and promoting a fair and inclusive workplace that is free from discrimination and harassment. The Equal Employment Opportunity Division ("EEOD"), a sub-unit of OEI, is responsible for the prevention and investigation of employment discrimination claims. EEOD investigations occur under the guidance and supervision of the Deputy Commissioner of Equity and Inclusion.

The EEOD investigator will evaluate the information submitted and make a recommendation as to whether there is reasonable cause to believe that unlawful discrimination has taken place. If there is a reasonable cause to believe that an unlawful discriminatory act has taken place, an EEOD investigator will promptly and thoroughly investigate the allegations. When an informal or formal complaint is made, it is EEOD's responsibility to make sure immediate steps are taken to stop the alleged misconduct and begin the investigation. The goal of the investigation is to identify and resolve internal problems before they become widespread and effect the overall culture of the NYPD. Investigations must be prompt and thorough to ensure everyone has the ability to work in a safe environment, free from any unlawful discriminatory practices. Once the investigator has completed the investigation, EEOD will make a determination on the merits of the charge. The final disposition is dependent on a variety of factors, including, but not limited to, the severity of the conduct, the impact of the conduct on good order and discipline, the member of the service's history of substantiated misconduct, if any, and input from the victim.

In most cases in which there has been a determination that the allegations are substantiated, the Deputy Commissioner of Equity and Inclusion submits a final case report to the Police Commissioner with recommendations regarding whether the case merits the issuance of a Command Discipline or whether the case should be handled through the service of Charges and Specifications. The EEOD will make recommendations, where appropriate, regarding whether a transfer of the member of the service is appropriate. In cases where the member of the service is a probationary member of the Department (either entry-level, dismissal or promotion probation), the EEOD will make recommendations regarding the extension of probation, dismissal and/or demotion to the member of the service's former civil service title.

**Presumptive Penalties for Equal Employment Opportunity Violations**

| Misconduct | Mitigated Penalty | Presumptive Penalty | Aggravated Penalty |
|---|---|---|---|
| Breach of Confidentiality | 10 Penalty Days | 15 Penalty Days | 30 Penalty Days |
| Disparaging Remarks Based on Membership in a Protected Class | 10 Penalty Days | 20 Penalty Days | Termination |
| Disparate Treatment Based on Membership in a Protected Class | N/A | 30 Penalty Days | Termination |
| Display of Offensive Material Based[89] on Membership in a Protected Class | 10 Penalty Days | 20 Penalty Days | 30 Penalty Days |

---

[89] See Patrol Guide Procedure 205-37, *Sexual, Ethnic, Racial, Religious, or Other Discriminatory Slurs Through Display of Offensive Material*.

48

| Failure to Report EEO Allegations | 5 Penalty Days | 10 Penalty Days | 20 Penalty Days |
|---|---|---|---|
| Retaliation | 20 Penalty Days | 30 Penalty Days | Termination |
| Sexual Harassment (verbal) | 10 Penalty Days | 20 Penalty Days | Termination |
| Sexual Harassment (suggestive touching) | N/A | 25 Penalty Days | Termination |
| Sexual Harassment (overt sexual touching/intimate physical contact) | 30 Suspension Days + Dismissal Probation | Termination | N/A |
| Sexual Harassment (habitual/predatory behavior) | Forced Separation | Termination | N/A |

**Protected Classes Pursuant to Federal, State, and Local Law (current as of June 16, 2020)**

| | |
|---|---|
| Race/Ethnicity | Creed |
| Gender (Sex or Gender Identity) | Prior Record of Arrest or Conviction |
| National Origin | Predisposing Genetic Characteristics/Genetic Information |
| Color | Consumer Credit History/Payment History |
| Religion (Including attire) | Caregiver Status |
| Disability | Status as a Victim of Domestic Violence, Sex Offenses or Stalking |
| Military Status | Partnership Status |
| Immigration or Citizenship Status | Unemployment Status |
| Age | Familial Status |
| Marital Status | Sexual and Reproductive Health Decisions |
| Sexual Orientation | Hairstyle Based on Race or Religion |

**Additional Potential Aggravating Factors**

- Nature of the professional relationship between member of the service and complainant (e.g. supervisor-subordinate relationship)
- Nature of Assignment
- Rank/Supervisory role of the member of the service
- Misconduct indicative of a pattern of behavior

49

# Misconduct Adjudicated by Command Discipline – General Terms

There are three types of Command Discipline ("CD"):  Schedule A ("A-CD"); Schedule B ("B-CD"); and Schedule C ("C-CD"). The A-CD and B-CD permit the commander of the unit involved to address minor misconduct/rule violations and set the penalty within the established ranges for each type of CD. For acts of misconduct enumerated in the Guidelines that are adjudicated by CD, commanders will impose penalties that are consistent with the presumptive penalties described herein, while considering relevant aggravating and mitigating factors. The C-CD is only issued by the Department Advocate for certain enumerated offenses and utilized in lieu of Charges and Specifications. An A-CD carries a penalty range from oral admonishment up to 5 days; a B-CD carries a penalty range up to 10 days; and a C-CD carries a penalty range up to 20 days[90]. The Department Advocate may direct that a disciplinary matter be adjudicated through CD in lieu of Charges and Specifications when appropriate.

## Adjudicated by Schedule A Command Discipline[91]

| MISCONDUCT – SCHEDULE "A" CD |
|---|
| Absence from meal location, post or assignment |
| Carrying packages, newspapers or other articles as prohibited while in uniform or Department vehicle |
| Failure to attend a range training cycle |
| Failure to comply with proper driving rules and regulations |
| Failure to have locker secured or properly tagged |
| Failure to lock an unguarded Department vehicle |
| Failure to maintain live, authorized ammunition in authorized weapons (includes having the required maximum amount of ammunition in the weapon) |
| Failure to maintain neat and clean professional appearance |
| Failure to make a timely notification to the Sick Desk and command, as required |
| Failure to make proper notifications |
| Failure to make routine inspections and surveys as required |
| Failure to notify commanding officer when address, telephone number, or social condition changes |
| Failure to notify supervising officer when leaving post for Department or personal necessity |
| Failure to perform duties in connection with court appearances |
| Failure to present required firearms to the range officer at firearms training cycle |
| Failure to properly perform patrol or other assignment |

---

[90] Vacation days and or accrued compensatory time may be forfeited through the Command Discipline process.
[91] See Patrol Guide Procedure 206-03, *Violations Subject to Command Discipline*.

50

| |
|---|
| Failure to sign in or out of court |
| Failure to sign return roll call |
| Failure to signal or improperly signal |
| Failure to submit reports in a timely manner |
| Illegal parking of Department or private vehicle |
| Improper uniform or equipment |
| Loss of Identification Card |
| Loss of summons or loss of summons book |
| Obvious neglect or care of firearms |
| Omitted Activity Log entries |
| Omitted entries in Department records, forms or reports |
| Reporting late for duty |
| Report present for duty before the start of the regular tour without prior authorization from a supervisor of a higher rank |
| Smoking as Prohibited |
| Use or display Vehicle Identification Plate ("Placard") while off duty or while not on official Department business |
| Using Any Electronic/Digital Device (e.g., personal gaming device, MP3 player, personal digital assistant, Bluetooth headset, etc.) while on duty |
| Unauthorized Person Riding in a Department vehicle |
| Unauthorized Use of Department telephones |
| Unnecessary conversation |
| Any minor FADO violation that, in the opinion of the CCRB or NYPD is appropriate for a Schedule "A" Command Discipline |
| Any minor violation that, in the opinion of the commanding/executive officer is appropriate for Schedule "A" Command Discipline procedure |

51

## Adjudicated by Schedule B Command Discipline[92]

| MISCONDUCT – SCHEDULE "B" CD |
|---|
| Bringing alcohol beverages into a Department facility or vehicle unless it is in within the scope of an assignment |
| Failure to give name and shield number to person requesting |
| Failure to respond, report disposition promptly, or acknowledge radio call directed to member's unit |
| Failure to safeguard prisoner |
| Loss of Activity Log |
| Loss of Department property |
| Loss of Shield |
| Unauthorized Radio Transmissions |
| Unauthorized Use of a Department Vehicle |
| Any FADO violation that, in the opinion of the CCRB or NYPD is appropriate for a Schedule "B" Command Discipline |
| Any other violation, which, in the opinion of the commanding/executive officer and consultation with the Department Advocate is appropriate for Schedule "B" Command Discipline procedure |

## Adjudicated by Schedule C Command Discipline[93]

A C-CD may be utilized in lieu of Charges and Specifications by the Deputy Commissioner, Department Advocate for situations in which there are no significant aggravating factors or additional misconduct.

The Deputy Commissioner, Department Advocate will evaluate each case on its merits and consider all relevant factors when making a determination to issue a C-CD including consultation with the member's Commanding Officer. Prior disciplinary history, including the same or similar acts of misconduct, contemporaneous pending unrelated disciplinary matters and any significant aggravating factors may make the issuance of a C-CD inappropriate. At the direction of the Deputy Commissioner, Department Advocate, the assigned member from the Department Advocate's Office will prepare the C-CD and forward it to the Commanding Officer of the appropriate adjudicating borough or equivalent command with a memorandum identifying the significant facts related to the misconduct, the appropriate penalty range as well as the presumptive penalty.

In accordance with Patrol Guide procedures 206-04 and 206-05, the Borough Adjutant (or equivalent) will adjudicate the C-CD promptly, adhering to the guidance/direction provided by the Department Advocate. If the subject member of the service declines the proposed penalty or elects Charges and Specifications, the Adjutant will comply with the provisions of Patrol Guide procedure 206-05.

---

[92] See Patrol Guide procedure 206-03, *Violations Subject to Command Discipline*. A members Commanding Officer or the Department Advocate's Office can impose a penalty of up to ten 10 vacation days or accrued time for Schedule "B" Command Discipline violations.
[93] See Patrol Guide procedure 206-03, *Violations Subject to Command Discipline*.

52

Upon adjudication of the Command Discipline, the Adjutant will return the endorsed Command Discipline to the Department Advocate. Once the Command Discipline is adjudicated and received by the Department Advocate's Office, it will be forwarded to the Leave Integrity Management Section ("LIMS") for the appropriate deduction of any penalty. An assigned member of the Department Advocate's Office will confirm the deduction of time with LIMS.

Commencing July 1, 2019, any misconduct that satisfies the requirements for Schedule "C" Command Discipline will be processed as such.

| MISCONDUCT – SCHEDULE "C" CD |
| --- |
| Accidental Firearm Discharge[94] |
| Computer Misuse with Dissemination of Information |
| Conducting Personal Business While On-Duty |
| Duplication of Parking Permit for Member's Own Use |
| Fail to Voucher Property |
| Failure to Comply with Direction |
| Failure to Notify the Department – Involvement in an Unusual Occurrence |
| Failure to Supervise |
| Insurance - Causing the Incorrect Rate to be Applied |
| License Plate Cover Violations |
| Misclassified Complaint Report/Fail to Prepare a Report |
| Out of Residence while Sick |
| Paid Detail Violations |
| Unauthorized Off-Duty Employment |
| Vehicle Pursuits that are outside Department guidelines and related policy violations |
| Violation of Social Media Guidelines[95] |

---

[94] Following review by the Use-of-Force Review Board and final determination by the Police Commissioner.

[95] Social Media means a category of internet-based resources that integrate user generated content and user participation. This includes, but is not limited to, social networking sites, photo and video sharing sites, wikis, blogs, and websites such as Facebook, Instagram, Flickr, YouTube, Linkedin, Snapchat, and Twitter. See, Patrol Guide procedures 203-32, *Personal Social Media Accounts and Policy*, 203-28, *Department Social Media Accounts and Policy*, and 203-10, *Public Contact – Prohibited Conduct*.

53

# Conclusion

The vast majority of members of the service abide by the many laws, policies, procedures and rules governing the policing profession. Police work and police decision making in the field rely on the discretionary judgment of officers and their accumulated experience, as well as an adherence to guiding principles, to solve a variety of problems. Public trust is eroded each time a New York City police officer's conduct does not conform to the values and standards of the New York City Police Department and the policing profession.  Both the public and our officers must be assured and indeed must expect that when the bounds of the law or Department policy are exceeded, fair and equitable discipline will result. These Guidelines serve to inform members of the service as to the expectations placed upon them and provide greater transparency regarding the Department's disciplinary process.

54

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan – October
2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix IV



## MEMORANDUM OF UNDERSTANDING

*MEMORANDUM OF UNDERSTANDING BETWEEN THE NEW YORK CITY POLICE DEPARTMENT AND THE NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD CONCERNING THE NYPD DISCIPLINE MATRIX*

MEMORANDUM OF UNDERSTANDING ("MOU") ENTERED INTO ON THIS 3RD DAY OF FEBRUARY, 2021, BETWEEN THE NEW YORK CITY POLICE DEPARTMENT ("NYPD"), WITH HEADQUARTERS AT ONE POLICE PLAZA, NEW YORK, NEW YORK 10038; AND THE NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ("CCRB"), WITH OFFICES AT 100 CHURCH STREET, NEW YORK, NEW YORK 10007 (COLLECTIVELY THE "PARTIES").

WHEREAS, SECTION 440 OF THE NYC CHARTER GIVES THE CCRB POWER TO RECEIVE, INVESTIGATE, HEAR, MAKE FINDINGS AND RECOMMEND ACTION UPON COMPLAINTS BY MEMBERS OF THE PUBLIC AGAINST MEMBERS OF THE POLICE DEPARTMENT THAT ALLEGE MISCONDUCT INVOLVING EXCESSIVE USE OF FORCE, ABUSE OF AUTHORITY, DISCOURTESY, OR USE OF OFFENSIVE LANGUAGE ("FADO"); AND

WHEREAS, IN ACCORDANCE WITH SECTION 440 OF THE NEW YORK CITY CHARTER, THE CCRB'S INVESTIGATORS COLLECT AND REVIEW ALL AVAILABLE EVIDENCE, SUCH AS DOCUMENTS AND VIDEO AND AUDIO RECORDINGS, AND INTERVIEW ALL AVAILABLE VICTIMS, WITNESSES, SUBJECT OFFICERS, AND WITNESS OFFICERS, AMONG OTHERS, AS PART OF ITS INVESTIGATIVE PROCESS; AND...

REV. FRED DAVIE     2/4/21 DATE
*CCRB CHAIR*

HON. DERMOT SHEA     2-4-21 DATE
*NYPD COMMISSIONER*

## MEMORANDUM OF UNDERSTANDING

## MEMORANDUM OF UNDERSTANDING BETWEEN THE NEW YORK CITY POLICE DEPARTMENT AND THE NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD CONCERNING THE NYPD DISCIPLINE MATRIX

Memorandum of Understanding ("MOU") entered into on this ____ day of _____ , 2021, between the New York City Police Department ("NYPD"), with headquarters at One Police Plaza, New York, New York 10038; and the New York City Civilian Complaint Review Board ("CCRB"), with offices at 100 Church Street, New York, New York 10007 (collectively the "Parties").

**WHEREAS,** Section 440 of the New York City Charter gives the CCRB power to receive, investigate, hear, make findings and recommend action upon complaints by members of the public against members of the police department that allege misconduct involving excessive use of force, abuse of authority, discourtesy, or use of offensive language ("FADO"); and

**WHEREAS,** in accordance with Section 440 of the New York City Charter, the CCRB's investigators collect and review all available evidence, such as documents and video and audio recordings, and interview all available victims, witnesses, subject officers, and witness officers, among others, as part of its investigative process; and

**WHEREAS,** the CCRB's Administrative Prosecution Unit ("APU"), which was created pursuant to a separate Memorandum of Understanding between the CCRB and the NYPD dated April 2, 2012, is authorized to prosecute substantiated cases where the CCRB has recommended that Charges and Specifications be brought against a subject officer, except in those cases where the Police Commissioner retains jurisdiction; and

**WHEREAS**, Section 440 (d)(1) of the New York City Charter requires that the NYPD provide assistance as the CCRB may reasonably request, cooperate fully with CCRB investigations, and provide the CCRB, upon request, records and other materials necessary for the investigation of complaints submitted to the CCRB, except such records or materials that cannot be disclosed by law, and the CCRB may, pursuant to Section 440(c)(3) of the New York City Charter, issue subpoenas for those records and other materials; and

**WHEREAS,** subdivision (b) of 38 Rules of the City of New York ("RCNY") § 15-19 provides that the CCRB and the NYPD may also exchange information pursuant to subdivision (b) of 38 RCNY § 15-12 and 38 RCNY § 15-18 to the extent that the disclosure of such information does not tend to reveal the identity of a party or witness involved in the investigation or prosecution of the substantiated civilian complaint which is the subject matter of the correspondence; and

**WHEREAS,** Section 434 of the New York City Charter gives the Police Commissioner cognizance and control over the disposition and discipline of the police department and police force; and

**WHEREAS,** Section 14-115 of the New York City Administrative Code gives the Police Commissioner discretionary power to discipline members of the NYPD for criminal offenses, neglect of duty, violation of rules, neglect or disobedience of orders, conduct injurious to the public peace or welfare, or immoral conduct or conduct unbecoming of an officer, by reprimand, suspension, with or without pay, or dismissal; and

**WHEREAS,** in January 2018, the CCRB instituted a pilot program to test the use of an internal disciplinary framework with the goal of creating more consistent voting recommendations across its various Board Panels; and

**WHEREAS,** in 2018, the NYPD convened an independent panel of experts which, after conducting a top to bottom review of the NYPD's disciplinary system, made thirteen recommendations, one of which was for the NYPD to consider adopting a non-binding disciplinary matrix; and

**WHEREAS,** Section 14-186 of the New York City Administrative Code establishes an internal NYPD disciplinary matrix, which sets forth an advisory schedule of violations, penalties, and mitigating and aggravating circumstances, or any other factors considered by the commissioner to be relevant to the process of determining the appropriate discipline for police department personnel for substantiated violations of department rules or other policies; and

**WHEREAS** on January 15, 2021 the NYPD released its Discipline Matrix, developed pursuant to the requirements of Administrative Code section 14-186, and which the public and the CCRB reviewed and provided comments in advance of its adoption; and

**WHEREAS,** while the CCRB investigates civilian complaints independent from the NYPD, the CCRB's Charter-mandated jurisdiction over FADO complaints brought by civilians against members of the NYPD makes the CCRB an integral component of the NYPD's disciplinary process; and

**WHEREAS,** the CCRB routinely requests officer employment histories from the NYPD in connection with its APU cases and it is in both Parties' interests to create an efficient process by which the CCRB can request and obtain officer employment histories from the NYPD; and

**WHEREAS,** shared use of the Discipline Matrix may increase accountability and efficiency in the system by giving the NYPD and the CCRB a framework from which to determine disciplinary recommendations;

**NOW THEREFORE,** upon the mutual agreement of the Parties, it is agreed as follows:

## I.   DISCIPLINE MATRIX

1. The goal of this MOU and the Discipline Matrix is to achieve consistent and fair discipline recommendations. As such, the CCRB and the NYPD are committed to the Discipline Matrix serving as a framework for discipline recommendations and to the administration by each agency of the discipline recommendations therein.

2. Where the CCRB's Board substantiates a complaint against a member of service, the CCRB agrees to use penalty guidelines set forth in the Discipline Matrix as the framework for its recommendations and shall only deviate from those recommendations in extraordinary circumstances. The CCRB shall use the subject officer's CCRB history, the NYPD employment history, and the totality of the circumstances, including but not limited to any aggravating or mitigating factors the subject officer applied, to guide its determination of the appropriate recommendation, as outlined in the Discipline Matrix. Such analysis shall be in writing, describing with particularity the basis for the recommended penalty, any aggravating and/or mitigating factors applied and a description of how those factors were applied, and shared with the NYPD, provided that the NYPD produces the subject officer's NYPD employment history to the CCRB, as described in section V.

## II.    NON-APU CASES

3. In cases where the CCRB's Board recommends Instructions, Formalized Training or Command Discipline, the recommended penalty will be in line with the Discipline Matrix penalty guidelines and take into account all the facts and circumstances, including but not limited to any aggravating or mitigating factors, as well as the NYPD employment history and any other relevant information. Such analysis shall be in writing, describing with particularity the basis for the recommended penalty, any aggravating and or mitigating factors applied and a description of how those factors were applied, and shared with the NYPD. Where there is a finding of guilty, or a plea of guilty, the Police Commissioner and his/her designees will accept the recommended penalty subject to section IV of this agreement.

## III.    APU CASES

4. In cases where the CCRB recommends charges and specifications, the CCRB agrees to use the Discipline Matrix as the framework for making penalty recommendations during the APU[1] process, subject to section IV of this agreement. The CCRB will take into account all the facts and circumstances, including but not limited to any aggravating or mitigating

---

[1] The process for when CCRB's APU Unit asserts jurisdiction over administrative prosecutions is outlined in a previous memoranda of understanding between the CCRB and the NYPD executed on April 2, 2012. The MOU also specifies when the NYPD may retain jurisdiction over such prosecutions. Nothing herein this agreement intends to replace or supersede this previous MOU that was executed on April 2, 2012.  *See* Memorandum of Understanding Between the Civilian Complaint Review Board (CCRB) and the Police Department (NYPD) of the City of New York Concerning the Processing of Substantiated Complaints (Apr., 2, 2012), https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/apu_mou.pdf.

3

factors, the NYPD employment history, and other relevant information. Such analysis shall be in writing, describing with particularity the basis for the recommended penalty, any aggravating and or mitigating factors applied and a description of how those factors were applied, and shared with the NYPD. Where there is a finding of guilty, or a plea of guilty, the Police Commissioner and his/her designees will accept the recommended penalty subject to section IV of this agreement.

5. In cases where the CCRB conducts plea negotiations with subject officers and their attorneys, to be heard by an NYPD Trial Commissioner and presented to the Police Commissioner for determination, the CCRB agrees to recommend penalties that are within the guidelines set forth in the Discipline Matrix, taking into account all the facts and circumstances, including aggravating and mitigating factors, the NYPD employment history, and other relevant information. Such analysis shall be in writing, describing with particularity the basis for the recommended penalty, any aggravating and or mitigating factors applied and a description of how those factors were applied, and shared with the NYPD. Subject to section IV of this agreement, the Police Commissioner will accept the plea recommendation.

## IV.   DEPARTURES FROM DISCIPLINE MATRIX AND CCRB RECOMMENDATIONS

6. In the extraordinary circumstance that the CCRB determines that a departure from the Discipline Matrix is required by the facts and circumstances, the CCRB shall set forth such departure in writing, describing with particularity the basis for such determination with reference to the guidelines set forth in the Discipline Matrix, including but not limited to aggravating and mitigating factors, and a description of how those factors were applied, and shall share the written determination with the NYPD and make it publicly available.[2]

7. In the extraordinary circumstance that the Police Commissioner determines that a departure from the Discipline Matrix is required by facts and circumstances, the Police Commissioner shall set forth such departure in writing, describing with particularity the basis for such determination with reference to the guidelines set forth in the Discipline Matrix, including but not limited to aggravating and mitigating factors, and a description of how those factors were applied, and shall share the written determination with the CCRB and make it publicly available.[3]

8. In the event that the Police Commissioner intends to impose discipline or penalty within the guidelines set forth in the Discipline Matrix that is lower than that recommended by the CCRB, the Police Commissioner shall notify the CCRB, with notice to the Respondent,

---

[2] Notwithstanding the above, the publicly available copy of any such written determination referenced in Section IV may be redacted or withheld only where permitted by applicable local, state, or federal laws.

[3] For purposes of paragraphs 7 and 8 of this section, such determinations by the Police Commissioner may be made based on recommendations from the NYPD Trials Commissioner or Department Advocate, where applicable.

4

pursuant to the process specified in the 2012 MOU between the NYPD and the CCRB,[4] and make the written determination publicly available.

## V.  ACCESS TO EMPLOYMENT HISTORY[5]

9. In any case where the CCRB investigator recommends that an allegation of misconduct be substantiated, the CCRB's Board must have access to the NYPD employment history of the officer in order to appropriately evaluate the appropriate penalty, including but not limited to aggravating and mitigating factors as set forth in the Discipline Matrix.

10. To obtain the NYPD employment history for an officer against the whom the CCRB has substantiated an allegation, the CCRB investigator shall complete and email a NYPD employment history request form to an electronic address designated by the Police Commissioner, providing as much information as is available at the time of the request. The email shall include, at minimum, the CCRB case number, and the name(s) and tax number(s) of the member(s) of service.

11. The NYPD employment histories provided to the CCRB may contain records and other materials that constitute law enforcement disciplinary records, which may be withheld from public disclosure, or subject to redactions within the meaning of New York Public Officers Law §§ 86(6-9), 87. Pursuant to the CCRB's existing policy, the CCRB shall not disclose any NYPD employment history to any person, organization or agency without first notifying the NYPD's Legal Bureau and providing the NYPD a reasonable opportunity to review the proposed disclosure and assert any applicable legal exemptions. The paragraph shall not apply to disclosures to the NYPD Trial Commissioner, the Department Advocate (DAO), or the NYPD Internal Affairs Bureau. Nothing in this agreement shall bar disclosure compelled by law, but the CCRB shall notify the NYPD of any such disclosure as soon as reasonably practicable.

12. Absent exceptional circumstances, which shall be documented in writing and shared with the CCRB, the NYPD employment histories shall be provided to the CCRB within twenty (20) business days. In instances where the CCRB determines the receipt of the NYPD employment history to be a high priority, the NYPD shall make best efforts to expedite the processing of an officer's employment history.

13. The NYPD shall not refuse to disclose or delay disclosure of an officer's employment history on the ground that it is conducting a concurrent or parallel investigation.

---

[4] Nothing in this MOU shall abrogate or modify the obligations of the NYPD to the CCRB pursuant to Memorandum of Understanding Between the Civilian Complaint Review Board (CCRB) and the Police Department (NYPD) of the City of New York Concerning the Processing of Substantiated Complaints (Apr., 2, 2012), https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/apu_mou.pdf.
[5] For purposes of the Section V, "employment history" refers to a document which was previously supplied by the NYPD to the CCRB in cases where CCRB's Administrative Prosecution Unit handled the prosecution of substantiated allegations resulting in charges and specifications.

5

14. The CCRB will ensure that all CCRB investigator and staff members granted access to NYPD documents will maintain the confidentiality of all information observed and obtained. Failure to maintain such confidentiality may result in termination of this agreement subject to the process outlined in Paragraph X.

## VI.    AMENDMENTS TO THE DISCIPLINE MATRIX

The Discipline Matrix is developed by and remains solely within the discretion of the NYPD. The NYPD shall have the authority to amend the Discipline Matrix at any time, but, consistent with Administrative Code Section 14-186, shall only do so following notice by posting such amendment on the NYPD's website, with an accompanying description of the modification as needed. The CCRB shall be given notice and an opportunity to provide comment on any proposed changes.

## VII.    OTHER LAW

Nothing in this agreement shall be interpreted to abrogate or otherwise conflict with State or Local law, or to modify or curtail the powers of the Police Commissioner under section 75 of the New York Civil Service Law or section 434 of the NYC Charter.

## VIII.    ANNUAL REVIEW OF THIS AGREEMENT

On August 1, 2021 and annually thereafter, the NYPD and the CCRB agree to review whether this agreement is accomplishing the mutual goal of consistent and fair discipline as well as the Discipline Matrix serving as a framework for discipline recommendations and to the administration by each agency of the discipline recommendations therein, as well as to consider any potential modifications to the agreement. Such reviews may include an analysis of relevant data such as the NYPD concurrence rate with the CCRB penalty recommendations, agency rates of deviation from the Discipline Matrix, facilitation and access to employment history, etc., in guiding any potential amendments to this agreement.

## IX.    AMENDMENT AND MODIFICATION

If at any time the Parties to this MOU determine that this MOU cannot be implemented substantially in the manner set forth herein for any reason, the parties shall act to amend such rules as may be appropriate. Any amendments or modifications must be writing and signed by both Parties. Unless explicitly stated, nothing in this MOU shall abrogate or modify the obligations of the NYPD to the CCRB pursuant to 2012 MOU between the CCRB and the NYPD.

## X.    TERMINATION

Termination of this Agreement requires written notice and reason(s) for termination to the other Party. Following the notification, the other Party shall have a period of thirty (30) days to cure before the termination takes effect.

6

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan – October
2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix V







 Return

Under New York State law, police officers may use force to protect life and property, to effect arrests, and to prevent escapes. Private persons, except in certain limited circumstances, may only use force in self-defense or in defense of others, and must exhaust all attempts at retreat before using deadly physical force, except in their own dwellings. In contrast, police officers are obligated to take action, and are required to pursue fleeing perpetrators and use force, if necessary, to stop that flight.

Although police achieve compliance in the vast majority of encounters with verbal commands alone, when those commands are insufficient, and subjects choose to ignore instructions or resist, officers may use an array of force options to compel others to submit to their lawful authority. These options range from physical force, to less-lethal options (e.g., OC spray, CEWs, or impact weapons), or only when appropriate, to deadly physical force. Officers are not required to move sequentially from one level of force to the next. Officers may escalate from verbal commands to pointing a CEW, for instance, or may de-escalate from a threatened use of force or a use of force to verbal commands, as situations evolve.

New York State law authorizes officers to use physical force only when they "reasonably believe such to be necessary" to effect arrest, prevent escape, or defend a person or property from harm. NYPD policy on the use of force is more restrictive than New York State and federal laws, and holds members of the NYPD to an even higher standard of restraint. New York State law, for example, allows the use of deadly physical force to protect property, but department policy does not. Under NYPD policy, deadly force may only be used against a person to "protect members of the service and/or the public from imminent serious physical injury or death" (Patrol Guide 221-01). Thus, there may be instances of force that may be permissible under New York State and/or federal law, but still violate department policy.

Under NYPD policy, "force may be used when it is reasonable to ensure the safety of a member of the service or a third person, or otherwise protect life, or when it is reasonable to place a person in custody or to prevent escape from custody" (Patrol Guide 221-01). In accordance with this standard of reasonableness, any application of force that is judged to be "unreasonable under the circumstances...will be deemed excessive and in violation of department policy" (Patrol Guide 221-01). Use of force, in this context, is broadly defined to encompass a wide range of force options that may be employed to gain compliance or ensure the control of a subject.

While the NYPD's use of force policy incorporates national best practices and serves as a benchmark for law enforcement agencies worldwide, the department is presently in the process of further refinement to its use of force protocols.

 Return

The NYPD Force Dashboard was developed to provide detailed insights into incidents in which NYPD Members of Service (MOS) used force. The dashboard contains three pages (or tabs). The three pages are named for their respective topic, specifically **Incidents**, **NYPD Members Using Force** and **Subjects**.

The **Incidents** page shows only the incidents where Members of Service used force (force incidents).  The various charts and counts seen within this section are an overview of these force incidents.  The charts within this section represent information within the "Incidents" count, including a breakdown by month, precinct, type of force and basis for encounter.  It is important to note that only the most serious type of force per incident is represented in the "Type of Force" chart.

The **NYPD Members Using Force** page displays information about the Members of Service who used force within the incidents described in the previous section.  This information includes the type of force utilized by each Member of Service, as well as their assignments types.  It also shows the category of injury associated with each Subject.  Furthermore, this section shows a breakdown of Officer rank and demographic information (race and gender).  The "Type of Force Used by NYPD Member" shows the most serious type of force used by each Officer out of the incidents represented in the previous section.  The "Category of Injury Sustained by Subject" chart is a subset of the subject count displayed at the top of this section.

The **Subjects** page displays information regarding all Subjects associated with the incidents seen in the first section.  The chart titled "Typed of Force Used by Subject Against NYPD Member" represents the type of forced used against Members of Service by each Subject.  Similar to the "Type of Force Used by NYPD Member" in the previous section, it only shows the most serious type of force used by each Subject.  This section also displays a chart showing the injuries, if any, sustained by Members of Service ("Category of Injury Sustained by NYPD Member").  Similar to "Category of Injury Sustained by Subject" in the previous section, if an Officer sustains multiple injuries only the most serious injury is represented in this chart.  Further, this section displays a breakdown of Subjects' demographic information including age, race and gender.

At the top of each page is a blue banner which will assist in navigation.  Beneath the title, on the left, is a month slider.  The user can drag the slider to filter the data to show only those incidents that occurred in those months.  The slider filters the data on all three pages and is also synced across each page.

To the right of the slider are key metrics for each topic: the number of incidents, the number of members involved and the number of subjects involved.  These indicators are dynamic and will update accordingly based on the month filter, as well as the chart filters (described on the right).  In addition, the indicators act as links to other pages.  Clicking on an indicator will take the user to that indicators page.  For example, when on the Incidents page, clicking on 'Subjects' or its value will bring the user to the Subjects page.

Each page contains a variety of visualizations that summarize various aspects of the incident and the individuals involved.  Each visualization is interactive.  For example, hovering over an element in a chart will provide additional details about that data point.

Furthermore, each visualization acts as a filter for other visualizations.  Clicking on an element in a chart will cause that element to be highlighted and will result in the other charts on that page being updated to focus on the element clicked.  In the image below, after clicking on the 120th Precinct in Staten Island, all the other visuals update to show only data related to the incidents in that precinct.  This includes the indicator totals in the banner.

Microsoft Power BI

‹  5 of 6  ›

 Return

The Threat, Resistance, or Injury (TRI) Report is the primary means by which the NYPD records use of force incidents. All reportable instances of force – whether used by a member of the Department, or against the member – are recorded on a TRI Report. Data used to construct the *NYPD Force Dashboard* are a result of the information captured on TRI Reports.

NYPD policy also requires the completion of a TRI Report in some instances when a member of the Department does not use force. For example, a prisoner that is assaulted by another prisoner – while in the Department's custody – would be documented on a TRI Report. Similarly, the suicide of a prisoner in police custody is reportable on a TRI Report, but is not considered a use of force incident. Additionally, instances where subjects assault members of the service, without force being used by the members themselves, would also generate a TRI Report. These incidents would all result in a "No Force" classification.

All of the department's use of force policies and procedures are found in the Department Manual, and the types of force members of the NYPD use are separated into several categories. Level 1 consists of hand strikes, foot strikes, forcible take-downs, discharging oleoresin capsicum (OC) spray, discharging conducted electrical weapons (CEWs) in "cartridge mode," and using mesh restraining blankets to secure subjects. Level 2 is the intentional striking of a person with any object (including a baton, other equipment, etc.), police canine bites, or using CEWs in "drive stun" mode. Level 3 is the use of physical force that is readily capable of causing death or serious physical injury (e.g., discharging a firearm). Level 4 incidents are those that result in death.

Thorough oversight and investigation are built into the NYPD force policy. All *four* levels of force must be reported on Threat, Resistance**,** or Injury (TRI) Reports. Level 1 force incidents are investigated by the member's immediate supervisor. Level 2 incidents are investigated by department executives in the rank of captain or above. The NYPD Internal Affairs Bureau (IAB) investigates all Level 3 incidents (i.e., cases where deadly physical force was used, but the subject's injuries are not life-threatening). Level 4 incidents, which include all firearm discharges and any event where a subject dies or is seriously injured and likely to die, are investigated by the NYPD Force Investigation Division (FID).

## Definitions

**Threat, Resistance, or Injury (TRI) Report**:
A Department form that is composed of an *Incident Report* (completed by a supervisor or investigating authority) and an *Interaction Report* (completed by the involved member). The TRI Report is the primary data collection mechanism for reportable uses of force.

**Members of the Service (MOS)**:
A member of the NYPD. The MOS designation encompasses both uniformed officers of all ranks (e.g., police officers, sergeants, lieutenants, etc.) and civilian members (e.g., traffic enforcement agents, school safety agents, etc.).

**Subjects**:
An individual who is the target, or focus, of police action, including a suspect, perpetrator, or prisoner, and any person that a member is attempting to direct or maintain custody or control over (e.g., disorderly person/group, emotionally disturbed person, etc.).

**Civilians/Bystanders**:
Any non-employee of the Department who is not the intended subject of police action, but is inadvertently injured by the actions of the police.

**Basis for Encounter**:
The conduct, offense, or reason which formed the basis for the initial approach by a member of the Department that led to police action.

**Physical Injury**:
Impairment of physical condition, and/or substantial protracted pain (e.g., minor swelling, contusions, lacerations, and/or abrasions).

**Substantial Physical Injury**:
Physical injury consistent with the application of Level 2 force (e.g., contusions indicative of baton strikes, unconsciousness, loss of a tooth/teeth, application of stiches/staples, etc.).

**Serious Physical Injury**:
Physical injury or illness that creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of function of any bodily organ/limb (e.g., gunshot wound, broken/fractured bone, aneurysm, injury requiring hospital admission, heart attack/stroke, other life threatening illness/injury, etc.).

Microsoft Power BI                     ‹   6 of 6   ›                          ⬆   ⤢

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan – October
2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix VI



# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan – October
2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix VII

# NYPD Annual Early Intervention Program Report

Local Law 68-2020 requires that the New York City Police Department ("NYPD" or "Department") submit a report to the Mayor and the Speaker of the City Council by January 31 of each year on the Department's use of early intervention during the previous year. This report covers the year 2020.

Police officers hold a unique position in our society. They are responsible for the safety and security of all of those who live in, work in, and visit the city. Whether they are responding to a call of a crime in progress or a cry for assistance due a medical or other type of emergency, they are a critical component of local government that people frequently interact with and rely upon for help. At the same time, they are given enormous discretion in how to perform their work. They are entrusted with the power to seize property, restrict the freedom of individuals, and, under appropriate carefully delineated circumstances, to use force in the course of their duties. With this vast discretion comes vast responsibility, that is, to perform their duties and exercise their authority within the bounds of the law and Department policy. The Early Intervention Program is just one of many efforts the Department is undertaking that are designed to ensure that our officers are performing their policing functions in concert with the Department's commitment to serve the public to the best of its ability.

While the NYPD has historically had a number of programs that have addressed issues of potentially at-risk officers, these programs have never been consolidated nor tracked in a unified way until now. The NYPD's Early Intervention Program ("EIP") now unites these previous disparate efforts. EIP is a non-disciplinary program, although entry into the program may be engendered by a pending or completed disciplinary action. EIP is designed to utilize risk management strategies to intervene at the earliest possible opportunity in order to support employee wellness and professional development by attempting to identify and mitigate factors which may lead to negative performance issues, employee discipline, or negative interactions with the public. EIP is neither punitive nor disciplinary in nature. At its core, it is designed to mentor and coach officers to provide support to as to ensure that each officer is performing his or her job in a way that scrupulously adheres to the legal, moral, and ethical principles to which the Department subscribes by correcting issues as soon as they are identified.

Under the Department's Early Intervention Program, when a designated threshold is triggered, Risk Management Bureau ("RMB") staff prepare an overview of the officer and their commanding officer is asked to make a recommendation regarding potential intervention to the Early Intervention Committee (the "Committee"). The commanding officer is asked to consider their prior experiences with the officer, both positive and negative, the officer's tenure with the Department, the facts of the underlying incident, and the effectiveness of any prior interventions prior to making a recommendation to the Early Intervention Committee.

The Early Intervention Committee is chaired by the Deputy Commissioner of RMB and is also composed of executive-level personnel representing the Deputy Commissioner of Legal Matters, the Deputy Commissioner of Equity and Inclusion, the Chief of Department, the Chief of Detectives, the Chief of Patrol, and the Chief of Personnel. The Committee met for the first time in August 2020 and was then convened once a month for the remainder of the year. When evaluating an officer, the Committee considers all relevant details relating to the incident or incidents that caused the officer to meet the designated threshold as well as their overall tenure with the Department, including whether the officer has previously been presented to the Committee.

The commanding officer and the Committee have a number of potential interventions to choose from including training, mentoring, enhanced supervision, ongoing review of the officer's body-worn camera footage, conferral with command or bureau leadership, or change in assignment. The Committee may also decide that no intervention is necessary. Where necessary, officers may be referred for a determination of whether or not monitoring is appropriate, to the Health and Wellness Section for an assessment, to the Internal Affairs Bureau for potential disciplinary action, or to a District Attorney's Office for potential criminal investigation.

After the Committee makes a final decision regarding potential intervention, that decision is documented and sent to the commanding officer for implementation. Commanding officers are required to document the implementation of any intervention that has been ordered within thirty business days of receiving the Committee's final decision.

In addition to the information collected pursuant to Local Law 68-2020, the Department's Early Intervention Program also collects information regarding certain declinations to prosecute as well as Law Department declinations to indemnify or represent officers in civil lawsuits alleging an unconstitutional stop, unconstitutional trespass enforcement, or racial profiling or slurs.[1]

The Department's Early Intervention Program will continue to evolve going forward. The Department will continue to improve the process as it gains more data on what non-disciplinary interventions work best to mentor and support members of the service, effectively serve the public better, and prevent officers from engaging in conduct that would merit discipline.

1. See Floyd v. City of New York, 08-cv-1034 (AT), Dkt. 767, Order at 2-5 (S.D.N.Y. June 2, 2020).

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan –
October 2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

**Appendix VIII**





## Police Commissioner's Letter

For New York City, and the world, this is one of the most challenging and painful times in recent memory. The coronavirus tragically claimed nearly 50 of our colleagues, and many more family members. In May of this year, our city, along with the nation, faced an important reckoning and was prompted to stand up against racial injustice and inequity. Additionally, massive budget cuts citywide and increasing violence in some of our neighborhoods have stoked concern and fear. This moment certainly deserves reflection. I believe moving empathetically and responsively through these crises is the way forward. One thing of which I am certain, though, is that the police – like the New Yorkers we serve – are incredibly resilient.

Since 2014, the NYPD has enacted significant reforms in areas ranging from training and use of force, to discipline and transparency. Yet, we are always ready to improve and evolve our practices to work more effectively, efficiently, and

safely. In fact, now is the time to redouble our efforts, to identify and focus on our strengths and weaknesses together, and to foster an environment where diverse talent and viewpoints are valued.

When I became Police Commissioner in December, I asked a team to develop a plan – a process that came to a close in late February, just as the NYPD began a sustained redirection of resources to address the pandemic, widespread protests, and the steep rise in shootings and murders. Through all of this, we never lost track of our long-term vision: to keep New Yorkers safe, to support all members of the police department, to foster strong bonds with the people we serve, and to keep the NYPD at the forefront of police reform in America.

This is truly a pivotal moment in policing. This plan incorporates the unique, uncertain times we have faced over the past seven months, and the great results we have achieved in recent years. Today

we reaffirm our commitment to police this City smartly, and in full collaboration with the community, our members, and our government partners – which means, notably, to continue enhancing our transparency and improving the ways we provide customer service both internally and externally, while having open and honest discussions about what works well, and what we all need to do differently. We must always strive to be better and safer.

In 2020, the NYPD marks 175 years of continued evolution. NYPD In Focus describes how our Neighborhood Policing philosophy engenders crime control and prevention strategies by better connecting with our city's young people, and by building trust and strengthening relationships throughout the five boroughs. And, perhaps most importantly, it supports our intention to always promote the health and wellness of our most critical resource – our uniformed and civilian members, without whom none of these programs would be possible.

This plan represents our commitment to providing the highest-quality police services and to keeping an open dialogue with our communities. Over the next few months we will continue to collaborate, educate, and actively listen to you, our partners and stakeholders, regarding the role of the NYPD in your communities. This process will build upon the commitments outlined here and to the people we serve.

We are never satisfied with the status quo. We will never be complacent. As a police department, we will always advance to ensure that New York City continues to be safe for everyone, and remains the world's leader in policing.

Dermot Shea
Police Commissioner



# 2014 - 2020: Our Progress

The hallmark of crime fighting in New York City throughout the current administration has been a sustained decrease in crime coupled with a reduced enforcement footprint. Through the creation and implementation of Precision Policing, the NYPD shifted its focus towards the drivers of crime and reduced overall index crime 14% below an already historically low crime rate. At the same time, investigative encounters instances dropped 93%, summonses declined 41%, and arrests declined 46%.

Simultaneously, the Department implemented several initiatives that fostered community partnerships, improved the deployment of Department resources, enhanced member training, and expanded the use of technology. These initiatives provided officers with the ability to address community concerns through non-enforcement means.

The introduction of Neighborhood Policing in 2015 anchored locally-based patrol officers in sectors throughout each precinct. These

officers dedicate their time to collaborating with community members, active problem-solving, and addressing recurring quality-of-life issues. The community trust being built through Neighborhood Policing is essential in addressing these issues and in both preventing and solving violent crimes.

## Through the creation and implementation of Precision Policing, the NYPD shifted its focus toward the drivers of crime and reduced overall index crime 14%

Neighborhood Policing also includes a commitment to increasing internal collaboration to ensure all NYPD resources are working toward the same goal. To this end, the NYPD redeployed personnel, such as narcotics investigators, to local borough investigations units in an effort to link proactive investigations to precinct priorities and local crime control.

To reinforce our renewed focus on community concerns, the NYPD enhanced our member training to include awareness of implicit biases, tactics to bring people safely into custody and de-escalate enforcement encounters, techniques to appropriately handle mental health calls, and the use of life-saving techniques and equipment. Additionally, with invaluable input from the community and external stakeholders, the NYPD's use of force policies have been revised over the past four years and continue to exceed national standards.

The NYPD also invested in several technology upgrades to ensure our officers had all of the data necessary to make informed decisions. These

upgrades included the deployment of smartphones to every officer, the use of ShotSpotter technology to detect gunshots, and the installation of wireless cameras to deter and investigate violent street crime. Moreover, we deployed body-worn cameras to every one of our patrol officers, giving us the ability to review and improve our interactions with the public.

While all of these initiatives have reduced violent crime and increased community trust, our work toward a safer future is never done. We must continue to build upon past reforms and always move forward to a safer New York City.

## A Focus on Recent Reforms

The NYPD continues to be a leader in setting the standard for innovation and reform. We pride ourselves on our efforts to continuously improve as evident by some of our recent reforms:

### 2014

**NYPD on Social Media**
January
NYPD adopts the use of Twitter, Facebook, and other platforms to increase community outreach and communication.

**NYPD Re-engineering**
April
1,200 NYPD participants of all ranks shared more than 800 recommendations with the Police Commissioner to improve the efficiency and effectiveness of the Department.

**Office of Collaborative Policing**
April
New unit established to collaborate with public/private partners to enhance public safety and police services.

**Community Partner Program**
July
Program involving community volunteers who work with new officers to assist them in learning about their neighborhood.

**Marijuana Arrest Policy Reform**
November
Criminal Court summonses were authorized for low-level marijuana offenses in lieu of arrest.

---

**Body-Worn Cameras (BWC)**
December
BWC Program initiated. Provides the ability to review and improve our interactions with the public.

**Ceasefire**
December
Violence-reduction program that partners police with communities that have high levels of gun violence.

**Gang Database Reform**
December
Improved accuracy and precision of records by implementing tighter standards for entry and oversight. Mandated reviews expunge names of individuals who are no longer affiliated with gang activity.

### 2015

**Investigative Encounters Reform**
February
Investigative encounters reforms initiated in all NYPD commands.

**Risk Management Bureau (RMB)**
March
RMB works collaboratively with the Federal Monitor, the Inspector General, the Law Department, the courts, the public, and NYPD bureaus and units to develop, implement, and audit required reforms, and to identify and mitigate various risks to the Department.

---

**Project Reset**
March
Joint program with District Attorney's offices to divert non-violent, first-time youth offenders into a remediation program rather than court or jail. Court records are expunged upon completion of program.

**Neighborhood Policing Model**
May
Implemented to increase community engagement, collaboration, and trust. Introduces the concepts of Neighborhood Coordination Officers (NCOs), steady sectors, and response autos.

**Smartphones and Tablets**
May
Mobile technology program for frontline officers initiated.

**Crisis Intervention Team (CIT) Training**
June
Training course designed in collaboration with mental health professionals to teach officers how to better approach and gain voluntary compliance from substance abusers and persons experiencing a mental health crisis (40-hour curriculum).

**Operation Gunstop**
June
Provides cash rewards to members of the public who provide information leading to the arrest of person(s) for the unlawful sale or illegal possession of illegal handguns.

---

**Force Investigative Division**
June
New unit established to investigate all firearms discharges and uses of force by officers.

**NYPD Open Data Platform**
December
Initiative increases transparency by making Department data publicly available for examination, review, and research.

### 2016

**Co-Response Teams**
March
Co-Response Unit created, establishing teams consisting of two uniformed members of the service (UMOS) and a licensed mental health professional who assess persons in need of mental health treatment and provide referrals to appropriate resources/services.

**Unified Investigations Model**
March
Consolidated Department investigative resources under the Detective Bureau, dissolving the Organized Crime Control Bureau.

---

**NYPD Use of Force Policies**
June
Extensive revision of use of force policies that include multi-classification system, mandates in-depth investigations, and introduces the Threat, Resistance, Injury (TRI) Report.

**Crime Victim Assistance Program (CVAP)**
September
Collaboration between the Department and Safe Horizon to place trained victim's advocates in commands.

**Precision Policing Strategy**
September
Focused resources on a small percentage of the population involved in violence, crime, and the drug trade.

**Vacating Summons Adjudication Part (SAP) Warrants**
September
Program initiated to vacate low-level warrants for crime victims, complainants and/or aided individuals.

**RxStat**
October
In coordination with the NYC Department of Health and Mental Hygiene and other City agencies, and in support of the Department's opioid prevention strategy, RxStat forums, based on the CompStat model, were initiated as a management tool to focus on the opioid crisis.

---

# A Focus on Recent Reforms

The NYPD continues to be a leader in setting the standard for innovation and reform. We pride ourselves on our efforts to continuously improve as evident by some of our recent reforms:

## 2017

**Heroin Overdose Prevention and Education Program (HOPE)/Project Clear**
February
Collaborative effort with District Attorneys' offices. Program that diverts low-level drug offenders into drug treatment programs instead of court or jail. Expunges arrest records upon completion of program.

**Criminal Justice Reform Act (CJRA)**
June
Moved prosecution of lower-level offenses from the Criminal court to the Civil court. Established civil penalties.

**Opioid Overdose Prevention Program**
October
Guidelines established for opioid prevention program.

## 2018

**Office of Equity and Inclusion**
January
Established to oversee, enhance, and ensure accountability of the Department's equity and inclusion strategies.

**Implicit Bias Training**
February
Implemented to mitigate bias that might affect the way police engage with the public and respond to situations.

**Adult Project Reset**
March
Diversion program for adults who engage in non-violent crimes.

**Homeless Outreach and Shelter Security Section**
March
Establishment of the NYPD units who work with the NYC Department of Homeless Services (DHS) and others to engage, protect, and provide services for the City's homeless population.

**Build the Block**
June
Initiated the Build the Block community engagement campaign.

**Blue Ribbon Panel**
June
External panel convened to review the Department's disciplinary process.

**Behavioral Heath Diversion Program**
July
Diverted 911 calls for non-violent persons experiencing mental health crisis to NYC Well, the City's crisis intervention and referral service.

**Right to Know Act**
October
Officers required to hand out a pre-printed business card containing their name, rank, and shield when conducting stops.

## 2019

**Public Posting of Department Trial Calendar**
February
Began to advise the public of when a particular MOS's case may be observed, and includes the date, time, rank, and name of the MOS and identifies the trial room for each hearing.

**Child-Sensitive Arrest Policies**
April
Established guidelines for MOS when a parent/guardian gets arrested in order to reduce trauma to children who may be present.

**Transit Bureau Homeless Diversion Program**
May
Partnered the NYPD Transit Bureau with the NYC DHS and other public and private agencies to offer shelter and harm-reduction services to homeless persons violating New York City Transit Rules of Conduct in lieu of criminal enforcement.

**Use of Force Revisions**
October
Use of force reporting and recording processes are revised and upgraded. TRI Report 2.0 introduced.

## 2020

**Youth Coordination Officer (YCO)**
January
Newly-created position to focus on engaging with youth and connecting them with resources in the community.

**YouthStat**
February
Regular meetings with other City agencies to identify and address youth issues.

**Facial Recognition Policy**
March
Establishes safeguards for the permissible use of facial recognition technology, striking a balance between public safety and privacy.

**NYPD Anti-Crime Units Disbanded**
June
More than 600 plainclothes anti-crime officers were reassigned to patrol and/or investigative duties.

**Race Forums**
June
Discussion forums for employees to share their experiences and views on race and law enforcement, and social justice.

**Civilian Liaison**
August
Appointed a Civilian Liaison, who will serve as a conduit between the Department and affected members of the public regarding the disciplinary system.

**Discipline Matrix**
September
Proposed discipline matrix is published for public comment.

**Interactive Dashboards**
September
Published interactive dashboards on hate crimes and staffing demographics.

**Customer Feedback Survey**
September
Survey published to solicit continuous feedback on customer service.

**Police Reform and Reinvention Collaborative**
October 2020
NYPD, Urban League, UFPWA, and Robin Hood co-sponsoring a series of community engagements leading to a published Reform Plan by April 1, 2021.



## Recent Reforms: By the Numbers

The various reforms demonstrate the progress the NYPD has made in building trust with communities while keeping New Yorkers safe.



Adversarial discharges have **declined 95%** since 1972.

## Recent Reforms: By the Numbers

The various reforms demonstrate the progress the NYPD has made in building trust with communities while keeping New Yorkers safe.

### Investigative Encounters
#### 2010 - 2019



Investigative encounters **declined by 98%** since their peak in 2011.

### Arrests by Category
#### 2010 - 2019



Arrests **declined by 49%** since 2010. Misdemeanor arrests **declined by 56%**, allowing patrol officers and detectives more time to address community concerns and/or major crimes.

## Recent Reforms: By the Numbers

The various reforms demonstrate the progress the NYPD has made in building trust with communities while keeping New Yorkers safe.

### Criminal Summonses
### 2010 - 2019



The NYPD issued **83% fewer** criminal summonses from 2010 to 2019.

### Marijuana Arrests
### 2010 - 2019



The NYPD effected **95% fewer** arrests for marijuana since 2010.

## Our Commitment

This plan represents our commitment to providing the highest-quality police services and to keeping an open dialogue with our communities. Over the next few months, as part of the police reform and reinvention collaborative, we will continue to work with, educate, and actively listen to you, our partners and stakeholders, on the role of NYPD in your community. At the conclusion of that process, the City will publish a Police Reform and Reinvention Collaborative Plan that will further outline our commitments to the people we serve.

This plan incorporates three main focus areas, which will lead the NYPD into the next era of policing.



### Keep Our City Safe

Encompasses all we do to keep New Yorkers safe, but also emphasizes strengthening our partnerships with communities to control gun violence and share information in new ways. This goal includes leveraging technology to improve the Department's response to violent crime.

### Promote Wellness and Equity in Our Workforce

Highlights our commitment to the physical and mental wellbeing and general job satisfaction of NYPD personnel. It includes a number of initiatives to improve Department programs and to promote inclusion, respect, and transparency for NYPD employees.

### Strengthen Community Partnerships

Describes how the NYPD will double down on our commitment to providing superior customer service both internally and externally, increase transparency of information, and strengthen the trust that is essential to successful policing and crime prevention.

## Keep Our City Safe

To counter steep increases in both murders and shootings in the summer of 2020, in addition to redeploying resources and real-time crime analysis, the NYPD will redouble its efforts to collaborate with community members for a safer city. The plan expands the Neighborhood Policing approach with an intensified focus on reaching and helping young people. Officers serving in the new title of Youth Coordination Officer (YCO) will work seamlessly with Neighborhood Coordination Officers (NCOs) and other City agencies to prevent young New Yorkers from being led on a downward trajectory of crime, and work towards our common goal of keeping all kids safe.

The Department will further support Neighborhood Policing by expanding the digital platform used to manage and direct responses to local problems that require police attention. We will target shootings through cooperative efforts with community partners, collect information on how communities feel about their experiences with the police, keep neighborhoods better informed about police actions, and invite the public to participate in educating our members and sharing their experiences.



### Our Commitment:

- **Build upon the successes of Neighborhood Policing**

- **Assess and improve how we allocate workforce and** policing resources

- **Develop Department-wide strategies with community partners to combat gun violence**

- **Expand our capabilities through the use of cutting-edge policing technologies**

## Keep Our City Safe

| Build upon the successes of Neighborhood Policing | |
| --- | --- |
| **Key Activity** | **Year\*** |
| Expand Neighborhood Policing digital platform to enable officers to better collaborate internally and connect with the community. | 2020 |
| Re-establish the Civilian Commendation Award to recognize members of the public for providing valuable assistance to the members of the NYPD. | 2021 |
| Establish a working group to regularly review Neighborhood Policing policies and procedures. | 2020 |
| Track the level of trust in police through community surveys and share the results publicly. | 2020 |

\* Year denotes when the NYPD will begin focusing our efforts on the key activity



### Neighborhood Policing Application

The Neighborhood Policing Application allows Neighborhood Coordination Officers (NCOs) and Precinct Sector Officers to better track, manage, and respond to neighborhood concerns, as well as manage the connections made with the neighborhoods' residents and other stakeholders.

## Keep Our City Safe

| Assess and improve how we allocate workforce and policing resources | |
|---|---|
| Key Activity | Year* |
| Further centralize crime analysis functions to better identify and engage with repeat offenders. | 2021 |
| Work with other City agencies and community partners to transition non-enforcement activities out of NYPD to ensure operational resources are most effectively deployed to protect our City. | 2020 |
| Continue to leverage technology to enhance workforce management and resource deployment. | 2020 |
| Evaluate the Department's recent response to and develop a plan to provide comprehensive training around mass demonstrations. | 2020 |

* Year denotes when the NYPD will begin focusing our efforts on the key activity



### Roll Call Application

The Roll Call Application is a highly-innovative internal-facing technological policing tool that provides up-to-the-minute live counts of all available on-duty uniformed members of the service assigned to commands. First piloted in Staten Island and then rolled out citywide, the application was conceived, crafted, and implemented as a way to deploy available resources in the most efficient manner possible, bolstering the NYPD's commitment to providing better policing services for the people of this City.

## Keep Our City Safe

| Develop Department-wide strategies with community partners to combat gun violence | |
|---|---|
| Key Activity | Year* |
| Expand the Ceasefire program, a violence-intervention strategy focused on the individuals who are disproportionately responsible for the majority of violence within their community. | 2021 |
| Share data and work with our community partners to proactively identify high-risk individuals for intervention to avoid becoming victims of gun violence. | 2021 |
| Expand the NYPD CompStat platform to include regular strategy meetings with law enforcement partners to share information and resources to reduce gun violence. | 2021 |
| Create a multi-agency intelligence team to focus on the people and groups that are most responsible for gun violence. | 2020 |

* Year denotes when the NYPD will begin focusing our efforts on the key activity

| Expand our capabilities through the use of cutting-edge policing technologies | |
|---|---|
| Key Activity | Year* |
| Expand gunshot detection systems and other proactive technologies in areas that have historically high levels of gun violence. | 2021 |
| Leverage data to identify crime patterns and trends to increase the efficacy of police actions through Precision Policing. | 2021 |
| Continue the installation of new security cameras to deter and prevent hate crimes. | 2021 |

**Interactive Dashboards** 

The Department has recently made available multiple user-friendly dashboards -with more on the way- that will allow the public to view our information in new and interactive way.





## Promote Wellness and Equity in Our Workforce

Our members are the Department's most important resource. Their work can be extremely stressful, and the COVID-19 pandemic has only added to that stress. So, too, has the uncertainty of community support for their mission. The plan seeks to identify and serve the current needs of the NYPD workforce in areas such as health and wellness, training, career paths and opportunities, working conditions, and general fairness in promotions, transfers, and discipline, while also providing help and support to employees and their families as the Department does its part to prevent the spread of the virus.

In 2019, the Department faced a mental health crisis when ten members took their own lives. We immediately responded by adding outreach and service programs to support our people, including the addition of in-house psychological services and the Finest Care program, a collaboration with NewYork-Presbyterian Hospital, where members can seek confidential, independent counseling services at no cost to them. The NYPD strives to reduce the stigma and fear associated with mental health and to encourage our members to seek help through the Department's medical and peer support programs if needed.



### Our Commitment:

- Ensure that employees have opportunities to maximize mental, emotional, and physical health

- Promote inclusion, respect, and transparency for NYPD employees

- Improve employee development opportunities

- Ensure that members feel supported and recognized

## Promote Wellness and Equity in Our Workforce

| Ensure that employees have opportunities to maximize mental, emotional, and physical health | |
|---|---|
| Key Activity | Year* |
| Improve the accessibility of mental and emotional health services. | 2020 |
| Expand our internal peer support network. | 2020 |
| Provide services to improve the physical health of our employees, including fitness and nutritional resources. | 2020 |
| Launch a Telemedicine program for uniformed members to discuss fitness for duty status with medical professionals remotely. | 2020 |
| Develop recommendations to streamline and improve Medical Division policies and procedures. | 2021 |
| Improve scheduled leave policies for uniformed members of the service. | 2021 |
| Evaluate the implementation of a compressed work week, including ten-hour tours. | 2021 |
| Offer financial, retirement, and career planning services to support employees. | 2021 |

* Year denotes when the NYPD will begin focusing our efforts on the key activity



### NYPD's Peer Support Program

The NYPD has trained almost 400 members of the service that volunteered to provide confidential, informal support, and guidance to their fellow first responders. The Peer Support members share information on mental and physical health, mental illness, suicide prevention, tools to fight the stigma associated with seeking help, how to maintain resilience, and other health-related information. Any member of the service can speak to a peer support member in their command or through a new internal Health & Wellness App.

## Promote Wellness and Equity in Our Workforce

| Promote inclusion, respect, and transparency for NYPD employees | |
| --- | --- |
| Key Activity | Year* |
| Collaborate with employees to develop policies and mechanisms that build and support an equitable and inclusive work environment. | 2020 |
| Formalize an employee feedback program to allow the sharing of ideas, comments, and concerns. | 2020 |
| Centralize our internal communications to provide clear and coordinated information to our members. | 2020 |
| Develop clear and accessible communication materials about the disciplinary process. | 2020 |
| Provide our officers with strategies to actively intervene and to foster a culture that supports them in doing so. | 2021 |

* Year denotes when the NYPD will begin focusing our efforts on the key activity



### Engaging our Workforce: Employee Race Forums

In June 2020, the Police Commissioner announced that the Office of Equity & Inclusion (OEI) would convene discussion forums for employees to share their experiences and views on race and law enforcement, and social justice.

Led by OEI, the virtual discussions have covered various topics including racial identity, systemic racism, diversity, acceptance, leadership, and obstacles to equity in both the Department and society in general.

Many of the themes throughout the course of these discussions have included ideas on how to create a more inclusive and equitable Department. These ideas will generate recommendations for the Department moving forward.

# Promote Wellness and Equity in Our Workforce

## Improve employee development opportunities

| Key Activity | Year* |
|---|---|
| Conduct a training needs assessment to address the evolving community and policing environment. | 2021 |
| Update and streamline the Department Manual for clarity and readability. | 2021 |
| Centralize training management to streamline remote and distance-learning opportunities. | 2020 |
| Develop a Pre-Commanders Course for uniformed executive staff in preparation for command leadership and expanded collaboration with the community. | 2021 |
| Develop a Civilian Managers Course to build leadership skills and set management expectations. | 2021 |
| Enhance the Department's efforts to identify employees that may be in need of non-disciplinary interventions, including training, mentoring, monitoring, or reassignment. | 2021 |

* Year denotes when the NYPD will begin focusing our efforts on the key activity

## Ensure that members feel supported and recognized

| Key Activity | Year* |
|---|---|
| Develop a plan for a more robust employee recognition program. | 2021 |
| Continue improvement of the onboarding experience for civilian employees. | 2020 |
| Evaluate the Department's discretionary promotion process. | 2021 |
| Evaluate our civilian advancement process. | 2020 |
| Identify opportunities to improve mentorship and orientation practices. | 2021 |



## Strengthen Community Partnerships

Community trust is essential to effective police work and the NYPD is dedicated to building that trust with all communities. At our core, the members of the NYPD work to provide quality police service to the public and we are committed to continuous improvements in collaborating with our partners. To that end, the Department is developing a comprehensive customer service feedback process that will allow us to constantly re-evaluate the service we provide. This feedback, coupled with policy input from community members, will ensure that the NYPD is connecting New Yorkers with the services they need. The Department's Youth Strategy, with the Youth Coordination Officer (YCO) as the cornerstone, will work with our community partners to identify programs and services for young people and help them pursue a path to opportunities to reach their full potential. This approach draws on talented, committed NYPD personnel, and their cumulative experience with young people to make a lasting and positive difference in their lives. Most importantly, the NYPD remains committed to improving transparency on data and policies, including the discipline process, providing the public with better insight into Department practices, and increasing trust between our officers and the communities they serve.



### Our Commitment:

- **Implement the Department's Youth Strategy**

- **Ensure the NYPD continues to evolve to meet the needs of NYC and foster public confidence**

- **Re-imagine the way the Department provides customer service, both internally and externally**

- **Be more transparent in the Department's disciplinary** processes

## Strengthen Community Partnerships

| Implement the Department's Youth Strategy | |
| --- | --- |
| **Key Activity** | **Year\*** |
| Onboard YCOs that will work with at-risk youth, assist youth crime victims, and collaborate with internal and external partners to ensure service accessibility for youth. | 2020 |
| Develop tools to track and share information about available youth services and programs. | 2020 |
| Expand the use of virtual reality technology to teach youth better decision-making skills. | 2020 |
| Launch YouthStat as a collaborative effort with other city partners to keep young people safe. | 2020 |
| Re-structure the Juvenile Crime Desk to better coordinate interagency information sharing | 2020 |
| Re-envision the Juvenile Rooms as opportunities to connect youth with social services. | 2020 |
| Liaise with external partners to activate underutilized indoor and outdoor spaces for young people. | 2021 |

\* Year denotes when the NYPD will begin focusing our efforts on the key activity

 

### Youth Strategy

The NYPD has renewed its commitment to proactively reach young people at risk of engaging in criminal activity before they do so. As an initial step, we are reshaping the roles of many NYPD personnel who focus exclusively on young people (e.g., Youth Officers, Uniformed Task Force, and the Juvenile Robbery Intervention Program). These positions have been incorporated into a new role, the Youth Coordination Officer (YCO), which is very similar to the Neighborhood Coordination Officer (NCO) model but is focused exclusively on protecting and serving children. YCOs will serve a central role in each precinct and Police Service Area (PSA). One of their primary functions will be to gain a full understanding of the local risks and needs of all young people in their commands, not only identifying crime trends involving young people, but also focusing on engaging and connecting them to resources and opportunities in the community. This new structure will increase the number of officers solely dedicated to helping young people. The ultimate goal is to keep every child in the City safe and on track. As an all-encompassing strategy, certain physical spaces have been carefully designed by the Department to minimize the exposure of youth to the criminal justice system, and to mitigate the stresses that may come with being in a precinct. Precinct Juvenile Rooms throughout the Department will be evaluated and remodeled to fit both legal and Department standards. This includes, for example, installing technology in each Juvenile Room that will connect the youth, via video application, directly to community-based services (e.g., mental health counselors, etc.) Also, each respective borough court location will designate an appropriate juvenile lodging area to expedite the arraignment process for juvenile offenders, known as Court Juvenile Rooms.

## Strengthen Community Partnerships

| Ensure the NYPD continues to evolve to meet the needs of NYC and foster public confidence | |
| --- | --- |
| **Key Activity** | **Year\*** |
| Develop a community input mechanism for Department policies and initiatives to increase the NYPD's understanding of community priorities. | 2020 |
| Provide officers with new policies and training on viable use of force alternatives and tactics, and ensure any use of force is reasonable and necessary. | 2020 |
| Assess the Department's handling of sexual assault cases through a survivor-focused lens. | 2020 |
| Create learning opportunities for community members on police methods at our Joint Tactical Training Centers (JTTC). | 2020 |
| Find ways to incorporate community members into the instruction of classes or panel discussions at the Police Academy. | 2021 |
| Leverage graduates of the Citizens Police Academy to assist in developing crime prevention strategies to better serve the needs of the community. | 2021 |
| Make crime and enforcement data and reports more transparent and accessible, including the addition of hate crimes in the CompStat report. | 2020 |

\* Year denotes when the NYPD will begin focusing our efforts on the key activity



### 127 Pennsylvania Avenue

As part of the East New York Neighborhood Plan, the NYPD worked with local leaders to create the first NYPD multi-purpose Youth Community Center for young people aged 12-19 at 127 Pennsylvania Avenue in Brooklyn. The NYPD's goal in opening this center was to embody the philosophy of Neighborhood Policing by building stronger community connections. The building, renovated by our Facilities Management Division, features a large classroom, a gym, a multi-media space, a counseling room, and a clubhouse to provide educational opportunities for youth. The Center melds the historical and aesthetic features of the existing structure with modern updates like a state-of-the-art computer lab, smartboards in classrooms, and a music studio. The Child Center of NY, Inc. together with community and police partners, conduct programming in basketball, boxing, dance classes, digital media skills development, and general tutoring. Community Board 5 is also co-located in the building and will, along with other community leaders, participate in a Community Outreach Committee to encourage make 127 Pennsylvania Avenue a safe, social hub for the residents of East New York.

## Strengthen Community Partnerships

| Re-imagine the way the Department provides customer service, both internally and externally | Year* |
|---|---|
| Create accountability for and ensure our employees have the tools they need to deliver superior service. | 2021 |
| Revise policies and practices to focus on superior service. | 2020 |
| Develop a comprehensive customer service feedback process. | 2020 |
| Enhance CompStat to measure progress towards building trust and community partnerships. | 2020 |
| Re-evaluate our meetings at the neighborhood and district levels to ensure our communities have the appropriate venues to communicate feedback and concerns. | 2021 |

* Year denotes when the NYPD will begin focusing our efforts on the key activity



### Customer Service Feedback

In September 2020, the Department launched a Customer Service Feedback Survey pilot program in the 25th and 113th precincts as part of our ongoing efforts to connect with the people we serve. The information collected in the survey will help us continue to provide superior customer service to our communities.

## Strengthen Community Partnerships

| Be more transparent in the Department's disciplinary processes | |
| --- | --- |
| Key Activity | Year* |
| Enhance regular disciplinary reporting to the public, including posting discipline records online. | 2021 |
| Expedite the disciplinary adjudication process. | 2020 |
| Increase transparency of the disciplinary process by creating and publishing a matrix of presumptive penalties. | 2020 |
| Appoint a Civilian Liaison to provide family members with information, including the status of any disciplinary proceedings, after use of force and other critical incidents. | 2020 |
| Conduct a periodic audit of discipline procedures with an external entity. | 2021 |

\* Year denotes when the NYPD will begin focusing our efforts on the key activity



### Discipline Matrix

The NYPD is committed to a fair and transparent discipline process. That is why in September of 2020, the Department released a comprehensive Discipline Matrix. The Discipline Matrix gives an overview of the goals of internal discipline, defines the presumptive penalties for specific acts of substantiated misconduct by officers, and outlines potential aggravating and mitigating factors that may be considered when assessing a disciplinary penalty.

In addition to increased transparency, the Discipline Matrix fosters building bridges between the NYPD and the public by soliciting public feedback on its contents. This feedback will be collected, aggregated, and evaluated for inclusion into the Discipline Matrix.

## Executive Staff

Police Commissioner **Dermot Shea**
First Deputy Commissioner **Benjamin Tucker**
Chief of Department **Terence Monahan**
Chief of Staff **Vincent Grippo**

**DEPUTY COMMISSIONERS**
**William W. Andrews**, Executive Communications
**John P. Beirne**, Labor Relations
**Richard J. Esposito**, Public Information
**Matthew C. Fraser**, Information Technology
**Robert L. Ganley**, Employee Relations
**Ernest F. Hart**, Legal Matters
**Amy Litwin**, Department Advocate
**Rosemarie Maldonado**, Trials
**Robert S. Martinez**, Support Services
**Tanya Meisenholder**, Equity and Inclusion
**John J. Miller**, Intelligence & Counterterrorism
**Chauncey Parker**, Community Partnerships
**Danielle M. Pemberton**, Strategic Initiatives
**Joseph J. Reznick**, Internal Affairs
**Kristine M. Ryan**, Management and Budget
**Jeffrey Schlanger**, Risk Management

**CHIEFS**
**David P. Barrere**, Housing
**Edward Delatorre**, Transit
**Thomas Galati**, Intelligence
**Rodney Harrison**, Detectives
**Nilda Irizarry Hofmann**, Transportation
**Juanita N. Holmes**, Collaborative Policing
**Donna G. Jones**, Criminal Justice
**Eli J. Kleinman**, MD, MPH, Supervising Chief Surgeon
**Michael Lipetri**, Crime Control Strategies
**Jeffrey Maddrey**, Community Affairs
**Martine Materasso**, Counterterrorism
**Martin Morales**, Personnel
**Fausto B. Pichardo**, Patrol Services
**Raymond Spinella**, Operations
**Harry Wedin**, Special Operations



# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan –
October 2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix IX



## ABLE
### Active Bystandership for Law Enforcement

**Christy Lopez**
Professor, Georgetown Law Center
Co-Director, Innovative Policing Program

**Rosa Brooks**
Professor, Georgetown Law Center
Co-Director, Innovative Policing Program

**Jonathan Aronie**
Partner, Sheppard Mullin LLP
Chair, ABLE Project Board of Advisors

## Active Bystandership for Law Enforcement (ABLE) Project
### FACT SHEET

### Executive Summary

Georgetown University Law Center's Innovative Policing Program, in collaboration with global law firm Sheppard Mullin LLP, created the Active Bystandership for Law Enforcement (ABLE) Project, to serve as a national hub for active bystander scholarship, training, and technical assistance.

- **ABLE teaches a practical skill.** ABLE training provides practical active bystandership strategies and tactics to prevent misconduct, reduce officer mistakes, and promote health and wellness. ABLE gives officers the tools they need to overcome the powerful inhibitors to intervene in another's actions.

- **ABLE requires agency commitment.** ABLE training currently is provided primarily through a Train-The-Trainer (TTT) program. To be considered for the TTT program, law enforcement agencies must commit to 10 ABLE Standards and submit four letters of support – one from the agency head (e.g., Chief/Sheriff), one from the locality head (e.g., Mayor/County Executive), and two from community groups vouching for the agency's commitment to ABLE. These Standards are meant to ensure that ABLE training is effective at preventing harm and changing culture.

- **ABLE is evidence-based.** The ABLE Project is unique in how carefully the training is built upon decades of research, field studies, and on-the-ground experience. When based on sound research, active bystandership works and can be taught.

- **ABLE is widely supported.** Officers, departments, civil rights/social justice groups, and members of the community embrace ABLE. Law Enforcement agencies that have made public commitments to ABLE include the New Orleans Police Department, the Philadelphia Police Department, the Washington State Criminal Justice Training Commission, the Northern Virginia Criminal Justice Training Academy, the New Hampshire Police Standards and Training Council, the Clemson University Police Department, the Wilmington North Carolina Police Department, and many others.

- **ABLE is not a reporting program.** ABLE is not a disciplinary program or a reporting program. If an action is reportable before the implementation of ABLE, it remains reportable after the implementation of ABLE. ABLE simply teaches officers a new skill – a better way to do something many want to do anyway – and seeks to promote a departmental culture where the use of that skill is encouraged, accepted, and even rewarded.


1.

*The Active Bystandership for Law Enforcement (ABLE) Project is a program of the Georgetown University Law Center.*
*The ABLE Project is a registered service mark of Georgetown.  For more information visit www.law.georgetown.edu/IPP/ABLE.*



## ABLE
### Active Bystandership for Law Enforcement

- **ABLE is tested**. The ABLE Project is founded upon the scholarship and research of Dr. Ervin Staub, professor emeritus, U. Mass. Amherst. Dr. Staub worked hand in hand with other experts and the men and women of the New Orleans Police Department to develop the country's first department-wide peer intervention program, called EPIC (Ethical Policing Is Courageous). EPIC has been in use successfully in New Orleans since 2016.

- **ABLE is adaptable**. No matter what policing or police departments look like tomorrow, we still will need active bystandership training.

### The ABLE Project Mission

The mission of the ABLE Project is simple and straightforward.

- Ensure every police officer in the United States has the opportunity to receive meaningful, effective active bystandership training.

- Produce and serve as a clearinghouse for thoughtful and sound training materials, including curricula, lesson plans, presentation materials, and teacher's aides.

- Provide guidance to police agencies and communities that want to develop meaningful active bystandership programs and build the cultures that sustain them.

- Establish standards and benchmarks for effective active bystandership programs.

- Serve as a hub to connect ABLE partners agencies, community groups, and other organizations across the U.S.

### ABLE Project Programs

The ABLE Project offers different active bystandership programs for law enforcement agencies of all sizes.

- **ABLE Train-The-Trainer Events**.  ABLE Train-The-Trainer events are offered free of charge to agencies willing to commit to the 10 ABLE Standards available at www.law.georgetown.edu/IPP/ABLE. Interested agencies must submit FOUR letters of support in conjunction with their applications: One letter from the agency head (chief/sheriff/director) one letter from the locality head (mayor/county executive/governor), and two letters from community groups vouching for the agencies sincerity in implementing ABLE.

- **ABLE Academy/POST-Focused Train-The-Trainer Events**. The ABLE Project is working with a number of statewide and regional academies and standards-setting agencies to offer dedicated Train-The-Trainer events for those organizations.



*The Active Bystandership for Law Enforcement (ABLE) Project is a program of the Georgetown University Law Center. The ABLE Project is a registered service mark of Georgetown.  For more information visit www.law.georgetown.edu/IPP/ABLE.*

152   NYC Police Reform and Reinvention Collaborative Draft Plan



## ABLE
### Active Bystandership for Law Enforcement

- **ABLE Overview Programs**. The ABLE Project from time to time holds "virtual open houses" to provide more information about active bystandership generally and the ABLE Project in particular. The first Open House was held in July 2020, and is available for free download at https://www.youtube.com/playlist?list=PL2QPFPgZ63f-40iGfVATW4DZjaiqaGK15.

- **Implementation Work Shops**. ABLE participants will be invited to participate in free, dedicated online workshops. These workshops will provide implementation support for agencies accepted into the ABLE Project.

- **Command Staff "Lunch & Learns."** Upon request and subject to availability, the ABLE Project offers free virtual overview programs to law enforcement agencies looking to participate in the ABLE Project.

- **Complementary Programs**. The New Orleans Police Department, in partnership with Loyola University New Orleans Law School, holds an annual Executive Leadership Conference focusing on peer intervention. More information about the EPIC conference can be found at https://epic.nola.gov. While this is not an ABLE-sponsored program, it is an excellent complement to the ABLE Project.

### How We Know Active Bystandership Training Works

While it is hard to quantify the success of active bystandership training because, in most cases, when it works, nothing happens, we have strong evidence it is effective.

- Dr. Ervin Staub and other scholars have studied active bystandership for decades. Their research confirms the skills necessary to intervene successfully can be taught and learned.

- Dr. Staub and others have conducted extensive field experiments that show the inhibitors to an intervention can be overcome even in hierarchical environments.

- Other national problems have been successfully mitigated using active bystandership techniques, including drunk driving, mistakes in surgery, pilot errors, and sexual assaults on campus.

- The on-the-ground experience of the New Orleans Police Department evidences the success of the ABLE principles. The NOPD developed and implemented a successful bystandership program called EPIC (Ethical Policing Is Courageous) in New Orleans in 2015, much of which served as the foundation for the ABLE Project.

- A survey of police officers in New Orleans showed officers who have gone through EPIC training perceive themselves as being more likely to intervene in another officer's actions.



*The Active Bystandership for Law Enforcement (ABLE) Project is a program of the Georgetown University Law Center.*
*The ABLE Project is a registered service mark of Georgetown.  For more information visit www.law.georgetown.edu/IPP/ABLE.*



**Active Bystandership
for Law Enforcement**

### ABLE History

The ABLE Project was launched in March 2020, but is built upon decades of research, field studies, and on-the-ground experience.

- Dr. Ervin Staub, Professor Emeritus at the University of Massachusetts and the founder of the Psychology of Peace and Violence Program, has studied active and passive bystandership for decades. Following the Rodney King beating, Dr. Staub was engaged by the LAPD to create active bystander training for LAPD officers.

- The 2012 New Orleans Consent Decree incorporated a requirement that NOPD teach peer intervention to its officers.

- In 2014 civil rights lawyer Mary Howell, social activist Ted Quant, psychologist Dr. Joel Dvoskin and others proposed incorporating an active bystandership training recommendation in the President's Task Force on 21st Century Policing Report.

- In 2014 and 2015, the New Orleans Police Department worked with Dr. Staub, Dr. Dvoskin, community members, and other experts to develop the country's first department-wide active bystandership program, called EPIC (Ethical Policing Is Courageous).

- The push to develop EPIC came from NOPD rank and file officers, working closely with Department leadership and community members, looking for a way to protect the public and save careers at the same time.

- In March 2020, following the tragic killing of George Floyd, Georgetown University Law Center's Innovative Policing Program, in collaboration with global law firm Sheppard Mullin LLP, created the Active Bystandership for Law Enforcement (ABLE) Project to serve as a national hub for active bystander scholarship, training, and technical assistance. The Active Bystandership for Law Enforcement (ABLE) Project is housed within Georgetown's existing Innovative Policing Program, led by Professors Christy Lopez and Rosa Brooks. The creators of the New Orleans EPIC program remain significantly involved in the ABLE Project.

- In September 2020, the ABLE Project began working with the FBI National Academy (NA), the country's premier education program for law enforcement executives, to bring the ABLE Project to even more agencies and communities across the country. Among other things, the FBI NA will incorporate active bystandership training taught by ABLE-certified professional NA instructors for all NA attendees and will give NA participants the option of taking a two-day ABLE certification program while at the NA to become an ABLE-certified instructor.



*The Active Bystandership for Law Enforcement (ABLE) Project is a program of the Georgetown University Law Center.*
*The ABLE Project is a registered service mark of Georgetown.  For more information visit www.law.georgetown.edu/IPP/ABLE.*



**ABLE**

Active Bystandership
for Law Enforcement

### ABLE Resources

The ABLE Project is always evolving. We continue to expand our training offerings and expand the resources available on our website. Here is a look at the resources that are or soon will be available via the ABLE Project web site:

- *Caselaw Digests*. Federal and state law regarding the civil and criminal liability of bystander officers continues to evolve. The ABLE Project website will provide a digest of relevant federal and state bystander caselaw.

- *Statutory Digests*. Legislatures across the country are actively seeking to impose requirements for officers to intervene to prevent wrongdoing. The ABLE Project website will track these legislative efforts.

- *Policy Best Practices*. To participate in the ABLE Project, law enforcement agencies must adopt certain policies designed to create a culture in which active bystandership will thrive. The ABLE Project website will provide a collection of model policies to assist agencies in adopting best practices in these areas.

- *Online "ABLE Shorts" Video Series*. To give agencies and communities a deeper understanding of what active bystandership is and how it works it in the context of policing, the ABLE Project will host a series of 20-minute Zoom interviews with thought-leaders in the areas of policing, social justice, civil rights, teaching, psychology, and related fields. These videos will be free to all, and will air beginning in November 2020.

- *Implementation Technical Assistance*. The ABLE Project provides law enforcement agencies accepted in the program with a wide variety of free implementation support. For agencies that require additional assistance, the ABLE Project website will offer a list of individuals and agencies offering free and fee-based support.

> **For More Information regarding the ABLE Project, please visit**
> https://www.law.georgetown.edu/innovative-policing-program/
> active-bystandership-for-law-enforcement/
> or email Lba17@georgetown.edu.


5.

*The Active Bystandership for Law Enforcement (ABLE) Project is a program of the Georgetown University Law Center.*
*The ABLE Project is a registered service mark of Georgetown.  For more information visit www.law.georgetown.edu/IPP/ABLE.*

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan –
October 2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix X

## NYPD Feedback Survey

Thank you for visiting the New York City Police Department.

Your responses to this survey will help us improve and provide excellent service to our communities. The survey will take about 2 minutes to complete, and is anonymous.

**1. Where did you visit the NYPD?**

- Manhattan
- Brooklyn
- Queens
- Bronx
- Staten Island

**2. What facility did you visit?**

- Precinct (Drop Down Lists By Borough)
- Other (Please Specify)

**3. Why did you visit an NYPD facility?**

- Report a Crime or Violation
- Obtain an Accident Report
- Report Lost or Stolen Property
- Pick Up Property
- Speak to a Detective
- Attend a Meeting
- Attend a Precinct Program
- Ask for Information
- Other (Please Specify)

**4. I am satisfied with the overall service I received.**

- Strongly agree
- Agree
- Neither agree nor disagree
- Disagree
- Strongly disagree

**5. How long did you wait at the facility before you met with someone who could assist you?**

- 0-5 minutes
- 5-10 minutes
- 10-20 minutes
- 20-30 minutes
- More than 30 minutes

**6. The person who greeted me was able to direct me toward the services I needed.**

- Strongly agree
- Agree
- Neither agree nor disagree
- Disagree
- Strongly disagree

**7. I spoke with a detective about my issue.**

- Yes
- No
- Unsure

**8. The detective I worked with was helpful in providing information about the investigative process.**

- Strongly agree
- Agree

- Neither agree nor disagree
- Disagree
- Strongly disagree


**9. The person who assisted me was knowledgeable about how to resolve my request.**

- Strongly agree
- Agree
- Neither agree nor disagree
- Disagree
- Strongly disagree


**10. I am satisfied with how my issue was addressed.**

- Strongly agree
- Agree
- Neither agree nor disagree
- Disagree
- Strongly disagree


**11. Please comment on your experience, specifically on the things NYPD did well or ways in which we could improve. Survey responses are not monitored 24/7. For emergencies, please call 911.**


To file a formal complaint, please contact the Internal Affairs Bureau (IAB) at 212-741-8401 or IAB@NYPD.org.

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203 Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan – October 2020

**Appendix IX**
Active Bystandership for Law Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening Sessions Presentation

# Appendix XI



# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan –
October 2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix XII

| Rank | WHITE | | | BLACK | | | HISPANIC | | | ASIAN | | | NAT AMERICAN | | | TOTALS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | M | F | TOTAL | M | F | TOTAL | M | F | TOTAL | M | F | TOTAL | M | F | TOTAL | M | F | TOTAL |
| **CHIEF** | 7 | 1 | **8** | 2 | 2 | **4** | 2 | | **2** | | | | | | | 11 | 3 | **14** |
| | *50.0%* | *7.1%* | *57.1%* | *14.3%* | *14.3%* | *28.6%* | *14.3%* | | *14.3%* | | | | | | | *78.6%* | *21.4%* | |
| **AC** | 13 | 2 | **15** | 1 | 2 | **3** | 4 | | **4** | | | | | | | 18 | 4 | **22** |
| | *59.1%* | *9.1%* | *68.2%* | *4.5%* | *9.1%* | *13.6%* | *18.2%* | | *18.2%* | | | | | | | *81.8%* | *18.2%* | |
| **DC** | 45 | 1 | **46** | 7 | 1 | **8** | 3 | | **3** | 1 | | **1** | | | | 56 | 2 | **58** |
| | *77.6%* | *1.7%* | *79.3%* | *12.1%* | *1.7%* | *13.8%* | *5.2%* | | *5.2%* | *1.7%* | | *1.7%* | | | | *96.6%* | *3.4%* | |
| **INS** | 87 | 7 | **94** | 11 | 4 | **15** | 15 | | **15** | 2 | | **2** | | | | 115 | 11 | **126** |
| | *69.0%* | *5.6%* | *74.6%* | *8.7%* | *3.2%* | *11.9%* | *11.9%* | | *11.9%* | *1.6%* | | *1.6%* | | | | *91.3%* | *8.7%* | |
| **DI** | 114 | 8 | **122** | 11 | 6 | **17** | 18 | 3 | **21** | 5 | | **5** | | | | 148 | 17 | **165** |
| | *69.1%* | *4.8%* | *73.9%* | *6.7%* | *3.6%* | *10.3%* | *10.9%* | *1.8%* | *12.7%* | *3.0%* | | *3.0%* | | | | *89.7%* | *10.3%* | |
| **CPT** | 192 | 12 | **204** | 25 | 10 | **35** | 48 | 8 | **56** | 38 | 4 | **42** | | | | 303 | 34 | **337** |
| | *57.0%* | *3.6%* | *60.5%* | *7.4%* | *3.0%* | *10.4%* | *14.2%* | *2.4%* | *16.6%* | *11.3%* | *1.2%* | *12.5%* | | | | *89.9%* | *10.1%* | |
| **LT** | 834 | 61 | **895** | 148 | 62 | **210** | 280 | 56 | **336** | 133 | 8 | **141** | 1 | | **1** | 1,396 | 187 | **1,583** |
| | *52.7%* | *3.9%* | *56.5%* | *9.3%* | *3.9%* | *13.3%* | *17.7%* | *3.5%* | *21.2%* | *8.4%* | *0.5%* | *8.9%* | *0.1%* | | *0.1%* | *88.2%* | *11.8%* | |
| **SGT** | 2,030 | 205 | **2,235** | 400 | 218 | **618** | 844 | 250 | **1,094** | 362 | 20 | **382** | 3 | | **3** | 3,639 | 693 | **4,332** |
| | *46.9%* | *4.7%* | *51.6%* | *9.2%* | *5.0%* | *14.3%* | *19.5%* | *5.8%* | *25.3%* | *8.4%* | *0.5%* | *8.8%* | *0.1%* | | *0.1%* | *84.0%* | *16.0%* | |
| **DET** | 2,269 | 243 | **2,512** | 581 | 189 | **770** | 1,031 | 286 | **1,317** | 195 | 24 | **219** | 4 | 1 | **5** | 4,080 | 743 | **4,823** |
| | *47.0%* | *5.0%* | *52.1%* | *12.0%* | *3.9%* | *16.0%* | *21.4%* | *5.9%* | *27.3%* | *4.0%* | *0.5%* | *4.5%* | *0.1%* | *0.0%* | *0.1%* | *84.6%* | *15.4%* | |
| **PO** | 8,620 | 1,336 | **9,956** | 2,320 | 1,294 | **3,614** | 5,383 | 2,028 | **7,411** | 2,197 | 208 | **2,405** | 10 | 6 | **16** | 18,530 | 4,872 | **23,402** |
| | *36.8%* | *5.7%* | *42.5%* | *9.9%* | *5.5%* | *15.4%* | *23.0%* | *8.7%* | *31.7%* | *9.4%* | *0.9%* | *10.3%* | *0.0%* | *0.0%* | *0.1%* | *79.2%* | *20.8%* | |
| **UMOS TOTALS** | 14,211 | 1,876 | **16,087** | 3,506 | 1,788 | **5,294** | 7,628 | 2,631 | **10,259** | 2,933 | 264 | **3,197** | 18 | 7 | **25** | 28,296 | 6,566 | **34,862** |
| | *88.3%* | *11.7%* | *46.1%* | *66.2%* | *33.8%* | *15.2%* | *74.4%* | *25.6%* | *29.4%* | *91.7%* | *8.3%* | *9.2%* | *72.0%* | *28.0%* | *0.1%* | *81.2%* | *18.8%* | |

*DEPARTMENT ALLOCATION ETHNIC RANK REPORT*

**Personnel Bureau - Strategic Analysis Unit**
Wednesday, February 24, 2021

Page 1 of 2

| TITLE | WHITE | | | BLACK | | | HISPANIC | | | ASIAN | | | NAT AMERICAN | | | TOTALS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | M | F | TOTAL | M | F | TOTAL | M | F | TOTAL | M | F | TOTAL | M | F | TOTAL | M | F | TOTAL |
| PAA | 23 | 200 | **223** | 29 | 642 | **671** | 12 | 266 | **278** | 35 | 84 | **119** | 1 | 3 | **4** | 100 | 1,195 | **1,295** |
| | *1.8%* | *15.4%* | *17.2%* | *2.2%* | *49.6%* | *51.8%* | *0.9%* | *20.5%* | *21.5%* | *2.7%* | *6.5%* | *9.2%* | *0.1%* | *0.2%* | *0.3%* | *7.7%* | *92.3%* | |
| SPAA | 11 | 108 | **119** | 10 | 481 | **491** | 5 | 113 | **118** | 6 | 28 | **34** | | | | 32 | 730 | **762** |
| | *1.4%* | *14.2%* | *15.6%* | *1.3%* | *63.1%* | *64.4%* | *0.7%* | *14.8%* | *15.5%* | *0.8%* | *3.7%* | *4.5%* | | | | *4.2%* | *95.8%* | |
| PRAA | 3 | 43 | **46** | 8 | 176 | **184** | 1 | 36 | **37** | 4 | 11 | **15** | | | | 16 | 266 | **282** |
| | *1.1%* | *15.2%* | *16.3%* | *2.8%* | *62.4%* | *65.2%* | *0.4%* | *12.8%* | *13.1%* | *1.4%* | *3.9%* | *5.3%* | | | | *5.7%* | *94.3%* | |
| PCT | 31 | 59 | **90** | 114 | 1,024 | **1,138** | 53 | 323 | **376** | 33 | 56 | **89** | 2 | 2 | **4** | 233 | 1,464 | **1,697** |
| | *1.8%* | *3.5%* | *5.3%* | *6.7%* | *60.3%* | *67.1%* | *3.1%* | *19.0%* | *22.2%* | *1.9%* | *3.3%* | *5.2%* | *0.1%* | *0.1%* | *0.2%* | *13.7%* | *86.3%* | |
| SSA | 120 | 157 | **277** | 783 | 2,531 | **3,314** | 454 | 839 | **1,293** | 150 | 97 | **247** | 1 | 11 | **12** | 1,508 | 3,635 | **5,143** |
| | *2.3%* | *3.1%* | *5.4%* | *15.2%* | *49.2%* | *64.4%* | *8.8%* | *16.3%* | *25.1%* | *2.9%* | *1.9%* | *4.8%* | *0.0%* | *0.2%* | *0.2%* | *29.3%* | *70.7%* | |
| TEA | 146 | 90 | **236** | 534 | 790 | **1,324** | 250 | 293 | **543** | 1,000 | 152 | **1,152** | 2 | 2 | **4** | 1,932 | 1,327 | **3,259** |
| | *4.5%* | *2.8%* | *7.2%* | *16.4%* | *24.2%* | *40.6%* | *7.7%* | *9.0%* | *16.7%* | *30.7%* | *4.7%* | *35.3%* | *0.1%* | *0.1%* | *0.1%* | *59.3%* | *40.7%* | |
| CAD | 40 | 10 | **50** | 15 | 20 | **35** | 47 | 35 | **82** | 32 | 10 | **42** | | | | 134 | 75 | **209** |
| | *19.1%* | *4.8%* | *23.9%* | *7.2%* | *9.6%* | *16.7%* | *22.5%* | *16.7%* | *39.2%* | *15.3%* | *4.8%* | *20.1%* | | | | *64.1%* | *35.9%* | |
| SCG | 36 | 537 | **573** | 61 | 801 | **862** | 48 | 776 | **824** | 30 | 187 | **217** | 1 | 6 | **7** | 176 | 2,307 | **2,483** |
| | *1.4%* | *21.6%* | *23.1%* | *2.5%* | *32.3%* | *34.7%* | *1.9%* | *31.3%* | *33.2%* | *1.2%* | *7.5%* | *8.7%* | *0.0%* | *0.2%* | *0.3%* | *7.1%* | *92.9%* | |
| OTH | 805 | 407 | **1,212** | 363 | 545 | **908** | 293 | 283 | **576** | 253 | 143 | **396** | 6 | 3 | **9** | 1,720 | 1,381 | **3,101** |
| | *26.0%* | *13.1%* | *39.1%* | *11.7%* | *17.6%* | *29.3%* | *9.4%* | *9.1%* | *18.6%* | *8.2%* | *4.6%* | *12.8%* | *0.2%* | *0.1%* | *0.3%* | *55.5%* | *44.5%* | |
| **CIVIL TOTAL** | 1,215 | 1,611 | **2,826** | 1,917 | 7,010 | **8,927** | 1,163 | 2,964 | **4,127** | 1,543 | 768 | **2,311** | 13 | 27 | **40** | 5,851 | 12,380 | **18,231** |
| | *43.0%* | *57.0%* | *15.5%* | *21.5%* | *78.5%* | *49.0%* | *28.2%* | *71.8%* | *22.6%* | *66.8%* | *33.2%* | *12.7%* | *32.5%* | *67.5%* | *0.2%* | *32.1%* | *67.9%* | |

| 2010 CITY CENSUS | WHITE | BLACK | HISPANIC | ASIAN | CITY POPULATION |
|---|---|---|---|---|---|
| | *33.3%* | *22.8%* | *28.6%* | *12.6%* | *8,175,133* |

| UNIFORM | WHITE | BLACK | HISPANIC | ASIAN | MALE | FEMALE |
|---|---|---|---|---|---|---|
| | *46.2%* | *15.2%* | *29.4%* | *9.2%* | *81.2%* | *18.8%* |

| CIVILIANS | WHITE | BLACK | HISPANIC | ASIAN | MALE | FEMALE |
|---|---|---|---|---|---|---|
| | *15.5%* | *49.1%* | *22.7%* | *12.7%* | *32.1%* | *67.9%* |

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan –
October 2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix XIII



2/26/2021                                                                 Microsoft Power BI

## Rank/Title, Gender and Race

Race ● Asian ● Black ● Hispanic ● Native American ● White



| Rank/Title | Police Officer | | | Detective | | | Sergeant | | | Lieutenant | | | Captain | | | Deputy Inspector | | | Inspector | | | Deputy Chief | | | Assistant Chief | | | Chief | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Race | Female | Male | Total | Female | Male | Total | Female | Male | Total | Female | Male | Total | Female | Male | Total | Female | Male | Total | Female | Male | Total | Female | Male | Total | Female | Male | Total | Female | Male | Total |
| Asian | 203 | 2142 | 2345 | 24 | 197 | 221 | 21 | 361 | 382 | 8 | 128 | 136 | 4 | 38 | 42 | | 5 | 5 | | 2 | 2 | | 1 | 1 | | | | | | |
| Black | 1278 | 2293 | 3571 | 190 | 584 | 774 | 222 | 400 | 622 | 58 | 140 | 198 | 10 | 25 | 35 | 6 | 11 | 17 | | 15 | 15 | | 8 | 8 | 2 | 1 | 3 | 2 | 2 | 4 |
| Hispanic | 1980 | 5291 | 7271 | 284 | 1042 | 1326 | 253 | 840 | 1093 | 53 | 279 | 332 | 9 | 48 | 57 | 3 | 18 | 21 | | 15 | 15 | | 3 | 3 | | 4 | 4 | | 1 | 1 |
| Native American | 6 | 10 | 16 | 1 | 4 | 5 | | 3 | 3 | | 3 | 3 | | 1 | 1 | | | | | | | | | | | | | | | |
| White | 1315 | 8555 | 9870 | 247 | 2292 | 2539 | 204 | 2023 | 2227 | 62 | 827 | 889 | 12 | 193 | 205 | 8 | 116 | 124 | 7 | 87 | 94 | 1 | 48 | 49 | 2 | 14 | 16 | 1 | 6 | 7 |
| Total | 4782 | 18291 | 23073 | 746 | 4119 | 4865 | 700 | 3627 | 4327 | 181 | 1375 | 1556 | 35 | 304 | 339 | 17 | 150 | 167 | 11 | 115 | 126 | 2 | 59 | 61 | 4 | 19 | 23 | 3 | 9 | 12 |

Microsoft Power BI                                ⟨  2 of 2  ⟩

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan –
October 2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

# Appendix XIV

## ABOUT THE CRISIS MANAGEMENT SYSTEM

The Crisis Management System: this network deploys teams of credible messengers who mediate conflicts on the street and connect high-risk individuals to services that can reduce the long-term risk of violence. From 2010 to 2019, data shows the Crisis Management System has contributed to an average 40% reduction in shootings across program areas compared to 31% decline in shootings in the 17 highest violence precincts in New York City.



- Teams of "violence interrupters" – typically credible messengers who have turned their lives around – engage individuals most likely to be involved in gun violence. The teams work to deescalate disputes before crisis or violence erupt and connect high-risk individuals to extensive networks that provide job training, employment opportunities, mental health services and legal services to increase the likelihood of long-term violence reduction.

- The effect of this effort is not only enhanced safety, but also an improved relationship between government and New Yorkers. Emerging evidence of this can be seen in some of the key indicators being tracked by the John Jay College of Criminal Justice, which is currently evaluating the Cure Violence component of the Crisis Management System.



# Crisis Management System Wrap Around Supportive Services

**School Conflict Mediation:** The school-based conflict mediation component is designed to provide culturally competent programming to at-risk youth to reduce the likelihood of their involvement in violence in their school and community while increasing their attendance, academic progress, and other social measures. The program includes school-wide activities to assist in changing culture around violence and to assist schools in their response to incidents that occur in the school or community.

**Employment Program:** Justice Plus is a flexible, wrap- around designed to support referred participants of neighborhood-based Cure Violence programs by providing a range of work readiness opportunities. These opportunities include: work experience placements, hard/ vocational and soft job skills development, and job search and career awareness/planning competencies. The program participants receive stipends.

**Therapeutic Mental Health Services:** Therapeutic mental health services are offered and designed to provide culturally competent therapeutic support to children, youth, and families impacted by gun violence by improving resilience, network support, and building skills in self-management and self-care.

**Legal Services:** Cure Violence participants receive support from the Legal Aid Society such as how to identify a legal emergency and substantive legal issues such as criminal law, housing, family, employment issues, what to do post-conviction and the hidden civil consequences of a criminal conviction. Legal representation is provided as needed.

**Anti- Gun Violence Employment Program:** The Anti-Gun Violence Employment Program (AGVEP) is a seasonal employment program that employs participants (14-24) who are serviced through the New York City Crisis Management System. The program consists of two phases: a 6 week summer program and a 25 week school year program. Job responsibilities include but are not limited to community canvassing, asset mapping, data/research gathering, community outreach and coordinating/ conducting shooting responses.

# Appendices

**Appendix I**
Executive Order No. 203

**Appendix II**
NYC Executive Order No. 203
Community Engagement

**Appendix III**
NYPD Discipline Matrix

**Appendix IV**
NYPD-CCRB Discipline Matrix
Memorandum of Understanding

**Appendix V**
NYPD Use of Force Dashboard

**Appendix VI**
NYPD Hate Crimes Dashboard

**Appendix VII**
NYPD Annual Early Intervention
Program Report

**Appendix VIII**
NYPD In Focus Strategic Plan –
October 2020

**Appendix IX**
Active Bystandership for Law
Enforcement (ABLE) Project Fact Sheet

**Appendix X**
NYPD Precinct Public Feedback Survey
Questions

**Appendix XI**
NYPD Digital Recruitment Campaign

**Appendix XII**
NYPD Allocation Ethnic Rank Report

**Appendix XIII**
NYPD Personnel Demographics
Dashboard

**Appendix XIV**
About The Crisis Management System

**Appendix XV**
Police Reform & Reinvention Listening
Sessions Presentation

## Appendix XV



NYC Police Reform and Reinvention Collaborative Draft Plan

## Reform & Reinvention Collaborative Timeline





| Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|------|-----|-----|-----|-----|-----|-----|

Planning → Community Engagement → Draft Plan → Public Comment → Revise and Ratify

- There are many opportunities to engage in the Reform and Reinvention Collaborative.
- Phase I of the Community Engagement process consists of virtual public meetings, just like this one.
- Phase II of the Community Engagement process will include a number of smaller meetings with organizational stakeholders and community leaders hosted by partners inside and outside of City government.

2

## Participant Expectations



- Listen with compassion.
- You are under no obligation to speak.
- One person will be invited to speak at a time.
- Please keep remarks brief so as to allow others time to be heard.
- All voices are welcomed, valued, respected, and more importantly, understood.
- Recognize and embrace difficult conversations.
- Be respectful of each other's experiences and opinions.
- Speak for yourself and not as a representative.
- It is OK to disagree with one another.
- Respect personal stories.



3

## How to Contribute



### During Tonight's Session:



Zoom

Please monitor your chat feed!  Use the chat feature for previews of upcoming discussion questions, to input questions or comments that may be read by your facilitators, or to request an opportunity to speak on a particular topic.



Facebook Live

Please use the comment box for previews of upcoming discussion questions, and to input questions or comments that may be read by your facilitators.

### After Tonight's Session:



Watch a full video of tonight's event, view materials and resources, and complete our survey at

**NYC.gov/NYPD/reform**

4

## Community Discussion (Sample Questions)



- What does safety mean to you?

- Do you feel safe in your neighborhood?

- Tell us about your quality of life.

- What role do you feel that the NYPD should play in addressing your neighborhood conditions?

- Do you have ideas about how the NYPD could better engage people in your neighborhood?

- How do you feel we can encourage a diverse universe of really good people to serve in the NYPD?

- What does justice mean to you?



5

## Recent Reforms



Arrests **declined by 49%** since 2010,
Misdemeanor arrests declined by 56%.

The NYPD issued **83% fewer** criminal
summonses from 2010 to 2019.







## Collaborative Policing & Youth Strategy





Community, Government, Advocate Relationships

Access to Services

Creative Crime Reduction Strategies

Increased non-enforcement options

Collaborative Policing

7




### Youth Strategy

The NYPD has renewed its commitment to proactively reach young people at risk of engaging in criminal activity before they do so. As an initial step, we are reshaping the roles of many NYPD personnel who focus exclusively on young people (e.g., Youth Officers, Uniformed Task Force, and the Juvenile Robbery Intervention Program). These positions have been incorporated into a new role, the Youth Coordination Officer (YCO), which is very similar to the Neighborhood Coordination Officer (NCO) model but is focused exclusively on protecting and serving children. YCOs will serve a central role in each precinct and Police Service Area (PSA). One of their primary functions will be to gain a full understanding of the local risks and needs of all young people in their commands, not only identifying crime trends involving young people, but also focusing on engaging and connecting them to resources and opportunities in the community. This new structure will increase the number of officers solely dedicated to helping young people. The ultimate goal is to keep every child in the City safe and on track. As an all-encompassing strategy, certain physical spaces have been carefully designed by the Department to minimize the exposure of youth to the criminal justice system, and to mitigate the stresses that may come with being in a precinct. Precinct Juvenile Rooms throughout the Department will be evaluated and remodeled to fit both legal and Department standards. This includes, for example, installing technology in each Juvenile Room that will connect the youth, via video application, directly to community-based services (e.g., mental health counselors, etc.) Also, each respective borough court location will designate an appropriate juvenile lodging area to expedite the arraignment process for juvenile offenders, known as Court Juvenile Rooms.

## Strengthening Community Partnerships











## Recruitment, Retention and Resiliency





9



## Training





10



**Investigative Encounters** 

### Investigative Encounters
**("Stops")**
2010-2019

Investigative Encounters **declined by 98%** since their peak in 2011.



12

## Discipline







13



**2019 Displinary Case Outcomes**
**Total Cases: 339**

■ Guilty
■ Not Guilty

17
322



**Penalties for Guilty Findings**
**Total Guilty: 322**

■ Dimissed
■ Forced Separation
■ Dismissal Probation & Penalty Days
■ Penalty Days

10   17
94
201

## Data Transparency



14

## Body Worn Camera



- 25,321 police officers in the field outfitted with BWCs.

- Over 13 million police interactions recorded.

- 18 month retention with auto deletion

- 130,000 new videos added each week.



15

## Inclusion, Respect, and Transparency





### Engaging our Workforce: Employee Race Forums

In June 2020, the Police Commissioner announced that the Office of Equity & Inclusion (OEI) would convene discussion forums for employees to share their experiences and views on race and law enforcement, and social justice.

Led by OEI, the virtual discussions have covered various topics including racial identity, systemic racism, diversity, acceptance, leadership, and obstacles to equity in both the Department and society in general.

Many of the themes throughout the course of these discussions have included ideas on how to create a more inclusive and equitable Department. These ideas will generate recommendations for the Department moving forward.



### NYPD's Peer Support Program

The NYPD has trained almost 400 members of the service that volunteered to provide confidential, informal support, and guidance to their fellow first responders. The Peer Support members share information on mental and physical health, mental illness, suicide prevention, tools to fight the stigma associated with seeking help, how to maintain resilience, and other health-related information. Any member of the service can speak to a peer support member in their command or through a new internal Health & Wellness App.



16