# Exhibit C



March 12, 2021

# NYC Police Reform and Reinvention Collaborative Draft Plan: Part 2



**THE POLICE COMMISSIONER**
CITY OF NEW YORK

The killing of George Floyd last year in Minneapolis was shocking and reprehensible. It amplified difficult but necessary conversations about race and the policing profession. While George Floyd wasn't killed by police in New York City, his death reminds us of New Yorkers like Clifford Glover, Amadou Diallo and Eric Garner and others.

At the New York City Police Department – like all police departments, we must look in the mirror and seize this moment in history if we are to truly achieve our country's guiding, yet unrealized, vision of equality and justice for all.

First, there must be a hard, honest moment of truth. We must acknowledge the clearly undeniable truth that more than 400 years ago, a caste system based on a narrative of racial difference was used to justify almost 250 years of slavery, followed by more than 150 years of systemic racism. These many years of racist policies and practices have caused – and continue to cause – immeasurable harm, trauma, discrimination, and injustice for so many in our nation.

Police have always been an inexorable part of that story. Whether it was arresting runaway slaves or enforcing unjust Jim Crow laws, it is a stain on the history of American law enforcement. We have to acknowledge this truth – and I do. We must also acknowledge the NYPD's role in moments of that long history, some of it much more recent than it should be – we continue to work hard to regain the trust that was lost in a misapplied stop question and frisk strategy that left entire communities alienated from the NYPD. We continue to build toward a renewed trust through the Neighborhood Policing Philosophy.

Reform, by definition is "to put an end to an evil by enforcing or introducing a better method or course of action," and as "to change into an improved form or condition." By both definitions, the NYPD has been on a steady path of reform for the past seven years. But out of crisis comes opportunity, and we cannot – we should not – waste this moment for meaningful partnerships and transformation. Our promise and obligation during this evolution is to ensure that we will never participate in, or tolerate, any further inequality or injustice.



**THE POLICE COMMISSIONER**
CITY OF NEW YORK

Reform is not a one-step process; it is a continuum. And, on behalf of the NYPD, I pledge that we will continue on our path to transparent, accountable policing – a path which recognizes racialized policing must be guarded against and where bias is never tolerated. Make no mistake, we all want the same thing: A New York City that is safe and fair for everyone, everywhere. We want this for each other, and for our children.

In my mind and heart, I know that the overwhelming majority of police officers are good, fair, and courageous. I also know that the overwhelming majority go their entire careers without firing their weapons or receiving a single civilian complaint. It is also a fact that more and more of our newest officers come from our city, live in our city, and look like our city.

In keeping with the philosophy behind Neighborhood Policing, the NYPD will continue to develop better ways to police in conjunction with the people we serve. Working with our communities to create a shared vision of public safety will remain our North Star. And by strengthening relationships and building trust, we will surely write our own moment in history – a time when we turned the corner, found each other, and began to achieve these goals anew.

And we must begin that journey, together, now.

Dermot Shea
Police Commissioner

1 Police Plaza, New York, NY 10038   ●   646-610-5410   ●   Fax: 646-610-5865
Website: http://nyc.gov/nypd



# CIVILIAN COMPLAINT REVIEW BOARD
100 CHURCH STREET 10th FLOOR
NEW YORK, NEW YORK 10007 ♦ TELEPHONE (212) 912-7235
www.nyc.gov/ccrb



BILL DE BLASIO
MAYOR

FREDERICK DAVIE
CHAIR

March 12, 2021

Dear Fellow New Yorkers,

In 1993, after decades of effort to overcome the New York City Police Department's use of excessive force and blatant discrimination against communities of color and other marginalized persons while rarely holding officers accountable, the people of this city, led by Mayor David N. Dinkins, created the independent, civilian oversight agency for the NYPD. As the City struggled to address the issues of race, over-policing, and police violence, the CCRB was part of that struggle.

Over the past seven years, the CCRB has continued to grow, learn from our mistakes, and build on our successes. CCRB now has more than 200 staff and has expanded its authority to hold officers accountable for sexual misconduct and false official statements. The agency's Administrative Prosecution Unit tried more than 800 members of the NYPD for misconduct from excessive force to abuses of authority and uses of offensive language. We prosecuted PO Daniel Pantaleo for the killing of Eric Garner and successfully argued for his termination. Our agency called for the repeal of 50-a and released its database of misconduct so that New Yorkers can have more transparent, informed conversation about policing.  The agency's Policy Unit released multiple reports highlighting needed reforms to issues including the Police Department's body-worn camera program and use of Tasers, as well as a report on how New York City's youth experience policing. These efforts, in addition to the events of the past year, inspired important conversations about what needs to change in policing and civilian oversight, and how we as a city can make that change.

I am confident the reforms proposed in the de Blasio Administration policing reform plan will move us forward. The NYPD's Disciplinary Matrix and the Memorandum of Understanding that I signed with the NYPD represent a milestone step the City took to address persistent inconsistencies within the police disciplinary process and concurrence with CCRB recommendations. I commend Mayor de Blasio for making these needed reforms a priority. The proposals outlined in the David Dinkins Plan, announced in the 2021 State of the City address, and the City's current ongoing police reform process will also be instrumental in empowering the CCRB in new ways. I am excited by the prospect of an expanded and strengthened CCRB, able to initiate complaints of its own accord and investigating racial and other types of profiling. I am particularly heartened by the inclusion of language supporting a change to New York State

1



# CIVILIAN COMPLAINT REVIEW BOARD
100 CHURCH STREET 10th FLOOR
NEW YORK, NEW YORK 10007 ♦ TELEPHONE (212) 912-7235
www.nyc.gov/ccrb



BILL DE BLASIO
MAYOR

FREDERICK DAVIE
CHAIR

sealing statutes that would give the CCRB access to certain evidence that will enable the CCRB to investigate its cases more effectively.

As the independent, civilian oversight agency for the New York City Police Department, the Civilian Complaint Review Board deals with the facts of each case impartially. We also confront the weight of history, a painful legacy of racialized policing that too often manifests itself in the cases we see, cases alleging unnecessary force, abuse of authority, discourtesy, and offensive language.

Now, we stand at a new moment of possibility. New Yorkers are engaged and ready for the reforms we need to make New York City a leader in civilian oversight. The era of those who see any oversight as detrimental to public safety is over. There is more to do, and I am confident the reforms now proposed and underway will help make this a better and fairer city.

Sincerely,

Fred Davie, Board Chair

2

# NYC Police Reform and Reinvention Collaborative Draft Plan: Part 2

## March 12, 2021

The City offers Part 2 of the NYC Police Reform and Reinvention Collaborative Draft Plan for comment. The below proposals build on and complement the 36 proposals released on March 5, 2021.  The new proposals outlined here are organized by the five critical themes introduced in Part 1:

- The Decriminalization of Poverty
- Recognition and Continual Examination of Historical and Modern-Day Racialized Policing in New York City
- Transparency and Accountability to the People of New York City
- Community Representation and Partnership
- A Diverse, Resilient, and Supported NYPD

# I. The Decriminalization of Poverty.

To provide service that is fair and just for all New Yorkers, the role of the NYPD in responding to non-emergency and non-crime situations, and in over-patrolling low-income communities, must be critically and vigorously reassessed. In furtherance of this commitment, the City additionally puts forward the following proposals:

**1. The City will systematically examine and end policies that lead to over-policing lower-income and people of color communities, perpetuating the cycle of impoverishment and incarceration.** These assessments will involve disparities in enforcement, as well as the disparate impact these policies have on these communities.

- The City will assess current summons practices to determine if and how they are disproportionately affecting low-income and/or minority communities. The City will assess disparities in the use and impact of different enforcement tools such as warnings, summonses, arrests, and desk appearance tickets, among others, for comparable offenses. This assessment will also include review of the practices of the District Attorneys' Offices.

- The City will systematically examine policies that affect low-income New Yorkers' access to public transportation, and may result in contacts with the criminal justice system.

- The City has abolished all fees and mandatory surcharges associated with supervision and diversion programs, and will develop a policy to ensure that no such fees are charged.

- The City supports legislation to amend the administrative code of the City of New York, in relation to prohibiting housing discrimination on the basis of arrest or criminal record.

- The City supports the reimagination of State parole supervision via the passage of the Less is More: Community Supervision Revocation Reform Act, which eliminates reincarceration for most minor non-criminal violations, requires prompt judicial review of parole warrants, caps revocation sanctions, and incentives parole compliance by shortening supervision terms based on good behavior.

**2. The City prioritizes principles of budget justice and will provide key services to support low-income individuals, families, and communities, and reduce the likelihood of justice involvement.**

- The City will create an Ending Poverty to Prison Pipeline initiative to prevent and reduce justice system contact and connect low-income and justice-involved clients and their families with streamlined

services. The initiative will:

» Analyze and map the pathways between poverty and the criminal justice system. Develop or deepen available programming to prevent communities afflicted with poverty from accessing these pathways.

» Coordinate and streamline care across City agencies and use experiences of low-income and justice system affected individuals to craft recommendations.

» Develop evidence-based service-coordination strategies and build continuums of care in consultation with affected individuals, as well as stakeholders.

» Establish formal agreements among health and human services agencies to coordinate care for justice-involved individuals and families.

» Develop opportunities for faith leaders and other allied professionals to connect low-income and justice-involved individuals and families with health and human services.

• The Mayor will issue an Executive Order requiring City agencies to establish service plans to ensure access to health and human services for individuals and families affected by the criminal justice system, similar to the City mandated Language Access Plan for health and human services agencies. The Executive Order will:

» Require health and human services agencies to develop service plans to identify and respond to the acute needs of those affected by the justice system.

» Support the implementation of service plans by requiring dedicated systems navigation staff within each health and human services City agency to troubleshoot service provision issues and coordinate access to services.

• The City will explore structural opportunities to ensure that health and human services are provided in a supportive, and client-centric manner, and develop an alternative model with funding for responding to and addressing these behaviors and activities at the individual and community level. Realigning funding and ownership of these services from criminal justice agencies, the health and human services sector would streamline and more efficiently connect clients to a full range of supportive health and human services.

• The City will ensure that health and human services Requests for Proposals include score components that support best practices for serving justice-system affected families and individuals.

• The City will standardize service entry-points to develop a "no

wrong door" approach. Currently many health and human services are specialized and siloed, requiring that clients seek out services at multiple agencies to address the full extent of their needs. This process is made worse by time consuming, redundant, and stressful intake practices and conditions that discourage client engagement, and lack of cross-agency collaboration and communication. This standardization will include:

» Removal of administrative barriers to care.

» Standardized intake practices and data-sharing across City agencies.

» Ensuring that agencies provide consistent information about available resources for low-income and justice system affected individuals and families.

» Collaborations between City agencies, faith leaders, and academic institutions to create accessible and consistently available resources for low-income and justice system affected individuals.

- The City will build a trauma-informed health and human services sector to prevent justice system contact due to trauma-related mental health and/or substance use issues, support mental and long-term physical health outcomes, and address trauma experienced by low-income and justice-involved individuals and families.

**3. To break the school to prison pipeline, the City will prioritize the health and wellbeing of youth while minimizing potential exposure to trauma in City schools through the investment in human resources and trauma-informed practices, moving school safety agents from NYPD to the Department of Education and retraining them, and revising policies that govern school safety.**

- The City will invest sufficient resources to ensure that every school can effectively support students' social emotional and behavioral needs with a trauma-informed approach. This may include investing in staff trained and coached in providing direct services to students, such as social workers, behavioral specialists, trauma-informed de-escalation staff, conflict resolution specialists, peacemakers, and school climate and restorative justice staff.

- The City will redesign the role of school safety agents and prioritize the specific needs of the school community.

- Following the transition of school safety agents to the Department of Education, the City and Department of Education will critically review all policies related to school safety officers' use of physical interventions on students, including metal handcuffs for students

16 and older, to ensure they are trauma-informed, guided by best practices, and ultimately reduce existing racial disparities in use.

**4. The City supports adopting important new public health approaches to reducing overdoses.**

- The City renews its call for New York State to allow the Overdose Prevention Center pilot, an essential next step for protecting New Yorkers with opioid use disorders. Overdose Prevention Centers will save the lives of New Yorkers, and we can't wait any longer. NYC is committed to a public health approach to reducing overdose including harm reduction practices, as shown through investments made in HealingNYC.

**5. The City will develop new policies and approaches to combatting sex trafficking which focus on the traffickers and do not entangle victims or those selling sex in the criminal justice system.**

- The City supports changes in State Law that would expand the number of crimes that will cause a victim of sex or labor trafficking to have their conviction vacated as a way of supporting victims of these crimes. Victims of sex trafficking often commit crimes at the behest of their trafficker. This has especially harmful consequences for immigrants for whom criminal convictions can have immigration consequences.

- The City will formalize the Task Force on Health and Safety Needs of Sex Workers to expand supportive community-based services for sex workers. Initially launched in 2018, it includes representatives from the NYPD, the Office of the First Lady of New York City, Department of Health and Mental Hygiene, the Department of Social Services, Law Department, Department of Youth and Community Development, Commission on Human Rights, The Mayor's Office to End Domestic and Gender-Based Violence (ENDGBV), the Mayor's Office of Immigrant Affairs, the Administration for Children's Services, the Unity Project, and the Mayor's Office of Criminal Justice.

  This Task Force will explore and refine proposals related to sex work programming, services, and decriminalization including new partnerships outside of law enforcement. Through this group, the City will:

  » Develop and invest in pre-arrest diversion programs, as opposed to post-arrest diversion which rely on criminal justice responses to sex work.

  » Explore and refine proposals related to sex work programs and services, especially sex worker led health, employment, and safety programs.

- » Identify and support new partnerships outside of law enforcement that focus on labor exploitation and trafficking as well as supporting affected communities.

- » Create strategies to address racialized policing of sex work. Only 8% of individuals arrested for patronizing a prostitute in 2019 were White, while 37% of individuals arrested were Black, 39% were Hispanic, and 13% were Asian.

- » Review what efforts are being made to identify where labor exploitation may be contributing to or co-occurring in trafficking cases and will establish procedures including referrals to labor rights and immigration services.

- » Evaluate ongoing reforms to the Vice Enforcement Division, which has shifted focus from policing sex work to policing trafficking and create proposals to address allegations of past misconduct and abuse, coercion and exploitation of sex workers.

- » Provide a recommendation to the Mayor by June 2021 on a State legislative framework for decriminalizing sex work and supporting people who are victimized by trafficking.

- The City will develop new strategies to combat trafficking while working to eliminate arrests for selling sex. Although there has been a reduction in arrests for prostitution, arrests for selling sex do continue (376 in 2019 compared to 1790 in 2014) as does the threat of arrest, potentially resulting in coercive practices. These arrests are driven by complaints, but racial disparities persist. In 2019, approx. 7% of those arrested on all prostitution-related charges were White, compared to 31% Asian, 33% Black and 29% Hispanic.

  NYPD will review policies and procedures for identifying and investigating human trafficking to develop alternative methods that focus on arresting traffickers without further criminalizing and harming those directly involved in the sex trade. NYPD will collaborate with other agencies to maximize their ability to arrest and prosecute traffickers and violent offenders without collateral trauma to people engaged in consensual sex work or victims of exploitation. This will build on progress made in this Administration to drastically reduce the arrests of sex workers.

  NYPD, ENDGBV, the Unity Project, and other experts will support officer training on identifying people who are being trafficked or exploited as well as improving engagement with members of the sex work community to mitigate the impact of law enforcement actions and ensure those who want services have full and fair information and access to them.

NYPD also commits to working with these partners on improving communication and creating information sharing structures where police can provide more information on enforcement actions and receive feedback from stakeholders and on the ground community members to inform enforcement strategies. These conversations can facilitate reporting of violence and exploitation, improve the ability to police trafficking, and ensure both victims and sex workers who should feel safe reaching out to law enforcement for help.

**6. The City will improve support for victims of domestic, gender-based and family violence through access to critical resources and customized training for officers.**

- The City will invest in community-based resources and supports for addressing family violence. Family-related homicides, as defined in the NYC Domestic Violence Fatality Review report, are homicides involving individuals who are related by marriage or blood, such as parents/children, siblings grandparents/grandchildren, cousins, and in-laws. In 2019, family violence related domestic violence homicides were up 52% - from 25 in 2018 to 38. The City is committed to enhancing responses to family violence by investing in new community-based resources, focusing on neighborhoods with the highest rates of family violence. New resources will be focused on family violence prevention services, including counseling, mediation, benefits assistance and case management. This enhanced response will aim to reduce violence, promote housing stability, reduce law enforcement involvement for victims, and enhance connections to services and test intervention models outside of the criminal legal system.

- The City will review services for survivors with a view to decoupling them from the criminal justice system. Currently, many resources for survivors can only be accessed by engagement with the criminal justice system. ENDGBV will conduct a City-wide review to identify services that require a survivor file a police report to receive them and understand whether this is a barrier to access. The review will identify changes that can be made at the city and state levels to support survivors and preserve their safety while reducing the harm associated with criminalization.

- NYPD will mandate training for officers to provide advanced skills to support survivors of and communities affected by domestic- and gender-based violence.
  The NYPD will develop interactive, mandated, online training modules for use department-wide designed to improve officer engagement with survivors of domestic and gender-based violence.

The Department will develop these training modules in collaboration with the ENDGBV Training Team and community partners, including survivors, who have engaged with NYPD and domestic and gender-based violence service providers and advocates, to be implemented in 2021.

ENDGBV and NYPD Counseling Unit will also collaborate to provide training and capacity building to NYPD staff regarding ways to support both survivors of domestic and gender-based violence and people who have caused harmed in their intimate partner relationships utilizing ENDGBV's recently created Offender Engagement Training for City agency staff, including referrals to appropriate programming, such as ENDGBV's soon-to-launch Respect and Responsibility, a voluntary community-based program for people who are using abuse in their intimate relationships.

**7. The City will enhance community-based approaches to combatting bias and hate crimes.**

- NYPD will work with the Office for the Prevention of Hate Crimes to report data on "Crimes with Bias Elements" that do not otherwise constitute Hate Crimes.

  "Crimes with Bias Elements" are criminal incidents where there is some evidence of the subject's animus against the victim(s) because of their real or perceived characteristics, such as race, religion, sexual orientation, or gender identity, but where there is insufficient evidence to establish probable cause to charge a violation of New York State's Hate Crime Law. Documenting and reporting "Crimes with Bias Elements" in addition to Hate Crimes, improves the trust relationship between police and the communities they serve because victims feel validated and supported.

  In addition to continuing to collect and publicly report Hate Crime data, NYPD will implement a system to report "Crimes with Bias Elements" data. This data will enable the NYC Office for the Prevention of Hate Crimes (OPHC) and the City Commission on Human Rights (CCHR) to gain insight into patterns of bias and hate so that resources such as education, training and community engagement can be targeted to hate crime prevention and deterrence, resulting in the improved safety and quality of life for all New Yorkers.

## II. Recognition and Continual Examination of Historical and Modern-Day Racialized Policing in New York City.

Addressing the legacy and harm of racialized policing in New York required a recognition and public acknowledgement of the Department's troubled history and current challenges with race.  That acknowledgement was made on February 23, 2021 by Police Commissioner Dermot Shea alongside the Greater Harlem Chamber of Commerce.  Having made that acknowledgement, the City commits to a critical examination of all City policies and practices that perpetuate structural and institutional racism. The below proposals are an important part of that work:

**1. The City will create a dedicated process to acknowledge, address, and repair past and present injustices and trauma caused by the practice of racialized policing.**

- City Hall and the NYPD will engage with reconciliation and restorative justice scholars and practitioners to devise and execute an authentic, participatory acknowledgment and reconciliation process at the city and precinct levels. This will occur in all 77 precincts, and all Patrols including Housing and Transit, and Headquarters. The process will include engagement of New York City residents selected by community stakeholders.

- The City will produce a comprehensive report documenting the past and present history of racialized policing in New York City, incorporating findings and testimony from the reconciliation and restorative justice process.

- The City will work with NYPD to ensure that past harms brought to light during the reconciliation process are not only acknowledged but can be investigated and subjected to accountability measures.

- The City will work with relevant stakeholders to explore, develop, and champion a reparative justice policy in response to the legacy of racially motivated policing. This includes identifying community reparative justice responses that most directly align with the racialized policies and practices that have harmed New Yorkers.

- NYPD and DOE will develop and implement respective educational materials based on the findings of the reconciliation and restorative justice process that educate police recruits and City school students on the history, impact, and legacy of racialized policing in New York City. These trainings will be provided to every NYPD recruit class, and the DOE educational resources to every public-school student.

**2. The NYPD will participate in a comprehensive, independent review to identify and assess persistent structures of racism within the Department.**

- City Hall will contract an independent entity to conduct a top to bottom review of: 1) public-facing NYPD policies, and practices to identify areas in which structures of racism affect New Yorkers (e.g., unintended consequences of crime fighting strategies), and 2) internal systems, policies, and practices within the NYPD to identify areas in which structural racism affects the Department and its employees.

- In 2014, this administration settled the Floyd v City of New York litigation, in which the court had found in 2013 that NYPD stopped individuals without reasonable suspicion that the persons stopped were engaged in criminal activity, or that they were armed and dangerous, and that stops and frisks were based on race or ethnicity, and were therefore discriminatory.

  The City agreed to a federal monitor, which oversees a set of reforms of the NYPD's policies training, supervision, auditing, and handling of complaints and discipline regarding stops, frisks, and trespass enforcement.

  These changes to the culture and fabric of the NYPD represent a fundamental transformation, and require ongoing work; they will extend long beyond court supervision.

**3. NYPD will require supervisors to proactively monitor discretionary officer activity for indications of biased-based policing and take corrective measures immediately.**

- NYPD will require all members of service to hold each other accountable for the practice of unbiased policing, including but not limited to race, ethnicity, gender identity, sexual orientation, religion, immigration status, housing status, and age.

- NYPD mandates that misconduct is reported to the Internal Affairs Bureau, and members of service can be disciplined for failing to take such action. NYPD will educate members of services to make it clear that reportable misconduct includes racially biased policing. If a member of the service becomes aware of biased or prejudiced policing, they must report the misconduct to the Internal Affairs Bureau Command Center.

- The NYPD Disciplinary Matrix will be updated to clarify that failure to report biased-motivated or prejudiced policing are subject to applicable progressive discipline.

- Officers found to be engaging in biased policing will be subjected to discipline as codified in the Disciplinary Matrix. The presumptive penalty for bias-based or racialized policing is termination.

# III. Transparency and Accountability to the People of New York City.

NYPD must be transparent and hold its members accountable, to be worthy of the trust of all the City's communities. The below additional proposals are provided in recognition of this critical need:

**1. NYPD will ensure that at-risk officers are identified and that swift, appropriate interventions occur.**

- While the NYPD conducts robust background checks in order to assess candidates during the hiring process, there are officers who are nonetheless potentially at risk of poor performance, impacting public and officer safety and community trust.  It is imperative that the NYPD invest resources in (1) identifying officers whose performance is sub-optimal at the earliest possible indication of risk, and (2) taking timely and impactful steps to improve officer performance, in order to mitigate any and all unnecessary risk to the public, the officer, and fellow members of the service.

- The NYPD will build upon the Early Intervention Program, initially launched in August of 2020, using a combination of objective threshold criteria and a 360 degree performance review to identify at risk officers who may be eligible for intervention.  Interventions range from change in assignment and additional supervision and training, to referrals to the counseling unit, or investigation of potential misconduct by the Internal Affairs Bureau, which may result in discipline up to or including termination.  In order to amplify the impact of the Early Intervention Program, the NYPD commits to a continuous review of threshold criteria to eliminate any program backlogs that may delay committee review.  The NYPD will assess the currently available interventions to determine if they are effective. The NYPD will also design new interventions, including amplified re-training and senior leader mentorship programs, to reduce risk to the public, the officer, and the Department.  Finally, the NYPD commits to transparency around both the utilization and efficacy of the Early Intervention Program, by publishing annual reports and accompanying data on the Department's website.

**2. NYPD will continually review the Disciplinary Matrix  and take other measures to ensure that members of service that engage in misconduct, cause harm, and violate policy are held accountable.**

- NYPD will ensure that disciplinary penalties are appropriate for serious acts of misconduct even when they do not result in harm or serious harm—misconduct must be met with proportionate

consequences, even where little to no injury occurred.

- NYPD will provide a minimum 30-day public comment period for future changes to the Discipline Matrix. The revised Matrix will be posted by the NYPD on or before the date at which it takes effect.
- Precinct and borough commanders with high rates of misconduct among their ranks will be subjected to coaching and intervention, as well as codified accountability processes, that may include removal from their command.

**3. NYPD must be transparent about the personal data that is collected and how it is used, which is critical to earning and maintaining the trust of the community.**

- The City will ensure the POST Act is working to achieve its stated objectives, including complete and thorough mandatory oversight audits of systems including but not limited to the NYPD criminal group database.

**4. NYPD policy changes that are identified as having a potential public impact and that aren't otherwise statutorily mandated will be subjected to public comment.**

- NYPD will develop a policy regarding notice and public comment.

**5. CCRB occupies a critical role in the accountability system, which should be evaluated for potential further expansion to additional NYPD employees.**

- The City will assess the possibility of expanding CCRB jurisdiction to include force, abuse of authority, discourtesy and offensive language complaints against civilian members of service.

**6. In certain egregious cases, the City should have the ability to impose suspensions without pay for longer than 30 days while the disciplinary process is underway.**

- The City supports a State Law change to increase the 30-day cap in unpaid suspensions for certain egregious cases of misconduct by police officers (that which resulted in death or serious physical injury which creates substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ), and cases at the Commissioner's discretion.

  Under current State law, a police officer who is suspended from duty, including when termination is pending, may not be paid for the first 30 days of their suspension, but subsequently is entitled to collect their regular pay no matter how long disciplinary proceedings take

to resolve. This minimizes the immediate consequences for the officer and removes incentive for the disciplinary process to move forward quickly. This provision in state law should be amended to require that suspensions or terminations based on charges resulting in death or serious injury to the public, or other cases at the Commissioner's discretion, be unpaid until they are resolved.

**7. Pension forfeiture must be a more meaningful and used disciplinary penalty for the most egregious instances of misconduct.**

- The City supports a State law change to create a pension reduction or forfeiture remedy for the most egregious misconduct cases, for example where there is death or serious physical injury which creates substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

**8. The City must hold officers accountable for "failure to take police action."**

- The consequences of an officer failing to take police action, a specific category of misconduct, can be potentially devastating. These incidents are also very fact-specific and can result in a very wide range of consequences. Currently, the Discipline Matrix indicates a presumptive penalty of 20 penalty days, with a range of 10 penalty days with mitigating factors and 30 days with aggravating factors. An oversight entity will review these cases to better understand the types of misconduct which fall under this category and its consequences, followed by a determination regarding the appropriateness of this penalty range.

**9. The City will create a Citywide policy to strengthen transparency and accountability in the use of biometric technology.**

- The Administration will establish a citywide biometric technology policy, by Mayoral Executive Order, to govern the fair and responsible use of biometric technology by all City agencies. The establishment of a uniform citywide policy on the use of biometric technology by City agencies—several of which, including the NYPD, are already using biometric systems in limited contexts pursuant to agency-specific policies or standards—is a necessary component of the City's work to promote equity, justice, transparency, and accountability for New Yorkers and our communities.

  The Mayoral Executive Order will establish standards and limits for how and under what circumstances these technologies may be used by City agencies, in a manner consistent with upholding

New Yorkers' rights and privacy, and which protects the security of highly sensitive biometric information collected by or on behalf of the City. A citywide biometric technology policy will require, through centralized oversight, the review of agency use of such types of tools, and agencies' compliance with new protocols for acquisition, implementation and transparency established by the policy to ensure that any use of this type of data and technology meets the City's standards for fair and responsible use.

**10. The City will equip NYC Sheriff's Deputies with Body-Worn Cameras.**

- In the past decade the Sheriff's Office has undertaken a significant increase in public safety duties, including enforcing state rules related to managing the COVID-19 pandemic and overseeing the electronic monitoring program. Even before this increase in responsibility, the Sheriff's Office regularly interacted with the public when enforcing laws relating to certain tax crimes and deed fraud. To increase transparency, improve interactions between officers and the public, and align the NYC Sheriff's Office with other law enforcement agencies in New York City, Sheriff's deputies will be equipped with body-worn cameras.

# IV. Community Representation and Partnership.

Cultural competence and meaningful partnership must be central to the Department's strategies. Additional proposals in this area include the following:

**1. The NYPD will consistently solicit real-time feedback from members of the community related to both positive and negative experiences and interactions and will work to implement programs that enhance precinct-based customer experiences.**

- NYPD will develop and launch a series of tools to collect public feedback, empowering community members to formally submit comments related to positive and negative encounters, without the interaction needing to rise to the level of a CCRB complaint.

- NYPD will routinely, actively, and systematically survey members of the community, consistent with social science best practices, ensuring that historically over-policed and criminal justice affected communities are well represented in the sample. The survey will focus on encounters and interactions with NYPD, perceptions of the Department, and crime and public safety concerns.

**2. The NYPD will invest in enhancing productive partnerships with community members and organizations and increasing officers' cultural competence.**

- NYPD will develop strategies to encourage members of service with satisfactory performance evaluation histories to remain in their commands long enough to gain local knowledge, build trust with the community and invest in its success.

- NYPD will require executive staff to provide transition plans when leaving a command to ensure that the community is informed, and that knowledge is transferred to the incoming executive.

- NYPD will develop and formalize, collect, and monitor metrics that track patrol officers' activity related to community engagement, procedural justice, collaboration, and problem solving.

**3. The NYPD will ensure that the composition of its workforce is reflective of the community it serves at all levels of the organization.**

- NYPD will facilitate hiring and application workshops in communities most affected by the criminal justice system, on at least a quarterly basis, providing education and support to prospective applicants for uniform and non-uniform roles.

- NYPD will establish partnerships with religious institutions, minority group organizations, and women's groups in communities most

affected by the criminal justice system to broaden the recruit candidate pool, and ensure individuals are aware of opportunities and benefits of NYPD uniform and non-uniform positions.

- The NYPD will implement mentoring, leadership, and professional development programs to support officers from underrepresented populations early in their careers.

**4. NYPD will work with the Mayor's Office for People with Disabilities to expand the reach and scope of services provided by the NYPD Disability Services Facilitator.**

- The NYPD Office of Equity and Inclusion oversees the NYPD's implementation of policies to ensure the Department meets the needs of the disability community. The Disability Services Facilitator (DSF) acts as a liaison between the Department and members of the public. The DSF coordinates all NYPD efforts to comply with the Americans with Disabilities Act and other federal, state, and local laws concerning accessibility for people with disabilities.

- The culture of equity and inclusion extends far beyond the statutory responsibilities of the DSF.  In response to requests made by disability advocates, the NYPD will work with the Mayor's Office for People with Disabilities to expand the reach and scope of services provided by the DSF by leveraging use of Community Ambassadors as local points of contact for all New Yorkers with disabilities who wish to participate in NYPD programs or who are in need of police services. The NYPD will also continue to assess and revise "Accessible NYPD," the Department's ADA Compliance Plan, and explore new ways to expose members to the lived experiences and unique needs of this diverse community.

**5. NYPD will take important steps to improve relationships with NYC's immigrant communities.**

**a) Improve language access.**

NYPD acknowledges the need to improve relations with the City's immigrant communities as part of its larger reform effort. While NYPD is proud of the diverse ethnic, linguistic, and racial background that comprise its membership, based on feedback from community leaders and in consultation with the Mayor's Office of Immigrant Affairs (MOIA), there is still much work to be done by way of meaningfully engaging immigrant communities. NYPD will take steps to improve language access by building on their existing Language Initiative Program and use of Language Line Service, and ensure that continued mechanisms are in place and utilized to readily facilitate reporting and tracking of language

access complaints. Further, NYPD will work with its sister agencies to ensure that language access gaps are identified and addressed in a timely manner so that there is equitable access to information, resources, and assistance for all New Yorkers, including the approximately 1.8 million residents who have limited English proficiency. In compliance with its reporting requirements pursuant to Local Law 30, NYPD will improve transparency around language access implementation by reviewing its systems and providing opportunity to track language accessibility data where reasonably possible.

**b) Support those seeking NYPD services regardless of their immigration status.**

NYPD has long adopted policies that are inclusive and aimed at providing crime victims with the reassurances needed to seek help regardless of immigration status. Some of these policies include the Department's commitment to honoring the City's detainer law, and never asking about an individual's immigration status when seeking help or reporting a crime. Recognizing the need to reassure and reaffirm its commitment to an immigrant inclusive New York, NYPD will continue to show its support to immigrant communities by vocalizing its support for policies and laws that would both improve public safety by strengthening community relationships and help mitigate immigration status-related collateral consequences to criminal justice contact where appropriate. Additionally, to support immigrant communities for whom any arrest can result in grave immigration consequences no matter how minor and regardless of ultimate outcome, NYPD will reinforce training on the charging of civil offenses when possible.

NYPD will continue to improve proactive communication with sister agencies and community groups when allegations of NYPD roles in immigration enforcement arise. NYPD has not and will not authorize ICE to imply or otherwise represent that they are NYPD when engaging in immigration enforcement. The City has sent a letter to ICE and will call on the White House to demand they cease these practices. NYPD commits to investigating all allegations of police impersonation, whether the subject is a member of the public or unauthorized organization or entity.

**c) Continue to better the relationship between NYPD and the Muslim Communities.**

NYPD will take affirmative steps to better the relationship between the Department and Muslim communities, which consist of approximately 800,000 New Yorkers. The Department acknowledges that prior policing practices have at times strained

its relationship with Muslim communities and affected trust and confidence in the Department. Following communications with community advocates, NYPD is aware that a major source of fear and mistrust is police surveillance practices, both historic and current. NYPD acknowledges that surveillance and other investigative practices may lead to individual and community trauma. Accordingly, NYPD commits to reviewing its use of surveillance technology and improving transparency as to its technology use and data collection. In addition, PD's increased transparency around accountability and discipline will also continue to reflect internal policies prohibiting racism, discrimination, including expressions of Islamophobia, and take severe disciplinary measures where warranted. As part of a larger effort to better the relationship between NYPD and Muslim communities, the Department commits to exploring holistic measures, like restorative justice practices, in partnership with its sister agencies, community leaders, and community based organizations who can facilitate and begin an honest and productive discussion on how to move forward as a City. As with all its reform efforts, NYPD commits to meaningful discussion and inclusion of trusted representatives and advocates of Muslim communities.

**6. The City will pilot the Advance Peace Model, a new approach to helping youth who are at risk for involvement with gun violence.**

- The City will pilot the Advance Peace Model. This program creates an effective mentorship connection between violence interrupters and young New Yorkers who are at-risk of engaging in gun violence.

- Outreach is conducted to youth who are identified as at-risk for gun violence; these individuals are invited to join the Peacemaker Fellowship. Through the Fellowship, they are connected to Neighborhood Change Agents who mentor them, help with tangible goals like a drivers' license or a GED. When the youth achieve their goals, they receive a monetary stipend.

# V. A Diverse, Resilient, and Supported NYPD.

The City aims to develop the most diverse and resilient law enforcement agency in the nation, one which supports its members and creates professionalism and excellence. The below proposals seek to further these important goals:

**1. The City will make residence in NYC a more significant factor in hiring police officers.**

- Currently, the City's Department of Citywide Administrative Services (DCAS) adds five points to the multiple-choice test score of those candidates for employment who qualify for the "New York City Residence Credit." Applicants who are NYC residents are moved upwards on the civil service list from which candidates are selected. Aside from military service, residency is the only factor external to the exam process that can raise a candidate's score.

  To underscore the economic and safety benefits that NYC finds to be important job qualifications and emphasize NYC's interest in having a police force that can closely identify with the public whom they serve, NYC will increase the point bonus associated with residence from five to ten points.

**2. The City will reform the promotions process to focus on transparency and fairness.**

*This builds on the proposal released in the March 5th draft.*

*From the March 5th draft:*

- Once a member of service achieves the rank of Captain, that member may opt-in for further promotional consideration. In practice, the NYPD considers myriad factors, including performance history (evaluations, discipline, and honors), as well as qualitative assessments of leadership, problem solving, competence in supporting the Department's mission, and community or department interactions. However, the criteria for discretionary promotion are informal, and have changed frequently without notice to employees, affecting members' career-planning and confidence in their professional futures, as well as community trust in the selection of their police leaders. The NYPD commits to overhauling the discretionary promotion system, in accordance with best practices across law enforcement and in partnership with experts in diversity, equity, and inclusion, in order to best reflect the City's values, build community trust, and support members' professional development.

*The City proposes to further supplement that proposal with the following important steps:*

- Accountability measures, including complaint and disciplinary history, will be systematically incorporated into the decision-making process before a member of service is entrusted with additional responsibility. NYPD will provide transparent codification regarding how experience, tenure, performance history, positive attributes, as well as disciplinary history all factor into consideration for assignments and promotions.

- The NYPD will implement systemic checks within the discretionary and civil service promotion processes to identify disparities in which members of service are eligible for consideration, and which members of service are ultimately promoted. NYPD will assess the composition of eligible candidates, and candidates who are promoted to all uniform ranks against the broader makeup of the applicable candidate pool, as well as the Department as a whole. Disparities will continue to be investigated for systemic barriers.