# Exhibit D

New York City
Department of Investigation



# Investigation into NYPD Response to the George Floyd Protests

Margaret Garnett
Commissioner

December 2020

**Investigation into NYPD Response to George Floyd Protests**

# Acknowledgements

Commissioner Margaret Garnett thanks the Review Team responsible for this Report, including for Part I: Inspector General & Counsel to the Commissioner Andrew Brunsden, Deputy Inspector General Arturo Sanchez, Assistant Inspector General Michael Garcia, Assistant General Counsel Christopher Tellet, Senior Policy Analyst Justyn Richardson, and Confidential Investigator Mariah Jno-Charles; and for Part II: First Deputy Inspector General Jeanene Barrett and Special Examining Attorney Eric del Pozo (the Commissioner extends additional thanks to Manhattan District Attorney Cyrus Vance, Jr., for the loan of then-ADA del Pozo to this project).

Commissioner Garnett also thanks the other members of DOI's staff who assisted in certain aspects of the project: Data Analyst Ari Lewenstein, Special Investigator Adrain Gonzales, Confidential Investigator Gabriel Lipker, Special Investigator Zachary Toner, Confidential Investigator Harlyn Griffenberg, Confidential Investigator Alex Davie, Assistant Inspector General Brad Howard, Special Investigator Shakina Griffith, Special Investigator Alex Lai, Assistant Inspector General Matin Modarressi, Confidential Investigator Rushelle Sharpe, Special Investigator Julian Watts, and Confidential Investigator Katherine O'Toole.

Finally, the project benefitted considerably from the wise counsel of First Deputy Commissioner Daniel Cort, Deputy Commissioner & Chief of Investigations Dominick Zarrella, Deputy Commissioner & General Counsel Leslie Dubeck, and Inspector General Phil Eure.

Investigation into NYPD Response to George Floyd Protests

# Executive Summary                                                          1

# Part I: NYPD Response to Floyd Protests                                    6

  **A.**  **DOI's Investigation**                         7

  **B.**  **Overview of the Scope and Scale of the Floyd Protests in New York City**   8
    Thursday, May 28                                       8
    Friday, May 29                                         9
    Saturday, May 30                                       11
    Sunday, May 31                                         13
    Monday, June 1                                         15
    Tuesday, June 2                                        16
    Wednesday, June 3                                      18
    Thursday, June 4                                       19
    Friday, June 5                                         22
    June 6, 2020 to June 20, 2020                          22

  **C.**  **Overall Data on the Protests**                 23
    NYPD data                                             23
    CCRB data                                             28

  **D.**  **DOI's Investigative Findings**                 30

    **Finding 1: NYPD Lacked a Clearly Defined Strategy Tailored to Respond to the Large Scale Protests of Police**   31

    **Finding 2: NYPD's Use of Force and Control Tactics to Respond the Floyd Protests Produced Excessive Enforcement That Contributed to Heightened Tensions**   39
    A.  NYPD's Disorder Control Response and Tactics   39
    B.  Curfew Enforcement                       46

    **Finding 3: Some Policing Decisions Relied on Intelligence Without Sufficient Consideration of Context or Proportionality**   49
    A.  The Role of NYPD's Intelligence Bureau in Connection with Protests Generally   49
    B.  NYPD's Intelligence Bureau Role During the Floyd Protests   51
    C.  Use of Intelligence During the Floyd Protests   53
      1.  Changes in Protest Activity   53
      2.  Specific Intelligence        54

    **Finding 4: NYPD Deployed Officers Who Lacked Sufficient Recent Training on Policing Protests**   56
    A.  Training Before the Floyd Protests        57
      1.  Academy Training                 57
        a.  New Recruits          57
        b.  Specialized Units     59
      2.  In-Service Training              60
    B.  Training After the Floyd Protests         61
    C.  Assessment of NYPD's Training Before and After Floyd Protests   61

**Finding 5: NYPD Lacked a Centralized Community Affairs Strategy for the Floyd Protests** 63

A. Community Affairs Officers Have Historically Interacted with Participants During Protests 63

B. The Community Affairs Bureau Was Not Part of the NYPD Response to the Floyd Protests 65

C. NYPD Employed an Inconsistent Approach to the Use of Precinct Level Community Affairs Officers During the Floyd Protests 66

**Finding 6: NYPD Lacked a Sufficient Data Collection Systems to Track Relevant Protest Data** 67

D. **Conclusion and Recommendations** 68

# Part II: External Police Oversight In New York City 72

A. **Who Externally Monitors Police Officers in New York City?** 72
1. External Oversight of the NYPD in City Government 72
Civilian Complaint Review Board 72
Commission to Combat Police Corruption 77
Office of the Inspector General for the NYPD 79
2. Oversight of the NYPD at the State Level 82
3. Civil Litigation and Criminal Prosecution 84

B. **Models of Police Oversight** 86
1. Development of Modern Civilian Review Structures 86
2. Categories of Police Oversight Models 88
Investigation-focused 88
Review-focused 89
Auditor/Monitor-focused 89
3. How Do These Models Work in New York City? 90

C. **Recurring Issues in External Oversight of the NYPD** 91
1. Redundancy, Confusion, and Conflict 92
2. Community Engagement 94
3. Identifying and Mitigating Perceptions of Institutional Bias 96
4. Challenges in Accessing NYPD Records 99
5. Effect of Oversight Recommendations on NYPD 103

D. **DOI's Findings** 106

**Finding 1: Police oversight would be strengthened if existing functions were consolidated into a single agency, headed by an independent board** 107

**Finding 2: No executive within the NYPD is accountable for ensuring that the Department meets its obligation to facilitate and cooperate with its oversight agencies** 109

E. **Conclusion and Recommendations** 110

**Investigation into NYPD Response to George Floyd Protests**

# Executive Summary

Public trust and legitimacy are essential for the police to perform their vital work and honor their duty to serve and protect the public. Policing can be dangerous, even life-threatening, work—but this alone does not distinguish them from other public servants who face danger, such as firefighters, corrections officers, sanitation workers, and the people we send underground to dig the subways and the tunnels that bring our water. Police officers are given extraordinary powers—to carry a gun in a city where few lawfully can, to detain and arrest under the authority of the state, and to use force where necessary to protect their own lives or the lives of others. Extraordinary demands are made on them as well: responding to every conceivable emergency, bearing witness to the worst things human beings do to themselves and one another, protecting the weak and vulnerable, and investigating crime to bring justice to victims and their families and uphold the rule of law. In turn, the public expects and demands what should be rather ordinary things: that the police carry out these responsibilities without bias or misuse of their authority, that they willingly and effectively mete out discipline to officers who fail to meet these standards, and that they submit to public accountability for their actions. How the police respond to public protests against police misconduct puts both the importance, and the fragility, of public trust and legitimacy on full display.

On May 25, 2020, a Minneapolis police officer killed George Floyd, an unarmed Black man, in the course of effectuating an arrest for using a suspected counterfeit bill. In the ensuing days and weeks, people across the country engaged in mass protests, including in New York City. The protests were sparked by Floyd's death, but quickly expanded to embrace broader concerns about systemic racism in law enforcement and whether police are held accountable for excessive force. Considering their scale and duration, New York City's protests were largely peaceful and the actions of most police officers were appropriate. However, the demonstrations also triggered numerous violent confrontations between police and protesters and widespread allegations that police had used excessive tactics against citizens exercising their First Amendment rights.

**Investigation into NYPD Response to George Floyd Protests**

On May 31, using his authority under Section 803 of the New York City Charter, the Mayor directed the New York City Department of Investigation (DOI) to conduct a review of the response by the New York City Police Department (NYPD or the Department) to the protests. This directive was later embodied in Executive Order 58, signed on June 20, 2020. The Executive Order also called upon the Corporation Counsel to conduct "a separate analysis . . . of factors that may have impacted the events at protests." DOI's report does not include the Corporation Counsel's separate analysis. Also on May 31, DOI received a written referral from City Council Speaker Corey Johnson and Councilmember Ritchie Torres, Chair of the Oversight & Investigations Committee, similarly requesting that DOI investigate the NYPD's approach to policing these protests.[1]

This Report outlines DOI's investigation into the NYPD's response to protests in New York City from May 28, 2020 through June 20, 2020 (hereinafter referred to as "the Floyd protests"). For purposes of this Report, DOI focused on the NYPD's institutional and operational systems for response to the Floyd protests, including but not limited to its planning, strategy, enforcement actions, intelligence collection and dissemination, training, and police-community relations. In New York City, accountability for the actions of individual police officers or supervisors must come through disciplinary investigations or criminal investigations (which are the province of NYPD's Internal Affairs Bureau (IAB), the Civilian Complaint Review Board (CCRB), or criminal prosecutors) or through civil litigation. Nearly all such investigations arising from the Floyd protests are ongoing as of the date of this Report. In order to avoid interfering with those investigations, or undermining their effectiveness, this Report does not consider allegations of individual misconduct by officers, except to the extent that such events had direct bearing on the systemic areas of inquiry noted above.

---

[1] On June 1, DOI acknowledged the Council's request and assured that DOI would maintain independent and final control of any fact-finding in its investigation. Letter from Margaret Garnett, DOI Commissioner, to Corey Johnson, Speaker of the New York City Council & Ritchie Torres, Chair of the New York City Council Committee on Oversight and Investigations (June 1, 2020), *available at* https://www1.nyc.gov/assets/doi/press-releases/2020/June/DOIResponse20Letter.pdf. On June 24, DOI also provided a public update on the status of the investigation. Letter from Margaret Garnett to Mayor de Blasio, Corey Johnson, and Ritchie Torres (June 24, 2020), *available at* https://www1.nyc.gov/assets/doi/press-releases/2020/June/08protestupdate_06242020finalwletter.pdf.

**Investigation into NYPD Response to George Floyd Protests**

DOI's investigation identified several deficiencies in the NYPD's response to the Floyd protests that undermined public confidence in the NYPD's discharge of its responsibility to protect the rights of citizens to engage in lawful protest.

- *The NYPD lacked a clearly defined strategy tailored to respond to the large-scale protests of police and policing.* NYPD officials acknowledged that the size, multiplicity, and intensity of protests across the City surprised them. They attributed any weakness in the policing strategy to the initial deployment of insufficient officers. This early under-deployment may have contributed to problems that then escalated tensions even on ensuing days when staffing was more appropriate. In addition, our investigation revealed that NYPD's primary strategy in at least the early days of the Floyd protests appears to have involved defaulting to an application of "disorder control" tactics and methods, without adjustment to reflect the NYPD's responsibility for facilitating lawful First Amendment expression. These deployment strategies, tactics, and shows of force exacerbated confrontations between police and protesters, rather than de-escalating tensions.

- *The NYPD's use of force and certain crowd control tactics to respond to the Floyd protests produced excessive enforcement that contributed to heightened tensions.* NYPD's use of force on protesters—encirclement (commonly called "kettling"), mass arrests, baton and pepper spray use, and other tactics—reflected a failure to calibrate an appropriate balance between valid public safety or officer safety interests and the rights of protesters to assemble and express their views. The inconsistent application of the curfew similarly generated legitimate public concerns about selective enforcement. NYPD use of force and crowd control tactics often failed to discriminate between lawful, peaceful protesters and unlawful actors, and contributed to the perception that officers were exercising force in some cases beyond what was necessary under the circumstances.

- *Some policing decisions relied on intelligence without sufficient consideration of context or proportionality.* Though some of NYPD's intelligence gathering pertained to generalized threats based on information from jurisdictions outside of New York City,

the NYPD also collected specific intelligence that warranted consideration in making policing judgments with respect to particular protest events. However, intelligence alone does not necessarily dictate a particular police response. In the case of the Mott Haven protest, for example, where NYPD had specific intelligence that may have warranted heightened concerns, its mass arrest of protesters for curfew violations, in the absence of evidence of actual violence, was disproportionate to the circumstances.

- *The NYPD deployed officers who lacked sufficient, or sufficiently recent, training on policing protests.* With the exception of officers in specialized units, most officers responding to the protests had not received recent relevant training for policing protests. After the Floyd protests, the Police Commissioner directed all officers to take additional training relating to policing protests. However, the training remains heavily focused on disorder control methods, without a sufficient community affairs or de-escalation component.

- *The NYPD lacked a centralized community affairs strategy for the Floyd protests.* The NYPD Community Affairs Bureau was not part of the planning or strategy for policing the Floyd protests. Though individual precinct-level Community Affairs officers were present at certain protests, their deployment was at the discretion of borough commanders, who also could use those officers in a patrol or enforcement capacity.

- *The NYPD lacked a sufficient data collection system to track relevant protest data.* The NYPD lacks a reliable, consistent method to capture relevant protest data including the total number of protest-related arrests. NYPD records reported divergent arrest numbers due to their different sources and collection methods.

At the conclusion of Part I of this Report, DOI makes several recommendations to the NYPD to improve its policies and practices for policing protests. The Department should embrace the proposed reforms as part of larger efforts to repair police-community relations.

**Investigation into NYPD Response to George Floyd Protests**

Executive Order 58 also directed DOI to address "any recommendations . . . about any additional areas of study and engagement worth pursuing." Part II of this Report examines the system for external oversight of the NYPD in New York City, and makes recommendations to strengthen that oversight, including by combining the existing police oversight functions into a single agency headed by an independent board.

# Part I: NYPD Response to Floyd Protests

People in New York City exercise their First Amendment freedoms through protest nearly every day. In recent decades, New York City has been the site for several prominent large-scale protests, including mass protests against the Iraq war in 2002 and 2003, demonstrations at the Republican National Convention in 2004, Occupy Wall Street in 2011, and protests following the deaths of Michael Brown and Eric Garner in 2014. New York City has also experienced riots accompanied by violence and extensive property damage such as those in Crown Heights and Washington Heights in the early 1990s. And, of course, New York City regularly hosts huge events such as the West Indian Day Parade, the United Nations General Assembly, and the Salute to Israel Parade, that present a variety of crowd control and public safety challenges. The NYPD responds to each of these large events and has no shortage of experience policing protests and mass events of every kind in the City.

When policing protests, NYPD's responsibility is to facilitate individuals' First Amendment rights to assemble and express themselves while protecting protesters and public safety. Under First Amendment case law, restrictions on protected assembly and expression must be narrowly tailored to serve the government's compelling interest in protecting public safety and may not be applied in a manner that discriminates based on viewpoint. These principles should limit the NYPD's use of certain tactics that would otherwise be within its lawful authority, if the tactics are disproportionate to the public safety need.

Beginning in mid-March 2020, New York City was in the grips of the coronavirus pandemic. All schools and cultural institutions were closed. All sporting events were cancelled and recreational facilities were closed. Restaurants, bars, and non-essential businesses remained shuttered. Millions of New Yorkers were suddenly working from home and hundreds of thousands found themselves with no work at all. Those who did have work that could not be done from home put themselves at greater risk of contracting the virus while also doing the vital work of caring for the sick, keeping food in stores and delivered to homes, picking up garbage, delivering mail and packages, and protecting public safety. Thousands of New Yorkers died.

Two months into this once-in-a-century tragedy, on May 25, 2020, a Minneapolis police officer killed George Floyd, an unarmed Black man, when he kneeled on Floyd's neck for several minutes while arresting him. Protests began the following day in Minneapolis and Saint Paul, Minnesota. Alongside peaceful protesters, crowds caused serious damage to police property, including setting fire to a police precinct, and threw rocks and bottles at police. Officers responded by firing rubber bullets, using tear gas, and throwing flash grenades. There was also looting and extensive damage to private buildings. On May 29, several hundred National Guard soldiers came to Minneapolis to assist in the response. By the end of the clashes, there were two additional deaths, damage to approximately 330 buildings, and estimates of $82 million in property damage.

On May 28, 2020, three days after Floyd's death, the first wave of protests began in New York City. Large protests continued for several days thereafter, and demonstrations persisted throughout June. Protests focused on George Floyd's death, but also the killings of other unarmed Black people by police, as well as broader concerns about systemic racism in law enforcement. They also expressed other grievances with policing by the NYPD.

The events largely formed organically and somewhat spontaneously, or were organized primarily through social media and other more informal communications. The Floyd protests generally did not involve the planning, permits, or other process that would have included advanced coordination with the NYPD. The Floyd protests as a whole were largely peaceful, but there were numerous incidents of violence toward police officers (some causing serious injury), property damage, and looting of businesses. There were also many complaints against the NYPD, both formal and informal, including that the Department's policing infringed upon citizens' First Amendment rights to protest, and that officers used excessive force on protesters (including causing a range of injuries).

## A.    DOI's Investigation

DOI's investigation included, among other investigative steps, (1) review of official statements, public reports, public hearings, news stories, and social media postings from both individuals and organizations regarding the Floyd protests; (2) review of various studies

and published reports on protest policing; (3) review of NYPD video and publicly-available video of incidents at the protests; (4) review of thousands of pages of NYPD records relating to the policing of the Floyd protests, including individual incidents, Department policies, intelligence information, training materials, and relevant data; (5) data analysis of arrest, racial demographic, geographic, and CCRB complaint data; and (6) interviews or meetings with NYPD executives and officials, Mayor's Community Affairs Unit (CAU) employees who attended the protests, individuals with protest-related organizations, representatives from Human Rights Watch and Physicians for Human Rights, the Public Advocate, and academics and former government officials with expertise on policing issues.[2] DOI's NYPD interviews included, among others, Police Commissioner Dermot Shea, Chief of Department Terence Monahan, the top two officials in NYPD's Intelligence Bureau, as well as the former heads of Training and the Community Affairs Bureau.[3]

## B. Overview of the Scope and Scale of the Floyd Protests in New York City

### Thursday, May 28

The Floyd protests in New York City began on Thursday, May 28. At around 3:00 p.m., a small group of individuals assembled at Union Square Park. The Department, anticipating the potential for mass arrests, activated the Criminal Justice Bureau Mass Arrest Processing Center (MAPC) at One Police Plaza.[4] By 7:00 p.m., the number of protesters at Union Square swelled to over 100, and police made several arrests, prompting a faction of protesters to leave Union Square and merge with another large group that had since gathered at City Hall. The group then proceeded toward NYPD headquarters at One Police

---

[2] DOI conducted outreach to the Police Benevolent Association, as well as to many known "affinity groups" within NYPD, to seek their input and views on how NYPD had policed the protests. None of these groups agreed to speak with the investigative team—either failing to respond to the outreach at all or declining our invitation to meet.

[3] DOI repeatedly sought to interview former Chief of Patrol Fausto Pichardo, both before and after he resigned from the Department. Despite the efforts of intermediaries at NYPD, we were informed that he declined to schedule the interview.

[4] The NYPD processed a significant number of protest-related arrests at the MAPC. Due to the size and scope of protests, the NYPD later activated two other MAPCs in Brooklyn and Queens to process the anticipated high volume of arrests from the protests.

**Investigation into NYPD Response to George Floyd Protests**

Plaza where many remained until 6:00 a.m. According to estimates, over 350 people were in the crowd at the peak of the demonstration.[5]

While MAPC data reported 75 arrests, Joint Operations Center (JOC) logs reported 73 arrests.[6] From DOI's analysis of the MAPC data, 42% (30 total) of the arrests were associated with a public-order related top charge, such as disorderly conduct or unlawful assembly, and 32% (24 total) of the arrests were associated with an obstructing governmental administration (OGA) top charge. Of those arrested, 47% (35 total) were white, 27% (20 total) were Black, and 17% (13 total) were Latino.[7] CCRB reported four incidents containing 18 allegations of police misconduct corresponding to this date.[8]

### Friday, May 29

On May 29, the City experienced another day of mass demonstrations. There were two large events that day, one in Manhattan and the other in Brooklyn. The first began around 1:00 p.m. as a small group gathered at Foley Square, outside the courthouses in Lower Manhattan. Within a

---

[5] Estimates of the number of individuals participating in protests are inherently uncertain. For purposes of this section, the estimates of participants are based on information in NYPD records. However, the number of participants certainly may be higher than the estimates reflected in those records.

[6] During the course of its investigation, DOI found several different data sources reporting a daily count of arrests related to the Floyd protests. These arrest figures often differed depending on the data source. While we discuss this issue later in the Report, this section notes the arrest figures from two of these data sources: MAPC and JOC arrest figures. The former provide data on protest-related arrests processed through MAPCs, while the latter provide data obtained by the JOC, which is part of the Operations Division and collected arrest numbers from a variety of sources. The MAPC data had more information about the arrestees, and DOI was thus able to conduct further analysis of the MAPC arrest figures. This section provides a further breakdown of MAPC data by identifying the top charge category and the reported race of arrestees. Arrests occurring before 6:00 a.m. are counted as part of the previous night's total.

[7] There is some ambiguity in NYPD's system for inputting racial data. For example, sometimes the racial data of the arrestee would be listed as "WH," which made it unclear if "White" or "White Hispanic" was intended to be designated. When DOI sought clarification, the Department was unable to resolve this uncertainty. Therefore, some number of the arrestees identified as "White" may, in fact, be "White Hispanic," who would otherwise have been included in the "Latino" category of this Report.

[8] DOI obtained CCRB data, updated as of December 14, 2020, concerning excessive force, abuse of authority, discourtesy, and offensive language allegations received by the CCRB during the Floyd protests from May 28 to June 20. This section reports the allegations by date of reported misconduct. A single CCRB complaint from an incident may sometimes contain several different allegations and those allegations can also be directed towards multiple officers. However, though useful information, allegations brought to the CCRB do not capture the full universe of protester experiences or complaints.

few hours, hundreds of individuals had congregated there and by 5:00 p.m., the crowd at Foley Square began to walk a few blocks south toward the Brooklyn Bridge to join the second event outside the Barclays Center, an arena located in Downtown Brooklyn at the intersection of Atlantic Avenue and Flatbush Avenue. Several other large groups had also gathered that afternoon, in front of the Manhattan Detention Center (which is in Lower Manhattan, near Foley Square) and at the intersection of Tillary Street and Adams Street in Brooklyn, near the entrance to the Brooklyn Bridge. These groups merged over the course of the late afternoon and early evening and by 6:00 p.m., over a thousand people had converged in the plaza and streets surrounding the Barclays Center. That number doubled within the hour. At its peak, around 8:00 p.m., the crowd outside the Barclays Center grew to approximately 3,000 people.

The NYPD mobilized resources from other parts of the City to join officers already at the Barclays Center. Video posted to social media captured some of the violent clashes between police and protesters, including images of police officers shoving or striking protesters, police vehicles set on fire, and two separate incidents where individuals struck NYPD vehicles with incendiary devices. At around 9:00 p.m., a group assembled in front of the 88th Precinct, located at the corner of Dekalb Avenue and Classon Avenue in the Clinton Hill neighborhood of Brooklyn. A volatile confrontation with police officers outside the precinct resulted in the arrest of at least 20 individuals and five officer injuries. Around 10:00 p.m., another protest in front of the 79th Precinct, located on Tompkins Avenue in the Bedford-Stuyvesant neighborhood of Brooklyn, resulted in six additional arrests, including one person armed with a loaded handgun.

While MAPC data reported 218 arrests, JOC logs reported 204 arrests. From DOI's analysis of the MAPC data, 85% (186 total) of the arrests were associated with a public-order related top charge and approximately 9% (20 total) of the arrests were associated with an OGA top charge. Of those arrested, 56% (121 total) were white, 30% (66 total) were Black, and 12% (26 total) were Latino. NYPD records indicate 59 officer injuries[9] and 37 damaged police vehicles (including total

---

[9] DOI received several records from the NYPD that referenced injuries to officers related to the Floyd protests. These records had divergent numbers regarding both the daily breakdown of

destruction by fire).[10] CCRB reported 37 incidents containing 299 allegations of police misconduct corresponding to this date.

## Saturday, May 30

On May 30, dozens of large and small protests continued throughout the City. The larger events took place at various locations in Manhattan and in Brooklyn:

- At around 1:00 p.m., approximately 170 demonstrators gathered at the Adam Clayton Powell Jr. State Building on 125th Street in Harlem.

- Approximately 200 demonstrators marched from Bay Street to the 120th Precinct on Richmond Terrace, near the Ferry Terminal on the northern edge of Staten Island.

- Demonstrators blocked the FDR Drive in both directions at East 111th Street in Manhattan, which resulted in the arrest of 30 individuals.

- At around 3:30 p.m., approximately 500 demonstrators stopped traffic on the West Side Highway in Manhattan.

- In the late afternoon, approximately 3,000 demonstrators congregated around Ocean Avenue and Parkside Avenue, in the Prospect Lefferts Gardens neighborhood of Brooklyn, along the southeastern edge of Prospect Park.

---

officer injuries and the total number of officer injuries over a specific period. For this Report, DOI includes numbers from a record produced by the NYPD's Medical Division that reported a daily breakdown of line of duty injuries relating to the Floyd protests from May 28 to June 11.

DOI also received records from NYPD that referenced injuries to protesters during the Floyd protests. However, these records do not reliably capture the number of protester injuries during the Floyd protests. Many protesters who were injured did not report their injuries to the NYPD. DOI received a spreadsheet that reported 108 protester injuries from May 28 to June 7. This figure does not represent the universe of protester injuries during the Floyd protests. Further, while NYPD produced other records indicating injuries, DOI was unable to determine the precise number of injuries that related to the protests based on the information in the forms, some of which were also outside DOI's review period.

[10] DOI received several records from the NYPD that referenced damage to Department equipment, particularly vehicles. For this Report, DOI includes the figures referenced in NYPD's JOC logs for the period from May 28 to June 20.

- By 6:00 p.m., approximately 1,500 individuals had gathered at Washington Square Park in Manhattan. At around 6:30 p.m., a police van was set on fire at the intersection of 12th Street and Broadway, about eight blocks away from the Park. Around 7:00 p.m., one group of demonstrators coming from the Washington Square Park gathering crossed the Brooklyn Bridge and another splinter group of about 400 people assembled outside NYPD Headquarters at One Police Plaza (which is just adjacent to the Manhattan-side entrance to the Brooklyn Bridge). At 7:50 p.m., a different group of approximately 200 protesters blocked the flow of traffic on the Westside Highway. At around 8:30 p.m., a group of about 700 protesters marched onto the traffic lanes of the Manhattan Bridge and prevented vehicles from entering into Manhattan from Brooklyn.

- Around 9:35 p.m., approximately 650 protesters were at Union Square Park in Manhattan and another group of approximately 300 protesters had gathered at Columbus Circle on the northern edge of Midtown Manhattan.

- At around 10:00 p.m., two police vehicles were set on fire at the intersection of East 12th Street and University Place, just south of Union Square, and a third vehicle was also on fire near at the intersection of 13th Street and 5th Avenue.

- Also around 10:00 p.m., approximately 500 demonstrators were gathered outside the Barclays Center in downtown Brooklyn.

- Several additional small street or vehicle fires occurred near Union Square Park in the hours just before and shortly after midnight.

Like the day before, what began as mostly peaceful gatherings became increasingly tense encounters. Media reported on numerous confrontations between police and protesters, including one incident captured on video of officers in police sport utility vehicles pushing through a crowd of protesters on the street, and a second incident where an officer approached a protester holding his arms up in the air, and the officer pulled down his face mask to pepper spray him.

While MAPC data reported 321 arrests, JOC logs reported 345 arrests From DOI's analysis of the MAPC data, 89% (287 total) of the arrests were associated with a public-order related top charge. Of those arrested, 53% (169 total) were white, 34% (110 total) were Black, and 10% (32 total) were Latino. NYPD documented 91 officer injuries and 55 damaged police vehicles. CCRB reported 66 incidents containing 429 allegations of police misconduct corresponding to this date.

**Sunday, May 31**

On May 31, protests began as early as noon, with several simultaneous events across the City in the early afternoon. Specifically, approximately 100 demonstrators gathered at the corner of Jamaica Avenue and 153rd Street in Queens, approximately 60 people gathered at the intersection of Victory Boulevard and Bay Street in Staten Island, and another group of approximately 40 gathered outside the Barclays Center in Brooklyn. By 2:00 p.m., approximately 50 demonstrators had assembled in Union Square in Manhattan, and the crowd outside the Barclays Center grew to approximately 500 demonstrators.

As the day wore on, the size of crowds and the number of distinct protest locations continued to grow. Around 3:15 p.m., a group of approximately 500 demonstrators in Manhattan traveled west on 14th Street and headed south toward Washington Square Park, while around 300 individuals came together for a vigil for George Floyd at Fort Tryon Park in far northern Manhattan. At around 4:00 p.m., a group of approximately 600 demonstrators blocked both pedestrian and vehicular traffic on the Williamsburg Bridge, and proceeded to use the pedestrian walkway to cross into Brooklyn. Around that same time, a group of about 200 demonstrators gathered at the Unisphere in Flushing Meadows-Corona Park in Queens, approximately 100 demonstrators gathered at Union Square Park in Manhattan, and another group of about 150 demonstrators gathered in Bryant Park in Midtown Manhattan.

By 5:00 p.m., a crowd gathered around Grand Army Plaza on the northern end of Prospect Park had grown to 400 demonstrators. A group of around 500 individuals had come together near the Mets stadium at Citi Field in Queens. By 6:00 p.m., a crowd outside the Barclays Center in Brooklyn had expanded to approximately 2,000 people. Over the next

**Investigation into NYPD Response to George Floyd Protests**

hour, the size of this group rose to around 3,000. Meanwhile, a different group, also numbering around 3,000, gathered at Times Square in Midtown Manhattan and marched south towards the Holland Tunnel. Separately, another group of similar size marched north on Centre Street in Lower Manhattan from the base of the Brooklyn Bridge towards the courthouse complex a few blocks away. Yet another group of approximately 3,000 demonstrators marched over the Manhattan Bridge from Brooklyn toward Manhattan, converging towards the group gathered outside the courthouses.

Around 9:40 p.m., the NYPD mobilized additional resources, including Housing, Transit, Staten Island, Queens North, Brooklyn North, Manhattan North and Manhattan South platoons, to respond to the large number of protests. At 11:20 p.m., following reports of looting of commercial businesses, additional officers were deployed to protect storefronts in Midtown and Lower Manhattan and to prevent further looting and commercial break-ins. At 11:38 p.m., within the confines of the 100th Precinct in the Rockaways in Queens, shots were fired toward an officer sitting inside of his marked police vehicle. One round shattered the rear windshield and the officer was taken to the hospital to treat non-life threatening injuries. Just before midnight, approximately 1,700 demonstrators marched from Brooklyn into Manhattan using the Manhattan Bridge. Around 1:00 a.m., five police vehicles were vandalized in the confines of the 13th Precinct, which covers the east side of Manhattan from 14th Street north to 28th Street and includes Union Square. At 3:23 a.m., a police officer was struck by a vehicle on West 8th Street in Manhattan.

While MAPC data reported 325 arrests, JOC logs reported 349 arrests. From DOI's analysis of the MAPC data, 46% (150 total) of the arrests were associated with a public-order related top charge and 42% (136 total) of the arrests were associated with a property-related top charge, such as burglary. Of those arrested, 65% (212 total) were Black, 18% (60 total) were white, and 13% (42 total) were Latino. NYPD documented 34 officer injuries and 13 damaged police vehicles. CCRB reported 16 incidents containing 90 allegations of police misconduct corresponding to this date.

Investigation into NYPD Response to George Floyd Protests

**Monday, June 1**

On June 1, Mayor Bill de Blasio signed Emergency Executive Order No. 117, declaring a local state of emergency and ordering a citywide curfew from 11:00 p.m. that night until 5:00 a.m. on June 2. Under the curfew, no person, with the exception of essential workers, or vehicles could be in public during that time. The executive order noted the "peaceful demonstrations" of George Floyd's death, but based the need for the curfew on "demonstration activities [that] subsequently escalated, by some persons, to include actions of assault, vandalism, property damage, and/or looting" primarily late at night. Both Mayor de Blasio and Governor Andrew Cuomo announced the curfew. In spite of the curfew and increased NYPD deployments of police officers to patrol the City, the night of June 1 saw a significant amount of violence, looting, and arrests.

There were planned[11] protests in the afternoon and early evening throughout the City, including in Manhattan at Union Square Park and Times Square; in Brooklyn on Nostrand Avenue and in Bay Ridge; and in Queens at Astoria Park and in Flushing. These protests were well-attended but largely peaceful. By the early evening, protest crowd sizes began to grow. Between 6:30 p.m. and 8:00 p.m., approximately 1,000 protesters had gathered at Astoria Park, a group of approximately 4,000 protesters had gathered outside of One Police Plaza in Manhattan, and approximately 2,500 protesters departed the front of the 77th Precinct on Utica Avenue in the Weeksville neighborhood of Brooklyn and began marching east on Atlantic Avenue. Around 8:30 p.m., a group of approximately 3,000 protesters departed the One Police Plaza gathering and began to march north on the FDR Drive, while another group of 2,000 protesters came from downtown Brooklyn and crossed the Brooklyn Bridge into Manhattan.

By 10:00 p.m., there were reports of widespread looting of commercial businesses in Midtown and Lower Manhattan, including at Macy's Department Store in Herald Square. At around that time, near 55th Street & Madison Avenue in Manhattan, video surfaced of an NYPD officer indiscriminately pepper spraying a group of individuals who were

---

[11] To the extent this section references "planned" protests, it refers to protests known to the NYPD before the event and does not necessarily indicate any advance coordination between protesters and the NYPD.

Investigation into NYPD Response to George Floyd Protests

standing on the sidewalk while the officer was running by them.[12] Around 11:00 p.m., the start time for the curfew, the NYPD had mobilized additional officers from Manhattan, Brooklyn, and Staten Island. While the majority of the protesters dispersed by 11:00 p.m., some remained, including a group of approximately 200 protesters who crossed the Manhattan Bridge from Brooklyn into Manhattan at around 11:30 p.m.

Significant looting occurred in the Bronx in the late evening and into the early morning of June 2, notably in the commercial corridor along Fordham Road in the western Bronx, and at the Bay Plaza Shopping Center near Co-op City in the eastern Bronx.

While MAPC data reported 308 arrests, JOC logs reported 643 arrests. From DOI's analysis of the MAPC data, 31% (97 total) of the arrests were associated with a curfew-related top charge, 29% (89 total) of the arrests were associated with a property-related top charge, 18% (56 total) were associated with a public-order related top charge, and 18% (54 total) were associated with an OGA-related top charge. Of those arrested, 62% (190 total) were Black, 19% (57 total) were white, and 17% (52 total) were Latino. NYPD documented 73 officer injuries and six damaged police vehicles. CCRB reported 11 incidents containing 90 allegations of police misconduct corresponding to this date.

Additionally, from 4:00 p.m. on June 1 to 4:00 a.m. on June 2, there were approximately fifty-one ATM robberies in the City, 23% occurring in the Bronx's 46th precinct alone, and 2,319 "commercial burglary" 911 calls.[13] The same twelve-hour period in previous weeks typically produced fewer than 50 commercial burglary 911 calls.

**Tuesday, June 2**

Due to the continued unrest, on June 2, Mayor de Blasio signed Emergency Executive Orders Nos. 118 and 119, extending the citywide curfew to begin three hours earlier, at 8:00 p.m., from June 2 through June 8. By 8:00 p.m. on the night of June 2, many protesters, the majority of whom were peaceful, remained outside.

---

[12] The NYPD later suspended that officer without pay following an IAB investigation.

[13] "Commercial burglary" is the crime report category for theft or attempted theft from an unoccupied business.

There were planned protests in the morning and early afternoon in various locations around the City, including: in Manhattan at the 9/11 Memorial, City Hall, One Police Plaza, Foley Square, and the Stonewall Inn in Greenwich Village; in Queens at Brookville Park in the Springfield Gardens neighborhood, Fort Totten Park in Bay Terrace, and on Steinway Street in Astoria; in Brooklyn on Grant Avenue in East New York; and in Staten Island at the 120th Precinct, which covers the North Shore neighborhoods. In the late afternoon, there were additional planned protests in Manhattan at Times Square and Bryant Park; in Far Rockaway, Queens; and in Brooklyn from the 78th precinct (located at 6th Avenue and Bergen Street in the Prospect Heights neighborhood) to Barclays Center and at McCarren Park in Williamsburg.

By around 5:30 p.m., there were approximately 4,000 to 5,000 protesters in front of Gracie Mansion on the Upper East Side in Manhattan. Around 6:00 p.m., there were approximately 1,200 protesters at Union Square Park, which grew to roughly 3,000 by about 6:40 p.m. At the same time, the Stonewall Inn event had about another 4,000 protesters. Shortly after 7:00 p.m., approximately 3,000 protesters demonstrated at Trump Tower in Midtown Manhattan, and an additional 2,000 protesters who were gathered in Foley Square in Lower Manhattan began moving west towards the West Side Highway. Shortly after the 8:00 p.m. curfew took effect, there were mass arrests in Lower Manhattan by the West Side Highway and, around 10:00 p.m. and later, around Union Square and Astor Place. Protesters at those locations reported being punched, kicked, tackled, and struck with batons. There were also several curfew-related arrests in the Lenox Hill and Upper East Side neighborhoods of Manhattan shortly after 8:00 p.m.

Meanwhile, in Brooklyn, at around 7:40 p.m., shortly before the curfew was to begin, a group of approximately 3,000 protesters left the Barclays Center and began marching on Flatbush Avenue towards the Brooklyn and Manhattan Bridges. About one-third of this initial group dispersed along the approximately one-mile route from Barclays Center to the base of the Manhattan Bridge. At around 8:30 p.m., approximately 2,000 protesters began to cross the roadway of the Manhattan Bridge heading into Manhattan. Approximately thirty minutes later, NYPD officers formed a barricade near the western end of the upper level of the Manhattan Bridge and prevented the group from entering Manhattan.

The bridge gradually filled with protesters, although the crowd remained largely peaceful. By around 10:30 p.m., after reports that the NYPD had blocked protesters on both sides of the bridge, the NYPD fully reopened the eastern end of the bridge and permitted the group to turn around and exit the bridge into Brooklyn. Most protesters then dispersed into Brooklyn; although the curfew was violated, no mass arrests were made.

While MAPC data reported 290 arrests, JOC logs reported 547 arrests. From DOI's analysis of the MAPC data, 89% (257 total) of the arrests were associated with a curfew-related top charge. Of those arrested, 51% (149 total) were white, 32% (94 total) were Black, and 12% (34 total) were Latino. NYPD documented 57 officer injuries and three damaged police vehicles. CCRB reported 30 incidents containing 339 allegations of police misconduct corresponding to this date. Although looting continued in parts of the City, there was a notable decrease in 911 calls for commercial burglaries and ATM robberies: approximately 306 commercial burglary 911 calls and approximately nine 911 calls for ATM robberies from 4:00 p.m. on June 2 to 4:00 a.m. on June 3.

## Wednesday, June 3

Protest participation increased again on June 3. Protests were widely dispersed around the City: in Manhattan at Washington Square Park and Gracie Mansion; in Brooklyn at Bedford Avenue and Eastern Parkway in Crown Heights, Maria Hernandez Park in Bushwick, and in the Bay Ridge neighborhood; in Queens at Queensbridge Park in Long Island City; and in Staten Island at the 122nd Precinct on Hylan Boulevard in Midland Beach, and at Tompkinsville Park on the North Shore.

By 5:45 p.m., there were approximately 5,000 protesters at Maria Hernandez Park. Around 6:30 p.m., a group of approximately 2,000 protesters departed the 77th Precinct on Utica Avenue in Brooklyn and headed towards Domino Park. At 6:45 p.m., approximately 5,000 protesters were gathered outside Gracie Mansion in Manhattan, who later started heading south on East End Avenue. Shortly after 7:00 p.m., groups of between 2,000 and 2,500 protesters were assembled in both Columbus Circle and outside the Barclays Center. By 7:50 p.m., the

Barclays Center group began marching down Flatbush Avenue towards the Manhattan Bridge.

At or around 8:00 p.m., the start of the curfew, there were still approximately 2,500 protesters outside the 78th Precinct, in Prospect Heights just south of the Barclays Center. Around 8:30 p.m., a large group of approximately 5,000 protesters were observed heading towards Cadman Plaza in downtown Brooklyn, near the base of the Brooklyn Bridge. Several curfew-related arrests occurred after 8:00 p.m. in the Upper East Side after a protest group departed Gracie Mansion, in Midtown East around East 54th Street and 3rd Avenue, and in Downtown Brooklyn around Cadman Plaza. At these locations, protesters reported "kettling" by police prior to arrests and that they were shoved and struck with batons.

While MAPC data reported 191 arrests, JOC logs reported 244 arrests. From DOI's analysis of the MAPC data, 94% (179 total) of the arrests were associated with a curfew-related top charge. Of those arrested, 64% (123 total) were white, 19% (37 total) were Black, and 11% (21 total) were Latino. NYPD documented 15 officer injuries and one damaged police vehicle. CCRB reported 33 incidents containing 222 allegations of police misconduct corresponding to this date. There was a significant decrease in reported looting and vandalism on the night of June 3, with 911 calls for commercial burglary returning to normal levels of fewer than 50 calls during the 12-hour period from 4:00 p.m. on June 3 to 4:00 a.m. on June 4.

**Thursday, June 4**

Although there was a continued decrease in reported looting and vandalism on June 4, NYPD made more arrests than the prior day, based mainly on curfew violations. There were several large, mobile protests throughout the day:

- Around 1:00 p.m., approximately 6,000 protesters were gathered at Cadman Plaza. By about 5:00 p.m., that group had traveled over the Brooklyn Bridge and into Foley Square in Manhattan.

- Between 2:30 p.m. and 9:00 p.m., a group of approximately 1,000 to 1,200 protesters marched from Gracie Mansion, to Columbus

**Investigation into NYPD Response to George Floyd Protests**

Circle, back to Gracie Mansion, and then to East 79th Street and York Avenue on the Upper East Side.

- Another group of approximately 3,000 protesters gathered at Grand Army Plaza in Brooklyn around 3:00 p.m., which expanded to approximately 5,000 protesters who marched on Flatbush Avenue. The group then traveled east on Rogers Avenue near the 67th Precinct in the East Flatbush neighborhood of Brooklyn.

- Around 6:00 p.m., an additional 5,000 protesters gathered at Washington Square Park in Manhattan. The group marched uptown and by 7:45 p.m., had shrunk to about 2,000 protesters and was marching south on 8th Avenue and 42nd Street in Manhattan. At 9:30 p.m., the group was at about 500 protesters and was at 53rd Street and 5th Avenue in Manhattan. Around 10:00 to 10:30 p.m., officers made a number of arrests at 60th Street and 5th Avenue and at 56th Street and 6th Avenue.

- A group of approximately 1,500 protesters gathered at the Barclays Center around 8:00 p.m., at the start of the curfew. Most of that group marched to the Manhattan Bridge and then back to the Barclays Center by around 9:45 p.m.

- Around 8:20 p.m., a group of about 3,000 protesters gathered at McCarren Park in Brooklyn and then marched eastward to Domino Park. The group eventually proceeded southeast towards Clinton Hill in Brooklyn and by around 9:50 p.m., the group had decreased to about 2,000 in the vicinity of Washington Avenue and Fulton Street.

The majority of the peaceful protest groups continued protesting well past the 8:00 p.m. curfew with initially limited NYPD intervention or arrests. By 9:00 p.m., large protest groups remained in Brooklyn, at locations around Prospect Park, the Barclays Center, and Domino Park; and in Midtown Manhattan around 5th Avenue and 53rd Street. Later in the night, NYPD arrested multiple protesters in Midtown Manhattan, and in the Brooklyn neighborhoods of Fort Greene and Williamsburg for curfew-related charges. Media and civilian observers reported use of "kettling" and force against protesters, including batons, to effectuate arrests in these areas.

As indicated by these reports, around 9:30 p.m. a group of protesters, who had marched from McCarren Park in the South Williamsburg neighborhood of Brooklyn, reported being "kettled" by NYPD officers around Wythe Avenue and Penn Street. Protesters at that location stated that the police rushed them, threw them to the ground, and struck them with batons. Multiple curfew-related arrests were made. Protesters in the Clinton Hill neighborhood of Brooklyn, around Washington Avenue and Fulton Street, also reported being "kettled" and assaulted by police just past 10:00 p.m. However, reports indicate that Councilmember Brad Lander and Public Advocate Jumaane Williams were at the scene and helped calm the situation, averting a mass arrest at this location.

Unlike some protests that continued in various parts of Manhattan and Brooklyn well after 8:00 p.m., the NYPD strictly enforced the curfew in the Bronx, after protesters marched from The Hub (the area around the intersection of East 147th Street, Willis Avenue, and 3rd Avenue) through the neighborhood of Mott Haven. Shortly before the 8:00 p.m. curfew took effect, NYPD Strategic Response Group (SRG) bicycle squad officers blocked the path of the protest group at Brook Avenue and East 136th Street. Simultaneously, another group of NYPD personnel approached from behind the protest group to enclose a larger portion of the group on a block with parked cars lining either side. Many protesters at the scene reported that officers blocked their movements leaving no opportunity to exit or disperse voluntarily. At around 8:00 p.m., officers began executing mass arrests for curfew violations, which were accomplished in part by using physical force against protesters, including striking them with batons. Among those arrested were identified legal observers, mainly from the National Lawyers Guild, and identified "medical volunteers" (not a legally defined category, but a term adopted by a number of protest or civil rights organizations to indicate those who wear insignia or other markings to show they are trained to provide medical treatment).

While MAPC data reported 278 arrests, JOC logs reported 525 arrests. From DOI's analysis of the MAPC data, 75% (209 total) of the arrests were associated with a curfew-related top charge and 22% (61 total) were associated with a public disorder-related top charge. Of those arrested, 66% (185 total) were white, 18% (49 total) were Black and 14%

(38 total) were Latino. NYPD documented 26 officer injuries and no damage to police vehicles. CCRB reported 39 incidents containing 357 allegations of police misconduct corresponding to this date. Burglary calls received by 911 were within normal levels on this date.

### Friday, June 5

By June 5, while protests continued, arrests began declining. In early afternoon, Staten Island saw several small gatherings of peaceful protesters. Between 1:00 p.m. and 4:30 p.m., approximately 100 protesters gathered near the courthouse complex on E. 161st Street in the Bronx. Between 4:00 p.m. and 8:40 p.m., a peak of about 200 protesters marched from Sutter Avenue and Lincoln Avenue to the nearby 75th Precinct in East New York, Brooklyn. Between 9:00 p.m. and 11:00 p.m., around 2,000 protesters participated in a "March for Jamel Floyd,"[14] which began in Sunset Park in Brooklyn and went to the Metropolitan Detention Center, a federal jail on the waterfront approximately 14 blocks away.

While MAPC data reported 41 arrests, JOC logs reported 129 arrests. From DOI's analysis of the MAPC data, all 41 of the arrests were associated with a curfew-related top charge. Of those arrested, 51% (21 total) were white, 20% (8 total) were Black, and 15% (6 total) were Latino. NYPD documented four officer injuries and three damaged police vehicles. CCRB reported five incidents containing 25 allegations of police misconduct corresponding to this date.

### June 6, 2020 to June 20, 2020

On June 6, there were further declines in NYPD enforcement activity as peaceful protests continued in the City. Notable demonstrations included a march which began on Central Park West and marched south to Washington Square Park, peaking at approximately 10,000 protesters; a sit-in at Van Cortlandt Park in the Bronx which peaked at approximately 1,500 attendees; and another approximately 1,500 protesters who marched in Washington Heights, from Mitchel Square Park to Dyckman Avenue and Broadway. NYPD issued 58 summonses related to protest activities or curfew orders. On June 7, Mayor de Blasio

---

[14] Jamel Floyd (no relation to George Floyd) was an inmate in the federal Metropolitan Detention Center in Brooklyn, who died on June 3, 2020, after being pepper-sprayed by jail staff.

ended the curfew a day earlier than initially planned. Largely peaceful gatherings were held throughout the day, and NYPD arrests for protest-related activity dropped dramatically.

Between June 8 and June 20, New York City continued to have large protests, mostly without the confrontations between police and protesters that had happened in the previous week. For this period, NYPD recorded 24 arrests related to protest activity, three officer injuries, and damage to 15 police vehicles.

## C.    Overall Data on the Protests

As part of its review, DOI made several data requests to the NYPD pertaining to the Floyd protests. These data requests included, but were not limited to, figures related to arrests and summonses, protester and officer injuries, misconduct complaints from members of the public, and damage to Department property. DOI also requested CCRB data concerning allegations of police misconduct against protesters.

**NYPD data**

With respect to arrest data, DOI did not receive a single data source reporting a complete count of arrests identified as relating to the protests. Rather, DOI located four separate sources of data in NYPD's production of records that reported arrest figures related to the Floyd protests:

1. *MAPC data.* NYPD spreadsheets reflected the processing of arrests during the protests through its MAPCs.

2. *JOC logs.* These logs, which provided a daily chronology of protest-related activity, included the number of arrests for each day identified by the JOC. DOI was informed that the JOC data included MAPC arrest information and arrests that were processed at precincts or by other units and reported to the JOC.

3. *Intelligence Bureau summary.* A document composed by the NYPD Intelligence Bureau included two charts: one depicting the daily protest-related arrests and the other depicting the daily summonses from May 28 to June 8.

4. *NYPD spreadsheet titled "Protest Related Activity May 28 [T]hrough June 7."* This spreadsheet included a daily listing of arrests and summonses from May 28 to June 7.

As set forth in the table and graph below, each of these sources reported different total arrests on a daily basis. These differences appear to be the result of their different sources or collection methods.[15] For example, MAPC data was limited to arrests processed through the centers, while JOC logs contained additional sources of arrest data. Some of these sources distinguished arrests from summonses, while other sources did not make this distinction.

| Four Sources of NYPD Arrest Data for Floyd Protests | | | | |
|---|---|---|---|---|
| Date | MAPC Arrest Data | Joint Operations Center Logs | Intel SITREPS | NYPD Spreadsheet |
| 5/28/2020 | 75 | 73 | 35 | 25 |
| 5/29/2020 | 218 | 204 | 87 | 49 |
| 5/30/2020 | 321 | 345 | 97 | 73 |
| 5/31/2020 | 325 | 349 | 78 | 67 |
| 6/1/2020 | 308 | 643 | 385 | 479 |
| 6/2/2020 | 290 | 547 | 229 | 260 |
| 6/3/2020 | 191 | 244 | 45 | 39 |
| 6/4/2020 | 278 | 525 | 84 | 84 |
| 6/5/2020 | 41 | 129 | 9 | 4 |
| 6/6/2020 | N/A | 88 | 7 | 2 |
| 6/7/2020 | N/A | 3 | 5 | 2 |
| 6/8/2020 | N/A | 3 | 0 | N/A |
| 6/9/2020 | N/A | 2 | N/A | N/A |
| 6/10/2020 | N/A | 0 | N/A | N/A |
| 6/11/2020 | 1 | 1 | N/A | N/A |
| 6/12/2020 | N/A | 0 | N/A | N/A |
| 6/13/2020 | N/A | 0 | N/A | N/A |
| 6/14/2020 | N/A | 1 | N/A | N/A |
| 6/15/2020 | N/A | 3 | N/A | N/A |
| 6/16/2020 | N/A | 0 | N/A | N/A |
| 6/17/2020 | N/A | 1 | N/A | N/A |
| 6/18/2020 | N/A | 1 | N/A | N/A |
| 6/19/2020 | N/A | 4 | N/A | N/A |
| 6/20/2020 | N/A | 2 | N/A | N/A |

[15] In addition, the sources provided arrest data for different date ranges. The table indicates "N/A" for instances where the particular data source did not report arrest numbers.

**Investigation into NYPD Response to George Floyd Protests**



Although MAPC arrest data does not represent a total accounting of NYPD arrests during the Floyd protests, this data included additional information that allowed DOI to analyze details about these arrests beyond the totals, including the top charge category and the race of the arrestee. DOI analyzed 2,048 arrests reflected in the NYPD's MAPC data. These arrests included 10 days of data from May 28, 2020 through June 11, 2020.[16] NYPD's data contained information such as the arrestee race,[17] gender, age, offense details, the location, date, and time of arrest.[18] This data analysis offers insight into the enforcement decisions and demographic impact of the NYPD's policing of the Floyd protests.

---

[16] There were no MAPC arrests from June 6-10. Additionally, there was only one arrest on June 11.

[17] Various NYPD personnel input arrestee racial data into NYPD's system. NYPD has a "Black," "Black Hispanic," "White," "White Hispanic," "Asian/PAC ISL," and "American Indian" racial category. NYPD's system does not have a "Hispanic" category, but rather, combines "White Hispanic" and "Black Hispanic" to report such information. Additionally, more than one category cannot be selected for a single arrestee.

[18] Protest arrestees were confined for various lengths of time after an arrest. The MAPC data included "arrest date," "arrest time," and "release time," but lacked a "release date" column. Without a "release date," it is unclear whether an arrestee's confinement continued into the following day.

**Investigation into NYPD Response to George Floyd Protests**



There were a total of 2,047 arrests processed May 28 through June 5 including 75 (3.7%) on May 28; 218 (10.6%) on May 29; 321 (15.7%) on May 30; 325 (15.9%) on May 31; 308 (15%) on June 1; 290 (14.2%) on June 2; 191 (9.3%) on June 3; 278 (13.6%) on June 4; and 41 (2%) on June 5.

NYPD made 166 felony, 1,002 misdemeanor, and 851 violation arrests that it processed through a MAPC.[19]

---

[19] DOI did not track the disposition of these cases once they were presented to prosecutors, so it is unclear how many of these arrests translated into criminal charges beyond the arrest (whether by complaint or indictment).

**Investigation into NYPD Response to George Floyd Protests**



While a small percentage (8%) of the total arrests were for felony charges, a disproportionate number of the felony arrestees were Black.[20] For context, although 38.4% of the total arrestees were Black, 68% of arrestees for felonies were Black. The racial breakdown of arrestees is presented below.[21]



---

[20] DOI did not conduct an analysis to identify which variables contributed to the disproportionate number of felony arrestees who were Black. Without additional information, DOI could not account for the range of factors that could potentially interact in officer determinations to charge a particular arrestee with a felony in individual cases.

[21] For context, the overall City population is 24.3% Black, 42.2% white, 29.2% Latino, 14.2% Asian, 0.5% American Indian and Alaska Native, and 0.10% Native Hawaiian and other Pacific Islander . However, there are no reliable statistics on the racial breakdown of participants in the Floyd protests.

With respect to injuries, NYPD records documented 386 officer injuries from May 28 to June 11, such as injuries from thrown bricks or bottles. NYPD also documented protester injuries, such as lacerations and bruises. However, NYPD records are not a reflection of the universe of protester injuries. Reports on social media and in the press showed numerous protester injuries, some at the hands of police. But protesters do not necessarily report their injuries to the NYPD. One NYPD spreadsheet documented only 108 protester injuries from May 28 to June 7. As noted earlier, although NYPD has other records such as medical treatment forms for arrestees, which indicate a higher number of protester injuries, this information has limited utility for quantification of protester injuries. It covers only injuries to arrestees, as opposed to injuries to protesters who were not arrested, and does not clearly distinguish protest-related arrests to allow further meaningful analysis.

### CCRB data

CCRB's mandate is to investigate public complaints alleging Force, Abuse of Authority, Discourtesy, and Offensive Language (FADO) by uniformed members of NYPD. CCRB received 1,646 protest-related allegations associated with 248 incidents occurring between May 28 and June 20, 2020. Force allegations comprised the largest number of allegations (1,052 in total), followed by Abuse of Authority (368 in total), Discourtesy (185 in total), and Offensive Language (41 in total).[22] The below chart reflects the timing of these allegations across the dates of the Floyd protests.[23]

---

[22] CCRB substantiates FADO allegations when there is a preponderance of evidence supporting the finding. If CCRB substantiates a FADO allegation, the matter will proceed to NYPD's disciplinary process, and the final determination is made by the Police Commissioner.

[23] IAB received 358 allegations from May 29 to June 7 relating to the protests: 139 allegations for damaged NYPD property, 74 allegations for use of force, 76 allegations for missing equipment, 22 allegations for Department rules violations, and 47 miscellaneous allegations, which includes discourtesy, abuse of authority, and other allegations.

**Investigation into NYPD Response to George Floyd Protests**



## D.    DOI's Investigative Findings

By any measure, the first ten days of the Floyd protests in New York City presented an extraordinary policing challenge. Even with advance scheduling and coordination, policing protests can be difficult.[24] The Floyd protests arose in circumstances that did not allow for such planning and coordination with the police for crowd management, and they were happening simultaneously in widely dispersed areas of the City. Emotions ran high among protesters and in some cases spilled over into abuse and violence directed at police officers on duty, which this Report does not excuse or condone. Some police officers engaged in actions that were, at a minimum, unprofessional and, at worst, unjustified excessive force or abuse of authority. But the problems went beyond poor judgment or misconduct by some individual officers. The Department itself made a number of key errors or omissions that likely escalated tensions, and certainly contributed to both the perception and the reality that the Department was suppressing rather than facilitating lawful First Amendment assembly and expression.

Comprehensive studies of protest policing have highlighted the substantive importance of public perceptions of police conduct:

> Police choices in handling protests can have far-reaching effects. Research shows that when citizens view police officers using fair and respectful procedures, they are more likely to support and cooperate with the police, comply with their directives, and obey the law. When a police officer is seen as unnecessarily impatient, rude, brutal, or otherwise unfair in dealing with a protester, people are more likely to

---

[24] Edward R. Maguire & Megan Oakley, Harry Frank Guggenheim Foundation, Policing Protests: Lessons from the Occupy Movement, Ferguson & Beyond: A Guide for Police 18-19, 80 (2020), *available at* https://www.hfg.org/Policing%20Protests.pdf (noting that some protesters can be disobedient, rude, hostile, and engage in attempts to provoke officers into arresting or using force against them, that dealing with offensive or even threatening behavior is frustrating, stressful, and at times frightening for police officers, and that police leadership must be mindful of the wellness and mental health of officers working long hours under such physically and emotionally exhausting conditions). The Maguire & Oakley report is based on extensive interviews and evaluations of more than two dozen police departments around the country, survey research on participants in the Occupy protests in a number of different cities, and a comprehensive assessment of the academic and research literature on crowd psychology and policing. Where this and other similar publications are cited in this Report, we have not included internal citations to the other authorities relied on by their authors.

view the police (and the law more generally) as illegitimate.[25]

The intertwined questions of procedural fairness and legitimacy—the extent to which people view an institution as having rightful authority—are also important beyond the immediate protest context. When people view police as behaving in a way that is procedurally fair or just, they are more likely to view the exercise of police authority in general as legitimate. Conversely, where they think the police act unfairly, they are more likely to resist police instructions or authority generally, and even support the use of violence to do so. Fair treatment thus not only encourages lawful behavior but also may improve officer safety and effectiveness.[26]

### Finding 1: NYPD Lacked a Clearly Defined Strategy Tailored to Respond to the Large Scale Protests of Police

In interviews, NYPD executives and officials consistently articulated that the Department's official approach and policy for policing protests is to facilitate the right of free expression by protesters and to exercise control of the crowd and public space, as necessary, to prevent violence or property damage. They acknowledged that the Floyd protests posed unique tactical challenges for the NYPD due to the simultaneous, large-scale nature of the protests across multiple locations in the City. However, few seemed to grapple with the fact that the protests' core critique of police action would pose additional challenges for whether the NYPD as an institution could perform its usual functions in a way that the public would view as fair and legitimate. Indeed, other than to inform intelligence gathering, discussed below, the fact that the target of the protests was policing itself does not appear to have factored into the Department's response strategy in any meaningful way.

DOI found that the NYPD engaged in planning that was broadly consistent with its policies relating to policing any large event.[27] NYPD executives were responsible for overall response planning and consulted with field supervisors during protests. Officials explained that the

---

[25] MAGUIRE & OAKLEY at 9-10.

[26] *Id.*

[27] *See* New York City Police Department, Patrol Guide, § 213-11 "Policing Special Events/Crowd Control."

highest ranking officer on the scene, often the borough or incident commander, had wide latitude over the utilization of available resources, strategies for policing particular protests, and judgments regarding enforcement action. The Operations Division received requests for resources through its Joint Operations Center and coordinated the allocation of resources for field deployment with commanders. The SRG, a highly trained unit of approximately 700 officers within the Special Operations Bureau, responded to the protests. In addition to the reliance on officers assigned to the Patrol Services Bureau, the Department also utilized other internal resources, including from the Intelligence Bureau, Special Operations Bureau, Technical Assistance Response Unit, Aviation Unit, and Legal Bureau.

Interviews and records revealed several additional actions taken by the NYPD to expand its deployment of resources to the protests after the first two days, particularly the following:

- On May 30, patrol officers working the day tour (typically 8:00 a.m. to 4:00 p.m.) were "held over" to police demonstrations on the night of May 30, and the Department modified the majority of officers' tours to twelve-hour shifts by June 2.

- The Department also created 30 additional Mobile Field Forces, which are rapidly deployable teams consisting of one lieutenant, five sergeants, and 40 police officers, beginning on May 31. One official reported that the Chief of Patrol, along with other senior officials, participated in briefings of these mobile teams at Randall's Island to provide instructions for deployments across the City. Another official explained that the Mobile Field Forces operated under the SRG's command.

- On June 2—several days after the protests began—the Police Commissioner directed "activation" of the Operations Division's JOC. DOI interviewed an official who stated that the JOC had been addressing resource requests since the beginning of the protests, but activation of the JOC triggered the commitment of additional resources to the JOC for the coordination of the citywide response. The official explained that the limited number of protests in the initial days, as well as COVID-19 safety concerns related to filling the JOC office with personnel, factored

into the Operations Division's previous decision not to activate the JOC.

These actions reflect a shift in the NYPD's initial strategy from the standard protest response relying on normal large event and patrol borough resources, to an increased police officer deployment and presence at the demonstrations.

Although the NYPD committed substantial resources to policing the protests, multiple officials stated that the Department's initial deployment of officers at the beginning of the protests was inadequate. The views of senior officials on this point were echoed by a number of police officers interviewed by CCRB as part of their protest-related complaint investigations to date, in which officers commented on the lack of sufficient personnel, including supervisors. The officers further noted the chaos and confusion created by both the staffing issues and deployments to unfamiliar places, with unfamiliar colleagues and unfamiliar supervisors.

NYPD officials reported that the Department did not anticipate the vast number of participants in the protests. In addition, officials described an unexpected amount of violence directed at officers, destruction of police property, and concurrent criminal activity while the protests were ongoing, including looting. Insufficient staffing, in both numbers and training, in the first few days, combined with the lack of coordinated strategy, likely contributed to overwhelmed and exhausted front-line police officers, creating conditions that increased the likelihood of poor judgment, unprofessional behavior, and unjustified use of force.[28]

---

[28] Research suggests that police action that is perceived as overly aggressive against protesters can increase the risk of confrontation, as moderate participants become more likely to shift their sympathy towards more radical participants who may be inclined towards police-directed violence. "[W]hen protest participants view themselves as engaging in peaceful and constitutionally protected behavior and police view them as a threat to public order or public safety. . . . [it can become] a self-fulfilling prophecy in which people thought to be disorderly and unruly become significantly more defiant and rebellious in response to shared perceptions about the way the police treat them." *See* MAGUIRE & OAKLEY at 44-45, 49-50. This dynamic may have made it even harder for the Department to recover from the mistakes and negative interactions in the earliest days of the Floyd protests, even if their subsequent response had been perfect (which it was not). The widespread use of social media no doubt amplified this problem, as those closely following the protest activity were influenced by reports of police misconduct even though they did not personally observe them.

DOI reviewed information, and heard police testimony, documenting that there were acts of violence and property damage, as well as looting. However, the majority of protesters peaceably exercised their rights to assemble, associate, and speak, and individuals seemingly unaffiliated with the protests used the opportunity to engage in looting. DOI interviewed several civilian witnesses who confirmed that most protesters acted in a peaceful manner. A number of NYPD officials, while noting incidents of violence, affirmed that the majority of protesters were nonviolent. Other evidence, such as available video, media reports, and testimony before the New York Attorney General, further confirms the mostly peaceful nature of the protests. In addition, while arrest data is not necessarily an apt basis for determinations about whether protests are peaceful—because arrests during protests are often for nonviolent offenses—a comparison of estimated participants and arrests shows that the vast majority of protesters were not subject to arrest during the Floyd protests.

Still, NYPD officials characterized the scope of violence, the looting, and the hostility toward police as a significant difference from past large demonstrations in the City. The NYPD thus shifted its approach toward an increased, targeted mobilization of resources during the course of the protests. NYPD officials credited the additional deployments of resources with enhancing the Department's response and helping reduce violence, property damage, and criminal activity after the first several days of protest activity. Whereas NYPD officials acknowledged shortcomings in its initial deployments, the majority of NYPD officials interviewed by DOI did not otherwise identify any flaws in the Department's planning or performance. When DOI asked NYPD officials whether, in retrospect, the Department could have done anything else differently and made any further changes to improve its response to the protests, with few exceptions, officials offered none. While some difference in views is to be expected, the wide gap between the apparent views of the Department's most senior officials and the views of members of the public who participated in the protests is troubling.

Moreover, DOI found that the NYPD lacked a particularized strategy tailored to respond to the inevitable tension between police and participants at the Floyd protests, where policing itself was the subject of scrutiny. First, DOI's review of NYPD policies revealed that the

Department does not have a policy specific to policing protests or First Amendment-protected expression. Rather, the NYPD Patrol Guide covers demonstrations in policies related to policing of "special events," such as parades; "emergency incidents," such as civil disorder; or "unusual disorder," such as riots. Though some of these policies note the role of police in facilitating protest rights, they fail to distinguish issue-driven First Amendment expression from other types of events. Further, CAU staff reported that the protests took a variety of forms—for example, marches, rallies, and vigils—and protesters were heterogeneous, insofar as they represented a diversity of views and behaviors with respect to the act of protest. The NYPD's overall strategy or planning did not appear to take this heterogeneity into account, relying instead on the use of "discretion" by officers and supervisors responding to facts and circumstances on the ground. While discretion in determining appropriate enforcement response can be a valuable feature of policing, that discretion was not always deployed effectively or proportionally during the Floyd protests.

Second, based on its assessments of events and threats, the NYPD's primary strategy appears to have involved application of disorder control tactics and methods. As noted above, the NYPD responded by deploying substantial police resources, including specialized disorder control units such as the SRG.[29] Under former Commissioner William Bratton, the NYPD created the SRG in 2015 to have a specialized unit dedicated to disorder control and counterterrorism. Reporting at the time of SRG's creation indicated internal discussion within NYPD as to the propriety of using SRG, a unit specially trained for serious disorder and counterterrorism, to respond to First Amendment activity such as protests. Nonetheless, the SRG has since been a primary resource for the NYPD's response to large-scale protests. In fact, one of the missions of the SRG is to "[r]espond to citywide mobilizations, civil disorder and major events with highly trained personnel and specialized equipment to maintain public order."[30]

---

[29] SRG has one unit in each of the City's five boroughs, and also includes the Disorder Control Unit (DCU). As explained by NYPD officials, DCU is a small unit that provides training for SRG officers and assists with deployment for disorder control operations.

[30] New York City Police Department, March 2020 Strategic Response Group Guide, at 10 (2020).

Though intended to preserve public safety, the disorder control response likely exacerbated tensions during protests about policing. NYPD trains SRG officers to use different tactical formations, such as line, separation, and lateral support formations, to control crowds. One of these formations uses "encirclement" tactics to surround a crowd, which individuals outside the Department have called "kettling." Disorder control also relies on the use of mass arrests, bicycle squads, and other tactics to enforce crowd control. These deployments, tactics, and shows of force may have unnecessarily provoked confrontations between police and protesters, rather than de-escalating tensions.[31]

"A key aspect of effective police response to protests is *facilitation*. Police often view protests and other public order events from the vantage point of how to control, regulate, or manage people. . . .[this is understandable but] when people have legitimate, constitutionally protected aims, the perception that police are overcontrolling or micromanaging them can give the impression that police are simply trying to limit or prohibit legitimate behavior. Protesters tend to have a heightened sense of grievance that can easily be turned toward the police."[32] This dynamic is all the more critical when the object of the protest activity is criticism or grievance against the police themselves. When police have both a mindset and a strategy of facilitating First Amendment expression to the greatest extent possible consistent with public safety, rather than a mindset or strategy focused on controlling, regulating, or quashing such expression, they can reduce conflict and violence, which benefits public safety, officer safety, and police-community relations.[33] While NYPD officials asserted in interviews that they believed the Department's role in policing protest was to facilitate that activity, the actual strategy and tactics employed were inconsistent with this role in significant part.

A "facilitation mindset" that also protects public safety requires that the policing strategy employ a differentiated approach—in other words, to actively facilitate peaceful and lawful protest even while taking

---

[31] Comprehensive assessments of protest policing have concluded that, contrary to outdated models of protest policing that rely on force, and the show of force, to achieve compliance, "[b]eyond merely complying with constitutional standards, fair and effective protest policing strategies attempt to secure voluntary compliance without triggering defiance or rebellion among protesters." MAGUIRE & OAKLEY at 11.

[32] *Id.* at 13.

[33] *Id.* at 13.

**Investigation into NYPD Response to George Floyd Protests**

enforcement action against people engaged in violence or property destruction. A differentiated response has three key components: (1) arrest sparingly (mass arrests of protest participants are rarely productive); (2) use force as a last resort; (3) wherever possible, avoid use of overly restrictive physical barriers and other crowd containment measures. The goal of differentiation is for police action under this model to, wherever possible, impose a burden only on those actually engaged in criminal activity.[34] In our interviews, a number of NYPD officials referred to these concepts in various ways, including, for example, discussing the challenges created for policing when a large-scale protest has interlocking or "laddered" groups (in descending order, (i) the general public who care about the issue but are rare or occasional participants in protest activity; (ii) organized traditional issue groups with members who are experienced protesters; (iii) radical or fringe groups who eschew coordination with authority and may affirmatively advocate violence or property destruction; and (iv) non-ideological opportunists (e.g. looters)). But, as with the assertions of a facilitation role, these conceptual understandings did not appear to translate into the Department's strategy for responding to the Floyd protests.

The Department's public messaging, at times, further reinforced the tensions created by the response strategy, by calling attention primarily to violence and looting without simultaneous acknowledgment of the pain and anger that gave rise to the protests, or due regard for the many individuals airing their grievances with the government in a peaceful manner.[35] Such public statements were counterproductive to healing the division between police and community that was on display during the protests, and undercut the authenticity of other public statements that did recognize the concerns and the rights of protesters. They also risked

---

[34] *Id.* at 13, 50, 76-77. *See* POLICE EXECUTIVE RESEARCH FORUM, THE POLICE RESPONSE TO MASS DEMONSTRATIONS: PROMISING PRACTICES AND LESSONS LEARNED, WASHINGTON, DC: OFFICE OF COMMUNITY ORIENTED POLICING SERVICES 16-21 (2018), *available at* https://www.policeforum.org /assets/PoliceResponseMassDemonstrations.pdf (hereinafter POLICE RESPONSE TO MASS DEMONSTRATIONS). A key challenge to differentiated strategy is concern for officer safety should a situation escalate quickly—research suggests that the best answer is to plan for a graded response with tactical resources available nearby, out of sight of the protest activity. In other words, hidden from view so as not to escalate a situation counterproductively, but available and able to respond rapidly. *Id.* at 3-5; MAGUIRE & OAKLEY at 14.

[35] *See, e.g.,* Dermot Shea (@NYPDShea), Twitter (May 31, 2020, 8:45 AM); *compare* discussion and examples of the Twitter feed of Chief Thomas Nestel III of the Philadelphia transit agency during the protests in Philadelphia following the death of Freddie Gray in police custody in Baltimore. MAGUIRE & OAKLEY at 73-74.

**Investigation into NYPD Response to George Floyd Protests**

detracting from the numerous positive contributions to community engagement during the Floyd protests, such as instances where NYPD executives or officers took a knee with protesters, joined marches, intervened to stop mass arrests, or otherwise proactively and publicly communicated with community members to hear their perspective. These laudable efforts at de-escalation and engagement were often overshadowed by public statements and control tactics that failed to distinguish protesters from unlawful actors and treated the protests themselves as a threat to public order requiring a firm police response.

Internal messaging to officers can play an equally important role. DOI's investigation found little coordinated effort to reinforce to officers the Department's asserted values of defending First Amendment expression. DOI spoke to one former police executive who had served as the chief of two different large urban police departments. He recalled how, after the Occupy protests in 2011 had taken on an anti-police cast, he recorded roll call messages for each shift during the protests that emphasized to front-line officers these core values: (i) the protesters are not your enemy; (ii) they are exercising their constitutional rights; (iii) the Constitution belongs to everyone, including you and including those expressing views you may not like; and (iv) protecting and defending constitutional rights is your duty and your honor. A similar strategy was endorsed by the Police Executive Research Forum in their 2018 report *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*. The report emphasized the importance of communicating clear messaging (both internally and externally) to ensure that "all officers understand that their role is to facilitate demonstrators' First Amendment rights while protecting public safety. In addition, the police should also convey this message to the public so community members know that police officers understand their role."[36] While effective messaging is not a panacea, nor is it merely window dressing. Beliefs shape behavior, and consistent statements of positive values can help to de-escalate tensions, open channels of communication with demonstrators, and help officers manage the increased stress of dealing with protesters who are hostile or antagonistic towards the police.[37]

---

[36] POLICE RESPONSE TO MASS DEMONSTRATIONS at 1.
[37] See, e.g., id. at 22-25.

As discussed further below, several additional factors undermined the NYPD's ability to respond effectively to the protests, including the application of disorder control tactics, inconsistent curfew enforcement, overbroad reliance on intelligence to justify disproportionate policing decisions, the deployment of officers lacking recent training for protest response, and the inadequate usage of Community Affairs officers.

### Finding 2: NYPD's Use of Force and Control Tactics to Respond the Floyd Protests Produced Excessive Enforcement That Contributed to Heightened Tensions

#### A.    NYPD's Disorder Control Response and Tactics

Participants in the Floyd protests expressed strong feelings of outrage and pain about police-involved killings, deeply held beliefs about systemic racism in law enforcement, and passionate calls for police reform. As noted above, the majority of protesters peaceably exercised their rights to assemble, associate, and speak.

Even so, during the course of the protests, numerous police officers were the target of violence, such as assaults and thrown objects, and suffered injuries, some of them serious. In addition, there was significant damage to police property, such as instances of incendiary devices thrown at police vehicles, graffiti on police vehicles, and attempts to cause damage at police precincts. Moreover, many stores and businesses were subject to looting. The First Amendment does not protect violence towards police officers or wanton property destruction and theft. Although there were some fringe groups and individual actors actively encouraging violence and property destruction, primarily on social media, the groups taking a leadership role in organizing the protests did not appear to be organizing or directing violence of any kind. In particular, the looting activity that alarmed both the public and the police appeared to be driven by opportunistic individuals with no clear ideological connection to the protests, taking advantage of chaos and an overwhelmed police force.

In this context, after the initial days of the protests included episodes of violence, property damage, and looting, the NYPD primarily pursued a disorder control response to the protests. NYPD policies and trainings refer to "unusual disorders" or "civil disorders" as mass unlawful

**Investigation into NYPD Response to George Floyd Protests**

actions.[38] "Disorder control" refers to strategies or tactics to restore order.[39] NYPD deployed both officers with special training in these tactics, such as SRG, and regular patrol officers for this purpose. Many of the officers had militarized equipment and uniforms, which one witness described as "riot gear."

NYPD had valid concerns about preventing violence, property damage, or looting that transpired during the early period of the Floyd protests. Yet by adopting a broad disorder control approach focused on force, control, and arrests, the NYPD gave insufficient attention to the need to balance the important objective of preventing additional violence and damage with the imperative of protecting citizens' rights to engage in lawful protest. This approach inevitably led to instances where NYPD officers acted indiscriminately as between lawful, peaceful protesters and unlawful actors, thereby exercising force beyond what was necessary under the circumstances. Further, the size and appearance of the force gave the NYPD response an intimidating, confrontational character, which contributed to rather than reduced tensions between the police and the crowds, provoking additional violence.[40]

Current research on the intersection between crowd psychology and policing has demonstrated that by "treating entire crowds as dangerous and indiscriminately denying participants the opportunity to express

---

[38] *See* New York City Police Department, Police Academy, Chapter 11, Maintaining Public Order Instructor Guide at 30 (2014). As noted, a riot is a form of civil disorder, but not the only one. *See id.*

[39] *See, e.g.*, New York City Police Department, Mounted Unit Disorder Control Plan at 5 (2020) ("The Mounted Unit's anticipated response to unusual disorders is primarily for *DISORDER CONTROL*. The Mounted Unit may be used for crowd control, but incident commanders need to make distinctions between simple crowd control (the need to maintain efficient movement of persons at parades, scheduled events, concerts, and large peaceful gatherings) and DISORDER CONTROL (the need to restore lawful order to ensure safety and reestablish the peace).")

[40] *See* PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING, FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING, WASHINGTON, DC: OFFICE OF COMMUNITY ORIENTED POLICING SERVICES 25 (2015) (hereinafter FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING) ("2.7 Recommendation: Law enforcement agencies should create policies and procedures for policing mass demonstrations that employ a continuum of managed tactical resources that are designed to minimize the appearance of a military operation and avoid using provocative tactics and equipment that undermine civilian trust. Police should emphasize protection of the First Amendment rights of demonstrators and effective ways of communicating with them."). The Task Force went on to note that responses to protest activity should prioritize de-escalation and promote a "guardian mindset" among officers: recommending regular patrol uniforms, avoiding riot gear wherever possible, and avoiding military-style formations. The visual effect of military-style equipment and staging can cause problems rather than deter them. *Id.*

themselves, police can inadvertently lead moderate members of a crowd to align with more radical members against the police."[41] Rather, effective protest policing focuses traditional enforcement action only on violence or property destruction that requires immediate attention, while making clear to other participants that the police will facilitate free expression as long as they are peaceful and law-abiding (not including public order offenses inherent to protest activity such as pedestrians marching in the street, or crowds assembling without a permit). A targeted response that does not criminalize the entire crowd or exert "unreasonable control" over an entire crowd, can in fact help to prevent conflict.[42]

Examples of the NYPD's protest response include:

*1.    Encirclement / "kettling".* Protesters complained that NYPD officers used formations to block their movements or surround them, calling the practice "kettling." DOI interviewed NYPD officials who claimed not to be aware of the term "kettling" or its meaning, at least until the term's use during and after the Floyd protests. DOI reviewed records describing one disorder control formation as "encirclement," which appears to be what the public and media calls "kettling." NYPD's policy and training documents suggest limited circumstances warrant tactical use of encirclement, such as when officers plan to make multiple arrests.[43] NYPD officials stated that protesters generally should be and were offered opportunities to leave when within a police formation. However, reports indicate that, in several instances during the Floyd protests, at least some protesters were unable to leave the formations

---

[41] MAGUIRE & OAKLEY at 12; *see also* POLICE RESPONSE TO MASS DEMONSTRATIONS at 3-6.

[42] MAGUIRE & OAKLEY at 55. A common view in policing is that "facilitation" ends when any portion of a crowd becomes violent or destructive. *See id.* At 62-63. To the contrary, this is when facilitation becomes most important. Police should explain when enforcement action or limits are happening and why, and maximize efforts to ensure that peaceful and lawful members can continue to protest without restrictions. A "[c]lear indication that police are supporting collective aims (and that violence endangers them) can make the difference between escalation and de-escalation." *Id.* at 63. Only where large portions of a crowd turn riotous (violent, destroying property, or looting) should police declare an unlawful assembly or enforce a curfew. *Id.*

[43] New York City Police Department, SRG Field Force Operations Module Number 6: Encirclement Formations Instructor Guide at 5 ("An Encirclement formation is utilized when there is a need to take a group of people into custody.").

**Investigation into NYPD Response to George Floyd Protests**

prior to being arrested, although there was no evidence of other criminal activity beyond a curfew violation or physical presence.[44]

2.      *Mass Arrests*. As noted above, there were instances where the NYPD took a significant number of protesters into custody at the same time through a mass arrest, including but not limited to lower Manhattan and Union Square on June 2, in East Williamsburg, Brooklyn on June 4, and Mott Haven, Bronx on June 4. From news reports, testimony to the New York State Attorney General's Office, and through other sources, there were several complaints made related to the mass arrest procedures during the Floyd protests. Those arrested frequently complained that their flex-cuffs were too tight and caused pain or damage—with some alleging long-term nerve damage—to their wrists or hands. When voicing those concerns to their arresting officers or other officers in the area, arrestees were told that the officers lacked the necessary equipment to remove the flex-cuffs. Arrestees therefore had to wait, oftentimes for long periods, until they got to their respective arrest processing center so that flex-cuffs could be removed. Those arrested also reported that, upon arrival to their arrest processing center, they were denied free calls to legal counsel or family, kept in custody for extended periods, oftentimes in crowded cells, and denied personal protective equipment to include face coverings and hand sanitizer. Several arrestees additionally reported that their personal property was destroyed or confiscated during mass arrests related to the protests.

3.      *Use of Force*. In addition, there were allegations of individual instances of excessive force, some widely reported, such as the police vehicle in Brooklyn driving into a crowd, excessive use of batons, and use of pepper spray. CAU staff in the field during the protests confirmed observing instances that they believed to constitute disproportionate force by officers, including punching, kicking, tackling, or using batons to strike protesters. Some CAU staff described certain police actions as lacking apparent justification. NYPD executives noted their agreement with disciplinary action against officers involved in particular reported incidents. Other than these few incidents, NYPD officials did not believe officers engaged in widespread excessive force during the protests.

---

[44] *See* POLICE RESPONSE TO MASS DEMONSTRATIONS at 27 ("Do not encircle the crowd and then order them to disperse. Ensure demonstrators have paths to disperse.").

Investigation into NYPD Response to George Floyd Protests

Rather, NYPD officials considered officers' actions to show restraint as a whole and proper use of force warranted by the circumstances. While assessments of whether individual officers used excessive or unjustified force in specific incidents await the conclusion of disciplinary investigations, there can be no question that NYPD officers employed force against protesters on numerous occasions that observers on the scene (whether CAU members, members of the media, or others) perceived to be unjustified by the circumstances.

4.    *Pepper Spray*. There were reports of improper or excessive use of pepper spray, including on elected officials at Barclays Center on May 29, on a protester who had a face covering pulled down by an officer before being sprayed, and an officer who indiscriminately sprayed a group on June 1 in Midtown Manhattan. NYPD policy states that pepper spray "may be used when a member reasonably believes it is necessary to effect an arrest of a resisting suspect, for self-defense or defense of another from unlawful force, or to take a resisting emotionally disturbed person into custody." The policy further specifies that officers should "[a]void discharging pepper spray indiscriminately over a large area for disorder control."[45] The Chief of Department stated that SRG members are authorized to utilize pepper spray for crowd control if approved by a supervisor, and that he approved its use on protesters at the Barclays Center after injuries to officers.[46]

5.    *Legal Observers, Medics, and Journalists*. Numerous media reports, along with reports and letters from nongovernmental organizations, noted detentions and arrests of legal observers, medical volunteers, and journalists during the Floyd protests.

While not the only instance of alleged interference with legal observers, the NYPD response at Mott Haven resulted in the detention of legal observers, who were reportedly zip tied and shoved to the street, when police executed mass arrests for curfew violations.[47] The Chief of

---

[45] New York City Police Department, Patrol Guide, § 212-95 "Use of Pepper Spray Devices" at 1-2.

[46] *Id.* at 2 ("Members who are specifically trained in the use of pepper spray for disorder control may use pepper spray in accordance with their training, and within Department guidelines, and as authorized by supervisors.")

[47] *See* JULIE CICCOLINI & IDA SAWYER, HUMAN RIGHTS WATCH, "KETTLING" PROTESTERS IN THE BRONX: SYSTEMIC POLICE BRUTALITY AND ITS COSTS IN THE UNITED STATES 32-36 (2020).

**Investigation into NYPD Response to George Floyd Protests**

Department stated during his interview that staff from the NYPD Legal Bureau made the determination authorizing the arrest of the legal observers. He also confirmed that when he learned of the arrests of legal observers, he ordered their release. The President of the National Lawyers Guild wrote letters arguing that the detention of legal observers violated the Patrol Guide and was contrary to assurances from City Hall staff that legal observers, as well as medics, were exempt from the curfew.[48] Elected officials also noted those prior assurances. In its written response, the NYPD stated that legal observers were not within the scope of the Executive Order's "Essential Workers" exemption from the curfew.[49] Nonetheless, the purpose of legal observers is to monitor protests for police activity that may infringe upon the civil rights of protesters.[50]

The NYPD also arrested four medical volunteers at the Mott Haven protest. According to reports, the volunteers reported being "pushed, threatened, detained, and arrested, despite the fact that their clothing, documents, and actions clearly identified them as health workers whose sole purpose was rendering necessary medical care."[51]

Public reports of police interference with journalists and media personnel also appeared during the Floyd protests, including the alleged assault of a Wall Street Journal reporter by officers during the protests.[52] In addition, the U.S. Press Freedom Tracker identified

---

[48] Letter from Andy Izenson, National Lawyers Guild President, New York Chapter, to Dermot Shea, NYPD Commissioner (June 7, 2020), *available at* https://www.scribd.com/document/464875743/2020-6-7-Nlgnyc-Lo-Letter-Final-Ocr-730pm-1#from_embed.

[49] Letter from Ernest F. Hart, NYPD Deputy Commissioner, Legal Matters, to Ida Sawyer, Acting Crisis and Conflicts Director, Human Rights Watch (September 16, 2020), *available at* https://www.hrw.org/sites/default/files/media_2020/09/Annex%20II_0.pdf.

[50] The New York Police Department's Patrol Guide generally prohibits police officers from obstructing observers to police action. City of New York Police Department, Patrol Guide, § 203-29 "When A Member of the Service Encounters An Individual Observing, Photographing, and/or Recording Police Activity."

[51] Phelem Kine & Joanna Naples-Mitchell, Physicians for Human Rights, A Targeted Attack on the Bronx" Police Violence and Arrests of Health Workers at a New York City Protest 5, https://phr.org/our-work/resources/a-targeted-attack-on-the-bronx/

[52] Kara Scannell & Madeline Holcombe, *District attorney to investigate alleged assault of WSJ reporter by NYPD officers during protests*, CNN (June 2, 2020), *available at* https://www.cnn.com/2020/06/02/media/wall-street-journal-assault-nypd-protest-investigation/index.html.

twenty-one incidents, including the incident above, involving conflict between the NYPD and journalists during the Floyd protests.[53]

6.      *The Pandemic*. That the protests took place in the midst of the pandemic heightened health and safety concerns of transmission under circumstances when police and protesters would be generally unable to practice social distancing. Video showed numerous officers were not wearing masks while policing the protests. NYPD executives stated that officers were required to wear masks while policing the protests. While most NYPD officials interviewed by DOI acknowledged some measure of noncompliance by officers with mask requirements, at least one official claimed that all officers were wearing masks, which flies in the face of the video and information that was available at the time. The documented lack of mask compliance by police officers may seem like a small matter compared to concerns about baton use or suppression of First Amendment expression. However, both the documented lack of compliance and the apparent dismissal of it by senior NYPD officials, both at the time and subsequently, was exactly the wrong message from officers of an institution charged with protecting public safety during a pandemic. In the context of the Floyd protests, it reinforced public perception that the police do not think the rules that apply to others apply to them, and that they can disregard them with impunity. This further undermined police legitimacy, making the necessary work of police officers more difficult.

Additionally, there were reports that arrests of protesters complicated compliance with public health guidance. Some arrested protesters reportedly lost masks or had them fall down their face, but did not receive replacement masks or assistance with face covering, which they were unable to do themselves due to cuffed hands.

7.      *Badges*. Additional reports, including photographic and video evidence, that some officers were covering their badge numbers with mourning bands suggest that these officers sought to avoid identification and accountability at the protests. NYPD officials stated that the Department encouraged officers to wear mourning bands to

---

[53] U.S. Press Freedom Tracker, New York City Incidents, *available at* https://pressfreedomtracker.us/all-incidents/?city=New%20York&tags=111; *see also* MAGUIRE & OAKLEY at 65 (discussing corralling, arresting, or using force against journalists as a sure way for police to undermine their legitimacy in the eyes of the general public).

honor those in the Department who lost their lives during the pandemic, but that officers were not permitted to use the bands to cover their badge numbers. Given numerous documented instances of badge-number-covering, the fact that NYPD officials interviewed by DOI stated that they did not witness even a single instance of it strains credulity. In addition, the dismissiveness with which officials appeared to treat such reports is another example of counterproductive messaging and a missed opportunity to reinforce a message of accountability and transparency to both police officers and the public.[54]

### B.    Curfew Enforcement

As noted above, the Governor and the Mayor announced a Citywide curfew beginning on June 1, 2020 from 11:00 p.m. until 5:00 a.m., and the following day the Mayor moved the start time of the curfew to 8:00 p.m. The Mayor lifted the curfew on June 7, 2020.

Our interviews indicated that NYPD executives were consulted on the decision to impose a curfew, but did not advocate for it. Indeed, in interviews, the Police Commissioner, as well as other Department officials, expressed reservations about the perception and effects of imposing a curfew, which prohibited people from being in public and effectively barred protests after a certain time. The Police Commissioner explained that his concerns centered on feeding a public perception that lawful expression was being suppressed. If a curfew was going to be imposed, however, the Police Commissioner's view was that the start-time of the curfew should be earlier from the outset, and he expressed that view to the Governor and the Mayor. One executive explained that the intention of the curfew was to stop violence and looting, and that the earlier curfew time reflected a determination that the 11 p.m. time was too late on the first night to effectively serve that purpose. DOI interviewed other NYPD officials who variously referenced the curfew

---

[54] Compare with one of the directives for policing demonstrations developed by the Madison, Wisconsin police department (the site of frequent demonstrations as both the state capital and home of a very large university): "Avoid anonymity at all costs. Police officers assigned to handle crowd duty are to be easily identifiable with their names and badge numbers clearly visible. We avoid any measures or practices that reduce the police to be anonymous agents. Anonymity or depersonalization of police conducting crowd management encourages negative crowd behavior. It can also lead to unaccountable behavior on the part of the police." MAGUIRE & OAKLEY at 82 (quoting the Madison, Wisconsin police department directive).

as an opportunity or tool for managing any unrest, insofar as it set a time limit on public activity.

DOI also inquired as to communications with officers regarding curfew enforcement. On June 1, 2020, the Operations Division issued a FINEST message[55] to all commands with information about the curfew. The message explained that people could not be in public unless an essential worker, homeless unable to find shelter, or individuals seeking medical treatment or supplies. The message instructed officers to provide reminders to anyone in public about the curfew and stated that "[e]nforcement will only be taken after several warnings are issued and the violator is refusing to comply." On June 3, 2020, the Operations Division circulated another FINEST message informing officers about the extension of the curfew and repeated the previously referenced exemptions. However, this subsequent message omitted the instruction requiring officers to provide reminders and warnings before taking any enforcement action, simply stating, "[i]f MOS observe a person violating the curfew, a C-summons may be issued for . . . violating a Mayoral emergency order." NYPD officials were unaware of the precise reason for the omission, and DOI was not able to determine how the change had occurred. Multiple officials explained that officers recognized the need for warnings and could still exercise discretion in their application of curfew restrictions even if the FINEST message did not specify the use of warnings prior to enforcement action.

DOI examined enforcement of the curfew during the Floyd protests. The Mott Haven event on Thursday, June 4 represents the largest single set of curfew arrests at a Floyd protest. DOI interviewed the borough commander who directed this enforcement action. He stated that he made the decision "in the field" for officers to arrest the protesters for curfew violations, and had not made a decision in advance to make arrests solely for curfew violations. He met with executive officers prior to the protest, and they discussed curfew enforcement as an available option to respond at the planned protest. The borough commander declared that he did not receive prior direction from superiors to make curfew arrests at the Mott Haven protest. Whereas some protesters

---

[55] FINEST is the Department's messaging system that can push announcements and directives out to all members of service (MOS). MOS typically receive these messages on their Department-issued mobile device, and they are distributed in a variety of other ways as well.

Investigation into NYPD Response to George Floyd Protests

stated that they heard no warnings prior to the arrests, the borough commander also stated that NYPD played curfew warnings on a Long Range Acoustic Device (LRAD)[56] before making curfew arrests. Available video indicates that several minutes prior to the arrests, the LRAD message stated that the curfew would be in effect beginning at 8:00 p.m., and that no one other than essential workers could be in public after that time. The LRAD message did not specifically communicate a warning to the crowd of protesters that they would be subject to arrest for curfew violations. Even if protesters received and heard the message, according to reports by protesters and other witnesses, it was impossible for most protesters to leave before the curfew because by that point officers, including those with SRG Bicycle Unit, had already employed formations that surrounded a substantial number of the protesters prior to the curfew and blocked their ability to move.

Enforcement of the curfew varied widely in different locations and on different dates. As outlined above, in some instances, protests were allowed to continue for hours after the curfew began, in others the arrival of the curfew was used as a tool to encourage or order protesters to disperse, and in still others the arrival of the curfew was used as a trigger for mass arrests based solely or primarily on curfew violation. DOI asked the Police Commissioner and other NYPD executives about differential enforcement of the curfew, particularly as compared with the events in Mott Haven. In the view of NYPD leadership, officers and supervisors retained discretion with respect to curfew enforcement and that different circumstances, such as locations with violence, could warrant a different approach as to application of the curfew. There was no single directive to the Department about a strategy for enforcing the curfew.

Inconsistent public messaging on curfew enforcement significantly undermined the effectiveness of the curfew as a means of controlling the small number of violent actors. Although the Executive Order itself declared the curfew to apply to all persons other than the listed

---

[56] The LRAD is defined in NYPD documents as a "highly intelligible communication system" that can "be used to clearly broadcast critical information, warnings or lawful orders over a large distance." New York City Police Department, SRG Field Force Operations Course Module Number 14: Long Range Acoustic Device (LRAD).

exceptions, the Mayor and other City Hall communications outlets almost immediately began to make public statements that the curfew would not be enforced against "peaceful protesters" or that those protesting peacefully would not be arrested.[57] These statements were unhelpful on multiple levels. First, as a substantive matter the ostensible purpose of the curfew was to clear the streets of law-abiding persons in order to allow police resources to be focused on looters or those intent on violence or property destruction. Telling the public that peaceful protests could continue past the curfew, without consequence, undermined this goal considerably, further skewing the trade-off between public safety and public perception of First Amendment suppression. Second, the statements were not consistent with the NYPD's understanding of the limits of its authority. Several officials, including the Police Commissioner, stated that the curfew, and the enforcement of it, was defined solely by the Executive Order, and that they did not view contrary public statements as limiting that authority. Third, even if the NYPD's enforcement was consistent with the Mayor's public statements, the discretion to define what constituted "peaceful" protest activity contributed to both the perception and the reality of differential enforcement of the curfew. Finally, the gap between the Mayor's public statements and the NYPD's understanding of its enforcement authority derived from the Executive Order, set up needless confrontations between police and protesters and unfairly fueled public perceptions that the NYPD was abusing its authority. This was counterproductive to reducing tensions and increasing public trust in the authority of the police.

### Finding 3: Some Policing Decisions Relied on Intelligence Without Sufficient Consideration of Context or Proportionality

#### A.   The Role of NYPD's Intelligence Bureau in Connection with Protests Generally

NYPD's Intelligence Bureau collects and disseminates intelligence information as part of investigating criminal activity in New York City.

---

[57] *See, e.g.,* Office of the Mayor of New York City, Transcript: Mayor de Blasio Holds Media Availability (June 4, 2020) (available at: https://www1.nyc.gov/office-of-the-mayor/news/738-20/transcript-mayor-de-blasio-holds-media-availability); Sydney Kashiwagi, *Protesters can stay out past curfew, if peaceful, but need to leave when cops tell them to go, mayor says,* Staten Island Advance (June 4, 2020) available at: https://www.silive.com/coronavirus/2020/06/protesters-can-stay-out-past-curfew-if-peaceful-but-need-to-leave-when-cops-tell-them-to-go-mayor-says.html.

**Investigation into NYPD Response to George Floyd Protests**

The Intelligence Bureau consists of both uniformed officers and civilian analysts who use open-source information in combination with additional investigative tools including the use of undercover officers and informants. For decades, the NYPD has been bound by a federal court decree, also known as the *Handschu* Guidelines, governing how the NYPD may investigate unlawful conduct related to political activity.[58]

During protests, the Intelligence Bureau gathers information to assist with NYPD deployment and tactical decisions.[59] Bureau staff sift through social media and other public information to identify upcoming protests, their locations, and their expected size. Additional information may be provided from other sources pursuant to an authorized *Handschu* investigation. Once that information has been compiled, the Intelligence Bureau disseminates that information to decision-makers such as Operations and the Borough Commands. While the Intelligence Bureau provides information and guidance, Intelligence Bureau personnel do not make deployment or tactical decisions for officers on the street. The Intelligence Bureau is also responsible for pursuing criminal intelligence leads and acting on source information—for example, if the Intelligence Bureau identifies information indicating that an individual is seeking to bring a weapon to an event, Bureau investigators themselves may conduct a surveillance and stop of the individual, rather than referring that information to an operational unit.

When a protest begins, the Intelligence Bureau typically dispatches officers alongside the mobile field forces—these deployments allow for rapid communication should any pertinent intelligence develop as the protest progresses. The Intelligence Bureau also utilizes spotter teams and covert deployments to provide live intelligence, such as the size and direction of a protest. Intelligence Bureau staff will also monitor social media for additional information.

---

[58] *Handschu v. Special Servs. Div.*, 349 F. Supp. 766, 771 (S.D.N.Y. 1972).

[59] In addition to the Intelligence Bureau, patrol borough commands also review social media and other sources for information relating to protest activity.

### B.    NYPD's Intelligence Bureau Role During the Floyd Protests

DOI sought to understand the role of the Intelligence Bureau in connection with the Floyd protests based on public statements by the Mayor, Police Commissioner, and other NYPD officials emphasizing that intelligence informed tactical decisions during the protests. The public statements included the following:

- On May 31, Deputy Commissioner John Miller provided a press briefing, stating that NYPD had evidence providing a high level of confidence that disorderly groups had organized bike scouts, medics, and supply routes of rocks, bottles, and accelerants for the purpose of vandalism and violence.[60]

- On June 5, Mayor de Blasio and Commissioner Shea pointed to intelligence to justify the mass arrest that took place the prior evening in Mott Haven.

- On June 6, Deputy Commissioner Miller provided a second press briefing where he provided data on arrests, burglaries, and the numbers of injured officers. Deputy Commissioner Miller also noted that officers had been attacked with bricks, trash cans, vehicles, and other projectiles, as well as homemade incendiary devices such as Molotov cocktails. The briefing also contained information on specific incidents, including the knife-attack by a "homegrown violent extremist," a Bronx vehicle stop that resulted in the discovery of hammers and accelerants, and a gun arrest that took place in the South Bronx prior to the Mott Haven protest.

DOI sought to determine (1) the Intelligence Bureau's role during the protests; (2) which intelligence the NYPD disseminated during the protests; and (3) the effect of that intelligence. To do so, DOI interviewed Intelligence Bureau officials and reviewed thousands of pages of

---

[60] Tom Winter et. al., *NYPD's Terrorism Official Says Unnamed Groups Planned Protest Violence in Advance*, NBC 4 New York (May 31, 2020), *available at* https://www.nbcnewyork.com/news/local/nypds-terrorism-chief-says-unnamed-groups-planned-protest-violence-in-advance/2440722/; Lisa Rozner, *CBS2 Gets An Exclusive Look Inside The NYPD's Joint Operations Center As Officers Monitor Protests*, CBS 2 New York (May 31, 2020), *available at* https://newyork.cbslocal.com/2020/05/31/nypd-joint-operations-center-protests/.

intelligence materials created or disseminated between May 28 and June 20, 2020.

Based on its intelligence collection activities, the Intelligence Bureau created several types of work product that went outside the Bureau:

- *Intelligence Bureau Daily Binders*. These binders provide a daily roundup containing a variety of information ranging from counterterrorism leads to gang activity. During the Floyd protests, the binders included open source information on upcoming demonstrations as well as demonstrations in the prior 24-hour period.

- *Situation Reports*. These documents, which are not limited to protests, report various types of criminal activity and incidents, including information on violent felonies, serious officer injuries, and arrests during protests.

- *Tactical Assessments*. These reports, much like situation reports, contain information on various types of criminal activity and incidents. During the protests, they focused on potential threats to officers in New York City based on reports of events that had occurred outside New York City that reportedly involved violence against law enforcement officers such as shootings, improvised incendiary attacks, and vehicle tampering.

- *Handschu Investigative Statements*. The *Handschu* consent decree requires that prior to any investigation into First Amendment activity—including investigation of unlawful activity by protesters or protest organizations—the Intelligence Bureau provide written justifications and receive written approval from the Deputy Commissioner of Intelligence and Counterterrorism. Absent exigent circumstances, that written approval must occur prior to any investigative action.

NYPD officials informed DOI that the binders and situational reports had a narrowly limited distribution to NYPD executives or senior officials. Conversely, all officers throughout the Department received the tactical assessments on their mobile devices through the NYPD's

messaging application. *Handschu* Investigative Statements go only to the designated *Handschu* Committee.

### C.    Use of Intelligence During the Floyd Protests

#### 1.    Changes in Protest Activity

Intelligence Bureau officials noted that the protests caught them off guard in terms of their size and intensity despite the fact that the Department typically handles between approximately 20 and 30 protests of some kind per day, and previously responded to large demonstrations during events such as the Republican National Convention and Occupy Wall Street. Officials also explained that while groups and organizers familiar to NYPD organized some of the demonstrations during the Floyd protests, relatively new leaders and groups, or leaderless protests, were common and were coordinated, if at all, largely by communication on social media shortly before or during the protests themselves.

Officials described ideological opposition among some of these new leaders and organizations to coordinating with police regarding the plans for their protests. Additionally, officials cited the increasing use of "de-arrest" tactics, which they described as efforts by protesters to actively interfere when an officer attempts to arrest another protester. De-arrest tactics have the potential to increase arrests as interference in the arrest of another can have ripple effects resulting in additional arrests. Such tactics also can risk officer safety and protester safety and contribute –partly by design—to a sense of chaos and mayhem. Intelligence officials explained that they provided information to NYPD leadership and officers relating to the increasing use of these tactics.

These circumstances appear to have presented intelligence challenges for identifying relevant information about the Floyd protests to assist in response planning or guide police action. The Intelligence Bureau drew on prior relevant information about some of the protest groups that were most likely to encourage, condone, or engage in violence or property destruction as a tactic. That information was appropriately shared with NYPD leadership. However, the Bureau had limited information about the relative importance of these groups or actors in the context of the Floyd protests as a whole. The unexpected scope, size, and spontaneity

Investigation into NYPD Response to George Floyd Protests

of the protest activity made it difficult to place this information in context and utilize the information they did have to inform policing decisions. These circumstances may have led NYPD leadership to overweight the importance of these groups relative to the protest participants as a whole.[61]

## 2.    Specific Intelligence

The Intelligence Bureau collected and disseminated an array of information concerning risks of violence against police officers and damage to police property. Intelligence officials gathered some of this information from reports of hostile postings about police on social media, as well as reported incidents from jurisdictions outside New York City. Though some of the intelligence materials represented a catalogue of generalized threats that lacked clear guidance for policing protests in the City, there were also instances where the Intelligence Bureau supplied specific intelligence that clearly played a role in guiding police response during particular protest events. In the course of DOI's review, we found that some police actions were narrowly tailored to identified threats, acknowledging the limitations of the available intelligence, while in other cases limited intelligence was used to justify a disproportionate response.

Mott Haven provides an illustrative example. The Intelligence Bureau and Bronx Borough Command had information pertaining to the June 4 protest in Mott Haven, which was organized by the "FTP Coalition."[62] NYPD officials reported a prior history of violence and property damage at FTP protests, and social media posts purporting to be from organizers prior to the Mott Haven protest depicted flaming police vans and a graphic of a masked protester punching a cop, among other similar images. In addition, three incidents raised particular concerns:

1. Officers conducted a vehicle stop near the planned protest location and found hammers, fireworks, and lighter fluid;

---

[61] These concerns highlight the importance of robust community affairs involvement in policing protests. *See* MAGUIRE & OAKLEY at 57 (discussing research on policing that emphasizes the value in building relationships with community members and "knowing potential allies").

[62] "FTP" is known to stand for "Fuck the Police," but has also been described as standing for "Feed the People" or "For the People."

evidence indicated that the vehicle occupants had been attending protests.

2. Officers arrested two men after a search of their vehicle uncovered, among other items, knives, two bricks, one power saw, and two bottles of fuel injector.

3. Officers recovered a firearm from an alleged gang member during a vehicle stop near the planned protest location prior to the start of the Mott Haven protest; other evidence indicated that the occupants of the vehicle intended to participate in the Mott Haven protest that evening and then to travel on foot into Manhattan to join others intent on looting.

On June 5, the day after the Mott Haven protest, both the Mayor and Police Commissioner pointed to the intelligence to explain the mass arrests of hundreds of protesters.[63] The Bronx borough commander explained to DOI that the totality of the intelligence, as well as his own conversations with Bronx business leaders following the extensive looting that had occurred on Fordham Road several days earlier, convinced him that it was appropriate to approach policing the Mott Haven protest with heightened concerns. The commander said that business leaders in Mott Haven pleaded with him for police to prevent looting and, on June 4 before the start of the protest, reported discovery of a collection of bricks and broken cinderblocks in the area. Ultimately, he determined during the protest that the primary goals were to prevent the assembled group from travelling into Manhattan and to prevent the group from splintering off towards commercial areas, including the Hub; he thus determined that strict curfew enforcement through encirclement and mass arrests was the appropriate tactic.

DOI recognizes that officers regularly make police judgments based on available information. Intelligence is often an inconclusive web of leads, allegations, or partial accounts requiring further corroboration, verification, and investigation—which may not always be possible to do

---

[63] Mayor de Blasio: "I've seen with my own eyes the materials that were meant to encourage violence." Commissioner Shea: "[T]hey put out posters advertising that they were going to burn things down, that they were going to injure cops, that they were going to cause mayhem. That was the plan. We disrupted the plan." Office of the Mayor of New York City, Transcript: Mayor de Blasio Holds Media Availability (June 5, 2020) (available at: https://www1.nyc.gov/office-of-the-mayor/news/410-20/transcript-mayor-de-blasio-holds-media-availability).

before the existing intelligence must inform operational decisions. DOI's investigation found that NYPD did have actionable intelligence that indicated the serious potential for violence and looting by some participants to occur at, or arise out of, the Mott Haven protest. Viewed only through that lens, the actions taken (chiefly, dividing the group and then arresting nearly everyone present in an encircled area as soon as the curfew began) did ensure that those potential events did not occur. Moreover, the NYPD had the legal authority to make those arrests based on the curfew order. But this approach came with significant costs. The force required to carry out a mass arrest was disproportionate to the identified threat, placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity, and severely damaged the Department's legitimacy in the eyes of those present, the surrounding community, and (given the attention to these events) the City as a whole.[64]

### Finding 4: NYPD Deployed Officers Who Lacked Sufficient Recent Training on Policing Protests

DOI also reviewed NYPD's training related to policing mass demonstrations and protests. Before the Floyd protests, NYPD training related to protests was provided through Police Academy curriculum for recruits, newly promoted supervisors, or officers assigned to SRG, as well as in-service training.[65] However, a significant number of officers deployed by the NYPD to respond to the Floyd protests lacked recent training related to policing protests. After the Floyd protests, the Police Commissioner directed that expanded in-service training curriculum related to policing protests be created and deployed for officers. Much of the expanded training instructs officers on a disorder control approach to policing protests.

---

[64] *See* Maguire & Oakley at 50 (discussing research on potential long-term damage to beliefs about police legitimacy); Final Report of the President's Task Force on 21st Century Policing 16 ("1.6 Recommendation: Law enforcement agencies should consider the potential damage to public trust when implementing crime fighting strategies. Crime reduction is not self-justifying. Overly aggressive law enforcement strategies can potentially harm communities and do lasting damage to public trust. . . .")

[65] Generally, Academy training provides instruction to newly hired or promoted officers so that they can perform functions of their role, such as new recruits or officers recently assigned to a specialized unit like SRG. In-service training provides refresher courses on material previously covered in an Academy course or instruction on new job requirements or expectations relating to an officer's position.

Investigation into NYPD Response to George Floyd Protests

## A.    Training Before the Floyd Protests

### 1.    Academy Training

#### a.    New Recruits

The Police Academy curriculum for new recruits does not have a specific course on policing protests. However, several Academy courses for newly hired recruits relate in some way to policing protests. The Academy curriculum includes a four-hour module on disorder control training conducted by the Disorder Control Unit. In this module, DCU instructors discuss legal considerations, Long Range Acoustic Device (LRAD) awareness, flex-cuffing techniques, mass arrest techniques, and team formations.[66]

The Academy curriculum also includes sixteen-and-a-half hours of training on additional topics that include some material applicable to policing protests. Relevant courses include the following:

- "Discretion": covers the concepts of law enforcement discretion and accountability with respect to protests, informs recruits that their duties at a demonstration are to protect the rights of both the demonstrators and non-demonstrators and to remain neutral while doing so. The course also teaches officers that they will be required at some demonstrations to follow specific orders and not take independent police action without prior permission.

- "Maintaining Public Order": covers a police officer's role at a demonstration and at a civil disorder or riot.[67] The course provides basic guidance on the First Amendment and viewpoint non-discrimination. The course also discusses the guidelines for police conduct at a demonstration, including use of force, and response

---

[66] While DOI did not receive the lesson plan or training material associated with this particular training module at the time this Report was issued, DOI did receive the training material associated with the SRG Academy curriculum for disorder control training. The topics referenced above are covered in that SRG Academy curriculum and are discussed in more detail below.

[67] The curriculum defines "demonstrations" as "organized groups comprised of many persons as well as the individual or small groups of individuals who utilize free speech and assembly to further their cause;" New York City Police Department, Police Academy, Chapter 11 Maintaining Public Order Instructor Guide at 20 (2014), and "civil disorders" or "riots" as "series of events where the civilian population engages in a mass action of lawlessness." New York City Police Department, Police Academy, Chapter 14 Civil Disorder Offenses Instructor Guide (2015), at 1-2.

to violent or nonviolent conduct toward officers on the part of demonstrators.[68]

- "Use of Force": aims "to train officers to differentiate between the various physical force options available to them. The training is also meant to prepare officers to explain how the force used was reasonable, based on a totality of the circumstances. The course teaches officers to determine the amount of force that they are permitted to use in a given situation, taking into account both the general nature of the situation they are confronting and the danger presented to the officer."[69]

Police recruits also participate in training on the use of O.C. pepper spray and batons. Pepper spray training includes a written and practical examination. The training indicates that pepper spray use may be appropriate during arrests or situations involving custodial constraint when other physical force or verbal commands have not or will not be successful. The training notes that officers should not use pepper spray in circumstances where physical force is not required or when subjects are exhibiting passive resistance. The training further informs officers to avoid using pepper spray indiscriminately across a large area in disorder control situations.[70] Baton training indicates that baton use may be appropriate when a subject is displaying threatening behavior, becoming violent, or attempting to assault an officer or third person during an arrest situation. As in the "Use of Force" course, the baton training instructs officers to use only the reasonable amount of force based on the totality of the circumstances. The training module associated with the expandable baton specifically notes that an officer should use their baton instead of their fists or feet whenever possible,

---

[68] The curriculum also includes a "Custodial Offenses" course that defines offenses such as resisting arrest, obstructing governmental administration and escape, and a "Civil Disorder Offenses" that discusses offenses of disorderly conduct, loitering, unlawful assembly, and inciting a riot, and notes that these offenses may pertain to unlawful conduct of persons at the scene of demonstrations or civil disturbances. New York City Police Department, Police Academy, Chapter 12 Custodial Offenses Instructor Guide (2015).

[69] *See* NEW YORK CITY DEP'T OF INVESTIGATION, OFFICE OF THE INSPECTOR GENERAL FOR THE NYPD, POLICE USE OF FORCE IN NEW YORK CITY: FINDINGS AND RECOMMENDATIONS ON NYPD'S POLICIES AND PRACTICES (2015), *available at* https://www1.nyc.gov/assets/doi/reports/pdf/2015/2015-10-01-Pr_uofrpt.pdf.

[70] The training notes that officers specifically trained in pepper spray use for disorder control situations can use pepper spray as long the use is in compliance with their training, Department guidelines, and supervisor authorization is given.

and that an officer can use a baton as a means of force to direct a disorderly crowd into a selected area or to defend the officer's life.

### b.    Specialized Units

Police personnel assigned to SRG attend an initial twenty-seven-day SRG Academy. Five of those Academy days are dedicated to disorder control training.[71] DOI reviewed the SRG Academy curriculum for disorder control training. The curriculum includes sixteen training modules each between fifteen minutes and ninety minutes in duration. Some curriculum topics related to policing protests are the following:

- "Mass Arrest": covers who within the Department can authorize an arrest at a civil disobedience event, the roles of the arrest team members, and the potential support units for a mass arrest.

- "Team Carries": discusses when and how to use multiple officers to carry and transport a noncompliant arrestee who refuses to move.

- "Legal Considerations": covers the legal and constitutional rules and guidelines associated with operations and use of force in crowd control management.

- "Flex-cuff Utilization": covers the proper application and removal of flex-cuffs, and discusses several precautions when utilizing flex-cuffs.[72]

- "Long Range Acoustic Device" (LRAD): discusses circumstances and authorization for use. Officers use the LRAD to communicate with a group during a protest or demonstration in order to provide instructions, provide warnings, or give lawful orders.

Additionally, there are five separate modules related to physical crowd management and control formations used by the SRG, including

---

[71] In addition, DOI learned that officers promoted to the rank of Sergeant, Lieutenant, and Captain receive a one-hour refresher course on disorder control concepts.

[72] Some precautions include periodically checking to ensure there is adequate blood flow to the hands of someone who is flex-cuffed and being aware of signs of poor circulation (e.g., loss of color in hands).

instruction on line formations, separation formations, wedge formations, encirclement formations, and crossbow formations.

Officers assigned to the SRG Bicycle Squad attend an initial five-day training course, beyond the general SRG Academy. The curriculum includes twenty-one training modules. Curriculum topics related to policing protests include "Introduction to SRG Bicycle Squad," "Crowd Control and Crowd Management," and several one-hour training modules related to riding tactics and formations.

### 2.   In-Service Training

In addition to NYPD's Academy training programs, the Department provides a range of in-service training courses, some Department-wide and some to particular groups of officers based on rank or duty. A NYPD executive informed DOI that training sergeants and officer liaisons also offer in-service training to those in their assigned command, some of which may be related to policing protests, at the precinct or borough command level. Training sergeants and training officer liaisons obtain training from the Academy's Specialized Training Section on a monthly basis and then return to their respective precincts or boroughs to offer training to the officers assigned there. In addition, a review of the NYPD's 2020 Training Course Catalog indicates that several training courses related to protests are available to officers. For instance, there are courses taught by SRG available to uniformed officers, including "Demonstrator Tactics" and "Field Force Operations (FFO)—Level II."[73]

In addition to the specialized SRG Academy, SRG officers receive additional in-service training related to policing protests. SRG officers participate in an annual two-day in-service training course as well as eight monthly, two-hour unannounced drills. Additionally, members of the SRG Bicycle Squad participate in an annual two-day refresher course. However, other than for personnel assigned to SRG, DOI found that, prior to the Floyd protests, NYPD lacked standardized, agency-wide, in-service training related to policing protests.

---

[73] The "Demonstrator Tactics" course description provides "[a] lecture to describe the tactics used to create disorder including the many individual roles within various protester groups." The field force course description provides that "[m]embers will gain knowledge by studying and analyzing past civil disturbances, demonstrations and the police response to those events, cities, and law enforcement agencies can apply lessons learned from those experiences to current and future incidents." *See* New York City Police Department, 2020 NYPD Training Course Catalog.

Investigation into NYPD Response to George Floyd Protests

### B.    Training After the Floyd Protests

After the Floyd protests, the Police Commissioner ordered an expansion of in-service training related to policing protests. Beginning in July 2020, the NYPD instituted a four-hour module on disorder control concepts for all officers with the rank of Captain or above. Topics include legal considerations, LRAD awareness, flex-cuffing techniques, mass arrest techniques, and team formations. The NYPD also instituted a two-day expanded course for officers, Sergeants, and Lieutenants on topics related to policing protests, which was first offered on August 6, 2020. Topics covered during this course include an overview of the Mobile Field Force, crowd management versus crowd control, crowd psychology, protestor roles and tactics, the *Handschu* agreement, formations, flex-cuffing, mass arrests, and team carries.[74]

DOI requested the opportunity to attend and assess these trainings. However, NYPD has suspended these trainings, along with other in-person trainings, due to the ongoing pandemic.

### C.    Assessment of NYPD's Training Before and After Floyd Protests

During interviews, NYPD officials emphasized the inherent difficulties in responding to simultaneous, large-scale protests occurring in different parts of the City, along with reported violence, property damage, and looting. The highly sensitive nature of protests targeting policing and police conduct highlight the need for properly trained officers to respond with informed judgment. Yet, outside of SRG, the NYPD deployed officers who largely lacked any recent training related to protests. Before the Police Commissioner's direction to implement the additional training discussed above, DOI found that the NYPD offered no comprehensive in-service training across the Department that related to policing protests at all. Whereas NYPD offered specialized

---

[74] At the time this Report was issued, DOI had only received a PowerPoint associated with this training. The PowerPoint defines a Mobile Field Force as a "Rapidly deployable team providing an effective tactical force for various missions" and discusses when Mobile Field Forces are used. The PowerPoint also distinguishes between managing the flow of pedestrians or vehicles at an event (i.e. crowd management) and the performance of tactics while using available personnel and tools (i.e. crowd control). The PowerPoint further distinguishes types of crowds - everyday citizens, professional crowds, and radical crowds – and notes several crowd control concepts, including the Elaborated Social Identity Model (ESIM) and others that may lead to violent actions (i.e. "mob mentality", "contagion effect", and "herd mentality"). The PowerPoint additionally discussed protester roles and protester tactics.

**Investigation into NYPD Response to George Floyd Protests**

training to SRG officers relating to protest response, other supervisors and officers did not receive a similar level of applicable training. One executive captured the contrast between SRG officers and other police officers in describing those assigned to SRG as "more disciplined" and "more trained" than regular officers. Some NYPD officials interviewed by DOI noted the lack of training they had received specific to policing protests and at least one explicitly acknowledged that additional training would have been useful. Therefore, NYPD appears to have deployed a large number of front-line supervisors and officers to police the Floyd protests without adequate training.[75] Although DOI did not identify specific links between a lack of training and improper police conduct, inadequate training raises concerns that officers lack the tools to make the necessary discretionary or tactical judgments during protests, particularly those as complex as the Floyd protests. The lack of training is consistent with other observations about officers feeling overwhelmed and underprepared to respond effectively to the unanticipated events of the Floyd protests.

The Police Commissioner's decision to expand training relating to protests across the Department is a welcome acknowledgment of the need for additional training. DOI was unable to conduct a full assessment of the new training.[76] However, based on analysis of the materials and discussion with knowledgeable parties, DOI determined that the new training largely focuses on instruction regarding disorder control methods. Much of the training examines crowd control tactics and physical formations, with limited emphasis on de-escalation and effective communication with protest participants in an attempt to maintain peace and order. From DOI's review, the new expanded training was the first instance in which the NYPD instituted agency-wide, scenario-based training specific to policing protests for officers, sergeants, and lieutenants. However, that scenario-based training appears focused solely or primarily on crowd control tactics and formations with no discernable reference to managing interactions,

---

[75] "Standards and programs need to be established for every level of leadership from the first line to middle management to executive leadership. If there is good leadership and procedural justice within the agency, the officers are more likely to behave according to those standards in the community." FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING at 54.

[76] As noted above, DOI was unable to attend the new training before it was suspended due to rising COVID-19 indicators in the City.

facilitating First Amendment rights, and minimizing the use of force. On a positive note, the new training represents the first time DOI observed a direct reference to crowd psychology in NYPD training related to policing protests other than that provided to SRG. The evidence-based study of crowd psychology can help guide police in how they should handle events including protests.[77] Additionally, while several NYPD executives noted the value in having Community Affairs officers engage with protest organizers and participants, DOI found no reference to the utility of Community Affairs officers in the new protest training. It also does not appear that members of Community Affairs are involved in conducting the training. Finally, DOI also found that NYPD does not include community organizations as part of the training process for protest policing.[78]

### Finding 5: NYPD Lacked a Centralized Community Affairs Strategy for the Floyd Protests

#### A.    Community Affairs Officers Have Historically Interacted with Participants During Protests

The purpose of the Community Affairs Bureau (CAB) is to build relationships between police and the community. It has four internal divisions: The School Safety Division, Crime Prevention Division, Community Outreach Division, and Youth Strategies Division. As of the time of the Floyd protests, CAB had approximately 100 officers who reported to the Chief of CAB. Individual precincts also have at least two assigned Community Affairs officers who report to their precinct commanding officer and the Patrol Services Bureau instead of CAB.

---

[77] "As noted by leading crowd psychologists, when police embrace a classic view of crowds as inherently irrational and dangerous, they tend to use more aggressive strategies and tactics…Conflict is most likely to arise when event participants view themselves as engaging in peaceful and legally permissible behavior and police view them as a threat to public order or public safety. This gap in perspectives can be overcome through the use of more effective communication strategies." MAGUIRE & OAKLEY at 54.

[78] As noted in the FINAL REPORT THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING, "[n]ot only can agencies make important contributions to the design and implementation of training that reflects the needs and character of their communities but it is also important for police training to be as transparent as possible. This will result in both a better informed public and a better informed officer." FINAL REPORT THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING at 54.

**Investigation into NYPD Response to George Floyd Protests**

Historically, CAB and individual precincts have dispatched Community Affairs officers to a variety of public events including parades and protests. A former CAB executive explained that Community Affairs officers at protests aim to maintain peace, engage with organizations about plans for protest activities, and promote positive communication between the police and protesters. Community Affairs officers generally dress in a lighter blue uniform that distinguishes them from other uniformed officers operating in a patrol or other operational capacity. Given the different role and appearance of Community Affairs officers, the official stated that protesters tend to react differently to Community Affairs officers and do not view them as a "threatening" presence. The official further explained that at large scale protests previously CAB, usually based on notice from the Operations Division, deployed officers to connect with protesters by walking through the crowds, speaking with participants, and then relaying relevant information to the Operations Division.[79] Individual precinct Community Affairs officers often handle smaller events without CAB officers.

NYPD records indicate that in cases of unrest, "the [CAB] has specific programs aimed at assessing, analyzing, and ameliorating tension, concerns and misinformation. The response will be immediate, after notification and adjusted according to the magnitude of the conflict or incident."[80] The plan further provides for CAB officers to coordinate with precinct community affairs officers and communicate with local clergy, elected officials, and other community groups to assist in mediation of any disputes or conflicts in such cases. CAB's Community Outreach Division maintains a database with contact information for community leaders in patrol boroughs and housing police service areas. One high-quality patrol borough plan specifically references the role of Community Affairs officers at protests:

> The philosophical approach to deal with these voluminous (legitimate and impromptu) protests has been to utilize

---

[79] This approach is consistent with research on effective protest policing. While police departments often focus on developing criminal intelligence about the protest participants with a history of violence or criminality, they should devote equal time to educating themselves about the composition, goals, and values of the peaceful protesters. As much time as is invested in knowing the hotheads should be invested in knowing potential allies for keeping the peace, whom experts call "influential moderates." MAGUIRE & OAKLEY at 57.

[80] New York City Police Department, Community Affairs Bureau Unusual Disorder Plan, Appendix A2 Introduction, at 8 (2020).

> Officers assigned to Community Affairs to flank and interact with the protesters, and to have sufficient personnel assigned to response teams at the ready, but outside of public view. It is believed that by not displaying a show of force, and by not being confrontational with these protesters tensions deescalated."[81]

DOI reviewed additional patrol borough plans that briefly referenced use of Community Affairs personnel during mobilizations to address unrest.

### B. The Community Affairs Bureau Was Not Part of the NYPD Response to the Floyd Protests

NYPD deviated from CAB's historical role during the Floyd protests insofar as the Department did not deploy CAB officers to engage with protesters. The former CAB executive noted that, in or around March 2020, CAB officers had been reassigned from their typical functions to pandemic relief efforts, such as mask distribution, or being detailed to cover other vacancies created by patrol officers on sick leave. The official stated that when the Floyd protests began, NYPD did not utilize CAB officers to assist with response to the protests. According to the former CAB executive, who led the bureau at the time, no one in NYPD leadership responsible for planning policing of the Floyd protests contacted the CAB executive about utilizing CAB officers as part of the protest response. As a result, contrary to standard policy and historical practice, CAB did not perform its traditional role of community engagement during the Floyd protests.[82] Further, CAB leadership was not included or consulted in the overall planning for response to the protests, whether the initial planning or high-level discussions about how to respond as events unfolded over the subsequent days.

---

[81] *See* New York City Police Department, 2020 Patrol Borough Queens South Unusual Disorder Plan at 7 (2020).

[82] *See* New York City Police Department, Patrol Guide, § 213-05 "Duties at an Unusual Disorder" at 2 ("Community Affairs personnel with community leaders, as listed in Appendix 'H' of the command's unusual disorder plan, can be used to dispel rumors and disseminate accurate information."); New York City Police Department, Patrol Guide, § 213-11 "Policing Special Events/Crowd Control" at 2 (stating that assigned supervisors responding to a large event must "confer with community affairs officer(s), operator of facility, event sponsor(s), security coordinators and other parties involved with the event").

### C.   NYPD Employed an Inconsistent Approach to the Use of Precinct Level Community Affairs Officers During the Floyd Protests

Although NYPD did not utilize CAB officers for response to the Floyd protests, it deployed some individual precinct Community Affairs officers. However, DOI found that the deployment of such Community Affairs officers was a local decision left to the discretion of borough or incident commanders responding to particular protests, rather than part of any centralized strategy. Observers familiar with past protests in the City noted the comparative lack of visibility and active engagement from Community Affairs officers at the Floyd protests.

Commissioner Shea confirmed that the NYPD did not reserve deployment of Community Affairs officers for community engagement during the protests. He stated that Community Affairs officers could be deployed for different assignments including acting as regular officers or, alternatively, as Community Affairs officers. DOI interviewed borough commanders who confirmed that they had discretion to deploy Community Affairs officers based on their own assessment of needs. This discretion resulted in different community affairs approaches at protests in different parts of the City. It also further indicates the lack of a centralized community affairs strategy for the protests. Notably, a senior operations official, who responded to requests for resources through the Operations Division during the protests, did not recall any requests for Community Affairs officers during the protests. While some NYPD executives told us that they were "making calls" to various community contacts during the protests, these calls lacked specificity and it was not clear what their purpose or strategy was. Certainly this outreach did not appear to be an effective substitute for an appreciation of the role of trained Community Affairs officers and a strategy for deploying them effectively.

Knowledgeable witnesses informed DOI that they observed some instances of Community Affairs officers at protests, but variously noted that they did not appear to be at the forefront of policing efforts in comparison with patrol officers, were under-utilized, and had minimal engagement with protesters. In a notable counter-example, one official, who was then a Patrol Borough Commander, stated that he utilized his individual precinct Community Affairs officers and deliberately restricted such officers in that borough to working in a community

affairs capacity in response to the protests. The official explained reasons for separating of community affairs and enforcement functions: "Their [(Community Affairs officers)] job was always to be in touch with the community, for people to always have a certain level of trust in them. When they saw that community affairs uniform, they knew that it was someone who they could talk to and didn't feel threatened by making arrests. So I didn't allow the Community Affairs officers that work under me to make arrests because I always wanted that trust to be there."

### Finding 6: NYPD Lacked a Sufficient Data Collection Systems to Track Relevant Protest Data

As indicated above, a review of the records received from the NYPD indicates that the Department lacked a sufficient data collection system for relevant protest data, particularly arrest data. DOI received four separate data sources from NYPD that reported different total arrests on a daily basis due to their different sources or collection methods. DOI found that the NYPD did not otherwise have a reliable, consistent method to capture relevant protest data including the total number of protest-related arrests.

DOI raised its concerns about the inconsistent reporting of arrest data with the NYPD during the course of the investigation. While NYPD informed DOI that MAPC data adequately tracked arrests relating to the protests that were processed through the MAPCs, it acknowledged the data limitations of arrests processed in other ways such as at precincts. In an effort to respond to DOI's request for "arrest data," the NYPD conducted a query of its Online Prisoner Arraignment Database (ZOLPA), which captures all NYPD arrests Citywide. However, the NYPD informed DOI that the system does not identify arrests as arising from or related to protests.[83]

---

[83] A review of an NYPD FINEST Message issued on June 2, 2020 indicates that the Department intended to distinguish between protest-related and non-protest-related arrests. That FINEST Message noted, "For all arrests related to the recent civil disorder, please indicate "Civil Disorder 2020" as the special event code in the arrest info section of the Omniform while entering the arrest. This event code should be used for all arrests made in connection with looting and other disorderly behaviors associated with recent civil unrest." New York City Police Department, FINEST Message (June 2, 2020). However, DOI did not receive any records from the NYPD to indicate whether or to what extent Department personnel adhered to this request, and the records that were produced suggest that the directive was not uniformly followed.

Transparency is paramount when it comes to building trust between police and the communities they serve. This is especially true in circumstances, like the Floyd protests, where there are concerns from the community about how the police responded and carried out their duties. Inconsistent or incomplete reporting of data and information related to police response during protests, including the total number of arrests and other relevant protest data, can undermine the necessary transparency. A consistent data collection system, one that can easily distinguish between arrests and other relevant data relating to a specific event or multiple events that take place over a longer period such as the Floyd protests, is critical for review and evaluation by the NYPD, oversight entities like DOI, and the public.

## D.   Conclusion and Recommendations

In sum, the scope and nature of the Floyd protests posed several challenges to NYPD's ability to respond, raised questions about the legitimacy of that response, and revealed some shortcomings in the NYPD's approach and preparedness for policing First Amendment-protected protest activity. DOI's investigation identified several deficiencies in NYPD's policing of the Floyd protests, including its planning, strategy, tactics and enforcement, intelligence use, training, use of community affairs, and public communication. NYPD should pursue reform in these areas.

DOI makes the following recommendations to improve NYPD's policies and practices relating to policing protests:

1.   NYPD should draft a Patrol Guide policy specific to policing protests and protected First Amendment activity. NYPD should consult on this policy with individuals and entities outside of the Department, including civil rights attorneys, community organizations, and police reform experts.

2.   NYPD should create a new Protest Response Unit, that does not report to Strategic Response Group, to lead the planning and strategy for response to large protests, to collaborate with the Community Affairs Bureau on community engagement, and to coordinate with other divisions, borough commands, and precincts on response.

**Investigation into NYPD Response to George Floyd Protests**

3.  NYPD should reevaluate the central role of the Strategic Response Group and Disorder Control Unit in response to large protests given their orientation to handle counterterrorism, riots, and other serious threats, and better calibrate their use to circumstances that require such specialized force.

4.  NYPD should create internal written records explaining the reasons and documenting authorization for deployment of the Strategic Response Group, Disorder Control Unit, and other specialized units for disorder control purposes at protests.

5.  To the extent NYPD deems the assignment of specialized units or officers in "riot gear" or "hard uniforms" potentially necessary to a protest response, it should stage those officers in nearby areas not visible to protesters for deployment only if necessary.[84]

6.  NYPD should develop a written policy outlining reasonable limitations on the use of disorder control tactics, such as encirclement and mass arrests, specific to their use at First Amendment-protected protests.

7.  Through both training and policies, NYPD should expand incorporation of differentiation methods into their protest policing to reduce reliance on indiscriminate enforcement approaches that fail to distinguish between those engaged in peaceful First Amendment activity and those engaged in violence or property destruction.

8.  NYPD should employ standardized daily messages or instructions for use by commanders and supervisors during roll calls or briefings involving officers responding to protests, including guidance about the constitutional rights of protesters and the objectives of the response.

9.  NYPD should play any LRAD dispersal orders or warnings at least three times from multiple locations at large protests and events, unless emergency circumstances do not permit.

---

[84] *See, e.g.,* MAGUIRE & OAKLEY at 12-13; POLICE RESPONSE TO MASS DEMONSTRATIONS at 3-7. This recommendation is not intended to bar the ready availability of helmets for use by officers in ordinary protest response.

10.    NYPD should audio or video record LRAD dispersal orders or warnings when made at protests both from a location near the device and, if practicable, a location near protesters at the furthest distance from the device.

11.    NYPD should consider expansion of instruction on de-escalation and crowd psychology in training relating to policing protests.

12.    NYPD should involve the Community Affairs Bureau in the development and presentation of training related to policing protests.

13.    NYPD should consult with community organizations and issue-advocacy groups on the content of protest policing training and consider inviting civilians with relevant experience organizing protests or other First Amendment events to participate in such training.

14.    NYPD should complete the deployment of its new training to officers as soon as possible to ensure that officers deployed to police protests have received recent and consistent training.

15.    NYPD should ensure that the Chief of the Community Affairs Bureau is involved in discussions and decisions regarding the planning and strategy for policing large protests.

16.    NYPD should formalize the use of Community Affairs Bureau officers and individual precinct Community Affairs officers in response to large-scale protests.

17.    NYPD should require that the use of Community Affairs officers during protests be solely in a community affairs capacity and separate them from any patrol or enforcement functions, unless their alternative use is necessary due to an emergency, absence of other available personnel when immediate public safety or officer safety needs arise, or other compelling reasons.

18.    NYPD should enhance and expand its public communication during protests, including additional use of social media; such communications should balance concerns about the First

Amendment rights of protesters, officer and public safety, and police-community relations.

19.   NYPD should establish data collection procedures to reliably track complete, relevant protest data, including but not limited to arrest data. These procedures may include mechanisms for officers to designate arrests as relating to protest activity and enter such information into NYPD databases accordingly.

20.   To promote transparency around NYPD policing of protests, NYPD should report to the public regarding its responses to these recommendations and any additional changes or plans relating to policing of future protests within 90 days.

Investigation into NYPD Response to George Floyd Protests

# Part II: External Police Oversight In New York City

EO 58 also directed DOI to assess "any recommendations . . . about any additional areas of study and engagement worth pursuing." One such area is whether current structures and systems for external oversight of the NYPD can be improved. This section of this Report will provide an overview of the agencies tasked with performing oversight of the NYPD, survey relevant oversight procedures in use in other jurisdictions, and make recommendations to strengthen and simplify oversight of the police in New York City.

## A.    Who Externally Monitors Police Officers in New York City?

Several civilian City agencies presently share responsibility for overseeing the NYPD. Among other functions, these agencies conduct systemic reviews, receive and respond to complaints alleging specific instances of misconduct, propose remedial action, and publish reports on their activities and findings. Beginning in April 2021, the New York State Attorney General's Office will also have a division dedicated both to investigating complaints of police misconduct and to assessing the policies and practices of local police departments across the entire State, including the NYPD.[85]

### 1.   External Oversight of the NYPD in City Government

In New York City, three separate civilian entities conduct regular oversight of the NYPD. These oversight bodies have been created over time through varying means, and thus derive their authority from differing sources. Their jurisdiction overlaps in some respects, but remains distinct in others. None has the power to bind the NYPD to any specific policy recommendation or disciplinary outcome.

**Civilian Complaint Review Board**

The Civilian Complaint Review Board (CCRB) is an independent agency empowered to receive, investigate, prosecute, mediate, and make recommendations regarding complaints filed by the public, alleging

---

[85] In addition to these various external mechanisms, the NYPD's Internal Affairs Bureau investigates allegations of wrongdoing, including corruption and other serious misconduct, by NYPD officers and employees.

excessive force, abuse of authority, discourtesy, or offensive language by members of the NYPD.[86]

The CCRB traces back to 1953, when a division by that name within the NYPD began investigating complaints against officers and submitting recommendations to a board of three deputy commissioners. The board reviewed the cases and made proposals for disciplinary action to the Police Commissioner, who had—much like today—exclusive authority to impose discipline. In 1966, Mayor John Lindsay sought to enlarge the CCRB's board to include four non-police members, but police unions opposed the measure, and the voters rejected it in a November 1966 ballot initiative.[87]

In 1986, after the City Council passed legislation authorizing private citizens to serve on the CCRB's board, Mayor Ed Koch appointed six civilians to the board, with the Police Commissioner appointing another six members. The following year, the CCRB first began using civilian investigators, though the remaining staff comprised NYPD employees.[88]

Calls for greater police accountability intensified in 1992, when six NYPD officers were arrested in Suffolk County for selling cocaine. That June, Mayor David Dinkins took two steps towards this goal. First, he proposed making the CCRB a fully civilian oversight agency, completely independent of the NYPD; and, second, he convened the New York City Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, colloquially labeled the Mollen Commission. In September 1992, thousands of officers marched on City Hall to protest these measures.[89]

---

[86] N.Y.C. Charter § 440(c)(1); *see* CCRB Annual Report 2 (2018) (hereinafter CCRB 2018 ANNUAL REPORT).

[87] *See* U.S. COMM'N ON CIVIL RIGHTS, REPORT ON POLICE PRACTICES AND CIVIL RIGHTS IN NEW YORK CITY 51-56 (2000) (hereinafter U.S. COMM'N ON CIVIL RIGHTS 2000 REPORT); *see also* Raymond W. Patterson, *Resolving Civilian-Police Complaints in New York City: Reflections on Mediation in the Real World*, 22 OHIO ST. J. ON DISP. RESOL. 189, 189-90 (2006).

[88] *See* U.S. COMM'N ON CIVIL RIGHTS 2000 REPORT at 52.

[89] *See* MARILYNN S. JOHNSON, STREET JUSTICE: A HISTORY OF POLICE VIOLENCE IN NEW YORK CITY 286-87 (Beacon Press 2003); *Officers Rally and Dinkins is Their Target*, N.Y. Times, Sept. 17, 1992, at B1.

**Investigation into NYPD Response to George Floyd Protests**

In December 1992, the City enacted legislation making the CCRB fully independent as of July 1993.[90] In November 2019, City voters approved a series of proposals from the Charter Revision Commission, including to enlarge the CCRB's board, to ensure a certain level of funding, and to streamline its subpoena power.[91]

The CCRB's mandate is to investigate misconduct complaints in a "complete, thorough and impartial" manner, through inquiries that are "conducted fairly and independently." To that end, the CCRB shall be "comprised solely of members of the public." Its fifteen-member board "shall reflect the diversity of the city's population" and consist of: (i) five members, one from each borough, appointed by the City Council; (ii) one member appointed by the Public Advocate; (iii) three members with experience in law enforcement, designated by the Police Commissioner and approved by the Mayor; (iv) five members appointed by the Mayor; and (v) a Chairperson appointed jointly by the Mayor and City Council Speaker. Board members serve three-year terms.[92]

With a complainant's consent, the CCRB may refer suitable cases to mediation for an informal resolution.[93] Otherwise, the CCRB's employees investigate any complaints received about matters within its jurisdiction, a process that includes interviewing witnesses and gathering relevant records from the NYPD.[94] Under the Charter, the NYPD is required to honor the CCRB's reasonable requests for assistance and must "cooperate fully with investigations," for instance by disclosing "necessary" records, except when prohibited by other law. The CCRB's Board or, at its delegation, the agency's Executive Director, may subpoena witnesses or documents.[95]

Regarding interviews, the Charter requires that the Police Commissioner "ensure that officers and employees of the [NYPD] appear

---

[90] N.Y.C. Local Law 1 (1993) (codified as amended at N.Y.C. Charter § 440).

[91] *See* FINAL REPORT OF THE 2019 NYC CHARTER REVISION COMMISSION 47-56 (2019).

[92] N.Y.C. Charter §§ 440(a), (b)(1), and (b)(3).

[93] N.Y.C. Charter § 440(c)(4); *see also* Patterson at 194-197 (describing how CCRB mediation works in practice).

[94] N.Y.C. Charter § 440(c)(5); N.Y.C. Rules tit. 38-A §§ 1-23–1-24.

[95] N.Y.C. Charter § 440(c)(3) and (d)(1). Given NYPD's obligation to provide records to CCRB, subpoenas should not be required for NYPD personnel and records. The subpoena power enhances CCRB's investigations by giving it authority to compel non-NYPD witnesses and obtain records from third-parties such as telephone companies and other private businesses.

**Investigation into NYPD Response to George Floyd Protests**

before and respond to inquiries of the [CCRB] and its civilian investigators in connection with investigations," provided that the interviews comply with the NYPD's procedures for interrogation of its members.[96] When a police officer is interviewed by CCRB, neither the statements made nor any information or evidence derived therefrom can be used against that officer in a later criminal proceeding.[97] However, a CCRB investigation will not prevent the independent prosecution of an officer, whether before a court or other authorized body, for any "violations of law."[98]

Each case is assigned either to a panel of three Board members or to the entire Board, which reviews the investigative record and issues written findings and recommendations. In reaching its conclusions, the panel or Board uses a preponderance-of-the-evidence standard. Complaints that are fully investigated—for example, where a complainant pursues a matter within the CCRB's purview and remains cooperative—generally result in one of five dispositions: (i) "substantiated" (at least one of the alleged acts occurred and constituted misconduct); (ii) "unsubstantiated" (there was insufficient evidence to determine whether an act of misconduct occurred); (iii) "exonerated" (the act occurred but was not misconduct); (iv) "unfounded" (the complained-of act did not actually happen); or (v) the officer(s) involved could not be identified.[99] According to the CCRB, in 2018 the agency received 4,745 complaints about matters within its jurisdiction, 30% of which proceeded through a full investigation. Of those, the CCRB concluded that 19% of the complaints were substantiated, 48% were unsubstantiated, 8% were unfounded, in 18% the officers were exonerated, and in 8% the involved officers could not be identified.[100] Since the November 2019 Charter revisions, the CCRB also has explicit authority to make findings and recommendations "regarding the

---

[96] N.Y.C. Charter § 440(d)(2).

[97] The police officer's immunity from the use of such statements in a later criminal prosecution "'attaches automatically by operation of law,'" because the officer may be subject to dismissal for refusing to answer CCRB's questions. *Caruso v. Civilian Complaint Review Bd.*, 158 Misc. 2d 909, 914 (Sup. Ct. N.Y. County 1993) (quoting *Matter of Matt v LaRocca*, 71 N.Y.2d 154, 159 (1987)). *See also Garrity v. New Jersey*, 385 U.S. 493 (1967). CCRB rules require that a police officer be informed of this use immunity before being interviewed by CCRB. N.Y.C. Rules tit. 38-A § 1-24(d).

[98] N.Y.C. Charter § 440(f).

[99] N.Y.C. Rules tit. 38-A § 1-31—1-33; *see* CCRB 2018 Annual Report at 27.

[100] *See* CCRB 2018 Annual Report at 9, 25, 30-32.

truthfulness" of any material statement by a police officer during an investigation of a complaint against that officer.[101]

The CCRB submits its findings and recommendations to the Police Commissioner, who retains sole authority to discipline officers.[102] An investigative subject has "the right to notice and a hearing" before any discipline may be imposed.[103] In serious cases, the CCRB may recommend administrative charges against the officer involved in the complaint.[104] In that event, under an agreement with the NYPD, the CCRB's Administrative Prosecution Unit litigates the charges in a public hearing before the NYPD's Deputy Commissioner of Trials.[105] When the CCRB submits findings or a recommendation, the Police Commissioner then "shall report to the board in writing on any action taken, including the level of discipline and any penalty imposed." In any "substantiated" case in which the Police Commissioner metes out "a different penalty or level of discipline" from that recommended, the Commissioner must provide a "detailed explanation of the reasons for" doing so. If the penalty or level of discipline is lower than the recommendation, then the Commissioner also must offer "an explanation of how the final disciplinary outcome was determined," including "each factor" considered in the decision.[106]

Finally, the CCRB is required to publish semiannual reports regarding its activities.[107] In recent years, the agency has invested in a Policy Unit, which has enhanced the agency's public reporting functions, to include monthly statistical reports, monthly reports on its operations, and periodic reports on topics of public concern—including, for example, recent analyses of police use of tasers and body-worn cameras.[108]

---

[101] N.Y.C. Charter § 440(c)(1).

[102] N.Y.C. Charter § 440(c)(1); N.Y.C. Rules tit. 38-A § 1-33(c).

[103] N.Y.C. Charter § 440(e).

[104] N.Y.C. Rules tit. 38-A, subch. E.

[105] *See* Memorandum of Understanding Between CCRB and NYPD Concerning the Processing of Substantiated Complaints (dated April 2, 2012).

[106] N.Y.C. Charter § 440(d)(3).

[107] N.Y.C. Charter § 440(c)(6).

[108] *See* CCRB: Directory of Reports, https://www1.nyc.gov/site/ccrb/policy/reports.page.

**Investigation into NYPD Response to George Floyd Protests**

**Commission to Combat Police Corruption**

As opposed to investigating specific allegations of misconduct, the Commission to Combat Police Corruption (CCPC) was created to monitor the NYPD's internal efforts to detect, remedy, and prevent corruption among its members.

In 1994, as part of its Final Report, the Mollen Commission recommended creating "an independent board with a small staff and without a prosecutorial role," to "provide investigative and auditing oversight" of the NYPD's internal systems for combating corruption. The Commission stressed, however, that the NYPD should retain "primary responsibility" to investigate and prevent corruption within its ranks.[109] In February 1995, Mayor Rudy Giuliani established the CCPC by Executive Order 18, after he and the City Council could not agree on the best way to implement the Mollen Commission's recommendations. The Council sought a role in selecting the new entity's commissioners and also believed that the proposed agency should have more investigative power to conduct police corruption inquiries independent of the NYPD. The Mayor and the City's district attorneys disagreed, arguing that an additional entity investigating police corruption was unnecessary and problematic, and that the proposed agency should be focused solely on monitoring/auditing the NYPD's own efforts. Ultimately the Council's proposals were not successful and the CCPC was created by executive order as a commission with five members, some or all with law enforcement experience, who are appointed by the Mayor. [110] The Commissioners serve without compensation, and are to employ an Executive Director and "appropriate staff."[111] At present, the CCPC has three Commissioners, one of whom serves as Acting Chairperson, with two vacancies (one which has been open for seven years, and the other for over a year).[112]

---

[109] Hon. Harold Baer, Jr. & Joseph P. Armao, The Mollen Commission Report: An Overview, 40 N.Y.L. Sch. L. Rev. 73, 83-85 (1995) (hereinafter The Mollen Commission Report: An Overview).

[110] Commission to Combat Police Corruption, Sixth Annual Report 1-2 (hereinafter CCPC Sixth Annual Report

[111] Exec. Order No. 18 (1995). The CCPC relies on DOI for certain administrative functions, such as budgeting and IT services, but its substantive work is directed by the appointed Commissioners, not by DOI.

[112] See CCPC: Commissioners, https://www1.nyc.gov/site/ccpc/about/commissioners.page.

**Investigation into NYPD Response to George Floyd Protests**

Executive Order 18 sets forth the CCPC's three overarching duties. First, the CCPC "shall perform audits, studies and analyses to assess the quality of the [NYPD]'s systems for combatting corruption." This mandate includes reviewing: (i) the NYPD's development and implementation of anti-corruption policies and procedures; (ii) the effectiveness of the NYPD's methods for rooting out, and investigating allegations of, corruption; (iii) the effectiveness of the NYPD's systems of accountability, supervision, and training for anti-corruption matters; (iv) the effectiveness of the NYPD's procedures for getting the whole organization to combat corruption; and (v) such other corruption-related issues, "without limitation," that the CCPC "deems appropriate" to analyze. Second, the CCPC "shall perform audits, studies and analyses of conditions and attitudes within the [NYPD] that may tolerate, nurture or perpetuate corruption," and assess any internal efforts "to combat such conditions and attitudes." Third, the CCPC "shall be authorized to accept complaints or other information from any source regarding specific allegations of police corruption." The executive order makes clear, however, that the NYPD remains primarily responsible for investigating specific allegations of corruption made against its personnel. As a result, the CCPC normally refers specific corruption complaints to the NYPD, but "may monitor" the NYPD's handling of any referred matter. The CCPC itself may investigate a corruption complaint only in "exceptional circumstances," if the CCPC, the Mayor, and the DOI Commissioner all agree that the investigation will aid an "assessment of the [NYPD]'s anti-corruption systems." If so, then the CCPC shall take reasonable steps to ensure that its investigation does not "inappropriately interfere" with other agencies' work, and it may call upon DOI to issue subpoenas.[113]

Although Executive Order 18 is broadly phrased to authorize the CCPC to monitor anything relating to "corruption," which the order does not define, in practice the CCPC has almost exclusively devoted its resources to serving as an independent auditor of the NYPD's Internal Affairs Bureau (IAB).[114] That role is discharged by, among other things: (1) attending IAB "Steering Committee" meetings, in which representatives from IAB subdivisions discuss major open cases with IAB executive staff; (2) participating in case review sessions held in IAB

---

[113] Exec. Order No. 18.

[114] *See* CCPC: Commission Mandate, https://www1.nyc.gov/site/ccpc/about/mandate.page.

**Investigation into NYPD Response to George Floyd Protests**

field offices, in which each group presents its entire active caseload to IAB supervisors and CCPC staff for review and input; and (3) analyzing a random sample of closed IAB cases, to "evaluate whether they were fair, thorough, accurate, and impartial."[115]

EO 18 requires the Police Commissioner to "mandate the full cooperation of all [NYPD] members" in the CCPC's work. More specifically, it requires the NYPD on request to furnish "any and all" records or information relating to matters within the CCPC's domain, except when other law prohibits disclosure. And it further directs the Police Commissioner to adopt a policy stating that "interference with or obstruction of the [CCPC]'s functions" shall be grounds for termination or "other appropriate penalty."[116]

The CCPC must publish annual reports analyzing the effectiveness of the NYPD's anti-corruption procedures and proposing any modifications thereto.[117] The CCPC has done so nearly every year since its inception.[118] As an example, the 2019 report proposed criteria that IAB should use as a guide when fixing administrative penalties in substantiated cases of corruption.[119]

**Office of the Inspector General for the NYPD**

The Office of the Inspector General for the NYPD ("OIG-NYPD") is the newest of the City entities exercising independent oversight of the police. In October 2012, members of the City Council introduced a proposal to vest DOI with this responsibility, partly in response to the NYPD's stop-and-frisk practices.[120] Nearly a year later, over Mayor Michael Bloomberg's veto, the Council passed legislation amending the

---

[115] CCPC SIXTH ANNUAL REPORT at 10-13.

[116] Exec. Order No. 18, § 3(a).

[117] Exec. Order No. 18, § 5(b).

[118] *See* CCPC: Annual Reports, https://www1.nyc.gov/site/ccpc/reports/annual-reports.page.

[119] *See* CCPC SIXTH ANNUAL REPORT at 128-30.

[120] *See* Kristen Meriwether, *What Will the New NYPD IG Inspect?*, GOTHAM GAZETTE, Mar. 28, 2014, *available at* https://www.gothamgazette.com/index.php/government/4927-nypd-inspector-general; J. David Goodman, *City Council Votes to Increase Oversight of New York Police*, N.Y. TIMES, June 27, 2013, *available at* https://www.nytimes.com/2013/06/27/nyregion/new-york-city-council-votes-to-increase-oversight-of-police-dept.html.

**Investigation into NYPD Response to George Floyd Protests**

Charter to codify the OIG-NYPD as a unit within DOI with oversight over the NYPD.[121]

The City Charter now requires that the DOI Commissioner "investigate, review, study, audit and make recommendations relating to the operations, policies, programs and practices" of the NYPD, with the goal of enhancing the NYPD's effectiveness, increasing public safety, protecting civil liberties and civil rights, and promoting public confidence in the police force. The law directs the Commissioner to designate an Inspector General for the NYPD, to be "responsible for overseeing the implementation of the[se] duties."[122] The only Inspector General has been Philip K. Eure, who currently serves in that role.[123]

In addition to examining systemic issues, the OIG-NYPD fields, assesses, and responds to complaints from the public "about any problems and deficiencies relating to the [NYPD]'s operations, policies, programs and practices."[124] In practice, the OIG-NYPD refers the bulk of the complaints that it receives to either the CCRB or IAB, as appropriate, based on an evaluation of the complaint's substance and the remedy it appears to seek.

Investigations by the OIG-NYPD employ the same evidence-gathering tools as other DOI investigations. In the course of an investigation, DOI is statutorily authorized to take sworn testimony or receive other evidence, and to subpoena documents and witnesses.[125] In addition, Mayoral Executive Order 16 specifically authorizes DOI "to examine, copy or remove any document prepared, maintained or held by any [City] agency," except those exempted by law from disclosure, and to compel the testimony of City employees.[126]

Because of the OIG-NYPD's legal authority to access a wide variety of NYPD records, the Charter vests the Mayor with "discretion" over how "sensitive information" that the OIG-NYPD may need from the NYPD

---

[121] *See* N.Y.C. Local Law 70 (2013).

[122] N.Y.C. Charter §§ 803(c), 808(a).

[123] *See* https://www1.nyc.gov/site/oignypd/about/biography.page.

[124] N.Y.C. Charter § 804.

[125] N.Y.C. Charter § 805(a)-(b). DOI's subpoena power is not necessary for City documents or employees; the authority enables DOI to secure documents or testimony needed for its investigations from non-City entities.

[126] Exec. Order No. 16 (1978), § 4(a).

**Investigation into NYPD Response to George Floyd Protests**

should be treated. "Sensitive information" includes information about pending investigations, undercover operations, the identities of confidential sources or protected witnesses, intelligence matters, and other things the disclosure of which would threaten national security or the City's safety.[127]

As with any DOI investigation, the Charter requires City employees—including police officers and other NYPD employees—to offer "[f]ull cooperation" with the OIG-NYPD's activities. None may "seek to prevent, interfere with, obstruct, or otherwise hinder" those efforts.[128] And no officer or employee of a City agency may retaliate against a colleague for making a complaint or disclosing information to the OIG-NYPD, unless the person supplying the information knows it to be false or acts with willful disregard for its truth or falsity.[129] Violations of these provisions can be grounds for suspension or termination.[130]

After completing an investigation, audit, or review, the OIG-NYPD must transmit "a written report or statement of findings" to the Mayor, the City Council, and the Police Commissioner, the last of whom shall respond in writing within ninety days. These written submissions also must be published on DOI's website.[131] In recent years, the OIG-NYPD has reported on topics such as programs and policies for NYPD officers' mental wellness, the handling of complaints about biased policing, the operations of NYPD's Special Victims Division, the implementation of police procedures for interactions with transgender and gender nonconforming people, the use of litigation data for early intervention programs, and the handling of nonimmigrant visa requests by crime victims.[132] In addition, the OIG-NYPD must publish an annual report summarizing "significant" findings and recommendations from the preceding year, identifying past recommendations that have yet to be fully implemented or completed, and detailing the number of

---

[127] N.Y.C. Charter § 803(c)(3).
[128] N.Y.C. Charter § 1128(a)-(b).
[129] N.Y.C. Charter § 803(c)(5).
[130] N.Y.C. Charter § 1128(a).
[131] N.Y.C. Charter § 803(d) and (e).
[132] *See* https://www1.nyc.gov/site/doi/oignypd/reports.page.

**Investigation into NYPD Response to George Floyd Protests**

investigations open for six months or more.[133] These annual reports, dating back to 2015, also appear on DOI's website.[134]

### 2. Oversight of the NYPD at the State Level

Under recently passed state legislation, effective April 2021, the New York State Office of the Attorney General will gain new oversight authority over local police departments, including the NYPD, via a newly established Law Enforcement Misconduct Investigative Office. A Deputy Attorney General, appointed by the State Attorney General, will lead this Office. Its mission will be "to review, study, audit and make recommendations relating to the operations, policies, programs and practices" of state and local law enforcement agencies, "including ongoing partnerships with other law enforcement agencies." It will do so "with the goal of enhancing the effectiveness of law enforcement, increasing public safety, protecting civil liberties and civil rights, ensuring compliance with constitutional protections and local, state and federal laws, and increasing the public's confidence in law enforcement."[135]

Among this Office's duties will be: (i) receiving and investigating complaints, from any source, alleging corruption, fraud, use of excessive force, criminal activity, conflicts of interest, or abuse by the police; (ii) informing police officials about those allegations and the progress of investigations; (iii) determining whether an allegation warrants disciplinary action, civil or criminal prosecution, or further investigation by a different agency, and aiding any such investigation on request; (iv) publishing written reports of investigations, subject to delay or redaction to protect confidential information or the integrity of ongoing investigations; (v) periodically examining police policies and procedures for the prevention and detection of corruption, fraud, use of excessive force, criminal activity, conflicts of interest, and abuse; (vi) proposing remedial action to counter the issues just mentioned; and (vii) analyzing

---

[133] N.Y.C. Charter § 803(e)(3).

[134] *See* https://www1.nyc.gov/site/doi/oignypd/reports.page.

[135] *See* N.Y. State Senate Bill S3595-C (2019-20) (approved June 16, 2020); *see also* Office of the Governor, The State of New York, Press Release: Governor Cuomo Signs Legislation Requiring New York State Police Officers to Wear Body Cameras and Creating the Law Enforcement Misconduct Investigative Office, *available at* https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-requiring-new-york-state-police-officers-wear-body-cameras-and.

**Investigation into NYPD Response to George Floyd Protests**

actions, claims, complaints, and investigations to identify patterns, practices, systemic issues, or trends in local police departments warranting scrutiny. In addition, the Office must submit annual reports to the Governor, the Attorney General, and the Legislature summarizing its activities and "recommending specific changes to state law to further [its] mission."[136]

In fulfilling these duties, the Deputy Attorney General may subpoena witnesses and documents, take sworn testimony, examine and receive local police records, and require a police officer or employee to answer questions about "any matter related to the performance of his or her official duties." A refusal to answer questions shall be grounds for termination "or other appropriate penalty." However, the law expressly bars the admission of any statement made by a person during such an interview, or any evidence derived therefrom, against that person in a subsequent criminal prosecution, "other than for perjury or contempt."[137]

The legislation creating the Law Enforcement Misconduct Investigative Office also imposes responsibilities on the local police. In particular, "[e]very officer or employee in a covered agency shall" promptly apprise the Office of "any information concerning corruption, fraud, use of excessive force, criminal activity, conflicts of interest or abuse by another officer or employee relating to his or her office or employment." The law prohibits "adverse personnel action" against any officer or employee who reports information under this provision. By contrast, the knowing failure to report such information may lead to termination of employment or other sanction. Moreover, if a local police department within two years receives at least five complaints about an officer or employee relating to at least five separate incidents, the department must forward the complaints to the Office for an investigation into whether the subject individual "has engaged in a pattern or practice of misconduct, use of excessive force, or acts of dishonesty."[138]

---

[136] Senate Bill S3595-C § 1 (to be codified at Executive Law § 75(3)(a)-(h)).
[137] Senate Bill S3595-C § 1 (to be codified at Executive Law § 75(4)(a)-(e)).
[138] Senate Bill S3595-C § 1 (to be codified at Executive Law § 75(5)(a)-(b)).

### 3.   Civil Litigation and Criminal Prosecution

Oversight agencies operate alongside other potential external mechanisms of police regulation. For example, courts also review police conduct in civil litigation, in cases alleging wrongdoing by individual officers or more systematic failures by the NYPD. Prior litigation has resulted in ongoing independent oversight of the NYPD, including by an independent monitor, *see Floyd v. City of New York,* 959 F. Supp. 2d 668 (S.D.N.Y. 2013), and civilian participation in formulating intelligence-gathering protocols, *see Handschu v. Special Services Division*, 605 F. Supp. 1384 (S.D.N.Y. 1985). While these cases can produce significant reform, they often take years to wend their way through the courts and can demand considerable resources.

Civil litigation against individual police officers for specific incidents of misconduct provides judicial review of the incident, and may result in monetary recovery for victims if constitutional violations are found. Rarely, however, does a police officer face individual liability as a result of civil litigation, except in cases of conduct that is clearly and willfully unconstitutional. In most cases, the doctrines of qualified immunity and the indemnification of City employees acting within the scope of their authority, will insulate the officer from civil liability in their personal capacity. Thus, civil litigation can be a flawed mechanism for holding individual officers accountable. However, when reviewed in aggregate, civil litigation can potentially highlight areas in need of reform or be valuable in early intervention strategies that inform internal efforts to minimize future misconduct.[139]

Some police officer misconduct may be addressed through criminal prosecution, whether by district attorneys, the New York State Attorney General, or federal prosecutors through federal civil rights laws. While unquestionably important in some cases, criminal prosecution of police officers is unlikely to be a viable solution for the concerns that animate the public's broad desire for police accountability. One expert in this field has noted that criminal prosecutions against police officers are "too rare to deter misconduct," in part because such cases often present

---

[139] *See* NEW YORK CITY DEP'T OF INVESTIGATION, OFFICE OF THE INSPECTOR GENERAL FOR THE NYPD, 2019 ASSESSMENT OF LITIGATION DATA INVOLVING NYPD (2019), *available at* https://www1.nyc.gov/assets/doi/reports/pdf/2019/Apr/13LitData_pressrelease_report_43019.pdf.

**Investigation into NYPD Response to George Floyd Protests**

"significant legal and practical obstacles." But even if prosecutions occurred more frequently, that fact might not appreciably deter misconduct or encourage systemic change, for the simple reason that many successful prosecutions center on truly "egregious misconduct" that police departments can be quick to characterize as isolated and aberrational, "rather than systemic."[140]

Another issue with criminal prosecution as an oversight mechanism is that the working relationship between local prosecutors and police may breed a perception, rooted in reality or not, that the former will not vigorously prosecute the latter. Of necessity, prosecutors rely on police officers to investigate crimes and provide testimony in criminal cases. Because of the close relationship between district attorneys and the police, the public may have doubts about a district attorney's neutrality when weighing potential charges against a police officer in their own jurisdiction. To address the potential public perception of conflict in investigating and prosecuting police officers in cases where an unarmed civilian dies in a police encounter, New York's Governor issued Executive Order 147 in July 2015.[141] That order appointed the State Attorney General as special prosecutor, requiring the Attorney General "to investigate, and if warranted, to prosecute" cases where a law enforcement officer caused the death of any "unarmed civilian" within the State. The order further required the Attorney General to submit an explanatory report whenever that Office declined to present a case to a grand jury, or the grand jury failed to return an indictment. This Executive Order remains in effect, with the Special Investigations and Prosecutions Unit of the Attorney General Office acting as the designated special prosecutor. Recently passed state legislation codifies the Attorney General's role, starting in April 2021, as special prosecutor in all cases in which police conduct or inaction leads to the death of any civilian, whether armed or not, superseding and expanding on the Governor's 2015 Executive Order.[142] The appointment of the Attorney General as a special prosecutor may address the public perception of a

---

[140] Rachel A. Harmon, *Promoting Civil Rights Through Proactive Policing Reform*, 62 STAN. L. REV. 1, 9 (2009).

[141] Exec. Order No. 147, at 1 (2015) (noting that "public concerns have been raised that such incidents cannot be prosecuted at the local level without," at a minimum, "the public perception of conflict or bias").

[142] *See* N.Y. State Senate Bill S2574-C (2019-20) (approved June 12, 2020) (establishing Office of Special Investigation within State Attorney General's Office).

conflict in such cases, but it does not address the underlying difficulty of regulating police officer conduct through criminal prosecutions.

To Professor Christy Lopez—lead federal investigator of the Ferguson, Missouri police department, and a primary drafter of the Ferguson Report—there is thus "no question" that criminal prosecutions are "insufficient" to realize the goals of police oversight, rendering civilian oversight vital to constitutional policing. As Professor Lopez explained to DOI, when done appropriately, civilian oversight looks at a broader swath of police conduct than the criminal law does. It also does so in a more transparent manner than criminal cases, which often end in pleas, which typically do not involve a public airing of all the evidence underlying the charges. And, in contrast to the prosecution of past misconduct, oversight entities can provide the "invaluable service" of looking prospectively for patterns and trends in an effort to shape policy and prevent incidents of misconduct from happening in the future. In short, to Professor Lopez, the objectives of criminal prosecution and public oversight are "completely different."

## B.    Models of Police Oversight

### 1.   Development of Modern Civilian Review Structures

Prior to the 20th century, mayors and the police commissioners they appointed were the primary mechanism for overseeing police departments. Corruption flourished, as some mayors treated the role of police chief as a patronage job and demanded political support and personal protection for their cronies in exchange for the appointment. Over time, a movement arose to place "power over the police" in the hands of police commissions, comprising politically independent "good citizens" who would serve on a part-time, volunteer basis. These commissions resembled civilian boards of directors for the police, with the authority to hire and fire police chiefs, set policy for the departments, and hold police officials accountable. But this model proved to be less effective than hoped, with "partisan political considerations" affecting the selection of individual police

**Investigation into NYPD Response to George Floyd Protests**

commissioners, and police chiefs and departments becoming "a power in their own right, insulated and, in practice, accountable to no one." [143]

A culture of no accountability and abuses of power in the policing of minority communities eroded trust and damaged the relationship between police and members of those communities. Motivated in part by outcries over police uses of force, the civil rights movement of the 1950s and 1960s thus brought about the modern trend of civilian review boards. [144] Initially, similar to the early commissions, civilian review boards were often served by volunteers, but the organizations gradually became more robust and began to employ paid staff. These oversight entities assumed different functions. Some reviewed a police department's completed internal investigations or disciplinary determinations; others displaced a police department's internal affairs process altogether; and still others took a more holistic approach to evaluating trends and policies within police departments, to promote systemic reforms. [145]

Current police oversight models fall roughly into these same categories, outlined in a 2016 report entitled *Civilian Oversight of Law Enforcement: A Review of the Strengths and Weaknesses of Various Models*, published by the National Association for Civilian Oversight of Law Enforcement (NACOLE). According to NACOLE, around 150 police oversight agencies exist across the United States, roughly divided into three categories or models (along with "hybrid" agencies that combine more than one of these features): (1) investigation-focused, where the agency independently investigates complaints filed by members of the public against individual police officers, a process that normally involves collecting evidence, interviewing witnesses, and making findings; (2) review-focused, in which a board or commission reviews the records of completed investigations, conducted by police staff or an internal affairs bureau, or hears appeals of determinations after internal

---

[143] POLICE ASSESSMENT RESOURCE CENTER, REVIEW OF NATIONAL POLICE OVERSIGHT MODELS 5 (Feb. 2005).

[144] *See id.* at 5-6.

[145] *See* JOSEPH DE ANGELIS ET AL., THE NAT'L ASSOC. FOR CIVILIAN OVERSIGHT OF LAW ENFORCEMENT, CIVILIAN OVERSIGHT OF LAW ENFORCEMENT: A REVIEW OF THE STRENGTHS AND WEAKNESSES OF VARIOUS MODELS 4 (2016), and sources cited therein, *available at* https://samuelwalker.net/wp-content/uploads/2010/06/NACOLEStrengthsWeaknesses.pdf (hereinafter NACOLE CIVILIAN OVERSIGHT OF LAW ENFORCEMENT REPORT).

investigations; and (3) auditor/monitor-focused, where an outside body evaluates law enforcement policies and procedures, and examines complaints or investigations for patterns or trends, to promote systemic reforms.[146]

Within these broad categories, these agencies' organizational structures and legal authorizations vary, with hybrids being most common.[147] This divergence results from the differences in jurisdictions' political, social and cultural environments, their available resources, and their histories of holding police accountable for misconduct, all of which influence a locality's oversight needs.[148]

### 2. Categories of Police Oversight Models

NACOLE has catalogued the key characteristics and possible strengths and weaknesses of the three basic types of police oversight models, presented below.[149]

**Investigation-focused[150]**

| Key Characteristics | Key Strengths | Key Limitations |
| --- | --- | --- |
| Conducts independent investigations of complaints against police officers<br><br>On occasion may replace the police internal affairs process<br><br>Staffed by non-police, "civilian" investigators | May reduce bias and increase trust in investigations into citizen complaints<br><br>Full-time civilian investigators may have specialized training<br><br>Most independent form of oversight | Most expensive and organizationally complex form of oversight<br><br>Civilian investigators may face strong resistance from police personnel<br><br>Public disillusionment can arise if accountability expectations are not met<br><br>Potential to undermine the responsibility of police chiefs to maintain discipline |

---

[146] *Id.* at 4-6; *see also* Barbara Attard, *Oversight of Law Enforcement is Beneficial and Needed—Both Inside and Out*, 30 Pace L. Rev. 1548, 1550-52 (2010).

[147] NACOLE Civilian Oversight of Law Enforcement Report at 6; Attard at 1549.

[148] *See* NACOLE Civilian Oversight of Law Enforcement Report at 15.

[149] *See id.* at 7-13.

[150] Oversight agencies of this model include: Office of Police Complaints, Washington, D.C., www.policecomplaints.dc.gov; Department of Police Accountability, San Francisco, CA, www.sfgov.org/dpa; Citizens' Law Enforcement Review Board, San Diego County, CA, www.sandiegocounty.gov/clerb.html; Citizen Police Review Board & Office of Municipal Investigations, Pittsburgh, PA, www.cprbpgh.org, www.pittsburghpa.gov/omi.

Investigation into NYPD Response to George Floyd Protests

## Review-focused[151]

| Key Characteristics | Key Strengths | Key Limitations |
|---|---|---|
| Focuses on reviewing the quality of completed police internal affairs investigations

May make recommendations regarding findings or request further investigation

Commonly headed by review board composed of citizens | Generally the least expensive form of oversight, relying on volunteers or a small paid staff

Outside review of internal investigations may increase public trust in police discipline procedures

Diverse board can make recommendations that improve police-community relations | May have limited authority and few resources

Review board volunteers may have less expertise than dedicated staffers

May be less independent than other forms of oversight |

## Auditor/Monitor-focused[152]

| Key Characteristics | Key Strengths | Key Limitations |
|---|---|---|
| Seeks to promote broad organizational change by conducting systemic reviews of police policies, practices, or training and recommending improvements

Also may examine patterns or trends in complaint investigations, including those regarding the quality of investigations, findings, and discipline

Tend to be policing experts, with larger budgets and more extensive training | May be more effective at promoting long-term systemic change in police departments, with ability to track implementation of recommendations

Usually more robust reporting practices than in other types of oversight

Less expensive than full investigative agencies, but more expensive than review agencies

Broader mandate often means broader access to police department records

Independence can increase credibility with public, strengthening public outreach | Activists may view lack of focus on specific misconduct cases with skepticism

Strongly dependent on quality of staff, given expertise required to conduct systemic policy reviews, and hiring staff with insufficient expertise may cause tension with police officers

Normally cannot compel law enforcement agencies to make systemic changes |

---

[151] Oversight agencies of this model include: Community Police Review Board, Albany, NY, www.albanycprb.org; Citizens' Police Complaint Office, Indianapolis, IN, www.indy.gov/agency/citizens-police-complaint-; Civilian Police Review Board, Urbana, IL, www.urbanaillinois.us/boards/civilian-police-review-board; Citizen Review Committee, St. Petersburg, FL, www.stpete.org/boards_and_committees/civilian_police_review_committee;

### 3.  How Do These Models Work in New York City?

New York City may be unique in having three separate oversight entities, one for each of the three common categories, which arose at different times in response to different perceived failings in police conduct.[153] The CCRB is primarily an investigative agency, receiving and investigating complaints from the community alleging excessive force, abuse of authority, discourtesy, or offensive language by police officers. The CCPC is primarily a review-focused agency, in practice operating as a reviewer of the IAB investigative and disciplinary process by evaluating a sample of closed cases and attending meetings at which pending matters are discussed. The OIG-NYPD is primarily an auditor/monitor agency, directed to "review, study, audit and make recommendations relating to the operations, policies, programs and practices" of the NYPD.[154] In addition, to some degree, each agency duplicates the core function of the others—for example, the OIG-NYPD also receives complaints directly from the public and investigates some portion of them; the CCRB also has a Policy Unit that identifies broad trends and issues systemic reports, as well as the required statistical reports on the agency's own work.

Having all three review models coexist in New York City, in three separate agencies, creates the potential for dissipation of effectiveness and inefficient use of resources, as well as conflict and competition. The current moment of re-imagining policing in New York City also creates an opportunity to re-imagine public oversight of the Department. "Oversight is not a static process and should evolve over time to

---

Community Review Board on Police Practices, San Diego, CA, www.sandiego.gov/communityreviewboard.

[152] Oversight agencies of this model include: Independent Police Auditor, San Jose, CA, www.sanjoseca.gov/ipa; Office of the Independent Monitor, Denver, CO, www.denvergov.org/oim; Independent Police Monitor, New Orleans, LA, www.nolaipm.gov; Office of the inspector General, Los Angeles Police Commission, Los Angeles, CA, www.oig.lacity.org.

[153] In contrast, the newly created State Law Enforcement Misconduct Investigative Office appears to be a hybrid of the three models, expressly tasked not only with performing systemic reviews of local police departments across the state, but also with investigating specific complaints of officer misconduct on a wide range of topics, and monitoring internal discipline measures through required reporting of officers subject to repeat complaints at the department level. *See* Senate Bill S3595-C § 1 (to be codified at Executive Law § 75(2)-(3)).

[154] N.Y.C. Charter § 803(c)(1).

incorporate effective practices learned from others and to be continually responsive to changing community needs."[155]

## C.   Recurring Issues in External Oversight of the NYPD

In assessing the current state of police oversight in New York City and developing recommendations for improvement, DOI consulted the scholarly literature on civilian oversight, drew on its own experience conducting oversight of both the NYPD and other City agencies, and conducted a series of interviews with individuals who have been involved in various ways with oversight of NYPD over the last 25 years. Those interviewed include:

- Daniel Gitner, criminal defense lawyer; former federal prosecutor; former Board member, CCRB

- Meera Joshi, former First Deputy Executive Director, CCRB; former Inspector General for Correctional Services, DOI

- Joo-Hyun Kang, Director, Communities United for Police Reform

- Rae Koshetz, former Deputy Commissioner of Trials, NYPD; lawyer in private practice on police disciplinary matters

- Christy Lopez, Professor in Practice and Co-Director of Program on Innovative Policing, Georgetown Law School; former Deputy Chief, Special Litigation Section, Civil Rights Division, U.S. Department of Justice

- Mark Pomerantz, criminal defense lawyer; former federal prosecutor; former Chairperson, CCPC

- Brett Stoudt, Associate Professor, CUNY Graduate Center; steering committee member, Communities United for Police Reform

- Nahal Zamani, Director of Movement Building, Demos; formerly at Center for Constitutional Rights

---

[155] Barbara Attard & Kathryn Olson, Overview of Civilian Oversight of Law Enforcement in the United States 5 (2013), *available at* http://accountabilityassociates.org/wp-content/uploads/Oversight-in-the-US-%E2%80%A6FINAL.pdf

Based on this review, we have identified five broad areas of recurring concern in external oversight of the NYPD, which inform our ultimate conclusions and recommendations: (i) the potential for redundancy, confusion, and conflict among oversight agencies; (ii) the need for community engagement; (iii) identifying and addressing perceptions of institutional bias; (iv) the challenges in accessing NYPD records; and (iv) the effect of oversight recommendations on NYPD policy and procedures.

### 1. Redundancy, Confusion, and Conflict

As outlined above, each of New York City's three police oversight entities arose in response to different precipitating events and animating concerns. Each of these entities has been modified further in the years since its creation, whether through legislation, Charter revision, or changed circumstances. Not surprisingly, then, these oversight agencies sometimes more closely resemble a many-headed hydra than a seamless and coherent whole. Some examples reinforce the point.

First, the Mollen Commission considered, but expressly rejected, creating an external Inspector General for the NYPD, in favor of a more modest entity (the CCPC) that was limited to an audit role focused on the NYPD's internal efforts to address corruption.[156] This may well have been a logical choice at the time, given the focus on criminal corruption and the belief that such work was better handled primarily by agencies like the FBI, the district attorneys' offices, and federal prosecutors. In 2012, facing a different landscape of concerns about police conduct, the City Council implicitly overrode that choice when it created the OIG-NYPD as an independent monitor of all "operations, policies, programs and practices" of the NYPD. Indeed, that grant of authority on its face encompasses the CCPC's duties to audit and study the NYPD's anti-corruption procedures.[157] However, OIG-NYPD does not now duplicate the CCPC's efforts, described in detail above. Although the CCPC's annual reports have identified some important flaws in IAB investigations and in NYPD discipline, and its function remains

---

[156] See THE MOLLEN COMMISSION REPORT: AN OVERVIEW AT 84-85; see also MOLLEN COMMISSION REPORT 151 (1994) (stating that Commission "rejected the Inspector General proposal because it wholly strips the [NYPD] of its capacity—and, most important, its responsibility—to investigate itself," which might "eliminate[] its accountability for battling" corruption).

[157] Compare N.Y.C. Charter § 803(c)(1), with EO 18 § 2(a)-(b).

Investigation into NYPD Response to George Floyd Protests

important, it bears consideration whether it needs to be performed by a standalone agency. The NYPD has made enormous strides in battling corruption within its ranks, as well as in creating and maintaining a professional and well-staffed IAB. Rooting out police corruption will of course always be a serious matter, but the monitoring of the NYPD's internal efforts at combatting it is but one in a constellation of pressing police oversight issues today, rather than the primary or over-riding one.

Second, all three oversight agencies regularly publish reports on systemic issues of concern within the NYPD, along with proposals for remedial action. Because the agencies have separate leadership, operate under different structures, and do not coordinate in selecting topics, this bevy of reports raises a potential for unintended conflict. Moreover, the NYPD also must expend significant time and resources absorbing, synthesizing, and deciding whether to implement some or all of these recommendations from three different agencies. At a minimum, the current structure of police oversight risks burying the NYPD and the public in information, diluting the force of any particular conclusion. As a leading commentator has suggested in a different context, a police department's "holistic review of information from multiple data sources" may lead to "information overload" and possible "errors" in weighing the information's relative importance.[158] Whatever is gained from the benefit of different perspectives is arguably lost to confusion or competing messages. Moreover, scarce resources (particularly at a time of fiscal crisis) can easily be wasted through duplication of effort.

Third, each of the three current oversight agencies separately invites public complaints about police misconduct. Investigating specific instances of misconduct constitutes the CCRB's core function, although that agency has jurisdiction over only those complaints alleging excessive force, abuse of authority, discourtesy, or offensive language. By contrast, the CCPC reviews the NYPD's internal systems for combating corruption, and may receive individual complaints but under the law must refer them to IAB for investigation, barring extraordinary circumstances. The OIG-NYPD also receives individual complaints from the public, investigates some of them, and refers others to the CCRB or IAB, as appropriate. In 2019, for example, the OIG-NYPD received 448 total complaints, referring 235, or more than half, to other entities: the

---

[158] Joanna C. Schwartz, *What Police Learn from Lawsuits*, 33 CARDOZO L. REV. 841, 878 (2012).

bulk of the referred complaints went to IAB, some to the CCRB, and a handful to other divisions of DOI, or individual police precincts or commands. The problem is not inter-agency referrals, per se, but rather that the constitutionally protected right of petitioning the government about an issue with law enforcement ought not resemble a game of telephone. A simpler oversight universe could provide the public with a clear path for misconduct complaints of all kinds, facilitate the investigative process, and lessen delay.

### 2. Community Engagement

These concerns about duplication and overlap go hand-in-hand with effective community outreach. Put simply, a police oversight agency needs to be a viable messenger, capable of assuring the community that its concerns about law enforcement will be heeded. The public needs to know that a public police oversight agency exists, what it does, how to contact it, and the results that it achieves. Both DOI as a whole and the CCRB are required to conduct public outreach and education.[159] DOI does so for its citywide mission through public information campaigns and extensive training of City employees. OIG-NYPD specifically has its own Outreach director, although the role is more focused on direct outreach to specific groups related to ongoing systemic reviews, rather than general public or community messaging. Through its Outreach and Intergovernmental Affairs Unit, the CCRB routinely engages the community on a host of topics throughout the five boroughs.[160] The CCRB's website also permits complainants to track the status of their complaints.[161]

Several interviewees stressed the importance of public outreach, including towards members of demographics who might not normally file complaints. Effective outreach would be facilitated by creating a strong identity as a comprehensive police oversight agency that is

---

[159] N.Y.C. Charter § 808(a) (DOI generally must "conduct annual outreach campaigns to educate the public on forms of government corruption, fraud, and waste, and provide information regarding how the public can submit complaints to the department."); N.Y.C. Charter § 440(c)(3)(7) (CCRB duties include "informing the public about the board and its duties" and "administer[ing] an ongoing program for the education of the public."); CCPC rarely, if ever, holds public events or engages in community outreach beyond its published reports.

[160] *See* CCRB: Outreach & Intergovernmental Affairs, https://www1.nyc.gov/site/ccrb/about/outreach.page.

[161] *See* Complaint Status Lookup, https://www1.nyc.gov/apps/ccrb-status-lookup.

professional, accessible to all, and fair to all. One interviewee summarized this as an identity that is neither "pro-police" nor "anti-police," but rather "anti-police-misbehavior." This echoes the sentiment of two past presidents of the board of directors of NACOLE, who have written that an "oversight agency cannot be seen as a champion of the community or a mouthpiece for the police department; instead, in order to have legitimacy, the agency must be seen as fair to all stakeholders."[162]

Broader investment in public information and outreach, with clear messaging, will have a salutary effect on police oversight, beyond merely facilitating individual complaints. One expert specifically recommends that police oversight agencies hold monthly public sessions to report on the entity's findings and invite questions from community members.[163] The CCRB currently holds monthly meetings that are open to the public. However, in our interview with former CCRB board member Daniel Gitner, he suggested that, in addition to holding town-hall-style forums to announce internal statistics and the like, the CCRB should convene regular public hearings around the City, where police officials may appear and testify about the NYPD's training, methods, and responses to newsworthy events, in response to which CCRB members may ask questions or offer feedback in a non-adversarial way. Such events could benefit all participants—the CCRB, the police, and the community. The goal would be to break down barriers between the public and police, who would offer a relatively current, unvarnished account of their actions, as well as showcase the CCRB as a neutral but effective inquisitor of the police. Moreover, this type of joint public outreach, different from the NYPD's current community board meetings, would commit the NYPD to a positive public message of welcoming complaints about police officer misbehavior and endorsing the function of an independent outlet for receiving those complaints. Since Mr. Gitner's time on the board, the CCRB has expanded its efforts to hold public meetings that are more community-focused and occur in locations other than at the CCRB's offices, although those efforts have generally not involved the NYPD.

---

[162] Attard & Olson at 9.

[163] Udi Ofer, *Getting It Right: Building Effective Civilian Review Boards to Oversee Police*, 46 Seton Hall L. Rev. 1033, 1051 (2016).

### 3.  Identifying and Mitigating Perceptions of Institutional Bias

Any review of police oversight structures and procedures should aim to identify features that may generate a perception of improper bias for or against law enforcement, and strive to minimize those potential effects. Attention to this issue promotes overall public confidence in the results of oversight, eases cooperation and acceptance from the police, and ideally strengthens trust between the Department and the community.

All interviewees expressed various concerns about independence and bias in police oversight. Those concerns typically encompassed one or more of the following related ideas: (i) that perspectives of law enforcement should be represented within a civilian oversight board or agency; (ii) that staffing such a board or agency with people whose primary outside employment involves suing or criticizing the police creates the opportunity for perceived bias or conflicts of interest; (iii) that groups or individuals advocating for police reform should have an active communications channel with the oversight agency; and (iv) that such an agency must be perceived as independent from both the Department and the Mayor. In sufficiently extreme cases, the composition of an oversight board or agency may lead both police officers and the community to believe, rightly or wrongly, that individuals who are too closely identified either with law enforcement, or conversely with a primary identity or occupation in direct opposition to law enforcement, cannot function as a neutral arbiter of misconduct allegations against the police or as a respected and effective voice for needed reforms.

The CCRB attempts to mitigate this concern by requiring, to the extent practicable, that every three-member panel assigned to review a case include one appointee of the Police Commissioner with prior law enforcement experience, in addition to appointees of the Mayor, the City Council, and the Public Advocate.[164] To guard against obstruction or stalemate, such panels may decide matters by a vote of any two of three members. Ms. Joshi endorsed the use of this and other "checks and balances" as a bulwark against structural bias, while noting the difficulty of deciding where to "draw the line" regarding who may serve on an oversight agency so as to inspire confidence in all stakeholders. And Professor Lopez cautioned against tilting the scale too far towards

---

[164] N.Y.C. Rules tit. 38-A § 1-31(b).

law enforcement, such that oversight agents effectively become "cheerleaders for the police." At the same time, although she does not believe that law enforcement expertise should be a prerequisite for oversight, and sees significant value in having civilians unaffiliated with the criminal justice system perform this duty (much like in the jury system), Professor Lopez noted that pairing individuals with and without law enforcement experience—as the CCRB does—has clear value, both for perceptions of neutrality and the substantive quality of the oversight work.

Numerous interviewees emphasized the importance of all involved in police oversight, regardless of their background, to acquire some understanding of the difficulties and realities of policing. A variety of methods could provide those who lack such insight with practical knowledge of policing, whether by periodically doing a "ride-along" with officers or participating in training sessions, perhaps with simulators used in the police academy. Similarly, a majority of interviewees noted that civilian investigators, by and large, tend to be junior staffers, sometimes straight out of college, which may affect how the NYPD views their recommendations. Efforts to hire some number of more permanent and seasoned investigators, including some with prior law enforcement experience, could make a valuable contribution in this regard. For a variety of reasons, neither the CCRB nor OIG-NYPD have many staff members with this type of prior experience.[165]

As to the corollary problem of the perception of being too close to the police, the OIG-NYPD's placement as a division within DOI presents particular concerns regarding its relationship with the NYPD. DOI is a law enforcement agency, whose core mission (investigating allegations of fraud, corruption, and other misconduct by City employees, agencies, and contractors) requires regular coordination and partnership with the NYPD. Indeed, although walled off from the work of OIG-NYPD, DOI has its own squad of NYPD detectives who are detailed to DOI to assist in other investigations, much like detectives assigned to the City's district attorneys' offices. Over the years, reform advocates and individual complainants to OIG-NYPD have consistently raised concerns about whether the office's placement within DOI (given the agency's overall mission and necessary relationship with NYPD)

---

[165] Both agencies do have a number of former prosecutors on staff, often in leadership positions.

**Investigation into NYPD Response to George Floyd Protests**

undermines the independence of OIG-NYPD or contributes to a perception of bias in favor of the police.

The opinions of our interviewees on this question were mixed. Several strongly echoed the concerns about at least the perception of bias or conflict of interest, and the importance of an oversight agency having total independence from law enforcement in general and the NYPD in particular. Others felt that DOI's longstanding reputation for independence could overcome any perceptions of institutional bias, and that OIG-NYPD had benefitted from DOI's extensive experience in oversight of City government and its institutional authority. Those most knowledgeable about DOI, however, acknowledged that DOI's oversight model for all other City agencies depends heavily on handling a wide range of investigations (from criminal fraud and corruption, to conflicts of interest, to individual misconduct) and widening out from that deep well of experience to prepare public reports on systemic issues and make policy and procedure recommendations for reform. Drawing on her experience at both DOI and the CCRB, Ms. Joshi confirmed that investigating specific complaints of misconduct will enhance an entity's capability to conduct systemic reviews, by enabling the entity to "dig around" in source material for evidence of wider practice and providing an expansive view of where the target agency is particularly vulnerable to corruption, misconduct, or abuse. The OIG-NYPD neither receives nor investigates anywhere near the volume of complaints that the CCRB does, or that the other IGs within DOI do (relative to the size of their respective agencies), potentially placing the OIG-NYPD at an informational disadvantage in identifying topics for systemic review that can have the greatest impact.

To be clear, none of these issues presently impedes the DOI Commissioner, or the Inspector General for the OIG-NYPD, from capably fulfilling their assigned function of monitoring the NYPD. Nevertheless, a perception of structural bias may be unavoidable, given that DOI itself is a law enforcement agency, which otherwise partners with the NYPD on a significant percentage of its non-OIG-NYPD work. Moreover, as a matter of good government, avoidance of potential conflicts of interest is generally not best left to reliance on the integrity of the specific individuals who happen to fill the roles at a given time, and whose occupation of those roles will inevitably be transient. Where

institutional design can eliminate the potential conflict, it should. Perceptions of bias or capture, regardless of merit, should be weighed with particular care in an area as fraught, and as dependent on fostering public trust, as police oversight. The criminal prosecution of police officers by local prosecutors—as discussed in a prior section—raises analogous issues, prompting the Governor and then the State Legislature to vest prosecutorial authority over police-involved killings in a special prosecutor at the state level, who does not routinely work with local police departments as a law enforcement partner.

### 4.  Challenges in Accessing NYPD Records

Varying legal provisions govern New York City's oversight entities' access to police records. However, all generally require the NYPD to fully cooperate, provide relevant documents, except where other laws prohibit disclosure, and mandate that its officers and employees appear for interviews on pain of discipline or termination. Specifically, the NYPD must provide the CCRB with "records and other materials which are necessary for investigations."[166] Similarly, the CCPC is entitled to "any and all documents, records, reports, files or other information relating to any matter within [its] jurisdiction."[167] DOI has "authority to examine, copy or remove any document prepared, maintained or held by any agency,"[168] and the statute specific to OIG-NYPD contemplates similarly broad access, with mayoral review of disputes about the circumstances of access to documents that may be particularly sensitive.[169]

Despite these seemingly broad rights of access, the process of obtaining materials from NYPD has not always gone smoothly. Across decades of oversight, a variety of institutional structures, and different leadership of oversight agencies and the NYPD, the recurring challenge of extracting documents and records from NYPD to facilitate effective oversight is a persistent theme. Every interviewee with personal experience in an oversight capacity noted that the NYPD historically has not responded to oversight agencies' requests with appropriate

[166] N.Y.C. Charter § 440(d)(1).
[167] Exec. Order 18 § 3(a) (1995).
[168] Exec. Order 16 § 4(a) (1978).
[169] N.Y.C. Charter § 803(c)(3), incorporating LL 70 (2013).

speed, openness, or alacrity. These accounts accord with the present-day experience of both the CCRB and the OIG-NYPD.

To be sure, the NYPD has many legitimate concerns that require caution in providing access to certain records. For example, both City and state law impose various restrictions on personal information of suspects and arrestees, state sealing statutes limit the disclosure of matters that did not result in criminal convictions, the safety of witnesses and informants must be protected, ongoing criminal investigations cannot be jeopardized, and the City's attorney-client privilege must be preserved against waiver by disclosure to third-parties or the public. However, many of these issues are not unique to NYPD, and in other settings are routinely resolved in favor of disclosure, even if subject to protections tailored to the relative need for confidentiality. Examples of such disclosure regimes abound in the context of DOI's oversight of other City agencies and in discovery procedures in criminal and civil litigation. The particular challenges of resolving these issues with NYPD appear to stem more from an entrenched resistance to external oversight, and doubts about its legitimacy or value, than from any truly intractable confidentiality concerns.[170]

The particular jurisdictional grant of each agency has also been cited by NYPD over time as a basis for deciding not to provide access to records or to unilaterally set the terms under which such records will be produced or interviews will occur. For example, when Mr. Pomerantz was the Chairman of the CCPC in the early 2000s (pre-dating the creation of OIG-NYPD), the agency attempted to initiate investigations into certain policies and practices of the Department, such as the NYPD's possible downgrading of crime reports to manipulate statistics, and the manner in which the NYPD handled allegations of excessive force when criminal suspects died in custody. Mr. Pomerantz informed DOI that the NYPD declined to provide records for these and other proposed CCPC investigations, on the asserted ground that, in the NYPD's view, those matters did not involve "corruption," which was the

---

[170] In addition, our survey of practices in other jurisdictions indicates that, while access to records is a recurring problem, it is not uncommon for police oversight agencies to have much simpler and more direct access to police records than is true in New York City. Such direct access can include, for example, the ability to directly access police databases that enable searching of body-worn camera footage or complaint/incident records (which at NYPD are commonly referred to as "61s").

**Investigation into NYPD Response to George Floyd Protests**

extent of the CCPC's mandate. The continual stalemate over access to records and the consequence that, in his view, CCPC could thus not fulfill its oversight mission, played a significant part in Mr. Pomerantz's resignation from the CCPC in 2005.[171]

Similarly, since the creation of the OIG-NYPD, the NYPD has frequently taken the position that there is a difference in the scope of OIG-NYPD's authority derived from the authority of the DOI Commissioner and the scope of its authority derived from the specific enabling legislation. In brief, NYPD has taken the position that DOI's broad EO16 authority applies only in investigations of misconduct, and OIG-NYPD's "systemic" or "policy and practice" investigations are governed by LL70, which in NYPD's view is different from DOI's general authority. This dispute has affected NYPD's willingness to provide certain requested records and also has engendered lengthy disagreements over the terms governing interviews of NYPD personnel.[172] Even where such disputes are ultimately resolved, their resolution can take months or even years of negotiation and discussion, delaying oversight work.[173]

For its part, in its latest annual report, the CCRB noted more than a five-fold increase over two years in the average number of days it took for the NYPD to release body-worn camera footage, which the CCRB sensibly views as "vital" to "effective oversight."[174] Based on our interviews, the access challenges faced by the CCRB have existed for

---

[171] *See* William K. Rashbaum, *Police Corruption Panel Is Losing Its Chairman*, N.Y TIMES, Apr. 22, 2005.

[172] For example, whether attorneys from the NYPD Legal Bureau may represent these witnesses; typically, DOI does not permit agency counsel to attend most witness interviews of City employees, although witnesses may be represented by their own counsel if they choose.

[173] DOI's subpoena authority is of little moment here, as that authority is generally employed for non-City entities and individuals (e.g. to obtain telephone records from Verizon, or to compel the testimony of the bookkeeper for a private business). DOI's authority to compel the production of City records and the testimony of City employees derives from EO16 and the related Charter provisions, not from subpoenas. Indeed, the power of a subpoena is in the availability of judicial process to enforce it; it would be highly unusual for a court to entertain an enforcement action between separate agencies of the same executive branch of City government.

[174] CCRB 2018 ANNUAL REPORT at 3; *see also* Erin Durkin, *Body cameras aid police misconduct investigations, but CCRB faces hurdles getting footage*, POLITICO, Feb. 27, 2020, *available at* https://www.politico.com/states/new-york/albany/story/2020/02/27/body-cameras-aid-police-misconduct-investigations-but-ccrb-faces-hurdles-getting-footage-1263841 ("Since the body camera program began, the board has requested footage more than 4,000 times, but only received it half the time.").

years, and cover a variety of materials beyond body-worn camera footage.

To be sure, the NYPD regularly provides significant amounts of material to its oversight agencies without difficulty or delay. But appropriate and meaningful access for purposes of oversight cannot be measured by merely comparing the volume of what has been provided to the volume of what has been withheld.

Structural issues within the NYPD also can create barriers to effective access. In recent years, the NYPD has created a Risk Management division, headed by a civilian Deputy Commissioner. Risk Management houses, among other things, the Inspector General Compliance Unit (IGCU), which is the primary contact for the OIG-NYPD for records and interview requests. In many ways, the IGCU is very helpful in facilitating the OIG-NYPD's work. However, in practice neither IGCU nor the Deputy Commissioner for Risk Management appear to have the authority to compel other parts of NYPD to provide requested records, and decision-making authority over access disputes often lies not with Risk Management but rather with the NYPD's Legal Bureau or other NYPD executives. Indeed, at times it is unclear who exactly is responsible for what access decisions, creating further challenges to resolving disputes in a timely way. Similarly, the CCRB's records requests go to the Legal Bureau for some matters, to IAB or the Department Advocate's Office for others, and still others to Risk Management. This diffusion of responsibility often operates to hinder the work of the oversight agencies.

At present, CCPC appears to have few access issues, in part because they have settled into a very narrow role that involves dealing almost exclusively with IAB, which is the division of NYPD that, in the present experience of all three agencies, is most amenable to the concept of external oversight.

These persistent access issues cannot be solved by giving these agencies new authority—their authority on paper is already extensive and thorough. At bottom, effective access (and thus effective oversight) requires buy-in from the Department at the highest levels. The NYPD, like most law enforcement agencies, is a para-military organization with a command-and-control structure. If a police commissioner accepted and

embraced the necessity and value of external civilian oversight, along with the obligation to cooperate fully with it, and then clearly communicated that cultural value to subordinates, many if not most of these access problems would disappear. Of course, NYPD is also a huge bureaucracy that can frustrate the designs of even those in the highest ranks; addressing the access issues will not be as simple as waving a magic wand. But one thing is clear: without support from the Police Commissioner, improvement on these issues is unlikely.

### 5.   Effect of Oversight Recommendations on NYPD

None of the three oversight agencies in New York City has the power to bind the NYPD to any specific policy recommendation or disciplinary outcome. The OIG-NYPD and CCPC recommend systemic reforms and, respectively, keep tabs on the extent to which the NYPD has implemented or rejected those proposals. The CCRB investigates complaints of misconduct, prosecutes serious administrative charges before the NYPD Deputy Commissioner of Trials, and submits findings and recommendations to the Police Commissioner, who may reject them upon providing a written explanation. As the CCRB has reported, in 2018, the Police Commissioner concurred 52% of the time in the discipline recommended in substantiated cases, and concurred 38% of the time in the discipline recommended after a CCRB administrative prosecution.[175]

According to NACOLE, very few existing oversight agencies have the authority to make final determinations regarding the outcome of an investigation.[176] This feature is more common in oversight agencies developed within the context of federal consent decrees.[177] Those few systems outside of consent decrees where an independent agency may make a final and binding determination—such as in Portland, Oregon—allow either side to appeal the decision.[178]

---

[175] *See* CCRB 2018 ANNUAL REPORT at 5.

[176] *See* NACOLE, FAQs, *Who should make the final determination as to whether the allegations in a complaint should be sustained and what corrective actions, or disciplinary measures should be imposed?*, https://www.nacole.org/faqs.

[177] *See id.*

[178] *See id.*; Portland City Code § 3.21.160; *see also* Ofer at 1043 (listing Newark, Chicago, Detroit, Milwaukee, San Francisco, and Washington, DC, as cities with civilian review boards able to impose "some form of disciplinary authority").

As to disciplinary recommendations, giving another agency the authority to bind the NYPD poses a number of complex issues, the resolution of which is beyond the scope of this Report. However, we encourage elected officials and policy makers to further study and consider the question of what authority external disciplinary findings should have. Some of the difficult questions that merit further consideration include what significance to assign to the relatively high rate of non-concurrence by the Police Commissioner on CCRB recommendations and what effect that has on public confidence in the accountability systems for police misconduct; whether the current CCRB process adequately provides for the due process necessary for binding disciplinary rulings; and what the effect would be on the ultimate accountability of the Police Commissioner for discipline. On that score, one interviewee noted to DOI that the NYPD already reports to a civilian—the Mayor—and questioned whether the extreme step of removing disciplinary authority from the Police Commissioner would improve police practices enough to offset the erosion of the NYPD's internal "command authority" that would likely result from that move. Finally, consideration of whether the CCRB should have authority to mandate disciplinary findings should also be evaluated in the context of the forthcoming NYPD disciplinary matrix. Recent City Council legislation calls for the NYPD to develop and publicly share "a disciplinary matrix that sets forth an advisory schedule of violations, penalties, and mitigating and aggravating circumstances, or any other factors" relevant to "determining the appropriate discipline for [NYPD] personnel for substantiated violations of department rules or other policies."[179] This law provides, however, that nothing in it "shall be construed to limit the discretion of the commissioner to impose discipline, and the commissioner may modify the disciplinary matrix at any time."[180] NYPD published a proposed disciplinary matrix for public comment in late August 2020, with the expectation that a final version will be unveiled in January 2021.

Even with the complexities identified above, compelling a police department to embrace a factual finding about a specific alleged instance of misconduct may be far simpler than demanding that it adopt

---

[179] N.Y.C. Introduction No. 1309-2018 (eff. July 15, 2020) (to be codified at Admin. Code § 14-186(a)).

[180] N.Y.C. Introduction No. 1309-2018 (to be codified at Admin. Code § 14-186(b)).

an outside auditor's systemic recommendation. A systemic change to a police department may face contractual or other legal hurdles, or entail a weighing of institutional costs and benefits (both financial and operational), that may be outside the base of knowledge of a purely external monitor. And insofar as the recommendation may require resources to effectuate, it may resemble an unfunded mandate, causing the police to divert needed personnel or funds from other areas to achieve compliance.[181] Professor Lopez remarked to DOI that for systemic recommendations, she found it less clear that any one entity "should have a fiat," opining instead that ongoing discussion among stakeholders with relevant expertise would likely be optimal.

Although frustration with the NYPD's perceived resistance to reform caused some of our interviewees to press for oversight agencies to be given authority to require the NYPD to implement their recommendations, we cannot agree with that view when it comes to policy, practice, and procedure recommendations.[182] Indeed, giving an oversight agency the unreviewable power to mandate policy changes in another agency would also be profoundly undemocratic, and counter to the norms of good governance. Decisions about which competing policy goals should take precedence, or how to prioritize the spending of limited public funds, can and should be made by elected officials (whether the Mayor or the City Council) who are accountable to the voters, or by the particular agency head who is accountable for the performance of his agency (in this case, the Police Commissioner). While we believe that mandates are ill-advised, public transparency and accountability are incredibly important, such as the work done by OIG-NYPD to routinely track and report on the NYPD's acceptance and implementations of its recommendations. Likewise in the discipline context, transparency can provide some measure of accountability even if disciplinary decisions are not binding, such as the new requirement that the Police Commissioner provide written reasons when deviating from a CCRB recommendation.

---

[181] *See* Harmon at 24-25 (highlighting the "strong ethical and legal barriers" to imposing unnecessary costs on police departments, and noting that even courts in police-reform litigation generally are limited to imposing remedial measures that are "no more costly than necessary to remedy the illegality.").

[182] As opposed to recommendations on individual discipline, as to which this Report takes no position.

In a similar vein, state and local legislators have recently taken various steps to make internal discipline of police officers more consistent, transparent, and trustworthy. In 2018, a panel of former federal officials was retained by then-Police Commissioner James O'Neil to examine the NYPD's disciplinary system. The panel's public report noted that "[l]ack of transparency was one of the most frequent complaints" regarding the NYPD's disciplinary process. The report also noted that the NYPD released "minimal data to the public on disciplinary outcomes or decision making," which "engendered mistrust in the community" and prevented the panel itself from "evaluat[ing] whether appropriate or consistent discipline was imposed."[183] Several interviewees echoed these sentiments to DOI. The panel recommended that the Police Commissioner be required to state in writing the reasons for departing from a disciplinary recommendation, which an amendment to the City Charter now requires in cases of misconduct that the CCRB deems substantiated.[184] Multiple interviewees lauded this development.

## D.   DOI's Findings

Countless well-informed articles and studies have analyzed issues relating to police oversight and suggested ways to optimize this process. DOI does not seek to replicate that mountain of scholarly work here. However, the following factors are widely accepted as key ingredients of successful police oversight and accord with our own findings:

1. *Independence* from interest groups, police, and government officials in reaching conclusions about investigations and policy issues;

2. *Support of key government officials* for oversight agencies' mission, recommendations, and independence;

3. *Access to senior law enforcement officials*, who should communicate directly and regularly with the oversight agency;

---

[183] HON. MARY JO WHITE, ET AL., REPORT OF THE INDEPENDENT PANEL ON THE DISCIPLINARY SYSTEM OF THE NEW YORK CITY POLICE DEPARTMENT 5 (2019).
[184] *See* N.Y.C. Charter § 440(d)(3).

4. *Ample authority* to perform independent investigations—including unfettered access to documents, witnesses, and other evidence—and to review any systemic issues that may surface through the investigation process or from community input;

5. *Adequate funding* to hire sufficient staff for timely and thorough investigations and reviews, and to purchase and maintain databases and other useful tools;

6. *Qualified staff,* with the training and experience to be viewed as effective and legitimate, including "some basic understanding of policing and the role of oversight";

7. *Community support and outreach*, whether through websites, social media, reporting, or other methods of communication, to educate the community about the agency's authority and efforts to improve policing; and

8. *Transparency and accountability*, through regular public reporting.[185]

In New York City, many, though not all, of these factors exist in our current police oversight regime, but there is room for improvement.

### Finding 1: Police oversight would be strengthened if existing functions were consolidated into a single agency, headed by an independent board

Although the current tripartite structure has arguable advantages, on balance we conclude that the work of police oversight would be best served by a single agency with the combined authority to (i) investigate complaints from the public and recommend discipline of individual officers; (ii) conduct systemic reviews of NYPD policy and practices and make recommendations for reform, including publishing regular public reports about complaint statistics and public tracking of progress on recommendations; and (iii) periodically audit NYPD's internal discipline and anti-corruption efforts.

A single agency, headed by an independent board with a mix of members, could create a strong identity as a complete police oversight

---

[185] ATTARD & OLSON at 5-10.

agency, and conduct effective public outreach and education to reinforce that identity and promote public trust. This structure could reduce inefficiencies and redundancies and thus use civilian oversight resources most efficiently in a time of fiscal challenge. It could more effectively draw on the synergies between misconduct investigations and systemic reviews, to produce high quality work in both areas. It could speak with one voice on access issues, pressing for consistent policies from the NYPD and enacting protocols to address NYPD's legitimate concerns without unduly delaying oversight investigations. A single agency has the potential to ease access issues in other ways as well, by streamlining communications and reducing the administrative burden on the NYPD of responding to disparate requests from three different agencies. A single agency would also mirror the powers and mandate of the new state entity in the Attorney General's office (*i.e.* misconduct investigations, policy and practice reviews, and disciplinary reporting and auditing), providing an effective counterpart—or, when necessary, counterweight—to those efforts for New York City. Finally, oversight must be dynamic, and a single agency possessing the full range of oversight authority is best positioned to evolve as needed to meet the next police oversight challenge.

Such a change could be accomplished within the current governing structure of the CCRB, retaining the board and its mixed membership selected by a combination of the Police Commissioner, the Mayor, the City Council, and the Public Advocate. A consolidated agency could take the form of two or three robust divisions that report, through an executive director, to this independent board: First, an investigations division that combines the current misconduct/complaints investigative authority of both the CCRB and the OIG-NYPD. Second, a strong inspector general/policy division that maintains the current authority and mandate of the OIG-NYPD to conduct systemic policy reviews and issue and track its recommendations, augmented by the resources of the CCRB's current Policy Unit, including but not limited to its complaint data analytics and statistical work. The internal discipline audit function currently performed by the CCPC and its staff could continue as a third division, or become one aspect of the work of the policy division.

Investigation into NYPD Response to George Floyd Protests

The procedural steps required to accomplish this proposal in whole or in part depend on the source of that agency's authority. Alone among the three entities, the CCPC was created by a mayoral executive order. The City Charter allows the Mayor, "by executive order, at any time, [to] create or abolish bureaus, divisions or positions," or alter their "specified functions, powers and duties," as the Mayor "may deem necessary."[186] On its face, this provision thus provides the Mayor with plenary authority over the CCPC's continued existence and functions. By contrast, as previously discussed at length, the CCRB and OIG-NYPD derive their respective authority from separate sections of the City Charter. Intended as an organic document, the Charter may be revised in a number of different ways: by state legislation,[187] by local law of the City Council that does not conflict with state law,[188] by voter petition,[189] or through the appointment of a Charter Revision Commission by the Mayor or City Council.[190]

Both the OIG-NYPD and the current independent version of the CCRB were created through local laws by the City Council, with certain aspects of the CCRB recently modified through a Charter Revision process generating five amendments approved by voters in November 2019. The normal City Council legislative process would be sufficient to consolidate the authority and mandate of these two agencies.

### Finding 2: No executive within the NYPD is accountable for ensuring that the Department meets its obligation to facilitate and cooperate with its oversight agencies

Presently, the oversight agencies interact with several apparent decision makers to obtain access to records and witnesses within the NYPD. This multiplicity takes the form both of having to go to different executives or divisions for different types of requests, as well as a lack of clarity as to whose permission or consent is needed to authorize access to certain records or witness testimony. This diffusion of responsibility for cooperating fully with civilian oversight can hinder, rather than

---

[186] N.Y.C. Charter § 8(f).

[187] N.Y. State Const. art. 9, § 2(b)(1).

[188] Municipal Home Rule Law § 10(1)(ii)(c)(1); N.Y.C. Charter § 40(1).

[189] Municipal Home Rule Law § 37; N.Y.C. Charter § 40(2). The voters must approve any local law that adopts an altogether "new charter," however. Municipal Home Rule Law § 23(2)(a).

[190] Municipal Home Rule Law § 36(2), (4).

facilitate, the work of these agencies and undermines accountability for decisions that frustrate access.

Locating this authority under a single Deputy Commissioner could ameliorate this problem, provided the executive had a mandate from the Police Commissioner and real authority within the NYPD to collect records from all divisions and bureaus and direct interviews with officers as necessary. The current Risk Management division could be an effective place for this role, permitting it to be aligned with NYPD's own internal reform mechanisms. Designating and empowering a single senior executive for this role would not preclude consultation with the Legal Bureau where necessary, but would promote accountability and enable the development of more consistent policies and protocols consistent with the existing laws' presumption of access. Such a structure, properly implemented, could also reduce the administrative burdens within the NYPD of responding to oversight agency requests.

## E.    Conclusion and Recommendations

No structural proposal can succeed without a Police Commissioner who embraces the necessity of effective civilian oversight and accepts the value of external perspectives. This is a fraught moment for policing, which is a vital City service. As discussed thoroughly in Part I of this Report, public trust is at a low ebb, hampering the ability of the police to do their jobs. A perception that the police operate with impunity damages the morale of the vast majority of good and dedicated police officers, makes recruiting a diverse police force more challenging, and makes the NYPD's core crime-fighting mission more difficult. While NYPD leadership may believe in good faith that they can effectively monitor themselves, we urge them to accept that in this moment their own efforts are not enough to restore and preserve trust with the public, and to seek a true partnership with robust civilian oversight.

To streamline and strengthen external oversight of the NYPD, and to promote accountability and trust in law enforcement, DOI makes the following recommendations:

    1.    The Mayor and City Council should consider consolidating existing police oversight functions into a single agency, headed by an independent board.

**Investigation into NYPD Response to George Floyd Protests**

2.    The Police Commissioner should designate and empower a single senior executive, at the Deputy Commissioner level, to be responsible and accountable for providing civilian oversight agencies with the access to records that the law requires.