**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In Re: New York City Policing
During Summer 2020 Demonstrations

20-cv-8924 (CM)(GWG)

This filing is related to:

*Payne v. De Blasio*, No. 20-cv-8924
*People v. City of New York*,
  No. 21-cv-322
*Sierra v. City of New York*,
  No. 20-cv-10291
*Wood v. De Blasio*, No. 20-cv-10541
*Yates v. New York City*,
  No. 21-cv-1904

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINTS**[1]

---

[1] The Plaintiffs in *Sow et al. v. City of New York*, No. 21-cv-533, are filing a separate opposition.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT ......................................................................................................................... 6

I.   Plaintiffs Have Standing to Seek Injunctive and Declaratory Relief and Those Claims Are
Not Moot. ........................................................................................................................ 6

    A.   The Individual Plaintiffs Have Standing to Seek Injunctive and Declaratory Relief
Because They Plausibly Allege Likelihood of Harm at Future Protests. .............................. 6

    B.   The State Has Parens Patriae Standing to Sue in the Interest of Its Citizens' Health
and Well-Being. .......................................................................................................... 8

    C.   Plaintiffs' Claims Are Not Moot Because Defendants Have Not Come Close to
Showing That Unlawful Conduct at Protests "Absolutely" Will Not Recur. ...................... 11

II.  Plaintiffs Have Stated Cognizable Claims for Relief. ................................................... 13

    A.   Plaintiffs Have Stated Municipal-Liability Claims Based on Defendants' Persistent
Custom and Practice, Failure to Train, and Ratified Policy. ................................................ 13

        i.   Plaintiffs Plausibly Plead a Widespread Custom and Practice of Excessive Force,
False Arrests, and Infringement of Plaintiffs' First Amendment Rights at Large-Scale
Protests. .................................................................................................................... 13

        ii.   Plaintiffs Plausibly Plead a Failure to Train and Supervise Amounting to Deliberate
Indifference. ............................................................................................................... 16

        iii.   Plaintiffs Plausibly Plead That NYPD Policymakers Ratified Unlawful Protest
Policing Practices. ...................................................................................................... 20

    B.   Plaintiffs Plausibly Plead That the Supervisory Defendants Violated the Constitution
by Their Own Conduct. ............................................................................................... 22

    C.   Injunctive Claims Against Supervisory Officials Are Proper. ............................... 23

    D.   Defendants Have Not Raised, and Have Therefore Waived, Any Rule 12(b)(6)
Challenge to Plaintiffs' Remaining Claims. ....................................................................... 24

III. Defendants Are Not Shielded by Qualified Immunity. .................................................. 24

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Adler v. Pataki*,
   185 F.3d 35 (2d Cir. 1999)..................................................................24

*Aguilar v. ICE*,
   811 F. Supp. 2d 803 (S.D.N.Y. 2011).....................................................8

*Aguirre v. City of N.Y.*,
   2017 WL 4236552 (E.D.N.Y. Sep. 22, 2017)..........................................19

*Amnesty America v. Town of West Hartford*,
   361 F.3d 113 (2d Cir. 2004)............................................................20, 21

*An v. City of N.Y.*,
   2017 WL 2376576 (S.D.N.Y. 2017)....................................................6, 7

*Batista v. Rodriguez*,
   702 F.2d 393 (2d Cir.1983)...............................................................21

*Bertuglia v. City of N.Y.*,
   839 F. Supp. 2d 703 (S.D.N.Y. 2012)....................................................18

*Brown v. City of N.Y.*,
   798 F.3d 94 (2d Cir. 2015)..................................................................5

*Brown v. Halpin*,
   885 F.3d 111 (2d Cir. 2018)...............................................................25

*Brown v. State*,
   89 N.Y.2d 172 (1996) .......................................................................24

*Case v. City of N.Y.*,
   233 F. Supp. 3d 372 (S.D.N.Y. 2017)...................................................19

*Case v. City of N.Y.*,
   408 F. Supp. 3d 313 (S.D.N.Y. 2019)....................................................5

*Davis v. City of N.Y.*,
   2018 WL 10070540 (S.D.N.Y. Mar. 30, 2018) .......................................19

*Dinler v. City of N.Y.*,
   2012 WL 4513352 (S.D.N.Y. Sept. 30, 2012)...........................................5

**Cases**                                                                            **Page(s)**

*Domenech v. City of N.Y.*,
    919 F. Supp. 702 (S.D.N.Y. 1996) ........................................................................20

*Douglas v. City of N.Y.*,
    730 F. App'x 12 (2d Cir. 2018) ...........................................................................5

*Dudek v. Nassau Cnty. Sheriff's Dep't*,
    991 F. Supp. 2d 402 (E.D.N.Y. 2014) ................................................................24

*Dwares v. City of N.Y.*,
    985 F.2d 94 (2d Cir. 1993)..................................................................................21

*Felix v. City of N.Y.*,
    344 F. Supp. 3d 644 (S.D.N.Y. 2018)...........................................................13, 19

*Fiacco v. City of Rensselaer*,
    783 F.2d 319 (2d Cir. 1986)................................................................................19

*Figuero v. Mazza*,
    825 F.3d 89 (2d Cir. 2016)..................................................................................23

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...........................................................................................11

*Gentile v. County of Suffolk*,
    926 F.2d 142 (2d Cir. 1991)...............................................................................16

*Greens at Chester LLC v. Town of Chester*,
    2020 WL 2306421 (S.D.N.Y. May 8, 2020) ......................................................10

*Guzman v. United States*,
    2013 WL 543343 (S.D.N.Y. Feb. 14, 2013)......................................................22

*Illinois v. City of Chicago*,
    137 F.3d 474 (7th Cir. 1998) ..............................................................................10

*Jenkins v. City of N.Y.*,
    478 F.3d 76 (2d Cir. 2007)..................................................................................17

*Kamen v. American Tel. & Tel. Co.*,
    791 F.2d 1006 (2d Cir. 1986)..............................................................................12

*Kucharczyk v. Westchester Cnty.*,
    95 F. Supp. 3d 529 (S.D.N.Y. 2015)...............................................................13, 21

*Ligon v. City of N.Y.*,
    925 F. Supp. 2d 478 (S.D.N.Y. 2013)..................................................................8

**Cases** Page(s)

*Lynch v. City of N.Y.*,
 952 F.3d 67 (2d Cir. 2020)..................................................................................19

*Marcavage v. City of N.Y.*,
 689 F.3d 98 (2d Cir. 2012)....................................................................................8

*Marlin v. City of N.Y.*,
 2016 WL 4939371 (S.D.N.Y Sept. 7, 2016).........................................................18

*McCants v. City of Newburgh*,
 2014 WL 6645987 (S.D.N.Y. Nov. 21, 2014) ......................................................19

*McLennon v. City of N.Y.*,
 171 F. Supp. 3d 69 (E.D.N.Y. 2016) ...................................................................21

*McRae v. City of Hudson*,
 2015 WL 275867 (N.D.N.Y. 2015) ........................................................................8

*Medina v. City of N.Y.*,
 2020 WL 7028688 (S.D.N.Y. Nov. 30, 2020) ...................................................8, 18

*Monell v. Department of Social Services*,
 436 U.S. 658 (1978)...............................................................................................2

*New York v. Griepp*,
 991 F.3d 81 (2d Cir. 2021)................................................................................9, 10

*New York v. Town of Wallkill*,
 2001 U.S. Dist. LEXIS 13364 (S.D.N.Y. March 16, 2001) ..........................9, 10, 11

*New York v. Utica City Sch. Dist.*,
 177 F. Supp. 3d 739 (N.D.N.Y. 2016) ..................................................................10

*Okin v. Village of Cornwall-on-Hudson Police Dep't*,
 577 F.3d 415 (2d Cir. 2009)..................................................................................16

*Osterhoudt v. City of N.Y.*,
 2012 WL 4481927 (E.D.N.Y. Sept 27, 2012) ......................................................19

*Packard v. City of N.Y.*,
 2020 WL 1467127 (S.D.N.Y. Mar. 25, 2020) ........................................................5

*Pennsylvania v. Porter*,
 659 F.2d 306 (3d Cir. 1981)..........................................................................9, 10, 11

*People v. Peter & John's Pump House, Inc.*,
 914 F. Supp. 809 (N.D.N.Y. 1996) .......................................................................10

**Cases**                                                                      **Page(s)**

*Perez v. Westchester County Dep't of Corr.*,
    2007 WL 1288579 (S.D.N.Y. Apr. 30, 2007).........................................................................25

*Seidemann v. Bowen*,
    499 F.3d 119 (2d Cir. 2007)..................................................................................................11, 12

*Stauber v. City of N.Y.*,
    2004 WL 1593870 (S.D.N.Y. 2004).............................................................................................7

*Tangreti v. Bachmann*,
    983 F.3d 609 (2d Cir. 2020)........................................................................................................23

*Tardif v. City of N.Y.*,
    991 F.3d 394 (2d Cir. 2021)........................................................................................................24

*Terebesi v. Torreso*,
    764 F.3d 217 (2d Cir. 2014)........................................................................................................23

*Trustees of Ind. Univ. v. Curry*,
    918 F.3d 537 (7th Cir. 2019) ......................................................................................................10

*Vann v. City of N.Y.*,
    72 F.3d 1040 (2d Cir. 1995)........................................................................................................17

*White v. City of N.Y.*,
    2015 WL 4601121 (S.D.N.Y. July 31, 2015) ...........................................................................18

**State Statutes**

N.Y. Executive Law § 75...................................................................................................................10

## PRELIMINARY STATEMENT

In these consolidated cases, the State of New York and dozens of individual plaintiffs and putative class representatives seek relief from the NYPD's unconstitutional policing practices at racial-justice protests across the City beginning in May 2020. For decades—from protests at the 2004 Republican National Convention (RNC), to Occupy Wall Street, to the recent protests following the killing of George Floyd—the NYPD has used excessive force against peaceful protesters in ways that caused serious injuries, and has arrested protesters, journalists, legal observers, medics, and other essential workers without probable cause and in retaliation for disfavored speech. This unconstitutional policing has chilled protected First Amendment activity. And the threat continues, with the most recent documented use of the NYPD's unlawful tactics at Martin Luther King, Jr. Day protests well after the original complaints in this case were filed.

Defendants now move to dismiss on a number of grounds, all of which are meritless. A fundamental error pervades defendants' motion: they rely on asserted "facts" that are wholly inconsistent with the well-pleaded allegations in plaintiffs' complaints. While defendants will have an opportunity to develop their version of events in discovery and at trial, on a motion to dismiss the Court must accept as true all the factual allegations in the complaints, and construe all reasonable inferences in the light most favorable to plaintiffs.

Contrary to defendants' contentions, the individual plaintiffs have standing to seek injunctive and declaratory relief because their complaints address unconstitutional policing practices that remain a serious threat to them as they continue protesting. And the State has standing to sue as parens patriae because the unconstitutional practices at protests undisputedly are affecting thousands of state citizens; the State has a quasi-sovereign interest in protecting the health and welfare of those citizens; and the State is best positioned to protect the broad interests of all

those citizens at once. The complaints are far from moot when the same unconstitutional conduct has continued for decades—despite prior class-action lawsuits and even after the complaints in this case were filed—and defendants have not come close to meeting their burden to prove with absolute clarity that the unconstitutional conduct has been completely and irrevocably eradicated.

The complaints also state plausible claims for relief for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and against the individual policymaking defendants. The complaints' detailed allegations of defendants' policy and custom of excessive force and unlawful arrests at protests, and their failure to train to prevent such unlawful conduct, states a municipal-liability claim. The complaints also allege that the policymaking defendants personally directed and oversaw unconstitutional conduct, making them personally liable and confirming municipal liability. At this early stage, the policymaking defendants have not shown any entitlement to qualified immunity for their unlawful conduct, and qualified immunity is in any event no defense to plaintiffs' injunctive, declaratory, and municipal-liability claims.

## STATEMENT OF FACTS

Plaintiffs' complaints describe how NYPD police officers and their supervisors have a widespread practice of using unjustifiable fist and baton strikes, pepper spray attacks, and other acts of physical violence at dozens of racial-justice protests that have occurred throughout New York City since May 2020. *Payne* Am. Compl. ¶¶ 2, 15, 107-211; *People* Am. Compl. ¶¶ 128-430; *Sierra* Am. Compl. ¶¶ 44-124; *Wood* Am. Compl. ¶¶ 142-46; *Yates* Compl. ¶ 19. These attacks left protesters bloodied, bruised, and emotionally traumatized. *E.g.*, *Payne* ¶ 2; *People* ¶ 3; *Sierra* ¶¶ 66-69. Officers also targeted for force and arrest individuals who were merely documenting police activity and providing essential services to protesters, including journalists toting professional cameras and press credentials, legal observers donning neon green identifying

2

hats, and medics in hospital scrubs. *People* ¶¶ 275, 282, 287, 289-90, 299, 307, 404, 408-10, 424-27; *Payne* ¶¶ 54, 61-62, 97, 130, 161-69; *Sierra* ¶ 71. The officers placed arrested individuals in excessively tight handcuffs and held them for prolonged periods, in overcrowded, often unsanitary conditions in the midst of the COVID-19 pandemic, *Payne* ¶¶ 2, 216; *see id.* ¶¶ 126, 133, 147, 187, 198, 205; *People* ¶¶ 244, 249-50, 404; *Sierra* ¶¶ 75-82, 94-97, 103, 110-114, 120-122, even though charges were in the vast majority of cases either never brought, or promptly dismissed by the district attorney, *People* ¶¶ 255, 310, 381; *Payne* ¶ 136, 158, 173, 192, 207; *Sierra* ¶¶ 87, 99, 107, 116, *Wood* ¶ 168. NYPD officers inflicted many of these injuries while using a tactic adopted by NYPD leadership called "kettling," *Payne* ¶ 2; *Wood* ¶ 44; *Sierra* ¶ 2, 127, i.e., physically corralling and detaining the protesters without first providing a warning or opportunity for them to leave and then charging at, assaulting, and arresting them, *e.g.*, *People* ¶¶ 4, 328; *Payne* ¶ 215; *Wood* ¶ 44; *Sierra* ¶¶ 2, 7 & n.1, 44, 57, 62-63, 73-75. Between May 29 and June 4, 2020 alone, the NYPD kettled protesters no fewer than seven times. *Sierra* ¶ 144; *see People* ¶¶ 330–87.

Defendants Mayor Bill de Blasio, Police Commissioner Dermot Shea, and Chief of Department Terence Monahan, oversaw and closely monitored the NYPD's protest response, and praised the NYPD's brutal suppression of the protests. *People* ¶¶ 98, 102; *Payne* ¶¶ 4, 56, 91; *Sierra* ¶¶ 3, 9, 128, 132-33; *Wood* ¶¶ 81-92, 96.[2] At press conferences, Mayor de Blasio repeatedly referenced his daily briefings with police leadership, noting that he "constantly was in touch" with Shea, Monahan, and other NYPD leadership, and expressed approval of specific instances of force used against protesters. *People* ¶ 99; *see Payne* ¶¶ 56; *Sierra* ¶¶ 131, 133; *Wood* ¶¶ 95, 183-85. At a June 7, 2020 press conference, Mayor de Blasio acknowledged that he had "approved the broad

---

[2] Only these individual defendants and the City of New York moved to dismiss, although some of the complaints name additional individual defendants. *See* Mot. to Dismiss (ECF 105).

strategies and sometimes very specific choices" employed by the NYPD at the protests. *People* ¶ 101; *Payne* ¶ 73; *Sierra* ¶ 3; *Wood* ¶ 94. Commissioner Shea also sanctioned the NYPD's violent response to the protests, including by commending officers who kettled, beat, and unlawfully arrested protesters and essential workers on June 4, 2020 in Mott Haven, and praising the "operation" as "nearly flawless[]." *People* ¶¶ 8, 387; *Payne* ¶ 69; *Sierra* ¶ 132. Chief Monahan regularly directed and supervised officers on the ground at the protests. *People* ¶¶ 98-99, 200, 292. He admitted to the City's Department of Investigation (DOI) that he personally approved the indiscriminate mass use of pepper spray against protesters at the Barclays Center on May 29, 2020, and was captured on video at Mott Haven on June 4 supervising the kettling and arrest of peaceful protesters, medics, and legal observers. *People* ¶¶ 200, 293-95, 370-71; *Sierra* ¶¶ 9, 46, 70.

The NYPD's practice of using excessive force and unlawfully arresting protesters began well before the racial justice protests of the past year. Following a 2003 anti-war protest and the 2004 RNC protests, NGOs documented nearly 400 accounts of excessive force by NYPD officers, including unwarranted use of batons and horses to disperse crowds as well as indiscriminate pepper spraying, and use of kettling and mass arrests of peaceful protesters and bystanders. *People* ¶¶ 25-26. Following the Occupy Wall Street demonstrations in 2011, NGOs likewise documented hundreds of complaints of excessive force against protesters, bystanders, lawyers, legal observers, and journalists. *Id.* ¶ 31. Numerous lawsuits arose from such protests, which frequently resulted in

findings of liability or potential liability against the NYPD,[3] or settlements.[4] In one case, then-district judge Richard Sullivan granted summary judgment against then-Deputy Chief Monahan for false arrests at the RNC protests based on the same unlawful kettling tactic that Monahan personally directed again in Mott Haven last year, *Payne* ¶¶ 66-67; *see People* ¶¶ 27-28; *Sierra* ¶¶ 46, 127, and a jury found Monahan liable for punitive damages.[5]

NYPD leadership has failed to train NYPD officers on how to constitutionally police protests. *People* ¶ 107. Chief Monahan has admitted that "[a] lot of cops had not received disorder trainings since they first came on the job." *People* ¶ 80. Mayor de Blasio likewise has acknowledged that the NYPD "lacked standardized, agency-wide, in-service training related to policing protests" and "deployed a large number of front-line supervisors and officers … without adequate training." *People* ¶¶ 40, 75, 110. Although the NYPD implemented new disorder training between July and October 2020, that training served only to *reinforce* kettling practices; and as the

---

[3] *See, e.g.*, *People* ¶ 32; *Payne* ¶ 219; *Sierra* ¶ 127 nn. 5-6; Verdict Sheet, *Gersbacher v. City of N.Y.*, No. 14-cv-7600 (S.D.N.Y. Jan. 11, 2018) (ECF 201) (verdict against NYPD supervisor on protester's excessive-force claim); *Dinler v. City of N.Y.*, 2012 WL 4513352, at *8-11, *27 (S.D.N.Y. Sept. 30, 2012) (finding kettling of hundreds of protesters unconstitutional and granting plaintiffs' motion for summary judgment); *Brown v. City of N.Y.*, 798 F.3d 94, 97, 100-03 (2d Cir. 2015) (officers' takedown and pepper spraying of protester could be excessive force); *Douglas v. City of N.Y.*, 730 F. App'x 12, 14-17 (2d Cir. 2018) (reversing summary judgment to defendants on legal observer's excessive force, false arrest, and other claims); *Case v. City of N.Y.*, 408 F. Supp. 3d 313, 320-22, 327-30 (S.D.N.Y. 2019) (denying summary judgment to defendants; awaiting trial on protester's false-arrest and failure-to-train claims); *Packard v. City of N.Y.*, 2020 WL 1467127 (S.D.N.Y. Mar. 25, 2020) (denying summary judgment to defendants; awaiting trial).

[4] *See, e.g.*, *MacNamara v. City of N.Y.*, No. 04-cv-9216 (S.D.N.Y.) (ECF 536) ($6.6 million class settlement); *Kunstler v. City of N.Y.*, No. 04-cv-01145 (S.D.N.Y.) (ECF 173) ($2 million settlement); *Peat v. City of N.Y.*, No. 12-cv-8230 (S.D.N.Y.) (ECF 46, 47) ($333,000); *Gerskovich v. Iocco*, No. 15-cv-7280 (S.D.N.Y.) (ECF 194) ($256,000); *Occupy Wall Street v. City of N.Y.*, No. 12-cv-4129 (S.D.N.Y.) (ECF 33) ($233,349); *Dierken v. City of N.Y.*, No. 12-cv-7462 (S.D.N.Y.) (ECF Nos. 45-1, 56-64) ($145,009 settlement, plus attorneys' fees); *Douglas v. City of N.Y.*, No. 14-cv-8124 (S.D.N.Y.) (ECF 104) ($145,000); *Marlin v. City of N.Y.*, No. 15-cv-2235 (S.D.N.Y.) (ECF 78) ($125,000).

[5] *Abdell v. City of N.Y.*, No. 05-cv-8453 (S.D.N.Y.) (ECF 432).

City's own DOI found, failed to include training on minimizing the use of force and facilitating First Amendment rights. *People* ¶¶ 104-07. The necessary training and policy changes to prevent unlawful policing at protests are not yet in place. Even well after defendants acknowledged failures of training and policy, and even after most of the original complaints were filed in this case, defendants have continued the same unlawful policing practices. For instance, on Martin Luther King, Jr. Day 2021, NYPD officers confronted a group of peaceful protesters at City Hall Park and ordered them onto the sidewalk; when the protesters complied, the officers kettled them, beat them, and arrested them. *People* ¶¶ 112-13.

## ARGUMENT

I.  **Plaintiffs Have Standing to Seek Injunctive and Declaratory Relief and Those Claims Are Not Moot.**

   A. **The Individual Plaintiffs Have Standing to Seek Injunctive and Declaratory Relief Because They Plausibly Allege Likelihood of Harm at Future Protests.**

   An individual plaintiff may demonstrate standing to seek injunctive and declaratory relief by plausibly alleging the existence of an official policy or custom, and a likelihood of future harm from that policy or custom. *An v. City of N.Y.*, 2017 WL 2376576, at *2-3 (S.D.N.Y. 2017); *accord* Mem. of Law in Support of Defs.' Mot. to Dismiss (Mem.) 7 (ECF 106).[6] Courts "have applied *Monell* and its progeny when evaluating whether a plaintiff has alleged an official policy or its equivalent for purposes of conferring standing." *An*, 2017 WL 2376576, at *3. As set forth *infra* at 13-21, plaintiffs have adequately alleged a municipal policy and custom of the NYPD using excessive force and unlawful arrests in policing protests. Plaintiffs also have plausibly alleged a likelihood of facing excessive force and unlawful arrest at future protests as a result of defendants' policy.

---

[6] Defendants do not challenge any plaintiffs' standing to pursue their claims for damages.

The individual plaintiffs intend to continue protesting for racial justice and policing reforms. *See, e.g.*, *Payne* ¶¶ 124, 137, 201. Plaintiffs have been inspired to protest by all-too-regular occurrences of police violence; have attended multiple demonstrations for racial justice and against police violence and intend to continue doing so despite being brutalized by the police; and have followed through on that intent by continuing to attend protests since the filing of the complaints. *See, e.g.*, *Payne* ¶¶ 124, 137, 142, 193, 201; *People* ¶ 44. Plaintiff Vidal Guzman, for example, is an activist focused on reforming the criminal justice system who has planned, organized, and attended over one hundred protests across the City, including almost every Black Lives Matter protest from May 2020 until October 2020, and intends to keep protesting. *Payne* ¶ 124. Such allegations are sufficient to confer standing to seek injunctive and declaratory relief. *See, e.g.*, *An*, 2017 WL 2376576, at *5 (likelihood of future harm where plaintiff alleges that he continues to film public police activity in a way that will bring him into contact with police); *Stauber v. City of N.Y.*, 2004 WL 1593870, at *18-19 (S.D.N.Y. 2004) ("[Plaintiff] has declared her intention to attend future demonstrations, including those at the Convention. An encounter with the NYPD, and with NYPD policies, is therefore much more likely than … speculative.").

There is no merit to defendants' assertions, Mem. 6, 8, that plaintiffs need not fear police misconduct at future protests because policing reforms have been proposed and the pandemic has receded. First, as discussed in further detail *infra* at 11-13, by defendants' own admission, the "reforms" they cite are far from complete, and are thus plainly insufficient to render plaintiffs' concerns moot at this stage. Second, that the pandemic may be receding has no bearing on whether police misconduct at protests has receded—and plaintiffs plausibly allege that it has not. Even after the filing of the complaints in this case—and after the policing "reforms" were announced— there have been additional instances of the NYPD employing excessive force, kettling, and

unlawful mass arrests, including at a November 4, 2020 protest, *People* ¶¶ 388-93, and at a January

18, 2021 protest, *People* ¶¶ 394-98, where plaintiff Payne was kettled, punched, and slammed to

the ground and then falsely arrested for the second time as a protester, *Payne* ¶¶ 138-39. The

repeated use of such practices provides a plausible basis to believe that they will be used again,

and thus confers standing for injunctive and declaratory relief. *See, e.g.*, *Ligon v. City of N.Y.*, 925

F. Supp. 2d 478, 522 (S.D.N.Y. 2013) ("possibility of recurring injury ceases to be speculative

when actual repeated incidents are documented" (quotation marks omitted)); *Aguilar v. ICE*, 811

F. Supp. 2d 803, 827-28 (S.D.N.Y. 2011) (standing for injunctive relief where plaintiffs alleged

that agents repeatedly and erroneously targeted homes of Latinx individuals); *McRae v. City of*

*Hudson*, 2015 WL 275867, at *5 (N.D.N.Y. 2015) (standing for injunctive relief where plaintiffs

alleged "at least five episodes of harassment by [police]" over several months).

Defendants' reliance on cases such as *Marcavage v. City of N.Y.*, 689 F.3d 98 (2d Cir.

2012), and *Medina v. City of N.Y.*, 2020 WL 7028688 (S.D.N.Y. Nov. 30, 2020), is misplaced.

*Marcavage* involved a challenge to NYPD policies implemented specifically to deal with the 2004

RNC, an event that had no prospect of recurring. *See* 689 F.3d at 102-03. By contrast, this case

challenges policies that continue to apply to ongoing protests. *Medina* involved a use of force

escalating out of a single ad hoc police encounter, 2020 WL 7028688, at *1-2, and the court found

that Medina was unlikely to face similar circumstances again, *id.* at *4-6. By contrast, plaintiffs

here intend to continue protesting and thus face the same threat of unlawful force and arrest.

### B.  The State Has Parens Patriae Standing to Sue in the Interest of Its Citizens' Health and Well-Being.

The State also satisfies all the requirements for parens patriae standing to sue on behalf of

its citizens. There are three requirements for parens patriae standing: (a) injury to a sufficient

number of state citizens; (b) a quasi-sovereign interest; and (c) a barrier to individual plaintiffs

obtaining the complete relief the State could obtain. *See New York v. Griepp*, 991 F.3d 81, 131 (2d Cir. 2021); *accord* Mem. 10. Defendants concede the first requirement—that defendants' injuries to numerous protesters constitute injury to a sufficient number of state citizens. Mem. 10. The State has satisfied the other two requirements as well.

*First*, "[c]ourts routinely acknowledge that a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents." *Griepp*, 991 F.3d at 132 (quotation marks omitted). This Court and others have specifically acknowledged that the State has a quasi-sovereign interest in "ensur[ing] that police agencies operate within the bounds of the law and do not violate the constitutional rights of citizens they are sworn to protect." *New York v. Town of Wallkill*, 2001 U.S. Dist. LEXIS 13364, at *9 (S.D.N.Y. March 16, 2001) (McMahon, J.); *accord Pennsylvania v. Porter*, 659 F.2d 306, 315 (3d Cir. 1981) (en banc). Here, the State sues to vindicate these same quasi-sovereign interests. *See, e.g.*, *People* ¶¶ 1-11, 18. Defendants recognize the State's quasi-sovereign interest in preventing police misconduct, Mem. 10, but err in claiming that they have sufficiently responded to the policing concerns raised in the State's complaint: for instance, by having the City's DOI and Corporation Counsel review NYPD's response to the protests at issue. The State's complaint extensively alleges, *see, e.g.*, *People* ¶¶ 7-8, 37-38, 41, 73-114—and the very reviews touted by defendants confirm, *see, e.g.*, *id.* ¶¶ 9, 39-40, 75-79, 94-96, 109—that defendants have *not* sufficiently responded to the State's concerns. In any event, whether the NYPD has taken action in response to the protests at issue has no bearing on whether the State has its own interest in ensuring that police operate lawfully and that state citizens are provided complete relief.[7]

---

[7] Contrary to Defendants' contention, recent steps by state lawmakers to address police misconduct underscore—rather than undermine—the State's interest in this litigation. The new state legislation

*Second*, the State is best positioned to obtain complete relief against future violations. The Second Circuit has confirmed the State's parens patriae standing, "when it is difficult and costly to litigate claims, and when the interests of individuals are not necessarily coextensive with those of the public." *See Griepp*, 991 F.3d at 132 (quotation marks omitted). "Both characteristics are presented here." *Id.* There is no dispute that the broad claims for injunctive and declaratory relief in the State's complaint, related to conduct at numerous protests involving many thousands of protesters, will be demanding and costly to litigate. *Accord, e.g.*, Defs.' Feb. 15, 2021 Ltr. 3 (ECF 30) (discovery alone "will be a tremendous undertaking"). Moreover, the State's interests are broader than those of any affected individuals. Of the plaintiffs, the State seeks the most comprehensive injunctive relief, covering not only protesters, but also journalists, legal observers, medics, and other essential service providers. *People* ¶¶ 439-40, 449-50, 455, 459-60 & p. 82. And because declaratory and injunctive relief is the *only* type of relief the State seeks, the State does not have any incentive to compromise such relief "in exchange for increased money damages." *People v. Peter & John's Pump House, Inc*., 914 F. Supp. 809, 813 (N.D.N.Y. 1996). In addition, regardless of whether any given individual is likely to face injury from unconstitutional policing at a future protest, there is no question that New Yorkers will continue to protest and face unconstitutional policing at protests again. *See infra* at 11-13. Thus, this Court and others

---

defendants cite (N.Y. Executive Law § 75) expressly empowers the Attorney General's office to pursue police misconduct through a broad range of means, including "civil or criminal" suits. Defendants also misplace their reliance on two Seventh Circuit cases for the proposition that federal courts should "be cautious" in "wading into" litigation by a state Attorney General against a municipality. Mem. 11. Neither of those cases involved a parens patriae suit. *See Trustees of Ind. Univ. v. Curry*, 918 F.3d 537 (7th Cir. 2019); *Illinois v. City of Chicago*, 137 F.3d 474 (7th Cir. 1998). The authority of state Attorneys General to sue municipalities and their officials in a parens patriae capacity, as in this case, is well settled. *See, e.g.*, *Porter*, 659 F.2d 306; *Greens at Chester LLC v. Town of Chester*, 2020 WL 2306421 (S.D.N.Y. May 8, 2020); *New York v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739 (N.D.N.Y. 2016); *Town of Wallkill*, 2001 U.S. Dist. LEXIS 13364.

addressing police misconduct claims have repeatedly held that States possess parens patriae standing. *Town of Wallkill*, 2001 U.S. Dist. LEXIS 13364, at \*21; *Porter*, 659 F.2d at 315-16.

### C. Plaintiffs' Claims Are Not Moot Because Defendants Have Not Come Close to Showing That Unlawful Conduct at Protests "Absolutely" Will Not Recur.

There is no merit to defendants' assertion that plaintiffs' claims for injunctive and declaratory relief are moot. As outlined at length in the complaints, "[f]or at least the last two decades, the NYPD has engaged in the same unlawful excessive force and false arrest practices while policing large-scale protests," and defendants "have further entrenched those practices by ratifying them through inaction and praise." *E.g.*, *People* ¶¶ 7-8. Moreover, recent conduct—including at post-election and Martin Luther King, Jr. Day protests well after the first complaints were filed in this case, *e.g.*, *id.* ¶¶ 111-13, 388-98; *Payne* ¶¶ 5, 8, 78-81, 138-41—confirms that defendants have continued, and will continue, engaging in unconstitutional conduct unless their conduct is abated through this litigation, *e.g.*, *People* ¶¶ 38-41; *Payne* ¶¶ 76, 82-83, 220.

Although defendants contend that this case is moot because of purported recent voluntary "reforms," Mem. 12, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation marks omitted). "If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Id.* (quotation marks omitted). To prove mootness, defendants bear the "formidable burden" to demonstrate that it is "absolutely clear" "that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Seidemann v. Bowen*, 499 F.3d 119, 128 (2d Cir. 2007) (quotation marks omitted); *see* Mem. 12.

By their own admission, defendants have not completed the "reforms" on which they rely, much less met their burden to prove with "absolute" clarity that these asserted reforms have "completely and irrevocably eradicated" the problems addressed in the complaints. *See Seidemann*, 499 F.3d at 128. As evidence of their purported reforms, defendants cite a handful of documents from outside the complaint. Mem. 13. These include reports from DOI and Corporation Counsel referenced in the complaints that harshly criticize defendants for the very failings that plaintiffs seek to remedy, Def. Exs. D-E (ECF 107-4, -5), as well as executive orders that called for such reports, Def. Exs. G-H (ECF 107-7, -8). The remainder of the documents are, by defendants' own description, "draft" "plans"—not policies yet in effect, Def. Exs. B-C (ECF 107-2, -3); *see* Mem. 13—and a protest response "recommendation tracker" showing that most reform recommendations remain "in progress," Def. Ex. A (ECF 107-1). These documents nowhere claim that defendants have completed the proposed reforms—much less prove that they have totally eliminated the deep-seated problems alleged in the complaints. In any event, documents that are not referenced in the complaints could form no basis for dismissal before discovery. *See, e.g.*, *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

Defendants also are wrong to assert, Mem. 12-13, that plaintiffs have acknowledged any claim in this case is moot. The statements of Mayor de Blasio saying that he and Commissioner Shea agree with DOI's finding of deficiencies in the NYPD's protest-related training and that "[w]e have to train our police force differently," *People* ¶ 110, confirm that the necessary training is not yet in place. Similarly, plaintiffs' allegations that the NYPD recently instituted a new disorder-control training explain that: this training reinforces the unlawful use of kettling, *People* ¶ 106; that, as DOI agreed, the training made no reference to avoiding excessive force or facilitating First Amendment rights, *id.* ¶ 107; and that NYPD's own chief of patrol confirmed that

the new training was "not enough," *id.* ¶ 85. These statements in no way suggest the urgent ongoing concerns addressed in the complaints are moot.

## II.    Plaintiffs Have Stated Cognizable Claims for Relief.

### A.    Plaintiffs Have Stated Municipal-Liability Claims Based on Defendants' Persistent Custom and Practice, Failure to Train, and Ratified Policy.

Plaintiffs have sufficiently pleaded that the City is subject to municipal liability for brutal protest policing. A plaintiff may show a municipal policy or custom subject to liability through, among other things, (1) "a practice so persistent and widespread, or permanent and well settled, as to constitute a custom or usage with the force of law and to imply the constructive knowledge of policy making officials," *Felix v. City of N.Y.*, 344 F. Supp. 3d 644, 653 (S.D.N.Y. 2018) (quotation marks omitted); (2) "a failure to train or supervise subordinates amounting to deliberate indifference to the rights of those with whom the municipality's employees come into contact," *id.* (quotation marks omitted); or (3) "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question," *Kucharczyk v. Westchester Cnty.*, 95 F. Supp. 3d 529, 538 (S.D.N.Y. 2015); *accord* Mem. 13-14. Plaintiffs have pleaded ample facts supporting each of these—any one of which supports a *Monell* claim.

> i. *Plaintiffs Plausibly Plead a Widespread Custom and Practice of Excessive Force, False Arrests, and Infringement of Plaintiffs' First Amendment Rights at Large-Scale Protests.*

Plaintiffs have more than sufficiently alleged a persistent, settled municipal custom and practice of which policymakers had constructive knowledge sufficient for *Monell* liability—including by alleging hundreds of individual incidents of unconstitutional policing at dozens of mass protests unfolding over many months; hundreds of Civilian Complaint Review Board (CCRB) complaints about the NYPD's protest response; dozens of reports indicating real-time municipal awareness of and involvement in that response; the personal presence of high-level

municipal policymakers at specific incidents; and decades of complaints and lawsuits alleging similar patterns of misconduct at large-scale protests.

The misconduct alleged by plaintiffs cannot seriously be characterized as "isolated acts." Mem. 16. Plaintiffs' allegations include at least fifty specific instances, at numerous protests, during which officers violated constitutional protections by punching, kicking, and striking protesters with blunt instruments without provocation, *People* ¶¶ 122-26; *Payne* ¶¶ 45, 50, 53, 55, 59-63, 138-41; *Sierra* ¶¶ 66, 120; numerous incidents of indiscriminate use of pepper spray against protesters, *Payne* ¶¶ 45, 47, 50, 59, 75, 119-22, 210; *People* ¶¶ 171-210; *Sierra* ¶¶ 67, 92, 102, 110-12, 119-20; and several incidents of kettling tactics to effectuate mass arrests without probable cause, *People* ¶¶ 64, 67-68, 70-71, 92-93, 106, 112-13; *Payne* ¶¶ 53, 55, 59-60, 62, 65-67, 78, 85, 125, 139, 144, 165-70; *Sierra* ¶¶ 55-73; *Wood* ¶¶ 67-71. Reports released by the City DOI and Corporation Counsel and by Human Rights Watch describe the same or similar additional incidents. *Payne* ¶¶ 95-106; *People* ¶¶ 31, 73-97, 106-07, 276-97; *Sierra* ¶ 9. The CCRB received 633 complaints related to protest policing in the span of one week, a fact known to the municipal defendants at the time, and received approximately 1,646 protest-related complaints for incidents that occurred between May 28 and June 20, 2020 alone. *Payne* ¶ 92. Regardless of the ultimate outcomes of those complaints, the sheer volume in such a short period put the City on notice of a problem. Contrary to defendants' contention, Mem. 16-17, the fact that NYPD officers employed multiple *forms* of excessive force in no way undermines plaintiffs' allegations of a consistent custom and practice of using excessive force against demonstrators.[8]

---

[8] All of these factual allegations also support plaintiffs' First Amendment claims because the excessive force and mass arrests directly interfered in protesters', legal observers', and journalists' exercise of First Amendment rights. Although defendants claim three recent instances of NYPD's interference with journalists described in the *People* complaint were "isolated incidents," Mem.

Mayor de Blasio's own staff were present at a number of these protests, and it can reasonably be inferred from that fact, as well as the press coverage of that fact, that they notified de Blasio of the police misconduct they personally observed. *Payne* ¶¶ 69, 78; *Sierra* ¶ 133. De Blasio and Commissioner Shea also gave frequent press conferences throughout the spring, summer, and fall where they admitted their knowledge of what was happening during the protests. *Payne* ¶¶ 46, 48-49, 56-57, 69-70, 72-73; *People* ¶¶ 48-49, 83-84, 98-103, 110-11, 114; *Sierra* ¶¶ 128-34. Indeed, in their motion, Mem. 17-18, defendants admit this notice. In addition to this real-time notice of the pattern that unfolded during the protests, the complaints meticulously document defendants' awareness of prior litigation and CCRB complaints raising similar claims in the years preceding the 2020 protests, arising out of numerous large-scale demonstrations such as anti-war protests in 2003, protests during the RNC in 2004, and Occupy Wall Street in 2011. *People* ¶¶ 24-39; *Payne* ¶¶ 66, 83, 94.

When faced with evidence of this decades-long pattern of misconduct, the City failed to take sufficient remedial action and instead tacitly, and sometimes overtly, acquiesced in this conduct. For instance, as discussed further *infra* at 16-20, the City failed to train officers to prepare them for the protests. The City also failed to discipline officers involved in prior misconduct at protests, *People* ¶¶ 27-30, and continued to rely on "Strategic Response Group" (SRG) counterterrorism tactics to police peaceful protests despite recommendations to cease, *People*

---

18, defendants ignore the numerous other instances of NYPD's interference with press and legal observers alleged in that and the other complaints, *see, e.g.*, *Payne* ¶¶ 53-54, 62, 65, 125-30, 202-08; *Sierra* ¶ 71; *People* ¶¶ 257, 284-97. And these recent examples are consistent with NYPD's history of repeatedly interfering with journalists and legal observers in earlier protests also described in the complaints. *See, e.g.*, *People* ¶¶ 31-32.

¶¶ 85-97; *Payne* ¶¶ 76-80.[9] Moreover, as discussed further *infra* at 20-21, despite being repeatedly pressed by media and advocates to condemn police violence, city policymakers repeatedly endorsed and validated the actions of the police. *Payne* ¶¶ 46, 48-50, 56-57, 69-70, 73, 79, 85; *Sierra* ¶¶ 128, 131-32; *Wood* ¶¶ 97-106, 170-86; *People* ¶ 8, 387.

Although defendants attempt to characterize isolated statements from NYPD leaders as official denunciation of the widespread pattern of violence and mass arrest, Mem. 17-18, even without the benefit of drawing all inferences in favor of plaintiffs, such a characterization cannot stand. The direct knowledge of high-level city officials followed by their failure to intervene to prevent the months-long unfolding pattern of unconstitutional policing of these protests "compel[s] the conclusion that it has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 439 (2d Cir. 2009) (quotation marks omitted); *see also Gentile v. County of Suffolk*, 926 F.2d 142, 151, 153 (2d Cir. 1991) (report and evidence that high-ranking officials "ratified the misconduct of individual police officers" were sufficient to both "establish the existence of a municipal policy or practice" and support allegations that misconduct was "consistently ignore[d]" (quotation marks omitted)).

    ii. *Plaintiffs Plausibly Plead a Failure to Train and Supervise Amounting to Deliberate Indifference.*

The City is also liable under *Monell* because its failure to train and supervise its officers amounts to deliberate indifference to plaintiffs' constitutional rights. To proceed on a deliberate-indifference theory of municipal liability, the plaintiff first must state a claim that the need for

---

[9] Contrary to defendants' suggestion, Mem. 15, plaintiffs do not allege that the "mere existence of SRG" is unconstitutional. Rather, plaintiffs allege that the repeated use of a specially trained counterterrorism force at overwhelmingly peaceful protests is wholly improper and contributes to NYPD's unconstitutional custom and practice of excessive force, unlawful arrests, and violation of First Amendment rights at such protests. *See, e.g.*, *People* ¶¶ 85-96.

better training or supervision to protect against the constitutional violations alleged in the complaints "was obvious." *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995); *see Jenkins v. City of N.Y.*, 478 F.3d 76, 94 (2d Cir. 2007). The plaintiff also must plausibly allege that "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation," and "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights," *Jenkins*, 478 F.3d at 94 (quotation marks omitted). Plaintiffs' pleadings satisfy each of these prongs.

Plaintiffs have stated a claim that the need for training and supervision in policing protests was obvious. "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations" and "may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann*, 72 F.3d at 1049. As explained, *supra* at 13-15, plaintiffs allege that the City has long been aware of repeated complaints of unlawful policing at protests—including complaints of excessive force, unlawful arrests, and First Amendment restrictions—through hundreds of CCRB complaints, lawsuits, and reports. Defendants and the City's DOI have further acknowledged that the NYPD implemented no training regarding appropriate policing at large-scale protests before this lawsuit, notwithstanding the long history of complaints. *See, e.g.*, *People* ¶¶ 39, 74-82, 94-96; *Payne* ¶ 82. This same history of unaddressed misconduct also satisfies the second prong for a failure-to-train-based *Monell* claim, by demonstrating "a history of employees mishandling" policing of large protests. *See Jenkins*, 478 F.3d at 94. And there is no serious dispute "that the wrong choice" by future officers policing protests "will frequently cause the deprivation of a citizen's constitutional rights"—because that has been the case again and again in the past. *See id.* As defendants do not

dispute, the complaints specifically allege numerous links between insufficient training and past and potential future violations of citizens' constitutional rights. *See, e.g.*, *People* ¶¶ 33, 39, 73-84, 94-95; *Payne* ¶¶ 82-85.

As this Court and others have repeatedly concluded, allegations of a history of complaints and reports such as those in the complaints here easily suffice to state a *Monell* claim at the motion-to-dismiss stage. *See, e.g.*, *Medina*, 2020 WL 7028688, at *8 (denying motion to dismiss failure-to-train-or-supervise claim where plaintiff cited to "CCRB reports and numerous lawsuits, along with the news reports detail[ing] a pattern of NYPD officers improperly escalating encounters through the unlawful use of excessive force"); *Marlin v. City of N.Y.*, 2016 WL 4939371, at *19-21 (S.D.N.Y Sept. 7, 2016) (McMahon, J.) (same where plaintiff cited DOI and other reports of excessive force at prior protests and substantiated CCRB complaints); *White v. City of N.Y.*, 2015 WL 4601121, at *3, *7-8 (S.D.N.Y. July 31, 2015) (same where plaintiff cited to prior U.S. Department of Justice letter and complaints addressing similar misconduct); *Bertuglia v. City of N.Y.*, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012) (same where plaintiff cited at least "fifteen cases where City prosecutors allegedly committed [similar] misconduct"). Plaintiffs' exhaustive allegations here not only of hundreds of lawsuits, complaints, and reports—but also of liability and potential liability findings and numerous substantial settlements in the lawsuits, *see supra* at 4-5 & notes 3-5—exceed any of the records sufficient to sustain *Monell* claims in these other cases.

Although defendants attempt to downplay the significance of the numerous past lawsuits, defendants acknowledge that they paid settlements in many of them, Mem. 3 & n.4, and ignore many of the findings of liability and potential liability in the lawsuits that were not settled, *see supra* notes 3, 5. In any event, defendants are wrong to assert, Mem. 20-21, that only a final judicial finding of liability for excessive force can support notice for purposes of municipal liability.

"[E]vidence that a number of claims of police brutality had been made by other persons against the City [is] relevant" in and of itself, because "[w]hether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force." *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986). Particularly "[i]n the context of Rule 12," "citations to pending lawsuits and settlement agreements" "permit a plausible inference of deliberate indifference," regardless of whether liability was found. *Case v. City of N.Y.,* 233 F. Supp. 3d 372, 406 (S.D.N.Y. 2017) (quotation marks omitted); *accord, e.g.*, *Osterhoudt v. City of N.Y.,* 2012 WL 4481927, at *1-2 (E.D.N.Y. Sept 27, 2012) (rejecting City's argument that prior filed lawsuits do not support a *Monell* claim regarding unconstitutional protest policing); *McCants v. City of Newburgh,* 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014) (finding notice to City sufficient for *Monell* claim based on seventeen prior filed lawsuits, even though "a majority of the claims were settled for nuisance value").[10]

Rather than addressing their undisputed knowledge of the long history of policing misconduct at major protests, defendants insist that they could not know they would confront major protests "in the middle of a pandemic." Mem. 20. But whether defendants knew they would confront such protests in a pandemic is beside the point. Defendants undisputedly knew they would confront major protests *at some time*—yet they wholly failed to train or prepare for that eventuality, despite officers' repeated misconduct at one major protest after another. *See Felix*, 344 F. Supp.

---

[10] Defendants are likewise wrong to discount, Mem. 14-15, prior reports of misconduct as support for a *Monell* claim at the pleading stage. *Davis v. City of N.Y.*, 2018 WL 10070540 (S.D.N.Y. Mar. 30, 2018), on which defendants rely, was a summary-judgment decision. *See Lynch v. City of N.Y.*, 952 F.3d 67, 81-82 (2d Cir. 2020) (reversing dismissal of *Monell* claim because defendants' reliance on summary-judgment decisions is "inapt" at pleading stage). The only motion-to-dismiss case defendants cite involved mere "boilerplate allegations" based on stale reports "all unrelated" to the case at hand—unlike the highly probative DOI, Corporation Counsel, and other reports, and supporting CCRB complaints and lawsuits, described in the complaints here. *Aguirre v. City of N.Y.*, 2017 WL 4236552, at *4-6 (E.D.N.Y. Sep. 22, 2017).

3d at 662 (past lawsuits and media reports on policing failures "plausibly supported the existence of a training deficiency and the City's awareness of the same," despite differences in "precise factual circumstances" of current lawsuit).

The complaints' ample allegations of the supervisory defendants' real-time notice as the protests unfolded, *e.g.*, *supra* at 15, also separately supports a *Monell* claim for failure to supervise. In *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 127-29 (2d Cir. 2004), the Second Circuit upheld a *Monell* failure-to-supervise claim on analogous facts, where "plaintiffs' evidence would allow a reasonable factfinder to conclude that violence did not occur as an isolated instance," but rather "permeated the entire arrest scene" at two successive demonstrations, and the police chief knew about the excessive force used and failed to intervene. *Id.* at 128.[11]

### iii. *Plaintiffs Plausibly Plead That NYPD Policymakers Ratified Unlawful Protest Policing Practices.*

Plaintiffs also sufficiently plead that Mayor de Blasio, Commissioner Shea, and Chief Monahan, who are undisputedly policymakers for *Monell* purposes,[12] adopted as city policy unlawful protest policing practices such as kettling. As defendants acknowledge, Mem. 13-14, plaintiffs need not allege a formal, written policy to assert a policy-based *Monell* claim. Rather,

---

[11] Defendants' further argument that plaintiffs have not stated a claim for failure to train regarding "Covid-19 Protocols; the Curfew Order; or Covering Badges," Mem. 21, is a straw man: plaintiffs make no standalone claims of unlawful failures to train on these subjects. Insofar as failures to address these matters in training are discussed in the complaints, they are mere examples of the ramifications of defendants' larger failure to provide any training for policing at protests.

[12] Defendants do not contend that the supervisory defendants are not policymakers, and thus waive any such argument. And for good reason: the City Charter establishes the Mayor and the Commissioner's authority to set policy with respect to the NYPD, and Chief Monahan, as the highest ranking uniformed officer, "oversees and supervises all NYPD operations, including patrol operations, and is responsible for developing and implementing policies for the NYPD." *Sierra* ¶¶ 37-38; *see also, e.g.*, *Domenech v. City of N.Y.*, 919 F. Supp. 702, 710 n.1 (S.D.N.Y. 1996) (Commissioner is final policymaker regarding "government, administration, disposition, and discipline" of NYPD).

plaintiffs need only allege "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question." *Kucharczyk*, 95 F. Supp. 3d at 538 (quotation marks omitted). Under this standard, either a policymaker's own action or a subordinate's action "that a policymaker ordered or ratified" or "consciously chose to ignore" "implicate[s] the municipality in the constitutional deprivation." *Amnesty Am.*, 361 F.3d at 126.

Here, plaintiffs allege that de Blasio, Shea, and Monahan directed NYPD officers' use of kettling to corral and trap the participants in various peaceful assemblies without individualized probable cause, and ratified that practice by praising its use. *People* ¶¶ 443, 445; *see id.* ¶¶ 4, 328, 330-87, 445; *Payne* ¶¶ 2, 73, 215-16; *Sierra* ¶¶ 2, 3, 7; *Wood* ¶ 44. Specifically, de Blasio acknowledged his role in setting strategies at the protests and stated that the use of kettling at the protests was justified; Shea praised the execution of kettling at the June 4 Mott Haven protest as "nearly flawless[]"; and Monahan personally oversaw the Mott Haven kettling, notwithstanding that he had previously been found liable for punitive damages for similar tactics in responding to another protest several years ago. *See People* ¶¶ 4, 8, 27-28, 101, 200, 293, 329, 387; *Payne* ¶¶ 66-69, 73; *Sierra* ¶¶ 2, 3, 7, 9, 132; *Wood* ¶ 7. Plaintiffs also allege that the policymakers ratified other police misconduct by publicly defending it during the protests. *See, e.g.*, *Sierra* ¶¶ 128, 131-132; *Payne* ¶¶ 46, 48-50, 56, 73, 80; *People* ¶¶ 29, 102-03; *Wood* ¶¶ 92-96. Such allegations plainly state a *Monell* claim. *See, e.g.*, *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983) ("repeatedly condon[ing] and even reward[ing]" allegedly unlawful police conduct states *Monell* policy); *McLennon v. City of N.Y.*, 171 F. Supp. 3d 69, 97 (E.D.N.Y. 2016) ("[A] policymaker's implicit ratification may be established by his or her reward or encouragement of the unlawful conduct.").[13]

---

[13] There is no merit to defendants' argument that "[c]ertain *Monell* claims [in *Sierra* and *Yates*] must be dismissed as boilerplate." Mem. 22 (citing *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d

**B.  Plaintiffs Plausibly Plead That the Supervisory Defendants Violated the Constitution by Their Own Conduct.**

Plaintiffs state cognizable claims against Mayor de Blasio, Commissioner Shea, and Chief Monahan by alleging facts supporting a plausible inference that they personally approved use of unreasonable force against protesters and the mass arrest of peaceful protesters without probable cause. Plaintiffs also state claims against de Blasio, Shea, and Monahan by alleging facts supporting a plausible inference that the unreasonable force and unlawful arrests they approved suppressed protected First Amendment activity and that they approved these actions in substantial part because they loathed the protesters' political message.

For instance, in his own words, de Blasio "approved the broad strategies and sometimes very specific choices" of tactics the NYPD adopted in the early June 2020 protests, including the use of batons and pushing protesters. *E.g.*, *People* ¶ 101; *Sierra* ¶ 3. Shea said NYPD's response to protests at Mott Haven on June 4 was an organized "operation," "executed nearly flawlessly." De Blasio deployed "observers from City Hall" to monitor it, demonstrating his advance knowledge of and participation in planning the NYPD response. *Payne* ¶ 69. Monahan personally led the NYPD's Mott Haven response and directed the kettling, assault, and arrest of protesters, *People* ¶¶ 292-96; *Sierra* ¶ 46; *Wood* ¶¶ 124-26, and he personally approved the mass use of pepper spray against protesters at the Barclays Center on May 29, 2020, *People* ¶ 200. That Monahan

---

Cir. 1993). "[T]o the extent that *Dwares* called for a heightened pleading standard for *Monell* claims, it was overruled by *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993), in which the Supreme Court squarely held that Rule 8(a)(2), and not a more rigorous pleading standard, applies to *Monell* claims." *Guzman v. United States*, 2013 WL 543343, at *12 (S.D.N.Y. Feb. 14, 2013). *Sierra*'s 168 paragraphs of detailed factual allegations and *Yates*'s many factual allegations satisfy Rule 8, and defendants make no argument whatsoever concerning alleged deficiencies in these claims. Should the Court find either complaint's *Monell* claim deficient, the plaintiffs seek leave to amend. Indeed, Yates had no prior opportunity to amend his complaint because his case was consolidated with the other cases after this Court's deadline for amended pleadings had passed.

would illegally order mass arrests without probable cause is especially plausible since he has done so before, resulting in a finding of liability and punitive damages. *People* ¶¶ 27-30; *Sierra* ¶ 127.

Such examples are more than sufficient to state a claim. It is decidedly not the law that a defendant must throw the punch, wield the baton, or apply the handcuffs to violate a plaintiff's constitutional rights. Municipal officials, supervisory or otherwise, are liable for their own actions (or inactions) that proximately cause other officials to physically carry out constitutional violations. *See, e.g.*, *Terebesi v. Torreso*, 764 F.3d 217, 233-35 (2d Cir. 2014) (denying qualified immunity to defendants who devised deficient tactics, foreseeably resulting in use of excessive force in executing warrant); *Figuero v. Mazza*, 825 F.3d 89, 106-07 (2d Cir. 2016) (liability for failure to intervene). *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), cited by defendants, Mem. 22-23, has no impact on this case. *Tangreti* involved Eighth Amendment deliberate-indifference claims, which require the defendants to have actual knowledge of and consciously disregard an excessive risk to health or safety. *See* 983 F.3d at 618-19. The court held that the *Tangreti* plaintiff could not rely on "special rules" to escape the otherwise applicable *mens rea* requirement and had to plausibly allege that the defendant prison supervisors were subjectively deliberately indifferent. *Id.* at 612. Plaintiffs here are not invoking any "special rule" of supervisor liability, but merely seeking to hold the supervisory defendants liable for their own acts.

### C.  Injunctive Claims Against Supervisory Officials Are Proper.

The supervisory defendants cite no authority for the proposition that injunctive claims cannot proceed against them in their individual capacities. Mem. 22. Public officials in their individual capacities are just like any other person subject to the Court's Article III remedial power. Plaintiffs state individual-capacity claims against the supervisory defendants, and the plaintiffs pursuing injunctive relief have standing to obtain it. *See supra* at 6-11, 22-23. Nothing prevents

the Court from crafting appropriate injunctive relief against the supervisory defendants to remedy their ongoing personal violations of the Constitution. Nor is there anything particularly remarkable about such relief. *See, e.g.*, *Dudek v. Nassau Cnty. Sheriff's Dep't*, 991 F. Supp. 2d 402, 413-14, 422 (E.D.N.Y. 2014) (denying motion to dismiss such claims against sheriff in personal capacity).

### D. Defendants Have Not Raised, and Have Therefore Waived, Any Rule 12(b)(6) Challenge to Plaintiffs' Remaining Claims.

Defendants also have failed to set forth *any* arguments challenging the sufficiency of plaintiffs' allegations supporting many of the claims for relief asserted in the complaints, including all claims brought under the New York State Constitution and state common law. *See People* ¶¶ 461-95; *Payne* ¶¶ 230-31, 233-34, 236-37; *Sierra* ¶¶ 195-222; *Wood* ¶¶ 232-43; *Yates* ¶¶ 33-36.[14] Defendants have therefore waived these arguments, and defendants may not raise new arguments seeking dismissal of these claims for the first time in their reply brief. *See, e.g.*, Order ¶ 6 (ECF 40); *Tardif v. City of N.Y.*, 991 F.3d 394, 404 n.7 (2d Cir. 2021).

## III.  Defendants Are Not Shielded by Qualified Immunity.

Defendants are not shielded from liability by qualified immunity. Defendants acknowledge that "[q]ualified immunity is not a shield that the municipality enjoys," Mem. 24 n.29, and assert a limited qualified-immunity defense only on behalf of the supervisory defendants: de Blasio, Shea, and Monahan, Mem. 23. Defendants also assert qualified immunity only for money-damages claims, Mem. 23, because it is well settled that qualified immunity "does not bar actions for declaratory or injunctive relief," *Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir. 1999).

---

[14] *Monell*'s policy or custom limitation on municipal liability does not apply to claims under the state constitution. Rather, under state law, localities may be "vicariously liable for constitutional torts by [their] officers or employees." *E.g.*, *Brown v. State*, 89 N.Y.2d 172, 193-94 (1996). And such constitutional torts by individual NYPD officers are undisputed here. *See, e.g.*, Mem. 17-18 (acknowledging at least some officers used excessive force against protesters and have been subject to discipline or criminal prosecution).

Insofar as defendants assert qualified immunity, they do so solely with respect to a non-existent challenge to de Blasio's Executive Order No. 117, which established a curfew for the night of June 1, 2020, and Shea and Monahan's willingness to enforce the curfew. *See* Mem. 24. None of the complaints allege that issuing the curfew order, or enforcing it, was unlawful. Rather, plaintiffs allege that defendants used unlawful protest policing tactics, such as excessive force and kettling, while purporting to enforce the curfew. *See People* ¶¶ 55, 58, 238-387; *Payne* ¶¶ 52, 56, 59; *Sierra* ¶¶ 55-123; *Wood* ¶¶ 116-67. Indeed, plaintiffs also allege that defendants used the same unlawful tactics at protests before and long after any curfew was in place—underscoring the irrelevance of the curfew to the allegations. *See, e.g.*, *People* ¶¶ 128-398; *Payne* ¶¶ 107-211; *Sierra* ¶¶ 140-68; *Wood* ¶¶ 43-78.

Defendants do not contend that de Blasio, Shea, and Monahan are protected by qualified immunity for the unlawful policing tactics they oversaw. Nor could they at this stage of the litigation. "It is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to [Rule] 12(b)(6)." *Perez v. Westchester County Dep't of Corr.*, 2007 WL 1288579, at *6 (S.D.N.Y. Apr. 30, 2007) (quotation marks omitted). That is because "[a] defendant presenting an immunity defense on a motion to dismiss must … show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018) (quotation marks omitted). Defendants have done neither with respect to any claim plaintiffs actually assert.

## CONCLUSION

For all these reasons, the Court should deny defendants' motion to dismiss.

Dated: April 23, 2021

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: /s/ Philip J. Levitz

Anisha S. Dasgupta
  *Deputy Solicitor General*
Philip J. Levitz
  *Assistant Solicitor General*

Jessica Clarke, *Chief of Civil Rights Bureau*
Lillian Marquez, *Assistant Attorney General*
Swati Prakash, *Assistant Attorney General*
Travis England, *Assistant Attorney General*
Jaclyn Grodin, *Assistant Attorney General*
Gregory Morril, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6325
philip.levitz@ag.ny.gov

*Counsel for Plaintiff in People of the State of New York v. City of New York, No. 21-cv-322*

NEW YORK CIVIL LIBERTIES UNION FOUNDATION

/s/ Molly Biklen
Molly Biklen
Jessica Perry
Daniel R. Lambright
Robert Hodgson
Lisa Laplace
Christopher T. Dunn
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
mbiklen@nyclu.org

*Co-Counsel for Plaintiffs in Payne v. De Blasio, No. 20-cv-8924*

THE LEGAL AID SOCIETY

/s/ Corey Stoughton
Corey Stoughton
Jennvine Wong
199 Water Street
New York, NY 10038

(212) 577-3367
cstoughton@legal-aid.org

*Co-Counsel for Plaintiffs in Payne v. De Blasio, No. 20-cv-8924*


HAMILTON CLARKE LLP

/s/ Lance A. Clarke
Lance A. Clarke, Esq.
Jason Clark, Esq.
William Guilford, Esq.
48 Wall Street, Suite 1100
New York, NY 10005
(212) 729-0952
lc@hamiltonclarkellp.com

*Co-Counsel for Plaintiffs in Sierra et al v. City of New York, No. 20-cv-10291*


THE LAW OFFICE OF JOSHUA MOSKOVITZ, P.C.

/s/ Joshua S. Moskovitz
Joshua S. Moskovitz, Esq.
14 Wall Street, Suite 1603
New York, NY 10005
(212) 380-7040
josh@moskovitzlaw.com

*Co-Counsel for Plaintiffs in Sierra et al v. City of New York, No. 20-cv-10291*


THE LAW OFFICE OF MICHAEL L. SPIEGEL

/s/ Michael L. Spiegel
Michael L. Spiegel, Esq.
48 Wall Street, Suite 1100
New York, New York 10005
(212) 587-8558
mikespieg@aol.com

*Co-Counsel for Plaintiffs in Sierra et al v. City of New York, No. 20-cv-10291*

KAUFMAN LIEB LEBOWITZ & FRICK LLP

/s/ Douglas E. Lieb
Douglas E. Lieb
10 East 40th Street, Suite 3307
New York, NY 10016
(212) 660-2332
dlieb@kllf-law.com

*Counsel for Plaintiff in Wood v. de Blasio, et al, No. 20-cv-10541*

STOLL, GLICKMAN & BELLINA, LLP

/s/ Andrew B. Stoll
Andrew B. Stoll
300 Cadman Plaza West, 12th Floor
Brooklyn, NY 11201
(718) 852-3710
astoll@stollglickman.com

*Counsel for Plaintiff in Yates v. New York City, No. 21-cv-1904*