**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

In Re: New York City Policing During Summer
2020 Demonstrations                                            20 Civ. 8924 (CM)(GWG)

-------------------------------------------------------------------

This filing is related to:

ADAMA SOW, DAVID JAKLEVIC, ALEXANDRA DE
MUCHA PINO, OSCAR RIOS, BARBARA ROSS,
MATTHEW BREDDER, SABRINA ZURKUHLEN,
MARIA SALAZAR, DARA PLUCHINO, and SAVITRI
DURKEE, *on behalf of themselves and others similarly situated,*

      Plaintiffs,

      - against -                                        21-cv-00533 (CM)(GWG)

CITY OF NEW YORK; MAYOR BILL DE BLASIO;
NEW YORK CITY POLICE DEPARTMENT
COMMISSIONER DERMOT SHEA; NEW YORK CITY
POLICE DEPARTMENT CHIEF OF DEPARTMENT
TERENCE MONAHAN; NYPD DETECTIVE
EDWARD CARRASCO (SHIELD NO. 1567); NYPD
OFFICER TALHA AHMAD (SHIELD NO. 21358);
NYPD OFFICER KEVIN AGRO (SHIELD NO. 8054);
and NYPD OFFICERS JOHN and JANE DOES # 1- 40,

      Defendants.

-------------------------------------------------------------------- X

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' PARTIAL MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................i

TABLE OF AUTHORITIES ......................................................................................................iii

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS ...........................................................................................................1

Summary of the Summer 2020 Protests .......................................................................................1

The *Sow* Plaintiffs' Experiences ...................................................................................................3

ARGUMENT .................................................................................................................................5

I.      Defendants' Motion is Limited On its Face .......................................................................5

II.     The Court Should Exclude Defendants' Improper Use of Extraneous Materials. ..............7

III.    The FAC Establishes Subject Matter Jurisdiction. ............................................................8

    A.  Plaintiffs have standing to pursue injunctive and declaratory relief, as the prospect
of future harm is real, not speculative. ...........................................................................8

    B.  Defendants' vague, indefinite, and illusory promises of future reform do not moot
Plaintiffs' claims for injunctive and declaratory relief. ................................................10

IV.     Plaintiffs Have Properly Pled Their *Monell* Claims ........................................................11

    A.  Plaintiffs have properly pled municipal liability. .........................................................11

       1.  Plaintiffs have adequately pled that Defendants subjected them to unconstitutional
policies and practices. ............................................................................................15

       2.  The FAC adequately pleads Plaintiffs' *Monell* theories based on Defendants'
enforcement of the Curfew Orders ..........................................................................16

       3.  The FAC adequately pleads that Defendant policymakers have displayed deliberate
indifference to the need to train. .............................................................................17

       4.  The FAC adequately pleads that Defendant policymakers have displayed deliberate
indifference to the need to supervise and discipline. ...............................................20

       5.  Plaintiffs have adequately pled that Defendants de Blasio, Shea, Monahan, and other
policymakers created, ratified, implemented, or were otherwise personally involved in
the challenged policies and practices .......................................................................21

V.    Plaintiffs Have Adequately Pled Claims against Individual Defendants de Blasio, Shea, and Monahan for Their Unconstitutional Conduct..........................................................21

VI.   Qualified Immunity Cannot Shield Defendants Based on the Standard Applicable to Their Pre-Answer Motion to Dismiss............................................................................22

CONCLUSION..................................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdell v. City of New York*,
   No. 05–cv-8453 (RJS) (JCF), 2009 U.S. Dist. LEXIS 42719 (S.D.N.Y. May 5,
   2009) ................................................................................................................................9

*Adams v. Zarnel (In re Zarnel)*,
   619 F.3d 156 (2d Cir. 2010) ............................................................................................11

*Aguirre v. City of New York*,
   15 Civ. 6043 (PKC), 2017 U.S. Dist. LEXIS 155422 (E.D.N.Y. Sept. 22, 2017) ..........14

*Amnesty America v. Town of W. Hartford*,
   361 F.3d 113, 129, 130 n.10 (2d Cir. 2004). ..........................................................17, 19, 21

*An v. City of N.Y.*,
   16 Civ. 5381 (LGS), 2017 U.S. Dist. LEXIS 84364 ........................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2008) ........................................................................................................11

*Barham v. Ramsey*,
   434 F.3d 565 (D.C. Cir. 2006) ........................................................................................23

*Bd. Of the Cnty. Comm'rs v. Brown*,
   520 U.S. 397 (1997) ........................................................................................................19

*Bray v. City of New York*,
   No. 04 Civ. 8255 (WHP), 2005 US Dist. Lexis 21748 (SDNY Sept. 30, 2005) ..............21

*Case v. City of New York*,
   408 F.Supp.3d 313 (S.D.N.Y. 2019) ("*Case II*") ............................................................13

*Case v City of NY*,
   233 F. Supp. 3d 372 (SDNY 2017) ("*Case I*") ..................................................13, 14, 20

*Cash v. County of Erie*,
   654 F.3d 324 (2d Cir. 2011) ............................................................................................18

*Chamberlain v. City of White Plains*,
   986 F.Supp.2d 363 (S.D.N.Y. 2013) ................................................................................19

*City of Canton v. Harris*,
   489 U.S. 378 (1989) ..............................................................................................12, 18, 19

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) .............................................................................................................. 8

*Connick v. Thompson,*
   563 U.S. 51 (2011) ................................................................................................ 17, 18, 19

*Dellums v. Powell,*
   566 F.2d 167 (D.C. Cir. 1977) ........................................................................................ 23

*DeShawn v. Safir,*
   156 F.3d 340 (2d Cir. 1998) ............................................................................................. 8

*DiFolco v. MSNBC Cable LLC,*
   622 F.3d 104 (2d Cir. 2010) ............................................................................................. 7

*Dinler v. City of New York,*
   No. 04 Civ. 7921 (RJS), 2012 U.S. Dist. LEXIS 141851 (S.D.N.Y. Sept. 30, 2012) ............... 13, 23

*Edrei v. City of New York,*
   254 F.Supp.3d 585 (S.D.N.Y. 2017) .............................................................................. 19

*Edrei v. Maguire,*
   892 F.3d 525 (2d Cir. 2018) ........................................................................................... 23

*Elrod v. Burns,*
   427 U.S. 347 (1976) ....................................................................................................... 19

*Felix v. City of NY,*
   344 F.Supp.3d 644 (S.D.N.Y. 2018) ................................................................... 13, 14, 20

*Floyd v. City of New York,*
   283 F.R.D. 153 (S.D.N.Y. 2012) ...................................................................................... 8

*Gonzalez v. City of New York,*
   16-cv-00254 (CM), 2016 U S Dist. LEXIS 177820 (S.D.N.Y. December 2, 2015) ....................... 14

*Ligon v. City of New York,*
   288 F.R.D. 72 (S.D.N.Y. 2013) ........................................................................................ 8

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
   797 F.3d 160 (2d Cir. 2015) ........................................................................................... 24

*Lynch v. City of New York,*
   952 F.3d 67 (2d Cir. 2020) .................................................................................. 13, 14, 15

*MacNamara v. City of New York,*
   275 F.R.D. 125 (S.D.N.Y. 2011) .................................................................................... 13

*Marcavage v. City of New York*,
689 F.3d 98 (2d Cir. 2012) ................................................................................................10

*Marlin v City of NY*,
No. 15 Civ. 2235 (CM), 2016 US Dist. LEXIS 122426 (S.D.N.Y. Sep. 7, 2016) ............... 7, 11, 14

*Marom v City of NY*,
No. 15-cv-2017 (PKC), 2016 US Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) ...........................20

*McKenna v. Wright*,
386 F.3d 432 (2d Cir. 2004) ...............................................................................................23

*Medina v. City of New York*,
No. 19-CV-9412 (AJN), 2020 U.S. Dist. LEXIS 222887 (S.D.N.Y. Nov. 30,
2020) .................................................................................................................................10

*Mhany Mgmt. v. Cty. of Nassau*,
819 F.3d 581 (2d Cir. 2016) ...............................................................................................11

*Monell v. Department of Social Services*,
436 U.S. 658 (1978) .....................................................................................................*passim*

*Osterhoudt v. City of N.Y.*,
No. 10-CV-3173 (RJD) (RML)*, 2012 US Dist. LEXIS 139700 (E.D.N.Y. Sep. 27,
2012) ............................................................................................................................. 13, 20

*Packard v. City of New York*,
15 Civ. 7130 (AT), 2017 U.S. Dist. LEXIS 233430 (S.D.N.Y. March 2, 2017) ..............................13

*Packard v. City of New York*,
2017 US Dist. LEXIS 189470 (S.D.N.Y. October 30, 2019) ................................................13, 14, 19

*Papineau v. Parmley*,
465 F.3d 46 (2d Cir. 2006) .................................................................................................23

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) ...........................................................................................................21

*People v. Jennifer Bezjak*,
11 Misc.3d 424 (NYC Crim. Ct.,2006)*, aff'd*, 26 Misc.3d 130(A) (App. Term, 1st
Dept., 2010), *cert. den'd*, 15 N.Y.3d 747–50 (2010) .............................................................23

*Saba v. Cuomo*,
20-cv-5859, ECF No 39 (SDNY Apr. 23, 2021) .....................................................................11

*Schiller v. City of New York*,
No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2–5 (S.D.N.Y. Jan. 23, 2008) ...........................13

*Stinson v. City of New York*,
   282 F.R.D. 360 (S.D.N.Y. 2012) ..................................................................................8

*Tangreti v. Bachman*,
   983 F.3d 609 (2d Cir. 2020) .......................................................................................22

*Tardif v. City of New York*,
   991 F.3d 394 (2d Cir. 2021) .........................................................................................7

*Tellier v. Fields*,
   280 F.3d 69 (2d Cir. 2000) ..........................................................................................23

*United States v. Quattrone*,
   402 F.3d 304 (2d Cir. 2005) ........................................................................................10

*Vasquez v. City of NY*,
   No. 16-cv-5296 (GHW), 2018 US Dist LEXIS 78429 (S.D.N.Y. May 9, 2018) ............21

*Walker v. City of New York*,
   974 F.2d 293 (2d Cir. 1992) ................................................................................. 19, 20

*Washington Mobilization Comm. v. Cullinane*,
   566 F.2d 107 (D.C. Cir. 1977) ....................................................................................23

*White v. City of NY*,
   13 Civ. 7241 (KPF) 2015 U.S. Dist. LEXIS 100772 (S.D.N.Y. 2015) ..........................20

*Williams v. City of New York*,
   121 F.Supp. 3d 354 (S.D.N.Y.) ...................................................................................19

**Other Authorities**

Fed. R. Civ. P. 12(d) ...........................................................................................................7

New York Criminal Procedure Law § 150.20(1)(a) ..................................................... 4, 5, 15

U.S. Const. amend. I..................................................................................................*passim*

U.S. Const. amend. IV .....................................................................................6, 18, 22, 23

U.S. Const. amend. XIV ...................................................................................6, 18, 22, 23

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this Memorandum of Law in Opposition to Defendants' partial Motion to Dismiss (*Payne* Dkt. Nos. 105–107)[1] the *Sow* Plaintiffs' First Amended Complaint ("FAC") (Dkt. No. 96). As the FAC incorporates the allegations in the operative pleadings in the related cases by reference (*see* FAC at 12 n.2), and Defendants have chosen to pursue one motion to dismiss all the related pleadings, Plaintiffs incorporate by reference the Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaints ("PMOL"), (Dkt. No. 134), in its entirety.

## STATEMENT OF FACTS

### Summary of the Summer 2020 Protests

When protests began across New York City on May 28, 2020, three days after George Floyd's murder and at the height of the COVID-19 pandemic, police responded by trapping, brutalizing, and making unlawful mass arrests of protesters. (FAC ¶¶ 1, 65-66, 125–28). Over the next seven days, and for many months thereafter, NYPD members—including some Defendants, such as Chief of Department Terence Monahan—continued to subject protesters, bystanders, and observers to brutal uses of force including, but not limited to, fist strikes, baton strikes to the head, tackles to the ground, and pepper spraying. Acting according to NYPD de facto policy and custom, NYPD members assigned to police the protests subjected arrestees to overlapping policies and practices that caused Plaintiffs to suffer, among other harms, chilling violations of their First Amendment rights, physical and other injuries, false arrests, excessive detentions, and baseless criminal prosecutions. For example, Defendants corralled protesters into spaces from which they could not escape—a practice known as "kettling"—then brutalized them, engaging in making mass arrests, all without lawful justification or

---

[1] All "Dkt. No." citations herein refer to documents filed on the consolidated cases docket, 20-cv-08924 (CM) pursuant to the Court's February 22, 2021 Order. (Dkt. No. 40).

fair warning; physically restrained people with painfully tight flex-cuffs; and subjected arrestees to lengthy and unnecessary arrest processing that put them in dangerously close quarters in a manner that obviously endangered them in light of the global COVID-19 pandemic. (*Id.* ¶¶ 2–4, 7, 67–99, 129–420, 462–505, 512, 566). The NYPD also targeted legal observers, medics, and essential workers—all without probable cause. (*Id.* ¶ 5). Defendants also created, implemented, and enforced arbitrary curfew orders in a manner that violated the plain text of actual Curfew Orders themselves, as well as bedrock fair notice principles, and other fundamental constitutional rights. (*See, e.g., id.* ¶¶ 25–28; 32; 72–99; 121–24; 438(c); 440–62; 478–83; 506–07).

Within two weeks of George Floyd's death, NYPD members had arrested approximately 2,047 protesters. Black protesters were disproportionately charged with felonies. (*Id.* ¶¶ 117–18). All or most charged violations of the Curfew Orders related to the protests that are the subject of this litigation were eventually dismissed. (*Id.* ¶¶ 98, 176, 236, 281, 308, 328, 344, 389, 417, 517). In stark contrast, during the same time period, NYPD members routinely escorted and facilitated pro-police and right-wing demonstrations and protesters, making no arrests even when those protesters assault counter-protesters and otherwise flagrantly violated laws and threatened public safety. (*Id.* ¶¶ 6, 100–07).

As discussed more fully in Point IV below, all of the constitutional deprivations that Plaintiffs suffered at Defendants' hands were caused by de facto  policies or widespread practices and/or the deliberate indifference of Defendant City policymakers in the face of the obvious, and demonstrated, need to train and supervise subordinate NYPD members. Although Defendants City, de Blasio, Shea, Monahan, and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to intervene, monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct. (*See, e.g., id.* ¶¶ 506–07). Defendants' deployment of these de facto policies and practices were part of the NYPD's long history of aggressive and unconstitutional policing of

2

certain First Amendment-protected activities, *see, e.g., id.* ¶¶ 421–29, and occurred against the backdrop of a historical failure to appropriately train and supervise its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their training and performance, *see, e.g., id.* ¶¶ 429–62.

Reports and investigations into the 2020 summer protests, including by the Attorney General's office, the NYC Department of Investigation, and Corporation Counsel itself, found, *inter alia*: pervasive misuse of flex-cuffs; failure of NYPD officers to wear protective face coverings; transportation and detention of arrestees in contravention of COVID-19 guidelines; insufficiently tailored strategy to respond to protests; the deployment of insufficiently trained officers; NYPD policies that failed to distinguish serious civil disorders and riots from peaceful First Amendment expression; the attempted suppression of protests; and the use of excessive and disproportionate use of force that "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity." (*Id.* ¶¶ 108–28).[2]

### The *Sow* Plaintiffs' Experiences

Plaintiffs participated in the protests between May 28, 2020 and June 6, 2020, wearing masks and other face coverings for protection in light of the pandemic. (*Id.* ¶¶ 1, 31, 130; 153-54; 180–81; 208–09; 221, 310–11; 239–40; 284; 332–33; 348–49; 392–93.) While the exact details of each Plaintiff's experiences vary, all of them were injured by NYPD members in similar ways, and subjected to the multiple, overlapping, unconstitutional NYPD policies and practices described in the FAC.

For example, as part of and consistent with Defendants' policies and practices regarding making arrests, including mass arrests without fair warning (*see, e.g., id.* ¶¶ 477–89, 512; 566), virtually all of the Plaintiffs were physically trapped, assaulted, and arrested by Defendants, without meaningful

---

[2] As Defendants note, violence at these protests *did* escalate—but as pled and presumed true at this stage, it was the NYPD that heightened tensions and used excessive force (*see, e.g.,* FAC ¶¶ 91, 94, 100, 294-297, 422)—not protesters, as Defendants improperly argue.

prior notice such as dispersal orders or opportunity to disperse. (*Id.* ¶¶ 132–35; 157–64; 182–84; 241–52; 287–97; 312–13; 334; 350; 396–99.) Many Defendants and other nearby NYPD members were not wearing masks while arresting, using force on, and/or detaining Plaintiffs. (*See, e.g., id.* ¶¶ 147, 234, 264). And Defendants and other NYPD members either removed the masks that Plaintiffs wore, or Plaintiffs' masks came off as Defendants assaulted and arrested them. (*Id.* ¶¶ 138, 198, 265, 289, 322, 354, 403.) For example, an officer grabbed Ms. Durkee's hair and pulled her head back and ripped her mask down. (*Id.* ¶ 403.) Defendants refused to fix Plaintiffs' masks or provide new ones. (*See, e.g., id.* ¶¶ 146, 198, 266, 355–56, 411). Indeed, when Mr. Sow asked an officer to pull his mask up to cover his nose and mouth, the officer mockingly pulled up Mr. Sow's mask so that it covered Mr. Sow's eyes instead, like a blindfold. (*Id.* ¶ 356.)

Defendants subjected Plaintiffs to unnecessary and excessive force, consistent with Defendants' policies and practices around using excessive force against protesters (*see, e.g., Id.* ¶¶ 463–476, 512, 566). Defendants beat Plaintiffs Rios and Zurkuhlen with batons. (*See, e.g., id.* ¶¶ 185–87, 251). Defendants tackled Plaintiffs Jaklevic, Rios, Bredder, and Durkee and threw them to the ground. (*Id.* ¶¶ 137, 185, 221, 316–18, 402). Defendants pepper sprayed Mr. Sow in his eye. (*Id.* ¶ 352). Defendants hit Plaintiffs Jaklevic and Salazar with their bicycles. (*Id.* ¶ 136, 288). Defendants punched Plaintiffs Rios and Bredder. (*Id.* ¶¶ 185, 314). And Defendants grabbed the bicycle of Barbara Ross, flinging her to the ground. (*Id.* ¶¶ 213, 214). Defendants then restrained Plaintiffs with their arms behind their backs in plastic flex-cuffs for hours, in a manner that caused extreme pain, and in some cases, serious nerve damage. (*Id.* ¶¶ 140, 166, 186, 257, 303, 324, 335, 358, 362–63.) When Plaintiffs and others pled for officers to remove or loosen their flex-cuffs, officers told them that they would not or could not. (*Id.* ¶¶ 142–45; 168; 195–96; 275; 299; 364–70.)

Consistent with Defendants' protest arrest processing policies and practices, *see id.* ¶¶ 490–505, Defendants arrested Plaintiffs for alleged offenses in connection with which New York Criminal

Procedure Law ("CPL") § 150.20(1)(a) required Defendants to release Plaintiffs with tickets on the street in lieu of a fuller detention. However, instead, Defendants subjected Plaintiffs to unreasonably lengthy, onerous, centralized mass arrest processing, which significantly increased the amount of time they would otherwise have been in custody and exposed them to inappropriate and especially hazardous conditions of confinement given the COVID-19 pandemic. (*Id.* ¶¶ 171–75; 201–04; 226–35, 326; 259, 274; 304–07; 340–42; 375–85; 413–15). For example, Plaintiffs were transported in vans or buses and placed in holding cells in close indoor contact with other arrestees whose masks fell off or were removed, exposing them to police officers who were not wearing masks. (*Id.* ¶¶ 169–70, 172, 197, 233, 325, 270–73, 300–02, 306, 339, 385, 413, 415). And, despite the summer heat and length of time in custody, and repeated pleas, Defendants denied Plaintiffs access to basic necessities like water**.** (*Id.* ¶¶ 173–74, 278–79, 303, 305).

Ultimately, those Plaintiffs who were charged with violating the law as a result of their arrests[3] were in custody from between 6 to 8.5 hours before being released with the tickets CPL § 150.20(1)(a) required Defendants to have given them on the street—a process that typically takes perhaps an hour or two, at most. (*Id.* ¶¶ 175, 235, 327, 280, 307, 343, 388, 417). All of their charges were ultimately dismissed. (*Id.* ¶¶ 176, 236, 328, 281, 308, 344, 389.) Mr. Bredder was exposed to this treatment during two arrests, on June 2 and June 4. (*Id.* ¶¶ 220–27, 310–30). And, as a result of Defendants' misconduct, all Plaintiffs have suffered lasting physical and emotional injuries, as well as other damages. (*See*, *e.g.*, *id.* ¶¶ 151, 178, 188–91, 206–07, 219, 237, 250, 261–62, 330–31, 345, 309, 390, 418–19.)

## ARGUMENT

### I.   Defendants' Motion is Limited On its Face.

The FAC enumerates eight claims for various forms of relief alleging that Defendants violated

---

[3] Mr. Jaklevic and Mr. Rios were both held in painful flex-cuffs and detained for hours before being released without any legal process. (*Id.* ¶¶ 148, 204).

Plaintiffs' First, Fourth, Fourteenth Amendment-based federal constitutional rights, as well as liability for the same against the City through *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and state law claims. (FAC ¶¶ 77–88.) Though Defendants' Notice of Motion, Dkt. No. 105, says it seeks dismissal of "the Amended Complaints" without limitation, Defendants' actual motion, as limited by their briefing, *see* Dkt. No. 106 ("DMOL"), is only a partial motion to dismiss. For example, Defendants do not move to dismiss Plaintiffs' First, Fourth, and Fourteenth Amendment, non-*Monell* claims, or their related state law claims (collectively Plaintiffs' "core claims"), at all. As to Plaintiffs' *Monell* claims, Defendants have explicitly not moved to dismiss three of the Plaintiffs *Monell* failure to train claims: (1) failure to train on providing "constitutionally meaningful dispersal orders and opportunities to disperse" or a similar fair warning before "using force or taking other enforcement action" (FAC ¶ 438(a)); (2) failure to train on making "clear the need for individualized probable cause to arrest in a protest context" (FAC ¶ 438(b)); and (3) failure to train related of the use of plastic flex-cuffs (FAC ¶ 438(f)). (*See* DMOL at 16 n.23 (limiting their motion to dismiss the *Sow* Plaintiffs' failure to train claims to those listed in FAC ¶ 438(c), (d), (e), and (g)).[4]

All that is properly before the Court is Defendants' motion to dismiss Plaintiffs' claims for injunctive and declaratory relief; some of Plaintiffs' policy and practice and failure to supervise *Monell* theories of liability; four of the *Sow* Plaintiffs' seven failure to train-based *Monell* theories; and Plaintiffs' individual claims against Defendants de Blasio, Shea, and Monahan and known and unknown police officers.

---

[4] Those claims relate to failure to train on: (c) the need to provide dispersal orders and a meaningful opportunity to comply in order to establish probable cause to arrest for a Curfew Order violation; (d) the use of reasonable and proportionate force in policing protests; (f) the need for, or tactics regarding, protest escort and facilitation (and the training's almost myopic focus on tactics designed to "disperse and demoralize" protesters; and (g) the need for NYPD members to wear masks, provide masks for arrestees, and take other COVID-19 related precautions related to arrests and arrest processing. (*See* FAC ¶ 438(c), (d), (e), and (g)).

Defendants have waived all other arguments and should not be permitted to raise new arguments seeking dismissal of other claims for the first time in their reply brief. *See, e.g.*, Dkt. No. 40¶ 6 ("[a]ny issue that is raised for the first time in reply will not be considered"); *Tardif v. City of New York*, 991 F.3d 394, at 404 n.7 (2d Cir. 2021).

## II.     The Court Should Exclude Defendants' Improper Use of Extraneous Materials.

Defendants' motion improperly seeks to rely on documents that are not attached to or incorporated by reference into the FAC.[5] *See* Exhibits A–C, G, and H to the March 26, 2021 Declaration of Brachah Goykadosh (Dkt. No. 107, "Goykadosh Decl."). Much of Defendants' Procedural History and Statement of Facts sections, *see* DMOL at 1–7, and many of Defendants' substantive arguments, refer to and seek to rely on either those records, or Defendants' own allegations—including selective and self-serving references to other proceedings, spinning facts related to them against Plaintiffs and in Defendants' favor. Plaintiffs object to and contest all of Defendants' improper uses of such extraneous materials, including, but not limited to, Exhibits A–C, G, and H to the Goykadosh Declaration, as well as all of Defendants' improper characterizations of those records, cases, and other matters outside the pleadings, in the light most favorable to Defendants.

Thus, Plaintiffs request that the Court strike or exclude from consideration Exhibits A–C, G, and F to the Goykadosh Decl., as well as all of Defendants' allegations that rely on those records or otherwise refer to matters outside the pleadings, from consideration, as required under Fed. R. Civ. P. 12(d).

---

[5] In contrast, Goykadosh Decl. Exhs. D and E, as well as two other reports, were referred to and incorporated by reference in the FAC. *See* FAC ¶ 7 n.1; p. 12 n.2; ¶¶ 108–24 (and related footnotes). So were the operative pleadings in the other cases. This Court should consider those other, related pleadings, as well as the reports Plaintiffs have referred to and incorporated by reference in them, in the light most favorable to Plaintiffs in considering this motion. *See, e.g.*, *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *Marlin v City of NY*, No. 15 Civ. 2235 (CM), 2016 US Dist. LEXIS 122426 (S.D.N.Y. Sep. 7, 2016) (discussed below).

III.    **The FAC Establishes Subject Matter Jurisdiction.**

A.      **Plaintiffs have standing to pursue injunctive and declaratory relief, as the prospect of future harm is real, not speculative.**

As explained above, the Court should strike or simply reject Defendants' claims that NYPD policing has been "reinvented" or "reimagined," which rely entirely on citations to matters outside Plaintiffs' pleadings, all of which Plaintiffs contest, and none of which are appropriate for this Court to consider. Plaintiffs, and the *Sow* putative Class Members, face real and imminent future harm unless this Court grants the relief requested herein. The FAC establishes that Plaintiffs face a "real and immediate threat of repeated injury." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983); *DeShawn v. Safir,* 156 F.3d 340, 344 (2d Cir. 1998). Plaintiffs are active protesters who intend to continue protesting police misconduct. (*See, e.g.*, FAC ¶ 516). The FAC plausibly pleads such real and imminent future harm, based on the facts of Plaintiffs' and putative Class Members' experiences, as well as the history of "repeated incidents" involving similar injuries caused by the City's deployment the same policies and practices against other historically disfavored speakers.

All of this establishes, for pleading purposes, that "[t]he possibility of recurring injury [has] cease[d] to be speculative [because] when actual repeated incidents are documented" and the history of frequent injuries pursuant to policy or practice coupled with the continuing deployment of the same policies and practices against Plaintiffs and other arrestees, as pled in *Sow* and the related cases- makes the risk of future injury "real and immediate, not conjectural." *Ligon v. City of New York*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013); *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012). Plaintiffs' lawful and protected conduct in attending future protests will "bring [them] into contact with police officers" who are likely to subject them to the municipal policies and widespread practices complained of herein. *An v. City of N.Y.*, 16 Civ. 5381 (LGS), 2017 U.S. Dist. LEXIS 84364, at *15–16 (S.D.N.Y. June 1, 2017; *see also, e.g.*, *Stinson v. City of New York*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012) ("[T]he fact that several Plaintiffs in this case have received multiple summonses alleged to have been issued

without probable cause suggests the potential for future harm to rise above the speculative level");

*Abdell v. City of New York*, No. 05–cv-8453 (RJS) (JCF), 2009 U.S. Dist. LEXIS 42719, at \*17 (S.D.N.Y. May 5, 2009) (finding standing for injunctive relief for plaintiffs who intended to participate in demonstrations and plead evidence of NYPD policy of improper enforcement of disorderly conduct laws in connection with protests).

From May 28 to June 5, 2020 alone, the New York City Department of Investigation reported 2,047 arrests at last summer's police misconduct demonstrations. (FAC ¶ 117). Notably, Plaintiff Bredder was arrested at two different locations on two separate nights while he was protesting police violence. (FAC ¶¶ 220–27, 310–30). Both nights, police officers injured him while he was protesting, applied flex cuffs that were excessively tight, and detained him to processing facilities. *Id.* And Plaintiffs have alleged multiple protests occurred throughout the rest of the summer of 2020, and even into 2021 (after this suit was filed), involving mass arrests, brutality from NYPD members, and other, misconduct on Defendants' behalf similar to, or the same as, their misconduct against Plaintiffs in this case. *See* PMOL at 11 (citing allegations in *Payne* and *People* FACs). [6] Beyond that, Defendants' practice of regularly deploying the historically brutal and inadequately trained and disciplined Strategic Response Group ("SRG") to police protests, which has been occurring since at least 2015, FAC ¶ 440–49, provides further support for the fact that Plaintiffs are likely to face similar harm when they later demonstrate at protests policed by the SRG.[7] Such facts—involving multiple arrests at multiple

---

[6] *See, e.g.*, *Payne* FAC ¶¶ 77 (describing NYPD officers as "ripping people off of the sidewalk" during a demonstration against ICE in Times Square); 78; *People* FAC ¶¶ 68, 388–93 (describing post-Election day protests in which NYPD officers forcibly pushed protestors, swarmed and trapped them onto a sidewalk, and used other force); 71, 112–13, 394–98 (describing NYPD kettling protestors near City Hall, using other force, and detaining them before releasing with a summons).

[7] Contrary to Defendants' assertions, *see* DMOL at 15, Plaintiffs do not seek to challenge the SRG's "mere existence." As the FAC pleads, Defendant City has a policy and practice of deploying the SRG to police protests. But that deployment is "particularly problematic" because when it comes to protest policing, the SRG is "inadequately trained, poorly supervised and disciplined," (*see* FAC ¶ 440-449). Those facts provide support for Plaintiffs' standing for injunctive and declaratory relief, as well as

protests, and municipal policies and practices that have persisted over a substantial period of time - raise Plaintiffs' risk of harm far above the speculative level.

Defendants rely on, *Medina v. City of New York*, No. 19-CV-9412 (AJN), 2020 U.S. Dist. LEXIS 222887 (S.D.N.Y. Nov. 30, 2020), which involves only an isolated incident, and *Marcavage v. City of New York*, 689 F.3d 98, 102-04 (2d Cir. 2012) which challenged specific "no-demonstration zones" set up during the 2004 Republican National Convention ("RNC") under circumstances the Court made clear were unique. Here, in contrast, Plaintiffs seek declaratory and injunctive relief to prevent Defendants from violently disrupting protests through long-standing, unconstitutional policies and practices that Defendants have applied to a substantial number of protests over a period of time and that they still actively employ. Finally, while Defendants say the pandemic is "hopefully receding" (DMOL at 8), and Plaintiffs hope that is and continues to be the case, that has nothing to do with Plaintiffs' clear standing to pursue the relief related to Defendants' ongoing, unlawful policies and practices related to protest policing that Plaintiffs seek herein.

### B. Defendants' vague, indefinite, and illusory promises of future reform do not moot Plaintiffs' claims for injunctive and declaratory relief.

Defendants' argument that Plaintiffs' claims for injunctive and declaratory relief are moot, as "[r]eform is underway" (DMOL at 12–13), relies on matters outside the pleadings, improperly viewed in the light most favorable to Defendants, and for that reason, this Court should reject them .

Beyond that, none of Plaintiffs' claims are moot. They remain very much "live." *United States v. Quattrone*, 402 F.3d 304, 308 (2d Cir. 2005). As seen in Point III A. above, Defendants have not "ceased" the misconduct Plaintiffs complain of herein. Plaintiffs have not "admitted" that anything is moot and Defendants have not met the "stringent and … formidable" burden they hear of showing

---

their *Monell* claims that the violations occurred as a result of policies and practices rather than isolated incidents, and that policymakers showed deliberate indifference to the need to train and supervise SRG members.

"that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Mhany Mgmt. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016). Even on Defendants' spin of the facts, their purportedly voluntary reforms are merely "underway"; "actions are being considered"; and "draft reform plans have been submitted." (DMOL at 13). Such contingent "plans" and "considerations" are not an "eradication" of the challenged practices as a matter of law. *See also Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156, 162 (2d Cir. 2010).

In fact, just today, April 23, 2021, Judge Liman wrote an opinion rejecting exactly the mootness argument Defendants make here, "for the straightforward reason that the [challenged policy] has not already changed." *Saba v. Cuomo*, 20-cv-5859, ECF No 39 at *10-11 (SDNY Apr. 23, 2021). He explained: "Although Defendants may have committed to undertake a process that, *at some future date*, will [provide the relief sought], … Defendants' prospective intentions do not 'eradicate[] the effects' of the alleged constitutional infirmity." *Id.* (emphasis in original), quoting *In re Zarnel*, 619 F.3d at 162. In short, "even if Defendants are already undertaking activities the Court would ultimately mandate in a judgment for Plaintiff, that does not obviate Plaintiff's entitlement to seek a court order granting such relief or strip the Court of its authority to grant it." *Id.* at 11–12 (collecting cases). And, as explored above, Defendants' "undertaking" does not even rise to *that* level.

## IV.    Plaintiffs Have Properly Pled Their *Monell* Claims.

### A.    Plaintiffs have properly pled municipal liability.

The FAC amply supports Plaintiffs' Core Claims, *see, e.g.*, FAC ¶¶ 65, 69, 81, 83, 94, 96, 125, 128, 129–420, 508–09, 527–64, as summarized above. The facts in the FAC and the documents incorporated by reference more than "nudge" Plaintiffs' related *Monell* claims against Defendant City "'across the line from conceivable to plausible,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2008) (citation omitted), on all four grounds for municipal liability recognized under *Monell*. *See, e.g.*, *Marlin v. City of NY*, No. 15 Civ. 2235 (CM), 2016 US Dist. LEXIS 122426, at *51 (SDNY Sep. 7, 2016) (summarizing

them and citing cases). The FAC also establishes, for pleading purposes, a "direct causal link," *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989), between the constitutional violations Plaintiffs experienced and each policy, practice, and related failure to train and supervise that they challenge.

Defendants' arguments to the contrary almost uniformly fail to engage with the facts in the FAC, the pleadings in the related cases, the reports, or the cases Plaintiffs have cited and incorporated by reference in the FAC. Principally, Defendants characterize their protest case-related jury trial track record in a self-serving way to argue that Plaintiffs have failed to plead a policy, practice, or history of unconstitutional protest policing practices or "deliberate indifference" on the part of policymakers. (*See, e.g.*, DMOL at 2–4, 17, 20–21). In support, throughout their papers, Defendants selectively and self-servingly list and describe, in the light most favorable to them, only a small portion of the lawsuits involving claims similar to those at issue in these related cases. They often rely on cases that are not mentioned in the FAC. At worst for Plaintiffs, Defendants' attempts to rely on and explorations of their own version of some of their litigation history points to the need for discovery into those aspects of Defendants' apparent defenses.

Tellingly, in contrast to their engagement with their own versions of their litigation history, with few exceptions, Defendants do not mention or address the cases Plaintiffs have cited to in the FAC. For example, Plaintiffs cite numerous cases in FAC ¶ 429 that support Plaintiffs' Core Claims of constitutional violations and their related *Monell* claims, including their policy and practice, and failure to train and supervise, claims. In most of the matters cited in FAC ¶ 429, there were findings of liability against the City, or denials of motions to dismiss and/or or summary judgment, and, in many cases, extensive discovery on *Monell* claims, including claims similar to those at issue in this case. *See, e.g.*, FAC ¶¶ 429(a)-(f), (k), and (l) (citing *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF)

(S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2)).[8] In fact, trials involving Occupy Wall Street-related incidents are currently scheduled on *Monell* claims that overlap significantly with those Plaintiffs are pursuing herein, including several of Plaintiffs' failure to train claims. *See Case,* 408 F.Supp.3d at 327–34 (denying Defendant City summary judgment on claims related to failure to train); *Packard III,* 2017 US Dist. LEXIS 189470, at *8–13, 29–36 (same, with respect to claims involving failures to train on proper dispersal orders in sidewalk protests).

Rather than addressing those or other cases cited in FAC ¶ 429, the pleadings or discovery in those matters, or their implications for this case, Defendants argue in sum that the complaints in the other lawsuits that they focus on contain mere unproven allegations and that that no resulting settlements contained an admission of liability. But citations to relevant complaints and reports (including pleadings), evidence developed in other lawsuits, and settlements (including without liability admissions) can contribute to plausibly pleading various grounds for *Monell* liability, including to establish the existence of a formal policy or practice, and to show municipal "deliberate indifference" to support failure to train and supervise claims. *See, e.g.,* *Lynch v. City of New York,* 952 F.3d 67, 81–82 (2d Cir. 2020); *Felix v. City of NY,* 344 F.Supp.3d 644, 662–63 (S.D.N.Y. 2018); *Case v. City of NY,* 233 F. Supp. 3d 372, 404–07 (SDNY 2017) ("*Case I*"); *Osterhoudt v. City of N.Y.,* No. 10-CV-3173 (RJD) (RML), 2012 US Dist. LEXIS 139700, at *4–7 (E.D.N.Y. Sep. 27, 2012) (citing *Colon v. City of New York,* 09-CV-8 (JBW), 2009 U.S. Dist. LEXIS 110520, at *4–5 (E.D.N.Y. Nov. 25, 2009)).

In *Lynch,* rejecting the lower court's finding that citations to other lawsuits could not establish the existence of an official policy, the Second Circuit squarely held that it is appropriate to cite

---

[8] *See also* *Schiller v. City of New York,* No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2–5 (S.D.N.Y. Jan. 23, 2008); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011); *Dinler,* No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012); *Case v City of NY,* 233 F. Supp. 3d 372 (SDNY 2017) ("*Case I*"); 408 F.Supp.3d 313 (S.D.N.Y. 2019) ("*Case II*"); *Packard v. City of New York,* 15 Civ. 7130 (AT)(RLE), 2017 U.S. Dist. LEXIS 233430, at *14–26 (S.D.N.Y. March 2, 2017) ("*Packard I*"); *Packard v. City of New York,* 2017 US Dist. LEXIS 189470, at *8–13, 29–36 (S.D.N.Y. October 30, 2019) ("*Packard II*").

"'numerous litigations as evidence of the 'official policy' element' of municipal liability claims.'" *Lynch*, 952 F.3d at 81–82. The Second Circuit explained that the cases the lower court had relied on to arrive at its conclusion, like the cases Defendants rely on here, "dealt with motions for summary judgment and proffers of proof, not with motions" to dismiss, *Lynch*, 952 F.3d at 81–82, and improperly focused on the fact that allegations in pleadings are "unproven" and settlement agreements without liability findings are not evidence of misconduct.

Therefore, the reports and their contents cited to and incorporated by reference in the FAC provide support for Plaintiffs' *Monell* theories of liability, including to establish the existence and use of the challenged policies and practices, the Defendants' knowledge of and roles in them, as well as the deliberate indifference, elements of Plaintiffs' *Monell* claims. *See Marlin*, 2016 U.S. Dist. LEXIS 122426, at *54 (noting that "data summarized in [reports] creates a plausible inference that NYPD had a pattern or practice of use of excessive force (particularly against Occupy Wall Street protestors), that the City was put on notice of this and did nothing, as shown by its failure to discipline officers, and that the City's inaction caused Plaintiff's alleged constitutional injury."); *see also, e.g.*, *Felix v. City of NY*, 344 F.Supp.3d 644, 662–63 (S.D.N.Y. 2018) (denying motion to dismiss *Monell* claim based in part on an Office of Inspector General report and pattern of lawsuits) (citing *White v. City of NY*, 13 Civ. 7241 (KPF) 2015 U.S. Dist. LEXIS 100772 (S.D.N.Y. 2015)); *Gonzalez v. City of New York*, 16-cv-00254 (CM), 2016 U S Dist. LEXIS 177820, at *21–25 (S.D.N.Y. December 2, 2015); *Case I*, 233 F.Supp.3d at 404-08.

Defendants' reliance on *Davis v. City of New York*, 12 Civ. 3297 (PGG), 2018 U.S. Dist. LEXIS 231116, at *17 (S.D.N.Y. Mar. 30, 2018) and *Aguirre v. City of New York*, 15 Civ. 6043 (PKC), 2017 U.S. Dist. LEXIS 155422, at *15–16 (E.D.N.Y. Sept. 22, 2017) is misguided. The *Davis* court's analysis of that report simply does not apply to the reports at issue in this Court's analysis of the FAC. And *Aguirre* essentially adopts the logic that this Court rejected in *Marlin*, 2016 U.S. Dist. LEXIS 122426,

14

at *56–63; *Lynch*, 952 F.3d at 81–82.

    1.    <u>Plaintiffs have adequately pled that Defendants subjected them to unconstitutional policies and practices.</u>

The FAC describes Defendants' deployment and implementation of "overlapping policies and practices," including "the use of excessive force, false arrests, and excessive and unreasonable detention at certain demonstrations—particularly those that focus on misconduct by the NYPD—but not others." (FAC ¶¶ 1–7). They include both written and *de facto* policies as well as practices that were widespread enough that Defendant policymakers were, or should have been, aware of them. The FAC summarizes these as: (1) uses of excessive force, and false arrests and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; (2) employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning; (3) engaging in retaliatory and selective enforcement of the Curfew Orders and other violations against perceived participants in First Amendment assemblies, particularly Black Lives Matter and/or anti-police brutality protests, without first developing proper policy, and without fair warning; (4) using flex-cuffs for protest-related arrests, while failing to supply officers with protective padding and adequate numbers of cutting tools to loosen or remove flex-cuffs; and (5) improperly subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at centralized arrest processing locations, in lieu of the brief street detentions required by CPL § 150.20(1)(a) and that are the norm under NYPD written procedure. (*See, e.g.*, FAC ¶¶ 2, 4, 423–29, 463–79, 484–05, 508–09, 512, 561–62, 566).

Although Defendants seek to characterize the events described in the pleadings and reports as isolated incidents limited to the pandemic, as seen elsewhere herein, Plaintiffs have adequately pled that they were not. For example, in addition to adequately pleading that the Defendants deployed the challenged policies and practices against Plaintiffs, the FAC also adequately pleads that Defendant City's deployment of those policies and practices against certain protesters, but not others, was "well

known to Defendants" de Blasio, Shea, and other policymakers, and that similar "overlapping policies and practices" to those at issue in this case, had been used "for years" in the past against historically disfavored speakers, and had "often resulted in litigation." (*see, e.g., id.* ¶¶ 7, 100–07, 421–29).

2.  <u>The FAC adequately pleads Plaintiffs' *Monell* theories based on Defendants' enforcement of the Curfew Orders.</u>

The NYPD arrested around 1,350 people for allegedly violating the Curfew Orders—well over half of the total number of arrests between May 28 and June 5, 2020. (FAC ¶¶ 97, 117). In fact, the FAC pleads that Defendants City, de Blasio, Shea, Monahan, and other policymakers, as well as other Defendants, created, adopted, implemented, and/or enforced the Curfew Orders between June 1, 2020 and continuing through June 7, 2020. (FAC ¶¶ 72–99; 121–24). The FAC describes formal, written policies related to the Curfew Orders (*see, e.g.,* FAC ¶¶ 72–80, 82, 480, 483); *de facto* policies in the form of practices related to how Defendants implemented and enforced the Curfew Orders (*see, e.g.,* FAC ¶¶ 81, 83–99, 122, 129–420 (as those facts relate to the individual Plaintiffs' experiences with the Curfew Orders), 478–79, 481–82); and the personal involvement of Defendants de Blasio, Shea, Monahan (*see, e.g.,* FAC ¶¶ 25–27, 32, as well as other Defendants (*see, e.g.,* FAC ¶¶ 28, 32, 129–420) in designing and/or implementing and/or enforcing the Curfew Orders. The FAC also describes and related failures to train "on the need for fair warning and a meaningful opportunity to comply with police directions as a prerequisite for probable cause to arrest for a curfew order violation" (*see, e.g.,* FAC ¶¶ 438(c)) and/or supervise (*see, e.g.,* FAC ¶¶ 123–24, 440–62, 506–07) subordinate officers in implementing and enforcing the Curfew Orders.

Although the plain text of the Curfew Orders themselves, and New York law authorizing arrests and providing the basis for prosecutions of Curfew Orders violations, required that a person refuse to comply with a dispersal order before an arrest or prosecution would be authorized, *see, e.g.,* FAC ¶¶ 75, 78–79, 480, written NYPD policy—including a June 3, 2020 NYPD-wide message making no mention of the need for any dispersal order or refusal to comply with it—contravened the text of

the Orders. (FAC ¶¶ 80, 82). In fact, a September 16, 2020 letter from the NYPD Deputy Commissioner of Legal Matters explicitly articulated the NYPD's policy that members who merely "observed individuals who were not essential workers in public" had "probable cause to" arrest for Curfew Orders violations, (FAC ¶ 483), without making the required dispersal orders and observing the required refusals to comply.

3.    <u>The FAC adequately pleads that Defendant policymakers have displayed deliberate indifference to the need to train.</u>

As Defendants themselves recognize (*see* DMOL at 16 n.23), the FAC goes far beyond "only plead[ing] that the city's failure to train caused the constitutional violation,"—which is all that is required at this stage—and well into identifying specific deficiencies in Defendants' training programs in the manner that is typically required to survive summary judgment. *Amnesty America v. Town of W. Hartford*, 361 F.3d 113, 129, 130 n.10 (2d Cir. 2004). The FAC pleads non-conclusory facts, which raise reasonable inferences, that are more than sufficient to establish the "deliberate indifference" required, *see, e.g. Connick v. Thompson*, 563 U.S. 51, 61–62 (2011), for pleading purposes, to sustain Plaintiffs' failure to train claims against Defendants' motion.

Against that backdrop, including the facts pled as to the NYPD's history of mishandling certain protests (*see* FAC ¶¶ 421–29), the FAC describes a history of failures to train subordinates in certain topics related to protest policing that are relevant to Plaintiffs' claims, (*see, e.g.,* FAC ¶¶ 429–62), including, *inter alia,* the failures to provide training that Defendants are seeking to dismiss relating to failure to train on: (c) the need to provide dispersal orders and a meaningful opportunity to comply in order to establish probable cause to arrest for a Curfew Order violation; (d) the use of reasonable and proportionate force in policing protests; (f) the need for, or tactics regarding, protest escort and facilitation (including the relevant NYPD training's historically myopic focus on tactics designed to "disperse and demoralize" protesters); and (g) the need for NYPD members to wear masks, provide masks for arrestees, and take other COVID-19 related precautions related to arrests and arrest

17

processing. (*See* FAC ¶ 438(c), (d), (e), and (g)).[9]

The FAC further describes how, "[s]ince at least the 1990's, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training," including in that "the NYPD's core training related to protest response" from then "to this day" essentially "treat disorders as military engagement…and focus[es] on tactics designed to *deter, disperse, and demoralize*" groups of protesters while failing to train on "specific, relevant aspects of constitutional policing of protests" such as "the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies" and "how to encourage or facilitate protests." (FAC ¶¶ 429–39, 462).

Particularly in light of this background, the FAC sufficiently shows that Defendant City policymakers had a "'policy of inaction' in light of notice that its program [would] cause constitutional violations," *Connick*, 563 U.S. at 61 (*quoting Canton,* 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)); that "the policymaker's inaction was the result of conscious choice and not mere negligence," *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011); that Defendant policymakers made a "deliberate choice . . . from among various alternatives," *see Canton*, 489 U.S. at 389; that they were "on actual or constructive notice that a particular omission in their training program[s]" were causing employees to violate constitutional rights and they "chose to retrain" virtually the same programs, *see Connick*, 563 U.S. at 61; and/or that policymakers have "continued [to] adhere[] to an approach that they knew or should have known has failed to prevent tortious conduct by employees," *see id.* at 62.

The Second Circuit has "never required" proof of a pattern of similar violations to establish

---

[9] As mentioned above, Plaintiffs only address those aspects of the *Sow* Plaintiffs' failure to train *Monell* claims that Defendants move to dismiss. (*See* DMOL at 16 n. 23).

deliberate indifference; Plaintiffs' "evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious.'" *Amnesty America*, 361 F.3d at 128; *see also Williams v. City of New York*, 121 F.Supp.3d 354, 373-374 (S.D.N.Y.); *Chamberlain v. City of White Plains*, 986 F.Supp.2d 363, 391–92 (S.D.N.Y. 2013); *Edrei v. City of New York*, 254 F.Supp.3d 585, 581 (S.D.N.Y. 2017). The "unconstitutional consequences of failing to train" police who are deployed to police protests in most, if not all, of the topics at issue in this case are "patently obvious." *See Connick*, 563 U.S. at 63–64. As such, even just evidence of only one incident of injury would be sufficient. *See Canton*, 489 U.S. at 390. Here, Plaintiffs have pled not just one incident, but thousands in May and June of 2020 alone, which were consistent with similar injuries NYPD members have historically inflicted on other protesters. Particularly given that the loss of First Amendment freedoms, even for "minimal periods" of time, "unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and in light of the clearly established principles mentioned in the qualified immunity point below, the sort of "high degree of predictability" that First Amendment and other constitutional violations will occur absent appropriate First Amendment training for police deployed to demonstrations, for example, "may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bd. Of the Cnty. Comm'rs v. Brown,* 520 U.S. 397, 409-410 (1997).

Considering the "three requirements that must be met" to establish such deliberate indifference, *see Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992), the FAC has plausibly pled—and common sense dictates—that Defendant policymakers "are aware that their officers, at some point, will need to [police large demonstrations[10] and, at times,] arrest protestors taking part in large demonstration… and that NYPD officers [making the wrong choice in decisions about how to

---

[10] Defendant City of New York has conceded this element of deliberate indifference in a protest case. Judge Aaron found in *Packard v. City of New York*, "[t]he parties do not dispute the first prong" of the deliberate indifference test. 2019 U.S. Dist. LEXIS 189470, *33 (S.D.N.Y. Oct. 30, 2019).

police such demonstrations, including when probable cause exists to make such arrests, have and will continue to] cause constitutional deprivations," *Marom v City of NY*, No. 15-cv-2017 (PKC), 2016 US Dist. LEXIS 28466, at *76 (S.D.N.Y. Mar. 7, 2016); *see also Case I*, 233 F.Supp.3d at 404. Additionally, officers assigned to police such demonstrations will undoubtedly be faced with "a difficult choice of the sort that training or supervision will make less difficult." *Walker*, 974 F.2d at 297.

Further, the FAC pleads a "history of employees mishandling" similar demonstrations, including mass demonstrations, *see Walker*, 974 F.2d at 297, including through citations to press, academic, governmental, and other reports, as well as federal civil rights cases and the pleadings and discovery in them. (*See, e.g.*, FAC ¶ 429). The required deliberate indifference "'may be inferred from a municipality's lack of appropriate response to repeated complaints of … violations'" of constitutional and statutory rights, regardless of the source of those complaints – whether in newspaper articles, pleadings in civil litigation, or elsewhere – and regardless of their ultimate outcome. *Osterhoudt*, 2012 US Dist. LEXIS 139700, at *4 (*quoting Jackler v. Bryne,* 658 F.3d 225, 236 (2d Cir. 2011)). In addition to such complaints, whatever their source, discovery and settlement agreements in relevant lawsuits can also provide municipalities with the required actual or constructive knowledge of the history of mishandling similar situations sufficient to demonstrate municipal "deliberate indifference." *Id.* at *4–8, *Felix,* 344 F. Supp. 3d at 662–63; *White,* 2015 U.S. Dist. LEXIS 100772, at *6–8, 14–26. The wrong choices by the NYPD in policing protests frequently result in constitutional violations; prior to Summer 2020 the policy makers with knowledge of this repeating history had not mandated any changes to the NYPD training or supervision; these same policy maker Defendants have approvingly adopted the NYPD conduct at these protests; thereby establishing the requisite deliberate indifference, for pleading purposes.

4.    The FAC adequately pleads that Defendant policymakers have displayed deliberate indifference to the need to supervise and discipline.

The same "deliberate indifferent" standards "applicable to a claim premised on a city's failure

to train its employees 'have been applied to…' claims based on a failure to discipline." *Vasquez v. City of NY*, No. 16-cv-5296 (GHW), 2018 US Dist LEXIS 78429, at *27 (S.D.N.Y. May 9, 2018) (internal citation omitted). So, on the same grounds, and for substantially the same reasons set out elsewhere herein, the FAC has adequately pled that Defendant policymakers, including Defendants de Blasio, Shea, and Monahan, knew or should have known that they and their subordinates were subjecting Plaintiffs and others similarly situated to constitutional violations, including through the challenged policies and practices; and that they failed to investigate, supervise, and/or discipline them.

        5.    <u>Plaintiffs have adequately pled that Defendants de Blasio, Shea, Monahan, and other policymakers created, ratified, implemented, or were otherwise personally involved in the challenged policies and practices.</u>

The FAC also describes actions and decisions by Defendant City's policymakers in the relevant areas, including, but not limited to, Defendants de Blasio, Shea, and Monahan, which give rise to municipal liability under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). For example, the FAC pleads that Defendants de Blasio, Shea, and Monahan were each high-level policymakers for Defendant City, (FAC ¶¶ 25–27), who were "responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of" the policies and practices challenged herein. (*See, e.g.*, FAC ¶¶ 32, 123, 429, 497, 506, 507; *see also, e.g.*, *Payne* ¶¶ 73, 80, 90, 91; *Wood* ¶ ¶ 7, 83, 84, 92-96, *People* ¶¶ 97–103, 387). "Even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered,' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty Am.*, 361 F.3d at 126 (*quoting Pembaur*, 475 U.S. at 481-82); *see also Bray v. City of New York*, No. 04 Civ. 8255 (WHP), 2005 US Dist. Lexis 21748, at *23–25 (SDNY Sept. 30, 2005) (finding liability based on on-the-scene decisions at protest by an Assistant Chief – a rank well below Monahan's and Shea's in the chain-of-command).

**V.    Plaintiffs Have Adequately Pled Claims against Individual Defendants de Blasio, Shea, and Monahan for Their Unconstitutional Conduct.**

Plaintiffs have pled facts to show that the individual Defendants approved of the use of excessive force, mass arrests, and retaliation against Plaintiffs' First Amendment rights. Defendants de Blasio, Shea, Monahan, and other policymakers "routinely received reports regarding arrests made in connection with First Amendment assemblies" as well as "internal critiques" and other reports regarding topics such as "arrests, use of force[ ]protest arrest processing, and . . . related prosecutions." (FAC ¶ 456). And, Defendants de Blasio and Shea, as well as others, made statements in the media confirming they knew mass arrests were unfolding. (FAC ¶ 507). Defendants de Blasio, Shea, and Monahan explicitly approved of NYPD tactics, and Defendant Shea even described NYPD actions at Mott Haven as "executed nearly flawlessly." *See* PMOL at 22. Defendants de Blasio, Shea, and Monahan were also "responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of" the policies and practices Plaintiffs challenge. (*See, e.g.*, FAC ¶¶ 32, 123, 429, 497, 506, 507). Plaintiffs refer the Court to the opposition of plaintiffs in related cases, which explains Defendants' mischaracterization of *Tangreti v. Bachman*, 983 F.3d 609, 618–19 (2d Cir. 2020), and how it is inapplicable here. *See* PMOL at 23.

As the policymakers who crafted the policies and practices that have harmed and will continue to harm Plaintiffs, the Court may properly hold Defendants de Blasio, Shea, and Monahan liable in their official capacities, so that injunctive claims may proceed against them. Here, Plaintiffs also refer the Court to the related opposition. *Id.* at 23–24.

**VI.    Qualified Immunity Cannot Shield Defendants Based on the Standard Applicable to Their Pre-Answer Motion to Dismiss.**

As seen in Point I above, Plaintiffs' arguments regarding qualified immunity are limited by Defendants' briefing, which focuses only on one limited aspect of Plaintiffs' claims against Defendant de Blasio as to his power to enact the Curfew Orders or whether they were facially constitutional in First Amendment terms. Yet Plaintiffs do not challenge the Curfew Orders on their face, but as applied, and they are grounded in Plaintiffs' First, Fourth, *and* Fourteenth Amendment claims, *see, e.g.*,

FAC ¶¶ 76, 489, 508-509, 555–56, 560, including basic fair notice principles. Defendants have not cleared the "formidable hurdle," *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir. 2004), to make out their pre-answer qualified immunity affirmative defense by meeting their burden to show as a matter of law that Plaintiffs' First, Fourth, or Fourteenth Amendment rights were not "clearly established," *see Tellier v. Fields,* 280 F.3d 69, 84 (2d Cir. 2000), under the circumstances, particularly given that Plaintiffs are entitled to the benefit of "all reasonable inferences from the facts alleged," including facts and inferences "that defeat the immunity defense." *McKenna,* 386 F.3d at 436.

Relatedly, of course, Defendants' claims that the Curfew Orders were content-neutral, narrowly tailored, and otherwise constitutional, and that they were enforced in a reasonable and lawful way, are contrary to the Plaintiffs' facts in the FAC. As pled in the FAC, the Curfew Orders were enforced in an unreasonable, selective, malicious, and retaliatory manner, through mass arrests, involving unreasonable uses of force, without constitutionally required fair notice before NYPD members took enforcement action. "'The purpose of the fair notice requirement…is to enable the ordinary citizen to conform [their] conduct'" to the law before force or arrests are deployed against them in the First Amendment context. *Papineau v. Parmley*, 465 F.3d 46, 60-61 (2d Cir. 2006), quoting *City of Chicago v. Morales*, 527 U.S. at 58. The relevant "fair notice" principles related to dispersal orders and uses of force in the crowd control and First Amendment assembly contexts have been "clearly established" since long before last summer. *See, e.g., Edrei v. Maguire*, 892 F.3d 525, 540–42 (2d Cir. 2018); *Papineau,* 465 F.3d at 60–61; *Dinler v. City of New York,* No. 04 Civ. 7921 (RJS), 2012 U.S. Dist. LEXIS 141851, *13-23, 35, 48–49 (S.D.N.Y. Sept. 30, 2012); *Dellums v. Powell,* 566 F.2d 167, 181–82, n.31 (D.C. Cir. 1977); *Barham v. Ramsey*, 434 F.3d 565, 576 (D.C. Cir. 2006); *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977); *People v. Jennifer Bezjak,* 11 Misc.3d 424, 434–35 (NYC Crim. Ct.,2006)*, aff'd*, 26 Misc.3d 130(A) (App. Term, 1ˢᵗ Dept., 2010), *cert. den'd*, 15 N.Y.3d 747–50, 752 (2010). For those and other reasons, including the reasons articulated in PMOL Point

III, the Court should deny Defendants' application as it relates to their attempt to assert a pre-answer qualified immunity defense.

## **CONCLUSION**

For the foregoing reasons, Defendants' partial motion to dismiss should be denied in its entirety. Should the Court find a claim lacking sufficient detail to survive, Plaintiffs request the opportunity to seek leave to amend. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189-91 (2d Cir. 2015).

Dated:   April 23, 2021
         New York, New York

Respectfully submitted,

(signatures on following page)

**BELDOCK LEVINE & HOFFMAN LLP**

By: _____
Jonathan C. Moore
David B. Rankin
Luna Droubi
Marc Arena
Deema Azizi
Rebecca Pattiz
Katherine "Q" Adams
Regina Powers

99 Park Avenue, PH/26th Floor
New York, New York 10016
t: 212-490-0400
f: 212-277-5880
e:  jmoore@blhny.com
drankin@blhny.com
ldroubi@blhny.com
marena@blhny.com
dazizi@blhny.com
rpattiz@blhny.com
qadams@blhny.com
rpowers@blhny.com

**WYLIE STECKLOW PLLC**

_____
By: Wylie Stecklow
Wylie Stecklow PLLC
231 West 96th Street
Professional Suites 2B3
New York, NY 10025
t: 212 566 8000
Ecf@wylielaw.com

**GIDEON ORION OLIVER**

_____
277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

**COHEN&GREEN P.L.L.C.**

By: _____
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
f: (929) 888-9457
e: elena@femmelaw.com
remy@femmelaw.com
jessica@femmelaw.com

**LORD LAW GROUP PLLC**

_____
Masai I. Lord
14 Wall St., Ste 1603
New York, NY 10005
P: 718-701-1002
E: lord@nycivilrights.nyc

25