

| | | |
|---|---|---|
| **GEORGIA M. PESTANA**<br>*Corporation Counsel* | THE CITY OF NEW YORK<br>LAW DEPARTMENT<br>100 CHURCH STREET<br>NEW YORK, NEW YORK 10007 | **DARA L. WIESS**<br>*Senior Counsel*<br>daweiss@law.nyc.gov<br>Phone: (212) 356-3517<br>Fax: (212) 356-1148 |

August 16 2021

**By ECF**
Honorable Gabriel W. Gorenstein
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   In Re: *New York City Policing During Summer 2020 Demonstrations*,
   No. 20 Civ. 8924 (CM) (GWG)
   This filing is related to all cases

Your Honor:

  I am a Senior Counsel in the Office of Georgia M. Pestana, Corporation Counsel of the City of New York, and I am among counsel for the defense in the above-referenced matter. I write to respectfully request a conference in accordance with Local Civil Rule 37.2, regarding defendants' anticipated motion pursuant to Rule 45 of the Federal Rules of Civil Procedure to quash portions of a subpoena that plaintiffs have served upon Sean Smoot (Ex. A). Mr. Smoot is a police practices expert who was retained by the team from the Office of the Corporation Counsel that investigated the NYPD's response to the summer 2020 protests and produced a report that issued recommendations for specific NYPD policy reforms (Ex. B) ("OCC Report," or "the Report").[1] The subpoena seeks materials such as all communications among Smoot and the Corporation Counsel team, draft versions of the OCC Report, and Smoot's comments on said drafts.[2] All such material is protected by the deliberative process privilege.

  In keeping with this Court's Individual Practices, the parties met and conferred telephonically about this issue on July 30 at 11:30 a.m., for approximately fifteen minutes.

---

[1] New York City Law Department, Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf, annexed hereto as Exhibit B.

[2] See In re: New York City Policing During Summer 2020 Demonstrations, No. 20-CV-8924 (CM)(GWG), Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Served Upon Sean Smoot on June 9, 2021 ("Smoot subpoena"), annexed hereto as Exhibit A, at 3, "Command[s]t o Produce" Nos. 1, 3, 5.

Counsel Elissa Jacobs participated on behalf of defendants, while plaintiffs' counsel Mr. Lieb participated on behalf of plaintiffs. Plaintiffs' counsel argued that the deliberative process privilege did not apply to the materials to which defense counsel objected as privileged. Defense counsel argued that these materials, which were collected and created during the creation of a report, are subject to the privilege, as detailed below.  At the conclusion of the conference call, the parties agreed that they were at an impasse, and that defense counsel would be requesting a conference with the Court.

I.      **Deliberative Process Privilege**

The deliberative process privilege extends to any "inter- or intra-agency document" that is "(1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated." Brennan Ctr. For Justice at NYU Sch. Of Law v. U.S. Dep't of Justice, 697 F.3d 184, 194 (2d Cir. 2012) (quotation marks and citations omitted).  To be "deliberative," "the record must bear on the formulation or exercise of policy-oriented judgment." New York Times Co. v. HHS, No. 20-CV-3063 (GWG), 2021 U.S. Dist. LEXIS 6267, at *20 (S.D.N.Y. Jan. 13, 2021) (quoting Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999)).

The deliberative process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front- page news, and its object is to *enhance the quality of agency decisions by protecting open and frank discussion* among those who make them within the Government." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) (internal citations omitted) (emphasis added).  The deliberative process privilege covers "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." HHS, 2021 U.S. Dist. LEXIS 6267, at *18 (quoting Klamath, 532 U.S. at 8). Such documents may include: "*recommendations*, *draft documents*, *proposals, suggestions*, and other subjective documents which reflect the *personal opinions of the writer rather than the policy of the agency*." Id. (quoting Grand Cent. P'ship, 166 F.3d at 482) (emphasis added) (quotation marks and citations omitted).

II.     **Deliberative Process Privilege Applies to Materials Sought by The Smoot Subpoena**

A.      *The Corporation Counsel Report*

Contrary to plaintiffs' characterizations of the OCC Report, it is not simply "a factual inquiry" with recommendations.  The Report's Introduction clearly indicates otherwise: *"…this report is less focused on reaching specific factual determinations* and more focused on understanding events, looking at the circumstances around those events, and *developing recommendations going forward*." Ex. B at 6 (emphasis added).  As indicated therein, by analyzing factors that likely contributed to the conditions at summer 2020 protests, the OCC Report aimed to develop policy-based strategies for the NYPD to help prevent that chapter of history from repeating itself.  Those strategies are presented throughout the OCC Report as recommended NYPD reforms, including specific policy adjustments and novel policies and procedures; the latter are sometimes described in greater detail and may include instructions for

2

implementation.  See generally, Ex. B.  The OCC Report's recommended policy changes have been the subject of deliberation by the mayor and other high-level decisionmakers within the NYPD, ultimately resulting in the implementation of the majority, if not all, such recommendations.

### B.   *Drafts of OCC Report and Smoot's Comments on The Same*

Under the heading "Command to Produce" at No. 1, the Smoot subpoena seeks: "All Documents provided to you [Smoot] by the New York City Law Dept. in connection with the work performed by you [Smoot] on the Corporation Counsel Investigation and/or [OCC Report]."  Ex. A, at 3.  This request necessarily includes draft versions of the OCC Report transmitted to Smoot.  Additionally, "Command to Produce" No. 5 seeks: "All Documents reflecting any revisions, comments, suggestions, edits, proposed changes, or other feedback provided by you [Smoot] to the [City Law Department] on the [OCC Report]."  Id.  These are precisely the sort of materials the deliberative process privilege was designed to shield from disclosure.  See, e.g., HHS, 2021 U.S. Dist. LEXIS 6267, at *18 (examples of documents protected by the deliberative process privilege include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency"), supra.  Draft versions of the OCC Report and of the specific policy recommendations therein fall squarely within this category, together with any feedback provided by Smoot on such drafts, which significantly, reflect Smoot's own "personal opinions…rather than the policy of the agency." Id.

All draft versions of the OCC Report, as well as comments, suggested revisions, etc., memorialized by Smoot regarding such drafts, plainly qualify as "predecisional."  These materials inevitably contain policy recommendations that were not yet fully developed or finalized, and not yet "vetted and endorsed" by Smoot and the other outside "expert" consultants retained by the Corporation Counsel team.[3]  These materials are further "deliberative" as well as "predecisional," because the finalized versions of the policy recommendations set forth in the published OCC Report were *intended to assist*, and *have actually* assisted, the mayor and other NYPD policymakers "in arriving at [their] decision[s]" regarding policy and procedural changes to institute within the NYPD, with a view to improving policing outcomes at protests.  Grand Cent. P'ship, 166 F.3d at 482, supra (quotation marks and citations omitted).

For example, in an April 20, 2021 press release from the Mayor of New York City, Police Commissioner Dermot Shea stated: "We feel that the constructive recommendations of the City's Department of Investigation [DOI] and the Law Department have been helpful in developing an improved approach to organized protest.  We have made significant strides in implementing the most practical aspects of those recommendations so that they are already in effect in the field." Ex. C.[4]  The press release listed at least two policy changes implemented as of

---

[3] See Exhibit B at 9 n.5 ("Lastly, the experts have vetted and endorsed all of the recommendations in this report.").

[4] Official Website of the City of New York, Press Release, More Training, More Reforms: New York City Outlines Changes to Protest Response, Apr. 20, 2021, https://www1.nyc.gov/office-of-the-mayor/news/286-21/more-training-more-reforms-new-york-city-outlines-changes-protest-response, annexed hereto as Exhibit C.

3

April 2021 that reflected the OCC Report's recommendation No. 4: "NYPD should develop processes for incorporating community sentiment into planning for protests." Ex. B, at 3, 51. These were: (1) "Designating representatives from NYPD Community Affairs as key liaisons on the ground at protests;" and (2) "Better collaboration and coordination with protest organizers, clergy, and community members before and during protests." Ex. C.

The draft of a new Patrol Guide section titled, "Response to First Amendment Activities," which was recently posted on the NYPD website for public comment, contains further detail on the NYPD's ongoing implementation of the Report's recommendation No. 4. Ex. D.[5] This Patrol Guide section (currently in the process of finalization), reframes NYPD response to protests as a response to "First Amendment activities." Reframing the concept of "protests" to "First Amendment expression" during NYPD training was strenuously endorsed in the OCC Report, which explained that "protests" carries an adversarial connotation for most officers, while failing to focus on demonstrators' constitutional rights. Ex. B at 42-43. While this issue was not presented as one of the Report's ten formal "recommendations," it was extensively addressed in the Report. See Id.; see also id. at 46-50.

Finally, the April 20 press release referred to two recently implemented changes to NYPD training that are directly responsive to the OCC Report's recommendation No. 6: "NYPD training should be assessed according to current best practices." Id. at 3, 52. Specifically, it noted that since summer 2020, the NYPD had implemented "new field trainings" addressing "how officers should protect the [F]irst [A]mendment rights of protesters, including appropriate crowd-control tactics and de-escalation involving large-scale incidents." Ex. C. The press release also noted the launch in April 2021 of another new training program, "Constitutional Policing at Community Events," "in response to specific protest recommendations set forth by the [DOI], the City Law Department [OCC Report], and the NYPD's own internal review." Ex. C.

Given the undisputed evidence that specific policy recommendations from the OCC Report have in fact been relied upon by the mayor and other high-level NYPD decisionmakers in "the formulation or exercise of policy-oriented judgment," HHS, 2021 U.S. Dist. LEXIS 6267, at *20, supra, draft versions of these policy recommendations contained in drafts of the OCC Report, as well as any documented feedback by Smoot regarding the same, qualify as both "predecisional" and "deliberative," and thus should be protected by the deliberative process privilege.

**C.**   *Communications Among Smoot and the Corporation Counsel Team*

As indicated above, Command No. 1, of the Smoot subpoena seeks: "All Documents provided to you [Smoot] by the New York City Law Department in connection with the work performed by you [Smoot] on the Corporation Counsel Investigation and/or [OCC Report]." Ex. A, at 3. This demand inevitably encompasses email communications from the Corporation Counsel team to Smoot. In addition, the subpoena at Command No. 3 seeks: "All

---

[5] Draft Patrol Guide Section, "Response to First Amendment Activities," https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/draft-1a-activities-for-public-comment-2021-05-27a.pdf, annexed hereto as Exhibit D.

communications between you [Smoot] and any employee of the New York City Law Department concerning the Corporation Counsel Investigation and/or [OCC Report]." Id. These portions of the subpoena should be quashed, as the materials sought are subject to the deliberative process privilege.

The Corporation Counsel team relied upon Smoot's contributions to the Report, as captured in those parties' communications, in order to finalize their recommendations for changes to NYPD policy and procedure – policy recommendations which, as explained above, were implemented by policymakers after being finalized and published. Thus, those communications among Smoot and the Corporation Counsel team are deliberative. See Brennan Ctr. For Justice, 697 F.3d at 194, supra. Those communications are also predecisional, as Smoot offered his opinions and ideas to the Corporation Counsel team, which then deliberated and ultimately chose which of Smoot's opinions and ideas to incorporate (and which *not to* incorporate) into the final OCC Report, including into the final policy recommendations set forth therein. Id.; HHS, 2021 U.S. Dist. LEXIS 6267, at *18, supra (quoting Grand Cent. P'ship, 166 F.3d at 482)). Accordingly, these documents should also be withheld from disclosure under the deliberative process privilege.

Moreover, Smoot's role as an outside consultant to the Corporation Counsel counsels that his communications with this government agency be protected from disclosure. The Second Circuit has affirmed the application of the deliberative process privilege to communications between an outside consultant and the government agency that retained said consultant, in the context of a FOIA challenge to Exemption No. 5. Tigue v. United States Dep't of Justice, 312 F.3d 70, 77-79 (2d Cir. 2002), cert. denied, 538 U.S. 1056 (2003). In Tigue, the Second Circuit held that a commission established by the IRS in order to "gather information and make suggestions on how to reform [the IRS] Criminal Investigations Department" was not a government agency, but was instead a consultant to a government agency, *i.e.*, the IRS. Tigue, 312 F.3d at 73-74. Therefore, when that commission solicited a memorandum from a different government agency, *i.e.*, the Southern District of New York (SDNY), in order to assist with its task as mandated by the IRS, the transmission of that memorandum from the SDNY to the commission – in its capacity as an outside consultant to the IRS – was considered an "inter-agency document" for purposes of applying the deliberative process privilege under FOIA Exemption 5. Id.

Smoot, like all outside consultants engaged by the Corporation Counsel to assist with the investigation and report, signed a non-disclosure agreement and communicated with the Corporation Counsel team with the expectation of privacy. Smoot and the other consultants were treated as part of the Corporation Counsel team, which shared with the consultants confidential materials, such as NYPD records and information, in order to seek their expert input, including suggestions and recommendations. All such communications were critical to the Corporation Counsel team's completion of the OCC Report. Smoot and the other consultants undoubtedly relied upon their reasonable expectation of privacy in order to freely express their opinions on and recommendations for improvements to City and NYPD policy, which is of course the *raison d'être* behind the deliberative process privilege; see Klamath, 532 U.S. at 8-9, supra.

Thank you for your consideration herein.

Respectfully submitted,

*Dara L. Weiss s/*

Dara Weiss
*Senior Counsel*
Special Federal Litigation Division

cc:     ALL COUNSEL (via ECF only)