```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                             :
                                        Docket #20cv8924

 IN RE NEW YORK CITY POLICING      :
 DURING SUMMER 2020 DEMONSTRATIONS

                                   : New York, New York
                                     August 19, 2021
-----------------------------------: TELEPHONE CONFERENCE


                     PROCEEDINGS BEFORE
             THE HONORABLE GABRIEL W. GORENSTEIN,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff People    NEW YORK STATE OFFICE OF
of the State of New     THE ATTORNEY GENERAL
York:                   BY:  TRAVIS ENGLAND, ESQ.
                        28 Liberty Street
                        New York, New York 10005


For Sow Plaintiffs:     COHEN & GREEN
                        BY:  REMY GREEN, ESQ.
                        1639 Centre Street, Suite 216
                        Ridgewood, New York 11385


For Payne Plaintiffs:   LEGAL AID SOCIETY
                        BY:  COREY STOUGHTON, ESQ.
                        199 Water Street
                        New York, New York 10036


For Sierra Plaintiffs:  RICKNER PLLC
                        BY:  ROB RICKNER, ESQ.
                        14 Wall Street, Suite 1603
                        New York, New York 10005


For Cameron Yates:      STOLL, GLICKMAN & BELLINA, LLP
                        BY:  ANDREW BRIAN STOLL, ESQ.
                        300 Cadman Plaza West, 12th Floor
                        Brooklyn, New York 11201


Transcription Service: Carole Ludwig, Transcription Services
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

APPEARANCES (CONTINUED):


For Defendants:          NEW YORK CITY LAW DEPARTMENT
                         BY:  ELISSA JACOBS, ESQ.
                              DARA WEISS, ESQ.
                         100 Church Street
                         New York, New York 10007

## INDEX

## E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

## E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

1

```
1                        PROCEEDINGS                      4

2              THE CLERK:  New York City Policing During Summer

3    2020 Demonstrations, docket number 20cv8924.  Counsel,

4    please state your appearances starting with plaintiff.

5              MR. TRAVIS ENGLAND:  Good morning, this is

6    Travis England on behalf of the People of the State of New

7    York.

8              MS. REMY GREEN:  This is Remy Green on behalf of

9    the Soh plaintiffs, and for the transcript that should

10   appear as Mx. Green, M-X period, rather than Mr. or Ms.

11             MS. COREY STOUGHTON:   This is Corey Stoughton

12   for the Payne plaintiffs.

13             MR. ROBERT RICKNER:   Robert Rickner for the

14   Sierra plaintiffs, good morning.

15             MR. ANDREW STOLL:  Andrew Stoll for Cameron

16   Yates, good morning, Your Honor.

17             THE COURT:   For defendants.

18             MS. ELISSA JACOBS:   Good morning, Your Honor,

19   this is Elissa Jacobs, Corporation Counsel, for

20   defendants.

21             MS. DARA WEISS:  And Dara Weiss from Corporation

22   Counsel for defendants.

23             THE COURT:  Okay, Mx. Green, you're doing issue

24   one in the letter of August 13 or issue two?

25             MX. GREEN:   Issue one.  As long as that issue
```

```
 1                          PROCEEDINGS              5
 2   is the one that's not about Captain Zelikow.
 3            THE COURT:   Right, and who's doing issue two?
 4            MR. ENGLAND:   This is Travis England.  I'll be
 5   handling that, Your Honor.
 6            THE COURT:   I assume you saw the email from my
 7   chambers this morning, Mx. Green?
 8            MX. GREEN:   Yes, Your Honor, and we were able
 9   to confer for about a half an hour this morning.  So I
10   have some good news and some bad news to report, and --
11            THE COURT:   Why don't you give me the news.
12            MX. GREEN:   All right, fantastic.  So we were
13   able to confer for about 30 minutes.  Ms. Weiss attended
14   as did I obviously, Mr. England, Elena Cohen, Molly
15   Bicklen, and Wylie Stecklow.  We have an agreement that
16   we've reached on a lot of things, and I think that, like
17   we did for the last time, we'd ask that the Court order
18   this agreement.
19            So here is the basic set of things we've agreed
20   on.  During their preparation officers will be shown
21   Schedule A and they'll also review their memo books.
22   We'll specifically look through their memo books for the
23   entries for May 28 through June 8 as we discussed, and
24   otherwise they'll review all of Schedule A including those
25   ten days to try to remember what protests they were
```

```
1                        PROCEEDINGS                  6
2   present for.
3            Defendants will then create a list of any
4   Schedule A protest that the officer remembers, including,
5   you know, through the various ways of jogging their memory
6   we've just discussed, and they will transmit that list to
7   plaintiff in advance of depositions.
8            Additionally, defendants will provide the
9   following documents in advance of depositions:  Activity
10  logs in each of the Schedule A protests the deponent
11  attended that have been figured out through the process
12  described, that I just described.  Their NYPD personnel
13  profile, their CCRB history, their IAB history, their CTI.
14  Any body-worn camera footage from each of the Schedule A
15  protests that the deponent attended.  Their arrest or OLBS
16  reports created during the relevant time period, meaning
17  from the first day of Schedule A to the last day of
18  Schedule A.  Summons the deponent created during the same
19  time period.  DATs the deponent created during the same
20  time period.  Aided, A-I-D-E-D, reports related to the
21  deponent during the same time period.  And TRI reports
22  related to the deponent during the same time period.
23            That's what we have agreement on.  I'm sorry, I
24  spoke a little bit out of turn.  Ms. Weiss had said that
25  she was going to get back to me on whether they agreed
```

```
 1                        PROCEEDINGS                    7
 2  that the Aided reports were included in that, and I just
 3  misspoke.  But assuming that defendants believe that
 4  that's appropriate, that's what we've agreed on; if they
 5  don't agree on Aided reports, I think we have a very small
 6  impasse on that.
 7            Where we have - and do you want me to stop there
 8  or I should then move to what we --
 9            THE COURT:   Let's stop to confirm, Ms. Weiss,
10  is that the agreement?
11            MS. JACOBS:   This is Ms. Jacobs.  That is the
12  agreement, Your Honor, and to be clear, much of this has
13  already been happening.  You know, the biggest dispute I
14  think we've had is whether or not we need to affirmatively
15  produce a list of where people, which protest people
16  attended or simply provide documents related to it, and
17  we've agreed that we'll produce the list.  We have, in
18  fact, been, you know, showing people in preparation, in
19  their deposition preparations, the schedule.  So much of
20  this has already been in process.  We do still have a
21  dispute about the Aided, and I don't believe we have an
22  answer on that just yet.  But the rest of it I believe we
23  are in agreement.
24            And just one clarification.  I believe Mx. Green
25  was speaking about providing arrest reports, summonses,
```

```
 1                         PROCEEDINGS              8
 2   DATs for the relevant time period.  I think what you mean
 3   by that, and please correct me if I'm wrong, is that it is
 4   for arrest reports, summonses, DATs, the relevant
 5   documents, not for that entire time period but that are
 6   related to the protests.  So any of the protests, any of
 7   those documents that are related to these protests are on
 8   Schedule A.
 9              MX. GREEN:   So I think we have a dispute on
10   that one, and we can crystallize that in a moment because
11   I think it plugs into the other issues neatly.
12              THE COURT:   Okay, well, then with that caveat,
13   what has been agreed to is so ordered.  So why don't we go
14   on with the disagreed reports to which there's
15   disagreement.
16              MX. GREEN:   Fantastic.  So I think the biggest
17   issue is timing, and so I think it makes a lot of sense to
18   start with how we got here.  So what the Court ordered on
19   July 21, and I'm going to just quote what you said from
20   the transcript, "So my ruling is that the officer needs
21   to, as part of your prep, Ms. Weiss, look through their
22   activity logs for this very brief period, which is May
23   28th through June 8th -- that has to be part of your prep.
24   And then you can ask them the memory of the rest…"  "And
25   then whatever you get as … answers has to be transmitted, …
```

```
 1                         PROCEEDINGS                    9
 2   if not that day, the next day to the plaintiff."  But we
 3   didn't get those answers, and we asked repeated for them
 4   in, you know, dozens of emails all referencing the order I
 5   think by line number.
 6           And during that period defendants haven't
 7   responded even once saying they didn't think they were
 8   required to provide those answers or, as we described it, a
 9   list.  Instead, you know, they didn't say anything.  And
10   so, and beyond that, the documents we did get were not
11   provided in anything like the time period the Court
12   ordered.
13           So I took Officer Montecino's deposition last
14   Monday, and he testified on Monday that he was prepared
15   twice, once a week before the deposition, so the Monday
16   before that Monday, and then there was an initial call two
17   weeks before the deposition.  But we got documents for the
18   first time late Friday night.  And this was the first
19   deposition of the resumed period, so I think, you know, if
20   anyone was the one where they were going to get us things
21   early because they had plenty of time to work with, it
22   should've been that one, and instead we were getting
23   documents that Your Honor had specifically ordered on
24   Saturday morning and Saturday midday.  And we even followed
25   up on that and didn't get everything.
```

```
 1                        PROCEEDINGS              10
 2            So I think, you know, a big thing that was
 3   motivating us in bringing this application was timing,
 4   right.  We should be getting answers if not the deponent is
 5   prepped, then the day after, and we're getting documents a
 6   week after preparation, and probably, more importantly,
 7   we're getting documents, you know, the morning of
 8   depositions in some cases.  One of the Payne case
 9   depositions they got documents for the first time the
10   morning of a deposition.  We got six pieces of body-worn
11   camera footage late last night for a deposition taking
12   place today.  And I don't think any of this is in keeping
13   with what the Court ordered.
14            So we have a dispute on timing, and defendants
15   have just said that it's too burdensome and they can't
16   commit to any kind of timing.   I think we just ask that we
17   get everything 48 hours in advance, and that's where the
18   dispute is for that piece of the impasse.
19            THE COURT:  All right, I'll hear from defendant.
20            MS. JACOBS:  Yes, Your Honor, this is Ms. Jacobs.
21   We are making an effort to send things 48 hours in advance,
22   which, again, is not the day after people were prepped but
23   to get the information 48 hours in advance of --
24            (interposing)
25            THE COURT:  Can I just back up a little bit?
```

```
 1                         PROCEEDINGS                    11

 2            MS. JACOBS:   Sure.

 3            THE COURT:   When I issued that order, I perhaps

 4   foolishly assumed that you would not be preparing these

 5   people without having all this material because that's the

 6   only way that you could competently prepare witnesses to,

 7   you know, have all their arrest reports and log, you know,

 8   maybe not logs, but whatever material is in your

 9   possession, that you would necessarily have that.  So my

10   theory was you already have that.  There's no reason you

11   should be holding onto it when you already have to have

12   collected it in order to prepare this deponent, and,

13   therefore, you should give it that day or the next day.

14   That was my theory.

15            So my theory could be wrong and that, in fact, you

16   don't collect all this stuff in order to prepare somebody

17   or my theory could be wrong in that you're preparing them

18   the night before the deposition, which makes it impossible

19   to get it to the other side timely.  So just so you

20   understand where I was coming from, that was my theory.  So

21   with that being said, I'll hear from you, Ms. Jacobs, and

22   then we'll keep going on this.

23            MS. JACOBS:   Certainly, Your Honor, and we are,

24   you know, we certainly go and, you know, look for

25   everything in advance for the prep and, you know, speak to
```

```
 1                      PROCEEDINGS              12
 2  the officers in advance of their preparations in order to
 3  try and have everything beforehand, but, you know, I think
 4  everyone has had, you know, you know, clients who come to a
 5  deposition and there's additional information that we find.
 6  There's also been times when, and these are outliers, but
 7  when, for example, the people who get us body-worn camera
 8  footage have been, you know, incredibly behind in their
 9  abilities to provide documents.  And so, unfortunately, you
10  know, and I think that last night was an outlier, but, you
11  know, those were provided at 6 p.m. last night in advance
12  of today's deposition.  That is not ideal for us, I
13  understand that's not ideal for plaintiffs, but that is on
14  occasion what we have ended up having to do, and we'd
15  prefer to do that rather than not provide it at all
16  certainly.
17          So, you know, we're doing the best we can to get
18  everything 48 hours in advance, and I think, you know, for
19  the majority of the time we have been able to, but
20  certainly it has not been --
21          THE COURT:  If I could just stop you.  The 48-
22  hour in advance thing, you know, maybe that's the way to
23  go.  It's just not the theory under which I was operating.
24  The theory under which I was operating was if you have
25  something, you shouldn't be holding onto it.  You should
```

```
 1                         PROCEEDINGS                    13
 2   give it to the other side.  If you have something that's
 3   relevant to that deponent, it should, you should not hold
 4   onto it; you should give it to the other side immediately
 5   more than 48 hours in advance of the deposition if you know
 6   you have it.  And my theory was you know you have it when
 7   you prepare, and that preparation must be happening more
 8   than 48 hours in advance.
 9            I mean if you think the way to do it is for me
10   just to order that it be provided two business days in
11   advance, plaintiffs seem happy with that.  I mean if you're
12   happy with that, that's fine.  My way just seemed to make
13   more sense to me, but maybe it doesn't because, in fact,
14   maybe you don't have these materials when you prepare the
15   deponents.
16            MS. JACOBS:  I think we have the majority of the
17   documents, and when we prep them, we do have the majority
18   of the documents that we are providing.  But, you know, and
19   we have produced everything that we get.  But I certainly –
20   you know, I don't believe we're holding onto things.  We're
21   trying to gather things from documents that have already
22   been produced and provide them.  We're trying to provide
23   them all at once.  There's certainly been occasions in this
24   process where documents have been sent piecemeal and then,
25   you know, have apparently, plaintiffs have missed.  So I
```

1                         PROCEEDINGS              14

2  think we are trying to avoid that problem as well and to

3  try and send everything at once, you know, once we are

4  certain that we have, you know, all if not the majority of

5  the documents.

6           THE COURT:   Is there any reason you cannot

7  provide - I'll try it the way that the plaintiff proposed.

8  Is there any reason you can't provide the materials two

9  business days ahead of the deposition?

10          MS. JACOBS:   Typically no, but I think, again,

11 you know, certainly there have been, and that is, in fact,

12 what we have been doing.  Again, there have been

13 circumstances where we have not been able to do that, and

14 the body-worn camera footage from last night is an example

15 of that that is an outlier, but, you know, the fact that

16 that unit was, just had some unusual delays made it

17 impossible for us to send it 48 hours in advance.  But

18 otherwise no, we --

19          (interposing)

20          THE COURT:   Do you have reason to believe that's

21 going to happen in the future?

22          MS. JACOBS:   I mean I cannot speak to that except

23 to say that we have certainly seen lots of circumstances

24 over the past, you know, year where due to circumstances

25 beyond any of our control, there have been fewer people in

```
 1                        PROCEEDINGS                15
 2    an office, there have been, you know, officers have been
 3    pulled out for other needs, and that has happened.  So I
 4    don't, you know, I don't have a specific reason to say that
 5    other than, you know, our experience has been on occasion
 6    (indiscernible).
 7              THE COURT:   When you say unit, you're talking
 8    about whoever's responsible for downloading this body
 9    camera footage?  What're you talking about?
10              MS. JACOBS:   Yes, for providing it, yes.
11    That's the one that we're talking about specifically right
12    now.  So my concern is that if there are, if there are –
13    for the most part I think we have been providing things,
14    you know, two business days before the depositions.
15              MX. GREEN:   Your Honor, this is Remy Green.
16    That's --
17              MS. JACOBS:   But I don't think we have a
18    problem doing that.
19              THE COURT:   All right, again, I'm not going to
20    worry about the past just this second.  I mean if I do
21    this, you have to understand that, you know, if I say you
22    have to do this two business days in advance and then you
23    don't do it, then you may have a consequence of having to
24    bring someone back or whatever it is, so you, you know,
25    you just need to understand that this is going to be a
```

```
 1                      PROCEEDINGS              16
 2   serious obligation, and I don't know what the impediments
 3   are to it, but you need to communicate to whoever it is
 4   that there are consequences to their not complying with
 5   it.  Mx. Green, go ahead.
 6          MX. GREEN:   That was all, Your Honor.  It was
 7   just that isn't what's happened.  It's in every single
 8   deposition that this is a problem for.  And I think to
 9   suggest it's a problem with getting the documents is also
10   at least somewhat misleading on some of the points
11   because, let's take Officer Montecino as an example again,
12   he testified that he gave them the documents when he
13   prepped a week before the deposition, and we got them late
14   Friday, it was like 9 o'clock, 10 o'clock on Friday night
15   when he prepped Monday.
16          But, look, I think two business days works for
17   us.  That makes a lot of sense to us given how we've
18   gotten here, and I don't want to move away from that.
19          THE COURT:   Okay, so that's the ruling then,
20   you have to provide it two business days ahead of the
21   deposition, and I'm very hopeful that that's what's going
22   to happen, and if not, I'm sure I'm going to hear about
23   it.  Mx. Green, anything else we need to do on this?
24          MX. GREEN:   Yeah, well, not on that, but we
25   have a number of other impasses, but that was the big one,
```

```
 1                      PROCEEDINGS              17

 2   but there are some smaller things.

 3            THE COURT:   All right, go ahead.

 4            MX. GREEN:   Okay, so I think - I have two big

 5   other things that, and I think I'll just do both of them

 6   if that's okay.  The first would be a category of kind of

 7   figuring out what should be on the list that they're

 8   transmitting, and so one of the issues is that, you know,

 9   defendants have taken an interpretation that the only way

10   they need to try to figure out what protests somebody was

11   at was their memory and their memo book.  And one of the

12   problems with that is that they've produced, you know, all

13   manner of other body camera footage or other documents

14   that clearly show an officer with that, say, a January

15   protest, and we're not getting the underlying documents

16   for the January protests even though we know that an

17   officer was there because we have his body camera for it.

18            And so we have an impasse and a dispute as to

19   whether defendant should, you know, look at the list of

20   body camera footage that they're already producing for a

21   deponent and add arrest documents for those events.  And I

22   think that also plugs into the other dispute that I think

23   we realize we have which is I think maybe the best way to

24   do this and avoid at least most of the issues around this

25   is is to just produce all the arrest records for a
```

```
 1                    PROCEEDINGS              18
 2   particular officer for the entire Schedule A period.  And,
 3   now, of course, there will be irrelevant arrest records in
 4   there where there might be, and we won't ask about those.
 5   But to minimize, you know, the burden on defendants,
 6   because they claim that the burden is the issue, maybe the
 7   best way to get through it is to, and I thought that's
 8   what we agreed on this morning, produce the entire set of
 9   arrest records for the relevant period.
10          But otherwise I think there's just no reason, if
11   we know for a fact that an officer was at a protest
12   because we have their body-worn camera footage for that
13   protest to not include arrest documents and everything
14   else for that protest.
15          THE COURT:  Let me just try to understand
16   what's going on.  Is it that - so if honestly the officer
17   remembers, it's not going to be an issue.  But you're
18   saying that there are situations where the officer, the
19   memo book doesn't show or the memory doesn't reflect
20   reality, they are, in fact, at protests and that --
21          MX. GREEN:   Sorry.
22          THE COURT:   -- and that isn't being revealed to
23   you.  So you have, are suggesting that body camera footage
24   will identify an officer being at a protest.  And my
25   question first on that is is that because you look at it
```

```
 1                     PROCEEDINGS                19
 2  and you recognize the officer or because the officer's, I
 3  mean how does - other than viewing the bodycam footage,
 4  how could you use it to determine whether an officer is
 5  present at a protest?  I'm not following that.
 6            MX. GREEN:  So it's actually easier than that.
 7  So I'll give you an example from what happened.
 8  Defendants produced to us, because it was already in their
 9  production, Officer Montecino's body camera footage for an
10  event in January I believe it was.  In their pre-
11  deposition production was body-worn camera footage for
12  January, but because he didn't specifically remember it
13  personally and it wasn't in the memo book (indiscernible)
14  you have ordered them to review, that protest didn't get
15  on, well, they weren't making a list, but we didn't get
16  any memo books for that day, we didn't get arrest
17  documents for that day, we didn't get anything else.  And
18  I think for Officer Montecino there were, in fact, two or
19  three protests that he had body-worn camera footage from
20  his body camera, and that's how we knew he was at the
21  protest.
22            THE COURT:  And the reason you had it - let me
23  just try to understand it - is the reason you had it is
24  that they've gone to all these protest dates and provided
25  the body camera footage for any officer who was at those
```

1                           PROCEEDINGS                    20

2   protests?

3           MX. GREEN:   Yes, I assume what they're doing,

4   and what I would do if it were me in their chair, is

5   they're just going to whatever kind of list of body-worn

6   camera footage they produced, and I imagine there's a

7   spreadsheet or something where they can type in an

8   officer's name and find all of the body-worn camera

9   footage they've already produced for a particular officer,

10  and then they're just producing all of them.  Which, you

11  know, that's the way to do this that makes sense

12  obviously.  And what's happening is they're producing all

13  of that, but then they're not kind of connecting the dots

14  between, ah, if Officer Montecino has body-worn camera

15  footage from a midtown protest in January, he was at a

16  midtown protest in January.

17          THE COURT:   Well, let me ask you this, I think

18  I'm following this, but let's try the arrest record route.

19  I heard them say, and we'll hear from them momentarily,

20  that they're willing to give you all arrest records of the

21  officer for, that they made at protests on the list of

22  Schedule A protests.  Does that solve the problem or is

23  that not enough?

24          MX. GREEN:   I'm sorry, could you just say that

25  again, Your Honor?  You broke up a little.

```
 1                      PROCEEDINGS              21

 2            THE COURT:   Okay, I thought I heard them say,

 3   and we'll hear from them momentarily, that they were

 4   willing to, instead of just relying on memory or the memo

 5   book, they are willing to determine whether, to get the

 6   officer's arrest records for that period and get you any

 7   of them that coincide with protests.

 8            MX. GREEN:   I had understood --

 9            THE COURT:   Would that solve the problem --

10            MX. GREEN:   I think that --

11            THE COURT:   Hold on.

12            MX. GREEN:   Sorry.

13            THE COURT:   Ms. Jacobs, were you agreeing to

14   that or did I mishear you?

15            MS. JACOBS:   Your Honor, I think that, yes, if

16   we ever aware that they were at a protest and they made

17   arrests or issued summons or DATs, we will provide those

18   records.

19            THE COURT:   No, no, no, that's not what I was

20   asking.  Do you have a way of - I mean people don't make

21   that many arrests.  Is it - if we take Officer A and you

22   say I'd like to look at all their arrests in this,

23   whatever, eight-month period is, it seems to me the

24   easiest thing is just to give over the records, that's

25   what they want, and say, you know, they'll ignore the ones
```

 1

 2    that coincide with protests.  But then I thought I heard

 3    you say, you know what, we'll pull out from that set of

 4    all those arrest records the ones that line up with the

 5    protest dates.  Did I mishear you on that or is that –

 6    what would be the burden on that, that's really my

 7    question.

 8          MS. JACOBS:   The burden on going through the

 9    arrest history and see if they are each protest related?

10          THE COURT:   Well --

11          MS. JACOBS:   I'm just trying to --

12          THE COURT:   Either – let's start with this.  Is

13    there any burden for Officer X to say, call up all Officer

14    X's arrests between whatever our dates are, March 2020 to

15    January 2021, maybe it's April, I'm sorry, is there any

16    burden to doing that for a particular officer?

17          MS. JACOBS:   I mean there's certainly a burden

18    in doing it.  It is --

19          (interposing)

20          THE COURT:   -- what is the burden?  Is it one

21    you're willing to spend some chits arguing you shouldn't

22    have to go through?

23          MS. JACOBS:   I think, Your Honor, it is – one

24    second, Your Honor.  It is, simply it is a time-consuming

25    task to hold those up, have an attorney look through – you

1                        PROCEEDINGS                  23

2  have to look through each arrest record, right.  You can

3  certainly narrow it down in terms of the date or the

4  location, but you have to get each - and some will be

5  sealed on top of that, but we'd have to look through each

6  arrest record to determine whether or not it is related.

7  And that is not, that may not be a big, a huge burden if

8  we are talking about, you know, one deposition happening

9  every week, but that's not the schedule that we're on.

10 And it is --

11          THE COURT:   Hold on, stop, stop, stop, stop.  I

12 think they really --

13          MS. JACOBS:   -- incredibly --

14          THE COURT:   Hold on a second.  I think they

15 really need to know whether the person was at a protest,

16 and since memories we've now learned are not reliable and

17 memo books may not even be reliable, they have no problem

18 doing that work for you if you just give them the list of

19 arrests which doesn't seem to be, which you could do under

20 a confidentiality order.  If you're relieved of the burden

21 of matching them up with arrest dates, what's the problem?

22          (interposing)

23          THE COURT:   -- you can get a listing of arrests

24 from some computer database.  Am I correct or not?

25          MS. JACOBS:   I do not know the answer to that,

```
 1                      PROCEEDINGS          24
 2   Your Honor.  I apologize, it's not something that I have
 3   done --
 4             THE COURT:   Mx. Green, do you know the answer
 5   to that question?
 6             MX. GREEN:   I mean my understanding is that
 7   it's very easy to pull the actual arrest records.  I don't
 8   know, you know, I have never --
 9             (interposing)
10             THE COURT:   The arrest records meaning we could
11   take Officer X, put in dates, April 1 through June 1, and
12   pull up the records?  You know what, it sounds like we
13   don't - I think you two need to talk about this, and if
14   you, and you need to get, the City needs to get more
15   information.  And here's the problem that needs to be
16   solved.  The problem that needs to be solved is that the
17   memories are imperfect, and apparently memo books are
18   imperfect, and the plaintiffs have proposed two ways, I
19   think they're independent, of trying to figure out if an
20   officer was at a protest.  One is just to see if they made
21   arrests because that would make it very obvious they were
22   at the protest.  And the other is to look at the log of
23   their body camera footage to see if they were at a protest
24   at a certain day and time.
25             Neither of these seem terribly burdensome to me,
```

1                          PROCEEDINGS                25

2  but it seems to me you've got to figure out some way to do

3  it, so I'd like you to get some of the answers to these

4  questions as to what the problem is and how you would do

5  it.  Because it seems like an important question which is

6  to know for these officers whether they were at protests

7  of the ones that they recall or that were in the memory

8  books and that we've learned already in fact comes about

9  that they didn't recall or that it wasn't in the memo

10 book.

11        So can we pause this?  The City can do its

12 research and can the two of you talk this afternoon or

13 tomorrow and try and figure this out?

14        MX. GREEN:   Your Honor, I'm happy to talk this

15 afternoon or tomorrow and bring this back.

16        THE COURT:   Okay.

17        MS. JACOBS:   Yes, that's fine, Your Honor.

18        THE COURT:   All right, Ms. Jacobs, so you

19 understand what I'm trying to get at here.

20        MS. JACOBS:   I do, Your Honor.  You know, we

21 will --

22        THE COURT:   So let's figure out a way to solve

23 the problem, and if you can't agree on it, you'll come

24 back to me.  Mx. Green, is there anything else we should

25 be doing on this --

```
 1                      PROCEEDINGS              26

 2            MX. GREEN:   Yes, but there's one clarification

 3   because I misspoke earlier, and I just, I don't want this

 4   to be on the record and not have corrected it, and then

 5   there's one more impasse.  And just the only other issue

 6   is we have actually have a live dispute about whether

 7   they're produced all the body-worn camera footage that

 8   exists for the protests.  So I did not mean to imply that

 9   they've, you know, what we have or what they've produced

10   is a complete record of all the body-worn camera footage,

11   only that they have produced a certain amount of it, and

12   there are officers' particular body-worn cameras among it.

13            So with that said, the final impasse we have is

14   the over-redaction problem.  And I think this plugs it

15   into the timing problem in part because, for example,

16   Officer Montecino we received a marker redacted IAB

17   history on Saturday morning before Monday deposition and

18   so it was redacted so that we could actually see

19   everything that was supposedly redacted, and there were

20   use of force incident that had been wholly redacted.  And

21   so we wrote an email, we tried to confer on it, defendants

22   responded that every redaction was proper despite us

23   pointing to the exact language in the exact Bates number

24   for the words use of force.  And then it was only after

25   the deposition that they reviewed and found, oh, we've
```

1                          PROCEEDINGS                    27

2  decided this was improper.

3          We think that there are a lot of other, and

4  we've identified instances of this in part because the

5  redactions are transparent.  We've identified other

6  instances that either do not, that appear to be facially

7  improper in that they are about honesty or things related

8  to the allegations in the case or that from the face of

9  the IAB or CCRB record that's been redacted, it's actually

10 impossible to tell whether it would involve honesty or not

11 or involve things similar to the allegations in this case

12 or not.

13         And, you know, I think this plugs into what

14 Judge Dolinger ordered in *Caravallo* which was to produce

15 certain things in camera which is what we would be asking

16 for along with some underlying records sufficient to

17 identify what the allegations were actually about so that

18 we can figure out whether, you know, these redactions are

19 appropriate.

20         THE COURT:  All right, I'm trying to understand

21 what's going on here.  Is this a listing, sort of – I've

22 seen these before and maybe it's changed, but what I've

23 seen before is a very brief summary listing of past

24 incidents, I don't remember if it's IAB or CCRB, that has

25 a brief description, date, and not much else, and the,

1                           PROCEEDINGS                      28

2   and, you know, substantiated, something like that.  And

3   some have been completely redacted and others have not,

4   and the reason that happened is I had previously ordered

5   you only have to give complaints involving use of force,

6   false arrest, or something involving dishonesty.  And then

7   that list comes, there's maybe 25 things, 12 of them are

8   blacked out.

9           If that's what we're talking about, apart from

10  this one thing where they did a bad blackout job, how do

11  you even know what these other incidents are or is that

12  what you're trying to do, do you want me to look to see if

13  they did their job correctly?  I don't quite understand

14  what you're asking me.

15          MX. GREEN:  So it's a little of column A and a

16  little of column B.  It wasn't just one incident where

17  it's a bad blackout job.  It was almost all of it was a

18  bad blackout job, so we saw all of it, and we think that

19  all of it improper.  There are also instances, and I think

20  we're going to talk about this more directly with Captain

21  Velikov, but there's also incidents where there are

22  publicly available records where we're able to kind of

23  dive under the redactions because we see a gap in time

24  that we know from publicly available records that

25  something involves excessive force or dishonesty, and

1
2   they're redacting it.

3            And so what we are – basically, you know, to
4   your question, because I should actually answer the
5   question, there is column A in that we want you to go
6   under and look at the things we are not able to see, but
7   the reason we think that's appropriate is because we've
8   seen a lot, and from what we've seen it's, there is a lot
9   of over-redacting.  And I think defendants have admitted
10  at least a couple of instances of over-redaction, and
11  over-redaction that happened in a prejudicial way in that
12  they weren't able to address it before the deposition.

13           THE COURT:   All right, who's speaking for the
14  defendant?

15           MS. JACOBS:   Yes, this is Elissa Jacobs again.
16  Yes, Your Honor, certainly there were a few over-
17  redactions that were raised with us and that we removed
18  those redactions.  But other than that, you know, we have
19  been, you know, redacting these in compliance with Your
20  Honor's orders, and we think that the redactions are
21  appropriate.

22           These are, in fact, these are the sort of kinds
23  of documents that you are thinking of.  They're from CCRB
24  as well as two different reports from NYPD that have a
25  date and a little bit of information on it.  The ones from

PROCEEDINGS                    30

1
2   NYPD, some of them can be more, provide more detail in

3   them and sort of a little bit of a narrative.  But those

4   are the kinds of documents that we're discussing.

5           And, again, what Your Honor asked us to turn

6   over was anything to do with force, anything to do with

7   false arrest, and anything to do with credibility.  You

8   know, Mx. Green says that there are - you know, they

9   believe that there are allegations related to credibility

10  that have been redacted, and I'm not sure what the basis

11  for that belief is or if perhaps we just have different

12  definitions of what may go to credibility.  But, you know,

13  we have been providing these with appropriate redactions.

14          THE COURT:   Well, how many different officers

15  did you make what you call mistakes?

16          MS. JACOBS:   I'm just trying to check.  I know

17  that there was one early on, but I'm not entirely sure.  I

18  don't believe there was - maybe two where they were over-

19  redacted.

20          THE COURT:   And what caused the over-redaction?

21          MS. JACOBS:   Your Honor, I think - I cannot

22  speak to that to say exactly what caused it other than it

23  was, you know, human error.

24          THE COURT:   I mean I don't, Mx. Green, I don't

25  mind looking if you want to pick out a few of these to see

```
 1                          PROCEEDINGS                    31

 2   if they're doing the right thing.  If you want to pick out

 3   some and have them send me an unredacted version of some

 4   of them.

 5               MX. GREEN:   That's exactly what we wanted, and

 6   I guess I would ask that we go maybe a quarter step

 7   further and do exactly what Judge Dolinger did in

 8   Caravallo which is, for some of these, you know, you won't

 9   be able to tell whether something involves the relevant

10   allegations or not.  One example I know offhand is that

11   false arrest gets coded by the IAB as abuse of authority,

12   and I believe there are some abuse of authority

13   redactions.  And without the underlying record, you

14   couldn't see or some underlying record that include a

15   little more narrative, you wouldn't be able to see what

16   happened.  Right?

17               So I think we would just ask that you order

18   exactly what Judge Dolinger did in Caravallo.  We can pick

19   three or four examples that we think are the ones where

20   we're pretty sure there are inappropriate redactions, and

21   either you'll see that the process they're using is

22   inappropriate or you won't.

23               MS. JACOBS:   Your Honor, I don't --

24               THE COURT:   Go ahead.

25               MS. JACOBS:   I don't believe that, I don't
```

```
1                        PROCEEDINGS                 32
2  believe that's correct in terms of the abuse of authority.
3  They do not - they get listed as disputed arrests or
4  disputed summons not as an abuse of authority.
5           THE COURT:  Well, we're only talking about a
6  few of these, and it's my time that would be wasted if
7  you're correct.  So why don't we let them pick the ones
8  they want, and then if there's a problem, you'll hear
9  about it, and if there isn't, then it won't matter if they
10 pick the wrong ones.
11          MS. JACOBS:  Just to be clear, just to be
12 clear, so we're talking about, in addition to the resumes,
13 are we talking about some underlying files as well?
14          THE COURT:  He says that - you're picking like
15 three or four entries, Mx. Green?
16          MX. GREEN:  I think we're going to pick three
17 or four documents, if that's okay.
18          THE COURT:  Oh, and how many entries am I going
19 to have to look at?
20          MX. GREEN:  I mean, you know, these are - some
21 of them, we have eight or nine entries redacted.  So I
22 think that's what we're talking about.  I mean we can do
23 two documents or three documents instead of four.
24          THE COURT:  Well, let's do this.  Let's start
25 with the documents and the entries without any underlying
```

```
 1                    PROCEEDINGS                  33
 2   documents, and if I think I need underlying documents to
 3   understand it, then I would ask for them.
 4           MS. JACOBS:   Understood, Your Honor.
 5           MX. GREEN:   Perfect.
 6           THE COURT:   Okay --
 7           MX. GREEN:   And, Your Honor, that's all I've
 8   got for you.
 9           THE COURT:   Okay, I'll wait - and you can
10   transmit them via email I guess.
11           All right, so I'm ready - anything else from the
12   defendants on this before we get to issue two?
13           MS. JACOBS:   No, Your Honor, not at this point.
14   I - not at this point, Your Honor.
15           THE COURT:   All right, it's Mr. England then?
16           MR. ENGLAND:   Yes, Your Honor, good morning,
17   this is Travis England on behalf of the People of the
18   State of New York, addressing issue two regarding the
19   disputes regarding the Velikov deposition.  So, first, I'd
20   like to address defendants' mistake (indiscernible) on
21   Local Rule 37.3 which applies only to the Eastern
22   District.  And to the extent Your Honor has questions
23   about the manner in which we handled the dispute at the
24   deposition, I'm happy to provide details, but we clearly
25   marked the record, had the parties state their positions
```

1                            PROCEEDINGS                    34

2   at the deposition, and noted that we would need to address

3   this issue following the deposition.

4           So to the extent Your Honor has questions about

5   how we raised the dispute and handled it at the

6   deposition, I'm happy to answer further questions, but we

7   believe that we've appropriately followed procedures here.

8           (interposing)

9           THE COURT:  Go ahead.

10          MR. ENGLAND:   I raise that only because the

11  defendants raised that in their letter.  And so on the

12  substance, we submit that the defendants have not met the

13  significant threshold requirements for invocation of the

14  privilege they seek here.  They call it either the law

15  enforcement privilege or the investigative privilege at

16  various places.  And as the court requires, substantial

17  threshold showing that disclosure would result in a

18  specific harm to identified important interests.  And the

19  defendants have simply not shown that here, and that's the

20  reason we bring this to the Court.

21          The only interest that the defendants have

22  presented is the right of privacy of the officer and third

23  parties such as family members --

24          THE COURT:  Before --

25          MR. ENGLAND:   -- while we --

```
 1                        PROCEEDINGS              35
 2            THE COURT:   Before we get to interests, I mean
 3   this is a question for the defendants not you.   This
 4   privilege is to protect an ongoing investigation or law
 5   enforcement techniques or confidentiality of sources.
 6   This has got nothing to do with any of the generic subject
 7   matter of the investigation before we even get to whether
 8   threshold showings have been made if there's any
 9   balancing.   So maybe the defendants could just address
10   that point.   What am I missing on this?
11            MS. JACOBS:   Well, Your Honor, we believe that
12   the officers, there is a concern here in terms of
13   providing private information about these officers and
14   that, you know --
15            THE COURT:   No, no, I want you to fit it into,
16   I mean I'll give you case if you want, but I think it
17   comes from Second Circuit case law.   There's a limited
18   number of categories that are law enforcement privilege.
19   Before we get to anything like privacy or interests, and
20   we can talk about that later.   I'll read it to you.   I'm
21   quoting from Dorset v. City of Nassau.   "1. Information
22   pertaining to law enforcement techniques and procedures.
23   2. Information underlying the confidentiality of sources.
24   3. Information that would endanger witnesses and law
25   enforcement personnel.   4. Information that would
```

```
 1                          PROCEEDINGS                    36
 2    undermine the privacy of individuals involved in an
 3    investigation.  5. Information that would seriously impair
 4    the ability of law enforcement agencies to conduct future
 5    investigations."  Which of these are you relying on?
 6              MS. JACOBS:   Your Honor, we do think that it
 7    has to do with, you know, I mean, Your Honor, I think it's
 8    actually more about the privacy rights of the officers
 9    than, you know, law enforcement privilege specifically.
10              THE COURT:   Okay, fine, I'm happy to hear you
11    say that because I think you're right.  I don't think
12    there's any law enforcement privilege.  We can talk about
13    whether Rule 26 would otherwise protect that.
14              So here's the problem.  I mean I'm not saying
15    that you didn't, you know, things happen quickly at a
16    deposition, and I'm not saying you didn't act in good
17    faith, but in the future, when you're confronted with a
18    situation like this, don't jump to privilege if privilege
19    doesn't apply.  You have other remedies if you have to
20    have them.  If it rises to the level of harassment, then
21    you should save the question for the end and terminate the
22    deposition and make an application to me under Rule 30(d)
23    to terminate.
24              Anything else though, unfortunately, Rule 26
25    doesn't allow you to stop the deposition.  What you need
```

1                          PROCEEDINGS                    37

2    to do is make your objections.  I think the parties should

3    certainly agree to mark the materials confidential.  I

4    think that gives you 90 percent of what you need anyway,

5    maybe even 100 percent of what you need.  But don't invoke

6    privilege unless you've got a really great argument about

7    it, and in the future something like this I don't see a

8    law enforcement privilege.

9            So I'm not saying you acted in bad faith.  I'm

10   rejecting the assertion of privilege.  But now we're in a

11   situation where you've sort of gotten something you

12   shouldn't have gotten which is you're getting a ruling

13   from me about now what has to happen which in a way

14   shouldn't have happened at all.  You should've gone on

15   the, continued on the record, presumably marking it

16   confidential, and just get the questions answered.  So

17   that's kind of what's bothering me about the situation

18   here.

19           But let me just jump to the merits which is the

20   plaintiffs, your contention about relevance is that this

21   could be relevant to whether the police department acted

22   properly in keeping this officer on or allowing them to

23   engage in certain activities because if they had knowledge

24   of, you know, violent or threatening conduct, that

25   should've affected their decision.  Do I understand that

1

2  that's the relevance?

3          MR. ENGLAND:   Exactly, Your Honor.

4          THE COURT:   Okay, so it seems to me that what's

5  relevant is what the police department knew about this

6  incident not what the officer may on the stand be

7  explaining about it or even what the underlying police

8  records show about it.  So are you getting that

9  information in some other form?  Surely if there was a

10  disciplinary hearing, there must've been testimony about

11  it or records about what happened, and that would answer

12  everything you needed to know about the what police

13  department knew.  What am I missing?

14          MR. ENGLAND:   Well, Your Honor, and,

15  unfortunately, we do not have those underlying records,

16  and we suspect that the defendants might claim the same

17  basis for withholding them.  Of central relevance and of

18  key probative value here are what the defendant did in the

19  face of the facts of the underlying circumstances giving

20  rise to the discipline that was at issue here, and that is

21  simply untestable what they did based on the information

22  we have.  And so we, you know, we agree there's some --

23          THE COURT:   Wait, wait, what's untestable?  Say

24  that again, I'm sorry.

25          MR. ENGLAND:    The merits of the disciplinary,

```
 1                      PROCEEDINGS              39

 2  the disciplinary decisions and actions of defendants in

 3  response to the underlying facts and circumstances --

 4            (interposing)

 5            THE COURT:   Right, but what you need, it seems

 6  to me, is the disciplinary record.  I don't know if you're

 7  asked for it or if they object to it, but I mean that's

 8  just, it's staring me in the face it would be one

 9  obviously relevant thing that you need to know and the

10  most relevant and much better than his testimony or even

11  the underlying criminal records.  You want to know what

12  the NYPD knew.

13            MR. ENGLAND:   Right, Your Honor, and we have

14  not received those files.

15            THE COURT:   Have you requested them or is it

16  part of what the document production is supposed to be?

17  And let me ask the defendants the question --

18            MR. ENGLAND:   Yes.

19            THE COURT:   -- is that something that's going

20  to be produced and is there an objection to producing it?

21            MS. JACOBS:   Yes, Your Honor, we have an

22  objection to producing it.  These are --

23            THE COURT:   Okay.

24            MS. JACOBS:   These are off duty incidents that

25  are of a personal nature, and we don't think – we take a
```

```
 1                      PROCEEDINGS              40
 2  position that we do not go, they are not relevant in these
 3  cases.  Particularly when we're talking about, you know,
 4  these are non-party officers, these are private family
 5  matters that, you know, again, the NYPD does respond to
 6  them, but it is our position that they are simply not
 7  relevant to the allegations in these cases.
 8            THE COURT:  Okay, I mean --
 9            MR. ENGLAND:  Your Honor --
10            THE COURT:  Go ahead.
11            MR. ENGLAND:  If I may just respond to that, I
12  believe, you know, the reason we believe these are central
13  relevance are, you know, this particular deponent was
14  appointed to a leadership position following the incident
15  that is at issue here.  And, you know, the decision-making
16  behind that, you know, the decision to appoint him in a
17  position of leadership where he commands officers in the
18  field, you know, what types of discipline has been, the
19  defendants have meted out this person in his past to
20  ascending to a leadership position, all of that, you know,
21  regardless of whether it was off duty or on duty incidents
22  remains relevant to the defendants' failure to train,
23  supervise, and, you know, adequately engage in policing as
24  our Monel claims go to.
25            THE COURT:  All right, here's --
```

```
 1                      PROCEEDINGS              41
 2          MS. JACOBS:   Your Honor --
 3          THE COURT:   -- here's – hold on, stop, stop.  I
 4  sprung this on you, so I feel it's a little unfair for
 5  both sides for me to have brough this up.  I brought this
 6  up because the thing that you are arguing about to me
 7  seems one quarter as relevant as the thing that I'm
 8  talking about.
 9          So I would rather avoid dealing with the issue
10  of getting this seemingly irrelevant material which is
11  what, you know, he claims happened or what the – and we
12  have a different problem in terms of the underlying field
13  arrest records which I can talk about if you want.  I
14  would rather not do a ruling on that and figure out
15  whether the plaintiffs are entitled to this thing, and if
16  they are entitled to this thing, that seems to be more
17  than enough and, in fact, what they really need which is
18  to find out what the police department knew when they
19  meted out this discipline.  Or more precisely, what they
20  knew when they then went on to promote this individual.
21          So I would like either you two to see if you can
22  reach an agreement on this or if not send me a joint
23  letter that lays out the issue with each side's position,
24  and then I'll just make a ruling on it.  And if it turns
25  out that I find for some reason that this record should
```

```
 1                        PROCEEDINGS              42
 2  not be produced, then I'll deal with the issue of whether
 3  there should be further deposition testimony or unsealing
 4  of the arrest records based upon the letters that I
 5  already have.  I think that's the way we need to deal with
 6  this right now.  Anything else --
 7              MS. JACOBS:  Your Honor, I would --
 8              THE COURT:   -- on the plaintiffs' side - hold
 9  on.  First, Mr. England, anything else from your side that
10  you think we should be doing on this?
11              MR. ENGLAND:  No, Your Honor, I think you
12  addressed my one question which is if we determine we need
13  an unsealing order, we would include that request in the
14  follow-up as well.
15              THE COURT:  Well, my vision of the follow-up is
16  solely on the issue of whether you get this disciplinary
17  record, whatever the underlying records are that reflect
18  what the department was told about this incident when they
19  issued the discipline.  So if you get that, you don't need
20  the arrest records.  You get everything you need when you
21  find out exactly what the department knew.  All right?
22  That's my theory.
23              MR. ENGLAND:  Okay, and --
24              THE COURT:  If it turns out --
25              MR. ENGLAND:  I --
```

1                         PROCEEDINGS                    43

2            THE COURT:   Hold on.  If it turns out that I

3   rule against you on that, that you don't get those

4   records, then I will deal with what you've asked for in

5   your letter which is more deposition testimony and the

6   16050 records.  If you want to spend a minute or two on

7   that now, that's fine.  It may be that I don't end up

8   ruling on it at all because you get the departmental

9   disciplinary file on this case.  But if you wanted to say

10  something about it, I don't mind.

11           MR. ENGLAND:   Your Honor, I think we can take

12  the approach you suggested and meet with defendants and

13  determine whether that, whether we can reach agreement on

14  that.

15           THE COURT:   Okay, and my point is I don't think

16  I need anymore briefing on the deposition or 16050 because

17  I think that's, whatever it is is in the letters.

18           MR. ENGLAND:   Understood.

19           THE COURT:   Okay, so I would point out that

20  under 16050 I don't think I can issue an order on that, to

21  the state courts.  I looked at case law on this, and if

22  you're curious, I'll tell you the case.  But either you

23  order a release, the individual to give a release – either

24  you go to state court or you subpoena someone you know has

25  the records like a DA or somebody like that or you make

```
 1                      PROCEEDINGS            44
 2  the person who's a party sign a release, and if they fail
 3  to do so, there's some consequence.  But the proposal you
 4  chose, which is me going to state court, I don't think
 5  case law (indiscernible).  I'm sorry, when I say me going
 6  to state court, I mean me ordering the state court to do
 7  something.
 8           MR. ENGLAND:   Okay, understood, Your Honor.
 9           THE COURT:   Okay, anything else that anyone
10  thinks we need to do today from the plaintiffs' side?
11           MR. ENGLAND:   No, Your Honor.
12           MX. GREEN:   This is Remy Green again.  I think
13  one thing that I wish we had addressed in the meet and
14  confer, and I think the answer might be to just address it
15  when we talk later today or tomorrow is what to do about
16  the documents that are missing for the depositions that
17  have already happened.  I understand --
18           THE COURT:   Oh, right.  Let's have that be part
19  of the meet and confer.
20           MX. GREEN:   Great.
21           THE COURT:   You know, obviously if there's
22  fault on the part of the City and there was significant
23  enough prejudice, you should get some additional
24  questioning.  The question of whether it rises to that
25  level of going and have to be decided on a case by case
```

```
1                          PROCEEDINGS               45

2  basis, and I think you two should talk about it.

3          MX. GREEN:   You know, candidly, Your Honor, I

4  think whether we have the bandwidth to do it will also

5  depend on whether it's serious or not.  So I think that

6  lines up and thank you.  That's all.

7          THE COURT:   Okay, anything else from the

8  defendants we need to do today?

9          MS. JACOBS:   No, Your Honor.

10         THE COURT:   All right, thank you everyone, good

11 bye.

12         MS. JACOBS:   Thank you.

13         (Whereupon the matter is adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25
```

46

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, In Re: New York

Policing During Summer 2020 Demonstrations, docket

#20cv8924, was prepared using PC-based transcription

software and is a true and accurate record of the

proceedings.

Signature  _Carole Ludwig_____

Date:  August 29, 2021