UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: :

IN RE NEW YORK CITY POLICING DURING SUMMER 2020 DEMONSTRATIONS :

Docket #20cv8924

: New York, New York
September 20, 2021
------------------------------------: TELEPHONE CONFERENCE

PROCEEDINGS BEFORE
THE HONORABLE GABRIEL W. GORENSTEIN,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Sow Plaintiffs: COHEN & GREEN
BY: REMY GREEN, ESQ.
1639 Centre Street, Suite 216
Ridgewood, New York 11385

For Payne Plaintiffs: NEW YORK CIVIL LIBERTIES UNION
BY: MOLLY BIKLEN, ESQ.
125 Broad Street, Suite 19
New York, New York 10004

For Sierra Plaintiffs: RICKNER PLLC
BY: ROB RICKNER, ESQ.
14 Wall Street, Suite 1603
New York, New York 10005

For Plaintiff People of the State of New York: NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
BY: SWATI PRAKASH, ESQ.
28 Liberty Street
New York, New York 10005

Transcription Service: Carole Ludwig, *Transcription Services*
155 East Fourth Street #3C
New York, New York 10009
Phone: (212) 420-0771
Email: Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Plaintiff Wood: KAUFMAN LIEB LEBOWITZ & FRICK LLP
BY: DOUGLAS LIEB, ESQ.
Ten East 40th Street, Suite 3307
New York, New York 10016

For Plaintiff Yates: STOLL, GLICKMAN & BELLINA, LLP
BY: ANDREW STOLL, ESQ.
300 Cadman Plaza West, 12th Floor
Brooklyn, New York 11201

For Defendants: NEW YORK CITY LAW DEPARTMENT
BY: ANTHONY DiSENSO, ESQ.
STEPHANIE BRESLOW, ESQ.
DARA WEISS, ESQ.
100 Church Street
New York, New York 10007

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---|---|---|---|---|---|

None

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|

None

THE CLERK: This is In Re New York City Policing During Summer 2020 Demonstrations, case number 20cv8924. Will counsel please state their appearances for the record, starting with plaintiff.

MS. SWATI PRAKASH: Good afternoon, this is Swati Prakash with the Office of the New York State Attorney General for plaintiffs People and the State of the New York.

MS. MOLLY BIKLEN: And this is Molly Biklen of the New York Civil Liberties Union Foundation for the Payne plaintiffs.

MR. DOUGLAS LIEB: Douglas Lieb for plaintiff Charles Henry Wood.

MR. ROB RICKNER: Rob Rickner, Rickner PLLC, for the Sierra plaintiffs.

MX. REMY GREEN: Remy Green, Cohen & Green, for the Sow plaintiffs, and I'll be speaking on the ESI communication issues. For the reporter I should appear in the transcript as Mx. Green, spelled M-X period rather than Mr. or Ms.

MR. ANDREW STOLL: Andrew Stoll, Stoll, Glickman & Bellina, for Cameron Yates. Good afternoon again.

THE COURT: For defendant.

MR. ANTHONY DiSENSO: Good afternoon, again, Your

Honor, this is Anthony DiSenso from the New York City Law Department. I'll be speaking on the ESI portion of the conference.

MS. STEPHANIE BRESLOW: Good afternoon, Your Honor, this is Stephanie - sorry - this is Stephanie Breslow from the City Law Department for defendants.

MS. DARA WEISS: And Dara Weiss from the New York City Law Department.

THE COURT: Okay, we're going to do this over again, and I should have started the other one by saying that this is being recorded. Any rebroadcast or recording of this proceeding by any other party is not permitted.

We have two issues, one relating to ESI and the other relating to a 30(b)(6) deposition. As I said before, I want to start with the ESI issue. And I think there's two aspects to it: One is the timing and the other is the methodology. I know that the plaintiffs are a little bit at a disadvantage because the defendants, you know, appears that the most complete statement about what's going on just happened on Friday, but let's see what we can accomplish now. So, Mx. Green, why don't you go ahead.

MX. GREEN: Sure, Your Honor, and as you said before, we reset. I think the biggest problem, as far as this goes, is that what's going on timing-wise is not even

nominally compliant with the Court's schedule. You ordered at docket 43 that the parties shall not require a deponent to appear for a deposition after December 3. All motions have to be made 30 days before December 31, and 11 weeks from September 27, which is when they said they would be at the earliest they will complete production, is mid to late December. I'm sorry, it's just mid-December, it's December 13.

It's also not compliant with the schedule Judge McMahon ordered. At docket 40 she specifically said if it's necessary to shorten periods for responding to discovery in order to meet the deadline, that should be done.

So I mean I think the biggest question we have is, you know, how do we get this done, and I think zooming out a little bit, it's a problem we've had throughout the case. I don't think that we are in a position to be meeting the Court's schedule for any number of reasons. You know, we bring as many issues as we can as quickly as we can to the Court when we know that there are going to be issues. But it's just – we are rolling towards disaster I think. I don't know how to address it other than to say I think what we care most about is timing, and, you know, getting an expert opinion without emails is just not

possible, let alone taking the remaining depositions without them. So that's where I'll stop for now at least.

THE COURT: All right, Mr. DiSenso or whoever's speaking for defendants.

MR. DiSENSO: Yes, Your Honor, this is Mr. DiSenso. As we said in our letter on Friday, we recognize the significant challenges that our estimate for review and production poses in this case. I can say, you know, and reiterate some of the points in the letter, that this is, you know, we are anticipating and preparing for this to be a very aggressive review schedule. A review team of 20 people, which is what we currently estimate hiring, is a very large team. And we are trying to find a way to do this as quickly and as efficiently as possible. That's one of the reasons why we're planning on leveraging both a managed review team and the use of technology assisted review.

As far as why it's going to take so long I think is a factor of the number of custodians we have here. We have 50 custodians. That is a huge number of people to collect from. And I realize that this is only for a fairly short date range, but, you know, as you can see, 50 custodians still yielded over a million documents collected. And we have been working for the past few weeks

to come up with a way to come up with a way to deal with that volume.

THE COURT: First of all, Mx. Green for some reason measured your 11 weeks from the 27th. I measured it from the 17th. What are you measuring it from?

MX. GREEN: Sorry, Your Honor, was that for me or Mr. DiSenso?

THE COURT: No, that's for Mr. DiSenso.

MR. DiSENSO: Oh, I apologize, Your Honor. That would be from the date of the Court conference I believe.

THE COURT: Meaning today.

MR. DiSENSO: Yes, Your Honor.

THE COURT: Okay. And just so I understand, these 20 attorneys are contract attorneys that you're hiring specifically for this case?

MR. DiSENSO: Yes.

THE COURT: And your expectation is, you're assuming that you're going to get down to 100,000 documents, is that what it is?

MR. DiSENSO: That is our – it is – I will emphasize this point that we believe – you know, it's very hard to estimate a set number of documents when you're using technology assisted review. We go based on estimated on our sampling. We have a 95 percent confidence level,

but there is a margin of error, but with a document set this large that means that there can be some significant variance in the number of documents we ultimately need to review. And for that reason we've tried to take that into account as much as we can in estimating that 11-week timeframe. But it's --

(interposing)

MR. DiSENSO: It's hard for me to give you a number of documents we will ultimately end up reviewing.

THE COURT: I mean we need to talk about the timeframe. You're hiring these people as contract attorneys. I certainly understand that you need to have (indiscernible) again --

MR. DiSENSO: Yes.

THE COURT: -- and you need to have quality control. I mean it sounds like if I take 11 weeks times 40 hours times 20 attorneys, I get something like, let's see, 8800 hours of attorney time. Did I do the math right?

MR. DiSENSO: Apologies, Your Honor, I will take --

THE COURT: Some of the time is devoted, some of the time is devoted to training, so I'm not saying you'll use all that time. So if it was a week of training or whatever, it would be 10 weeks times 40 hours times 20

attorneys would be 8,000 hours.

MR. DiSENSO: I can provide a little bit more detail in how that 11 weeks breaks down. Again, we're anticipating here and again this is a very aggressive schedule, you know, hiring and training a review team within one week. And then we think that after that the review will, the stages of the review will take approximately seven weeks' worth of time for the review team. There are numbers after that including the fact that we need to validate that the review was successful in finding responsive documents. That takes some additional time.

We have some quality control that's not necessarily related to the review team's review, you know, coding documents correctly. But related to the fact that there may be coding conflicts, you know, for example, a document responsive in privilege but, you know, without a privilege call on it. Given the volume, we estimate that that would take an additional week. There are also a number of holidays in between now and December that we have to account for in that. And we also anticipate, and we're factoring a time for actual production here, production takes, you know, quite a bit of time when you're dealing with this many documents. It's just machine time and also

QC time to make sure that the production was run correctly. We anticipate that that would take between one and two weeks.

THE COURT: Why does it take, why is that – what's involved in production, I don't understand?

MR. DiSENSO: When we run --

THE COURT: I'm assuming you're not printing this out. You're, you know, applying – I don't know what you're doing to it. What does production mean?

MR. DiSENSO: So under the agreed-upon format what we're doing is we are applying – and we're actually essentially creating TIFF images of all of the emails and the attachments and also creating an extracted text file for each one of the documents we've produced for Excel spreadsheets we're producing natively, but they're like not the original native but a version of the native. We're also producing various what are called DAT files which allow basically the database to understand how to organize and assemble document families and also provide metadata associated with each of the documents.

You know, depending on the size, that can take multiple days to actually generate that through just machine time. We always build in more time because after we receive it, we have to run quality control on it to make

sure that it was run correctly, and if it was not run correctly, it will have to go through that process over again.

THE COURT: Mx. Green, did you have any – let's put aside the time. In terms of the methodology of being used here, is there anything to be said now or is that for another time?

MX. GREEN: You know, Your Honor, I think, I don't think any of this takes anywhere near as long as Mr. DiSenso is suggesting. I think in terms of the methodology I have no idea if, assuming that they're going to contract attorneys, I have no idea why the number is 20. Right? If that's the biggest slowdown here, why aren't they hiring a hundred attorneys? The math doesn't quite work out for me either, right, as you said it's 8800 attorney hours if you run their calculation, and with the review population they've suggested, that suggests that an attorney is only getting through 25 documents in an hour. Most people as a rule of thumb use 100 documents per attorney per hour. So the math seems a little wrong.

THE COURT: Well, just in fairness, I assumed all 11 weeks were attorney review time, and I think they --

MX. GREEN: Yeah, that's --

THE COURT: -- made clear that that's not the

case.

MX. GREEN: Yeah. I also, you know, it doesn't seem to me that there's any reason, as Mr. DiSenso suggests, that a rolling production should slow anything down. After all, it's just machine time. Right? They put it on the machine, it produces, that shouldn't slow down the review.

But I think, you know, the biggest objection we have is, as many documents as, you know, half a million or 250,000 as the meaningful review population relative to, you know, zero documents, relative to major cases it's nothing. Right? Like a typical white collar investigation has millions if not hundreds of millions of documents, and firms get through those on much more aggressive schedules than this regularly every day. And it's, you know, the idea of getting through a quarter of a million documents takes, it's taken them, you know, two months since we agreed on a protocol plus another three months is just, it's absurd.

And so on the methodology I think they've made a choice to say 20 attorneys. I don't know why they've made that choice. And that's probably the biggest objection we had.

THE COURT: Well, okay, so there's two issues,

Mr. DiSenso. One is I'm not sure that you're the right person to address it which is why it took until now to get to this point. But the second one is why 20 attorneys and why not double that and then that would significantly shorten the time.

MR. DiSENSO: The reason for 20 attorneys, and I will say, reiterate my earlier point, which is that 20 attorneys is a very aggressive number of document reviewers. It is because we need to balance the number of documents reviewed per day against what the case team can QC. And, you know, as it stands right now, this is aggressive not because of the number of attorneys we're necessarily hiring, it's aggressive because of the burden that it puts on the case team on a daily basis to review the work of those attorneys.

I must say we have to do that especially where we're leveraging technology assisted review because it's important for us and for the review process to ensure that the reviewers are coding documents correctly. We don't want to be in a position where we're not doing adequate QC because we have a hundred reviewers going at once, and then we discover down the line that, you know, they're, they missed a whole bunch of documents that should've been coded responsive. So that's the reason why we are, you know,

proposing 20 attorneys or at least thinking about 20 attorneys now.

If I may, Your Honor, just to address another point that was raised, as far as rolling productions go, the reason why that could slow things down is because it's not just a factor of sending a production to the vendor and to have it run, and it's just not machine time. There's a number of steps which I outlined in my initial breakdown that go into readying a production set. So that includes, you know, coding, QC, cleanup. That includes cleanup and QC of the production process. It also necessitates that we take resources away from QC-ing in order to deal with those coding QC issues. Based on how the review is set up, it may require us to kind of pause the review while we ready a production set. So that's kind of where that thinking comes from, and it is based on our past experience with similar models.

THE COURT: How many attorneys in the law department are doing this quality review you're talking about?

MR. DiSENSO: You know, I think that's still being determined, but it is I believe four is what we anticipate.

MS. WEISS: Your Honor, if I may, this is Dara

Weiss. We have four as of now and we're working on getting a fifth. And I just want to add this is work that is going to be done in the evenings after hours. This is work that is going to be QC'd after the review team has done their work for the day, so these attorneys then have to log on at night to review their work.

THE COURT: I mean I guess that's admirable, but couldn't they log on the first thing the next morning and have essentially, you know, why does it have to be done at night?

MS. WEISS: Well, then it would have to be done before the review team starts their work at, I don't know, Anthony, whatever time the team starts work --

THE COURT: Oh, I see, you're giving them directions that would apply instantaneously, is that the point?

MR. DiSENSO: That's correct, Your Honor, and that's very important, especially where, at the beginning of a review and when we're using technology assisted review because we want to catch at the earliest part, point possible any confusion with what is relevant and make sure it's corrected so that we don't have to review large portions of the review.

MX. GREEN: Your Honor, if I may, a lot of this

seems like, you know, perfect world type stuff. I am a little baffled by the use of technology assisted review here. This just isn't, I don't think the volume of documents where that pays off. It really – and I also find it kind of shocking the number of attorneys who are able to QC even after the Court has, I think, repeatedly told defendants they need to staff the case more robustly.

But it's, you know, I think that the answer to your question is obviously people should just be doing it during the day, and, yes, you usually have to redo the first part of a review, that's kind of normal in big document reviews. But, you know, I don't think attorneys working in the evening should be the hurdle here.

THE COURT: Well, I don't think it's being presented as a hurdle. Maybe you feel the number is a hurdle. I'm not sure that having five attorneys do this from the law department and 20 attorneys contracted is out of line with what might be expected in terms of staffing. I think it's unfortunate we've gotten to this point because I think we could have moved a lot quicker. I don't want to start assigning blame as to how we got there.

But here's where I think we should be right now. I've consulted with Judge McMahon about this, and I'm authorized to provide an appropriate extension of the

various deadlines so that we can make sure this happens. I'm not sure I want to just announce right now and say what that is. I think it's been a big hiccup between the parties because I don't think there's no way to start, you know, when one side says, oh, I should order it produced next week and the other side says not for 11 weeks, it leaves no room for compromise. I understand from the plaintiffs' point of view, because they need it, you know, pretty soon if they're going to do all the things that they need to accomplish by the end of December. I'm not sure they would need it in one week, but they, you know, need it in a matter of just a few weeks at most.

So if I can loosen that stricture, and I said I will loosen that stricture, what I think I want to have happen is I would like to have a more serious discussion between the parties to talk about a realistic deadline for the ESI that would allow for the remaining tasks, being the experts and, you know, discovery of key individuals who might be implicated by the ESI, to have that happen after it would get produced.

It's really important that the Law Department be forthcoming about what they're doing and how they're doing it because I don't want to have a situation where you make some decision early on about relevance or something else

and about how TAR algorithm needs to be pointed, and then it turn out that you made some decision that I later found out was unreasonable and we've lost tons of time because of that.

So knowing that we can do something on the timing, and that would apply obviously to the expert report and the class certification, I feel like that that should be an impetus to, if not coming to an agreement, at least someone giving me a more realistic proposal from the plaintiffs' side if they can't come to agreement with the defendant about what can be done and what should be done. I'm not sure I buy the idea that 20 attorney is the wrong number, and, you know, depending upon a lot of other factors here, but it's really all dependent on the City being very forthcoming with the plaintiffs as to how they're doing this, how they're staffing it, and what decisions should be made. I shouldn't have to issue orders telling the City to provide this information. The City should be very forthcoming about this.

So having said this, Mx. Green, I think you can read that I don't want to pick that date now. I suppose I'm open to a request to do that, but tell me if you have some thoughts having heard what I said.

MX. GREEN: Yes, Your Honor. I think, you know,

it's hard to say what we need without knowing what extension we're going to get, but I understand exactly why you might not want to tell us right now. And certainly I am happy to go discuss something that is a little less than a week from the conference, especially given that, you know, rather than - when we wrote that, I think we had in mind that they might try to get ahead of it by starting review while the motion was pending. But, of course, we're willing to go and talk about it.

I think one - a couple of things that will help us address this, in a meet and confer we've had today and a number of meet and confers we had last week, you know, whenever we ask for basic information about how the City is searching for things and that sort of thing, they've started saying that we don't think it's appropriate for them to be discussing it with us. And they say, you know, that's discovery on discovery and wildly inappropriate, and they shut down. And obviously that isn't going to work.

I think the right thing to do might be for defendants to provide status letters that they file on the docket, and that way, you know, we can all make sure that things are going the right way, and we don't have to necessarily, you know, fight with them about what's confidential because they've been designating staffing as

confidential every time they tell us about it.

THE COURT: All right, who's going to speak – I normally have one attorney per issue, but I understand I'm now raising things beyond just mere ESI technicalities. So whoever wants to speak from the Law Department.

MS. WEISS: Yes, Your Honor, this is Dara Weiss. I strongly disagree with any thought of providing status letters, especially filed on the docket. A lot of what ends of taking the time of the attorneys for the defendant is things like writing letters and participating in meet and confers and responding to letters that plaintiffs write, and that takes us away from the tasks of providing the discovery and getting them the information that they need.

And what we were opposed to in the meet and confers that Mx. Green spoke about before was not providing statuses of where we are in discovery but providing details of exactly what our clients have done in the process of searching for certain documents which is what defendants think is inappropriate. But a matter of providing plaintiffs with the status of where we are in searches and how long we think it might take us to provide them with things such as these emails that we're searching for now or plaintiffs pointed out that there appear to be some

documents that weren't provided, you know, providing the status of looking for those documents or status of finding and naming proper 30(b)(6) witnesses and where we are in the process of getting that done, that's absolutely fine. We have no problem with providing that information to plaintiffs.

But things like filing status reports on the docket I think is unnecessary and inappropriate.

THE COURT: Filing on the docket is not my issue. What's important, particularly for the ESI process, you know, 30(b)(6) is its own thing, but for the ESI process this has to be transparent. They have to, and maybe you want to develop a template when you finally figure out the precise process as to how many documents got reviewed or whatever it is. That is easily filled in. I assume you're going to keep track of this yourself in some way. I'm not trying to burden you. But the ESI process in particular is a break from the way things were done in the past when people just presented documents after they've done a search. The plaintiffs have to be part of that process and have to understand when choices get made that might affect them and also might affect the timing, particularly given that we're in a crunch when it comes to timing.

So I'm not going to require it to be filed on the docket, but I almost think it would be better for you to have a template, you know, for the ESI process that you do once a week. I think it might spare you questions. I don't want to start ordering - the only thing I'm going to order is what I already did which is that you have to be completely forthcoming on this. This is a way to avoid discovery on discovery. This is not discovery on discovery. Attorneys telling the other side about the ESI process is normal. And if you end up not being forthcoming about it, then I might have to order discovery on discovery which I think would be a disaster for you. So this is a way to forestall that.

So, Ms. Weiss, having said that, is there a reaction?

MS. WEISS: That sounds reasonable and easier for both sides. I have to admit that I am by far not an expert on the e-discovery process in this office, so I don't know how it's usually done in the usual scope of a litigation, but that is why we have an e-discovery team. So I will certainly work with them to make sure that this office is transparent in the rest of the e-discovery and email collection and production process.

MR. DiSENSO: Your Honor --

THE COURT: Yeah, on the - go ahead.

MR. DiSENSO: I apologize, Your Honor, this is Anthony DiSenso. If I could just add to that. You know, by way of explanation some of the information, a lot of the information that we included in our letter of this Friday we did not have available to us yet when the original letter was submitted. You know, a lot of this revolves around models that are created, you know, based on the sample review that was conducted the prior week, and this has been an iterative process to try and cut down the review burden and to speed up the efficiency of the review.

And we definitely appreciate and understand the need for cooperation in the ESI process, but a lot of this stuff we did explain to plaintiffs as far as the considerations go, as far as what we were doing, the sampling we were doing, why we were doing it, and what kinds of review we were considering. We did address some of those in the abstract with plaintiffs, you know, when we did discuss how long email was doing to take and why we didn’t have answers yet. So I will just say, offer that to the Court.

THE COURT: All right, just give me a moment.

(pause in proceeding)

THE COURT: I mean I guess one thing I heard,

you know, a lot of what you're talking about is an effort to reduce the 286,000 document number to 100,000. Right? That's a big part of what you're trying to do, is that right?

MR. DiSENSO: Well, we're trying to reduce it as low as we can.

THE COURT: So I mean I think, you know, maybe I misheard them, but is there any, is there some view on the plaintiffs' side that we should just nix the TAR review and just, you know, it's not going to save that much time? Just go straight to those 286,000 documents. Is that what you were trying to say?

MX. GREEN: Well, Your Honor, you know, without exact estimates, it's hard to respond exactly, but I feel like I heard Mr. DiSenso say both that the biggest limitation on the speed is not the line level reviewers but the QC and that doing TAR makes more demands on the QC attorneys' time than, you know, just doing QC for humans. And so to the extent that is something that is slowing down what appears to be the bottleneck here, then we have some objection to that on the speed level, but otherwise, you know, I don't think that we have a categorical objection beyond it doesn't seem like the right use of resources.

THE COURT: Well, Mr. DiSenso, are you, you're

convinced the TAR is going to speed this up.

MR. DiSENSO: Yes, Your Honor, just from our modeling and from our letter, you can, I mean I think it’s a logical conclusion that it’s going to take less time to review less documents, and hopefully the technology assisted review, continuous active learning program --

THE COURT: Well, the question is is it putting, is the, you know, four or five attorneys from the Law Department causing some kind of bottleneck under a TAR that wouldn't exist if it was just the usual review process?

MR. DiSENSO: No, we always do QC, and I think for the same reasons we, you know, you articulate before, we don’t want them to get offtrack as far as what is relevant and what is not. And that’s true whether we’re doing what we call linear review or we’re just reviewing the documents straight or in a technology assisted review situation.

My only point was that, you know, I would only say that I think it’s more important to do an adequate and robust QC process for a technology assisted review only because it goes faster. They’re reviewing more documents a day. And it’s also impacting the model of responsiveness that the software is creating. So it’s important and would have to be done in either scenario. But there are I guess

additional reasons why it's crucial to do it timely and on a daily basis when you have a technology assistant review program assisting the review.

THE COURT: Is there no option to - I mean the way I feel like it's being portrayed is we wait 11 weeks with the plaintiffs getting nothing, and then 100,000 documents arrive, and then we have to start up, you know, depositions and so forth. And that is just so inefficient. You know, what is - it would almost be worth it to add a week or whatever if that's what it was to get a significant traunch of documents that might allow for - I mean before I go too far down this road, maybe I'm saying - I mean I know the plaintiffs asked for rolling production. But if there's 40 custodians and you get production from 20, are you going to be prepared to depose those 20 knowing that you might learn something in the later production that, you know, we're not going to have two depositions obviously. Is it really the case that rolling production is going to assist in things like taking depositions and, you know, yeah, taking depositions?

MX. GREEN: Well, Your Honor, I think it's going to assist in taking depositions even if we were to hold off Until the production was complete because obviously, you know, we don't, the day they produce it, suddenly have

complete know of evidence. Right? We have to do our own review. And so if nothing else, I think that we gain more than a week by having both sides reviewing in parallel if we're right that it adds maybe a week to the process for them to roll every week.

THE COURT: I think figuring out a way to doing rolling production is very important here for the reason Mx. Green just said. I mean we can't dump 100,000 documents and expect depositions to start the next day. What are our options, Mr. DiSenso?

MR. DiSENSO: Certainly, Your Honor. I will say, I mean, you know, we've mentioned to the plaintiffs that we weren't necessarily opposed to rolling productions. It was more of just we wanted them to understand the considerations that go into it that impact a decision to do rolling productions, and that is delaying the ultimate conclusion of the review. I think there are, you know, we're happy to have a discussion with the plaintiffs as to what makes sense, and there are, you know, there's no reason we couldn't do a rolling production. It is hard to build into our model, you know, how that's going to slow things down. That is one thing I will say.

You know, we know it's going to slow the review. We don't know how much it'll slow down the review. I think

it also depends on how many rolling productions we're doing because, like I said, every time we prepare a production, that's resources we divert from the actual ongoing review to prepare that production. So these are all like balancing considerations I would say.

THE COURT: I understand, but I mean some of those resources are completely unrelated, I mean this process of creating the TIFFs and the extracted texts has nothing to do with the review process. Right?

MR. DiSENSO: That's correct, but getting to the point where we're ready to create the TIFFs, there's a lot of legwork that needs to go in after the first level review is done, including resolving coding conflicts and I believe our review managers have their own QC. This is the vendor who would be providing the attorneys. So there is some case team resources that need to be diverted to deal with those issues ahead of running the production.

THE COURT: All right, well, I think we've talked this out enough. I think, I hope I've given enough direction. I will allow the parties to confer, and I'll propose a schedule that's going to allow this to happen on a realistic timeline and give plaintiffs a realistic opportunity to prepare expert reports and conduct the depositions. Obviously, I'm not assuming a lengthy delay,

but I'm assuming the potential for a reasonable delay in order to accommodate this.

Mx. Green, anything else you think we should talk about on this? I mean before you answer that, the process – I don't know why the 11 weeks didn't start Friday. Eleven week, whatever that process, that training process, this is going forward, we need to start it immediately. So, Mr. DiSenso, do you understand that?

MR. DiSENSO: Yes, Your Honor, we've reached out to our vendor who will supply the reviewers. I believe they're in the process of starting to look for attorneys that can do this review.

THE COURT: So that has to start, and then you have to now also have discussion with Mx. Green about what the plan is. And on an ongoing basis if you spend an hour or whatever, two hours a week doing nothing but telling the plaintiffs exactly where you are on this, that's not to me a huge burden on the City if one of you has to do that for an hour a week. Or maybe it makes your life easier by filling in some template about where you are on things. But the transparency is exceedingly important, and you have to keep that in mind.

MR. DiSENSO: Yes, Your Honor.

THE COURT: Mx. Green, anything else that you

think we should be doing right now on this?

MX. GREEN: Yes, Judge, just two quick things. I think all I'll say on the first is, you know, I think we're going to need real rolling but we'll discuss that. You know, last time we tried to do rolling production, we got, you know, 98 percent of the documents in the last two weeks. But the other thing I did want to make sure if just let's get a date for when we need to give you a proposal so that, you know, there is some pressure on us.

THE COURT: What's a good date from your point of view?

MX. GREEN: Next Tuesday, the 28th?

THE COURT: Sounds reasonable, a week from tomorrow. Ms. Weiss, any problem?

MS. WEISS: No, Your Honor, that sounds fine.

THE COURT: Okay, so letter on this, either joint or separate proposals on the 28th. I would love to see a joint proposal.

MX. GREEN: I would too, Judge.

THE COURT: Okay, so you said two things. Did you do two --

MX. GREEN: That was --

THE COURT: One was the rolling and one was the due date.

MX. GREEN: Yep, exactly. Thank you, Your Honor.

THE COURT: All right, so we'll now turn to the 30(b)(6) issues. It may be that now that we know that there's going to be a change in the schedule, it may relieve a little pressure on the 30(b)(6). I was getting the impression from the City's last letter that things were ongoing even today on all this. I mean I've certainly gotten some ideas from the letters. I'm happy to review things. Should we go through this one by one? I'm going to turn to plaintiffs for the answer. I don't know – who's speaking for the plaintiffs?

MS. BIKLEN: This is Molly Biklen, Your Honor, speaking for the plaintiffs on the 30(b)(6) question. As you suggest --

THE COURT: Ms. Biklen, I'm sorry, (indiscernible).

MS. BIKLEN: Yes, Biklen from the New York City Civil Liberties Union Foundation. B-I-K-L-E-N.

THE COURT: Got it.

MS. BIKLEN: As Your Honor suggests, we have substantial progress with the City, even speaking today, but ultimately these matters are, you know, quite intertwined with the ESI. And so there are a couple of

issues that I do think are important to address today. First, you know, most significantly, even where we do have progress, for example, where the City has agreed in theory to produce witnesses, we still do not have any, we're not any closer to having the City identify who those people are so that we can be prepared for identifying dates and production.

And to the extent that we have agreed to allow defendants to cross-designate fact witnesses, high-level fact witnesses for 30(b)(6) deponents, we are now stuck that if we do not have their communication and ESI on a rolling basis, then there's a significant concern that we're not going to be able to cover any ground while we're sort of waiting on the production of this ESI.

So that is sort of the first issue is that we, you know, believe that to the extent that the parties are able to agree on the topics, we do need, you know, a requirement to affirmatively identify who is going to be produced on that issue so that we can work toward either getting their communications produced in an initial rolling production or at least preparing for when that is going to happen or determining that if that is not a cross-designate, then being able to go ahead and take, you know, to actually have that person be deposed.

THE COURT: So it sounds like all you're asking on this point is for the name of the 30(b)(6) deponent?

MS. BIKLEN: Well, that's for the areas we do have agreement, and at this point that is on topics 1 through 3, 6, and 7. Further, this was an initial 30(b)(6) notice that the plaintiffs served July 2 in an effort to sort of get out ahead on some early issues that we thought could, you know, would be easy to get out of the way first before the second notice. And so this is just one of – the second notice was served on August 6. We have some agreement there. We're going to work towards some further agreement, Your Honor. But for anything where the City has agreed to a topic, we feel that we need the identity of those witnesses so we can work toward that.

And then, second --

THE COURT: Hold on --

MS. BIKLEN: -- we still are unable to agree --

(interposing)

MS. BIKLEN: -- on 4 and 5.

THE COURT: Okay, so I mean it's exactly what I said, which is you just want to know the name of the deponent for the ones that you agree.

MS. BIKLEN: That's right, Your Honor.

THE COURT: Okay. I mean so you have an

objection to doing that at some point before the deposition? It's not going to be a secret once the deposition starts.

MS. WEISS: NO, Your Honor. This is Dara Weiss. Of course, it's not going to be a secret. A big part of why we weren't ready to provide names was because we needed to narrow down the topics and know exactly what we had to produce a witness to testify about. Now that we've come to an agreement - and we knew the basics of the topics. It was a matter of narrowing it down and figuring out exactly what we were going to produce someone to testify about. Now that we've reached agreement, we can follow up on that and with the help of our clients figure out exactly who the best witness or witnesses will be, and it will be several witnesses. And that is in the works.

It has been since, you know, since we started coming to the start of our agreements last week, and we will certainly provide those names as soon as we have them narrowed down. There are some potential names that our clients have given to us. I have plans to speak to a couple of people during the course of this week, and I mean I can't give Your Honor and plaintiffs a date by which I'll have all the names for them on this call today because as, you know, I know plaintiffs are aware, the U.N. General

Assembly is going on this week. So most of the higher ranking officials are deeply involved with that, so some of them may be a little bit harder to get in touch with and sit down and have a long conversation with. I don't have a lot of hope for a lot of progress this week, but, you know, hopefully I'll have at least some word by sometime next week. You know, that's kind of my hope --

THE COURT: -- provide names of these people by a week from Friday?

MS. WEISS: I hope to. I mean that would certainly be my goal, yeah.

THE COURT: Let me just ask, I mean obviously the sooner the better, but when are we going to have these depositions? Are they going to await production from the ESI, in which case, you know, if I order it a week from Friday or two weeks from Friday wouldn't make that much difference to you. Ms. Biklen.

MS. BIKLEN: Well, I think that's the question, Your Honor. You know, to the extent that defendants are seeking to cross-designate fact witnesses, that is one issue, but not everyone may be cross-designated as a fact witness. And so to be, you know, we want to move forward and make some progress, and so to the extent that people are not cross-designated as fact witnesses, then there is

no reason we wouldn't be able to move forward at least on some topics without full ESI. There may be some where we will need full ESI.

THE COURT: Ms. Weiss, is there really a possibility that someone will be a 30(b)(6) witness who the plaintiffs are not going to be seeking as a fact witness?

MS. WEISS: My best guess is that there will be fact witnesses. I couldn't be a hundred percent sure. But there’s probably going to be ESI from these higher ranking folks, be they fact witnesses or not.

THE COURT: No, my point is anyone who you are putting up as a 30(b)(6) witness it seems to me is likely to also be a fact witness that the plaintiff is seeking.

MS. WEISS: I would say probably 95 percent, yes.

THE COURT: Yeah, exactly. So I mean, Ms. Biklen, the odds are all these people are going to be fact witnesses anyway. So I don’t know how that affects the timing. I’m not sure what you want me to do at this point.

MS. BIKLEN: Well, I think it would be helpful to have names so we can start planning dates. I mean one of the real problems --

THE COURT: Are you prepared to depose these people without having the ESI?

MS. BIKLEN: It depends on who that person is. You know, I'm hesitant to say no or yes, but I guess if they know who that person is, I'm not sure why they can't tell us so that we can start negotiating over both, you know, if that person's going to be at the top of the rolling production. It just seems quite inefficient, Your Honor, for --

THE COURT: Well, I --

(interposing)

MS. BIKLEN: -- very end to find all --

THE COURT: I agree. Ms. Weiss, it seems to me if I give you two weeks from Friday, there's no reason you couldn't figure out who's going to be your witnesses on these topics. I don't think – you shouldn't have to wait for the ESI production. So October 8 --

(interposing)

THE COURT: October 8 tell them who we're talking about, and then hopefully we can do some depositions before the ESI is done. Okay, Ms. Biklen, you want to talk about 4 and 5?

MS. BIKLEN: Thank you, Your Honor. Yes, and so, again, this is sort of part of an issue where when we have identified issues with the ESI production or with the production in general and these specific topics go to that,

we have made several efforts to narrow the issues both by offering, to narrow them through meet and confers so that we could actually find out this information and thus narrow it or to receive letters about it, at every pass defendants have told us that this is either not an appropriate topic for a 30(b)(6) or simply not an appropriate topic.

But we've already identified areas where they have not (indiscernible) information. For example, in the Argos (phonetic) video, we continue to attempt to meet and confer over a failure to produce certain information. And so we just simply think it most efficient to proceed by 30(b)(6) so that we can get someone in the room with knowledge, ask those questions, figure out where we then need to proceed on discovery without the sort of back and forth that Ms. Weiss contends is taking away from the other discovery in this case.

THE COURT: Well, I notice the Argos video. Is there some other area where there's actually been some suggestion of loss of data?

MS. BIKLEN: I think we don't know, Your Honor. We have been trying to have a meet and confer on specific missing documents, and we tried to have that last Friday. We then again tried to have it today. We were told yet again that this information will be told to us in an email;

we have not gotten that email yet. There are certainly, you know, numerous areas where documents have not been produced. Ms. Weiss this morning admitted that there have been some failures to production and if those documents exist. And so part of what plaintiffs are trying to do is meet their obligations that have been set by the Court to complete discovery, and we simply cannot do that if we have to wait until the very last day to determine if there's an entire traunch of missing documents.

Already we've had a significant dispute over the unusual occurrence forms. We've been told they exist, they don't exist. And, you know, quite simply, at the end of the day, there are people in the NYPD who know this information who can tell us directly.

THE COURT: All right, whoever's speaking for defendants.

MR. DiSENSO: Your Honor, this is Anthony DiSenso. I can address topics 4 and 5.

You know, the first thing I'll point out is Ms., you know, plaintiffs' counsel is now saying that these were propounded in response to different deficiencies that they've identified that, you know, these were propounded, these requests were propounded on July 2 as plaintiffs' counsel admits, and that was before any deficiency could

have possibly been known.

But putting that aside, you know, we have sought to work with plaintiffs' counsel on these issues. You know, we've pressed them to identify deficiencies. We received the first deficiency letter after hours on Friday, September 10, and it was very lengthy, raised a lot of issues, some of which seem completely off base. For example, there are certain requests that they say we didn't respond to, but, in fact, we had objected to providing documents on that information. Other requests, you know, we've clearly provided documents on, and others we just need clarification as to why they think there's deficiency.

In terms of - and that's for, I should say, Your Honor, for topic number 5.

For topic number 4, which deals with preservation and retention issues, you know, again, there was no discussion of the Argos video at the time that these were served. And, in addition to that, in the most recent letter filed on this on Friday, they point to I guess Judge McMahon's individual rules on ESI which we don't believe apply, was never raised when the parties discussed, you know, Judge McMahon's rules on ESI. And, you know, in general, we have offered with respect to the Argos video to investigate this topic, to provide information to

plaintiffs on this potential retention issue and figure out what happened here and whether there was a discovery obligation.

I think the issue that plaintiffs have is they're not just seeking information on this one issue that they've identified, they apparent now want deposition testimony on four different agencies' retention process, and that is what we are objecting to, Your Honor.

THE COURT: Okay, this is sort of a process issue. I'm not going to allow discovery about the discovery process unless there is some evidence of a loss and answers can't be gotten in some other way. But the defendants still need to have transparency on this, and if questions are asked about, you know, the collection process, answers should be given. On Argos, I think the defendants owe a sworn statement from somebody saying exactly what the retention process is where these documents are and so forth, so that should be provided in the next week.

Everything else, you know, we can't just start taking depositions about, you know, ESI sources and databases and types of data used and search capabilities. That's something that has to be, there has to be some level of appropriate action as officers of the court to provide

information and to fulfill your responsibilities to be forthcoming.

So at this point, and without prejudice, I'm denying the application for 30(b)(6) depositions on 4 and 5. The defendants should provide the sworn statement about Argos. I'm hoping that they'll forthcoming about other questions as appropriate, but at this point I'm not prepared to issue any orders on it. Any questions about my ruling, Ms. Biklen?

MS. BIKLEN: No questions, Your Honor, but if I could just clarify with respect to transparency. We would ask that that would include having someone with knowledge of the systems and the searches that were done so that when defendants provide this information to us, it is often the case that if we ask a follow-up question, then it's immediately we'll have to get back to you on it, and then we do not get that information. And so we would ask that in providing that it has to be from someone that ultimately has some kind of personal knowledge who can speak to that issue.

THE COURT: Well, I can't say that with respect to every issue and every call they have to someone with personal knowledge. I think if it's important enough, then that might be the appropriate thing to do. If you're

nearing a point where there's some critical database and the defendants, you know, simply can't answer the questions and they keep having to go back and forth, then they should have the person on the line, I agree. But I'm not going to issue some blanket ruling that whenever you have a discovery conference, people who are in charge of the systems have to be on the line. I'm hopeful that the parties will be reasonable in the future. If it doesn't happen, Ms. Biklen, you know how to reach me.

MS. BIKLEN: Thank you, Your Honor.

THE COURT: Any questions from the defendants on this?

MR. DiSENSO: Yes, Your Honor. I think it's important, and, of course, you know, as you mentioned, we understand, Your Honor, the necessity of transparency, particularly where ESI is involved. The only thing that I think we would like some clarification on is it's the level of detail that the plaintiffs are seeking. Certainly, we can tell them what has been searched for, what hasn't been searched for. I think there's no problem with that.

I think the concern that defendants have is where you draw the line and balance between transparency and Sedona Principle 6, that each party is, you know, in charge of its own search and production process and should be

allowed to do so without, you know, oversight by the requesting party. And I think that's where we have a concern that, you know, a lot of these questions as far as how databases are searched, you know, how information is gathered from the databases is of such a granular detail and is, you know, it just slows down the production, I'm sorry, the discovery process when we're constantly pressed to answer these questions in the level of detail, for example, that is in the, you know, topic number 5 of --

THE COURT: I agree. Topic 5 is beyond anything you should be expected to provide, whether by - some of it - whether by 30(b)(6) or otherwise. I don't know that I can give you the guidance that you need on this. I think you're going to have to continue having a dialogue, and if the plaintiffs feel you're not being sufficiently forthcoming, they're obviously are going to be the ones that come to me, and they'll have to have a good reason why. It can't just be because they don't trust you that you're doing it properly. So to the extent that's what Sedona number 6 is talking about, I agree with that principle.

It shouldn't be that they just want to find out every detail about how you're doing it. There has to be - and this is what normally happens in cases. When something

goes wrong, it's usually, you usually have ways of figuring it out beyond having grilled someone for hours in advance about how they plan to conduct their discovery process. So I agree that's not appropriate. I don't think I can give you any further guidance beyond what I've already said.

MR. DiSENSO: Thank you, Your Honor, that's helpful.

THE COURT: Anything else from the defendants?

MR. DiSENSO: No, Your Honor.

THE COURT: I got this letter Friday about Velikov, and maybe I can save the parties some time and just deal with it now. Is there some answer that can be given on when they're going to get this?

MS. WEISS: Your Honor, I apologize. I saw the ECF - this is Dara Weiss - I saw the ECF (indiscernible) with the letter. I did not have a chance to read it yet. I understand there is some discovery they requested from one of the line officer's depositions. But I don't have any details with respect to it. But I can, what I can say here, without knowing any details, is that I will certainly look into it, and if there is discovery that needs to be provided, we'll certainly request it and provide it as soon as possible.

THE COURT: Well, I --

(interposing)

THE COURT: I can tell you you didn't read the letter because it's something --

(interposing)

THE COURT: -- and it's just a question of when you're going to do it. So you'll answer in the normal course which would be tomorrow.

MS. WEISS: Yes.

THE COURT: And I was just trying to save you some trouble. But I'll get the letter tomorrow, I'll get the letter tomorrow. Okay, anything else? I know there's a few other little issues floating out there. One is the review of the CCRB IAB redactions. I know that's still out there. And I know the motion to quash is still out there. But is there anything else – and we're not going to deal with that here. Is there anything else that needs to be done from the plaintiffs' side?

MX. GREEN: Yes, Your Honor, this is Remy Green. You ordered defendants to make a choice between providing us with helmet index or responding within one day. We actually had to set up a meet and confer on that. They made a choice I think more than a week ago to provide us the helmet index, and we still don't have it.

THE COURT: They were going to provide it to two

attorneys?

MX. GREEN: Yes, or whatever it was they were going to do. Whatever it is was they were going to do with the helmet index, they agreed to do it, but still haven't done it for reasons I don't understand.

THE COURT: Ms. Weiss, what's the problem?

MS. WEISS: Unfortunately, I was not a party to that agreement. I don't know anything about that and would certainly not --

THE COURT: It's not --

(interposing)

THE COURT: Ms. Weiss, Ms. Weiss, it's not an agreement. It's an order I issue.

MS. WEISS: Okay, I apologize, Your Honor, I was not on the court conference where that order was made. I was not prepared to discuss it today. So I don't have --

THE COURT: That's okay --

MS. WEISS: -- a response.

THE COURT: You know, it wasn't a conference. It was a written order based on letters. I was trying to save some trouble by not having the conference. I'm obviously making a mistake by trusting you to just provide it by a date. I issued an order requiring you to make an election, and apparently you made the election to provide

this helmet index. I'm ordering you now to provide it by Wednesday, the 22nd. If there's some problem, you'll have to write me a letter.

MS. WEISS: Yes, Your Honor.

THE COURT: Okay, Mx. Green, anything else?

MX. GREEN: From my perspective no, but as you know, we speak in more than one voice.

THE COURT: Well, that's all I had on the agenda for today. So if we've covered our agenda items, then that's it. Anything else from the defendant?

MS. WEISS: No, Your Honor.

THE COURT: Okay, thank you everyone, good bye.

MX. GREEN: Thank you, Judge.

MS. BIKLEN: Thank you, Your Honor.

(Whereupon the matter is adjourned.)

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, In Re: New York Policing During Summer 2020 Demonstrations, docket #20cv8924, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature Carole Ludwig ____________________

Date: September 23, 2021