```
                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                          Docket #20cv8924

 IN RE NEW YORK CITY POLICING     :
 DURING SUMMER 2020 DEMONSTRATIONS
                                  : New York, New York
                                    September 20, 2021
-----------------------------------: TELEPHONE CONFERENCE


                    PROCEEDINGS BEFORE
         THE HONORABLE GABRIEL W. GORENSTEIN,
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Sow Plaintiffs:       COHEN & GREEN
                          BY:  REMY GREEN, ESQ.
                          1639 Centre Street, Suite 216
                          Ridgewood, New York 11385

For Payne Plaintiffs:     NEW YORK CIVIL LIBERTIES UNION
                          BY:  MOLLY BIKLEN, ESQ.
                          125 Broad Street, Suite 19
                          New York, New York 10004

For Sierra Plaintiffs:    RICKNER PLLC
                          BY:  ROB RICKNER, ESQ.
                          14 Wall Street, Suite 1603
                          New York, New York 10005

For Plaintiff People      NEW YORK STATE OFFICE OF
of the State of New       THE ATTORNEY GENERAL
York:                     BY:  SWATI PRAKASH, ESQ.
                          28 Liberty Street
                          New York, New York 10005




Transcription Service: Carole Ludwig, Transcription Services
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For Plaintiff Wood:        KAUFMAN LIEB LEBOWITZ & FRICK LLP
                           BY:  DOUGLAS LIEB, ESQ.
                           Ten East 40th Street, Suite 3307
                           New York, New York 10016

For Plaintiff Yates:       STOLL, GLICKMAN & BELLINA, LLP
                           BY:  ANDREW STOLL, ESQ.
                           300 Cadman Plaza West, 12th Floor
                           Brooklyn, New York 11201

For Defendants:            NEW YORK CITY LAW DEPARTMENT
                           BY:  ANTHONY DiSENSO, ESQ.
                                STEPHANIE BRESLOW, ESQ.
                                DARA WEISS, ESQ.
                           100 Church Street
                           New York, New York 10007

<u>INDEX</u>

## E X A M I N A T I O N S

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> | <u>Court</u> |
|---|---|---|---|---|---|
| None | | | | | |

## E X H I B I T S

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

1

```
 1                        PROCEEDINGS                4

 2            THE CLERK:  This is In Re New York City Policing

 3   During Summer 2020 Demonstrations, case number 20cv8924.

 4   Will counsel please state their appearances for the record,

 5   starting with plaintiff.

 6            MS. SWATI PRAKASH:  Good afternoon, this is Swati

 7   Prakash with the Office of the New York State Attorney

 8   General for plaintiffs People and the State of the New

 9   York.

10            MS. MOLLY BIKLEN:  And this is Molly Biklen of

11   the New York Civil Liberties Union Foundation for the Payne

12   plaintiffs.

13            MR. DOUGLAS LIEB:  Douglas Lieb for plaintiff

14   Charles Henry Wood.

15            MR. ROB RICKNER:   Rob Rickner, Rickner PLLC, for

16   the Sierra plaintiffs.

17            MX. REMY GREEN:  Remy Green, Cohen & Green, for

18   the Sow plaintiffs, and I'll be speaking on the ESI

19   communication issues.  For the reporter I should appear in

20   the transcript as Mx. Green, spelled M-X period rather than

21   Mr. or Ms.

22            MR. ANDREW STOLL:   Andrew Stoll, Stoll, Glickman

23   & Bellina, for Cameron Yates.  Good afternoon again.

24            THE COURT:   For defendant.

25            MR. ANTHONY DiSENSO:  Good afternoon, again, Your
```

1                        PROCEEDINGS                    5

2    Honor, this is Anthony DiSenso from the New York City Law

3    Department.  I'll be speaking on the ESI portion of the

4    conference.

5            MS. STEPHANIE BRESLOW:  Good afternoon, Your

6    Honor, this is Stephanie – sorry – this is Stephanie

7    Breslow from the City Law Department for defendants.

8            MS. DARA WEISS:   And Dara Weiss from the New

9    York City Law Department.

10           THE COURT:  Okay, we're going to do this over

11   again, and I should have started the other one by saying

12   that this is being recorded.  Any rebroadcast or recording

13   of this proceeding by any other party is not permitted.

14           We have two issues, one relating to ESI and the

15   other relating to a 30(b)(6) deposition.  As I said before,

16   I want to start with the ESI issue.  And I think there's

17   two aspects to it:  One is the timing and the other is the

18   methodology.  I know that the plaintiffs are a little bit

19   at a disadvantage because the defendants, you know, appears

20   that the most complete statement about what's going on just

21   happened on Friday, but let's see what we can accomplish

22   now.  So, Mx. Green, why don't you go ahead.

23           MX. GREEN:  Sure, Your Honor, and as you said

24   before, we reset.  I think the biggest problem, as far as

25   this goes, is that what's going on timing-wise is not even

```
 1                         PROCEEDINGS              6
```

2  nominally compliant with the Court's schedule.  You ordered

3  at docket 43 that the parties shall not require a deponent

4  to appear for a deposition after December 3.  All motions

5  have to be made 30 days before December 31, and 11 weeks

6  from September 27, which is when they said they would be at

7  the earliest they will complete production, is mid to late

8  December.  I'm sorry, it's just mid-December, it's December

9  13.

10            It's also not compliant with the schedule Judge

11  McMahon ordered.  At docket 40 she specifically said if

12  it's necessary to shorten periods for responding to

13  discovery in order to meet the deadline, that should be

14  done.

15            So I mean I think the biggest question we have

16  is, you know, how do we get this done, and I think zooming

17  out a little bit, it's a problem we've had throughout the

18  case.  I don't think that we are in a position to be

19  meeting the Court's schedule for any number of reasons.

20  You know, we bring as many issues as we can as quickly as

21  we can to the Court when we know that there are going to be

22  issues.  But it's just – we are rolling towards disaster I

23  think.  I don't know how to address it other than to say I

24  think what we care most about is timing, and, you know,

25  getting an expert opinion without emails is just not

```
1                              PROCEEDINGS                    7
2    possible, let alone taking the remaining depositions
3    without them.  So that's where I'll stop for now at least.
4              THE COURT:   All right, Mr. DiSenso or whoever's
5    speaking for defendants.
6              MR. DiSENSO:   Yes, Your Honor, this is Mr.
7    DiSenso.  As we said in our letter on Friday, we recognize
8    the significant challenges that our estimate for review and
9    production poses in this case.  I can say, you know, and
10   reiterate some of the points in the letter, that this is,
11   you know, we are anticipating and preparing for this to be
12   a very aggressive review schedule.  A review team of 20
13   people, which is what we currently estimate hiring, is a
14   very large team.  And we are trying to find a way to do
15   this as quickly and as efficiently as possible.  That's one
16   of the reasons why we're planning on leveraging both a
17   managed review team and the use of technology assisted
18   review.
19             As far as why it's going to take so long I think
20   is a factor of the number of custodians we have here.  We
21   have 50 custodians.  That is a huge number of people to
22   collect from.  And I realize that this is only for a fairly
23   short date range, but, you know, as you can see, 50
24   custodians still yielded over a million documents
25   collected.  And we have been working for the past few weeks
```

```
 1                          PROCEEDINGS                8
 2   to come up with a way to come up with a way to deal with
 3   that volume.
 4           THE COURT:   First of all, Mx. Green for some
 5   reason measured your 11 weeks from the 27th.  I measured it
 6   from the 17th.  What are you measuring it from?
 7           MX. GREEN:   Sorry, Your Honor, was that for me
 8   or Mr. DiSenso?
 9           THE COURT:   No, that's for Mr. DiSenso.
10           MR. DiSENSO:   Oh, I apologize, Your Honor.  That
11   would be from the date of the Court conference I believe.
12           THE COURT:   Meaning today.
13           MR. DiSENSO:   Yes, Your Honor.
14           THE COURT:   Okay.  And just so I understand,
15   these 20 attorneys are contract attorneys that you're
16   hiring specifically for this case?
17           MR. DiSENSO:   Yes.
18           THE COURT:   And your expectation is, you're
19   assuming that you're going to get down to 100,000
20   documents, is that what it is?
21           MR. DiSENSO:   That is our – it is – I will
22   emphasize this point that we believe – you know, it's very
23   hard to estimate a set number of documents when you're
24   using technology assisted review.  We go based on estimated
25   on our sampling.  We have a 95 percent confidence level,
```

PROCEEDINGS                    9

1

2  but there is a margin of error, but with a document set

3  this large that means that there can be some significant

4  variance in the number of documents we ultimately need to

5  review.  And for that reason we've tried to take that into

6  account as much as we can in estimating that 11-week

7  timeframe.  But it's --

8         (interposing)

9         MR. DiSENSO:  It's hard for me to give you a

10 number of documents we will ultimately end up reviewing.

11        THE COURT:  I mean we need to talk about the

12 timeframe.  You're hiring these people as contract

13 attorneys.  I certainly understand that you need to have

14 (indiscernible) again --

15        MR. DiSENSO:  Yes.

16        THE COURT:  -- and you need to have quality

17 control.  I mean it sounds like if I take 11 weeks times 40

18 hours times 20 attorneys, I get something like, let's see,

19 8800 hours of attorney time.  Did I do the math right?

20        MR. DiSENSO:  Apologies, Your Honor, I will take

21 --

22        THE COURT:  Some of the time is devoted, some of

23 the time is devoted to training, so I'm not saying you'll

24 use all that time.  So if it was a week of training or

25 whatever, it would be 10 weeks times 40 hours times 20

```
 1                          PROCEEDINGS                   10
```

2   attorneys would be 8,000 hours.

3          MR. DiSENSO:   I can provide a little bit more

4   detail in how that 11 weeks breaks down.  Again, we're

5   anticipating here and again this is a very aggressive

6   schedule, you know, hiring and training a review team

7   within one week.  And then we think that after that the

8   review will, the stages of the review will take

9   approximately seven weeks' worth of time for the review

10  team.  There are numbers after that including the fact that

11  we need to validate that the review was successful in

12  finding responsive documents.  That takes some additional

13  time.

14          We have some quality control that's not

15  necessarily related to the review team's review, you know,

16  coding documents correctly.  But related to the fact that

17  there may be coding conflicts, you know, for example, a

18  document responsive in privilege but, you know, without a

19  privilege call on it.  Given the volume, we estimate that

20  that would take an additional week.  There are also a

21  number of holidays in between now and December that we have

22  to account for in that.  And we also anticipate, and we're

23  factoring a time for actual production here, production

24  takes, you know, quite a bit of time when you're dealing

25  with this many documents.  It's just machine time and also

```
 1                         PROCEEDINGS                11
 2  QC time to make sure that the production was run correctly.
 3  We anticipate that that would take between one and two
 4  weeks.
 5           THE COURT:   Why does it take, why is that –
 6  what's involved in production, I don't understand?
 7           MR. DiSENSO:   When we run --
 8           THE COURT:   I'm assuming you're not printing
 9  this out.  You're, you know, applying – I don't know what
10  you're doing to it.  What does production mean?
11           MR. DiSENSO:   So under the agreed-upon format
12  what we're doing is we are applying – and we're actually
13  essentially creating TIFF images of all of the emails and
14  the attachments and also creating an extracted text file
15  for each one of the documents we've produced for Excel
16  spreadsheets we're producing natively, but they're like not
17  the original native but a version of the native.  We're
18  also producing various what are called DAT files which
19  allow basically the database to understand how to organize
20  and assemble document families and also provide metadata
21  associated with each of the documents.
22           You know, depending on the size, that can take
23  multiple days to actually generate that through just
24  machine time.  We always build in more time because after
25  we receive it, we have to run quality control on it to make
```

```
1                           PROCEEDINGS               12
2    sure that it was run correctly, and if it was not run
3    correctly, it will have to go through that process over
4    again.
5              THE COURT:   Mx. Green, did you have any – let's
6    put aside the time.  In terms of the methodology of being
7    used here, is there anything to be said now or is that for
8    another time?
9              MX. GREEN:   You know, Your Honor, I think, I
10   don't think any of this takes anywhere near as long as Mr.
11   DiSenso is suggesting.  I think in terms of the methodology
12   I have no idea if, assuming that they're going to contract
13   attorneys, I have no idea why the number is 20.  Right?  If
14   that's the biggest slowdown here, why aren't they hiring a
15   hundred attorneys?  The math doesn't quite work out for me
16   either, right, as you said it's 8800 attorney hours if you
17   run their calculation, and with the review population
18   they've suggested, that suggests that an attorney is only
19   getting through 25 documents in an hour.  Most people as a
20   rule of thumb use 100 documents per attorney per hour.  So
21   the math seems a little wrong.
22             THE COURT:   Well, just in fairness, I assumed
23   all 11 weeks were attorney review time, and I think they --
24             MX. GREEN:   Yeah, that's --
25             THE COURT:   -- made clear that that's not the
```

```
 1                        PROCEEDINGS                    13

 2   case.

 3            MX. GREEN:   Yeah.  I also, you know, it doesn't

 4   seem to me that there's any reason, as Mr. DiSenso

 5   suggests, that a rolling production should slow anything

 6   down.  After all, it's just machine time.  Right?  They put

 7   it on the machine, it produces, that shouldn't slow down

 8   the review.

 9            But I think, you know, the biggest objection we

10   have is, as many documents as, you know, half a million or

11   250,000 as the meaningful review population relative to,

12   you know, zero documents, relative to major cases it's

13   nothing.  Right?  Like a typical white collar investigation

14   has millions if not hundreds of millions of documents, and

15   firms get through those on much more aggressive schedules

16   than this regularly every day.  And it's, you know, the

17   idea of getting through a quarter of a million documents

18   takes, it's taken them, you know, two months since we

19   agreed on a protocol plus another three months is just,

20   it's absurd.

21            And so on the methodology I think they've made a

22   choice to say 20 attorneys.  I don't know why they've made

23   that choice.  And that's probably the biggest objection we

24   had.

25            THE COURT:   Well, okay, so there's two issues,
```

1                          PROCEEDINGS                   14

2   Mr. DiSenso.  One is I'm not sure that you're the right

3   person to address it which is why it took until now to get

4   to this point.  But the second one is why 20 attorneys and

5   why not double that and then that would significantly

6   shorten the time.

7              MR. DiSENSO:   The reason for 20 attorneys, and I

8   will say, reiterate my earlier point, which is that 20

9   attorneys is a very aggressive number of document

10  reviewers.  It is because we need to balance the number of

11  documents reviewed per day against what the case team can

12  QC.  And, you know, as it stands right now, this is

13  aggressive not because of the number of attorneys we're

14  necessarily hiring, it's aggressive because of the burden

15  that it puts on the case team on a daily basis to review

16  the work of those attorneys.

17             I must say we have to do that especially where

18  we're leveraging technology assisted review because it's

19  important for us and for the review process to ensure that

20  the reviewers are coding documents correctly.  We don't

21  want to be in a position where we're not doing adequate QC

22  because we have a hundred reviewers going at once, and then

23  we discover down the line that, you know, they're, they

24  missed a whole bunch of documents that should've been coded

25  responsive.  So that's the reason why we are, you know,

1                              PROCEEDINGS                        15

2   proposing 20 attorneys or at least thinking about 20

3   attorneys now.

4           If I may, Your Honor, just to address another

5   point that was raised, as far as rolling productions go,

6   the reason why that could slow things down is because it's

7   not just a factor of sending a production to the vendor and

8   to have it run, and it's just not machine time.  There's a

9   number of steps which I outlined in my initial breakdown

10  that go into readying a production set.  So that includes,

11  you know, coding, QC, cleanup.  That includes cleanup and

12  QC of the production process.  It also necessitates that we

13  take resources away from QC-ing in order to deal with those

14  coding QC issues.  Based on how the review is set up, it

15  may require us to kind of pause the review while we ready a

16  production set.  So that's kind of where that thinking

17  comes from, and it is based on our past experience with

18  similar models.

19          THE COURT:   How many attorneys in the law

20  department are doing this quality review you're talking

21  about?

22          MR. DiSENSO:   You know, I think that's still

23  being determined, but it is I believe four is what we

24  anticipate.

25          MS. WEISS:   Your Honor, if I may, this is Dara

```
 1                        PROCEEDINGS              16
 2   Weiss.  We have four as of now and we're working on getting
 3   a fifth.  And I just want to add this is work that is going
 4   to be done in the evenings after hours.  This is work that
 5   is going to be QC'd after the review team has done their
 6   work for the day, so these attorneys then have to log on at
 7   night to review their work.
 8            THE COURT:  I mean I guess that's admirable, but
 9   couldn't they log on the first thing the next morning and
10   have essentially, you know, why does it have to be done at
11   night?
12            MS. WEISS:  Well, then it would have to be done
13   before the review team starts their work at, I don't know,
14   Anthony, whatever time the team starts work --
15            THE COURT:  Oh, I see, you're giving them
16   directions that would apply instantaneously, is that the
17   point?
18            MR. DiSENSO:  That's correct, Your Honor, and
19   that's very important, especially where, at the beginning
20   of a review and when we're using technology assisted review
21   because we want to catch at the earliest part, point
22   possible any confusion with what is relevant and make sure
23   it's corrected so that we don't have to review large
24   portions of the review.
25            MX. GREEN:  Your Honor, if I may, a lot of this
```

```
 1                           PROCEEDINGS                    17
 2  seems like, you know, perfect world type stuff.  I am a
 3  little baffled by the use of technology assisted review
 4  here.  This just isn't, I don't think the volume of
 5  documents where that pays off.  It really – and I also find
 6  it kind of shocking the number of attorneys who are able to
 7  QC even after the Court has, I think, repeatedly told
 8  defendants they need to staff the case more robustly.
 9          But it's, you know, I think that the answer to
10  your question is obviously people should just be doing it
11  during the day, and, yes, you usually have to redo the
12  first part of a review, that's kind of normal in big
13  document reviews.  But, you know, I don't think attorneys
14  working in the evening should be the hurdle here.
15          THE COURT:  Well, I don't think it's being
16  presented as a hurdle.  Maybe you feel the number is a
17  hurdle.  I'm not sure that having five attorneys do this
18  from the law department and 20 attorneys contracted is out
19  of line with what might be expected in terms of staffing.
20  I think it's unfortunate we've gotten to this point because
21  I think we could have moved a lot quicker.  I don't want to
22  start assigning blame as to how we got there.
23          But here's where I think we should be right now.
24  I've consulted with Judge McMahon about this, and I'm
25  authorized to provide an appropriate extension of the
```

1                          PROCEEDINGS                    18

2   various deadlines so that we can make sure this happens.

3   I'm not sure I want to just announce right now and say what

4   that is.  I think it's been a big hiccup between the

5   parties because I don't think there's no way to start, you

6   know, when one side says, oh, I should order it produced

7   next week and the other side says not for 11 weeks, it

8   leaves no room for compromise.  I understand from the

9   plaintiffs' point of view, because they need it, you know,

10  pretty soon if they're going to do all the things that they

11  need to accomplish by the end of December.  I'm not sure

12  they would need it in one week, but they, you know, need it

13  in a matter of just a few weeks at most.

14          So if I can loosen that stricture, and I said I

15  will loosen that stricture, what I think I want to have

16  happen is I would like to have a more serious discussion

17  between the parties to talk about a realistic deadline for

18  the ESI that would allow for the remaining tasks, being the

19  experts and, you know, discovery of key individuals who

20  might be implicated by the ESI, to have that happen after

21  it would get produced.

22          It's really important that the Law Department be

23  forthcoming about what they're doing and how they're doing

24  it because I don't want to have a situation where you make

25  some decision early on about relevance or something else

```
1                         PROCEEDINGS                   19
```

2  and about how TAR algorithm needs to be pointed, and then

3  it turn out that you made some decision that I later found

4  out was unreasonable and we've lost tons of time because of

5  that.

6           So knowing that we can do something on the

7  timing, and that would apply obviously to the expert report

8  and the class certification, I feel like that that should

9  be an impetus to, if not coming to an agreement, at least

10 someone giving me a more realistic proposal from the

11 plaintiffs' side if they can't come to agreement with the

12 defendant about what can be done and what should be done.

13 I'm not sure I buy the idea that 20 attorney is the wrong

14 number, and, you know, depending upon a lot of other

15 factors here, but it's really all dependent on the City

16 being very forthcoming with the plaintiffs as to how

17 they're doing this, how they're staffing it, and what

18 decisions should be made.  I shouldn't have to issue orders

19 telling the City to provide this information.  The City

20 should be very forthcoming about this.

21           So having said this, Mx. Green, I think you can

22 read that I don't want to pick that date now.  I suppose

23 I'm open to a request to do that, but tell me if you have

24 some thoughts having heard what I said.

25           MX. GREEN:  Yes, Your Honor.  I think, you know,

1

2  it's hard to say what we need without knowing what

3  extension we're going to get, but I understand exactly why

4  you might not want to tell us right now.  And certainly I

5  am happy to go discuss something that is a little less than

6  a week from the conference, especially given that, you

7  know, rather than – when we wrote that, I think we had in

8  mind that they might try to get ahead of it by starting

9  review while the motion was pending.  But, of course, we're

10 willing to go and talk about it.

11         I think one – a couple of things that will help

12 us address this, in a meet and confer we've had today and a

13 number of meet and confers we had last week, you know,

14 whenever we ask for basic information about how the City is

15 searching for things and that sort of thing, they've

16 started saying that we don't think it's appropriate for

17 them to be discussing it with us.  And they say, you know,

18 that's discovery on discovery and wildly inappropriate, and

19 they shut down.  And obviously that isn't going to work.

20         I think the right thing to do might be for

21 defendants to provide status letters that they file on the

22 docket, and that way, you know, we can all make sure that

23 things are going the right way, and we don't have to

24 necessarily, you know, fight with them about what's

25 confidential because they've been designating staffing as

1                          PROCEEDINGS                    21

2    confidential every time they tell us about it.

3              THE COURT:   All right, who's going to speak – I

4    normally have one attorney per issue, but I understand I'm

5    now raising things beyond just mere ESI technicalities.  So

6    whoever wants to speak from the Law Department.

7              MS. WEISS:   Yes, Your Honor, this is Dara Weiss.

8    I strongly disagree with any thought of providing status

9    letters, especially filed on the docket.  A lot of what

10   ends of taking the time of the attorneys for the defendant

11   is things like writing letters and participating in meet

12   and confers and responding to letters that plaintiffs

13   write, and that takes us away from the tasks of providing

14   the discovery and getting them the information that they

15   need.

16             And what we were opposed to in the meet and

17   confers that Mx. Green spoke about before was not providing

18   statuses of where we are in discovery but providing details

19   of exactly what our clients have done in the process of

20   searching for certain documents which is what defendants

21   think is inappropriate.  But a matter of providing

22   plaintiffs with the status of where we are in searches and

23   how long we think it might take us to provide them with

24   things such as these emails that we're searching for now or

25   plaintiffs pointed out that there appear to be some

PROCEEDINGS                           22

1

2    documents that weren't provided, you know, providing the

3    status of looking for those documents or status of finding

4    and naming proper 30(b)(6) witnesses and where we are in

5    the process of getting that done, that's absolutely fine.

6    We have no problem with providing that information to

7    plaintiffs.

8            But things like filing status reports on the

9    docket I think is unnecessary and inappropriate.

10           THE COURT:   Filing on the docket is not my

11   issue.  What's important, particularly for the ESI process,

12   you know, 30(b)(6) is its own thing, but for the ESI

13   process this has to be transparent.  They have to, and

14   maybe you want to develop a template when you finally

15   figure out the precise process as to how many documents got

16   reviewed or whatever it is.  That is easily filled in.  I

17   assume you're going to keep track of this yourself in some

18   way.  I'm not trying to burden you.  But the ESI process in

19   particular is a break from the way things were done in the

20   past when people just presented documents after they've

21   done a search.  The plaintiffs have to be part of that

22   process and have to understand when choices get made that

23   might affect them and also might affect the timing,

24   particularly given that we're in a crunch when it comes to

25   timing.

```
1                        PROCEEDINGS                    23
```

2           So I'm not going to require it to be filed on the

3    docket, but I almost think it would be better for you to

4    have a template, you know, for the ESI process that you do

5    once a week.  I think it might spare you questions.  I

6    don't want to start ordering — the only thing I'm going to

7    order is what I already did which is that you have to be

8    completely forthcoming on this.  This is a way to avoid

9    discovery on discovery.  This is not discovery on

10   discovery.  Attorneys telling the other side about the ESI

11   process is normal.  And if you end up not being forthcoming

12   about it, then I might have to order discovery on discovery

13   which I think would be a disaster for you.  So this is a

14   way to forestall that.

15           So, Ms. Weiss, having said that, is there a

16   reaction?

17           MS. WEISS:   That sounds reasonable and easier

18   for both sides.  I have to admit that I am by far not an

19   expert on the e-discovery process in this office, so I

20   don't know how it's usually done in the usual scope of a

21   litigation, but that is why we have an e-discovery team.

22   So I will certainly work with them to make sure that this

23   office is transparent in the rest of the e-discovery and

24   email collection and production process.

25           MR. DiSENSO:   Your Honor --

50

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, In Re: New York

Policing During Summer 2020 Demonstrations, docket

#20cv8924, was prepared using PC-based transcription

software and is a true and accurate record of the

proceedings.

Signature _____*Carole Ludwig*_____

Date:   September 23, 2021