```
         J1VsBROc

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF NEW YORK
2        ------------------------------x

3        KAREN BROWN, et al.,

4                       Plaintiffs,

5                  v.                               15 Civ. 4091 (PKC)

6        CITY OF NEW YORK, et al.,

7                       Defendants.

8        ------------------------------x
                                                    New York, N.Y.
9                                                   January 31, 2019
                                                    11:15 a.m.
10
         Before:
11
                            HON. P. KEVIN CASTEL,
12
                                                    District Judge
13
                                  APPEARANCES
14
         BERNSTEIN CLARKE & MOSKOVITZ PLLC
15            Attorneys for Plaintiffs
         BY:  JOSHUA S. MOSKOVITZ
16            -and-
         LEVENTHAL LAW GROUP, P.C.
17            Attorneys for Plaintiffs
         BY:  JASON L. LEVENTHAL
18
         NEW YORK CITY LAW DEPARTMENT
19            Attorneys for Defendants
         BY:  ANGHARAD WILSON
20            QUANA SMITH-WILLIAMS

21

22

23

24

25
```

1              (Case called)
2              MR. MOSKOVITZ:  Good morning, your Honor.  Joshua
3     Moskovitz with Bernstein Clarke Moskovitz for the plaintiff.
4              THE COURT:  Good morning.
5              MR. LEVENTHAL:  Good morning, your Honor.  Jason
6     Leventhal for the plaintiff.
7              THE COURT:  Good morning, Mr. Leventhal,
8     Mr. Moskovitz.
9              For the defendants?
10             MS. WILSON:  Angharad Wilson from the New York City
11    Law Department.
12             MS. SMITH-WILLIAMS:  Quana Smith-Williams.
13             Good morning, your Honor.
14             THE COURT:  Good morning to you.
15             This is an unusual situation, a distressing situation
16    to say the least.  As I'm advised, the City took the position
17    that it couldn't locate recordings of officers' contemporaneous
18    radio communications at the scene of Mr. Williams' arrest and
19    asserted that they had been destroyed.
20             I ordered the filing of an affidavit as to the
21    circumstances of the destruction, and thereafter the City
22    advised that they had located 140 pages of documents, the audio
23    recording, some video recordings, and I'm advised that they
24    were produced.
25             I would like to hear from the City of New York why

1   they were not produced and why the claim was made they were
2   destroyed when they were not, in fact, destroyed.
3            MS. WILSON:  Your Honor, as to the audio recordings,
4   the audio recordings had originally been requested at the
5   inception of this case from NYPD.
6            THE COURT:  Lets not use the passive voice.
7            Who requested?
8            MS. WILSON:  Our office did.  I did so.
9            THE COURT:  You requested them from whom?
10           MS. WILSON:  The police department.  However, they had
11  been -- the copy in the E-911 system had been deleted according
12  to the then in existence 180-day dilution policy at the time
13  that I requested them.  It was my understanding based on that
14  that they had --
15           THE COURT:  Let me pause.
16           Was it that more than 180 days had expired, therefore,
17  the assumption was they were destroyed, or was an actual check
18  made to see whether they were destroyed?
19           MS. WILSON:  Well, the information that I received
20  back was that they had been deleted in accordance with the
21  180-day dilution policy.
22           THE COURT:  OK.  What, if anything, did you know about
23  the Transit Bureau's Investigation Unit's activity in this
24  case?
25           Did you know there was a Transit Bureau Investigation

1  Unit looking into the death of Mr. Williams?

2  MS. WILSON:  In the unusual occurrence report in this
3  matter, your Honor, there lists a number of people from the
4  Transit Bureau Investigation Unit, in addition to a number of
5  individuals from the Internal Affairs Bureau.  We were aware of
6  the Internal Affairs Bureau's investigation into this matter
7  and produced the IAB investigative file as part of defendants'
8  initial disclosures in September of 2015.  However, I was
9  unaware of the fact that there was a separate Transit Bureau
10  Investigation Unit file.

11  THE COURT:  Well, just so that we're clear here, if I
12  understand where the plaintiff is in this, this is not an issue
13  at the moment about you, Ms. Wilson, it is about your clients,
14  including your client, the City of New York.  That's as I read
15  this.

16  Your client obviously knew about the Transit Bureau
17  Investigation Unit's inquiry into the circumstances surrounding
18  Mr. Williams' death, I assume.

19  MS. WILSON:  I believe that that is correct, your
20  Honor, but I was unaware of that and I apologize for that.

21  THE COURT:  Well, if what we were talking about here
22  was solely your conduct, that would be one thing.  But now the
23  knowledge of this investigation, I assume, extended to the
24  individual defendants in this lawsuit.  No?

25  MS. WILSON:  No, your Honor.

1  THE COURT:  So they did not know, they were not
2  questioned by this investigative unit, correct?
3  MS. WILSON:  That's correct, your Honor.
4  Well, let me amend that statement.  So the
5  individuals, the individual defendants, were given GO-15s
6  a number of months after.
7  THE COURT:  I don't know what a GO-15 is, please.
8  MS. WILSON:  Were interviewed by the Internal Affairs
9  Bureau a number of months after this incident.  Their direct
10 supervisor, Sergeant Facetti, was interviewed on the date of
11 the incident, and one of the people present at that interview
12 was an individual from the Transit Investigation Bureau.  That
13 is in addition to the IAB investigator who conducted the
14 interview and a number of other individuals from the police
15 department who were present at that interview.
16 THE COURT:  All right.  Let me work this from the
17 other end of the telescope.
18 How did you become aware that there was a Transit
19 Bureau Unit investigating the death of Mr. Williams?
20 MS. WILSON:  We became aware of it when, in the course
21 of doing our due diligence prior to preparing the affidavit for
22 the audio, regarding the audio recordings.  We endeavored to
23 find out if there were any other locations within the NYPD
24 where such a recording might have been kept in a hard copy.
25 In doing so, we became aware of the fact that Transit

1  had, in fact, that the Transit Bureau Investigations Unit had,
2  in fact, conducted an investigation that was in a file that was
3  separate from the Internal Bureau Affairs file.
4         THE COURT:  Lets stop right there and lets get a
5  little bit more specific.
6         Who is we and how did we become aware?
7         You haven't told me.  I mean, humans act in a certain
8  manner.  A person picks up a phone or visits or e-mails another
9  human being, typically, and asks a question and then gets a
10 response.
11        Could you tell me what happened in those simple terms?
12        MS. WILSON:  We --
13        THE COURT:  Who is we?
14        MS. WILSON:  The law department.
15        THE COURT:  A department can't communicate as a
16 department.  Humans in the department can communicate.
17        Who did what?
18        MS. WILSON:  Myself and my supervisor, Ms. Williams,
19 inquired of the NYPD Legal Bureau.
20        THE COURT:  Of whom?
21        Who did you inquire of?
22        MS. SMITH-WILLIAMS:  Your Honor, if I may?
23        THE COURT:  Yes.
24        MS. SMITH-WILLIAMS:  After receiving your Honor's
25 order to provide an affidavit as to the destruction of the

1  radio communications, Ms. Wilson and myself contacted the Legal
2  Bureau, Elizabeth Dates, who is the director there, as well as
3  a Lieutenant Robert Corbett, who is, I believe, one of the
4  managing attorneys in the department, to advise them of the
5  need to prepare an affidavit reflecting the fact that the radio
6  communications had been deleted pursuant to the automatic
7  180-day deletion policy.
8          In the course of the NYPD looking for the individual
9  to confirm that affidavit, someone in their tapes and
10  communications department to confirm that it was, in fact,
11  deleted within the course of the normal automatic retention
12  policy, they also asked to look at the 49 prepared by IAB,
13  which indicated the individuals who would have been involved in
14  the initial investigation.
15         In doing that, they did notice -- this is Ms. Dates --
16  did notice that there was an indication of a Transit Bureau
17  Investigation Unit file.  It is not really an investigation.
18  They didn't investigate this incident, IAB investigates.  But
19  in any event, there was a notation that the Transit Bureau
20  Investigation Unit had been involved.
21         In contacting the Transit Bureau Investigation, they
22  looked within their files and confirmed that they did, in fact,
23  have a hard copy of the file that was prepared at the time of
24  their initial inquiry into what had happened to Mr. Williams.
25         At that point, the file was copied, it was produced to

us, and I believe the hard copies of the handwritten notes in the file, as well as other documentation, was provided to plaintiffs, as well as the radio communication. In that file there was also some notation of additional video of the platform where this incident also occurred, and my understanding from Ms. Wilson is that those tapes were either produced to plaintiffs today or will be produced to plaintiffs today. But that is how we ended up here, your Honor.

        THE COURT: Thank you.

        An aspect of this that is particularly troubling to a judge presiding, as I do, over cases in which the City of New York is a defendant is this. Those representing the defendants in this case, the lawyers representing the defendants in this case, were either advised, asked, of course, first is a request for production of documents, of course. But then when the audio recording is not produced, an inquiry is made of opposing counsel by plaintiff's counsel.

        Plaintiff's counsel makes an inquiry of defendants' counsel, as I understand in this case, where is the recording, and I'm advised that they are told initially it can't be found. But after further pressing, they are told that it's been destroyed.

        Only when a federal judge is asked to intervene and orders the production of an affidavit describing the circumstances of the destruction does a further inquiry get

made to find out if this is really the case.  That further inquiry leads to the discovery of that very audio recording and other documents.

That scenario would lead a reasonably prudent district court judge to require such affidavits on a more frequent basis when claims are made that something doesn't exist because, left to their own devices, the hard-working lawyers of the Corporation Counsel and the hard-working people in the Legal Affairs Bureau can't come up with accurate information.

That's what happens as a result of an incident like this.  And even my ordering the declaration and affidavit in this case is based on experience in other cases.  This was an appropriate case to ask for it.  But I now wonder whether there aren't a ton more cases.  Because it is only when someone from the Legal Affairs Bureau or some person within the NYPD is going to have to put their name on a declaration and under penalty of perjury, and if they are lying, they can go to jail and lose their job, that we get accurate information.

This is a problem.  The extent to which this is a Corporation Counsel problem or a Legal Affairs Bureau problem or a file within the police department problem, I don't know.  But the information was knowable because it became known and it became known because of a judge's order.

I came to this job with a viewpoint that that is a needless burden to put on an officer of the court.  If they say

they've made a diligent inquiry, accept it at face value.  I was a practicing lawyer for 26 years and was in this situation of having to talk to clients and get representations, but this apparently didn't work, just relying on the diligence of counsel.

Again, I get it that Corporation Counsel is frustrated too.  I would imagine so.  But I'm running a court, I'm presiding over litigation, and this is a problem.

Now, questions of sanctions against the city remain in this case.  That I can tend to at my leisure.  There can be a motion down the road.  There can be responsive briefing.  There may be an evidentiary hearing.  But I'm not holding up this case for that.  I can do that before trial.  I can do that after trial.  I can do that at any time convenient.

But right now there is a claim by Karen Brown, as administratrix of the estate of Mr. Williams, against individuals.  I want to make sure that that is the priority here, and not chasing around those who deserve to be sanctioned.  We'll get to that.  We'll get to that.

Now, let me turn to the plaintiffs' counsel first.

Do you happen to know who Dr. Joseph Simm is, who is referred to in Exhibit 2?

MR. LEVENTHAL:  Judge, the medical records indicate he was the emergency room doctor who declared Mr. Williams deceased in Lincoln Hospital.

1            THE COURT:  All right.  Did you take his deposition in
2   this case?
3            MR. LEVENTHAL:  We did not.
4            THE COURT:  All right.  Is part of your request to
5   take his deposition?
6            MR. LEVENTHAL:  No, your Honor.
7            THE COURT:  All right.  Then what, if anything, do you
8   want to do with regard to the information in Exhibit 2?
9            MR. LEVENTHAL:  Judge, we would like to know the
10  author of that note and depose that person.
11           THE COURT:  All right.  That sounds reasonable.
12           Any objection to that, Ms. Wilson?
13           MS. WILSON:  No objection, your Honor.
14           THE COURT:  OK.  We will talk about the timing of
15  that.
16           Now, it sounds from the description in your letter
17  that there is material in the 140 pages and what you've
18  received so far, and I gather there is more coming.
19           There are two video disks, is that correct?
20           MR. MOSKOVITZ:  Your Honor, we were handed three video
21  disks before the conference.  In addition --
22           THE COURT:  When you say before the conference, when
23  before the conference?
24           MR. MOSKOVITZ:  In the hallway.
25           THE COURT:  So you haven't seen them yet?

1    MR. MOSKOVITZ:  I have not seen them yet, your Honor.

2    THE COURT:  Is there more coming you're told?

3    MR. MOSKOVITZ:  I believe that is all of them.

4    THE COURT:  Ms. Wilson, is there anything more coming?

5    MS. WILSON:  There is nothing else coming, your Honor.

6    THE COURT:  All right.  Go ahead.

7    MR. MOSKOVITZ:  There was also something we received

8    just late last night, which is an additional investigation file

9    from an entirely new community that we've never seen before.

10   THE COURT:  What unit is this?

11   MR. MOSKOVITZ:  From the 44th Precinct Detective

12   Squad, your Honor, which contains interviews contemporaneous in

13   the EMS personnel by a detective of whose name we've never seen

14   before in this case, and we would request to obviously have any

15   notes that that detective made, memo book entries, activity log

16   entries, and take that officer's deposition.

17   THE COURT:  Any objection?

18   MS. WILSON:  No objection, your Honor.

19   THE COURT:  In terms of the briefing on the summary

20   judgment motion, plaintiff has filed its motion for partial

21   summary judgment.  The defendants have responded and moved for

22   summary judgment.

23   What remains in the briefing on summary judgment?

24   I know it is not completed.

25   MR. LEVENTHAL:  Judge, plaintiff's opposition and

1  reply are presently due Tuesday, February 5.

2  THE COURT: OK. It is your opposition to their motion
3  and your reply on your motion?

4  MR. LEVENTHAL: Yes.

5  THE COURT: All right. I am going to stay that.

6  What I'm going to do is set a limited 45-day period
7  for discovery relating to the newly produced materials. I
8  would point out to the plaintiffs that if there are helpful
9  things in the materials produced, things that contradict sworn
10 testimony of defendants' witnesses, you may use them on either
11 your motion or an opposition to the City's motion, the
12 defendants' motions. Just use them. You don't actually have
13 to call in a witness and say, You told me X. I now have
14 evidence that the truth was Y. You just come right in with
15 what you have and that works just fine.

16 So I'm not so sure you need to redepose somebody,
17 because now you have evidence that flatly contradicts it. This
18 is something you'll be able to use presumably, unless there is
19 some evidentiary foundation that can't be resolved by a
20 stipulation, in which event that is fine.

21 This is a 45-day period that should be used
22 efficiently because my goal here is to try and find out if this
23 case should be resolved in whole or in part by summary judgment
24 or is this a matter for the jury. If it is a matter for the
25 jury, I want to get it on a path to a jury trial.

1  What I propose to do is have the 45-day period, and
2  that will end March 15. I'll give the plaintiffs until April 3
3  to put in their supplemental or their opposition and their
4  reply. We'll see where we are at that point. But my present
5  intent would be to set this case down for oral argument, and
6  whether it is a grant or denial of summary judgment, the
7  standards are reasonably clear and well plowed in this area of
8  the law, and with work on my part and my law clerk's part and
9  work on your part, we may be able to get some of this resolved
10  at a motions hearing. Then we'll know whether we are headed
11  forward a trial.
12  I can set a date for final pretrial submissions and
13  trial, and as I've said to you, the question of what are the
14  consequences of this kerfuffle is something that remains, but
15  is of a different order of priority than getting the claim
16  resolved.
17  Anything further from the plaintiff?
18  MR. LEVENTHAL: Your Honor, in the 45-day discovery
19  period, will we be able to depose the officers who we now hear
20  on the radio runs and allow them to listen to their voices and
21  question them just specifically on that part of the incident?
22  THE COURT: Why do you need that?
23  I read that in your letter. That is what prompted my
24  earlier comments.
25  MR. LEVENTHAL: Well, Judge, certainly we could

imagine the officers answering our questions and not being very helpful on summary judgment, but those answers are answers that we would need and like prior to trial.

      There is a possibility that listening to those recordings, refreshing their recollection as to the timing of the --

      THE COURT:  This is two officers?

      MR. LEVENTHAL:  It sounds like two officers, yes.

      THE COURT:  All right.  You can take their continued deposition for two hours.

      Now, when I say two hours, all you need to do is show me that somebody on the other side was trying to play beat the clock by gamesmanship, and we'll have a third round at depositions and they can go on.  I'll give you seven hours then.

      It behooves everyone involved to be efficient. Efficient is in everybody's best interest.  But when I set a time limit, it is not an invitation for gamesmanship on either side.

      MR. LEVENTHAL:  Thank you, your Honor.

      Secondly, if there are any disputes during this 45-day period, should we bring them to your Honor or should we bring them to Judge Gorenstein?

      THE COURT:  Regrettably, my answer for the moment is me.

```
1                MR. LEVENTHAL:  Thank you, Judge.
2                THE COURT:  That may be regrettable for all of you as
3    well, but that is what I am going to do.
4                Ms. Wilson?
5                MS. WILSON:  Your Honor, I would just ask that you
6    order a date for defendants' reply brief to be due.
7                THE COURT:  I thought I did.
8                Didn't I say April 3?
9                MS. WILSON:  No.  That is for plaintiff's reply to
10   their motion and their opposition to defendants' motion.
11               THE COURT:  Their opposition to your motion and their
12   reply.
13               MS. WILSON:  On their motion.
14               THE COURT:  What are you asking me to set then?
15               MS. WILSON:  A date for the reply on defendants'
16   motion.
17               THE COURT:  That's easy enough.  Delighted.
18               April 17.
19               MS. WILSON:  Thank you, your Honor.
20               THE COURT:  Anything further?
21               MR. LEVENTHAL:  No, your Honor.  Thank you.
22               THE COURT:  Anything further?
23               MS. WILSON:  Nothing further.  Thank you.
24               THE COURT:  Thank you all very much.
25               (Adjourned)
```