UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In Re: New York City Policing During Summer     :     OPINION & ORDER
2020 Demonstrations                                              20 Civ. 8924 (CM) (GWG)
                                                                  :
------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

      The plaintiffs in these consolidated cases allege that the City of New York ("the City"),

the New York City Police Department ("NYPD"), and certain individuals employed by the City

violated the plaintiffs' constitutional rights during protests held beginning in May 2020.  Plaintiff

People of the State of New York, represented by the New York State Office of the Attorney

General ("OAG"), named Dr. Edward R. Maguire as an expert witness.  In response, the City has

moved to disqualify Dr. Maguire.[1]  For the reasons that follow, the City's motion is granted.

---

[1]  Motion to Disqualify Plaintiffs' Expert, filed Nov. 4, 2021 (Docket # 312); Memorandum of Law in Support, filed Nov. 4, 2021 (Docket # 313) ("Def. Mem."); Declaration of Gavin B. Mackie in Support, filed Nov. 4, 2021 (Docket # 313-1) ("Mackie Decl."); Exhibit A to Mackie Decl., filed Nov. 4, 2021 (Docket # 313-1) ("OCC Report");  Exhibit B to Mackie Decl., filed Nov. 4, 2021 (Docket # 313-1) ("Executive Order No. 58"); Declaration of Elissa B. Jacobs in Support, filed Nov. 4, 2021 (Docket # 313-2); Consultant Non-Disclosure Agreement, filed Nov. 4, 2021 (Docket # 313-3) ("NDA"); Memorandum in Opposition, filed Nov. 22, 2021 (Docket # 321) ("Pl. Mem."); Declaration of Dr. Edward Maguire in Opposition, filed Nov. 22, 2021 (Docket # 322) ("Maguire Decl."); Exhibit A to Maguire Decl., filed Nov. 22, 2021 (Docket # 322-1) ("Maguire CV"); Declaration of Lillian M. Marquez in Opposition, filed Nov. 22, 2021 (Docket # 323) ("Marquez Decl."); Reply Memorandum of Law, filed Dec. 3, 2021 (Docket # 328).

      Although the motion to disqualify is purportedly made by the "defendants," only the City of New York (or its employees sued in their official capacities) have an interest in raising the deliberative process privilege, which is the basis for this motion.  Thus, we refer to the movant in this case as "the City."

I.      BACKGROUND

        A.      The OCC Report

On May 25, 2020, a Minneapolis Police Department officer murdered George Floyd, an individual who had been placed under arrest.  See OCC Report at 1, 18.  Nationwide protests followed, including in New York City, where "the volume and geographic spread of [the demonstrations] were unprecedented."  Id. at 1-2.  Some protests "involved intense verbal and physical conflict between protesters and police.  Scores of protesters and police suffered injuries, with many requiring hospital treatment."  Id. at 1.

On June 20, 2020, New York City Mayor Bill de Blasio issued Executive Order No. 58, which required the Commissioner of the New York City Department of Investigation ("DOI") and the New York City Law Department Office of Corporation Counsel ("OCC") to conduct reviews of the NYPD's response to these protests.  See Executive Order No. 58 § 1(a).  DOI was tasked with conducting "a review and evaluation of the NYPD's planning and response to the protests" and making "factual findings about relevant events during the protests after conducting an objective review of statements from NYPD officers and the public as well as any other evidence in the City's possession."  Id. § 1(c).  OCC was to conduct "a separate analysis . . . of factors that may have impacted the events at protests."  Id. (the "OCC Review").  OCC's role was not to "reach[] specific factual determinations" but to "understand[] events, look[] at the circumstances around those events, and develop[] recommendations going forward."  OCC Report at 6.

In December 2020, OCC issued its 53-page report, entitled "Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the

George Floyd Protests in New York City."  The OCC Report concluded that the COVID-19 pandemic, the nature and context of the protests, as well as shortcomings with NYPD's officer training and preparation for mass demonstrations "contributed to the intensity of the protests." Id. at 1-2, 9-46.  The OCC Report offered ten policy recommendations to improve "Department Readiness," "Officer Preparedness," and "Interagency Coordination."  Id. at 50-53.

      B.    OCC's Retention of Dr. Maguire

To prepare the OCC Report, OCC used a special team of Assistant Corporation Counsels (the "Review Team") — walled off from OCC attorneys litigating protest-related matters — to review a "broad range of materials."  Id. at 1.  The team spoke with NYPD officers and reviewed a multitude of sources, including NYPD documents.  See id.  OCC also "engaged and consulted with third-party subject matter experts of national standing to provide input in four distinct areas: (a) policing protests; (b) management of high-impact events from the perspective of senior managers; (c) crisis response from the perspective of officers; and (d) organizational behavior." Id. at 1, 8-9; see also Mackie Decl. ¶ 7.  There were only two individual experts consulted, one of whom was Dr. Maguire.  See OCC Report at 8; Mackie Decl. ¶ 7.  Dr. Maguire's background was described in the Report as follows:

> Edward Maguire is a professor of criminology and criminal justice at Arizona State University, where he also serves as director of the Public Safety Innovation Lab and associate director of the Center for Violence Prevention and Community Safety.  Dr. Maguire's research focuses primarily on policing and violence.  His recent research has focused on police response to protests, procedural justice and legitimacy, gangs and gang violence, officer safety and wellness, the effectiveness of violent crime control initiatives, and the influence of the COVID-19 pandemic on police practices.  He has written or edited seven books and more than 90 journal articles and book chapters on various themes related to policing, violence, and crowds.  Based on a national study of protest policing practices

3

in the U.S., Dr. Maguire has co-authored a guidebook for police on handling protests entitled "Policing Protests: Lessons from the Occupy Movement, Ferguson & Beyond: A Guide for Police".  He has also lectured and provided training on protest policing issues to law enforcement audiences in the U.S. and abroad.  Dr. Maguire currently serves as chair of the research advisory board for the Police Executive Research Forum.

OCC Report at 8; see also Maguire Decl. ¶¶ 2-14; Maguire CV.  Dr. Maguire describes himself as "the preeminent expert on the intersection between protest policing, crowd psychology, and intergroup communication in the United States" and states that he is "unaware of any other expert in the United States with analogous experience."  Maguire Decl. ¶¶ 13-14.

Dr. Maguire signed a non-disclosure agreement ("NDA") with OCC that required Dr. Maguire to "keep all Confidential Information strictly confidential and not disclose it to any person, except as required for [Dr. Maguire] to work on the [OCC Review] and only to individuals employed by [Dr. Maguire] who need to know the information in order to work on the [OCC Review] on behalf of [Dr. Maguire]."  NDA at 1; see also Maguire Decl. ¶¶ 15-17. The NDA defined "Confidential Information" as "all information acquired by [Dr. Maguire] as a result of [his] employment with [OCC] including documents and deliverables produced by [Dr. Maguire] in connection with said employment," except for information "previously known by [Dr. Maguire] without a duty to keep such information confidential," "generally available to the public," or "independently developed by [Dr. Maguire] prior to his . . . engagement with [OCC]."  NDA at 1.

C.     Dr. Maguire's Role with OCC

Although the NDA does not describe Dr. Maguire's role with OCC, the parties have

submitted evidence on the matter.  First, the OCC Report itself explains that the third-party

experts retained by OCC "provided their experienced assessments of NYPD's policies and

practices"; "advised the review team on issues including crowd psychology, best practices in

policing protests, and behavioral science as they related to policing and protests"; "contributed to

the content of [the OCC Report]"; and "vetted and endorsed all of the recommendations in [the

OCC Report]."  OCC Report at 9.  The OCC Report states that Dr. Maguire "advised" on the

creation of a "strategic checklist" "for planning and responding to" future "First Amendment

events."  Id. at 9, 46-50.  The checklist, which appears as the final section of the report, covers

numerous protest-related matters, from "gather[ing] intelligence about the nature of the event"

and "develop[ing] a clear plan for responding to acts of property damage or violence" to

"ensur[ing] that officers' emotional health and wellness needs are being met" and coordinating

"between the NYPD and the relevant District Attorney's office," the Law Department, and City

Hall.  Id. at 47-50.

An uncontroverted declaration from Assistant Corporation Counsel Gavin Mackie, a

member of the Review Team, explains that:

> From the beginning of the analysis, Maguire participated in
> discussions regarding the scope of the review and the strategies the
> Review Team would pursue.  He helped shape document requests
> and other inter-agency communications.  He assisted in developing
> framing questions and had access to and participated in the Review
> Team's internal deliberations and conversations at every step of
> the analysis.

Id. ¶ 12.  Mackie further notes that Dr. Maguire "reviewed and provided extensive feedback on

drafts of the Corporation Counsel Report."  Id. ¶ 14.  Mackie explains that the Review Team

5

evaluated numerous materials, ranging from news reports to confidential documents from NYPD

and other City agencies.  See Mackie Decl. ¶ 6; OCC Report at 7.  The Review Team wrote

memoranda summarizing their "thoughts and impressions" regarding these materials, and "as

part of the process of developing policy recommendations," gave the memoranda to Dr. Maguire,

who "provided feedback" to the Review Team.  Id. ¶ 13.  Finally, Mackie notes that Dr. Maguire

"had access to and provided feedback on the work product of other independent consultants."  Id.

Dr. Maguire's description of his role in the OCC Review is cursory but ultimately does

not contradict Mackie's description.  Dr. Maguire confirms that he "drafted [the] strategic

checklist that was included in the final report."  Maguire Decl. ¶ 18.  While he concedes that he

"participated in team meetings[,] and reviewed drafts of the [OCC] Report," he also claims that

he "do[es] not recall the particulars of their substance."  Id. ¶ 19.  Dr. Maguire states that he did

not retain "any documents or files" from his work on the OCC Review and did not "participate in

any discussions with [OCC] regarding future litigation or any related strategy."  Id. ¶¶ 20-21.

> D.      OAG's Retention of Dr. Maguire

Beginning in early 2021, OAG sought to "retain an expert or multiple experts with the

experience and knowledge to testify about the significant issues" in this case.  Marquez Decl.

¶ 2.  In particular, "OAG sought an individual with expertise on crowd psychology and how that

research informs policing practices at protests."  Id. ¶ 3.

Upon reviewing a list of scholars who study crowd psychology, "expert reports from

similar civil rights litigation, and recommendations of civil rights attorneys and policing

practices experts," OAG "identified approximately 14 potential crowd psychology experts."  Id.

¶ 4.  OAG then evaluated "each candidate's published works and experience serving as an

expert." Id. ¶ 5. This narrowed the search to three candidates. Id. ¶ 6. According to OAG, several of the 14 candidates lacked experience in protest policing. See id. Some had no background in crowd psychology. See id. Others had disqualifying conflicts of interest. See id. OAG interviewed the three remaining candidates. Id. ¶ 7. One candidate "did not in fact have particular expertise regarding protest policing and the crowd psychology of mass demonstrations." Id. A second expert, whom OAG describes as "an excellent candidate," "was based in the United Kingdom, making coordination difficult." Id. The remaining candidate was Dr. Maguire. Id. Following an unsuccessful meet-and-confer process during which the City first raised its conflict-of-interest objection, OAG "notified [d]efendants that it had retained Dr. Maguire as a testifying expert." Id. ¶¶ 12-18.

II.    DISCUSSION

A federal court has inherent power to disqualify an expert witness. Junger v. Singh, 514 F. Supp. 3d 579, 598 (W.D.N.Y. 2021); accord Capitol Records, Inc. v. MP3tunes, LLC, 2010 WL 11590131, at *1 (S.D.N.Y. Apr. 15, 2010) (citation omitted). "Disqualification is designed to protect the integrity of the judicial process by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit." Loc. 3621, EMS Officers Union v. City of New York, 2021 WL 5362256, at *4 (S.D.N.Y. June 2, 2021); see also Eastman Kodak Co. v. Kyocera Corp., 2012 WL 4103811, at *8 (W.D.N.Y. Sept. 17, 2012) (expert cannot separate confidential information learned from first party during course of later litigation because "the human brain does not compartmentalize information in that manner") (quoting Pellerin v. Honeywell Int'l, Inc., 2012 WL 112539, at *3 (S.D. Cal. Jan. 12, 2012)). Where, as here, the

disqualification is sought because the expert was previously retained by another party, the movant bears the burden of establishing that "(i) the moving party held an objectively reasonable belief in the existence of a confidential relationship with the challenged expert; and (ii) during the relationship there was a disclosure of confidential or privileged information to the expert that is relevant to the current litigation." <u>Junger</u>, 514 F. Supp. 3d at 598 (internal quotation and punctuation omitted); <u>accord</u> <u>Auto-Kaps, LLC v. Clorox Co.</u>, 2016 WL 1122037, at *2 (E.D.N.Y. Mar. 22, 2016). "As a third element, some courts also consider whether 'the public [has] an interest in allowing or not allowing the expert to testify.'" <u>In re Namenda Direct Purchaser Antitrust Litig.</u>, 2017 WL 3613663, at *3 (S.D.N.Y. Aug. 21, 2017) (quoting <u>Grioli v. Delta Int'l Mach. Corp.</u>, 395 F. Supp. 2d 11, 14 (E.D.N.Y. 2005)) (alteration in original) (additional citation omitted).

OAG suggests that an additional element must be shown: "potential prejudice," which it characterizes as the "heart of the disqualification inquiry." Pl. Mem. at 11. But as the cases OAG cites confirm, there is no separate requirement that a movant prove "prejudice" will result from the expert's continued involvement. Rather, case law merely notes that a "purpose" of the existing inquiry is to "protect the former employer from use of its confidential information against itself." <u>In re Namenda Direct Purchaser Antitrust Litig.</u>, 2017 WL 3085342, at *8; <u>Auto-Kaps</u>, 2016 WL 1122037, at *3. Once the elements of the inquiry are demonstrated, case law imposes no additional burden that the movant prove some specific "prejudice" that would result if the disclosed information was used against the prior employer.

Here, OAG does not dispute that Dr. Maguire's prior engagement with OCC satisfied the first element. <u>See</u> Pl. Mem. at 7; NDA. Instead, OAG contends that the City failed to

adequately establish the remaining prerequisites of the expert disqualification standard.  See Pl.

Mem. at 7.  Accordingly, we next discuss (a) whether confidential information was disclosed; (b)

whether that information was relevant to the litigation; and (c) the public interest.

       A.      <u>Disclosure of Confidential Information</u>

The City's submission describes a host of materials that were provided to Dr. Maguire

during his engagement, including NYPD training resources, documents about prior protests, and

reports from City agencies.  See Mackie Decl. ¶ 6.  The City does not assert that any of these

materials — which appear to be largely factual — form the basis for their motion.  Instead, the

City points to the fact that Dr. Maguire (1) "participated in the Review Team's internal

deliberations and conversations at every step of the analysis"; (2) "reviewed internal memoranda

developed by [OCC] attorneys on the Review Team, which contained attorney thoughts and

impressions in addition to confidential deliberations regarding potential policy recommendations,

as well as work product produced by other independent experts"; and (3) "reviewed and provided

feedback on drafts of the [OCC] Report."  Def. Mem. at 6.  These contentions are supported by

the Mackie Declaration.  Mackie Decl. ¶¶ 12-14.  Mackie avers that

> Maguire participated in discussions regarding the scope of the
> review and the strategies that the Review Team would pursue.  He
> helped shape document requests and other inter-agency
> communications.  He assisted in developing framing questions and
> had access to and participated in the Review Team's internal
> deliberations and conversations at every step of the analysis.

<u>Id.</u> ¶ 12; <u>see also</u> Def. Mem. at 6.  Mackie further states that "[t]he Review Team viewed our

communications with Maguire as confidential."  Mackie Decl. ¶ 15.

As to why these disclosures should be considered confidential, the City points to the

deliberative process privilege.  Def. Mem. at 5 (citing, <u>inter alia</u>, <u>Dep't of Interior v. Klamath</u>

9

Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001)).[2]  The deliberative process privilege shields from disclosure intra-agency or inter-agency "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  Klamath, 532 U.S. at 8 (quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975)).  Restated, "[t]he privilege protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999) (quotation omitted).  The privilege

> rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

Klamath, 532 U.S. at 8-9 (quotation and citation omitted).  The privilege applies not merely to governmental employees but also governmental consultants, such as Dr. Maguire.  Tigue v. U.S. Dep't of Justice, 312 F.3d 70, 77 (2d Cir. 2002).

For a document to be protected by the privilege, the agency must demonstrate that the document is both "(1) predecisional, i.e., prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, i.e., actually . . . related to the process by which policies are formulated."  Am. Civ. Liberties Union v. Nat'l Sec. Agency, 925 F.3d 576, 592 (2d Cir. 2019) (citations omitted) (alteration in original).

---

[2]  Although the City's briefing makes occasional reference to "attorney thoughts and impressions," Def. Mem. at 6-7, the City does not invoke the attorney work product privilege as a basis for their motion and thus we do not consider that possibility further.

In a prior ruling, the Court considered a third-party subpoena seeking documents from the other individual consultant hired by the City for the OCC Review, Sean Smoot.  In re New York City Policing During Summer 2020 Demonstrations, 2021 WL 4344919 (S.D.N.Y. Sept. 24, 2021) , at *2-3; Order of November 2, 2021 (Docket #310) ("Nov. 2 Order").  We concluded that the documents OCC gave to Smoot constituted pre-decisional and deliberative materials protected from disclosure under the deliberative process doctrine.  In re New York City Policing During Summer 2020 Demonstrations, 2021 WL 4344919, at *2-3; Nov. 2 Order.  As we explained with respect to the Smoot documents, "[t]he OCC had a clear role in making recommendations to the Mayor."  In re New York City Policing During Summer 2020 Demonstrations, 2021 WL 4344919, at *2 (citing Executive Order No. 58 § 1(c)(3)).  The materials identified in this motion — OCC Report drafts, Review Team memoranda disclosed to Dr. Maguire, and conversations between Dr. Maguire and OCC staff — are of the same type as the Smoot documents and are therefore also predecisional.  In fact, one can hardly think of a document more obviously predecisional than internal discussions regarding a report to a Mayor offering policy recommendations.  Likewise, by providing Dr. Maguire with their "thoughts and impressions" regarding the materials described in paragraph six of the Mackie Declaration, see Mackie Decl. ¶¶ 6, 13, the Review Team was "assisting OCC in making those recommendations."  In re New York City Policing During Summer 2020 Demonstrations, 2021 WL 4344919, at *2.

As to the deliberative element, the information conveyed to Dr. Maguire, made for the purpose of issuing the OCC report, plainly bore "on the formulation . . . of policy-oriented judgment."  Grand Cent. P'ship, 166 F.3d at 482; see also Exxon Corp. v. Dep't of Energy, 585

11

F. Supp. 690, 698 (D.D.C. 1983) ("Draft documents, by their very nature, are typically predecisional and deliberative.  They reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation either by their authors or by superiors." (quotation omitted)); accord Automobile Club of N.Y., Inc. v. The Port Auth. of New York and New Jersey, 2015 WL 3404111, at *3 (S.D.N.Y. May 27, 2015).  In Executive Order No. 58, the Mayor directed OCC to provide "recommendations . . . about any additional areas of study and engagement worth pursuing."  Executive Order No. 58 § 1(c)(3).  Thus, the OCC Report was designed to assist the Mayor in deciding whether to implement policy changes in the wake of the protests, and if so, what changes would be appropriate.  And the OCC Report was the product of an iterative drafting process that involved the solicitation, provision, and incorporation of feedback to and from Dr. Maguire.  See Mackie Decl. ¶ 12; Maguire Decl. ¶¶ 18-19; OCC Report at 9.  With respect to the Review Team memoranda, the Mackie Declaration explains that these documents "were produced as part of the process of developing policy recommendations," and Dr. Maguire not only received the memoranda but "provided feedback" on them.  Mackie Decl. ¶ 13.  Like Dr. Maguire's conversations with OCC staff "at every step of the analysis," id. ¶ 12, these memoranda represent the quintessential type of back-and-forth discussion among governmental actors that the deliberative process privilege was designed to protect.  See Klamath, 532 U.S. at 8-9 (citations omitted).  Thus, the deliberative process privilege applies to the drafts of the OCC Report, the Review Team memoranda, and Dr. Maguire's conversations with OCC personnel about the development of the OCC Report.

Indeed, OAG does not contest that Dr. Maguire was provided with material subject to the deliberative process privilege.  Instead, it argues that these documents were not "confidential"

under the expert disqualification standard because no court has previously relied on the deliberative process privilege as a basis for disqualifying an expert.  See Pl. Mem. at 7-11.  But no court has rejected the use of deliberative process in the expert disqualification context either. The only case cited by OAG on this specific point, Raba v. Suozzi, 2006 WL 8435604 (E.D.N.Y. Nov. 17, 2006), involved a motion to disqualify counsel, rather than an expert, which implicates an entirely different analysis.[3]  See Junger, 514 F. Supp. 3d at 598 ("because '[u]nlike attorneys, expert witnesses serve generally as sources of information and not necessarily as recipients of confidences,' courts do 'not apply the stringent attorney-client conflict standards' in determining whether an expert should be disqualified." (quoting Grioli, 395 F. Supp. 2d at 13)).

OAG recognizes that the fundamental purpose of the expert disqualification standard is to "preserv[e] litigation fairness."  Pl. Mem. at 10 (citing Auto-Kaps, 2016 WL 1122037, at *2). But fairness dictates that material so clearly protected by the law from disclosure, that is treated as confidential by the governmental agency, and that the consultant agreed was confidential, see NDA, constitutes "confidential" material under the expert disqualification standard.  Although agency deliberations are not "trade secrets," which OAG concedes constitute confidential information, see Pl. Mem. at 7, much as protecting the confidentiality of trade secrets is essential

---

[3]  Moreover, other aspects of Raba render its holding irrelevant to our analysis.  Raba did not involve the disqualification of an attorney who represented the movant in some other matter but rather involved a former employee who was retained by the challenged attorney as a consultant.  See 2006 WL 8435604, at *1-4.  Raba rejected the disqualification motion in part because the former employer could not show that the former employee had in fact disclosed confidential information to the attorney.  See id. at *6-8.  As to the deliberative process argument, the Raba court did not indicate that information protected by the deliberative process privilege may not be considered "confidential" in the context of a motion to disqualify.  Rather, the court held that the deliberative process privilege does not provide a separate basis for disqualification, independent of the standard disqualification analysis.  See id. at *17-18.

to commercial innovation and growth, maintaining the secrecy of agency deliberations is critical to ensure the effectiveness of governmental functions. See Klamath, 532 U.S. at 8-9 (deliberative process privilege is necessary "to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government") (quotation marks and citations omitted).

Given the importance of preserving the confidentiality of agency deliberations, we have no doubt that materials subject to the deliberative process privilege, including the materials at issue here, fit comfortably within the concept of "confidential or privileged information," Junger, 514 F. Supp. 3d at 598, that is at the heart of the expert disqualification analysis. The information given to Dr. Maguire was of a type that is customarily treated as private and was in fact treated as such. And the information's unauthorized disclosure could harm the governmental interest that the deliberative process privilege was designed to protect.

To hold otherwise would defy the purpose of the deliberative process privilege by imposing a chilling effect on governmental retention of third-party experts inasmuch as government officials would naturally avoid hiring a consultant who might later be used against them. We therefore conclude that information protected by the deliberative process privilege qualifies as "confidential or privileged information" under the second element of the expert disqualification standard and that the information provided to Dr. Maguire fits within this category.

B.     Relevance

The City must also show that the confidential information provided to Dr. Maguire is "relevant to the current litigation." See Auto-Kaps, 2016 WL 1122037, at *2 (citations omitted);

14

accord Junger, 514 F. Supp. at 598.  To satisfy this requirement, the City must produce "specific and unambiguous evidence to establish the relationship between the information received and the issues in the litigation."  Auto-Kaps, 2016 WL 1122037 at *3 (quotation omitted).  That test is easily met here inasmuch as the subject matter of this litigation — the 2020 protests — is the very same subject matter on which Dr. Maguire was engaged.

To counter this obvious link, OAG looks not to the whether the confidential information Dr. Maguire received is relevant to the "current litigation."  Instead, OAG focuses on the expertise it states that it intends to seek from Dr. Maguire, noting that he "is being asked to provide an opinion on the contemporaneous effect of the NYPD tactics used at the Protests," Pl. Mem. at 13 (emphasis in original), rather than any actions taken afterwards.  It asserts that the confidential information Dr. Maguire received related to OCC's "thought process in determining what policy changes to recommend after the protests."  Id. (emphasis in original).  In OAG's view, the confidential materials received by Dr. Maguire "do not bear on Plaintiff's claims."  Id.

Putting aside the Court's skepticism that plaintiffs would not in fact seek to use Dr. Maguire for the purposes of proposing a remedy in the event they were successful in the liability phase, the disqualification test does not focus on the specific point of expertise that will be extracted from the former employee or consultant.  Rather, it asks the Court to determine the relevance of the confidential material to the "current litigation" as a whole.  Auto-Kaps, 2016 WL 1122037, at *2-3.  In any event, even if we were to accept that the subject of this litigation for purposes of the disqualification analysis is the propriety of the actions taken by the NYPD at the time of the protests — not any post-protest reforms that were considered or implemented — OAG's argument depends on its premise that the confidential information learned by Dr.

15

Maguire consisted exclusively of "the Review Team's ideas regarding post-protest reform."  Pl. Mem. at 13.  OAG's argument may be expressed as the following syllogism: (1) the only potentially protected materials received by Dr. Maguire were the City's deliberations regarding policies to be adopted by the NYPD at a future point in time; (2) the City's deliberations regarding policies to be adopted in the future are not the subject of litigation; (3) therefore, the material received by Dr. Maguire is not relevant to this litigation.

There are many problems with OAG's argument.  But the most obvious is that it incorrectly assumes that the deliberations the City shared with Dr. Maguire bore no relation to the City's past actions.  In fact, the record shows that the City's deliberations were specifically about what actions to take in the future in response to police conduct that actually occurred in 2020 during the protests.  While, as OAG puts it, the OCC Report involved determining "what policy changes to recommend after the Protests," Pl. Mem. at 13 (emphasis in original), the City's post-protest review could not be performed without an analysis of the propriety of what actually occurred during the protests, as is demonstrated in the OCC Report itself, which indicates that Dr. Maguire provided his "experienced assessment[] of NYPD's policies and practices," OCC Report at 9, and contains a section on the nature of the 2020 protests, see id. at 21-22, as well as the Mackie Declaration, which makes clear that Dr. Maguire participated in "deliberations and conversations at every step of the analysis," and learned the Review Team's "thoughts and impressions regarding" the purely factual materials that formed the basis of the report, which obviously included materials "covering the period in question," Mackie Decl. ¶¶ 6, 12-13.  Critically, OCC's recommendations were based on OCC's identification of shortcomings in NYPD policies, training, and preparation for policing the protests.  See OCC Report at 1-4,

27-46. The Court might face a harder question if Dr. Maguire had been hired to consult on police practices generally — that is, without regard to conduct during the 2020 protests.  But the engagement here was specifically tied to the 2020 protests — the very subject of this litigation. It is thus plain that the confidential information provided to Dr. Maguire is relevant to the litigation before this Court.

Contrary to OAG's suggestion, see Pl. Mem. at 12, it does not matter that Dr. Maguire has not disclosed and does not intend to disclose any confidential information.  This is because "the human brain does not compartmentalize information in that manner."  Pellerin, 2012 WL 112539, at *3.  The risk that Dr. Maguire's testimony will be influenced by OCC's deliberations is plain, notwithstanding his claim that he remembers nothing about "the particulars of the[] substance" of his meetings with City officials.  Maguire Decl. ¶ 19. [4]

In sum, the City has established that confidential information disclosed to Dr. Maguire is relevant to "the issues in [this] litigation."  Auto-Kaps, 2016 WL 1122037, at *3.

C.  Public Interest

Finally, we balance "the public's interest in preserving judicial integrity and fairness" against "the party's right to the assistance of experts who possess specialized knowledge and the right of such experts to pursue their professional calling."  Auto-Kaps, 2016 WL 1122037, at *2.

---

[4]  The OAG argues that there is no "risk" that Dr. Maguire could use the City's opinions against it in this litigation because the City's opinions have "no bearing on the question of the NYPD's liability or any issues Dr. Maguire [would be] opining on," Pl. Mem. at 12.  Putting aside our doubts about the premise of this argument, the OAG's invocation of the lack of "risk" attending Dr. Maguire's use of the City's opinions derives entirely from the OAG's argument that there is some independent requirement that the City make an affirmative showing of "prejudice" from the disclosure.  As already noted, however, no independent showing of prejudice is required.

In balancing these concerns, we must keep in mind that we are obligated to the extent possible to "protect the integrity of the judicial process by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit." Gordon v. Kaleida Health, 2013 WL 2250506, at *5 (W.D.N.Y. May 21, 2013) (quotation omitted). While a party moving to disqualify an expert has the burden of showing that the expert had a confidential relationship with the movant and that confidential information relevant to the litigation was transmitted to the expert, it is the non-movant's burden to show that other factors outweigh the public's interest in judicial integrity and fairness. See generally Auto-Kaps, 2016 WL 1122037, at *4 ("Although the movant bears the burden of establishing the elements supporting its motion for disqualification, Auto-Kaps has not presented evidence that would outweigh the public's interest in preserving judicial integrity.").[5]

First, we reject OAG's suggestion that because the "purpose of [OAG's] action is to promote the public's interest in lawful protest policing," the harms from risking disclosure of confidential information are somehow mitigated. Pl. Mem. at 16. Although OAG's stated goal is a laudable one, it does not logically follow that any action taken to further that goal ipso facto outweighs the public interest in the integrity of the proceedings.

---

[5] To the extent Grioli, 395 F. Supp. 2d at 14, holds that the burden is on the movant to show that balancing weighs in favor of disqualification, we respectfully disagree inasmuch as proof of the first two elements of expert disqualification are sufficient to establish that the proceedings will be improperly tainted by the retention of the expert. The allocation of the burden is of no moment in this case, however, inasmuch as we would reach the same conclusion regardless of which party bore the burden on the public interest balancing factor.

OAG's main point is that in light of Dr. Maguire's "unique knowledge," the public interest, on balance, is more benefitted than harmed by Dr. Maguire's testimony in this case. Id. at 14. Case law does recognize that a lack of available experts weighs against disqualification. See Topps Co. v. Productos Stani Sociedad Anomina Industrial y Commercial, 2001 WL 406193, at *2 (S.D.N.Y. Apr. 20, 2001); Auto-Kaps, 2016 WL 1122037, at *4. However, we cannot find that such a lack exists here --- and certainly not to the extent that it would outweigh the public interest in avoiding any taint of these proceedings. OAG itself recognizes that one of its final candidates, whose credentials OAG describes as "excellent," had comparable experience to Dr. Maguire, although this expert's location in the United Kingdom made the expert less desirable. Marquez Decl. ¶ 7. Additionally, we cannot find that it is necessary for plaintiffs to have an expert with the "niche" expertise of Dr. Maguire to establish liability. If it is in fact the case that Dr. Maguire is, as he puts it, the "preeminent expert on the intersection between protest policing, crowd psychology, and intergroup communication in the United States," Maguire Decl. ¶ 14, such expertise should be supported by scholarship that would be available to other experts in the field who would wish to apply it.

In any event, the use of policing practices experts nationally is simply too widespread for the Court to conclude that Dr. Maguire is the only possible expert that could be retained by OAG in this matter. Certainly, there is no evidence that policing practices experts must have the "niche" expertise claimed by Dr. Maguire. Moreover, case law contains specific references to experts in policing practices other than Dr. Maguire. See, e.g., Buck v. City of Albuquerque, 2009 WL 4263562, at *1 (D.N.M. Nov. 16, 2009); Burdett v. Reynoso, 2007 WL 4554034, at *1

(N.D. Cal. Nov. 20, 2007).  The Court is thus persuaded that experts exist other than Dr. Maguire

who can effectively serve to opine on the propriety of the practices challenged in the complaint.

In the end, whatever burden may fall on OAG by retaining a less desirable expert is

simply not sufficient to outweigh the public interest in the integrity of these proceedings.

Municipalities must feel free to engage and deliberate with consultants without fear that those

consultants will be hired to prove the municipalities' liability on the very matters about which

the consultant was engaged.  Notably, OAG cites no case wherein a court declined, purely on the

balancing of the public interest, to disqualify an expert who had previously received relevant

confidential information from the adverse party.  In the two cases cited by OAG in which

disqualification was not granted, the moving party had failed to establish that confidential

information was disclosed to the expert.  See Pl. Mem. at 14-17 (citing Topps, 2001 WL 406193,

at *2-3 ("there has been no showing that confidential information actually passed to Mr.

Boutin"); Homeward Residential, Inc. v. Sand Canyon Corp., 2019 WL 5634171, at *2

(S.D.N.Y. Oct. 31, 2019) ("Homeward itself does not argue that Olasov received confidential

information in connection with Carlton Fields's work relating to Ocwen Servicing.")).

We therefore conclude that to "protect the integrity of the judicial process by ensuring

that experts do not use, even unwittingly, confidential information that they learned from a party

in the course of an earlier engagement against that party in a later lawsuit," Gordon, 2013 WL

2250506, at *5, we must order Dr. Maguire's disqualification.  Despite OAG's suggestions

otherwise, see Pl. Mem. at 17-18, no remedy short of disqualification is adequate to vindicate the

interests subject to harm from Dr. Maguire's testimony in this case.  We recognize that

"[d]isqualification is a drastic remedy and should be resorted to rarely."  Breitkopf v. Gentile,

2014 WL 12843765, at *3 (E.D.N.Y. Mar. 24, 2014).  But this is one of the rare cases in which a litigant has attempted to use an expert who was specifically engaged by its adversary on the same subject matter of the litigation.  Because the public interest in the integrity of these proceedings is not outweighed by any other interest, disqualification is warranted.

III.    <u>CONCLUSION</u>

For the foregoing reasons, the motion to disqualify Dr. Maguire (Docket # 312) is granted.

SO ORDERED.

Dated: January 24, 2022
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

21