

**GEORGIA M. PESTANA**
*Corporation Counsel*

T HE C ITY OF N EW Y ORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK , NEW YORK 10007

**DARA L. WEISS**
*Senior Counsel*
daweiss@law.nyc.gov
Phone:  (212) 356-3517
Fax:  (212) 356-1148

**By ECF**

February 18, 2022

Honorable Gabriel W. Gorenstein
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

  In Re:  *New York City Policing During Summer 2020 Demonstrations*,
   No. 20 Civ. 8924 (CM) (GWG)
   This filing is related to all cases

Your Honor:

I am a Senior Counsel in the Office of Georgia M. Pestana, Corporation Counsel of the City of New York and I am among counsel for the defense in the above-referenced matter. We write in response to plaintiffs' letter of February 16, 2022 (Dkt# 406) and in compliance with the Court's order of February 17, 2022 (Dkt.# 407).

An an initial matter, we note for the Court that a number of the materials which were the subject of the meet and confer are not due to Plaintiffs until March 11, 2022. In any event, after a nearly 2 ½ hour meet and confer, pursuant to Your Honor's direction, the meet and confer cannot be considered  "unproductive." This particular meet and confer was "finally figure this out and (the Court) can understand what the burdensomeness issue is." 2022-02-16 Tr. 75:14-75:16.

 After a nearly 2 ½ hour meet and confer, pursuant to Your Honor's direction, it is inconceivable that plaintiffs' counsel can assert it was "unproductive."  We think that no matter what was said or done at that meet and confer, anything short of actually handing the requested documents to plaintiffs' counsel would be "unproductive" in their eyes.

The bulk of the meet and confer consisted of two members of the NYPD, both the managing attorney of NYPD's Civil Litigation Unit, Bridget Fitzpatrick and an attorney from the NYPD's e-discovery group, Heidi Grygiel[1], explaining the processes for trying to locate the

---

[1] Both Ms. Fitzpatrick and Ms. Grygiel are expected to be present at today's conference

requested documents, and the specific burdens involved. They also tried to explain how the NYPD's technology systems work and how its paper document procedures work, as background and as a basis to further explain the burden. The undersigned, who was also present at the meet and confer, lost track of the number of times that the NYPD attorneys were interrupted by plaintiffs' counsel during their explanations. Due to the constant interruptions, and other behaviors by some of plaintiffs' counsel, it was impossible for Ms. Fitzpatrick and Ms. Grygiel to fully articulate what they were on the call to express.

Although plaintiffs were impatient with NYPD counsel's attempts to explain and they repeatedly cut them off as they spoke, as described in more detail below, the documents plaintiffs seek may be in many different locations, and filed in a number of different ways, are in a searchable format in only some of the locations, may not include a subject, may not have been distributed and/or filed in hard copy, and not even exist in hard copy, instead living on microfiche as part of a vast archive of NYPD documents maintained in any number of off-site storage facilities. There is no way to know where each document is until the searches are actually done, which is in and of itself a tremendous burden.

Nonetheless, attached to this letter is the chart Your Honor directed to be provided with this response. It includes definitive answers to the specific burdens of producing each category of documents listed on pages 1-2 of plaintiffs' February 16, 2022 letter (Dkt # 406) as to each past protest, including an estimated number of person-hours it will take to produce the documents and specific information as to any impediment not tied to labor expended by City personnel.

Turning now to the list of plaintiffs' "illustrations" on pages 3-4 of their letter, many are incomplete, inaccurate, or downright misleading to the Court.

• Plaintiffs state that the defendants have not searched for Mass Arrest Reports from any era, although the CJB has historically maintained all such Mass Arrest Reports in a single, centralized location on a shared drive. This is misleading. What was done in the past is not necessarily what is done now. When plaintiffs complained that these documents hadn't been searched for, the undersigned reminded them that defendants had objected to production and provided the reasons for those objections on several occasions. Regardless, the NYPD attorneys tried to explain to plaintiffs' counsel many times the burden involved, but plaintiffs' counsel would not allow them to complete their descriptions. Rather, they simply interrupted with questions, accusations and tales of past litigations, and repeatedly rejected the defendants' explanations of the processes for collecting responsive documents and the burden of doing so.

• Plaintiffs state that defendants had no information on searches within any NYPD commands for 49's from any era, including 49's from the protests at issue in these consolidated actions, although Defendants well know which. This is simply untrue. First, defendants have expressed on several occasions, and plaintiffs acknowledged, that 49's for the protests at issue are included with the email discovery previously produced. On Wednesday's meet-and-confer, defendants further explained that given the "all-hands-on-deck" nature of NYPD's response to the summer 2020 protests, it is less likely that memorandum were created and disseminated because many of the commanding officers who would have received them were in the field and received

reports verbally as the protests were taking place. Since they were there, these was no need for someone to report to them what had occurred. Going back to the very beginning of this litigation, the defendants have tried to get clarity on what plaintiffs refer to as "49's," which is actually outdated police jargon. Ms. Fitzpatrick and another attorney at NYPD, Peter Callaghan, have explained to plaintiffs' counsel what, exactly, a "49" is, and it is simply ANY memo or written communication within the NYPD. During Wednesday's meet-and-confer, Ms. Fitzpatrick and Ms. Grygiel attempted to explain the many, many different ways these 49's, which can refer to anything, be sent by anyone, and sent to anyone, are created, distributed, and saved, and in short, there is no uniform way…each officer or command does different things. Finally, not until Wednesday's meet-and-confer, did plaintiffs gave some clarity on what they actually want. Although defendants still assert that plaintiffs' request for "all 49's" is impermissibly overbroad, at least with the clarity of what they are looking for paired with their suggestion of the commands that were involved in planning for policing, policing, and evaluating the policing of, the relevant protests, defendants can better estimate the burden with respect to person-hours needed.

• Plaintiffs state that the defendants could not say where any such Mass Arrest Reports or 49's were, who sent or received them, or what it would take to collect them. This statement is misleading. NYPD attorneys, on more than one occasion, gave extremely detailed explanations of what "49s" are, and how they are used at NYPD. They explained that the term "49" is very non-specific, and that there is no uniform process for their creation nor any centralized repository for them. They explained how they are created in Word, printed & signed, sometimes scanned and (frequently) sent to the email of the sender or sent via email to the relevant PAA (Police Administrative Aide) for distribution. Distribution may take place via email, but it may also take place via hard copy. If hard copy, prior to being "sent," a 49 is entered into a paper logbook and assigned a reference. Divisions/departments/commands may have their own system of assigning references. Then, a 49 is given a cover sheet – which does not necessarily include a topic – and is delivered via NYPD interoffice mail by hand. Once delivered, a 49 will be read by the addressee(s) and passed to a PAA to be entered into a paper communications log, and from there it may be filed, scanned or saved into an e-folder, or placed in a paper folder. Further, Ms. Grygiel noted that even when copies are scanned to emails, NYPD copiers are not set to OCR so documents are not often searchable. There are 17 command share drives and the data on those drives is unstructured – i.e., there is no set structure for folders, etc. and each command sets its drive up individually. Therefore, in order to even begin to search for the relevant information, the NYPD would have to interview anyone they can identify as most knowledgeable about each drive and the information stored there. They estimate that the amount of data on the drives is in the petabytes.

• Plaintiffs state that defendants did not have any information about which Prior Protest documents are stored on NYPD shared drives, or how the relevant shared drives are organized and searchable. This statement is misleading. As explained above, defendants explained that the data on the relevant shared drives is unstructured – i.e., there is no set structure for folders, etc. and each command sets its drive up individually. Therefore, in order to begin to search for the relevant information, NYPD would have to interview anyone they can identify as most knowledgeable about each of the 17 drives and the information stored there. With respect to actually searching for

the information on the drives, they estimate that the amount of data stored is, once again, in the petabytes.

• Plaintiffs state that defendants said searching for certain documents would take herculean efforts when common sense and/or past experiences in similar cases have shown that there are much simpler ways of searching (like asking the relevant custodians which documents are stored where and how they are searchable). This statement is misleading. As explained above, defendants repeatedly raised concerns about the scope of plaintiffs' requests for certain documents, including the burden of searching for "all" responsive documents, "made or maintained at any time," and the proportionality of such a burden to the likelihood that significant responsive documents existed in all possible locations. However, also as explained above, during the meet and confer, the parties identified and agreed upon a limited number of command areas –thereby limiting the potential custodians - where responsive documents might exist, and defendants have begun the process of searching for and obtaining any responsive documents from those areas. In fact, a tranche of documents from the Republican National Convention were identified yesterday, and will be produced after review by this office, along with a privilege log, if applicable.

The undersigned thoroughly explained what the Law Department did with the files concerning the lawsuits stemming from prior protests…in so much detail that it might have bordered on revealing privileged information. But plaintiffs have interrupted or misconstrued that information. In any event, I explained in detail what is on the Law Department's internal drives, what is archived, searches personally done for responsive documents, and the burden associated with continuing the search.

Adverse inference as a sanction unnecessary. Defendants respectfully request that the Court deny Plaintiffs' application. Thank you for your consideration herein.

Respectfully submitted,

*Dara L. Weiss s/*

Dara Weiss
*Senior Counsel*
Special Federal Litigation Division

 Attachment
cc:     ALL COUNSEL (via ECF only)