```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK

In re:                           :
                                        Docket #20cv8924

 IN RE NEW YORK CITY POLICING    :
 DURING SUMMER 2020 DEMONSTRATIONS

                                 : New York, New York
                                   February 18, 2022
-----------------------------------: TELEPHONE CONFERENCE


                   PROCEEDINGS BEFORE
          THE HONORABLE GABRIEL W. GORENSTEIN,
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff People      NEW YORK STATE OFFICE OF
of the State of New       THE ATTORNEY GENERAL
York:                     BY:  GREGORY MORRIL, ESQ.
                          28 Liberty Street
                          New York, New York 10005


For Gray Plaintiffs:      WYLIE STECKLOW PLLC
                          BY:  WYLIE STECKLOW, ESQ.
                          111 John Street, Suite 1050
                          New York, New York 10038


For Minett and Hernandez  GIDEON ORION OLIVER, ESQ.
Plaintiffs:               277 Broadway, Suite 1501
                          New York, New York 10007


For Payne Plaintiffs:     NEW YORK CIVIL LIBERTIES UNION
                          BY:  DANIEL LAMBRIGHT, ESQ.
                          125 Broad Street, Suite 19
                          New York, New York 10004




Transcription Service: Carole Ludwig, Transcription Services
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

2

APPEARANCES (CONTINUED):

For Sierra Plaintiffs:    RICKNER PLLC
                          BY:  ROB RICKNER, ESQ.
                          14 Wall Street, Suite 1603
                          New York, New York 10005

For Sow Plaintiffs:       COHEN & GREEN
                          BY:  REMY GREEN, ESQ.
                          1639 Centre Street, Suite 216
                          Ridgewood, New York 11385

For Yates Plaintiff:      STOLL, GLICKMAN & BELLINA, LLP
                          BY:  ANDREW STOLL, ESQ.
                          300 Cadman Plaza West, 12th Floor
                          Brooklyn, New York 11201

For Defendants:           NEW YORK CITY LAW DEPARTMENT
                          BY:  DARA WEISS, ESQ.
                               GENEVIEVE MILTON, ESQ.
                               JENNY WANG, ESQ.
                          100 Church Street
                          New York, New York 10007

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

1

```
 1                        PROCEEDINGS                     4
 2            HONORABLE GABRIEL W. GORENSTEIN (THE COURT):
 3   Let's start the case.
 4            THE CLERK:  This is In Re New York City Policing
 5   During Summer 2020 Demonstrations, case number 20cv8924.
 6   Will counsel please state their appearances for the
 7   record, starting with the plaintiffs.
 8            MR. GREGORY MORRIL: Good afternoon, Your Honor,
 9   for plaintiffs People of the State of New York, Greg
10   Morril, M-O-R-R-I-L, for the New York State Office of the
11   Attorney General.
12            MR. WYLIE STECKLOW:  Good afternoon, Your Honor,
13   for plaintiffs in the Matter of Gray v. City of New York,
14   Wylie Stecklow.
15            MR. GIDEON OLIVER:  For plaintiffs in the
16   Matters of Hernandez, et al. v. The City of New York and
17   Minett v. City of New York, Gideon Oliver.  Good
18   afternoon.
19            MR. DANIEL LAMBRIGHT:  Good afternoon, Your
20   Honor, for the Payne plaintiffs Daniel Lambright.
21            MR. ROB RICKNER:   Good afternoon, Your Honor,
22   for the Sierra plaintiffs, Rob Rickner.
23            MX. REMY GREEN:  Good afternoon, for the Sow
24   plaintiffs this is Remy Green, and for the recording I
25   should appear in the transcript as Mx. Green, spelled M-X-
```

```
 1                         PROCEEDINGS                    5

 2    period, rather than Mr. or Ms.

 3               MR. ANDREW STOLL:  And good afternoon, for

 4    plaintiff Cameron Yates it's Andrew Stoll, Stoll Glickman

 5    & Bellina.

 6               THE COURT:  For defendants.

 7               MS. DARA WEISS:  Good afternoon, this is Dara

 8    Weiss from the New York City Law Department.  In addition

 9    to co-counsel who will state their appearances for the

10    record in just a second, I want to let the Court note that

11    from the NYPD we have with us Bridget Fitzpatrick, Peter

12    Callahan, and Heidi Grego (phonetic).

13               MS. GENEVIEVE MILTON:  Genevieve Milton for

14    defendants, good afternoon, Your Honor.

15               MS. JENNY WANG:  And Jenny Wang for the

16    defendants, good afternoon, Your Honor.

17               THE COURT:  Okay, welcome, everyone.  Two items

18    in my mind on the agenda today, one that is specifically

19    on the agenda which is to deal with the prior protest

20    issue.  After that's done, I do want to talk generically

21    about the order I was just issuing just to implement my

22    order of, oral orders of last Friday, February 11.  So

23    I'll want to have a discussion about that, and in the

24    unlikely event I forget to get to them, if someone will

25    remind me.
```

```
 1                          PROCEEDINGS                      6

 2              On the prior protest issue – let me just remind

 3      everyone to keep themselves on must if they're not

 4      speaking to the Court, and also any dissemination of the

 5      recording of this proceeding is forbidden by court rule.

 6              On the prior protest issue, let me just, let me

 7      give the big picture here.  The big picture is that the

 8      City at some point, and probably today, has to make its

 9      arguments about what it's producing and what it contends

10      is too burdensome to produce.  I'm not sure I've ever

11      heard that.  I don't know if plaintiffs have heard it.

12      But it's not the case that every document that plaintiffs

13      want has to be produced if it's burdensome and not

14      proportional.  So between the 100 percent of what the

15      plaintiffs want, there may be some lesser number that is

16      appropriate for production and they don't get the full

17      hundred percent.

18              By the same token, of course, the City under

19      Rule 34 has to say in response, it's their obligation to

20      say here's how we're responding to this discovery request.

21      We are giving you these documents because we don't feel we

22      can make an objection under Rule 26(b) for proportionality

23      and burdensome.  Recognizing that that's a losing argument

24      for us, so these are being produced, and these are being

25      withheld.  In the sense, when I say withheld, meaning
```

1

2    we're not going to undertake the effort to look for those

3    documents because we don't think it's proportional to the

4    case.

5            So that has to be presented.  Maybe it should

6    happen today, maybe it should happen Tuesday.  Unless I'm

7    mistaken, and, believe me, I'm sure I'll hear from both

8    sides, that's what happens essentially in every discovery

9    request, that's what should happen with all the other

10   discovery requests, and we'll get to that in part two.  It

11   should happen really promptly, if it hasn't happened

12   already, and when I say promptly, I mean in a matter of

13   days.  And then if the parties have a disagreement and I

14   certainly expect that may happen, they should present that

15   to me as soon as possible, and then I will say, you know

16   what, I don't think that's too burdensome.  City, you have

17   to produce that.  Or I will say I think the City's right,

18   that is not proportional to the needs of the case.

19           So to give one tiny example of all this, when

20   the prior protests issue was first brought to my

21   attention, I had an immediate reaction that going back 20

22   years was too much, and I said you don't have to do any

23   (indiscernible) documents.  And then I got, I conceded

24   last time that was a precipitously issued order because I

25   hadn't fully heard from the plaintiffs at that point; it

1                              PROCEEDINGS                        8

2     was my error.  But it may be that there are burdens that I

3     might say the City should bear for a later protest that

4     they might not have to bear for a protest from 20 years

5     ago.

6             So that's the big picture here.  I have to be

7     able to get that.  I think we're closer to that than we

8     were before, but I don't think the City has ever done what

9     it's supposed to do which is to say here's what we're

10    producing and here's what is too burdensome to produce.

11    And it may be that there was a negotiating and discussion

12    that was just dragging that process out, I don't know, but

13    that's my big picture.  We have to end up with that as

14    soon as possible, really soon, in days, not just for this

15    but for everything else.  And then I'm going to be ready

16    and maybe we'll do oral presentations rather than written,

17    I don't know.  To the extent that the plaintiffs have not

18    been persuaded, I mean they should certainly talk to the

19    City about what the burdens here involved, and the City

20    said that they're not going to do it.

21            But then that has to be keyed up for me, and we

22    can talk about the best process for that, and I'll either

23    say yes, the City's right, or I'll say, no, the City's

24    wrong, they're going to have to do it, and they're going

25    to do it on this timetable.

1                              PROCEEDINGS                        9

2              So that's what I had hoped would, when I ordered

3    last week for this discussion to happen, that's what I had

4    hoped would come out of it would be a statement about what

5    is going to be produced and what the City is saying is not

6    going to be produced.  And I guess a timetable, though if

7    anyone's thinking beyond, you know, a few weeks for

8    production, that's not realistic for the schedule of this

9    case.

10             So having said all that, let me turn it over to

11   the plaintiffs and hear, whoever's speaking for the

12   plaintiffs, hear their thought about what we can do today

13   and whether, you know, how we should proceed in order to

14   get to that, whether we should try to do something on

15   Tuesday or Wednesday.  So I'll turn it over to the

16   plaintiffs to start.

17             MX. GREEN:   Thank you, Judge.  I think, you

18   know, listening to what you've just said, my first

19   reaction is that I could not agree more.  And I think to

20   begin with that's why we need the motion back in June last

21   year to get in compliance with the 2015 amendment, and I

22   think that's why you ordered the algorithm letters that we

23   ended up getting throughout that period.  Right?  The

24   (indiscernible) at that time, as I understood it, was to

25   get exactly the kind of information you're talking about,

```
 1                          PROCEEDINGS                    10
 2    which is what the City's producing, what they aren't, and
 3    what the burden would be of producing what they claim is
 4    too burdensome.  Yet, here we are nearly a year later
 5    without any of that still.
 6              And I think one of the other issues, and it was
 7    highlighted last week by Mr. Rickner and we'll likely get
 8    to some examples of that today is that the City's position
 9    changes constantly.  You know, I think the, for example,
10    and, again, we'll get into this later, throughout this
11    case I think three or four times the City has formally
12    said they are not objecting based on burden to producing
13    49, and, you know, I think we thought that was the end of
14    that, and here they are today asserting that gathering 49
15    is too burdensome even as to the protests that took place
16    in the summer of 2020.
17              Now, in terms of burden, one of the I suppose
18    guiding principles that I should we should have in mind
19    here, and there are plenty of cases, but I found a case,
20    Overrule Your Corporation Counsel Objection, written by
21    Judge Dolinger to read from today, and this case is Wesley
22    v. Muhammad, and it's on Lexis at 2008 LEXIS 74342.
23    Corporation Counsel's, quote, "underlying assumption that
24    an institution may shield itself from discovery by
25    utilizing a system of recordkeeping which conceals rather
```

```
 1                        PROCEEDINGS                    11
 2   than discloses relevant records or makes it unduly
 3   difficult to identify or locate them, thus rendering the
 4   production of documents an excessively burdensome and
 5   costly expenditure is incorrect."  You know, this is a
 6   well-settled principle that amounts to if your file system
 7   makes no sense, that's not a valid burden objection.
 8            And I think, you know, I think we are still very
 9   far away from understanding what they think the burden is,
10   but most if not all of what was in the letter that was
11   filed this afternoon was saying that their file system is
12   so bad that they can't search it.  That's not a real
13   burden.  And I also don't think it's true.  But --
14            THE COURT:   Mr. Green, hold on.  I think we're
15   - I'm sorry, Mx. Green, I think we're jumping ahead.
16            MX. GREEN:   Okay.
17            THE COURT:   Because you're now arguing specific
18   burden and I --
19            MX. GREEN:   Understood.
20            THE COURT:   -- mean - if your answer to my
21   question is we should resolve what I, we should resolve
22   the burden issue as to each point and each set of
23   documents today and I'll say yes, that is a burden or no,
24   that's not, if that's what you want, then we can do that,
25   but that's --
```

```
 1                        PROCEEDINGS              12

 2            MX. GREEN:   Yeah, I --

 3            THE COURT:   That's not --

 4            MX. GREEN:   I apologize --

 5            THE COURT:   -- this second.

 6            MX. GREEN:   I apologize.  Then let me cut to

 7   the chase and say, yes, I think that's the right way to do

 8   it.

 9            THE COURT:   Okay, and do we do it now in this

10   phone call?

11            MX. GREEN:   I mean --

12            THE COURT:   Maybe I should ask – go ahead.

13            MX. GREEN:   Sorry, I think, yes, we should do

14   this on this phone call.  You know, with the schedule we

15   have, I don't know that we have another option.

16            THE COURT:   Yeah, I tend to agree too, and we

17   have the right people here.  Ms. Weiss, your thoughts on

18   this?

19            MS. WEISS:   Your Honor, we apologize if we

20   misunderstood your order, but it seems as if you were

21   asking for us to express what the burdens are.  From the

22   very beginning, we had a burdensomeness argument and in

23   addition to other objections and indicated that we weren't

24   producing any documents.  Through a number of

25   conversations and Your Honor's instructions and even in
```

```
 1                        PROCEEDINGS                    13

 2  large part based upon the conversations that we had on

 3  Wednesday, an additional conversation that I and my

 4  colleagues have had with our clients, we're certainly

 5  going to produce a number of these documents despite the

 6  burden.  Some we still I think are too burdensome and not

 7  proportional, and, by the way, this is not completely

 8  sure, but I think that the Magistrate Judge Dolinger case

 9  that Mx. Green cited before for proportionality, I

10  (indiscernible), but I think that that's the case.

11           So based upon proportionality, we certain think

12  things like the WES documents are not proportional, and we

13  would not produce them based upon burdensomeness and

14  proportionality.  But we haven't gone through each

15  document and each category of documents to determine what

16  we would produce and what we wouldn't produce.  We simply

17  laid out what the burdens were, and I have three attorneys

18  from the NYPD on the call now who are certainly prepared

19  to answer any questions regarding the specific burden.

20           But I think that perhaps letting plaintiffs and

21  the Court know in writing once we've certainly come to a

22  conclusion in the next few days of course, very quickly,

23  what we will and will not produce.  I don't think there is

24  any reason to go through things document by document if

25  we're going to, in fact, produce them.  I imagine that
```

```
 1                          PROCEEDINGS                    14
 2   what we state we're not going to produce due to burden and
 3   not being proportional, plaintiffs are not going to agree
 4   with, and we could argue that at that time, but I don't
 5   know if we're there yet today.
 6             THE COURT:   I think we have to try to do this
 7   today.  I don't think we can put this off any longer.  We
 8   shouldn't be here at this point.  So I think we're going
 9   to go through these, and I'm going to tell you what you
10   have to produce, and I'm going to give you the day you
11   have to produce it.  I don't see our waiting.
12             Let's go through your letter, and before I do
13   that, I just want to make sure from plaintiffs' point of
14   view we have the right categories here and the right
15   protests?
16             MX. GREEN:   That's right, Your Honor.
17             THE COURT:   Okay.  All right, so turning to
18   your letter.  I didn't understand the double asterisked
19   footnote.  What is this reference to 750 boxes?  Is that
20   for all of these combined?  What are you talking about?
21             (pause in proceeding)
22             THE COURT:   Ms. Weiss, I don't know if you're
23   on mute, but I'm not getting an answer.
24             MS. WEISS:   I'm sorry, I was actually going to
25   ask Mr. Callahan if he can explain the relevance of the
```

```
 1                          PROCEEDINGS                    15
 2  approximate 750 boxes.
 3            THE COURT:   If it at any point you need a break
 4  to consult with someone, that's fine.  My preference is
 5  for you to answer the things you know, but if you don't,
 6  I'll live with your turning it to someone else.  There's a
 7  cost to that.  If you need a break to consult, if you have
 8  a mechanism you're doing it outside this phone call, I
 9  don't care.  What do you want to do with the answer to
10  this question?
11            MS. WEISS:   I can answer if you'd just give me
12  about 20 seconds.
13            THE COURT:   All right, we'll wait for you.
14  Take your time.
15            MS. WEISS:   Thank you.
16            (pause in proceeding)
17            MS. WEISS:   Okay, there are – these are boxes
18  that are, these are archived through an archive company
19  called GRM, and NYPD has tallied the number of boxes that
20  could potentially have responsive information of them that
21  may come from different units.  The Chief of Department
22  operations unit can have documents in about 110 boxes.
23  Patrol Services Bureau may have documents in 41 boxes.
24  And IAB could have somewhere between 500 and 600 boxes.
25  These are typical sort of banker's boxes that can hold
```

```
1                         PROCEEDINGS                    16
2   about 2,500 pages each.  So those are the amount of
3   archived, NYPD archived boxes that would have to be looked
4   through to find the documents and information that has
5   been archived in response to plaintiffs' request.
6              So that's to say that some documents are
7   electronic.  Obviously, they wouldn't be in these 750 or
8   so boxes.  Some documents reside elsewhere.  But of
9   documents that appear at this point to have been archived,
10  they could be in somewhere within these 750 boxes
11  approximate.
12             THE COURT:  I'm totally lost.  Is it, I mean
13  boxes when they're put in archives usually have an
14  accession number.  Someone has an index that says what's
15  in there.  I don't understand what you're talking about.
16             MS. WEISS:   The index --
17             THE COURT:  Maybe we – I think what I'm going
18  to do is I don't – talking about boxes generally doesn't
19  make sense.  If in response to a certain request – we're
20  going to go through these by category.  If in response to
21  a category you tell me to look for this we have to look
22  through 750 boxes, then you will say that.  I might need
23  your person to say that.  But that's, you know, I don't
24  understand what you're talking about.  I don't understand
25  if you're telling me that for each of these categories of
```

```
 1                          PROCEEDINGS                    17
 2   all these things we have to look through 750 boxes.
 3   Presumably they have dates on them if nothing else.  So
 4   I'm not sure what you're talking about.  Do you understand
 5   my confusion?
 6         MS. WEISS:   I think I do, Your Honor.  Not
 7   everything is archived, and there is an index to the
 8   archives, but there --
 9             (interposing)
10         THE COURT:   All right, then let's wait - to me
11   this footnote is irrelevant, and it makes no sense.
12   (indiscernible) has boxes that have to be reviewed to
13   ascertain if they contain (indiscernible).  This footnote
14   makes absolutely no sense.  I am ignoring it, and if you
15   think looking through boxes is relevant to any particular
16   category and you want to tell me what the burden is for
17   looking at that category, you're free to tell me.  But the
18   footnote as written is nonsensical and I haven't heard an
19   explanation that makes sense to me.
20             Okay, so let us start with the 2002 protest.  So
21   mass arrest reports, tell me what these are, how many are,
22   are they generated when there's a mass arrest, and
23   presumably, you know, there's a limited number of mass
24   arrests.  I don't know how many in 2002.  Was there ten,
25   were there twenty?  What is going on with these?  What are
```

```
1                         PROCEEDINGS                    18
2   they and how do you find them?
3              MS. WEISS:   Your Honor, mass arrest reports are
4   generated when a mass arrest processing center is
5   activated which can happen during a protest or any other
6   large scale event.  They list personal information about
7   the people arrested, what they were arrested for, the
8   arresting officer, and some other information.  For the
9   WEF demonstrations there were not a huge number of mass
10  arrests, I don't know the exact number.  I'm not sure if
11  any of my clients on the call know the exact number.  But
12  it's more a matter of finding where they reside.  There's
13  not a large number of them, but they can be in one of many
14  places, most likely archived.
15             THE COURT:   Okay.  Which of your clients is
16  most knowledgeable about this?
17             MX. GREEN:   Your Honor, if I may, I think I can
18  actually cut through this which is we have a deposition of
19  an NYPD person named Lieutenant Chris Czark taken in 2017
20  specifically about mass arrest reports in these eras.  And
21  in his testimony he says there's one folder on his share
22  drive where he keeps all of them for every demonstration,
23  and I think it's even in a folder by event.  And we've
24  been telling defendants this, and I've been sending them
25  the transcript since June last year saying all you need to
```

1                               PROCEEDINGS                    19

2   do is call Chris Czark.  At the meet and confer on

3   Wednesday, they still had not called Chris Czark.

4            It's, you know, it's – I think the answer to

5   this is it's very easy to do.  We're, you know, we're

6   fairly sure about that.  And all they say in their letter

7   about this, when we I think pointed that out and cited the

8   deposition testimony, is that it's not necessarily true

9   that he still organizes things in the exact same way he

10  did in 2017 when he was talking about every protest from

11  2017.  And, you know, I don't think that's been rebutted.

12           THE COURT:   Mr. Czark, what's his title?

13           MX. GREEN:   Lieutenant.

14           THE COURT:   So you think Czark has this in a

15  very accessible place.

16           MX. GREEN:   Correct.

17           THE COURT:   All right, well, if you're willing

18  to – I'm willing to move on and direct that they be

19  produced, that the search consists of getting Chris Czark

20  to produce them, and that is obviously very easy, and that

21  should be the end of it.  Any problem with that, Ms.

22  Weiss?

23           MS. WEISS:   Your Honor, earlier this afternoon

24  Mr. Callahan met with Lieutenant Czark, and – please

25  correct me if I'm wrong, Peter – but Lieutenant Czark only

```
 1                         PROCEEDINGS                   20

 2  has spreadsheets dating back to 2003.  So he would not

 3  have those on the WEF which occurred in 2002.

 4         MR. CALLAHAN:   That is correct.

 5         THE COURT:   I'm sorry, you said spreadsheet?  I

 6  thought he had the actual reports.

 7         (interposing)

 8         MR. CALLAHAN:   -- spreadsheets.

 9         THE COURT:   A report is a spreadsheet.

10         MS. WEISS:   That's correct, Your Honor.

11         THE COURT:   Okay.  Now, I'll get back to you,

12  Mx. Green.  Ms. Weiss, I had asked you who's the most

13  knowledgeable about this.  Is it Mr. Callahan?  About all

14  of it.

15         MS. WEISS:   Your Honor, different people on

16  this call are more knowledgeable about different things

17  depending on what they've done.  That's which they're all

18  on the call.  Ms. Grego is familiar with the electronic

19  portion of it, not the paper portion of it.  So for

20  anything that was before things were put on computer in

21  the NYPD, which was fairly recently, Mr. Callahan and Ms.

22  Fitzpatrick would, one or both of them would be essential

23  to speak depending on what they particularly did.

24         THE COURT:   Okay.  So, Mx. Green, so we have

25  this problem with 2002.
```

```
 1                    PROCEEDINGS              21
 2          MX. GREEN:   Okay, I mean I suppose then the
 3   question becomes, you know, I would, I don't think that
 4   we're going to ask them to go piece together documents
 5   destroyed in the hurricane or anything like that, but if
 6   what they're saying is they talked to Lieutenant Czark
 7   now, this morning, and he said he has everything and it's
 8   easy except for stuff before 2003, the answers then
 9   become, or the question then becomes is there an easy way
10   to find or a reasonable way to find what's from before
11   2003.  And --
12          THE COURT:   All right, Mr. Callahan, what would
13   it take to find before that?
14          MR. CALLAHAN:   Absolutely, sir.  So we would
15   need to get their index of their GRM storage to see
16   whether or not --
17          THE COURT:   Who's they?
18          MR. CALLAHAN:    Criminal Justice Bureau.
19   Criminal Justice Bureau being the custodian of the mass
20   arrest spreadsheet reports.  We would need to get their
21   index to see if they have - and we do have it; we just
22   need to go through it to see where they have located their
23   records from 2002 and specifically if they have it
24   detailed enough to see if that lists mass arrest
25   spreadsheets or maps the records generally.  And then we
```

1                              PROCEEDINGS                        22

2  would request those boxes, go through them.

3           It would take a week or two to get the box, but

4  presumably if it's one box, you'd be able to go through it

5  rather quickly.  If it's more than that, it's going to

6  take some time.  But for one mass arrest spreadsheet or

7  for the World Economic Forum which I believe took place

8  over the course of a week, I would expect them to be in

9  one or two boxes, if that.  If they maintain them.

10          THE COURT:   Okay.  And assuming it's one or two

11 boxes, I assume it would just take a matter of a few

12 minutes to go through them to see if it's in there.  It's

13 a recognizable document?

14          MR. CALLAHAN:   Yes, sir, and, again, we'd need

15 to make sure that that requires the boxes to be

16 specifically listed on their index.

17          THE COURT:   If they have it listed, yeah.

18          MR. CALLAHAN:   Correct.

19          THE COURT:   Got it.

20          MR. CALLAHAN:   If they don't, I don't know what

21 Your Honor would ask us to do as far as pulling everything

22 from 2002, etc.  I guess that depends on the specificity

23 of the index.

24          But if I could make note of what Ms. Weiss was

25 saying earlier about 750 boxes, just real quick, those

```
 1                        PROCEEDINGS                    23
 2   were IAB boxes, Chief of Department Operations Division
 3   boxes. Those would be the two main custodians I believe
 4   for the records we're looking at on here as far as NYPD is
 5   concerned.  And --
 6               (interposing)
 7               THE COURT:  I understand --
 8               MR. CALLAHAN:   -- mass arrest reports.
 9               THE COURT:  I understand that, but if I did
10   order you to get the mass arrest reports from 2002 and
11   they were identified, you would not have to look through
12   750 boxes --
13               MR. CALLAHAN:  Yes, absolutely.
14               (interposing)
15               THE COURT:  -- identified.  That's why I said
16   it was meaningless to tell me how many --
17               MR. CALLAHAN:  Understood.  Piece by piece, I
18   hear you, sir.
19               THE COURT:  Okay.  All right, I'm going to go
20   through these --
21               MX. GREEN:  Your Honor, if I --
22               THE COURT:  -- I'll give you a chance - go
23   ahead.
24               MX. GREEN:  If I may.  I think the other, just
25   a brief thought, and this is going to be a blast from your
```

1

2  past I suspect.  I think that the exhibits to depositions

3  in (indiscernible) have all of – which was a case you were

4  on – have all of the mass arrest reports in them.  So

5  another way to get them, to get at this would be the

6  exhibits from the depositions in Allen but I don't know

7  where those live if anywhere.

8           THE COURT:   All right, well, that's going to be

9  a category coming up, but thank you for pointing out that

10 we don't need to do both if I order the exhibits, and we

11 wouldn't need to do both.

12          MX. GREEN:   Very likely.

13          THE COURT:   Okay, so, Mx. Green, let me just

14 tell you my plan here.  My plan is to go do what I'm doing

15 now.  We'll see how long this works.  Going through each

16 of these categories to understand the burden from Mr.

17 Callahan and anyone else with personal knowledge.

18          MX. GREEN:   Understood.

19          THE COURT:   And then at the end of it – while

20 it's going on, if there's something you want to ask Mr.

21 Callahan, that's fine, I'll give you a chance, you can

22 pipe up if I seem to forget to ask you.  And then at the

23 end of it all, I, you know, I'll give people a chance to

24 say what they think is burdensome and not burdensome and

25 what should be produced and not be produced, and then I'll

```
 1                        PROCEEDINGS                    25

 2   make a ruling.  That's my plan.

 3             MX. GREEN:   Understood, Judge.

 4             THE COURT:   Okay, so I'm going to keep going.

 5   I'm going to have you, Mx. Green, I just want you to jump

 6   in if there's something you want to ask Mr. Callahan or

 7   want to say.  All right?

 8             MX. GREEN:   I am more than happy to do that,

 9   Judge.

10             THE COURT:   Okay.  So the next category is

11   what's called 49s which I know if the City thinks that

12   they aren't a specific thing, but I don't even what - Mx.

13   Green, maybe tell them what you think a 49 is and then

14   they can say what they think a 49 is.

15             MX. GREEN:   Yes.  Yes, Your Honor.  I mean a 49

16   is shorthand for a memo.  It's got a To, a From, a

17   Subject.  It's got a body, and then it's got a cc list.

18   They're the way that, for example, you know, you request

19   an SRGD at a protest or, you know --

20             THE COURT:   SRG?

21             MX. GREEN:   Strategic response group.  One of

22   the divisions of NYS at issue in this case.  They are - in

23   large part they are how the NYPD mechanically functions in

24   a lot of contexts.  They are - we need these people to go

25   here.  And then also they cover, or at least they used to
```

```
 1                        PROCEEDINGS                    26

 2   cover, reports on how an event went or how an enforcement

 3   action went, and I think, for example, in particular for

 4   the World Economic Forum, I believe the RNC, there were

 5   some 49s that were very critical of the police response,

 6   and my understanding is they stopped doing the after-

 7   action report 49s essentially after those got disclosed in

 8   litigation.

 9            But they cover a range of things, but they are

10   historically the basic method of communication in the

11   NYPD.

12            THE COURT:   And is this something that would be

13   in the deposition transcript exhibits?

14            MX. GREEN:   I believe many would, yes, although

15   I am not certain, as certain it would be all of them.

16            THE COURT:   Okay.  Mr. Callahan, see, I don't

17   even know how – if what these are are memos, what is the,

18   what methodology could one use to search for these

19   documents?

20            MR. CALLAHAN:   So we would call them

21   communications.  To/from memos that Mx. Green is referring

22   to are detail requests.  And then I believe the post-event

23   49s they're referring to is an unusual occurrence report

24   which are only used in specific circumstances, unusual

25   circumstances.  So as far as --
```

```
 1                    PROCEEDINGS                    27
 2         THE COURT:   Is that your understanding of what
 3  an after-action report is?  When you say a post-event 49.
 4         MR. CALLAHAN:   No, I was referring to unusual
 5  occurrence reports.
 6         THE COURT:   So that's a kind of --
 7             (interposing)
 8         MR. CALLAHAN:   And my – in my time here I can't
 9  say I've seen, you know, post-event reports or the phrase
10  (indiscernible) reports after-action.
11         THE COURT:   After-action report is not a phrase
12  you use?
13         MR. CALLAHAN:   Not me personally.  I've been
14  here since 2016.
15         THE COURT:   All right.  Okay, so what's the –
16  what would be the method for search --
17         MR. CALLAHAN:   So if someone asks me --
18         THE COURT:   It's a little --
19         MR. CALLAHAN:   Absolutely.  So if someone asks
20  me for 49s from the World Economic Forum, knowing that
21  they're probably protest related, I would request Chief of
22  Department Operation Division TRM index, look through
23  there, get all the TRM box numbers that state they have
24  detail information in them, detail requests, and
25  communications.  I looked at the index today, and those
```

```
 1                        PROCEEDINGS                 28
 2  are the two main categories of documents or boxes that we
 3  would request from Chief of Department OPS Division which
 4  should be the custodian for these records, and the total
 5  there was just north of I believe 100 boxes.  Excuse me,
 6  let me apologize there for a second.  That would be
 7  totaling ELM, Occupy Wall Street, RNC, and World Economic
 8  Forum.  So it would be a smaller amount for the World
 9  Economic Forum, but looking prospectively, we would order
10  all the boxes in one fell swoop if that's what happened.
11  If that's what's ordered.
12            THE COURT:   You don't know how many are
13  attributable to each protest?
14            MR. CALLAHAN:   Not at the current moment.
15            THE COURT:   Did you ever --
16            MR. CALLAHAN:   I do have --
17            THE COURT:   Do the numbers, I mean was it
18  equally divided between them?  Were there many more for
19  one versus the other?
20            MR. CALLAHAN:   I don't recall.  I can look at
21  it, but it's a large index.  Those aren't obviously the
22  only types of records that they're storing.
23            THE COURT:   So this is an index of unusual
24  occurrence reports for these protests, is that what it is,
25  and post-events?
```

```
 1                         PROCEEDINGS                    29
 2            MR. CALLAHAN:   No, so that is not what I'm
 3   stating.  These are more the prospective or before the
 4   event, and I would request all the boxes that say
 5   communications on them because in the even there was any
 6   49 after the event discussing it, it would be in a
 7   communications box.  Or, alternatively, if we're talking
 8   about electronic storage, you would hope that that command
 9   has a communications share drive location.
10            THE COURT:   I've lost you when you said shared
11   drive.  I thought we were talking about boxes, I'm sorry.
12            MR. CALLAHAN:   I switched into a little
13   electronic storage.  So for the date where it cuts off on
14   the index, you would then hope that the commands have a
15   communication share drive location electronically.
16            THE COURT:   I see, because you're looking at
17   all of them.  I'm kind of focusing on these one at a time.
18   All right, that's fine.  When I say one kind of protest at
19   a time.  All right.  So after action reports.  I assume
20   you saw this chart.  Does that have meaning for you as to
21   how you would look for that, and if not, tell me about it.
22            MR. CALLAHAN:   For me personally, no, but I
23   would defer to Ms. Fitzpatrick who runs our civil
24   litigation unit which handles document requests.
25            MS. WEISS:   Your Honor, if I may --
```

```
 1                        PROCEEDINGS                    30
 2            THE COURT:   All right, Ms. Fitzpatrick.
 3            MS. WEISS:   Your Honor, if I may, just before
 4    Ms. Fitzpatrick speaks, when I prepared this chart, I
 5    considered after-action reports to be a type of 49 I
 6    suppose because in my experience that is what I have heard
 7    them called.  As Mr. Callahan explained, 49s to be pretty
 8    much any communication, any memo within the police
 9    department, and an after-action report would also be that
10    type of to/from memo.  But I will let Ms. Fitzpatrick
11    explain further.
12            MX. GREEN:   And for what it's worth, we're all
13    in agreement there.
14            MS. FITZPATRICK:   I apologize.  I lost the
15    thread.  We're speaking specifically now with looking for
16    49s with regards to, as they are on shared drives?
17            THE COURT:   No, we're talking, right now we're
18    on the 2002 WEF protest.
19            MS. FITZPATRICK:   Okay.
20            THE COURT:   And we're trying to figure out what
21    the burden is to you to producing after-action reports,
22    how you find them and how you would produce them.
23            MS. FITZPATRICK:   Well, they'd be paper-based
24    and they would be stored, as Mr. Callahan said, and that
25    the company that we currently use is GRM.  This may
```

1                          PROCEEDINGS                    31

2  require looking for other boxes in other places because it

3  depends upon when they were stored and by whom.  So that

4  would be dictated largely by the command, so that would

5  require us going back and speaking to somebody with

6  historical knowledge with regards to document storing

7  procedures for the Criminal Justice Bureau at that time.

8          THE COURT:   This is different from your 49

9  process?

10         MS. FITZPATRICK:   No, I mean it's all basically

11  the same.  It's all just communications.  49 is an

12  umbrella term, and then there's like specific types of

13  subjects that one would address.

14         THE COURT:   Because Mr. Callahan was talking

15  about looking through an index.  He said he's already done

16  it.

17         MS. FITZPATRICK:   He was talking – sorry, Your

18  Honor, he was talking specifically about the index for the

19  boxes that are stored in GRM, which I mean I'm basically

20  saying the same thing.  I mean it would require – but what

21  I'm trying to say is that there's always the possibility

22  that these boxes were stored prior to the time of the

23  department using GRM as a storage facility and they may be

24  stored in a different location and they may have a

25  different type of index.  So in order to be able to make

1                          PROCEEDINGS                    32
2    sure that we did a fulsome search, I would be more
3    comfortable with going to somebody from the Criminal
4    Justice Bureau and speaking to them specifically with
5    regards to their policies and practices for storage at the
6    time of the event and how long they keep things onsite and
7    then where they send them when they go offsite.
8              THE COURT:   Okay.
9              MS. FITZPATRICK:   That would be the more
10   fulsome way.
11             THE COURT:   Okay, so we're redoing our
12   discussion now of 49s because Mr. Callahan assumed GRM
13   would be sufficient.  You think we should, you'd be asking
14   about other units or other storage facilities rather, is
15   that what you're saying?
16             MS. FITZPATRICK:   I mean based upon my
17   knowledge of the department, I've been with the department
18   since 2010, I mean I feel like if we wanted to do a
19   thorough search, that would be the most appropriate way to
20   do it.
21             THE COURT:   Okay, well --
22             MS. FITZPATRICK:   I think a jumping off point,
23   Mr. Callahan is correct, that it would be a jumping off
24   point and that perhaps, depending upon how well things are
25   indexed and stored, and that's largely dictated by the

1                              PROCEEDINGS                    33

2  persons doing it and how the command decides that they

3  want it done, it could potentially be, but I mean to my

4  mind, since document production is what I do, I would

5  think that that would be the best way to do it.  More

6  complete.  Which would add quite a bit of time onto the

7  search, requiring us going back and getting historical

8  knowledge and finding somebody who knows exactly how the

9  bureau was run at the time of the World Economic Forum and

10 what types of documents they produced at that time and

11 then where they were stored in addition to looking at GRM.

12          THE COURT:   All right.  Again, there was

13 something about the term after-action report that I guess

14 Mr. Callahan wasn't familiar with and, therefore, deferred

15 to you.  But it sounds like Mr. Callahan was describing

16 one search process, and you're just tacking on another

17 possibility there.

18          In terms of the term after-action reports, does

19 that have some particular meaning to you?  Is that just a

20 kind of 49, a memo about the protest that happens

21 afterwards as opposed to before?

22          MS. FITZPATRICK:   Another way to think of it,

23 Your Honor, is to think of it as something along the lines

24 of things that we learned from this particular event.  And

25 to my understanding, again, with the caveat that I just

```
 1                        PROCEEDINGS                    34
 2   joined the department in 2010, I wasn't there in 2004
 3   which I believe is what we're discussing right now --
 4            THE COURT:   2002, 2002.
 5            MS. FITZPATRICK:   Right, well, with regards to
 6   that, yes.  What I mean to say, an after-action report
 7   would probably look a little bit different than a 49
 8   although it could be in the form of a 49 depending upon
 9   how the author decided to write it.  But it would
10   basically contain some information regarding an analysis
11   of the tactics that were used at the event and, excuse me,
12   a discussion of, you know, things that we can improve upon
13   or that worked well and that we should continue to do.
14   The department.
15            THE COURT:   Okay.
16            MS. FITZPATRICK:   Kind of like a postmortem.
17            THE COURT:   Okay.
18            MS. FITZPATRICK:   Of an event.
19            THE COURT:   Deposition transcripts.  Ms. Weiss,
20   I assume that's not Mr. Callahan or Ms. Fitzpatrick.
21            MS. WEISS:   No, that is my office, Your Honor.
22   I have learned that all of the files having to do with any
23   of these WEF lawsuits that my office dealt with, I believe
24   there are two, one is Burly and one is Allen.  They have
25   been archived, they've been archived for several years.
```

1                          PROCEEDINGS                    35

2   The archiving is done internally.  We don't have an

3   outside company doing the archiving for us.  It's our law

4   department's own (indiscernible) department.

5           There's no - for the WEF cases there's no sort

6   of index.  There's just the boxes with all of the case

7   materials in them.  So other than getting all of the boxes

8   for both of the cases from the archives, there's no way to

9   tell what's in each box.  And --

10          THE COURT:   How many boxes are there?

11          MS. WEISS:   I believe I was told there's about

12  a hundred for the two cases, and then once we have the

13  boxes, there's no guarantee, in fact, I doubt that the

14  deposition exhibits are put in their own folder or file.

15  They're probably just scattered throughout the redwelds in

16  the files wherever they would have been put according to

17  the attorney on the cases filing methods.

18          THE COURT:   Okay, see - go ahead.

19          MS. WEISS:   And I don't think - I'm trying to

20  think, Your Honor, I don't think there are any attorneys

21  left at the law department who worked on the WEF cases.  I

22  played a very, very small part but I certainly had nothing

23  to do with filing or archiving of those cases.

24          THE COURT:   All right, CCRB/IAB records from

25  this protest.  There's no, it just says 30 hours.  I don't

```
 1                        PROCEEDINGS                  36
 2  know anything else about it.  Maybe you're not – are you –
 3  I guess for all 2002 you're saying that that's not
 4  proportional.  So why don't you talk about that.
 5             MS. WEISS:   Well, Your Honor, I can speak.
 6  (indiscernible) on the line can't speak as to the CCRB
 7  records.  I can.  After a conversation with my liaisons at
 8  the CCRB, and they can certainly pull up complaints from
 9  2002 from the, approximately from the time period there's
10  nothing that indicates that they're specifically related
11  to WEF protests.  They can use names that, they can try to
12  look by names that have been pulled from the lawsuits that
13  are in my office, but there's no way --
14             THE COURT:   Can they search by date?
15             MS. WEISS:   No, they can't search by date.
16  They can search by year.  They can possibly put in some
17  terminology that might possibly lead to the type of
18  complaints – there's no way to, say, put in the date of a
19  protest or WEF or even – they could put in protest but
20  it's no guarantee that it's going to lead to that if
21  whoever puts it in didn't put in the word protest.
22             THE COURT:   All right, and when you say 30
23  hours, that meant your plan was to get all the 2002 and
24  have someone go through and find the ones that relate to
25  WEF protesters?
```

```
 1                       PROCEEDINGS                    37

 2            MS. WEISS:   Try to narrow it down as much as

 3   possible to try to figure out what might be related to a

 4   WEF protest.

 5            MX. GREEN:   Your Honor, I suppose we would like

 6   to know who (indiscernible) that because that just doesn't

 7   seem plausible that you can't narrow by the date of

 8   incident.   I mean like every CCRB document says the date

 9   of incidence on it.

10            MS. WEISS:   Yes, but they're not searchable in

11   the CCRB's database by date.

12            (interposing)

13            THE COURT:   -- computerized, you're saying

14   these are computerized records, Ms. Weiss, from 2002 that

15   have the date but you can't search by date?

16            MS. WEISS:   That is what I have been informed.

17   I'm sorry I don't have someone from CCRB on this line

18   today.

19            MX. GREEN:   Your Honor, in this case I think

20   repeatedly we hear things are impossible until we get into

21   the room with the people who actually understand --

22            THE COURT:   Okay.

23            MX. GREEN:   -- repeatedly find out it's

24   possible.

25            THE COURT:   Okay, let's, I mean we're going
```

```
 1                    PROCEEDINGS                    38

 2   through this.  I'm going to make decisions based upon

 3   what's represented.  If at any time in the future you find

 4   out that what was represented is not correct, Mx. Green,

 5   obviously that would be a basis to come back if, in fact,

 6   it showed some lack of burden.  Okay?

 7            MX. GREEN:   Okay.

 8            THE COURT:   And if you need me – it's hard to

 9   believe the City would protest, but they should certainly

10   if at an appropriate time, in conjunction perhaps with

11   other CCRB issues, bring someone from the CCRB to verify

12   and to answer questions about it.

13            MX. GREEN:   Yes, Your Honor, I mean I suppose I

14   don't know how we would figure it out if we can't take a

15   deposition, but it's, it has just been I think our

16   experience in this case and in other cases.  For example,

17   when we were told that it was extremely burden to export

18   audit trail logs, even last week, as soon as we were in a

19   room with the people from NYPD legal, we found out it was

20   actually quite easy and it could be done at the press of a

21   button.  And, you know, it was at multiple conferences

22   that --

23            THE COURT:   I --

24            (interposing)

25            THE COURT:   Mx. Green, we got to stay on --
```

```
 1                         PROCEEDINGS                    39

 2           MX. GREEN:  I understand --

 3           THE COURT:  I already - what I told you was I

 4  thought I was doing better than a deposition which was I

 5  think they should make such a person available to you,

 6  and, you know --

 7           MX. GREEN:  Sorry, I misunderstood.

 8           THE COURT:  -- find out --

 9           MX. GREEN:  Great, I will --

10           THE COURT:  No, I meant in a non-deposition

11  context.

12           MX. GREEN:  Great, yeah --

13           THE COURT:  That should be something that's an

14  option where you have a good basis for it.  There's no

15  point wasting time at a deposition (indiscernible) someone

16  on a phone call.

17           MX. GREEN:  Understood.

18           THE COURT:  So if something changes, that if

19  something is misrepresented here, obviously that changes

20  the burden, then you're welcome to first talk to them and

21  come back to me.

22           MX. GREEN:  Understood.

23           THE COURT:  Okay, I'm going to keep going

24  through these.  Maybe we'll end up being duplicative, I'm

25  not sure.  But let's now go through RNC 2004.  So, Ms.
```

1                          PROCEEDINGS                    40

2    Weiss, the way I read this is for the mass arrest reports

3    there is no impediment and that this is just a matter of I

4    guess someone reviewing --

5              MX. GREEN:   Oh, Your Honor --

6              THE COURT:   What?

7              MX. GREEN:   -- IAB is separate from CCRB.  They

8    are different agencies.  One is within the NYPD and the

9    other is a city agency.

10             THE COURT:   Okay.

11             MX. GREEN:   So I don't think CCRB covers IAB.

12             THE COURT:   Ms. Weiss, what's the answer on IAB

13   records?

14             MS. WEISS:   That's correct.  Mr. Callahan,

15   correct me if I'm wrong, you referred to the 500 or 600

16   boxes of IAB records in storage.  Would that be applicable

17   to IAB records for the WEF?

18             MR. CALLAHAN:   Yes, it would.  It was just like

19   the other set of records made to be divided up into which

20   ones were actually relevant to the WEF and not

21   (indiscernible) --

22             THE COURT:   Are they computerized in some way

23   or not?

24             MR. CALLAHAN:   No, they are paper files held in

25   storage in DRM or at the command of the location.

```
 1                         PROCEEDINGS                  41
 2              THE COURT:   Okay.
 3              MR. CALLAHAN:   And there you would be demanding
 4    the boxes from the storage location, having to sift
 5    through --
 6              THE COURT:   Do you have any IAB boxes or IAB
 7    record boxes for 2002?
 8              MR. CALLAHAN:   Not specifically for 2002.  We
 9    need to review the index.
10              THE COURT:   Okay.
11              MS. FITZPATRICK:   Your Honor, if I may.  I'm
12    sorry, there's also a database, an IAB database.
13              MR. CALLAHAN:   Yeah, let me be clear.  These
14    were the paper files are only from 1999 to 2018.  Sorry.
15              THE COURT:   I'm sorry, so there's a
16    computerized database.  I've lost you, try me again.
17              MS. FITZPATRICK:   There's a computerized
18    database, it's called IAPro.  It was operational, I mean
19    you can still access it, but there's a new database that
20    actually is now used that went online in 2012 called ICMS,
21    Internal Case Management System.
22              THE COURT:   So from this period there's a
23    database that shows what?
24              MS. FITZPATRICK:   So logs basically which would
25    be basically case number, log number, and then a brief
```

```
1                         PROCEEDINGS                      42
2    description – let me state, restate – would be a
3    description of the allegation, and then there would be
4    some, there'd be another page that you go to that would
5    give you a little bit more of a summary of what the
6    underlying allegation, like what it was actually alleged
7    to have happened.
8             THE COURT:   Okay, but it's not obviously the
9    file.
10            MS. FITZPATRICK:   No, no.  As Mr. Callahan
11   said, up until 2012 all of the internal files for IAB were
12   paper based.
13            THE COURT:   Okay.
14            MX. GREEN:   Can you search IAPro by date?
15            MS. FITZPATRICK:   You can search, yes,
16   beginning date/ending date.  It's a key incident received
17   date range though, so I don't know if it's actually the
18   date of the occurrence or the date when the allegation was
19   made.  I think it would be the date that the allegation
20   was made --
21            (interposing)
22            THE COURT:   So you don't even know if it's –
23   you don't know if it's searchable by occurrence.
24            MS. FITZPATRICK:   Sorry, I'm looking at the
25   search page right now.  No, I do not.  It doesn't appear
```

```
 1                          PROCEEDINGS                    43
 2   to be, but I could be mistaken.
 3            THE COURT:   Okay, but if you did search by
 4   occurrence, it would give you this sort of summary data --
 5            MS. FITZPATRICK:   Yes.
 6            THE COURT:   -- and it would not tell you where
 7   the paper file was or it would?
 8            MS. FITZPATRICK:   You would be able to know
 9   that based upon the case number, and it would also --
10            THE COURT:   I see.
11            MS. FITZPATRICK:   -- indicate the group that
12   investigated it.
13            THE COURT:   I see, so you could look up the
14   case number.
15            MS. FITZPATRICK:   Yes.
16            THE COURT:   Okay.  All right, you may need to
17   go over this again with me as we, you know, I'm doing this
18   - you may not realize this, Ms. Fitzpatrick and Mr.
19   Callahan, I mean I'm looking at a chart and I'm going
20   through the chart box by box.  So you may be answering
21   questions that apply to all the protests, and I'm not
22   focusing on that now so I may ask you the same questions
23   over and over again.  Just because that's the way I'm
24   thinking about the problem.
25                 Okay, so I guess, Ms. Weiss, there was, your
```

```
 1                        PROCEEDINGS                 44
 2  chart is not entirely complete with respect to CCRB/IAB,
 3  because the way I read it, I thought you can get all of
 4  these records within 30 hours, over 30 hour of work, and I
 5  think it sounds like you have some impediments to the
 6  extent that you have to, you'd have to order boxes, you
 7  have to identify the records and order up boxes.  I gather
 8  that's an issue.
 9            MS. WEISS:   That's correct, Your Honor.
10            THE COURT:   Okay.  See, this is the problem
11  here.  You - we haven't, and I'm not going to - I know the
12  position (indiscernible), I'm not necessarily disagreeing
13  with them.  Right now I want to solve the problem.  And,
14  you know, the thing that should've happened hasn't
15  happened which is the City saying this is too much and why
16  and here's what it would entail and here's what wouldn't
17  be burdensome with respect to this protest, and,
18  therefore, this is what should be ordered.  We'll see if
19  we can keep doing this and for how long.  All right, let's
20  turn to 2004.
21            MS. WEISS:   Your Honor, if I may,
22  (indiscernible) at least to 2004 are in (indiscernible).
23  Mr. Callahan was able to locate a large traunch of
24  documents that are responsive to what plaintiffs are
25  requesting.  He found sort of a creative way to get the
```

 1

 2  documents.  So they are available, they have been

 3  collected.  There's a huge number of documents, I don't

 4  know the number offhand.  Perhaps Mr. Callahan does.  And

 5  I don't think we can guarantee that they are every single

 6  one of the mass arrests reports, 49s, etc.  But it would

 7  certainly be the majority.  And from now it's a matter of

 8  us at the law department reviewing them, redacting them,

 9  and getting them prepared for production.

10          MX. GREEN:   Your Honor --

11          THE COURT:   Well --

12          MX. GREEN:   -- on that I think, I hope we can

13  just do this here.  We're talking about mass arrest

14  reports I assume.  I don't think that - I think there are

15  only three possible redactions which would be names, first

16  name, last name, and address, and I just want to make sure

17  that that's what we're talking about.  And then the

18  redactions would just be a column.

19          MS. WEISS:   Well, Mx. Green, with respect to

20  mass arrest reports, yeah, it would be the personal

21  information regarding the arrestees, but I think the

22  documents that Mr. Callahan has located are more than just

23  mass arrest reports.  There are a number of different

24  documents, and I think other than deposition transcripts

25  and I'm not sure about, well, certainly not CCRB, but I'm

PROCEEDINGS                          46

1

2   not sure about IAB records and Mr. Callahan should be able

3   to answer that.  We seem to have most if not all of the

4   documents.

5                THE COURT:   Okay, well, Mx. Green was just

6   talking about, just wanted to make sure you weren't doing

7   any redactions other than the personal detail.  So is that

8   correct that that's what the redactions are about?

9                MS. WEISS:   That's correct.

10               THE COURT:   Okay, that's all that should be

11  redacted obviously.  Okay, so Mr. Calla - I mean this is

12  all very mysterious.  So, Mr. Callahan, can you explain

13  what it is you did and what it is you think you found and

14  whether there's some other methodology for getting the

15  mass arrest reports, 49s, and after-action reports for the

16  2004 RNC protest?

17               MR. CALLAHAN:   Yeah, sure, so I went to more

18  senior members of my command, my command structure who

19  have been around much longer than I have, asked if, you

20  know, in the past whether there was a central repository

21  for these records or, you know, if there's a creative way

22  to go about collecting them.  And what I was told was to

23  check with our FOIL unit who did have a collection of

24  records.  My understanding that this was a hot button

25  event that happened in 2004, certainly plenty of people

```
 1                          PROCEEDINGS                    47
 2   have requested records related to it, and they had
 3   numerous records related to the RNC including mass
 4   arrests, 49s, and after-action reports.
 5            THE COURT:   And this was collected by the FOIL
 6   unit in response to FOIL requests.
 7            MR. CALLAHAN:   Over the course of their
 8   history, that's the way I understand it.
 9            THE COURT:   Okay.  And those are ready to go,
10   they just have to be redacted?
11            MR. CALLAHAN:   Correct, they're being redacted.
12            THE COURT:   Okay.  So if you wanted to do a
13   check on the FOIL unit or get anymore, is it the same
14   thing you described before or something else you --
15            MR. CALLAHAN:   I was in the process of doing
16   that.  I am in the process of doing that with Occupy Wall
17   Street.
18            THE COURT:   Oh, because they don't have, the
19   FOIL unit didn't come through with you on that?
20            MR. CALLAHAN:   Not yet.
21            MS. WEISS:   And if I may, Your Honor, I just
22   want to remind the Court that Occupy Wall Street
23   demonstrations took part over the course of nearly two
24   years, and unlike the WEF which was a week and RNC which
25   was essentially a weekend, Occupy Wall Street had a number
```

```
 1                           PROCEEDINGS                    48
 2   of different dates of large demonstrations where there
 3   were mass arrests.  So it's possible that there were FOIL
 4   requests for a specific date, but I don't think that, and
 5   I could be wrong, but I don't think that a request could
 6   be made to the FOIL unit to produce everything from Occupy
 7   Wall Street.  We would have to give them the dates of the
 8   demonstrations.
 9               MR. CALLAHAN:   That's correct, and maybe even
10   the request --
11               (interposing)
12               MX. GREEN:   I think we're getting ahead of
13   ourselves.
14               MR. CALLAHAN:   Well, yeah.
15               THE COURT:   Because we haven't finished with
16   RNC, Mx. Green, is that what you're saying?
17               MX. GREEN:   Yeah, exactly.
18               THE COURT:   Okay, so I guess the question
19   becomes what are you doing, Mr. Callahan, in addition to
20   whatever you're producing from the FOIL unit?  Are you
21   doing something?  What's the proposal?  Maybe it's a
22   question for Ms. Weiss.  I mean what's the position --
23               MR. CALLAHAN:   As it relates to which records?
24               THE COURT:   2004 RNC.  Beyond the FOIL, I know
25   the FOIL unit sounds great, sounds like a good thing to
```

```
 1                       PROCEEDINGS                    49

 2  do.  I --

 3          MX. GREEN:   Mr. Callahan, is the set of

 4  documents --

 5          MR. CALLAHAN:   Also discussing it with

 6  Lieutenant Czark and CJB.

 7          MX. GREEN:   Sorry, is the set of documents you

 8  found from the FOIL unit, the pre-collected and pre-

 9  redacted ones, or are they as produced under FOIL?

10  Because I think that that, you know, on one hand that

11  would make them very easy to produce because they're

12  already public records and there's no even colorable

13  objection to just immediately producing them.  But, on the

14  other hand, that there are, there are ways that you can

15  redact things under FOIL that don't apply in civil

16  litigation.  So, you know, on one hand, on the other, if

17  they are the redacted versions, we should be able to get

18  them tomorrow.  On the other hand, I don't know that

19  that's going to be perfect or even correct because a lot

20  of things get redacted for interagency privilege under

21  FOIL that shouldn't be in civil litigation.

22          MR. CALLAHAN:   I don't have an answer to your

23  question.

24          THE COURT:   You don't know whether the FOIL

25  unit is giving you redacted or unredacted --
```

```
 1                        PROCEEDINGS                    50

 2              (interposing)

 3              THE COURT:   -- produced it --

 4              MR. CALLAHAN:   I just haven't reviewed the

 5    records.  I just haven't reviewed them, and I did not ask

 6    them that question when they provided it to me.

 7              THE COURT:   Okay.  So, Ms. Weiss, if they have

 8    a set of documents as produced to a member of the public,

 9    zero chance of any privilege or any objection.  So those

10    should just be produced immediately.

11              MS. WEISS:   Just in as long a time as it takes

12    to get them on our system and then (indiscernible) with

13    Bates numbers and such.

14              THE COURT:   Yes.  Yes.  I mean I assume

15    (indiscernible), hours or days, not weeks.

16              MS. WEISS:   (inaudible)

17              THE COURT:   Okay, so let me just try to figure

18    out what we're going to do - so, Mr. Callahan, you said

19    you were still trying to look for 49s, mass arrests, what

20    they're calling after-action reports for this or not?

21              MR. CALLAHAN:   I believe you asked if I was

22    searching anywhere else, and my response was I did also

23    speak about the RNC with Lieutenant Czark earlier today.

24              THE COURT:   And?

25              MR. CALLAHAN:   So I have (indiscernible) or
```

```
 1                         PROCEEDINGS                    51

 2  CJB, excuse me.  I think I said this before, there are

 3  mass arrest reports dating back to the RNC and 2003.

 4            THE COURT:   And this forms the hundred boxes?

 5            MR. CALLAHAN:   No, this was an electronic

 6  collection where I met with Lieutenant Czark earlier

 7  today.  He showed me a shared drive location that Mx.

 8  Green referred to earlier.

 9            THE COURT:   That he's maintained what on?  Or

10  someone's maintained what on this shared drive?

11            MR. CALLAHAN:   Mass arrest reports, excuse me.

12            THE COURT:   Just the mass arrest reports.

13            MR. CALLAHAN:   And other related MAPSI

14  (phonetic) records, whether they're --

15            THE COURT:   Other related what records, I'm

16  sorry?

17            MR. CALLAHAN:   Mass arrest processing

18  (indiscernible) records, so administrative records that

19  they might have, instructions, what have you.

20            THE COURT:   Okay.  So that's something that's

21  going to be readily available then?

22            MR. CALLAHAN:   Yes.  It just needs to be

23  reviewed for responsive, what, in fact, is responsive.

24            MX. GREEN:   Well, let me perhaps make this

25  easier.  I think if we aren't getting the other
```

```
 1                      PROCEEDINGS                   52
 2  administration records, we're going to send a request for
 3  them.  Perhaps the best thing to do is to cross out mass
 4  arrest reports from everything remaining because it sounds
 5  like everything through the present is pretty easy.
 6  Unless there is some objection to burden after that.
 7              THE COURT:   Mx. Green, let me just - I didn't
 8  quite follow.  So the theory is that these mass arrest
 9  reports are --
10              (interposing)
11              MX. GREEN:   They're all in one digital folder.
12              THE COURT:   That Lieutenant Czark knows about.
13              MX. GREEN:   Yes.  And it sounds like what Mr.
14  Callahan has said is that they don't have the stuff from
15  2002 in there, but everything 2003 and after is in that
16  folder.  And so I think our request, if they are going to
17  withhold something on responsiveness, we'll serve today a
18  request asking for the contents of that folder.  And I
19  would hope we can just skip ahead to it's not burdensome,
20  there is some redaction that might need to take place of
21  those documents, but otherwise we'll get them.  And we can
22  cross mass arrest reports off of every remaining protest.
23              THE COURT:   Okay, except it sounds like you
24  want mass arrest reports that don't relate to these
25  protests if they're in there, is that what you're saying?
```

```
 1                         PROCEEDINGS                    53
 2            MX. GREEN:   I think that the answer is we have
 3  every year covered, and I don't, you know, we have in
 4  response to an interrogatory, we have a list of every time
 5  between 2000 and the present that a mass arrest center was
 6  opened.  I don't - if they have been opened outside of
 7  these protests, it's been a very limited number of times,
 8  and, you know, yes, if there is something from a
 9  different, from a (indiscernible) protest, obviously it's
10  not relevant, and I don't know that we really have too
11  much objection to not getting that.  But I think the
12  contents of that folder are almost one to one with this
13  request if you take it through all the protests.
14            THE COURT:   Okay.  So, Mr. Callahan, what's the
15  status of that folder?  Have you - how many - it's in
16  electronic form and you're reviewing it or what's going
17  on?
18            MR. CALLAHAN:   Yes, so it's collected and it
19  needs to be reviewed.
20            THE COURT:   Okay, and what's the volume, do you
21  know?
22            MR. CALLAHAN:   I do not.  I do know from
23  Lieutenant Czark that it contains CJB and MAPSI materials
24  from 2003 to the present.
25            THE COURT:   Okay.  All right, so let's put, I'm
```

```
 1                          PROCEEDINGS                    54
 2   going to - by the way, the presumptive date for production
 3   of all of these is March 11.  That was the month from --
 4              MX. GREEN:   Thirty days from --
 5              THE COURT:   -- last week.  Yeah.  So that's
 6   going to be the date unless someone prevails on me
 7   otherwise and successfully prevails on me otherwise.
 8              Okay, so what do we do - Mx. Green, I don't
 9   know, what do we do now about 49s and after-action
10   reports?  What's --
11              MX. GREEN:   I mean it's pending kind of knowing
12   whether or not there are, you know, whether we're talking
13   about the actual documents or sheets of paper covered in
14   black.  It sounds like we found a way to do it.
15              THE COURT:   The FOIL unit.
16              MX. GREEN:   Right, exactly.  It sounds like we
17   found a way to do everything but deposition and CCRB/IAB.
18   And maybe the best thing to do is if it turns out that we
19   don't, that everything's redacted, then that's kind of a
20   guide to what we need to collect otherwise anyway.
21              THE COURT:   In other words, if you're getting
22   post-redaction FOIL material?
23              MX. GREEN:   Exactly, right, and, you know,
24   based on extensive experience with FOIL materials, I would
25   expect these kinds of materials to be almost entirely
```

```
 1                          PROCEEDINGS                      55
 2  redactions.  But at the very least --
 3            THE COURT:   I can't believe a FOIL unit would
 4  not keep both the pre and post-redacted materials because
 5  it just seems crazy not to.
 6            MX. GREEN:   I would hope so too, and so, you
 7  know, which is why I'm saying let's see what we're
 8  getting.  I think that that's, we can call that done for
 9  today.
10            THE COURT:   Okay.  Mr. Callahan, if this FOIL
11  material is redacted with anything other than, you know,
12  someone's name and arrest number or something like that,
13  Ms. Weiss, you need to tell us immediately.  Okay?
14  Because right now we're relying --
15            MS. WEISS:   Sure, Your Honor.
16            THE COURT:   -- on FOIL for this.
17            MS. WEISS:   Absolutely, Your Honor.
18            THE COURT:   You tell the other side
19  immediately, and then they can tell me.  Okay, so now we
20  have to talk about --
21            MX. GREEN:   Deposition --
22            (interposing)
23            THE COURT:   -- deposition transcripts and CCRB,
24  okay.  So what is the story --
25            MX. GREEN:   (indiscernible)
```

| 1 | PROCEEDINGS                                    56 |

2          THE COURT:   Yeah, what's the story with

3   deposition transcripts?

4          MS. WEISS:   Your Honor, we produced, a few

5   weeks ago we produced a large number of deposition

6   transcripts.  Mx. Green indicated that she thought they

7   were not all there.  When we spoke on Wednesday,

8   plaintiffs' counsel pointed out specifically some that

9   they knew should have been there and were not.  I went

10  back to speak with my colleague who was in charge of the

11  RNC cases and who had told me where the transcripts would

12  be, and at some point in our conversation, we realized

13  that the paralegal who took care of archiving and filing

14  the RNC cases had electronically filed some other

15  deposition transcripts in another place.

16          I have since spoken with him.  He gave me the

17  ones that we knew specifically were outstanding, and I now

18  know where to find the rest.  I have not been able to do

19  that yet because I've been doing other things on this

20  case.  But I will be able to review, look through and pull

21  the rest of the transcripts early next week to get them to

22  plaintiffs.

23          With respect to any exhibits --

24          THE COURT:   Ms. Weiss, Ms. Weiss.

25          MS. WEISS:   Yes, Your Honor.

```
 1                      PROCEEDINGS                    57
 2             THE COURT:   Ms. Weiss, could you please ask Ms.
 3   Pistata (phonetic) to give you someone that could look
 4   through boxes or whatever for transcripts so that you
 5   don't have to do that because you have a lot of other
 6   things you have to do as managing this case?
 7             MS. WEISS:   I can certainly ask, Your Honor,
 8   and hopefully --
 9             THE COURT:   I thought you - I'm being a little
10   tongue in cheek, Ms. Weiss, because you had led me to
11   believe that there were up to nine attorneys working on
12   this case.  It's hard to believe that this should be,
13   first of all, it's hard to believe it's an attorney
14   function.  I'm just worried about the staffing of this
15   case when you tell me that the deposition production
16   depends upon you searching through files.
17             MS. WEISS:   I will ask and try to find support
18   staff who can do that.
19             THE COURT:   All right, I interrupted you, go
20   ahead.
21             MS. WEISS:   (indiscernible) exhibits.  So I
22   know that plaintiffs' counsel were also asking for
23   exhibits for these depositions.  They are electronically
24   in our office.  They were put on a separate database which
25   has since been closed out.  It may be possible to have
```

1

2  that database reinstituted.  We don't know yet, but even

3  if we were able to, it would cost several thousand

4  dollars.  Otherwise, any exhibits would be archived, and

5  it would be much the same process that we spoke about

6  earlier --

7            THE COURT:  Well, do you know – did they not

8  archive – well, tell me about it.  How many boxes, do we

9  know which, can you order up the boxes with just the

10  exhibits?  Is it indexed that way?

11            MS. WEISS:  It's indexed better than the WEF

12  cases, but I do not believe from what I understand, I have

13  not looked at the indexes myself, but it's upon

14  conversations, they're not, there's no box that is

15  specifically deposition exhibits.  There might be

16  somewhere there's a small folder of some deposition

17  exhibits, but they're not organized in any way that, you

18  know, if we have Chief Monahan's deposition, that there's

19  a corresponding folder with the exhibits from that

20  deposition.  And there are several hundred boxes.

21            MX. GREEN:  Your Honor, I think it may make

22  sense to find out what the exact price is.  Because if

23  it's several thousand dollars, let's call that 3,000 or

24  4,000, I mean in terms of attorney time on these two

25  conferences and the meet and confer this week, we've

```
1                          PROCEEDINGS                    59
2    easily cleared that number.  If that's, you know, if
3    that's what the impediment is, I think if they - it's a
4    very good use of money to spool up that database.  It also
5    strikes me that, you know, I cannot imagine not backing up
6    a database to a useable form for cases that are not, are
7    less than seven years old.
8              THE COURT:   Whoa, whoa, whoa.  This is the two
9    thousand - I thought we're talking about RNC.
10             MX. GREEN:   We are talking about RNC, but I
11   mean much of the, I think the RNC litigation went on for
12   ten years.  So we're within seven years of when it ended.
13             THE COURT:   All right, Ms. Weiss, get an exact
14   quote for what it would cost to get this and let the other
15   side know, and then if you disagree about what to do,
16   bring it to me.
17             MS. WEISS:   Yes, Your Honor.
18             THE COURT:   I mean do that, you know, in the
19   next week.
20             MS. WEISS:   Okay.
21             THE COURT:   Okay, CCRB and IAB records.
22             MS. WEISS:   With respect to CCRB, it's
23   essentially going to be the same as I discussed for - the
24   database is not easily searchable.  These documents at the
25   time were not even originally in - I think part of the
```

PROCEEDINGS                    60

1
2   problem arises that these documents were not originally on
3   an electronic database and were put on one later.  I'm not
4   a tech person, but I think that that interferes with the
5   searchability of them.
6            THE COURT:   I'm sorry, you need to say what you
7   said again.  Do we have the same answer for the CCRB and
8   the IAB records which is the belief that it can't be
9   searched by date?
10           MS. WEISS:   I'm speaking just as to the CCRB
11  records which is not something that the NYPD can speak to.
12           THE COURT:   I --
13           MX. GREEN:   Your Honor, I think this is
14  something where we just need to talk to the relevant
15  people.  There was a letter that the CCRB sent talking
16  about 63 specific cases when the NYPD I believe declines
17  to discipline many of the officers involved in the various
18  crackdowns during the RNC, you know, I just find it,
19  frankly, impossible to believe that they don't know
20  exactly where those 63 case files are.  You know, there's
21  a Times article about it that you can just Google.
22           THE COURT:   Okay, well, this falls in the
23  category of if you find out a representation is wrong, Mx.
24  Green, then whatever I order, if it's not favorable to
25  you, you can come back to me on.

```
 1                        PROCEEDINGS                    61
 2            MX. GREEN:  Understood.
 3            THE COURT:  Okay.  IAB.  Same problem as
 4  before?
 5            MS. FITZPATRICK:  Yes.  It would be the - it's
 6  the same database that I discussed previously would be the
 7  one that we would have to search.  Then we would find the
 8  logs, and then we would have to order the paper case
 9  files.
10            THE COURT:  Okay, and you say you can't search
11  it by, you think you can't search it by date of incident.
12            MS. FITZPATRICK:  I don't believe so, no.
13            THE COURT:  Okay, well, you need to confirm
14  that, and then if it's incorrect, tell Ms. Weiss
15  immediately.
16            MS. FITZPATRICK:  I will.
17            THE COURT:  And --
18            (interposing)
19            MX. GREEN:  And, Your Honor.
20            THE COURT:  Yep.
21            MX. GREEN:  I think the other thing we ought to
22  do on that is search by reporting - if you can only search
23  by reporting date, then maybe search, I don't know, six
24  months after the RNC or six months after the World
25  Economic Forum and see what the volume is.  Because if the
```

```
 1                            PROCEEDINGS                    62
 2   volume is low and we get, as Ms. Fitzpatrick suggested, a
 3   summary of the cases, and let's say we only get 30 cases
 4   in six months, maybe that's not true, but, you know, if
 5   it's somewhere below, you know, a hundred cases or
 6   somewhere below 200 or 300 cases, I don't think it would
 7   take particularly long to just look at the, what I think
 8   was described as a one-paragraph summary and figure out if
 9   it was protest related.
10           MS. WEISS:   Respectfully, Your Honor, looking
11   through six months of IAB files, even if it's just that
12   one page, is a Herculean task.
13           THE COURT:   All right, let's just move on.
14   Okay, so now we're on Occupy Wall Street.  We had this,
15   we're already dealing with mass arrest reports in the same
16   way as with, through this Lieutenant, is that correct?
17           MX. GREEN:   I believe so, Your Honor.
18           THE COURT:   Okay.
19           MS. WEISS:   That would be correct.
20           THE COURT:   And same thing for 49 and after-
21   action reports.  So now we're on to deposition
22   transcripts, right?
23           MS. WEISS:   Yes, Your Honor.  So I happen to
24   have been the attorney in charge of the Occupy Wall Street
25   cases, so I have a lot of personal knowledge regarding
```

1                          PROCEEDINGS                      63

2   them, and these, probably 90 percent of the cases are now

3   in archives.  I believe there's only two active cases

4   left, and those files are obviously in our office.  I

5   happen to know that only a small portion of the deposition

6   transcripts were saved electronically in our system.

7   Those are easy to produce.  I believe I produced most if

8   not all of them, and I can (indiscernible) they're also

9   each categorized rather than as a general Occupy Wall

10  Street type file, are each by their own case, and there

11  were approximately 100 cases.

12          So while looking through those electronic files

13  on those hundred cases is a big job.  It's certainly

14  something that we have been doing and can continue to do

15  and hopefully whatever support staff I can hopefully find

16  to help out with the RNC depositions can help out with

17  this.  We'll give that a shot.

18          The ones that are not electronic and are in

19  archives are going to be time-consuming and burdensome to

20  collect, bring back, look through the boxes, and find the

21  depositions.  There's at least I would have to say, you

22  know, 90 different cases in archives, and all of the

23  cartons for all of the cases would have to be brought in

24  and looked through because the files are not indexed in

25  any way in archive.  They're just simply archived by the

```
 1                      PROCEEDINGS                    64
 2  case name.
 3          And that would go for – in a way that would go
 4  for exhibits because not all of them would be on our
 5  electronic system.  It's possible some are.  I know that
 6  there are some where an attorney happened to file
 7  deposition exhibits under separate electronic files called
 8  deposition exhibits, but I would say that that happened
 9  maybe 5 percent of the time.  So it would require going
10  through the depositions, picking out the exhibits, and
11  then looking for the actual exhibit in the electronic
12  file.  And it might not even be there.  It only might be
13  in paper form.  So finding most of the deposition
14  transcripts is not overly burdensome.  Anything more than
15  that really starts to put the burden on.
16          And then, you know, the burdensomeness on all of
17  this becomes cumulative because there's so much to go
18  through and so much to attempt to locate, that things that
19  are burdensome and less important, you know, if we're
20  required to locate and produce them, just makes it all the
21  most difficult to find the things and take more time to
22  find the things that are more important.
23          THE COURT:  All right, we're in the same place
24  on CCRB and IAB records.
25          MS. WEISS:  Yes, Your Honor.
```

```
 1                    PROCEEDINGS                    65

 2           THE COURT:   Mx. Green, anything on this before

 3  we get to the current --

 4           MX. GREEN:   No, I think --

 5           THE COURT:   -- 2020?

 6           MX. GREEN:   If it's the same stuff, it's the

 7  same stuff, you know, I think that that covers it.

 8           THE COURT:   Okay.  I'm surprised BLM is on our

 9  prior protest agenda just because that's the current

10  protest, as it were.

11           MX. GREEN:   Yes, Your Honor, although I think

12  BLM protests started in 2013.  So, you know --

13           THE COURT:   Oh, I'm sorry, we're not talking

14  about, we're not talking about 2020.

15           MX. GREEN:   Well, I think in this chart they

16  are lumped together, and, frankly, in our requests they

17  were lumped together perhaps - well, we had framed it as

18  basically, you know, the requests here were about

19  everything through the start of the summer 2020 protests,

20  and separately elsewhere we requested the same documents

21  for the current protests.

22           THE COURT:   Okay --

23           (interposing)

24           THE COURT:   Is Lieutenant Czark getting mass

25  arrest reports from old BLM protests, Mr. Callahan?  His
```

```
 1                          PROCEEDINGS                    66
 2  just goes through the present.  He doesn't care what the
 3  protest was as long as it's mass arrests, right?
 4          MR. CALLAHAN:   His file includes dating back to
 5  2003.  Any time the mass arrest centers were activated and
 6  handled arrests, there would be a relevant or related mass
 7  arrest report for them.  So, yes, for 2013 through '20 I
 8  would expect at least some reports for BLM-related
 9  demonstrations.
10          THE COURT:   Okay, well, so then we're - it's
11  all the same for the rest of this, I mean I think we're
12  now repeating ourselves.  I guess we could talk about
13  depositions for the --
14          MS. FITZPATRICK:   Oh, Your Honor --
15          THE COURT:   -- for the past BLM --
16          MS. FITZPATRICK:   I apologize.  With regards to
17  IAB the system changed in 2012.  There's a different
18  database that is currently used, and the files are
19  digital.  That's the only difference.
20          THE COURT:   Okay, and can we - and can we
21  search by date?
22          MS. FITZPATRICK:   Let me just - my search
23  functionability is very limited.  I believe that they can
24  in the new system by date of occurrence, but I will
25  confirm that as well with IAB records.
```

```
1                         PROCEEDINGS                    67
2              THE COURT:   Mx. Green, you would need to supply
3   those dates of the --
4              (interposing)
5              MX. GREEN:   Yes, and to make things easy, it's
6   what defendants responded, the dates would be the dates
7   defendant answered our interrogatory 14.
8              THE COURT:   Okay.
9              MX. GREEN:   Which are all the dates that the
10  mass arrest processing center was open.
11             THE COURT:   Okay, I don't think we heard about
12  depositions.  What's going on with that, Ms. Weiss?
13             MS. WEISS:   Sorry, Your Honor.  There were not
14  a tremendous number of lawsuits for these prior Black
15  Lives Matter protests.  The ones that I've certainly been
16  able to learn were definitely Black Lives Matter protests
17  I requested to find out where the transcripts are.  They
18  should be electronic.  Part of the problem is knowing
19  exactly which were considered Black Lives Matter protests.
20  It's really a matter of asking around the office.  So in
21  the process of doing that, I haven't completed that yet.
22             THE COURT:   So you're doing a survey of current
23  attorneys to know the answer to this question.
24             MS. WEISS:   And I'm having one of our support
25  staff try to go through, not try to, but go through one of
```

```
 1                           PROCEEDINGS                    68
 2   our systems to see if there's notations that, a specific
 3   case in the Black Lives Matter cases, there's no definite
 4   code for that, but he's working on figuring that out.
 5           THE COURT:   All right, Trump Car Caravan.  I
 6   guess we're in the same place with that.  There's no
 7   deposition transcripts, so it's whatever.
 8           MX. GREEN:   Yeah, Your Honor, for these I'm
 9   just kind of shocked to see the ten-hour numbers because,
10   you know, there was no MAPSI.  They told us that in
11   interrogatory 14.  I don't think there are any 49s because
12   there was no enforcement action.  I don't, yeah, I
13   certainly don't think that any CCRB files have been
14   opened.  I don't understand how they can say it would take
15   ten hours for any of these categories.
16           MS. WEISS:   Well, because your telling us, Mx.
17   Green, that there was no enforcement action, there were no
18   CCRB's.  We can't go on your word.  We've got to do the
19   searches to make sure.  If it turns out that there wasn't,
20   then there wasn't, but we need the time to do the
21   searches.
22           THE COURT:   Okay, let's not worry about this.
23   Okay, so I am pretty much in a position to make rulings
24   about what they have to do and what they don't, and I said
25   I'd give each side a chance.  So if there's anything more,
```

1                           PROCEEDINGS                        69

2   I mean, Mx. Green, you want to say about burden?  You've

3   been saying to some degree all along, I've been --

4               MX. GREEN:   Yes.

5               THE COURT:   -- listening and taking notes.  I

6   guess if you want to redo, reprise Judge Dolinger, that's

7   fine.  So anything you want to say now is fine, and I'll

8   hear from Ms. Weiss, and then I'll try to give a --

9               (interposing)

10              MX. GREEN:   Sorry, Your Honor, I think there's

11  one thing that we kind of slid past fairly given the

12  structure of this report which is 49s for the current

13  protests, which have a storied history.  The Court had

14  ordered defendants to produce samples of them way back in

15  June.  We've never gotten those samples.  The explanation

16  has been ever shifting as to why we don't have the samples

17  and what, you know, whether they exist at all.  But I

18  think that's something we should cover here today because

19  it's teed up.

20              THE COURT:   I guess I wasn't sure it was teed

21  up.  I assumed we were just talking about past protests

22  before 2020.

23              MX. GREEN:   I think that is certainly part of

24  where we started, you know, I think this is part of what

25  we – it's in our letter for better or worse.  It's in

```
 1                         PROCEEDINGS                    70
 2   defendants' response for better or worse.  We would have
 3   to meet and confer --
 4            THE COURT:   Okay, what's - what's the issue on
 5   the 49s for the 2020?  It's the 49s for the 2020 protests,
 6   is that what we're talking about?
 7            MX. GREEN:   Correct.
 8            THE COURT:   Okay, so what's the issue then?  I
 9   don't recall it from the letters, but I've had, you know,
10   dozens of letters in front of me, so it's not a surprise.
11            MX. GREEN:   Understood, Judge.  I mean the
12   issue is that when we were first in front of you in June,
13   you told defendants that something wasn't making sense,
14   that's a quote, about their response to, or their
15   objections and directed them to produce a couple samples
16   of what they were going to be producing and what they were
17   going to be withholding.  Aside from --
18            THE COURT:   As to what?  As to, quote, "49s"?
19            MX. GREEN:   As to, quote, "49s."
20            THE COURT:   Okay, go ahead.
21            MX. GREEN:   They never did that.  They didn't
22   seek relief from the order.  They just didn't do it.  What
23   ended up happening is they then said that they had
24   conducted a diligent search and believe that they didn't
25   exist.  That seemed wrong to us, but we didn't have
```

```
 1                         PROCEEDINGS                    71

 2   anything to rebut it with.

 3         What happened at one of the meet and confers is

 4   Ms. Fitzpatrick had asked Ms. Weiss or had told Ms. Weiss,

 5   oh, you don't need to send me a 49 for that.  And so what

 6   defendants have said is we don't think that the NYPD uses

 7   49s anymore.  We are certain that's not true now.

 8         Additionally, in the email production we have an

 9   email, this has been marked confidential.  It's Bates

10   number DEF_E_ED_, and I'm skipping the leading zeroes,

11   100310.  Without revealing any of what — I don't think

12   that the confidential marking is correct in the first

13   place, but I don't think, I am certain that this is not

14   what's confidential about it.  It basically directs

15   somebody to send me all the 49s related to a list of

16   protests.  So I think --

17         THE COURT:   (indiscernible) it was me.  You,

18   Mx. Green?

19         MX. GREEN:   No, it's a member of the NYPD.

20   It's a Peter Simonetti.

21         THE COURT:   Okay.

22         MX. GREEN:   But, you know, the idea that there

23   were not 49s related to the summer 2020 protests is

24   clearly wrong.  And so, you know, we still don't know what

25   defendants are going to do to collect them, and, you know,
```

1                           PROCEEDINGS                    72

2    we're well out from a court order saying you need to

3    figure out what's going on with this.  And, you know, I'll

4    just quote from an email from defendants.  "The

5    information provided in yesterday's letter was what our

6    client told us and the research our client did and how

7    they looked for those.  So if the documents don't exist I

8    don't know what more you're looking for."  And that's kind

9    of where we left it.  But the documents do exist, and so

10   we need to get them.

11             THE COURT:   All right, Ms. Weiss.

12             MS. WEISS:   Your Honor, there was a lot of

13   confusion throughout this litigation about 49s.  In fact,

14   a 49 is, it was an old name for an old document that's not

15   even used anymore.  A lot of members of the NYPD still use

16   that terminology when they're referring to these to/from

17   memos.  It was our understanding at first that plaintiffs

18   were seeking 49s or memos that — this is very, very broad,

19   and we were trying to get them to narrow it down to find

20   out if it was after-action report type reports or exactly

21   what it is.  And there was a lot of back and forth over

22   the months, and it was never resolved until very recently

23   where we were told that they want every single to/from

24   memorandum, every single communication.

25             THE COURT:   Can I just cut through this?  I

```
 1                         PROCEEDINGS                    73
 2   can't believe anyone is sending paper memos anymore.
 3   Wouldn't your email production have covered all this?
 4              MS. WEISS:   No, as a matter of fact, as I think
 5   Mx. Green said, in the email productions there were a lot
 6   of to/from type memos, and they would have absolutely been
 7   captured in the email production that we provided.
 8   Because, yes, things were --
 9              (interposing)
10              THE COURT:   Mx. Green, I just don't understand.
11   I mean --
12              MX. GREEN:   Your Honor --
13              (interposing)
14              THE COURT:   -- anyone puts anything on paper.
15              MX. GREEN:   So, Your Honor, the problem with
16   that is because, you know, of defendants' complaint about
17   burden, we limited our collection of emails to I think
18   literally two weeks.  That's obvious, you know, that's
19   obviously not the full span of these things, and with the
20   understanding that certain kinds of documents, even though
21   they are electronically stored, will be collected another
22   way, like 49s that are kept, you know, in a folder or
23   that's, for example, in the email I read, somebody
24   somewhere in the PD has all the 49s sent to them and files
25   them.  The fact is that we --
```

```
 1                       PROCEEDINGS                    74
 2            THE COURT:   How about this guy in the email,
 3   sounds like he got them?
 4            MX. GREEN:   I agree.  I think that he is one of
 5   the people we need to call, that defendants need to call
 6   and collect the 49s from.
 7            THE COURT:   Mr. Callahan, is the magic
 8   lieutenant perhaps have all these?
 9            MS. FITZPATRICK:   Your Honor, I believe Mr.
10   Callahan --
11            THE COURT:   I'm not saying that facetiously by
12   the way.  I truly think he's magic.  Lieutenant Czark.
13            MS. FITZPATRICK:   I believe Mr. Callahan had to
14   step off the call.  He had another commitment.
15            MR. CALLAHAN:   I'm still here, but, no,
16   Lieutenant Czark would not be the correct person for that.
17            THE COURT:   It's too late for him?
18            MR. CALLAHAN:   I can't say --
19            THE COURT:   He's an archivist, he doesn't do
20   the --
21            (interposing)
22            MR. CALLAHAN:   He works in criminal --
23            THE COURT:   In any event, how do we find the
24   equivalent of the 49s for the 2020 protests?  I don't mean
25   49s.  I mean memos about what happened.
```

```
1                        PROCEEDINGS                    75

2            MR. CALLAHAN:   At the time Chief of Department

3   Operations Division was the main custodian for keeping

4   detailed requests, sending out those, quote/unquote, "49s"

5   that detail the MOS that are needed.

6            THE COURT:   Is there someone who's likely to

7   have all of these for 2020?  I mean for that period in

8   2020.  I gather it's just a couple of months.

9            MS. FITZPATRICK:   Your Honor, if I may, I think

10  some of the confusion may lie in the fact that, as Ms.

11  Weiss was trying to express to you.  It wasn't too clear

12  to us, or at least it wasn't clear to me, what exactly we

13  were, they were looking for, the plaintiffs.  Originally,

14  they started talking about unusual occurrence reports

15  which are also in the form of a to/from memo which also is

16  referred to as an unusual occurrence 49.  Based upon the

17  patrol guide, those types of reports aren't necessarily

18  going to be generated for a large scale protest.  So

19  that's where some of the confusion may lie.

20            Additionally, I think that the Department does

21  have a rather antiquated way of communicating, so there

22  are quite a few people who still rely on paper and paper

23  does go through channels and go through what we refer to

24  colloquially as snail mail.  And there are log books with

25  communication numbers.  So it's - searching for them is
```

```
 1                         PROCEEDINGS                76
 2   not very simple necessarily because the log books are
 3   actual log books are maintained at the commands where the
 4   49 originated from and then also at the commands where the
 5   49 is going to.  So that's one of the reasons why it's a
 6   bit more complicated than one might think because of the
 7   way --
 8            MX. GREEN:   Your Honor --
 9            MS. FITZPATRICK:   -- the Department handles
10   communications.
11            MX. GREEN:   Let me just jump in if I may to say
12   I don't think there's any confusion on our end.  We have
13   been very clear that we want all of it.  We want the
14   communications.  We want the memos.  Our document requests
15   use all of the terms because we know that everybody uses
16   them.  And when defendants made this argument in front of
17   you on this motion in June, you said something was not
18   making sense about their argument and ordered them to
19   produce samples, which --
20            THE COURT:   All right, all right, and then
21   their claim is that they don't exist, that's why they're
22   claiming they didn't produce them.  Right?  I'm not saying
23   they're right, but --
24            (interposing)
25            MX. GREEN:   Later they claimed that, but then,
```

```
 1                           PROCEEDINGS                    77
 2    you know, as Ms. Weiss said, 49s are in the email
 3    productions.  It's clear that's just not true.
 4             THE COURT:   I think 49 is wasting our time.  We
 5    need to use the term memo.  Okay?
 6             MX. GREEN:   Sure.
 7             THE COURT:   And let's talk about content.  I
 8    don't care if they call it a 49 or they call it to/from or
 9    a memo or anything else.  The content is some kind of I
10    gather pre-protest plan or is it post-protest?  What is it
11    exactly?  Tell me content-wise what it is.
12             MX. GREEN:   It could be all of the above and a
13    few other things.  It's --
14             THE COURT:   Okay.
15             MX. GREEN:   But we can send you samples if
16    there's some confusion.  We have --
17             THE COURT:   I don't - we just need to figure
18    out a way, what's the best way for Ms. Callahan to find
19    this?  Should she go to Simonetti and say, gee, you've got
20    all the 49s, give us your collection?  Should she send an
21    email to a certain group of people saying give me any
22    reports - well, give us an idea of what you think should
23    be done.
24             MX. GREEN:   After the meet and confer we sent a
25    list of nine commands.  We think that somebody at NYPD
```

```
 1                        PROCEEDINGS                    78
 2   should call all nine of those commands and say how do you
 3   keep your 49s or how do you keep your memos, sorry.  And -
 4   -
 5             THE COURT:   About planned large-scale protests.
 6             MX. GREEN:   Well, I think the question should
 7   be --
 8             THE COURT:   About these protests --
 9             MX. GREEN:   -- general --
10             THE COURT:   About these protests.
11             MX. GREEN:   Right, but I think the question
12   should be, should move from general to specific, right, it
13   should be how do you keep these, okay, are the ones from
14   protests in anywhere special or what do we have to do to
15   figure out which ones are from protests.
16             THE COURT:   Okay.  Ms. Callahan, but, again,
17   we're trying to - this came up because we're trying to
18   find the 2020 protest memos, right?
19             MX. GREEN:   Correct.
20             THE COURT:   Okay, so that's what I want to ask
21   Ms. Callahan, how do we find those.  If someone wrote a
22   memo about these protests, how do we find them?
23             MS. FITZPATRICK:   Your Honor, there's a couple
24   of different ways we could go about it.  I think our plan
25   now would be, and Ms. Grego who's also on the call might
```

```
 1                        PROCEEDINGS                    79
 2   be the better person to speak about this because this
 3   falls within her wheelhouse.  But basically there are
 4   shared drives, and we would go to these eight commands and
 5   we would speak to them about their shared drives and if
 6   they have 49s saved in their shared drives.  And if we can
 7   review them and if they are related to the protests in any
 8   way, either a pre-action plan like a detail report, as Mr.
 9   Callahan was referring to, or something like an after-
10   action report, then that would be one way to go about it.
11               Another way is, as we did point out, as Ms.
12   Weiss pointed out, that there are a lot of these were
13   produced as attachments in emails because there are some
14   people in the department who do use the email more than
15   others.  So that would be another way to go about it.
16               THE COURT:   Those would've been produced
17   already.
18               MS. FITZPATRICK:   Correct.  Those have already
19   been produced.
20               THE COURT:   Okay.  So I heard Mx. Green say
21   nine commands.  Is there a dispute about whether it's
22   eight or nine?
23               MS. FITZPATRICK:   I apologize, I misspoke, Your
24   Honor, it's nine, yes.
25               THE COURT:   Okay, so, Ms. Weiss, it seems like
```

```
 1                          PROCEEDINGS                    80
 2   absolutely Mr. Callahan should do that right away.  Any
 3   problem with that?
 4           MS. WEISS:   Certainly.  Well, there is one
 5   problem in that Ms. Fitzpatrick is going to be out of the
 6   country next week.
 7           THE COURT:   Well, I don't care who does it as
 8   long as it all gets produced by March 11.  That's your
 9   deadline.  Okay, so, Mx. Green, we had gotten onto this
10   topic --
11           MX. GREEN:   Yes.
12           THE COURT:   I said to you this is your chance
13   to give any overall statements about burden and so forth.
14           MX. GREEN:   Right, so, Your Honor, I think to
15   use Ms. Fitzpatrick's phrase, the problem here in terms of
16   the burden appears to largely be that systems are
17   antiquated or that NYPD has not archived things in a way
18   where they can retrieve them or, you know, in the instance
19   of the law department, apparently do not organize their
20   past case files by any method other than saying here are
21   all the documents from a case.
22           I think the case law's fairly clear, right, that
23   there is that case but there are countless others, you
24   know, here is one of my favorites, this is a District of
25   Maryland case called Kozlowski v. Sears.  The defendant
```

```
 1                       PROCEEDINGS                    81
 2  may not excuse itself from compliance with Rule 34 by
 3  utilizing a system of recordkeeping which conceals rather
 4  than discloses its relevant record (indiscernible) makes
 5  it unduly difficult to identify or locate them, thus
 6  rendering the production of documents an excessively
 7  burdensome and costly expedition.  I think the fact is the
 8  only burdens we've heard today amount to NYPD does not
 9  keep their documents in a way where they can easily be
10  retrieved or in a way where they can easily be searched.
11  At the end of the day that makes, that amounts to a
12  perverse incentive.
13          I think part of the reason, I mean the NYPD is a
14  paramilitary organization.  It is an organization that
15  does need to retrieve certain kinds of information for
16  certain reasons.  It runs counter to their objectives to
17  make information this difficult to search for.  I am not
18  going to draw the inference from there, but I think the
19  cases all speak of the perverse incentives that allowing
20  that to be a cognizable burden creates.  And the idea is
21  if that is a cognizable burden, then everyone, everyone
22  who fears liability will throw documents in a box where
23  they never find them again.  That's, you know, that sounds
24  like what defendants are asserting at least some of their
25  filing systems amount to.  That's not okay, and it's not,
```

1

2  under the rules it's not a cognizable burden.

3          The other burdens we've heard are things like

4  calling 17 people, this was in the letter, to figure out

5  where the documents actually are and what it would involve

6  to retrieve them.  I don't think calling 17 people is

7  particularly burdensome.  I don't think calling nine

8  people, which is what we've reduced it to, is particularly

9  burdensome.  And, you know, one theme I will highlight,

10 right, we got a chart from defendants saying that it was

11 going to take 40, 50 hours to pull together mass arrest

12 reports.  It turns out that the answer, except as to World

13 Economic Forum, instead is going to take 30 minutes.

14 There is one folder in one drive, as we've been saying

15 since June last year, and I don't know how you can file

16 the spreadsheet they filed when that's true.

17          Beyond there, you know, I think the only other

18 impediment seems to be staffing.  As the Court observed,

19 Ms. Weiss personally shouldn't be digging through boxes

20 for depositions.  That's, you know, at least a junior

21 attorney task if not a paralegal task.  And, you know, I

22 know this pretty well because I've had the City criticize

23 my timesheets when I do things like that.  I don't see how

24 the case is being staffed the way it is, and I don't see

25 how this is burdensome.

```
 1                         PROCEEDINGS                    83

 2          Finally, you know, even taking every assumption

 3   they want us to make, in a case of this size I added up

 4   the numbers.  They're talking about 725 total hours if

 5   they're right about everything, and I think we've seen

 6   that many of those things they're not right about.  But if

 7   they're right about everything, they're talking about 725

 8   hours to collect, you know, the history of protests in New

 9   York City.  In a case of this size, you know, I think that

10   - if the case is adequately staffed, you can accomplish

11   that, and it's what they should've been accomplishing

12   since, you know, at the very latest July of last year when

13   they sent us an email saying we are going to produce

14   documents from the RNC and back.

15          If they had actually started this in July when

16   they agreed they would be producing or in August when they

17   agreed they would be producing, we would not be here

18   today.  The only reason where here today is because we,

19   because - and this is, I find it unfathomable - because

20   they did not even have the index Wednesday.  Today or

21   yesterday appears to be when they got the index to the

22   boxes.  And despite that Ms. Weiss in the first appearance

23   on discovery was telling the Court that they were going to

24   be going through boxes from the World Economic Forum.  We

25   quoted that in our letter.  I just - it shocks me, and I
```

1

2   don't know what else to say, so I won't say anymore.

3            (pause in proceeding)

4            MX. GREEN:   I'm sorry, did I love everybody?

5            MS. FITZPATRICK:   I'm still here.

6            THE COURT:   I'm the one who was on mute, I'm

7   sorry.   I've been talking all this time, and now I'm the

8   one who's guilty.   Ms. Weiss.

9            MS. WEISS:   Thank you, Your Honor.   I think

10  that the one that Mx. Green has been forgetting throughout

11  which (indiscernible) been saying the proportionality

12  argument.   So burdensomeness in and of itself is one

13  thing, but when you add it in with proportionality, it

14  takes on a whole new meaning.   And are documents from 20

15  years ago proportional to the needs of the case when

16  taking the burden of finding them into consideration, and

17  the answer to that is no.   We had spoken quite a while ago

18  about trying to produce documents from the RNC forward,

19  and that's a little different because Judge McMahon

20  specifically referred to protests going back to the

21  Republican National Convention.   So while there is

22  definitely a burden associated with locating a lot of

23  those documents, it may be a little bit more proportional

24  to the case.

25            No one, neither the City Law Department nor the

1                              PROCEEDINGS                    85

2   Police Department are trying to conceal any documents or

3   purposefully file them in a way that they're difficult to

4   find.  But they're old documents.  They're not recent

5   documents, they're not seven-year-old documents, they're

6   not even ten-year-old documents.  They're 18 and 20 even

7   10, you know, more than 10 years old.  So it's not

8   surprising that they've been archived and put away.  And

9   while they are accessible hopefully, they are difficult to

10  get and time-consuming and burdensome.

11          And I just want to correct something that Mx.

12  Green said.  We never argued that making phone calls to

13  these people or these commands is in and of itself

14  burdensome.  The cumulative effect of everything that

15  needs to be done, we're simply doing one thing and the

16  burden would certainly be left in having to go to and

17  speak a lot of different people at a lot of different

18  places and trying to get the right people who know the

19  information, especially when some of these incidents were

20  so long ago and there are very little if any members of

21  the NYPD still around to ask about the documents.

22          Finally, I just want to make another comment on

23  the City's staffing.  There are enough staff certainly to

24  be able to litigate these cases, but when I think Mx.

25  Green she added up 750 hours, when that is put on top of

1                          PROCEEDINGS                       86

2  the depositions that we are going to be defending in the

3  next couple of month and other discovery responsibilities

4  with respect to some of the more newly consolidated cases

5  and preparing for the class action motions are going to be

6  coming up and everything else having to do with litigating

7  this case, it becomes what might not have been overly

8  burdensome before, certainly becomes burdensome now.

9           THE COURT:   Mr. Callahan, are you still on the

10 line?

11          MS. WEISS:   No, I think Mr. Callahan did, in

12 fact, finally jump off.

13          THE COURT:   All right.

14          MS. FITZPATRICK:   Your Honor, this is Ms.

15 Fitzpatrick, I would like to add just one point if I may.

16          THE COURT:   Yeah.

17          MS. FITZPATRICK:   So the Department as it was

18 constituted in 2002 is a very different places as it is

19 now, and so to the point of basically saying that we were

20 actively engaging in trying to obfuscate is a bit

21 disingenuous because the facts of the matter is is the

22 Department has constantly been moving forward to improve

23 its recordkeeping and to digitize as many records as we

24 possibly can.  So that's why the further on we go in the

25 timeline, it's much easier for us to find documentation.

1                          PROCEEDINGS                    87
2  So it's a bit disingenuous to say that the Department is
3  engaging in some sort of tactic to make it difficult to
4  find documents.  It's, in fact, the exact opposite.
5              THE COURT:   All right.  So I'm going to –
6  unfortunately, I had a lot of information thrown at me.
7  I'm going to try to go through this, and I may need
8  people's help to remind me.
9              Ms. Callahan, you work with, I'm sorry, Ms.
10 Fitzgerald, Fitzpatrick, you work with Mr. Callahan,
11 right?
12             MS. FITZPATRICK:   Yes.
13             THE COURT:   Or are you in a different unit?
14             MS. FITZPATRICK:   Well, I run the civil
15 litigation unit, Your Honor, which is litigation support
16 for the entire law department, entire NYPD.  Mr. Callahan
17 is assigned to the police action litigation section which
18 is another section of the legal bureau.  We work together,
19 and we have been working together very closely on this
20 case.
21             THE COURT:   Okay.  So I'm just trying it
22 decipher my notes about 2002.  Let me just say that I
23 adhere to my view that this is very attenuated from the
24 current protest.  There have been other protests in the
25 meantime, and I certainly am prepared to accept that there

1                            PROCEEDINGS                        88

2   is potential relevance of the 2002 protests, but that's a

3   far cry from doing what I believe to be burdensome

4   searches.

5           Actually, before I get to that, I am not

6   prepared at this point, based on anything I've heard or

7   seen in this case, to make a finding that the police

8   department has created a record system, certainly without,

9   obviously without any intent, I can't find there was any

10  intent to obfuscate.  The fact is that, you know, you

11  could look at many city agencies.  They suffer from lack

12  of resources.  These are not – that has to be part of the

13  analysis about where one spends one's money in terms of

14  putting in systems and so forth.  This is not a Fortune

15  500 corporation that has a lot of choices about putting in

16  state of the art systems and systems that are easily

17  searchable.  And I think that has to be taken into

18  account.  So I'm not prepared to accept the argument that

19  there should be some punishment for having a bad system.

20          All right, now going back to 2002, from my notes

21  what I had understood, and tell me if I got this right, is

22  that he does, Mr. Callahan said that there was a way to

23  look at an index to see if mass arrest reports or memos

24  were listed on the index and that the order of boxes that

25  would, if it were shown that the box contained that

```
 1                         PROCEEDINGS                    89
 2   document.  Did I recollect that correctly, Ms.
 3   Fitzpatrick?
 4            MS. FITZPATRICK:   Yes, Your Honor.
 5            THE COURT:   Okay.  So, in other words, there's
 6   not going to be some order in hundreds of boxes to see if
 7   we can find any of these.  If the document appeared, if a
 8   mass arrest report or any memorandum related to a mass
 9   arrest at the WEF appears in index, the box should be
10   ordered immediately.  No, examined immediately.  The box
11   has to be ordered and it has to be gone through and the
12   document found and produced if it's there.
13            As to deposition transcripts, again, the burden,
14   given the age of going through a hundred boxes to figure
15   out if we can find exhibits I find is not proportional to
16   the needs of the case.
17            On the CCRB and IAB records, I mean we have to
18   determine for once and for all definitively, Ms.
19   Fitzpatrick, whether it's searchable by date of incident.
20   If it is not searchable by date of incident, I'm not going
21   to require production of CCRB or IAB records.  Did you
22   tell me the IAB records were searchable for 2002 but not
23   for, I'm sorry, not for the date of the incidents.  We
24   have to establish that one way or the other.
25            MS. FITZPATRICK:   Yes, Your Honor.  It's
```

```
 1                          PROCEEDINGS                    90
 2  unclear from the way the database is structured and the
 3  search functionability of the database, like the way they
 4  - the nomenclature in it is not clear to me that it's the
 5  date of the incident or the date of the time that it was
 6  reported.  So I need to clarify that.
 7              THE COURT:  Okay, if it's the date of the
 8  incident, then you need to search for records that are
 9  attributable to the specific date of a WEF protest, and if
10  there are such records, then you - are they findable in a
11  particular box or not?
12              MS. FITZPATRICK:  They would be stored in an
13  offsite facility and be indexed much the same way that the
14  other records that Mr. Callahan spoke of.  So it would be
15  on an index and it would either likely be like a case
16  number, most likely by a case number of log number on the
17  index.  And then we would pull that specific box and then
18  pull that specific file.
19              THE COURT:  Hold on a second, guys.
20              (pause in proceeding)
21              THE COURT:  Sorry about that, folks, I have
22  some criminal responsibilities that are still lingering,
23  and it's possible I'll get for about another 20 seconds
24  shortly.  But let's keep going.
25              All right, so anyway that's for 2002.  Things
```

1                          PROCEEDINGS                    91

2   become - I think what we need to do is get the answer to

3   the search, the searchability of those records.  I

4   certainly am not going to have them hold up depositions,

5   but that doesn't mean we can't do a process where we you

6   figure out what might be available if you are able to

7   search by date of the incident.  But I'm not going to

8   require the City to call up, you know, all complaints and,

9   you know, even for a period of several months just to go

10  through them to see if there's any particular complaints

11  about a protest.  It's just not proportional to the

12  subject matter of this case.

13          All right, as to 2004, all right, now we have

14  the lieutenant's materials, thank goodness.  So that's

15  going to solve a lot of our problems.  In terms of the

16  depositions, I'm not going to require the City to call up

17  hundreds of boxes from cases to see if we can find

18  exhibits.  So there should be a continuing process on

19  attempts to find depositions.  There should be attempts to

20  find exhibits outside of the storage area.  But hopefully,

21  you know, the fact - I'm a little less concerned about

22  that because it seems to me that the files Lieutenant

23  Czark may have may produce the exhibits that I think

24  otherwise might have been needed.

25          Same ruling as to the Occupy Wall Street

```
 1                          PROCEEDINGS                    92
 2   deposition transcripts and exhibits.
 3              MX. GREEN:   Your Honor, in the interest of a
 4   clear transcript, I assume when you say Lieutenant Czark,
 5   you also mean that the FOIL unit is tied to what makes the
 6   exhibits unnecessary?
 7              THE COURT:   Yes, yes, I'm sorry.  It was both
 8   Czark the FOIL unit.
 9              MX. GREEN:   Thank you.  Just wanted to be clear
10   on that.
11              THE COURT:   Yeah, I apologize, thank you.  And
12   for the past Black Lives Matter protests, Ms. [sic]
13   Callahan is going to undertake the search we talked about
14   among the nine commands.  That's certainly perfectly
15   reasonable.  And to gather records in that way.  Our
16   assumption is that on the new IAB system we'll be able to
17   search by date of incident, and the plaintiffs should
18   supply dates of incident, dates of incidents, so that a
19   search can be made by the City.  I'm sorry, the search of
20   the nine commands, that was for the current documents.
21              MS. FITZPATRICK:   That's with regards to 49s,
22   Your Honor?
23              THE COURT:   Yeah, unusual – when I say 49s I
24   mean --
25              MS. FITZPATRICK:   I'm sorry, to/from memos.
```

```
 1                        PROCEEDINGS                        93

 2            THE COURT:    -- memos.

 3            MS. FITZPATRICK:    To/from memos.

 4            THE COURT:    To/from memos.  Now, did you say -

 5   the nine commands is for the 2020 protests.  For the past

 6   protests I think we're relying on Lieutenant Czark to

 7   provide what's needed on that.  And I think we already

 8   talked I think the process being described for getting

 9   disposition transcripts and exhibits for the past BLM

10   cases is sufficient, but, again, everything needs to be

11   produced by March 11 on all of these.

12            Did I - Mx. Green, I know you're not happy.  Is

13   the ruling clear?  Did I cover everything?

14            MX. GREEN:    Your Honor, I think you'd be

15   surprised with how happy I am with it.  But I think

16   everything was clear except that I don't think we said

17   that Lieutenant Czark as 49s.  I thought we'd come up with

18   something else.

19            THE COURT:    On what year are we talking about

20   or just in general?

21            MX. GREEN:    The 2013 up until the start of the

22   summer 2020 protests.

23            THE COURT:    Oh, he just has mass arrest

24   reports, is that what you're saying?

25            MS. FITZPATRICK:    Yes.
```

```
1                        PROCEEDINGS                    94

2              MX. GREEN:   Yes.  I think this was a FOIL, we

3   were going to --

4              THE COURT:   Yes, it was the FOIL people that

5   had the 49s for 2004, right?

6              MX. GREEN:   2004, and I think either we were

7   going to ask about that, as the FOIL unit going forward or

8   perhaps the right thing to do is - I don't know that we

9   actually ended up drilling down on this for the 2013 --

10             MS. FITZPATRICK:   Your Honor, I'm more than

11  happy to send the 49 to the nine commands that we

12  discussed previously, requesting whatever they have on

13  file with regards to 49s, after - to/from memos, after-

14  action reports, anything like that related to those

15  protests as well.

16             THE COURT:   You mean the 2013 through present

17  BLM protests.

18             MS. FITZPATRICK:   Correct.

19             THE COURT:   Okay.  It's ironic you used the

20  word 49, but I'm sure everyone enjoyed it.  You said you

21  were going to send a 49 to them, right?

22             MS. FITZPATRICK:   Yes, and I'm going to send

23  the 49 to them to ask them about their 49s.

24             THE COURT:   Okay --

25             MS. FITZPATRICK:   I apologize, Your Honor --
```

```
 1                        PROCEEDINGS                    95

 2           (interposing)

 3           THE COURT:   Okay.  Mx. Green, anything I left

 4  out?

 5           MX. GREEN:   I think the only thing was you were

 6  going to, we are supposed to get a cost estimate for

 7  spooling up the old database.

 8           THE COURT:   Yes, Ms. Weiss, you need to supply

 9  that by this coming Thursday.

10           MS. WEISS:   Yes, Your Honor.

11           THE COURT:   24th.  Okay, can we go on to the

12  part 2 which I'm not sure how much strength I have for it,

13  but I just want to make sure we can leave this.

14           MX. GREEN:   Yes, Judge.

15           THE COURT:   Okay.  Part 2 is my effort to put

16  together what happened last Friday, and some of it's easy.

17  I just want to recall what I was writing.  By the way,

18  we're not going to get to what I call the prophylactic

19  proposal which is docket number 394.  So we're not doing

20  that today.  If I decide to hold a conference on that, I

21  will let you know.  Or issue an order, I will just issue

22  an order.  But I am, as I said, putting together what

23  happened last time, and some of it's easy.  I'm going to

24  have a section on discovery sanction, the audit, trail

25  logs.  And then I had this rather lengthy memo or proposal
```

1
2  rather from you, Mx. Green.  Let me try and go at this
3  another way because this exercise has caused me to
4  reinforce the view I had earlier.
5          So, Ms. Weiss, I think what has to happen now is
6  you have to do the exercise of what we did here today on
7  this call without me and in writing and really swiftly
8  with respect to all the other requests.  I know we've been
9  through this before, and I don't want to dwell on the past
10 until I have to, and I'm not there yet.  (indiscernible)
11 exactly what I said at the beginning.  You notice we went
12 through here, you got, you know, with the help of the
13 people, thank goodness, from the Police Department who are
14 on the line, we were able to definitively go through what
15 burdens were and so forth.
16         And when you have a meeting with the plaintiffs,
17 they're going to say to you, okay, document request, you
18 know, 1, and you're going to say, you know, to do these
19 types of documents, we would have to do the following
20 things which involve getting a hundred boxes and going
21 through them and so forth.  And then you can say, if you
22 think you could justify it, we're not going to do that.
23 Here's what we are going to do, we're going to do this
24 search, we're going to, and produce it based upon that
25 search, and here's the documents.  Either you can describe

```
 1                        PROCEEDINGS                97
 2  the documents, you'll know what documents you'll get out
 3  of that, or you'll say whatever documents are identified
 4  through that you'll produce.
 5           And they can then come to me and say, you know
 6  what, this is not so burdensome, you can order the City to
 7  do this first thing.  Or they may say, you know what,
 8  we're never going to convince Judge Gorenstein of that.
 9  Let's pick our battles, we're going to pick some other
10  thing that we disagree with you on.  We'll bring that to
11  Judge Gorenstein.  Or they'll think you're reasonable on
12  all of them, who knows.
13           But you have to do the exercise of going through
14  and saying exactly what you're going to produce and what
15  you're not, and to the extent you're not producing it, and
16  if it's on burdensomeness grounds rather than relevance,
17  you need to specify in detail what that burden is.  And
18  you got to do that for every request.  So first, Ms.
19  Weiss, you understand what I'm asking?
20           MS. WEISS:   Yes, Your Honor.
21           THE COURT:   Okay, so that to me, it seems to
22  me, it's got to be in writing.  I think, you know, I mean
23  if you guys think you want to talk first, that's fine, but
24  that's got to happen really soon.  For the non-prior
25  protest documents, you know, maybe I'll give you another
```

1
2    week on that, but that's about it.  That's a month from
3    today.  I want all - if this is done right, I want all the
4    documents that are being produced to be done a month from
5    today as to all the other categories.
6          Now, it may be that there are some things, for
7    example, some CCRB arrests, you know, from years ago,
8    well, that's something that you could start depositions of
9    high level people without having, and it would not be a
10   great impediment to the plaintiffs proving their case.
11   Some things are really important before we do high level
12   depositions, things like mass arrest reports.  But there
13   are other things that are not as critical.  So it may be
14   there are some documents that can reasonably dribble in
15   after March 18, and the plaintiffs can, the depositions do
16   not have to be, deposition schedule does not have to be
17   compromised.  But that's an exception.  That's not going
18   to be, you know, it's not going to be the rule.  The rule
19   is everything should be produced by March 18.
20         Now, I need to know way in advance if there's
21   things you're claiming burden on that you say, oh, we
22   don't want to have to produce, because if I disagree, I'm
23   going to make you produce them on March 18 probably.  So
24   that - and this was what was I trying to draft.  You need
25   to in a very short timeframe, like by the end of next

week, put together a chart, and it's not going to quite
look like the chart you gave to me in 409.  It's a
different chart, it's a chart that gives the document
request.  It says what – and I'm going over this again, I
know, but I want to make it really clear.  It says what
you're going to produce, and if appropriate you can say
how you're going to produce it, you need to specify that.
And then say here's what we're not going to do, and here's
the burden of it, and that's why we're not going to do it.
So that has to be put together for any remaining disputed
discovery disputed discovery request.

          And I don't see how, you know, I was thinking in
like two days, but I know next week is a short week, so
I'm willing to put it off till next Friday.  But that has
to be, I mean that should be in your mind already it seems
to me.  But the time has come to essentially put up or
shut up on all the document requests about what it is
you're producing and what is not, what you're not.

          Okay, so for purposes of drafting my order, I'm
going to require that by February 28 you provide a letter
that annexes a chart, this is what I'm doing – let me just
read my draft.  Annexed is a chart showing for each of the
document requests, I'm not sure it's each, maybe it's the
disputed ones.  I'm going to hear from Mx. Green

1                          PROCEEDINGS                    100

2   momentarily.  A description of the responsive documents

3   that will be produced and, two, a description of the

4   responsive documents the City declines to produce and a

5   specific explanation of the objection.  And if it relates

6   to burden, a detailed description of that burden.

7              As to those documents, I'm going to order the

8   ones that are responsive to be produced by March 18, and

9   as to the ones that you say are too burdensome, I may

10  still have you do it by March 18, but I'm going to need to

11  know immediately if there's any dispute about that, and

12  maybe we should set up a conference for the week of the

13  28th so we can go through that if there are any disputes.

14  Again, I'm going to keep it on hold and wait for the

15  plaintiffs to tell me we need it.

16             And that's sort of what's going to be the sum

17  total of my order at this point --

18             MS. WEISS:   Your Honor --

19             THE COURT:   Okay.

20             MS. WEISS:   I'm sorry.

21             THE COURT:   Go ahead.

22             MS. WEISS:   I just wanted to clarify one thing.

23  Are these, this chart for the document requests, I believe

24  it's 101 document requests from the consolidated

25  plaintiffs' counsel that had been provided previously, or

```
 1                        PROCEEDINGS                    101
 2   does this include much more recent documents, document
 3   requests served by some of the newer consolidated
 4   plaintiffs including Gray and Hernandez that wasn't part,
 5   that weren't part of this first group?
 6              THE COURT:   When did they come in?
 7              MS. WEISS:   I don't have the dates in front of
 8   me, but they did, there are discovery disputes in those
 9   cases, but they are much more recent disputes.
10              MX. GREEN:   Your Honor, I think they're all --
11              THE COURT:   Well --
12              (interposing)
13              MX. GREEN:   They're all before the new year,
14   and I think all of them, if not all of them, many of them
15   are already subject to orders because defendants failed to
16   respond.
17              THE COURT:   Yeah, I mean, here's the thing, Ms.
18   Weiss, what I'm talking about should not be something new.
19   This is something that under Rule 34 you had to do a long
20   time ago.  So as long as these requests were more than 30
21   days ago and it sounds like they were, I don't see any
22   reason why you shouldn't be doing this.  What I'm
23   describing is a kind of a streamlined Rule 34 response.
24   This is what you're supposed to do in Rule 34 anyway;
25   you're supposed to say here's what I'm producing, here's
```

PROCEEDINGS                    102

1
2     the Bates numbers, and, you know, I'm not requiring you to
3     do Bates numbers because I'm giving a little leeway, a
4     little lead time before you actually have to produce it
5     because it's not till the 18th on the second set, but I
6     don't see why you shouldn't have to do that right now.  SO
7     the answer to your question is yes, it includes any new
8     disputes.
9             MS. WEISS:   Thank you, Your Honor, I just
10    wanted to clarify that that was the case.
11            THE COURT:   Okay.  All right, I think that's
12    all I was going to say about any of this, but I'm ready to
13    hear from the plaintiffs.
14            MX. GREEN:   Yes, Your Honor.  So I think a
15    couple thoughts.  First, I already used the wrong word.  I
16    think that that sounds like an extremely useful exercise
17    for the more recent, call them more recent document
18    requests.  I think, you know, we're talking about requests
19    from somewhere between September and October.  Because in
20    those requests we still don't have documents or in many
21    cases even objections.
22            For the first and second consolidated requests,
23    what I tried to do in the order, and I understand it was,
24    I'll call it a monster, what I tried to put in there, and
25    I think, you know, we discussed 24 hours at the last

1                           PROCEEDINGS                    103

2  conference, and defendants did not object to the

3  conference, so I assume that's, you know, we all agree

4  that it was correct.  What's in there is what we've agreed

5  defendants are going to produce --

6          THE COURT:   And you want it ordered.

7          MX. GREEN:   Yes, exactly.  Yes, yes, yes.  I

8  think I have managed to meet and confer as to at least

9  the first and second consolidated requests.  Our way

10 around the burden objections, although, you know, I –

11 perhaps the better --

12         THE COURT:   Maybe, Mx. Green, maybe – remember

13 there was that pages 5 through 8 --

14         MX. GREEN:   Exactly.

15         THE COURT:   -- of the letter.  Is that what's

16 really needed for this letter of the 28th?

17         MX. GREEN:   So it's in part that, and we had

18 agreed to narrow in some places, and we agreed, and there

19 were also the second consolidated requests which we had to

20 make a motion to get new objections on, and so we've

21 agreed, at least I think we've agreed the scope of what's

22 going to be produced in each of those instances.  And I

23 think that's what, you know, I spent quite a few hours

24 putting together that order, and I think that's what's

25 reflected in the first and second consolidated requests

```
 1                        PROCEEDINGS                    104
 2  sections of it is --
 3              (interposing)
 4              THE COURT:   Hold on, let me just --
 5              MX. GREEN:   Sorry.
 6              THE COURT:   Let me just look at it for a
 7  second.  I mean the reason I was thrown off by your order
 8  is I imagined an order that was summarizing the literal
 9  things I said in the conference, and you extrapolated to
10  inferences, as it were --
11              MX. GREEN:   I did, I apologize.
12              THE COURT:   I'm not blaming you for that, but I
13  just want to understand where we are on this.  Okay, well,
14  I mean what you did was give a listing then --
15              MX. GREEN:   Yes.
16              THE COURT:   -- of things they had agreed to?
17              MX. GREEN:   That's how I understand it.  You
18  know, I don't want to put words in Ms. Weiss's mouth, but
19  that's - it is based on my notes and everybody else on the
20  team's notes from the meet and confers.
21              THE COURT:   Well, I guess under my theory
22  everything is being produced on the 18ᵗʰ that they have
23  said that they would produce.  Anything they said in the
24  past they would produce, they now must produce on the 18ᵗʰ
25  because they haven't put up the burdensomeness objection.
```

```
 1                            PROCEEDINGS                    105
 2              MX. GREEN:   Right.
 3              THE COURT:   So if you're telling me that's a
 4    list of what they said they would produce, then --
 5              MX. GREEN:   Correct.
 6              THE COURT:   -- that's where we are.
 7              MX. GREEN:   Right.  I think that is it, you
 8    know, given how things happened in the past, I would not
 9    be shocked to see a new burdensomeness objection on some
10    of these things that hadn't been asserted before.  But --
11              THE COURT:   Okay, so from your point of view
12    the only dispute is what I'm calling pages 5 through 8 and
13    that's what you need the chart on?
14              MX. GREEN:   Sorry, no, pages 5 through 8 are
15    covered by the proposed order.  What we need the chart on
16    are the Payne plaintiffs have a set of consolidated
17    requests that you just wrote an order ordering defendants
18    to respond to and finding their objections waived, except
19    as to privilege.  The Sow plaintiffs similarly have an
20    independence, as do the Gray - did I say Gray plaintiffs?
21              THE COURT:   Wait, wiat, wait, wait.  Wait.
22    You're not talking about - you're not talking about - I
23    don't keep this in my mind by plaintiffs but by docket
24    number.  You're not talking about 379 and 370, you're
25    talking about something else?
```

```
 1                         PROCEEDINGS                    106
 2            MX. GREEN:   Let me pull the docket --
 3            THE COURT:   No, it wasn't - I just gave the
 4   wrong numbers I think.
 5            MX. GREEN:   But I think we're on the same page.
 6   Three seven --
 7            THE COURT:   Hold on.
 8            (interposing)
 9            THE COURT:   Say it again, say it again.  What?
10            MX. GREEN:   370 is the Payne motion that you've
11   already issued an order on, and that's --
12            (interposing)
13            THE COURT:   I issued an order on two things
14   today.  So we're not talking about that, right?
15            MX. GREEN:   I think we are talking about that
16   actually.
17            THE COURT:   Okay, let's not - I don't need to
18   do anything more on that, do I?
19            MX. GREEN:   I think the answer you find their
20   objections waived, so no.  But for the Gray responses,
21   which I think we have only agreed to get documents and
22   objections have not been found to be waived yet, that's
23   somewhere where I think that chart would be very useful.
24            THE COURT:   Okay, so - I'm sorry, let's start
25   again.  Let's start with the chart and then let's deal
```

```
 1                           PROCEEDINGS                    107
 2   with the rest of it.  Let's find out what's needed on the
 3   chart.  I thought what's needed on the chart is - maybe we
 4   should start with - I'm not even sure now.  You tell me,
 5   what do you think is - you understand what I think you
 6   need.  Maybe you've gotten some of it.  I mean if they're
 7   already agreed to produce something, I've no problem
 8   ordering that to be produced by March 18.  Is there a way
 9   to identify that?
10             MX. GREEN:   Yes, and I think that is exactly
11   what I tried to do in the proposed order.
12             THE COURT:   Okay, and where did you get those
13   things from?  Is that from like some other letter or is
14   that from your --
15             MX. GREEN:   So it's - some of it - it is from
16   our meet and confer notes which then in turn the meet and
17   confers were structured based on the letter, for example,
18   with pages 5 through 8.  Right?  So we just went through
19   that list at the meet and confer and found out what they
20   were going to do and then agreed that they would do it by
21   certain dates.
22             THE COURT:   What's wrong with my idea which is
23   to just do the chart for all of it, and then presumably
24   for the ones they've agreed to, it'll --
25             MX. GREEN:   Right.
```

```
 1                           PROCEEDINGS                  108
 2               THE COURT:    -- just say, yeah --
 3               MX. GREEN:    I suppose nothing's wrong with it.
 4    That makes a lot of sense.   The only thing that I will
 5    briefly say that I have concerns about is we have
 6    depositions slated for mid-March that I think if
 7    everything is getting pushed to March 18 instead of the
 8    11th, you know, those are an important seven days.
 9               THE COURT:    All right, well, look, I think you
10    have, I mean I was doing 30 days from today because I
11    thought I already ordered a bunch of things for March 11.
12    I would like to give them an extra week now since I
13    already said it.
14               MX. GREEN:    Understood.
15               THE COURT:    Is it going to mess up your
16    deposition schedule though?
17               MX. GREEN:    Candidly, I think it will mess up
18    at least some.   You know, we're still at the drawing board
19    figuring out what it is that we can do, but, you know,
20    certainly having one week less than we thought we would
21    have changes how we're thinking about things.
22               THE COURT:    Okay, no, but I'm willing to tack a
23    week on at the end --
24               MX. GREEN:    Understood --
25               THE COURT:    -- responsibility for that.
```

```
 1                        PROCEEDINGS                      109
 2              MX. GREEN:   Understood.  I think, you know, the
 3   only problem is that as far as scheduling depositions
 4   there are noticed depositions that just aren't on the
 5   schedule yet because defendants haven't scheduled them,
 6   and they have said there's no room to schedule them in the
 7   current schedule --
 8              THE COURT:   Is there any value, I mean I'm
 9   certainly willing - this is all the City's fault as far as
10   I'm concerned - I'm certainly willing to require them to
11   bring people back if documents pop up later on.  On the
12   other hand, I don't want to depose someone where you know
13   there's going to be, you know --
14              MX. GREEN:   Understood.
15              THE COURT:   -- hours of deposition.  So if you,
16   you know, if you think it's likely that any new documents
17   would require only deposition of, you know, like a
18   redeposition of under an hour or something, then I would,
19   you know, if you can commit to that, then it would
20   certainly be fine to go forward --
21              MX. GREEN:   Yeah.
22              THE COURT:   -- and then it if it turned out
23   that there were documents that, you know, specifically
24   involve this deponent, you know, it's not that hard to put
25   an hour here and there.
```

```
 1                         PROCEEDINGS                      110
 2              MX. GREEN:   I suppose let me put it this way,
 3    if we're sure that we're going to, you know, be able to
 4    schedule everything wherein all the depositions we've
 5    noticed at some point before whatever ends up being the
 6    final end date in discovery, and we get to make the choice
 7    as to, you know, what risks we take with which deponents,
 8    I don't know that we have an objection to March 18.
 9              THE COURT:   Okay, so let's just stick with
10    that.  So, Ms. Weiss, you should do, you know, all the
11    discovery requests.  I don't think in the days of
12    computers and with the new paralegal help Ms. Pistata is
13    giving you, it shouldn't be very hard to put together a
14    chart with these requests and, you know, says – if you
15    promise to produce it, you're going to put in the chart
16    will be produced by March 18.  And if it's something else,
17    then you'll put something else, and we talked about what
18    that's going to look like.  Mx. Green, does that cover it?
19              MX. GREEN:   I think that does.  Yeah, I mean
20    and if it's inconsistent with what we agreed at a meet and
21    confer, then we know how to get in touch.
22              THE COURT:   Yeah.  Should we reserve a time?
23              MX. GREEN:   I think that makes a lot of sense
24    and – yeah.
25              THE COURT:   I said the 25th for the chart,
```

```
 1                        PROCEEDINGS                   111
 2  that's a week from today?
 3            MX. GREEN:   Correct.
 4            THE COURT:   So you'll need time to look at it.
 5  Here's your choice, Tuesday afternoon or Thursday
 6  afternoon.
 7            MX. GREEN:   I'll be greedy and say Thursday
 8  because that's the better day for me, if it works for the
 9  Court.
10            THE COURT:   Ms. Weiss.
11            MS. WEISS:   Thursday is a better day for me as
12  well.  I'm unavailable on Tuesday afternoons.  So that
13  works.
14            THE COURT:   Okay, so March 3, let's say 3 p.m.
15  I'm just reserving it.  I'm only going to hold it, Mx.
16  Green, if you tell me we need to do something or whoever.
17            MX. GREEN:   Understood.  Hope springs eternal.
18            THE COURT:   Okay, let me just look at my order
19  to see.  Give me a second to go over what I wrote.  Just
20  give me a second.  I'll let you say anything after that.
21  I need to think for a second.
22            So the chart showing for each outstanding
23  document request, is that the way to phrase it?
24            MX. GREEN:   I think at this point it may make
25  sense to just not have to parse what's outstanding and
```

```
 1                        PROCEEDINGS                   112
 2   what's not.
 3            THE COURT:   Each document request.  Okay.
 4            MS. WEISS:   Respectfully, Your Honor, that is,
 5   there were a lot of document requests that there wasn't an
 6   issue with, and to have to put them on the chart is just
 7   going to add a lot more time to what defendants really
 8   don't --
 9            THE COURT:   You mean you --
10            MS. WEISS:   -- have a lot of time to do.
11            THE COURT:   You've already fulfilled them, is
12   that what you're saying?
13            MS. WEISS:   There are definitely a number of
14   requests that have been fulfilled or there's been no sort
15   of disagreement on.
16            THE COURT:   Mx. Green, as long as it's all the
17   ones that were in your proposed order, you're going to be
18   satisfied?
19            MX. GREEN:   Yes, maybe the best thing to do is
20   if defendants think that one, just have it cover all of
21   them, and if defendants think that there's one they fully
22   fulfilled, that's all they have to write.  And if we
23   disagree, we can raise it.
24            THE COURT:   Wait, say that again.
25            MX. GREEN:   So if let's say they think they've
```

```
1                         PROCEEDINGS                    113
2   done everything with regard to document request number 3,
3   I assume it's actually going to be easier to make the
4   spreadsheet if you don't omit numbers.  So --
5              THE COURT:   Yeah, that's a big deal.  Just say
6   3 fulfilled.
7              MX. GREEN:   Right, exactly.  I think that
8   that's the best way to do it, and then if we disagree,
9   then we can raise it.
10             THE COURT:   Yeah, just say 3, fulfilled.  I
11  mean if you really want to, you could have a list of
12  numbers at the end, 3, 12, 16, all fulfilled, whatever.  I
13  mean it seems that it's easier to have it in order, but if
14  it makes a big difference to you, Ms. Weiss, you can put
15  all the numbers together at the end and say they've been
16  fulfilled.
17             MS. WEISS:   Okay, we'll see how it works out
18  easiest.  Your Honor and Mx. Green, if you – well, Mx.
19  Green really, if you could just send us a copy of the
20  chart that you proposed, it would, or the list you
21  proposed, it would make it a lot easier for us.
22             MX. GREEN:   You were cc'd.
23             MS. WEISS:   Yeah, I know, I don't see it.  So
24  if you could resend it, that would be very helpful.
25             MX. GREEN:   Sure, I mean it's not in chart
```

```
 1                          PROCEEDINGS                    114
 2   form, so I suspect it's not --
 3              (interposing)
 4              THE COURT:   It's a listing.  It's a proposed
 5   order and it's a listing.
 6              MS. WEISS:   A list might still be helpful.
 7              THE COURT:   Okay, Mx. Green's going to send it
 8   to you.
 9              MX. GREEN:   Yep, absolutely.
10              THE COURT:   Give me a second, I was looking at
11   my document.
12              (pause in proceeding)
13              THE COURT:   Oh, okay, so I think that's it.  My
14   document is going to have the discovery sanction, the
15   audit trail logs, ruling, and the requirement to produce
16   the chart and a requirement that all documents be produced
17   by March 18.  And, again, this is the non-prior protest
18   documents.  I already required March 11 for the prior
19   protest documents.  Any questions before we hang up?  Mx.
20   Green, anything?
21              MX. GREEN:   Yes, Your Honor, just some quick I
22   suppose clarifications.  As I understand, the chart is
23   going to cover four, the first and second consolidated
24   requests.  It will cover everything and either say
25   fulfilled or it will say what we're getting or, you know,
```

```
 1                          PROCEEDINGS                   115
 2  exactly what you just described.  I don't mean to try to
 3  limit it there.  We're also going to be getting in that
 4  chart things that fully cover every other document, set of
 5  document requests.  Correct?
 6             THE COURT:   I don't understand what you just
 7  said.
 8             MX. GREEN:   So there are two consolidated
 9  document requests.  There is - then individual plaintiffs
10  also have some narrower document --
11             THE COURT:   You said it's the two consolidated
12  requests plus - right, I said as long as it's more than 30
13  days old, I want it in there.
14             MX. GREEN:   Great.  Just making sure.
15             THE COURT:   Right.  Yeah.
16             MX. GREEN:   And then for certain document
17  requests, one of the things we've been hearing from
18  defendants --
19             THE COURT:   Hold on a second.  Just for
20  purposes of my order, are there any document requests
21  later than 30 days ago?
22             MX. GREEN:   I don't believe so.
23             THE COURT:   Okay, so I'm just going to say each
24  existing document request.  All right, go ahead, what were
25  you saying?
```

```
 1                        PROCEEDINGS                    116
 2            MX. GREEN:   And one of the responses we've
 3  gotten a lot is already produced without any specificity.
 4  If defendants are going to assert that something was
 5  previously produced, not, right, so if they produce – they
 6  are claiming they produced it in response to the first
 7  consolidated requests, that's done, but in response to,
 8  say, the Gray plaintiffs' requests, if they're saying
 9  something has already been produced, I think we should,
10  they should in that chart have to identify the Bates range
11  where it exists.
12            THE COURT:   All right, Ms. Weiss, so this is
13  for the later document requests.  If you're saying that
14  you have produced something in response, you should
15  identify where that is.
16            MS. WEISS:   We advised counsel that – I'm
17  sorry.  We advised counsel that we would let them know
18  where in the prior productions, and it's mostly the email
19  productions that we've been talking about, that those
20  documents were provided.  It's much more difficult to
21  provide the Bates numbers because of the way they are in
22  our system, but we told plaintiffs and we will point them
23  to where the documents are.
24            THE COURT:   In some manner other than Bates
25  numbers?
```

```
 1                          PROCEEDINGS                    117
 2              MS. WEISS:   Yeah, I mean if it ends up being
 3   easier to do it by Bates numbers, that's fine, but it
 4   would more likely be pointing them to a place in the prior
 5   productions where they can find those documents.  It might
 6   turn out that Bates numbers is the easiest, but it's --
 7              THE COURT:   Let's leave this for another day.
 8   Hopefully, this will be clear.  Anything else, Mx. Green?
 9              MX. GREEN:   I think that covers everything.
10   Yep, that covers everything.
11              THE COURT:   Ms. Weiss, anything?
12              MS. WEISS:   Yeah, just one thing, Your Honor.
13   Plaintiffs in one of the cases that was consolidated I
14   believe served discovery requests less then 30 days ago.
15   I know that we just got discovery requests might be --
16              THE COURT:   If it's less than 30 days ago, they
17   don't have to be on the chart.
18              MS. WEISS:   Okay, thank you.  That is it.
19              THE COURT:   I mean you need to respond however
20   --
21              MS. WEISS:   Well, yes.
22              THE COURT:   -- under Rule 34, and it may make
23   your life easier to put it on the chart.
24              MS. WEISS:   Understood.
25              THE COURT:   But a proper response under Rule 34
```

```
 1                          PROCEEDINGS                    118
 2   is going to do 90 percent of what I just described.  I
 3   don't think a Rule 34 response you'd have to detail the
 4   burden and so forth, but you have to describe what you are
 5   producing and what you aren't producing.
 6             MS. WEISS:   Of course.
 7             THE COURT:   Just keep that in mind.
 8             MS. WEISS:   Yes, Your Honor.
 9             MX. GREEN:   And I'm sorry, I made a mistake.  I
10   think the only other thing, there is one other thing which
11   is privilege log and timing for privilege log.
12             THE COURT:   Oh, right.  Geez.  Well, I think I
13   already ruled on that.  Produce it at the same time.
14             MX. GREEN:   I had thought so too.  Defendants
15   have interpreted your order to mean that they have a
16   couple of weeks after production to produce privilege
17   logs.
18             MS. WEISS:   That's not true.  There have been
19   times where we had asked for more time, and producing it
20   on the same day is often not possible, especially some of
21   these productions that are likely going to be - there
22   could possibly be thousands of pages that are privileged,
23   and we would request some extra time after the date of
24   production to produce the privilege log.
25             THE COURT:   I'm just curious, where's the - I -
```

```
 1                        PROCEEDINGS                   119

 2   where's the privilege stuff coming in in this - you know,

 3   in the email production I understand, but in some of this

 4   document type production, where does the privilege come

 5   in?

 6            MS. WEISS:   There is often documents that are

 7   subject to the law enforcement privilege.  You know,

 8   that's the first one that comes to mind.  There are also

 9   intelligence type stuff, intelligence type documents.

10   There's also going to be personally identifiable

11   information, PII, you know, there could be police

12   officers' personal phone numbers or their families' names

13   that --

14            THE COURT:   Okay, well, hold on, hold on.  I

15   assume you're redacting things, personal information.

16            MS. WEISS:   Yes.

17            THE COURT:   Right?  If you're redacting

18   something and it's obvious it's someone's name or date of

19   birth or social security number, you don't have to do a

20   privilege log for that.  All right, I'll tell you that

21   right now.  Anything else, yes, but just things that are

22   personal identifying information, minor redaction that's

23   obvious from context what it is, you don't have to do a

24   log.

25            MS. WEISS:   Okay.  So it just could possibly be
```

```
 1                     PROCEEDINGS                120
 2  subject to the law enforcement privilege.  There might be
 3  a lot, there might not be a lot.
 4           THE COURT:  Well, the presumption is you're
 5  doing it on that date.  If as I – as you're doing this
 6  production you think – and, remember, you can do a
 7  privilege log categorical if that's appropriate.  But if
 8  you think you need more time, ask for it as soon as
 9  possible.
10           MS. WEISS:  Yes, Your Honor, the issue with
11  categorical though or a little bit in the broader sense,
12  plaintiffs have --
13           THE COURT:  I pretend – forget I said that.
14  I'm not encouraging you to do a categorical log.  I'm
15  happy to have you do an individual log.  So I don't want
16  to spend time on that.
17           MX. GREEN:  Your Honor, I think 40 email
18  production, for example, defendants didn't, told us that
19  they were on track to meet the deadlines, and then the day
20  of the final production, they said that they weren't going
21  to be producing a privilege log until the end of January,
22  which was two or three weeks away.  You know, I think if –
23  what I guess troubled me here is --
24           THE COURT:  Okay, okay, hold on, hold on.  Hold
25  on.  Mx. Green, Ms. Weiss, if you know you can't do a log
```

```
 1                        PROCEEDINGS                    121

 2   on that date, there's no reason you won't know at least a

 3   week in advance.  So if you're going to make an

 4   application, and also I may not grant it.  So I think

 5   you'd be crazy to wait longer than a week beforehand to

 6   ask for an extension.

 7            MS. WEISS:   Absolutely, Your Honor.

 8            THE COURT:   Does that solve your problem, Mx.

 9   Green?

10            MX. GREEN:   It very much does, thank you,

11   Judge.

12            THE COURT:   Okay.  Anything else for today from

13   - I already asked the plaintiffs.  Anything else, Ms.

14   Weiss?

15            MS. WEISS:   No, Your Honor.

16            THE COURT:   Okay, thank you everyone, good bye.

17            (Whereupon the matter is adjourned.)

18

19

20

21

22

23

24

25
```

122

## C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, In Re: New York City

Policing During Summer 2020 Demonstrations, docket

#20cv8924, was prepared using PC-based transcription

software and is a true and accurate record of the

proceedings.

Signature _____

CAROLE LUDWIG

Date:  February 22, 2022