In re:                              :
                                        Docket #20cv8924

 IN RE NEW YORK CITY POLICING        :
 DURING SUMMER 2020 DEMONSTRATIONS

                                    : New York, New York
                                      February 11, 2022
------------------------------------: <u>TELEPHONE CONFERENCE</u>

PROCEEDINGS BEFORE
THE HONORABLE GABRIEL W. GORENSTEIN,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Sow and Hernandez    COHEN & GREEN
Plaintiffs:              BY:  REMY GREEN, ESQ.
                         1639 Centre Street, Suite 216
                         Ridgewood, New York 11385


For Payne Plaintiffs:    NEW YORK CIVIL LIBERTIES UNION
                         BY:  JESSICA PERRY, ESQ.
                         125 Broad Street, Suite 19
                         New York, New York 10004


For Sierra Plaintiffs:   RICKNER PLLC
                         BY:  ROB RICKNER, ESQ.
                         14 Wall Street, Suite 1603
                         New York, New York 10005


For Plaintiff People     NEW YORK STATE OFFICE OF
of the State of New      THE ATTORNEY GENERAL
York:                    BY:  TRAVIS ENGLAND, ESQ.
                         28 Liberty Street
                         New York, New York 10005

Transcription Service: Carole Ludwig, *Transcription Services*
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES (CONTINUED):


For Gray Plaintiffs:      DAVIS WRIGHT TREMAINE LLP
                          BY:  ROBERT BALIN, ESQ.
                          1251 Avenue of the Americas
                          New York, New York 10020

For Yates Plaintiff:      STOLL, GLICKMAN & BELLINA, LLP
                          BY:  ANDREW STOLL, ESQ.
                          300 Cadman Plaza West, 12th Floor
                          Brooklyn, New York 11201

For Defendants:           NEW YORK CITY LAW DEPARTMENT
                          BY:  DARA WEISS, ESQ.
                               GENEVIEVE MILTON, ESQ.
                               JENNY WANG, ESQ.
                          100 Church Street
                          New York, New York 10007

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---|---|---|---|---|---|
| None | | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

1

HONORABLE GABRIEL W. GORENSTEIN (THE COURT): Okay, you can call the case.

THE CLERK: This is In Re: New York City Policing During Summer 2020 Demonstrations, case number 20cv8924.

Will counsel, please state your appearances for the record, starting with plaintiffs.

MX. REMY GREEN: Good morning, this is Remy Green from Cohen & Green, representing the Sow and Hernandez plaintiffs. And for the recording, I should appear in the transcript as Mx. Green spelled M-X-period, rather than Mr. or Ms., thank you.

MR. TRAVIS ENGLAND: Good morning, this is Travis England from the Office of the New York State Attorney General on behalf of The People of the State of New York.

MS. JESSICA PERRY: Good morning, this is Jessica Perry with the New York Civil Liberties Union Foundation appearing on behalf of the Payne plaintiffs.

MR. ROB RICKNER: Good morning, this is Rob Rickner, Rickner PLLC, appearing for the Sierra plaintiffs.

MR. ROBERT BALIN: Good morning, Your Honor, this is Robert Balin of Davis Wright Tremaine,

appearing on behalf of the Gray plaintiffs.

MR. ANDREW STOLL: And, good morning, this is Andrew Stoll for Cameron Yates.

THE COURT: All right, and for defendants?

MS. DARA WEISS: Good morning, Your Honor, this is Dara Weiss from the New York City Law Department.

MS. GENEVIEVE MILTON: Good morning, Your Honor, this is Genevieve Milton also from the Law Department.

MS. JENNY WANG: Good morning, Your Honor, this is Jenny Wang also from the Law Department.

THE COURT: Okay, let me remind everyone we're being recording but any other recording of the proceeding is forbidden, as is any transmission, dissemination or rebroadcast.

We're here based on a number of matters and I have an order in my mind I'd like to go through them, basically from smaller in scope to larger in scope. You did have something that did not, was not the subject of an order, it was something from Mr. Rankin, number 386, which sounds like it's being solved by stipulation so I'm assuming that's going to be given to me in due course and I'm not going to be concerned about that further.

The next one that I want to go to are, hold on a

second, the two unopposed letters for which there are

proposed orders 370 and 374. I am not sure there's a lot

to say but if the City wants to say anything about the

phrasing of the orders that's fine, anything on 370?

MS. WEISS: Yes, Your Honor, this is Dara

Weiss. On 370, which is the order on the *Payne v. de*

*Blasio* case, I just, there were two things. First, we

respectfully request that Your Honor permit the

defendants to assert objections on the, the discovery

demands that, that were not responded to. although we

were late, it's part of I guess the overall issue that

we're having in this case and that has led to

everything that we're here for today. The plaintiffs

are absolutely bombarding the defendants with letters

and emails and letters to the Court and requests for

meet and confers. And these discovery responses fell

sort of into the category the rest of these issues

were in that we're simply unable to keep up. There

was no malice, it was inadvertent that responses

weren't done, the attorney from our office who was

assigned to draft the responses to these was wrapped

up in a lot of other things. She communicated with

plaintiffs on a number of occasions that she needed a

little more time, it just, unfortunately, did not get

done.  So for that we apologize to plaintiffs and to
the Court but we think that that's such a strong
remedy of not allowing the defendants to interpose
objections is certainly a lot.

We're really happy to produce responses and
the documents that our clients have in a short period
of time, but we would like to be able to pose
objections. The second thing is plaintiff have put in
their proposed order that full responses should be
submitted by February 15th which his five days from
today and considering all the other discovery that
we're trying to get out to plaintiffs and the fact
that we're in the middle of depositions, we just don't
think that that is a reasonable time period for
defendants to be able to respond.

THE COURT:  All right, before I hear from
plaintiffs, on the first point, it's completely
unacceptable to not comply with Court orders and to
not comply with my individual practices.  There are
not so many letters coming in to me that that
shouldn't be an obligation that you keep paramount in
your mind, and if you can't comply with my orders and
you can't comply with my individual practices, it
really makes you question whether you're doing

everything else you're supposed to do in terms of

dealing directly with the plaintiffs when I'm not

there to oversee it.  So it's completely inexcusable

and I'm surprised you don't understand that.

So in terms of the merits of this particular

request, I didn't just, you know, endorse the letter,

as you saw, I allowed you to make, to address it here

at the conference. So if there is something that is,

you on the merits say you shouldn't have to produce,

I'm ready to hear from you, we're going to do it right

now. If it's simply a timing issue, we can talk about

that.

MS. WEISS:  Well I think on the merits for the

second request, plaintiffs had requested that we

attempt to identify some officers by photographs which

are fine, you know, we do that quite often, we send

those photos to our clients and see if there is

anything in them that allows them to attempt to make

an identification. And we have no problem doing that

quickly but there is no guarantee that they will be

able to, to identify them, so I just want to make that

clear.  And I think I'm (indiscernible), I'm sorry, I

just want to double check that, I am, this is the

second set.

I think that a big part of the issue though is, is the document request, they're asking for all, in their order they're asking for all of the documents. It's a lot of stuff, a lot of stuff, a lot of which has been produced already, but for us to produce all of something, it kind of puts us in a bad position because there's no way to guarantee that we have all or can produce all of something. We could produce what's in our possession, what we can locate, but putting in the word all kind of sets us up to fail because if something is not there that we find later, you know, based upon the prior acts of plaintiffs' counsel, it's, they're going to, we fear that they're then going to Your Honor and complain that we didn't produce all. We know we have an ongoing obligation to supplement any discovery responses and we will, of course, do that, but it's a matter of being ordered to produce the documents in response to the request that can be located after the searches that our clients do.

A lot of the document request in this supplemental request are already the subject of a lot of other document requests in other of the consolidated cases, be it their consolidated discovery demands or discovery demands that have been sent by

individual plaintiffs' cases so there's really

probably not anything here that hasn't been either

produced or was the subject of a meet and confer that

we had just this past Wednesday. I'm looking at it

now, Your Honor, and it's really, it's really things

that have been dealt with in other cases in

consolidated demands during meet and confers and it,

these -- and just one final thing, if we're unable to

identify these two officers then we're certainly not

going to be able to provide documents related to them.

To the extent that we can identify these two officers,

as we have been doing throughout this litigation,

we'll provide these types of documents that are

related to that officer.

THE COURT: Okay, I think I'm, I think all I

heard was that if you can't locate the documents you

won't be producing them, and that's, I'm going to put

in the order that if there is some category here

you're not producing you have to explain that in

writing at the time you make the production, I think

that will solve that.

Anything else on the plaintiffs' side, I guess

it is, let's see, hold on, Ms. Perry maybe who signed

this letter, whomever is speaking about this?

1

2          MS. PERRY:  Yes, Your Honor, I'm speaking

3    about this for the Payne plaintiffs, good morning. I

4    think the only, the only things I would say are the,

5    you know, in the second document request, you know,

6    the documents that we've requested are not documents

7    that we, that have been produced yet and we, and there

8    is also not language in the second document request

9    that requests all documents, so I just wanted to note

10   that, note that for the record.

11          But, and I guess I'll just briefly --

12          THE COURT:  Well, I mean your proposed, your

13   proposed order says all documents, I think that's'

14   what set this off.

15          MS. PERRY:  I understand, Your Honor, that's

16   understandable.  In that case, I don't think we have

17   any, anything else to respond to that Ms., that Ms.

18   Weiss raised.

19          THE COURT:  Okay.  All right, so and does this

20   relate to any upcoming depositions, this particular

21   document production, that's a question for Ms. Perry

22   or Ms. Weiss?

23          MS. PERRY:  We have noticed a number of

24   depositions that have not yet been scheduled of I

25   believe three officers who, who are identified in both

the second and third requests, but those depositions

have not been scheduled and we're still sort of been

conferring over defendants about getting those depositions

scheduled.

THE COURT:  Okay, and the reason I'm asking is

that I want to frontload document obligations onto the City

that relate to, you know, imminent depositions.  So it seems

like this is not something that should be frontloaded.  I'm

not saying, you know, we should wait some lengthy period but

this doesn't have to be done in the next few days, would you

agree, Ms. Perry?

MS. PERRY:  Yes, we, I agree in that we, the

depositions are not currently scheduled and we're currently

in the process of undertaking other depositions.  But I will

just note that, you know, a pattern that we've noticed in

this case is that for individual fact witnesses and

individual cases, those, the discovery relating to those

cases often gets put on the back burner and then we're left

in a position of kind of attempting to track down discovery

that we need to make out our individual claims.

And so we do think that a deadline of five days is

reasonable, and given that defendants have had not over a

month since they responded to give us the response to the

third request, we do think that, you know, to the extent

they have any documents in their possession right now they

should be produced in short order.

THE COURT: I'll keep that in mind, I'm going to,

when I issue the order is when I'm going to fill the dates

in so you'll see it when it comes out.

MS. PERRY: Thank you, Your Honor.

THE COURT: Okay, our next one I guess is from

Mr. Rickner, it's number 374, I'm going to start with

the defendants to see if there is anything they want

to say about the wording of the order?

MS. WEISS: Yes, Your Honor, this is another

issue with the word all. We can certainly produce

documents that we have and that are in our possession,

the defendants, but that doesn't necessarily account for

all that may exist. So I just wanted to point that out

again, and --

THE COURT: If I can just interrupt you, Ms.

Weiss, I'm just a little thrown off when you say we

can produce things in our possession but that's not

necessarily all. As I'm sure you know, Rule 34 only

requires you to produce things that are in your, I

forget the word, custody, possession, so what is it

you're getting at?

MS. WEISS: I do think, as I said before, it

2  kind of sets us up to fail because it's in, as we've

3  noticed throughout the litigation of this case,

4  plaintiffs very often revert to saying that things

5  should exist or they can't believe things don't exist.

6  And then when the defendants produce whatever they

7  have in their possession, custody or control,

8  plaintiffs often complain that that's not it, this is

9  not all. They certainly can't know what is in the

10  defendants' possession yet they claim to.  And then if

11  the defendants supplement their response afterwards because

12  they have then found something else, plaintiffs tend

13  to complain that we violated an order or an agreement

14  because the first time we made a production we didn't

15  produce all.

16          So that's kind of our concern. I understand

17  what the Federal Rules say and we can only produce

18  what we have and we're required to supplement but we

19  do. But that just, it makes another place for

20  plaintiffs to complain and then, once again, write

21  emails and letters and go to the Court which we're

22  really hoping to try to have plaintiffs cut down on.

23  Because, as I think you've seen in the letter that I

24  submitted last night, it's, it's a lot.

25          THE COURT:  Ms. Weiss, I have to say this line

2  of argument makes no sense to me. From what I've

3  gathered, what actually is typically happening is that

4  City is producing some materials, the plaintiffs are

5  noticing it's not all, you're conceding, as you just

6  did now in your discourse that you then come up with

7  it, and they're right, you did violate the order. Now

8  it's possible you did a reasonable search in which

9  case it's justified, but it's also possible you didn't

10 do a reasonable search and the only reason you came up

11 with the other stuff was because the plaintiffs

12 happened to know that it existed.

13         So no one is being set up when they're being

14 told to produce all documents on a topic, that happens

15 every single day in every single litigation.  Parties

16 then do a reasonable search and they don't feel

17 they're being set up.  They produce the documents and

18 usually there's not an issue, and when there is an

19 issue then we solve it through the mechanisms. And,

20 you know, maybe we'll talk later about whether those

21 are working or not. But you're making me very

22 concerned with these objections, the idea that you are

23 incapable of producing, of doing a reasonable search

24 to produce the documents, it makes no sense.

25         So there's nothing on the substance of this

then in terms of scope or date of the proposed order?

MS. WEISS: No, those, these are documents that we will produce. We would like a date further out than February 18th, that's a week from now, we would request 30 days to provide these documents.

THE COURT: Mr. Rickner, is there a deposition as to which these are going to relate that's coming up?

MR. RICKNER: Well, there may, it depends on what's in the documents so it's hard for me to know. We know for a fact that Dermot Shea weighed in on the sanctions on Mr. Mullins so, and I don't believe his deposition is within the next 30 days so that isn't the issue. But the problem is, is that I suspect there were an awful lot of high level people involved in this decision, I mean fire, the recommendation to fire the head of the Sergeants Benevolent Association is not a minor event at the NYPD, so I don't know. I don't know who was involved with that because I can't see under the hood because I don't have the documents. So there very well may be depositions that are currently scheduled and when we get the documents we're going to say, oh, no, I would have liked to have used this on some other person's deposition, like the

Dowling deposition that's going right, going on right

now.  It also might be relevant to the 30(b)(6)

depositions which are being scheduled, you know,

within the next 30 days or taking place within the

next 30 days, at least for some of them.

So it's hard for me to answer the question and

it kind of highlights the entire problem we have,

which is I don't know what there is and what there

isn't until the City gives it to me. And, you know, I

guess I would just say that if it does turn out that,

you know, there are key documents to a witness whose

deposition has already taken place, that we be able to

recall that witness because we've certainly been

diligent.

THE COURT:  Right. Well, I mean the, I mean

the email searches have happened, and that's a done

deal.  So this seems like it's documents mainly about

an investigation, is that, was that what you're

seeking, Mr. Rickner?

MR. RICKNER:  Yeah --

THE COURT:  Like these are actual

investigation reports or something like that?

MR. RICKNER:  Yeah, I mean my assumption is,

is that there's, well we know there's the CCRB

investigation, in fact, several of them. I believe

there was also an internal NYPD investigation of some

kind, as well, I know less about what that looks like.

So, yes, so that is the, I guess sort of the meat and

potatoes of what we're looking for. But, again, there

may be other things that are relevant and I don't know

enough about how the NYPD structures these things to

know specifically what documents to look for.  For

example, if there is a process that the NYPD goes

through when they decide to override the CCRB's

decision to fire somebody and go to a lesser sanction,

if there's, I don't know what that process is, but if

it's out there and it's document that's also included

in our requests.

        THE COURT:  Ms. Weiss, what do you know about

the burdensomeness of this request?

        MS. WEISS:  I, I don't know, to be honest,

Your Honor. We had originally objected to providing

these documents for a number of reasons, not including

burdensomeness, we'll now provide them.  CCRB

documents I know are fairly quick and easy to get,

internal NYPD investigations not as easily acceptable.

And I know from other internal investigation documents

that the plaintiffs have requested in this case,

there's many, many, many of them that they take quite

a bit of time to get and that unit is very, very

backed up right now. You know, we could certainly ask

them to put something to the head of the line, but

then it's just going to slow down the process for the

other ones that, that the plaintiffs have asked for in

these cases, you know. And, additionally, there's

likely --

THE COURT:  What other ones are you talking

about? Are you talking about other incidents regarding

arrests and so forth?

MS. WEISS:  Yeah, other IAB and internal NYPD

investigations into arrests and uses of force for

these protests as well as I believe plaintiffs had

requested individual IAB histories for defendant

officers and witness officers. I don't have all of

those requests in front of me right not, I apologize,

but I do know that the IAB section has been working

very hard and as quickly as they can to get us any

other outstanding sort of disciplinary documents for

other issues in these cases.

And if I may, Your Honor, although I

understand that allegations of bias policing are a

part of some of the plaintiffs' claims in these cases,

I don't think that they are some of the bigger issues

for the overall consolidated cases. So although there

is going to be one 30(b)(6) deposition on this issue,

there's a number of other 30(b)(6) depositions on a

lot of other I think more sort of overall and pressing

issues in these cases.

So I don't want to belittle the importance of

this issue, but I think it's just a smaller one

overall for these consolidated cases as opposed to

ones like, you know, improper training, things like

that.

THE COURT:  Is the 30(b)(6) on this topic

scheduled?

MS. WEISS:  I know there's a witness, I don't

know when that witness is scheduled for.

THE COURT:  Does someone, Mr. Rickner, do you

know?

MR. RICKNER:  I, unfortunately, I do not have

that information at my fingertips but I will say that

the lion's share of these have been scheduled to be

completed before the end of March. So there's a good

chance that it is scheduled and, you know, it's not

just getting the documents, we need to prepare and

think about them in order to make proper use. So

giving them to us, you know, what happens to be two

days beforehand doesn't necessarily do much good.

I mean also to the other point, this is

protests as part of the Black Lives Matter movement,

racism among high level people at the NYPD is of

paramount importance. This isn't something that could

be I think shuffled to the side or just dealt with

later because it's not a big issue, it is a big issue.

And also the idea that this Court's order would sort

of just go into the morass of regular discovery is a

false equivalence, this is a Court order, it goes to

the top of the pile, it gets paramount importance.

And, frankly, it's important over emails and other

requests and other things they're doing.

THE COURT:  Well I think they're talking about

other productions in this case so I'm not sure this

particular, I mean I don't know but I'm not sure this

particular production is more important than other

productions they're doing in this case, is that what

you're saying?

MR. RICKNER:  Well, I'm saying that the other

productions may not necessarily be part of a Court

order and I do think, in general Court orders should

take priority. But another --

THE COURT:  No, no, they're willing to do that, what they're saying is if you do it then now other things are going to be delayed. I mean I can't believe this is going to delay much but that's their point.  They're not saying that it won't happen, they're saying that it will cause delay in other things. So my question is, you know, what, is this of greater, you know, temporal importance than the other things in terms of the need for the documents (indiscernible), that's all I was trying to figure out.

I don't think it's going to make much difference. I'm going to, I'm going to give a date in the next week or two to produce these so I'll figure them out at the end of this. I think we're okay on this now.

MR. RICKNER:  Yep, understood, thank you, Your Honor.

THE COURT:  Okay, my next issue is 379, we're going to end with the prior protests. So, Mr. Rickner, I think this was your letter, right?

MX. GREEN:  No, I believe this is mine and this is Mx. Green, Your Honor.

THE COURT:  I'm looking at 379, it has Mr.

Rickner's signature on it.

MX. GREEN:  Oh, sorry, prior protests, 379, my mistake.

THE COURT:  No, no, I said prior protests was last, you're 369.

MX. GREEN:  Oh, I am so sorry.

THE COURT:  Okay, no problem.  Mr. Rickner, this is you, right?  Mr. Rickner, you may be on mute.

MR. RICKNER:  You're right, I was on mute, thank you, Your Honor.

THE COURT:  Okay.

MR. RICKNER:  So going to the, the audit trail logs, I mean really this is two motions in one I suppose, one is for sanctions and one is to actually get the information that we've been seeking for many months. I can address those in either order that the Court would prefer.

THE COURT:  And let's end, let's have sanctions last.

MR. RICKNER:  Okay, well, I think the first, the primary argument they're making is burden, and this is very troubling because I thought we had already settled this issue. After the motion that we filed in August the Court ordered a conference with

people from the NYPD. This was actually a really

productive conference, we learned a lot, and the NYPD

conceded that bulk exports of audit trail logs weren't

that hard, they just had to set up their system and

turn off or turn on one particular function and then

they could do bulk productions.

So on September 28th the City through Alyssa

Jacobs, counsel who was on this case, emailed and they

said, and this is a quote in the email, September 28th,

"I have spoken with the clients who have agreed that

they would permit bulk downloads in these

circumstances, and so we will withdraw the

burdensomeness objection to the extent it was based on

having to download each audit train individually."

Now following that, in two separate letters,

in the January 18th motion which resulted in the order

which got us where we are today, as well as my motion

regarding the, you know, the failure to comply with

that order on February 3rd, in both of those I said

specifically, the only thing left here to talk about

is relevance. The City did not jump in on either of

those letters to say, no, Mr. Rickner is wrong, we

still have another burdensomeness argument. And now I

get the letter, as did the Court last night, and we

see a burdensomeness argument.

This is really a core problem in this case, which is we cannot get the City to take a clear and coherent point and we don't find out what their point is until, until effectively motion practice and even then, in this case, it's contradictory to what I thought was a pretty clear waiver of this argument beforehand. It's really been waived two times, once by not responding to the February 3rd letter or the January 18th letter, and once through the September 28th email that I thought settled the burdensomeness issue.

And also, above and beyond that, they're wrong, this isn't burdensomeness. You can look and see the audit trails that we've attached to the motion and you can see there's tagging and, in fact, in some cases even tagged to my case, to the Sierra plaintiffs. And so they can use those tags through the evidence.com system which is designed to tag and catalog large amounts of bodycam footage. It's sophisticated program, I've read multiple portions of the manual, that's why I was so confident that this could be done relatively easily when I went into the meet and confer with the NYPD, and so you can look up

those tags and do bulk exports. I actually sent, I
attached to one of my motions the part of the manual
where it shows the little box you click to include the
audit trail logs in your bulk export.

        And I think the final portion is, if the City
has really produced these in such a haphazard manner
that they can't even figure out what it is that they
produced, that's on them.  That's their problem, that
is a mess that they have created through their own
actions and it shouldn't now be any kind of barrier or
burdensomeness argument.

        So, in sum, I think we should get the audit
trail logs, I think we should get them relatively
soon, and it's important that we get them soon because
we have a lot of people watching these body worn
camera footage videos, and the audit trail logs give
them a window into other information they should also
be looking at like CCRB files, summonses, other officers
who were there, explained in my letter. That makes the
process, the review, easier, it makes it more thorough, it
makes it easier to understand what you're looking at.

        So really, I think we're being actively
prejudiced by not having this, these audit trail logs
right now.

THE COURT:  I need a little bit more background,
Mr. Rickner, I think the letters assume a level of
knowledge about the camera footage that I don't think
was presented to me, or if it was it was presented in
some other form at another time that I can't locate.
So what, let's start from the beginning, what have
you, what did you get and what was the volume, and
what did it look like?  In other words, did you get
like, was it 600, I've seen the word 600 and 1,000,
I'm not sure, what did you get, what did it look like,
and how does the audit trail logs relate to it?

MR. RICKNER:  Okay, so there's a few pieces to
that.  Initially, we got the body worn camera footage
produced to us through a digital system where they
would just give us the video files. The video files --

THE COURT:  Stop right there.

MR. RICKNER:  Okay.

THE COURT:  This happened when and about how
many?

MR. RICKNER:  This happened during the course
of the line officer depositions, so if my memory is
correct, we're talking about starting June or July of
last year.

THE COURT:  Okay.

1

2      MR. RICKNER:  And they were pegged to, well at

3  the time we thought we were getting footage that was

4  relating to our specific plaintiff, like footage that

5  would show our plaintiff, instead we got a larger

6  production that I think was more like, well, we think

7  this might have to do with your plaintiff. And we

8  also, and so there was some repeats, but they came in

9  large blocks, I think probably the largest of them for

10  Sow was over 100 and I would say we got approximately

11  50 or so of these, of these productions or these

12  videos.

13      The --

14      THE COURT:  Wait, hold on.  Hold on, stop,

15  stop, stop.

16      MR. RICKNER:  Sorry.

17      THE COURT:  You got a total of 50 on someone,

18  is that what you're saying?

19      MR. RICKNER:  I'm saying each --

20      THE COURT:  Yes, go ahead.

21      MR. RICKNER:  Each team got their own

22  production of body worn camera videos that the City

23  said were related to either a particular plaintiff or

24  particular deponent. It's approaching 1,000 total, I

25  think, and it came in multiple different tranches and

I think there's also some substantial repeats there.

THE COURT:  Okay, I assume, Mr. Rickner -- Mr. Rickner, I assume you're speaking on behalf of all plaintiffs now, right, I mean in terms of this issue?

MR. RICKNER:  Yes.

THE COURT:  Okay, good. So just so I, let me just get it in my head, there were approximately 1,000 productions, some of which may have been duplicates, last summer, of, and a unit I guess is one particular officer on a particular day, that counts as one?

MR. RICKNER:  Yes, that is almost always correct. If the officer turns their camera on and off more than once, there would be more than one video generated, but for the vast majority, you know, each unit is one video, the officer clicks on the body worn camera, it films, clicks it off, they put it in the docking bay and it gets uploaded automatically to evidence.com.

THE COURT:  Okay.  And what information did you have with respect to any given video, for example, officer's name, date, time, location, did you have all that or not?

MR. RICKNER:  We could use, date we absolutely had, although the time was off because of the way that

1

2    the videos were produced, although we could surmise

3    that it was always off by about four hours. That's

4    actually something that's corrected in the audit trail

5    logs. And obviously the date, we knew which protest it

6    was. We generally knew the location, that was not

7    universally true which is why we were pursuing GPS

8    data because sometimes we couldn't figure it out.  And

9    we sometimes knew the officer but often didn't, they

10   produced a spreadsheet that you could look at the

11   times of the video and click through and try to

12   guesstimate as to which officer may have been

13   producing, may have been wearing that particular

14   camera. But we definitely couldn't figure it out for

15   all of them and, in fact, when we chose the examples

16   we picked ones that, for the most part, we couldn't

17   figure out. So sometimes we could figure out who the

18   officers were with a fair amount of effort, and

19   sometimes we couldn't figure out their names.

20            THE COURT:  Okay, so the, I'm trying to find,

21   do you have a letter with the sample audit trail logs,

22   do you remember the docket number?

23            MR. RICKNER:  That was the, that was the most

24   recent one and, hold on --

25            THE COURT:  385 maybe?

MR. RICKNER:  385, yes.

THE COURT:  Okay.  All right, so let me just look at -- so this very first exhibit to your letter is an audit trail log?

MR. RICKNER:  Yes, that's correct.

THE COURT:  Evidence audit, evidence audit trail, okay.

MR. RICKNER:  Yes.

THE COURT:  So is this associated with a particular recording?

MR. RICKNER:  Yes, it is.

THE COURT:  Every audit trail log pertains to one recording.

MR. RICKNER:  Exactly.

THE COURT:  And so someone at some point did something to put all this information and associate it with a recording, is that what happened?

MR. RICKNER:  Yes, although it's almost, I'd say, even better than that because the way the evidence.com evidence system works is if you look there's a source, a particular device name, it starts with an X, it says X81 and a string of digits.

THE COURT:  Yep.  Yep.

MR. RICKNER:  That's a specific camera, so

after their shift the officer who is wearing the

camera puts it in the docking bay, it's automatically

uploaded to evidence.com, it's supposed to be tamper

proof up until that point, so really you get the nice

pristine body cam footage. And then the audit trail is

actually automatically generated by the system,

obviously there's additional information that's added

later like the tags, but we can look at the camera footage

and we see that device name, the X81 and then, you know,

ideally when we get all of the audit trails, if you, our

order is granted, we can control that search for the

device name and, boom, now we get the history of that

piece of body worn camera footage.

        And it's meant to work like the evidence locker

for physical evidence, right, so you can tell everything

that's happened.  If there's been an excerpt that's

loaded, that's identified, if there's tags, that's

identified.  And, you know, as it says in the letter,

there's various ways this is useful.

        THE COURT:  Right.  So the camera, this audit

trail log is not associated with any particular date, it's

associated with a camera, and then each date it gets

docked the date gets added trail, is that it?

        MR. RICKNER:  No, that's not it, each video

generates its own audit trail log, so, but the camera and

the camera being placed in the dock is sort of the

triggering event, but then every single file that they

produced on evidence.com has an audit trail that looks

just like --

THE COURT: I see, I'm just trying to

understand, so this audit trail is all about one

particular piece of footage, in this case the first one it

looks like is an hour and a half long and it's all the

things that happened to this footage on evidence.com?

MR. RICKNER: Yes, including --

THE COURT: Right, okay.

MR. RICKNER: Yes.

THE COURT: Go ahead.

MR. RICKNER: One more point that I think is

important, all of these different tags like the

categories, demonstration, civil disobedience, those are

all searchable because this software is designed, and

it's well made, it's designed to keep track of this

information. And so --

THE COURT: Okay.

MR. RICKNER: You can search it and then you

can bulk download it.

THE COURT: Okay, so when, I'm just trying to

figure out what, unfortunately you may now, now that I

understand this a little better you may need to repeat

some things.  So you are looking for the audit trail

logs for the material that was already produced to you

last summer, is that it, for that thousand videos --

MR. RICKNER:  Yes.

THE COURT:  Of which many are duplicates?

MR. RICKNER:  Well we believe some are. I

should mention, because we sort of got cut off a

little in our conversation, there is then a second set

of body worn camera productions or second

(indiscernible) body worn camera production, we, in

effect, complained that we didn't think we had

everything and then we got another, much more

recently, I think in the last two months, a production

of 600 or so body worn camera videos which some were,

some were already produced according to the City

although we don't know which ones without doing a

manual compare and some were new.  So the universe

we're looking for is, is all of those really. If

they've produced it to us we would like the

accompanying audit trail so we can start working out

what we've got.

THE COURT:  Right.  Okay, all right, so I'll

hear from the City.

MS. WEISS: Yes, Your Honor, it's Dara Weiss again. I just want to clarify a couple of things that Mr. Rickner said. The first actions of body worn camera footage were produced actually well before the line officers' depositions, they were produced, if I'm not mistaken prior to the plaintiffs' depositions. Plaintiffs' counsel insisted that they be provided with body worn camera footage before each of their plaintiffs were deposed. Because we didn't have a system in place, an electronic system in place yet for providing them, we actually just sent the videos themselves through a secure email system. They hadn't been Bates numbered in any way or with any other identifying information, we were just trying to get them the videos as quickly as possible so they could have them before their clients' depositions.

Then when plaintiffs noted they were having trouble figuring out certain information about the videos, we started sending them spreadsheets that showed the name of the video, which officer was taking it, and there might have been a little bit more information, I think the time of the, the length of the video. And then plaintiffs asked for the

production of these same videos through an electronic

system where they would be Bates numbered and further

identified so we did that, which is why there are

duplicates of some of the videos. And I am pretty sure

that when they were sent they were noted that these

are just reproductions of the videos that were

provided earlier.

It's entirely possible that there are

duplicates of videos or things that seem like

duplicates because the way the system works is that if

a certain officer, if their bodycam video is searched

the system is going to also provide the names of

officers who are within a certain distance of that

target officer and who also had their video on, so we

would have provided that as well. So that can

certainly make it, if two officers were near each

other recording something, it would certainly make it

look like it could be the same video but it likely is

not.

We did provide the sample audit trail logs and

it was when Mr. Rickner brought it to our attention

during a meet and confer we immediately sent it over.

But as you can see, there's a lot of information on

these audit trails that's completely irrelevant and

unnecessary. There certainly is the information in the

beginning about the officer's name and when they took

the video and when they downloaded it, but the bulk of

this information is what happened to it afterwards,

mostly as a result of obtaining it to provide in

discovery in these lawsuits or for CCRB or other

internal purposes.

If plaintiffs, it seems like the reason the

plaintiffs are claiming they need these audit trail

logs is so they can tell one video from the next and

two took a video and if they'd seen it before in their

review. But these audit trail logs really provide

substantially more information that's just not

relevant or necessary for these cases.  As mentioned,

we, the City provided spreadsheets that gives --

THE COURT:  Ms. Weiss, if I could just make

life simple, as long as there is some information on

here that I find is relevant, I assume it's easier for

you just to produce the whole thing than to go over it

line by line with a black felt marker taking out some

potentially irrelevant material.

MS. WEISS:  Well, certainly, Your Honor, if

you're looking at the audit trail you could see what a

burden that would be. But I just, although, I

1

2  personally was not aware of the bulk download issue, I

3  do know that it's not difficult to actually press the

4  button and print these things, but there are so many

5  of them that we have produced that we've given the

6  relevant information that I don't think that there's a

7  need to, you know, kind of press the button for

8  everything.

9         The other thing that I'm concerned about is

10  that although it may be true that you can simply do a

11  search by a category such as demonstration or civil

12  disobedience, it's entirely possible that that would

13  produce audit trail logs that are for things that are

14  not at issue at this case or audit trail logs for --

15  I'm sorry, I'm having trouble sort of articulating

16  this so I apologize, but simply putting in a category

17  is not going to necessarily produce the audit trail

18  logs for the videos that were produced. In order to be

19  sure to produce the audit trail logs for the videos

20  that were in fact produced, they have to be done one

21  by one. It's possible that a wrong category was put in

22  and then you'd come up with a bodycam video audit

23  trail log of something that is not part of these cases

24  or, you know, if bodycam footage was taken, for

25  example, of --

THE COURT: Okay, you're going into all this because they proposed a way to get around doing it one by one and you're saying that won't work, is that why you're getting into this?

MS. WEISS: It's my understanding that that's not going to be accurate and that they have to be done one by one.

THE COURT: Hold on, let me just, I've got to talk to Mr. Rickner, hold on. Mr. Rickner, you're happy to just get the audit trail logs for the videos they produced to you, I assume you're not, I'm not sure what's going on here about searching audit trail logs in general?

MR. RICKNER: Well --

THE COURT: Is that the one you asked for?

MR. RICKNER: Well, yeah, I mean the way to get the audit trail logs that we're looking for is through a search function. This is an ordinary ESI issue, they have tags on these logs, they actually have a specific locker in the Law Department. The Law Department has an evidence.com access code with body worn camera footage that they've produced in this case that's actually tagged, you can see it in some of the logs. The point is tell us what searches you're going

to run, we'll look at it, produce the bulk audit trail

logs to us after those searches have been performed

and give it to us. And don't let the perfect be the

enemy of the good. If there's one that's missing,

we're not going to run to Court, we're just going to

email Dara and say, okay, camera XYZ looks like it

wasn't captured in one of the searches but it's really

important, can we get it, and that solves the problem.

THE COURT: So you would do some search in

this time period for demonstration or something like

that, is that it?

MR. RICKNER: I mean I'd need to know which

tags that the Law Department had used, but, yeah, we'd

work it out. It's not impossible to get vastly all of

the information.

THE COURT: So, to you, that's better for you?

The way I was originally imagining this was you were

going to give them a list of 600 or something device

names and dates and you were going to have them, and

times, you know, you were going to identify recordings

and then they were going to find the log and then

print it out one by one and you're saying that's not

what you're seeking?

MR. RICKNER: That's not what we're seeking

and, in fact, to catalog all of that information would

be an immense burden on plaintiffs.

THE COURT:  I see.

MR. RICKNER:  Instead, we want them --

THE COURT:  So no one, neither the plaintiff

nor the defendants want to have someone push a button a

thousand times, is that correct?

MR. RICKNER:  Correct.  Yes, absolutely.

THE COURT:  Okay.  Because I was having trouble

figuring all this out.  Okay, so back to Ms. Weiss, no one

is having you push a button a thousand times which is what I

thought I was hearing you tell me.

MS. WEISS:  That's why I'm just -- sorry.

THE COURT:  So what they're asking for, and I'm

just looking at this first one, it has a category, you know,

demonstrations, civil disobedience, whatever, they're asking

you to do a search for that during the time period and just

produce those audit trail logs. That seems unburdensome,

what's the problem?

MS. WEISS:  That is not burdensome but that is

likely to be inaccurate, because these videos can certainly

be mistagged or not have a tag, or other irrelevant videos

could be mistagged with a demonstration tag.  The tag is

helpful overall, but it's not, it is certainly not going to

--

THE COURT: So what? So what if it's inaccurate, what do you care, unless you'd rather figure out the thousand videos you produced and press a button a thousand times, if you want to do that, hire someone to do that in the next week, that's your alternative.

MS. WEISS: No, Your Honor, we certainly don't but we're loathe to provide inaccurate information because that, once again, puts us --

THE COURT: You're not providing inaccurate information, you're providing you think potentially irrelevant, but let's run it and then you'll figure out whether that's true or not.

MS. WEISS: I just don't think that that is a good way to go about this. I don't know what the best way is.

THE COURT: Why?

MS. WEISS: Because, Your Honor, I don't --

THE COURT: Why don't you tell me a better way?

MS. WEISS: To not provide the audit trail logs for the body worn camera that has been previously produced except for in the most recent batch of 600 or so we know which are the new ones, we can certainly

2  give that.  But like I said earlier, we provided the

3  information including the names of the officers, when

4  the body cam produced was taken, so I don't think that

5  this information is necessary.

6        THE COURT:  Okay, the relevance objection is

7  overruled, it sounds like we have a plan that's not

8  going to be burdensome at all. Let's see what running

9  the search produces. If, you know, if it's more or

10 less matching what was produced already then that's

11 going to be great, if it's vastly uninclusive or over

12 inclusive, there could be, you know, discussion about

13 that, it could be produced under a confidentiality

14 order certainly since there may be some irrelevant

15 material in there. So that's my ruling on that.

16        This seems like something that should be done

17 relatively quickly, to at least do a run of this,

18 because it's a very, a very closed system and very

19 limited search terms. So I'm going to require this to be

20 done in the next two weeks.

21        Anything else, Mr. Rickner?

22        MR. RICKNER:  Yes, I'd like to know what searches

23 that they're running.

24        THE COURT:  Yes, you need to work, Ms. Weiss, you

25 need to work with Mr. Rickner on the actual search terms,

you should talk about that as soon as possible.  If you

haven't figured it out in the next few days you need to

write me, Mr. Rickner, you need to write a joint letter

giving the defendants' position so I can quickly rule on

search terms.

MR. RICKNER:  Yes, Your Honor, and I would ask

that that meet and confer be attended by the people

from the NYPD who came last time who were very

familiar with the technology and knew exactly how it

worked, which is how we made progress initially.

THE COURT:  Certainly makes sense that only

people who know exactly how this works should be involved

in discussing how to deal with it.  Yes, so ordered.

MR. RICKNER:  Thank you, Your Honor.

THE COURT:  Ms. Weiss, anything else?

MS. WEISS:  No, Your Honor.

THE COURT:  Okay, that's 379.

MR. RICKNER:  Well would you like to discuss

the sanctions issue that was also part of 379?

THE COURT:  Oh, gosh, I'm sorry, I'm, I

apologize, you're absolutely right.  Okay --

MR. RICKNER:  Well I will --

THE COURT:  Hold on, hold on.  Go ahead.

MR. RICKNER:  I would say I'll try to make

this brief.

THE COURT: No, no, give me a second to, give me a second, I just need to re-read my order and so forth, hold on.

MR. RICKNER: Yes, Your Honor.

THE COURT: Okay, go ahead.

MR. RICKNER: Thank you, Your Honor. So going to the sanctions issue, it seems, it seems that one of the major thrusts of Ms. Weiss' arguments is that she doesn't have time, and I think it's worth noting that this particular issues, the body worn camera issue and, in fact, the meet and confer where we got into the technical specifications was being handled by attorney Alyssa Jacobs. And she actually made good progress. In fact, in the September 28th email that I mentioned before, she says we are in the process of obtaining those four audit trails that should allow us to continue our discussions, and she said I have one that I expect in the next, quote, "In the next few days." Now this is months ago now.

This was good progress. The problem is, is that Ms. Jacobs was reassigned to other cases. There is, she moved to withdraw. And actually if you go to the motion, this was October 22nd and it's docket

1

2 number 296, in that motion Ms. Jacobs and another

3 attorney for the Law Department who was also very

4 senior and working on this case said don't worry, this

5 case won't be understaffed if we leave. I'm

6 paraphrasing but that was the thrust of the statement.

7 And that wasn't true.

8        And so I understand that this may be, you

9 know, dealing with all of this information may be

10 personally unpleasant for Ms. Weiss, but this is a

11 specific set of decisions by the Law Department and

12 the NYPD as to where to place the resources and what

13 resources to obtain. If you put it all on one lawyer

14 maybe, yes, that lawyer gets overloaded, but that

15 doesn't mean that the plaintiffs are wrong for asking

16 for all this material, it means you need more staff.

17 And so I think, you know, the primary explanation for

18 why this wasn't done really falls apart when you look

19 at this as a larger issue and go, yes, they need to

20 put more lawyers who know what's going on and

21 certainly shouldn't be taking lawyers off this case.

22        Now, again, you know, as far as, you know,

23 priority, and I think I made this point earlier, in

24 fact, Your Honor did, which is Court orders go to the

25 top of the pile, they're not the equivalent of, you

know, the emails, and (indiscernible) as part of

discovery. And so this particular order should have

gone to the top of the pile. And we know it wasn't

ultimately that hard to comply with because after I

filed the motion we got the documents the next

morning. The problem is, is that whatever it took

between the City and the NYPD to make that happen

didn't occur when it should have. So really, again, I

don't think the idea that this was somehow burdensome

and that's why it didn't work out, holds any water.

And, further, this is really a, this whole

dispute is a microcosm of what we've been facing in

every discovery dispute. We cannot rely on the City

to take clear positions, we end up not finding out

what their true position is until motion practice or,

in this case, apparently Ms. Weiss forgot about the

earlier position they had taken on burden and then,

you know, changed their mind again in motion practice.

We just can't make progress if that keeps happening.

They promised to give us documents of

information. We have, they never really objected to

the sample logs and we have email after email where

either Ms. Jacobs or Ms. Weiss is saying, oh, don't

worry, we're going to get them to you shortly, we're

looking into it and it just never happened.  So we

can't rely on them when they say they're going to do

something in the meet and confer, that they're

actually going to do it.  And compounding this and

also this appeared with the body worn camera footage

issue generally, we spent two months almost I think

scheduling the meet and confers, not regarding the

Court order but following the Court ordered meet and

confer where we needed to do all the follow-up and

build on the progress we had made, they just won't

schedule them. This was part of another motion that

Mx. Green put in and that I think detailed it fairly

well.

           And then when we finally get fed up and we

file motions, sometimes more than one, Aviation took

two motions, body worn camera took two motions, these

are key documents where we're applying to the Court

multiple times, they don't follow the orders. Or they

don't take any action until, in candor, it looks like

they're obviously going to lose a motion and they

decide, gosh, you know, quick, I may just well try to

fix this.  We have experienced this at every level

really, you know, every single one of those complaints

that I've made could be applied entirely or at least

in large part to all of the discovery requests. And

that is why, you know, we're facing this, you know,

very strict schedule and, you know, the plaintiffs are

panicking, because we aren't getting information we

need in the time to use it in depositions, in time to

analyze it and understand how it fits with the larger

case, and it's really created a lot of burden.

I mean, so, yes, we've been filing a lot of

letters and making a lot of requests, but we don't see

a choice. They have forced this, they have forced us

into this through the multiple deficiencies in the

actions that I've outlined. So I think a sanction

needs, and, you know, we can maybe talk about this as

a larger issue, but there needs to be a sanction that

is sufficient to get them to knock it off.

THE COURT:  Ms. Weiss?

MS. WEISS:  Your Honor, respectfully, as I'm

sure the Court knows and plaintiffs' counsel, I am not

the only attorney on this case.  These cases are fully

staffed by a full team of attorneys and paralegals

plus a lot of non-team attorneys who are doing

specific tasks. Part of the problem is that earlier on

Your Honor told the plaintiffs that when they have

issues they should have one attorney dealing with the

1

2  issue write to us or contact us with all of the issues

3  once a week or once every two weeks or whatever the

4  time period may be. That's not happening.  We're

5  getting dozens and dozens of emails and letters and

6  requests for meet and confer all by different

7  attorneys on different individual cases.  These are

8  supposed to consolidated for discovery but plaintiffs'

9  counsel are supposed to act as one with respect to

10  discovery.  It's not happening and although we're

11  certainly not missing out on things or we're ignoring

12  things, we're not ignoring things at all.  Any missed

13  deadlines are simply inadvertent, but we're really

14  trying to scramble to keep up with plaintiffs'

15  onslaught.

16          And, you know, this goes into Mx. Green's

17  letter as well, we want to get these documents and

18  this information to plaintiff, plaintiffs.  They're

19  making it very, very difficult because we're spending

20  an inordinate amount of time responding to them rather

21  than having the time we need to actually get these

22  documents, review them, get them out to plaintiffs

23  while still trying to defend our clients. It's, it's

24  constant and it's impossible to keep up with because

25  the plaintiffs are, instead of acting like a

consolidated group of cases and a number of these

cases actually asked to be consolidated into these

actions, they're still, they're still litigating these

cases in large part like they're individuals cases.

And it's, it's unfair to defendants to try to ask us to

keep up.

And then when we try to concentrate on one issue,

if another issue falls by the wayside we then have those

counsel coming up to us and insisting. We can't do

everything at once, things have to happen in an order, and

the last few weeks have really, really been, really since

the start of the year but the last two weeks especially,

it's just been constant and not possible for us despite our

full and fairly large team of attorneys working on this.

So, you know, we certainly apologize, we certainly

in no way meant to ignore any kind of order but it happened

and it was missed, and we would love to find some sort of

way to, to I guess, I understand plaintiffs have their

issues and we're happy to hear them, but some sort of

orderly way to do it so we have everything in front of us at

once instead of piecemeal so we can deal with it that way.

(interposing)

THE COURT:  Sorry?  Mr. Rickner?

MR. RICKNER:  I'm sorry, Your Honor --

THE COURT:  Go ahead, Mr. Rickner.  Actually, Ms. Weiss, you were done, right?

MR. RICKNER:  I'd just like to correct --

THE COURT:  Hold on, Ms. Weiss, you were done, right?

MS. WEISS:  Well I just wanted to conclude by saying, you know, based upon the good faith the defendants are trying to engage in, I don't think that sanctions are appropriate.

MR. RICKNER:  I'd like to correct the record, Your Honor, on one specific issue.  We have not been spreading different discovery issues across different teams. The body worn camera audit trail logs are a perfect example. This has been, for better or worse, my problem from the beginning, I'm on the Sierra team, I have one protest, not all 83, but I've been -- but I didn't limit my demands to that protest. I worked with everyone, I've been on all the meet and confers on the issue which, mind you, the City, in fact, has shifted around who's on the meet and confers, but I've handled this, you know, pretty much from start to finish, I've always been the point person on communicating about this with the attorneys assigned and that's the way we do it every time.

1

2          So somebody has Aviation, actually that was

3  me, as well, so that's a bad example. Somebody has the

4  audit trail logs. Somebody has disciplinary records.

5  And it's really always been the same attorney on one

6  of the consolidated teams who's followed up.  So the

7  accusation that we're somehow picking an issue and

8  coming at it with five different people throwing

9  emails at Ms. Weiss or the rest of defense counsel,

10 that's not true. That's not what we've been doing.

11         And I'd also like to note, it has taken a

12 remarkable amount of coordination on the plaintiffs'

13 side, we aren't always in agreement, to always present

14 a unified front with one person handling each issue.

15 Almost always. I mean I can't say we've always been

16 perfect but 95 percent of the time, we've worked

17 together internally and then put one person up to

18 handle it.

19         THE COURT:  All right, let me do what's

20 simple. What's simple is I issued a very clear order

21 requiring documents to be produced and the City failed

22 to comply with it. The excuse I have heard is

23 certainly not sufficient for that. It does not show,

24 it does not show substantial justification or any

25 other circumstances that make an award of expenses

unjust. So with respect to the failure to comply with

the order, Mr. Rickner, your, I'm awarding as a

sanction your attorney's fees for having to write me

the letter, I guess your letter of February 8th, and

any other related time for that. So if you can make a

presentation by letter to me at some point to get

those fees and so we can specify the amount of those

fees.

            MR. RICKNER:  Yes, Your Honor.

            THE COURT:  With respect to the substantive --

okay, with respect to, and by the way, I suggest you

show it to the other side and maybe they'll agree on

the amount and then I won't have to be involved.  With

respect to the overall issue of the production of the

body worn camera audit logs, I'm not happy certainly

with the City's conduct during that, I'm on the fence

about it, I'm going to reserve sanctions on that, I'm

going to see how things go otherwise and I reserve the

right to issue sanctions with respect to that course

of conduct but at this point I'm not going to be doing

that today so that's being reserved to another date.

            Let me just address what Ms. Weiss said, it's

probably going to come up with Mx. Green, the notion

that it's unfair to ask you to keep up with discovery

issues is completely unacceptable. If the case is not

sufficiently staffed, it needs to be sufficiently

staffed.  Ms. Pestana is an extremely competent

administrator and attorney and if the demands are

large enough that more staff is needed she will

understand that, you need to present that to her.  You

need to suggest to her that I've raised this issue

with you. It's not acceptable for you to say that, and

I'm now quoting you, "It's unfair to defendants to ask

us to keep up with the discovery demands here."  The, if you

had come to me and said that there were, you were getting

different signals from the plaintiffs, that you had two

different attorneys asking for the same thing and

doing it in different ways, I want to hear about that

immediately, that that is unfair. But if there are 10

discovery issues or 15 discovery issues and they're

being presented by 4 or 5 lawyers, that's not, that's

not a grave problem it seems to me.  You're certainly

welcome to have a single conference with each, they're

all required to speak when you want to meet and

confer, if that scheduling makes it easier for you,

but there's no point in, as long as they're keeping to

the notion that the discovery requests or discovery

disputes, each one is being handled by a single

1
2   attorney, that's nothing to complain about, they don't
3   all have to be handled by one attorney.

4           And as I said, you know, if there's a problem,
5   the solution is not to ignore Court orders and refuse
6   to meet and confer, I mean there is a whole litany of
7   that here. The solution, if it's a problem, is to come
8   to me and say here's how to make this more efficient,
9   we need to have it done some particular way, you know,
10  these two attorneys are across purposes and we can't
11  keep up with that.

12          It doesn't surprise me that in a case like
13  this, I think you said there were nine attorneys on
14  it, one person may just be responsible for dealing
15  with the discovery disputes and that might involve a
16  lot of meeting and conferring during the week, so that
17  shouldn't be a big surprise.  And part of the reason,
18  from what I can tell from the letters, that we need so
19  much meeting and conferring is that the City is not
20  giving definitive positions on things.

21          You know, I'm ready to decide disputes about
22  what is burdensome and what is not burdensome but the
23  City has to get to the point where it can articulate
24  exactly what the burden is which almost never happens.
25  Even when it comes to me there is just this sort of

generic statement about this is burdensome without

saying, you know, what's involved, without saying how

many hours are involved, how much personnel is

involved. At the bare minimum the City has to figure

out, if it's going to be making these objections, what

actually is the burdensomeness objection, I'm almost

never getting that. So from the record presented to

me, and the record from the City is extremely thin, I

get very detailed letters from the plaintiffs

describing at length, you know, refusals by the City

to meet and confer, cutting off a session after an

hour and a half that involves a lot of issues, the

City never denies any of this, never responds, never

explains. And if the only explanation is going to be,

well, we can't keep up, that's just not an acceptable

explanation.  What's going on here is just of the

character of what might be expected in a case like

this.

             Okay, so that's my ruling as to 379. I think

what we have left is 369, the prior (indiscernible) so

I'll turn it over to Mx. Green.

             MX. GREEN:  Thank you, Judge. I think there

are a couple of things in the letter, I'm happy to try

to address them all at once or if you'd rather, as we

did before, we can start with the merits of --

THE COURT:  Yes, I was a little unprecipitous

and I apologize because I had forgotten that I had

promised you a reply date on the issue of the 2002 and

prior documents. So I apologize, I read your letter, I

thought of it as a reply, so I'm ready to deal with

the merits of that.

MX. GREEN:  Okay.

THE COURT:  I should have asked what you meant

by the merits.

MX. GREEN:  Exactly, Judge.

THE COURT:  Okay, so why don't we discuss

that, then I'll hear from Ms. Weiss, and then I'll

make a ruling on that.

MX. GREEN:  Okay, I think one of the just

core, call it, themes of this case is that this is

what the NYPD has done forever, they have engaged in

the same practices, sometimes they give them new

names, sometimes they rename the units that are doing

it, but at the core they have over more than 20 years

engaged in a policy of brutalizing protestors, of

intentionally intending to "disburse and demoralize,"

those are quotes from a Power Point presentation

during the Work Economic Forum, protestors, rather

2 than facilitating First Amendment expression.

3          I think that, while it's certainly important

4 and I don't think that, you know, we would conceded we

5 can't make our case without World Economic Forum and

6 that era of protests, I think that that is the most, I

7 mean more than Republican National Convention, I think

8 that that's probably the most important origin point

9 for a lot of the policies that we intend to track

10 through time. I'm not going to say on the record or on

11 a public call what has been designated confidential,

12 but the, the quote that was redacted in my letter I

13 think speaks directly to that.

14          Beyond that, you know, separating the

15 Republican National Convention from the World Economic

16 Forum is somewhat artificial given that, you know,

17 the, all of these sets of litigations dragged out for

18 a decade each. And so the documents all overlap, I

19 mean the question is just when, when is the start date

20 for collection. And as far as, I think it seems to me

21 that it's obvious that it's relevant, it's important,

22 being able to say that, that it has happened across

23 three major eras of protests is, you know, much better

24 at trial than being able to say it happened over two

25 major eras of protest, right? Whether it's literature

2   or art or comedy, we all talk about a rule of three

3   sometimes.

4          I think, the question is what's the burden,

5   and as you just said, we haven't heard even a word

6   about the burden. And I think this is, that's

7   particularly significant because at the very first

8   discovery conference, Ms. Weiss, in complaining about

9   the scope of our request, specifically identified the

10  World Economic Forum as something that they were

11  looking at doing, right, they were looking at getting

12  those documents and said, and said to the Court that

13  she didn't know then what the burden of doing it was.

14  And despite, you know, a specific direction from the

15  Court to respond to all the arguments in our letter,

16  we still have no idea what the burden of doing it is.

17         I think that relevance is not really at issue,

18  the question is maybe proportionality and burden and

19  at this point I don't see how the City hasn't waived

20  it.  We had to make motions about compliance with the

21  2015 amendments earlier in the case where the Court

22  specifically, I think, identified burdensomeness as

23  something they'd have to object to with specificity and

24  tell us if they were refusing to make certain searches.

25  The Court also ordered algorithm letters during which they

2  did not say a word, not one word about what they weren't

3  collecting from the World Economic Forum. And, you know, I

4  do not see how in good faith they can assert that these

5  objections are preserved, let alone meritorious. So that's

6  the merits.

7           THE COURT:  Okay, so just turning to the 2002

8  and earlier, Ms. Weiss?

9           MS. WEISS:  Yes, Your Honor. So I think that,

10 so the defendants had objected initially back to times of

11 even the Republican National Convention in 2004 as being not

12 proportional. Plaintiffs then, after Judge McMahon issued

13 her order on the City's motion to dismiss, she specifically

14 mentioned the relevance, I suppose, of the Republican

15 National Convention to the claims or mentioned the

16 Republican National Convention.

17          So the defendants withdrew that part of their

18 objection and offered to produce materials with, certain

19 materials with respect to the Republican National

20 Convention. But, and plaintiffs used Judge McMahon's order

21 trying to convince us to provide materials from as far back

22 as the Republican National Convention, that's the date that

23 they used at that time. It's really hard to fathom how

24 events that happened 20 years ago are relevant to events

25 that happened so much more recently.

2          There is, the police department is a completely

3  different place now.  There, there have been many changes

4  between the time of the Republican National Convention and

5  today.  It's, I don't see how policies that went back that

6  far could possibly have relevance today. In addition, as we

7  have learned recently as we're collecting materials from the

8  Republican National Convention and other demonstrations and

9  protests and related lawsuits, burden is incredible.  We're

10 having difficulty obtaining documents from the Republican

11 National Convention because it was so long ago, they exist

12 but they're not all electronic.  Papers are likely archived.

13 Part of the, part of the discussions in producing those

14 documents was that we in our office at the Law

15 Department were going to try to go through our files

16 and see what we still had from those litigations

17 because it's likely that we would have gotten anything

18 from New York City Police Department that the

19 plaintiffs are looking for here.

20         It turns out that the database that we had

21 them on is no longer in existence.  Paper documents

22 would be archived and not easy to access. Documents

23 from the World Economic Forum were even older. They're

24 not electronic formats at the New York City Police

25 Department. There were a couple of them but they would

generally be paper documents.  Anything in our office

from those lawsuits which I expect would have the

types of documents that plaintiffs are looking for are

not even, they're so old that they're not even on our

most basic sort of electronic file system that we use

every day. I was involved in a couple of those cases

and if I try to bring them up on our internal system

they're not even there.

So I think, besides the fact that those events

were so distant in time to the ones at issue here, and

the burden of trying to track down these papers

documents from archive and find the relevant

documents, it's really, you know, it outweighs the

relevance. Plaintiffs are going to have documents from

2004 and actually even a little bit before 2004, which

include some of the planning type documents for the

Republican National Convention, it just seems like an

added burden to what's already burdensome to try to

get documents that are even older.

MX. GREEN:  Your Honor --

THE COURT:  No, no, no, no, hold on.

MX. GREEN:  Okay.

THE COURT:  So explain the paper archive

process, Ms. Weiss, how does that work, how do you

1
2  find out about documents, what does it take to get

3  them, what's the issue?

4      MS. WEISS:  So from, I know how it works in my

5  office.  The cases are closed, they're boxed up

6  hopefully with the name of the case on the box, and

7  they are brought to an offsite warehouse. I know from

8  the WEF cases there's got to be at least 100 boxes.

9  There is unlikely going to be any sort of index of

10 what's in each box and I also don't know what, you

11 know, the extent that all documents were properly

12 filed and saved, I'd like to assume that they're all

13 there but I know generally when we request boxes out

14 of archive it takes some time to come. I haven't done

15 it since, since the pandemic started so I don't

16 exactly know what the timeframe is on that.  But then

17 it would take significant or support staff hours to go

18 through those boxes and try to find the relevant

19 documents.  I don't know exactly how it works from the

20 police department's standpoint, unfortunately, but I

21 do know --

22      THE COURT:  That's going to be the more

23 targeted documents, I mean, if they have, you know,

24 plans, operational plans, whatever it is.

25      MS. WEISS:  I do, I do know from other cases

1

2  that police department archives are a similar system,

3  they're boxed up and sent to either offsite archives

4  or sometimes I know, for example, I had a case where

5  documents were placed in a basement of a precinct and

6  it just so happened that there was a flood and they

7  were destroyed. I think actually during Hurricane

8  Sandy but I'm not saying that that's happening here. I

9  don't know where these boxes are archived, but when

10 they're not saved electronically, it's just many, many

11 hours --

12      THE COURT:  Well, Ms. Weiss, this is very

13 disturbing because this issue's been on the radar for

14 months. It seems like you should know what the burden

15 is exactly for what they're asking, what you could and

16 what you could not do, why don't we have the answers

17 to those questions?

18      MS. WEISS:  Well, Your Honor, because we have

19 been concentrating on the documents from the

20 Republican National Convention which --

21      THE COURT:  Well as to those, let me ask as to

22 those, as to those documents, what's the, are you

23 giving up on the NYPD, are you just producing from the

24 Law Department, what's going on with those?

25      MS. WEISS:  No, Your Honor, not at all, but

they, the documents have been requested.  Hopefully

they're somewhere on, at least some of them are on,

have been saved electronically.  We've provided

previous --

THE COURT:  At the NYPD?

MS. WEISS:  Yes.  We've already provided

certain documents --

THE COURT:  Is there more to be found at the

NYPD?

MS. WEISS:  There's things like after action

reports, there's a few specific documents that I know

Mx. Green has spoken about that we were hoping would

be exhibits to certain depositions which we did

produce. We produced the depositions, unfortunately

the exhibits were not contained along with them.

They're in the Law Department database that no longer

exists that had been made specifically for the RNC

cases.  But we --

THE COURT:  Are they in an identified box?

MS. WEISS:  I, I do not believe so.

THE COURT:  Who, who's responsible for looking

for all this?

MS. WEISS:  It would be myself and my team for

the Law Department, and then we have liaisons at NYPD who

search for documents or assign searches for documents.

THE COURT:  I, the vagueness here is incredible to me. I mean you need to, I mean are the exhibits, for example, for the depositions in an identified box that's in an archive that can be ordered or not --

MS. WEISS:  I --

THE COURT:  Or don't you know the answer, if you don't know the answer it's very important that you tell me you don't know rather than guess?

MS. WEISS:  Oh, I'm not guessing, Your Honor, I don't know, but I can speak to the attorney who was in charge of those cases who is still with the Law Department. He's the one who was able to point me to the deposition transcripts which were requested and produced.

THE COURT:  Well why hasn't that happened? (indiscernible) know the answer to that right now --

MS. WEISS:  I'm don't, I'm sorry. Respectfully, Your Honor, I did not know that I was going to be asked how exhibits are archived, I apologize.

THE COURT:  Well it's raised in your letter. All right, Mx. Green, did I interrupt you?

2 | MX. GREEN: Your Honor, the only thing I was

3 | really aiming to add, well, two things. First, I

4 | think where Ms. Weiss ended before you two started

5 | talking, I think it's very important to note we still

6 | don't have documents, and we still don't have an

7 | explanation or an affidavit like you ordered, and I

8 | think that's partly what's driving the problem.

9 | Although the other thing that I would add is my

10 | understanding of whenever, you know, the City doesn't

11 | get to just archive or destroy things, they actually

12 | have to ask permission from the Corporation Counsel.

13 | And there are, I think there are affidavits that are

14 | created whenever anything goes to an archive. And, you

15 | know, certainly we're not going to ask them to try to

16 | reconstruct documents that were destroyed in a flood

17 | or a hurricane, but I, you know, it is just as

18 | incredible to me that we don't know the basic answers.

19 | You know, I'll segue to sanctions, we'll segue

20 | to sanctions at some point but I think at some point,

21 | you know, the fact that we don't have answers, it

22 | might be a deterrent sanction to make them, you know,

23 | collect this no matter the burden.

24 | THE COURT: I, there's an utter lack of

25 | information here about burden and I, I mean I, I'm

ready to, I guess maybe one thing to do would be to

get the NYPD people to meet with you, Mx. Green, like

Monday and so you can talk to them about where these

documents might be, would that help and we can get

back on the phone, I could try to find a time next

week for us to continue this?

MX. GREEN:  I mean I suppose --

THE COURT:  I don't want, I don't want them to

do, I mean I'm not prepared to say they've waived the

burdensomeness objection because I mean I do have a

goal in trying to move this along. And on the prior

protests, you know, we're not going to, I don't want a

litigation, I don't want, you know, to require them to

produce on the RNC or Occupy Wall Street, you know,

the set of documents that would have been or were

produced as part of, you know, a case that was brought

about those two things.  This is a much more limited

production having to do with their, you know,

operations, conduct, something, I mean it's just

something much more limited and I think there has to

be a way to figure out how to do this without

burdensomeness.

MX. GREEN:  I agree, Your Honor --

THE COURT:  Let me just tell you on 2002, it's

a long time ago, I don't, you know, the relevance

becomes, I disagree on your, your view, Mx. Green,

that it's necessarily relevant. Certainly, I have no

problem you're asking about anything you want in

deposition, the question is how much burden I'm going

to put on the City to produce documents from it. I,

when I made my ruling I was persuaded, perhaps I

shouldn't have been, that there was going to be a

burden, a significant burden in producing 2002

documents, I just don't know that we've gotten to the

bottom, the bottom of this and I'm trying to figure

out a good way to do it, do you have any thoughts, Mx.

Green?

        MX. GREEN:  Well, you know, I suppose a

meeting would be useful. I'm not sure if the people

we've been talking to at NYPD know this stuff, if

there's an archivist maybe that's the right person to

talk to. You know, knowing only what I do about the

NYPD through litigation, I don't know who the relevant

--

        THE COURT:  Ms. Weiss, who are you talking,

who's responsible for this at the NYPD, who is

responsible for looking for this?

        MS. WEISS:  My liaison is the managing counsel

of the Civil Litigation Unit and her, one of her main

roles is knowing where to find documents and give it

to the Law Department for litigation. We also have an

attorney liaison from the Police Action Litigation,

I'm not sure of what the acronym is but he's an

experienced litigation attorney at the police

department and he also plays a role in helping us

obtain necessary documents.  So between the two of

them, I have no doubt that they will know who to speak

to, to find out more information about these

documents.

MX. GREEN:  Your Honor, if I may, they'll know

who to speak to, not they're the people to speak to.

And I do think this plugs into something I want to

talk about a little later which is, you know, the meet

and confers on the first consolidated requests where

the Court ordered defendants to be ready to find confirmed

dates on a list of documents that we sent them in

September last year.  And the best we were able to do

talking to this liaison was getting dates, getting

commitments to give us dates to give us dates 20 days

from Wednesday.  So, you know, clearly that person

doesn't know where documents are with firsthand

knowledge, she knows who to talk to, and that's

clearly not enough.

THE COURT:  And I mean the nature of the documents we're talking about, I mean that's also a little bit unclear to me and maybe this is partly an issue for you, Mx. Green, which is what is it that you are looking for?  Because, as I said, you can't do a re-litigation of RNC or anything else.

MX. GREEN:  Of course. I think our discovery requests spell it out in some detail, but it's stuff like after action reports, UF-49s, some arrest reports, action plans, after action reviews. I think we may have asked for some disciplinary material, although my understanding is that that's going to be a very thin stack of paper if it exists at all.  It's that kind of stuff, it's spelled out in more detail in the requests but it is targeted in that we named by name the kind of documents we want.

THE COURT:  So you don't think there is any utility in having someone from (indiscernible) talking to anyone at NYPD, and I can have them bring the people who are responsible for --

MX. GREEN:  If it's the right person --

THE COURT:  (continuing) -- that has some knowledge of where the documents are.

MX. GREEN:  If it's the right person I think it would be hugely useful, the problem is that we've never been in the room with the right person except on the, on the body worn camera issue. The people that have been coming to our meet and confers need to go talk to other people and don't have any personal knowledge of what searches have been done. And, in fact, you know, they'll put a footnote on that because the general answer is that they haven't started searches at all.

MS. WEISS:  Respectfully, I disagree with a lot of what Mx. Green --

THE COURT:  Have they started searches, Ms. Weiss?

MS. WEISS:  Yes.  Yes, Your Honor.

THE COURT:  Okay, who, is it this managing attorney who personally looks or they delegate someone?

MS. WEISS:  No, she does not personally look, there is, there's dozens and dozens and dozens of different places where, where documents can be. And she does not personally look.  She either reaches out to the different places where documents could be to have searches done or she has, if it's something

simple she delegates to one of her staff. But she does
not personally do searches.  Different searches,
different types of searches for different types of
material are done in different places by different
people.  It's just not practical to have all these
different people on meet and confer which is why all
the information is consolidated through this managing
attorney.

THE COURT:  Well we have limited categories of
documents so I'm ordering that the people who know
where those documents are appear in a conference call
with or without the managing attorney and do it by
Monday or Tuesday so that we can finally figure this
out and I can understand what the burdensomeness issue
is.  I'm leaving 2000 -- I'm leaving the World
Economic Forum in the mix for right now, I'm not going
to make a final ruling on it without hearing what it
would take for you to get documents from them, but we
need a meeting with the actual people who know where
this stuff is, I don't believe it's dozens and dozens.
I believe that given the listing that Mx. Green has
described, that's going to be circumscribed.

MX. GREEN:  Your Honor, can we order -- I'm
sorry, I did not mean to interrupt.

THE COURT:  Go ahead.

MX. GREEN:  Can we order a meet and confer time just because of the difficultly we've been having in getting these scheduled --

THE COURT:  Sure. Let's say Tuesday.

MX. GREEN:  Can we do Monday at one o'clock?

THE COURT:  Well I want them to be able to get people to work on this.

MX. GREEN:  Understood.

THE COURT:  I'd rather do Tuesday or Wednesday.

MX. GREEN:  Okay, then for me a Wednesday afternoon would be ideal.

THE COURT:  Okay, Wednesday, 2 p.m.

MS. WEISS:  Your Honor, respectfully, if the person who is in charge of this is not available Wednesday at two, I don't want to be in violation of the Court --

THE COURT:  Then you'll write me a letter telling me what the problem is after talking to Mx. Green first.

MS. WEISS:  Yes, Your Honor.

THE COURT:  And, by the way, that's advice for the future, if I order something and you feel you

can't do it, you can't just blow it off, you have to

do something about it, do you understand that, Ms.

Weiss?

          MS. WEISS:  Yes, Your Honor.

          THE COURT:  Okay, so my problem is I'm a

little booked up in the following days but I, probably

Friday afternoon I have time for us to reprise this

next Friday.  Okay, why don't we reserve the p.m. on

the 18th in case, 2:30 p.m. on the 18th in case we need

it. I'm not putting this down as a conference yet but

we'll see what, see what report I get.

          MX. GREEN:  Understood.

          THE COURT:  If you come to an agreement on

this it would be great.  And, you know, Ms. Weiss, you

have responsibility in the meantime, it's not just

NYPD, you've got to get your ducks in a row completely

about what the Law Department can get its hands on,

what it would take to get something from archives --

          MS. WEISS:  Yes, Your Honor.

          THE COURT:  You know, whether, how they're

identified and what the big deal is, you can't just

have guesses about based upon some experience you once

had in the past.

          MS. WEISS:  Understood.

THE COURT: All right, we have some other

pieces of this, Mx. Green, do we have any other pieces

on this, I feel like there was some other order that

was violated --

MX. GREEN: Yes, Your Honor. So I mean we

haven't talked about the sanctions issue on this issue

and --

THE COURT: Okay, so let's finish out the

merits, maybe we have finished out the merits, before

we get to sanctions, and we're putting off the merits,

I guess.

MX. GREEN: Yeah, the only thing I will add on

the merits is I'm not entirely sure we have a full set

of depositions so I'd like that to be, you know, we,

Ms. Weiss and I can meet about that, but I, I do not

think that they were, that we've gotten is

particularly comprehensive. I think it's, anyway, I

will address that separately if that's okay with

everybody.

THE COURT: Okay. So we're on sanctions then?

MX. GREEN: I believe so. So I think, if I

may, I'd like to start with, you know, a particular

set of sentences in the letter opposing it where

defendants wrote in ECF --

THE COURT:  Before you get to the opposition, just since I have a bunch of issues here, just remind me specifically --

MX. GREEN:  Understood.

THE COURT:  Is this the one where I required an affidavit?

MX. GREEN:  It is.

THE COURT:  Okay.

MX. GREEN:  An affidavit or production and we still are, have no affidavit as of today and the production is still incomplete as of today.

THE COURT:  Okay, just give me the docket number of my order.

MX. GREEN:  Absolutely, give me one second unless somebody has it and can pass it to me.  I believe this is 383.

THE COURT:  Hold on.  No, I think the order is 359.

MX. GREEN:  Oh, I'm sorry, I thought you meant the, yes, that, yes, correct.

THE COURT:  359, okay, so let me just look at it. I need to pull it up here.  Okay, go ahead.

MX. GREEN:  Okay, so I think given where the Court wanted to start, where I'd like to start then is just

briefly with the history of what's happened here. These are documents that I think, you know, our view is that we should have gotten them on July 31st. They are clearly part of the first set of consolidated requests, although defendants did object ultimately I think the Court ultimately rejected the argument on which they were objecting in a decision that it issued on the motion to dismiss before July 31st.

The way we've gotten to where we are now is we then sent an email, defendants asked for a couple of weeks to think about it, they thought about it and that just kept getting kicked down the road with progressive commitments to get us documents and revised objections, you know, every few weeks. And so, you know, theoretically, at least, I would have hoped that somebody was looking for the documents in that time.

Ultimately, skipping forward a bunch, defendants made a firm commitment, and if I'm remembering this issue correctly, this is one where they even said, yes, there will be consequences, we agree you'll be able to call witnesses back if we don't make a deadline of December 17th. What happened, and this connects some of the staffing stuff we were talking about earlier, is that Ms. Weiss had planned

a vacation and, of course, attorneys should be allowed to go

on vacation, there is nothing wrong with that, that lasted

for about two and a half weeks starting on December 20th.

And so this was not the only commitment that defendant sets

for December 17th and 18th, there were five or six big issues

that they promised productions on and they didn't produce

anything.

        And so what happened is we then started trying to

follow up and the answer we got from the rest of defendants'

litigation team was that they were not able to respond to

anything while Ms. Weiss was out of the office and that

every decision needs to be signed off on by Ms. Weiss.  And,

you know, I think for this issue, in particular, that was

striking because at every meet and confer we had, Ms. Weiss

told me that this was not her issue, that she was not

dealing with it, that somebody else on her team was dealing

with it and would be getting the answers soon and until the

commitment of December 17th.

        Ultimately then, you know, we held off on making a

motion although we sent them a motion I think on December

20th or 21st under ECF 317 that said, you know, we want to

compel these documents, it's, you know, disserving that

you're blowing our, you know, the things you've committed in

writing to us to do. Ultimately, we decided to hold off and

2   let Ms. Weiss have an opportunity to address it when she

3   got back to the office and what we got was nothing when

4   she got back to the office, she just didn't respond to the

5   emails. And so we filed the letter and the first time

6   around defendants filed an opposition that the Court said

7   did not actually do any of the things it was supposed to do.

8   And so they filed another opposition and, you know, what it

9   seems like from what they've said about at this stage their

10  failure to produce is that they started collecting these

11  documents for the first time after the Court ordered

12  them, not even after the Court ordered them to, to

13  file a second opposition letter but they didn't start

14  collecting them until the Court literally ordered them

15  to collect the documents.  And so, you know, on

16  sanctions Ms. Weiss' letter focuses on how it wasn't

17  unreasonable for them to miss a deadline when the

18  Court ordered it on January 24th for January 28th.  And

19  maybe in isolation that's true, but that ignores the

20  entire history of this. It ignores that they've been

21  promising these documents for more than, you know, six

22  months.

23          And the other thing I will say about the

24  letter that defendants have filed, there's a line in it

25  that says --

THE COURT:  You're talking about docket 381?

MX. GREEN:  381 that says, "Defendants do not take the orders of this or any other Court lightly."  As Your Honor knows, this case is on a rocket docket with ten consolidated cases, several of them purported class actions, dozens of attorneys, with seemingly unlimited time and resources for bullying and attempting to intimidate defendants and their counsel.  Of course, as the Court probably remembers, just before that at ECF 347, the Court had written there are many problems with the City's response and I'm just kind of putting ellipses in here.  The City's letter improperly accuses plaintiffs' counsel of acting unprofessionally without providing a basis for that accusation. Such accusations shall not be repeated in the future. It didn't even, their claim to be taking the Court's orders seriously didn't even last a single sentence.

This is not the only order that we're running into problems on.  As the other letter I filed last week as a status report, and that's, if you give me a second, sorry --

THE COURT:  380?

MX. GREEN:  I believe that's right, yes, 380, despite a clear Court order saying that they needed to be ready to provide firm dates on documents they've known we don't have since September, and really they've known

2 we weren't going to get since March, defendants were not

3 prepared to provide firm dates.  We objected to it at the

4 first meet and confer that they cut off after about an hour

5 last week, and this week they were no more prepared to

6 provide us firm dates on any, you know, I -- I may have, if

7 I suggested they haven't started looking for anything, I

8 overstated it earlier, but it's very clear that for a large

9 number, if not a majority of the categories identified in

10 the September letter, defendants are considering how to

11 collect the documents for the first time in our meet

12 and confers. And then they need to go talk to the

13 people who organized those documents to find out how

14 long it's going to take to collect. When the Court has

15 already ordered them to provide firm deadlines, that's

16 just not okay.  It's, it's extraordinarily frustrating

17 and it's obviously on the schedule grinding things to

18 a halt.

19          In terms of what we should do at this point,

20 to my mind there are three basic kinds of sanctions.

21 There are sanctions that are individual that are

22 intended to provide some kind of deterrent effects,

23 for example, fining an individual attorney $500 in a

24 written decision --

25          THE COURT:  Before, wait, wait, before we get

to the types of sanctions I need, I need greater

specificity on what you're talking about in terms of

what specific conduct is being sanctioned and what

letter is raising this. You're talking about sanctions

based on 380?

MX. GREEN:  So I think that there are

appropriate sanctions based on 380 --

THE COURT:  This is not, we're not going to do

sanctions based on 380, that's not, that was not keyed

up for this, I'm happy to talk about --

MX. GREEN:  Understood. And I, I don't mean to

be suggesting that we're asking for it directly, I

think that I'm mentioning it because this is, at this

point, to say that this is not an intentional course

of conduct, it strains reality. I think that more

orders have been violated than have not.  Just this

week, you know, after the Court's comments at the lack

of deposition, about the 48 hour rule, it was not

until Thursday at 4:00 for a, I'm sorry, Tuesday at

4:00 for a Thursday deposition that we got, we got the

documents that the Court had ordered for every

deponent. It's, there is a total lack of respect for

the Court's orders.

Now I think it is teed up with regard to the

2   prior protest motion, right, that it is that course of

3   conduct, that violation of a clear order to produce or

4   provide an explanation by way of affidavit with

5   somebody with personal knowledge as to why collection

6   was impossible, neither of which has been done even as

7   of today.  That's what we're seeking sanctions on. But

8   I think the reason I am talking about the rest of it

9   is I think that bears very much on the severity of the

10  sanction that's warranted and kind of, I know we'll

11  talk in a moment about the kinds of sanctions, but the

12  point is the kind of sanction that will actually get

13  this case back on track.

14          THE COURT:  Okay, so --

15          MX. GREEN:  And I thought I should mention it

16  was because of our, the lack of documents on this that

17  we had to cancel the deposition that was scheduled for

18  Tuesday.

19          THE COURT:  Because of lack of prior protest

20  documents?

21          MX. GREEN:  Yes, correct.

22          THE COURT:  Yes, okay.  So, all right, so now

23  I know we're talking about 359, go ahead about the

24  types of sanctions.

25          MX. GREEN:  Okay.  So to my mind there are

basically three ways we can look at sanctions. There

is, you know, the individual, I mean it's more than a

slap on the wrist but a targeted, you know, Dara Weiss

shall pay plaintiff $500. I don't know that that's

going to get us much of anywhere in this case.  You

know, certainly it's, I don't even think that most of

this is Dara Weiss' fault, I think most of it's the

client's fault, so I don't know that I think that

would be appropriate.

Past there, there are two ways I see of

looking at sanctions. First is kind of backward

looking make whole sanctions. So those are things like

ordering attorneys' fees, or perhaps even, you know,

an order of preclusion when, you know, documents have

been destroyed and there is no way to replace them.

and them. And then there are forward looking

sanctions, and this would be category three, that aim

at fixing the problem going home, whether through

deterrents or, you know, I know it wasn't phrased as a

sanction, but things like you see at 317 that provide

procedures that try to stop the problems from popping

back up again.

You know, I thought a lot about what would

work in this case. I think attorneys' fees, as we

understand it, are mandatory, so we'd ask for those.

But in terms of fixing the problem going forward,

here's what I think makes sense.  In order to stop us

from ending up here and expending more unnecessary

motion practice when the City misses Court ordered and

agreed upon deadlines, we'd ask the Court to do

something like this.

First, if the City anticipates missing a

deadline, Court ordered or one agreed by from the

parties, they must submit an affidavit from the

appropriate custodian, so either NYPD or Mayor's

Office, at least two days before the deadline

explaining in detail why the deadline is impossible to

meet so the Court can decide whether an extension is

appropriate and actually have a chance to tell them

that the extension is inappropriate if it believes it

is. The Court can then also schedule a conference

requiring the person from the NYPD or Mayor's Office

to come to see if an extension is warranted if the

information in the affidavit it threadbare or not

sufficient.

Second, we think that at this point it makes

sense to have the Court so order any and all of the

parties' agreements about defendants' deadlines to

produce that we agree on at meet and confers or an email

that we exchange in lieu of meet and confers. In terms of

process, what I'd propose is that plaintiffs send an email

to defendants summing up any commitments that we believe

they've made and proposing language to be so ordered, and if

they don't object that (indiscernible) we can send it to the

Court can be so ordered. If they do object, then they can do

so by identifying what they disagree with, and for the

issues that aren't in dispute, then we can submit those to

the Court to be so ordered, for everything that is in

dispute, as with ECF 317 we'll make ourselves available

within 24 hours to discuss and otherwise defendant should

propose alternate language that they believe reflects the

agreements and we can go from there.

Third, if the City misses a deadline without

submitting an affidavit two days in advance, they must

submit a letter within one day of missing the deadline

explaining why they shouldn't be sanctioned for further

failures to comply with the Court's orders.

And then, finally, if defendants fail to submit a

letter, we think it would be appropriate for the Court to

set a presumed scale for progressive monetary sanctions for

each deadline missed. We're really hoping that won't be

necessary, but we think that having the system in place so

that we're not coming to the Court and providing fair

warning to defendants, and specifically to, you know, to

counsel's clients that there will be consequences for

failure to follow the Court's orders is necessary at this

point to insure that we're not missing deadlines, both, you

know, committed to formally in the Court's meet and confer

process, and ordered by the Court.

THE COURT: Okay, gather this is the first time

Ms. Weiss is hearing this, Mx. Green?

MX. GREEN: That's correct, this is something

that, you know, we've spent some hours in common interest

meetings putting together, but yes.

THE COURT: Okay. All right, Ms. Weiss, I know

you're blindsided a little by this but I'll hear from you.

MS. WEISS: Yeah, you could say that. First of

all, I appreciate, Mx. Green, that you don't think sanctions

against me personally are appropriate here. But, you know,

Your Honor pointed out this is, this is new, and these

sort of sanctions. Mx. Green's letter talked about

attorneys' fees under Rule 37 and that was, frankly,

all we were prepared to discuss. You know, and, Your

Honor, this goes back to the argue with respect to

audit trails and our opposition to that. Despite Mx.

Green's contentions, none of this is purposeful or an

intentional disregarding of the Court's order.  That's

just not something that is at issue in this case at

all.

And I also appreciate that Mx. Green said that

I, attorneys can go on vacation. I don't know

everything that happened while I was on vacation, I

know what happened when I came back. If there were any

orders that were, were missed, I sincerely apologize.

We're working now on getting the documents, we're,

it's going to be the discussion on Monday to make sure

that we get documents as quickly as possible. I'm not

sure that deposition had to be postponed because of

lack of these documents but, you know, plaintiffs

wanted to do that and that was fine with defendants,

it's understandable. There's a very tight amount of

time to do depositions, we're trying to fit in fifty-

some-odd in that time but I'm sure we'll be able to

reschedule it.

But, once again, this was in no way

intentional, it was just so many things coming in at

once and trying to keep up with it.  And I made this

argument earlier in this conference and we rest on

that.

THE COURT:  Here's the part I don't

understand, Ms. Weiss, I issue a Court order requiring

you to provide an affidavit and you literally just act

as if it doesn't exist. I mean we have a lot remedies,

you can move for reconsideration, you can object, but

why is violating it an option?

MS. WEISS:  Well, Your Honor, it was not

intentionally violated. I was busy trying to get the

documents and the date, the date just passed and I

apologize that we didn't get the affidavit. It was, it

was a complete oversight. We --

THE COURT:  Did you read -- I don't issue that

many orders, did you read the January 24th order?

MS. WEISS:  Yes, I did, Your Honor.

THE COURT:  Were you aware that you either had

to produce or provide this affidavit, did you

understand that from the order?

MS. WEISS:  Yes, Your Honor, and I was working

on --

THE COURT:  And at the time you read it did

you think, did you think I'm not going to have to do

that affidavit because I know we're all going to get

it done or did you think, you know, we're not going to

get this done by the 28th, I'm going to have to do an

affidavit?  Did you think either of those things?

MS. WEISS:  I don't remember exactly what I thought when I got the order, but I, I proceeded as if I was attempting to get the documents.

THE COURT:  You thought you would have it all produced by the 28th?

MS. WEISS:  I didn't know, I was looking through documents to see what I could produce and then the date simply passed.

MX. GREEN:  Your Honor, that's also just not true. In an email the day it was due, defendants wrote saying we intend to produce prior protest documents on a rolling basis. The idea that this passed without notice is, I mean it's not believable on a Court order in the first place.  But in writing defendants said that they intended to produce prior protest documents on a rolling basis, I emailed them back saying that's not consistent with the Court's order and didn't get a response.

THE COURT:  What date did you email them?

MX. GREEN:  They emailed me on the 28th and I emailed them back on the 28th.  It's quoted in my letter and I'm happy to file --

THE COURT:  You it that to Ms. Weiss?

MS. WEISS:  Yes, Ms. Weiss and Ms. Robinson.

THE COURT:  Well, Ms. Weiss, you got an email

saying that you had to produce this affidavit on the

28th, right, reminding you?

MS. WEISS:  It's possible, I don't have my

emails from the 28th open here and I don't specifically

remember.

THE COURT:  I mean this, we can't function if

you don't read and comply with Court orders, that's so

basic.  I mean I'm just flabbergasted that I don't know

what you expect is going to happen if you don't comply

with a Court order or try to do something about if you

think you can't comply with it.  I mean this one,

obviously, could have been complied with.  I just, I, I

don't think I ever had a litigant quite so contentious

(indiscernible).

All right, I think I would like, Mx. Green, for

you to put this proposal you gave to me on future

sanctions in a letter and then I will -- file it as soon

as you can, Ms. Weiss, you can respond within two days,

and then I'll decide what I think is the best way going

forward as to those.

As to a Rule 37 sanction for violating my

extremely clear order of January 24th at docket number

359, the City is sanctioned by awarding the attorneys'

fees that Mx. Green had to go through to bring this to my

attention afterwards. So we're going to use the same

procedure that we used in the other case.  Mx. Green, you

put together, you know, whatever your proposal is for the

fees, show it to Ms. Weiss, if you want to work it out on

your own, that's fine, otherwise you'll just send it to

me.

MX. GREEN:  Yes, Your Honor. If I may clarify

what's the starting date on, just so we don't end up

in dispute about what's fair game for this --

THE COURT:  After January 24th.

MX. GREEN:  After the 24th, okay.

THE COURT:  No, no, no, I take it back, it has

to be after the 28th, it has to be after the failure to

file the affidavit, it's post January 28th.

MX. GREEN:  Understood.

THE COURT:  And also relevant to this

particular issue.

MX. GREEN:  No, of course, I suppose the only

thing I --

THE COURT:  We're talking about basically the

369 but, you know, if there's some other work you did

on it, that's fine.

MX. GREEN:  Well, Your Honor, I suppose what,

I understand the, I think that's 37(a) for violating

the Court order, we'd also ask for 37(b) and I may

have mixed them up, sanctions related to, you know,

having to just follow-up for nearly a year on this

stuff and --

THE COURT:  Yes, I understand, on the merits

of that I'm putting that off for now.

MX. GREEN:  Understood, that's all I want to

clarify.

THE COURT:  Okay.

MX. GREEN:  I'm not going to argue and I just

wanted to know what I'm supposed to send them.

THE COURT:  I'm glad you asked.  Okay, what's

left, Mx. Green?

MX. GREEN:  I suppose I think the right way to

handle what's been going on on the, kind of the bigger

picture stuff, I mean, you know, I understand that

perhaps I have blindsided Ms. Weiss with the specific

proposal but I think that we had asked to be, everyone

to be ready to talk today about the bigger picture

issue that it's not just Court orders that are getting

disregarded but, you know, defendants are not keeping

their commitments in the meet and confers, they're not

scheduling meet and confers, that just getting basic

information is pulling teeth here.

I think the proposed sanction handles that in part. I suppose what I would ask in addition to that is just if we could submit all of the commitments defendants have made in the most recent meet and confers to be so ordered, that might also help us move forward. Otherwise I think the proposed prophylactic sanction is, covers that part of our request.

THE COURT: I think it's a good idea to have Court ordered deadlines where possible so I'll agree with you on that. I guess there's a listing, and I can't remember what docket number it is, of categories that the City, that you're in discussions with the City on --

MX. GREEN: Correct.

THE COURT: Is it that they have made commitments on some and you want them so ordered?

MX. GREEN: So what we would have to do here because they did not come to that meet and confer prepared to discuss firm dates, is they have committed, that's 20 days from this Wednesday, they will give us what we referred to as a date for a date. Meaning, or, sorry, the 20 days from Wednesday was a date for a date, meaning on that day we will get a firm commitment. And, you know, I think in our view the discovery schedule is kind of blown already at

this point, we're discussing separately requesting an

extension and, you know, rescheduling depositions as

is appropriate. But I think whatever comes out of

their mouth on the 20th we want that to be so ordered

and we want the fact that it has to come out of their

mouth, not the 20th, in 20 days, and the fact that it

has to come out of their mouth in 20 days also to be

so ordered.

THE COURT:  That's fine. I'm a little

concerned about this notion that there's some

automatic extension of a discovery schedule that's

going to happen, is this going to affect other dates?

MX. GREEN:  Your Honor, I believe it is, I

just, you know, we've been talking to the City about

it. I think the only other option is, you know, given

the prejudice we've had to be talking about preclusive

sanctions instead of prophylactic sanctions. I

understand --

THE COURT:  Proving what exactly?

MX. GREEN:  I mean the reason we didn't ask

for it specifically is because I can't think of

anything that wouldn't basically amount to striking

the City's answer.  And I, you know, please do tell me

if I'm wrong but I assume you're not there.

1

2          THE COURT:  Well, no, I mean we have to, I

3     mean you're not stopping all depositions, I assume. I

4     assume there are some, I mean I can see how for high

5     level people there may need to be a moving to the end

6     but you're not talking about halting depositions, are

7     you?

8          MX. GREEN:  We're not talking about halting

9     them, but because of the way we did things if, the

10    reason that we didn't finish discovery at the end of

11    last year is that the City, despite the Court's order

12    on when to produce documents and, you know, despite

13    the Court's order on when discovery ended had, without

14    telling anybody, decided they were going to produce

15    emails at either the end of December or beginning of

16    January, which was past the discovery end date.  And

17    we only found that out because we moved to compel

18    those.  And so, you know, what was left at that point

19    in terms of depositions was high level.  There are

20    line level officers that we've discovered exist from

21    various discovery, from emails, from so on, and we had

22    noticed some of those, but really all that's left were

23    the depositions that in the first instance we decided

24    we were unable to take without significant document

25    production. And, of course, all of those decisions

were made on the assumption that we were going to get

everything on July 31st which didn't happen. And, you

know, even though the Court ordered -- sorry, please.

THE COURT:  Well I'm trying to follow where we

are now.  So some depositions are going to be

happening because they can go forward without this

production, there are others you want to wait on the

production for, is that it?

MX. GREEN:  That's correct.

THE COURT:  Okay.  How many others are waiting

on the production?

MX. GREEN:  I could not tell you offhand

where, I am happy to discuss with the common interest

group and put together a list of each category but I

am not prepared to say that right now.

THE COURT:  I mean, again, the parties just

can't assume that if they agree to it that deadlines

are going to be extended, the Court has an interest,

too. So, you know, I'm not saying that some brief

extension isn't possible but we have to do what we can

to, you know, limit it.

MX. GREEN:  I understand, Your Honor. I think

what I would like to just say on that, almost every

one of these motions that we're here on today were

filed, you know, about commitments the defendants missed

in mid-December at the beginning of January. And I

understand why it's taken so long to get here on a

conference, I do, but, you know, what we had asked for in

each of these letters was production in time to keep the

schedule and we're just --

THE COURT: I don't want to talk about the past or

blame, I want to talk about --

MX. GREEN: Yes.

THE COURT: Like one way to solve this is to say

20 days is too long, we need the commitments sooner and, you

know, if I think the commitment is so unreasonable then, you

know, if they're going to extend discovery more than, you

know, some brief period of time, then they are not going to

be acceptable.

MX. GREEN: Understood, Judge. I think, you know,

what we had been discussing between the parties was

(indiscernible) extension. Another problem that we have is

that despite, you know, really not trying to cast blame

here, but not every deponent is even on the schedule yet and

the Court had ordered that. And then defendants also, after

I think last week shuffled all of their 30(b)(6) deposition

designations and so, you know, that, that is also affecting

things and the need for an extension.

I understand what the Court's saying, that, you know, we, we shouldn't assume that we're going to get an extension but given --

THE COURT:  No, I understand the problem.  I mean there's, you know, I mean if the City was actually able, I mean the City had shot itself in the foot because it's not, it's not been articulating burdens and it's possible that if they articulated, you know, particular burdens in producing things, I would say that's too much, I'd rather sacrifice the documents, have the case, you know, go forward on what I think is an appropriate schedule.  That's, you know, an option, there's a tradeoff to be made potentially between producing documents and getting the case over with, and one might sacrifice some category of documents to say, you know, it's not worth waiting for these, better that the depositions go forward and the case go forward. Or that the documents only happen after the depositions and they can only be able to use, be used without having questioned deponents on them, that's probably the more likely option.

Do you see what I'm saying, Mx. Green, there's a balancing here.

MX. GREEN:  I do, Your Honor.

THE COURT:  The plaintiffs have an interest in moving the case along more than the City I would

1

2  think.

3        MX. GREEN:  I think that's right. I think it

4  ultimately comes down to prejudice though. You know,

5  we have, we spent significant time at the beginning of

6  last year mapping out a schedule that allowed us to

7  take the depositions and get the discovery we wanted

8  in a way that we thought allowed us to best prove our

9  case.  I think that there are very important documents

10 and you're, of course, right that perfect productions

11 are not something to hold up depositions for. But we

12 are still missing just major, major crucial categories

13 of documents, you know, and it's something that I

14 think --

15       THE COURT:  My point is those need to be

16 prioritized. I mean I assume prior protests is one of

17 those categories, right?

18       MX. GREEN:  Absolutely.

19       THE COURT:  Yes. And I guess there's others I

20 haven't heard about.

21       MX. GREEN:  That's correct, Your Honor.

22       THE COURT:  In terms of being presented.

23       MX. GREEN:  Right, or they were listed in the

24 September letter that became the October motion that

25 became the January motion.

THE COURT:  Okay, but not, the merits have not

been presented to me.

MX. GREEN:  Right, because presumably

defendants were agreeing to produce them, they just

haven't.

THE COURT:  Right. Yes, I mean you need to be

sensitive to the possibility that some categories need

to be frontloaded so that depositions can happen,

others can wait because, I mean if the City ever

showed it they would be too burdensome to be produced

before the deposition and the plaintiffs might just

have to wait in order to have a schedule when the case

moves forward.  So I just want to throw that in the

hopper as a thought that you need to consider.

MX. GREEN:  Yes, Your Honor, and I, you know,

I would respectfully suggest that we have considered

it and we've considered it I think pretty thoroughly

at a lot of different stages in this case --

THE COURT:  Well, I mean I'm not saying --

MX. GREEN:  We've taken fifty-some-odd

depositions, there's a deposition going on right now.

THE COURT:  I'm not saying you're slacking,

what I'm saying is that for purposes of seeking an

extension, as someone said earlier, perfect could be

the enemy of the good which is to say there are some

categories of documents we can wait till after the

depositions.  Because, you know, we won't be able to

make the case to Judge Gorenstein that the City should

have to produce all of it in time to have this go on

the schedule that I'm contemplated.

MX. GREEN:  Understood. I think the best thing

to do then is, you know, for the documents we care

about we will, you know, I suppose propose that they

be ordered produced sooner rather than later and that

might involve renegotiating some of the commitments

we've made and then otherwise we'll propose a new

schedule and request an extension in the appropriate

way.

THE COURT:  All right.  I mean I think we're

not thinking about schedule extensions, I was thinking

more in the nature of, you know, 30 days, 45 days, I

think what you're talking about is a lot longer than I

was ever contemplating or would be expected to approve

of.

MX. GREEN:  I mean, Your Honor, I guess all I

would say is if we count the days from when we were

supposed to get documents and when we moved on them,

which would be mid-December, so December 15th, 16th,

17th and, you know, what I think the Court has signaled

is the shortest period it's willing to order which is

15 days from now, we're talking about --

THE COURT: Wait, wait, wait, 15 days from

now, I'm sorry, I lost you?

MX. GREEN: When we were discussing various

productions earlier in this call the Court was

ordering, was suggesting it was going to order, you

know, two-week type deadlines, not five-day or three-

day deadlines. And so, you know, if you had the 15

days at the end of last year, the 15 days from now,

and the time it's been since January 1st, that's 60

days --

THE COURT: Okay, right, I'm not sure that's

necessarily the way to think about it but, fine,

understood, maybe you'll be able to make the case for

60 days. I mean how many, how much, how many days of

depositions are contemplated once you get these

documents?

MX. GREEN: I think we have something like 40

depositions outstanding, maybe less than that, at the

high level.

THE COURT: And how long are you expecting it

to take you to do 40 depositions?

MX. GREEN:  Well I think the time schedule extends into May I want to say, so about three months total.

THE COURT:  Right, well that's another place where efficiency, I mean other efficiencies could be achieved, right? I mean the current deadline is, in fact, April 22nd.

MX. GREEN:  Then I apologize because I had gotten the deadlines wrong, obviously the schedule for the most part complies with that although defendants have scheduled, I think there are a couple of witnesses that defendants have given updates that are past the discovery deadlines more.

THE COURT:  Right. I mean if there is any play in, you know, liability and deadlines, that's something to be considered.  Okay, well, I think, are we done, Mx. Green?

MX. GREEN:  I believe so. I think, you know, the only other thing I would say is if we end up not having crucial documents at depositions and we can't get time to get those, I think we, we would end up contemplating another motion that takes, you know, curative sanctions in the form of some kind of preclusion.

THE COURT:  Preclusion of what?

MX. GREEN:  I mean maybe precluding them from arguing probable cause on, you know, the arrests of people over 2020, in the course of something like that.

THE COURT:  All right, well, we're, I mean preclusion is always an option depending upon what the City does.  But nothing to be addressed right now.

MX. GREEN:  Understood.

THE COURT:  Ms. Weiss, anything you want to say in response to what you heard?

MS. WEISS:  No, Your Honor, if and when these issues come up we'll certainly address them. I know that Mx. Green was just sort of throwing things out there now, but I don't think they need to be addressed at this moment by the City.

THE COURT:  The date for the date is really bothering me.  It's just too long.  When, Ms. Green, what do you calculate this promise date to be?

MX. GREEN:  It's 20 days from Wednesday and if you give me a moment I can look at a calendar and see what that actually means.

THE COURT:  Twenty days from this past Wednesday?

MX. GREEN:  Yes, so that's going to be the 1st

of March.

MS. WEISS:  Your Honor, we had originally proposed it earlier but during the earlier week the NYPD liaison, the managing attorney of the unit, is going to be on vacation, so we extended it until she got back from vacation because she's really the one who needs to get and would have the information.

THE COURT:  (indiscernible)?

MS. WEISS:  It's the week after Presidents Day so I think that's the week of the 21st.

MX. GREEN:  Right, defendants did not want to be responsible for something at all that week so we moved it to the next week.

THE COURT:  I mean is any work being done on actually looking for the documents, I mean, or is this date to announce when you're going to be looking in the future, Ms. Weiss?

MS. WEISS:  No, it's a, it's a date to give plaintiffs a firm date of when the documents will be produced.  Our liaison is reaching out --

THE COURT:  The work on searching for them has to happen immediately, is that happening or not?

MS. WEISS:  It is, our liaison has already reached out to or is in the process, the meet and

confer just happened on Wednesday, the process of

reaching out to all the different units who would be

in possession of these documents or these types of

documents to have them looking and she will then let

us and plaintiffs know when each of these units will

have the documents all collected.

THE COURT: Right, and also they should be

collecting it, too, I mean --

MS. WEISS: Well, yes --

THE COURT: That should be started.

MS. WEISS: Yes, that is the part of it, I

can't guarantee that she has been able to reach and

speak to all of the units as of now, you know, I don't

know what people's days off are or people's

availability --

THE COURT: Well make clear that the

collection process has to start, it's not just an

exercise to figure out when, how long it would take if

it started on March 1st.

MS. WEISS: Yes, of course.

THE COURT: Start right now.

MS. WEISS: Absolutely.

THE COURT: And that they may be called in to

say what they've done on particular searches.

1

2          MS. WEISS:  Yes, Your Honor.

3          THE COURT:  So maybe people -- okay, Mx. Green

4   anything else?

5          MX. GREEN:  Given all of that, perhaps the

6   best thing to do is just set the deadline that

7   everything needs to be produced or an affidavit needs

8   to be produced by March 1st?

9          THE COURT:  Well I, you mean actually produce

10  the documents by March 1st or give --

11         MX. GREEN:  Yes.

12         THE COURT:  I mean they're being required to

13  meet with you on March 1st, right?

14         MX. GREEN:  They're being --

15         THE COURT:  Or not?

16         MX. GREEN:  The previous agreement which I

17  think, you know, I think assumes perhaps wrongly that

18  we would be able to get significant further time from

19  the Court is, because defendants didn't come prepared as

20  ordered to provide firm dates at a meet and confer and, you

21  know, it's not the first time they were ordered, they were

22  ordered to do that in October, as well --

23         THE COURT:  I'm happy to order them to provide

24  firm dates on March 1st, is that what you're asking or

25  something else?

MX. GREEN:  Well, no, I mean, you know, I think that's what we've agreed to do, I think the problem is if we're not going to be able to get the significant discovery extension that what we agreed to in that meet and confer doesn't work.

THE COURT:  Well, I mean it depends what you mean by significant.

MX. GREEN:  Sixty, ninety days.

THE COURT:  It depends what these dates are. So I, let me think about this, I mean I, I'm flying blind here because I would have to go through the categories and understand what the issues are. Let me just think about this. I mean if the assumption is, right, that you're going to produce the documents on March 1st unless it's impossible to do so?  Ms. Weiss is maybe on mute.

MS. WEISS:  I'm sorry, I was on mute.  The intention was not to produce the documents on March 1st unless, of course, we have them, but the intention was to be able to have full and thorough conversations with the folks who are searching for the documents to get a firm date by which they know they could get the documents to us and then we, in turn, can turn them over to plaintiff.

THE COURT: Mx. Green, the categories of documents are listed where right now?

MX. GREEN: They are in the September 10th letter that's attached to the first motion on this, give me a second and I'll give you a docket number. It's going to be one of the 354s, it's 354-2 --

THE COURT: Yes.

MX. GREEN: 342-2 provides the list and the list is provided between pages 5 and 8, and this was the motion that was made on, initially, or this is a letter that was filed on September 10th and then attached to a motion made in October. And then again attached to a motion made in January.

THE COURT: Yes, January, right.

MX. GREEN: And the January motion came because we weren't able to complete a process where the Court had ordered us to meet and confer and get firm dates for production.

THE COURT: I don't understand how the City gets a letter like this in September and doesn't know now what its position it in terms of the ability to produce them. Ms. Weiss, how does that happen?

MS. WEISS: Your Honor, we responded to the letter, plaintiffs were not satisfied with our

response so we continued to engage in meet and confers

to try to reach, to reach a conclusion that the

parties would be satisfied with.  This has been going

on and we have been responding.  There had been a

series of meet and confers, the City provided

materials and information to plaintiffs, we haven't

heard anything for quite a while and then once they

started contacting us, again, we started engaging in

further meet and confers. And this week --

THE COURT:  All right, this is what we're

going to do on this.  By, on March 1st you need to

produce something, either produce these documents or

give a letter to the other side that says when you're

producing the, and if it's more than two weeks away

you need to have a full explanation of what the

problem is.

MS. WEISS:  Okay.

THE COURT:  If we do that, if you get

everything, if you get everything, maybe, Mx. Green,

where does that take us?

MX. GREEN:  I think that that probably means

that we'll, you know, assuming we actually do get

everything and there isn't an objection that shows up

for the first time, say, to privilege that we didn't

expect, that, I think that gives us some ability to,

well, let's see, that would put us in March. I think

maybe that means that with a 90 or 100, maybe 90 day

extension of the discovery deadline we can keep things

going, assuming that there are no scheduling issues.

Like, for example, that the mayor is not, or the

former mayor is not available for an entire month.

THE COURT:  That's just too long.

MX. GREEN:  I mean, Your Honor, I think, you

know, one of the things that struck me in what Ms.

Weiss just said, when explaining why they couldn't

give us dates today it was, well, we just had this

meet and confer on Wednesday.  All we did at the meet

and confer is go through this list, I said the name of

the document request and read it and asked what the

status was. And what we got on virtually every one is,

okay, well those documents live here, I will go make a

request. You know, it's very clear that defendants did

not view this as something they needed to do until the

Court specifically ordered it.

MS. WEISS:  That's, that's not accurate at

all.

THE COURT:  Go ahead, Ms. Weiss. I mean for

each of these categories have people been working on

1

2 getting them or not?

3        MS. WEISS: For some of the categories,

4 absolutely but, Your Honor, a lot of them were either

5 unclear or plaintiffs -- defendants objected to and

6 then we withdrew objections, it's not as clear cut.

7 And I don't have all my notes from that meet and

8 confer with me so I can't tell you everything that

9 happened, unfortunately, I didn't think that that was

10 necessary to have with me today for today's

11 conference. But I think Mx. Green is generalizing

12 quite a bit.

13        THE COURT: All right, let's, let's leave it,

14 let's -- give me a second. Whatever this order is,

15 Mx. Green, I mean how is it phrased, I mean is it all

16 of documents on this list to which objection has not

17 been made and is that, does that make it clear?

18        MX. GREEN: I think that the answer is, you

19 know, produce, shall produce all documents identified

20 in document identifier or shall, you know, I mean, you

21 know, end up with the basic thing that we should have

22 gotten in the first document, the first set of

23 objections which is state what's being withheld and

24 why, if anything is being withheld. Obviously, we also

25 need a privilege log on that day if there is anything

being withheld and we need, but, you know, I think

that these are all things and we picked these

categories because they were not ones where defendants

stated they were withholding documents.

MS. WEISS: Your Honor, I also just want to --

THE COURT: Some of these have been produced,

right, I mean, or it's already been covered by things

we've talked about.

MS. WEISS: Yes, Your Honor.

MX. GREEN: Some and in part. But, for

example, let's take stop reports, that's document

request 10, we talked for the first time on Wednesday

about defendants gathering stop reports. There is no

objection to producing stop reports, stop reports are

something that's required, as I understand it, by a

Court order in *Floyd* which is a stop and frisk case,

and, you know, we just don't know when they are going

to get them to us. And, you know, that item has been

on this list since September 10th and it took until the

beginning of February to even have them start

searching for them.

MS. WEISS: Your Honor, if I may just point

out that the September 10th letter, if I'm not

mistaken, referred to one, one of plaintiffs',

consolidated plaintiffs' discovery requests. The meet

and confer that we had this past week extended to

their second or supplemental request which had 101

requests, it was not part of the motion. We discussed

it anyway because we understand that there are items

in there that might not have yet been located. So not

everything here was at any point the subject of a

motion. Not to say that we're not --

        MX. GREEN:  Your Honor, that's not true, we

moved on the second consolidated request, too, because

they didn't, they didn't give us requests that

complied with the 2015 amendment. And the Court

ordered us to meet and confer on those immediately at

the beginning of January, it has been the subject of a

motion.

        MS. WEISS:  Okay, I apologize, that is right,

I -- that's right.

        THE COURT:  I keep trying, I keep trying to

get the City to just state what they're producing and

what they're objecting to, and you're saying Mx.

Green, you haven't even gotten that?

        MX. GREEN:  I mean I think we've gotten closer

on the second consolidated request. Again, you know,

some of what we were agreeing to, perhaps wrongly, we

assumed that we'd be able to, given what's happened,

ask for an extension. But, you know, we're certainly

not at the end of that, we don't have a privilege log

for, you know, substantial privilege assertions and,

you know, it's also true that a lot of the content of

our meet and confers gets lost between them.  In that

particular instance, Ms. Weiss decided that there were

no privilege assertions that warranted a privilege log

despite the fact that they're withholding massive

amounts of documents on privilege bases, and we had to

just go back through on Wednesday the meet and confer

we'd had just the previous week to remind her that

there are privilege assertions she's making.

          MS. WEISS:  Some of which were withdrawn, that

was discussed.

          MX. GREEN:  Right, no, some were withdrawn but

then her response to having committed to getting us a

privilege log by February 4th and then not doing it

was, well, I don't think that we need it anymore. And

then, you know --

          MS. WEISS:  No, that's --

          MX. GREEN:  It's absurd.

          THE COURT:  All right --

          MX. GREEN:  And, you know, this is not just,

these are not the only requests, right?  As you know,

we just ordered today responses to individual RFPs

that are still outstanding, there was just an

agreement reached on the motion by Mr. Rankin at the

very beginning that, you know, we've agreed on, but

like there are -- like the amount of material we're

missing is massive.

THE COURT:  All right, I'm prepared to do

this. I'm prepared to order the production by 30 days

from now which is going to be March 11th.  If I get a

request for, you know, 60 or maybe something a little

more extension on the depositions, we'll try to figure

that out.  I just, I'm just trying to figure out, the

thing I'm ordering is what pages of September, the

September 10th letter?

MX. GREEN:  So that's going to be pages 5

through 8.

THE COURT:  That's what's the subject of the

March 1st conference?

MX. GREEN:  Yes.  Yes.

MS. WEISS:  Your Honor, there was a lot more,

I think I'm confused.

MX. GREEN:  Let me propose this, Your Honor,

we can draft an order, if defendants commit to giving us

approval or any objections within 24 hours, we can probably

get that out to the Court by the end of next week.

THE COURT:  And order to what exactly is being

produced by March --

MX. GREEN:  Yes, exactly.  Exactly.

THE COURT:  Okay, I mean, did I say the 8th, what

did I say?

MS. WEISS:  You said the 11th initially.

THE COURT:  The 11th, yes.

MX. GREEN:  I mean, you know, Your Honor, I just

would say, right, most of these motions were made

January 1st, 2nd, 3rd, 4th so, you know, this is us

finally getting documents 60 days after we've moved to

compel them, you know, it's a lot of time.

THE COURT:  All right, so you'll give me a

proposed order on that.

MX. GREEN:  Yes, and can we ask that the City

just either give us objections with specificity and

propose alternate language within 24 hours of getting

our draft which we'll get to them by close of business

or by the end of the night Monday?

MS. WEISS:  That's fine.

THE COURT:  Okay, you'll respond on Tuesday.

Okay, I'm a little concerned that, you know, I've done

a lot of oral orders and they still count. I wouldn't

mind someone putting it in a form that I could sign.

You don't have to worry about 370 and 374 because I

have those, but to the extent there were other orders,

I think it would be a big help to give me a draft

order. So, for example, you know, producing the audit

trail logs and I forget what date, I think I had two

weeks, and then a brief sanctions order, same thing

for you, Mx. Green, for 369 --

        MX. GREEN:  Right, and the proposed sanction

order, prophylactic order that we discussed, Your

Honor.

        THE COURT:  Well that's a proposal.

        MX. GREEN:  Oh, sorry, yes.

        THE COURT:  I want to implement what I said

today, not merely by my having said it, but also in a

written order.

        MX. GREEN:  Understood.

        THE COURT:  (indiscernible) I actually ordered

and that's what I'd just like to get a draft of. And

you can just email it to me, cc the other side, if

they want to complain about it they can give their own

order.

        MX. GREEN:  Understood.  And I assume it makes

sense to separate --

THE COURT:  Anything I ordered other than 370 and 374.

MX. GREEN:  Right, and I assume it makes sense to send two separate orders, one being the things you actually ordered and then, second, the proposed sanctions order on --

THE COURT:  Yes, your proposed sanctions order should be filed on ECF.

MX. GREEN:  Okay, perfect.

THE COURT:  What I'm talking about you can just email to me because it's merely implementing something I've already said. Anything that I haven't ordered you should file on ECF.

MX. GREEN:  Understood.

THE COURT:  Okay, so I think we're done. Anything else, Mx. Green?

MX. GREEN:  No, Judge.

THE COURT:  Ms. Weiss, anything?

MS. WEISS:  No, Your Honor.

THE COURT:  Okay, thank you, everyone.  Good-bye.

(Whereupon the matter is adjourned.)

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, In Re: New York City Policing During Summer 2020 Demonstrations, docket #20cv8924, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature _____  *Carole Ludwig*

CAROLE LUDWIG

Date:  February 15, 2022