UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

EDO GELBARD; LUKE HANNA; MICHAEL STERNFELD; and TIM YOUNG,

                Plaintiffs,

  -against-

CITY OF NEW YORK; Mayor BILL de BLASIO, in his individual capacity; NYPD Commissioner DERMOT SHEA, in his individual capacity; NYPD Chief of Department TERENCE MONAHAN, in his individual capacity; and NYPD Members of the Service JOHN and JANE DOES #1-40, in their individual capacities,

                Defendants.

No. 1:20-CV-03163-MKB-RER

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

## PRELIMINARY STATEMENT

1.     In the spring of 2020, hundreds of thousands of New Yorkers took to the streets in the wake of George Floyd's murder to peacefully express their revulsion at police brutality, especially against Black people, and to demand systemic change.

2.     The NYPD has responded with a frenzy of organized violence seemingly designed to prove the protesters' point.

3.     Plaintiffs are ordinary New Yorkers who engaged in peaceful protest in opposition to police violence and in support of the principle that Black Lives Matter.

4.     For exercising his First Amendment rights, Luke Hanna had his head split open by an NYPD police baton, requiring ten staples to his scalp. Tim Young had his thumb and his wrist injured by the NYPD. Edo Gelbard had his tooth chipped after

1

being struck in the face with a baton by the NYPD.  Mike Sternfeld was slammed to the pavement by the NYPD.

5.    The NYPD's brutality toward Plaintiffs is neither accidental nor unique.  It is a product of the NYPD's deliberate plan to surround peaceful protesters, charge them with batons, and violently assault them.

6.    The NYPD's organized violence has injured hundreds, if not thousands, of New Yorkers.  It has no justification.

7.    The NYPD has at times asserted—without providing any evidence—that it used force to break up peaceful protests because "outside agitators" were plotting violence against police.

8.    Whatever the merits of this dubious claim in other instances, it plainly does not apply to the peaceful gathering in Brooklyn's Cadman Plaza on the night of June 3, 2020, where Plaintiffs were attacked.

9.    Neither Plaintiffs nor any of their fellow protesters in Cadman Plaza were engaged in violence.  No threat, let alone an imminent one, existed.  The police were not in danger.  The police *were* the danger.

10.    The NYPD has also defended its violent tactics on the basis that "the streets were out of control" and order needed to be restored.

11.    But a generalized desire for "control" cannot justify sadistically beating specific individuals who are not themselves out of control.  The idea that "control" and "order" permit indiscriminate police violence against peaceful citizens is the logic of a totalitarian dictatorship, not of a constitutional democracy that guarantees the rights to speech and assembly.

12.     While the violence inflicted by the NYPD has no justification, it has a clear purpose: to assert police dominance, discourage further protests, and punish expression that the police perceive to be hostile and threatening to their interests.

13.     At a vigorous protest against police brutality and racism, at which some protesters demand that the police be defunded or abolished, the police are not disinterested enforcers of the law.  They are counter-protesters.

14.     The police do not like it when citizens accuse them of racism.  The police do not like it when people take to the streets and vociferously call for fellow officers to be fired or criminally prosecuted.  The police do not like it when people take to the streets demanding that their jobs disappear.

15.     When the NYPD orders angry cops to suit up in riot gear, surround peaceful protesters, and charge the protesters with batons, indiscriminate police violence against nonviolent citizens is not just foreseeable.  It is virtually certain.  And it is intended.

16.     For themselves, for others subjected to similar brutality, and for their cause, Plaintiffs demand accountability from the NYPD.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a), and 1367(a).

18.     Venue lies in the Eastern District of New York under 28 U.S.C. § 1391(b)(2) because the protest at which Plaintiffs were beaten occurred in Brooklyn.

## PARTIES

19.     Plaintiff Edo Gelbard is a 33-year old man who resides in Brooklyn.

20.     Plaintiff Luke Hanna is a 27-year old man who resides in Brooklyn.

21.     Plaintiff Michael Sternfeld is a 36-year old man who resides in Brooklyn.

3

22.     Plaintiff Tim Young is a 34-year old man who resides in Brooklyn.

23.     Defendant City of New York is a municipal corporation organized under the laws of New York with its principal place of business in Manhattan.

24.     Defendant Bill de Blasio is the Mayor of the City of New York, whose workplace is at City Hall in Manhattan.

25.     Defendant Dermot Shea is the Commissioner of the NYPD, a civilian position, whose workplace is at One Police Plaza in Manhattan.

26.     Defendant Terence Monahan is the Chief of Department of the NYPD, the department's highest ranking uniformed member of the service, whose workplace is at One Police Plaza in Manhattan.

27.     John and Jane Does #1-40 are NYPD uniformed members of the service whose identities are unknown at this time and who, on information and belief, are assigned to various NYPD precincts throughout Brooklyn.

28.     Defendants de Blasio, Shea, Monahan are hereinafter referred to as the "Supervisory Defendants."

29.     Defendants John and Jane Does #1-40 are hereinafter referred to as the "Individual Defendants."

30.     The Supervisory Defendants and the Individual Defendants are sued in their individual capacities.

## JURY DEMAND

31.     Plaintiffs demand a jury trial.

## FACTS

### *New Yorkers Take to the Streets to Express Their Outrage*
### *at Police Brutality, and the NYPD Responds with Police Brutality*

32.     On May 25, 2020, four Minneapolis police officers murdered George Floyd.  Derek Chauvin held his knee on Mr. Floyd's neck for 8 minutes and 46 seconds as Mr. Floyd suffocated.

33.     Outraged by Mr. Floyd's murder, the recent killings of other Black Americans by police, and a long history of systemic police racism and brutality, protesters took to the streets across the country, including in New York City.

34.     Widespread protests began in New York City on May 29.

35.     The overwhelming majority of protests have been entirely peaceful.

36.     Protest activity has been particularly concentrated near the Barclays Center in Downtown Brooklyn, in the vicinity of Foley Square in Lower Manhattan, and on the bridges connecting Lower Manhattan and Brooklyn.

37.     In the first few days of protests, some isolated and much-publicized instances of theft and violence also occurred.

38.     The NYPD began using excessive and indiscriminate force against peaceful protesters from the beginning.  By way of illustration and example:

39.     On May 29, Dounya Zayer was standing peacefully on the sidewalk filming police activity during a protest in Brooklyn.

40.     NYPD Officer Vincent D'Andraia called her a "stupid fucking bitch" and forcefully shoved her to the ground, leading to serious injuries requiring hospitalization.

41.     Dozens of NYPD personnel walked by as the violence occurred happened and did nothing to stop Officer D'Andraia or aid Ms. Zayer.

42.     On May 30, a peaceful protester in Queens was standing in front of police with his hands up, wearing a mask in compliance with public health guidance.

43.     For no reason, an NYPD officer pulled down his mask and sprayed him point-blank with pepper spray.

44.     On May 30, New York State Senator Zellnor Myrie and New York State Assemblywoman Diana Richardson were pepper sprayed while peacefully protesting outside the Barclays Center in Downtown Brooklyn.

45.     Sen. Myrie was, at the time, wearing a neon yellow shirt identifying himself and his office.

46.     At approximately 7:00 p.m. on June 1, a group of peaceful protesters walked in front of a line of police cars on a quiet block of Dean Street in Crown Heights.

47.     NYPD members of the service said of the protesters, over the police scanner, "Run them over" and "Shoot those motherfuckers."

48.     Another member of the service said, "Don't put that over the air."

### The NYPD Employs a Policy of Surrounding, Charging, and Assaulting Peaceful Protesters

49.     Such violence is not accidental.  It is a policy choice.

50.     At peaceful protests throughout the City since late May 2020, the NYPD has employed a deliberate policy of surrounding, charging, and indiscriminately assaulting protesters.[1]

51.     On **May 29** at around 7:00 pm, a group of protesters peacefully crossed from Manhattan to the **foot of the Brooklyn Bridge** in Brooklyn.

---

[1]     Surrounding protesters is also called "kettling" or "corralling" in certain contexts.

52.     A group of hundreds of NYPD personnel in riot gear stopped the protesters there.

53.     The NYPD charged the protesters without warning, indiscriminately shoved peaceful protesters to the ground, and struck them with batons, including from behind.

54.     On **May 29** at around 9:20 p.m. in the vicinity of **608 Pacific Street, Brooklyn**, a group of approximately 25 peaceful protesters was chanting, among other things, "Hands Up, Don't Shoot."

55.     Without warning, NYPD personnel surrounded the group, as well as approximately ten uninvolved bystanders.

56.     The police charged the peaceful protesters, violently forced protesters against a wall, pushed protesters to the ground, and struck protesters with batons.

57.     On **May 31**, New York State Senator John Liu was with a group of peaceful protesters who crossed the Manhattan Bridge from Brooklyn onto **Canal Street** in Lower Manhattan.

58.     According to Sen. Liu's testimony at a public hearing held by New York Attorney General Letitia James (the "AG Hearing"), the group peacefully marched across Canal Street, turned onto Church Street, and was stopped by police from proceeding further.

59.     After a few minutes in which no violence occurred, police charged the crowd of peaceful protesters and knocked them over, causing injury to several protesters.

60.     The police had no apparent reason to charge the protesters and gave no instructions before doing so.

61.     On **June 2**, in **Midtown East**, a group of young protesters held a dance party on 53rd Street.

62.     A reporter observing the events described it as "the definition of a peaceful protest."

63.     Without warning, police charged the group from behind.

64.     According to the reporter, "[t]hose at the back of the protest were beaten and arrested at random."

65.     Police tackled at least one reporter in the group.

66.     On **June 3**, in the vicinity of Third Avenue and 53rd Street in **Midtown East**, police surrounded a group of peaceful protesters marching downtown from a vigil at Gracie Mansion.

67.     Without warning, police began running at the crowd from behind and tackling peaceful protesters.

68.     When one protester tried to calmly leave the area, an NYPD officer beat her legs with a baton.

69.     Confused about where they were supposed to go and what they were supposed to do, the protesters did their best to move away from the area.

70.     As they did so, the NYPD pushed, hit, and struck them with batons.

71.     On **June 4** in **Mott Haven**, officers surrounded peaceful protesters on all sides.

72.     Without warning, police charged into the crowd and began striking protesters with batons.

73.     At least one protester was taken away on a stretcher.

74.     On **June 4**, at the intersection of **Penn and Wythe Streets** in South Williamsburg at around 9:15 pm, the NYPD surrounded a group of peaceful protesters who were chanting "Peaceful protest" and singing.

75.     Without warning, the NYPD charged into the crowd.

76.     The *New York Times* reported on June 5: "In the past several days, New York Times journalists covering the protests have seen officers repeatedly charge at demonstrators after curfew, with seemingly little provocation, shoving them onto sidewalks, striking them with batons, and using other rough tactics."

77.     It is plainly not a coincidence that different NYPD personnel from different precincts in different boroughs, under different conditions on different days, have responded to peaceful protests using the same operational tactics.

78.     The NYPD has consistently responded in this manner because the NYPD adopted a policy, whether express or implicit, of dispersing peaceful protests against police brutality in May and June 2020 by surrounding, charging, and assaulting the protesters.

79.     It is foreseeable that police ordered to charge with their batons into a crowd of peaceful protesters against police misconduct will use indiscriminate and unreasonable force.

80.     Indeed, the Civilian Complaint Review Board (CCRB) received 1,646 allegations of police misconduct regarding incidents that occurred between May 28 and June 20, 2020, 633 of which were from one week alone, May 29 to June 5.

81.     According to public reports, at Mayor De Blasio's behest, the NYPD's Internal Affairs Bureau ("IAB") investigated 64 instances of alleged excessive force by officers during the George Floyd protests that were captured on video. However, IAB

fully or partially substantiated only 14 of the allegations and issued charges and specifications—the process for initiating a disciplinary prosecution required in the most serious misconduct cases—against just five officers.

82.     A number of the people depicted in these videos being brutalized by the NYPD were never contacted by IAB as part of its supposed investigation.

83.     In one particularly egregious case, video from a June 2, 2020 protest shows an officer violently shoving several demonstrators and then lifting one protester up off the ground, tossing the protester over his shoulder, and slamming him down several feet onto the pavement, causing his head to gush blood. The man testified to the City Council that he had done nothing to provoke the assault other than asking officers not to beat up a demonstrator who was being arrested nearby. The IAB never contacted the man, and its investigation exonerated the officer's use of force. He was not disciplined.

84.     Many of the NYPD personnel who carried out the policy of surrounding, charging, and assaulting peaceful protesters taped over their shield numbers with black tape in an open and notorious manner.

85.     The NYPD Patrol Guide requires uniformed members of the service to wear a shield or shield patch over their outermost garment at all times.

86.     The point of requiring police to publicly display their shield numbers is to allow them to be individually identified by the citizens to whom they are ultimately accountable.

87.     On information and belief, many of the NYPD personnel who carried out the policy of surrounding, charging, and assaulting peaceful protesters have deactivated their body-worn cameras while doing so.

88.     The NYPD Patrol Guide requires uniformed members of the service to activate their body-worn cameras when, among other things, engaging in "[p]ublic interactions that escalate and become adversarial," making arrests, or responding to assignments concerning potential crimes.

89.     The pervasive covering of police shield numbers and disabling of body cameras are intended to prevent protesters from identifying which NYPD personnel used excessive force against them, or otherwise engaged in misconduct.

### *The Supervisory Defendants Are Responsible for the NYPD's Policy of Surrounding, Charging, and Assaulting Peaceful Protesters*

90.     Under Chapters 1 and 18 of the New York City Charter, Mayor de Blasio appoints the police commissioner, who reports to the Mayor, serves at the Mayor's pleasure, and can be removed in the Mayor's discretion for any reason.

91.     Under Chapter 18 of the New York City Charter, Commissioner Shea has "cognizance and control of the government, administration, disposition and discipline of the [NYPD], and of the police force."

92.     Commissioner Shea "shall be chargeable with and responsible for the execution of all laws and the rules and regulations of the department."

93.     Commissioner Shea has the legal authority to set departmental policy, including with regard to use of force.

94.     Commissioner Shea was directly involved in establishing the NYPD's strategy for responding to peaceful protests and dispersing protests continuing past curfew.

95.     In testimony to the New York City Department of Investigation (DOI), Commissioner Shea stated that he was "personally involved" in making decisions about

11

and formulating the NYPD's strategy for policing George Floyd protests by no later than least May 29, 2020, and that it would be "fairly accurate" to classify his participation throughout the protests as "monitoring events, and making the decision as things are happening."

96.     On May 29, Commissioner Shea and Chief of Department Monahan had "planning meetings" during which they discussed NYPD deployment with respect to protests and increasing the amount of NYPD personnel that would respond to future protests.

97.     On the same day, the two men had a similar meeting with Mayor de Blasio.

98.     In his DOI testimony, Commissioner Shea stated that decisions to make large-scale arrests would not be made by individual officers but would be made by on-site commanders "and higher" in "conjunction" with centralized command.

99.     In his own words, Commissioner Shea spoke with command staff, including Chief Monahan, "literally every day" and continually received daily briefings and up-to-date intelligence throughout the protests.

100.    At a June 4 news conference, for example, Commissioner Shea spoke at length about the NYPD's purported adjustment of its tactics to the specific context of each protest, described in detail events at certain protests the previous night, and explained that the NYPD had recently made a tactical adjustment concerning vehicles.

101.    On information and belief, Commissioner Shea was the moving force behind Mayor de Blasio's decision to move the curfew up from 11:00 p.m. to 8:00 p.m. on June 3, 2020, after Commissioner Shea told the Mayor he thought 11:00 p.m. was too late.

102.    On information and belief, Commissioner Shea and Chief Monahan also took part in discussions that led the NYPD to re-issue a new "Finest Message," announced to all NYPD personnel, on June 3, 2020 that omitted a direction previously included in an earlier Finest Message to the effect that officers should issue warnings before using force to enforce the curfew.

103.    Asked by DOI investigators whether he was personally involved in discussions as to whether NYPD officers should provide warnings before any curfew enforcement, Commissioner Shea stated, "[it] wouldn't surprise me at all I took part in those conversations."

104.    Although Mayor de Blasio had publicly stated that the curfew would not be enforced against peaceful protestors, when Commissioner Shea was asked whether it was NYPD policy to differentiate between peaceful and non-peaceful protestors for purposes of curfew enforcement, he repeatedly equivocated, stating that the NYPD had discretion.

105.    Defendant Monahan, as Chief of Department, has primary responsibility for NYPD operations—that is, for the police response on the street.

106.    He supervises the various bureaus within the NYPD, including Patrol, as well as specialized tactical units that report directly to him.

107.    Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service are obligated to obey any lawful order given by Chief Monahan.

108.    As a practical matter, Chief Monahan has served as the field general for the NYPD's response to protests in New York City.

109.    Chief Monahan was a highly visible presence in the streets observing the protests and giving tactical commands to his subordinates. Chief Monahan testified to

DOI that he attended a different protest every day between May 28 and June 20 and was "personally involved" in the oversight, planning, implementation, and execution of the NYPD response to the protests "[f]rom the beginning."

110.    Monahan told DOI investigators he was the impetus behind the NYPD's decision, in the days leading up to the June 3 protest in Cadman Plaza, to employ a strategy of overwhelming protesters with police force: "I wanted to get 30 Field Forces put together. So that's when [NYPD Operations] started to put together the increase in personnel."

111.    In his testimony, Chief Monahan also stated that, during the George Floyd protests, he regularly relayed intelligence gathered by the NYPD—along with instructions on how to understand and interpret that intelligence—to commanding officers on the scene at particular demonstrations. Monahan stated that that intelligence "could determine how lenient we [the NYPD] were or weren't in the course of a demonstration."

112.    Monahan also testified that, due to the unprecedented scope of the protests, the NYPD's protest response was centralized and he was in "daily" contact with the Mayor, Commissioner Shea, other NYPD executives, and commanders on the ground to make decisions about the NYPD's approach to policing the demonstrations.

113.    Chief Monahan stated that throughout any given protest, he would directly 14iaison and physically meet with NYPD commanders on scene as the protest unfolded, skipping the ordinary chain of command due to the large scale of the protests.

114.    In Chief Monahan's own words, "I was making decisions on the street. No one was interfering with the decisions that I had to make."

115.    According to his testimony, Chief Monahan was instrumental in convincing City leadership to move the curfew from 11:00 p.m. to 8:00 p.m.

116.    Chief Monahan also told DOI investigators that, during the protests, he regularly supervised line officers on the ground in real time as protests unfolded and would call for resources and additional officers as he deemed necessary and appropriate.

117.    For example, at the demonstration in Mott Haven on June 4, Chief Monahan personally ordered the arrest of a protest leader, who was promptly tackled by NYPD personnel. "Whatever cop was standing there, I just said place her under arrest, and they moved in and arrested her."

118.    Other video footage from Mott Haven depicts Chief Monahan literally looking the other way as police charge and strike peaceful protesters with batons in front of him.

119.    The NYPD has a command center at One Police Plaza from which senior departmental officials monitor live surveillance footage of protests, which generally occur in prominent public places with comprehensive camera coverage.

120.    On information and belief, when Chief Monahan is not in the field personally observing the NYPD response to protests, he typically monitors it in real time, either in the command center or by other means.

121.    Mayor de Blasio himself has personally approved the strategies developed by Defendants Shea and Monahan.

122.    At a June 7 press availability, Mayor de Blasio was asked: "Did you approve the tactics that we saw at [*sic*] the NYPD using, starting on June 3rd and June 4th?  That's the use of batons, more sort of pushing at protests, that kind of thing?  Did you approve those?"

123.    Mayor de Blasio responded, among other things: "I approved the broad strategies and sometimes very specific choices."

124.    Mayor de Blasio also noted that he "constantly talk[s]" to Commissioner Shea about videos depicting the force used by the NYPD against protesters.

125.    As they each testified to DOI, Commissioner Shea and Chief Monahan were in communication with Mayor de Blasio on a "frequent" and "daily" basis throughout the protests.

126.    Commissioner Shea stated these conversations concerned both past and future protests. He confirmed that he had frequent "conversations" with the Mayor and/or his staff regarding how to police the protests.

127.    Chief Monahan told DOI that, during the protests, he typically received directions from Mayor de Blasio, as a result of which Mayor De Blasio's concerns were "pushed out into Ops." Monahan explained that he personally Mayor de Blasio informed in real time regarding "what was going on" and "how we were handling it."

128.    Chief Monahan also stated that throughout the course of the George Floyd protests, he never received any direction from the Mayor's office related to the presence of members of the press, legal observers, or essential workers at these protests.

129.    On information and belief, Mayor de Blasio frequently assigned his own staff to be present on the scene during protests to report back to him as events unfolded.

130.    Chief Monahan testified that Mayor de Blasio's' people were on scene at a lot of different incidents."

131.    At the conclusion of its review, DOI issued a report finding, among other things, that the NYPD "default[ed] to an application of 'disorder control' tactics and methods, without adjustment to reflect the NYPD's responsibility for facilitating law ful

First Amendment expression"; that "NYPD's use of force on protesters—encirclement (commonly called 'kettling'), mass arrests, baton and pepper spray use, and other tactics—reflected a failure to calibrate an appropriate balance between valid public safety or officer safety interests and the rights of protesters to assemble and express their views'; that "NYPD use of force and crowd control tactics often failed to discriminate between lawful, peaceful protesters and unlawful actors"; and that the NYPD "deployed officers who lacked sufficient, or sufficiently recent, training on policing protests."

132.    The day the report was released, Mayor de Blasio released a video apology for "what happened in May and June," stating: "I'm sorry I didn't do better. And I've learned a lot of valuable lessons and I want the Police Department to do better. And I'm going to insist on that."

### Defendants Shea and Monahan Are Openly Hostile to the Peaceful Protesters' Message

133.    Defendants Shea and Monahan have been open that they disapprove of—indeed, are seethingly angry about—the substance of the protesters' message.

134.    In a press briefing on June 4, Commissioner Shea angrily condemned "hateful" rhetoric against the NYPD, including by unspecified politicians, which he blamed for fueling violence against police, including assassinations of police officers.

135.    Commissioner Shea stated: "You look at the anti-police rhetoric, it disgusts me to my core."

136.    He continued (at a press conference, ironically): "Less press conferences, less tweets, more action, more accountability for your words.  If you don't have something nice to say, keep your mouth closed . . . ."

17

137.    While not specifying exactly what "rhetoric" he was referring to, Commissioner Shea was referring in context to assertions that the NYPD is institutionally racist, is harmful to communities of color, and should be defunded or abolished.

138.    These messages are legitimate policy criticisms, are plainly protected by the First Amendment, and are widely expressed on placards, by speakers, and in chants at the gatherings at which the NYPD has surrounded, charged, and assaulted peaceful protesters.

139.    In a national television interview on June 2, Chief Monahan complained about "outside agitators telling people to go out and cause mayhem in the city, . . . using, I think this movement for an agenda to end policing throughout the country, an anarchist agenda.  That's what they do.  All the signs that you see is defund policing, no more police."

140.    In the same television segment, while standing in the command center watching live surveillance footage of peaceful protests, Deputy Chief Edward Mullane disparaged the protesters, stating: "This is mob mentality.  This has nothing to do with peaceful protests, trying to right injustice. . . .  We don't like people walking in the middle of the street.  We like the rights of everybody else who wants to drive in Manhattan."

141.    In Chief Monahan's inaccurate and patronizing view, calls to defund or abolish the police cannot reflect the authentic views of real New Yorkers who believe in democratic governance, but must reflect an "anarchist" agenda artificially "imposed" by "outside agitators."

142.     Other high-ranking NYPD brass have expressed similar sentiments toward protesters.

143.     On June 1, and throughout the whole of the protests, Commissioner Shea repeatedly denigrated the protesters as "outside agitators," employing a well-known trope to suggest that anyone with the temerity to protest against the conduct of police officers must be a violent extremist, rather than someone airing legitimate views protected by the First Amendment.

144.     Testifying to DOI, Commissioner Shea characterized the protestors as "looking to sow distrust between the police and the community" and "infiltrate[d]" by an "anarchist side [that was] intentionally attempting to drive a wedge between the police and the community."

145.     Throughout the protests, Commissioner Shea frequently portrayed the protestors as engaged in indiscriminate acts of violence and vandalism.

146.     Answering criticism that the NYPD engaged in brutal tactics and failed to deescalate the violence during the previous days' protests, in a May 30 press conference Commissioner Shea blamed protesters, again suggesting that anti-police brutality demonstrators are inherently violent and radical: "it's tough to practice de-escalation when you have a brick being thrown at your head," and stating that many protestors had come to the rallies with the intent to attack police officers.

147.     At the same press conference, Mayor De Blasio similarly accused protestors of having an "agenda of violence." "They meant to attack police officers," he said. "They were there to incite violence."

148.    Responding to an incident in which NYPD officers drove their SUVs through a group of unarmed protestors on May 30, Commissioner Shea stated: "You have to be in those officers' shoes."

149.    The following day, May 31, Commissioner Shea posted a message on Twitter to the Members of the NYPD legitimizing the NYPD's violent response to the protests. He tweeted: "I'm extremely proud of the way you've comported yourselves in the face of such persistent danger, disrespect, and denigration . . . I only wish that those who castigate you from afar had the first-hand experience of being a New York City cop for just one evening."

150.    Chief Monahan similarly expressed his personal dislike of the protesters' message, which he considered a personal insult. He described the protests as characterized by "persistent" and "prolonged" "attacks" on NYPD officers, "with every sort of object thrown at them" and described protestors as "provocateurs . . . whose sole purpose was to attack cops and to engage cops."

151.    Throughout the protests, Commissioner Shea repeatedly tweeted out photos of weapons and objects allegedly recovered at the protests, and tweeted unfounded allegations that protestors were using concrete mixed in ice cream containers as weapons.

152.    On June 3, Commissioner Shea tweeted a video he claimed showed bricks and rocks left in storage containers, writing: "This is what our cops are up against: Organized looters, strategically placing caches of bricks & rocks at locations throughout NYC."

153.    The bricks Commissioner Shea tweeted were located in Gravesend, nowhere near the locus of prior protests. When the New York City Council Member for

the area, Mark Treygar, investigated, he found the bricks were near a construction site

and reported that the NYPD acknowledged to him that the bricks might simply contain

construction materials. *See* Fig. 1.



*Fig. 1*

154.    Nonetheless, Commissioner Shea repeated this fiction in a press

conference on June 4, stating, "We hear of anarchists gathering more bricks from

construction sites throughout the city" and "[t]his is not what democracy looks like. This

is violence pure and simple."

155.    The excessive force the NYPD uses against the protesters is a direct reflection of the open animosity and revulsion of Commissioner Shea, Chief Monahan, and their senior colleagues toward these peaceful protesters' message.

156.    Notably, Defendant Monahan also has a demonstrated history of hostility toward and misconduct concerning other peaceful, nonviolent protests.

157.    In 2004, Defendant Monahan engineered the false arrest of 227 peaceful protesters during the Republican National Convention.

158.    After purporting to negotiate an agreement with protesters to allow them to march on the sidewalk, Defendant Monahan, who was then a Deputy Chief of Department, ordered that the protesters be penned in.

159.    After the protesters were unable to disperse from the penned-in area, Defendant Monahan ordered them arrested.

160.    The charges against all 227 were later dismissed, and Judge Richard Sullivan of the Southern District of New York ruled that the arrests were unlawful.

161.    The City spent approximately $18 million to settle lawsuits with protesters as a result of Defendant Monahan's policy of arrests without probable cause.

162.    On information and belief, Defendant Monahan faced no departmental discipline, counseling, or other consequences for ordering the unlawful mass arrest of peaceful protesters.

163.    He has since been promoted to his current position as the NYPD's highest-ranking uniformed member of the service.

***In Cadman Plaza on June 3, 2020, the NYPD Launches a Police Riot
Against Peaceful Protesters Exercising Their First Amendment Rights***

164.    On the evening of June 3, 2020, a group of approximately one thousand
protesters began marching from the Barclays Center northwest on Flatbush Avenue,
toward Downtown Brooklyn.

165.    The protesters were loudly and conspicuously demonstrating against
police violence and brutality and showing support for the Black Lives Matter movement.

166.    An 8:00 p.m. citywide curfew was in effect.

167.    When the protesters reached the vicinity of Brooklyn Borough Hall and
Columbus Park, they encountered a line of NYPD officers blocking their route.

168.    Some protest leaders attempted to speak with NYPD officials at the scene
to request that the group be allowed to proceed.

169.    As it became clear that the group would not be allowed to continue
marching toward the bridges connecting Brooklyn to Manhattan, some protesters began
to disperse.

170.    The remaining protesters were assembled in Cadman Plaza.

171.    Protesters began to notice that a large group of NYPD officers had
gathered in the area, seemingly surrounding the demonstrators on three sides.

172.    Suddenly, at approximately 9:00 p.m., around the time when it began to
rain, the NYPD officers at the scene began to charge at the protesters, screaming at them
to "move" and indiscriminately shoving demonstrators and beating them with batons.

173.    Video footage recorded by protesters that evening shows numerous
officers screaming at peaceful protesters already trying to disperse to "move," and then
shoving them, tackling them, and striking them with batons.

174.    Many of the baton strikes were from behind, as protesters were fleeing the area.

175.    The rain became heavy as the incident unfolded.

176.    Officers took advantage of the weather conditions and decreased visibility to sow confusion and act with impunity.

177.    At no time during the events in Cadman Plaza on the night of June 3, 2020 were NYPD personnel in physical danger, let alone imminent danger.

178.    There was no violence and no threat of violence—other than by the NYPD—when the NYPD charged into the crowd and started beating protesters.

179.    There was no violence and no threat of violence—other than by the NYPD—as the police continued to beat protesters until the crowd fully dispersed.

180.    Based upon Plaintiffs' observations, other witnesses' observations, video footage, and public reports, *no one* assembled in Cadman Plaza on the night of June 3, 2020, engaged in any act of violence toward any NYPD personnel.

181.    The protest was entirely peaceful.

182.    New York City Public Advocate Jumaane Williams was present at the protest and livestreamed portions of it on Twitter.

183.    Public Advocate Williams repeatedly stated, live on video, that the protests were exclusively peaceful and that no violence or looting was occurring.

184.    As he watched police manhandle peaceful protesters, Public Advocate Williams repeatedly asked them, "Why?"  He got no response.

185.    Defendants Shea and Monahan have both acknowledged that the June 3 protest in Cadman Plaza was peaceful.

186.    In a scripted, slickly produced Facebook video for NYPD members of the service published on June 12, Chief Monahan repeatedly stated that violence and attacks on police officers occurred over a period of "four days."

187.    On information and belief, Chief Monahan was referring to the period from May 29 to June 1.

188.    Similarly, in a nationally televised interview on June 4, Commissioner Shea stated that the support of the National Guard was unnecessary because the protests had been peaceful "for the last two nights"—i.e., the nights of June 2 and June 3.

189.    No justification exists for the brutal and indiscriminate force used against Plaintiffs and other peaceful protesters in Cadman Plaza.

### The NYPD Viciously Beats Plaintiffs for Peacefully Exercising Their First Amendment Rights

190.    While each Plaintiff's experience differed, the NYPD engaged in indiscriminate and unreasonable violence against all four Plaintiffs in and around Cadman Plaza on the night of June 3, 2020.

191.    All of the Plaintiffs were exclusively engaged in peaceful, nonviolent protest against police brutality.

192.    All of the Plaintiffs were unarmed.

193.    All of the Plaintiffs were subjected to significant physical force by the NYPD *while complying with police directives to leave the area*, including being struck with batons from behind and shoved forcefully to the ground from behind.

194.    No Plaintiff was warned that force was about to be used against him.

195.   No Plaintiff was given an opportunity to avoid the use of force by complying with a specific police directive.

196.   No Plaintiff engaged in any act of violence toward any NYPD personnel.

197.   No Plaintiff used any physical force against any NYPD personnel.

198.   No Plaintiff was arrested.

199.   No Plaintiff resisted arrest.

200.   No Plaintiff was charged with any offense.

201.   No Plaintiff witnessed any other person engage in any act of violence toward any NYPD personnel in Cadman Plaza on the night of June 3, 2020.

*Edo Gelbard*

202.   Plaintiff Edo Gelbard was among the protesters who marched from the Barclays Center to Cadman Plaza on the evening of June 3.

203.   After the protesters reached the line of officers blocking their path, at around 8:30 p.m., Mr. Gelbard began to notice scattered instances of officers grabbing demonstrators, pushing them, or attempting to wrest away their bicycles.

204.   Mr. Gelbard was positioned near the front of the group of demonstrators and could clearly see the line of officers in front of them.

205.   He did not see any of the protesters do anything violent or threatening.

206.   No one threw any objects at the officers or touched any of them.

207.   Mr. Gelbard, who is a medical school graduate in the process of obtaining his medical license in New York State, identified himself to the officers as possessing physician training, and held up a stethoscope he had brought with him.

208.   Mr. Gelbard began to hear from others in the crowd that the group of protesters would be leaving the area.

26

209.    Mr. Gelbard took out his cell phone and began to record what he expected to be the peaceful denouement of the evening's demonstration.

210.    Suddenly, at approximately 9:00 p.m., one of the officers lined up facing the protesters broke away from the others and rushed into the crowd at full speed.

211.    The officer began to beat protesters indiscriminately with his baton.

212.    Almost immediately, the other officers who had been lined up in front of the protesters began to rush the crowd, swinging batons and indiscriminately beating demonstrators.

213.    Frightened protestors began to flee, but the density of the crowd made it impossible for many of the demonstrators to escape.

214.    Protesters attempting to flee the officers' violent onslaught were indiscriminately beaten and shoved to the ground.

215.    As he tried to escape, Mr. Gelbard realized that officers were beating protesters all around him.

216.    He tried to record the scene, holding his phone in one hand and his stethoscope in the other.

217.    Without provocation, Defendant John/Jane Doe #1 knocked Mr. Gelbard into a parked bicycle.

218.    As Mr. Gelbard tried to maneuver around the bicycle and continue fleeing, Defendant John/Jane Doe #2 forcibly knocked him to the ground from behind. Mr. Gelbard could not tell whether Defendant John/Jane Doe #2 used their body or a baton.

219.    When Mr. Gelbard was on the ground, Defendants John/Jane Does #3, 4, 5, 6, and 7 gathered around him and began to beat him indiscriminately with their batons.

220.    On information and belief, Defendants John/Jane Does #8, 9, and 10 were present at the scene of Mr. Gelbard's beating, saw it occur, and had a realistic opportunity to intervene to prevent or stop it, but nonetheless failed to do so.

221.    Mr. Gelbard, still on the ground, attempted to record the incident with his phone.  Defendant John/Jane Doe #3 struck the back of his right hand with their baton, causing his phone to fall out of Mr. Gelbard's grasp onto the ground.

222.    Mr. Gelbard remained on the ground and continued to clutch his stethoscope in the air with his left hand.

223.    Defendant John/Jane Doe #4 then struck Mr. Gelbard in the face with a baton, chipping his front tooth and causing him severe physical pain.

224.    Ultimately, another protester was able to reach out to Mr. Gelbard, help pull him up off the ground, and assist him in moving away from the officers attacking him.

225.    Mr. Gelbard committed no crime and was not detained, arrested, or charged with any offense.

226.    He was simply beaten by the NYPD as punishment for his presence at a protest against police brutality.

*Luke Hanna*

227.    Plaintiff Luke Hanna was marching with other protesters at approximately 8:30 p.m. on the evening of June 3 when the group encountered hundreds of officers arrayed across Cadman Plaza West near the intersection with Tillary and Clinton Streets.

228.    After it became clear that the officers would not allow the demonstrators to continue marching north, a group of protesters decided to walk back down south toward Borough Hall.

229.    Suddenly, at approximately 9:00 p.m., the officers began running into the crowd aggressively.

230.    The officers' stampede was not preceded by any kind of verbal warning or directive to the protesters.

231.    Mr. Hanna locked arms with some other protesters as a show of solidarity.

232.    He was behaving peacefully and was not a threat to anyone.

233.    Defendant John/Jane Doe #11 pushed Mr. Hanna to the ground without warning or provocation.

234.    After Mr. Hanna remained in the area for some time, police charged the protesters again.

235.    At that point, Mr. Hanna began walking away in a southerly direction with his hands up, in compliance with police instructions.

236.    As Mr. Hanna was walking away, without warning or provocation of any kind, Defendant John/Jane Doe #12 struck Mr. Hanna in the back of the head with a baton.

237.    The force of the blow opened a bleeding wound on Mr. Hanna's head that required ten staples to close.

238.    He suffered severe pain and distress.

239.    On information and belief, Defendants John/Jane Does #13, 14, 15, and 16 were present when Mr. Hanna was pushed to the ground, saw the push occur, and had a realistic opportunity to intervene to prevent or stop it, but nonetheless failed to do so.

240.    On information and belief, Defendants John/Jane Does #17, 18, 19, and 20 were present when Mr. Hanna was struck with a baton, saw the strike occur, and had a realistic opportunity to intervene to prevent or stop it, but nonetheless failed to do so.

241.    Mr. Hanna was peacefully protesting, committed no crime, and was not arrested, detained, or charged with any offense.

*Michael Sternfeld*

242.    Plaintiff Michael Sternfeld was also peacefully protesting at Cadman Plaza on the evening of June 3, 2020.

243.    Mr. Sternfeld noticed New York City Public Advocate Jumaane Williams demonstrating with the protesters near the line of NYPD officers arrayed across Cadman Plaza West.

244.    Mr. Sternfeld decided to try to stay near Public Advocate Williams, assuming this would approve his chances of remaining safe.

245.    Suddenly, without any preceding warning or dispersal order, the officers rushed the crowd of protesters at approximately 9:00 p.m.

246.    Mr. Sternfeld attempted to record the officers' actions with his cell phone while also complying with their shouted instructions to "move."

247.    Mr. Sternfeld noticed that a group of officers was throwing another protester to the ground, and tried to capture the incident on video.

248.    Without warning, Defendant John/Jane Doe #21 physically picked Mr. Sternfeld up from behind and slammed him down onto the pavement.

249.    The force of being body-slammed to the ground caused Mr. Sternfeld to endure severe and persistent pain in his tailbone and elbow.

250.    Upon information and belief, Defendants John/Jane Does #22, 23, 24, 25, 26, 27, 28, 29, and 30 were present when Mr. Sternfeld was assaulted, saw the assault occur, and had a realistic opportunity to intervene to prevent or stop it, but nonetheless failed to do so.

251.    Mr. Sternfeld was peacefully protesting, committed no crime, and was not arrested, detained, or charged with any offense.

### *Tim Young*

252.    Plaintiff Tim Young joined the protest at the Barclays Center around 6:00 p.m. on the evening of June 3, 2020.

253.    Mr. Young, who had his bicycle with him, marched with the group toward Cadman Plaza, where the protesters encountered a line of police officers blocking their path.

254.    Mr. Young observed the protesters behaving peacefully and complying with officers' commands to remain on the sidewalk.

255.    Just as heavy rain began to fall, Mr. Young noticed demonstrators running south from the front of the march toward the back.

256.    He quickly realized that they were running because NYPD officers were chasing them.

257.    Mr. Young observed numerous officers pushing protesters from behind, causing them to slip and fall on the slick ground.

258.    As the protesters would get up, officers would push them down again.

259.    Officers continually screamed for demonstrators to "move" and "go," even as the crowd was trying to do exactly that.

260.    Mr. Young was struck multiple times with police batons from behind while attempting to leave the area.

261.    After being repeatedly screamed at to "move" by NYPD officers who could clearly see that he was doing his best to maneuver with a bicycle in a dense crowd during a rainstorm, Mr. Young asked rhetorically, "Where do you want me to go?"

262.    Defendant John/Jane Doe #31 grabbed Mr. Young and his bicycle from behind and shoved him forward.

263.    As a result, Mr. Young collided with Defendants John/Jane Does #32, 33, 34, and 35.

264.    In response, Defendants John/Jane Does #32, 33, 34, and 35 grabbed Mr. Young and body-slammed him to the ground.

265.    Upon information and belief, Defendants John/Jane Does # 36, 37, 38, 39, and 40 were present when Mr. Young was assaulted, saw the assault occur, and had a realistic opportunity to intervene to prevent or stop it, but nonetheless failed to do so.

266.    As a result of being violently attacked by the NYPD, Mr. Young sustained scrapes to the left side of his body and suffered severe pain in his wrist, knee, and ankle.

267.    Mr. Young, who is a professional keyboardist, was diagnosed with a sprain in his hand and was required to wear a cast.

268.    Mr. Young did nothing to instigate, provoke, or justify the officers' assault.

269.    He committed no crime and was not arrested or charged with any offense.

270.    He was beaten and injured solely as retaliation for publicly expressing disapproval of the NYPD.

### *The Supervisory Defendants and Other Senior City Officials Ratify the NYPD's Policy of Surrounding, Charging, and Assaulting Peaceful Protesters*

271.    Regardless of whether the Supervisory Defendants were the architects of the NYPD's policy of surrounding, charging, and assaulting peaceful protesters, they certainly became aware of that policy as it was unfolding on the streets of New York City.

272.    Rather than change the policy or redress it, they ratified and continued it.

273.    To say that the NYPD's tactics against peaceful protesters were the subject of significant, contemporaneous public attention is a massive understatement.

274.    On May 31, Governor Andrew Cuomo described video footage of force used by the NYPD against peaceful protesters as "truly disturbing" and "inexplicable" and tasked Attorney General Letitia James to investigate the NYPD's use of force.

275.    Virtually every New York media outlet has covered the protests comprehensively on a daily basis.

276.    The Supervisory Defendants have given numerous media interviews and press briefings, including on national television, concerning the NYPD's use of force against protesters.

277.    In addition to the AG Hearings, which lasted two days and were personally presided over by the state's chief law enforcement official, the City Council has held hearings into the NYPD's use of force against protesters.

278.    Commissioner Shea has publicly acknowledged his awareness of the media coverage of the NYPD's use of force against protesters.

279.    On June 4, he stated: "I've heard a lot about bad videos.  There were some bad videos."

280.    At no time have Defendants Shea or Monahan expressed any regret or hesitation about the NYPD charging into crowds of peaceful protesters and indiscriminately assaulting them with batons.

281.    To the contrary, a reporter directly asked Defendant Monahan whether he felt the NYPD's use of force at the June 4 protest in Mott Haven—at which he personally observed such events—was "appropriate."

282.    Defendant Monahan responded: "Yes, I do."

283.    Within hours of the relevant events in Cadman Plaza on June 3, Mayor de Blasio was made aware of video footage of the NYPD assaulting peaceful protesters like Plaintiffs with batons.

284.    Jonathan Rosen, a close informal advisor to the Mayor, personally informed the Mayor's press secretary of the videos at 10:33 p.m. on the night of June 3.

285.    At a press briefing the following morning, a reporter specifically called Mayor de Blasio's attention to videos of the NYPD using batons against peaceful protesters and asked whether the Mayor "condone[d] that type of police behavior."

286.    Mayor de Blasio denied having seen the video footage but said that the NYPD had acted with "a lot of restraint[] . . . overall" and baselessly and falsely claimed that there were "some in these crowds who are committing violence."

287.    The sum and substance of the Mayor's comments was to endorse and ratify the NYPD's use of unreasonable and indiscriminate force against peaceful protesters in Cadman Plaza on June 3.

288.    On June 4, Commissioner Shea again claimed that the NYPD had acted with "extreme restraint."

289.   Based upon public reports, as of the filing of this Complaint, a grand total of *two* NYPD uniformed members of the service have been suspended or terminated for engaging in improper force against protesters.[2]

290.   On information and belief, no NYPD member of the service has been disciplined in any way for striking peaceful protesters with batons or pushing them to the ground while dispersing them.

## CAUSES OF ACTION

### FIRST CLAIM
### 42 U.S.C. § 1983 – Fourteenth Amendment – Excessive Force Against Defendants John/Jane Does #1-7, 11-12, 21, and 31-35

291.   Plaintiffs reallege the preceding paragraphs as if set forth here.

292.   On June 3, 2020, Defendants John/Jane Does #1-7 used objectively unreasonable force against Plaintiff Gelbard, proximately causing injury.

293.   On June 3, 2020, Defendants John/Jane Does #11-12 used objectively unreasonable force against Plaintiff Hanna, proximately causing injury.

294.   On June 3, 2020, Defendant John/Jane Doe #21 used objectively unreasonable force against Plaintiff Sternfeld, proximately causing injury.

295.   On June 3, 2020, Defendants John/Jane Does #31-35 used objectively unreasonable force against Plaintiff Young, proximately causing injury.

296.   At all relevant times, Defendants John/Jane Does #1-7, 11-12, 21, and 31-35 were acting under color of state law.

---

[2]      One of them was Officer D'Andraia, who caused the hospitalization of bystander Ms. Zayer by shoving her to the pavement.  Based upon public reports, however, Commissioner Shea *opposed* the arrest of Officer D'Andraia on misdemeanor charges, even though his actions plainly constituted the offense of assault at minimum.

297.   The conduct of Defendants John/Jane Does #1-7, 11-12, 21, and 31-35 was willful, wanton, and reckless.

## SECOND CLAIM
### 42 U.S.C. § 1983 – First Amendment Retaliation
### Against Defendants John/Jane Does #1-7, 11-12, 21, and 31-35

298.   On June 3, 2020, Plaintiffs engaged in protected First Amendment activity.

299.   Motivated by Plaintiff Gelbard's protected activity, Defendants John/Jane Does #1-7 took adverse action against him, proximately causing injury.

300.   Motivated by Plaintiff Hanna's protected activity, Defendants John/Jane Does #11-12 took adverse action against him, proximately causing injury.

301.   Motivated by Plaintiff Sternfeld's protected activity, Defendant John/Jane Does #21 took adverse action against him, proximately causing injury.

302.   Motivated Plaintiff Young's protected activity, Defendants John/Jane Does #31-35 took adverse action against him, proximately causing injury.

303.   At all relevant times, Defendants John/Jane Does #1-7, 11-12, 21, and 31-35 were acting under color of state law.

304.   The conduct of Defendants John/Jane Does #1, 11-12, 21, and 31-35 was willful, wanton, and reckless.

## THIRD CLAIM
### 42 U.S.C. § 1983 – Fourteenth and First Amendments – Failure to Intervene
### Against Defendants John/Jane Does #8-10, 13-20, 22-30, and 36-40

305.   Plaintiffs reallege the preceding paragraphs as if set forth here.

306.   On June 3, 2020, Defendants John/Jane Doe #8-10 were aware of the violation of Plaintiff Gelbard's constitutional rights, had an opportunity to intervene, and chose not to do so, proximately causing injury.

36

307.    On June 3, 2020, Defendants John/Jane Does #13-20 were aware of the violation of Plaintiff Hanna's constitutional rights, had an opportunity to intervene, and chose not to do so, proximately causing injury.

308.    On June 3, 2020, Defendants John/Jane Does #22-30 were aware of the violation of Plaintiff Sternfeld's constitutional rights, had an opportunity to intervene, and chose not to do so, proximately causing injury.

309.    On June 3, 2020, Defendants John/Jane Does #36-40 were aware of the violation of Plaintiff Young's constitutional rights, had an opportunity to intervene, and chose not to do so, proximately causing injury.

310.    At all relevant times, Defendants John/Jane Does #8-10, 13-20, 22-30, and 36-40 were acting under color of state law.

311.    The conduct of Defendants John/Jane Does #8-10, 13-20, 22-30, and 36-40 was willful, wanton, and reckless.

**FOURTH CLAIM**
**42 U.S.C. § 1983 – Fourteenth Amendment – Personal Supervisory Involvement**
**Against the Supervisory Defendants**

312.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

313.    The Supervisory Defendants created and/or allowed the continuance of the NYPD's policy of surrounding, charging, and assaulting peaceful protesters against police brutality in May-June 2020.

314.    The Supervisory Defendants, after being informed of the use of excessive force against peaceful protesters, failed to remedy the wrong.

315.    The Supervisory Defendants exhibited deliberate indifference to the rights of peaceful protesters not to be subjected to excessive force by police by failing to act on information indicating that the use of such force was occurring.

316.    The conduct of the Supervisory Defendants proximately caused Plaintiffs' injuries.

317.    At all relevant times, the Supervisory Defendants were acting under color of state law.

318.    The conduct of the Supervisory Defendants was willful, wanton, and reckless.

**FIFTH CLAIM**
**42 U.S.C. 1983 – First Amendment – Personal Supervisory Involvement**
**Against Defendants Shea and Monahan**

319.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

320.    The NYPD's policy of surrounding, charging, and assaulting peaceful protesters was motivated at least in part by the animus of Defendants Shea and Monahan toward perceived anti-police expression such as Plaintiffs'.

321.    The conduct of Defendants Shea and Monahan proximately caused Plaintiffs' injuries.

322.    At all relevant times, Defendants Shea and Monahan were acting under color of state law.

323.    The conduct of Defendants Shea and Monahan was willful, wanton, and reckless.

**SIXTH CLAIM**
**42 U.S.C. § 1983 – Fourteenth Amendment – Municipal Liability**
**Against Defendant City of New York**

324.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

38

325.    Defendant City of New York has a policy, custom, or usage of surrounding, charging, and assaulting peaceful protesters.

326.    That policy, custom, or usage was a moving force behind the violation of Plaintiffs' Fourteenth Amendment rights.

327.    That policy, custom, or usage proximately caused Plaintiffs' injuries.

328.    In addition or in the alternative, Defendant City of New York is liable for the unlawful actions of the Supervisory Defendants in their capacity as municipal policymakers.

**SEVENTH CLAIM**
**42 U.S.C. § 1983 – First Amendment – Municipal Liability**
**Against Defendant City of New York**

329.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

330.    Defendant City of New York has a policy, custom, or usage of retaliating against protesters engaged in perceived anti-police expression by subjecting them to unnecessary and unreasonable force.

331.    That policy, custom, or usage was a moving force behind the violation of Plaintiffs' First Amendment rights.

332.    That policy, custom, or usage proximately caused Plaintiffs' injuries.

333.    In addition or in the alternative, Defendant City of New York is liable for the unlawful actions of the Supervisory Defendants in their capacity as municipal policymakers.

**EIGHTH CLAIM**
**Common-Law Assault**
**Against Defendant City of New York**

334.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

335.    On July 16, 2020, all Plaintiffs served notices of claim pursuant to General Municipal Law § 50-e upon Defendant City of New York through the Office of the Comptroller's online system.

336.    On October 1, 2020, the City conducted an examination of Plaintiff Gelbard pursuant to General Municipal Law § 50-h.

337.    More than 90 days have elapsed since service of notice by Plaintiffs Hanna, Sternfeld, and Young, and the City has not made a demand for an examination of Hanna, Sternfeld, or Young under General Municipal Law § 50-h.

338.    On June 3, 2020, Defendants John/Jane Does #1-7 placed Plaintiff Gelbard in imminent apprehension of harmful or offensive contact.

339.    On June 3, 2020, Defendants John/Jane Does #11-12 placed Plaintiff Hanna in imminent apprehension of harmful or offensive contact.

340.    On June 3, 2020, Defendant John/Jane Doe #21 placed Plaintiff Sternfeld in imminent apprehension of harmful or offensive contact.

341.    On June 3, 2020, Defendants John/Jane Does #31-35 placed Plaintiff Young in imminent apprehension of harmful or offensive contact.

342.    None of the Plaintiffs consented to harmful or offensive contact, and such contact would not have been otherwise privileged.

343.    At all relevant times, Defendants John/Jane Does #1-7, 11-12, 21, and 31-35 were acting within the scope of their employment as employees, agents, and/or servants of Defendant City of New York.

344.    As a result of these acts, Plaintiffs suffered the damages hereinbefore alleged.

**NINTH CLAIM**

**Common-Law Battery**
**Against Defendant City of New York**

345.   Plaintiffs repeat and reallege the preceding paragraphs as if set forth here.

346.   On June 3, 2020, Defendants John/Jane Does #1-7 made harmful or offensive bodily contact with Plaintiff Gelbard.

347.   On June 3, 2020, Defendants John/Jane Does #11-12 made harmful or offensive bodily contact with Plaintiff Hanna.

348.   On June 3, 2020, Defendants John/Jane Doe #21 made harmful or offensive bodily contact with Plaintiff Sternfeld.

349.   On June 3, 2020, Defendants John/Jane Doe #31-35 made harmful or offensive bodily contact with Plaintiff Young.

350.   None of the Plaintiffs consented to harmful or offensive bodily contact, and the contact was not otherwise privileged.

351.   At all relevant times, Defendants John/Jane Does #1-7, 11-12, 21, and 31-35 were acting within the scope of their employment as employees, agents, and/or servants of Defendant City of New York.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.   Compensatory damages in an amount to be determined at trial;

B.   Punitive damages against all Defendants except the City of New York in an amount to be determined at trial;

C.   Reasonable costs and attorneys' fees under 42 U.S.C. § 1988:

D.   Pre- and post-judgment interest to the fullest extent permitted by law; and

E.   Any additional relief the Court deems just and proper.

Dated:      June \_\_\_, 2021
               New York, New York

                                  KAUFMAN LIEB LEBOWITZ
                                  & FRICK LLP


                                  _____/s/_____
                                  David A. Lebowitz
                                  Douglas E. Lieb

                                  10 E. 40th Street, Suite 3307
                                  New York, New York 10016
                                  (212) 660-2332
                                  dlebowitz@kllf-law.com
                                  dlieb@kllf-law.com

                                  *Attorneys for Plaintiffs*