UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In Re: New York City Policing                         20 Civ. 8924 (CM)(GWG)
During Summer 2020 Demonstrations


---------------------------------------------------------------x

This filing is related to:

Payne v. de Blasio, et al.                            20 Civ. 8924 (CM)(GWG)


---------------------------------------------------------------x

Sierra v. City of New York, et al.                    20 Civ. 10291 (CM)(GWG)


---------------------------------------------------------------x

People v. City of New York, et al.                    21 Civ. 322 (CM)(GWG)


---------------------------------------------------------------x

Sow v. City of New York, et al.                       21 Civ. 533 (CM)(GWG)


---------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## BY SERGEANTS BENEVOLENT ASSOCIATION
## <u>TO INTERVENE UNDER FEDERAL RULE OF CIVIL PROCEDURE 24</u>

Anthony P. Coles
**DLA PIPER LLP (US)**
1251 6th Avenue
New York, NY 10020
Telephone: (212) 335-4844
Facsimile: (212) 884-8644
Email: anthony.coles@dlapiper.com

*Attorney for Proposed Intervenor*
*Sergeants Benevolent Association*

*Of Counsel*:
Andrew C. Quinn, Esq.
The Quinn Law Firm
399 Knollwood Road, Suite 220
White Plains, NY 10603
Telephone: (914) 997-0555
Facsimile: (914) 997-0550
Email: aquinn@quinnlawny.com

# **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 3

    I.    The SBA represents the unique interests of NYPD sergeants, who act as street-level managers within the largest police force in the country. .................... 3

    II.    Plaintiffs' claims concerning the use of protective equipment and defensive tactics pose a direct threat to the safety of sergeants and their ability to protect subordinate officers. ....................................................................... 3

    III.    NYPD sergeants are empowered with substantial discretion to ensure officer safety during protests, and they rely on a suite of tools to protect themselves and others. ............................................................................................ 4

    IV.    The Summer 2020 protests illustrate the need for the challenged equipment and practices to protect officer safety. ................................................. 5

    V.    NYPD sergeants and police officers have distinct interests and concerns in this case. ............................................................................................................. 6

ARGUMENT .......................................................................................................................... 7

    I.    The SBA is entitled to intervene under Rule 24(a). ................................................ 7

        A.    The SBA has a protectable interest in ensuring officer safety that may be impaired by the outcome of this litigation. .................................. 8

        B.    The SBA's interests will not be adequately represented in this action, by the PBA or otherwise. ............................................................ 12

    II.    The SBA should be granted permissive intervention under Rule 24(b). .............. 14

CONCLUSION .................................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*BNP Paribas v. Kurt Orban Partners LLC*,
    No. 19-CV-9616, 2021 WL 355136 (S.D.N.Y. Feb. 2, 2021)................................................15

*Brennan v. N.Y.C. Bd. of Educ.*,
    260 F.3d 123 (2d Cir. 2001)........................................................................................8, 11, 12

*Bridgeport Guardians, Inc. v. Delmonte*,
    602 F.3d 469 (2d Cir. 2010)....................................................................................................7, 9

*Floyd v. City of New York*,
    302 F.R.D. 69 (S.D.N.Y. 2014) ...........................................................................................13

*Friends of the E. Hampton Airport, Inc. v. FAA*,
    No. 15-CV-0441, 2016 WL 792411 (E.D.N.Y. Feb. 29, 2016) ...........................................15

*In re Holocaust Victim Assets Litig.*,
    225 F.3d 191 (2d Cir. 2000)..................................................................................................15

*LaRouche v. FBI*,
    677 F.2d 256 (2d Cir. 1982)..................................................................................................12

*Miller v. Silbermann*,
    832 F. Supp. 663 (S.D.N.Y. 1993) ......................................................................................15

*N.Y. Pub. Interest Rsch. Grp. v. Regents*,
    516 F.2d 350 (2d Cir. 1975)..................................................................................................12

*In re N.Y.C. Policing During Summer 2020 Demonstrations*,
    No. 21-1316, __ F.4th __, 2022 WL 627436 (2d Cir. Mar. 4, 2022) ............................ *passim*

*Nat. Res. Def. Council v. Costle*,
    561 F.2d 904 (D.C. Cir. 1977) ..............................................................................................14

*New York v. U.S. Dep't of Health & Human Servs.*,
    No. 19-CV-4676, 2019 WL 3531960 (S.D.N.Y. Aug. 2, 2019)............................................16

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972)..............................................................................................................12

*U.S. Postal Serv. v. Brennan*,
    579 F.2d 188 (2d Cir. 1978)..................................................................................................15

*United States v. Mattis*,
    963 F.3d 285 (2d Cir. 2020)..........................................................................................9

*United States v. N.Y.C. Hous. Auth.*,
    326 F.R.D. 411 (S.D.N.Y. 2018) ...............................................................................15

*United States v. Shader*,
    472 F. Supp. 3d 1 (E.D.N.Y. 2020) ............................................................................9

*Yang v. Kellner*,
    No. 20-CV-3325, 2020 WL 2115412 (S.D.N.Y. May 3, 2020) ...............................15

## Other Authorities

Fed. R. Civ. P. 24 ................................................................................................ *passim*

Proposed Intervenor Sergeants Benevolent Association ("SBA") submits this Memorandum of Law in Support of its Motion to Intervene Under Federal Rule of Civil Procedure 24 in *Payne v. De Blasio*, No. 20-CV-8924; *People v. City of New York*, No. 21-CV-322; *Sow v. City of New York*, No. 21-CV-533; and *Sierra v. City of New York*, No. 20-CV-10291.

## **INTRODUCTION**

On March 4, 2022, the Second Circuit held that the Police Benevolent Association of the City of New York, Inc. ("PBA") is entitled to intervene in these cases based on the PBA's "interest in the personal safety of its member officers at the merits stages" of actions seeking declaratory or injunctive relief.  *In re N.Y.C. Policing During Summer 2020 Demonstrations*, No. 21-1316, __ F.4th __, 2022 WL 627436, at *1 (2d Cir. Mar. 4, 2022) (hereinafter "Second Circuit Op."). In its opinion, the Second Circuit recognized the PBA's "cognizable interest" under Rule 24(a) in "the safety of front-line officers" that "may be impaired in litigation that could result in a determination that NYPD policies governing the interaction of officers and protesters are unlawful and must be altered." *Id.* at *5.

This reasoning applies with equal force to the SBA, which serves as the collective-bargaining unit for all police sergeants in the New York City Police Department ("NYPD"). The SBA has an interest in ensuring the personal safety of its member officers, some of whom were seriously injured in the Summer 2020 demonstrations. Sergeants now face a sea change in policies that govern some of the most dangerous aspects of their work. This Court's merits rulings and the ensuing relief may upend settled disorder-control techniques and rules of engagement, which sergeants are tasked with overseeing at the patrol level. The resolution of these cases may affect the ability of sergeants to handle dynamic situations that demand a range of responses, all without the promise of adequate training or opportunities for practice. And given the injuries to officers during the Summer 2020 protests—despite the use of the challenged equipment and tactics in some

circumstances—the relief requested in these cases threatens the safety of every NYPD sergeant called to respond to a protest.  The SBA thus has a compelling interest in entering this litigation.

No existing party, including the PBA, will adequately represent the SBA's interests.  The SBA's involvement is necessary to ensure the interests of sergeants are represented in the resolution of issues that disproportionately affect their job responsibilities and personal safety.  While the SBA and the PBA represent similar constituencies in some respects, they have different responsibilities and perspectives.  In the labor context, sergeants and police officers have separate collective-bargaining units to protect their unique interests in negotiations with the City of New York (the "City").  The same recognition is warranted here, where the requested relief could fundamentally alter how sergeants perform their supervisory job functions.  And now is the time for the SBA to take a seat at the table alongside the PBA, as the City's recent reference to a "23-page [proposal of] terms for declaratory and injunctive relief" makes clear.  (Doc. 448 at 3.)

The SBA's focus in this litigation would be on the importance of the sergeant's unique supervisory functions in protest settings.  Sergeants are the superior officers closest to the front line, working at the intersection of written policy and street-level reality.  They ensure the implementation of directives regarding the use of tactics and equipment during protests.  But critically, sergeants have discretionary authority to modify those directives to ensure officer safety.  If this discretion is eliminated or constrained, sergeants could face discipline for taking action to protect officer safety.  Because it is far from "assured" that the PBA would vigorously advocate for this position, the SBA meets the "minimal" standard for demonstrating that the existing parties are inadequate to represent its interests.  Second Circuit Op. at *7.

Alternatively, permissive intervention is appropriate under Rule 24(b) to ensure the fair and efficient resolution of these cases.  The SBA should be permitted to contribute to the discovery

process, the development of evidence, merits decisions on the proper use of disorder-control tactics and equipment, and the crafting of proposed relief. The SBA's participation would not prejudice any existing party. It would ensure the Court's perspective on the interests of police officers takes account of the important and distinct perspective of supervisory front-line officers. Permissive intervention is thus appropriate and beneficial to the just resolution of these cases.

## FACTUAL BACKGROUND

I.     **The SBA represents the unique interests of NYPD sergeants, who act as street-level managers within the largest police force in the country.**

The SBA is an independent municipal police union whose membership consists of approximately 13,000 active and retired sergeants of the NYPD. (Declaration of Vincent J. Vallelong at ¶ 4 (annexed as Exhibit A) ("Vallelong Decl.").) The SBA's central mission is to advocate for and protect the interests of NYPD police sergeants. (*Id.* ¶ 2.)

II.    **Plaintiffs' claims concerning the use of protective equipment and defensive tactics pose a direct threat to the safety of sergeants and their ability to protect subordinate officers.**

Plaintiffs' claims involve challenges to the legality of certain practices and procedures employed in the Summer 2020 demonstrations, and their requests for declaratory and injunctive relief may trigger changes to those practices and procedures. (*Id.* ¶ 11.) Plaintiffs also seek to install a monitor who would oversee changes to police tactics, training, and equipment. (*Id.*)

Many of the challenged practices and procedures are in place to ensure the safety of officers during demonstrations, as well as to ensure they maintain a safe environment for the public. (*Id.* ¶ 12.) Plaintiffs challenge nearly every tactic used by officers to maintain order and keep themselves safe, including the alleged use of "pepper spray and baton, bicycle, and body strikes as crowd control tactics" and the use of "tight plastic zip-ties" on arrestees. (*Id.* (quoting *People* Am.

Compl. ¶ 435, No. 21-CV-322 (Doc. 51)).)  If plaintiffs are successful in securing the requested declaratory and injunctive relief, the safety of the SBA's members will be put at risk.  (*Id*.)

### III.   NYPD sergeants are empowered with substantial discretion to ensure officer safety during protests, and they rely on a suite of tools to protect themselves and others.

NYPD police sergeants are line supervisors responsible for, among other things, supervising police officers and implementing NYPD policies at the street level.  (*Id*. ¶ 5.) Sergeants are required to train, instruct, monitor, and advise police officers in their duties, and they can be held directly responsible for the performance of their subordinates.  (*Id*.)  Whenever new training is mandated, new equipment is provided, or new procedures are developed, it falls to sergeants to ensure police officers meet expectations and deploy techniques appropriately.  (*Id*.)

During protests and demonstrations, the key function of sergeants is to ensure officer safety.  According to the NYPD Patrol Guide, sergeants are "responsible for the performance of the squad they are assigned" in these environments.  (*Id.* ¶ 6 (quoting NYPD Patrol Guide § 213-05 at p. 5).)  Each sergeant instructs a squad of eight police officers from their respective precincts on the nature of the disorder, mission objectives, the use of equipment, and prohibited conduct, among other things.  (*Id*.)  Mandatory directives about the use of equipment are established by more senior officers, including the senior leadership of the NYPD.  (*Id*.)

Sergeants rely on essential defensive tools when handling dangerous protest scenarios and other forms of civil unrest.  (*Id*. ¶ 13.)  Shields, OC spray, helmets, and batons are necessary to keep sergeants safe while lawfully protecting the public.  (*Id*.)  Mounted officers and crowd-containment techniques are also essential when managing or dispersing large crowds.  (*Id*.) Sergeants facing violent crowds would be placed in greater personal danger if stripped of these tools in certain circumstances.  (*Id*.)  With fewer options at their disposal, officers may have no choice but to use greater force methods, such as hand-to-hand contact or the use of batons.  (*Id*.)

Critically, sergeants act as front-line managers and are vested with discretion to amend management's directives in the interest of officer safety, such as when circumstances change and protests become dangerous.  (*Id.* ¶ 14.)  For example, police officers are often directed at the outset of protests not to use helmets or shields.  (*Id.*)  If members of the public begin to threaten the safety of police officers, those officers are still not authorized to use helmets or shields to protect themselves.  (*Id.*)  However, a sergeant is authorized to direct officers to use helmets and shields to protect themselves in that scenario, notwithstanding written directives from senior leadership. (*Id.*)  Because sergeants are the superior officers closest to the front line in these dynamic events, it is critical that they be empowered with this discretion.  (*Id.*)  This discretion is vested in sergeants because there are fewer more senior officers (*e.g.*, lieutenants and captains) dispatched to protests, and those officers may be physically removed from the part of the protest that has become violent and thus not able to react as quickly.  (*Id.*)

## IV.   The Summer 2020 protests illustrate the need for the challenged equipment and practices to protect officer safety.

Plaintiffs' complaints focus almost exclusively on the nature of the police response to the Summer 2020 demonstrations.  (*Id.* ¶ 8.)  There is little discussion of the conditions that precipitated those responses.  (*Id.*)  Although the Attorney General's complaint describes the protests in New York City that summer as "overwhelmingly peaceful," information provided by sergeants paints a starkly different picture.  (*Id.*)  While some protests were indeed peaceful, New York City also was beset by violent agitators, rioters, and looters who took advantage of the demonstrations to wreak havoc.  (*Id.*)  Rioters threw bricks, bottles, bicycles, frozen bottles of water, and even Molotov cocktails at responding officers.  (*Id.*)  Other protestors screamed at officers and crowded around them while they tried to maintain order.  (*Id.*)  Protestors gathered

and moved across the boroughs in large numbers, without permits and without regard for curfews imposed by the City.  (*Id*.)

An NYPD spokesperson estimated that 472 officers, including sergeants, were injured during two weeks of protests, while 319 of those officers required hospital treatment.  (*Id*. ¶ 9.) For example, a driver in the Bronx intentionally ran over Sgt. William Maher, who was responding to reports of looting in the area.  (*Id*.)  Sgt. Maher suffered cracked ribs, a broken collarbone, and a collapsed lung, and he was hospitalized in critical condition.  (*Id*.)  Other sergeants were pelted with projectiles and beaten with large objects like metal scooters, which resulted in open wounds and the need for sutures.  (*Id*.)

The police response to these protests was hampered by the failure of NYPD management to anticipate that the demonstrations could become violent, despite clear evidence that similar protests in Minneapolis, Seattle, Portland, and other cities had escalated to include violent attacks on police and extensive property damage.  (*Id*. ¶ 10.)  NYPD management was concerned about the appearance of police officers in tactical equipment, and officers were instructed not to use helmets or shields on protest detail.  (*Id*.)  This lack of foresight led to preventable officer injuries. (*Id*.; *see also* Second Circuit Op. at *6 ("The PBA introduced evidence that officers suffered injuries during interactions with protesters because of policies governing the rules of engagement with protesters and the equipment issued to officers.").)

## V.    NYPD sergeants and police officers have distinct interests and concerns in this case.

While sergeants and police officers both have a generalized interest in personal safety, each group has a unique and nuanced perspective on the potential effect of this litigation on their respective interests.  (*Id*. ¶ 16.)

Sergeants and police officers have distinct roles, responsibilities, and perspectives given their positions in the chain of command.  (*Id*.)  Police officers are below sergeants in the chain of

command and do not have supervisory or managerial responsibilities. (*Id.*) Sergeants are empowered with supervisory authority that is relevant in the protest environment. For example, sergeants are authorized to use certain restraining devices that are not available to police officers. (*Id.*) Sergeants also have discretionary authority to direct police officers to use certain equipment—including OC spray, batons, helmets, and shields—when circumstances warrant. (*Id.*) They also have discretion to initiate "Level One" mobilizations, which are designed to rapidly mobilize police personnel to a scene. (*Id.*) And sergeants determine when it is appropriate to retreat from a scene. (*Id.*)

If permitted to intervene, the SBA's focus in this litigation would be on the importance of the sergeant's unique supervisory functions in protest settings, among other things. (*Id.* ¶ 18.) SBA's involvement is necessary to ensure the interests of sergeants are represented in the resolution of issues that uniquely or disproportionately affect sergeants' safety. (*Id.*)

## ARGUMENT

## I.     The SBA is entitled to intervene under Rule 24(a).

A party has the right to intervene under Rule 24(a) when (a) the motion to intervene is timely filed, (b) the putative intervenor has an interest in the existing litigation, (c) the intervenor's interest would be impaired by the outcome of the litigation, and (d) the intervenor's interest will not be adequately represented by the existing parties. *Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 473 (2d Cir. 2010). Because the SBA satisfies each of these elements, intervention is required as a matter of law.[1]

---

[1] The Second Circuit held that the PBA had established a right to intervene in these cases under Rule 24(a) even though the PBA had not included a pleading with its motion. This Court ordered the PBA to file a pleading "promptly" once the Second Circuit issues its mandate, thus cementing the PBA's party status. (Doc. 456.) The SBA proposes to follow a similar procedure by promptly filing a pleading upon becoming a party unless the Court orders otherwise.

As an initial matter, this motion timely follows the Second Circuit's recent determination that a police union "has a cognizable interest at stake in [these] actions seeking declaratory or injunctive relief with respect to NYPD policies." Second Circuit Op. at *5. The SBA acted quickly following this decision clarifying its rights and the state of the law to ensure this motion could be considered before the parties expend significant resources to bring the PBA into the fold. At this point, SBA and PBA are on equal footing vis-à-vis the existing parties in these cases, and no party could claim prejudice from the SBA's addition to the case. Indeed, the City recently volunteered that "[t]he analysis set forth in the Second Circuit decision would apply to the SBA and DEA as well," saying nothing about potential prejudice from an application of the Second Circuit's decision to those organizations. (Doc. 448 at 3.) This motion is therefore timely.

### A.   The SBA has a protectable interest in ensuring officer safety that may be impaired by the outcome of this litigation.

The Second Circuit's conclusion that the PBA has identified an interest that may be impaired by the disposition of these cases applies in equal measure to the SBA. Like the PBA, the SBA has a direct interest in the merits based on the potential effect of conclusions about police practices on injunctive relief, which could, in turn, impair the safety of sergeants on the job.

In its decision, the Second Circuit held that "the PBA has a cognizable interest at stake in those actions seeking declaratory or injunctive relief with respect to NYPD policies—that is, the *Payne*, *Sow*, *Sierra*, and *People* actions." Second Circuit Op. at *5. The court concluded that the PBA's interest in officer safety is "the mirror image" of the interests the plaintiffs in those actions seek to vindicate, which justifies its intervention. *Id.* at *6 (quoting *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 130 (2d Cir. 2001)). The court explained that the PBA is entitled to participate in the merits stage because that is when the court must determine the issue that affects its interest— *i.e.*, "whether certain NYPD policies are permissible." *Id.* at *5. The court reasoned that the PBA

8

has an interest in "the continuation or alteration of policies that are alleged to be unlawful" at the merits stage because that is the organization's only opportunity to "contest the proposition that the challenged policies are unlawful and should be changed." *Id.*

The SBA also has a "direct, substantial, and legally protectable" interest at stake in these cases. *Bridgeport*, 602 F.3d at 473.  At their core, these cases challenge the legality of equipment and practices that are designed to keep officers safe, seeking to change policies "to be more protective of the protesters and correspondingly less focused on the safety interest of the front-line officers."  Second Circuit Op. at *5.  As street-level supervisors, sergeants have a particularized interest in defending the lawfulness of current policing practices and ensuring any reforms not only protect the public but also the safety of sergeants.

Hundreds of officers were injured in the protests despite the use of the challenged tactics and equipment in some circumstances.  (Vallelong Decl. ¶¶ 8-9.)  These officers paid a heavy price for protecting the public.  Police vehicles were surrounded and lit on fire, officers were repeatedly pelted by projectiles, pepper sprayed, spat upon, and, in at least two cases that led to federal indictments, were the targets of Molotov cocktails.[2]  (*Id.*)  Many protestors showed little to no regard for attempts to regulate the safety of the demonstrations, such as curfews imposed by the City.  (*Id.* ¶ 8.)

This context is missing in Plaintiffs' complaints, which focus on solely on police response.  As the Second Circuit recounted, Plaintiffs allege that officers:

-------

[2] *See, e.g.*, *United States v. Mattis*, 963 F.3d 285, 287 (2d Cir. 2020) (stating that defendants "were arrested following an incident in which defendant Rahman allegedly threw a Molotov cocktail into an unoccupied police vehicle and Mattis allegedly acted as the getaway driver"); *United States v. Shader*, 472 F. Supp. 3d 1, 2 (E.D.N.Y. 2020) (stating that defendant's "charges arose from [her] alleged participation in a protest demonstration and her alleged Molotov cocktail attack on police officers who were sitting in a marked police vehicle on the evening of May 29, 2020").

- used excessive force in response to "mostly peaceful protestors;"

- employed "militarized tactics," including the deployment of "massive amounts" of NYPD officers "in full riot gear, including external Kevlar vests, helmets, and forearm plates," which was intended to "alarm[]" and "deter[]" protestors;

- intimidated protestors when they "form[ed] a line" and "began to move towards the protesters with their helmets on and batons out;" and

- "unlawfully arrest[ed] over 300 individuals" in a campaign of "excessive force" that culminated in "mass detentions and arrests."

Second Circuit Op. at *2. Plaintiffs' concerns about the use of protective equipment such as "external Kevlar vests, helmets, and forearm plates," *id.*, encapsulates the disconnect between the SBA's interest in maintaining the personal safety of its member officers and Plaintiffs' purported interest in not being intimidated by the appearance of police. Allegations about use of force similarly lack any acknowledgement of the dangerous conditions on the ground. Plaintiffs pay lip service to "instances of property damage and injuries to NYPD Officers" at the protests. (*People* Am. Compl. ¶ 46, No. 21-CV-322 (Doc. 51).) But they fail to grapple with the fact that violent and threatening behavior, including assaults on police officers by protestors, necessitated a response.

Against this backdrop, Plaintiffs seek to limit the range of defensive and proactive actions that sergeants can employ to protect themselves, their fellow officers, and the public. (*See, e.g.*, *id.* ¶ 435 (challenging use of "pepper spray and baton, bicycle, and body strikes as crowd control tactics" and the use of "tight plastic zip-ties" on arrestees).) In removing essential tools used by officers in disorder-control scenarios, the requested relief is likely to lead to more officer injuries.[3]

---

[3] At the same time, the SBA agrees with the Attorney General that NYPD failed to provide officers with sufficient training related to policing protests and would benefit from enhanced training on the use of equipment and tactics. (*People* Am. Compl. ¶ 75, No. 21-CV-322 (Doc. 51) (alleging that "NYC-DOI concluded in a recent report, prior to the Protests, [that] NYPD lacked standardized, agency-wide, in-service training related to policing protests and as a result it

Because Plaintiffs challenge the reasonableness and legality of nearly every tactic sergeants use during protests, sergeants have an interest in defending those practices on the merits to protect their personal safety during future protests.

Moreover, Plaintiffs and the City may seek to replace sergeants' discretion with bright-line prohibitions or overly complicated conditions on the use of certain tactics, which would hobble officers in responding to dynamic situations. As superior officers who are also on the front line, sergeants are entrusted with discretion to alter directives when circumstances warrant. They can direct police officers to use certain types of equipment, such as helmets or shields, to protect themselves from imminent threats, even when senior leadership has directed officers not to use that equipment. (Vallelong Decl. ¶ 14.) If reforms are adopted in this litigation to remove the discretion of sergeants in this regard, sergeants and police officers would be less safe. In addition, sergeants could face discipline for directing police officers to take actions to protect themselves, even when doing so is essential for their safety. (*Id.*)

As the Second Circuit recognized was the case for the PBA, the interests of the SBA are the "the mirror image" of the interests Plaintiffs seek to vindicate in almost all respects. Second Circuit Op. at *6 (quoting *Brennan*, 260 F.3d at 130). The SBA is entitled to an opportunity to defend the legality of the challenged actions and practices and contribute to the determination of any necessary reforms.

---

'deployed a large number of front-line supervisors and officers to police the Floyd protests without adequate training.'").)

**B.    The SBA's interests will not be adequately represented in this action, by the PBA or otherwise.**

The SBA also satisfies its "minimal burden" of showing that the existing parties may not adequately represent its interests in this matter.  Second Circuit Op. at *7 (quoting *LaRouche v. FBI*, 677 F.2d 256, 258 (2d Cir. 1982)).  As is true for the PBA, the SBA's singular focus as an organization would be its singular focus in this litigation: protection of and advocacy for its members.  Because neither the City nor the PBA is assured to represent the SBA's distinct interests, the SBA is entitled to enter the case and speak for itself.

The inadequacy of representation requirement of Rule 24(a) "is satisfied if the applicant shows that representation of his interest *may be* inadequate; and the burden of making that showing should be treated as minimal."  *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (emphasis added; quotation marks omitted).  The question is whether an existing party has interests that are "*so similar* to those of [the proposed intervenor] that adequacy of representation [is] *assured*."  *Brennan*, 260 F.3d at 132-33 (emphasis added).  A proposed intervenor is inadequately represented in a case when it may make "a more vigorous presentation" on a relevant issue than the existing parties would be incentivized to make.  *N.Y. Pub. Interest Rsch. Grp. v. Regents*, 516 F.2d 350, 352 (2d Cir. 1975).

In this case, the Second Circuit held that the PBA "ha[d] shown that its interest might not be adequately represented by the City."  Second Circuit Op. at *8.  The court found that the PBA's views on the appropriateness of police actions during the Summer 2020 protests "diverged from the views of the City and the NYPD" in specific and material ways, noting the PBA's argument "that the approach of the City and the NYPD resulted in officer injuries."  *Id.*  The court also found that the City's "widely understood" stance on the pressing need for policing reforms cast doubt on its ability and willingness to represent the interests of front-line officers.  *Id.*

Here, despite the PBA's presence, there is no party that can be expected to vigorously represent the SBA's interests.  For their part, the City defendants are conflicted by multiple interests and are no more fit to represent sergeants than they are to represent police officers.  NYPD management either failed to anticipate that the protests would include a violent criminal element or were too concerned with whether their police force appeared to be "militarized" to require all officers to take basic precautions like wearing helmets and carrying batons.  (Vallelong Decl. ¶ 10.)  Whatever the case, despite injuries to several hundred officers during these supposedly peaceful protests, the City has chosen to openly solicit settlement offers from each plaintiff on the open docket rather than vigorously defend the challenged practices.  (*See* Doc. 448 at 3.)  Any settlement would assuredly include injunctive terms that change the conditions of police engagement with the public during protests, potentially making officers even less safe than they were two years ago.  As the district court in *Floyd* observed about the *City of Los Angeles* case, "the existing municipal defendant had every reason to distance itself from the officers' conduct" and "could not be counted on to adequately represent the officers' interests."  *Floyd v. City of New York*, 302 F.R.D. 69, 107 (S.D.N.Y. 2014), *aff'd*, 770 F.3d 1051 (2d Cir.).  That dynamic is playing out in real time in this Court.  The City has never represented the interests of sergeants in these cases, and it likely never will.  *See* Second Circuit Op. at *8 ("We observed in *Floyd* that it was not evident that the City '*ever*' adequately protected the interests of NYPD officers.").

The PBA also cannot be expected to focus on issues that primarily affect sergeants.  Sergeants and police officers have distinct roles, responsibilities, and perspectives given their positions in the chain of command.  (Vallelong Decl. ¶ 16.)  Given their subordinate relationship to sergeants, police officers will be less focused on issues that primarily affect their supervisors.  For example, sergeants are authorized to use certain restraining devices that are not available to

police officers. (*Id.*) Sergeants also have discretionary authority to direct police officers to use certain equipment—including OC spray, batons, helmets, and shields—when circumstances warrant. (*Id.*) And sergeants are generally responsible for the performance and safety of an entire squad, not just themselves. (*Id.* ¶ 6.) As a result of these distinctions, sergeants and police officers have different interests and concerns in this litigation.

The SBA thus has a narrower and more focused perspective on the key issues in this case than the existing parties. *See Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977) (reversing district court's denial of intervention where intervenor had an interest that was "more narrow and focussed [*sic*]" than that of the existing governmental defendant, which was concerned primarily with regulation). The SBA expects to focus on sergeants' supervisory functions in protest settings, among other things. The SBA would advocate forcefully for sergeants to retain their current discretionary authority to direct police officers to use certain equipment—including OC spray, batons, helmets, and shields—when circumstances warrant. This authority relates directly to the sergeants' role in disorder-control scenarios like the Summer 2020 demonstrations. The SBA cannot rely on the PBA to vigorously defend against attempts to undermine or eliminate this discretion, which is paramount for keeping officers safe in crowd-control environments that often change quickly from peaceful to violent.

Because sergeants occupy a mid-level managerial position within the complex and sprawling organization of the NYPD, there is "sufficient doubt" that either front-line officers, NYPD management, or the City itself would adequately represent their interests. *See* Second Circuit Op. at *7. The SBA is thus entitled to party status to protect its members' interests.

## II.     The SBA should be granted permissive intervention under Rule 24(b).

Alternatively, it is also appropriate to allow the SBA to intervene under Rule 24(b) to ensure the Court's understanding of the officer perspective is not skewed toward interests of rank-

and-file officers over street-level supervisors.  In other words, permissive intervention would "provide this Court with a fuller picture to evaluate the fairness, reasonableness, and equities" of proposed reforms.  *United States v. N.Y.C. Hous. Auth.*, 326 F.R.D. 411, 419 (S.D.N.Y. 2018).

Permissive intervention is appropriate when "the application is timely" and "the 'applicant's claim or defense and the main action have a question of law or fact in common.'"  *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 202 (2d Cir. 2000) (quoting Fed. R. Civ. P. 24(b)(2)).  "Courts in this district have consistently held that Rule 24(b) 'is to be liberally construed,'" *Yang v. Kellner*, No. 20-CV-3325, 2020 WL 2115412, at *1 (S.D.N.Y. May 3, 2020) (citation omitted), and that motions under this rule should be "liberally granted," *Miller v. Silbermann*, 832 F. Supp. 663, 673 (S.D.N.Y. 1993).  "The phrase 'claim or defense' is not to be read technically and only requires 'some interest on the part of the applicant.'"  *Friends of the E. Hampton Airport, Inc. v. FAA*, No. 15-CV-0441, 2016 WL 792411, at *8 (E.D.N.Y. Feb. 29, 2016) (citation omitted).

The "principal consideration" in the analysis is whether intervention would unduly delay or prejudice the adjudication of the rights of the existing parties.  *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978); *BNP Paribas v. Kurt Orban Partners LLC*, No. 19-CV-9616, 2021 WL 355136, at *2 (S.D.N.Y. Feb. 2, 2021) ("Additional parties always take additional time which may result in delay, but this does not mean that intervention should be denied.  The rule requires the court to consider whether intervention will *unduly* delay the adjudication." (emphasis added; quotation omitted)).  The court may consider several other non-dispositive factors, including whether the putative intervenor will benefit from the application, the nature and extent of its interests, whether its interests are represented by the existing parties, and whether the putative intervenor will contribute to the development of the underlying factual issues.  *U.S. Postal Serv.*,

579 F.2d at 191-92.  However, permissive intervention "does not require a finding that party representation be inadequate."  *New York v. U.S. Dep't of Health & Human Servs.*, No. 19-CV-4676, 2019 WL 3531960, at *6 (S.D.N.Y. Aug. 2, 2019).

The SBA's intervention will not unduly delay or prejudice the existing parties.  The SBA timely moved to intervene following the Second Circuit's decision, in part to ensure it could enter the case close in time to the PBA and thereby minimize the disruptive effect of adding new parties. Indeed, the parties already anticipate that the Second Circuit's decision may lead to the intervention of other police unions in these cases.  (*See* Doc. 450 at 4 (Plaintiffs' letter stating that "the anticipated addition of *one or more* intervenor defendants will have a significant effect on the consolidated case calendar" (emphasis added)); Doc. 448 at 3 (City's letter stating that "the PBA, *and possibly SBA and DEA*, would need an opportunity to focus on resolving this matter." (emphasis added)).)  Accordingly, the parties have agreed on the need to modify the existing discovery schedule to accommodate intervenors.  (*See* Docs. 448 (City's request for a stay of discovery); 450 (Plaintiffs' request for an "amended discovery schedule" in part to "accommodate the effects of intervention").)  Also, the Court has already held in abeyance certain high-level depositions.  Thus, the SBA's intervention at this stage is unlikely to incrementally affect the pace of the proceedings.

Now is the time for the SBA to make sergeants' voices heard in this matter.  The Court cannot adjudge the propriety (or the necessity) of the challenged practices without the on-the-ground perspective of sergeants, who understand both the importance of policies and the realities of patrol.  NYPD sergeants also need a seat at the table where the parties and the Court will consider potential reforms to the nature and scope of training and the conditions for police engagement in disorder-control scenarios, including the use of specific equipment and crowd-

control tactics.  The City's explicit reference to settlement discussions in its recent letter to the Court, which apparently now involve a "23-page [proposal of] terms for declaratory and injunctive relief" (Doc. 448 at 3), exposed the urgency of this need.

The addition of the SBA at this stage, rather than at the remedies stage—where the Court already contemplated new motions to intervene by the police unions—is the most efficient and just approach.  It will ensure the views of street-level supervisors are considered when they matter most: on the merits, and in the crafting of injunctive relief that affects how they discharge their duties.  Permissive intervention should be granted.

## CONCLUSION

The Court should grant the SBA's motion to intervene as of right under Federal Rule of Civil Procedure 24(a) or, in the alternative, grant permissive intervention under Rule 24(b).

Dated: March 29, 2022
New York, New York

Respectfully Submitted,

*/s/ Anthony P. Coles*
Anthony P. Coles
**DLA PIPER LLP (US)**
1251 6th Avenue
New York, NY 10020
Telephone: (212) 335-4844
Facsimile: (212) 884-8644
Email: anthony.coles@dlapiper.com

*Attorney for Proposed Intervenor*
*Sergeants Benevolent Association*

*Of Counsel*:
Andrew C. Quinn, Esq.
The Quinn Law Firm
399 Knollwood Road, Suite 220
White Plains, NY 10603
Telephone: (914) 997-0555
Facsimile: (914) 997-0550
Email: aquinn@quinnlawny.com

## <u>CERTIFICATE OF SERVICE</u>

I, Anthony P. Coles, hereby certify that, on this 29th day of March, 2022, I caused the foregoing motion and its attachments to be served on all counsel of record in these cases by filing on the CM/ECF system.

*/s/ Anthony P. Coles*
Anthony P. Coles
