UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

| | |
|---|---|
| In Re: New York City Policing During Summer 2020 Demonstrations | 20 Civ. 8924 (CM)(GWG) |

------------------------------------------------------------------x

This filing is related to:

| | |
|---|---|
| Payne v. de Blasio, et al. | 20 Civ. 8924 (CM)(GWG) |

------------------------------------------------------------------x

| | |
|---|---|
| Sierra v. City of New York, et al. | 20 Civ. 10291 (CM)(GWG) |

------------------------------------------------------------------x

| | |
|---|---|
| People v. City of New York, et al. | 21 Civ. 322 (CM)(GWG) |

------------------------------------------------------------------x

| | |
|---|---|
| Sow v. City of New York, et al. | 21 Civ. 533 (CM)(GWG) |

------------------------------------------------------------------x

## DECLARATION OF VINCENT J. VALLELONG

Pursuant to 28 U.S.C. § 1746, Vincent J. Vallelong declares as follows:

1. I am currently a sergeant with the New York City Police Department ("NYPD") and the President of the Sergeants Benevolent Association ("SBA"). I am making this declaration to provide the Court with information in support of the SBA's motion to intervene in this action. I have personal knowledge of the facts I explain below.

2. This litigation threatens to fundamentally alter how NYPD sergeants handle some of the most dangerous and challenging parts of their jobs. Sergeants have a direct interest in defending the range of equipment and tactics at their disposal in dangerous settings like the Summer 2020 protests. They also have an interest in preventing any remedial order that would either prohibit practices that are designed to keep them safe or constrain their discretionary authority in protest settings. Because the central mission of the SBA is to advocate for and protect

the interests of the thousands of sergeants in the NYPD, the SBA is seeking to enter this litigation to ensure sergeants' voices are heard.

## I. My Background and the SBA

3. I have 32 years of experience as an NYPD officer, having been appointed to the NYPD in 1990. I have been assigned to the 5th and 62nd Precincts, as well as the Manhattan South Task Force, the 63 Robbery Apprehension Module, and the 62 Detective Squad. As a Sergeant, I was assigned to the Brooklyn South Detective Operations, where I was an SBA delegate. I also have served as the SBA's Detective Bureau Director and Marshal. I earned a bachelor's degree in Marketing Management from Pace University. I was appointed President of the SBA on October 6, 2021.

4. The SBA is an independent municipal police union whose membership consists of approximately 13,000 active and retired sergeants of the NYPD. The SBA is the fifth-largest police union in the country and the country's largest superior officers' union. The SBA is recognized by the City of New York (the "City") as the sole and exclusive bargaining representative for all NYPD sergeants. In this capacity, the SBA is entitled to negotiate changes to the terms and conditions of employment with the City.

## II. The Role of NYPD Sergeants in Protests and Demonstrations

5. NYPD police sergeants are line supervisors responsible for, among other things, supervising patrol officers and implementing policies of the NYPD on the street level. Sergeants are required to train, instruct, monitor, and advise patrol officers in their duties, and they can be held directly responsible for the performance of their subordinates. Whenever training is mandated, equipment is provided, or procedures are developed, it falls to sergeants to ensure patrol officers meet expectations and deploy techniques appropriately.

6. This is especially true in protests and demonstrations, where sergeants are "responsible for the performance of the squad they are assigned." NYPD Patrol Guide § 213-05 at p. 5. According to the Patrol Guide, each sergeant instructs a squad of eight police officers from their respective precincts on the nature of the disorder, mission objectives, the use of equipment, and prohibited conduct, among other things. *Id.* Mandatory directives about the use of equipment are established by more senior officers, including the senior leadership of the NYPD. Critically, however, sergeants act as front-line supervisors and are vested with discretion to amend these directives in the interest of officer safety when protests become dangerous.

### III. The Summer 2020 Demonstrations

7. In this litigation, the Attorney General and the individual plaintiffs allege that officers violated the rights of participants in the protests that took place around New York City in Summer 2020. For example, they allege that officers:

- used OC spray, batons, and other equipment in response to "mostly peaceful protests;"

- engaged in crowd-control techniques, including a technique they refer to as "kettling," in ways that constituted an excessive use of force;

- employed "militarized tactics," including the deployment of "massive amounts" of NYPD officers "in full riot gear, including external Kevlar vests, helmets, and forearm plates," which was intended to "alarm[]" and "deter[]" protestors;

- intimidated protestors when they "form[ed] a line" and "began to move towards the protestors with their helmets on and batons out;"

- "unlawfully arrested over 300 individuals" in a campaign of "excessive force" that culminated in "mass detentions and arrests."[1]

8. Plaintiffs' complaints focus almost exclusively on the nature of the police response to these demonstrations. There is little discussion of the conditions that precipitated those

---

[1] *In re N.Y.C. Policing During Summer 2020 Demonstrations*, No. 21-1316, __ F.4th __, 2022 WL 627436, at *2 (2d Cir. Mar. 4, 2022) (excerpting allegations from Plaintiffs' complaints).

responses. Although the Attorney General's complaint describes the protests in New York City that summer as "overwhelmingly peaceful" (Am. Compl. ¶ 1, *People v. City of New York*, No. 1:21-cv-00322 (S.D.N.Y. Mar. 5, 2021) (Doc. 51)), information provided by sergeants paints a starkly different picture. While some protests were indeed peaceful, New York City also was beset by violent agitators, rioters, and looters who took advantage of the demonstrations to wreak havoc. Rioters threw bricks, bottles, bicycles, frozen bottles of water, and even Molotov cocktails at responding officers. Other protestors screamed at officers and crowded around them while they tried to maintain order. Police vehicles were surrounded and lit on fire, officers were repeatedly pelted by projectiles, pepper sprayed, spat upon, and, in at least two cases that led to federal charges, were the targets of Molotov cocktails.[2] Protestors gathered and moved across the boroughs in large numbers, without permits and without regard for curfews imposed by the City.

9. In my role as President of the SBA, I am aware that numerous sergeants sustained serious injuries in violent attacks by protestors and looters in these demonstrations. I was made aware of these injuries at meetings and through SBA delegates. For example, a driver in the Bronx intentionally ran over Sgt. William Maher, who was responding to reports of looting in the area. Sgt. Maher suffered cracked ribs, a broken collarbone, and a collapsed lung. He was hospitalized in critical condition. Another sergeant assigned to the NYPD's Strategic Response Group was hit with a rock fired from a slingshot. The rock struck the sergeant in the knee, causing him to fall to the ground and ultimately go out of the line of duty. I am also aware of multiple sergeants who

---

[2] *See, e.g.*, *United States v. Mattis*, 963 F.3d 285, 287 (2d Cir. 2020) (stating that defendants "were arrested following an incident in which defendant Rahman allegedly threw a Molotov cocktail into an unoccupied police vehicle and Mattis allegedly acted as the getaway driver"); *United States v. Shader*, 472 F. Supp. 3d 1, 2 (E.D.N.Y. 2020) (stating that defendant's "charges arose from [her] alleged participation in a protest demonstration and her alleged Molotov cocktail attack on police officers who were sitting in a marked police vehicle on the evening of May 29, 2020").

were struck with large objects like metal scooters and pelted with objects such as rocks, frozen water bottles, and bricks, which often resulted in open wounds and the need for sutures. An NYPD spokesperson estimated that 472 officers, including sergeants, were injured during two weeks of protests, while 319 of those officers required hospital treatment.

10. The police response to these protests was hampered by the failure of NYPD management to anticipate that the demonstrations could become violent, despite clear evidence that similar protests in Minneapolis, Seattle, Portland, and other cities had escalated to include violent attacks on police and extensive property damage. NYPD management was concerned about the appearance of police officers in tactical equipment, and officers were instructed not to use helmets or shields on protest detail. This lack of foresight led to preventable officer injuries.

**IV.     The Potential Implications of Plaintiffs' Claims for Sergeants**

11. Plaintiffs' claims involve challenges to the legality of certain practices and procedures employed in the Summer 2020 demonstrations, and their requests for declaratory and injunctive relief may trigger changes to those practices and procedures. Plaintiffs also seek to install a monitor who would oversee changes to police tactics, training, and equipment.

12. Many of the challenged practices and procedures are in place to ensure the safety of officers during demonstrations, as well as to ensure they maintain a safe environment for the public. Plaintiffs challenge nearly every tactic used by officers to maintain order and keep themselves safe, including the alleged use of "pepper spray and baton, bicycle, and body strikes as crowd control tactics" and the use of "tight plastic zip-ties" on arrestees. (*People* Am. Compl. ¶ 435 (Doc. 51).) Any change to the tactics, training, and equipment used in disorder-control settings has the potential to put individual police officers at risk of personal physical harm. If plaintiffs are successful in securing the requested declaratory and injunctive relief, the personal safety of the SBA's members will be put at risk. Restrictions also would impact the ability of sergeants to

protect the non-protesting public, including the store owners whose shops and livelihoods have been destroyed.

13. In managing potentially dangerous situations like protests, officers rely on a suite of tools to keep themselves safe and maintain order. In the Summer 2020 demonstrations, officers were ordered to disperse crowds that did not obey their commands or obey curfews imposed by City officials. In some instances, members of the public became violent and threatened the safety of officers. In these situations, sergeants rely on essential defensive tools and tactics, including shields, OC spray, helmets, and batons, to keep themselves safe while lawfully protecting the public. They also rely on the use of mounted officers and crowd-containment techniques when managing or dispersing large crowds. Sergeants would be placed in greater personal danger if stripped of these tools in certain circumstances. Prohibitions or overly complicated restrictions on the use of certain tactics and equipment raises safety concerns for officers as well as the public. With fewer options at their disposal, officers may have no choice but to use greater force methods, such as hand-to-hand contact or the use of batons.

14. Similarly, sergeants and officers would be less safe if this litigation diminishes or eliminates sergeants' discretionary authority at protests. For example, police officers are often directed at the outset of protests not to use helmets or shields. At such a protest, if members of the public begin to threaten the safety of police officers, those officers are not authorized to ignore the advance directive and use helmets or shields to protect themselves. However, a sergeant has discretionary authority to direct officers to use equipment when necessary to protect their safety, notwithstanding written directives from senior leadership. Because sergeants are the superior officers closest to the front line, it is critical that they be empowered with this discretion in dynamic events. This is particularly important because there are at least three or four times more sergeants

dispatched to handle protests than more superior officers (*e.g.*, lieutenants and captains), who may be physically removed from the part of the protest that has become violent. It is thus vital to the safety of police officers that this discretion remain vested in sergeants and not restricted or diminished, such as by requiring approval of higher-ranking officers. In addition, if policies are reformed to remove this discretion, sergeants could face discipline for directing police officers to use equipment to protect themselves, even when doing so is essential for their safety.

15. Now is the time for the SBA to make sergeants' voices heard on these issues. I understand the parties have already contemplated settlement and may have exchanged proposed terms for declaratory and injunctive relief. The addition of the SBA at this stage, rather than after a proposed settlement has been reached, will ensure any remedial order accounts for the interests of front-line supervisors who understand both the importance of policies and the realities of patrol.

**V.     The Distinct Interests of the SBA in This Litigation**

16. Sergeants and police officers have distinct roles, responsibilities, and perspectives given their positions in the chain of command. For example, sergeants are authorized to use certain restraining devices that are not available to police officers. Sergeants also have discretionary authority to direct police officers to use certain equipment—including OC spray, batons, helmets, and shields—when circumstances warrant. They also have discretion to initiate "Level One" mobilizations, which are designed to rapidly mobilize police personnel to a scene. Sergeants also determine when it is appropriate to retreat from a scene. In contrast, police officers are below sergeants in the chain of command and do not have supervisory or managerial responsibilities and thus have a different viewpoint on the importance of policies and how they are implemented.

17. In the labor context, the distinct roles, responsibilities, and perspectives of sergeants and police officers is evidenced by their membership in separate collective-bargaining organizations, which allows sergeants and police officers to prioritize different issues in

negotiations with the City.  Just as the PBA could not be expected to advocate for the interests of sergeants in negotiations with the City, it cannot be counted on to adequately represent sergeants in this litigation.  Police officers cannot represent the interests of their superior officers because this would reverse their hierarchical relationship.

18. If permitted to intervene, the SBA's focus in this litigation would be on the importance of the sergeant's unique supervisory functions in protest settings, among other things.  For example, the SBA would advocate forcefully for sergeants to retain their discretionary authority to direct police officers to use certain equipment.  This authority relates directly to the sergeants' role in disorder-control scenarios like the Summer 2020 demonstrations.  SBA's involvement is necessary to ensure the interests of sergeants are represented in the resolution of issues that uniquely or disproportionately affect sergeants' safety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: March 28, 2022

Vincent J. Vallelong