UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In Re: New York City Policing During Summer 2020
Demonstrations

------------------------------------------------------------------x
This filing is specifically related to:

*Payne v. de Blasio, et al.*

Civil Action No.:
20-CV-8924 (CM) (GWG)

------------------------------------------------------------------x

*Sierra v. City of New York, et al.*

Civil Action No.:
20-CV-10291 (CM) (GWG)

------------------------------------------------------------------x

*People v. City of New York, et al.*

Civil Action No.:
21-CV-0322 (CM) (GWG)

------------------------------------------------------------------x

*Sow v. City of New York, et al.*

Civil Action No.:
21-CV-0533 (CM) (GWG)

------------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF PROPOSED INTERVENOR DETECTIVE ENDOWMENT ASSOCIATION'S MOTION FOR INTERVENTION


**PITTA LLP**
**Stephen Mc Quade, Esq.**
**Vincent F. Pitta, Esq.**
***Attorneys for Proposed Intervenor***
***Detective Endowment Association***
**120 Broadway, 28th Floor**
**New York, New York 11554**
**(212) 652-3885**
smcquade@pittalaw.com
vpitta@pittalaw.com

{00696033-5}

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 1

ARGUMENT ....................................................................................................... 3

POINT I  INTERVENTION AS OF RIGHT IS WARRANTED IN THE INSTANT
ACTION ............................................................................................................... 3

    A.  Intervention is Timely                                                                    4

    B.  The Union's Interests Are Direct, Substantial, and Legally Protectable        6

    C.  Only the Union Can Address Personal Safety and Statutory Impairments    12

    D.  No Other Party Can Represent the Union or its Members                     14

POINT II  PERMISSIVE INTERVENTION OF THE DEA IS ALSO APPROPRIATE
IN THE INSTANT MATTER .............................................................................. 18

CONCLUSION .................................................................................................... 20

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Brennan v. New York City Bd. of Educ.*,
   260 F.3d 123 (2d Cir. 2001)........................................................................................... 6, 7

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d. Cir. 2001)............................................................................................... 4

*EEOC v. AT&*,
   T, 506 F.2d 735 (3d Cir. 1974) ...................................................................................... 12

*Farmland Dairies v. Comm. of New York State Dept. of Agriculture and Markets*,
   847 F.2d 1038 (2d Cir. 1998)........................................................................................... 5

*Floyd v. City of New York*,
   302 F.R.D. 69 (S.D.N.Y. 2014) ..................................................................................... 5, 7

*H.L. Hayden Co. of New York v. Siemens Medical Sys., Inc.*,
   797 F2d 85 (2d Cir. 1986).............................................................................................. 17

*In re Holocaust Victim Assets Litigation*,
   225 F.3d 191 (2d Cir. 2000)............................................................................................. 5

*In re NYC Policing During Summer 2020 Demonstrations*,
   2022 WL 627436 (2d Cir. March 4, 2022) ............................................................. *passim*

*Long Island Trucking, Inc. v. Brooks Pharmacy*,
   219 F.R.D. 53 (E.D.N.Y. 2003) ....................................................................................... 4

*Madison Stock Transfer, Inc. v. Netco Investments, Inc.*,
   2007 WL 2902960 (E.D.N.Y. September 27, 2007) ...................................................... 14

*N.Y. Pub. Interest Rsch. Grp. v. Regents*,
   516 F.2d 350 (2d Cir. 1975)........................................................................................... 12

*Northwest Forest Resource Council v. Glickman*,
   82 F.3d 825 (9th Cir. 1996) ........................................................................................... 14

*Oneida Indian Nation of Wisc. v. State of New York*,
   732 F.2d 261 (2d Cir. 1984)......................................................................................... 6, 7

{00696033-5}

*Rios v. Enterprise Association Steamfitters Local Union 638,*
    520 F.2d 352 (2d Cir. 1974) ................................................................................. 14

*Spangler v. Pasadena City Bd. of Educ.,*
    552 F.2d 1326 (9th Cir. 1977) .............................................................................. 17

*Trbovich v. United Mine Workers of Am.,*
    404 U.S. 528 (1972) ............................................................................................. 12

*U.S. v. City of Los Angeles,*
    288 F.3d 391 (9th Cir. 2002) ................................................................................. 4

*U.S. v. Pitney Bowes,*
    25 F.3d 66 (2d Cir. 1994) ....................................................................................... 5

*United States v. N.Y.C. Hous. Auth.,*
    326 F.R.D. 411 (S.D.N.Y. 2018) ......................................................................... 17

**Statutes**

N.Y. Civ. Rights Law § 28 .......................................................................................... 11

N.Y.C. Collective Bargaining Law § 12-306(a)(4) ............................................... 13, 14

N.Y.C. Collective Bargaining Law § 12-307(b) ............................................. 12, 13, 19

**Rules**

FRCP Rule 24(a) ........................................................................................... 1, 16, 19

FRCP Rule 24(a)(2) ...................................................................................................... 4

FRCP Rule 24(b) .................................................................................................. 3, 19

FRCP Rule 24(b)(1)(B) .............................................................................................. 16

FRCP Rule 24(b)(3) .................................................................................................... 17

**Other Authorities**

*Correction Officers Benevolent Association*, 49 OCB 40 (BCB 1992) ...................... 10

*EMS Superior Officers Association*, 75 OCB 15 (BCB 2005) .................................... 10

*EMS Superior Officers Association*, 79 OCB 7 (BCB 2007) ..................................... 10

*Sergeants Benevolent Association*, 23 OCB 6 (BCB 1979) ........................................ 10

{00696033-5}

*Uniformed Firefighters Association*, 43 OCB 70 (BCB 1989) ..................................................... 10

*Uniformed Firefighters Association*, 49 OCB 39 (BCB 1992) ..................................................... 10

*Uniformed Firefighters Association*, 3 OCB2d 16 (BCB 2010) ...............................................9, 10

{00696033-5}

## PRELIMINARY STATEMENT

This memorandum of law is submitted on behalf of Proposed Intervenor, the Detectives'

Endowment Association (hereinafter "DEA" or "Union"), in support of its Motion for

Intervention, pursuant to Federal Rules of Civil Procedure (hereinafter "FRCP"), Rule 24 in the

above-captioned matters.

Recently, the United States Court of Appeals for the Second Circuit (hereinafter "Second

Circuit") held that the Patrolmen's Benevolent Association (hereinafter "PBA") is entitled to

intervene in the instant matters because the PBA demonstrated an "interest in the personal safety

of its member officers at the merits stages" of these actions that are seeking declaratory or

injunctive relief. *In re NYC Policing During Summer 2020 Demonstrations*, No. 21-1316, __ F.4th

__, 2022 WL 627436, at *1 (2d Cir. March 4, 2022) (hereinafter "Appellate Opinion").  In the

Second Circuit's decision, the Court recognized the PBA's "cognizable interest" under FRCP Rule

24(a) in "the safety of front-line officers" that "may be impaired in litigation that could result in a

determination that NYPD policies governing the interaction of officers and protesters are unlawful

and must be altered." *Id.* at *5.

The stated rationale set forth in the Appellate Opinion equally applies to the DEA, which

serves as the certified collective bargaining representative for the over 5,000 employees in the rank

of Detective, irrespective of Grade, in the New York City Police Department (hereinafter "NYPD"

or "Department").[1]  The DEA, like the PBA, has an interest in ensuring the personal safety of

Detectives, some of whom were seriously injured in the protests, demonstrations, and riots, as

---

[1] The DEA is aware that a similar motion is being made by the Sergeants Benevolent Association (hereinafter "SBA"). To the extent that the arguments presented by the SBA are consistent with the DEA's arguments, the Union joins in those arguments. However, for the purposes of consistency and ease of reference, the instant memorandum of law will only refer to the application being made by the DEA in connection with the above-captioned matters.

detailed in the accompanying Declaration of DEA President, Paul DiGiacomo, dated March 30, 2022 (hereinafter "DiGiacomo Declaration").  As a result of the instant litigation, this Union's members, as well as all other unions representing uniformed employees of the NYPD, are likely to face evolving rules, regulations, policies, and procedures of the NYPD.  This Court's substantive rulings and ensuing relief may upheave previously-established protocols used by Detectives concerning a multitude of issues, including crowd control techniques and rules of engagement, which Detectives are tasked with implementing, when ordered to do so.  The resolution of these instant matters may also affect the ability of Detectives to address dynamic situations that demand a range of operational responses, some of which Detectives will not be sufficiently trained in to implement.  Further, the Appellate Opinion recognized the link between the safety of employees with the statutory mandate set forth in the New York City Collective Bargaining Law (hereinafter "NYCCBL") that requires collective negotiations between public sector employer and public sector unions involving issue of practical impacts on safety.  Thus, the DEA has compelling interests in entering the instant litigation.

Additionally, the DEA's involvement in the instant matters is necessary because the Union is in the best position to place membership safety above all other equitable concerns, ensure that the statutorily-created collective bargaining rights of the DEA retain their integrity, and the results of the instant matters' resolution, do not unnecessarily adversely impact the safety of DEA members.  The necessity of the Union's participation in the instant matters is highlighted by the ability of the Union's members to provide valuable, direct insight into the practical challenges of maintaining the requisite balance between peaceful protest and unlawful disorder, not from a distance, but from the streets, under the stress of action.  Therefore, the DEA belongs at the table.

{00696033-5}

Alternatively, permissive intervention is appropriate under FRCP Rule 24(b) to ensure the fair and efficient resolution of these cases. The DEA should be permitted to contribute to, *inter alia*, the discovery process, the development of evidence, substantive decisions on the proper use of crowd-control techniques, rules of engagement, proper equipment, and the crafting of proposed relief. The DEA's participation herein would not prejudice any existing party. To the contrary, it would ensure the Court receives input from front-line, plain clothes officers cast into untenable circumstances without proper equipment (given that Detectives are not routinely outfitted with tactical, crowd-control gear), and clear direction, only to be presented with violent mobs focused on mayhem and destruction. Permissive intervention is thus appropriate and beneficial to the just resolution of these cases.

Based upon the instant memorandum of law, as well as the Union's submissions in connection with the instant application, this Court should grant the DEA's Motion for Intervention.

## STATEMENT OF FACTS

The facts relevant to this application are set forth in the DiGiacomo Declaration, the Declaration of Stephen Mc Quade, dated March 30, 2022 (hereinafter "Mc Quade Declaration"), the exhibits annexed thereto, as well as all other previous submissions submitted by the Union in connection with the above-captioned matters. (*See* Dkt. 51, 52, 53, and 101).

## ARGUMENT

## POINT I

## INTERVENTION AS OF RIGHT IS
## WARRANTED IN THE INSTANT ACTION

According to the Federal Rules of Civil Procedure (hereinafter "FRCP"): "On a timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated, that disposing of the

3

action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FRCP Rule 24(a)(2).

Under this provision of the FRCP, the Courts have held that intervention is proper if: i) the motion is timely; ii) the proposed intervenor has an interest in the existing litigation; iii) the proposed intervenor's interest would be impaired by the outcome of the litigation; and iv) the proposed intervenor's interest will not be adequately represented by the existing parties. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d. Cir. 2001); *see Long Island Trucking, Inc. v. Brooks Pharmacy*, 219 F.R.D. 53, 55 (E.D.N.Y. 2003) (stating that: "The test is flexible and courts generally look at all of the factors rather than focusing narrowly on any one of the criteria"). Furthermore, this standard has been applied liberally because intervention "serves both efficient resolutions of issues and broadened access to the courts." *U.S. v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002) (holding that by allowing parties with an interest in the outcome of a specific case to intervene, "we often prevent or simplify future litigation involving related issues; at the same time we allow an additional interested party to express its views before the court"); *see generally, In re NYC Policing During Summer 2020 Demonstrations*, at *21

The DEA's motion to intervene meets each of these elements and therefore, should be granted.

### A. Intervention is Timely

The timeliness of a motion to intervene is determined by analyzing:

> (1) how long the applicant had notice of its interest in the action before making its motion; (2) the prejudice to the existing parties resulting from this delay; (3) the prejudice to the applicant resulting from a denial of the motion; and (4) any unusual circumstances militating in favor of or against intervention.

4

*In re Holocaust Victim Assets Litigation*, 225 F.3d 191, 198 (2d Cir. 2000). Additionally, in applying these factors, the Courts have "broad discretion in assessing the timeliness of a motion to intervene, which defies precise definition." *U.S. v. Pitney Bowes*, 25 F.3d 66, 70 (2d Cir. 1994); *see Farmland Dairies v. Comm. of New York State Dept. of Agriculture and Markets*, 847 F.2d 1038, 1044 (2d Cir. 1998) (holding that the timeliness of a motion to intervene "must be evaluated against the totality of the circumstances before the court").

Further, in analyzing the timeliness of the PBA's current motion to intervene that was granted by the Second Circuit, the PBA satisfied the above-stated 4-prong standard. In fact, the Second Circuit distinguished the PBA's current motion to intervene with a similar motion by the same party in the stop-and-frisk litigation. *See generally, Floyd v. City of New York*, 302 F.R.D. 69 (S.D.N.Y. 2014) (*affd.* 770 F.3d 1051 (2d Cir. 2014). In the Appellate Opinion, the Second Circuit stated that "we faulted the police unions for failing to move to intervene *before* the parties agreed to the remedial order that settled the litigation . . . because the full scope of these cases and the potential reform measures were readily apparent from years of extensive public filings and intense media scrutiny." *In re NYC Policing During Summer 2020 Demonstrations*, at *17 (emphasis in original). As such, the timeliness issue that plagued the PBA's previous motion to intervene in *Floyd* is not present herein.

In the instant matter, the DEA has undoubtedly satisfied this prong of the intervention as of right standard. The Appellate Opinion was issued on March 4, 2022, and the Union is filing the instant application with the Court less than one month later. In addition, since the issuance of the Appellate Opinion, the Union attempted to stipulate with Plaintiffs and Defendants to permit intervention to the DEA based upon the recent decision by the Second Circuit. Moreover, the parties have acted as though the intervention of the DEA is a *fait accompli* referencing that the

5

"analysis set forth in the Second Circuit decision would apply to the SBA and DEA," while noting

no objection to any potential prejudice they would suffer as a result of the DEA being granted

intervention. (*See* Dkt. 448).[2]  Accordingly, the Union has satisfied this element in favor of

intervention.

### B.  The Union's Interests Are Direct, Substantial, and Legally Protectable

Motions for intervention are fact sensitive, and do not fit neatly into previous precedential

compartments.  The interests at issue that necessitate intervention must be "direct, substantial, and

legally protectable" in order for the Court to permit intervention.  *Brennan v. New York City Bd.*

*of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001).  To satisfy this prong of the intervention standard, a

proposed intervenor must demonstrate "an interest relating to the property or transaction which is

the subject of the action," but not an actual property interest.  *Id.*, at 130 (cautioning "against

requiring that a proposed intervenor identify a narrow interest amounting to a legal entitlement").

Further, the Courts, when analyzing an application for intervention, have cautioned that "an

application to intervene cannot be resolved by reference to the ultimate merits of the claims which

the intervenor wishes to assert following intervention."  *Oneida Indian Nation of Wisc. v. State of*

*New York*, 732 F.2d 261, 265 (2d Cir. 1984).

### 1.  Safety Interests

The Second Circuit recently grappled with this very issue concerning whether the PBA had

"a direct substantial, and legally protectable interest" in the above-captioned matters.  *In re NYC*

*Policing During Summer 2020 Demonstrations*, at *12.  The Appellate Opinion stated

unequivocally that the PBA, and by logical extension the similarly-situated union representing

---

[2] It bears mentioning with respect to timeliness, the above-captioned matters were initiated in late 2020/early 2021. Approximately one month later, the DEA filed its original motion to intervene. (*See* Dkt. 51, 52, and 53).  Given these temporal circumstances, neither Plaintiff nor Defendants may claim delay or prejudice.  Finally, intervention now wisely maximizes the input the DEA can have in working to a constructive result in this difficult case.

Detectives, had "a protectable interest in the continuation or alteration of policies that are alleged to be unlawful – and therefore it has such an interest in the outcome of the litigation at issue here." *Id.*, at \*14 (stating conversely that the PBA did not have "a protectable interest in acting unlawfully"). Ultimately, the Second Circuit found that "the record in this case more clearly shows that changes to policies affecting interactions between officers and protesters may affect officer safety," as highlighted by the evidence introduced by the PBA of its members suffering injuries during interactions with protesters because of policies governing the rules of engagement with protesters and the equipment, or lack thereof, issued to officers.[3] *Id.*, at \*16.

Significantly, the Second Circuit also distinguished the PBA's application for intervention in the above-captioned matters from its similar motion in the *Floyd* case. The Appellate Opinion stated that it denied said application because "we noted that there was no evidence in the record showing that the union members' careers had been tarnished, that their safety was in jeopardy, or that they had been adversely affected in any tangible way." *Id.* (*quoting Floyd*, at 1061). In contrast, given that Plaintiffs are seeking "to change policies to be more protective of the protesters and correspondingly less focused on the safety interest of the front-line officers," the PBA was asserting a safety interest that "mirrored" the claims that permitted intervention in the *Brennan* case. *Id.* (*citing Brennan*, at 130). As such, the PBA was entitled to participate in the merits stage of the instant matters because that is when the court must determine the issue that affects the PBA's interest—*i.e.*, "whether certain NYPD policies are permissible." *Id.* at \*5.

In the instant matter, the Union has submitted sufficient evidence demonstrating that the DEA and its members have a direct, substantial, and legally protectable interest in the instant matters. As detailed in the DiGiacomo Declaration, DEA members were subjected to physical

---

[3] It bears repeating that Detectives are typically in plain clothes and are not outfitted with standard tactical, crowd-control equipment. They normally only have their ballistic vests.

{00696033-5}

assaults that resulted in a number of injuries, when they were stationed at the protests that gave rise to the instant matters. On several instances, Detectives were beaten with baseball bats, pipes, 2X4's, metal barriers, and Citi Bikes. (*See* DiGiacomo Declaration ¶¶ 17-40). Additionally, these assaults occurred while the Detectives were dutifully complying with the orders of their superior officers, some of which are Defendants herein, and were attempting to protect the life, safety, and property of the citizenry of the City. (*See* id.). Moreover, the NYPD failed to properly outfit Detectives, who are typically in plain clothes, with protective equipment, such as helmets, shields, and shin/forearm guards, to safely conduct the assignments that they had been given.[4] (*See* id.).

Further, the Detectives referenced herein were grossly outmanned by the riotous mobs, whose sole purpose was not to peacefully demonstrate but rather to engage in criminal activity and inflict maximum amount of physical injury and property damage. The orders received from the NYPD by the Detectives in connection with these deplorable incidents were inconsistent at best, placed them at a strategic disadvantage, and forced them into increasingly difficult and dangerous encounters with the "protesters." Most importantly, Detectives were often forced into a Hobsian dilemma of either complying with the commands of the Department and stop criminal activity or protect their own lives. And because of the catch-22, Detectives, as a result of these unprovoked attacks, suffered injuries to their heads, necks, shoulders, torsos, biceps, and knees necessitating surgical intervention and installation of anchors and other medical instrumentation, and permanently affected their physical health going forward. (*See* id.).

As expressly stated in the Appellate Opinion, the Second Circuit recognized the above-stated interests as sufficient to satisfy this prong of the intervention standard, and the DEA presents

---

[4] It bears repeating that Detectives are generally in plain clothes and not in traditional police uniform. As such, they routinely do not have any body armor, ballistic helmets, or crowd-control shields. Rather, at most, they simply have their ballistic vests.

{00696033-5}

the "mirror image" of the interests articulated in the PBA's motion to intervene.  *In re NYC Policing During Summer 2020 Demonstrations*, at *16,  Based upon the foregoing, the DEA is entitled to an opportunity to defend the legality of the challenged actions and practices, as alleged by Plaintiffs, and to contribute to the determination of any necessary reforms related to the underlying subject matters at issue herein.

           2.  <u>Statutory Interests</u>

By examining the perspective of the New York City Collective Bargaining Law (New York City Administrative Code, Title 12, Chapter 3) (hereinafter "NYCCBL") and the case law interpreting the same by the New York City Board of Collective Bargaining (hereinafter "BCB" or "Board"), it is demonstrable that the resolution of the instant matter could infringe upon the statutory rights of the DEA members, thereby necessitating the need for intervention at this time.

NYCCBL § 12-307(b) requires that public sector employers and public sector unions negotiate over issues affecting, *inter alia*, the practical impact on safety.  *See* NYCCBL § 12-307(b) (stating that "questions concerning the practical impact that decisions on the above matters have on terms and conditions of employment, including, but not limited to, questions of workload, staffing and employee safety, are within the scope of collective bargaining").  Coalescing the prohibitions contained in NYCCBL § 12-306(a)(4), which make it an improper practice for failing to negotiate in good faith regarding mandatory subjects of bargaining, along with the mandates contained in the latter portion of NYCCBL § 12-307(b), it is obvious that a public employer may run afoul of its duty to bargain in good faith if the public employer fails to negotiate in good faith concerning a topic that has a practical impact on safety.  *See, e.g., Unif. Firefighters Assn.*, 3 OCB2d 16, at 35-36 (finding that the non-mandatory subject of bargaining dealing with the assignment of Firefighters to asbestos abatement activities at the scene of a steam pipe explosion

had a practical impact of the safety of Firefighters, and therefore required bargaining) (*see* Dkt. 52-6); *Correction Officers Benevolent Assn.*, 49 OCB 40, at 18 (BCB 1992) (*see* Dkt. 52-12); *Unif. Firefighters Assn.*, 49 OCB 39, at 43 (BCB 1992) (finding that the non-mandatory subject of bargaining addressing the assignment of light duty firefighters, who were inadequately trained, created a practical impact on safety, and therefore mandated bargaining) (*see* Dkt. 52-13).

In establishing such a violation, a union "must substantiate with sufficiently specific details . . . the existence of a threat to safety." *EMS Superior Officers Assn.*, 75 OCB 15, at 16 (BCB 2005) (*see* Dkt. 52-14). However, this demonstration does not require a showing of an actual injury because "potential impact arising from exposure to a dangerous condition can be a basis for finding a practical impact on safety." *Unif. Firefighters Assn.*, 3 OCB2d 16, at 30 (*see* Dkt. 52-6); *see also Sergeants Benevolent Assn.*, 23 OCB 6, at 25 (BCB 1979) (stating that "while it would be difficult to foresee every factor relating to safety, it seems proper to require that the parties discuss potentially unsafe conditions") (*see* Dkt. 52-7); *EMS Superior Officers Assn.*, 79 OCB 7, at 31 (BCB 2007) (holding that "the Board does not require a union to show that injuries have actually resulted from management's action in order to demonstrate a practical impact on safety") (*see* Dkt. 52-8). Further, "managerial action (or inaction) may be challenged . . . on the ground that it allegedly has had a practical impact on affected employees' safety." *Unif. Firefighters Assn.*, 43 OCB 70, at 3 (BCB 1989). (*See* Dkt. 52-15).

Building upon the membership safety issues raised above, the outcome of the instant litigation could result in changes to policing practices, as requested by Plaintiffs, and those alterations could have a practical impact on the safety of the DEA's membership. As detailed in the DiGiacomo Declaration, the actions and directions of the NYPD frequently placed DEA members in harm's way, and resolution of the instant matters could mandate what directives are

given to DEA members in the field, which undoubtedly will have a practical impact on the safety of its membership. The BCB case law specifically states that speculative threats to safety can be grounds for finding a violation of § 12-306(a)(4) of the NYCCBL. Further, it is the obligation of the City to negotiate specifically with the DEA to address these issues because the statutory mandates set forth in the NYCCBL run to a specific collective bargaining representative, and not a conglomeration of unions.

Additionally, the interests of the Union would be impinged upon because the City could be placed in a position of shielding the members of the DEA from potential civil litigation, under the common law concept of agency. Recently, this State passed a law that permits a private right of action against a DEA member, if he/she fails to provide medical or psychological aid to an individual in his/her custody. *See* N.Y. Civ. Rights Law § 28. Also, this legislation expressly provides that qualified immunity, as a governmental actor effectuating his/her official duties, is not a defense to said action. Furthermore, there is a local law that affords the public a private right of action against, amongst others, a DEA member who deprives an individual of his/her constitutional right against unreasonable searches and seizures. *See* New York City Local Law 48 of 2021. These new causes of action would require DEA members to retain their own counsel because he/she could not entrust the City or NYPD to effectively represent their interests either during the course of trial or settlement negotiations. Further, the Union, with more than 5,000 members, is incapable of supporting the tsunami of litigation that will arise in the near future. Therefore, protection by the City is not applicable when the government openly encourages the public to sue dedicated uniformed members of service.

Based upon the foregoing, this Court should determine that these statutory interests are sufficient to satisfy this specific prong of the motion for intervention standard.

**C. Only the Union Can Address Personal Safety and Statutory Impairments**

The inadequacy of representation requirement of Rule 24(a) "is satisfied if the applicant shows that representation of his interest may be inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). The question is whether an existing party has interests that are "so similar to those of [the proposed intervenor] that adequacy of representation [is] assured." *Brennan*, at 132-33. A proposed intervenor is inadequately represented in a case when it may make "a more vigorous presentation" on a relevant issue than the existing parties would be incentivized to make. *N.Y. Pub. Interest Rsch. Grp. v. Regents*, 516 F.2d 350, 352 (2d Cir. 1975).

Further, when ascertaining whether a protectable interest will be impaired by the pending litigation for the purposes of deciding a motion to intervene, the protection and enforcement of member safety and statutory rights satisfies the third element of the four-part standard. *See EEOC v. AT&T*, 506 F.2d 735, 741-742 (3d Cir. 1974) (finding that a consent decree that impairs "existing employment practices" meets this prong of the intervention standard). Further, when the resolution of pending litigation empowers the court or its agent to unilaterally override collective bargaining rights, then the impairment element has been met. *See U.S.*, at 401 (permitting intervention of a union's challenge to a consent decree because said decree, "by its terms purports to give the district court the power, on the City's request, to override the Police League's bargaining rights under California law and require the City to implement disputed provisions of the consent decree").

As demonstrated above, the DEA has demonstrated that the member safety and statutory interests set forth could be impaired depending on the resolution of the instant matters. It is the obligation of the DEA to ensure that the safety of its membership be held in the highest regard, and that the NYPD policies and procedures governing responses to protests, demonstrations, riots,

and other crowd-control operations do not unduly place Detectives in harms' way or somehow hamper their ability to protect the persons and property of the City.  It is also the statutory duty of the DEA to ensure that the integrity of the Union members' rights under NYCCBL are not modified and/or invalidated.  The DEA is the only entity that is uniquely qualified to rise to the challenge and meet these obligations.

*Nunez v. City of New York*, 11-CV-5845 (LTS) (JCF) (hereinafter "*Nunez*"), starkly illustrates how the safety interests and statutory rights of a union's membership are impaired as a result of litigation to which it was not a party.  In *Nunez*, a group of inmates filed a civil rights action against the City, as well as the New York City Department of Correction (hereinafter "DOC").  In litigation that spanned five years and which is still subject to the Court's overview, as well as a federal monitor, a Consent Judgment was entered that contained an extensive reworking of the use of force policy utilized by the DOC. (Dkt. 52-3).  As set forth in its 65 pages, the Consent Judgment permanently altered the manner in which DOC employees handle uses of force incidents and address training, staffing, and recordation. (Id.).  Further, it outlined acceptable and unacceptable use of force tactics, set forth disciplinary penalties for those DOC employees who are found to have violated the DOC's new, *Nunez*-compliant use of force policy, and created new predicates for discipline.  *Nunez* also micromanaged the duties of DOC employees when confronted with anticipated and/or actual use of force incidents. (Id.).

All of the above-described aspects of the Consent Judgment have hampered the abilities of DOC employees to confront violent threats from dangerous individuals, and have eviscerated several aspects of the unions' respective collective bargaining agreements. (Dkt. 52-3).  Worse, the unions are locked into a destructive conundrum, not having intervened and having no input at the Court level. (Id.).  As such, the members of the three DOC unions who are most greatly

13

affected by the Consent Judgment in *Nunez* face constant scrutiny from the DOC in the form of increased disciplinary penalties; face unending criticism from the federal monitor who receives no input on the operational findings and recommendations he makes; and face increased inmate violence due to their inability to properly and lawfully restrain bad actors in the DOC facilities due to a lack of consequences for these felonious inmates. (Id.). The perpetual, operational disaster occurring as a result of *Nunez* serves as a grim harbinger of the possible outcome in the above-captioned matters, and further highlights the increased danger to the personal safety of hard working civil servants, when the unions representing them are not permitted to adequately represent the memberships' interests.

### D.  No Other Party Can Represent the Union or its Members

"The determination as to adequacy of representation lies within the discretion of the court." *Madison Stock Transfer, Inc. v. Netco Investments, Inc.*, 2007 WL 2902960, *1 (E.D.N.Y. September 27, 2007); *see Rios v. Enterprise Association Steamfitters Local Union 638*, 520 F.2d 352, 355 (2d Cir. 1974) (holding that a determination of "the adequacy of existing representation necessarily involves an assessment of factors which are within the discretion of the district court"). These factors include whether the interest of an existing party is such that it will make the same arguments of the proposed intervenor; whether and existing party is capable and willing to make such arguments; and whether the proposed intervenor would offer any necessary elements to the litigation that other parties would neglect. *See Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 838 (9th Cir. 1996).

Here, the reasons why the existing parties cannot adequately represent the interests of the DEA are legion.  Plaintiffs herein seek to demonize the actions that the Union's members took during a tumultuous time and during emotionally-heated protests that often were expressly directed

14

against the uniformed members of the NYPD. Defendants herein cannot adequately represent the above-described interests of the Union because they, in other situations, take positions that are anathema to those interests. The City, through the New York City Office of Labor Relations (hereinafter "OLR"), seeks to impinge upon the statutory rights of the DEA and its members and to claw back the benefits the DEA has attained through collective bargaining. OLR often takes the position that the City possesses unfettered rights under NYCCBL § 12-307(b) that concessions are required in order for the hard working members of the DEA to achieve modest economic and operational gains at the negotiation table. Therefore, the DEA certainly cannot rely on the City to protect and enforce the integrity of the statutory rights of DEA members and the benefits they enjoy, given that OLR is dedicated to diminishing those rights and benefits.

Further, the interests of the DEA cannot be adequately represented by Defendants because there is an inherent conflict of interests between the NYPD and DEA. *See In re NYC Policing During Summer 2020 Demonstrations*, at *18. As briefly discussed above, the Police Commissioner is the final adjudicator of discipline against DEA members. As such, she cannot be expected to advance arguments in the instant matters that would protect DEA members who could face discipline as a result of the outcome herein. Similarly, the members of the DEA may face external investigations that are conducted by the New York City Civilian Complaint Review Board (hereinafter "CCRB"), which is a statutorily-created extension of the City, whose sole purpose is to investigate complaints made by members of the public, draft reports and conduct hearings related thereto, and to provide the Police Commissioner with disciplinary recommendations. Once again, the City, through the collaboration between the NYPD and CCRB, serves in the role of "prosecution" while members of the DEA stand as the "accused."

15

Significantly, as recently as earlier this month, the CCRB publicized that it had substantiated 187 disciplinary charges against 104 members of the NYPD, Detectives included, and are awaiting final dispositions from the Police Commissioner.  (Police watchdog found 104 officers guilty of misconduct during 2020 protests, but few faced discipline - Gothamist (last visited on March 25, 2022)).  Additionally, as detailed in the DiGiacomo Declaration, there are dozens of DEA members who have already been questioned/investigated concerning allegations of misconduct that the CCRB is still processing, so the numbers contained in the CCRB's latest public reporting are sure to rise.  As such, the City is/will be an adverse party to the DEA and its members in these scenarios; and therefore the City and its respective interests certainly would not be aligned with the interests of the Union or its membership.  The City will not make the same arguments in this litigation which the DEA can and will.

Additionally, the personal safety and statutory interests of DEA members cannot be adequately represented by the PBA and/or SBA.  First, Detectives, unlike Police Officers and Sergeants, are routinely assigned in plain clothes and do not have tactical gear, such as helmets, batons, shields, and forearm/shin guards; at most, Detectives have their ballistic vests.  Arguably, the injuries suffered by Detectives M.S., L.D., and J.N. could have been less severe if they had been outfitted with the protective equipment provided to PBA and SBA members.  (*See* Mc Quade Declaration, Ex. 1 ¶¶ 21-41).  Second, Detectives, when assigned to crowd-control details, such as protests, demonstrations, and parades, are assigned significantly different tasks then that of Police Officers and Sergeants.  Typically, Detectives are ordered to observe/report on criminal activity, effectuate lawful arrests, prevent any terroristic threat that may be present, and engage in any undercover operations; they also typically travel to these locations in unmarked NYPD vehicles.  (*See* id.).  These types of tasks and responsibilities are innate in the NYPD units to which

16

Detectives are assigned, such as Narcotics Division, Vice Enforcement Division, Gun Violence Suppression Division, the Intelligence Bureau, and the Criminal Enterprise Investigative Unit. (*See* id. ¶¶ 12, 22, 36). Third, with respect to the SBA, Detectives do not generally possess the operational discretion referenced in the SBA's application for intervention. (*See* Dkt. 468). Instead, Detectives receive and must comply with all lawful orders from their superior officers, including by not limited to Sergeants.

Fourth, under the NYCCBL, the statutory rights of Detectives run exclusively to the DEA, as the certified bargaining representative of this NYPD rank. The failure of a public sector employer to negotiate with a public sector union regarding mandatory subjects of bargaining, as well as topics involving a practical impact on safety, as codified under NYCCBL §§ 12-306(a)(4) and 12-307(b), are claims that only the specific public sector union can bring on behalf of its members as an improper practice before the New York City Board of Collective Bargaining. Another public sector union lacks standing to allege such violations of the NYCCBL on behalf of another public sector union's members. Fifth, the collective bargaining agreement by and between the City, on behalf of the NYPD, and DEA, varies from those agreements the City, on behalf of the NYPD, has with the PBA and SBA. (*See* Mc Quade Declaration, Ex. 2). The changes sought by Plaintiffs herein could have a disparate effect on the statutory and contractual rights of DEA members, as opposed to these same rights of PBA and SBA members because these agreements are not identical and the bargaining history regarding the same vary greatly. (*See* id.).

Therefore, based upon the factual distinctions between the personal safety, operational, and tactical differences between Detectives, in contrast with those of Police Officers and Sergeants, the PBA and/or SBA cannot adequately represent the interests of the DEA in the above-captioned matters. Further, the statutory and contractual rights of Detectives place the DEA in the best

{00696033-5}

position to zealously advocate for its membership, their statutory rights under the NYCCBL, and their collective bargaining agreement.[5]   Accordingly, this Court should determine that Defendants, can adequately represent the interests of Detectives, as there exists an inherent conflict between Defendants and the DEA in the instant matter.  *See In re NYC Policing During Summer 2020 Demonstrations*, at *8 (finding: "We observed in *Floyd* that it was not evident that the City 'ever' adequately protected the interests of NYPD officers").  This Court should also determine that neither the PBA nor SBA can provide adequate representation concerning the personal safety and statutory rights of the DEA's membership.  Finally, because the Union has met all of the relevant criteria under FRCP Rule 24(a), this Court should grant the motion to intervene submitted by the DEA.

## POINT II

### PERMISSIVE INTERVENTION OF THE
### DEA IS ALSO APPROPRIATE IN THE INSTANT MATTER

In addition to the above "as-of-right" manner in which a party may enter a pending litigation as an intervenor, the FRCP also provides: "On timely motion, the court may permit anyone to intervene who: . . . has a claim or defense that shares with the main action a common question of law or fact."  FRCP Rule 24(b)(1)(B).  Further: "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  FRCP Rule 24(b)(3).

The Courts have indicated that the satisfaction of this rule is not a high burden to meet, and that the prospective intervenor need only establish that he/she/it has a sufficient stake in the outcome of the litigation to satisfy the ordinary requirements for standing.  *See H.L. Hayden Co.*

---

[5] It is important to stress that nothing contained herein is meant to disparage or besmirch the respective counsel of the PBA and SBA, as both unions are represented by exemplary attorneys, rather the DEA is simply highlighting the need for the Union to protect its own members.

*of New York v. Siemens Medical Sys., Inc.*, 797 F2d 85, 89 (2d Cir. 1986) (holding that district courts have very broad discretion is granting permissive intervention).   Moreover, when determining the issue of permissive intervention, the main consideration for the court is whether intervention will unduly delay or prejudice the adjudication of the original action. *See Brennan*, at 191. The Courts will also look to other relevant factors, such as:

> [T]he nature and extent of the intervenors' interest, the degree to which those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.

*H.L. Hayden Co. of New York*, at 89 (*quoting Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977) (internal quotation marks omitted)); *see also United States v. N.Y.C. Hous. Auth.*, 326 F.R.D. 411, 419 (S.D.N.Y. 2018) (holding that permissive intervention provides the court "with a fuller picture to evaluate the fairness, reasonableness, and equities" of proposed reforms).

In the instant matter, the DEA should be permitted entry for the multitude of reasons set forth above. The DEA is the legal, authorized representative of its members whose personal safety, operational requirements, and contractual/statutory rights clearly established a stake in the outcome of the above-captioned matters.   No delay or prejudice exists in the Union's early intervention as teed-up by the Second Circuit.   The interests of the Union and its members are substantial and in imminent danger of impairment; and no existing party, Plaintiffs, Defendants, or the PBA, can be reasonably viewed as representing the interests of the DEA and its membership. These factors alone would warrant permissive intervention, but there is more.

Concerning the concept of permissive intervention, the DEA will certainly contribute significantly to the full development of the underlying factual issues, as well as a just and equitable

{00696033-5}

adjudication of the instant matters. The Union's members, especially the ones who were present during and suffered injuries at the various protests that gave rise to Plaintiffs' claims, can provide context and insight into these events, as well as the day-to-day implementation of the policies and procedures of the NYPD which Plaintiffs wants to change. Further, permissive intervention is appropriate herein because the Union's instant application satisfies the underlying principles of intervention, which are "efficient resolutions of issues and broadened access to the courts." *U.S.*, at 398.

As detailed in the submissions of the DEA herein, the granting of the Union's latest motion to intervene can only benefit this Court in its analysis of the claims raised by Plaintiffs and the defenses asserted by Defendants. Furthermore, this Court will undoubtedly benefit from the insight obtained from the Detectives who were present during these incidents that gave rise to the above-captioned matters. The Union and its members will be able to expand upon the compromised safety issues that were suffered by all who were present during these protests, give insight to the manner in which all acted during these incidents, and the directives given by the NYPD related thereto. Therefore, in order for this Court to equitably adjudicate the above-captioned matters, the DEA should be granted the right to participate herein, so that the Court may provide an appropriate resolution.

Based upon the foregoing reasons, the DEA should be allowed to participate in the above-captioned matter on the ground of permissive intervention because the Union has satisfied the statutory criterion set forth in FRCP Rule 24(b) and the judicial precedent in the above-cited case law.

### CONCLUSION

WHEREFORE, the DEA respectfully requests that the instant motion to intervene, dated March 30, 2022, be granted finding that intervention of the Union as of right is appropriate under FRCP Rule 24(a), or in the alternative, finding that permissive intervention of the Union is appropriate under FRCP Rule 24(b), as well as such other and further relief as this Court finds just and proper.

Dated: New York, New York
      March 30, 2022

**PITTA LLP**

By: _____
     Stephen Mc Quade, Esq.
     Vincent F. Pitta, Esq.
     Attorneys for Proposed Intervenor
     *Detectives Endowment Association*
     120 Broadway, 28th Floor
     New York, New York 10271
     (212) 652-3885
     smcquade@pittalaw.com
     vpitta@pittalaw.com

{00696033-5}