`

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In Re: New York City Policing During Summer 2020
Demonstrations

------------------------------------------------------------x
This filing is specifically related to:

*Payne v. de Blasio, et al.*                          Civil Action No.:
                                                      20-CV-8924 (CM) (GWG)

------------------------------------------------------------x

*Sierra v. City of New York, et al.*                  Civil Action No.:
                                                      20-CV-10291 (CM) (GWG)

------------------------------------------------------------x

*People v. City of New York, et al.*                  Civil Action No.:
                                                      21-CV-0322 (CM) (GWG)

------------------------------------------------------------x

*Sow v. City of New York, et al.*                     Civil Action No.:
                                                      21-CV-0533 (CM) (GWG)

------------------------------------------------------------x

## PROPOSED INTERVENOR DECLARATION IN SUPPORT

**PAUL DIGIACOMO**, being duly sworn, declares, pursuant to 28 U.S.C. §1746, under

the penalty of perjury, that the following is true and correct:

    1.    I am the President of the Detectives' Endowment Association (hereinafter "DEA"

or "Union"), the Proposed Intervenor in the above-captioned matters, and have served in this

position since January 24, 2020.

    2.    I am also a full-time detective with the New York City Police Department

(hereinafter "NYPD") and have been employed as a uniformed NYPD employee for the past 39

years.

    3.    I was originally hired as a Housing Police Officer in July 1983, was promoted to

Detective Investigator in the Brooklyn South Narcotics Division on July 29, 1994, and was

{00695990-4}

subsequently promoted to Detective 2nd Grade assigned to the High Intensity Drug Trafficking Area Regional Task Force on December 24, 2001.

4.      Based upon the foregoing, as well as my review of the submissions in connection with the instant matters, I have personal knowledge of the facts contained herein, and make this Declaration in support of the DEA's motion to intervene in the above-captioned matters.

5.      The DEA is a certified and recognized public employee organization, pursuant to the New York City Collective Bargaining Law (New York City Administrative Code, Title 12, Chapter 3) (hereinafter "NYCCBL") representing employees within the rank of Detective employed by the NYPD.

6.      Currently, there are approximately 5,200 Detectives in the NYPD, which is a significant decrease in headcount in comparison to the over 7,200 Detectives on the job on September 11, 2001.

7.      As the following declaration will detail, I believe that intervention of the DEA in the instant matters is appropriate and will serve to benefit the Court as this litigation unfolds, given that the DEA's membership, will have unique, first-hand insight into the matters complained of in these actions.

8.      As will additionally be explained below, the DEA's participation herein will provide the Union the sole effective avenue to ensure that its members' rights and interests are protected from any deliberate and/or inadvertent diminishment by the parties hereto.

9.      As will further be explained below, the DEA's participation herein is in accordance with the recent decision from the United States Court of Appeals for the Second Circuit in *In re NYC Policing During Summer 2020 Demonstrations*, Case No. 21-1316 (2d Cir. March 4, 2022) (Dkt. 432).

{00695990-4}

**NYPD Detectives**

10.     Detectives in the NYPD are responsible for performing numerous duties and assignments; it is also the most unique and diverse rank within the NYPD on the bases of race and gender.

11.     The members of the Union constitute the majority of NYPD employees in the Detective and Homicide squads throughout the City investigating all manners of crimes from assaults and robberies to rapes and murders, as well as counter-terrorism operations.

12.     Additionally, Detectives serve in the NYPD's Emergency Service Unit, the Narcotics Division, the Vice Enforcement Division, the Gun Violence Suppression Division, the Intelligence Bureau, and various other critical jobs throughout the NYPD.

13.     What is equally unique to the rank of Detective is that the NYPD routinely takes DEA members in plain-clothes units, such as the ones listed above, and reassigns them to details, such as demonstrations, protests, parades, and other events that draw large crowds.

14.     As part of these details, DEA members typically remain in plain clothes are not outfitted in uniforms, given that Detectives' assignments differ significantly from the rank-and-file, uniformed members of the NYPD, such as observing/reporting of potential criminal activity, addressing/quelling any potential terroristic threat, effectuating lawful arrests, and engaging in any undercover operations.

15.     Many of the above-stated tasks may be performed under perilous conditions, involving armed perpetrators, assailants, and/or suspects in violent crimes.

16.     As such, in order for Detectives to do their job to the best of their respective ability, we must walk a fine line between the safety of ourselves, our families, and our uniformed

brothers and sisters in the NYPD, while tirelessly pursuing justice for the benefit of the victims of horrific crimes, and the public in general.

17.      With specific regard to the incidents that gave rise to the above-captioned matters, the members of the DEA faithfully complied with the orders they were given by the NYPD.

18.      As a result of their actions during these protests, DEA members were subjected to physical assaults that resulted in a number of long lasting physical injuries.

19.      In general, during these protests, members of the DEA had Molotov cocktails thrown at them, as well as marked NYPD vehicles they were occupying.

20.      DEA members were pelted with bricks and bottles while attempting to carry out their obligation to protect and serve the public.

21.      More specific, Detective M.S.,[1] a male DEA member with over 20 years with the NYPD, was assaulted when he confronted rioters and looters breaking into businesses located around Union Square.

22.      Detective M.S., who was normally assigned to the Criminal Enterprise Investigative Unit, was ordered on that day, along with his whole squad, which consisted of about 100 Detectives, to report to NYPD Headquarters, colloquially referred to a "1 PP."

23.      At 1 PP, Detective M.S. was ordered to an area covered by the 13th Precinct to stop "looters," observe/report criminal activity, and effectuate lawful arrests, but he was not

---

[1]      At this stage of the litigation, the Union will be using initials to identify specific DEA members who were brutally assaulted during the protests, demonstrations, and riots that are the center of the above-captioned matter. In the event that the instant motion by the Union is granted, the DEA shall comply with all relevant portions of the Federal Rules of Civil Procedure concerning discovery, as well as all orders and stipulations concerning mandatory disclosures.

{00695990-4}

outfitted with any protective gear to address such mass protests, such as helmets, shields, or shin/forearm guards.[2]

24.    Upon arriving at the scene in an unmarked NYPD vehicle, he attempted to effectuate a lawful arrest of an individual breaking a storefront window, but while this suspect was resisting arrest, Detective M.S. was confronted by a group of rioters armed with baseball bats, 2x4's, and pipes.

25.    He was struck multiple times in the head, neck, and back with such instruments, and had to make the Hobsian choice of either finalizing the arrest of this one individual or protect his own personal safety.

26.    Out of sheer fear for his own life, Detective M.S. released the suspect and began engaging the individuals who were striking him with these blunt-force objects.  During the fracas, the unknown assailants attempted to take Detective M.S.' firearm, radio, and handcuffs, but he was able to fend off his attackers.

27.    As a result of this unprovoked assault, Detective M.S. suffered tears to his left shoulder and bicep, as well as his right bicep; these injuries required multiple surgical procedures necessitating the use of anchors and instrumentation; and still to this day, Detective M.S. does not have full range of motion to his upper extremities.

28.    In another example where the personal safety of DEA members was at risk, Detective L.D. was beaten with a metal barrier used for crowd control.

29.    Detective L.D., who is a female DEA member that has approximately 20 years with the NYPD and is normally assigned to 1 PP, was mobilized and reported to the corner of Chambers and Centre Streets to protect the points of ingress/egress to City Hall.

---

[2]    Detectives are generally a plain clothes unit and traditionally are not outfitted with any type of protective equipment, other than their ballistic vests.

{00695990-4}

30.     While assigned to this location along with 10 other Detectives, Detective L.D. was ordered by a NYPD Chief at approximately 7:30 p.m. to start setting out and locking the metal parade barriers to protect City Hall from an approaching group of "protesters."

31.     In the driving rain that evening, as Detective L.D. positioned these barriers, as per NYPD orders, an individual on a Citi Bike struck her with it from behind.

32.     Then, a group of similar "protesters" began trying to take the metal barrier that Detective L.D. was holding and using the same as a battering ram.

33.     She found herself surrounded by this angry mob who was attempting to crush her with the very barriers designed to ensure the safety of the NYPD employees, as well as any peaceful protesters.

34.     As a result of this unprovoked assault, Detective L.D. suffered a torn rotator cuff in her left shoulder that required surgery that necessitated the breaking of her left clavicle to properly install anchors and instrumentation to secure her muscles and ligaments.

35.     Further, Detective L.D. still suffers from nerve damage to her dominant, left hand and fingers and has undergone countless rounds of physical therapy and cortisone injections.

36.     Additionally, Detective J.N., who has approximately 20 years with the NYPD and has been assigned to the Criminal Enterprise Investigations Unit located in Manhattan, was injured during the protests that serve as the background to the above-captioned matter.

37.     He was called off of his routine assignment to report to 1 PP to "counteract looting" that had accompanied these "protests."

38.     According to Detective J.N., the order he received from the NYPD was to respond and deter any and all criminal activity occurring, but other than that, "there was not much of a plan."

39.     Outfitted with only a ballistic vest and no other protective gear, Detective J.N. encountered an individual leaving a CVS store near the Empire State Building exiting the same from a broken store front window.

40.     When he confronted this individual, the suspect took off and a foot pursuit followed.

41.     He was able to grab the fleeing suspect, but in the course of doing so, he ruptured his MCL, ACL, and meniscus in his left knee.

42.     As a direct result of the actions undertaken by the various, riotous mobs at the protest locations, over 400 DEA members were physically injured.

43.     Moreover, as a result of the protests at issue in the instant matters, over $1 billion worth of property damage occurred.

44.     The directives given to the Union's membership present at these protests by the NYPD placed DEA members in harm's way.

45.     As such, it is imperative that the Court grant the instant motion by the Union, as the participation of the DEA could only assist the Court in fashioning any remedies in the instant matters.

46.     Ill-conceived, ill-informed, and/or misguided remedies imposed upon us could result in injury or death to ourselves, to our brethren/sistren, or the people of the City, as well as harm our respective families.

**DEA's Statutory Rights**

47.     In addition to the operational interests expressed above, the DEA also has contractual and statutory rights that may be adversely affected by the outcome of the above-captioned matters.

48.     The collective bargaining agreement by and between the City and DEA covers the time period from April 1, 2012 to March 31, 2019 (hereinafter "CBA"); further, the City and DEA recently entered into a successor Memorandum of Agreement, dated December 28, 2021, covering the time period from April 1, 2019 to May 31, 2022 (hereinafter "MOA") (collectively, "Agreement").   (*See* Declaration of Stephen Mc Quade, dated March 30, 2022.)[3]

49.     One of the main goals of the DEA, and of me as the President, is to ensure the protection of the constitutional, statutory, contractual, and regulatory rights of Detectives, and only Detectives.[4]

50.     This goal is achieved through various methods, including but not limited to the initiation of administrative actions before the New York City Board of Collective Bargaining (hereinafter "BCB" or "Board"), such as improper practice petitions and scope of bargaining petitions, the filing grievances and arbitrations, and participation in Labor-Management Committee meetings.

51.     With respect to the statutory rights of the DEA's membership that could be infringed upon by the outcome of in the above-captioned matters, the Union is obligated, as the exclusive bargaining representative for Detectives, to ensure that its members have the right to participate or refuse to participate in union activity, as codified in the NYCCBL.

52.     NYCCBL § 12-307(a) provides the City and Union must negotiate over "wages . . ., hours . . ., [and] working conditions."

---

[3]  Hereinafter, the Declaration of Stephen Mc Quade, dated March 30, 2022, shall be referred to as "Mc Quade Declaration"

[4] The DEA is aware that, as result of the recent appellate decision herein, the PBA has been granted intervention. Further, the DEA is aware that the Sergeants Benevolent Association (hereinafter "SBA") will be filing a similar motion for intervention herein.  For the purposes of consistency and ease of reference, the instant declaration will only refer to the application being made by the DEA in connection with the above-captioned matters.

53.     In interpreting this provision, the BCB has held that policies and procedures that are promulgated by the employer that are appurtenant to and/or have an effect upon wages, hours, and working conditions shall be deemed mandatory subjects of bargaining.

54.     Moreover, there is a strong and sweeping public policy that favors collective bargaining in this State.

55.     As explained in the accompanying memorandum of law, resolution in the instant matters will likely impose new processes and procedures upon DEA members, which are mandatory subjects of bargaining.

56.     Furthermore, the DEA, on behalf of Detectives, has an absolute right to negotiate over managerial decisions that have a practical impact on their respective safety, as set forth NYCCBL § 12-307(b).

57.     As a result of the presence of DEA members at the protests that give rise to the instant matters, their respective safety was compromised by some, not all, of the participants there.

58.     There are documented instances of Detectives being assaulted with baseball bats, pipes, metal barriers, and Citi Bikes resulting in long lasting physical injuries requiring surgical interventions. (*See* ¶¶ 17-40)

59.     Even though the NYCCBL and Board precedent does not require the Union to demonstrate actual injury to properly invoke a practical impact on safety claim, the DEA can do so.

60.     As such, this Court should not ignore the dangers and threats to DEA members, nor the injuries they suffered; and accordingly should recognize that the Union and its members have protectable interests in the above-captioned matters.

**No Existing Party Can or Will Protect the Interests of Our Members**

61.     The DEA cannot rely on any existing party to protect Detectives, including the City and/or NYPD, because the Union is in the best position to represent the interests of Detectives.

62.     Moreover, the City and/or NYPD cannot represent our members because they are often in conflict.

63.     The members of the DEA may face external investigations that are conducted by the New York City Civilian Complaint Review Board (hereinafter "CCRB").

64.     The CCRB investigates complaints lodged against DEA members from members of the public at large and, after said investigation, issues a recommended finding and penalty resulting therefrom.

65.     Here again, the CCRB, a statutorily-created extension of the City, that is a named defendant in the above-captioned matters, serves in the role of "prosecution" while members of the DEA stand as the "accused."

66.     As such, the City would be an adverse party to the DEA and its members in these scenarios; and therefore the City and its respective interests certainly would not be aligned with the interests of the Union or its membership.

67.     In fact, I know of dozens of instances where DEA members have been questioned/investigated arising out of the events that gave rise to the above-captioned matters.

68.     Some of these investigations have resulted in the CCRB substantiating disciplinary allegations against DEA members, as detailed in its recent public reporting.  (*See* Police watchdog found 104 officers guilty of misconduct during 2020 protests, but few faced discipline - Gothamist (last visited March 25, 2022)).

{00695990-4}

69.     According to this reporting by the CCRB, it has substantiated 187 disciplinary allegations against 104 uniformed members of service with the NYPD, some of which are members of the DEA, and the ultimate disposition of these cases lie with the Police Commissioner at this time.

70.     Accordingly, it is incongruous that the DEA and its membership could be effectively served by the representation of the City and/or NYPD in the instant matters.[5]

71.     Specifically, in the above-described situations, the City and/or NYPD could not adequately represent and protect the interests of the DEA's membership given the potentially adversarial roles they occupy in different legal forums.

**Additional, New Need for Intervention and Participation**

72.     A further example of divergent interests and the lack of adequate representation arises from the recent spate of legislation designed to impose personal liability in civil actions against DEA members.

73.     Currently, there is a law that affords the public a private right of action against, amongst others, a DEA member who is found to have not administered medical and/or psychological aid to an individual who is in police custody.  *See* N.Y. Civ. Rights Law § 28.

74.     Also, there is a law that affords the public a private right of action against, amongst others, a DEA member who deprives an individual of his/her constitutional right against unreasonable searches and seizures.  *See* New York City Local Law 48 of 2021.

---

[5] Additionally, the PBA, which serves as the certified bargaining representatives of NYPD employees in the rank of Police Officer, and the SBA, which serves as the certified bargaining representatives of NYPD employees in the rank of Sergeant, cannot represent the personal safety and statutory interests of members in a different bargaining unit as spelled out in the NYCCBL, given that the PBA and SBA, respectively, represent different NYPD ranks, possess unique collective bargaining agreements differing from the Agreement, and are generally not in plain clothes.  Further, for the reasons detailed in the accompanying memorandum of law, it is the position of the DEA that the PBA and/or SBA cannot adequately represent the personal safety and statutory interests of Detectives.
{00695990-4}

75.     Due to the combination of these laws, as well as possible other statutorily-imposed mandates, DEA members are constantly exposed to monetary liability due to their countless, regular, and routine interactions with the public on a daily basis.

76.     These interactions could potentially give rise to meritless civil actions against DEA members and would thereby require the retention of private, independent counsel because they could not entrust the City or NYPD to effectively represent their interests either during the course of trial or settlement negotiations.

**Conclusion**

77.     In summary, the Union I lead represents the statutory, contractual, and safety interests of our members, and those interests may be impaired as a result of the instant litigation, and no existing party will adequately protect those imperiled interests.

78.     Therefore, based upon the foregoing, the DEA respectfully requests that the Court grant the instant motion to intervene in the above-captioned matters for the reasons set forth above.

_____
PAUL DIGIACOMO