THE LAW OFFICE OF
# MICHAEL L. SPIEGEL
**48 WALL STREET, SUITE 1100**
**NEW YORK, NEW YORK 10005**
TEL:(212)587-8558          FAX:(888)398-0032

*Of Counsel*
HAMILTON CLARKE LLP

April 14, 2022

**BY ECF**

Hon. Gabriel W. Gorenstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:  *In re: New York City Policing During Summer 2020 Demonstrations*
No. 20-CV-8924 (CM) (GWG)
This Motion Relates to *Sierra v. City*, 20 CV 10291; *Wood v. City,* 20 CV 10541;
*Sow v. City*, 21 CV 533, and *Hernandez v. City*, 21 CV 7406.

Your Honor:

I am counsel for the *Sierra* plaintiffs and I write on behalf of plaintiffs in the *Sierra, Wood, Sow* and *Hernandez* actions to respectfully request that the Court direct the production of body worn camera ("BWC") video materials before the depositions of four bicycle squad supervisory officers involved in policing the June 4, 2020 Mott Haven protest.   Plaintiffs described the requested discovery in detail and sought a meet and confer with defendants on April 4 and April 6, 2022, but received no response.

The undersigned then sent this motion to defendants on April 8, 2022, seeking the BWC video, the Audit Logs, and the Detail Rosters for the approximately fifty officers in the bike squads.   On April 11, 2022, Assistant Corporation Counsel Daniel Braun emailed the undersigned that defendants "will attempt to give [Detail Rosters] Bates Nos."; that with respect to BWC video "to the extent it has not been provided for the bike officers whom defendants can identify, it will be provided pursuant to the deposition protocol"; and that "Defendants will not produce audit trails without good cause."   The Plaintiffs now respectfully request that the Court direct defendants to produce the discovery requested herein one week in advance of the first deposition of the bike squad supervisors (two depositions have been scheduled thus far).

The supervisory officers whose depositions are about to commence were in command of bicycle-mounted officers who were the primary police instrument used to perform the initial seizure of 300 people in Mott Haven.   Plaintiffs have persistently sought, through interrogatories and targeted document requests, to identify the officers and their immediate supervisors and to obtain their BWC video.   Defendants have refused to substantively respond to plaintiffs' October 2021 interrogatory seeking the chain of command of the bike squads, and with respect to documents, have not identified any Detail Rosters by Bates number.   With respect to BWC

Audit Logs, A.C.C. Braun's April 11 email refusing to produce them is in plain defiance of this Court's order that they be produced (*see* transcript of conference with all parties on February 11, 2022, at 37:17-22, 43:6-8).

Faced with this scorched-earth recalcitrance, and considering the time, expense, and judicial resources involved in the persistent litigation of paper discovery, plaintiffs have sought the information through depositions.   At the deposition of a bike officer, we obtained the name of a Sergeant in command of a bike squad.   At the deposition of the Sergeant, Steven Lackos, he produced a "Detail Roster/Assignment Sheet" ("Detail Roster") listing his name as well as the name of his supervising Lieutenant and the 18 officers in his bike squad (attached as Exhibit A). Before the upcoming depositions of the Lieutenants, plaintiffs now seek the Detail Rosters listing the names of the other 30+ officers in the bike squads and their supervisors, the BWC footage from those officers, and the corresponding BWC Audit Logs.   As discussed below, this discovery is critical to the preparation of plaintiffs' cases.

**The Role of the Bike Squads at the Mott Haven Police Operation**

The NYPD's Mott Haven operation was unique among the incidents at issue in these Consolidated Cases because the very highest levels of the NYPD planned the operation in advance and directed it on the ground; because of the number of officers deployed to police the protest; and because of the number of arrests.   Over 600 officers were mobilized in advance to police the Mott Haven event; a dozen Narcotics Unit arrest vans and Corrections Department buses were pre-assigned to the operation; Mobile Field Forces, consisting of upwards of forty officers, were arrayed around the protest before it began; and dozens of officers were pulled from precincts all over the city and sent to the Bronx for the sole purpose of being assigned four or five arrestees per officer for arrest processing.   Approximately 300 people were arrested; it was the largest mass arrest of the summer's protests.

They were directed by no less than *eight* Chiefs who were present and directly involved in effecting the arrests, including Chief of Department Terence Monahan, the Commanding Officer ("C.O.") of Patrol Borough Bronx, the C.O. of the 40th Precinct where the protest took place, and the entire command structure of the Special Operations Bureau, which includes the Strategic Response Group ("SRG") and the Disorder Control Unit ("DCU"), from the Chief of the Special Operations Bureau and his second- and third-in-command, on down to the C.O.'s of SRG and DCU and their Executives, and the C.O.'s of the Bronx and Queens SRG units.   Every police witness who has been asked at deposition about the number of NYPD Chiefs and Executives at the Mott Haven operation has testified that they did not see as many Chiefs and other high-level NYPD Executives at any other protest they were at that summer.

A critical part of the Mott Haven operation involved the use of bicycle-mounted officers to make the initial seizure of the protesters before the 8:00 p.m. curfew.   The protest itself, unlike many of the protests during the summer of 2020, was not a "pop-up" event; it was a traditional protest called by several community-based organizations in the Bronx, and advertised in advance.   It began around 6:30 p.m. with a rally at a plaza at The Hub, a major intersection in

the South Bronx, followed by a peaceful march on major thoroughfares through the Mott Haven neighborhood and stopping to express support for a local business on Willis Avenue.[1]   While the march was on Willis Avenue, the police radio dispatcher asked, "is the group peaceful? disorderly?"   A police official responded, "they're not disorderly yet."   The police estimated 400 marchers at that time, according to the radio traffic.

Until the protest was stopped by the bicycle-mounted officers, there were no arrests, no violence, no property damage, and no confrontations with officers; nor did the police order the marchers to desist or give any other instructions to them – indeed, they mostly kept out of sight.

As the march proceeded south on Willis Avenue, bike units were directed to block the entrance to the Willis Avenue Bridge into Manhattan at East 135th Street.   Other SRG foot-officer units were directed to fall in behind the marchers in order to encircle the protesters on Willis Avenue when they had proceeded beyond East 136th Street toward the bike line at East 135th Street.   It was 7:50 p.m.   (Police radio recorded the order to "block 'em in" at that time.) However, when the line of bike officers blocking the entrance to the bridge became visible to the marchers, they did not advance toward the officers, as the Chiefs expected.   Instead, the march turned east onto East 136th Street, avoiding a confrontation with the police.   Unbeknownst to the protesters, they had just walked out of the first attempt to encircle and arrest them, but were about to walk into the second.

After the march had proceeded about 300 yards down East 136th Street, a squad of bicycle-mounted officers rode down the north sidewalk of the street, passing the front of the march, and setting up a barricade of officers and bicycles at Brook Avenue, preventing anyone from crossing that line.   It was 7:56 p.m., according to the time on a BWC.   There was no egress on either side of the block between Brook Avenue and Brown Place.   As the protesters filed onto that block and stopped, they were followed by approximately sixty SRG foot officers and fifteen NYPD Chiefs, Inspectors and other Executives.   The protesters were held until it was after 8:00 p.m.

The bike officers were on the front line of the violent arrests that followed.   The block between Brown Place and Brook Avenue is a steep hill that slopes down to Brook Avenue; it is a narrow street, with about twenty feet between the cars that were parked on both sides of the street that day.   The bike line was at the bottom of the hill, at Brook Avenue, completely blocking the sidewalks and roadway.   Half-way up the hill toward Brown Place were the NYPD Chiefs and a phalanx of SRG foot officers equipped with pepper spray cannisters the size of fire extinguishers, a "PepperBall gun," and plexiglass shields.   After playing a pro-forma announcement that the curfew was in effect, the Chiefs and SRG foot officers, without warning, advanced down the hill on the trapped protesters.   The crowd was indiscriminately pepper sprayed and people were violently taken to the ground by three to five officers at a time.

---

[1] Attached as Exhibit B are maps of the Mott Haven neighborhood.   The arrows show the route of the march; the X's show the lines of bike officers, and the O's show the position of white-shirted NYPD Executives and approximately 60 SRG foot officers when the arrests of the protesters began.

At the bottom of the hill, the bike officers picked up their bikes and thrust them into the people who were already crushed together by the recoil of the people uphill from them.   The bike officers repeatedly shouted "move back" in unison as they thrust their raised bikes into the people facing them, who could not move back because of the dense crush of people.   Officers began striking the contained people with batons from behind the bicycles, and from on top of parked cars, and indiscriminately pepper sprayed into the crowd.   All of these events will be captured on the BWC's of the front-line officers in the bike squads.

### The Discovery at Issue

Because of the critical role of the bike units in seizing the plaintiffs before the curfew and their role on the front line of the violent arrests on the Brook Avenue side of the "kettle," plaintiffs have made specific, targeted discovery requests concerning the identities of the bike officers and to obtain their BWC video.   For example, plaintiffs have long sought the Detail Rosters for the officers in the bike squads in order to identify them; Exhibit A is the only bike squad Detail Roster plaintiffs have received (if defendants have produced others, they have not been identified by Bates number and plaintiffs have not found them).[2]   Plaintiffs now seek the Detail Rosters for the other bike squads at Mott Haven (presumably two to five documents). The essential first step in obtaining discovery about the bike squads is to know which officers were in them, which should be recorded in the Detail Rosters.[3]

 Plaintiffs have also sought the BWC video and BWC Audit Logs for each of the officers in the bike squads, but have not received them (or if they have been produced, they have not been identified by Bates number).   With respect to the officers listed in the one Detail Roster that we have, Exhibit A, plaintiffs have been able to locate some, but not all, of the BWC video and Audit Logs.   Plaintiffs now seek those BWC videos and Audit Logs and the same materials for the officers in the other bike squads at Mott Haven, in advance of the upcoming depositions of the Lieutenants.   Plaintiffs also respectfully request that defendants be required to produce the materials one week in advance of the first scheduled deposition, so that plaintiffs' counsel have an opportunity to review the video and its documentation before the depositions.[4]

The BWC Audit Logs have already been the subject of a direction from Your Honor to produce them, *supra*.   Plaintiffs need the specific bike squad BWC Audit Logs produced or identified because each log has a record of when the camera was turned on, how long it recorded,

---

[2]  Most recently, plaintiffs wrote defendants on February 23, 2022, requesting production of "[t]he 'Detail Roster/Assignment Sheet' as depicted at DEF_DEP_01602-03 [Exhibit A to this motion] for each bike squad detailed to the June 4, 2020, Mott Haven protest."   No response was ever received.

[3]  In A.C.C. Braun's April 11, 2022, email, he raises the possibility that the bike officers at Mott Haven are not listed in Detail Rosters (the email does not say what the basis is for this suggestion or what inquiries have been made about this).   If defendants claim they cannot identify the officers by Detail Rosters or some other means, then plaintiffs respectfully request that Your Honor direct them to produce Affidavits from the supervisory Sergeants, Lieutenants, and Captain stating what efforts have been made to identify the officers under their command that day, why they have been unsuccessful, and why there is no other way to identify them.

[4]  Plaintiffs recognize that this may necessitate a short postponement of the scheduled April 21, 2022 deposition of Lt. Louis Sojo.

4

and a record of subsequent reviews of the footage.   For example, the Audit Log relating to BWC video taken by P.O. Louis Delia, who is listed in Exhibit A, revealed that the video footage that had been produced started 14 minutes after the Audit Log showed the camera was turned on. Plaintiffs need the Audit Logs because they provide some assurance that the video that is produced is the complete video that was taken at the scene (or not, as in the case of officer Delia).   For five of the officers listed in Exhibit A, plaintiffs could not locate any Audit Logs (nor BWC footage).   It should exist, since in the circumstances at issue here, NYPD Patrol Guide Procedure No: 212-123, "Use of Body-Worn Cameras," clearly requires activation of the camera and the creation of an Audit Log.

This discovery should be produced before the depositions because the BWC footage is certainly likely to show the supervisory Lieutenants who are about to be deposed, the orders they gave to the bike squads, and how those orders were carried out.   The BWC audio will potentially pick up orders given in-person and over the radio – including the orders given to bike squad supervisors by NYPD Chiefs ("it was the Chiefs . . . who made the decision as to where the bikes were formed," according to A.C.C. Braun's April 11, 2022 email).   The bike squads moved as units, so BWC footage will show the activities of the entire unit and its supervisors. All of the footage should be produced in advance of the supervisory depositions because different cameras started recording at different times, depending upon when the individual officer turned on the camera.   Different cameras picked up different audio, depending on where the camera's microphone was in relation to the sound source.   Also, the bike units at Mott Haven operated in at least two teams, and perhaps more, so that receipt of all of the bike officer BWC footage is necessary to determine which units and supervisors did what, gave what orders, and carried out what orders from the Chiefs.   It will also contain front-line images of the assault on the trapped protesters at the Brook Avenue side of the encirclement.

For the foregoing reasons, plaintiffs respectfully request that defendants be directed to produce the Detail Rosters for all of the bike squads at the Mott Haven police operation, and if all bicycle-mounted officers are not named in the produced Detail Rosters, to provide the names of the other officers; all BWC footage; and all BWC Audit Logs; all to be produced one week before the deposition of the first Mott Haven bike squad supervisory officer.   If defendants cannot identify the officers, plaintiffs request that Your Honor direct them to produce Affidavits from the supervisory officers concerning their inability to identify the officers under their command.

If defendants claim that a Detail Roster, BWC video, or Audit Log does not exist for any bicycle-mounted officer at Mott Haven, plaintiffs respectfully request that defendants be required to produce an Affidavit from a person with personal knowledge explaining why they don't exist.

Respectfully submitted,

s/

Michael L. Spiegel

5