THE LAW OFFICE OF
# MICHAEL L. SPIEGEL
48 WALL STREET, SUITE 1100
NEW YORK, NEW YORK 10005
TEL:(212)587-8558      FAX:(888)398-0032

*Of Counsel*
HAMILTON CLARKE LLP

April 14, 2022

**BY ECF**
Hon. Gabriel W. Gorenstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *In re: New York City Policing During Summer 2020 Demonstrations*
     No. 20-CV-8924 (CM) (GWG)
     This Motion Relates to All Cases

Your Honor:

  I am counsel for the *Sierra* plaintiffs and write on behalf of all plaintiffs in these consolidated actions to respectfully request that the Court direct the appearance of NYPD Deputy Chief Gerard Dowling for additional fact deposition testimony because "additional time . . . [is] needed to fairly examine the deponent" and because "the deponent, another person, or any other circumstance impede[d] or delay[ed] the examination." Fed. R. Civ. P. 30(d)(1). The parties met and conferred regarding the substance of this application at the conclusion of Deputy Chief Dowling's deposition, attached as Exhibit A, at 281:4-286:6, and arrived at an impasse.

**The Deponent**

  Deponent Deputy Chief Gerard Dowling was the second-in-command of the NYPD Strategic Response Group ("SRG") during the racial justice protests of 2020-2021 (the "Protests").[1] SRG officers are the "shock troops" of NYPD protest policing – members of a specially equipped and trained paramilitary unit. SRG is able to mobilize bicycle-mounted squads that can rapidly maneuver in city streets to channel, block, or contain protesters. Foot officers operate in units transported in vans to conduct crowd control operations and mass arrests of protesters. They are regularly trained in coordinated crowd control techniques and formations, including "encirclement." They are equipped with extra-strength small-fire-extinguisher-size cannisters of oleoresin capsicum (OC) spray, "PepperBall guns," plexiglass shields, specialized body armor, and other crowd control equipment. SRG also contains a Disorder Control Unit ("DCU"), which operates Long Range Acoustical Devices ("LRADs") and trains regular patrol officers who may be called upon, as they were during the Protests, to form into Mobile Field

---

[1] Dowling held the rank of Inspector and was the Executive Officer of the Strategic Response Group until he was promoted to Deputy Chief and re-assigned to the Internal Affairs Bureau in October 2021.

Forces that enhance crowd control capabilities.

On February 8, just days before Dowling's deposition, defendants provided a list of the Protests where he recalled being present. Dowling listed *forty* such protests, nearly half of all protests at issue in these Consolidated Cases.

**The First Day of Fact Deposition Testimony**[2]

Molly Biklen, Esq., of the New York Civil Liberties Union Foundation and counsel in the *Payne* case, conducted the deposition on February 11, 2022. Plaintiffs' counsel worked together leading up to the deposition to coordinate questioning and avoid duplicative efforts, including reviewing Ms. Biklen's outline, suggesting questions during the deposition, and coordinating exhibits. Although Ms. Biklen was designated to lead off the deposition, other counsel intended to pose non-duplicative questions to Dowling about matters relevant to their own cases. However, despite Ms. Biklen's best efforts, no other attorneys who wished to question Dowling were able to do so before nearly seven hours of testimony had expired.

Deputy Chief Dowling was the first high-ranking SRG officer to be deposed in this litigation; consequently, a certain amount of questioning was necessarily foundational. Ms. Biklen introduced twenty exhibits, including many videos. Dowling repeatedly requested and required video footage to refresh his recollection of events. Ex. A at 81:14-19; 135:14-19; 136:5-137:9; 137:23-138:2; 140:3-10; 145:14-18; 146:13-16; 148:18-149:20; 157:25-158:8; 161:6-13; 162:22-163:19; 164:11-15; 165:7-22; 166:7-167:24; 173:4-13; 176:6-10; 178:2-5; 186:13-15; 192:24-194:3; 227:24-228:3; 233:16-234:2; 246:5-9; 257:23-258:11; 274:25-276:8; 279:25-280:19. Plaintiffs' available time to ask other questions was constrained by the need to repeatedly refreshing the witness's recollection with video.

Some unavoidable delay was caused by technical difficulties concerning the witness's ability to view exhibits over Zoom. Ex. A at 43:22-44:25; 104:9-107:12; 158:6-19; 232:5-15; 259:6-10.

Time was also spent resolving defense counsel's instruction to Dowling not to answer questions concerning three open CCRB investigations arising from his role in policing the Protests. The parties eventually agreed to stipulate to his return in March to answer questions about the CCRB investigations. When defendants' counsel explained the stipulation to Dowling, "I made that agreement, Chief. You are coming back in March," he responded, "Why not?"[3] Ex. A at 19:24-22:6, 117:16-118:18. When Ms. Biklen ended her questioning that day, she reserved the 15 minutes she had left (defendants' counsel calculated 11 minutes) to ask about the open

---

[2] Dowling was also designated by the City as a 30(b)(6) witness on certain subjects; that deposition took place on February 10, 2022. This motion concerns Dowling's single day of fact deposition on February 11, totaling less than seven hours of testimony. "For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition." Committee Notes to 2000 Amendments to Fed. R. Civ. P. 30.

[3] The deposition was conveniently conducted remotely, allowing Dowling to testify via Zoom from his desk in his own office. The same convenience will be afforded if his deposition is continued.

CCRB investigations. She also proposed that, "given the number of protests that he was at and the number of cases involved here, I think additional time is reasonable." Other counsel joined in the request for additional time on the record. Defense counsel refused: "[W]e object to keeping the deposition open. We're done, Chief." Ex. A at 281:4-286:6.

**The Need for Further Testimony**

Deputy Chief Dowling is a key witness whose additional testimony is essential. He was personally present—in a leadership role—at 40 protests that are at issue in these consolidated cases. If counsel spent all seven hours only asking questions about those protests, they would have ten-and-a-half minutes per protest—with no time for questions about SRG, Dowling's training and experience, or any other topic. Given "the sheer volume of relevant information possessed by [this] single witness," more time is appropriate. *City of Almaty v. Ablyazov*, No. 15 Civ. 5345(AJN)(KHP), 2017 WL 9771809 at *4 (S.D.N.Y. July 28, 2017). Deposition time greater than seven hours is particularly appropriate for knowledgeable witnesses in large and complex cases. *Arista Recs. LLC v. Lime Grp. LLC*, No. 06 Civ. 5936 (GEL), 2008 WL 1752254 at *1 (S.D.N.Y. Apr. 16, 2008) (granting a request for additional time because the "presumptive length of depositions provided in Rule 30, which are more than adequate for the general run of simpler litigation, was not designed for a witness of this significance in a case of this magnitude").

To begin with, the Court should grant additional time to make up for the time spent refreshing Dowling's recollection and playing requested video footage. Fed. R. Civ. P. 30(d) (courts must grant additional time if the deponent "impedes or delays the examination"). Courts have granted additional time when relevant but time-consuming recordings are necessary to elicit a deponent's testimony. *E.g.*, *Robinson v. De Niro*, No. 19 Civ. 9156(KHP), 2022 WL 274677 at *3 (S.D.N.Y. Jan. 26, 2022) (granting additional deposition time to accommodate playing recordings and questioning the witness about them).

Most importantly, additional time is needed in order not to prejudice plaintiffs with different interests who wish to examine this witness. "'The court *must* allow additional time . . . if needed to fairly examine the deponent.'" *Arista Recs. LLC*, 2008 WL 1752254 at *1 (quoting Fed. R. Civ. P. 30(d)) (emphasis in original opinion). "In multi-party cases, the need for each party to examine the witness may warrant additional time." Committee Notes to 2000 Amendments to Fed. R. Civ. P. 30. Here, counsel in the other consolidated cases, involving protests over almost eight months, were unable to ask any questions concerning any of those events. "If the examination will cover events occurring over a long period of time, that may justify allowing additional time." *Id*. Counsel have worked diligently to coordinate their efforts in these cases, including Dowling's deposition. However, the eight consolidated cases remain distinct, and all plaintiffs are entitled to litigate their own cases. Indeed, in the consolidated litigation surrounding the 2004 RNC protests, plaintiffs were permitted to question witnesses for as long as necessary: five NYPD Chiefs testified for three to six-and-a-half days, the Deputy Commissioner for Intelligence testified for five days, and two Inspectors for three and three-and-a-half days. No plaintiff should be prejudiced because their case has been consolidated for

discovery.

**<u>Outstanding Areas of Inquiry</u>**

*Sierra* counsel was prepared to delve deeper into the June 4, 2020 police operation that resulted in the mass arrest of approximately 300 people in the Mott Haven section of the Bronx. The Mott Haven incident is the sole subject of the *Sierra* putative class action. In that incident, over 600 officers (including SRG bike squads and Mobile Field Forces) were mobilized in advance to police a traditional protest march. The march proceeded entirely peacefully for a mile without police interference or instructions until they were surrounded by SRG officers before the 8:00 p.m. curfew, held until after the curfew was in effect, then assaulted and arrested. Dowling arrived at the Mott Haven operation command center hours before the protest began; he attended planning meetings with Chiefs (eight of whom were there), he briefed and directed subordinates, and then participated in executing the police operation. He was in the front line of SRG officers that assaulted and cuffed the trapped protesters, resulting in numerous injuries.

*Sierra* counsel was prepared to use contemporaneous police radio traffic to question Dowling. Dowling testified that he was listening to those radio transmissions throughout the Mott Haven operation. Ex. A at 223:4-11; 227:14-16; 228:19-21. The critical 45 minutes of radio traffic give a real-time account of police actions and protester conduct from the time the march began until the protesters were arrested. *Sierra* counsel requests the opportunity to ask Dowling about statements heard on the transmissions, including any made by him, and to have him identify who was ordering who to do what, in order to understand how the operation was carried out based upon what was actually said as it was happening. Detailed inquiry into the radio transmissions is especially necessary given the witness's inability to independently recall so many important facts. Playing such audio recordings, and questioning the witness about them, necessarily will be time consuming. *See*, *Robinson v. De Niro, supra,* at *3.

In addition, *Sierra* counsel requests the opportunity to inquire into exactly what Dowling was doing during the several hours he was at the operation command center before the protest began and about the planning meetings he attended, instructions he gave to subordinates, and other aspects of the planning of the Mott Haven operation. Finally, counsel requests the opportunity to show additional videos from the protest— which the witness repeatedly testified is what he needs to refresh his recollection—in order to elicit testimony. While Ms. Biklen asked Dowling some questions about the Mott Haven protest, he was not asked detailed questions about the several hours he spent at the operation command center before the protest began and the planning for the police operation, nor asked about the radio transmissions. The *Sierra* plaintiffs—whose case is about this single protest—should not be forced to make do with the limited testimony obtained from this important witness from a deposition by an attorney for another case that inquired into eight protests, the witness's background, and general SRG operations.[4]

---

[4] Counsel in *Wood* have coordinated with counsel in *Sierra* concerning the Dowling deposition, and *Wood* counsel are not requesting further time to question Dowling.

Similarly, the *Hernandez* case is focused on the NYPD's arrest and use of force against twelve Legal Observers at Mott Haven on June 4, 2020. Counsel for *Hernandez* were prepared to ask Dowling specific, targeted and non-duplicative questions regarding these plaintiffs. For example, counsel wished to inquire into his understanding, training and supervision regarding the NYPD's curfew order exemption for Legal Observers, as well as what role he personally had in the decision (and execution of the decision) to detain, use force against, and seize the work product of the *Hernandez* plaintiffs.

At the opposite end of the spectrum, the *People*'s case encompasses all of the 83 locations and dates of the various Protests. The *People* highlighted dozens of unconstitutional acts in its Amended Complaint, but seek only to depose Dowling regarding a handful of incidents about which he has not yet testified: the May 29th protest near Barclays Center; the June 2nd protest in lower Manhattan; and the various protests near Union Square and Washington Square Park on November 4, 2020. Like *Sierra*'s questioning, the *People* need significant time to ask Dowling about his involvement in planning, coordinating, and directing the response to these sprawling and hours-long protests, some of which is captured on video that will be played for him.

Likewise, counsel for *Sow*, a putative class action also encompassing all 83 protest locations, require time to question Dowling on class-specific issues, including relating to his enactment and execution of city-wide policies, practices, and customs that were applied at the Protests and which, *Sow* argues, constitute a unitary scheme in which the Defendants violated the constitutional rights of its Class Members.

Finally, *Payne* plaintiffs need a small amount of additional time beyond the 15 minutes remaining to question Dowling on the September 19 incident that defendants' counsel, without an applicable privilege, instructed him not to answer as it was subject to an open CCRB investigation. Dowling has unique factual knowledge about the command of that protest response that is not available from other witnesses, and likely will need to review video evidence to refresh his recollection of the events.

Given the scope and magnitude of these Consolidated Cases—each of which is a large and complex case on its own—fairness requires granting further inquiry. In light of the plaintiffs' efforts to coordinate their questioning, and their intentions to ask non-duplicative questions concerning matters that have not been inquired into with this important witness, plaintiffs respectfully request that Deputy Chief Dowling's deposition be continued as long as necessary to permit plaintiffs to adequately question him.

    Respectfully submitted,

    s/

    Michael L. Spiegel