1                    Inspector G. Dowling

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - -+
                               |
5    JARRETT PAYNE, et al,     |
                               |
6            Plaintiffs,        |      Case Number:
                               |
7      vs.                      |      _____
                               |
8    MAYOR BILL DE BLASIO,      |
     et al,                     |
9                               |
             Defendants.        |
10   - - - - - - - - - - - - -+

11

12

13              Remote Deposition of

14            INSPECTOR GERARD DOWLING

15           Friday, February 11, 2022

16                  10:00 a.m.

17

18

19

20

21

22

23   Job No. 206339

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25

```
                                                    Page 2
1              Inspector G. Dowling
2
3
4
5
6                    February 11, 2022
7                      10:00 a.m.
8
9       Deposition of INSPECTOR GERARD DOWLING,
10  held via videoconference (Zoom), with the
11  witness and all parties participating
12  remotely, pursuant to the Rules of the United
13  States District Court for the Southern
14  District of New York, subject to such
15  stipulations as may be recited herein or
16  attached hereto, before Laurie Donovan, a
17  Registered Professional Reporter and notary
18  public of the District of Columbia, who
19  officiated in administering the oath to the
20  witness.
21
22
23
24
25
```

```
                                                    Page 3
1              Inspector G. Dowling
2
3              A P P E A R A N C E S
4   ON BEHALF OF THE PAYNE PLAINTIFFS:
5          New York Civil Liberties Union
6          125 Broad Street
7          New York, New York 10004
8          By:  Molly Biklen, Esq.
9
10
11
12  ON BEHALF OF THE DEFENDANTS AND THE WITNESS:
13          New York City Law Department
14          100 Church Street
15          New York, New York 10007
16          By:  Amy Robinson, Esq.
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 4
1              Inspector G. Dowling
2   (Appearances continued)
3
4   ON BEHALF OF SIERRA PLAINTIFFS:
5          Hamilton Clarke LLP
6          48 Wall Street
7          New York, New York 10005
8          By:  Michael Spiegel, Esq.
9              (Of Counsel for Hamilton)
10
11
12
13  ON BEHALF OF THE SOW PLAINTIFFS:
14          Beldock Levine & Hoffman LLP
15          99 Park Avenue
16          New York, New York 10016
17          By:  Jonathan Moore, Esq.
18
19
20  ALSO PRESENT:
21          Lillian Marques, Asst. Attorney General
22          Allison Frick, for Wood Plaintiff
23
24
25
```

```
                                                    Page 5
1              Inspector G. Dowling
2              EXAMINATION INDEX
3                                          PAGE
4   EXAMINATION BY MS. BIKLEN . . . . . . . . .    7
5
6
7
8
9              E X H I B I T S
10  EXHIBIT    DESCRIPTION               PAGE
11  Exhibit 2-1  Police Department document that
12               gives background on officers . .   43
13  Exhibit 2-2  Email sent by Dowling on May 28,
14               2020, Bates number 61341 . . . .   81
15  Exhibit 2-3  Email from Elido Capella sent on
16               May 28, 2020, Bates 66602 . . .   92
17  Exhibit 2-4  Video . . . . . . . . . . . .  104
18  Exhibit 2-7  TARU video . . . . . . . . . .  129
19  Exhibit 2-9  TARU video . . . . . . . . . .  144
20  Exhibit 2-32 Video . . . . . . . . . . . .  177
21  Exhibit 2-33 Video . . . . . . . . . . . .  177
22  Exhibit 2-34 Video . . . . . . . . . . . .  177
23  Exhibit 2-11 Email sent on June 6, 2020, Bates
24               number 56807 . . . . . . . . .  187
25
```

```
 1              Inspector G. Dowling
 2
 3   (Exhibits continued)
 4   EXHIBIT    DESCRIPTION                    PAGE
 5   Exhibit 2-15 Arrest report . . . . . . . . 192
 6   Exhibit 2-16 Document . . . . . . . . . . . 196
 7   Exhibit 2-19 Situation Report, Bates number
 8                15949 . . . . . . . . . . 200
 9   Exhibit 2-20 Email from Chief Mullane re:
10                Bay Ridge Demo & FTP Bronx . . . 211
11   Exhibit 2-21 Document . . . . . . . . . . . 215
12   Exhibit 2-22 Video . . . . . . . . . . . . 229
13   Exhibit 2-24 Video . . . . . . . . . . . . 252
14   Exhibit 2-27 Email from Chief Mullane re
15                protests . . . . . . . . . . . 263
16   Exhibit 2-28 Video . . . . . . . . . . . . 273
17   Exhibit 2-29 Police roster . . . . . . . . 276
18   Exhibit 2-31 Video . . . . . . . . . . . . 279
19
20
21
22
23
24
25
```

```
 1              Inspector G. Dowling
 2   ---------------------------------------------
 3              P R O C E E D I N G S
 4              10:00 a.m.
 5   ---------------------------------------------
 6              * * * * *
 7   Whereupon,
 8              INSPECTOR GERARD DOWLING,
 9        having been first duly sworn, testified
10        upon his oath as follows:
11   EXAMINATION BY COUNSEL FOR PAYNE PLAINTIFFS
12   BY MS. BIKLEN:
13        Q    Chief Dowling, can you please state your
14   name and business address for the record?
15        A    Yes.  Gerard Dowling.  It's 1 Police
16   Plaza, New York, New York, 10031.
17        Q    Thank you, Chief Dowling.  I know you
18   did this yesterday, but the rules are going to be
19   the same.
20             My name is Molly Biklen, and I represent
21   the plaintiffs in the case of Payne vs. de Blasio,
22   which is one of the consolidated cases at issue,
23   and today I'll be asking you some questions
24   related to the protests that occurred starting in
25   the spring and summer of 2020.
```

```
 1              Inspector G. Dowling
 2             Can you hear me okay?
 3        A    I'm sorry.  I had to itch my ear.  I
 4   apologize.
 5        Q    Okay.  That's fine.
 6             So again, just to briefly go over some
 7   of those rules, because the court reporter is
 8   taking down everything we say, it's very important
 9   that we not interrupt each other, so I'll ask that
10   you allow me to finish my question even if you
11   know where I'm going.  I will make sure also not
12   to interrupt you.
13             Okay?
14        A    Yes.
15        Q    And all of your answers must be verbal,
16   so no head nods or head shakes.
17        A    Yes.
18        Q    And then finally, your attorney here
19   will be making objections, and that is Amy
20   Robinson today?
21        A    Yes.
22        Q    And unless she instructs you not to
23   answer, if you understand the question, please do.
24        A    Understood.
25        Q    And do you understand that you're under
```

```
 1              Inspector G. Dowling
 2   oath and legally required to answer questions
 3   truthfully to the best of your ability?
 4        A    Yes.
 5        Q    Okay, and is there any reason you are
 6   aware of today why you could not give accurate and
 7   truthful answers?
 8        A    No.
 9        Q    So I know that yesterday you went
10   through some of your background, so I'll try not
11   to repeat that, but yesterday was it your
12   testimony that it was your first deposition as a
13   member of the New York City Police Department?
14        A    That is correct.
15        Q    And have you ever been deposed in any
16   other capacity?
17        A    Besides being interviewed by the
18   Civilian Complaint Review Board or Internal
19   Affairs, that was the only times.
20        Q    And have you ever testified under oath
21   in a civil proceeding in court?
22        A    No.
23        Q    Have you ever testified under oath in a
24   criminal proceeding in court?
25        A    Yes.
```

Inspector G. Dowling

1
2      Q    First, how many times?
3      A    Approximately ten.
4      Q    And do you know about when those were?
5      A    It's been a while.  Probably from 1997
6  to, from what I recall, 2003, roughly.
7      Q    In any of those instances, did a judge
8  find that you were not credible?
9      A    To.
10            MS. BIKLEN:  Off the record for a
11     moment.
12            (Discussion was held off the
13            record.)
14  BY MS. BIKLEN:
15     Q    And did you meet with your lawyer here
16  today to prepare for this deposition?
17     A    Yes, I did.
18     Q    When?
19     A    On Wednesday.
20     Q    Approximately how many hours?
21     A    From what I recall, five hours, roughly.
22  Four and a half, five hours.
23     Q    And was that the same preparation you
24  testified to yesterday for the 30(b)(6) as well?
25     A    Yes.

Inspector G. Dowling

1
2      Q    And did you review documents during that
3  preparation?
4      A    Yes, I did.
5      Q    I believe you testified to some emails.
6      A    Yes, I did.
7      Q    Anything else during that preparation?
8      A    Video.  I was shown a video.
9      Q    I believe you testified that that was a
10  TARU video from June 4?
11     A    It was -- I didn't testify that.  I
12  believe Amy Robinson is the one who said that was
13  a TARU video.
14     Q    Okay, thank you, but was the video from
15  June 4?
16     A    Yes, it was.
17     Q    And since that preparation, have you
18  reviewed any other video?
19     A    No.
20     Q    Did you review anything with your lawyer
21  this morning?
22     A    No.
23     Q    Did you speak to anyone, other than your
24  attorney, about this deposition?
25     A    No.  Besides my wife, that's it.

Inspector G. Dowling

1
2      Q    You didn't tell your commanding officer?
3      A    I'm sorry?
4      Q    You didn't tell your commanding officer?
5      A    Today, no.  That I was being deposed,
6  no.  I didn't speak to anybody today regarding
7  this deposition.
8      Q    And did you provide any documents to
9  your attorneys in connection with this lawsuit?
10     A    No.
11     Q    Have you searched your department-issued
12  cell phone related to this lawsuit?
13     A    No.
14     Q    Have you searched any department-related
15  texts related to this lawsuit?
16     A    No.
17     Q    Have you searched your calendar related
18  to this lawsuit?
19     A    No.
20     Q    Any files --
21     A    Sorry.  By "calendar" do you mean like
22  see what date it was on, the deposition?
23     Q    Any search of your calendar in any way
24  related to this case.
25     A    No.

Inspector G. Dowling

1
2      Q    And have you collected or been asked to
3  collect any kind of notes or other scratch paper,
4  other files that you keep in your personal office
5  but that are related to this case?
6      A    Could you repeat that?  I'm sorry.
7      Q    Have you searched for any papers or
8  other materials that you keep in your office,
9  files related to this case?
10     A    Related to which case?
11     Q    This case, related to the case involving
12  the summer protests.
13     A    Yes, training issues, yes, training
14  paperwork, yes.
15     Q    And what training pages were those?
16     A    SRG training, so it would be PowerPoints
17  and syllabus for training.
18     Q    Do you have a computer that you use for
19  work?
20     A    Yes, I do.
21     Q    Okay.  It's connected to a network?
22     A    Yes.
23     Q    Do you have a particular drive on that
24  network that is dedicated to you?
25     A    I'm not computer-literate, so I, I

Inspector G. Dowling

1    might -- I use my desktop.  That's what I use.
2
3        Q    Do you know if you have a SharePoint
4    drive?
5        A    I don't -- I can't answer that.  I don't
6    know.  I'm sorry.
7        Q    You were deposed yesterday as a 30(b)(6)
8    witness, and you were asked certain questions
9    about your educational background and history with
10   the NYPD.
11            Were your answers with respect to your
12   positions and commands yesterday accurate?
13       A    Yes.
14       Q    Is there anything you'd like to change?
15       A    No.
16       Q    Okay.  I'm not going to go through those
17   again, and you adopt those answers in your
18   personal capacity in this deposition?
19       A    Yes.
20       Q    I believe you testified that you are a
21   deputy chief as of October 2021.
22       A    That is correct.
23       Q    And that was a promotion?
24       A    Yes, it was.
25       Q    I believe you testified that it was a

Inspector G. Dowling

1    discretionary promotion?
2
3        A    Yes.
4        Q    Meaning that you did not have to take a
5    test?
6        A    Yes.
7        Q    And were you interviewed as part of that
8    promotion?
9        A    Yes.
10       Q    Who were you interviewed by?
11       A    Deputy Chief D'Entremont, Assistant
12   Chief Iglesias, and Assistant Chief Conforti.
13       Q    I'm sorry.  The first name, could you
14   spell that?
15       A    D, apostrophe, E-N-T-R-E-M-O-N-T.
16       Q    Thank you, and what was involved in that
17   interview?
18       A    My resume, they would review my resume
19   and personal statement.
20       Q    And were you asked questions?
21       A    Yes.
22       Q    I'm going to use the term "George Floyd
23   protest" to refer generally to the protests and
24   violence that started after George Floyd's death
25   in May 2020, and continued at least until early

Inspector G. Dowling

1    2021.
2
3            Do you understand what protests I'm
4    referring to?
5        A    Yes, I do.
6        Q    During that interview were you asked
7    anything about the George Floyd protest?
8        A    Not to my recollection.
9        Q    Was there any discussion of your role in
10   the George Floyd protests as part of that
11   interview at all?
12       A    No, not to my recollection.
13       Q    The interview happened with the three,
14   the deputy chief and assistant chiefs?
15       A    Ballpark guess, I'm going to say March
16   of 2021.
17       Q    Okay, and in March of 2021, do you know
18   whether you had any open CCRB investigations at
19   that time?
20       A    I know I was interviewed by CCRB.  I did
21   not know the -- I did not know the disposition of
22   those cases, however, or if they were closed.
23       Q    Okay.  Fair enough.  In the interview of
24   March 2021 after your promotion, were you asked at
25   all about those CCRB cases?

Inspector G. Dowling

1
2        A    No.
3        Q    Was there any discussion in any way of
4    the CCRB cases?
5        A    No.
6        Q    I'm sorry.  I think I missed your answer
7    here.  Other than the interview and submitting the
8    resume and personal statement, was there anything
9    else that was involved in your promotion?
10       A    No, not on my end.
11       Q    I'd like to go back to what you
12   mentioned about the CCRB interviews.  You
13   testified yesterday, I believe, that you were
14   interviewed twice or three times by the CCRB?
15       A    I was interviewed I believe twice by
16   three different investigators, because, as you
17   said, the "new normal."  Two investigators did a
18   Zoom meeting on one day, and one was a separate,
19   separate -- on a separate day.  Excuse me.
20       Q    Okay.  I think I understand, but I just
21   want to make sure.
22       A    Sorry.
23       Q    There was an interview that took place
24   on one day that covered two incidents?
25       A    Yes, by two different CCRB

Page 18

Inspector G. Dowling

investigators.
Q But it was in --
A And there was one --
Q -- the same course of the day?
A Yes. Sorry I interrupted you. There was one that was specific to one incident, and there was another day that I was interviewed by two CCRB investigators regarding two different incidents.
Is that clarified?
Q Maybe. Let me go forward and see if I understand.
So my understanding is that one of those interviews related to an incident on September 19?
A Yes.
Q And the other of the interviews related to two incidents on June 2?
A I remember one incident on June 2, but yes, it would be June 2.
Q Okay, and do you know the outcome of those investigations?
A No, I do not.
Q And you were interviewed under oath?
A For those -- for the CCRBs?

Page 19

Inspector G. Dowling

Q Yes.
A Yes.
Q And you had counsel present?
A Yes, I did.
Q Were you also interviewed by the IAB related to any of those investigations?
A Yes.
Q When were you interviewed by the IAB?
A Sometime -- from what I recall -- later in 2020.
Q Was it just one interview?
A Just one interview. Correct.
Q Do you recall what incident it related to?
A The June 2 incident at Battery City -- sorry -- Battery Place and West Side Highway.
Q Do you know the outcome of that investigation?
A No. Oh, I apologize. The Internal Affairs investigation, yes. I was exonerated.
Q And do you know when that happened?
A I don't recall.
MS. BIKLEN: Amy, yesterday we discussed whether Chief Dowling would answer

Page 20

Inspector G. Dowling

questions related to the June 2nd and September 19th incidents. Are you going to allow that today?
MS. ROBINSON: No, not with respect to the -- not with respect to the incidents underlying the CCRBs.
MS. BIKLEN: And just to be crystal clear, I believe that is June 2 on the West Side Highway in or around Battery Place and September 19 in Midtown?
MS. ROBINSON: I believe the June 2, there were two incidents. One was at the West Side Highway and 50th, one was at Battery Place, and the incident on September 19 was, yes, in Midtown on 46th and 47th.
MS. BIKLEN: And what is the basis for that refusal to allow answers?
MS. ROBINSON: He's not represented by counsel in those matters during this deposition, so he could potentially make statements against his own interest without due process.
MS. BIKLEN: Are you his counsel?

Page 21

Inspector G. Dowling

MS. ROBINSON: I'm his counsel for purposes of this deposition but not with respect to his CCRBs. He has private counsel for that.
MS. BIKLEN: Let's go off the record for a moment if we can.
(Discussion was held off the record.)
MS. BIKLEN: So in the break we discussed that Ms. Robinson will be instructing her client not to answer and not allow any questioning regarding three specific incidents that are related to CCRB investigations, two on June 2, 2020 on the West Side Highway, one in or about Battery Place, one in or about 50th Street, and an incident on September 19, 2020 in Midtown in or about 46th and 47th Avenue.
I have objected to that and suggested that we call the court over the break. We've also determined that there are other ways to resolve this problem, and we will potentially be able to come to an agreement on that.

Page 22

Inspector G. Dowling

1
2       Does that fairly encapsulate our
3   discussion, Amy?
4           MS. ROBINSON:  Yes.
5           MS. BIKLEN:  All right.  We will
6   return to that.
7   BY MS. BIKLEN:
8       Q    Now, Chief Dowling, you testified
9   yesterday I believe that you were in the
10  operations bureau?
11      A    City-wide operations, correct.
12      Q    And if you can just very briefly tell us
13  what your duties and responsibilities were with
14  respect to the city-wide operations bureau.
15      A    I worked directly for Chief Thomas
16  Purtell, who was the bureau chief.  I would
17  perform administrative tasks on his behalf, sign
18  communications.  Any issues with the commands,
19  they would speak to me.  I would be his
20  go-between.  Any issues that he had, that he
21  needed to reach out to a certain command, he would
22  go through me, and there were times where I also
23  went out to the Black Lives Matter details as well
24  as parades and other details with the chief.
25      Q    When you say you went out to "the Black

Page 23

Inspector G. Dowling

1   Lives Matter detail," approximately what years
2   were those?
3       A    I want to say 2016, but that's a guess.
4   I apologize for not having exact dates.
5       Q    And did you have a role in preparing for
6   a response to those protests, Black Lives Matter
7   protests at that time?
8       A    We would receive detail requests, so
9   what personnel is expected of our members, and
10  that would be filtered down to the subordinate
11  commands, so that was my role.
12      Q    And you would, in fact, go out into the
13  street on some of those details; is that right?
14      A    Some of those details, yes.
15      Q    Do you recall any specific protests that
16  you were physically present at during that time?
17      A    Not specifically, no.
18      Q    Were you ever an incident commander at
19  the Black Lives Matter protests during that time?
20      A    Patrol services incident command?  No.
21      Q    Were you a city-wide operations bureau
22  incident commander?
23      A    Yes.
24      Q    And what is involved in being a
25

Page 24

Inspector G. Dowling

1   city-wide operations bureau incident commander?
2       A    I would be in charge of the field forces
3   assigned to the strategic response group, so I'd
4   oversee --
5       Q    All right.  I apologize for interrupting
6   you.  I'm asking simply about your time at the
7   city-wide operations bureau.
8       A    Yes.  That's what I'm -- they were --
9       Q    I apologize.
10      A    No, no, not at all.  They were a
11  subordinate command, so if an executive from SRG
12  was not present, I could be present and take all
13  the actions of the incident commander for the
14  strategic response group field force.
15      Q    Thank you, and in any of those
16  incidents, were members of service under your
17  command make arrests?
18      A    Not that I recall.
19      Q    And how would you compare the
20  demonstrations, the Black Lives Matter
21  demonstrations that you went to as part of the
22  city-wide operations bureau as an incident
23  commander for SRG at that time versus the George
24  Floyd protests that happened in the summer of

Page 25

Inspector G. Dowling

1   2020?
2       A    The protests, the Black Lives Matter
3   protests during the time I was at city-wide
4   operations, they were somewhat winding down, for
5   lack of a better term, so there were less people,
6   whereas the George Floyd protests, I was present
7   at the initiation of those protests, so definitely
8   the amount of people.  That's one thing I can say.
9   Much different.
10      Q    Did you feel like you had experience
11  from those prior protests that was helpful to you
12  in responding to the George Floyd protests?
13      A    Yes.
14      Q    What experience?
15      A    Well, I was a Manhattan South captain
16  for many years.  I was assigned as the commanding
17  officer in the Fifth Precinct where we also
18  policed the Occupy Wall Street demonstrations,
19  and, you know, throughout my time, my career with
20  protests and my experience, I believe I was
21  capable of -- more than capable of handling being
22  the incident commander of strategic response field
23  force.
24      Q    So let's talk a little bit more about

Inspector G. Dowling

1
2    that protest experience.  You mentioned that you
3    had experience at Occupy Wall Street.
4              What was your role there?
5        A    I could be a -- from what I recall, I
6    could be a sector commander, so I would be in
7    charge of a certain amount of police officers who
8    monitored groups that were marching, that were
9    moving throughout New York City.
10             If those groups became violent, we would
11   make arrests, if they committed any infractions.
12   Where an incident commander wants to effect an
13   arrest, we would effect arrests.
14       Q    Did you ever use any less-than-lethal
15   force in policing the Occupy Wall Street
16   demonstrations?
17       A    Less-than-lethal?
18       Q    Yes.
19       A    Unless, if I had to grab somebody -- I
20   have grabbed people during Occupy Wall Street, but
21   nothing, nothing else.
22       Q    Did you use OC spray?
23       A    No, I did not.
24       Q    Baton?
25       A    No.

Inspector G. Dowling

1
2        Q    Did you take part in any training as a
3    result of Occupy Wall Street protests?
4        A    During Occupy Wall Street or --
5        Q    During or after, in response to those
6    protests and the NYPD's handling thereof.
7        A    No, besides when I, when I was assigned
8    to, as the executive officer strategic response
9    group, there I went to training, so . . .
10       Q    Did you take part in any demonstrations
11   in -- sorry.  Withdrawn.
12             Do you have any experience responding to
13   demonstrations involving the World Economic Forum
14   in 2002?
15       A    No.
16       Q    Any involvement in demonstrations around
17   the time of the Iraq war in 2003?
18       A    If I recall, there was an anti-war
19   protest when I was a lieutenant, so I did take
20   part in that, in one of those anti-war
21   demonstrations, if that is in the time period I'm
22   thinking of, in or around 2003 to 2004.  Is that
23   the area you're talking about?
24       Q    Yes, and what about with respect to the
25   RNC; were you involved in that response at all?

Inspector G. Dowling

1
2        A    No.
3        Q    I believe you testified yesterday that
4    you know what an after action report is.
5        A    Yes.
6        Q    And did you participate in after action
7    reports with respect to any of the demonstrations
8    that we have just discussed?
9        A    Not that I recall.
10       Q    I believe you testified yesterday that
11   an after action report could be as informal as
12   just talking to another member, another executive
13   within the NYPD; is that right?
14       A    We, we -- sorry.  We call it the hot
15   wash or an after action or a post TAC meeting
16   or -- we -- I, I thought you meant -- sorry.  I
17   thought you meant an actual physical document for
18   an after action report, because there is an actual
19   physical document which I mentioned yesterday.
20   After parades we used to do them when I was
21   commanding officer in the Fifth Precinct, but we
22   do absolutely have verbal discussions about best
23   practices, what went right, what can we do better,
24   so there is discussions with that.
25       Q    I believe you just called it the "hot

Inspector G. Dowling

1
2    wash"?
3        A    Yes.
4        Q    And when you're talking about the verbal
5    discussions, that's a hot wash?
6        A    That's, that's what some people call it.
7    I don't -- I have no idea why, but that's what
8    they call it sometimes.
9        Q    I believe you mentioned one other term
10   that I did not get.  A "TAC" something?
11       A    Maybe I spoke too fast.  I'm sorry.
12       Q    Is there another term for this kind of
13   informal or formal discussions about what went
14   right and what went wrong?
15       A    Oh, post TAC meeting.
16       Q    Did you engage in any hot wash or post
17   TAC meetings with respect to Occupy Wall Street?
18       A    I don't recall specifics, but I'm sure I
19   did.
20       Q    And what about with respect to the Black
21   Lives Matter demonstrations in 2016 that we
22   discussed previously?
23       A    Again, I don't recall specifically, but
24   I'm sure I did.
25       Q    Based on your experience, was there

                    Inspector G. Dowling
1    ultimately any difference in policing these prior
2    protests versus the George Floyd protest?
3    A    No, not that I can recall, no.
4    Q    I'd like to talk now about your
5    responsibilities as an inspector, as the executive
6    officer of SRG.  That was your most recent
7    position prior to your current one?
8    A    Yes.
9    Q    If you can briefly tell me about your
10   duties and responsibilities on sort of an average
11   day or week.
12   A    In the absence of a commanding officer,
13   I would act as the commanding officer.  I would, I
14   would deploy personnel to precincts as determined
15   by the chief of patrol, which is the chief
16   department, to high crime areas, to ensure that
17   they are in the correct locations.
18        I would speak to commanding officers of
19   any issues that may arise.  Administratively, I
20   would sign any communications in the absence of
21   the commanding officer.  I would review my emails
22   each day, obviously.
23        Again with details, we would determine,
24   once it's approved by, as I said, details -- I

                    Inspector G. Dowling
1    apologize.  Details would go from the patrol
2    borough commander to the operations unit approval,
3    and then it would go to our parent command, which
4    is special operations, and then it filtered down
5    to our detail unit, and I would deploy personnel
6    as needs of the department to the details.
7    Q    You mentioned that you would act as
8    commander when the commanding officer was not
9    present or other things you would do when the
10   commanding officer was not present.  That
11   commanding officer was John D'Adamo?
12   A    Yes.
13   Q    How frequently would you have to do that
14   when he was not present?
15   A    I could not put a number on it, but
16   it's -- I'm not saying it was frequent.  It
17   wasn't -- I was there three and a half years, so I
18   can't put a number on it.
19   Q    Would you say it was a regular part of
20   your duties?
21   A    When he wasn't present?
22   Q    To perform those functions, yes.
23   A    Yes.
24   Q    And did those duties as you just

                    Inspector G. Dowling
1    described them to me change at all during the
2    George Floyd protests?
3    A    No.  He remained as commanding officer.
4    I remained as the executive officer.
5    Q    And in your normal workday as the
6    executive officer of SRG, did you regularly go out
7    in the field?
8    A    I would respond to possibly large-scale
9    incidents throughout the city, but -- again, I
10   didn't go out every day, but if the, if jobs
11   called for it, I was there.  I went out.
12   Q    I believe we talked about this
13   yesterday, so I want to go through it very
14   quickly, but were part of your duties training SRG
15   officers?
16   A    No.  I do not train SRG officers.
17   Q    Okay.  Any policies for SRG members?
18   A    No.
19   Q    Promotions within SRG?
20   A    I can make recommendations.  I do not
21   promote.  We don't promote within SRG.
22   Q    So someone can never go from -- into a
23   sergeant position within SRG?
24   A    That is -- you have to take a civil

                    Inspector G. Dowling
1    service test to become a sergeant.
2    Q    Captain position?
3    A    Lieutenant, captain, civil service
4    positions.
5    Q    Do you have any role in hiring or
6    transferring within SRG?
7    A    Yes.
8    Q    Discipline of SRG members?
9    A    Yes.
10   Q    Planning for SRG response to incidents?
11   A    Yes.
12   Q    Serving as an SRG incident commander?
13   A    Yes.
14   Q    You mentioned before that people
15   would -- that you would go out into the field when
16   called on larger incidents.
17        Who would call you to go out in the
18   field?
19   A    Well, if an incident was deemed a
20   response by SRG members, the command where the
21   incident was occurring would activate a, what we
22   call a Level 1 mobilization, which would be a
23   patrol borough SRG response.  Those members would
24   respond, and depending on type of incident, if I

Page 34

Inspector G. Dowling

1 deemed it necessary for my, for my presence to be
2 there, I would go.
3       Q    So you were the one determining whether
4 it was appropriate to go out to one of these
5 incidents?
6       A    Myself, yes.
7       Q    Was your presence, to your knowledge,
8 ever requested from higher up officials?
9       A    Not to my knowledge.  Not that I recall.
10      Q    Did your commanding officer ever suggest
11 that you go out?
12      A    No.
13      Q    Chief of department ever suggest that
14 you go out?
15      A    No, not to my knowledge.  Not that I
16 recall.
17      Q    Just so I'm understanding, your position
18 within the command structure of SRG was right
19 below the commanding officer?
20      A    That is correct.
21      Q    And everyone below that level in some
22 cases reported to you; is that fair to say?
23      A    Yes, that's fair to say.
24      Q    Did you have any specific people who
25

Page 35

Inspector G. Dowling

1 reported to you?
2       A    No.
3       Q    And generally how do you communicate
4 within SRG about issues on the job?
5       A    Telephonically, in person, email.
6       Q    Did you ever use texts?
7       A    Yes, I have.
8       Q    During the George Floyd protests?
9       A    That I don't recall.
10      Q    And did you ever communicate over the
11 radio?
12      A    Yes.
13      Q    During the George Floyd protests?
14      A    Yes.
15      Q    I believe you also mentioned about a
16 Level 1 response.
17      A    Mobilization.
18      Q    Mobilization.  Thank you.  That is
19 borough command plus SRG; is that right?
20      A    A command in question that calls that,
21 so again, I have to give an example if it's okay.
22 The 9th Precinct in Manhattan South calls for a
23 Level 1 -- for a missing, special category
24 missing.  There would be response by the Manhattan
25

Page 36

Inspector G. Dowling

1 SRG to that location to assist the precinct in
2 question.
3       Q    And would you be the one approving that
4 Manhattan level response to the request for
5 assistance in that way?
6       A    I could -- depending on resources and
7 depending on the type of incident, I could cancel
8 it if I deemed necessary.
9       Q    Is there something above a Level 1?  Is
10 there a Level 2?
11      A    There's Level 2, there's a Level 3, and
12 there's a Level 4.
13      Q    Can you tell me what a Level 2, a Level
14 3 and a Level 4 are?
15      A    A Level 2 is -- and I'll just -- I'll
16 try and keep it simple.  I'm not disparaging you.
17 Believe me.
18           So a Level 2 could be all SRGs respond
19 to a certain location.  A Level 3 would be -- and
20 there's other units involved.  It escapes me, but
21 ESU and so on and so forth, but a Level 3 would be
22 one sergeant and eight police officers from each
23 command in that geographical borough, okay?  And
24 then a Level 4 is -- if my memory serves me
25

Page 37

Inspector G. Dowling

1 correctly, it's a one and eight from every command
2 in the city.
3       Q    During the George Floyd protests, were
4 there any Level 3s requested?
5       A    I don't recall.
6       Q    Any Level 4s?
7       A    Again, I don't recall.
8       Q    Okay.  So during the George Floyd
9 protests -- and I want to talk about just the
10 early period, May 28 to June 6.  Could you
11 describe to me a typical workday, when you started
12 work, what were your first activities, and when
13 you left work for the day.
14      A    From May 28 to June 6?
15      Q    Yes, those early days of the George
16 Floyd protests.
17      A    Okay.  From my recollection, I would
18 come in to work usually around 10:00.  I would
19 come in, speak to the chief, what resources we
20 have, possibly what went right and how can we
21 improve on things from the night before or the day
22 before.  Get dressed, and we were normally
23 utilized for the protests that are ongoing that
24 day, so we would respond to whatever location was
25

Inspector G. Dowling

1    deemed necessary, and we would brief our, our
2    supervisors, and most of those days went on and on
3    and on.
4          There was days I didn't get out until
5    6:00 in the morning, there was days I didn't get
6    out until 2:00 in the morning, and so on and so
7    forth.  Again, policing protests also in that day.
8    I apologize.
9    Q    Thank you.
10         Now, you mentioned that some days you
11   would not finish until 6:00 a.m., so almost a
12   20-hour tour; am I understanding that correctly?
13   A    That's correct.
14   Q    You also mentioned that you would speak
15   to your superiors.  Who were you referring to?
16   A    My supervisors.
17   Q    So supervisors within SRG?
18   A    Yes.
19   Q    And what -- when you say "supervisors"
20   in SRG, what do you mean by that?
21   A    That would be supervisors.  Sergeants
22   and lieutenants assigned to the detail often give
23   instructions as to what is expected.  As I
24   mentioned yesterday, the call of the day, the
25

Inspector G. Dowling

1    return date, where we would be deployed, where we
2    want people set up after conferral with the
3    borough commander, certain instructions like that.
4    Q    You also mentioned speaking with the
5    chief.  Were you referring to Chief D'Adamo?
6    A    I apologize.  Yes, Chief D'Adamo.
7    Q    Did you speak with any other chiefs
8    during this period?
9    A    During the details, yes.
10   Q    And you mean during the protest detail?
11   A    I'm sorry.  I apologize.  Yes, during
12   protest details.
13   Q    What types of chiefs did you speak with
14   or which chiefs did you speak with?
15   A    Chief Steve Hughes, commanding officer
16   of patrol borough Manhattan South.  Deputy Chief
17   James Keel, Manhattan South.  Chief Maddrey,
18   commanding officer of Brooklyn North.  Chief
19   Monahan, then chief of the department.
20         I'm sure there's many others.  I don't
21   recall everybody.
22   Q    Chief Wedin?
23   A    Yes.
24   Q    And Chief Lehr?
25

Inspector G. Dowling

1    A    Yes.
2    Q    You mentioned Chief Monahan.  What did
3    you speak with him about during the George Floyd
4    protests?
5    A    I could tell you one time, whether we've
6    got to make arrests or not, but that's -- that was
7    the only thing I can remember.
8    Q    And when was that conversation?
9    A    I don't recall.
10   Q    Where were you?
11   A    Midtown Manhattan.
12   Q    Do you recall what day?
13   A    I can tell you it was when the looting
14   was occurring.  I don't know what specific day.
15   Q    So that conversation with Chief Monahan,
16   he was the chief of the department at the time;
17   that was a superior position to yours?
18   A    Oh, much superior, yes.
19   Q    And did you consult with him about
20   whether to make arrests?
21   A    Again, I don't remember the crux of the
22   conversation.  I just remember we were discussing
23   about making arrests.
24   Q    And is it fair to say that in that type

Inspector G. Dowling

1    of situation, you were to follow his directions?
2    A    Yes.
3    Q    And did you, in fact, follow his
4    directions on that day?
5    A    Yes.
6    Q    So as you discussed yesterday, part of
7    SRG's purpose is to respond to protests and large
8    demonstrations?
9    A    Yes.
10   Q    And specifically with respect to SRG,
11   you have received training on doing that?
12   A    Yes.
13   Q    And beyond that, have you also received
14   training in your normal duties as a police officer
15   with respect to policing protests?
16   A    I recall in the academy briefly
17   receiving training regarding protests.  Through my
18   training -- sorry.  Through my experience,
19   however, that's where most of my knowledge came
20   from for policing protests.
21   Q    And your academy training would have
22   been in 1995; is that right?
23   A    '95/'96, yes.
24   Q    So when you say your experience came

Inspector G. Dowling

1   through -- or your training came through
2   experience, I wonder if you can elaborate on that.
3   By direction from other officers or just by
4   handling things and learning from that?
5        A    By both.  I was blessed to, in my
6   opinion, learn from great executives who have
7   dealt with -- when I was first assigned to
8   Manhattan South, the Fifth Precinct, learn from
9   those individuals who guided me and instructed me
10  on how to handle large-scale protests, and I
11  continued learning, developing; and then when I
12  went to SRG, attending the mobilization exercises
13  and also solidified my knowledge on how to police
14  these demonstrations.
15       Q    Do you recall the names of any of the
16  executives that you were fortunate to learn from
17  that you just mentioned?
18       A    I can tell you one.  Dennis DeQuatro.
19       Q    Any others that you recall?
20       A    Now he's a chief.  Chief Winski, Chief
21  Edward Winski.
22       Q    Any others?
23       A    Thomas Purtell.
24       Q    Any others?

Inspector G. Dowling

1        A    Those are the three names that stick out
2   to me.
3        Q    Did you have any negative experiences
4   policing protests that led you to learn something?
5        A    I can't think of anything off the top of
6   my head right now, but I'm not saying that's -- I
7   just can't think of one specific incident.
8        Q    But is it fair to say that you learned
9   from mistakes?
10       A    Yes.  I'm not infallible.  Yes.
11            MS. BIKLEN:  Okay.  I'm going to
12       use an exhibit.  I have premarked them, and I
13       have premarked them as Dowling Exhibit 2 to
14       represent today, and I'm going to put it in
15       the chat.  Let's see if you can see it.
16            And Amy, these are the ones that I
17       have sent to you.
18            (Exhibit 2-1 was marked for
19            identification.)
20  BY MS. BIKLEN:
21       Q    I just sent you an exhibit in the chat,
22  which is like the little speech bubble at the
23  bottom of your screen.
24       A    I got it.

Inspector G. Dowling

1        Q    What I'll ask you to do is download that
2   and open it up.  You should be able to click on
3   it, and let me know when you have done that.
4        A    Do I keep clicking on it?  Is that what
5   it is?  Sorry.
6        Q    So the way it works for me, and maybe
7   Amy can explain it, is I click on it, and then it
8   sort of downloads and opens in another window.  I
9   don't know if that's true for you.
10           MS. ROBINSON:  Chief, do you need
11      some tech help?
12           THE WITNESS:  I may.  I know this
13      is confidential.  Can I bring in somebody to
14      help me with this?
15           MS. ROBINSON:  Yes.  If you have
16      the tech guy come in and just help you with
17      this one, then maybe you'll be able to do the
18      rest of them.
19           THE WITNESS:  Yeah, I apologize.
20           MS. BIKLEN:  Let's take a
21      five-minute break.
22           MS. ROBINSON:  Okay.
23           (Whereupon, a short recess was
24            taken.)

Inspector G. Dowling

1   BY MS. BIKLEN:
2        Q    All right, Chief.  I have put in the
3   chat what has been marked as Dowling Exhibit 2-1.
4   Can you see that?
5        A    Yes.
6        Q    And what is this document?
7        A    That is called "cupper" or CPR.  It's
8   information as to rank, name.  It's a department
9   document that gives you a background on the
10  officer in question.
11           (Discussion was held off the
12           record.)
13  BY MS. BIKLEN:
14       Q    And it says "NYPD - Personnel Profile
15  Report - All History," correct?
16       A    Correct.
17       Q    And this is your name on the document?
18       A    Yes.
19       Q    And in Exhibit 2-1, do you see the tax
20  ID?
21       A    Yes, I do.
22       Q    And that's tax ID 915640?
23       A    Yes.
24       Q    And that's yours?

Inspector G. Dowling

1

2    A    Yes.

3    Q    Okay, great.

4         Now, if you turn to the page marked at

5    the bottom DOWLING-DEP-009, or if you scroll down

6    to that page.

7    A    Yes, I have it.

8    Q    You'll see some trainings, and are these

9    trainings that you took and you completed?

10   A    Yes.

11   Q    Do you see the entry for training "SRG

12   LRAD training" is on October 22, 2019?

13   A    I do.

14   Q    What did that training consist of?

15   A    It's been a while, but how to utilize

16   the, as it's called here, "long-range acoustic

17   device."  Distance away from demonstrators,

18   protesters.  The numbers that correspond with the

19   violation they are committing.  That's what I

20   recall.

21   Q    Now, you just said which numbers to

22   check.  Is that -- are you referring to which

23   warnings to send out through the LRAD?

24   A    There are preprogrammed warnings within

25   the LRAD, whether it is to have people,

Inspector G. Dowling

1

2    demonstrators, protesters move out of the street,

3    the type of violation they are committing, things

4    of that nature.

5    Q    And did you receive training, other than

6    which numbers go with which message, but sort of

7    which messages to use in which circumstances?

8    A    It's based on the incident itself, not

9    specific training for that.

10   Q    When you say it's "based on the incident

11   itself," what do you mean?

12   A    It could be a certain crime that's

13   occurring, unlawful assembly, disorderly conduct,

14   so that's what I mean by it's based on the

15   incident that's occurring.

16   Q    But there are different types of

17   warnings that go through the LRAD, correct?

18   A    Correct.

19   Q    One could be a warning to disperse?

20   A    Yes.

21   Q    Another could be a warning that the

22   crowd is under arrest and do not resist?

23   A    Correct.

24   Q    And some of those warnings are specific

25   to the violation or crime that's occurring?

Inspector G. Dowling

1

2    A    Yes.

3    Q    And my question is:  Did you receive

4    training on sort of the different types of

5    warnings to use, depending on the situation?

6    A    I don't recall.

7    Q    Now, that LRAD training course, was that

8    just for executives?

9    A    No.  That was for all -- I believe that

10   was for all members assigned to SRG.  Again, I

11   don't recall.  I'd like to rephrase that.  I'm not

12   100 percent certain on that.

13   Q    About whether it's for all SRG members?

14   A    Correct.

15   Q    Who has access to the LRAD warnings at a

16   demonstration?

17   A    Disorder control unit.

18   Q    And what level of officer determines

19   whether to start playing one at a demonstration?

20   A    An executive assigned to SRG or the

21   incident commander or their designees to request.

22   Q    And by "executive," is that referring to

23   a captain and above?

24   A    Yes.

25   Q    Could an incident commander assigned to

Inspector G. Dowling

1

2    SRG be in some position less than a captain?

3    A    An incident commander assigned to SRG,

4    yes.

5    Q    And in that position, they could

6    determine whether to play an LRAD warning as

7    appropriate?

8    A    No.  Again, they can be requested.  The

9    incident commander from a patrol borough can

10   request the I'll say lieutenant for incident

11   command from SRG to start playing warnings if

12   there's not an SRG executive on the scene.

13   Q    And so you said that at this training,

14   you were not -- it did not cover when to play the

15   warnings.  Is there a training that does cover

16   when to play warnings?

17   A    No, I didn't say that they did not -- we

18   didn't learn to play warnings.  I just said I

19   don't know, I don't recall, because when we play

20   warnings, it's when we're at the scene and it's

21   determined that the incident commander wants, for

22   whatever reason, to play a warning to the

23   demonstrators or protesters, just play the

24   warnings.

25   Q    Okay.

Inspector G. Dowling

2    A    So it's hard to say that we have trained
3 in that.  That's a -- the functionality of the
4 LRAD is what we learned.
5    Q    Okay, but do you have any written
6 materials describing when such warnings should be
7 played when SRG is policing a protest?
8    A    I don't recall.
9    Q    Is it up to the discretion of the SRG
10 executives and incident commanders on the scene?
11    A    The incident commander on the scene.
12    Q    The patrol bureau incident commander?
13    A    Correct.
14    Q    And also the SRG executive?
15    A    No.  The patrol borough commander will
16 dictate if and when he or she wants those warnings
17 to be played.
18    Q    If I had a document that said Inspector
19 Dowling authorized LRAD to be used, what would be
20 meant by that authorization?
21    A    It depends on who the document came
22 from.  It would have -- if that -- if you do have
23 one, I received permission or a request from a
24 patrol borough incident commander to play the
25 warnings or play the LRAD.

Inspector G. Dowling

2    Q    So just so I understand, is it your
3 testimony that SRG cannot play warnings without
4 permission from a patrol borough services incident
5 commander?
6    A    I never say never.  There could be
7 exigent circumstances.
8    Q    Let me rephrase.
9         Is it your testimony that SRG does not
10 play an LRAD warning without permission from a
11 patrol borough services incident commander?
12         MS. ROBINSON:  Objection; asked and
13    answered.  You can answer.
14         THE WITNESS:  I said absent exigent
15    circumstances, we do not do that, yes.
16 BY MS. BIKLEN:
17    Q    And what are the exigent circumstances
18 in which an LRAD would be played without
19 permission from the patrol borough incident
20 commander?
21    A    One such incident, if we came upon a
22 tumultuous crowd, and we tried to get them off the
23 street, and an incident commander was not present,
24 in order to bring order back to that specific
25 location, we could, could play the LRADs as a

Inspector G. Dowling

2 de-escalation technique.
3    Q    During the George Floyd protest, was it
4 ever the case that SRG was responding to an
5 incident without patrol borough incident command?
6    A    I'm sure there were many incidents.  I
7 would say yes.  None that I can specifically
8 recall, but I would say yes.
9    Q    And in that training with respect to
10 LRAD, was the content of the messages discussed in
11 any way?
12    A    Would you repeat that question?  I
13 apologize.
14    Q    In the LRAD training that you took in
15 October of 2019, other than the specific
16 relationship between the number and the offense,
17 was the, the content, the meaning of the messages
18 discussed in any way?
19    A    I don't recall.
20    Q    Have you ever taken a training
21 specifically discussing dispersal warnings?
22    A    I don't recall.
23    Q    Do you recall anything related to the
24 specific elements of what should be in a dispersal
25 warning?

Inspector G. Dowling

2    A    I tell you what we normally do is give
3 warnings, and then we -- absent exigent
4 circumstances, of course -- give a command to --
5 that the subjects will be arrested or the people
6 will be arrested since they didn't heed our
7 warnings.
8    Q    And what are those exigent circumstances
9 where you would not give the command that the
10 subjects will be arrested?
11    A    Again, the incident itself would dictate
12 that.  It could be tumultuous behavior.  Again,
13 it's not necessary.  It's not our policy to always
14 give a warning.  However, we'd like to de-escalate
15 situations, and if the incident doesn't allow us
16 to give those warnings like we normally would, we
17 wouldn't give those warnings.
18    Q    And is it your testimony that providing
19 the warning that the subjects are now under
20 arrest, does it help to de-escalate a situation?
21    A    We gave the warnings prior that they
22 were in violation.  That's what I mean.  So
23 that -- we attempt to de-escalate in that sense,
24 and if they do not comply with a lawful order, we
25 say you will be arrested.

Page 54

Inspector G. Dowling

1
2     Q    I'm just trying to understand the
3 relationship with de-escalation.  Is it your
4 testimony that providing those warnings helps
5 de-escalation?
6     A    In many instances it has.
7     Q    If you go down to the next page that is
8 marked at the bottom DOWLING-DEP-010, I'd like to
9 ask you about a training called "SRG Refresher"
10 dated May 12, 2019.
11    A    I'm sorry.  Number 10?
12    Q    Yes, of the document, not of the PDF.
13    A    Yes, I have it, I have it.  May 12,
14 2019.
15    Q    Yeah, it's about a third down the page,
16 "SRG Refresher," what does that refer to?
17    A    Again, that's going on almost three
18 years.  That could be -- I don't recall
19 specifically.  I don't want to guess.
20    Q    Do you recall any refreshers about
21 protests?
22    A    I recall the mobilization exercises
23 monthly.  Excuse me.  Eight times per month, I
24 should say, we gave the mobilization exercise.
25    Q    And I believe you testified yesterday

Page 55

Inspector G. Dowling

1
2 that those were field exercises?
3     A    Yes.
4     Q    Did this refresher course on May 12,
5 2019 happen in the field?
6     A    I don't recall.
7     Q    If it says "department training" on the
8 left side, does that help refresh your
9 recollection?
10    A    No.
11    Q    Do you recall anything related to the
12 right to assemble in this 2019 refresher course?
13    A    I don't recall.
14    Q    Was there discussion of First Amendment
15 rights of protesters in this 2019 course?
16    A    I don't recall.
17    Q    Anything related to using OC spray in
18 this 2019 course?
19    A    I don't recall.
20    Q    You mentioned the mobilization field
21 exercises that happen regularly.
22    A    Yes.
23    Q    Do those do training on less-than-lethal
24 force?
25    A    Yes.

Page 56

Inspector G. Dowling

1
2     Q    Including using OC spray and when that's
3 appropriate?
4     A    Yes.
5     Q    And when did that start?
6     A    I want to say sometime in 2018.
7     Q    And what is the training on
8 less-than-lethal force?
9     A    Our job is to protect everybody's First
10 Amendment rights.  We protect life and personal
11 safety.  Less-than-lethal force, if we -- we use
12 the amount of force necessary, the minimal amount
13 of force necessary to effect an arrest while
14 preserving life and personal safety.
15    Q    I'm not sure you answered my question.
16 Are those tenets what is trained on in the field
17 mobilizations that you've been discussing?
18    A    We have spoken about that during field
19 mobilization, yes.
20    Q    And including when it's appropriate to
21 use OC spray in a protester situation?
22    A    Yes.
23    Q    Okay.  What was discussed?
24    A    We try not to use OC spray
25 indiscriminately absent exigent circumstances.  We

Page 57

Inspector G. Dowling

1
2 have different types of OC spray, when those can
3 be utilized, by whom they could be utilized.
4 That's what I recall from that training, from
5 mobilization exercises.
6     Q    And it's your testimony that that type
7 of training started in 2018?
8     A    Sometime in 2018, 2019.
9     Q    Okay, and is it your testimony that OC
10 spray could be used indiscriminately if there are
11 exigent circumstances?
12    A    One more time?  Sorry.
13    Q    Is it your testimony that OC spray can
14 be used indiscriminately in exigent circumstances?
15    A    That wasn't clear.  Sorry.  Sprayed
16 indiscriminately?  I'm trying to think of the
17 right terminology.  Not used indiscriminately.  I
18 apologize.  That's the wrong terminology.  Sprayed
19 in a vast direction indiscriminately, absent
20 exigent circumstances.  I apologize.
21    Q    Okay.  So just to be clear, you are
22 saying that OC spray should not be sprayed in a
23 vast direction absent exigent circumstances?
24    A    Correct.
25    Q    What are the exigent circumstances that

Page 58

```
                    Inspector G. Dowling
1                   Inspector G. Dowling
2    OC could be sprayed in a vast direction?
3         A    If we need to -- if the police horses
4    are getting approached by a tumultuous multiple
5    group, advanced on, and we have to egress, that is
6    one way.  If we have to extract an aided case from
7    the scene, and the crowd will not disperse, that's
8    another way.
9              Those are the ones that I recall right
10   now.
11        Q    And when you say spray in a "vast
12   direction," you mean spray across a crowd of
13   people, correct?
14        A    Correct.
15        Q    And how many times since 2018 would you
16   say that SRG officers have trained on that issue?
17             MS. ROBINSON:  Objection.  You can
18   answer.
19             THE WITNESS:  I don't have that
20   answer.
21   BY MS. BIKLEN:
22        Q    Have you personally instructed SRG
23   officers with respect to those types of
24   circumstances in which they could use OC spray
25   across a crowd of individuals?
```

Page 59

```
1                   Inspector G. Dowling
2         A    No.
3         Q    What information are SRG members given
4    to help with these types of exigent circumstances,
5    as you've described them, versus just a group of
6    individuals yelling and screaming?
7         A    If supervisors are present, supervisors
8    can give direction as to whether or not that
9    situation requires that type of less-than-lethal
10   force.
11        Q    And are SRG members supposed to get
12   supervisor approval before using that type of
13   less-than-lethal force?
14        A    Not in all uses of OC spray.
15        Q    Well, you've just told me that the way
16   that members are instructed about how to
17   distinguish those situations is because
18   supervisors are present.  So if they don't need
19   supervisory approval, how else are they supposed
20   to distinguish those situations where they could
21   use OC spray across a vast array of people versus
22   when it's just a crowd yelling and screaming?
23        A    If there's a possibility that they are
24   in danger of serious physical injury or serious
25   injury, they can utilize -- they can determine
```

Page 60

```
1                   Inspector G. Dowling
2    when to utilize that OC spray.
3         Q    Does that situation include if they're
4    with, you know, dozens of other cops and could
5    just move somewhere?
6         A    I would have to know the whole
7    situation.
8         Q    Fair enough.
9              Okay.  I would like to turn back to page
10   DOWLING-DEP-009, the page previous, and ask you to
11   look at a training called "COVID-19 Protective
12   Masks" that was on May 25, 2020.
13        A    Yes.
14        Q    Okay, and that was right before the
15   protests started?
16        A    Yes.
17        Q    Okay, and that training was about
18   wearing masks to protect from COVID?
19        A    Yes.
20        Q    And at that time what was the policy of
21   the NYPD related to wearing masks to protect from
22   COVID?
23        A    If I remember correctly, we were
24   supposed to wear masks at all times while, while
25   working.
```

Page 61

```
1                   Inspector G. Dowling
2         Q    And was that part of the training?
3         A    From what I recall, yes.
4         Q    Did you complete that training?
5         A    Yes.
6         Q    Successfully?
7         A    Successfully.
8         Q    And now I'd like you to turn to the
9    previous page, DOWLING-DEP-008, "SRG Field Force
10   Operations - Executive Awareness," dated July 7,
11   2020.
12        A    Yes.
13        Q    Okay, and this is a training just for
14   SRG executives?
15        A    That was for executives throughout the
16   department, if I'm not mistaken.
17        Q    Okay, and what was that training about?
18        A    So it would give an overview of what
19   executives from the New York City Police
20   Department could expect while field forces are
21   assigned to them, how to deploy them, how to
22   monitor what is happening, and it also showed what
23   equipment was available to SRG members to the
24   deployment, show how SRG bicycles can be utilized.
25             That's what I recall from that training.
```

Inspector G. Dowling

1
2      Q     And was this training in relationship to
3   the protests and the field forces that had been
4   used during the protest just prior to that?
5      A     Yes.
6      Q     Did it discuss the protests?
7      A     I'm sure there were examples given
8   during a protest -- or utilizing the protest.  I'm
9   sorry.  I'm sorry.
10      Q     No.  Continue.
11      A     That was it.
12      Q     Any lessons learned from the
13   mobilization of field forces at the protests?
14      A     Yes.
15      Q     What were some of those lessons?
16      A     That advance with officers should not,
17   should not caravan.  By "caravan," I mean line up
18   behind a large mobile protest.  Officers should
19   walk alongside the demonstrators, not behind.  The
20   frequency utilized by our department radios and
21   how to use those radios to keep chatter off, so
22   that if there's an emergency message, people can
23   get through.
24          That's, that's what it was.  Some of the
25   best practices that was discussed.

Inspector G. Dowling

1
2      Q     Was there any discussion of mass arrests
3   at that training?
4      A     I don't recall.
5      Q     Containment for the purpose of mass
6   arrests at that training?
7      A     I don't recall.
8      Q     That training aside, have you received
9   training on mass arrests?
10      A     Again, in mobilization exercises, we do.
11   We have actors portraying themselves as -- we have
12   actors portraying themselves as peaceful
13   demonstrators as well as non-peaceful
14   demonstrators, so I have received training
15   regarding mass arrest situations.
16      Q     And as part of that training, have you
17   received training on sort of the tactics effecting
18   mass arrests?
19      A     Yes.
20      Q     Containment for the purpose of mass
21   arrests?
22          MS. ROBINSON:  Objection.  You can
23      answer.
24          THE WITNESS:  By "containment,"
25      what -- I'm sorry.  What do you mean by

Inspector G. Dowling

1
2      "containment"?
3   BY MS. BIKLEN:
4      Q     Well, let's, let's go back.
5          How, how have you been instructed about
6   how to effect mass arrests?
7      A     Depending on the, the incident itself,
8   so we have -- it could be peaceful demonstrators.
9   They would read the warnings if possible.  We
10   would approach each person after a warning is
11   given, instruct each person that they will be
12   arrested, place them in cuffs.  They would be led
13   to the prisoner wagon where a supervisor would be
14   present.  They would -- the supervisor -- they
15   would be searched.  Their belongings would be
16   placed in an envelope.  The supervisor would
17   ensure that the officer is aware of why the arrest
18   was being made.
19          A picture would be taken with the
20   arresting officer or the assigned officer and the
21   arrestee, and that arrestee would be placed in the
22   van where they would be taken to an arrest
23   processing center, and that could be in a local
24   precinct, that could be perhaps downtown at the
25   mass arrest processing center at 1 Police Plaza --

Inspector G. Dowling

1
2   sorry -- inside 1 Police Plaza.
3          A supervisor would respond to 1 Police
4   Plaza or the precinct where the arrestees are
5   being taken to, and ensure that the proper
6   paperwork is being prepared, along with that the
7   person -- sorry -- the officer knows why that
8   person is being arrested.
9      Q     So Chief, let me just stop you there,
10   because I want to go back to the field part.
11          You said if they're peaceful, they might
12   be arrested one by one; is that accurate?
13      A     One by one.
14      Q     You would go up to each protester and
15   arrest them?
16      A     Ideally we'd like to, yes.
17      Q     Okay.  When you say "peaceful," could
18   peaceful mean screaming and yelling?
19      A     Sure.
20      Q     Could peaceful mean carrying signs?
21      A     Yes.
22      Q     Could peaceful mean standing in the
23   middle of the street?
24      A     Yes.
25      Q     Could peaceful mean linking arms?

Inspector G. Dowling

1              Inspector G. Dowling
2    A    If they unlink arms when we go to arrest
3  them, that would be peaceful, absolutely.
4    Q    And in that situation, how do you keep
5  them from all running away when you go up to
6  arrest them?
7    A    We can use an encirclement maneuver
8  where we encompass the people we want to arrest.
9    Q    Can you describe that encirclement
10  maneuver to me?  And I'll just note for the record
11  that Chief Dowling put out his arms in sort of a
12  circle manner.
13        Can you describe that using words?
14    A    We could give a hand signal as we want
15  encirclement, so that would be above our heads,
16  like you said, a circle movement, or a verbal
17  direction as to have officers or bicycle officers,
18  it doesn't matter, encircle that crowd, that group
19  we are going to arrest, and arrest those people.
20    Q    And so when you say "encircle that
21  crowd," does that mean police officers would be in
22  formation on each side of the crowd?
23    A    They would literally be a circle around
24  that crowd.  They would form a circle around that
25  crowd.

Inspector G. Dowling

1              Inspector G. Dowling
2    Q    And that could be bicycle officers and I
3  believe you said other officers?
4    A    Correct.  Foot officers.
5    Q    And you're using the term "encirclement"
6  for that?
7    A    Yes.
8    Q    Have you ever used heard the term
9  "cattling"?
10    A    I have.
11    Q    Have you heard the term cattling to
12  describe what you just called encirclement?
13    A    By the media, yes.
14    Q    Other than the different term, the name
15  encirclement versus cattling, what are the
16  differences in your mind between what the media
17  has called cattling and what you just called
18  encirclement?
19        MS. ROBINSON:  Objection.  You can
20    answer.
21        THE WITNESS:  Again, with the media
22    terminology with cattling, that is -- I don't
23    even know what the media terminology is, to
24    be quite honest with you.
25

Inspector G. Dowling

1              Inspector G. Dowling
2  BY MS. BIKLEN:
3    Q    So you don't know what the term cattling
4  means?
5    A    Only from what the media said.
6    Q    When you've heard it used in the media,
7  did it sound like encirclement to you?
8    A    No.
9    Q    So what is the difference?
10    A    That's -- I don't know what the
11  terminology that the, the media would have used,
12  so I don't know what the definition of their term
13  cattling is.  I just know what our term, our
14  method of encirclement entails.  It's not -- you'd
15  have to ask somebody from the media.  I don't
16  know.
17    Q    If I represent to you that cattling has
18  been used as a term to represent when police
19  officers surround a protest march, does that sound
20  like encirclement to you?
21    A    I'd have to see the example that's being
22  put forth.
23    Q    We will get back to that later.
24        I believe you talked about -- so that's
25  with a peaceful crowd.  What training do you have

Inspector G. Dowling

1              Inspector G. Dowling
2  on making mass arrests with not a peaceful crowd?
3  And I'm just asking about sort of the process of
4  putting people into cuffs.  We'll deal with all
5  the other stuff another time.
6    A    Again, we -- our job at protests is to
7  protect life and personal safety, so once a
8  peaceful protest can become unlawful or violent,
9  we would have to use the least amount of force
10  necessary to effect those arrests.
11    Q    Okay.  Well, you've just described to me
12  where a crowd is encircled and arrested -- an
13  officer going up to the person and arresting them.
14  When they are encircled, are they free to leave?
15    A    They are informed that they are being
16  arrested.
17    Q    So they're under arrest at that point;
18  is that right?
19    A    Correct, in our custody, yes.
20    Q    Now, a peaceful march could be unlawful,
21  right?
22    A    They could have committed violations,
23  yes.
24    Q    Okay.  They could be blocking traffic?
25    A    Yes.

Inspector G. Dowling
1
2       Q    Now, is there a different maneuver other
3  than encirclement that you use for a non-peaceful
4  crowd?
5       A    We, we don't necessarily use
6  encirclement every time.  It could be one on one
7  with an officer trying to get that person into
8  custody with using -- if that person is using like
9  physical evasive movements, resisting arrest, we
10 try to assign that based on our -- I want to say
11 amount of personnel that we have, we try to assign
12 that arrest specifically for resisting arrest to
13 that one officer who the person was fighting with,
14 so that's -- we don't always use encirclement.
15      Q    Do you ever use encirclement while an
16 order to disperse is playing?
17      A    I cannot recall an incident where that
18 happened.
19      Q    Can a member of the crowd disperse if
20 they are encircled?
21      A    It's happened.
22      Q    How would they disperse in those
23 situations?
24      A    There have been times where they just
25 walked out between officers and have not been

Inspector G. Dowling
1
2  arrested.  It's possible.
3       Q    Did any of those times happen during the
4  George Floyd demonstrations?
5       A    Yes.
6       Q    When?
7       A    I don't have specifics, but I know --
8  I've been there when it has happened, but I don't
9  have specifics.
10      Q    No time that you can recall that comes
11 to mind?
12      A    No.
13      Q    I'd like to go back quickly to the
14 discussion on the OC spray.  You discussed three
15 instances where it could be used against a crowd,
16 and let me know if this testimony is correct.
17           When the NYPD has to egress, when you
18 have to extract an aided case and the crowd won't
19 disperse, and -- or if the officer is in danger of
20 serious injury; is that your testimony?
21      A    Can I just go back for a second?
22           The original one, if we have to egress
23 and a violent crowd is not allowing us to egress,
24 if we have to utilize OC spray, we utilize OC
25 spray to get out of that crowd.

Inspector G. Dowling
1
2           As far as an aided case, same example, a
3  tumultuous crowd, violent.  We can use that OC
4  spray to form a protective barrier or a zone of safety to remove
5  that aided in a peaceful and noninjurious manner,
6  and if an officer is in fear for his -- serious in
7  fear for his physical safety, he can utilize that
8  OC spray to remove himself from that scene.
9
10      Q    And again this is specifically on
11 crowds, not on individuals.  Is that still your
12 answer?
13      A    That's still my answer.
14      Q    Okay, and use of OC spray is considered
15 use of force that must be reported?
16      A    Less-than-lethal, yes.
17      Q    Are there special circumstances for the
18 use of OC spray when there is a crowd?
19      A    Tumultuous groups that are violent,
20 trying to -- actively resisting, we can utilize OC
21 spray to overcome an assault.
22      Q    What about concern for bystanders; where
23 does that come in?
24      A    Again, our job is to protect the safety
25 of everyone involved.

Inspector G. Dowling
1
2       Q    How does that -- what is an SRG officer
3  to do when there is a crowd and there are
4  bystanders who are not committing any violations
5  or not being tumultuous?
6       A    The bystanders -- again, I would have to
7  know the situation.
8       Q    They're in the crowd.
9       A    They're in the crowd, a tumultuous
10 crowd.
11      Q    Well, what do you mean by "tumultuous"?
12      A    So violence, making arrests, are we --
13 are they resisting arrests actively, are they
14 pulling at officers.
15      Q    When you use the word "tumultuous," do
16 you mean that every single person in the crowd is
17 doing that?
18      A    No.  I'm asking -- I'm sorry.  I'm not
19 trying to ask you the question, but I'm trying to
20 capture the scene.
21      Q    Well, you're saying a tumultuous crowd,
22 so I'm trying to understand that what a tumultuous
23 crowd is.  Does that mean every single person in
24 the crowd is committing violence?
25      A    It could.  It's happened.

Page 74

Inspector G. Dowling

1      Q     Could it also mean that some people in
2  the crowd are not doing that?
3      A     Sure, it could be, yes.
4      Q     And in those circumstances where not
5  every single person in the crowd is committing
6  violence, have you instructed SRG officers about
7  how to take into consideration the effect on
8  bystanders, non-violent people, when using OC
9  spray in those situations?
10     A     I have not personally instructed
11 officers on that, no.
12     Q     Do you know of anyone who has?
13     A     During training, we are trained to -- if
14 an individual is within a crowd and they are
15 acting irrationally or violently, they will be
16 targeted with OC spray, and we would target them.
17 Now, unfortunately, if there is a bystander, as
18 you said, a peaceful bystander next to them, of
19 course, if they get sprayed, we would get them
20 medical treatment if necessary.
21     Q     And this is training from the DCU that
22 does this?
23     A     Yes.
24     Q     And then have you ever received training

Page 75

Inspector G. Dowling

1  on protest tactics of any particular
2  organizations?
3      A     Particular organizations? No, not that
4  I recall.
5      Q     Any training on tactics, for example,
6  FTP?
7      A     Have we, have we -- by "training" -- I'm
8  sorry.  What exactly do you mean by "training"?
9      Q     I'll rephrase the question.
10         In your training, have you ever
11 discussed the tactics of the group FTP?
12     A     Yes.
13     Q     What did you discuss?
14     A     Through history of some of these
15 protests, FTP has acted violently toward police
16 officers, criminal mischief in communities, so we
17 would -- again, we would give examples of maybe a
18 protest where FTP was involved in.
19     Q     And that's the DCU trainings?
20     A     Yes.
21     Q     What about decolonize/displace; have
22 those been discussed in trainings?
23     A     I don't recall that one specifically.
24     Q     And what about Black Lives Matter?  Have

Page 76

Inspector G. Dowling

1  tactics or histories of those groups been
2  discussed in DCU trainings?
3      A     Yes, but again it's not -- sorry.  It's
4  not specific to the group.  It's what happened
5  during those specific protests.
6      Q     Any other organizations and specific
7  protests involving those organizations that you
8  can recall?
9      A     Another example was the Proud Boys.
10 That was another example that was utilized.
11         Those are the ones that come to my mind.
12     Q     Now, yesterday you were asked about the
13 first time you learned that there might be
14 protests in New York City relating to the murder
15 of George Floyd, and was that on May 28th itself?
16     A     I believe that's when we first found out
17 there was going to be a protest at Union Square.
18     Q     Prior to May 28, did you have any
19 discussions with anybody regarding the possibility
20 of protests in New York City related to the murder
21 of George Floyd?
22     A     Yes.
23     Q     When was that?
24     A     Can't say specifically.  It was in

Page 77

Inspector G. Dowling

1  between the time of the first protest and the
2  death of George Floyd and the events that occurred
3  in Minneapolis.
4      Q     So sometime between May 25 and May 28?
5      A     Yes.
6      Q     When did you learn about the first
7  planned protest in New York City on May 28?
8      A     It was either by word of mouth or a
9  detail request.
10     Q     When you say "word of mouth," what do
11 you mean?
12     A     It's possible that Chief D'Adamo told me
13 that there was going to be a protest.  Possibly
14 someone from our detailing unit could have told me
15 that.  I don't know specifically how I found that
16 out.
17     Q     Did you have discussions with Chief
18 D'Adamo about the plan to protest on May 28?
19     A     Yes.
20     Q     What did you discuss?
21     A     Where units are going to be deployed,
22 who was going to be assigned to that detail.
23     Q     Anything else?
24     A     No, no, not that I recall.

Page 78

Inspector G. Dowling

```
1                Inspector G. Dowling
2      Q    Did you have any intelligence related to
3  that protest?
4      A    Besides the location and time, I don't
5  recall.
6      Q    Do you get intelligence briefings --
7  withdrawn.
8           As an executive officer of SRG, did you
9  get intelligence briefings?
10     A    No.
11     Q    Did you receive any emails related to
12 intelligence on upcoming things in the city?
13     A    Yes.
14     Q    Did you receive any emails related to
15 intelligence about the May 28 protest?
16     A    A spreadsheet with the details that
17 occurred during the week, but that's the extent of
18 it that I recall.
19     Q    Now, you mentioned that you discussed
20 with Chief D'Adamo about the response, the detail.
21 How did that discussion take place?  Was it in
22 person?
23     A    Yes.
24     Q    And when you receive detail requests,
25 how does that happen?
```

Page 79

Inspector G. Dowling

```
1      A    Well, I'll explain it from A to Z if
2  that's okay.
3           So we would have -- the patrol borough
4  would learn of a protest demonstration parade in
5  their borough.  They would ask for a specific
6  amount of resources from a variety of units.  That
7  would then be sent to the operations unit at 1
8  Police Plaza.
9           Operations would approve the amount of
10 personnel or send it back to the borough to cut
11 the detail; in other words, to remove personnel
12 from that detail.  That -- from operations, it
13 goes to -- if it's approved, it goes to special
14 operations, who will approve it and then send it
15 to SRG.
16     Q    When you said the operations unit at
17 1 Police Plaza, that was your old unit?  City-wide
18 operations?
19     A    No, no, no, no.  That was city-wide
20 operations, and there was an operations unit that
21 worked for Chief of Department's office.
22     Q    And at that time did you learn about
23 what the message of the protest on May 28 would
24 be?
25
```

Page 80

Inspector G. Dowling

```
1      A    They were protesting the death of George
2  Floyd, from what I recall.
3      Q    And did you take that into account in
4  planning the response?
5      A    The specific death of George Floyd?
6      Q    Or the perceived message of the protest.
7      A    We take any intelligence or any, any
8  newsworthy events where we see violence occurring
9  in other cities raised our awareness to the
10 possibility that that may occur at the protest in
11 New York City.
12     Q    So other than approving or being
13 notified of detail requests to send SRG details
14 out on May 28, did you take part in any other
15 planning for that protest response, the first
16 protest on May 28?
17          MS. ROBINSON:  Objection.  You can
18     answer.
19          THE WITNESS:  I sent an email,
20     which was an exhibit yesterday, to executives
21     assigned to SRG, remind them of -- you know,
22     be professional at all times, beware of your
23     safety, and I'd have to review the document
24     again.  It's been a while.
25
```

Page 81

Inspector G. Dowling

```
1  BY MS. BIKLEN:
2      Q    And other than that email about
3  deploying SRG units, any other planning that you
4  engaged in with respect to that first protest on
5  May 28?
6      A    None that I can recall.
7      Q    And that first protest was at Union
8  Square on May 28?
9      A    Yes.
10     Q    And there was also a protest near City
11 Hall on May 28?
12     A    Yes.
13     Q    Were you physically present at either of
14 those?
15     A    I'm not 100 percent certain of the one
16 at Foley Square.  If you have video of me there,
17 I'll say I was there.  The one in Union Square, I
18 was physically present.
19          MS. BIKLEN:  I'm going to put
20     another document in the chat, and this is
21     going to be marked Dowling Exhibit 2-2.
22          (Exhibit 2-2 was marked for
23          identification.)
24
25
```

Inspector G. Dowling

1                Inspector G. Dowling
2  BY MS. BIKLEN:
3       Q    And if you can please open that and take
4  a look.
5       A    Yes.  This is the email -- you asked me
6  to describe it?  I'm sorry.
7       Q    I'll ask a question, but thank you.
8            You are able to see the document marked
9  Dowling Exhibit 2-2?
10      A    Yes.
11      Q    And this document which ends with the
12 Bates number 61341 is an email from you sent on
13 May 28, 2020 at approximately 12:02 p.m.?
14      A    Correct.
15      Q    And this was the email that you were
16 just referring to in your testimony?
17      A    Yes.
18      Q    And you sent this to other SRG
19 executives?
20      A    Yes.
21      Q    Now, I know you were asked questions
22 about this yesterday, and I'll try to be very
23 brief.
24           So you say that, in the email, that
25 "there have been social media posts calling for

1                Inspector G. Dowling
2  retaliation."
3            What did you mean by "retaliation"?
4       A    At the time, if my memory serves
5  correct, retaliation against police officers for
6  what happened to George Floyd.
7       Q    Physical retaliation?
8       A    If my memory serves correct, killing
9  police officers.
10      Q    Is that what you meant in this email?
11      A    Yes.
12      Q    And is that the message that you
13 intended to send, that there could be retaliation
14 by the killing of police officers?
15      A    The killing by police -- not killing by
16 police officers.  There was social media posts
17 that said to kill police officers.
18      Q    And Amy, I'll just again ask for those
19 to be produced.
20           Did you view those social media posts in
21 your capacity as an executive officer of SRG?
22      A    I don't recall that at this time.
23      Q    Did you personally see the posts, or
24 were you informed of them?
25      A    Again, I might have witnessed them, or I

1                Inspector G. Dowling
2  could have -- somebody told me about them.
3       Q    And at that time at about noon on
4  May 28, did you expect that there would be
5  peaceful protesters?
6       A    I could say I hoped there was peaceful
7  protesters, I know that, because every protest we
8  go in hoping.
9       Q    Did you consider conveying to your staff
10 that there might be peaceful protesters?
11      A    Yes.
12      Q    Why didn't you write that?
13      A    I don't know what my frame of mind was
14 back then, to be quite honest with you, but I can
15 tell you if I read the whole document, I might be
16 able to figure out exactly what I was implying or
17 not implying.
18      Q    Please read the document.  It's short.
19           (Witness peruses document.)
20           THE WITNESS:  So in item number
21      2 -- sorry.  In the second bullet, it said
22      "civil disobedience arrests will be approved
23      only by a patrol borough executive," so there
24      was a hope that if any action was going to be
25      taken, there might be civil disobedience.

1                Inspector G. Dowling
2  BY MS. BIKLEN:
3       Q    That's what you meant to convey by
4  saying that, that there might be peaceful civil
5  disobedience?
6       A    Possibly.  I don't recall from this
7  time.  It's about three years ago.
8       Q    Did you consider reminding your
9  executives about the First Amendment rights of
10 protesters?
11      A    I don't recall specifically for this
12 date, but I have.
13      Q    When have you done that before?
14      A    Addressing other demonstrations, I've
15 said everybody has a right to protest, we protect
16 that right, but I don't have specific dates, times
17 or anything to that effect.
18      Q    But that's an important message to
19 convey?
20      A    Absolutely.
21      Q    But not one that you felt important to
22 convey here on May 28?
23           MS. ROBINSON:  Objection.  You can
24      answer.
25           THE WITNESS:  Again, I don't --

Page 86

Inspector G. Dowling

1                Inspector G. Dowling
2        this was three years ago.  I don't know.
3        It's important.  Just because I didn't put it
4        in an email doesn't make it less important.
5    BY MS. BIKLEN:
6        Q    Well, reviewing this email, if you're
7    reading it, would an SRG executive understand the
8    importance of First Amendment rights of protesters
9    from this email?
10       A    Through their extensive training, yes.
11       Q    But not from this email?
12       A    I cannot get in another person's head.
13   I don't know what, what -- how they took this
14   email.
15       Q    Now, you mentioned in bullet point 2,
16   "Remember red light green light regarding
17   arrests."
18            For civil disobedience, patrol borough
19   commanders would have to authorize; is that right?
20       A    The patrol borough incident commander or
21   his designee.
22       Q    So that would be a designee of Chief
23   Hughes?
24       A    Correct.  Sorry.  For this incident, you
25   mean?

Page 87

Inspector G. Dowling

1                Inspector G. Dowling
2        Q    Yes.
3        A    Yes, yes.
4        Q    At that time?
5        A    I apologize.  Yes.
6        Q    And how would that information be
7    conveyed; by radio?
8        A    I can't say specifically to this
9    demonstration.  However, it could come across the
10   radio.  It could be conferrable as you're standing
11   next to the Chief.  That's pretty much the two
12   ways we're going to find out whether to make civil
13   disobedience arrests.
14       Q    If you have an SRG member of service,
15   they're at the protest, they're standing there,
16   how are they informed that they have the green
17   light for civil disobedience arrest?
18       A    Through their supervisors.
19       Q    And that would be a sergeant?
20       A    Yes.
21       Q    Anyone else?
22       A    The, the information that we received to
23   start effecting arrests for civil disobedience
24   would filter down to lieutenants, sergeants and
25   police officers.

Page 88

Inspector G. Dowling

1                Inspector G. Dowling
2        Q    So you as an inspector, you would tell
3    the lieutenant to okay a green light?
4        A    I could tell the police officers it's a
5    green light.  If I'm on the scene, I would say,
6    all right, we have to start making arrests.  It's
7    a green light.  In sum and substance, of course.
8        Q    And when you were, you were physically
9    at that protest, how did you communicate with
10   other members of service?  Was it verbal?
11       A    Primarily verbal, from what I recall.
12       Q    Did you use your radio at all?
13       A    I don't recall.  I'm going to say
14   probably yes.
15       Q    And would you have been using your phone
16   or text at that time?
17       A    I don't think so.  I don't know.  I
18   can't recall back then.
19       Q    And when the green light is given for a
20   civil disobedience arrest, is that with respect to
21   a specific person or to the crowd?
22       A    It could be a specific person, not
23   necessarily a crowd, because one person can be
24   standing in the street.
25       Q    And so the patrol borough would

Page 89

Inspector G. Dowling

1                Inspector G. Dowling
2    authorize the arrest of that specific person, and
3    that information would be conveyed to an SRG
4    member?
5        A    Yes.
6        Q    So what time did you arrive at the Union
7    Square protest on May 28?
8        A    That I don't recall.  I remember it was
9    light out.  That much I do know.
10       Q    And how did you arrive at that protest?
11       A    In my vehicle.
12       Q    Other than your driver, were you alone?
13       A    From what I remember, yes.
14       Q    Was Chief D'Adamo at that protest?
15       A    Again, if I saw a video with him there,
16   he was there, but I'd like to say he was there.
17       Q    What about Deputy Inspector McGeown?
18       A    Yes.
19       Q    And you all arrived separately?
20       A    Yes.
21       Q    About how many protesters were there
22   when you first arrived at the protest?
23       A    I want to say -- my recollection is 50.
24       Q    And approximately how many NYPD officers
25   were there when you first arrived?

Page 90

Inspector G. Dowling

1
2     A    I can't speak for patrol.  I know SRG
3  officers, we probably had 50 officers, including
4  sergeants and lieutenants.
5     Q    So if I'm understanding this, just from
6  SRG alone had about as many as there were
7  protesters when it first started?
8     A    Yes.
9     Q    Did you consider how the crowd would
10  react to having as many officers as protesters?
11     A    No.
12     Q    Did you consider whether that would
13  escalate the situation?
14     A    I don't know why that would escalate the
15  situation.
16     Q    So is that no?
17     A    I just don't know why it would escalate
18  the situation is what I'm saying.
19     Q    Have you ever considered whether police
20  presence escalates a situation?
21     A    I guess you could say I have.  The
22  amount of police, I guess you could say that
23  happened.  I didn't recall that day.  I always
24  view police as good people to have, so I don't
25  think of it that way, but there have been details

Page 91

Inspector G. Dowling

1  where a large amount of police officers have been
2  removed to maybe outlying areas, so I guess I
3  could say yes.
4     Q    But just to be clear here, it's your
5  testimony that's not something you considered on
6  May 28?
7     A    No, and again, it's not my -- it wasn't
8  my decision.  That would be the incident
9  commander's decision.
10     Q    And when you say "the incident
11  commander," you mean the patrol borough services
12  incident commander?
13     A    Yes, yes.  Sorry.
14     Q    But do you consult with the incident
15  commander about what's happening on the scene?
16     A    If Chief D'Adamo was on the scene, he
17  would consult with them, and they would
18  determine -- sorry.  The patrol borough services
19  incident commander would determine whether he or
20  she wanted to remove members of service or police
21  officers from the scene.  I would not determine
22  that.
23     Q    But if you were the incident commander
24  on the scene and Chief D'Adamo is not there, you
25

Page 92

Inspector G. Dowling

1
2  would have those conversations with the patrol
3  incident commander on scene, right?
4     A    Yes.
5          MS. BIKLEN:  I'm going to put
6     another document in the chat.
7          (Exhibit 2-3 was marked for
8          identification.)
9          MS. BIKLEN:  Amy, do you see that
10     in the chat?
11          MS. ROBINSON:  I do.
12  BY MS. BIKLEN:
13     Q    Chief, tell me when you're able to open
14  it up and view it.
15     A    I have.
16     Q    Great.  So I have now -- we're
17  discussing what has been marked as Dowling Exhibit
18  2-3.  It is an email from Elido Capella that was
19  sent on May 28, 2020, at approximately 1:22 p.m.,
20  and the first page ends with the Bates number
21  66602.
22          Is that what you're seeing?
23     A    Yes.
24     Q    And you received this email?
25     A    Yes.

Page 93

Inspector G. Dowling

1
2     Q    And what is it?
3     A    It's a detail roster.
4     Q    And who is the person who sent it?
5     A    He's a police officer.  We call him
6  "Cappy" Capella.  He works in our operations
7  office.
8     Q    And when you say "our operations
9  office," that's SRG operations?
10     A    Correct.
11     Q    And who came up with the information
12  that is in this email?
13     A    I'm sorry.  What exactly --
14     Q    Well, so, for example, this identifies
15  the incident commander as Chief D'Adamo, an
16  assistant as Inspector Dowling, and a mobile field
17  force executive as Deputy Inspector Hillery.
18          Did Capella decide that information, or
19  it was decided elsewhere and he's just noting it
20  down?
21     A    That would be decided elsewhere, and he
22  would just be noting it down.
23     Q    Okay.  So who decided that?
24     A    Chief D'Adamo.  Deputy Inspector
25  McGeown.

                    Inspector G. Dowling
1
2        Q    You didn't have any role in that?
3        A    Not what personnel goes to a detail, no,
4  no.
5        Q    So what would be your relationship as
6  assistant with respect to the mobile field force
7  executive?  How do those interact?
8        A    I would supervise him, so I would work
9  with the -- with Chief D'Adamo.  If the chief may
10 be busy with something, I might have to, in his
11 stead, make decisions, but as far as the mobile
12 field force executive, they would be one level
13 below me.
14       Q    And what are the duties of the mobile
15 field force executive?
16       A    He is to oversee deployment of two
17 lieutenants, five -- and this is -- it can vary,
18 the amount of personnel, but normally it's two
19 lieutenants, five sergeants and 40 officers.
20       Q    What does the "hybrid mobile field
21 force" mean?
22       A    That means there is bicycles as well as
23 foot patrol in that field force.
24       Q    So just to understand the hierarchy on
25 that day, it was Chief D'Adamo, and then below is

                    Inspector G. Dowling
1
2  you, and then Deputy Inspector Hillery, and then
3  below that is Captain Miller; is that right?
4        A    Correct.
5        Q    Turning to the next page of the exhibit,
6  is the COBRA team a separate deployment from the
7  mobile field force?
8        A    Yes.
9        Q    So the mobile field force had 42
10 officers, six sergeants and two lieutenants; is
11 that right?
12       A    Two lieutenants, six sergeants and 40
13 police officers, correct.
14       Q    Okay.  So you got it very right in terms
15 of about 50, including the supervisors.  Good job.
16       A    I'm not that good.  Believe me.
17       Q    And then the AM COBRA team is another 15
18 officers, two sergeants and one lieutenant?
19       A    Yes.
20       Q    And according to this document, that
21 team deployed to near Madison Square Park?
22       A    Yes.
23       Q    And did they ultimately come to the
24 protest at Union Square?
25       A    I'd have to review video or listen to

                    Inspector G. Dowling
1
2  transmissions.  I'm not sure if they were called
3  down.  I'm not sure.
4        Q    Okay, and then there's a PM COBRA team.
5  What does that mean?
6        A    PM -- so AM starts at say 5:00 in the
7  morning.  The PM COBRA team starts at 2:30 in the
8  afternoon.  That's how we differentiate between
9  both COBRA teams.  Usually one relieves the other.
10       Q    Well, here, according to this email, it
11 says that the AM COBRA team will report at 14:00,
12 which is 2:00 p.m.?
13       A    Yes.
14       Q    And when would the PM COBRA team report?
15       A    Sometime around -- it could be upon
16 turnout, so upon turnout would be -- 16:00 would
17 be 4:00 in the afternoon, so upon turnout, we
18 could say 4:00 for all intents and purposes.
19       Q    To your understanding, were they
20 relieving the AM COBRA, or would both be deployed
21 at that time?
22       A    Reviewing this document, I would say
23 they would be both deploying to that location.
24       Q    And within this deployment, both the
25 hybrid field force and the COBRA teams included

                    Inspector G. Dowling
1
2  members of DCU?
3        A    If you -- right under "Sergeant
4  Guerrieri," it has the "AM COBRA DCU TAC van."
5  That has DCU personnel, and the PM also has DCU
6  personnel assigned to it.
7        Q    And is the bike squad in DCU?
8        A    They can be bicycle-trained, so we can
9  utilize them if necessary.
10       Q    I'm not sure that answers my question.
11 Is the bike squad part of DCU or --
12       A    Oh, I'm sorry.  No.  I misunderstood the
13 question.  I apologize.  No, they're not part of
14 DCU, but we can have DCU members bike-qualify.
15       Q    Understood.
16            So if Captain Miller was commanding the
17 hybrid mobile field force, would that be mostly
18 made up of people from DCU or all over SRG?
19       A    Anybody who was bicycle-trained could
20 utilize their bicycles.
21       Q    So you were the assistant incident
22 commander on that day.  Describe to me sort of
23 where you were physically located at the protest.
24 Were you with other executives?  Were you with
25 officers?

```
 1              Inspector G. Dowling
 2              MS. ROBINSON:  Objection.  You can
 3      answer.
 4              THE WITNESS:  I was with, at some
 5      point in time, with executives and police
 6      officers.  I want to say 14th Street and
 7      Union Square East primarily, at least at the
 8      inception of the detail.
 9   BY MS. BIKLEN:
10      Q    And did you move on foot anywhere?
11      A    I know arrests were eventually made, so
12   we moved to 14th Street and Union Square West.
13   That's what I recall from that detail.
14      Q    Did you make any arrests at that time?
15      A    I don't make arrests.  I'm not the
16   arresting officer.
17      Q    Okay.  Let me define that.
18           Did you engage in arrests in the sense
19   of putting someone into handcuffs or flex cuffs,
20   as the case may be?
21      A    I assisted in placing people in
22   handcuffs.
23      Q    And when you say you're not the
24   arresting officer, what do you mean by that?
25      A    So I'm not -- I don't fill out the
```

```
 1              Inspector G. Dowling
 2   paperwork.  I could assign an arrest where I made,
 3   so that's why I'm not the arresting officer.
 4      Q    Were there instances where you had the
 5   personal knowledge of the violation and assigned
 6   an arresting officer to that on May 28?
 7      A    It has happened.  I don't recall on
 8   May 28 whether I was or wasn't.
 9      Q    And what were those arrests on May 28
10   that you assisted with?  Misdemeanors?  Felonies?
11      A    I believe one was -- if my memory serves
12   correctly, it was a robbery.  I believe there were
13   misdemeanors for resisting.  That's from my
14   recollection.
15      Q    And do you know if -- did you end up
16   having any discussions with anyone from the
17   Assistant District Attorney's Office relating to
18   those arrests on May 28?
19      A    No, not that I recall, no.
20      Q    Do you know whether those charges were
21   dismissed?
22      A    No, I don't recall.
23      Q    And did you order the arrest, the
24   arrests that you assisted with?
25      A    No.
```

```
 1              Inspector G. Dowling
 2      Q    Who did?
 3      A    Again, if it's a penal law misdemeanor
 4   or felony, no one has to authorize it.  I didn't.
 5   I was there when arrests were being taken, and I
 6   assisted in making those arrests, so no one has to
 7   authorize that arrest.
 8      Q    Were there any civil disobedience
 9   arrests that you assisted with?
10      A    Again, I'd have to, I'd have to review
11   video, I don't recall, or documents for that
12   matter.
13      Q    Okay, and at protests it's fair to say
14   that there's a large amount of discretion about
15   whether to order arrests?
16      A    I'm sorry.  Could you repeat that?
17      Q    At protests, is it fair to say that
18   there is discretion as to whether to order
19   arrests?
20      A    There is discretion to make civil
21   disobedience arrests by the patrol borough
22   incident commander or their designee.  As far as
23   penal law misdemeanors or felonies, we are taught
24   in the academy that, you know, we can effect those
25   arrests.
```

```
 1              Inspector G. Dowling
 2      Q    You can, but not always, right?
 3      A    Not always.
 4      Q    Effect those arrests?
 5      A    Felonies, it's a must arrest.
 6   Misdemeanors, it is a probable arrest.
 7      Q    So if one person is smoking marijuana in
 8   a group of peaceful protesters, is that the
 9   situation where that person would be arrested?
10      A    Marijuana is legal in New York right
11   now, and again, I'm not trying to parse, I'm not
12   trying to parse.  Believe me.  I'm not.  We're
13   talking about back then?
14      Q    Back then.
15      A    Okay.  Yes, that person -- you know,
16   there was a lot of pot smoking, and there were no
17   arrests being made.
18      Q    So that was in the exercise of
19   discretion?
20      A    Correct.
21      Q    And did you instruct anyone with respect
22   to exercising that discretion on May 28?
23      A    No, not that I recall.
24      Q    Did you hear the -- withdrawn.  How did
25   you know that the patrol borough had authorized
```

Inspector G. Dowling

1                Inspector G. Dowling
2  arrests on May 28?  Sorry.  The patrol borough
3  incident commander.
4       A    Again, it's -- I don't recall civil
5  disobedience arrests being made, like I said.  I'd
6  have to review paperwork or video.  I remember
7  where arrests were being made for misdemeanors and
8  felonies, so the patrol borough executive does not
9  have to give permission to effect those arrests.
10      Q    Did you suggest to anyone on that day
11 that they not arrest for misdemeanors?
12      A    You broke up.  Sorry.
13      Q    Did you suggest to anyone on that day
14 that they not make arrests for misdemeanors?
15      A    Not that I recall.
16      Q    Did you observe any members of service
17 using excessive force on May 28 of the protest?
18      A    No.
19      Q    Did you see or hear reports of officers
20 using their batons to strike people in the head
21 area?
22      A    No.
23      Q    Did you see or hear reports of officers
24 using OC spray?
25      A    Not that I remember, no.

Inspector G. Dowling

1                Inspector G. Dowling
2       Q    Did you see or hear reports of officers
3  using their fists, knees or feet to strike people
4  on May 28?
5       A    No, I don't.
6       Q    Did you see or hear reports of officers
7  using their bikes as instruments of force on
8  May 28?
9       A    We are -- we don't teach SRG members to
10 use it as a weapon or force.  We use it to push
11 back or to guide people back, and if my memory
12 serves correct, we tried to get people onto the
13 sidewalk instead of the street.  So we utilized
14 those bikes as a barrier to move them back onto
15 the sidewalk.
16      Q    Did you see or hear reports of
17 individuals being hurt or yelling, saying they
18 were injured when those bikes were used to move
19 them from the streets to the sidewalk?
20      A    No, not that I recall.
21      Q    Did you see or hear reports of officers
22 applying flex cuffs excessively tight?
23      A    No.
24      Q    Were you requested at any time to assist
25 in cutting off flex cuffs?

Inspector G. Dowling

1                Inspector G. Dowling
2       A    No.
3       Q    Did you hear or see anyone request flex
4  cuff cutters?
5       A    No.
6       Q    Did you intervene to stop any officer
7  from doing anything on May 28?
8       A    No, not that I recall, no.
9            MS. BIKLEN:  I'd like to show a
10      video which is pretty short, so I'm going
11      to -- well, I'll put it in the chat.  Let's
12      see how it goes.
13           Maybe it's better to share my
14      screen.  Hold on a second.
15           (Exhibit 2-4 was marked for
16           identification.)
17           (Discussion was held off the
18           record.)
19 BY MS. BIKLEN:
20      Q    I think this will work.  Let's see.
21           All right, folks.  Can you see the
22 video?
23      A    Yes.  It came up on my screen, anyhow.
24           MS. ROBINSON:  Yes.
25

Inspector G. Dowling

1                Inspector G. Dowling
2  BY MS. BIKLEN:
3       Q    And just to be clear, can you see
4  anything else other than the video in our little
5  boxes?
6       A    That's all I can see, and the top right
7  corner of the body cam.
8       Q    Yes.  Okay, great.  I'm going to play
9  it.  I just want to know if you can hear some
10 sound.
11           (Video played.)
12           MS. BIKLEN:  And I'm going to just
13      skip ahead out of the buffer.
14           Can you hear that?
15           MS. ROBINSON:  No.
16           THE WITNESS:  No, there's nothing
17      playing.
18           MS. BIKLEN:  Okay.  Let's try this
19      again.  Tell me if you can hear sound.
20           Could you hear sound?
21           MS. ROBINSON:  No.
22           THE WITNESS:  No.
23           MS. BIKLEN:  All right.  Well, Amy,
24      let's take that break, and then we'll come
25      back, and we'll be able to figure it out.

Inspector G. Dowling

1
2          MS. ROBINSON:  How long do you want
3     to take?
4          MS. BIKLEN:  Let's take five
5     minutes now.  Let's see if we can just press
6     through until 1:30, and then we can take a
7     longer break.
8          MS. ROBINSON:  Okay, that's fine.
9          (Whereupon, a short recess was
10         taken.)
11    BY MS. BIKLEN:
12         Q    Okay.  Let's try this again.
13         Now, I'm just going to play and see if
14    you can hear the sound, and then we'll go back to
15    the beginning, okay?
16         (Video played.)
17    BY MS. BIKLEN:
18         Q    Do you hear that sound?
19         A    Yes.
20         MS. ROBINSON:  Yes.
21    BY MS. BIKLEN:
22         Q    Okay, great, and you just see the video
23    on the screen?
24         A    Yes.
25         Q    So I've now gone back to the beginning.

Inspector G. Dowling

1
2     It's 001, and this is about a three minute and
3     nine second video.  Do you see the body-worn
4     camera notation at the top, "Axon Body 2"?
5          A    Yes, I do.
6          Q    And do you see the date above it?  It
7     says 5/28.
8          A    I don't see the date.  It seems to be
9     blacked out on my computer.  I don't know if it's
10    the same on anybody else's.
11         MS. ROBINSON:  Yeah, I can't see
12         that either.
13    BY MS. BIKLEN:
14         Q    Okay.  Well, let me represent to you
15    that it says 5/28, and the time says 21:11:03.
16         Are you familiar with how Axon body cam
17    works?
18         A    I know it's a recording device.
19         Q    Okay.  Are you aware that Axon body
20    videos sometimes show the time stamp as four hours
21    ahead?
22         A    Yes, I am aware of that.
23         Q    And so 21:11 would be 9:11 p.m.?
24         A    Correct.
25         Q    Does this look like 9:11 p.m.?

Inspector G. Dowling

1
2          A    No.
3          Q    So this would be approximately
4     5:11 p.m.?
5          A    Yes.
6          Q    And do you recognize this scene?
7          A    Yes.
8          Q    This was Union Square on May 28?
9          A    That's Union Square during a protest,
10    but the body cam says May 28, so May 28.
11         Q    Okay.  I'm going to play for a little
12    bit and let's just watch together.
13         (Video played.)
14         MS. ROBINSON:  We don't hear any
15         sound.
16         MS. BIKLEN:  There's no sound in
17         this part.  It's in the buffer.
18         MS. ROBINSON:  Oh, right.
19    BY MS. BIKLEN:
20         Q    I'd like to stop there at 24 seconds.
21         Do you understand why the -- or what is
22    your understanding of why officers were so close
23    to the protesters?
24         A    The only -- I don't know for certain.
25    The only thing I could think of was to -- there's

Inspector G. Dowling

1
2     a bicycle lane there, so we wanted to maintain
3     that bicycle lane, as you can see, police officers
4     from the back and police officers on the side.
5     That's the only thing I can think of right now.
6          Q    And those police officers, do you see
7     them with bikes there?
8          A    Yes.
9          Q    And those are SRG's bike squad?
10         A    Yes, they are.
11         Q    And what's that line of officers called
12    when they're arrayed with their bikes in that way?
13         A    I don't recall.
14         Q    And was this line of officers something
15    that they're trained on?
16         A    Yes.  Could I just go back?  I would, I
17    would personally call that a straight line, a line
18    formation.
19         Q    And did you consider how the crowd would
20    react to a line formation so tightly against them?
21         MS. ROBINSON:  Objection.  You can
22         answer.
23         THE WITNESS:  Again, it wasn't my
24         decision to place the officers on that
25         sidewalk.

Case 1:20-cv-08924-CM   Document 492-1   Filed 04/14/22   Page 29 of 98

```
1                Inspector G. Dowling
2   BY MS. BIKLEN:
3       Q    But you were an executive present.  Did
4   that take consideration into any of your
5   decision-making at that time?
6       A    Again, I didn't make that decision.
7   That decision was made by -- I believe the
8   incident commander for the patrol borough was on
9   that scene.
10      Q    And that was Chief Hughes on that day?
11      A    Yes.
12      Q    And to your knowledge, had traffic been
13  redirected or stopped anywhere in the vicinity of
14  that protest?
15      A    I know traffic was moving.  I believe in
16  all directions it was moving that day.
17           MS. BIKLEN:  I'd like to play a
18       little bit more, and again the sound should
19       come out around one minute.
20           (Video played.)
21  BY MS. BIKLEN:
22      Q    Okay.  Did you hear sound for about 20
23  seconds since the minute mark?
24      A    Yes.
25      Q    Okay.  So in that clip did you see the
```

```
1                Inspector G. Dowling
2   line of officers move?
3       A    Move?
4       Q    Move with their bikes.
5       A    I seen an officer move up with his bike,
6   yes, to close the space.
7       Q    And push against protesters?
8       A    I can't say he pushed against
9   protesters.  Maybe the protesters pushed back
10  against him.  I can't see from that angle.
11      Q    And who would have authorized that
12  movement?
13      A    To have that officer move up?
14      Q    Yes.
15      A    It could be discussion with the incident
16  commander.  It could be discussion with a
17  supervisor.  I don't, I don't recall.
18      Q    Well, you know, that happened very
19  quickly.  Would a supervisor on the scene have
20  ordered that?
21      A    He could have, yes.
22      Q    Would that be something that a bike
23  officer would just decide for themselves?
24      A    Not unless we say make a line and there
25  was a space.  I can't say whether he would make up
```

```
1                Inspector G. Dowling
2   his own mind or not, but it's possible.  I'd have
3   to see other angles, the totality of that as to
4   what happened, so . . .
5       Q    Could Deputy Inspector McGeown have
6   ordered it?
7       A    He could have.
8       Q    Could Captain Miller have ordered it?
9       A    He could have.
10      Q    Let's go back and see if you can
11  recognize anybody in the frame.
12           Do you see an executive in a white shirt
13  there?
14      A    Yes.
15      Q    Sort of where my cursor is?
16      A    Yes.
17      Q    There are a number of executives in --
18  or there's one executive in a white shirt?
19      A    I see him.
20      Q    Do you know that person?
21      A    I don't.
22      Q    Would that have been an SRG officer?
23      A    No.
24      Q    And how do you know that?
25      A    He is wearing a patrol uniform hat.
```

```
1                Inspector G. Dowling
2       Q    I'm going to go back up to 1:20 where we
3   were watching, and then let's watch some more.
4           (Video played.)
5   BY MS. BIKLEN:
6       Q    Did you hear some screams on the
7   recording?
8       A    The only -- I heard a female, so to the
9   right of my screen, speaking, and I heard someone
10  saying he's okay.
11      Q    Did you hear anyone screaming on that
12  day or saying they were injured?
13      A    No, not to my knowledge.  I don't
14  recall.
15      Q    When a bike is used to move the crowd
16  back, have you heard of any injuries to crowd
17  members that result from that?
18      A    None that I can recall.
19      Q    Never?
20      A    Can it happen?  I'm sure it can happen,
21  but none that I can recall.
22           (Video played.)
23  BY MS. BIKLEN:
24      Q    So that was two minutes and 22 seconds.
25  Do you see the protesters in this video?
```

Page 114

Inspector G. Dowling

1
2    A    Yes, I do.
3    Q    And they're not standing in the street,
4 right?
5    A    No.
6    Q    They're on the sidewalk area?
7    A    Right.
8    Q    Not blocking traffic?
9    A    No.
10        (Video played.)
11 BY MS. BIKLEN:
12    Q    Do you see officers coming onto the
13 sidewalk area?
14    A    Yes.
15    Q    And why would they be doing that?
16    A    Zone of safety.
17    Q    What does that mean?
18    A    To create a zone where we can effect an
19 arrest or remove an aided case from the scene so
20 people don't interfere with an arrest/de-arrest
21 situation or assault a police officer.
22    Q    To your knowledge, was there an aided
23 case that had to be removed at that time?
24    A    I don't recall.  I'd have to see the
25 whole video.

Page 115

Inspector G. Dowling

1
2    Q    To your knowledge, anything that you
3 have seen so far that would suggest why officers
4 would be moving onto the sidewalk?
5    A    There appears -- if you look at the
6 video, there appears to be police action to the
7 right of this video, so that could be why we want
8 to keep protesters away from whatever is happening
9 to the right side.
10    Q    Just keep watching.
11        (Video played.)
12 BY MS. BIKLEN:
13    Q    Okay.  Did you see an officer in a white
14 stripe who just came on the video?
15    A    Sure did.
16    Q    Do you recognize that person?
17    A    I do.  He's a handsome man.
18    Q    Could you tell for the record who you
19 recognize it to be?
20    A    That's -- if we're discussing that
21 person who right now has the patch on the back of
22 the shirt that says "NYPD Strategic Response
23 Group," that is me.
24    Q    Okay, and did you hear yourself say
25 "pull back, pull back"?

Page 116

Inspector G. Dowling

1
2    A    Yes.
3    Q    Okay.  We'll play a little bit more.
4        (Video played.)
5 BY MS. BIKLEN:
6    Q    That's where it stops, so we'll just go
7 back to that mark of three minutes, and I can stop
8 sharing.
9        Okay.  Why were you saying "pull back"?
10    A    Again, I don't recall specifically, but
11 I can give you a possibility that someone of
12 higher rank wanted to have everybody pull back out
13 of the park.  Maybe the incident that we made a
14 zone of safety for could have been completed, and
15 therefore we were pulling back out of the park.
16    Q    I mean you were at a pretty high rank at
17 that time.  Are you saying that you would not have
18 made that decision?
19    A    No.
20    Q    Who of higher rank would have made that
21 decision to pull back?
22    A    It could have possibly been Chief
23 Hughes.
24    Q    Do you recall who it was?
25    A    No.

Page 117

Inspector G. Dowling

1
2    Q    And if you saw officers push in in a way
3 that you did not think was appropriate, would you
4 have, on your own, told them to pull back?
5    A    I've had officers in the past move back.
6 As far as that incident, I wouldn't -- I did not,
7 from what I recall, did not tell them to, on my
8 own accord, tell them to pull back.
9    Q    So you were conveying instructions from
10 someone else is your testimony?
11    A    Yes.
12        (Discussion was held off the
13        record.)
14        (Whereupon, the lunch recess was
15        taken.)
16        MS. BIKLEN:  So during the break,
17 Ms. Robinson and I had a discussion about the
18 Chief's testimony with respect to -- or
19 refusal to testify with respect to the June 2
20 and September 19 incidents that are subject
21 to CCRB investigations, and we have agreed to
22 the following:
23        That the parties will enter into a
24 stipulation to be so ordered by the court
25 that will require Chief Dowling to come back

Inspector G. Dowling

1    in March to testify regarding those
2    incidents, and that the defendants will pay
3    the appearance fee for the court reporter,
4    and that at least ten days prior to the
5    deposition taking place in March, defendants
6    will produce updated CCRB files related to
7    those incidents and the interviews to the
8    extent that they have not already been
9    produced.
10           Did I correctly describe that
11   agreement, Amy?
12           MS. ROBINSON:  Yes.
13           MS. BIKLEN:  Okay.
14           MS. ROBINSON:  I made that
15   agreement, Chief.  You are coming back in
16   March.
17           THE WITNESS:  Why not?
18           MS. BIKLEN:  Was there something
19   else you wanted to say?
20           MS. ROBINSON:  She's referring to
21   the clarification, Chief.
22           THE WITNESS:  When -- so the last
23   video that you showed of me saying "pull
24   back" to the officers -- and I think they

Inspector G. Dowling

1    were on bikes and maybe some on foot.  I just
2    want to clarify that I said that was possibly
3    the incident commander that ordered that.
4            I could have ordered that also.  If
5    the incident as to what we went into the park
6    to create a zone of safety or what appears to
7    be a zone of safety was completed, or I
8    believed that the officers had advanced too
9    far, creating a safety hazard for the people
10   in the park as well as the officers.
11           So I could have, on my own accord,
12   told them to pull back away from the crowd.
13   I would have to see the totality of the
14   video.
15   BY MS. BIKLEN:
16       Q    And your best recollection today, what
17   was it that happened?
18       A    Again, I could only say what -- my
19   recollection was that, what the video showed, that
20   I told those bicycle officers as well as foot
21   officers to pull back, and I can only recollect
22   that I, through the video, I was the one who
23   ordered that, and it could have been just for
24   somebody's safety, as I said, the demonstrators

Inspector G. Dowling

1    and the police officers, or that the incident,
2    that we created a force protection, that we take a
3    force protection for was completed and we pulled
4    back.
5            I would have to see in totality to
6    hopefully refresh my memory even more.
7        Q    Is it your testimony that today you
8    don't have any independent recollection of why you
9    were saying "pull back"?
10       A    That is correct.
11       Q    Okay.  Let's move on, and were you
12   involved in policing any protests on May 29?
13       A    Yes.
14       Q    Which ones?
15       A    Again, we were in many, many
16   neighborhoods in the city.  I believe there was
17   one that took place in Foley Square on the 29th,
18   and there was one out by the Barclays Center in
19   Brooklyn.
20       Q    Any other that you remember off the top
21   of your head?
22       A    That Foley -- sorry.  That Barclays
23   Center protest was mobile that night, and I do
24   recall going to various sites, not specific sites,

Inspector G. Dowling

1    I don't have that recollection, but various sites
2    throughout Brooklyn.
3        Q    Do you recall crossing any of the
4    bridges with protesters on May 29?
5        A    No.  No, I do not.
6        Q    On May 29, did you discuss the prior
7    day's protest with Chief D'Adamo?
8        A    I don't have a recollection, but I'm
9    sure I did.
10       Q    Do you recall discussing the prior day's
11   protest with any other executives?
12       A    Again I'm sure I did, but I don't have a
13   recollection.
14       Q    What would you have discussed?
15           MS. ROBINSON:  Objection.  You can
16   answer.
17           THE WITNESS:  Generally we would
18   discuss deployment of personnel, was it best
19   where they were located, was it the best for
20   that specific detail, the amount of personnel
21   used.  We might need more, might need less.
22   Any injured officers, the status of those
23   officers, and things of that nature.

```
1                Inspector G. Dowling
2   BY MS. BIKLEN:
3        Q    Okay.  Deputy Inspector McGeown
4   submitted his TRI for an injury on May 28.  Would
5   you have discussed that injury on May 29?
6        A    More than likely, yes.
7        Q    Do you recall whether he reported to
8   work on May 29?
9        A    I'd have to look at records to determine
10  that.  I don't have a recollection of that.
11       Q    Do you have an independent recollection
12  of whether he missed several days of work for any
13  reason at that time?
14       A    Yes, he did.  He had an injured
15  shoulder.
16       Q    And how did you learn there would be
17  protests on May 29?
18       A    Again, we would receive a request
19  from -- that was submitted by the borough, given
20  to operations, to the special operations division,
21  to -- once it's approved all the way through, it
22  would come to our operations unit in SRG.
23       Q    And that process that you described, did
24  that happen every single day of the George Floyd
25  protests?
```

```
1                Inspector G. Dowling
2        A    It happened a lot.  I can't say every
3   single day.
4        Q    Were there any special procedures that
5   were put into place to respond to the George Floyd
6   protests?
7             MS. ROBINSON:  Objection.  You can
8        answer.
9             THE WITNESS:  From SRG?  Is that
10       what you're asking?
11  BY MS. BIKLEN:
12       Q    Either from SRG or within the NYPD that
13  you were aware of.
14       A    Any special procedures?  Based on the
15  amount of protesters, there were enhanced field
16  forces in the amount and size, but that would be
17  determined by the department, not by SRG.
18       Q    Did SRG implement any specific
19  procedures for responding to the types of
20  city-wide protests that were happening during the
21  George Floyd protests?
22       A    Not that I can recall.
23       Q    And you've described before some of your
24  duties with respect to protests as an incident
25  commander or assistant incident commander for SRG
```

```
1                Inspector G. Dowling
2   on May 28.
3             Did that also -- were those the same
4   responsibilities that you had on May 29?
5        A    Yes.
6        Q    Anything different?
7        A    In respect to my role?
8        Q    Yes.
9        A    No.
10       Q    Okay.  Now, you mentioned going to
11  several protests on May 29.  How did you travel
12  between protests?
13       A    By vehicle.
14       Q    And at specific protests, did you get
15  around on foot?
16       A    Yes.
17       Q    Were you ever involved in escorting a
18  crowd?
19            MS. ROBINSON:  Objection.  You can
20       answer.
21            THE WITNESS:  Escorting or
22       following a crowd?
23  BY MS. BIKLEN:
24       Q    Yes.
25       A    Yes.
```

```
1                Inspector G. Dowling
2        Q    So you mentioned the Foley Square
3   protest.  Approximately what time did you get to
4   Foley Square?
5        A    I don't recall.  It was daytime.
6        Q    And were you there with other executives
7   from SRG?
8        A    I don't recall.
9        Q    During that time did you split up with
10  other executives if there were multiple protests
11  going on at once?
12       A    That can normally happen.  I don't
13  recall on that day.
14       Q    And if you and Chief D'Adamo were in
15  different places, how would you communicate
16  throughout the day?
17       A    Via radio.  Phone.  Telephonically.
18  Excuse me.  There was, there was times I was in
19  his car responding to locations, but primarily
20  phone or telephonically.
21       Q    By "phone or telephonically," do you
22  mean radio or telephonically?
23       A    I'm sorry.  Radio or telephonically.
24       Q    Ever by text?
25       A    From what I recall, most of those nights
```

Inspector G. Dowling

1    it was too hectic to text, so it would be phone or
2    radio.
3
4         Q    And what about during the days?
5         A    Even those protests could have been
6    hectic sometimes, moving around and stuff.
7         Q    Now, the Foley Square protest was during
8    the day, and did you assist in making any arrests
9    at that protest?
10        A    Again, if my memory serves me correctly,
11   that protest exited Foley Square on the north end
12   by Center Street and proceeded northbound on
13   Center Street toward Canal Street.  I believe it
14   was around White Street or Walker Street that
15   arrests were effected, if that's the day in
16   question I'm thinking of.
17        Q    And why were arrests effected?
18        A    There were demonstrators walking in the
19   street, acting disorderly.  That's what I recall
20   from that incident.  Again, I would have to see
21   video to refresh my memory.
22        Q    When you say "acting disorderly," what
23   do you mean by that?
24        A    I believe -- and again, I'd have to see
25   video.  Some of these do blend, unfortunately.

Inspector G. Dowling

1    Throwing things in the street.  I don't want to
2    seem specific to this detail.  Like I say, I'd
3    have to see video, but that's what I would mean by
4    "disorderly," throwing things in the street, maybe
5    throwing things at officers, objects at officers.
6    Again, I would have to see the video to see this
7    specific incident.
8         Q    And did the protest that was starting
9    near Foley Square and went north have a permit?
10        A    I don't know that answer.
11        Q    Did you at the time?  Would you be
12   notified whether a protest was permitted or
13   unpermitted?
14        A    I could have been, but I don't recall.
15        Q    And would that change the way in which
16   you police it, if it's permitted versus
17   unpermitted?
18        A    Not necessarily.  Again, we protect
19   everybody's First Amendment rights, whether
20   permitted, not permitted, so . . .
21        Q    Do you recall whether the protesters had
22   signs?
23        A    I'm sure there were, but I don't recall,
24   to answer your question.

Inspector G. Dowling

1         Q    Do you recall whether you authorized use
2    of an LRAD at this protest?
3         A    Again, if my memory serves me correct, I
4    called for an LRAD when arrests were being made,
5    but due to traffic volume or pedestrian volume, I
6    was unable to make it to the location in time.
7         Q    When you called for an LRAD, was that at
8    the request of someone from patrol or you made
9    that determination to get an LRAD out there?
10        A    I could have made a request for the
11   LRAD, determining how the crowd was acting or
12   proceeding.  There's a possibility that a patrol
13   borough executive did ask me to get one, but I
14   don't recall at this time.
15        Q    And based on how things had gone the
16   previous day on May 28, did you consider in any
17   way about how the crowd would respond to large
18   numbers of officers?
19        A    No, no, not from my recollection.
20             MS. BIKLEN:  Let's watch some more
21        video.  I'm going to try this again, and I'm
22        skipping here, Amy, just so we can save some
23        time.  We're going to what's been premarked
24        as Exhibit 2-7.

Inspector G. Dowling

1             (Exhibit 2-7 was marked for
2             identification.)
3    BY MS. BIKLEN:
4         Q    I will share my screen.
5             Sorry.  Hold on a minute.
6             I will represent to you that this is a
7    TARU video that has been produced by the city, and
8    I'm going to play it, and tell me if you can hear
9    sound.
10            (Video played.)
11   BY MS. BIKLEN:
12        Q    Did you hear that sound?
13        A    I did.
14            (Discussion was held off the
15            record.)
16   BY MS. BIKLEN:
17        Q    Let's watch the video that's been marked
18   as Exhibit 2.7.
19            (Video played.)
20   BY MS. BIKLEN:
21        Q    Chief, do you recognize where this is?
22        A    That is on Center Street, and I'm not
23   exactly sure if it's near White Street.
24        Q    Okay.  Do you recall being at this

Page 130

```
                  Inspector G. Dowling
1
2    location?
3        A    Yes.
4        Q    Okay.  Do you see protesters on the
5    sidewalk?
6        A    Yes.
7        Q    And maybe one or two are in the street?
8        A    You'd have to show me the whole video,
9    because that street is a long street.
10       Q    On this video so far, what have you
11   seen?
12       A    I see one individual being arrested.
13       Q    In the street?
14       A    In the street.
15       Q    And do you see protesters on the
16   sidewalk?
17       A    Yes.
18       Q    And it's fair to say in this video, what
19   we've watched so far, about as many police
20   officers as protesters?
21       A    In this clip right here?
22       Q    Yes.
23       A    Yes.
24       Q    Let's watch a little bit more.
25            (Video played.)
```

Page 131

```
1                 Inspector G. Dowling
2    BY MS. BIKLEN:
3        Q    Okay.  So I'm going to ask if you
4    recognize anybody in this video.
5        A    Yes, I do.
6        Q    Do you recognize the officer in the
7    white shirt with "NYPD Strategic Response Group"
8    on the back?
9        A    Yes, I do.
10       Q    Wearing a baseball cap?
11       A    Yes, I do.
12       Q    Who is that?
13       A    That is me.
14       Q    And at that protest, did you observe
15   protesters not committing any violations?
16            MS. ROBINSON:  Objection.  You can
17       answer.
18            THE WITNESS:  At that protest --
19       sorry.
20   BY MS. BIKLEN:
21       Q    At that protest did you observe any
22   protesters not committing violations?
23       A    Yes.
24       Q    And how did you determine what
25   discretion to use in determining whether and when
```

Page 132

```
1                 Inspector G. Dowling
2    to arrest?
3        A    Someone who is violating the law can be
4    arrested, and people who are peaceably
5    demonstrating will not be arrested.
6        Q    Right.  As we've discussed before,
7    although people who are violating the law can be
8    arrested, is every single person who is violating
9    the law there arrested?
10       A    I would have to see the totality of the
11   video to determine that.  I can't recall.
12       Q    Well, not everyone must be arrested if
13   they violate the law, correct?
14       A    No.
15       Q    So there's some discretion?
16       A    Yes.
17       Q    Did you instruct anyone with respect to
18   utilizing that discretion on May 29?
19       A    Not to my recollection.
20       Q    And on May 29, did there come a time
21   where some protesters marched in the street and
22   were followed by officers?
23       A    I don't recall.  I'd have to look at the
24   video.
25       Q    Let's watch a little bit more.
```

Page 133

```
1                 Inspector G. Dowling
2            (Video played.)
3    BY MS. BIKLEN:
4        Q    So we've just watched from about the
5    20-second mark up through 38 seconds.  What are
6    you doing in this video?
7        A    I appear to be instructing people to
8    remove the arrestees to a different location.
9        Q    And why were you doing that?
10       A    To clear the scene.
11       Q    Why?
12       A    I don't understand the question.
13       Q    Why were -- what was the objective of
14   clearing the scene?
15       A    Because if other protesters left Foley
16   Square, we would have to free up resources.
17   Again, this is what I'm seeing from the video,
18   what I can recall, and so we'd have to free up
19   these resources here to possibly, possibly go with
20   another protest that broke off.
21       Q    Sorry.  I don't understand.  You're
22   saying that they had to clear that arrest that
23   they're doing right in that moment so that
24   resources can be deployed to another protest?  Is
25   that your testimony?
```

Inspector G. Dowling

1
2     A    So if I'm not mistaken again with the
3 video, there are still protesters inside Foley
4 Square, so they could break off and go somewhere
5 else, so we need resources to follow those people.
6     Q    Let's keep watching.
7          (Video played.)
8 BY MS. BIKLEN:
9     Q    So we can stop watching there.  Do you
10 recognize this person right here in a baseball
11 cap, no mask that's on the screen?
12    A    Deputy Inspector Hillery.
13    Q    Remind me what his position is.
14    A    He was the commanding officer of
15 Strategic Response Group 1.
16    Q    What is his position now?
17    A    I don't know.  I'm not part of SRG.  I
18 know he's not -- I can tell you he is not the
19 commanding officer of Strategic Response Group 1.
20    Q    To your knowledge, has he been promoted?
21    A    No.
22    Q    To your knowledge, has he been demoted?
23    A    No.
24    Q    Transferred elsewhere?
25    A    Transferred within SRG.

Inspector G. Dowling

1
2     Q    And in this video that we just watched
3 up through the one minute and 34-second mark,
4 Exhibit 2-7, there was quite a number of police
5 officers, including many from the strategic
6 response group.
7          What was the goal there of these
8 officers, and what were they doing?
9     A    A review of that video, it appears that
10 they were effecting arrests.
11    Q    Anything else?
12    A    No.  Protecting officers that were
13 effecting those arrests.  Other than that, no.
14    Q    Is it your view that that was the
15 appropriate number of officers to be effecting
16 those arrests?
17    A    I would have to see the entirety of that
18 video, the span of that video to determine that
19 was a correct response.
20    Q    Well, is your recollection -- what is
21 your -- how did you think about the sort of
22 deployment of forces on that day to the Foley
23 Square protest; was it appropriate?
24    A    On that day, if I recall correctly, yes.
25

Inspector G. Dowling

1
2          (Whereupon, a short recess was
3          taken.)
4 BY MS. BIKLEN:
5     Q    Chief, in that protest that we were just
6 discussing on May 29 that started in or about
7 Foley Square, do you recall issuing any orders to
8 disperse?
9     A    I don't recall.  I would have to review
10 video.
11    Q    Well, would an order to disperse have
12 been issued before those arrests were made that we
13 watched?
14    A    Not necessarily.
15         MS. ROBINSON:  Objection.  You can
16    answer.
17         THE WITNESS:  Not necessarily.
18         Sorry.  Could I back up one second?
19 We would tell people, not by LRAD all the
20    time, but we would tell people to get on the
21    sidewalks.
22 BY MS. BIKLEN:
23    Q    And did that, in fact, happen on May 29?
24    A    I don't recall.  I'd have to see the
25 video.

Inspector G. Dowling

1
2     Q    Do you have any independent recollection
3 of issuing any orders to disperse on May 29, you
4 personally?
5     A    I don't recall.
6     Q    What would refresh your recollection?
7     A    Video would refresh my recollection.
8     Q    Anything else?
9     A    No.
10    Q    What is an instance where an arrest
11 would be effected prior to issuing an order to
12 disperse?
13    A    Sorry.  Could you say that one more
14 time?
15    Q    I'll withdraw the question.
16         Well, we'll just move on.  I can ask
17 later.
18         Okay.  I'd like to move to May 30.  Did
19 you police any protests on May 30?
20    A    Yes.
21    Q    Do you recall where?
22    A    I don't.
23    Q    Okay.  Were you at Union Square?
24    A    Like I say, I was Manhattan South.
25 Again, if you have video of me, I'll say I was

Inspector G. Dowling

1  there.  I'm sure I was at some point.
2  
3      Q    Do you recall going over to Brooklyn on
4  May 30?
5      A    I do have a recollection, yes.
6      Q    Okay.  Barclays Center?
7      A    Yes.
8      Q    Do you recall going over any bridges
9  with protests?
10     A    I don't recall.
11     Q    There were several protests that spanned
12 across various Manhattan-to-Brooklyn bridges
13 during the George Floyd protest, correct?
14     A    Yes.
15     Q    Do you have any independent recollection
16 of going onto the bridges during that time?
17     A    What's the time period one more time?
18 Sorry.  I know the George Floyd protest had going
19 on for a long time, so walking across or going
20 across?
21     Q    Walking across, yes.
22     A    Have I walked across the bridge for a
23 protest?  I can't say in that period.  I know the
24 beginning of this year, I did.
25          Actually, I recall July 15.  I know I

Inspector G. Dowling

1  walked across the bridge.
2  
3      Q    That's your only independent
4  recollection during the summer protest period?
5      A    Of walking across a bridge, yes.
6      Q    And when you would go out to those
7  specific incidents -- and now I'm returning to
8  May 30 -- who would specifically direct you to go
9  to which protests?
10     A    We would be requested by the patrol
11 borough commander.  Again, with the --
12     Q    Let me rephrase.  Your specific
13 position, right?  I understand you're saying that
14 SRG in particular was requested by the patrol
15 borough commander?
16     A    Yes.
17     Q    Okay.  Did that request include the
18 executive officer of SRG to go?
19     A    Not specifically, no.
20     Q    So how did you decide which protest to
21 go to during this period?
22     A    Chief D'Adamo would tell me which
23 protest to go to.
24     Q    Anybody else that would tell you which
25 protest to go to?

Inspector G. Dowling

1      A    No.
2  
3      Q    So did there come a time when you
4  attended a protest in the Midtown/Times Square
5  area on May 30?
6      A    Possibly.  Again, I'd have to see video.
7      Q    Do you recall about what time you
8  arrived?
9      A    Again, I don't know if I was there, but
10 if there's video, I'll say I was there.
11     Q    Okay.  Do you have any recollection
12 about whether that protest was at night or during
13 the day?
14     A    I don't recall.
15     Q    And is it your testimony that Chief
16 D'Adamo would have directed you to attend that
17 particular protest?
18     A    The -- we have split where large groups
19 might be, you know, like protesting in one area,
20 and I might say, Chief, I'm going to head over to
21 this area, something to that effect, but it's
22 possible that he told me to go to that area.
23     Q    So together with Chief D'Adamo, you
24 would have decided which protest that you were
25 attending; is that fair to say?

Inspector G. Dowling

1      A    That's fair to say.
2  
3      Q    Okay, and when you would leave one
4  protest and go to another, if the first protest
5  was still going on, who then would become the
6  incident commander for SRG?
7      A    The next highest rank at the scene.
8      Q    And how do you communicate that change
9  of command to SRG members?
10     A    I would speak to the incident
11 commander -- well, sorry.  I would speak to the
12 next ranking executive and explain to them I have
13 to go over to this scene, and he would relay that
14 to, to his supervisors.
15     Q    Let me make sure I understand.  The next
16 ranking executive from SRG or --
17     A    Yes.
18     Q    Okay, and when you say "supervisors"
19 there, you mean like sergeants and lieutenants?
20     A    Yes.
21     Q    And how is that chain of command then
22 communicated to the non-SRG people on site?
23          MS. ROBINSON:  Objection.  You can
24     answer.
25          THE WITNESS:  Probably verbally.

Inspector G. Dowling

1
2  BY MS. BIKLEN:
3      Q    So is it possible that in the course of
4  a demonstration, the incident commander for SRG
5  changes multiple times?
6      A    Yes.
7      Q    And is that also true on the patrol
8  borough side?
9      A    Yes.
10     Q    So how do people know who is in charge
11 at any one time?
12          Withdrawn.
13          How do members of service know who was
14 in charge at the protest at any specific moment in
15 time?
16     A    Again, in charge of the whole detail?
17     Q    Of the protest response.
18     A    Again, it's word of mouth.  As Chief
19 D'Adamo is leaving, Inspector Dowling is going to
20 be incident commander.  Mostly by word of mouth.
21     Q    Okay.  So you're saying verbally talking
22 to one another on the scene?
23     A    Correct.
24     Q    And how effective is that when it's sort
25 of a scene with a lot of people yelling and

Inspector G. Dowling

1
2  screaming?
3      A    It's effective.
4      Q    And do you, as the SRG incident
5  commander, know the changes that are happening on
6  the patrol borough's side?
7      A    If it's at that specific site, yes.
8      Q    So if you were the incident --
9      A    At most times, most times, yes.
10     Q    -- commander at a site, and Chief Hughes
11 is leaving or another higher ranking officer comes
12 on the scene, how are you informed of those
13 changes?
14     A    Normally by word of mouth.  Verbally.
15     Q    And when you were at the protests as
16 incident commander, were you responsible for
17 supervising any other members of service other
18 than SRG?
19     A    As an executive in the New York City
20 Police Department or as a supervisor in the New
21 York City Police Department, I can direct
22 resources where I deem necessary, so I could be --
23 I don't want to say be in charge of, but I can
24 direct resources as necessary.
25     Q    And did you do that?  Did you direct

Inspector G. Dowling

1
2  officers who are not in SRG during the George
3  Floyd protests?
4      A    There were times, yes.
5      Q    And so an order like "pull back, pull
6  back" would be one example of that?
7      A    Correct.
8      Q    I'd like to go back to the Midtown
9  incident on May 30, and I'm going to share another
10 video.
11          Amy, this is going to be premarked as
12 Dowling Exhibit 2-9, and I'm going to represent
13 it's another TARU video which has been marked as
14 video 155.
15          MS. ROBINSON:  Okay.
16          (Exhibit 2-9 was marked for
17          identification.)
18          (Video played.)
19 BY MS. BIKLEN:
20     Q    Do you see a video on the screen?
21     A    Yes, I do.
22     Q    And do you see the street signs in this
23 area, 57th Street and Fifth Avenue?
24     A    Yes, I do.
25     Q    I'm going to play it, and tell me if you

Inspector G. Dowling

1
2  hear sound.
3      A    Yes, I do.
4      Q    So I'm just going to stop.  Did you
5  recognize yourself in this video at the beginning?
6      A    Yes, I did.
7      Q    So you were present?
8      A    Yes, I was.
9      Q    And you were wearing a baseball cap?
10     A    Yes, I was.
11          MS. BIKLEN:  Let's watch some more.
12          (Video played.)
13 BY MS. BIKLEN:
14     Q    Okay.  How would you characterize this
15 protest based on what you see on the video?  Would
16 you call that a peaceful protest?
17     A    I'd have to see the totality of that
18 protest.
19     Q    Well, limited to what you have seen on
20 the video so far, Exhibit 2-9, would you
21 characterize that as peaceful?
22          MS. ROBINSON:  Objection.  You can
23 answer again.
24          THE WITNESS:  In that limited
25 scope, I cannot tell if that was a peaceful

Inspector G. Dowling

1   protest.
2   BY MS. BIKLEN:
3       Q   Okay.  In what we just saw, up through
4   second, third -- three thirty-four, did you see
5   someone being arrested?
6
7       A   Yes, I did.
8       Q   Did you order that arrest?
9       A   Yes, I did.
10      Q   And what was the basis?
11      A   I don't recall.  I'd have to see
12  paperwork as to why that person was arrested.
13      Q   Did you give that person a verbal order
14  to disperse?
15      A   I don't recall.  I'd have to look at the
16  video, at the totality of the video.
17      Q   Well, shall we watch it again?
18      A   Sure.
19          (Video played.)
20  BY MS. BIKLEN:
21      Q   I stopped it at the 37-second mark.  Did
22  you give anyone a verbal notice to disperse?
23      A   Again, I might have beforehand.  I don't
24  know.
25      Q   In those 37 seconds, did you hear a

Inspector G. Dowling

1   verbal order to disperse?
2
3       A   There's something in the background that
4   says "get off the street."  That's all I know.  It
5   could have been an LRAD playing prior to that.  I
6   have no idea.
7       Q   If you heard someone say "get off that
8   street" within that 37 seconds, did you expect
9   that people would have time to comply with that
10  order?
11      A   It's a reasonable assumption that they
12  could.
13      Q   How long do you expect it takes people
14  to comply in those circumstances?
15      A   I'm not in another person's head.
16      Q   How long would it take you to comply?
17      A   I always abide by the law, so it could
18  take me five seconds to walk over to the sidewalk.
19      Q   Okay.  Five seconds?
20      A   Yes.
21      Q   Okay.  Did you inform the person that
22  was under arrest before you put them under arrest?
23          MS. ROBINSON:  Objection.  You can
24      answer.
25          THE WITNESS:  I don't know.  I

Inspector G. Dowling

1
2       don't know if I had a mask on at the time.  I
3       don't know if I had time to.  I'm not sure.
4   BY MS. BIKLEN:
5       Q   Let's go back and look.  I want you to
6   point out yourself in the video here.
7           So I'm starting at 25, and I want you to
8   describe what you're doing in this video up
9   through 37 seconds, okay?
10      A   Okay.
11          (Video played.)
12  BY MS. BIKLEN:
13      Q   Sorry.  Up through 36 seconds.
14      A   Okay.  I grabbed an individual who was
15  standing in the street.  Again, it appears to
16  sound like they were warned to get off the street
17  and they failed to comply.
18      Q   You're saying within the period from 27
19  seconds to 36 seconds, you determined that person
20  failed to comply?
21      A   If you play the video again, I'm not
22  sure that that was the entirety of the time that
23  they had to get off the street.
24      Q   Tell me when you hear an order to get
25  off the street.  I'll start from the beginning

Inspector G. Dowling

1
2   again.
3          (Video played.)
4   BY MS. BIKLEN:
5       Q   Do you hear that voice that says "one
6   collar a person"?
7       A   Could you replay that?  I'm sorry.
8          (Video played.)
9   BY MS. BIKLEN:
10      Q   Do you recognize who said that?
11      A   No, I don't.
12      Q   It looks like there was an NYPD legal
13  person there.  Do you know who that was?
14      A   Can you go back from -- I'm sorry.  Can
15  you go back again?
16      Q   I think that's the only view.  Do you
17  recognize who that is?
18      A   Not from that angle.
19      Q   Okay.  All right.  Let's watch again.
20          (Video played.)
21          THE WITNESS:  "Get out of the
22      street," it says, at 12 seconds.  Sounds like
23      it's going from 12 seconds or 34 seconds.
24  BY MS. BIKLEN:
25      Q   Okay.

Inspector G. Dowling

1     A     And again that's a short video where I
2 don't know what happened prior to that.
3     Q     But you heard an order to disperse at 12
4 seconds?
5     A     I heard an order to disperse at 12
6 second.
7     Q     And did you see people actually walking
8 away?
9     A     I seen some people walking away.
10     Q     Did you give that verbal order to
11 disperse?
12     A     Again, I can't see -- I can't determine
13 that from the video.
14     Q     And did you verbally order, tell anyone
15 they were under arrest prior to putting your hands
16 on them?
17     A     It doesn't appear so in that video, but
18 I cannot tell.  I don't recall.
19     Q     Okay.  I'm going to share again.  This
20 is the same video.  I'd like to play up through a
21 minute and 21 seconds.
22         (Video played.)
23 BY MS. BIKLEN:
24     Q     Did you hear the video say -- him say

Inspector G. Dowling

1 "I'm a legal observer"?
2     A     I heard someone say they were a legal
3 observer.  I'm not sure if it was him or the
4 person on the ground.
5         Excuse me.  Can I back up for one
6 second?
7     Q     Yes.
8     A     We had a legal representative on scene,
9 an NYPD legal representative, so therefore we
10 would have conferred with them as to the legal and
11 justified enforcement actions.  So as to your
12 question before, those arrests would have been
13 justified.
14     Q     I don't think that was my question, but
15 we'll back up.
16     A     Sorry.
17     Q     We're now at one minute and 17 seconds,
18 and there is a picture of a person wearing a shirt
19 saying "NYPD Legal."
20         Do you know who that is?
21     A     It's not a great angle.  I can't tell
22 from that angle.
23     Q     So let's watch again from one minute and
24 17 seconds so we can see who's saying "I'm a legal

Inspector G. Dowling

1 observer."
2         (Video played.)
3 BY MS. BIKLEN:
4     Q     Okay.  So do you now know who that voice
5 is saying "I'm a legal observer"?
6     A     Well, I couldn't see -- the person has a
7 mask on, so it's possibly him that said he's a
8 legal observer.
9     Q     The person being arrested?
10     A     Correct.
11     Q     And it looks like everyone else in that
12 scene are cops, police officers?
13     A     For effecting that arrest.  It looked
14 like there was another perpetrator in front of him
15 when he was being taken to the ground.
16     Q     Why were the arrestees taken to the
17 ground?
18     A     If you move that video back, he was
19 resisting, so he intentionally prevented or
20 attempted to prevent being arrested.
21     Q     On the video do you hear anyone tell him
22 verbally that he's under arrest?
23     A     You would have to back up.  I'd have to
24 hear it.

Inspector G. Dowling

1     Q     Okay.  Let's back up.
2         (Video played.)
3         THE WITNESS:  As you can tell
4     there, those two weren't complying.  They got
5     back on the street.
6         THE REPORTER:  I can't hear what
7     you're saying when the video is playing.
8 BY MS. BIKLEN:
9     Q     Did you hear him being verbally told he
10 was under arrest?
11     A     There was a lot of screaming and yelling
12 going on.  I couldn't tell if he was or wasn't.
13     Q     Well, the person we watched at the
14 beginning of the video that you put hands on, if
15 you had not put your hands on him, how would he
16 know he was under arrest?
17     A     If I did put my hands on him, he may not
18 be arrested.
19     Q     Well, if you verbally informed him, and
20 then he was taken down to the ground by other
21 officers, how does one know one is under arrest if
22 not through a verbal command?
23     A     If they were in police custody -- not
24 all the time in custody, but if they were in

Inspector G. Dowling

1  Inspector G. Dowling
2  police custody with handcuffs on, they're under
3  arrest.
4           Again, I'm just trying to answer your
5  question.  I don't understand the question.
6       Q    Okay.  If you go up to a protester on
7  the street and arrest them, at what point, if you
8  do not verbally say "you're under arrest," should
9  they know that they're under arrest?
10      A    When they're, when they're taken into
11 police custody and placed in handcuffs, we try at
12 most times to tell the person they're under
13 arrest, but sometimes it doesn't happen that way,
14 depending on circumstances.
15      Q    Well, what can a person do in that
16 situation on the video to avoid being thrown down
17 to the ground in that way?
18      A    There's active resistance and there's
19 passive resistance.  Again, I would have to see
20 the video.  He could have been tensing his arms,
21 which is considered active resistance.  He could
22 be flailing his arms, which could be active
23 resistance.  If the person being arrested puts
24 their hands behind their back, most times you are
25 not taken down to the ground.

1  Inspector G. Dowling
2       Q    How does a person know to put their
3  hands behind their back if they're not told to do
4  that before being grabbed?
5       A    How does a person know to put their
6  hands behind their back when they're being
7  arrested?
8       Q    Yes, if they're not told that they are
9  under arrest.
10      A    Most times during arrests, we give them
11 verbal commands.  Put your hands behind your back.
12      Q    On that video I don't hear any verbal
13 commands.  If a person doesn't hear that verbal
14 command, how do they avoid being thrown down to
15 the ground?
16      A    Don't resist.  Put your hands behind
17 your back.
18      Q    How do you know to do that if you're not
19 being told?
20      A    We can't tell everybody everything, so
21 most times --
22      Q    Wouldn't you tell them they're under
23 arrest?
24      A    Sorry.
25      Q    I mean wouldn't you tell them you're

1  Inspector G. Dowling
2  under arrest?
3       A    Sure, we try to, yes, depending on
4  circumstances.
5       Q    Now, we heard the discussion, we heard
6  the person say that "I'm a legal observer" on the
7  video.  You heard that?
8       A    Yes.
9       Q    Okay.  What do you understand that to
10 mean?
11      A    I take it to mean that they give legal
12 advice to demonstrators, protesters.  They're
13 there if there's any questions to be asked about
14 the legality of their protest.
15      Q    Do you have an understanding of whether
16 legal observers should be arrested in the course
17 of a demonstration?
18      A    Sorry.  Say again.
19      Q    Do you have any understanding of any
20 policies with respect to whether legal observers
21 should be arrested?
22           MS. ROBINSON:  Objection.  He's not
23      a 30(b)(6) witness now, so he's not
24      testifying as to policies and practices with
25      respect to the NYPD legal observers.

1  Inspector G. Dowling
2           MS. BIKLEN:  I'm asking for his
3      personal understanding at a protest that he
4      was at.
5           MS. ROBINSON:  You can answer.
6           THE WITNESS:  I can tell you that
7      they have to abide by the same rules and
8      regulations and laws that everybody else
9      does, so if they're told to get off the
10     street, they are to remove themselves from
11     the street.
12 BY MS. BIKLEN:
13      Q    On the video that we just watched, did
14 you hear him being told to get off the street?
15      A    Again, I would have to see the totality
16 of that video.
17      Q    I'm asking about the video that we just
18 watched, up through a minute and 40 seconds.  Did
19 you hear that just now?
20      A    He could have been told by another
21 person to get off the street, the police officers
22 walking by.  I don't know.  I would have to see
23 many videos to -- different viewpoints of that
24 incident.
25      Q    That was not my question.  I'm asking

Page 158

```
                Inspector G. Dowling
 1   you:  On the video that we just watched, up
 2   through a minute and 40 seconds, as you sit here
 3   today, did you hear him being told to get off the
 4   street?
 5        A    Again, if I see -- can I watch the video
 6   again?
 7        Q    Sure.  I'm going to start at 44 seconds.
 8            (Video played.)
 9            THE WITNESS:  We're not seeing the
10   video.
11   BY MS. BIKLEN:
12        Q    Shoot.  Sorry about that.  Let's do it
13   again.  I apologize.
14            I'm going to start it at 46 seconds.
15   Are you able to see it now?
16        A    Yes.
17        Q    Okay.
18            (Video played.)
19   BY MS. BIKLEN:
20        Q    I stopped it at one minute and 31
21   seconds, so between the 44-second mark and the one
22   minute and 31 seconds, did you hear a verbal order
23   for him to get out of the street?
24        A    No, but that person appears to have come
```

Page 159

```
                Inspector G. Dowling
 1   up from behind, so he might have been told to get
 2   off the street and he ran up behind the officers,
 3   so there is a possibility.  Again, I would have to
 4   see more video.
 5        Q    We'll move on, but I'd like you to
 6   answer the questions that I'm asking.
 7        A    I'm trying to.  I just -- I need --
 8   sometimes I need more substance.  That's all.
 9        Q    Did there come a time when you arrived
10   on or near the FDR Drive and Gouverneur Slip East
11   sometime on May 30?
12        A    Yes.
13        Q    Do you recall about when that was?  Was
14   it light out?
15        A    I want to say it was dusk.
16        Q    How did you arrive there?
17        A    By vehicle.
18        Q    Did you arrive with anybody else?
19        A    Besides my driver?
20        Q    Right.
21        A    No.  I was the only one in the car.
22   Sorry.  My driver and myself, that's all I arrived
23   with.
24        Q    Were there other SRG executives there
```

Page 160

```
                Inspector G. Dowling
 1   when you arrived?
 2        A    No.
 3        Q    Do you recall who the, before you
 4   arrived, who the incident commander for that
 5   demonstration response was?
 6        A    No.
 7        Q    And where exactly did you arrive?
 8        A    I can tell you the service road on the
 9   FDR.  Not Gouverneur itself.  Further north on the
10   service road.
11        Q    And when you say that, the service road
12   is a street next to the FDR that has a barrier in
13   between?
14        A    Yes.
15        Q    Approximately how many police officers
16   were there when you arrived?
17        A    My vague recollection, 20 to 30.
18        Q    And about how many protesters?
19        A    Again, vague recollection, about 50.
20        Q    You mentioned your driver.  Do you
21   always have the same driver?
22        A    Primarily.  There are times when he is
23   off and I have to take somebody else.
24        Q    And who is your driver?
```

Page 161

```
                Inspector G. Dowling
 1        A    John Kennedy.
 2        Q    Does he engage in policing activities,
 3   or does he stay with the car?
 4        A    He stays with the car.
 5        Q    Okay, and did SRG respond to that
 6   protest on FDR Drive?
 7        A    I don't recall.  I'd have to look at
 8   video.
 9        Q    Do you recall whether there were bicycle
10   cops present?
11        A    I don't recall.  I'd have to look at
12   video.
13        Q    Do you recall what the protesters were
14   doing when you arrived?
15        A    They were standing.  The majority were
16   standing on the service road.  To my recollection,
17   the majority were standing on the service road of
18   the FDR.  There were objects being thrown at some
19   point in time during that encounter.
20        Q    Do you recall who was throwing those
21   objects?
22        A    Do you mean from the protesters?  It
23   wasn't the police.  I don't know who was throwing
24   those objects at the protest.  I don't recall.
```

Page 162

Inspector G. Dowling

1
2    Q    Was it like multiple protesters or one?
3    A    I recall it was multiple.
4    Q    When you say that they were on the
5  service road, the protesters, at that point they
6  were exiting from the FDR Drive; is that right?
7    A    Yes.  I, I know we couldn't get through,
8  so when I got out of the vehicle, I walked up on
9  foot to the vicinity of Gouverneur Slip and the
10  FDR, and I did notice officers escorting
11  demonstrators off the roadway.
12    Q    When you say "the roadway," you mean the
13  FDR Drive?
14    A    I apologize.  The FDR Drive.
15    Q    You mentioned protesters throwing
16  things.  Do you recall what they were throwing?
17    A    I don't recall exactly what they were
18  throwing, no.
19    Q    And did you observe protesters who were
20  not throwing things?
21    A    Yes.
22    Q    Did you observe protesters on the
23  sidewalk area on the non-roadway side of the
24  service road?
25    A    I don't recall.  I'd have to look at

Page 163

Inspector G. Dowling

1  video.
2    Q    Did you observe protesters that were not
3  committing any violations?
4    A    I don't recall.  I'd have to look at the
5  video.
6    Q    Do you recall whether there was an LRAD
7  warning played at any time?
8    A    Again, I'd have to look at the video.  I
9  don't recall.  I don't believe so, but I'd have to
10  look at video.
11    Q    Did you hear any verbal warnings issued
12  to protesters at FDR Drive and Gouverneur Slip
13  East when you arrived or after you arrived?
14    A    Again, I'd have to look at the video.  I
15  don't know.
16    Q    You don't have any independent
17  recollection?
18    A    No.
19    Q    Did you authorize the use of OC spray at
20  the FDR Drive and Gouverneur Slip East?
21    A    Did I authorize it?  No.  I didn't ask
22  anybody to use OC spray.
23    Q    Okay.  Did you approve anyone's use of
24  OC spray?
25

Page 164

Inspector G. Dowling

1
2    A    No.
3    Q    Did you hear or see reports -- sorry.
4  Did you see OC spray being used?
5    A    Not that I recall.
6    Q    Did you hear reports of it being used?
7    A    Not that I recall.
8    Q    Do you recall any aided reports as a
9  result of that demonstration?
10    A    Aided reports?  No.
11    Q    Do you recall whether any NYPD members
12  had to egress from the situation such that they
13  would use OC spray?
14    A    No, not to my knowledge.  Again, I'd
15  have to look at video to determine that.
16    Q    Okay.  Were there arrests at the FDR
17  location after you arrived, the Gouverneur Slip
18  East and service road area?
19    A    Yes, there were.
20    Q    Did you authorize those arrests?
21    A    I didn't have to authorize those
22  arrests.  That was an unlawful assembly, since we
23  had objects thrown at us.
24    Q    So explain to me that.  Who can be
25  arrested if there is an unlawful assembly?

Page 165

Inspector G. Dowling

1
2    A    It's a misdemeanor, so therefore the
3  police officer can take police action if it's an
4  unlawful assembly.  Independent police action.
5    Q    That's not civil disobedience?
6    A    Unlawful assembly?  No.
7    Q    How do you know that that was the basis
8  for the arrests?
9    A    When I got on the scene, that's what I
10  witnessed.  I believe -- and again, I have to see,
11  I have to look at video.  I believe it was
12  unlawful assembly after, when they started
13  throwing objects at us, and it fell into the penal
14  law definition of four or more people creating
15  tumultuous activity.  So in my determination, that
16  was unlawful assembly.
17    Q    Did you tell anyone else there was an
18  unlawful assembly?
19    A    I would have told police officers what
20  there were being arrested for.  I would say this
21  is an unlawful assembly, start making arrests.
22  I'd have to look at the video.  I don't recall.
23    Q    If you instruct officers that it's an
24  unlawful assembly and start making arrests, does
25  that mean that everyone in the crowd is arrested?

Page 166

Inspector G. Dowling

1
2      A    If they're part of that unlawful
3    assembly, they can be.
4      Q    Would a warning be issued prior to that
5    time?
6      A    Not necessarily.
7      Q    In this case was any order to disperse
8    issued?
9      A    Again, I would have to look at the
10    video.  I don't recall.
11      Q    And is an unlawful assembly grounds to
12    use OC spray on a crowd?
13      A    Depending on the actions of the crowd,
14    it may be.  Again, I can't specifically say for
15    this instance without looking at video.
16      Q    Well, you were there.  Did this crowd
17    justify the use of OC spray on multiple
18    individuals?
19          MS. ROBINSON:  Objection.  You can
20        answer.
21          THE WITNESS:  Again, I'd have to
22        see the video.  When you say multiple, that
23        it was used on multiple people, was it
24        indiscriminately sprayed or was it sprayed at
25        the person or sprayed at the ground?  I don't

Page 167

Inspector G. Dowling

1
2    know.  I'd have to look at the video.
3    BY MS. BIKLEN:
4      Q    Okay.  If I represent do you that OC
5    spray was sprayed across a group of people, based
6    on what you know about the protest at FDR Drive
7    and Gouverneur Slip East, was the use of OC spray
8    across a crowd of people, was that justified?
9          MS. ROBINSON:  Objection.  You can
10        answer.
11          THE WITNESS:  I don't know, because
12        I'd have to see the video.
13    BY MS. BIKLEN:
14      Q    I'm asking for your testimony as to what
15    you recollect here today.
16      A    I just said I don't recall.  I'd have to
17    see video.
18      Q    You don't recall enough about the
19    demonstration to determine whether it would have
20    been appropriate to use OC spray across a crowd of
21    people?
22          MS. ROBINSON:  Objection; asked and
23        answered.  You can answer again.
24          THE WITNESS:  Correct.
25

Page 168

Inspector G. Dowling

1
2    BY MS. BIKLEN:
3      Q    If one person in the crowd throws an
4    object, does that make the entire group then an
5    unlawful assembly?
6      A    Not necessarily, no.
7      Q    What makes it -- or what are the -- when
8    you say "not necessarily," what do you mean?
9      A    We would try to extract that one person
10    who is creating that behavior or is instigating
11    that behavior.  I remember that night it was more
12    than one person in that group that was throwing
13    those bottles.  Excuse me.  Throwing those
14    objects.  I apologize.
15      Q    Did you try to extract any people at the
16    crowd on FDR Drive and Gouverneur Slip East?
17      A    Again, from what I remember, it was
18    tumultuous.  No, we didn't arrest everybody at
19    that scene.
20      Q    And at that scene, did you see or hear
21    reports of officers using excessive force?
22      A    No.
23      Q    And at that scene, did you see or hear
24    reports of officers applying flex cuffs
25    excessively tight?

Page 169

Inspector G. Dowling

1
2      A    Not that I recall, no.
3      Q    Yesterday you were asked about carrying
4    flex cutters.  Do you remember that?
5      A    Yes.
6      Q    And it was your testimony that you did
7    not carry flex cutters?
8          MS. ROBINSON:  Objection.
9          THE WITNESS:  It's my testimony
10        that I did carry flex cutters.
11    BY MS. BIKLEN:
12      Q    Were you ever requested to use your flex
13    cutters to remove anyone's cuffs on May 30?
14      A    Not that I recall, no.
15      Q    Throughout the entire George Floyd
16    protests, were you ever requested for the use of
17    your flex cutters?
18      A    Yes.
19      Q    Do you recall when that was?
20      A    No, not specifically.
21      Q    Was it more than once?
22      A    It would be less than four times, I
23    would say.
24      Q    And do you recall about how many people
25    were arrested on May 30 at the FDR Drive and

Inspector G. Dowling

1  Inspector G. Dowling
2  Gouverneur Slip East location?
3      A    I'd have to review paperwork, but I
4  believe it was around ten.
5      Q    Would you be surprised if someone was
6  pepper-sprayed but not arrested?
7          MS. ROBINSON:  Objection.  You can
8      answer.
9          THE WITNESS:  There were times when
10      you pepper spray people, and it doesn't
11      affect them and they run away, so there are
12      instances like that.
13  BY MS. BIKLEN:
14      Q    Okay.  Let me represent to you that one
15  of our clients alleges that he was pepper-sprayed,
16  that it was injurious at this incident on May 30,
17  that it was incredibly painful, and he was not
18  arrested.
19          Given those facts as I've just told you,
20  is that consistent with your understanding of how
21  pepper spray should be used?
22          (Discussion was held off the
23          record.)
24          MS. BIKLEN:  Laurie, can you read
25      back the last question, please?

Inspector G. Dowling

1  Inspector G. Dowling
2          (Whereupon, reporter reads
3          requested material.)
4          THE WITNESS:  Depends.  Was he
5      close to a person who was the meaningful
6      recipient of pepper spray, and if so and he
7      wasn't being arrested, and he didn't
8      commit -- if he was not committing a
9      violation of, a violational crime, he should
10      have received medical attention.
11  BY MS. BIKLEN:
12      Q    And when you say he should have received
13  medical attention, would that have been medical
14  attention called by the NYPD?
15      A    Yes, or even another protester or a
16  passerby could also call 911.
17      Q    And do incidents of using pepper pray
18  have to be reported?  I think I've asked this, but
19  if you could answer again.
20      A    Yes.  So obviously on an arrest basis,
21  it will be documented on a threat-resistant injury
22  report.  In this situation, if, as I said before,
23  it could be documented on an aided case.  Sorry.
24  An aided card.
25      Q    And is it the responsibility of the

Inspector G. Dowling

1  Inspector G. Dowling
2  officer who uses the pepper spray to get the
3  medical assistance?
4      A    It could be any officer on the scene.
5      Q    I'd like to move ahead to May 31.  The
6  duties as you have described to me with respect to
7  May 28 and May 29, were those the same duties you
8  had with respect to the protest on May 31?
9      A    Yes.
10      Q    Any changes from the previous days?
11          MS. ROBINSON:  Objection.  You can
12      answer.
13          THE WITNESS:  Not that I recall.
14  BY MS. BIKLEN:
15      Q    And did you physically respond to
16  protests on May 31?
17      A    Yes.
18      Q    Union Square?
19      A    Possibly.
20      Q    Times Square?
21      A    Possibly.
22      Q    Manhattan Bridge?
23      A    Possibly.
24      Q    And prior to May 31, did you receive
25  intelligence reports about the expected protests

Inspector G. Dowling

1  Inspector G. Dowling
2  on those days?
3      A    I don't recall.
4      Q    Now, were you present at the protest at
5  the night on May 31 at Union Square?
6      A    Again, I may have been.  I'd have to see
7  video.
8      Q    Without seeing video, do you have any
9  independent recollection of your role in the
10  protest at Union Square on May 31?
11          MS. ROBINSON:  Objection.  You can
12      answer.
13          THE WITNESS:  I don't.
14  BY MS. BIKLEN:
15      Q    Was there an incident on May 31 that you
16  would classify as a riot?
17          MS. ROBINSON:  Objection.  You can
18      answer.
19          THE WITNESS:  I want to ask you a
20      question.  Was that the first night of
21      looting in Manhattan?
22  BY MS. BIKLEN:
23      Q    Is that your recollection of when it
24  was?
25          MS. ROBINSON:  Objection.  You can

Inspector G. Dowling

1  answer.
2
3         THE WITNESS:  If that occurred on
4    May 31, yes.
5  BY MS. BIKLEN:
6      Q    Okay, and it's your understanding that
7  looting is part of a riot?
8      A    Again, it's four or more people creating
9  tumultuous acts where it places grave -- I would
10 have to look at the penal law section.  It's been
11 a while.  Grave -- I'd have to look at the penal
12 law section, but there was much going on that
13 night, if I'm not mistaken.  People were throwing
14 objects at the police, burning cars, breaking
15 windows, so that would be a riot --
16     Q    And --
17     A    -- according to the penal law guide.
18     Q    Okay.  Are you finished with your
19 answer?
20     A    Yes.
21     Q    How do you distinguish between people
22 who are out protesting and those who are out doing
23 these kinds of activities like looting or breaking
24 windows?
25     A    Sometimes it's difficult, but we try to

Inspector G. Dowling

1  do our best.  If they're not breaking windows.  If
2  they're not setting cars on fire.  If they are
3  protesting, they're protesting.
4      Q    And what makes it difficult, as you
5  said?
6      A    Sometimes those people who commit those
7  acts enter groups that are protesting to protect
8  themselves from arrest.
9      Q    And do you have training on how to make
10 that distinction when it's happening in real time?
11     A    Just through job experience.  Training?
12 I don't recall any training for that.
13     Q    Prior to the George Floyd protests, what
14 was your experience in dealing with looting?
15     A    I don't recall, in my career, ever
16 seeing a city looted.  That was a once-in-a-career
17 confluence of events.
18     Q    So is it your testimony then that you
19 did not have experience in how to distinguish
20 protesters from looting in that way?
21         MS. ROBINSON:  Objection.  You can
22    answer.
23         THE WITNESS:  Through my
24    experience, I know what tumultuous behavior

Inspector G. Dowling

1  is, and as per the penal law that I was
2  taught in the academy, we can recognize the
3  difference between demonstrators and looters.
4  BY MS. BIKLEN:
5      Q    So you were near Canal Street and Church
6  Street the night of May 31; is that correct?
7      A    Sorry.  Canal and --
8      Q    Church in Manhattan.
9      A    I'd have to see video.  I believe I was.
10     Q    Okay.  I'm going to show you a series of
11 videos.  The first one is 31 seconds, the second
12 one is also 31 seconds, and the third one is about
13 a minute and 20 seconds, and these have been
14 previously produced by Cameron Yates, who was
15 another plaintiff in these cases.
16         And I'm going to represent to you that
17 this depicts protesters and police on Church
18 Street, just south of Canal, on May 31 at
19 approximately 9:12 in the evening, and I'm going
20 to ask you some questions about these videos, and
21 I will share my screen.
22         MS. ROBINSON:  Do you have Bates
23    stamps for these videos?
24         MS. BIKLEN:  So it's going to be

Inspector G. Dowling

1  Exhibit -- I premarked them as Exhibit 2-32,
2  which is Yates 144, Exhibit 2-33, which is
3  Yates 145, and Exhibit 2-34, which is Yates
4  514, and these have been previously produced,
5  Amy.
6         MS. ROBINSON:  Understood.
7         (Exhibit 2-32 was marked for
8         identification.)
9         (Exhibit 2-33 was marked for
10        identification.)
11        (Exhibit 2-34 was marked for
12        identification.)
13        THE WITNESS:  We're not seeing them
14    if you think we are.
15 BY MS. BIKLEN:
16     Q    I gotcha.  I'm all alone here.  I'll do
17 my best.
18        Okay.  Can you see this now?
19     A    Yes, I can.
20        (Video played.)
21 BY MS. BIKLEN:
22     Q    Did you see yourself among the officers
23 in the video that is marked Dowling Exhibit 2-32?
24     A    No, I did not.

Page 178

Inspector G. Dowling

1
2     Q     Do you recognize any of the officers
3  that are in the video Exhibit 2-32?
4     A     Can I review that video again?  I'm
5  sorry.
6     Q     Okay.
7          (Video played.)
8  BY MS. BIKLEN:
9     Q     I stopped it at seven seconds.  Do you
10  recognize anybody there?
11     A     No.  The picture is very blurry, but I
12  don't recognize --
13     Q     Let's see if I can find a cleaner place.
14  Does that help?
15     A     Once it's stopped, it becomes blurry.
16     Q     Okay.  Have you been able to recognize
17  anybody in that video?
18     A     No.
19     Q     We'll go to the next one, and this is
20  the exhibit that's been marked Exhibit 2-33.
21          (Video played.)
22  BY MS. BIKLEN:
23     Q     Did you see yourself in that video?
24     A     No, I did not.
25     Q     And were you able to recognize anybody?

Page 179

Inspector G. Dowling

1
2     A     No, I was not.
3     Q     Okay.  I'm going to go to the next one.
4  Are you able to see the video?
5     A     Yes, I am.
6          (Video played.)
7  BY MS. BIKLEN:
8     Q     Did you see yourself in that video?
9     A     No.
10     Q     Did you recognize anybody else?
11     A     No.
12     Q     So just to be clear for the record, did
13  you see yourself in the video marked Dowling
14  Exhibit 2-34?
15     A     No.
16     Q     And did you recognize anybody else in
17  the video marked Exhibit 2-34?
18     A     No.
19     Q     Did you recognize that there were some
20  are SRG officers present?
21     A     No.
22     Q     Do you recall at that particular event
23  where officers moved forward on Church Street
24  toward Canal?
25     A     I have no independent recollection of

Page 180

Inspector G. Dowling

1
2  that, no.
3     Q     Were you involved in the decision to
4  move officers forward on Church Street toward
5  Canal?
6          MS. ROBINSON:  Objection.  You can
7       answer.
8          THE WITNESS:  No, not that I can,
9       not that I can recall.
10  BY MS. BIKLEN:
11     Q     And having just watched those videos,
12  did you observe anyone throw anything in any of
13  those videos, Exhibits 2-32, 2-33 and 2-34?
14     A     I saw it at the end of the last video.
15  I saw something flying in the air toward the end
16  of it, but I can't be certain unless I see it
17  again.
18     Q     And by "last video" you mean Exhibit
19  2-34?
20     A     Yes, that's what it was, and I could be
21  mistaken.  It could have been just a light.
22     Q     And did you observe anyone in the crowd
23  doing anything unlawful in the videos you just
24  watched?
25     A     Besides being on the street when the

Page 181

Inspector G. Dowling

1
2  sidewalk is available to them?  Again, in that
3  short period of time, that's the only violation I
4  did observe, unless they were given warnings to
5  remove themselves from the street.
6     Q     Did you hear any warnings on the videos
7  we just watched?
8     A     No.  Again, it's not necessary, but I
9  did not hear anything.
10     Q     Prior to watching these videos today and
11  discussing this, did you have any understanding of
12  why the officers moved forward?
13          MS. ROBINSON:  Objection.  You can
14       answer.
15          THE WITNESS:  No.
16  BY MS. BIKLEN:
17     Q     Now, at some point the mobile field
18  forces started to be turned out on Randall's
19  Island?
20     A     Correct.
21     Q     When did that start?
22     A     I don't know.  Sometime end of May,
23  early June.
24     Q     If I tell you that Chief Monahan
25  testified to May 31 in an interview, does that

Page 182

Inspector G. Dowling

1
2  sound right?
3      A    At the end of May, early June, yes, yes.
4      Q    Do you know who made that decision to
5  turn out the mobile field forces on Randall's
6  Island?
7      A    No.
8      Q    Were you involved in that decision in
9  any way?
10     A    No.
11     Q    Did you participate in the roll calls
12 out on Randall's Island?
13     A    Yes.
14     Q    Okay.  How did you participate?
15     A    Yes.  So obviously, personnel from SRG
16 were assigned to what we call the incident command
17 post.  At the location, they would gather rosters
18 of officers that arrived and put them into mobile
19 field forces.  I would -- I was one of the
20 executives that would instruct the outgoing
21 supervisors as to their responsibility with field
22 forces.
23     Q    Anything else?
24     A    Also, I would tell them where they are
25 going to be deployed in most instances.  That was

Page 183

Inspector G. Dowling

1
2  it, relatively much.
3      Q    Were you present on Randall's Island
4  every day once it started?
5      A    Randall's Island ran for a long time.  I
6  can't, I can't say every day.  I'm not -- I would
7  have to know what days I was there.
8      Q    And when you say you instructed
9  supervisors, that is the lieutenant and sergeant
10 level?
11     A    At times, yes.  Executives, captains,
12 deputy inspectors, inspectors sometimes.
13     Q    What instructions did you provide?
14     A    You would be in charge of two
15 lieutenants, five sergeants, and 40 police
16 officers.  Take meals at the same time, respond to
17 locations quickly but safely, move with a purpose
18 when called, protect each other, be safe.
19     Depending on what happened the day
20 before, I would tell them as to what might have
21 occurred at certain locations, and that's what I
22 can recollect right now.
23     Q    If you want to know on any day where you
24 were during the protests, how would you know that?
25     A    Besides independent recollection?

Page 184

Inspector G. Dowling

1
2  Video.
3      Q    Could you look at your calendar?
4      A    I don't really maintain a calendar.
5      Q    You don't have appointments that you
6  have to attend and put them in the calendar?
7      A    No.  I could put them in my Launch
8  Zoom -- sorry.  My Outlook calendar.
9      Q    That's what I'm asking.  Could you look
10 at your Outlook calendar to determine where you
11 were?
12     A    I could, but I don't think I put
13 anything in there.  Do you want me to look now?
14     Q    No.  I'm just asking a question.
15     Executive timesheets; would that show
16 where you were on any particular day?
17     A    There's times I would, I would have put
18 them in there, depending on the detail.
19     Q    Do you have an assistant or someone else
20 who is responsible for keeping your outlook
21 calendar or determining or knowing when you're
22 available?
23     A    No.
24     MS. ROBINSON:  Can we take a quick
25     break?

Page 185

Inspector G. Dowling

1
2     MS. BIKLEN:  Okay.
3     MS. ROBINSON:  Just five minutes is
4  fine.
5     (Whereupon, a short recess was
6     taken.)
7  BY MS. BIKLEN:
8      Q    Okay.
9      A    Can I just refer back to something for
10 one second?  You asked how could they tell where I
11 was for a day.
12     In the exhibit you showed earlier, there
13 is a detail sheet that assigns us.  That was the
14 one for Union Square.  It would tell -- uh,
15 Incident Commander Chief D'Adamo, Assistant
16 Inspector Dowling, so that would be one of the
17 locations I would be for the day if someone wanted
18 to know where I was, so it is a possibility.
19     Q    And are you referring to the note sheet?
20     A    Correct.
21     Q    And that's Dowling Exhibit 2-3.
22     Okay.  So when we broke before the
23 break, we were talking about Randall's Island, and
24 I believe you mentioned instructing supervisors.
25     Did you ever instruct any members of

Inspector G. Dowling

1  service?
2  
3      A    Again, there -- I have.  I can't
4  specifically say it was the George Floyd protests,
5  but I have instructed members of the service at
6  Randall's Island at some point in time.
7      Q    So specifically with respect to the
8  George Floyd protests at Randall's Island, did you
9  provide instructions to supervisors with respect
10 to the curfew?
11     A    I don't recall.  There's a possibility,
12 but I don't recall.
13     Q    What would refresh your recollection?
14     A    Video.  Again, I'm not certain, but
15 there's a possibility.  I don't know.
16     Q    Is there video at roll call?
17     A    I'm only being honest with you.  That's
18 all.
19     Q    Did you provide any instructions on
20 equipment to any of the supervisors on Randall's
21 Island?
22     A    If a van is being equipment, I would
23 tell them not to get behind a protest, and make
24 sure the officers get out of the van when they're
25 told to get out of the van, in a quick manner.

Inspector G. Dowling

1  
2      Q    Did you provide instructions on making
3  arrests?
4      A    If we respond to a location, and arrests
5  are to be made, make sure you have arresting
6  officers already picked out of your field force.
7      Q    Did you provide instructions on wearing
8  face masks related to COVID?
9      A    I don't recall.  Possibly, but I'm not
10 sure.  I don't recall at this time.
11     Q    Did you ever see any member of service
12 not wearing a face mask white on duty at protests?
13     A    Yes.
14     Q    And what did you do in those instances?
15     A    I did not take any action.
16         MS. BIKLEN:  I'm going to share in
17     the chat what has been premarked as Dowling
18     Exhibit 2-11.
19         (Exhibit 2-11 was marked for
20         identification.)
21 BY MS. BIKLEN:
22     Q    Chief, open that and see if you can --
23     A    2-11, you said?
24     Q    Yes.
25     A    I see it.  It's up on my computer.

Inspector G. Dowling

1  
2      Q    Okay, and this exhibit is an email that
3  was sent on June 6, 2020, approximately 3:34 p.m.,
4  and the first page ends with the Bates number
5  56807.
6         Do you recall receiving this email?
7      A    I don't recall receiving it.  I do see
8  it today.  I know it's addressed to me.
9      Q    The email notes that -- and this is
10 underlined -- "Officers will be instructed to
11 avoid overhead strikes at all times."
12         What was your understanding of who would
13 be instructing the officers to avoid overhead
14 strikes?
15     A    We're taught in the academy not to
16 utilize overhead strikes, absent exigent
17 circumstances.
18     Q    So for this email related to mobile
19 field force enforcement guidelines in the PBMS, is
20 that the Patrol Borough Manhattan South?
21     A    Patrol Borough Manhattan South.
22     Q    So all mobile field forces that were
23 policing in Patrol Borough Manhattan South would
24 have to abide by these rules?
25     A    That is something we have to abide by

Inspector G. Dowling

1  whether in mobile field force or not.
2      Q    Okay, but this email is addressed to
3  mobile field force executives?
4      A    Yes.
5      Q    And those would be commanders of mobile
6  field forces from other places, including SRG?
7      A    Yes.
8      Q    So SRG members who were operating in
9  Patrol Borough Manhattan South would be requested
10 to abide by these enforcement guidelines?
11     A    Yes.
12     Q    Did you instruct anyone in SRG to abide
13 by these enforcement guidelines?
14     A    Yes.
15     Q    Who?
16     A    The supervisors who we instructed, the
17 officers who we instructed prior to turning out at
18 Randall's Island, supervisors, officers that may
19 not have turned out at Randall's Island, that may
20 have turned out at a different location based on
21 the detail or the protest.
22         And I just want to go back.  You asked
23 what I would instruct field force executives on,
24 and one of the things that I failed to mention was

Inspector G. Dowling

1    the red light green light.  A red light is a civil
2    disobedience arrest, and a green light is the
3    penal law misdemeanor felony arrests, so I
4    apologize.
5         Q    And do you recall specifically
6    instructing supervisors with respect to
7    instructing officers to avoid overhead strikes at
8    all times?
9         A    I don't recall that.  It's on the sheet,
10   and I have read the sheet many times, so there's a
11   possibility I did, but I don't have a recollection
12   of that.
13        Q    Okay.  Do you have any understanding
14   about why it was underlined in this email?
15        A    No.
16        Q    Does that suggest that it was important?
17        A    Again, I did not construct this email,
18   so I don't know.  I don't want to answer for
19   somebody else.
20        Q    Do you know why officers would need to
21   be instructed to avoid overhead strikes at all
22   times?
23        A    Again, we reinforce certain things in
24   the department, just like I sent out that email

Inspector G. Dowling

1    originally just to reinforce officers to be aware
2    of red light green light.  Chief Hughes might have
3    thought that was important.  I don't know.
4         Q    And it also says in the underlined
5    section to "give clear instruction (get
6    back/disperse)."
7              What do you understand that to mean?
8         A    I take that as, if you encounter a
9    crowd, to advise them to get back and disperse
10   from the area.
11        Q    And do you recall giving instructions to
12   mobile field force executives on Randall's Island
13   about giving clear instruction to get back and
14   disperse?
15        A    Again, I've seen this document before.
16   It's a good possibility I did.  I don't have an
17   independent recollection of saying that.
18        Q    We'll put that away.
19             I'd like to turn your attention to
20   June 1.  Were you present at protests in Midtown
21   on June 1?
22        A    There's a possibility.  I'd have to look
23   at the detail sheet, but I'd have to also review
24   video.

Inspector G. Dowling

1         MS. BIKLEN:  Okay.  Well, let's
2         look at some documents.  I'm going to put
3         some more in the chat, and I'm going to start
4         with a document that has been labeled Dowling
5         Exhibit 2-15.
6              (Exhibit 2-15 was marked for
7              identification.)
8    BY MS. BIKLEN:
9         Q    Open that up and let me know when you
10   can see it.
11        A    Yes, it's on my screen.
12        Q    Okay, and what is this document that's
13   been labeled Exhibit 2-15?
14        A    That is a New York City Police
15   Department Omniform System - Arrests, so that
16   would be, as we call it, an arrest report or
17   online booking sheet.
18        Q    So let's -- can you read the Details
19   section to yourself?
20             (Witness peruses document.)
21             THE WITNESS:  Okay.  Yes.
22   BY MS. BIKLEN:
23        Q    Okay.  So in the Details section, it
24   says that the "AO was informed by Inspector

Inspector G. Dowling

1    Dowling of SRG that defendant was with over one
2    hundred others at the above location engaging in a
3    demonstration.  The demonstration engaged in
4    violent and tumultuous conduct by breaking store
5    windows, throwing bottles, discharging fireworks
6    and yelling and screaming."
7              Did you personally observe all of those
8    things?
9         A    Yes.
10        Q    Did you personally observe this
11   defendant doing any of those things?
12        A    I don't have independent recollection
13   right now.  I would have to see video.
14        Q    Okay.  Is yelling and screaming
15   tumultuous behavior?
16        A    No, not necessarily.  Not just, not just
17   yelling and screaming, no.
18        Q    It also says that the "group was
19   blocking roadway, preventing cars from passing
20   through.  Defendant and others were given multiple
21   orders to disperse via verbal warnings, and
22   defendant refused to disperse."
23             What were those orders to disperse?
24        A    Again, I don't have any independent

Page 194

Inspector G. Dowling

1            Inspector G. Dowling
2   recollection of this arrest, so I'd have to look
3   at a video to see.
4        Q    And without a video, how else would you
5   determine what happened?
6             MS. ROBINSON:  Objection.  You can
7        answer.
8             THE WITNESS:  I have a pretty good
9        memory.  I don't recall.  I know this was up
10       by, this is up by Radio City Music Hall.  I
11       remember there was a large amount of people
12       in the street, I believe on 51st Street.
13       Windows to a -- I want to say Duane Reade,
14       some sort of pharmacy, was broken by an
15       individual.  Numerous people were throwing
16       things at the police.
17            That's my recollection of that
18       event.
19   BY MS. BIKLEN:
20       Q    And to your recollection, you saw one
21   person break a window?  Is that what you just
22   testified to?
23       A    My recollection at this time, yes.
24       Q    And in this Details section, that
25   indicates that the arresting officer was informed

Page 195

Inspector G. Dowling

1   of this by you; is that right?
2        A    That is correct.
3        Q    Okay, and were you the one to order
4   these arrests?  Were you the person who ordered
5   these arrests?
6        A    No.  Again, this arrest was for -- well,
7   I ordered this arrest, but if the charges are a
8   misdemeanor or a felony, any officer observing
9   these arrests can effect those arrests.
10       Q    I'm asking about this particular arrest.
11   Did you order it?
12       A    Yes.
13       Q    And so this would indicate that the
14   arresting officer did not necessarily observe any
15   of this activity, right?
16       A    Correct.
17       Q    And how did you convey to the arresting
18   officer that this, that this activity had
19   occurred?
20       A    I would verbally tell the officer.
21       Q    For each person that was arrested with
22   these details in it, you verbally told that
23   officer?
24       A    This specific one, I spoke to that

Page 196

Inspector G. Dowling

1   officer.
2             MS. BIKLEN:  You can put that away.
3        I'd like to put up another exhibit, Dowling
4        Exhibit 2-16.
5             (Exhibit 2-16 was marked for
6             identification.)
7   BY MS. BIKLEN:
8        Q    And open that up, Chief, and let me know
9   when you have it open.
10       A    I have it.
11       Q    And if you can read the Details section
12   to yourself.
13       A    That was roughly the same location, if
14   I'm not mistaken.
15       Q    All right, and how did you inform this
16   arresting officer of the circumstances of the
17   arrest?
18       A    Again, I would speak to the arresting
19   officer or officers and explain to them what I
20   witnessed.
21       Q    Okay, and did you do that in this case?
22   You verbally spoke to every single arresting
23   officer and tell them what you witnessed?
24       A    If it was a mass arrest, I could bring

Page 197

Inspector G. Dowling

1   the officers together and speak to them, yes.
2        Q    Is that what you did?
3        A    I don't recall exactly what I did.  I
4   would have to have -- I don't have any independent
5   recollection of it, but it has happened in the
6   past.
7        Q    Okay.  Do you recall someone from NYPD
8   Legal present there?
9        A    I don't have any independent
10   recollection.
11       Q    Did you consult with -- would you have
12   consulted with them about the charges?
13       A    Again, not necessarily.
14       Q    Did you ever speak to anyone from the
15   District Attorney's Office about these arrests?
16       A    No, I did not.
17       Q    Were you ever asked about any kind of
18   testimony with respect to these arrests on
19   June 1st at or about 6th Avenue and I believe 51st
20   Street?
21       A    No.
22       Q    And how did you decide which charges
23   would be related to this arrest?  Did you decide
24   with respect to the penal law code?

Page 198

```
                    Inspector G. Dowling
1
2        A    Not necessarily.  I would say that they
3   were obstructing governmental administration.
4   They would speak to -- when this person was
5   brought to MAPC, which is the mass arrest
6   processing center, they would speak to a person
7   from Legal, and Legal could ask them what
8   happened.  They could say I was assigned this
9   arrest by Chief Dowling -- I'm only surmising this
10  could happen -- and they would explain as to what
11  to charge the people with.
12       Q    And were you the one who gave verbal
13  orders to disperse on that night to all the
14  protesters?
15       A    Again, I have no independent
16  recollection of that.
17       Q    And for this particular defendant,
18  Marilyn Barton, do you recall what all, if
19  anything, she did?  Do you have any independent
20  recollection of that?
21       A    Without looking at the online, no, I
22  don't.
23       Q    Do you recall whether she broke any
24  windows?
25       A    I'd have to look at the video.
```

Page 199

```
                    Inspector G. Dowling
1
2        Q    Threw bottles?
3        A    I'd have to look at video.
4        Q    Do you recall how many people were
5   discharging fireworks?
6        A    Again, I'd have to look at video.
7        Q    And if there isn't video, how would you
8   refresh your recollection?
9        A    That's truly the only way I could do
10  that.  I would want camera video, TARU video.
11       Q    But you don't wear a body camera,
12  correct?
13       A    That is correct.
14       Q    Did you instruct anyone to activate
15  their body-worn camera video for those arrests?
16       A    I don't recall.  On many occasions I
17  have.  I don't recall specifically that night.
18       Q    You can put that away.
19            So we can just skip ahead a little bit
20  and ask you about a protest on June 4.  You were
21  present at the protest in Motthaven on the evening
22  of June 4?
23       A    Yes.
24       Q    And when did you first learn about a
25  proposed protest on June 4 in Motthaven?
```

Page 200

```
                    Inspector G. Dowling
1
2        A    I'm not sure.  It could have been June 3
3   or June 4.
4        Q    And who did you learn from?
5        A    Again, possibly Chief D'Adamo.  Possibly
6   the operations unit in SRG.  Could be word of
7   mouth from somebody else.  I'm not sure.
8        Q    Do you recall receiving any intelligence
9   related to the protest?
10       A    I remember seeing a poster, and I'm sure
11  it was an open source poster, saying "burn down
12  the Bronx" in sum and substance, regarding that
13  protest, and then I believe on that poster, if my
14  memory serves me correctly, the meeting location
15  was at 149 and 3rd, The Hub, which would be in the
16  confines of the 40 Precinct.
17       Q    And do you recall when that was that you
18  saw that poster?
19       A    Again, it would have to be sometime
20  around June 3 or June 4.
21            MS. BIKLEN:  I'm going to put a
22       document I've marked as Dowling Exhibit 2-19
23       in the chat.
24            (Exhibit 2-19 was marked for
25            identification.)
```

Page 201

```
                    Inspector G. Dowling
1
2   BY MS. BIKLEN:
3        Q    Let me know if you're able to open that.
4        A    It is open.
5        Q    Okay.  So this is a report titled
6   "Situation Report," and it begins with the Bates
7   number ending 15949.
8            Have you seen this document before?
9        A    I'm just scrolling through it to see if
10  it refreshes my memory.
11            I don't recall seeing something like
12  this.
13       Q    So on the first page is a graph about
14  daily protest arrests over time.  Would you have
15  received information like that, or did you receive
16  information like that?
17       A    I don't recall.  I don't think so.  I
18  don't recall.
19       Q    If you could just look at the graph now,
20  it shows that arrests peak on June 1st with 385.
21       A    Yes.
22       Q    And then on June 2nd there are fewer,
23  229, and on June 3rd, 45.
24       A    Yes, I see that.
25       Q    Did you have any kind of information
```

Inspector G. Dowling

1  Inspector G. Dowling
2  yourself during that time that would have made you
3  aware that arrests were going down at that point
4  in time?
5      A    The only information I had was June 1st
6  was the time of the looting.  June 2nd was -- and
7  June 1st, if my memory serve me correctly, was the
8  first day of the 11:00 p.m. curfew.  June 2nd was
9  the first day of the 8:00 p.m. curfew, and that is
10 the only reason -- or that could be one of the
11 reasons as to why the arrests were going down, but
12 June 1st was one of the days of looting.
13     Q    But is it your testimony that you had no
14 sort of real time information about whether there
15 were, you know, more or fewer arrests each day?
16     A    As it pertains to SRG, I would know.  As
17 it pertains to the city, there's a possibility I
18 would not, but I can.  I don't have any
19 independent recollection of that.
20     Q    And does this sort of graph coincide
21 with your memory about SRG arrests and the
22 information that you would have had?
23     A    I don't know whether SRG arrests went up
24 or down during that period.
25     Q    Would they have been included in the

1  Inspector G. Dowling
2  total number of arrests that is reported here
3  city-wide?
4      A    They should, yes.
5      Q    And to your knowledge, would Chief
6  D'Adamo have this kind of information, this
7  situation report?
8           MS. ROBINSON:  Objection.  You can
9      answer.
10          THE WITNESS:  I don't know.
11 BY MS. BIKLEN:
12     Q    To your knowledge, what position in the
13 NYPD would this kind of information go to?
14     A    Again, I don't know.  I don't think I've
15 ever seen this before, so I don't want to speak
16 for other people.
17     Q    All right.  You can take that down.
18          Did you attend any meetings regarding
19 the planning of the response to the Motthaven
20 protest or the protest at The Hub on -- that
21 started at The Hub on June 4th?
22     A    A response to the 40th precinct where we
23 had a, a pre-meet with Lehr, Inspector Gallitelli,
24 and members of the SRG executive staff who were
25 going to be present at the, at the demonstration.

1  Inspector G. Dowling
2      Q    And that you're referring to Chief
3  D'Adamo?
4      A    Yes.
5      Q    Okay, and Captain Miller?
6      A    I don't know if he was present for the
7  meeting, but he would have been present at the
8  detail itself.
9      Q    Okay.  Deputy Inspector McGeown?
10     A    Again, not sure if he was present at the
11 meeting, but he was present at the detail.
12     Q    Do you recall whether Chief Wedin was at
13 the meeting at the 40th precinct?
14          MS. ROBINSON:  Objection.  You can
15     answer.
16          THE WITNESS:  I don't recall, but I
17     don't think so, but I could be mistaken.  I
18     don't recall.  That's my best answer.
19 BY MS. BIKLEN:
20     Q    Do you recall whether Chief Monahan was
21 at the meeting?
22     A    I don't recall.
23     Q    Have you been in a lot of meetings with
24 Chief Monahan?
25     A    Not a lot.  Believe me.  Not a lot.

1  Inspector G. Dowling
2      Q    So that's not memorable to you?
3      A    He was my, he was my commanding officer,
4  so I somewhat knew him, so it's not that
5  memorable.
6      Q    And what was the purpose of this meeting
7  at the 40th Precinct?
8      A    The deployment of personnel,
9  instructions by Lehr as to what he expected from
10 SRG, the route that possibly the demonstrators
11 might take.  On my recollection, that's what it
12 was.
13     Q    Did Lehr run the meeting?
14     A    Again, it was an informal meeting in
15 front of the 40 if I'm not mistaken.  He spoke --
16 he was the -- yes, you could say he ran the
17 meeting.
18     Q    When you say "informal meeting," what do
19 you mean by that?
20     A    So it wasn't -- maybe "informal" isn't
21 the right word.  It was done in front of the
22 precinct as to what his wishes were with
23 deployment, what he expected.  Again, informal
24 wasn't the correct word, so I'd like to strike
25 that.  Sorry.

Inspector G. Dowling

1
2    Q    When you say "in front of the precinct,"
3  do you mean outside?
4    A    Outside.
5    Q    In the street?
6    A    Yes.
7    Q    Approximately how long did it occur?
8    A    From what I recall, about ten minutes.
9    Q    Were you there for the entire meeting,
10  as far as you're concerned?
11   A    From what I recall, yes.
12   Q    And what were Lehr's expectations with
13  respect to SRG?
14         MS. ROBINSON:  Objection.  You can
15    answer.
16         THE WITNESS:  All I recall his
17    expectations were is he gave us the route
18    that they possibly might take and where he
19    wanted us deployed, which I don't know
20    exactly where he wanted us deployed at this
21    time.
22  BY MS. BIKLEN:
23   Q    Was it discussed how many SRG members
24  would be present?
25   A    I don't recall.  Sorry.  Present at?

Inspector G. Dowling

1
2    Q    The protest.  Withdrawn.  If you
3  understand, answer.
4    A    I do understand.  We would tell him as
5  to what resources we had available.
6    Q    And then did Lehr make a decision about
7  how many resources he wanted and convey that to
8  you?
9    A    I don't recall.
10   Q    Was the overall staffing of NYPD members
11  of service at the protest discussed at this
12  meeting?
13   A    I don't recall.
14   Q    Do you recall what the route was that he
15  shared with you?
16   A    I can tell you what the route was.  As
17  for what he said, I'm not 100 percent certain.
18  No, I don't recall.
19   Q    Did you take any notes at this meeting?
20   A    No.
21   Q    Did you see anyone take any notes at
22  this meeting?
23   A    No.
24   Q    Was there any discussion of intelligence
25  at this meeting?

Inspector G. Dowling

1
2    A    Maybe.  In regard to the poster that was
3  circulating, there was some talk about that.
4    Q    Any discussion of any other specific
5  incident in the Bronx with respect to this protest
6  at the meeting?
7    A    There was reports -- and I don't know
8  who said it -- that there were bricks placed
9  around parts of the 40 that were located, so like
10  pallets of bricks located in the 40.  There was
11  another report where -- and I'm not sure if it was
12  said at this meeting or if it was after the
13  meeting, but a person that was in the group of
14  protesters was arrested with a firearm.
15   Q    I'm just asking about the meeting itself
16  at this point.
17   A    I can't recall if that was in the
18  meeting or not.  That might have been after, but
19  as far as the, the poster I mentioned before, that
20  was mentioned at the meeting.
21   Q    Was there any discussion of looting
22  incidents mentioned at the meeting?
23   A    I don't recall.
24   Q    Any discussion of the looting on Fordham
25  Road at this meeting?

Inspector G. Dowling

1
2    A    There might have been.  I don't recall.
3    Q    You mentioned discussion of someone said
4  that pallets of brick had been found in the
5  precinct?
6    A    In or around the precinct, yes.
7    Q    Were any pictures of that provided?
8    A    No, not at that time, nor anytime that I
9  know of.
10   Q    And what did you understand that to
11  mean?
12   A    There was a possibility that those
13  bricks were going to be used against police
14  officers.
15   Q    And had you heard that with respect to
16  any other protest during the George Floyd
17  protests?
18   A    Not to my recollection.
19   Q    At any time after this meeting, did you
20  ever see bricks at the protest?
21   A    No.
22   Q    Was anyone from the Criminal Justice
23  Bureau at this meeting at the 40 Precinct?
24   A    Not that I recall.
25   Q    Was there any discussion of a plan for

Page 210

Inspector G. Dowling

1   making arrests?
2       A   Yes.
3       Q   What was that discussion?
4       A   If there were going to be mass -- if it
5   was going to be a mass arrest situation, we had
6   Corrections Plus available to transport the
7   arrestees to -- I think it was MAPC.  I'm not
8   sure.
9       Q   Was there a discussion of who would
10  order those arrests if there was a mass arrest
11  situation?
12      A   I don't, I don't recall.
13      Q   And had you attended any other kind of
14  meetings at precincts during the entire George
15  Floyd protest response?
16      A   At commands, no.
17      Q   Was this meeting unique?
18      A   It was unique in the sense that we
19  didn't turn out of Randall's Island for this
20  detail, from what I remember.  We responded direct
21  to the 40th Precinct.
22      Q   Did you have these kinds of meetings
23  with chiefs at Randall's Island for other
24  protests?
25

Page 211

Inspector G. Dowling

1       A   I want to say no, if my memory serves me
2   correctly.
3           MS. BIKLEN:  Let's show you another
4           document in the chat.  This one has been
5           marked Dowling Exhibit 2-20.
6           (Exhibit 2-20 was marked for
7           identification.)
8   BY MS. BIKLEN:
9       Q   And you can open it and let me know when
10  it's open.
11      A   It's open.
12      Q   Okay, and what is this document marked
13  Exhibit 2-20?
14      A   It appears to be an email from Chief
15  Mullane.
16      Q   And you received this email?
17      A   Yes.  I'm on the, the list.
18      Q   And this was sent about 3:30 p.m. on
19  June 4th?
20      A   Yes.
21      Q   So the subject of the email is "Bay
22  Ridge Demo & FTP Bronx"?
23      A   Yes.
24      Q   Now, with respect to the protest in
25

Page 212

Inspector G. Dowling

1   Motthaven, how many total members of service were
2   detailed to respond?
3       A   According to this sheet, five
4   lieutenants, 13 sergeants and 122 officers.
5       Q   Okay.
6       A   Again, that's not my independent
7   recollection.  That's from the detail sheet.
8       Q   And that's from Bay Ridge, correct?
9   That's the Bay Ridge number on the first page?
10      A   It says Bay Ridge Demo & FTP Bronx, so
11  I'm not sure if the PBBS -- that would be Patrol
12  Borough Brooklyn South -- would that be assigned
13  to Bay Ridge, and 303 and 305 would be assigned to
14  the Bronx.
15          I apologize.  Sorry.  I didn't scroll
16  down far enough.
17          So for the Bronx, it would have been 15
18  lieutenants, 48 sergeants and 476 PO/detectives,
19  for a total of 539.
20      Q   539 total NYPD members of service?
21      A   Correct.  Yes.
22      Q   And do you know who set that, decided
23  that number?
24      A   Again, it's, it's a request from patrol
25

Page 213

Inspector G. Dowling

1   borough to operations.  Operations can determine
2   whether they want more or less.  From us it's sent
3   to the special operations division, and then comes
4   to us, so I don't know who specifically.  I know
5   the Bronx requests personnel, but I don't know
6   what request the Bronx had.
7       Q   And are those requests for personnel in
8   writing?
9       A   Via email, like we call it a 49, so it
10  would be writing.
11      Q   And was this total number of personnel
12  discussed at the meeting at the 40th Precinct in
13  the Bronx?
14      A   Again, I don't recall.
15      Q   Do you recall what time that meeting
16  took place?
17      A   It was still light out.  Possibly in the
18  16:00 -- excuse me -- 4:00 p.m. time frame, maybe
19  a little later.  I don't know.  It could have been
20  5:00.  I'm not 100 percent certain.
21      Q   And I'm sorry if I asked this before,
22  but was there any discussion of the curfew at this
23  pre-meeting at the 40th Precinct?
24      A   I'm sure there was, because that was,
25

Page 214

Inspector G. Dowling

1          Inspector G. Dowling
2   that was in effect.
3        Q    And a total of 539 officers, how did
4   that compare to the total number of demonstrators?
5        A    I think the demonstrators that night had
6   approximately 300 demonstrators, so this number
7   would be larger than what the demonstrators had
8   that night.
9        Q    And to your knowledge, was there any
10  other protest in which such a large number of
11  officers were tasked to respond to a demonstration
12  with not as many participants or not as many --
13  yeah, not as many participants?
14       A    I don't recall any.
15       Q    If you can go to the last page, the last
16  two pages.
17       A    Same document?
18       Q    Same document.  Scroll down.
19       A    Yes.
20       Q    Is this the poster that you were
21  referring to before?
22       A    This one doesn't look familiar.
23       Q    Go to page 4 of the document.
24       A    No, no, I see it, I see it.  This one
25  doesn't look familiar.  It must have been another

Page 215

Inspector G. Dowling

1   one that I seen.  This one doesn't look familiar.
2   The one with the burning police van you're talking
3   about, correct?
4        Q    Right.
5        A    No.
6        Q    And you're familiar with the term "FTP"?
7        A    Yes.  What it stands for?
8        Q    Well, we'll just talk about the term
9   right now.  Have you policed demonstrations that
10  involved FTP before?
11       A    Yes, I have.
12       Q    How many?
13       A    I think, from my recollection, all four.
14            MS. BIKLEN:  You can put that away
15       now.
16            I'll put another document in the
17       chat that I have marked Dowling Exhibit 2-21.
18            (Exhibit 2-21 was marked for
19            identification.)
20  BY MS. BIKLEN:
21       Q    Open it and let me know when you have it
22  open.
23       A    I have it open.
24       Q    Okay.  Have you seen the document that's

Page 216

Inspector G. Dowling

1   been marked Dowling Exhibit 2-21 before?
2        A    Besides right now?  Not to my
3   recollection, no.
4        Q    Did you hear about a protest plan at the
5   pre-meet on June 4th?
6        A    Not that I recall besides the plan that
7   Inspector Lehr and us shared between SRG members,
8   no.  That was the only plan.
9        Q    The plan you're referring to from Lehr;
10  was that a written plan?
11       A    No.
12       Q    Were there any written documents
13  exchanged at that meeting at the 40th Precinct?
14       A    No, not between myself and Lehr.
15       Q    At that meeting at the 40th Precinct
16  that you were in attendance at, was there any
17  discussion ever of mobilizing fewer officers?
18       A    Not that I recall.
19       Q    I'll represent to you that Dermot Shea
20  told reporters the day after this protest we're
21  discussing on June 4th in Motthaven, "We had a
22  plan was which executed nearly flawlessly in the
23  Bronx."
24            Do you agree with that statement?

Page 217

Inspector G. Dowling

1        A    Yes, I do.
2        Q    What was that plan that was executed
3   nearly flawlessly?
4        A    We -- there was a group of demonstrators
5   where there was information that there's a
6   possibility that they would commit violence
7   against the community, and we successfully stopped
8   the possibility of that from occurring.
9        Q    Did you see any violence committed
10  against the community at the demonstration?
11       A    As I said, reports again.  There was a
12  female, I believe, in that crowd with a firearm,
13  so there was a possibility that that person may
14  use that firearm against a member of the community
15  or the police or a demonstrator for that matter.
16            There were reports of bricks being laid
17  about to possibly be used against police forces or
18  break windows in that community, and there was a
19  vehicle that appeared to be attached to that
20  demonstration that was pulled over, and incendiary
21  devices in the form of gasoline cans, and hammers,
22  I believe; three or four individuals were arrested
23  in that vehicle, and that vehicle was confiscated.
24            So there was no violence committed

Page 218
Inspector G. Dowling
1  against that community that night, so I would
2  consider that a success.
3
4       Q    Let's go back to that.  It's your
5  testimony today, though, that you did not see any
6  evidence of the bricks in the area; is that right?
7       A    That is correct.  I said reports, I said
8  reports of bricks.
9       Q    You did not see any reports of bricks,
10 correct?
11            MS. ROBINSON:  Objection; asked and
12       answered.  You can answer again.
13            THE WITNESS:  I heard reports of
14       bricks.
15 BY MS. BIKLEN:
16      Q    You say that there was a car that
17 appeared to be associated with the protest.  What
18 do you mean by that?
19      A    Again, this was a car that -- the
20 information I received, that that car was part of
21 that protest, some information that was received,
22 and it was pulled over approximately a half mile
23 away, I believe, with incendiary devices and
24 hammers in the vehicle.  Again, I would have to
25 look at the arrest report.

Page 219
Inspector G. Dowling
1       Q    Who did you hear this information from?
2       A    I don't recall at this time.
3       Q    Approximately what time did you hear
4  that information?
5       A    Approximately 17:30 to 18:00.
6       Q    Was this before or after the meeting at
7  the 40th Precinct?
8       A    It was after the meeting --
9       Q    So this car was not --
10      A    -- from what I recall.
11      Q    -- discussed at the meeting at the 40th
12 Precinct?
13      A    I don't recall.  I'm going to say no.
14      Q    And did you ever observe anyone in the
15 crowd with a firearm?
16      A    No.
17      Q    And how would you have received this
18 information that you're talking about?
19      A    Again, it could have been verbal,
20 telephonically.  I don't recall the exact means of
21 communication regarding that.
22      Q    From the intelligence bureau?
23            MS. ROBINSON:  Objection.  You can
24       answer.

Page 220
Inspector G. Dowling
1            THE WITNESS:  I don't recall.
2  BY MS. BIKLEN:
3       Q    And was the plan to conduct large-scale
4  arrests?
5       A    No.
6       Q    Was the plan to encircle protesters in
7  order to arrest them?
8       A    No.
9       Q    So what was the plan then that was
10 executed flawlessly?
11      A    We were going to read -- again, I'm not
12 1,000 percent sure of the plan at the time, from
13 my recollection, I should say.  It was -- the
14 protesters -- there's a curfew at 20:00 hours or
15 8:00 p.m. to read warnings.  Again, it's -- to
16 recall, and to read the warnings, and if they did
17 not heed those warnings, we were going to make
18 arrests.
19      Q    So just to be clear here, your testimony
20 here is that the plan that was executed
21 flawlessly, in your opinion, was to read warnings,
22 and if those warnings were not heeded, to make
23 arrests?
24            MS. ROBINSON:  Objection.  You can

Page 221
Inspector G. Dowling
1       answer.
2            THE WITNESS:  That would have been,
3       from what I recall, part of the plan.
4  BY MS. BIKLEN:
5       Q    What other parts were there?
6       A    I said I don't recall all the plan.
7       Q    So what time did you arrive at the
8  protest?  Did you go to The Hub?
9       A    We were in the vicinity of The Hub.
10      Q    Where?
11      A    149th Street, and I think I was staged
12 at -- in the vicinity of Morris Avenue.
13      Q    And where did you go next?
14      A    I don't recall exactly where I went
15 next.  I know we moved when the protesters started
16 to move.
17      Q    So were you behind the protest?
18      A    I don't recall.
19      Q    Who were you with at that vicinity of
20 149th and Morris?
21      A    Chief D'Adamo was present.  I was with
22 my driver.  I think that was -- that's all I
23 recall.
24      Q    Did you have any particular assignment

Page 222

Inspector G. Dowling

1     Inspector G. Dowling
2   with respect to the protest?
3       A    Besides being the, quote-unquote,
4   assistant incident commander to Chief D'Adamo?
5       Q    Yes.
6       A    No.
7       Q    Were you the assistant incident
8   commander with Chief D'Adamo at that protest?
9       A    Assistant incident commander for SRG at
10  the protest.
11      Q    And were you with SRG, other SRG members
12  at that area adjacent to The Hub when it first
13  started?
14      A    I don't recall.  Besides the Chief's
15  driver, the Chief, my driver and myself, I don't
16  recall anybody else.
17      Q    Did you see Chief Kathleen O'Reilly at
18  any time during the protest?
19      A    No, I did not.
20      Q    So where did you go after 149th and
21  Morris?
22      A    I'm not -- I don't recall where exactly
23  we went.
24      Q    Were you following -- were you moving
25  near the protest as they marched?

Page 223

Inspector G. Dowling

1     Inspector G. Dowling
2       A    Yes.  That's a fair assessment, yes.
3       Q    Were you in eyesight of them?
4       A    At some point in time in the march, we
5   were in eyesight of them.
6       Q    How did you know where to go with
7   respect to the protest as it proceeded?
8       A    So over our police radio, someone
9   would -- and a member of the service, I'm not sure
10  who it was, would dictate the direction of the
11  protest.
12      Q    And were you traveling on foot or in the
13  car?
14      A    In the car.
15      Q    Were you and Chief D'Adamo in the same
16  car?
17      A    I don't think so.
18      Q    Was there any --
19      A    I don't recall.  Sorry.
20      Q    Did there ever come a time where you
21  followed the protest on foot?
22      A    At some point in time that protest went
23  onto Willis Avenue and made a left onto 136th
24  Street, and at some point in time I did get out on
25  foot.

Page 224

Inspector G. Dowling

1     Inspector G. Dowling
2       Q    And was that route, Willis Avenue to
3   136th Street, was that the route, expected route
4   that Lehr had shared with you?
5       A    I don't recall.
6       Q    Do you recall whether the protest was
7   taking the route that you expected them to take?
8       A    I don't recall.
9       Q    What was the crowd doing when you saw
10  them during the protest?
11      A    They were walking in the middle of the
12  street.
13      Q    Did you see anything else besides
14  walking in the middle of the street?
15      A    No.
16      Q    Were they carrying signs?
17      A    I don't recall.
18      Q    Would you consider walking in the middle
19  of the street to be an orderly protest?
20      A    They're in violation of 1156A, or if
21  they were blocking traffic, disorderly conduct,
22  but it could be considered orderly.
23      Q    Did you see anyone in the crowd throw
24  anything while they were walking along?
25      A    Not when I was -- not while they were

Page 225

Inspector G. Dowling

1     Inspector G. Dowling
2   walking, no.
3       Q    And did you order any arrests while the
4   crowd was walking?
5       A    No.
6       Q    So you mentioned that the crowd was in
7   violation because they were walking in the
8   streets.  Did you do anything to stop them from
9   walking in the streets up until they turned onto
10  136th Street?
11      A    No.
12      Q    Okay.  Were police officers present
13  observing them walking in the street during this
14  period?
15      A    Yes.
16      Q    Did you participate in any arrests up at
17  this time until they turned onto 136th Street in
18  any way?
19      A    No.
20      Q    Did you hear any instructions to the
21  protesters up until this period on 136th Street?
22      A    No.
23      Q    At any time prior to turning onto 136th
24  Street, did you hear any orders for the protesters
25  to disperse?

Page 226

Inspector G. Dowling

1

2     A    No.

3     Q    At the meeting had there been discussion

4 of letting the crowd march?

5     A    I don't recall.

6     Q    So you mentioned at some point the crowd

7 turned -- was it left on 136th Street?  Is that

8 what you said?

9     A    I'd love to give you a direction.  I'm

10 not sure, but they were traveling on Willis

11 Avenue, they made a left onto 136th.  I think they

12 tried to go toward the Willis Avenue bridge and

13 may have doubled back, and they made a right on

14 136th Street whereas I made a left on 136th

15 Street.

16        Does that make sense?

17    Q    So the crowd was going toward Brook

18 Avenue, and you were coming from behind on Broad

19 Place?

20    A    Sorry.  They were going toward the

21 Willis Avenue bridge, and then they doubled back

22 toward 136th Street and made a right onto 136th

23 Street.  We made a left onto 136th Street, so they

24 would have been ahead of us.

25    Q    And officers stopped them at that point?

Page 227

Inspector G. Dowling

1

2     A    I'm sorry?

3     Q    Officers stopped them at that point, the

4 crowd?

5     A    When they tried to get onto Willis

6 Avenue bridge, yes.

7     Q    But then they came back onto 136th,

8 correct?

9     A    Correct.  They made the right onto 136th

10 Street, yes.

11    Q    And then did you see the crowd go past

12 136th Street?

13    A    I don't recall.

14    Q    What makes you think that the crowd was

15 trying to cross the Willis Avenue bridge then?

16    A    The reports on the radio.

17    Q    But you did not witness anything?

18    A    No.

19    Q    Did there come a time when officers

20 stopped the crowd at 136th Street?

21    A    No.

22    Q    Did they stop them at Brook Avenue?

23    A    No.

24    Q    Were you giving directions to any SRG

25 officers during this period?

Page 228

Inspector G. Dowling

1

2     A    Not that I recall.  I would have to see

3 video, to refresh my recollection.

4     Q    Well, if it wasn't you directing SRG

5 officers where to be, who would it have been

6 giving those directions?

7     A    SRG officers would be instructed to

8 follow the group over the radio -- sorry -- follow

9 the, the route over the radio.

10    Q    Okay, and who was giving out the route

11 on the radio?

12    A    I don't recall.

13    Q    And would officers have been following

14 the crowd from behind?

15    A    It's a possibility.  I'd have to --

16 again, I'd have to refresh my recollection, but I

17 believe I was behind them, anyhow, or some faction

18 of SRG was behind them.

19    Q    And were you also following along the

20 route on the radio?

21    A    Yes.

22        MS. BIKLEN:  I'm going to show some

23    video.

24        Amy, this has been premarked as

25    Dowling Exhibit 2-22, and it is a TARU video

Page 229

Inspector G. Dowling

1

2    that's been marked as TARU video number 427.

3        (Exhibit 2-22 was marked for

4        identification.)

5 BY MS. BIKLEN:

6     Q    Okay.  Chief, do you see the video on

7 the screen?

8     A    Yes, I do.  Sorry.  It just got blurry.

9 I'm not sure if that's because you stopped it.

10    Q    Okay.  Well, let me play for a bit, and

11 let's see what you see.

12        (Video played.)

13 BY MS. BIKLEN:

14    Q    Okay.  Are you able to see the screen?

15    A    Yes.

16    Q    Is it clear to you?

17    A    It's not very clear.  It's observable,

18 but it's not very clear, for whatever reason.

19    Q    You testified that you prepared by

20 reviewing some video.  Is this familiar to you?

21    A    Yes.

22    Q    Is this the video you reviewed in your

23 preparation?

24    A    It appears that, yes.

25    Q    Okay.  Do you recognize anybody in this

Inspector G. Dowling

1
2  screen?
3      A    I recognize myself.
4      Q    Okay, and if you can describe what
5  you're wearing.
6      A    I have a white shirt, blue pants, black
7  shoes.
8      Q    And you're wearing a helmet?
9      A    Yes, I am.
10     Q    And the visor is flipped up?
11     A    Yes, it is.
12     Q    Okay.  Do you have a particular helmet
13 that is associated with you?
14     A    Sorry?
15     Q    Do you have a helmet that's yours that
16 you bring to events if you need it?
17     A    Yes.
18     Q    Does it have a number that is associated
19 with it?
20     A    My helmet does not have a number.
21     Q    Do you always wear the same helmet?
22     A    Yes.
23     Q    Previously we saw in video you were
24 wearing a baseball cap.  Why are you wearing a
25 helmet here?

Inspector G. Dowling

1
2      A    The reports that bricks being laid about
3  the precinct caused concern.  I was, not
4  specifically in this day, but at other times,
5  bricks were thrown at us during some of these
6  protests, and from my -- I utilized my personal
7  protective equipment for my safety.
8      Q    And did you wear a helmet during any of
9  the other George Floyd protests?
10     A    Yes, I did.
11     Q    Have you ever worn a helmet with any
12 other officer's number in it?
13     A    No.
14     Q    Do you recognize anybody else who was in
15 this video with you?
16     A    Chief D'Adamo.
17     Q    And can you describe what he's wearing?
18     A    He has blue pants, black shoes, white
19 shirt, and a helmet.
20     Q    Is he the person standing next to you?
21     A    Yes.
22     Q    Closest to the screen, we see an officer
23 with three stars.  That's the Chief?
24     A    Yes, it is.
25     Q    And do you recognize who that is?

Inspector G. Dowling

1
2      A    Yes, I do.
3      Q    Who is that?
4      A    That is Chief Harry Wedin.
5      Q    And Chief Wedin in this video, he's
6  wearing a mask, a face mask?
7      A    Again, it's blacked out on top.  It
8  appears so.
9           MS. ROBINSON:  Molly, it's on, but
10     there's a black-out part where you can't see
11     Chief Wedin's head, really, and Chief
12     D'Adamo's head is kind of cut off also.  I
13     don't know what that black box is.
14          Ah, there we go.
15          THE WITNESS:  It's gone, it's gone.
16 BY MS. BIKLEN:
17     Q    All right.  Great.  So you see that
18 Chief Wedin is wearing a mask?
19     A    Yes.
20     Q    And you were not wearing a face mask,
21 correct?
22     A    No, I'm not.
23     Q    And Chief D'Adamo is not wearing a face
24 mask?
25     A    No, he is not.

Inspector G. Dowling

1
2      Q    And you were standing next to someone
3  holding kind of a backpack on their front; is that
4  right?
5      A    That is correct.
6      Q    And that is the LRAD player?
7      A    The LRAD 100, correct.
8      Q    So how did it come to be that that is
9  where you're standing?
10     A    The protesters, like I said, made a
11 right onto 136th Street.  They stopped in between
12 Brown and Brook, Brown Place and Brook Avenue, and
13 we stopped.
14     Q    Is it your testimony that the
15 protesters -- well, withdrawn.
16          Why did the protesters stop?
17          MS. ROBINSON:  Objection.  You can
18     answer.
19          THE WITNESS:  I don't recall.
20 BY MS. BIKLEN:
21     Q    Okay.  Was it because there was a line
22 of officers in front of them?
23          MS. ROBINSON:  Objection.  You can
24     answer.
25          THE WITNESS:  I'd have to see the

Page 234

```
                    Inspector G. Dowling
1
2       video.
3               MS. BIKLEN:  Well, let's watch a
4       little bit more.
5               (Video played.)
6    BY MS. BIKLEN:
7       Q    I just want to ask you if you recognize
8    anybody else who is now in the frame.
9       A    No.  People with their shields down, no.
10      Q    I'll keep going.
11              (Video played.)
12   BY MS. BIKLEN:
13      Q    Do you recognize the person who is
14   standing behind Chief Wedin in the NYPD Legal
15   garb?
16      A    Sorry.  If you let it go a little bit
17   more, I might -- if they turn around, I may be
18   able to identify them.
19      Q    Okay.
20              (Video played.)
21   BY MS. BIKLEN:
22      Q    Okay.  Are you able to see who that was?
23      A    He's got a mask on.  Can you let it go a
24   little bit more?
25              (Video played.)
```

Page 235

```
                    Inspector G. Dowling
1
2    BY MS. BIKLEN:
3       Q    Were you able to determine who that was
4    in the NYPD Legal?
5       A    No.  If we let it go, I can maybe
6    identify them later on.  I'm not sure.
7       Q    Was anyone from NYPD Legal at the
8    meeting at the precinct?
9       A    I don't recall.
10      Q    So there's an LRAD message playing now.
11   Let's just play a little bit more so that you can
12   hear it again.
13              (Video played.)
14   BY MS. BIKLEN:
15      Q    Okay.  So was that message discussed --
16   the content of that message, was that discussed at
17   the pre-meeting?
18      A    In all probability, we most likely
19   discussed that we had an LRAD warning for the
20   curfew.  I don't independently recall at this
21   time, but there's a good probability that we did
22   discuss that.
23      Q    Okay, and that message does not have a
24   warning specifically to leave the area.  Why is
25   that?
```

Page 236

```
                    Inspector G. Dowling
1
2       A    I don't know that answer.
3       Q    Do you think it should have?
4               MS. ROBINSON:  Objection.  You can
5       answer.
6               THE WITNESS:  No.
7    BY MS. BIKLEN:
8       Q    Did you want people to leave the area?
9       A    As per the Mayor's executive order, they
10   should not have been on the street, except
11   essential workers, after 20:00 hours or 8:00 p.m.
12      Q    So is your answer that you did not want
13   people to leave the area?
14      A    I didn't say that.  What I said was they
15   weren't supposed to be on the street after
16   8:00 p.m., as per the Mayor's executive order.
17      Q    So at that time, was it the goal of
18   playing that message to have people leave the
19   area?
20      A    Yes, to give them an opportunity to
21   leave, yes.
22      Q    Okay.  So if it was supposed to give
23   them an opportunity to leave, why was not there an
24   explicit instruction to leave the area?
25      A    We played that message over and over.  I
```

Page 237

```
                    Inspector G. Dowling
1
2    don't know how many times we played that message,
3    so they had their opportunity to leave, and they
4    refused to leave.  I, I can't get into the minds
5    of the people that didn't want to leave.
6       Q    Well, I was asking you, in your mind.
7    Why didn't you play a message that told people
8    explicitly to disperse and exit?
9       A    I don't think it was necessary.  I don't
10   know what I thought back then, but I can tell you
11   now I don't think it was necessary.
12      Q    So from this vantage that we're looking
13   at, there's a line of officers -- you included --
14   in front of the protesters there, and we will see
15   later on the video that there's a line of bike
16   officers in the back.
17              Where should they have left at this time
18   if they wanted to disperse?
19      A    Were those line of bike officers there
20   when the warnings were being read?
21      Q    Yes.  Let me represent to you, yes.
22      A    I have to see video as to, as to, as to
23   that.
24      Q    And at this time did you see protesters
25   throwing anything?
```

Page 238

```
                  Inspector G. Dowling
1
2      A    No, no.  Not at that time, no.
3      Q    I'd like to just go back a little bit.
4  Do you see this person taking a picture?
5      A    Yes.
6      Q    Do you understand that to be a member of
7  the press?
8      A    It appears he has credentials on.  I
9  don't know what those credentials are.
10     Q    Was there any discussion during the
11 pre-meeting of press being essential workers?
12     A    I don't recall.
13     Q    Do you recall ever having discussion
14 about members of the media being essential
15 workers?
16     A    I do remember having discussions.  I
17 don't know exactly when, to be quite honest.
18          (Video played.)
19 BY MS. BIKLEN:
20     Q    Did you hear someone say "SRG, nice and
21 easy, let's go"?
22     A    Can you go back a little bit?
23          (Video played.)
24 BY MS. BIKLEN:
25     Q    Did you hear that?
```

Page 239

```
                  Inspector G. Dowling
1
2      A    Yes.
3      Q    Okay, and who was that speaking?
4      A    I believe that was Chief D'Adamo.
5      Q    And what did you understand "SRG go" to
6  mean?
7      A    To move up.
8      Q    To make arrests?
9      A    Yes.
10     Q    Was the crowd under arrest at that
11 point?
12     A    The crowd, the individuals in that crowd
13 could be placed under arrest, yes.
14     Q    Was there ever a warning or announcement
15 to the individuals in that crowd that they were
16 under arrest?
17     A    Over the LRAD?
18     Q    Yes.
19     A    I'd have to -- you'd have to play the
20 video.  I'm not sure.
21     Q    Do you have --
22     A    I don't recall.
23     Q    -- any recollection?
24     A    I don't recall.
25     Q    If there is no LRAD warning, was there
```

Page 240

```
                  Inspector G. Dowling
1
2  any other measures by which the crowd would
3  understand that they were now under arrest?
4      A    When officers approached them, they
5  could have said "you're under arrest, put your
6  hands behind your back."
7      Q    Anything else?
8      A    No.
9      Q    If Chief D'Adamo saying SRG go, are the
10 protesters then free to leave at that point?
11     A    There were protesters that did leave.
12 They were free to leave.
13     Q    So if a protester was leaving as they're
14 approached by an officer, they're not under arrest
15 at that point?
16     A    Some of those protesters walked on the
17 sidewalk, and they had egress from the location,
18 so some of the protesters stayed, locked arms, and
19 those people were arrested --
20     Q    You observed --
21     A    -- again.
22     Q    -- protesters leave the situation?
23     A    From my recollection, yes.
24     Q    And when Chief D'Adamo says SRG go, who
25 made the decision to order those arrests at that
```

Page 241

```
                  Inspector G. Dowling
1
2  point?
3      A    Lehr would have ordered those arrests.
4      Q    And where was he?
5      A    He was somewhere in that group with us.
6      Q    And that group that you just described
7  where we saw you was on the Brown Place side?
8      A    Sorry.  Could you say that one more
9  time?
10     Q    All right.  So Lehr, you say he was in
11 the group.  You mean where we saw you standing
12 with a line of officers?
13     A    Yes.
14     Q    And at that point, what was the reason
15 for the arrests?
16     A    Curfew violations.
17     Q    Let's watch some more.
18          (Video played.)
19 BY MS. BIKLEN:
20     Q    So at this point did you assist in any
21 arrests?
22     A    I believe I did, yes.
23     Q    Okay, and did you verbally inform any
24 protesters that they were under arrest prior to
25 putting hands on them?
```

Page 242

Inspector G. Dowling

1
2    A    I don't recall.
3    Q    What would refresh your recollection?
4    A    Video.
5    Q    Well, I guess let's watch.
6         (Video played.)
7    BY MS. BIKLEN:
8    Q    Do you hear the person who says "guys,
9    move it up"?
10   A    Yes, I did.
11   Q    Was that you?
12   A    Yes, it is.
13   Q    And why were you saying that?
14   A    Because we were effecting arrests.
15   Those protesters that were there were intently
16   preventing people from being arrested or
17   preventing themselves from being arrested, so they
18   were resisting arrest.  We needed more personnel
19   up there for our safety and the safety of others.
20   Q    Would it have been helpful to you to use
21   the LRAD to let people know they were under arrest
22   and should not resist?
23        MS. ROBINSON:  Objection.  You can
24   answer.
25        THE WITNESS:  No.

Page 243

Inspector G. Dowling

1
2    BY MS. BIKLEN:
3    Q    Did you ever discuss --
4    A    That's my, that's my opinion.
5    Q    Did you ever discuss playing such a
6    message?
7    A    No.
8    Q    Did you consider any other methods for
9    effecting the arrest of that crowd?
10   A    No.
11   Q    Did you consider trying to arrest
12   protesters one by one?
13   A    That's what we were attempting to do.
14   Q    And it's your testimony that you have no
15   independent recollection of whether you verbally
16   informed anyone they were under arrest before
17   trying to place them in handcuffs?
18   A    That is correct.
19   Q    So I'd like to play up to four minutes.
20        (Video played.)
21   BY MS. BIKLEN:
22   Q    Well, I'd like to stop the video here,
23   which is the three-minute 52-second mark, and see
24   if you can see the line of officers toward the
25   back.

Page 244

Inspector G. Dowling

1
2    A    Are you referring to Brook Avenue?
3    Q    Yes.
4    A    Yes, I do see that.
5    Q    And was everyone in the crowd at this
6    point under arrest, in your consideration?
7    A    Yes.
8    Q    Okay, and they were not free to leave?
9    A    No, even though some did, yes.
10   Q    And --
11   A    They were in violation of the curfew.  I
12   apologize, folks, for talking over you.  Sorry.
13   Q    How would they have known at that point
14   that they were under arrest?
15   A    Well, from the warnings we gave with the
16   LRAD numerous times prior to 8:00 and even after
17   8:00, the warnings themselves, if I'm not
18   mistaken, mentioned they were in violation of the
19   curfew.  Officers approached them, and I'm sure
20   some of the officers told them they were under
21   arrest.  They seen people in front of them being
22   arrested.
23        So again, I can't speak for a protester
24   as to whether or not they know they're being
25   arrested.

Page 245

Inspector G. Dowling

1
2    Q    But it was your intent -- you believed
3    that through the LRAD message which said that
4    there was a curfew, that had been playing since
5    before 8:00, that just as a result of that and the
6    officers, that they should know that at that point
7    they're under arrest at this time?
8    A    In or around 8:00.  They were in
9    violation.
10   Q    But is the curfew violation a
11   must-arrest?
12   A    No.
13   Q    And if I represent to you that other
14   protests in the city took part in that night and
15   were not arrested, would that sound consistent
16   with your understanding of curfew enforcement?
17        MS. ROBINSON:  Objection.  You can
18   answer.
19        THE WITNESS:  Yes.
20   BY MS. BIKLEN:
21   Q    And so at this time were there officers
22   on Brook Avenue behind the protest and coming from
23   the direction of Brown Place?
24   A    Yes.  They were, they were scattered, it
25   seems, in the middle of Brook Avenue, yes.

Inspector G. Dowling

1
2      Q    Sorry.  Who was scattered in the middle
3  of Brook Avenue?
4      A    Police officers.
5      Q    Did you consider it to be encirclement?
6      A    Almost a partial encirclement, because I
7  don't see if Brook Avenue is -- if officers are
8  lined there so people can't get out, I would have
9  to see another form of the video.
10     Q    And was that part of the plan that was
11 discussed at the 40th Precinct, was to have an
12 encirclement?
13     A    I don't recall.
14     Q    Okay.  During these arrests, did you see
15 or hear reports of the use of any OC spray?
16     A    I got sprayed, so there was, there was
17 some OC spray used.
18     Q    Did you authorize that OC spray?
19     A    I don't have to authorize OC spray, but
20 I did not authorize it.
21     Q    Did you -- were you carrying OC spray on
22 that night?
23     A    Yes.
24     Q    Did you use it?
25     A    No.

Inspector G. Dowling

1
2      Q    Why not?
3      A    I, I've never utilized my OC spray.
4      Q    Did you feel you didn't need to use it
5  on that night?
6      A    For the situation I was in, yes.
7      Q    Yes, you would have used it?
8      A    No.  For the situation I was in for the
9  arrests that I was assisting in, I did not, I did
10 not feel the need to use it.
11     Q    Do you know who sprayed you?
12     A    No.
13     Q    Did you ever have any discussions with
14 any SRG officers about the use of OC spray on June
15 4th at this protest?
16     A    I probably told somebody that I got
17 sprayed.  That was about it.
18     Q    Did that ever happen to you before?
19     A    Yes.
20     Q    We'll watch a little bit more.
21          (Video played.)
22 BY MS. BIKLEN:
23     Q    I stopped it at four minutes and 52
24 sends.  Do you consider this to be a tumultuous
25 crowd?

Inspector G. Dowling

1
2      A    No.  I did see an object get thrown
3  prior to you stopping the video, but no, not for
4  the large majority part, no, although they are
5  resisting.  Some, some are resisting.
6      Q    The arrests here are just for curfew
7  violations?
8      A    Some of those people could have been
9  going for obstructing governmental administration
10 by de-arresting tactics, resisting arrest, but
11 they are in violation of the curfew.
12     Q    But the people who are standing here on
13 the video now who have not been -- well, have not
14 been informed that they are under arrest, are they
15 resisting arrest?
16     A    No.
17     Q    Did you consider de-escalating the
18 situation in any way?
19     A    The warnings are still playing, but as
20 far as de-escalation, I did not consider that.
21     Q    When you say "the warnings are still
22 playing," what do you mean by that?
23     A    They're still playing in the background
24 is what I'm saying --
25     Q    But --

Inspector G. Dowling

1
2      A    -- advising the people they're in
3  violation of the curfew.
4      Q    And could they have left at that point?
5      A    It looks like they could have left by
6  Brook Avenue.
7      Q    So you're saying that if they could have
8  left by Brook Avenue, they would have been allowed
9  to?
10     A    I believe they would have.
11     Q    Okay, and if they couldn't have left by
12 Brook Avenue?
13          MS. ROBINSON:  Objection.  You can
14     answer.
15          THE WITNESS:  They could be
16     arrested.  Again, they are in violation of
17     the curfew.
18 BY MS. BIKLEN:
19     Q    No, I understand that.  I'm just asking
20 if -- did you consider at any point issuing a more
21 clear dispersal order that ordered them to leave
22 the area?
23     A    No.
24     Q    I'm going to go up to about 11 minutes.
25 I'm going to skip ahead, let's say to ten minutes

Page 250

```
              Inspector G. Dowling
1    here.  We'll watch from there.
2            Okay.  I'm going to start playing.
3            (Video played.)
4    BY MS. BIKLEN:
5         Q    So I want to stop here and see if you
6    see the line of officers here on Brook Avenue.
7         A    Yes.
8         Q    And what was their role there?
9         A    I don't know.  They were patrol
10   officers.  I don't know.
11        Q    Let's play a little more.
12           (Video played.)
13   BY MS. BIKLEN:
14        Q    So in that clip that we just watched,
15   starting at about ten minutes and went to about 11
16   minutes 31 seconds, did you hear any verbal
17   warnings that people were about to be arrested?
18        A    Again, there's a helicopter overhead.
19   There's masks on.  I did not hear it in that clip.
20           MS. ROBINSON:  Molly, we have just
21           a little under an hour left.  If you're
22           planning on bringing the Chief back, that's
23           not giving you a lot of time.
24           MS. BIKLEN:  Okay, Amy.  He was at
25
```

Page 251

```
              Inspector G. Dowling
1    a lot of protests, and so I think we're just
2    going to need more time.
3            MS. ROBINSON:  Then you're going to
4            have to ask the court for it, because we're
5            not going in any form or fashion beyond 14
6            hours.
7            MS. BIKLEN:  We'll apply to the
8            court.
9    BY MS. BIKLEN:
10        Q    Chief, how can the protesters hear if
11   there's helicopters?  How were they supposed to
12   understand instructions?
13           MS. ROBINSON:  Objection.  You can
14           answer.
15           THE WITNESS:  I'm sorry.  Say it
16   again.  I don't understand the question.
17   BY MS. BIKLEN:
18        Q    When we were watching the video, I asked
19   if you heard any verbal orders that people were
20   under arrest, and you said you could not because
21   of the helicopters.
22           Is that a fair characterization of your
23   testimony?
24        A    The helicopter overhead that the
25
```

Page 252

```
              Inspector G. Dowling
1    microphone from the video camera picked up, those
2    officers next to those people, they could have
3    said you're under arrest.
4         Q    Do you recall being there?  Was it loud?
5         A    The protesters screaming?  It was loud.
6    I don't have independent recollection.  I don't
7    remember the helicopter being there.
8         Q    Fair to say there was a helicopter
9    there?
10        A    Fair to say.
11           MS. BIKLEN:  I'm going to show
12           another video, and this one I've marked as
13           Dowling Exhibit 2-24.
14           (Exhibit 2-24 was marked for
15           identification.)
16   BY MS. BIKLEN:
17        Q    And I'm going to share my screen again.
18   Do you see the video?
19        A    Yes, I do.
20        Q    Okay.  So this is body-worn camera
21   video, so there's not going to be sound on at the
22   beginning.
23           MS. ROBINSON:  Do you have a Bates
24           stamp for this video, Molly?
25
```

Page 253

```
              Inspector G. Dowling
1            MS. BIKLEN:  I do.  It is
2    DEF-CCRB-000349190202004402_video_202004402.
3    It's DEF_CCRB_0034919.
4            MS. ROBINSON:  And can you put that
5            in the chat if you wouldn't mind?
6            MS. BIKLEN:  I'll send it to you
7            when we're off the record.  That's a little
8            bit much for me to type right now.
9            MS. ROBINSON:  Understood.
10           MS. BIKLEN:  Okay.
11           (Video played.)
12           MS. BIKLEN:  I'm going to move
13           ahead so we can hear some sound.
14           (Video played.)
15   BY MS. BIKLEN:
16        Q    Chief, do you recognize where this video
17   is coming from?
18        A    It is -- again, I don't know the
19   direction.  It's on 136th Street, facing Brook
20   Avenue.  I believe those are the -- that's the
21   Milbrook developments.
22        Q    When we see the white shirt officers who
23   are marching ahead there, that was -- you were
24   part of that group, correct?
25
```

Page 254

Inspector G. Dowling

1
2     A    If that's the original part of the
3 video, yes.
4     Q    And did you see Chief Monahan with you
5 in that area?
6     A    No.
7     Q    Was he present at the protest?
8     A    I think at some point in time he was.
9 I'm not sure.
10     Q    I'm going to move ahead here.
11          (Video played.)
12 BY MS. BIKLEN:
13     Q    So I would like to move ahead to --
14     A    Can I just point out that was one
15 example where he said to the man "put your hands
16 behind your back"?
17     Q    There's no question pending.
18          I'm going to start here.
19          (Video played.)
20 BY MS. BIKLEN:
21     Q    Okay.  I stopped the video at 2 minutes
22 and 15 seconds.
23          Do you see a cannister in blue?
24     A    Yes.
25     Q    What is that?

Page 255

Inspector G. Dowling

1
2     A    That appears to be an MK9.
3     Q    And what is that?
4     A    It's an OC spray cannister.
5     Q    Did you hear coughing on the video?
6     A    I did not.  If you rewind it, I might.
7     Q    Well, did you hear any warning that OC
8 spray would be used when you were there?
9     A    No, but it's not necessary.
10     Q    Using OC spray without warning is not
11 necessary, in your view?
12     A    No.
13     Q    Do you know who is carrying that?
14     A    No.  It's an SRG member.  I don't know
15 who.
16     Q    Have you heard of Sergeant Cindy
17 Sánchez?
18     A    Yes.
19     Q    Do you know whether she used OC spray on
20 that night?
21     A    I don't know.
22          (Video played.)
23 BY MS. BIKLEN:
24     Q    Were you able to hear your voice on
25 this?

Page 256

Inspector G. Dowling

1
2     A    No.
3     Q    Do you recall assisting in this arrest?
4     A    There's a possibility.  I don't know.  I
5 would have to see remainder of the video.
6          (Video played.)
7 BY MS. BIKLEN:
8     Q    Does that help you?
9     A    That's me.
10     Q    And are you assisting in that arrest?
11     A    Yes.
12     Q    And does the way that officers are
13 putting those flex cuffs on comport with the
14 training that you described yesterday?
15     A    I seen the pads of fingers go in, and
16 from what it looks like there, it's not
17 operational, those pair of flex cuffs at that
18 time, as you could tell.  Struggling to utilize
19 those flex cuffs.
20     Q    Do you give them any instruction on what
21 to do?
22     A    Not that I recall.  Probably told them
23 to take them off and put on a new set.
24     Q    And why is this protester being taken
25 down to the ground?

Page 257

Inspector G. Dowling

1
2     A    I don't know.  You've have to -- I'd
3 have to see the video as to why he was taken to
4 the ground.
5     Q    Just watching it?
6     A    Can we just see it again?  I didn't
7 realize I was there.  I didn't know what the
8 question was going to be as it advanced.
9          (Video played.)
10 BY MS. BIKLEN:
11     Q    I'm going to stop it there.
12          Is struggling to get flex cuffs on a
13 reason to take someone down to the ground?
14     A    He was struggling not to give up his
15 arms, so he was actively resisting.
16     Q    Okay.
17          (Video played.)
18 BY MS. BIKLEN:
19     Q    Is that you saying "relax"?
20     A    I don't know.
21          (Video played.)
22 BY MS. BIKLEN:
23     Q    Is that your voice telling to "get him
24 up"?
25     A    I don't know.  I would have to see.  I

Page 258

```
                Inspector G. Dowling
1
2    would have to determine if it's my voice or not.
3    I'd have to look at more video.
4        Q    You don't recognize your voice when you
5    hear it?
6             MS. ROBINSON:  Objection.  You can
7        answer.
8             THE WITNESS:  Sometimes I do.  I
9        don't, I don't recognize it there.  I'm not
10        saying that's not me.  I would have to see
11        more video.
12   BY MS. BIKLEN:
13       Q    Do you recall submitting a TRI report
14   for this night?
15       A    I don't recall.  I'd have to review my
16   records on that.
17       Q    Does a TRI report that you injured your
18   thumb grappling with an arrest refresh your
19   recollection?
20       A    It doesn't.  I've had many TRIs during
21   these incidents, so that doesn't refresh my
22   recollection, but if it was documented and I
23   prepared a TRI report, then I'll take your word
24   for it.
25       Q    Would it have been referring to this
```

Page 259

```
                Inspector G. Dowling
1
2    arrest?
3             MS. ROBINSON:  Objection.  You can
4        answer.
5             THE WITNESS:  I don't recall.
6             MS. BIKLEN:  I'm going to move
7        ahead the video to 34 minutes.
8             This doesn't seem to be working.
9        Hold on a minute.  Let's take a break.  Let's
10        take about a ten-minute break.
11             (Whereupon, a short recess was
12             taken.)
13   BY MS. BIKLEN:
14       Q    And on June 4th, did you have any
15   discussions prior to making arrests about whether
16   anybody was essential workers?
17       A    I don't recall.
18       Q    Did you instruct any SRG members with
19   respect to the exemption of healthcare workers?
20       A    Specific to that day, I don't recall.
21       Q    Did you give any instructions to SRG
22   members there, prior to making arrests, about
23   whether legal observers were exempt?
24       A    I don't recall.
25       Q    Did you give any instructions to any SRG
```

Page 260

```
                Inspector G. Dowling
1
2    members about whether media personnel were exempt?
3        A    I don't recall.
4        Q    Is there anything that would refresh
5    your recollection?
6        A    Video, email, if I prepared one, but I
7    don't know if I did, but -- I don't recall if I
8    did.  Sorry.
9        Q    Would you -- to your knowledge, did you
10   receive any emails related to curfew exemptions?
11   Withdrawn.
12             Other than Finest messages, did you
13   receive any emails related to curfew exemption?
14       A    I was going to mention the Finest
15   messages.  I don't recall.  I don't recall.
16       Q    Did you receive Finest messages related
17   to the curfew?
18       A    Yes, yes.
19       Q    And that included information on curfew
20   exemptions?
21       A    Yes.
22       Q    And did you discuss those with anybody
23   in relation to the protest at Motthaven on June
24   4th?
25       A    I don't recall.
```

Page 261

```
                Inspector G. Dowling
1
2        Q    Did you see Captain Delgado at the
3    protest at Motthaven?
4        A    Yes, I did.
5        Q    Where did you see him?
6        A    Somewhere in the vicinity of 136th
7    Street between Brook Avenue and Brown Place.
8        Q    And what was he doing?
9        A    He -- if my recollection is correct, he
10   was a mobile field force commander.
11       Q    And in that role, would he have ordered
12   arrests?
13       A    Yes.
14       Q    And effected arrests?
15       A    He would assist in arrests, yes.
16       Q    Do you know whether legal observers were
17   arrested at Motthaven?
18       A    I don't recall.
19       Q    Did you hear Lehr order any arrests?
20       A    He gave the instructions to arrest
21   violators of the curfew.
22       Q    What time was that?
23       A    I believe it was somewhere around 20:05
24   or 20:10, which would have been 8:05 p.m. or
25   8:10 p.m., after the warnings were given.
```

Inspector G. Dowling

1
2    Q    And how did you hear that instruction?
3    A    Verbal.
4    Q    Not over the radio?
5    A    No.
6    Q    Did you hear any verbal instruction to
7    arrest legal observers?
8    A    To arrest legal observers?
9    Q    Yes.
10   A    No.
11   Q    Did you hear any order over the radio to
12   arrest legal observers?
13   A    No.
14   Q    What about medics?
15        MS. ROBINSON:  Objection.  You can
16   answer.
17        THE WITNESS:  No.
18   BY MS. BIKLEN:
19   Q    Within SRG, did you ever hear protests
20   referred to as battles?
21   A    Not that I recall at this time.
22   Q    Would you consider arrests for curfew
23   violations to be a battle?
24   A    I wasn't in the military.  I was never
25   in battle.  Peaceful or civil disobedience arrests

Inspector G. Dowling

1
2    where there is no active resistance, I can't see
3    that being termed as a battle.  You know,
4    resisting arrest, can we say, you know, we had to
5    battle that person to arrest them?  There's a
6    possibility, but I don't recall it being called a
7    battle.
8        MS. BIKLEN:  All right.  I'd like
9        to move forward and share another document
10       that I'll put in the chat.  This one has been
11       marked Dowling Exhibit 2-27.
12           (Exhibit 2-27 was marked for
13           identification.)
14   BY MS. BIKLEN:
15   Q    Can you please open it and let me know
16   when you have it open.
17   A    I have it open.
18   Q    Now it's not opening for me.  Hold on.
19   A    This is the email from Chief Mullane?
20   Q    Yes, and did you regularly receive
21   emails from Chief Mullane regarding protests?
22   A    I don't recall receiving emails, but
23   apparently I did if I'm on this email chain.
24   Q    And did you receive this email?
25   A    If you don't mind, let me just check.

Inspector G. Dowling

1
2        Yes, I am on the, the first of the
3    email.
4    Q    And the subject of the document marked
5    Dowling Exhibit 2-27 is "Demonstrations for
6    Wednesday, July 15, 2020"?
7    A    Yes.
8    Q    And it shows -- if you go halfway down
9    the page or toward the bottom of the first page
10   that's marked with the ending Bates number 84468,
11   there's two protests listed on July 15, in the
12   bottom portion, so one says "Black Lives Matter,"
13   and the reason is "Counter Protest."
14       Do you see that?
15   A    Sorry.  I'm just scrolling all the
16   way -- is it the last page?
17   Q    No.  I'm sorry.  I'm on the bottom of
18   the first page.
19   A    Sorry.  You're talking in the shaded
20   box?
21   Q    Yes.
22   A    Yes.
23   Q    Okay, and that identifies whether the
24   march has a permit?
25   A    Yes.

Inspector G. Dowling

1
2    Q    Okay, and for the first march, the Black
3    Lives Matter NYC counter protest, what does it say
4    as to whether there's a permit?
5    A    It says "no."
6    Q    And the protest below it that is not
7    shaded, that's referred to as "United Clergy
8    Coalition," does that one identify as having a
9    permit?
10   A    No.
11   Q    And that's called "The Jericho March:
12   the Power of Prayer March with Clergy and Law
13   Enforcement," and there is a notation below.  What
14   is that notation below?
15   A    Pro PD event.
16   Q    And do you know why this was identified
17   as a pro PD event?
18   A    No, I do not.
19   Q    What did you understand that to mean?
20   A    They're in favor of the police
21   department.
22   Q    And you were physically present at this
23   protest?
24   A    Yes, I was.
25   Q    Okay, and this document indicates that

Page 266

Inspector G. Dowling

1
2  the Jericho March did not have a permit?
3       A    Yes.  We clarified that.  It says this
4  on the, on the email.
5       Q    So below, there looks to be a kind of
6  protest route; is that right?
7       A    Yes.
8       Q    And that's identified as planning to
9  march over the Brooklyn Bridge?
10      A    That's like page 3, right?  Yes, you are
11 correct.
12      Q    Okay, and would traffic have to be
13 halted for that?
14      A    Yes.
15      Q    Did you observe protesters walking in
16 the roadway on the Brooklyn Bridge for the Jericho
17 March?
18      A    Yes.
19      Q    Was that march ordered to disperse?
20      A    No.
21      Q    Was that march in violation of any penal
22 law?
23      A    It would have been -- if traffic was not
24 flowing, they could have been -- it could have
25 been disorderly conduct for blocking vehicular

Page 267

Inspector G. Dowling

1
2  traffic, being on a road -- or 1156A, being in a
3  roadway when a sidewalk is available to them.
4       Q    Is it fair to say that people are not
5  normally allowed to walk over the road portion of
6  the Brooklyn Bridge?
7       A    Yes, it is.  During the George Floyd
8  protest, it happened numerous times.
9       Q    Did you give or hear any warnings to the
10 marchers on the Jericho March to disperse?
11      A    No.
12      Q    Did you arrest any of the participants
13 in the Jericho March for any civil disobedience
14 offense?
15      A    We arrested people on the bridge, but
16 not specifically for the Jericho March, no.
17      Q    Did you play any LRAD warnings to the
18 participant in the Jericho March?
19      A    No.
20      Q    Did you see or hear of any excessive
21 force toward participants in the Jericho March?
22      A    No.
23      Q    And there were also counter protesters
24 that day?
25      A    Yes.

Page 268

Inspector G. Dowling

1
2       Q    And the counter protesters also did not
3  have a permit?
4       A    That is correct.
5       Q    Did you observe counter protesters
6  walking in the roadway?
7       A    I can't say walking in the roadway.  I
8  observed them jumping over the walkway of the
9  Brooklyn Bridge onto the roadway, trying to block
10 that protest or demonstration, whatever.
11      Q    Did you give or hear any warnings to the
12 counter protesters to disperse?
13      A    I don't recall.
14      Q    What would refresh your recollection?
15      A    Video.
16      Q    Anything else?
17      A    No.
18      Q    Did you authorize an LRAD to be used
19 that day with respect to the counter protesters?
20      A    Again, I'd have to look at video.  I
21 don't, I don't recall.
22      Q    To your knowledge, were any arrests made
23 of counter protesters on that day?
24      A    Yes.
25      Q    Why would one group be allowed to walk

Page 269

Inspector G. Dowling

1
2  over the Brooklyn Bridge and not be ordered to
3  disperse, but another group would be ordered to
4  disperse?  What are the circumstances that would
5  allow that?
6       A    Well, throughout the George Floyd
7  protests, I don't make that decision, but I'm told
8  what to do.  With the George Floyd protests, many
9  groups marched over the Brooklyn Bridge or the
10 Manhattan Bridge.  This group was afforded the
11 approval or the ability to walk over the bridge,
12 and the counter protesters tried to block that,
13 tried to block that march across the bridge.
14      Q    And you said that this group was
15 afforded the approval to walk over the bridge.
16 Who approved that?
17      A    I don't know.
18      Q    Were you told that it was approved?
19      A    I was told they were going to march over
20 that bridge.
21      Q    And you were informed not to arrest or
22 disperse them?
23      A    Correct.
24      Q    And who would know who gave that
25 approval?

```
              Inspector G. Dowling
1
2              MS. ROBINSON:  Objection.  You can
3      answer.
4              THE WITNESS:  I don't have an
5      answer.  I don't know.
6  BY MS. BIKLEN:
7      Q    Do you remember who told you not to
8  arrest or disperse?
9      A    No, I don't.
10     Q    How would that information have come to
11  you?
12     A    Verbal.
13     Q    Would it be from someone, a superior
14  officer?
15     A    Yes.
16     Q    Do you recall other executives that were
17  present with you on the roadway on that day?
18     A    Deputy Inspector Hillery was present
19  with me.  Chief Steve Hughes was present with me
20  at some point in time on the roadway.  I'd have to
21  look.  Was it from the Brooklyn side or the
22  Manhattan side?  I'm not sure exactly where.
23     Q    And did you see or hear reports about
24  arrests of media personnel on July 15?
25     A    No.
```

```
              Inspector G. Dowling
1
2      Q    Okay.  Do you recall that on October 1,
3  2011, the NYPD arrested 700 people on the Brooklyn
4  Bridge?
5      A    Yes.
6      Q    What was different about this day from
7  when people -- that date from when people were not
8  allowed to march versus this day on July 15?
9      A    I can't answer that.  I don't know.  I
10  was not present in 2011 for that date.
11     Q    Did the content of the march's message
12  have anything to do with it?
13             MS. ROBINSON:  Objection.  You can
14     answer.
15             THE WITNESS:  I'm sorry.  For which
16     march?
17  BY MS. BIKLEN:
18     Q    Sorry.  For the Jericho March being
19  allowed to march over the Brooklyn Bridge, did the
20  message of the march have any impact on being
21  allowed to march over without being arrested?
22     A    Again, I can't make that determination,
23  because I wasn't the one who made that call.  I
24  don't know.
25     Q    And what level, what level of authority
```

```
              Inspector G. Dowling
1  would have made that call?
2
3             MS. ROBINSON:  Objection.  You can
4     answer.
5             THE WITNESS:  Someone of higher
6     rank than me.
7  BY MS. BIKLEN:
8      Q    What would be a reason that officers
9  would arrest someone on the Brooklyn Bridge on
10  July 15, 2020, if they were doing nothing other
11  than taking pictures?
12             MS. ROBINSON:  Objection.  You can
13     answer.
14             THE WITNESS:  If they failed to
15     disperse, tried to block a protest from
16     occurring, they could be arrested.
17  BY MS. BIKLEN:
18     Q    Do media personnel have to disperse when
19  there's a dispersal order given?
20     A    Yes.  For everybody's safety involved,
21  they are, they are bound by the laws just like
22  everybody else.  However, they can go into a
23  frozen area when a frozen area is set up.  They do
24  have more access than some people as long as
25  they're credentialed.
```

```
              Inspector G. Dowling
1
2      Q    So on this day, if someone was a member
3  of the press and was taking pictures, what would
4  have been the circumstances that they could be
5  arrested?
6      A    I'd have to look at the video.  I don't
7  know why they were -- I don't know if any media
8  members were arrested.
9      Q    And do you know who gave the order to
10  make arrests of the counter protesters on July 15?
11     A    I don't recall.
12             MS. BIKLEN:  Let's briefly watch
13     some video.  This is going to be Dowling
14     Exhibit 2-28.
15             (Exhibit 2-28 was marked for
16             identification.)
17             MS. ROBINSON:  Do you have a Bates
18     stamp for this video, Molly?
19             MS. BIKLEN:  I do.  I'll share it
20     with you --
21             MS. ROBINSON:  Okay.
22             MS. BIKLEN:  -- after.
23  BY MS. BIKLEN:
24     Q    Okay.  Do you see an image of a
25  body-worn camera video on your screen?
```

Page 274

Inspector G. Dowling

1
2    A    Yes, I do.
3    Q    There's not going to be any sound for a
4 while, so I'm going to move ahead.  I guess I'll
5 ask you first:  Are these strategic response group
6 members?
7    A    Yes, they are.
8    Q    And do you recall this scene on the
9 approach to the Brooklyn Bridge?
10   A    Yes.
11   Q    I'm going to move ahead to about three
12 minutes.
13        (Video played.)
14 BY MS. BIKLEN:
15   Q    Did you see yourself in that video?
16   A    Yes, I did.
17   Q    Were you talking on the radio?
18   A    Yes, I was.
19   Q    I'm going to back up a little bit.
20        Tell me if you recall now, if this
21 refreshes your recollection as to who ordered the
22 arrests.
23        (Video played.)
24 BY MS. BIKLEN:
25   Q    So Chief, does this refresh your

Page 275

Inspector G. Dowling

1
2 recollection as to who ordered the arrests on
3 July 15?
4    A    No.
5    Q    Could it have been you?
6    A    It could have been.  I can't say for
7 certain.
8    Q    And what would refresh your
9 recollection?
10   A    More video prior to entering the roadway
11 or possibly further back on the roadway, on the
12 Brooklyn side of the bridge.  I don't know.
13   Q    Okay.  Now, were you present at any
14 demonstrations on July 28 in Kips Bay?
15   A    Possibly.  I'd have to -- I don't recall
16 at this time.
17   Q    Okay, Madison about 24th, 25th Streets?
18   A    Again, I'd have to see video.  I'm not
19 100 percent certain.
20   Q    Okay, and assuming that -- well, to
21 take -- just assuming you were there, that the
22 video will show that you were there, why -- do you
23 recall why SRG was detailed to this demonstration?
24        MS. ROBINSON:  Objection.  You can
25        answer.

Page 276

Inspector G. Dowling

1
2        THE WITNESS:  I don't have any
3        independent recollection.
4 BY MS. BIKLEN:
5    Q    Is there anything that would refresh
6 your recollection?
7    A    Video.  A detail roster or detail sheet
8 from SRG.
9        MS. BIKLEN:  I'm going to show you
10       what's been marked as Exhibit 2-29, and you
11       can open it up.
12        (Exhibit 2-29 was marked for
13        identification.)
14 BY MS. BIKLEN:
15   Q    Let me know when you have it open.
16   A    I have it open.
17   Q    Okay.  What is this document?
18   A    That is a document that -- it's like
19 a -- for lack of a better term, I don't have the
20 exact terminology for it, but it is a document
21 that contains field forces names, field force
22 number, the location where they're, where they're
23 assigned to.
24   Q    Does it refresh your recollection as to
25 whether field forces were deployed to Madison

Page 277

Inspector G. Dowling

1
2 Square Garden?
3    A    It appears one was assigned to Madison
4 Square Park.
5    Q    Okay, and were you in charge of these
6 field forces?
7    A    No.
8    Q    Your name at the top of this document;
9 what does that indicate?
10   A    I was present.  I was not in charge of
11 all those field forces, no.
12   Q    You were in charge -- withdrawn.  Are
13 these not all SRG field forces?
14   A    That is correct.
15   Q    Okay, and does this document indicate
16 that you would have been instructing the
17 supervisors of these field forces?
18   A    I could have.  Not necessarily, but I
19 could have.
20   Q    Explain.
21   A    So upon turnout, if I responded to -- I
22 believe at this time -- sorry.  If they were
23 responding to Randall's Island or turning out at
24 Randall's Island, there was a possibility where I
25 could have instructed these supervisors or

Page 278

```
 1              Inspector G. Dowling
 2   executives.
 3       Q    And would anything refresh your
 4   recollection as to whether you actually did?
 5       A    No, no, not that I can remember.
 6       Q    Okay.  I will play some more video, and
 7   I'm going to play what has been marked -- I
 8   believe it's Exhibit -- withdrawn.
 9            Do you recall whether you made arrests
10   at this protest on July 28?
11       A    I don't recall.
12       Q    Do you recall whether you ever spoke to
13   a district attorney about any arrests for this
14   protest?
15       A    I want to say no.  I didn't speak to too
16   many district attorneys regarding these arrests,
17   so I don't recall them.
18            MS. BIKLEN:  I have a video.  I
19       will share it.  I'll have to send this to
20       you, Amy.  I'll represent to you that it's --
21            MS. ROBINSON:  I'm sorry.  I didn't
22       hear the last part there.
23            MS. BIKLEN:  That has been produced
24       by the defendants.  We'll call it Dowling
25       Exhibit 2-31.
```

Page 279

```
 1              Inspector G. Dowling
 2            (Exhibit 2-31 was marked for
 3            identification.)
 4   BY MS. BIKLEN:
 5       Q    Okay.  So I'd like to move ahead in this
 6   video to see if you recognize anyone.  Okay.
 7            (Video played.)
 8   BY MS. BIKLEN:
 9       Q    Do you recognize anybody in this video?
10       A    No.
11       Q    I stopped it there.  Do you recognize
12   anybody in this video?
13       A    It's blurry.  That appears to be me in
14   the back.
15       Q    Yes.  Is that you in the baseball cap?
16       A    Can you just let it go for a second?
17       Q    Sure.  I'll turn it back a little bit.
18   We're at two minutes and 59 seconds.
19            (Video played.)
20   BY MS. BIKLEN:
21       Q    Do you see yourself in the background
22   there?
23       A    I didn't.  If you say I was there, I was
24   there.
25       Q    Well, if you can identify yourself.
```

Page 280

```
 1              Inspector G. Dowling
 2            All right, that's the best I can do.
 3   I'm circling my cursor around the person with a
 4   baseball cap.
 5       A    It's possibly me.  I don't know that for
 6   certain, and I've admitted to being many places
 7   today, so I can't say that's definitely me.
 8       Q    You have no independent recollection?
 9       A    If I see the whole entirety of the
10   video, it's possible.
11       Q    It's possible that that would refresh
12   your recollection?
13       A    Yes.
14       Q    And do you know who ordered the arrests
15   on July 28?
16            MS. ROBINSON:  Objection.  You can
17       answer.
18            THE WITNESS:  Again, I'd have to
19       see the entirety of the video.
20   BY MS. BIKLEN:
21       Q    No independent recollection?
22            MS. ROBINSON:  Objection; asked and
23       answered.  You can answer again.
24   BY MS. BIKLEN:
25       Q    You can answer.
```

Page 281

```
 1              Inspector G. Dowling
 2       A    Oh, I'm sorry.  I apologize.  No, I
 3   don't have any independent recollection.
 4            MS. BIKLEN:  Okay.  So at this
 5       time, Amy, I believe I have 15 minutes left,
 6       and I will reserve that time to ask about
 7       June 2nd and September 19.
 8            MS. ROBINSON:  You have 11 minutes
 9       left.
10            MS. BIKLEN:  I'll say, given the
11       number of protests that he was at and the
12       number of cases involved here, I think
13       additional time is reasonable.
14            MS. ROBINSON:  We don't agree.  We
15       agreed on two-day depositions.  This is the
16       end of your second day.  You've got now ten
17       minutes left if you want to use it.  If not,
18       then, we're done.
19            MS. MARQUEZ:  This is Lillian
20       Marquez.  I'm an assistant attorney general
21       in the New York State Attorney General's
22       Office and counsel for plaintiff in a
23       consolidated action, 21CV-322.  I have been
24       on the deposition since the start today.
25            I did want to acknowledge, as
```

Inspector G. Dowling

1 Ms. Biklen noted, that we just learned as of
2 February 8, by a letter from counsel,
3 defendant's counsel that the witness was
4 personally present at 40 protests.  We
5 weren't aware of that scope before, and of
6 course, I think Ms. Biklen has done a great
7 job at trying to get through the incidents
8 that she needs to and still needs some more
9 time.
10
11          I wanted to note on behalf of the
12 People, our objection to not being able to
13 question the witness about separate incidents
14 that we learned he was at, and would like to
15 ask questions of the witness about, and so I
16 just want to note my objection on the record
17 that we need our own time as a separate
18 action to do our jobs and ask those
19 questions.
20          MS. ROBINSON:  And we object.
21          MS. BIKLEN:  Okay.  Are we done?
22          MS. ROBINSON:  Well, I'll --
23          MR. MOORE:  Let me make a -- for
24 the record, this is Jonathan Moore on behalf
25 of the Sow plaintiffs.  We join in the

Inspector G. Dowling

1 objections by the attorney general, and we
2 will be asking the court for additional time,
3 and we really think, under the circumstances,
4 given his extensive involvement in this whole
5 series of events, that it's reasonable and
6 that you should agree to it rather than
7 bother --
8
9          MS. ROBINSON:  Well, you can say
10 that about any of the, any of the witnesses
11 that are going.  There are several two-day
12 witnesses.
13          MR. MOORE:  It is what it is.
14          MS. ROBINSON:  We agreed to two-day
15 depositions, and we're not going beyond that.
16 The deposition is over.
17          MR. MOORE:  We note our objection
18 for the record.
19          MS. ROBINSON:  And we note ours.
20          MR. FRICK:  This is Allison Frick
21 on behalf of Plaintiff Charles Henry Wood in
22 case 20-10541, and I join any objections.
23 Our plaintiff -- our case is only about the
24 Motthaven protest.  We had hoped to be able
25 to ask additional questions about Motthaven,

Inspector G. Dowling

1 including showing additional video.
2
3          And Ms. Biklen has done an
4 incredible job trying to amass a huge amount
5 of facts, and the fact simply is that if we
6 were all permitted to do these cases
7 separately, there would be eight seven-hour
8 depositions of Chief Dowling, so we note our
9 objection, and we will be joining the request
10 for additional time with this witness.  Thank
11 you.
12          MS. ROBINSON:  Well, it's not one
13 case -- it's not separate cases.  It's one
14 consolidated case.  We agreed on two-day
15 depositions, and so we note our objection.
16          MR. SPIEGEL:  This is Michael
17 Spiegel.  Amy, you agreed to that.  We
18 didn't.
19          MS. ROBINSON:  Yes, you did.  You
20 asked for it.
21          MR. SPIEGEL:  So we will see --
22          MS. ROBINSON:  I don't know if you
23 were on the meet and confers, but it was
24 asked of us, and we agreed to it.
25          MR. SPIEGEL:  Counsel for the

Inspector G. Dowling

1 Sierra plaintiffs wish to join in the
2 objections that were just made by the other
3 counsel in the other cases.  I have
4 non-duplicative questions concerning what
5 took place at Motthaven, and if we are not
6 able to continue this deposition, we will be
7 denied the opportunity to ask those questions
8 of this witness.
9
10          He has needed to have his
11 recollection refreshed by showing video which
12 has consumed quite a bit of time.  For all
13 the other reasons that the other counsel has
14 stated, we also wish to join in the
15 application that will be made to extend the
16 deposition.  Thank you.
17          MS. ROBINSON:  We note our
18 objection.
19          MS. BIKLEN:  And I will just
20 continue to note that I do reserve time to --
21 and intended today to ask about June 2nd and
22 September 19th, and will intend to do that on
23 behalf of the Payne team, the plaintiffs in
24 Payne, and with that I think we are concluded
25 for this portion, but we will, as noted

Page 286

Inspector G. Dowling

1   through the objections, keep it open for the
2
3   remaining parts.
4           MS. ROBINSON:  And we object to
5   keeping the deposition open.
6           We're done, Chief.
7           THE WITNESS:  Thank you, guys.
8   Thank you, Amy.  Thank you very much.  Have a
9   great weekend.
10          THE REPORTER:  And you would like a
11  transcript, I assume.
12          MS. BIKLEN:  Yes.  Normal delivery.
13          THE REPORTER:  And Ms. Robinson, I
14  don't know if she's still there, but does she
15  normally get a transcript?
16          MS. BIKLEN:  She'll contact you for
17  whatever she needs.
18          MS. ROBINSON:  You'll be providing
19  us with a copy of the transcript, actually.
20          MS. BIKLEN:  Are you requesting
21  that under Rule 30(e), Amy?
22          MS. ROBINSON:  You're taking the
23  deposition, and as the person taking the
24  deposition -- we're not splitting costs
25  here -- it's your obligation to send us a

Page 287

Inspector G. Dowling

1
2   copy of the transcript.
3           MS. BIKLEN:  I'll interpret that as
4   a request for a copy of the transcript for
5   him to read and sign under Rule 30(e), and
6   you will get that.
7               (Signature having not been
8               waived, the remote deposition
9               of Inspector Gerald Dowling was
10              concluded at 6:26 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 288

Inspector G. Dowling

1
2
3
4
5
6           ACKNOWLEDGEMENT OF WITNESS
7           I, Inspector Gerard Dowling, do
8   hereby acknowledge that I have read and
9   examined the foregoing testimony, and the
10  same is a true, correct and complete
11  transcription of the testimony given by me,
12  and any corrections appear on the attached
13  Errata sheet signed by me.
14
15
16  _____  _____
17  (DATE)              (SIGNATURE)
18
19
20
21
22
23
24
25

Page 289

ERRATA SHEET

1
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads      Should Read  Reason
6   ___  ___ _____     _____   _____
7   ___  ___ _____     _____   _____
8   ___  ___ _____     _____   _____
9   ___  ___ _____     _____   _____
10  ___  ___ _____     _____   _____
11  ___  ___ _____     _____   _____
12  ___  ___ _____     _____   _____
13  ___  ___ _____     _____   _____
14  ___  ___ _____     _____   _____
15  ___  ___ _____     _____   _____
16  ___  ___ _____     _____   _____
17  ___  ___ _____     _____   _____
18  ___  ___ _____     _____   _____
19  ___  ___ _____     _____   _____
20
21              _____
22              Signature of Deponent
    SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____ DAY OF _____, 2022.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

Page 290
1                    Inspector G. Dowling
2
3
4
5    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
6              I, Laurie Donovan, Registered
      Professional Reporter, Certified Realtime
7     Reporter, and notary public for the District
      of Columbia, the officer before whom the
8     foregoing deposition was taken, do hereby
      certify that the foregoing transcript is a
9     true and correct record of the testimony
      given; that said testimony was taken by me
10    stenographically and thereafter reduced to
      typewriting under my supervision; and that I
11    am neither counsel for, related to, nor
      employed by any of the parties to this case
12    and have no interest, financial or otherwise,
      in its outcome.
13
              IN WITNESS WHEREOF, I have hereunto
14    set my hand and affixed my notarial seal this
      24th day of February 2022.
15
16    My commission expires:  March 14, 2022
17
18
19    *Laurie Donovan*
20    LAURIE DONOVAN
      NOTARY PUBLIC IN AND FOR
21    THE DISTRICT OF COLUMBIA
22
23
24
25

**0**

**001** 107:2

**1**

**1** 7:15 33:23 35:17,24 36:10 64:25 65:2,3 79:8,18 134:15,19 191:21,22 271:2

**1,000** 220:13

**10** 54:11

**100** 48:12 81:16 207:17 213:21 233:7 275:19

**10031** 7:16

**10:00** 7:4 37:19

**11** 249:24 250:16 281:8

**1156A** 224:20 267:2

**11:00** 202:8

**12** 54:10,13 55:4 149:22,23 150:4,6

**122** 212:5

**12:02** 82:13

**13** 212:5

**136th** 223:23 224:3 225:10,17,21,23 226:7,11,14,22,23 227:7,9,12,20 233:11 253:20 261:6

**14** 251:6

**144** 177:3

**145** 177:4

**149** 200:15

**149th** 221:12,21 222:20

**14:00** 96:11

**14th** 98:6,12

**15** 95:17 138:25 212:18 254:22 264:6, 11 270:24 271:8 272:10 273:10 275:3

**281:5**

**155** 144:14

**15949** 201:7

**16:00** 96:16 213:19

**17** 151:18,25

**17:30** 219:6

**18:00** 219:6

**19** 18:15 20:11,16 21:18 117:20 281:7

**1995** 41:23

**1997** 10:5

**19th** 20:3 285:22

**1:20** 113:2

**1:22** 92:19

**1:30** 106:6

**1st** 197:20 201:20 202:5,7,12

**2**

**2** 18:18,19,20 19:16 20:9,13 21:15 36:11, 12,14,16,19 43:14 84:21 86:15 107:4 117:19 254:21

**2-1** 43:19 45:4,20

**2-11** 187:18,19,23

**2-15** 192:6,7,14

**2-16** 196:5,6

**2-19** 200:22,24

**2-2** 81:22,23 82:9

**2-20** 211:6,7,14

**2-21** 215:18,19 216:2

**2-22** 228:25 229:3

**2-24** 252:14,15

**2-27** 263:11,12 264:5

**2-28** 273:14,15

**2-29** 276:10,12

**2-3** 92:7,18 185:21

**2-31** 278:25 279:2

**2-32** 177:2,8,24 178:3 180:13

**2-33** 177:3,10 178:20 180:13

**2-34** 177:4,12 179:14, 17 180:13,19

**2-4** 104:15

**2-7** 128:25 129:2 135:4

**2-9** 144:12,16 145:20

**2.7** 129:19

**20** 110:22 160:18 176:14

**20-10541** 283:22

**20-hour** 38:13

**20-second** 133:5

**2002** 27:14

**2003** 10:6 27:17,22

**2004** 27:22

**2011** 271:3,10

**2016** 23:4 29:21

**2018** 56:6 57:7,8 58:15

**2019** 46:12 52:15 54:10,14 55:5,12,15, 18 57:8

**2020** 7:25 15:25 19:11 21:15,18 25:2 60:12 61:11 82:13 92:19 188:3 264:6 272:10

**2021** 14:21 16:2,16, 17,24

**20:00** 220:15 236:11

**20:05** 261:23

**20:10** 261:24

**21** 150:22

**21:11** 107:23

**21:11:03** 107:15

**21CV-322** 281:23

**22** 46:12 113:24

**229** 201:23

**24** 108:20

**24th** 275:17

**25** 60:12 77:5 148:7

**25th** 275:17

**27** 148:18

**28** 37:11,15 76:19 77:5,8,19 78:15 79:24 80:15,17 81:6, 9,12 82:13 84:4 85:22 89:7 91:7 92:19 99:6,8,9,18 101:22 102:2,17 103:4,8 104:7 108:8, 10 122:4 124:2 128:17 172:7 275:14 278:10 280:15

**28th** 76:16

**29** 120:13 121:5,7 122:5,8,17 124:4,11 132:18,20 136:6,23 137:3 172:7

**29th** 120:18

**2:00** 38:7 96:12

**2:30** 96:7

**2nd** 20:2 201:22 202:6,8 281:7 285:21

**3**

**3** 36:12,15,20,22 200:2,20 266:10

**30** 137:18,19 138:4 139:8 140:5 144:9 159:12 160:18 169:13,25 170:16

**30(b)(6)** 10:24 14:7 156:23

**30(e)** 286:21

**300** 214:6

**303** 212:14

**305** 212:14

**31** 158:21,23 172:5,8, 16,24 173:5,10,15 174:4 176:7,12,13,19

**181:25 250:17**

**34** 149:23 259:7

**34-second** 135:3

**36** 148:13,19

**37** 146:25 147:8 148:9

**37-second** 146:21

**38** 133:5

**385** 201:20

**3:30** 211:19

**3:34** 188:3

**3rd** 200:15 201:23

**3s** 37:5

**4**

**4** 11:10,15 36:13,15, 25 199:20,22,25 200:3,20 214:23

**40** 94:19 95:12 157:18 158:3 183:15 200:16 205:15 208:9, 10 209:23 282:5

**40th** 203:22 204:13 205:7 210:22 213:13, 24 216:14,16 219:8, 12 246:11

**42** 95:9

**427** 229:2

**44** 158:8

**44-second** 158:22

**45** 201:23

**46** 158:15

**46th** 20:16 21:19

**476** 212:19

**47th** 20:17 21:19

**48** 212:19

**49** 213:10

**4:00** 96:17,18 213:19

**4s** 37:7

**4th** 203:21 211:20

216:6,22 247:15
259:14 260:24

**5**

**5/28** 107:7,15

**50** 89:23 90:3 95:15
160:20

**50th** 20:14 21:17

**514** 177:5

**51st** 194:12 197:20

**52** 247:23

**52-second** 243:23

**539** 212:20,21 214:3

**56807** 188:5

**57th** 144:23

**59** 279:18

**5:00** 96:6 213:21

**5:11** 108:4

**6**

**6** 37:11,15 188:3

**61341** 82:12

**66602** 92:21

**6:00** 38:6,12

**6th** 197:20

**7**

**7** 61:10

**700** 271:3

**8**

**8** 282:3

**84468** 264:10

**8:00** 202:9 220:16
236:11,16 244:16,17
245:5,8

**8:05** 261:24

**8:10** 261:25

**9**

**911** 171:16

**915640** 45:23

**95/'96** 41:24

**9:11** 107:23,25

**9:12** 176:20

**9th** 35:23

**A**

**a.m.** 7:4 38:12

**abide** 147:17 157:7
188:24,25 189:11,13

**ability** 9:3 269:11

**absence** 30:13,21

**absent** 51:14 53:3
56:25 57:19,23
188:16

**absolutely** 28:22
66:3 85:20

**academy** 41:17,22
100:24 176:3 188:15

**access** 48:15 272:24

**accord** 117:8 119:12

**account** 80:4

**accurate** 9:6 14:12
65:12

**acknowledge**
281:25

**acoustic** 46:16

**act** 30:14 31:8

**acted** 75:16

**acting** 74:16 126:19,
22 128:12

**action** 28:4,6,11,15,
18 84:24 115:6
165:3,4 187:15
281:23 282:18

**actions** 24:14 151:12
166:13

**activate** 33:22
199:14

**active** 154:18,21,22
263:2

**actively** 72:20 73:13
257:15

**activities** 37:13
161:3 174:23

**activity** 165:15
195:16,19

**actors** 63:11,12

**acts** 174:9 175:8

**actual** 28:17,18

**additional** 281:13
283:3,25 284:2,10

**address** 7:14

**addressed** 188:8
189:3

**Addressing** 85:14

**adjacent** 222:12

**administration**
198:3 248:9

**administrative**
22:17

**Administratively**
30:20

**admitted** 280:6

**adopt** 14:17

**advance** 62:16

**advanced** 58:5
119:9 257:8

**advice** 156:12

**advise** 191:10

**advising** 249:2

**Affairs** 9:19 19:21

**affect** 170:11

**afforded** 269:10,15

**afternoon** 96:8,17

**agree** 216:25 281:14
283:7

**agreed** 117:21

281:15 283:14
284:14,17,24

**agreement** 21:25
118:12,16

**ahead** 105:13 107:21
172:5 199:19 226:24
249:25 253:14,24
254:10,13 259:7
274:4,11 279:5

**aided** 58:6 71:18
72:2,4,6 114:19,22
164:8,10 171:23,24

**air** 180:15

**alleges** 170:15

**Allison** 283:20

**allowed** 249:8 267:5
268:25 271:8,19,21

**allowing** 71:23

**alongside** 62:19

**amass** 284:4

**Amendment** 55:14
56:10 85:9 86:8
127:20

**amount** 25:9 26:7
56:12 69:9 70:11
79:7,10 90:22 91:2
94:18 100:14 121:21
123:15,16 194:11
284:4

**Amy** 8:19 11:12
19:24 22:3 43:17
44:8 83:18 92:9
105:23 118:12
128:23 144:11 177:6
228:24 250:25
278:20 281:5 284:17
286:8,21

**angle** 111:10 149:18
151:22,23

**angles** 112:3

**announcement**
239:14

**answers** 8:15 9:7
14:11,17 20:19 97:10

**anti-war** 27:18,20

**anyone's** 163:24

169:13

**anytime** 209:8

**AO** 192:25

**apologize** 8:4 19:20
23:5 24:6,10 31:2
38:9 39:7,12 44:20
52:13 57:18,20 87:5
97:13 158:14 162:14
168:14 190:5 212:16
244:12 281:2

**apostrophe** 15:15

**apparently** 263:23

**appearance** 118:4

**appeared** 217:20
218:17

**appears** 115:5,6
119:7 135:9 148:15
158:25 211:15
229:24 232:8 238:8
255:2 277:3 279:13

**application** 285:15

**apply** 251:8

**applying** 103:22
168:24

**appointments** 184:5

**approach** 64:10
274:9

**approached** 58:4
240:4,14 244:19

**approval** 31:3 59:12,
19 269:11,15,25

**approve** 79:10,15
163:24

**approved** 30:25
79:14 84:22 122:21
269:16,18

**approving** 36:4
80:13

**approximately** 10:3,
20 23:2 82:13 89:24
92:19 108:3 125:3
160:16 176:20 188:3
206:7 214:6 218:22
219:4,6

**area** 27:23 102:21
114:6,13 140:5,19,

21,22 144:23 162:23
164:18 191:11 218:6
222:12 235:24 236:8,
13,19,24 249:22
254:5 272:23

**areas** 30:17 91:3

**arise** 30:20

**arms** 65:25 66:2,11
154:20,22 240:18
257:15

**array** 59:21

**arrayed** 109:12

**arrest** 26:13 47:22
53:20 56:13 63:15
64:17,22,25 65:15
66:2,6,8,19 69:17
70:9,12 87:17 88:20
89:2 99:2,23 100:7
101:5,6 102:11
114:19 132:2 133:22
137:10 146:8 147:22
150:16 152:14,23
153:11,17,22 154:3,
7,8,9,13 155:9,23
156:2 168:18 171:20
175:9 190:3 192:17
194:2 195:7,8,11
196:18,25 197:24
198:5,9 210:6,11
218:25 220:8 239:10,
13,16 240:3,5,14
241:24 242:18,21
243:9,11,16 244:6,
14,21 245:7 248:10,
14,15 251:21 252:4
256:3,10 258:18
259:2 261:20 262:7,
8,12 263:4,5 267:12
269:21 270:8 272:9

**arrest/de-arrest**
114:20

**arrested** 53:5,6,10,
25 64:12 65:8,12
69:12,16 71:2 101:9
130:12 132:4,5,8,9,
12 146:6,12 152:10,
21 153:19 154:23
155:7 156:16,21
164:25 165:20,25
169:25 170:6,18
171:7 195:22 208:14
217:23 240:19

242:16,17 244:22,25
245:15 249:16
250:18 261:17
267:15 271:3,21
272:16 273:5,8

**assessment** 223:2

**assign** 70:10,11 99:2

**assigned** 24:4 25:17
27:7 38:23 42:8
48:10,20,25 49:3
61:21 64:20 77:23
80:22 97:6 99:5
182:16 198:8 212:13,
14 276:23 277:3

**assignment** 221:25

**assigns** 185:13

**assist** 36:2 103:24
126:8 241:20 261:15

**assistance** 36:6
172:3

**assistant** 15:11,12
16:14 93:16 94:6
97:21 99:17 123:25
184:19 185:15 222:4,
7,9 281:20

**assisted** 98:21
99:10,24 100:6,9

**assisting** 247:9
256:3,10

**assume** 286:11

**assuming** 275:20,21

**assumption** 147:11

**attached** 217:20

**attempt** 53:23

**attempted** 152:21

**attempting** 243:13

**attend** 140:16 184:6
203:18

**attendance** 216:17

**attended** 140:4
210:14

**attending** 42:13
140:25

**attention** 171:10,13,
14 191:20

**arrestee** 64:21

**arrestees** 65:4 133:8
152:17 210:8

**arresting** 64:20
69:13 98:16,24 99:3,
6 187:5 194:25
195:15,18 196:17,19,
23

**arrests** 24:18 26:11,
13 40:7,21,24 63:2,6,
9,18,21 64:6 69:2,10
73:12,13 84:22 86:17
87:13,23 88:6 98:11,
14,15,18 99:9,18,24
100:5,6,9,15,19,21,
25 101:4,17 102:2,5,
7,9,14 126:8,15,17
128:5 135:10,13,16
136:12 151:13
155:10 164:16,20,22
165:8,21,24 187:3,4
190:4 192:16 195:5,
6,10 197:16,19
199:15 201:14,20
202:3,11,15,21,23
203:2 210:2,11
220:5,19,24 225:3,16
239:8 240:25 241:3,
15,21 242:14 246:14
247:9 248:6 259:15,
22 261:12,14,15,19
262:22,25 268:22
270:24 273:10
274:22 275:2 278:9,
13,16 280:14

**arrive** 89:6,10
159:17,19 160:8
221:8

**arrived** 89:19,22,25
140:8 159:10,23
160:2,5,17 161:15
163:14 164:17
182:18

**assault** 72:21 114:21

**assemble** 55:12

**assembly** 47:13

**attorney** 8:18 11:24
278:13 281:20,21
283:2

**Attorney's** 99:17
197:16

**attorneys** 12:9
278:16

**authority** 271:25

**authorization** 50:20

**authorize** 86:19 89:2
100:4,7 163:20,22
164:20,21 246:18,19,
20 268:18

**authorized** 50:19
101:25 111:11 128:2

**Avenue** 21:19
144:23 197:20
221:13 223:23 224:2
226:11,12,18,21
227:6,15,22 233:12
244:2 245:22,25
246:3,7 249:6,8,12
250:7 253:21 261:7

**average** 30:11

**avoid** 154:16 155:14
188:11,13 190:8,22

**aware** 9:6 64:17
107:19,22 123:13
191:2 202:3 282:6

**awareness** 61:10
80:10

**Axon** 107:4,16,19

———

**B**

**back** 17:11 51:24
60:9 64:4 65:10
68:23 71:13,21 79:11
84:14 88:18 101:13,
14 103:11,14 105:25
106:14,25 109:4,16
111:9 112:10 113:2,
16 115:21,25 116:7,
9,12,15,21 117:4,5,8,
25 118:16,25 119:13,
22 120:5,10 131:8
136:18 144:5,6,8
148:5 149:14,15
151:6,16 152:19,24

153:2,6 154:24
155:3,6,11,17 170:25
185:9 189:23 191:10,
14 218:4 226:13,21
227:7 237:10,16
238:3,22 240:6
243:25 250:23
254:16 274:19
275:11 279:14,17

**back/disperse**
191:7

**background** 9:10
14:9 45:10 147:3
248:23 279:21

**backpack** 233:3

**Ballpark** 16:15

**Barclays** 120:19,23
138:6

**barrier** 72:5 103:14
160:13

**Barton** 198:18

**baseball** 131:10
134:10 145:9 230:24
279:15 280:4

**based** 29:25 47:8,10,
14 70:10 123:14
128:16 145:15 167:5
189:21

**basis** 20:18 146:10
165:7 171:20

**Bates** 82:12 92:20
176:23 188:4 201:6
252:24 264:10
273:17

**Baton** 26:24

**batons** 102:20

**Battery** 19:16,17
20:10,15 21:16

**battle** 262:23,25
263:3,5,7

**battles** 262:20

**Bay** 211:22 212:9,10,
11,14 275:14

**beginning** 106:15,25
138:24 145:5 148:25
153:15 252:23

**begins** 201:6

**behalf** 22:17 282:11, 24 283:21 285:23

**behavior** 53:12 168:10,11 175:25 193:16

**believed** 119:9 245:2

**belongings** 64:15

**beware** 80:23

**bicycle** 66:17 67:2 109:2,3 119:21 161:10

**bicycle-trained** 97:8,19

**bicycles** 61:24 94:22 97:20

**bike** 97:7,11 109:9 111:5,22 113:15 237:15,19

**bike-qualify** 97:14

**bikes** 103:7,14,18 109:7,12 111:4 119:2

**Biklen** 7:12,20 10:10, 14 19:24 20:8,18,25 21:6,10 22:5,7 43:12, 21 44:21 45:2,14 51:16 58:21 64:3 68:2 81:2,20 82:2 85:2 86:5 92:5,9,12 98:9 104:9,19 105:2, 12,18,23 106:4,11, 17,21 107:13 108:16, 19 110:2,17,21 113:5,23 114:11 115:12 116:5 117:16 118:14,19 119:16 122:2 123:11 124:23 128:21 129:4,12,17, 21 131:2,20 133:3 134:8 136:4,22 142:2 144:19 145:11,13 146:3,20 148:4,12 149:4,9,24 150:24 152:4 153:9 157:2,12 158:12,20 167:3,13 168:2 169:11 170:13, 24 171:11 172:14 173:14,22 174:5 176:5,25 177:16,22 178:8,22 179:7

180:10 181:16 185:2, 7 187:16,21 192:2,9, 23 194:19 196:3,8 200:21 201:2 203:11 204:19 206:22 211:4, 9 215:15,21 218:15 220:3 221:5 228:22 229:5,13 232:16 233:20 234:3,6,12,21 235:2,14 236:7 238:19,24 241:19 242:7 243:2,21 245:20 247:22 249:18 250:5,14,25 251:8,10,18 252:12, 17 253:2,7,11,13,16 254:12,20 255:23 256:7 257:10,18,22 258:12 259:6,13 262:18 263:8,14 270:6 271:17 272:7, 17 273:12,19,22,23 274:14,24 276:4,9,14 278:18,23 279:4,8,20 280:20,24 281:4,10 282:2,7,21 284:3 285:19 286:12,16,20

**bit** 25:25 108:12 110:18 116:3 130:24 132:25 199:19 229:10 234:4,16,24 235:11 238:3,22 247:20 253:9 274:19 279:17 285:12

**black** 22:23,25 23:7, 20 24:21 25:3 29:20 75:25 230:6 231:18 232:13 264:12 265:2

**black-out** 232:10

**Blasio** 7:21

**blend** 126:25

**blessed** 42:6

**block** 268:9 269:12, 13 272:15

**blocking** 69:24 114:8 193:20 224:21 266:25

**blue** 230:6 231:18 254:23

**blurry** 178:11,15 229:8 279:13

**Board** 9:18

**body** 105:7 107:4,16, 19 108:10 199:11

**body-worn** 107:3 199:15 252:21 273:25

**booking** 192:18

**borough** 31:3 33:24 35:20 36:24 39:4,17 49:9 50:15,24 51:4, 11,19 52:5 79:4,6,11 84:23 86:18,20 88:25 91:12,19 100:21 101:25 102:2,8 110:8 122:19 128:14 139:11,15 142:8 188:20,21,23 189:10 212:13 213:2

**borough's** 143:6

**bother** 283:8

**bottles** 168:13 193:6 199:2

**bottom** 43:24 46:5 54:8 264:9,12,17

**bound** 272:21

**box** 232:13 264:20

**boxes** 105:5

**Boys** 76:10

**break** 21:10,22 44:22 105:24 106:7 117:16 134:4 184:25 185:23 194:21 217:19 259:9, 10

**breaking** 174:14,23 175:2 193:5

**brick** 209:4

**bricks** 208:8,10 209:13,20 217:17 218:6,8,9,14 231:2,5

**bridge** 138:22 139:2, 5 172:22 226:12,21 227:6,15 266:9,16 267:6,15 268:9 269:2,9,10,11,13,15, 20 271:4,19 272:9

274:9 275:12

**bridges** 121:5 138:8, 12,16

**briefings** 78:6,9

**briefly** 8:6 22:12 30:10 41:17 273:12

**bring** 44:14 51:24 196:25 230:16

**bringing** 250:23

**Broad** 226:18

**broke** 102:12 133:20 185:22 198:23

**broken** 194:14

**Bronx** 200:12 208:5 211:23 212:11,15,18 213:6,7,14 216:24

**Brook** 226:17 227:22 233:12 244:2 245:22, 25 246:3,7 249:6,8, 12 250:7 253:20 261:7

**Brooklyn** 39:19 120:20 121:3 138:3 212:13 266:9,16 267:6 268:9 269:2,9 270:21 271:3,19 272:9 274:9 275:12

**brought** 198:5

**Brown** 233:12 241:7 245:23 261:7

**bubble** 43:23

**buffer** 105:13 108:17

**bullet** 84:21 86:15

**bureau** 22:10,14,16 23:22 24:2,8,23 50:12 209:23 219:23

**burn** 200:11

**burning** 174:14 215:3

**business** 7:14

**busy** 94:10

**bystander** 74:18,19

**bystanders** 72:22 73:4,6 74:9

**calendar** 12:17,21, 23 184:3,4,6,8,10,21

**call** 21:21 28:14 29:6, 8 33:18,23 38:25 93:5 109:17 145:16 171:16 182:16 186:16 192:17 213:10 271:23 272:2 278:24

**called** 28:25 32:12 33:17 45:8 46:16 54:9 60:11 67:12,17 96:2 109:11 128:5,8 171:14 183:18 263:6 265:11

**calling** 82:25

**calls** 35:21,23 182:11

**cam** 105:7 107:16 108:10

**camera** 107:4 199:10,11,15 252:2, 21 273:25

**Cameron** 176:15

**Canal** 126:13 176:6, 8,19 179:24 180:5

**cancel** 36:8

**cannister** 254:23 255:4

**cans** 217:22

**cap** 131:10 134:11 145:9 230:24 279:15 280:4

**capable** 25:22

**capacity** 9:16 14:18 83:21

**Capella** 92:18 93:6, 18

**Cappy** 93:6

**captain** 25:16 33:3,4 48:23 49:2 95:3 97:16 112:8 204:5 261:2

**captains** 183:11

**capture** 73:20

**car** 125:19 159:22 161:4,5 218:16,19,20 219:10 223:13,14,16

**caravan** 62:17

**card** 171:24

**career** 25:20 175:16

**carry** 169:7,10

**carrying** 65:20 169:3 224:16 246:21 255:13

**cars** 174:14 175:3 193:20

**case** 7:21 12:24 13:5, 9,10,11 52:4 58:6 71:18 72:2,4 98:20 114:19,23 166:7 171:23 196:22 283:22,23 284:13,14

**cases** 7:22 16:22,25 17:4 34:23 176:16 281:12 284:6,13 285:4

**category** 35:24

**cattling** 67:9,11,15, 17,22 68:3,13,17

**caused** 231:3

**CCRB** 16:18,20,25 17:4,12,14,25 18:9 21:14 117:21 118:7

**CCRBS** 18:25 20:7 21:4

**cell** 12:12

**center** 64:23,25 120:19,24 126:12,13 129:23 138:6 198:6

**chain** 141:21 263:23

**change** 14:14 32:2 127:16 141:8

**characterization** 251:23

**characterize** 145:14,21

**charge** 24:3 26:7 142:10,14,16 143:23

**capture** 183:14 198:11 277:5, 10,12

**charges** 99:20 195:8 197:13,23

**Charles** 283:21

**chat** 43:16,22 45:4 81:21 92:6,10 104:11 187:17 192:4 200:23 211:5 215:18 253:6 263:10

**chatter** 62:21

**check** 46:22 263:25

**chief** 7:13,17 14:21 15:11,12 16:14 19:25 22:8,15,16,24 30:16 34:14 37:20 39:6,7, 16,17,18,19,20,23,25 40:3,16,17 42:21 44:11 45:3 65:9 66:11 77:13,18 78:20 79:22 86:22 87:11 89:14 91:17,25 92:13 93:15,24 94:9,25 110:10 116:22 117:25 118:16,22 121:8 125:14 129:22 136:5 139:22 140:15, 20,23 142:18 143:10 181:24 185:15 187:22 191:3 196:9 198:9 200:5 203:5 204:2,12,20,24 211:15 221:22 222:4, 8,15,17 223:15 229:6 231:16,23 232:4,5, 11,18,23 234:14 239:4 240:9,24 250:23 251:11 253:17 254:4 263:19, 21 270:19 274:25 284:8 286:6

**Chief's** 117:18 222:14

**chiefs** 16:14 39:8,14, 15 210:24

**Church** 176:6,9,18 179:23 180:4

**Cindy** 255:16

**circle** 66:12,16,23,24

**circling** 280:3

**circulating** 208:3

**circumstances** 47:7 51:7,15,17 53:4,8 56:25 57:11,14,20, 23,25 58:24 59:4 72:17 74:5 147:14 154:14 156:4 188:17 196:17 269:4 273:4 283:4

**cities** 80:10

**city** 9:13 19:16 26:9 32:10 37:3 61:19 76:15,21 77:8 78:12 80:12 81:11 120:17 129:8 143:19,21 175:17 192:15 194:10 202:17 245:14

**city-wide** 22:11,14 23:22 24:2,8,23 25:4 79:18,20 123:20 203:3

**civil** 9:21 32:25 33:4 84:22,25 85:4 86:18 87:12,17,23 88:20 100:8,20 102:4 165:5 190:2 262:25 267:13

**Civilian** 9:18

**clarification** 118:22

**clarified** 18:11 266:3

**clarify** 119:3

**classify** 173:16

**cleaner** 178:13

**clear** 20:9 57:15,21 91:5 105:3 133:10,22 179:12 191:6,14 220:20 229:16,17,18 249:21

**clearing** 133:14

**Clergy** 265:7,12

**click** 44:3,8

**clicking** 44:5

**client** 21:12

**clients** 170:15

**clip** 110:25 130:21 250:15,20

**close** 108:22 111:6 171:5

**closed** 16:22

**Closest** 231:22

**Coalition** 265:8

**COBRA** 95:6,17 96:4,7,9,11,14,20,25 97:4

**code** 197:25

**coincide** 202:20

**collar** 149:6

**collect** 13:3

**collected** 13:2

**command** 22:21 23:21 24:12,18 31:4 33:21 34:19 35:20,21 36:24 37:2 49:11 52:5 53:4,9 141:9,21 153:23 155:14 182:16

**commander** 23:19, 23 24:2,14,24 25:23 26:6,12 31:3,9 33:13 39:4 48:21,25 49:3,9, 21 50:11,12,15,24 51:5,11,20,23 86:20 91:12,13,16,20,24 92:3 93:15 97:22 100:22 102:3 110:8 111:16 119:4 123:25 139:11,15 141:6,11 142:4,20 143:5,10,16 160:5 185:15 222:4, 8,9 261:10

**commander's** 91:10

**commanders** 50:10 86:19 189:6

**commanding** 12:2,4 25:17 28:21 30:13, 14,19,22 31:9,11,12 32:4 34:11,20 39:16, 19 97:16 134:14,19 205:3

**commands** 14:12 22:18 23:12 155:11, 13 210:17

**commit** 171:8 175:7 217:7

**committed** 26:11 69:22 217:10,25

**committing** 46:19 47:3 73:4,24 74:6 131:15,22 163:4 171:8

**communicate** 35:4, 11 88:9 125:15 141:8

**communicated** 141:22

**communication** 219:22

**communications** 22:18 30:21

**communities** 75:17

**community** 217:8, 11,15,19 218:2

**compare** 24:20 214:4

**Complaint** 9:18

**complete** 61:4

**completed** 46:9 116:14 119:8 120:4

**comply** 53:24 147:9, 14,16 148:17,20

**complying** 153:5

**comport** 256:13

**computer** 13:18 107:9 187:25

**computer-literate** 13:25

**concern** 72:22 231:3

**concerned** 206:10

**concluded** 285:24

**conduct** 47:13 193:5 220:4 224:21 266:25

**conferrable** 87:10

**conferral** 39:3

**conferred** 151:11

**confers** 284:23

**confidential** 44:14

**confines** 200:16

**confiscated** 217:24

**confluence** 175:18

**Conforti** 15:12

**connected** 13:21

**connection** 12:9

**consideration** 74:8
110:4 244:6

**considered** 72:14
90:19 91:6 154:21
224:22

**consist** 46:14

**consistent** 170:20
245:15

**consolidated** 7:22
281:23 284:14

**construct** 190:18

**consult** 40:20 91:15,
18 197:12

**consulted** 197:13

**consumed** 285:12

**contact** 286:16

**containment** 63:5,
20,24 64:2

**content** 52:10,17
235:16 271:11

**continue** 62:10
285:7,20

**continued** 15:25
42:12

**control** 48:17

**conversation** 40:9,
16,23

**conversations** 92:2

**convey** 85:3,19,22
195:18 207:7

**conveyed** 87:7 89:3

**conveying** 84:9
117:9

**cops** 60:4 152:13
161:11

**copy** 286:19

**corner** 105:7

**correct** 9:14 14:22
19:13 22:11 30:18
34:21 38:14 45:16,17
47:17,18,23 48:14
50:13 57:24 58:13,14
67:4 69:19 71:16
82:14 83:5,8 86:24
93:10 95:4,13 101:20
103:12 107:24
120:11 128:4 132:13
135:19 138:13
142:23 144:7 152:11
167:24 176:7 181:20
185:20 195:3,17
199:12,13 205:24
212:9,22 215:4
218:7,10 227:8,9
232:21 233:5,7
243:18 253:25 261:9
266:11 268:4 269:23
277:14

**Corrections** 210:7

**correctly** 37:2 38:13
60:23 99:12 118:11
126:10 135:24
200:14 202:7 211:3

**correspond** 46:18

**costs** 286:24

**coughing** 255:5

**counsel** 7:11 19:4
20:21,25 21:2,4
281:22 282:3,4
284:25 285:4,13

**counter** 264:13
265:3 267:23 268:2,
5,12,19,23 269:12
273:10

**court** 8:7 9:21,24
21:21 117:24 118:4
251:5,9 283:3

**cover** 49:14,15

**covered** 17:24

**COVID** 60:18,22
187:8

**COVID-19** 60:11

**CPR** 45:8

**create** 114:18 119:7

**created** 120:3

**creating** 119:10
165:14 168:10 174:8

**credentialed** 272:25

**credentials** 238:8,9

**credible** 10:8

**crime** 30:17 47:12,25
171:9

**criminal** 9:24 75:17
209:22

**cross** 227:15

**crossing** 121:4

**crowd** 47:22 51:22
58:7,12,25 59:22
66:18,21,22,24,25
68:25 69:2,12 70:4,
19 71:15,18,23,25
72:3,18 73:3,8,9,10,
16,21,23,24 74:3,6,
15 88:21,23 90:9
109:19 113:15,16
119:13 124:18,22
128:12,18 165:25
166:12,13,16 167:8,
20 168:3,16 180:22
191:10 217:13
219:16 224:9,23
225:4,6 226:4,6,17
227:4,11,14,20
228:14 239:10,12,15
240:2 243:9 244:5
247:25

**crowds** 72:11

**crux** 40:22

**crystal** 20:8

**cuff** 104:4

**cuffs** 64:12 69:4
98:19 103:22,25
168:24 169:13
256:13,17,19 257:12

**cupper** 45:8

**curfew** 186:10 202:8,
9 213:23 220:15
235:20 241:16
244:11,19 245:4,10,
16 248:6,11 249:3,17

260:10,13,17,19
261:21 262:22

**current** 30:8

**cursor** 112:15 280:3

**custody** 69:19 70:8
153:24,25 154:2,11

**cut** 79:11 232:12

**cutters** 104:4 169:4,
7,10,13,17

**cutting** 103:25

---

**D**

**D'ADAMO** 31:12
39:6,7 77:13,19
78:20 89:14 91:17,25
93:15,24 94:9,25
121:8 125:14 139:22
140:16,23 142:19
185:15 200:5 203:6
204:3 221:22 222:4,8
223:15 231:16
232:23 239:4 240:9,
24

**D'Adamo's** 232:12

**D'ENTREMONT**
15:11

**daily** 201:14

**danger** 59:24 71:19

**date** 12:22 39:2 85:12
107:6,8 271:7,10

**dated** 54:10 61:10

**dates** 23:5 85:16

**day** 17:18,19,24 18:5,
8 30:12,23 32:11
37:14,22,25 38:8,25
40:13,15 41:5 90:23
94:25 97:22 102:10,
13 110:10,16 113:12
122:24 123:3 125:13,
16 126:8,15 128:17
135:22,24 140:13
183:4,6,19,23 184:16
185:11,17 202:8,9,15
216:21 231:4 259:20
267:24 268:19,23
270:17 271:6,8 273:2
281:16

**day's** 121:8,11

**days** 37:16 38:3,5,6,
11 118:5 122:12
126:4 172:10 173:2
183:7 202:12

**daytime** 125:5

**DCU** 74:22 75:20
76:3 97:2,4,5,7,11,
14,18

**de** 7:21

**de-arresting** 248:10

**de-escalate** 53:14,
20,23

**de-escalating**
248:17

**de-escalation** 52:2
54:3,5 248:20

**deal** 69:4

**dealing** 175:15

**dealt** 42:8

**death** 15:24 77:3
80:2,6

**decide** 93:18 111:23
139:20 197:23,24

**decided** 93:19,21,23
140:24 212:23

**decision** 91:9,10
109:24 110:6,7
116:18,21 180:3
182:4,8 207:6 240:25
269:7

**decision-making**
110:5

**decisions** 94:11

**decolonize/
displace** 75:22

**dedicated** 13:24

**deem** 143:22

**deemed** 33:20 34:2
36:9 38:2

**DEF-CCRB-
0003491902020044
02_VIDEO_
202004402** 253:3

**DEF_CCRB_0034919** 253:4

**defendant** 193:2,12, 21,23 198:17

**defendant's** 282:4

**defendants** 118:3,6 278:24

**define** 98:17

**definition** 68:12 165:14

**Delgado** 261:2

**delivery** 286:12

**Demo** 211:23 212:11

**demonstrating** 132:5

**demonstration** 48:16,19 79:5 87:9 142:4 156:17 160:6 164:9 167:19 193:4 203:25 214:11 217:11,21 268:10 275:23

**demonstrations** 24:21,22 25:19 26:16 27:10,13,16,21 28:7 29:21 41:9 42:15 71:4 85:14 215:10 264:5 275:14

**demonstrator** 217:16

**demonstrators** 46:17 47:2 49:23 62:19 63:13,14 64:8 119:25 126:18 156:12 162:11 176:4 205:10 214:4,5,6,7 217:5

**demoted** 134:22

**denied** 285:8

**Dennis** 42:19

**department** 9:13 30:17 31:7 34:14 39:20 40:17 45:9 55:7 61:16,20 62:20 123:17 143:20,21 190:25 192:16 265:21

**Department's** 79:22

**department-issued** 12:11

**department-related** 12:14

**depending** 33:25 36:7,8 48:5 64:7 154:14 156:3 166:13 183:19 184:18

**depends** 50:21 171:4

**depicts** 176:18

**deploy** 30:15 31:6 61:21

**deployed** 39:2 77:22 95:21 96:20 133:24 182:25 206:19,20 276:25

**deploying** 81:4 96:23

**deployment** 61:24 94:16 95:6 96:24 121:19 135:22 205:8, 23

**deposed** 9:15 12:5 14:7

**deposition** 9:12 10:16 11:24 12:7,22 14:18 20:22 21:3 118:6 281:24 283:16 285:7,16 286:5,23,24

**depositions** 281:15 283:15 284:8,15

**deputy** 14:21 15:11 16:14 39:17 89:17 93:17,24 95:2 112:5 122:3 134:12 183:12 204:9 270:18

**Dequatro** 42:19

**Dermot** 216:20

**describe** 37:12 66:9, 13 67:12 82:6 97:22 118:11 148:8 230:4 231:17

**describing** 50:6

**designee** 86:21,22 100:22

**designees** 48:21

**desktop** 14:2

**detail** 23:2,9 31:6 38:23 39:11 77:10,23 78:20,24 79:12,13 80:14 93:3 94:3 98:8, 13 121:21 127:3 142:16 184:18 185:13 189:22 191:24 204:8,11 210:21 212:8 276:7

**detailed** 212:3 275:23

**detailing** 77:15

**details** 22:23,24 23:14,15 30:24,25 31:2,7 39:10,13 78:16 80:14 90:25 192:19,24 194:24 195:23 196:12

**determination** 128:10 165:15 271:22

**determine** 30:24 49:6 59:25 91:19,20, 22 122:9 131:24 132:11 135:18 150:13 164:15 167:19 184:10 194:5 213:2 235:3 258:2

**determined** 21:22 30:15 49:21 123:17 148:19

**determines** 48:18

**determining** 34:4 128:12 131:25 184:21

**developing** 42:12

**developments** 253:22

**device** 46:17 107:18

**devices** 217:22 218:23

**dictate** 50:16 53:11 223:10

**difference** 30:2 68:9 176:4

**differences** 67:16

**differentiate** 96:8

**difficult** 174:25 175:5

**direct** 139:8 143:21, 24,25 210:21

**directed** 140:16

**directing** 228:4

**direction** 42:4 57:19, 23 58:2,12 59:8 66:17 223:10 226:9 245:23 253:20

**directions** 41:2,5 110:16 227:24 228:6

**directly** 22:15

**discharging** 193:6 199:5

**Discipline** 33:9

**discretion** 50:9 100:14,18,20 101:19, 22 131:25 132:15,18

**discretionary** 15:2

**discuss** 62:6 75:14 77:21 121:7,19 235:22 243:3,5 260:22

**discussed** 19:25 21:11 28:8 29:22 41:7 52:10,18 56:23 62:25 71:14 75:12,23 76:3 78:19 121:15 122:5 132:6 206:23 207:11 213:13 219:12 235:15,16,19 246:11

**discussing** 40:23 52:21 56:17 92:17 115:20 121:11 136:6 181:11 216:22

**discussion** 10:12 16:9 17:3 21:8 22:3 45:12 55:14 63:2 71:14 78:21 104:17 111:15,16 117:12,17 129:15 156:5 170:22 207:24 208:4,21,24 209:3,25 210:4,10 213:23 216:18 226:3

238:10,13

**discussions** 28:22, 24 29:5,13 76:20 77:18 99:16 238:16 247:13 259:15

**dismissed** 99:21

**disobedience** 84:22,25 85:5 86:18 87:13,17,23 88:20 100:8,21 102:5 165:5 190:3 262:25 267:13

**Disorder** 48:17

**disorderly** 47:13 126:19,22 127:5 224:21 266:25

**disparaging** 36:17

**dispersal** 52:21,24 249:21 272:19

**disperse** 47:19 58:7 70:16,19,22 71:19 136:8,11 137:3,12 146:14,22 147:2 150:4,6,12 166:7 191:10,15 193:22,23, 24 198:13 225:25 237:8,18 266:19 267:10 268:12 269:3, 4,22 270:8 272:15,18

**disposition** 16:21

**Distance** 46:17

**distinction** 175:11

**distinguish** 59:17, 20 174:21 175:20

**district** 99:17 197:16 278:13,16

**division** 122:20 213:4

**document** 28:17,19 45:7,10,18 50:18,21 54:12 80:24 81:21 82:8,11 84:15,18,19 92:6 95:20 96:22 191:16 192:5,13,21 200:22 201:8 211:5, 13 214:17,18,23 215:17,25 263:9 264:4 265:25 276:17, 18,20 277:8,15

**documented**
171:21,23 258:22

**documents** 11:2
12:8 100:11 192:3
216:13

**doubled** 226:13,21

**Dowling** 7:1,8,13,15,
17 8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1,
25 20:1 21:1 22:1,8
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1,14 44:1 45:1,4
46:1 47:1 48:1 49:1
50:1,19 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1,11 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1,22 82:1,9
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1,17 93:1,16
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1,25 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1,19
143:1 144:1,12 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1

167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1,24 178:1
179:1,13 180:1 181:1
182:1 183:1 184:1
185:1,16,21 186:1
187:1,17 188:1 189:1
190:1 191:1 192:1,5
193:1,2 194:1 195:1
196:1,4 197:1 198:1,
9 199:1 200:1,22
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1,6 212:1
213:1 214:1 215:1,18
216:1,2 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1,25 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1,14 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1,11
264:1,5 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1,13 274:1 275:1
276:1 277:1 278:1,24
279:1 280:1 281:1
282:1 283:1 284:1,8
285:1 286:1

**DOWLING-DEP-008**
61:9

**DOWLING-DEP-009**
46:5 60:10

**DOWLING-DEP-010**
54:8

**download** 44:2

**downloads** 44:9

**downtown** 64:24

**dozens** 60:4

**dressed** 37:23

**drive** 13:23 14:4
159:11 161:7 162:6,
13,14 163:13,21
167:6 168:16 169:25

**driver** 89:12 159:20,
23 160:21,22,25
221:23 222:15

**Duane** 194:13

**due** 20:24 128:6

**duly** 7:9

**dusk** 159:16

**duties** 22:13 30:11
31:21,25 32:15 41:15
94:14 123:24 172:6,7

**duty** 187:12

---

## E

**E-N-T-R-E-M-O-N-T**
15:15

**ear** 8:3

**earlier** 185:12

**early** 15:25 37:11,16
181:23 182:3

**East** 98:7 159:11
163:14,21 164:18
167:7 168:16 170:2

**easy** 238:21

**Economic** 27:13

**educational** 14:9

**Edward** 42:22

**effect** 26:12,13 56:13
64:6 69:10 74:8
85:17 100:24 101:4
102:9 114:18 140:21
195:10 214:2

**effected** 126:15,17
137:11 261:14

**effecting** 63:17
87:23 135:10,13,15
152:14 242:14 243:9

**effective** 142:24
143:3

**egress** 58:5 71:17,
22,23 164:12 240:17

**elaborate** 42:3

**elements** 52:24

**Elido** 92:18

**else's** 107:10

**email** 35:6 80:20 81:3
82:5,12,15,24 83:10
86:4,6,9,11,14 92:18,
24 93:12 96:10
188:2,6,9,18 189:3
190:15,18,25 211:15,
17,22 213:10 260:6
263:19,23,24 264:3
266:4

**emails** 11:5 30:22
78:11,14 260:10,13
263:21,22

**emergency** 62:22

**encapsulate** 22:2

**encircle** 66:18,20
220:7

**encircled** 69:12,14
70:20

**encirclement** 66:7,
9,15 67:5,12,15,18
68:7,14,20 70:3,6,14,
15 246:5,6,12

**encompass** 66:8

**encounter** 161:20
191:9

**end** 17:10 99:15
126:11 180:14,15
181:22 182:3 281:16

**ending** 201:7 264:10

**ends** 82:11 92:20
188:4

**enforcement** 151:12
188:19 189:11,14
245:16 265:13

**engage** 29:16 98:18
161:3

**engaged** 81:5 193:4

**engaging** 193:3

**enhanced** 123:15

**ensure** 30:17 64:17
65:5

**entails** 68:14

**enter** 117:23 175:8

**entering** 275:10

**entire** 168:4 169:15
206:9 210:15

**entirety** 135:17
148:22 280:9,19

**entry** 46:11

**envelope** 64:16

**equipment** 61:23
186:20,22 231:7

**escalate** 90:13,14,17

**escalates** 90:20

**escapes** 36:21

**escorting** 124:17,21
162:10

**essential** 236:11
238:11,14 259:16

**ESU** 36:22

**evasive** 70:9

**evening** 176:20
199:21

**event** 179:22 194:18
265:15,17

**events** 77:3 80:9
175:18 230:16 283:6

**eventually** 98:11

**everybody's** 56:9
127:20 272:20

**evidence** 218:6

**exact** 23:5 219:21
276:20

**EXAMINATION** 7:11

**examples** 62:7 75:18

**excessive** 102:17
168:21 267:20

**excessively** 103:22
168:25

**exchanged** 216:14

**excuse** 17:19 54:23 125:18 151:6 168:13 213:19

**executed** 216:23 217:3 220:11,21

**executive** 24:12 27:8 28:12 30:6 32:5,7 48:20,22 49:12 50:14 61:10 78:8 83:21 84:23 86:7 93:17 94:7,12,15 102:8 110:3 112:12,18 128:14 139:18 141:12,16 143:19 184:15 203:24 236:9, 16

**executives** 42:7,17 48:8 50:10 61:14,15, 19 80:21 82:19 85:9 97:24 98:5 112:17 121:12 125:6,10 159:25 182:20 183:11 189:4,24 191:13 270:16 278:2

**exempt** 259:23 260:2

**exemption** 259:19 260:13

**exemptions** 260:10, 20

**exercise** 54:24 101:18

**exercises** 42:13 54:22 55:2,21 57:5 63:10

**exercising** 101:22

**exhibit** 43:13,14,19, 22 45:4,20 80:21 81:22,23 82:9 92:7, 17 95:5 104:15 128:25 129:2,19 135:4 144:12,16 145:20 177:2,3,4,8, 10,12,24 178:3,20 179:14,17 180:18 185:12,21 187:18,19 188:2 192:6,7,14 196:4,5,6 200:22,24 211:6,7,14 215:18,19 216:2 228:25 229:3 252:14,15 263:11,12 264:5 273:14,15

276:10,12 278:8,25 279:2

**Exhibits** 180:13

**exigent** 51:7,14,17 53:3,8 56:25 57:11, 14,20,23,25 59:4 188:16

**exit** 237:8

**exited** 126:11

**exiting** 162:6

**exonerated** 19:21

**expect** 61:20 84:4 147:8,13

**expectations** 206:12,17

**expected** 23:10 38:24 172:25 205:9, 23 224:3,7

**experience** 25:11, 15,21 26:2,3 27:12 29:25 41:19,25 42:3 175:12,15,20,25

**experiences** 43:4

**explain** 44:8 79:2 141:12 164:24 196:20 198:10 277:20

**explicit** 236:24

**explicitly** 237:8

**extend** 285:15

**extensive** 86:10 283:5

**extent** 78:17 118:9

**extract** 58:6 71:18 168:9,15

**eyesight** 223:3,5

---

**F**

**face** 187:8,12 232:6, 20,23

**facing** 253:20

**fact** 23:13 41:4 136:23 284:5

**faction** 228:17

**facts** 170:19 284:5

**failed** 148:17,20 189:25 272:14

**fair** 16:23 34:23,24 40:25 43:9 60:8 100:13,17 130:18 140:25 141:2 223:2 251:23 252:9,11 267:4

**fairly** 22:2

**familiar** 107:16 214:22,25 215:2,7 229:20

**fashion** 251:6

**fast** 29:11

**favor** 265:20

**FDR** 159:11 160:10, 13 161:7,19 162:6, 10,13,14 163:13,21 164:16 167:6 168:16 169:25

**fear** 72:7,8

**February** 282:3

**fee** 118:4

**feel** 25:11 247:4,10

**feet** 103:3

**fell** 165:13

**felonies** 99:10 100:23 101:5 102:8

**felony** 100:4 190:4 195:9

**felt** 85:21

**female** 113:8 217:13

**fewer** 201:22 202:15 216:18

**field** 24:3,15 25:23 32:8 33:16,19 55:2,5, 20 56:16,18 61:9,20 62:3,13 65:10 93:16 94:6,12,15,20,23 95:7,9 96:25 97:17 123:15 181:17 182:5, 19,21 187:6 188:19, 22 189:2,4,7,24

191:13 261:10 276:21,25 277:6,11, 13,17

**fighting** 70:13

**figure** 84:16 105:25

**files** 12:20 13:4,9 118:7

**fill** 98:25

**filter** 87:24

**filtered** 23:11 31:5

**finally** 8:18

**find** 10:8 87:12 178:13

**fine** 8:5 106:8 185:4

**Finest** 260:12,14,16

**fingers** 256:15

**finish** 8:10 38:12

**finished** 174:18

**fire** 175:3

**firearm** 208:14 217:13,15 219:16

**fireworks** 193:6 199:5

**fists** 103:3

**five-minute** 44:22

**flailing** 154:22

**flawlessly** 216:23 217:4 220:11,22

**flex** 98:19 103:22,25 104:3 168:24 169:4, 7,10,12,17 256:13, 17,19 257:12

**flipped** 230:10

**flowing** 266:24

**Floyd** 15:22 16:7,10 24:25 25:7,13 30:3 32:3 35:9,14 37:4,9, 17 40:4 52:3 71:4 76:16,22 77:3 80:3,6 83:6 122:24 123:5,21 138:13,18 144:3 169:15 175:14 186:4, 8 209:16 210:16

231:9 267:7 269:6,8

**Floyd's** 15:24

**flying** 180:15

**Foley** 81:17 120:18, 23 125:2,4 126:7,11 127:10 133:15 134:3 135:22 136:7

**folks** 104:21 244:12

**follow** 41:2,4 134:5 228:8

**foot** 67:4 94:23 98:10 119:2,21 124:15 162:9 223:12,21,25

**force** 24:15 25:24 26:15 55:24 56:8,11, 12,13 59:10,13 61:9 69:9 72:15 93:17 94:6,12,15,21,23 95:7,9 96:25 97:17 102:17 103:7,10 120:3,4 168:21 187:6 188:19 189:2,4,24 191:13 261:10 267:21 276:21

**forces** 24:3 61:20 62:3,13 123:16 135:22 181:18 182:5, 19,22 188:22 189:7 217:18 276:21,25 277:6,11,13,17

**Fordham** 208:24

**form** 66:24 72:4 217:22 246:9 251:6

**formal** 29:13

**formation** 66:22 109:18,20

**fortunate** 42:17

**Forum** 27:13

**forward** 18:12 179:23 180:4 181:12 263:9

**found** 76:17 77:16 209:4

**frame** 84:13 112:11 213:19 234:8

**free** 69:14 133:16,18 240:10,12 244:8

**frequency** 62:20

**frequent** 31:17

**frequently** 31:14

**Frick** 283:20

**front** 152:15 205:15, 21 206:2 233:3,22 237:14 244:21

**frozen** 272:23

**FTP** 75:7,12,16,19 211:23 212:11 215:7, 11

**functionality** 50:3

**functions** 31:23

———————————

**G**

**Gallitelli** 203:23

**garb** 234:15

**Garden** 277:2

**gasoline** 217:22

**gather** 182:17

**gave** 53:21 54:24 198:12 206:17 244:15 261:20 269:24 273:9

**general** 281:20 283:2

**General's** 281:21

**generally** 15:23 35:4 121:18

**geographical** 36:24

**George** 15:22,24 16:7,10 24:24 25:7, 13 30:3 32:3 35:9,14 37:4,9,16 40:4 52:3 71:4 76:16,22 77:3 80:2,6 83:6 122:24 123:5,21 138:13,18 144:2 169:15 175:14 186:4,8 209:16 210:15 231:9 267:7 269:6,8

**Gerard** 7:8,15

**give** 9:6 35:22 38:23 53:2,4,9,14,16,17 59:8 61:18 66:14

**giving** 191:12,14 227:24 228:6,10 250:24

**go-between** 22:20

**goal** 135:7 236:17

**good** 90:24 95:15,16 191:17 194:8 235:21

**gotcha** 177:17

**Gouverneur** 159:11 160:10 162:9 163:13, 21 164:17 167:7 168:16 170:2

**governmental** 198:3 248:9

**grab** 26:19

**grabbed** 26:20 148:14 155:4

**graph** 201:13,19 202:20

**grappling** 258:18

**grave** 174:9,11

**great** 42:7 46:3 92:16 105:8 106:22 151:22 232:17 282:7 286:9

**green** 86:16 87:16 88:3,5,7,19 190:2,3 191:3

**ground** 151:5 152:16,18 153:21 154:17,25 155:15 166:25 256:25 257:4, 13

**grounds** 166:11

**group** 24:4,15 27:9 58:5 59:5 66:18 75:12 76:5 101:8 115:23 131:7 134:15, 19 135:6 167:5 168:4,12 193:19 208:13 217:5 228:8

**75**:18 102:9 116:11 146:13,22 150:11 155:10 156:11 191:6 226:9 236:20,22 256:20 257:14 259:21,25 267:9 268:11

**groups** 26:8,10 72:19 76:2 140:18 175:8 269:9

**Guerrieri** 97:4

**guess** 16:15 23:4 54:19 90:21,22 91:3 242:5 274:4

**guide** 103:11 174:17

**guided** 42:10

**guidelines** 188:19 189:11,14

**guy** 44:17

**guys** 242:8 286:7

———————————

**H**

**half** 10:22 31:18 218:22

**halfway** 264:8

**Hall** 81:12 194:10

**halted** 266:13

**hammers** 217:22 218:24

**hand** 66:14

**handcuffs** 98:19,22 154:2,11 243:17

**handle** 42:11

**handling** 25:22 27:6 42:5

**hands** 150:16 153:15,16,18 154:24 155:3,6,11,16 240:6 241:25 254:15

**handsome** 115:17

**happen** 55:5,21 71:3 78:25 113:20 122:24 125:12 136:23 154:13 198:10 247:18

**happened** 16:13 19:22 24:25 70:18,21 71:8 73:25 76:5 83:6

**90**:23 99:7 111:18 112:4 119:18 123:2 150:3 183:19 194:5 197:6 198:8 267:8

**happening** 61:22 91:16 115:8 123:20 143:5 175:11

**hard** 50:2

**Harry** 232:4

**hat** 112:25

**hazard** 119:10

**head** 8:16 43:7 86:12 102:20 120:22 140:20 147:15 232:11,12

**heads** 66:15

**healthcare** 259:19

**hear** 8:2 101:24 102:19,23 103:2,6, 16,21 104:3 105:9, 14,19,20 106:14,18 108:14 110:22 113:6, 11 115:24 129:9,13 145:2 146:25 148:24 149:5 150:25 152:22, 25 153:7,10 155:12, 13 157:14,19 158:4, 23 163:12 164:3,6 168:20,23 181:6,9 216:5 219:2,4 225:20,24 235:12 238:20,25 242:8 246:15 250:17,20 251:11 253:14 255:5, 7,24 258:5 261:19 262:2,6,11,19 267:9, 20 268:11 270:23 278:22

**heard** 67:8,11 68:6 113:8,9,16 147:7 150:4,6 151:3 156:5, 7 209:15 218:13 251:20 255:16

**hectic** 126:2,6

**heed** 53:6 220:18

**heeded** 220:23

**held** 10:12 21:8 45:12 104:17 117:12 129:15 170:22

**helicopter** 250:19 251:25 252:8,9

**helicopters** 251:12, 22

**helmet** 230:8,12,15, 20,21,25 231:8,11,19

**helpful** 25:12 242:20

**helps** 54:4

**Henry** 283:21

**hierarchy** 94:24

**high** 30:17 116:16

**higher** 34:9 116:12, 20 143:11 272:5

**highest** 141:7

**Highway** 19:17 20:10,14 21:16

**Hillery** 93:17 95:2 134:12 270:18

**hiring** 33:6

**histories** 76:2

**history** 14:9 45:16 75:15

**Hold** 104:14 129:6 259:9 263:18

**holding** 233:3

**honest** 67:24 84:14 186:17 238:17

**hope** 84:24

**hoped** 84:6 283:24

**hoping** 84:8

**horses** 58:3

**hot** 28:14,25 29:5,16

**hour** 250:22

**hours** 10:20,21,22 107:20 220:15 236:11 251:7

**Hub** 200:15 203:20, 21 221:9,10 222:12

**huge** 284:4

**Hughes** 39:16 86:23 110:10 116:23 143:10 191:3 270:19

**hundred** 193:3

**hurt** 103:17

**hybrid** 94:20 96:25 97:17

---

**I**

**IAB** 19:6,9

**ID** 45:21,23

**idea** 29:7 147:6

**Ideally** 65:16

**identification** 43:20 81:24 92:8 104:16 129:3 144:17 177:9, 11,13 187:20 192:8 196:7 200:25 211:8 215:20 229:4 252:16 263:13 273:16 276:13 279:3

**identified** 265:16 266:8

**identifies** 93:14 264:23

**identify** 234:18 235:6 265:8 279:25

**Iglesias** 15:12

**image** 273:24

**impact** 271:20

**implement** 123:18

**implying** 84:16,17

**importance** 86:8

**important** 8:8 85:18, 21 86:3,4 190:17 191:4

**improve** 37:22

**incendiary** 217:21 218:23

**inception** 98:8

**incident** 18:7,15,19 19:14,16 20:15 21:18 23:19,21,23 24:2,14, 23 25:23 26:12 33:13,20,22,25 36:8 43:8 47:8,10,15 48:21,25 49:3,9,10,

21 50:10,11,12,24 51:4,11,19,21,23 52:5 53:11,15 64:7 70:17 86:20,24 91:9, 11,13,15,20,24 92:3 93:15 97:21 100:22 102:3 110:8 111:15 116:13 117:6 119:4,6 120:2 123:24,25 126:20 127:8 141:6, 10 142:4,20 143:4,8, 16 144:9 157:24 160:5 170:16 173:15 182:16 185:15 208:5 222:4,7,9

**incidents** 17:24 18:10,18 20:3,6,13 21:14 24:17 32:10 33:11,17 34:6 52:6 117:20 118:3,8 139:7 171:17 208:22 258:21 282:8,13

**include** 60:3 139:17

**included** 96:25 202:25 237:13 260:19

**including** 56:2,20 90:3 95:15 135:5 189:7 284:2

**incredible** 284:4

**incredibly** 170:17

**independent** 120:9 122:11 137:2 138:15 139:3 163:17 165:4 173:9 179:25 183:25 191:18 193:13,25 197:5,10 198:15,19 202:19 212:7 243:15 252:7 276:3 280:8,21 281:3

**independently** 235:20

**indiscriminately** 56:25 57:10,14,16, 17,19 166:24

**individual** 74:15 130:12 148:14 194:15

**individuals** 42:10 58:25 59:6 72:11

103:17 166:18 217:23 239:12,15

**infallible** 43:11

**inform** 147:21 196:16 241:23

**informal** 28:11 29:13 205:14,18,20,23

**information** 45:9 59:3 87:6,22 89:3 93:11,18 201:15,16, 25 202:5,14,22 203:6,13 217:6 218:20,21 219:2,5,19 260:19 270:10

**informed** 69:15 83:24 87:16 143:12 153:20 192:25 194:25 243:16 248:14 269:21

**infractions** 26:11

**initiation** 25:8

**injured** 103:18 113:12 121:23 122:14 258:17

**injuries** 113:16

**injurious** 170:16

**injury** 59:24,25 71:20 122:4,5 171:21

**inside** 65:2 134:3

**inspector** 7:1,8 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1,6 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1,18 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1

84:1 85:1 86:1 87:1 88:1,2 89:1,17 90:1 91:1 92:1 93:1,16,17, 24 94:1 95:1,2 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1,5 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1,3 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1,12 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1,19 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1,16 186:1 187:1 188:1 189:1 190:1 191:1 192:1,25 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1,23 204:1,9 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1,8 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1

253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1,18 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1

**inspectors** 183:12

**instance** 137:10 166:15

**instances** 10:7 54:6 71:15 99:4 170:12 182:25 187:14

**instigating** 168:10

**instruct** 64:11 101:21 132:17 165:23 182:20 185:25 189:13,24 199:14 259:18

**instructed** 42:10 58:22 59:16 64:5 74:7,11 183:8 186:5 188:10 189:17,18 190:22 228:7 277:25

**instructing** 21:12 133:7 185:24 188:13 190:7,8 277:16

**instruction** 191:6,14 236:24 256:20 262:2, 6

**instructions** 38:24 39:4 117:9 183:13 186:9,19 187:2,7 191:12 205:9 225:20 251:13 259:21,25 261:20

**instructs** 8:22

**instruments** 103:7

**intelligence** 78:2,6, 9,12,15 80:8 172:25 200:8 207:24 219:23

**intend** 285:22

**intended** 83:13 285:21

**intent** 245:2

**intentionally** 152:20

**intently** 242:15

**intents** 96:18

**interact** 94:7

**interest** 20:23

**interfere** 114:20

**Internal** 9:18 19:20

**interrupt** 8:9,12

**interrupted** 18:6

**interrupting** 24:6

**intervene** 104:6

**interview** 15:17 16:6,11,13,23 17:7, 23 19:12,13 181:25

**interviewed** 9:17 15:7,10 16:20 17:14, 15 18:8,24 19:6,9

**interviews** 17:12 18:15,17 118:8

**investigation** 19:19, 21

**investigations** 16:18 18:22 19:7 21:15 117:21

**investigators** 17:16, 17 18:2,9

**involved** 15:16 17:9 23:25 27:25 36:21 72:25 75:19 120:13 124:17 180:3 182:8 215:11 272:20 281:12

**involvement** 27:16 283:5

**involving** 13:11 27:13 76:8

**Iraq** 27:17

**irrationally** 74:16

**Island** 181:19 182:6, 12 183:3,5 185:23 186:6,8,21 189:19,20 191:13 210:20,24 277:23,24

**issue** 7:22 58:16

**issued** 136:12 163:12 166:4,8

**issues** 13:13 22:18, 20 30:20 35:5

**issuing** 136:7 137:3, 11 249:20

**itch** 8:3

**item** 84:20

___

**J**

**James** 39:18

**Jericho** 265:11 266:2,16 267:10,13, 16,18,21 271:18

**job** 35:5 56:9 69:6 72:24 95:15 175:12 282:8 284:4

**jobs** 32:11 282:18

**John** 31:12 161:2

**join** 282:25 283:22 285:2,14

**joining** 284:9

**Jonathan** 282:24

**judge** 10:7

**July** 61:10 138:25 264:6,11 270:24 271:8 272:10 273:10 275:3,14 278:10 280:15

**jumping** 268:8

**June** 11:10,15 18:18, 19,20 19:16 20:2,9, 13 21:15 37:11,15 117:19 181:23 182:3 188:3 191:21,22 197:20 199:20,22,25 200:2,3,20 201:20, 22,23 202:5,6,7,8,12 203:21 211:20 216:6, 22 247:14 259:14 260:23 281:7 285:21

**Justice** 209:22

**justified** 151:12,14 167:8

**justify** 166:17

___

**K**

**Kathleen** 222:17

**Keel** 39:18

**keeping** 184:20 286:5

**Kennedy** 161:2

**kill** 83:17

**killing** 83:8,14,15

**kind** 13:3 29:12 197:18 201:25 203:6, 13 210:14 232:12 233:3 266:5

**kinds** 174:23 210:23

**Kips** 275:14

**knees** 103:3

**knew** 205:4

**knowing** 184:21

**knowledge** 34:8,10, 16 41:20 42:14 99:5 110:12 113:13 114:22 115:2 134:20, 22 164:14 203:5,12 214:9 260:9 268:22

___

**L**

**labeled** 192:5,14

**lack** 25:6 276:19

**laid** 217:17 231:2

**lane** 109:2,3

**large** 41:8 62:18 91:2 100:14 128:18 140:18 194:11 214:10 248:4

**large-scale** 32:9 42:11 220:4

**larger** 33:17 214:7

**Launch** 184:7

**Laurie** 170:24

**law** 100:3,23 132:3,7, 9,13 147:17 165:14

174:10,12,17 176:2 190:4 197:25 265:12 266:22

**lawful** 53:24

**laws** 157:8 272:21

**lawsuit** 12:9,12,15, 18

**lawyer** 10:15 11:20

**learn** 42:7,9,17 43:5 49:18 77:7 79:5,23 122:16 199:24 200:4

**learned** 43:9 50:4 62:12 76:14 282:2,14

**learning** 42:5,12

**leave** 69:14 141:3 235:24 236:8,13,18, 21,23,24 237:3,4,5 240:10,11,12,22 244:8 249:21

**leaving** 142:19 143:11 240:13

**led** 43:5 64:12

**left** 37:14 55:8 133:15 223:23 226:7,11,14, 23 237:17 249:4,5,8, 11 250:22 281:5,9,17

**legal** 101:10 149:12 151:2,3,9,10,11,20, 25 152:6,9 156:6,11, 16,20,25 197:9 198:7 234:14 235:4,7 259:23 261:16 262:7, 8,12

**legality** 156:14

**legally** 9:2

**Lehr** 39:25 203:23 205:9,13 207:6 216:8,10,15 224:4 241:3,10 261:19

**Lehr's** 206:12

**less-than-lethal** 26:14,17 55:23 56:8, 11 59:9,13 72:16

**lessons** 62:12,15

**letter** 282:3

**letting** 226:4

**level** 33:23 34:22 35:17,24 36:5,10,11, 12,13,14,15,16,19, 20,22,25 37:5,7 48:18 94:12 183:10 271:25

**lieutenant** 27:19 33:4 49:10 88:3 95:18 183:9

**lieutenants** 38:23 87:24 90:4 94:17,19 95:10,12 141:19 183:15 212:5,19

**life** 56:10,14 69:7

**light** 86:16 87:17 88:3,5,7,19 89:9 159:15 180:21 190:2, 3 191:3 213:18

**Lillian** 281:19

**limited** 145:19,24

**lined** 246:8

**linking** 65:25

**list** 211:18

**listed** 264:11

**listen** 95:25

**literally** 66:23

**Lives** 22:23 23:2,7,20 24:21 25:3 29:21 75:25 264:12 265:3

**local** 64:23

**located** 97:23 121:20 208:9,10

**location** 36:2,20 37:25 51:25 78:4 96:23 128:7 130:2 133:8 164:17 170:2 182:17 187:4 189:21 193:3 196:14 200:14 240:17 276:22

**locations** 30:18 125:19 183:17,21 185:17

**locked** 240:18

**long** 106:2 130:9 138:19 147:13,16

183:5 206:7 272:24

**long-range** 46:16

**longer** 106:7

**looked** 152:14

**looted** 175:17

**looters** 176:4

**looting** 40:14 173:21
174:7,23 175:15,21
202:6,12 208:21,24

**lot** 101:16 123:2
142:25 153:12
204:23,25 250:24
251:2

**loud** 252:5,6

**love** 226:9

**LRAD** 46:12,23,25
47:17 48:7,15 49:6
50:4,19,25 51:10,18
52:10,14 128:3,5,8,
10,12 136:19 147:5
163:7 233:6,7
235:10,19 239:17,25
242:21 244:16 245:3
267:17 268:18

**LRADS** 51:25

**lunch** 117:14

---

**M**

**Maddrey** 39:18

**made** 64:18 97:18
98:11 99:2 101:17
102:5,7 110:7
116:13,18,20 118:15
128:5,9,11 136:12
182:4 187:5 202:2
223:23 226:11,13,14,
22,23 227:9 233:10
240:25 268:22
271:23 272:2 278:9
285:3,15

**Madison** 95:21
275:17 276:25 277:3

**maintain** 109:2
184:4

**majority** 161:16,18
248:4

**make** 8:11 17:21
20:22 24:18 26:11
32:21 40:7,21 86:4
87:12 94:11 98:14,15
100:20 102:14 110:6
111:24,25 128:7
141:15 168:4 175:10
186:23 187:5 207:6
220:18,23 226:16
239:8 269:7 271:22
273:10 282:23

**makes** 168:7 175:5
227:14

**making** 8:19 40:24
69:2 73:12 88:6
100:6 126:8 165:21,
24 187:2 210:2
259:15,22

**man** 115:17 254:15

**maneuver** 66:7,10
70:2

**Manhattan** 25:16
35:23,25 36:5 39:17,
18 40:12 42:9 137:24
172:22 173:21 176:9
188:20,21,23 189:10
269:10 270:22

**Manhattan-to-
brooklyn** 138:12

**manner** 66:12 72:6
186:25

**MAPC** 198:5 210:8

**march** 16:15,17,24
68:19 69:20 118:2,6,
17 223:4 226:4
264:24 265:2,11,12
266:2,9,17,19,21
267:10,13,16,18,21
269:13,19 271:8,16,
18,19,20,21

**march's** 271:11

**marched** 132:21
222:25 269:9

**marchers** 267:10

**marching** 26:8
253:24

**marijuana** 101:7,10

**Marilyn** 198:18

**mark** 110:23 116:7
133:5 135:3 146:21
158:22 243:23

**marked** 43:19 45:4
46:4 54:8 81:22,23
82:8 92:7,17 104:15
129:2,18 144:13,16
177:8,10,12,24
178:20 179:13,17
187:19 192:7 196:6
200:22,24 211:6,7,13
215:18,19 216:2
229:2,3 252:13,15
263:11,12 264:4,10
273:15 276:10,12
278:7 279:2

**Marquez** 281:19,20

**mask** 134:11 148:2
152:8 187:12 232:6,
18,20,24 234:23

**masks** 60:12,18,21,
24 187:8 250:20

**mass** 63:2,5,9,15,18,
20 64:6,25 69:2
196:25 198:5 210:5,
6,11

**material** 171:3

**materials** 13:8 50:6

**matter** 22:23 23:2,7,
20 24:21 25:3 29:21
66:18 75:25 100:12
217:16 264:12 265:3

**matters** 20:21

**Mayor's** 236:9,16

**Mcgeown** 89:17
93:25 112:5 122:3
204:9

**meals** 183:16

**meaning** 15:4 52:17

**meaningful** 171:5

**means** 68:4 94:22
219:21

**meant** 28:16,17
50:20 83:10 85:3

**measures** 240:2

**media** 67:13,16,21,
23 68:5,6,11,15

82:25 83:16,20
238:14 260:2 270:24
272:18 273:7

**medical** 74:21
171:10,13 172:3

**medics** 262:14

**meet** 10:15 284:23

**meeting** 17:18 28:15
29:15 200:14 204:7,
11,13,21 205:6,13,
14,17,18 206:9
207:12,19,22,25
208:6,12,13,15,18,
20,22,25 209:19,23
210:18 213:13,16
216:14,16 219:7,9,12
226:3 235:8

**meetings** 29:17
203:18 204:23
210:15,23

**member** 9:13 28:12
70:19 87:14 89:4
187:11 217:15 223:9
238:6 255:14 273:2

**members** 23:10
24:17 32:18 33:9,21,
24 48:10,13 59:3,11,
16 61:23 88:10 91:21
97:2,14 102:16 103:9
113:17 141:9 142:13
143:17 164:11
185:25 186:5 189:9
203:24 206:23
207:10 212:2,21
216:8 222:11 238:14
259:18,22 260:2
273:8 274:6

**memorable** 205:2,5

**memory** 36:25 83:4,
8 99:11 103:11 120:7
126:10,21 128:4
194:9 200:14 201:10
202:7,21 211:2

**mention** 189:25
260:14

**mentioned** 17:12
26:2 28:19 29:9 31:8
33:15 35:16 38:11,
15,25 39:5 40:3
42:18 55:20 78:19

86:15 124:10 125:2
160:21 162:15
185:24 208:19,20,22
209:3 225:6 226:6
244:18

**message** 47:6 62:22
79:24 80:7 83:12
85:18 235:10,15,16,
23 236:18,25 237:2,7
243:6 245:3 271:11,
20

**messages** 47:7
52:10,17 260:12,15,
16

**method** 68:14

**methods** 243:8

**Michael** 284:16

**microphone** 252:2

**middle** 65:23 224:11,
14,18 245:25 246:2

**Midtown** 20:11,16
21:18 40:12 144:8
191:21

**Midtown/times**
140:4

**Milbrook** 253:22

**mile** 218:22

**military** 262:24

**Miller** 95:3 97:16
112:8 204:5

**mind** 67:16 71:11
76:12 84:13 112:2
237:6 253:6 263:25

**minds** 237:4

**minimal** 56:12

**Minneapolis** 77:4

**minute** 107:2 110:19,
23 129:6 135:3
150:22 151:18,24
157:18 158:3,21,23
176:14 259:9

**minutes** 106:5
113:24 116:7 185:3
206:8 243:19 247:23
249:24,25 250:16,17
254:21 259:7 274:12

279:18 281:5,8,17

**mischief** 75:17

**misdemeanor** 100:3 165:2 190:4 195:9

**misdemeanors** 99:10,13 100:23 101:6 102:7,11,14

**missed** 17:6 122:12

**missing** 35:24,25

**mistaken** 61:16 134:2 174:13 180:21 196:15 204:17 205:15 244:18

**mistakes** 43:10

**misunderstood** 97:12

**MK9** 255:2

**mobile** 62:18 93:16 94:6,11,14,20 95:7,9 97:17 120:24 181:17 182:5,18 188:18,22 189:2,4,6 191:13 261:10

**mobilization** 33:23 35:18,19 42:13 54:22,24 55:20 56:19 57:5 62:13 63:10

**mobilizations** 56:17

**mobilizing** 216:18

**Molly** 7:20 232:9 250:21 252:25 273:18

**moment** 10:11 21:7 133:23 142:14

**Monahan** 39:20 40:3,16 181:24 204:20,24 254:4

**monitor** 61:22

**monitored** 26:8

**month** 54:23

**monthly** 54:23

**Moore** 282:23,24 283:13,17

**morning** 11:21 38:6,

7 96:7

**Morris** 221:13,21 222:21

**Motthaven** 199:21, 25 203:19 212:2 216:22 260:23 261:3, 17 283:24,25 285:6

**mouth** 77:9,11 142:18,20 143:14 200:7

**move** 47:2 60:5 98:10 103:14,18 111:2,3,4,5,13 113:15 117:5 120:12 137:16,18 152:19 159:6 172:5 180:4 183:17 221:17 239:7 242:9 253:13 254:10, 13 259:6 263:9 274:4,11 279:5

**moved** 98:12 179:23 181:12 221:16

**movement** 66:16 111:12

**movements** 70:9

**moving** 26:9 110:15, 16 115:4 126:6 222:24

**Mullane** 211:16 263:19,21

**multiple** 58:4 125:10 142:5 162:2,3 166:17,22,23 193:21

**murder** 76:15,21

**Music** 194:10

**must-arrest** 245:11

---

**N**

**names** 42:16 43:2 276:21

**nature** 47:4 121:24

**necessarily** 70:5 88:23 127:19 136:14, 17 166:6 168:6,8 193:17 195:15 197:14 198:2 277:18

**needed** 22:21 242:18 285:10

**negative** 43:4

**neighborhoods** 120:17

**network** 13:21,24

**newsworthy** 80:9

**nice** 238:20

**night** 37:22 120:24 140:12 168:11 173:5, 20 174:13 176:7 198:13 199:17 214:5, 8 218:2 245:14 246:22 247:5 255:20 258:14

**nights** 125:25

**nods** 8:16

**non-duplicative** 285:5

**non-peaceful** 63:13 70:3

**non-roadway** 162:23

**non-srg** 141:22

**non-violent** 74:9

**noninjurious** 72:6

**noon** 84:3

**normal** 17:17 32:6 41:15 286:12

**north** 39:19 126:11 127:10 160:10

**northbound** 126:12

**notation** 107:4 265:13,14

**note** 66:10 185:19 282:11,16 283:17,19 284:8,15 285:17,20

**noted** 282:2 285:25

**notes** 13:3 188:9 207:19,21

**notice** 146:22 162:10

**notified** 80:14 127:13

**noting** 93:19,22

**number** 31:16,19 52:16 54:11 82:12 84:20 92:20 112:17 135:4,15 188:4 201:7 203:2 212:10,24 213:12 214:4,6,10 229:2 230:18,20 231:12 264:10 276:22 281:11,12

**numbers** 46:18,21 47:6 128:19

**numerous** 194:15 244:16 267:8

**NYC** 265:3

**NYPD** 14:10 28:13 45:15 60:21 71:17 89:24 115:22 123:12 131:7 149:12 151:10, 20 156:25 164:11 171:14 197:8 203:13 207:10 212:21 234:14 235:4,7 271:3

**NYPD's** 27:6

---

**O**

**O'REILLY** 222:17

**oath** 7:10 9:2,20,23 18:24

**object** 168:4 248:2 282:20 286:4

**objected** 21:20

**objection** 51:12 58:17 63:22 67:19 80:18 85:23 98:2 109:21 121:16 123:7 124:19 131:16 136:15 141:23 145:22 147:23 156:22 166:19 167:9, 22 169:8 170:7 172:11 173:11,17,25 175:22 180:6 181:13 194:6 203:8 204:14 206:14 218:11 219:24 220:25 233:17,23 236:4 242:23 245:17 249:13 251:14 258:6

**objections** 8:19 283:2,22 285:3 286:2

**objective** 133:13

**objects** 127:6 161:19,22,25 164:23 165:13 168:14 174:14

**obligation** 286:25

**observable** 229:17

**observe** 102:16 131:14,21 162:19,22 163:3 180:12,22 181:4 193:8,11 195:15 219:15 266:15 268:5

**observed** 240:20 268:8

**observer** 151:2,4 152:2,6,9 156:6

**observers** 156:16, 20,25 259:23 261:16 262:7,8,12

**observing** 195:9 225:13

**obstructing** 198:3 248:9

**OC** 26:22 55:17 56:2, 21,24 57:2,9,13,22 58:2,24 59:14,21 60:2 71:14,24 72:4,9, 14,18,20 74:9,17 102:24 163:20,23,25 164:4,13 166:12,17 167:4,7,20 246:15, 17,18,19,21 247:3,14 255:4,7,10,19

**occasions** 199:16

**Occupy** 25:19 26:3, 15,20 27:3,4 29:17

**occur** 80:11 206:7

**occurred** 7:24 77:3 78:17 174:3 183:21 195:20

---

**occurring** 33:22
40:15 47:13,15,25
80:9 217:9 272:16

**October** 14:21 46:12
52:15 271:2

**offense** 52:16 267:14

**office** 13:4,8 79:22
93:7,9 99:17 197:16
281:22

**officer** 12:2,4 25:18
27:8 28:21 30:7,13,
14,22 31:9,11,12
32:4,5,7 34:11,20
39:16,19 41:15 45:11
48:18 64:17,20 65:7
69:13 70:7,13 71:19
72:7 73:2 78:8 83:21
93:5 98:16,24 99:3,6
104:6 111:5,13,23
112:22 114:21
115:13 131:6 134:14,
19 139:18 143:11
165:3 172:2,4 194:25
195:9,15,19,21,24
196:2,17,20,24 205:3
231:22 240:14
270:14

**officer's** 231:12

**officers** 26:7 30:19
32:16,17 36:23 42:4
58:16,23 62:16,18
66:17,21 67:2,3,4
68:19 70:25 73:14
74:7,12 75:17 83:5,9,
14,16,17 87:25 88:4
89:24 90:3,10 91:2,
22 94:19 95:10,13,18
97:25 98:6 102:19,23
103:2,6,21 108:22
109:3,4,6,11,14,24
111:2 114:12 115:3
117:2,5 118:25
119:9,11,21,22 120:2
121:23,24 127:6
128:19 130:20
132:22 135:5,8,12,15
144:2 152:13 153:22
157:21 159:3 160:16
162:10 165:19,23
168:21,24 177:23
178:2 179:20,23
180:4 181:12 182:18
183:16 186:24 187:6

188:10,13 189:18,19
190:8,21 191:2
196:20 197:2 209:14
212:5 214:3,11
216:18 225:12
226:25 227:3,19,25
228:5,7,13 233:22
237:13,16,19 240:4
241:12 243:24
244:19,20 245:6,21
246:4,7 247:14
250:7,11 252:3
253:23 256:12 272:8

**officials** 34:9

**Omniform** 192:16

**once-in-a-career**
175:17

**ongoing** 37:24

**online** 192:18 198:21

**open** 16:18 44:3 82:3
92:13 187:22 192:10
196:9,10 200:11
201:3,4 211:10,11,12
215:22,23,24 263:15,
16,17 276:11,15,16
286:2,5

**opening** 263:18

**opens** 44:9

**operating** 189:9

**operational** 256:17

**operations** 22:10,
11,14 23:22 24:2,8,
23 25:5 31:3,5 61:10
79:8,10,13,15,17,19,
21 93:6,8,9 122:20,
22 200:6 213:2,4

**opinion** 42:7 220:22
243:4

**opportunity** 236:20,
23 237:3 285:8

**order** 51:24 53:24
70:16 99:23 100:15,
18 136:11 137:11
144:5 146:8,13
147:2,10 148:24
150:4,6,11,15 158:23
166:7 195:4,12
210:11 220:8 225:3
236:9,16 240:25

249:21 261:19
262:11 272:19 273:9

**ordered** 111:20
112:6,8 117:24
119:4,5,24 195:5,8
241:3 249:21 261:11
266:19 269:2,3
274:21 275:2 280:14

**orderly** 224:19,22

**orders** 136:7 137:3
193:22,24 198:13
225:24 251:20

**organizations** 75:3,
4 76:7,8

**original** 71:22 254:2

**originally** 191:2

**outcome** 18:21
19:18

**outgoing** 182:20

**outlook** 184:8,10,20

**outlying** 91:3

**overcome** 72:21

**overhead** 188:11,13,
16 190:8,22 250:19
251:25

**oversee** 24:5 94:16

**overview** 61:18

---

**P**

**p.m.** 82:13 92:19
96:12 107:23,25
108:4 188:3 202:8,9
211:19 213:19
220:16 236:11,16
261:24,25

**pads** 256:15

**pages** 13:15 214:16

**painful** 170:17

**pair** 256:17

**pallets** 208:10 209:4

**pants** 230:6 231:18

**paper** 13:3

**papers** 13:7

**paperwork** 13:14
65:6 99:2 102:6
146:12 170:3

**parade** 79:5

**parades** 22:24 28:20

**parent** 31:4

**park** 95:21 116:13,15
119:6,11 277:4

**parse** 101:11,12

**part** 15:7 16:10 24:22
27:2,10,20 31:20
32:15 41:7 61:2
63:16 65:10 80:15
97:11,13 108:17
134:17 166:2 174:7
218:20 221:4 232:10
245:14 246:10 248:4
253:25 254:2 278:22

**partial** 246:6

**participant** 267:18

**participants** 214:12,
13 267:12,21

**participate** 28:6
182:11,14 225:16

**parties** 117:23

**parts** 208:9 221:6
286:3

**passerby** 171:16

**passing** 193:20

**passive** 154:19

**past** 117:5 197:7
227:11

**patch** 115:21

**patrol** 23:21 30:16
31:2 33:24 39:17
49:9 50:12,15,24
51:4,11,19 52:5 79:4
84:23 86:18,20 88:25
90:2 91:12,19 92:2
94:23 100:21 101:25
102:2,8 110:8 112:25
128:9,13 139:10,14
142:7 143:6 188:20,
21,23 189:10 212:12,
25 250:10

**papers** 13:7

**pay** 118:3

**Payne** 7:11,21
285:23,24

**PBBS** 212:12

**PBMS** 188:19

**PD** 265:15,17

**PDF** 54:12

**peaceably** 132:4

**peaceful** 63:12 64:8
65:11,17,18,20,22,25
66:3 68:25 69:2,8,20
72:6 74:19 84:5,6,10
85:4 101:8 145:16,
21,25 262:25

**peak** 201:20

**pedestrian** 128:6

**penal** 100:3,23
165:13 174:10,11,17
176:2 190:4 197:25
266:21

**pending** 254:17

**people** 25:6,9 26:20
29:6 33:15 34:25
39:3 46:25 53:5
58:13 59:21 62:22
66:8,19 69:4 74:2,9
90:24 97:18 98:21
102:20 103:3,11,12
114:20 119:10 132:4,
7 133:7 134:5
136:19,20 141:22
142:10,25 147:9,13
150:8,10 165:14
166:23 167:5,8,21
168:15 169:24
170:10 174:8,13,21
175:7 194:11,15
198:11 199:4 203:16
234:9 236:8,13,18
237:5,7 240:19
242:16,21 244:21
246:8 248:8,12 249:2
250:18 251:20 252:3
267:4,15 271:3,7
272:24 282:12

**pepper** 170:10,21
171:6,17 172:2

**pepper-sprayed**
170:6,15

**perceived** 80:7

**percent** 48:12 81:16 207:17 213:21 220:13 275:19

**perform** 22:17 31:23

**period** 27:21 37:11 39:9 138:17,23 139:4,21 148:18 181:3 202:24 225:14, 21 227:25

**permission** 50:23 51:4,10,19 102:9

**permit** 127:10 264:24 265:4,9 266:2 268:3

**permitted** 127:13,17, 21 284:6

**perpetrator** 152:15

**person** 35:6 64:10, 11 65:7,8 69:13 70:7, 8,13 73:16,23 74:6 78:22 88:21,22,23 89:2 93:4 101:7,9,15 112:20 115:16,21 132:8 134:10 146:12, 13 147:21 148:19 149:6,13 151:5,19 152:7,10 153:14 154:12,15,23 155:2, 5,13 156:6 157:21 158:25 166:25 168:3, 9,12 171:5 194:21 195:5,22 198:4,6 208:13 217:14 231:20 234:13 238:4 242:8 263:5 280:3 286:23

**person's** 86:12 147:15

**personal** 13:4 14:18 15:19 17:8 56:10,14 69:7 99:5 157:3 231:6

**personally** 58:22 74:11 83:23 109:17 137:4 193:8,11 282:5

**personnel** 23:10 30:15 31:6 45:15 70:11 79:11,12 94:3, 18 97:5,6 121:19,21 182:15 205:8 213:6,

8,12 242:18 260:2 270:24 272:18

**pertains** 202:16,17

**peruses** 84:19 192:21

**pharmacy** 194:14

**phone** 12:12 88:15 125:17,20,21 126:2

**physical** 28:17,19 59:24 70:9 72:8 83:7

**physically** 23:17 81:14,19 88:8 97:23 172:15 265:22

**picked** 187:6 252:2

**picture** 64:19 151:19 178:11 238:4

**pictures** 209:7 272:11 273:3

**place** 17:23 19:17 20:10,15 21:17 64:12 78:21 109:24 118:6 120:18 123:5 178:13 213:17 226:19 233:12 241:7 243:17 245:23 261:7 285:6

**places** 125:15 174:9 189:7 280:6

**placing** 98:21

**plaintiff** 176:16 281:22 283:21,23

**plaintiffs** 7:11,21 282:25 285:2,23

**plan** 77:19 209:25 216:5,7,9,10,11,23 217:3 220:4,7,10,13, 21 221:4,7 246:10

**planned** 77:8

**planning** 33:11 80:5, 16 81:4 203:19 250:23 266:8

**play** 49:6,14,16,18, 19,22,23 50:24,25 51:3,10,25 105:8 106:13 108:11 110:17 116:3 129:9 144:25 148:21 150:21 229:10

235:11 237:7 239:19 243:19 250:12 267:17 278:6,7

**played** 50:7,17 51:18 105:11 106:16 108:13 110:20 113:4, 22 114:10 115:11 116:4 129:11,20 130:25 133:2 134:7 144:18 145:12 146:19 148:11 149:3, 8,20 150:23 152:3 153:3 158:9,19 163:8 177:21 178:7,21 179:6 229:12 234:5, 11,20,25 235:13 236:25 237:2 238:18, 23 241:18 242:6 243:20 247:21 250:4, 13 253:12,15 254:11, 19 255:22 256:6 257:9,17,21 274:13, 23 279:7,19

**player** 233:6

**playing** 48:19 49:11 70:16 105:17 147:5 153:8 235:10 236:18 243:5 245:4 248:19, 22,23 250:3

**Plaza** 7:16 64:25 65:2,4 79:9,18

**PM** 96:4,6,7,14 97:5

**PO/DETECTIVES** 212:19

**point** 69:17 86:15 98:5 138:2 148:6 154:7 161:20 162:5 181:17 186:6 202:3 208:16 223:4,22,24 226:6,25 227:3 239:11 240:10,15 241:2,14,20 244:6,13 245:6 249:4,20 254:8,14 270:20

**police** 7:15 9:13 26:7 36:23 41:15 42:14 58:3 61:19 64:25 65:2,3 66:21 68:18 75:16 79:9,18 83:5,9, 14,15,16,17 87:25 88:4 90:19,22,24 91:2,21 93:5 95:13

98:5 109:3,4,6 114:21 115:6 120:2 127:17 130:19 135:4 137:19 143:20,21 152:13 153:24 154:2, 11 157:21 160:16 161:24 165:3,4,19 174:14 176:18 183:15 192:15 194:16 209:13 215:3 217:16,18 223:8 225:12 246:4 265:20

**policed** 25:19 215:10

**policies** 32:18 156:20,24

**policing** 26:15 30:2 38:8 41:16,21 43:5 50:7 120:13 161:3 188:23

**policy** 53:13 60:20

**portion** 264:12 267:5 285:25

**portraying** 63:11,12

**position** 30:8 32:24 33:3 34:18 40:18 49:2,5 134:13,16 139:13 203:12

**positions** 14:12 33:5

**possibility** 59:23 76:20 80:11 116:11 128:13 159:4 185:18 186:11,15 190:12 191:17,23 202:17 209:12 217:7,9,14 228:15 256:4 263:6 277:24

**possibly** 32:9 37:21 77:14 85:6 116:22 119:3 133:19 140:6 152:8 172:19,21,23 187:9 200:5 205:10 206:18 213:18 217:18 275:11,15 280:5

**post** 28:15 29:15,16 182:17

**poster** 200:10,11,13, 18 208:2,19 214:20

**posts** 82:25 83:16,

20,23

**pot** 101:16

**potentially** 20:22 21:24

**Power** 265:12

**Powerpoints** 13:16

**practices** 28:23 62:25 156:24

**pray** 171:17

**Prayer** 265:12

**pre-meet** 203:23 216:6

**pre-meeting** 213:24 235:17 238:11

**precinct** 25:18 28:21 35:23 36:2 42:9 64:24 65:4 200:16 203:22 204:13 205:7, 22 206:2 209:5,6,23 210:22 213:13,24 216:14,16 219:8,13 231:3 235:8 246:11

**precincts** 30:15 210:15

**premarked** 43:13,14 128:24 144:11 177:2 187:17 228:24

**preparation** 10:23 11:3,7,17 229:23

**prepare** 10:16

**prepared** 65:6 229:19 258:23 260:6

**preparing** 23:6

**preprogrammed** 46:24

**presence** 34:2,8 90:20

**present** 19:4 23:17 24:13 25:7 31:10,11, 15,22 51:23 59:7,18 64:14 81:14,19 110:3 145:7 161:11 173:4 179:20 183:3 191:21 197:9 199:21 203:25 204:6,7,10,11 206:24,25 221:22

225:12 254:7 265:22 270:17,18,19 271:10 275:13 277:10 282:5

**preserving** 56:14

**press** 106:5 238:7,11 273:3

**pretty** 87:11 104:10 116:16 194:8

**prevent** 152:21

**prevented** 152:20

**preventing** 193:20 242:16,17

**previous** 60:10 61:9 128:17 172:10

**previously** 29:22 176:15 177:5 230:23

**primarily** 88:11 98:7 125:19 160:23

**prior** 25:12 30:2,8 53:21 62:4 76:19 118:5 121:7,11 137:11 147:5 150:3, 16 166:4 172:24 175:14 181:10 189:18 225:23 241:24 244:16 248:3 259:15,22 275:10

**prisoner** 64:13

**private** 21:4

**pro** 265:15,17

**probability** 235:18, 21

**probable** 101:6

**problem** 21:23

**procedures** 123:4, 14,19

**proceeded** 126:12 223:7

**proceeding** 9:21,24 128:13

**process** 20:24 69:3 122:23

**processing** 64:23, 25 198:6

**produce** 118:7

**produced** 83:19 118:10 129:8 176:15 177:5 278:23

**professional** 80:23

**Profile** 45:15

**promote** 32:22

**promoted** 134:20

**promotion** 14:23 15:2,8 16:24 17:9

**Promotions** 32:20

**proper** 65:5

**proposed** 199:25

**protect** 56:9,10 60:18,21 69:7 72:24 85:15 127:19 175:8 183:18

**Protecting** 135:12

**protection** 120:3,4

**protective** 60:11 72:5 231:7

**protest** 15:23 16:7 26:2 27:19 30:3 39:11,13 50:7 52:3 62:4,8,18 68:19 69:8 75:2,19 76:18 77:2,8, 14,19 78:3,15 79:5, 24 80:7,11,16,17 81:5,8,11 84:7 85:15 87:15 88:9 89:7,10, 14,22 95:24 97:23 102:17 108:9 110:14 120:24 121:8,12 125:3 126:7,9,11 127:9,13 128:3 131:14,18,21 133:20, 24 135:23 136:5 138:13,18,23 139:4, 20,23,25 140:4,12, 17,24 141:4 142:14, 17 145:15,16,18 146:2 156:14 157:3 161:7,25 167:6 172:8 173:4,10 186:23 189:22 199:20,21,25 200:9,13 201:14 203:20 207:2,11 208:5 209:16,20 210:16 211:25

214:10 216:5,21 218:17,21 221:9,18 222:2,8,10,18,25 223:7,11,21,22 224:6,10,19 245:22 247:15 254:7 260:23 261:3 264:13 265:3, 6,23 266:6 267:8 268:10 272:15 278:10,14 283:24

**protester** 56:21 65:14 154:6 171:15 240:13 244:23 256:24

**protesters** 46:18 47:2 49:23 55:15 84:5,7,10 85:10 86:8 89:21 90:7,10 101:8 108:23 111:7,9 113:25 115:8 121:5 123:15 127:22 130:4, 15,20 131:15,22 132:21 133:15 134:3 156:12 160:19 161:14,23 162:2,5, 15,19,22 163:3,13 175:21 176:18 198:14 208:14 220:7, 15 221:16 225:21,24 233:10,15,16 237:14, 24 240:10,11,16,18, 22 241:24 242:15 243:12 251:11 252:6 266:15 267:23 268:2, 5,12,19,23 269:12 273:10

**protesting** 80:2 140:19 174:22 175:4, 8

**protests** 7:24 13:12 15:23 16:3,10 23:7,8, 16,20 24:25 25:3,4,7, 8,12,13,21 27:3,6 30:3 32:3 35:9,14 37:4,10,17,24 38:8 40:5 41:8,16,18,21 42:11 43:5 54:21 60:15 62:3,6,13 69:6 75:16 76:6,8,15,21 100:13,17 120:13 122:17,25 123:6,20, 21,24 124:11,12,14 125:10 126:5 137:19 138:9,11 139:9

143:15 144:3 169:16 172:16,25 175:14 183:24 186:4,8 187:12 191:21 209:17 210:25 231:6, 9 245:14 251:2 262:19 263:21 264:11 269:7,8 281:11 282:5

**Proud** 76:10

**provide** 12:8 183:13 186:9,19 187:2,7

**provided** 209:7

**providing** 53:18 54:4 286:18

**pull** 115:25 116:9,12, 21 117:4,8 118:24 119:13,22 120:10 144:5

**pulled** 120:4 217:21 218:22

**pulling** 73:14 116:15

**purpose** 41:8 63:5, 20 183:17 205:6

**purposes** 21:3 96:18

**Purtell** 22:16 42:24

**push** 103:10 111:7 117:2

**pushed** 111:8,9

**put** 31:16,19 43:15 45:3 66:11 68:22 81:20 86:3 92:5 104:11 123:5 147:22 153:15,16,18 155:2, 5,11,16 182:18 184:6,7,12,17 191:19 192:3 196:3,4 199:18 200:21 215:15,17 240:5 253:5 254:15 256:23 263:10

**puts** 154:23

**putting** 69:4 98:19 150:16 241:25 256:13

---

### Q

**question** 8:10,23 35:21 36:3 45:11 48:3 52:12 56:15 73:19 75:10 82:7 97:10,13 126:16 127:25 133:12 137:15 151:13,15 154:5 157:25 170:25 173:20 184:14 251:17 254:17 257:8 282:13

**questioning** 21:13

**questions** 7:23 9:2 14:8 15:20 20:2 82:21 156:13 159:7 176:21 282:15,19 283:25 285:5,8

**quick** 184:24 186:25

**quickly** 32:15 71:13 111:19 183:17

**quote-unquote** 222:3

---

### R

**radio** 35:12 87:7,10 88:12 125:17,22,23 126:3 194:10 223:8 227:16 228:8,9,11,20 262:4,11 274:17

**radios** 62:20,21

**raised** 80:10

**ran** 159:3 183:5 205:16

**Randall's** 181:18 182:5,12 183:3,5 185:23 186:6,8,20 189:19,20 191:13 210:20,24 277:23,24

**rank** 45:9 116:12,16, 20 141:7 272:6

**ranking** 141:12,16 143:11

**reach** 22:21

**react** 90:10 109:20

**read** 64:9 84:15,18
170:24 190:11
192:19 196:12
220:12,16,17,22
237:20

**Reade** 194:13

**reading** 86:7

**reads** 171:2

**real** 175:11 202:14

**realize** 257:7

**reason** 9:5 49:22
122:13 202:10
229:18 241:14
257:13 264:13 272:8

**reasonable** 147:11
281:13 283:6

**reasons** 202:11
285:13

**recall** 10:6,21 19:10,
14,23 23:16 24:19
26:5 27:18 28:9
29:18,23 30:4 34:10,
17 35:10 37:6,8
39:22 40:10,13 41:17
42:16,20 46:20 48:6,
11 49:19 50:8 52:8,
19,22,23 54:18,20,22
55:6,11,13,16,19
57:4 58:9 61:3,25
63:4,7 70:17 71:10
75:5,24 76:9 77:25
78:5,18 80:3 81:7
83:22 85:6,11 88:11,
13,18 89:8 90:23
98:13 99:7,19,22
100:11 101:23 102:4,
15 103:20 104:8
109:13 111:17
113:14,18,21 114:24
116:10,24 117:7
120:25 121:4,11
122:7 123:22 125:5,
8,13,25 126:19
127:15,22,24 128:2,
15 129:25 132:11,23
133:18 135:24 136:7,
9,24 137:5,21 138:3,
8,10,25 140:7,14
146:11,15 150:19
159:14 160:4 161:8,
10,12,14,21,25

**receive** 23:9 47:5
48:3 78:11,14,24
122:18 172:24
201:15 260:10,13,16
263:20,24

**received** 41:12,14
50:23 63:8,14,17
74:25 87:22 92:24
171:10,12 201:15
211:17 218:20,21
219:18

**receiving** 41:18
188:6,7 200:8 263:22

**recent** 30:7

**recess** 44:24 106:9
117:14 136:2 185:5
259:11

**recipient** 171:6

**recognize** 108:6
112:11 115:16,19
129:22 131:4,6
134:10 145:5 149:10,
17 176:3 178:2,10,
12,16,25 179:10,16,
19 229:25 230:3
231:14,25 234:7,13
253:17 258:4,9
279:6,9,11

**recollect** 119:22
167:15 183:22

**recollection** 16:8,12
37:18 55:9 89:23
99:14 119:17,20
120:9 121:2,9,14
122:10,11 128:20
132:19 135:20 137:2,
6,7 138:5,19 139:4
140:11 160:18,20
161:17 163:18 173:9,
23 179:25 183:25
186:13 190:12
191:18 193:13 194:2,
17,20,23 197:6,11
198:16,20 199:8
202:19 205:11
209:18 212:8 215:14
216:4 220:14 228:3,
16 239:23 240:23
242:3 243:15 252:7
258:19,22 260:5
261:9 268:14 274:21
275:2,9 276:3,6,24
278:4 280:8,12,21
281:3 285:11

**recommendations**
32:21

**record** 7:14 10:10,13
21:7,9 45:13 66:10
104:18 115:18
117:13 129:16
170:23 179:12 253:8
282:16,24 283:18

**recording** 107:18
113:7

**records** 122:9
258:16

**red** 86:16 190:2 191:3

**redirected** 110:13

**refer** 15:23 54:16

185:9

**referred** 262:20
265:7

**referring** 16:4 38:16
39:6 46:22 48:22
82:16 118:21 185:19
204:2 214:21 216:10
244:2 258:25

**refresh** 55:8 120:7
126:21 137:6,7
186:13 199:8 228:3,
16 242:3 258:18,21
260:4 268:14 274:25
275:8 276:5,24 278:3
280:11

**refreshed** 285:11

**refresher** 54:9,16
55:4,12

**refreshers** 54:20

**refreshes** 201:10
274:21

**refusal** 20:19 117:19

**refused** 193:23
237:4

**regard** 208:2

**regular** 31:20

**regularly** 32:7 55:21
263:20

**regulations** 157:8

**reinforce** 190:24
191:2

**related** 7:24 12:12,
15,17,24 13:5,9,10,
11 18:15,17 19:7,14
20:2 21:14 52:23
55:11,17 60:21 76:21
78:2,11,14 118:7
187:8 188:18 197:24
200:9 260:10,13,16

**relating** 76:15 99:17

**relation** 260:23

**relationship** 52:16
54:3 62:2 94:5

**relax** 257:19

**relay** 141:13

**relieves** 96:9

**relieving** 96:20

**remainder** 256:5

**remained** 32:4,5

**remaining** 286:3

**remember** 18:19
40:8,22,23 60:23
86:16 89:8,13 102:6,
25 120:21 168:11,17
169:4 194:11 200:10
210:21 238:16 252:8
270:7 278:5

**remind** 80:22 134:13

**reminding** 85:8

**remove** 72:3,5,9
79:12 91:21 114:19
133:8 157:10 169:13
181:5

**removed** 91:3
114:23

**repeat** 9:11 13:6
52:12 100:16

**rephrase** 48:11 51:8
75:10 139:12

**replay** 149:7

**report** 28:4,11,18
45:16 96:11,14
171:22 192:17 201:5,
6 203:7 208:11
218:25 258:13,17,23

**reported** 34:23 35:2
72:15 122:7 171:18
203:2

**reporter** 8:7 118:4
153:7 171:2 286:10,
13

**reporters** 216:21

**reports** 28:7 102:19,
23 103:2,6,16,21
164:3,6,8,10 168:21,
24 172:25 208:7
217:12,17 218:7,8,9,
13 227:16 231:2
246:15 270:23

**represent** 7:20 43:15
68:17,18 107:14
129:7 144:12 167:4

170:14 176:17
216:20 237:21
245:13 278:20

**representative**
151:9,10

**represented** 20:20

**request** 36:5 48:21
49:10 50:23 77:10
104:3 122:18 128:9,
11 139:17 212:25
213:7 284:9

**requested** 34:9 37:5
49:8 103:24 139:10,
14 169:12,16 171:3
189:10

**requesting** 286:20

**requests** 23:9 78:24
80:14 213:6,8

**require** 117:25

**required** 9:2

**requires** 59:9

**reserve** 281:6 285:20

**resist** 47:22 155:16
242:22

**resistance** 154:18,
19,21,23 263:2

**resisting** 70:9,12
72:20 73:13 99:13
152:20 242:18 248:5,
10,15 257:15 263:4

**resolve** 21:23

**resources** 36:7
37:20 79:7 133:16,
19,24 134:5 143:22,
24 207:5,7

**respect** 14:11 20:5,6
21:4 22:14 27:24
28:7 29:17,20 41:11,
16 52:9 58:23 81:5
88:20 94:6 101:21
117:18,19 123:24
124:7 132:17 156:20,
25 172:6,8 186:7,9
190:7 197:19,25
206:13 208:5 209:15
211:25 222:2 223:7
259:19 268:19

**respond** 32:9 33:25
36:19 37:25 41:8
65:3 123:5 128:18
161:6 172:15 183:16
187:4 212:3 214:11

**responded** 210:21
277:21

**responding** 25:13
27:12 52:4 123:19
125:19 277:23

**response** 23:7 24:4,
15 25:23 27:5,8,25
33:11,21,24 35:17,25
36:5 78:20 80:5,16
115:22 131:7 134:15,
19 135:6,19 142:17
160:6 203:19,22
210:16 274:5

**responsibilities**
22:13 30:6,11 124:4

**responsibility**
171:25 182:21

**responsible** 143:16
184:20

**rest** 44:19

**result** 27:3 113:17
164:9 245:5

**resume** 15:18 17:8

**retaliation** 83:2,3,5,
7,13

**return** 22:6 39:2

**returning** 139:7

**review** 9:18 11:2,20
15:18 30:22 80:24
95:25 100:10 102:6
135:9 136:9 170:3
178:4 191:24 258:15

**reviewed** 11:18
229:22

**reviewing** 86:6
96:22 229:20

**rewind** 255:6

**Ridge** 211:23 212:9,
10,11,14

**rights** 55:15 56:10
85:9 86:8 127:20

**riot** 173:16 174:7,15

**RNC** 27:25

**road** 160:9,11,12
161:17,18 162:5,24
164:18 208:25 267:2,
5

**roadway** 162:11,12
193:20 266:16 267:3
268:6,7,9 270:17,20
275:10,11

**robbery** 99:12

**Robinson** 8:20
11:12 20:5,12,20
21:2,11 22:4 44:11,
16,23 51:12 58:17
63:22 67:19 80:18
85:23 92:11 98:2
104:24 105:15,21
106:2,8,20 107:11
108:14,18 109:21
117:17 118:13,15,21
121:16 123:7 124:19
131:16 136:15
141:23 144:15
145:22 147:23
156:22 157:5 166:19
167:9,22 169:8 170:7
172:11 173:11,17,25
175:22 176:23 177:7
180:6 181:13 184:24
185:3 194:6 203:8
204:14 206:14
218:11 219:24
220:25 232:9 233:17,
23 236:4 242:23
245:17 249:13
250:21 251:4,14
252:24 253:5,10
258:6 259:3 262:15
270:2 271:13 272:3,
12 273:17,21 275:24
278:21 280:16,22
281:8,14 282:20,22
283:9,14,19 284:12,
19,22 285:17 286:4,
13,18,22

**role** 16:9 23:6,12
26:4 33:6 94:2 124:7
173:9 250:9 261:11

**roll** 182:11 186:16

**roster** 93:3 276:7

**rosters** 182:17

**roughly** 10:6,21
196:14

**route** 205:10 206:17
207:14,16 224:2,3,7
228:9,10,20 266:6

**Rule** 286:21

**rules** 7:18 8:7 157:7
188:24

**run** 170:11 205:13

**running** 66:5

---

**S**

**safe** 183:18

**safely** 183:17

**safety** 56:11,14 69:7
72:5,8,24 80:24
114:16 116:14 119:7,
8,10,25 231:7 242:19
272:20

**save** 128:23

**scattered** 245:24
246:2

**scene** 49:12,20
50:10,11 58:7 72:9
73:20 88:5 91:16,17,
22,25 92:3 108:6
110:9 111:19 114:19
133:10,14 141:7,13
142:22,25 143:12
151:9 152:13 165:9
168:19,20,23 172:4
274:8

**scope** 145:25 282:6

**scratch** 13:3

**screaming** 59:6,22
65:18 113:11 143:2
153:12 193:7,15,18
252:6

**screams** 113:6

**screen** 43:24 104:14,
23 106:23 113:9
129:5 134:11 144:20
176:22 192:12 229:7,
14 230:2 231:22
252:18 273:25

**scroll** 46:5 212:16
214:18

**scrolling** 201:9
264:15

**search** 12:23

**searched** 12:11,14,
17 13:7 64:15

**seconds** 108:20
110:23 113:24 133:5
146:25 147:8,18,19
148:9,13,19 149:22,
23 150:5,22 151:18,
25 157:18 158:3,8,
15,22,23 176:12,13,
14 178:9 250:17
254:22 279:18

**section** 174:10,12
191:6 192:20,24
194:24 196:12

**sector** 26:6

**send** 46:23 79:11,15
80:14 83:13 253:7
278:19 286:25

**sends** 247:24

**sense** 53:23 98:18
210:19 226:16

**separate** 17:18,19
95:6 282:13,17
284:13

**separately** 89:19
284:7

**September** 18:15
20:3,11,16 21:18
117:20 281:7 285:22

**sergeant** 32:24 33:2
36:23 87:19 97:3
183:9 255:16

**sergeants** 38:22
87:24 90:4 94:19
95:10,12,18 141:19
183:15 212:5,19

**series** 176:11 283:6

**serve** 202:7

**serves** 36:25 83:4,8
99:11 103:12 126:10
128:4 200:14 211:2

**service** 24:17 33:2,4
87:14 88:10 91:21
102:16 142:13
143:17 160:9,11,12
161:17,18 162:5,24
164:18 186:2,5
187:11 207:11 212:2,
21 223:9

**services** 23:21 51:4,
11 91:12,19

**Serving** 33:13

**set** 39:3 212:23
256:23 272:23

**setting** 175:3

**seven-hour** 284:7

**shaded** 264:19 265:7

**shakes** 8:16

**share** 104:13 129:5
144:9 150:20 176:22
187:16 252:18 263:9
273:19 278:19

**shared** 207:15 216:8
224:4

**Sharepoint** 14:3

**sharing** 116:8

**She'll** 286:16

**Shea** 216:20

**sheet** 185:13,19
190:10,11 191:24
192:18 212:4,8 276:7

**shields** 234:9

**shirt** 112:12,18
115:22 131:7 151:19
230:6 231:19 253:23

**shoes** 230:7 231:18

**Shoot** 158:13

**short** 44:24 84:18
104:10 106:9 136:2
150:2 181:3 185:5
259:11

**shoulder** 122:15

**show** 61:24 104:9
107:20 130:8 176:11
184:15 211:4 228:22
252:12 275:22 276:9

**showed** 61:22
118:24 119:20
185:12

**showing** 284:2
285:11

**shown** 11:8

**shows** 201:20 264:8

**side** 19:17 20:10,14
21:16 55:8 66:22
109:4 115:9 142:8
143:6 162:23 241:7
270:21,22 275:12

**sidewalk** 103:13,15,
19 109:25 114:6,13
115:4 130:5,16
147:18 162:23 181:2
240:17 267:3

**sidewalks** 136:21

**Sierra** 285:2

**sign** 22:17 30:21

**signal** 66:14

**signs** 65:20 127:23
144:22 224:16

**simple** 36:17

**simply** 24:7 284:5

**single** 73:16,23 74:6
122:24 123:3 132:8
196:23

**sit** 158:3

**site** 141:22 143:7,10

**sites** 120:25 121:2

**situation** 41:2 48:5
53:20 56:21 59:9
60:3,7 66:4 73:7
90:13,15,18,20 101:9
114:21 154:16
164:12 171:22 201:6
203:7 210:6,12
240:22 247:6,8
248:18

**situations** 53:15
59:17,20 63:15 70:23
74:10

**size** 123:16

**skip** 105:13 199:19
249:25

**skipping** 128:23

**Slip** 159:11 162:9
163:13,21 164:17
167:7 168:16 170:2

**smoking** 101:7,16

**social** 82:25 83:16,
20

**solidified** 42:14

**somebody's** 119:25

**sort** 30:11 44:9 47:6
48:4 63:17 66:11
69:3 97:22 112:15
135:21 142:24
194:14 202:14,20

**sound** 68:7,19
105:10,19,20 106:14,
18 108:15,16 110:18,
22 129:10,13 145:2
148:16 182:2 245:15
252:22 253:14 274:3

**Sounds** 149:22

**source** 200:11

**south** 25:16 35:23
39:17,18 42:9 137:24
176:19 188:20,21,23
189:10 212:13

**Sow** 282:25

**space** 111:6,25

**span** 135:18

**spanned** 138:11

**speak** 11:23 12:6
22:19 30:19 37:20
38:15 39:8,14,15
40:4 90:2 141:10,11
196:19 197:2,15
198:4,6 203:15
244:23 278:15

**speaking** 39:5 113:9
239:3

**special** 31:5 35:24
72:17 79:14 122:20
123:4,14 213:4

**specific** 18:7 21:14
23:16 34:25 40:15
43:8 47:9,24 51:24
52:15,24 76:5,6,7
79:6 80:6 85:16

88:21,22 89:2 120:25
121:21 123:18
124:14 127:3,8
139:7,12 142:14
143:7 195:25 208:4
259:20

**specifically** 23:18
29:23 41:11 52:7,21
54:19 70:12 72:10
75:24 76:25 77:16
85:11 87:8 116:10
139:8,19 166:14
169:20 186:4,7 190:6
199:17 213:5 231:4
235:24 267:16

**specifics** 29:18 71:7,
9

**speech** 43:23

**spell** 15:14

**Spiegel** 284:16,17,
21,25

**split** 125:9 140:18

**splitting** 286:24

**spoke** 29:11 195:25
196:23 205:15
278:12

**spoken** 56:18

**spray** 26:22 55:17
56:2,21,24 57:2,10,
13,22 58:11,12,24
59:14,21 60:2 71:14,
24,25 72:4,9,14,18,
21 74:10,17 102:24
163:20,23,25 164:4,
13 166:12,17 167:5,
7,20 170:10,21 171:6
172:2 246:15,17,18,
19,21 247:3,14
255:4,8,10,19

**sprayed** 57:15,18,22
58:2 74:20 166:24,25
167:5 246:16 247:11,
17

**spreadsheet** 78:16

**spring** 7:25

**squad** 97:7,11 109:9

**Square** 76:18 81:9,
17,18 89:7 95:21,24

98:7,12 108:8,9
120:18 125:2,4
126:7,11 127:10
133:16 134:4 135:23
136:7 137:23 140:4
172:18,20 173:5,10
185:14 277:2,4

**SRG** 13:16 24:12,24
30:7 32:7,15,17,18,
20,22,24 33:7,9,11,
13,21,24 34:19 35:5,
20 36:2 38:18,21
41:11 42:13 46:11
48:10,13,20 49:2,3,
11,12 50:7,9,14 51:3,
9 52:4 54:9,16 58:16,
22 59:3,11 61:9,14,
23,24 73:2 74:7 78:8
79:16 80:14,22 81:4
82:18 83:21 86:7
87:14 89:3 90:2,6
93:9 97:18 103:9
112:22 122:22 123:9,
12,17,18,25 125:7
134:17,25 139:14,18
141:6,9,16 142:4
143:4,18 144:2
159:25 161:6 179:20
182:15 189:7,9,13
193:2 200:6 202:16,
21,23 203:24 205:10
206:13,23 216:8
222:9,11 227:24
228:4,7,18 238:20
239:5 240:9,24
247:14 255:14
259:18,21,25 262:19
275:23 276:8 277:13

**SRG's** 41:8 109:9

**SRGS** 36:19

**staff** 84:9 203:24

**staffing** 207:10

**staged** 221:12

**stamp** 107:20 252:25
273:18

**stamps** 176:24

**standing** 65:22
87:10,15 88:24 114:3
148:15 161:16,17,18
231:20 233:2,9
234:14 241:11

248:12

**stands** 215:8

**stars** 231:23

**start** 48:19 49:11
56:5 87:23 88:6
148:25 158:8,15
165:21,24 181:21
192:4 250:3 254:18
281:24

**started** 15:24 37:12
57:7 60:15 90:7
136:6 165:12 181:18
183:4 203:21 221:16
222:13

**starting** 7:24 127:9
148:7 250:16

**starts** 96:6,7

**state** 7:13 281:21

**stated** 285:14

**statement** 15:19
17:8 216:25

**statements** 20:23

**status** 121:23

**stay** 161:4

**stayed** 240:18

**stays** 161:5

**stead** 94:11

**Steve** 39:16 270:19

**stick** 43:2

**stipulation** 117:24

**stop** 65:9 104:6
108:20 116:7 134:9
145:4 225:8 227:22
233:16 243:22 250:6
257:11

**stopped** 110:13
146:21 158:21 178:9,
15 217:8 226:25
227:3,20 229:9
233:11,13 247:23
254:21 279:11

**stopping** 248:3

**stops** 116:6

**store** 193:5

**straight** 109:17

**strategic** 24:4,15
25:23 27:8 115:22
131:7 134:15,19
135:5 274:5

**street** 21:17 23:14
25:19 26:3,15,20
27:3,4 29:17 47:2
51:23 65:23 88:24
98:6,12 103:13 114:3
126:12,13,14,19
127:2,5 129:23,24
130:7,9,13,14 132:21
144:22,23 147:4,8
148:15,16,23,25
149:22 153:6 154:7
157:10,11,14,21
158:5,24 159:3
160:13 176:6,7,19
179:23 180:4,25
181:5 194:12 197:21
206:5 221:12 223:24
224:3,12,14,19
225:10,13,17,21,24
226:7,14,15,22,23
227:10,12,20 233:11
236:10,15 253:20
261:7

**streets** 103:19 225:8,
9 275:17

**strike** 102:20 103:3
205:24

**strikes** 188:11,14,16
190:8,22

**stripe** 115:14

**structure** 34:19

**struggling** 256:18
257:12,14

**stuff** 69:5 126:6

**subject** 117:20
211:22 264:4

**subjects** 53:5,10,19

**submitted** 122:4,19

**submitting** 17:7
258:13

**subordinate** 23:11
24:12

**substance** 88:7
159:9 200:12

**success** 218:3

**successfully** 61:6,7
217:8

**suggest** 34:11,14
102:10,13 115:3
190:17

**suggested** 21:21

**sum** 88:7 200:12

**summer** 7:25 13:12
24:25 139:4

**superior** 40:18,19
270:13

**superiors** 38:16

**supervise** 94:8

**supervising** 143:17

**supervisor** 59:12
64:13,14,16 65:3
111:17,19 143:20

**supervisors** 38:3,
17,18,20,22 59:7,18
87:18 95:15 141:14,
18 182:21 183:9
185:24 186:9,20
189:17,19 190:7
277:17,25

**supervisory** 59:19

**supposed** 59:11,19
60:24 236:15,22
251:12

**surmising** 198:9

**surprised** 170:5

**surround** 68:19

**sworn** 7:9

**syllabus** 13:17

**System** 192:16

**Sánchez** 255:17

---

**T**

---

**TAC** 28:15 29:10,15,
17 97:4

**tactics** 63:17 75:2,6,
12 76:2 248:10

**takes** 147:13

**taking** 8:8 118:6
224:7 238:4 272:11
273:3 286:22,23

**talk** 25:25 30:5 37:10
208:3 215:9

**talked** 32:13 68:24

**talking** 27:23 28:12
29:4 101:13 142:21
185:23 215:3 219:19
244:12 264:19
274:17

**target** 74:17

**targeted** 74:17

**TARU** 11:10,13 129:8
144:13 199:10
228:25 229:2

**tasked** 214:11

**tasks** 22:17

**taught** 100:23 176:3
188:15

**tax** 45:20,23

**teach** 103:9

**team** 95:6,17,21
96:4,7,11,14 285:23

**teams** 96:9,25

**tech** 44:12,17

**technique** 52:2

**telephonically** 35:6
125:17,20,21,22,23
219:21

**telling** 257:23

**ten** 10:3 118:5 170:4
206:8 249:25 250:16
281:16

**ten-minute** 259:10

**tenets** 56:16

**tensing** 154:20

**term** 15:22 25:6 29:9,
12 67:5,8,11,14 68:3,
12,13,18 215:7,9

276:19

**termed** 263:3

**terminology** 57:17,
18 67:22,23 68:11
276:20

**terms** 95:14

**test** 15:5 33:2

**testified** 7:9 9:20,23
10:24 11:5,9 14:20,
25 17:13 22:8 28:3,
10 54:25 181:25
194:22 229:19

**testify** 11:11 117:19
118:2

**testifying** 156:24

**testimony** 9:12 51:3,
9 53:18 54:4 57:6,9,
13 71:16,20 82:16
91:6 117:10,18 120:8
133:25 140:15
167:14 169:6,9
175:19 197:19
202:13 218:5 220:20
233:14 243:14
251:24

**text** 88:16 125:24
126:2

**texts** 12:15 35:7

**thereof** 27:6

**thing** 25:9 40:8
108:25 109:5

**things** 31:10 37:22
42:5 47:3 78:12
121:24 127:2,5,6
128:16 162:16,20
189:25 190:24 193:9,
12 194:16

**thinking** 27:22
126:16

**thirty-four** 146:5

**Thomas** 22:15 42:24

**thought** 28:16,17
191:4 237:10

**threat-resistant**
171:21

**three-minute** 243:23

Index: Threw..verbally

**Threw** 199:2

**throw** 180:12 224:23

**throwing** 127:2,5,6
161:21,24 162:15,16,
18,20 165:13 168:12,
13 174:13 193:6
194:15 237:25

**thrown** 154:16
155:14 161:19
164:23 231:5 248:2

**throws** 168:3

**thumb** 258:18

**tight** 103:22 168:25

**tightly** 109:20

**time** 16:19 23:8,17,20
24:7,24 25:4,20
27:17,21 40:6,17
57:12 60:20 69:5
70:6 71:10 76:14
77:2 78:4 79:23 83:4,
22 84:3 85:7 87:4
88:16 89:6 96:21
98:5,14 103:24
107:15,20 110:5
114:23 116:17
122:13 125:3,9
127:12 128:7,15,24
132:20 136:20
137:14 138:16,17,19
140:3,7 142:11,15
147:9 148:2,3,22
153:25 159:10
161:20 163:8 166:5
175:11 181:3 183:5,
16 186:6 187:10
194:23 201:14 202:2,
4,6,14 206:21 209:8,
19 213:16,19 219:3,4
220:13 221:8 222:18
223:4,20,22,24
225:17,23 227:19
235:21 236:17
237:17,24 238:2
241:9 245:7,21
250:24 251:3 254:8
256:18 261:22
262:21 270:20
275:16 277:22 281:5,
6,13 282:10,17 283:3
284:10 285:12,20

**times** 9:19 10:2

17:14 22:22 54:23
58:15 60:24 70:24
71:3 80:23 85:16
125:18 142:5 143:9
144:4 154:12,24
155:10,21 160:23
169:22 170:9 172:20
183:11 184:17
188:11 190:9,11,23
231:4 237:2 244:16
267:8

**timesheets** 184:15

**titled** 201:5

**today** 7:23 8:20 9:6
10:16 12:5,6 20:4
43:15 119:17 120:8
158:4 167:15 181:10
188:8 218:5 280:7
281:24 285:21

**told** 59:15 77:13,15
84:2 117:4 119:13,21
140:22 153:10 155:3,
8,19 157:9,14,20
158:4 159:2 165:19
170:19 186:25
195:23 216:21 237:7
244:20 247:16
256:22 269:7,18,19
270:7

**top** 43:6 105:6 107:4
120:21 232:7 277:8

**total** 203:2 212:2,20,
21 213:12 214:3,4

**totality** 112:3 119:14
120:6 132:10 145:17
146:16 157:15

**tour** 38:13

**traffic** 69:24 110:12,
15 114:8 128:6
224:21 266:12,23
267:2

**train** 32:17

**trained** 50:2 56:16
58:16 74:14 109:15

**training** 13:13,15,16,
17 27:2,9 32:15
41:12,15,18,19,22
42:2 46:11,12,14
47:5,9 48:4,7 49:13,
15 52:9,14,20 54:9

55:7,23 56:7 57:4,7
60:11,17 61:2,4,13,
17,25 62:2 63:3,6,8,
9,14,16,17 68:25
74:14,22,25 75:6,8,9,
11 86:10 175:10,12,
13 256:14

**trainings** 46:8,9
75:20,23 76:3

**transcript** 286:11,
15,19

**Transferred** 134:24,
25

**transferring** 33:7

**transmissions** 96:2

**transport** 210:7

**travel** 124:11

**traveling** 223:12
226:10

**treatment** 74:21

**TRI** 122:4 258:13,17,
23

**TRIS** 258:20

**true** 44:10 142:7

**truthful** 9:7

**truthfully** 9:3

**tumultuous** 51:22
53:12 58:4 72:3,19
73:5,9,11,15,21,22
165:15 168:18 174:9
175:25 193:5,16
247:24

**turn** 46:4 60:9 61:8
182:5 191:20 210:20
234:17 279:17

**turned** 181:18
189:20,21 225:9,17
226:7

**turning** 95:5 189:18
225:23 277:23

**turnout** 96:16,17
277:21

**two-day** 281:15
283:11,14 284:14

**type** 33:25 36:8 40:25

47:3 57:6 59:9,12
253:9

**types** 39:14 47:16
48:4 57:2 58:23 59:4
123:19

**typical** 37:12

___

**U**

**ultimately** 30:2
95:23

**unable** 128:7

**underlined** 188:10
190:15 191:5

**underlying** 20:7

**understand** 8:23,25
16:3 17:20 18:13
51:2 54:2 73:22 86:7
94:24 108:21 133:12,
21 139:13 141:15
154:5 156:9 191:8
207:3,4 209:10 238:6
239:5 240:3 249:19
251:13,17 265:19

**understanding**
18:14 34:18 38:13
90:5 96:19 108:22
156:15,19 157:3
170:20 174:6 181:11
188:12 190:14
245:16

**Understood** 8:24
97:15 177:7 253:10

**uniform** 112:25

**Union** 76:18 81:8,18
89:6 95:24 98:7,12
108:8,9 137:23
172:18 173:5,10
185:14

**unique** 210:18,19

**unit** 31:3,6 48:17
77:15 79:8,17,18,21
122:22 200:6

**United** 265:7

**units** 36:21 77:22
79:7 81:4

**unlawful** 47:13 69:8,

20 164:22,25 165:4,
6,12,16,18,21,24
166:2,11 168:5
180:23

**unlink** 66:2

**unpermitted** 127:14,
18

**upcoming** 78:12

**updated** 118:7

**utilize** 46:15 59:25
60:2 71:24 72:8,20
97:9,20 188:16
256:18

**utilized** 37:24 57:3
61:24 62:20 76:11
103:13 231:6 247:3

**utilizing** 62:8 132:18

___

**V**

**vague** 160:18,20

**van** 64:22 97:4
186:22,24,25 215:3

**vantage** 237:12

**variety** 79:7

**vary** 94:17

**vast** 57:19,23 58:2,11
59:21

**vehicle** 89:11 124:13
159:18 162:8 217:20,
24 218:24

**vehicular** 266:25

**verbal** 8:15 28:22
29:4 66:16 88:10,11
146:13,22 147:2
150:11 153:23
155:11,12,13 158:23
163:12 193:22
198:12 219:20
250:17 251:20 262:3,
6 270:12

**verbally** 141:25
142:21 143:14
150:15 152:23
153:10,20 154:8
195:21,23 196:23
241:23 243:15

**versus** 24:24 30:3
59:5,21 67:15 127:17
271:8

**vicinity** 110:13 162:9
221:10,13,20 261:6

**video** 11:8,10,13,14,
18 81:17 89:15 95:25
100:11 102:6 104:10,
22 105:4,11 106:16,
22 107:3 108:13
110:20 113:4,22,25
114:10,25 115:6,7,
11,14 116:4 118:24
119:15,20,23 126:21,
25 127:4,7 128:22
129:8,11,18,20
130:8,10,18,25 131:4
132:11,24 133:2,6,17
134:3,7 135:2,9,18
136:10,25 137:7,25
140:6,10 144:10,13,
14,18,20 145:5,12,
15,20 146:16,19
148:6,8,11,21 149:3,
8,20 150:2,14,18,21,
23,25 152:3,19,22
153:3,8,15 154:16,20
155:12 156:7 157:13,
16,17 158:2,6,9,11,
19 159:5 161:9,13
163:2,6,9,11,15
164:15 165:11,22
166:10,15,22 167:2,
12,17 173:7,8 176:10
177:21,24 178:3,4,7,
17,21,23 179:4,6,8,
13,17 180:14,18
184:2 186:14,16
191:25 193:14 194:3,
4 198:25 199:3,6,7,
10,15 228:3,23,25
229:2,6,12,20,22
230:23 231:15 232:5
234:2,5,11,20,25
235:13 237:15,22
238:18,23 239:20
241:18 242:4,6
243:20,22 246:9
247:21 248:3,13
250:4,13 251:19
252:2,13,19,22,25
253:12,15,17 254:3,
11,19,21 255:5,22
256:5,6 257:3,9,17,
21 258:3,11 259:7

260:6 268:15,20
273:6,13,18,25
274:13,15,23 275:10,
18,22 276:7 278:6,18
279:6,7,9,12,19
280:10,19 284:2
285:11

**videos** 107:20
157:23 176:12,21,24
180:11,13,23 181:6,
10

**view** 83:20 90:24
92:14 135:14 149:16
255:11

**viewpoints** 157:23

**violate** 132:13

**violating** 132:3,7,8

**violation** 46:19 47:3,
25 53:22 99:5 171:9
181:3 224:20 225:7
244:11,18 245:9,10
248:11 249:3,16
266:21

**violational** 171:9

**violations** 69:22
73:4 131:15,22 163:4
241:16 248:7 262:23

**violators** 261:21

**violence** 15:24
73:12,24 74:7 80:9
217:7,10,25

**violent** 26:10 69:8
71:23 72:3,19 193:5

**violently** 74:16 75:16

**visor** 230:10

**voice** 149:5 152:5
255:24 257:23 258:2,
4

**volume** 128:6

**W**

**wagon** 64:13

**walk** 62:19 147:18
267:5 268:25 269:11,
15

**walked** 70:25 138:22
139:2 162:8 240:16

**Walker** 126:14

**walking** 126:18
138:19,21 139:5
150:8,10 157:22
224:11,14,18,24
225:2,4,7,9,13
266:15 268:6,7

**walkway** 268:8

**Wall** 25:19 26:3,15,20
27:3,4 29:17

**wanted** 91:21 109:2
116:12 118:20
185:17 206:19,20
207:7 237:18 282:11

**war** 27:17

**warned** 148:16

**warning** 47:19,21
49:6,22 51:10 52:25
53:14,19 64:10 163:8
166:4 235:19,24
239:14,25 255:7,10

**warnings** 46:23,24
47:17,24 48:5,15
49:11,15,16,18,20,24
50:6,16,25 51:3
52:21 53:3,7,16,17,
21 54:4 64:9 163:12
181:4,6 193:22
220:16,17,18,22,23
237:20 244:15,17
248:19,21 250:18
261:25 267:9,17
268:11

**wash** 28:15 29:2,5,16

**watch** 108:12 113:3
128:21 129:18
130:24 132:25
145:11 146:17
149:19 151:24 158:6
234:3 241:17 242:5
247:20 250:2 273:12

**watched** 130:19
133:4 135:2 136:13
153:14 157:13,18
158:2 180:11,24
181:7 250:15

**watching** 113:3

115:10 134:6,9
181:10 251:19 257:5

**ways** 21:23 87:12

**weapon** 103:10

**wear** 60:24 199:11
230:21 231:8

**wearing** 60:18,21
112:25 131:10 145:9
151:19 187:7,12
230:5,8,24 231:17
232:6,18,20,23

**Wedin** 39:23 204:12
232:4,5,18 234:14

**Wedin's** 232:11

**Wednesday** 10:19
264:6

**week** 30:12 78:17

**weekend** 286:9

**West** 19:17 20:9,14
21:16 98:12

**white** 112:12,18
115:13 126:14
129:24 131:7 187:12
230:6 231:18 253:23

**wife** 11:25

**Willis** 223:23 224:2
226:10,12,21 227:5,
15

**winding** 25:5

**window** 44:9 194:21

**windows** 174:15,24
175:2 193:6 194:13
198:24 217:19

**Winski** 42:21,22

**wishes** 205:22

**withdraw** 137:15

**withdrawn** 27:11
78:7 101:24 142:12
207:2 233:15 260:11
277:12 278:8

**witnessed** 83:25
165:10 196:21,24

**witnesses** 283:10,12

**Wood** 283:21

**word** 73:15 77:9,11
142:18,20 143:14
200:6 205:21,24
258:23

**words** 66:13 79:12

**work** 13:19 37:13,14,
19 94:8 104:20
122:8,12

**workday** 32:6 37:12

**worked** 22:15 79:22

**workers** 236:11
238:11,15 259:16,19

**working** 60:25 259:8

**works** 44:7 93:6
107:17

**World** 27:13

**worn** 231:11

**write** 84:12

**writing** 213:9,11

**written** 50:5 216:11,
13

**wrong** 29:14 57:18

**Y**

**Yates** 176:15 177:3,4

**year** 138:24

**years** 23:2 25:17
31:18 54:18 85:7
86:2

**yelling** 59:6,22 65:18
103:17 142:25
153:12 193:7,15,18

**yesterday** 7:18 9:9,
11 10:24 14:7,12
17:13 19:24 22:9
28:3,10,19 32:14
38:25 41:7 54:25
76:13 80:21 82:22
169:3 256:14

**York** 7:16 9:13 26:9
61:19 76:15,21 77:8
80:12 101:10 143:19,
21 192:15 281:21

| Z |
| --- |

**zone** 72:5 114:16,18 116:14 119:7,8

**Zoom** 17:18 184:8