# EXHIBIT A

This transcript was exported on Jan 25, 2022 - view latest version here.

Speaker 1 (00:00:01):

Welcome to the audio conferencing center. Please enter a conference ID. If you're the meeting organizer, press star now.

Supervising Investigator (00:00:21):

My Jabber's locked and I don't understand why. It's not going through. Are you having luck with your Jabber?

Speaker 1 (00:00:27):

You are now joining the meeting. Please wait for the leader to... You are now joining the meeting.

Supervising Investigator (00:00:44):

Great. Okay. I'm good now. Okay, so I have my 3482 extension and Investigator Finch, are you 7212?

Investigator Finch (00:00:57):

Yeah, that's me.

Supervising Investigator (00:00:59):

All right. Great. Gentlemen. We are now on record. Just so you're aware, I'm going to begin reading the script Investigator Fincher. Is there anything else we need to do on the technical front before I begin?

Investigator Finch (00:01:14):

No. If I could just ask everyone to, with any presentation of any photos or video, if you could just say the name of the case number and the IA number and the file name, that'd be really helpful.

Supervising Investigator (00:01:27):

Okay. Some of these are right now stored locally, is the thing, due to a concern over internet connectivity. Is the file name acceptable?

Investigator Finch (00:01:38):

Whatever you got of those items.

Supervising Investigator (00:01:41):

Okay. I understood. Okay. I will go from here.

Supervising Investigator (00:01:49):

Today is March 5th of 2021 and the time is now 10:08 AM. I am Supervising Investigator Chavez and I am conducting an official investigation into CCRB case number tow, zero, two, zero, zero, six, eight, five, five, on the complaint of multiple individuals who alleged that at approximately 7:50PM on June 4th of 2020 in the vicinity of East 136th Street and Brook Avenue in the Bronx, the following misconduct occurred, by category, we have force, abuse of authority, discourtesy and offensive language. This interview is taking place over Microsoft Teams as a video conference and is being recorded digitally. Chief, could you please state your name, rank and command.

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:02:33):
Chief Terrance Monahan, Chief of the New York City Police Department.

Supervising Investigator (00:02:37):
Thank you. Present acting as your legal representative is?

Counsel for Monahan (00:02:42):
Louis La Pietra. Good morning.

Supervising Investigator (00:02:46):
Good morning. Counsel, is there anybody else present there? I apologize, because my screen is truncating your video a little. Are you? Oh, okay. Just sole council. Okay, and present from the CCRB are?

Speaker 3 (00:03:00):
Supervising investigator Chris Anderson.

Speaker 4 (00:03:03):
And Supervising Investigator Yasmin.

Supervising Investigator (00:03:05):
Thank you both. Chief, you are- [crosstalk 00:03:08].

Speaker 5 (00:03:08):
And Investigator Greg Finch recording.

Supervising Investigator (00:03:09):
Oh, sorry about that. Thank you. Chief, you are being interviewed as a subject in this matter. Do you wish to make any voluntary statements?

Monahan (00:03:18):
No.

Supervising Investigator (00:03:20):
This interview is taking place under the provisions of Patrol Guide Procedure 211-14. Chief, have you read and do you understand that procedure?

Monahan (00:03:26):
Yes, I do.

Supervising Investigator (00:03:28):
Have you also read and do you understand the CCRB policy statement concerning the rights of a New York City police officer being interviewed by the CCRB?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:03:35):

Yes, I do.

Supervising Investigator (00:03:36):

Counsel, do you waive the formal reading of that CCRB policy statement?

Counsel for Monahan (00:03:40):

Chief waives the reading, but not the rights thereunder. Thank you.

Supervising Investigator (00:03:44):

Understood. Chief, have you also read and do you understand Patrol Guide Procedure 203-08? Which states that absent any exceptional circumstances, an officer will be dismissed from the police department for intentionally making a false official statement.

Monahan (00:03:57):

Yes.

Supervising Investigator (00:03:59):

Okay. Then I'm going to direct your attention to June 4th of 2020. Feel free to consult any notes, memos or daily activity records you have regarding these form questions. What hours did you work?

Monahan (00:04:12):

I worked from 0700 to 2200.

Supervising Investigator (00:04:18):

Okay. Forgive me, these questions are obviously intended for folks of the more sort of patrol rank and file. What was either your assignment or main responsibility that day?

Monahan (00:04:30):

Chiefing the New York City Police Department.

Supervising Investigator (00:04:32):

Okay. Understood. Let me ask, was there a specific task, sector, condition, etcetera, that you were working on?

Monahan (00:04:38):

Conditions throughout New York City.

Supervising Investigator (00:04:41):

Okay. Understood. I recognize that you would not have a partner in the conventional sense. Do you have either a staff member, an assistant or somebody else who accompanies, drives, guards you as you go about the business?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:04:52):

Yes. I had three people with me that day.

Supervising Investigator (00:04:56):

Who was that?

Monahan (00:05:01):

Sergeant Domniac, Lieutenant Chris Fitzy and Detective Scott Gleck... and Joe Greer, joined later in the day.

Supervising Investigator (00:05:09):

Okay. We don't need you to go into any great detail. Do those officers collectively have sort of shared responsibilities or do they each specialize in something as part of your team?

Monahan (00:05:21):

Most of them, my advance and drivers.

Supervising Investigator (00:05:24):

Okay. Understood. Were you dressed in uniform?

Monahan (00:05:29):

Uniform.

Supervising Investigator (00:05:30):

Do you have a specific motor vehicle that you use day-to-day?

Monahan (00:05:34):

Car three.

Supervising Investigator (00:05:35):

Okay. Is that marked?

Monahan (00:05:39):

Unmarked. Suburban.

Supervising Investigator (00:05:40):

Unmarked. Could you describe it? The make, model, body type?

Monahan (00:05:43):

A suburban [crosstalk 00:05:45].

Supervising Investigator (00:05:45):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Understood. I recognize, Chief, that you probably do not maintain a memo book in the conventional sense. Do you, as part of your day-to-day responsibilities, have a record keeping system analogous to the ECMS DD5's and administrative equivalent?

Monahan (00:06:01):

No.

Supervising Investigator (00:06:02):

Okay. Did you prepare any documentation regarding the incident we are describing, memos, post-op, debriefing stuff, anything like that?

Monahan (00:06:10):

No.

Supervising Investigator (00:06:10):

Okay. Did you, in your official organized capacity, provide statements or information to other members of the department for them to prepare? Did they ask you for information or did you make statements for arrest documents? That kind of thing?

Monahan (00:06:26):

No.

Supervising Investigator (00:06:29):

Okay. Are you ever equipped with the body-worn camera as the Chief?

Monahan (00:06:33):

No.

Supervising Investigator (00:06:34):

Okay. Have you ever been trained on it or qualified to use one in the first place?

Monahan (00:06:39):

No.

Supervising Investigator (00:06:40):

Okay. Understood. Did you, over the course of this incident, ever inspect or monitor the use of body worn cameras by subordinate staff?

Monahan (00:06:54):

No.

Supervising Investigator (00:06:55):

This transcript was exported on Jan 25, 2022 - view latest version here.

Right. I'm going to run through some questions here just to make sure we don't miss anything that will actually pertain to you.

Supervising Investigator (00:07:10):

Chief [inaudible 00:07:10], did you take yourself any videos or photographs during this incident on any technology, outside of a body worn?

Monahan (00:07:16):

No.

Supervising Investigator (00:07:16):

Department cell phone that kind of thing? Okay. Did you personally direct any officers to make recordings, from the TARU team or other folks? Did you point stuff out that needed to be recorded?

Monahan (00:07:28):

No.

Supervising Investigator (00:07:28):

Okay. I'm going to ask broadly, now we may revisit this issue later, but the CCRB is at shorthand referring to May 25th of 2020 as an important date. The beginning of widespread public demonstrations and protests and civil unrest regarding anti-police sentiment, the George Floyd incident out in the Midwest. As of May 25th 2020, in between then and our incident date here, June 4th, did you yourself participate in any operations, orders or instructions to the Department regarding body-worn camera use? That's a mouthful of a question.

Counsel for Monahan (00:08:11):

I'm going to object to the question. I'm not sure if that question refers to anything within [inaudible 00:08:18] force abuse, discourtesy, or other. I believe that's a policy question. I want my objection noted for the record. I understand that the CCRB is going to be expanding its powers. I'm not sure if that's happened yet. I need to make that objection to the record, clear.

Supervising Investigator (00:08:40):

Counsel your objection is noted and recorded. Let me just for the moment, clarify the reason I'm asking, it is twofold. First, it is essentially the scripted equivalent of what I have been obligated to ask each officer of any rank regarding the protests, broadly associated with this sort of early summer unrest period.

Supervising Investigator (00:08:57):

The other reason that I'm asking it is, the chief himself obviously does not use a body-worn and it doesn't pertain to his physical operation. We are asking officers who may or may not have recorded things, what the instructions were that they received in so far as the chief of department here would've potentially been involved in those instructions, in those orders. We would like to hear it from him to corroborate and make sure we have a clear sense of what officers were operating under during these periods, what their training and instructions were. With your permission, I would like to ask the question

This transcript was exported on Jan 25, 2022 - view latest version here.

and get an answer from the chief, but I hear your objection and to whatever extent you would like to preserve it for further appeal. I have no issue with that.

Counsel for Monahan (00:09:41):

Go ahead and answer the question.

Monahan (00:09:43):

Okay. So no, there was no change issued in any of the policies that were already in place prior to May 25th.

Supervising Investigator (00:09:51):

Okay. I appreciate that, chief. Tessa, Chris, anything about a body worn issue or sort of the form questions that you would like to adapt at this time? I'm just going through the script.

Speaker 7 (00:10:03):

No.

Speaker 8 (00:10:03):

No.

Supervising Investigator (00:10:04):

Okay. In that case, chief, I'm going to direct your attention to the date of June 4th, 2020. I recognize this was an extended incident with some background lead up and ask that you tell me what happened.

Counsel for Monahan (00:10:17):

Well, can we narrow that down? That was a long day. I think the chief testified he worked from oh 0700 to 2200 a week. Can we get a time on what we're talking about?

Supervising Investigator (00:10:28):

I mean, absolutely. As I read into the record before, the main escalation and the bulk of complaints from the civilian perspective started at approximately 7:50 PM, 1950, shortly before eight and the curfew. I guess I was just opening up the question, because in speaking to other more senior staff, they have indicated that material facts began to develop prior to that time. If that is not your understanding as the chief, we can start at 7:50, but...

Counsel for Monahan (00:10:58):

Well, just for the record. So I'm looking at, we talked about case number 6855, and it talks about June 4th, at 7:50 PM. Are we now moving outside of that case number and talking about something else?

Investigator Finch (00:11:13):

No, counsel. What I'm saying is that, and again, I don't mean to be presumptuous, in speaking to other senior staff, they have independently stated to me that their understanding of this incident and their decision making process, as it affected this incident, harkens back to information they learned in actions they took prior, in fact to that date. If again, that is not the case. If there is no material evidence from

This transcript was exported on Jan 25, 2022 - view latest version here.

the chief's perspective prior, but we can start at 6:00 PM, 7:00 PM. I'm not picky. I just asked, because, well, that's what I'm frankly expecting from what I've heard before.

Counsel for Monahan (00:11:49):
I am at a loss to explain in a different way what I'm trying to say here. We have a case number 6855, date of time and occurrence six, four, 2020 at 7:50 PM. To the extent that you want to ask something outside of this document and this case number, we're going to a different case and we need to know that, right? So we can have adequate notice pursuant to your own rule. Now you're talking about things that happened before this. You're talking about things that happened before this, we're going outside of the parameters of this particular case, which we started out discussing. That's my question. Are we going outside of this case?

Supervising Investigator (00:12:31):
No, sir. We are not.

Counsel for Monahan (00:12:33):
So then to make it neat and efficient, why don't we stick to this case and to the extent that we have to get into another case. The chief here to answer questions. You ask him a question, he's going to give you an answer, but to talk about generally what happened on June 4th, that goes outside the four corners of the document. That's not how it works. We've all done enough of these to know that. Why don't we stick to the case at hand and to the extent that we need to move beyond that and we will.

Supervising Investigator (00:13:11):
Okay. Chief, I'm going to ask that you tell me insofar as what happened at approximately 7:50 PM on June 4th in the vicinity of East 136 and Brook in the Bronx. I'm going to ask that you tell me what happened.

Monahan (00:13:26):
I wasn't there.

Supervising Investigator (00:13:30):
Okay. My apologies. You were not present physically for that incident?

Monahan (00:13:37):
I didn't arrive, but let's make the record clear when you set that incident, We are narrowing the incident to the incident involved in case number 6855, Thursday, June 4th at 7:50 PM. So when you say that incident, so that the record is clear, we're talking about the incident-

Speaker 1 (00:13:57):
You've been muted. To unmute yourself, press star six.

Counsel for Monahan (00:14:04):
Apparently, and I'll make it a little easier. He had not arrived yet. Okay.

This transcript was exported on Jan 25, 2022 - view latest version here.

**Supervising Investigator (00:14:09):**

Okay, counsel. I'm not, forgive me, asking you to make anything easier. In fact, that is sort of the opposite of what you're doing right now. In discussing this incident and in putting a pleading sheet together, the CCRB has never, and in this case has not limited the jurisdiction of our questions to the 60 seconds surrounding on average 7:50 PM. That is a time that has been provided to give you guys some sense of what basic police operation we are talking about here. Things happened. Forgive me, if I sound frustrated here, at 7:00 PM, they happened at 9:00 PM by the collected sworn testimony of any number of police officers. This was a lengthy multi-hour incident. By the standards of the CCRB's pleading, the way we interview, the way we provide these sheets, all of that is encompassed in that document.

**Supervising Investigator (00:14:59):**

I'm not talking about a separate case number right now. This is all broadly speaking, the same interview and the same case. I don't mean to sound glib. This is a large scale incident that, to my knowledge, the chief has spoken publicly on. I'm of the understanding that everybody here is on the same page, that we are talking about a mass arrest situation involving hundreds of officers and hundreds of people out, across at a minimum, we're talking about a block long area. To say nothing of the proceeding march and patrol and police operations throughout that neighborhood.

**Counsel for Monahan (00:15:32):**

Let me ask-

**Supervising Investigator (00:15:32):**

The CCRB is going to ask about all of that. That is what we've discussed with other officers up to, and including a supervising assistant chief. Counsel, I believe you were present for some of those interviews.

**Counsel for Monahan (00:15:42):**

Yes.

**Supervising Investigator (00:15:44):**

That's what we're talking about.

**Counsel for Monahan (00:15:46):**

Okay. Let me offer you this. Why don't you ask the chief on June four in the vicinity of 136 street in Brook avenue, what time you got there and why don't we go from there? Would you adopt that question?

**Supervising Investigator (00:15:59):**

I mean, for now that that is one of the many material questions we will need to determine, chief, regarding that date and that location. What time did you arrive on scene?

**Monahan (00:16:08):**

It was approximately 8:15 to 8:30, somewhere in that time frame.

**Supervising Investigator (00:16:15):**

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Let me ask, prior to that, were you aware of what was happening at that location?

Monahan (00:16:22):
I had a radio transmission that the group had been stopped in that area. I started to head over to that area to find out what was going on.

Supervising Investigator (00:16:31):
Okay. Where were you coming from?

Monahan (00:16:34):
I was in the vicinity of the Hub around 149th street.

Supervising Investigator (00:16:38):
Around 149th street. Forgive me. You mean the Hub as conventionally defined in the Bronx? Same neighborhood?

Monahan (00:16:45):
Correct.

Supervising Investigator (00:16:45):
Okay. Let me ask, in the lead up to this incident that you would eventually arrive at by your estimate, approximately 8:15 to 8:30, had you participated in police department planning for an event in this neighborhood?

Monahan (00:17:01):
Yes. I had conversations with Chief Lehr prior to the event.

Supervising Investigator (00:17:07):
Okay. When approximately did those conversations begin?

Monahan (00:17:12):
At approximately 3:00 PM.

Supervising Investigator (00:17:16):
3:00 PM of the same date?

Monahan (00:17:18):
Yes.

Supervising Investigator (00:17:19):
Okay. I'm going to ask specifically on earlier dates in the, I'm going to say the June 1st, second, third lead up, were you aware of any large scale policing issues within the same neighborhood that the department had to respond to?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:17:38):
It was not in the neighborhood of 149th street, starting on June 1st. You had the destruction along Fordham road, fires and looting that took place in the Bronx. In addition to obviously everything else that was going on throughout the city during the course of that week.

Supervising Investigator (00:18:00):
Okay. I'm going to ask this question broadly to start, because frankly I mean, you have a broad responsibility and a broad set of experience within the police department, did those issues that you've just alluded to or described the lead up, both the citywide and the Bronx specific unrest, did those events impact the planning for or response to the incident we're talking about today?

Monahan (00:18:27):
The incidents in the Bronx made an effect to Chief Lehr, incidents that occurred over the course of a day or so that he told me about. The incident of people being grabbed with accelerants on their way to this event, of a gun arrest that was made of an individual on their way to this event. These were all issues that Chief Lehr had explained to me. He also explained the phone calls that he had received from numerous elected officials about this particular event in the fear that it was going to be similar to what had happened on June 1st, within the Bronx. Including the chamber of commerce, which had recovered various materials along the Hub, rocks and stalls and such.

Supervising Investigator (00:19:21):
Okay. And Chief, I just want to clarify from my own sake here, these are all things that AC Lehr told you at approximately 3:00 PM on June 4th, you're saying?

Monahan (00:19:31):
From 3:00 PM up until around seven, as things were occurring, we had ongoing conversations.

Supervising Investigator (00:19:37):
Okay. Multiple conversations across that afternoon and early evening.

Monahan (00:19:41):
Yes.

Supervising Investigator (00:19:42):
Okay. Again, I just want to establish prior to AC Lehr having those conversations with you, had anybody from the department brought to your attention, the planning or intelligence related to what would become this march and protest?

Monahan (00:19:58):
Yes. Intel division had sent out fliers that they had received regarding the call to this event.

Supervising Investigator (00:20:06):
Okay. When did you become aware that Intel was working on that?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:20:12):

Probably, and I'm going to estimate, it was some time that morning, because we were involved the night before on the two offices that were attacked and stabbed and shot. I was working on that the night before, so it was early the next morning that I really started focusing on the events of June 4th.

Supervising Investigator (00:20:30):

Okay. Chief, I don't mean to be glib, that attack that you were referring to, did that become in any way related to the incident we're discussing now or was that a separate location instead of criminal?

Monahan (00:20:39):

That was a separate terrorist attack on two police officers that I had spent most of the night on.

Supervising Investigator (00:20:44):

Okay. Understood. Obviously, sorry to hear that. We just want to be able to disting...that that's a separate issue. What was, as of the beginning of this day, what was the intelligence bureau's understanding of what was going on here?

Monahan (00:21:04):

They had fliers of cars that has been set in flames, Satan that, "come out tonight into the Mott Haven neighborhood." That was given in conjunction with the conversations that Chief Lehr had also throughout the neighborhood. I drove through the Hub specifically, every store that I passed, had signs up, asking, please do not loot. This is a minority owned business. That was posted throughout the neighborhood on all of the stores. These were the things that we were seeing prior to the start of this event.

Supervising Investigator (00:21:45):

Okay. Thank you. This is all very helpful. This sets the stage for us. Chief, let me ask, did the Intel teams have any information about who was involved in organizing or participating in this event?

Monahan (00:22:00):

I believe it was F12.

Supervising Investigator (00:22:04):

Okay. To your understanding, Chief, what does F12 mean?

Monahan (00:22:09):

F the police.

Supervising Investigator (00:22:10):

Oh, sorry. What I mean is, as a group, is that, forgive me, who are they? What type of group are they?

Monahan (00:22:18):

They're a group that had participated in various acts of vandalism on other events that had happened in the city prior to these coming days.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (00:22:31):

Okay. Were you familiar with them as a point of issue for the department?

Monahan (00:22:37):

Yeah, we know about them and we know that in the past there had been numerous acts of vandalism perpetrated by members at one of their process in the past.

Supervising Investigator (00:22:46):

Okay. To your understanding. And again, prior to this incident, did you know who their leaders or organizational heads are?

Monahan (00:22:56):

They did not identify any organizational heads. That was one of the issues that we had sought throughout that there wasn't anyone who really wanted to take lead as being the organizer, that it was a group of people together without a specific leader.

Supervising Investigator (00:23:10):

Okay. Again, prior to this incident, I'm talking about department intelligence and familiarity. Did you guys have an estimated size for F12? How many folks or members they have?

Monahan (00:23:21):

We were uncertain how many were going to show up. In the past they had had hundreds. So going into this event, in light of all that had been occurring, we weren't sure how large an event it would or wouldn't be.

Supervising Investigator (00:23:34):

Okay. Understood. Were there any other groups or affiliations that Intel had identified as potentially involved in the lead up?

Monahan (00:23:43):

There may have been others? I'm not sure though. I don't recall.

Supervising Investigator (00:23:47):

Okay. Understood. Give me a moment, Chief, check over my notes here, trying to go in order with you not bouncing around in the timeline. In the lead up this actual event occurring, did you have any information about the route or locations that these people were going to be working in?

Monahan (00:24:13):

We weren't even sure if they were going to be marching.

Supervising Investigator (00:24:16):

Okay. I just want to be like, did you have any geography at all pinned down? A meeting place, an address, a building?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:24:24):

We know the location would be somewhere on the Hub. I can't say the exact location, but it was near 149 Street.

Supervising Investigator (00:24:29):

Okay. Understood. The department identify any outstanding, like iCards, warrants or other specific investigative document related to this group before things began?

Monahan (00:24:50):

No.

Supervising Investigator (00:24:51):

Okay. Did you guys have any other sort of like, I know for example, the field intelligence office can put a threat advisory, the Intel bureau has similar mechanisms. You guys use wanted posters. Was any of that sort of documentation distributed down the chain of command to folks?

Monahan (00:25:10):

Not that I'm aware of.

Supervising Investigator (00:25:14):

Okay. Did you guys have any intelligence or assessment that at its inception, this event was going to be illegal? That an illegal act, an act of civil disobedience, terror, crime, etcetera, was going to be committed?

Monahan (00:25:27):

Yes. There was belief that there were going to be acts of disobedience, possibly disrupting based on the stuff that I had mentioned before that Chief Lehr had discussed.

Supervising Investigator (00:25:43):

Okay.

Monahan (00:25:43):

The people with the accelerants, the guy coming to the location with the gun, the rocks and stones that were recovered. This led, in his determination, that he was fearful that there could be destruction based on this group.

Supervising Investigator (00:25:55):

Okay. Understood. Let me just ask, and I recognize that you, Chief, would not have in all likelihood been hands on making apprehensions of these individual suspects, to your knowledge, how was it determined that these folks were affiliated or associated with the F12 protest and event?

Monahan (00:26:18):

Which folks?

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (00:26:19):
The folks who were arrested, the Chief described them as having accelerants and a firearm in one case.

Monahan (00:26:26):
The people that were grabbed beforehand, because they said this was the event that they were going to when questioned.

Supervising Investigator (00:26:33):
The suspects or perpetrators made those statements to officers, you're saying?

Monahan (00:26:37):
Yes, they did.

Supervising Investigator (00:26:38):
Okay. Understood. Guys, any questions about the lead up and intelligence?

Speaker 7 (00:26:48):
I'm okay.

Speaker 8 (00:26:49):
Yeah, no. None from me. Thank you.

Supervising Investigator (00:26:52):
Okay. Chief, as you're beginning to get this information from Intel and later from Chief Lehr, who, if anyone, and are you collaborating with at the department level?

Monahan (00:27:09):
Chief Lehr. Chief Lehr was ultimately in charge of this location.

Supervising Investigator (00:27:14):
Okay. From a organizational standpoint, what put Chief Lehr in charge, so to speak, with that? A decision that was made, his standing position, et cetera?

Monahan (00:27:24):
It's his borough. The event was taking place in his borough. So whoever the borough commander is on site, they're the ones that take ownership. They have to live their day in, day out. So this was his responsibility.

Supervising Investigator (00:27:40):
Okay. Understood. In response to the information that the Chief Lehr gave you and everything, what actions or decisions did you take yourself?

Monahan (00:28:00):

This transcript was exported on Jan 25, 2022 - view latest version here.

I told him, we made sure we had enough personnel working. He told me that he was comfortable to amount of personnel that he had there. He said he would be working hand in hand with the legal division on scene and that he would monitor the group. I told him to make any determination that he had in conjunction with legal and it was his cause what happened.

Supervising Investigator (00:28:22):

Okay. I want to clarify a couple things Chief. You're saying that as of this point, as of this conversation, he already had legal bureau personnel with him or in contact with him?

Monahan (00:28:35):

Yes.

Supervising Investigator (00:28:36):

Okay. To your knowledge at the time, how many sworn officers did he have at his disposal?

Monahan (00:28:45):

The exact number, I don't know, but he had lot. It was a substantial number of police officers working.

Supervising Investigator (00:28:50):

I recognize you probably won't know down to the single digit. Do you know that he had a 100, 500 certain number of divisions or commands?

Counsel for Monahan (00:28:57):

He can't testify if he doesn't know.

Supervising Investigator (00:28:59):

Okay. I was just asking for an estimate, council. That's all. Just order a magnitude, if you knew.

Monahan (00:29:02):

There was a lot, I don't want to try and give you a number, because I'd probably be off by a bit.

Supervising Investigator (00:29:08):

Okay.

Monahan (00:29:09):

I think somewhere, so that's something you can get...gotten to you.

Supervising Investigator (00:29:13):

Fair enough. Did he request any specific, additional resources or personnel from you?

Monahan (00:29:18):

No.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (00:29:18):

Okay. Are there any kinds by procedure, any kinds of resources that an assistant chief commanding a borough would need your authorization for? Things like aviation, certain commands, that kind of stuff.

Monahan (00:29:32):

The way this all worked, everything, all requests would go through the operations division. So whatever he needed, he requested for operations prior to the event and had them join. He didn't request any additional information once I was there.

Supervising Investigator (00:29:46):

Okay. In a situation where a supervisor and executive staff would need to go outside the department to other agencies for resources, is that something that in some cases assistant chief Lehr would be able to do on his own or do those requests by definition have to go through you or someone else?

Monahan (00:30:06):

Operations division.

Supervising Investigator (00:30:07):

Okay. In this case, if it's reported, for example, that there were issues with the provision of medical care and things like that, and so the CCRB is going to ask about the presence of EMT's on scene and FDNY, and that kind of thing, did you have any coordination with specifically to start FDNY EMT's or their leadership?

Monahan (00:30:28):

No.

Supervising Investigator (00:30:28):

Okay. It's also been reported that department of corrections, vehicles and personnel were used during transport and apprehension and stuff. Did you have in the lead up or through the incident itself, any coordination with the department of corrections?

Monahan (00:30:44):

No, that is all coordinated for the operations division.

Supervising Investigator (00:30:48):

Okay. When you say, forgive me, the operations division, who would be in charge of that as of this incident date?

Monahan (00:30:55):

Chief Mullane.

Supervising Investigator (00:30:57):

This transcript was exported on Jan 25, 2022 - view latest version here.

Chief Mullane. Did you have any communication with Chief Mullane over the course of this incident that he was, or she, I don't know if you said their gender, that he or she was getting outside resources like that?

Monahan (00:31:10):

[inaudible 00:31:10] when it comes to corrections, corrections buses, we've utilized them in the past and I know specifically what outside resources he was getting for this event. No.

Supervising Investigator (00:31:21):

Okay. Understood. Chief, I'm going to ask a few questions and again, keep in mind, these are sort of bog standard for an event of this type, regardless of rank, don't mean to be we're not trying to ignore the unique position you're in right now. We would ask your sort of tenure within the police depart up to the incident to date, how long you had been a sworn member?

Monahan (00:31:47):

I sworn 1980. So January, 1982. So 38 and a half years by that point.

Supervising Investigator (00:31:53):

Okay. Understood. How much of that time was spent as a Captain or higher?

Monahan (00:32:00):

1992. That's 17 years, 18 years.

Supervising Investigator (00:32:09):

What was your tenure in your current position at the time as the chief of department, as of the incident?

Monahan (00:32:14):

Two and a half years.

Supervising Investigator (00:32:17):

Okay. Over the course of your tenure in the department, just to start yes or no, had you participated in large scale crowd control or protested situations before?

Monahan (00:32:26):

Yes.

Supervising Investigator (00:32:27):

Okay. I'm not going to ask you to run through any or all of them. For folks listening to just get a sense of your training and experience. Were there certain highlights, low lights, large scale events that you would cite as informing your understanding of how these things go?

Monahan (00:32:43):

This transcript was exported on Jan 25, 2022 - view latest version here.

Numerous events starting from Crown Heights to Washington Heights, through the RNC, through the World Economic Forum. Mass events, be it world series, all star games, numerous events throughout my career.

Supervising Investigator (00:33:00):

Okay. Understood. I'm not going to take you back to, forgive me, you said the 1980's there, Chief, but in the, I'm going to say, five years leading up to this event, did you yourself go through any department training regarding crowd control and protests?

Monahan (00:33:21):

No, I don't believe so.

Supervising Investigator (00:33:23):

Had you ever in your tenure served in sort of what we now would describe as a more specialized unit for crowd control? You have things like SRG, the DCU. Did you ever serve or command in a unit like that?

Monahan (00:33:35):

No.

Supervising Investigator (00:33:37):

In your role as Chief, have you gone through any of the specialized trainings that the department offered to SRG or DCU for crowd control?

Monahan (00:33:45):

Back in 2004 I went to some of it.

Supervising Investigator (00:33:48):

Okay, understood. I'm going to ask, in between May 25th, again, sort of this is the start as a rule of thumb for this wave of unrest, in between May 25th of 2020, and the incident date, did the department change any-

PART 1 OF 4 ENDS [00:34:04]

Supervising Investigator (00:34:04):

... 2020 and the incident date, did the department change any procedures or issue any operational orders regarding the policing of protests?

Monahan (00:34:11):

No.

Supervising Investigator (00:34:11):

Okay. Were there any sort of changes to standards, rules, or even just reminders sent out about certain issues in that timeframe?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:34:19):

Not that I recall.

Supervising Investigator (00:34:21):

Understood, thank you. Guys, anything about background training or training protocols?

Speaker 9 (00:34:28):

No.

Monahan (00:34:29):

No. Thank you.

Supervising Investigator (00:34:46):

Okay. Over the course of the evening that you've described, Chief, you said sort of between three and seven, approximately, you were in communication with Chief Lehr. Over that time, are you in communication with him via radio, cell phone, or some other department means?

Monahan (00:35:00):

In person. I knew where he was. I'd drive to where he was and speak to him.

Supervising Investigator (00:35:05):

Okay. And we're not going go into asking you questions about [unintelligible] allegations with other incidents. Were you working on other things in the interim?

Monahan (00:35:16):

Yeah, I was in touch with people throughout the city as to what was going on in locations in Brooklyn, Manhattan. So I was concentrating on what was happening citywide.

Supervising Investigator (00:35:28):

Okay. Understood. And just so we have an understanding of your mindset... Again, we're not going to ask any [unintelligible] questions about that stuff. Were there other incidents and protests going on over this timeframe?

Monahan (00:35:38):

There were small things. Nothing that required too much of my attention as I recall.

Supervising Investigator (00:35:48):

Okay. And over the course of that afternoon and evening, did you physically remain in the Bronx and Mott Haven area, roughly speaking?

Monahan (00:35:57):

Yes.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (00:35:58):

Okay. Understood. And so you were able to have those face to face interactions with Chief Larry, you said.

Monahan (00:36:04):

Yes.

Supervising Investigator (00:36:05):

Did you have consultations either electronically, remotely, or in person with other members of the department about this issue we're talking about now in Mott Haven?

Monahan (00:36:24):

I'm sure I spoke to someone from in town, probably Tommy Galati. I'm sure I reached out to Commissioner Shea. In general, I know I was getting numerous phone calls from the mayor's office, different people from the mayor's office. And I recall exactly who, what, when I was speaking to at that point of the day from three o'clock up until the incident. I don't recall exactly who I was talking to.

Supervising Investigator (00:36:43):

Okay. Understood. Chief, I'm going to ask you a question about chain of command, which again is somewhat unusual here compared to a standard CCRB incident. When either the Mayor's Office or the Commissioner reaches out to you, who do you identify as your immediate supervisor giving you instructions?

Monahan (00:37:05):

At that point, I'm the highest ranking uniform member of the police department. So they're not giving me instructions, they're asking for information.

Supervising Investigator (00:37:12):

Okay. Understood. And I don't mean this sarcastically, folks who are listening to this may not be familiar with the chain of command at this level. If the Commissioner calls you up and gives you a priority or asks for something, are you duty bound to fulfill that? Or do you have autonomy to handle the situation as you see fit?

Monahan (00:37:32):

No, I'd be duty bound. I do report to the police commission.

Supervising Investigator (00:37:32):

Okay. And over the course of this incident, did the police commissioner give you any instructions or orders on what to do and what to get done?

Monahan (00:37:40):

No.

Supervising Investigator (00:37:41):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Just looking at my notes here. Guys, do you have any questions about contact with civilian leadership about this?

Speaker 10 (00:38:02):
I do not. Thank you.

Speaker 9 (00:38:03):
No.

Supervising Investigator (00:38:05):
Okay. Chief, I apologize. You gave me a name there. Tommy... And I don't want to mispronounce his last name. Galati? Galony?

Monahan (00:38:11):
Galati. Chief Galati.

Supervising Investigator (00:38:14):
Chief Galati. Is he the chief of the intel bureau?

Monahan (00:38:18):
Yes, he is.

Supervising Investigator (00:38:18):
Okay. Understood. And what was the last time that you spoke to Chief Lehr, I'm going to say in person, before that 8:15 or 8:30 arrival that you've described at the incident proper?

Speaker 11 (00:38:40):
Can you repeat the question please?

Supervising Investigator (00:38:43):
Yeah. The Chief has indicated that he was going to Chief Lehr's position on multiple occasions. And I was asking for the final one the penultimate one before the Chief responded at 8:15 or 8:30.

Monahan (00:38:58):
I have to estimate time, 6:00, 6:30, somewhere in that range.

Supervising Investigator (00:39:02):
Okay. And I'm asking what was happening at that point?

Monahan (00:39:06):
I believe the last thing I heard from him was the day we're going to start a march soon.

Supervising Investigator (00:39:11):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Did you ever yourself observe on scene the physical origin of this march or unrest?

Monahan (00:39:21):
The meeting place where they first met up?

Supervising Investigator (00:39:23):
Yeah, exactly.

Monahan (00:39:25):
I drove past it. Yeah. But the [inaudible 00:39:27] them taking off in a march.

Supervising Investigator (00:39:29):
What did you observe at that time? A

Monahan (00:39:31):
A lot of people gathered in the area.

Supervising Investigator (00:39:33):
Okay. Did you observe anything that was illegal?

Monahan (00:39:41):
I didn't come that close to it. I just drove by and told people. I didn't observe anything illegal at that point.

Supervising Investigator (00:39:42):
Okay. Understood. How long were you in the area for? Are you literally just moving past.

Monahan (00:39:48):
Driving by.

Supervising Investigator (00:39:49):
Okay. Understood. And in between that point and the 8:30 arrival that you estimated, what did you do?

Monahan (00:40:00):
I drove within the area, second location again. Again, that's when I was looking at all the stores that were boarded up or closed down, drove through Patterson Houses. [inaudible 00:40:11] spoke to some people there at one point. And I was just in the general vicinity in case anything happened.

Supervising Investigator (00:40:18):
Okay. And did anything come up during that time that stuck out to you as being material?

Monahan (00:40:26):

This transcript was exported on Jan 25, 2022 - view latest version here.

The only thing I can say is when I was at Patterson Houses, there was a lot of upset people yelling about groups that walk through there.

Supervising Investigator (00:40:35):

Okay. To your understanding, were those the same groups that would later be involved in this main incident?

Monahan (00:40:41):

I would assume so based on what I know now.

Supervising Investigator (00:40:44):

Okay. And what are those factors that you now... What do you mean by that?

Monahan (00:40:50):

There was a group of younger individuals yelling, "If these people come back here there's going to be trouble."

Supervising Investigator (00:40:56):

Okay. Were there any more specific statements or incitements that you recall?

Monahan (00:41:01):

No, that was it. I rolled down my window. Once they saw the uniform, they stopped talking.

Supervising Investigator (00:41:07):

Okay. Anything else happen in that intervening period between... And again, I'm just using your estimate, 6:30 and 8:15?

Monahan (00:41:16):

No.

Supervising Investigator (00:41:17):

Okay. Chief, let me ask you a couple tech questions. When you are out in your vehicle, do you have access to a patrol level department radio?

Monahan (00:41:29):

Yes.

Supervising Investigator (00:41:30):

And does the department have... I don't know if the term would be parallel or sub-separate radio systems for executive staff?

Monahan (00:41:43):

This transcript was exported on Jan 25, 2022 - view latest version here.

I believe we were on two separate channels, one for the general detail and one for the executives that were running the detail.

Supervising Investigator (00:41:51):
Okay. Understood. And over what you would refer to as the general detail, the rank and file radio, what, if anything, were you able to learn about this incident proceeding?

Monahan (00:42:04):
The radio I was left into I believe was the executive. I could be mistaken if there was the two, but I know it was just that there was the group marching with various locations that they were at.

Supervising Investigator (00:42:15):
Okay. What were those locations?

Monahan (00:42:18):
I don't recall exactly. I know at one point, they hit the bridge to Manhattan.

Supervising Investigator (00:42:25):
Okay. Is that, forgive me, the Willis Avenue Bridge?

Monahan (00:42:36):
I'm not sure which bridge it was, to be honest with you. Somewhere in that vicinity most likely.

Supervising Investigator (00:42:41):
Okay. Before we get too far into the incident itself, I want to ask a few specific questions. First, to your knowledge, was there a staff meeting, a planning meeting at the 40th Precinct Station House in the lead up to this incident?

Monahan (00:43:01):
Yes. That's where I first met with Chief Lehr.

Supervising Investigator (00:43:05):
Okay. And so forgive me, you attended that... Approximately when in the day was that?

Monahan (00:43:13):
He had a staff meeting. I came to the 40 Precinct. He was out there, people were out there, and that's when he briefed me on it. So I wasn't there, I guess, for his original staff meeting that he held. But I had conversations with him at the 40 Precinct.

Supervising Investigator (00:43:28):
Okay. But you did not attend the more formal organized meeting that he held prior?

Monahan (00:43:34):

This transcript was exported on Jan 25, 2022 - view latest version here.

No.

Supervising Investigator (00:43:35):

Okay. Understood. And to the best of your knowledge at that meeting, what resources or commands were organized?

Monahan (00:43:46):

I wasn't at that meeting, his formal meeting, I said.

Supervising Investigator (00:43:49):

Oh, no. I understand, sir. What I mean is did he communicate to you? Did he tell you about it? Did he make some kind of report to you about what he had gotten together at that meeting?

Monahan (00:43:57):

Oh, he told me what his plans were, the personnel that he had out there, how much personnel he had, and that it was going to have to be fluid because it was uncertain as to how many people were going to show or what was going to happen. He explained to me the fears that the community had at that point in time.

Supervising Investigator (00:44:19):

Okay. And this goes to a specific set of allegations here, Chief. So I'm going to ask it, even though it may contradict what you just said. It's been specifically alleged that the department decided to detain and use force against people prior to the incident occurring in a premeditated or pre-planned way. I'm going to ask, were you part of any decision making to apprehend people involved in the lead up to it before it actually started?

Monahan (00:44:46):

Absolutely not.

Supervising Investigator (00:44:48):

Okay. And I'm going to ask specifically, was it ever planned to use force against the protest to compress them and pack them into a certain area prior to the event occurring?

Monahan (00:45:01):

Absolutely not.

Supervising Investigator (00:45:02):

Okay. I'm going to ask a couple of questions. Well, I guess it probably... I guess it will make sense. My understanding is that on this incident date, there was a curfew in effect.

Monahan (00:45:17):

Yes.

Supervising Investigator (00:45:18):

This transcript was exported on Jan 25, 2022 - view latest version here.

What was your understanding of the curfew, its details and protocol?

Monahan (00:45:24):

Eight o'clock curfew, everyone except for essential workers going to and from work.

Supervising Investigator (00:45:33):

Okay. And again, to the department's understanding, who were essential workers?

Monahan (00:45:35):

Essential workers are... They include all federal, state, and city employees. Examples include healthcare workers, police officers, providers of child and senior care, security guards, maintenance workers, and media personnel. Examples of essential businesses are grocery stores, pharmacies, and restaurants. This was an order that my office put out.

Supervising Investigator (00:46:00):

Chief, does that order have a serial number on it or an official title or date to refer to in the record?

Monahan (00:46:07):

6220, issued at 15:53:08. Serial number 37644505.

Supervising Investigator (00:46:19):

I appreciate that. Thank you. And within that order or through other instructions, how were members of the department expected to identify and distinguish essential from non-essential individuals?

Monahan (00:46:37):

We were supposed to use as much discretion as we could. That was the message given to everyone, "Use discretion when enforcing this order."

Supervising Investigator (00:46:47):

Okay. And when you say that was the instruction given, did that come from you and your office? Was that come from some other source?

Monahan (00:46:55):

That came directly from the Mayor's conversations to the Police Commissioner's conversations to my conversations.

Supervising Investigator (00:47:02):

Okay. And I'm going to ask you to define or explain for the record what you mean by discretion in this case?

Monahan (00:47:08):

That the person in charge of any incident monitor incidents, monitor situations on the street, and have that determination whether or not to enforce this order using consultation with legal and after more than enough warnings were given.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (00:47:27):

Okay. And was that discretion presumed to apply then to supervisors in charge of an incident? Or did it extend down to the PO and patrol level of an individual sworn member?

Monahan (00:47:39):

Every incident, we were all supposed to act as a team. So individual officers shouldn't have been taking individual actions to enforce this. It would've been done for supervisory control.

Supervising Investigator (00:47:52):

Okay. Understood. And I don't mean to falsely summarize. What I'm hearing you say is that the highest ranking individual at a given scene or set would be the one exercising that discretion and communicating to their subordinates.

Monahan (00:48:06):

Correct.

Supervising Investigator (00:48:07):

Okay. I understand. Let me take a look here. Chief, I've a question about just from a very basic, rock stupid operational standpoint. I understand the curfew on paper is at 8:00 PM. Did the department determine in any way what the lead up and escalation of enforcement, if there was to be one, would look like in a timeframe?

Monahan (00:48:31):

No, because every incident that was taking place over the course was unique to the scene, that had to be given to the discretion of the people who were monitoring it, who were there. So we did not give any set rules because what happens in Manhattan, in Brooklyn could be different than what happens in the Bronx. What happens in a protest one day could be different than a protest the next day. The information... Everything had to be given to the one person in charge of that incident. We weigh everything going together and have conversations with our legal division and make whatever decisions that they deem appropriate to keep people safe.

Supervising Investigator (00:49:14):

I understand. And so I'm again asking for my own clarity here, it sounds like there was not, for example, a timeline put out or a set of guidelines put out saying, "At 7:30, this should be happening. At 7:45, at 7:50, officers should be looking to take these kinds of steps."

Monahan (00:49:31):

No, not at all.

Supervising Investigator (00:49:35):

Okay. Understood. A series of questions here about medical professionals on scene. If a medical professional was asking or attempting to render aid to an injured protestor, would that, by the department's understanding, have been considered essential work under the curfew order?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:49:52):

Essential work and in conversation with legal, because everything is run through our legal on the scene with these... Is that that essential worker is considered essential traveling to and from work or while at work. So participating in a protest without anything specifically saying that they're an organized group doing it, as per legal, a determination was that they weren't essential workers.

Supervising Investigator (00:50:21):

Okay. And let me try to be more specific in my questioning regarding someone who was not participating in the protest but who was either traveling to or from work or stationed out in the community as a medical worker. If they saw someone being injured and under their professional obligation to render aid began to do so, would that person qualify as an essential worker?

Monahan (00:50:48):

It would have to be a determination on the scene, and the incident, how it came to be... I can't give a general answer. Generally, we have a ESU that can respond within seconds to a scene... Excuse me, EMTs, that can respond within seconds to give the proper aid of a person that we know is truly identified as a first responder. So an injured person, we would immediately call for an EMT to come and to render whatever aid is necessary.

Speaker 11 (00:51:19):

For the record, when you say medical professional, are you talking about someone who is properly identified as such? Or can you define a little more specifically who you're describing to be a medical professional?

Supervising Investigator (00:51:34):

As regards to the allegations, it's folks who identify themselves verbally to officers on scene as possessing some sort of medical degree or rank. A nurse, an EMT, a doctor, someone like that.

Speaker 11 (00:51:50):

So for the record, your understanding of that would include someone who verbally said, "Hey, I'm a medical professional. Hey, I'm a doctor. I'm here to help."?

Supervising Investigator (00:51:57):

Yes. We have allegations and legal questions at this point as an investigation surrounding allegations, again, from the civilian side that folks approached the incident, identified themselves as possessing medical training and saying, "I want to treat these people who appear to have visible injuries or medical conditions."

Speaker 11 (00:52:16):

Thank you for the clarification.

Supervising Investigator (00:52:18):

This transcript was exported on Jan 25, 2022 - view latest version here.

Yeah, of course. I realize it's an atypical thing and it's somewhat complex given the curfew's definition. Guys, any, anything about that, and [inaudible 00:52:30] I open it up to you at this point regarding the legal observer issue.

Speaker 9 (00:52:36):
Sure. I really only have two questions. Are you familiar with legal observers from the National Lawyers Guild?

Monahan (00:52:45):
Yes, I am.

Speaker 9 (00:52:46):
Okay. And to your understanding, were they classified as essential workers?

Monahan (00:52:55):
As far as our legal division, no.

Speaker 9 (00:52:57):
Okay. And were you ever made aware of any conversation that happened between the mayor's office and the National Lawyers Guild classifying legal observers as essential workers?

Monahan (00:53:09):
No.

Speaker 9 (00:53:09):
Okay. And were you aware of a written attestation that legal observers were equipped with during the protests on that date exempting them from the curfew?

Monahan (00:53:23):
No.

Speaker 9 (00:53:24):
Okay. That's all I have right now.

Supervising Investigator (00:53:28):
Okay.

Monahan (00:53:29):
I'll add one thing to that is that I made that determination when I was on the scene in conversation with one of the legal observers to release all the legal observers.

Speaker 9 (00:53:39):
Okay. Can you just tell us more about that?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:53:41):
I had a conversation. He said they were legal observers. I told him anyone who was wearing the legal observers hat as part of the Lawyers Guild that we would have them released. So immediately I spoke to... I think it was a Lieutenant who went out and got all of these legal observers out and released them. There were also, he told me, legal observers there that did not have their hats because they ran out of them. So I allowed him to walk through the group with the Lieutenant and pull out anyone that he said was part of the Legal Guild and remove them from the group.

Speaker 9 (00:54:21):
Okay. Thank you. Do you know which Lieutenant this was?

Monahan (00:54:25):
I don't. I don't recall.

Speaker 9 (00:54:28):
Okay. Do you know around what time this was? Was this post the curfew?

Monahan (00:54:36):
Oh, well post. Probably closer to 9:00.

Speaker 9 (00:54:39):
Okay. And around where did this happen?

Monahan (00:54:45):
On 136th Street, right on... What's that, 136th Street and...

Speaker 9 (00:54:46):
Brook? Or Brown?

Monahan (00:54:46):
Yeah, Brook.

Speaker 9 (00:54:55):
Okay. Sorry, were you going to say something, Matt?

Supervising Investigator (00:54:58):
No. No. Just legally observing here.

Speaker 9 (00:55:02):
I might have more questions later but I'm good for now.

Supervising Investigator (00:55:06):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Guys, is there anything that anyone wants to cover at this point before I move us into, as the Chief has described, to 8:15 arrival to this scene?

Speaker 9 (00:55:23):
I'm okay.

Supervising Investigator (00:55:23):
Okay. Chief, I don't literally mean your Suburban, but what brought you to the incident as of 8:15, 8:30? What triggered your arrival there?

Monahan (00:55:35):
Monitoring the radio, they said they had the group stopped at 136 and Brook.

Supervising Investigator (00:55:42):
Okay. Before you got there, did you have any more information about how that situation came to be? Meaning the units who made that stop, what the situation looked like, et cetera?

Monahan (00:55:53):
No.

Supervising Investigator (00:55:53):
Okay. And did you, prior to your arrival, know why the group either had stopped or had been stopped at that area?

Monahan (00:56:01):
No.

Supervising Investigator (00:56:01):
I'm going to ask for the record, did you issue any directions, orders or make any requests that the group be stopped in that vicinity?

Monahan (00:56:09):
No.

Supervising Investigator (00:56:11):
Okay. And to your knowledge, was there any specific strategic or tactical reasons why that would occur at that area? By which I mean anything in your experience, but also there's a sensitive building there, the way the streets are set up, it's a point of transit, that kind of thing.

Monahan (00:56:29):
No.

Supervising Investigator (00:56:29):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Understood. When you arrived on scene, where did you go within the intersection in the area?

Monahan (00:56:40):
I arrived over at 136 and Brook.

Supervising Investigator (00:56:44):
And my understanding is that it's sort of a T-shaped intersection where on one side of the T you have the beginning of a night in development, and then East 136 moves just perpendicular uphill away from that. Does that match your understanding of the layout?

Monahan (00:57:02):
Yes.

Supervising Investigator (00:57:03):
Within that layout, where did you go? Forgive me. Towards the housing, towards the main crowd?

Monahan (00:57:09):
I pulled off on 136, and I walked towards the middle of the street because that's where all the activity was at that point in time to find out what was going on.

Supervising Investigator (00:57:19):
And what did you see out before you?

Monahan (00:57:23):
We had the bicycle police lined up across 136 with the crowd pushing against them. And I believe arrests were being made behind them at that point.

Supervising Investigator (00:57:37):
And my apologies, when you say behind them, do you mean up 136 in that bulk crowd or behind the officers back in the fence line towards the housing?

Monahan (00:57:46):
Going up the hill by 136.

Supervising Investigator (00:57:48):
Okay. And when you say arrests were being made, did you understand at that point who was being arrested and for what?

Monahan (00:57:55):
At that point, I didn't know.

Supervising Investigator (00:57:59):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Did you have the sense that it was one or two scattered people who were being apprehended or did there appear to be a larger scale enforcement activity going on?

Monahan (00:58:08):
At that point, I didn't know.

Supervising Investigator (00:58:10):
Okay. At this point, had you indicated that anybody should be arrested to your staff?

Monahan (00:58:17):
Yes. One individual.

Supervising Investigator (00:58:20):
Okay. Was that somebody in the large main crowd or in another area?

Monahan (00:58:28):
Across the street in front of the housing development.

Supervising Investigator (00:58:31):
Okay. I ask that you tell me about what you observed and the decision you made.

Monahan (00:58:36):
I observed an individual with a megaphone yelling to the crowd, "Push through the police, push through the police." I went up to this individual, asked them to put the megaphone down. She's inciting the crowd, at which point she used an expletive to me. And I just told the police officer, "All right, take her." Under arrest for using a megaphone, an amplified device, and also it was past curfew hours.

Supervising Investigator (00:59:05):
Okay. I'm going to ask a few questions about this. Can you describe that person to me and their pedigree information?

Monahan (00:59:12):
It was a female.

Supervising Investigator (00:59:14):
Okay. An upon seeing her on scene, did you know who that person was?

Monahan (00:59:22):
No.

Supervising Investigator (00:59:23):
Did you have any familiarity recognition or intelligence about that person?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (00:59:27):

No.

Supervising Investigator (00:59:28):

Okay. And I'm going to ask explicitly, did you know that their name was, and I'm stating for the record, Shannon Jones?

Monahan (00:59:35):

No.

Supervising Investigator (00:59:35):

Are you familiar with that name as of now?

Monahan (00:59:37):

No.

Supervising Investigator (00:59:38):

Okay. And did you know that that person would later self identify publicly and in interviews as a leader or organizer of this protest? At the time, did you know they were a protest leader?

Monahan (00:59:51):

No.

Supervising Investigator (00:59:51):

Okay. You've described that it was past curfew, you said, and that they were using an amplification device. You described them, you used the term inciting. And Chief, I don't want to pretend to be a lawyer or anything. Are you referring to a charge like inciting to riot?

Speaker 11 (01:00:09):

Okay.

Monahan (01:00:10):

It was her on the megaphone, encouraging the crowd to push through the police. I thought was going to be problematic. It was also causing people from the housing development to start to gather. In public safety issue, I felt it best that she be removed and placed under arrest for those violations.

Speaker 11 (01:00:29):

Chief, before you made that decision, did you give her an opportunity to stop what she was doing?

Monahan (01:00:35):

Yes, I did.

Speaker 11 (01:00:37):

This transcript was exported on Jan 25, 2022 - view latest version here.

How did you do that?

Monahan (01:00:38):
I asked her to please stop using the megaphone, and she told me to go F myself.

Supervising Investigator (01:00:44):
And Chief, I apologize, I don't mean to be crude. Did she say, "Go fuck yourself,"?

Monahan (01:00:48):
Yes.

Supervising Investigator (01:00:49):
Okay. Understood. This is a dumb question. How many times did you approach and interact closely with this person?

Monahan (01:01:00):
Once.

Supervising Investigator (01:01:01):
Okay. And so, forgive me, you walk over to her, did she approach you?

Monahan (01:01:05):
I walked over to her.

Supervising Investigator (01:01:07):
And as you walked over to her, I'm going to ask to the best of your recollection to describe what statements you made to her.

Monahan (01:01:14):
Told her, "Please put down the megaphone."

Supervising Investigator (01:01:16):
Okay. And what was her response to that?

Monahan (01:01:19):
"Go fuck yourself."

Supervising Investigator (01:01:21):
Did you guys have any further words back and forth before you indicated she should be arrested?

Monahan (01:01:26):
No.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:01:27):

Okay. In total, how long would you say your interaction with her lasted approximately?

Monahan (01:01:33):

Seconds.

Supervising Investigator (01:01:34):

Okay. At the time that you were interacting with her, I know that previously you described having a set of... Forgive me if it was three or four, sergeants and detectives who travel with you. Is that correct?

Monahan (01:01:49):

That's correct.

Supervising Investigator (01:01:50):

Were they on scene with you at this point?

Monahan (01:01:52):

They were somewhere in the general vicinity.

Supervising Investigator (01:01:55):

Okay. Did you have other offer officers near you and with you as you approached this person?

Monahan (01:02:00):

Yes.

Supervising Investigator (01:02:01):

Who were they?

Monahan (01:02:03):

They were the officers on the scene. Their names, I don't know.

Supervising Investigator (01:02:06):

Okay. Do you know the commands that they belong to?

Monahan (01:02:09):

No.

Supervising Investigator (01:02:10):

Okay. And so let me just ask then, you said you indicated to a police officer that this woman should be arrested. Do you mean that specifically by rank or do you just mean someone who was out there at the time?

Monahan (01:02:23):

This transcript was exported on Jan 25, 2022 - view latest version here.

Someone who was out there. I believe it was a ranking officer. Who? I don't know who it was.

Supervising Investigator (01:02:26):

Okay. Let me ask you-

Monahan (01:02:29):

I walked over to her, other officers walked over there with me.

Supervising Investigator (01:02:31):

Okay. Let me just ask you, was there any specific reason why you directed that subordinate to make this arrest by their training, rank, position, whatever or was it just who was on scene?

Monahan (01:02:41):

It was who was standing next to me.

Supervising Investigator (01:02:43):

Okay. And I'm going to ask, to the best of your recollection what did you tell that person?

Monahan (01:02:48):

"Place her under arrest."

Supervising Investigator (01:02:50):

Okay. And I know you've spoken that you don't have any prior knowledge of this woman. I just want to be clear. Did you have any information indicating that she was likely to resist arrest?

Monahan (01:03:08):

Prior to my interaction with her, no.

Supervising Investigator (01:03:11):

Okay. Based on your interaction with her, did you expect her to resist arrest in your training and experience?

Monahan (01:03:19):

Well, when someone tells me to go fuck myself, I feel that they're probably not going to be extremely compliant.

Supervising Investigator (01:03:26):

Okay. Understood. Let me just take a look real quick here. Once you gave that subordinate officer the instruction to arrest this person, what happened?

Monahan (01:03:46):

I walked away.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:03:48):
Okay. Where did you go?

Monahan (01:03:52):
I went back. I started to work my way to the other side of 136th Street on top of the hill so I could find Chief Lehr to find out what was going on.

Supervising Investigator (01:04:03):
Okay. Let me hold you there for a sec, Chief. I'm going to ask a few questions. Did you observe what happened after you instructed that subordinate to arrest Ms. Jones?

Monahan (01:04:12):
He grabbed her. That's all I saw. I walked away.

Supervising Investigator (01:04:15):
Okay. What did you see of her apprehension?

Monahan (01:04:20):
I just saw him grabbing her and I walked away. Honest, I didn't see it.

Supervising Investigator (01:04:24):
Okay. And-

Monahan (01:04:26):
Then they grabbed her, I walked away from her.

Supervising Investigator (01:04:29):
Okay. Did you give any further instructions or directions regarding her apprehension beyond what you've described?

Monahan (01:04:36):
No.

Supervising Investigator (01:04:38):
Okay. And beyond, as you put it, an officer grabbing her, did you see anyone use further use of force against her?

Monahan (01:04:46):
No.

Supervising Investigator (01:04:47):
Did you see civilians in the immediate vicinity begin to speak, engage in the arrest, interfere with it, do anything like that?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (01:04:56):

There were a lot of people yelling at that point in time. People came down from the development.

Supervising Investigator (01:05:03):

Okay. Did any of them physically attempt to interfere in the arrest that you saw?

Monahan (01:05:08):

Not that I saw.

Supervising Investigator (01:05:09):

Okay. And as of your last awareness of that situation, how many police officers or broadly officers of any rank were around at that point near Ms. Jones?

Monahan (01:05:22):

There were numerous officers around at that point. How many, I couldn't even give you an estimate.

Supervising Investigator (01:05:28):

Okay. Understood. And I'm going to ask for the record again based on specific allegations, did you yourself use any force against Ms. Jones?

Monahan (01:05:37):

No.

Supervising Investigator (01:05:38):

Did you ever make physical contact with her in any capacity?

Monahan (01:05:40):

No.

Supervising Investigator (01:05:42):

Okay. And did you ever tell her that she could be subjected to force through any means, any dialogue?

Monahan (01:05:48):

No.

Supervising Investigator (01:05:49):

Okay. Understood. Guys, any questions about the apprehension of Ms. Jones?

Speaker 9 (01:05:54):

No.

Speaker 10 (01:05:57):

No.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:05:58):
Okay. I'm just going to check in real quick. Investigator Finch, can you hear us okay?

Investigator Finch (01:06:07):
Oh yeah.

Supervising Investigator (01:06:08):
Any signs or signals of issues with the audio recording, just because we're over an hour at this point?

Investigator Finch (01:06:14):
No, [inaudible 01:06:16]-

Supervising Investigator (01:06:21):
Investigator Finch, your audio is not intelligible. You sound like you are underwater or using a Speak & Spell or something.

Speaker 11 (01:06:30):
Investigator Chavez, as you point out, it's been over an hour. We request a break of 10 minutes at this point.

Supervising Investigator (01:06:37):
I was about to actually suggest the same thing, gentlemen. Because of how the audio is set up, if it's okay with you, we're just going to leave it running. If you guys want to either mute yourselves or step out of the room for privacy, feel free. Are you guys okay with coming back at 11: 23?

Speaker 11 (01:07:00):
You sure you don't want to do 11:22 and 10 seconds?

Supervising Investigator (01:07:02):
Only because my computer doesn't have a seconds clock. I can bring up an internet one if that's better, Counsel, it'll go down to any number of digits and milliseconds.

Speaker 11 (01:07:13):
How's 11:25?

Supervising Investigator (01:07:13):
11:25 is great. That sounds great.

Investigator Finch (01:07:15):
You can hear me, okay?

Supervising Investigator (01:07:22):
Yeah. Now you sound crystal clear.

This transcript was exported on Jan 25, 2022 - view latest version here.

Investigator Finch (01:07:24):
Yeah, it was on my headphones.

Speaker 10 (01:07:26):
Yeah, audio is great.

Supervising Investigator (01:07:28):
Okay, great. We are still rolling, for the record.

Investigator Finch (01:07:30):
Sure.

Supervising Investigator (01:07:31):
Still going here. I'm going to step away from the computer, mute myself real quick to get some water. Time is now 11:14. All parties seem to have left the chat. Audio, still recording.

PART 2 OF 4 ENDS [01:08:04]

Supervising Investigator (01:18:55):
[Silence 01:18:55].

Supervising Investigator (01:18:55):
Time is now 11: 25 AM, this is SI Chaves. I am rejoining the call via video and audio, we will wait for other folks to come back. We have an investigator, SI Anderson is back.

Monahan (01:19:05):
Yes.

Speaker 12 (01:19:05):
Okay. Are we back on, can you view it Shannon?

Supervising Investigator (01:19:11):
Yes, audio and video is good. I can see both the chief and counsel. We have investigated SIS, he is back. All the audio recordings seem to be going. Guys, we are on record. Is it okay to pick back up?

Speaker 12 (01:19:24):
Yes.

Monahan (01:19:24):
Yes, please.

Supervising Investigator (01:19:25):

This transcript was exported on Jan 25, 2022 - view latest version here.

Go for it. Okay. Here we go. Chief, when we left off, we were on scene. And you had indicated that you had walked away from the actual literal intersection near the housing development where Ms. Jones was apprehended and you had indicated that you were headed... Forgive me, towards the back of the protest. Is that correct?

Monahan (01:19:47):
Correct.

Supervising Investigator (01:19:49):
I would ask that you tell me about what you observed in that period.

Monahan (01:19:54):
I had to walk around the block. I did not go through the line of police officers. We had to walk up Brook Avenue, whatever that block is there, down on Brown to come around. As I got up there, I looked for Chief Lehr. I had a conversation with Chief Lehr and he explained to me that he made that determination to make the arrest based on what he saw at a bridge and then coming here that he made the determination to lock up everyone that was involved for the curfew violations and for I think some other violence.

Supervising Investigator (01:20:34):
Okay. I just want to be clear, he relayed that to you verbally face to face.

Monahan (01:20:39):
Yes.

Supervising Investigator (01:20:41):
Where were you guys when you had that conversation?

Monahan (01:20:44):
On 136th street.

Supervising Investigator (01:20:46):
Okay. On 136th, but you had gone... You said all the way around the block, meaning on 137th and Willis Ave to come back down 136?

Monahan (01:20:57):
I think it was Brown. I am not sure, but whatever the first block up was, you could not go through a police line.

Supervising Investigator (01:21:07):
Okay. You were now at the rear of the protest though?

Monahan (01:21:10):
Yes.

Mon Pt 2-Def_CCRB_00034802_202004402_Interview_2... (Completed    **Page 43 of 78**
01/25/22)
Transcript by Rev.com

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:21:11):

Or what had been the protest and was now, forgive me, a scene of arrest.

Monahan (01:21:14):

Yes.

Supervising Investigator (01:21:15):

Okay. He communicated those things to you? He cited those factors? I am going to ask, did he cite any other factors in his decision making to make the mass arrest?

Monahan (01:21:27):

He had told me that they were disorderly, that he had been giving them numerous warnings warnings warnings and made the determination after conversation with legal to make the arrest.

Supervising Investigator (01:21:41):

At the time that you were having this conversation, were you near or speaking to anyone from legal?

Monahan (01:21:48):

I do not believe so.

Supervising Investigator (01:21:50):

Okay. To your knowledge, who was on scene from legal during this incident?

Monahan (01:21:54):

Lieutenant. One lieutenant from legal. I forget his name.

Supervising Investigator (01:22:00):

Okay. Did you ever speak to that person yourself?

Monahan (01:22:03):

Yes.

Supervising Investigator (01:22:04):

Okay. When did you do so?

Monahan (01:22:06):

After I walked back around and block to the front.

Supervising Investigator (01:22:09):

Okay. We will get to that in a moment then, try to take it in order. When you were speaking to assistant chief, was anybody else involved in that conversation?

Monahan (01:22:21):

This transcript was exported on Jan 25, 2022 - view latest version here.

I do not believe so.

Supervising Investigator (01:22:22):

Okay. I just want to be clear, one final blanket question. Did he cite any other factors, threats, or priorities that influenced his decision?

Monahan (01:22:33):

Exact conversation, I do not recall exactly, but I do know he made the determination that he was going to make arrests based on his observations and based on his conversations with legal.

Supervising Investigator (01:22:48):

Okay. I want to be clear then chief, you did not order the arrest of these folks yourself?

Monahan (01:22:54):

No, I did not.

Supervising Investigator (01:22:55):

Okay. Your understanding is that, decision was made and the orders were given out prior to your presence on scene?

Monahan (01:23:04):

Yes.

Supervising Investigator (01:23:05):

Okay. Did, in the lead up to this incident, did anybody ever express to you from within the department concerns that there was going to be further disruption, unrest, potential violence in the Hub area? This coming night, the night of June 4th?

Monahan (01:23:31):

Yeah, I covered that before.

Supervising Investigator (01:23:33):

Okay. And so that...

Monahan (01:23:35):

Talk about the accelerants, the guns, all the signs up on the businesses in the Hub, the phone calls that Chief Lehr had discussed with me from the chamber commerce and his local elected's, including the DA's office.

Supervising Investigator (01:23:47):

Understood chief. I bring it back up because what I want to ask at this point is, did AC Lehr communicate to you that he had concerns about department resource allocation and availability at this point?

Monahan (01:24:04):

This transcript was exported on Jan 25, 2022 - view latest version here.

Can you rephrase the question?

Supervising Investigator (01:24:06):

Yeah. I am not trying to be obtuse or anything. Let me ask you. Did the assistant chief communicate to you that he was concerned that he and his officers were going to, if they did not resolve this issue that we are talking about here at 136, that the department would not have enough manpower to patrol and protect the Hub and other areas nearby?

Monahan (01:24:28):

He had beforehand, expressed to me that he had a lot of fear about the Hub being attacked based on everything I just mentioned a couple of times here. He had this fear from well before the incident going into the demonstration, based on all his conversations, based on the guns and accelerants recovered, he had a fear. He expressed that at the start that he was going to be monitoring this event, whether it was a march or not and he had a fear of the Hub.

Supervising Investigator (01:25:00):

I hear you on that loud and clear chief and I just want to be as specific as I can. Did he indicate to you... did he make statements to you that that fear motivated him to make arrests here at 136 to preserve the future freedom and deployment availability of these officers in other areas?

Speaker 12 (01:25:20):

I am going to object to that question. If you are asking the chief to testify as to what motivated another chief.

Supervising Investigator (01:25:27):

I am not asking for...

Speaker 12 (01:25:28):

--mind, I am not going to allow him to answer that question.

Supervising Investigator (01:25:32):

I understand. I recognize that no number of years in the department grants you to telepathy chief, what I am asking is, did AC Lehr make statements to you communicating that idea? Did he say that to you?

Speaker 12 (01:25:43):

Did he say what to him?

Supervising Investigator (01:25:45):

Express the idea. Did he say to the chief that "I needed to resolve this issue. I am concerned that if we do not arrest these folks now and clear these streets, I won't have enough cops for later at the Hub."

Monahan (01:25:59):

No, we did not.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:26:01):

Okay. That is what I am getting at. I want to be clear. Did you, from your position express a sentiment like that, did you say to him, it is important we wrap this up now because we need to redeploy to the Hub or other areas?

Monahan (01:26:15):

No.

Supervising Investigator (01:26:15):

Okay. After you spoke to the assistant chief here, where did you go, what did you do?

Monahan (01:26:27):

I was receiving numerous phone calls from city hall. So I had a walk and had conversations within city hall. I walked back around to the front. There was a group of people from the housing development there. I had conversations with them, explained what happened. They thanked me and left. I then had conversations, I think with Phil Thompson from the mayor's office, who was on scene. I had conversations with him, he was in conversation with the mayor at the time. I explained what I knew at that point. At that point, then I had a conversation with someone from the Civil Liberties Union, the Lawyers Guild, excuse me, about the people that were arrested from the Lawyers Guild and that is when I, you know, I spoke to the lieutenant from legal, who explained to me that under the law, they are not considered essential workers. I told him, I was going to make the determination myself to release all the lawyers that were there. Observed, legal observance.

Supervising Investigator (01:27:44):

Chief, let me hold you there then because there are a few things I do not want to make you go back and repeat yourself. When you indicated that you were receiving calls from the mayor's office, what was the content of those calls?

Monahan (01:27:54):

What is going on? What happens? Basically just explaining what had occurred as I know it at that moment in time.

Supervising Investigator (01:28:06):

Did you have an understanding, again, I recognize you do not read minds of how the mayor's office came to be aware of this incident or what their concerns were? Do you know what prompted those calls?

Monahan (01:28:16):

They did have someone on scene, I believe. I think it was Phil Thompson.

Supervising Investigator (01:28:20):

Okay.

Monahan (01:28:20):

This transcript was exported on Jan 25, 2022 - view latest version here.

They might, he was on scene.

Supervising Investigator (01:28:22):

Okay. Did anyone from the mayor's office either make requests of you or issue instructions based on mayor on authority?

Monahan (01:28:29):

No.

Supervising Investigator (01:28:30):

Okay. Guys, any questions about the communication with the mayor's office?

Speaker 12 (01:28:39):

No.

Supervising Investigator (01:28:40):

Okay. You indicated that you spoke to someone on scene, you said Phil Thompson. I am sorry.

Monahan (01:28:50):

Yeah, I think that is... I may have his name. I am pretty sure that is what his name was.

Supervising Investigator (01:28:55):

Okay. What was Phil Thompson's sort of role in this incident?

Monahan (01:28:57):

He was an observer from the mayor's office, communicating back to the mayor's office whatever he observed.

Supervising Investigator (01:29:02):

Okay. What did you talk to him about?

Monahan (01:29:07):

I just explained that they were making the arrests. He made the decision to make the arrest for the curfew violations and other disorderly violations that he observed, the legally given warnings that he made the call to make the arrest.

Supervising Investigator (01:29:20):

Okay. Again, not to be redundant, but did Mr. Thompson communicate anything to you based on mayor authority requests or instructions as to what to do?

Monahan (01:29:28):

No.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:29:29):

Okay. You indicated that you then spoke to, as you put it, the lieutenant from legal. Investigator ___, I am going to sort of turn things over to you on that regarding the issue of the legal observers. You are on mute.

Speaker 13 (01:29:50):

Sorry I was on mute. I should have asked you before. I am sorry. Do you know who made the decision initially to bring the legal observers into custody?

Monahan (01:30:02):

Lieutenant, Lieutenant from legal made a determination saying that they were not under the law considered essential workers.

Speaker 13 (01:30:09):

Okay. Was it then, I am sorry if I am making you repeat yourself, is it then from legal that informed your understanding that they were not considered essential workers?

Monahan (01:30:24):

Yes.

Speaker 13 (01:30:25):

Okay. To the extent of your knowledge, were the legal observers brought into custody for anything besides the curfew violation?

Monahan (01:30:35):

I do not know.

Speaker 13 (01:30:36):

Okay.

Monahan (01:30:40):

That is all.

Speaker 13 (01:30:41):

Okay. How was your attention brought to the legal observers? I know that you made the decision to cut them loose, but...

Monahan (01:30:47):

It was someone from the legal aid society. It is one of the legal people came up and asked me about it and I made that determination that I would release them.

Speaker 13 (01:31:00):

Okay. Why did you decide to release them?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (01:31:05):

Just a determination. I have been involved in numerous demonstrations in the past. This issue has come up to me in the past with legal observers being arrested. I have always gotten from legal, "You're allowed," but I use my discretion and past experience to say I made the decision to cut them loose.

Speaker 13 (01:31:26):

Okay. You mentioned earlier about their green hats. Is that how you at least initially identified them?

Monahan (01:31:35):

Yes.

Speaker 13 (01:31:36):

Okay. You also mentioned that some of the people were not equipped with those hats and you allowed another legal observer to point out who they were?

Monahan (01:31:46):

Yes.

Speaker 13 (01:31:46):

Okay. To your understanding in the function of legal observers at protests, while they are doing their duties of legal observers, are they allowed to cross police lines?

Monahan (01:32:03):

No.

Speaker 13 (01:32:04):

Okay. Are they allowed to take notes?

Monahan (01:32:09):

Yes.

Speaker 13 (01:32:10):

Okay. Are they allowed also to gather the names of civilians that are detained and arrested?

Monahan (01:32:15):

Yes.

Speaker 13 (01:32:23):

Okay. I am sorry, my audio was cutting out earlier. You may have already said this and I apologize if you did. Did the representative that was there from the mayor's office, give you... Did you talk about legal observers?

Monahan (01:32:37):

This transcript was exported on Jan 25, 2022 - view latest version here.

No. We just talked about in general, what was happening. It was at that point I think one of the legal observers walked up to me, whoever it was and that is when I had a conversation.

Speaker 13 (01:32:44):
Okay. I am good for now.

Supervising Investigator (01:32:57):
Okay. Thank you. Can I ask you something? Chief, up to the point that we have reached in the chronology, are arrests still actively ongoing? Are police apprehending people throughout what you have described so far, these conversations?

Monahan (01:33:09):
Yeah.

Supervising Investigator (01:33:09):
Okay. To your awareness', how long did the arrest go on for?

Monahan (01:33:14):
I am not sure how long it took to get everyone in custody.

Supervising Investigator (01:33:17):
Okay.

Monahan (01:33:20):
I was focusing on different things at that point.

Supervising Investigator (01:33:22):
Okay. Let me ask then, to be clear regarding that statement, did you direct the apprehension efforts?

Monahan (01:33:30):
No.

Supervising Investigator (01:33:32):
Okay. To your knowledge, who was directing them or in charge of that?

Monahan (01:33:36):
That would be chief Lehr.

Supervising Investigator (01:33:38):
Okay. That would have maintained under his authority. How long were you physically on scene for?

Monahan (01:33:45):
I was out of there around 9:30 ish.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:33:48):

Okay. Let me ask, what led to your decision to leave at that point?

Monahan (01:33:57):

I slept three hours in the last 72.

Supervising Investigator (01:34:02):

Pretty good reason for the record. Let me ask specifically chief, at that point, had the incident concluded, stabilized. Did you go home to another incident?

Monahan (01:34:13):

It stabilized. I was going back to headquarters to go to sleep.

Supervising Investigator (01:34:16):

Okay. Understood. I am going to ask some questions over the course of what you did or did not see on scene. Is there anything else guys in the main chronology that you want to cover before I get into some of the specific pled allegations that we will need to cover?

Speaker 13 (01:34:33):

I am okay.

Speaker 12 (01:34:37):

No, thank you.

Supervising Investigator (01:34:38):

Okay. Chief, I am going to run through some stuff here. Things may at times either contradict or seem to butt up against what you have already asked. I am obligated to ask because these now go literally letter for letter to allegations. Give me one moment. Over the course of your time on scene. Did you observe other... Let me ask, did you yourself ever use force against anybody during this incident?

Monahan (01:35:11):

No.

Supervising Investigator (01:35:12):

Okay. Did you observe other officers use force against civilians during this incident?

Monahan (01:35:17):

I did see some pushing and shoving in the crowd when I was in there. I saw some of the arresting taking place, but there were teams in their hands on it. So I did not get involved in it.

Supervising Investigator (01:35:29):

Okay. When you say pushing and shoving, I recognize what those words mean. Did you see physical hand to hand force beyond that? Including take downs, strikes or blows of any kind, that stuff?

This transcript was exported on Jan 25, 2022 - view latest version here.

Monahan (01:35:43):

No.

Supervising Investigator (01:35:43):

Okay. To your awareness through any means, did officers ever deploy pepper spray, OC spray during this incident?

Monahan (01:35:53):

Not to my knowledge.

Supervising Investigator (01:35:54):

Okay. I am going to ask, you did not smell it in the wind, have someone make a report? Anything secondhand like that?

Monahan (01:36:01):

No.

Supervising Investigator (01:36:01):

Okay. Did you ever observe other officers use their night sticks, batons and/or asps, broadly speaking impact weapons against civilians during this incident?

Monahan (01:36:16):

No.

Supervising Investigator (01:36:17):

Okay. Did you see officers with those devices or tools out, ready?

Monahan (01:36:24):

Yeah, I may have.

Supervising Investigator (01:36:25):

Okay. But I want to be clear, you did not yourself observe officers swinging or striking people with them?

Monahan (01:36:31):

No.

Supervising Investigator (01:36:32):

Okay. Were officers on scene to your knowledge equipped with police shields, either ballistic or the lighter plastic broadly called riot shields?

Monahan (01:36:45):

I do not recall seeing them.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:36:48):

Okay. I am going to ask specifically, did you ever observe an officer use a police shield of either type to push or strike somebody?

Monahan (01:36:54):

No.

Supervising Investigator (01:36:55):

Okay. It has been specifically alleged that officers used their bicycles as a weapon or a means of force to push and strike into people. Did you see officers use their bicycles like that?

Monahan (01:37:12):

The officers, what I saw do with their bikes is form a line on 136th street, which is a standing tactical practice.

Supervising Investigator (01:37:19):

Okay. When you say formal line, you mean in a sort of stationary manner. They are just standing there holding them.

Monahan (01:37:25):

Right. But people were pushing against them.

Supervising Investigator (01:37:28):

Civilians were pushing against the bicycles and now I am asking, did you see officers use the bikes, pick them up and pushed them back?

Monahan (01:37:35):

No.

Supervising Investigator (01:37:36):

Okay. Let me ask. Okay. If I could ask you chief, to describe to your observation, did you see civilians do anything to threaten, attack or engage with officers?

Monahan (01:37:59):

I did see, as I stated before, some typical, the arresting tactics, when officers were trying to take people into custody, people trying to push through to the officers. There was a lot of pushing and shoving going on within that group when I walked in, before I left.

Supervising Investigator (01:38:15):

Okay. Did you see civilians use other uses of force?

Monahan (01:38:21):

Not that I observed. I did hear about it afterwards.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:38:24):

Okay. What was reported to you later?

Monahan (01:38:28):

At some point later, something was thrown off of one of the yards into the police officer, some object, exactly what it was.

Supervising Investigator (01:38:36):

Okay. But you yourself did not observe that on scene?

Monahan (01:38:38):

No, I did not observe it.

Supervising Investigator (01:38:40):

While you were on scene, let me ask, did you ever deal with what officers call locally referred to as air mail? Meaning small thrown objects, bottles, fluids, things like that.

Monahan (01:38:50):

At the point I was there, no.

Supervising Investigator (01:38:52):

Okay. Chief, let me ask in your role as a supervisor, indeed, as the chief, did you issue any instructions to anybody about the use of force while you were on scene?

Monahan (01:39:09):

No. I had Chief Lehr. My conversation from him, he had, but it appeared to me is control of the situation.

Supervising Investigator (01:39:18):

Okay. I am going to ask in both the affirmative and the negative, did you ever approve of, or disapprove of, to other folks, any specific uses of force? Say this is or is not allowed?

Monahan (01:39:28):

No.

Supervising Investigator (01:39:29):

Did you ever call for the deployment of any specialized equipment along the lines of disorder control stuff, the larger __ form pepper spray, the use of pepper ball guns, anything like that?

Monahan (01:39:41):

No.

Supervising Investigator (01:39:42):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. To your knowledge, did assistant Chief Lehr or his close subordinates, make any of those decisions in your presence? Did you see assistant Chief Lehr specifically authorize or de-authorize any uses of force?

Monahan (01:39:57):

No.

Supervising Investigator (01:39:58):

Okay. I am going to ask now, only because you brought it up. Broadly speaking, did you believe the assistant Chief Lehr had control of the scene during the time you were there?

Monahan (01:40:09):

Yes.

Supervising Investigator (01:40:10):

Over the course of this incident, to your knowledge, either from observation or after the report, did assistant Chief Lehr ever... was he ever not the commanding officer of the scene?

Monahan (01:40:21):

No.

Supervising Investigator (01:40:22):

Okay. Just to be clear, he did not relinquish that control to somebody else by protocol. He did not have to leave the area, anything like that?

Monahan (01:40:30):

No.

Supervising Investigator (01:40:30):

Okay. Guys, any questions about the alleged uses of force?

Speaker 13 (01:40:36):

No.

Speaker 12 (01:40:39):

No.

Supervising Investigator (01:40:39):

Okay. Do you guys have anything that you want to show or discuss in general before I play some video and ask the chief to comment on?

Speaker 13 (01:40:53):

I don't.

This transcript was exported on Jan 25, 2022 - view latest version here.

Speaker 12 (01:40:55):

No. Thank you.

Supervising Investigator (01:40:55):

Okay. Just give me one moment to run through the notes and questions here. Okay. Did you ever observe civilians who appeared to either be medically unwell or visibly injured?

Monahan (01:41:12):

No.

Supervising Investigator (01:41:12):

Okay. I would include in that folks making complaints of things that you could or could not corroborate, people asking for medical attention or complaining of injuries, physical issues?

Monahan (01:41:26):

No.

Supervising Investigator (01:41:27):

Okay. Did any of your subordinate officers ever report to you that people had been injured or were making complaints of medical needs?

Monahan (01:41:36):

No.

Supervising Investigator (01:41:37):

Okay. Did you have any role in directing the medical response during this incident? Be it from officers with training, EMTs, outside stuff, anything like that?

Monahan (01:41:47):

No.

Supervising Investigator (01:41:48):

Okay.

PART 3 OF 4 ENDS [01:42:04]

Supervising Investigator (01:42:04):

To your knowledge, were any officers injured during this incident?

Terence Monahan (01:42:09):

I believe they were. [crosstalk 01:42:10] important. I don't know what or any observations that I made.

Supervising Investigator (01:42:15):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. When you say you believe there were, can I just ask what that's based on, like a report afterwards?

Terence Monahan (01:42:22):

Yeah. Report afterwards.

Supervising Investigator (01:42:23):

Okay. It was one person, it was a large group, there were folks who were critically injured or went line of duty. Can you comment on that?

Terence Monahan (01:42:32):

I don't recall. It's all [crosstalk 01:42:33] somewhere.

Supervising Investigator (01:42:42):

Okay. My understanding is that folks, upon being apprehended and placed under arrest, had to be transported somewhere. To your understanding, how was that handled?

Terence Monahan (01:42:55):

I don't know. Again I left Chief Lehr in charge of that.

Supervising Investigator (01:42:58):

Okay. So to be clear, you did not play any supervisory role in how people were transported or processed?

Terence Monahan (01:43:05):

No.

Supervising Investigator (01:43:05):

Do you know, as of this date, where prisoners were taken?

Terence Monahan (01:43:11):

No.

Supervising Investigator (01:43:11):

Okay. And did anybody ever communicate to you later on in the evening or the next day any issues about the transport processing and detainment of people?

Terence Monahan (01:43:25):

No.

Supervising Investigator (01:43:25):

Okay. Let me see here. You were on... Well, Chief, let me just ask, are you familiar with the acronym, the LRAD, long range acoustic device?

This transcript was exported on Jan 25, 2022 - view latest version here.

Terence Monahan (01:43:43):

Yes.

Supervising Investigator (01:43:45):

While you were on scene, was the LRAD deployed? Was it used?

Terence Monahan (01:43:49):

I don't recall.

Supervising Investigator (01:43:51):

Okay. Do you have an understanding of how officers communicated to the protestors that they needed to leave the area?

Terence Monahan (01:44:01):

Chief Lehr explained to me that they had been playing the LRAD.

Supervising Investigator (01:44:03):

Okay. That it was used prior to your arrival?

Terence Monahan (01:44:07):

Yes.

Supervising Investigator (01:44:08):

Okay. And did he indicate who gave the order for the LRAD to be played and to be utilized?

Terence Monahan (01:44:17):

I don't recall.

Supervising Investigator (01:44:18):

Okay. Is that something that by protocol would fall under his command of the situation broadly?

Terence Monahan (01:44:24):

Broadly, yes.

Supervising Investigator (01:44:24):

Okay. He doesn't need to go, forgive me, outside to some other element of the department to get that done.

Terence Monahan (01:44:36):

The LRAD is handled by the SRG, so he would have conversation with whoever the SRG commander on the scene was.

Supervising Investigator (01:44:38):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Appreciated. I'm going to bring up some video here, Chief. Some of this will just be helping us establish a timeline and stuff. These videos are stored locally to ensure playback because I've had issues with remote stuff. So rather than reading in the IA numbers, I'm going to attempt to identify them by file name, type, and length. This video is entitled Shannon Jones Arrest Video. It's an MP4. I'm going to open it now. And it is one minute and 57 seconds long. Let me share it with you guys and make sure you can see it okay. Chief and counsel, can you see the opening frame of this video?

Terence Monahan (01:45:29):
Yes.

Supervising Investigator (01:45:30):
Okay. I'm going to play from 00:00. Chief and counsel, I would ask that you just let me play it through up to a point where I pause it and then I will ask for comment. Don't narrate over it, only because it makes the audio really confusing to listen to later. Playing from 00:00.

Audio (01:45:48):
[inaudible 01:45:48].

Supervising Investigator (01:45:55):
I'm pausing that at 10 seconds. Chief and counsel, are you able to hear the video's audio stream?

Terence Monahan (01:46:03):
The audio is very low.

Supervising Investigator (01:46:03):
The audio is very low. Let me see if I can amplify it. I'm going to pull it back to 00:00, just to make sure you guys can hear it. I'm going to play.

Audio (01:46:18):
[inaudible 01:46:18]. Can y'all hear me on the other side?

Supervising Investigator (01:46:27):
Pausing again at 00:9. Is that better, guys?

Counsel (01:46:30):
The audio is a little bit louder. It's barely discernible. It sounds like a woman's voice yelling something and then we can make out the word "outside" or "other side" but...

Supervising Investigator (01:46:44):
Okay. That is also basically what I can hear, with headphones on the local machine. Let me just ask before we go any further, investigators, can you guys hear the audio on the video?

Speaker 14 (01:47:00):
Very low. Similar to what [crosstalk 01:47:01]-

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:47:00):

Very low?

Speaker 14 (01:47:00):

Yeah.

Supervising Investigator (01:47:01):

The same as him. Concerned it is ducking, despite my setting. No, it should be good. It said not to. Well, unfortunately I have it up as loud as the player interface will allow. Guys, I'm going to play it from here and we'll see if the rest of it becomes intelligible. It does get a little clearer in my memory of seeing it. I'm going to play it from 00:9.

Audio (01:47:34):

[inaudible 01:47:34] on the other side.

Audio (01:47:51):

No justice, no peace. [inaudible 01:47:51].

Supervising Investigator (01:47:53):

I'm going to pause that at 00:26. Chief, do you see yourself in the video at this point?

Terence Monahan (01:47:59):

Yes, I do.

Supervising Investigator (01:48:01):

Okay. I'm just going to ask for the record. There's a white male sort of in the center of the frame wearing a white supervisor's shirt and a formal NYPD command cap. Is that you?

Terence Monahan (01:48:12):

Yes.

Supervising Investigator (01:48:13):

Okay. I appreciate that. I'm going to play it from 00... Well actually, let me ask, Chief, have you ever seen this video before?

Terence Monahan (01:48:19):

No.

Supervising Investigator (01:48:20):

Okay. Are the events being depicted here familiar to you, to your recollection?

Terence Monahan (01:48:25):

Yes.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:48:26):

Okay. I'm going to play it forward from 00:26.

Audio (01:48:32):

[inaudible 01:48:32].

Supervising Investigator (01:48:38):

I'm going to pause that at 00:33. The audio becomes a little chaotic. Chief, I'm going to ask, having seen the video, does this corresponds to the portion of your statement where you talked about speaking to Ms. Jones prior to her arrest?

Terence Monahan (01:48:54):

Yes.

Supervising Investigator (01:48:55):

Okay. And were you able to make out any of the audio between yourself and her that plays in the video?

Terence Monahan (01:49:02):

No.

Supervising Investigator (01:49:03):

Okay. I understand. It is quite muted and muffled. Having seen this portion, do you want to clarify anything, point anything out, or otherwise add to your statement about this topic?

Terence Monahan (01:49:15):

No.

Supervising Investigator (01:49:16):

Okay. Understood. Guys, do you have any questions about what I just played, or this video?

Speaker 14 (01:49:25):

No. I mean, if it would be helpful, I can try and play it to see if it's your computer being weird, but [crosstalk 01:49:32]-

Supervising Investigator (01:49:32):

Having listened to it a dozen times prior to this, the audio is just very muffled, of the interaction we're dealing with.

Speaker 14 (01:49:39):

Then no.

Supervising Investigator (01:49:41):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Thanks. Same. Okay. Hold on just one sec, guys, I'm going to... I'm fast forwarding it a little bit, guys. If you would like, I'm more than happy to play the video and its entirety, given that it's only two minutes, but for the purposes of convenience, you can see I'm skipping ahead here to 00:57. I'm going to play it from there, guys, just start.

Audio (01:50:06):
[inaudible 01:50:06].

Supervising Investigator (01:50:06):
Okay. I'm going to pause that at 1:21. Chief, Counsel, were you guys able to see that portion of the video?

Terence Monahan (01:50:38):
We were.

Supervising Investigator (01:50:39):
Okay. Chief, let me ask, do the events being played here, do you have an equivalent or matching recollection of seeing this?

Terence Monahan (01:50:49):
No.

Supervising Investigator (01:50:49):
Okay. So I want to be clear. When you said that you had walked away, in your statement, and did not witness the actual apprehension, you yourself did not see what we're looking at here?

Terence Monahan (01:51:00):
No.

Supervising Investigator (01:51:01):
Okay. [crosstalk 01:51:02]-

Counsel (01:51:01):
The video showed that the chief actually turned around and at that point, his back was turned, and he was walking away from who has now been identified as Jones.

Supervising Investigator (01:51:13):
Understood, Counsel. So noted. I'm going to stop the share on this video. Let me bring up... I'm just trying to find the right moment. Here, guys. Okay. I'm going to share with you a video now entitled Ash Agony PT.5, as in part five. This is a video that was downloaded from a social media account under that name. It's also an MP4 file. It is 1:12 long, minute and 12 seconds long. And I'm going to share it with you guys now. It's coming through okay?

Terence Monahan (01:52:34):

Okay.

Supervising Investigator (01:52:36):
I'm going to play it from 44 seconds, with you guys' permission, and Chief, I'd ask that you keep an eye... I believe you're identifiable here in the command cap. I'll play it for a few seconds.

Audio (01:52:48):
[inaudible 01:52:48].

Supervising Investigator (01:53:00):
Okay. I'm going to pause that at 57 seconds. Chief, can you see yourself in the video?

Terence Monahan (01:53:06):
Yeah. It's paused at 50 seconds, but I see myself.

Supervising Investigator (01:53:09):
Yeah. And there appeared to be, to my count, approximately three other sort of white shirted supervisors, all wearing department issue, like plastic shielded, riot helmets. Chief, who are those people?

Terence Monahan (01:53:25):
I don't know.

Supervising Investigator (01:53:26):
Okay. Are they part of your regular commander assistant staff?

Terence Monahan (01:53:30):
No.

Supervising Investigator (01:53:30):
Do you know the command that they belong to?

Terence Monahan (01:53:34):
No.

Supervising Investigator (01:53:36):
Okay. I'm going to play it from 57... Well, let me ask actually, do you see anyone in the video who you do recognize at this point, from your team or through other means?

Terence Monahan (01:53:48):
I believe the guy standing directly in front of me, John Fogelman.

Supervising Investigator (01:53:51):

This transcript was exported on Jan 25, 2022 - view latest version here.

John Fogelman. Is that the sort of thinner built, a white male in a blue polo shirt?

Terence Monahan (01:53:56):
Yes, I believe that's him.

Supervising Investigator (01:53:58):
Okay. And what is John Fogelman's rank and position within the department?

Terence Monahan (01:54:02):
Detective. He's currently retired.

Supervising Investigator (01:54:05):
Okay.

Audio (01:54:09):
[inaudible 01:54:09].

Supervising Investigator (01:54:14):
Oh, I apologize, I was playing from 00:57. We're now at 1:04. Keeping it going from 1:04.

Audio (01:54:19):
[inaudible 01:54:19].

Supervising Investigator (01:54:22):
I'm going to pause that at 1:07, and I can move it forward by a frame or two, go back. Chief, are you able to recognize any of the folks who you appear to have spoken to at this point?

Terence Monahan (01:54:33):
No.

Supervising Investigator (01:54:34):
And do you know who any of them are by rank or position within the department?

Terence Monahan (01:54:37):
It's a police officer, that's all I can tell by the shoe.

Supervising Investigator (01:54:41):
Okay. Understood. Guys, do you have any questions about this video before I move on?

Speaker 15 (01:54:51):
No.

Supervising Investigator (01:54:52):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Stop sharing-

Speaker 14 (01:54:53):
Matt, can you go back to the 57 or 54?

Supervising Investigator (01:54:58):
Yeah, of course.

Speaker 14 (01:54:59):
[inaudible 01:54:59].

Supervising Investigator (01:55:01):
I apologize guys, it's a little dizzying to see it scroll. I'm going to bring it to 50 and I'm going to play it. Investigator, just let me know when you want me to pause it playing from 50.

Speaker 14 (01:55:11):
I just saw someone in a legal jacket, and I'm wondering if that's the lieutenant, if you know, if that's the lieutenant that you were conferencing with kind of throughout.

Terence Monahan (01:55:21):
I don't recall.

Supervising Investigator (01:55:22):
Oh, so there's... At 55 you can see there's an individual with a NYPD legal over on the left-hand side of the frame. Is that who you're referring to, Investigator?

Speaker 14 (01:55:30):
Yes.

Supervising Investigator (01:55:31):
Yeah. Chief, do you know who that person is?

Terence Monahan (01:55:34):
No, I can't tell by that.

Supervising Investigator (01:55:36):
Okay. Yeah.

Terence Monahan (01:55:39):
[crosstalk 01:55:39] I spoke to him.

Speaker 14 (01:55:42):
Okay.

This transcript was exported on Jan 25, 2022 - view latest version here.

**Supervising Investigator** (01:55:44):

Anything else?

**Speaker 14** (01:55:45):

No.

**Supervising Investigator** (01:55:46):

Okay. I will stop the share on that guy. I have one further video to show and then I think we'll be good to conclude. This video is entitled TARU2, with no spaces, T-A-R-U number two. It was provided from the department from the TARU unit. It's an ADCHD video file. I'm going to open it up. It is 23 minutes and 56 seconds long. I will not play the whole thing, unless you guys have particular desire. And I'm going to move it forward here a little bit. So I'm at 33 seconds. I'll begin the share.

**Supervising Investigator** (01:56:40):

Chief, counsel, can you see the video?

**Terence Monahan** (01:56:43):

Yes.

**Supervising Investigator** (01:56:44):

Great. I'm going to ask, Chief, there are some folks whose faces are pretty clear here, and in some cases you can even see collar brass. Starting with the white male wearing a medical mask and the three star collar brass, do you know who that person is?

**Terence Monahan** (01:56:59):

I believe that's Chief Wedin.

**Supervising Investigator** (01:57:01):

Chief Wedin. What is Chief Wedin's position within the department?

**Terence Monahan** (01:57:05):

Operations.

**Supervising Investigator** (01:57:06):

I'm sorry?

**Terence Monahan** (01:57:07):

Special operations division.

**Supervising Investigator** (01:57:09):

Special operations. My apologies. My understanding is that that's the bureaucratic entity that oversees SRG.

This transcript was exported on Jan 25, 2022 - view latest version here.

**Terence Monahan** (01:57:15):

Yes.

**Supervising Investigator** (01:57:16):

Okay. And then next to him we have an officer holding what I believe is the LRAD. Do you know that officer?

**Terence Monahan** (01:57:23):

No.

**Supervising Investigator** (01:57:25):

There's then a white shirted individual with his arms crossed and a sort of heavier gauge watch on. Who is that person?

**Terence Monahan** (01:57:31):

I believe that's Inspector Dowling.

**Supervising Investigator** (01:57:33):

Inspector Ballon. What is Inspector Ballon's position?

**Terence Monahan** (01:57:35):

Dowling. D. Dowling.

**Supervising Investigator** (01:57:39):

Dowling, D-O.

**Terence Monahan** (01:57:39):

He's the XO of the SRG unit.

**Supervising Investigator** (01:57:42):

Okay. And then there's a white male in a blue, perhaps an SRG uniform, judging by the embroidery, and a tactical helmet. Do you know who that is?

**Terence Monahan** (01:57:54):

No, I'm not sure.

**Supervising Investigator** (01:57:55):

And then there's another white male sort of adjusting or touching his face shield on his helmet, holding a collapsible baton in his other hand. Who is that?

**Terence Monahan** (01:58:04):

Don't know.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (01:58:05):
Okay. I'm going to play this forward from 33 seconds. Just..

Audio (01:58:12):
[inaudible 01:58:12].

Supervising Investigator (01:58:13):
Oh goodness, it's not scrolling. This video format is a little touchy. Hold on.

Audio (01:58:19):
[inaudible 01:58:19].

Supervising Investigator (01:58:19):
Oh, come on.

Audio (01:58:24):
[inaudible 01:58:24].

Supervising Investigator (01:58:24):
No. Maybe.

Audio (01:58:27):
No person or occupied vehicles are permitted in public or on city streets. Thank you for your cooperation. Beginning at 8:00 PM a citywide curfew will be in effect. Other than essential workers, no person or occupied vehicles are permitted in public or on city streets. Thank you for your cooperation. Beginning at 8:00 PM a citywide curfew will be in effect.

Supervising Investigator (01:58:58):
I'm going to pause that at what now reads at 1:27. Chief, were you able to see the video okay?

Terence Monahan (01:59:06):
No. It stayed at 57. Never moved.

Supervising Investigator (01:59:10):
It did not play for you guys. Goodness. Okay.

Speaker 14 (01:59:13):
No, I [crosstalk 01:59:14] the audio.

Supervising Investigator (01:59:15):
Okay. I-

Counsel (01:59:18):

This transcript was exported on Jan 25, 2022 - view latest version here.

[crosstalk 01:59:18] of what apparently sounds like an LRAD, but the frame never moved.

Supervising Investigator (01:59:23):

Okay. I appreciate that. I'm sorry, guys. On my end, it was playing beautifully. Give me one sec and I'll stop the share on it and try to bring it back. My limited technical understanding is that it's the sort of high tech TARU video doesn't cooperate super nice with the VLC player. Let me try and open it with a different program. Well, that's fascinating. Guys, this is playing right now without audio, but in all seriousness, that's okay from my standpoint, for the question that I want to give, I want to just, Chief, play you a short section of this to start. It shouldn't have audio at this point. I apologize. This is the same video being played from a different player, starting at 00:15. Or I'm going to jump it a little bit to 00:27. Can you guys see it?

Terence Monahan (02:00:40):

It's not playing. I see it, but it's not playing.

Counsel (02:00:45):

I can see a still of-

Supervising Investigator (02:00:47):

[crosstalk 02:00:47]-

Counsel (02:00:47):

... first one we saw.

Supervising Investigator (02:00:49):

Okay, great. Yeah. You see the assembled staff and everything. I'm going to play it from 27. Is it moving?

Terence Monahan (02:00:55):

Yeah.

Counsel (02:00:56):

Yeah.

Supervising Investigator (02:00:56):

Okay, great. I apologize. We're back in the age of silent film, but...

Terence Monahan (02:01:02):

Stopped.

Speaker 14 (02:01:03):

Yeah. Now stopped at 31.

Supervising Investigator (02:01:06):

This transcript was exported on Jan 25, 2022 - view latest version here.

Okay. Well, I'm going to have to go yell at someone from TARU to get older, junkier video. I'm going to stop that. Chief, from the sections that I was able to play for you, do you have a recollection of being present at that point?

Terence Monahan (02:01:20):
No.

Supervising Investigator (02:01:22):
Okay. Did you ever assemble in that formation with those executive staff or senior staff as they approached the rear of the protest?

Terence Monahan (02:01:31):
No.

Supervising Investigator (02:01:32):
Okay. I appreciate that. We just wanted to confirm your presence or absence in that portion, because it's been pointed out to us by other folks as being a material moment within the incident. Guys, do you have any other questions or anything?

Speaker 14 (02:01:48):
Do you know who Sergeant Kenneth Rice is, from legal?

Terence Monahan (02:01:57):
No.

Speaker 14 (02:02:24):
Okay. That's all I wanted to ask.

Speaker 15 (02:02:24):
I have nothing, thank you.

Supervising Investigator (02:02:24):
Okay. Give me one moment.

Greg (02:02:25):
[inaudible 02:02:25].

Speaker 14 (02:02:25):
Greg, you're [inaudible 02:02:25] again.

Supervising Investigator (02:02:26):
It's your microphone, Investigator.

This transcript was exported on Jan 25, 2022 - view latest version here.

Greg (02:02:30):

Can you hear me?

Supervising Investigator (02:02:31):

Yes.

Greg (02:02:33):

Matt, if you want me to walk you through your ducking audio settings, I-

Supervising Investigator (02:02:37):

I confirmed that they are set to the appropriate do nothing mode.

Greg (02:02:43):

Okay. Sometimes unchecking it, like getting out of it and then reapplying it, works.

Supervising Investigator (02:02:50):

Okay. I think we're good. There was nothing in the audio from the TARU video that I had particular inquiry about. I just wanted the chief to be able to see that formation and confirm or deny his involvement in it.

Greg (02:03:02):

Sure.

Supervising Investigator (02:03:04):

Guys, I believe we are good to go. I'm going to refer to the script here. Chief, have you told me everything that you remember regarding this incident?

Terence Monahan (02:03:13):

Yes, I have.

Supervising Investigator (02:03:14):

Is there anything else you would like to add you believe is relevant to the CCRB's understanding of what happened that you have not been asked about?

Terence Monahan (02:03:21):

No.

Supervising Investigator (02:03:22):

Okay. In that case, the interview is now concluded and the time is now 12:09 PM.

Counsel (02:03:31):

[crosstalk 02:03:31] I just want to ask the question because I have [crosstalk 02:03:34] here.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (02:03:34):

Absolutely.

Counsel (02:03:36):

So as we started in the beginning, we're talking about the events of June 4th of 2020. I have four different case numbers, and so I want to be sure that this now concludes all of those case numbers. We're talking about from June 4th of 2020, the first allegation sheet starts at 7: 45 and it ends at 10:45 PM, but it seems to be the same incident, the exact same location, and the exact back pattern of events and the allegations surrounding those events. I want to be sure that we're not going to be coming back to revisit any of these other... And I can give you the case numbers if it helps.

Supervising Investigator (02:04:23):

No, Counsel, let me explain to my understanding what's going on, why you're looking at the multiple sheets there. As this incident unfolded, and then in the aftermath, people began to file complaints through various agencies. They reached the CCRB at different times. Some folks filed directly, some folks filed through the department, so on and so forth, and so different case numbers were opened up.

Supervising Investigator (02:04:47):

And as the scale of the incident and the involvement of various officers of different ranks came to be understood by the CCRB, some of those case numbers... I mean, they all covered the same events.

Counsel (02:05:03):

Yes, I agree.

Supervising Investigator (02:05:05):

And so if you would like to, Counsel... I mean, I'm right now basing my conclusion off of the chief's answers, that he was not on scene for certain portions and did not witness uses of force, authorize or involve himself in those uses of force. If there are allegations that you see on those sheets that you believe have not been addressed, and you have a concern that they are open pending, and the chief has not had a chance to make a statement, I would ask that you identify them to me by the case number and name, and I'll check and make sure to see whether the agency has an answer.

Supervising Investigator (02:05:39):

But if the chief had said to me that he participated in the _____ allegations involving those people, that he monitored certain arrests, that he observed certain people that stuck out to him, if those things are true, by all means, we can and must discuss them now. But I'm going off of the chief's answers that that was not reflective of his role in this incident.

Counsel (02:06:00):

Right. In an abundance of caution and in the interests of Chief's time, I'm going to say that I think it's clear in the record that on this day, the chief did not participate in his own use of force, did not employ pepper spray, did not direct the employment of force or pepper spray or ask for a baton. And so I say this generally, because these are varied allegations that come up in all four of these cases, but to the extent that that testimony satisfies all these allegations, we're fine with that.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (02:06:36):

Okay. Let me ask, Counsel, do you see anything listed there that's a separate topic that we have not covered? For example, by _____ category, the use of certain kinds of discourtesies, offensive language, issues of Fourth Amendment things, is there anything that we have not discussed? I mean, the chief was clear in his answering regarding, I think, the use of force, that he did not participate in any physical or authoritative level.

Counsel (02:07:04):

Yeah. I'm just look looking quickly. The only question that was not asked and answered that I can see... Actually, there are two. One is, in case number ending in 4301, allegation 3T, like Tom, the allegation is, "Force Chief Terence Monaghan participated in hitting individuals against bikes." I don't think that specific Q&A was gone into. I'd like to essentially make sure that that issue's closed. Do you want to ask that question?

Supervising Investigator (02:07:47):

My recollection, Counsel, is that I did in fact ask the chief about whether he saw officers pick up and use bikes. Chief, do you have a memory of answering that question, and make sure I'm not hallucinating?

Terence Monahan (02:07:57):

Investigator, that's not the question. The allegation is that he himself participated in the hitting of individuals against bikes [crosstalk 02:08:06]-

Supervising Investigator (02:08:07):

Okay. Well, let me ask then, Chief, did you participate in the use of bikes as a weapon or implement of force?

Terence Monahan (02:08:15):

No, I did not.

Supervising Investigator (02:08:16):

Okay. And then [crosstalk 02:08:18]-

Terence Monahan (02:08:17):

There's one more. 3U, as in union, the allegation states, "Force Chief Terence Monaghan participated in striking individuals with police shields." I believe there was Q&A on police shields, but not whether he himself employed one against anybody.

Supervising Investigator (02:08:34):

Okay. In that case, I'm happy to ask, Chief, were you carrying or equipped with a shield during this incident?

Terence Monahan (02:08:40):

No, I was not.

This transcript was exported on Jan 25. 2022 - view latest version here.

Supervising Investigator (02:08:41):
And did you yourself use a shield acquired through any other means to strike or push a civilian?

Terence Monahan (02:08:47):
No, I did not.

Supervising Investigator (02:08:48):
Okay. Did you [crosstalk 02:08:49]-

Terence Monahan (02:08:50):
I'm sorry, go ahead.

Supervising Investigator (02:08:52):
No, I was going to ask if you directed officers to do so, but...

Terence Monahan (02:08:56):
[crosstalk 02:08:56] an answer, I believe.

Supervising Investigator (02:08:57):
Okay. Understood.

Counsel (02:08:59):
And then finally, in the case ending in 4142, again, same location, same time and place, allegation D, allegation against Force... I'm sorry. Allegation against officer by letter D like David. Abuse of authority. Chief Terence Monaghan detained Natalie Baker and other individuals. I don't believe we discussed anyone named Natalie Baker.

Speaker 14 (02:09:24):
[crosstalk 02:09:24] part of the discussion about legal observers.

Counsel (02:09:28):
Okay. But I don't remember her name being expressly put into the record, but that's fine. If she's part of that, and we're satisfied, we're good to go.

Supervising Investigator (02:09:40):
Chief, let me ask a couple questions that regard the detainment more generally, and I recognize that some of your answers may apply here, but as it's an allegation, I want to cover it, as counsel's pointed out, as thoroughly as we can here. Are you familiar through any means with, in the policing context, use of the term kettling?

Terence Monahan (02:10:00):
No.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (02:10:01):

Okay. Have you heard that term used in the media, at press conferences, to discuss this incident?

Terence Monahan (02:10:07):

Yes.

Supervising Investigator (02:10:08):

Okay. And I'm going to ask, is that a term that the department uses internally?

Terence Monahan (02:10:12):

No.

Supervising Investigator (02:10:14):

Is it a misnomer for an equivalent or similar tactic that the department does use and train?

Terence Monahan (02:10:19):

No.

Supervising Investigator (02:10:20):

Okay. Does the department's disorder control units, and I apologize, because I realize that's a literal assignation, but I mean more broadly, does SRG and crowd control teams, do they train in what might be called a surrounding or encirclement tactic?

Terence Monahan (02:10:38):

Yes, when they're arresting an individual, or individuals.

Supervising Investigator (02:10:43):

Okay. Does SRG, DCU, and similar units train in tactics that deal with the physical surrounding or enclosure of groups of people?

Terence Monahan (02:10:54):

No.

Supervising Investigator (02:10:55):

Okay. And again, because it's been alleged as part of the detainment, it's been alleged that during this incident, the department surrounded and for a measured period of time penned in and compressed all the people there as sort of a collective use of force. Let me ask, does that description match your understanding of any trained tactic or policy within the department?

Terence Monahan (02:11:17):

No.

Supervising Investigator (02:11:18):

This transcript was exported on Jan 25, 2022 - view latest version here.

And did you observe that happen yourself?

Terence Monahan (02:11:22):
I observed them making mass arrests.

Supervising Investigator (02:11:25):
Okay. Did you observe the department, the officers, surrounding people, pushing them in physically with hands and batons, and not apprehending them, just keeping them in a compressed state?

Terence Monahan (02:11:36):
No.

Supervising Investigator (02:11:37):
Okay. And did any officer, including, but not limited to Chief Lehr indicate to you that he had either ordered or witnessed officers doing that?

Terence Monahan (02:11:48):
No.

Supervising Investigator (02:11:49):
Okay. Guys, anything about the kettling allegations as they've been made to the agency?

Speaker 14 (02:12:00):
No.

Speaker 15 (02:12:00):
None. Thank you.

Supervising Investigator (02:12:01):
Okay. Counsel, do you feel like we have covered the matters that have been pled against the chief as of now?

Counsel (02:12:08):
Yes, and I thank you for [crosstalk 02:12:12]... Sorry.

Supervising Investigator (02:12:12):
No, of course it's an atypical situation, and with all the bureaucratic shell game of all the different case numbers, it's good that we check those boxes. Chief, again, I'm going to give you final carte blanche here. Anything that you would like to add to the record before we conclude?

Terence Monahan (02:12:28):
No.

This transcript was exported on Jan 25, 2022 - view latest version here.

Supervising Investigator (02:12:28):

Okay. In that case, the interview is now concluded. The time is 12:18 PM. Is there any reason you guys would want the video call to continue to resolve any sort of statements, questions, off record?

Counsel (02:12:42):

No.

Supervising Investigator (02:12:43):

Okay. In that case, I will say good afternoon. Have a good one. Chief, I'm not officially authorized to make any statement here, but my understanding is you are retiring from the department. So, congratulations. Good luck in the future. Thank you for your time, and we will not see you in the future.

Terence Monahan (02:13:03):

Well, still working for the city, so I'll still be around.

Speaker 14 (02:13:06):

Okay. Thank you.

Terence Monahan (02:13:07):

Thank you very much. Thank you.

Speaker 14 (02:13:08):

Bye-bye.

Supervising Investigator (02:13:10):

Take care, everybody.

Terence Monahan (02:13:10):

Take care.

PART 4 OF 4 ENDS [02:13:23]