STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
CIVIL RIGHTS BUREAU

February 15, 2023

**BY ECF**

Honorable Gabriel W. Gorenstein
United States Magistrate Judge
United Stated District Court, Southern District of New York
Daniel Patrick Moynihan Courthouse, 500 Pearl Street
New York, New York 10007

Re: *In re: New York City Policing During Summer 2020 Demonstrations,*
No. 20-CV-8924 (CM) (GWG)
***This Letter Relates to All Cases***

Dear Judge Gorenstein:

We write on behalf of the non-stayed Plaintiffs in these consolidated cases to oppose Defendants' renewed motion for a protective order limiting the number of remaining depositions. There are 57 remaining fact-witness depositions.[1] Defendants' renewed request for a protective order specifically objects to twenty-two of the remaining fact witnesses and arbitrarily seeks a cap of "15-25" fact-witness depositions total. Dkt. No. 841. Defendants' motion should be denied.

**Background**

On December 7, 2021, over fourteen months ago, this Court ordered the parties to confer about the issue of the total number of depositions[2] and ordered "any dispute about the number" to be presented to the Court "promptly" and "in accordance with paragraph 2.A of the Court's Individual Practices." Dkt. No. 330.[3] Defendants did not then raise any dispute and instead, in January 2022, provided Plaintiffs with a deposition schedule and made several additional agreements to place certain deponents on the schedule. Ex. A, Email from Defendants' counsel

---

[1] In an effort to further narrow depositions, Plaintiffs withdraw Kenneth Corey and Edward Delatorre, in addition to the 31 notices Plaintiffs have already withdrawn. To date, Plaintiffs have conducted a total of 81 fact depositions (including depositions taken over the last week), not 85 as Defendants assert, Dkt. 841 at 4. Fourteen of those were led by attorneys in the *Sierra*, *Wood*, and *Yates* cases. Notably, Plaintiffs have also offered to withdraw additional deponents in exchange for Defendants' admissions to specific RFAs.

[2] This portion of the Court's order was a direct response to Defendants' assertion in their December 6, 2021, letter that, given the 73 depositions Plaintiffs had noticed to date, they expected that "Plaintiffs will not notice any additional depositions." Dkt. 329 at 2.

[3] Defendants had previously mentioned wanting a limit on depositions, *see, e.g.*, Dkt Nos. 199 and 201, but did not follow through on the Court's invitation to follow its rules and make a proper motion.

Honorable Gabriel W. Gorenstein
Page 2

Amy Robinson, dated January 21, 2022; Ex. B February 3, 2022 Email. Defendants agreed at that time to produce many of the deponents they now seek to preclude.

At the March 4, 2022 court conference, the parties discussed deposition scheduling and cancellations of line and high-level officers. There, Defendants failed to raise any issue with the total number of depositions and instead spoke only to the minutiae of the Plaintiffs' scheduling concerns and in relation to the overall discovery deadline. Ex. C (3/4/2022 Tr. at 16:10-21:25).

Issues related to scheduling of high level and 30(b)(6) deponents again came before the Court in July 2022 and the Court held a series of conferences and made orders relating to that scheduling. *See, e.g.*, Dkt. Nos. 667, 678, 679. As Defendants have acknowledged, "the Court's July 2022 Order accounted for 132 deponents." Dkt No. 796, Defendants' 12/23/22 Motion for a Protective Order (citing Dkt No. 679). Yet, Defendants did not oppose the overall number of depositions in the telephonic conferences leading up to the Court's deposition-pacing schedule order (Dkt No. 679). To the contrary, Defendants' counsel Amy Robinson explained at that conference, "we are doing our best to make the schedule happen and … we've been planning to respond to [plaintiffs' proposed] schedule." Ex. D (7/11/2022 Tr. at 68:5-14). In a subsequent July 21 letter, Defendants stated that they "have been working to schedule the noticed deponents' depositions" and cited the court-ordered deponent contact list that they had provided to Plaintiffs earlier that week. *See* Dkt. Nos. 678 at 3, 667-2.

Almost two years into this litigation and over a year after depositions began, Defendants seek to limit the total number of depositions and dispute previously-scheduled deponents.

I. **Defendants' Arbitrary Cap Must Be Rejected**

   a. **Defendants Have Waived and Should be Estopped from Asserting an Arbitrary Cap on the Number of Depositions**

As a matter of fairness, this Court should reject Defendants' attempt to impose an arbitrary numerical limit on the number of depositions. Plaintiffs have substantially relied on Defendants' good faith agreements and representations to the Court on scheduling to make discovery decisions throughout this case. Imposing an arbitrary limit on the number of depositions after Defendants have had complete control over which deponents were scheduled would cede control over Plaintiffs' deposition strategy to Defendants and significantly prejudice Plaintiffs.

Defendants knew of most of the remaining fact witnesses as early as June 2021, when they were noticed, and were aware of the number of depositions days and most of the deponents at issue as of at least July 2022. *See* Dkt. No. 679. But Defendants did not lodge any objection at a reasonable time after the Court issued its order. *See Alli v. Steward-Bowden*, No. 11-CV-4952, 2013 WL 6053481, at *2 (S.D.N.Y. Nov. 7, 2013) (citing Rule 72(a) ("when a party objects to a magistrate judge's order on a non-dispositive matter, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law"). Instead, Defendants expressly committed to scheduling only line-level officers before it would move on to higher-level depositions, ignoring Plaintiffs' expressed priorities that would have intermixed high- and line-level witnesses. *See, e.g.,* Dkt. No. 667. Defendants failed

even to confer with Plaintiffs about just how many depositions they would object to, setting forth this proposed arbitrary cap for this first time in their letter motion.[4]

Plaintiffs have relied on Defendants' representations regarding depositions—as well as the Court's orders, which Defendants did not challenge—in making myriad strategic decisions at every stage of this litigation. Principles of fairness and equity require that Defendants live with their decisions to not address this years ago at the Court's invitation to do so "promptly," Dkt. No. 330, or to challenge any of the Court's deposition scheduling orders. Defendants' failure to timely raise these objections should preclude their late-hour plea to avoid high-level depositions.

### b. Defendants Fail to Establish Good Cause for an Arbitrary Cap

Even if their calculated delay does not estop the cap request, Defendants fail to justify the cap under Rule 26(c). "An order precluding the deposition of a witness is of course the exception rather than the rule in federal court, and in order to obtain such relief, the party resisting discovery must show 'good cause.'" *Martin v. Valley Nat'l Bank of Arizona,* 140 F.R.D. 291, 314 (S.D.N.Y. 1991) (citations omitted); *see also Rekor Sys., Inc. v. Loughlin*, No. 19-CV-7767, 2022 WL 488941, at *1 (S.D.N.Y. Feb. 17, 2022) ("entirely prohibiting the taking of an oral deposition is very unusual"). "To establish good cause under Rule 26(c), courts require a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Ampong v. Costco Wholesale Corp.*, 550 F. Supp. 3d 136, 139 (S.D.N.Y. 2021) (cleaned up). The Court in fact instructed Defendants to be specific, "so that the Court understands whose depositions would *not* be taken under the numerical limitation proposed by defendants and the subject areas of those depositions." Dkt. No. 801. Defendants did not follow that instruction. By specifically objecting to only 22 witnesses, yet simultaneously asking the Court to limit all future fact-witness depositions to "15-25," Defendants obscure the fact that they are seeking to strike an additional 35 witnesses without providing written justification for each of those objections.[5] Because Defendants have not lodged specific objections as to 35 witnesses, they have failed to satisfy their burden of showing "good cause," and their protective order motion may not be considered to encompass those depositions. *Ampong*, 550 F. Supp. 3d at 139.

Further, Defendants' protective order motion should be denied as the need for additional depositions is consistent with Rule 26(b)(2) and the scope of the relief sought. *Brown v. Astoria Fed. Sav. & Loan Ass'n*, 444 F. App'x 504, 505 (2d Cir. 2011). Here, consideration of the needs of the case, the amount in controversy, the injunctive relief requested, the insufficiency of the other

---

[4] This failure to confer alone is a basis to deny Defendants' first request. (*See* Ex. E (1/27/2023 Tr. at 35:23-36:6); *see also* Dkt. No. 841 n.1, acknowledging that the parties did not confer again on this issue after the January 27 conference). Plaintiffs also note that Defendants have waived any objections to the 30(b)(6) topics and witnesses, having failed to move on any objections by February 8. *See* Ex. E (1/27/2023 Tr. at 40:5-41:8) (setting February 8 as the deadline for 30(b)(6)-related objections).

[5] Defendants' numerical limitation would also improperly preempt Plaintiffs' ability to notice additional fact witnesses where it may be necessary, for example, in the context of Jane/John Doe Defendants. To take one example, the *Gray* lawsuit involves five journalist plaintiffs, six incidents, and fourteen defendant officers personally involved in those incidents, including one John Doe defendant who was only recently identified by Defendants. At a February 7, 2023, meet and confer, Defendants' lawyer acknowledged the "good point" made by *Gray* counsel: that it would be inequitable for Defendants to take the position that the *Gray* plaintiffs should be limited to deposing only 10 of their named defendants and no other fact witnesses or defendants, an issue also raised by *Rolon* counsel.

methods of obtaining the information, the importance of the issues to the litigation, and the importance of this particular discovery tool in resolving the issues, all weigh in favor of Plaintiffs' need for additional depositions beyond the presumptive limit. *Commodity Futures Trading Comm'n*, No. 05-CV-5741, 2005 WL 3030816, at *1 (S.D.N.Y. Nov. 10, 2005).

The litigation needs of these consolidated cases are significant as they present a broad challenge to the police response to many of the 84 protests that took place over 8 months across the largest city in the United States. *See, e.g., RxUSA Wholesale, Inc. v. McKesson Corp.*, No. 06-CV-4343, 2007 WL 1827335, at *1 (E.D.N.Y. June 25, 2007) (granting additional depositions beyond the presumptive limit in a $50 million liability case against the largest global pharmaceuticals distributor). Indeed, the number of depositions in this case is rather modest when compared to similar litigation, like the hundreds of depositions taken in the Republican National Convention consolidated protest litigation, which concerned only seven days of protest.

Beyond this, Plaintiffs' deposition needs for their *Monell* claims are also significant. Defendants have had complete control over which deponents to present and when, based upon the notion that all deponents noticed would be produced. As such, to date, Plaintiffs have deposed only two high-level NYPD deponents whose testimony was especially relevant to Plaintiffs' *Monell* claims. Given that the remainder of noticed fact-witnesses are largely high-level deponents, depositions will surely be an invaluable tool in resolving the issues. Finally, because Defendants have stonewalled responses to interrogatories, depositions have been particularly useful for Plaintiffs' ability to identify Jane/John Doe Defendants, many of which remain unidentified. In short, Defendants cannot establish that these necessary depositions exact an "annoyance, embarrassment, oppression, or undue burden or expense" that would justify a protective order.

## II. **Defendants' Objections to Specific Deponents Fail**

### a. **Mayoral and Commissioner Deponents Have Unique Personal Knowledge Other Witnesses Lack**

Defendants seek to shield the current and former City mayors and police commissioners from depositions but fail to disclose their extensive personal involvement with issues key to these cases. Although depositions of high-ranking government officials are given special scrutiny, that "limitation is not absolute." *Presti v. City of New York*, No. 21-CV-3811, 2022 WL 2442824, at *2 (E.D.N.Y. July 5, 2022) (citing *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007)). The qualified protection aims to ensure that those officials do not "spend 'an inordinate amount of time tending to pending litigation'" about which they have no "unique first-hand knowledge" and thus "interfere with the official's government duties." *Moriah v. Bank of China Ltd.*, 72 F. Supp. 3d 437, 440 (S.D.N.Y. 2014).

The noticed officials here have the necessary "unique first-hand" knowledge of the contemporaneous protest operations or the subsequent reforms and discipline authorized by the City of New York. The former Mayor—and defendant—de Blasio and former Commissioner Shea were extensively involved in the daily direction and assessment of the NYPD's response to the Protests. *See* Dkt. 21-cv-322, Doc. No. 51 ¶¶ 98–103, 387. Defendants make no mention of the contemporaneous press conferences that the former officials held during which they noted their

personal calls to the then Chief of Department and critiqued and praised certain conduct relating to high-profile incidents of alleged force and unlawful arrests. This information is not available from other witnesses. For instance, as First Deputy Commissioner Benjamin Tucker testified, Mayor de Blasio sought regular briefings on the protests with the Commissioner. Moreover, Plaintiffs do not merely seek information regarding policies formulated "in consultation with . . . other police officials," Mot. at 6, but also their personal directives to investigate certain misconduct or how to handle peaceful protests. Of course, these witnesses' decisions and the context of their statements as policymakers also bear on *Monell* liability.

Defendants also fail to contend with the fact that the former mayor and commissioner no longer have government duties with which to interfere. "[T]he fact that [a proposed deponent is] not [a] current high-ranking official[ ] is a factor when considering whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's government duties." *Moriah*, 72 F. Supp. 3d at 440; *see also Presti*, 2022 WL 2442824, at *2 n.2 ("[T]he risk of interference with former officials' job responsibilities is less pronounced once they are out office"); *cf. Sanstrom v. Rosa*, No. 93 Civ. 7146, 1996 WL 469589 ("because Mr. Cuomo is no longer governor, he cannot claim this privilege"). By latest reports, these men are privately employed in academia and real estate[6] and their depositions would not interfere with the conduct of any government business. And Defendants have not provided an affidavit suggesting otherwise. *See Sanstrom*, 1996 WL 469589, at *4 (rejecting argument that former Governor Mario Cuomo was too busy to be deposed absent an affidavit substantiating the claim).

Contrary to Defendants' assertion, Dkt. No. 841 at 5–6, Mayor Adams and Commissioner Sewell have personal roles in the implementation of reforms and discipline—or lack thereof. Regarding reforms, Defendants maintain as a defense an argument that was rejected at the motion to dismiss stage: that plaintiffs' pursuit of injunctive relief is moot because "[r]eform is underway." ECF No. 106 at 19. In support of their argument, Defendants claimed that "[b]oth the Mayor and the Commissioner have stated that the NYPD will be trained differently" and "the City has been modifying and modernizing its policing strategies." *Id.* at 19–20. While these generalities certainly remain insufficient to moot any of plaintiffs' claims, recent statements and actions by these officials suggest backtracking and retrenchment of longstanding policies and practices.[7]

---

[6] *See* Harvard Kennedy School: Institute of Politics, *New York City Mayor Bill de Blasio Joins the Institute of Politics as a Fall 2022 Visiting Fellow*, https://iop.harvard.edu/about/newsletter-press-release/new-york-city-mayor-bill-de-blasio-joins-institute-politics-fall-2022; Craig McCarthy, et al., *Former NYPD Commissioner Dermot Shea to Join Hudson Yards Real Estate Firm*, New York Post (Jan. 28, 2022), ( https://nypost.com/2022/01/28/former-nypd-commissioner-dermot-shea-to-join-hudson-yards-real-estate-firm/.

[7] Mayor Adams, for instance, provided his own standard for the "proper way to document" actions by officers—one that is not in line with written NYPD policy—telling individuals who record police activity on their cell phones: "Stop being on top of my police officers while they're carrying out their jobs. That is not acceptable and it won't be tolerated." NBC New York, *NYC Mayor Adams: Filming Police Has 'Gotten Out of Control; Must be Done 'Properly,'"* (Mar. 17, 2022), https://www.nbcnewyork.com/news/local/nyc-mayor-adams-filming-police-has-gotten-out-of-control-must-be-done-properly/3603260/ (citing Mar. 16, 2022 https://twitter.com/i/status/1504099400762675200). For her part, it has been reported that Commissioner Sewell has unilaterally changed the disciplinary matrix that itself was recommended by an independent panel and the product of a two-year process that purportedly incorporated input from the community, but has not published those changes. Anna Lucente Sterling, *Police Comm'r Keechant Sewell Proposes Changes to NYPD Disciplinary Guidelines*, NY1

Commissioner Sewell has played a central role in the NYPD's imposition—or not—of discipline for misconduct at the protests. Independent of deputy commissioners and the CCRB, Commissioner Sewell has retained 13 cases from CCRB's jurisdiction pursuant to her determination that such investigations would be detrimental to the NYPD's disciplinary process, and rejected CCRB recommendations against at least 25 officers upon whom the Commissioner then imposed lesser or no discipline.[8] Now, the Commissioner has made unknown changes to the way NYPD officers are disciplined, potentially including those who are still in the disciplinary process for their actions at the Protests, for reasons she would personally know and be most equipped to explain at a deposition. Commissioner Sewell has unique knowledge not attainable elsewhere as to the bases for her disciplinary decisions and changes to the disciplinary matrix.

Plaintiffs should be allowed to question the current Mayor and Commissioner—even if each deposition is limited to four hours each—as to what reforms, or regressions, the NYPD has made at their behest since the Protests and what bases could exist for them in the face of the egregious conduct exhibited just a few years earlier at the Protests.

### b. Defendants' Arguments About the Legal Bureau Rely on Inapposite Caselaw

In seeking to quash two depositions of Legal Bureau attorneys — attorneys who gave direct orders to NYPD officers and signed off on specific strategies used during the protests — Defendants argue that depositions of opposing counsel are disfavored.[9] But these witnesses are not opposing counsel and each personally played a core, unique role in the response to the Protests.

Neither Professor Ernest Hart nor Chief of Staff Oleg Chernyavsky represents any of the defendants in this litigation, or are affiliated with the New York City Law Department, and, so, are not opposing counsel. Defendants mistakenly cite *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003), Dkt. No. 841 at 7-8, but that case is inapposite. The concern that an attorney deposition "could potentially lead to the disclosure of the [opposing] attorney's litigation strategy," *id.* at *5 (citing *Friedman,* 350 F.3d at 71), is simply not present where the attorney sought to be deposed "is not affiliated with a lawyer representing any party in the instant litigation and where his sole relevance is to testify to his recollection of historical events he witnessed that are at the center of this case," *id.* at *6.[10] Nor is it applicable where, as here, a party

---

Spectrum (Dec. 15, 2022), https://www.ny1.com/nyc/all-boroughs/public-safety/2022/12/15/police-commissioner-keechant-sewell-proposes-changes-to-nypd-disciplinary-guidelines; *see also* NYPD, *N.Y.C. Police Dep't Disciplinary System Penalty Guideline* at 4 (Jan. 15, 2021), https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/disciplinary-system-penalty-guidelines-effective-01-15-2021-compete-.pdf (describing process to create the matrix).

[8] *See* N.Y.C. Civilian Complaint Review Board, *2020 NYC Protests* (January 2023), https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/2020NYCProtestReport.pdf, at 73–111 (departure memoranda).

[9] Even if the deponents were opposing counsel, which they are not, the Second Circuit has held that depositions of opposing counsel are not disfavored in every case. *See Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Delaware, Inc. v. Friedman (In re Subpoena Issued to Dennis Friedman),* 350 F.3d 65, 71 (2d Cir. 2003) ("[We] have stated specifically that the disfavor with which the practice of seeking discovery from adversary counsel is regarded is not a talisman for the resolution of all controversies of this nature.").

[10] *See also In re Gawker Media LLC*, No. 16-11700, 2017 Bankr. LEXIS 1798, at *19 (Bankr. S.D.N.Y. June 28, 2017) (permitting deposition where attorney did not represent opposing party but was a "fact witness whose

has placed an advice of counsel defense at issue. That is because the assertion of such a defense "makes an attorney's advice an issue in the litigation [and] that party waives the attorney client privilege." *Granite Partners, L.P. v Merrill Lynch, Pierce, Fenner & Smith, Inc*., 2002 U.S. Dist. LEXIS 7290, at *5 (S.D.N.Y. Apr. 26, 2002). *Friedman*, therefore, does not apply. *See, e.g.*, *Rekor Sys., Inc. v. Loughlin*, No. 19-cv-7767, 2022 WL 671908, at *2 (S.D.N.Y Mar. 7, 2022) (distinguishing *Friedman* where the attorney sought to be deposed is not affiliated with counsel for the other party in the pending litigation).[11]

Instead, they are attorneys who formerly worked at the NYPD Legal Bureau, where they participated in decision-making pertaining to Defendants' enforcement policies at the Protests. Professor Hart personally signed the letter NYPD sent to Human Rights Watch attempting to justify the brutality at Mott Haven on June 4, 2020.[12] In it, then-Deputy Commissioner Hart asserts that "[p]lainly there cannot be a legal observer of a protest that is itself illegal"—a claim challenged in these actions. *Id.* at 3. Professor Hart was also in the small, high-level group discussing how to respond to the *New York Times*'s release of a series of videos about brutality at the Protests — and how to address discipline or the lack thereof. Likewise, he — with Mr. Chernyavsky — was involved in discussing possible reforms to use-of-force policies in the wake of the Protests.[13]

Mr. Chernyavsky's testimony is also unique and necessary, as he personally waived privilege for the NYPD on these matters by informing the CCRB that he had given legal advice about who was and was not exempt from the curfew at the June 4 protest. For context: the CCRB recommended disciplinary charges against a member of the Legal Bureau because he had ordered the arrest of legal observers at a protest. The CCRB withdrew the recommendation when Mr. Chernyavsky informed the CCRB that he had given the sergeant legal advice about the curfew exemptions including as they related to legal observers, thus establishing the advice of counsel defense that Defendants presumably assert here, too. Professor Hart and Mr. Chernyavsky's depositions are therefore not only appropriate but central to the curfew claims.

### c. The Remaining Noticed Deponents Are Relevant and Not Duplicative or Cumulative

Defendants challenge 16 named deponents as duplicative and cumulative but they are key witnesses who have uniquely relevant knowledge.

- **Former Deputy Commissioner of Intelligence and Counterterrorism John Miller.** Former Chief Miller has unique knowledge of the basis for the scope and tactics of the NYPD's violent protest-policing tactics. During his interview with the Inspector General's office, Chief

---

communications . . . do not implicate the concerns that attend the attorney-client privilege" and stating that the "concerns that informed the *Friedman* decision are not present here").

[11] Even if this Court were to apply *Friedman*, the factors favor allowing the depositions, because: (1) Defendants have raised advice of counsel-type defenses regarding curfew arrests, putting that advice at issue; (2) each witness had a "role in connection with the matter on which discovery is sought and in relation to the pending litigation," *Friedman*, 350 F.3d at 72; (3) there is no real risk of privilege and work-product related issues arising in their depositions because they will be focused to the waived privilege regarding the advice of counsel; and (4) their testimony will provide unique insights that are distinct from the discovery up to this point.

[12] Annex II: Letter from the NYPD to Human Rights Watch, Annex II_0.pdf (hrw.org)

[13] Plaintiffs are happy to provide the Court with documents referenced herein.

> Terence Monahan repeatedly identified DC Miller as among a small "crew of individuals at the Department that makes the strategy" for these protests. However, at critical times throughout the protests of 2020, DC Miller was the sole member of the NYPD's intelligence apparatus in direct communication with the Mayor, First Deputy Mayor, and Police Commissioner concerning the intelligence informing the NYPD's response to the Protests. Due to his position and his exclusive communications with the Mayor and Police Commissioner, DC Miller is uniquely positioned to know whether and to what extent the NYPD's fact-gathering provided reasonable cause for the highest-ranked policymakers in the NYPD and the City to authorize the use of force against protesters.

- **Deputy Commissioner of the Internal Affairs Bureau ("IAB") Joseph Resnick.** DC Resnick's anticipated testimony regarding his personal involvement in the investigation and suspension of officers and their alleged misconduct at the Protests will not be redundant of the 30(b)(6) testimony by Captain Lauren Foster. As documents bear out, DC Resnick authorized a number of immediate suspensions for protest misconduct – an unusual action in a disciplinary process that typically involves extensive investigation and hearings before any discipline is meted out. DC Tucker's testimony suggested that this was the result of direct communications between the then-head of IAB and top NYPD leaders, including Commissioner Shea, who contemporaneously reviewed video from the incidents. Lt. Foster will not have the factual basis to testify to these communications and the genesis of these investigations. However, if Plaintiffs are not precluded from deposing Commissioner Shea and he is able to testify to these matters, Plaintiffs are willing to withdraw this witness.

- **Commanding Officer of the Criminal Justice Bureau ("CJB"), Chief Donna Jones.** Chief Donna Jones is the commanding officer of the NYPD's Criminal Justice Bureau (or "CJB"). Chief Jones's testimony about the operation of the MAPCs during the racial justice protests — and about why the NYPD refuses to even consider the volume of decline to prosecute decisions that came out of them in looking at its policies (*see, e.g.*, Dkt. No. 96 ¶ 358) — is unique and can only come from her. She is where the buck stops on those decisions. On information and belief, she participated in the conversations about the fact that virtually every MAPC arrest was found to be no good,[14] and she is the CJB's representative in high-level discussions; this is particularly important because the NYPD has historically refused to learn any lesson from DAs declining to prosecute. And Chief Jones is the only person who can explain why the staggering figures from the racial justice protests still appears not to have moved the needle on that issue. Moreover, the 30(b)(6) testimony from Lt. Czark will not reach the broader role the CJB plays in policymaking and learning the lessons of failures in protest policing.

- **Former Chief of Patrol Juanita Holmes.** Former Chief Holmes has publicly acknowledged her role in the after-action review of the NYPD's Protest Response. As she testified to the New York City Council's Committee on Public Safety on February 16, 2021, the former Chief and others who remain unidentified "sat down as a whole, at the table, took a look back at what could [NYPD] have done better, where did [NYPD] go wrong at [*sic*]. And out of that came the retraining of several thousand members of the service because [she and others] realized that they just weren't as trained in disorder control as they should have been" and that "four

---

[14] This is also particularly important because the City refused to admit that it declines to consider these in updating police training or policy.

hours of training in disorder control was not enough and that's what they were receiving."[15] She also acknowledged some of the specific ways officers' response went wrong, stating "They were making independent decisions. They were making decisions based on as if they were responding to a different type of event and someone threw a bottle; 'Oh, they just attempted assault on me.' My reaction is to arrest them."[16]

Plaintiffs have attempted to avoid the deposition of Chief Holmes by propounding RFAs to confirm that there was no dispute Chief Holmes made these statements, but Defendants have refused to admit them. At the Court's invitation, ECF No. 811, Plaintiffs intend to re-propound similar RFAs and an interrogatory regarding who met with Chief Holmes at the after-action review to avoid this deposition. Should Defendants again refuse to admit those RFAs, Plaintiffs will limit Chief Holmes's deposition to four hours.

- **Sergeant Shuzhen Wong.** Sgt. Wong led the NYPD IAB's investigation of NYPD Sgt. Christopher B. Hewitson, who is alleged to have injured *Gray* Plaintiff Jason Donnelly. Sgt. Wong made the decision to close this investigation without any determination of wrongdoing, or identifying the officer involved, and thereby has unique and personal knowledge of this decision. By contrast, the CCRB substantiated most of Photojournalist Donnelly's allegations against Sgt. Hewitson. The CCRB's records indicate that they subsequently referred the matter to the NYPD's Administrative Prosecution Unit for prosecution of Sgt. Hewitson before the NYPD Deputy Commissioner of Trials. Far from finding excessive use of force or other misconduct by Sgt. Hewitson, Sgt. Wong and her IAB colleagues didn't even bother to interview him.

It is thus inaccurate, indeed frivolous, for Defendants to assert that Sgt. Wong was "not personally involved in the incidents." The *Gray* Plaintiffs are asserting a *Monell* claim against the City, which includes allegations that the City has failed to "supervise" or "discipline" officers—like Sgt. Hewitson—who interfere with the First Amendment right of the public and press to record police activity in public places. See *Gray* Second Am. Compl. ¶¶ 121–29; 130–40. The Second Amended Complaint also requests ongoing injunctive relief. Thus, the relevant "incident" is not limited to the June 2, 2020 assault of photojournalist Donnelly, but rather includes the events which occurred before and after the assault, including the NYPD's lack of any meaningful response or discipline of Sgt. Hewitson, the person determined by the CCRB to be the assailant. IAB investigator Sgt. Wong has highly relevant testimony that bears directly on the *Gray* plaintiffs' failure to discipline claim. Finally, Sgt. Wong's deposition testimony will not be duplicative of the 30(b)(6) witness designated by the City to "as to the initiation, conduct, and outcome" of investigations by the IAB. During a February 7, 2023 meet and confer, City attorneys informed plaintiffs' counsel that their 30(b)(6) witness on discipline can testify generally, but cannot testify as to each individual disciplinary investigations conducted by the IAB.

- **Sergeant Stuart Wohl of the NYPD Firearms and Tactics Section.** Plaintiffs do not seek Sgt. Wohl's testimony on the narrow basis that he "designed" the Constitutional Policing and Community Events ("CPACE") training class, but because of Sgt. Wohl's extensive

---

[15] New York City Council's Committee on Public Safety, (Feb. 16, 2021) at 1:42:00–1:42:42, 1:44:50–1:45:00, https://councilnyc.viebit.com/player.php?hash=izdoBc0yH9EK.
[16] *Id.*

involvement in trainings relating to policing mass protests and large crowds. Sgt. Wohl was assigned to the Disorder Control Unit for six years, where he conducted trainings on Civil Disorder, and helped design the Strategic Response Group (SRG), a specialized NYPD unit that was deployed in response to multiple incidents underlying Plaintiffs' claims. Wohl in fact trained all SRG members, which would include several of the individual defendants. Furthermore, Wohl currently teaches a variety of classes related to civil disorder and policing protests. Wohl has uniquely broad and relevant knowledge of NYPD's trainings and tactics relevant to situations involving large crowds, and how that training has evolved over time. This specific, personal knowledge of relevant facts renders his testimony critical to the Plaintiffs' failure-to-train *Monell* claims.

- **Chief Harry Wedin, Commanding Officer of Special Operations.** As head of Special Operations, Chief Wedin was in charge of the Strategic Response Group ("SRG"), the unit of the NYPD that was called to respond to many of the protests. As indicated by his interview with the Department of Investigation, Chief Wedin had extensive personal involvement in the policing of the protests during the week of the curfew. Chief Wedin personally attended the protests on May 30th at Canal Street, and May 31st at Union Square in Manhattan and Barclay Center in Brooklyn as well as on June 2. During protests on June 3-6, Chief Wedin was in regular contact with other NYPD executive officers, particularly the Police Commissioner and the officers directly in charge of SRG.

- **Captain Isaac Soberal.** Captain Isaac Soberal's deposition is not duplicative of Inspector Robert Gallitelli. Captain Soberal, who operates as Gallitelli's deputy, was the *executive* officer of the 40th Precinct and was at the June 4, 2020, Mott Haven planning meeting and protest. Defendants have asserted that their response to the June 4 Mott Haven protests was driven, in part, based on information related to the group associated with it, FTP. Captain Soberal has unique information relevant to Plaintiffs' claims because he was the incident commander for the Bronx for a prior protest organized by FTP on January 31, 2020, and the officer who directed the arrest of a witness in the *People*'s complaint, and thus has specific knowledge of the policing of these protests.

- **Chief Thomas Conforti.** Defendants argue that Plaintiffs seek to depose former Chief Conforti as a "run around" Defendants' assertion of privilege regarding documents related to his after-action report. Dkt. No. 841 at 11. First, a critical topic for the deposition is the NYPD's *approach* to after-action reviews, which does not involve the content of the allegedly privileged documents themselves. In the February 13, 2023, conference, Defendants conceded that such information would not be privileged and that it could be a topic for former Chief Conforti's deposition. Second, Defendants have never suggested that *all* materials related to the after-action report are privileged. The court should not preclude a deposition "simply because a deponent may be asked about privileged information." *Marisol A. v. Giuliani*, No. 95-CV-10533, 1998 WL 132810, at *7 (S.D.N.Y. Mar. 23, 1998). Rather than seek to bar a deposition entirely, Defendants can object to specific questions if necessary to protect the privilege. *See Naftchi v. New York Univ. Med. Ctr.*, 172 F.R.D. 130, 132 (S.D.N.Y. 1997) ("it is exceedingly difficult to demonstrate an appropriate basis for an order barring the taking of a deposition").

- **Police Officers Sher, McCloud, and Migliaccio; Sergeant Counihan, and Lieutenant Dym.** Defendants object to these witnesses solely on the basis that *People* has exceeded the number of depositions allowed to them under the Rule. Thus far, *People* has deposed 16 line-level officers[17] involved in 14 separate incidents of misconduct at the Protests. As the Court is aware, the *People*'s Amended Complaint is expansive, as is warranted and demanded by our *parens patriae* standing. It covers myriad claims, including excessive force against protesters and false arrest of journalists and legal observers, and explicitly referenced dozens of unconstitutional acts. Given the scope of the claims and misconduct at the Protests, the presumptive limit should not apply. At the same time, the People have endeavored to target deposition notices to individuals with the greatest factual knowledge about conduct alleged in their Amended Complaint.

Officers Sher, McCloud, and Migliaccio, Sergeant Counihan, and Lieutenant Dym fall within this category. These members were involved in two of the acts referenced specifically in the *People*'s Amended Complaint, the pepper spraying of Andrew Smith and others in East Flatbush on May 30 and the batoning of kettled protesters at Mott Haven on June 4. These individuals were found by the CCRB to have used excessive force, among other violations, and have in part evaded discipline for those actions. Plaintiffs should be allowed to depose them about these incidents, which go to the heart of the *People*'s—and the consolidated actions'—claims.

For these reasons, Defendants' request for a protective order should be denied.

Respectfully submitted,

  *s/ Lillian Marquez*
Lillian Marquez, Assistant Attorney General
Civil Rights Bureau
Office of the New York State Attorney General
Tel: 212-416-6401
Lillian.Marquez@ag.ny.gov

CC: All counsel of record

---

[17] It is not clear how Defendants attribute 32 line-officer depositions to *People*. By Plaintiffs' tally, *People* are leading ten additional line-level officer depositions, including these challenged five depositions. Plaintiffs further note that *People* have propounded RFAs that, if admitted, would allow the withdrawal of two of the noticed officers, Police Officer Daniel Tooma and Deputy Inspector Robert O'Hare, and, upon learning recently that Officer Sher was deposed in another case, have offered to accept Officer Sher's deposition transcript in lieu of his deposition.