

**HON. SYLVIA O. HINDS-RADIX**
*Corporation Counsel*

THE CITY OF NEW YORK
LAW DEPARTMENT
100 CHURCH STREET
NEW YORK , NEW YORK 10007

**AMY ROBINSON**
*Senior Counsel*
arobinso@law.nyc.gov
Phone:  (212) 356-3518
Fax:  (212) 356-1148

**By ECF**

February 22, 2023

Honorable Gabriel W. Gorenstein
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      In Re:  *New York City Policing During Summer 2020 Demonstrations*,
              No. 20 Civ. 8924 (CM) (GWG)
              This filing is related to all cases

Your Honor:

      I am a Senior Counsel in the Office of the Honorable Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, and I am among counsel for the defense in the above-referenced matter. Defendants write in reply to Plaintiffs' Letters in Opposition to Defendants' Motion for Protective Order. (Dkt. Nos. 845, 855).

## Background

      As an initial matter it must be pointed out that plaintiffs' position that defendants *never* brought up the issue of too many depositions is entirely overstated. Defendants have raised the burden of this many depositions in the past. Regardless of when the motion was made, defendants certainly did not waive their objections to the inflated number of depositions, including the approximately 70 depositions that remain, or to seeking preclusion of certain witnesses. Further, plaintiffs' willingness to withdraw certain depositions in exchange for defendants' response to certain Requests for Admission ("RFAs") (Dkt No. 855, FN 1) comes with the condition that defendants must admit all such RFAs in order to avoid these depositions. This defendants cannot do in good faith without jeopardizing defenses in these consolidated cases and other unrelated matters.

I. **A Limit on Depositions Must be Instituted**

    A. **A Limit on the Number of Depositions Should be Imposed:  Neither Waiver Nor Estoppel Precludes This Result.**

Plaintiffs argue that it is unfair for defendants to impose an arbitrary limit on the number of depositions.  In fact, the Federal Rules do this, not defendants. The Federal Rules of Civil Procedure presumptively limit each party to ten depositions. See Fed. R. Civ. P. 30(a)(2)(A) ("[a] party must obtain leave of court . . . if the parties have not stipulated to the deposition and . . . the deposition would result in more than ten depositions being taken . . ."); see also DelaRaba v. Suozzi, 2006 U.S. Dist. LEXIS 92813, 2003 WL 8435603, at *1 (E.D.N.Y. Nov. 17, 2006) ("[a]bsent an agreement among the parties, a party must obtain leave of the court before taking any additional depositions beyond the limit of ten.").  Plaintiffs repeatedly refer to actions and agreements made by the parties—all taken before the settlements in five of these ten cases—to establish the unfairness of a limit.  However, the limit is in the Rules, and it is plaintiffs' obligation to seek leave of the Court in order to exceed the presumptive limit.  In any event, even when there were ten cases, the number of depositions plaintiffs wanted to take greatly exceeded 100. Plaintiffs have clearly violated this rule and have provided the Court with no reason other than to say that they relied on defendants not to challenge them.

Plaintiffs further state that imposing a limit on depositions is unfair as defendants have complete control over which deponents are scheduled, and this cedes control over plaintiffs' deposition strategy to defendants to plaintiffs' prejudice. However, scheduling is a separate issue than the number of depositions a party can take.  The issue before the Court is whether the number of depositions plaintiffs have noticed is appropriate—not whether defendants have a strategy regarding scheduling these depositions. In any event, with such a tight deadline to conduct this many depositions, neither party has strategic control of any kind over the depositions. As outlined in recent letters to the Court, numerous factors dictate the scheduling of depositions.[1]  Defense counsel has limited resources and in addition to all of the time that goes into these depositions, and other discovery issues and motion practice, this is another factor in scheduling depositions. There is no nefarious strategy being employed.

    B. **Defendants are under no Obligation to Establish Good Cause for a Limit on Depositions.**

Defendants are under no obligation to establish good cause for a limit on depositions.  It is plaintiffs who are under an obligation to seek leave of the Court to exceed the presumptive limit.

---

[1] The schedule is dependent on officer availability, considering changing regularly-scheduled days off, vacation days, last-minute assignments, whether officers have open disciplinary allegations against them and must be represented by union counsel at their deposition, the availability of union counsel to do so, defense counsel availability to prepare themselves for a deposition, prepare a witness, and defend a deposition, whether their phones have been collected and data can be downloaded, what stage of processing their phones are in, and other factors.

Further, plaintiffs' conspiracy theory that defendants deliberately scheduled line officers first in order to deprive plaintiffs of high-ranking officers is untrue. As explained to plaintiffs, the reason that the high-ranking officers are currently going later is due to plaintiffs' demands for the high-ranking officers' calendars and text messages, which have taken an inordinate amount of time and effort. With the limited resources of the case team and a small team at NYPD who must undertake this task, this was the only way to schedule depositions with any expectation that the high-ranking could go forward on time. Furthermore, it is not defendants' obligation to protect plaintiffs' counsels from themselves. Plaintiffs continue to add and/or refuse to withdraw deponents without regard to the Rules. In fact, as an example, plaintiffs refused to withdraw approximately 10 depositions noticed in settled cases.[2]

Defendants are in no way depriving plaintiffs of necessary high-ranking depositions or Rule 30(b)(6) depositions or of Monell discovery. Indeed, there are 12 Rule 30(b)(6) deponents going forward. Defendants are seeking a decrease in the number of deponents, which does not include the Rule 30(b)(6) witnesses. Plaintiffs can determine which witnesses are necessary for their cases and should be remain – should the Court grant defendants' motion.

Further, plaintiffs' statement that the parties failed to meet and confer on the number of depositions (Dkt. No. 855, FN 4) is just plain wrong. The parties conferred at length on the excessive number of depositions being taken in this case, especially in the People matter. In addition, to the extent that "Does" may be identified during the course of the deposition (Dkt. No. 855, FN 5), then there may be good cause to seek those witnesses' depositions. This should have no impact on the number of depositions as they currently stand and the need for a limit on those depositions.

Additionally, plaintiffs provide no support for the statement that hundreds of depositions took place in the RNC litigation or even whether those hundreds of depositions took place after class certification in those cases.

## II. Depositions of High-Ranking Officials Should be Precluded

### A. Mayoral and NYPD Commissioner Deponents do not have Unique Personal Knowledge that other Deponents Lack.

Depositions of high-level officials should only be allowed if the party seeking the deposition can establish that: "1) the deposition is necessary in order to obtain relevant information that cannot be obtained from any other source, and 2) the deposition would not significantly interfere with the ability of the official to perform his governmental duties. Marisol A. v. Guiliani, No. 95 CV 10533 (RJW), 1998 U.S. Dist. LEXIS 3719, at *6–7 (S.D.N.Y. Mar. 23, 1998) (citations omitted). Plaintiffs argue that Bill de Blasio and Dermot Shea have unique personal

---

[2] For example, People refuses to withdraw depositions that have not been taken, including Lt. Dym (noticed in Sierra), Officer Migliaccio (noticed in Sierra), and Robert O'Hare (noticed in Minett). In fact, many depositions have gone forward for officers noticed in settled cases at People's insistence, which only serves to increase the number of depositions taken by People significantly over 10.

knowledge that other witnesses lack. This is simply not true. Neither worked in a vacuum during the protests. They both worked with numerous individuals regarding NYPD's response to the protests and the issuance and enforcement of the curfew orders, including various Rule 30(b)(6) witnesses as set forth in defendants' moving papers.

Moreover, plaintiffs' argument that the immunity for high-ranking officials does not apply to former officials is incorrect. While the former Mayor and the former NYPD Commissioner are not currently active City officials, the limited immunity continues to apply to them. Bey v. City of New York, 99 CV 3873 (LMM) (RLE), 2007 U.S. Dist. LEXIS 40480, at *7 (S.D.N.Y. June 4, 2007); In re Terrorist Attacks on September 11, 2001, 2020 U.S. Dist. LEXIS 166886 (S.D.N.Y. August 27, 2020) ("The doctrine applies to both current and former high-ranking officials")(quoting, Moriah v. Bank of China Ltd., 72 F.Supp. 3d 437, 440 (S.D.N.Y. 2014)).

Present Mayor Eric Adams and Commissioner Keechant Sewell had no involvement in the protests and were not in office during the period at issue. Current statements made by both officials that plaintiffs admit were "generalities" as to their commitments to NYPD being trained differently and modifying and modernizing policing strategies is hardly a basis to depose them pertaining to protests that occurred when they were not in office. That Commissioner Sewell has the obligation to make disciplinary decisions with respect to some officers involved in the protests in not sufficient cause for her deposition. Moreover, plaintiffs fail to address the fact that preparing for and attending depositions in these cases would significantly interfere with the ability of both the Mayor and the Commissioner to perform their important governmental duties.

Accordingly, with respect to Mayor Adams, Commissioner Sewell, former Mayor de Blasio and former Commissioner Shea, plaintiffs' arguments cannot overcome the Marisol A. test, and these depositions should be precluded. Further, with respect to the current and former Mayors and the current and former Commissioners, while defendants respectfully request that the Court preclude these depositions, should the Court permit any of them, defendants request that they be limited to no more than three hours each.

### B. Judge Ernest Hart's and Chief of Staff Oleg Chernyavsky's Depositions Should be Precluded.

Plaintiffs oppose defendants' motion to preclude the depositions of Hart and Chernyavsky by arguing that they are not "opposing counsel" and "played a core, unique role in the response to the Protests." Dkt No. 855, at 6. These arguments fail to overcome the stubborn fact that the overwhelming substance of any possible testimony from these former high-ranking officials of NYPD's Legal Bureau would constitute legal advice to their client, NYPD. Given that defendants are not relying on this advice as a defense, the risk of encountering privilege is extreme, while the need for plaintiffs to depose Hart and Chernyavsky is negligible as the role plaintiffs claim these attorneys played is misstated and misleading.

"The NYPD Legal Bureau serves as the NYPD's 'in-house' counsel, advising the Commissioner and members of the NYPD on legal issues affecting the Department." MacNamara v. City of New York, 2008 U.S. Dist. LEXIS 3937 at *2 (S.D.N.Y. Jan. 17, 2008). When the "client" is an entity rather than a person, no employee of the entity falls outside of the ambit of

4

attorney- client privilege when consulting in-house counsel for legal advice within the scope of their employment. Upjohn Co. v. United States, 449 U.S. 383, 395-398 (1981). Communications consisting of or seeking legal counsel between an attorney and their client is protected from disclosure. This is an axiomatic proposition of law that normally does not require clarifying nor further explanation.  However, plaintiffs have gone to great length in conflating this widely accepted general proposition by making an irrelevant distinction: that Hart and Chernyavsky are not "opposing counsel."  Dkt No. 855 at 6.

Plaintiffs also argue that Hart and Chernyavsky "played a core, unique role in the response to the Protests" (Dkt No. 855 at 6) without explaining or defining what constitutes a core and unique role, why plaintiffs' characterization is relevant, and without citing to legal authority in support.  Rather, plaintiffs double down on their vagueness by reciting instances when Hart and Chernyavsky provided counsel to the NYPD.  The factual circumstances plaintiffs cite in support only reinforce that Hart and Chernyavsky were acting in their roles as counsel.  Indeed, if serving as counsel to a police department constitutes a "core and unique role," as plaintiffs have seemingly inferred, and again have not defined, that characterization fails to change the fact that Hart and Chernyavsky were acting within the capacities as attorneys for NYPD.  Further, both Hart and Chernyavsky, in their capacity as agency counsel to NYPD, advise that agency with respect to legal and policy issues on a host of topics.  It would be difficult to segregate matters of privilege from other issues plaintiffs may seek to exam them about.

Moreover, plaintiffs' argument that Hart's and Chernyavsky's sole relevance is to testify to their recollection of historical events at the center of this case fails to appreciate that the historical events they can testify to concern the legal advice they dispensed to NYPD.  That Hart and Chernyavsky have provided legal advice to NYPD regarding the events and claims at issue in this case does not place that advice at issue as plaintiffs suggest—without citing to legal authority. Plaintiffs cannot legally support this argument, because their reasoning would erode the attorney-client privilege to a degree where it would no longer provide protection to any attorney-client relationship.

Further, with respect to Hart and Chernyavsky, while defendants respectfully request that the Court preclude these depositions, should the Court permit either of them, defendants request that they be limited to no more than three hours each.

### C. Duplicative and Cumulative Deponents Should be Excluded.

As mentioned in defendants' moving papers, duplicative and cumulative deponents should be precluded.  Plaintiffs' arguments raised in opposition are not sufficiently compelling for these depositions to proceed.

- **Former Deputy Commissioner of Intelligence and Counterterrorism John Miller**. First, Commissioner Miller would have no reason to know, and is therefore in no position to testify as to, "whether and to what extent the NYPDs fact-gathering provided reasonable cause for the highest-ranked policymakers in the NYPD and the City to authorize the use of force against protesters," which is plaintiffs' stated reason for demanding this deposition.  Second, as stated, Deputy Commissioner Miller's testimony would be

5

duplicative of Rule 30(b)(6) witness, Chief of Intelligence, Thomas Galati, who has been designated on the requested topic of Intelligence, including a variety of related sub-topics pertaining to the Summer 2020 protests. As Chief of Intelligence, Chief Galati is in the best position to testify on this information. Further former Deputy Commissioner Miller is informed by Chief Galati, i.e., Commissioner Miller obtained intelligence information from Chief Galati.

- **Deputy Commissioner of IAB Joseph Resnik**.  Captain Lauren Foster is the Rule 30(b)(6) witness designated to testify as to the initiation, conduct, and outcome of investigations by the NYPD Internal Affairs Bureau and the disciplinary actions taken by NYPD imposed on officers for their conduct during the Summer 2020 Protests—as requested in plaintiffs' Rule 30(b)(6) Notice.  Although plaintiffs referred to Captain Foster as a "low-level" officer in meet and confers, Captain Foster was a direct report to Commissioner Reznick and was present and involved for many of the discussions regarding change in duty status for officers involved in alleged misconduct during the protests.  Thus, Commissioner Resnik's deposition would be duplicative.

- **Commanding Officer of the Criminal Justice Bureau, Chief Donna Jones**.  Chief Jones' deposition was withdrawn by plaintiffs via email on January 20, 2023.

- **Former Chief of Patrol Juanita Holmes**.  Plaintiffs state that they are willing to withdraw this witness if the RFAs containing statements that Chief Holmes allegedly made are admitted.  However, plaintiffs have thus far refused to re-propound the RFAs involving Chief Holmes as ordered to (not invited to) by the Court. (Dkt. No. 811, pg. 2, Item 1).  Plaintiffs are now, for the first time in their opposition, adding a new condition to withdrawing Chief Holmes' deposition—an Interrogatory—which was never conferred upon and should be entirely ignored as a basis for demanding the Chief's deposition.  Further, should her deposition be allowed, Chief Holmes should not be deposed for any length of time as her testimony would be duplicative of the Patrol Borough Chiefs being deposed in these cases.

- **Sergeant Shuzhen Wong**.  Sergeant Wong was not involved in planning any protest, she was not present at any protest, and she did not conduct any after action review of any protest.  Whatever her determinations may have been with respect to Sergeant Hewitson, they are moot now as the matter has been referred to the NYPD's Deputy Commissioner of Trials, and Sgt. Hewitson is awaiting an administrative trial pertaining to the incident to which plaintiffs refer.   In any event, the reasons behind her determination are already laid out in the investigation file.

- **Former Firearms and Tactics Section Sergeant Stuart Wohl**.  It is entirely inaccurate to state that Sergeant Wohl "trained all SRG members," as he was part of a team of Disorder Control Unit ("DCU") members who performed training some of whom are still active and remain part of the unit to this day. Sergeant Wohl, on the other hand, is retired.  Further,

Sergeant Wohl was not involved in training anyone that joined or remained in SRG after his departure from DCU in early 2018, which is a critical two-year window of training leading into the events of 2020 to which Sergeant Wohl cannot testify. Further, a Rule 30(b)(6)witness has been designated to testify as to the training of SRG members, Captain David Miller, the Commanding Officer of DCU, who trains and did train SRG members both before and after the Summer 2020 Protests.

- **Captain Isaac Soberal**. Captain Soberal was not an Incident Commander of any "Fuck the Police" ("FTP") protest or any other organized protest in the Bronx on January 31, 2020, or as what defendants expect that plaintiffs' meant, on May 31, 2020. Captain Soberal was present for the mass looting that took place on Fordham Road in the Bronx on May 31, 2020. Further, his testimony would be entirely duplicative of his Commanding Officer, Inspector Robert Gallitelli, who is the Commanding Officer of the 40th Precinct and who is entirely familiar with the mass looting in the Bronx, "FTP," and Mott Haven Incidents, which all occurred within the confines of his Precinct.

- **Chief Thomas Conforti**. Plaintiffs stated reason for deposing Chief Conforti, whose draft report is privileged, is to testify as to, "the NYPDs *approach* to after-action reviews." Chief Conforti is not a Rule 30(b)(6) witness in these cases, and therefore cannot speak to the NYPDs approach to after-action reviews. Plaintiffs should not be able to depose Chief Conforti as an end run around the privilege determination of a draft report which he authored.

- **Former Lieutenant Dym, Police Officers Migliaccio Sher, McCloud and, Sergeant Counihan and**. First, former Lt. Dym and Officer Migliaccio were noticed in now settled cases, and their depositions should not go forward. Second, plaintiffs have already determined that they would accept the deposition transcript of Officer Sher in lieu of him being deposed again on the same incident.

    Third, People have not deposed 16 line officers; they have deposed or are scheduled to depose approximately 28 line officers (not including high-ranking officers People have noticed). Prior to the pause, People deposed nine line officers noticed in People. Since the pause, People have deposed or are scheduled to depose 10 officers, and they have already taken or are scheduled to take the depositions nine line officers in cases that were already settled, including Minett, Hernandez and Sierra. Accordingly, the depositions of McCloud, Migliaccio, Counihan and Dym should be precluded, which will bring the line officer depositions in People down to 24, which is still staggeringly over the deposition limit regardless of how expansive they believe their case to be.

7

**III.    Reply to Opposition filed by Counsel in the "Coordinated Cases" on February 9, 2023**.

The City objects to the letter filed on behalf of the so-called "Coordinated Cases" (Docket No. 845) on the grounds that those plaintiffs are not parties to the consolidated actions, and therefore lack standing in this dispute. Defendants were not aware that they were required to also meet and confer with plaintiffs in other cases not included in the consolidated actions concerning their discovery. Defendants note that there are dozens of actions currently pending relating to the Summer 2020 protests. While some of those cases may be "coordinated" and share counsel with the consolidated cases, many of them do not.

Furthermore, it is not clear that the so-called "Coordinated" plaintiffs are stating any interest that is incompatible with defendants' motion. Defendants have moved to limit the number of depositions in the consolidated cases but have not sought to curtail or prevent legitimate Monell discovery. As counsel notes, the notion of "coordination" between the consolidated cases and others is limited to Monell discovery. Indeed, defendants have already agreed to produce a number of witnesses on a wide-ranging array of Rule 30(b)(6) topics. There is no reason to believe that the 19 plaintiffs in the "Coordinated cases" would be prejudiced by any limit on depositions in the consolidated cases. To the extent plaintiffs in the "Coordinated cases" need additional fact witnesses related to their individual claims, they can, as their counsel acknowledges, seek to depose those witnesses in the usual course of discovery in those respective cases. Defendants did not include the "Coordinated Cases" in its proposal to limit the total number of depositions, because they never understood those cases to be subject to any limits on fact discovery in the consolidated cases. In fact, defendants do not understand plaintiffs to be waiving officer depositions in the so-called "Coordinated Cases" where those officers have already been deposed in the consolidated cases. In fact, it appears plaintiffs want two attempts to depose the same officers on the same incidents. To the extent there are fact witnesses relevant solely to the "Coordinated Cases," those witnesses can be deposed in those cases as appropriate, without adding 19 additional plaintiffs and number officers to the already significant discovery in the consolidated cases.

**IV.    Conclusion**

For these reasons, and those set forth in defendants' moving papers (Dkt No. 841), defendants respectfully request that their motion for a protective order be granted concerning depositions in these matters.

Respectfully submitted,

*Amy Robinson s/*

Amy Robinson
*Senior Counsel*

cc:   ALL COUNSEL (*via* ECF)