

March 28, 2023

Hon. Gabriel W. Gorenstein, U.S.M.J.
United States District Court, Southern District of New York
Daniel Patrick Moynihan Courthouse, 500 Pearl Street
New York, New York 10007

By Electronic Filing.

Re:     **In re: New York City Policing During Summer 2020 Demonstrations, 1:20-CV-8924 (CM) (GWG) — This Letter Relates to *Sow*, 21-cv-533**

Dear Judge Gorenstein:

I write on behalf of the *Sow* Plaintiffs in the consolidated case above, relating to the meet and confer the Court ordered in Dkt. No. 780 on December 12, 2022. As to the documents sought by *Sow* Document Request 12 — documents (1) kept by the City's Early Intervention Program for problem officers and (2) regarding the City's history of paying judgments for (or not) and representing (or not) problem officers. While Defendants have still yet to describe any meaningful burden, if what Defendants said at confers is correct, the burden they are asserting is clearly not "so great" as to excuse a violation of multiple court orders. Dkt. No. 780.

Specifically, and particularly given the delays to date, Plaintiffs ask the Court to overrule any burden objection on its merits, as discussed below. And in the alternative, Plaintiffs ask the Court to schedule a hearing (*cf.* Dkt. No. 834) to finally resolve Defendants' objections.

## BACKGROUND

The background on this issue is long, and set out in more depth several other places on the docket. At issue are requests served in November of 2021. In February, *Sow* Plaintiffs moved to compel. Dkt. No. 386. Defendants responded and promised "defendants will provide document responses and documents in two weeks [from the February motion], and that will be a court-ordered date." Dkt. No. 391. However, Defendants did not ultimately serve the first round of responses until late May — violating that agreement and order.

Throughout the last two years, the parties have also litigated — extensively — Defendants' refusal to serve rule-compliant discovery responses. Though the Court has issued many rounds of deadlines — starting with July 21, 2021, and extending into several rounds of *final* final deadlines in 2022 — Defendants continued to say they were still collecting documents and could not say what they were producing. After several rounds of motions and sanctions, that came to a head in February last year, the Court directed Defendants to re-do their discovery responses in chart form, saying "the time has come to essentially put up or shut up on all the document requests about what it is you're producing and what is not, what you're not." 2022-02-18 Tr. 99:16- 19. That was after months of the Court making every effort to get Defendants "to just state what [they are] producing



and what they're objecting to." 2022-02-11 Tr. 117:19-23.  Even then, instead of following that Order, Defendants served what they called "an evolving document" apparently intended to convey that "Defendants can't say what they will produce." Dkt. No. 477 at 2.  Following that dust-up — and the Court sanctioning Defendants for their failure to follow the related orders — the Court again made clear that the purpose of the chart was the Defendants were to "do the exercise of going through and saying exactly what you're going to produce and what you're not, and to the extent you're not producing it, and if it's on burdensomeness grounds rather than relevance, you need to specify in detail what that burden is." 2022-04-12 Tr. at 96-97.  And Defendants committed that "if there is no burdensome or responsiveness or other objection in the chart, we are producing the documents." 2022-04-12 Tr. 43-44.

But despite the fact that the City promised to produce in response to *Sow* Document Request 12 —- seeking "documents 'related to the information collected pursuant to Local Law-2020, the Department's Early Intervention Program (which collects information regarding certain declinations to prosecute), as well as Law Department declinations to indemnify or represent officers in civil lawsuits brought from protest arrests alleging a constitutional violation'" (Dkt. No. 780 at 1, quoting Dkt. No. 742 at 4 n. 11) — they did not.  In fact was not until after a meet and confer, in an email, that Defendants raised an unspecified burden objection to the request for the first time.  Understanding that to be waived, and seeking to enforce the City's promise to produce, Plaintiffs moved to compel in September last year.

On the motion to compel, while the Court noted that the "positions taken as reflected in the 'discovery chart' should ordinarily be binding on defendants," it left open that "there may be some few instances where the degree of irrelevance or burden may be so great or obvious that the City will be permitted to interpose such objections even if they were not listed." Dkt. No. 780 at 2.  Thus, the Court directed the parties "to confer again regarding this matter and to include a discussion of burden and relevance/overbreadth." *Id.*

Immediately on receiving the order on December 13, Plaintiffs sought to confer. *See* Exhibit 1 at 8.  Plaintiffs followed up again on December 19. *Id.* at 7.  Defendants asked for more time to respond to the request to confer more than 24 hours after that.  *Id.* at 8.  After more follow up, Defendants initially refused to meet until January 31 — and ultimately the earliest Defendants were willing to agree to meet was January 17, 2023 (Ex. 1 at 1-4), more than a month after the Court directed the parties to meet in short order.

At that meeting,[1] Defendants began by saying they believed the Court had already found a burden and sustained the objection.  They then refused to answer any questions about how the information sought in Request 12 was stored.  Indeed, when Plaintiffs asked for a simple yes or no to the question, "does the Early Intervention Program store information in a text searchable format,"

---

[1] That meeting lasted for about an hour and a quarter.  In attendance were myself, Veronica Salama, Lillian Marquez, Wylie Stecklow, Corey Stoughton, and law student interns for Plaintiffs; and Daniel Braun and Joe Hiraoka for Defendants.





Defendants claimed it was "not a yes or no question."[2]  Even then, Defendants refused to put their answer to that ground level question in an affidavit or any other writing.  Defendants said, verbatim, "I'm not going to volunteer that" (meaning an affidavit).  Other similar[3] answers included Defendants refusing to confirm whether the Law Department had *ever* declined to indemnify an officer in period relevant to this case, saying it was beyond the scope of the question — but simultaneously asserting that producing any information about indemnification was too burdensome.[4]  But, obviously, if such a failure to indemnify has only happened once — or never — there is no burden to identifying that.  Moreover, Defendants gave a demonstrably incorrect explanation of the burden:  They claimed there were *thousands* of potentially relevant EIP referral files.  But pulling public information, Plaintiffs were able to show them that there are usually only between 100 and 190 EIP referrals per quarter, so the relevant referral period was going to be — at most — a few hundred files (at least at the meet and confer, Defendants conceded this appeared to be correct).

To be very clear:  Defendants were totally and completely (1) unprepared to and (2) unwilling to answer any questions about what the actual claimed burden was.

After all this, Defendants asked Plaintiffs to put the information they were seeking specifically about EIP documents in writing.  So Plaintiffs did so.  And like every other time Plaintiffs have sought to understand a burden, they asked basic technical questions:

"We think understanding the claim of burden requires us to know, among other things:

- How does the NYPD collect and store the information that it reports in its quarterly reports about EIS referrals?

- How, and in what format, does the NYPD share information about EIS referrals to the Early Intervention Committee?

- Does the NYPD maintain a database to allow it to track outcomes of EIS referrals? If not, how does it track those outcomes, as it has reported to City Council that it does?

- Can the NYPD isolate EIC documentation according to which of the court-ordered EIS referral thresholds triggered the referral?

- Are documents and other information collected by the EIC in a text-searchable format?  If not, is OCRing the documents something that could be automated?  How much time would

---

[2] Defendants specifically said the databases were not text-searchable "in the way you are imagining," but refused to explain what that meant, or bring an NYPD person with personal knowledge to explain further.
[3] Defendants also (among other things) claimed they didn't understand the word "protest," that the fact of declining to indemnify an officer might be somehow privileged, and that asking them to take a position on that privilege was somehow "beyond the scope of the meet and confer."
[4] Not so.  The request seeks all documents concerning "Law Department declinations to indemnify … officers in civil lawsuits brought from protest arrests alleging a constitutional violation."  Dkt. No. 742 at 4 n. 11.



Page 3 of 9

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



setting that up take?

- How many total EIS referrals took place in the period the City believes is likely to contain Schedule A protest related referrals? How many in each quarter in that period?"

Exhibit 2 at 1.

Instead of answering (*accord,* Dkt. No. 856),[5] two weeks later, Defendants reverted to a total refusal to answer — and a version of that approach that seemed to abandon the understandings the parties had reached about basic facts. For example, Defendants asserted a generic burden with no explanation (or statement about whether records were text searchable — which would obviously eliminate most of the burden of reviewing non-protest files) of how the burden existed, and again invented the claim that they would need to "obtain and review such underlying materials for well over 1,000 officers." Exhibit 3 at 4-5. In response, Plaintiffs *again* spelled out why Defendants' claims were dubious — noting, among other things, that "[a]ccording to the City's public reporting, even taking the time frame for a search for all referrals from the inception of the program in 2020 through the first quarter of 2022, there are only 453 referrals, and not every referral is a unique officer." *Id.* at 5. Thus, we explained, "[i]t should be fairly simple to pull the RMB-prepared overview sheet for each of those referrals and quickly determine whether the referral was related to misconduct at a protest or a protest-related arrest, and only produce the relevant documents related to those referrals." *Id.* Of course, that is only even *necessary* if the records are not text-searchable (in which case, the parties can just agree on collection terms).

What has followed since then is yet another series of delays. Defendants spent from February 3 (Ex. 3 at 4) to the present saying they would get back to us "shortly" (Ex. 3 at 3) or "next week" (Ex. 3 at 1). They are now *long* past their most recent self-granted extension with no indication they intend to provide answers. At this stage, the Court ordered a substantive meeting on this issue more than three months ago, and despite attending a meet and confer, Defendants have simply not complied with the substance of that order. In sum, Defendants have not presented any meaningful burden at all, let alone one "so great" as to override the default that Defendants' answers in the chart should be binding.

## DISCUSSION

As the Court reviewed in Dkt. No. 780, the request at issue "seeks documents 'related to the information collected pursuant to Local Law-2020, the Department's Early Intervention Program (which collects information regarding certain declinations to prosecute), as well as Law Department declinations to indemnify or represent officers in civil lawsuits brought from protest arrests alleging a constitutional violation.'" Dkt. No. 780 at 1, quoting Dkt. No. 742 at 4 n. 11. That is, it seeks information about both the EIP and decisions about the City being on the hook for individual officer

---

[5] Defendants also explicitly committed to confirming whether they were genuinely asserting that declination was privileged by January 31, 2023. Yet, no position is in their email — instead, making the bizarre claim that the information was public (it's not — and the link that Defendants sent has nothing to do with indemnification or declination to represent). *See generally,* Ex. 3 at 5-6.

COHEN&GREEN                                                                                  Page 4 of 9

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



misconduct. In discovery, Defendants never asserted any burden until Plaintiffs sought to compel agreed-upon production of the documents. That is, as the Court noted, "in the 'discovery chart,' *defendants agreed to produce such documents*, except as they may be privileged." Dkt. No. 780 at 1 (emphasis added).

The information sought is of major importance to the *Monell* claims in the case:

**For the EIP**: As the NYPD itself describes it, the EIP is "a non-disciplinary program designed to utilize risk management strategies to intervene at the earliest possible opportunity" in order "to ensure that each officer is performing his or her job in a way that scrupulously adheres to the legal, moral, and ethical principles to which the Department subscribes by correcting issues as soon as they are identified."[6] Or put more simply, it is the NYPD's chief mode of monitoring for bad apples.

**For the declination decisions outside the EIP**: Understanding when the Law Department has — or, more commonly, has not — declined to indemnify and to a lesser extent represent officers is vital to showing just how much the culture of violence against protesters critical of police has permeated the City's financial decisions. As President Biden has famously quipped many times, "Don't tell me what you value. Show me your budget—and I'll tell you what you value."[7] Whatever platitudes the City has offered, if they are routinely paying out for the same officer, committing the same misconduct, aimed at the same speech, that shows what it values — and in turn, what its policies prioritize.

As set out below, the burden is neither "so great" nor "so … obvious" (Dkt. No. 780) as to counsel in favor of allowing the City to wiggle out of its unambiguous commitment. Indeed, at *most*, the burden for EIP is reviewing the summary portion of about 400 files — and even that makes some unreasonable and unwarranted assumptions (like the incorrect assumption that there is no way to make those files text searchable). Instead, the entire burden asserted appears to be a function of the fact that Defendants' attorneys are simply not getting full answers from the NYPD — and that in turn appears to come from an unwillingness to ask relevant questions.

### I. The Burden is Negligible — And Certainly is Not "So Great" or "So … Obvious" As to Excuse Violation of a Court Order.

A. **There is no undue burden to producing EIP documents.**

As set out above, there is every reason to believe the documents at issue are text searchable, which means there is no question that the burden is "so great" as to form an exception to the Court-directed (and sanction-enforced) chart process. The EIP (at least in its current form) came about in part because another Judge of this Court ordered it. *See generally,* Order, *Floyd v. City of New York*, 08-cv-1034, Dkt. No. 767. That is, the Court in *Floyd* specifically ordered that (among other things)

---

[6] https://www.nyc.gov/site/nypd/stats/reports-analysis/early-intervention-program-reports.page
[7] *See, for examples,* https://twitter.com/POTUS/status/1508530790249947147?s=20, https://twitter.com/VP44/status/562347649429278720?s=20



Cohen&Green P.L.L.C. · 1639 Centre Street, Suite 216 · Ridgewood, New York · 11385 · t : (929) 888.9480 · f : (929) 888.9457 · FemmeLaw.com



information about officer misconduct must be "entered into computerized relational databases," in a way that allows the NYPD to "systematically assess" certain kinds of conduct. *Id.* at 5-6. By specifying that the database must be relational, the Court required that the database be capable of identifying relations between the data it stores. It is also beyond belief that a modern relational database would *not* be text searchable. That is, the fact that the word "relational" is used means that if the database is not text searchable, the NYPD is almost certainly violating the Order because then the database as it exists is not "relational." And the Order further specifies in multiple places that "NYPD shall enter into the computerized database described in paragraph 2 above" various kinds of information. *Id.* at 5, 10. Likewise, the Order specifies that the NYPD must collect information about declinations to represent or indemnify officers (although because the EIP was formed in 2020, it does not necessarily have information about the historical practices Plaintiffs are investigating). *Id.* at 4-5. Again, all of this means the databases should be text searchable.

The bottom-line purpose of all of this was so that the "the NYPD [could] designate personnel to compile the above categories of information on a regular basis and identify police officers who may require early intervention" and so that stakeholders could "develop a program for systematically receiving and assessing information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements for consideration in officer performance evaluations, transfer requests and discretionary promotional decisions." *Id.* at 6. Put directly: If the database is not reasonably searchable, the NYPD has set it up in a way that can only be described as designed to thwart the *Floyd* remedial order.

While the *Floyd* Order was limited to certain kinds of arrests, the City decided — quite reasonably — to apply the same procedures more broadly. That is, the EIP is not limited to stop-and-frisk and other similar misconduct. Rather, it is (supposedly) broadly "designed to mentor and coach officers to provide support and to ensure that each officer is performing his or her job in a way that scrupulously adheres to the legal, moral, and ethical principles to which the Department subscribes by correcting issues as soon as they are identified" without limitation.[8] The reports issued by the EIP reflect this — including, for example, candidates for early intervention because of, among other things, "Biased Policing Allegation[s]," "CCRB," "Vehicle Pursuit," "Adverse Credibility Finding[s]," and "Declined Prosecutions."[9] Indeed, in one report, the EIP specifies that "Two UMOS were assessed due in part to their recent history of use of force."[10] Or, put differently, the program is designed to systemically track potential bad apples to try to catch them before the whole barrel rots. And such systemic tracking only works at all if the system allows searching and easy review. The entire system fails if simply pulling or searching for information is too burdensome to ever do.

Yet, in this context, Defendants refused to even answer the question of whether information was text searchable — or whether it could be loaded into the Relativity database the City is already using for this exact purpose in this litigation. Instead, they simply expected Plaintiffs to take at face value the claim that there was some unspecified burden. That is simply not credible or reasonable. If

---

[8] https://www.nyc.gov/site/nypd/stats/reports-analysis/early-intervention-program-reports.page
[9] https://www.nyc.gov/assets/nypd/downloads/pdf/eip/2q2022-eip-data-report.pdf,
https://www.nyc.gov/assets/nypd/downloads/pdf/eip/3q2021-eip-data-report.pdf
[10] https://www.nyc.gov/assets/nypd/downloads/pdf/eip/data-from-august-through-december-2020.pdf



Page 6 of 9

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



the City has violated the *Floyd* order, it can say so — but the Order is clear the database must be relational and useable in the ordinary ways a computer database is (including being searchable). Even then, if there is some obscure technical problem, the solution is to bring knowledgeable people to the meet and confer — not to stonewall and demand Plaintiffs take half-remembered[11] information at face value. All of this calls to find Defendants have failed to meet the burden of showing a burden "so great" (Dkt. No. 780) that they should another attempt at it.

Beyond that, though, even if it were true that entirely manual review is required — and that obviously not true — the burden does not appear undue. Rather, Defendants' counsel appears to simply be uninformed about the volume of information at issue. Because of the age of the EIP, the relevant records it will have are records about the 2020 protests at issue in this case. For those records, as explained above (unless Defendants believe there are records in other quarters), the relevant referrals likely end early in 2022 at the latest. Taking that view, despite Defendants' bare representation that there were reviews required for files of "well over 1000 officers" (Ex. 3 at 5-6), the simple fact is that (according to the public data both parties are using) between the inception of the program in 2020 and the first quarter of 2022, ***there were only a total of 453 referrals***.[12] And even then, not every referral is a unique officer. A summary report is easily available for each referral, and a review of that sheet would be sufficient to determine whether the referral involved misconduct at a protest or a protest-related arrest. Moreover, because of the nature of the *Floyd* Order, again, unless the City is saying it has violated the *Floyd* Order, all of the records related to each referral are in one place.

All of that adds up to an easy conclusion: the burden here is neither "so great" nor "so … obvious" as to allow Defendants to walk back their "ordinarily … binding" — and made under a collection of orders and sanctions — "agree[ment] to produce such documents." Dkt. No. 780 at 1.

B. **Defendants have shown no burden at all to collecting the small volume of declinations to indemnify in the relevant period.**

The document request also seeks information outside the EIP as to declinations to indemnify or represent officers who engaged in misconduct at protests. At the meeting, Plaintiffs sought to find out, among other things, whether the number of times the City has ever declined to indemnify an officer in a protest case is more than a small handful. The City refused to even provide that baseline information. But historically such declinations are extremely rare, verging on non-existent.[13]

---

[11] It is worth noting that repeatedly throughout this case, Defendants attorneys will assert one thing, and then as soon as someone with knowledge shows up, the opposite turns out to be true. For example, Defendants asserted that the NYPD no longer uses "UF-49s." Then, they walked that back. Or they asserted there was no way to export audit trail logs from Evidence.com. Then, they walked that back. Or they asserted that disciplinary records were not text searchable. Then, they walked that too back. This is by no means an exhaustive list.

[12] Indeed, it is not even clear that program has referred over a thousand officers in its entire existence.

[13] In fact, relying on interrogatories saying "there are no cases" in which the City Law Department "has represented a NYPD police officer and punitive damages have been assessed against the officer, and the City of New York has failed to indemnify the officer for punitive damages" or "compensatory damages," one



Page 7 of 9

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



At present, we do not understand this to be part of the City's asserted burden — particularly given that its response (Ex. 3 at 5-6) declined to provide even the baseline information.[14]

Thus, even on Defendants' own terms, the burden at issue is reasonable relative to the importance of the information — and would be appropriate even under the more traditional standard. It by no means reaches a stage where it is "so great" that it should override the City's clear and unambiguous promise to produce these documents.

### II. In the Alternative, the Court Should Schedule a Hearing to Resolve this Issue.

If the Court believes that the *Floyd* Order itself and common sense do not establish the burden is negligible, Plaintiffs would ask the Court to set a hearing to finally resolve this. Defendants have managed to drag this motion from September of last year — based on a meet and confer Plaintiffs asked for in a detailed letter on June 28, 2022, and after Defendants shifted positions after a meeting for two months —- for nearly a year. Particularly given the point of the chart in general — an attempt to get Defendants to "put up or shut up on all the document requests about what it is you're producing and what []you're not" (2022-02-18 Tr. 99:16- 19) — some end point must come to the City's time to assert a burden. It has now been more than four months since the Court ordered the parties to confer. Yet, Defendants still have not explained why they think there is a burden — indeed, they are still mechanically and uncritically reciting information that is demonstrably untrue (specifically, that somehow, reviewing 453 or so referrals somehow is reviewing files for "well over 1000 officers").

Since the City is not apparently willing to do so in meet and confers, if the Court does not believe either (1) the burden is clearly not "so great" as to excuse violation of its orders or (2) the burden objection is not waived by the City's refusal to engage, Plaintiffs respectfully ask that the Court schedule a hearing to finally get to the end of this issue.

### CONCLUSION

As set out above, we ask that the Court either (1) overrule the burden objection, since the objection is ill-founded anyway, or (2) set a hearing, where members of the NYPD are directed to

---

Court barred the City from even suggesting an officer will individually pay to juries or mentioning the officer's finances, because "If in fact the reality is that in the last 100 punitive damages awards the city has always indemnified," any such testimony or argument would be irrelevant. *Gyasi v. City of N.Y.*, No. 05 Civ. 9453 (S.D.N.Y.), relevant documents attached in Ex. 4 at Int. 5 and 7; and Ex. 5 at 6.

[14] As noted above, the public information Defendants pointed to does not appear to say anything at all about indemnification, or anything definitive about representation: Rather, here is a sample of the information in those spreadsheets:

| Matter Name | Plaintiff & Firm | Individual Defendants | Tax # | Represented by | Lit Start | Disp Date | Total City Payout AMT | Disposition | Docket/ Index# | Court | Use of Force Alleged? | Assault/ Battery Alleged? | Malicious Prosecution Alleged? | False Arrest/Imprisonment Alleged |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A., R., ET AL. VS CITY OF NEW YORK, ET AL | Akhand, Rubayat-Law Offices of Steven A. Hoffner, Esq.; Kumar, Ivan-Law Offices of Steven A. Hoffner, Esq.; Kumar, Ryan-Law Offices of Steven A. Hoffner, Esq.; Kumar, Mandeep-Law Offices of Steven A. Hoffner, Esq. | | | | 7/17/2015 | 1/31/2017 | $550,000.00 | Settlement | 15CV03787 | U.S. District Court - Eastern District NY | Y | N | N | Y |
| AARON, ELAINA VS CITY OF NEW YORK | Aaron, Elaina-Douglas Herbert, Esq. | | | | 4/5/2018 | | $0.00 | | 009010-2018 | Civil Court - Kings | N | Y | Y | Y |
| ABASCAL-MONTALVO, ISIDRO VS CITY OF | Abascal-Montalvo, Isidro-Pro Se | | | | 5/5/2016 | | $0.00 | | 100112/2016 | Supreme Court - New | N | N | N | Y |

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



appear and testify as to what the burden actually is, so this issue can finally be resolved.

Once again, we thank the Court for its continued time and attention.

                                                      Respectfully submitted,

                                                       /s/
                                                _____

J. Remy Green
    *Honorific/Pronouns: Mx., they/their/them*
**COHEN&GREEN P.L.L.C.**
*Attorneys for Sow Plaintiffs*
1639 Centre St., Suite 216
Ridgewood, New York 11385

cc:
All relevant parties by electronic filing.

Page 9 of 9

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com