# EXHIBIT G

New York City
Department of Investigation



# Investigation into NYPD Response to the George Floyd Protests

Margaret Garnett
Commissioner

December 2020

**Investigation into NYPD Response to George Floyd Protests**

### B. NYPD's Intelligence Bureau Role During the Floyd Protests

DOI sought to understand the role of the Intelligence Bureau in connection with the Floyd protests based on public statements by the Mayor, Police Commissioner, and other NYPD officials emphasizing that intelligence informed tactical decisions during the protests. The public statements included the following:

- On May 31, Deputy Commissioner John Miller provided a press briefing, stating that NYPD had evidence providing a high level of confidence that disorderly groups had organized bike scouts, medics, and supply routes of rocks, bottles, and accelerants for the purpose of vandalism and violence.[60]

- On June 5, Mayor de Blasio and Commissioner Shea pointed to intelligence to justify the mass arrest that took place the prior evening in Mott Haven.

- On June 6, Deputy Commissioner Miller provided a second press briefing where he provided data on arrests, burglaries, and the numbers of injured officers. Deputy Commissioner Miller also noted that officers had been attacked with bricks, trash cans, vehicles, and other projectiles, as well as homemade incendiary devices such as Molotov cocktails. The briefing also contained information on specific incidents, including the knife-attack by a "homegrown violent extremist," a Bronx vehicle stop that resulted in the discovery of hammers and accelerants, and a gun arrest that took place in the South Bronx prior to the Mott Haven protest.

DOI sought to determine (1) the Intelligence Bureau's role during the protests; (2) which intelligence the NYPD disseminated during the protests; and (3) the effect of that intelligence. To do so, DOI interviewed Intelligence Bureau officials and reviewed thousands of pages of

---

[60] Tom Winter et. al., *NYPD's Terrorism Official Says Unnamed Groups Planned Protest Violence in Advance*, NBC 4 New York (May 31, 2020), *available at* https://www.nbcnewyork.com/news/local/nypds-terrorism-chief-says-unnamed-groups-planned-protest-violence-in-advance/2440722/; Lisa Rozner, *CBS2 Gets An Exclusive Look Inside The NYPD's Joint Operations Center As Officers Monitor Protests*, CBS 2 New York (May 31, 2020), *available at* https://newyork.cbslocal.com/2020/05/31/nypd-joint-operations-center-protests/.

**Investigation into NYPD Response to George Floyd Protests**

intelligence materials created or disseminated between May 28 and June 20, 2020.

Based on its intelligence collection activities, the Intelligence Bureau created several types of work product that went outside the Bureau:

- *Intelligence Bureau Daily Binders*. These binders provide a daily roundup containing a variety of information ranging from counterterrorism leads to gang activity. During the Floyd protests, the binders included open source information on upcoming demonstrations as well as demonstrations in the prior 24-hour period.

- *Situation Reports*. These documents, which are not limited to protests, report various types of criminal activity and incidents, including information on violent felonies, serious officer injuries, and arrests during protests.

- *Tactical Assessments*. These reports, much like situation reports, contain information on various types of criminal activity and incidents. During the protests, they focused on potential threats to officers in New York City based on reports of events that had occurred outside New York City that reportedly involved violence against law enforcement officers such as shootings, improvised incendiary attacks, and vehicle tampering.

- *Handschu Investigative Statements*. The *Handschu* consent decree requires that prior to any investigation into First Amendment activity—including investigation of unlawful activity by protesters or protest organizations—the Intelligence Bureau provide written justifications and receive written approval from the Deputy Commissioner of Intelligence and Counterterrorism. Absent exigent circumstances, that written approval must occur prior to any investigative action.

NYPD officials informed DOI that the binders and situational reports had a narrowly limited distribution to NYPD executives or senior officials. Conversely, all officers throughout the Department received the tactical assessments on their mobile devices through the NYPD's

DEF_000174265

messaging application. *Handschu* Investigative Statements go only to the designated *Handschu* Committee.

### C. Use of Intelligence During the Floyd Protests

#### 1. Changes in Protest Activity

Intelligence Bureau officials noted that the protests caught them off guard in terms of their size and intensity despite the fact that the Department typically handles between approximately 20 and 30 protests of some kind per day, and previously responded to large demonstrations during events such as the Republican National Convention and Occupy Wall Street. Officials also explained that while groups and organizers familiar to NYPD organized some of the demonstrations during the Floyd protests, relatively new leaders and groups, or leaderless protests, were common and were coordinated, if at all, largely by communication on social media shortly before or during the protests themselves.

Officials described ideological opposition among some of these new leaders and organizations to coordinating with police regarding the plans for their protests. Additionally, officials cited the increasing use of "de-arrest" tactics, which they described as efforts by protesters to actively interfere when an officer attempts to arrest another protester. De-arrest tactics have the potential to increase arrests as interference in the arrest of another can have ripple effects resulting in additional arrests. Such tactics also can risk officer safety and protester safety and contribute –partly by design—to a sense of chaos and mayhem. Intelligence officials explained that they provided information to NYPD leadership and officers relating to the increasing use of these tactics.

These circumstances appear to have presented intelligence challenges for identifying relevant information about the Floyd protests to assist in response planning or guide police action. The Intelligence Bureau drew on prior relevant information about some of the protest groups that were most likely to encourage, condone, or engage in violence or property destruction as a tactic. That information was appropriately shared with NYPD leadership. However, the Bureau had limited information about the relative importance of these groups or actors in the context of the Floyd protests as a whole. The unexpected scope, size, and spontaneity

**Investigation into NYPD Response to George Floyd Protests**

of the protest activity made it difficult to place this information in context and utilize the information they did have to inform policing decisions. These circumstances may have led NYPD leadership to overweight the importance of these groups relative to the protest participants as a whole.[61]

### 2. Specific Intelligence

The Intelligence Bureau collected and disseminated an array of information concerning risks of violence against police officers and damage to police property. Intelligence officials gathered some of this information from reports of hostile postings about police on social media, as well as reported incidents from jurisdictions outside New York City. Though some of the intelligence materials represented a catalogue of generalized threats that lacked clear guidance for policing protests in the City, there were also instances where the Intelligence Bureau supplied specific intelligence that clearly played a role in guiding police response during particular protest events. In the course of DOI's review, we found that some police actions were narrowly tailored to identified threats, acknowledging the limitations of the available intelligence, while in other cases limited intelligence was used to justify a disproportionate response.

Mott Haven provides an illustrative example. The Intelligence Bureau and Bronx Borough Command had information pertaining to the June 4 protest in Mott Haven, which was organized by the "FTP Coalition."[62] NYPD officials reported a prior history of violence and property damage at FTP protests, and social media posts purporting to be from organizers prior to the Mott Haven protest depicted flaming police vans and a graphic of a masked protester punching a cop, among other similar images. In addition, three incidents raised particular concerns:

1. Officers conducted a vehicle stop near the planned protest location and found hammers, fireworks, and lighter fluid;

---

[61] These concerns highlight the importance of robust community affairs involvement in policing protests. *See* MAGUIRE & OAKLEY at 57 (discussing research on policing that emphasizes the value in building relationships with community members and "knowing potential allies").

[62] "FTP" is known to stand for "Fuck the Police," but has also been described as standing for "Feed the People" or "For the People."

> evidence indicated that the vehicle occupants had been attending protests.
>
> 2. Officers arrested two men after a search of their vehicle uncovered, among other items, knives, two bricks, one power saw, and two bottles of fuel injector.
>
> 3. Officers recovered a firearm from an alleged gang member during a vehicle stop near the planned protest location prior to the start of the Mott Haven protest; other evidence indicated that the occupants of the vehicle intended to participate in the Mott Haven protest that evening and then to travel on foot into Manhattan to join others intent on looting.

On June 5, the day after the Mott Haven protest, both the Mayor and Police Commissioner pointed to the intelligence to explain the mass arrests of hundreds of protesters.[63] The Bronx borough commander explained to DOI that the totality of the intelligence, as well as his own conversations with Bronx business leaders following the extensive looting that had occurred on Fordham Road several days earlier, convinced him that it was appropriate to approach policing the Mott Haven protest with heightened concerns. The commander said that business leaders in Mott Haven pleaded with him for police to prevent looting and, on June 4 before the start of the protest, reported discovery of a collection of bricks and broken cinderblocks in the area. Ultimately, he determined during the protest that the primary goals were to prevent the assembled group from travelling into Manhattan and to prevent the group from splintering off towards commercial areas, including the Hub; he thus determined that strict curfew enforcement through encirclement and mass arrests was the appropriate tactic.

DOI recognizes that officers regularly make police judgments based on available information. Intelligence is often an inconclusive web of leads, allegations, or partial accounts requiring further corroboration, verification, and investigation—which may not always be possible to do

---

[63] Mayor de Blasio: "I've seen with my own eyes the materials that were meant to encourage violence." Commissioner Shea: "[T]hey put out posters advertising that they were going to burn things down, that they were going to injure cops, that they were going to cause mayhem. That was the plan. We disrupted the plan." Office of the Mayor of New York City, Transcript: Mayor de Blasio Holds Media Availability (June 5, 2020) (available at: https://www1.nyc.gov/office-of-the-mayor/news/410-20/transcript-mayor-de-blasio-holds-media-availability).

**Investigation into NYPD Response to George Floyd Protests**

before the existing intelligence must inform operational decisions. DOI's investigation found that NYPD did have actionable intelligence that indicated the serious potential for violence and looting by some participants to occur at, or arise out of, the Mott Haven protest. Viewed only through that lens, the actions taken (chiefly, dividing the group and then arresting nearly everyone present in an encircled area as soon as the curfew began) did ensure that those potential events did not occur. Moreover, the NYPD had the legal authority to make those arrests based on the curfew order. But this approach came with significant costs. The force required to carry out a mass arrest was disproportionate to the identified threat, placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity, and severely damaged the Department's legitimacy in the eyes of those present, the surrounding community, and (given the attention to these events) the City as a whole.[64]

### Finding 4: NYPD Deployed Officers Who Lacked Sufficient Recent Training on Policing Protests

DOI also reviewed NYPD's training related to policing mass demonstrations and protests. Before the Floyd protests, NYPD training related to protests was provided through Police Academy curriculum for recruits, newly promoted supervisors, or officers assigned to SRG, as well as in-service training.[65] However, a significant number of officers deployed by the NYPD to respond to the Floyd protests lacked recent training related to policing protests. After the Floyd protests, the Police Commissioner directed that expanded in-service training curriculum related to policing protests be created and deployed for officers. Much of the expanded training instructs officers on a disorder control approach to policing protests.

---

[64] *See* MAGUIRE & OAKLEY at 50 (discussing research on potential long-term damage to beliefs about police legitimacy); FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING 16 ("1.6 Recommendation: Law enforcement agencies should consider the potential damage to public trust when implementing crime fighting strategies. Crime reduction is not self-justifying. Overly aggressive law enforcement strategies can potentially harm communities and do lasting damage to public trust. . . .")

[65] Generally, Academy training provides instruction to newly hired or promoted officers so that they can perform functions of their role, such as new recruits or officers recently assigned to a specialized unit like SRG. In-service training provides refresher courses on material previously covered in an Academy course or instruction on new job requirements or expectations relating to an officer's position.

DEF_000174269

**Investigation into NYPD Response to George Floyd Protests**

### A. Training Before the Floyd Protests

#### 1. Academy Training

##### a. New Recruits

The Police Academy curriculum for new recruits does not have a specific course on policing protests. However, several Academy courses for newly hired recruits relate in some way to policing protests. The Academy curriculum includes a four-hour module on disorder control training conducted by the Disorder Control Unit. In this module, DCU instructors discuss legal considerations, Long Range Acoustic Device (LRAD) awareness, flex-cuffing techniques, mass arrest techniques, and team formations.[66]

The Academy curriculum also includes sixteen-and-a-half hours of training on additional topics that include some material applicable to policing protests. Relevant courses include the following:

- "Discretion": covers the concepts of law enforcement discretion and accountability with respect to protests, informs recruits that their duties at a demonstration are to protect the rights of both the demonstrators and non-demonstrators and to remain neutral while doing so. The course also teaches officers that they will be required at some demonstrations to follow specific orders and not take independent police action without prior permission.

- "Maintaining Public Order": covers a police officer's role at a demonstration and at a civil disorder or riot.[67] The course provides basic guidance on the First Amendment and viewpoint non-discrimination. The course also discusses the guidelines for police conduct at a demonstration, including use of force, and response

---

[66] While DOI did not receive the lesson plan or training material associated with this particular training module at the time this Report was issued, DOI did receive the training material associated with the SRG Academy curriculum for disorder control training. The topics referenced above are covered in that SRG Academy curriculum and are discussed in more detail below.

[67] The curriculum defines "demonstrations" as "organized groups comprised of many persons as well as the individual or small groups of individuals who utilize free speech and assembly to further their cause;" New York City Police Department, Police Academy, Chapter 11 Maintaining Public Order Instructor Guide at 20 (2014), and "civil disorders" or "riots" as "series of events where the civilian population engages in a mass action of lawlessness." New York City Police Department, Police Academy, Chapter 14 Civil Disorder Offenses Instructor Guide (2015), at 1-2.

DEF_000174270

to violent or nonviolent conduct toward officers on the part of demonstrators.[68]

- "Use of Force": aims "to train officers to differentiate between the various physical force options available to them. The training is also meant to prepare officers to explain how the force used was reasonable, based on a totality of the circumstances. The course teaches officers to determine the amount of force that they are permitted to use in a given situation, taking into account both the general nature of the situation they are confronting and the danger presented to the officer."[69]

Police recruits also participate in training on the use of O.C. pepper spray and batons. Pepper spray training includes a written and practical examination. The training indicates that pepper spray use may be appropriate during arrests or situations involving custodial constraint when other physical force or verbal commands have not or will not be successful. The training notes that officers should not use pepper spray in circumstances where physical force is not required or when subjects are exhibiting passive resistance. The training further informs officers to avoid using pepper spray indiscriminately across a large area in disorder control situations.[70] Baton training indicates that baton use may be appropriate when a subject is displaying threatening behavior, becoming violent, or attempting to assault an officer or third person during an arrest situation. As in the "Use of Force" course, the baton training instructs officers to use only the reasonable amount of force based on the totality of the circumstances. The training module associated with the expandable baton specifically notes that an officer should use their baton instead of their fists or feet whenever possible,

---

[68] The curriculum also includes a "Custodial Offenses" course that defines offenses such as resisting arrest, obstructing governmental administration and escape, and a "Civil Disorder Offenses" that discusses offenses of disorderly conduct, loitering, unlawful assembly, and inciting a riot, and notes that these offenses may pertain to unlawful conduct of persons at the scene of demonstrations or civil disturbances. New York City Police Department, Police Academy, Chapter 12 Custodial Offenses Instructor Guide (2015).

[69] *See* NEW YORK CITY DEP'T OF INVESTIGATION, OFFICE OF THE INSPECTOR GENERAL FOR THE NYPD, POLICE USE OF FORCE IN NEW YORK CITY: FINDINGS AND RECOMMENDATIONS ON NYPD'S POLICIES AND PRACTICES (2015), *available at* https://www1.nyc.gov/assets/doi/reports/pdf/2015/2015-10-01-Pr_uofrpt.pdf.

[70] The training notes that officers specifically trained in pepper spray use for disorder control situations can use pepper spray as long the use is in compliance with their training, Department guidelines, and supervisor authorization is given.

and that an officer can use a baton as a means of force to direct a disorderly crowd into a selected area or to defend the officer's life.

### b. Specialized Units

Police personnel assigned to SRG attend an initial twenty-seven-day SRG Academy. Five of those Academy days are dedicated to disorder control training.[71] DOI reviewed the SRG Academy curriculum for disorder control training. The curriculum includes sixteen training modules each between fifteen minutes and ninety minutes in duration. Some curriculum topics related to policing protests are the following:

- "Mass Arrest": covers who within the Department can authorize an arrest at a civil disobedience event, the roles of the arrest team members, and the potential support units for a mass arrest.

- "Team Carries": discusses when and how to use multiple officers to carry and transport a noncompliant arrestee who refuses to move.

- "Legal Considerations": covers the legal and constitutional rules and guidelines associated with operations and use of force in crowd control management.

- "Flex-cuff Utilization": covers the proper application and removal of flex-cuffs, and discusses several precautions when utilizing flex-cuffs.[72]

- "Long Range Acoustic Device" (LRAD): discusses circumstances and authorization for use. Officers use the LRAD to communicate with a group during a protest or demonstration in order to provide instructions, provide warnings, or give lawful orders.

Additionally, there are five separate modules related to physical crowd management and control formations used by the SRG, including

---

[71] In addition, DOI learned that officers promoted to the rank of Sergeant, Lieutenant, and Captain receive a one-hour refresher course on disorder control concepts.
[72] Some precautions include periodically checking to ensure there is adequate blood flow to the hands of someone who is flex-cuffed and being aware of signs of poor circulation (e.g., loss of color in hands).

**Investigation into NYPD Response to George Floyd Protests**

---

instruction on line formations, separation formations, wedge formations, encirclement formations, and crossbow formations.

Officers assigned to the SRG Bicycle Squad attend an initial five-day training course, beyond the general SRG Academy. The curriculum includes twenty-one training modules. Curriculum topics related to policing protests include "Introduction to SRG Bicycle Squad," "Crowd Control and Crowd Management," and several one-hour training modules related to riding tactics and formations.

### 2. In-Service Training

In addition to NYPD's Academy training programs, the Department provides a range of in-service training courses, some Department-wide and some to particular groups of officers based on rank or duty. A NYPD executive informed DOI that training sergeants and officer liaisons also offer in-service training to those in their assigned command, some of which may be related to policing protests, at the precinct or borough command level. Training sergeants and training officer liaisons obtain training from the Academy's Specialized Training Section on a monthly basis and then return to their respective precincts or boroughs to offer training to the officers assigned there. In addition, a review of the NYPD's 2020 Training Course Catalog indicates that several training courses related to protests are available to officers. For instance, there are courses taught by SRG available to uniformed officers, including "Demonstrator Tactics" and "Field Force Operations (FFO)—Level II."[73]

In addition to the specialized SRG Academy, SRG officers receive additional in-service training related to policing protests. SRG officers participate in an annual two-day in-service training course as well as eight monthly, two-hour unannounced drills. Additionally, members of the SRG Bicycle Squad participate in an annual two-day refresher course. However, other than for personnel assigned to SRG, DOI found that, prior to the Floyd protests, NYPD lacked standardized, agency-wide, in-service training related to policing protests.

---

[73] The "Demonstrator Tactics" course description provides "[a] lecture to describe the tactics used to create disorder including the many individual roles within various protester groups." The field force course description provides that "[m]embers will gain knowledge by studying and analyzing past civil disturbances, demonstrations and the police response to those events, cities, and law enforcement agencies can apply lessons learned from those experiences to current and future incidents." *See* New York City Police Department, 2020 NYPD Training Course Catalog.