UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JARRETT PAYNE; ANDIE MALI; CAMILA GINI; VIDAL GUZMAN; VIVIAN MATTHEW KING-YARDE; CHARLIE MONLOUIS-ANDERLE; JAMES LAUREN; MICAELA MARTINEZ; JULIAN PHILLIPS; NICHOLAS MULDER; and COLLEEN MCCORMACK-MAITLAND, | |
| Plaintiffs, | |
| v. | 1:20-cv-08924 (CM) (GG) |
| MAYOR BILL DE BLASIO; CHIEF OF DEPARTMENT TERENCE MONAHAN; CITY OF NEW YORK; COMMANDING OFFICER OF PATROL BOROUGH BRONX, CHIEF KENNETH LEHR; SERGEANT MAJER SALEH; OFFICER BRYAN S. ROZANSKI; OFFICER JAKUB TARLECKI; SERGEANT KEITH CHENG; OFFICER MATTHEW TARANGELO; OFFICER STEPHANIE CHEN; OFFICER TAYLOR CORCORAN; OFFICER MATTHEW L. PERRY; DETECTIVE DAMIAN RIVERA; OFFICER BRYAN PIZZIMENTI; OFFICER JOSEPH DECK; LIEUTENANT MICHAEL BUTLER; OFFICER AARON HUSBANDS; SERGEANT THOMAS E. MANNING; OFFICERS JOHN DOE 1-26; OFFICER JANE DOE 1; OFFICER DOE ESPOSITO; and OFFICER HENSLEY CARABALLO, | **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |

## PRELIMINARY STATEMENT

1.      This civil rights action challenges the City of New York's brutal response to large-scale protests against police violence that began in May and June of 2020. On May 25, 2020, Minneapolis police officers murdered George Floyd, an unarmed Black man. The killing, which

was captured on camera, sparked protests across the country by people outraged by the callous and repeated murders of unarmed Black people by police. In New York City, protesters took to the streets and sidewalks in large numbers, focusing on a long history of racial violence and harassment by the New York Police Department. Protesters repeatedly were met with the very pattern of police violence they marched to end. The Mayor of New York and the NYPD's leadership condoned and even promoted that violence.

2.      Over and again, at protests throughout the City in May and June, NYPD officers descended on protesters with unjustifiable fist and baton strikes, chemical pepper spray attacks, and other acts of physical violence. At numerous protests, officers encircled groups of protesters to prevent them from escaping such violence using a tactic repeatedly endorsed by NYPD leadership called "kettling." Protesters, who were arrested en masse, were placed in excessively tight plastic handcuffs commonly referred to as "flex-cuffs" or "zip ties," which caused pain, bruising and, in some cases, led to long-term injury. Almost none of the officers involved in the attacks or subsequent mass arrests wore masks, exposing the protesters to the deadly coronavirus. At the end of the onslaughts, protesters were left with bloody head wounds, concussions, broken bones, and emotional trauma.

3.      These attacks and mass arrests were directed by NYPD supervising officers, including officers at the highest ranks of police leadership. They were unprovoked and legally unjustified. And, they were undertaken in retaliation for the protesters' message — calling for greater police accountability, a reallocation of funding from away from police departments and into Black and Latinx communities, the end of police brutality, and a recognition that Black Lives Matter.

4.      Prior to directing officers to police these protests, Mayor Bill de Blasio, NYPD Commissioner Dermot Shea, and Chief of Department Terence Monahan deliberately failed to take steps to prevent police from using excessive force against non-violent protesters, including failing to adequately train or supervise police to avoid excessive force. As the protests continued and well-documented, indisputable patterns of unlawful use of force emerged, the Mayor, the Commissioner, and Chief Monahan deliberately did not take steps to prevent police from using those tactics again and again. Instead, they repeatedly praised the actions of the NYPD, promoting, authorizing, sanctioning and encouraging mass arrests and further violence, including several of the specific tactics of violence and excessive force experienced by Plaintiffs and other protesters.

5.      The eleven individual plaintiffs in this action are victims of this violence spanning nine protests during one month in Manhattan, the Bronx, and Brooklyn. One of the plaintiffs, Jarret Payne, was victimized again by police at a protest against policy brutality in January 2021. These individuals suffered egregious abuses, including police officers breaking the arm of Plaintiff Charlie Monlouis-Anderle, pepper spraying Plaintiff Vidal Guzman directly in the face as he engaged in a moment of contemplation, and handcuffing Plaintiff Micaela Martinez so tightly that her hands became numb.

6.      Many of the protesters — including Plaintiffs Andie Mali, Camila Gini, Vivian Matthew King-Yarde, Jarrett Payne, Charlie Monlouis-Anderle, James Lauren, Micaela Martinez, and Julian Phillips — were arrested pursuant to mass arrest processing procedures for engaging in peaceful protesting. As punishment for participating in the protests, the NYPD transported and held them for long periods of time without adequate food and water and in cramped, filthy, and unsanitary conditions that further endangered their health. In some instances, the NYPD prolonged their detention on account of their race.

7.      The Defendants' actions violate the First and Fourth Amendments of the United States Constitution and their counterpart provisions of the New York Constitution. The Plaintiffs seek a declaration that the City's violent response to the protests was unlawful as well as injunctive relief and damages for injuries stemming from the violations of the Plaintiffs' rights.

**PARTIES**

8.      Plaintiff Jarrett Payne (he/him) is a Black resident of Queens, New York who was falsely arrested and subjected to excessive force and excessive detention on June 2, 2020 and January 18, 2021 in New York, New York.

9.      Plaintiff Andie Mali (he/him) is a Black resident of Queens, New York who was falsely arrested and subjected to excessive force and excessive detention on May 30, 2020 in Brooklyn, New York.

10.      Plaintiff Camila Gini (she/her) is a Hispanic resident of Queens, New York who was falsely arrested and subjected to excessive force and excessive detention on May 30, 2020 in Brooklyn, New York.

11.      Plaintiff Vidal Guzman (he/him) is a Latinx resident of Harlem, New York who was subjected to excessive force on May 30, 2020 in New York, New York.

12.      Plaintiff Vivian Matthew King-Yarde (he/him) is a Black resident of Brooklyn, New York who was falsely arrested and subjected to excessive force and excessive detention on May 31, 2020 in New York, New York.

13.      Plaintiff Charlie Monlouis-Anderle (they/them) is a Black resident of Brooklyn, New York who was falsely arrested and subjected to excessive force and excessive detention on June 3, 2020 in Brooklyn, New York.

14.     Plaintiff James Lauren (they/them) is a white resident of Queens, New York who was falsely arrested and subjected to excessive force and excessive detention on June 4, 2020 in the Bronx, New York and excessive force on June 28, 2020 in New York, New York.

15.     Plaintiff Micaela Martinez (she/her) is a Chicano resident of New York, New York who was falsely arrested and subjected to excessive force and excessive detention on June 4, 2020 in the Bronx, New York.

16.     Plaintiff Julian Phillips (he/him) is a Black resident of Brooklyn, New York, who was falsely arrested and subject to excessive force and excessive detention on June 4, 2020 in the Bronx, New York.

17.     Plaintiff Nicholas Mulder (he/him) is white resident of New York, New York who was falsely arrested and subjected to excessive force and excessive detention on June 4, 2020 in Williamsburg, New York.

18.     Plaintiff Colleen McCormack-Maitland (she/her) is a white resident of Brooklyn, New York who was subjected to excessive force on June 28, 2020 in New York, New York.

19.     Defendant Bill de Blasio was, at all times relevant to this Complaint, the Mayor of New York City. As Mayor, de Blasio had final policymaking authority with respect to City policy generally, including with respect to the NYPD. In addition, as Mayor, de Blasio was responsible for appointing the New York City Police Commissioner. He is sued in his official and individual capacities.

20.     Defendant Terence Monahan is or was the Chief of Department of the NYPD at all times relevant to the complaint. As Chief, Monahan has been delegated final policymaking authority with respect to NYPD policies including, but not limited to, those related to management of protests; use of force; deployment of weapons; arrests; and treatment of arrestees. He is sued in

his official and individual capacities.

21.      Defendant Kenneth Lehr is or was the Commanding Officer of Patrol Borough Bronx. As Commanding Officer, Chief Lehr has been delegated final policymaking authority with respect to NYPD patrol officer practices in the Bronx including, but not limited to, planning for the policing of protests, the deployment of officers to protests, use of force by officers, enforcing curfew orders, and arrests. He is sued in his official and individual capacities.

22.      Defendant the City of New York is a municipal corporation within the State of New York. The NYPD is an agency of the City of New York.

23.      Defendant NYPD Sergeant Majer Saleh is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraph 123-24, *infra*. He is being sued in his official and individual capacities.

24.      Defendant NYPD Officer Bryan S. Rozanski is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiff described in paragraph 130–32, *infra*. He is being sued in his official and individual capacities.

25.      Defendant NYPD Officer Jakub Tarlecki is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiff described in paragraph 129–30, *infra*. He is being sued in his official and individual capacities.

26.      Defendant NYPD Sergeant Keith Cheng is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraph 143, *infra*. He is being sued in his official and individual capacities.

27.      Defendant NYPD Officer Matthew Tarangelo is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraph 144, *infra*. He is being sued in his official and individual capacities.

28.    Defendant NYPD Officer Stephanie Chen is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraph 152–59, *infra*. She is being sued in her official and individual capacities.

29.    Defendant NYPD Officer Taylor Corcoran is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraph 152–59, *infra*. She is being sued in her official and individual capacities.

30.    Defendant NYPD Officer Matthew L. Perry is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraphs 162–64, *infra*. He is being sued in his official and individual capacities.

31.    Defendant NYPD Detective Damian Rivera is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraphs 173–76, *infra*. He is being sued in his official and individual capacities.

32.    Defendant NYPD Police Officer Bryan Pizzimenti is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraph 184, *infra*. He is being sued in his official and individual capacities.

33.    Defendant NYPD Officer Joseph "Ducky" Deck is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraphs 194–95, *infra*. He is being sued in his official and individual capacities.

34.    Defendant NYPD Lieutenant Michael Butler is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraphs 209–11, *infra*. He is being sued in his official and individual capacities.

35.    Defendant NYPD Officer Aaron Husbands is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraph 211, *infra*.

He is being sued in his official and individual capacities.

36.     Defendant NYPD Sergeant Thomas E. Manning is or was a police officer employed by the NYPD who participated in the encounters with the Plaintiffs described in paragraph 216, *infra*. He is being sued in his official and individual capacities.

37.     Defendants NYPD Officers John Doe 1-26 are members of the NYPD whose full identities are not known to the Plaintiffs, but are or were employed as police officers by the NYPD, and participated in the encounters with the Plaintiffs described in paragraphs 113–209, *infra.* They are all sued in their official and individual capacities.

38.     Defendant NYPD Officer Jane Doe 1 is a member of the NYPD whose full identity is not known to the Plaintiffs, but is or was employed as a police officer by the NYPD, and participated in the encounters with the Plaintiffs described in paragraph 193, *infra.* She is sued in her official and individual capacities.

39.     Defendant NYPD Officer Doe Esposito is a member of the NYPD whose full identity is not known to the Plaintiffs, but is or was employed as a police officer by the NYPD, and participated in the encounters with the Plaintiffs described in paragraph 114, *infra*. He is sued in his official and individual capacities.

40.     Defendant NYPD Officer Hensley Caraballo is or was a police officer employed by the NYPD, and participated in the encounters with the Plaintiffs described in paragraph 216, *infra*. He is sued in his official and individual capacities.

## **FACTS**

**The Murder of George Floyd, the Long History of NYPD Harassment and Abuse Targeting Black and Latinx New Yorkers, and the Eruption of Protests in New York City**

41.     On May 25, 2020, a white Minneapolis police officer pressed his knee to George Floyd's neck during an arrest over a suspected counterfeit $20 bill. The officer kept his knee on

Mr. Floyd's neck for eight minutes and 46 seconds. Mr. Floyd repeatedly gasped, "I can't breathe." The officer did not remove his knee even after Mr. Floyd lost consciousness, and for a full minute after paramedics arrived at the scene. Mr. Floyd, a Black man, was declared dead at Hennepin County Medical Center less than an hour later. Official and independent autopsies determined his death was a homicide.

42.     The brutal killing of Mr. Floyd, captured on a bystander's video, sparked protests against police brutality in all 50 states and around the world. For many, the killing of Mr. Floyd was reminiscent of the killings of Tamir Rice, Philando Castile, Freddie Gray, Alton Sterling, and Michael Brown, all unarmed Black people killed at the hands of law enforcement officers. This year, once again, the entire country has been witness to a string of horrific examples of police violence against Black people including the killing of Ahmaud Arbery outside Brunswick, Georgia by a white retired police detective and his son; the March shooting of Breonna Taylor by Louisville, Kentucky police in her own home; and the May killing of Tony McDade, a Black transgender man, by police in Tallahassee, Florida, who yelled a racial epithet before shooting him.

43.     The NYPD has its own long history of violence towards Black and Latinx people. The NYPD's victims of racist violence include, to name only a few, Amadou Diallo, a West African immigrant who was gunned down by NYPD officers as he reached for his wallet on February 4, 1999; Sean Bell, who was murdered on the day before his wedding when officers unloaded a fusillade of 50 bullets into his car on November 25, 2006; Ramarley Graham, an 18-year-old teenager who was murdered in his bathroom by police officers on February 2, 2012; and Eric Garner, who was choked to death as he cried "I can't breathe" on July 17, 2014.

44.     In these instances and others, City and NYPD leaders have repeatedly failed to

answer demands from the family members of victims of police violence to hold officers meaningfully accountable for their misconduct, further exacerbating community distrust of the NYPD, particularly among Black and Latinx New Yorkers.

45.     Further, from 2002 to 2013, the NYPD implemented an aggressive and racially discriminatory stop-and-frisk program, making over 5 million stops. Nearly 90 percent of those stopped were Black or Latinx, and nearly all of them were innocent. In 2013, a federal court declared the program unconstitutional. While the overall number of stops has dropped significantly since the court's ruling, racial disparities in stop-and-frisk practices as well as in the enforcement of a range of low-level — so-called "quality of life" offenses — have only increased since 2013, continuing to strain relationships between police and the communities they are meant to serve, in particular Black and Latinx communities.

46.     When the COVID-19 pandemic hit New York City, the NYPD's enforcement practices disproportionately targeted Black and Latinx New Yorkers. In early May, the Kings County District Attorney's Office found that 35 out of 40 people arrested for social distancing violations were Black New Yorkers.[1] Additionally, while police officers handed out protective equipment in largely white neighborhoods, they used aggressive tactics to enforce social distancing in majority Black and Latinx neighborhoods.[2] In a bystander video gone viral, Officer Francisco Garcia is captured on video tackling, punching, and sitting on top of a Black man during an arrest

---

[1] Ashley Southall, *Scrutiny of Social-Distance Policing as 35 of 40 Arrested Are Black*, N.Y. TIMES (May 7, 2020), https://www.nytimes.com/2020/05/07/nyregion/nypd-social-distancing-race-coronavirus.html; Josiah Bates, *Police Data Reveals Stark Racial Discrepancies in Social Distancing Enforcement Across New York City*, TIME (May 8, 2020), https://time.com/5834414/nypd-social-distancing-arrest-data/.

[2] *Id.*

of social distancing enforcement.[3] A young Black mother was brutally arrested inside a subway station, in front of her young child, for improperly wearing a mask.[4] At the same time, photos, videos, and complaints of officers refusing to wear masks proliferated, reinforcing a sense of deep frustration at racist and unfair police encounters.[5]

### The City's Deliberately Hostile, Violent Response to Protests in New York and the Mayor and Police Leadership's Explicit Endorsement of that Response

47.     On May 28, the first significant protest in New York City sparked by the police killing of Mr. Floyd took place in Union Square in Manhattan.[6] As hundreds of people gathered, the NYPD deployed a massive and aggressive police presence, according to first-hand press accounts. Near City Hall, approximately 100 demonstrators filled the steps and sidewalk in front of the Tweed Courthouse. According to the New York Attorney General's preliminary report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd, the demonstrators were met "by dozens of police officers behind a wall of motorcycles." These police officers kettled the protesters, "trapping them between the façade of the courthouse and a line of officers who created a barricade with their bicycles."

48.     The next day, on May 29, protests in Manhattan and Brooklyn continued as did the NYPD's violence against protesters. Police made hundreds of arrests and indiscriminately used

---

[3] *Video of NYPD Arrest During Social Distancing Enforcement Sparks Outcry*, ABC NEWS (May 4, 2020), https://abc7ny.com/nypd-violent-arrest-east-village-caught-on-camera-legal-aid/6147631/; Justine Re, *Viral Videos Spark Concern About Unequal Social Distancing Enforcement in Five Boroughs*, SPECTRUM NEWS (May 6, 2020), https://www.ny1.com/nyc/all-boroughs/coronavirus-blog/2020/05/06/controversial-social-distancing-arrest.

[4] Jake Offenhartz, *Violent Arrest Of Brooklyn Mom During Mask Confrontation Deemed "Troubling" By De Blasio*, GOTHAMIST (May 14, 2020), https://gothamist.com/news/violent-arrest-brooklyn-mom-during-mask-confrontation-deemed-troubling-de-blasio.

[5] Michael Wilson, *Why are so many NYPD Officers Refusing to Wear Masks at Protests?*, N.Y. TIMES (June 11, 2020), https://www.nytimes.com/2020/06/11/nyregion/nypd-face-masks-nyc-protests.html.

[6] *At Least 40 Arrests Made At Union Square Protest Over George Floyd's Death*, CBS N.Y. (May 28, 2020), https://newyork.cbslocal.com/2020/05/28/several-arrests-made-at-union-square-protest-over-george-floyds-death/.

pepper spray on crowds of demonstrators at Barclay's Center on Flatbush Avenue in Brooklyn, including against least two Black state legislators — Senator Zellnor Myrie and Assemblywoman Diana Richardson. Both state legislators reported that "officers with bicycles began surrounding them and the group of protesters they were demonstrating alongside. The officers began pressing the wheels of their bikes into their bodies and then proceeded to pepper-spray them."[7] Videos showed NYPD officers violently throwing protesters to the ground, punching and striking protesters with their batons, and indiscriminately pepper-spraying protesters.[8]

49.    Answering criticism that the NYPD engaged in brutal tactics and failed to de-escalate the violence during the May 29 protests, Commissioner Shea blamed protesters, saying: "It's tough to practice de-escalation when you have a brick being thrown at your head." The Commissioner provided no evidence that any protesters had thrown bricks at the heads of any police officers. Shea described the protest at Barclay's Center as "a well-planned, orchestrated protest" designed "specifically to cause mayhem," providing no evidence that the intent of the protest was to "cause mayhem" and ignoring the many signs and chants specifically calling for reforms and de-funding of the NYPD.[9] Commissioner Shea repeatedly denigrated the protesters as "outsiders" and implied that their calls for changes to policing were akin to "anarchy."

50.    Police violence against protesters escalated further during demonstrations on May 30. At demonstrations in Brooklyn throughout the day, NYPD helicopters repeatedly flew low

---

[7] Amanda Luz Henning Santiago, *Even Black Lawmakers Get Pepper-Sprayed*, CITY & STATE N.Y. (June 3, 2020), https://www.cityandstateny.com/articles/politics/news-politics/even-black-lawmakers-get-pepper-sprayed.html.

[8] Matt Troutman, *NYPD, Protesters Clash at Rally Over George Floyd Killing*, PATCH (May 30, 2020), https://patch.com/new-york/prospectheights/brooklyn-joins-protests-over-george-floyd-killing.

[9] *200 Arrested in 2nd Day of Violent NYC Protests Against Police Brutality Over George Floyd Death*, NBC N.Y. (May 28, 2020), https://www.nbcnewyork.com/news/local/more-than-a-dozen-arrested-during-george-floyd-protest-at-union-square/2436965/.

over the protesters, kicking up trash in the streets and even bending trees. NYPD officers hit protesters with batons and pepper-spray and arrested many protesters, including kettling one group.[10] Many police officers had covered their badge numbers with black bands, preventing protesters from identifying officers who committed acts of violence.

51.     In one of the day's most extreme instances of violence, an NYPD truck facing a crowd of protesters standing behind a barricade in Brooklyn drove forward into the crowd, knocking people over.[11] Mayor de Blasio was aware of the incident, but he refused to hold the police officers accountable for endangering lives. Instead, he blamed the protesters.

52.     On the morning of May 31, Commissioner Shea tweeted out a message to the Members of the NYPD that ignored the widespread nonviolence and specific demands of the protests and legitimized the NYPD's violent response, saying: "What you've endured these last couple of days and nights — like much of 2020, so far — was unprecedented. In no small way, I want you to know that I'm extremely proud of the way you've comported yourselves in the face of such persistent danger." [12]

53.     In the early evening of May 31, over 600 protesters gathered near Union Square in Lower Manhattan. During this protest, an NYPD officer was videotaped flashing the "okay" hand gesture, a hand sign that has been tied to white supremacy.[9] Protesters continued to demonstrate peacefully into the evening, but police presence increased dramatically. As the evening went on,

---

[10] Alan Feuer & Azi Paybarah, *Thousands Protest in N.Y.C., Clashing With Police Across All 5 Boroughs*, N.Y. TIMES (June 11, 2020), https://www.nytimes.com/2020/05/30/nyregion/protests-nyc-george-floyd.html; Nick Pinto, *Over 300 Arrested In Third Day of Explosive George Floyd Protests in NYC*, GOTHAMIST (May 31, 2020), https://gothamist.com/news/over-300-arrested-third-day-explosive-george-floyd-protests-nyc.

[11] Amir Vera, *Video Appears to Show NYPD Truck Plowing Through Crowd During Protest*, CNN (May 31, 2020), https://www.cnn.com/2020/05/31/us/nypd-truck-george-floyd-protest/index.html.

[12] Commissioner Dermot Shea (@NYPDShea), TWITTER (May 31, 2020), https://twitter.com/NYPDShea/status/1267074838436425729.

police used kettling tactics and pepper-spray against protesters, swinging batons and pushing protesters to the ground.[10] During this protest, an NYPD officer also pointed and waved a gun at fleeing protesters.[11] By May 31, there were "[c]ountless videos circulated on social media showing officers violently clashing with demonstrators," barricading in protesters using the kettling technique, and "hitting people with batons and spraying pepper spray."[13] The same day, Governor Cuomo announced that he would ask the New York Attorney General to investigate violence against protesters by police that the Governor described as "truly disturbing" and "inexplicable."[14] The Governor also said that he had spoken to Mayor de Blasio about the Attorney General's investigation into the NYPD.

54.     On June 1, Mayor de Blasio issued Emergency Executive Order (EEO) 117, declaring a state of emergency within the City of New York and imposing a curfew on all of New York City's 8.4 million residents from 11:00 p.m. on June 1 until 5:00 a.m. on June 2. Based on the June 1 state of emergency, the Mayor issued two additional EEOs, 118 and 119, imposing a City-wide curfew from 8:00 p.m. on June 2 until 5:00 a.m. on June 8. These orders declared and then extended a separate state of emergency and imposed a curfew that banned people from public presence anywhere in New York City and imposed criminal liability on those who knowingly violated the order.

55.     Police enforcement of the curfew was inconsistent across the City. While in some instances police allowed protests to continue after the curfew, in other instances police used the

---

[13] Sydney Pereira, *Cuomo Says Attorney General Will Investigate NYPD's "Inexplicable" Policing Of George Floyd Protests*, GOTHAMIST (May 31, 2020), https://gothamist.com/news/cuomo-says-attorney-general-will-investigate-nypds-inexplicable-policing-george-floyd-protests.

[14] *Id.*

curfew as a pretext for perpetrating mass violence on and arresting protesters en masse, with no apparent justification for the differential treatment.

56.     On the evening of June 1 in Midtown, a phalanx of officers charged at a group of peaceful protesters, making arrests on the street and sidewalk, battering some with batons, and chasing them up Eighth Avenue with pepper spray.[15] The same night, near Union Square, a reporter for the *Wall Street Journal* said that officers hit him in the face with riot shields and pushed him to the ground as he held his hands up and displayed his press credentials.[16] On June 2 in the early afternoon, about 2,000 protesters gathered at Foley Square in Manhattan for a demonstration against police brutality. Police soon surrounded the protesters. After a number of speeches and chants held, the crowd, which had swelled to about 10,000 demonstrators, began marching north towards East Harlem without incident. But as evening approached and the demonstration arrived on the Upper West Side, the tenor and behavior of the police escorting this group changed dramatically. NYPD officers tackled a person with press credentials, charged into the crowd, and made several arrests.[17]

57.     That same day, in Chelsea, officers ripped a man out of his car for following behind a protest.[18] Elsewhere in Manhattan, NYPD officers forced two Associated Press journalists to

---

[15] Sydney Pereira, *Video: Cop Suspended Without Pay After Pepper-Spraying Bystander During* Demonstrations, GOTHAMIST (June 16, 2020), https://gothamist.com/news/video-cop-suspended-without-pay-after-pepper-spraying-bystander-during-demonstrations.

[16] *After Widespread Looting, Curfew Is Moved Up to 8 P.M.*, N.Y. TIMES (published Jun. 1, 2020, updated Jun. 2, 2020), https://nytimes.com/2020/06/01/nyregion/nyc-protests-george-floyd.html

[17] *Demonstrators Linger After Curfew, Some Are Arrested in New York City* N.Y. TIMES (published Jun. 2, 2020, updated Jun. 5, 2020), https://www.nytimes.com/2020/06/02/nyregion/nyc-protests-george-floyd.html

[18] Jake Seiner and Deepti Hajela, *'Not Stopping': Defiant NYC Protesters March Through Curfew*, ASSOCIATED PRESS (June 3, 2020), https://apnews.com/article/33dbad46a5f8f1ea6bef22869350fccf

stop covering the protests by surrounding, shoving, and cursing at them to go home.[19] Near the West Side Highway, multiple officers beat a female protester of color with batons.[20] Almost no NYPD officers wore masks during these close confrontations with protesters.

58.     On June 3, Ali Watkins, reporting for the *New York Times*, observed the kettling of protesters by NYPD officers at a rally near Cadman Plaza in Brooklyn. Police officers penned protesters with their bodies in close quarters, while the coronavirus pandemic still required social distancing. After police advanced on protesters, Watkins described the scene: "For the next 20 minutes in Downtown Brooklyn, officers swinging batons turned a demonstration that had been largely peaceful into a scene of chaos."

59.     During a June 4 press conference, the Mayor was asked about "widely circulated videos of NYPD officers hitting peaceful protesters with batons the previous night" in Cadman Plaza and claimed that he had not seen any of those videos.[21] De Blasio instead praised the police response: "It is the nature of New York City and the restraint shown by the NYPD that we're trying to give people extra space, if they do it the right way — if they respect the instructions of the NYPD and do no violence, no harm — don't commit any violence."[22] The Mayor failed to address that many protesters and bystanders abused by the police had acted in "the right way" but were nonetheless brutalized. At that same conference when asked whether he endorsed police violently

---

[19] The Associated Press, *Police Shove, Make AP Journalists Stop Covering Protest*, ASSOCIATED PRESS (June 2, 2020), https://apnews.com/article/1d2d9e4afdd822b27bfcce570e0cbdb5

[20] Yoav Gonen, Carson Kesler, and Peter Senzamici, *In Their Own Words: Dozens of Protesters Detail Violent Encounters with NYPD*, THE CITY (June 10, 2020), https://www.thecity.nyc/2020/6/10/21287326/protesters-detail-violent-encounters-with-nypd.

[21] Shant Shahrigian, *See No Evil: NYC Mayor de Blasio Claims Ignorance of NYPD Use of Batons on Peaceful Protesters*, N.Y. DAILY NEWS (June 4, 2020), https://www.nydailynews.com/news/politics/ny-bill-de-blasio-sees-no-evil-20200604-u5iryfqrpvcf5l4tfjvwl6igue-story.html.

[22] Ali Watkins, *Kettling of Peaceful Protesters Shows Aggressive Shift by N.Y. Police*, N.Y. TIMES (June 5, 2020), https://www.nytimes.com/2020/06/05/nyregion/police-kettling-protests-nyc.html.

dispersing peaceful protesters after the curfew with baton strikes, shoving, and pepper spray, Mayor de Blasio did not disavow such tactics.

60.     That same day at a different press conference — as protests calling for defunding the police and demanding police reform persisted — Commissioner Shea stated, "You look at the anti-police rhetoric, it disgusts me to my core."

61.     Around 9:15 p.m. on June 4, at a protest in the Williamsburg neighborhood of Brooklyn, police officers charged into a group of protesters and beat them with batons, tackling several people and making multiple arrests. Officers stood over at least a dozen protesters, zipping plastic handcuffs on them and ignoring screams and cries for help. One man, pinned face-down near the curb, said he was a member of the press. A woman who swore at officers was flung to the ground and cuffed. Around the corner on Bedford Avenue, at least three officers tackled a male cyclist, pulling him off his bike and onto the pavement.

62.     That same evening, a group of predominantly Black and Latinx people participated in a planned rally and march through the Mott Haven neighborhood of the Bronx. Prior to that protest, NYPD officers had been monitoring social media and became aware that a group called "FTP" would be attending that march. Intelligence gathered from social media messages was relayed to Defendant Kenneth Lehr who was serving as the Commanding Officer of Patrol Borough Bronx. As Commanding Officer, Chief Lehr was responsible for all patrols in the 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50 and 52 precincts. After learning of the messages of groups he believed would be protesting on that day, Chief Lehr decided to use an aggressive strategy against the protestors in Mott Haven.

63.     Chief Lehr ordered lines of officers to be assembled in Mott Haven so that as the protesters marched through the neighborhood, they would be surrounded by police officers in riot

gear on all sides. Many people asked officers to be let out so they could comply with the 8:00 p.m. curfew but were ignored. No one was given an opportunity to disperse. Shortly before the curfew began, Chief Lehr ordered the police to make arrests and officers began to attack the kettled protesters with baton strikes and pepper spray, violently plowing through lines of protesters as other officers followed in their wake, handcuffing protesters with plastic zip ties. Well over 200 people were arrested.

64.     At some time after 8 p.m., once police had begun to attack and arrest protestors en masse, a recording announcing the citywide curfew was played, but many protesters could not hear or understand the recording, and those that did were unable to disperse or go home because they were trapped by the police.

65.     Many protesters were injured, some seriously so. Medics had attended this protest to provide emergency medical care to injured protesters, but the NYPD officers arrested most of the medics and refused their pleas to be released to provide emergency care to those who had been wounded.

66.     Jake Offenhartz of WNYC and *Gothamist* was an eyewitness to the event. He wrote: "Moments before curfew struck at 8 p.m., demonstrators marching down 136th Street in Mott Haven were blocked by a wall of heavily armored police with bicycles. As those cops heaved their bikes into protesters, another group of officers emerged at the top of the street, charging down the hill and pushing protesters into the advancing throngs of bike cops."[23] Offenhartz further observed: "Over the next hour, cops would handcuff roughly 100 individuals in the group — including several legal observers and medics. Two people were seen leaving the scene on a

---

[23] Jake Offenhartz, *NYPD's Ambush of Peaceful Bronx Protesters Was "Executed Nearly Flawlessly," City Leaders Agree*, GOTHAMIST (June 5, 2020), https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree.

stretcher." Video from the scene captured police beating people with batons.

67.     Chief of Department Terence Monahan was present during the action and personally directed the response, along with Chief Lehr and at least 24 other uniformed supervisory officers, officers from the Legal Bureau, the Technical Assistance Response Unit,[24] and the Strategic Response Group (SRG).

68.     The SRG is a unit of approximately 700 officers dedicated primarily to counterterrorism and disorder control. Many of the officers deployed to police this summer's protests against police brutality were members of the SRG.[25] Many officers in the SRG have substantial histories of police misconduct allegations.[26]

69.     Video footage reviewed by Human Rights Watch captured an official from the Legal Bureau directing uniformed officers to make arrests of legal observers.[27] Chief Monahan approached one of the organizers and attempted to grab her megaphone. He is captured on video speaking to nearby officers who then formed a line and within a minute later, violently assault and arrest the group of protestors closest to them.[28]

70.     At the 2004 Republican National Convention in New York City, Monahan (who was a high-level NYPD official in the Bronx at that time) unlawfully ordered the arrest of over

---

[24] The Technical Assistance Response Unit provides specialized equipment and tactical support to the NYPD and often records footage at demonstrations.

[25] Greg B. Smith, *How the NYPD Failed to Learn the Lessons of Past Protest Policing Missteps*, THE CITY (Dec. 20, 2020), https://www.thecity.nyc/2020/12/20/22191991/nypd-protest-policing-floyd-rnc-occupy-wall-street.

[26] Ali Winston, *NYPD Unit at Center of Protest Policing Has Dozens of Offices with Long Misconduct Histories*, APPEAL (Oct. 15, 2020), https://theappeal.org/nypd-srg-misconduct/.

[27] HUMAN RIGHTS WATCH, 'KETTLING' PROTESTERS IN THE BRONX: SYSTEMIC POLICE BRUTALITY AND ITS COSTS IN THE UNITED STATES (Sept. 2020), https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

[28] *Id.* at 29.

200 people who were peacefully marching on a sidewalk in lower Manhattan.[29] After the RNC protests, the Civilian Complaint Review Board received more than 60 complaints related to mass arrests, including from innocent bystanders who were swept up in maneuvers initiated by then-Deputy Chief Monahan. The CCRB specifically cited Monahan in connection with those complaints. At the 2004 RNC protests, the police also penned in large groups of people and did not allow them to disperse.

71.     These tactics bear an unmistakable resemblance to the kettling tactics used throughout the protests arising from the murder of George Floyd and during the June 4 Mott Haven operation in particular. As at the RNC protests in 2004, Monahan failed to give adequate notice to the protesters in Mott Haven to disperse before the police boxed them in, and beat and arrested many.

72.     The 40th Precinct Community Council, which includes the Mott Haven neighborhood where the protest took place, posted a message about the planned protest on Facebook in the morning of June 4, indicating that the NYPD had prior knowledge of the protest.[30] By early in the evening of June 4, police already had numerous vehicles and prisoner vans placed near the protest.

73.     At a June 5 press conference, Commissioner Shea described the NYPD's "operation" in Mott Haven as "a plan which was executed nearly flawlessly."[31] Mayor de Blasio

---

[29] Greg B. Smith, *Top NYPD Curfew Cop Faulted for Mass Arrest Tactics During 2004 GOP Convention*, THE CITY (June 5, 2020), https://www.thecity.nyc/2020/6/5/21282199/top-nypd-curfew-cop-faulted-for-mass-arrest-tactics-during-2004-gop-convention.

[30] HUMAN RIGHTS WATCH, *supra* note 27.

[31] *WATCH: NYC Mayor de Blasio Says Protests Are Largely Peaceful, Curfew Will Continue*, PBS NEWSHOUR (June 5, 2020), https://www.pbs.org/newshour/nation/watch-nyc-mayor-de-blasio-says-protests-are-largely-peaceful-curfew-will-continue.

said regarding the Mott Haven operation: "This is something the NYPD saw coming." In response to questioning at the June 5 press conference, Mayor de Blasio further stated: "We had observers for City Hall" present at the NYPD operation in Mott Haven, who reported their accounts back to him, demonstrating the Mayor's advance knowledge of and participation in the planning and execution of the NYPD operation in Mott Haven.

74.    During the June 5 press conference, Mayor de Blasio and Commissioner Shea provided a pretextual justification for the violent and abusive NYPD operation in Mott Haven, claiming that the intent of protest organizers was "to cause mayhem."[32] Mayor de Blasio has also repeated this baseless justification for the Mott Haven operation, stating: "There was a specific pre-announced threat of violence and then people appeared at the protest with weapons and gasoline . . . it is absolutely incumbent upon the police to make sure that does not proceed because we won't tolerate violence." The Mayor's comments were false. Instead, "[t]he firearm was recovered by police hours before the protest began, several blocks away, in the car of an individual with no apparent link to the demonstration" and "[g]asoline was not found at the scene."[33]

75.    On June 5, at a protest on Nostrand Avenue in Brooklyn, Zach Williams, a reporter for *City and State* magazine, filmed officers surrounding peaceful protesters and arresting them, as well as officers shoving, threatening with batons, and arresting people doing nothing more than

---

[32] Jake Offenhartz, *Meet the "Outside Agitator" Whose Bronx March Was Violently Cracked Down On by the NYPD*, GOTHAMIST (June 10, 2020), https://gothamist.com/news/meet-outside-agitator-whose-bronx-march-was-violently-crushed-nypd.

[33] *Id.*; Craig McCarthy, *NYPD Commissioner Dermot Shea Ignores His Own 'Misinformation' Warnings*, N.Y. POST (June 8, 2020), https://nypost.com/2020/06/08/nypd-commissioner-ignores-his-own-misinformation-warnings/.

filming the officers from a safe distance, including at least one reporter who was walking away from police officers when they attacked him.[34]

76.     On June 5, in response to criticism from medical professionals that the NYPD's use of pepper spray at the recent protests posed a public health threat and calls to prohibit its use, the NYPD reaffirmed its policy of using pepper spray as a crowd control device.[35]

77.     During a June 7 news conference, Mayor de Blasio was asked: "Did you approve the tactics that we saw the NYPD using, starting on June 3rd and June 4th? That's the use of batons, more sort of pushing of protests, that sort of thing? Did you approve those?"[36] Mayor de Blasio answered that he "approv[ed] the broad strategies and sometimes very specific choices." Mayor de Blasio also noted that he "constantly talk[s]" to Commissioner Shea and Chief of Department Monahan about videos and reporting depicting the use of force used by the NYPD against protestors.

78.     Protests in support of defunding the police and police reform persisted throughout the month of June and the NYPD continued to respond with violence.[37] On June 14, a reporter in Times Square documented NYPD officers grabbing metal barricades and using them and their fists

---

[34] Zach Williams (@ZachReports), TWITTER (June 5, 2020, 10:38 PM), https://twitter.com/ZachReports/status/1269096296247369732; Zach Williams (@ZachReports), TWITTER (June 5, 2020, 10:21 PM), https://twitter.com/ZachReports/status/1269091966710624256; Zach Williams (@ZachReports), TWITTER (June 5, 2020, 10:36 PM), https://twitter.com/ZachReports/status/1269095713444712450.

[35] Virginia Breen, *Eye Docs' Crystal-Clear Message to NYPD: Stop Using Pepper Spray*, THE CITY (June 5, 2020), https://www.thecity.nyc/health/2020/6/5/21282192/eye-docs-crystal-clear-message-to-nypd-stop-using-pepper-spray.

[36] *New York City Mayor De Blasio News Conference*, C-SPAN (June 7, 2020), https://www.c-span.org/video/?472854-1/york-city-mayor-de-blasio-news-conference.

[37] *See* Ruschell Boone, et al., *'I've Been Waiting for This Generation': Protesters in NYC Demand Police Reform*, SPECTRUM NEWS (June 16, 2020), https://www.ny1.com/nyc/all-boroughs/news/2020/06/16/black-lives-matter-protests-continue-into-20th-day-of-demonstrations; N.Y.S. OFFICE OF THE ATTORNEY GENERAL, PRELIMINARY REPORT ON THE NEW YORK CITY POLICE DEPARTMENT'S RESPONSE TO DEMONSTRATIONS FOLLOWING THE DEATH OF GEORGE FLOYD (July 2020), https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.

to shove large groups of protesters to the ground.[38] On June 23, around 100 demonstrators set up camp in the park across from City Hall, referred to as "Occupy City Hall," to pressure Mayor de Blasio and the City Council to make significant funding cuts to the NYPD.[39] On June 30, without warning, NYPD officers encircled the group, pushed them to the sidewalk, and struck them with batons hours before the City Council voted on the budget.[40]

79.     On June 28, thousands of protesters took to the streets of Manhattan for the Queer Liberation March for Black Lives and Against Police Brutality.[41] The Queer Liberation March explicitly identifies as an action in juxtaposition to the annual Pride March, rejecting corporate ties and affiliation with the police.[42] The march was peaceful until the protesters entered Washington Square Park, where large numbers of police officers were waiting. The officers then charged into the crowd to arrest a protester who allegedly used a sharpie to write on a car. The Reclaim Pride Coalition, the group that organized the protest, states that "[s]uddenly, a large crowd of NYPD officers rushed in and attacked with pepper spray . . . . One NYPD member reached out to slam a

---

[38] Rosalind Adams (@RosalindZAdams), TWITTER (June 14, 2020, 5:23 PM), https://twitter.com/RosalindZAdams/status/1272278438787928064?s=20.

[39] Amanda Rosa, *How the Police Ousted 'Occupy City Hall'*, N.Y. TIMES (July 23, 2020), https://www.nytimes.com/2020/07/23/nyregion/occupy-city-hall-nyc.html.

[40] Jake Offenhartz & Gwynne Hogan, *NYPD Officers Rough Up Protesters Occupying City Hall in Show of Force Before Budget Vote*, WNYC (June 30, 2020), https://gothamist.com/news/nypd-officers-rough-protesters-occupying-city-hall-show-force-budget-vote.

[41] Tim Fitzsimons, *NYC's Queer Liberation March Draws Thousands, Clashes with NYPD*, NBCNEWS (June 29, 2020), https://www.nbcnews.com/feature/nbc-out/nyc-s-queer-liberation-march-draws-thousands-clashes-nypd-n1232396.

[42] "The Queer Liberation March had its roots in the 2017 Pride March, which featured the disruptive début of the Resistance Contingent, a consortium of activist groups that formed in response to the Trump Administration. It included groups such as Gays Against Guns, which staged a die-in, and Hoods4Justice, which formed a blockade to prevent the N.Y.P.D. marching band from joining the parade, with banners reading "There are no queer friendly cops" and "Decolonize pride." Michael Schulamn, *A Radical Challenger to New York City's Pride March*, NEW YORKER (June 25, 2020), https://www.newyorker.com/culture/cultural-comment/queer-liberation-march-a-radical-challenger-to-new-york-city-pride.

woman on a bicycle to the ground. Other marchers were punched and violently shoved."

80.     Since the summer of 2020, the NYPD has continued its aggressive tactics towards protestors seeking fundamental changes to law enforcement. On September 17, 2020, approximately 50 to 60 protestors gathered at Foley Square to protest the treatment of women detained while in Immigration and Customs Enforcement (ICE) custody. From the beginning these protestors were flanked by approximately 100 police, "including members of the Strategic Response Group, plainclothes officers, bicycle police, police on motor scooters, and an NYPD helicopter."[43] Approximately 20 minutes after the protest began, it was forcefully ended. In that short period of time officers threw protestors to the ground causing one to bleed from his head and made 10 arrests.

81.     Two days later on September 19, 2020, police officers used similar aggressive tactics against demonstrators against ICE in Times Square. While hundreds of protesters were present, they appeared to be substantially outnumbered by NYPD officers. The officers blocked off traffic before the rally began, "but as soon as protesters tried to get onto the street, officers 'descended from all sides' and 'started ripping people off of the sidewalk.'"[44]

82.     On November 4, 2020, police officers responded to a post-Election Day protest in Manhattan in or around 14th Street with violence.[45] Police forcefully pushed protesters with their bicycles and their bodies, violently tackling and arresting people on the ground. After hours of

---

[43] Nick Pinto, *NYPD Crushes Tiny Anti-ICE Protest With Overwhelming Force And Bloody Arrests*, GOTHAMIST (September 18, 2020), https://gothamist.com/news/nypd-uses-overwhelming-force-arrest-small-group-abolish-ice-protesters-lower-manhattan

[44] Ganesh Setty and Susannah Cullinane, *New York Police arrest 86 anti-ICE protesters,* CNN (September 20, 2020), https://www.cnn.com/2020/09/20/us/times-square-nyc-ice-protest/index.html.

[45] Christopher Robbins, Gwynne Hogan, Jake Offenhartz, Sydney Pereira, and Stephen Nessen, *Updates: NYPD Violently Arrests Post-Election Protesters in Manhattan,* GOTHAMIST (Nov 4, 2020) https://gothamist.com/news/updates-new-yorkers-hit-streets-trump-campaign-threatens-lawsuits-stop-ballot-counting.

peaceful protest, NYPD forced groups of protestors onto the sidewalk and refused to let them pass — including Mayor Bill de Blasio's press secretary. Protesters were trapped by NYPD as officers swarmed into the group, forcefully grabbing and arresting people. Protesters were soon outnumbered by the police as officers closed in, swinging fists and batons.

83.     Later that same week, a recurring protest held at Stonewall Inn was met with a heavy presence by the SRG.[46] This event was a march for Black Trans Liberation and SRG officers almost immediately instigated conflict with the protesters. Public Advocate Jumaane Williams was one of the protesters met with excessive force at that event.

84.     A few months later on January 18, 2021, Martin Luther King Day, a group of protestors marched over the Brooklyn Bridge and into Manhattan. Police charged at these protestors using baton strikes and arrested dozens of peaceful protesters. Commissioner Shea defended the actions of the police.[47]

85.     Prior to and during these protests, the City and NYPD failed to adequately train, supervise, and discipline police officers, including the individual officers named in this action, to prevent the use of excessive force.

86.     The NYPD's training of officers deployed to protests was and remains wholly deficient in numerous respects, including little, or in many cases, no training for officers on policing lawful First Amendment events. A majority of the police officers deployed at protests during the summer of 2020 received no in-service refresher trainings on protest policing beyond

---

[46] Jake Offenhartz, *How an NYPD Anti-Terror Squad Became a Tool for Cracking Down on Protests*, GOTHAMIST (Feb 19, 2021) https://gothamist.com/news/how-elite-anti-terror-squad-transformed-nypds-approach-protest-policing.

[47] *NYPD Commissioner Defends Arrests of 28 Protesters at MLK Day Demonstration,* NBC (January 19, 2021), https://www.nbcnewyork.com/news/local/nypd-arrests-28-protesters-at-mlk-day-demonstration/2837174/.

what they received at the Police Academy. And training materials that are provided to new recruits place little emphasis on de-escalation tactics.

87.     Defendants Commissioner Shea, Chief of Department Monahan, and Mayor de Blasio knew that NYPD officers would confront demonstrators protesting policy brutality and that NYPD police officers previously had mishandled demonstrations and protests with excessive force and unlawful arrests. Defendants Commissioner Shea, Chief of Department Monahan, and Mayor de Blasio knew to a moral certainty that the NYPD lacked sufficient training to police lawful First Amendment protest activity and that deploying these insufficiently-trained officers would lead to the deprivation of Plaintiffs' constitutional rights. Despite this knowledge, they continued to deploy large numbers of inadequately trained police officers to peaceful demonstrations, resulting in excessive force and unlawful arrests.

88.     In recognition of this deficient training, in mid-July 2020, Commissioner Shea announced that the NYPD is undergoing an evaluation of its protest response tactics. According to Commissioner Shea, the Department will be implementing a "disorder control training" for its entire force, reinstating a program that it had ended some years ago.

89.     On February 16, 2021, during a City Council hearing by the Committee on Public Safety, Chief of Patrol Juanita Holmes stated that a review in July by the NYPD determined that officers were not properly trained in disorder control of protests and, as a result of that lack of appropriate training, made arrests that they should not have. [48] She confirmed that "four hours of disorder training is not enough" at the police academy.

---

[48] New York City Council Committee on Public Safety Hearing, at 01:41:49 – 01:45:19 (Feb. 16, 2021), https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=837165&GUID=0B230AE4-078A-4A38-B639-57108A195767&Options=info|&Search=.

90.     The violence by police officers against the plaintiffs and other protesters at demonstrations and rallies in support of Black Lives Matter and against police violence were not isolated instances. Rather, the challenged practices often resulted from official policy or the acts of official policymakers, and were so widespread and frequent as to constitute a custom and usage of the NYPD.

91.     Mayor de Blasio, Commissioner Shea, and Chief Monahan knew to a moral certainty that NYPD officers would confront protesters marching against police brutality; that officers would respond with violence, including the use of kettling, chemical irritants, fists, baton strikes, and excessively tight handcuffs; that officers would conduct mass arrests of protestors; and that officers would deliberately refuse to wear masks in violation of state law.

92.     In some instances, Mayor de Blasio, Commissioner Shea, and Chief Monahan personally directed, promoted and/or condoned the deployments and operations that led to this violence.

93.     During the period of these protests, the Mayor and police leadership were aware of NYPD actions to violently suppress protests against police accountability through media reports, reports from staff, and regular interactions with other NYPD leaders. Their corresponding inaction to address this pattern and statements and actions endorsing it constitute a City policy to engage in excessive force, discriminate on the basis of viewpoint against those fighting for greater police accountability for brutality, and retaliate against people engaged in their constitutionally protected right to protest.

94.     On information and belief, Mayor de Blasio and Commissioner Shea received regular reports from Chief of Department Monahan and other NYPD officials responsible for implementing the City's response to the protests.

95.     On information and belief, Mayor de Blasio, Commissioner Shea, and Chief Monahan regularly reviewed media reports documenting patterns of police responses to the protests.

96.     In the space of one week of protests, the Civilian Complaint Review Board received 633 complaints, information the Mayor and police leadership knew at the time the complaints were filed.[49] By June 12, the number of CCRB complaints regarding protest policing had grown to over 700, a fact that Mayor and police leadership knew at the time.  The New York City Department of Investigation subsequently reported that the CCRB received 1,646 protest-related complaints for incidents that occurred between May 28 and June 20, 2020.

97.     On information and belief, NYPD issued a memo titled "Floyd Demo Quick Reference," instructing all members of service that all arrests related to the demonstrations citywide would be brought to mass arrest processing centers ("MAPC"). Specifically, the NYPD had a policy not to issue appearance tickets that would ordinarily be issued on the street, instead instructing officers to detain those individuals at MAPC for issuance of appearance tickets on protest-related offenses including but not limited to disorderly conduct and walking in the roadway.

98.     The City has a long history of misconduct — including, but not limited to, mass false arrests, excessive force, and excessive detention — associated with the NYPD's development and implementation of policies and practices concerning arrests and crowd control arising out of protests. These large protest events, to name only a few, include protests against the police shooting of Amadou Diallo in 1999, the Republican National Convention in 2004, and Occupy Wall Street

---

[49] Shayna Jacobs, *NYPD Faces 633 Complaints After a Week of Protests*, WASH. POST (June 5, 2020), https://www.washingtonpost.com/national-security/george-floyd-protests-new-york-nypd-complaints/2020/06/05/dd91e4dc-a754-11ea-b619-3f9133bbb482_story.html.

in 2011 and 2012. That history of misconduct is reflected in the NYPD's conduct towards Plaintiffs and other demonstrators during the protests described herein.

**Investigations and Reports on the NYPD's Protest Activities**

99.    On or about June 2020, New York Attorney General Letitia James launched an investigation into the NYPD's practices during the protests, which gathered information from the NYPD and other New York City agencies, numerous witnesses and community-based organizations, as well as over 1,000 written submissions.

100.    The most common complaints focused on police officers' excessive use of force particularly by "using excessive force against protesters, including use of batons and indiscriminate use of pepper, brandishing firearms at protesters, and pushing vehicles or bikes into protesters." Additionally, the Office of the Attorney General gathered extensive testimony about the use of the "kettling" tactic, which often led to violent clashes between NYPD and protesters, and unlawful arrest related practices, including using extremely tight zip-ties to restrict hands, and holding protesters for significant time after arrest.

101.    On September 25, 2020, Physicians for Human Rights ("PHR") released a report detailing the police violence and arrests of health care workers at the June 4 protest in Mott Haven in the Bronx.[50] PHR findings corroborated the reports of unprovoked police violence. PHR concluded that (1) there was dangerous police violence and excessive force against peaceful protesters; (2) the police created dangerously crowded conditions by "kettling" protesters and medics in the setting of a pandemic; and (3) the police denied volunteer medic access to injured protesters, effectively depriving injured protesters to immediate medical assessment and care.

---

[50] PHYSICIANS FOR HUMAN RIGHTS, 'A TARGETED ATTACK ON THE BRONX: POLICE VIOLENCE AND ARRESTS OF HEALTH WORKERS AT A NEW YORK CITY PROTEST (Sept. 2020), https://phr.org/wp-content/uploads/2020/09/A-Targeted-Attack-on-the-Bronx_Police-Violence_Sept-2020.pdf.

102.    Days later, on September 30, 2020, Human Rights Watch ("HRW") released a comprehensive report on the same protest. HRW's months-long investigation revealed that the police response to the peaceful Mott Haven protest was intentional, planned, and unjustified.[51]

103.    Based on interviews with over 100 witnesses, HRW found that the protest was peaceful until NYPD began kettling the protesters.[52] Approximately 155 videos showed 21 incidents of police beating protestors with batons, 11 incidents, of police officers punching or kicking protesters, 19 incidents of police slamming, tackling, or dragging protesters, 14 incidents of police firing pepper spray directly into participants' faces, four incidents of police throwing bikes against protesters, and two incidents where police restrained participants with a knee to the face or upper neck.[53]

104.    The report details several first-hand accounts of police brutality that evening in addition to the video footage that was reviewed by HRW. Additionally, the report detailed protestor accounts of the mass arrests process – long periods of waiting for police vans to arrive, being transported, waiting to be processed, and being held in cramped cells without access to food, little or no water, and no access to personal protective equipment or other protections from COVID-19.

105.    In December 2020, the New York City Department of Investigation ("DOI") issued a report on the NYPD's response to protests in New York City from May 28, 2020 through June 20, 2020. This investigation was ordered by defendant Mayor de Blasio.[54]

---

[51] HUMAN RIGHTS WATCH, *supra* note 27.

[52] *Id*. at 23–29.

[53] *Id.* at 45

[54] NYC DEP'T OF INVESTIGATION, INVESTIGATION INTO NYPD RESPONSE TO THE GEORGE FLOYD PROTESTS (Dec. 2020),

106.    For its investigation, DOI relied on, among other sources, "thousands of pages of NYPD records relating to the policing of the Floyd protests, including individual incidents, Department policies, intelligence information, training materials, and relevant data" and "interviews or meetings with NYPD executives and officials, Mayor's Community Affairs Unit (CAU) employees who attended the protests, individuals with protest-related organizations, representatives from Human Rights Watch and Physicians for Human Rights, the Public Advocate, and academics and former government officials with expertise on policing issues." Those interviewed included, "Police Commissioner Dermot Shea, Chief of Department Terence Monahan, the top two officials in NYPD's Intelligence Bureau, as well as the former heads of Training and the Community Affairs Bureau."[55]

107.    After review, DOI determined that "the problems [seen at the protests] went beyond poor judgment or misconduct by some individual officers [rather] [t]he Department itself made a number of key errors or omissions that likely escalated tensions."[56]

108.    There were significant problems in how the NYPD planned and staffed the protests. "Multiple officials stated that the Department's initial deployment of officers at the beginning of the protests was inadequate."[57] These failures, "likely contributed to overwhelmed and exhausted front-line police officers, creating conditions that increased the likelihood of poor judgment, unprofessional behavior, and unjustified use of force."[58]

---

https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[55] *Id.* at 8.

[56] *Id.* at 29.

[57] *Id.* at 31.

[58] *Id.* at 33.

109.     Further, the NYPD's Patrol Guide lacks of a specific policy as to how protests should be policed as opposed to riots, emergency incidents, and other "special events."[59] Instead of applying strategies uniquely crafted for protests, the NYPD used "disorder control tactics and methods."[60] "These deployments, tactics, and shows of force may have unnecessarily provoked confrontations between police and protesters," including, "instances where NYPD officers acted indiscriminately as between lawful, peaceful protesters and unlawful actors, thereby exercising force beyond what was necessary under the circumstances."[61] In particular, the NYPD excessively used tactics such as kettling, mass arrests, punching, kicking, tackling, or using batons to strike protesters and pepper spray.[62]

110.     Finally, the report identified lack of training as another contributing factor to the police violence. While officers in the Police Academy are required to go through trainings concerning mass demonstrations, "a significant number of officers deployed by the NYPD to respond to the Floyd protests lacked recent training related to policing protests."[63]

### Plaintiffs' Experiences of Police Abuse at New York City Protests

*Plaintiffs Andie Mali and Camila Gini*

111.     On May 30, 2020, Plaintiffs Andie Mali and Camila Gini saw protesters against police violence gathered near the Barclay's Center in Brooklyn and were moved to participate.

---

[59] *Id.* at 34.

[60] *Id.* at 35.

[61] *Id.* at 36.

[62] *Id.* at 40–43.

[63] *Id.* at 56.

They marched with other protesters up Fort Greene Place and over to the corner of DeKalb and Flatbush Avenue, where they listened to speeches, including from people who had lost family members to police violence, and observed a moment of silence for victims of police shootings. As they listened, police began to surround the crowd. Mali and Gini heard screaming and saw some protesters running. Afraid of police violence, they headed toward where their car was parked, so they could return home.

112.    Mali and Gini could not outrun the police violence. As they walked down Flatbush Avenue on the sidewalk that night at or around 12:30 a.m., they heard a man screaming "I can't breathe!" from inside a ring of several police officers. For Mali, the words evoked the death of George Floyd. He worried for the man's life and, remembering how a bystander's video had exposed what happened to George Floyd, felt an obligation not to walk away while the man was pleading for his life.

113.    As he approached from a safe distance to observe the actions of the police officers, an officer in a white shirt (Officer John Doe 1) asked him, "what the fuck are you doing?" Before Mali could respond, the officer shoved him with two hands. Mali explained that he was not trying to interfere and just wanted to see what was happening, but the officer shoved him again and began cursing, calling Mali an "asshole" and denigrating the protests as "pointless" and about things that "didn't happen here."

114.    Several other officers, in addition to the officer in the white shirt, quickly gathered around Mali. None of the officers, including the officer in the white shirt, were wearing masks. Mali started to back away from the officers toward the building behind him. Some of the officers yelled at Mali to leave, and others yelled at him to get down on the ground. Mali did not know what to do in the face of these conflicting orders and froze. Two or three of the officers began to

strike Mali on his head, legs and arms with batons (Officers John Doe 2-4). Gini stepped between Mali and the officers with her arms up, saying "we are leaving, we are leaving." At least three other officers, including Officer Doe Esposito, and Officers John Doe 5 and 6, tackled Gini to the ground, pinning her legs down with their knees, beating her on the head, neck and back with batons, and twisting her arms back to be handcuffed.

115.    When Mali saw Gini tackled and beaten by the officers, he immediately dropped to the ground and begged them to stop beating Gini. The officers continued to strike him on the head and on the legs with their batons, pinning him down with their bodies and placing him in handcuffs.

116.    Eventually, Mali and Gini were placed on a bus to be transported away from the protest. As they waited, the man they heard screaming "I can't breathe" was brought onto the bus. Mali and Gini could see he was in serious pain. His clothes were ripped, he was wearing one shoe, and he had been pepper sprayed in the face and could not see. In response to his pleas for help, an officer poured water down his face, which caused more pepper spray to enter his nose and mouth and prompted the man to spit on the floor of the bus. An officer then shoved the man against the window of the van, held a Taser to his head, and told him to "watch what happens if you do that again." The officer then put a second set of handcuffs on the man so tightly that the man cried out in pain and could not sit down for the entire bus journey. Mali and Gini were terrified.

117.    Mali and Gini were taken to the 88th Precinct for processing. As they exited the bus and entered the precinct with other protesters single-file, officers gathered to jeer at them, calling out names of countries that seemed to be attempts to guess the protesters' nationalities. Mali heard the officers yelling the names of African countries as he passed, and Gini heard the officers say "Cambodia" as she passed them. Some of the officers had their phones out and appeared to be recording this humiliating encounter. Mali and the other male protesters on their

bus were patted down, but officers subjected Gini to a more intensive frisk. Mali and Gini were held in the precinct until approximately 3:00 a.m. on May 31, when they were released with tickets for disorderly conduct, describing the time of their offenses as 1:30 a.m. Mali was issued a summons by Police Officer Yahaira Perez-Guitierrez, Tax ID 967647. Gini was issued a summons by Police Officer Zakie Karimzada, Tax ID 960745. Their summonses were never prosecuted.

118.    After returning home to rest, Gini and Mali sought medical treatment for their injuries the next day, including bruising, abrasions, and head injuries.

119.    Before the death of George Floyd, Mali and Gini were not particularly active protestors. In fact, the May 30, 2020, protest was Gini's first one. The following night, Mali went to one protest that ended up going into Manhattan, but left early. Both Mali and Gini have wanted to attend more protests but have not done so out of a fear of being brutalized in the same way that they were on May 30th.

*Plaintiff Vidal Guzman*

120.    Between May and October 2020, Plaintiff Vidal Guzman attended protests in the Bronx, Brooklyn, Manhattan, Queens, and Staten Island, all in support of Black lives and advocating to defund the NYPD. At many of these protests, Guzman witnessed NYPD officers harm protesters by hitting them with batons, shoving them to the ground with their hands, bicycles, and metal barricades, punching and kicking them, and pepper-spraying peaceful protesters with no warning or order to disperse.

121.    Guzman attended one of these protests calling for justice for George Floyd and in support of Black Lives Matter on the evening of May 30, 2020. Guzman joined the protest at Union Square in the early evening. They protesters marched from Union Square towards FDR Drive, and then entered the FDR and headed south. While on the FDR, NYPD helicopters hovered

dangerously close to the protesters, which frightened Guzman and others. Once the protesters reached the South Street exit, they exited the FDR onto South Street without incident.

122.    After exiting the FDR, Guzman and the remaining protesters gathered and formed a community circle to share words of appreciation and hope with one another near the entrance to the Lower Eastside Service Center, a treatment center and community space. As different community members and protesters came together, Guzman noticed that NYPD officers had surrounded the protesters in police vehicles and were starting to get out of their vehicles.

123.    Before the protesters could end the community circle and without any warning or notice to disperse, NYPD officers charged at the circle of protesters. As the police charged at the protesters, Guzman heard an officer say, "you have to get off of here," but before Guzman even had a chance to move, Sergeant Majer Saleh sprayed him with pepper-spray directly in the face.

124.    Guzman immediately fell to the ground in pain, injuring his right leg. Guzman's eyes, mouth, nose, face, and arms burned with intense pain. Another protestor came to Guzman and pulled him onto the steps of the Lower Eastside Service Center and treated his eyes with milk and water. Once Guzman finally was able to open his eyes, he saw other protesters recovering from being pepper-sprayed. He saw NYPD officers hitting other protesters repeatedly with batons.

125.    Guzman was not arrested.

126.    Guzman later learned that around 15 other protesters, none of whom were arrested, had been injured by the police. Some had injuries from the police hitting them repeatedly with batons and others had been pepper-sprayed.

127.    For the next three days, Guzman's eyes, face, and arms continued to burn from the pepper-spray. He also had pain in his right leg and had trouble walking for around three weeks. This pain severely limited his ability to do normal activities.

128.    Guzman is a very engaged activist and protestor who focuses on reforming the criminal legal system. He had a role in organizing or planning almost every Black Lives Matter protest from May 28 until early October. During this time period, he attended over 100 protests across the City. In October 2020, Guzman took a break from protesting out of concerns for his safety and health, but he is now ready to return. After being a victim of police violence, Guzman fears that he will be attacked again or arrested just for exercising his First Amendment rights.

*Plaintiff Vivian Matthew King-Yarde*

129.    During the late the evening of May 31, 2020, Plaintiff Vivian Matthew King-Yarde was on Broadway Avenue near Union Square filming protesters as part of his work as an independent member of the press. The protesters, who were being pushed back by police officers, kept their hands in the air. As he filmed from his bicycle, a police officer told King-Yarde to back up. King-Yarde started to back up but before he could completely move out of the officer's way, Officer Jakub Tarlecki, Tax ID 964310 shoved him. He repeatedly stated that he was a member of the press, but the officer shoved him again, knocking him to the ground and bringing his bicycle down on top of him. The phone that King-Yarde used to record the protest when flying to the ground and was eventually crushed.

130.    Officer Tarlecki then threw King-Yarde's bike aside and three police officers (Officers John Doe 7-9) pinned him down by placing their knees onto his back, shoulders, legs, and arms. While he was on the ground, he could not breathe. A police officer then zip-tied his wrists with Flex Cuffs, causing a sharp pain in his right shoulder. King-Yarde did nothing to provoke or justify this violent response or his arrest.

131.    After he was placed into Flex Cuffs, King-Yarde remained in the custody of Officer Rozanski. Officer Rozanski did not have probable cause to arrest King-Yarde and did not seek out any information from other officers related to King-Yarde.

132.    After about an hour, Officer Rozanski placed King-Yarde into a police van and took him to One Police Plaza. King-Yarde's wrists and shoulder were in a lot of pain from the tight handcuffs, which he was forced to wear for around three hours. During the time he was handcuffed, his face mask was hanging off of his face and no officer offered to help him fix it to cover his nose and mouth. He was very worried that his mask was off in such close quarters and that none of the police officers wore masks, exposing him to a heightened risk of contracting COVID-19.

133.    King-Yarde was placed in a holding cell when he arrived at One Police Plaza. He was packed into the small holding cell with about five other protesters, many of whom were handcuffed with their masks hanging off and leaving their noses and mouths uncovered. While in the cell, King-Yarde lifted his shirt and realized that he was bleeding from a laceration on his stomach. King-Yarde was held in detention for several hours and was eventually released at about 4 a.m. on June 1, 2020. At the police station, his arrest was "voided," and King-Yarde was not charged with any crime.

134.    For several days after the incident King-Yarde had shoulder pain and he still has a scar on his stomach. Additionally, King-Yarde was left traumatized with significant emotional distress.

135.    King-Yarde is still fearful to be around police officers. This fear has greatly influenced the assignments that he has chosen to cover. Prior to May 31, 2020, King-Yarde had covered several protests as an independent journalist. Since being attacked, King-Yarde has not

intentionally covered any other protests due to a fear that he will be subjected to the same violence that he was on May 31st.

*Plaintiff Jarrett Payne*

136.    On June 2, 2020, Plaintiff Jarrett Payne attended a protest that began at Foley Square and marched uptown. As the evening approached, Payne was aware of the Mayor's curfew starting at 8:00 p.m. but, because the protest was peaceful and he had heard that police had allowed peaceful protests to continue past the curfew on other occasions, he decided to keep marching as long as the police allowed it.

137.    As Payne marched up the sidewalk on the Central Park side of 5th Avenue, he noticed police officers beginning to gather towards the rear of the protest. Some officers in white shirts were lined up across the street and swinging their batons in a menacing way that made Payne nervous. As one of those officers (Officer John Doe 10) crossed the street to approach him, Payne slowly backed away and was blindsided by another officer (Officer John Doe 11) who struck him with a baton and shoved him to the ground. Payne's body struck something hard — possibly a bench — and then fell into the wall of Central Park and onto the ground, knocking his glasses off his face so he could not see properly. Several officers (Officers John Doe 12-14) then struck him repeatedly with batons, yelling at him to put his arms underneath him, but pinning him down so that he could not comply. No officer had given any instruction to Payne prior to attacking him, and Payne did not resist the officers in any way.

138.    Eventually the officers pulled Payne up and placed handcuffs very tightly around his wrists, causing him pain. Payne was bleeding very badly from his head, with blood soaking his mask and covering his sign, which lay on the ground and read "The System is the Problem." The officers seized his blood-soaked mask from the ground, where it had been knocked off Payne's

face during the attack and did not offer a replacement or any medical assistance. None of the officers were wearing masks.

139.    As Payne was waiting in handcuffs to be transported for arrest processing, one of the police officers standing nearby said to him, unprovoked, "you got what was coming to you."

140.    Police officer Joseph Sung was assigned to process Payne's arrest by Lieutenant Douglas Kautter, Tax ID 935093. Officer Sung took him to Brooklyn, where other officers broke a pair of scissors trying unsuccessfully to remove his tight handcuffs. They eventually offered him a band-aid for his bleeding, which he immediately bled through, and then a second one, which he also bled through. He and other people in his cell, who were alarmed by his physical condition, repeatedly asked for help, but no other first aid was offered throughout the many hours Payne remained incarcerated until his release at around 2 or 3:00 a.m. on June 3, 2020. He was met by jail support volunteers who took him to the emergency room, where he was treated for his injuries and received stitches. To date he still has significant back and wrist pain caused by the officers' attack.

141.    Payne received summonses for disorderly conduct and violation of the Mayor's curfew, which were dismissed by the district attorney's office.

142.    Before the George Floyd protests, Payne sporadically attended protests. Because of the murder of George Floyd and his own experience with police brutality on June 2, he has attended many protests in support of Black Lives Matter and against police brutality and volunteered as "jail support" to help support other activists. At these subsequent events, Payne has observed police officers repeatedly assault other protesters, using baton strikes, bikes as weapons, and other example of excessive force.

143.    He also experienced continued police violence and harassment as a protester. He was present at a protest on or about January 12, 2021 near Myrtle and Flatbush Avenues when an officer brandished his weapon in response to protesters confronting him for not wearing a face mask.[64] Later the same week, on or about January 16 in the evening, he was attending a demonstration in downtown Brooklyn when he was forcefully and repeatedly shoved in his chest by Sergeant Keith Cheng (Badge Number 644) despite only approaching the officer to ask a question.

144.    On January 18, 2021, Martin Luther King Day, Payne attended a protest near City Hall Park when he observed SRG officers begin to aggressively shove protesters inside the crowd on the street back towards the park. Payne was trapped inside the crowd. Within moments, Officer Matthew Tarangelo (Tax Registry Number 955162) punched him in the face and grabbed him by his sweatshirt, throwing and dragging him into the ground where he was punched again. He was slammed to the ground and felt pressure on the back of his neck, pushing his face into the pavement. Officer Tarangelo threw him with such force that Payne's glasses were destroyed.

145.    Payne was arrested between 8 and 8:30 p.m. and held for hours before being released at approximately 2:00 a.m. with a summons for disorderly conduct. He was one of approximately 30 protesters violently arrested that evening.

146.    Payne suffered facial bruising and lacerations as well as a fractured nose that required surgery weeks later.

147.    Payne plans on remaining active in demonstrating against police violence and brutality as opportunities continue to arise in the coming weeks and months. He is in contact with

---

[64] Cristian Benavides, *Video shows NYPD officer draw his firearm when confronted by protesters about mask-wearing,* PIX 11 (Jan. 13, 2021) https://pix11.com/news/local-news/video-shows-nypd-officer-draw-his-firearm-when-confronted-by-protesters-about-mask-wearing/

various groups who organize such protests and jail support services for such protests to keep track of such opportunities.

*Plaintiff Charlie Monlouis-Anderle*

148.     On June 3, 2020, Plaintiff Charlie Monlouis-Anderle attended a demonstration in Brooklyn. As they arrived that evening, they immediately noticed a large police presence and that many officers seemed angry even though the crowd was marching peacefully. One police officer with no mask came within a foot of Monlouis-Anderle with no mask on and yelled at them. Monlouis-Anderle was wearing a mask, but most of the police officers at the demonstration were not.

149.     They marched with other protesters toward Borough Hall. When they arrived at Cadman Plaza, dozens of police officers in full riot gear with their batons out surrounded the protesters, penning them in on four sides except for a very small opening next to Borough Hall. Monlouis-Anderle was terrified. They never heard the police tell the protesters to leave or disperse.

150.     Suddenly, at or around 8:15 p.m., the NYPD officers sprinted toward the protesters with their batons raised. Monlouis-Anderle saw NYPD officers tackle and repeatedly beat with batons two protesters while they were on the ground trapped against a fountain.

151.     Seconds later, without warning or provocation, Monlouis-Anderle was tackled to the ground by at least three police officers (Officers John Doe 15-17). The officers repeatedly and forcefully beat them with batons while they were on the ground. Officers John Doe 15, 16 and 17 pinned Monlouis-Anderle's arms, legs, and head to the ground as they felt their body go limp and their bladder release.

152.     Officer Stephanie Chen and Officer Taylor Corcoran were present when Officers John Doe 15, 16, and 17 tackled them to the ground and forcefully beat them with batons while

they were on the ground but did not take any steps to prevent the unnecessary force despite having an opportunity to prevent the harm to Monlouis-Anderle.

153.    While Monlouis-Anderle was face down on the ground, the officers forcefully pulled Monlouis-Anderle's arms behind them and Officer Stephanie Chen tightly placed metal handcuffs on their wrists with the assistance of Officer Taylor Corcoran and Officers John Doe 15, 16, 17, causing extreme pain. The officers then forcefully lifted them from the ground. They yelped, feeling a sharp, intense pain in their right arm. Monlouis-Anderle had the acute sensation that their right arm was detached from their body and yelled out in shock.

154.    Monlouis-Anderle repeatedly asked for urgent medical attention. The police officers ignored their requests. Officers Corcoran and Chen marched them to a bus. On the way to this bus, Officer Chen stopped to replace the metal handcuffs on Monlouis-Anderle's wrists with plastic zip ties. Officer Chen tightly zip-tied Monlouis-Anderle and yanked at their wrists in the process. Officer Corcoran then yanked their right arm and yelled at them to walk. Monlouis-Anderle repeatedly begged Officer Corcoran not to pull their right arm. Their right arm was in excruciating pain, and intense pain radiated throughout the rest of their body. They felt that their right arm was somehow in front of their body, even though it was behind them.

155.    They were in so much pain, they felt like they were going to vomit. Tears and saliva streamed down Monlouis-Anderle's face as they begged the officers not to touch their right arm. Officer Corcoran said to the Officer Chen, "That's disgusting." Officer Corcoran continued to yank their right arm and yell at them to walk.

156.    As Officers Chen and Corcoran continued to walk them to the bus, Officer Corcoran pulled back on Monlouis-Anderle's right arm and brought it up above their head and behind them so that they doubled-over forwards. Monlouis-Anderle heard a snapping sound come

from their right arm and screamed out in extreme pain. In addition to feeling intense shooting pain, they also felt additional numbness and tingling in their right arm, hand, and wrist.

157.    Officer Corcoran screamed at them, "You should be ashamed of yourself, you're an embarrassment!" Monlouis-Anderle repeatedly begged Officer Corcoran not to pull their arm, but the more they pleaded, the more Officer Corcoran repeatedly tightened her grip and roughly pushed and pulled on their right arm.

158.    Despite the fact that Monlouis-Anderle was clearly in excruciating pain, Officer Corcoran and Officer Chen made no attempt to seek medical attention for them at any point despite having numerous opportunities to do so and to ease Monlouis-Anderle's suffering.

159.    By the time they arrived at the bus, the excruciating pain made it difficult to see or walk. Officer Corcoran threw Monlouis-Anderle onto the bus. Monlouis-Anderle noticed there was a large and growing lump on their right upper arm or shoulder area, and below the lump, their arm hung at an angle. Their hands began to turn blue because the zip ties were so tight. Monlouis-Anderle asked repeatedly two male officers on the bus (Officers John Doe 18 and 19) for medical help and to cut the zip ties from their wrists, but they refused.

160.    Another protestor on the bus informed Officers John Doe 18 and 19 of Monlouis-Anderle's gender-neutral pronouns, but both officers ignored the protestor, and instead repeatedly purposefully used the wrong pronouns when referring to Monlouis-Anderle, which felt humiliating.

161.    Much later, the paramedics arrived and asked Monlouis-Anderle if they could feel their fingers on their right arm. They barely could. Sometime after, the paramedics finally cut the zip ties and provided them with pain medication. The paramedics put them on a stretcher and onto

an ambulance. A police car followed the ambulance to New York Presbyterian Brooklyn Methodist Hospital.

162. When they arrived at the hospital, two male police officers, Officer Matthew L. Perry (Tax Reg. No. 6622200) and John Doe 20 followed Monlouis-Anderle into the trauma room, where Monlouis-Anderle was forced to disclose their gender identity in front of the officers, which felt humiliating. Monlouis-Anderle told the hospital staff what had happened and saw the police officers roll their eyes.

163. As they waited for an x-ray, hospital staff left them alone in the room with the police officers. Monlouis-Anderle began having difficulty breathing and had an anxiety attack. When the hospital staff returned, they begged them not to leave them alone with the police officers again.

164. Lt. Thomas Hardell ordered Officer Perry to write Monlouis-Anderle a summons, and Officer Perry wrote Monlouis-Anderle a summons for disorderly conduct, N.Y. Penal Law § 240.20(6). The officers left them at the hospital later that night. Monlouis-Anderle received a letter in the mail from the Criminal Court of the City of New York, County of Kings informing them that the June 3, 2020, charge for disorderly conduct "was dismissed on September 1, 2020" and "was sealed pursuant to Section 160.50 CPL."

165. Monlouis-Anderle suffered a fracture to their right arm as well as nerve damage and has sought and received additional medical care and treatment as a result of this traumatic incident.

166. Monlouis-Anderle has been actively involved in protests in support of Black lives and queer people of color for years. This year, before the June 3rd protest at Cadman Plaza, they attended two George Floyd protests. After Cadman Plaza, they went to the June 28th Queer

Liberation March and a protest on July 9 at Brooklyn's Woodhull Hospital in support of Sha-Asia Washington, a Black woman who died in childbirth. They would like to attend more protests, however, as a result of the trauma they sustained on June 3rd, they have been deterred from attending because the sight of large numbers of police officers causes them significant emotional distress and they are afraid of becoming a victim of police violence again.

*Plaintiff James Lauren*

167.    On June 4, 2020, Plaintiff James Lauren attended a protest organized in the Mott Haven neighborhood of the Bronx. They were there to support the cause of protesting against police violence by using their skills as a trained nurse and emergency medic to provide essential medical services to anyone injured while exercising their rights. They brought medical supplies to the protest, which they kept in a fanny pack attached around their waist, as well as in a clear backpack clearly marked with a large red cross which they wore. At the protest, Lauren wore hospital scrubs with a large red cross on the front and back of the shirt so protesters and police could clearly identify them as a medic.

168.    Lauren also carried papers that said they were a volunteer with New York City's Jail Support team and specified that since they were an essential medical worker, they were exempt from the curfew. They also carried their hospital identification card identifying them as a nurse.

169.    Lauren and other protesters gathered at the starting point for the protest in the Bronx, near a building known as the Hub. As protesters gave speeches and chanted things like, "No Justice! No peace!" and "Black Lives Matter!" Lauren noticed a large police presence. Almost all the protesters, including Lauren, wore masks, but very few, if any, police officers wore masks.

170.    At around 7:00 p.m., the crowd began marching, and a line of police officers followed behind. At around 7:30 p.m., Lauren noticed many police officers wearing full body

armor and riding their bicycles around the protesters. When the march turned down a side street, the police penned in the marchers on the front, right, and left sides. Lauren was at the very back of the march and saw the police close in the march from the rear, pressing Lauren and other protesters into one another and penning them in on all four sides.

171.    Lauren and other marchers were tightly penned in — kettled — by the police and had no way to get out. People started begging the police to let them out so they could go home, but the police did not allow them to do so.

172.    Shortly before 8:00 p.m., Lauren saw the police place a speaker right in front of them and heard it play a recording about the curfew starting. Lauren did not hear an order to disperse and had no ability to do so. Meanwhile, police officers continued to ignore protesters' requests to leave.

173.    Around 8:00 p.m., the NYPD officers in the rear of the march charged into the crowd and immediately started beating people with batons. A police officer named Detective Damian Rivera (Tax Registration No. 922858, 40th Precinct, Command Code: 138) violently shoved Lauren to the ground, pinned them down, and forcefully pulled their hands behind their back and put them in zip tie handcuffs. Even though they were clearly wearing a medic shirt and clear backpack with a large red cross, they had no opportunity to explain that they were a medic or to show anyone their medic papers and hospital identification.

174.    While they were down on the ground, they heard protesters screaming. Detective Rivera pulled Lauren to their feet. They saw officers beating people with batons and shoving bikes into protesters. They saw many people crying with swollen eyes and bleeding. They saw a lot of people with injuries, including one protestor with a serious, bleeding head wound that badly

needed to be cleaned. Lauren begged repeatedly for Detective Rivera to remove their zip tie cuffs so they could administer first aid. He refused.

175.     Lauren noticed that almost all of the other medics at the protest were also in handcuffs, and therefore unable to administer any first aid to the injured protesters. While Lauren looked on helplessly, Detective Rivera acknowledged the smell of chemical irritant in the air.

176.     Later Detective Rivera took Lauren to a police van. Before loading them into the van, still handcuffed, police officers took Lauren's picture and confiscated their fanny pack and their backpack with medical supplies. The police officers repeatedly referred to Lauren and other protesters as "bodies," which felt very dehumanizing.

177.     It was extremely hot and crowded inside the police van. Lauren tried to help calm a person who started to have a panic attack. Lauren was brought to a police precinct in Queens. They were first put in a small cell and were then moved to a larger cell with more people in it. The floors of that cell were disgusting, covered in some places with a dried, sticky brown liquid. There was only one toilet for many people and not enough places to sit, so most people sat on the floor. It was impossible to socially distance in either of the cells.

178.     Lauren observed that the police processed and released the white protesters faster than the protesters of color. Lauren was the first person to be released from their cell, although they were not the first person in their group loaded off the van, nor the first person processed for arrest, nor the first person moved from the small cell to the large cell.

179.     They were released late that night after a police officer gave them two Criminal Court Appearance Tickets. The first charged them with Disorderly Conduct, N.Y. Penal Law § 240.20(6). The second Criminal Court Appearance Ticket charged them with a Curfew Violation, § 3-108 of the N.Y.C. Administrative Code. Lauren later received a letter from the Bronx County

Supreme Court informing them that both the Disorderly Conduct charge and the Curfew Violation charge from June 4, 2020 were "dismissed on September 4, 2020" and were "sealed pursuant to Section 160.50 CPL."

180.     On June 28, 2020, Lauren attended the Queer Liberation March in Washington Square Park in Manhattan to act as a protest medic. In the late afternoon, the protesters peacefully gathered by the Washington Square Park Arch, singing, dancing and celebrating Pride.

181.     At around 4:15 p.m., Lauren suddenly noticed a large number of police charging towards the crowd. Lauren saw that someone had been directly pepper-sprayed in the face, so stopped to treat them.

182.     Lauren saw the police push people in the crowd, knocking some down to the ground, and noticed a police van in the middle of the crowd. At or around 4:30 p.m., they saw protesters who seemed to need medical care near the van. They then saw another line of cops with their batons raised approaching the crowd.

183.     Then, without provocation, the line of police charged at the crowd, beating and shoving protesters with batons. Protesters were unable to move out of their way. Lauren saw a protestor shoved to the ground by police and helped them get to the sidewalk.

184.     The protesters were almost all wearing masks, but few if any of the police officers were in masks. Lauren saw one particular police officer, Police Officer Bryan Pizzimenti (Badge No. 01406, Tax Reg. No. 922858), with no mask screaming at protesters and saw his spittle flying all over protesters. Officer Pizzimenti then violently shoved Lauren from the side, forcefully knocking them into other protesters.

185.     The crowd chanted for the NYPD to go home. The cops again rushed through the crowd, beating people with batons, and pulling and pushing people to the ground without regard

to the protesters' conduct. Lauren observed numerous protesters with swollen and red eyes who had been pepper-sprayed.

186.    Lauren treated two people with bruising on their legs from batons. They spoke with many protesters who were in shock and traumatized by the police attacking them while they were celebrating Pride.

187.    Lauren has been actively protesting since November 2015. In February 2020, they trained to be a protest medic and worked as a medic at protests from May until September 2020. Over this time period, they attended approximately two protests per week. Since September, they have been to approximately three or four protests as a medic. They remain concerned for their safety at protests and have been deterred from attending more protests because they do not want to be a victim of police violence again or to be arrested.

*Plaintiff Micaela Martinez*

188.    On June 4, 2020, Plaintiff Micaela Martinez attended the protest march in Mott Haven. She was aware of the Mayor's curfew and intended to march, leave the protest before the curfew, and then return to her home nearby. Instead, the police formed kettle lines around the protesters as many of them held batons, confining her before the curfew began and preventing her from complying with the curfew as she had planned.

189.    As the officers closed in on the protesters, they pushed Martinez and other people in the crowd against each other in such a tight manner that Martinez found it difficult to breathe. She witnessed others in the crowd panic and request to leave. She tried to leave, repeatedly asking officers to let her leave the protest to go home before the curfew. The NYPD officers refused. During this time, Martinez and other protesters chanted, "Let us go!" At no time did Martinez did hear an order to disperse, and she was not allowed to disperse.

190.    Around 8:00 p.m., without provocation, NYPD officers began beating protesters with their batons and pepper spraying individuals in the face. Martinez witnessed at least four NYPD officers strike multiple people, who were posing no threat, in the head and body with clubs. Without provocation, two NYPD officers stood on top of a civilian's parked car while striking downward on protesters' heads and clubbing anyone within their reach, even people with their backs turned to them.

191.    Further, Martinez saw an NYPD officer tackle and beat a Latinx man forcefully with a baton while his girlfriend screamed, "They are going to kill him!" The woman tried to push past Martinez, but the kettling was so tight that Martinez had no way to physically move her body to let the woman run away. Martinez tried to reassure the woman and said, "It will be okay." The woman replied, "No it's not. They are going to kill me too."

192.    Martinez looked for identifying information on the badges of officers she saw beating protesters, but the officers had obstructed their badges with black bands.

193.    With no provocation, a white male officer (Officer John Doe 21) grabbed Martinez by the arm and pulled her out of the crowd once the police started violently arresting protesters. A female officer, Officer Jane Doe 1, then tightly zip tied Martinez's hands together and to her backpack, putting extra weight and strain on her wrists. Shortly after securing the zip ties on Martinez's wrists, she tightened them even further. The zip ties were so tight that they caused significant numbing, bruising, discomfort, swelling, and lingering pain in her wrists and hands. After Martinez's repeated requests to loosen her zip ties, several officers who inspected them agreed they were much too tight. However, no officer removed them, leaving her to languish in pain for hours.

194.    Officer Joselyn Jimenez (Tax ID. No. 935071) then took Martinez and instructed

her to wait on the ground in the middle of the street. She waited there until she was processed by a white male officer, Officer Joseph "Ducky" Deck (40th precinct). Martinez made repeated requests to loosen her zip ties and officers who inspected them acknowledged they were too tight. Officer Deck said multiple times to other officers that Martinez's zip ties were overly tight and needed to be removed.

195.    Officer Deck walked Martinez to the NYPD bus, where she waited at least thirty minutes until Officer Deck finally removed the overly tight handcuffs and put looser zip tie handcuffs on her. For a few days after the protest, Martinez experienced soreness in her wrists. The NYPD detained her for approximately two hours before taking her to Central Booking in Queens.

196.    Inside the precinct, the NYPD lined up Martinez with seven other women of color along a wall and made them wait a long time before processing them. While waiting, one white-shirted NYPD officer, standing approximately two to four feet from Martinez and the other women made light of their concerns about the coronavirus and intentionally coughed in their direction.

197.    Martinez observed that the NYPD processed white women faster than women of color. Officers first took Martinez to a holding cell and then moved her to another cell, where the conditions were unsanitary with a bench, a rusty and broken toilet with no water in it, and a rusty and broken sink. The toilet had blood and feces on it and below it on the floor. In the second cell, Martinez had to sit on the cold cement floor the entire time because there was not enough room for everyone to sit on the bench.

198.    The NYPD finally released Martinez at approximately 2:45 a.m. with a summons. On September 4, 2020, the Criminal Court of the City of New York, Bronx County dismissed the case and sealed it, pursuant to Section 160.50 of New York's Criminal Procedure Law.

199.    Martinez is well aware of the impacts of structural racism through her work as a professor and researcher on public health disparities. And, the recent police killings of Black people underscored the systemic nature of racism. Martinez's concerns about racism in her own community drew her to attend two other George Floyd related protests. As a result of what Martinez experienced at Mott Haven she has made a strategic decision to refrain from attending other protests for fear of retaliation by law enforcement officers.

*Plaintiff Julian Phillips*

200.    On June 4, 2020, Plaintiff Julian Phillips joined the march through Mott Haven as the crowd was already progressing through the neighborhood. As with Plaintiffs Lauren and Martinez, he found himself kettled in a large crowd of people, surrounded by so many police officers that they appeared to outnumber the protesters. Shortly after the officers established the kettle, Phillips saw an officer yell at a young woman to get on the ground and begin to punch her in the stomach. Phillips took out his camera to record the violence and yelled at the officer to stop, which the officer did. He thought about trying to leave, but did not want to abandon the group he was with and felt safer with the crowd than on his own.

201.    As the curfew approached, Phillips was very close to the line of officers surrounding the crowd and heard police play an audio tape informing the protesters they were in violation of the Mayor's curfew. But he heard it so faintly that he was sure most people, who were not as close as him, could not hear it. The crowd began to chant "let us go" and yelling at officers that they were not being allowed to disperse. Phillips realized he could not leave even if he tried.

202.    As 8:00 p.m. approached, Phillips made eye contact with an officer in a white shirt who smiled smugly at him and pointed to his watch. Shortly after that moment, officers charged the crowd. Phillips saw officers throwing people to the ground in front of him and firing pepper

spray indiscriminately. The air was so thick with pepper spray he could feel it entering is eyes and mouth, causing him pain. He saw one officer using a riot shield as a battering ram to slam people to the ground, as other officers following with restraints. Suddenly, he was pushed to the ground by other people's bodies who were being pushed on top of him by the police.

203.     While he was pinned down underneath other bodies, Phillips had trouble breathing. He shouted "I'm being crushed" and "I can't breathe." Afraid he might suffocate like George Floyd, he was terrified for his life and worried he would break a promise he made to his sister to not get himself killed during the protests. After several minutes, he felt the other bodies pulled off of him and a police officer yanked him up off his back only to immediately shove him back down to the ground on his stomach. He was then pinned to the ground by two or three police officers, who dug their knees into his back, shoulders and legs, yanking his hands behind his back. (Officers John Doe 22-24). While he was on the ground, one of the officers purposefully kneed him in the head multiple times, yelling at him to "stop resisting" even though he was not resisting in any manner. Eventually officers placed handcuffs on him and pulled him up off the ground. His mask had been ripped off during the melee, and no officer offered him a replacement. None of the officers involved were wearing masks.

204.     Phillips' handcuffs were put on very tightly by Police Officer John Doe 25, causing significant pain. Eventually, other officers came around and agreed to loosen his cuffs. Phillips saw many other protesters in handcuffs in significant pain, and many who had lost their masks or had masks on improperly and could not adjust them because of the handcuffs.

205.     Phillips was placed in a transport van with several NYPD officers and other arrestees and taken to the 41st Precinct. At the precinct, the NYPD officers who were in the transport van chose arrestees to process at random. Detective Lee Arroyo (Tax Reg. No. 950024)

issued Phillips a summons for violating the Mayor's curfew. Phillips was held until about 1:30 a.m. The district attorney declined to prosecute.

206.    Phillips had abrasions from his injuries and experienced ongoing pain for several hours from the pepper spray that permeated his clothes. Since this incident he has occasionally had difficulty breathing.

207.    Phillips is an active protestor and has continued to protest in support of Black lives. In the weeks immediately after the protest in Mott Haven, he attended fewer demonstrations due to his treatment by the NYPD. After being brutalized by the NYPD, Phillips is more discerning about what demonstrations to attend and whether he attends by foot or bike. Following his experience, he began opting to attend demonstrations by bike instead and to stay out of the front line. He plans to continue protesting because he feels it is important to be able to express discontent with injustice through physical, visible action.

*Plaintiff Nicolas Mulder*

208.    On the evening of June 4, 2020 at around 9:00 p.m., Plaintiff Nicholas Mulder attended a protest in Williamsburg, Brooklyn to assist his wife, a journalist, who was filming and reporting on the protest. As the marchers approached the intersection of Penn Street and Wythe Street, dozens of NYPD officers blocked the road and brought the march to an end. As the crowd began to disperse, the officers suddenly charged them – some with batons in their hands, attacking several people from behind.

209.    As Mulder and a film crew continued to film the violence from a safe distance, an NYPD officer in a white shirt, Lieutenant Michael Butler, shoved him against a parked car and then tackled him from behind. Mulder landed on his knee with the full weight of the officer on top of him. Mulder stated repeatedly that he was working with the press. While he was on the ground,

another NYPD officer (Officer John Doe 26) hit Mulder with a baton on his head, causing his head to bleed, and then put his full weight on Mulder while Lieutenant Butler restrained him in plastic handcuffs so tightly that it caused pain in his wrists. As Mulder lay on the ground, he repeatedly told the officers that he was in pain. However, the officers ignored him and did not offer or provide any medical attention. It was not until the next day after his arrest that Mulder obtained medical attention for the injuries he incurred as a result of the police violence at the protest.

210.    While he was restrained in plastic handcuffs, Mulder saw officers continue to assault protesters despite their peaceful conduct. He witnessed multiple unidentified officers tackle his wife to the ground after speaking with, and receiving, her crew's film equipment from another officer. Mulder saw an arrestee with multiple head contusions who needed medical attention, but the unidentified officers did not assist this injured man. He also saw a man splayed out on the ground, intertwined with his bicycle while his head was bleeding profusely, and unidentified NYPD officers declined to provide medical assistance to this man.

211.    Sometime after Lieutenant Butler zip-tied Mulder, Mulder was then transferred to another officer. That officer put Mulder on an NYPD bus that transported him and others to central booking in Brooklyn. His arresting officer, Officer Aaron Husbands, also escorted another arrestee to the bus and remained on the bus with Mulder. Mulder witnessed several people in severe pain from overly tight handcuffs on the NYPD bus that transported them to central booking in Brooklyn. One man was screaming in pain and begging for medical assistance as his hands took on a sickly blue-green color due to the extreme tightening of the zip ties.

212.    After Mulder's arrest for violating the Mayor's curfew, the NYPD detained Mulder for several hours and eventually released him at about 1:45 a.m. on June 5, 2020.

213.    On October 5, 2020, the Criminal Court of the City of New York, Kings County,

dismissed Mr. Mulder's summons.

214.     The murder of George Floyd and other Black people by police officers woke up Mulder to the violence that many Black Americans face. Prior to 2020, he had primarily attended class-focused protests, like Occupy Wall Street, but in response to the highly publicized murders, he attended several protests both in a personal capacity to show his support for Black Lives Matter and to help his wife cover the events. After his assault by officers on June 4, Mulder has not attended more protests because he fears the repercussions.

*Plaintiff Colleen McCormack-Maitland*

215.     On June 28, 2020, Plaintiff Colleen McCormack-Maitland attended the Queer Liberation March. The march was very peaceful, and people were dancing to music upon arriving at Washington Square Park, where the march terminated.

216.     As she stood in the park, McCormack-Maitland saw a dozen or more officers on mopeds driving recklessly through protesters arriving in the park from Washington Square Park North. She saw Sergeant Thomas E. Manning screaming, without wearing a face mask or covering, at a protester to "Get the fuck away" as he and other officers, including Police Officer Hensley Caraballo (Tax Reg. No. 962970), began to shove other protesters and onlookers back toward where McCormack-Maitland was standing, trapping her between an ice cream truck and other people's bodies, unable to disperse. Officer Caraballo then sprayed a stream of pepper spray at McCormack-Maitland and the other bystanders. As she felt her eyes sting and begin to burn, Officer Caraballo pepper-sprayed the crowd again. Eventually, she was able to retreat further into Washington Square Park where she washed her eyes and face with water.

217.     Prior to the Queer Liberation March, McCormack-Maitland had gone to a number of protests and demonstrations concerning a number of issues including police brutality. After the

Queer Liberation March, she went to a small protest a week or two later in Brooklyn. She felt heightened anxiety during this protest and noted that she consciously chose to march towards the edges or the back of the protest. Whereas she would normally want to be close to the speakers at a demonstration, she deliberately chose not to in this instance. McCormack-Maitland also would have ordinarily attended the weekly recurring protests at Stonewall Inn. Instead, she refrained from attending because of her anxiety from her experience being trapped and pepper sprayed by NYPD officers. She distinctly remembers considering attending a protest at Stonewall Inn in early November, and instead, chose not to. In early November, NYPD SRG made a number of aggressive arrests at a demonstration for Black Trans Liberation at Stonewall Inn.[65]

### The Plaintiffs' Injuries Were Caused by NYPD Policy, Custom and Practice

218.    Plaintiffs have been injured proximately and directly by the Defendants, including being subjected to excessive force, false arrest, excessive detention and infringement on their rights to free speech, expression, and assembly.

219.    Defendants subjected protesters, including the Plaintiffs, to false arrests, excessive detention, and excessive force in retaliation for and on account of their participation in and or presence at protests against police violence and abuse, and in support of Black Lives Matter after the killing of George Floyd.

220.    The City of New York, Mayor de Blasio, Commissioner Shea, and Chief of Department Monahan have directly enforced, promoted, authorized, and sanctioned the NYPD's custom and practice of using excessive force when policing protests, including the unprovoked or unjustified use of pepper spray, baton or fist strikes, and excessively tight handcuffs.

---

[65] *See* Offenhartz, *supra* note 47.

221.   The City of New York, Mayor de Blasio, Commissioner Shea, and Chief of Department Monahan have directly enforced, promoted, authorized, and sanctioned the NYPD's custom and practice of using kettling – or penning – of protesters exercising protected First Amendment rights without adequate notice or opportunity to disperse.

222.   The NYPD maintained a policy or practice instructing officers at protests to arrest protestors for offenses for which summonses should have been issued, which subjected protestors to mass arrests rather than releasing them from custody on to the street. This policy subjected protestors to unreasonable and punitive transport, processing, and detention at Mass Processing Centers or precincts across the City in unsanitary and hazardous conditions during the COVID-19 pandemic.

223.   The City of New York, Mayor de Blasio, Commissioner Shea, and Chief of Department Monahan have enforced, promoted, authorized, and sanctioned the NYPD's custom and practice of conducting mass arrests of protestors, rather than issuing them summonses and releasing them from custody, pursuant to mass arrest processing procedures, which subjected protestors to unreasonable and punitive transport, processing, and detention in unsanitary and hazardous conditions during the COVID-19 pandemic.

224.   Defendant City of New York has inadequately trained, supervised, and disciplined NYPD officers with respect to its officers' use of kettling, fist and baton strikes, zip tie handcuffs, pepper spray at large protest events, as well as with respect to officers' wearing of masks during the coronavirus pandemic.

225.   Defendant City of New York has repeatedly had notice that NYPD training and officer supervision were inadequate and likely to result in constitutional violations based on multiple incidents of excessive force, false arrest and other misconduct against protesters at large

protest events dating back to at least 1999. The First Amended Complaint in the related case, *People of the State of New York v. City of New York, et al*., 21-cv-0322 (CM) (GWG), ECF No. 51, paragraphs 27-32, which are incorporated by reference into this complaint, detail the lawsuits and findings of the CCRB regarding prior constitutional violations and misconduct against protesters.

226.    The NYPD continues to employ, promote, and even give additional responsibility to NYPD officers with a known history of abusive behavior towards protesters.

227.    Defendant City of New York, through Mayor de Blasio, Commissioner Shea, and Chief of Department Monahan, ratified the unsafe and unconstitutional treatment of protesters by their knowledge of, participation in, and/or deliberate indifference to such actions, as well as the failure to discipline or hold misbehaving officers accountable.

228.     In these failures, Defendant City of New York, through Mayor de Blasio, Commissioner Shea, and Chief Monahan, has been deliberately indifferent to the rights of protesters and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiffs as alleged herein.

229.    As a direct result of the Defendant City of New York's failures and policies as described herein, Plaintiffs suffered damages, including physical injury, emotional distress, fear, apprehension, and concern for Plaintiffs' own safety.

230.    In many of the protests cited above, officers covered their badge numbers, making it difficult for protesters, including the Plaintiffs, to identify individual officers involved in the unconstitutional and unlawful acts alleged herein.

231.    The City of New York, the Mayor, Commissioner Shea and Chief Monahan were aware that officers involved in policing the protests covered their badge numbers, and failed to take action to stop it.

232.    Plaintiffs demand a trial by jury in this action.

### JURISDICTION AND VENUE

233.    This Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)–(4).

234.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

### FIRST CAUSE OF ACTION

235.    Defendants' actions toward Plaintiffs constitute excessive force in violation of the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### SECOND CAUSE OF ACTION

236.    Defendants' actions toward Plaintiffs constitute excessive force in violation of Article I, section 12 of the New York State Constitution.

237.    At least thirty days have elapsed since the service of any notice of claim and adjustment or payment thereof has been neglected or refused. All claimants are complying with demands for examination.

### THIRD CAUSE OF ACTION

238.    Defendants' actions violate Plaintiffs' rights to speech, expression, and to assemble in violation of the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

239.    Defendants' actions violate Plaintiffs' rights to speech, expression and to assemble under Article I, section 8 of the New York State Constitution.

240.    At least thirty days have elapsed since the service of any notice of claim and adjustment or payment thereof has been neglected or refused. All claimants are complying with demands for examination.

## FIFTH CAUSE OF ACTION

241.    Defendants' arrest and detention of Plaintiffs Andie Mali, Camila Gini, Vivian Matthew King-Yarde, Jarrett Payne, Charlie Monlouis-Anderle, James Lauren, Micaela Martinez, Julian Phillips, and Nicholas Mulder violate the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## SIXTH CAUSE OF ACTION

242.    Defendants' arrest and detention of Plaintiffs Andie Mali, Camila Gini, Vivian Matthew King-Yarde, Jarrett Payne, Charlie Monlouis-Anderle, James Lauren, Micaela Martinez, Julian Phillips, and Nicholas Mulder violate of Article I, section 12 of the New York State Constitution.

243.    At least thirty days have elapsed since the service of any notice of claim and adjustment or payment thereof has been neglected or refused. All claimants are complying with demands for examination.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that this Court:

(a)    Assume jurisdiction over this matter;

(b)    Declare that Defendants' actions violate the First and Fourth Amendments to the United

States Constitution and their state law counterparts;

(c)    Enjoin Defendants from further violations of Plaintiffs' constitutional rights, including but not limited to an injunction ordering Defendants to take appropriate measures to refrain from their unconstitutional policies and practices of employing excessive force, unlawful arrests, excessive detention, and retaliation against Plaintiffs for their protected activity under the First Amendment and Article I, section 8 of the New York State Constitution;

(d)    Award Plaintiffs compensatory and punitive damages;

(e)    Award Plaintiffs attorneys' fees and costs; and

(f)    Grant any other relief the Court deems appropriate.

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
  FOUNDATION

By: */s/Molly K. Biklen*
    Molly K. Biklen
    Jessica Perry
    Daniel R. Lambright
    Veronica Salama
    Robert Hodgson
    Perry Grossman
    Lisa Laplace
    Christopher T. Dunn
    125 Broad Street, 19th Floor
    New York, N.Y. 10004
    (212) 607-3300
    mbiklen@nyclu.org
    jperry@nyclu.org
    dlambright@nyclu.org
    vsalama@nyclu.org
    rhodgson@nyclu.org
    pgrossman@nyclu.org
    llaplace@nyclu.org
    cdunn@nyclu.org

*Attorneys for the Plaintiffs*


Dated: April 12, 2023
    New York, New York

THE LEGAL AID SOCIETY

By: */s/ Corey Stoughton*
    Corey Stoughton
    Jennvine Wong
    Rigodis Appling
    Paula Garcia-Salazar
    199 Water Street
    New York, N.Y. 10038
    (212) 577-3367
    cstoughton@legal-aid.org
    jwong@legal-aid.org
    rtappling@legal-aid.org
    pgarciasalazar@legal-aid.org