# EXHIBIT 4

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    -----------------------------------------X
      PEOPLE OF THE STATE OF NEW YORK, by Letitia
 4    James, Attorney General of the State of New
      York,
 5
                              PLAINTIFF,
 6
 7         -against-           Case No.:
                               21-CV-322
 8                             (CM)(GWG)
 9    CITY OF NEW YORK, MAYOR BILL DE BLASIO,
      POLICE COMMISSIONER DERMOT F. SHEA, and
10    CHIEF OF DEPARTMENT TERENCE A. MONAHAN,
11                            DEFENDANTS.
      -----------------------------------------X
12
13              DATE:  April 6, 2023
14              TIME:  9:35 a.m.
15
16
17         VIDEOCONFERENCE DEPOSITION of a
18    30(b)(6) Witness, JOHN KANGANIS, taken by
19    the respectful parties, pursuant to the
20    Federal Rules of Civil Procedure, held at
21    the above date and time, before JANNA
22    LIRTSMAN, a Notary Public of the State of
23    New York.
24
25
```

```
 1
 2   A P P E A R A N C E S:
 3
 4   OFFICE OF THE NEW YORK ATTORNEY GENERAL
        Attorney for the Plaintiff
 5      PEOPLE OF THE STATE OF NEW YORK, by
        Letitia James, Attorney General of the
 6      State of New York
        28 Liberty Street, 20th Floor
 7      New York, New York 10005
        BY: GINA BULL, ESQ.
 8          LILLIAN MARQUEZ, ESQ.
 9
10   NEW YORK CITY LAW DEPARTMENT
     Corporation Counsel
11      Attorneys for the Defendants
        CITY OF NEW YORK, MAYOR BILL DE BLASIO,
12      POLICE COMMISSIONER DERMOT F. SHEA, and
        CHIEF OF DEPARTMENT TERENCE A. MONAHAN
13      100 Church Street
        New York, New York  10007
14      BY: SERGEY MARTS, ESQ.
15
16
     ALSO PRESENT:
17      Peter Callaghan, Esq., (NYPD)
        Michael Vitoroulis, Esq. (Legal Aid)
18      Peter Scutero, Esq., (Corp. Counsel)
        Veronica Salama (NY Civil Liberties Union
19          for Plaintiff)
        J. Remy Green, Esq (for SOW Plaintiffs)
20      Wylie Stecklow, Esq.
        Aymen Aboushi, Esq.
21
                  *         *         *
22
23
24
25
```

Page 3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24               *     *     *     *

25

```
                                     Page 4
1                    J. KANGANIS
2            MR. MARTS:  I want to put a few
3       things on the record which I believe
4       is going to streamline the process.
5            Before we logged in, I noticed
6       that the deposition is being
7       recorded.  I want to put on the
8       record that it does not appear it's
9       consistent with the parties'
10      Stipulation and Federal Procedure
11      Pursuant to Rule 30 Sub F.
12           Additionally, as we indicated
13      in our e-mail, the Inspector Kanganis
14      was designated as a 30(b)(6) which is
15      on topics 20 and 21.  He was not
16      designated to testify with respect to
17      any other topics including topics 17
18      and 18.  As we indicated in our
19      e-mail, our position is that shall
20      plaintiff ask any questions
21      pertaining to subject matter that
22      fall outside of topics 20 and 21, any
23      answers by the DI Kanganis will not
24      be binding on the City.
25           Thank you.
```

                                                        Page 5

1                        J. KANGANIS

2              MS. BULL:   I would say we

3         negotiated with defendants the

4         understanding these remote

5         depositions will be recorded.   That's

6         included in the stipulation, but we

7         will let the stipulation speak for

8         itself.

9              And the 30(b)(6) Notice also

10        speaks for itself in terms of what

11        subject matters are covered by the

12        topics for which Deputy Inspector

13        Kanganis is designated.

14

15   J O H N   K A N G A N I S, called as a

16   witness, having been first duly sworn by a

17   Notary Public of the State of New York, was

18   examined and testified as follows:

19   EXAMINATION BY

20   MS. BULL:

21        Q.    Good morning, Deputy Inspector.

22   My name is Gina Bull.   I represent the

23   People of the State of New York in one of

24   the few lawsuits stemming from the racial

25   justice protests in 2020.

```
 1                    J. KANGANIS
 2              You can answer if you
 3         understand the question, Inspector.
 4       A.    There is a Patrol Guide
 5   procedure on arrest processing.  That's the
 6   only procedure I'm aware of.  There was no
 7   new procedure created for the summer of
 8   2020.
 9       Q.    What section of the Patrol
10   Guide is that?
11       A.    I believe it's 208 section, but
12   I couldn't tell you what subdivision.
13       Q.    All right.  Can you walk me
14   through the steps that officers were
15   trained to take in preparing an arrest for
16   prosecution starting from the time of an
17   arrest?
18              MR. MARTS:  Objection.
19              Outside of scope.
20       A.    No, I can't.
21       Q.    And so you're not prepared to
22   answer this question?
23              MR. MARTS:  Objection.
24              The question is outside of the
25         scope of the topic.
```

```
 1                  J. KANGANIS
 2            You can answer, Inspector.
 3       A.   I can't answer the question.  I
 4  don't have knowledge of how an arrest is
 5  processed now.  I haven't made an arrest in
 6  about 25 years.
 7       Q.   You have no knowledge about
 8  NYPD's procedure for processing arrests and
 9  coordinating with district attorney offices
10  as outside of knowing there is a Patrol
11  Guide on point?
12       A.   Correct.
13            MR. MARTS:  For the record,
14       please note my objection.
15       Q.   If at some point after an
16  arrest during the period of the 2020
17  protests the district attorney's office
18  decided to dismiss or to decline to
19  prosecute an arrest, who would be informed
20  of that?
21            MR. MARTS:  Objection to form.
22            You can answer if you answer
23       the question.
24       A.   Decision not to prosecute an
25  arrest is made by the district attorney.
```

```
 1                    J. KANGANIS
 2   There is nobody that I'm aware of that they
 3   would notify of their decision.
 4        Q.    When you say that you are aware
 5   of, you don't know if there is someone
 6   within the NYPD who would be informed if a
 7   district attorney decided to dismiss or
 8   declined to prosecute an arrest?
 9        A.    No.   There is nobody designated
10   to receive that information, if that's a
11   clear answer.
12        Q.    So do you know if an arresting
13   officer would be informed in the situation
14   such as that?
15             MR. MARTS:   Objection.
16             You can answer.
17        A.    I don't know.
18             MR. MARTS:   Gina, can you give
19        me one second?  I apologize.  I just
20        need one minute.  My apologies.
21             MS. BULL:   All right.  We will
22        go off the record for a few minutes.
23             MR. MARTS:   Thank you.  My
24        apologies.
25             (Whereupon, at 10:16 a.m., a
```

Page 38

1                      J. KANGANIS

2          short recess was taken.

3                At 10:20 a.m., the deposition

4          resumed.)

5                MR. MARTS:  Thank you for

6          accommodating my request.  I

7          appreciate it.

8                MS. BULL:  Sure.

9        Q.    Deputy Inspector, are you

10   prepared to answer what questions the NYPD

11   is responsible for preparing when they are

12   preparing an arrest for prosecution?

13                MR. MARTS:  Objection.

14                You can answer, Inspector, if

15          you understand the question.

16        A.    I don't understand the

17   question.

18        Q.    So I asked earlier, walk me

19   through the steps that officers are trained

20   to take in preparing an arrest for

21   prosecution starting from the time of

22   arrest.  Are you prepared to answer that

23   question?

24        A.    I answered there was a Patrol

25   Guide procedure that explains the steps.

```
                                         Page 39
 1                    J. KANGANIS
 2   It speaks for itself.  I'm not familiar to
 3   the extent that I can answer questions
 4   about the procedure.
 5               MR. MARTS:  And for the record,
 6          please note my objection that the
 7          question was asked, it's outside of
 8          the scope of the topic 20, 21.
 9               MS. BULL:  I'm going to ask
10          that you stop with the speaking
11          objections, please.
12               MR. MARTS:  My apologies.
13      Q.    It's just a yes-or-no question.
14               Are you prepared to answer the
15   question?
16               There is not great audio.  If
17   you can speak up, please.
18      A.    I said no.
19      Q.    Are you prepared to answer the
20   question what involvement would the
21   arresting officer have in the preparation
22   of a criminal complaint?
23               MR. MARTS:  Objection.
24               Scope.
25      A.    No.
```

```
 1                    J. KANGANIS
 2        Q.     And when are officers trained
 3   in the procedures for preparing an arrest
 4   for prosecution?
 5                 MR. MARTS:  Objection.
 6                 Scope.
 7        A.     Is the question am I prepared
 8   to answer questions about that?
 9        Q.     Well, I'm first asking you the
10   question.
11        A.     I didn't understand the
12   question.
13        Q.     When are officers trained in
14   the procedures of preparing an arrest for
15   prosecution?
16        A.     Initially, at the police
17   academy.
18        Q.     After that police academy?
19        A.     I said initially at the police
20   academy.
21        Q.     Any other training?
22                 MR. MARTS:  Objection.
23                 Scope.
24        A.     Training continues after the
25   police academy in the field.
```

```
                                         Page 41

 1                  J. KANGANIS
 2        Q.    Can you be more specific?
 3        A.    Officers, after graduation from
 4   the police academy, are assigned to field
 5   training units.  Those assignments they get
 6   hands-on experience, and they would be
 7   taught how to process an arrest.
 8        Q.    Are you aware of any specific
 9   trainings that the NYPD conducts on those
10   procedures?
11              MR. MARTS:  Objection.
12              Scope.
13        A.    No.
14        Q.    So you're not prepared to
15   answer this question on behalf of the NYPD?
16              MR. MARTS:  Objection.
17        A.    Correct.
18        Q.    In a situation in which an
19   officer does not have personal knowledge
20   for why a person is being arrested, how
21   does that influence the procedure for
22   processing of an arrest?
23              MR. MARTS:  Objection.
24              Outside of scope.
25        A.    I'm going to refer you to the
```

```
 1                    J. KANGANIS
 2  arrest processing procedure I mentioned
 3  earlier.
 4        Q.    So are you not prepared to
 5  answer that question on behalf of the NYPD?
 6              MR. MARTS:  Objection.
 7        A.    Right.
 8        Q.    Who would be responsible for
 9  making -- for responding to any request
10  from district attorney offices needed for
11  the prosecution of an arrest at NYPD?
12              MR. MARTS:  Objection.
13              Form.
14              You can answer.
15        A.    Well, the arresting officer has
16  to provide whatever documents the district
17  attorney would need.
18        Q.    Is anyone else responsible for
19  that?
20        A.    Not familiar with the procedure
21  I mentioned earlier, so again I will refer
22  you to that procedure.
23        Q.    So you're not prepared to
24  answer that question on behalf of the City
25  of New York?
```

```
                                              Page 43
  1                      J. KANGANIS
  2        A.      Correct.
  3        Q.      What was the procedure for
  4   coordinating with district attorney offices
  5   at the time of the 2020 protests when an
  6   interview of an officer was necessary?
  7              MR. MARTS:  Objection to form.
  8              You can answer.
  9        A.      There is no procedure that --
 10   to address what you just asked me about.
 11        Q.      So you are sure there was no
 12   procedure at the time to coordinate with
 13   district attorney offices to interview any
 14   officer when necessary?
 15        A.      Beyond what is in the Patrol
 16   Guide in the 208 section, there is no
 17   special procedure for the summer of 2020,
 18   if that's what you are asking.
 19        Q.      I'm not asking about any
 20   special procedure.  I'm asking about what
 21   procedure was in place at the time.
 22        A.      Patrol Guide procedure 208, the
 23   arrest procedure in the Patrol Guide.
 24        Q.      Was there any unwritten policy
 25   in place governing that process at the
```

```
 1                    J. KANGANIS
 2   time?
 3              MR. MARTS:  Objection.
 4              You can answer.
 5        A.     No.
 6        Q.     Was there any category of cases
 7   in the period of the 2020 protests where
 8   the procedures in that Patrol Guide were
 9   not used?
10              MR. MARTS:  Objection to form.
11              You can answer.
12        A.     No.
13        Q.     I asked earlier about a
14   district attorney's office decision to
15   dismiss or declined to prosecute an arrest,
16   and you said that you were not aware of
17   anyone who would be informed about that;
18   right?
19        A.     I don't remember your specific
20   question and the specific answer; but if
21   you are asking me again, what you just said
22   is accurate.
23        Q.     So you're not prepared to
24   answer that question on behalf of the City
25   of New York?
```

```
 1                    J. KANGANIS
 2               MR. MARTS:  Objection.
 3        A.    I'm prepared and I've answered,
 4   there is nobody designated to serve the
 5   role that you just described.
 6        Q.    I didn't ask if someone was
 7   designated.  I asked if anyone would be
 8   informed.
 9        A.    No, I'm not prepared to answer
10   the question that you just asked.
11        Q.    Has there been any change to
12   any of the policies and procedures with
13   respect to coordinating with the district
14   attorney offices in the processing of an
15   arrest from 2020 to present?
16               MR. MARTS:  Objection.
17               Outside of scope.
18               You can answer, Inspector.
19        A.    I'm not prepared to answer that
20   question.
21               MS. BULL:  I'm going to show an
22          exhibit that will be marked Kanganis
23          3.
24               (Whereupon, the aforementioned
25          document was marked as Kanganis
```

```
 1                    J. KANGANIS
 2        Exhibit 3 for identification as of
 3        this date by the Reporter.)
 4              MS. BULL:   This bears Bates
 5        stamp DEF_000323038 through 054, and
 6        I will put that in the chat.
 7        Q.    Do you see the document on the
 8   screen that says, "Affidavit in Support of
 9   Declining/Deferring Prosecution" on the
10   top?
11        A.    Yes.
12        Q.    Have you seen this document
13   before?
14        A.    No.
15        Q.    Do you recognize what type of
16   document this is?
17        A.    Other than the title, no.
18        Q.    I'm going to scroll through the
19   first two pages of this document and ask
20   you to read them; okay?  Just let me know
21   if you need me to slow down.  Let me know
22   when you finish the first page.
23        A.    Okay, continue.  You can finish
24   if you have anymore.
25        Q.    We will start with the first
```

```
                                           Page 47

 1                     J. KANGANIS

 2    few pages.

 3             MR. MARTS:  I'm not sure

 4         whether you put the name of the

 5         document on the record.  And I

 6         apologize if you did, but if you can

 7         just put it on the record.

 8             MS. BULL:  Affidavit of Support

 9         of Declining/Deferring Prosecution.

10             MR. MARTS:  Please note my

11         objection for the record to the

12         document.

13        Q.    Deputy Inspector, here at the

14    bottom where it says, "the assigned desk

15    appearance representative," do you know

16    what does that mean?

17             MR. MARTS:  Objection.

18        A.    I don't know.

19        Q.    You're not prepared to answer

20    that?

21             MR. MARTS:  Objection.

22        Q.    I didn't hear an answer.

23        A.    The answer was I don't know.

24    If you want to say I'm not prepared to

25    answer it, I'm not prepared to answer it
```

```
 1                    J. KANGANIS
 2   because I don't have knowledge of the
 3   assigned desk appearance representative.
 4        Q.    It says, "Captain Delgado of
 5   the Strategic Response Group who was
 6   involved in assigning the arrest."  What do
 7   you understand that to mean?
 8              MR. MARTS:  Objection.
 9        A.    I understand that to mean the
10   assigned officers to process this
11   particular arrest.
12        Q.    And can you tell me what is the
13   process of assigning another officer to an
14   arrest?
15              MR. MARTS:  Objection.
16              Outside of scope.
17        A.    I will refer you to Patrol
18   Guide procedure that I mentioned earlier.
19        Q.    I'm just asking you to answer
20   the question.
21        A.    I can't answer the question.
22   I'm not familiar with the procedure to the
23   extent that I can answer your questions
24   about it.
25        Q.    Okay, so you're not prepared to
```

```
                                        Page 49
 1                    J. KANGANIS
 2    answer that question.
 3         A.    No.
 4         Q.    After reading this affidavit,
 5    what is your understanding as to why the
 6    district attorney decided to dismiss the
 7    charges of unlawful assembly and disorderly
 8    conduct here?
 9              MR. MARTS:  Objection to form.
10              Outside of the scope.
11              You can answer.
12         A.    It states it was dismissed in
13    the interest of justice.
14         Q.    Does it say any other reason
15    for dismissing the prosecution?
16         A.    You want me to read it again?
17    That's what stuck out to me, declining to
18    prosecute in the interest of justice.
19         Q.    Do you see on page two the
20    second paragraph, "without the ability to
21    identify the defendants as individuals
22    suspected of criminal conduct in addition
23    to the crimes described above, it is our
24    position that the evidence currently
25    presented will not convince a jury beyond a
```

```
 1                    J. KANGANIS
 2   reasonable doubt that their presence in the
 3   group constituted an incitement which was
 4   both directed towards and likely to produce
 5   imminent violent and tumultuous conduct"?
 6              MR. MARTS:  Objection.
 7        A.    I see it.
 8        Q.    The first paragraph, it says,
 9   The arresting officer nor Captain Delgado
10   had sufficiently individualized knowledge
11   of each defendant's conduct to justify
12   additional charges aside from the violation
13   of the emergency order; correct?
14              MR. MARTS:  Objection.
15        A.    That's what it says.
16        Q.    Would you agree that this
17   affidavit seems to say that the district
18   attorney did not find there was sufficient
19   probable cause for the charge of unlawful
20   assembly and disorderly conduct?
21              MR. MARTS:  Objection.
22              Please note my objection for
23          the record.
24        A.    It says they didn't think they
25   could convince a jury beyond a reasonable
```

```
 1                    J. KANGANIS
 2   doubt so they dismissed it in the interest
 3   of justice.  That's what it says.  It
 4   speaks for itself.
 5        Q.    You didn't answer my question.
 6        A.    You asked me if I agree with
 7   it.
 8        Q.    Your understanding.  If you
 9   understand that to mean that it was not
10   just in the interest of justice, but that
11   it was insufficient individualized
12   knowledge of each defendant's conduct to
13   justify additional charges --
14              MR. MARTS:  Objection to form.
15        Objection to the question.
16              Outside the scope.
17        A.    If we are going to go into my
18   understanding of it, let's go back to the
19   first paragraph which ends on page two
20   where it mentions which is a summonsable
21   offense, and it states, "The Penal Law
22   sections for unlawful assembly and
23   disorderly conduct."  But I don't see any
24   other statement that relates to those
25   charges other than they would not be
```

```
 1                    J. KANGANIS
 2  justified, so I don't understand the
 3  question.
 4      Q.    What is the standard for
 5  establishing probable cause to arrest
 6  someone for unlawful assembly as an arrest?
 7              MR. MARTS:  Objection.
 8              Outside the scope.
 9              You can answer if you
10         understand the question.
11              THE WITNESS:  I understand.
12      A.    Probable cause is a legal
13  standard which is necessary -- required to
14  effect an arrest.  Other than that, I don't
15  understand what you are asking me.
16      Q.    Do you understand specifically
17  what would be needed to have probable cause
18  for the offense of unlawful assembly?
19              MR. MARTS:  Objection.
20              Outside of the scope.
21      A.    The Penal Law, you need one
22  plus four violent and tumultuous behavior;
23  you need facts and circumstances against
24  the individual to support the probable
25  cause to make that arrest.
```

```
                                         Page 53
 1                    J. KANGANIS
 2       Q.    What is the probable cause
 3   needed to make out an offense of disorderly
 4   conduct?
 5             MR. MARTS:  Objection.
 6             Outside of the scope of the
 7        topics.
 8       A.    Again, facts and
 9   circumstances --
10             THE WITNESS:  Do you want me to
11        answer that question or --
12             MR. MARTS:  You can answer the
13        question if you understand.
14       A.    Facts and circumstances which
15   support the standard of probable cause, I
16   believe sub six is obstructing vehicular
17   traffic; but I'm not certain as to the
18   subdivision.
19             But again, you would need facts
20   and circumstances against the particular
21   individual to support the charge.
22       Q.    Are you familiar with case law
23   cited here, Demler versus City of New York
24   on page two?
25       A.    No.
```

```
                                            Page 54
 1                    J. KANGANIS
 2              MR. MARTS:  Objection.
 3              Outside of the scope.
 4        Q.    I'm going to go to page three
 5   of Kanganis 3 and ask you to read under
 6   details.  Let me know when you are
 7   finished.
 8        A.    I'm finished.
 9        Q.    Based on the facts alleged in
10   this details section here, do you think
11   that there is probable cause to make out
12   the offense of unlawful assembly?
13              MR. MARTS:  Objection to form.
14              Objection to outside of the
15         scope.
16              You can answer, Inspector.
17        A.    Yes.
18        Q.    Why?
19              MR. MARTS:  Objection.
20        A.    Did you ask me why?
21        Q.    Can you explain why the answer
22   is yes.
23        A.    Because considering the
24   circumstances that were going on I think it
25   constitutes violent and tumultuous
```

```
 1                    J. KANGANIS
 2   behavior; shoving the police, slapping the
 3   police, the unknown liquids, it could be
 4   the gasoline.  There were several molotov
 5   cocktails.  They refused orders to
 6   disburse.  I believe it meets.  I'm not a
 7   district attorney, so.
 8        Q.    Do you think the facts as
 9   described here make out probable cause for
10   the offense of disorderly conduct?
11             MR. MARTS:  Objection.
12             Outside of the scope.
13             You can answer.
14        A.    Yes.  Refused the orders to
15   disburse, so --
16        Q.    I'm going to go back to the
17   affidavit.
18             Let's assume for the purpose of
19   this discussion that the person who -- the
20   arresting officer did not see the
21   individual defendant engage in any of that
22   conduct, any of this violent and disorderly
23   conduct that's described in the affidavit.
24   Do you think that makes out the probable
25   cause for the offense of unlawful assembly?
```

```
 1                    J. KANGANIS
 2              MR. MARTS:  Objection to form.
 3              Objection to outside of the
 4        scope.
 5        A.    Probable cause has to be
 6   against the individual protester or the
 7   individual involved in the acts that are
 8   alleged.
 9        Q.    The answer is a yes-or-no
10   question.
11        A.    Can you ask the question again,
12   please?
13        Q.    I will rephrase it.
14              So looking at this affidavit,
15   right, without the ability to identify the
16   defendants as individuals suspected of
17   criminal conduct, let's assume that this
18   person was in a crowd of protesters but
19   there was no knowledge that person, this
20   defendant, was engaged in the alleged
21   violent and disorderly conduct, is there a
22   probable cause?
23              MR. MARTS:  Objection to form
24        and scope.
25        A.    You want a yes or no answer?
```

1                    J. KANGANIS

2        Q.      Yes.

3        A.      The answer would be no.

4        Q.      Would there be probable cause

5    for disorderly conduct?

6                MR. MARTS:  Objection.

7                Outside of scope.

8        A.      If you can't identify the

9    individual that's violating the statute,

10   you don't have the probable cause against

11   that individual.

12       Q.      So an individual who is part of

13   a crowd but there is not individualized

14   knowledge of the violent behavior as

15   described in this last paragraph on page

16   one, there is no probable cause for those

17   two offenses?

18                MR. MARTS:  Objection.

19                Outside of scope.

20       A.      To charge an individual with a

21   particular crime, you have to have

22   individualized probable cause against the

23   individual.

24       Q.      It was a yes-or-no question.

25       A.      Can you ask it again, please?

1              J. KANGANIS

2        Q.      In a situation as described in

3    this affidavit where the defendant is a

4    member of a crowd but there is not

5    individualized knowledge that they were

6    engaged in any of the violent activity that

7    is described in page one, is there probable

8    cause for those two offenses?

9              MR. MARTS:  Objection.

10              Asked and answered.

11              You can answer.

12        A.      No.

13        Q.      How does the NYPD ensure that

14    there is individualized probable cause in

15    arrests for large demonstrations such as

16    these?

17              MR. MARTS:  Objection to form

18         and scope.

19              You can answer, Inspector.

20        A.      Large demonstrations, there are

21    supervisors there to verify arrests.  And

22    often there is a Legal Bureau attorney on

23    scene to assist.

24        Q.      Anything else?

25              MR. MARTS:  Objection.

```
                                          Page 59
 1                     J. KANGANIS
 2        A.     That's the answer.
 3        Q.     Is there any training or
 4   guidance provided to officers to make that
 5   determination?
 6              MR. MARTS:  Objection.
 7              Outside of the scope.
 8              You can answer, Inspector.
 9        A.     I spoke about training earlier
10   and field training.  I spoke about training
11   in the police academy.
12        Q.     Were there occasions where
13   staff in any district attorney office
14   expressed lack of probable cause in arrests
15   related to the 2020 protests?
16              MR. MARTS:  Objection to form
17        and scope.
18              You can answer.
19        A.     To whom?  To me?
20        Q.     The question is, you are
21   testifying today on behalf of the City of
22   New York.  Were there occasions where staff
23   in any district attorney offices expressed
24   issues of lack of probable cause or
25   individualized knowledge in arrests related
```

```
                                            Page 60
 1                  J. KANGANIS
 2   to the 2020 protests?
 3       A.    No.   That's a very broad
 4   question.   I can't say who had
 5   conversations in the police department, but
 6   I can say as an agency we did not receive
 7   any communication regarding lack of
 8   probable cause.
 9       Q.    Were there occasions that the
10   City of New York or the NYPD learned from
11   district attorney offices that they were
12   declining or dismissing a prosecution
13   related to the 2020 protests based on lack
14   of sufficiently individualized knowledge or
15   probable cause to justify the charges?
16            MR. MARTS:  Objection to form.
17       A.    Again, that's a very broad
18   question.
19            As an agency, there was no
20   communication from any of the DAs that
21   there was a lack of probable cause and that
22   was the cause of their dismissal.
23       Q.    So did the City of New York
24   receive affidavits declining to prosecute
25   arrests such as the one that I have just
```

```
                                    Page 61

 1                    J. KANGANIS
 2   showed you in Kanganis 3?
 3            MR. MARTS:  Objection to form.
 4       A.    You just showed me that one.  I
 5   haven't seen any others.
 6       Q.    You are testifying here today
 7   on behalf of the City of New York; correct?
 8       A.    Correct.
 9       Q.    So in your answer, on behalf of
10   the City of New York, were there occasions
11   that the NYPD learned that any district
12   attorney's office was declining or
13   dismissing a prosecution related to the
14   2020 protests based on lack of sufficient
15   individualized knowledge or probable cause
16   to justify the charges?
17            MR. MARTS:  Objection.
18            Asked and answered.
19       A.    Any occasions is very broad.
20   Other than the one you just showed me and
21   there may be others, but the answer is no.
22       Q.    So there may be others meaning
23   you don't know if there were others?
24            MR. MARTS:  Objection.
25            You can answer.
```

```
 1                    J. KANGANIS
 2         A.     I'm not prepared to answer that
 3   because I haven't reviewed the documents
 4   you just produced and whether there are
 5   anymore or not.
 6                 Based on that logic, I could
 7   see the district attorney office filling
 8   out a similar document in a different
 9   borough, so it may exist.
10         Q.     I'm going to show you Kanganis
11   3 just quickly again.
12                 I'm on the bottom of the second
13   page.  Do you see where it says, "action to
14   be taken by arresting officer"?
15         A.     Yes.
16                 MR. MARTS:  Objection.
17         Q.     Is it your understanding that
18   this document would be shared with the
19   arresting officer?
20                 MR. MARTS:  Objection.
21         A.     I haven't seen this document
22   before.
23         Q.     Are you prepared to answer this
24   question on behalf of the City of New York?
25         A.     No.
```

```
 1                    J. KANGANIS
 2       Q.    Did the City of New York or the
 3   NYPD take any action in response to any
 4   feedback from district attorney's offices
 5   describing lack of sufficiently
 6   individualized knowledge or probable cause
 7   during the time of the 2020 protests?
 8               MR. MARTS:  Objection to form.
 9               You can answer.
10       A.    I'm not prepared to answer that
11   question.
12       Q.    At any point during the 2020
13   protests did the NYPD provide instructions
14   or guidance to officers as to how to
15   determine probable cause for an arrest at a
16   protest?
17               MR. MARTS:  Objection to form.
18               Outside of the scope.
19       A.    I'm not prepared to answer that
20   question.
21       Q.    Did the NYPD take any action in
22   response to any district attorney's
23   declination to prosecute any arrest arising
24   out of the 2020 protest?
25               MR. MARTS:  Objection to form.
```

```
1                 J. KANGANIS
2              You can answer.
3         A.    No.
4         Q.    The answer is no, they did not
5    take any action; or no, you're not
6    prepared?
7         A.    No, they did not take any
8    action.
9              MS. BULL:  I'm going to show
10        what will be marked Kanganis 4.
11             (Whereupon, the aforementioned
12        document was marked as Kanganis
13        Exhibit 4 for identification as of
14        this date by the Reporter.)
15             MS. BULL:  This document has
16        the Bates stamp DEF_000323140 through
17        142.  I'm putting that in the chat.
18        Q.    There is no title to this
19   document or that is listed on the document,
20   but I will represent to you that the
21   metadata that we received for this document
22   has a date of June 5, 2020.
23             Do you recognize this document?
24        A.    No.
25             MR. MARTS:  Please note my
```

```
                                            Page 65
 1                    J. KANGANIS

 2         objection.

 3         Q.    So you've never seen this

 4    before?

 5         A.    No.

 6         Q.    I'm going to go to the third

 7    page of the document.  It says, "three

 8    charges" at the top.

 9         A.    Yes, I see it.

10         Q.    If you want to read this and

11    let me know when you are ready.

12         A.    Okay, I read it.

13         Q.    Would you describe this as a

14    template narrative for use by officers when

15    they are writing arrest reports?

16              MR. MARTS:  Objection to form

17          and outside of the scope.

18         A.    I wouldn't -- I would describe

19    this as, you know, relating the facts and

20    circumstances of this particular incident.

21              The answer to your question is

22    no.

23         Q.    Let me go to the first page

24    again, if you want to review those quickly.

25              Let me know when you are ready.
```

```
 1                    J. KANGANIS
 2       A.     Okay, I'm ready.
 3       Q.     Would you describe these as
 4  premade narratives for officers to use when
 5  writing arrest reports?
 6            MR. MARTS:  Objection to form.
 7            Outside of the scope.
 8       A.     I don't know what they are.  I
 9  haven't seen them before.
10       Q.     Are you aware of any sort of
11  template or premade narratives that are
12  provided to officers for that purpose?
13            MR. MARTS:  Objection.
14       A.     Not aware of any.
15       Q.     Does the Legal Bureau provide
16  any templates for officers to use when they
17  are writing up arrests?
18       A.     The criminal section of the
19  Legal Bureau may do that.
20            I haven't seen the documents
21  you've put in front of me.
22       Q.     So you're not prepared to
23  answer that on behalf of the City of New
24  York?
25       A.     I think I just answered.
```

```
 1                    J. KANGANIS
 2        Q.    You said that they may.  So you
 3   don't know the answer?
 4        A.    You asked me about this
 5   particular document.  I don't know where it
 6   came from, and I haven't seen it before.
 7        Q.    My question is, generally
 8   speaking, does the Legal Bureau provide any
 9   sort of template or premade narrative that
10   arrests -- that officers can use when
11   writing up arrest reports.
12              MR. MARTS:  Objection to form.
13              You can answer.
14        A.    They may.  I just haven't seen
15   this particular document before.
16              So we are there to assist
17   officers in the field.  If they need
18   assistance, I can see us preparing a
19   document similar to this one and
20   distributing it.
21              But I can't say this particular
22   one was created by the Legal Bureau and
23   shared with the field.
24        Q.    My question was not about this
25   particular document.  It was about any type
```

```
                                              Page 68
 1                      J. KANGANIS
 2   of document that I just described on behalf
 3   of the City of New York.  Does the Legal
 4   Bureau provide any such document?
 5        A.    Yes.
 6        Q.    Okay.
 7              And have you seen any of those
 8   documents?
 9        A.    I haven't seen them.
10              But I know this looks like one
11   that may have been, but I can't say it is.
12   I have not seen it.
13        Q.    Have you ever drafted any of
14   them?
15        A.    No.
16        Q.    Have you ever edited any of
17   them?
18        A.    No.
19        Q.    You can confirm that the Legal
20   Bureau does prepare documents with sample
21   narratives for police officers to draft
22   arrest reports?
23        A.    Yes.
24              MR. MARTS:  Objection.
25              Asked and answered.
```

```
                                    Page 69
 1                  J. KANGANIS
 2        Q.     Going back to the third page,
 3   would you agree that the language in this
 4   paragraph looks very similar to the
 5   description of the arrest that we saw in
 6   Kanganis 3?
 7              MR. MARTS:  Objection.
 8        A.     Yes.
 9        Q.     And does it have the same
10   defects as described by the district
11   attorney's affidavit in terms of describing
12   individualized probable cause?
13              MR. MARTS:  Objection to form
14        and outside the scope.
15        A.     I would just say this one
16   identifies this person as a member of the
17   crowd but it doesn't identify this person
18   as the individual involved in the assault
19   described by the inspector.
20        Q.     Is there sufficient information
21   in this paragraph to make out
22   individualized probable cause for unlawful
23   assembly and disorderly conduct?
24              MR. MARTS:  Objection to form.
25              Outside of the scope.
```

```
 1                    J. KANGANIS
 2              You can answer.
 3       A.    This seems to have a similar
 4  defect to the prior document you showed me.
 5       Q.    You said you're not aware of
 6  this particular document, but are you aware
 7  of any similar sample or template document
 8  that was provided to officers around the
 9  time of the 2020 protests?
10       A.    No.
11              MR. MARTS:  Objection.
12              Asked and answered.
13       Q.    Let me just go back.
14              You said it has the same
15  defect.  Can you please identify what the
16  defect is?
17              MR. MARTS:  Objection.
18       A.    Again, the probable cause is
19  not against an individual; it's against a
20  group.
21       Q.    Was any similar document used
22  in the course of the 2020 protests?
23              MR. MARTS:  Objection.
24       A.    I'm not prepared to answer that
25  question.
```

```
 1                  J. KANGANIS
 2      Q.     I'm going to show you another
 3  exhibit.  It will be marked Kanganis 5.
 4              (Whereupon, the aforementioned
 5          document was marked as Kanganis
 6          Exhibit 5 for identification as of
 7          this date by the Reporter.)
 8              MS. BULL:  It has the Bates
 9          number DEF_E_PD_00000995 through 998.
10      Q.     I'm going to scroll through the
11  document quickly, Deputy Inspector.
12              Have you seen this document
13  before?
14      A.     No.
15              MR. MARTS:  I apologize.  You
16          just scrolled too fast.
17              I wasn't finished reading it.
18          Can you go back up a little bit?
19              MS. BULL:  You want to see the
20          e-mails?
21              MR. MARTS:  No.  Just the
22          middle portion.  You just went
23          through too fast.  I apologize.
24              I'm good, if you can scroll
25          down.
```

```
 1                    J. KANGANIS
 2       Q.    Are you familiar with any
 3  demonstration quick reference guide in
 4  reference to the arrests?
 5       A.    I'm not.
 6       Q.    Are you familiar with any
 7  document named Floyd Demo Quick Reference?
 8  Do you know who wrote this --
 9            MR. MARTS:  Objection.
10       Q.    -- Floyd Demo Quick Reference?
11            MR. MARTS:  You can answer.
12       A.    No.
13       Q.    Are you familiar with any
14  document provided to officers that may be
15  similar to this document?
16            MR. MARTS:  Objection to form
17        and scope.
18            You can answer, Inspector.
19       A.    No.
20       Q.    Are you familiar with any type
21  of document that gives officers
22  instructions to use as reference when
23  prosecuting any particular offenses?
24            MR. MARTS:  Objection to form
25        and outside of the scope.
```

Page 73

```
 1                    J. KANGANIS
 2            You can answer, Inspector.
 3      A.    No.
 4      Q.    Does the City of New York or
 5  the NYPD provide any reference documents at
 6  the time of the protests that could be used
 7  by officers to understand what different
 8  Penal Law offenses --
 9            MR. MARTS:  Objection.
10         Objection to form.
11            You can answer.
12      A.    One on the screen.  The answer
13  is yes.
14      Q.    So are you saying this document
15  was provided to officers?
16            MR. MARTS:  Objection.
17            You can answer.
18      A.    It's from the Operations Unit,
19  and it has wide distribution.  I'm
20  confident saying yes, it was shared.
21      Q.    But do you have any knowledge
22  of that outside of seeing the document I'm
23  showing you right now?
24      A.    No.
25            MR. MARTS:  Please note my
```

```
 1                    J. KANGANIS
 2        objection.
 3        Q.    So you're not prepared to
 4   answer that question on behalf of the City
 5   of New York?
 6        A.    Other than what is right on the
 7   screen and I understand and recognize the
 8   source of the e-mail, that would be my
 9   preparation.  Other than that, the answer
10   to your question is no.
11        Q.    Do you know what VTL 1156a is?
12              MR. MARTS:  Objection.
13              Outside the scope.
14              You can answer, Inspector.
15        A.    It says right there, "walking
16   in the roadway."
17        Q.    How often in your years with
18   the police department did you issue a
19   summons for VTL 1156a, if at all?
20              MR. MARTS:  Objection to form
21         and scope.
22              You can answer, Inspector.
23        A.    I never issued a summons for
24   VTL 1156a.
25        Q.    Are you aware of anyone else in
```

```
 1                J. KANGANIS
 2   the NYPD issuing a summons for VTL 1156a
 3   during your years in the police department?
 4             MR. MARTS:  Objection to form
 5        and scope of the question.
 6             You can answer, Inspector.
 7        A.    As to particular individuals,
 8   no.
 9             Do I know that it's used, yes,
10   it's used.  But I don't know particular
11   individuals who have issued a summons for
12   VTL 1156a.
13        Q.    Are you aware of anyone else in
14   the NYPD issuing a summons for VTL 1156a
15   outside of protest or First Amendment
16   activities?
17             MR. MARTS:  Objection to form
18        and scope.
19             You can answer.
20        A.    No.
21        Q.    I'm asking you on behalf of the
22   City of New York who wrote this Floyd Demo
23   Quick Reference that we see in this e-mail.
24             MR. MARTS:  Objection to form.
25             You can answer.
```

```
 1                    J. KANGANIS
 2        A.    The e-mail was sent by the
 3   Operations Unit.  I don't know the author
 4   of the document.
 5        Q.    So you're not prepared to
 6   answer that question?
 7        A.    Correct.
 8        Q.    Was any district attorney's
 9   office consulted in the creation of the
10   Floyd Demo Quick Reference?
11             MR. MARTS:  Objection to form
12        and scope.
13             You can answer, Inspector.
14        A.    I'm not prepared to answer that
15   question.
16        Q.    I'm going to focus on the first
17   paragraph that starts with "all arrests
18   related to the demonstration."
19             Let me know when you've read
20   that paragraph.
21        A.    Okay, I read it.
22        Q.    What precipitated the providing
23   this instruction?
24             MR. MARTS:  Objection to form
25        and scope.
```

```
 1                    J. KANGANIS

 2             You can answer.

 3       A.    I'm not prepared to answer that

 4  question.

 5       Q.    Where it says, "summons must be

 6  issued and signed by MOS who personally

 7  observed the violation," what is the origin

 8  of that advice?

 9             MR. MARTS:  Objection to form

10       and scope.

11             You can answer, Inspector.

12       A.    MOS has to observe the person

13  to issue a summons.

14             I can't speak to this document,

15  but I can speak to as the rule, I think

16  it's the CPL, says the summons must be

17  issued by MOS who personally observed

18  violation.

19       Q.    Was there any feedback from the

20  district attorney office precipitated that

21  instruction?

22       A.    I'm not prepared to answer that

23  question.

24             MR. MARTS:  Please note my

25       objection as to form and scope.
```

```
 1                    J. KANGANIS
 2       Q.    Where it says, "the district
 3   attorney have pledged to aggressively
 4   prosecute cases where MOS or members of the
 5   public are endangered or injured," what is
 6   the foundation for that statement?
 7                 MR. MARTS:  Objection.
 8                 You can answer.
 9       A.    I can't answer that question.
10       Q.    I'm going to go to the last
11   paragraph on the second page starting with
12   discovery.
13                 Please read it and let me know
14   when you are ready?
15       A.    I read it.
16       Q.    What is the foundation for the
17   statement "if we do not collect all this
18   information and make available to district
19   attorney offices there is an extremely high
20   likelihood that a criminal case will be
21   dismissed"?
22                 MR. MARTS:  Objection to form.
23       A.    I believe it's 245 of the CPL
24   in the discovery rules what's in the
25   possession of the police department is in
```

                         J. KANGANIS

1    the possession of the district attorney

2    offices.  Other than that, why it's in this

3    document, I don't know who wrote it or the

4    source of it other than what I just said.

5        Q.    Was this advice in this

6    paragraph followed by officers during this

7    period of protests?

8              MR. MARTS:  Objection to form

9         and scope.

10             You can answer, Inspector.

11       A.    Yes.

12       Q.    So officers did upload their

13   body-worn camera footage with the label

14   Floyd-2020-05-29?

15             MR. MARTS:  Objection.

16             You can answer.

17       A.    That particular date, that's

18   how you would search for the body-worn

19   camera video, yes.

20       Q.    On that particular date, do you

21   mean May 29, 2020?

22       A.    Yes.

23       Q.    Were body-worn camera footage

24   uploaded with a label indicating their

```
 1                    J. KANGANIS
 2   apparently.
 3        Q.    In the announcement it says
 4   that the district attorney's office will
 5   decline to prosecute unlawful and
 6   disorderly conduct arrests; correct?
 7              MR. MARTS:  Objection.
 8              You can answer.
 9        A.    I believe that's what it says.
10        Q.    Does NYPD or the City of New
11   York have an understanding as to why the
12   district attorney was not prosecuting those
13   two offenses?
14              MR. MARTS:  Objection.
15              Asked and answered.
16              You can answer.
17        A.    The rationale is in his
18   announcement.  Beyond that, the answer to
19   your question is no.
20        Q.    The announcement also says that
21   the office will evaluate and decline to
22   prosecute other protest-related charges
23   where appropriate; right?
24              MR. MARTS:  Objection.
25              You can answer.
```

```
 1                    J. KANGANIS
 2       A.     That's what it says.
 3       Q.     And the second paragraph
 4  explains that these offenses undermine the
 5  critical bonds between law enforcement and
 6  communities; right?
 7               MR. MARTS:  Objection.
 8               You can answer.
 9       A.     Yes.
10       Q.     And it specifically mentions,
11  quote, "police violence as a crime",
12  unquote?
13               MR. MARTS:  Objection to form
14        and scope.
15               You can answer.
16       A.     That's what it says.
17       Q.     What was the City of New York's
18  response to this reasoning for the district
19  attorney's decision?
20       A.     I'm not prepared to answer that
21  question.
22       Q.     What is the NYPD's
23  understanding as to whether there are any
24  specific examples of violence that
25  contributed to the district attorney's
```

```
 1                    J. KANGANIS
 2   statement and decision?
 3             MR. MARTS:  Objection.
 4             You can answer.
 5        A.    I'm not prepared to answer.
 6        Q.    Does the NYPD or the City of
 7   New York agree or disagree that the
 8   prosecution of those offenses undermines
 9   critical bonds between law enforcement and
10   communities that they serve?
11             MR. MARTS:  Objection.
12             You can answer.
13        A.    Not prepared to answer.
14        Q.    On June 5, 2020, did the NYPD
15   have any security details within the
16   district attorney's offices?
17             MR. MARTS:  Objection to form.
18             You can answer.
19        A.    I don't know if on June 5th.
20             I know there were details
21   assigned to Manhattan district attorney's
22   office.
23        Q.    Prior to June 5, 2020, did the
24   NYPD have security details within the
25   district attorney offices?
```

1                    J. KANGANIS

2        A.    My understanding is yes, they

3    had details assigned to the district

4    attorney offices.

5        Q.    Did the NYPD pull their

6    security details out of the district

7    attorney offices shortly after the

8    announcement that those offices would

9    decline to prosecute certain protest

10   offenses?

11             MR. MARTS:  Objection to form.

12             You can answer.

13       A.    At a point in time, the

14   personnel assigned to those details were

15   reassigned to enforcement duties as needed.

16       Q.    So the answer is yes.

17       A.    Can you repeat your question?

18       Q.    Did the NYPD pull their

19   security details out of the district

20   attorney offices shortly after the

21   announcement that they would decline to

22   prosecute certain protest arrests?

23             MR. MARTS:  Objection.

24             You can answer.

25       A.    I don't like your

```
 1                    J. KANGANIS
 2   characterization pulled.  They reassigned
 3   the personnel that were assigned to those
 4   offices to street -- to other duties.
 5        Q.     Who made those decisions?
 6        A.     I'm not prepared to answer
 7   that.
 8        Q.     Why did they make that
 9   decision?
10        A.     I can't answer that.
11        Q.     When was that decision made?
12        A.     I don't know the date.  I can't
13   tell you the date that it was made.
14        Q.     So you're not prepared to
15   answer that question?
16             MR. MARTS:  Objection.
17        A.     The date of the order, no, I'm
18   not prepared to answer that question.
19        Q.     Isn't it true that district
20   attorney offices were only informed mere
21   hours after their public announcement that
22   the details would be reassigned out of
23   their offices?
24             MR. MARTS:  Objection.
25             You can answer.
```

```
 1                    J. KANGANIS
 2        A.    I'm not prepared to answer.  I
 3   don't know when they were informed.
 4        Q.    I will show you what will be
 5   Kanganis 8.
 6              (Whereupon, the aforementioned
 7          document was marked as Kanganis
 8          Exhibit 8 for identification as of
 9          this date by the Reporter.)
10              MS. BULL:  This has the Bates
11          stamp DEF_000267108 through 111.
12        Q.    Do you see the document on my
13   screen?
14        A.    Yes.
15        Q.    Have you seen this document
16   before?
17        A.    Yes.
18        Q.    When did you see this document?
19        A.    Recently within the last week.
20        Q.    And it's a New York Times
21   article dated June 15, 2020?
22        A.    Yes.
23        Q.    The first paragraph says, "A
24   few hours after the Manhattan district
25   attorney announced he would not prosecute
```

```
 1                 J. KANGANIS
 2    those arrests, the police department sent
 3    him a message that all the officers
 4    assigned to his office would be pulled off
 5    the job to help with crowd control";
 6    correct?
 7              MR. MARTS:  Objection.
 8              You can answer.
 9         A.    That's what it says.
10         Q.    So do you dispute the accuracy
11    of that report?
12              MR. MARTS:  Objection.
13         A.    Other than the New York Times,
14    I have no other source as to when the order
15    was given.
16              I can tell you that as alleged
17    here, you know, the reason they were
18    redeployed was because there was a need for
19    the officers in the field.
20              If you remember, we had a
21    pandemic.  We had unparalleled,
22    unprecedented civil address.  We had a
23    20-percent sick rate of officers depleting
24    our ranks.  And we pretty much had every
25    uniformed member of the service deployed in
```

```
                        J. KANGANIS
 1
 2    the field.
 3              So there was a need in the
 4    field for additional uniformed members of
 5    the service.
 6              I'm not relying on the New York
 7    Times as a source, and you may want to. But
 8    I can't tell you, you know, to answer your
 9    questions other than what is in the
10    article.  If you want to rely on it, fine.
11              I'm not relying on them as to
12    the timing or the reasoning for a
13    particular order of the police department.
14         Q.    So what are you relying on in
15    your understanding of the reasoning for
16    that decision?
17         A.    I'm relying on my own knowledge
18    that there was civil unrest, there was a
19    pandemic, it was a need for personnel in
20    the field, and everybody was deployed to
21    the street.
22         Q.    And you don't know who made
23    that decision?
24              MR. MARTS:  Objection.
25         A.    No.  As I stated earlier, I
```

```
 1                    J. KANGANIS
 2   don't know who made the decision.
 3        Q.    So the NYPD decided to increase
 4   enforcement of protests even as the
 5   district attorney offices were announcing
 6   that they were not prosecuting
 7   protest-related arrests?
 8              MR. MARTS:  Objection to form.
 9              You can answer.
10        A.    There was a need in the field
11   not just for protests; there is also public
12   safety issues, 911 calls.  There is a
13   general, you know, feeling of safety that
14   needs to be assured to the public.
15              So there were large protests.
16   There was a need to police the protests,
17   and there was a need to answer 911 calls as
18   we would in the regular course of business.
19        Q.    And your understanding as to
20   that need to reassign those details, is
21   that based on your personal knowledge or as
22   your position here speaking for the City of
23   New York?
24        A.    I'm speaking for the City of
25   New York, and I'm also telling you that
```

```
 1                    J. KANGANIS
 2   there was the reasons I just enumerated,
 3   that there was a reason that we needed
 4   uniformed members of the service in the
 5   field.
 6        Q.    And why was there a greater
 7   need on the day of June 5, 2020 than there
 8   was before June 5, 2020?
 9              MR. MARTS:  Objection.
10              You can answer.
11        A.    I can just tell you that the
12   sick rate kept increasing; there was a
13   close to a 20-percent sick rate.  I can't
14   say it was COVID, but COVID was raging
15   within the department.  I had to deploy
16   most of my uniformed members of the service
17   from the Legal Bureau to the field.
18              The demonstrations were going
19   on at that point for nine, ten days, at
20   least a week.  So there was a need for, as
21   I said, uniformed members in the field.
22        Q.    And the reasons that you are
23   stating to be clear, is that the reasons
24   stated by the City of New York or by you
25   personally?
```

```
 1                    J. KANGANIS
 2              MR. MARTS:  Objection.
 3              Asked and answered.
 4              You can answer.
 5         A.    I'm here to speak for the City
 6    of New York.  But I'm telling you I had
 7    personal knowledge as well as to the
 8    reasons that not just these officers, all
 9    uniformed members of the service were
10    deployed to the field.
11         Q.    That's not really answering my
12    question.  That's why I'm a little confused
13    because you are saying both.  So I want to
14    know what is the answer of the City of New
15    York and --
16         A.    The answer from the police
17    department is that all uniformed members of
18    the service including the officers you are
19    speaking about in the district attorney
20    offices were deployed to the field for
21    public safety.
22         Q.    And speaking on behalf of the
23    City of New York, I will ask my question
24    again, so it's clear.
25              Why was there a specific need
```

```
 1                    J. KANGANIS
 2   on June 5, 2020 to reassign details from
 3   the district attorney offices?
 4             MR. MARTS:  Objection.
 5             Asked and answered I believe
 6        twice.
 7             You can answer, Inspector.
 8        A.    I'm going to repeat myself.
 9   There was a need in the field for uniformed
10   members of the service.  That June 5th has
11   to be -- I mean this stuff -- these
12   demonstrations and the violence started May
13   28th and continued past June 5th.
14             I told you about, you know,
15   COVID, the pandemic, the large
16   demonstrations and in various locations.
17   There was a need for uniformed members of
18   the service to be in the field.  It wasn't
19   just -- go ahead.
20        Q.    So that need in the field did
21   not exist prior to June 5, 2020?
22             MR. MARTS:  Objection.
23        A.    It was a continuous need that
24   began I believe Thursday May 28th and
25   continued into early June.
```

```
 1                 J. KANGANIS
 2      Q.    Was there any other part of the
 3  NYPD where other officers could have been
 4  pulled from?
 5      A.    Listen, I think everybody at
 6  one point was deployed to the street.
 7      Q.    How did district attorney
 8  offices interpret learning that the NYPD
 9  would be pulling or would be reassigning
10  their details outside of their offices?
11      A.    I'm not prepared to answer your
12  question.
13            MR. MARTS:  Please note my
14        objection to form and scope.
15      Q.    I will show you what will be
16  marked Kanganis 9.
17            (Whereupon, the aforementioned
18         document was marked as Kanganis
19         Exhibit 9 for identification as of
20         this date by the Reporter.)
21      Q.    I will scroll down.  Let me
22  know when you've read it.
23      A.    Okay.
24      Q.    Have you seen this before?
25      A.    No.
```

Page 114

```
 1                    J. KANGANIS
 2        Q.    Does this appear to be e-mails
 3   between Devora Kaye and other members of
 4   the NYPD including Commissioner Shea?
 5              MR. MARTS:  Objection.
 6        A.    Devora Kaye to Chief Demor --
 7   yes.
 8        Q.    Do you know, who is Devora
 9   Kaye?
10        A.    I believe she worked in the
11   office of the deputy commissioner of public
12   information.
13        Q.    Do you see here at the bottom
14   of the screen the district attorney offices
15   are still saying this is in response to
16   their announcement about not prosecuting
17   from the arrests?
18        A.    I see that.
19        Q.    So the district attorney
20   offices interpreted the reassignment of the
21   details to be in response their
22   announcements; right?
23              MR. MARTS:  Objection.
24              You can answer.
25        A.    That's what it's saying.
```

```
 1                    J. KANGANIS
 2        Q.    Did the NYPD have conversations
 3   with district attorney offices about this
 4   decision?
 5             MR. MARTS:  Objection.
 6             You can answer.
 7        A.    No.
 8        Q.    You are answering on behalf of
 9   the City of New York that there was no
10   conversations between the district attorney
11   offices?
12        A.    The conversations seem to be
13   between Kaye and the New York Times.
14   That's how I read it.
15        Q.    Are you aware of any
16   conversations between the district
17   attorney's offices?
18        A.    Is the question about
19   conversations between the NYPD and the
20   district attorney offices?
21        Q.    So let me ask you differently.
22             Is it the position of the City
23   of New York that the New York Times was
24   lying that this was in response to the
25   announcement regarding prosecuting the
```

```
 1                    J. KANGANIS
 2    arrests?
 3              MR. MARTS:  Objection to the
 4         form of how the question is phrased.
 5         A.    I'm not prepared to answer the
 6    question, so...
 7         Q.    Now, in the response that was
 8    drafted by Ms. Kaye, it says that the NYPD
 9    mobilized the entire department; correct?
10         A.    Every single element of the
11    police department, yes.
12         Q.    What other details were
13    reassigned at that time?
14              MR. MARTS:  Objection.
15         A.    It just says, "every element of
16    the police department."
17         Q.    Did the details that had
18    previously been at the district attorney
19    offices eventually returned there?
20         A.    Not prepared to answer it.
21         Q.    But there is no promise in the
22    NYPD announcement that the district
23    attorney offices details would return at a
24    later time; correct?
25         A.    In this particular e-mail?  Go
```

```
 1                    J. KANGANIS
 2  ahead, I'm sorry.
 3              MR. MARTS:  Please note my
 4       objection.
 5              You can answer, Inspector.
 6       Q.    Well, in this e-mail, there was
 7  no promise that they --
 8       A.    No.  I don't see one.
 9       Q.    Was there any other promise
10  that they would return at a later time that
11  was communicated?
12       A.    Not prepared to answer.
13              MS. BULL:  I'm going to be
14       moving on to a different topic, so we
15       could take a lunch break now or
16       later.
17              It's up to you.
18              MR. MARTS:  Whatever works for
19       you.  How do you want to do it?  It's
20       up to you.  If you want to take lunch
21       now, by all means.
22              MS. BULL:  Why don't we take it
23       now.  I think it's a good stopping
24       point.
25              (Whereupon, at 12:11 p.m., a
```

```
 1                    J. KANGANIS
 2          lunch break was taken.
 3                At 12:42 p.m., the deposition
 4          resumed.)
 5          Q.    Deputy Inspector, I'm going to
 6    move to some questions about the Civil
 7    Complaint Review Board investigation.
 8                So we understand the Civilian
 9    Complaint Review Board is CCRB?
10          A.    Yes.
11          Q.    What legal authority governs
12    how the CCRB operates?
13                MR. MARTS:  Objection.
14                Outside of scope.
15                You can answer.
16          A.    The City Charter.  I don't know
17    what section.
18          Q.    Does section 440 of the City
19    Charter require the NYPD to cooperate with
20    CCRB investigations?
21                MR. MARTS:  Objection.
22                You can answer.
23          A.    Well, we cooperate.  I'm not
24    sure of the section, but I know we
25    cooperate with CCRB.
```

```
 1                    J. KANGANIS
 2      Q.    Would something refresh your
 3 recollection?
 4      A.    You want to put it on the
 5 screen?  I will read it.
 6           MS. BULL:  This will be marked
 7      Kanganis 10.
 8           (Whereupon, the aforementioned
 9      document was marked as Kanganis
10      Exhibit 10 for identification as of
11      this date by the Reporter.)
12      Q.    It says, "section 440, public
13 complaints against members of the police
14 department" at the top.  Do you see that?
15      A.    Yes, I do.
16      Q.    Have you read this before?
17      A.    I have read it, you know, years
18 ago I have read it, yes, or months ago.  I
19 previously read it.  I don't know when I
20 read it.
21      Q.    So I will direct you to section
22 440 D1.
23           Does this section of the City
24 Charter require the NYPD to cooperate with
25 CCRB investigations?
```

```
 1                    J. KANGANIS
 2   answer.
 3        Q.    You stated before that there is
 4   an 18-month statute of limitation for a
 5   CCRB investigation.  What happens if the
 6   CCRB cannot conclude their recommendation
 7   by the end of the statute of limitations?
 8             MR. MARTS:  Objection.
 9             Outside of the scope.
10        A.    Not prepared to answer.
11        Q.    What happens if the CCRB
12   submits a recommendation close to the
13   conclusion of the statute of limitations?
14             MR. MARTS:  Objection.
15             Outside of the scope.
16        A.    Not prepared to answer.
17        Q.    Can the commissioner impose
18   training even after the statute of
19   limitation has passed?
20             MR. MARTS:  Objection to the
21         scope.
22        A.    Not prepared to answer that.
23        Q.    Is it fair to say that the
24   delays caused by the factors that we
25   discussed from the CCRB resulted in a case
```

```
 1                    J. KANGANIS
 2  being closed with no discipline imposed
 3  even where it is clear that an officer was
 4  guilty of the alleged misconduct?
 5              MR. MARTS:  Objection to form.
 6              Outside of the scope.
 7       A.    I'm not prepared to answer your
 8  question.
 9       Q.    I'm going to move on to talk
10  about the Department of Investigation and
11  Law Department investigations.
12              Did there come a time when
13  Mayor de Blasio ordered an independent
14  investigation into the enforcement actions
15  of the NYPD during the 2020 protests?
16       A.    Yes.
17       Q.    How did he do that?
18       A.    Executive Order 58.
19       Q.    Was that issued on June 20,
20  2020?
21       A.    I believe that's the correct
22  date.
23       Q.    What were the objectives of the
24  investigations?
25       A.    Independent investigation into
```

```
 1                    J. KANGANIS
 2   to be called into them in addition to a
 3   report being done, but they -- they would
 4   have received notice of officer injuries.
 5        Q.    Who gives notice to the medical
 6   division about the injury?
 7        A.    It could be the police officer,
 8   could be the supervisor.
 9              MR. MARTS:  Please note my
10         objection.
11              Outside of scope.
12        Q.    Did NYPD do anything to ensure
13   that any officer injury that's reported to
14   the medical division is also reflected in a
15   TRI report?
16        A.    I'm not prepared to answer
17   that.
18        Q.    The DOI report also says that
19   records do not reliably capture the number
20   of injuries sustained by the protestors;
21   correct?
22        A.    Yes.
23        Q.    How does the NYPD collect data
24   on injuries reported by protesters?
25              MR. MARTS:  Objection.
```

```
 1              J. KANGANIS
 2          Outside of the scope.
 3      A.    They'll tell you the TRI
 4  report.  It's a two-way street, records the
 5  officers injuries and an injury to a
 6  civilian.
 7      Q.    Any other place where that
 8  would be recorded?
 9      A.    An aided report which is
10  anytime somebody is injured, not
11  necessarily as a result of police action,
12  would be recorded on there.
13      Q.    And if a civilian reports to a
14  police officer or mentions that they are
15  injured, is an officer required to put that
16  information in a TRI report?
17          MR. MARTS:  Objection.
18          Outside of the scope.
19          You can answer.
20      A.    Not prepared to answer.
21      Q.    I'm going to talk about the
22  last category of information that I
23  mentioned before which is interviews.
24          Are you aware of any documents
25  that list every individual that the
```

```
 1                    J. KANGANIS
 2   Department of Investigation interviewed in
 3   the course of their investigation?
 4        A.    A document that lists every --
 5   no, I'm not aware.
 6        Q.    Do you have the information of
 7   what individuals employed by the City of
 8   New York were interviewed by the DOI?
 9              MR. MARTS:   Objection.
10        A.    I do not have it with me.
11        Q.    Do you have it somewhere?
12        A.    I know that some people,
13   high-level people were interviewed.
14              I don't have a list of all
15   people interviewed anywhere.
16        Q.    Was that record maintained by
17   anybody?
18        A.    I can't answer that.  I'm not
19   prepared to answer that.
20              If they made a request for
21   interviews, we recorded the request for
22   interviews and we went about securing the
23   notification.  And they worked out the
24   specifics of when and where that person
25   would be interviewed.
```

```
 1                J. KANGANIS
 2      Q.     Is there anyone who DOI
 3  requested to interview from the NYPD who
 4  they were unable to interview?
 5      A.     Yeah.  Chief Pichardo.
 6      Q.     And why were they unable to
 7  interview him?
 8      A.     He had retired, and he was no
 9  longer in New York.
10      Q.     And did he decline the
11  interview?
12             MR. MARTS:  Objection.
13      A.     Not prepared to answer.
14             An alternate person from that
15  command was provided or offered.
16      Q.     Do you understand that he has
17  made himself available to be deposed in
18  this litigation?
19             MR. MARTS:  Objection.
20             You can answer.
21      A.     Not prepared to answer.
22      Q.     Did the City of New York desire
23  to interview Chief Pichardo at the time DOI
24  was investigating?
25             MR. MARTS:  Can you repeat the
```

```
 1                    J. KANGANIS
 2       question?
 3            MS. BULL:  Did the City desire
 4       to interview Chief Pichardo at the
 5       time of this investigation.
 6            MR. MARTS:  Are you speaking
 7       about DOI?
 8            MS. BULL:  I'm saying the City
 9       of New York.
10       Q.    But at the time that this
11  request was made.
12       A.    DOI made the request.  I'm not
13  aware of any other request to interview.
14       Q.    Did at any point the City of
15  New York attempt to interview Chief
16  Pichardo in connection with the 2020
17  protests?
18            MR. MARTS:  Objection.
19       A.    Not prepared to answer.
20       Q.    Was there anyone else who DOI
21  requested to interview but did not?
22       A.    Pichardo is the one that I know
23  they requested and did not interview.
24  Other than him, I'm not aware of anybody
25  else.
```

```
 1                     J. KANGANIS
 2        Q.    The Law Department also
 3   completed their report reviewing the
 4   protests as directed by the Executive
 5   Order; correct?
 6        A.    Yes.
 7        Q.    What, if anything, was
 8   different in the document information and
 9   witnesses reviewed by the Law Department
10   from what was reviewed by the DOI?
11              MR. MARTS:  Objection.
12              You can answer.
13        A.    Well, the Law Department, DOI
14   gave the documents we provided to them
15   including the interviews to the Law
16   Department.  The Law Department focus was
17   more on the officer health and safety and
18   historical perspective regarding the NYPD's
19   response to prior large-scale protests.
20        Q.    Did the Law Department conduct
21   any interview of any members of the NYPD
22   separate from the interviews conducted by
23   the DOI?
24              MR. MARTS:  Objection to form.
25              I couldn't hear you.
```

```
 1                    J. KANGANIS
 2       Q.    Did the Law Department conduct
 3  any interviews of any members of the NYPD
 4  separate from the interviews conducted by
 5  the DOI?
 6             MR. MARTS:  Objection to the
 7         form of the question.
 8       A.    I don't recall any interviews
 9  other than DOI investigators sharing their
10  interviews with high-level NYPD members
11  with the Law Department.
12             So the answer to your question
13  is no unless you can refresh my
14  recollection.
15       Q.    I'm going to show you what will
16  be Kanganis 19.
17             (Whereupon, the aforementioned
18         document was marked as Kanganis
19         Exhibit 19 for identification as of
20         this date by the Reporter.)
21             MS. BULL:  This has the Bates
22         stamp SOW001641 through 1695.
23       Q.    Do you recognize this document?
24       A.    Yes.  That's the Law Department
25  report.
```

```
                        J. KANGANIS
 1
 2        Q.     Page nine -- sorry.
 3        A.     That's all right.
 4        Q.     It says at the very end, "The
 5   Law Department also reviewed DOI
 6   interviewees with NYPD officers in this
 7   report.  All references to discussions with
 8   NYPD are references to DOI's interviewees
 9   with NYPD except where specified that it
10   was a Law Department interviewee."
11        A.     Do they mean interviewees with
12   the NYPD or one of their people outside the
13   NYPD because I'm not aware of any
14   interviews other than the DOI interviewees?
15        Q.     I read this sentence to mean
16   that there were Law Department interviewees
17   separate from DOI.  Can you answer whether
18   there were any such interviewees?
19        A.     Again, I'm going to say no.  I
20   think they are referring to Professor
21   McGuire and all these other academics that
22   they went and spoke to.
23        Q.     Are you aware of any documents
24   listing who the Law Department interviewed
25   in connection with this report?
```

```
 1                    J. KANGANIS
 2           MR. MARTS:  Objection.
 3           Outside of the scope.
 4      A.    No.
 5      Q.    How did the Law Department and
 6 DOI coordinate in creation of their
 7 reports?
 8           MR. MARTS:  Objection.
 9      A.    Not prepared to answer.
10           MS. BULL:  Can we take a
11       five-minute break?
12           (Whereupon, 4:01 p.m., a short
13       break was taken.
14           (At 4:10 p.m., the deposition
15       resumed.)
16      Q.    What was the NYPD's response to
17 the published DOI and Law Department
18 reports?
19      A.    We accepted the findings and
20 implemented the recommendations.
21      Q.    Was that also the City of New
22 York's response?
23      A.    Yes.
24      Q.    Did Mayor de Blasio make any
25 public statements about the DOI report
```

```
 1                  J. KANGANIS
 2   after it was completed?
 3        A.    I saw that video.  Is that what
 4   you are referring to?
 5        Q.    Yes, if that's a public
 6   statement.  Are you aware of any other
 7   public statements?
 8        A.    No, I'm not.
 9        Q.    Did he make that statement
10   shortly after the release of the district
11   attorney report?
12        A.    I believe he did.  I'm not
13   certain of the date; but the way he was
14   speaking, it was around the same time.
15        Q.    And in that statement, is it
16   correct that Mayor de Blasio stated that
17   both he and Commissioner Shea agree with
18   the report's analysis and recommendations?
19        A.    Yes.
20        Q.    And that they both agreed to
21   implement the recommendations right away?
22        A.    Yes.
23        Q.    Is that what he said?
24        A.    Yes.  I'm sorry, I said yes.
25        Q.    Mayor de Blasio also said that
```

```
 1                    J. KANGANIS
 2    he had remorse about what happened in the
 3    protests in May and June and wishes he had
 4    done better; correct?
 5         A.    Correct.
 6              MR. MARTS:  Objection.
 7              You can answer.
 8         A.    Yes, that's what he said.
 9         Q.    Do you know what he meant by
10    that exactly?
11              MR. MARTS:  Objection.
12         A.    No.  I can't -- I don't have
13    any basis to answer that.
14         Q.    Who would we need to talk to to
15    determine what he meant?
16              MR. MARTS:  Objection.
17              You can answer.
18         A.    I think it's pretty clear what
19    he said and what he meant by the words he
20    used.
21         Q.    I thought --
22         A.    I don't have a name for you.
23         Q.    Would we have to talk to Mayor
24    de Blasio to know what he meant?
25              MR. MARTS:  Objection.
```

1                    J. KANGANIS

2        A.    I'm not prepared to answer

3    that.

4        Q.    You are also not prepared to

5    answer what he meant; correct?

6        A.    I understood what he said.  It

7    was pretty clear to me.

8        Q.    So what was he looking back on

9    with remorse?

10            MR. MARTS:  Objection.

11            You can answer.

12        A.    Decisions he made as the head

13    of the City.

14        Q.    Which decisions?

15        A.    Not prepared to answer.

16        Q.    Who could answer that?

17            MR. MARTS:  Objection.

18        A.    I think I answered that.  I

19    can't tell you.  I'm not prepared to

20    answer.  de Blasio made a statement.  It

21    seems pretty clear.  I can't interpret it

22    for you.  I don't know who can.

23        Q.    Could Mayor de Blasio answer

24    what decisions he was looking back on with

25    remorse?

Page 249

1              J. KANGANIS

2              MR. MARTS:  Objection.

3              That's speculation.

4      A.     I'm not prepared to answer your

5  question about Mayor de Blasio.

6      Q.     What has the City and NYPD done

7  to implement the recommendations of the DOI

8  and Corporation Counsel reports?

9      A.     A team was put together of

10  different representatives from different

11  bureaus.  And they went through the

12  recommendations, and they took action on

13  all.

14              But I think the last time I

15  looked one was still pending, putting in

16  the plan to consolidate commission to

17  combat police corruption and Inspector

18  General taking it out of DOI and putting it

19  under CCRB.

20      Q.     Who made the decision that the

21  City would accept and implement those

22  recommendations?

23      A.     For the NYPD, it was

24  Commissioner Shea.

25      Q.     And for the City of New York?

```
1                    J. KANGANIS
2        A.    Mayor de Blasio.
3        Q.    And who was part of the team
4   that you said was implementing the
5   recommendations?
6        A.    I don't have identities.  I can
7   tell you there was a team of
8   representatives from Strategic Initiatives
9   Bureau, the Legal Bureau, and different
10  commands that were specific to particular
11  recommendations.  If it was training, it
12  would be Training Bureau representative, et
13  cetera.
14       Q.    Are you prepared to answer
15  exactly who was part of the team?
16       A.    No, I'm not prepared to answer.
17            MR. MARTS:  Please note my
18        objection for the record.
19            Asked and answered.
20       Q.    I'm going to show you what will
21  be marked Kanganis 20.
22            (Whereupon, the aforementioned
23        document was marked as Kanganis
24        Exhibit 20 for identification as of
25        this date by the Reporter.)
```

1                    J. KANGANIS

2        Q.    It says, "Mass Demonstrations

3    Response Recommendations Tracker" on the

4    top; is that right?

5        A.    Correct.

6              MS. BULL:  I will just say for

7         the record that this is the document

8         that was publicly available on the

9         NYPD website.

10       Q.    Is this the tracker document

11   that you've referenced before in this

12   testimony?

13       A.    Yes, it is.

14       Q.    Does this contain all of the

15   recommendations from the DOI and Law

16   Department reports?

17       A.    It's supposed to.

18             I see you have one of four.  If

19   it's the complete document, then yes, it

20   does.

21       Q.    Who was responsible for writing

22   this document?

23       A.    Not prepared to answer.

24       Q.    Does this document accurately

25   describe all the steps that NYPD has taken

```
                                      Page 252
 1                  J. KANGANIS
 2   to implement the reports recommendations?
 3        A.     Yes.
 4        Q.     And the date of this document
 5   is December 22, 2021; correct?
 6        A.     Correct.
 7        Q.     Does this reflect the final
 8   version of this tracking document?
 9        A.     I'm not prepared to answer
10   that.
11        Q.     As you said before, every
12   column says complete as status.  I think
13   you said that 21A is the only one that says
14   in progress; is that what you meant before?
15        A.     Yes.
16               MR. MARTS:  My apologies.
17         Could you zoom in a little bit
18          because the font is really small and
19          I'm having difficulty?
20        Q.     When I ask you a specific
21   question, I will zoom in.
22               MR. MARTS:  Thank you.
23        Q.     Were the DOI and Law Department
24   consulted in the implementation of the
25   recommendations?
```

1                    J. KANGANIS

2        A.    Not prepared to answer.  There

3    were meetings with DOI regarding the

4    progress of implementation.

5        Q.    Who were part of those

6    meetings?

7        A.    I was part of those meetings

8    and Arturo Sanchez, and I believe the

9    general counsel of DOI was part of those

10   meetings.

11       Q.    Who is Arturo Sanchez?

12       A.    He was the point of contact,

13   lead investigator with the DOI

14   investigation.

15       Q.    Anyone else was part of those

16   meetings?

17             MR. MARTS:  Objection.

18             Asked and answered.

19       A.    Not that I can recall.

20       Q.    How many meetings did you have?

21       A.    I recall two face-to-face

22   meetings and a couple of telephone calls.

23       Q.    What was discussed during those

24   meetings?

25       A.    Where we were in

```
 1                    J. KANGANIS
 2   implementation, what steps we still needed
 3   to do, and when we expected to have
 4   completed their recommendations.
 5        Q.    Did the Law Department
 6   participate in any of those meetings?
 7        A.    No.
 8        Q.    Were there separate meetings
 9   with the Law Department?
10        A.    No.
11        Q.    Did DOI ever express in any
12   communications, whether in those meetings
13   or separate, reservations about the ways
14   that the NYPD was implementing the
15   recommendations?
16              MR. MARTS:  Objection to form.
17              You can answer.
18        A.    No.
19        Q.    Were there any disagreements
20   between DOI and NYPD about how best to
21   implement the recommendations?
22        A.    No.
23              MR. MARTS:  Please note my
24         objection for the record.
25        Q.    Are those meetings ongoing?
```

                            J. KANGANIS
1
2        A.      Not prepared to answer.
3        Q.      When was the last meeting that
4   you were aware of?
5        A.      Early 2022.
6        Q.      Are you aware if there were any
7   other meetings after that?
8        A.      Not prepared to answer.  I'm
9   not aware.
10       Q.      I'm going to ask you about a
11  few of these.  Let's focus on number two.
12  And I'm going to just look at the progress
13  proposed next steps.
14               It says, "the citywide event
15  planning and coordination section was
16  created."  What is that?
17       A.      It's a command to do exactly
18  what it says.  It's going to coordinate a
19  planning and strategy to respond to large
20  protests.
21       Q.      Is it currently in operation?
22       A.      I believe it is, but I'm not
23  prepared to answer it.  It's complete.
24       Q.      What do you mean by complete?
25       A.      Meaning the recommendation is

```
 1                    J. KANGANIS
 2  complete.  It was implemented, so they
 3  should be in existence even now
 4  continuously.
 5       Q.    Do you have any independent
 6  knowledge about the citywide event planning
 7  and coordination section that is not based
 8  on this document?
 9       A.    No.
10       Q.    How is the citywide event
11  planning and coordination section
12  organized?
13       A.    Not prepared to answer.
14       Q.    How many members does it have?
15       A.    Not prepared to answer.
16       Q.    Who leads it?
17       A.    Not prepared to answer.
18       Q.    What are its responsibilities?
19       A.    Well, the responsibilities to
20  coordinate and plan and strategize a
21  response to large protests, that would be
22  its mission.
23       Q.    How is it governed?
24             MR. MARTS:  Note my objection.
25       A.    Not prepared to answer.
```

Page 257

```
 1                      J. KANGANIS
 2      Q.      What is its relationship to the
 3  Strategic Response Group?
 4      A.      Not prepared to answer.
 5      Q.      Has it been involved in
 6  coordinating, planning, and strategy for
 7  any protests?
 8                  MR. MARTS:  Objection.
 9      A.      Not prepared to answer that
10  question.
11      Q.      Let's go to the highlighted
12  column directly below for number three.
13                  The recommendation here,
14  "reevaluate the role of Strategic Response
15  Group and Disorder Control Unit", so is it
16  accurate that the steps that the City has
17  taken to implement that recommendation is
18  reevaluating the role of the Strategic
19  Response Group and Disorder Control Unit?
20      A.      That's correct.
21      Q.      How has it recalibrated their
22  use?
23      A.      The Patrol Guide procedure
24  mentioned in number one mentions their use.
25  I think that's 2/13/20, I believe.
```

1                    J. KANGANIS

2        Q.    What does it say about --

3        A.    Not prepared to answer the

4    question.

5        Q.    In what situations following

6    this implementation will the Strategic

7    Response Group and Disorder Control Unit be

8    assigned to protests?

9              MR. MARTS:   Objection.

10             Outside the scope.

11             You can answer.

12       A.    I'm not prepared to answer your

13   question.

14       Q.    I'm going to show you what will

15   be marked Kanganis 21.

16             (Whereupon, the aforementioned

17        document was marked as Kanganis

18        Exhibit 21 for identification as of

19        this date by the Reporter.)

20             MS. BULL:   This has a Bates

21        stamp DEF_00004055524 and ending on

22        543.

23       Q.    I will just scroll through

24   this, but let me know if you recognize this

25   document.

```
 1                     J. KANGANIS
 2        A.    I don't recognize the document
 3   yet.
 4        Q.    Nothing?
 5        A.    No.  I don't recognize it.
 6        Q.    Do you recognize what type of a
 7   document this is?
 8        A.    Yes.  That's a communication
 9   cover sheet from the deputy commissioner on
10   legal matters, and the rest of it was the
11   series of internal memorandums.
12        Q.    Just looking at page five, this
13   memo, it purports to respond to the DOI
14   report's recommendation to reevaluate the
15   role of Strategic Response Group and
16   Disorder Control Unit in response to large
17   protests; right?
18        A.    Yes.
19        Q.    Let me give you a chance to
20   read the draft interim order starting on
21   page six.
22        A.    Okay, I have read it.
23        Q.    Here on page ten, is it
24   accurate that it states that the mission,
25   function, and staffing of SRG will be
```

```
 1                    J. KANGANIS
 2   maintained?
 3             MR. MARTS:  Objection.
 4             You can answer.
 5        A.    Yes.
 6        Q.    But it will no longer play a
 7   central role in response to protests
 8   because it's now under the coordination
 9   and --
10             MR. MARTS:  Objection.
11        A.    That's what it says.
12        Q.    Page six, looking at this
13   document on page six which says, "one of
14   two draft interim order," is it accurate
15   that all this order does is change the name
16   from Disorder Control Unit to Crowd
17   Management Unit?
18             MR. MARTS:  Objection.
19        A.    Can I see Appendix A, the next
20   page, because I don't know if they moved it
21   somewhere?
22             I see the name change.  I don't
23   know where it was prior to that.  But if it
24   was under Strategic Response Group, then
25   the answer to your question is yes.
```

```
 1                    J. KANGANIS
 2       Q.    Are you prepared to answer
 3  today any other way that the NYPD has
 4  reevaluated the role of the SRG and
 5  Disorder Control Unit?
 6       A.    No, not prepared.
 7             MR. MARTS:  Please note my
 8         objection to the scope to the
 9         previous question.  Thank you.
10       Q.    I'm going to go back to
11  Kanganis 20.
12             Looking at number four,
13  recommendation, document reasons and
14  authority for deploying SRG, discon, and
15  other specialized unit.  It says, "The
16  department currently documents the need for
17  deploying specialized unit after every
18  event for which such units have been
19  deployed"; right?
20       A.    Yes.
21       Q.    Has there been any change to
22  the department policy as a result of this
23  recommendation?
24       A.    I'm not prepared to answer that
25  question.
```

1              J. KANGANIS

2       Q.     The policies listed here, are

3   they all contained in Patrol Guide guide

4   section 22107?

5       A.     What was the section, please?

6       Q.     22107.

7       A.     I'm not familiar with that

8   number, no.

9       Q.     So where are the policies that

10   are referenced here?

11       A.     I believe I mentioned it

12   earlier.  There is a new Patrol Guide

13   procedure regarding response to First

14   Amendment activities.  I thought it was

15   21310, but that's the title "Response to

16   First Amendment Activities".

17       Q.     And is it published in full on

18   the NYPD website?

19       A.     It should be.  I think it was

20   published and open to comments from the

21   public and stockholders.  And their

22   feedback was considered and some cases

23   included prior to publishing the order the

24   Patrol Guide procedure.

25       Q.     There is only one section in

```
 1                    J. KANGANIS
 2   the Patrol Guide called "Response to First
 3   Amendment Activities"?
 4              MR. MARTS:  Please note my
 5         objection.
 6              You can answer.
 7        A.    That's what I believe.  Yes.
 8        Q.    Are these policies referenced
 9   here memorialized anywhere else?
10              MR. MARTS:  Objection.
11        A.    I'm not prepared to answer your
12   question.
13        Q.    I'm going to go to number
14   seven.  The recommendation is expand
15   training and policy to differentiate
16   between violent and peaceful protesters.
17   It says, "NYPD has completed an assessment
18   of existing training curricular."  When was
19   that assessment conducted?
20        A.    I can't answer your question.
21   I'm not prepared to answer as to when.
22        Q.    What community partners were
23   provided feedback?
24        A.    Not prepared to answer.
25        Q.    Is this assessment anywhere in
```

1                    J. KANGANIS

2   writing?

3              MR. MARTS:  Objection.

4        A.    I'm not prepared to answer your

5   question.

6        Q.    Is feedback from community

7   partners contained anywhere in writing?

8        A.    I'm not prepared to answer that

9   question.

10        Q.    Let's go to number eight.

11   Recommendation is standardize internal

12   communications regarding protests.  It

13   says, "The NYPD has developed guidelines

14   and instruction on appropriate enforcement

15   actions at the scene of protests."

16              When were these guidelines and

17   instructions developed?

18              MR. MARTS:  Objection.

19              You can answer.

20        A.    I believe they were developed

21   and published in the order referenced

22   earlier, 9/10/21.

23        Q.    9/10/21 is the date?

24        A.    Yeah, that's the date.

25              I don't remember if it was

```
 1                    J. KANGANIS
 2    21310, but the First Amendment procedure we
 3    were speaking about.
 4         Q.    So it's contained in the Patrol
 5    Guide section?
 6         A.    It's my recollection, yeah.
 7         Q.    Is it memorialized anywhere
 8    else?
 9         A.    Not prepared to answer.
10         Q.    And who developed these
11    guidelines and instructions?
12              MR. MARTS:  Objection.
13         A.    Not prepared to answer.
14         Q.    Okay.  Looking at number nine
15    and ten regarding the LRAD, it says that
16    the practice of playing the LRAD warning
17    three times has already been put into
18    practice.  Is that new?  When was that
19    policy made?
20         A.    Not prepared to answer when.
21         Q.    When is it memorialized?
22         A.    I believe it is in the
23    procedure we have been discussing, the
24    First Amendment procedure.
25         Q.    So just in the Patrol Guide?
```

```
 1                    J. KANGANIS
 2        A.    Yes.
 3        Q.    Is this practice a change from
 4   the practice that was in place during the
 5   2020 protests?
 6              MR. MARTS:  Objection.
 7        A.    Not prepared to answer.
 8        Q.    Going down to number 14 through
 9   17, these are all recommendations related
10   to community affairs officers; right?
11        A.    Yes.
12        Q.    Where has NYPD memorialized the
13   new procedures that are referenced here?
14        A.    They would be in the Patrol
15   Guide.  But I can't give you the number, a
16   guide in the patrol procedure number.
17        Q.    So you're not prepared to
18   answer where exactly --
19        A.    Correct.
20        Q.    Down to 21A, this is the one
21   that you said before is still in progress.
22              What is the current status of
23   the plan to consolidate the commission to
24   combat police corruption and Office of the
25   Inspector General under CCRB?
```

```
1                    J. KANGANIS
2         A.    Not prepared to answer.
3         Q.    The recommendation under that
4    relates to designating a senior executive
5    to liaison with civilian oversight
6    agencies?
7         A.    Yes.
8         Q.    When was the commissioner of
9    legal matters appointed to provide --
10        A.    I'm going to guess 2021.  I
11   can't even see the implementation date on
12   the spreadsheet.  It was shortly after --
13   it was an easy recommendation to implement.
14        Q.    Why do you say it was easy?
15        A.    Because the Legal Bureau is
16   under the deputy commission of legal
17   matters.  And we were just completing our
18   mission to provide them with the documents
19   and information they requested, so it was
20   already set up.
21        Q.    Didn't you say earlier that the
22   provision of records other than body-worn
23   camera was under the auspices of the IAB
24   and not the Legal Bureau?
25        A.    Yes, I did.  But we had a team
```

```
 1                     J. KANGANIS
 2    in place to respond to outside entities, so
 3    it was just a continuation.  It was a
 4    natural progression.  It wasn't a difficult
 5    recommendation to implement.
 6         Q.    So are requests for documents
 7    and records now sent to the Legal Bureau
 8    instead of the IAB CCRB liaison?
 9         A.    There was a reorganization.
10    That's what should be going on.  So I can't
11    -- I'm not prepared to say what's going on
12    today, but personnel were moved around so
13    that the document piece was put under
14    deputy commissioner of legal matters.
15         Q.    How many people are assigned
16    under the deputy commissioner of legal
17    matters to that role?
18              MR. MARTS:  Objection.
19              Outside of the scope.
20         A.    I can't give you a count.  I'm
21    not prepared to answer.
22         Q.    Number 23, recommendation,
23    institute regular after-action reviews.
24    What is this formal process of conducting
25    after-action reviews that has been
```

1                    J. KANGANIS

2  established?

3       A.    I'm not prepared to answer your

4  question.

5       Q.    When was that process of

6  conducting the after-action reviews

7  established?

8       A.    Not prepared to answer.

9       Q.    Who was responsible for

10 conducting the after-action reviews in this

11 process?

12            MR. MARTS:  Objection.

13            Outside of the scope.

14      A.    Not prepared to answer.

15      Q.    Where is it memorialized what

16 this process is?

17      A.    Not prepared to answer.

18      Q.    Number 24, it says, "The NYPD

19 is reviewing ways in which the community

20 can provide input on policies."  Did that

21 review take place?

22      A.    There is a -- it's posted

23 online, and feedback is received and

24 considered for policy changes.

25      Q.    What is posted online?

```
 1                    J. KANGANIS
 2       A.     Any proposed procedural
 3  changes, policy changes.
 4       Q.     Meaning Patrol Guide changes?
 5       A.     That's one example.  Like the
 6  First Amendment procedure we spoke about
 7  earlier, that was posted online; and
 8  comments were received.
 9       Q.     Are there any other documents
10  or types of policies that would be posted
11  online?
12               MR. MARTS:  Objection.
13               Outside the scope.
14       A.     No.  Not prepared to answer.
15       Q.     Following this review, did the
16  NYPD decide to incorporate community input
17  into after-action reviews?
18       A.     Yes.
19       Q.     How?
20       A.     Not prepared to answer.
21       Q.     Where is it memorialized that
22  community input is part of after-action
23  reviews?
24               MR. MARTS:  Objection.
25               Outside the scope.
```

```
 1                    J. KANGANIS
 2            You can answer.
 3       A.    Not prepared to answer.
 4       Q.    25, community input in protest
 5  planning was recommendation number 25.  It
 6  says that NYPD regularly incorporates
 7  community input in event planning.  Is that
 8  a change from the policy that was in place
 9  in 2020?
10       A.    Not prepared to answer.
11       Q.    How will planning for protests
12  incorporate community input following the
13  implementation of this recommendation?
14            MR. MARTS:  Objection.
15       A.    Not prepared to answer.
16       Q.    It says, "memorialization in
17  relevant procedures is in progress."  Is
18  that memorialization complete?
19       A.    It says it is complete.
20       Q.    Where is it memorialized?
21       A.    I'm not prepared to answer your
22  question.
23       Q.    Recommendation number 30, work
24  with DAs to plan for First Amendment
25  events.  It says that the Legal Bureau and
```

```
 1                     J. KANGANIS
 2    the Criminal Justice Bureau have
 3    established channels of communication with
 4    the district attorney's offices before,
 5    during, and after protests.
 6              How, if at all, did these
 7    channels of communications differ from the
 8    channels of communication that were in
 9    place during the 2020 protests?
10         A.    Not prepared to answer --
11              MR. MARTS:  Note my objection.
12              Scope.
13         A.    Not prepared to answer.
14         Q.    Is the memorialization of those
15    communications channels complete?
16         A.    The document says it is
17    complete; but other than that, I'm not
18    prepared to answer.
19         Q.    Is it memorialized?
20         A.    Not prepared to answer.
21         Q.    Number 31, reform
22    implementation team, is this the team you
23    were talking about before?
24         A.    Yes.
25         Q.    What records did that team
```

```
 1                    J. KANGANIS
 2  maintain, if any?
 3             MR. MARTS:  Objection.
 4             Outside of the scope.
 5      A.    Not prepared to answer.
 6      Q.    Is there anything this team has
 7  done that is not described in this
 8  document?
 9             MR. MARTS:  Objection.
10             Outside of the scope.
11      A.    Not prepared to answer.
12      Q.    You were a member of that team?
13      A.    No, I was not a member of the
14  team.
15      Q.    I'm going to move on.
16             Let's talk about the Attorney
17  General's report.
18             Did there come a time when the
19  NYPD and the City of New York learned that
20  governor could have directed the New York
21  State Attorney General to investigate
22  interactions between NYPD and the public
23  during the 2020 protests?
24      A.    There came a time when the AG
25  opened investigation, yes.
```

```
 1                    J. KANGANIS
 2        Q.    Was the AG's investigation
 3   pursuant to the direction by Governor
 4   Cuomo?
 5        A.    I don't know the source of the
 6   authority, but I know there was an
 7   investigation.
 8        Q.    Is it correct that the OAG
 9   submitted several requests for documents
10   and information to the NYPD beginning in
11   early June 2020?
12        A.    Yes.
13              MR. MARTS:  Please note my
14         objection to the form.
15        Q.    How did the NYPD respond to
16   those requests?
17        A.    The team, I discussed earlier,
18   they dealt with DOI and dealt with the Law
19   Department, also dealt with OAG.
20        Q.    And that team was responsible
21   for furnishing the information to the OAG?
22        A.    Yes.
23        Q.    And were they responsible for
24   collecting the information from within the
25   agency?
```

```
 1                    J. KANGANIS
 2        A.     The same protocols were
 3   followed.  We sent out requests for
 4   information, got them back, made sure we
 5   got what we asked for and forwarded them to
 6   the OAG.
 7        Q.     Was there any difference in the
 8   way NYPD managed requests for documents and
 9   information from OAG as opposed to DOI and
10   the Law Department?
11        A.     No.
12        Q.     How were overlapping requests
13   for documents and information managed?
14             MR. MARTS:  Objection.
15             Form.
16        A.     We made multiple copies.  If we
17   were overlapping, we made two or three
18   copies, whatever was appropriate, and
19   delivered them.
20        Q.     Did there come a time when the
21   OAG requested interviews with members of
22   the NYPD?
23        A.     I know they interviewed
24   Commissioner Shea.  I don't remember if
25   they requested interviews of any other
```

```
 1                    J. KANGANIS
 2   high-level executives, but they did
 3   interview Commissioner Shea.
 4        Q.    I'm going to show you what will
 5   be Kanganis 22.  This is going to be marked
 6   Kanganis 22.  It has a Bates stamp
 7   DEF_0000405667 ending in 671.
 8               (Whereupon, the aforementioned
 9           document was marked as Kanganis
10           Exhibit 22 for identification as of
11           this date by the Reporter.)
12        Q.    Do you recognize this document?
13        A.    That's a communication cover
14   sheet for deputy commissioner of legal
15   matters.
16        Q.    Have you seen it before?
17        A.    This particular one I don't
18   recall seeing before.
19        Q.    Let me go down to page three.
20   Have you seen this before?
21        A.    I don't remember seeing this
22   before, but it's from Chief Clark I
23   believe.  And we had a few communications
24   with Chief Clark.
25        Q.    So this is a letter from the
```

1                    J. KANGANIS
2    chief of the Civil Rights Bureau office of
3    June 18, 2020; correct?
4         A.    Yes.
5         Q.    Page five, there is a list of
6    individuals that the OAG was requesting to
7    interview; correct?
8         A.    Yes.
9         Q.    Does this refresh your
10   recollection whether --
11        A.    Well, they obviously did based
12   on this letter.  It doesn't refresh my
13   recollection, but I still don't remember
14   anybody other than Chief Shea being
15   interviewed; but I may be wrong.
16        Q.    When you referenced the
17   interview with Chief Shea, are you
18   referencing to when you testified before
19   the OAG's public hearing?
20        A.    Yes.
21        Q.    Are you aware of any interviews
22   that took place outside of that public
23   hearing with members of the NYPD?
24        A.    And the AG?
25        Q.    And the Attorney General's

```
 1                    J. KANGANIS
 2   Office, yes.
 3       A.    I'm not aware of any.  I might
 4   be confusing them with DOI interviews.
 5             But to answer your question,
 6   no.
 7       Q.    I'm going to show you another
 8   exhibit.  This will be Kanganis 23, Bates
 9   stamp DEF_000405663.
10             (Whereupon, the aforementioned
11             document was marked as Kanganis
12             Exhibit 23 for identification as of
13             this date by the Reporter.)
14       Q.    It ends in 666.  Do you
15   recognize this document?
16       A.    I don't recognize it.
17       Q.    Does this appear to be a letter
18   from the deputy commissioner of legal
19   matters to Chief Clark regarding the
20   request to interview?
21       A.    Yes.
22       Q.    Does it refresh your
23   recollection about whether or not the NYPD
24   consented to have members of the department
25   interviewed by the Attorney General's
```

```
 1                    J. KANGANIS
 2    Office?
 3         A.    Can I read a little more,
 4    please?
 5               Yes, it refreshes my
 6    recollection.
 7         Q.    What do you recall?
 8         A.    The OAG wanted to interview
 9    those executives.  But when they issued the
10    interim report, attorney general referenced
11    us for criminal sanctions or charges.  And
12    that chilled the environment regarding
13    providing the witnesses unless they could
14    give assurances that there would be no
15    criminal charges.
16         Q.    Did the OAG following this
17    letter provide assurances that any
18    statements would not be used in a criminal
19    proceeding?
20         A.    I don't believe they did.
21         Q.    Are you sure that that
22    assurance was not provided?
23               MR. MARTS:  Objection.
24         A.    I'm not sure.  I'm just saying
25    I don't recall an assurance from the OAG
```

1                    J. KANGANIS

2   regarding a guarantee that they would not

3   pursue criminal charges.

4        Q.    Are you prepared to answer any

5   questions about communications subsequent

6   to this letter between OAG and the NYPD

7   about interviews?

8        A.    At this moment, no.  If you

9   want to show me some letters, they might

10  refresh my recollection.  But to remember

11  the issue...

12       Q.    In the course of their

13  investigation, did the OAG share

14  information about complaints that they had

15  received from members of the public?

16       A.    They would ask us for documents

17  specific to certain incidents.  They

18  wouldn't always say why they needed them.

19            So the answer to your question

20  is no, they didn't always provide

21  information about complaints from the

22  public.  But that's what they were doing.

23  They were investigating incidents, and they

24  needed documentation to support the

25  investigation.

Page 281

```
1                    J. KANGANIS
2       Q.    But your answer said they
3  didn't always.  Did they ever?
4       A.    If they had a conversation with
5  them, we might ask them why they needed
6  something.  But, you know, I'm -- I can't
7  say it was -- did they ever?  Yes, they
8  did.  But I can't recall specifically an
9  incident where they did.
10      Q.    Did any request for
11 documentations about any specific
12 complaints they had received trigger any
13 action by the NYPD?
14            MR. MARTS:  Objection.
15            You can answer.
16      A.    I don't understand the question
17 really.  What --
18      Q.    Did the NYPD open any internal
19 investigations into complaints that they
20 learned about through conversations with
21 the OAG?
22            MR. MARTS:  Objection.
23      A.    Not prepared to answer.
24            MR. MARTS:  My apologies.  Just
25        for the record, object to the scope.
```

1                    J. KANGANIS

2        A.    Not prepared to answer.

3        Q.    Attorney General James also

4   called public hearings during the course of

5   her investigation; right?

6        A.    Yes.

7        Q.    On this June 17th, 18th, and

8   22nd?

9        A.    If those were the dates, I

10  don't know; but yes.

11       Q.    And the hearing was

12  live-streamed?

13       A.    Yes.

14       Q.    What, if anything, did the City

15  of New York do to track what was said

16  during the hearings?

17              MR. MARTS:   Objection.

18              Outside of the scope.

19       A.    I'm not prepared to answer

20  that.

21       Q.    I'm going to show you what will

22  be marked Kanganis 24.  It has Bates stamp

23  DEF_E_PD_ 00073644 through 645.

24              (Whereupon, the aforementioned

25         document was marked as Kanganis

```
 1                    J. KANGANIS
 2         Exhibit 24 for identification as of
 3          this date by the Reporter.)
 4         Q.    I'm going to give you a chance
 5    to look at this.  Let me know when you are
 6    ready.
 7         A.    Okay, I have read it.
 8         Q.    Have you seen this before?
 9         A.    No.
10         Q.    It appears to be an e-mail from
11    Oleg Chernyavsky --
12         A.    Yes.
13         Q.    -- dated June 19, 2020; right?
14         A.    Yes.
15         Q.    And it is addressed to
16    Commissioner Shea among other executives?
17         A.    Yes.
18         Q.    It summarizes the issues that
19    were raised during the AG's hearings?
20         A.    Yes.
21         Q.    What was the purpose of this
22    summary?
23         A.    Not prepared to answer.
24         Q.    What, if anything, was done in
25    response to the information that was
```

```
 1                   J. KANGANIS
 2   collected?
 3        A.    Again, I'm not prepared to
 4   answer.
 5              This is the first time I'm
 6   seeing this.
 7        Q.    The attorney general also
 8   posted written testimony that was submitted
 9   during the hearing on her website; correct?
10        A.    I didn't see it.  But if you
11   say it's there, I will take your word for
12   it.
13        Q.    Did anyone at the NYPD or the
14   City of New York direct any individuals to
15   read the written testimony?
16              MR. MARTS:  Objection.
17              Form.
18        A.    Not prepared to answer.
19        Q.    Did the City of New York take
20   any action in response to information
21   collected during the Attorney General's
22   hearings?
23              MR. MARTS:  Objection to form
24         and scope.
25        A.    Not prepared to answer.
```

1                    J. KANGANIS

2        Q.    Did NYPD open any internal

3    investigations as a result of testimony in

4    the AG hearings?

5              MR. MARTS:  Objection to the

6         scope.

7        A.    Not prepared to answer.

8        Q.    Did the hearings testimony

9    influence the NYPD's response to the

10   protests in any way?

11       A.    Not prepared to answer.

12       Q.    Following the hearings, did the

13   AG publish a preliminary report on her

14   office's findings?

15       A.    Yes.

16       Q.    Was that in July 2020?

17       A.    I believe so.

18       Q.    Was anyone within the NYPD or

19   the City of New York directed to review the

20   preliminary report?

21       A.    Not prepared to answer.

22       Q.    Did the NYPD or the City of New

23   York take any action in response to the

24   information contained within the

25   preliminary report?

1                      J. KANGANIS

2       A.      Not prepared to answer.

3       Q.      Specifically, did the NYPD

4  consider the recommendations contained

5  within the report?

6       A.      Not prepared to answer your

7  question.

8       Q.      What, if anything, was done in

9  response to the recommendations in the AG's

10 preliminary report?

11      A.      Again, I'm not prepared to

12 answer your question.

13      Q.      After receiving requests for

14 information from the Attorney General's

15 Office, Corporation Counsel, and DOI, did

16 the NYPD take any steps to ensure that

17 records were preserved in anticipation of

18 future litigation?

19              MR. MARTS:  Objection.

20              Outside of the scope.

21      A.      Preservation notices were sent

22 out.

23      Q.      And who was responsible for

24 that?

25              MR. MARTS:  Objection.

```
 1                    J. KANGANIS
 2              Outside of the scope of the
 3         topics.
 4      A.    Not prepared to answer.
 5      Q.    When were preservation notices
 6   sent out?
 7              MR. MARTS:  Objection.
 8              Outside of the scope of the
 9         topics.
10      A.    I'm not prepared to answer.
11      Q.    How were the preservation
12   notices communicated?
13              MR. MARTS:  Objection.
14              Outside the scope of the
15         topics.
16      A.    I'm not prepared to answer.
17      Q.    I'm going to show you what will
18   be marked Kanganis 25.  This has a Bates
19   stamp DEF_000173545 through 546.
20              (Whereupon, the aforementioned
21         document was marked as Kanganis
22         Exhibit 25 for identification as of
23         this date by the Reporter.)
24      Q.    Do you recognize this document?
25      A.    If you scroll down, I might be
```

```
 1                    J. KANGANIS
 2  able to.  Yes.
 3       Q.    What is this document?
 4       A.    It is a preservation notice
 5  with my signature on it.
 6       Q.    It's dated June 22, 2020?
 7       A.    I can't see the top.  Yes.
 8       Q.    To whom was this sent?
 9       A.    The commanding officer,
10  Technical Assistance Response Unit.
11       Q.    Was a similar preservation
12  notice sent to anyone other than the
13  Technical Assistance Response Unit?
14            MR. MARTS:  Objection.
15            Outside of the scope.
16       A.    There were additional
17  preservation notices sent, but I can't tell
18  you to whom.
19       Q.    Is that because you can't
20  recall or you're not prepared to answer
21  that question?
22       A.    Well, I really can't recall the
23  destination of these memos.
24       Q.    What triggered this
25  preservation notice going out?
```

```
 1                    J. KANGANIS
 2              MR. MARTS:  Objection.
 3              Outside of the scope.
 4       A.    It says, "anticipated
 5  litigation against the City and the
 6  department," so that's what triggered it.
 7       Q.    What made the department
 8  anticipate litigation?
 9              MR. MARTS:  Objection.
10              Outside of the scope of the
11        topics.
12       A.    I'm not prepared to answer.
13       Q.    Did you or anyone else in this
14  department send any other preservation
15  notices earlier during the period of the
16  protests?
17              MR. MARTS:  Objection.
18              Outside of the scope of topics.
19       A.    Not prepared to answer.
20       Q.    Did you or anyone else in the
21  department send any other preservation
22  notices after June 22, 2020 during the
23  period of the protests?
24              MR. MARTS:  Objection.
25              Outside of the scope.
```

```
 1                    J. KANGANIS
 2        A.    I'm not prepared to answer your
 3   question.
 4        Q.    I'm going to return to some
 5   policy and procedure questions related to
 6   the topic of the NYPD's coordination with
 7   local district attorney's offices.
 8             At the time of the 2020
 9   protests, how did the NYPD handle requests
10   by a local district attorney's office for
11   materials or information related to any
12   investigation into a member of service?
13             MR. MARTS:  Objection.
14             Outside the scope.
15        A.    I'm not prepared to answer.
16   I'm not aware of any investigations that
17   you just mentioned.
18        Q.    How would the procedure for
19   handling requests by the district attorney
20   office related to an investigation into a
21   member of service differ from the procedure
22   that they might follow for any other
23   arrest?
24             MR. MARTS:  Objection.
25        A.    I'm not prepared to answer
```

```
 1                    J. KANGANIS
 2   that.
 3        Q.    What was the procedure when a
 4   District Attorney's Office requested an
 5   interview with a member of service related
 6   to an investigation into any member of
 7   service?
 8             MR. MARTS:  Objection to the
 9        scope.
10             You can answer.
11        A.    Not prepared to answer.
12        Q.    Who would be responsible for
13   handling those requests?
14        A.    Not prepared to answer.
15        Q.    How would those requests be
16   communicated to the officer?
17             MR. MARTS:  Objection.
18             You can answer.
19        A.    Listen, any request,
20   notification is sent to the officer.  So
21   that's the answer to the question.  How
22   were they notified, a formal notification
23   is generated.
24        Q.    Where is that notification
25   generated?
```

1                    J. KANGANIS

2        A.    There is a computer system that

3    sends a notice to the command, and the

4    command serves it on the officer.  I can't

5    tell you the name of it.

6        Q.    Would the member of service be

7    required to cooperate in any request for

8    interview by the district attorney office?

9              MR. MARTS:  Objection.

10             Outside the scope.

11       A.    Not prepared to answer.

12       Q.    Were any formal notifications,

13   in fact, generated in response to requests

14   to interview a member of service from the

15   district attorney office?

16             MR. MARTS:  Objection.

17             Outside of the scope.

18       A.    Not prepared to answer.

19       Q.    What would happen if a member

20   of service failed to cooperate with a

21   request for an interview?

22       A.    By the district attorney's

23   office?

24       Q.    Yes.

25       A.    You are saying they are not

```
 1                    J. KANGANIS
 2   complying with the notification, or you're
 3   talking about something else?
 4        Q.    What would happen if they
 5   failed to cooperate with a request to be
 6   interviewed by a district attorney's
 7   office?
 8        A.    Not prepared to answer.
 9        Q.    If a district attorney's office
10   had any requests related to investigation
11   into a member of service related to the
12   protests, who would be responsible to
13   answer them?
14              MR. MARTS:  Objection.
15              Outside of the scope of the
16         topics.
17        A.    Not prepared to answer.
18        Q.    At the time of the 2020
19   protests, was there any relevant written
20   policy in place about DA investigations
21   into members of service?
22              MR. MARTS:  Objection.
23              Outside of the scope.
24        A.    Not prepared to answer.
25        Q.    Was there any unwritten policy
```

```
                          J. KANGANIS
 1
 2    at the time of the 2020 protests about DA
 3    investigations into members of the NYPD?
 4              MR. MARTS:  Same objection.
 5         A.    Same answer, not prepared to
 6    answer that question.
 7         Q.    Has there been any change to
 8    any policy and procedure related to DA
 9    investigations into members of the NYPD
10    since 2020 protests?
11              MR. MARTS:  Same objection.
12         A.    Not prepared to answer.
13         Q.    Is the NYPD aware of any actual
14    investigations by any district attorney
15    office in New York City of a member of the
16    NYPD related to the 2020 protests?
17         A.    I'm not prepared to answer that
18    question.
19              MR. MARTS:  Please note my
20         objection.  Apologies.
21         Q.    Did any district attorney
22    office request any materials or assistance
23    from the NYPD related to any investigation
24    of a member of the NYPD related to the 2020
25    protests?
```

```
 1                    J. KANGANIS
 2        A.    From the team that we were
 3   discussing, the answer is no.  No requests
 4   from the district attorney offices.
 5        Q.    Are you aware of any such
 6   request?
 7        A.    No.
 8        Q.    So you're not prepared to speak
 9   about any such request?
10        A.    Correct.
11              MR. MARTS:  Note my objection.
12        Q.    Did the NYPD receive any
13   subpoenas compelling production of
14   documents or testimony related to any
15   investigation involving the 2020 protests?
16        A.    Not prepared to answer.
17        Q.    Are you aware, is the City
18   aware of any investigations by a district
19   attorney office that related to the 2020
20   protests that resulted in a decision to
21   prosecute a member of service?
22              MR. MARTS:  Objection.
23              Outside of the scope.
24        A.    Not prepared to answer.
25        Q.    Are you aware of any district
```

```
1                    J. KANGANIS
2    attorney investigation into Officer Vincent
3    D'Andraia during the 2020 protests?
4         A.    No.
5         Q.    Is the City aware of any
6    investigation into Officer D'Andraia?
7                MR. MARTS:  Objection.
8         A.    Not prepared to answer.
9         Q.    Is the City aware of any
10   district attorney's investigation into
11   Officer Michael Sher during the 2020
12   protests?
13               MR. MARTS:  Same objection.
14        A.    Not prepared to answer.
15        Q.    Going back to the questions I
16   asked earlier about the preservation
17   notices, in response to any request for
18   information by the attorney general, the
19   DOI, district attorney offices, or the Law
20   Department, did the City of New York learn
21   that responsive documents have been
22   deleted?
23               MR. MARTS:  Objection.
24               Outside of the scope.
25        A.    No.
```

```
 1                     J. KANGANIS
 2        Q.     In responding to any request
 3   for information by the attorney general,
 4   the district attorney offices, the
 5   Department of Investigation, or the Law
 6   Department, did the City of New York learn
 7   that responsive documents have been
 8   overwritten?
 9              MR. MARTS:  Same objection.
10        A.     No.
11        Q.     Moving to a different topic,
12   are you aware of a March 14, 2023 letter
13   from the Legal Aid Society to Mayor Adams
14   describing an analysis of Commissioner
15   Sewell's departure from CCRB
16   recommendations?
17        A.     I'm aware of a letter, but I
18   haven't read it.
19        Q.     I'm going to show you what will
20   be marked Kanganis 26.
21              (Whereupon, the aforementioned
22         document was marked as Kanganis
23         Exhibit 26 for identification as of
24         this date by the Reporter.)
25        Q.     Do you recognize this document?
```

```
 1                    J. KANGANIS
 2        A.     No.
 3        Q.     Does it appear to be a letter
 4   from the Legal Aid Society to Mayor Eric
 5   Adams from March 15, 2023?
 6        A.     Yes.
 7               MR. MARTS:  Objection.
 8               Scope.
 9        Q.     On page four, just if you can
10   read this paragraph here.
11        A.     I read it.
12        Q.     It says that the Legal Aid
13   Society found that the commissioner had
14   rejected CCRB's recommendations in 346
15   cases because the NYPD decided that the
16   CCRB's recommendation was sent to the NYPD
17   too close to the complaint's statute of
18   limitation; correct?
19               MR. MARTS:  Objection.
20               Outside of the scope.
21        A.     That's what it says.
22        Q.     Does the City dispute the
23   accuracy of the number?
24               MR. MARTS:  Objection.
25               Outside of the scope.
```

```
 1                    J. KANGANIS
 2       A.    Not prepared to answer.
 3       Q.    Going to the second paragraph,
 4  do you agree that it says that Legal Aid
 5  found that the average time between the
 6  CCRB's recommendation and the statute of
 7  limitations was over three weeks; is that
 8  right?
 9             MR. MARTS:  Objection.
10             Outside of the scope.
11       A.    Not prepared to answer.
12       Q.    Well, that's what this letter
13  says; correct?
14       A.    Yeah.
15             MR. MARTS:  Objection.
16       A.    I thought you asked me if I
17  agreed.
18       Q.    Do you dispute that number?
19             MR. MARTS:  Objection.
20             Outside of the scope and asked
21        and answered.
22       A.    I'm not prepared to answer your
23  question.
24       Q.    Is a period of three weeks
25  sufficient to make a determination to
```

```
                                    Page 300
 1                    J. KANGANIS
 2   accept or reject a CCRB recommendation?
 3             MR. MARTS:  Same two
 4        objections.
 5       A.    Not prepared to answer.
 6       Q.    What is a sufficient amount of
 7   time for a commissioner to make a
 8   determination about whether or not to
 9   accept CCRB's recommendation for
10   discipline?
11             MR. MARTS:  Objection.
12             Outside of the scope of the
13        topics.
14       A.    Not prepared to answer your
15   question.
16       Q.    In cases when the commissioner
17   determines that the recommendation is too
18   close to the statute of limitations or that
19   it has expired, can NYPD still impose
20   discipline on an officer where warranted?
21             MR. MARTS:  Objection.
22             Outside the scope.
23       A.    Not prepared to answer.
24       Q.    Does the NYPD consider training
25   or instructions discipline in those cases?
```

```
 1                    J. KANGANIS
 2            MR. MARTS:  Objection.
 3            Outside the scope of the
 4       topics.
 5       A.    Not prepared to answer your
 6  question.
 7       Q.    What was the NYPD's response to
 8  this report from the Legal Aid Society?
 9            MR. MARTS:  Objection.
10            Outside the scope of the
11       topics.
12       A.    Not prepared to answer.
13       Q.    Is it accurate that NYPD
14  sources told New York Post that the CCRB
15  dumped hundreds of cases on them?
16            MR. MARTS:  Objection.
17            Outside of the scope of the
18       topics.
19       A.    Not prepared to answer.
20       Q.    I'm going to show you what will
21  be marked Kanganis 27.
22            (Whereupon, the aforementioned
23       document was marked as Kanganis
24       Exhibit 27 for identification as of
25       this date by the Reporter.)
```

```
                                        Page 302
 1                  J. KANGANIS
 2            MS. BULL:  This is a New York
 3        Post article that was shared with
 4        counsel before the deposition today.
 5        Q.    Have you seen this before?
 6        A.    No.
 7        Q.    I didn't hear that.
 8        A.    No.
 9        Q.    This appears to be a New York
10   Post article called "Civilian Complaint
11   Review Board Dumped Hundreds of Cases on
12   NYPD At the Last Minute, Police Sources."
13   Just read the first sentence highlighted
14   here.
15        A.    Okay.
16        Q.    Does this statement reflect a
17   position of the NYPD?
18            MR. MARTS:  Objection.
19            Outside of the scope of the
20        topics.
21        A.    I'm not prepared to answer it.
22        Q.    Can you explain what is meant
23   by the statement, that is, "the CCRB dumped
24   hundreds of cases on the NYPD"?
25            MR. MARTS:  Objection.
```

```
 1                    J. KANGANIS
 2              Outside of the scope of the
 3       topics.
 4       A.    No.
 5       Q.    I want to go back to Kanganis
 6  1.  We said before these were the two
 7  topics you were designated for today.
 8       A.    Yes.
 9       Q.    How do you interpret your
10  responsibility to answer questions about
11  topic 21B?
12              MR. MARTS:  Could you repeat
13       the question?
14              (Whereupon, the referred to
15       question was read back by the
16       Reporter.)
17              MR. MARTS:  Objection.
18       Objection to the form.
19              You can answer if you
20       understand the question.
21       A.    Well, I have, you know -- how
22  do I explain?  Is that your question?  How
23  do I explain?  There were no
24  communications, to answer your question,
25  regarding their decision not to prosecute
```

1                    J. KANGANIS

2    or dismiss a prosecution.  So there is not

3    really much for me to say if there were no

4    communications.

5         Q.    So is your understanding of

6    this topic limited to any communications

7    that district attorney offices had with the

8    NYPD about decisions to decline or dismiss

9    a prosecution?

10        A.    How am I going to testify about

11   the district attorney's decisions if I

12   haven't spoken to them?

13        Q.    The topic is NYPD and City of

14   New York's response to any decisions.

15        A.    And I answered the question you

16   asked me about that.

17        Q.    Didn't you also testify today

18   that you were not aware of any specific

19   decisions to decline to prosecute or

20   dismiss a prosecution related to the

21   protests?

22              MR. MARTS:  Objection.

23        A.    We discussed -- didn't we

24   discuss the Vance article or memo?

25        Q.    Outside of that announcement?

                        J. KANGANIS
1

2       A.     That was it.  That was the

3  decision not only by Vance's office, but it

4  was an article regarding the other district

5  attorneys in the Bronx, Brooklyn, and

6  Queens to make their decisions.  So there

7  is nothing really to respond to.  Those

8  decisions were made in the prosecutor's

9  office.

10      Q.     Were you prepared at all to

11 talk about any specific decisions such as

12 the affidavit that we showed you at the

13 beginning of this deposition?

14              MR. MARTS:  Objection.

15      A.     Which affidavit are you

16 referencing?

17      Q.     The affidavit in support of

18 dismissing prosecution.

19      A.     No.  I have never seen that

20 document before as I told you when you

21 asked me questions about it.

22      Q.     How did you interpret the part

23 of topic 20 that references any local

24 district attorney's office?

25      A.     Again, I think you want me to

1              J. KANGANIS

2    testify to communications that did not

3    happen.  There was no coordination

4    regarding the decision to dismiss or not

5    prosecute certain cases.  There was no

6    response.

7         Q.    Topic 20, it doesn't talk about

8    dismissals to prosecute.

9         A.    Continuing, if I may, I'm not

10   aware of any investigations similar to

11   that, those that were conducted by CCRB,

12   DOI, Law Department, the AG that were

13   conducted by local district attorneys.

14        Q.    So your interpretation of topic

15   20 was that it only pertained to any

16   investigation by district attorney office

17   that was similar in nature to that of the

18   investigations by the Department of

19   Investigation or the Law Department?

20             MR. MARTS:  Objection.

21             Objection to form.

22             You can answer.

23        A.    Yes.

24        Q.    Would you agree that NYPD and

25   the City of New York's response to the

```
 1                    J. KANGANIS
 2   reports mentioned in topic 20 would include
 3   any action taken to implement
 4   recommendations from those reports?
 5        A.    Yes.
 6        Q.    What is your basis for
 7   understanding that topic 20 would only
 8   encompass investigations by district
 9   attorney office that were similar in nature
10   to that of the Law Department or the DOI's
11   investigations?
12               MR. MARTS:  Objection to form.
13               You can answer.
14        A.    Because they all grew up
15   together.  There is no mention of criminal
16   investigations by any local district
17   attorney office, district attorney, CCRB,
18   DOI into the City's responses to the summer
19   of 2020 protests.
20        Q.    Does any local district
21   attorney office in New York conduct any
22   criminal investigations?
23        A.    I'm not aware of any such
24   investigation, any local district attorney
25   office.  They would have come through our
```

Page 308

```
                              J. KANGANIS
 1
 2   team.   There were no such requests.
 3        Q.   Does the local district
 4   attorney office have any authority to
 5   conduct a non-criminal investigation?
 6             MR. MARTS:  Objection.
 7        A.   Listen, I'm not aware of the
 8   Law Department conducting an investigation
 9   either, and they did.
10        Q.   The Law Department was
11   specifically ordered to conduct that
12   investigation by Mayor de Blasio; right?
13        A.   Yes.
14        Q.   So they had authority to
15   conduct that investigation?
16        A.   Yes, they did.
17        Q.   In preparation for this
18   deposition, did you ever ask anyone outside
19   of your legal counsel what type of
20   investigations might be contemplated by
21   topic 20 including involving a district
22   attorney office?
23             MR. MARTS:  Objection.  I
24        apologize for speaking, but can you
25        clarify your question please because
```

```
 1                    J. KANGANIS
 2        I'm a little confused?
 3        Q.    In the course of preparing for
 4   this deposition, did it ever occur to you
 5   that there were no investigations by any
 6   district attorney office falling under the
 7   definition of topic 20 that you thought
 8   existed?
 9             MR. MARTS:  Objection to the
10        form of the question, also asking the
11        witness to speculate.
12        A.    I don't have an answer for you
13   other than what I have already told you.
14        Q.    Is there anything that you want
15   to change or add to your testimony that was
16   given today?
17        A.    No.
18             MS. BULL:  I'm going to turn
19        over questioning to co-counsel Remy
20        Green.
21   EXAMINATION BY
22   MX. GREEN:
23        Q.    Good evening.  I think we
24   should be able to get through what I have
25   very quickly.
```

```
 1                    J. KANGANIS
 2              Just so you know, I'm one of
 3    the attorneys on one of the other
 4    consolidated cases.  I am representing a
 5    group of plaintiffs led by a plaintiff
 6    named Adama Sow, A-D-A-M-A   S-O-W.
 7              Within the scope of topic 21B,
 8    what I would like to ask you about is how
 9    the City and the NYPD reacts to
10    declinations to protect suit or decisions
11    to dismiss a prosecution.  I think it
12    should be pretty simple answers.
13              Does the City ever take into
14    account declination to prosecute decisions
15    to revise its policies?
16              MR. MARTS:  Objection to the
17         scope.
18              MX. GREEN:  What --
19              MR. MARTS:  You asked me a
20         question.  I can explain.  I believe
21         there is another topic that's
22         relevant to specific policies.  If
23         I'm not mistaken, it's topic one.
24              MX. GREEN:  But what I asked
25         about was whether the NYPD and the
```

                    J. KANGANIS

1          City's response to decisions by any

2          district attorney to decline to

3          prosecute ever led to changes in

4          policy.

5              What is your argument or what

6          is your objection to that question

7          being within the scope of the NYPD

8          and the City of New York's response

9          to a decision by a district attorney

10         to decline to prosecute?

11             MR. MARTS:  As I said, I

12         believe it is not a topic that

13         addresses changes in policy.

14             MX. GREEN:  That is

15         nonresponsive.

16             What is your objection to being

17         within this topic?

18             MR. MARTS:  I told you my

19         understanding, there is another topic

20         that potentially deals with changes

21         in policies.  In my opinion, it falls

22         under that topic.

23             MX. GREEN:  That's not what --

24         I mean --

```
 1                    J. KANGANIS
 2             MR. MARTS:  I put my objection
 3         on the record.
 4             MX. GREEN:  I think it's a
 5         bad-faith objection.
 6             MR. MARTS:  If that's what you
 7         think, by all means.
 8             MX. GREEN:  I think it's
 9         nonsensical, but fine.
10       Q.    Deputy Inspector, please answer
11    the question.
12       A.    Can you repeat the question?
13       Q.    Is it your understanding that
14    the City of New York does not take into
15    account declination to prosecute decisions
16    in revising NYPD policy?
17       A.    No.
18       Q.    Sorry, maybe it's because I
19    asked it in a double negative way.
20             Is that no to say that the City
21    does not take those into account?
22       A.    We have a Risk Management
23    Bureau does analysis of, you know, declines
24    to prosecute.
25             And if we see an issue that
```

```
 1              J. KANGANIS
 2   needs to be addressed, we might address it
 3   in training or something like that.
 4        Q.    Did the Risk Management Bureau
 5   take into account at any point any of the
 6   declination to prosecute decisions during
 7   the summer 2020 protests?
 8        A.    Not prepared to answer.
 9        Q.    You're not prepared to answer
10   whether the NYPD and the City of New York
11   response to declination to prosecute
12   decisions during summer 2020 protests
13   involved a consideration by the Risk
14   Management Bureau?
15              MR. MARTS:  Asked and answered.
16        A.    Right.
17        Q.    Did any agency or other
18   decision-making body outside of the Risk
19   Management Bureau take into account
20   declination to prosecute decisions during
21   the summer of 2020 in evaluating NYPD
22   policy?
23        A.    Not prepared to answer.
24        Q.    Did your preparation at any
25   point during this involve speaking to
```

Page 314

```
 1                    J. KANGANIS
 2  anyone at the Risk Management Bureau?
 3       A.    No.
 4            MX. GREEN:  I have nothing
 5        further.
 6            MR. MARTS:  Do you have any
 7        follow-up questions?
 8            MS. BULL:  I do not.
 9            MR. MARTS:  Can we take like an
10        eight-minute break?
11            MS. BULL:  So see you at 5:50?
12            MR. MARTS:  Yes.  Thank you.
13            (Whereupon, at 5:43 p.m., a
14        short recess was taken.
15            At 5:50 p.m., the deposition
16        resumed. )
17            MR. MARTS:  I just want to put
18        on the record the same objections I
19        stated at the beginning of the
20        deposition, that based on how the
21        deposition transpired, I believe it's
22        obvious that the plaintiffs did not
23        comply with the paragraph 12 of the
24        stipulation pertaining to remote
25        deposition as well as Federal Rule of
```

1                    J. KANGANIS

2        Procedure 30.

3            And I also reiterate the same

4        objection as stated in the beginning

5        of the deposition pertaining to

6        certain questions that were asked,

7        questions that were outside the

8        topics 20 and 21 the witness was

9        designated to testify to.

10            And I just want to reiterate

11        the position it's the defendant's

12        position that the answers to those

13        questions are not binding on the

14        City.

15            MS. BULL:  We want to state for

16        the record that we will hold these

17        topics open because of the pervasive

18        lack of preparation that Deputy

19        Inspector Kanganis had for the topics

20        20 and 21 for which the witness was

21        designated to testify to.

22            MR. MARTS:  Obviously, just for

23        the record, we disagree with the

24        objection.

25            MS. BULL:  And we disagree with

```
                                            Page 316
 1                    J. KANGANIS
 2        your objections.
 3              MR. MARTS:  I can see that.
 4              MS. BULL:  Thank you very much
 5        for your time.
 6              MR. MARTS:  I would ask that
 7        the copy of the transcript be made
 8        available.
 9              MS. BULL:  Yeah, it will be.
10              (Whereupon, at 5:45 p.m., the
11        Examination of this witness was
12        concluded.)
13
14              °         °         °         °
15
16
17
18
19
20
21
22
23
24
25
```

Page 324

1              J. KANGANIS

2            C E R T I F I C A T E

3

4    STATE OF NEW YORK          )

                               :   SS.:

5    COUNTY OF KINGS            )

6

7

8      I, JANNA LIRTSMAN, a Notary Public for

9    and within the State of New York, do hereby

10   certify:

11     That the witness whose examination is

12   hereinbefore set forth was duly sworn and

13   that such examination is a true record of

14   the testimony given by that witness.

15     I further certify that I am not related

16   to any of the parties to this action by

17   blood or by marriage and that I am in no

18   way interested in the outcome of this

19   matter.

20     IN WITNESS WHEREOF, I have hereunto set

21   my hand this 11th day of April, 2023.

22

23

24   _____

              JANNA LIRTSMAN

25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.