# EXHIBIT A

Page 1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    --------------------------------------------X
3    In Re:   New York City Policing During Summer
     2020 Demonstrations,
4
                                    Index No.:
5                                   20-cv-8924(CM)(GWG)
                                    20-cv-10291(CM)(GWG)
6                                   20-cv-10541(CM)(GWG)
                                    21-cv-322(CM)(GWG)
7                                   21-cv-533(CM)(GWG)
                                    21-cv-1904(CM)(GWG)
8
     --------------------------------------------X
9
10
                           April 13, 2023
11                         10:41 a.m.
12
13
14
15
16
17
18
19         VIRTUAL DEPOSITION OF LAUREN FOSTER, the
20
21    Witness, pursuant to Subpoena, taken at the above
22
23    date and time, before MARIA ACOCELLA, a Notary
24
25    Public within and for the State of New York.

```
 1        A P P E A R A N C E S:

 2

          STATE OF NEW YORK
 3        OFFICE OF THE ATTORNEY GENERAL
          LETITIA JAMES
 4              Attorney for Plaintiff
                28 Liberty Street
 5              New York, New York 10005
          BY:  LILLIAN MARQUEZ, ESQ.
 6              GINA BULL, ESQ.

 7

          SYLVIA HINDS-RADIX, ESQ.
 8              Corporation Counsel
                Attorneys for Defendants
 9              100 Church Street
                New York, New York 10007
10        BY:  ELISSA JACOBS, ESQ.

11

12

13

14

15        ALSO PRESENT:  Matthew Russo, NYPD Legal

16

17        Maggie Hadley, Esq., Payne Plaintiffs

18

19        Remy Scott, Esq.

20

21        Mickey Osterreicher, Esq.

22

23        Tahanie Aboushi, Esq.

24

25        Maleeha Riaz, Fellow, Cohen Law Firm
```

```
                                          Page 87

 1                    Lauren Foster

 2               MS. JACOBS:  Objection, outside

 3       the scope.

 4       A.      I don't know if this is the first

 5   version.

 6       Q.      Okay.  Do you have an

 7   understanding as to when it was first

 8   implemented?

 9               MS. JACOBS:  Objection, outside

10       the scope.

11       A.      No.  It was implemented while I

12   was at --

13               No.  Actually, I don't know.

14       Q.      I am going to skip ahead to page

15   8, and if I draw your attention to the second

16   paragraph here, starting with -- rather, the

17   last two sentences in that second paragraph.

18               So IAB may assign some misconduct

19   investigations to the bureau/borough

20   investigation units, which function as

21   satellites of IAB and are responsible for the

22   integrity controls within their respective

23   units.  These investigation units report

24   their findings through IAB, which retains

25   oversight over the investigations.
```

```
                                             Page 88
 1                    Lauren Foster
 2              Do you see that?
 3        A.      Yes.
 4        Q.      Okay.  And this is 2021.
 5              So was it your understanding that
 6    the IAB retains oversight over investigations
 7    conducted by bureau/borough investigation
 8    units at the time?
 9        A.      So the borough/bureau
10    investigation units, my understanding is they
11    fall under chief of department investigations
12    review section.
13              IAB did conduct steering with
14    them, but as far as -- and would provide
15    some -- would provide guidance.
16              However, as far as signing off on
17    cases, the sign-off was done not by IAB
18    personnel.
19              I guess it is how you define --
20    those are two different versions of
21    oversight, I guess.
22        Q.      So what do you mean by conducted
23    steering with them?
24        A.      So steering is a meeting where
25    executive -- well, executives from IAB, and
```

```
                                        Page 89
 1                    Lauren Foster
 2   if it is an IU, elsewhere -- they sit down
 3   and they go through current cases, and it is
 4   a formal case review.
 5        Q.     What are they reviewing for?
 6        A.     Just status of cases, next steps,
 7   investigative gaps, things of that nature.
 8        Q.     Would the IAB executives in that
 9   meeting be able to dictate to the IUs what to
10   do next, or simply suggest next steps?
11        A.     I don't know what the
12   consequences of not doing a suggested step
13   would be.
14        Q.     And what level of executives
15   would be involved in those meetings?
16        A.     Those were usually -- Chief
17   O'Neill would sometimes to go them, if he was
18   available, chief Cooper.
19        Q.     Sorry.  Who was that, Cooper?
20        A.     Cooper, Alan Cooper.
21        Q.     What was his rank?
22        A.     Deputy Chief.
23        Q.     Did you attend any of those
24   meetings?
25        A.     No.
```

Page 238

1                           Lauren Foster

2          A.      Yes.

3          Q.      Okay.  And I kind of tabled that,

4     because I think it would have been just

5     easier to talk about a specific case rather

6     than in the abstract.

7                   So I am going to pull up a case.

8     I think you mentioned having reviewed it, but

9     I may have -- you may have given a different

10    first name.

11                  Did you review a case file

12    involving Jason Donnelly?

13         A.      Oh, yeah.  I think I called him

14    James.

15         Q.      But it was Jason?

16         A.      Donnelly, yes.

17         Q.      Are you familiar with the conduct

18    of the investigation on the IAB side of those

19    allegations relating to him?

20         A.      Somewhat.

21                  I would be more comfortable

22    looking through the case again.

23         Q.      Sure.

24                  MS. MARQUEZ:  So I think we are

25         at 13?

Page 239

1                    Lauren Foster

2              MS. JACOBS:  Yes.

3              MS. MARQUEZ:  And so this was

4        produced -- actually, this is a publicly

5        filed docket document.  It is a docket

6        number 116-1, filed in Federal Case

7        21-cv-6610, and so I will just show it

8        to you.

9              MS. JACOBS:  Where is the case

10       filed?

11             MS. MARQUEZ:  It is, I think, one

12       of the consolidated cases here, but it

13       was an independent, not in the main

14       case.

15             So it is one of Judge McMann's.

16       So is this -- this is essentially the

17       CCRB conclusions as documented in a

18       letter to the complainant.

19             (Whereupon, a document was marked

20       as Foster Exhibit 13 for identification,

21       as of this date.)

22       Q.      Have you seen this before,

23   Captain?

24       A.      No.

25       Q.      Have you seen a document like

Page 240

1                    Lauren Foster

2    this before?

3         A.      Yes.

4         Q.      What do you understand this

5    generally to be?

6         A.      It is a communication to a

7    complainant from CCRB regarding the outcome

8    of CCRB's investigation.

9         Q.      And I just wanted to show you, to

10   contextualize our conversation about the IAB

11   case, which I will show you a second.

12              So this is Jason Donnelly again,

13   correct?

14        A.      Yes.

15        Q.      And just going to scroll down to

16   the force allegation.

17              So on page 2 at the top, subpart

18   G, force, Sergeant Christopher Hewitson used

19   physical force against Jason Donnelly.

20              And it says that that was

21   substantiated and resulted in charges.

22              Is that fair to say, just based

23   on your review what you are seeing in front

24   of you?

25        A.      That is what it says.

Page 241

1              Lauren Foster
2          MS. MARQUEZ:  And then show you
3      what will be Foster 14.  That was
4      produced as DEF_000481742 to 745.
5          Sorry, just one second.
6          So do you mind if we go off the
7      record real quick to get that document?
8          (Whereupon, a short recess was
9      taken at 4:08 p.m. and testimony resumed
10     at 4:09 p.m.)
11         MS. MARQUEZ:  Sorry about that.
12         So this will be Foster 14, same
13     Bates Stamps that I provided before.
14         (Whereupon, a document was marked
15     as Foster Exhibit 14 for identification,
16     as of this date.)
17     Q.    Do you see that?
18     A.    Yes.
19     Q.    I will just scroll through it
20 again.
21         Have you had a chance to look
22 at -- at least scan this?
23     A.    Yes.
24     Q.    Okay.  And have you reviewed this
25 before?

Page 242

1                       Lauren Foster
2        A.      Yes.
3        Q.      And this is the ICMT log for --
4   or I guess, record for Jason Donnelly's
5   allegations?
6        A.      It is not the log, no.
7        Q.      The case is that --
8                How would you describe it?
9        A.      This is the closing worksheet.
10       Q.      Closing work sheet, okay.
11               And it is in ICMT because the
12   group in charge of this investigation was
13   Patrol Borough Manhattan South?
14       A.      Yes, Patrol Borough Manhattan
15   South Investigations Unit.
16       Q.      Okay.  Do you know the reason why
17   it was being investigated by that
18   investigation unit specifically?
19       A.      This was one of the cases where
20   after an attempt to identify the subject
21   officer, to make it -- to determine what --
22   where the appropriate investigative entity
23   resided, they -- within a short time period,
24   they were unable to.
25               So it was then assigned to Patrol

Veritext Legal Solutions
212-267-6868                                516-608-2400

Page 243

1                    Lauren Foster

2    Borough Manhattan South, because the incident

3    occurred geographically there.

4         Q.      Okay.  Got it.

5                 So for this particular incident,

6    is it accurate to say the IAB was just

7    looking at allegations three to five -- the

8    IAB was investigating allegations of physical

9    force?

10        A.      You would have to slowly go

11   through it before I can accurately say that.

12        Q.      So let's go one by one.

13                Allegation three, force, physical

14   force?

15        A.      What are one and two?

16        Q.      Oh, they are not force or

17   physical force; that is why I wasn't focusing

18   on those.

19        A.      Oh, okay.

20        Q.      Or one is, but it is referred out

21   to CCRB.

22        A.      Okay.

23        Q.      Yeah.  So I just wanted to focus

24   on three to five.

25                So just on three, let's start

Page 244

1                    Lauren Foster
2    with, it says force, physical force, and then
3    allegation index other.  Do you see that?
4         A.      Uh-huh.
5         Q.      Why is the allegation index other
6    for that?
7         A.      I am not sure.
8         Q.      And just to contrast, allegation
9    four, if you see it, use of force level two
10   has an allegation index of force
11   investigation notification?
12        A.      Correct.
13        Q.      Do you know why the two are
14   distinct?
15        A.      Because level two is -- in the
16   world of NYPD force, you have level one, two,
17   three, four.  And when you have a force
18   allegation, it is not just one allegation, it
19   gets broken up into different pieces to
20   account for different elements, different
21   potential outcomes.
22               One active force may result in
23   multiple different allegations.
24               And a level -- and a use of force
25   hyphen level two, one, three, whatever it is,

Page 245

1                    Lauren Foster
2     the index ends up being force investigation
3     notification.
4          Q.      Okay.  So for the allegation
5     four, do you see the comments where it says
6     allegations closed as unsubstantiated, based
7     on the video provided by the complainant?  If
8     any force was used against him, it was not
9     captured, presumably captured.  Inquiries of
10    BWC footage resulted in no BWC footage being
11    found, so the allegation cannot be proven or
12    disproven.
13         A.      Right.
14         Q.      One question for you, the comment
15    that the allegation cannot be proven or
16    disproven, is that a necessary conclusion, if
17    the victim is providing their account that
18    they had, in fact, been -- that force had
19    been used against him by a member of service?
20         A.      It is not a necessary conclusion,
21    but I don't know -- this is just a closing
22    statement, the closing worksheet, so it
23    doesn't give me enough information to
24    determine what other investigative steps were
25    taken to reach this conclusion.

Page 246

Lauren Foster

1

2      Q.      Okay.  But does the fact that

3    there is, for instance, no body worn camera

4    footage, meaning that an allegation that by

5    complaining witness or victim that an officer

6    used force against them cannot be proven is

7    not a necessary conclusion simply 'cause

8    there is no video?

9      A.      No.  No.

10     Q.      I just want to focus on this

11   right here, so start -- this paragraph, I

12   don't know if you can see me highlighting it?

13     A.      Uh-huh.

14     Q.      And this is on page 3?

15     A.      Yes.

16     Q.      So Sergeant Taylor was

17   interviewed, and in sum and substance, he

18   stated he did mark the job, but he was never

19   approached by the complainant, and he does

20   not know who Mr. Donnelly is.

21             Sergeant Taylor added that the

22   reason why he did not activate his body worn

23   camera at the time at the location was

24   because there was a large demonstration going

25   on, which we do not record.

Page 247

```
 1              Lauren Foster
 2         So just to that question of
 3  Sergeant Taylor's assertion that large
 4  demonstrations are not recorded per NYPD
 5  policy presumably; is that accurate?
 6              MS. JACOBS:  Objection, outside
 7      the scope.
 8      A.    There are officers who are
 9  confused about the application of camera, and
10  that seems to be the case here.
11              MR. MARQUEZ:  I will concede, it
12      is outside the scope.
13      Q.    I just wanted to lay that
14  question down so I could ask you the
15  follow-up, which is, this sort of testimony
16  is presented to an investigator in the course
17  of their investigation does not appear to be,
18  you know, related directly to the allegation
19  that started the investigation, but could an
20  IAB investigator hear that testimony and, you
21  know, would it warrant opening another log
22  for failing to activate body worn camera
23  footage, for instance?
24      A.    No.
25              MS. JACOBS:  Objection.
```

Page 248

1          Lauren Foster

2          You can answer.

3     Q.     Why not?

4     A.     Not necessarily.

5          In this case -- in a case like

6     this, where the reason provided, while

7     misguided, perhaps is not unreasonable.

8          This is more of a teaching

9     moment, if you will, that an internal

10    investigation regarding serious misconduct or

11    corruption, so.

12    Q.     Okay.

13         MS. MARQUEZ:  And then just one

14         more on this, so it will be Foster 15.

15         I apologize, because I appear to have

16         misplaced some of these.

17              It was produced as

18         OAG-0324767-771, okay?

19              And yes, this is Foster 15.  I am

20         going to share my screen again.

21              (Whereupon, a document was marked

22         as Foster Exhibit 15 for identification

23         as of this date.)

24    Q.      I just represent to you that this

25    is an internal document to the CCRB relating

Page 249

Lauren Foster

```
 1                  Lauren Foster
 2    to their own investigation of the same
 3    allegations by Jason Donnelly.
 4                  I just want to focus, after I
 5    scroll through this, to communications
 6    documented by the CCRB investigator of
 7    communications with the IAB investigator, but
 8    just want to make sure you see the document
 9    first.
10                  Were you able to look through all
11    of that?
12        A.    No.
13        Q.    At least see that this is a
14    document that is five pages long?
15        A.    Yes.
16        Q.    I am going to focus your
17    attention to page -- this last page,
18    actually.
19                  So I am just going to read the
20    entry at 586, called PBMS investigations at a
21    particular phone number Sergeant Wong
22    answered.
23                  Sergeant Wong confirmed that she
24    has not been able to identify the subject
25    sergeant, even after her recent GO 15
```

Lauren Foster

1
2    interview of Sergeant Taylor and Sergeant
3    Taylor's driver.
4              What is -- I just want to pause
5    there.
6              What is a GO 15 interview?
7         A.      It is the same thing as PG
8    206-13.  It is the authority under which the
9    ability to conduct the compelled testimony
10   exists.  And prior to the creation of 206-13,
11   it was known as a GO 15, so they are
12   interchangeable.
13        Q.      Okay.  Thank you.
14             And then I am to going skip down
15   to this last sentence.  Sergeant Wong advised
16   that the rosters of possible sergeants
17   attached to her case file total approximately
18   300 sergeants.  It was unclear how the
19   universe came to be narrowed to that number.
20             So one of my questions to you is,
21   you know, how does an IAB investigator go
22   about narrowing the potential sergeants who
23   might be involved in a particular incident?
24        A.      First, I would -- Sergeant Wong
25   is not an IAB investigator.

Page 251

```
 1                    Lauren Foster
 2        Q.      Is she an investigation unit
 3   investigator --
 4        A.      Yes.
 5        Q.      -- who is trained by the IAB?
 6        A.      Not trained.
 7                Well, they do receive some
 8   training, yes.
 9        Q.      Okay.  I guess independent of
10   Sergeant Wong, how would an IAB investigator
11   go about narrowing the field?
12        A.      From what to what?
13        Q.      From the 300 sergeants to the
14   possible sergeant who is alleged to have used
15   force against this individual?
16        A.      It depends on what the -- what
17   description is available of the potential
18   subject sergeant.
19        Q.      Okay.  And just if you could
20   remind me, for investigation units -- and I
21   know this has changed perhaps, since at the
22   time of the protests, though investigation
23   unit investigators were supervised by who?
24        A.      They fell under chief of
25   department investigation review section, and
```

Page 252

1              Lauren Foster
2   then in some capacity, IAB had oversight.
3       Q.     What was the extent of that
4   oversight?
5       A.     They conducted steering assigned
6   case.
7              They did not sign off on their
8   cases.
9       Q.     Okay.  So I just want to move to
10  a different part of this log by the CCRB
11  investigator at the top of page 5.
12             MS. JACOBS:  Lillian?
13             MS. MARQUEZ:  Yes.
14             MS. JACOBS:  That is fine.
15             But I do want to say, I am going
16        to put in front of her, or have
17        available to her, the ICMT case
18        regarding Jason Donnelly.
19             It is on my computer, but it is
20        something that she reviewed, so.
21             MS. MARQUEZ:  I think -- is that
22        the one that we just looked at?
23             MS. JACOBS:  No, it is much
24        longer than that.
25             MS. MARQUEZ:  Okay.  I will take

Page 253

1                    Lauren Foster
2          this opportunity to call for production,
3          to the extent it hasn't been produced,
4          because I think the one I showed is the
5          one I have.
6                    MS. JACOBS:  I just ask that it
7          be put in writing.
8                    MS. MARQUEZ:  Okay.  Understood.
9          Q.       So just to focus on these
10  entries, Captain, 580, 581 and 582, there is
11  reference to a Sergeant Hewitson, who
12  ultimately was indicted as the subject
13  officer in the CCRB case.
14                   So my question just to you -- and
15  I understand that this is an investigation,
16  unit investigator, but do IAB investigators
17  interface with CCRB investigators in the same
18  way as this document is suggesting that CCRB
19  investigators interfaced with investigation
20  unit investigators?
21                   MS. JACOBS:  Objection, outside
22          the scope.
23          A.       Yeah, I am not sure.
24                   This seems to be a lot of
25  interfacing.

Page 254

1          Lauren Foster
2          I don't know -- I don't know how
3    common this level of interaction is.
4          Q.     Okay.  Would, for instance, an
5    IAB investigator know if a CCRB investigator
6    has identified a subject officer?
7          A.     Not necessarily, unless the CCRB
8    investigator shared that information.
9          Q.     Okay.  So it is not as a matter
10   of course that the two are sharing
11   information in that way?
12         A.     No.
13         Q.     Okay.  And I guess as an
14   extension of that, would they -- as a matter
15   of protocol, or in practice, an IAB
16   investigator let a CCRB investigator know
17   when they are going to do an interview of a
18   particular officer?
19         A.     No, that wouldn't be.
20         Q.     Or the vice versa, are you aware
21   of CCRB investigators giving heads up in that
22   way to the IAB?
23         A.     That would not be common.
24         Q.     Okay.  Okay.  Is there any
25   other -- can you describe the general sense

```
 1                    Lauren Foster
 2   of or level of cooperation between the two
 3   when they are both investigating the same
 4   incident?
 5             MS. JACOBS:  Objection.
 6             You can answer.
 7      A.      They are pretty independent of
 8   each other.
 9      Q.      Is there any level of cooperation
10   that is like baseline, that always happens
11   where again, they are both investigating the
12   same incident?
13             MS. JACOBS:  Objection.
14             You can answer.
15      A.      Not that I know.
16      Q.      Okay.
17             MS. MARQUEZ:  I am going to take
18      this down, and just move to a few -- it
19      is going to be jumping around a little
20      bit, 'cause I am closing up, so forgive
21      me.  I am going to jump topics.
22      Q.      But just for IAB complaints,
23   what -- is there a statute of limitations
24   that applies to IAB investigations of
25   administrative violations?
```