# EXHIBIT E

## Annex II: Letter from the NYPD to Human Rights Watch



**POLICE DEPARTMENT**
NEW YORK, N.Y. 10038-1497

ERNEST F. HART
DEPUTY COMMISSIONER, LEGAL MATTERS

September 16, 2020

Ida Sawyer
Acting Crisis and Conflict Director
Human Rights Watch
350 5th Avenue, 34th Floor
New York, NY 10118

Re: Police Response to June 4 Protest in Mott Haven

Dear Director Sawyer:

On behalf of Police Commissioner Shea, I am writing in response to your letter, dated July 31, 2020, stating that Human Rights Watch is investigating the police response to a demonstration, which was entitled "Fk the Police," on June 4, 2020 in the Mott Haven section of the Bronx.

While Commissioner Shea cannot answer every question that was posed in your initial letter, I will refer you to his submitted written statement and testimony before a hearing conducted by the New York State Attorney General on June 22, 2020, which focused on police and public interactions during the George Floyd protests and the subsequent rioting that took place. His prepared statement and testimony can be found here: https://ag.ny.gov/nypd-protest-response#video. Many of the questions that you posed were answered during that hour-long exchange with Attorney General James.

Fundamental to a free society is the right to communicate one's ideas and the NYPD believes in the importance of the First Amendment and the public's right to peacefully express themselves. Regardless of the subject, it is the responsibility of the NYPD to secure, support and facilitate a safe environment for lawful and peaceful dissent. New York City endured unprecedented turmoil during the early days of the George Floyd demonstrations. Unfortunately, some in attendance took advantage of the mostly peaceful public demonstrations, protests, and marches; using them as opportunities to engage in acts of vandalism, arson, property destruction, looting, and most notably, targeted attacks against police officers. As police officers worked to restore order, they were attacked with bricks, knives, trash cans, vehicles, glass bottles bricks, masses of concrete, and homemade incendiary devices like Molotov cocktails. Department vehicles were set ablaze and precinct houses were attacked. Nearly 400 NYPD personnel were injured during the protests and subsequent riots. 65% of our injured personnel had to be treated at a hospital.

I believe any inquiry into the performance of NYPD officers during this challenging time must also account for this reality. Given the mission of your organization, the rights of these human beings, members of the NYPD, should not be discounted simply because they wore a uniform and dedicated their lives to public service.

Following several consecutive nights of violence, Mayor de Blasio declared a state of emergency within the City on June 1, 2020. On June 3, 2020, a city-wide curfew was imposed by Executive Order

COURTESY • PROFESSIONALISM • RESPECT
www.nyc.gov/nypd

Misc. 243-46 (04-19)

(No. 119). The executive order stated that from June 3rd to June 8th, between the hours of 8PM to 5AM, no persons or vehicles may be in public. The order did not apply to first responders, medical professionals, and those performing or traveling to and from "essential work" as defined by the Empire State Development Corporation (ESDC).

As noted above, on June 4, 2020, the Bronx played host to a "Fk the Police Rally." Social media advertisements, postings, and invites to the event encouraged killing and injuring police officers, looting, resisting arrest, and fire-bombing police vehicles. Local gangs were encouraged on social media to converge on the event site to attack police and destroy police, city-owned, and privately-owned property. A firearm was recovered from a member of the "Mac Balla" gang just prior to the start of the rally, and a car stop of three individuals who were en route to the rally yielded hammers, fireworks, and lighter fluid. Simply put, the intent of this assembly was to engage in violence and inflict harm. More pointedly, given the name of the rally and its stated intentions, its purpose was to direct violence at a class of individuals based on their profession.

Upon 8PM on June 4, 2020, the demonstration that took place in Mott Haven was unlawful under the Mayor's Executive Order establishing a curfew. After 8PM, officers policing this demonstration observed individuals who were not essential workers in public. That observation provided officers with probable cause to take, at a minimum, enforcement for Administrative Code Section 3-108, Violating a Mayoral Executive Order, a "B" misdemeanor. Their detention was lawful. Individuals who engaged in other unlawful activity, in addition to violating the curfew, were charged accordingly.

Your letter alleges that legal observers deployed by the National Lawyers Guild (NLG) were "targeted" for arrest. I strongly disagree with this allegation. As noted above, the Mayor's curfew order did not apply to first responders, medical professionals, and those performing or traveling to and from "essential work." Notably, the Order stated the following:

> "Essential Work' is work performed by essential business or entities as defined by the Empire State Development Corporation."

Contrary to your letter, as well as assertions made by NLG in the media, legal observers did not enjoy an exemption as essential workers. As you probably know, very often the observers are not attorneys – but even if they were, this type of activity was not exempted under guidance issued by ESDC at the time. I note the following from such guidance:

> "Lawyers may continue to perform all work necessary for any service so long as it is performed remotely. Any in-person work presence shall be limited to work only in support of essential businesses or services; however, even work in support of an essential business or service should be conducted as remotely as possible. (Emphasis Added)"

Officers policing this demonstration who observed individuals who were not essential workers in public, including legal observers, during the hours of 8PM to 5AM, had probable cause to take enforcement for Administrative Code Section 3-108. Plainly, there cannot be a legal observer of a protest that itself is illegal. Such arrest and detention, however, are not a commentary on the value of the NLG Legal Observers, legal support for protestors, or the Department's position on the program. Over the years, we have found the presence of legal observers at protests and demonstrations to be constructive.

Lastly, your letter references witness accounts who state that that they were held for prolonged periods in Department custody. During the Floyd protests, the NYPD experienced an exceptional state of affairs. By June 4th, over 2,500 individuals were taken into Department custody in connection with the protests. The climate during the protests made it impossible for officers to issue summonses on the street

safely. These arrests needed to be processed in a Department facility, which at the beginning of these protests took place in the Mass Arrest Processing Center (MAPC) at 1 Police Plaza.

While certainly not optimal, such prolonged detentions were judicially scrutinized and found legally permissible hours before the "Fk the Police" rally on June 4th. In response to a writ of habeas corpus issued in *People of the State of New York ex rel. Corey Stoughton on Behalf of Lazeme Harris et al. v. Shea*, claiming that the Department was "slow-rolling" arrests of protests, New York Supreme Court held that the elongated detentions were reasonable given the pressures the Department was facing from the demonstrations as well as restrictions from the COVID-19 pandemic while at the same time literally deploying nearly all of its officers to address the civil unrest. Nevertheless, despite this ruling, the Department instituted a number of measures in an attempt to expedite the release of detainees for the remaining days of the protests.

Thank you for your letter and for your inquiry.

Sincerely,

Ernest F. Hart
**Deputy Commissioner,**
**Legal Matters**