


June 5, 2023

**Via ECF**

The Honorable Gabriel W. Gorenstein
United States Magistrate Judge
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

    Re:    *In re: New York City Policing During Summer 2020 Demonstrations*,
             No. 20-CV-8924
             *This Filing is Related to All Cases*

Dear Judge Gorenstein:

      We represent the Plaintiffs in *Payne v. de Blasio* and write respectfully on behalf of all non-stayed consolidated cases to oppose Defendants' protective order to preclude the depositions of former Mayor Bill de Blasio and former Police Commissioner Dermot Shea. Both former Mayor de Blasio and former Commissioner Shea were extensively and personally involved in the direction and assessment of the NYPD's response to the Protests. Each has "unique first-hand knowledge" of whether, to what extent, and upon what basis they directed, ratified, or knowingly failed to stop the unconstitutional protest policing at the core of Plaintiffs' claims, and that information cannot be obtained through other means. Accordingly, Plaintiffs can establish "exceptional circumstances" to justify their depositions.

      Plaintiffs note that this briefing takes place prior to the deposition of former Chief of Department Terence Monahan—a two-day deposition scheduled to take place on Wednesday, June 7 and Friday, June 9—and, at least as of 10 p.m. today, prior to the production of former Commissioner Shea's text messages.[1] Because that evidence may narrow the scope of these depositions or obviate the need for one or both, Plaintiffs request the court extend the reply deadline to June 12, the next business day after the close of the Monahan deposition. Defendants consent to Plaintiffs' request for this extension. In the interim, Plaintiffs renew their prior request for two full days each to depose Mr. Blasio and Mr. Shea. ECF No. 876-2 at 2-3.

### Procedural Background

      On February 8, 2023, Defendants moved for a protective order pursuant to Fed. R. Civ. P. 26(c)(1)(D) seeking to preclude the depositions of Mr. de Blasio and Mr. Shea arguing that any

---

[1] Defendants have agreed to produce Commissioner Shea's responsive text messages by the end of June 5, 2023, but have not provided a timeline on the production of texts from Mayor de Blasio.

information they could provide in a deposition could be obtained from other deponents. ECF No. 841 at 6-7. Plaintiffs opposed the motion, arguing that both de Blasio and Shea have "unique personal knowledge" that other witnesses lack. ECF No. 855 at 4-6. The Court held a discovery conference to address the issues raised in the letters on March 6, 2023, and ordered supplemental briefing on the protective order as to Mr. Shea and Mr. de Blasio. Tr. at 64-66 (Mar. 6, 2023). After the parties agreed to a brief adjournment of the supplemental briefing, the Court ordered the parties to submit supplemental letters and replies by June 5 and June 8, respectively, regarding Defendants' motion for a protective order. ECF No. 977.

## Argument

In the Second Circuit, a plaintiff seeking the deposition of a high-ranking official must establish *either* "that the official has unique first-hand knowledge related to the litigated claims *or* that the necessary information cannot be obtained through other, less burdensome or intrusive means." *New York v. United States Dep't of Com.*, 339 F. Supp. 3d 144, 151 (S.D.N.Y. 2018) (quoting *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013)). Thus, "where a court finds that the relevant government official 'has unique first-hand knowledge related to the litigated claims, it need not make a separate finding that the necessary information cannot be obtained through other, less burdensome or intrusive means.'" *In re Terrorist Attacks on Sept. 11, 2001*, 2020 WL 8611024, at *14 (S.D.N.Y. Aug. 27, 2020) (*In re Terrorist Attacks*) (ordering depositions of high-ranking Saudi Arabian government officials), *objections overruled*, 2021 WL 2227204 (S.D.N.Y. June 2, 2021), at *14 (quoting *Dep't of Commerce*, 339 F. Supp. 3d at 152)).

To the extent courts consider at all whether the information at issue can be obtained through less burdensome means, they "accord[] less weigh[t] to whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's government duties." *Terrorist Attacks*, 2020 WL 8611024, at *14. Because both Mr. de Blasio and Mr. Shea are not "current high-ranking official[s]," requiring them to each sit for a deposition would not interfere with any "greater duties" or otherwise unduly burden them. *See Herrera v. New York City Dep't of Educ.*, 2022 WL 2719186, at *2 (S.D.N.Y. June 15, 2022) (citing *Lederman*, 731 F.3d at 203) (denying motion to quash deposition of former Mayor de Blasio); *see New York v. United States Dep't of Com.*, 2018 WL 5260467, at *1 (S.D.N.Y. Aug. 17, 2018) (rejecting argument that compelling a *sitting* high-ranking DOJ official "to sit for a single deposition would meaningfully 'hinder' him 'from performing his numerous important duties,' let alone 'unduly burden' him or the [DOJ]").

**A. Testimony from Mr. de Blasio and Mr. Shea Is Related to the Extent to Which These Policymakers Approved or Ratified the NYPD's Unconstitutional Protest Policing Practices.**

Plaintiffs bring these cases, in part, under a *Monell* theory of liability, and former Mayor de Blasio and Commissioner Shea possess unique, first-hand personal knowledge that goes to the core of those claims. Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), a city may be held liable for the unconstitutional acts of its officials in at least three circumstances. First, a policymaker may directly perpetrate or order the constitutional deprivation or enact a policy that

compels a subordinate to do so. *See Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir. 2004). Second, municipal liability exists where "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Id.* at 126 (citing *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870–71 (2d Cir. 1992) ("stating that municipal liability lies where the subordinate's misconduct is 'so manifest as to imply the constructive acquiescence of senior policy-making officials'")). "[B]ecause a single action on a policymaker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability." *Amnesty Am.*, 361 F.3d at 127. And third, apart from "effectively ratifying" through acquiescence, a policymaker may directly "ratif[y] the subordinates' actions." *Id.* at 126. The Mayor and the Police Commissioner are authorized policymakers under the New York City Charter. *See Soto v. Schembri*, 960 F. Supp. 751, 759 (S.D.N.Y. 1997) ("The New York City Charter vests final policymaking authority in the Mayor . . . ."); *Walton v. Safir*, 122 F. Supp. 2d 466, 477 (S.D.N.Y. 2000) (noting that Charter also vests authority in the Police Commissioner as "chief executive of the Police Department" with "cognizance and control of the government, administration, disposition, and discipline of the [police] department").

The discovery record to date supports Plaintiffs' allegations in their complaints: Former Mayor de Blasio and Commissioner Shea were personally involved in the daily direction and assessment of the NYPD's response to the protests and deliberately and repeatedly failed to take steps to prevent the NYPD from using excessive force and improper arrests against non-violent protesters again and again throughout the George Floyd protests. *See, e.g.*, ECF No. 957, Payne Second Am. Compl. ¶¶ 4, 19, 54, 59, 73-78, 87-95, 223-228; Dkt. 21-cv-322, ECF No. 51, People's Am. Compl. ¶¶ 21, 22, 55, 98-103, 387. These are textbook *Monell* claims. *See Amnesty Am.* 361 F.3d at 113 (providing as examples of circumstances giving rise to municipal liability through the approval or ratification of policymaker include where policymakers are "aware that [a city] policy may be unconstitutionally applied by inadequately trained employees but the city consciously chooses not to train them, or where the city's official policy on the reasonable use of force in arrests is valid, but the city's actual practice is to use excessive force.") *Id.* at 126-27. Thus, the extent of Mayor de Blasio's and/or Commissioner Shea's awareness of and personal involvement in approving or ratifying the unconstitutional conduct of the NYPD in policing the George Floyd protest is of central importance to Plaintiffs' claims.

### B. Mr. de Blasio Has Unique First-Hand Knowledge of His Personal Participation in Approving and Ratifying the NYPD's Policies, Practices, Strategy, and Tactics in Policing the George Floyd Protests.

Plaintiffs have developed a record to date indicating that as early as the first George Floyd protest in New York City, Mayor de Blasio was consistently informed about the NYPD's unconstitutional protest policing strategies and tactics and, at times during the protests, personally approved them. However, certain facts concerning the full extent of Mayor de Blasio's personal awareness and approval or ratification of the NYPD's conduct remain within his unique, firsthand knowledge because other witnesses did not possess the necessary knowledge or presented conflicting testimony that Mr. de Blasio's testimony can resolve.

As an example, on May 28, protesters at Union Square were met with an aggressive police response beginning in the late afternoon and continuing into the evening. At 9:48 p.m. that evening, Mayor de Blasio wrote to First Deputy Mayor Dean Fuleihan, who served as the 30(b)(6) witness for the Office of the Mayor, "███████████████████████████████████████████████." Ex. A.[2] The then-Mayor further wrote: "███████████████████████████████████████████████████████████████████████████" *Id.* (emphasis in original). Mr. Fuleihan, regarding this email exchange, testified that he did not know or did not recall which witnesses the Mayor heard from, what they reported to him, what "assurances" the Mayor received from the NYPD hierarchy, or how those first-hand reports might have conflicted with them. Ex. B, Fuleihan Dep. 72:5-73:10.

Mr. Fuleihan also testified that as of May 31, 2020, Mayor de Blasio personally "believed it would be necessary to investigate the NYPD's response to the protests that had occurred" up to that time. Ex. B, Fuleihan Dep. 329:15-20. But, while Mr. Fuleihan testified that the Mayor's call for an investigation was based on allegations of misconduct, he could not recall any specifics. *Id.* at 329:22-330:6. Given the 30(b)(6) witness's general understanding but admitted lack of knowledge on specifics, Mr. de Blasio's testimony here is important for establishing when his knowledge of misconduct in the NYPD's protest policing began and what steps, if any, he took toward addressing his concerns.

Similarly, the discovery record is clear that Mayor de Blasio received information concerning the NYPD's strategies, tactics, and their execution before, during, and after the June 4 protest at Mott Haven. The record is also clear that the Mayor approved of at least some of those strategies and tactics. At a June 5 press availability, the Mayor stated that he personally reviewed intelligence purportedly showing that the protest organizers intended to encourage violence and that "individuals appeared [at the protests] with tools of violence, with the intent to do violence in that community." Ex. C, at 9. The Mayor then stated that the NYPD response at Mott Haven intervened to stop violence "effectively," using a plan that Commissioner Shea described moments later as executed "nearly flawlessly." *Id.* The Mayor did not contemporaneously correct or question Commissioner Shea's description. At his June 7, 2020, press availability, Mayor de Blasio was asked by a reporter, "Did you approve the tactics that we saw at the NYPD using, starting on June 3rd and June 4th? That's the use of batons, more sort of pushing at protests, that kind of thing? Did you approve those?" *See* Ex. D, at 14. The Mayor responded, "I approved the broad strategies and sometimes very specific choices." *Id.* at 15.

But no witness from the Mayor's office has been able to testify as to what plan Mayor de Blasio knew of, which parts he approved, or to what the extent the NYPD's execution of the plan was consistent with the Mayor's understanding. The 30(b)(6) witness for the Office of the Mayor testified that, "what happened that night [June 4], no, that was not a plan I was aware of." Ex. B, Fuleihan Dep. 220:18-221:4. During the Mott Haven protest on June 4, Mr. Fuleihan also

---

[2] As this document was produced with a "confidentiality" designation, it is not appended to this letter. Plaintiffs are emailing to Chambers the seven exhibits to this brief that were produced with such designations (Exhibits A, E, H, I, J, L, M). Per the Court's Practice 2(E), Defendants must now make an application to seal those documents.

confirmed that de Blasio communicated with senior officials in the NYPD where no other staff from the Mayor's office was present or, if an electronic communication, copied. *See, e.g.*, Ex. B, Fuleihan Dep. 242:7-243:16 (reviewing a June 4 email between Shea and de Blasio referencing a call between them that evening, when asked "And, were you on that call?," Fuleihan responded, "I don't recall," and when asked, "Do you know what was said on that call?," Fuleihan responded, "I do not."). Plaintiffs therefore must question the former Mayor about his understanding of the information he received in those conversations to understand which strategies and tactics he approved, ratified, or rejected and when and how he made those decisions at Mott Haven and other protests. *See, e.g.*, Ex. B, Fuleihan Dep. 291:22-292:2 ("Q. Is there an example of a tactic that the NYPD wanted to use that the Mayor's Office said, 'No, you cannot.'? . . . A. I don't recall. I don't recall.")

Commissioner Shea also communicated directly with Mayor de Blasio on June 4 as reports of police use of force at Mott Haven were circulating on the internet. In the thick of the mass arrest at Mott Haven, Mayor de Blasio called Commissioner Shea at 8:20 p.m., but Mr. Fuleihan was not knowledgeable about the contents of that call. At 8:59 p.m., Shea e-mailed de Blasio directly, not including anyone else on the email, to say that the Mott Haven protest "███ ████████████████████████████████████████████" Ex. E, at DEF-E_000052961 (emphasis added). During a press conference the following morning, Mayor de Blasio said, "I've seen with my own eyes the materials that were meant to encourage violence. And then, individuals appeared with tools of violence, with the intent to do violence in that community." Ex. C, at 9. However, Mr. Fuleihan did not recall whether the Mayor's office ever asked for or received evidence to substantiate Commissioner Shea's report or other NYPD intelligence. Ex. B, Fuleihan Dep. 245:15-248:2.

And in fact, protest monitors from the Mayor's office relayed their contemporaneous observations of a peaceful protest that was met with police use of force and mass arrest for purported curfew violations without adequate notice or opportunity to disperse. Ex. F, Carrion Dep. 186:13-20; 203:13-204:10. Ultimately, only Mr. de Blasio can testify to his contemporaneous understanding of the reports he received and how they informed his decision-making at the time in approving or ratifying the police response at Mott Haven or elsewhere. The above are just a few examples that illustrate the relevant unique, firsthand evidence that Mr. de Blasio possesses in this case, given other witnesses' lack of knowledge and/or conflicting evidence in the record. The Court should permit Plaintiffs to depose Mr. de Blasio to fill these gaps in the discovery record concerning his personal role in approving or ratifying the NYPD's response to the George Floyd protests.

### C. Mr. Shea Has Unique, First-Hand Knowledge Concerning His Approval or Ratification of the NYPD's Policing of the George Floyd Protests and also Information that Informed Both His and the Mayor's Decisionmaking at that Time.

Former Commissioner Shea has unique, first-hand knowledge concerning the full extent of his awareness ogf and direct involvement in the NYPD's planning and execution of responses to the policing of the George Floyd protests.

Commissioner Shea was personally and directly involved in the direction and assessment of the NYPD's response to the George Floyd protests from the start. *See, e.g.*, Ex. G, at 2 (giving status updates on protests, including May 28 and May 29 protests); Ex. H, at DEF_E_PD_00083211 (May 30, 9:25 a.m. e-mail from Shea to Mullane, stating, "███████████████████████████████████████████████████████████████████████████████████████████████████ *emphasis in original*). By May 29, Mayor de Blasio and Commissioner Shea were well aware of the widespread use of force at protests, including through an e-mail sent by Mayor de Blasio exclusively to Commissioner Shea forwarding a reporter's tweet noting at the May 29 protest at Barclay's Center, "████████████████████████████████████████████████████████████████████████████" Ex. I. Early the following day, Shea requested from an NYPD official a list of █████████████████████████████████████████████████████████████████████████████ Ex. J. Notably, Shea did not ask for any information on injured protesters or use-of-force incidents. *See id.*

As discussed with respect to Mayor de Blasio, Commissioner Shea provided information directly to the Mayor through one-on-one communications, including communications on June 4 that caused the Mayor to discount the firsthand observations of his own staff. *See, e.g.*, Ex. E, at DEF-E_000052961 – DEF-E_000052962 (June 4, 2020 email between only Shea and de Blasio where Mayor de Blasio writes at 8:20 p.m., "████████████████████████████████████████████████████████████████████████████████████ Mr. Shea's personal understanding of the policing plan at Mott Haven that he characterized as having been executed "nearly flawlessly," Ex. C, at 9, go to establishing whether and to what extent the mass arrest and use of force at Mott Haven were pre-planned. Only Mr. Shea can testify to his own efforts to ensure that the intelligence was validated before providing it to the Mayor and whether and to what extent the NYPD's fact-gathering provided reasonable cause for the Department's highest-ranked policymaker to approve or ratify the use of force against peaceful protesters that night. *See* Ex. F, Carrion Dep. 186:13-20; 203:13-204:10.

Commissioner Shea was the primary—and sometimes sole—liaison between the NYPD and the Mayor during the George Floyd protests. *See* Ex. K, Galati 30(b)(6) Dep. Rough Tr. 196:16-197:13 ("I would say in general, from the police department, communications with the mayor's office go through the police commissioner"). Commissioner Shea frequently and directly communicated NYPD intelligence and protest planning and strategy to the mayor, sometimes in real time. *See, e.g.*, Ex. E, at DEF-E_000052961 – DEF-E_000052962 (June 4, 2020, email between only Shea and de Blasio); Ex. L (June 28, 2020, email between de Blasio and Shea where Shea sent de Blasio ██████████████████████████████████); Ex. M (July 22, 2020, email between only Shea and de Blasio regarding ███████████████████

Defendants have argued in prior briefing on this issue that Commissioner Shea has no unique, first-hand knowledge relevant to this case not possessed by the other high-ranking, senior NYPD officials who would be produced in this case. *See* ECF No. 841 at 7. But no NYPD witness to date has testified that they had first-hand knowledge of whether and to what extent the NYPD kept the Mayor aware of their protest policing strategies, tactics, and intelligence

gathering. *See* Ex. K, Galati 30(b)(6) Dep. Rough Tr. 196:16-197:13; *see, e.g., id.* at 196:5-15 (Chief Galati testifying that he "was not interacting with the mayor's office").

\* \* \* \*

Plaintiffs therefore respectfully request that the Court deny Defendants' motion for a protective order and allow the depositions of former Mayor de Blasio and former Commissioner Shea to proceed, with two days for each deposition.

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION FOUNDATION

By: *s/Perry Grossman*
Perry Grossman
Jessica Perry
Molly K. Biklen
Daniel R. Lambright
Robert Hodgson
Veronica Salama
Lisa Laplace
Christopher T. Dunn
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
pgrossman@nyclu.org
jperry@nyclu.org
mbiklen@nyclu.org
dlambright@nyclu.org
rhodgson@nyclu.org
llaplace@nyclu.org
cdunn@nyclu.org

THE LEGAL AID SOCIETY

By: *s/ Corey Stoughton*
Corey Stoughton
Jennvine Wong
Rigodis Appling
Paula Garcia-Salazar
Margaret Hadley
199 Water Street
New York, NY 10038
(212) 577-3367
cstoughton@legal-aid.org
jwong@legal-aid.org
rappling@legal-aid.org
pgarciasalazar@legal-aid.org
mhadley@legal-aid.org

*Attorneys for the Payne Plaintiffs*

Cc: All counsel of record by ECF