**SYLVIA O. HINDS-RADIX**
*Corporation Counsel*

**THE CITY OF NEW YORK**
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK , NEW YORK 10007

JOSEPH M. HIRAOKA, JR.
*Senior Counsel*
jhiraoka@law.nyc.gov
Phone: (212) 356-2413
Fax: (212) 356-1148

June 8, 2023

**BY Electronic Case Filing**
Honorable Gabriel W. Gorenstein
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

>   In Re: *New York City Policing During Summer 2020 Demonstrations*
>   No. 20 Civ. 8924 (CM) (GWG)
>   <u>This filing is related to all cases</u>

Your Honor:

   I am a Senior Counsel in the Office of the Honorable Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, and I am among counsel for the defense in the above-referenced matter. Defendants write in response to plaintiffs' request for defendants to re-produce Chief Jeffrey Maddrey for deposition and pay associated costs, or in the alternative, to produce the closed disciplinary records at issue and answer relevant interrogatories under oath. (Docket No. 1042). Defendants respectfully submit that paying the cost to re-produce Chief Maddrey for a second deposition is not warranted. As such, defendants respectfully request that plaintiffs' application be denied.

## BACKGROUND

   As set forth in plaintiffs' motion, Chief Maddrey appeared at his deposition on May 26, 2023. Near the start of the deposition, Chief Maddrey testified that he had been deposed in 2018 in a still pending civil lawsuit. (Excerpt of the Deposition of Chief Jeffrey Maddrey, taken on May 26, 2023, annexed hereto as Exhibit A, at 6:21-7:23). He further testified that he had been accused of lying under oath in 2017 in an NYPD internal IAB investigation involving Ms. Foster that arose out of the same circumstances as in her open civil lawsuit. (Exhibit A at 10:25-11:24).

   Defending counsel then informed plaintiffs that the attorney who represents Chief Maddrey

in the open civil case (which also relates to the internal investigation) intended to be present later in the deposition, and requested that plaintiffs wait to ask questions related to those two matters until his private counsel appeared at 2:30 or 3:00 p.m., and plaintiffs agreed to do so. (Exhibit A at 11:25-13:15).

When plaintiffs were almost prepared to question Chief Maddrey about his open civil case and an open CCRB case later in the deposition, defending counsel informed plaintiffs of a communication from Chief Maddrey's private attorney that he would not be able to appear at the deposition. (Exhibit A at 237:2-238:7).  Defending counsel then advised plaintiffs that Chief Maddrey could not answer questions about his open civil case and CCRB case without his private counsel being present.  However, counsel assured plaintiffs that Chief Maddrey would return to answer questions about his open cases with his private counsel present, but would not pay the court reporter fee for the further deposition. (Exhibit A at  238:7-239:6).

Plaintiffs then sought testimony on matters unrelated to Chief Maddrey's open cases or closed IAB case. (Exhibit A at  242:19-263:13).  When plaintiffs returned to that line of examination regarding his open cases and closed IAB case, defending counsel also did not allow Chief Maddrey to testify about the underlying facts of the closed IAB case that is related to the open civil case as well as his open CCRB case as his private counsel was not  present. (Exhibit A at  263:14-266:14,  267:24-270:17,  275:7-277:15,  278:9-281:6).   However, the undersigned reiterated that Chief Maddrey would be produced again when his private counsel could be present. (Exhibit A at 284:6-18).

On May 30, 2023, the next business day, defendants e-mailed plaintiffs to request available dates to complete Chief Maddrey's deposition.  Plaintiffs responded by e-mail the same day to inquire whether defendants had changed their position on paying the court reporter fee for Chief Maddrey's continued deposition.  Plaintiffs then sent another e-mail on May 31, 2023, and advised that in lieu of having Chief Maddrey appear for a continued deposition, plaintiffs would accept production of the full closed IAB filer, and have Chief Maddrey provide responses to interrogatories about that file.

Defendants responded by e-mail on June 1, 2023, to advise that defendants were conferring with Chief Maddrey's private counsel about the two options plaintiffs provided.  Defendants also requested that Chief Maddrey's deposition transcript be provided forthwith to help determine whether defendants would re-produce Chief Maddrey for a deposition or consider plaintiffs' newly proposed option of producing the full closed IAB file and have Chief Maddrey respond to interrogatories regarding that file.

Plaintiffs filed the instant motion on June 6, 2023, without having provided Chief Maddrey's deposition transcript. Rather, plaintiffs chose to send the deposition transcript on June 6 *after* they filed the instant motion, and before defendants had the opportunity to discuss Chief Maddrey's deposition transcript with his private counsel.

Also, defendants advised plaintiffs by e-mail today that they agree to pay the court reporter fee for Chief Maddrey's second deposition as requested by plaintiffs.  However, plaintiffs refused to withdraw their motion.

## ARGUMENT

### I.   The Court Should Deny Plaintiff's Request to Compel Defendants to Pay the Costs for Chief Maddrey's Further Deposition and Making the Instant Motion

As Chief Maddrey's deposition transcript shows, and as plaintiffs acknowledge in the instant motion, defendants have already agreed to re-produce Chief Maddrey to complete his deposition with his private counsel present.  Defendants sought the deposition transcript in order to confer with private counsel to determine the best course of action based on the options presented by plaintiffs.  Plaintiffs would not make that simple accommodation until after making their motion.  In any event, defendants have already agreed to pay for the one hour of deposition testimony plaintiffs seek in order to complete Chief Maddrey's deposition.   Had plaintiffs provided the transcript as requested, defendants believe their application would not have been necessary.  Accordingly, the Court should deny the portion of plaintiffs' request to pay the court reporter fee for Chief Maddrey's second deposition as moot.

With respect to plaintiffs' request for fees associated with making the instant motion to compel, Rule 37 establishes a mechanism under which reasonable fees can be recovered if a motion to compel is granted.  See Fed. R. Civ. P. 37.  However, Rule 37 is also clear that a party cannot recover fees when "the nondisclosure was 'substantially justified' or 'other circumstances make an award of expenses unjust.'" See Underdog Trucking, L.L.C. v. Verizon Servs. Corp., 273 F.R.D. 372, 377 (S.D.N.Y. 2011)(citing Fed. R. Civ. P. 37(a)(5)(A)(ii), (iii)).   In turn, reasonableness of a party's conduct is determined by whether there was genuine dispute or if reasonable people could differ as to the appropriateness of the contested action." Id. (citing Comprehensive Habilitation Servs. v. Commerce Funding Corp., 240 F.R.D. 78, 87 (S.D.N.Y. 2006) (denying sanctions motion where opposing party raised valid relevancy objections to document requests)).

Here, the New York City Law Department cannot represent a deponent on matters involving an open investigation as that presents a conflict of interest.  In addition, as Chief Maddrey has retained private counsel to represent his interests in the open CCRB investigation and civil lawsuit, this Office, under the codes of ethics, were obligated to have his private counsel present for such examination.  Defending counsel's refusal to allow Chief Maddrey to answer questions about these matters without the benefit of his private counsel was substantially justified.  Allowing Chief Maddrey to answer questions about open cases without his private counsel present could have led to him giving potentially incriminating statements without the benefit of his private counsel being present, and potentially jeopardizing his defense in those open cases.  In fact, there have been other depositions in the consolidated cases where union counsel had to appear at depositions to represent an officer because this Office declined representation in full or because there was an open investigation.

The fact that his private counsel could not eventually appear at the deposition was beyond this Office's control.  Indeed, he represented that he could be available, and we have no reason to believe he did not make best efforts before advising us that he could not appear.  In addition, as previously stated, defendants voluntarily agreed several times on the record to re-produce Chief

Maddrey to complete his deposition with his private counsel present so that his interests could be fully protected.

Under such circumstances, defendants' refusal to allow Chief Maddrey to answer questions about the underlying facts of his open cases when his private counsel was not present was substantially justified.

Moreover, the questions posed about Chief Maddrey's open cases had nothing to do with his involvement in any protest cases, and were not germane in any manner. As such, while plaintiffs wanted to examine him on these matters, they were unrelated to his participation in any Summer 2020 protests. To be clear, although defendants do not believe that in-depth examination was needed on these matters, which were unrelated to the Summer 2020 Protests, defendants never sought to prevent him from being re-produced for that limited purpose. Rather, he just had to have proper legal representation.

The crux of the dispute though is plaintiffs' complaint that defendants would not agree to pay for the additional hour of deposition testimony. Defendants were provided with different options from plaintiffs to obtain this testimony: 1) Chief Maddrey's return to sit for another hour of deposition; or 2) production of the full IAB file involving Tabatha Foster (which is unrelated to the Summer 2020 Protests), and Chief Maddrey's responses to interrogatories about that file. As defendants did not represent Chief Maddrey on these matters, it was reasonable for us to confer with his private counsel before reaching a decision. Ultimately, it was decided, in consultation with his private counsel, that Chief Maddrey would have a second sitting and defendants would agree to pay for the cost of the court reporter for the one hour. Defendants are working with Chief Maddrey's private counsel and will include plaintiffs to schedule a mutually available date.

## CONCLUSION

For the reasons stated herein, defendants respectfully request that the Court: 1) deny plaintiffs' request to have defendants pay the court reporter costs for Chief Maddrey's second deposition as that request is moot; and 2) deny plaintiffs' request for fees under Rule 37.

Thank you for your time and consideration.

Respectfully submitted,

*Joseph M. Hiraoka, Jr.  s/*

Joseph M. Hiraoka, Jr.
*Senior Counsel*
Special Federal Litigation Division

Encl.
cc:   ALL COUNSEL (*via* ECF)

EXHIBIT A

**Page 1**

1
2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------------X
      PEOPLE OF THE STATE OF NEW YORK, by Letitia
4    James, Attorney General of the State of New
      York,
5
                       PLAINTIFF,
6
7      -against-        Case No.:
                    21-cv-322(CM)(GWG)
8
9
      CITY OF NEW YORK, MAYOR BILL DE BLASIO,
10   POLICE COMMISSIONER DERMOT F. SHEA, and
      CHIEF OF DEPARTMENT TERENCE A. MONAHAN,
11
                     DEFENDANTS.
12   ------------------------------------------X
13
14            DATE:  MAY 26, 2023
15            TIME:  10:32 A.M
16
17        REMOTE DEPOSITION of CHIEF JEFFREY
18   MADDREY, taken by the Plaintiffs, pursuant to
19   a Notice and to the Federal Rules of Civil
20   Procedure, held via video teleconference,
21   before Diane Buchanan, a Notary Public of the
22   State of New York.
23
24
25

Page 2

```
 1
 2      A P P E A R A N C E S:
 3
        NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
 4      Attorneys for the Plaintiffs
             28 Liberty Street
 5           New York, New York 10005
             BY:  LILLIAN MARQUEZ, ESQ.
 6
 7
        NEW YORK CITY LAW DEPARTMENT
 8      Corporation Counsel of the City of New York
             100 Church Street
 9           New York, New York 10007
             BY:  JOSEPH HIRAOKA, ESQ.
10
11      ALSO PRESENT:  Alicia Calzada, Esq.
                       Veronica Salama, Esq.
12                     Aymen Aboushi-Rolan, Esq.
                       Elizabeth Moehle, Esq.
13                     Laura Mulle
14                  *          *          *
15
16
17
18
19
20
21
22
23
24
25
```

1

2          F E D E R A L   S T I P U L A T I O N S

3

4

5          IT IS HEREBY STIPULATED AND AGREED by and

6     between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an unsigned

14    copy of the deposition may be used with the

15    same force and effect as if signed by the

16    witness, 30 days after service of the

17    original & 1 copy of same upon counsel for

18    the witness.

19

20            IT IS FURTHER STIPULATED AND AGREED

21    that all objections except as to form, are

22    reserved to the time of trial.

23

24            *       *       *       *

25

1       CHIEF JEFFREY MADDREY

2   People of State of New York in one

3   litigation.  As you may have had this

4   experience before the court reporter you just

5   met will be recording your answers and I'm

6   also, as I mentioned, recording this on the

7   Zoom software that we have here.  Do you

8   understand, Chief, that you just took an oath

9   to tell the truth?

10      A.   Yes, I do.  Yes, I do.

11      Q.   Okay.  And though we are on Zoom

12  conference call, that is the same oath you

13  would take had you testified in court today?

14      A.   Yes.

15      Q.   Have you ever been deposed before?

16      A.   Yes.

17      Q.   When?

18      A.   The last time I believe was in

19  2018.

20      Q.   What was the circumstance?

21      A.   It was -- I was being sued.  I was

22  being sued civilly in 2018.

23      Q.   Is that suit over or is that

24  ongoing?

25      A.   It's still ongoing.

Page 7

1          CHIEF JEFFREY MADDREY

2          Q.    What is the case name?

3          A.    It's Tabatha Foster versus Jeffrey

4    Maddrey.

5          Q.    Do you happen to know the case site

6    or what court it's in?

7          A.    No, I'm not aware.

8          Q.    Or if it's state court versus

9    federal court?

10          A.    State court.

11          Q.    Okay.  And what does that case

12    pertain to?

13          A.    It's a defamation of character

14    suit.

15          Q.    And so, sorry, you are being sued

16    for defamation of character?

17          A.    Yes.

18          Q.    Any other claims?

19          A.    That's the only claim.

20          Q.    Okay.  You mentioned that you, I

21    guess, you were a defendant and so you were

22    just testifying pursuant to Notice there?

23          A.    Yes.

24          Q.    And any other times that you have

25    been deposed before?

1          CHIEF JEFFREY MADDREY

2    don't know exactly who.  And the City of

3    New York.

4          Q.    Okay.  Any other times you recall

5    being deposed?

6          A.    No.  I think I was deposed one

7    other time, it was an extremely long time

8    ago.  I don't remember.

9          Q.    Was it while you were in NYPD?

10         A.    Yes.

11         Q.    Or in your capacity as a member of

12   the service?

13         A.    Yes.

14         Q.    More than ten years ago would you

15   say?

16         A.    Yes.

17         Q.    Any other times?

18         A.    The best of my recollection, that's

19   it.

20         Q.    Okay.  And I'm guessing you also

21   testified in criminal cases?

22         A.    Yes.

23         Q.    How many times would you say?

24         A.    At least ten times.

25         Q.    Have you ever been accused of lying

Page 11

CHIEF JEFFREY MADDREY

2   under oath?

3        A.    Yes.

4        Q.    When?

5        A.    In 2017.

6        Q.    In connection with what?

7        A.    In connection with a case in the

8   police department.

9        Q.    Internal investigation?

10        A.    Internal investigation, yes.

11        Q.    Involving who?

12        A.    The same case with Tabatha Foster.

13        Q.    When you say the same case, is it

14   arising from the same circumstances or

15   involving that civil suit that's in court

16   right now?

17        A.    Arising from the same

18   circumstances.

19        Q.    Involving, I'm not sure what her

20   rank was, Tabatha Foster?

21        A.    She was a police officer.

22        Q.    PO.   Okay.   And was Officer Foster

23   a subordinate of yours or outside of your

24   command?

25             MR. HIRAOKA:   Ms. Marquez, I just

1       CHIEF JEFFREY MADDREY

2   want to step in for a moment.  The case

3   is still open and I'm not representing

4   Chief Maddrey with respect to that open

5   case.  The attorney who is representing

6   him should be available later this

7   afternoon.  So, I have no problems with

8   you asking questions about that, but I

9   will not allow him to answer questions

10  while his attorney is not present.  If

11  you could wait to ask questions about

12  open cases until 2:30, 3 o'clock, when

13  his private attorney could log in, that

14  would be appreciated.

15      Q.   My understanding, Chief, that was

16  closed under plea, that particular

17  investigation; is that right?

18      A.   Yes.

19      MS. MARQUEZ:  Joe, do you still

20  want me to wait, I could do that later,

21  but my understanding that it's closed.

22      MR. HIRAOKA:  That would be

23  appreciated.  Because there could be

24  some overlap and so forth to prevent

25  future problems when his attorney who

Page 13

1       CHIEF JEFFREY MADDREY

2       represents him on the case that is still

3       open, since the facts they may overlap I

4       think to prevent any problems if you

5       could wait until his private attorney is

6       available and logs in, that would be

7       better.  I would very much appreciate

8       it.

9           MS. MARQUEZ:  What time are they

10      joining?

11          MR. HIRAOKA:  He should be

12      available between 2:30 and 3:00.

13          MS. MARQUEZ:  Okay.

14      Q.   I will hold off on those questions,

15      Chief.

16          Aside from that instance of that

17      accusation in you said 2017?

18      A.   Yes, I was deposed in 2017, 2017.

19      Q.   You were deposed, sir?

20      A.   Yes, I was deposed in 2017.  Yes.

21      Q.   And I just want to make sure, I

22      will get into the questions a little more

23      then.  I just wanted to make sure I was about

24      to ask a follow-up about depositions versus

25      interviews with IAB.  Because I will make a

1    CHIEF JEFFREY MADDREY

2        MS. MARQUEZ:  Joe, I thought his

3    counsel would have been here by now.  I

4    thought you mentioned 2:30.

5        MR. HIRAOKA:  Yes, I think I got a

6    communication earlier, I don't know if

7    he's actually going to be able to make

8    it today.  So, what I could suggest

9    right now and of course you are allowed

10   to ask him other questions.  If he's not

11   available today I will bring him back

12   Chief Maddrey to finish the deposition.

13       MS. MARQUEZ:  We can go off the

14   record for this.  It is 4:33.

15       (Whereupon, an off-the-record

16   discussion was held.)

17       MS. MARQUEZ:  On the record again

18   at 5:02 p.m.  There was an open question

19   about when we were closing out the last

20   break about an open I believe it's a

21   CCRB and so, Joe, we asked you to check

22   to see because you said that his

23   personal attorney, you could put it on

24   the record whatever you explained to me

25   and then I can respond.

1   CHIEF JEFFREY MADDREY

2       MR. HIRAOKA:  So, for the record, I

3   found out that Chief Maddrey's personal

4   attorney regarding his open cases will

5   not be able to appear today partly

6   because it's the holiday weekend and his

7   office is closed.  Given the fact that

8   Chief Maddrey does have an open CCRB

9   case and he does have an open civil

10  lawsuit that is related to a closed IAB

11  investigation.  Since his Counsel is not

12  here for those two cases, I will not

13  allow him to answer any questions

14  regarding the open CCRB case or the open

15  civil case involving a closed IAB

16  lawsuit.  With respect to the closed IAB

17  lawsuit, like I said I have no problem

18  with you asking general things, like the

19  general allegations and the outcome and

20  any penalty, but because his private

21  attorney is not here, I will not allow

22  him to answer questions regarding the

23  underlying facts until his personal

24  attorney is here.  As I indicated on the

25  record, Chief Maddrey will come back to

1      CHIEF JEFFREY MADDREY

2      answer those questions with his private

3      counsel present and we can go forward

4      and also we would not consent to pay for

5      the deposition transcript for when Chief

6      Maddrey returns.

7          MS. MARQUEZ:  As I was informing

8      Counsel off the record, and will now

9      state on the record, it was already put

10     on the record that at the start of the

11     deposition, you know, you represented to

12     me that his private counsel would be on

13     this afternoon, he did not come on in

14     the afternoon and you had asked me to

15     hold off asking questions based on that

16     representation and I did.  And now it's

17     past business hours and I don't feel

18     it's right to call the Court at this

19     hour to ask for a ruling on this, but

20     it's not appropriate to direct a witness

21     to not answer questions regarding an

22     open CCRB case, which is not anything

23     that is protected, as I understand it,

24     there's no privilege there, there's no

25     other basis I'm aware of that you can

1    CHIEF JEFFREY MADDREY

2    late this afternoon that I was informed

3    he would not be available.  So, I have

4    no control over that.  I apologize.   At

5    this point I would ask you continue with

6    your deposition and any future disputes

7    we have regarding fees and so forth will

8    be taken up at the appropriate time.  I

9    have no problem with you finishing up

10   the questions you have right now.  And

11   like I said we will bring Chief Maddrey

12   back regarding any questions you have

13   regarding any open cases he may have.

14       MS. MARQUEZ:  When were you alerted

15   private counsel would not be available?

16       MR. HIRAOKA:  That was

17   approximately, approximately 3:45 this

18   afternoon, approximately.

19       Q.   Let's start with the rest of the

20   questions.  Chief, we went over a number of

21   incidents, I remember one more protest you

22   said you were at June 3rd, Cadman Plaza,

23   correct?

24       A.   Yes.

25       Q.   Were you the incident commander

1          CHIEF JEFFREY MADDREY

2     there?

3          A.    Yes.

4          Q.    And did you issue any orders to

5     disburse?

6          A.    Yes.

7          Q.    And what were the words you used,

8     or if you used a device, what device did you

9     use?

10         A.    I believe we used a LRAD, I don't

11    remember exactly.

12         Q.    You don't remember the message used

13    on the LRAD?

14         A.    We used the mega phone.  We were --

15    it was the curfew was in effect.  We had a

16    large group trying to cross over the bridge

17    and we wouldn't allow them because of the

18    curfew.  We were only allowing essential

19    workers, people who worked there or people

20    there for different reasons, for safety

21    reasons.  There was a lot of looting in

22    Manhattan.  And there was a significant

23    group, we told them they couldn't come over

24    and we gave them, you know, we gave them

25    messages, they weren't allowed to cross the

1         CHIEF JEFFREY MADDREY

2  bridge.   And they were to leave.

3      Q.    Do you recall testifying or

4  providing a statement to the Department of

5  Investigation saying that you didn't really

6  get a lot of direction from the Department as

7  to the curfew order?

8      A.    I didn't get a lot of direction, I

9  mean when the curfew was put in place, you

10  know, we were told we were going to give

11  ample warnings to people that we just weren't

12  going to immediately arrest people.  And that

13  it was to help with public safety pretty

14  much, that was it.  We knew we had to give

15  ample warnings and it was all about keeping

16  people safe and keeping the community safe

17  and property safe.

18      Q.    And you previously had stated that

19  you ordered a line preventing people onto the

20  bridge; is that right?

21      A.    Yes.

22      Q.    Do you remember any other order as

23  incident commander for that night?

24      A.    No.  We were just -- we were just

25  not allowing people to cross the bridge

1          CHIEF JEFFREY MADDREY

2     without, you know, being an essential worker

3     or someone who lived in Manhattan or someone

4     who had some proper cause.  The crowd started

5     getting very unruly and hostile toward us,

6     getting, getting in the officers' faces and I

7     believe a couple of bottles were thrown as

8     well.  And we were standing there for quite a

9     while.  A significant amount of time.  It

10    wasn't a short amount of time we were

11    standing there with them.  And then at some

12    point I think somebody attacked one of the

13    officers and we made a few arrests.  The

14    crowd started walking, you know, garbage cans

15    were being thrown.  We were walking behind

16    them as they were walking.

17          Q.    Were you walking?

18          A.    Yes, I was walking.

19          Q.    Sorry, where were you walking?  I

20    was unclear.

21          A.    Walking down Cadman Plaza in the

22    direction toward Atlantic Avenue.  The group

23    split up, the bulk of the group went down

24    into the Fulton Street Mall area which I

25    walked maybe two blocks, three blocks with

1          CHIEF  JEFFREY  MADDREY

2     them  and  then  we  stopped  and  turned  around

3     and  went  back  to  the  bridge.

4          Q.    Were  you  aware  of  an  allegation  a

5     protester  was  hit  over  the  head  with  a  baton?

6          A.    Not  that  I  recall.

7          Q.    And  that  he  had  to  get  stitches  to

8     his  head?

9          A.    Not  that  I'm  aware  of.

10          Q.    Were  you  aware  of  an  incident  that

11     a  journalist  was  pushed  by  an  officer  to  the

12     ground?

13          A.    No.   I'm  not  personally  aware.

14          Q.    Were  you  aware  of  an  protesters  who

15     testified  to  the  AG  office  during  a  public

16     hearing  she  was  pushed  with  somebody  by  an

17     officer  with  their  baton?

18          A.    I'm  not  aware  of  that  incident.

19          Q.    Did  you  hand  out  flex  cuffs  to  any

20     officers  that  evening?

21          A.    I  don't  hand  out  flex  cuffs,  no.

22          Q.    Were  you  aware  whether  officers

23     were  using  flex  cuffs  that  evening  to

24     apprehend  individuals?

25          A.    I  was  not  personally  aware,  no.

Page 247

1          CHIEF JEFFREY MADDREY

2          Q.    Did you help arrest anybody?

3          A.    No.

4          Q.    Were you injured yourself?

5          A.    No.

6          Q.    Did you do any After Action

7    Reports?

8          A.    No.

9          Q.    I'm including -- sorry, did you do

10   any assessments verbally or discuss orally

11   what happened at the protest in an effort to

12   assess your performance?

13         A.    Not that I recall.

14         Q.    Did anybody else ask you to?

15         A.    That night?

16         Q.    At any point during or after the

17   protests?

18         A.    No.

19         Q.    Was SRG at Cadman Plaza on June

20   30th?

21         A.    I think they were, yes.

22         Q.    Okay.  And do you know if patrol

23   officers did have flex cuffs where they would

24   have acquired those?

25         A.    No.

1      CHIEF JEFFREY MADDREY

2      Q.   Do you know if police officers at

3  that point were trained in the use of flex

4  cuffs?

5      A.   I would have to look at individual

6  officers, individual officers go for

7  different kinds of training.  So, there are

8  patrol officers who are trained with flex

9  cuffs, there are officers used to be in the

10  task force.  I would have to look at

11  individuals.

12      Q.   Okay.  If there were arrests for

13  unlawful assembly that night it would have

14  been you as incident commander who authorized

15  those?

16      A.   I don't recall what the charges

17  were.  There were some for disorderly conduct

18  and curfew violations.  I don't know all of

19  the charges.

20      Q.   Did you if there were arrests for

21  curfew violations would it have been at your

22  order that those arrests could happen?

23      A.   Yes.

24      Q.   And same question for disorderly

25  conduct?

1       CHIEF JEFFREY MADDREY

2       A.   Not necessarily, no.

3       Q.   Was there any other charges that

4    would have required your authorization as

5    incident commander to make the arrest for?

6       A.   No.

7       Q.   Okay.  So not unlawful assembly?

8       A.   No.

9       Q.   And, sorry, just to make sure that

10   was clear.  It doesn't require an incident

11   commanders authorization to arrest for

12   unlawful assembly; is that the testimony?

13      A.   No, it does not require instant

14   commanders authorizations.  There are other

15   supervisors they authorize.

16      Q.   Do you know if unlawful assembly

17   was prepared at Cadman Plaza June 3, 2020?

18      A.   Not that I'm aware of.

19      Q.   Just shifting gears.  In any of

20   your positions at NYPD have you ever played a

21   role in the discipline proceedings against a

22   member of service?

23      A.   Ever played a role in the

24   discipline proceedings?  I don't quite

25   understand your question.

1          CHIEF JEFFREY MADDREY

2          Q.   Sure, let me break it down.

3     Possible roles, have you ever recommended

4     discipline against a member of service?

5          A.   Yes.

6          Q.   In what instances, and it can be

7     general, it doesn't have to be a particular

8     person?

9          A.   I had officers who -- I had one

10    officer who was charged with assault, assault

11    of his girlfriend.  I had one officer who

12    some kind of dispute we had to discipline

13    that officer.  I had an officer who

14    unlawfully fired a round and had discipline

15    proceeded on that officer.  So, you know, a

16    few throughout my career.

17         Q.   So for the girlfriend, what was the

18    recommended discipline?

19         A.   Termination.

20         Q.   Why -- that's obviously a severe

21    discipline, yes?

22         A.   Yes.

23         Q.   And why did you recommend that

24    level of discipline?

25         A.   I don't -- I'm trying to recall.

1              CHIEF JEFFREY MADDREY

2     It's been over ten years.  So, I'm just

3     trying to recall.  It was when I investigated

4     it was immediate situation.  It was a young

5     girl she had glasses, she took her glasses

6     off her eye was basically shattered, so we

7     recommend harsh.

8          Q.   Because you take domestic violence

9     disputes seriously?

10         A.   Yes.

11         Q.   And then what did you recommend for

12    the officers who you said unlawfully fired a

13    round from their service recommend?

14         A.   I did not recommend anything.   I

15    just recommended charges and specs.

16         Q.   What happened to that case?

17         A.   I don't know the outcome.

18         Q.   Why did you recommend charges and

19    specs?

20         A.   Just the normal thing, recommend

21    charges and specifications that way the

22    department advocate would, would make the

23    determination from there.

24         Q.   Is that because of misuse of a

25    service weapon is a serious offense?

1           CHIEF JEFFREY MADDREY

2       A.   Yes.

3       Q.   Okay.  So, just going back to the

4   roles, have you ever approved discipline?

5       A.   I mean in-house discipline, yes.

6       Q.   Is that meaning like command

7   discipline?

8       A.   Yes, I have approved command

9   discipline.  Approved modifications, I

10  approved suspensions.

11      Q.   And that's modifications of

12  assignment?

13      A.   Yes, we remove the officers shield

14  and weapon.

15      Q.   Okay.  And did you either recommend

16  or approve discipline for any officers with

17  regards to misconduct at the protests?

18      A.   No.

19      Q.   Did you track discipline of your

20  subordinates in any of your roles in NYPD?

21      A.   No.

22      Q.   Or monitor?

23      A.   No.

24      Q.   Did you receive training with

25  respect to insure subordinates are complying

1          CHIEF JEFFREY MADDREY

2    with NYPD policy?

3          A.    Yes.

4          Q.    What is that training that you

5    received?

6          A.    I mean when you get promoted to

7    sergeant, captain you go through a different

8    training school and just your role as

9    supervisor.

10         Q.    What did they teach you about those

11   responsibilities specifically?

12         A.    Teach you about being responsibile

13   for monitoring your personnel, teach you how

14   to do administrative functions.  Things of

15   that nature.

16         Q.    You are saying in general.  Is

17   there anything specific that they say you

18   have to do to insure subordinates are

19   complying with NYPD policing?

20         A.    You monitor your subordinates and

21   make sure they follow-up.  I don't know

22   specifically what you say, you monitor their

23   actions and make sure they are in compliance

24   with the policy.

25         Q.    For instance, do you have anybody

Page 254

CHIEF JEFFREY MADDREY

1
2    under your command gather all of the TRI's

3    for those in your command and look at them in

4    a set point quarterly or weekly or monthly or

5    something along those lines?  I'm trying to

6    see if there's anything protocol-wise you had

7    in place?

8         A.   Yes.  And at the borough level when

9    I was borough commander all of the TRIs

10   forward down to the borough and one of the

11   inspectors, I don't recall which inspector,

12   had that assignment, but they will review the

13   TRI Reports for compliance.

14        Q.   For compliance in the sense they

15   were filled out?

16        A.   They were filled out, yes.

17        Q.   Did they look at anything else like

18   patterns emerging across TRI's?

19        A.   Not that I'm aware of.

20        Q.   Did they report out to you anything

21   specific?

22        A.   If it was egregious they report to

23   me.  Nothing that I recall at this moment.

24        Q.   Do you remember receiving any

25   report out regarding the TRI's during the

1           CHIEF JEFFREY MADDREY

2    protests?

3           A.    No.

4           Q.    Did you review body worn camera

5    footage during that time to determine whether

6    those under your command were complying with

7    NYPD policy at the protests?

8           A.    Very little.

9           Q.    Which body work did you review?

10          A.    I don't remember.  It's been three

11   years.  I don't remember.

12          Q.    Is there any mechanism to determine

13   when an officer should have turned on their

14   body worn camera but did not?

15          A.    Only we have a unit, we have a body

16   worn camera unit that reviews officers

17   cameras to make sure they are in compliance

18   also at the precinct level, supervisor's

19   integrity control officers they are also

20   tasked to review body worn calm.

21          Q.    Are they able to determine when

22   they review the body worn that exists are

23   they able to determine when somebody should

24   have activated and created footage but did

25   not?

1    CHIEF JEFFREY MADDREY

2    A.    There's ways they can determine

3    that, but I don't know any specific

4    instances.

5    Q.    Do they report that out?

6    A.    Well, yes.

7    Q.    Did you receive that report in any

8    of your supervisor positions?

9    A.    No.

10   Q.    Why not?

11        MR. HIRAOKA:  Objection.  You can

12   answer.

13   A.    I just didn't receive it.  It

14   wasn't one of my supervisory functions.  I

15   had other supervisors in my borough who did

16   that.

17   Q.    So who would have received that,

18   what rank or what position?

19   A.    It was our inspectors at the

20   precinct.

21   Q.    Inspector level you mean rank?

22   A.    Yes, inspector.

23   Q.    Okay.  They were asked for, those

24   reports?

25   A.    They basically have oversight of

1                CHIEF JEFFREY MADDREY

2    those reports.

3         Q.   Were you ever an inspector?

4         A.   Yes.

5         Q.   So as an inspector did you see

6    those kinds of reports?

7         A.   By the time they created those

8    reports I was no longer inspector.

9         Q.   Meaning at a certain point the NYPD

10   did not review for failures to activate body

11   warn?

12        A.   Body worn cameras didn't come into

13   existence until 2015, 2016.  I was already a

14   chief at that point.

15        Q.   Got it.  Did you ever receive

16   training on the importance of giving truthful

17   statements to IAB inspectors?

18        A.   Yes.

19        Q.   What does that entail?

20        A.   Just past the Department rules, we

21   will be truthful at the time we give our

22   statements under oath.

23        Q.   Okay.  So, it's just based on the

24   general requirement that everybody in the

25   service knows and follows the NYPD patrol

Page 258

1              CHIEF  JEFFREY  MADDREY

2    guide?

3         A.    Yes.

4         Q.    Okay.   And have you ever been

5    involved in the decision to promote officers

6    to the rank of lieutenant or above.

7         A.     The regular lieutenant is a test.

8    The rank of sergeant and captain are tests.

9         Q.    And so, sorry, you said lieutenant

10   sergeant and --

11        A.    Captain.

12        Q.    What about ranks above that?

13        A.    Yes.

14        Q.    And what is involved in that

15   process?

16        A.    I mean we will sit down and review

17   who, what supervisors are out there are doing

18   a good job, what positions they are in.

19   Multitude of things we look at.   And then we

20   make a determination whether they are to be

21   promoted and if they are going to take on a

22   new assignment or stay active in their

23   current role.

24        Q.    When you say we decide, who is with

25   you?

1       CHIEF JEFFREY MADDREY

2       A.    Currently I will seek guidance from

3   some of my other bureau chiefs to see who is

4   doing a good job.  If I notice someone is

5   doing a good job I will ask opinions, find

6   out, look at some of their work, look at

7   their performance and then we will go from

8   there.

9       Q.    Okay.  And is there a predetermined

10  person who would decide, for instance, who

11  gets promoted to patrol, like a patrol

12  borough command, do you have to be one rank

13  higher?  How does that work as to who can do

14  the promotion deciding?

15      A.    I'm not understand exactly what you

16  are asking.

17      Q.    So let's start with you.  Who have

18  you approved for promotion?  And it doesn't

19  have to be, again, specific to name, but more

20  like rank?

21      A.    At this current position?

22      Q.    No, whenever you decided anybody

23  above captain, if you could give any example?

24      A.    I mean it's only really been in the

25  last year I have recommended deputy

1          CHIEF JEFFREY MADDREY

2    inspector.  You have to be in the higher

3    levels to make these decisions.  So, it's

4    been within the last year I recommended

5    members to various ranks that would be

6    inspector, inspector, chief.

7          Q.    But you don't have to be chief of

8    the department to be able to determine if a

9    deputy inspector goes to inspector, correct?

10         A.    You have other chiefs who can make

11   the recommendation.  They can say chief

12   deputy inspector so and so is performing at a

13   high level.  They have been in the position

14   for a while.  And we will take a look at the

15   overall, how long they have been doing it and

16   make a decision.  I make recommendations,

17   ultimately the police commissioner has the

18   last say.

19         Q.    So the police commissioner has to

20   approve every promotion anything above

21   captain; is that accurate?

22         A.    Every promotion in the department.

23         Q.    Every promotion no matter what

24   level?

25         A.    Has to be approved by the police

1          CHIEF JEFFREY MADDREY

2   commissioner, yes.

3          Q.   I understood you to say earlier

4   lieutenant, sergeant, captain is just a test?

5          A.   Yes, those are service tests.

6   Discretionary promotions have to be approved.

7          Q.   Discretionary promotions are

8   anything above the rank of captain?

9          A.   Yes, and also detective and other

10  lower ranks as well.

11         Q.   Definitely the commissioner?

12         A.   Yes.

13         Q.   And then is a disciplinary charge

14  ever disqualifying in a promotion?

15         A.   Sometimes yes.

16         Q.   When?

17         A.   It depends on the circumstances,

18  depends on the time.

19         Q.   Do you receive any training or is

20  there any policy that might dictate how to

21  consider a candidates disciplinary history?

22         A.   No.

23         Q.   Okay.  So it's just, when you say

24  those factors that play into the

25  determination whether a disciplinary charge

1              CHIEF JEFFREY MADDREY

2    is disqualifying, that's on a case-by-case

3    basis?

4         A.   Yes.

5         Q.   Determined by, I guess, ultimately

6    the police commissioner?

7         A.   Ultimately the police commissioner,

8    yes.

9         Q.   So just to go briefly over the

10   CCRBs.  You said everything that was opened

11   against you was unsubstantiated as it relates

12   to the protests?

13        A.   To my knowledge, yes.

14        Q.   Okay.  And what informs your

15   knowledge?

16        A.   I received, I received letters from

17   CCRB stating that they were closed, that they

18   were unsubstantiated and closed.

19        Q.   Did you receive a letter from CCRB

20   saying as much for the case we sort of

21   discussed on May 30th at the Brooklyn Bridge?

22        A.   I sat through CCRB hearings for

23   approximately four days in the summer of

24   2021.  There was multiple charges and to my

25   knowledge I received letters back on all of

1           CHIEF JEFFREY MADDREY

2      them saying they were all unsubstantiated.

3           Q.   Do you know if anybody else, any

4      other subject officer from that case against

5      whom charges and specifications were filed?

6           A.   I don't understand your question.

7           Q.   So you were one subject officer,

8      but there were others in that case, May 30th,

9      Brooklyn Bridge.  Are you aware of the status

10     of the case as to those officers?

11          A.   No, I don't know who received

12     complaints on May 30th at the Brooklyn

13     Bridge, so I can't provide an answer.

14          Q.   Okay.  And then you had also

15     testified earlier to a closed case involving

16     -- my apologies.  Tabatha Foster?

17          A.   Yes, Foster.

18          Q.   And the allegations there were that

19     you got into a physical altercation with Ms.

20     Foster?

21          A.   Yes.

22          Q.   And that you failed to report that

23     altercation to patrol supervisor?

24          A.   Yes.

25          Q.   And that you intended to impede the

```
1              CHIEF JEFFREY MADDREY
2    investigation by lying about the fact that
3    Ms. Foster brandished her service weapon?
4          A.    I never lied about that.
5          Q.    That was an allegation?
6          A.    The allegation I impeded the
7    investigation by -- I impeded the
8    investigation by telling them that, you know,
9    I was police chief and everything was okay.
10         Q.    And did Ms. Foster actually
11   brandish a weapon?
12              MR. HIRAOKA:  No.  Don't answer
13         that.
14              MS. MARQUEZ:  That's a closed case.
15              MR. HIRAOKA:  As I stated on the
16         record beforehand, I'm not going to
17         allow him to answer questions regarding
18         the substance of the case.  The
19         allegations and the outcome is fine.
20         And I'm not saying you can't ask them
21         ever, I'm just saying I will not allow
22         him to answer without his private
23         counsel present.
24              MS. MARQUEZ:  You said the
25         opposite.  If it's closed you will not
```

1          CHIEF JEFFREY MADDREY

2     direct him not to answer.

3          Q.   This is a closed case, Chief?

4          A.   Yes, it is.

5               MR. HIRAOKA:  What was your comment

6     to me?

7               MS. MARQUEZ:  I was going to ask

8     another question.

9          Q.   You entered a plea in that case,

10    yes?

11         A.   Yes.

12         Q.   The 45 days loss of vacation days;

13    is that right?

14         A.   Yes.

15         Q.   And that is a large amount, no?

16         A.   Yes.

17         Q.   And why did you plead?

18              MR. HIRAOKA:  No.  Don't answer

19    that.  Okay.  So, again, Counsel at this

20    point, like I said, I'm allowing him to

21    answer question.  It's a closed,

22    regarding closed allegation, regarding

23    the allegations and the outcome as for

24    any subjective matters regarding the IAB

25    case there's an open civil case, I will

1          CHIEF JEFFREY MADDREY

2     not allow him to answer further

3     questions regarding the IAB case without

4     his counsel present.

5          MS. MARQUEZ:  Do you have case law

6     allowing him not to answer questions?

7          MR. HIRAOKA:  Rule 30.  This will

8     be made at that base.  He does have a

9     private counsel.  I'm not saying he

10    can't answer them ever.  I'm not

11    allowing him to answer without his

12    personal counsel present.

13         MS. MARQUEZ:  I'm marking it for a

14    ruling.

15         Q.   You did plead to 45 days loss of

16    vacation, correct?

17         A.   Yes.

18         Q.   And I believe you won't stop me

19    from asking at least what the ultimate

20    charges that you pled to were?

21         A.   Yes, it was physical altercation,

22    failure to report and impede an

23    investigation.

24         Q.   So to all three?

25         A.   Yes.

1        CHIEF JEFFREY MADDREY

2        Q.    Okay.  If I told you it had been

3   reported that the last charge was dropped

4   from the ultimate findings, is that an

5   accurate reporting?

6        A.    When you say the last charge out of

7   the three I just spoke about?

8        Q.    The attempt to impede investigation

9   was dropped?

10       A.    The three3 charges I just named,

11  impeded investigation, physical altercation

12  and failure to report were the three charges.

13       Q.    Okay.  So your recollection is that

14  you pled, I guess, guilty to those three?

15       A.    Yes.

16       Q.    You didn't undergo a trial because

17  of that plea, correct?

18       A.    Yes.

19            MS. MARQUEZ:  And I'm going call

20       for production of that file.

21            MR. HIRAOKA:  Put all requests in

22       writing and we will take it under

23       advisement.

24       Q.    Was Tabatha Foster ever subject to

25  investigation with respect to that same

1          CHIEF JEFFREY MADDREY

2    investigation?

3          MR. HIRAOKA:  Don't answer.  Same

4          objection.  I will not let him answer

5          questions.

6          MS. MARQUEZ:  That is a

7          third-party, Tabatha Foster.

8          MR. HIRAOKA:  It still involves, it

9          still involves the IAB investigation

10         that is closed and the open civil case,

11         so same objection.

12         Q.  Is Tabatha Foster currently a

13    member of service?

14         MR. HIRAOKA:  Same objection.

15         Don't answer.

16         MS. MARQUEZ:  Seriously, that's a

17         matter of public record.

18         MR. HIRAOKA:  If it's a matter of

19         public record you can get it.

20         MS. MARQUEZ:  So you are actually

21         directing him not to answer something

22         that should be in the public record?

23         You are directing a person not to answer

24         something in federal, in a deposition

25         that I could potentially go online and

Page 269

1        CHIEF JEFFREY MADDREY

2    look up?

3        MR. HIRAOKA:  Again, this involves,

4    this is related to his open civil suit.

5    All right, so I'm not going allow him to

6    answer any other questions other than

7    what he agreed to without his private

8    counsel present.

9        MS. MARQUEZ:  Are you going to stop

10    me from asking him if he has an open

11    civil suit?

12        MR. HIRAOKA:  You did.

13        MS. MARQUEZ:  That's an open civil

14    suit.  I think we can agree not all

15    questions about open civil suit that it

16    falls within whatever you are defining

17    as something you could tell him to stop

18    responding to.

19        MR. HIRAOKA:  We will go question

20    by question basis.  So, you know, you

21    can continue with your questioning.  I'm

22    not obstructing your questioning.  I'm

23    just saying there are certain parameters

24    that I will not let him go beyond and

25    answer the questions because he does not

1          CHIEF JEFFREY MADDREY

2     have private counsel present here.

3     Q.    Did Ms. Foster retire?

4     A.    Yes.

5     Q.    When did she retire?

6          MR. HIRAOKA:   That's it.   Lillian,

7     no more about her retirement.

8          MS. MARQUEZ:   I want to get it on

9     the record, you are directing the

10    witness not to answer my question?

11         MR. HIRAOKA:   That particular

12    question, yes.

13         MS. MARQUEZ:   Okay.

14    Q.    Did you consider the altercation

15    akin to domestic violence incident?

16         MR. HIRAOKA:   Don't answer.   Same

17    objection.

18    Q.    You are taking the advise of

19    counsel, Chief, on all of these; is that

20    correct?

21    A.    He's the lawyer, yes.

22    Q.    Okay.   Just want to make sure.

23         And is it not a violation of NYPD

24    policy that pulling out a service weapon,

25    otherwise known as brandishing a service

1          CHIEF JEFFREY MADDREY

2     liable?

3          A.    No.

4          Q.    Anywhere the City of New York was

5     found to be liable?

6          A.    No.

7          Q.    Okay.  Are you aware of a CCRB

8     investigation into an incident November 24,

9     2021 where you are alleged to have abused

10    your authority by releasing from custody

11    retired NYPD Officer Kruythoff?

12         A.    Yes.

13         Q.    And what is the status of that

14    CCRB?

15         A.    I just -- I decided that I'm going

16    to take this to trial.  So, I'm going to

17    trial.

18              MR. HIRAOKA:  It's still open?

19              THE WITNESS:  It's open, yes.

20         Q.    Are you aware of reporting that

21    Commissioner Sewell has reprimanded you in

22    connection with this matter by proposing a

23    loss of ten vacation days?

24         A.    Yes.

25         Q.    And do you know that to be

Page 276

```
 1              CHIEF JEFFREY MADDREY
 2    accurate?
 3         A.    It was proposed to me and I did not
 4    accept the findings.
 5         Q.    And how was it proposed to you?
 6         MR. HIRAOKA:  Don't answer that.
 7         Q.    And the allegation is abuse?
 8         MR. HIRAOKA:  Same objection
 9    because his private counsel isn't here.
10         Q.    I get to ask the question at least.
11    Is the allegation, do you know what the
12    allegations are?  I will go through what I
13    understand they are.  Abuse of authority?
14         A.    Yes.
15         Q.    Anything else?
16         A.    That's it.
17         Q.    Okay.  Did you play any role in
18    causing the release of Mr. Forrester from
19    custody?
20         MR. HIRAOKA:  Objection.  Same
21         objection.  His private counsel is not
22         here.  Again, we are going into the
23         underlying facts of the case.
24         MS. MARQUEZ:  You are directing him
25         not to answer?
```

1          CHIEF JEFFREY MADDREY

2              MR. HIRAOKA:  Don't answer.

3      Q.   What was the recommendation by

4   CCRB?

5      A.   Schedule B command discipline ten

6   days.

7      Q.   Were you served with charges and

8   specifications yet?

9      A.   Yes.

10     Q.   Okay.  Is that where you got the

11  proposal for the ten days?

12     A.   No.

13     Q.   Okay.  This is by separate

14  communication?

15     A.   Yes.

16     Q.   Would a false arrest be

17  investigated by an abuse of authority by the

18  CCRB?

19             MR. HIRAOKA:  In this case or in

20     general?

21             MS. MARQUEZ:  In general.

22     A.   A false arrest?

23     Q.   Yes.

24     A.   Yes.

25     Q.   Okay.  And were you interviewed by

1          CHIEF JEFFREY MADDREY

2    CCRB in relation to this matter?

3          A.   Yes.

4               MS. MARQUEZ:   We call for the

5          production of this case.

6               MR. HIRAOKA:   Please make all

7          requests in writing.   We will take it

8          under advisement.

9               MS. MARQUEZ:   Just to get on the

10         record you are, you are directing the

11         Chief not to answer any further

12         questions on the CCRB or the closed IAB

13         relating to Ms. Foster for the civil

14         suit by Ms. Foster, correct?

15              MR. HIRAOKA:   No.   I said we will

16         take it on a question by question basis.

17         You are free to ask the questions.   If I

18         find it's too far into the underlying

19         case I will direct him not to answer.

20         He is my client and I'm defending him,

21         his private counsel is not here.

22         Q.   At any point before today did you

23    know retired NYPD Officer Forrester?

24         A.   Yes.

25         Q.   In what capacity?

```
 1              CHIEF JEFFREY MADDREY
 2              MR. HIRAOKA:  Objection.  Don't
 3      answer that.
 4         Q.   When was he retired?
 5              MR. HIRAOKA:  Objection.  Don't
 6      answer that either.
 7         Q.   Do you know that he was alleged to
 8      have chased three teens in Brownsville with a
 9      gun?
10              MR. HIRAOKA:  Objection.  Don't
11      answer.
12         Q.   Do you know that Mr. Forrester was
13      taken into custody by NYPD officers?
14              MR. HIRAOKA:  Objection.  Don't
15      answer.
16         Q.   Do you know the reason for him
17      being taken into custody?
18              MR. HIRAOKA:  Objection.  Don't
19      answer.
20         Q.   Again, this relates to November 24,
21      2021, do you understand?
22         A.   Yes.
23         Q.   What happened ultimately to
24      Mr. Forrester?
25              MR. HIRAOKA:  Objection.  Don't
```

1            CHIEF JEFFREY MADDREY

2      answer.

3      Q.   When did you first learn of

4  Forrester's arrest?

5            MR. HIRAOKA:   Objection.   Don't

6      answer.

7      Q.   What did you do with that

8  information, if anything?

9            MR. HIRAOKA:   Objection.   Don't

10     answer.

11     Q.   Have you spoken to the press in any

12  capacity around these allegations?

13           MR. HIRAOKA:   Objection.   Don't

14     answer.

15     Q.   What role, if any, did you play in

16  causing the release of Mr. Forrester from

17  custody?

18           MR. HIRAOKA:   Objection.   Don't

19     answer.

20     Q.   And why did you direct that action?

21           MR. HIRAOKA:   Objection.   Don't

22     answer.

23     Q.   Is this in accordance with NYPD

24  policy?

25           MR. HIRAOKA:   Objection.   Don't

Page 281

1           CHIEF JEFFREY MADDREY

2      answer.

3           Q.   Did you cause his arrest to be

4      voided?

5                MR. HIRAOKA:   Objection.  Don't

6           answer.

7           Q.   And, Chief, just as a general

8      matter, what does it mean for an arrest to be

9      voided?

10                MR. HIRAOKA:   A general manner.

11           A.   As a general manner if you find

12      probable cause is lacking you can void an

13      arrest.

14           Q.   Was this incident investigated by

15      anybody, any other entity other than CCRB?

16           A.   Yes.

17           Q.   By whom?

18           A.   By the Internal Affairs Bureau, by

19      Kings County District Attorney's office.

20           Q.   Okay.  Are those investigations

21      closed?

22           A.   Yes.

23           Q.   And what is the outcome, if you

24      know?

25           A.   Both of them found that I did

Page 284

1      CHIEF JEFFREY MADDREY

2  remainder of the time for a court ruling

3  to bring you back.

4      Was there anything on your end,

5  Joe?

6      MR. HIRAOKA:  No.  I mean we are

7  agreeing to bring him back.

8      MS. MARQUEZ:  Well, at Counsel's

9  expense.  I think you inappropriately

10  directed him not to answer questions on

11  these things.  I was asking if you had

12  any questions.

13      MR. HIRAOKA:  No, no questions.

14      Once again, we will bring him back

15  and, you know, we are not directing him

16  not to answer forever it's just he can

17  answer in the presence of his private

18  counsel.

19      MS. MARQUEZ:  I think that's it

20  then.

21      (Time noted:  6:00 p.m.)

22

23      _____

24          JEFFREY MADDREY

25