# EXHIBIT A

```
1

2              UNITED STATES DISTRICT COURT

3           SOUTHERN DISTRICT OF NEW YORK

4

5   In Re:  New York City          )Case No.
    Policing During Summer 2020    )1:20-cv-8924
6   Demonstrations                 )(CM)(GWG)
                                   )
7   ---------------------------    )
                                   )
8   This filing is related to:     )
                                   )
9   ALL CASES                      )
                                   )
10                                 )
                                   )
11  -------------------------------)

12

13

14       30(b)(6) VIDEOCONFERENCE DEPOSITION OF

15                  DEAN FULEIHAN

16              New York, New York

17           Thursday, May 11, 2023

18

19

20

21

22

23

24  Reported by:
    TAMI H. TAKAHASHI, RPR, CSR
25  JOB NO. J9635499
```



1

2                         May 11, 2023

3                         9:16 a.m.

4

5              30(b)(6) Videoconference Deposition

6     of DEAN FULEIHAN, held via Zoom remote

7     videoconferencing software in New York,

8     pursuant to Notice, before TAMI H. TAKAHASHI,

9     a Registered Professional Reporter and Notary

10    Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2   A P P E A R A N C E S:

3   (All parties appearing remotely)

4

5   Representing the Plaintiffs:

6        NEW YORK CIVIL LIBERTIES UNION

7              125 Broad Street, 19th Floor

8              New York, New York  10004

9              203.610.1771

10       BY:   ROBERT A. HODGSON, ESQ.

11             rhodgson@nyclu.org

12

13

14   Representing the Payne Plaintiffs:

15       NEW YORK CIVIL LIBERTIES UNION

16             125 Broad Street, 19th Floor

17             New York, New York  10004

18             203.610.1771

19       BY:   MOLLY BIKLEN, ESQ.

20             mbiklen@nyclu.org

21

22

23

24

25



```
1
2    A P P E A R A N C E S:
3    (All parties appearing remotely)
4
5    Representing the People of the State of New
6    York:
7        NEW YORK STATE OFFICE OF THE ATTORNEY
8         GENERAL
9             28 Liberty Street, 23rd Floor
10            New York, New York  10005-1495
11            646.574.2180
12       BY:   GINA M. BULL, ESQ.
13            gina.bull@ag.ny.gov
14
15
16   Representing the New York City defendants:
17       NEW YORK CITY LAW DEPARTMENT
18            100 Church Street
19            New York, New York  10007
20            212.356.2371
21       BY:   THOMAS DEAN, ESQ.
22            thdean@law.nyc.gov
23
24
25
```



1

2  A P P E A R A N C E S:

3  (All parties appearing remotely)

4

5  Representing Defendant-Intervenors the

6  Sergeants Benevolent Association:

7      QUINN LAW FIRM

8          399 Knollwood Road, Suite 220

9          White Plains, New York  10603

10         914.997.0555

11     BY:   MARYKATE ACQUISTO, ESQ.

12         office@quinnlawny.com

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2        IT IS HEREBY STIPULATED AND AGREED

3   by and between the attorneys for the

4   respective parties herein, that filing

5   and sealing be and the same are hereby

6   waived.

7        IT IS FURTHER STIPULATED AND AGREED

8   that all objections, except as to the

9   form of the question, shall be reserved

10  to the time of the trial.

11       IT IS FURTHER STIPULATED AND AGREED

12  that the within deposition may be signed

13  and sworn to before any officer

14  authorized to administer an oath, with

15  the same force  and effect as if signed

16  and sworn to before the Court.

17

18

19

20

21              -O-

22

23

24

25



1

2              STENOGRAPHIC REPORTER:  Good

3         morning.  This is Tami Takahashi.  I'm a

4         Registered Professional Reporter and New

5         York State notary public.  This

6         deposition is being held via

7         videoconference.  The witness and I are

8         not in the same room.  The witness will

9         be sworn in remotely, and the parties

10        stipulate that the testimony is being

11        given as if the witness was sworn in

12        person.

13   D E A N   F U L E I H A N,  called as a

14        witness, having been duly sworn by a

15        Notary Public, was examined and testified

16        as follows:

17                  EXAMINATION

18   BY MR. HODGSON:

19        Q.   Mr. Fuleihan, my name is Bobby

20   Hodgson.  I'm an attorney for the New York

21   Civil Liberties Union and I represent the

22   plaintiffs in this -- one of these

23   consolidated cases, Payne versus de Blasio.

24        I -- we will be joined throughout

25   the day, perhaps, by lawyers from other



1                    D. Fuleihan

2      don't recall the time.

3           Q.    Okay.

4           A.    I have no reason to doubt this.

5      I'm just -- but I -- you asked me my

6      recollection of the time, and I didn't recall

7      it.

8           Q.    All right.  So were you yourself

9      receiving updates about the protests and the

10     arrests that happened in Mott Haven in

11     realtime?

12          A.    Yes, I'm on this email.

13          Q.    Okay.  Other than this email, were

14     you receiving any additional updates from

15     people on the ground at the protest?

16          A.    I believe I was.

17          Q.    From whom?

18          A.    I'm quite sure Marco.

19          Q.    Okay.  From anyone else?

20          A.    Possibly.  Possibly.

21          Q.    But you're not sure?

22          A.    From -- possibly from the -- I'm

23     quite sure there were conversations as well

24     with the NYPD.  But I don't recall who

25     specifically two years ago I had that



```
 1                    D. Fuleihan
 2   conversation with.
 3        Q.   Okay.  Did you receive any emails
 4   or texts from NYPD personnel on the night of
 5   June 4th regarding Mott Haven?
 6        A.   I don't recall that.  I'm quite
 7   sure I had phone calls about them.  And,
 8   again, I assume you would know if I had an
 9   email or a text.
10             MR. HODGSON:  Okay.  So you can put
11        that exhibit away and open up Exhibit
12        19.
13             THE WITNESS:  Okay.
14             MR. HODGSON:  This is Bates
15        numbered DEF_DEP_MARCO CARRIÓN
16        TEXTS_PART 2_00133 to 135.  And it's
17        three pages.
18             (Plaintiffs' Exhibit 19,
19        CONFIDENTIAL_DEF_DEP_MARCO CARRIÓN
20        TEXTS_PART 2_00133 through
21        CONFIDENTIAL_DEF_DEP_MARCO CARRIÓN
22        TEXTS_PART 2_00135, marked for
23        identification as of this date.)
24   BY MR. HODGSON:
25        Q.   Let me know when you've opened it.
```



1                          D. Fuleihan

2          A.    I've opened it.

3          Q.    Okay.  So I'll represent that I'm

4     showing you a text chain that was produced by

5     the City from the phone of Marco Carrión.

6          A.    Um-hum.

7          Q.    And as you'll see on the second

8     page of the document, the first text starts

9     June 4, 2020 at 10:15 p.m., correct?

10         A.    I'm sorry.  I'm looking for 10:15.

11    I have it now.

12              MR. DEAN:  Yeah, I explained --

13              THE WITNESS:  Yes.

14              MR. DEAN:  -- emails work from the

15         bottom up.

16              THE WITNESS:  Yes.  I was going the

17         wrong way.  I apologize.

18              MR. HODGSON:  No worries.

19    BY MR. HODGSON:

20         Q.    And so you had just texted (sic)

21    that you were certain you spoke with Marco

22    Carrión on the night of June 4th, correct?

23         A.    Yes.

24         Q.    And he was present for some portion

25    of the Mott Haven protest that night,



```
 1                    D. Fuleihan
 2   correct?
 3        A.   That's my recollection.
 4        Q.   And do you have any reason to doubt
 5   the observations of Marco Carrión from that
 6   night?
 7        A.   No.
 8        Q.   So starting at 10:16 p.m. --
 9        A.   Um-hum.
10        Q.   -- in response to a text that asks
11   him "are they violent?" Mr. Carrión replied,
12   "The protesters no."
13             Do you see that?
14        A.   Yes.
15        Q.   Is that description consistent with
16   the Mayor's Office' understanding of whether
17   the Mott Haven protesters were violent on the
18   night of June 4th?
19        A.   I don't believe it is consistent
20   with what NYPD saw.
21        Q.   So was the Mayor's Office's
22   understanding of whether there was violence
23   not based on the observations of the Mayor's
24   Office staff?
25        A.   It was based on both observations.
```



1                          D. Fuleihan

2          Q.   Okay.

3          A.   I mean, we were -- there was a

4    reason to have Mayor's Office staff there and

5    there was a reason to ask NYPD what they were

6    observing.

7          Q.   And so the description that

8    Mr. Carrión gave of the protesters not being

9    violent, you're saying, was in conflict with

10   reporting that you got or the Mayor's Office

11   got from the NYPD?

12         A.   I'm saying that I believed the NYPD

13   information at the time is not consistent

14   with this.

15         Q.   Okay.  Not consistent in what way?

16         A.   My recollection is that they felt

17   there were danger there, they had made

18   arrests and they thought there was the

19   presence of additional danger.

20              I don't recall if they actually

21   said there was also incidences of violence on

22   the part of the protesters beyond the -- the

23   items they confiscated that evening.

24         Q.   And where did this reporting come

25   from?



```
 1                    D. Fuleihan

 2        A.    NYPD.

 3        Q.    Who?

 4        A.    It would have come up through,

 5   again, the senior management.  I know Terry

 6   Monahan was at the site, so I doubt it came

 7   from him there.  But it would have come from

 8   the commissioner.

 9        Q.    Okay.  Directly to you?

10        A.    And maybe John Miller, as well, who

11   was head of intelligence.

12        Q.    But you're not sure?

13        A.    I'm not sure.

14        Q.    And did this information come

15   directly to you?

16        A.    Sure, it would have -- I would --

17   it could have gone to the mayor as well.  But

18   it certainly would have come to me, as would

19   Marco's.

20        Q.    Okay.  So just a few lines down --

21        A.    Um-hum.

22        Q.    -- at 10:17 in response to the

23   question "Cops?" Marco Carrión texts,

24   "Aggressive."

25        A.    Um-hum.
```



1                          D. Fuleihan

2          Q.   Is that description consistent with

3     the Mayor's Office's understanding of whether

4     the NYPD was aggressive in Mott Haven on June

5     4th?

6          A.   That's consistent with what Marco

7     and his staff were saying.  And -- and ends

8     up being consistent -- I hate -- forgive me,

9     but it ends up being consistent with DOI's

10    findings.

11         Q.   And what was the Mayor's Office's

12    understanding of whether the cops were

13    aggressive at the Mott Haven protest on June

14    4, 2020?

15         A.   We were getting this information

16    and we were conveying it to the NYPD and

17    asking questions and challenging what -- is

18    this accurate?

19         Q.   What was the mayor's understanding

20    of whether the cops were aggressive that

21    night?

22         A.   The mayor would have gotten the

23    exact same information I did.

24         Q.   Can you testify as to what his

25    understanding of the situation was?



1                        D. Fuleihan

2        A.   That his staff, that his personal

3    staff, the City Hall staff, felt that NYPD

4    was being very aggressive and that the NYPD

5    were arguing that they had to be, that there

6    were reasons.

7        Q.   Okay.  And between the two, who

8    would the mayor have believed if there was

9    reporting that was in conflict?

10            MR. DEAN:  Objection to form.

11       A.   He would try to get to what -- what

12   actually is happening.  And, obvious, in

13   these situations, there's confusion and

14   conflicting reports.  And he would try to

15   understand exactly what was happening, which

16   is what he tried to do.

17   BY MR. HODGSON:

18       Q.   So the mayor was confused about

19   what was happening on the night of June 4th?

20       A.   No.

21            MR. DEAN:  Objection to form.

22       A.    No.  He was trying to understand,

23   as I was trying to understand, exactly what

24   was happening.

25   BY MR. HODGSON:



```
 1                      D. Fuleihan
 2        Q.   But he did not have a clear
 3   understanding of what was happening?
 4             MR. DEAN:  Objection to form.
 5        A.   We were getting confusing
 6   messages -- we were getting disagreeing
 7   messages as to what was happening and why it
 8   was happening.
 9        Q.   Okay.  So did he have a clear
10   understanding of what was happening?
11             MR. DEAN:  Objection to form.
12        A.   I'm going to -- there's a reason
13   the mayor asked for the DOI investigation and
14   the Corporation Counsel --
15   BY MR. HODGSON:
16        Q.   I'm sorry.  You're not answering my
17   question.  It's very simple.
18             Did he have a clear understanding
19   of what was happening the night of June 4,
20   2020?
21             MR. DEAN:  Objection to form.
22        A.   He had different information.  He
23   was not on the site.  Neither was I.
24   BY MR. HODGSON:
25        Q.   Okay.  At 10:19 p.m., Mr. Carrión
```



1                        D. Fuleihan

2    texts, "Tonight they been using the curfew to

3    arrest protesters regardless of tenor of

4    march from my vantage point and my teams

5    (sic) field reports."

6            Is that description consistent with

7    the Mayor's understanding of whether the NYPD

8    used the curfew to arrest protesters

9    regardless of tenor of the March at Mott

10   Haven on June 4th?

11       A.   Our understanding was that the NYPD

12   was arresting people and had done a

13   significant number of arrests at Mott Haven.

14   And not everyone who was being arrested

15   was -- was a -- was acting in a way that in

16   another area of the city they may not have

17   arrested them.

18       Q.   At the top of the next page,

19   there's at text that says, "Bill must be

20   ok ing this or he doesn't know."

21            Was Mayor de Blasio okaying the

22   arrest of protesters after 8 p.m. regardless

23   of the tenor of the march?

24            MR. DEAN:  Can you tell us the time

25        that you're looking at.



1              D. Fuleihan

2         MR. HODGSON:  Sure.  This is the

3    very top of the next page at 10:20 p.m.

4    There's a text that says, "Bill must be

5    ok ing this or he doesn't know."

6  BY MR. HODGSON:

7    Q.   Do you see that?

8    A.   Yes.

9    Q.   Was Mayor de Blasio okaying the

10  arrest of protesters after 8 p.m. regardless

11  of the tenor of the march?

12        MR. DEAN:  Objection to form.

13   A.   I don't believe so.

14  BY MR. HODGSON:

15   Q.   Based on what?

16   A.   His intent was to allow peaceful

17  protests to continue and people to -- if the

18  PD thought they had to disperse, to give

19  proper notification and allow it to happen.

20   Q.   Okay.  And so it would be in

21  conflict with his understanding of how

22  arrests were intended to occur that night if

23  peaceful protesters were being arrested

24  regardless of the tenor of the march,

25  correct?



1                          D. Fuleihan

2          A.   Correct.

3          Q.   Do you need me to repeat the

4    question?

5          A.   I'm sorry.  I thought I answered

6    it.

7               MR. DEAN:  He said "correct."

8    BY MR. HODGSON:

9          Q.   What did you say?

10         A.   Well, now you should repeat it.  I

11   apologize, but I thought I answered you.

12              MR. HODGSON:  Did you get an

13         answer, Tami?  What was it?

14              STENOGRAPHIC REPORTER:  He said

15         "yes."  I'm sorry.  He said "correct."

16   BY MR. HODGSON:

17         Q.   Great.  I'm so sorry.  I did not

18   hear it.  I think my earphones are a little

19   low.

20         A.   Okay.

21         Q.   Okay.  So the next text down or a

22   few texts down at 10:20 p.m., Marco Carrión

23   says, "The deal with PD is they'd let folks

24   march if they were peaceful."

25               Is that correct?



1                     D. Fuleihan

2        A.   Yes.

3        Q.   Okay.  So on June 5th, the next

4   day, Police Commissioner Shea said that the

5   NYPD --

6        A.   I'm sorry.  Are we still on this or

7   you want me to --

8        Q.   You can -- you can close this out.

9        A.   Okay.  Thank you.  And we should go

10  back to you?

11            MR. DEAN:  Is there another exhibit

12       you want us to look at?

13            MR. HODGSON:  I wasn't going to put

14       up an exhibit, but I may depending on

15       how you answer my questions.

16            MR. DEAN:  Okay.

17            THE WITNESS:  Fine.

18  BY MR. HODGSON:

19       Q.   So I'm representing to you --

20            THE WITNESS:  I would just as soon

21       look at someone.  I'm sorry.

22            MR. HODGSON:  Sure.

23  BY MR. HODGSON:

24       Q.   -- that on June 5, 2020 the next

25  day, Police Commissioner Shea stated in a



1                        D. Fuleihan

2    press conference that the NYPD's plan was

3    executed nearly flawlessly the night of June

4    4th.

5                    Was it the position of the Mayor's

6    Office that the NYPD's plan was executed

7    nearly flawlessly at Mott Haven?

8         A.   It was not.

9         Q.   Why not?

10        A.   There were peaceful protesters who

11   were arrested without the opportunity to

12   disperse.  And I know you get annoyed when I

13   refer to it and I apologize, but that was

14   confirmed in the DOI report.

15        Q.   I'm certainly not annoyed.  I

16   welcome reference to the DOI report.

17        A.   Okay.

18        Q.   So going back to Commissioner

19   Shea's language about a plan being executed

20   nearly flawlessly, was the Mayor's Office

21   aware of a specific NYPD plan regarding the

22   Mott Haven June 4th protest?

23                    MR. DEAN:  Well, objection to form.

24        A.   The NYPD was going to address their

25   concerns with what they perceived to be the



```
 1                      D. Fuleihan
 2    violence and what they were picking up in
 3    intelligence.  What happened that night, no,
 4    that was not a plan I was aware of.
 5    BY MR. HODGSON:
 6         Q.   Okay.  I mean, did the Mayor's
 7    Office understand in advance that the NYPD
 8    would plan to arrest people right at 8
 9    o'clock?
10         A.   And give them no ability to
11    disperse?  No, we did not know that.
12         Q.   Regardless of the ability to
13    disperse, was the Mayor's Office aware of
14    NYPD plans to begin arresting people right at
15    8 o'clock?
16         A.   I don't believe so.  That's not my
17    recollection.
18         Q.   Is it -- was the mayor aware of the
19    NYPD -- of an NYPD plan to begin arresting
20    people right at 8 o'clock at Mott Haven?
21              MR. DEAN:  Objection to form.
22         A.   I don't believe so.
23    BY MR. HODGSON:
24         Q.   Okay.  Would he know?
25              MR. DEAN:  Objection to form.
```



1                          D. Fuleihan

2          A.    I think -- I am -- I do not

3    believe -- so let me restate it.

4               I do not believe that we had

5    knowledge that everyone at Mott Haven was

6    going to be arrested at 8 p.m.

7    BY MR. HODGSON:

8          Q.    Did you have knowledge that anyone

9    was going to be arrested at Mott Haven at 8

10   o'clock?

11         A.    Well, to the extent that NYPD was

12   concerned about particular individuals and

13   particular violence and potential -- and

14   potential violence and those individuals,

15   they were looking for and would try to arrest

16   them.  So I can't give it a blanket that no

17   one would be arrested.

18         Q.    Did the Mayor's Office expect

19   peaceful protesters to be arrested at Mott

20   Haven on June 4th?

21         A.    In general --

22               MR. DEAN:  At any time?  At any

23         time, you're asking?

24               MR. HODGSON:  I said --

25               THE WITNESS:  You mean -- sorry.



```
 1                     D. Fuleihan
 2        You should answer.  You should ask the
 3        question.  I apologize.
 4             MR. HODGSON:  No.
 5   BY MR. HODGSON:
 6        Q.   So the Mayor's Office was aware
 7   that the NYPD expected potential threats of
 8   violence, correct?
 9        A.   Correct, correct.
10        Q.   The Mayor's Office was not aware of
11   any specific plan to address that expected
12   threat, correct?
13        A.   No, we assumed that they would
14   address the expected threat as best they
15   could.
16        Q.   But you were not aware --
17        A.   I mean, if they did find someone
18   with a gun, they -- they -- they arrested
19   that person.  If they found people with
20   incendiary devices, they arrested those
21   people.  Of course, we would expect that.
22        Q.   We're fine.
23             MR. HODGSON:  Okay.  So I am going
24        to show you another exhibit.  This will
25        take just a second.  Can we actually
```



```
 1                D. Fuleihan

 2    take a five-minute break?  I'm having a

 3    little bit of a tech issue.

 4         MR. DEAN:  Sure.

 5         MR. HODGSON:  And just come back

 6    at -- actually, a three-minute break at

 7    2:15?

 8         MR. DEAN:  Okay, yeah.

 9         THE WITNESS:  Sure.

10         MR. HODGSON:  Sorry, I just froze

11    up a second.

12         MR. DEAN:  That's fine.

13         THE WITNESS:  Thank you.

14         MR. HODGSON:  Okay.  We'll go off

15    the record.  Back at 2:15.

16         (Recess taken.)

17         MR. HODGSON:  So I've just dropped

18    a new exhibit into the chat.  It's

19    marked --

20         THE WITNESS:  Page 6?

21         MR. HODGSON:  -- Fuleihan Exhibit

22    36.  And it may take a moment to open.

23         MR. DEAN:  You just click "save"

24    once, once you've got it.

25         THE WITNESS:  I don't have it.  Do
```



1                        D. Fuleihan

2          you see it?  I don't see 36 yet.

3                MR. DEAN:  Go back.

4                THE WITNESS:  Oh, it's right there

5          saved.  I'm sorry, I see what's

6          happening.  Okay.

7                MR. DEAN:  And then you go back --

8                THE WITNESS:  Then you go back

9          here, okay.

10               Okay, we have it open.

11  BY MR. HODGSON:

12         Q.   Great.  So as you'll see, this is a

13  download from the New York City website that

14  hosts a transcript of the mayor -- the

15  mayor's press conference of June 5, 2020.

16  It's very long.  I'm not going to ask you to

17  see the whole thing.  I will represent that I

18  downloaded it from the City's website and,

19  because of technical issues, I just did that.

20         A.   Okay.

21         Q.   So I would ask you to go to the

22  ninth page of this document of 14.

23         A.   Okay.  We're almost there.  I think

24  we're on the ninth page.

25         Q.   Okay.  So towards the bottom of the



1                           D. Fuleihan

2              MS. BULL:  All right.  Thank you.

3        No further questions for me.

4              MR. DEAN:  I haven't any.

5              THE WITNESS:  Thank you.

6              STENOGRAPHIC REPORTER:  Ms. Bull,

7        are you ordering a copy of the

8        transcript?

9              MS. BULL:  No, I'm not.  Thank you.

10             (Time noted:  5:05 p.m.)

11

12

13             _____

14                   DEAN FULEIHAN

15

16   Subscribed and sworn to before me

17   this_____ day of _____, 2023.

18

19   _____

20

21

22

23

24

25



1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                             : ss.

5    COUNTY OF NEW YORK      )

6

7            I, TAMI H. TAKAHASHI, a Notary

8        Public within and for the State of New

9        York, do hereby certify:

10           That DEAN FULEIHAN, the witness

11       whose deposition is hereinbefore set

12       forth, was duly sworn by me and that

13       such deposition is a true record of the

14       testimony given by the witness.

15           I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage, and that I

18       am in no way interested in the outcome

19       of this matter.

20           IN WITNESS WHEREOF, I have hereunto

21       set my hand this 20th day of May 2023.

22

23

24       _____

25                TAMI H. TAKAHASHI

