UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

In Re: New York City Policing During Summer

2020 Demonstrations

**Index No. 20-CV-8924(CM)(GWG)**

---------------------------------------------------------

## STIPULATED ORDER PURSUANT TO FED. R. CIV. P. 41(a)(2)

WHEREAS plaintiffs Jarrett Payne; Andie Mali, Camila Gini, Vidal Guzman, Vivian Matthew King-Yarde; Charlie Monlouis-Anderle, James Lauren, Micaela Martinez, Julian Phillips, Nicholas Mulder, and Colleen McCormack-Maitland have filed their corrected second amended complaint in docket number 20-cv-8924;

WHEREAS plaintiff the People of the State of New York have filed their amended complaint in docket number 21-cv-322;

WHEREAS plaintiffs Kyla Rolon, Corey Gilzean, Michael Hernandez, Christopher Husary, Keith Clingman and Jonathan Peck have filed their second amended complaint in docket number 21-cv-2548;

WHEREAS plaintiffs Adam Gray, Jason Donnelly, Diana Zeyneb Alhindawi, Jemell D. Cole, and Amr Alfiky have filed their third amended complaint in docket number 21-cv-6610;

WHEREAS plaintiffs in the Consolidated Cases (as defined below) allege that the NYPD engaged in unconstitutional policing—using excessive force and arresting protestors, journalists, and legal observers without probable cause and in retaliation for their speech—at racial justice protests across New York City beginning in May 2020 in violation of the federal and state constitutions and state law;

1

WHEREAS, the City Defendants (as defined below) have denied the allegations in the consolidated complaints that they have violated plaintiffs' constitutional or statutory rights;

WHEREAS, the Sergeants' Benevolent Association and the Detectives' Endowment Association have intervened in this matter and maintain that the governing law permits uniformed members of service of the New York City Police Department ("MOS") to use appropriate, reasonable, and commensurate force to protect the safety of the public, other MOS, and other individuals engaged in demonstrations, as well as the direction and speed of any and all First Amendment Activity ("FAA"), as defined below;

WHEREAS, the Plaintiffs, City Defendants and Union Intervenors (as defined below) (hereinafter, "Parties"), desiring to resolve the claims for injunctive relief, including those *parens patriae* claims brought by the New York State Office of the Attorney General, raised in this litigation without further proceedings and without admitting any fault or liability, have in good faith jointly negotiated the terms of this settlement agreement;

WHEREAS, the Parties share the goal of an approach to policing that assures the rights of protesters, journalists and legal observers and uses arrest and force only when necessary and in compliance with the Constitution of the United States and the Constitution and laws of the State of New York and the New York City Charter and local laws, in addition to assuring the safety and rights of the general public; and,

WHEREAS, the individual plaintiffs in *Payne*, *Gray*, and *Rolon* have reached a settlement with the City Defendants with regard to their monetary damages, and will file their respective stipulations of dismissals within forty-five (45) days of the Court's endorsement of this Order,

It is hereby ordered pursuant to Fed. R. Civ. P. 41(a)(2) as follows:

## I.   DEFINITIONS

1.      "Consolidated Cases" shall refer to the cases bearing the captions *Payne, et al. v. Mayor Bill de Blasio et al.*, No. 20-cv-8924; *People of the State of New York v. City of New York et al.*, No. 21-cv-322; *Gray et al. v. City of New York, et al.*, 21-cv-6610; and *Rolon et al. v. City of New York, et al.*, 21-cv-2548.

2.      "Plaintiffs" shall refer to all individuals and entities listed as plaintiffs in any of

the Consolidated Cases.

3.      The "People of the State of New York" shall refer to the Plaintiff represented by and through the Office of the New York State Attorney General, which has brought litigation against Defendants raising federal and state claims pursuant to the *parens patriae* doctrine.

4.      "City Defendants" shall refer to the City of New York and its relevant agencies and employees.

5.      "Union Intervenors" shall refer to the Detectives' Endowment Association and the Sergeants Benevolent Association.

6.      "First Amendment Activity" or "FAA" shall refer to any protest or demonstration at which individuals are expressing their rights under the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution. A protest and a counter-protest in the same general location shall be considered a single FAA for purposes of this Agreement.

7.      The "Strategic Response Group" ( "SRG") is defined in this Agreement to mean the unit currently named the Strategic Response Group, which includes the Crowd Management Unit, and whatever name such Group or unit may bear in the future, as well as any unit or organizational component of NYPD that now or in the future holds similar responsibilities for crowd management or disorder control.

8.      "Agreement" shall refer to the provisions contained in this Stipulated Order.

9.      "Effective Date" shall mean the date on which this Stipulated Order is approved by the Court.

10.     To the extent that this Agreement references governing policies and provisions of the NYPD, it refers to those policies and provisions as of the Effective Date of this Agreement.

## II.     GENERAL PRINCIPLES GOVERNING THE POLICING OF FAAs

11.     The City Defendants acknowledge that First Amendment-protected activities serve important societal functions, including promoting transparency in government affairs;

3

ensuring accountability of public officials; and encouraging community feedback, whether critical or laudatory, that ultimately reduces tension and fosters a sense of openness and trust between government officials and the public.

12. The NYPD embraces an approach to policing that assures the rights of protesters and uses arrest and force only when necessary and in compliance with the Constitution of the United States, the Constitution and laws of the State of New York, and the New York City Charter and local laws.

13. It is current NYPD policy not to, and officers shall not, police FAAs differently based on the message of the FAA, the race or ethnicity of the participants, or the neighborhood where the FAA is occurring.

14. The NYPD shall respect the right to observe and record officers in the public discharge of their duties in public spaces, including sidewalks, parks, and locations of FAAs, as well as any other areas where people otherwise have a legal right to be present, including a person's home or business and common areas of public and private facilities and buildings. Pursuant to this right, neither a press pass nor any other form of press identification is required to observe and record police activity from a public place, including but not limited to (a) an area where FAAs are taking place, (b) near where crimes are being committed, and (c) where matters of public concern are occurring, subject only to constitutionally permissible reasonable time, place and manner restrictions. NYPD officers may not prohibit, restrict or interfere with this right to observe and record. In addition, NYPD officers may not arrest any person solely for observing or recording police activity in a public place.[1]

15. NYPD shall continue to enforce its policy that officers may not take any police action in retaliation for individuals expressing a viewpoint, engaging in FAAs, or lawfully exercising their right to witness, observe, record, comment on, or protest police activity. This includes detaining, searching, arresting, issuing a citation, or using force when the officer would not have taken such action in the absence of the protected statements or actions.

16. No individual will be arrested on account of their exercise of their lawful First

---

[1] The Parties acknowledge that (i) current NYPD policy, as reflected in the Patrol Guide, states there is no right to record inside an NYPD precinct; and (ii) there is currently litigation concerning this issue. This Agreement does not seek to resolve that disagreement and all Parties acknowledge they will be bound by any controlling case law.

Amendment speech.

17.     No individual will have any force used against them on account of their lawful First Amendment speech.

18.     Officers deployed to an FAA shall attempt to engage in de-escalation techniques with the goal of facilitating the First Amendment rights of protesters.

19.     The NYPD shall, at all times, maintain its ability to enforce the law consistent with the U.S. Constitution, the laws of the State of New York, and the New York City Charter.

## III.    NYPD POLICIES AND PRACTICES GOVERNING THE POLICING OF FAAs

### A.  FAA Senior Executive/Compliance Manager & Revised Incident Commander Structure

20.     The NYPD shall designate the Chief of Department or a senior-level designee within the Chief of Department's office holding the rank of Deputy Chief or higher with extensive knowledge of the application of the First Amendment as it relates to protest activity to work in conjunction with members of its Legal Bureau and to act as compliance manager for this Agreement and to play a role in overseeing significant operational decisions relating to FAAs, as set forth below. The NYPD may select any appropriate title for this person, but they shall be referred to in this Agreement as the "FAA Senior Executive."

21.     The FAA Senior Executive shall oversee the development all policies, procedures and training curricula required by this Agreement and shall be responsible for ensuring they are consistent with the terms of this Agreement, including the general principles set forth in Section II, *supra*.

22.     The FAA Senior Executive shall oversee the NYPD's continuing work to develop a culture of facilitating free speech, deploying police only when necessary, and minimizing arrests and uses of force in demonstrations. To that end, the FAA Senior Executive shall play an active role in the preparation of the Department's response to planned or anticipated FAAs and shall participate in after-action reviews relating to any FAA, when appropriate.

23.     The NYPD will continue to designate an Incident Commander at each FAA to be responsible for the command, control and coordination of all police operations. Where it is reasonably believed that an FAA will not escalate beyond Tier One, a Member of Service holding the rank of Sergeant or higher may be designated as the Incident Commander. In any other situation, where an FAA is within a single precinct, the Precinct Commander or Executive Officer, or designee holding the rank of Captain or higher, will be designated as the Incident Commander. If the FAA is scheduled or occurs in two or more commands within the same Patrol Borough, the Patrol Borough Commander or designee shall be designated as Incident Commander. In cases where the FAA affects or is scheduled to affect more than one Patrol Borough, the Chief of Patrol or designee holding the rank of Captain or higher will be designated as Incident Commander. In the event that the Incident Commander was initially a Sergeant, but the FAA has escalated above Tier One, the Sergeant shall remain the Incident Commander until such time as a higher-ranking individual arrives.

24.     In all circumstances, NYPD shall document the identity of the Incident Commander in the After-Action Report (as defined in Part VIII, *infra*).

25.     Once designated, the Incident Commander shall remain in command of police operations for the duration of the FAA, except that when an FAA starts in one precinct or borough and travels to another, the NYPD may designate the Precinct Commander of the new location, or the Patrol Borough Commander, as the Incident Commander.

26.     The transition between Incident Commanders, when feasible under the specific circumstances of the FAA, must be a direct transfer and include a full debrief on the conditions experienced, deployment decisions made, and other relevant information. All Incident Commanders involved in an FAA shall prepare a written debrief summarizing their observations and deployment decisions, which shall be included in an After-Action Report for an FAA, where applicable under the terms of this Agreement.

27.     Unless infeasible under the specific circumstances of the FAA, changes in Incident Commander must be documented in real time, including time and reason for transfer.

**B. Policies and Procedures Governing Arrests at FAAs – The Red Light/Green Light Policy and Mass Arrest Processing**

28.     The NYPD has a policy called Red Light Green Light, which shall reflect the

following: "Red Light" offenses are those offenses that require the approval of someone at the rank of Captain or above before any officer may make an authorized arrest.

29.     The following offenses shall be "Red Light" offenses: riot, incitement to riot, non-violent obstruction of governmental administration, violation of emergency orders, disorderly conduct, trespass, criminal mischief 3 or 4, New York State Vehicle and Traffic Law ("VTL") 1156(a), and unlawful assembly (New York State Penal Law 240.10). Any offense not designated as a "Red Light" offense shall be considered a "Green Light" offense.

30.     Where a Captain (or individual of higher rank) makes the decision to authorize a Red Light arrest, the identity of the individual who authorized the Red Light arrest shall be documented.

31.     NYPD members of service shall not conduct an arrest unless there is individualized probable cause, as currently defined in NYPD policy, to believe that the person has committed Green Light offenses or authorized Red Light offenses. This means that an NYPD member of service may not arrest any person unless the member has sufficient objective facts based on the member's own personal knowledge, or reliable and trustworthy information provided by other NYPD members or third parties, to establish probable cause that the person engaged in an unlawful act.

32.     If an individual is arrested and turned over to another officer for processing, the identity of the officer who observed the arrestable offense and initiated the arrest shall be clearly documented in the processing officer's Digital Activity Log or other required method of recording daily activity. This is NYPD's current policy.

33.     Only the FAA Senior Executive or their designee can authorize the establishment of a Mass Arrest Processing Center ("MAPC") and will document the reason for one. NYPD agrees to the following protocols when activating MAPC:

   a.     The address and contact information, including telephone number, fax number and email, to any MAPC utilized related to arrests made at an FAA must be made publicly available at the time that the MAPC is established. The FAA Senior Executive shall be responsible for ensuring that information is publicly disseminated via NYPD social media accounts.

7

b.      A MAPC shall continue to have and provide to all people held: clean water, food (if held for more than 2 hours), personal protective equipment ("PPE"), prompt access to telephones, adequate medical care and restrooms.

c.      Whenever a MAPC is established related to an FAA, NYPD shall assign enough members of service to staff the telephone line, fax, and email to ensure prompt and accurate communication with members of the public and attorneys contacting the MAPC about an arrestee or arrestees. NYPD must promptly accept and acknowledge receipt of invocations of representation as to arrestees by legal counsel whether received in-person, via fax, or e-mail, as well as respond to requests for information from legal counsel and, where appropriate, other members of the public, including family members and/or elected officials.

d.      The NYPD has and shall continue enforcing its policy of placing people at facilities, including at MAPC, consistent with their gender identity.

e.      The decision and justification for establishing a MAPC shall be documented.

34.      The NYPD shall expedite the processing of any juvenile or adolescent arrested at a protest to ensure that any period of detention is no longer than necessary to complete the processing of that individual's arrest.

35.      Where an individual other than a juvenile or adolescent is arrested for a violation or misdemeanor, that person's arrest processing time shall not exceed 7.5 hours. The processing time may exceed this limit if: (1) An arrestee requires emergency medical care involving emergency services or receives medical attention at a medical or hospital facility immediately following the arrest that prevents timely arrest processing; (2) there is an exception under CPL 150.20 or an out-of-state warrant requiring the individual to be brought to an arraignment court; or (3) an arrestee is charged with a violation, misdemeanor, or felony not involving an FAA during their arrest processing.

**C. The Tiered Approach to Policing FAAs**

36.      In an effort to assure the rights of protesters, the NYPD shall employ a tiered response with one of the primary goals being to facilitate the First Amendment rights of protesters. The NYPD shall begin its response at the lowest applicable tier based on the conditions presented

8

at the FAA and may move between the tiers as appropriate based on the conditions.

37.     Officers who are deployed to or stationed at a location in the regular course of their work do not need to vacate their post because an FAA is taking place in the same or similar location.

*TIER ONE*

38.     This tier applies, and should presumptively apply, to all FAAs, unless thresholds for another tier apply and/or protesters specifically request the presence of officers.

39.     The NYPD shall only deploy police officers in this tier as described below.

40.     The NYPD may dispatch protest liaisons who meet the following criteria:

    a.     *Qualifications*: These officers shall be selected from the Community Affairs Bureau ("CAB") and shall act pursuant to the Mission of the Community Affairs Bureau to "strengthen[ ] community relationships and [build] trust" and pursuant to provisions 6, 7, 11, 12 and 15 of PG 202-10.

    b.     *Role*: These officers focus on communicating with protesters, understanding the aims of protest organizers, communicating with protesters about how officers can facilitate those aims and the circumstances in which they cannot, and explaining to protesters any police action that is anticipated, imminent, or undertaken. To the extent identifiable, officers should have this dialogue with protest leaders. If not identifiable, officers should attempt outreach to multiple protesters among the crowd.

    c.     *Training*:  Subject to the provisions of Paragraph 75 below, the NYPD shall not dispatch any protest liaison who has not received training on serving in this role as required in Section IV (Training) below.

    d.     *Appearance*: The officers shall wear uniforms of jackets or shirts of the Community Affairs Bureau which clearly displays their name, shield number, and command.

e.    *Number of protest liaisons*: The NYPD shall dispatch no more protest liaisons than necessary, in light of the conditions present at the time, to engage in an effective dialogue with the crowd.

f.    *Documentation*: The NYPD shall document the identities of all protest liaisons dispatched to any FAA.

41.    Where an FAA temporarily blocks vehicular or pedestrian traffic or otherwise obstructs public streets or sidewalks, the NYPD shall whenever possible accommodate the demonstration. When necessary, NYPD may deploy patrol officers to reroute vehicular or pedestrian traffic. These officers shall not be drawn from SRG and shall not carry equipment associated exclusively with those units such as flex-cuffs. The NYPD shall dispatch no more patrol officers than necessary, in light of the conditions present at the time, to address vehicular or pedestrian traffic. Where an FAA is so large or occurs in such a manner as to obstruct access to critical infrastructure, e.g., highways, bridges and tunnels, railways, subways, schools, hospitals, and rerouting vehicular or pedestrian traffic is not adequate to address the obstruction, the NYPD may use the above members of service to direct the FAA to another route or location. Before so doing, protest liaisons shall endeavor to negotiate an alternative route or location with participants in the FAA, when feasible. All officers shall refrain from engaging in any enforcement activity unless it conforms to the NYPD's "Red Light/Green Light" policy as memorialized in this Agreement.

42.    If any patrol officers are deployed for traffic subject to Paragraph 41, the NYPD shall deploy protest liaisons.

*TIER TWO*

43.    The NYPD may begin at or may move to Tier Two if the Incident Commander, in consultation with the FAA Senior Executive, reasonably believes that Green Light violations are imminent but have not yet occurred or that the FAA is so large or occurs in such a manner that creates a risk of obstructing access to critical infrastructure, e.g., highways, bridges and tunnels, railways, subways, schools, hospitals, such that it is reasonably anticipated that the deployment of additional officers may become necessary, and that the risk of obstructing access cannot be relieved by directing individuals to alternate entrances and exits of the critical infrastructure location.

44.    The FAA Senior Executive must authorize the basis for the decision to move to

Tier Two and the Incident Commander must document the reasonable belief that served as the basis to employ Tier Two.

45.     The NYPD shall dispatch protest liaisons into the crowd and may dispatch officers for traffic control consistent with Paragraphs 40 and 41 above.

46.     The NYPD may station additional officers nearby but off-scene, and to the extent possible, out of view of protesters. Those officers will only be deployed to the scene if Tier Three or Tier Four is authorized.

47.     There is a presumption against the stationing of additional officers on scene in this tier. However, in the event that the Incident Commander reasonably believes that there is a threat of major property damage and/or violence, and where the Incident Commander reasonably believes that the stationing of additional resources on scene would deter the threat of property damage and/or violence, the Incident Commander may station limited resources on scene for that purpose. The resources deployed shall be proportional and no more than necessary to address the imminent threat. Those resources shall be removed when the threat has resolved.

48.     Nothing in Tier Two prevents the NYPD from engaging in enforcement activities as permitted in any other lower tier.

*TIER THREE*

49.     The NYPD may begin at, or may move to, Tier Three if there is individualized probable cause to arrest individuals who are engaged in Green Light offenses or authorized Red Light offenses. Arrests in Tier Three shall be guided by NYPD's "Red Light/Green Light" policy and relevant Patrol Guide provisions, as well as the provisions governing arrests in this Agreement.

50.     The Incident Commander must authorize the implementation of Tier Three.

51.     The NYPD may deploy an appropriate number of officers sufficient to address the specific individuals engaged in Green Light offenses or authorized Red Light offenses.

52.     If applicable, while officers are employing a targeted approach to address the specific individuals among the crowd, protest liaisons and patrol officers deployed to address traffic concerns should continue to facilitate the FAA.  The fact that some individuals in a crowd have engaged in unlawful conduct does not by itself provide grounds to end the FAA and order

11

the crowd to disperse.

53.     Where the use of specialized formations and/or equipment is deemed necessary by the FAA Senior Executive to address the specific individuals engaged in Green Light offenses or authorized Red Light offenses, and in a manner consistent with ensuring the safety and continuity of the FAA, SRG may be deployed in Tier Three. These limited resources shall only be deployed for as long as is necessary to address the conditions that they were deployed to address.

54.     If the Incident Commander determines that the FAA has returned to the conditions described in Tier One or Tier Two, they shall have the discretion to implement those protocols.

55.     Nothing in Tier Three prevents the NYPD from engaging in enforcement activities as permitted in any other lower tier.

*TIER FOUR*

56.     The NYPD is permitted to move to Tier Four if protesters are seeking to gain unauthorized entry, or physically blocking others' entry, into a sensitive location or engaged in a criminal offense of trespass in the third degree or higher. A sensitive location includes, but is not limited to, a police precinct, courthouse, other government building, hospital, clinic, medical facility, or medical provider. This tier does not apply if protesters are merely gathered in front of a sensitive location. Sensitive locations shall be identified in each command's Unusual Disorder Plan pursuant to Patrol Guide Procedure Number 213-08 and shall be subject to review and approval by the FAA Senior Executive.

57.     The NYPD is also permitted to move to Tier Four if either:

   a.   Officers have engaged in targeted efforts to address widespread Green Light offenses, or widespread instances of riot, incitement to riot, or engaging or preparing to engage in violent or tumultuous conduct within the meaning of the unlawful assembly statute, but those offenses continue unabated and cannot be addressed through further de-escalation or targeted enforcement; or

   b.   Officers are presented with conditions at a location where there is probable cause sufficient to establish widespread Green Light offenses, or widespread instances of riot, incitement to riot, or engaging in or preparing to engage in violent and tumultuous conduct within the meaning of the unlawful assembly

statute, and there was no viable opportunity to address those widespread offenses through further de-escalation or targeted enforcement.

58.     Once the conditions outlined in Paragraphs 56 or 57 are met, the NYPD may only move to Tier Four if authorized jointly by the FAA Senior Executive in consultation the Incident Commander.  Nothing in Tier Four prevents the NYPD from engaging in enforcement activities as permitted in any other lower tier.

59.     In Tier Four, the Incident Commander, if approved and directed by the FAA Senior Executive, may disperse the FAA, but may not take any police action based solely on that dispersal order until the crowd has been provided with reasonable opportunity to disperse. Nothing in this Agreement shall diminish the obligation for all arrests for any offense to be justified by individualized probable cause based on the actions of the individuals arrested.

60.     The FAA Senior Executive must authorize the issuance of the dispersal order[2] and the NYPD must document the specific basis for the decision, consistent with the requirements herein, to move to Tier Four.

61.      It is current NYPD policy and shall remain NYPD policy that any dispersal orders shall:

> a.      Be audible to the entire crowd and officers should make sure the order can be heard and understood, which may require the officers to move from the front to the back of the crowd;
>
> b.      Clearly identify and not block actual exit points to allow individuals to disperse;
>
> c.      Clearly identify where the FAA may continue, if feasible within sight and sound, or as close as possible, to the original location or target of the FAA; and
>
> d.      Be issued at least three times before police action is taken, when consistent with public safety.

---

[2]In this document, "dispersal order" is defined as an order issued by the NYPD which directs all participants of the FAA to disperse from the area and which is issued with the purpose of ending the FAA. Other lawful orders, such as orders to clear a public walkway or roadway shall not be defined as "dispersal orders."

62.     The NYPD shall document all details about the dispersal order, including the date, time, location of the dispersal order, the specific paths of egress offered (where applicable), the text of the dispersal order, the amount of time given to exit, instructions given regarding other means of protesting, the number of times the order was issued before action was taken and, if less than three times, the public safety justification for doing so.

63.     If the crowd refuses to disperse after all procedures have been followed, the NYPD, as approved and directed by the FAA Senior Executive, may initiate arresting individuals who have refused to disperse. The NYPD shall ensure that an individual with personal knowledge shall document the approval to make arrests in this situation and the specific reasons for arrests.

### D.  Use of Force at FAAs

64.     Provisions regarding Oleoresin Capsicum/pepper spray ("O.C. spray"):

a.      The NYPD recognizes that use of O.C. spray constitutes physical force under the New York State Penal Law;

b.      O.C. spray shall not be used at an FAA unless the use of physical force is otherwise permitted by law or NYPD policy;

c.      O.C. spray may be used in the following circumstances:

(i)     To gain or maintain control of any individual(s) actively resisting arrest or lawful custody or exhibiting active aggression;
(ii)    To prevent individuals from physically injuring themselves or any other individual; or
(iii)   In any other circumstance, officers are to be guided by the NYPD Patrol Guide and the corresponding training;

d.      In Tier Four, where the MK-9 Spray or any larger volume canister is being used to disperse a crowd, it can only be used by officers who have been trained in its use;

e.      In Tier Four, where the MK-9 or any larger volume canister is being used to disperse a crowd, that use must be authorized by a supervisor;

14

f.      The MK-9 Spray or any larger volume canister may not be used against peaceful protestors or those engaging in passive resistance;

g.      Where feasible, MOS should advise that O.C. spray will be used before applying such force;

h.      Nothing in this Agreement prevents MOS from using O.C. spray in accordance with the Patrol Guide and the corresponding training;

i.      This is NYPD's current policy.

65.     Police officers shall avoid intentional strikes to the head unless they reasonably believe that they, or another, is facing the threat of death or serious bodily injury. Batons shall not be brandished solely for the purpose of intimidating an individual engaged in lawful First Amendment activity. This is NYPD's current policy.

66.     Bicycles shall continue to be used in accordance with the operative training for crowd management and crowd control and, when deployed at an FAA, shall only be used when consistent with the tiered approach to policing set forth in this Agreement. In any other circumstance, police officers may use bicycles exclusively for defensive measures unless they reasonably believe that they, or another, are facing the threat of death or physical injury. This is NYPD's current policy.

67.     The NYPD prohibits and shall continue to prohibit chokeholds in compliance with PG 221-01.

68.     Encirclement, when used as an arrest circle, cannot be used except to effectuate the arrest on individualized probable cause of one or more specific individuals, subject to the Red Light/Green Light policy, within a crowd. The NYPD must only seek to encircle the individual or individuals within a crowd who are the target of the particular arrest. To the extent that any other individuals as to whom there is not individualized probable cause to execute an authorized arrest are inadvertently or mistakenly encircled, such individuals must be permitted to exit the encirclement formation immediately, and officers must facilitate those individuals' exit at the earliest moment possible. Enclosing individuals with an intent to take police action against them without having individualized probable cause is what the Plaintiffs have defined as "kettling." The

15

NYPD shall not engage in such a tactic.

69.     Officers shall provide or seek immediate medical attention for anyone injured from a use of force or anyone seeking or in need of medical attention at an FAA. As is stated in existing NYPD policy, failure to provide or seek immediate medical attention pursuant to NYPD policy shall result in discipline. This is current NYPD policy.

70.     Officers who use force (level 1, 2 or 3) during an FAA must report the force to a supervisor and complete a TRI Interaction Report prior to the end of their tour. The TRI report includes a narrative section, requiring officers to provide a full account of the force incident, along with any injuries sustained and the identities of other officers that observed that use of force. Any failure to adequately document, report, or to complete the TRI Interaction Report in a timely manner will result in discipline. This is current NYPD policy.

71.     Officers have a duty to intervene if they observe a use of force which does not comply with the Paragraphs 64-74 of this Agreement or with the NYPD Patrol Guide. The NYPD shall not retaliate against any officer who complies with this duty. This is current NYPD policy.

72.     NYPD shall distribute and have on hand the tools necessary to safely remove or loosen a restraint in a manner that makes them readily available to officers. Failure to loosen flex cuffs that arrestees claim are too tight or to carry the necessary tools to safely remove flex cuffs may subject an officer to discipline however, the officers must have a reasonable amount of time to loosen the cuffs and it must be safe to do so.

73.     For any person arrested at an FAA, officers shall check to ensure that any cuffs used are not too tight on an arrestees wrists at least the following intervals: (1) upon entering a transport van; (2) upon exiting a transport van; and (3) regularly after arriving at the applicable arrest processing location.

74.     The NYPD, including its Aviation Unit, shall not deploy helicopters with the intent of intimidation or the intent of disrupting, interfering with or dispersing a lawful FAA.

### E.  Supervision of Officers Deployed to Demonstrations

75.     NYPD will expeditiously roll out the agreed-upon training and refresher training with the goal of ensuring that all officers deployed to FAAs are trained pursuant to this Agreement.

NYPD will prioritize such training for executives and Community Affairs Bureau officers. NYPD commits that by Month 15 of Phase II, all initial FAA training will have been rolled out and any MOS deployed to an FAA will have been trained. Thereafter, NYPD shall only deploy to FAAs officers who have received the training required under this Agreement.

76.     It is current NYPD policy and shall remain NYPD policy that BWC footage recorded during an FAA shall be promptly categorized as demonstration-related and any additional categorization that would help to identify the individual FAA from which it was recorded.

77.     Supervisors will continue to proactively monitor officer activity for indications of unlawful arrest, unlawful use of force, or biased-based policing and immediately take corrective measures where such indications are observed or heard about and substantiated. Supervisors must also endeavor to be easily accessible to both lower-ranking officers and community members to hear feedback about unlawful police conduct.

## IV.   TRAINING

78.     The FAA Senior Executive shall ensure that any training developed or enhanced reflects the policies described above.

79.     For recruits who join the NYPD following Phase I of this Agreement, this training shall occur in the academy and through periodic refresher trainings at least every two years, or more often if a change in the law requires an additional training. The periodic refresher training may take the form of videos available to NYPD officers via the NYPDU link. For all other uniformed members of service, in addition to the specific requirements set forth below, the NYPD shall educate its members on any policy amendments or training enhancements as a result of this Agreement and shall implement periodic refresher trainings as described above.

80.     The NYPD shall also enhance its current training and provide yearly refresher training for all members of service eligible to be protest liaisons and all supervisors. The training shall cover effective communication with protesters, de-escalation, emotional intelligence, and crowd psychology, as well as the specific provisions of this Agreement relevant to their roles at an FAA.

81.     For all members of service eligible to be Incident Commanders, the training shall cover the topics listed in Paragraph 80 above and shall also include refreshers on the provisions

governing arrests at FAAs set forth in this Agreement and the responsibilities of Incident Commanders set forth in this Agreement.

82.     NYPD training shall continue to emphasize the importance of and skills for maintaining content and viewpoint neutrality, including where policing is the subject of the FAA. NYPD training shall also continue to emphasize the importance of facilitating First Amendment rights, including the requirements that any content-neutral restrictions on the time, place, or manner of expression be narrowly tailored to serve legitimate governmental interests and provide ample alternative channels of expression. Such training shall not create the impression that any particular political group or viewpoint is inherently hostile or prone to unlawful activity.

83.     Defendants shall train members of service who would be responsible for issuing dispersal orders on the dispersal order conditions required by Paragraph 61, including the importance of ensuring that people have a reasonable opportunity to disperse and can continue to lawfully protest following a dispersal order whenever possible.

84.     Periodic refresher training shall be provided to all supervisors on how to oversee and manage officers during FAAs, including intervening to ensure subordinate officers are acting consistent with policies and training. This training shall also include the responsibility of supervisors to direct that officers under their command, where appropriate, view refresher videos on NYPDU.

85.     The NYPD shall preserve for the duration of the Stipulated Order all training materials, attendance records in an electronic format, and any video recordings of trainings.

## V.     DISCIPLINE FOR MISCONDUCT DURING DEMONSTRATIONS

86.     It is the responsibility of the NYPD to promptly, consistently, and sufficiently discipline officers for misconduct.

87.     The NYPD shall, pursuant to its duties under the New York City Charter, continue to refer all complaints or suspected incidents of FADO misconduct or bias-based policing arising from any FAA to CCRB for investigation and recommended penalty.

18

88.     The NYPD Disciplinary Matrix[3] shall be amended as follows: Add under the first "Potential Aggravating Factors" for "Use of Excessive Force": "Inappropriate purpose or motivation such as the use of force to punish, retaliate, coerce, or harass a subject for any reason including, but not limited to, making a statement, or engaging in legally protected First Amendment speech."

## VI.    TREATMENT OF MEMBERS OF THE PRESS

89.     During Phase I (as defined in the Oversight section below) NYPD shall institute policies, protocols, and updates to the Patrol Guide and Administrative Guide relating to the NYPD's interactions with members of the press applicable to both FAA and non-FAA related circumstances, which shall include the following:

a.      The Patrol and/or Administrative Guide (at minimum, the current Administrative Guide § 304-21) shall be updated to acknowledge that there is a clearly established right under the First Amendment, New York Civil Rights Law § 79-P, and New York City Administrative Code § 14-189 to record police activity in public.

b.      The NYPD recognizes and acknowledges that under the First Amendment to the U.S. Constitution, New York Civil Rights Law § 79-P, and New York City Administrative Code § 14-189 members of the press and the public have a clearly established right to photograph and record police performing their duties in public places.  Pursuant to this right, neither members of the press nor members of the public need a press pass or any other form of press identification to observe and record police activity from a public place, including but not limited to: (i) An area where FAAs are taking place;  (ii) near where crimes are being committed; and (iii) where matters of public concern are occurring, subject only to constitutionally permissible reasonable time, place and manner restrictions.  NYPD officers may not prohibit, restrict or interfere with this right to observe and record.  In addition, NYPD officers may not arrest a member of the press or public solely for observing or recording police activity in a public place.

---

[3]https://www1.nyc.gov/site/nypd/about/about-nypd/policy/nypd-discipline-matrix.page#bookmark3

c.      The NYPD shall specify examples of valid and invalid restrictions on the right to record in its policy and training, with the primary goal of maximizing access to observe and record police activity.

d.      NYPD recognizes and acknowledges that a member of the press is not limited to people holding officially issued MOME press passes and the NYPD shall set clear standards in its trainings to ensure that members of the press are able to exercise their rights.[4] Government-issued press passes from jurisdictions or government agencies other than New York City must be acknowledged as valid but not exclusive indicia of an individual being a member of the press.

e.      Members of the press shall have access to any location where the public is permitted access. NYPD officers may not put up crime/accident/incident scene tape or establish what are commonly known as "frozen zones" for the purpose of preventing members of the press from viewing or recording the scene from a public place.

f.      NYPD officers may not prevent members of the press from observing or recording any member of service from a public place.

---

[4] "Journalist" or "member of the press" means an individual who gathers, reports, or licenses news or content, for the purpose of publishing, broadcasting, or cablecasting articles, commentaries, books, photographs, video, film, or audio by electronic, print, or digital media such as radio, television, newspapers, magazines, wire, books, and the Internet, including but not limited to an employee of a newsgathering organization, independent contractor, freelancer, or a self-employed person.

To facilitate the real-time identification of members of the press protected under this Agreement, the following shall be considered indicia of being a member of the press: visible identification as a member of the press, such as by wearing or carrying a press credential or other press identification or wearing or displaying distinctive clothing, labeling, insignias, or logos that identifies the bearer as a member of the press. Other indicia may include carrying professional equipment such as cameras, lights, microphones, or audio recorders as well as engaging in journalistic activities such as photographing, recording (video or audio), livestreaming or broadcasting, interviewing, or notetaking. These indicia are not exclusive, and a person need not exhibit every one of them to be considered a journalist or member of the press.

g.    In response to an order by the NYPD to leave an area, MOME press pass holders are not required to leave the area but shall move to a safe location.  At the discretion of the Incident Commander, members of the press may be directed to move to a different location where, to the fullest extent possible, they may still see and hear (unaided by any electronic device) ongoing newsworthy events and will not be subject to arrest for documenting police activity or for not leaving the general area.

h.    Where a member of the press is arrested for any Red Light offense(s)  and presents a MOME press credential or an official government-issued press credential from another jurisdiction or government agency, process for that arrest shall be approved by the Incident Commander and/or DCPI personnel at the time of the arrest.  If such member of the press is arrested for a C-summons-eligible Red Light offense, the presumption shall be that the arrested member of the press will be issued process at the point of encounter.  Such arrested member of the press may be removed to an arrest processing facility or otherwise transported to another location only in those instances where the Incident Commander determines that issuing process at the point of encounter would create a health and/or safety risk to officers or any other individual.  In the event the member of the press is presenting a government-issued press credential from another jurisdiction or government agency, this shall be verified, to the extent possible, at the time of encounter.  In a circumstance where the validity of the press credential is unable to be verified on scene, officers shall consider the following as indicia of the credential being valid: the identification contains a name which matches another form of identification, contains a photograph of the individual, details the issuing city or agency, includes the associated media outlet or indicates whether that individual is independent, includes an expiration date, or includes a serial or identification number.

i.    In recognizing the rights of the press, this Agreement does not in any way reduce the rights of the public to record police activity in public.

90.    NYPD shall amend current policy and training to reflect the above terms.  Additionally, NYPD shall train officers on treatment of the press, including policies outlined in the previous paragraph as well as Administrative Guide § 304-21 ("When A Member of the Service Encounters an Individual Observing, Photographing, and/or Recording Police Activity") and the actual interference requirements to make an arrest for Obstructing Governmental Administration (Penal Law § 195.05). Said training shall include, at minimum: (a)

21

annual training for all executive officers; (b) training at the Police Academy; (c) one-time training for all officers, which may be in the form of a prerecorded NYPDU video prepared with the participation and input of a third party qualified to train on press rights and which shall include test questions for officers to complete at its conclusion; (d) FINEST message(s) to be read at least five consecutive days' of roll calls; (e) at least two questions concerning press rights included in testing incorporated into academy training for newly promoted sergeants; and (f) in-person training for any officers who provide trainings outlined above, which shall be conducted by a third party qualified to train on media-police relations, who shall be approved by the NYPD and Plaintiffs' counsel. Policies relating to treatment of the press in protest circumstances shall also be incorporated in trainings concerning policing protests and community events. Training materials, recordings of trainings, and electronic records of attendance and proof of satisfactory completion shall be preserved.

91.     For the duration of the Agreement, the NYPD agrees to participate in meetings at least twice per year to discuss any problems related to the press and newsgathering activities, and to allow representatives of the press to make any recommendations with respect to related policies and practices. In attendance at these meetings shall be representatives from press organizations and/or trade groups, including two of Plaintiffs' counsel (and in no event fewer than one of Plaintiffs' counsel). These attendees shall not exceed seven (7) individuals in total. Defendants agree to have in attendance the DCPI, the Commanding Officer ("CO") of the Public Information Division, counsel for DCPI, and another NYPD employee deemed necessary by the CO of the Public Information Division.  Either the DCPI or CO of the Public Information Division may send a designee if he/she is unable to attend, but not both.

## VII.    TREATMENT OF LEGAL OBSERVERS

92.     The NYPD has established and will continue to enforce the following policy with respect to Legal Observers, which is incorporated herein. The Legal Observer Program is a comprehensive system of legal support coordinated by the National Lawyers Guild (NLG) and the New York Civil Liberties Union (NYCLU). Recognizing the importance of their work, the Department permits properly identified legal observers free access through police lines at the scene of any First Amendment activity. Legal observers generally wear bright green hats (NLG) or blue hats and blue vests (NYCLU). All members of the service will extend every courtesy and cooperation to observers. Observers shall be permitted to remain in any area, or observe any police activity, subject only to restrictions necessitated by personal safety factors, as determined by the Incident Commander.

## VIII.  DOCUMENTATION

93.    For all FAAs where the below conditions are met, the NYPD shall prepare an After-Action Report containing, at a minimum, the information set forth in this section of the Agreement.

94.    The conditions requiring the completion of an After-Action Report include the following:

a.    There five or more arrests at the FAA;
b.    A MAPC is activated and arrestees are brought to the MAPC;
c.    SRG is deployed on scene;
d.    Any officers are deployed pursuant to Paragraph 47 (in Tier Two) of this Agreement;
e.    The FAA moves to Tier Four and/or a dispersal order within the meaning of this Agreement is issued; or
f.    Any use of force involving baton strikes, OC spray, Taser or other less-lethal force, or where an individual was injured.

95.    The Parties agree and acknowledge that no particular form of After-Action Report is required and that the creation of this document by the NYPD will take place in Phase I. The After-Action Report shall convey, at a minimum, the information contained in the following categories:

a.    **Basic background information on the FAA**. This category includes start time and location, estimated crowd size, topic of the FAA; and whether any permits were issued in connection with the FAA.
b.    **Route of Travel.**  This category includes planned route of travel, route of travel if deviated from planned route, or route of travel if not planned.
c.    **Incident Commander(s)**. This category includes the identity of the Incident Commander(s) and identities of any other executives present at the FAA.
d.    **Deployment information and personnel assigned to the FAA.** This category includes: (i) The number of protest liaisons deployed to the FAA; (ii) whether and when personnel were deployed for traffic control purposes pursuant to Paragraph 41 of this Agreement; (iii) whether and when SRG was deployed pursuant to

23

Paragraph 53 of this Agreement; and (iv) whether and when personnel were deployed to response to threats pursuant to Paragraph 47 of this Agreement.

e. **Tiers.** This category includes the tier(s) the FAA started at and moved to and information sufficient to understand the basis for the decision to start and move to those tiers.

f. **Non-confidential intelligence.** Whether the NYPD obtained non-confidential intelligence relating to this FAA prior to the event.

g. **LRAD.** This category includes information on whether, when and for what purpose an LRAD was used.

h. **All enforcement actions taken at the FAA.** This category includes: (i) Total arrests and charges associated with those arrests; (ii) whether any journalist or legal observer was arrested, and if so the number of journalists or legal observers arrested; (iii) whether any individuals were recording police activities at the time of their arrest and if so the number of such arrests; and (iv) if Red Light arrests were authorized, who authorized them.

i. **Dispersal Order.** This category includes information on (i) whether and why any dispersal order was issued; (ii) when such order was issued; and (iii) who authorized the dispersal order.

j. **Mass Arrest Processing Center.** This category includes whether and when a mass arrest processing center was established.

k. **Number of people arrested held in excess of 7.5 hours following their arrest.**

l. **Property damage and injuries to members of service and civilians.** This category includes any efforts to obtain medical aid or assistance.

m. **Helicopters and specialized equipment.** This category includes: (i) Whether and when helicopters were deployed to the FAA; (ii) whether and when officers were instructed to carry helmets or specialized equipment in responding to the FAA; and (iii) whether and when specialized equipment, such as large OC-spray cannisters, was requested in the course of the FAA.

n. **Use of Force and Less Lethal Devices.** This category includes information on the use of batons, OC spray, or tasers for which a TRI report would have to be completed.

o. **Instructions and communications.** This category includes: (i) Information and instructions shared with officers deployed to the FAA such as the anticipated climate of the FAA; (ii) confirmation that members of service were made aware of their direct supervisors at the FAA; and (iii) communications NYPD made or

24

attempted to make with any individual at the FAA pursuant to the terms of Paragraph 40(b).

96.     After-Action Reports shall be produced to the Collaborative Committee within forty (40) days following the conclusion of any eligible FAA.

97.     The New York City Department of Investigation ("DOI") may request additional documentation relating to any FAA documented by an After-Action Report for the purposes of carrying out their responsibilities in the Oversight phase of this Agreement, including arrest reports, TRI reports, video footage, radio runs, activity reports, etc.

## IX.     OVERSIGHT

98.     The Parties agree to the following structure for oversight of the Agreement:

## PHASE I

99.     The purpose of Phase I is for the Parties to work in good faith to implement the policies, procedures, and training mandated by the Agreement.

*Parties' Responsibilities in Phase I*

100.     After this Agreement is signed, the Parties shall work in good faith to carry out any changes to training and policy (i.e., Patrol Guide changes) flowing from the agreements contained herein. This shall be known as "Phase I."

101.     The responsibilities of the Parties during Phase I are as follows:

a.     NYPD shall draft relevant policies/procedures and training curricula to effectuate the provisions of this Agreement. This includes the form that shall be used for the After-Action Report referenced in Part VIII above. The NYPD shall produce to Plaintiffs and Union Intervenors (as defined in this Agreement) all relevant, proposed policies/procedures and training curricula on the same date.

b.     Plaintiffs and Union Intervenors shall have ninety (90) days to review and provide good-faith recommendations on material items on the draft policies, procedures

and training curricula as prepared in (a). Recommendations will be provided by unions/plaintiffs in consolidated documents from the respective sides.

c.   Fourteen (14) days after receiving recommendations, the Parties shall meet-and-confer regarding any outstanding differences with regard to the draft policies, procedures and training curricula and attempt in good faith to resolve those differences. The NYPD shall provide the parties with copies of any revised draft policies, procedures and training curricula following the meet-and-confer.

d.   If, after exhausting the meet-and-confer process, Plaintiffs believe in good faith that the City has drafted relevant policies/procedures and training curricula that omit or violate material terms of this Agreement, they may make a motion to the Court on that basis. Plaintiffs shall have the burden to show that the policies/procedures and/or training curricula at issue omit or violate a material term of the Agreement.

e.   Plaintiffs shall have two opportunities to attend each training module developed as a result of this Agreement. Plaintiffs can raise material issues with training concerning the material terms of this Agreement as those observations occur, including in Phase II.

f.   Any subsequent material changes to the relevant policies, procedures, or training curricula made during Phase II of this Agreement shall be subject to the meet-and-confer process outlined above.

PHASE II

102.   Phase II shall begin forty-five (45) days after NYPD's final approval of all policies, procedures, and training curricula.

103.   The purpose of Phase II is to collaboratively review the NYPD's implementation of the terms of this Agreement, through (a) collaborative discussions as set forth below and (b) the Department of Investigation's review of certain FAAs as set forth in Paragraph 115.

26

*Collaborative Review Committee*

104.    At the start of Phase II, the Parties shall establish a Collaborative Review Committee ("Collaborative Committee").[5] The Committee will consist of:

a.    The Commissioner of the DOI;

b.    The FAA Senior Executive;

c.    A representative of the Office of Corporation Counsel;

d.    A representative from an Intervenor Union (as defined in this Agreement);

e.    A representative from the Office of the Attorney General;

f.    Two attorneys from Plaintiffs' attorneys in the Consolidated Cases (as defined in this Agreement).

105.    Plaintiffs believe that community input provides an important perspective for the Collaborative Committee during the Oversight Phase.  To that end, Plaintiffs shall hire an expert in community outreach who will be responsible for engaging affected communities including grassroots organizations, legal organizations, press organizations and legal observers, and ensuring that community input is incorporating into the Oversight Phase of this Agreement. Plaintiffs and their community outreach expert shall organize regular efforts to solicit feedback and input from stakeholders, including grassroots organizations, legal organizations, press organizations, and legal observers, to provide such feedback at the standing meetings. Such feedback and input shall include regular community meetings, roundtables, and engagement efforts with organizations and individuals engaged in FAAs.

---

[5] DOI is permitted to bring any staff needed to Committee meetings. Any other member of the committee presenting information to the Committee is permitted to bring staff to help present that information, including the expert on community outreach referred to in paragraph 105. Any such staff shall sign the Confidentiality Agreement agreed to by the Parties.

106.     The Collaborative Committee shall convene as set forth in the chart below.

*Role of DOI*

107.     Pursuant to the following paragraphs, DOI shall take on the role described below.

108.     DOI shall serve as Chair of the Collaborative Committee. No party shall have *ex parte* communications with DOI related to this Agreement without the written consent of all other parties, except insofar as DOI may confer with the Law Department as needed for any legal advice pertaining to DOI's fulfilment of its obligations under this Agreement or any related legal issues. In addition, DOI may speak on an *ex parte* basis with the NYPD to discuss compliance with information requests and schedule witness interviews. DOI may also request information or schedule interviews with community members as part of its oversight work. With respect to the Review FAAs (as defined below), DOI will share all requests for information and scheduled interviews, as well as a list of individuals interviewed to date, with the Parties three (3) months prior to the Collaborative Committee meetings at Months 6, 12, 18, 24, 30 and 33 at which those FAAs will be discussed. Any Committee member may propose that DOI make additional requests for information, or interview additional witnesses with respect to specific FAAs, at DOI's discretion. Such proposals must be received by DOI no later than two months prior to the above-referenced Collaborative Committee meetings at which those FAAs will be discussed.

109.     To perform this role, the City commits to provide DOI with funding to hire additional full-time DOI staff, for a minimum of three years and three months. The role will require five additional DOI staff with relevant experience, including but not limited to project management experience. Police oversight experience will be preferred but not required. DOI will post the positions and begin the hiring processes prior to the commencement of Phase II, to allow sufficient time to onboard staff. DOI estimates a minimum of $500,000 per year ($1,625,000 in total) to hire the additional staff. Without this funding and staffing, DOI cannot perform its role. In the event that DOI does not receive the funding outlined in this paragraph, either party may move the Court for appropriate relief.

110.     As set forth in the Responsibilities section below, DOI shall assess the NYPD's application of the terms of the Agreement through its review of the FAAs selected for each of the Collaborative Committee meetings at Months 6, 12, 18, 24, 30, and 33 (see schedule below). DOI may issue recommendations stemming from its review to further the NYPD's implementation of this Agreement. In the event that DOI has sufficient funding and staffing but fails to conduct the

28

required reviews under this Agreement, any Party may make a motion to the Court to seek appropriate relief to ensure that DOI performs its responsibilities.

*Structure of Phase II*

111.    In Phase II, the Collaborative Committee shall have standing meetings as follows: it shall meet two (2) times between Month 0 and Month 12; three (3) times between Month 13 and Month 24; and three (3) times between Month 25 and Month 36.

112.    At standing meetings that occur every six months, the Collaborative Committee shall review two FAAs. DOI has discretion to select additional FAAs for review. These FAAs shall be referred to in this Agreement as "the Review FAAs." The Review FAAs shall be selected six (6) months prior to the meetings. Plaintiffs will select two FAAs at the start of Phase II for the meeting at Month 6, two FAAs at Month 6 for review at Month 12, etc., except that the City Defendants shall be entitled to select one of the Review FAAs for each of the meetings at Month 18 and Month 24. Review FAAs shall be ones that would require completion of an After-Action Report; the Review FAAs selected by the City must additionally be ones where either a dispersal order was issued or arrests were made.

113.    To ensure that the DOI can complete its review of two FAAs within a 6-month period and to ensure Plaintiffs' review of NYPD's conduct is consistent with the Agreement, the NYPD must promptly produce all relevant materials to DOI. They shall also make available for interview any NYPD personnel whom DOI deems necessary to evaluate compliance with this Agreement. The NYPD shall also designate an NYPD officer with authority to receive any requests for relevant materials, produce those materials, and make NYPD witnesses available for interviews. Only DOI shall interview such individuals; witnesses may have a union representative or their attorney present for such interviews. NYPD will not provide highly sensitive law enforcement materials (e.g., information that could identify or risk exposing undercovers or confidential informants; or counterterrorism intelligence). If the NYPD claims that any documents contain privileged or law enforcement sensitive information that the NYPD believes warrants redactions or withholding, the NYPD will identify the basis for any such redactions or withholding of materials to DOI, and shall in good faith endeavor to provide the DOI with the necessary information while maintaining privilege and/or protecting law enforcement sensitive information, and shall produce a privilege log consistent with this paragraph within one week of such production. DOI shall additionally provide to the Collaborative Committee an index of all documents relied upon in reviewing the Review FAAs.

114.    DOI shall provide its recommendations in draft form fourteen (14) days prior to the meetings at Months 6, 12, 18, 24, and 30, and will include citations to materials upon which its recommendations are based. Fourteen (14) days prior to the above-referenced meetings, DOI shall provide those cited materials to Plaintiffs along with any privilege log previously obtained from NYPD. DOI shall provide its recommendations, in final form, with citations to materials upon which its recommendations are based, fourteen (14) days prior to the deadlines at Months 8, 14, 20, 26 and 32.

115.    At the meetings concerning discussion of the Review FAAs, the Collaborative Committee shall review the FAAs with respect to the following:

a.    Whether the appropriate applicable tiers were enacted at all stages of the Review FAA, including whether the basis for enacting those tiers was supported; whether the reasons for enacting those tiers were appropriately documented pursuant to the terms of this Agreement and in a manner sufficient to enable collaborative review; and whether the NYPD accommodated the FAA where possible including by managing vehicular and pedestrian traffic;

b.    Whether protest liaisons were deployed and carried out their functions appropriately at the Review FAA pursuant to the terms of this Agreement;

c.    Whether Incident Commanders were properly identified and selected as outlined in this Agreement;

d.    Whether other MOS were appropriately stationed and/or deployed at the Review FAA pursuant to the terms of this Agreement, including whether the justification for those deployment decisions was supported, and whether the justification for such deployment was documented pursuant to the terms of this Agreement and in a manner sufficient to enable collaborative review;

e.    If SRG was deployed, whether (1) SRG was necessary to ensure safety; (2) SRG assured the continuation of the FAA; and (3) the deployment of SRG otherwise conformed to the terms of this Agreement;

f.      Whether any dispersal orders issued in Tier Four, or any arrests stemming from a failure to disperse, were issued for a reason and in a manner conforming to terms of this Agreement and whether the justification for those decisions were documented pursuant to the terms of this Agreement and in a manner sufficient to enable collaborative review;

g.      Whether any use of the tactic known as encirclement as defined in this Agreement conformed to the terms of this Agreement;

h.      Whether arrests made at the Review FAAs conformed to the provisions set forth in this Agreement and whether arrests were appropriately documented pursuant to the terms of this Agreement and in a manner sufficient to enable collaborative review;[6]

i.      Whether arrests made at the Review FAA conform to the limits on time in custody set forth in this Agreement;

j.      Whether the use of force at the Review FAA conformed to the terms of this Agreement, whether MOS sought medical attention for specific injured individuals pursuant to the terms of this Agreement and whether officers appropriately documented the use of force pursuant to the terms of this Agreement and in a manner sufficient to enable collaborative review;

k.      Whether any use of helicopters at the FAA conformed to the terms of this Agreement;

l.      Whether the NYPD's actions in relation to members of the press and individuals engaged in recording police activity conformed to the terms of this Agreement concerning the right to record and treatment of journalists;

---

[6] To the extent any inquiry within this paragraph concerns any arrest where criminal charges related to that arrest are actively being prosecuted, they will be investigated at the discretion of DOI, which shall be exercised in a manner that ensures DOI's oversight responsibilities under this Agreement are not impaired. "Actively being prosecuted" in this context may not include cases that have been adjourned in contemplation of dismissal.

m.      Whether Defendants' action or inaction at the Review FAA, including any arrests, demonstrate bias or retaliation against protesters based on race, ethnicity and/or the message or viewpoint of the protesters.

116.    The members of the Collaborative Committee shall discuss the NYPD's compliance with the Agreement, including the issues outlined above, and any recommendations for achieving compliance in the future. Based on its analysis of the Review FAAs, DOI shall present its draft recommendations at the meetings concerning discussion of the Review FAAs, and the other members of the committee shall have the opportunity to comment on, and discuss, these draft recommendations.

117.    In analyzing the issues outlined above, the Collaborative Committee may also discuss any issues with training that had been raised in Phase I that may be linked to indications of material breach.

118.    At the meetings at Months 21, 27, and 33 (where no Review FAAs are selected), the Collaborative Committee shall convene to discuss the NYPD's implementation of this Agreement, including recommendations made by DOI. DOI shall not be obliged to investigate any matter outside of those listed in Paragraph 115.

119.    No person attending or participating in the Collaborative Committee meeting shall record or permit the recording of any part of the meeting, including audio, video, chat, closed-captions, or any other methods of communication. No person shall disclose to the public any communications made exclusively during and for the Collaborative Committee process. Nothing in this provision shall prevent any person attending or participating in the Collaborative Committee from discussing the feasibility of any proposed recommendations with relevant stakeholders, and nothing in this provision shall inhibit discussions of the Collaborative Committee process with relevant stakeholders, Plaintiff counsel, or Plaintiff parties. Also nothing in this provision shall prevent the Parties from relying on information obtained from the Collaborative Committee process to support a motion before the Court. Documents provided to the Collaborative Committee in the form of the After-Action Reports and any documents shared, reviewed, or discussed at the Collaborative Committee shall be confidential and may not be disclosed to anyone outside of the Collaborative Committee; except that the disclosure requirements of this paragraph do not apply to the extent such documents or information are otherwise obtainable through applicable public disclosure laws (FOIL). Committee members shall be bound by the Confidentiality Agreement agreed upon by the Parties.

120.    If Plaintiffs identify additional indications of lack of implementation of this Agreement, Plaintiffs may place such matters on the agenda of any standing meeting of the Collaborative Committee, and the Committee shall engage in good faith discussions in an attempt to resolve the issue. Such matters may not arise solely from sporadic instances of alleged minor violations of the terms of this Agreement.

121.    Within five (5) days after each standing meeting, DOI shall publish on its website the identity of all participants and a list of agenda topics discussed at the meeting, including the date and location of the FAAs reviewed or discussed.

122.    DOI shall make final determinations regarding its recommendations to NYPD. Fourteen (14) days before the deadlines at Months 8, 14, 20, 26, and 32, DOI shall issue final written recommendations to the NYPD, if any, stemming from its review and the issues discussed at the standing meetings. Subsequent standing meetings shall include updates from Defendants on implementation of DOI's recommendations.

123.    Plaintiffs may also ask DOI to convene an emergency meeting if they believe that there are ongoing material violations of the issues set forth in Paragraph 115, meaning the alleged violations must be persistent and include the prospect of irreparable harm. Should DOI convene an emergency meeting, the meeting shall focus on the issues set forth in Paragraph 115.

124.    If any party has a good faith basis to assert that the opposing party is in material breach of the material terms of this Agreement in Phase II, they may move the Court for tailored relief appropriate to cure the specific alleged material breach. The moving party shall bear the burden. The moving party shall attempt to resolve the matter through a meet and confer with the opposing party prior to any motion and, to the extent possible, through a meeting of the Collaborative Committee. The motion must be made on the basis of a specific alleged material breach.

a.  Where such a motion alleges a breach of the material terms of this Agreement arising out of the DOI Month 18 or Month 30 reports, the record upon which the Court shall evaluate such a motion shall be such reports and information obtained from the Collaborative Committee process underlying those reports. Any motion shall be consistent with the terms of Paragraph 115 of this Agreement.

b.  Such a motion may also be made on the basis of allegations of either: (i) Persistent failure to engage with the terms of the collaborative process in a manner that materially undermines DOI or the Parties' ability to fulfill their obligations in Phase II; or (ii) that

33

Defendants have promulgated policies/procedures and/or training curricula that omit or violate material terms of this Agreement.

c.  No such motion may be made for the purpose of requesting that the Court modify or revise the terms or length of this Agreement.

d.  DOI shall provide an index of all materials that it relied upon to issue its reports. In the event that a party opts, in good faith, to engage in motion practice pursuant to this section, then within thirty (30) days of a request for materials from the index required to support the motion, DOI shall produce those materials to the requesting party. Such materials shall include recordings or transcripts of interviews, if available, but shall not include any attorney notes or impressions relating to such interviews.

*DOI Reports and Recommendations*

125.    Eighteen (18) months following the inception of Phase II, DOI shall issue a progress report summarizing their review of the Review FAAs, assessing whether the recommendations have been implemented, and summarizing the issues raised at the Collaborative Committee to date. This report shall be public and filed with the Court. The Parties shall each be entitled to file a response to this report, which may include information raised at the Collaborative Committee meetings.

126.    Thirty (30) months following the inception of Phase II, DOI shall issue a report summarizing their review of the Review FAAs, assessing whether the recommendations have been implemented, and summarizing the issues raised at the Collaborative Committee to date. This report shall be public and filed with the Court. The Parties shall be entitled to file a response to this report, which may include information raised at the Collaborative Committee meetings. Within 30 days of receiving the report, Defendants shall inform the Collaborative Committee if they intend to move for early termination of Phase II of the Agreement. Defendants would bear the burden of proof to demonstrate that they have achieved a level of compliance that does not deviate significantly from the material terms of the entire Agreement. All Parties shall be provided an opportunity to be heard on that motion.

127.    Unless Phase II has been previously terminated by the Court, thirty-six (36) months following the inception of Phase II, DOI shall issue a report summarizing their review of the Review FAAs, assessing whether the recommendations have been implemented, and summarizing the issues raised at the Collaborative Committee to date. This report shall be public and filed with the Court. Following publication of this report, Phase II shall terminate.

34

128.    Any deadline can be extended by written agreement of the Parties.

*Schedule of Collaborative Committee Standing Meetings and Reporting*

| Start of Phase II (Month 0) | Plaintiffs select two Review FAAs |
|---|---|
| Month 6 | Collaborative Committee Meeting to discuss Review FAAs from Month 0 and other agenda items. Plaintiffs select two Review FAAs for next meeting. |
| Month 8 | DOI issues any final recommendations |
| Month 12 | Collaborative Committee Meeting to discuss review FAAs from Month 6, NYPD's progress on any recommendations and other agenda items. Plaintiffs select one Review FAA and the City Defendants select one Review FAAs in accordance with Paragraph 112 for the next meeting. |
| Month 14 | DOI issues any final recommendations |
| Month 18 | Collaborative Committee Meeting to discuss Review FAAs from Month 12, NYPD's progress on any recommendations and other agenda items. Plaintiffs select two Review FAAs for next meeting.<br><br>DOI files progress report with the Court |
| Month 20 | DOI issues any final recommendations |
| Month 21 | Collaborative Committee Meeting to discuss NYPD's progress on any recommendations and other agenda items |
| Month 24 | Collaborative Committee Meeting to discuss Review FAAs from Month 18, NYPD's progress on any recommendations and other agenda items. Plaintiffs select one Review FAA and the City Defendants select one Review FAAs in accordance with Paragraph 112 for the next meeting |
| Month 26 | DOI issues any final recommendations |
| Month 27 | Collaborative Committee Meeting to discuss NYPD's progress on any recommendations and other agenda items. |
| Month 30 | Collaborative Committee Meeting to discuss Review FAAs from Month 24, NYPD's progress on any recommendations and other agenda items. Plaintiffs select two Review FAAs for next meeting. |

| | DOI files its progress report with the Court |
|---|---|
| Month 31 | Defendants have opportunity to move Court for early termination, as outlined in Agreement |
| Month 32 | DOI issues any final recommendations |
| Month 33 | Collaborative Committee Meeting to discuss NYPD's progress on any recommendations and other agenda items. |
| Month 36 | DOI issues its Final Report/Review; Plaintiffs have opportunity to move Court for material breach as set forth in Paragraph 124(a). |

PHASE III

129.    For a period of twelve (12) months following the termination of Phase II, the Court shall retain jurisdiction over this Agreement.

130.    If, at any time during Phase III, Plaintiffs have good-faith reason to believe that Defendants are in material breach of the terms of this Agreement, Plaintiffs may move the Court for tailored relief appropriate to cure the specific alleged breach(es). Plaintiff shall bear the burden to show material breach. No motion may be made for the purpose of requesting that the Court modify or revise the terms or length of this Agreement.

131.    This Agreement shall terminate twelve (12) months following the termination of Phase II. The Court shall retain jurisdiction to resolve any motion pending at the termination of Phase III or enforce relief ordered by the Court during Phase III.

## XII.   ATTORNEYS FEES AND COSTS

132.    The City shall establish a fund of $1,450,000 for reasonable attorneys' fees and costs accrued during Phase I and Phase II.

133.    Every four months, Plaintiffs' counsel shall submit to the City proof of any reasonable fees or costs for work performed (e.g., vouchers, receipts, billing records). Plaintiffs' first submission shall occur four months after the initiation of Phase I.

134.    The City shall reimburse Plaintiffs for any reasonable work done or costs incurred within sixty (60) days.

36

135. In the event that the Parties have a disagreement about the reasonableness of Plaintiffs' submission, they shall meet and confer within fourteen (14) days of Plaintiffs' submission. In the event that the Parties cannot resolve any such dispute, any dispute with regard to fees or costs shall be adjudicated by the Court on motion practice.

136. Under no circumstances shall the City pay to Plaintiffs a sum greater than $1,450,000 for reasonable fees and costs accrued during Phase I and Phase II.

137. Should the amount of reimbursement sought by the Plaintiffs be less than $1,450,000 after termination of this Agreement, any excess funds would revert to the City.

138. If Plaintiffs prevail on a motion pursuant to this Agreement, the City shall be responsible for Plaintiffs' reasonable fees and costs in connection with such a motion and the amounts provided in Paragraph 136 shall not apply to those fees, costs and disbursements in connection with such motion. If the City prevails on a motion pursuant to this Agreement, Plaintiffs shall be responsible for reasonable costs in connection with such a motion.

139. An agreement in principle on attorneys' fees has been reached in *Payne* and will be addressed in the individual stipulation of dismissal to follow. The attorneys for *Gray* and *Rolon* will separately negotiate reasonable attorneys' fees and costs incurred during the course of the litigation. If the attorneys for *Gray* or *Rolon* cannot resolve reasonable fees and costs through negotiations, they will submit a fee application to the Court, to which Defendant City of New York will respond.

## XIII.  OTHER PROVISIONS

140. Nothing contained in this Stipulation shall abridge, limit, infringe, and/or otherwise restrict the statutory rights of uniformed members of service and/or the recognized employee organizations that represent the respective uniformed members of service, as codified in NYCCBL Section 12-307(a) and (b), as well as the respective collective bargaining agreements by and between the City and the respective recognized employee organizations. Implementations and/or enforcements of this provision that may run afoul of said rights shall be subject to adjudication through either actions under NYCCBL or grievance/arbitration procedures contained in the respective collective bargaining agreements by and between the City and the respective recognized employee organizations.

141.    Nothing in this Agreement has waived the Union Intervenors' (as defined in this Agreement) rights to bargain over any changes in working conditions resulting from this Agreement and any Department policies and procedures resulting therefrom.

**SO ORDERED:**

 

 

_____
Hon. Colleen McMahon
United States District Judge

 

Dated: _____
       New York, New York

38

STIPULATED AND AGREED:

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of the City of New York
100 Church Street Rm. 3-207
New York, NY 10007

By:   */s/ Patricia Miller*

Patricia Miller
Division Chief, Special Federal Litigation Division
Omar J. Siddiqi
Genevieve Nelson
Jenny Weng
*Counsel for Defendants*

THE LEGAL AID SOCIETY

By: */s/ Corey Stoughton*
Corey Stoughton
Jennvine Wong
Rigodis Appling
Paula Garcia-Salazar
49 Thomas Street
New York, NY 10013
Csgtoughton@legal-aid.org

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION

By: */s/ Molly K. Biklen*
Molly K. Biklen
Daniel R. Lambright
Jessica Perry
Veronica Salama
Robert Hodgson
Perry Grossman

39

Lisa LaPlace
Christopher T. Dunn
125 Broad Street, 19th Floor
New York, NY 10004
mbiklen@nyclu.org

*Counsel for Payne plaintiffs*

LETITIA JAMES
*Attorney General of the State of New York*

By: /s/   *Travis England*
Travis England, *Deputy Chief, Civil Rights Bureau*
Lillian Marquez, *Assistant Attorney General*
Lois Saldana, *Assistant Attorney General*
Swati Prakash, *Assistant Attorney General*
Nancy Trasande, *Assistant Attorney General*
Gina Bull, *Assistant Attorney General*
Tracy Edwards, *Assistant Attorney General*
Colleen Faherty, *Assistant Attorney General*
Greg Morill, *Assistant Attorney General*
John Marsella, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
(212) 416-6233
Travis.England@ag.ny.gov

DAVIS WRIGHT TREMAINE LLP
By: */s/ Robert D. Balin*
Robert D. Balin
Abigail Everdell
Kathleen Farley
Nimra H. Azmi
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Fax: (212) 489-8340
robbalin@dwt.com

Wylie Stecklow
WYLIE STECKLOW PLLC
Carnegie Hill Tower 152 W. 57th Street, 8th Floor
NY NY10019
(t) 212 566 8000
ecf@WylieLAW.com

Mickey H. Osterreicher
General Counsel
 NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
70 Niagara Street
Buffalo, New York 14202
Tel: (716) 983-7800
Fax: (716) 608-1509
lawyer@nppa.org

Alicia Calzada (pro hac vice)
ALICIA WAGNER CALZADA, PLLC
Deputy General Counsel National Press Photographers Association
926 Chulie Drive, Suite 16
San Antonio, TX 78216
210-825-1449
Alicia@calzadalegal.com

*Attorneys for Gray Plaintiffs*

The Aboushi Law Firm PLLC
/s/ Tahanie A. Aboushi
Tahanie A. Aboushi, Esq.
Aymen A. Aboushi, Esq.
1441 Broadway, 5th Floor
New York, NY 10018
Tel: (212) 391-8500
Tahanie@Aboushi.com
Aymen@Aboushi.com

COHEN&GREEN P.L.L.C.
By:  /s/ Elena L. Cohen
Elena L. Cohen
J. Remy Green
Jessica Massimi
1639 Centre Street, Suite 216

Ridgewood (Queens), NY 11385
t: (929) 888-9480
f: (929) 888-9457
e: elena@femmelaw.com
remy@femmelaw.com
jessica@femmelaw.com

GIDEON ORION OLIVER
/s/ Gideon Orion Oliver___
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

*Counsel for Plaintiffs in Rolon, et al. v. City of New York, et al., No. 21-cv-2548*


PITTA LLP

/s/ Stephen Mc Quade
Stephen Mc Quade, Esq.
*Attorneys for the Detectives' Endowment Association*
120 Broadway, 28th Floor
New York, New York 10271
*Telephone:* (212) 652-3885
smcquade@pittalaw.com

/s/ Andrew Quinn
Andrew C. Quinn, Esq.
The Quinn Law Firm, PLLC
*Attorneys for the Sergeants Benevolent Association*
399 Knollwood Road, Suite 220
White Plains, New York 10603
Tel: (914) 997-0555
Fax: (914) 997-0550
Aquinn@quinnlawny.com