UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

| | |
|---|---|
| In Re: New York City Policing During Summer 2020 Demonstrations | Index No. 20-CV-8924(CM)(GWG) |

-------------------------------------------------------------

**DECLARATION OF LOUIS ANEMONE IN SUPPORT OF POLICE BENEVOLENT ASSOCIATION'S OPPOSITION TO PROPOSED SETTLEMENT**

**LOUIS ANEMONE** affirms as follows under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I served over 35 years in the New York City Police Department ("NYPD") and retired as Chief of Department in 1999.

2. I submit this Declaration in support of the Police Benevolent Association ("PBA")'s opposition to the proposed settlement in the consolidated matters captioned above (the "Proposed Settlement", annexed hereto at Exhibit A).

3. My statements in this declaration are based on 35 years of experience planning, staffing, training, attending, supervising and critiquing the NYPD's response to public protests.[1] The total number of such events I have participated in is certainly over 350.

4. Based on my extensive experience, I recognize acute risks to the safety of police officers, protestors, and other members of the public, should the Proposed Settlement be approved.

5. As discussed more fully below, the Proposed Settlement will:

---

[1] As addressed at p. 9, fn. 1 of the PBA's accompanying memorandum of law, the Proposed Settlement's definition of "First Amendment Activities" appears to be so broad that it would at least arguably apply not only to virtually all protests, but to all public gatherings. For purposes of this declaration, I will employ the term "Protest" to describe the events being discussed.

- Present a significant risk of serious injury to police officers, protestors, and the public, in light of several factors, including delays associated with requiring a Senior Executive who may not be on the scene to decide what tactics and tier should be utilized in the field;

- The above risks are further compounded when the Senior Executive must manage multiple requests, from multiple Incident Commanders, from multiple protest locations throughout the City, including moving protests, occurring at night, involving violence, and using multiple staging locations. As difficult as it may be for one Incident Commander to notify the Senior Executive in a timely manner, and/or request permission to move to another tier, deploy SRG, or make other tactical authorizations, these difficulties are heightened when dealing with multiple incidents;

- Increase safety risks to police officers, protestors, and the public arising out of not having sufficient resources deployed at the beginning of the event where the mere presence of police officers or verbal commands might have ensured a violence free event;

- Pose significant risks to injury of police officers, protestors, and the public due to provisions of the agreement that require delaying traffic for the protestors, allowing the protest to continue after protesters have been ordered to disperse, or allowing a protest to continue while serious crimes are being committed.

6. I set forth the reasons for these statements below, after briefly summarizing my background, training and experience.

## I. BACKGROUND, TRAINING AND EXPERIENCE

7. I joined the NYPD in December 1964 as a Police Trainee and was appointed as a probationary patrolman upon turning 21. From the beginning of my career, I was trained in tactics for disorder control by the Police Academy Firearms and Tactics Section and the Emergency Service Unit. I performed police duty as a patrolman, at protests throughout Brooklyn and Manhattan from 1967-1973.

8. I was promoted to Sergeant in June 1973 and recertified as a member of the disorder control staff. As a sergeant I supervised police officers performing duty at protests throughout Manhattan.

9. I was promoted to Lieutenant in November 1977, and I supervised police operations at multiple protests throughout Manhattan.

10. I was promoted to Captain in 1982 and was trained and certified as an NYPD "Incident Commander" and NYC "On Scene Coordinator" in 1982, 1984, and 1986 by the Police Academy and the Special Operations Division. In May 1989, I was promoted to Deputy Inspector and to Inspector a year later. In 1992, I was selected as a member of the disorder control staff for the NYPD, with teaching responsibilities at the Police Academy for newly promoted Captains.

11. As Chief of Patrol in January 1994, and subsequently as Chief of Department in January of 1995, I played a major role in the planning, staffing and reviewing of police deployments to all types of protests, as well as parades, presidential visits, UN General Assembly, Fourth of July Fireworks Displays, and other major sporting and entertainment events. In addition, my team and I drafted NYPD's policies, duties, responsibilities, tactics, and mobilization levels to respond to civil disorders.

12. I retired on July 9, 1999, as Chief of Department, the highest-ranking sworn member of the NYPD.

## II.     THE TIERED RESPONSE STRUCTURE

13.     I summarize here details of the tiered response structure that are most pertinent to my analysis and conclusions.

*A.  Tier I*

14.     Tier I "applies, and should presumptively apply, to all First Amendment Activity ("FAA"), unless thresholds for another tier apply and/or protesters specifically request the presence of officers." ¶38. "FAA" as defined in the Stipulation, includes "any protest or demonstration at which individuals are expressing their rights under the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution." ¶ 6.

15.     At Tier I, only Community Affairs officers may be deployed (¶40(a)), unless "an FAA temporarily blocks vehicular or pedestrian traffic or otherwise obstructs public streets or sidewalks". ¶41.

16.     In that event, the NYPD "may deploy patrol officers to reroute vehicular or pedestrian traffic" but 1) "shall dispatch no more patrol officers than necessary", and 2) may not dispatch members of the SRG unless "an FAA is so large or occurs in such a manner as to obstruct access to critical infrastructure . . . and rerouting vehicular or pedestrian traffic is not adequate to address the obstruction". *Id.*  Before any such deployment to protect threatened critical infrastructure, "protest liaisons shall endeavor to negotiate an alternative route or location with participants in the FAA, when feasible". *Id.*

17.     At all times in Tier I, officers cannot make arrests for "Red Light" offenses -- riot, incitement to riot, non-violent obstruction of governmental administration, violation of emergency orders, disorderly conduct, trespass, criminal mischief 3 or 4, New York State Vehicle

and Traffic Law 1156(a) (pedestrians on roadways), or unlawful assembly without the approval of someone at the rank of Captain or above. *Id.*; *see also* ¶¶28-31.

18. The NYPD may move to Tier II only if:

> the Incident Commander, in consultation with the FAA Senior Executive, reasonably believes that Green Light violations are imminent but have not yet occurred or that the FAA is so large or occurs in such a manner that creates a risk of obstructing access to critical infrastructure . . . such that it is reasonably anticipated that the deployment of additional officers may become necessary, and that the risk of obstructing access cannot be relieved by directing individuals to alternate entrances and exits of the critical infrastructure location.

¶43.

19. At Tier II, The NYPD may station additional officers only a) off scene, or b) if the Incident Commander reasonably believes that there is a threat of major property damage and/or violence that additional officers will deter, in which case the "resources deployed shall be proportional and no more than necessary to address the imminent threat . . . [and] shall be removed when the threat has resolved." ¶47.

B. Tier III

20. Only the Incident Commander may authorize moving to Tier III, and may do so only "if there is individualized probable cause to arrest individuals who are engaged in Green Light offenses or authorized Red Light offenses." ¶¶49-50.  In that event, the NYPD is limited to deploying only "an appropriate number of officers sufficient to address the specific individuals engaged in Green Light offenses or authorized Red Light offenses."  ¶51.

21. Only the FAA Senior Executive may authorize the deployment of "specialized formations and/or equipment" at Tier III, s/he must do so only "in a manner consistent with ensuring the safety and continuity of the FAA", and such deployment is allowed only "for as long as is necessary to address the conditions that they were deployed to address." ¶53.

*C. Tier IV*

22. The NYPD is permitted to move to Tier IV only if jointly authorized by the FAA Senior Executive in consultation the Incident Commander (¶58), and then only if 1) "protesters are seeking to gain unauthorized entry, or physically blocking others' entry, into a sensitive location or engaged in a criminal offense of trespass in the third degree or higher; 2) officers have engaged in targeted efforts to address widespread Green Light offenses, or widespread instances of riot, incitement to riot, or engaging or preparing to engage in violent or tumultuous conduct within the meaning of the unlawful assembly statute, but those offenses continue unabated and cannot be addressed through further de-escalation or targeted enforcement; 3) there is probable cause sufficient to establish widespread Green Light offenses, or widespread instances of riot, incitement to riot, or engaging in or preparing to engage in violent and tumultuous conduct within the meaning of the unlawful assembly statute, and there was no viable opportunity to address those widespread offenses through further de-escalation or targeted enforcement." ¶¶56-57.

## III. THE PROPOSED SETTLEMENT INCREASES RISKS TO POLICE OFFICERS, PROTESTORS AND THE PUBLIC

23. The power and duties of the NYPD are defined at § 435 of the New York City Charter, which reads in relevant part as follows:

> The Police Department and force shall have the power and it shall be their duty to preserve public peace; prevent crime; detect crime; detect and arrest offenders; suppress riots, mobs and insurrections; Disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks, and places.

24. The Proposed Settlement would limit police actions, delay police response, and limit numbers of and equipment available to officers deployed. As discussed below, this will conflict with the above Charter mandate, the Seven C's of Critical Incident Management, and the

Use of Force Continuum, leading to a significant risk of injury to police officers, protestors, and the public.

### A.     The Seven C's of Critical Incident Management

25.     The Seven C's have been used and embodied in the Critical Incident Management Systems utilized at local, New York State and federal levels for decades.[2] These Seven C's are COMMAND, CONTROL, COMMUNICATION, CONTAINMENT, COORDINATION, COMPLACENCY, AND CRITIQUE.

26.     The overall lesson of the Seven C's is that speed, decisiveness, and familiarity with the 7 principles by police incident commanders, allows everyone to operate in a safer environment during any and all protests. Rather than responding to an incident after it has boiled over, appropriate deployment of police resources at the earliest possible moment significantly decreases the odds of violence occurring.

27.     The Proposed Settlement would prevent the NYPD from implementing several of these critical principles.  It undercuts the ability of an incident commander to take rapid decisive action without the approval or notification of a Senior Executive who may or may not actually be at the scene. Time lost in attempting these notifications, explaining a situation that will most certainly be in flux and the justification for actions recommended will increase the risk of violence by the time approval is received and officers arrive. The requirement of approval for certain Red Light/Green Light arrests will prevent the police from acting appropriately in real time during a fluid event.

---

[2] *See, e.g.*, fema.gov/sites/default/files/2020-07/fema_nims_doctrine-2017.pdf; policeforum.org/managing-a-critical-incident; irp.fas.org/doddir/army/fm3-19-15.pdf.

### B. The Proposed Settlement Also Disrupts the Use Of Force Continuum, A Critical Element Of The Management Of Public Protests.

28. Another critical concept underlying the policing of public protests is the "Use of Force Continuum",[3] a series of calibrated actions by police to employ, based on the actions and compliance of the subject. These police actions are designed to gain compliance with the use of the minimum amount of force. The levels of the Use of Force Continuum are: Presence, Verbal, Physical Force, Deadly Force.

29. The first level on the Use of Force Continuum is the tool of **Presence.** An officer's mere presence, without verbal communication or commands, preserves peace and prevents crimes. Just as drivers are more likely to obey a traffic signal when an officer in a marked vehicle is visibly observing, in the face of a strong and visible police presence, protestors or observers of a protest are less likely to engage in illegal acts that, in a group dynamic, may tend to fuel escalating disorder. When presence is sufficient, no force by the police is necessary, and peaceful protests may continue unabated.

30. The next level on the Continuum is **Verbal**. An officer can change a person's behavior with a verbal command in an effort to gain compliance with a lawful order or direction. "Pull over" to a motorist, "Break it up" to a group occupying a sidewalk for an illegal dice game are examples of everyday verbal commands. Generally, no force is necessary with verbal commands. Again, the goal is compliance without the need to use force. If the Proposed Settlement is approved as written the effective use of verbal commands will be compromised by insufficient numbers of police resources at the scene and restrictions on use of the SRG, the NYPD unit that is trained to respond to disorder and crowd control.

---

[3] *See, e.g.*, https://nij.ojp.gov/topics/articles/use-force-continuum.

31.     An incident commander at a protest who cannot gain compliance with verbal commands will have no recourse but to move to the next and third level on the use of force continuum -- **Physical force**. This action of course increases the risks of injury to police and protesters. The longer it takes to gain sufficient resources or appropriate resources to the scene, the more difficult it is to change behavior early on in a degenerating protest. Physical force involves the use of open or closed hands, electronic control devices (taser, for example) and impact weapons (batons, for example).

32.     **Deadly Force**, the fourth and final step on the Use of Force Continuum, is controlled by the U.S Constitution, New York State Penal Law, Criminal Procedure Law, and NYPD Patrol Guide.

33.     The Proposed Settlement obstructs operation of the Use Of Force Continuum in various ways.  For example, unless there is an actual blockage of traffic or critical infrastructure, at Tier I it prohibits even police presence beyond "protest liaisons" focused on communicating with protestors unless "protesters specifically request the presence of officers." ¶¶38-41.

34.     This denies timely access to the most fundamental policing tool for avoiding escalation. In the case of a protest that becomes unruly, disorderly, or violent, the delay in actually getting sufficient numbers of police officers to the scene at the appropriate tiered response level will result in losing the ability to control this behavior by mere presence, as would be the case if immediate deployment of sufficient numbers had been allowed when the need was perceived by the incident commander on the scene or prior to the event even beginning.

35.     In addition, the tiered approach imposes remote oversight, and attendant delays, on the deployment of equipment and tactics deemed necessary by the incident commander. This will result in an increased risk of injury to police officers, protestors and the public. These

9

proposed changes may result in officers arriving and having to move to level 3 on the Use Of Force Continuum, Physical Force, due to the Proposed Settlement's mandate that police presence should be limited or not present at the inception of the protest (Tier I, ¶¶39-41) or officers not being allowed to use personal protective equipment without approval (Tier I ¶41), or certain officers (SRG) not being allowed to be utilized without the FAA Senior Executive's approval (Tier III, ¶53). The Proposed Settlement also creates an opportunity for serious injuries at Tier IV (¶¶59-61) because it allows for a continuation of the protest after a dispersal order has been issued. Confusion, chaos and serious risks of injury to police officers trying to implement this Proposed Settlement can be expected to occur.

**C. Summary of Other Examples of How the Proposed Settlement Increases Safety Risks to Officers**

36.     Although this summary is necessarily non-exhaustive given the Proposed Settlement's extraordinary complexity, I collect here examples of other specific provisions that jeopardize the safety of officers, protestors, and the public:

- Requiring that the NYPD move to the highest tier only if green light violations are "widespread", with no standard for what is deemed to be "widespread".  (¶57.)

- Limiting officer deployment (*e.g.*, ¶¶40-41, 45-47, 53) without making explicit that the safety of the officers can be factored into how and how many officers are deployed to police FAA events.

- Infringing on the public's right to seek police protection and on police-community relations by prohibiting police presence at Tier I FAA events even when requested by the public.  (¶38.)

- Requiring that a Captain or higher be designated as the Incident Commander at every FAA event (except where it may "not escalate beyond Tier I").  (¶23.)  This reflects a lack of recognition of the number of such events that the NYPD manages each year without incident, many with sergeants or lieutenants as the ranking officer, and the importance of the Department's professional expertise in determining which ranks

should be present at each event based on past experiences, knowledge of the participant groups, and the inevitability of limited resources.

Moreover, at least in the case of unanticipated or spontaneous FAA events, the incident commander title will by nature of the circumstances, flow from the first officer on the scene, to the first supervisor on the scene, to higher ranking supervisors on the scene. The cumbersome structure here risks creating delay in taking appropriate action due to no Captain or FAA Senior Executive being available.

- Severely impairing the ability of the Incident Commander and the Department itself to deploy officers or units where and when needed. (¶24, 26-27, 30).

- Directing the manner in which special protest liaison officers are deployed and how they are to interact with the leaders of the FAA event. (¶¶41, 52).

Protest liaison officers work for the Incident Commander and take direction and orders from that person. In directing when such officers should be deployed "into the crowd", the Proposed Settlement denies the Incident Commander discretion to deploy these resources as needed based on the circumstances he or she observes. Moreover, in cases where no FAA leaders step forward it is even more dangerous for these officers to be deployed "into the crowd" as their effectiveness and ability to control the group is non-existent in that scenario.

- Prohibiting patrol officers deployed at Tier I to reroute vehicular or pedestrian traffic where a protest "temporarily blocks vehicular or pedestrian traffic or otherwise obstructs public streets or sidewalks" from using "equipment exclusively associated with" SRG units, "such as flex cuffs." (¶41.)

SRG officers carry and wear helmets with face shields, flex cuffs, batons, and shields. These are defensive in nature.  None of this equipment is "associated exclusively" with SRG, as other officers may use it if and as necessary; thus,  the inclusion of "flex cuffs" as an example of the equipment subject to this ban  nullifies what might otherwise be  the meaning of the word "exclusively." It seems to be the intent of the Proposed Settlement that the use of face shields, batons, and shields is prohibited to non-SRG officers deployed to reroute traffic.  This may create a situation where these officers need the equipment, but it will not be immediately available to them. This raises the unnecessary risk of injury to officers.

- Requiring those officers who are deployed at Tier I to reroute vehicular or pedestrian traffic to "whenever possible accommodate the demonstration", without clarifying that they may first address the obstruction. (¶41.)

  This makes a dangerous assumption about detouring vehicular and or pedestrian traffic when the protest blocks streets, sidewalks, or otherwise blocks vehicles or pedestrian traffic, and creates the risk of a dangerous situation when protesters meet vehicles or pedestrians who come upon the event unknowingly.

  It is far safer and easier to accommodate the protest if officers have first established control over the movement of pedestrian or vehicle traffic into all intersections, sidewalks and the like. Attempting to "accommodate the demonstration" before doing that may result in a panicked motorist or aggressive protester taking action that will require police action to restore order, increasing the risk of injury to officers and the public.

- Requiring that, in order to move to Tier II, the Incident Commander, "in consultation with the FAA Senior Executive", must "reasonably believe[] that Green Light violations are imminent but have not yet occurred," and obliging those on scene to consult with those not on scene where violations such as assaults, throwing objects, lighting fires, property damage, are "imminent". (¶43)

- Requiring at Tier III that, where the Incident Commander has authorized targeted enforcement "to address the specific individuals among the crowd" who may be engaging in unlawful conduct, that "liaisons and patrol officers deployed to address traffic concerns should continue to facilitate" the demonstration. (¶¶52-53.)

  A dangerous conflict is raised by requiring SRG officers both to make arrests and ensure continuation of the demonstration while, at the same time, requiring other officers to ensure continuation of the demonstration. Public safety and officer safety concerns require that officers should not pursue potentially conflicting goals -- the continuation of the protest should cede its precedence to public safety concerns. Continuation of the protest may occur after order has been restored and the risk of injury to officers has been reduced.

- Limiting the use of police resources that may otherwise be necessary at a Tier II event. (¶47.)

- Requiring joint FAA Senior Executive and Incident Commander authorization to move to Tier IV, ¶58, and then only if "targeted efforts to address widespread green light violations" "continue unabated and cannot be addressed through further de-escalation or targeted enforcement" ¶57,

- without providing clear guidance as to how those determinations are to be made.

- Moreover, there is an incongruity between who can authorize movement to Tiers II and III. Specifically, ¶50 provides that the Incident Commander must authorize a Tier III response, but for a lower level, Tier II, ¶44, says that the FAA Senior Executive must authorize the move.

- Paragraphs 14 and 89(b), related to right to record, fails to make clear that the right to record under state law does not permit the person to "engage in actions that physically interfere with law enforcement activity," or "physically interfere with an official and lawful police function" under City law.

- Restricting use of encirclement as written in ¶68 creates ambiguity as to its permissible usage for other law enforcement purposes, for example, to maintain order in the event of crowd-splitting during protests.

## IV.   CONCLUSION

37. The tiered response plan in the Proposed Settlement increases the risk to the safety of police officers, protestors, and the public, due to the unreasonable requirements of little or no police presence at protests, delays caused by the need to notify and or get authorization from the NYPD executives before moving from Tier II to III or IV or to effect necessary arrests, limits on protective equipment used by police, and unreasonable restrictions on the use of trained personnel at the scene prior to the event degenerating into a mob or riot.  Reinforcements may not be mobilized in time to prevent injuries or damages due to the tiered response which will slow decision making and response capabilities of the police.

38. The Proposed Settlement undercuts the authority of the on-scene incident commander to make appropriate tactical decisions based on her/his "good faith" judgment to protect life and property while simultaneously ensuring the rights of protesters. Restraints on the personnel allowed or when and who can effect arrests will create confusion and chaos at the scene.

39. The Proposed Settlement contains language that will require a senior executive from police headquarters to make decisions, based on second-hand information from an incident commander, as to which tier the police response should be, what protective equipment the police should be allowed to use, and whether additional officers and/or specialized units like the SRG may be deployed. In the chaotic circumstance of a protest at risk of escalation, this will significantly increase the risk of injury to officers, protestors and the public.

Date:  New York, New York
       October 6, 2023

*Louis Anemone*
Louis Anemone