**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re: New York City Policing During Summer 2020 Demonstrations | 20-cv-8924(CM) |
|---|---|

## THE POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REJECT PROPOSED SETTLEMENT

**SCHLAM STONE & DOLAN LLP**

Richard H. Dolan
Thomas A. Kissane
26 Broadway, 19th Floor
New York NY 10004
Tel.:    (212) 344-5400
Fax:     (212) 344-7677
Email: rdolan@schlamstone.com
Email: tkissane@schlamstone.com

- and -

**LAW OFFICES OF ROBERT S. SMITH**

Robert S. Smith
7 Times Square, 28th floor
New York, N.Y. 10036
Tel.:  (917) 225-4190
Email: robert.smith@rssmithlaw.com

*Attorneys for Intervenor the Police Benevolent*
*Association of the City of New York, Inc.*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

I.     RESPONSE TO THE COURT'S QUESTIONS ............................................................. 2

     A.    Was The PBA Involved In Settlement Negotiations And To What Extent? ......... 3

     B.    Does The Grant of Intervention Mean That The PBA Can Veto Any Settlement In The Cases Seeking Injunctive Relief That It Does Not Like? ........................... 3

     C.    Can an Intervening Party Like the PBA Force the Rest of the Litigants to Try These Cases on the Merits? (and Related Questions) ............................................. 5

     D.    Should the Settlement Be Entered Among the Agreeing Parties and the Case Tried Against the PBA Alone? ................................................................................. 7

     E.    Do the PBA's Objections Present a Labor Relations Issue, Rather Than a Litigation Issue? ................................................................................................... 7

     F.    What Does The PBA Have To Demonstrate In Order To Establish That Its Members Are Prejudiced By The Settlement? How Can The Union Satisfy That Burden? ........................................................................................................... 8

     G.    Are We Required To Hold A Hearing With Witnesses? If So, Who Would Those Witnesses Be? ............................................................................................. 8

II.    THE PROPOSED SETTLEMENT SHOULD NOT BE APPROVED BECAUSE IT JEOPARDIZES THE SAFETY OF OFFICERS, PROTESTERS AND OTHER MEMBERS OF THE PUBLIC AND WOULD IMPOSE UNDUE BURDENS ON THE COURT ............................................................................................................................ 9

     A.    The Proposed Settlement's Tiered Structure Is Unreasonable And Impractical And Its Other Provisions Unreasonably Restrict Officer Discretion And Present Other Risks To The Safety Of Officers And The Public ....................................... 9

     B.    The Proposed Settlement's Implementation Process Excludes The PBA, Is Impractical, And Imposes Undue Burdens On The Court ................................... 13

          1.    The Proposed Settlement's Oversight Structure ....................................... 13

               a.    Phase I of the Oversight Structure ................................................ 13

               b.    Phase II of the Oversight Structure ............................................... 14

               c.    Phase III of the Oversight Structure .............................................. 15

          2.    Resolution Of Disputes Concerning Specialized Policing Issues Represents An Unreasonable Burden On The Court ............................... 16

CONCLUSION ................................................................................................................... 177

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Agosto v. New York City Dep't of Educ.*,
  982 F.3d 86 (2d Cir. 2020)........................................................................................... 6

*Bhatia v. Piedrahita*,
  756 F.3d 211 (2d Cir. 2014)......................................................................................... 8

*D'Alto v. Dahon California, Inc.*,
  100 F.3d 281 (2d Cir.1996).......................................................................................... 6

*Galasso v. Eisman, Zucker, Klein & Ruttenberg*,
  310 F. Supp. 2d 569 (S.D.N.Y. 2004).......................................................................... 6

*In re New York City Policing During Summer 2020 Demonstrations*,
  27 F.4th 792 (2d Cir. 2022) ................................................................................. passim

*Paysys Int'l, Inc. v. Atos IT Servs. Ltd.*,
  901 F.3d 105 (2d Cir. 2018).......................................................................................... 2

*Roberson v. Giuliani*,
  346 F.3d 75 (2d Cir. 2003)............................................................................................ 4

*Savarese v. City of New York*,
  547 F. Supp. 3d 305 (S.D.N.Y. 2021)......................................................................... 6-7

*Shaw Fam. Archives, Ltd. v. CMG Worldwide, Inc.*,
  No. 05 CV 3939, 2008 WL 4127549 (S.D.N.Y. Sept. 2, 2008) ................................. 3

**Statutes**

Penal Law § 24.06(1)................................................................................................... 12

Penal Law § 140.17(1)................................................................................................. 12

Penal Law § 145.05(2)................................................................................................. 12

U.S. Const. Amend. I ..................................................................................................... 9

Intervenor The Police Benevolent Association of the City of New York, Inc. ("PBA") respectfully submits this memorandum in support of its motion to reject the proposed settlement of this matter (the "Proposed Settlement") (ECF No. 1099-2).

## PRELIMINARY STATEMENT

The Proposed Settlement, advanced by Plaintiffs and the City of New York, establishes a complex, four-tiered scheme for policing large protests involving First Amendment Activities ("FAA"), and would oblige police officers, including the PBA's members, to conform their behavior to shifting standards based upon which of its multiple tiers is in effect at a given time. As the accompanying declaration of a highly qualified expert, retired Chief Louis Anemone (the "Anemone Dec."), explains, the standards for each tier are confusing and, even if they were clearer, there is no way to ensure that the tier applicable at any given moment will be disseminated to line officers dealing with the sort of large and chaotic protests that the Proposed Settlement contemplates. And substantively, the tier system puts unreasonable limits on police officers' ability to protect themselves and the public. For example, officers are in most situations forbidden to arrest people who they see engaged in a violent riot, or unlawfully entering a building with an explosive or a firearm, without approval from at least a Captain. For these reasons, the Proposed Settlement creates unjustified risks to police, protesters, and other members of the public.

The Proposed Settlement, the substantial equivalent of a consent decree, fails the test applicable to such decrees: that its terms be fair, reasonable and in the public interest. This is true not only because of its impact on the safety of officers and others, but also because it places an excessive burden on the Court, requiring it to act essentially as a settlement monitor for more than four years and to review complex, split-second policing decisions.

At Point I, we address certain questions raised by the Court.  At Point II, we develop the arguments summarized above.

I.      **RESPONSE TO THE COURT'S QUESTIONS**

In its Order Rescheduling Conference (ECF No. 1108) and Additional Thoughts For Briefing (ECF No. 1109), the Court directed the parties to address several questions.  Many of the questions focus on what the legal and procedural implications will be if the Proposed Settlement is rejected. These are important subjects for the Court to consider, and we give the PBA's answers to the questions below.

To put our answers in context, however, we first point out that the Court does not necessarily face a stark choice between the Proposed Settlement and no settlement at all. The Court has discretion to decline to approve the settlement or to place conditions on its approval, in which event the parties to the Proposed Settlement will have the option of either accepting the conditions or rejecting them and litigating the case. See, e.g*., Paysys Int'l, Inc. v. Atos IT Servs. Ltd.,* 901 F.3d 105, 109 (2d Cir. 2018) ("it is the plaintiff, rather than the court, who has 'the choice between accepting the conditions and obtaining dismissal and, if he feels that the conditions are too burdensome, withdrawing his dismissal motion and proceeding with the case on the merits.'") (internal citations omitted).

The PBA would not oppose an order which approved the Proposed Settlement on the condition that the flaws pointed out in this brief and the Anemone Dec. are eliminated. That would require major changes in the settlement, but it would not necessarily require the parties to try the case.

**A.      Was The PBA Involved In Settlement Negotiations And To What Extent?**

The parties to the mediation signed the S.D.N.Y. mediation confidentiality agreement which provides that "[a]ny communications made exclusively during or for the mediation process shall be confidential." Thus, the PBA is limited in divulging the details of such communications. That said, to respond to the Court: the PBA attended sessions of the mediation to which it was invited, with appearances (in person or remotely) spanning from July 2022 to August 2023. The PBA received drafts of the agreement discussed at these meetings, and it commented on them in writing as early as September 2022 and as late as August 2023, and on multiple occasions in between. Its comments received no substantive response, and no significant changes were made to the provisions to alleviate the problems the PBA had raised.

**B.      Does The Grant of Intervention Mean That The PBA Can Veto Any Settlement In The Cases Seeking Injunctive Relief That It Does Not Like?**

The short answer to this question is no. That does not mean, however, that the other parties are free to impair, without the PBA's consent, the interests that led the Second Circuit to grant the PBA intervention as of right. We submit that the grant of intervention means that the PBA is entitled to have the Court determine *whether any provisions of the Proposed Settlement would materially and adversely impact its members' interest in their personal safety*, and that the Court should reject any settlement which it finds to have such an impact. *Cf. Shaw Fam. Archives, Ltd. v. CMG Worldwide, Inc*., No. 05 CV 3939, 2008 WL 4127549, at *5 (S.D.N.Y. Sept. 2, 2008) (McMahon, J.) (while there is a presumption in favor of voluntary dismissal, that operates only "'absent a showing that defendants will suffer substantial prejudice as a result.'''" (Internal citation omitted).

The PBA's and its members' interest in their personal safety is central to the Second Circuit's decision to allow the PBA to intervene.  See, e.g., *In re New York City Policing During*

3

*Summer 2020 Demonstrations*, 27 F.4th 792 (2d Cir. 2022) at 799: "the PBA identified a direct, substantial and legally protectable interest in officer safety that may be impaired by the disposition" of these actions; *id*. at 804: "changing the policies that govern officer conduct may affect officer safety." The Second Circuit also said that because the "nature and scope of any injunctive relief and accommodations could turn on political calculations with respect to which the individual officer defendants would not be influential and to which they may not even be privy. . .  the PBA has identified an interest that may be impaired by the disposition of the consolidated actions." *Id.* The Second Circuit's findings would be a nullity if the other parties could reach a bargain between themselves, over the PBA's objections, that injured the very interest that intervention was meant to protect.

Also, because the Proposed Settlement calls for the Court to exercise oversight and continuing jurisdiction (the burdens of which are addressed at Point II(B)), we submit the Court's review should be informed by the Second Circuit's instructions for review of consent decrees -- that is, whether the terms are fair, reasonable and in the public interest.  *Roberson v. Giuliani,* 346 F.3d 75, 82 (2d Cir. 2003) (in considering eligibility for fee recovery, "the district court's retention of jurisdiction in this case is not significantly different from a consent decree and entails a level of judicial sanction sufficient to support an award of attorney's fees."); A. DiSarroa, *Six Decrees of Separation: Settlement Agreements and Consent Orders in Federal Civil Litigation*, 60 Am. U. L. Rev. 275 (2011) (collecting cases holding "that where a district court incorporates a private settlement into an order, and signs or otherwise indicates written approval of the order's terms, the result is sufficiently analogous to a consent decree to confer prevailing party status."); *U.S.S.E.C. v. Citigroup Glob. Markets, Inc.,* 752 F.3d 285, 294 (2d Cir. 2014) ("proper standard for reviewing a proposed consent judgment involving an enforcement

4

agency requires that the district court determine whether the proposed consent decree is fair and reasonable, with the additional requirement that the 'public interest would not be disserved'" (citation omitted)).

### C. Can an Intervening Party Like the PBA Force the Rest of the Litigants to Try These Cases on the Merits? (and Related Questions)

While no party can literally be "forced" to try a case, it is normal that a party who wants to obtain certain relief must try the case or forgo the relief, unless the parties against whom relief is sought consent to it; here, the Second Circuit has decided that the relief Plaintiffs seek, to the extent it affects officer safety, justifies the PBA's intervention in this case.  In that sense there is nothing extraordinary about the idea that the PBA can "force" other parties to try the case. If the Court finds – as we submit it should, for the reasons presented at Point II(A) below – that the Proposed Settlement would materially impair the interest that was the basis for the Second Circuit's holding, a trial is necessary unless the Proposed Settlement is revised to eliminate the impairment.

If a trial is necessary, the injunctive relief cases should be tried in their entirety, not merely as to relief.  This is so because the Second Circuit expressly found that a determination of liability alone presents sufficient risk to justify PBA's intervention.  27 F.4th at 795: "We hold that the district court erred in holding that the PBA did not have a cognizable interest in the personal safety of its member officers *at the merits stages of the actions* seeking injunctive or declaratory relief" (emphasis added).  For this Court to approve a settlement without even considering whether that disposition impairs the interest of the PBA would run directly contrary to this holding. This Court would in effect be holding that parties who, as the Second Circuit

determined, do not adequately represent the PBA's interest in officer safety[1] may nevertheless impair that interest at will. Compare *Shaw Fam. Archives, Ltd., supra*; *Galasso v. Eisman, Zucker, Klein & Ruttenberg,* 310 F. Supp. 2d 569, 572 (S.D.N.Y. 2004) (McMahon, J.) ("Voluntary dismissal of a complaint without prejudice under Rule 41(a)(2) will be allowed only if the defendant will not be prejudiced thereby", citing *D'Alto v. Dahon California, Inc.,* 100 F.3d 281, 283 (2d Cir.1996)).

The central merits issue in this case is whether the official policies of the New York City Police Department have deliberately required its police officers to violate the First Amendment rights of protesters.[2]  But the parties asking this Court to approve the Proposed Settlement have presented no evidence whatsoever that anything of the sort has happened. They have not even tried to show that the record in this case supports a finding that would justify any award of relief by a federal court. Cf. *Savarese v. City of New York*, 547 F. Supp. 3d 305, 356–57 (S.D.N.Y. 2021) (in § 1983 action alleging violations of plaintiff's constitutional arising from his arrest for obstruction of governmental administration, granting summary judgment City because plaintiff

---

[1] See 27 F.4th at 803: "the PBA has met its burden to demonstrate that the City's representation may be inadequate".

[2]  See *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97–98 (2d Cir. 2020) (internal citations omitted:

> The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right. . . .*Monell* expressly prohibits *respondeat superior* liability for municipalities, . . . meaning that a plaintiff must demonstrate that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged," . . . "[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."

failed to offer proof of "the existence of a 'widespread and persistence [sic] practice' to which the City acquiesced.")

It is impossible to decide what if any remedy is appropriate without first knowing what if any violations of Plaintiffs' constitutional rights have occurred as a result of City or NYPD policies, and the Second Circuit was clear that the PBA has a right to be heard on that question.

### D.    Should the Settlement Be Entered Among the Agreeing Parties and the Case Tried Against the PBA Alone?

We submit that this is not a feasible solution, in part for the reason the Court's order suggests: If the PBA prevails at trial, that will "scuttle" the whole settlement. ECF No. 1108. If, as we contend, the Proposed Settlement materially injures the PBA's and its members' interest in physical safety, then to enter the settlement among the agreeing parties would create the very injury that intervention by the PBA was intended to prevent. Beyond that, it is impossible as a practical matter to imagine a trial of this case without the City's participation. The City's policies are attacked as unconstitutional. The witnesses who can defend those policies best are City employees, and the City cannot responsibly sit by and let the question of whether its policies violate protesters' First Amendment rights be decided at a trial in which it does not participate.

### E.    Do the PBA's Objections Present a Labor Relations Issue, Rather Than a Litigation Issue?

This question, we submit, is answered in the negative by the Second Circuit's Opinion, which expressly held that that the PBA's "interest in officer safety is not limited to the PBA's collective-bargaining rights and is independently cognizable." 27 F.4th at 801.

We note that ¶140 of the Proposed Settlement appears to be intended to protect the rights of all union members, including the PBA's, under their Collective Bargaining Agreement with the City.  However, ¶141 provides "Nothing in this Agreement has waived the Union Intervenors' (as defined in this Agreement) rights to bargain over any changes in working

conditions resulting from this Agreement and any Department policies and procedures resulting therefrom".  The Union Intervenors are defined at ¶5 as the Detectives' Endowment Association and the Sergeants Benevolent Association, and not the PBA.  In their letter to the Court dated September 8, 2023 (ECF No. 1105), Plaintiffs' counsel wrote that ¶141 does not abridge any Collective Bargaining rights of the PBA's members. Any order approving the Proposed Settlement, in its present form or with modifications, should reflect that assurance.

> **F.** **What Does The PBA Have To Demonstrate In Order To Establish That Its Members Are Prejudiced By The Settlement? How Can The Union Satisfy That Burden?**

As argued above, this Court should not approve any settlement that the PBA has shown to have a material, adverse impact on the safety of its member officers, because the Second Circuit has expressly confirmed that the PBA has the right to be heard in these actions on its officer safety concerns.  The other parties cannot negate that right by an agreement to which the PBA is not a party.

The Second Circuit's holding on this issue is in itself sufficient to satisfy the requirement that a non-settling party objecting to a settlement must show "some formal legal prejudice as a result of the settlement." *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014).

> **G.** **Are We Required To Hold A Hearing With Witnesses?  If So, Who Would Those Witnesses Be?[3]**

Because the terms of the Proposed Settlement are not in dispute, and because the flaws in the settlement are established by indisputable facts, we believe the PBA's showing at Point II

---

[3] The Court also asked "How exactly is the PBA (or its membership) prejudiced by the terms of the Proposed Settlement" and "What if any obligations does the settlement impose on the PBA or its members?"  (Dkt. 1109). We believe that these questions are answered above and in Point II.

below and in Chief Anemone's Declaration is sufficient to warrant rejection of the Proposed

Settlement without a hearing.  Moreover, under the circumstances as discussed above, *see* Part

I(B), the Court's review should be informed by the Second Circuit's instruction for review of

consent decrees, which requires that the terms be "fair, reasonable and in the public interest."

## II.   THE PROPOSED SETTLEMENT SHOULD NOT BE APPROVED BECAUSE IT JEOPARDIZES THE SAFETY OF OFFICERS, PROTESTERS AND OTHER MEMBERS OF THE PUBLIC AND WOULD IMPOSE UNDUE BURDENS ON THE COURT

As we show below, the Proposed Settlement's tiered response structure is unreasonable and

impractical and its other provisions unreasonably restrict officer discretion and present other

risks to the safety of officers and the public (Point IIA). In addition, its oversight provisions

exclude the PBA, are impractical, and impose undue burdens on the Court (Point II(B)).

Therefore, as set forth below and in the Anemone Dec., the Proposed Settlement should not be

approved.[4]

### A.   The Proposed Settlement's Tiered Structure Is Unreasonable And Impractical And Its Other Provisions Unreasonably Restrict Officer Discretion And Present Other Risks To The Safety Of Officers And The Public

The Proposed Settlement creates a four-tiered response structure *See* Anemone Dec.

¶¶13-22. In the lower tiers, the presence of police officers at the scene is strictly limited. In Tier

---

[4]  The Proposed Settlement's flaws are all the more significant because, although it says it is limited to a subset of protests or gatherings that qualify as "First Amendment Activities", its definition of that term (at ¶ 9) includes "any protest or demonstration at which individuals are expressing their rights under the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution."  The First Amendment to the U.S. Constitution protects religious rights, freedom of speech and of the press, and the right of the people peaceably to assemble and to petition the Government for a redress of grievances. Thus, the Proposed Settlement will at least arguably apply to virtually any public gathering (cf. *Matthew* 18:20 (King James) ("For where two or three are gathered together in my name, there am I.")

I, only "protest liaisons" are allowed, except that patrol officers may, where needed, be deployed to direct traffic. Proposed Settlement ¶¶ 39-42. Protest liaisons are specially trained officers whose role is to "focus on the aims of protesters, understanding the aims of protest organizers, and communicating with protesters about how officers can facilitate those aims and the circumstances in which they cannot." *Id.* ¶ 40(b). No other officers may even be present, unless a move to Tier II is justified, which can generally happen only if senior officers "reasonably believe" that serious crimes are imminent or that access to critical infrastructure is threatened. *Id.* ¶ 43. There is one other basis on which Tier II can be invoked: if "protesters specifically request the presence of officers." *Id.* ¶ 38. Thus protesters are given an ability to request officer presence that is not given to other members of the public, and discretion over police *deployment* that is not permitted to the senior police officers in charge.

In Tier II subject to a limited exception, police other than protest officers may only be stationed "nearby but off-scene, and if possible out of view of protesters." *Id.* ¶ 46. (This makes clear that in Tier I, officers other than protest liaisons and those directing traffic may not be deployed at all, even to a nearby location out of sight of the protesters.) Only when Tier III is reached – which can occur only if serious crimes have already been committed and "there is individualized probable cause to arrest individuals" – may officers whose primary role is criminal law enforcement be in the vicinity. *Id.* ¶ 49.

The Proposed Settlement is not only restrictive in its limits on deployment of officers; it also requires cumbersome consultations before decisions are made. The "Incident Commander" (the officer in charge at the scene of the protest) may decide to move from Tier I to Tier II only "after consultation with the FAA Senior Executive," a senior police official (not necessarily present at the protest) designated to "act as compliance manager for this Agreement." *Id.* ¶¶ 43,

20. The FAA Senior Executive "must authorize" the decision and the Incident Commander "must document the reasonable basis" for it. *Id.* ¶ 44. Similarly, a transition to the highest tier, Tier IV, is permissible only when a demonstration threatens a "sensitive location" or involves "widespread," serious criminal conduct (*see id.* ¶¶ 56, 57), and requires authorization "jointly by the FAA Senior Executive in consultation [with] the Incident Commander." *Id.* ¶ 58. The tier structure is further bureaucratized with requirements that command decisions be extensively documented. *See, e.g. id.* ¶¶ 27, 30, 33, 44, 60 and 62.

The Anemone Dec. demonstrates that this approach is most unwise, and endangers police officers and the public. It ignores the simple reality that an FAA event involving a large crowd, emotional issues, prior history of violence, and/or "bad actors", may degenerate rapidly and unpredictably into a violent encounter or riot, and that a strong police presence at an early stage, with an ability to react quickly and flexibly to unforeseen events, may be the best way to prevent that from happening. Chief Anemone's experience confirms this common-sense conclusion. Anemone Dec. ¶¶5, 27-36. And surely no one can doubt it who saw or read about the events of January 6, 2021.

Requiring the ranking officer on scene to obtain approval from an off-site supervisor before deploying such officers, tactics and equipment as he or she believes necessary to prevent escalating violence makes no more sense than requiring a homeowner who sees a fire flashing on the stove to hold off on deploying a fire extinguisher until he or she can get approval from the fire department. The escalation that may happen during even a brief delay makes any such requirement extremely dangerous. The Proposed Settlement presents a real risk of harm to to both liaison officers and officers assigned to traffic duties where a protest escalates rapidly.

Other provisions of the Proposed Settlement also jeopardize officer and public safety. These include, but are not limited to, provisions: (i) directing the manner in which special protest liaison officers are deployed and how they are to interact with the leaders of the FAA event; (ii) requiring that the NYPD move to the highest tier only if green light violations are "widespread", with no standard for what is deemed to be "widespread"; (iii) requiring that "no more protest liaisons than necessary" "in light of the conditions present at the time" shall be dispatched "to engage in effective dialogue with the crowd" as part of Tier I; (iv) requiring that, where the Incident Commander has authorized targeted enforcement "to address the specific individuals among the crowd" who may be engaging in unlawful conduct, that "liaisons and patrol officers deployed to address traffic concerns should continue to facilitate" the demonstration; and (v) limiting use of specialized units where Incident Commander deems it necessary to protect the safety of officers or the public Anemone Dec., ¶¶35-36.

Apart from ill-judged and dangerous procedural requirements, the Proposed Settlement imposes extraordinary substantive burdens on the ability of police officers to enforce the law. The settlement defines so-called "Red Light" offenses – i.e., offenses for which  no arrest may be made without the approval of an officer with the rank of Captain or above (¶28), a group including less than 3% of the Department -–— to include such crimes as first degree riot ("tumultuous and violent conduct" by a group of more than ten people that causes "physical injury or substantial property damage," Penal Law § 24.06(1)), trespass in the first degree (unlawful entry of a building with a deadly weapon or explosive, Penal Law § 140.17(1)), and third-degree criminal mischief criminal mischief (damaging property worth between $250 and $1500, Penal Law § 145.05(2)). Proposed Settlement ¶ 29. Putting obstacles in the way of arrests

for such crimes will do much more to endanger police officers and the public than to protect citizens' First Amendment rights.

In short, the Proposed Settlement will materially harm the interest of the PBA's members in their personal safety, the interest that the PBA intervened in this action to protect. A settlement containing provisions like these should not be approved over the PBA's objection.

### B.   The Proposed Settlement's Implementation Process Excludes The PBA, Is Impractical, And Imposes Undue Burdens On The Court

In order to approve the Proposed Settlement, the Court must exercise its discretion to accept continuing jurisdiction to oversee its implementation.  The parties, of course, cannot compel the Court to retain jurisdiction, even in a non-class action, and the Court should decline to do so here. The Proposed Settlement includes unwieldly and impractical oversight provisions and will call upon the Court to resolve claims of non-compliance with every "material" term in this extensive agreement. Moreover, the provisions exclude the PBA, in defiance of the Second Circuit's holding that the PBA should be part of any resolution of these matters.  See, e.g., 27 F.4th at 799, 804 (quoted above).

#### 1.   The Proposed Settlement's Oversight Structure

Section IX of the Proposed Settlement (¶¶98-131) establishes a three-phased structure. We briefly outline each phase.

##### a.   Phase I of the Oversight Structure

The first phase (¶¶100-101) calls for the NYPD to draft policies/procedures and training curricula ("PPTC") to effectuate the Proposed Settlement and pass them on to Plaintiffs, the SBA and the DEA – but not the PBA, which has far more members who will be affected – who then have 90 days to provide feedback.  This is followed by meet-and-confer sessions and further discussion of any revisions and, if Plaintiffs object that the resulting PPTC "omit or violate a

material term of the Agreement", they can make a motion to the Court ¶101(d).  Any

"subsequent material changes" to the PPTC are subject to this same process. ¶101(f).

### b.        Phase II of the Oversight Structure

Phase II (¶¶102-128) begins 45 days after the NYPD's final approval of the Phase I

PPTC.  It begins with the establishment of a Collaborative Committee consisting of the

Commissioner of the New York City Department of Investigation ("DOI") (which will chair the

Committee), the person selected by the NYPD as the Senior FAA Executive, representatives

from the Office of Corporation Counsel, the AG's Office and the SBA and DEA (but not the

PBA) and two of Plaintiffs' attorneys.

The Collaborative Committee will meet at least eight times over 27 months (¶¶106, 128),

during which it will, among other things, consider recommendations the DOI is to make

concerning the NYPD's compliance with the Proposed Settlement at selected FAAs.

This review will include the following at the selected FAAs: enactment and

documentation of the tiered structure; deployment of protest liaisons; selection and identification

of Incident Commanders; deployment of officers; arrests and any use of force (including

justification and documentation of same); deployment of the NYPD's Strategic Response Group

(including whether it was "necessary to ensure safety"); justification for any documentation of

any dispersal orders issued in Tier IV, or any arrests stemming from a failure to disperse;

provision of medical relief to protesters; any use of encirclement or helicopters; treatment of the

press and individuals engaged in recording police activity; and appearance of racial, ethnic or

viewpoint discrimination.  ¶115(a-m).  Phase II persists three years.

The Collaborative Committee, while it may have much to investigate and discuss, has

little or no enforcement power; it is an essentially consultative and advisory body. The burden of

enforcing the Proposed Settlement during Phase II will fall almost entirely on the Court.

Paragraph 124 of the Proposed Settlement says:

> If any party has a good faith basis to assert that the opposing party is in material breach of the material terms of this Agreement in Phase II, they may move the Court for tailored relief appropriate to cure the alleged material breach.

Paragraph 124 goes on to provide for a "meet and confer" process that shall "to the extent possible" include the Collaborative Committee. But if this process produces no agreement, only the Court may resolve the dispute – doing which would presumably require the Court to discern, before reaching the merits of an issue, what the parties considered "material" terms and whether an alleged breach is "material," and, before granting a remedy, what is meant by the word "tailored." In addition, any party may make a motion to the Court if it believes the DOI has not received proper funding from the City, or has failed to conduct the required reviews.  ¶¶109-110.

There is a substantial possibility that enforcement of this agreement will keep the Court quite busy during the years that Phase II is in existence.

Paragraphs 125-127 set forth the concluding steps of Phase II.  These provide that, after 18 months, DOI is to issue a progress report on its review of selected FAAs and compliance with its recommendations, to be filed with the Court and responded to in Court filings where any Party so desires followed, one year later, by another such report to be similarly filed and subject to filed comment and then, six months after that, a final such report to be filed with the Court.

### c.    *Phase III of the Oversight Structure*

Phase III (¶¶129-131) calls for the Court to retain jurisdiction for an additional twelve months (beyond whatever time is consumed by Phase I, which has no time limit,  and the 36 months of Phase II).  If at any time during that period Plaintiffs contend that "Defendants are in material breach of the terms of this Agreement, Plaintiffs may move the Court for tailored relief

appropriate to cure the specific alleged breach(es)." ¶130. Upon termination of Phase III, "The Court shall retain jurisdiction to resolve any motion pending at the termination of Phase III or enforce relief ordered by the Court during Phase III." ¶131.

### 2. Resolution Of Disputes Concerning Specialized Policing Issues Represents An Unreasonable Burden On The Court

The Proposed Settlement calls for this Court to retain jurisdiction through three phases over  more than four years.  During this time, the Court may be called upon to review the parties' compliance with any of the Proposed Settlement's many detailed obligations.  It is entirely possible that the Court will be required to review the creation and/or modification of procedures by which Plaintiffs seek to micromanage the NYPD's policing of public gatherings, and to oversee disputes regarding compliance with those procedures – including the decision to move from tier to tier, equipment and tactics that officers may use, the number of officers appropriate for any number of unforeseeable tasks and whether the number of officers deployed or the duration of their deployment was appropriate – based  on review of the actions of officers, supervisors and protesters undertaken in chaotic and rapidly-changing circumstances.  See Anemone Dec., ¶¶35-36_(providing examples of operational decisions, any of which the Court may be called upon to review.)

The PBA submits that the establishment and enforcement of the Proposed Settlement's procedures not only present an unwarranted threat to the safety of its member officers, but also would impose an unreasonable and unwarranted burden on the Court.

## CONCLUSION

For all of the above reasons, the PBA respectfully submits that the Proposed Settlement as presented to the Court should not be approved in its current form.

Dated:      October 6, 2023
              New York, New York

**SCHLAM STONE & DOLAN LLP**

By: /s/ Thomas A. Kissane
Richard H. Dolan
Thomas A. Kissane
26 Broadway, 19th Floor
New York NY 10004
Tel.:   (212) 344-5400
Fax:   (212) 344-7677
Email: rdolan@schlamstone.com
Email: tkissane@schlamstone.com

*Attorneys for Intervenor the Police Benevolent Association of the City of New York, Inc.*

- and -

**LAW OFFICES OF ROBERT S. SMITH**

Robert S. Smith
7 Times Square, 28th floor
New York, N.Y. 10036
Tel.:  (917) 225-4190
Email: robert.smith@rssmithlaw.com

FREDERICK W. VASSELMAN
Office of the General Counsel
Police Benevolent Association of the
City of New York, Inc.
125 Broad Street, 11th Floor
New York, NY 10004
Tel: (212) 298-9144
E-mail: fvasselman@nycpba.org

Gaurav I. Shah,
Associate General Counsel
E-mail: gshah@nycpba.org

*Of Counsel*

17