**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In Re: New York City Policing
During Summer 2020 Demonstrations

20 Civ. 8924 (CM)(GWG)

This filing is related to:

ALL CASES

**CONSOLIDATED PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO INTERVENOR POLICE BENEVOLENT ASSOCIATION'S MOTION TO REJECT THE SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 5

   I.    THE PBA CANNOT DEMONSTRATE UNDUE LEGAL PREJUDICE RESULTING FROM DISMISSAL OF PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF.................... 5

     A.  The PBA's Policy Objections to the Settlement Do Not Constitute Undue Legal Prejudice Sufficient to Support Denial of the Settling Parties' Rule 41(a)(2) Motion to Dismiss. ..................................................................................................................... 6

     B.  The PBA's Participation in the Litigation and Mediation Process that Led to the Settlement Fully Satisfies Their Interest as Intervenors. ...................................... 12

     C.  Because Modification of the Settlement Agreement on the PBA's Terms Would Scuttle a Delicately Negotiated Resolution, the Court Must Assume that Failure to Approve the Settlement Will Lead to a Trial, With Absurd Results. ......................................... 15

   II.    THE PBA'S ARGUMENTS ARE UNPERSUASIVE REASONS TO REJECT THE SETTLEMENT UNDER ANY LEGAL STANDARD. ....................................................... 17

     A.  The Settlement Enhances Officer Safety .................................................... 17

     B.  The Settlement is Not "Impractical" ........................................................... 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bhatia v. Piedrahita*,
    756 F.3d 211 (2d Cir. 2014)........................................................5,7,8

*Camilli v. Grimes*,
    436 F.3d 120 (2d Cir. 2006)..........................................................12

*Chevron Corp. v. Donziger*,
    2013 WL 1481813 (S.D.N.Y. Apr. 8, 2013)................................7

*Cohen v. DHB Indus., Inc.*,
    658 F. App'x 593 (2d Cir. 2016) ...................................................6

*Cnty. of Santa Fe, N.M. v. Pub. Serv. Co. of New Mexico*,
    311 F.3d 1031 (10th Cir. 2002) ..............................................7,17

*Commercial Recovery Corp. v. Bilateral Credit Corp., LLC*,
    2013 WL 8350184 (S.D.N.Y. Dec. 19, 2013) ...............................9

*Floyd v. City of N.Y.*,
    770 F.3d 1051 (2d Cir. 2014)........................................................13

*Gavin v. City of N.Y.*,
    2021 WL 3774113 (S.D.N.Y. Aug. 24, 2021)...............................20

*Genesis HealthCare Corp. v. Symczyk*,
    569 U.S. 66 (2013).........................................................................17

*GEOMC Co. v. Calmare Therapeutics Inc.*,
    918 F.3d 92 (2d Cir. 2019)...........................................................4

*Harvey Aluminum, Inc. v. Am. Cyanamid Co.*,
    15 F.R.D. 14 (S.D.N.Y. 1953) ......................................................6

*In re County of Erie v. State of N.Y. Pub. Empl. Relations Bd.*,
    12 N.Y.3d 72 (2009) ......................................................................13

*In re New York City Policing During Summer 2020 Demonstrations*,
    27 F.4th 792 (2d Cir. 2022) .....................................................3,13,14

*Jones v. Sec. & Exch. Comm'n*,
    298 U.S. 1 (1936)...........................................................................8

*Kirkland v. New York State Dep't of Corr. Servs.*,
   711 F.2d 1117 (2d Cir. 1983)..........................................................................................11

*Kozlowski v. Coughlin*,
   871 F.2d 241 (2d Cir. 1989)............................................................................................11

*Lan v. Time Warner, Inc.*,
   2016 WL 6778180 (S.D.N.Y. Oct. 18, 2016), *report and rec. adopted*, 2016 WL 6779526
   (S.D.N.Y. Nov. 15, 2016) ..................................................................................................9

*Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
   478 U.S. 501 (1986)...........................................................................................10,11,15

*Melito v. Experian Mktg. Sols., Inc.*,
   923 F.3d 85 (2d Cir. 2019)................................................................................................7

*New Mexico ex rel. State Eng'r v. Aamodt*,
   582 F. Supp. 2d 1313 (D.N.M. 2007) .............................................................................12

*Nix v. Off. of Comm'r of Baseball*,
   2017 WL 2889503 (S.D.N.Y. July 6, 2017) ...................................................................6,9

*Pedreira v. Sunrise Children's Servs., Inc.*,
   79 F.4th 741 (6th Cir. 2023) .............................................................................................9

*Rhoden v. Mittal*,
   2020 WL 8620716 (E.D.N.Y. Oct. 26, 2020)...................................................................8

*Rhoden v. Mittal*,
   2021 WL 857396 (E.D.N.Y. Feb. 23, 2021)....................................................................8

*Roberson v. Giuliani*,
   346 F.3d 75 (2d Cir. 2003)..............................................................................................10

*S.E.C. v. Lorin*,
   869 F. Supp. 1117 (S.D.N.Y. 1994) .................................................................................6

*Shaw Fam. Archives, Ltd. v. CMG Worldwide, Inc.*,
   2008 WL 4127549 (S.D.N.Y. Sept. 2, 2008)...................................................................9

*United States v. District of Columbia*,
   933 F. Supp. 42 (D.D.C. 1996) ......................................................................................15

*Vulcan Soc. of Westchester Cty., Inc. v. Fire Dep't of City of White Plains*,
   1979 WL 259 (S.D.N.Y. June 28, 1979) ........................................................................14

*Waller v. Fin. Corp. of Am.*,
   828 F.2d 579 (9th Cir. 1987) ............................................................................................8

*WildEarth Guardians v. Haaland*,
    2022 WL 1773480 (D.D.C. June 1, 2022) ........................................................................7

*Zagano v. Fordham Univ.*,
    900 F.2d 12 (2d Cir. 1990) .............................................................................................9

**Statutes, Rules & Regulations**

42 U.S.C. § 1988 ...................................................................................................................5

Fed. R. Civ. P. 41(a)(2) ................................................................................................ *passim*

N.Y. Coll. Bargaining Law § 12-307(b).............................................................................13

N.Y. Civ. R. L. § 79-P ........................................................................................................22

New York City Administrative Code § 14-189..................................................................22

**INTRODUCTION**

Plaintiffs in the consolidated protest cases collectively submit this memorandum of law in opposition to the Police Benevolent Association's ("PBA") motion to reject the settlement agreement among all plaintiffs, all the original defendants, and two of the three intervenor unions, resolving claims for injunctive relief. *See* ECF Nos. 1118, 1119, 1120.[1] The Court should deny the PBA's motion because the concerns the PBA has articulated do not constitute the type of legal prejudice necessary for the Court to grant the relief that it seeks and, even if they did, the PBA's concerns have no merit.

First, the PBA has not met its burden to prove undue legal prejudice necessary for the Court to reject the parties' settlement and voluntary dismissal with prejudice under Federal Rule of Civil Procedure 41(a)(2). The PBA's policy objections to the content of the settlement agreement filed at ECF No. 1099-2 cannot constitute legal prejudice. It has asserted no cross-claims or counter-claims that would be affected by dismissal. If the settling parties' motion is granted, the PBA will be in no different legal position than if these cases had never been filed at all.

Nothing about the Second Circuit's decision granting the PBA intervenor status alters this conclusion. That decision merely afforded the PBA a right to participate in the litigation process—which it did—not to dictate the terms by which claims brought by Plaintiffs against the City of New York and other defendants would be voluntarily resolved. Certainly, the Second Circuit's decision did not change the legal standard applicable to motions to dismiss with prejudice under

---

[1] The consolidated actions include *Payne, et al., v. de Blasio et al.*, No. 20-CV-8924; *People of the State of New York v. City of New York et al.*, No. 21-CV-322 ("*People*"); *Rolon et al. v. City of New York*, No. 21-CV-2548 ("*Rolon*"); *Gray et al. v. City of New York et al.*, No. 21-CV-6610 ("*Gray*"). Unless otherwise noted, all docket entries cited herein refer to *Payne, et al., v. de Blasio et al.*, No. 20 Civ. 8924 ("*Payne*").

1

Rule 41(a)(2). To hold otherwise would be to virtually guarantee the absurd result of forcing Plaintiffs to litigate claims against a party entirely willing to satisfy those claims.

Second, the PBA's criticisms of the settlement agreement have no merit and thus provide the Court with no justification for rejecting the settlement under any legal standard. They are based entirely on the speculation of an individual who possesses no relevant factual information and gets basic facts about the settlement agreement, NYPD operations, and the issues in the 2020 protests wrong. This meager record provides the Court no basis for drawing a conclusion that the settlement agreement will pose any risk — let alone an undue risk — to officer safety. Indeed, a sincere look at the settlement shows that it will make officers *safer*. The PBA's baseless concerns about the burdens of the settlement's oversight period are also entirely disconnected from the text of the agreement.

For these reasons, the Court should reject the PBA's effort to prevent a landmark resolution of this case on painstakingly negotiated terms—following more than 50 mediation sessions—that manages to satisfy more than a dozen plaintiff-protesters and -journalists, two other major police unions, the New York City Police Department ("NYPD"), and the State of New York.

## BACKGROUND

The settlement agreement and motion to dismiss with prejudice under Rule 41(a)(2) would resolve the injunctive relief claims arising out of four civil rights actions filed in the Southern District of New York between October 2020 and March 2021 against the City of New York and certain City and NYPD leadership and personnel (collectively, "Defendants"), alleging that Defendants have engaged or continue to engage in unconstitutional or otherwise illegal conduct in response to racial justice protests occurring throughout New York City in 2020 and 2021. *See generally* Corrected Second Amended Complaint in *Payne* (ECF No. 957); Amended Complaint in *People* (ECF No. 51); Second Amended Complaint in *Gray* (ECF No. 761); Amended

2

Complaint in *Rolon* (ECF No. 65). The Court consolidated these cases and several others seeking only damages for pre-trial purposes. *Payne*, ECF No. 40, ¶¶ 1, 4; *Gray*, ECF No. 281.

The PBA, alongside the Sergeants Benevolent Association ("SBA") and the Detectives' Endowment Association ("DEA"), moved to intervene as defendants in *Payne* and *People*. ECF Nos. 45, 48, 51. This Court denied those motions, ECF No. 144, but the Second Circuit reversed that denial as to the PBA, holding that it had identified a cognizable interest in the safety of front-line officers, which could be impaired in litigation that could result in an adjudication "that NYPD policies governing the interaction of officers and protesters are unlawful and must be altered" and had established that its interests "might" not be adequately represented by the City, and thus had a right to intervene in the cases seeking injunctive or declaratory relief. *In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 800, 803 (2d Cir. 2022). The PBA later intervened in *Gray* and *Rolon* by stipulation. ECF Nos. 729, 730.

On June 30, 2022, a revised discovery order was issued extending the time for fact discovery and setting a schedule for the PBA's service of discovery. ECF No. 630. At that time, only one high-level deposition had occurred; the remainder took place after the intervenors' entry into the litigation. *See, e.g.*, ECF No. 670 (setting forth procedure for high-level depositions). On July 8, 2022, Judge Gorenstein referred the parties to mediation, which began with a session on July 28, 2022. The parties—including the PBA—engaged in intensive discussions at that time, seeking and obtaining extensions of discovery to facilitate mediation. *See, e.g.*, ECF Nos. 716, 718 (joint stipulation to discovery limits during mediation).

For over a year after that referral, the parties engaged in substantive and significant mediation. By Plaintiffs' count, there were well over 50 mediation sessions held, including approximately 20 sessions in June and August 2023, almost all of which the PBA was invited to

and, in most cases, did attend. The parties also exchanged dozens of drafts of the settlement agreement over the course of the negotiations, copying counsel for the PBA.

Notwithstanding various discovery stays, the Plaintiffs and Defendants also engaged in vigorous discovery, taking 140 depositions, producing and reviewing thousands of pages of documents and terabytes of video footage and engaging in extensive motion practice. Meanwhile, the PBA attended no court conferences following its intervention, noticed no depositions, and designated no expert witnesses, despite having every opportunity to do so. The PBA also declined to file any counter- or cross-claims with its answer. Indeed, the PBA's pleading does not contain any claims or defenses related to officer safety. *See* ECF Nos. 562-565 (PBA answers).[2]

On July 3, 2023, almost at the close of fact discovery, the parties again entered into a stay of discovery, and two months later, the individual Plaintiffs, the SBA, the DEA, the City and the State of New York came to an agreement on the final settlement terms for all injunctive relief claims. The settlement agreement incorporates current NYPD policies for the policing of protest and use of force, emphasizes de-escalation and minimizing the use of mass arrests in favor of focused enforcement action and a multi-tiered response system for protests. It also creates new requirements for written after-action reports for protests where significant enforcement activity occurs and a novel collaborative oversight committee to review the NYPD's response to such protests. The settlement agreement also provides for revised training and policies to improve the treatment of members of the press. *Id.* On September 5, 2023, The settling parties filed a Joint Motion to Dismiss with Prejudice and Retain Jurisdiction and the Settlement Agreement as a Stipulated Order Pursuant to Fed. R. Civ. P. 41(a)(2). ECF No. 1099.[3]

---

[2] Had the PBA actually sought relief or asserted claims, the other parties would have had the opportunity to test those claims in the course of the litigation. *See, e.g., GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92 (2d Cir. 2019).
[3] The plaintiffs asserting damages claims against the City have also resolved those claims in principle and expect to submit individual stipulations of dismissal of the damages claims. *See* ECF No. 1099-2 ¶ 139.

This Court set out a series of questions for the parties to answer in their briefing. ECF Nos. 1108 and 1109. Plaintiffs answer each of these in this memorandum of law.

## ARGUMENT

### I.   THE PBA CANNOT DEMONSTRATE UNDUE LEGAL PREJUDICE RESULTING FROM DISMISSAL OF PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF.

The Court should grant the settling parties' motion under Rule 41(a)(2) because the PBA cannot demonstrate the required formal legal prejudice resulting from dismissal and the settlement agreement. *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014). To the extent they have any weight at all, the PBA's arguments certainly do not have the status of "objections" that can scuttle an agreement that the Court has determined meets the relevant standard for voluntary dismissal. Although the PBA admits, correctly, that it cannot "veto" the settlement, it arrogates to itself exactly that power by interpreting, incorrectly, the Second Circuit's grant of intervenor status as requiring this Court to "reject any settlement which it finds" to "materially and adversely impact [the PBA's] members' interest in their personal safety . . . ." The PBA's Memorandum of Law in Support of Motion to Reject Proposed Settlement, Oct. 6, 2023, (hereinafter "PBA Br.") at 3. That is not what the Second Circuit held. To the contrary, the Second Circuit's opinion makes clear that the PBA's participation in the litigation process was all that its intervenor status entitled it to; because it chose not to lodge neither cross-claims nor counter-claims against any other party and Plaintiffs have no claims against the PBA, the PBA's role ends when that litigation process ends.[4]

The PBA has not identified any legal authority (and Plaintiffs can find none) suggesting that an intervenor party is, in such circumstances, entitled to a judicial determination that any settlement does not materially and adversely impact the interests that warranted that party's

---

[4] Should these matters go to trial, as an intervenor-defendant, the PBA may be liable for attorney's fees under 42 U.S.C. § 1988.

intervention before a settlement can be approved. The consequences of adopting the PBA's radically aggrandizing vision of its powers as intervenor would be to undo more than a year's worth of effort to construct the settlement and absurdly put this case on track for a trial where the only party facing liability is willing to resolve the Plaintiffs' claims. For all of these reasons, which are elaborated upon in the sections that follow, the Court should deny the PBA's motion without any need to resolve competing factual claims about officer safety and the administrability of the settlement.

### A. The PBA's Policy Objections to the Settlement Do Not Constitute Undue Legal Prejudice Sufficient to Support Denial of the Settling Parties' Rule 41(a)(2) Motion to Dismiss.

In reviewing a motion to dismiss with prejudice under Rule 41(a)(2), courts in the Second Circuit have considered whether "the dismissal of the action will be unduly prejudicial." *S.E.C. v. Lorin*, 869 F. Supp. 1117, 1119 (S.D.N.Y. 1994); *Harvey Aluminum, Inc. v. Am. Cyanamid Co.*, 15 F.R.D. 14, 18 (S.D.N.Y. 1953) ("Under Rules 41(a)(2) the Court's discretion is invoked. The essential question is whether the dismissal of the action will be unduly prejudicial to the defendants"); *Nix v. Off. of Comm'r of Baseball*, No. 17-CV-1241, 2017 WL 2889503, at *2 (S.D.N.Y. July 6, 2017) (same). Prejudice, in this context, is "generally evaluated as to the party against whom the claim is asserted." *Cohen v. DHB Indus., Inc.*, 658 F. App'x 593, 595 (2d Cir. 2016).

While the Second Circuit has not had the opportunity to apply this standard to a dismissal with prejudice involving an intervenor, the undue prejudice standard is consistent with the court's more general rule concerning a non-settling defendant's standing to object to a settlement. *See Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014). In *Bhatia*, the Second Circuit held that "there is a recognized exception to th[e] general rule [that non-settling defendants lack standing to

challenge a settlement] which permits a non-settling defendant to object where it can demonstrate that it will sustain some formal legal prejudice as a result of the settlement." *Id.*; *see also Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 92 (2d Cir. 2019) (holding that a third party did not have standing to appeal a dismissal pursuant to Rule 41(a)(2) because the settlement had not "formally strip[ped]" the third party of any claim or defense"). This reasoning is consistent with the reasoning of courts in other circuits that have considered the standard under Rule 41(a)(2), finding that a showing of "legal prejudice" is required to deny a motion to dismiss with prejudice. *See, e.g.*, *Cnty. of Santa Fe, N.M. v. Pub. Serv. Co. of New Mexico*, 311 F.3d 1031, 1047-49 (10th Cir. 2002)(explaining the requirement to show legal prejudice and the "rare circumstances" in which a dismissal with prejudice would affect a non-settling intervenor and found them present where such settlement would adversely impact the intervenor-plaintiff's ability to prosecute the claim); *WildEarth Guardians v. Haaland*, No. CV 21-175 (RC), 2022 WL 1773480, at *5 (D.D.C. June 1, 2022)("The central question is whether dismissal would result in legal prejudice to the other parties, in particular, the Intervenor-Defendants.").

Where the objecting party has failed to establish formal legal prejudice, courts have declined to review the propriety of settlement terms between the settling parties. For example, in *Chevron Corp. v. Donziger*, the non-settling party asked the court to review the substantive terms of the settlement to determine whether to grant the voluntary dismissal, but the court rejected this invitation, holding that "[a]s the non-settling defendants have not established any legal prejudice flowing from the dismissal, the Court's role under Rule 41 is at an end. The Court declines to express any view as to the propriety of the settlement agreement terms." No. 11-CV-0691, 2013 WL 1481813, at *4 (S.D.N.Y. Apr. 8, 2013); *see also Waller v. Fin. Corp. of Am.*, 828 F.2d 579,

584 (9th Cir. 1987) (declining to review settlement further after determining that it did not subject intervenor to formal legal prejudice).

Taking the PBA's submissions at face value, they do not present a *prima facie* case of undue or formal legal prejudice. The PBA's concerns are nothing more than a series of policy objections and concerns about the administrability of the oversight phase of the settlement. But the Second Circuit has made clear that formal legal prejudice "exists only in those rare circumstances when, for example, the settlement agreement *formally* strips a non-settling party of a legal claim or cause of action, such as a cross-claim for contribution or indemnification, invalidates a non-settling party's contract rights, or the right to present relevant evidence at a trial." *Bhatia*, 756 F.3d at 218 (emphasis in the original). The PBA's approach also contradicts Supreme Court precedent, which has identified only one "ground for denying a complainant in equity the right to dismiss[:]. . . that the cause has proceeded so far that the defendant is in a position to demand on the pleadings an opportunity to seek affirmative relief and he would be prejudiced by being remitted to a separate action." *Jones v. Sec. & Exch. Comm'n*, 298 U.S. 1, 20 (1936). Courts have generally rejected efforts to scuttle a motion under Rule 41(a)(2) unless the objecting party has actual claims or counter-claims at stake, which the PBA does not. *See, e.g., Rhoden v. Mittal*, No. 18-CV-6613, 2020 WL 8620716, at *3 (E.D.N.Y. Oct. 26, 2020), *report and recommendation adopted*, No. 18-CV-6613, 2021 WL 857396 (E.D.N.Y. Feb. 23, 2021) (finding no legal prejudice where the objecting parties "have neither asserted nor alluded to counterclaims in their Answer"); *Nix*, 2017 WL 2889503, at *3 (depriving defendants of federal venue and forcing litigation in state court is not legal prejudice); *Lan v. Time Warner, Inc.*, No. 11CIV2870ATJCF, 2016 WL 6778180, at *6 (S.D.N.Y. Oct. 18, 2016), report and recommendation adopted, No. 11CIV2870ATJCF, 2016 WL 6779526 (S.D.N.Y. Nov. 15, 2016) (being deprived of an opportunity to win a Rule 11

sanctions motion is not legal prejudice); *see also Pedreira v. Sunrise Children's Services, Inc.*, 79 F.4th 741, 751 (6th Cir. 2023) (granting dismissal over non-settling defendant's objection where it had "not identified any claims or defenses that would be foreclosed by dismissal").[5]

The PBA's speculative concerns about how the policy changes embodied in the settlement might play out on the ground simply do not constitute formal legal injury. Nor does the Settlement Agreement impose any obligations on the PBA or its members. The agreement embodies policies aimed at NYPD's management and tasks that do not create any new duties or obligations for individual members of service at the patrol officer level. Deployment decisions, whether to authorize a mass processing center (Settlement Agreement ¶ 33) or issue a dispersal order (*id.* ¶¶ 59-61), and the supervision of officers deployed to a demonstration (*id.* ¶¶ 75-77) are duties of supervisors and executives. There are very few aspects of the agreement that require patrol officers to do or refrain from doing anything, and all of these are already obligations imposed by law or current NYPD policies. *See, e.g.*, *id.* ¶¶ 16-17 (providing that individuals cannot be arrested or be subject to the use of force on account of their exercise of lawful First Amendment speech); *id.* ¶ 31 (requiring individualized probable cause as currently defined in NYPD policy for an arrest); *id.* ¶¶ 13, 15, 19, 28, 61, 64-67, 69-71, 76-77 (incorporating current NYPD policy). These provisions

---

[5] In considering what constitutes legal prejudice, the PBA's submission unhelpfully fails to distinguish between cases where plaintiffs have sought dismissal *without prejudice* from those where, as here, the Plaintiffs are agreeing to dismiss *with prejudice*, an error that may explain why the PBA conflates its speculative concerns with cognizable legal prejudice. The PBA cites *Shaw Fam. Archives, Ltd. v. CMG Worldwide, Inc.*, No. 05-CV-3939 (CM), 2008 WL 4127549, at *5 (S.D.N.Y. Sept. 2, 2008), a case where the plaintiffs sought dismissal without prejudice, and the court therefore evaluated the factors set forth in *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990), all of which relate to assessing the risks of plaintiffs tactically withdrawing and refiling an action, a concern of no relevance here, and which factors in any case favor Plaintiffs. Here, Plaintiffs have litigated this matter with diligence, the motion comes prior to any significant motion practice by the PBA, and Plaintiffs have a good reason to dismiss, namely, a settlement. *See* PBA Br. at 3. The distinction between dismissal with prejudice and without is important, however, because as this Court has noted "courts have generally subjected motions for voluntary dismissal *with* prejudice to far less scrutiny." *Commercial Recovery Corp. v. Bilateral Credit Corp., LLC*, No. 12-CV-5287, 2013 WL 8350184, at *5 (S.D.N.Y. Dec. 19, 2013) (McMahon, J.) (emphasis in the original).

impose no new or different obligations on the rights of the PBA's members, let alone create legal prejudice.

Perhaps recognizing that it cannot meet the applicable legal standard, the PBA casts about for a different standard altogether. Although the settlement agreement is not a consent decree that enters the terms of the agreement as an order of the court enforceable directly through remedies of contempt,[6] the PBA suggests that the Court's consideration of this question "should be informed by" the law governing approval of consent decrees because it "calls for the Court to exercise oversight and continuing jurisdiction." PBA Br. at 4. But the authority cited by the PBA does not support that proposition. Instead, those cases draw an analogy between Rule 41 settlements and consent decrees for the purpose of establishing that plaintiffs can be "prevailing parties" in the former for purposes of a fee award and *not* what level of scrutiny a court must apply. *See* PBA Br. at 4 (citing *Roberson v. Giuliani*, 346 F.3d 75, 82 (2d Cir. 2003)). The fact that the court's retention of jurisdiction under Rule 41(a)(2) constitutes a sufficient quantum of "judicial sanction" to warrant a fee award, *Roberson*, 346 F.3d at 82, does not provide a basis for this Court to ignore the prevailing legal standard for approving Rule 41 agreements and substitute the standard for a consent decree.

But even if the Court accepts the PBA's invitation to look to the law governing consent decrees, the PBA's concerns still provide no basis for rejecting the settling parties' motion. In the context of consent decrees, the Supreme Court has rejected the idea that an intervening union's objections to a consent decree can block it. *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO*

---

[6] Unlike a consent decree, the settlement agreement would not be a judicial order that carries the weight of a judgment. *See Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 518-19 (1986) (noting that consent decrees "bear some of the earmarks of judgments entered after litigation" including the court's ability to modify the decree and enforce it by citation for contempt). Consequently, and by way of further distinguishing a Rule 41 settlement, this Court would not be able to find a party in contempt until the Court "take[s] an extra step by first ordering specific performance and then, if a party does not comply, finding that party in contempt." *Roberson v. Giuliani*, 346 F.3d 75, 83 (2d Cir. 2003).

*C.L.C. v. City of Cleveland*, 478 U.S. 501, 528–29 (1986) ("*Firefighters*") ("It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent."). In the *Firefighters* case, the Court held that because the union had not brought any cross- or counter-claims, its policy-based objections to the consent decree could not prevent its adoption. *Id.* at 529–30; *see also Kirkland v. New York State Dep't of Corr. Servs.*, 711 F.2d 1117 (2d Cir. 1983) (entering a consent decree over objections of public employee union). Thus, the law governing consent decrees brings the PBA back to the same place: an absence of the formal legal prejudice needed to block voluntary dismissal and settlement of this case.

Beyond that, the standard for approval of a consent decree turns on whether the decree 1) "spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction," 2) "come[s] within the general scope of the case made by the pleadings," and 3) "further[s] the objectives of the law upon which the complaint was based." *Kozlowski v. Coughlin*, 871 F.2d 241, 244 (2d Cir. 1989) (citing *Firefighters,* 478 U.S. at 525). The settlement plainly meets this standard, and the PBA does not seriously argue otherwise.

The PBA cites no cases to support its claim that an intervenor may veto any settlement if it "materially impairs" or "prejudices" the interests that formed the basis for that party's intervention, because there are none. Contrary to the PBA's contention, this does not mean that settling parties may "impair [intervenor's] interest at will." PBA Br. at 6. If an intervenor's interest was impaired by prior conduct to the point of legal injury,  the intervenor will have brought a

counter-claim or cross-claim; or, if it is future misconduct the PBA fears, it may bring independent

litigation if and when it suffers a legal injury. Tellingly, the PBA brought no such claim.[7] Short of

such legal prejudice, there is no basis for rejecting the settlement.

**B.  The PBA's Participation in the Litigation and Mediation Process that Led to the Settlement Fully Satisfies Their Interest as Intervenors.**

The PBA has successfully protected its interest in avoiding a judicial determination that

certain NYPD policies are unlawful, because the settlement agreement does not result in any such

judicial determination. It has also achieved dismissal with prejudice without any finding of liability

– the most it could obtain after trial. Like any other full party, what rights the PBA has turns on

the claims and defenses it pleads. Even outside the pleadings, the PBA also had an unencumbered

opportunity to raise any concerns about officer safety during the litigation. No part of the Second

Circuit's decision suggests the PBA's role as intervenor goes beyond this level of participation,

still less that it should be given veto power over settlement of claims that lie between Plaintiffs

and the City of New York. [8]

The Second Circuit's ruling speaks primarily to the PBA's interest in preventing a

*judgment* that would declare certain policies unlawful, where those policies may implicate officer

safety. *See In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th at 801

---

[7] To the extent the PBA complains that its interest is outside the scope of the pleading it chose to file, that sounds in waiver: The PBA is not making an intervention motion for the first time here. Rather, it intervened some time ago and asserted its claims. Had the PBA sought, for example, an injunction barring the City from adopting certain policies the implicated its interest in officer safety, it might be on different footing. And, although its concerns are specious as discussed in Part II, *infra*, if somehow one or more of the PBA's officer safety concerns did mature to the point of legal prejudice, nothing about the settlement would prevent litigation of that issue when or if it ever ripened to that point – a fact that standing alone warrants rejection of the PBA's motion. *See New Mexico ex rel. State Eng'r v. Aamodt*, 582 F. Supp. 2d 1313, 1319–20 (D.N.M. 2007) (rejecting non-settling defendants' objections in part because those parties could adjudicate any legal claims elsewhere); *see also Camilli v. Grimes*, 436 F.3d 120, 124 (2d Cir. 2006) (holding that a plaintiff's dismissal without prejudice could not be rejected on the grounds that it negatively impacted the defendant's ability to bring a separate malicious prosecution claim).

[8] Thus, in answer to the Court's question, the settlement can be entered solely among the agreeing parties, but there would be nothing further for the PBA to defend, as plaintiffs will have obtained all the relief they seek.

("The PBA seeks to contest the proposition that the challenged policies are *unlawful* and should be changed.") (emphasis added). Changing such policies by voluntary settlement – even one that is enforceable on contract terms by this Court – is not akin to a judgment because it does not remove such policies from the menu of possible policy options in the way that a judicial determination of unlawfulness would; nor does it have any *res judicata* effect. Instead, it is ultimately NYPD changing those policies voluntarily, something that is well within the City's authority to do even over a union's objection. *See* N.Y. Coll. Bargaining Law § 12-307(b) (exempting from mandatory collective bargaining wide-ranging matters of managerial prerogative); *Floyd v. City of N.Y.*, 770 F.3d 1051, 1061 (2d Cir. 2014) (noting that changes to "policies, procedures, supervision, training, and monitoring" that may impact employees "fall squarely within" managerial prerogative); *In re County of Erie v. State of N.Y. Pub. Empl. Relations Bd.*, 12 N.Y.3d 72, 78 (2009) ("[D]ecisions are not bargainable as terms and conditions of employment where they are inherently and fundamentally policy decisions relating to [its] primary mission[.]"). The Second Circuit's recognition of the PBA's interest in a judgment arising from this litigation does not, indeed it could not, create a new power of the union to interfere with management prerogatives or set NYPD policy.

Moreover, the Second Circuit's acknowledgment of the PBA's interest contemplated intervention as a means of the PBA participating in and influencing the development of the record and any motions practice that may later inform "the nature and scope of injunctive relief." *In re New York City Policing*, 27 F.4th at 803. And the PBA has had an unencumbered opportunity to do so: to influence the resolution of this case, to contribute to discovery and to provide its perspective on pre-trial motions practice that shaped the case as it headed toward a resolution.

The PBA was also heard at the mediation table. This degree of participation in settlement negotiations is by no means guaranteed for intervenors. *See Vulcan Soc. of Westchester Cty., Inc. v. Fire Dep't of City of White Plains*, No. 78-CV-911, 1979 WL 259, at *1 (S.D.N.Y. June 28, 1979) (denying intervenors' motion to be included in ongoing settlement negotiations because "parties cannot be prevented from negotiating on their own"). The PBA's false assertions that, during the mediation, its "comments received no substantive response, and no significant changes were made to the provisions to alleviate the problems the PBA had raised," PBA Br. at 3, arguably puts at issue otherwise confidential facts about the mediation process. Plaintiffs endeavor herein to expose this falsehood without further compromising the parties' confidentiality obligations,[9] in order to ensure that the Court understands that the PBA had every opportunity to present its views during the mediation process and was heard on the views it chose to present.

The PBA was present at all critical stages of the mediation process and the court-appointed mediator and other parties consistently prompted its representatives to engage substantively with the proposals under discussion. It was invited to the overwhelming majority of mediation sessions. And many parties did not attend all of the dozens of meetings and mediation sessions; sometimes meetings related only to specific issues arising between two parties or were designed for a smaller group to make progress on an issue in order to bring it back to all parties. The PBA was provided with every operative draft proposal exchanged by the parties and invited to provide feedback. *See* Declaration of Corey Stoughton, ¶¶ 2-4, Nov. 1, 2023. Plaintiffs responded to the unions' proposals, which were often presented collectively from all three police unions, and the settling

---

[9] As the Court is undoubtedly aware, the Southern District's mediation confidentiality agreement states that "communications made exclusively during or for the mediation process shall be confidential." Plaintiffs, therefore, do not discuss the substance of either the PBA's input or any party's response, and do not submit with this motion evidence of the fact that the PBA chose not to meaningfully engage in the mediation process because that evidence contains confidential communications. But Plaintiffs do not understand the confidentiality agreement to cover facts such as which parties attended which mediation sessions, nor do Plaintiffs understand it to prevent counsel from discussing other facts about the mediation process that indicate the nature of the PBA's participation in that process.

parties accepted several of them. Not all were accepted, but that is the nature of a settlement process.

For these reasons, contrary to the PBA's assertion, interpreting the Second Circuit's order as requiring only an opportunity to participate in the litigation like any other party does not render the order "a nullity." PBA Br. at 4. Certainly, the PBA has a right to be heard, as it repeatedly insists in its submissions to the Court—and it has been heard. *See, e.g.*, PBA Br. at 8. Among other things, the PBA had the opportunity to contribute to the factual record that shaped the parties' mediation positions. This is consistent with the role set out by the Supreme Court for union intervenors, even in cases ending in a consent decree. *See Firefighters*, 478 U.S. at 529 (approving a settlement over union objections, holding that the fact that the union "took full advantage of its opportunity to participate in the District Court's hearings … was permitted to air its objections to the reasonableness of the decree and to introduce relevant evidence" meant that "the District Court gave the union all the process that [it] was due"). "Being heard" does not equate to having veto power over an agreement that resolves Plaintiffs' claims. *See United States v. District of Columbia*, 933 F. Supp. 42, 47-48 (D.D.C. 1996) ("Moreover, it is well settled that the right to have its objections heard does not, of course, give the intervenor the right to block any settlement to which it objects.") (cleaned up). To the contrary, what the Second Circuit intended is that the PBA use the opportunity of its participation to raise concerns in the litigation process, to strengthen that process as a vehicle of truth-finding. Because that occurred, the PBA's interests have been protected.

**C. Because Modification of the Settlement Agreement on the PBA's Terms Would Scuttle a Delicately Negotiated Resolution, the Court Must Assume that Failure to Approve the Settlement Will Lead to a Trial, With Absurd Results.**

The PBA does not offer any line edits, nor any specific proposals to reconcile its outlier views with the settlement. Rather, the PBA vaguely urges the Court to "approve the Proposed Settlement on the condition that the flaws pointed out in this brief and the Anemone Dec. are eliminated," acknowledging that this would require "major changes." PBA Br. at 2. What these "major changes" are is left to the imagination. The gist of the PBA's objection is a rejection of the heart of the parties' compromise: the tiered deployment structure and the Red Light/Green Light arrest policy, the latter of which pre-dates the settlement agreement.[10] "Eliminating" those provisions would eliminate the settlement agreement.

For this reason, the PBA is flat wrong when it states that "the Court does not necessarily face a stark choice between the Proposed Settlement and no settlement at all." PBA Br. at 2. That is exactly the choice the Court faces. Plaintiffs do not rule out that a different settlement is possible, but the document submitted to the Court on September 5 is the one and only result of the mediation process that began more than a year earlier, in July 2022, and involved the Court's generous grant of significant breaks in the litigation process so that the parties could focus in good faith on resolution. It represents dozens of delicate compromises and trade-offs among the Plaintiffs, the City, NYPD, and two other police officer unions. Indulging the PBA's spoiler role would send that process back to square one and, therefore, likely pave a road to trial.

---

[10] *See, e.g.*, Settlement Agreement ¶ 28 (noting that "The NYPD has a policy called Red Light Green Light"). Retired Commanding Officer of Patrol Borough Manhattan South, Assistant Chief Stephen Hughes, a two-star officer with 41 years of experience and the former head of the Strategic Response Group, *see* Stoughton Decl. Ex. 2, Hughes Dep. 18-19, June 20, 2023, testified that his patrol bureau has utilized a version of the red light/green light policy since 2015. *See Id.*, Ex. 3 Hughes Dep. 125: 17-25, May 5, 2023. Testifying in his capacity as a Rule 30(b)(6) witness on NYPD procedures for effecting large-scale arrests, Chief Hughes further testified that the red light/green light policy was eventually implemented citywide during the George Floyd protests because the NYPD wanted to ensure that line officers had "clear instruction when they [went] out there when to take action, when not" and to ensure that they did not take "independent action." *Id.* at 19:19-20:17, 144: 5-25. *See also* Declaration of Hassan Aden, Ex. F, PERF 2018 Report, at 17.

This would lead to an absurd result of Plaintiffs litigating claims against a party that is willing to enter an agreement in resolution of all their claims.[11] The PBA attempts to rationalize this, stating that it is "normal that a party who wants to obtain certain relief must try the case or forgo the relief, unless the parties against whom relief is sought consent to it." PBA Br. at 5. But Plaintiffs do not seek any relief from the PBA, so its consent is irrelevant. Indeed, as the PBA recognizes, PBA Br. at 7, it could not practically defend this matter without the City's participation, thus imposing significant and inequitable burdens on parties that have sought settlement precisely to avoid the further time and expense of litigation. *See Cnty. of Santa Fe, N.M. v. Pub. Serv. Co. of New Mexico*, 311 F.3d 1031, 1049 (10th Cir. 2002) (noting that courts must consider under Rule 41(a)(2) "the equities not only facing the defendant but also those facing the plaintiff").

## II.   THE PBA'S ARGUMENTS ARE UNPERSUASIVE REASONS TO REJECT THE SETTLEMENT UNDER ANY LEGAL STANDARD.

Even if the PBA's vague objections did constitute legal prejudice cognizable under Rule 41, which they do not for the reasons stated above, those concerns are entirely meritless.

### A.  The Settlement Enhances Officer Safety

The settlement agreement reflects current nationally accepted policing best practices including community engagement before and during the events, an emphasis on de-escalation, minimizing the use of mass arrests in favor of focused enforcement action, a "graded" or multi-tiered response system, and a process for review and improving police response to protests. Declaration of Hassan Aden (Nov. 1, 2023) (hereinafter, "Aden Decl.") ¶¶ 38-58. These practices, with their stimulation of communication between police and protesters, are aimed at preserving

---

[11] Given that the Plaintiffs and Defendants will have resolved their differences, it is questionable whether there is even a case or controversy remaining under Article III. *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 71-72 (2013).

First Amendment rights while maintaining order and avoiding the cycle of tension and violence more commonly associated with the escalated force model proposed by the PBA and its declarant, Louis Anemone. *See* ECF No. 1119, Declaration of Louis Anemone (Oct. 6, 2023) (hereinafter "Anemone Decl.").

The Red Light/Green Light model of regulating officer discretion to execute arrests for low-level offenses further reflects modern policing practice that will enhance officer and public safety. As Chief Aden explains, when policing demonstrations, the degree of lawlessness matters. Demonstrators committing acts of civil disobedience, such as blocking a roadside, will leave the street after an hour or two. Aden Decl. ¶¶ 50-51. As such, contrary to Chief Anemone's opinion, Anemone Decl. ¶ 27, the more appropriate response for the police is to simply reroute traffic, rather than arresting demonstrators *en masse*, which can create hostility toward the police, tie up critical police resources for days, and worsen an already tense situation. Similarly, the tiered response approach can protect officer safety, as staging officers in riot gear in view of the crowd can inflame the very conflict it is intended to prevent. Aden Decl. ¶ 53. Further, the tiered response system, incident commander and FAA Senior Executive provisions of the settlement agreement will improve coordination and communication by ensuring accountability for key decisions and creating a robust mechanism for ongoing review and critique of the NYPD's response to protest. Aden Decl. ¶¶ 38-58.

The Anemone Declaration does not present any credible argument that the PBA's interest in officer safety will be impaired by the settlement agreement. Chief Anemone is not an expert and is not entitled to the weight of an expert. Nor has the PBA laid a foundation for his possessing relevant factual information. He has not served as a police officer for the last 25 years nor has he provided any indication that he has kept current with best practices in policing of protests.

*Compare* Anemone Decl. ¶¶ 7–12; *with* Aden Decl. ¶¶ 7-21. This is important because, as Chief Aden notes, policing "best practices are not fixed or static" and "there have been significant advances in policing mass demonstrations," including a rejection of the "escalated forced model" underlying Chief Anemone's approach. Aden Decl. ¶¶ 4-5, 22-34. Far from laying a foundation for any relevant knowledge about effective policing at protests, Chief Anemone's claim of extensive involvement in the NYPD's past response to protests indicates that the testimony may not be reliable, given that the consolidated cases expressly challenge the NYPD's violent history of unconstitutional use of force and arrests at protests and implicate longstanding practices. And every conclusion he draws is directly refuted by the fact that, in agreeing to the settlement, the NYPD's existing leadership, with its superior knowledge and understanding of all of the issues Chief Anemone addresses, as well as the members of two other police unions, have endorsed the settlement's approach.

Fundamentally, Chief Anemone's conclusions are unreliable because they rest on a false, outdated assumption that the presence of large numbers of police officers at protests inherently reduces violence. Anemone Decl. ¶¶ 26, 29, 34. In fact, as Chief Aden meticulously explains in his declaration, drawing on his extensive personal experience on the ground at protests within the last twenty years in multiple parts of the country and with specific citations to contemporary best practices validated by scholars and institutions such as the United States Department of Justice, the International Association of Chiefs of Police, the National Policing Institute and the Police Executive Research Forum, the opposite is true. Aden Decl. ¶¶ 6, 22-34. "The escalated force model … does not improve officer safety. Instead, it puts it at risk." *Id.* ¶ 30.

The unreliability of Chief Anemone's opinions is further demonstrated by several obviously erroneous factual assumptions about both the settlement and NYPD operations. For

example, Anemone claims that allowing for "a continuation of the protest after a dispersal order has been issued" could create "risk of serious injury to police officers," Anemone Decl. ¶ 35, but ignores that the settlement only requires this "when feasible," precisely in anticipation of this potential. Settlement Agreement ¶ 61. (To say nothing of the "uninterrupted history of NYPD officers mishandling dispersal orders" by failing to provide opportunities to disperse after giving such orders. *Gavin v. City of N.Y.*, No. 20-CV-8163, 2021 WL 3774113, at *4 (S.D.N.Y. Aug. 24, 2021).) He claims that paragraph 41 results in "officers not being allowed to use personal protective equipment without approval," Anemone Decl. ¶ 35, when it merely states that when officers are sent for traffic control purposes they should not be equipped to execute mass arrests.[12] He asserts that the meaning of "widespread" is undefined, Anemone Decl. ¶ 36, even though, in context it clear that "widespread" means that officers tried to contain the problem through targeted arrests of individual offenders, but could not. Settlement Agreement ¶ 57. He implies, without citing any specific part of the settlement, that it would prevent the NYPD from factoring in "the safety of the officers" when determining "how and how many officers are deployed to police [] events," Anemone Decl. ¶ 36, when it does exactly the opposite, because the tiered approach is keyed to specific levels of threat.

More fundamentally, in catastrophizing about the consequences of the tiered deployment thresholds, *see, e.g.,* Anemone Dec. ¶¶ 24, 33-34; PBA Br. at 10, Chief Anemone appears to assume that the tiered approach requires holding back necessary deployments, when in reality it creates a structure for precisely appropriate deployments, including discretion to respond to a wide

---

[12] The PBA also makes some obvious misstatements of its own; for example, it wrongly asserts that "protesters are given an ability to request officer presence that is not given to other members of the public, and discretion over police *deployment* that is not permitted to the senior police officers in charge," PBA Br. at 10, but in fact it is common sense that any New Yorker can request police presence and a protesters' request does not *control* deployment decisions, it only gives the NYPD the option of considering that request in making its deployment decisions.

range of potential scenarios. Settlement Agreement ¶¶ 40-41 (discretion to deploy protest liaisons and traffic control officers in any tier); ¶ 46 (discretion to deploy officers "nearby but off-scene" if there is a "reasonable belief" that there will be serious offenses or obstruction of critical infrastructure); ¶ 47 (allowing deployment of officers in Tier 2 to address specific risks of property damage or violence); ¶¶ 49, 51, 53 (authorizing the deployment of officers needed to make arrests on probable cause including, where necessary, SRG officers); ¶¶ 56-63 (discretion to deploy officers to disperse a crowd where unlawful acts cannot be controlled through targeted arrests). Chief Anemone fails to grapple with the fact that where the NYPD believes there is a risk of violence, officers may be deployed nearby in a manner that enables rapid enforcement if such action is required; there is no basis for his assumption that officers will be too far away to effectively respond if needed.[13] He also ignores that the agreement contemplates that, in certain circumstances, officers may be deployed on the scene to deter violence or property damage. Settlement Agreement ¶ 47. As Chief Aden confirms, this approach reflects best practice for both facilitating free speech and protecting public and officer safety – indeed, it "improves officer safety." Aden Decl. ¶ 56.

In speculating that the need to consult with the FAA Senior Executive about deployment will cause delays, Mr. Anemone appears not to understand that deployment decisions are already made by (often off-site) senior leadership in the Operations Division and/or the Chief of

---

[13] The NYPD does not adopt Chief Anemone's assumption that a tiered response will slow [the police's] "decision making and response capabilities[.]" Anemone Decl. ¶ 37. SRG Deputy Chief John D'Adamo testified that since the 2020 protests—and in response to recommendations by the Department of Investigation—the NYPD has begun stationing SRG officers about five blocks away from any protest, rather than in the front of it. Instead, NYPD Community Affairs officers are placed at the front of the protest. Chief D'Adamo further testified that this change involves "only calling for SRG [to the front] if there is going to be confrontation or arrests being made." Stoughton Decl., Ex. 3, John D'Adamo Dep. 68:5-70:4, May 10, 2023.

Department's office.[14] Incident commanders may request additional deployments, but the involvement of these executive functions was required even during the 2020 protests; the settlement agreement does not add any new layer of bureaucratic management in this regard. He also is apparently unaware that some of the policies he singles out as dangerous have been part of NYPD practice for some time without ill effect, at least in some parts of the City, including the Red Light/Green Light arrest policy.

As a further example, Chief Anemone suggests that two references to New York's Civil Rights Law § 79-P and New York City Administrative Code § 14-189, concerning the "Right to record law enforcement related activities" (N.Y. Civ. R. L. 79-P(1)), will "jeopardize the safety of officers, protesters and the public," because they do not quote enough language from the underlying laws. Anemone Decl. ¶ 13. He lays no foundation for, and suggests no relevant data to support, his conclusory statement that respecting the rights of the public and press to record police activity in public is antithetical to the safety of officers, protesters and the public. Moreover, since the laws are cited and incorporated by reference, Chief Anemone's complaint seems to be little more than a stylistic quibble.

This is not a complete accounting of the errors in Chief Anemone's analysis. But, particularly when considering against the weight of Chief Aden's declaration, the lack of foundation for Chief Anemone's relevant knowledge, and the evidence of his reliance on an outdated theory of policing, it is a sufficient accounting for the Court to disregard his conclusions and find that the PBA has failed to meet its burden to establish any grounds for declining to approve the settlement, under any legal standard. This is particularly so given that, by and large, Chief

---

[14] *See, e.g.*, Stoughton Decl., Ex. 4, Terence Monahan Dep. 20:18-21:15, 139:3-12, June 9, 2023 (testifying regarding the deployment of personnel during the 2020 protests).

Anemone is speculating about potential outcomes, the risks of which – if any risk exists at all, a conclusion that cannot be supported on this record – can be managed though the collaborative process set up by the Settlement Agreement.

Should the Court conclude, however, that the Anemone Declaration raises concerns that call into question whether to enter the proposed order of dismissal, which it should not for all the reasons stated above, a hearing is unambiguously required. The PBA makes no plausible case for how the Court could make any factual finding at all, let alone a finding that the settlement would adversely affect officer safety, based on the Anemone Declaration, particularly without any opportunity for cross-examination, and in the context of the record submitted by the parties opposing its motion.

### B.  The Settlement is Not "Impractical"

As an initial matter, the PBA provides no basis to complain about the administrability of the settlement: it does not impact patrol officer safety and, as non-parties to the agreement, will not affect its interests in any way. In any event, the PBA's argument that the settlement will generate extensive post-judgment litigation is hyperbole completely divorced from the text of the actual proposal. Plaintiffs can only bring a motion to the Court for "material breach" of the agreement. Settlement Agreement ¶¶ 101(d), 124. Such a motion may be filed only if a mandatory meet and confer process has failed. *Id.* The existence of the Collaborative Committee is designed to avoid unnecessary post-settlement litigation by setting a tone and creating a structure for collaboration; the settling parties invested a great deal of effort in constructing this part of the settlement agreement precisely for this purpose.

Should motions practice become necessary, they can be brought only at certain inflection points: at the conclusion of Phase I, in the event that the policies and training materials the NYPD

develops so deviate from the terms of the agreement that they constitute a material breach of it (¶ 101(d)); 18 months or 30 months into Phase II—the oversight period—or at its conclusion, if the Department of Investigation's reports suggest there is material breach or if there is a "persistent failure" to engage in the collaborative process or changes to the policies or training that constitute material breaches of the agreement (¶ 124); during the 12 months of Phase III, if Plaintiffs can demonstrate backsliding that constitutes material breach, and only then to obtain "tailored relief" specific to that breach (¶ 130). This structured process is a far cry from the PBA's claim that "the Court may be called upon to review the parties' compliance with any of the Settlement Agreement's many detailed obligations" at any time. PBA Br. at 16.

In the event that such a motion is required, there is little risk that the Court will find itself mired in interpretive complexity around such common legal concepts as "material breach" and "tailored relief," as the PBA seems to assume. PBA Br. at 15. The "material breach" standard, as well as the requirement that motions relating to breaches at protest events are grounded in the DOI's review of those events, also plainly prevents the specter the PBA raises of Plaintiffs looking to the Court to "micromanage the NYPD's policing of public gatherings." PBA Br. at 16. In sum, contrary to the impression left by the PBA's submission, the oversight period is a well-structured, time-limited, tailored process designed to be collaborative while providing sufficient mechanisms for the parties to ensure basic compliance.

For these same reasons, the PBA is incorrect in asserting that "the burden of enforcing the Proposed Settlement during Phase II will fall almost entirely on the Court." PBA Br. at 15. The Court plays no active role in enforcing or overseeing the settlement agreement. Its only role is to adjudicate any motion for breach, which motions can only come in certain circumstances, after meeting certain thresholds, if both the collaborative process and mandatory meet and confer

process has failed. Moreover, in framing its concerns about burden and administrability, the PBA never bothers to compare the settlement to the only alternative: managing a series of trials involving these parties and administering a remedial order in the event of a judgment in favor of any plaintiff. Given the number of parties, as well as the additional confusion created by the PBA's motion, the burden these cases would place on the Court in that posture would clearly be more unwieldy than the structured process developed by the settling parties.

Finally, the PBA was invited to, and remains welcome, to sign the settlement agreement before it is entered. But unless it chooses to become a party to that agreement, it cannot claim any legal right to participate in the collaborative committee or any of the other voluntary structures the settling parties have erected to ensure that policing at future protests is constitutional and effective. This is not a reason to reject the settlement agreement; it is simply a choice the PBA must make.

## CONCLUSION

For these reasons, the PBA has failed to provide the Court with any basis for rejecting the settlement of the injunctive relief claims in the four consolidated cases.[15]

Dated: November 3, 2023

THE LEGAL AID SOCIETY

*/s/ Corey Stoughton*
Corey Stoughton
Jennvine Wong
Paula Garcia-Salazar
49 Thomas Street
New York, NY 10013

---

[15] The PBA more modestly asks the Court to ensure that "[a]ny order approving the Proposed Settlement, in its present form or with modifications, should reflect [an] assurance" that the agreement "does not abridge any Collective Bargaining rights of the PBA's members." PBA Br. at 8. Plaintiffs do not object to the Court incorporating this concept into its Order but submit that is it unnecessary because the PBA has not made any argument for how the agreement could possibly impair such rights. To the contrary, the agreement already makes clear that it does not abridge any collective bargaining rights, and the omission of specific mention of the PBA from paragraph 141 of the agreement is simply a function of the PBA, unlike its fellow unions, refusing to be a party to that agreement. For this reason, as set forth above, the agreement does not impose *any* obligations on the PBA, including any obligation that impairs their collective bargaining rights.

(212) 577-3367
cstoughton@legal-aid.org

NEW YORK CIVIL LIBERTIES UNION FOUNDATION

*/s/ Molly. K. Biklen*
Molly K. Biklen
Jessica Perry
Daniel R. Lambright
Robert Hodgson
Veronica Salama
Lisa Laplace
Perry Grossman
Christopher T. Dunn
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
mbiklen@nyclu.org

*Counsel for Plaintiffs in Payne v. De Blasio, 20 Civ. 8924*

LETITIA JAMES
*Attorney General of the State of New York*

By: /s/ __Travis England__
Sandra Park, Chief, *Civil Rights Bureau*
Travis England, *Deputy Chief, Civil Rights Bureau*
Lillian Marquez, *Assistant Attorney General*
Lois Saldana, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
(212) 416-6233
Travis.England@ag.ny.gov

*/s/ Abigail Everdell*
Robert D. Balin
Nimra H. Azmi
Abigail Everdell
Kathleen Farley
Alexandra Settelmayer
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Fax: (212) 489-8340

robbalin@dwt.com
abigaileverdell@dwt.com
kathleenfarley@dwt.com

Wylie Stecklow
WYLIE STECKLOW PLLC
Carnegie Hill Tower
152 W. 57th Street, 8th Floor
NY NY10019
(t) 212 566 8000
ecf@WylieLAW.com

Mickey H. Osterreicher
General Counsel
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
70 Niagara Street
Buffalo, New York 14202
Tel: (716) 983-7800
Fax: (716) 608-1509
lawyer@nppa.org

Alicia Calzada (pro hac vice)
ALICIA WAGNER CALZADA, PLLC
Deputy General Counsel
National Press Photographers Association
926 Chulie Drive, suite 16
San Antonio, TX 78216
210-825-1449
Alicia@calzadalegal.com

*Co-Counsel for Plaintiffs in Gray v. City of New York et al*

The Aboushi Law Firm PLLC

*/s/ Tahanie A. Aboushi*
Tahanie A. Aboushi, Esq.
Aymen A. Aboushi, Esq.
The Aboushi Law Firm
1441 Broadway, 5th Floor
New York, NY 10018
Tel: (212) 391-8500
Tahanie@Aboushi.com
Aymen@Aboushi.com

**COHEN&GREEN P.L.L.C.**

By: *Elena L. Cohen*

Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
        remy@femmelaw.com
        jessica@femmelaw.com


GIDEON ORION OLIVER

*/s/ Gideon Orion Oliver*
277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

*Counsel for Plaintiffs in Rolon, et al v. City of New York, et al, No. 21-cv-2548*