UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: New York City Policing During Summer 2020 Protests | Index No. 20-CV-8924 (CM) (GG) |

# DECLARATION OF HASSAN ADEN

**HASSAN ADEN** affirms as follows under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.  I have over 36 years of law enforcement experience and have served in every position starting as a recruit officer and ending as a chief. I worked for 25 years with the Alexandria Police Department in Virginia, where I rose to the rank of Deputy Chief of Police, and 3 years with the Greenville Police Department in North Carolina, where I served as Chief of Police.

2.  I have been retained by counsel for the Plaintiffs in support of their opposition to the Police Benevolent Association's objection to the settlement, annexed hereto as Exhibit A (the "Settlement Agreement"). I was initially retained by Plaintiffs during the discovery phase of this litigation and understand that on September 1, 2021, the Office of the New York State Attorney General and *Payne* Plaintiffs designated me as their retained expert in the above-captioned case.

3.  Plaintiffs have asked me to provide my expert opinion concerning whether and to what extent the settlement entered into by the individual Plaintiffs, Plaintiff State of New York, Defendant City of New York, and Union-Intervenors Sergeants Benevolent Association and Detectives' Endowment Association, is consistent with nationally accepted policing practices.

4.  It is important to note that best practices are not fixed or static. They evolve over time as new research, technologies, and methodologies emerge. Continuous evaluation, adaptation, and improvement are essential to ensure that best practices remain up-to-date and effective in addressing the evolving needs and challenges of a given industry or field.

5.  There have been significant advances in policing mass demonstrations, particularly as research on crowd psychology has advanced, from the ***escalated force model*** (espoused by (ret.) Chief Anemone in his declaration in support of the PBA's objection to the Settlement Agreement), to the ***negotiated management model***, which emerged after four presidential commissions exposed the flaws of the escalated force model. Under the negotiated management model, police officers are trained to see their role as helping to facilitate First Amendment expression.

6.  Based on my decades-long law enforcement experience, my leadership role on four different Consent Decree monitoring teams for large metropolitan police departments in Baltimore, Chicago, Cleveland, and Seattle, as well as my work with professional organizations

1

such as the International Association of Chiefs of Police (IACP) and the Police Executive Research Forum (PERF), it is my opinion that the Settlement Agreement follows the latest recommendations in policing demonstrations such as: (i) engaging community members before and during protests, (ii) emphasizing de-escalation and minimizing the use of mass arrests, and (iii) implementing multi-tiered demonstration response systems.

EXPERIENCE & QUALIFICATIONS

7. I have over 36 years of extensive experience with law enforcement, including personal experience in both a rank-and-file and senior leadership roles in two urban police departments, serving as both a leader and member for decades in numerous nationally-respected professional policing organizations, and overseeing consent decrees requiring reforms in the Baltimore, Chicago, Cleveland, and Seattle Police Departments. I also serve as the Independent Police Monitor of the Santa Barbara Police Department in California. Moreover, I have direct experience in the training, planning and establishment of the structures to manage a scalable range of demonstrations and, more recently, have been involved in after-action reviews and live monitoring of mass demonstrations.

8. I hold an undergraduate degree from American University, a Master of Public Administration from American University School of Public Affairs, a certificate from the Robins School of Business at the University of Richmond, and a Leadership and Responsible Public Administration certificate from the Leadership Institute City of Alexandria.

9. During my 25-year tenure with the Alexandria Police Department, I held administrative, investigative, and operational assignments, working on issues such as crime control, community relations and strategic planning. In my role as Police Captain and the Commander of Patrol, I built a highly functional and diverse team of officers responsible for a tremendous turnaround in crime and public order issues. I facilitated the planning of strategic and tactical responses that resulted in major reductions in crime, as well as a demonstrable rise in the quality of life. I was also the commanding officer of the defensive tactics training unit and served as Deputy Chief of Police for the Patrol Operations Bureau where I led the Bureau's COMPSTAT crime control strategies and problem-solving activities. I served as a Special Assistant to the Chief of Police and was an Aide to the Mayor and City Council for the Alexandria Police Department where I counseled the City regarding policing matters. I also commanded the Police Department's field training unit and served as a subject matter expert in the field of interoperable communications for the National Institute of Justice.

10. From 2012 to 2015, I then served as Chief of Police for the City of Greenville, North Carolina, where I oversaw all the administrative and operational aspects of policing and updated the department's policies to be aligned with nationally accepted policing practices. Significant reform occurred in the Greenville Police Department during my administration, as policies, practices, and training were realigned to meet the needs of our community. The training we implemented across the organization focused on procedural justice and realignment of performance measures and community engagement, specifically in building trust with community members. These changes, and the derived positive results, were recognized on the national level

as best practices. As a result, I was selected to be on the United States Department of Justice's Collaborative Reform Initiative, charged with assessing the St. Louis County Police Department and its actions immediately following the shooting of Michael Brown in Ferguson, Missouri. Specifically, my team worked on the response to the mass protests that the City of Ferguson and the region experienced.

11. Since retiring from Greenville PD, I have gained extensive experience with researching and implementing nationally accepted policing practices across the country. I have also served in leadership roles at major organizations that conduct research, education, and accreditation on policing practices. My areas of expertise include policing of large-scale events and First Amendment activity, the use of force, officer training, policies and procedures, police operations and administration, civil rights investigations, internal/administrative investigations, police discipline and citizen complaints. I have served on monitoring teams in multiple jurisdictions and currently serve as the deputy monitor for the Baltimore Consent Decree monitoring team, associate monitor for the Chicago Consent Decree, and as the Independent Police Monitor of the Santa Barbara Police Department in California.

12. I have served in leadership roles at major organizations that conduct research, education, and accreditation on policing practices. My areas of expertise include policing of large-scale events and First Amendment activity, the use of force, officer training, policies and procedures, police operations and administration, civil right investigations, internal/administrative investigations, police discipline and citizen complaints. I have served on monitoring teams in multiple jurisdictions and currently serve as the deputy monitor for the Baltimore Consent Decree monitoring team and an associate monitor for the Chicago Consent Decree.

13. From January 2015 to February 2016, I was the Director of Research and Programs of IACP. IACP is the world's largest association of police leaders and is known for preparing current and emerging police leaders—and the agencies and communities they serve—to succeed in addressing the most pressing issues, threats, and challenges of the day. As Director, I engaged with law enforcement leaders throughout the country and oversaw a large portfolio of operational programs aimed at advancing professional police services and promoting enhanced technical and operations police practices. I served on numerous advisory groups within the U.S. Department of Justice on projects involving policy development, law enforcement forecasting, and grant funding.

14. From February 2016 to January 2018, I served as the Senior Advisor to the Vera Institute of Justice. As the Senior Advisor, I provided oversight and leadership on local, state, and federal law enforcement projects and worked to develop and implement strategies designed to improve how police interact and serve vulnerable communities.

15. From 2012 to 2016, I served as a commissioner on the governing board of the Commission on Accreditation for Law Enforcement Agencies (CALEA). I continue to advise the board on current issues in the policing field.

16. From February 2016 to January 2018, I served as a Senior Advisor to the National Policing Institute (formerly known as the Police Foundation) on all local, state, and federal law

enforcement initiatives and projects. I provided direction and oversight on projects and proposal development and guided project management methodologies and strategies.

17. I am a member of the Police Executive Research Forum as well as the National Academies of Sciences, Engineering and Medicine and serve on the Academies' Committee on Proactive Policing to advise national research priorities related to law and justice. I also am the principal of the Aden Group LLC, which provides strategic guidance to police departments in assessing their performance against the President's Task Force on 21st Century Policing recommendations and policy positions.

18. I currently serve as the Deputy Monitor on the Baltimore Police Monitoring Team, which is charged with overseeing the implementation of the Consent Decree between the City of Baltimore and the U.S. Department of Justice. The monitoring team's mission is to help the court gauge whether, consistent with the Consent Decree's objectives, the Baltimore City Police Department is achieving meaningful police reform.

19. I also serve as the Associate Monitor for Supervision on the Chicago Police Monitoring Team, which is charged with overseeing the implementation of the Consent Decree between the City of Chicago and the State of Illinois. In addition, I have previous experience as a monitor, overseeing consent decrees requiring reforms with the Seattle Police Department and the Cleveland Police Departments. As part of my assigned duties in Chicago, I am tasked with providing technical assistance in the Chicago Police Department's response plan for the 2024 Democratic National Convention. Part of that response focuses on the police response to civil disturbance and associated policies regarding incidents requiring multiple arrests (previously referred to as "Mass Arrest").

20. A copy of my curriculum vitae, which sets forth my experience in detail, is attached as Exhibit B.

NATIONALLY ACCEPTED POLICING PRACTICES

21. Nationally accepted policing practices are defined as a set of guidelines, methods, or techniques that are widely accepted as superior or more effective in policing. They represent the collective wisdom and experience of experts and professionals who have identified the most successful and efficient approaches to achieve desired outcomes in the increasingly complex field of policing. In short, they are considered best practices from the field.

22. The body of knowledge and literature that inform nationally accepted policing practices derive from federal and state judicial decisions; federal, state, and local statutes; departmental policies and procedures; model policies, training, and research from such organizations such as the IACP, the PERF, and the National Policing Institute (formerly known as the Police Foundation).

23. The process of defining nationally accepted policing practices typically involves the following steps:

a. <u>Research and Analysis:</u> Experts, academics and practitioners study and analyze existing practices, methodologies, and outcomes in policing. They identify patterns, trends, and commonalities among successful approaches.

b. <u>Evaluation and Comparison:</u> Different practices and approaches are evaluated and compared based on their effectiveness, efficiency, impact, scalability, and other relevant criteria. The goal is to identify the most successful and proven methods.

c. <u>Documentation:</u> Once the best practices are identified, they are documented in a clear and comprehensive manner. This documentation includes detailed instructions, step-by-step processes, guidelines, and any necessary supporting materials.

d. <u>Consensus and Validation:</u> The identified best practices are shared with other experts, professionals, or relevant stakeholders within the field. Feedback and input are collected, and a consensus is reached regarding the efficacy and applicability of the proposed practices.

e. <u>Dissemination and Adoption:</u> The best practices are widely disseminated through various channels, such as industry publications, conferences, workshops, professional development networks, and other platforms. Organizations and individuals within the policing field are encouraged to adopt and implement these practices in their own work.

24. Nationally accepted policing practices for mass demonstrations have emerged through this process, resulting in a set of best practices that have been disseminated in recent years. Some examples of these publications include:

a. U.S. Department of Justice, Office of Community Oriented Policing Services, *Final Report of the President's Task Force on 21st Century Policing* (2015) (attached as Ex. C)

b. Edward R. Maguire and Megan Oakley, *Policing Protests: Lessons from the Occupy Movement, Ferguson & Beyond: A Guide for Police* (2020) (attached as Ex. D) ;

c. Police Executive Research Forum, *Rethinking the Police Response to Mass Demonstrations: 9 Recommendations* (2022), (attached as Ex. E);

      d.  Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned* (2018) (attached as Ex. F) .[1]

## NEGOTIATED MANAGEMENT MODEL FACILITATES FIRST AMENDMENT ACTIVITY WHILE PROTECTING OFFICER SAFETY

25.    As mentioned above, there have been significant advances in policing mass demonstrations in the past several decades—from what is known as an ***escalated force model*** to a ***negotiated management model***.

26.    Policing scholar Dr. Edward Maguire and Megan Oakley found that in the 1960s, policing mass demonstrations and protests entailed showing dominant force early on to deter criminality and civil disobedience. This "escalated force model" assumed that a sufficiently dominant show of force by the police would encourage protesters to back down and comply with their directives. It often led to an escalation of force until the police achieved compliance. The model is based on an outdated theory of crowd psychology that treats crowds as inherently unruly and dangerous.[2]

27.    Chief Anemone in his declaration appears to support the escalated force model of policing demonstrations by citing the "Use of Force Continuum" (*See* Anemone Decl. ¶¶ 25–32.)—a linear concept of policing that is both flawed and outdated.[3] Outside of the NYPD, however, the Use of Force Continuum is generally not only ***not*** taught anymore but explicitly not used by numerous agencies that have transitioned to more effective and non-linear force options. Officers are now taught to use the "Use of Force Options," model, which begin with a clear statement on using de-escalation tactics and a critical decision-making model.[4]

---

[1] The Police Executive Research Forum's 2022 and 2018 reports built on the Forum's prior scholarship, including its reports in 2006, Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches, 2011, Managing Major Events: Best Practices from the Field, and 2015, Re-Engineering Training on Police Use of Force ("PERF 2015 Report"), *available at* https://www.policeforum.org/free-online-documents.

[2] Ex. D, Maguire Report, at 25–28 and 47–48.

[3] Ex. E, PERF 2022 Report, at 8 ("Use-of-force continuums are an outdated approach"); PERF Daily Critical Issues Report (June 15, 2020) (explaining that PERF has long raised concerns about the "Use of Force Continuum" which, when applied, "may unintentionally result in greater use of force by officers, because it suggests that the way to resolve conflicts is to keep taking another step upward toward higher levels of force until the incident is over."), *available at* https://www.policeforum.org/criticalissuesjune15; PERF 2015 Report, at 9 ("[T]here is an increasing understanding that use of force cannot be measured in such a mechanical way. Rather, officers must be trained to evaluate the entire situation they are facing, and to make good decisions about the wide range of options that may be available to them, depending on the circumstances, including de-escalation strategies.").

[4] Ex. E, PERF 2022 Report, at 6, 20, 28–30, 36 (describing the critical decision-making model).

28. Chief Anemone opines—consistent with the escalated force model and the Use of Force Continuum—that a dominant deployment of police "at the earliest possible moment significantly decreases the odds of violence occurring" and posits that it would be appropriate for even officers tasked with directing traffic at a protest to don full-fledged riot gear. (*Id*. ¶¶ 26, 29, 36.)

29. The escalated force model, however, does not improve officer safety. Instead, it puts it at risk. History has taught us that premature or ill-advised use of force against protesters has the effect of amplifying conflict and making things worse, rather than better. In their in-depth study of 15 police agencies and their responses to the Occupy movement, Dr. Maguire and Megan Oakley used recent developments in crowd psychology to explain why this occurs:

> One very useful perspective on crowd psychology relevant to protest policing is known as the Elaborated Social Identity Model (ESIM); it provides a powerful framework for thinking about how to avoid crowd conflict. ESIM suggests that by treating entire crowds as dangerous and indiscriminately denying participants the opportunity to express themselves, police can inadvertently lead moderate members of a crowd to align with more radical members against the police. A better approach is for police to focus enforcement actions on only those whose violent, destructive, or otherwise illegal conduct requires immediate attention. In a protest setting, the police should make it clear that they are continuing to facilitate the rights of other participants to continue expressing their views as long as they behave in a peaceful and law-abiding manner. A targeted response that does not criminalize or exert unreasonable control over an entire crowd can help to prevent conflict between police and crowds.
>
> When police are viewed as exerting their authority in an oppressive way, ***conflict becomes more likely.*** If the goal is genuinely to keep the peace and prevent conflict, dressing officers in riot gear and shutting down dialogue between protesters and police is likely to fail. Unless there are compelling reasons to deploy officers in riot gear, officers should be wearing soft uniforms and engaging in dialogue meant to keep lines of communication open and prevent conflict. If police are concerned about the possibility of violence, they can adopt a "graded response" in which officers in riot gear are staged out of sight in a nearby location where they can be deployed quickly. Staging officers in riot gear in full view of a peaceful crowd is a flawed strategy ***that may stimulate the very conflict it is intended to prevent***.[5]

---

[5] Ex. D, Maguire Report, at 12 (*citing* John Drury and Steve Reicher, *Collective Action and Psychological Change: The Emergence of New Social Identities*, British Journal of Social Psychology 39 (2000), 579–604)) (emphasis added). Maguire and Oakley's study is based on surveys of Occupy participants, interviews, focus groups, and site visits of 15 American police agencies from cities across the country. *See* Ex. D at 20–21.

30. During the 1960s and 1970s, four presidential commissions exposed the flaws of the escalated force model, showing how it tended to inflame tensions and provoke violence by protesters, rather than preventing it.[6]

31. The negotiated management model then emerged as the better approach. The negotiated management model requires police officers to see their role as helping to facilitate First Amendment expression. Under this model, police recognize that communication with protesters is key to achieve mutually agreeable outcomes and may involve appointment of one or more liaisons to communicate on an ongoing basis to minimize the potential for misunderstanding. Further, the use of arrest and force as a means of controlling protesters is minimized, with police sometimes even making arrangement ahead of time to arrest those protesters who wished to be arrested as a sign of their commitment to the cause and as an act of civil disobedience. This model—with its stimulation of communication between police and protesters—was successful at preserving First Amendment rights while maintaining order, avoiding the cycle of tension and violence more commonly associated with the escalated force model.[7]

32. By the late 1990s, however, police began ratcheting up their responses to mass demonstrations and protests once again. After September 11, 2001, there were even more aggressive police responses to mass demonstrations, as some agencies feared losing control of large events would make those events prime targets for terrorist activity.[8]

33. In the past 15 years—and especially after the 2011 Occupy Movement, the Ferguson protests in 2014, the Unite the Right rally in Charlottesville in 2017, and the 2020 George Floyd protests—the evolution of police agencies' management of demonstrations has shifted back toward the negotiated management model in recognition that police have a critical role to play in facilitating the First Amendment rights of assembly and free speech.[9]

THE NEW PLAYBOOK FOR THE POST-OCCUPY ERA: FACILITATION, COMMUNICATION, DE-ESCALATION, AND MINIMAL USE OF MASS ARRESTS

34. Protests in the United States have varied from peaceful to contentious, or in some cases violent. The type of police response almost always impacts the outcome of the protest. Historically, protests either were planned in advance or began spontaneously after an incident over an event.

---

[6] Ex. D, Maguire Report, at 26–28 (describing the Johnson Commission, the Kerner Commission, the Eisenhower Commission and the Scranton Commission).

[7] *Id*. at 28–29.

[8] *Id.* at 29–31.

[9] *See* Ex. E, PERF 2022 Report, at 14–18.

35.     In recent years, with increased media coverage, and the ability for most citizens to record events with their smartphones and communicate over social media platforms, protests changed and are no longer organized solely by word of mouth within groups of impacted people. Modern protests tend to be leaderless and organized based on social issues rather than with a formal agenda and demands.  The "leaderless" dynamic and the huge crowds that can assemble due to social media platforms can sometimes assemble spontaneously or with little or no advance notice.  A relatively small number of violent offenders also may intentionally mix among peaceful protesters and use peaceful protesters as cover, increasing challenges for law enforcement.

36.     The Occupy Protests of 2011 were some of the earliest demonstrations to have this spontaneous element.  Since then, Nationally Accepted Policing Practices have emerged within the past decade to help ensure the safety of both the protesters and police personnel—while also respecting Constitutional rights—even in today's complex environment.  These include:

a. Provide comprehensive training to all police officers regarding crowd management, crowd psychology, de-escalation techniques, and the First Amendment rights of protesters.[10]

b. Gradually escalate police responses to non-compliant behavior, rather than immediately resorting to mass arrests which should be avoided whenever possible. Use the minimum level of force necessary to maintain public order and safety. Consider utilizing tactics, such as creating a physical barrier or redirecting vehicular or pedestrian traffic, before considering arrests.[11]

c. Clearly identify individuals who are engaged in criminal activities or who pose an immediate threat to public safety. Avoid arresting individuals in a manner that appears to be punitive or retaliatory.  Focus on those who are directly involved in illegal actions rather than peaceful protesters.[12]

d. If arrests become necessary, use force only as a last resort and apply it judiciously. Ensure that officers are trained in the appropriate use of force techniques and adhere to departmental policies. Only use of force that is reasonable, necessary and proportional to effect the arrest and prioritize techniques that minimize the risk of injury to all parties involved.[13]

e. Establish clear guidelines and protocols for conducting mass arrests, emphasizing the importance of proportionality and respect for Constitutional rights. Before initiating

---

[10] Ex. C, President's Task Force Policing Report, at 20–21, 56–57, 59; Ex. D, Maguire Report, at 78; Ex. E, PERF 2022 Report, at 27–30.

[11] Ex. C, President's Task Force Policing Report, at 20-21, 25; Ex. D, Maguire Report, at 76–81; Ex. E, PERF 2022 Report, at 31–37, 41–43.

[12] Ex. D, Maguire Report, at 62–63; Ex. E, PERF 2022 Report, at 29.

[13] Ex. E, PERF 2022 Report, at 27–30, 31–37.

mass arrests, police must communicate with the protesters and issue clear and audible warnings about unlawful conduct. Prior to making mass arrests, a dispersal order must be given, informing protestors of the consequence of refusing to disperse. The dispersal order must provide avenues to leave the area and ample time for protesters to disperse voluntarily.[14]

f.  Ensure that officers on the ground are able to share information to inform high-level decision-making as developments at the demonstration unfolds. Communication up and down the chain of command ensures that senior leaders set clear norms for officers, while receiving on the ground intelligence to aid their decision-making.[15]

g.  Document the mass arrest process thoroughly, including the reason for the arrest, identification of individuals, and the circumstances surrounding the event. Uses of force should be similarly documented. This documentation can be critical in ensuring accountability and providing evidence for legal proceedings.[16]

h.  Provide immediate medical attention and care to anyone who is injured during the arrest process. Ensure that detained individuals have access to necessary medical treatment and support, if required or requested.[17]

i.  Conduct a thorough review of the response to each mass demonstration, including an examination of the circumstances leading to any arrests, the conduct of officers involved, and any allegations of misconduct. Take appropriate disciplinary action if misconduct is identified and implement necessary policy or training changes to prevent future violations.[18]

## THE SETTLEMENT AGREEMENT IS ALIGNED WITH NATIONALLY ACCEPTED POLICING PRACTICES FROM THE POST-OCCUPY ERA

37. The Settlement Agreement reflects the nationally accepted policing practices outlined above. As described below, these best practices include (i) engaging the community before and during the events, (ii) emphasizing de-escalation and minimizing the use of mass arrests

---

[14] Ex. C, President's Task Force Policing Report, at 25; Ex. E, PERF 2022 Report, at 47–49; Ex. F, PERF 2018 Report, at 16–19, 27–28, 73–73.

[15] Ex. E, PERF 2022 Report, at 24–26.

[16] International Association of Chiefs of Police, Law Enforcement Policy Center, *Crowd Management* (2019), at 7, 10–11, *available at* https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf ("IACP Crowd Management Model Policy").

[17] IACP Crowd Management Model Policy, at 7.

[18] Ex. E, PERF 2022 Report, at 43, 49–50; IACP Crowd Management Model Policy, at 11.

in favor of focused enforcement action, (iii) using a "graded" or multi-tiered response system, and (iv) employing a process for review and improving police response to protests:

38. **Community engagement before and during an event**. One obstacle many police departments face in responding to protests is the lack of trust and established relationships between community members and police officers. This lack of trust can cause tension and misunderstanding and inhibit open communication. A national analysis of after-action reports from protests in 2020 underscored that mistrust between protesters and police officers fueled tension and misunderstandings and led to poor outcomes.[19]

39. In response to this challenge, modern best practices in policing include robust community engagement efforts to build police-community ties before demonstrations, and open communication with protesters and community leaders during demonstrations to facilitate information-sharing and de-escalate tension.[20] I have testified in other proceedings how police departments have used social media tools, for example, to quickly establish relationships with protesters, even those that are critical of the police.[21]

40. The provisions of the Settlement Agreement comport with nationally accepted best practices for increased community engagement and improved police-community relations.

41. For instance, the Settlement Agreement provides that, absent specific circumstances, the officers the NYPD dispatches to any Tier 1 First Amendment Activity ("FAA") must be protest liaison officers. (*See* Ex. A, Settlement Agreement, ¶ 40.)

42. Protest liaison officers are police officers who will receive specialized additional training in community engagement and responding to protests. This training will include effective communication with protesters, de-escalation, emotional intelligence, and crowd psychology, as well as the specific provisions of the Settlement Agreement relevant to their roles at a protest. (*See* Ex. A, Settlement Agreement, ¶¶ 40, 80.) Protest liaisons must complete this training before being dispatched to any protest and complete annual refreshers thereafter. (*Id*.)

43. Protest liaison officers must be selected from the NYPD's Community Affairs Bureau ("CAB"), an existing bureau within the NYPD whose mission is to strengthen community relationships and build trust. (*Id*. ¶ 40(a).) The CAB is already engaged in efforts to develop relationships with community leaders. The police officers within the CAB are focused on this objective. The Settlement Agreement builds on these existing relationships and efforts.

---

[19] *See* Ex. E, PERF 2022 Report, at 9–10, 20.

[20] *Id.* at 19–23.

[21] *See* Jan. 31, 2015 Testimony of Hassan Aden on behalf of the International Association of Chiefs of Police, Task Force on 21st Century Policing Listening Session: Social Media at 5 (citing as an example Palo Alto Police Department's use of Twitter (now X) to engage positively with protesters), *available at* https://www.theiacp.org/sites/default/files/TaskForceTestimonyHassanAdenSocialMedia.pdf.

44. When responding to an FAA, the Settlement Agreement further provides that protest liaisons will focus their efforts on communicating with protest leadership, when identifiable, and protesters. (*Id*. ¶ 40(b).)  These officers will work to understand the protesters' aims, communicate with protesters about how officers can facilitate those aims and the circumstances in which they cannot, and explain to protesters any police action that is anticipated or undertaken.  (*Id*.)

45. Chief Anemone criticizes the Settlement Agreement provision because he asserts that deploying protest liaisons into the crowd is "dangerous."  (*See* Anemone Decl. ¶ 36.)  But officers communicating with the public and establishing relationships, even fleeting ones, can help avoid conflict and ease tensions because it gives the crowd an opportunity to see officers as humans and not soldiers trying to repress their First Amendment rights.[22]  In my review of the Portland demonstrations in 2017 to 2020, I directly observed the improvement of relations between protestors and police when protest liaisons were introduced to the Incident Command System planning efforts.  The trained liaisons, who wore brightly colored polo shirts highlighting their presence and their roles, were immediately impactful on how the crowd communicated with them to highlight their needs, including situations that may not have been otherwise visible to police, such as health emergencies deep within the crowds. These types of interactions rendered the liaisons as valuable resources for the protestors.

46. It also should be noted that Protest Liaison Officers will be required to wear a full NYPD uniform (thought it should be a different and notable color), and all of the equipment a patrol officer would wear on the street under normal conditions, meaning a "soft uniform."

47. **Focused enforcement and minimizing the use of mass arrests.**  In line with best practices of minimizing the use of mass arrests and focusing on individual enforcement, the Settlement Agreement incorporates NYPD's Red Light/Green Light Policy.  Under that policy, if an officer observes a violent criminal act (such as throwing a trash can through a store window), the officer has a green light to make an arrest and does not have to ask for permission to do so.[23]

48. However, the officer must seek authorization from someone at the rank of Captain or above before he or she can make an arrest of "Red Light" offenses.  These Red Light offenses include the following:  riot, incitement to riot, non-violent obstruction of governmental administration, violation of emergency orders, disorderly conduct, trespass, criminal mischief 3 or 4, New York State Vehicle and Traffic Law § 1156(a), and unlawful assembly (New York State Penal Law § 240.10).

49. In all instances, there must be individualized probable cause to make an arrest.  (*See* Ex. A, Settlement Agreement, at ¶¶ 28–29, 31.)

---

[22] Ex. D, Maguire Report, at 78.

[23] Ex. E, PERF 2022 Report, at 41 (quoting an NYPD lieutenant).

50. The Red Light/Green Light Policy recognizes that certain protest activity—such as blocking a road as an act of civil disobedience—may be unlawful but is not violent and therefore requires authorization before an arrest should be effectuated.

51. This is aligned with National Accepted Police Practices which recognize that, when policing demonstrations, the degree of lawlessness matters. Demonstrators committing acts of civil disobedience, such as blocking a roadside, will remain for only a finite period. Contrary to Chief Anemone's opinion (Anemone Decl. ¶27), the more appropriate response for the police is to simply reroute traffic, rather than arresting demonstrators *en masse* which can create hostility toward the police, tie up critical police resources for days, and worsen an already heightened situation.[24]

52. **Graded or Multi-Tiered System.** Another best practice for policing demonstrations is the graded or multi-tiered response. In a graded or tiered response plan, police officers are dispatched into large crowds in soft uniforms without riot gear to facilitate the event and communicate with participants. By facilitating the demonstration or event, the officers can build goodwill with crowd leaders and establish positive relationships early on that may be necessary for crowd control should tensions heighten. For instances in which there are concerns about the possibility of crowd violence, tactical assets are staged nearby, out of the sight of the crowds, but able to be deployed rapidly if events turn riotous.

53. The graded or multi-tiered response can protect officer safety, as staging officers in riot gear in view of the crowd can inflame the very conflict it is intended to prevent.[25] This is the lesson the Boston Police Department learned during the Democratic National Convention in 2004, as described by Superintendent Bernard O'Rourke:

> During the Democratic National Convention in 2004, we had five days of protests with our bicycle patrols, and we started with the soft approach. We had public order platoons on standby all week long.
>
> We made one big mistake. On the last day, we got a request from the commander of those public order platoons. They felt that they weren't taking part in the situation, so they wanted to come out to the street. The mistake they made was coming out in full turtle gear. They didn't walk out and mingle; they marched out. And as soon as that happened, the crowd started throwing things at them, and we had to make several arrests. We learned from that. Since then, unless we need the public order platoons, they stay out of sight.[26]

54. Since then, Boston Police Department has adopted a three-tiered response where the first tier is the "soft" approach, i.e., officers in regular uniforms, trying to engage and talk to

---

[24] *Id.* at 41–42.

[25] Ex. D, Maguire Report, at 12–13, 78; Ex. C, President's Task Force Policing Report, at 25.

[26] Ex. F, PERF 2018 Report, at 4.

people. This tier is backed up by a more direct response if necessary, with officers carrying batons and wearing helmets. And the third tier are the public order platoons who don the full gear but stay out of sight until they are needed.[27] Other jurisdictions have implemented a similar approach to policing protests and large-scale events with success, both inside and outside the United States.[28]

55. Similarly, the Settlement Agreement establishes a four-tiered system that emphasizes demonstration facilitation as the default tier (Tier One) and allows for the staging of mobile field forces (nearby but preferably out of sight) in Tier 2. (*See* Ex. A, Settlement Agreement, ¶¶ 38–63). Strategic Response Group officers with specialized equipment may be deployed in Tier 3, but only for as long as necessary. And in Tier Four, NYPD may issue dispersal orders and initiate mass arrests, as detailed below:

   a. Tier One is the default tier and allows NYPD to dispatch "no more officers than necessary" from Community Affairs Bureau and patrol officers to reroute traffic to facilitate the protest.

   b. Tier Two may be deployed if the Incident Commander, in consultation with an FAA Senior Executive (*see* Paragraph 60) believes that (i) Green Light violations are imminent or (ii) that the event creates a risk of obstructing critical infrastructure, which cannot be relieved by re-directing individuals. If there is a need to dispatch additional officers beyond those from CAB and patrol officers, NYPD may do so with the presumption that they will be nearby but off-scene.

   c. Tier Three may be deployed if there is individualized probable cause to arrest individuals who are engaged in Green Light offenses or authorized Red Light offenses. The Incident Commander may authorize Tier Three and, with the consultation of the FAA Senior Executive, dispatch SRG to the protest.

   d. Tier Four may be deployed if (i) protesters are seeking to gain unauthorized entry or physically blocking others' entry into a sensitive location or engaged in a criminal offense of trespass in the third degree or higher; (ii) officers have engaged in targeted efforts to address widespread Green Light offenses, instances of riot or violent or tumultuous conduct within the meaning of the unlawful assembly statute but those offenses continue unabated, or (iii) there is probable cause sufficient to establish such widespread Green Light offenses, instances of riot or violent or tumultuous conduct within the meaning of the unlawful assembly statute but there is no viable opportunity to address those offenses through de-escalation or targeted enforcement. Only in Tier Four can dispersal orders be issued, and mass arrests effectuated for those who refuse to disperse. For dispersal orders, the Settlement Agreement requires the crowd be given a reasonable opportunity to disperse (*see* Ex. A, Settlement Agreement, ¶ 59).

---

[27] *Id.*; Ex. D, Maguire Report, at 78.

[28] *See, e.g.*, Ex. D, Maguire Report, at 53 (describing the graded response of the Polícia de Segurança Pública Portuguesa in policing the 2004 European Football Championships); *id.* at 79 (describing the graded response used by the Chicago Police in anticipation of the 2012 NATO summit).

56.     Contrary to Chief Anemone's opinion, the tiered or graded response improves officer safety because it encourages officers to interact with the crowd while in regular uniform and avoids the escalation of emotion and tensions that can be caused by large numbers of officers or officers in full-fledged riot gear.  Other units may still be staged nearby, and off-scene should the need arise for a more heightened police approach (Tier Two) and deployed rapidly in an elevated Tier Three or Four situation.

57.     Additionally, Chief Anemone concludes, without explanation, that the Settlement Agreement "undercuts the ability of an incident commander to take rapid decisive action without approval or notification of a Senior Executive." (Anemone Decl. ¶ 27.)

58.     The Settlement Agreement, however, is directly in line with the National Incident Management System (NIMS), which provides a standardized framework for management of incidents by any level of government.[29] NIMS' Incident Command System (ICS) is utilized by police departments across the country as the preeminent model for command and supervision in policing protests.  When responding to an incident, law enforcement should have: (1) a previously determined clear command structure; (2) clearly delineated and communicated tactical elements; and (3) effective and established framework for communication to permit appropriate mobile resources.

59.     The Settlement Agreement, as described above and in the next section, establishes just that, as well as reflects countless other studies and publications that have developed evidence-based responses to modern protests.

60.     **The FAA Senior Executive.**  Another best practice to policing demonstrations is ensuring that police agencies have systems for reviewing and improving their approaches to policing mass demonstration.  The Settlement Agreement establishes the role of the First Amendment Activity ("FAA") Senior Executive charged with ensuring review, among other responsibilities including:

  a. Overseeing the development of policies, procedures, and training curricula regarding policing of First Amendment activity;

  b. Playing an active role in preparing NYPD's response to planned or anticipated FAAs;

  c. Communicating with incident commanders on the ground responsible for the command, control and coordination of police operations whenever the police response needs to be escalated and requires FAA approval;

  d. Authorizing the establishment of a mass arrest processing center; and

---

[29] *See* The U.S. Department of Homeland Security, National Incident Management System (Dec. 2008), *available at* https://www.fema.gov/pdf/emergency/nims/NIMS_core.pdf.

  e. Participating in after-actions reviews relating to any FAA. (*See* Ex. A, Settlement Agreement, ¶¶ 20–23, 33, 44, 58.)

61. The FAA role is in line with the Nationally Accepted Policing Practice of ensuring officers keep senior leaders informed of developments during mass demonstrations and that there is a mechanism to ensure ongoing, robust review of policing practices. These mechanisms help police agencies make sure they are receiving feedback from the community and other stakeholders in a timely way—crucial when developments on the ground are happening quickly. As a recent PERF report observed:

> Demonstrations can be dynamic, extremely challenging events to manage, and any missteps by police can erode community trust long after the demonstrations are over. Mechanisms to debrief policing practices and receive community feedback are therefore invaluable. . . . After demonstrations end, PERF recommends that agencies invite community representatives to debrief with police leaders.[30]

CONCLUSION

62. Policing in the United States is continuously evolving, and in the last three decades, has more openly accepted research and evidence-based practices.

63. Policing protests is one such area that has changed drastically over that period and has quickened the pace of change since the 2014 Ferguson protests. The transition from the escalated force model used in the 1980s and the 1990s to the negotiated management model has significantly changed the tone and predictability of protests. One has to look no further than the Baltimore protests in 2020. After the 2015 riots that resulted from the death of Freddie Gray, the Baltimore Police Department brought in experts to conduct a thorough after-action report, which resulted in the transition to a negotiated management model and a change in response policies and training at all levels.

64. In 2020, I personally observed multiple days of protests as a federal monitor in Baltimore. The change in how the police responded was incredibly successful in keeping arrests, protestor and officer injuries to an absolute minimum, while giving the protestors the space and ability to express their emotions in the wake of the death of George Floyd.

65. There is always the possibility of the presence of some protestors with plans to cause violence and property damage, but for the majority of people protesting an issue that is important to them, that is the farthest thing from their mind, and the police response should always be one that genuinely reflects that they are there to facilitate and protect protestors' rights to express their view. The tiered approach is intended to address a range of protest situations from peaceful protests to protests where the possibility of or actual violence erupts. The multi-tiered approach included in the Settlement and described in this declaration, ensures that proper planning has occurred, that the resources available are sufficient to address each of the four tiers if needed,

---

[30] Ex. E, PERF 2022 Report, at 49–50.

and that the appropriate command, control and supervision is on scene to make the best decisions on any protest, large or small, peaceful of violent.

66. The changes in policy, training, equipment and resources, moving to a negotiated management model for crowd management and implementing a tiered approach, *all* will significantly enhance the NYPD's ability to keep protestors and police officers safe at protests—the two are not diametrically opposed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 1, 2023
Alexandria, VA

_____
HASSAN ADEN