Ex. D



**HARRY FRANK GUGGENHEIM FOUNDATION**

# Policing Protests

## Lessons from the Occupy Movement, Ferguson & Beyond : A Guide for Police

Edward R. Maguire & Megan Oakley





HARRY FRANK
GUGGENHEIM
FOUNDATION

Policing Protests

*Lessons from the*
*Occupy Movement,*
*Ferguson & Beyond:*

*A Guide for Police*

Edward R. Maguire
& Megan Oakley

January 2020

42 West 54th Street
New York, NY 10019
www.hfg.org

**T** 646.428.0971
**F** 646.428.0981

# Contents

Acknowledgments                                                          7

Executive Summary                                                        9
    Background and purpose
    Protest policing in the United States
    Basic concepts and principles
    Lessons learned

1. Background and Purpose                                                15
    The Occupy movement
    The political and social context for protest policing
    Description of our research
    The stakes of protest policing
    Overview of this volume

2. Protest Policing in the United States                                 25
    A brief history of protest policing in the United States
    Newer approaches in the era of globalization and terrorism
    Policing the Occupy movement
    Policing public order events after the Occupy movement
    Conclusion

3. Basic Concepts and Principles                                         39
    Constitutional issues
    Understanding compliance and defiance
    Crowd psychology
    Conclusion

4. Lessons Learned                                                       57
    Education
    Facilitation
    Communication
    Differentiation
    Conclusion

Authors                                                                  83

## Acknowledgments

This guide and the research that preceded it benefited from the help and support of many people and agencies. We are grateful to the Office of Community Oriented Policing Services (COPS) of the U.S. Department of Justice for funding this project, which allowed us the opportunity to explore how American police agencies responded to the Occupy movement as well as other social movements and public order events. We thank Robert E. Chapman, Deputy Director of the COPS Office, for his many forms of support and assistance along the way.

We are also grateful to The Harry Frank Guggenheim Foundation for its willingness to publish this guide. A special thanks to Joel Wallman at the Foundation for taking this project on and helping to shepherd this guide through the publication process.

Matthew Pimm of the Museum of Modern Art was very helpful in the process of file format conversion. The handsome design is the work of Peter Mendelsund.

Thanks also to the 15 police executives who permitted us access to their agencies and personnel so we could learn more about their approaches to protest policing. We are also grateful to the police officers at all levels who shared with us their front-line perspectives on the challenges of policing protests.

In June 2014, we held a two-day focus group meeting at the COPS Office in Washington, D.C., to discuss our preliminary findings. We are grateful to the COPS Office for hosting that meeting, to John Lesko for serving as our certified professional facilitator, and to the police officials from eight agencies who participated in the meeting:

Superintendent Colm Lydon, Boston (Massachusetts) Police Department

Deputy Chief Jeff Estes, Charlotte-Mecklenburg (North Carolina) Police Department

Chief Calvin Williams, Cleveland (Ohio) Division of Police

Captain Tom Snyder, Madison (Wisconsin) Police Department

Assistant Chief James Harpole, Milwaukee (Wisconsin) Police Department

Commander Sara Westbrook, Portland (Oregon) Police Bureau

Captain Steve Wilske, Seattle (Washington) Police Department

Chief Brian Dugan, Tampa (Florida) Police Department

Many protesters and community activists were reluctant to speak with us because of concerns about whether we intended to provide police with guidelines for suppressing protests. Therefore we are particularly thankful to members of those communities who agreed to share their unique perspectives on protest policing. We hope this guide clears up any confusion about our true motives.

Though not an explicit part of the project, while the research was being carried out we benefited from a

7

number of informal conversations with thoughtful police officials from throughout the United States and other nations who shared a professional interest in how to develop fairer and more effective strategies for policing protests and other public order events.

While the guide was being written, we had the opportunity to provide training on protest policing, procedural justice, and law enforcement legitimacy to approximately 40 police executives participating in the Texas Major Cities Police Chief Leadership Series. We also delivered talks on protest policing to police, scholars, and other stakeholders in Australia, England, Honduras, and the United States. We are grateful to the participants in those various events for helping to sharpen our thinking on protest policing.

We also want to acknowledge the four external reviewers who provided helpful feedback on previous drafts of this guide:

Deputy Chief Mike Federico, Toronto (Canada) Police Service

Lieutenant Pete Herrera (retired), Riverside County (California) Sheriff's Department

Chief Mike Masterson (retired), Boise (Idaho) Police Department

Professor Bill Wells, Sam Houston State University, Texas

We are also grateful to Elise Frasier of Octopus Editorial for her expert assistance in editing the first draft of the guide.

Although relationships between police and protesters are heavily strained in some communities, the agencies and officials involved in this study inspire confidence that it is possible to find common ground. Thoughtful police officials can develop fair and effective strategies that preserve and protect freedom of speech and assembly while also maintaining public safety and public order. As the agencies involved in this study make clear, community policing can serve as a strong foundation for protest policing strategies that accomplish these multiple objectives.

# Executive Summary

## Background and purpose

The purpose of this guide is to convey general principles regarding police response to protests based upon the experiences of cities examined, recent protest events, and the findings from scientific research on policing, protests, and crowds.   The goal is for agencies to apply the principles outlined in the guide to their own policies and practices.

**The rapid emergence of the Occupy movement made it clear that police organizations around the nation had very different levels of experience with and preparedness for such events.**

The guide grows out of the Occupy movement, which, fueled by social media, swept quickly through the United States in 2011, taking many police departments by surprise and making it hard to formulate well-thought-out strategies for responding. Suddenly police were faced with crowds of people marching in the streets, disrupting traffic, holding demonstrations in front of government and financial buildings, and camping out in public places. Often, protesters did not obtain required permits, which compounded the inability of police departments to plan ahead. The rapid emergence of Occupy made it clear that U.S. police agencies had different levels of experience with, and preparedness for, such events. Occupy brought out the best in some departments and the worst in others.

Governments have legitimate reasons for regulating protest but there is wide variation in how this regulatory authority is exercised. Many local officials enforce time, place, and manner restrictions in principled ways that are consistent with the Constitution. Others abuse their discretion by restricting freedom of speech and assembly in ways that are illegal.

Throughout the nation, numerous lawsuits alleging that police violated the civil rights of protesters have been settled, including some with substantial seven-figure payouts to protesters. Many focused on allegations of wrongful arrest, use of excessive force, and due process or equal protection violations.  Some alleged violations of First Amendment speech and assembly rights. In certain cities, journalists claimed that police interfered with freedom of the press by arresting and using force against them while they were covering Occupy events. The Occupy movement did not originally focus on the police, but as news of alleged civil rights abuses spread, attention turned toward police misconduct.

Conversely, some recent protests have demonstrated huge strides by agencies in establishing strong relationships with communities. Police choices in handling protests can have far-reaching effects. Research shows that when citizens view police officers using fair and respectful procedures, they are more likely to

support and cooperate with the police, comply with their directives, and obey the law.[1] When a police officer is seen as unnecessarily impatient, rude, brutal, or otherwise unfair in dealing with a protester, people are more likely to view the police (and the law more generally) as illegitimate. Principles of community policing provide a useful foundation upon which to develop fair and effective protest policing strategies.

## Protest policing in the United States

The United States has a rich history of protests. However, police efforts to prevent, disrupt, and otherwise control protests also figure prominently. In the 1960s and early 1970s, protest policing in the United States was based on the idea that if police make a sufficiently dominant show of force, protesters will back down and comply with their directives. Agencies adopting this perspective would continue to escalate the level of force until compliance was achieved.

The failure of these aggressive approaches led to the emergence of a negotiated management model in the 1970s and 1980s, in which police negotiate with protesters to make plans, avoid conflict, and help facilitate their First Amendment rights. Agencies relying on this approach often display a greater level of tolerance for disruption and communicate clearly ahead of time what they will abide and what they will not. They recognize that communication with protesters is necessary to achieve mutually agreeable outcomes.

The negotiated management model reduced conflict but began to fade in the late 1990s as police adopted a variety of more aggressive approaches in the wake of violent confrontations between police and protesters at the 1999 World Trade Organization Conference in Seattle, which, to some, revealed the weaknesses of negotiated management.   Changes in police responses to public order events were further accelerated by the terrorist attacks of September 11, 2001, at a time when police departments were still modifying their approaches in light of the Seattle protests.

Accordingly, newer approaches to protest policing have been characterized by a number of elements, including a sense of disrespect for the exercise of First Amendment rights, an intolerance for community disruption, an unwillingness to communicate or negotiate with protesters, the use of arrests and force as primary methods for controlling protests, intensified efforts to control access to space, surveillance of protesters, and greater information sharing between law enforcement agencies. Some of these newer approaches are based on the view that protests are inherently disorderly and must be tightly controlled to avoid more serious problems. More extreme versions are based on an aggressive, militarized approach that relies heavily on riot control techniques. These techniques are warranted under certain circumstances. However, some agencies have chosen to use them against peaceful protesters, often resulting in civil rights violations and costly lawsuits.

By the time Occupy arrived in U.S. cities in 2011, newer protest control methods had begun to gain traction.

---

1. Edward R. Maguire, Belén V. Lowrey, and Devon Johnson, "Evaluating the Relative Impact of Positive and Negative Encounters with Police: A Randomized Experiment," *Journal of Experimental Criminology* 13, no. 3 (2017), 367-391, doi: 10.1007/s11292-016-9276-9; Lorraine Mazerolle, Sarah Bennett, Emma Antrobus, and Elizabeth Eggins,  "Procedural Justice, Routine Encounters, and Citizen Perceptions of Police: Main Findings from the Queensland Community Engagement Trial (QCET)," *Journal of Experimental Criminology* 8, no. 4 (December 2012), 343–367, doi: 10.1007/s11292-012-9160-1; Tom R. Tyler, *Why People Obey the Law* (Princeton, NJ: Princeton University Press, 2006).

Because the movement emerged suddenly, it caught many police agencies off guard. Some responded forcefully and decisively, quickly making national and international news with photos and videos showing police abusing peaceful but noncompliant protesters.  Others, however, behaved in a professional, thoughtful, empathetic, and creative manner to facilitate the First Amendment rights of Occupy protesters to assemble peacefully and express their views. In some localities, police continued to rely on negotiated management approaches. A close look at the response of police departments reveals considerable variation across the nation in how police handle protests.

By the summer of 2014, all Occupy encampments in the United States had been closed through either eviction or withering interest among participants. The period of relative calm was unfortunately short-lived. A police shooting in Ferguson, Missouri, in August 2014, triggered intense protests in the St. Louis area. While most people protested peacefully, others behaved destructively. Local police departments responded forcefully to the protests with a militarized response that likely worsened matters. Police threatened, manhandled, and arrested journalists on multiple occasions, in some cases while being recorded on video. Once again, the evening news featured police officers in riot gear, repeatedly deploying chemical agents and less-lethal munitions at peaceful protesters and journalists. On August 18, President Barack Obama reminded the nation that police must find ways to preserve people's constitutional rights. Several other incidents involving white police officers using deadly force against unarmed black men triggered the most intense legitimacy crisis U.S. police have faced in more than 50 years. The nationwide protests over these incidents helped fuel the rapid growth of the Black Lives Matter movement, with protests continuing throughout the nation.

The nation has continued to experience protests, some of which raise important questions about appropriate handling of these events by police. The most well-known such event occurred in Charlottesville, Virginia, in August 2017. Each new event provides opportunities for learning and growth.

## Basic concepts and principles

Certain concepts and principles from law, psychology, and criminology are useful for thinking about protest policing strategies.

For example, protest policing in the United States raises complex constitutional issues. The First Amendment to the U.S. Constitution contains provisions to protect freedom of speech and the right to assemble peacefully. In addition, civil rights lawsuits arising from police handling of protests can often involve the Fourth and Fourteenth Amendments. Fourth Amendment challenges tend to focus on allegations of false arrest or excessive force, while Fourteenth Amendment challenges involve alleged violations of due process and equal protection rights. Developing fair and effective protest policing strategies means paying careful attention to people's constitutional rights.

Beyond merely complying with constitutional standards, fair and effective protest policing strategies attempt to secure voluntary compliance without triggering defiance or rebellion among protesters. How to do so has inspired a long history of scientific research.[2] Two central concepts here are procedural justice and legitimacy.

2. Edward R. Maguire, "New Directions in Protest Policing," *Saint Louis University Public Law Review* 35, no. 1 (2016), 67–108; Tom R. Tyler and Jeffrey

Procedural justice is concerned with how people perceive the fairness of the procedures used by an authority figure. Legitimacy is concerned with the extent to which people view an institution, like policing, as having rightful authority.

As mentioned, research finds that when people view the police as behaving in a procedurally just manner, they are more likely to view the police and the law as legitimate sources of authority, and, therefore, to behave lawfully.[3] Several recent studies have found that when protesters perceive that the police have treated them or their peers unfairly, they are more willing to support the use of violence against police officers. Thus, the use of procedurally just approaches not only encourages law-abiding behavior but can also improve officer safety.

One very useful perspective on crowd psychology relevant to protest policing is known as the Elaborated Social Identity Model (ESIM); it provides a powerful framework for thinking about how to avoid crowd conflict. ESIM suggests that by treating entire crowds as dangerous and indiscriminately denying participants the opportunity to express themselves, police can inadvertently lead moderate members of a crowd to align with more radical members against the police.[4]  A better approach is for police to focus enforcement actions on only those whose violent, destructive, or otherwise illegal conduct requires immediate attention. In a protest setting, the police should make it clear that they are continuing to facilitate the rights of other participants to continue expressing their views as long as they behave in a peaceful and law-abiding manner. A targeted response that does not criminalize or exert unreasonable control over an entire crowd can help to prevent conflict between police and crowds.

When police are viewed as exerting their authority in an oppressive way, conflict becomes more likely.   If the goal is genuinely to keep the peace and prevent conflict, dressing officers in riot gear and shutting down dialogue between protesters and police is likely to fail. Unless there are compelling reasons to deploy officers in riot gear, officers should be wearing soft uniforms and engaging in dialogue meant to keep lines of communication open and prevent conflict. If police are concerned about the possibility of violence, they can adopt a "graded response" in which officers in riot gear are staged out of sight in a nearby location where they can be deployed quickly. Staging officers in riot gear in full view of a peaceful crowd is a flawed strategy that may stimulate the very conflict it is intended to prevent.

## Lessons learned

Crowds are typically heterogeneous, comprising subgroups with distinct social identities. Social psychologists emphasize the importance of *education* in the sense that police must learn about the social identities of the various subgroups in a crowd, including their overall values and goals and their specific intentions for a protest event.

A key aspect of effective police response to protests is *facilitation*. Police often view protests and other public

Fagan, "Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?" *Ohio State Journal of Criminal Law* 6 (2008), 231–275; Tom R. Tyler, *Why People Obey the Law* (see note 1).

3. Tyler and Fagan, "Legitimacy and Cooperation" (see note 2); Tyler, *Why People Obey the Law* (see note 1).

4. John Drury and Steve Reicher, "Collective Action and Psychological Change: The Emergence of New Social Identities," *British Journal of Social Psychology* 39 (2000), 579-604.

order events from the vantage point of how to control, regulate, or manage people. This viewpoint is understandable, but when people have legitimate, constitutionally protected aims, the perception that police are overcontrolling or micromanaging them can give the impression that police are simply trying to limit or prohibit legitimate behavior. Protesters tend to have a heightened sense of grievance that can easily be turned toward the police. One way to minimize this transfer of grievance is to allow protesters a reasonable chance to express themselves in a peaceful manner.[5] When police operate from the vantage point of how to facilitate peaceful protests rather than how to control or regulate them, they can improve the relationships between police and protesters and reduce the likelihood of conflict and violence.

Another important component of fair and effective protest policing is *communication*. Communication is the principal mechanism through which police can discover the aims of event organizers and how police can best facilitate these aims. It is also the best way for police to learn about potential public order or public safety issues and try to prevent them together with event organizers and participants. Even in the case of more spontaneous events like flash protests arranged through social media or spontaneous sports celebrations, it is usually possible to identify informal organizers or influential participants with whom police can communicate in an effort to preserve order and prevent conflict.

In addition to direct communications with protesters, police can enhance their legitimacy and avoid conflict by establishing a solid external communications strategy for informing the public at large. Key aspects of that strategy are developing healthy partnerships with the news media and taking advantage of social media.

Finally, police should rely on a *differentiated* approach to protest policing, in which they continue to facilitate peaceful and lawful behavior even when taking enforcement action against those who are engaging in violence, property destruction, or other serious crimes. This approach is intended to preserve the perceived legitimacy of the police and reduce the likelihood of widespread defiance or rebellion. Developing a differentiated response strategy means rethinking three key aspects of protest policing. First, whenever possible, arrests should be made sparingly. Mass arrests of peaceful protesters are rarely a good idea and often result in costly civil rights lawsuits. Second, force should be used only as a last resort. Third, the use of overly restrictive physical barriers or other crowd containment measures should be avoided whenever possible. While the use of containment measures to manage large crowds and preserve public safety is justifiable, unreasonable use of these measures may limit movement unnecessarily, endanger people in the crowd, and interfere with people's civil rights. A differentiated response attempts to minimize collateral damage, ensuring that whenever possible, police actions impose a burden only on those who are engaged in criminal activity.

One key challenge in getting police to adopt more differentiated responses is a concern with officer safety. Asking police officers to go into large crowds in soft uniforms without protective gear raises concerns about how officers will protect themselves if the crowd turns against them. Needless to say, this is a valid concern and one that demands thoughtful solutions. One answer is to adopt a graded response plan for those instances in which there are concerns about the possibility of crowd violence. In a graded response, tactical assets are available nearby and are able to be deployed rapidly if needed, but they are not visible to the crowd.

Taken together, education, facilitation, communication, and differentiation form the basis for a new approach

---

5. *Adapting to Protest: Nurturing the British Model of Policing* (London: Her Majesty's Chief Inspector of Constabulary, 2009), https://www.justiceinspectorates.gov.uk/hmic/media/adapting-to-protest-nurturing-the-british-model-of-policing-20091125.pdf

to protest policing in the United States. Developing new strategies based on these principles will require focused and committed leadership. Unfortunately, some U.S. police agencies are still policing protests in much the same way as they did in the 1960s. Protest policing is admittedly difficult, and even the most well-intentioned leaders make mistakes. Yet, our research uncovered many instances of police leaders developing fair and effective protest policing practices based on mistakes that had occurred in their own or other agencies. Through creative and thoughtful community policing strategies that incorporate the principles outlined here, police agencies can focus on those who are violating the law while upholding the constitutional rights of those engaged in peaceful and lawful expression.

14

# 1. Background and Purpose

This chapter provides a brief introduction to the origins of this guide, which began as a result of the police response to the Occupy movement in the United States in 2011. We obtained a grant from the U.S. Department of Justice's Office of Community Oriented Policing Services (COPS Office) to study the police response to the Occupy movement in 15 American police agencies. The goal was to learn from police and other community stakeholders about the policing of the Occupy movement and other protest events. This guide is based on our research in these 15 agencies as well as a review of the scientific evidence on policing protests and other crowd events. In addition, we also briefly discuss lessons learned from more recent events, including major protests that occurred in Ferguson, Missouri, Charlottesville, Virginia, and elsewhere. This guide serves as a resource for agencies seeking to adopt more evidence-based approaches to protest policing.

## The Occupy movement

The Occupy movement emerged in the United States in the summer of 2011, inspired in part by the Arab Spring, the civil resistance movement that had spread throughout many countries in the Middle East the preceding year, toppling autocratic rulers in four nations. Occupy Wall Street, the Occupy movement's first encampment, began on September 17, 2011, in New York City's Zuccotti Park. Fueled by social media, particularly Twitter, the movement spread quickly throughout the nation and the world. Nobody knows exactly how many Occupy sites arose in the United States (because many were quite small), but most estimates range from 400 to 1,000.[6] Focusing on a range of social justice issues, including economic inequality, corporate power and greed, tax breaks for the wealthy, and corporate influence in government, the Occupy movement sought to highlight the growing gap between Wall Street and "Main Street." While often criticized for lacking a detailed and coherent platform,[7] the Occupy movement focused much of its discontent against the wealthiest one percent of Americans and organized around the notion of improving economic prospects for the remaining 99 percent. "We are the 99 percent" became the rallying cry for Occupy groups throughout the United States.

The speed with which the Occupy movement swept throughout the nation took many police departments by surprise, making it hard for them to formulate well-thought-out strategies for responding. Suddenly they were faced with crowds of people marching in the streets, disrupting traffic, holding demonstrations in front of government and financial buildings, and camping out in public places, often in locations where overnight

---

6. Sasha Costanza-Chock, "Mic Check! Media Cultures and the Occupy Movement!," *Social Movement Studies* 11, no. 3–4 (2012), 375–385, 378, doi: 10.1080/14742837.2012.710746; Neal Caren and Sarah Gaby, "Occupy Online: Facebook and the Spread of Occupy Wall Street," 2011. Available at SSRN: http://ssrn.com/abstract=1943168.

7. Robert Schlesinger, "The Incoherence of the 'Occupy Wall Street' Movement," *U.S. News and World Report,* November 17, 2011, http://www.usnews.com/opinion/blogs/robert-schlesinger/2011/11/17/the-incoherence-of-the-occupy-wall-street-movement; Daniel Indiviglio, "5 Reasons Why 'Occupy Wall Street' Won't Work," *The Atlantic,* October 3, 2011, http://www.theatlantic.com/business/archive/2011/10/5-reasons-why-occupy-wall-street-wont-work/246041.

camping was prohibited. In many jurisdictions, protesters did not obtain the required permits to hold demonstrations, which compounded the inability of police agencies to plan ahead. The rapid emergence of the Occupy movement made it clear that police organizations around the nation had very different levels of experience with and preparedness for such events.

Some police agencies had already amassed considerable experience in dealing with large-scale protests and other crowd events and were able to draw on this experience in dealing with Occupiers. Some had established special teams or squads that were available on call to handle public order events. Others had very little experience or training in dealing with these types of events, leaving these agencies ill-prepared to deal with the various challenges that they posed for police. Even among agencies with significant experience and training in dealing with crowds, the standard strategies and tactics for handling these types of events varied widely, with some adopting more aggressive approaches and others favoring more tolerant approaches. The Occupy groups themselves varied as well, both in size and behavior. Police agencies facing Occupy groups that were small and peaceful had a much easier job than those facing larger and less compliant Occupy groups, particularly those in which protesters chose to engage in property damage or violence. The leaderless nature of the Occupy movement also posed special challenges, even for those police agencies with the inclination to negotiate with these groups. Those factors all blended together to generate significant variation across the country in how police agencies responded to the Occupy groups that sprouted up in their communities.

These variations quickly became apparent, with intense media coverage of police use of force against protesters in certain communities. In one of the most highly publicized incidents, former U.S. Marine and Iraq War veteran Scott Olsen had his skull fractured when he was struck in the head by a "less-lethal" beanbag round fired into a crowd by police at an Occupy Oakland protest in California.[8] An independent review of the police response to Occupy Oakland noted systemic deficiencies and concluded that the agency's crowd control tactics were "outdated, dangerous, and ineffective."[9] In another well-known example, a police lieutenant at the University of California at Davis pepper-sprayed a group of seated protesters who were engaged in an act of nonviolent civil disobedience on campus. Photos and videos of this incident quickly went viral on social media and became some of the most iconic images of the Occupy movement.[10] A university task force led by a former California Supreme Court Justice later concluded that "the pepper spraying incident . . . should and could have been prevented."[11] An external review by a security firm led by experienced police administrators concluded that "the police operation and police leadership on November 18 [, 2011] were flawed in both planning and execution."[12] On the other side of the country, the New York City Police Department (NYPD) came under harsh criticism for numerous allegations of excessive force and wrongful arrest associated with its response to Occupy Wall Street. A report produced by law clinics at New York University (NYU) and Fordham University concluded that the NYPD's response to Occupy Wall Street involved "frequent alleged

8. Matthew Artz, "Oakland to Pay Iraq War Vet $4.5 Million for Occupy Shooting," *San Jose Mercury-News,* March 21, 2014, http://www.mercurynews.com/ci_25392114/oakland-pay-iraq-war-vet-4-5-million

9. Frazier Group, LLC, *Independent Investigation: Occupy Oakland Response, October 25, 2011,* (unpublished report, June 14, 2012).

10. Brian Nguyen, "University of California to Pay Nearly $1 Million in Deal with 21 Pepper-Sprayed UC-Davis Occupy Protesters," NBCNews.com, last modified September 26, 2012, http://usnews.nbcnews.com/_news/2012/09/26/14112860-university-of-california-to-pay-nearly-1-million-in-deal-with-21-pepper-sprayed-uc-davis-occupy-protesters

11. *UC Davis November 18, 2011"Pepper Spray Incident" Task Force Report: "The Reynoso Task Force Report"* (unpublished report, March 2012), https://www.aclunc.org/sites/default/files/asset_upload_file556_11667.pdf

12. *Report Concerning the Events at UC Davis on November 18, 2011* (Los Angeles: Kroll, 2012), http://blogs.sacbee.com/crime/reynoso-report.pdf (35–190).

incidents of unnecessary and excessive police use of force against protesters, bystanders, journalists, and legal observers . . . unjustified and sometimes violent closure of public space, dispersal of peaceful assemblies, and corralling and trapping protesters en masse" in addition to other civil rights issues.[13]

In all three of these jurisdictions, lawsuits alleging that police had violated the civil rights of protesters were settled with substantial seven-figure payouts to protesters. Elsewhere, allegations of aggressive policing against Occupy protesters led to a wave of litigation over alleged civil rights violations. These lawsuits have focused primarily on allegations of wrongful arrest and the use of excessive force in shutting down protests and marches and closing Occupy encampments. Occupiers allege that heavy-handed approaches to protest policing violated their First Amendment rights, typically freedom of speech and assembly, thus chilling their ability to express political views in public forums. In some jurisdictions, journalists allege that police interfered with freedom of the press as well. Numerous members of the press were arrested and had force used against them by the police while trying to cover Occupy protests and marches in some cities. Some Occupiers, particularly those swept up in mass arrests or who had force used against them by police, also raised Fourth and Fourteenth Amendment challenges alleging wrongful arrest, excessive force, and other due process or equal protection violations. Chapter 3 provides a brief review of these constitutional issues.

> [N]umerous police administrators and government officials. . . did not want their responses to the Occupy movement to end up on the evening news. Thus, many communities developed their own home-grown strategies for preventing conflict and maintaining calm and cordial relationships between police and protesters.

In spite of the gravity of these issues, there is a silver lining in the experiences of police agencies in Oakland, at UC Davis, in New York, and in other agencies involved in early clashes with Occupy protesters. Police and local government officials all around the nation followed the intensive media coverage of these events as they were unfolding and adjusted their own strategies accordingly. During the course of our research, we heard from numerous police administrators and government officials that they did not want their responses to the Occupy movement to end up on the evening news. Thus, many communities developed their own home-grown strategies for preventing conflict and maintaining calm and cordial relationships between police and protesters.

At first, the Occupy movement did not focus its protests directly on the police. In fact, many Occupiers viewed the police, like themselves, as part of the 99 percent. They routinely encouraged the police to join together with them in opposition to economic inequality and related grievances. However, as news of alleged civil rights abuses began to spread, the Occupy movement began to confront the issue of police misconduct. As one journalist noted, a movement that was focused primarily on economic inequality quickly morphed into "a protest against the police state."[14] Even in cities where the police exercised considerable professionalism and

---

13. Sara Knuckey, Katherine Glenn, and Emi MacLean, *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (New York: NYU School of Law and Fordham Law School, 2012), http://chrgj.org/wp-content/uploads/2012/10/suppressingprotest.pdf.
14. Erik Kain, "Police Response to Occupy Wall Street is Absurd," *Forbes*, November 19, 2011,

restraint in dealing with protesters, Occupiers held solidarity marches and rallies to draw attention to wrongful arrest, use of force, and other alleged forms of police misconduct against their fellow protesters in other jurisdictions. Occupy Oakland began holding weekly "Fuck the Police" marches, with Occupy groups in some other cities quickly following suit.[15]

Of course, in any conflict there are at least two parties involved, so the conduct of the police is only one part of the equation in thinking about conflict between protesters and the police. Our general impression from talking with hundreds of Occupiers is that many of them were thoughtful, compassionate, and genuinely interested in helping to build a more just world. At the same time, as we will discuss later, a subset of Occupy protesters also appeared to embrace violence and property damage as legitimate protest strategies. This is especially the case for militant or radical elements of the Occupy movement and other protest groups who embrace a "diversity of tactics," an innocuous phrase that in reality often includes property damage and violence.[16] During our research, we attended a "general assembly" meeting at one Occupy site where a rabbi gave a beautifully written and very moving speech about the importance of relying on peaceful protest tactics, only to have his speech interrupted by several fights breaking out among people in the audience who disagreed with one another about his message. Although the Occupy movement professed to embrace peaceful and nonviolent strategies and tactics, in reality there were considerable differences among participants over these issues.

## The political and social context for protest policing

Policing protests is inherently difficult. Protesters are often disobedient and sometimes treat police officers in a rude and hostile manner. Protesters occasionally attempt to bait police officers into arresting or using force against them. Protesters who are perceived as victims of police repression earn credibility among fellow protesters for their sacrifice to the movement. In one of the sites we visited, an angry protester repeatedly blew smoke into the face of a police officer in a clear attempt to provoke the officer. An administrator who observed the officer remaining stoic in the face of this attempted provocation eventually took the officer's place to give him a break. After dealing with Occupy protesters on an ongoing basis, one police sergeant we interviewed discovered that she had cracked her teeth by grinding them so hard because of the daily stress of dealing with the protesters. Other police officers we interviewed had been subjected to physical aggression, which in some cases was limited to pushing and shoving but in other cases involved having objects thrown at them by protesters, including bottles, bricks, and jars filled with urine. While most of the protesters we interviewed favored peaceful tactics, some admitted that they embraced more extreme approaches, including property damage and violence. Viral video footage has captured Black Lives Matter protesters in New York chanting "What do we want? Dead cops! When do we want it? Now."[17] Police officers are human beings, and

http://www.forbes.com/sites/erikkain/2011/11/19/police-response-to-occupy-wall-street-is-absurd/#d7a559420d78.

15. Josh Harkinson, "Occupy Oakland's Black Panther Roots," *Mother Jones,* February 1, 2012, http://www.motherjones.com/mojo/2012/01/occupy-oakland-black-panther-roots.
16. Ibid.
17. "Video Shows NYC Protesters Chanting for 'Dead Cops,'" NBC New York, last modified December 15, 2014, http://www.nbcnewyork.com/news/local/Eric-Garner-Manhattan-Dead-Cops-Video-Millions-March-Protest-285805731.html.

dealing with such offensive and threatening behavior can make the job of protest policing both frustrating and frightening not only for them but also for their families.

Managing these complex, dynamic, and sometimes volatile events represents a significant challenge for police in a democratic society. The tension between police and protesters in the Occupy movement and beyond highlights the fundamental role of the police in enabling—and potentially limiting—free democratic expression. As the political scientist David Bayley puts it, the behavior and tactics of the police "determine the limits of freedom in organized society" and are an "essential feature in determining the character of government."[18] The freedoms Bayley writes about are tested when citizens choose to protest against powerful interests like corporations and the government, often in a deliberately rebellious manner that directly undermines police conceptions of what is orderly and permissible. The manner in which police choose to maintain order "directly affects the reality of freedom."[19] Democracy can be messy sometimes. The nature and character of protest policing is in some ways a measure of democracy, revealing how free we really are.

> ## Democracy can be messy sometimes. The nature and character of protest policing is in some ways a measure of democracy, revealing how free we really are.

In the United States, the rights of protesters are enshrined in the Constitution, particularly the First Amendment's freedom of speech and assembly provisions. Yet the Supreme Court's First Amendment jurisprudence reminds us that these rights are not limitless. Among other restrictions, the courts have ruled that the government can impose reasonable restrictions on "the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."[20] While governments have legitimate reasons for regulating protests, there is wide variation across the country in how this regulatory authority is exercised. Many local officials enforce time, place, and manner restrictions in principled ways that seem consistent with the spirit of the First Amendment and related case law. Some officials abuse their discretion by restricting the freedom of speech and freedom of assembly in ways that seem content-based, overly broad, or not associated with a legitimate government interest or in ways that shut down alternative avenues of communication. Later in this guide, we will explore these issues in greater detail.

While protests in the Occupy movement and beyond have provided many opportunities for conflict between the police and protesters, they also offer a chance for police to demonstrate the huge strides many agencies have made over the years in establishing strong relationships with the communities they serve. The choices police leaders make in addressing protests, mass demonstrations, and other crowd events can have far-reaching effects. Every time a police officer is patient and polite and exercises restraint, the police bolster the legitimacy of their institution. A large body of scientific research has concluded that when people view police officers and other legal authorities using fair and respectful procedures, they are more likely to support and cooperate with

18. David H. Bayley, *Patterns of Policing: A Comparative International Analysis* (New Brunswick, NJ: Rutgers University Press, 1985), 5.
19. Ibid.
20. *Perry Education Association v. Perry Educators' Association,* 460 U.S. 37, 45 (1983).

the police, comply with their directives, and obey the law.[21] Every time a police officer is unnecessarily impatient, rude, brutal, or otherwise unfair in dealing with a protester, the police diminish their own reputation. Research suggests that when people view the police as behaving in an unfair or disrespectful manner, they are more likely to view the police and in some cases the law more generally as illegitimate.[22] Moreover, there is research evidence to suggest that these two ways of treating people may have asymmetric effects. When people are treated poorly, it may leave a more significant lasting impression than when they are treated well.[23] The principles of community policing, which focus heavily on community partnerships and problem solving, provide a useful foundation upon which to develop fair and effective protest policing strategies.

## Description of our research

Though the Occupy movement was focused largely on economic issues, the interplay between police and protesters ended up raising fundamental issues about policing in a democracy. In particular, the Occupy movement highlighted the tension between maintaining public order and public safety and preserving the constitutional rights of people to engage in free democratic expression. Given the gravity of these issues, the research team launched a two-phase study of protest policing. In the first phase, we carried out surveys of Occupy participants from February to June of 2012 in two primary locations: New York, New York (347 surveys), and Washington, D.C. (136 surveys). Later in this guide, we present some of the results from these surveys, which yielded useful insight into protesters' perspectives on policing. More limited surveys were also carried out in four other cities: Charlotte, North Carolina; Dallas, Texas; Houston, Texas; and Oakland, California.

The second phase of the research, which was funded by the COPS Office, involved a study of the police response to the Occupy movement in 15 American police agencies. The purpose of this phase was to gather police perspectives on their experiences with the policing of the Occupy movement and other protest events. This guide is based primarily on the findings from this second phase of the research. Agencies were able to participate in the study in three ways, with some participating in two of the three possible ways. First, seven agencies participated by hosting three- to five-day site visits from our research teams, each of which consisted of a researcher and a current or former police professional. Second, eight agencies participated by making key personnel available to participate in one or more brief interviews conducted by telephone, via e-mail, over Skype, or in person.[24] Finally, eight agencies participated by sending representatives to a two-day focus group meeting held in Washington, D.C., in June 2014. Table 1 on page 21 lists the participating agencies

21. Lorraine Mazerolle, Emma Antrobus, Sarah Bennett, and Tom R. Tyler, "Shaping Citizen Perceptions of Police Legitimacy: A Randomized Field Trial of Procedural Justice," *Criminology* 51, no.1(2013), 33–64; Tyler, *Why People Obey the Law* (see note 1).

22. Lawrence W. Sherman. "Defiance, Deterrence, and Irrelevance: A Theory of the Criminal Sanction," *Journal of Research in Crime & Delinquency* 30, no.4 (1993), 445–473; Tyler, *Why People Obey the Law* (see note 1).

23. Wesley G. Skogan, "Asymmetry in the Impact of Encounters with Police," *Policing & Society* 16, no. 2 (2006), 99–126; Maguire, Lowrey, and Johnson, "Evaluating the Relative Impact of Positive and Negative Encounters with Police" (see note 1).

24. Three agencies (Boulder, Burlington, and Wilmington) participated in telephone interviews; one agency (Columbia) participated in an e-mail interview; two agencies (Portland and U.S. Capitol Police) participated in interviews in person; one agency (Milwaukee) participated in both telephone and in-person interviews; and one agency (Seattle) participated in both Skype and in-person interviews.

and the means by which each participated in the study.

Table 1. Occupy study participants

| Agency name | State | Brief interview(s) | Full site visit | Focus group meeting |
|---|---|---|---|---|
| Boulder Police Department | CO | ✓ | | |
| Boston Police Department | MA | | ✓ | ✓ |
| Burlington Police Department | VT | ✓ | | |
| Charlotte-Mecklenburg Police Deptartment | NC | | ✓ | ✓ |
| Chicago Police Department | IL | | ✓ | |
| Cleveland Division of Police | OH | | ✓ | ✓ |
| Columbia Police Department | SC | ✓ | | |
| Madison Police Department | WI | | ✓ | ✓ |
| Milwaukee Police Department | WI | ✓ | | ✓ |
| Portland Police Bureau | OR | ✓ | | ✓ |
| Salt Lake City Police Department | UT | | ✓ | |
| Seattle Police Department | WA | ✓ | | ✓ |
| Tampa Police Department | FL | | ✓ | ✓ |
| United States Capitol Police | DC | ✓ | | |
| Wilmington Police Department | DE | ✓ | | |

# The stakes of protest policing

While vestiges of the Occupy movement are still present in some communities, the Occupy encampments of 2011 and 2012 are now a distant memory. Yet many of the challenges that emerged for police during the Occupy movement reflected longstanding issues that continue to be relevant today. In chapter 2, we will provide a brief review of protest policing in the United States that helps to provide some historical and social context. That review is broken down into three sections covering the pre-Occupy era, the Occupy movement itself, and the post-Occupy era. For those who question whether these issues are worthy of attention, consider the following.

In January 2014, more than two years after the NYPD cleared out the original Occupy Wall Street encampment in Zuccotti Park, New York City agreed to pay $18 million to settle dozens of lawsuits associated with wrongful arrests that occurred during the 2004 Republican National Convention—almost a decade earlier.[25] In 2012, the City of Chicago agreed to pay $12 million to settle lawsuits associated with the wrongful arrests of more than 900 protesters at a 2003 march against the war in Iraq.[26] In 2010, Washington, D.C., agreed to pay $13.7 million to settle a class-action lawsuit by people wrongfully arrested at a 2000 protest near the World Bank and the International Monetary Fund.[27] In 2009, the City of Los Angeles agreed to pay nearly

25. Erin Durkin and Daniel Beekman, "City Pays $18 Million to Settle Lawsuits Stemming from 2004 Republican National Convention at Madison Square Garden," *New York Daily News*, January 15, 2014, http://www.nydailynews.com/new-york/city-pays-18m-settle-rnc-lawsuits-article-1.1581416.
26. Hal Dardick, "Aldermen Settle Iraq War Protest Lawsuits for $12 Million," *Chicago Tribune*, June 6, 2012, http://articles.chicagotribune.com/2012-06-06/news/chi-aldermen-settle-iraq-war-protest-lawsuits-for-12-million-20120606_1_protest-aldermen-police-conduct.
27. Maria Gold, "D.C. Agrees to $13.7 Million Settlement in 2000 Mass Arrest," *Washington Post*, July 1, 2010, http://www.washingtonpost.com/wp-

$13 million to settle several lawsuits associated with the use of excessive force by police at a 2007 May Day rally.[28] The failure of police to exercise appropriate restraint during protests can be costly for local governments and their insurers.

In August 2014, a white police officer in Ferguson, Missouri, shot and killed Michael Brown, an 18-year-old African-American man. The controversial shooting led to a series of protests not only in the immediate aftermath of the event but also at other stages, particularly after a grand jury declined to indict the officer. An extensive investigation by the U.S. Department of Justice cleared the officer in the shooting. However, the response of police agencies in and around Ferguson to the protests was viewed by critics as heavy-handed and overly militarized. The Ferguson protests were different in many important respects from the Occupy protests. At the same time, the police response to the Ferguson protests raised some of the same civil rights issues that emerged in other cities as a result of the Occupy protests.

The police response to the Ferguson protests led in part to President Barack Obama's decision to sign an Executive Order establishing the Task Force on 21st Century Policing. In May 2015, the task force released a report that contained numerous recommendations for police reform in the United States, including some that focused on improving the way police agencies respond to protests.[29] The task force noted that the use of evidence-based policing practices at mass demonstrations "can make the difference between a peaceful demonstration and a riot. Citizens have a constitutional right to freedom of expression, including the right to demonstrate peacefully. There are strong examples of proactive and positive communication and engagement strategies that can protect constitutional rights of demonstrators and the safety of citizens and the police."[30] This conclusion is consistent with an idea that is central to this guide: community policing and protest policing go hand in hand.

In the aftermath of the Occupy movement, events in Ferguson, and the recommendations of the President's Task Force, the issue of how to respond properly to protests continues to be highly salient. The chaotic and violent events that occurred during the Unite the Right rally in Charlottesville, Virginia, in August 2017, emphasize the importance of the police response to protests. Other major protest events continue to remind us of how important this issue really is for police leaders.

## Overview of this volume

Chapter 2 provides an overview of protest policing in the United States, including its evolution from the civil rights movement in the 1960s until today. This brief review is useful for reflecting on whether and how we as a nation have improved the policing of protests during the past five decades. Chapter 3 outlines some basic concepts and principles from law and social science that are useful for rethinking strategic approaches to protest policing. It begins by providing a brief review of legal issues associated with protest policing,

---

dyn/content/article/2010/06/30/AR2010063005200.html.
28. Maeve Reston and Joel Rubin, "Los Angeles to Pay $13 Million to Settle May Day Melee Lawsuits," *Los Angeles Times,* February 5, 2009, http://articles.latimes.com/2009/feb/05/local/me-lapd-settlement5.
29. President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing* (Washington, D.C., Office of Community Oriented Policing Services, 2015), http://www.cops.usdoj.gov/pdf/taskforce/TaskForce_FinalReport.pdf.
30. Ibid., 20.

particularly those involving the First, Fourth, and Fourteenth Amendments to the U.S. Constitution. It discusses the scientific literature on compliance and defiance, including a review of foundational concepts like deterrence, procedural justice, and legitimacy that have received a lot of attention lately. It then provides a brief overview of concepts and findings from the field of crowd psychology and their implications for protest policing and public order policing more generally. Chapter 4 reviews some of the lessons learned from the 15 agencies that participated in our research and outlines a vision for the future of protest policing in the United States.

Note that the guide does not focus on police tactics. Instead, it focuses primarily on principles and strategies. Much of the police practitioner literature on protest policing focuses on tactics for handling riots. This literature does a good job of addressing technical issues like police formations, command and control, crowd containment and dispersal methods, and the use of chemical agents and less-lethal munitions. However, noticeably absent from this literature is any significant attention to *preventing* protests and other public order events from becoming riotous in the first place. Even when prevention is emphasized, the recommendations are typically not based on the findings from scientific research on these issues. That is where this guide fits in. It provides a set of evidence-based principles, strategies, and lessons for how to handle protests and other public order events in a manner that can prevent conflict and violence. It is intended to serve as a resource to help agencies develop thoughtful community policing strategies for managing protests and other public order events in an effective, efficient, fair, and respectful manner.

# 2. Protest Policing in the United States

*"Those who cannot remember the past are condemned to repeat it."* — George Santayana, *Reason in Common Sense* (London: Archibald Constable & Co., 1905), 284.

This chapter examines protest policing in the United States. It contains three sections. Section 1 provides a brief history of protest policing from the civil rights movement of the 1960s until the start of the Occupy movement in 2011. Section 2 discusses the emergence of the Occupy movement in the United States as well as the police response to the movement. Section 3 discusses protest policing since Occupy, including events in Ferguson, Missouri, Charlottesville, Virginia, and elsewhere. The chapter also reviews some of the related recommendations from the President's Task Force on 21st Century Policing, whose final report was released in May 2015. One important question is in what ways we have learned from the past and in what ways we are continuing to make the same mistakes.

## A brief history of protest policing in the United States

The United States has a rich history of protests. Indeed, our nation's democracy was founded on the American colonists' rebellion against oppressive British rule. President Dwight D. Eisenhower once remarked that Americans "are descended in blood and in spirit from revolutionaries and rebels—men and women who dare to dissent from accepted doctrine."[31] The workers' rights movement, the women's suffrage movement, and the civil rights movement are just a few examples of disruptive social movements in which mass demonstrations generated significant social change in the United States. Protests helped forge the liberty on which this great nation stands.[32] As agents of the government, the police have historically played a key role in managing protest events. The history of U.S. social movements has unfortunately included numerous efforts by police to prevent, disrupt, and otherwise suppress peaceful protests. A detailed treatment of the police handling of protests throughout American history is beyond our scope. Here, we provide a very brief history of protest policing in the United States since the civil rights movement of the 1960s to highlight some of the key events and influential forces that have helped to shape protest policing.

Protest policing strategies in the 1960s were often based on the *escalated force* model, which operated on the assumption that a sufficiently dominant show of force by police would encourage protesters to back down and comply with their directives. This assumption led police to continue escalating the level of force until they achieved compliance with their demands.[33] As we will demonstrate later, these approaches to protests and other crowd events are based on some questionable assumptions about the psychology of crowds and the

---

31. Dwight D. Eisenhower, address at the Columbia University National Bicentennial Dinner, New York City, May 31, 1954, http://www.presidency.ucsb.edu/ws/?pid=9906.

32. Jean-Baptiste Velut, "A Tale of Polarizations: Stress, Inertia and Social Change in the New Gilded Age," in Emmanuelle Avril and Johann N. Neem, eds., *Democracy, Participation, and Contestation: Civil Society, Governance and the Future of Liberal Democracy* (New York: Routledge, 2015), 107–122.

33. Clark McPhail, David Schweingruber, and John McCarthy, "Policing Protest in the United States: 1960–1995," in Donatella della Porta and Herbert Reiter, eds., *Policing Protest: The Control of Mass Demonstrations in Western Democracies* (Minneapolis, MN: University of Minnesota Press, 1998), 49–69.

people they comprise. History has taught us that the premature or ill-advised use of force against protesters, particularly the use of riot control techniques, sometimes has the effect of amplifying conflict with protesters and making things worse rather than better. Moreover, these approaches have also played a key role in some of our nation's darkest moments, including the police response to protesters in Alabama at the Birmingham civil rights campaign in May 1963 and the Bloody Sunday protests in Selma in March 1965; the Orangeburg Massacre in February 1968 in South Carolina; the Chicago Democratic National Convention in August 1968; and the campus demonstrations at Jackson State College in Mississippi in May 1970. These watershed events in American history raised important questions about the legitimacy of the American police and the limits of freedom for people interested in expressing their views through public protest.

> ### History has taught us that the premature or ill-advised use of force against protesters, particularly the use of riot control techniques, sometimes has the effect of amplifying conflict with protesters and making things worse rather than better.

The heavy-handed police response to protests and other public order events in the United States during the 1960s and early 1970s played an important role in the formation, deliberations, and findings of four separate presidential commissions. The President's Commission on Law Enforcement and Administration of Justice (the Johnson Commission) was established in July 1965 by President Lyndon B. Johnson. Less than a month later, the Watts riots rocked Los Angeles, resulting in 34 deaths and more than $45 million in property damage and injuring 85 police officers and numerous others.[34] While the commission's mandate was to perform a comprehensive review of crime and criminal justice issues facing the nation, a small part of its work focused on demonstrations and riots. The commission concluded that "most of the recent big-city riots were touched off by commonplace street encounters between policemen and citizens. In short, the way any policeman exercises the personal discretion that is an inescapable part of his job can, and occasionally does, have an immediate bearing on the peace and safety of an entire community, or a long-range bearing on the work of all policemen everywhere. Police must not react to disorder in the course of demonstrations too quickly or with too much force."[35] The Johnson Commission noted that the "tactics chosen at the beginning of disorder may well be the crucial factor in controlling a riot. The kinds and extent of police force employed, and equipment involved, must be thought out well in advance, taught to personnel through training and constantly reassessed."[36] The commission acknowledged that police would be "greatly helped in their task of preserving order and protecting constitutional rights if the leaders of protesting or demonstrating groups discussed, in advance with the police, the appropriate times and places for demonstrations and methods of demonstrating."[37]

The National Advisory Commission on Civil Disorders (the Kerner Commission), established in July 1967, concluded that in half of the cases of violent civil disorder in the 24 cities it studied, police actions immediately

---

34. Robert E. Jaffe and Gary W. Dubin, "Trends in Municipal Liability: Riot Damages," *Insurance Law Journal* 532, no. 5 (May 1967), 282–288.
35. President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society* (Washington, D.C.: Government Printing Office, 1967), 118.
36. Ibid., 119.
37. Ibid.

preceded the outbreak of violence. The commission noted that "the abrasive relationship between the police and the minority communities has been a major—and explosive—source of grievance, tension and disorder."[38]

The commission went on to note that the American police are regularly

> faced with demands for increased protection and service in the ghetto. Yet the aggressive patrol practices thought necessary to meet these demands themselves create tension and hostility. The resulting grievances have been further aggravated by the lack of effective mechanisms for handling complaints against the police. Special programs for bettering police-community relations have been instituted, but these alone are not enough. Police administrators, with the guidance of public officials, and the support of the entire community, must take vigorous action to improve law enforcement and to decrease the potential for disorder.[39]

The Kerner Commission made numerous recommendations for improving the police handling of protests and civil disorders, one of which involved the provision of specialized training to prevent civil disorders and control riots.

The National Commission on the Causes and Prevention of Violence (the Eisenhower Commission), established in June 1968, found that "the police handling of protesters was often unrestrained and only increased the potential for violence—in the immediate situation and for the future."[40] Its Task Force on Violent Aspects of Protest and Confrontation, led by Jerome Skolnick, echoed the findings from other commissions in noting that "the police used uncalled-for force, often vindictively, against protesters, often regardless of whether the latter were 'peaceful' or 'provocative.'"[41] This task force noted that a study of events at the 1968 Democratic National Convention in Chicago revealed

> unrestrained and indiscriminate police violence on many occasions, particularly at night. . . . That violence was made all the more shocking by the fact that it was often inflicted upon persons who had broken no law, disobeyed no order, made no threat. These included peaceful demonstrators, onlookers, and large numbers of residents who were simply passing through, or happened to live in, the areas where confrontations were occurring. Newsmen and photographers were singled out for assault and their equipment deliberately damaged. Fundamental police training was ignored; and officers, when on the scene, were often unable to control their men.[42]

The report of the Eisenhower Commission's Task Force on Law and Law Enforcement concluded optimistically that while improper police action could escalate the level of violence, "swift and massive commitment of prudent and well-trained law enforcement personnel can usually extinguish a civil disorder in its incipiency."[43]

The President's Commission on Campus Unrest (the Scranton Commission) was established by President

---

38. National Advisory Commission on Civil Disorders, *Report of the National Advisory Commission on Civil Disorders* (Washington, D.C.: National Institute of Justice, 1968), 8, https://www.ncjrs.gov/pdffiles1/Digitization/8073NCJRS.pdf

39. Ibid.

40. Jerome H. Skolnick, *The Politics of Protest: A Task Force Report Submitted to the National Commission on the Cause and Prevention of Violence under the Direction of Jerome H. Skolnick* (New York: Simon and Schuster, 1969), 265.

41. Ibid., 266.

42. Ibid.; Daniel Walker, *Rights in Conflict: Convention Week in Chicago, August 25–29, 1968* (New York: E.P. Dutton, 1968).

43. National Commission on the Causes and Prevention of Violence, *Law and Order Reconsidered: Report of the Task Force on Law and Law Enforcement to the National Commission on the Causes and Prevention of Violence* (Washington, D.C.: Government Printing Office, 1969), 334.

Richard M. Nixon in June 1970 in the wake of protesters being shot and killed by National Guardsmen at Kent State University in Ohio and by police at Jackson State College in Mississippi. The commission commended law enforcement officers "who have endured taunts and assaults without reacting violently and whose careful conduct has prevented violence and saved lives."[44] At the same time, the commission concluded that "there have been dangerous and sometimes fatal instances of unnecessary harshness and illegal violence by law enforcement officers. We therefore urge that peace officers be trained and equipped to deal with campus disorders firmly, justly, and humanely. They must avoid both uncontrolled and excessive response."[45] In the 1960s and early 1970s, the use of the term "police riot" became an increasingly popular shorthand for describing instances in which police instigated or escalated violent confrontations with crowds. The police response to protests and other public assemblies was just one part of a much broader set of concerns raised about police behavior during this era. Yet out of crisis came change.

These various presidential commissions made numerous recommendations for transforming American police and their relationships with their communities. The creation in 1968 of the Law Enforcement Assistance Administration (LEAA), a federal agency within the U.S. Department of Justice, led to the development of research, education, and training focused on improving policing and criminal justice more broadly. The LEAA's efforts gave rise to numerous reform movements in policing, including early precursors of what would later come to be known as community policing. The transition to a softer approach to policing protests known as the *negotiated management* model was one small part of a much larger and more powerful sea change in policing that emerged as a result of the civil rights era.[46]

The negotiated management model emerged due to the failures of overly aggressive protest policing strategies in the 1960s and early 1970s. Using this approach, police "negotiate with demonstrators before the demonstration so that demonstrators can exercise their First Amendment rights with minimal conflict with police . . . even in demonstrations in which protesters break the law as a form of civil disobedience . . . police following the negotiated management style use minimal force and may even make prearrest arrangements with demonstrators."[47] Under the negotiated management model, police respect and even help facilitate the First Amendment rights of protesters. The police have a greater level of tolerance for disruption, often communicating ahead of time what they will tolerate and what they won't. Using the negotiated management style, the police recognize that communication with protesters is necessary to achieve mutually agreeable outcomes. The police and protest groups may each appoint one or more liaisons to communicate on an ongoing basis to minimize the potential for misunderstandings. Finally, under the negotiated management style, the use of arrest and force as means of controlling protesters is minimized. Police may even make arrangements ahead of time to arrest those protesters who wish to be arrested as a sign of their commitment to the cause for which they are protesting. These arrests are then executed in a peaceful manner and the arrest process is made simple for protesters.

The spread of the negotiated management model in the late 1970s and into the 1980s "substantially decreased the number and intensity of street clashes between police and protesters."[48] The negotiated management

---

44. President's Commission on Campus Unrest, *Campus Unrest: The Report of the President's Commission on Campus Unrest* (Washington, D.C.: Government Printing Office, 1970), 11, http://files.eric.ed.gov/fulltext/ED083899.pdf.

45. Ibid.

46. McPhail, Schweingruber, and McCarthy, "Policing Protest in the United States," (see note 33).

47. Ibid, 51.

48. Patrick Gillham and John Noakes, "'More than a March in a Circle': Transgressive Protests and the Limits of Negotiated Management,"

model was successful on a number of fronts. The permitting process provided police and other public officials with sufficient notice about planned protests, enabling them to prepare accordingly. The fact that police knew ahead of time about protest events took away the element of surprise, which—as pointed out by the Johnson Commission in 1967—had led to adverse outcomes in the past. The negotiated management model also stimulated communication between police and protesters, giving each side a human face, allowing both sides to state their wishes and expectations, and reducing the likelihood of miscommunications and misunderstandings. More generally, the negotiated management process reduced conflict and led to a softer style of policing protests.

The negotiated management approach began to fade in many agencies in the late 1990s as U.S. police began to adopt newer, more aggressive and invasive approaches to protest policing.[49] In some ways these newer approaches are similar to the protest policing approaches of the 1960s, though they contain certain characteristics that set them apart from earlier approaches. One popular explanation for these shifts is that they resulted primarily from the violent confrontations between police and protesters at the 1999 World Trade Organization (WTO) Ministerial Conference in Seattle, Washington. During the WTO protests, Seattle police lost control of the crowd. Demonstrators clashed with police, caused millions of dollars in property damage, and succeeded in disrupting the WTO meetings. Police made more than 600 arrests and deployed a variety of chemical agents (pepper spray and CS gas) and less-lethal munitions (including bean bags and wooden, plastic, and foam projectiles) against the crowd.[50] The governor declared a state of emergency and mobilized the National Guard to help restore order in the city.[51] The chaos of the WTO protests came to be known as "the Battle in Seattle."

The Seattle City Council established a WTO Accountability Review Committee to conduct a comprehensive review of the episode. The committee concluded that

> members of the public, including demonstrators, were victims of ill-conceived and sometimes pointless police actions to "clear the streets." Police response, particularly on Capitol Hill, was sometimes out of proportion to the threats faced. Our inquiry found troubling examples of seemingly gratuitous assaults on citizens, including use of less-lethal weapons like tear gas, pepper gas, rubber bullets, and "beanbag guns," by officers who seemed motivated more by anger or fear than professional law enforcement.[52]

Seattle Police Chief Norm Stamper, who resigned in the aftermath of the incident, later recalled:

> What happened in Seattle in 1999 was a police overreaction, which I presided over. It was the worst mistake of my career. We used chemical agents, a euphemism for tear gas, against nonviolent and essentially nonthreatening protesters. The natural consequence of which [is] that we were the catalyst for

*Mobilization* 12, no. 4 (December 2007), 371–387, 342, doi: 10.17813/maiq.12.4.j10822802t7n0t34;  McPhail, Schweingruber, and McCarthy, "Policing Protest in the United States," (see note 33).

49. Patrick F. Gillham, Bob Edwards, and John A. Noakes, "Strategic Incapacitation and the Policing of Occupy Wall Street Protests In New York City, 2011," *Policing & Society* 23, no. 1 (2013), 81–102, doi: 10.1080/10439463.2012.727607; John Noakes and Patrick Gillham, "Police and Protester Innovation since Seattle," *Mobilization* 12, no. 4 (December 2007), 335–340, doi: 10.17813/maiq.12.4.hk88jk1mw3036302.

50. Seattle Police Department, *The Seattle Police Department After Action Report: World Trade Organization Ministerial Conference, Seattle, Washington, November 29–December 3, 1999* (Seattle, Washington: Seattle Police Department, 2000), http://www.seattle.gov/police/publications/WTO/WTO_AAR.PDF.

51. Patrick F. Gillham, "Securitizing America: Strategic Incapacitation and the Policing of Protest Since the 11 September 2001 Terrorist Attacks," *Sociology Compass* 5, no.7 (July 2011), 636–652, doi: 10.1111/j.1751-9020.2011.00394.x.

52. Seattle City Council, *Report of the WTO Accountability Review Committee* (Seattle, WA: Seattle City Council, 2000), http://depts.washington.edu/wtohist/documents/arcfinal.pdf.

heightened tension and conflict rather than peacekeepers.[53]

Stamper concluded that the effect of the police response to protesters "was to heighten tensions, not de-escalate tension.... A whole lot of others would not have acted as they did if we didn't act as we did."[54] After stepping down as chief, Stamper went on to become a vocal critic of the excessive militarization of police agencies and the overly aggressive police response to protests and other large-scale public events.

Other police officials derived lessons from the Seattle protests that differed in important ways from those learned by Chief Stamper. For many police leaders, the Seattle experience helped to reveal the weaknesses of the negotiated management model, emphasizing just how quickly and easily protests could get out of hand. Police leaders viewed the Seattle incident as "the kind of situation they needed to retrain and retool for so that it did not occur in their city, on their watch."[55] Just as the tragedy at Columbine High School in Colorado became the pivotal event that reshaped the police response to active shooter situations, the Seattle WTO protests had a profound effect on the policing of protests in the United States and beyond.

Although the Battle in Seattle served as a major turning point in police thinking about how to prepare for and respond to protests, the issues that arose in Seattle had been building for some time. The antiglobalization movement had been gaining in popularity, with meetings of major international bodies (like the G-8, the International Monetary Fund, the World Bank, the World Economic Forum, the WTO, and others) attracting seasoned activists from all over the world. Radical activist groups had begun to reject the negotiated management model and the "choreographed demonstrations" that resulted from the permitting process.[56] According to one researcher, "activists complained that demonstrations orchestrated with the police were overly accommodating and ineffectual for promoting their goals."[57] Radical activists "refused to use 'contained' or familiar and undisruptive tactics and instead engaged in 'transgressive' or innovative confrontational tactics."[58] The activists' rebellion against negotiated management was facilitated by the use of communication technologies. One scholar referred to the Seattle WTO protests as "the first wired mass demonstration."[59] Organizers used the internet and e-mail to plan and coordinate the protests. Once the protests were already underway, mobile devices like cell phones and pagers were used to help organizers "move demonstrators, block streets, and coordinate protesters."[60] The use of these technologies in Seattle facilitated the emergence of more efficient "swarming" tactics in which protesters mobilize in a particular location very quickly and then disperse just as quickly once police arrive. The swarming phenomenon made the job of policing protests much more challenging as demonstrators outflanked and outmaneuvered police.[61]

Changes in the police response to public order events were further accelerated by broad and dramatic shifts in

---

53. Amanda Taub, "Seattle's Former Police Chief Speaks Out on Ferguson and Police Militarization," *Vox*, last modified August 14, 2014, http://www.vox.com/2014/8/14/6002451/ferguson-police-militarization-seattle.

54. Maria L. La Ganga, "Seattle Police Chief During WTO Unrest Appalled by Ferguson Violence," *Los Angeles Times*, August 16, 2014, http://www.latimes.com/nation/nationnow/la-na-nn-former-seattle-police-chief-reacts-to-ferguson-20140815-story.

55. Noakes and Gillham, "Police and Protester Innovation since Seattle" (see note 49).

56. Gillham, "Securitizing America" (see note 51).

57. Ibid.

58. Ibid.

59. William Briggs, "Sea Turtles, Cell Phones, and the WTO," *Communication World* 17, no. 3 (February 2000), 13.

60. Ibid.

61. Jack Linguan Qiu, "Mobile Communication and Social Movements," in John Downing, ed., *Encyclopedia of Social Movement Media* (Thousand Oaks, CA: Sage, 2011), 336–339.

American policing that occurred in the aftermath of the terrorist attacks on September 11, 2001.[62] The terrorist attacks came at a time when police departments throughout the United States were still modifying their approaches to public order events in response to the Seattle protests. After 9/11, in addition to dealing with crime, disorder, traffic safety, and other local issues, American police became a more integral part of the nation's sprawling homeland security apparatus. Although the Federal Government is responsible for coordinating counterterrorism efforts in the United States, "responsibility for establishing the front line of defense in America's cities and towns falls most heavily on state and local police."[63] Intelligence units that had been dismantled or scaled back in the 1970s after the FBI's COINTELPRO domestic surveillance scandal and other similar events were reactivated. The U.S. military funneled surplus equipment, including weaponry, to state and local police departments, igniting a debate over the militarization of American policing.[64] Police officials were accustomed to the idea that protest events would attract social justice advocates, college students, and low-level troublemakers. Now they also needed to ask whether the chaos and disorder surrounding these events might attract terrorists intent on taking lives and causing widespread destruction. As the perceived threat posed by protests and other public order events increased, the police adjusted their strategies and tactics accordingly, reverting to some of the more aggressive approaches that predated the negotiated management era.

## Newer approaches in the era of globalization and terrorism

Some observers of these strategic shifts in the police response to protests since the Seattle WTO protests in 1999 and the 9/11 terrorist attacks in 2001 have characterized them as a move away from negotiated management in some situations and toward more aggressive approaches that demonstrate a disrespect for the exercise of First Amendment rights, an intolerance for community disruption, an unwillingness to communicate or negotiate with protesters, the use of arrests and force as primary methods for controlling protests, intensified efforts to control access to space, surveillance of protesters, and greater information sharing between law enforcement agencies.[65] The spread of these more aggressive methods for dealing with protests has led to intense criticism of the police, with a particular focus in the United States on the constitutionality of these practices.[66]

---

62. Gillham, "Securitizing America" (see note 51).
63. Edward R. Maguire and William R. King, "Federal-Local Coordination in Homeland Security," in Brian Forst, Jack R. Greene, and James P. Lynch, eds., *Criminologists on Terrorism and Homeland Security* (New York: Cambridge University Press, 2011), 322–356.
64. David A. Klinger and Dave Grossman, "Who Should Deal with Foreign Terrorists on U.S. Soil?: Socio-Legal Consequences of September 11 and the Ongoing Threat of Terrorist Attacks in America," *Harvard Journal of Law and Public Policy* 25, no. 2 (Spring 2002), 815–834; Peter B. Kraska and Victor E. Kappeler, "Militarizing American Police: The Rise and Normalization of Paramilitary Units," *Social Problems* 44, no. 1 (February 1997), 1–18, doi: 10.2307/3096870.
65. Gillham and Noakes, "'More than a March in a Circle'" (see note 48).
66. Mary M. Cheh, "Demonstrations, Security Zones, and First Amendment Protection of Special Places," *University of the District of Columbia Law Review* 8, no. 1 (2004), 53–76, http://scholarship.law.gwu.edu/cgi/viewcontent.cgi?article=1469&context=faculty_publications; Alex S. Vitale, "From Negotiated Management to Command and Control: How the New York Police Department Polices Protests," *Policing and Society* 15, no 3 (2005), 283–304, doi: 10.1080/10439460500168592; Alex S. Vitale, "The Command and Control and Miami Models at the 2004 Republican National Convention: New Forms of Policing Protests," *Mobilization* 12, no. 4 (December 2007), 403–415, doi: 10.17813/maiq.12.4.97541013681695q5; Gillham, "Securitizing America" (see note 51); Gillham and Noakes, "'More than a March in a Circle'" (see note 48).

**The spread of these more aggressive methods for dealing with protests has led to intense criticism of the police, with a particular focus in the United States on the constitutionality of these practices.**

One particularly noteworthy approach to protest policing is the *Miami model*, which got its name from the response of the Miami area police to protests that occurred during the negotiations of the Free Trade Area of the Americas (FTAA) agreement in 2003.[67] With police expecting trouble from anarchists, approximately 2,500 police officers in riot gear were deployed to the area from more than three dozen agencies.[68] Opinions differed about how well the police handled the protests. Miami Mayor Manuel Diaz said the police response should be considered "a model for homeland security."[69] A circuit court judge who observed the protests called police actions "a disgrace for the community."[70] A City of Miami civilian investigative panel concluded that "most officers conducted themselves admirably, professionally, and with considerable restraint and discipline, even when they were subjected to acts of violence and other indignities. However, instances of police misconduct were observed. . . . Some demonstrators were profiled, unlawfully searched, detained, and/or arrested."[71] The investigative panel recommended that the Miami Police Department train its officers on First Amendment rights, noting that officers were not prepared to handle "the intermingling of peaceful demonstrators with violent protesters."[72] In the aftermath of the FTAA protests, the City of Miami and several other local governments agreed to legal settlements in excess of $1.5 million as the result of alleged constitutional violations by police.

The Miami model is characterized by an aggressive, militarized approach to protest control, including "the creation of no-protest zones, heavy use of less-lethal weaponry, surveillance of protest organizations, negative advance publicity by city officials of protest groups, preemptive arrests, preventive detentions, and extensive restrictions on protest timing and locations."[73] It is referred to as a "hard hat" approach to protest policing because it involves deploying officers in full riot gear, as opposed to "soft hat" approaches in which officers wear their regular uniforms.[74] The Miami model tends to be used for more transgressive protesters or groups that are viewed by police as unable to be controlled through softer approaches (the word "transgressive" is often used to describe protesters who embrace the use of more confrontational, subversive, or destructive methods). The Miami model relies on riot control techniques that are warranted under certain circumstances,

---

67. Vitale, "The Command and Control and Miami Models" (see note 66).
68. "Police, Protesters Clash Near Miami Trade Talks," Cable News Network, last modified November 20, 2003, http://www.cnn.com/2003/US/South/11/20/miami.protests.
69. Michelle Goldberg, "This Is Not America," *Salon*, last modified December 16, 2003, http://www.salon.com/2003/12/17/miami_police.
70. "Miami Judge Questions Police Action at Free Trade Demonstrations," *The St. Augustine Record*, December 21, 2003, http://staugustine.com/stories/122103/sta_2013242.shtml#.VRGr6WetG70.
71. *Report on the Free Trade Area of the Americas Summit* (Miami, FL: City of Miami Civilian Investigative Panel, 2006), finding 13–14.
72. Ibid., recommendation 11.
73. Alex S. Vitale, "Policing Protests in New York City," in Gary Cordner and Dilip K. Das, eds., *Urbanization, Policing, and Security: Global Perspectives* (New York: Taylor and Francis, 2009), 275–299.
74. Vitale, "The Command and Control and Miami Models" (see note 66).

such as rioting and looting. However, some agencies have chosen to use these methods against peaceful protesters, which has often later resulted in costly civil settlements.

Taken together, the newer approaches to protest policing discussed in this section represent more aggressive and invasive options than negotiated management. For proponents, these new approaches are necessary to confront the disorder, unpredictability, property damage, and violence associated with radical or violent protesters who are unwilling to obey the law or cooperate with police in reaching mutually beneficial negotiated management solutions. For critics, these new approaches represent a significant threat to free democratic expression and other foundational rights that are guaranteed in the U.S. Constitution. These newer approaches have also led to costly legal settlements with protesters who allege that police have violated their constitutional rights. As noted in chapter 1, these settlements have exceeded $10 million in several cities.

## Policing the Occupy movement

Occupy Wall Street and the movement it spawned has been called the "most significant social movement to utilize transgressive protest tactics in the U.S. in the last 40 years."[75] As noted in chapter 1, the movement emerged very suddenly, catching many police agencies off guard. In city after city across the United States, Occupy protesters quickly established encampments in parks and public squares, often violating laws and policies governing the use of these spaces. Protesters exercised their First Amendment rights of peaceful assembly and free speech loudly and often chaotically, routinely defying requests from police and local government officials to secure permits or follow pre-established routes during protest marches. Occupy protesters challenged the authority of the police in many jurisdictions, engaging in mostly peaceful acts of civil disobedience. Police leaders struggled to address the various challenges posed by the Occupy movement. Some responded forcefully and decisively. As a result, images of "mass arrests, riot gear–clad police, pepper spraying of demonstrators, and the use of tear gas and concussion grenades became commonplace in the United States in the fall of 2011."[76] The aggressive responses of some agencies quickly made the national (and international) news, with certain photos and videos showing police using force against peaceful but noncompliant protesters going viral. This type of media coverage generated substantial legitimacy costs for the American police.

What was often not shown on the evening news were the many instances in which police behaved in a professional, thoughtful, empathetic, and creative manner to facilitate the First Amendment rights of Occupy protesters to assemble and express their views in a peaceful manner. In some localities, police continued to rely on negotiated management approaches, working together with protesters to find mutually agreeable solutions. In Cleveland, for instance, Occupiers and police established cordial relationships in part because of their mutual opposition to current efforts to repeal Ohio's collective bargaining laws.[77] Milwaukee, Wisconsin, police also went to great lengths to preserve relationships between police and protesters. For instance, the day before a major Occupy event in Milwaukee, Police Chief Ed Flynn announced publicly, "We recognize that

75. Gillham, Edwards and Noakes, "Strategic Incapacitation" (see note 49).

76. Alex S. Vitale, *Managing Defiance: The Policing of the Occupy Wall Street Movement*, invited lecture given at Vera Institute of Justice, New York, February 15, 2012, http://politicsandprotest.ws.gc.cuny.edu/files/2012/07/PPW-4-Vitale.docx.

77. John Celock, "Occupy Cleveland: Issue 2 Fosters Cordial Relations with Police Union," Huffington Post, last modified December 28, 2011, http://www.huffingtonpost.com/2011/10/28/ohio-issue-2-occupy-cleveland_n_1063722.

our responsibility tomorrow is to protect life and property. A co-equal responsibility of all of us tomorrow is to protect the right to peaceably assemble and to exercise free speech. We intend to see to it that tomorrow is a safe, peaceable, law-abiding, and constitutionally protected day."[78]

Similarly, police in Boston, Massachusetts, relied on community policing principles to shape their interactions with Occupy Boston. As former Boston Police Commissioner Ed Davis pointed out in an interview with Fox News,

> We decided that we were going to apply a community policing philosophy to the protest. We reached out to the people involved in it—we got to know them. . . . We were able to develop a relationship and a trust between the police and the people there, which is what we are trying to do across the city. So it was perfectly consistent with our policies and it worked out well for us.[79]

The Occupy movement arrived at a time when police were experimenting with new methods of handling protests and other public order events. For some agencies, negotiated management had run its course and was eclipsed by newer, more aggressive and invasive approaches. At the same time, some of the agencies that had already tested out these newer approaches were forced to reconsider them when protesters prevailed in injunctions, lawsuits, and settlements against the police for violating their constitutional rights. For other agencies, negotiated management was still a viable approach under most conditions. A close look at the response of U.S. police agencies to the Occupy movement reveals considerable variation across the nation in how police handle protests.

## Policing public order events after the Occupy movement

By June of 2014, the Occupy encampments in the United States had finally been shut down, either through eviction or attrition among participants (the nation's longest running encampment, in Honolulu, Hawai'i, was closed on June 2, 2014). Occupy movement participants continued to participate in occasional protests associated with various social justice causes, often joining together with other groups. For the most part, however, the waning of the Occupy movement led to a period of relative calm in terms of protest policing in the United States. The same could not be said for the rest of the world. From May through July 2014 alone, clashes between police and protesters in other nations—including Brazil,[80] Cambodia,[81] China,[82] France,[83]

78. "Police Chief Ed Flynn Talks About Policing Plans for Occupy Milwaukee," Daily Motion, accessed May 17, 2012, http://www.dailymotion.com/video/xlp5pk_raw-video-police-chief-ed-flynn-talks-about-policing-plans-for-occupymilwaukee_news.
79. "Commissioner Ed Davis on Occupy Boston," My Fox Boston, accessed May 17, 2012, http://topics.myfoxboston.com/m/49534904/commissioner-ed-davis-on-occupy-boston.htm.
80. Brian Winter and Marcelo Teixeira, "Brazil Police, Protesters Clash as World Cup Begins," Reuters, last modified June 12, 2014, http://www.reuters.com/article/2014/06/12/us-brazil-worldcup-protests-idUSKBN0EN1DD20140612.
81. "Dozens Injured as Cambodian Police, Protesters Clash near Phnom Penh's Freedom Park," Australian Broadcasting Corporation, last modified July 15, 2014, http://www.abc.net.au/news/2014-07-15/cambodia-clashes-at-freedom-park/5599306.
82. Tom Phillips, "Bloodshed as Chinese Environmental Protest Sparks Riot," The Telegraph, May 11, 2014, http://www.telegraph.co.uk/news/worldnews/asia/china/10822917/Bloodshed-as-Chinese-environmental-protest-sparks-riot.html.
83. Philippe Wojazer, "Pro-Palestinian Protesters Clash with Police in Paris," Reuters, last modified July 19, 2014, http://www.reuters.com/article/2014/07/19/us-palestinians-israel-france-idUSKBN0FO0OY20140719.

Hong Kong,[84] India,[85] Kenya,[86] Macedonia,[87] Turkey,[88] and Venezuela[89]—received prominent media coverage.

The calm in the United States was unfortunately short-lived. On August 9, 2014, a white police officer in Ferguson, Missouri, shot and killed an unarmed 18-year-old black man named Michael Brown. The details of the incident are disputed, but for many black residents in the area, the shooting represented the culmination of a long line of abusive police practices primarily targeting African Americans. The incident led to intense protests in Ferguson and the St. Louis area more generally. While most people protested peacefully, others behaved destructively. Area police departments responded forcefully to the protests with an overly militarized response that likely escalated tensions between protesters and police. Police undermined freedom of the press by threatening, using force against, and arresting journalists, in some cases while being recorded on video.[90] News stories and viral videos featured police officers in riot gear, firing chemical agents and "less-lethal" projectiles at peaceful protesters and journalists. On August 18, President Obama weighed in, telling the nation that "our constitutional rights to speak freely, to assemble, and to report in the press must be vigilantly safeguarded, especially in moments like these."[91]

On November 24, St. Louis County prosecutor Robert McCulloch announced that a grand jury had decided not to indict the officer in the Ferguson shooting (a later investigation by the U.S. Department of Justice also cleared the officer). The announcement spurred intense looting and rioting in and around Ferguson. Rioters threw rocks and bottles at police, torched one police car and damaged several others, fired gunshots in the air, and set fire to more than a dozen buildings. The protests quickly spread across the nation, fueled in part by the grand jury's decision and in part by other well-known cases. For instance, in July 2014, an unarmed African-American man named Eric Garner died after being taken to the ground and held down in Staten Island by a white New York City Police Department (NYPD) officer attempting to arrest him for selling loose cigarettes. On November 22, 2014, a white police officer in Cleveland shot and killed a 12-year old African-American child named Tamir Rice who was holding a toy gun. On December 3, a grand jury in New York City decided not to charge the NYPD officer for Garner's death, further intensifying the growing national protest movement.

The nationwide protests over these shootings helped fuel the rapid growth of the Black Lives Matter

84. Denver Nicks, "Police Arrest 511 People at Hong Kong Democracy Protest," *Time*, last modified July 2, 2014, http://time.com/2947978/hong-kong-police-arrest-nearly-200-at-democracy-protest

85. "Indian Police Use Water Cannon to End Gang-Rape Protest in Lucknow," *The Guardian*, June 2, 2014, http://www.theguardian.com/world/2014/jun/02/india-police-gang-rape-protest-lucknow-uttar-pradesh

86. "Kenyan Police Disperse Protest over Security Concerns," Reuters, last modified June 19, 2014, http://www.reuters.com/article/2014/06/19/us-kenya-attacks-idUSKBN0EU0UQ20140619

87. Kole Casule, "Macedonian Police Clash with Ethnic Albanians over Murder Trial," Reuters, last modified July 4, 2014, http://www.reuters.com/article/2014/07/04/us-macedonia-trial-clashes-idUSKBN0F91CQ20140704

88. "Turkish Police Tear Gas Protesters on Taksim Anniversary," BBC, last modified May 31, 2014, http://www.bbc.com/news/world-europe-27649472

89. "Venezuelan Police Break Up Four Protest Camps," *The Guardian*, May 8, 2014, http://www.theguardian.com/world/2014/may/08/venezuela-protest-camps-arrests

90. Abby Phillip, "Police in Ferguson Arrest and Threaten More Journalists," *Washington Post*, August 18, 2014, https://www.washingtonpost.com/news/post-nation/wp/2014/08/18/police-in-ferguson-arrest-and-threaten-more-journalists/?utm_term=.c3da43a94ac6

91. "The President Speaks on Iraq and Ferguson," The White House, August 18, 2014, https://obamawhitehouse.archives.gov/photos-and-video/video/2014/08/18/president-speaks-iraq-and-ferguson; for transcript, see "Full transcript: Obama's Remarks on Ferguson, Mo. and Iraq," *Washington Post*, August 18, 2014, https://www.washingtonpost.com/politics/running-transcript-obamas-remarks-on-ferguson-mo-and-iraq/2014/08/18/ed29d07a-2713-11e4-86ca-6f05cbd15c1a_story.html

movement, which was established in 2012 after the death of Trayvon Martin in Sanford, Florida. Black Lives Matter protests continued to be held throughout the nation following the deaths of Walter Scott in North Charleston, South Carolina (April 4, 2015); Freddie Gray in Baltimore, Maryland (April 19, 2015); Alton Sterling in Baton Rouge, Louisiana (July 5, 2016); Philando Castile in Falcon Heights, Minnesota (July 6, 2016); Terence Crutcher in Tulsa, Oklahoma (September 16, 2016); Jordan Edwards in Balch Springs, Texas (April 29, 2017); Stephon Clark in Sacramento, California (March 18, 2018); and numerous others.

In the wake of events in Ferguson, President Obama established the Task Force on 21st Century Policing on December 18, 2014. The goal of the task force was to identify "the best means to provide an effective partnership between law enforcement and local communities that reduces crime and increases trust."[92] The creation of the task force was an historic moment in American policing because it had been almost 50 years since a U.S. President had appointed a blue ribbon panel to review American policing practices. The task force worked quickly, soliciting testimony from a wide variety of experts and convening a series of listening sessions around the country. In May 2015, the task force released its report to the president.[93] The report described the policing philosophy of the task force as follows: "to build trust between citizens and their peace officers so that all components of a community are treating one another fairly and justly and are invested in maintaining public safety in an atmosphere of mutual respect."[94] Though the task force had a broad mandate to review American policing practices, a part of its focus was on the policing of protests.

The task force's report noted that protests and mass demonstrations "are occasions where evidence-based practices successfully applied can make the difference between a peaceful demonstration and a riot."[95] Recommendation 2.7 focused specifically on protests:

> Law enforcement agencies should create policies and procedures for policing mass demonstrations that employ a continuum of managed tactical resources that are designed to minimize the appearance of a military operation and avoid using provocative tactics and equipment that undermine civilian trust.[96]

This recommendation was accompanied by two action items. The first called for law enforcement agencies to develop policies and procedures "for implementing a layered response to mass demonstrations that prioritize de-escalation and a guardian mindset. These policies could include plans to minimize confrontation by using "soft look" uniforms, having officers remove riot gear as soon as practical, and maintaining open postures."[97] This action item is consistent with a more general movement in policing (not associated with protest policing specifically) to reconceptualize the primary role of the police as guardians rather than warriors. The task force quoted the written testimony of Edward Maguire (lead author of this guide) in noting that "when officers line up in a military formation while wearing full protective gear, their visual appearance may have a dramatic influence on how the crowd perceives them and how the event ends."[98] In the second action item, the task force recommended that the federal government create an enforcement mechanism "for investigating complaints and issuing sanctions regarding the inappropriate use of equipment and tactics during mass

92. Exec. Order No. 13,684, 79 Fed. Reg. 246 (Dec. 23, 2014), https://www.govinfo.gov/content/pkg/FR-2014-12-23/html/2014-30195.htm
93. President's Task Force on 21st Century Policing, *Final Report* (see note 29).
94. Ibid., 5.
95. Ibid., 20.
96. Ibid., 25.
97. Ibid.
98. Ibid.

demonstrations.''[99] These recommendations are consistent with those made by a generation of presidential commissions almost 50 years earlier.

> **This action item is consistent with a more general movement in policing …to reconceptualize the primary role of the police as guardians rather than warriors.**

Since the President's Task Force released its recommendations in May 2015, the nation has continued to experience major protests associated with a variety of social, political, and economic issues. The police response to many of these events did not trigger significant controversy. However, some of these events raised important issues associated with police handling of protests and therefore provide useful opportunities for learning and reflection.

On January 20, 2017, a presidential inauguration was held in Washington, D.C., to swear in Donald J. Trump as the 45th president of the United States. The event attracted thousands of protesters, most of whom behaved peacefully. However, some protesters engaged in serious property damage and violence, breaking windows, setting fire to a limousine, and throwing objects at police officers. Police arrested 234 people, most of whom were charged with felonies. Critics noted that the "kettling" tactics used by police to confine and control the crowd failed to differentiate between people who were engaged in rioting and those who had not engaged in illegal conduct, thus raising important civil rights concerns. Journalists, legal observers, medics, and peaceful protesters were all swept up in the mass arrests merely because they were located in the area where the property damage and violence took place. Ultimately, 21 defendants pleaded guilty; the remaining defendants were either acquitted at trial or had their charges dropped by federal prosecutors. [100]

On August 11th and 12th, 2017, a "Unite the Right" rally organized by white nationalists was held in Charlottesville, Virginia, in response to the city's plans to remove a Confederate monument. Marchers carried torches and chanted "white lives matter" as well as Nazi slogans like "blood and soil." Protesters clashed with counter-protesters. A car driven by a suspected white supremacist rammed into a crowd of counter-protesters, injuring 19 people and killing 32-year old Heather Hayer (two state troopers en route to the event were also killed when their helicopter crashed). An after-action report noted that police planning for the event was "inadequate and disconnected" and that the Charlottesville Police Department had "devised a flawed operational plan" for the rally. The report concluded that "the City of Charlottesville protected neither free expression nor public safety" in its response to the rally.[101]

On August 22, 2017, just ten days after the Charlottesville rally, President Trump held a controversial campaign-style rally in Phoenix, Arizona. Tension at the event was fueled by the possibility that President

---

99. Ibid.

100. Jonah Engel Bromwich, "Felony Charges for Journalists Arrested at Inauguration Protests Raise Fears for Press Freedom," *New York Times* (January 25, 2017); Alexandra-Yoon Hendricks, "Prosecutors Dropping Remaining Charges against Trump Inauguration Protesters," *New York Times* (July 6, 2018); Timothy Zick, "Protests in Peril," *U.S. News & World Report Weekly*, (November 20, 2017), http://scholarship.law.wm.edu/facpubs/1869.

101. Hunton & Williams, LLP, *Independent Review of the 2017 Protest Events in Charlottesville, Virginia. Final Report*, 2017.

Trump would issue a pardon to former Maricopa County Sheriff Joe Arpaio, who had been convicted of contempt of court for disobeying a judge's order to stop engaging in racial profiling. Thousands of people gathered outside of the event, engaging in spirited but peaceful protest for several hours. The mood began to shift shortly after nightfall as certain protesters began to don masks. While the vast majority of the crowd remained peaceful, some protesters began to throw items at police near the building where Trump was speaking. Researchers present at the event noted that "police quickly changed into riot gear and formed a skirmish line." Suddenly, without warning, police fired chemical agents and "less lethal" munitions at the crowd. The projectiles injured numerous people and hundreds (if not thousands) were exposed to chemical agents. The researchers noted that "the vast majority of these people had not broken any law and had not been warned to disperse."[102]

From September 15th through November 24th, 2017, numerous protests took place In St. Louis, Missouri, following the acquittal of a white police officer accused of murdering an African-American man named Anthony Lamar Smith. Consistent with protests in several other U.S. cities, the events remained peaceful during the daytime but turned more violent and destructive during the evening. While most protesters behaved lawfully, some chose to engage in violence and property damage. Several police officers were injured as a result of conflict between police and protesters. Police made more than 300 arrests during the protests. Critics alleged a variety of civil rights violations, including wrongful arrests and excessive force. The police use of kettling tactics resulted in the arrest of numerous people who had not broken any laws, including journalists, bystanders, peaceful protesters, and an undercover police officer. After police had made numerous arrests one evening, reporters recorded police officers marching in the streets chanting "Whose streets? Our streets."[103] On November 15, 2017, a federal judge issued a preliminary injunction against the City of St. Louis to prevent police from continuing to violate the civil rights of people who were not engaging in illegal conduct.[104]

# Conclusion

Much has improved in American policing since the landmark reforms that were implemented in the aftermath of the civil rights movement. With regard to protest policing specifically, some agencies have made significant progress in developing thoughtful practices that are both fair and effective, while there is still important work to be done in others. As illustrated by the police response to certain protests during the Occupy movement and beyond, much remains to be learned. In chapter 3, we will explore some basic principles and insights from law and the social sciences that can serve as a foundation for thinking strategically about responding to protests and other public order events.

---

102. Edward R. Maguire, Natasha Khade, and Victor Mora (in press). "Improve the Policing of Crowds." In *Transforming the Police: Thirteen Key Reforms*, edited by Charles Katz and Edward R. Maguire. (Long Grove, IL: Waveland Press).

103. John Eligon, "In St. Louis, Protests Over Police Violence Disrupt Economy, and Win Attention," *New York Times* (October 20, 2017); Tim O'Neil and Monica Davey, "St. Louis Protests: Police Say They 'Owned' the Night After 80 Arrests," *New York Times* (September 17, 2017).

104. *Ahmad v. City of St. Louis, Missouri,* Case No. 4:17 CV 2455 CDP, (2017), https://assets.documentcloud.org/documents/4224868/Protest-injunction-full-order.pdf

# 3. Basic Concepts and Principles

This chapter outlines some basic concepts and principles from law, psychology, and criminology that provide a useful foundation for thinking about protest policing strategies. We cover three primary topics. In the first section, we provide a brief overview of some of the major constitutional issues that are associated with protest policing, particularly the First Amendment to the U.S. Constitution. In the second section, we examine some insights about compliance and defiance from psychology and criminology. Fair and effective protest policing practices encourage people to comply voluntarily with the law and legal authorities. Unfair and ineffective protest policing strategies run the risk of instigating defiance or rebellion, thus potentially worsening matters. This section provides brief coverage of key concepts like deterrence, procedural justice, and legitimacy. In the third section, we examine crowd psychology and its implications for protest policing. Developing fair and effective protest policing practices requires a solid understanding of how crowds function. Unfortunately, some of the strategies and tactics used commonly in protest policing are based on fundamental misconceptions about crowd psychology. As a result, these approaches often make things worse, not better. We close by discussing the collective implications of these three general topics for developing fairer and more effective protest policing strategies.

## Constitutional issues

Protest policing in the United States entails a number of complex constitutional issues. A comprehensive analysis of these issues is beyond the scope of this guide. However, we think it is important to provide a brief overview of basic concepts and principles to acquaint readers with the most common constitutional issues that arise in protest policing today. We begin by discussing the First Amendment to the U.S. Constitution, which serves as the nation's primary legal foundation for the rights of protesters. Among its several clauses, the most obviously relevant ones are freedom of speech and the right of people to assemble peacefully.[105] The history of protest policing in the United States is filled with examples of police violating these constitutional rights by arresting, using force against, or otherwise restricting the activities of peaceful protesters. Police behavior in many communities has criminalized protests and denied members of the public their First Amendment rights.

At the same time, even in communities where police are mindful of these constitutional rights, some protesters engage in destructive or violent behaviors that the framers would be unlikely to view as "peaceable." Just as the First Amendment's right to free speech does not extend to all speech (the classic example is yelling "fire" in a

---

105. Recent legal scholarship has argued for a greater emphasis on the petition clause as a legal basis for supporting or expanding protesters' rights. Ronald J. Krotoszynski Jr., *Reclaiming the Petition Clause: Seditious Libel, "Offensive" Protest, and the Right to Petition the Government for Redress of Grievances* (New Haven, CT: Yale University Press, 2012); Christina E. Wells, "Protest, Policing, and the Petition Clause," *Alabama Law Review* 66, no. 5 (2015), 1159–1168, http://scholarship.law.missouri.edu/cgi/viewcontent.cgi?article=1577&context=facpubs.

crowded theater when there is no fire), the right of people to assemble covers only peaceful assembly. Unfortunately for protesters and police, the definition of peaceful protest is in the eye of the beholder. Our interviews with protesters and police suggest that the two groups often have very different viewpoints on what constitutes peaceful protest behavior. We spoke with some protesters, for instance, who made impassioned arguments in support of property damage as a legitimate protest tactic. Obviously police have a very different perspective on that issue. At the same time, many protesters have been arrested or had force used against them by police for engaging in behavior that while peaceful by most definitions was viewed as disorderly by police. In between peaceful protest and violent or destructive protest lies a wide range of behaviors. Police have considerable discretion about when and how to regulate these behaviors, including choices about whether to make arrests or use force. Where police choose to draw lines regarding which actions on the part of protesters will lead to arrests or use of force is often the flashpoint influencing how the protest ends and how the police come to be perceived by protesters and the public. The second and third sections of this chapter will discuss some research findings that might be helpful for making more thoughtful decisions about these issues.

As noted earlier, First Amendment rights are not limitless. The U.S. Supreme Court has ruled that in traditional public forums like parks and sidewalks, the government is permitted to place reasonable "time, place, and manner" (TPM) restrictions on the exercise of these rights. However, these restrictions must meet four standards. First, they must be content-neutral in the sense that the restriction is unrelated to the content of the speech or the message. For example, in *Snyder* v. *Phelps,* the court ruled that admittedly hurtful speech by members of the Westboro Baptist Church near the funeral of a U.S. service member killed in action was protected by the First Amendment. Chief Justice John Roberts, writing for the majority, focused on the issue of content neutrality:

> The record confirms that any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself. A group of parishioners standing at the very spot where Westboro stood, holding signs that said 'God Bless America' and 'God Loves You,' would not have been subjected to liability. It was what Westboro said that exposed it to tort damages.[106]

Although *Snyder* was a tort case, it is a useful reminder that the First Amendment protects speech even when it is upsetting or offensive or arouses contempt. Thus, with the exception of unprotected speech like obscenity, child pornography, or "fighting words," police must ensure that their decisions to restrict speech or other forms of expression do not hinge on the speech or expression's content.[107]

Second, restrictions must be narrowly tailored, that is, they must not be overly broad. For instance, in *McCullen* v. *Coakley* (2014), the U.S. Supreme Court ruled that a Massachusetts law requiring protesters to remain behind a 35-foot no-protest zone around abortion clinics was unconstitutional because "the buffer zones burden substantially more speech than necessary to achieve the Commonwealth's asserted interests."[108] Police must ensure that their decisions to restrict speech or other forms of expression are not unnecessarily broad.

---

106. *Snyder* v. *Phelps,* 562 U.S. 443 (2011).
107. Kathleen Ann Ruane, *Freedom of Speech and Press: Exceptions to the First Amendment* (Washington, D.C.: Congressional Research Service, 2014), à://www.fas.org/sgp/crs/misc/95-815.pdf
108. *McCullen v. Coakley,* 573 U.S. ___ (2014), https://www.supremecourt.gov/opinions/13pdf/12-1168_6k47.pdf

Third, restrictions must serve a specific and significant government interest. A 2015 protest outside Boston provides a good example of what constitutes a significant government interest. On January 15, protesters associated with the Black Lives Matter movement chained themselves to concrete-filled barrels on Route 93 during the busy morning commute to call attention to "White complacency in the systemic oppression of Black people in Boston."[109] Traffic slowed to a halt, and the state police closed down the busy highway. Thousands of people were significantly delayed in reaching their destinations, with purposes ranging from the mundane to the absolutely essential. For instance, an ambulance carrying an 82-year old crash victim with a broken neck to a level 1 trauma center in Boston had to divert to a hospital without a trauma center as a result of the traffic problems caused by the protesters' human blockade.[110] The protesters did not just inconvenience people; they also endangered people's lives. As representatives of the government, police have a significant interest in restricting forms of expression that endanger public safety.

Finally, restrictions must allow for alternative means of conveying the message to the intended audience. For example, in November 2003, Amnesty International obtained a permit from the City of Miami to conduct a demonstration. When demonstrators gathered at the spot specified in the permit, police established a cordon approximately 50 to 75 yards from them and did not allow others to enter the area. An important fact is that people who were located outside the cordon were unable to see or hear the demonstrators as a result of the cordon. Police also refused to allow demonstrators to pass out literature to people outside the cordoned-off area. The court ruled that the police cordon was knowingly designed to "utterly eviscerate fundamental expressive freedoms" and that it did not leave open ample alternative channels of communication:

> [T]he police did not set about to enforce a reasonable rule designed to ensure the public's safety. Rather, the Defendants are said to have effectively and completely closed off Amnesty's opportunity to speak, assemble, and leaflet in a public park. The police allegedly provided Amnesty with no alternative channel of communication by effectively foreclosing the only venue allowed under the permit.[111]

In numerous other cases, courts have upheld the rights of governments to place reasonable restrictions on the locations where protests can take place as long as demonstrators are still able to get their message across.

The case law on TPM restrictions is both complex and dynamic. A comprehensive review of these legal issues is therefore well beyond the scope of this guide. Our aim is simply to provide an overview of basic concepts and principles. Understanding these concepts and principles will help police officials make better choices about how to approach the job of protest policing.

In lawsuits arising from police handling of protests, the most common First Amendment violations alleged by plaintiffs involve freedom of speech and freedom of assembly. But these are not the only First Amendment issues they allege. It is not uncommon for journalists to be arrested during protests, especially during mass arrests. During the Occupy movement, journalists in several cities were arrested and had force used against them while covering protest events. Several journalists were arrested while covering protests over the shooting death of Michael Brown by police in and around Ferguson, Missouri, prompting President Obama to remind

---

109. "Boston Area Highway Blocked by Protesters," *Boston Herald,* January 15, 2015, https://www.apnews.com/7c0636818f494bbfac4b96bea502c9b9
110. John R. Ellement and Evan Allen, "Angry Words after Ambulance is Diverted from Trauma Center," *Boston Globe,* January 15, 2015, https://www.bostonglobe.com/2015/01/15/easton-ambulance-with-injured-driver-diverted-brockton-hospital-due-protestors-fire-chief-says/Uk1ffBGmC5OobFNPXNI6IJ/story.html
111. *Amnesty International USA v. Battle,* 559 F.3d 1170 (11th Cir. 2009).

the nation that "here in the United States of America, police should not be arresting or bullying journalists who are just trying to do their jobs."[112] Despite this sober reminder, journalists have continued to be arrested while covering protest events. Nine journalists were arrested in Washington, D.C., while covering the protests surrounding President Donald Trump's inauguration (January 2017).[113] At least ten journalists were arrested in St. Louis while covering the protests following the acquittal of a former police officer for a controversial 2011 shooting.[114]

In addition to First Amendment issues, civil rights lawsuits arising from police handling of protests often also involve Fourth and Fourteenth Amendment challenges. Fourth Amendment challenges tend to focus on allegations of false arrest or excessive use of force. The Fourth Amendment is best known for its restrictions on search and seizure, and an arrest is considered the seizure of a person. Therefore, false arrest and the use of excessive force while making an arrest fall under the Fourth Amendment's protections against unreasonable seizures.[115]

Fourteenth Amendment challenges involve alleged violations of the due process and equal protection clauses. The due process clause prohibits states from depriving "any person of life, liberty, or property, without due process of law," while the equal protection clause prohibits states from denying people "the equal protection of the laws."[116] Civil rights lawsuits arising from the policing of protests typically allege violations of the First, Fourth, and/or Fourteenth Amendments. For instance, on September 9, 2015, the City of Los Angeles settled a $2.45 million class-action lawsuit with Occupy protesters who alleged that police violated their constitutional rights under these three amendments while evicting them from their encampment.[117] Similarly, other settlements in the early 2010s involving Occupy protesters at the University of California at Davis[118] as well as protesters in and around Ferguson[119] were also based on allegations that police violated protesters' rights under these three amendments. For this reason, police leaders would be wise to ensure that protest policing strategies and tactics are based on a solid and up-to-date understanding of the rights afforded to people under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

## Understanding compliance and defiance

A key challenge in policing protests and other public order events fairly and effectively is securing voluntary compliance both with the law and with directives issued by police officers while minimizing (rather than amplifying) people's sense of defiance and rebellion. Why do people choose to obey the law or follow the

---

112. "Statement by the President: Edgartown, Massachusetts," (Washington, D.C.: The White House, August 14, 2014), https://www.whitehouse.gov/the-press-office/2014/08/14/statement-president

113. Jaclyn Peiser, "Journalist Charged with Rioting at Inauguration Day Protest Goes Free," *New York Times,* (December 21, 2017).

114. Jim Salter, "Media Groups Condemn St. Louis Protest Arrests of Reporters," *U.S. News and World Report,* (October 26, 2017).

115. Mitchell W. Karsch, "Excessive Force and the Fourth Amendment: When Does Seizure End?" *Fordham Law Review* 58, no. 4 (1990), 823–841, http://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=2876&context=flr

116. U.S. Const., amend. XIV, § 1.

117. Veronica Rocha, "City Council Approves $2.45-million Deal with Occupy L.A. Protesters," *Los Angeles Times,* (April 1, 2015), http://www.latimes.com/local/lanow/la-me-ln-city-council-settlement-occupy-20150401-story.html

118. *Baker et al.* v. *Katehi et al.,* 2 :12-CV-00450, stipulation for settlement (E.D. Calif. filed September 26, 2012).

119. *Templeton et al.* v. *Dotson et al.,* 4:14-CV-2019, motion to dismiss pursuant to settlement as to all defendants at 1 (8th Cir. Mar. 25, 2015).

directives of legal authorities like the police? There is a long history of research on these issues, and the findings from this research are instructive for thinking about how to police protests fairly and effectively.

One of the most common explanations for why people obey the law and legal authorities is that the costs of not doing so usually outweigh the benefits. This is the basic premise behind deterrence theory, which posits that the certainty, severity, and swiftness of punishment influence people's decisions to obey the law or legal authorities.[120] A useful metaphor for thinking about deterrence theory is the prospect of touching the red-hot burner of a stove. In this case, the "punishment" (burned fingers) would be certain (a 100 percent chance of getting burned), severe (the burn would be painful), and swift (the burn would happen immediately). Because of this optimal mix of certainty, severity, and swiftness, people tend not to touch the red-hot burner of a stove on purpose. Deterrence theory is one of the classic criminological explanations for why people choose to comply with the law and legal authorities.

An alternative explanation for compliance comes from social psychology and focuses instead on the extent to which people view the law and legal authorities as fair and legitimate. This is a large and complex body of scholarship, but two of its most central concepts are procedural justice and legitimacy. Readers will find these two terms featured prominently in the 2015 report issued by the President's Task Force on 21st Century Policing. Although these terms are now used regularly in discussions about police reform, our interaction with law enforcement officials suggests that there may still be some confusion about their meaning. Because both concepts play such an important role in protest policing, it is important here to clarify them.

Procedural justice is concerned with how people perceive the fairness of the procedures used by an authority figure. It is typically viewed as having two components: quality of treatment and quality of decision making. In the context of policing, quality of treatment is concerned with the nature of the interpersonal interaction between a police officer and a citizen. For instance, did the police officer treat the citizen in a fair, polite, and respectful manner? Quality of decision making is concerned with the fairness of the procedures used by an officer in making decisions that impact a citizen. Police-citizen encounters involve a sequence of discretionary decisions such as whether to stop someone, whether to conduct a search, whether to issue a citation or make an arrest, or whether to use force. Citizens evaluate the fairness and neutrality of the procedures officers use to make these decisions. For instance, if citizens believe they were stopped or searched as a result of their race or because the officer was trying to meet a quota, they are likely to view the stop or search as procedurally unjust. During their interactions with police officers, citizens regularly make judgments about the quality of treatment and quality of decision making exhibited by the officer. As we will demonstrate, these judgments can have powerful consequences.

A crucial distinction is that people's judgments about the fairness of the outcomes they receive (such as a stop, search, citation, or arrest) are separate from their judgments about the procedures used to reach those outcomes. The former type of judgment is associated with distributive justice, while the latter is associated with procedural justice. For instance, people may be upset that they received a citation (a distributive justice judgment) while simultaneously judging the behavior of the officer who issued the citation as fair and respectful (a procedural justice judgment). This distinction turns out to be very important for police because it

---

120. Raymond Paternoster, "How Much Do We Really Know about Criminal Deterrence?" *Journal of Criminal Law and Criminology* 100, no. 3 (May 2010), 765–824, doi: 10.2307/25766109.

suggests that even when officers must make unpopular decisions like issuing a citation, making an arrest, or using force, it is still possible to leave people with the perception that the officer behaved in a procedurally just manner. Certainly not everyone with whom a police officer interacts will be capable of making these subtle distinctions, but research has shown that many people are able to form separate judgments about outcomes and processes. Thus, it should not be assumed that people who receive an adverse outcome from the police will view the involved officers in a negative light.

> **Even when officers must make unpopular decisions like issuing a citation, making an arrest, or using force, it is still possible to leave people with the perception that the officer behaved in a procedurally just manner.**

Procedural justice focuses largely on encounter-level judgments about the interaction between an authority figure and someone who is subject to that authority (such as a police officer and a citizen). Legitimacy, on the other hand, focuses on broader judgments about institutions such as the government, the law, or the police. The precise meaning of legitimacy is a matter of debate, but it is generally concerned with whether the authority exerted by an institution is rightful, proper, or appropriate.[121] For instance, if a democratically elected government is overthrown by a dictator, people are likely to view the democratic government as more legitimate than the dictatorship. For our purposes, the key question is to what extent people view the law and legal institutions like the police as legitimate. For instance, in some developing nations where police are corrupt, brutal, and inept, citizens are unlikely to view them as legitimate sources of authority. In the United States, recent use-of-force events have led to a substantial legitimacy crisis in policing, particularly in minority communities.

The importance of procedural justice and legitimacy hinges on the linkages between them. In *Why People Obey the Law*, social psychologist Tom Tyler provides evidence that people's perceptions of procedural justice influence their judgments about the legitimacy of law and legal authorities.[122] Put differently, when people view authority figures like the police as behaving in a procedurally just manner, they are more likely to view the police and the criminal law more generally as legitimate sources of authority. They are thus more likely to comply with the law and the directives of legal authorities like police officers. This chain of relationships is referred to as the process-based model of regulation, and it has vital implications for many aspects of policing, including the policing of protests. It suggests that by behaving in a fair and respectful manner during their interactions with citizens, police officers can enhance the extent to which the public views the police and the law as legitimate institutions. Perceived legitimacy, in turn, influences people's decisions to obey the law and legal authorities. A crucial lesson is that the inverse of this argument is also true. When police officers treat citizens in a manner that is perceived as procedurally unjust, the police and the law are viewed as less

121. Devon Johnson, Edward R. Maguire, and Joseph B. Kuhns, "Public Perceptions of the Legitimacy of the Law and Legal Authorities: Evidence from the Caribbean," *Law and Society Review* 48, no. 4 (December 2014), 947–978, doi: 10.1111/lasr.12102; Justice Tankebe, "Viewing Things Differently: Examining the Dimensions of Public Perceptions of Police Legitimacy," *Criminology* 51, no. 1 (February 2013), 103–135, doi: 10.1111/j.1745-9125.2012.00291.x.
122. Tyler, *Why People Obey the Law* (see note 1).

legitimate, and people are consequently less likely to comply with the law or legal authorities.

Legitimacy is also thought to engender other socially meaningful benefits such as cooperation with legal authorities and support for legal institutions like the police. In a nutshell, when people view the police as behaving fairly, they are more likely to comply with, cooperate with, and support the police. Figure 1 summarizes this set of relationships.

**Figure 1. The effects of procedural justice and legitimacy**



The process-based model of regulation serves as an alternative to deterrence theory, which suggests that people comply with the law to avoid punishment. The reality is that both perspectives are valid. Since the early 1990s, numerous jurisdictions have been able to drive down violent crime rates through the use of "focused deterrence" strategies.[123] At the same time, research evidence in support of the process-based model of regulation highlights the importance of procedural justice and legitimacy in shaping people's willingness to obey the law. A growing body of research has sought to determine which has a greater effect in generating compliance: fear of punishment or perceptions of legitimacy. In many studies, the effects of legitimacy have been found to be stronger.[124] The process-based model is appealing because it suggests that authority figures should treat people fairly not only because it is the right thing to do but also because it works.

We often tend to think of the opposite of compliance as being noncompliance. According to this perspective, people fall somewhere on a continuum between complying with requests on one end and not complying with them on the other. For instance, suppose a parent asks a toddler to put away a toy. The toddler can put the toy away as requested, choose not to put the toy away, or fall somewhere in the middle of the compliance continuum by starting to put the toy away and not finishing. However, the compliance-noncompliance continuum ignores another possibility. If the child becomes angry or emotional, he or she can have a temper

---

123. Anthony A. Braga and David L. Weisburd, "The Effects of 'Pulling Levers' Focused Deterrence Strategies on Crime," *Campbell Systematic Reviews* 8, no. 6 (2012), doi: 10.4073/csr.2012.6.
124. Tom R. Tyler, Stephen J. Schulhofer, and Aziz Huq, "Legitimacy and Deterrence Effects in Counter-Terrorism Policing: A Study of Muslim Americans," *Law and Society Review* 44, no. 2 (June 2010), 365–402, doi: 10.1111/j.1540-5893.2010.00405.x; Tyler, *Why People Obey the Law* (see note 1).

tantrum or escalate to a higher level of misbehavior. Thus, in their efforts to secure compliance, parents must be careful not to trigger outright defiance that makes things worse. Similarly, police efforts to control protest events and secure the compliance of protesters can actually trigger a defiant or rebellious response in which protesters engage in even greater law breaking than if the police had not intervened at all. This perspective emerges from a more general body of research which demonstrates that when people perceive the law or legal authorities as illegitimate, abusive, or unfair, they are more likely to rebel or become defiant. Thus, it is in the best interest of authority figures to behave in ways that preserve or enhance perceptions of legitimacy.

Recent studies of protesters in two cities reinforce these ideas.[125] The studies examined the nature and correlates of attitudes among Occupy protesters in Washington, D.C., and New York City toward the use of violence against police. In both cities, surveys revealed that some participants appear to embrace the use of violence against police. In Washington, D.C., for example, the survey evidence showed that "31.5 percent of respondents find it reasonable to use minor forms of violence against police (pushing or shoving them), 16.9 percent find it reasonable to use moderate forms of violence (hitting or kicking them), and 10.9 percent find it reasonable to use severe forms of violence (throwing harmful objects or using a weapon against them)."[126] The studies sought to determine why some protesters are more willing than others to use violence against police to accomplish their objectives. The findings revealed that the most important factors in explaining people's willingness to use violence against police were their perception of the extent to which the police behave in a procedurally just manner and to which police used force against protesters unjustly. Though the specific findings differed somewhat across both cities, the overall results showed that the effects of perceived justice and injustice were stronger than the effects of all other explanatory variables including race. When protesters believe the police behave in a procedurally unjust manner, they are significantly more likely to support the use of violence against the police. Thus, in addition to the fact that procedurally just strategies and tactics are likely to be more successful in encouraging law-abiding behavior, these approaches may also improve officer safety.

## Crowd psychology

Public order policing strategies and tactics are often based, whether implicitly or explicitly, on *theories of crowd behavior*. Police officials who deal with crowds on a regular basis often have firmly held theories about how crowds function. These theories shape their decisions about the most appropriate strategies and tactics for dealing with crowds. One thing that has become very apparent to us in talking with police officials, from both the study agencies and other departments, is that these theories—and the strategies and tactics that flow from them—vary widely. Some of these theories are consistent with current perspectives from crowd psychology while others are more consistent with older perspectives in crowd psychology that have since been discredited. Basing strategies and tactics on inaccurate theories or assumptions about how crowds function is a recipe for

125. Edward R. Maguire, Maya Barak, Karie Cross, and Kris Lugo, "Attitudes among Occupy DC participants about the use of violence against police," *Policing and Society* 28, no. 5 (2018), 526-540, https://doi.org/10.1080/10439463.2016.1202247; Edward R. Maguire, Maya Barak, William Wells, and Charles Katz, "Attitudes towards the Use of Violence against Police among Occupy Wall Street Protesters," *Policing: A Journal of Police and Practice*, (2018), https://doi.org/10.1093/police/pay003; David H. Tyler, Maya Barak, Edward R. Maguire, and William Wells, "The Effects of Procedural Injustice on the use of Violence against Police by Occupy Wall Street Protesters," *Police Practice and Research* 19, no. 2 (2018), 138-152, https://doi.org/10.1080/15614263.2018.1418153

126. Maguire, Barak, Cross, and Lugo, "Attitudes among Occupy DC participants" (see note 125).

conflict and can endanger both crowds and the police. As a result, we think it is important to provide a brief review of crowd psychology and its lessons for policing protests and other public order events.

## The classic perspective: The social contagion model

The classic perspective on crowd psychology is well summarized by French scholar Gustave Le Bon, whose 1895 book, *The Crowd: A Study of the Popular Mind,*[127] has been called "one of the most influential books" ever written in social psychology.[128] Le Bon's thesis is that crowds take on a life of their own, quite different from the individuals that constitute them. According to Le Bon, under certain conditions, "an agglomeration of men presents new characteristics very different from those of the individuals composing it."[129] Moreover, individuals within a crowd begin to lose their own individual identities and the capacity for individual decision making as people become mesmerized by the magnetic and irresistible influence of the crowd.

> The sentiments and ideas of all the persons in the gathering take one and the same direction, and their conscious personality vanishes. A collective mind is formed, doubtless transitory, but presenting very clearly defined characteristics. The gathering has thus become . . . an organised crowd, or, if the term is considered preferable, a psychological crowd. It forms a single being, and is subjected to the law of the mental unity of crowds.[130]

Moreover, Le Bon further notes that the individual characteristics or backgrounds of the people making up the crowd do not really matter. They are all still subject to the contagious ideas of the larger crowd.

> The most striking peculiarity presented by a psychological crowd is the following: Whoever be the individuals that compose it, however like or unlike be their mode of life, their occupations, their character, or their intelligence, the fact that they have been transformed into a crowd puts them in possession of a sort of collective mind which makes them feel, think, and act in a manner quite different from that in which each individual of them would feel, think, and act were he in a state of isolation. There are certain ideas and feelings which do not come into being, or do not transform themselves into acts except in the case of individuals forming a crowd. The psychological crowd is a provisional being formed of heterogeneous elements, which for a moment are combined, exactly as the cells which constitute a living body form by their reunion a new being which displays characteristics very different from those possessed by each of the cells singly.[131]

According to LeBon, when it comes to crowds, the whole is different than the mere sum of the parts. From this perspective, even though crowds are composed of people with different backgrounds, thoughts, and perspectives, crowds transform quickly into homogeneous entities. This process occurs through a process LeBon calls social contagion. A *contagion* refers to the transmission or spread of some phenomenon from person to person. The term is used most often to refer to the spread of disease. A *social contagion* refers to the transmission or spread of ideas, thoughts, or feelings. According to LeBon, people lose their individual identity in crowds due to social contagion effects:

---

127. Although the book was published in French in 1895, the first English translation was not available until 1896. This publication cites a 2002 reprint: Gustave Le Bon, *The Crowd: A Study of the Popular Mind* ([London: T. Fisher Unwin, 1896] Mineola, NY: Dover Publications, 2002).
128. Susan Herbst, *Rude Democracy: Civility and Incivility in American Politics* (Philadelphia: Temple University Press, 2010), 36.
129. LeBon, *The Crowd,* 1 (see note 127).
130. Ibid., 1–2.
131. Ibid., xiii.

> We see, then, that the disappearance of the conscious personality, the predominance of the unconscious personality, the turning by means of suggestion and contagion of feelings and ideas in an identical direction, the tendency to immediately transform the suggested ideas into acts; these, we see, are the principal characteristics of the individual forming part of a crowd. He is no longer himself, but has become an automaton who has ceased to be guided by his will.[132]

Based on the idea that crowds have a collective mind of their own, LeBon adopts an intensely pessimistic view of crowds, noting that they "are only powerful for destruction. Their rule is always tantamount to a barbarian phase."[133] The classical view of crowds that he espouses views them as unreasonable, unruly, and dangerous. As a result, it provides an implicit justification for repressive crowd control measures.[134] However, the classical view of crowd psychology has long been discredited as inaccurate. According to leading crowd psychology scholars, the classical view is "not only wrong, but dangerously wrong."[135]

### A different perspective: The Elaborated Social Identity Model

The classical view of crowds, together with certain other perspectives that emerged decades later, is based on the idea that individuals in a crowd lose their personal identity or sense of self and consequently lose control over their own behavior.[136] An alternative perspective comes from *social identity theory*, which is based on the idea that people's social identities are associated with the contexts in which they are embedded and the groups with which they associate. As explained by social psychologists, social identity "should be seen as the way in which people understand how they are positioned relative to others."[137] People are typically associated with more than one social group and therefore have multiple social identities, each having its own level of depth and intensity. For instance, a person can be a Catholic, a police officer, and a Red Sox fan. People tend to be more heavily influenced by those with similar social identities than those with whom they have little in common. Although crowds bring people together who share at least something in common, they also contain people with a wide range of social identities. Understanding the various social identities of people involved in protests and other public order events is crucial for developing fair and effective approaches for policing these events.

**Understanding the various social identities of people involved in protests and other public order events is crucial for developing fair and effective approaches for policing these events.**

The conventional view of social identities held that they have some level of permanence; they may not last forever, but they are also not fleeting. Eventually this conventional view of social identities gave way to the

---

132. Ibid., 8.

133. Ibid., 4.

134. Stephen Reicher, "The Psychology of Crowd Dynamics," in Michael A. Hogg and R. Scott Tindale, eds., *Blackwell Handbook of Social Psychology: Group Processes* (Oxford, UK: Blackwell, 2008), 182–208.

135. Stephen Reicher, Clifford Stott, Patrick Cronin, and Otto Adang, "An Integrated Approach to Crowd Psychology and Public Order Policing," *Policing: An International Journal of Police Strategies and Management* 27, no. 4 (2004), 558–572, 565, doi: 10.1108/13639510410566271.

136. John Drury and Steve Reicher, "Collective Psychological Empowerment as a Model of Social Change: Researching Crowds and Power," *Journal of Social Issues* 65, no. 4 (December 2009), 707–725, doi: 10.1111/j.1540-4560.2009.01622.x.

137. Ibid., 712.

Elaborated Social Identity Model (ESIM), which allows for the possibility of more fleeting shifts in social identity as a result of the contexts in which people are embedded. ESIM provides a powerful framework for understanding crowd psychology and more specifically crowd conflict. ESIM is based on the premise that people in a crowd shift from individual identities to group identities. Crowds are heterogeneous and contain multiple subgroups, each with different norms and values. For instance, anyone who visited the Occupy encampments can attest to the fact that the movement attracted a wide range of participants from different (though perhaps overlapping) social groups, including college students, disillusioned professionals, aging hippies, anarchists, the homeless, and numerous others. People belonging to these different subgroups are likely to have different social identities and different behavioral norms. They don't lose their identity in the ways outlined by LeBon, but they do take on different social identities when they become part of a crowd. A central aspect of the ESIM perspective is the notion that in crowd settings, the nature of participants' social identities can be heavily influenced by the behavior of outsiders, especially the police.

One of the methods used by social psychologists who have studied crowd psychology is to observe behavioral patterns at crowd events. Studies of different types of crowd events have discovered similar patterns:

> Events would start with a heterogeneous crowd, the majority of which identified themselves as moderates who simply wanted to express their view to the authorities, and a minority of whom were radical and saw the authorities as an antagonist. However, crowd members were perceived as homogenously dangerous by the authorities (notably the police) and treated as such—that is denied the ability to express themselves as they wished. This then led to a radicalization among moderate crowd members who then joined with the radicals in challenging the police. Not only that, but they came to change their views about the authorities and hence about their own identity in relation to the authorities.[138]

By treating entire crowds as if they are dangerous and indiscriminately denying participants the opportunity to express themselves, the police can inadvertently lead moderate members of the crowd to align with more radical members against the police. Moderates enter protests and other types of crowd events with one sense of identity and through their interactions with or observations of police may take on a different social identity. This idea—that police can inadvertently alter the social identities of people in crowds—is central to the ESIM perspective.

Psychologists have identified some of the conditions responsible for generating conflict and violence in crowds. One of the main conditions under which conflict is likely to emerge is when there are discrepancies in the way events are viewed by insiders (crowd participants) and outsiders (such as the police). This condition occurs regularly when protest participants view themselves as engaging in peaceful and constitutionally protected behavior and police view them as a threat to public order or public safety. A second condition is differences in the level of power between crowds and those who seek to regulate them. This condition is often present given the power of the police—including their ability to use force and deprive people of their liberty—relative to protesters. A third condition is the tendency for police to view crowds as homogeneous and to adopt strategies and tactics "which impose a common fate on all crowd members."[139] This condition often becomes a self-fulfilling prophecy in which people thought to be disorderly and unruly become significantly

---

138. Ibid.
139. Ibid., 713.

more defiant and rebellious in response to shared perceptions about the way the police treat them.

For example, crowd psychology researchers conducted an observational study of an environmental protest in the UK. They found that as a result of the way police handled the event, "'respectable' local protesters found themselves positioned as radicals, came to see themselves as radicals, and therefore came to see other radical environmentalists (from whom they had previously distanced themselves) as part of the same overall group."[140] Similarly, as protesters began to view the police as "defenders of powerful interests in society rather than neutral arbiters among different interests, so their perception of the legitimacy of police actions changed. Policing as a whole came to be seen as illegitimate and particular actions came to be construed as instances of this illegitimacy: protestors complained of police colluding with private contractors, failing to protect the protestors from the actions of these contractors, indiscriminate arrests of protestors, and excessive violence."[141] As a result, the protesters widened their focus to include standing up to the police in addition to the issues that brought them together in the first place.

One of the key insights of the ESIM perspective is that police actions can inadvertently cause crowd conflict and violence. When crowd participants view themselves as engaging in lawful and constitutionally protected behavior, and they view the police as engaging in indiscriminate and illegitimate enforcement actions, "then the entire crowd will unite around a sense of opposition to the police and the authorities they are protecting."[142] They may experience a greater willingness to defy, rebel against, or use violence against the police. This is one of the key areas of overlap between crowd psychology and the notions of procedural justice and legitimacy presented earlier in the chapter. Furthermore, those who viewed themselves initially as moderates may come to reconsider their views of the police. When the police treat moderate crowd members as radicals, the moderates may begin to identify with the radicals to a much greater extent than they did before. Willingness to challenge or push back against the police can spread quickly under such conditions. However, unlike the fatalistic perspective that dominates the classic view of crowds espoused by LeBon, this escalation process is not inevitable. Based on the principles of the ESIM perspective, police can develop innovative public order policing strategies that prevent and de-escalate conflict rather than inadvertently triggering or escalating it.[143]

In addition to the short-term consequences that result from avoidable conflict between police and crowd participants, certain long-term consequences are also thought to occur. First, there is some evidence that when police actions inadvertently radicalize moderates, the newly radicalized participants are more likely to participate in future activities or events that bring them into further contact and possibly conflict with police.[144] Second, social psychologists believe that these traumatic experiences may influence people's long-term views of the police, including a greater tendency to view police as illegitimate sources of authority.[145] The previous section, which focused on procedural justice and legitimacy, outlined the undesirable consequences that result from deficits in police legitimacy. Thus, preventing avoidable conflict with crowd participants can generate

140. Ibid., 721.
141. Ibid.
142. Ibid., 713.
143. Clifford Stott, Martin Scothern, and Hugo Gorringe, "Advances in Liaison Based Public Order Policing in England: Human Rights and Negotiating the Management of Protest?" *Policing: A Journal of Policy and Practice* 7, no. 2 (June 2013), 212–226, doi: 10.1093/police/pat007; Reicher et al., "An Integrated Approach" (see note 135).
144. Drury and Reicher, "Collective Psychological Empowerment" (see note 136).
145. Ibid.

more beneficial short-term and long-term effects.

Most of the research on ESIM and its applications to policing has been carried out in Europe. The ESIM perspective serves as the foundation for recent reforms in public order policing in several Western European nations. For instance, after the tragic death of Ian Tomlinson at the hands of a police officer during the 2009 G-20 summit in London, Her Majesty's Chief Inspector of the Constabulary incorporated ESIM into its recommendations for reforming the policing of protests in England and Wales. Consider the following passage from the Chief Inspector's review:

> Indiscriminate use of force by the police can create a sense of unity in the crowd through a common perception of the illegitimacy of police action and corresponding opposition in response. Perceptions of police legitimacy are critical because they affect the crowd's internal dynamics, facilitating or undermining the ability of those seeking conflict to exert social influence over others in the crowd. Consequently, there is an increase in the numbers within the crowd who perceive conflict against the police as acceptable or legitimate behaviour, thereby empowering those prepared to engage in physical confrontation with the police. In this way, the crowd is drawn into conflict even though the vast majority had no prior intention of engaging in disorder.[146]

The review urged police in England and Wales to adopt a variety of strategies and tactics that would minimize the extent to which a minority of protesters would "transfer" their grievances toward the police to the rest of the crowd.[147] A subset of the Chief Inspector's recommendations is shown in the box on page 52.

---

146. *Adapting to Protest: Nurturing the British Model of Policing* (see note 5).
147. Ibid., 7.

<table>
<tr><td colspan="2" style="text-align:center">

**Recommendations for Policing Crowds from
Her Majesty's Chief Inspectorate of the Constabulary (UK)**

</td></tr>
<tr><td colspan="2" style="text-align:center">

Her Majesty's Chief Inspector of the Constabulary recommends that public order command training should be significantly enhanced to provide explicit guidance to officers on managing crowd dynamics, which should include the following:

</td></tr>
<tr><td>

Prior to a crowd event, police should seek to inform themselves about the culture and general conduct of particular protest crowds. Planning for an operation should include gathering information on the underlying intent of the protest group.

The information regarding the general protest culture of the group should be considered in the local context and an assessment made as to how the policing operation can be designed to facilitate the legitimate intentions of the protesters.

Police strategy or tactics should not be oriented exclusively toward the control of the crowd through the threat or use of force but should ensure the effective facilitation of the legitimate intentions underpinning the protesters' action. This should be effectively communicated to protesters together with an indication of what conduct will and will not be tolerated by the police.

</td><td>

Initial contact with the protest group at the commencement of the policing operation should be characterized by "low impact" visibility, information gathering, and monitoring. Police on the ground should engage (including nonaggressive postures, smiles, nods, etc.) with crowd members to gather information about their intentions, demeanor, concerns, and sensibilities.

Any targeted intervention by police should be informed by an accurate intelligence assessment about the source of the risk or factors causing the problem and ensure that any police response accurately reflects and is proportionate to the actual level and sources of risk.

Depending on the nature of the risk, escalation in police deployment may be necessary. A graduated tactical approach should be characterized by firm but targeted communication of tolerance limits and some increased visibility of the police capability to use force. Critically, police should seek to communicate to those posing the risk that they are creating the potential for police action.

</td></tr>
</table>

Source: *Adapting to Protest: Nurturing the British Model of Policing* (London: Her Majesty's Chief Inspector of Constabulary, 2009), 90, https://www.justiceinspectorates.gov.uk/hmic/media/adapting-to-protest-nurturing-the-british-model-of-policing-20091125.pdf

Protests are only one type of crowd event in which the ESIM perspective has been applied to public order policing strategies and tactics. So-called "football hooliganism" (violence and destructive behavior around soccer matches) is a major issue in many countries. Police in several Western European nations have incorporated the ESIM principles into their strategies for policing these events. The Council of the European Union has also incorporated these principles into a handbook on preventing and controlling violence and disturbances associated with international soccer matches.[148]

---

148. Council Resolution 2010/C 165, Concerning an Updated Handbook with Recommendations for International Police Cooperation and Measures to Prevent and Control Violence and Disturbances in Connection with Football Matches with an International Dimension, in which At Least One Member State is Involved, 2010 O.J. (C 165) 1–21, http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32010G0624(01)&rid=2

For many years, English soccer fans have had a reputation for engaging in violent and destructive behavior at international tournaments held throughout Europe.[149] In spite of their reputation, English fans attending the 2004 European Football Championships (Euro2004) in Portugal engaged in very little collective violence in most locations. Yet riots involving English fans did break out in Albufeira, a small resort community in the south of Portugal. What factors explain why riots occurred in Albufeira but not in larger cities? Social psychologists studied Euro2004 to answer this question.[150]

As noted earlier, based on findings from crowd psychology research, ESIM principles were shared with police agencies throughout Europe before Euro2004. However, only one of Portugal's two main police forces—the Polícia de Segurança Pública Portuguesa (PSP)—had integrated these principles into its policing plans for Euro2004. As noted by researchers who studied these events,

> The PSP has jurisdiction over all of Portugal's major cities, and was therefore responsible for all match venues involving the England team. The Guarda Nacional Republicana (GNR) has jurisdiction over Portugal's rural areas and small towns, including Albufeira. These two police forces developed different public order policies, strategies and tactics for the tournament. Thus, in contrast to the GNR, the PSP approach was directly informed by ESIM principles, particularly in its emphasis on 'low profile', information led, graded, proportional and specifically targeted deployment. This strategy contrasted with a strategy more reliant upon 'high profile', reactive and generally targeted forms of deployment associated with the escalation of violence at previous tournaments, but favoured by the GNR.[151]

The adoption of different policing approaches by the PSP and GNR served as a useful "natural experiment" that enabled researchers to study the effects of these decisions.

Research evidence from Euro2004 and other football tournaments suggests that when police adopt a low-profile, proactive approach, they reduce the likelihood that fans will become violent in response to the perception that police are treating them in a heavy-handed manner. In addition, there is evidence that such an approach also tends to stimulate self-policing within crowds because more moderate fans seek to control those whose behavior is more extreme. In the case of the Euro2004 tournament, the PSP assigned officers in soft uniforms to work in pairs, engaging with the crowd, "interacting, communicating tolerance limits, and facilitating legitimate behaviour."[152] This enabled the officers to gather information, be proactive, and prevent issues before they had a chance to escalate. Riot police were staged nearby and were available if necessary, but they remained out of sight.[153] When police adopt a higher-profile reactive approach to football crowds, they tend to prompt or escalate violence in response to the perception among fans that police are treating them in a heavy-handed manner.

## Practical implications

Crowd psychology has practical implications for how police should handle crowd events. As noted by leading

---

149. Steve Frosdick and Peter Marsh, *Football Hooliganism* (Portland, OR: Willan, 2005).

150. Clifford Stott, Otto Adang, Andrew Livingstone, and Martina Schreiber, "Variability in the Collective Behaviour of England Fans at Euro2004: 'Hooliganism,' Public Order Policing, and Social Change," *European Journal of Social Psychology* 37, no. 1 (January/February 2007), 75–100, doi: 10.1002/ejsp.338.

151. Ibid., 78–79.

152. James Hoggett and Clifford Stott, "The Role of Crowd Theory in Determining the Use of Force in Public Order Policing," *Policing and Society* 20, no. 2 (2010), 223–236, 226, doi: 10.1080/10439461003668468.

153. Ibid.

crowd psychologists, when police embrace a classic view of crowds as inherently irrational and dangerous, they tend to use more aggressive strategies and tactics. They also miss opportunities "to develop more efficient, effective, and less confrontational approaches to the management of public order during crowd events."[154] Conflict is most likely to arise when event participants view themselves as engaging in peaceful and legally permissible behavior and police view them as a threat to public order or public safety. This gap in perspectives can be overcome through the use of more effective communication strategies. For instance, if police encourage groups holding an event (or gathering in the venues where events will be held) to appoint marshals, stewards, or peacekeepers who are responsible for serving as intermediaries between police and event participants, those individuals can help to mitigate the possibility of miscommunications resulting in unnecessary arrests or uses of force by police.[155] For instance, the Seattle police now rely on parade marshals—individuals within a crowd who work closely with the incident commander—to maintain open lines of communication and to encourage self-policing within crowds.

These individuals can exert influence within a crowd to help ensure that people behave in ways that are consistent with police expectations as long as those expectations are viewed within the crowd as reasonable and not arbitrary or unnecessarily restrictive. If marshals or stewards are viewed within the crowd as making unreasonable or overly restrictive requests, they will come to be seen by the crowd as sellouts or traitors who are on the side of the police. The idea of mobilizing third parties to assist the police in reducing crime or disorder or keeping the peace is consistent with a more general police reform movement called "third-party policing."[156] As with other reform movements like problem-oriented policing and community policing, third-party policing is based on the idea that police can be much more effective if they mobilize partners to assist them in achieving safer and more orderly communities. Mobilizing third parties like marshals or stewards at protests or other types of public order events can help improve the communication between police and crowds and reduce the likelihood of conflict and violence.

> Mobilizing third parties like marshals or stewards at protests or other types of public order events can help to improve the communication between police and crowds and reduce the likelihood of conflict and violence.

Another condition under which conflict is likely to emerge is when there are clear and obvious differences in the level of power between crowds and those who seek to manage or control them. In the eyes of crowd participants, there is a world of difference between a police officer who behaves respectfully and humanely and

---

154. Ibid., 223.

155. Jerry M. Lewis, "Peacemarshalling," *Peace & Change* 8, no. 2–3 (July 1982), 73–80, doi: 10.1111/j.1468-0130.1982.tb00650.x; Clifford Stott, Andrew Livingstone, and James Hoggett, "Policing Football Crowds in England and Wales: A Model of 'Good Practice'?" *Policing and Society* 18, no. 3 (2008), 258–281, doi: 10.1080/10439460802091641.

156. Michael E. Buerger and Lorraine Mazerolle, "Third-Party Policing: A Theoretical Analysis of an Emerging Trend," *Justice Quarterly* 15, no. 2 (1998), 301–327, doi: 10.1080/07418829800093761; Lorraine Mazerolle and Janet Ransley, *Third Party Policing* (New York: Cambridge University Press, 2006).

who looks and acts like a human being and one who asserts his or her power in a rude and aggressive manner and who looks and acts like a soldier or a robot. The two ways of asserting power and authority over crowd participants are likely to elicit very different responses. If the goal is genuinely to keep the peace and prevent conflict, dressing officers in riot gear and shutting down dialogue between protesters and the police is very likely to fail. As we will discuss more fully in chapter 4, unless there are compelling reasons to deploy officers in riot gear, officers should be wearing soft uniforms and engaging in dialogue meant to keep lines of communication open and prevent unnecessary conflict. If police are concerned about the possibility of violence, they can adopt a graded response in which officers in riot gear are staged out of sight in a nearby location where they can be deployed quickly. Staging officers in riot gear in full view of a peaceful crowd is a flawed strategy that is based on outdated principles from crowd psychology. It is a classic example of a strategy that is likely to generate unintended consequences, in this case potentially stimulating the very conflict it is intended to prevent.

A third condition under which conflict is likely to emerge is when police view crowds as homogeneous and impose sanctions on the whole crowd based on the actions of a small number of its members. A central feature of the ESIM is that crowds are heterogeneous, consisting of people with different social identities and different levels of tolerance or support for property damage, violence, and law breaking. When police behave in an overly aggressive and unreasonable manner toward a whole crowd based on the actions of a few of its members, they inadvertently set in motion a self-fulfilling prophecy in which the moderate members of the crowd begin to side with the more extreme or radical members against the police. A more strategically sound approach is for police to focus their enforcement actions on only those whose violent, destructive, or otherwise illegal conduct requires immediate attention. In a protest setting, the police should make it clear that they are continuing to facilitate the rights of peaceful and law-abiding protesters to express their viewpoints as long as they behave appropriately. Using a very targeted and differentiated response that does not criminalize or exert unreasonable control over an entire crowd will go a long way toward preventing unnecessary conflict and violence between police and crowds.

## Conclusion

This chapter has outlined a series of basic concepts and principles from law and the social sciences that have direct relevance for protest policing. The first section outlined the importance of the First Amendment to the U.S. Constitution as the foundation of protesters' rights. The police can play a central role in facilitating activities protected by the First Amendment, particularly the freedoms of speech, assembly, and the press. Civil rights lawsuits resulting from the police response to protests often involve alleged violations of the First, Fourth, and Fourteenth Amendments. Thus, police leaders would be well advised to review their protest policing strategies and tactics to ensure compliance with these constitutional provisions. The second section of the chapter summarized the science of compliance and defiance with a particular focus on procedural justice and legitimacy. In short, when police actions are viewed as procedurally unjust, people are more likely to view the police and the law as illegitimate sources of authority. Under such circumstances, people are less likely to comply with, cooperate with, or support the police. The third section of the chapter summarized concepts and principles from crowd psychology. The basic conclusion is that when police use ill-advised strategies and

tactics in response to public order events, they can very easily make things worse by causing or escalating conflict and violence. However, thoughtful approaches to public order policing can prevent violence and conflict. The concepts and principles outlined in this chapter serve as a useful foundation for rethinking protest policing approaches in the United States.

# 4. Lessons Learned

In this chapter, we outline some of the lessons learned about protest policing in the United States from the police agencies that participated in our research and other influential police departments. The chapter is divided into four sections and a conclusion. The four main sections are based on a framework developed by social psychologists who specialize in the study of crowd events and who have worked closely with police forces throughout Europe to develop novel public order policing strategies.[157] The four elements in this framework are education, facilitation, communication, and differentiation. These constitute key building blocks for the development of effective protest policing strategies. The chapter concludes with a brief summary of lessons learned about protest policing. Fair and effective protest policing results when leaders establish the right structures, policies, and practices—as well as the right tone—for their agencies and their communities.

## Education

As noted in chapter 3, crowds are typically heterogeneous, comprising subgroups with separate and distinct social identities (even if overlapping to some extent) that exert a powerful influence on the attitudes and behaviors of their members. Social psychologists emphasize the importance of police educating themselves about the social identities of the various subgroups in a crowd, including "their values and standards, aims and goals, their sense of what is right and proper, their stereotypes and expectations of other groups, their history of interaction with these groups,"[158] and anything else of symbolic significance to them, including key "dates, places, objects, [and] forms of action."[159]

**Police should get to know the influential moderates in a crowd who can be counted on as partners in reducing conflict.**

It is common for police to develop criminal intelligence on protest participants with a history of violence or other criminal behavior. However, it is also important for police to gather more general types of information, educating themselves about the nature of the event or the movement and the social identities of people who are expected to participate, including not only those who may break the law but also those who may be able to play a key role in maintaining public order and public safety. One of the protesters we interviewed reinforced this idea, noting that "police know the hotheads; they should know their allies too." Her point was that police should get to know the influential moderates in a crowd who can be counted on as partners in reducing

157. Reicher et al., "An Integrated Approach" (see note 135).
158. Ibid., 566.
159. Ibid., 566.

conflict. Understanding the composition of a crowd enables police to develop more nuanced and thoughtful policing strategies. It also helps to ensure that police are not taken by surprise. There are two key ways police can accomplish that goal: through information gathering and through peer knowledge sharing. We discuss both in the sections that follow.

## Educating via information gathering

Taking advantage of the many streams of information available to them can educate police about the protesters and their intentions. First and foremost among these information streams is direct communication with those who are organizing or leading the event. We discuss this way of gathering information and establishing trust in the section of this chapter that focuses on communication. Open-source information such as social media sites where event participants communicate their worldviews and their intentions is another valuable avenue.[160] Recent advances in "geofencing" technology enable police to monitor social media traffic in designated geographic areas, helping police analyze crowd movements and spot potential crime and public safety issues. Police can also rely on more traditional criminal intelligence methods such as the use of undercover officers, informants, and various types of surveillance as sources of information. During the Occupy movement, as some encampments began to attract residents with histories of violence (some with serious mental health or addiction issues), frightened Occupiers would provide information about these individuals and their activities to police officers with whom they had established trusting relationships. Police must exercise caution to ensure that the use of undercover officers is clearly warranted. In the absence of criminal conduct, intelligence gathering on otherwise lawful activities can raise constitutional issues and undermine community trust.

The bottom line is that police should not approach protests and other public order events blindly. Detailed knowledge about the social identities of the groups or subgroups participating in the event can help provide a clearer sense of the most appropriate policing strategies. Social psychologists remind us that "by understanding the social identities of groups in the crowd, it is possible to know what the aims of the groups are, whether and how to support them, the forms of police action that might antagonize them and make them more sympathetic to violent elements in the crowd."[161] This type of information should feature prominently in police intelligence briefings, in the selection of strategies and tactics, and in the way police address the media, whether through conventional sources or social media. This information will help police develop more balanced approaches to protest policing that are more commensurate with the potential threat. This information is especially vital when preparing for events that may attract both protesters and counter-protesters, because there is often greater potential for violence at such events.

## Educating via peer knowledge sharing

Communicating with or visiting other police agencies is another way that police can educate themselves, often in preparation for protests and other major events. This type of peer knowledge exchange enables police agencies to learn from the experiences of others. For example, after three college students died in separate incidents associated with spontaneous sports celebrations between 2004 and 2008, the Boston Police Department brought in police officials from Northern Ireland to help revise their crowd management and

---

160. Zeynep Tufeckci and Christopher Wilson, "Social Media and the Decision to Participate in Political Protest: Observations from Tahrir Square," *Journal of Communication* 62, no. 2 (April 2012), 363–379, doi: 10.1111/j.1460-2466.2012.01629.x.
161. Reicher et al., "An Integrated Approach" (see note 135).

crowd control practices.[162] When Utah's Salt Lake City Police were developing their security plan for the 2002 Winter Olympics, they visited Ottawa to learn more about the public safety challenges and security arrangements associated with the 2001 G-20 summit. They also brought in a civil disorder expert from the Los Angeles Police Department to provide advice during the Olympics. When police in Tampa, Florida, were planning for the 2012 Republican National Convention (RNC), they sent officials to visit Chicago during the North Atlantic Treaty Organization (NATO) summit in May 2012.[163] They also met with officials from Saint Paul, Minnesota, to learn more about their experience during the 2008 RNC.[164] When the Charlotte-Mecklenburg Police Department (CMPD) was planning for the 2012 Democratic National Convention (DNC), officers visited Tampa during the RNC (which was held a week earlier), and the department invited officers from Canada to provide training on crowd management and control. The CMPD also sent 100 officers to Chicago in May 2012 to help police the protests that occurred during the NATO summit.[165]

## Peer knowledge exchange enables police agencies to learn from the experiences of others.

Our research uncovered numerous examples of peer knowledge sharing by police agencies, particularly with regard to major events. The consequences of *not* gathering this type of information can sometimes be severe. An after-action report written after the August 2017 Unite the Right rally in Charlottesville, Virginia, noted that although the Charlottesville Police Department engaged in significant intelligence-gathering, they …"did not try to learn about successful strategies for managing the Klan and counter-protesters from law enforcement personnel with experience at similar events."[166]

While peer knowledge sharing is beneficial in many ways, there are two potential dangers in borrowing practices from other agencies. First, bad practices can be diffused just as easily as good practices. Agencies that do a poor job of policing protests, including those whose practices have resulted in costly verdicts or settlements from civil lawsuits, are often more than willing to provide advice to other agencies about how to police protests and other public order events. Before taking advice from other agencies, a department should ensure they are sufficiently qualified to give that advice. A common mistake is to confuse technical competence in riot control and other related methods with more generalized competence across the full spectrum of strategies and tactics needed for fair and effective protest policing. Second, borrowing practices from other agencies in an uncritical way can result in the adoption of one-size-fits-all approaches. Ultimately the police response to these events must fit local circumstances and values. Thus, strategies and tactics from other

---

162. Maria Cramer, "Police Get Irish Tips on Crowd Policing," *Boston Globe,* August 28, 2008, http://archive.boston.com/news/local/articles/2008/08/28/police_get_irish_tips_on_crowd_policing.

163. Leonora LaPeter Anton, "Tampa Police Study Chicago Protests to Hone RNC Strategy," *Tampa Bay Times*, May 25, 2012, http://www.tampabay.com/news/politics/local/tampa-police-study-chicago-protests-to-hone-rnc-strategy/1232031.

164. Tamara Lush, "Republican National Convention 2012 Security: Tampa Police Preparing for Event," *U.S. News & World Report*, July 22, 2012, http://www.usnews.com/news/politics/articles/2012/07/22/police-getting-ready-for-rnc-convention-in-tampa.

165. Erica Bryant, "100 CMPD Officers Get First-Hand Experience Handling Thousands of Protesters in Chicago," Cox Media Group, last modified May 21, 2012, http://m.wsoctv.com/news/entertainment/100-cmpd-officers-get-first-hand-experience-handin/nPBW7.

166. Hunton & Williams, *Independent Review* (see note 101).

jurisdictions may need to be customized accordingly.

Although it is instinctual to emulate departments that are perceived as successful, there is also much to learn from the mistakes made by police agencies. For instance, former Seattle Chief of Police Norm Stamper has written extensively about the errors he and his department made in leading the police response to the 1999 World Trade Organization protests.[167] His various accounts of what went wrong in Seattle provide a useful resource for agencies thinking about how to improve their own handling of protests. Similarly, Chief Susan Riseling of the University of Wisconsin–Madison has written a detailed account of the police response to protests at the Wisconsin state capitol in February and March of 2011. Her coverage of events includes a candid discussion of mistakes made and lessons learned.[168] Another valuable source for learning from mistakes made in policing public order events is after-action reports and other types of post-event reviews and investigations. These reports vary widely in terms of quality and candor. Some are clearly designed to deflect blame or whitewash what really happened, while others are probing and insightful and contain powerful recipes for reform. The box on page 61 lists some reports that contain useful summaries of the police response to protests. They discuss what went right, what went wrong, lessons learned, and recommendations for the future. Reading these reports can help police leaders think carefully about how to craft their own protest policing strategies and tactics.

---

167. Norm Stamper, *Breaking Rank: A Top Cop's Exposé of the Dark Side of American Policing* (New York: Nation Books, 2006); Norm Stamper, "Paramilitary Policing from Seattle to Occupy Wall Street," The Nation, November 28, 2011, https://www.thenation.com/article/paramilitary-policing-seattle-occupy-wall-street; La Ganga, "Seattle Police Chief During WTO Unrest Appalled" (see note 54).
168. Susan Riseling, *A View from the Interior: Policing the Protests at the Wisconsin State Capitol* (Milwaukee, WI: Maven Mark Books, 2013).

<div style="border:1px solid;">

### Recommended Readings: After-Action Reviews of Police Responses to Protests

**2003 Free Trade of the Americas Summit protests** (Miami, FL)

*City of Miami Civilian Investigative Panel Report on the Free Trade Area of the Americas Summit* (Miami, FL: City of Miami Civilian Investigative Panel, 2006), http://www.miamigov.com/cip/downloads/FTAAReport.pdf

**2007 May Day protests** (Los Angeles, CA)

*An Examination of May Day 2007* (Los Angeles: Los Angeles Police Department, 2007), http://assets.lapdonline.org/assets/pdf/Final_Report.pdf

**2009 G-20 Summit** (London, UK)

*Adapting to Protest* (London: Her Majesty's Chief Inspector of Constabulary, 2009), http://www.justiceinspectorates.gov.uk/hmic/media/adapting-to-protest-20090705.pdf

(Not to be confused with *Adapting to Protest—Nurturing the British Model of Policing* [see note 5].)

**2010 G-20 Summit** (Toronto, Canada)

*G20 Summit Toronto, Ontario June 2010: Toronto Police Service After-Action Review* (Toronto, Canada: Toronto Police Service, 2011), http://www.torontopolice.on.ca/publications/files/reports/g20_after_action_review.pdf

**2011 Occupy Oakland protests** (Oakland, CA)

*Independent Investigation: Occupy Oakland Response October 25, 2011* (Baltimore, MD: Frazier Group, LLC, 2012), http://media.cmgdigital.com/shared/news/documents/ 2012/06/14/independent_invest_occupy_oak.pdf

**2011 University of California campus protests** (State of California)

*Response to Protests on UC Campuses* (Oakland, CA: University of California, 2012), http://campusprotestreport.universityofcalifornia.edu/documents/protest-report-091312.pdf

**2012 May Day protests** (Seattle, WA)

*After-Action Review: May Day Events 05/01/2012* (Seattle, WA: Seattle Police Department, 2012), http://www.seattle.gov/police/publications/MayDay/SPD_After_Action_May_Day_2012.pdf

**2014 March against State Violence** (Berkeley, CA)

*Response to Civil Unrest December 6th and 7th, 2014: A Review of the Berkeley Police Department's Actions and Events of December 6 and 7, 2014* (Berkeley, CA: Berkeley Police Department, 2015), http://www.ci.berkeley.ca.us/uploadedFiles/Police/Level_3_-_General/BPD Response to Civil Unrest.pdf

</div>

## Facilitation

Police sometimes view protests and other public order events from the vantage point of how to control, regulate, or manage people. This is understandable to some extent given the role of the police in preserving public order and safety and the possibility that such events can turn destructive or violent. However, when people have legitimate aims such as observing their First Amendment rights of speech or assembly, the

perception that police are overcontrolling or micromanaging them can give the impression that police are simply trying to limit or prohibit legitimate behavior. As we discussed in chapter 3, perceptions of police fairness have powerful implications for the relationships between police and the public. This is an especially sensitive issue in the context of protest events. As Her Majesty's Chief Inspector of Constabulary in the UK has noted, protesters tend to have "a heightened sense of grievance" that can easily be turned toward the police.[169] One way to minimize this transfer of grievance is to allow protesters "a fair and reasonable chance to make their point peacefully."[170] When police operate from the vantage point of how to facilitate peaceful protests rather than how to control, regulate, or manage them, they can achieve a dramatic change in the relationships between police and protesters and minimize the likelihood of conflict and violence.[171] This is especially the case when police are the object of protests, since efforts to block protests will inevitably strengthen the perception that police are unjust or illegitimate.

> When police operate from the vantage point of how to facilitate peaceful protests rather than how to control, regulate, or manage them, they can achieve a dramatic change in the relationships between police and protesters and minimize the likelihood of conflict and violence.

### Facilitating relations with protesters

Managing relationships with protesters is not very different from managing other types of relationships. For protesters to feel that their requests are being given an appropriate level of consideration, police must be careful to establish a conversational tone that reinforces their commitment to facilitation.

As social psychologists have explained,

> an emphasis on facilitation needs to be paramount at all stages of the police operation. In planning for an event one needs to identify the legitimate aims of crowd members in order to consider how best to organize policing so as to enable them to be met. If there is some reason why they cannot be met in the way that organizers request it is essential not simply to give a negative response, but to be positive and creative in finding alternative ways of meeting (and being seen to meet) the underlying aims.[172]

It is a common perspective in policing that if portions of a crowd become violent or destructive, then facilitation is no longer necessary or even possible. To the contrary, it is at this moment that facilitation becomes most important.[173] Under such circumstances, if the police must take enforcement action or impose limits on the crowd, it would be wise for police to rely on the principles outlined in chapter 3, explaining why they are imposing these limits and ensuring that peaceful and lawful members of the crowd are still able to engage in legitimate forms of expression.[174] As we will see later in this chapter, police should adopt a

---

169. *Adapting to Protest: Nurturing the British Model of Policing* (see note 5).
170. Ibid.
171. Reicher et al., "An Integrated Approach" (see note 135).
172. Ibid., 567.
173. Ibid.
174. Ibid.

differentiated response that handles violent or destructive individuals as needed while reinforcing for peaceful protesters that the police will continue to facilitate their right to protest. Social psychologists remind us that at this point, "a clear indication that the police are supporting collective aims (and that violence endangers them) can make the difference between escalation and de-escalation."[175]

In the rare instance when large portions of a crowd turn riotous—engaging in violence, destruction of property, or looting—then police may need to declare an unlawful assembly or a curfew to keep the peace. This step is unfortunately sometimes necessary, though it is probably overused. Consistent with the logic of the Elaborated Social Identity Model outlined in chapter 3, options like declaring an unlawful assembly or a curfew should be treated as a last resort. If crowds perceive that the police have taken these steps unfairly, moderates may align with the radicals in opposition to the police. Martin Luther King, Jr. once said that "a riot is the language of the unheard."[176] While riots result from many complex social and economic causes, many of which are beyond the control of police, they are often touched off by a controversial arrest or use of force by police. A riot is sometimes a sign that police failed earlier in the process to anticipate it, to put in place appropriate preventive measures, or to address the issues or conditions within their control that may have led to the riot. A fundamental guiding principle is that police should invest at least as much energy in preventing riots as in preparing to respond to them.

In Salt Lake City (SLC), police were involved in facilitating the rights of Occupy participants at every stage of the movement. Some of the Occupiers we interviewed told us that they had seen media coverage of conflictual and combative relationships between police and protesters in other cities, and they didn't want the same thing to happen in SLC. Therefore, they contacted the police during the planning stages of Occupy SLC to discuss their intentions. Three Occupy SLC activists met with a deputy police chief and several other command staff at police headquarters. The activists recall that they were nervous initially about talking with the police but that the police officials treated them very well, reducing the apprehension they were feeling. From the outset, the deputy chief told the activists that he would respect their rights to protest as long as they respected the need for police to address public safety issues. The deputy chief also attended an initial planning meeting for Occupy SLC, where he recalls telling the crowd, "We respect your right to demonstrate and express your opinions—let us know how we can help." The activists later met with then Chief Chris Burbank, who shared the same supportive and facilitative message.

The police continued to facilitate the needs of Occupy SLC participants when they began to set up an encampment in Pioneer Park in downtown SLC, which had curfews and prohibited overnight camping. The deputy chief did not want to start off on the wrong foot by having the Occupiers violate the law by camping overnight illegally, so he made arrangements to give them a "conditional use" permit. The Occupiers we interviewed recalled feeling grateful that police leaders were willing to take this step on their behalf. Later, when Occupiers were looking for new space to occupy, police officials helped them find suitable space. One Occupier recalled that police "went pretty far out of their way to make sure it was as peaceful as possible." The deputy chief recalls that his relationships with protesters saved a lot of potential trouble. As he noted, "It's kind of hard

---

175. Ibid.

176. Martin Luther King, Jr., *The Other America,* speech delivered at Stanford University, Palo Alto, CA, April 14, 1967, http://auroraforum.stanford.edu/files/transcripts/Aurora_Forum_Transcript_Martin_Luther_King_The_Other_America_Speech_at_Stanford_04.1 5.07.pdf.

to be mad at a guy who has been your advocate."

> The deputy chief recalls that his relationships with protesters saved a lot of potential trouble. As he noted, "It's kind of hard to be mad at a guy who has been your advocate."

Part of the reason that SLC police were able to adopt such a measured response to Occupy SLC was their experience in dealing with numerous other protests in the past. Former Chief Burbank recalled that during the 2002 Winter Olympics in SLC, which attracted numerous protests, he learned a valuable lesson: you need to "provide people an avenue through which they can communicate their message." During various types of protest events, Burbank worked hard to cultivate trusting relationships with protesters. These relationships ended up paying dividends in unexpected ways. For instance, during the controversial criminal trial of an environmental activist in SLC, radical Black Bloc activists came in from out of town, acting as agitators and behaving in a disruptive manner. Local protesters shunned them due to the solid relationships they had developed with police. Later, in the early days of the Occupy movement, these positive relationships helped to ensure that Occupy SLC did not attract anarchists from other cities. Good relationships between police and protesters can also help to stimulate self-policing within the crowd, which can act as a sort of force multiplier that makes the job of the police easier (see chapter 3).

From the beginning, SLC police wanted to ensure that the activists' grievances were not focused on them, so they actively sought to keep the relationship cordial. Police and city leaders recognized from the experiences of other cities the potential for the wrong response to escalate matters. In fact, a member of the mayor's staff came up with a tongue-twister to summarize their perspective on this issue: "The more resistance we provided to the resistance, the more the resistors would resist." The Occupiers we interviewed agreed that the facilitative stance of police and local government officials helped to reduce conflict. Their opinion was that arrests early on in the movement would not have deterred them. In fact, they told us that early arrests would likely have fueled the fire and encouraged more people to join the protest movement. As one activist noted, "we were determined to stand in solidarity with Occupy Wall Street."

Other agencies adopted similar approaches. A senior police official in Boston talked about the power of facilitation, noting, "That's the spirit. Talk with them, negotiate with them. . . . We made friends down here." For him and his colleagues, dealing with the Occupy protests was "Community Policing 101." From the outset, they attempted to cultivate an environment of mutual respect with Occupy participants. A senior police official in Tampa agreed with the need for facilitation, noting, "It goes back to conversation. Ask them what they want to get done. Help them do it without violence. Help them to do it while still adhering to the law." Susan Riseling, Chief of Police for the University of Wisconsin–Madison, has written that preserving life and property are not the only goals of police during a demonstration. Preserving the "constitutionally protected rights of the people to agree or disagree with their elected leadership" constitutes another key goal for police.[177]

---

177. Riseling, *A View from the Interior* (see note 168), 10.

As a result, "negotiating and talking with demonstrators is vital in a democratic society."[178] Former Madison (Wisconsin) Police Chief Noble Wray told us, "Demonstrators have a purpose. We try to work with them to accommodate that." His agency would ask protest groups what the police could do to facilitate their goals and then negotiate with them to find mutually agreeable solutions. For instance, some protesters want to be arrested as a sign of their commitment to the cause. Therefore, as part of facilitating their requests, several of the agencies in our study reported that they have negotiated ahead of time for peaceful arrests, in some cases using expedited booking procedures so that protesters could be released very quickly. The protesters we interviewed reinforced the idea that when police ask them what they want, it goes a long way toward building trust and reducing the potential for conflict.

A key aspect of successful facilitation is neutrality. As difficult as it may be, police must try to facilitate protected forms of First Amendment expression even in those instances where they find the content of that expression to be distasteful or even repugnant.[179] Neutrality is the cornerstone of First Amendment case law, which specifies that police may exert reasonable time, place, and manner restrictions but that these restrictions must be *content-neutral*.[180] In chapter 3, we discussed *Snyder* v. *Phelps,* a case in which the Supreme Court upheld the right of the Westboro Baptist Church to picket the funeral of a U.S. Marine killed in action. Writing for the majority, Chief Justice John Roberts quoted Justice William J. Brennan's opinion for the court in the 1989 flag-burning case *Texas* v. *Johnson*: "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."[181] It can be very challenging for police leaders to develop a cultural mindset among their officers that they must facilitate free speech that they find offensive. After police dispersed an Occupy protest in one city (not one of the sites in our study), we observed a police officer laughing while yelling to a crying protester, "Now you'll have to get a job." This type of conduct represents a failure of both training and supervision. A captain in the Madison Police Department reminded his officers, "We don't take sides in this. Be careful about what you say and how you act. Our goal is neutrality. Be unbiased." Similarly, a captain in the Wisconsin State Capitol Police told his officers, "Everybody gets to have their say. We are content-neutral. You were hired to do a job. Your personal feelings don't count." Thoughtful police administrators find ways to meet the challenge of neutrality and uphold peaceful and constitutionally protected expression.

## Facilitating relationships with the media

So far, our discussion of facilitation has focused largely on the aims and needs of protesters. Another aspect of facilitation that is frequently overlooked is ensuring that journalists covering protests and other public order events are handled properly by police and are given the appropriate levels of access. Freedom of the press is enshrined in the First Amendment of the U.S. Constitution. Unfortunately, it has become a common theme in major protests for journalists to be corralled or arrested or to have force used against them by police. Incurring the wrath of journalists is a quick way for police agencies to undermine their own legitimacy in the eyes of the public. Moreover, journalists tend to know their constitutional rights, and when police violate these rights,

---

178. Ibid.

179. As discussed in chapter 3, not all speech is protected by the First Amendment. Some examples of unprotected speech include threats, incitement, fighting words, and libel. Steven J. Heyman, "Spheres of Autonomy: Reforming the Content Neutrality Doctrine in First Amendment Jurisprudence," *William and Mary Bill of Rights Journal* 10, no. 3 (2002), 649–717, http://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=1328&context=wmborj.

180. Neutrality is also embedded in the Fourteenth Amendment's equal protection clause, which prohibits states from denying people "equal protection of the laws."

181. *Texas* v. *Johnson,* 491 U. S. 397, 414 (1989), quoted in *Snyder* v. *Phelps* (see note 106).

costly civil litigation is likely to result.

> Incurring the wrath of journalists is a quick way for police agencies to undermine their own legitimacy in the eyes of the public. Moreover, journalists tend to know their constitutional rights, and when police violate these rights, costly civil litigation is likely to result.

During the protests and riots in Ferguson, Missouri, from August to November of 2014, more than twenty journalists were arrested. Audio and video recordings of police officers threatening or using force against journalists were posted online and quickly went viral. In August 2014, attorneys representing three area police departments (Ferguson Police Department, St. Louis County Police Department, and Missouri State Highway Patrol) signed an agreement in federal court with a journalist who had filed a civil rights lawsuit against them. The agreement stipulated that

> the media and members of the public have a right to record public events without abridgement unless it obstructs the activity or threatens the safety of others, or physically interferes with the ability of law enforcement officers to perform their duties.[182]

As the protests continued, the plaintiff in this case alleged that police were violating the agreement and continuing to obstruct the freedom of the press. As a result, on November 21, 2014, a federal judge issued preliminary injunctions permanently enjoining each agency from "interfering with individuals who are photographing or recording at public places but who are not threatening the safety of others or physically interfering with the ability of law enforcement to perform their duties."[183] In March 2015, four professional journalists filed a federal civil rights lawsuit alleging that the St. Louis County Police Department and 20 of its officers violated their constitutional rights under the First, Fourth, and Fourteenth Amendments with the intention of "obstructing, chilling, deterring, and retaliating against" them for doing their jobs.[184] The case was settled on March 20, 2016. Many similar lawsuits have been settled in recent years, including several associated with the arrest or use of force against journalists attempting to cover the police response to the Occupy movement.

Although protecting the constitutional rights of journalists is essential, freedom of the press is not limitless. Several police administrators in our study pointed out that dealing with the media can be very challenging for

---

182. *Hussein* v. *County of St. Louis et al.,* 4:14-CV-1410-JAR, agreement (E.D. Mo. filed August 15, 2014), https://www.aclu-mo.org/sites/default/files/field_documents/032_-_mis_mpi_0.pdf

183. Ibid. Note that the quote comes from the injunctions issued against St. Louis County (https://www.aclu-mo.org/sites/default/files/field_documents/040_-_order_regarding_county_0.pdf) and the Missouri State Highway Patrol (https://www.aclu-mo.org/sites/default/files/field_documents/038_-_order_regarding_state.pdf). The injunction issued against the Ferguson Police Department (https://www.aclu-mo.org/sites/default/files/field_documents/039_-_order_regarding_city_of_ferguson.pdf) contains the same essential message but is more explicit, prohibiting the agency and those within its control from enforcing or threatening to enforce "any rule, policy, or practice that grants law enforcement officers the authority or discretion to arrest, threaten to arrest, or interfere with any individual, including any member of the media or member of the public photographing or recording in public places unless that person is threatening the safety of others or physically interfering with the ability of law enforcement to perform their duties."

184. *Devereaux et al.* v. *County of St. Louis et al.,* 2:15-CV-00023 (E.D. Mo. filed March 30, 2015).

officers on the front lines of public order events. The unfortunate reality is that journalists sometimes interfere with police operations by positioning themselves or otherwise behaving in ways that compromise officer safety during protest events. While police must understand the importance of allowing journalists to do their jobs, journalists must understand the importance of not interfering with police officers who are trying to do their jobs, often under difficult conditions. In spite of the challenges associated with media coverage of protests, finding creative ways to resolve these challenges without exerting unnecessary control over journalists and without arresting or using force against them (or threatening to do so) is essential. For instance, in the aftermath of a protest in which three journalists reported being struck with batons by police, an after-action report by the Berkeley (California) Police Department made two recommendations associated with the press. First, their report recommended the development of a press credentialing mechanism so officers can more easily identify members of the press in a crowd during public order events. Second, it recommended that the department create collaborative training for members of the press "to enhance their safety and safeguard the First Amendment right of a free press."[185] Finding ways to facilitate media coverage of protests can bolster the perceived legitimacy of the police and influence how people respond to the police, themes we discussed in chapter 3. One surefire way for police to lose legitimacy is to behave in ways that turn the media against them.

On August 14, 2014, after several journalists had been arrested while trying to cover the unrest in Ferguson, Missouri, President Obama spoke about the events in that city. He began by chastising those who were engaged in looting, vandalism, and violence against the police, noting that there was no excuse for their behavior. But then he turned his attention toward the importance of police facilitating the constitutional rights of both protesters and journalists:

> There's also no excuse for police to use excessive force against peaceful protests, or to throw protestors in jail for lawfully exercising their First Amendment rights. And here, in the United States of America, police should not be bullying or arresting journalists who are just trying to do their jobs and report to the American people on what they see on the ground. Put simply, we all need to hold ourselves to a high standard, particularly those of us in positions of authority.[186]

As police agencies consider how to hold themselves to the "high standard" encouraged by President Obama, facilitating people's First Amendment rights should play a key role.


# Communication

Communication is the lifeblood of organizations, and police are no exception. The nature and quality of internal communication within a police organization has a direct influence on the information available to employees and the quality of service they are able to deliver. External communication with multiple stakeholders—including residents, business owners, politicians, other community agencies, and the press—is also essential for securing the information, resources, and legitimacy that make it possible for police to do their jobs. Communication has long been viewed as an essential ingredient of successful community policing

---

185. *Response to Civil Unrest December 6th and 7th, 2014: A Review of the Berkeley Police Department's Actions and Events of December 6 and 7, 2014* (Berkeley, CA: Berkeley Police Department, 2015), 58, http://www.ci.berkeley.ca.us/uploadedFiles/Police/Level_3_-_General/BPD Response to Civil Unrest.pdf.
186. "Statement by the President: Edgartown, Massachusetts" (see note 112).

strategies. Establishing strong relationships between police and communities and solving community problems requires ongoing proactive communication.[187] When relationships with communities reach a crisis point, police and communities can rely on existing communication networks to resolve crises and prevent conflict. In the absence of ongoing proactive and positive communication between police and communities, crises can escalate quickly. Regular communication between police and communities is akin to making regular deposits into a savings account. Those investments can establish a positive balance of trust and goodwill that one hopes will be sufficient to cover the inevitable moments when a controversial arrest or use-of-force incident results in a withdrawal from the account.

> Regular communication between police and communities is akin to making regular deposits into a savings account. Those investments can establish a positive balance of trust and goodwill that one hopes will be sufficient to cover the inevitable moments when a controversial arrest or use-of-force incident results in a withdrawal from the account.

Communication is also central to fair and effective protest policing. While many forms of internal and external communication are important, in this section we focus primarily on communication between police and protesters.[188] We also touch briefly on the importance of communicating effectively with the media and the community at large. Communication is the principal mechanism through which police can discover the aims of event organizers and how police can best facilitate these aims. It is also the best way for police to learn about potential public order or public safety problems and try to prevent them together with event organizers and participants. Even in the case of more spontaneous events like sports celebrations or flash protests arranged through social media, it is usually possible to identify informal organizers or influential participants with whom police can communicate in an effort to preserve order and prevent conflict.

### Communicating with protesters

While communication between police and protesters is vital, it can also be exceptionally challenging. Protests and other public order events are sometimes highly decentralized and disorganized. Some protests emerge spontaneously and therefore lack clear leadership or direction. Others are connected with larger social movements that reject the idea of leadership or hierarchy as a matter of principle.[189] For instance, the Occupy movement was described as "leaderless," although informal leaders or representatives emerged in most sites. Once a protest event is underway, particularly a major demonstration, it is often loud and chaotic and can take on a life of its own. That is why efforts to communicate with protesters should start long before an actual

---

187. Edward R. Maguire and William H. Wells, "Community Policing as Communication Reform," in Howard Giles, ed., *Law Enforcement, Communication, and Community* (Philadelphia: John Benjamins Publishing Company, 2002), 33–66.

188. Communication within police agencies and between police and other public safety agencies is also an important issue worthy of careful consideration. For instance, interoperability issues arise frequently in multiagency and multijurisdictional responses to protests and other public order events. However, these types of communication issues are beyond the scope of this document.

189. Natasha Koustova, Catherine T. Kwantes, Gregory Thrasher, and Trevin Fernando, "Leadership Structures in Leaderless Social Movements," in Harold Ellens, ed., *Winning Revolutions: The Psychosocial Dynamics of Revolts for Freedom, Fairness, and Rights, volume II: Political Revolts* (Santa Barbara, CA: Praeger, 2014), 37–56.

protest event whenever possible. Communication between police and event participants is especially challenging when there is a history of conflict between both parties. As social psychologists note, "Where there is a long history of conflict then the very attempt to tell crowd members how policing is designed to facilitate them may be seen as dishonest and actually provoke hostility. As a consequence, it is necessary to consider not only *what* one communicates, but also *how* one communicates."[190]

These challenges become exacerbated to a much greater extent when a protest is focused on the police. In the aftermath of a controversial arrest or use-of-force incident, people are angry, emotions run high, and event participants may be less willing to communicate or cooperate with police in a calm and productive manner. The ratio of moderates to radicals may be smaller than usual relative to other types of protests. Police may naturally feel frustrated and defensive and less willing to negotiate or facilitate under these conditions. While this is certainly understandable at a human level, at a professional level these are exactly the moments when communication and facilitation become most important. People who are protesting police misconduct expect the police to treat them poorly. They may even attempt to goad the police into treating them poorly to capture it on video, provide grounds for a complaint or a lawsuit, or otherwise prove a point. Changing the interpersonal dynamic at moments like this can have powerful effects on the tone of these events and prevent them from escalating into conflict or violence. Communicating in a patient, thoughtful, and professional manner when people are angry or frustrated with you and the institution you represent can sometimes help calm people down. Over time, as these positive interactions accumulate, they can improve relationships between the police and those segments of the public whose opinions of the police are most negative.

Some of the police officials we interviewed contrasted their approach with how they have observed other police agencies handle protests. For instance, some police agencies encourage officers to stand in a fixed position or in a skirmish line at protests, adopting a very formal or rigid manner and not engaging in dialogue with protesters. Skirmish lines are sometimes necessary to contain a crowd or to prevent it from entering a particular location. However, as the report by the Berkeley police put it, "skirmish lines should be deployed judiciously and only in those situations where the reasonable use of force that may be necessary to enforce the line and protect officers is warranted by the objective of deploying the line."[191]

Most of the agencies in our study encouraged officers to interact with crowds in a friendly manner whenever possible. They highlighted the importance of humanizing the police so that protesters are able to see the person behind the badge. There was universal agreement that officers should not get involved in debating or taking sides on the issue under protest, but otherwise most agencies in our study viewed open communication between officers and protesters as a useful method for establishing trust and preventing conflict. In Madison, police officials emphasized the importance of the customer service relationship in policing protests, noting that police in the field must understand that their communications with protesters set a tone that helps to define that relationship. As a result, they encourage officers to comb the crowds and talk with people. A protester in Madison noted that when police communicate with protesters in a calm and respectful manner, it goes a long way toward encouraging cooperation with police.

Significant thought should be invested in the decision about who should be entrusted with ultimate

---

190. Reicher et al., "An Integrated Approach" (see note 135), 567.
191. *Response to Civil Unrest* (see note 185), 50.

responsibility for communicating and negotiating with protest leaders or representatives. On the police side, the lead communicator should have sufficient authority to be able to make and keep promises. Someone who makes a promise to event participants and is then unable to honor that promise because of insufficient rank or authority will not likely be viewed by participants as credible or trustworthy. In smaller police agencies, a chief or deputy chief may take on this function. In larger agencies, this responsibility might fall on a captain, a commander, or a major. In Boston, for instance, Superintendent (and later Commissioner) Billy Evans, who at the time led the department's uniformed branch, handled this function during the Occupy protests in 2011. Evans visited the Occupy encampment several times per day and shared his cell phone number with Occupiers in case they needed him. Evans emphasized the importance of communication in working with the Occupiers: "Our motto is to kill them with kindness. You can talk your way out of anything. We don't need sticks out. We don't need helmets on."[192]

The official selected to serve as lead communicator for the police must have certain characteristics to perform the role well. The most effective individuals will have outstanding interpersonal and communications skills, high emotional intelligence, a lot of patience, and a thick skin. The official should not have a history of conflict with the individuals or the group holding the event. Selecting the wrong person to handle this function can sour the relationship between police and protesters quickly and result in unnecessary conflict. The goal is to build trust from the outset. In Milwaukee, Wisconsin, the police chief selected the department's Incident Response Team commander to serve as the liaison with protesters. One senior police official noted that this officer "was equally comfortable eating lunch with a homeless guy or the executive of a company." His strong interpersonal skills were helpful for establishing trust and avoiding conflict. In most of the agencies in our study, the police officials selected as lead communicators shared their cell phone numbers with key members of the Occupy movement to encourage continuous dialogue.

While having a lead communicator is essential, most of the communications between police and protesters will involve line-level officers who are working a protest event or responding to calls for service associated with the actions of protest participants. Our study agencies reinforced the importance of selecting the right officers for policing protests and then preparing and supervising them properly. In Boston, a senior police official emphasized the idea that "one wrong person and one wrong move at one wrong moment can change everything." For several of the agencies in our study, selecting the right officers meant relying whenever possible on specialized community policing or bicycle patrol officers to handle crowd-related events. Police officials in these agencies told us that the officers assigned to these functions tend to have a calmer demeanor and more experience engaging in dialogue with people.[193] Seattle (Washington) police have invested heavily in the use of bicycle officers to handle protests and other public order events. While the use of specialized officers is a good solution for smaller protests and other crowd events, for larger events it will be necessary to rely on a wider range of officers. Thinking carefully about the training, preparation, and responsibilities of both

---

192. Maria Cramer and Travis Andersen, "William Evans Steps In as Police Commissioner: Praised for Work at Marathon, during Occupy Protests," Boston Globe, November 1, 2013, https://www.bostonglobe.com/metro/2013/11/01/william-evans-named-acting-commissioner-boston-police-officials-say/oBpmxtyOuixMdwc0wdJMAK/story.html

193. Bicycle officers also offer a number of other advantages: They are more mobile than officers on foot, they have "soft look" uniforms that are perceived as less threatening, and if the situation worsens they can use their bikes to form a barricade. In addition, because they are wearing bicycle helmets, they have the added protection afforded by the helmet without the threatening appearance of a riot-gear helmet. We are grateful to the Seattle Police Department for these insights.

generalized and specialized officers is essential. The box on page 71 discusses one potential approach: the "Dialogue Police" model in Sweden, which relies heavily on communication to build trust and reduce conflict at protests and other crowd events.

<div style="border:1px solid;">

### Swedish Dialogue Police

One potential approach for ensuring that the right officers are assigned to protest events is the "dialogue police" model used in Sweden.[*] Like many reforms in protest policing, the model was developed in the aftermath of violence between protesters and police. During June 15–16, 2001, the European Union (EU) summit was held in Gothenburg, Sweden. Approximately 50,000 demonstrators converged on Gothenburg to protest a variety of issues, including capitalism, Swedish membership in the EU, and the visit of U.S. President George W. Bush. The protests became violent, with 143 people, including 53 police officers, seeking medical treatment for injuries sustained during the summit.[†] Police took approximately 600 people into custody during the summit. When demonstrators began to attack police officers, the police shot and wounded three of them.

In Sweden, these events were viewed as "something of a national trauma," resulting in the formation of a review board known as the Gothenburg Committee.[‡] The committee released its findings in 2002, highlighting what one observer characterized as "serious deficiencies in crowd management training for the police as well as deficiencies in terms of know-how."[§] The committee emphasized the importance of dialogue between the police and protesters and concluded that "the police must develop dialogue as a working method."[**] As a result of the committee's recommendations, in 2004 the Swedish National Police adopted a number of reforms to improve the response to mass demonstrations and other major public order events. The centerpiece of these reforms was the *dialogue police model*.

The role of dialogue police officers is to communicate with crowd members, serving as intermediaries between event organizers and the police command. The job of the dialogue police is based on three principles: "dialogue, de-escalation, and nonconfrontation."[††] The dialogue police model emphasizes the importance of communication at three stages: before, during, and after a protest or other crowd event. Dialogue officers are encouraged to build long-term trust with event organizers and participants.

By communicating in a genuine and respectful manner, they seek to discover the needs of protest groups and educate these groups on the needs of police. When events are planned ahead of time, dialogue police are brought in early to assist with planning. For events without permits, including those that emerge spontaneously, dialogue police seek to establish communication on the spot. During protest events, they wear casual clothing with a reflective vest identifying them as dialogue police officers. The dialogue police model recognizes that

> when the police take on a tough line there is a greater risk of violence and damage. Dialogue, on the other hand, involves communication between two parties and not one party telling the other one what to do. A communicative attitude is at the core of the special police tactics but it also includes an ability on the part of the police organisation to carry out decisive, precise action at the right time against demonstrators who are prone to violence.[‡‡]

While in the crowd, dialogue police officers serve as observers, paying careful attention to the atmosphere and the potential for conflict or violence, intervening where necessary, and in some cases notifying their colleagues about any police actions that may inadvertently be stirring up the crowd and increasing the likelihood of conflict. In the aftermath of an event, dialogue police will follow up with event organizers and participants to review how things went and continue the process of establishing a long-term trusting relationship.

</div>

[*] Stefan Holgersson, *Dialogue Police: Experiences, Observations and Opportunities* (Stockholm: Swedish National Police Board, 2010).
[†] Kristina M.C. Johnsson, Per A. Örtenwall, Anne-Lii H. Kivi, and Annika H.E. Hedelin, "Medical Support during the European Union Summit in Gothenburg, Sweden, June 2001," *Prehospital and Disaster Medicine* 21, no. 4 (August 2006), 282–285, doi: 10.1017/S1049023X00003848.
[‡] Holgersson, *Dialogue Police*, 15.
[§] Ibid.
[**] The Gothenburg Committee's report was published in Swedish. The English language translation of this passage from the Committee's report comes from Holgersson, *Dialogue Police*, 15.
[††] Holgersson, *Dialogue Police*, 15.
[‡‡] Ibid., 24.
Source: Chief Thomas J. Nestel III's Twitter page, username @TNestel3, accessed August 2, 2016, https://twitter.com/tnestel3?lang=en

Whenever possible, police should encourage protest groups to select certain members to serve as liaisons or primary points of contact with police. These individuals should also be patient, have good communication skills, and preferably not have pre-existing anger toward police. In spontaneous or leaderless movements it may be very difficult to identify a leader, particularly one with these characteristics. In such instances, police are encouraged to seek out informal leaders or influential group members who can speak on behalf of the group. One important issue to consider is that protesters or activists who work with police often fall under suspicion by their peers, especially more radical peers, as being traitors or sellouts who are merely serving as mouthpieces for the police. In some instances, they may even be viewed as informants. Moreover, during negotiations between police and protesters (over issues such as time, place, and manner restrictions), if police do not cede any ground, these liaisons may be viewed as ineffectual by their peers and may lose legitimacy as a result. Thus, among protest groups, the most effective liaisons are people who are well-known and respected by their peers, including both moderates and radicals. To help preserve their legitimacy (and thus their influence) with their peers, police should work hard to find a middle ground with them during negotiations. These liaisons are a crucial part of getting protest groups to self-police. As noted in chapter 3, a key aspect of successful protest policing is behaving in ways that stimulate self-regulation among protest groups. Communication is a vital part of making that happen.

> Among protest groups, the most effective liaisons are people who are well-known and respected by their peers, including both moderates and radicals. To help preserve their legitimacy (and thus their influence) with their peers, police should work hard to find a middle ground with them during negotiations.

## Communicating with the public and the media

In addition to direct communications with protesters, another way for police to enhance their legitimacy is to establish a solid external communications strategy for informing the public at large. An important aspect of that strategy involves developing healthy partnerships with the media. As part of its recommendations for improving the police response to protests in England and Wales after the 2009 G-20 summit in London, Her Majesty's Chief Inspector of the Constabulary noted,

> The police must also develop more effective media communication strategies. Like it or not, the media are the eyes and the ears of the people. They play a central role in determining public opinion and are therefore a key influencer of public confidence in policing. It is no longer an option for the police not to include the media in briefings before, during, and after large scale public order events.[194]

In the agencies that participated in our study, many police leaders had thought carefully about their relationships with the news media and how to work with the media before, during, and after protest events. In Chicago, for example, police administrators worked hard to cultivate strong relationships with the media around the 2012 NATO summit, providing local reporters with direct access to police commanders and allowing them to walk alongside officers during the protests. This strategy was useful for helping the media

---

194. *Adapting to Protest: Nurturing the British Model of Policing* (see note 5), 31.

understand the challenges facing police during the event and reducing the likelihood of factually inaccurate reporting. Police administrators in Madison noted that they attempt to "maintain open dialogue with citizens and the news media before, during and after demonstrations." Similarly, SLC police have worked hard to cultivate relationships with the media, hosting regular media summits at police headquarters. When SLC police eventually closed down the Occupy encampment in Pioneer Park, former Chief Burbank invited the media to observe because, as he put it, "We had nothing to hide that night."

While establishing solid working relationships with conventional news media is an important aspect of an agency's overall external communication strategy, another essential ingredient is taking advantage of social media technologies. A thorough review of the police use of social media is beyond the scope of this guide, but we will highlight a few key points that are most relevant to protest policing. While many police agencies are taking advantage of social media as an investigative tool, far fewer are realizing its benefits for enhancing communication and relationships with communities. For example, the Boston Police Department's Tweet from the Beat program was developed to enhance the department's ongoing community policing activities. The program allows police command staff to "publicize positive interactions with the community that are important but would not be picked up by traditional news outlets."[195] Social media technologies provide a relatively simple way for police agencies to "return to and deepen their commitment to the ideas at the heart of community policing—rethinking what the police want to get across to the community, how the police should listen to the community, and how the police and the community can work together in pursuit of their common objectives."[196] Unlike the portrayal of police in more conventional media accounts, social media allows for a more informal, more personal, and in some cases more humorous or lighthearted way of communicating with the public.[197] During the Occupy protests, the BPD used social media to engage in ongoing dialogue with protesters.

For a good example of how social media can be used to reinforce community policing ideals during protest events, consider the tweets (postings made on the social media site Twitter) posted by Chief Thomas Nestel III of the Southeastern Pennsylvania Transportation Authority (SEPTA) Police Department during the "Philly is Baltimore" protest held in Philadelphia on April 30 and May 1, 2015. Chief Nestel walked along with protesters and tweeted his observations in real time. The box on page 74 contains a sampling of the tweets posted by Nestel on the first day of the protest. His tweets emphasize a number of key themes:

- an effort to create common ground by expressing a sense of pride in the city of Philadelphia (police and protesters may have different viewpoints on some issues, but a mutual sense of pride in their city can create a shared bond)

- a clear sense of facilitating and even encouraging peaceful First Amendment expression

- appreciation for protesters who choose to avoid conflict and violence and to exercise their freedom of expression in a peaceful manner

---

195. Edward F. Davis, III, Alejandro A. Alves, and David Alan Sklansky, "Social Media and Police Leadership: Lessons from Boston," *New Perspectives in Policing* (Cambridge, MA: Harvard University Kennedy School of Government, 2014), 6, https://www.ncjrs.gov/pdffiles1/nij/244760.pdf
196. Ibid., 7.
197. Ibid.

- appreciation for the difficult job of the police who are working at the event

- an attempt to provide regular updates on the status and location of the protests and to point out factual inaccuracies that may be circulating, whether through uninformed rumors, intentional misinformation, or the news media

- an effort to educate people about why police are taking certain actions such as stopping traffic to ensure the safety of protesters

- a clear sense of personality, humanity, and humor (unlike standard formal press releases, the informality of social media can help to remind people that underneath the badge is a real person)

74

## Sampling of Tweets Posted by Chief Thomas Nestel III on April 30, 2015

Coming to the rally at City Hall? Know your rights and have a safe day!

Maybe I am biased, but the Birthplace of America is THE BEST city in the United States!

A variety of causes are being represented at Dilworth Park. It is a peaceful expression of free speech. It's a beautiful day!

Rally goin in two directions. One going NB on Broad approaching Race and the other going SB around City Hall. All peaceful.

It's like being in a stadium with a crowd. Very exciting. You can feel the positive energy.

Crowd chanting F**k the Police while pointing at @PhillyPolice Inspector Dales. Good man who understands frustration.

Crowd in 1700 Walnut has circled stopped police car. Still peaceful.

Crowd moving! PEACEFUL Fantastic professionalism on part of @PhillyPolice officer and awesome restraint on part of marchers. Critical moment

Philadelphia is AWESOME! Peaceful protest!

Group 1 at Broad and Cherry. Group 2 at 16/JFK. PEACEFUL. COMPLETELY TOTALLY PEACEFUL.

Group yelling to tighten up at 16/Vine. Leader saying that more people are en route to join up with them. Concern that crowd may attempt 676.

Group 2 stopping at 15 /Callowhill. Looks as if attempt to enter interstate might occur. @PhillyPolice and @PAstatepolice ready to prevent.

Group 2 continuing to move. Peace continues. Credit to marchers for avoiding conflict.

Group 2 has stopped at Broad and Vine. All is peaceful. The crowd has had great respect for people stuck in traffic.

Crowd is sitting down at Broad and Vine. Woman telling everyone NO VIOLENCE! Crowd cheering her. Great words.

Brief skirmish at Broad and Vine when Group 2 tried to enter 676. Horses have moved in. Skirmish is over.

Police officer's hat snatched by crowd and being thrown around. Police moving in to recover hat.

Another police hat has been snatched by the crowd and is being thrown around. Police moving in to recover hat.

So far 2 police hats snatched and 2 police hats recovered. This activity is unnecessary. Part of crowd moving EB on Vine.

Although it was "tense" for 10 minutes, this is overwhelmingly peaceful! Describing it otherwise is disingenuous.

Marchers trying to enter 4 Seasons Hotel. @PhillyPolice bike officers preventing entry. Crowd estimated to be 150 people.

Although marchers are verbally abusive towards police, they are not threatening or causing any property damage. Still peaceful.

Marchers moving EB on Vine crossing 15. Several now wearing masks. Although chopper est crowd at 150, appears larger to me.

Marchers moving NB on Broad with contingent of @PhillyPolice ensuring that traffic does not cause a danger for the marchers.

Rolling roadblocks to ensure safety for marchers. Otherwise, Center City is safe.

It is important that people know what is happening. This is peaceful. I even got a high five from a marcher.

Marchers headed SB on 21st St. THIS IS A PEACEFUL PHILADELPHIA expression of the 1st Amendment. Showing the world how we do it.

Small groups of people are drifting away from the marchers outside the 9th District. I have started to think about what to have for dinner.

One brief skirmish when marchers tried to enter I-676 and were stopped by police. 10 minutes out of 6.5 hours.

Guy just walked past me carrying pizza. It's the first time in my life that I considered committing a criminal act.

Groups of 4-5 at a time leaving the main group. One of the men leaving made it a point to come over and thank me. AWESOME!

Marchers are dispersing. This was a fantastic success story. Huge credit to marchers and mad respect for @PhillyPolice. PHILLY ROCKS!

Ladies and gentlemen this rally is a wrap and I couldn't be prouder of my city. I love Philadelphia. Thanks for following and goodnight.

# Differentiation

Our coverage of crowd psychology in chapter 3 outlined the unintended consequences that can result from viewing a crowd as homogeneous and taking unilateral action against the whole crowd in response to the misbehavior of a subset of its participants. Treating moderate members of a crowd as criminal or dangerous can have the inadvertent effect of leading moderates to align with more radical or extreme members against the police. Social psychologists advise police to understand the social identities of the various subgroups in a crowd and not to inadvertently radicalize those with more moderate social identities by behaving in a manner that moderate members perceive as unjust or overly aggressive. Thus, whenever possible, police must engage in a *differentiated* response in which they continue to facilitate peaceful and lawful behavior even when taking enforcement action against those who are engaging in violence, property destruction, or looting. This approach is intended to preserve the perceived legitimacy of the police and reduce the likelihood of widespread defiance or rebellion.

Developing a differentiated response strategy consistent with the principles outlined in chapter 3 means rethinking three key aspects of protest policing. First, if possible given the circumstances of the event, arrests should be made sparingly. Every effort should be made to avoid taking enforcement action against a whole crowd. Mass arrests are rarely a good idea and often result in costly civil rights lawsuits. Second, the use of force should be limited to those instances when it is absolutely necessary and unavoidable. Too often, protests and other crowd events turn into free-for-alls in which police use force indiscriminately, thereby undermining public trust and escalating conflict unnecessarily. Police sometimes justify the use of force against protesters as a means of preserving officer safety. Ironically, the use of indiscriminate force by police probably places officers at greater risk by increasing the number of people who are hostile toward the police and who view the use of force against police as justifiable. Third, the use of overly restrictive barriers or other crowd containment methods sometimes imposes an unnecessary burden on peaceful protesters, frustrating them and encouraging widespread defiance and rebellion against police. While the reasonable use of containment measures to manage large crowds and preserve public safety is justifiable, unreasonable use of these measures limits movement unnecessarily, places vulnerable people at risk, and may interfere with people's civil rights. For instance, the use of kettling—in which people are indiscriminately detained for long periods by barriers or police cordons, often without access to food, water, or bathrooms—is widely condemned. Indiscriminate crowd containment measures often result in lawsuits, costly civil settlements, and other undesirable outcomes. A differentiated response strategy is intended to minimize collateral damage, ensuring that whenever possible, police actions impose a burden only on those who are engaged in criminal activity.

Crowd psychologists remind us that differentiation is not an approach to be tacked on to existing policing strategies. Instead, it must be "built into every tactical or strategic decision, into training, planning, equipping, briefing, and operating in crowds."[198] A differentiated police response focuses with laser-like precision on those in a crowd whose illegal actions must be addressed to preserve public safety. At the same time, police must find ways to continue facilitating the lawful and peaceful behavior of other crowd members. The key is to ensure that only those who are engaged in violent or otherwise unlawful conduct are subjected to police

---

198. Reicher et al., "An Integrated Approach" (see note 135), 568.

enforcement measures.

Two examples are instructive. The first occurred in London during the 2009 G-20 summit. In an effort to head off the violence that had come to characterize protest activities at previous G-20 and other global summits, police established a widespread network of cordons to control the movement of crowds in central London. A 47- year-old newspaper vendor named Ian Tomlinson left his newsstand at the end of his shift and began to walk home but repeatedly encountered police cordons that forced him to alter his route home. As he struggled to find a way home that was not blocked by police, at one point four riot officers shoved him. At another point, he was bitten by a police dog. Later on his journey, an officer struck him on the legs with a baton and then shoved him to the ground from behind. At the time, Tomlinson had his hands in his pockets and was unable to break his fall, so his head struck the ground, injuring him. He was helped up by a bystander, he walked a short distance away, and he then collapsed. By the time he arrived at the hospital he had already succumbed to his injuries. A later review of the incident recommended that when police adopt containment measures like those used at the G-20 summit, they should incorporate a "release plan to allow vulnerable or distressed persons or those inadvertently caught up in the police containment to exit . . . the MPS [Metropolitan Police Service] should consider scenarios where observers may be employed to identify vulnerable people."[199]

The second example is associated with protests held in and around Ferguson, Missouri, from August to December of 2014. Six plaintiffs alleged that three area police agencies (St. Louis Metropolitan Police Department, St. Louis County Police Department, and the Missouri State Highway Patrol) used indiscriminate force against them while they were engaged in constitutionally protected behavior under the First, Fourth, and Fourteenth Amendments. According to the plaintiffs, they were

> subjected to actions by police acting under authority of command now designated as the Unified Command, designed to frighten and intimidate plaintiffs and to deter their continued exercise of First Amendment rights. Officers acting under authority of Unified Command have intimidated demonstrators, impeded their entry or exit from demonstrations, assaulted them with chemical agents including tear gas and pepper spray, shot them with so-called 'less than lethal' projectiles, rounded them up in mass arrests, engaged in physical and verbal abuse, failed to visibly identify themselves, and categorically labeled demonstrations as unlawful assemblies.[200]

In December 2014, a federal judge issued a temporary restraining order against the three police agencies named in the lawsuit. Her decision echoed the theme of this section in noting that police had not done a good job of distinguishing between peaceful protesters and criminals. She concluded that "people involved in peaceful, nonviolent political speech can do that without being lumped in with the criminals."[201] The parties settled the suit in March 2015. In the settlement agreement, the three police agencies agreed not to use chemical agents to disperse people not engaged in criminal activity unless they first issue "clear and unambiguous warnings that such chemical agents will be utilized,"[202] provide people with the opportunity to "heed the warnings and exit

---

199. Adapting to Protest (see note 5), 11.

200. *Templeton et al.* v. *Dotson et al.,* 4:14-CV-2019, complaint (E.D. Mo. filed December 8, 2014).

201. Joel Currier, "Judge Orders St. Louis Area Police to Give Protesters Tear Gas Warning and Time to Flee," *St. Louis Post-Dispatch,* December 11, 2014, http://www.stltoday.com/news/local/crime-and-courts/judge-orders-st-louis-area-police-to-give-protesters-tear/article_d93628c7-cc4c-5dfa-9873-cd4baf59ad73.html; *Templeton et al.* v. *Dotson et al.,* 4:14-CV-2019, temporary restraining order (E.D. Mo. filed December 11, 2014).

202. *Templeton et al.* v. *Dotson et al.,* 4:14-CV-2019, motion to dismiss pursuant to settlement as to all defendants (see note 119).

the area,"[203] adopt reasonable measures "to minimize the impact of such chemical agents on individuals who are complying with lawful law enforcement commands,"[204] and  provide people with a safe means of exiting the area. The agreement also specified that police cannot use chemical agents on people who are "engaged in non-criminal activity for the purpose of frightening them or punishing them for exercising their constitutional rights."[205] During a later wave of protests in 2017, the St. Louis Metropolitan Police Department violated the provisions of this agreement and another federal judge issued a preliminary injunction covering some of the same issues.[206]

One difficulty in getting police to adopt more differentiated responses is the widespread acceptance in policing "of classic views of agitation and contagion and hence the belief that once violence starts, everyone is dangerous."[207] Outdated and inaccurate assumptions about crowd dynamics serve as a major barrier to the adoption of progressive and evidence-based police strategies for dealing with protests and other public order events. This issue can best be addressed through training that includes coverage of principles from modern crowd psychology. This training should include a practical component based on lessons learned by European police forces that have developed policing strategies based on the ESIM outlined in chapter 3.

Another difficulty in getting police to adopt more differentiated responses results from concerns about officer safety. Asking police officers to go into large crowds in soft uniforms without protective gear raises concerns about how officers will protect themselves if the crowd turns against them. This is a valid concern and one that demands thoughtful responses from police administrators. One answer is to adopt a graded response plan for those instances in which there are concerns that crowd violence may be a possibility. In a graded response, tactical assets are available nearby and are able to be deployed rapidly if needed, but they are not visible to the crowd. If they are visible to the crowd, instead of enhancing officer safety they may place officers at greater risk by escalating matters.

Agencies may adopt different ways of enacting a graded response. For instance, after experimenting with a variety of approaches over the years, the Boston department has adopted a graded response that begins with a soft response (with officers wearing regular soft uniforms) backed up by a harder response (with officers wearing helmets and carrying 36-inch riot batons, which they refer to as "hats and bats"), backed up by a tactical response (with officers wearing riot gear, which they refer to as "turtling up"). As one Boston police official told us, "if you start hard, where else do you have to go?" During the Occupy protests, Boston police were prepared to have officers don riot gear if necessary, but the need did not arise. Boston's approach to policing public order events is consistent with the principles of the ESIM. The approach is based on the recognition that establishing relationships with the public, even fleeting ones, can help prevent trouble later. For instance, one senior police official told us that during Red Sox games, he greets the fans as they enter the stadium. If they drink too much and get rowdy after the game, "it's a lot harder to throw a bottle at a guy who said hi to you on the way in." This comment reinforces one of the most important themes in this chapter: the need for crowds to perceive police officers as human beings rather than as soldiers or robots.

---

203. Ibid.
204. Ibid.
205. Ibid.
206. *Ahmad v. City of St. Louis, Missouri* (see note 104).
207. Reicher et al., "An Integrated Approach" (see note 135), 569.

In this spirit, former Chicago Police Superintendent Garry McCarthy made the decision not to deploy officers in riot gear for the 2012 NATO summit. The vast majority of officers wore their regular soft uniforms (arrest teams wore riot gear to protect officers who would be entering the crowd briefly to make arrests). There was a contingency plan in place for officers to don riot helmets in case "airmail" (rocks, bottles, and other items being thrown at officers) became a problem. Officers in riot gear were staged nearby in an out-of-sight location in case conditions worsened and they were needed to restore order. The reasoning behind the decision not to wear riot gear from the outset was surprisingly similar across sites. In Madison, a senior police official told us that when officers wear riot gear, "it incites a type of reaction that might backfire and agitate." In Charlotte, North Carolina, a police official said "once the hats and bats and turtle suits come out, it brings aggression with it." In Cleveland, Ohio, a police officer said wearing riot gear "sets the tone in a bad way and scares people." A senior police official from Cleveland made a similar point when noting that "police must set the tone for civility, not confrontation." Former Chief Burbank of SLC told us that "if you line up a bunch of police officers with riot gear and shields, you are telling protesters 'to go ahead and throw rocks and bottles at us.'" Riot gear is essential under certain conditions, but when used unnecessarily it can trigger unanticipated consequences that make things worse, not better. In a graded response, officers on the front lines wear soft uniforms, but the agency has well-rehearsed contingency plans in place to protect officers and to harden their approach if events turn riotous.

<span style="color:red">A differentiated response to protests involves focusing police enforcement efforts on those who are engaged in serious unlawful behavior while facilitating the rights of others to engage in peaceful and lawful behavior. A graded response involves police relying on soft approaches from the outset and only hardening their approach (such as deploying officers in riot gear or using chemical agents against the crowd) if circumstances require them to do so.</span>

The training challenge in adopting a graded, differentiated response is to emphasize both the underlying principles behind the approach as well as the technical skills necessary to implement it seamlessly when needed. A differentiated response to protests involves focusing police enforcement efforts on those who are engaged in serious unlawful behavior while facilitating the rights of others to engage in peaceful and lawful behavior. A graded response involves police relying on soft approaches from the outset and only hardening their approach (such as deploying officers in riot gear or using chemical agents against the crowd) if circumstances require them to do so. These are *strategic* approaches that have *tactical* dimensions. A common mistake is to allow a focus on tactics to overshadow the underlying strategic principles. For instance, the use of arrest or extraction teams can be an important component of a graded, differentiated response in which police focus enforcement attention on those who are engaging in serious unlawful behavior (like violence or looting) while facilitating the rights of other participants to engage in peaceful and lawful behavior. However, in the absence of a full graded and differentiated response strategy, arrest or extraction teams are merely a tactic than can be deployed either wisely or unwisely.

The use of a graded, differentiated response can be difficult in events being policed by multiple agencies. Mutual aid among police agencies raises a number of complex challenges, not the least of which are fundamental differences across agencies in how protests are handled. These are sometimes the result of deliberate differences in protest policing strategy, but they are often a simple function of differences in training or experience. Officials from one agency, for example, told us that a bus full of officers in full riot gear from another agency arrived to help them with a major crowd event. Local police asked the officers from the other agency to remove their riot gear and they refused. As a result, the local police chose not to accept their help. Mutual aid agreements should be very carefully thought out to ensure that other agencies do not inadvertently undermine the carefully designed protest policing strategies of the focal agency. This can be very challenging sometimes, particularly when the event is spontaneous and involves a large area or number of participants. During the protests that erupted in and around Ferguson, Missouri, in August 2014, more than 50 police agencies responded, resulting in what has been described as "a mishmash of tactics and confusion."[208]

The use of a graded, differentiated strategy can pose certain challenges for officers who are working on the front lines of a protest event. Some protesters are verbally abusive toward officers, calling them names, trying to goad them and get under their skin, sometimes looking to elicit an aggressive or otherwise ill-conceived response that can be captured on video and shared with the world. When officers are wearing soft uniforms, they may fear for their safety if the crowd turns against them. Working long hours under such conditions can also be physically exhausting. The combination of stress, fear, and fatigue can make it very difficult to police these types of events. Police leaders need to take these officer health and wellness issues seriously and prepare accordingly.

The agencies we studied relied on a number of strategies to address these issues. In Tampa, a police corporal used a viral video of an officer from another agency as part of a training program in preparation for the RNC. In the video, a protester is blowing soap bubbles (like the kind used by children) in front of a police officer. The officer, visibly angry, tells the young woman, "If the bubble touches me, you're going to be arrested for assault." Shortly after that, she is arrested. Tampa police used this video as the centerpiece of a training program called Don't Be That Guy. The training emphasized the need for officers to maintain their composure and not allow protesters to provoke them into making a mistake that would become a "YouTube moment." Similarly, in Boston, former Commissioner Davis reminded his officers, "We don't want to be the issue, we don't want to be the subject of a YouTube video on excessive force, don't be baited into crossing the line." In Chicago, a police sergeant took it upon himself during the NATO summit to send regular radio transmissions reminding officers to stay calm, remember their training, and work as a team. The police officials who participated in our focus group in Washington, D.C., were unanimous in their opinion that police leaders must pay careful attention to the emotional health of their officers during protest events. Police leaders must also ensure that appropriate plans are put in place to meet officers' physical health needs, ensuring that they remain hydrated, fed, and protected from prolonged exposure to extreme weather. At major events, particularly those in which police are being taunted or are under threat of physical violence, officers must be rotated out periodically so they can rest, have a meal or a snack, and compose themselves before resuming their duties. Ideally, supervisors will be on the lookout for officers who may be exhibiting early signs of stress or anger so

---

208. Ben Kesling and Pervaiz Shallwani, "Ferguson Police Tactics Challenged as Conflict Evolved: Critics Fault Authorities for Lack of Coordination," *The Wall Street Journal,* August 21, 2014, http://www.wsj.com/articles/ferguson-police-tactics-challenged-as-conflict-evolved-1408675855.

they can relieve these officers temporarily as needed. Officers should also be trained to look out for signs of stress or anger in themselves and their peers and to take appropriate steps to prevent conflict from escalating.

# Conclusion

Taken together, the four principles we have articulated in this chapter—education, facilitation, communication, and differentiation—form the basis for developing a new way of thinking about protest policing in many U.S. police agencies. Altering existing strategies or developing new strategies based on these foundational principles will require focused and committed leadership and a willingness to question the status quo. The unfortunate reality is that some police agencies in the United States are still policing protests in much the same way they did in the 1960s prior to the recommendations issued by four separate presidential commissions during that era (see chapter 2). Moreover, some agencies appear not to be dissuaded by costly civil settlements resulting from abusive and unconstitutional policing practices that violate the civil rights of protesters, journalists, or bystanders. Protest policing is admittedly difficult, and even the most well-intentioned leaders make mistakes. One of the things that set the most progressive police leaders apart is their willingness to rethink existing practices when confronted with obvious evidence of the need for reform. The best leaders treat mistakes as opportunities for reflection, learning, and growth rather than becoming defensive and entrenched in their position. Our research uncovered numerous instances of police leaders developing thoughtful, fair, and effective protest policing practices based on mistakes that had occurred in their own or in other agencies.

Fair and effective protest policing strategies require leaders who are willing to set the tone for their agencies about how the difficult job of protest policing will be accomplished. One good example is the Madison Method, developed in the 1970s and 1980s by former Chief David Couper of the Madison (Wisconsin) Police Department. Madison has been called "the Berkeley of the Midwest" because of its liberal leanings and the many protests it sees. The Madison Method, which is outlined in the box on page 82, is consistent with many of the principles outlined in this chapter. It pre-dated much of the crowd psychology research outlined in chapter 3 and was decades ahead of its time.

Modern perspectives on crowd psychology provide a useful foundation on which to base progressive policing strategies for dealing with public order events. Throughout the last two chapters, we have drawn on a blend of insights from our own research on protest policing and the scientific literature on compliance, defiance, and crowd psychology to make a series of recommendations for U.S. police. The goal is to develop approaches that encourage the crowd to regulate itself as much as possible, thus reducing some of the burden on the police. According to crowd psychologists, one of the best ways to accomplish this objective is

> to place a major emphasis on how to be supportive towards crowd members pursuing legal goals and activities, even under conditions where one is aware of the presence of groups with illegal goals and even at points where these groups start to act in illegal or violent ways. Such an emphasis makes it more likely
>
> that crowd members will, at best, suppress violence in their midst. At worst, one can expect members to isolate people acting violently and accept police action against violent groups should it prove necessary.[209]

---

209. Reicher et al., "An Integrated Approach" (see note 135), 566.

Through the use of strategies that incorporate the basic principles outlined in this chapter—education, facilitation, communication, and differentiation—police agencies can address those who are violating the law while upholding the constitutional rights of those who are engaged in peaceful and lawful expression.

---

### The Madison Method of Handling People in Crowds and Demonstrations

Always begin with a "soft" approach and plenty of dialogue. If possible, we begin speaking with the organizers of a demonstration before the event. A soft approach means that officers do not wear hats, appear relaxed and friendly, and openly talk with people in the crowd. Dialogue means two-way conversation, which also means listening to the unpopular opinions and suggestions from others.

Always be prepared to negotiate. We maintain continuous conversation with organizers and crowd members. We state our position up front: We are here to defend your right to demonstrate, but we cannot allow you to hurt others or destroy property. Whether or not we support your position, we will remain neutral. That is our job. We will not allow others to harm you if you hold an unpopular position. If you want to be arrested to make a statement, we will help you do that and will treat you respectfully and not harm you while in our custody. In turn, we expect you to cooperate with us.

Be able to protect officers working with the crowd. If the situation warrants it, we have a tactical unit (with full protective equipment) on standby in a location near the demonstration but out of sight. They are available as an emergency response to protect or rescue officers or others in danger of being harmed. Their mission is to protect people first and property second. Deploying the emergency response team is a last-ditch tactic and will indicate that we have not been effective in managing the crowd with softer methods.

Use specially trained officers. The best officers to use in crowd situations are officers who are specially selected and trained for this kind of work, and who have the personality to use a soft approach under sometimes trying circumstances—self-control is essential. Not every police officer can do this kind of work.

Avoid using outside police officers. Police from other cities and locations usually do not have the training or ability necessary to work with us. Most of them do not have soft crowd management experience or knowledge of our city, nor could we count on them being responsive to our direction. It is extremely important to us that that we take personal responsibility for the handling of crowd events in our city and avoid relying on outside police agencies.

Avoid anonymity at all costs. Police officers assigned to handle crowd duty are to be easily identifiable with their names and badge numbers clearly visible. We avoid any measures or practices that reduce the police to be anonymous agents. Anonymity or any depersonalization of police conducting crowd management encourages negative crowd behavior. It can also lead to unaccountable behavior on the part of the police.

Have visible leadership. During high-profile demonstrations, police command officers needed to be visible, communicative, and willing to take charge. There was no such thing as a "routine" large gathering of people without prior preparation and planning and command officers being present.

Source: "Crowds, Protest, and Police," Improving Police: A Veteran Police Chief Discusses Effective Ways to Lead, Improve, and Restore Trust [blog of Dave Couper], October 31, 2011, https://improvingpolice.wordpress.com/2011/10/31/crowds-protest-and-police

# Authors

**Edward R. Maguire** is a professor of criminology and criminal justice at Arizona State University, where he also serves as an associate director of the Center for Violence Prevention and Community Safety. His research focuses primarily on policing, violence, and comparative criminology.

**Megan Oakley** is a research specialist at the Center for Violence Prevention and Community Safety at Arizona State University.  A career professional in criminal justice project management, she has managed over six million dollars in externally funded projects focusing on police reform, violence prevention, and program evaluation.

## The Harry Frank Guggenheim

Foundation is a leader in creating and disseminating knowledge on the nature, consequences, and reduction of violence in its many forms, including war, crime, and human aggression.



42 WEST 54TH STREET, NEW YORK, NY 10019