Ex. E

# CRITICAL ISSUES IN POLICING SERIES

# Rethinking the Police Response to Mass Demonstrations:

## *9 Recommendations*









POLICE EXECUTIVE
RESEARCH FORUM

CRITICAL ISSUES IN POLICING SERIES

# Rethinking the Police Response to Mass Demonstrations: 9 Recommendations

**February 2022**



POLICE EXECUTIVE
RESEARCH FORUM

This publication was supported by the Motorola Solutions Foundation. The points of view expressed herein are the authors' and do not necessarily represent the opinions of the Motorola Solutions Foundation or all Police Executive Research Forum members.

Police Executive Research Forum, Washington, D.C. 20036
Copyright © 2022 by Police Executive Research Forum

All rights reserved

Printed in the United States of America

ISBN: 978-1-934485-65-1

Graphic design by Dave Williams.

# Contents

Acknowledgments ........................................ 1

Introduction: The Three Crises of 2020 ....... 3

The three crises of 2020 were interconnected ...................... 4

The focus of this report: Demonstrations and violence ...... 5

We must take police-community engagement
on demonstrations to a higher level ....................................... 5

Police agencies also must rethink their approach
to use of force during demonstrations ................................... 6

Sources of Information in This Report ........ 8

PERF "Daily Reports" on demonstrations in 2020-21 ........ 8

After-action reports ................................................................ 9

PERF webinar ........................................................................ 10

Executive Summary and
Key Recommendations ............................... 12

A Brief History of the Police Response
to Mass Demonstrations ........................... 14

A 2006 PERF report calls for an alternative
to escalated force ................................................................... 15

PERF's 2011 report emphasizes facilitating
demonstrations – and avoiding arrests ............................... 15

PERF's 2018 report addresses a new phenomenon:
"Leaderless demonstrations" ............................................... 16

The demonstrations of 2020:
Unprecedented in number, size, and violence ................... 17

New challenge for police: Handling large numbers
of anti-police demonstrations during a pandemic ............. 18

Recommendation 1: Rethink the role of
community representatives before and
during protests. ........................................ 19

1A. Engage your community in discussions about all
aspects of the police response to demonstrations,
including key issues such as use of force, less-lethal
force options, and how police make decisions in
complex situations ................................................................ 20

1B. Invite community members to observe and
participate in training courses and tabletop exercises
on the police response to demonstrations, and
to provide input on policies. ................................................ 21

1C. Train community leaders to be mediators
and co-responders. ................................................................ 22

   *Sidebar:* Police Scotland Involved Elected Officials
   and Community Leaders in their Preparations for the
   COP26 International Climate Change Summit ................ 22

1D. Maintain daily incident reports, and share them
with the public. ..................................................................... 23

1E. Involve community representatives in after-action
reviews after demonstrations have concluded ................... 23

Recommendation 2: Ensure that internal
communications can flow promptly and
clearly, up and down the policing chain
of command. ............................................. 24

2A. Begin by highlighting that police should see
their role as facilitating First Amendment rights,
while ensuring public safety ................................................ 25

2B. Provide officers with clear guidelines for acceptable
and unacceptable responses to protest behavior. .............. 25

2C. Reinforce key messages during daily briefings
and other recurring events. .................................................. 26

2D. Ensure that officers on the ground are able
to share information to inform high-level
decision-making as protests unfold. ................................... 26

## Recommendation 3: Train officers and supervisors adequately. ............................. 27

3A. Provide commanders with the necessary knowledge to coordinate a proportionate, effective police response to mass demonstrations. ........................................ 28

3B. Train officers in crowd management strategies that facilitate peaceful protest. ................................ 28

3C. Train officers on how to handle demonstrations where violent offenders are intermixed with peaceful demonstrators. ................................................... 29

3D. Emphasize de-escalation. ................................. 29

3E. Write clear, specific policies on the use of "less-lethal" tools, and provide training for officers, supervisors and commanders on how to implement the policies. ............... 30

## Recommendation 4: Re-engineering the guidelines for use of less-lethal weapons. ..................................... 31

4A. Establish clear guidelines for when various types of less-lethal force are warranted or are prohibited, with details about their capabilities and limitations. ......... 32

4B. The U.S. Dept. of Justice's research branch, the National Institute of Justice, and academic experts should assist the policing profession by conducting a wide range of new research on less-lethal tools. NIJ and academics should aim to provide concrete information about the capabilities and limitations of each tool, as well as recommendations about whether and how each type of tool should be used in various circumstances. ....... 35

4C. State in policy who is authorized to make the decision to use each type of less-lethal force. ............... 35

4D. Emphasize through policies and training that de-escalation, not less-lethal tools, should be the primary tactic for managing demonstrations. ............. 36

4E. Require the use of body-worn cameras when deploying less-lethal force. ................................... 37

4F. Discuss the use of less-lethal tools with your community ................................................. 37

## Recommendation 5: Warn demonstrators before deploying any less-lethal force, and provide clear instructions for the demonstrators' response. ........................... 38

5A. Establish clear scripts ahead of time. ........................... 38

5B. Try to ensure that all warnings are audible to all demonstrators. ......................................... 39

5C. Give demonstrators clear, reasonable instructions, and provide adequate time to react. ........................... 39

5D. Play warnings in multiple languages. ........................... 40

## Recommendation 6: Minimize the use of mass arrests. ............................................ 41

6A. Avoid the use of mass arrests whenever possible. ........ 42

6B. Plan adequately for mass arrests in case they become unavoidable. ................................... 42

## Recommendation 7: Prepare and activate mutual aid agreements. .............................. 44

7A. Ensure that mutual aid agreements are specific and clear. ..................................... 44

7B. Have ongoing discussions with mutual aid agencies about response protocols. ................................. 45

7C. Conduct tabletop exercises or other training with mutual aid partners. ................................. 45

## Recommendation 8: Prioritize officer safety, health, and wellness. ......................... 46

8A. Don't neglect the basics, such as providing officers with access to food and water. ........................... 46

8B. Issue adequate personal protection equipment. .......... 47

8C. Keep riot gear out of sight. ................................ 47

8D. Plan for adequate rest time and incorporate mental health considerations into risk assessments before mass demonstrations. ................................. 47

8E. Teach officers techniques for protecting their own emotional well-being. ................................. 48

8F. Provide access to wellness support programs after mass demonstrations have concluded. ...................... 48

## Recommendation 9: Ensure ongoing, robust review of policing practices. ........... 49

9A. Debrief notable events at the end of shifts. ................. 49

9B. Conduct timely internal reviews of body-worn camera footage, use-of-force reports, and other materials to understand what went well and what can be improved. ... 50

9C. Invite community representatives to discuss their perspectives with police leaders after demonstrations have concluded. ..................................... 50

*Sidebar: Police Scotland Model for Community Engagement* ................................. 50

## Conclusion: The Demonstrations of 2020 Were a Wake-Up Call. ................................ 51

About PERF. ............................................ 54

About the Motorola Solutions Foundation ........................ 55

# Acknowledgments

THIS REPORT IS THE PRODUCT OF A MULTI-faceted project that took place over the course of 16 months and involved many people. The project started with the Daily Critical Issues Reports that PERF produced on the demonstrations of 2020-21 (see page 8). PERF is grateful to all of the police chiefs, sheriffs, and other experts who agreed to be interviewed for more than 20 Daily Reports about the challenges they were facing and their strategies for managing demonstrations, safeguarding protesters' Constitutional rights, and protecting public safety.

PERF is also thankful to the eight experts who participated in PERF's webinar[1] on demonstrations and helped to guide the content of this report:

- Assistant Police Chief Jeffery Carroll, Metropolitan Police Department, Washington, DC

- Brian Castner, Senior Crisis Advisor, Amnesty International

- Louisville, KY Mayor Greg Fischer

- Baltimore Police Commissioner Michael S. Harrison

- Dr. Tamara D. Herold, University of Nevada, Las Vegas

- Columbia, SC Police Chief William "Skip" Holbrook

- Deputy Chief Constable Will Kerr, Police Scotland

- Tara Murray, Civil and Human Rights Attorney, Washington, DC

PERF is grateful to the Motorola Solutions Foundation, which for more than 20 years has supported PERF's *Critical Issues in Policing* series of research projects. One of the key benefits of the *Critical Issues* series is that PERF can address the vital issues in policing as they happen, without a lag time.

PERF thanks Greg Brown, Motorola Solutions Chairman and CEO; Jack Molloy, Executive Vice President of Products and Sales; Jason Winkler, Executive Vice President and Chief Financial Officer; Jim Mears, Senior Vice President; Tracy Kimbo, Chief of Staff, Global Enterprise and Channels; Monica Mueller, Vice President of Government Affairs; Shamik Mukherjee, Chief Marketing Officer; Karem Perez, Executive Director of the Motorola Solutions Foundation; and Wesley Anne Barden, Manager of Evaluation and Grantmaking at the Foundation.

Thanks also go to the Howard G. Buffett Foundation, which helped support PERF's Daily Reports of 2020-21.

Special thanks go to Police Scotland and Will Kerr, who served for years as commander in Belfast, Northern Ireland, a hotbed of protest activity in the past. They have led the way in promoting community engagement during protests.

Many PERF staff members contributed to this project. Chief Program Officer Kevin Morison managed the project and was actively involved in all aspects of it, including the Daily Reports, the webinar and assistance from the panel of experts, and overseeing the development of this report. Research Assistant Adam Kass reviewed approximately 25

---

1. PERF. "Managing Demonstrations: New Strategies for Protecting Protesters and the Police." https://youtu.be/WBAiuPucZQ0

after-action reports by cities that experienced major demonstrations in 2020 and conducted or commissioned reviews to learn if their response to such events could be improved. Research Associate Jason Cheney assisted Adam in organizing, cataloging, and synthesizing the information contained in the reports. Senior Research Associate Sarah Mostyn, Assistant Director of Communications James McGinty, and Director of Applied Research and Management Tom Wilson contributed to the Daily Reports and webinar, and provided further guidance and insight on the project.

Consultant Ben Heller further analyzed the after-action reports and webinar discussions, synthesized that information into the findings and recommendations in this report, and drafted most sections of the document. Communications Director Craig Fischer

edited and managed production of this report, and Graphic Designer Dave Williams designed the publication.

Back in 2014, then-Police Chief Steve Anderson of Nashville made headlines for his response to protests about a Missouri grand jury's decision not to charge Ferguson Police Officer Darren Wilson in the fatal shooting of Michael Brown.

Steve and his officers greeted protesters with coffee and hot chocolate, and closed streets to accommodate the demonstrations. He told protesters that the Nashville police saw their role as protecting everyone's First Amendment rights.

The result was a peaceful demonstration in Nashville, with no arrests or incidents of violence. This report is intended to help all police agencies to achieve those kinds of results.

*Chuck Wexler*
*Executive Director*

# Introduction:
# The Three Crises of 2020

## *By Chuck Wexler*

POLICE AGENCIES' MANAGEMENT OF PROTESTS and demonstrations is not a new issue. PERF produced major reports on this topic in 2006, 2011, and 2018 (see pp. 15-17).

And yet, the demonstrations of 2020 required PERF to throw out those playbooks and realize that we had to look at demonstrations very differently. **Police simply did not expect and were not prepared for the level and extent of violence they encountered. It was unlike anything they had seen in 20 years.**

Police actually faced three major crises in 2020:

Crisis 1: The COVID-19 pandemic,

Crisis 2: Thousands of demonstrations following the murder of George Floyd, and

Crisis 3: A spike in homicides and shootings.

*This report is mainly about Crisis 2, demonstrations. But I want to briefly discuss all three crises, because each one posed difficult, sometimes unprecedented challenges to law enforcement agencies, and the three crises compounded each other, creating a synergy that made all of the problems worse.*

### Crisis 1: COVID-19 upends nearly every aspect of policing

In January-February 2020, we all heard about a new disease called COVID-19 that was threatening to become a global pandemic. For a few days or weeks, we hoped the impact might be limited, but it soon became clear that COVID-19 was spreading across the United States.

Police departments quickly responded with dozens of changes in how they operated. Unlike many professions where employees could shift to working from home, most police work requires an in-person response. So the basic question was how to keep police agencies operating.

Police executives recognized the danger of the coronavirus sweeping through their departments. It could become impossible to maintain adequate staffing levels if a high percentage of officers became sick or had to quarantine. And without functioning police departments, cities might experience lawlessness.

By March 2020, police agencies across the United States and around the world were taking quick actions to protect officers against the virus, so they could keep doing their jobs. To reduce opportunities for the virus to spread, police departments cancelled community meetings and events. They suspended many types of internal meetings, such as recruit training and in-service training sessions. They held roll calls outdoors, or online. They stopped responding in person to incidents like minor traffic accidents or property crimes, having individuals instead report those incidents over the phone or online. They changed work schedules to reduce the number of daily contacts among officers. They closed precinct stations to the public, scrambled to acquire supplies of personal protective equipment, and in dozens of other ways, worked to reduce the spread of the coronavirus.

In March, PERF began documenting these changes in "Daily COVID-19 Reports."[2] Over the course of the next year, PERF produced 116 of these reports, providing a daily digest of original research into how COVID impacted policing and how police leaders were responding. That information and other research is summarized in PERF's recent publication, *Lessons from the COVID-19 Pandemic: What Police Learned from One of the Most Challenging Periods of Our Lives*.[3]

## Crisis 2: Thousands of demonstrations after the murder of George Floyd

On May 25, 2020, another event shook the policing profession. George Floyd was killed by a police officer in Minneapolis, and video footage of Mr. Floyd's death was captured by a 17-year-old bystander. Officer Derek Chauvin was promptly fired, criminally charged, and later found guilty of murder and manslaughter charges in Mr. Floyd's death.

The killing of George Floyd – and other incidents of police use of force in the months to come – triggered a wave of demonstrations unlike anything the policing profession has seen in modern history.

Many large cities experienced dozens or even hundreds of demonstrations in the next few months. By September, Portland, OR Police Chief Chuck Lovell told PERF that Portland had experienced demonstrations and/or riots for nearly 100 nights in a row.[4] In many cities, the demonstrations were not necessarily about any complaints about the local police; rather, demonstrators turned out to show solidarity with those protesting George Floyd's death and other incidents in various locations.

## Crisis 3: Spikes in violent crime rates

In the fall of 2020, PERF began hearing about sharp increases in violent crime in many cities. PERF and the Major Cities Chiefs Association conducted surveys of our members, and found that among 223 responding agencies of all sizes, the total number of homicides in the first 9 months of 2020 was 28% greater than in the same period in 2019.[5] Aggravated assaults also increased 9%. Later, a follow-up survey of PERF members found that increasing violent crime trends had continued through the first seven months of 2021.[6]

In September 2021, the FBI released UCR data indicating that there were more than 21,500 homicides reported in 2020, a level not seen since the 1990s. This was the largest single-year increase in murders recorded by the FBI since the 1960s.

## The three crises were interconnected

These three crises compounded each other in ways that made their total impact worse.

For example, many police chiefs reported that the COVID pandemic contributed to the increases in violent crime. COVID forced many court systems to drastically curtail their operations, because in-person trials would have endangered the health of everyone in the courtroom. With few or no trials being held, many criminal offenders saw little reason to accept plea agreements, so major elements of the criminal justice system essentially ceased to function in some places. And many jails, worried about COVID sweeping through their facilities, released large numbers of inmates early, in order to allow for greater social distancing among those who remained.

So there were thousands more criminal offenders on the streets as a result of COVID-19. And often the offenders were not subject to the same controls

2. PERF. "Responding to COVID-19." https://www.policeforum.org/covid-19-response
3. Police Executive Research Forum. "Lessons from the COVID-19 Pandemic: What Police Learned from One of the Most Challenging Periods of Our Lives." December 2021. https://www.policeforum.org/assets/COVIDPandemic.pdf
4. PERF Daily Critical Issues Report, "Demonstrations in Portland and Washington, DC." September 3, 2020. https://www.policeforum.org/criticalissuessep3
5. PERF Daily Critical Issues Report, "PERF Analysis Reveals a Spike in Some Violent Crimes This Year." November 18, 2020. https://www.policeforum.org/criticalissuesnov18
6. PERF Special Report, "Violent Crime Trends: Homicides, Shootings, and Carjackings Are Increasing in 2021; Robberies Continue to Decline." September 22, 2021. https://www.policeforum.org/violentcrimesurveyseptember2021

they would have received in normal times, such as enforceable probation conditions. Released inmates also did not receive resources, such as drug treatment, that they might have normally received.

In a number of cities, offenders committed serious crimes, such as carjackings,[7] and did not face any meaningful sanctions, adding to the chaos on the streets.

The thousands of demonstrations also likely contributed to increased crime, in part because the protests, occurring day after day, forced police to move detectives and officers from crime-fighting units in high-crime neighborhoods to policing demonstrations.[8]

The demonstrations also increased COVID risks to the police, because officers had no choice but to be in close contact with often-maskless demonstrators. It was impossible to maintain 6 feet of distance during many of these large, crowded events.

## The focus of this report: Demonstrations and violence

This report is about the second crisis described above: the demonstrations that continued through the summer and into the fall of 2020, and the unprecedented violence that occurred in many cities.

This report provides 35 recommendations for actions that law enforcement agencies can take to improve their planning for, and response to, demonstrations in their communities.

The demonstrations of 2020 were especially difficult to manage because the protests were *about* policing. And in many jurisdictions, the police response to the demonstrations added to the anger and distrust toward the police that many demonstrators felt. How can police meet with protest leaders and discuss how to facilitate peaceful demonstrations when some protest leaders view the police as the enemy?

And yet, as we learned throughout this project, engaging the community is vitally needed to achieve the twin goals of safeguarding First Amendment rights and protecting public safety.

**The challenge is to find new approaches to working with community leaders during peaceful times, and then engaging them in new ways when demonstrations emerge.**

## We must take police-community engagement on demonstrations to a higher level

The #1 recommendation in this report, the most important one, calls upon police to rethink how they engage the community regarding demonstrations.

Police departments and sheriffs' offices should broaden community engagement in at least two important ways:

**1. Police should invite community leaders to participate in police meetings and training sessions about planning the police response to demonstrations. These meetings should discuss the police response to demonstrations as a general matter, as well as planning for particular demonstrations.**

These meetings should include discussions of key issues, such as how police balance their role in facilitating First Amendment expression with the need to protect public safety when demonstrations begin to turn violent.

In many of the 2020 demonstrations, violent agitators embedded themselves among peaceful protesters, and sometimes threw rocks or other projectiles at police, started fires, or threatened public safety in other ways. Police have limited tools for responding to these kinds of situations. Often, when faced with acts of violence during the 2020 demonstrations, police used CS gas to disperse crowds, which prompted complaints that police were using excessive force to shut down demonstrations that appeared to be mostly peaceful, but included dangerous elements.

**By inviting community leaders to participate in police planning sessions about how to handle these difficult situations in the future, police agencies**

---

7. PERF Daily Critical Issues Report, "Increases in Carjackings." February 8, 2021. https://www.policeforum.org/criticalissues8feb21
8. PERF Daily Critical Issues Report, "Violent crime increases in large cities." November 23, 2020. https://www.policeforum.org/criticalissuesnov23

can gain valuable input, while also building trust and showing their communities that police share the same goals of facilitating the peaceful exercise of First Amendment rights.

These forums can serve as a good sounding board for discussions about tactics and the police response to various types of situations.

Police also can build trust by inviting community members to observe police training sessions and tabletop exercises about demonstrations.

**2. Police should build trust <u>during</u> demonstrations, by inviting community leaders who have strong credibility among the general public to <u>serve as observers and partners on the streets</u>.**

By letting community leaders see the police department's systems and procedures for managing a demonstration, police can help the community to understand the challenges they are facing and develop solutions, while building trust.

For example, in a situation where violent agitators, embedded in a mostly-peaceful crowd of demonstrators, are throwing rocks or fireworks at police at the south end of a park, community leaders might communicate with protest leaders on the ground, and ask the peaceful protesters to separate themselves from those who are committing violent acts.

In this way, a joint police-community response could potentially help police resolve situations without having to resort to CS gas or other types of force.

Police might also consider designating interested community leaders as marshals who observe and document demonstrations and the police response. In the aftermath of a demonstration, these marshals can provide the community with feedback about what occurred and why.

<u>The community members should not be merely observers. Rather, police should work with these individuals to identify specific roles they can take to be helpful.</u>

Of course, one of the challenges that many law enforcement agencies faced during the protests of 2020 was identifying community leaders with whom they could work. Many of the demonstrations that focused on calls for police reform were carried out by "leaderless" groups of protesters, who organized

organically on social media platforms. This made it difficult for police officials to single out individuals who (1) carried weight with the demonstrators and (2) would be willing to work with the police.

This situation demands that police agencies redouble and expand their efforts to reach out to and engage broad segments of the community on an everyday basis, not only during demonstrations. Traditional community leaders may not be the individuals who lead anti-police protests, and they may have little connection to those who do lead protests. Police officials at all levels need to develop contacts and initiate communication with a wider range of community members and leaders, and work to build their trust long before a major demonstration occurs. This outreach can be done in-person and online, through the social media platforms that protesters use.

This work won't be easy: many of the people involved in demonstrations about policing have little faith or trust in the police. But by doing the hard work of outreach and engagement today, agencies will be better prepared to work with the community to manage tomorrow's protests.

## Police agencies also must rethink their approach to use of force during demonstrations.

Another major issue during the demonstrations of 2020 was that suddenly many police departments were using "less-lethal force" tools they hadn't used in years. CS gas, pepper spray, beanbag rounds, rubber bullets, "flash-bang" devices, and other tools were being used in many cities, and often, police officers hadn't received special training on their use. It simply hadn't been a priority for training, because these devices hadn't been widely used for many years.

This report provides recommended guidance on limiting the use of various less-lethal tools to certain specified situations. We also recommend that decisions about whether to use less-lethal tools be made only at a high level in a police department. The name "less-lethal" suggests that these devices are relatively safe, but the fact is that they can and do cause serious injuries. We also recommend that officers be trained to use the Critical Decision-Making Model (CDM) as they face complex situations during demonstrations.

We also believe that the U.S. Justice Department's research branch, the National Institute of Justice, could take an important role in evaluating specific less-lethal weapons and making detailed recommendations about when and where each type of weapon may be used, or should not be used.

**The level of violence and destruction in the demonstrations of 2020 was unlike anything police had seen in decades. In many cities, agitators threw Molotov cocktails and rocks at police, committed acts of arson, smashed windows and looted stores, and often used peaceful demonstrators as cover to commit acts of violence. This combination of violent agitators and peaceful demonstrators became the most challenging situation for police to manage.**

**As this report will explain, too often in 2020, existing approaches and tools proved inadequate for these complex incidents. We need to create and test new approaches that are different from the ways things are done now. This report is intended to help police departments and sheriffs' offices develop these new concepts.**

*Chuck Wexler*

Chuck Wexler
Executive Director



Los Angeles Police Chief Michel Moore in a discussion with George Floyd protesters

# Sources of Information
# in This Report

THIS REPORT PROVIDES 38 RECOMMENDATIONS for law enforcement agencies regarding the handling of demonstrations, public assemblies, and other First-Amendment protected activities, as well as civil disturbances and violence that sometimes occur during demonstrations.

The recommendations are based on information collected and analyzed from the following sources and reports:

## PERF "Daily Reports" on demonstrations in 2020-21

In 2020 and 2021, PERF produced approximately 250 Daily COVID-19 Reports[9] and Daily Critical Issues Reports[10] on issues related to the COVID-19 pandemic and other issues, including demonstrations and riots following the death of George Floyd in May 2020, and various police reform proposals being considered. These reports presented original research, usually based on PERF's interviews of police chiefs and other experts.

Following is a list of some of these reports about demonstrations and related issues:

### 2020

- Thursday, June 4: The intersection of COVID-19, demonstrations, and riots

- Tuesday, June 9: If Minneapolis officers had acted on their "duty to intervene," would George Floyd be alive today?

- Thursday, June 11: Washington, DC Police Chief Pete Newsham on why "defunding" threatens reforms

- Monday, June 15: Use-of-force continuums are an outdated approach

- Wednesday, June 24: Talk of "defunding" police brings focus on mental health co-responder programs

- Friday, June 26: How disciplinary processes thwart reforms

- Thursday, July 2: Cities are bracing for many July 4 problems

- Friday, July 24: Interview with Seattle Chief Carmen Best about recent violent groups in the city

- Wednesday, August 5: The boogaloo movement and the threat it poses to law enforcement

- Friday, August 7: Interview with Portland Chief Chuck Lovell

- Monday, August 10: NYPD Tactical Assessment details threats against officers

- Friday, August 14: Interview with Salt Lake City Chief Mike Brown

- Thursday, September 3: Demonstrations in Portland, OR and Washington, DC

- Tuesday, September 8: Possible changes to the qualified immunity doctrine

- Wednesday, September 9: Changes to no-knock warrants and forced entry raids

9. PERF Daily COVID-19 Reports. https://www.policeforum.org/covid-19-response
10. PERF Daily Critical Issues Reports. https://www.policeforum.org/critical-issues-reports

- **Friday, October 23:** Demonstrations discussion from PERF's Town Hall
- **Wednesday, November 4:** Interview with Minneapolis Chief Medaria Arradondo

**2021**

- **Tuesday, February 9:** Peter Newsham on policing demonstrations in Washington, DC
- **Friday, February 26:** Interview with San Diego Chief David Nisleit about his agency's new policy on First Amendment activity
- **Thursday, March 11:** Preparing for the Derek Chauvin trial in Minneapolis
- **Tuesday, April 20:** Recommendations from PERF's webinar about demonstrations
- **Thursday, April 22:** PERF board members on how they're planning to move forward after the Chauvin trial

## After-action reports

Many cities around the country commissioned "after-action reports" or similar reviews in the aftermath of their demonstrations to understand what happened and to examine the response of police and other agencies.

PERF reviewed and analyzed the following 26 after-action reports from 20 cities. Each listing below cites the jurisdiction and the organization that conducted the after-action review. In some cities, multiple reviews were conducted by different organizations.

- **Asheville, NC — Asheville Police Department**
  https://drive.google.com/file/d/1iMOOETz-wPY
  WIB9LbEDI_1bj8xDsIWQL/view
- **Charleston, SC — Charleston Police Department**
  https://www.charleston-sc.gov/strengthening-charleston-preliminary-report
- **Chicago — Chicago Police Department**
  https://home.chicagopolice.org/wp-content/
  uploads/2021/02/AAR_FINAL_2-4-21.pdf
- **Chicago — Office of the Inspector General**
  https://igchicago.org/wp-content/uploads/
  2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf

- **Cleveland — Cleveland Division of Police**
  https://s3.documentcloud.org/documents/
  20419471/cleveland-may-30-riot-after-action-review.pdf
- **Cleveland — Cleveland Police Monitoring Team**
  https://static1.squarespace.com/static/5651f9b5e
  4b08f0af890bd13/t/603bdd2e4e6a0d1861571
  cdc/1614535987518/Ninth+Semiannual+Report+
  w%3AAttachments.pdf
- **Columbia, SC — Columbia Police Department**
  https://issuu.com/columbiapdsc/docs/
  cpd_critical_incidents_review_2020
- **Dallas — Dallas Police Department**
  https://dfw.cbslocal.com/wp-content/uploads/
  sites/15909545/2020/08/Final-After-Action-Report-1.pdf
- **Denver — Office of the Independent Monitor**
  https://www.denvergov.org/files/assets/public/
  independent-monitor/documents/
  2020gfpreport_oim.pdf
- **Fredericksburg, VA — Police Executive Research Forum**
  https://www.fredericksburgva.com/Document
  Center/View/18750/PERF-Final-Report-February-3-2021-PDF?bidId
- **Indianapolis — Independent Review Panel**
  https://www.wfyi.org/files/wfyi/files/impd-review-panel-full-report.pdf;
- **La Mesa, CA — Hillard Heintze, LLC**
  https://www.nbcsandiego.com/news/local/
  consulting-firms-report-on-la-mesa-riot-concludes-police-was-unprepared/2504731/
- **Los Angeles — Los Angeles Police Department**
  http://lapd-assets.lapdonline.org/assets/pdf/LAPD
  %20After%20Action%20Report%202020.pdf
- **Los Angeles — Independent Counsel**
  https://int.nyt.com/data/documenttools/lapd-george-floyd-protests-report/ec6b2bf2056f6727/
  full.pdf
- **Los Angeles — National Police Foundation**
  https://lapdonlinestrgeacc.blob.core.
  usgovcloudapi.net/lapdonlinemedia/2021/
  11/A-Crisis-of-Trust.pdf

 - **New York City — New York City Department of Investigation**
  https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20George Floyd%20Protests.12.18.2020.pdf
- **New York City — State of New York Attorney General**
  https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf
- **Oakland, CA — Oakland Police Department**
  https://cao-94612.s3.amazonaws.com/documents/After-Action-29MAY20-to-4JUN20-9-24-20-update.pdf
- **Omaha, NE — Omaha Police Department**
  https://drive.google.com/file/d/18Bo_MPV-GR fjtZ4IQkSiWn7s-RN3PkKf/view;
- **Philadelphia — CNA and Montgomery McCracken**
  https://www.cna.org/CNA_files/PDF/IAA-2020-U-028506-Final.pdf
- **Raleigh, NC — Raleigh Police Department**
  https://cityofraleigh0drupal.blob.core.usgovcloudapi.net/drupal-prod/COR23/2020RPDAfterActionReview.pdf
- **Raleigh, NC — 21CP Solutions**
  https://go.boarddocs.com/nc/raleigh/Board.nsf/files/BV8SZL741092/$file/20201110C MORaleighPoliceDepartment-External%20 ConsultantsReport.pdf;
- **San Jose, CA — San Jose Police Department**
  https://sanjose.legistar.com/View.ashx?M=F&ID=8769493&GUID=3ED4A6F5-F069-4E7F-BADE-99421D9991B3
- **San Luis Obispo, CA — San Luis Obispo Police Department**
  https://www.slocity.org/Home/Components/News/News/7867/17
- **Santa Monica, CA — OIR Group**
  https://www.santamonica.gov/Media/Default/CMO/Attachment-11153.pdf;
- **Seattle — Seattle Office of Police Accountability**
  http://www.seattle.gov/Documents/Departments/OPA/Special-Reports/OPA-Response-to-Council-CCW-Ordinance-081520.pdf.

## PERF webinar

On April 15, 2021, PERF also hosted a webinar[11] with eight subject matter experts to discuss PERF's preliminary list of recommendations.

The webinar panelists reviewed PERF's findings and provided additional perspectives on the demonstrations of 2020, and the lessons that police agencies should take from that experience.

Following is a list of the webinar participants:

**Assistant Police Chief Jeffery Carroll, Metropolitan Police Department, Washington, DC**

**Brian Castner, Senior Crisis Advisor, Amnesty International**

e's
from
o Care

**Louisville, KY Mayor Greg Fischer**

**Baltimore Police Commissioner Michael S. Harrison**

11. PERF. "Managing Demonstrations: New Strategies for Protecting Protesters and the Police." https://youtu.be/WBAiuPucZQ0

**Dr. Tamara D. Herold, University of Nevada, Las Vegas**

 **Deputy Chief Constable Will Kerr, Police Scotland**

 **Columbia, SC Police Chief William "Skip" Holbrook**

 **Tara Murray, Civil and Human Rights Attorney, Washington, DC**

# Executive Summary and
# Key Recommendations

FOLLOWING IS A SUMMARY OF PERF'S 9 MAJOR recommendations.

In subsequent chapters of this report, each major recommendation is discussed and supplemented with more detailed guidance.

1. **Reinventing the role of the community:** For years, police leaders have talked about working with community members during protests and in the days and weeks before planned demonstrations. That is not new. What PERF is proposing now is about taking the relationship to a new level.

    *PERF recommends that police should invite community leaders to observe and participate in police planning discussions, training initiatives, tabletop exercises, and other activities related to demonstrations.*

    This should be done in a general, routine manner – not only when a particular demonstration is expected, but when police are creating overall plans and protocols for *all* demonstrations.

    This will generally help to build trust in the community, and will demonstrate to community leaders that the police see their primary role during demonstrations as facilitating safe and lawful First Amendment expression. That type of engagement may result in community leaders being more willing to work with police when they are planning a particular demonstration.

    **In this way, community members become "force-multipliers" for the police. Police** agencies will always be challenged to have enough officers to effectively manage large, hostile demonstrations that continue for weeks at a time. But in cities where police have built trust with many community members and leaders, there will be less need for a massive police response.

    *Community leaders also should be invited to serve as observers and partners to police during demonstrations.* Community members may be able to help guide the police response in ways that minimize use of force while facilitating First Amendment expression. Police should establish ways of being in touch with leaders during demonstrations by cellphone calls, texts, and in-person consultations. These community members also can document the event, report back to the community about how police viewed their role and responded to particular issues that arose during the demonstration, and obtain a better understanding of the complex challenges that police often face during demonstrations.

2. **During a demonstration, communicate effectively, up and down the policing chain of command.** The goal of such communication is to ensure that everyone in the police agency has a clear understanding of the goals of policing mass demonstrations, as well as specific tactics, actions, and tools that are acceptable responses to different types of actions by members of the public.

3. **Train officers and supervisors adequately** so that they have the knowledge and skills they need to maintain public order while facilitating freedom of speech and assembly.

4. **The policing profession, with assistance from academic experts and the U.S. Dept. of Justice's research branch, the National Institute of Justice, should re-engineer how we think about less-lethal weapons.** This should include a comprehensive evaluation of each type of less-lethal tool, how it works, its capabilities and limitations, and any risks it poses to community members and/or to police officers. The policing profession should create strong policy guidelines about the circumstances under which the use of each tool may be considered, and any situations in which the tool should be prohibited.

   Currently, police agencies have no playbook and little information beyond what the manufacturers say about their products. What do we know about the effectiveness of each weapon or tool? What new technologies could be developed?

   For example, currently, some tools, such as CS gas, are warranted in specific circumstances, but when used unnecessarily or improperly, can antagonize protesters and be counter-productive. And other so-called "less-lethal" tools, such as soft projectiles, can cause serious or even fatal injuries, and can be difficult to target.

   The Justice Department's research branch, the National Institute of Justice, should play a key role in this process of conducting research on less-lethal tools, and developing strong policy guidance about their use.

5. **Warn crowds before deploying less-lethal force.** In addition to providing advance notice of the possible use of force, officers should give specific instructions to demonstrators, through loudspeakers that can be heard by all, about what they should do (such as leaving a park by certain exits or streets), and with a deadline for action.

   Clear guidance is necessary to avoid confusion and prevent situations where large crowds are subjected to uses of force merely because they were not given clear instructions about how to leave the scene or otherwise comply with police orders, or weren't given sufficient time to disperse.

6. **Avoid the use of mass arrests.** Unnecessary arrests can create the impression that police are stifling First Amendment rights, which undermines community trust. And on a tactical level, mass arrests can take officers away from more important tasks on the front line, and can result in major administrative and legal issues later.

7. **Prepare and activate mutual aid agreements.** These agreements should be specific and clear about response protocols, and should state that officers from assisting agencies must adhere to the policies and practices of the host agency. In this way, when agencies are overburdened, they can rely on officers from neighboring jurisdictions who will behave in accordance with the local department's norms and policies.

8. **Prioritize officer safety, health, and wellness** to protect officers' well-being and avoid burnout and poor decision-making that may result from prolonged exposure to the stress of policing a mass demonstration.

9. **Ensure robust review of the police response to each demonstration,** both in daily debriefings and longer-term review of large events, so that police agencies can refine their approaches to policing mass demonstrations, based on internal feedback from officers as well as community members' views.

The size, scale, and duration of the police protests of 2020 were unprecedented, and have revealed a need for an updated approach to policing mass demonstrations. Large, leaderless groups are able to assemble with little or no advance notice through social media, and the highly partisan nature of American politics sometimes results in more frequent and violent demonstrations, between groups of protesters and counter-protesters with an opposing view.

To preserve officer safety and maintain public order while facilitating First Amendment rights, law enforcement agencies of all sizes need comprehensive strategies to manage demonstrations. This report provides recommendations about essential components of such an approach.

# A Brief History of the Police Response to Mass Demonstrations



Police and protesters during a demonstration in Baltimore

THE POLICE RESPONSE TO MASS DEMONSTRA-tions has changed substantially over the years, according to a detailed analysis by Dr. Edward Maguire of Arizona State University, who serves as chair of PERF's Research Advisory Board.

Dr. Maguire's research found that in the 1960s, policing mass demonstrations and protests entailed showing dominant force early on, in order to deter criminality and civil disobedience. Unfortunately, this type of response, known as the **"escalated force model,"** tended to inflame tensions and provoke violence by protesters, rather than preventing it.

Starting in the late 1970s, after four presidential commissions exposed the flaws of the escalated force model, the **"negotiated management model"** emerged. Under this new approach, police officers were trained to see their role as helping to facilitate First Amendment expression, communicating ahead of time what behaviors they would or would not tolerate. This model was successful at preserving First Amendment rights while maintaining order, avoiding the cycle of tension and violence commonly associated with the escalated force model.

By the 1990s, however, according to Professor Maguire's analysis, police began ratcheting up their responses to mass demonstrations and protests once again. Violent clashes between the police and protesters at the 1999 World Trade Organization Ministerial Conference in Seattle marked a watershed moment. In hindsight, Seattle Police Chief Norm Stamper called his handling of that event "the worst mistake of my career." He explained, "We used chemical agents, a euphemism for tear gas, against nonviolent and essentially nonthreatening protesters. The natural consequence of which [was] that we were the catalyst for heightened tension and conflict, rather than peacekeepers." [12]

---

12. Maguire, E. R., Oakley, M. (January 2020). "Policing Protests: Lessons from the Occupy Movement, Ferguson & Beyond: A Guide for Police," *Harry Frank Guggenheim Foundation*. https://static1.squarespace.com/static/5b293370ec4eb7e463c960e6/t/601d60d2a7f98e73c3dbee05/1612538076086/Policing+Protests.pdf.

The terrorist attacks of September 11, 2001, in Professor Maguire's view, further reinforced the trend toward more assertive police responses to mass demonstrations, as some agencies feared losing control of large, crowded events, which they believed were prime targets for terrorist activity.

*More recently, the evolution of police agencies' management of demonstrations has shifted back toward a recognition that police have a major role to play in protecting American democracy, by helping to facilitate the First Amendment rights of assembly and free speech.*

*PERF has helped to promote that view, as can be seen in three PERF reports, released in 2006, 2011, and 2018.*

## A 2006 PERF report calls for an alternative to escalated force

PERF has released three major reports over the last two decades focused on how to police mass demonstrations. The first was the 2006 report *Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches*. This report drew on two PERF-convened forums of police executives from around the world, and provided recommendations for policing mass demonstrations. It recommended that police show restraint when using force, in part because "the use of force by police against the public […] usually conveys a disturbing appearance," and a single incident of force can escalate tensions for an entire event.[13]

The report recommended that police use force only when absolutely necessary to protect life or property. Even tools referred to as "less-lethal" uses of force – like rubber bullets, pepper spray, or CS gas – can sometimes lead to severe health complications or even death for individuals. Thus, the report said, police should be aware of the risks of these less-lethal tactics and deploy them only when other methods to prevent more serious violence prove inadequate.

In addition, the 2006 report recommended that departments show restraint with the type of protective equipment that officers wear. Most mass demonstrations do not require military-style equipment. Over-responding with riot gear may show that the police are in control, but it also may elevate tensions in a way that works against the ultimate goal of maintaining order. "The appearance of heavily protected 'Robocop' officers," the report explained, can lead to "a public perception that the police are being heavy-handed and overreacting."[14]

The report also addressed issues with mass arrests, noting that large-scale arrests can lead to widely disseminated images of "law-abiding protesters and passersby [being] rounded up and detained along with violators in overly broad sweeps." Mass arrests can agitate demonstrators and lead to anti-police sentiments, which make policing mass demonstrations significantly more challenging, the report said.

## PERF's 2011 report emphasizes facilitating demonstrations – and avoiding arrests

PERF's 2011 report, *Managing Major Events: Best Practices from the Field*, expanded on how law enforcement agencies should respond to a wide range of major events, from sporting championships and celebratory crowds to natural disasters and protests.

The 2011 report explored strategies and tools for handling large-scale incidents, including mutual aid agreements with neighboring police agencies and use of the National Incident Management System. It also included specific advice about avoiding unnecessary arrests of demonstrators, from Charles Ramsey, then Police Commissioner in Philadelphia:

*My advice is to avoid arrests if at all possible. You have to make up your mind in the beginning that there are certain behaviors you just have to tolerate…. First, the more arrests you make, the more*

---

13. Narr, T., Toliver, J., Murphy, J., McFarland, M., Ederheimer, J. (2006). "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches," *Police Executive Research Forum*, https://www.policeforum.org/assets/docs/Critical_Issues_Series/police%20management%20of%20mass%20demonstrations%20-%20identifying%20issues%20and%20successful%20approaches%202006.pdf .

14. Ibid., page 58.

*likely it is that you'll wind up in court for a long time…. Second, you deplete your own resources by making a lot of arrests. If you make a mass arrest, you take your people off the line to go process prisoners and so forth. Protesters will often send out groups who try to get arrested. Maybe they'll block an intersection, but so what? Just direct traffic around them….*[15]

On a more fundamental level, the report recommended that police agencies remind their officers at every rank that their main goal should be to facilitate the peaceful exercise of First Amendment rights.

## PERF's 2018 report addresses a new phenomenon: "Leaderless demonstrations"

PERF's 2018 report, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, drew on a national conference that PERF hosted in conjunction with the U.S. Department of Justice's Office of Community Oriented Policing Services.

During the conference, one of the main points of discussion was that the origins of demonstrations were changing dramatically. In the past, demonstrations often were announced weeks in advance by a major civil rights organization or other group. Police would have time to work with the organizers to set ground rules, make plans for closing certain streets or reserving parks so demonstrators could assemble safely, and otherwise facilitate the logistics of the demonstration.

*In contrast, many of today's demonstrations are "leaderless."* They occur more spontaneously with little or no advance notice, as thousands of people use Twitter, Instagram, or other social media to let each other know they are going to a certain location to demonstrate. And once the demonstration begins, participants post photographs or videos of it online,

which attract more participants. The Occupy protests of 2011 were some of the early demonstrations to have this feature.

These types of organic, spontaneous demonstrations are more difficult for police to manage. However, police can use the same social media platforms that the demonstrators are using to communicate in real time with the demonstrators. As Seattle Police Assistant Chief Steven Wilske said, "We announce our officers' rules of engagement to the public to try to make it predictable for the protesters."[16]

In Denver, protests historically involved coordinated marches that culminated with rallies and speeches at the Colorado State Capitol Building and other major government facilities, according to the 2020 report by Denver's Office of the Independent Monitor. By contrast, the George Floyd protests in Denver "developed quickly, without an obvious schedule for the first five days. Groups often split from each other and moved in different directions without easily discernable intended destinations."[17]

The 2018 PERF report noted that police sometimes can identify "informal leaders" of demonstrations by carefully watching social media posts, and then communicate with those leaders via social media. In some cases, it is also possible for officers on the ground to see who the informal leaders are and to work with them.

The report also highlighted the strategic importance of bicycle officers, due to their maneuverability in crowded settings and general approachability. Bicycle helmets also provide officers with some protection without appearing militaristic, and bicycles can be used as mobile fences if needed.

Finally, the report stressed the importance of looking after officers' mental and physical well-being when they have stressful encounters with hostile demonstrators. As Dr. Edward Maguire said,

*Some of these protesters are really provocative…. Police on skirmish lines take a lot of verbal abuse, and it can get tough. I've talked to a lot of officers*

15. Police Executive Research Forum (2011). "Managing Major Events: Best Practices from the Field," https://www.policeforum.org/assets/docs/Critical_Issues_Series/managing%20major%20events%20-%20best%20practices%20from%20the%20field%202011.pdf.
16. Police Executive Research Forum (2018). "The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned," http://www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf. Page 58.
17. Denver Office of the Independent Monitor. "The Police Response to the 2020 George Floyd Protests in Denver, an Independent Review." Page 6. https://www.denvergov.org/files/assets/public/independent-monitor/documents/2020gfpreport_oim.pdf

*who struggled being out there for hours on end. It's important to talk about what kind of steps we can take to talk about preserving emotional well-being and handling stress.*

*One recommendation is to train officers to just withdraw from the line if they're getting heated, and the second is to train officers to pull each other off of the line. You need to build that into the deployment plan, so you have the capacity for officers to check out or encourage their peers to check out.*[18]

## The demonstrations of 2020: Unprecedented in number, size, and violence

PERF's previous reports took on new relevance during the summer of 2020. On May 25, 2020, Minneapolis police officer Derek Chauvin knelt on George Floyd's neck for nearly nine minutes, killing him and sending shockwaves around the world.

Mr. Floyd's killing triggered massive demonstrations across the United States and in other countries, in what some have called the largest social movement in American history.[19]

The Major Cities Chiefs Association (MCCA) reported that between May 25 and July 31, 2020, there were approximately 8,700 mass demonstrations in 68 major cities or counties that provided data to MCCA.[20] Many of these demonstrations attracted enormous crowds through social media and were "leaderless," making it difficult for police to make connections with community members and manage the events proactively.

MCCA asked its members to characterize the nature of the individual demonstrations they policed, and found that:

- 51% of the demonstrations that took place were peaceful and lawful;

- 42% involved unlawful activity, usually acts of civil disobedience, such as occupying roads or intersections or spray-painting public property;

- 7% turned violent, including offenses such as assaults on police officers, looting, and arson.[21]

When MCCA asked its members about the totality of all demonstrations they experienced from May to July 2020:

- 62% of the jurisdictions experienced looting in at least one demonstration, and 56% experienced arson;

- 72% of jurisdictions reported injured officers;

- The agencies reported making more than 16,200 arrests during the 8,700 protests, and 17% of the individuals arrested faced felony charges.

Los Angeles and New York City each experienced more than 1,000 protests, with multiple events in different locations on the same days. The largest single demonstration occurred in Houston, with an estimated 60,000 protesters.[22] Portland, OR experienced over 100 consecutive nights of protests.[23] In Seattle, police officers abandoned one of their buildings after a week of violent standoffs with protesters; demonstrators quickly turned several streets around the precinct into the police-free "Capitol Hill

18. Police Executive Research Forum (2018). "The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned," http://www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf. Page 13.

19. Buchanan, L., Bui, Q., Patel, J. K. (July 3, 2020). "Black Lives Matter May Be the Largest Movement in U.S. History," *New York Times*, https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

20. Major Cities Chiefs Association, Intelligence Commanders Group (October 2020). "Report on the 2020 Protests and Civil Unrest," https://majorcitieschiefs.com/wp-content/uploads/2021/01/MCCA-Report-on-the-2020-Protest-and-Civil-Unrest.pdf

21. Major Cities Chiefs Association, First Amendment Assembly Working Group (April 2021). "Law Enforcement Response to First Amendment Assemblies: Best Practices and Tactics," https://majorcitieschiefs.com/wp-content/uploads/2021/04/MCCA-First-Amendment-Assembly-Working-Group-Final-Report.pdf

22. Major Cities Chiefs Association, Intelligence Commanders Group (October 2020). "Report on the 2020 Protests & Civil Unrest," https://majorcitieschiefs.com/wp-content/uploads/2021/01/MCCA-Report-on-the-2020-Protest-and-Civil-Unrest.pdf.

23. Fuller, T. (September 5, 2020). "100 Days of Protest: A Chasm Grows Between Portland and the Rest of Oregon," *New York Times*, https://www.nytimes.com/2020/09/05/us/portland-political-chasm-protests-unrest.html.

Autonomous Zone."[24] In New York City, by the end of July, the NYPD reported that 303 vehicles had been vandalized, including 14 destroyed by fire.[25]

In Denver, the Police Department reported 81 officer injuries during George Floyd protests, and "the vast majority were caused by individuals throwing objects, such as rocks, fireworks, and other projectiles," according to the Office of the Independent Monitor report. "We are aware of no other event in Denver's recent history that resulted in this number of injuries to DPD officers…. Every command officer we spoke to during this review said that the protests were extremely difficult to manage."[26]

## New challenge for police: Handling large numbers of anti-police demonstrations during a pandemic

**The scale of the mass demonstrations during 2020, the fact that police actions were the subject of the protests, and they were occurring during a once-in-a-century global pandemic presented police departments across the country with unprecedented challenges.**

For example, Indianapolis's Independent Review Panel found that "Indianapolis has a history of peaceful protests," and the city's police officers "are accustomed to being able to talk to protest organizers in advance, generally agree on the terms and parameters of a protest event, and avoid violence." But "there were significant differences here," the IRP noted, saying:

> *"First, the [George Floyd] protests drew out a much larger crowd than any prior gathering. Many … were not affiliated with any groups that [the police] were accustomed to working with, nor did they necessarily respond to the efforts of those groups to exercise leadership or control. More importantly, the nature of this protest was different. The subject was specifically the conduct of the police themselves. Thus, the crowd was not inclined to be 'managed' or 'controlled' by the police."[27]*

Another new challenge was that agencies often were unable to take advantage of mutual aid agreements, because neighboring jurisdictions' police forces were also busy policing their own demonstrations.

In addition, the COVID-19 pandemic raised the stakes of large demonstrations, making them a public health risk for the protesters and the police. Arrests were especially problematic, and any attempts to enforce local mask mandates or other COVID precautions would have been fruitless.

24. Baker, M. (11 June, 2020). "Free Food, Free Speech and Free of Police: Inside Seattle's 'Autonomous Zone,'" *New York Times*, https://www.nytimes.com/2020/06/11/us/seattle-autonomous-zone.html.

25. Associated Press (28 July 2020). "NYPD: 303 Police Cars Damaged Since Floyd Death, Costing $1M," *ABC News*, https://abcnews.go.com/US/wireStory/nypd-303-police-cars-damaged-floyd-death-costing-72026145.

26. Denver Office of the Independent Monitor. "The Police Response to the 2020 George Floyd Protests in Denver, an Independent Review." Page 7. https://www.denvergov.org/files/assets/public/independent-monitor/documents/2020gfpreport_oim.pdf

27. "Final Report of Independent Review Panel" (February 23, 2021). Page 16. https://www.wfyi.org/files/wfyi/files/impd-review-panel-full-report.pdf

## RECOMMENDATION 1:

# Rethink the role of community representatives before and during protests.



Toronto Police Service
and protestors

THE DEMONSTRATIONS OF 2020 SHOWED THAT many police departments' existing protocols and policies were not adequate for responding to large-scale, often violent protests that continued in hundreds of cities across the nation, in many cases for weeks or months.

Police need a new approach for working with their communities on a continuing basis to facilitate demonstrations. This cannot be done in the midst of an ongoing crisis. This new approach is all about building trust in incremental ways.

In this way, even if police do not have the opportunity to work with organizers in the days immediately preceding a demonstration, they will have built a wide range of relationships in the community over a period of years. Ideally, many people taking part in the demonstration, especially those who are formal or informal community leaders, will personally know and trust several police officers or leaders. They will not be inclined to "assume the worst" about police, and they will know individual officers they can talk to about issues that arise during the demonstration.

**Police should make special efforts to bring community members into their general process of planning for all types of demonstrations.** This should include police meetings on policy issues related to demonstrations, table-top exercises and other training programs, meetings with mutual aid partners, etc. Allowing community members to witness and participate in these meetings will demonstrate that police truly see their role as facilitating protests, and will help to prevent community leaders from believing the worst about police, such as thinking that police wish to suppress protests, in particular protests that are about police actions.

In this way, community members become the force-multipliers. Police will always be challenged to have enough officers to manage large demonstrations that continue for weeks. Engaging the community is essential to bolstering the police response.

**Police still will face challenges in managing leaderless demonstrations that are promoted via social media and occur with little or no advance notice, or in dealing with leftist anarchist groups**

> *"It's really important to have relationships with law enforcement ahead of time. Those relationships must be built not when protest begins, but months and years in advance."*
>
> **Tara Murray, civil and human rights attorney in Washington, D.C.**

or right-wing anti-government groups like the boogaloo movement that have no interest in working with the police. But it will help if police have broad support from more mainstream community leaders and activists.

**Police also should strive to work with community leaders during demonstrations.** Ideally, community leaders can take an important role as "go-betweens" between police and demonstrators in the field, providing real-time communications back and forth between protesters and police about what is happening on the ground.

For example, community leaders might use their cell phones to tell police that small numbers of people are arriving at certain locations with rocks or other objects to throw at officers. With this information, police might be able to neutralize the threat before it can grow.

Or conversely, if demonstrators have taken over a street that is an essential route for ambulances or fire trucks, community leaders could help to spread the word among demonstrators that police want to clear one side of the street in order to allow any emergency vehicles to pass. If the demonstrators understand that the purpose is to maintain public safety, they likely will be more willing to comply than if they assume that police are just flexing their authority for no reason.

Other community leaders could serve as on-the-ground marshals in the demonstration, providing information to the public and relaying the public's concerns or questions to the police command center.

**Building trust:** According to some of the after-action reports that PERF reviewed, a key challenge that many police departments faced during the 2020 protests was that they had not built trust with the wide range of people demonstrating. This lack of trust was compounded by the fact that the demonstrations of 2020 were mostly about excessive use of force or other allegations of police misconduct, rather than

other issues such as climate change, where police might generally be seen as neutral observers of the demonstrations.

As a result, in the demonstrations of 2020, many members of the public expected that police would obstruct their First Amendment rights, rather than serving as an ally in maintaining peaceful, lawful gatherings. Tensions, therefore, ran especially high.

The after-action reports highlighted this lack of trust. In West Philadelphia, for example, protesters said they "felt that the police were more concerned with protecting property [than protecting] members of the community."[28] In Indianapolis, "there were several instances in which mutual misunderstanding, and to some extent distrust, fueled tensions between IMPD and the community."

Following are specific recommendations for strengthening police-community ties in ways that build trust and understanding in advance of mass demonstrations. Together, these recommendations will help communities feel included and understood by police.

## 1A. Engage your community in discussions about all aspects of the police response to demonstrations, including key issues such as use of force, less-lethal force options, and how police make decisions in complex situations.

PERF recommends that police agencies involve their communities in discussions about the police response to demonstrations. These discussions should not be focused only on particular protest events, but rather should address broader issues, such as the circumstances under which police might use (or might be barred from using) different types of less-lethal force tools, how officers use a Critical Decision-Making Model to guide their thinking in managing complex situations during a demonstration, and broader issues.

---

28. See "After-action reports," pp. 9-10, for links to full texts of after-action reports cited in this report.

> *"Write rules of engagement that everybody is aware of and agrees upon, because an inconsistent response from one protest to another creates distrust and causes people to feel that the police are unpredictable."*
>
> **Dr. Tamara Herold, Associate Professor, University of Nevada, Las Vegas**

Los Angeles police and protesters



Taking the time to create a shared understanding of objectives, needs, and challenges will make it easier for officers to gain cooperation and compliance during events.

Including community members in these discussions will provide them with a better understanding of what they can expect from police, and of the rationale behind police decisions during demonstrations. Involving community members also will highlight the difficult choices police departments must make in order to keep everyone safe during large and unpredictable protests.

Many of the after-action reports PERF reviewed support this recommendation. Philadelphia's report called for developing a community outreach plan to build relationships, share information about police roles and responsibilities, and establish guidelines about acceptable and unacceptable behaviors. The result will be an "improved understanding of perspectives and goals" on both sides, the report said.

Raleigh's after-action report went farther, calling on police to "include community representatives in the development of training, policy, and the organizational implementation of both."

New York City's Department of Investigation after-action report also highlighted the need to engage communities proactively. Its recommendations include creating a new Protest Response Unit, tasked with involving the Community Affairs Bureau in "discussions and decisions regarding the planning and strategy for policing large protests." The report also advises the NYPD to "enhance and expand its public communication during protests," so that officers and community members can benefit from real-time communication. The report also calls for all police-initiated communications to "balance concerns about the First Amendment rights of protesters, officer and public safety, and police-community relations."

## 1B. Invite community members to observe and participate in training courses and tabletop exercises on the police response to demonstrations, and to provide input on policies.

PERF recommends inviting community leaders to observe and provide feedback on training courses and tabletop exercises pertaining to demonstrations, as well as providing input into agency policies.

A number of 2020 after-action reports supported this idea:

- San Jose's after-action report recommended that the city's Police Department work with the community on a "comprehensive review of the Department's policies and procedures applicable to crowd control events and use of force."

- Raleigh's report mentioned developing an approach to crowd management "in conjunction with city leadership and the community."

Allowing police officials and trainers to hear from community leaders about how they perceive police actions during a demonstration can help to improve training and policies. This can help police to clear up misunderstandings and avoid actions that may unintentionally increase tensions with the community.

## 1C. Train community leaders to be mediators and co-responders.

PERF recommends that police agencies invite community leaders to be mediators during demonstrations. Police also should assemble co-response teams of police and community leaders.

By working together during demonstrations to defuse incidents as they arise, these teams may avoid the "us-against-them" mentality that sometimes occurs when police respond to protests on their own.

Some jurisdictions' after-action reports call for this type of mediation, where police departments proactively engage a group of individuals who can mobilize on the day to help facilitate positive police-community interactions. For example, Raleigh's report states:

*"Although it may not be possible in every crowd control context, the identification and outreach to individuals who may serve as specific points of contact or liaisons between protestors and police can lead to better outcomes…. Crowd marshals or stewards*

### Police Scotland Involved Elected Officials and Community Leaders in their Preparations for the COP26 International Climate Change Summit

In November 2021, many thousands of demonstrators, including more than 100,000 reported at one demonstration, rallied at the 26th United Nations Climate Change Conference of the Parties (COP26), a 12-day summit held in Glasgow, Scotland, to demand greater action against climate change.[29]

Because many large demonstrations were expected at this event, Police Scotland's Deputy Chief Constable Will Kerr told PERF that in advance of the summit, he invited elected officials to witness police training sessions for managing the protests:

"Community engagement, both before and during a major event, is key. I brought in politicians from across Scotland to experience our public order training in advance of COP26. Some of them, including the Presiding Officer of the Scottish Parliament, even put on full PPE and joined the shield line. Most described the experience as 'revelatory.'

"Having community observers in command rooms is another way to increase public confidence.

"A designated senior officer should be constantly speaking to community representatives, explaining police tactics and the command protocols during an event. All good police plans, when there is the potential to use force, should have community confidence as a key consideration during their planning phase. Many UK police services use 'community impact assessments' for that purpose. These assessments raise a series of questions about the nature of the event and who is likely to be there.

"For example, this assessment of likely demographics should inform the approved range of tactics that are available to commanders. If you can reasonably anticipate a lot of children/young people at a demonstration, you might not approve 'indiscriminate' tactical options such as CS gas, and only authorize the use of targeted force tactics against individuals."

29. See, for example, Sky News. "COP26: Tens of thousands march to demand action on biggest day of protests at climate summit." November 6, 2021. https://news.sky.com/story/cop26-tens-of-thousands-march-to-demand-climate-action-on-biggest-day-of-protests-at-climate-summit-12462301

> *"I met with faith leaders, academic leaders, and community activists, including some who were critical of the police department or critical of me.*
>
> *"We brought them all in, as many as would volunteer to come in. We asked them to play a pivotal role in helping the police keep the crowds of demonstrators safe, and keep those protests from turning violent."*
>
> **Michael Harrison, Baltimore Police Commissioner**

*can serve as both an advocate for the crowd but also a key communicator to the police, encouraging de-escalation and information-sharing as the day's event proceeds."*

Some municipalities, like Baltimore, have already implemented such initiatives, reaching out to individuals who can work with police and communities to keep demonstrations safe and lawful.

## 1D. Maintain daily incident reports, and share them with the public.

Another effective way to communicate with the public during mass demonstrations is through daily incident reports. These regular summaries can help demonstrate that police are committed to transparency. Daily reports can also provide vital information to members of the public about streets that may be cordoned off, any curfews in place, or other restrictions to maintain public safety. Finally, they can help keep peaceful bystanders away from volatile situations, which will help officers more effectively distinguish between people breaking laws and those who are unintentionally caught up in a crowd with lawbreakers.

Dallas's after-action report focused on the importance of the Public Information Office (PIO) at keeping members of the public safe and informed during fast-moving events:

*"A daily incident report of events that occurred the previous day should be created each morning. The information would include crowd sizes, whether and/or how many arrests were made, charges, use-of-force techniques used to disperse crowds, and any other significant issues that may be in the public's interest."*

Beyond sharing information about previous incidents, Charleston's after-action report suggested that the Charleston Police Department work with local media partners to broadcast messages about how to stay safe:

*"A media team should focus on partnering with local media outlets to provide the public with instructions on how to stay safe, as well as with regular updates of the situation, and with ways they can help resolve the situation."*

Social media platforms also have become essential elements of police communications strategies, especially during demonstrations. No communications technology is faster than social media in disseminating critical information to targeted audiences. Police agencies should be familiar with all major social media platforms, and should create accounts and establish a presence on platforms used in their communities.

During a particular demonstration, police should use the platform or platforms *that demonstrators are using* to share their own messages about the demonstration. This will help to ensure that police messages actually reach the people who can benefit from them.

## 1E. Involve community representatives in after-action reviews after demonstrations have concluded.

When police conduct after-action reviews following difficult demonstrations, it is important to obtain the perspectives of community members who were present.

## RECOMMENDATION 2:

# Ensure that internal communications can flow promptly and clearly, up and down the policing chain of command.

DEMONSTRATIONS CAN BE DYNAMIC EVENTS – peaceful one minute and violent the next, or peaceful on one block but violent around the corner. And they can grow in size rapidly, especially via social media. In this regard, the demonstrations of 2020 were especially challenging. In some cities, police responded to demonstrations every night for weeks or even months. And violent demonstrators often embedded themselves in crowds of peaceful protesters, throwing rocks or other objects at police while remaining hidden in the crowd.

In these types of complex, changing situations, effective communication within a police agency is essential, starting with overall guidance from the top. Police leaders must set clear expectations for how officers will approach mass demonstrations, and how they will respond to various types of actions by protesters.

Some of the 2020 after-action reports indicate that police were not always able to keep up with rapidly changing conditions. For example:

- According to the Chicago Police Department's after-action report, "the chaotic nature of the [demonstrations …] precluded department leaders from communicating specific plans (and their underlying rationales) with the field supervisors and/or [officers] ultimately expected to execute them."

- Indianapolis's report found that a "roster of officers was prepared, indicating who would be on duty and who the supervisors would be; but no strategy was articulated nor specific objectives stated, other than to generally keep the peace; protect lives and property; and protect the Constitutional rights of the protesters."

- In Philadelphia, an independent report by CNA and the law firm Montgomery McCracken found that Incident Commanders were not given the authority to make important decisions in the early days of demonstrations, including canceling officers' days off and extending tours of duty. As a result, in some cases "officers felt outnumbered, which may have contributed to their unnecessary applications of force against protesters."

PERF proposes several recommendations to ensure that all ranks and units in a department have a shared understanding of the goals and acceptable tactics for managing a demonstration. It is important that communications flow in both directions

*"Police chiefs will make statements about demonstrations and protests, about their expectations. But sometimes that doesn't trickle down to the officers on the streets with the protesters. I think that communication needs to come from top to bottom."*

**Tara Murray, civil and human rights attorney in Washington, D.C.**

> *"The language that we use is, 'We want to facilitate, and we have a legal duty to facilitate, peaceful protest. That's what we're here to do.'*
>   *"We will protect the rights of the majority to protest, and we'll deal with disorder when it happens. We're unambiguous and clear about that."*
>
> **Will Kerr, Deputy Chief Constable, Police Scotland**

within the department. Officers should understand their agencies' goals, policies, and protocols as defined by top leaders. And senior leaders must be able to receive information coming from officers on the ground, in order to inform strategic and tactical decision-making.

## 2A. Begin by highlighting that police should see their role as facilitating First Amendment rights, while ensuring public safety.

Police leaders and supervisors should start their messaging by making clear to officers that their goal at demonstrations should be to facilitate *safe and lawful* First Amendment expression. It can be easy for officers to lose sight of this goal when faced with large crowds, especially if some protesters are hostile or the subject of the demonstration is police misconduct. Communicating this message clearly and consistently is essential.

For example, Fredericksburg's after-action report recommended that the city's police department "add language [to its demonstrations policy] to state that the department's approach to its handling of public demonstrations has two equal components: upholding the First Amendment rights of demonstrators, while at the same time ensuring public safety."

Officers also should communicate this message with members of the public, which can help build trust. When police repeatedly reassure protesters that their goal is to keep them safe and free to demonstrate, they may be more willing to accept instructions, and perhaps even to share information with the police.

## 2B. Provide officers with clear guidelines for acceptable and unacceptable responses to protest behavior.

Police departments should provide concrete guidance about appropriate and inappropriate tactical responses to different types of behavior by demonstrators. This guidance should not be entirely technical; rather, it should always keep a focus on the larger picture of maintaining a successful, peaceful demonstration.

For example, Fredericksburg's after-action report recommends that commanders "focus not just on operational tactics, but more importantly on how to achieve a successful resolution with sound strategy and resources."

Even if officers have attended training courses that cover such material, providing daily reminders during demonstrations will help to ensure that all officers understand the relevant policies and how they apply to the types of demonstrations that a city is experiencing.

A police department's policy on demonstrations should provide for a system of documentation to properly record and investigate use-of-force incidents by officers, and/or injuries to persons sustained because of police actions while at a demonstration. Injuries to demonstrators or to officers, as well as statements made by demonstrators or officers at the time of the use-of-force incidents, should be captured on officers' body-worn cameras if possible and made a part of the record and investigation.

For more detailed recommendations about policies on less-lethal force, see Recommendation 4, page 31.

## 2C. Reinforce key messages during daily briefings and other recurring events.

Police supervisors should reinforce messages about facilitating First Amendment rights and tactical instructions at daily briefings or roll calls.

Many of the after-action reports make such recommendations.

- Dallas's after-action report noted that "the need for effective communication … elevates as an event goes on." The nature of demonstrations often changes over time. In the summer and fall of 2020, many cities experienced peaceful demonstrations during the day, but after nightfall, the protests would become violent. The Dallas after-action report recommended that commanders and other leaders have frequent opportunities to clarify to subordinates any new objectives, tactics, or expectations.

- San Jose's after-action report recommended that "briefings prior to deployment to large-scale events [should] include a review of rules of engagement, use of force, and other relevant policies."

## 2D. Ensure that officers on the ground are able to share information to inform high-level decision-making as protests unfold.

Agencies should ensure they have systems in place to hear from officers on the ground about what is happening during mass demonstrations. This will enable people in the command center to make well-informed choices about how to keep both protesters and officers safe, ideally while also ensuring that the demonstration can continue.

By communicating effectively both up and down the policing chain of command, agencies can ensure they set clear norms for officers and receive important intelligence to aid decision-making.

*"We had our own live-streaming team, so that we could be in the middle of the demonstration and see what was taking place."*

**Greg Fischer, Mayor of Louisville**

## RECOMMENDATION 3:
# Train officers and supervisors adequately.



Demonstrators and
police in Baltimore

EFFECTIVE TRAINING AND PREPARATION CAN help officers remain calm and de-escalate situations even when tensions run high. Prior to the demonstrations of 2020, however, officers in many agencies had not received adequate training in maintaining public order, appropriate use of tactics and less-lethal options, or other skills relevant to policing mass demonstrations.

With so many issues affecting the police, such as violent crime, the opioid crisis, and police use of force, preparing for demonstrations became a much lower priority. There had not been such widespread, numerous, violent demonstrations for 20 years or more. So police in many cities were blindsided by the enormous numbers of violent protests in 2020.

In many cities there was no anticipation that police would be facing hostile, violent crowds. So training for that kind of situation had not been a priority. It seemed to make little sense to spend millions of dollars training officers on crowd-control techniques if it seemed unlikely that would be needed.

The Chicago Police Department's after-action report found that "Department leaders and key members lacked recent, up-to-date training or practice" on the National Incident Management System (NIMS) and Incident Command System (ICS) frameworks. And because the Chicago Police Department has a large number of recently hired officers, leaders "could not rest on experience alone to guide those in the field through civil unrest."

According to the Cleveland Police Monitoring Team's report, some "members of the Patrol Section had not received their [Mobile Field Force] training since 2015 and had not practiced the use of their [personal protection equipment]," which put officers and members of the public at risk.

In some cases, existing training may be based on principles of crowd psychology that treat large groups as inherently dangerous. This approach may lead officers to approach peaceful protesters suspiciously, and that may become a self-fulfilling prophecy. If officers generally treat demonstrators as potentially

> *"Training is a key to a lot of these issues. These are very high-risk situations with very low frequency. So anytime you put commanders and personnel in these situations, it's going to be challenging for them. The more that we can train, the better."*
>
> **Jeffery Carroll, Assistant Chief, Metropolitan Police Department, Washington, D.C.**

violent agitators, otherwise peaceful demonstrators may feel abused and encouraged to commit acts of civil disobedience or lawlessness.[30]

Training is essential to executing a well-planned, professional response to mass demonstrations that protects public safety as well as demonstrators' First Amendment rights.

### 3A. Provide commanders with the necessary knowledge to coordinate a proportionate, effective police response to mass demonstrations.

Commanders and other agency leaders should receive training on the knowledge and skills they need to coordinate a proportionate, effective police response to mass demonstrations. As Dallas's after-action report outlined:

> *"All command-level personnel should attend regular Incident Command System (ICS) and National Incident Management System (NIMS) training. Training presents a prime opportunity to expand the knowledge base of commanders during critical events that require a baseline familiarity with [Emergency Operations Centers] procedures. A robust training and development program will ensure commanders are prepared with the necessary background knowledge particularly relevant for incidents requiring ICS/NIMS."*

ICS and NIMS training provides leaders with a standardized vocabulary, structure, and approach to manage a wide range of critical events and incidents,

including mass demonstrations. Ensuring that all leaders have received ICS/NIMS training will help them deploy and manage officers in line with best practices.

Maintaining adherence to an Incident Command System plan can be complicated during large, dynamic events. The Los Angeles Independent Counsel's report said:

> *"When confronted by multiple large-scale events, it is important that there be a clear chain of command, where everyone knows who is in charge, and those in charge provide clear direction. This did not consistently occur during the protests. There were times when command staff officers arrived on the scene of a protest and issued orders without coordination with the Incident Commander…. This created confusion."*

### 3B. Train officers in crowd management strategies that facilitate peaceful protest.

In addition to training agency leaders, PERF recommends that police agencies train patrol officers and other personnel in crowd management tactics that facilitate peaceful protest. New York City refers to this approach as a "facilitation mindset," because officers see themselves as facilitating protests, not "policing" demonstrations.

However, in some cases facilitating demonstrations while protecting the public is more easily said than done, particularly when violent offenders, intent on starting riots, are embedded within crowds of peaceful demonstrators.

---

30.  Reicher, S., Stott, C., Drury, J., Adang, O., Cronin, P., Livingstone, A. (13 December 2006.) "Knowledge-Based Public Order Policing: Principles and Practice," *Policing: A Journal of Policy and Practice*, Volume 1, Issue 4, pp. 403–415, https://doi.org/10.1093/police/pam067.

Successful crowd management tactics include:

- distinguishing between peaceful protesters and the typically small number of violent agitators;

- being careful to engage with peaceful protesters in a respectful manner, and not in any way that may come across as antagonizing them;

- understanding crowd psychology and how to keep large groups calm; and

- bearing in mind the importance of proportionality when responding to rapidly unfolding situations.

Many after-action reports noted that navigating such challenging and rapidly evolving situations requires frequent training that covers a comprehensive range of topics. For example, La Mesa's after-action report called for a demonstrations policy that "emphasizes First Amendment rights to free speech and peaceful protest, outlines preparation and planning efforts, describes use-of-force options, emphasizes de-escalation, provides guidance on the use of the Incident Command System, and [incorporates] other guidance and procedures related to controlling crowds." The report adds that training should take place "no less than once annually" for mobile field force officers.

## 3C. Train officers on how to handle demonstrations where violent offenders are intermixed with peaceful demonstrators.

It is relatively easy for police to manage peaceful protests. And police have received training about responding to rioting, arson, looting, and aggravated assaults. **What is difficult is training officers on how to handle situations where most demonstrators are behaving nonviolently, but a relatively small number of violent offenders intentionally mix among the peaceful protesters, often using them as "cover" to throw rocks or other objects at police, for example.**

In this context, it is important to understand that _degrees_ of lawlessness matter. Demonstrators often commit acts, such as occupying streets without

authorization, that violate an ordinance but are not violent in nature. For years, many police chiefs have called for a general posture of tolerance in these situations, especially if police can simply reroute traffic around a street that demonstrators are temporarily occupying. Often, the demonstrators will leave the street after an hour or two. By contrast, arresting demonstrators in this situation can create hostility toward the police, and can tie up police resources for days.

**It is a mistake to approach every large gathering as if it is dangerous, but it is also naïve to believe that peaceful assemblies never devolve into violence.**

**To clarify the police responses in these various situations, it is helpful to begin by providing officers with a clear understanding of First Amendment rights, so they know what types of actions are constitutionally protected.**

In line with this recommendation, Philadelphia's after-action report called for "annual training for all officers that includes legal updates on protected First Amendment activities and how to determine when protected activity becomes unlawful activity," as well as the ability "to identify and distinguish peaceful, nonviolent groups from violent groups."

## 3D. Emphasize de-escalation.

In addition to crowd control strategies, PERF recommends that police agencies provide officers with training on de-escalation strategies.

De-escalation is one of the fundamental guidelines in PERF's 2016 report, Guiding Principles on Use of Force:

> _"Agencies should adopt General Orders and/or policy statements making it clear that de-escalation is the preferred, tactically sound approach in many critical incidents. General Orders should require officers to receive training on key de-escalation principles. De-escalation policy should include discussion of proportionality, using distance and cover, tactical repositioning, 'slowing down' situations that do not pose an immediate threat, calling for supervisory and other resources, etc. Officers must be trained in_

*these principles, and their supervisors should hold them accountable for adhering to them.*[31]

In the context of demonstrations, de-escalation training could include a discussion of how officers should try to win the trust of demonstrators by taking a reasonable approach to solving minor problems resulting from a demonstration, avoiding an unnecessarily heavy-handed enforcement approach.

For example, if a large demonstration takes over a public park or downtown area of a city, but demonstrators are behaving peacefully and not threatening anyone's safety, police can de-escalate by working to address any traffic disruptions or other issues that occur, rather than trying to force the demonstrators to move to a different location or threatening demonstrators with arrests or citations.

A Critical Decision Making Model, as described in PERF's report, *ICAT: Integrating Communications, Assessment, and Tactics*, can help officers assess their options in complex situations, ask themselves the right questions, and make good decisions about the best actions to take (see page 36).

*Police also can practice de-escalation by explaining their actions.* For example, if demonstrators occupy a street or intersection at a choke point that would make it impossible for ambulances or firefighting equipment to respond to certain locations, police can try to de-escalate the situation by using a loudspeaker to explain the public safety risk before asking demonstrators to move to one side of the street or go to the next block, rather than ordering them to leave without explanation.

At the same time, today's demonstrations are more complicated, and not all situations can be de-escalated. The Los Angeles Independent Counsel's report noted:

> *"Crowd psychology is a necessary component of training police to better handle dynamic crowd behavior. The strategies used by some small groups causing violence during the protests in Los Angeles have dramatically changed from past disrupters. Disrupters now have become more mobile and better organized, likely due to the use of technology, and more violent. This shift has significantly impacted the ability of officers to facilitate peaceful protesters exercising their First Amendment rights. The challenge for police today is how to facilitate the exercising of a crowd's First Amendment right while at the same time interdicting smaller groups who are attempting to disrupt the lawful demonstrations."*

## 3E. Write clear, specific policies on the use of "less-lethal" tools, and provide training for officers, supervisors and commanders on how to implement the policies.

Police use of less-lethal tools was a major source of contention during the protests of 2020 and a leading topic in almost every after-action report. Demonstrators who were protesting police use of force became agitated, and sometimes violent, when police used less-lethal tools in ways the protesters felt were excessive and indiscriminate. In some instances, news reporters and bystanders were struck by less-lethal munitions.

From their perspective, police often felt that they had few options for dealing with crowds that became unruly and violent. Less-lethal tools were seen as a reasonable, if imperfect response to dangerous situations.

Recommendation 4 of this report discusses use-of-force considerations in greater detail. As a foundation, agencies need detailed policies on the use of less-lethal tools and extensive training for personnel at all levels on how to carry out those policies.

---

31. Police Executive Research Forum. *Guiding Principles on Use of Force.* 2016. Page 40. https://www.policeforum.org/assets/guidingprinciples1.pdf

## RECOMMENDATION 4:

# Re-engineering the guidelines for use of less-lethal weapons.

NO ISSUE CAUSED MORE CONTROVERSY DURING the demonstrations of 2020 than the use of less-lethal weapons, such as CS gas, rubber or plastic bullets, and "soft" munitions such as bean-bag rounds. Inappropriate use of these tools can be self-defeating, agitating an otherwise peaceful crowd and triggering violence rather than preventing it.

Furthermore, less-lethal force tools can inflict permanent physical damage and even death. Such force often is imprecise, impacting people in a wide radius of the intended target. A *USA Today* analysis in 2020 outlined the risks of various less-lethal weapons:

*"[S]ome officers appear to have violated their department's own rules when they fired 'less lethal' projectiles at protesters who were for the most part peacefully assembled.*

*"Critics have assailed those tactics as civil rights and First Amendment violations, and four federal judges have ordered temporary restrictions on their use.*

*"At least 60 protesters sustained serious head injuries, including a broken jaw, traumatic brain injuries and blindness, based on news reports, interviews with victims and witnesses and a list compiled by Scott Reynhout, a Los Angeles researcher.*

*"Photos and videos posted on social media show protesters with large bruises or deep gashes on the throat, hands, arms, legs, chest, rib cage and* *stomach, all caused by what law enforcement calls 'kinetic impact projectiles' and bystanders call 'rubber bullets.'*

*"At least 20 people have suffered severe eye injuries, including seven people who lost an eye, according to the American Academy of Ophthalmology.*

*"With terms like 'foam,' 'sponge' and 'bean bag,' the projectiles may sound harmless. They're not."*[32]

At the same time, as noted earlier in this report, police officers faced high levels of violence by demonstrators during the protests of 2020, according to a survey of 68 police departments conducted by the Major Cities Chiefs Association (MCCA).

*"There were a variety of weapons used by protesters during acts of civil disobedience or violence. The most common weapons were improvised or weapons of opportunity such as rocks, bricks, pieces of landscape, and bottles (including frozen water bottles and glass bottles"…. Another common violent tactic used by protesters involved throwing 'molotov cocktails' at officers.*

*"Other items used as weapons or projectiles against officers included fire extinguishers, hammers, wood, cinderblocks, rocks, frozen fruit, and suspected bodily fluids…. Another common tactic was to use peaceful protesters as human shields while violent individuals attacked officers and attempted to incite violence by throwing objects from deep within the crowds.*

---

32.  Szabo, Liz et al. (June 19, 2020). "Fractured skulls, lost eyes: Police break their own rules when shooting protesters with 'rubber bullets.'" *USA Today*. https://www.usatoday.com/in-depth/news/nation/2020/06/19/police-break-rules-shooting-protesters-rubber-bullets-less-lethal-projectiles/3211421001/

*"A slight majority of agencies (51%) were also confronted with firearms, most of which were legally carried based on open carry laws. In these instances, protesters often carried semi-automatic assault rifles such as AR-15s, shotguns, and handguns…. Five agencies reported police officers being shot or critically injured during protests."*[33]

Police currently have too little solid information about the capabilities of various less-lethal tools, as well as their dangers and limitations. The policing profession, with assistance from academic experts and the U.S. Justice Department's research agency, the National Institute of Justice, should evaluate less-lethal tools and develop clear, specific policies regarding their use.

## 4A. Establish clear guidelines for when various types of less-lethal force are warranted or are prohibited, with details about their capabilities and limitations.

As noted above, no issue caused more controversy during the demonstrations of 2020 than the use of less-lethal weapons. Despite their name, these devices can inflict serious physical injuries and even death. But there is too little understanding of the capabilities, the limits, and the dangers of these devices.

The policing profession needs more comprehensive research on each type of less-lethal weapon, how they compare with each other, the circumstances in which they may be useful, the types of situations in which they should be limited or prohibited, and how they should be used when they are deployed.

Many of the after-action reports cited in this report recognize the importance of such guidance. For example, Denver's report recommends that the Police Department restrict the use of pepper balls to "only circumstances in which a person is displaying active aggression or aggravated active aggression."

As noted in the next recommendation, 4B, the U.S. Justice Department's research branch, the National Institute of Justice (NIJ), is well situated to help the policing profession on this issue.

As an initial starting point, the experts who participated in PERF's webinar (see pp. 10-11) and other PERF consultants reached broad consensus on the following 7 points regarding less-lethal weapons.

### Police Agency Policies on Less-Lethal Tools

1.  **No weapons should be used against peaceful demonstrators.**

    There was agreement on this guideline among police leaders, academics, and human rights advocates. This includes use of CS gas, pepper spray, so-called "soft" projectiles, and other weapons.

2.  **Beanbag rounds, rubber bullets, and other "soft" projectiles should be considered only for use against people who are committing acts of violence, and only when they can be aimed at a specific individual who is committing a serious criminal act, such as setting a fire or throwing dangerous objects. These weapons should not be used when it is impossible to aim them accurately enough to target a specific individual.**

    "Shooting beanbag rounds or rubber bullets into an open crowd is irresponsible and dangerous," a leading police department's expert on demonstrations told PERF. "The intent of deploying these types of projectiles is that they only strike one individual at a time to incapacitate them. These methods are most effective when utilized to control an extremely dangerous crowd, such as instances where a Molotov cocktail or other dangerous objects are being thrown at officers. … The advantage of deploying these projectiles is that there is a safe standoff distance between the officer and the targeted subject. However, firing rubber bullets from a distance decreases both their force and their accuracy, increasing the risk of shooting people where not intended, such as in the face, or striking random bystanders."

---

33. Major Cities Chiefs Association, Intelligence Commanders Group. *Report on the 2020 Protests and Civil Unrest.* https://majorcitieschiefs.com/wp-content/uploads/2021/01/MCCA-Report-on-the-2020-Protest-and-Civil-Unrest.pdf

"These weapons should not be banned, but officers need to be trained to aim them only at people whose behavior warrants this level of force," said Dr. Edward Maguire, Professor of Criminology and Criminal Justice at Arizona State University, and Chair of PERF's Research Advisory Board. "There have been many instances of officers using these weapons against journalists and people who are not committing a crime."

Brian Castner, Senior Crisis Advisor at Amnesty International, agreed with that approach. "The use of any kinetic impact projectiles can only be justified in situations where officers are able to apply the principle of discrimination, meaning that they only target individuals committing or about to commit violent actions, while also not striking peaceful protesters," Mr. Castner said. "To put it simply, if they have a clear shot against a violent individual, that is justified, but otherwise no. The major hazard of kinetic impact projectiles is that they can cause significant injuries, especially when a person is struck in the head. Amnesty International has documented many cases of broken jaws, cracked skulls, and lost eyesight."

"Any use of force that carries the risk of injury must be highly focused," said Dr. Tamara D. Herold of the University of Nevada, Las Vegas. "To the degree that any of these weapons and instruments will affect people not directly involved in harmful conduct or behavior, they should not be deployed. Police legitimacy is harmed when bystanders experience indiscriminate use of force. The public sees individuals in wheelchairs attempting to escape gas, or the death of bystanders who are hit by projectiles fired into a crowd. The Victoria Snelgrove case is an example."[34]

3. **CS gas should be considered to disperse a crowd only when the following conditions have been met:**

- **The crowd has become violent or is causing significant property damage.**

- **Police have issued an order to disperse and have repeatedly communicated that order**

**to the crowd.** Police should use loudspeakers to ensure that the dispersal order has been heard. If police are considering using CS gas, they should inform the crowd of that. (See Recommendation 5, page 38.) If possible, police should station personnel at the outer edges of the crowd to ensure that the warnings are audible to everyone.

- **Police have given the crowd ample time to comply with the dispersal order and have provided specific instructions about how to comply.** (See Recommendation 5.)

4. **Police should not use CS gas unless it is needed to address a public safety concern.** For example, police should *not* use CS gas to disperse a large crowd simply because a few youths are spray-painting graffiti. It is relatively easy to power-wash paint off a wall, compared to the years it may take to repair the harm done to police-community relationships if police appear to be using force to shut down a largely peaceful demonstration.

"CS should never be used on peaceful demonstrators," one assistant police chief in a major city said.

"The health effects of tear gas are largely unknown, and more medical research is needed to know what is a safe dose for a person to breathe," said Brian Castner.

Police agencies also should remember that CS gas has limited effectiveness. "Many rioters bring gas masks," a police official said. "CS is also only a temporary tool. After deploying CS, you need to have sufficient resources to continue to disrupt the violent crowd. If not, they may return after the CS clears the area. And you need to ensure that the police officers have appropriate PPE (i.e., air-purifying respirators/gas masks)."

"With CS gas, wind is your enemy," another leading police department expert said. "It's a chemical capable of causing physical injury and material damage, and it can be carried beyond your targeted audience and affect unintended persons as well as the surrounding community."

---

34. WBUR News. "Grief Remains 10 Years After Accidental Death Outside Fenway." October 21, 2014. https://www.wbur.org/news/2014/10/21/victoria-snelgrove-anniversary

5. **OC spray and other chemical irritants used against individuals should be deployed only when police can accurately target individuals without harming innocent bystanders. And chemical irritants should be used only to address acts of violence or rioting.**

   **These weapons should not be used against peaceful demonstrators, even if demonstrators are engaging in minor acts of civil disobedience that do not threaten public safety, such as occupying a park without a permit, or blocking a street that is not an essential artery for ambulances, fire trucks, or other public safety vehicles.**

   "Pepper spray is one of the safest available tools when dealing with individuals attempting to destroy property or assault individuals," one leading police official told PERF. "But it should only be used on the specific individuals committing these types of criminal acts."

   PERF's experts generally said that pepper spray devices that are designed to be used against individuals should be subject to the same restrictions as CS gas used against large crowds of people. Chemical irritants can be effective against violent agitators or rioters if police are able to target the spray to specific persons, without harming peaceful bystanders.

   Police should carefully balance the First Amendment rights of peaceful demonstrators with the rights of everyone to be protected against violence or harm. If police are perceived as overreacting to minor infractions of laws, such as occupying streets that are not essential avenues for public safety, community members may question whether the police are genuinely interested in protecting Constitutional rights to assembly and free speech. And when journalists are caught up in a police overreaction, the First Amendment guarantee of freedom of the press is also implicated.

6. **"Flash bangs" and grenade-type devices should not be used in demonstrations.**

   "Flash-bang" devices were developed for hostage-rescue incidents, not demonstrations. Their intent is to disorient people by temporarily blinding or deafening them, which is not consistent with the goal of encouraging demonstrators to disperse or otherwise comply with police orders. A person who is stunned and disoriented is unable to follow directions and comply with police directions.

   PERF's experts said that flash-bang devices are especially counter-productive when used in combination with mechanisms of causing injury, such as "stinger ball" grenades that propel rubber pellets and CS gas in all directions for a radius of up to 50 feet while also using blinding light and deafening sound to disorient people. These devices reportedly have caused many serious injuries and even deaths when used in demonstrations.[35]

   "To produce their blinding light, flash bangs use combustible materials that burn very quickly and at a very high temperature, which can lead to severe burns if deployed on or near a person," a police department expert told PERF. "Once a flash bang is deployed, it cannot be retrieved before detonation, which occurs after a 2-4 second delay once initiated. Consequently, if handled improperly, these devices can result in the loss of fingers or hands to officers or civilians."

   "Grenades that release projectiles in an indiscriminate manner, sometimes packaged with flash-bangs, cannot really be aimed," said Dr. Edward Maguire. "They spread rubber pellets or balls, striking anyone in the area. They can take out an eye or cause many other types of serious injuries. Most instances of their use by police in last year's protests were irresponsible."

   One police expert said that the only scenario in which a flash-bang device might be considered during a demonstration would be "if police intervention is required to enter an aggressive and violent crowd to extract officers, such as an officer-down situation, or to rescue innocent civilians or in other extreme life-threatening situations."

---

35.  Pro Publica. "Hotter Than Lava." January 12, 2015. https://www.propublica.org/article/flashbangs

> *"CS is going to punish everybody in a crowd. Is everybody in that area actually being violent? Or if you deploy 37-millimeter projectiles, how far away are you firing? If you're on the roof of the police station, how accurate are you with that weapon? And if you don't hit the person who's being violent, are you actually bringing law and order to the situation, or are you contributing to the skirmish?"*
>
> **Brian Castner, Senior Crisis Advisor, Amnesty International**

7. **A broader perspective on less-lethal force: Proportional, Lawful, Accountable, and Necessary (PLAN)**

Deputy Chief Constable Will Kerr of Police Scotland offered the following perspective on questions of police use of force during demonstrations. Earlier in his career, he spent 27 years with the Police Service of Northern Ireland, where his command-level posts included Assistant Chief Constable in Belfast.

*"On the issue of proportionality, how do you ensure that <u>police use the minimum amount of force to achieve their lawful purpose</u>? That strategic objective should be built into all operational orders and operational training, setting the broader mindset for all operations.*

*"From harsh experience in Belfast, I know that this simple starting position can have a massive impact on officer behavior and tactics. The basic template against which Northern Ireland officers used any force was the PLAN principles:*

- *Is the use of force <u>Proportionate</u>?*
- *Is there a <u>Lawful</u> authority for the use of force?*
- *Is there <u>Accountability</u>?*
- *Is it <u>Necessary</u>? And if a use of force involves a potentially lethal tactical tool, then this test rises to whether it is <u>absolutely</u> necessary."*

**4B. The National Institute of Justice, the research arm of the U.S. Department of Justice, and academic experts should assist the policing profession by conducting a wide range of new research on less-lethal tools. NIJ and academics should aim to provide concrete information about the capabilities and limitations of each tool, as well as recommendations about whether and how each type of tool should be used in various circumstances.**

As the research branch of the U.S. Department of Justice, the National Institute of Justice (NIJ) is highly respected in the policing profession. Working with academic experts, NIJ should conduct or commission research identifying the strengths and weaknesses of each type of less-lethal tool, and should provide guidance to law enforcement agencies regarding policies and protocols for regulating the use of these tools.

**4C. State in policy who is authorized to make the decision to use each type of less-lethal force.**

Police departments should have clear rules defining who can make decisions to use each type of less-lethal force, and the decision-makers should be at a high enough rank to ensure accountability.

For example, Philadelphia's after-action report recommends that "[a]s a matter of policy, the Police Commissioner or his/her designee will have the sole authority to approve each instance of CS gas dispersal." The report also recommends establishing a "specialized unit designated solely for crowd control and management, [which] should be the primary resource for when CS needs to be deployed."

In Dallas, the use of CS gas during crowd control situations was modified to require authorization from the chief of police or his/her designee following the summer of 2020 protests.

In Denver, the Office of the Independent Monitor noted that "mass protest events are inherently chaotic, and supervisors are often stretched too thin to closely supervise the force being used by individual officers." As a result, police agencies have developed internal controls to regulate the use of force, such as tracking the distribution of less-lethal munitions,

requiring officers to use body-worn cameras to record uses of force, and allowing only certified officers to deploy munitions such as 40mm launchers.

However, "there were significant gaps in the Denver Police Department's use of each of these internal controls" during the George Floyd protest, the OIG stated. On the second day of protests, DPD began purchasing additional munitions, and spent more than $200,000 in five days, mainly on pepper-ball rounds, but the department "did not effectively track this inventory," the OIG said.

**PERF's experts generally agreed that decisions about whether to use less-lethal weapons should be made at high levels within a police department.**

"When Incident Command has been deployed, the Incident Commander should make the overall call to use soft projectiles, CS gas, OC spray, and other tools," said Dr. Edward Maguire. "However, on scene, lower levels must make the call, because the Incident Commander cannot reasonably see what is going on everywhere. I would like to see on-scene commanders, hopefully lieutenants or captains, making the call. When these decisions are left up to officers or sergeants, it often doesn't end well."

However, some police officials said that while large canisters of pepper spray should be authorized only by the Incident Commander, individual officers should be authorized to use their small canisters of OC spray under the same guidelines and restrictions that apply when they use it in their daily operations, as sanctioned by their department's overall use-of-force policy.

## 4D. Emphasize through policies and training that de-escalation, not less-lethal tools, should be the primary tactic for managing demonstrations.

Policies and training should emphasize that de-escalation should be the overarching principle for managing demonstrations. Less-lethal force tools should be considered only if other tactics have failed and demonstrators are actively threatening public safety with violence.

### Using a Critical Thinking and Decision-Making Tool

The Critical Decision-Making Model (CDM), a key element of PERF's Integrating Communications, Assessment, and Tactics (ICAT) training program,[36] can be useful in helping officers manage large demonstrations. Instead of providing officers with hundreds of rigid rules for each specific situation they might encounter, the CDM provides a structure that officers can use to analyze any type of incident and develop appropriate responses.

In the context of demonstrations, officers using the CDM would ask themselves questions such as:

- What are the threats and risks to the public, if any, in the current situation? Am I facing potential threats or immediate ones? Minor threats or serious, dangerous threats? Do I need more information to assess the situation? Do I need to take immediate action? Do I need additional resources?

- What legal authorities do police have in this situation?



**Critical Decision-Making Model**

Collect information.

Assess situation, threats, and risks.

Act, review, and re-assess.

Ethics
Values
Proportionality
**Sanctity of human life**

Identify options and determine best course of action.

Consider police powers and agency policy.

Adapted from the UK National Decision Model

---

36.  PERF. ICAT: Integrating Communications, Assessment, and Tactics. 2016. See pp. 27-32. https://www.policeforum.org/assets/icattrainingguide.pdf

- What are the police department policies governing this situation?

- What options do I have? What exactly am I trying to achieve? Can I slow the situation down to buy time and perhaps achieve a peaceful resolution? How can I communicate with the peaceful demonstrators and with those who are breaking laws or posing a threat?

After taking an action, the CDM calls on officers to ask themselves: Did the action have the desired effect? If so, what should I do next?

If the action does not have the desired effect, then the officer begins the process again and goes back to one of the previous steps of collecting information; assessing the situation, threats, and risks; considering police powers and authority; identifying options and choosing a course of action; taking action; and assessing the results.

**Police should explain to their communities how they use a CDM to make decisions in complex, difficult situations.**

### 4E. Require the use of body-worn cameras when deploying less-lethal force.

PERF recommends that when officers use less-lethal force, they be required to activate their body-worn cameras (BWC), if they are equipped with those devices. Video recordings can provide evidence of the context that justified (or failed to justify) the use of less-lethal force, as well as any required warnings officers provided before deploying it. Body-worn footage can also prove useful when debriefing demonstrations, as officers and supervisors can review what happened and identify any areas for improvement.

Many after-action reports recommend mandated use of body-worn cameras when deploying less-lethal force. For example, Philadelphia's report stated, "All Philadelphia Police Department units and officers designated as responsible for deploying [CS] gas should be required by policy to be equipped with BWC and have it activated when any gas is used."



In addition, Denver's report stated:

*"The OIM recommends that the Denver Police Department amend its Operations and Crowd Management Manuals to require that all sworn personnel working in the field during protest operations be required to wear BWCs, regardless of rank. Further, the OIM recommends that … a supervisor [be assigned] to conduct regular spot check comparisons between rosters and the BWC database to identify any gaps in officer recording that must be addressed."*

### 4F. Discuss the use of less-lethal tools with your community.

The issues outlined in this section are complex and in many cases involve difficult judgment calls. Police leaders should involve community leaders, local elected officials and city government leaders, and the general public in developing policies and practices governing specific weapons. Police should share their expertise and experience about the types of situations in which a tool may be effective, as well as when it is not effective, and when it may pose a greater risk of injury than is warranted by various types of particular circumstances. But police should have broad community support for their policies on use of force, and that support can be obtained only when the community is involved in the decision-making process.

## RECOMMENDATION 5:

# Warn demonstrators before deploying any less-lethal force, and provide clear instructions for the demonstrators' response.

PROVIDING ADVANCE NOTICE TO CROWDS before using force or making arrests, and giving demonstrators clear instructions for how they should respond, gives peaceful protesters an opportunity to leave, and can help avoid any need for escalation of conflict. Advance notice helps to maintain peace and order without unnecessary tensions or use of force.

Advance warning also can reduce the number of peaceful demonstrators getting caught between police and violent agitators, and helps prevent the exposure of peaceful demonstrators to less-lethal force such as CS gas.

When making dispersal orders, it is important to provide specific instructions about *how* demonstrators should respond, such as "Leave by the south exit to the park, on Market Street." Otherwise, demonstrators who wish to comply may get caught up in a confused, delayed response, and it may be unclear to police whether most demonstrators are trying to comply.

Throughout the summer of 2020 protests, there were reports that many law enforcement agencies were not providing advance notice to protesters before using force:

- Denver's Office of the Independent Monitor found that the Denver Police Department "did not consistently issue dispersal orders before using force to disperse crowds." When DPD did broadcast instructions, the orders sometimes lacked information about dispersal routes and did not warn protesters that by remaining, they would be subjected to force and arrest.

- Cleveland's independent monitor found that during one protest, "force was directed to be used within one minute of giving the final dispersal order," giving peaceful protesters little time to vacate the area.

"When CS gas is used without dispersal orders, or when a crowd is trapped, it is a Constitutional violation as well as a human rights violation," said Dr. Edward Maguire. "It is OK to tell a crowd after several warnings, 'We are now going to deploy CS gas.' The verbal warning will go a long way toward dispersing the crowd."

### 5A. Establish clear scripts ahead of time.

Law enforcement agencies should have policies requiring officers to provide advance notice to crowds before deploying CS gas or any other less-lethal tools. Otherwise, agencies risk inflaming tensions and creating an impression that they are "ambushing" demonstrators for exercising their First Amendment rights.

These announcements should explain the legal basis for dispersing a crowd – i.e., the unlawful actions that are taking place, such as blocking a street – and should explain the consequences of ignoring an order to disperse. Otherwise, members of the public may be subjected to force or arrest without knowing they had been doing anything wrong.

Live announcements are preferable to recordings, because they "humanize" the directives and sound less intimidating than audio recordings. Live

announcements also give police the opportunity to tailor their messages to specific situations. To ensure that dispersal orders are clear, Philadelphia's after-action report suggested that police should write standard scripts that can be used – and, if needed, customized – in various situations.

## 5B. Try to ensure that all warnings are audible to all demonstrators.

To make sure that any advance notice or dispersal orders are audible to all protesters, Raleigh's 21CP after-action report recommended "investing in sound amplification devices … to ensure that critical communication addressing tactics is not misunderstood or unheard in loud, chaotic crowd contexts."

New York City's Department of Investigation report recommended that officers announce dispersal orders or advance notice of less-lethal force "at least three times from multiple locations at large protests and events."

Police also should send officers out into crowds, or to the outer reaches of the crowd, to listen and make sure that any announcements are clearly audible to everyone.

## 5C. Give demonstrators clear, reasonable instructions, and provide adequate time to react.

Orders to disperse or otherwise comply with instructions should be specific, reasonable, and well-planned, to ensure that demonstrators who wish to comply can do so promptly and without confusion.

Police should include a brief explanation of why an order to disperse or other instructions are being given. For example, if demonstrators are blocking a road or a critical intersection, the first option for police should be to reroute traffic, rather than making arrests, if possible. (See Recommendation 6.) If rerouting traffic is not possible and police decide that the blocked street must be opened, a dispersal order should briefly mention why it is dangerous for the street to be blocked – for example, because ambulances and firefighting equipment would be unable to respond to emergencies.

Providing explanations can help avoid giving demonstrators any impression that police are trying to shut down a demonstration for no apparent reason. The more reasonable a dispersal order sounds, the more likely it is that most demonstrators will comply with it. Whenever possible, it is preferable to simply redirect demonstrators to a nearby location.

In some cases, police may decide to disperse a crowd because a small group of violent agitators are causing injuries. Again, rather than simply ordering the demonstrators to disperse, police should provide a brief explanation that will seem reasonable to most people, stating that the dispersal order is being made in the interest of protecting public safety, not suppressing First Amendment rights.

Police must provide demonstrators with enough time to comply with instructions. And the instructions should be clear, understandable, and detailed enough to provide an orderly response. Some cities' after-action reports recounted situations in which it was unclear whether demonstrators were trying to comply with dispersal orders, because they were walking in all directions and being blocked by each other.

Police should post dispersal orders and other information on social media, especially on the social media platforms that demonstrators are using during the event. Where possible, police should tag the social media accounts of protest organizers and use the same hashtags as the demonstrators, to increase the chances of their posts being seen. In recent years, demonstrations increasingly are announced, promoted, and publicized via social media, so it is essential that police use those same social media platforms to reach demonstrators and provide critical information.

**Police also should make time-stamped video recordings of themselves issuing instructions and warnings, to serve as a record of their actions that can be shared publicly later.**

## 5D. Play warnings in multiple languages.

In diverse communities, PERF recommends that law enforcement agencies issue warnings or dispersal orders in multiple languages. For example, San Jose's after-action report recommended that agencies record "dispersal orders in the three languages most likely to be encountered in San Jose: English, Spanish and Vietnamese."

Agencies also should post any dispersal orders on social media platforms in multiple languages.



## RECOMMENDATION 6:
# Minimize the use of mass arrests.

SINCE 2006, PERF HAS BEEN STRONGLY CAUTION-ing police agencies against making mass arrests at demonstrations.

In the 2006 report, Police Management of Mass Demonstrations, PERF said:

*"[T]he mass detention of protestors not actively engaged in violence can create significant problems for law enforcement agencies. Mass arrests during demonstrations in Washington, D.C., New York City, and other major locales have been criticized. In some cases, the protest activity, while unlawful, was not necessarily violent. Complaints included that law-abiding protestors and passersby were rounded up and detained along with violators in overly broad sweeps. The negative impact of these media images damages the public perception of the police operation, as it draws into question the reasonable-ness and proportionality of the police response.*

*"Subsequent litigation has proven to be par-ticularly costly. Litigation has included criticism of understaffed prisoner processing operations that, when overwhelmed, led to inordinate detention without charge."* [37]

In a 2018 PERF report, NYPD Lieutenant Christophe Stissi said that the NYPD makes a criti-cal distinction between criminal behavior and civil disobedience:

*"The message that we communicate to officers is that if they observe a violent criminal act—for example, throwing a bottle and potentially causing a serious injury, or throwing a trash can through a store win-dow—they have a green light to make an arrest, and they don't have to ask anybody's permission.*

*"In cases of civil disobedience—for example, a crowd goes into a roadway and obstructs vehicle traffic, or a crowd blocks pedestrians who are trying to get into a store—officers are instructed that under no circumstances will they make an arrest without the approval of the incident commander.*

*"Civil disobedience is very different from a criminal act. If you make an arrest, you're taking away that person's right to demonstrate."* [38]

Assistant Chief Jeffery Carroll of the Washing-ton, DC Metropolitan Police Department outlined the extensive planning that must go into any large-scale arrests:

*"You have to make sure you have a system for han-dling mass arrests before a large protest takes place. How are you going to process people if you do arrest them? How are you going to transport them? Where are you going to take them? Are you going to feed them? How long are you planning on having them?*

---

37. *Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches.* Police Executive Research Forum (2006). P. 55. https://www.policeforum.org/assets/docs/Critical_Issues_Series/police%20management%20of%20mass%20demonstrations%20 -%20identifying%20issues%20and%20successful%20approaches%202006.pdf

38. *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned.* Police Executive Research Forum (2018). Pp. 17-18. http://www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf

*"You cannot take 50 people into a district station and expect them to be processed in a timely manner unless you've preplanned.*

*"We have a high-volume arrest processing system that we use, and we have officers who are specifically trained on how to use it. We have pre-determined locations where we can process a large number of arrestees.*

*"If you're going to give warnings and potentially make arrests, you should be specific about the laws people are violating. For example, if people are blocking a major highway, you have to tell them what law they are breaking.*

*"We give demonstrators three audible warnings before we make arrests. We have to ensure that the entire crowd can actually hear these warnings.*

*"Another thing we learned is the importance of ensuring that you don't encircle the crowd without allowing an avenue of escape. If you're telling a crowd to disperse, you cannot completely encircle the entire crowd with officers, because then they have no way to go elsewhere.*

*"You also have to be careful to ensure that you don't accidentally involve people who aren't actually part of the protest. You don't want to draw onlookers into a demonstration and not give them an avenue to leave if they choose to do so."*[39]

## 6A. Avoid the use of mass arrests whenever possible.

PERF recommends that whenever possible, law enforcement agencies avoid mass arrests. Mass arrests can give the impression that police are stifling First Amendment expression rather than facilitating it. This can erode community trust and goodwill.

Video recordings of mass arrests on TV news programs and social media can galvanize public opinion against the police, calling into question their motives.

As noted above, mass arrests also consume enormous amounts of police resources, and can distract officers from responsibilities that are more urgent and more relevant to public safety.

In a PERF report, then-Philadelphia Police Commissioner Charles Ramsey explained the rationale for avoiding arrests other than individual arrests for specific crimes:

*"My advice is to avoid arrests if at all possible. You can't lock people up for everything they do. First, the more arrests you make, the more likely it is that you'll wind up in court for a long time. Second, you deplete your own resources by making a lot of arrests. You take your people off the line to go process prisoners. You're losing personnel that you may need later on.*

*"Protesters will often send out groups who try to get arrested. Maybe they'll block an intersection, but so what? Just direct traffic around them. If they're blocking an Interstate highway, of course you have to do something. But a city street where you can just redirect traffic is a different ballgame."*[40]

## 6B. Plan adequately for mass arrests in case they become unavoidable.

Even though police should avoid any unnecessary or excessive use of their arrest powers during demonstrations, they should also recognize that there may be incidents where a large number of arrests may be required.

For example, rioting or violence during demonstrations cannot be ignored, and arrests may be the only mechanism for stopping criminal behavior. Or in the case of civil disobedience that is creating a public safety risk, such as blocking major highways that are essential for emergency response, arrests may be necessary if demonstrators refuse all requests for voluntary compliance.

39. *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned.* Police Executive Research Forum (2018). Pp. 18-19. http://www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf
40. Police Executive Research Forum (2011). "Managing Major Events: Best Practices from the Field," pp. 44-45. https://www.policeforum.org/assets/docs/Critical_Issues_Series/managing%20major%20events%20-%20best%20practices%20from%20the%20field%202011.pdf.

Thus, police should have policies, general orders, and protocols for managing each aspect of large-scale arrests, including:

- In the case of civil disobedience, video recordings or other documentation of police orders and warnings being given repeatedly, to show that demonstrators heard the orders and had time to comply;

- Plans for transporting arrestees to locations where large numbers of arrestees can be processed expeditiously;

- Plans for having adequate staffing at processing locations, with persons who know how to manage arrests;

- Plans for deciding whether arrestees will be taken into custody or issued a citation;

- Plans for providing bathroom facilities and food and water to arrestees if they will be held in custody for a significant amount of time.

Fredericksburg's after-action report recommended that FPD "continue to review and conduct tabletop exercises regarding mass arrest situations, specifically how to address the resources required to manage the arrest processes."

Philadelphia's report recommended that agencies develop contingency plans, including "backup processing stations," to ensure that large numbers of detainees can be processed in a timely manner.

RECOMMENDATION 7:
# Prepare and activate mutual aid agreements.

MUTUAL AID AGREEMENTS CAN HELP LAW enforcement agencies when mass demonstrations require a larger police response than one agency can muster. When multiple agencies work together, however, there must be clear written understandings that officers from the assisting agencies will take direction from, and abide by the policies of, the lead agency.

During the 2020 protests, mutual aid was a significant issue. Because demonstrations were occurring across the country in jurisdictions of all sizes, many law enforcement agencies were dealing with mass demonstrations and civil unrest in their own jurisdictions and could not respond to assist other agencies.

Even so, the protests revealed that many agencies did not have up-to-date or detailed mutual aid agreements. In some jurisdictions that activated mutual aid agreements, agencies experienced challenges reconciling the norms and training of different police forces.

Mutual aid agreements also brought logistical challenges during the 2020 protests. For example, the Philadelphia after-action report found that multiple decision-makers and conflicting instructions from different agencies resulted in "confusion and delayed decision-making for deployment of resources." Philadelphia's mutual aid coordinator struggled to "maintain information on the availability and real-time location of the outside law enforcement agencies' personnel."

The challenges of managing mutual aid during large demonstrations have been a difficult issue in policing for many years. A PERF report about the Baltimore Police Department's handling of riots following the arrest and death in police custody of Freddie Gray in 2015 found that uncertainty about mutual aid was one of several major problems. "Many police agencies did provide assistance to the Baltimore Police Department, but because of certain requirements under the regional mutual aid compact, BPD was unable to know exactly how much assistance would be provided," the report said. "There was confusion about the roles that each mutual aid department would take, and about the use-of-force policies and the equipment that would be used during the police response to the demonstrations and the rioting."[41]

## 7A. Ensure that mutual aid agreements are specific and clear.

PERF recommends that agencies create mutual aid agreements with specific, clear instructions about response protocols. Officers from various jurisdictions may be accustomed to different policies or tactics on using force, or their department may have a different "culture" about use of force during protests. To avoid misunderstanding and confusion during a demonstration or other event, and to ensure that community members receive a consistent level

---

41. PERF. (2015) "Lessons Learned from the 2015 Civil Unrest in Baltimore." https://www.policeforum.org/assets/2015baltimorecivilunrest.pdf

> *"Whether you're a small, medium-size, or large department, when you have mutual aid agreements and you bring in resources from outside of your jurisdiction, you have to establish clear command and control.*
>
> *"Otherwise, people are coming into your jurisdiction and performing based on their policies and training. I think there needs to be a mechanism of training with other counties and cities."*
>
> **Michael Harrison, Baltimore Police Commissioner**

of service, police agencies should review existing mutual aid agreements or draft new ones that go into an appropriate level of detail.

For example, the report by the Denver Office of the Independent Monitor stated that Denver's mutual aid agreement "permitted each agency to follow its own guidelines about when force could be used rather than the DPD's standards, and use less-lethal tools that were not permitted under DPD policy." The Independent Monitor's report recommended that *"during future mutual aid deployments in Denver, the DPD [should] require its Mutual Aid Partners to adhere to the DPD's Use of Force Policy, and to utilize only types of weapons and munitions approved for use by the DPD."*

Philadelphia's after-action report recommended reviewing all mutual aid agreements "to determine if they are adequate in specifying the commitment, scope, and general procedures for all parties."

## 7B. Have ongoing discussions with mutual aid agencies about response protocols.

Updating or creating mutual aid agreements requires having detailed discussions with participating agencies about mutual aid response expectations. PERF recommends that agencies have these conversations frequently, to ensure that agency leaders on all sides are familiar with the details of response protocols. Whenever possible, these discussions should take place immediately prior to any planned or unplanned events that may require a mutual aid response.

Fredericksburg's after-action report suggests having "high-level discussions with neighboring law enforcement agencies to ensure there are clear understandings about how mutual aid responses will be conducted." The report also recommends that jurisdictions share their policy language on critical

issues with mutual aid partners to avoid any misunderstandings about use of force and other matters.

If an agency changes its use-of-force policies or tactics, it should inform agencies with whom it has mutual aid agreements.

## 7C. Conduct tabletop exercises or other training with mutual aid partners.

**PERF recommends that mutual aid partners conduct joint tabletop exercises and training. Training together helps to clarify key issues and policy differences. And it also gives police leaders and officers opportunities to get to know one another.**

Whenever two or more police agencies work together during a complex critical incident, it is helpful if they already know each other, have built a relationship of trust, and are familiar with individuals' strengths or any weaknesses.

Many after-action reports from the 2020 protests made this recommendation. For example, the Columbia, SC Police Department's report recommended conducting joint tabletop exercises "at least once a year to ensure the department Command Staff and subordinate supervisors understand and can execute functions, processes, and plans."

Dallas's after-action report called for "increased information sharing, and local conferences to share best policies and practices." It also suggests working with partner agencies "to develop opportunities for increased interjurisdictional training, with the goal of creating a more cohesive and efficient response to large-scale public safety incidents."

Again, when there is some advance warning of a critical incident that may require mutual aid, agencies should conduct joint tabletop exercises immediately prior to the event.

## RECOMMENDATION 8:
# Prioritize officer safety, health, and wellness

LARGE-SCALE DEMONSTRATIONS CAN CAUSE intense physical and emotional strain on officers. Policing demonstrations often means exposure to large crowds, tense encounters, and in some cases, threatening and dangerous situations. In 2020, many cities experienced demonstrations every night for weeks. Burnout, post-traumatic stress disorder, and other psychological issues may result from the challenges of policing mass demonstrations.

Police departments have a duty to take care of their officers, especially during stressful events like mass demonstrations.

A number of after-action reports cite these challenges. Cleveland's report noted that on a practical level, "there was limited ability to take breaks for food, water, or rest" during the demonstrations. Dallas's report said that the "personal and cultural attacks [on police] were devastating to the morale of officers." And the Los Angeles Independent Counsel's report noted that many police officers and commanders "were sleep-deprived during the protests" because of their long hours of duty, and officers also were traumatized by people throwing bricks, concrete blocks, and explosive devices at them.

In the wake of the 2020 protests, there is evidence that officers have been leaving the profession at higher rates. A May 2021 survey of police agencies conducted by PERF found that among the 194 responding police agencies, the rate of resignations increased 18% in the 12-month period ending March 31, 2021, compared to the same period one year earlier. The survey also found a 45% increase in the retirement rate in that period.[42]

### 8A. Don't neglect the basics, such as providing officers with access to food and water.

Even the most basic tasks, such as providing food and water to officers working long shifts during mass demonstrations, can be logistically difficult when crowds are large, officers are moving to different locations as conditions change, and officers don't have time to take a break because they are needed on the front lines.

A number of after-action reports noted that attending to officers' basic needs can be difficult, and offered suggestions. Dallas's report recommended that the Police Department create a special secure area during demonstrations where officers can go to get food and drinks. Cleveland's after-action report even suggested "a contract for water, Gatorade/Powerade and snacks" that will cover a minimum amount purchased yearly, to ensure CPD officers have enough food and drink for officers during such large-scale events.

---

42. PERF Special Report. (11 June 2021). "Survey on Police Workforce Trends," *Police Executive Research Forum*, https://www.policeforum.org/workforcesurveyjune2021.

## 8B. Issue adequate personal protection equipment.

Another basic but important component of officer well-being is ensuring that all officers have adequate personal protection equipment (PPE). This was especially importantly during 2020, when officers needed gear to protect them from physical assaults *and* from COVID-19. PERF recommends auditing supply levels and distribution protocols to ensure that all officers are issued the necessary gear.

After-action reports noted that providing PPE is an essential element of responding to demonstrations. Philadelphia's report recommended that all officers receive "a riot helmet, a gas mask, and goggles or safety glasses" and specifies that the PPE "should be easily accessible for officers to ensure that they are equipped even on short notice." Cleveland's report specified that officers should have equipment that fits them, and that they "receive updated training on PPE" to ensure proper use.

In situations where police may be considering use of CS gas, they need to make sure that all officers have gas masks.

## 8C. Keep riot gear out of sight.

As noted in previous PERF reports, when there is no indication that a demonstration will become violent, but police want to be prepared for the possibility of violence, police should keep riot gear and heavy equipment nearby but out of sight, in order to avoid giving the impression that they are expecting a riot, or are planning an aggressive response to a peaceful demonstration. Agency leaders should bear this in mind and make sure that they keep officers safe, without intimidating crowds in a way that escalates tensions and ultimately makes situations less safe for officers and demonstrators.



## 8D. Plan for adequate rest time and incorporate mental health considerations into risk assessments before mass demonstrations.

Mass demonstrations, especially in the age of social media, can occur unexpectedly. PERF recommends that law enforcement agencies create plans for emergency schedules that can be activated when there is a need to have more officers on duty. The emergency schedules should include adequate rest time for officers.

For example, Columbia's after-action report suggested that agencies "rotate officers during critical incidents and emergency operations in order to provide necessary mental and physical rest." These rotations will distribute the burden more evenly.

During the demonstrations of 2020, some cities experienced peaceful demonstrations during the day, but after sundown, the peaceful demonstrators went home and violent offenders would arrive, committing acts of vandalism and clashing with officers. A rotating schedule could help ensure that the same officers would not be assigned the most difficult shifts repeatedly, exposing them to extremely high levels of stress. When supervisors see an officer who

seems agitated, they should take the officer out of service to relieve the strain.

Many agencies conduct risk and threat assessments for events before they take place to ensure that they are aware of and prepared for any issues that may arise. For example, risk assessments may point to the need for protective barricades around a police station or the need to have additional PPE on hand for officers.

When conducting these assessments before and during mass demonstrations, PERF recommends that agencies incorporate considerations about the mental health of officers and other staff. If agency leaders know that officers will be exposed to situations likely to cause emotional distress, they should put mitigation measures in place the same way they would with threats to officers' physical safety. Access to quiet recuperation spaces or mental health support, for example, may help officers avoid long-lasting psychological harm. For example, Columbia's after-action report suggested that agencies "ensure that the mental health of personnel is incorporated into planning."

Agencies should ensure that their full range of mental health resources – psychological services, employee assistance, peer support, chaplains, and others – are adequately staffed and resourced in advance of any major demonstrations, especially if the protests are likely to run over several days or longer. These services need to be available during and after the event (see Recommendation 8E, below).

## 8E. Teach officers techniques for protecting their own emotional well-being.

Police departments can create systems that promote officer well-being, and officers themselves can also take steps to maintain their own health and wellness. PERF recommends that police departments provide officers with the tools to keep themselves well.

For example, Philadelphia's after-action report recommended two training courses for officers. The first focuses on "protest interactions and professional communications" and "promote[s] the importance of officers managing their emotions … even under the most stressful of circumstances." The second course focuses on "train[ing] officers to 'not take it personally' when dealing with non-compliant, resistive, and aggressive individuals."

Another idea, from the Columbia, SC after-action report, is to promote well-being through physical fitness programs, which have been shown to reduce stress.

## 8F. Provide access to wellness support programs after mass demonstrations have concluded.

Many officers may experience emotional distress after mass demonstrations have ended. PERF recommends that agencies provide ongoing emotional support services and peer support to ensure that officers have guidance, time, motivation, and assistance to work through any emotional issues.

For example, Dallas's after-action report pledged that the department "will continue to work hard to provide all staff with access to psychological services and peer support." And considering the long-standing stigma associated with mental health care, it urges department leaders to "continue to engage officers in frank and honest conversations, with the goal of creating a positive environment for ensuring emotional health."

Similarly, La Mesa's after-action report suggested ensuring that "officers involved in emergency or critical incidents are provided with an opportunity for an after-action review and … wellness support when needed."

## RECOMMENDATION 9:
# Ensure ongoing, robust review of policing practices.

POLICE AGENCIES SHOULD HAVE SYSTEMS FOR reviewing and improving their approaches to policing mass demonstrations. Demonstrations can be dynamic, extremely challenging events to manage, and any missteps by police can erode community trust long after the demonstrations are over. Mechanisms to debrief policing practices and receive community feedback are therefore invaluable.

In the wake of the summer of 2020 protests, many larger agencies either wrote or commissioned after-action reports to identify policing strategies that were successful, as well as any practices that were harmful. Agencies of any size should take the time to ask internal and external stakeholders how the police response can be improved.

It is important that accountability mechanisms be respected during large demonstrations and civil unrest. A number of after-action reports noted that body-worn cameras (BWCs) were not always deployed as required, in some cases because the cameras were not designed to be attached to officers' protective "turtle gear." In Chicago, the Office of Inspector General said that there was "widespread non-compliance" with CPD's policy requiring the use of BWCs, because officers working outside of their regular schedules deployed directly to the scenes of protests, rather than from their precinct stations where the BWCs were stored. And officers' uses of force were not always self-reported, in part because of "significant confusion among CPD's highest ranks – and as a natural result, among

its rank-and-file members – about whether and when members were required to complete Tactical Response Reports under mass arrest protocols," the OIG report said.

When rules are not adhered to, it compromises accountability of officers as well as protesters engaging in civil disturbances, the OIG said. "Missing reports and videos may limit or preclude prosecution of some arrestees as well as accountability for individual officers, and may compromise CPD and the City's position in investigations or litigation," the OIG report said.

## 9A. Debrief notable events at the end of shifts.

Officers are experts on their own experiences, and in many cases can provide insights to inform future strategic and tactical decisions. PERF recommends that when possible, agencies make time at the end of shifts for debriefs. These debriefs will provide officers with a chance to share knowledge, reflections, and suggestions while their experiences are fresh in their minds.

Raleigh's after-action report recommended such debriefs, saying, "During periods of protest, crowd management, and critical incident management activity, there should be a debrief after the end of shifts" to "enable rapid knowledge transfer," among other benefits.

## 9B. Conduct timely internal reviews of body-worn camera footage, use-of-force reports, and other materials to understand what went well and what can be improved.

Officers' body-worn camera footage and use-of-force reports can provide important, detailed information about what occurred during a demonstration, how individual officers responded, and how the agency performed as a whole. PERF recommends that agencies establish protocols to ensure that these opportunities are not wasted, and that agencies always use this information to improve their policies and practices.

For example, in addition to reviewing use-of-force reports and body-worn camera footage, Philadelphia's after-action report recommended "survey[ing] officers to evaluate if their baton applications are appropriate, effective, and result in the desired outcomes and/or if additional training and/or alternative applications of force would prove more appropriate and effective."

Fredericksburg's report called for a wide-angle analysis of use-of-force reviews, in order to understand "the entire incident, not just the moment force was used."

## 9C. Invite community representatives to discuss their perspectives with police leaders after demonstrations have concluded.

After demonstrations end, PERF recommends that agencies invite community representatives to debrief with police leaders. Raleigh's after-action report said that it is important to hear from community members about their individual experiences and general community concerns. The community members invited to these debriefs should include individuals who participated in the demonstrations and could provide credible, first-hand accounts of what happened during an event.

## Police Scotland Model for Community Engagement

The preparations of Police Scotland for large-scale demonstrations during COP26, the U.N. Climate Change Conference, in 2021 provide a model for planning such events. (See "Police Scotland Involved Elected Officials and Community Leaders in their Preparations for the COP26 International Climate Change Summit," p. 22.)

A year before the COP26 summit began, Deputy Chief Constable Will Kerr of Police Scotland created an advisory committee to provide a wide range of expertise on how to manage the conference and any demonstrations that could be expected during it. The committee included human rights lawyers, academics, disability rights advocates, and elected officials as well as police leaders. The panel helped to write the policies that would govern the police response to COP26, and they helped to develop, and observe, the police training for the event.

And the committee's work did not end when the U.N. Summit concluded; the panel continued to meet afterwards in order to address issues raised by demonstrators about police actions during the conference.[43]

---

43. For details, see "'Uncomfortable conversations': Police Scotland's lessons from the COP26 demonstrations." (November 13, 2021.) Police Executive Research Forum. https://www.policeforum.org/trending13nov21

# Conclusion:
# The Demonstrations of 2020 Were a Wake-Up Call

THE DEMONSTRATIONS OF 2020 REPRESENTED one of the largest challenges to American police agencies in years. Many departments were overwhelmed by the size and number of protests, occurring day after day for weeks or months. And while most of the demonstrations were peaceful, some involved acts of violence. Television coverage included scenes of protesters throwing rocks, bricks, Molotov cocktails, and other objects at police officers, or committing acts of arson, vandalism, or looting. And in some cases, there were scenes of officers using unnecessary force, or officers suffering injuries.

Since 2006, PERF has been developing guidance for police agencies about managing demonstrations, but the demonstrations of 2020 were unprecedented, and many police agencies were blindsided by the situations they faced.

Following are some of PERF's key findings about what went wrong in 2020, and the new challenges that police agencies must face:

1. **Police departments were simply not prepared for the level of violence that they encountered.** Many of the after-action reports conducted by cities found failures of intelligence about demonstrations that were being planned, and the violence that was happening on a nightly basis.

   And officers lacked training in how to respond to demonstrations. This is understandable, because the United States had not faced such widespread demonstrations, occurring for so many weeks and months, in many years. So police training programs understandably had focused on other priorities.

2. **Police agencies' traditional forms of working with community leaders to manage demonstrations are not enough to meet today's demands.** In 2018, a major PERF report addressed the growing phenomenon of "leaderless demonstrations" – protests that occur spontaneously, with little or no advance notice. Unlike the demonstrations of the past, which often were organized by established civil rights groups or other organizations, leaderless demonstrations are promoted on social media and can occur spontaneously.

   The demonstrations of 2020 showed what can happen when police are not adequately connected to community leaders during protests.

   Police need a new approach for working with their communities on a continuing basis to facilitate demonstrations. This cannot be done in the midst of an ongoing crisis.

   This should include special efforts to bring community members into police agencies' processes for managing demonstrations. For example, police can invite community members to observe and participate in officer training programs and tabletop exercises regarding protests, and to discuss policies governing the use of less-lethal tools when demonstrations are violent. Police also can invite community leaders to serve as mediators during demonstrations.

   In this way, police can build a wide range of relationships in the community over a period of years. Ideally, many people taking part in demonstrations, especially those who are formal or

informal community leaders, will personally know and trust police officers or leaders.

As a result, community members can become force-multipliers. Police will always be challenged to have enough officers to respond to large numbers of incidents that become violent. But if police have support among the demonstrators, and have established relationships of trust with many of them, these relationships can bolster the police response.

Police still will face challenges in dealing with people and groups that have no interest in working with police, such as leftist anarchist groups or right-wing anti-government groups like the boogaloo movement. But it will help if police have broad support from more mainstream community leaders and activists.

**Regaining public trust will require reinventing this relationship as part of a continuing, ongoing effort.**

3. **A key flash point in many cities was the use of less-lethal weapons.** No issue caused more controversy during the demonstrations of 2020 than the use of less-lethal weapons, such as CS gas, rubber or plastic bullets, and "soft" munitions such as bean-bag rounds. Inappropriate use of these tools can be self-defeating, agitating an otherwise peaceful crowd and triggering violence rather than preventing it.

Law enforcement agencies must establish clear guidelines for situations when less-lethal force is warranted, as well as situations when less-lethal force is inappropriate.

These issues are explored in many of the after-action reports that cities commissioned to evaluate their response to protests. For example, Denver's report recommended that the Police Department restrict the use of pepper balls only to incidents in which a person is exhibiting "active aggression."

As a starting point for a national review of these issues, Recommendation 4 in this report offers guidance on the use of several types of tools, which PERF produced with assistance from the experts who participated in PERF's webinar and other consultants. These initial recommendations include the following:

- No weapons should be used against peaceful demonstrators.

- Beanbag rounds, rubber bullets, and other "soft" projectiles should be considered only for use against people who are committing acts of violence, and only when they can be aimed at a specific individual who is committing a serious criminal act, such as setting a fire or throwing dangerous objects.

- Police should not use CS gas unless it is needed to address a public safety concern. For example, police should *not* use CS gas to disperse a large crowd simply because a few youths are spray-painting graffiti.

- OC spray and other chemical irritants used against individuals should be deployed only when police can accurately target individuals without harming innocent bystanders. And chemical irritants should be used only to address acts of violence or rioting.

- "Flash bangs" and grenade-type devices should not be used in demonstrations.

The National Institute of Justice, the U.S. Justice Department's research agency, should make a high priority of helping the policing profession develop these guidelines, by conducting or arranging for research on each type of less-lethal tool, its capabilities as well as its limitations and risks, and on new types of tools that may be developed in this area.

4. **Officers should be trained to use a Critical Decision-Making Model to manage their response to demonstrations.** Since 2016, PERF has advocated the use of a Critical Decision-Making Model (CDM) to help officers make the best decisions when they respond to situations involving a person in crisis, such as a person with mental illness brandishing a knife on the street.

The CDM is also useful in many other situations, including police officers' response to demonstrations. The CDM is a five-step process, in which officers (1) collect information about the situation they are facing; (2) assess any threats or risk, and whether they need to take immediate

action or can buy time to de-escalate the situation; (3) consider what legal authority the police have to respond in various ways; (4) identify options and determine the best course of action; and (5) take action, review what happened, and if necessary, re-assess the situation.

The CDM may sound complicated, but when officers use it routinely, it becomes second-nature. During a large demonstration that may involve a complex mix of conditions, such as a few violent offenders using a much larger,

peaceful crowd as cover, the CDM can help officers take appropriate, proportionate actions that help protect public safety without alienating peaceful demonstrators.

*The demonstrations of 2020 were a wake-up call for American police agencies. In a number of ways, today's protests and demonstrations – especially those that are about police actions – present much more difficult challenges than they did a generation ago.*

*This report presents a new playbook that police can use to develop responses to these challenges.*

# About the Police Executive Research Forum

THE POLICE EXECUTIVE RESEARCH FORUM (PERF) is an independent research organization that focuses on critical issues in policing. Since its founding in 1976, PERF has identified best practices on fundamental issues such as reducing police use of force; developing community policing and problem-oriented policing; using technologies to deliver police services to the community; and developing and assessing crime reduction strategies.

PERF strives to advance professionalism in policing and to improve the delivery of police services through the exercise of strong national leadership; public debate of police and criminal justice issues; and research and policy development.

The nature of PERF's work can be seen in the reports PERF has published over the years. Most of these reports are available without charge online at http://www.policeforum.org/free-online-documents. All of the titles in the *Critical Issues in Policing* series can be found on the back cover of this report and on the PERF website at https://www.policeforum.org/critical-issues-series.

In addition to conducting research and publishing reports on our findings, PERF conducts management studies of individual law enforcement agencies; educates hundreds of police officials each year in the Senior Management Institute for Police, a three-week executive development program; and provides executive search services to governments that wish to conduct national searches for their next police chief.

All of PERF's work benefits from PERF's status as a membership organization of police officials, who share information and open their agencies to research and study. PERF members also include academics, federal government leaders, and others with an interest in policing and criminal justice.

All PERF members must have a four-year college degree and must subscribe to a set of founding principles, emphasizing the importance of research and public debate in policing, adherence to the Constitution and the highest standards of ethics and integrity, and accountability to the communities that police agencies serve.

PERF is governed by a member-elected President and Board of Directors and a Board-appointed Executive Director.

**To learn more about PERF, visit www.policeforum.org.**



# About the Motorola Solutions Foundation

As the charitable and philanthropic arm of Motorola Solutions, the Motorola Solutions Foundation partners with organizations around the globe to create safer cities and equitable, thriving communities. We focus on giving back through strategic grants, employee volunteerism and other community investment initiatives. Our strategic grants program supports organizations that offer first responder programming and technology and engineering education, and align to our values of accountability, innovation, impact, diversity and inclusion. The Foundation is one of the many ways in which the company lives out its purpose of helping people be their best in the moments that matter.

**For more information on the Foundation, visit:**
**www.motorolasolutions.com/foundation**

# CRITICAL ISSUES IN POLICING SERIES

Lessons from the COVID-19 Pandemic: What Police Learned from One of the Most Challenging Periods of Our Lives

Municipal and Campus Police: Strategies for Working Together During Turbulent Times

How Local Police Can Combat the Global Problem of Human Trafficking: Collaboration, Training, Support for Victims, and Technology Are Keys to Success

An Occupational Risk: What Every Police Agency Should Do to Prevent Suicide Among Its Officers

Chapter 2: How Police Chiefs and Sheriffs Are Finding Meaning and Purpose in the Next Stage of Their Careers

Reducing Gun Violence: What Works, and What Can Be Done Now

Promoting Excellence in First-Line Supervision: New Approaches to Selection, Training, and Leadership Development

The Police Response to Homelessness

The Changing Nature of Crime and Criminal Investigations

The Revolution in Emergency Communications

ICAT: Integrating Communications, Assessment, and Tactics

Guiding Principles on Use of Force

Advice from Police Chiefs and Community Leaders on Building Trust: "Ask for Help, Work Together, and Show Respect"

Re-Engineering Training on Police Use of Force

Defining Moments for Police Chiefs

New Challenges for Police: A Heroin Epidemic and Changing Attitudes Toward Marijuana

The Role of Local Law Enforcement Agencies in Preventing and Investigating Cybercrime

The Police Response to Active Shooter Incidents

Civil Rights Investigations of Local Police: Lessons Learned

Policing and the Economic Downturn: Striving for Efficiency Is the New Normal

An Integrated Approach to De-Escalation and Minimizing Use of Force

Improving the Police Response to Sexual Assault

How Are Innovations in Technology Transforming Policing?

Labor-Management Relations in Policing: Looking to the Future and Finding Common Ground

Managing Major Events: Best Practices from the Field

Is the Economic Downturn Fundamentally Changing How We Police?

Guns and Crime: Breaking New Ground By Focusing on the Local Impact

Gang Violence: The Police Role in Developing Community-Wide Solutions

Violent Crime and the Economic Crisis: Police Chiefs Face a New Challenge – PART I

Violent Crime and the Economic Crisis: Police Chiefs Face a New Challenge – PART II

Violent Crime in America: What We Know About Hot Spots Enforcement

Police Chiefs and Sheriffs Speak Out on Local Immigration Enforcement

Violent Crime in America: "A Tale of Two Cities"

Police Planning for an Influenza Pandemic: Case Studies and Recommendations from the Field

Strategies for Resolving Conflict and Minimizing Use of Force

Patrol-Level Response to a Suicide Bomb Threat: Guidelines for Consideration

Violent Crime in America: 24 Months of Alarming Trends

A Gathering Storm— Violent Crime in America

Police Management of Mass Demonstrations

Exploring the Challenges of Police Use of Force

Challenge to Change: The 21st Century Policing Project



**POLICE EXECUTIVE RESEARCH FORUM**

Police Executive Research Forum
1120 Connecticut Avenue, NW, Suite 930
Washington, DC 20036
202-466-7820
www.PoliceForum.org

We are grateful to the
**Motorola Solutions Foundation**
for its support of the
**Critical Issues in Policing Series**

