Ex. F

# The Police Response to Mass Demonstrations

## PROMISING PRACTICES AND LESSONS LEARNED



POLICE EXECUTIVE
RESEARCH FORUM

This project was supported, in whole or in part, by cooperative agreement number 2015-CK-WX-K018 awarded by the Office of Community Oriented Policing Services, U.S. Department of Justice. The opinions contained herein are those of the author(s) and do not necessarily represent the official position or policies of the U.S. Department of Justice. References to specific agencies, companies, products, or services should not be considered an endorsement by the author(s) or the U.S. Department of Justice. Rather, the references are illustrations to supplement discussion of the issues.

The Internet references cited in this publication were valid as of the date of publication. Given that URLs and websites are in constant flux, neither the author(s) nor the COPS Office can vouch for their current validity.

Recommended citation:
Police Executive Research Forum. 2018. *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*. Washington, DC: Office of Community Oriented Policing Services.

Published 2018

# Contents

Letter from the PERF Executive Director ............................................................ iii

Acknowledgments ................................................................................................ iv

Introduction ......................................................................................................... 1

1. Response Planning and Preparation ............................................................... 3
   Proportionality: Tailoring responses to the actions and mood of the crowd ........................ 3
   Bicycle officers: A critical resource in mass demonstrations .................................. 8
   Officer wellness: How to protect the health and well-being of officers in mass
   demonstrations ...................................................................................... 11
   Competing protest groups: How to manage conflicts among protesters with
   opposing views .......................................................................................... 15
   Arrests: Avoid mass arrests but be prepared if arrests are necessary .................................. 16
   Internal communication: Setting clear expectations for officers and command staff ......... 21
   Recommendations: Response planning and preparation .................................... 25

2. Training ...................................................................................................... 29
   Types of training: How departments should equip and train their officers ........................ 30
   Training together: Bringing mutual aid agencies together to prepare for mass
   demonstrations ...................................................................................... 34
   Recommendations: Training ....................................................................... 37

3. The Importance of Mutual Aid and Systems for Managing It ......................... 39
   Pre-event preparation: Determining which agency will take the lead during a mass
   demonstration and which policies will control responses .................................... 41
   Use of force: Ensuring all agencies are operating under the same guidelines ................... 43
   Recommendations: The importance of mutual aid and systems for managing it .............. 46

4. The Incident Command System ..................................................................... 49
   Keeping lines of communication open among responding agencies .................................. 50
   Recommendations: Incident Command System .................................................. 52

5. The Changing Nature of Mass Demonstrations: Dealing with Leaderless Groups ........... 55
   Communicating with members of leaderless demonstrations ............................................ 55
   Winning the loyalty contest with protesters ....................................................... 64
   Recommendations: The changing nature of mass demonstrations; dealing with
   leaderless groups ...................................................................................... 67

Conclusion ......................................................................................................... 69

**Appendix A. Summary of Recommendations** .............................................................. **71**

1. Response planning and preparation ................................................................... 71

2. Training .......................................................................................................... 73

3. The importance of mutual aid and systems for managing it ............................... 75

4. The Incident Command System ........................................................................ 77

5. The changing nature of mass demonstrations: Dealing with leaderless groups ............... 78

**Appendix B. Unified Command Proposal** ....................................................... **81**

**Appendix C. Mutual Aid Agreement** ............................................................... **85**

**Appendix D. List of Forum Participants** .......................................................... **95**

**Abbreviations** ................................................................................................... **98**

**Resources** ......................................................................................................... **99**

**About PERF** ....................................................................................................... **101**

# Letter from the PERF Executive Director

Changes in mass demonstrations in recent years have prompted a reexamination of how police departments need to equip and train their officers to prepare for these events. In the past, large-scale protests and demonstrations usually were planned by civil rights groups or other established organizations. By contrast, today's demonstrations often are less organized; they occur more spontaneously and are promoted and managed largely through social media. Today's protesters are often less willing to speak with officers in advance of the demonstration or during it.  In many cases, it is difficult for police even to identify leaders of a demonstration; some demonstrations are described as being "leaderless."  Additionally, police agencies often have to manage multiple groups of protesters with diverse, and sometimes opposing, viewpoints. These factors complicate the police mission of maintaining public safety and officer safety while protecting demonstrators' constitutional rights to free speech and assembly.

Ensuring that police responses to mass demonstrations are proportional to the actions and mood of the crowd is critically important. These considerations are particularly important for demonstrations that are about police use of force or other police actions, as opposed to economic or social issues.  Officer safety and wellness strategies take on additional urgency when the subject of a demonstration is policing, which can make it more likely that officers will face antagonism from demonstrators.

In April 2016, the Police Executive Research Forum and the Department of Justice's Office of Community Oriented Policing Services brought together law enforcement leaders and other experts from across the country to engage in a peer-to-peer discussion of strategies to address these new challenges. The police departments represented included those from Ferguson and St. Louis, Missouri; Pasco, Washington; Oakland, California; Seattle; Boston; Baltimore; New York City; and Minneapolis—all of which have had significant mass demonstrations in recent years. Representatives from the American Civil Liberties Union, the Advancement Project, and academic experts were also among the meeting participants.

This report documents the promising practices and lessons that were identified during the day's discussions.  Topics included strategies for communicating with demonstrators, response planning and preparation, officer training, tactics for minimizing use of force, maintaining officer wellness, developing mutual aid agreements, and maintaining transparency and accountability.

It is our hope that these recommendations will benefit all law enforcement agencies that are reexamining their approaches to mass demonstrations.

Chuck Wexler
Executive Director
Police Executive Research Forum

# Acknowledgments

The Police Executive Research Forum (PERF) would like to thank the U.S. Department of Justice's Office of Community Oriented Policing Services (COPS Office) for supporting this examination of police responses to mass demonstrations. We support COPS Office Director Ronald Davis's commitment to reexamining this important issue in light of how mass demonstrations have changed in recent years. Thanks go to COPS Office managers, particularly Helene Bushwick, for their support and encouragement throughout the project.

We would also like to thank the more than 50 representatives from police agencies, academia, advocacy groups, and the federal government who participated in our April 7, 2016 forum in Washington, D.C. (see appendix D for a list of participants). Their insights resulted in a thoughtful discussion about the dynamic nature of demonstrations and how we can best equip our police departments to respond effectively, to protect community members' First Amendment rights, and to support officer wellness.

Finally, credit is due to PERF staff members who prepared for and hosted the joint COPS Office and PERF forum and who wrote and edited this publication: Jessica Toliver, director of Technical Assistance; Craig Fischer, director of Communications; Elizabeth Miller and Margaret Brunner, research associates; Adam Kemerer, research assistant; and Kenneth Stesin, research intern.

# Introduction

*"Over the last two years, there has been a significant change in the tenor of protests. One of the most notable differences is that there's a palpable feeling that this is about us, that they don't like the police."*

*— Captain Daniel Perea, San Francisco Police Department*

In the last several years, the nature of mass demonstrations in the United States has changed, including the types of issues protested and people's means of organizing mass demonstrations. People are often protesting police and police actions in addition to economic or social issues. Many demonstrations are no longer planned by established organizations; rather, demonstrations happen more spontaneously and quickly, as individuals interested in certain issues can easily find each other on social media. Demonstrators can also use cell phones to send live video coverage of demonstrations to viewers around the world.

Because police departments are responsible for managing and facilitating demonstrations, departments need to review existing strategies, and modify them if necessary, to meet the challenges these trends present. Police departments should start by ensuring all officers understand that their role is to facilitate demonstrators' First Amendment rights while protecting public safety. In addition, the police should also convey this message to the public so community members know that police officers understand their role. Police departments also need to find ways of communicating with demonstrators to discuss logistics, to develop a plan, and to establish expectations, all of which may be difficult when demonstrations occur spontaneously, with little or no established leadership structure. Finally, police departments must help officers to manage the increased stress that can result from managing protesters who are often antagonistic toward the police. In short, the challenges facing police departments today include how to protect the First Amendment rights of protesters and ensure the public's safety while also maintaining the safety and well-being of officers.

In an effort to examine these issues, the U.S. Department of Justice's (DOJ) Office of Community Oriented Policing Services (COPS Office) and the Police Executive Research Forum (PERF) hosted a forum titled, "The Police Response to Mass Demonstrations," on April 7, 2016, in Washington, D.C. The forum brought together more than 50 police executives, academics, and subject matter experts to discuss strategies for policing mass demonstrations in this new context. These participants were carefully chosen for their experience and expertise. The police departments represented included those from Ferguson and St. Louis, Missouri; Pasco, Washington; Oakland, California; Seattle; Boston; Baltimore; New York City; and Minneapolis—all of which have had major mass demonstrations in recent years.

Representatives from the American Civil Liberties Union, the Advancement Project, and academic experts were also among the forum participants.

Participants in the forum shared lessons learned and promising practices for the following topics:

- Communicating with demonstrators
- Response planning and preparation
- Training
- Use of force
- Maintaining officer wellness
- Mutual aid
- Arrest policies
- Transparency and accountability

This report outlines the issues raised during the forum, as well as the recommendations that emerged from the discussion. This report also builds upon PERF's previous publications on mass demonstrations and major events, which outline successful strategies for responding to both planned events and unplanned incidents,[1] as well as the lessons agencies learned.[2]

This latest report provides timely additions to policing strategies and tactics that reflect recent trends in the nature of mass demonstrations and how and by whom they are organized. Police executives will find the most up-to-date promising practices and lessons learned. Moreover, this report is the compilation of the most effective tactics for preparation, training, mutual aid, and communication, all of which are informed by police responses to mass demonstrations.

---

[1] On its "Glossary of Related Terms" web page, FEMA defines an *incident* as "an occurrence or event, natural or human-caused, that requires an emergency response to protect life or property," and it defines an *event* as "a planned, nonemergency activity. [The Incident Command System] can be used as the management system for a wide range of events: e.g., parades, concerts, or sporting events."

[2] For other information about responding to mass demonstrations, see *Managing Major Events: Best Practices from the Field*, Critical Issues in Policing Series (Washington, DC: Police Executive Research Forum, 2011), http://www.policeforum.org/assets/docs/Critical_Issues_Series/managing%20major%20events%20-%20best%20practices%20from%20the%20field%202011.pdf; *Lessons Learned from the 2015 Civil Unrest in Baltimore* (Washington, DC: Police Executive Research Forum, 2015), http://www.policeforum.org/assets/2015baltimorecivilunrest.pdf; Tony Narr et al., *Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches* (Washington, DC: Police Executive Research Forum, 2006), http://www.policeforum.org/assets/docs/Critical_Issues_Series/police%20management%20of%20mass%20demonstrations%20-%20identifying%20issues%20and%20successful%20approaches%202006.pdf; *National Incident Management System (NIMS): Overview* (Washington, DC: Federal Emergency Management Agency, 2011), https://www.fema.gov/media-library-data/20130726-1853-25045-0014/nims_overview.pdf.

# 1. Response Planning and Preparation

The nature of mass demonstrations has changed, along with the ways in which police departments plan for managing them. Police agencies cannot expect protesters to contact them in advance to coordinate plans for keeping a demonstration safe and orderly, nor can police assume they will be able to identify and communicate with protest leaders once a demonstration is under way. As a result, police departments' planning efforts need to be comprehensive to increase the chances that they will be able to respond quickly and effectively with little notice as events unfold.

This need for adaptive and thoughtful planning takes on a greater urgency when the police themselves are the subject of the protests they are managing. Police need to be aware of how demonstrators will respond to certain police actions, such as the equipment they bring. At the same time, police must always be ready to take appropriate actions to keep protesters and officers safe.

## Proportionality: Tailoring responses to the actions and mood of the crowd

Ensuring that police responses to mass demonstrations are proportional to the actions and mood of the crowd is critical to making sure the police do not unintentionally escalate tensions during protests. However, police agencies must balance this concern with their need to keep officers and the community safe. Many forum participants agreed that striking this balance requires a tiered response plan that starts soft but that enables police to react promptly to protect public safety if the demonstration begins to shift toward violence or serious criminal activity. The following sections highlight the forum participants' experiences on this subject in their own words.

| Boston Police Superintendent Bernard O'Rourke: |
| --- |

"We generally plan our resources based on a 40-percent estimate. For example, if we see on social media that 1,000 people are saying they will come to a demonstration, more often than not, you're going to get about 400."

During our Occupy Boston protests in 2011,[3] Commissioner Billy Evans had the job that I have now (i.e., superintendent, Bureau of Field Services, which includes the Special Operations Division, Patrol Divisions, Field Support Division, and Special Events Management), and he was down there at the Occupy protest site pretty much every day, engaging with the people. He knew a lot of the protesters by name, and after the events were over, he wrote recommendations for a lot of these people to go to college, to get jobs, etc. That's how much of a rapport he had with them.

---

[3] Beth Teitell, "A Day at Occupy Boston Camp," *Boston Globe*, October 12, 2011, https://www.bostonglobe.com/lifestyle/2011/10/12/occupy-boston-view-life-inside-tent-city/apnCPY4IfYl23982ORzllJ/story.html.

## Boston's Three-Tiered Approach to Mass Demonstrations

by Boston Police Superintendent Bernard O'Rourke

We have three levels of response to mass demonstrations, and usually we are able to stay at the lowest level. Within that system, it's important not to go higher than is needed.

First, we have the soft approach—officers in regular uniforms, trying to engage and talk to people, mingling with the crowd, and staying away from the "line of cops here versus line of protesters there" approach. Engaging with the groups is the key. Sometimes it's difficult to find out who is leading a demonstration, because some of them make a point of not being hierarchical or having official leaders. But even if you don't have a protest leader stepping forward and talking to you, often you can see who is running the show just by watching what's happening.

If it does start to escalate—and everybody in this room knows how you can feel a change in the tension level—that's when we'll shift to level two and pull out the regular officers. That's when we put a lot of stock in our bicycle officers. First and foremost, they kind of embody community policing; they can talk to people. But they also have a helmet on, so it does change a little. They become our frontline officers, and we pull the officers without helmets on back. We also have our motorcycle squads, who are helmeted as well, and we will use them.

> **"We have three levels of response to mass demonstrations, and usually we are able to stay at the lowest level."**

And the third level is the public order platoons,[*] who have the full gear ready to go if they are needed: for example, if people start rioting. Fortunately, we haven't had to use them in quite some time.

During the Democratic National Convention in 2004, we had five days of protests with our bicycle patrols, and we started with the soft approach. We had public order platoons on standby all week long.

We made one big mistake. On the last day, we got a request from the commander of those public order platoons. They felt that they weren't taking part in the situation, so they wanted to come out to the street. The mistake they made was coming out in full turtle gear. They didn't walk out and mingle; they marched out. And as soon as that happened, the crowd started throwing things at them, and we had to make several arrests. We learned from that. Since then, unless we need the public order platoons, they stay out of sight. ∎

_____

[*] Public order platoons are often referred to as mobile field force or civil disturbance platoons.

So we learned from that, and we do it now with a lot of demonstrations. We get command staff personnel down there, trying to engage protesters. Obviously the key person is the sergeant on the street, but if you have the big bosses down there leading by example, it helps the sergeants to really step up and do what they are supposed to do.

We also learned from our mistakes during some of the sporting event celebrations, when we took a hard approach: drawing a line and coming out equipped with body armor and heavy equipment. In some cases, you need that, but not in others.

As a result, we generally take a soft approach. We get a little bit of a pushback from our labor unions in that regard, but they are coming around, because they are realizing that it works. We have been fortunate in Boston. The worst part of most of our demonstrations has been that there are traffic problems. We haven't had a lot of violence or property damage.

We generally plan our resources based on a 40-percent estimate. For example, if we see on social media that 1,000 people are saying they will come to a demonstration, more often than not, you're going to get about 400.

## San Francisco Police Captain Daniel Perea:

*"I'll make the call based on the mood of the crowd on whether or not we need to wear helmets and carry batons when we go out."*

When we go out, we have helmets and batons with us in case we need them. I'll make the call based on the mood of the crowd on whether or not we need to wear helmets and carry batons when we go out, because as soon as you put that stuff on, it can look like you're getting ready for a fight.

At the same time, we have to make sure that our officers don't get hurt. If we make the decision to deploy without the gear on, we'll have cars following us with support personnel, and I have officers load their helmets and batons. Then if it's necessary to use them, we'll start passing them down the line.

As for military-style vehicles, we don't bring them out for protests. That's not the world we live in, and that's not the age we live in. We need to have that equipment on hand, but we don't bring it out for protests.

## St. Louis (Missouri) Metropolitan Police Chief Samuel Dotson:

*"The measure of success . . . should be if everybody gets home safely."*

Our challenge is how to balance protection of our employees with taking the soft approach. I believe the measure of success on this should be if everybody gets home safely. We always start soft, and we won't change our demeanor or tone unless it's necessary.

As a police chief, you need to feel comfortable operating with protesters. You must engage in a dialogue, because most situations can be defused by conversations. And you don't defuse a situation by having a sniper on top of a BearCat.

In protests, sometimes our officers want to win when we're at a standoff with protesters, and protesters feel the same. Somebody has to look at the entire environment and say a win is actually going home peacefully without anyone getting hurt. Someone has to make the decision to unwind that tense situation. I don't want to use the term *de-escalate*, because a tense situation can be perfectly peaceful. You just have to keep it peaceful and ease the tension.

## Arizona State University Professor Dr. Edward Maguire:

"Showing up in riot gear communicates that you're ready to fight."

It's possible to make things worse, and it happens all of the time. It's possible for the police to stimulate conflict and violence within crowds, and then that conflict can be turned toward the police. Showing up in riot gear communicates that you're ready to fight. Very simple things like that make a difference. Have a response plan to keep riot gear close by but out of sight unless and until it's needed.

## St. Louis County (Missouri) Police Chief Jon Belmar:

"We had a lot of training protocols and response protocols, but in the middle of all of this, you realize there are very few things you can actually accomplish during a riot."

Our training is based around the First, Fourth, and 14th Amendments.[4] Officers need to understand what those amendments are there for. They also need to understand that there is a difference between tactical and strategic decisions and who should make those decisions.

In August 2014, our situation with protests about a Ferguson, Missouri, officer fatally shooting Michael Brown escalated very quickly, as did the unfortunate violence and emotion that stemmed from it. As a result, we really had to think on our feet. We had a lot of training protocols and response protocols, but in the middle of all of this, you realize there are very few things you can actually accomplish during a riot. You have to protect life and have officers respond with a certain professional bearing, but in certain situations, there isn't much you can do beyond that.

---

[4] The First Amendment to the U.S. Constitution says that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The 14th Amendment requires the states to provide due process and equal protection of the laws to all people within their jurisdiction.

The Police Response to Mass Demonstrations

After the events of August 2014, we knew that the grand jury decision was happening in the fall. We knew we had to plan meticulously for that, and the planning that we did was tremendously important. The night of the decision was still the worst night we've ever had, but we had procedures in place and relationships in the community. The relationships weren't just with businesses and community leaders but also with protest groups, and we were much closer to an understanding at the time than we'd been in August.

For the 2015 anniversary of Michael Brown's death, our community engagement was off the charts. We talked with civic groups, the NAACP (National Association for the Advancement of Colored People), the Urban League, and anyone else we could think of to engage with. We had a good foundation with protest leaders. If not for the actions of the criminal elements in the crowd exchanging gunfire among themselves, things would've been a lot different. Since 2015, we haven't had many problems.

I have three messages for police:

1.  A major demonstration can happen at any time in your city.

2.  When it does, make decisions based on the goal of protecting human life, and make a high priority of keeping the public informed.

3.  Engage the community not only in times of crisis but all of the time.

| Chicago Police Deputy Chief Kevin Ryan: |
| --- |

"We have the capability to increase our level of response and use a higher level if necessary, but normally we can handle everything in normal field gear."

If police show up at a demonstration in full riot gear right away, you are projecting conflict and escalation. You only empower the protesters if you try to go down after you got them ratcheted up.

We have the capability to increase our level of response and use a higher level if necessary, but normally we can handle everything in normal field gear. If we think we might need to go up a notch, we have personnel outfitted in tactical gear on standby. We keep them away from the protest and only pull them out as a last resort.

| American Civil Liberties Union Senior Staff Attorney Lee Rowland: |
| --- |

"For things like sound cannons or microwave ray guns, we oppose agencies having them at all."

We have real concerns about the excessive weaponry or preparation that militarizes police. For things like sound cannons or microwave ray guns, we oppose agencies having them at all, and we try to make them an option of absolute last resort when they can't be removed entirely. We do preemptory public records requests just to see what equipment will be out when events happen. We do that from a community notice point of view. People should have a clear understanding of what they should expect.

## Bicycle officers: A critical resource in mass demonstrations

Several participants in the forum spoke about the importance of bicycle officers in managing mass demonstrations. Bicycle officers are able to maneuver more quickly in a crowd than officers in motor vehicles, and bicycle helmets provide some head protection but are not seen as militaristic gear. Bicycle officers are often seen as less intimidating than other officers and, therefore, are able to engage with protesters more easily. Also, the bicycles can be used to form a mobile barrier.

### Boston Police Superintendent Bernard O'Rourke:

> "With any major demonstrations where we are going to have a full call up, we will bring bike squads in. They're very, very helpful."

Before the 2004 Democratic National Convention in Boston, we did crowd control training across the board for the whole department. The bicycles squads got additional training. And for the most part, that was it. We relied on the crowd control training, and the first part of that is about trying to avoid conflicts if you can. At that time, we did not have the training on bias in policing that we have now, which has implications for issues of demonstrations.

We have had such good success with our bike squads that we started a program called COBRA: Cops on Bikes Regional Approach. It's a mutual aid agreement with cities and towns surrounding Boston. We can reach out to them and borrow bike officers, and they can borrow ours. They all have virtually the same training in their operation as bicycle officers. Through that, we were able to come up with at least another 100 bicycles from the cities and towns around Boston. And in return, Boston police go out to some of these cities and towns with major arenas that have large concerts. When they want some help, we will send our officers down there. We use the bikes for the Boston Marathon. And with any major demonstrations where we are going to have a full call up, we will bring bike squads in. They're very, very helpful.

There are two reasons for the bicycles. First, they are a great community policing tactic. Every-one will talk to officers on bicycles. The bike squads are very nonthreatening, even when they're wearing helmets. In case any objects are thrown, it's a great way to have helmets on the line. Second, we also use bicycles interlocked as barriers. They're worth more than their weight in gold during demonstrations.

### The 2015 Rioting Was Unlike Anything We Had Seen during Our Entire Careers

*Lessons Learned from Baltimore*

by Baltimore Police Colonel Melissa Hyatt

*Colonel Hyatt, who was in charge of patrol during the disturbances of 2015, spoke about the challenges that Baltimore faced following the in-custody death of Freddie Gray.[*]*

We hadn't had any riots like that since 1968, and like a lot of other major cities, our priority has been dealing with violent crime. We've been constantly chasing murders. We are still maintaining the fight against violence, but following the riots last year, we have done some things to push training for mass demonstrations in a way that we have never done before. We have our civil disturbance platoons, which are rank-and-file officers, and they are receiving training. We have our mobile field force, which Kevin Jones leads, and they have received training.

> **"In terms of lessons learned, probably our biggest failure in the April riots was on the logistics end. We thought things were being done, but they weren't."**

One change we have made since last April is that our Civil Disturbance Unit—our rank-and-file frontline platoons—now has standoff capability. During the riots, they didn't have confidence that they could deal with any assault they might face until the mobile field force resources came in and rescued them. This created a lot of issues both for performance and for confidence with the officers and the supervisors. That's one of the things that we've really improved on and we've made a focal point of our training.

Probably the biggest change, and this is still a work in progress, is that we have created our own incident management team. Our fire department and our Office of Emergency Management and Communications have given us a lot of guidance on this. For years, in the police department we had a couple of people who tried to push the Incident Command System (ICS), but it was never a priority, and it didn't stick very well.

So we have created our own incident management team, and everyone from command staff on down receives what we call "Baltimore-centric ICS." It was a program created specifically for our agency, in our city.

*cont'd*

*cont'd from previous page*

In terms of lessons learned, probably our biggest failure in the April riots was on the logistics end. We thought things were being done, but they weren't. We thought people had certain gear, but it hadn't come down to them. We thought people who had been on duty for many hours had been fed, but they hadn't. When you are sitting in the command center, you get information relayed to you that isn't exactly what's going on in the street in real time.

So, for example, one of our improvements after we created our logistics section was creating a logistics radio channel. That way, instead of having to rely on a ranking officer saying, "We have people over here who haven't eaten in 16 hours," we can have any officer on the line switch to that channel and say, "We are at this location, and we haven't received anything."

Between the training improvements and our incident management team, we are growing; we are improving. We still have a lot to improve on, and after every single demonstration or protest rally, we are still coming back to the table, because there are always things that we realize we should have done better.

We also have officers and command staff who are doing a lot more in the community than we have ever done before. In addition to our Community Collaboration Division, our patrol officers are getting out there and engaging the community. So we are dealing with that side of it, and we are also continuing to push the training so we are prepared for a worst-case scenario. We are trying to put credits in the bank. We have things like Third Grade Reads,[†] Coffee with a Cop,[‡] and Cocoa with a Cop,[§] and we have movie night in the districts. There is still a lot of mistrust in the communities, but we have made some inroads, particularly in the Western District area. ■

---

\* "Report Details 'Major Shortcomings' in Baltimore Police Response to Unrest," *The Baltimore Sun*, November 16, 2015, http://www.baltimoresun.com/news/maryland/freddie-gray/bs-md-ci-perf-unrest-report-20151116-story.html.

† Baltimore officers are participating in the mayor's Third Grade Reads tutoring program, which is helping more than 800 children to achieve literacy goals. See "Strategic Investments in Baltimore Kids," *The Baltimore Sun*, May 25, 2016, http://www.baltimoresun.com/news/opinion/oped/bs-ed-early-reading-20160525-story.html.

‡ See "Background," Coffee with a Cop, accessed December 6, 2016, http://coffeewithacop.com/about; Joe Vince, "Coffee with a Cop Day: Chicago Police Try to Build Trust over a Cup of Joe," *Chicago Patch*, October 7, 2016, http://patch.com/illinois/chicago/coffee-cop-day-chicago-police-try-build-trust-over-cup-joe.

§ This program mirrors Coffee with a Cop but focuses on giving children and their parents an opportunity to talk with police officers. See Jordee Kalk, "Kids and Parents Build Trust with Police at Cocoa with a Cop Event," *WDAY*, December 12, 2015, http://www.wday.com/news/3902626-kids-and-parents-build-trust-police-cocoa-cop-event.

## Seattle Police Assistant Chief Steve Wilske:

*"Marches bring traffic to a halt; our cars can't get through, but bicycles can."*

Bike officers are a staple of our management of demonstrations, and we've trained them extensively for that purpose.

One of the things we've noticed with the demonstrations is that they almost always involve a march now. Bicycles can get around much more quickly in a downtown environment. Marches bring traffic to a halt; our cars can't get through, but bicycles can. We also use the bicycles as a barrier; they're a mobile fence line.

For us, bike officers have been a phenomenal resource. Everyone in that unit is verbally skilled and very experienced in handling demonstrations. For us, it's been a huge success.

## Chicago Police Deputy Chief Kevin Ryan:

*"Now all officers are being trained on bike tactics while in the academy."*

During the NATO (North Atlantic Treaty Organization) summit in Chicago in 2012,[5] I was commander of the Gang Enforcement Division, which was basically our mobile field force. They trained in crowd control formations and interdictions. One of the big things we did was ramp up our bike team training. We have about 200 bikes, and we used to train officers who volunteered for it, but now all officers are being trained on bike tactics while in the academy. Our bike unit has now assumed responsibility for the training, so all the officers have training in crowd control techniques.

# Officer wellness: How to protect the health and well-being of officers in mass demonstrations

According to forum participants, police agencies should carefully attend to the well-being of officers tasked with responding to a mass demonstration. Major demonstrations often produce an all-hands-on-deck response in which officers may be asked to work long hours under high levels of stress. Physical and mental fatigue can impact (1) officers' ability to manage protests effectively and, in the long term, to maintain positive community relationships, (2) officer morale, and (3) the long-term health and productivity of the department as a whole. Officer wellness strategies take on new urgency when the actions of the police are the subject of protests, which may make it more likely that officers will face antagonism from demonstrators.

---

[5] "Protests Dwindle in Chicago as NATO Summit Concludes," *Reuters*, May 21, 2012, http://www.reuters.com/article/us-nato-summit-protests-idUSBRE84I09X20120521.

## Baltimore Police Colonel Melissa Hyatt:

*"You have to plan a lot farther out and include things like days off for officers in your plan."*

If you have a major demonstration that goes on for days and if you only planned for one or two operational periods, you are already behind the ball. One major lesson we learned is that you have to plan a lot farther out and include things like days off for officers in your plan.

It is important, but it gets pretty tricky. For example, if you are requesting mutual aid, it can be difficult to tell outside agencies that you need their help, but at the same time you're planning for days off for your own officers. It might not go over well, but we learned that it has to be a conversation that you have with your partners.

## Oakland (California) Police Captain Darren Allison:

*"Arranging for food and water for officers is also very important on protracted events."*

When we plan, we plan for multiple operational periods. We have to ensure that we bring in enough personnel while at the same time preserving our normal police responses and functions. We talk about bringing in mutual aid if necessary and try to ensure 12 hours of rest between shifts. Arranging for food and water for officers is also very important on protracted events.

Mostly, it is critical for the line officer and sergeant to pay attention to the fatigue factor. They need to be good at monitoring that level of friction and move folks off the line to get relief when needed.

## New York City Police Deputy Chief Stephen Hughes:

*"We . . . assigned officers the same post each day and night . . . and surveyed construction sites for dumpsters that may have contained debris that could be used as projectiles."*

When we had the Republican National Convention in New York, we had 12-hour shifts (07:00–19:00 and 19:00–07:00) and assigned officers the same post each day and night so they had familiarity with their assignments and patrol area. Additionally, we removed all street garbage cans and surveyed construction sites for dumpsters that may have contained debris that could be used as projectiles and had them removed from the surrounding streets. Street newspaper stands or other things a storeowner may have placed that could be used as projectiles in front of their businesses were also removed. No-parking zones, including police department vehicles, were also established. Pretty much anything that could become a projectile, we removed from the scene.

### Arizona State University Professor Dr. Edward Maguire:

*"Train officers to just withdraw from the line if they're getting heated."*

Something I want to mention is finding ways to look out for the emotional and physical well-being of officers. Some of these protesters are really provocative and push free speech to the breaking point. Police on skirmish lines take a lot of verbal abuse, and it can get tough. I've talked to a lot of officers who struggled being out there for hours on end. It's important to talk about what kind of steps we can take to talk about preserving emotional well-being and handling stress.

One recommendation is to train officers to just withdraw from the line if they're getting heated, and the second is to train officers to pull each other off of the line. You need to build that into the deployment plan, so you have the capacity for officers to check out or encourage their peers to check out. It's well worth the effort to have the extra capacity so you can put someone else in, because then you don't have the heated moments that end up defining your agency in the eyes of the public.

### Baltimore Police Captain Kevin Jones:

*"There were times when I had to pull people off of the line, because their heads were not in the right place; they were getting angry."*

From the field perspective, I learned that you have to give a personal touch to your guys. You need to let them know you care about their well-being. For example, you can remind them to check in on their families.

Operationally, you also have to individually check on people. There were times when I had to pull people off of the line, because their heads were not in the right place; they were getting angry about what they were seeing. And you don't want those people on the frontlines, because they may react and be the spark that sets something off.

### Boston Police Deputy Superintendent Colm Lydon:

*"Supervisors have to keep an eye on the officers who are getting fatigued and remove them if necessary."*

If an individual officer is targeted and starting to be overly antagonized by a crowd, we should rotate him or her out. It's also important to reinforce officer behavior when they are working to express an air of tolerance and command presence. Supervisors have to keep an eye on the officers who are getting fatigued and remove them if necessary. Supervisors should make sure that all officers are sending the same message of unflappability to the protesters. Command staff should also be keeping an eye on officers so that if they are taking too much abuse from protesters, they can take those officers aside and off of the line to have a break.

## Hennepin County (Minnesota) Sheriff Richard Stanek:

*"The ratio of officers and deputies to first-line supervisors should be lower during protests."*

The ratio of officers and deputies to first-line supervisors should be lower during protests than in other assignments. The job of supervisors is to keep everyone under control, and the verbal abuse that officers experience on the line begins to wear on people. So the level of supervision should be greater than is typical, so that you can recognize when people are burning out and pull people if necessary. It's also important to make sure there are enough breaks in shifts as well.

## St. Louis (Missouri) Metropolitan Police Chief Samuel Dotson:

*"It's not just employees you need to be concerned about; it's also their families."*

We realized early on that it's not just employees you need to be concerned about; it's also their families. Your approach for providing wellness services needs to be wraparound.

With the advent of social media and the 24-hour news cycle, things have changed. It used to be that families would hear stories after the officers came home, but families didn't have to live through a riot by watching it on TV or their computer. Now families are living through protests with the officer minute by minute. So we sent letters to families, saying counseling was available not only to officers but also to family members.

## Ferguson (Missouri) Former Interim Police Chief Alan Eickhoff:

*"Officers may be reluctant to go to mental health evaluations, so we made them mandatory."*

During the protests in Ferguson, people were threatening to kill officers and their families and even their pets. The verbal abuse was nonstop. We had resident officers who had to file for bankruptcy because protesters showed up at their houses, threatening their families, scaring the wife and kids, and forcing the families to move. The group known as Anonymous also hacked officers' identities and made fraudulent purchases.

You're fighting on two fronts: the protesters on the line and the behind-the-scenes harassment. So we worked on cyberthefts and had employee assistance.

Officers may be reluctant to go to mental health evaluations, so we made them mandatory. We put everyone in front of mental health specialists and even offered services to their families. This continuous abuse affected the entire family, not just the officer.

# Competing protest groups: How to manage conflicts among protesters with opposing views

Many forum participants noted that police agencies often have to manage multiple groups of protesters with diverse, and sometimes opposing, viewpoints. This can make protecting public safety while ensuring all demonstrators' constitutional rights exceptionally challenging. Departments should anticipate and plan for this challenge in advance.

### New York City Police Deputy Chief Stephen Hughes:

"The courts have allowed the NYPD to establish separate demonstration areas and direct individual removal from areas if a public safety issue exists."

"Sight and sound" is the standard the courts have given us. For example, we had a group protesting in front of the United Nations headquarters on First Avenue in New York. They damaged the building by throwing paint and debris during the demonstration. The next day, the demonstrators returned, so we established an area on Second Avenue, one block further away, to prevent objects from striking the building. The demonstrators brought us to court, and the judge ruled that we have to give demonstrators a space that is within sight and sound of their chosen protest location: *sight* to provide the demonstrators with an unobstructed view of the building, and *sound* to ensure people in the building can hear the demonstrators' voices unamplified.

Opposing groups that protest simultaneously also presented challenges. The courts have allowed the NYPD to establish separate demonstration areas and direct individual removal from areas if a public safety issue exists.

### American Civil Liberties Union Senior Staff Attorney Lee Rowland:

"Transparency helps police defend themselves from any claims that a call was made for reasons other than operational concerns."

With regard to the protest zones, I think they have to be determined with an eye toward making sure that voices are heard within the relevant area. Protesters have to be within sight and sound of certain locations, but you can certainly keep groups of protesters separate if need be.

Here I think transparency helps police defend themselves from any claims that a call was made for reasons other than operational concerns. You have to make sure demonstrators know how you are assigning space, dealing with permits, and giving directions to groups on an equal basis regardless of their political affiliation.

You want to make sure that people have an actual platform and they are heard in a meaningful way by the audience they care about and that you're treating everyone equally regardless of their point of view. As someone who has monitored a protest between neo-Nazi biker gangs and the Westboro Baptist Church of Topeka, Kansas, I know that sometimes there are no obvious good guys.

Police can best defend themselves against potential constitutional problems by having more transparency and very clear rules about how they determine if, when, and where these separations need to be made and how they're done, without regard to the messages that people are sharing.

| Toronto Police Service Superintendent Bill Neadles: |
| --- |
| "[Protestors] thought that being in the free speech zone meant that . . . we weren't allowed to go in and arrest them." |

We have had bad experiences trying to delegate areas of protest, or what we call a freedom of speech zone. After the freedom of speech zone was created at one event, about 25,000 protesters arrived. Then the anarchists showed up, and we had a very big component of Black Bloc tactics.[6] The Black Bloc group went through the city and did almost $5 million in damage. We chased them around, and eventually we got them back to the freedom of speech zone. Then when we started to effect arrests, they thought that being in the free speech zone meant that they were home free. They thought it was their safe zone and that we weren't allowed to go in and arrest them. People were saying, "How dare the police come into our area!"

So it's great to separate protesters and give them an area, but you have to make them aware that they don't own it. In Toronto, they thought they owned that land and that we could not arrest them because the police had no jurisdiction on that land.

## Arrests: Avoid mass arrests but be prepared if arrests are necessary

Many officials at the forum said that police agencies should use engagement and de-escalation techniques to avoid making mass arrests as much as possible during demonstrations. Mass arrests are legally and logistically complex, and they can produce mistrust and antagonism between the police and demonstrators.

As a result, some participants recommended that police agencies adopt a high bar for determining when protesters will be arrested during a mass demonstration. Police agencies should clearly communicate the thresholds for arrest and should give warnings to demonstrators when they are in violation of the law and subject to arrest. Police agencies also need to have plans and mechanisms in place for arresting protesters and processing them quickly and efficiently.

---

[6] James Tennent, "Black Bloc: Who Are the Masked Protest Provocateurs?" *International Business Times*, November 5, 2015, http://www.ibtimes.co.uk/black-bloc-who-are-anonymous-anarchist-protest-provocateurs-million-mask-march-1527383.

| New York City Police Lieutenant Christophe Stissi: |
| --- |

*"Any time we have a mass demonstration, we make a distinction between criminal behavior and civil disobedience."*

Any time we have a mass demonstration, we make a distinction between criminal behavior and civil disobedience. The message that we communicate to officers is that if they observe a violent criminal act—for example, throwing a bottle and potentially causing a serious injury or throwing a trash can through a store window—they have a green light to make an arrest, and they don't have to ask anybody's permission.

In cases of civil disobedience—for example, a crowd goes into a roadway and obstructs vehicle traffic, or a crowd blocks pedestrians who are trying to get into a store—officers are instructed that under no circumstances will they make an arrest without the approval of the incident commander.

The incident commander is the borough patrol commander. New York City is broken down into eight patrol boroughs. The borough patrol commanders are stakeholders in their communities. They know the church leaders and other community leaders, so we want that patrol commander to make the decision about any potential civil disobedience arrests. We have officers prepared to film the arrest, and they'll respond to that patrol commander.

### The New York City Police Department's Strategic Response Group

by Deputy Chief Stephen Hughes

We formed the Strategic Response Group (SRG) in 2015. We're tasked with responding to large-scale events and disorder that may result in mass arrests. Presently, the SRG has 650 members. We are trained and equipped to respond to disorder control; chemical, biological, radiological, nuclear, and explosives (CBRNE) response and terrorist and active shooter incidents; and peaceful protests.

The SRG has a citywide response capability that supports patrol requests for additional manpower because of large-scale planned and unplanned events. Our real specialty is crowd control, which we use on a day-to-day basis in New York. The SRG has also improved the use of training and equipment by providing a more disciplined response to large-scale situations. We figured out that a big key was having a unified command structure with a consistent response. ■

We send a department attorney out to work with the patrol commander as well. Any time we have a demonstration, we have department attorneys in the field working with us. When I report with the rest of the Strategic Response Group (see the sidebar "The New York City Police Department's Strategic Response Group" on page 17), I stay right near that patrol commander's side, because he or she is in charge of making decisions about civil disobedience arrests.

Civil disobedience is very different from a criminal act. If you make an arrest, you're taking away that person's right to demonstrate. So we want to make sure that decision is made while looking at all of the factors.

> ## Washington (D.C.) Metropolitan Police Commander Jeffery Carroll:
>
> *"We try to prevent making mass arrests if at all possible. If you are going to arrest demonstrators, you need mechanisms in place."*

We try to prevent making mass arrests if at all possible, but there are some lessons learned that we've translated into promising practices if we have to make mass arrests. You have to make sure you have a system for handling mass arrests before a large protest takes place. How are you going to process people if you do arrest them? How are you going to transport them? Where are you going to take them? Are you going to feed them? How long are you planning on having them? You need a mass processing system that is efficient enough to get them through and get them out. Are you actually going to do a custodial arrest, or are you going to issue a citation in lieu of arrest?

If you are going to arrest demonstrators, you need mechanisms in place to process a large volume of arrestees. You cannot take 50 people into a district station and expect them to be processed in a timely manner unless you've preplanned.

*"If you're going to give warnings and potentially make arrests, you should be specific about the laws people are violating."*

It goes back to training. We have a high-volume arrest processing system that we use, and we have officers who are specifically trained on how to use it. If we believe that we might need to make a large number of arrests, we have the capacity to do so. We have predetermined locations where we can process a large number of arrestees. We have the necessary systems and forms in place and people who are trained to process people as quickly as possible, so that demonstrators can be released or see a judge or pay their citation.

If you're going to give warnings and potentially make arrests, you should be specific about the laws people are violating. For example, if people are blocking a major highway, you have to tell them what law they are breaking. We have pre-scripted warnings that we use, in which we cite the law and then order the protesters to cease and desist. We give demonstrators three audible warnings before we make arrests.

The Police Response to Mass Demonstrations

We have to ensure that the entire crowd can actually hear these warnings. In order to do that, we call in officers to record while we're giving warnings. We also station officers on the other side of the crowd, listening to determine whether our warnings are audible to everyone. They indicate to us whether they can hear the warnings. One of the mechanisms we use is a Long Range Acoustic Device (LRAD). This allows us to ensure the entire crowd can hear the warnings.

We document the warnings we give at appropriate intervals, and then if we have to arrest people, we can do so properly, quickly, and efficiently. We want to ensure that everyone's rights are protected.

Another thing we learned from past events is the importance of ensuring that you don't encircle the crowd without allowing an avenue of escape. If you're telling a crowd to disperse, you cannot completely encircle the entire crowd with officers, because then they have no way to go elsewhere.

You also have to be careful to ensure that you don't accidentally involve people who aren't actually part of the protest. You don't want to draw onlookers into a demonstration and not give them an avenue to leave if they choose to do so.

We developed a standard operating procedure (SOP) on how to respond to First Amendment demonstrations, and this is a guide for officers and commanders.[7] With the SOP, everyone has the rules that we follow, and everyone is clear on what we do and what we don't do. That way, it's clear to everybody from the officer on the street to the assistant chief how we will handle demonstrations. And if we do have to make arrests, we're prepared, and we take the appropriate actions.

## American Civil Liberties Union Senior Staff Attorney Lee Rowland:

*"We want to make sure that people who are arrested are given actual notice and warning."*

The emphasis in a police department should be on reaching out to the community and clearly explaining the rules that apply during a demonstration. Cops should be helping people to obtain protest permits. Ideally, demonstrators should inform law enforcement about planned events and have a clear communication stream before things get to the point of arrest or disruption.

One of the things we've had a huge problem with in some cities is the kettling[8] of protesters. This is often done without clear audio warnings or any other warnings to disperse. We want to make sure that people who are arrested are given actual notice and warning. And in general, it's not really in law enforcement's interest to arrest protesters who have no notice that they are breaking the law.

---

[7] *Standard Operating Procedures: Handling First Amendment Assemblies and Mass Demonstrations* (Washington, DC: Metropolitan Police Department), July 2013, https://go.mpdconline.com/GO/SOP_11_01.pdf.
[8] *Kettling* means containing a group of protesters within a circle of police.

## Use Evidence-Based Practices Identified by Crowd Psychologists to Inform Policy on Responding to Mass Demonstrations

by Arizona State University Professor Dr. Edward Maguire

We are developing a guidebook for police executives on responding to mass demonstrations. It follows a framework designed by crowd psychologists, and it covers some basic ideas on how to think about approaching crowd-related events. These apply not only to protests or mass demonstrations but also to large events in general. One issue the Europeans have been dealing with for quite a while is football hooliganism and soccer games that get out of control. Crowd psychologists have developed a framework that has four components for dealing with these crowd events.

The first component is **education**. You might think of it as intelligence, but it's just gathering information about the event, the organizers, and their aims. You want to know what they're planning to do and why.

**Facilitation** is the second component. This involves very clearly letting event organizers know that you take seriously your responsibility to facilitate their First Amendment expression and that you're going to help them do that. It's also a good time to communicate to them your own expectations of their behavior and of the people in their group.

**Communication** is the third component. It's critical to establish continued lines of communication among crowds, organizers, and police.

The fourth component is **differentiation**, which is the idea that crowds are not entirely homogenous. They are heterogeneous, and they have different groups of people with different aims, some of whom are troublemakers, many of whom are not. The idea of differentiation is that you're not going to respond to those two groups the same way. When you look back at crowd events that have gone badly, it's typically when police are taking action against the entire crowd rather than individual members of the group. Differentiation is about tailoring your response to the different segments of the crowd, so that the people who are not engaging in trouble-making get one response and law-breakers get another. This is where you end up having extraction teams that move in with laser-like precision to arrest only people who are engaged in violence or property damage, without infringing on First Amendment rights. ∎

**Seattle Police Assistant Chief Steve Wilske:**

"We made mass arrests [at the World Trade Organization protests in 1999] and lost all of those cases in court."

The World Trade Organization protests in 1999 were a learning experience for us with regard to mass arrests.[9] We made mass arrests and lost all of those cases in court. Officers need to see a person commit a criminal act; you need individual probable cause to make every arrest. As a result, we've really moved away from making mass arrests, and we focus on individual people if an arrest is needed.

We're also more patient with unpermitted marches now. We used to get involved in disputes with unpermitted marchers on the streets. The question we now ask ourselves is whether those fights are worth it versus the alternative of just managing traffic issues. We're leaning more toward the latter option now.

## Internal communication: Setting clear expectations for officers and command staff

Departments need to communicate clearly what they expect of their officers during mass demonstrations. This communication ensures that officers understand what they are supposed to do, are consistent in their tactics and their messaging with protesters, and feel supported by their departments while they are on the line.

**New York City Police Inspector John D'Adamo:**

"One of the most important things is for the troops to have a clear message from the incident commander who is running the scene."

It comes down to communication. One of the most important things is for the troops to have a clear message from the incident commander who is running the scene. The last thing they need is a gray area where they're not sure what the mission is. In the NYPD, we have tactical meetings, and Chief Stephen Hughes, the commanding officer of the Strategic Response Group (see the sidebar "The New York City Police Department's Strategic Response Group" on page 17), will go through the priorities for the Strategic Response Group that comes from the incident commander. Clear and concise messaging to the troops in the field can make demonstrations go successfully.

---

[9] See "What the 1999 World Trade Organization Conference in Seattle Taught Police Executives," in *Managing Major Events: Best Practices from the Field*, Critical Issues in Policing Series (Washington, DC: Police Executive Research Forum, 2011), 4–5, http://www.policeforum.org/assets/docs/Critical_Issues_Series/managing%20major%20events%20-%20best%20practices%20from%20the%20field%202011.pdf.

## Oakland (California) Police Captain Darren Allison:

*"For internal staff, we want to communicate command intent and expectations and policies."*

For internal staff, we want to communicate command intent and expectations and policies. We can't go out on different sheets of music and expect to do well. With a couple hundred officers out there, it's essential that everyone carries out several functions as seamlessly as we can.

I like to meet with the command staff ahead of time to make sure we're all on the same page with the basic operational guidelines that we're carrying out. This is especially important for administrative reporting of use of force and use of cameras.

Then we discuss the strategy and tactics for the operation itself and hold a mass briefing so that everyone knows the situation, the mission, and how to execute.

## Seattle Police Assistant Chief Steve Wilske:

*"We have learned that when a demonstration begins to take a bad turn, communications are the first thing that falls apart."*

Starting about a year ago, we sat down with the Seattle City Attorney's Office and drafted our rules of engagement. Those give people pretty clear directions for foreseeable things that we might have to respond to. For very large events that we believe might become contentious, we'll start planning months out. We'll have tactics meetings every week or two and talk through contingencies.

We have learned that when a demonstration begins to take a bad turn, communications are the first thing that falls apart. As a result, we try to talk through the contingencies ahead of time. We preload as much information as we can and let people know how they are supposed to respond, because it is difficult to get decisions out quickly in the middle of an event.

## Washington (D.C.) Metropolitan Police Commander Jeffrey Carroll:

*"The interaction between officers and protesters can swing the entire dynamics of a demonstration."*

Make sure you start with the right expectations. Officers need to be aware of regulations and rules, and they need to learn the tactics that protesters will use to try to agitate police. If the police are prepared for that, they won't overreact. Let officers know, "Some protesters may do these things, so be ready for it. They may try to get you to do something that you shouldn't do."

The interaction between officers and protesters can swing the entire dynamics of a demonstration, so officers need to be prepared to handle things well. They need to de-escalate, not inflame a tense situation. So communicating your plan and their roles and how you expect them to respond goes a long way. You're there to maintain peace and protect protesters' First Amendment rights, so remember that. Have supervisors there to make sure that everyone is in line.

## St. Louis County (Missouri) Police Chief Jon Belmar:

*"You have to spend your time on officers' bearing and professionalism."*

We do civil disturbance response training. We really want our officers from all of the responding agencies in our mutual aid agreements to understand the First Amendment, the Fourth Amendment, and the 14th Amendment. We put this information on laminated cards in their pockets, and we put the oath of office on those laminated cards. And at roll call out in the parking lot, we would have a young officer read to everybody his or her oath of office, so they understood what we were really out there for—to protect people's constitutional rights.

It is not really that hard to talk to officers about line formations, but you have to spend your time on officers' bearing and professionalism. Even if you are in a protest environment that may eventually spin out of control, the bearing of police officers should be relaxed, as though they're working security at a Cardinals game. St. Louis Metropolitan Police Chief Sam Dotson led the effort on that.

## St. Louis (Missouri) Metropolitan Police Chief Sam Dotson:

*"Officers could pick up the written details and say, 'Okay, this is my job; this is what I am supposed to do.'"*

I wanted to put something in the hands of the officers, giving them written details, so they know what their job is, both in terms of responding to unlawful behavior and protecting the constitutional rights of those who were assembling. It was very important to us to set the tone for the officers. We can get the helmets, the shields, and the equipment, and we can train officers about line formations, but it was also important for the officers to know that there was a plan. Officers could pick up the written details and say, "Okay, this is my job; this is what I am supposed to do; this is what I am supposed to accomplish; and here are the people supporting me."

And that last part is important, about support. The officers needed to know they had a whole support mechanism behind them, so they didn't think that they were the only ones out there on the line.

Having the details also helped with the problem of self-deployment that we saw early on in Ferguson, because now, if you didn't have a job, if you didn't have anywhere to go, you had to go to staging and go through the logistical process to get checked in.

So the training is important, but so is having a plan. You have to build a plan, and it is the Incident Command System; it is the National Incident Management System model. That gives you a good foundation, and it can be expanded. So we had a plan that anticipated peaceful protests, but the plan had an annex if it went somewhere else.

## Pasco (Washington) Police Chief Robert Metzger:

*"We are not going to argue over some blacktop."*

We thought we had a good plan for protests,[10] but we found out that some of our line officers weren't aware of what we were thinking. And we had some mutual aid officers from other departments who had a different philosophy about how to interact with demonstrators, and we hadn't done a lot of training on that with them beforehand.

For example, when protesters took over an important intersection, I made the decision not to go in with riot gear. Some of the other departments' command officers were not happy with that. It was my fault because I hadn't discussed it with their chiefs or their command beforehand.

We remind our officers that the role of the police is protecting First Amendment rights. So we let protesters take over an intersection. We are not going to argue over some blacktop. Some people get upset, but my philosophy is to let the motorists get upset with us, not the protesters.

## Office of Community Oriented Policing Services Director Ronald Davis:

*"If the plan doesn't provide expectations for the officers, then you are setting yourself up for a lot of letdowns."*

One of the things that we at the COPS Office have seen as we go into different jurisdictions to provide assistance is that if the plan doesn't provide expectations for the officers, then you are setting yourself up for a lot of letdowns.

For example, if, going into a demonstration, the officers' expectation is that they will be making an arrest for every violation of the law but then, in the middle of the demonstration, you tell them not to make an arrest, it may feel to them like an abdication of their duty and their responsibility. They feel that you have abandoned them and put them in an unsafe situation.

On the other hand, if you tell the officers at the beginning of a demonstration that you expect them to respect the sanctity of life, to protect demonstrators' First Amendment rights, and to find strategic ways to enforce the law when lawbreakers threaten those issues, then the expectations are more reasonable, and the officers won't feel like they're getting mixed signals.

So I agree with what St. Louis County Chief Jon Belmar is saying. The training on the skirmish lines and all that is the tactical training; it's just the mechanics of how to disband a rowdy crowd. But the larger issue is developing strategies to manage a protest. This means you have to win the loyalty contest so that

---

[10] In early 2015, Pasco, Washington, experienced protests in response to the police shooting death of Antonio Zambrano-Montes. See "Pasco Police Shooting: Hundreds Protest Death of Antonio Zambrano-Montes," *NBC News*, February 14, 2015, http://www.nbcnews.com/news/us-news/pasco-police-shooting-hundreds-protest-death-antonio-zambrano-montes-washington-n306421.

most of the crowd will see that the police are protecting the demonstrators' rights and will support that. And you have to set the expectations for the officers so they won't think you are asking them to violate their oath of office by not making an arrest.

And that is what we have heard in Baltimore and other places. Officers felt abandoned because they wanted to make the arrest. They wanted to get the guy who threw the brick or smashed a window, not recognizing that, strategically, maybe arresting that one guy will be counterproductive because it may antagonize the crowd or even spark a riot.

> "If you tell the officers at the beginning of a demonstration that you expect them to respect the sanctity of life, to protect demonstrators' First Amendment rights, and to find strategic ways to enforce the law when lawbreakers threaten those issues, then the expectations are more reasonable."

Setting expectations should also apply to logistics so officers know they will be relieved after so many hours. There is only so much a human being can take with regard to being called names and spat on, and we have to acknowledge that. And you need to tell them that you will take every reasonable step to protect their identity so their families are not threatened.

Set those expectations of what you want from them, what they should get from you, and what they can be held accountable for. You want to be on the same page with the officers so they won't feel that they are isolated, that the police responses are political, that the command is abandoning them, or that the community doesn't care about them.

I think this is a bigger challenge for us today than it was 10 years ago.

## Recommendations: Response planning and preparation

### Proportionality: Tailoring responses to the actions and mood of the crowd

- Respond to a mass demonstration in gear and with equipment that are proportional to the mood of the crowd. Officer safety is critical and should be considered at all times. Part of that consideration is ensuring that police departments do not increase the tension in a mass demonstration unintentionally by outfitting their responding officers in more gear and with more equipment than are necessary during their initial contact with the crowd. Begin with the lowest response level and be prepared to change if conditions change.

- Have a plan to efficiently increase your level of response if you begin to detect signs of impending violence. A mass demonstration might begin calmly but then start to grow volatile. To protect the safety of protesters and officers, police departments should have a plan for efficiently and quickly increasing their level of response in proportion to what is happening on the street. In some cases, demonstrators may remain peaceful, but other persons may attempt to exploit a demonstration in order to commit crimes. A comprehensive plan may include having officers equipped with protective gear assembled nearby and ready for deployment as needed to relieve officers on the line.

- Extend proportionality to the types of equipment that departments use to respond to mass demonstrations. Military-style equipment is not required to respond effectively to typical protests. "Bringing a BearCat out to a protest doesn't do us any good," said Chicago Police Department Deputy Chief Kevin Ryan. "Unless we see a machine gun, we won't bring a BearCat."

## Bicycle officers: A critical resource in mass demonstrations

- Plan to use bicycle officers during mass demonstrations. They are able to maneuver in crowds more easily than officers in vehicles, and bicycle officers are often seen as more approachable. In addition, bike helmets provide officers with some head protection that is not perceived to be militaristic gear.

- Interlock officers' bicycles to use as a mobile field fence if needed.

## Officer wellness: How to protect the health and well-being of officers in mass demonstrations

- In developing plans for a demonstration, be prepared for the possibility that a demonstration may continue for many days. Plan for multiple shifts, and include plans for days off for officers to safeguard against officer fatigue.

- Have a dedicated radio channel for logistics. This setup ensures that command staff can stay apprised of conditions on the ground and of officers' needs, such as food and water.

- Plan to rotate officers off the frontline at appropriate intervals so they can eat, hydrate, and take a break.

- Pull officers off the line if they appear to grow hostile toward protesters or are becoming over-stressed because protesters are focusing their antagonism on them.

- If possible, prepare for a demonstration by removing potential projectiles such as trash cans from areas where protesters will gather.

- Prepare to provide not only wraparound wellness services and programs but also follow-up for officers and their families. This might include mental health counseling and other assistance, such as credit counseling if officers become the target of identity theft in connection with protests about police actions.

## Competing protest groups: How to manage conflicts among protesters with opposing views

- Prepare to separate protesters and counter-protesters to prevent violent conflict. This might include using dedicated protest zones, provided they are constitutionally compliant.

- Be transparent and have clearly defined rules about how the determination to move competing demonstrators into protest zones will be made.

## Arrests: Avoid mass arrests, but be prepared if arrests are necessary

- Avoid making mass arrests if at all possible, but develop a logistical system for efficiently processing large numbers of arrested individuals if that becomes necessary. Plans should include trained staff, a staging area, and procedures for processing arrests efficiently.

- If arrests are needed, videotape them so police agencies have a complete record of the event.

- Determine what the bar for making arrests will be, and communicate it to all officers. Most departments do not make arrests for low-level civil disobedience during a protest, such as blocking traffic, particularly if traffic can be rerouted around a blocked intersection.

- Develop standard language for officers to use when communicating warnings to protesters, including specific language about the laws protesters are violating.

- Develop a procedure for communicating those warnings to protesters—i.e., one that covers when the warnings are given, how they are given, and how often they are repeated before arrests may take place—and train officers on that procedure.

- Use officers stationed at different points in a protest area to confirm that warnings are audible to persons in all locations who could be affected.

- Do not encircle the crowd and then order them to disperse. Ensure demonstrators have paths to disperse.

- If given enough advance notice of a protest, communicate arrest procedures to protesters and the community before the demonstration begins.

## Internal communication: Setting clear expectations for officers and command staff

- Instruct officers about the department's overall strategy, goals, and operational guidelines in responding to a mass demonstration. This instruction ensures that responding officers understand that the department has an overarching response plan and that their roles and responsibilities are designed to support that strategy. Internal communication will also prevent situations in which officers feel they are receiving mixed messages during a demonstration: e.g., whether to make arrests or to engage in other responses.

- Clearly communicate to officers the specific behaviors, tactics, and messaging that are expected of them in a mass demonstration. This communication will make them more confident in their decision making on the line and demonstrate to them that they are supported by the department in those actions.

# 2. Training

The changing nature of mass demonstrations in recent years has prompted a reexamination of how police departments need to equip and train their officers to prepare for these events. These considerations are particularly important for demonstrations about police use of force and other police actions, as opposed to economic or social issues or other matters that are often the subject of protests.

The most common types of training used to prepare police for mass demonstrations include education on the following topics:

- The First Amendment
- Mobile field force and civil disturbance
- The Incident Command System (ICS)
- The use of less-lethal munitions[11]

Agencies with mutual aid agreements (discussed in detail in chapter 3) and memoranda of understanding often participate in interagency training on response protocols for mass demonstrations.

It is critical that police agencies provide First Amendment training[12]  for their officers on the constitutional protections afforded to peaceful demonstrators, including the rights to free speech and peaceful assembly. Some agencies develop this training in partnership with civil liberties groups, such as the American Civil Liberties Union. This training should include education about

- the differences between constitutionally protected activity and criminal acts;
- rules for maintaining officers' displayed name or badge number when wearing civil disturbance gear;
- agency policies on the use of hard protective gear and equipment vs. soft gear during mass demonstrations.

---

[11] For general training resources, see "Center for Domestic Preparedness," FEMA, accessed December 7, 2016, https://cdp.dhs.gov/; Rodney Monroe, "Recommendation 1: Implementing Comprehensive Training Strategies" (part of his prepared testimony on the topic of mass demonstrations, presented to The President's Task Force on 21st Century Policing at the "Listening Session: Policy and Oversight" in Cincinnati, Ohio, on January 30, 2015, https://cops.usdoj.gov/pdf/taskforce/submissions/Monroe-Rodney-Testimony.pdf; CNA Analysis and Solutions, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies* (Washington, DC: Bureau of Justice Assistance, 2013), 79–82, https://www.bja.gov/Publications/LSSE-planning-Primer.pdf.

[12] For more on First Amendment training, see "First Amendment Online Training," Bureau of Justice Assistance, accessed December 7, 2016, https://www.ncirc.gov/Training_First_Amendment.aspx; Criminal Intelligence Coordinating Council, *Recommendations for First Amendment-Protected Events for State and Local Law Enforcement Agencies* (Washington, DC: Bureau of Justice Assistance, 2011), https://www.ncirc.gov/onlinetraining/modules/first_amendment_rollcall/Recommendations.pdf.

Some departments use case studies drawn from past experiences to instruct their officers on constitutionality in the context of a mass demonstration. Examples often include outdated tactics that should be avoided and more effective strategies and may include discussion of the Seattle Police Department's response to the World Trade Organization riots in 1999 and the Washington (D.C.) Metropolitan Police Department's handling of the International Monetary Fund and World Bank protests in 2000.[13]

Mobile field force and civil disturbance training[14] deals with tactical responses to mass demonstrations, such as crowd control, formations, and making arrests safely and efficiently. New versions of mobile field force training also include techniques for de-escalating tense situations during major events. Because both types of trainings are often hands-on, it is important for units that will be assigned to work together during critical incidents to train as a group.

The National Incident Management System (NIMS) is a set of standards and practices outlined by the Federal Emergency Management Agency to improve interagency coordinated responses to serious incidents in the United States. The central component of NIMS is ICS,[15] which describes the chain of command for multiple agencies responding to a single event, as well as the roles and responsibilities of emergency responders.[16] (ICS is discussed in more detail in chapter 4). It is critical for departments to train their personnel in ICS and to regularly refresh that knowledge base through in-service training.[17] In addition, commanders should be trained in each relevant ICS position, so multiple people in each agency are able to assume these roles.

Last, officers need to be trained in the safe and effective use of any less-lethal munitions[18] their departments use, as well as deployment policies for using them in the field.

## Types of training: How departments should equip and train their officers

The types of traditional training outlined in the previous section are crucial to managing mass demonstrations; however, just as mass demonstrations have changed, so too have training needs. Many forum participants agreed that topics such as de-escalation and building goodwill between protesters and the police are increasingly important. This additional training is critical, as agencies are increasingly

---

[13] See *Managing Major Events* (see note 2).

[14] For more on mobile field force training, see "Field Force Operations," Center for Domestic Preparedness, FEMA, accessed December 7, 2016, https://cdp.dhs.gov/find-training/course/PER-200.

[15] See "ICS Resource Center," FEMA, accessed December 5, 2016, https://training.fema.gov/emiweb/is/icsresource.

[16] For more information on NIMS and ICS training, see "National Incident Management System (NIMS)," Emergency Management Institute, FEMA, accessed December 7, 2016, https://training.fema.gov/nims/.

[17] See Narr et al., *Police Management of Mass Demonstrations*, 22 (see note 2).

[18] *Lessons Learned from the 2015 Civil Unrest*, 39 (see note 2).

using a soft approach to mass demonstrations: i.e., one that fosters positive communication between officers and demonstrators and emphasizes that the role of officers to protect public safety while facilitating protesters' First Amendment rights.

### Arizona State University Professor Dr. Edward Maguire:

*"The key to maintaining peace is thinking about the interaction between a single police officer and a single protester."*

Most American police agencies are doing civil disorder training, riot training, and training on other topics that are heavily focused on tactics. I think one of the things that's missing is how to prevent incidents from turning riotous. The main issue for me is drawing a sharp line between protests and riots. In many cases, police prepare for riots when they should be preparing for protests. Bringing riot prep to a protest changes the situation. I think what's missing in some departments is thoughtful training about how to deploy, what to look like when you deploy, and how to behave when you deploy, so that you won't trigger the very thing that you want to avoid.

I do research on protests, and that includes going to protests and just watching. I watch the interactions that happen between the splinter groups or between the police and protesters. And one thing that becomes very clear is that there is a dynamic between police and protesters, where the attitudes and behavior of one influence the attitudes and behavior of the other.

This works in both directions, so a wrong move by either side can trigger something that can get out of hand very rapidly. So I think the key to maintaining peace is thinking about the interaction between a single police officer and a single protester. What can we do to make it a positive interaction or to prevent a negative interaction from escalating and getting out of hand? That's what I'd like to see our training address.

### Baltimore Police Colonel Melissa Hyatt:

*"By giving all our regular officers Civil Disturbance Unit (CDU) training, we are giving them the confidence that they can handle an event even if it goes badly."*

Our position is that we should come to a protest in a soft response with our mobile field force–trained officers in our back pocket, ready to step in if they are needed. Coming out in full riot gear at the beginning of a demonstration does not send a good message and certainly raises the temperature of the event. Of course we remain concerned about officer safety and public safety; we can have resources in gear nearby but out of sight.

We have been investing heavily in training as an answer. By giving all our regular officers Civil Disturbance Unit (CDU) training, we are giving them the confidence that they can handle an event even if it goes badly and some people start rioting. The officers have the confidence now that they can defend themselves if things start to deteriorate.

## Pasco (Washington) Police Chief Robert Metzger:

"Procedural justice training . . . reminded us of what we're really out there to do."

Procedural justice[19] training was very good for us because it reminded us of what we're really out there to do, and that is to protect and facilitate people's constitutional rights. It's a reminder of what we went through at the academy and what we learned in basic police training.

## Cleveland Police Deputy Chief Wayne Drummond:

"We want to make sure our officers have the professionalism to act in an appropriate manner and can de-escalate tense situations."

We use de-escalation training. In volatile situations with high emotions, we want to make sure our officers have the professionalism to act in an appropriate manner and can de-escalate tense situations effectively. We also make sure our officers understand that protesters have a right to say what they want as long as they are not violent.

We also have mobile field force training, which covers topics like how to deal with a violent crowd and how to arrest someone during a volatile situation.

Like most people here, we're training on crowd control and the dynamics of crowds, and we incorporated our patrol section; our line officers are actively involved in that. They have to understand the basic concept of field force operations, so we have to get them involved. And we have to make sure they are properly equipped, that they have the helmets and the turtle gear, so that's part of our responsibility. But we also have that soft approach for our initial response.

## Baltimore Police Captain Kevin Jones:

"ICS training is helpful because it assigns specific duties to certain people."

ICS training is helpful because it assigns specific duties to certain people, so everyone knows what they should be doing. In ICS, you have to realize that sometimes it is not the rank but the skills of a person or their training that makes them the right person for a particular job.

---

[19] See *Legitimacy and Procedural Justice: A New Element of Police Leadership* (Washington, DC: Police Executive Research Forum, 2014),
http://www.policeforum.org/assets/docs/Free_Online_Documents/Leadership/legitimacy%20and%20procedural%20justice%20-%20a%20new%20element%20of%20police%20leadership.pdf.

## Oakland (California) Police Captain Darren Allison:

*"During . . . academy trainings, we bring in cadets and volunteers to act as protesters."*

We have de-escalation training as part of crisis intervention team training, and we have scenario-based training that emphasizes crowd control. There is continued professional training every 18 months. We just taught all of our frontline officers crowd control techniques, crowd movements, and communication. There is also quarterly command training where we do tabletop exercises on crowd control.

During training in which we teach crowd movements, we'll bring in newer commanders or supervisors to help direct the officers in the academy as they practice. So it's also training for commanders to practice directing crowd movements and officer movements. During those academy trainings, we bring in cadets and volunteers to act as protesters. We'll use water balloons to mimic objects thrown. We really want to simulate the elevated stress levels that they'll have to operate under.

## Washington (D.C.) Metropolitan Police Commander Jeff Carroll:

*"Across the city, each patrol district has CDU platoons that are assigned to them."*

CDU training is run out of the Special Operations Division, which I command. We have a unit within our division that handles all the CDU training. And across the city, each patrol district has CDU platoons that are assigned to them. We also have the ability to form platoons from other units within the department.

Our CDU officers recertify every year. They go through tactics training; they go through crowd management training; they go through a classroom portion about how demonstrations work and the motivation of demonstrators. So within every patrol district, we have officers who are trained, and we have up to four platoons, with 28 officers each, spread throughout the city in each patrol district.

You must have the resources. You must have the yearly training on these tactics, and you must incorporate the new tactics that are being developed into your training. For example, we looked at the riots in Baltimore last year and asked how that type of situation might affect us. And one of the things we adopted was incorporating shield training into our CDU tactics to give the officers some additional protection. So you have to look at every large-scale demonstration and re-evaluate what you do. Reviews like that are outstanding methods to see how you can improve your skills and response.

We have large-scale demonstrations that in some cases are annual events, like the March for Life and other demonstrations that are normally peaceful. We help with crowd management, and we facilitate getting people to the National Mall or the downtown area where these marches and demonstrations occur.

The Special Operations Division also normally handles the impromptu protests that we are seeing now, the ones with less-identified leaders, which happen on more of a routine daily basis. And with those demonstrators, we have our officers use the tactics that we all spoke about. They redirect traffic; they allow peaceful protesters to take nonmajor roadways. If protestors want to sit down in an intersection, we will box out traffic, redirect traffic around them. And they usually stay there for a little bit and then get up and march on.

We have had the same difficulty others have mentioned with establishing communications with some protest groups. Some are more apt to tell us where they are marching and where they would like to go. Others don't. Sometimes you can identify the informal leaders; you can see whom the protestors crowd around or who gets on the bullhorn and decides where they are going to go.

Sometimes there is a direct route they want to take, and they will tell us. Sometimes they won't. And sometimes they will pretend that they are going to disband and they go into the subway, and 30 minutes later you get notified by a patrol district that the protestors popped up somewhere else in the city and are lying down in an intersection. So we shift our resources quickly. We have the ability to use patrol officers who already have CDU training to respond quickly and manage the demonstration until Special Operations can get there to assist them.

## Training together: Bringing mutual aid agencies together to prepare for mass demonstrations

The larger and more enduring a mass demonstration, the more likely police departments will need to rely on neighboring agencies to provide assistance under mutual aid agreements. Training together can help agencies achieve a coordinated response with all agencies in agreement about tactics and rules of engagement. Interagency training can also serve as a training of trainers and allow agencies with advanced skills (in areas such as mobile field force) to share their knowledge. And ICS-based joint training can bring nonpolice agencies, such as fire departments and public works departments, together with their police partners to ensure a well-coordinated response in the event of a mass demonstration or other major event.

| Seattle Police Assistant Chief Steve Wilske: |
| --- |

"[Neighboring agencies] can't just work together one day and expect everything to go smoothly; you actually have to train together during the year."

Mutual aid has been a progression for us, and our approach has changed just over the last year. For us, the primary event that we have during the year for which we use mutual aid is called May Day. It's a very large, peaceful march during the day about immigration issues. But historically, it's also been a very violent confrontation in the evening, with 500 to 1,000 people, primarily anarchist-based.

We have mutual aid for that event every year. We work with some of our neighboring agencies. We trust them, and they trust us. But in the past, we never trained together. That's something that we're starting to do this year. Our folks go to their training, and their folks come to our training. We sit down and talk through our rules of engagement and let them know that they have to agree to our training standards: for example, how we deploy less-lethal options. We cross-train all of our people specifically in preparation for this May Day event. You can't just work together one day and expect everything to go smoothly; you actually have to train together during the year.

The purpose of training together is to ensure that we're consistent across agencies. If we go to another agency's training and see that they have a much different approach, we won't ask them for a mutual aid agreement. Fortunately, that has not been the case with the agencies we work with. They come to our training, and they have to be comfortable with how we do things. We go to their training, and we have to be comfortable with what they're doing.

### Hennepin County (Minnesota) Sheriff Richard Stanek:

*"It can get complicated when you have more than 30 local police departments trying to work together."*

Hennepin County has about 1.2 million people, 45 different cities, and 36 local police departments. There are about 3.5 million people in the metro area. Keep in mind that when an incident happens in a major city, it doesn't mean that demonstrations will necessarily be confined to that city. We've also had demonstrations at our airport, which is not part of the city of Minneapolis or Saint Paul, and at the Mall of America, which is also outside the city of Minneapolis. These events quickly cross jurisdictional boundaries.

When you are policing a metropolitan area, you have a lot of resources at your disposal, but it can get complicated when you have more than 30 local police departments trying to work together. We've been very fortunate to have the ability to train together as a metropolitan area and within our county. It really started with the Republican National Convention in Saint Paul in 2008. We had a couple of years' notice it was going to be there, and we trained; we worked hard; we put together our command structure. Over the last eight years since then, we have continued to use this structure time and again.

### Toronto Police Service Superintendent Bill Needles:

*"It's important to have some cohesion and understanding."*

I can speak from the perspective of our last major mass demonstration, which turned out to be a full-scale riot, at the G20 economic summit in Toronto in 2010.[20] In Canada, we in local law enforcement have very limited access to any kind of funding from the federal government. But if it is a designated

---

[20] "G20 Protest Violence Prompts over 400 Arrests," *CBC News*, last updated June 27, 2010, http://www.cbc.ca/news/canada/g20-protest-violence-prompts-over-400-arrests-1.906583.

federal event, the federal government usually sends funds to allow us to do some joint training. We try to get all the boots on the ground, the officers from the riot teams and the public order side of the house, together for a couple days in advance of the event so at least they have some familiarity with each other when 1,500 riot officers are on the street at once, as we did for the G20.

It's important to have some cohesion and understanding. It's not necessarily that everyone does the tactics the same way, but each team needs to know what the other teams are doing. And you need commander training and commander communications and organization from the boots on the ground right up to the major incident command post where you've got all the major commanders talking. We also have a lot of other elements, such as a fire program and a paramedic program, that fit right in with our police program. We have horses. We have training on chemical, biological, radiological, nuclear, and explosives (CBRNE) threats and training on less-lethal options.

If you can put all of these things together upfront, you are mitigating some of your risk going into a major event.

## Ohio State Highway Patrol Major Michael Black:

> "We have a coordinated staffing effort, and the key for us is going to be communication and coordination."

I see our role in preparing for the Republican National Convention[21] as having a partnership with the Cleveland Police Department. Fortunately, the State Highway Patrol and the Cleveland police have established a great working relationship over the last several years. We are going to have a large number of troopers to back them up at the convention. Obviously they are the lead agency.

In the last year or so, our officers were given the typical mobile field force training that other agencies have already spoken about, and we started training in the last year with the Cleveland Police Department. We work with them; we are training with them; we are going to continue to train with them. We have a coordinated staffing effort, and the key for us is going to be communication and coordination. That is what we are training on right now with the Cleveland Police Department and the Secret Service: making sure that we are all on the same page as to how we are going to react and being able to have command and control of this event. We are going to be able to work together, follow each other's orders, and know the direction of how we will respond to whatever is thrown at us.

---

[21] This COPS Office and PERF forum took place before the July 2016 Republication National Convention in Cleveland.

The Police Response to Mass Demonstrations

# Recommendations: Training

## Types of training: How departments should equip and train their officers

- Provide mobile field force and civil disturbance training, ensuring any units that will be deployed together during a mass demonstration train together as well.

- Train officers and command staff in the ICS, so they will be well versed in their roles and responsibilities during a mass demonstration.

- Train command staff in all relevant ICS positions so each person can fill a number of roles during a mass demonstration.

- Provide officers and command staff with training on the use of less-lethal munitions. This training includes how to use less-lethal munitions effectively as well as agency policies that determine when, how, and by whom their use can be authorized.

- Train officers on protesters' constitutional rights and what they mean in a mass demonstration context. The role of the police is to protect community members' First Amendment rights while protecting public safety. Officers should be trained to understand these roles and to convey them to demonstrators so the demonstrators will know that the police see their role as protecting protesters.

- Emphasize the importance of de-escalation and communications tactics in the context of a mass demonstration. The quality of interpersonal interactions between individual officers and protesters can change outcomes. Ensure officers are equipped to handle interactions calmly and professionally, even if protesters are antagonistic. Small groups may engage in violence, but if most demonstrators understand and see that the police view their role as facilitating the demonstration while protecting public safety, violence is less likely to spread.

- Simulate the high-stress environment of a demonstration during scenario-based training.

- Bring new commanders into the academy to command cadets during their training on crowd movements. This gives commanders an opportunity to practice directing officers and managing crowds during mass demonstrations.

- Constantly re-evaluate training in the context of events in other jurisdictions, taking lessons from those events and modifying training accordingly.

- Train officers in procedural justice and how they can practice it in the context of managing demonstrations. Procedural justice is about demonstrating respect to community members, treating them with dignity and fairness, and allowing community members to express their views and tell their side of the story during encounters with the police. Research has shown that when the public believes the police exercise their authority in these procedurally just ways, they are more likely to accept the legitimacy of the police and defer to police authority.[22]

- Regularly refresh officers' training on responding to protests.

## Training together: Bringing mutual aid agencies together to prepare for mass demonstrations

- Agencies with mutual aid agreements and memoranda of understanding should participate in joint training for responding to mass demonstrations. This builds trust among these agencies and creates an opportunity to identify any issue areas, such as inconsistencies in policies and tactics regarding use of force, and address them in advance of a mass demonstration. The host agency must be in charge of all officers responding jointly to an event, setting the policies and practices that will be followed.

- Agencies should use interagency training as an opportunity to share partner agencies' expertise. For example, if one agency has expertise in civil disturbance training, the agency can share that expertise by training partner agencies' trainers.

- Police departments should involve nonpolice agencies, such as fire departments, in ICS training to improve coordinated responses to mass demonstrations.

---

[22] See *Legitimacy and Procedural Justice* (see note 19).

# 3. The Importance of Mutual Aid and Systems for Managing It

Sometimes mass demonstrations and other major events are too large and complex for a single agency to manage alone. As a result, some police departments have entered into mutual aid agreements (MAA) or memoranda of understanding (MOU) with other police agencies and first responders. These compacts create a framework through which agencies can provide assistance to each other across jurisdictional boundaries during critical incidents.[23] This assistance can take the form of personnel, equipment, and operational support. Forum participants agreed that if a police agency chooses to engage in mutual aid, written agreements should be in place in advance of any protests.

MAAs and MOUs should address the following:

- Mission
- Direction: a joint philosophical framework
- Supervision
- Assignment of personnel
- Authority (deputation)
- Joint organizational structure
- Equipment
- Funding, payment, and financial processes
- Joint facilities agreements
- Internal and external communications plan
- Liability and legal services
- Documentation and tracking system agreement
- Operational plans
- Use of force policy
- Duration[24]

---

[23] For more information, see "Resource Management and Mutual Aid," Federal Emergency Management Agency, accessed April 26, 2017, https://www.fema.gov/resource-management-mutual-aid.
[24] See Narr et al., *Police Management of Mass Demonstrations*, 22 (see note 2); Phil Lynn, *Mutual Aid: Multijurisdictional Partnerships for Meeting Regional Threats* (Washington, DC: Bureau of Justice Assistance, 2005), 13–20, https://www.ncjrs.gov/pdffiles1/bja/210679.pdf.

MAAs and MOUs should also be as specific as possible. For example, they should address how many officers and other personnel responding agencies will provide to the requesting agency, specifying, for instance, how many special weapons and tactics (SWAT)-trained officers or intelligence analysts they will deploy.[25] MAAs and MOUs also need to anticipate any challenges, such as liability issues, that might arise when officers deploy across jurisdictional lines. In addition, participating agencies should use these agreements to clarify the extent to which mutual aid officers will be able to enforce laws outside their own jurisdiction.[26]

---

### Mutual Aid Agreements vs. Memoranda of Understanding

It is critical for police agencies at the federal, state, local, and tribal levels to support each other during major events. Pledges of mutual aid can take the form of mutual aid agreements, in which multiple agencies in the same region can participate as signatories. These agreements are often managed by state or local emergency management agencies.* If police agencies are not parties to a mutual aid agreement, they can pledge to support individual agencies in emergency situations through more limited memoranda of understanding.

Either type of compact needs to address how officers from neighboring jurisdictions will deploy, how they will be used, what rules of engagement will be followed, and what the guiding philosophy is that will inform their joint response to a mass demonstration. This information ensures all agencies are working together toward the same mission. ∎

_____

* See Phil Lynn, *Mutual Aid: Multijurisdictional Partnerships for Meeting Regional Threats* (Washington, DC: Bureau of Justice Assistance, 2005), 7–12, https://www.ncjrs.gov/pdffiles1/bja/210679.pdf.

---

[25] *Lessons Learned from the 2015 Civil Unrest*, 51 (see note 2).

[26] The Commission on Accreditation for Law Enforcement Agencies (CALEA) recommends that MAAs include "procedures for vesting provider agency personnel with the legal authority to act within the receiver agency's jurisdiction." See "Mutual Aid Agreement," CALEA, accessed December 8, 2016, http://www.calea.org/content/mutual-aid-agreements.

# Pre-event preparation: Determining which agency will take the lead during a mass demonstration and which policies will control responses

## Washington (D.C.) Metropolitan Police Commander Jeffrey Carroll:

"It helps to have relationships in place so we know what each agency's role and response are during the event."

We have a unique situation in Washington. We have the Metropolitan Washington Council of Governments, and all of the governments in the region are part of that. As a result, we have MOUs and MAAs that allow us to request mutual aid, when necessary, from the agencies in the metropolitan area. And the MPD is a large agency, so within our agency we have a lot of manpower to respond to mass demonstrations.

Within the city of Washington, D.C., there are more than 28 police agencies, some of which are quite large, like the U.S. Park Police and U.S. Capitol Police. We have complex jurisdictional lines regarding who has the primary jurisdiction over the streets, the sidewalks, etc.

A majority of demonstrations in Washington take place on the National Mall or the U.S. Capitol grounds, and usually the protesters then march somewhere in the city, which means they're crossing multiple jurisdictions, often as many as three or four. As a result, we have close working relationships with other agencies here in the city, and we are constantly working together on regular planned events. It helps to have relationships in place so we know what each agency's role and response are during the event.

## St. Louis (Missouri) Metropolitan Police Chief Samuel Dotson:

"We worked with [other agencies] to agree on our terminology and to make sure we discussed any differences in the language in our use of force policies."

We worked with the St. Louis County Police Department and the State Highway Patrol to agree on our terminology and to make sure we discussed any differences in the language in our use of force policies and our civil disobedience guidelines. The language can be different, the rules of engagement can be different, and the context can be different among all of our agencies, so we worked out what we thought was the best wording in our unified command proposal.[27] We sent that proposal to the chiefs for review and for their final approval.

So in November 2014, when a grand jury decided not to indict Ferguson Officer Darren Wilson in the death of Michael Brown, we knew we might expect large demonstrations. But we knew that our three agencies were really on the same page. We had everything spelled out.

---

[27] See appendix B on page 81 for a copy of this unified command proposal.

## St. Louis County (Missouri) Police Chief Jon Belmar:

*"We could count on those agencies having the capacity to staff their jurisdictions and give us supplemental manpower in the long term."*

As Chief Dotson said, we knew that we were likely to see activity after the grand jury decision in the Michael Brown case, and we took the time to prepare together and make sure that we were all on the same page in our response.

One of the biggest lessons we learned is that self-deployments by officers from other agencies are a huge issue, and it can really cause you problems, so we didn't allow that. We also tightened up our use of force policy as well our civil disobedience guidelines and other policies and procedures that needed to be ironed out among our three agencies. Every agency and every officer understood exactly what their roles were. I can count on one hand every municipality that really came forward to assist us in a positive manner. Those agencies understood exactly what was expected of them, and they worked under our guidelines. It has to be that way.

In my situation, this is about capacity. We found that in our area, the St. Louis Metropolitan Police Department, the St. Louis County Police Department, and the State Highway Patrol were the most effective partners, because we could count on those agencies having the capacity to staff their jurisdictions and give us supplemental manpower in the long term. It also eliminated the need to work with 10 to 15 smaller agencies, which was logistically challenging and had the potential to overextend agencies with limited capacity.

## Baltimore Police Department Colonel Melissa Hyatt:

*"We had issues with demobilization and the tracking of resources."*

During the unrest in Baltimore, we needed mutual aid, and we really appreciated all of the assistance that we received.[28] That being said, there were a few key challenges that we faced and that we've learned from.

First, we learned that we didn't fully understand the capabilities and standard practices of some of the responding agencies, which led to some issues in communication. Specifically, we learned some lessons with the National Guard. We didn't fully understand their capabilities, we didn't fully understand when they would demobilize, and we didn't fully understand the type of briefing they were accustomed to and how it differed from a law enforcement briefing. In a law enforcement agency, for instance, we can do a 30-minute briefing and roll call and think that we're bringing people up to speed quickly and deploying resources quickly. The National Guard has a different means of briefing and preparation, which is important to know and understand when working together.

---

[28] See appendix C on page 85 for a copy of Baltimore Police Department's mutual aid agreement with the Montgomery County Police Department.

The Police Response to Mass Demonstrations

Second, we had issues with demobilization and the tracking of resources. We're still dealing with some issues of reimbursement. If you don't fully track who is responding from which agencies, the missions they went on, the equipment and munitions they used, and how long they were present, then when they're seeking reimbursement, you can't confirm their expenditure of resources against your own records. If you can't confirm, you're going to be paying out for what they said they used or spent.

> ### Emergency Management Assistance Compact
>
> The Emergency Management Assistance Compact (EMAC), which has been ratified by Congress and is law in all 50 states, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands, is "the nation's state-to-state mutual aid system."[*] States are able to receive assistance through EMAC once their governors declare a state of emergency. According to the EMAC website, "once the conditions for providing assistance to a requesting state have been set, the terms constitute a legally binding contractual agreement that makes affected states responsible for reimbursement. The EMAC legislation solves the problems of liability and responsibilities of cost and allows for credentials, licenses, and certifications to be honored across state lines."[†] ∎
>
> _____
>
> [*] See "Emergency Management Assistance Compact," accessed December 12, 2016, http://www.emacweb.org.
>
> [†] See "What is EMAC?" Emergency Management Assistance Compact, accessed December 12, 2016, http://www.emacweb.org/index.php/learnaboutemac/what-is-emac.

## Use of force: Ensuring all agencies are operating under the same guidelines

When multiple agencies respond to a mass demonstration, they need to operate under the same use of force protocols to ensure consistency in their response to protesters. A failure to establish a common response creates confusion among officers and demonstrators and undermines the lead agency's strategic goals.

### Baltimore Police Colonel Melissa Hyatt:

> "We had some issues making sure that all responding agencies were following Baltimore's use of force protocols."

During the unrest in Baltimore in April 2015, we had an issue with use of force guidelines and making sure that everyone was briefed and on the same page ahead of time. There were some conflicts among the different responding agencies. So on one side of the street, you would see officers from jurisdictions

in full turtle gear. On the other side of the street, you would see officers from a different jurisdiction in soft gear. That certainly sends conflicting messages.

Baltimore was the lead agency, and we went back to the Incident Command System (ICS) structure.[29] The incident commander was a representative of the Baltimore Police Department, so the use of force rules that were in effect were those of the Baltimore Police Department. But we had some issues making sure that all responding agencies were following Baltimore's use of force protocols.

If it appeared that there were coordination issues with an agency regarding use of force, it was best to use them for critical infrastructure instead of mobile field force or civil disturbance units. We pulled them back so they were in areas like the Inner Harbor and places where we needed fixed infrastructure support. But it was difficult, because we desperately needed every officer we had.

### Major Cities Chiefs Association Executive Director Darrel Stephens:

> "There is a clear need to establish which agency's use of force policy will govern a joint response in drafting mutual aid agreements."

There is a clear need to establish which agency's use of force policy will govern a joint response in drafting mutual aid agreements. When you seek mutual aid from other agencies, the officers that respond must be sure about their authority and the policy on use of force. There are examples of departments having problems because of officers acting differently from expectations. In most cases, mutual aid agreements specify that responding officers must comply with the host agency's use of force policy. For major events like a political convention, the opportunity exists for officers to receive training in advance. We've seen big improvements in the way police handle major events like the national political conventions and other large-scale events.

### Washington (D.C.) Metropolitan Police Commander Jeffery Carroll:

> "We deal with these issues by deploying our officers and officials in the areas where we believe there could be issues."

There can be use of force issues when you have multiple agencies responding to an event. That's true even when you have time to prepare and you know it's going to happen. We deal with these issues by deploying our officers and officials in the areas where we believe there could be issues based on the current intelligence or historical information. That alleviates some of the conflicts with use of force policies between different police agencies.

---

[29] See "Incident Command System Resources," Federal Emergency Management Agency, accessed December 12, 2016, https://www.fema.gov/incident-command-system-resources.

## Oakland (California) Police Captain Darren Allison:

*"We bring all of our responding partners to our staging area so that we can inspect their munitions."*

When we call for mutual aid, we bring all of our responding partners to our staging area so that we can inspect their munitions. We take a look at what they have, because we try to avoid the deployment of indiscriminate impact munitions that might injure someone accidentally. We ask our partners to stow those munitions.

## Washington (D.C.) Metropolitan Police Commander Jeffrey Carroll:

*"The chief or her designee is the only one who can authorize deploying CS gas."*

During a First Amendment assembly, the chief or her designee is the only one who can authorize deploying CS gas.[30] As far as other use of force mechanisms, such as platoon formations, and the use of constructive or physical force, that decision is made by the on-scene commander based on the threat they are facing.

It's the same thing with Civil Disturbance Unit (CDU) protective gear. We don't deploy CDU protective gear without there being a danger of violence and without the authorization of the on-scene commander. The on-scene commander who authorizes the use of CDU protective gear must provide a written report explaining their decision and actions to the chief within 48 hours of the deployment.

## Chicago Police Department Deputy Chief Kevin Ryan:

*"We have several departments we work with constantly, and we do a few things to ensure a smooth response."*

We have several departments we work with constantly, and we do a few things to ensure a smooth response. We use the Incident Command System so our partners are included on our orders. We also don't put our partners anywhere on the frontline. And none of them carry OC spray[31] or munitions of that nature. Some of them come with turtle gear, but that's it. We regularly work with our state and county partners, along with federal agencies. We partner often with the Illinois State Police and the Cook County Sheriff's Office. Incident Command is used, as it is the common standard and best practice. When working with outside agencies, we would not normally put them in a position to be immediately on the frontline. The Chicago Police Department also makes the decision to use any less than lethal options (OC spray, gas, etc.). Equipping or using these would only be done on orders of the superintendent.

---

[30] CS gas, otherwise known as 2-chlorobenzylidene malonitrile, is commonly known as tear gas.
[31] OC (oleoresin capsicum) spray is commonly known as pepper spray.

## Office of Community Oriented Policing Services Director Ronald L. Davis:

*"Independent action is where agencies get in trouble."*

There is a difference between an individual officer working a demonstration and the commander who can either give the green light to use CS gas and beanbags or instead tell us to leave the weaponry. This is usually where the problem comes in. While agencies should have a set policy, if we're worried about individual officer actions, at some point there is somebody—usually a sergeant or lieutenant, depending on the size of the event and the watch command structure—who is going to be making the kinds of calls that will determine officers' response to the crowd.

I think this is a critical point: Even if you reconcile the differences among agencies' use of force policies and procedures, you also have to be clear that agencies can't take independent action. I'm not talking about immediate defense of life; you can't compromise on safety. But outside of that, independent action is where agencies get in trouble. You have units that go outside of the command and start making those decisions, and everything collapses. It collapses the integrity of the entire operation, and later, after the fact, you have a hard time finding out who even made that call.

So it should be clear that if you're going to have these MAAs, the city requesting assistance sets the tone in making decisions about what type of weaponry we use, when it will be used, and when you're going to elevate to certain levels of equipment and uniform. Decisions of that nature cannot be outside of joint command.

## Recommendations: The importance of mutual aid and systems for managing it

### Pre-event preparation: Determining which agency will take the lead during a mass demonstration and which policies will control responses

- Ensure MAAs and MOUs are in place before a mass demonstration or other major event. These agreements should address how officers from neighboring jurisdictions will deploy, how they will be used, what rules of engagement will be followed, and what guiding philosophy will inform their joint response to a mass demonstration. This ensures that all agencies are working together toward the same mission. Before any mission, lead agencies should provide clear direction on goals and objectives.

- Make MAAs and MOUs as specific as possible, including precise information about how many personnel with given areas of expertise (such SWAT or intelligence analysis) will be deployed.

- Make it clear which agency is in charge and whose rules (especially regarding use of force) and command will be followed. Ensure partner agencies agree to this command structure in advance of a mass demonstration.

- Train together with all partner agencies (see the section "Training together: Bringing mutual aid agencies together to prepare for mass demonstrations" on page 34) so responses to mass demonstrations are well-coordinated at all levels, from officers on the line through command staff.

- Ensure policies and terminology on use of force and civil disobedience are consistent across agencies to prevent misunderstandings and loss of control during mass demonstrations. If necessary, resolve any inconsistencies in advance of a mass demonstration in a mutually agreed-upon unified command proposal.

- Use ICS so all responding agencies are well coordinated (see chapter 4, "The Incident Command System," for more information).

- Provide written guidance to mutual aid partners that includes rules of engagement, expectations of responding agencies and individual officers, and a list of which munitions are allowed.

- Work with partnering agencies to identify and agree upon the best approach to managing the mass demonstration. For instance, the lead agency may state its intention to begin with a soft approach to protests, in which officers wear regular uniforms and engage protesters by communicating that the police see their role as protecting demonstrators' First Amendment rights. Body armor and heavy equipment are kept in reserve and used only in the case of rioting or other acts of violence.

- Communicate expectations to partnering agencies. The lead agency needs to tell its partners how it would like to deploy them during a mass demonstration and how it expects them to respond to incidents that might occur during a protest. For example, if the lead agency does not want protesters engaged in minor acts of civil disobedience to be arrested, it needs to make that expectation clear to its partner agencies.

- Invite mutual aid partners to predeployment briefings. These are critical opportunities to clarify requests for assistance, roles and responsibilities, and expectations.[32] A lead agency should also brief all mutual aid partners on its intelligence about the event, its rules of engagement, its mission priorities, and its rules on the use of force and less-lethal munitions.[33] Predeployment briefings are also an opportunity for lead agencies to assess participating mutual aid agencies' equipment, skill levels, and potential limitations.

- If possible, work with a few larger agencies rather than many small ones when responding to a long-term event. Larger agencies have the capacity to provide officers and other resources while still maintaining their everyday functions over an extended period of time. This approach also reduces the number of responding agencies, which makes interagency communication and coordination easier.

---

[32] "Incident Command System Resources" (see note 29); Lynn, *Mutual Aid*, 21 (see note 24).
[33] Lynn, *Mutual Aid*, 21 (see note 24).

- Plan to include all responding agencies in post-event debriefings. This ensures that all of the agencies involved understand the lessons learned during a mass demonstration. This improves interagency understanding and will improve future coordinated responses.

- Track who is responding from each agency, their roles and activities, and when they demobilize.

## Use of force: Ensuring all agencies are operating under the same guidelines

- If possible, the lead agency should use its own officers in the locations that are considered more likely to experience violence or other incidents that may require officers to use force. This can help to ensure that the lead agency's policies and practices are followed.

- Other than in emergencies, any decision to use force or hard gear should be made by command staff from the lead agency. This policy should also be clearly communicated to all responding agencies.

- If possible, the lead agency should inspect partner agencies' munitions before they deploy to ensure the partners are outfitted according to the policies of the lead agency.

The Police Response to Mass Demonstrations

# 4. The Incident Command System

All agencies responding to a mass demonstration need to know whose orders they will be following, and systems must be in place to facilitate the flow of information from the incident commander to the leaders of partner agencies as well as to the officers responding on the ground. These efforts will ensure that members of all agencies are responding consistently to demonstrators and have a clear understanding of what they are supposed to do as events unfold.

The U.S. Department of Homeland Security's Federal Emergency Management Agency (FEMA) maintains the National Incident Management System (NIMS),[34] a set of standards and practices to enhance co-operation and coordination among government and nongovernment entities during an unplanned incident or a planned event. Police departments are required to adopt NIMS in order to receive federal emergency preparedness funding.[35]

The primary component of NIMS is the Incident Command System (ICS),[36] which determines a clear hierarchy of authority and outlines the unique roles of emergency response units. ICS prevents mis-understandings by standardizing terminology and practices among first responders and by defining a clear chain of command (see figure 1 on page 50). When multiple agencies are involved in the response to an incident, the incident commander establishes a Unified Command System, which includes representatives with authority from each agency.[37]

Incident planning is also an integral part of ICS. FEMA encourages agencies to complete an incident action plan (IAP) documenting response plans for each incident or planned event in the agency's jurisdiction.[38] FEMA provides fill-in-the-blank forms to ensure all necessary elements are included, such as response strategies, resource allocations, logistical information, communication plans, and traffic plans.

IAPs should contain detailed assignments for mutual aid agencies.[39] The lead agency should draft the IAP and clearly articulate its vision for mutual aid agencies' participation. The IAP should also include input from key stakeholders in the ICS operation, including the planning section chief and the operations

---

[34] See "National Incident Management System (NIMS)" (see note 16); "National Incident Management System," FEMA, accessed December 12, 2016, https://www.fema.gov/national-incident-management-system.

[35] *Lessons Learned from the 2015 Civil Unrest*, 12–15 (see note 2).

[36] See "Incident Command System Resources" (see note 29); "ICS Resource Center," Emergency Management Institute, FEMA, accessed December 12, 2016, https://training.fema.gov/emiweb/is/icsresource/index.htm; *ICS: Review Material* (Washington, DC: Federal Emergency Management Agency, 2008), https://training.fema.gov/emiweb/is/icsresource/assets/reviewmaterials.pdf.

[37] *Lessons Learned from the 2015 Civil Unrest*, 12–15 (see note 2).

[38] *ICS: Review Material*, 18–25 (see note 36).

[39] *Lessons Learned from the 2015 Civil Unrest*, 23–24 (see note 2).

section chief. This document must be clear and detailed, as it serves as a guide for incident commanders during crises.[40] All mutual aid agencies should participate in predeployment briefings with the lead agency, at which point the lead agency should share with partner agencies the specifics of the IAP, including roles, assignments, and the location of the mutual aid staging area.

**Figure 1. FEMA's online training ICS organizational chart**



Source: *ICS: Review Material* (Washington, DC: Federal Emergency Management Agency, 2008), 7, https://training.fema.gov/emiweb/is/icsresource/assets/reviewmaterials.pdf.

## Keeping lines of communication open among responding agencies

**Ohio State Highway Patrol Major Michael Black:**

"The incident command structure is always adhered to."

Our agency traditionally comes in to support city agencies, and our first goal is to put our incident commander in with theirs. We always look to put our boss in with their boss, so when decisions are made, we don't have confusion, and the incident command structure is always adhered to. We've been deployed all across Ohio to back up our major cities numerous times, and that's always our goal so we don't have confusion or breakdowns in the chain of command.

---

[40] Ibid., 12–15.

## Washington (D.C.) Metropolitan Police Commander Jeffery Carroll:

*"We assign a liaison to assist in communication between our department's command structure and the unit commander of the agency assisting us."*

When we have outside agencies come into D.C. to assist us for events, like a presidential inauguration, we assign a liaison to assist in communication between our department's command structure and the unit commander of the agency assisting us. That communication helps with command and control. Someone in our department can tell the other agency's commander, "Hey, that's against our policy." So they are aware of our policies and keep communicating what our objectives and goals are.

## Oakland (California) Police Captain Darren Allison:

*"We always attach one representative from our police department to every outside agency that we deploy."*

We always attach one representative from our police department to every outside agency that we deploy in Oakland. We call these Oakland officers pathfinders. The use of pathfinders helps our partners to navigate through the city quickly and also provides a method for us to note our partner agencies' responses to protesters.

Our pathfinders have body cameras, so they capture what the partner agencies' officers do. That way we know the kind of engagements our partners are in, the level of force they're using, and the kinds of munitions they're deploying.

At the end of a mass demonstration, our pathfinders also write reports describing which partner agency they were with and what its officers were doing. We can reconcile these reports on the demobilization on the back end.

## St. Louis (Missouri) Metropolitan Police Chief Samuel Dotson:

*"We had city officers next to county officers next to Ferguson officers, so information could be shared."*

We had conversations after the Ferguson demonstrations. It was clear that in St. Louis County and even in Ferguson, Chief Jon Belmar was in charge, and in St. Louis City, I was in charge. Those lines were laid out very clearly.

There was embedding and cross-embedding of officers. We had city officers next to county officers next to Ferguson officers, so information could be shared. Cross-pollination of officers has to happen, and you can't have stand-alone workgroups. I understand about departments sending a liaison, but when you've got somebody in a blue shirt next to a brown shirt next to a white shirt, it makes a lot more sense, because everyone is working together and operating on the same information.

> **St. Louis County (Missouri) Police Chief Jon Belmar:**
>
> "As large as my agency is, we could not do it without Dotson's officers, and both of us needed help from the state."

I agree wholeheartedly with Chief Dotson. That's pretty much the only way you can do it. Whether you have a memorandum of understanding or not, what I found out in St. Louis County was that you have to own it. The Ferguson Police Department did everything they could, but they simply did not have the capacity to ride their city and also manage the demonstrations that were going on, so we inherited that. As large as my agency is, we could not do it without Dotson's officers, and both of us needed help from the state.

## Recommendations: Incident Command System

- Ideally, jurisdictions should plan all incidents and events with an IAP. This detailed planning among officials provides for more efficient and effective action should an incident arise. However, incidents may occur without notice, so writing an IAP in advance for a specific incident may not always be possible.

- The lead agency should share specifics of the IAP—including roles, assignments, and the location of the Unified Command Center and the mutual aid staging area—with all partner agencies during predeployment briefings. Agencies should also use this opportunity to discuss terminology so there is no confusion on the ground. (For example, some agencies may have a different understanding of the number of officers in a platoon, or may have different understanding of what constitutes mobile field force training.)[41]

- The lead agency should organize police and nonpolice agencies' responses to incidents and events by following FEMA's ICS. This standard provides for a clear chain of command and minimizes confusion.

- Senior decision makers from each mutual aid agency should report to the Unified Command Center[42] so the incident commander can make decisions seamlessly with the assistance of mutual aid agencies. Mutual aid agencies should send senior commanders who have the authority, from their police chief or sheriff, to make decisions on the ground.[43]

---

[41] Ibid., 42–43.
[42] Lynn, *Mutual Aid*, 21 (see note 24).
[43] *Lessons Learned from the 2015 Civil Unrest*, 48 (see note 2).

- If possible, the lead agency should assign a liaison to work with each responding agency. The liaison helps to ensure that responding agencies follow the policies of the lead agency and that any miscommunication is quickly corrected.

- Another approach is to deploy officers from different agencies in mixed groups. This will improve the consistency of their responses to protesters, since they will not be isolated in working groups composed only of officers from their own agencies.

- Under a unified command structure, the lead agency should set up a convenient staging area for mutual aid agencies that is close to the Unified Command Center.[44]

---

[44] Lynn, *Mutual Aid*, 26–27 (see note 24).

# 5. The Changing Nature of Mass Demonstrations: Dealing with Leaderless Groups

Success in managing a demonstration often depends on communication between police agencies and protesters. In the past, most demonstrations were organized by established civil rights organizations or other organized groups, and police agencies could work with those leaders to share information about when and where demonstrations would take place, logistical issues, expectations about how demonstrators and police officers would function, etc. This planning process also gave police agencies opportunities to demonstrate that they saw their role as protecting demonstrators' First Amendment rights while protecting public safety.

However, according to forum participants, many of today's demonstrations are not organized that way. Demonstrations are often planned informally on social media rather than by established organizations. Protesters are often less willing to speak with officers in advance of the demonstration or during it, and in many cases it is difficult for police to identify the leaders of a demonstration. Many demonstrators express a preference for events that are democratic rather than hierarchical, so it is not unusual for police to manage demonstrations that are essentially leaderless.

As a result, police departments have been developing new strategies for sharing information with demonstrators, as well as learning about their goals and their plans for how a demonstration will take place.

## Communicating with members of leaderless demonstrations

**New York City Police Deputy Chief Stephen Hughes:**

"In today's protests . . . leaders are hard to find."

About two weeks ago, we had a rally. We found out about it through social media. One of the websites was putting out the information about how people should meet for the protest. There were about 10,000 hits on the site and about 5,000 people who said they were going. Our history shows that of the 5,000 individuals who say they are going to protest, approximately 30 percent, or 1,500, show up. As it happened, about 750 people showed up for this event.

In today's protests, such as Black Lives Matter and Occupy Wall Street, leaders are hard to find. More and more, there isn't anybody to find or anybody who would talk to the police. So we rely more on our Intelligence Division. Open sources out there are probably the key for us right now for getting good intel. The Intelligence Unit notifies me and the patrol commands directly when they see information starting to develop about a demonstration.

And just to clarify, I'm talking about open-source websites or meetings in a public space as opposed to going to a closed meeting at someone's residence.

### American Civil Liberties Union Senior Staff Attorney Lee Rowland:

*"Departments can think creatively about using social media as a tool for reaching out to all demonstrators."*

I think it's kind of tunnel vision if you are asking a question and you've already determined that the answer is, "We must know. We must have a leader. We must communicate prior to the event." I think you have to recognize that there is also a different version, namely that you have to respect the movement that tells you "there are no leaders; we are *all* leaders."

And in that situation, I think it requires law enforcement to change their paradigm of thinking. So for example, if you are on social media looking for those folks, remember that social media works two ways. Instead of insisting that you need to have a one on one with the leaders of a demonstration, I think departments can think creatively about using social media as a tool for reaching out to all demonstrators. This approach doesn't risk alienating the people you are trying to reach.

### St. Louis (Missouri) Metropolitan Police Chief Samuel Dotson:

*"Protesters are also worried about losing their 'street cred' by talking to the police."*

The Hands Up, Don't Shoot coalition is an example of the fragmentation of leadership regarding the demonstrations we are experiencing. This group is made up of 50 different subgroups. Imagine trying to get 50 groups with different agendas to come together for a conversation.

We try the traditional approach of identifying who the leaders are and meeting with them beforehand. And if we don't know who the leaders are, we talk to the people we do know; they may not be involved in a certain protest, but they know the people who are involved. And so it's important to have relationships where you can routinely pick up the phone and call somebody who is generally active in the movement and say, "Okay, tell me what the issues are today, and what's going on. Have you heard about this protest? What is it about, and what are they trying to accomplish?" I would describe it as human capital, human intelligence, having a conversation.

And then what we can do is push messages out. Protesters might be thinking that they're going to get teargassed and thrown in jail, and we let them know that's not what we want to do.

Protesters are also worried about losing their 'street cred' by talking to the police. I had an experience during a march down a major street, Grand Avenue, in St. Louis. I was walking with one of the organizers, and he said, "Hey, would you not walk with me? I am going to lose credibility if you do." This is really a challenge, because people want the police to have better relationships with the community, and what better way is there to do that than to walk side by side with community members?

And one more point I'd like to make is that the word *protester* has become too generic. Protesters are the people whose First Amendment rights we are there to protect. We need to make sure that we always differentiate between peaceful protesters and people who show up to commit crimes.

"We know that the vast majority of people in our communities respect and support the vast majority of our officers. That's a message we really need to push down to our officers."

And one final point: Our officers continually hear various messages that can be summed up as "you're bad." They see it on social media, from the mainstream media, and sometimes from protesters. But we know that the vast majority of people in our communities respect and support the vast majority of our officers. That's a message we really need to push down to our officers.

### San Francisco Police Captain Daniel Perea:

"Our approach is to give information and ask questions."

As in other cities, we often find in San Francisco that there are no leaders. Or sometimes people say, "I am not a leader, but I can take information back." When we do have a protest where someone will work with us, it's very refreshing.

But our approach is to give information and ask questions. If nobody wants to stand up and say, "I am in charge of this demonstration," we just generally put out our messages on social media and in other ways. We say, "Our purpose is to facilitate your First Amendment rights, and our concern is about your safety. We want to make sure that you are safe. If you want to demonstrate in the street, we would like to know about the route you want to take and overall what you hope to accomplish. We are here to help you."

We have the resources to manage a demonstration in terms of traffic control and public safety. In San Francisco, the community standard is accepting of demonstrations. If a demonstration blocks traffic, that's not an issue that will generate a lot of complaints. We police to that standard.

## Seattle Police Assistant Chief Steven Wilske:

*"In a lot of our protests, we have something like 15 people who are on social media claiming to be the leader."*

In contrast to what some of the other agencies participating in this forum are seeing with protests that have no leaders, in a lot of our protests, we have something like 15 people who are on social media claiming to be the leader. And none of them want to work with each other, and none of them want to work with us. So a lot of our smaller protests, the ones with 100 or 200 people, are pretty disorganized.

As a rule, very few are willing to work with us or communicate with us beforehand or even on the day of the event. That is important because we always offer our assistance on the day of event. We walk into the crowd and ask, "Is anybody here willing to talk to us about what you want to do? Where is it that you want to go?" And generally we don't get a lot of responses.

So what we've developed over the last couple of years is a set of simple rules that we always apply. We announce our officers' rules of engagement to the public to try to make it predictable for the protesters. So even if protesters are not willing to talk to us, they understand that, for us, it is really simple: We will immediately respond to any act of violence, whether it is toward us or toward another person. If you act violently toward anybody, you will get a very quick and decisive response from us.

We also have zero tolerance for damage to property. We had a couple of protests where we did not quickly respond to property crime, and we ended up with a million dollars or more of damage to our downtown core.

We have found this to be successful. If protesters are not willing to talk to you, then at least have a clear understanding: This is the line; if you do this, we will respond to it. Most of these groups understand. Some might bump up close to the line, but they generally won't cross it.

## Chicago Police Deputy Chief Kevin Ryan:

*"There will always be leaders, even when it seems like no one wants to say they're a leader."*

It's important to set clear expectations. There will always be leaders, even when it seems like no one wants to say they're a leader. They will rise to the top, and you just have to find them. Give them a voice. It doesn't mean you always have to let them do what they want to do. But I'll go back and forth with them. They tell me what they want, and I tell them what I can give them. If they want to sit down in the street, let them sit down on the street for a while. You need to decide in advance where you are going to draw the line. In Chicago, for example, we usually won't let people block North Michigan Avenue, Lake Shore Drive, or the expressways. Just keep the communication going.

## Lessons Learned from the 4th Precinct Occupation

*An interview with Chief Janeé Harteau of the Minneapolis Police Department*

by Chuck Wexler, Executive Director, Police Executive Research Forum

**Chuck Wexler:** Chief Harteau, you've gone through a challenging time in the wake of an officer-involved shooting in Minneapolis.[*] What are some of the takeaways that you have had from this case and the ensuing demonstrations, which included an encampment outside of the 4th precinct station for 18 days?

**Chief Harteau:** That was something that we had never experienced at that level before. What began as a typical law enforcement operation managing large protests evolved to something very similar to an Occupy movement outside of a police precinct that really involved the entire city.

There were multiple organizations participating in the movement, so we were trying to manage different organizations' needs, desires, and demands. And we had elected officials who were among our protest groups. They were supporting the protesters' causes and concerns, from police accountability to equity in jobs and education.

> **"We had elected officials who were among our protest groups."**

When we look back at this, minute by minute, it was a situation that was fluid, dynamic, and rapidly changing during that period of 18 days. Once the protesters became entrenched with tents and structures and occupied the vestibule of the precinct station, it became politically and logistically challenging to do things that we normally would do in managing demonstrations. We were familiar with the Occupy movement and had really good relationships and points of contacts with those committee organizers, but this was an entirely different situation.

We began to have dialogue and negotiations with various groups that included Black Lives Matter and the Minneapolis chapter of the NAACP (National Association for the Advancement of Colored People). But the organized groups were not in agreement with each other, and we had outside splinter groups, anarchists, and hate agitators within the crowd, which eventually led to individuals shooting five of our protesters.[†] We investigated the shootings, and we made arrests within about 24 hours.[‡]

Then finally we had a group of key leaders in the community who had originally supported the occupation hold a press conference along with the mayor, asking for the occupation to end because it had become unsafe.[§]

*cont'd*

*cont'd from previous page*

**Wexler:** Chief, all of that was happening in November and December of 2015. And then in March 2016, you had a phase two, when you were expecting a decision by the district attorney, Mike Freeman, about whether he would file criminal charges against the two officers. You knew that announcement was coming. What steps did you take to prepare for the possibility of more demonstrations?

**Chief Harteau:** Well, I'm very fortunate to have the relationships I do with the Police Executive Research Forum and with the Office of Community Oriented Policing Services, which have been helpful for me and for our city in providing guidelines for best practices and lessons learned from other cities. And the mayor and I were having conversations with the key leaders in the community to try to set guiding principles for balancing people's First Amendment rights with providing public safety for all. For every person who was interested in protesting and wanted to be sure they could do that, we also had a lot of people who were concerned that we were going to let the city burn down.

> "For every person who was interested in protesting and wanted to be sure they could do that, we also had a lot of people who were concerned that we were going to let the city burn down. So I produced a short video to talk about this balance."

So I produced a short video to talk about this balance, and I was very explicit about what we would not tolerate.[**] We would not tolerate violence; we would not tolerate reoccupations of any government buildings; we would not tolerate fires in the streets. My message was clear in saying that this is about balance. We need to have a balance while ensuring everyone's First Amendment right of freedom of speech, because our number one priority is public safety, and that includes protesters and police officers.

The video got mixed reviews. Some of the groups were unhappy and felt I had painted protesters in a negative light. But there's a larger contingency that felt safe and were supportive.

**Wexler:** So when you were preparing for this announcement, you realized that you had multiple audiences: the demonstrators, the citizens of Minneapolis, and your police officers. In crafting this message, you were trying to appeal to all three, weren't you?

**Chief Harteau:** Correct. It was important that everybody heard the message and the balance. It had the outcome that I was looking for, because when the prosecutor's decision not to charge the officers was announced,[††] people knew what to expect from the police. Several hundred people in various locations in the city protested, marched, held vigils, and went to the precinct again. But the protests were not violent. There was some flag burning, and they did try to block the front door of the precinct. But this time, we were able to contact the community leaders, and instead of sending officers in there to remove the protesters, the community leaders went to the scene. It was amazing to watch them leave at the instruction of the community.

I can also mention some quick lessons learned for us about tactics and equipment. We learned that there are some new flashpoints out there in terms of how people view the police. Something as simple as camouflage is a flashpoint that can really incite the crowd, so we've changed our special weapons and tactics (SWAT) uniform, so there's no camo; they're navy blue. And we painted our BearCat a solid black.

We also had to reevaluate the use of 40-mm marking rounds to ensure that our chemical agent response teams carry those instead of our line officers. The fact that the equipment using those rounds look similar to an assault rifle tends to upset and often incite people. Today we are very cognizant of issues regarding any militarized look, and we decided it's better to try to avoid inciting people with these things. ■

_____

* "Timeline of the Jamar Clark Case," *CBS Minnesota*, March 29, 2016, http://minnesota.cbslocal.com/2016/03/29/jamar-clark-case-timeline.

† "5 Injured in Shooting near 4th Precinct; Witnesses Say Gunmen Were White Supremacists," *CBS Minnesota*, November 24, 2015, http://minnesota.cbslocal.com/2015/11/24/shooting-at-4th-precinct-leaves-5-protesters-hospitalized.

‡ "Men Charged in 4th Precinct Shootings to Appear in Court," *CBS Minnesota*, December 1, 2015, http://minnesota.cbslocal.com/2015/12/01/men-charged-in-4th-precinct-shootings-to-appear-in-court.

§ "Officials Call for End to 4th Precinct Occupation, Protesters Vow to Stay," *CBS Minnesota*, November 30, 2015, http://minnesota.cbslocal.com/2015/11/30/mayor-hodges-rep-ellison-call-for-end-to-4th-precinct-occupation.

** "A Message from the Chief Regarding the Balance between Public Safety and 1st Amendment Rights," Minneapolis Police Department, Facebook post, March 24, 2016, https://www.facebook.com/MinneapolisPoliceDepartment/videos/vb.197191512515/10154767613307516/?type=2&theater.

†† "Hennepin Co. Attorney: No Charges to Be Filed in Jamar Clark Shooting," *CBS Minnesota*, March 30, 2016, http://minnesota.cbslocal.com/2016/03/30/jamar-clark-charges-announcement.

## New York City Police Deputy Chief Stephen Hughes:

*"We wanted to explain the law, be proactive, and tell the people beforehand what they might be facing."*

After the protests following Eric Garner's death,[45] we reached out to the American Civil Liberties Union and people at the next rally in Union Square Park to communicate, via the use of hand bills, the prohibitions of walking on the Brooklyn Bridge without a permit. We printed about 1,000 of them, and we went out beforehand, when the rally was forming. The handout explained the rules about blocking traffic and not using the bridges and put everybody on notice. We used a communications truck and played a nice clear voice about the rules and regulations, about individuals observing the rights of not blocking vehicle traffic, and about how they might be subject to arrest. We wanted to explain the law, be proactive, and tell the people beforehand what they might be facing, and we told them that they're not going to be able to get onto the bridges.

By putting that notice out there, we were able to prevent many problems. A few people still attempted to get onto the roadway of the bridge, but we made arrests. When we went down to court, we were able to show that we were very clear about staying off the roadways. Once you arrest somebody, everybody's got their camera out filming you. But what was clear on the audio of those videos was the police department giving them warnings and notices. It was really clear and helped us win a lot with those cases. The video showed them in the roadway, the warning was given, and they remained there.

## Oakland (California) Police Captain Darren Allison:

*"The long-term [community] relationships you build, and the transparency you show, make a difference."*

What we are seeing in Oakland are blended groups. Some protesters are from the community; others are from outside the city and are coming into the city to participate in the event. We are also seeing criminal elements come in—opportunistic individuals who are there just to see what will happen between police and the protesters. And then you have professional anarchists.

So it becomes very difficult sometimes to identify the leadership. These groups tend to be very fast and mobile, and they communicate very well. So they can move from one part of your city to another before you can figure out what is going on. They are highly agile.

Several years ago, we used to rely on social media to gather information about who would be coming to participate and where they would be. And that would help us to communicate at the front end and prepare. But they have gotten very compartmentalized now in their social media. They don't talk as much on open-source media. They have closed-door meetings, which makes it harder for us to know in advance what might happen and prepare for it.

---

[45] "'I Can't Breathe': Eric Garner Put in Chokehold by NYPD Officer – Video," *The Guardian*, December 4, 2014, https://www.theguardian.com/us-news/video/2014/dec/04/i-cant-breathe-eric-garner-chokehold-death-video.

We continue to try to identify leaders through social media and to reach out to them as much as we can. But what really works for us is how we operate on a daily basis as a police department. The long-term relationships you build, and the transparency you show, make a difference. If you wait for a challenging event to happen or a protest to occur and then try to build relationships, you are way too late. So everything we do today matters.

The communication also has to go through the event itself. Sometimes we look for the person working the bullhorn, the person working the microphone. They may be the impromptu leader. Or the leaders can be folks we have worked with during past protests. We have a pretty robust negotiations team that can recognize informal leaders. Sometimes we know people who are not pulling the group together for the current event but who may have influence in the group.

## Pasco (Washington) Police Chief Robert Metzger:

*"I had a sergeant who speaks Spanish interpret for me."*

We had a unique situation, in that we had not ever had protests before.[46] So we were coming into this totally blind. We met with the family of the man who was killed and set the route with them. We had some pushing and shoving among different organizations about who was leading the protest. I didn't know who the leaders were or weren't, so I talked to everybody in the group.

We are about 60 percent Hispanic in my area, and a lot of people do not speak English, so I had a sergeant who speaks Spanish interpret for me. I also have had a citizen advisory group for many years, and a member of that group also was there to interpret. He also had credibility within the community, which helped.

## Yale University Police Chief Ronnell Higgins:

*"The Occupy movement signaled a paradigm shift that impacted how we planned, trained, collaborated, and responded to leaderless movements."*

To talk about protests, we sometimes have to go back to the late 1960s and early 1970s, when campus activism was at its height. In most cities, especially where there is a highly regarded university, one can expect the protest is going to be at or near that university. People don't go to the city square; they go to protest on campus.

At Yale, my partner is New Haven Police Chief Dean Esserman, and we work very well together. In fact, when he came back to New Haven as chief in 2011, after having served as assistant chief there in the 1990s, it was only weeks later that the Occupy movement came to New Haven. They established a base camp directly across from the main campus gates. That was our first glimpse of what can happen when

---

[46] Chief Metzger discussed a demonstration in Pasco following a controversial officer-involved shooting in February 2015. See "No Charges for Pasco Police Officers Who Killed Antonio Zambrano-Montes, Man Who Threw Rocks," *NBC News*, Sept. 9, 2015, http://www.nbcnews.com/news/us-news/no-charges-pasco-police-officers-who-killed-antonio-zambrano-montes-n424571.

there's a leaderless group converging on the city and impacting our open campus. We learned a lot from Occupy. We haven't had to deploy resources to demonstrations the way others have over the last couple of years, but the Occupy movement signaled a paradigm shift that impacted how we planned, trained, collaborated, and responded to leaderless movements; this includes campus and city administrations. It's a very complex environment for all of us.

## Winning the loyalty contest with protesters

Forum participants noted that the majority of protesters want to exercise their First Amendment rights peacefully. In some cases, however, the goal of a small number of people is to incite and participate in acts of violence. In the view of Professor Edward Maguire, the police compete with these agitators for the loyalty of protesters. If the police succeed in maintaining a respectful, friendly relationship with the crowd, they make it difficult for agitators to turn the crowd against the police.

| Arizona State University Professor Dr. Edward Maguire: |
| --- |

> "If the police come in and treat that crowd in an illegitimate manner, essentially the police are increasing the legitimacy of the agitators."

First, protests are really focused on the police right now. Even protests that were originally focused on other issues are turning toward the police.

Second, police officials have mentioned that the crowds they are facing are not homogeneous. You have a lot of people who are just attempting to exercise their First Amendment rights, but you also have some agitators coming in. You have some anarchists. You have some people who are intent on doing violence or committing crimes.

There is a whole body of research about crowd psychology, and the research isn't coming from the United States; it is from Europe. In Britain and Sweden and some other places in Europe, you have a very vibrant field of high-quality crowd psychology research that studies these things in detail.

One takeaway from this that I found very powerful and practical is this idea that crowds are not homogeneous. I think the way to think about it is like this: When you are policing a crowd, you have a loyalty contest going on. You have agitators who are coming in who are not interested in peaceful protesting, and they are trying to win the hearts of the crowd.

A large majority of the crowd has legitimate aims: just exercising their right to free speech. So if the police come in and treat that crowd in an illegitimate manner, essentially the police are increasing the legitimacy of the agitators. You are allowing those agitators to win the hearts and minds of the larger crowd against the police.

And so, thinking strategically about this, my advice is that whatever you do and how you choose to police that crowd, win that loyalty contest.

We have seen a lot of examples of this. We saw it in Boston; we saw it in Salt Lake City and other places, when agitators came in and tried to fire up the crowd. But because the police have good relationships with the crowd, the agitators do not win the legitimacy contest. They end up walking away alone and not being able to do the things they came to do. They get out-voted; they get out-voiced. I think that is the strategic principle to keep in mind in all of this.

<div style="background:#2b6a8f;color:white;padding:4px 8px;">**Office of Community Oriented Policing Services Director Ronald L. Davis:**</div>

> "Outside is about where you're from, and agitator is about a behavior. We shouldn't conflate the two concepts."

I want to raise a point that needs clarification in terms of our language. Often local residents complain that so-called *outside agitators* come in and foster violence or rioting that tears up their community.

I suggest we should be careful with our verbiage, because it's two separate ideas. *Outside* is about where you're from, and *agitator* is about a behavior. We shouldn't conflate the two concepts. Outsiders have the same right as local people do to protest what they believe to be a social injustice. But if anyone engages in violent behavior, regardless of where they're from, police should take action to stop it.

For example, at the Ferguson protests, some of the protesters were probably people from nearby cities and towns who had lived in Ferguson before. Maybe they still work in Ferguson or go to church or go shopping in Ferguson. And so they feel like the issues are very near and dear to them. There may also be protesters from out of state who are focusing on the issue of police misconduct, which means they are going all over the country to get to a larger issue. As long as these people from different places protest lawfully, it's the police department's job to protect everyone's First Amendment rights.

In terms of behavior, you have people who come to a demonstration for different reasons. Most demonstrators are not interested in breaking the law. But you may have agitators who think that the only way to get something done is through creating anarchy and violence. And you might have a criminal element, those who just want to take advantage of any confusion or disorder to steal things. The police response should change according to people's behavior. But it shouldn't change based on where people are from.

So as we work to win the loyalty contest and show that the police are legitimate, I think it's important not to take a whole group of good people and classify them as outside agitators just because they happen not to live in the city where the demonstration is happening.

## Cleveland Police Deputy Chief Wayne Drummond:

*"It's not just training in mobile field forces; it's also about working with the community. I think that is extremely vital."*

We have various experts with whom we consult about the training of our officers. We are working with the Federal Emergency Management Agency (FEMA), the U.S. Department of Homeland Security, the Ohio State Patrol, and so forth in advance of the Republican National Convention. It's not just training in mobile field forces; it's also about working with the community. I think that is extremely vital.

We're going to have police coming in from all over, various states and cities, but I think the key for us and part of the reason why we have been relatively successful in keeping things calm in the city of Cleveland is our community relationships. The relationships that our mayor, our Police Chief Calvin Williams, and our community relations board established with the community have kept things relatively calm. The rapport that we have established is tremendous. We have five districts in the city of Cleveland, each run by a commander, and the community members absolutely trust those district commanders.

## St. Louis County (Missouri) Police Chief Jon Belmar:

*"We also have been using social media to win the loyalty contest."*

During the Ferguson protests, I think we won the loyalty contest face to face, as we were shaking hands with demonstrators on West Florissant Avenue. But at night when people were rioting, there wasn't a contest to win. To be frank, that was just a different dynamic.

We also have been using social media to win the loyalty contest, and we have found it to be an outstanding tool to get messages out. For example, when one of our cars was shot during the demonstrations, 23 minutes later we had photographs of the bullet holes on social media. That showed the community what we were up against, which helped. I think we need to work harder as law enforcement for that. If the community doesn't trust us, if we don't have legitimacy, it makes it much more difficult for us to protect the community.

## St. Louis County (Missouri) Police Sergeant Brian Schellman:

*"One of the ways we used social media was to quell myths or lies that were out there about what was happening."*

I think that social media really sets the tone for your event. It's important to understand that everybody out there now has a smartphone, so anyone can start a narrative about your organization that may not be true. You can't ignore it. You need to put your messages out to convey accurate information and correct misstatements.

Unfortunately, at the time when Michael Brown was killed in Ferguson on August 9, 2014, we didn't have a good grasp on the social media world. We were too far behind the curve at that point. But we have expanded it a lot since then. In October, the chief hired a woman who used to work for the local Fox TV affiliate in St. Louis, and she is now our social media coordinator.

By November 24, when Bob McCulloch, the prosecuting attorney in St. Louis County, made the announcement that the grand jury would not indict the officer in Ferguson, we had such a strong foothold in the social media world that we were tweeting every few minutes about what was going on or what was about to happen. That night of November 24 was the worst night we had seen with rioting, but between 9 p.m., when the announcement was made, and 7 a.m. the next morning, we reached 10.1 million people on Twitter alone. And one of the ways we used social media was to quell myths or lies that were out there about what was happening.

> ### Major Cities Chiefs Association Executive Director Darrel Stephens:
>
> "If you don't have a communications strategy built into your overall plan for handling these events, you will miss a huge opportunity."

I think this area is critical; you need to have a communications strategy as a part of the planning process for any large demonstration or major event. It is important for day-to-day operations as well. But for these events, social media is a powerful force not only for getting your message out but also for being able to influence people's thinking because they can hear directly from the police. And even though the community's level of trust in the police has suffered over the last couple of years, police still have a higher level of credibility than the news media.

So you have an audience out there that is going to give credibility to what you are communicating. If you don't have a communications strategy built into your overall plan for handling these events, you will miss a huge opportunity to deal with rumors, correct misperceptions, and inform the public in a timely manner.

## Recommendations: The changing nature of mass demonstrations; dealing with leaderless groups

### Communicating with members of leaderless demonstrations

- When possible, develop relationships with protest movement leaders ahead of time to facilitate cooperation. When this is not possible, develop relationships with community members who are generally involved in protest movements—even if they are not leading the demonstration you are preparing for, because they may know persons who are involved.

- Use social media and other communications tools to convey the message that the police understand that their role in managing demonstrations is to protect demonstrators' rights while also protecting public safety. When demonstrations seem to be leaderless, it is particularly important to communicate directly with all demonstrators and the general public.

Police also can use social media to share direct messages with protesters about logistical issues and to solicit feedback and information. Remember that social media is a two-way tool for communication.

- Focus on building relationships with the community in the long term to improve communication and understanding.

- Work with intermediaries, such as the American Civil Liberties Union and the Advancement Project, to communicate with demonstrators.

- Have translators available if needed in order to communicate with protesters whose first language might not be English.

- Announce rules of engagement before and during demonstrations so protesters know what to expect, and announce the goals of the police department: e.g., facilitating First Amendment rights and maintaining public safety. Departments can make these announcements using social media, flyers, and clearly audible announcements during mass demonstrations.

## Winning the loyalty contest with protesters

- Remind first responders that crowds are not usually homogenous. They might include protesters with constitutionally protected aims, as well as other individuals aiming to commit acts of violence or other serious criminal offenses.

- In demonstrations where agitators intend to provoke disruption or where criminal offenders hope to commit thefts or other crimes under the cover of confusion, crowded conditions, and heavy activity, understand that police agencies are in a contest with agitators for the loyalty of protesters. Police need to focus on building positive relationships with the crowd so violent agitators are unable to win the crowd's support or foster discord and potentially criminal behavior.

- Build relationships and goodwill with the community over the long term.

- Develop a communications strategy for using social media during a mass demonstration.

- Use social media to build rapport with the community, to share accurate information, and to correct misinformation in real time during a mass demonstration.

- Have a dedicated social media staff specialist, if possible.

# Conclusion

Several changes in the dynamics of protests and demonstrations have emerged in recent years:

- Protests sometimes do not have identifiable leaders. Unlike past protests, which often were planned by established civil rights groups or other organizations, today's protests often emerge spontaneously and are organized informally via social media. As a result, the police might have a more difficult time identifying protest leaders, which could hinder the police's ability to establish communications with leaders, to discuss the police role in facilitating exercises of First Amendment rights, to set ground rules, and to plan logistical issues. And even when leaders emerge in a demonstration, they may be reluctant to engage with the police.

- Crowds of protesters might have multiple agendas that are not necessarily compatible with each other. A demonstration might include counter-protesters who directly oppose the goals of the event's organizers.

- Demonstrators often protest police actions in addition to social and economic issues that have been the subject of protests in the past.

Many police agencies have experienced these shifts firsthand, and the resulting challenges are multifaceted: Police agencies must not only ensure protesters are able to exercise their First Amendment rights but also facilitate demonstrations, protect the public against threats of violence or significant lawbreaking, and preserve officer safety and wellness.

This report is intended to help police agencies reexamine existing approaches to managing major demonstrations in light of changing dynamics. It provides specific recommendations for police agencies on everything from how to use bicycle officers during major events to internal communications planning.

However, this review of the police response to mass demonstrations is ultimately part of two larger questions: What are the values of 21st century police agencies, and how should officers be trained to reflect those values? The best practices described in this report—working with protesters in advance, emphasizing that the police role is to protect First Amendment rights and public safety, using a soft approach whenever possible and avoiding mass arrests, planning thoroughly to ensure all responding agencies will be governed by the host agency's policies and protocols, maintaining effective communications during a demonstration within the police agencies and between the police and the public, and carefully providing for officers' needs—are a critical part of the answer to those questions.

The challenges presented by the changing nature of mass demonstrations are an opportunity for police departments to build stronger partnerships with the communities they serve by demonstrating their institutional values directly to protesters. Agencies that promote positive engagement with protesters, that work with protesters to facilitate their First Amendment rights, and that keep protestors safe can improve the response to mass demonstrations while also building positive connections to the communities they serve.

# Appendix A. Summary of Recommendations

## 1. Response planning and preparation

### Proportionality: Tailoring responses to the actions and mood of the crowd

- Respond to a mass demonstration in gear and with equipment that are proportional to the mood of the crowd. Officer safety is critical and should be considered at all times. Part of that consideration is ensuring that police departments do not increase the tension in a mass demonstration unintentionally by outfitting their responding officers in more gear and with more equipment than are necessary during their initial contact with the crowd. Begin with the lowest response level and be prepared to change if conditions change.

- Have a plan to efficiently increase your level of response if you begin to detect signs of impending violence. A mass demonstration might begin calmly but then start to grow volatile. To protect the safety of protesters and officers, police departments should have a plan for efficiently and quickly increasing their level of response in proportion to what is happening on the street. In some cases, demonstrators may remain peaceful, but other persons may attempt to exploit a demonstration in order to commit crimes. A comprehensive plan may include having officers equipped with protective gear assembled nearby and ready for deployment as needed to relieve officers on the line.

- Extend proportionality to the types of equipment that departments use to respond to mass demonstrations. Military-style equipment is not required to respond effectively to typical protests. "Bringing a BearCat out to a protest doesn't do us any good," said Chicago Police Department Deputy Chief Kevin Ryan. "Unless we see a machine gun, we won't bring a BearCat."

### Bicycle officers: A critical resource in mass demonstrations

- Plan to use bicycle officers during mass demonstrations. They are able to maneuver in crowds more easily than officers in vehicles, and bicycle officers are often seen as more approachable. In addition, bike helmets provide officers with some head protection that is not perceived to be militaristic gear.

- Interlock officers' bicycles to use as a mobile field fence if needed.

## Officer wellness: How to protect the health and well-being of officers in mass demonstrations

- In developing plans for a demonstration, be prepared for the possibility that a demonstration may continue for many days. Plan for multiple shifts, and include plans for days off for officers to safeguard against officer fatigue.

- Have a dedicated radio channel for logistics. This setup ensures that command staff can stay apprised of conditions on the ground and of officers' needs, such as food and water.

- Plan to rotate officers off the frontline at appropriate intervals so they can eat, hydrate, and take a break.

- Pull officers off the line if they appear to grow hostile toward protesters or are becoming over-stressed because protesters are focusing their antagonism on them.

- If possible, prepare for a demonstration by removing potential projectiles such as trash cans from areas where protesters will gather.

- Prepare to provide not only wraparound wellness services and programs but also follow-up for officers and their families. This might include mental health counseling and other assistance, such as credit counseling if officers become the target of identity theft in connection with protests about police actions.

## Competing protest groups: How to manage conflicts among protesters with opposing views

- Prepare to separate protesters and counter-protesters to prevent violent conflict. This might include using dedicated protest zones, provided they are constitutionally compliant.

- Be transparent and have clearly defined rules about how the determination to move competing demonstrators into protest zones will be made.

## Arrests: Avoid mass arrests, but be prepared if arrests are necessary

- Avoid making mass arrests if at all possible, but develop a logistical system for efficiently processing large numbers of arrested individuals if that becomes necessary. Plans should include trained staff, a staging area, and procedures for processing arrests efficiently.

- If arrests are needed, videotape them so police agencies have a complete record of the event.

- Determine what the bar for making arrests will be, and communicate it to all officers. Most departments do not make arrests for low-level civil disobedience during a protest, such as blocking traffic, particularly if traffic can be rerouted around a blocked intersection.

- Develop standard language for officers to use when communicating warnings to protesters, including specific language about the laws protesters are violating.

- Develop a procedure for communicating those warnings to protesters—i.e., one that covers when the warnings are given, how they are given, and how often they are repeated before arrests may take place—and train officers on that procedure.

- Use officers stationed at different points in a protest area to confirm that warnings are audible to persons in all locations who could be affected.

- Do not encircle the crowd and then order them to disperse. Ensure demonstrators have paths to disperse.

- If given enough advance notice of a protest, communicate arrest procedures to protesters and the community before the demonstration begins.

### Internal communication: Setting clear expectations for officers and command staff

- Instruct officers about the department's overall strategy, goals, and operational guidelines in responding to a mass demonstration. This instruction ensures that responding officers understand that the department has an overarching response plan and that their roles and responsibilities are designed to support that strategy. Internal communication will also prevent situations in which officers feel they are receiving mixed messages during a demonstration: e.g., whether to make arrests or to engage in other responses.

- Clearly communicate to officers the specific behaviors, tactics, and messaging that are expected of them in a mass demonstration. This communication will make them more confident in their decision making on the line and demonstrate to them that they are supported by the department in those actions.

## 2. Training

### Types of training: How departments should equip and train their officers

- Provide mobile field force and civil disturbance training, ensuring any units that will be deployed together during a mass demonstration train together as well.

- Train officers and command staff in the ICS, so they will be well versed in their roles and responsibilities during a mass demonstration.

- Train command staff in all relevant ICS positions so each person can fill a number of roles during a mass demonstration.

- Provide officers and command staff with training on the use of less-lethal munitions. This training includes how to use less-lethal munitions effectively as well as agency policies that determine when, how, and by whom their use can be authorized.

- Train officers on protesters' constitutional rights and what they mean in a mass demonstration context. The role of the police is to protect community members' First Amendment rights while protecting public safety. Officers should be trained to understand these roles and to convey them to demonstrators so the demonstrators will know that the police see their role as protecting protesters.

- Emphasize the importance of de-escalation and communications tactics in the context of a mass demonstration. The quality of interpersonal interactions between individual officers and protesters can change outcomes. Ensure officers are equipped to handle interactions calmly and professionally, even if protesters are antagonistic. Small groups may engage in violence, but if most demonstrators understand and see that the police view their role as facilitating the demonstration while protecting public safety, violence is less likely to spread.

- Simulate the high-stress environment of a demonstration during scenario-based training.

- Bring new commanders into the academy to command cadets during their training on crowd movements. This gives commanders an opportunity to practice directing officers and managing crowds during mass demonstrations.

- Constantly re-evaluate training in the context of events in other jurisdictions, taking lessons from those events and modifying training accordingly.

- Train officers in procedural justice and how they can practice it in the context of managing demonstrations. Procedural justice is about demonstrating respect to community members, treating them with dignity and fairness, and allowing community members to express their views and tell their side of the story during encounters with the police. Research has shown that when the public believes the police exercise their authority in these procedurally just ways, they are more likely to accept the legitimacy of the police and defer to police authority.[47]

- Regularly refresh officers' training on responding to protests.

### Training together: Bringing mutual aid agencies together to prepare for mass demonstrations

- Agencies with mutual aid agreements and memoranda of understanding should participate in joint training for responding to mass demonstrations. This builds trust among these agencies and creates an opportunity to identify any issue areas, such as inconsistencies in policies and tactics regarding use of force, and address them in advance of a mass demonstration. The host agency must be in charge of all officers responding jointly to an event, setting the policies and practices that will be followed.

---

[47] See *Legitimacy and Procedural Justice* (see note 19).

- Agencies should use interagency training as an opportunity to share partner agencies' expertise. For example, if one agency has expertise in civil disturbance training, the agency can share that expertise by training partner agencies' trainers.

- Police departments should involve nonpolice agencies, such as fire departments, in ICS training to improve coordinated responses to mass demonstrations.

## 3. The importance of mutual aid and systems for managing it

### Pre-event preparation: Determining which agency will take the lead during a mass demonstration and which policies will control responses

- Ensure MAAs and MOUs are in place before a mass demonstration or other major event. These agreements should address how officers from neighboring jurisdictions will deploy, how they will be used, what rules of engagement will be followed, and what guiding philosophy will inform their joint response to a mass demonstration. This ensures that all agencies are working together toward the same mission. Before any mission, lead agencies should provide clear direction on goals and objectives.

- Make MAAs and MOUs as specific as possible, including precise information about how many personnel with given areas of expertise (such SWAT or intelligence analysis) will be deployed.

- Make it clear which agency is in charge and whose rules (especially regarding use of force) and command will be followed. Ensure partner agencies agree to this command structure in advance of a mass demonstration.

- Train together with all partner agencies (see the section "Training together: Bringing mutual aid agencies together to prepare for mass demonstrations" on page 34) so responses to mass demonstrations are well-coordinated at all levels, from officers on the line through command staff.

- Ensure policies and terminology on use of force and civil disobedience are consistent across agencies to prevent misunderstandings and loss of control during mass demonstrations. If necessary, resolve any inconsistencies in advance of a mass demonstration in a mutually agreed-upon unified command proposal.

- Use ICS so all responding agencies are well coordinated (see chapter 4, "The Incident Command System," for more information).

- Provide written guidance to mutual aid partners that includes rules of engagement, expectations of responding agencies and individual officers, and a list of which munitions are allowed.

- Work with partnering agencies to identify and agree upon the best approach to managing the mass demonstration. For instance, the lead agency may state its intention to begin with a soft approach to protests, in which officers wear regular uniforms and engage protesters by communicating that the police see their role as protecting demonstrators' First Amendment rights. Body armor and heavy equipment are kept in reserve and used only in the case of rioting or other acts of violence.

- Communicate expectations to partnering agencies. The lead agency needs to tell its partners how it would like to deploy them during a mass demonstration and how it expects them to respond to incidents that might occur during a protest. For example, if the lead agency does not want protesters engaged in minor acts of civil disobedience to be arrested, it needs to make that expectation clear to its partner agencies.

- Invite mutual aid partners to predeployment briefings. These are critical opportunities to clarify requests for assistance, roles and responsibilities, and expectations.[48] A lead agency should also brief all mutual aid partners on its intelligence about the event, its rules of engagement, its mission priorities, and its rules on the use of force and less-lethal munitions.[49] Predeployment briefings are also an opportunity for lead agencies to assess participating mutual aid agencies' equipment, skill levels, and potential limitations.

- If possible, work with a few larger agencies rather than many small ones when responding to a long-term event. Larger agencies have the capacity to provide officers and other resources while still maintaining their everyday functions over an extended period of time. This approach also reduces the number of responding agencies, which makes interagency communication and coordination easier.

- Plan to include all responding agencies in post-event debriefings. This ensures that all of the agencies involved understand the lessons learned during a mass demonstration. This improves interagency understanding and will improve future coordinated responses.

- Track who is responding from each agency, their roles and activities, and when they demobilize.

## Use of force: Ensuring all agencies are operating under the same guidelines

- If possible, the lead agency should use its own officers in the locations that are considered more likely to experience violence or other incidents that may require officers to use force. This can help to ensure that the lead agency's policies and practices are followed.

---

[48] "Incident Command System Resources" (see note 29); Lynn, *Mutual Aid*, 21 (see note 24).
[49] Lynn, *Mutual Aid*, 21 (see note 24).

- Other than in emergencies, any decision to use force or hard gear should be made by command staff from the lead agency. This policy should also be clearly communicated to all responding agencies.

- If possible, the lead agency should inspect partner agencies' munitions before they deploy to ensure the partners are outfitted according to the policies of the lead agency.

## 4. The Incident Command System

### Keeping lines of communication open

- Ideally, jurisdictions should plan all incidents and events with an IAP. This detailed planning among officials provides for more efficient and effective action should an incident arise. However, incidents may occur without notice, so writing an IAP in advance for a specific incident may not always be possible.

- The lead agency should share specifics of the IAP—including roles, assignments, and the location of the Unified Command Center and the mutual aid staging area—with all partner agencies during predeployment briefings. Agencies should also use this opportunity to discuss terminology so there is no confusion on the ground. (For example, some agencies may have a different understanding of the number of officers in a platoon, or may have different understanding of what constitutes mobile field force training.)[50]

- The lead agency should organize police and nonpolice agencies' responses to incidents and events by following FEMA's ICS. This standard provides for a clear chain of command and minimizes confusion.

- Senior decision makers from each mutual aid agency should report to the Unified Command Center[51] so the incident commander can make decisions seamlessly with the assistance of mutual aid agencies. Mutual aid agencies should send senior commanders who have the authority, from their police chief or sheriff, to make decisions on the ground.[52]

- If possible, the lead agency should assign a liaison to work with each responding agency. The liaison helps to ensure that responding agencies follow the policies of the lead agency and that any miscommunication is quickly corrected.

---

[50] *Lessons Learned from the 2015 Civil Unrest*, 42–43 (see note 2).
[51] Lynn, *Mutual Aid*, 21 (see note 24).
[52] *Lessons Learned from the 2015 Civil Unrest*, 48 (see note 2).

- Another approach is to deploy officers from different agencies in mixed groups. This will improve the consistency of their responses to protesters, since they will not be isolated in working groups composed only of officers from their own agencies.

- Under a unified command structure, the lead agency should set up a convenient staging area for mutual aid agencies that is close to the Unified Command Center.[53]

# 5. The changing nature of mass demonstrations: Dealing with leaderless groups

## Communicating with members of leaderless demonstrations

- When possible, develop relationships with protest movement leaders ahead of time to facilitate cooperation. When this is not possible, develop relationships with community members who are generally involved in protest movements—even if they are not leading the demonstration you are preparing for, because they may know persons who are involved.

- Use social media and other communications tools to convey the message that the police understand that their role in managing demonstrations is to protect demonstrators' rights while also protecting public safety. When demonstrations seem to be leaderless, it is particularly important to communicate directly with all demonstrators and the general public. Police also can use social media to share direct messages with protesters about logistical issues and to solicit feedback and information. Remember that social media is a two-way tool for communication.

- Focus on building relationships with the community in the long term to improve communication and understanding.

- Work with intermediaries, such as the American Civil Liberties Union and the Advancement Project, to communicate with demonstrators.

- Have translators available if needed in order to communicate with protesters whose first language might not be English.

- Announce rules of engagement before and during demonstrations so protesters know what to expect, and announce the goals of the police department: e.g., facilitating First Amendment rights and maintaining public safety. Departments can make these announcements using social media, flyers, and clearly audible announcements during mass demonstrations.

---

[53] Lynn, *Mutual Aid*, 26–27 (see note 24).

## Winning the loyalty contest with protesters

- Remind first responders that crowds are not usually homogenous. They might include protesters with constitutionally protected aims, as well as other individuals aiming to commit acts of violence or other serious criminal offenses.

- In demonstrations where agitators intend to provoke disruption or where criminal offenders hope to commit thefts or other crimes under the cover of confusion, crowded conditions, and heavy activity, understand that police agencies are in a contest with agitators for the loyalty of protesters. Police need to focus on building positive relationships with the crowd so violent agitators are unable to win the crowd's support or foster discord and potentially criminal behavior.

- Build relationships and goodwill with the community over the long term.

- Develop a communications strategy for using social media during a mass demonstration.

- Use social media to build rapport with the community, to share accurate information, and to correct misinformation in real time during a mass demonstration.

- Have a dedicated social media staff specialist, if possible.

# Appendix B. Unified Command Proposal

*Note: The formatting of this appendix has been modified to conform to COPS Office publication standards. Its text has not been changed.*

## Unified Command Proposal

### Mission statement

The overall goal of the Unified Command of the St. Louis Metropolitan Police Department, the St. Louis County Police Department, and the Missouri State Highway Patrol is the preservation of life, property, and the protection of a citizens 1st amendment rights. The First Amendment of the Constitution of the United States will be the scale of justice against which all of our actions are measured. This amendment will have a direct influence on how police departments approach and resolve issues. When it is possible, legal guidance will be sought to guide our actions. We should ensure that our actions do not deprive citizens of any rights, particularly the rights guaranteed under the First Amendment.

### Civil Disobedience Guidelines

#### *Use of force*

Deadly force: is any use of force that is likely to cause death or serious physical harm. Deadly force includes any discharge of a firearm at a person. Deadly force also includes strikes with a weapon to the areas of the body including head, neck, internal organs, genitalia, and spinal column.

#### *General guidelines regarding deadly force:*

Reverence for human life will guide officers in the use of deadly force. Deadly force will only be used when necessary to protect the lives of officers or other persons; it is never justified solely to protect property. Officers will use the least amount of force necessary to accomplish their lawful objectives while safeguarding their own lives and the lives of others. Deadly force will be a last resort, and will only be exercised when all reasonable alternatives have been exhausted.

**Non-deadly force:** is any of use of force not likely to cause death or serious bodily injury. Non-deadly force includes the use of defensive tactics (punches/kicks) as well as the offensive use of any department approved weapon, other than a firearm, in a manner not embodied within the definition of "deadly force."

***General guidelines regarding non-deadly force:***

Officers will access the situation to determine the best method to safely bring the incident under control with the least amount of force applied. Officers may use non-deadly force for the resolution of incidents, as follows:

- To protect themselves or others from physical harm

- To restrain or subdue a resistant individual; or

- To bring any unlawful situation safely and effectively under control.

It should be evident when considering actions regarding deadly force or any use of force to always adhere to your parent departments guidelines.

***Chain of command/span of control***

All officers assigned to the civil disobedience multi-jurisdictional Unified Command structure will always follow the universal chain of command.

All officers will be assigned to a squad and one sergeant will manage this squad. The span of control should be one sergeant to four officers. Sergeants will be under the command of a lieutenant who could be in command of several squads or a company of officers.

No line patrol officers will be allowed to take individual action of their own accord.

All direction/action for squad officers on the skirmish line will be given by their squad sergeants.

Point of contact: Physical contact by protestors is unacceptable. Verbal threats that can be articulated such as "I am going to kill you" will not be tolerated. Spitting on officers, fingerpointing within inches of an officer's face and eyes, and throwing objects at officers intended to harm officers can be cause for arrest.

***Rules of engagement***

*Skirmish line:*

While assigned to the Civil Disobedience Skirmish Line, officers will follow all orders given by his or her supervisor.

Skirmish line sergeants and lieutenants will have the ability direct the following duties:

1. Sergeants and lieutenants will have the authority to direct officers on the line.

2. Sergeants and lieutenants will have the authority to have agitators within a crowd arrested, by skirmish line arrest teams.

3. Sergeants and lieutenants will be given the authority to have arrests made for blatant criminal activity committed by protestors. For example: destruction of property, on view burglary, personal threats to officers safety and assault.

4. Sergeants and lieutenants will have the responsibility of having their officers maintain the skirmish line integrity.

5. Sergeants and lieutenants will be cognizant of officers safety and watch for signs of fatigue while on the line.

*Civil disobedience unified command decisions:*

Captains and above will be responsible for all major civil disobedience/unrest decisions. Captains and above will remember to follow the chain of command and that the incident commander will be the final authority on these issues.

Unified Command will have the authority, but not limited to, the following types of civil disobedience events with regards to enforcement action:

1. The blocking of any highway ramp.

2. The blocking of access to any hospital or any other critical infrastructure.

3. The blocking of access to any business.

4. The blocking of access to any residential home.

5. Enforcement action of any state or municipal law violations.

Unified Command will have the ultimate responsibility any deployment of tactical units at the scene. Unified Command will insure that when tactical units are deployed they will have a clear purpose and direction. For example, crowd movements, crowd dispersal, and the address of lethal threats.

Unified Command will direct tactical units in the deployment of any control items at their disposal.

Under these circumstances the Unified Command will use the following escalation of force:

1. Verbal commands/sounds

2. Gas-hand tossed smoke to be deployed first and then hand tossed capsicum spray (C/S or tear gas).

3. Launchable C/S (OC pepper spray would be an option).

4. Deployment of focused impact munitions. Sting ball grenades.

5. Deadly force

Unified Command will always adhere to the mission statement of the preservation of life, property, and an individuals first amendment rights.

Unified Command will identify "report writers" to capture and document each event such as a march, sit-ins, a mass arrest situation, etc.

At the conclusion of any civil disobedience incident, Unified Command will conduct a critical incident review of the event and the multi-jurisdictional response.

# Appendix C. Mutual Aid Agreement

*Note: The formatting of this appendix has been modified to conform to COPS Office publication standards. Its text has not been changed.*

## Mutual Aid Agreement between Montgomery County, Maryland, the Montgomery County Police Department, and the City of Baltimore, Maryland, and the Baltimore Police Department

This mutual aid agreement, made this 16 day of December, 2015, by and between **Montgomery County, Maryland,** a body corporate and politic of the State of Maryland, by and through the **County Executive** and **County Council of Montgomery County, Maryland,** (collectively, **"Montgomery County"**), the **Montgomery County Police Department ("MCPD"),** the Mayor and City Council of Baltimore, a municipal corporation of the State of Maryland **(the "City"),** and the **Baltimore Police Department,** an agency and instrumentality of the State of Maryland **("BPD").**

**Whereas,** it is in the public interest that law enforcement agencies throughout the State of Maryland cooperate to the greatest extent possible to provide prompt, effective, and professional police services.

**Whereas,** it is in the public interest that law enforcement agencies throughout the State of Maryland cooperate to the greatest extent possible lo ensure effective, and professional police services is maintained by sharing of resources between communities/jurisdictions during an emergency.

**Whereas,** the City, BPD, Montgomery County and the MCPD anticipate that circumstances may arise in their respective jurisdictions where there is a need for outside assistance in the form of law enforcement personnel and equipment.

**Whereas,** all law enforcement officers (hereinafter sometimes called "police" or "officers") are trained in current law enforcement techniques and have completed a course of training prescribed by the Maryland Police Training Commission.

**Whereas,** section 2-102 (b)(1) of the Criminal Procedure Article of the Maryland Annotated Code states, in pertinent part, the following: "[s]ubject to the limitations of paragraph (3) of this subsection, a police officer may make arrests, conduct investigations, and otherwise enforce the laws of the State throughout the State without limitations as to jurisdiction."

**Whereas,** section 2-102(b)(3) of the Criminal Procedure Article of the Maryland Annotated Code states, in pertinent part, the following: "(3) A police officer may exercise the powers granted by this section when: (i) 1. the police officer is participating in a joint investigation with officials from another state, federal, or local law enforcement unit, at least one of which has local jurisdiction; 2. the police officer is

rendering assistance to another police officer; 3. the police officer is acting at the request of a police officer or state police officer; or 4. an emergency exists; and (ii) the police officer is acting in accordance with regulations adopted by the police officer's employing unit to carry out this section."

**Whereas,** section 2-105 (e)(1) of the Criminal Procedure Article of the Maryland Annotated Code states, in pertinent part, the following: "The governing body of a county or municipal corporation or the Maryland-National Capital Park and Planning Commission may make a reciprocal agreement for the period that it considers advisable with the District of Columbia or a county, municipal corporation, or the Maryland-National Capital Park and Planning Commission, within or outside the state, and establish and carry out a plan to provide mutual aid by providing its police officers and other officers, employees, and agents, together with all necessary equipment as provided in subsection (b) of this section."

**Whereas,** the commissioner of BPD, pursuant to Public Local Laws §16-7(11) has the authority "[t]o make and execute contracts and other instruments as may be authorized in the exercise and performance of the powers vested in him and the department . . . . "

**Whereas,** the City and Montgomery County enter into this agreement to provide mutual aid, pursuant to the authority granted by section 2-105(e)(1) of the Criminal Procedure Article of the Maryland Annotated Code.

**Now, therefore,** in consideration of the mutual covenants and agreements hereinafter contained, Montgomery County, MCPD, the City, and the BPD do hereby agree as follows:

1. The foregoing recitals are hereby incorporated into, and made a part of this agreement.

2. Whenever any of the conditions set forth in section 2-102(b)(3) of the Criminal Procedure Article of the Maryland Annotated Code exists, and in the judgment of the chief of MCPD (or designee) and the commissioner of BPD (or designee) outside assistance is needed, each party may request assistance in the form of police personnel or equipment from the other jurisdiction.

3. Whenever practicable, the chief of MCPD (or designee) and the commissioner of BPD (or designee) shall consult with their respective presiding officials of Montgomery County and the City before requesting assistance or mutual aid under this agreement. However the failure of the chief of MCPD (or designee) or the commissioner of BPD (or designee) to consult with the presiding officials of Montgomery County or the City does not make a request for assistance invalid.

4. Any request for assistance or mutual aid shall be directed, in writing, to the commissioner BPD (or designee), or the chief of MCPD (or designee). The request shall describe in detail the nature of the circumstance meeting any of the conditions under section 2-102(b)(3) of the Criminal Procedure Article of the Maryland Annotated Code, the number of police officers and the amount and type of equipment needed, and a reasonable estimate of the length of time they will be needed.

5. A request for assistance will be evaluated by the responding agency's commissioner/chief (or designee), based on the circumstances of the request, and the capacity of the responding agency to provide the requested aid, while providing adequate services to the residents of the responding jurisdiction. The responding agency will engage in good faith efforts to provide necessary support to the requesting agency.

6. The chief of MCPD (or designee) or the commissioner BPD (or designee) shall have the authority to terminate their participation in meeting any request for assistance or mutual aid, at any time when circumstances are such that continued participation is deemed not in the best interest of either Montgomery County or the City. However, the chief of MCPD (or designee) or the commissioner BPD (or designee) covenant to engage in good faith discussions with the other party, when feasible, before terminating any participation in response to a request for assistance or mutual aid.

7. In the circumstances where Montgomery County or the City wish to terminate this agreement, that party shall provide written notice to the other party, thirty (30) days prior to the proposed dale of termination. Written notice of termination may be accomplished by email.

8. The chief of MCPD (or designee) and the commissioner of BPD (or designee) shall have the sole authority to determine, for their respective departments, the personnel and equipment, if any, available for assistance or mutual aid.

9. Notwithstanding anything to the contrary herein, this agreement shall not be construed to authorize the chief of MCPD to "deputize" the law enforcement officers of BPD as officers and deputies of MCPD.

10. Notwithstanding anything to the contrary herein, this agreement shall not be construed to authorize the commissioner of BPD to "deputize" the law enforcement officers of MCPD as officers and deputies of BPD.

11. The manner of providing assistance, as set forth in this agreement, shall be in addition to, and shall not limit, the authority granted police officers in matters involving fresh pursuit as provided in section 2-301 of the Criminal Procedure Article or the powers granted by sections 5-801, 5-802, 5-807, 5-808, and 5-901 of the Criminal Law Article of the Maryland Annotated Code.

12. Pursuant to section 2-105(c), of the Criminal Procedure Article of the Maryland Annotated Code, Montgomery County and the City acknowledge that any and all acts performed in furtherance of, or pursuant to, this agreement by any police, other public officials, or employees of Montgomery County and the City shall be deemed to be for a public and governmental purpose.

13. This agreement shall not be construed as a waiver of any immunity from tori liability, statutory, common law or otherwise, enjoyed by Montgomery County, the City, the chief of MCPD, the commissioner of BPD, any police officer covered by this agreement, or any employee of Montgomery County or the City.

14. Pursuant to section 2-105(c)(3) of the Criminal Procedure Article of the Maryland Annotated Code, Montgomery County and the City acknowledge that their officers, agents and employees, when acting in furtherance of the authority of this agreement beyond the boundaries of the jurisdiction within the state in which they are commissioned or employed, have all the immunities from liability described in section 5-612 of the Courts & Judicial Proceedings Article of the Maryland Annotated Code, and exemptions from laws, ordinances and regulations, and all the same pension, relief, disability, workers ' compensation, and other benefits enjoyed by them, to which these police officers and employees are otherwise entitled while performing their respective duties within the boundaries of the jurisdiction in which they are commissioned or employed.

15. Montgomery County, MCPD, the City, and BPD each acknowledge that they shall only be responsible for all the pension, relief, disability, workers' compensation, other benefits and death claims of their own employees that may arise out of performance of this agreement.

16. The chief of MCPD and the commissioner of BPD each acknowledge that he or she shall be solely responsible for the discipline of any police officer (under their respective commands) who commits misconduct while taking law enforcement action under this agreement. Upon learning of the facts and circumstances comprising potential misconduct by a law enforcement officer under their command committed within the jurisdiction of the other party, the chief of MCPD (or designee) and the commissioner of BPD (or designee) shall immediately (within twenty four (24) hours) notify the other party of the facts and circumstances comprising potential misconduct. Again, notification by email is deemed sufficient under this agreement.

17. A police officer who acts under the authority granted by this agreement remains at all times and for all purposes an employee of the employing unit (the unit acting beyond its boundaries).

18. Pursuant to section 2-105 of the Criminal Procedure Article of the Maryland Annotated Code, Montgomery County and the City each agree to the following:

   a. To waive any and all claims that are against the other parties to this agreement and that may arise out of their activities outside their respective jurisdictions under the agreement; and

   b. To indemnify and hold harmless the other parties to this agreement from all claims by third parties that are for property damage or personal injury and that may arise out of the activities of the other parties to the agreement outside their respective jurisdictions under the agreement.

The Police Response to Mass Demonstrations

19. Montgomery County, MCPD, the City, and BPD each agree to cooperate fully with the other party in the defense of claims, pursuant to the indemnifications of paragraph 18(b) above. This cooperation will include, but is not limited to, the following:

    a. Immediate notification to the other party of any accident, incident or enforcement action resulting in personal injury, damage or having the potential for liability;

    b. Permit a party to this agreement to conduct a parallel independent investigation of any accident or incident;

    c. Make reports, records, and equipment available for purposes of the defense of any claim or suit.

20. Senior ranking personnel (and their contingent) responding to a request for assistance or for mutual aid under this agreement shall report to the senior police officer of the agency requesting assistance or mutual aid, and Unified Command will be established. Command officers of the responding agency will work closely with command officers of the requesting agency in addressing their IAP's (incident action plans), goals, objectives, and operational needs, and in determining parameters regarding deployment of assets. Overall command of the operation will reside in the senior police officer of the requesting agency.

21. Radio communication between the jurisdictions shall be coordinated through the Communications Section of MCPD and BPD, respectively.

22. A responding police officer who is providing assistance or mutual aid under this agreement shall use the forms and reports of the requesting agency. Any responding police officer who makes an arrest shall transfer the arrestee to the custody of a police officer of the requesting agency for processing, in accordance with the procedures of the requesting agency. Any report that is filed by a responding police officer to a requesting agency is deemed sufficient notice to the chief of MCPD or the commissioner of BPD under section 2-102(c)(1) of the Criminal Procedure Article of the Maryland Annotated Code.

23. This Mutual Aid Agreement authorizes a police officer who is providing assistance or mutual aid beyond the officer's sworn jurisdiction, to enforce the Maryland Vehicle Law within the territorial jurisdiction of the requesting/receiving county or municipal corporation.

24. Section 35-13 of the Montgomery County Code authorizes the county executive to enter into police mutual aid agreements with counties and municipal corporations, subject to the County Council's approval of such an agreement.

25. This agreement shall be governed by the laws of the State of Maryland.

26. Any notification permitted under this agreement shall be made to the parties listed below:

| For Montgomery County: | For the City: |
|---|---|
| Isiah Leggett | Stephanie Rawlings-Blake |
| County Executive | Mayor |
| Executive Office Building | City Hall |
| 101 Monroe Street, 2nd Floor | 100 N. Holliday Street |
| Rockville, MD 20850 | Baltimore, MD 21202 |
| Email: ocemail@montgomerycountymd.gov | Email: Stephanie.Rawling-Blake@baltimorecity.gov |
| **For MCPD:** | **For BPD:** |
| J. Thomas Manger | Kevin Davis |
| Chief of Montgomery County Police Department | Commissioner of the Baltimore Police Department |
| 100 Edison Park Drive, 3rd floor | 601 East Fayette Street |
| Gaithersburg, MD 20878 | Baltimore, MD 21202 |
| Email: MCPDCHIEF.ChiefPolice@montgomerycountymd.gov | Email: Kevin.Davis@baltimorepolice.org |

**[Signatures to follow on next page]**

As witness the hands and seals of the parties the day, month, and year first above written.

Attest:                                    **Mayor and City Council of Baltimore**

_[signature]_                              BY: _[signature]_
CUSTODIAN OF THE CITY SEAL                 STEPHANIE RAWLINGS-BLAKE, MAYOR

                                           BY: _[signature]_
                                           BERNARD C. "JACK" YOUNG, PRESIDENT
                                           BALTIMORE CITY COUNCIL

                                           Approved by the Board of Estimates

                                           _[signature]_
                                           CLERK                         DATE
                                                DEC 1 6 2015

Attest:                                    **Montgomery County**

_David Stevenson_                          BY: _[signature]_
                                           ISIAH LEGGETT, COUNTY EXECUTIVE

                                           Approved by the Montgomery County Council

                                           Resolution # <u>18-438</u>
                                           Date: <u>April 5, 2016</u>

                                           **Police Department of Baltimore City**

                                           BY: _[signature]_
                                           KEVIN DAVIS,              POLICE
                                           COMMISSIONER

                                           **Montgomery County Department of Police**

                                           BY: _[signature]_
                                           J. THOMAS MANGER, CHIEF

Appendix C. Mutual Aid Agreement                                              91

Approved as to Form and Legal Sufficiency

MARK DEWIRE
CHIEF CITY SOLICITOR
CITY OF BALTIMORE, DEPARTMENT OF LAW

Approved as to Form and Legal Sufficiency

DAVID E. STEVENSON
ASSOCIATE COUNTY ATTORNEY
MONTGOMERY COUNTY, MARYLAND

The Police Response to Mass Demonstrations

Resolution No.: 18-438
Introduced: February 23, 2016
Adopted: April 5, 2016

## County Council for Montgomery County, Maryland

Lead Sponsor: Council President at the request of the County Executive

Subject:                          Approval of a police Mutual Aid Agreement between Montgomery County and
                                  the City of Baltimore Background

## Background

1. Maryland Code, Criminal Procedure Article, § 2-105 (b) empowers the County to authorize its
   police officers, together with all necessary equipment, to go beyond the boundaries of the
   County, to any place within .or outside the State.

2. Maryland Code, Criminal Procedure Article, § 2-105 (e) authorizes the County to enter into a
   reciprocal Mutual Aid Agreement with the City of Baltimore, Maryland, to provide and receive
   the extraterritorial police assistance allowed by Criminal Procedure Article, § 2-105 (b).

3. Montgomery County Code, 2004, section 35-13, authorizes the County Executive to enter into a
   police mutual aid agreement subject to the approval of the County Council, and subject to the
   approval of the County Attorney as to form and legality.

4. Maryland Code, Criminal Procedure Article, § 2-102 (b) (2) states that a police officer is not
   authorized to enforce the Maryland Vehicle Law beyond the police officer's sworn jurisdiction,
   unless the officer is acting under a mutual aid agreement authorized under § 2-105 of the
   Criminal Procedure Article.

5. Situations such as civil unrest or a natural disaster can develop in which Montgomery County or
   the City of Baltimore would not have sufficient police resources immediately available, and
   would require assistance from the other jurisdiction to provide the prompt and effective
   professional law enforcement service required to meet the public's needs. Adoption of the
   attached Mutual Aid Agreement will provide both jurisdictions the ability to pre-plan for the
   provision of mutual aid under the conditions and terms set out in the Agreement, when
   circumstances warrant such a response. And when providing mutual aid in the neighboring
   jurisdiction, the parties' police officers will have the authority to enforce the Maryland
   Vehicle Law.

6. The attached Mutual Aid Agreement has been executed by the County Executive and the Chief
   of the Police Department of Montgomery County. The Agreement has also been executed by
   the Mayor of Baltimore City, and the President of the Baltimore City Council. The Baltimore
   City Board of Estimates approved the attached Agreement on December 16, 2015.

7. The County Executive recommends Council approval of the attached Mutual Aid Agreement, which the Department of Police and the County Attorney's Office believe to be sound, desirable, practicable, and beneficial to the County.

8. Approval of this Agreement will provide more effective and efficient utilization of existing law enforcement resources.

9. The County Attorney has approved the attached Mutual Aid Agreement, for form and legality.

10. The Council's Public Safety Committee held a worksession on the Mutual Aid Agreement on March 21 and recommended that the Council approve the Agreement.

**Action**

The County Council for Montgomery County, Maryland, based on the reasons presented above, approves the following resolution:

The Council accepts and approves the attached police Mutual Aid Agreement between Montgomery County and the City of Baltimore, which Agreement is made a part of this resolution.

The Council authorizes the County to request, provide, and receive mutual aid under the circumstances described, and to the extent specified, in the Mutual Aid Agreement.

This is a correct copy of Council action.

*Linda M. Lauer*

Linda M. Lauer, Clerk of the Council

The Police Response to Mass Demonstrations

# Appendix D. List of Forum Participants

**Darren Allison**
Captain, Oakland (CA) Police
Department

**Jon Belmar**
Chief of Police, St. Louis
County (MO) Police
Department

**Michael Black**
Major, Ohio State Highway
Patrol

**Gwen Boniface**
Deputy Executive Director,
International Association of
Chiefs of Police

**Armando Bonilla**
Associate Deputy Attorney
General, U.S. Department of
Justice

**Margaret Brunner**
Research Associate, Police
Executive Research Forum

**Helene Bushwick**
Supervisory Policy Analyst,
Office of Community
Oriented Policing Services,
U.S. Department of Justice

**Michael Butler**
Lieutenant, Cleveland (OH)
Police Department

**Jeffery Carroll**
Commander, Metropolitan
Police Department (DC)

**Robert Chapman**
Deputy Director, Office of
Community Oriented Policing
Services,
U.S. Department of Justice

**Melanca Clark**
Chief of Staff, Office of
Community Oriented Policing
Services, U.S. Department of
Justice

**Nazmia Comrie**
Collaborative Reform
Specialist, Office of
Community Oriented Policing
Services, U.S. Department of
Justice

**Laura Cooper**
Director of Government
Affairs, Major County
Sheriffs' Association

**John D'Adamo**
Inspector, New York City
Police Department

**Ronald L. Davis**
Director, Office of
Community Oriented Policing
Services, U.S. Department of
Justice

**Samuel Dotson**
Chief of Police, St. Louis (MO)
Metropolitan Police
Department

**Jessica Drake**
Vice President of Program
Management and
Development, Strategic
Applications International

**Wayne Drummond**
Deputy Chief, Cleveland (OH)
Police Department

**Alan Eickhoff**
Acting Chief of Police,
Ferguson (MO) Police
Department

**Sarah Estill**
Senior Social Science Analyst,
Office of Community
Oriented Policing Services,
U.S. Department of Justice

**Stephen Fender**
State Policy Advisor, Bureau
of Justice Assistance, U.S.
Department of Justice

**Craig Fischer**
Director of Communications,
Police Executive Research
Forum

**Michael Franco**
Special Assistant to the
Director, Office of
Community Oriented
Policing Services, U.S.
Department of Justice

**Dominica Fuller**
Sergeant, Ferguson (MO)
Police Department

**Erin Healy Gallagher**
Trial Attorney, Office of
Community Oriented Policing
Services, U.S. Department of
Justice

**Ronnell Higgins**
Chief of Police, Yale
University Police Department

**Patrice Howard**
Social Science Research
Analyst, Office of Community
Oriented Policing Services,
U.S. Department of Justice

**Stephen Hughes**
Deputy Chief, New York City
Police Department

**Melissa Hyatt**
Colonel, Baltimore (MD)
Police Department

**Kevin Jones**
Captain, Baltimore (MD)
Police Department

**Anwawn Jones**
Sergeant, Oakland (CA)
Police Department

**Adam Kemerer**
Research Assistant, Police
Executive Research Forum

**Jerry Leyshock**
Lieutenant Colonel, St. Louis
(MO) Metropolitan Police
Department

**Colm Lydon**
Deputy Superintendent,
Boston (MA) Police
Department

**Edward Maguire**
Professor, Arizona State
University

**Thomas Mariadason**
Staff Attorney,
Advancement Project

**James McGinty**
Communications
Coordinator, Police Executive
Research Forum

**Katherine McQuay**
Senior Advisor, Office of
Community Oriented
Policing Services, U.S.
Department of Justice

**Robert Metzger**
Chief of Police, Pasco
(WA) Police Department

**Elizabeth Miller**
Research Associate, Police
Executive Research Forum

**Lindsay Miller Goodison**
Senior Research Associate,
Police Executive Research
Forum

**Paul Monteiro**
Acting Director, Community
Relations Service, U.S.
Department of Justice

**Bill Neadles**
Superintendent, Toronto
Police Service

**Bernard O'Rourke**
Superintendent, Boston (MA)
Police Department

**Daniel Perea**
Captain, San Francisco (CA)
Police Department

**Ken Roske**
Captain, Pasco (WA)
Police Department

**Lee Rowland**
Senior Staff Attorney,
American Civil Liberties
Union

**Kevin Ryan**
Deputy Chief, Chicago (IL)
Police Department

**Brian Schellman**
Sergeant, St. Louis County
(MO) Police Department

**Cornelia Sorensen Sigworth**
Associate Deputy Director,
Bureau of Justice Assistance,
U.S. Department of Justice

**Richard Stanek**
Sheriff, Hennepin County
(MN) Sheriff's Office

**Darrel Stephens**
Executive Director,
Major Cities Chiefs

**Christophe Stissi**
Lieutenant, New York City
Police Department

**Jessica Toliver**
Director of Technical
Assistance, Police Executive
Research Forum

**Tracey Trautman**
Deputy Director, Bureau
of Justice Assistance,
U.S. Department of Justice

**Brian Vaught**
Sergeant, Pasco (WA)
Police Department

**Laura Waxman**
Director of Public Safety,
U.S. Conference of Mayors

**Chuck Wexler**
Executive Director, Police
Executive Research Forum

**Sean Whent**
Chief of Police, Oakland (CA)
Police Department

**Steven Wilske**
Assistant Chief, Seattle (WA)
Police Department

Appendix D. List of Forum Participants

97

# Abbreviations

| | |
|---|---|
| ACLU | American Civil Liberties Union |
| CART | chemical agent response team |
| CDU | Civil Disturbance Unit |
| CIT | crisis intervention team |
| COBRA | Cops on Bikes Regional Approach |
| COPS Office | Office of Community Oriented Policing Services |
| DOJ | U.S. Department of Justice |
| EMAC | Emergency Management Assistance Compact |
| FEMA | Federal Emergency Management Agency |
| IAP | incident action plan |
| ICS | Incident Command System |
| LRAD | Long Range Acoustic Device |
| MAA | mutual aid agreement |
| MOU | memorandum of understanding |
| NAACP | National Association for the Advancement of Colored People |
| NATO | North Atlantic Treaty Organization |
| NIMS | National Incident Management System |
| PERF | Police Executive Research Forum |
| SOD | Special Operations Division |
| SOP | standard operating procedure |
| SRG | Strategic Response Group |
| SWAT | special weapons and tactics |

# Resources

CNA Analysis and Solutions. 2013. *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*. Washington, DC: Bureau of Justice Assistance. https://www.bja.gov/Publications/LSSE-planning-Primer.pdf.

Criminal Intelligence Coordinating Council. 2011. *Recommendations for First Amendment-Protected Events for State and Local Law Enforcement Agencies.* Washington, DC: Bureau of Justice Assistance. https://www.ncirc.gov/onlinetraining/modules/first_amendment_rollcall/Recommendations.pdf.

FEMA (Federal Emergency Management Agency). 2008. *ICS: Review Material*. Washington, DC: Federal Emergency Management Agency. https://training.fema.gov/emiweb/is/icsresource/assets/reviewmaterials.pdf.

———. 2011. *National Incident Management System (NIMS): Overview.* Washington, DC: Federal Emergency Management Agency. https://www.fema.gov/media-library-data/20130726-1853-25045-0014/nims_overview.pdf

———. 2016. "Center for Domestic Preparedness webpage." Federal Emergency Management Agency. Accessed December 5, 2016. https://cdp.dhs.gov/find-training/course/PER-200.

———. 2016. "ICS Resource Center." Federal Emergency Management Agency. Accessed December 5, 2016. https://training.fema.gov/emiweb/is/icsresource/index.htm.

Lynn, Phil. 2005. *Mutual Aid: Multijurisdictional Partnerships for Meeting Regional Threats*. Washington, DC: Bureau of Justice Assistance. https://www.ncjrs.gov/pdffiles1/bja/210679.pdf.

Metropolitan Police Department. 2013. *Standard Operating Procedures: Handling First Amendment Assemblies and Mass Demonstrations*. Washington, DC: Metropolitan Police Department. https://go.mpdconline.com/GO/SOP_11_01.pdf.

Narr, Tony, Jessica Toliver, Jerry Murphy, Malcolm McFarland, and Joshua Ederheimer. 2006. *Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches.* Washington, DC: Police Executive Research Forum. http://www.policeforum.org/assets/docs/Critical_Issues_Series/police%20management%20of%20mass%20demonstrations%20-%20identifying%20issues%20and%20successful%20approaches%202006.pdf.

Norton, Blake, Edwin Hamilton, Rick Braziel, Daniel Linskey, and Jennifer Zeunik. 2015. *An Assessment of the St. Louis County Police Department*. Collaborative Reform Initiative. Washington, DC: Office of Community Oriented Policing Services. http://ric-zai-inc.com/Publications/cops-p316-pub.pdf.

PERF (Police Executive Research Forum). 2011.  *Managing Major Events: Best Practices from the Field*. Critical Issues in Policing Series. Washington, DC: Police Executive Research Forum. http://www.policeforum.org/assets/docs/Critical_Issues_Series/managing%20major%20events%20-%20best%20practices%20from%20the%20field%202011.pdf.

———. 2014. *Legitimacy and Procedural Justice: A New Element of Police Leadership*. Washington, DC: Police Executive Research Forum. http://www.policeforum.org/assets/docs/Free_Online_ Documents/Leadership/legitimacy%20and%20procedural%20justice%20-%20a%20new% 20element%20of%20police%20leadership.pdf.

———. 2015. *Lessons Learned from the 2015 Civil Unrest in Baltimore*. Washington, DC: Police Executive Research Forum. http://www.policeforum.org/assets/2015baltimorecivilunrest.pdf.

# About PERF

The **Police Executive Research Forum** (PERF) is an independent research organization that focuses on critical issues in policing. Since its founding in 1976, PERF has identified best practices on fundamental issues such as reducing police use of force, developing community policing and problem-oriented policing, using technologies to deliver police services to the community, and evaluating crime reduction strategies.

PERF strives to advance professionalism in policing and to improve the delivery of police services through the exercise of strong national leadership, public debate of police and criminal justice issues, and research and policy development.

In addition to conducting research and publishing reports on our findings, PERF conducts management studies of individual law enforcement agencies, educates hundreds of police officials each year in a three-week executive development program, and provides executive search services to governments that wish to conduct national searches for their next police chief.

All of PERF's work benefits from PERF's status as a membership organization of police officials, academics, federal government leaders, and others with an interest in policing and criminal justice.

All PERF members must have a four-year college degree and must subscribe to a set of founding principles, emphasizing the importance of research and public debate in policing, adherence to the Constitution and the highest standards of ethics and integrity, and accountability to the communities that police agencies serve.

PERF is governed by a member-elected president and board of directors and a board-appointed executive director. A staff of approximately 30 full-time professionals is based in Washington, D.C.

To learn more, visit PERF online at www.policeforum.org.

Social media has enabled the rise of leaderless movements, changing the form and function of mass demonstrations in the United States. New philosophies and tactics are needed to help police departments ensure public safety and the First Amendment rights of protesters while also maintaining the safety and well-being of their officers.

To explore the best strategies for policing mass demonstrations, the Office of Community Oriented Policing Services and the Police Executive Research Forum brought more than 50 police executives, academics, and subject matter experts to-gether in April 2016 for a forum dedicated to identifying the most effective practices. This report details their discussions and recommendations, offering lessons learned and proven strategies for communi-cating with demonstrators, planning and preparing for police response, training, determining the need for use of force, maintaining officer wellness, establishing and organizing mutual aid, discussing arrest policies, and ensuring transparency and accountability.



Police Executive Research Forum
1120 Connecticut Avenue NW
Suite 930
Washington, DC 20036
202-466-7820

Visit PERF online at **www.policeforum.org**.