UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

IN RE: NEW YORK CITY POLICING DURING SUMMER
2020 DEMONSTRATIONS

                                        20 Civ. 8924 (CM)

------------------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.'S <u>MOTION TO REJECT PROPOSED SETTLEMENT</u>

**HON. SYLVIA O. HINDS-RADIX**
CORPORATION COUNSEL OF THE CITY OF NEW YORK
*Attorney for Defendants*
100 Church Street
New York, New York 10007

By:    Patricia Miller
        *Division Chief*
        Omar J. Siddiqi
        *Senior Counsel*
        Special Federal Litigation Division
        (212) 356-2345

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ........................................................................... 1

    I.     An Explanation of the Settlement Agreement ........................................... 4

         A.  The Tiered System ............................................................................. 4

         B.  Red Light/Green Light ....................................................................... 5

         C.  The Collaborative Committee ............................................................. 6

    II.    United States v. Albuquerque ................................................................... 9

    III.   Answers to the Court's Questions .......................................................... 11

         1.  Was the PBA Involved in Settlement Negotiations and to What Extent? ............................................. 12

         2.  Does the Grant of Intervention Mean That the PBA Can Veto Any Settlement in the Cases Seeking Injunctive Relief That It Does Not Like- And Related Questions .................................... 13

         3.  Is the PBA's Disagreement with a Settlement Agreed to by The City and Other Unions a Labor Relations Issue, Rather Than a Litigation Issue? ......................................... 14

         4.  What Does the PBA Have to Demonstrate in Order to Establish That Its Members Are Prejudiced by the Settlement? How Can the Union Satisfy That Burden? Are We Required to Hold a Hearing with Witnesses? If So, Who Would Those Witnesses Be? ......................................................... 14

         5.  What if Any Obligations Does the Settlement Impose on the PBA or Its Members? ..................................................................... 16

         6.  How Exactly Is the PBA (Or Its Membership) Prejudiced by the Terms of the Proposed Settlement? ........................................ 16

**Page**

CONCLUSION.................................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                    <u>Pages</u>

*Bhatia v. Piedrahita,*
   756 F.3d 211 (2d Cir. 2014) ........................................................................... 15

*D'Alto v. Dahon California, Inc.*,
   100 F.3d 281 (2d. Cir. 1996) .......................................................................... 15

*Galasso v. Eisman, Zucker, Klein & Ruttenberg,*
   310 F. Supp. 2d 569 (S.D.N.Y. 2004) ........................................................... 16

*Kallas v. Egan,*
   842 F. App'x 676 (2d Cir. 2021) ................................................................... 14

*Local No. 93 v. Cleveland,*
   478 U.S. 528 (1986) ....................................................................................... 10

*Paysys Int'l, Inc. v. Atos IT Servs. Ltd.*,
   901 F.3d 105 (2d Cir. 2018) .................................................................... 15, 16

*Rhoden v. Mittal,*
   No. 18-CV-6613, 2020 U.S. Dist. LEXIS 250486
   (E.D.N.Y. Oct. 26, 2020)............................................................................... 15

*Shaw Fam. Archives, Ltd. v. CMG Worldwide, Inc.,*
   No. 05-CV-3939, 2008 WL 4127549
   (S.D.N.Y. Sept. 2, 2008)................................................................................ 16

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016) ................................................................................... 14

*United States v. Albert Inv. Co.*,
   585 F.3d 1386 (10th Cir. 2009)...................................................................... 10

*United States v. City of Albuquerque,*
   No. Civ. 14-1025, 2020 U.S. Dist. LEXIS 103158
   (D.N.M. Nov. 30, 2016) ........................................................... 3, 9, 10, 11, 13, 14

*United States v. City of New York,*
   308 F.R.D. 53 (E.D.N.Y. 2015) ..................................................................... 15

*WildEarth Guardians v. United States Forest Serv.*,
   778 F. Supp. 2d 1149 (D.N.M. 2011)............................................................. 10

<u>Statutes</u>

Fed. R. Civ. P. 23 ................................................................................................ 15

**<u>Statutes</u>**                                                                                    **<u>Pages</u>**

Fed. R. Civ. P. 41(a)(2) ...........................................................................................................2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

IN RE: NEW YORK CITY POLICING DURING SUMMER
2020 DEMONSTRATIONS

20 Civ. 8924 (CM)

------------------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.'S MOTION TO REJECT PROPOSED SETTLEMENT

### PRELIMINARY STATEMENT

Defendants, by their attorney, the Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, respectfully submit this memorandum of law in opposition to the Police Benevolent Association of the City of New York's (the "PBA") motion to reject the proposed settlement that has been agreed to by the consolidated plaintiffs, the Detective Endowment Association, and the Sergeant Benevolent Association, and defendants ("settling parties"). (Docket Entry No. 1120).[1]

From June 2022 to September 2023, the settling parties in this matter engaged in lengthy, substantive, and difficult settlement negotiations, with the assistance of Rebecca Price from the Southern District of New York's Mediation Office. These laborious sessions, the vast majority of which the PBA attended, resulted in the formulation of a settlement agreement which

---

[1] Throughout this motion, "Defendants" refers to the City of New York and all individually named defendants including current and former employees. The Intervenor-Defendants are referred to herein by name.

represents in part many New York City Police Department ("NYPD") policies already in place. The Settlement Agreement resolves the equitable portion of the consolidated civil rights actions against defendants.

The parties filed this Agreement with the Court in the form of a Stipulated Order Pursuant to Fed. R. Civ. P. 41 (a)(2) ("Settlement Agreement") on September 5, 2023.

The Court endorsed the Parties' Motion to Dismiss Injunctive Claims with Prejudice and Retain Jurisdiction, which would have enacted the Settlement Agreement, on September 7, 2023. (Docket Entry No. 1102). Despite being fully aware, days in advance, that the settling parties were filing their Settlement Agreement on September 5, 2023, the PBA alerted the Court to its objections after the Court had already endorsed the Settlement Agreement. (Docket Entry No. 1104). In light of the PBA's request to object, the Court vacated its endorsement of the Motion to Dismiss (Docket Entry No. 107). The Court, in two separate docket entries, posed questions it asked the parties to address. (Docket Entry Nos. 1108 and 1109).

On October 6, 2023, the PBA filed its Motion to Reject the Proposed Settlement. Putting aside the motion's mischaracterization of the Settlement Agreement; conclusory legal assertions; a Declaration of a former NYPD Chief of Department who retired more than twenty-three (23) years ago (prior to any major protest activity in the City of New York in the 21st Century); and PBA's rewriting of the history of the relevant settlement negotiations -- the motion fails to demonstrate a legal mechanism that allows it to destroy a Settlement Agreement that the settling parties have spent fifteen (15) months constructing. The law does not allow a party, particularly an intervening party, to act as a spoiler and essentially force all other parties then to litigate at their own risk and expense. The PBA has no legal basis to prevent the settling parties

from entering into this Settlement Agreement. Even if such a basis existed, the PBA has failed make a showing that the Settlement Agreement is unreasonable, unfair, or inconsistent with federal law—the proper standard for such an inquiry.

When the Second Circuit granted its motion for intervention and allowed the PBA to become an intervenor-defendant at the "merits phase," the PBA essentially became the "dog that caught the car."  That is to say, faced with the prospect of being unsure of what to do with having been afforded the right to intervene, the PBA has now sought to make a public splash through the opposition of this Settlement Agreement. Indeed, the Second Circuit granted intervention to the PBA at least in part to prevent the City from entering into a politically motivated settlement. "The nature and scope of any injunctive relief and accommodations could turn on political calculations with respect to which the individual officer defendants would not be influential and to which they may not even be privy…We therefore hold that the PBA has identified an interest that may be impaired by the disposition of the consolidated actions." (Docket Entry No. 432 at p. 18). Ironically, one could argue that the PBA, which had every draft of this Settlement Agreement while it was being developed and chose to never raise any issues with the Court until this motion, is the one acting with a political motive.

For the reasons set forth *infra*, defendants respectfully request that the Court deny the PBA's motion in its entirety. Defendants further respectfully request that the Court once again endorse the Settlement Agreement so that the settling parties may move beyond the protests of the Summer of 2020.

Defendants have set forth their Opposition as follows: (1) An accurate description of the Settlement Agreement; (2) A discussion of *United States v. City of Albuquerque*; and (3) Answers to the Court's Questions raised in Docket Entry Nos. 141 and 142.

## I.    An Explanation of the Settlement Agreement

Unfortunately, throughout its papers, the PBA mischaracterizes and miscasts the terms of the Settlement Agreement. Defendants now rebut the positions taken by the PBA in order to present an accurate picture of the Settlement Agreement.[2]

As an initial matter more than a dozen provisions of the Settlement Agreement pertaining to the NYPD's commitment to policing First Amendment Activity ("FAA") simply repeat existing NYPD policies.[3] Furthermore, the Settlement Agreement has an overriding mandate that "the NYPD shall, at all times, maintain its ability to enforce the law consistent with the U.S. Constitution, the laws of the State of New York, and the New York City Charter." (Docket Entry No. 1099-2 at ¶19). Therefore, the PBA's argument that this entire Settlement Agreement, agreed to by two other unions, somehow represents a reckless novel form of policing has no basis in fact.

### A.    The Tiered System

The first portion of the Settlement Agreement that PBA challenges is the Tiered System. The PBA's presentation of what was agreed to is simply inaccurate. Specifically, the settling parties have agreed that "in an effort to assure the rights of protestors, the NYPD shall employ a tiered response…the NYPD shall begin its response at the lowest *applicable* tier based on the conditions presented at the FAA and may move between the tiers as appropriate based on the conditions." (Docket Entry No. 1099-2 at 36) (emphasis added). The Tiered System is

---

[2] "The first one to plead his cause seems right, until his neighbor comes and examines him." (Proverbs 18:17).

[3] These are: Not policing differently based on message/race/neighborhood; only conducting arrests where there is individualized probable cause; documenting the identity of a processing officer who records an arrest; the Red Light/Green Light concept; the form and method of dispersal orders; baton strike policy; bicycle use policy; chokehold policy; encirclement policy; OC (pepper) spray policy; medical attention policy; TRI policy; duty to intervene policy; BWC policy; and refresher training policy. (*See* Docket Entry No. 1099-2, Paragraphs 13, 31, 32, 61, 65, 66, 67, 68, 69, 70, 71, 76, 80)

explicitly designed to account for fluid situations and to allow the NYPD to rapidly adjust its response and deployment decisions in light of the realities on the ground. This language makes clear that the PBA's presentation of the Tiered System as a highly graded, rigid, vertical protocol is entirely incorrect. The NYPD begins its response "at the lowest *applicable* tier"-- meaning that the NYPD responds to the scene appropriately as dictated by the situation at the scene.

Further, the NYPD's movement between the tiers is fluid and non-graduated "as appropriate based on the conditions." Therefore, the idea that hours of consultation between police officials would need to occur for a protest to move from Tier One to Tier Four runs counter to the explicit language of the Agreement. An FAA may begin at Tier Four; or it may begin at Tier Two and move to Tier Four; or it may begin and stay at Tier One; or it may begin at Tier Three and be downgraded to Tier Two. The intent is to balance the safety of officers, the non-participating public, and the First Amendment rights of protestors.

The Settlement Agreement, here and throughout its provisions, provides the discretion necessary to NYPD officials to comply with their duty pursuant to Paragraph 19 of the Settlement Agreement, which is to at all times be able to appropriately enforce the law. Mr. Anemone's Declaration uses the language of the NYPD only being able to "move to" a higher Tier to mistakenly convey the idea of a vertical system where one can only graduate from Tier One to Tier Two, and from Tier Three to Tier Four. (Anemone Decl. at ¶¶ 18, 20, and 22). That implication is inaccurate and counter to the agreement of the settling parties. Indeed, Mr. Anemone's "understanding" is completely counter to the words written on the settlement papers.

B.     *Red Light/Green Light*

The Red Light/Green Light protocol sets forth that for certain offenses committed at an FAA, officers must obtain supervisory approval before placing an individual under arrest.

This protocol is not new. To the extent that Mr. Anemone did not know that fact, he cannot be faulted because it was developed after 1999 when Mr. Anemone was last at the NYPD. The Red Light/Green Light protocol was existing policy at the time that the parties began their negotiations, and as such, cannot form the basis of any valid objection by the PBA.

C.    *The Collaborative Committee*

Here again, the PBA gives the Court a highly skewed picture of the Collaborative Committee and oversight provisions of the Settlement Agreement. The Collaborative Committee process developed by the settling parties was specifically formulated to avoid the PBA's imaginary "unwieldy and impractical [regime that] will call upon the Court to resolve claims of non-compliance with every "material" term in this extensive agreement." (Docket Entry No. 1120 at p.16).

The Oversight portion of the Settlement Agreement is divided into three phases. Phase I, in essence, allows the NYPD to develop training and policy consistent with the terms of the Settlement Agreement. The only time that a motion can be made to the Court in Phase I is in the event that, after a lengthy meet-and-confer process, plaintiffs believe in good faith that defendants drafted training materials omitting or violating *material* terms of the Agreement. Importantly, the *plaintiffs bear the burden* to show that the relevant materials are in violation. Defendants note to the Court that paragraph 138 of the Settlement Agreement provides that any party prevailing on motion practice collects prevailing party costs. Plaintiffs are incentivized against bringing frivolous motions not only by the burden of proving a material breach, but also by paying costs to defendants in the event that plaintiffs lose such a motion.

Phase II is the collaborative review phase. Here, the New York City Department of Investigation ("DOI") will chair a committee made up of the settling parties including the

Unions (SBA and DEA) who are signatories to the Settlement Agreement. The PBA expresses umbrage at its exclusion from the Collaborative Committee. By refusing to sign the Settlement Agreement the PBA has removed itself as a party to that settlement. It seems inconsistent then for the PBA to seek to insinuate itself into a large part of the Settlement Agreement. Indeed, the Collaborative Committee-- as the name suggests-- is aimed to build upon and improve. The PBA's objections to the Settlement Agreement seem calculated instead to dismantle. By contrast, the SBA and the DEA as signatories to the Settlement Agreement will be part of the Collaborative Committee to presumably protect the interests of their respective members.

Regardless, Phase II establishes the Collaborative Committee. That phase will last no longer than 36 months. Phase II allows DOI to examine NYPD's enactment of the terms of the Settlement Agreement through its review of twelve (12) selected FAAs. During this Collaborative process, the settling parties (including two unions), along with DOI, will examine compliance as well as whether the terms laid out in the Settlement Agreement are working or not. The DOI shall only review these FAAs with respect to a list of discrete factors laid out in Paragraph 115 of the Settlement Agreement. Importantly, and counter to the assertion of the PBA, any motions made by plaintiffs would be made sparingly and within stringent guidelines. (Docket Entry No. 1099-2, ¶124).

Plaintiffs would have the burden of showing a *material* breach by defendants, which was not solved by a meet-and confer. Further, the motion can only be made on the basis of those factors that are reviewed by DOI pursuant to paragraph 115; the only exceptions are if the NYPD has essentially abandoned the Collaborative Process, or has started to promulgate policies and procedures that plainly run counter to the Settlement Agreement. Furthermore, plaintiffs may, under *no circumstances* request that the Court modify or revise the terms or length of this

Agreement. This makes clear that in Phase II, motions may be made only in the most extreme of circumstances, and even in those circumstances, plaintiffs seek only a narrowly tailored remedy, if any is required.

As to Phase III, this is the "passive oversight" phase. It lasts for twelve (12) months. Once this Phase begins, the Collaborative Committee no longer convenes. The Court retains jurisdiction only to allow plaintiffs to file a motion if they can demonstrate a *material breach* of the Settlement Agreement-- such as the NYPD simply deciding to drop the Tiered System. Plaintiffs may only request *tailored relief appropriate to cure the alleged material breach, and may not request modification or revision of the length of the Settlement Agreement.* (Docket Entry No. 1099-2, ¶130). Again, all three Phases allow for a prevailing party to recover costs as a means to deter any party from filing a frivolous motion.

Moreover, the material breach language; the burden on the moving party to show a material breach; prevailing party costs to avoid frivolous motions; and sunset times for Phase II and Phase III, are all specifically designed to avoid enormous expense to the taxpayers of the City of New York-- the kind of enormous expense often associated with substantial compliance monitorships with no set timeframes.

Therefore, the PBA was simply wrong in its description of a regime under which the Court would be mediating daily or weekly disputes between the parties (as unfortunately occurred in discovery in this matter). The parties came to a Settlement Agreement with protections designed to specifically prevent a repeat of history. The Court's attention will be sought in the most dire of circumstances, and thus rarely.

Here, it is important to note that the settling parties have achieved what few other police-related civil rights equitable resolutions have done in the country. They have avoided a

costly, lengthy, cumbersome monitorship. And in its stead, they have agreed to a collaborative process to be chaired by a reputable City agency renowned for its fairness and investigatory prowess. The Court is called upon to do what it would do in any litigation involving a contract-- to resolve violations of alleged material breaches. The structure worked out by the settling parties will save the taxpayers money, reduce the burden of the Court, and allow the parties to collaborate and work together toward creative solutions rather than to be locked in an eternally adversarial relationship/monitorship.

## II.      *United States v. Albuquerque*

As the Court has stated, the issues raised by the PBA seem to be "questions of first impression" in the Second Circuit. (Docket Entry No. 141). However, in at least one other jurisdiction, a court did address similar concerns to those raised here. Defendants wish to draw the Court's attention to a decision, dated June 12, 2020, from the United States District Court of the District of New Mexico. *United States v. City of Albuquerque*, No. Civ. 14-1025, 2020 U.S. Dist. LEXIS 103158. In that matter, the Federal Government launched an investigation into allegedly unconstitutional policies and practices of the Albuquerque Police Department ("APD"). After lengthy settlement negotiations, just as here, the Federal Government entered into a Settlement Agreement with the APD.  Pursuant to that agreement, certain reform measures were to be carried out in phases. One of the phases required the APD to revise its Use of Force Policy. In 2019, the Federal Government and the APD agreed on revisions, and the Albuquerque Police Officers Association ("APOA") objected and filed a motion to intervene and strike the settlement claiming that the terms violated their Collective Bargaining Agreement ("CBA").[4]

---

[4] Defendants acknowledge the differences between the APOA's standing and the PBA's standing here. Here, the PBA is already an Intervenor Defendant as directed by the Second Circuit's decision. However, the APOA asserted many of the same arguments that the Second Circuit found compelling in granting the PBA's motion to intervene-- particularly those arguments having to do with an interest at both the merits and remedy stages of the litigation.

The court in *City of Albuquerque* said, essentially, that one party cannot block others from entering into a settlement agreement. Specifically, the court laid out that:

> ""It has never been supposed that one party -- whether an original party, a party that was joined later, or an intervenor -- could preclude other parties from settling their own disputes and thereby withdrawing from litigation." *Local No. 93 v. Cleveland*, 478 U.S. at 528-29. An intervenor, therefore, is entitled to "present evidence and have its objections heard at the hearings on whether to approve a consent decree," but "it does not have power to block the decree merely by withholding its consent." *Local No. 93 v. Cleveland*, 478 U.S. at 529. **Allowing [a party] to intervene does not mean that it can veto the settlement . . . The district court can still approve the consent decree if it finds that the settlement is reasonable, fair and consistent with [federal law]."** *WildEarth Guardians v. United States Forest Serv.*, 778 F. Supp. 2d at 1149 (quoting *United States v. Albert Inv. Co.*, 585 F.3d 1386, 1398 (10th Cir. 2009)(internal citations omitted)). Nonetheless, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, **these claims remain and may be litigated by the intervenor.** *Local No. 93 v. Cleveland*, 478 U.S. at 529."

*United States v. City of Albuquerque*, 2020 U.S. Dist. LEXIS 103158, *169-170 (emphasis added)

In analyzing settlement agreements in particular, the court went on to say:

> "Intervention gives the Officers Association merely the right to present its Objections to the Court. It does not make the Officers Association a party to the Settlement Agreement, nor does it give the Officers Association the ability to override the Settlement Agreement. Of course, the Court could reject the Original Settlement Agreement based on the Officers Association's Objections."

*United States v. City of Albuquerque*, 2020 U.S. Dist. LEXIS 103158, *247

The judge in *City of Albuquerque* faced  questions very similar to the ones faced by the Court here. A police union with the right to intervene essentially sought to prevent the plaintiffs and the defendant APD from reaching a settlement that the settling parties believed was fair and reasonable. The Court in *City of Albuquerque* laid out that intervention status is not a

---

Moreover, the Settlement Agreement in the matter before this Court is not a consent decree.

*carte blanche* allowing the intervenor-defendant the ability to veto a settlement. Rather, the court could allow the parties to settle over the objection of the intervenor if the court believed that the settlement was reasonable, fair, and consistent with federal law.

Here, the Settlement Agreement is reasonable, fair, and consistent with federal law. It was negotiated over fifteen (15) months by the plaintiffs, defendants (including representatives of the NYPD), all intervenor unions, and with the assistance of the head of the SDNY's Mediation Office. The NYPD was involved and apprised of the negotiations throughout. At the end of the process, plaintiffs, the NYPD, defendants, and the unions representing the Sergeants and Detectives agreed to the terms of this Settlement. The only party opposing was the PBA. Should the Court request additional briefing with regard to the scope, nature, and commentary of the PBA throughout the negotiations, defendants can provide that under seal so as not to run afoul of confidentiality agreements that are a standard part of SDNY mediations and were signed by all participants to this process, including the PBA.

Defendants submit that if the Court reviews the terms of the Settlement Agreement, the terms are, on their face, fair, reasonable, and consistent with federal law. Nothing within this Agreement imposes an undue burden on officers beyond the inherent risk of being a New York City Police Officer. Moreover, the Collaborative Committee process, chaired by the DOI Commissioner, is intended to be sure that the terms of the Settlement Agreement are fair and reasonable not just on their face, but in actual practice.

## III.    Answers to the Court's Questions

In its Orders dated, September 11, 2023 and September 18, 2023, the Court posed the following questions:

1.  Was the PBA involved in settlement negotiations and to what extent?;

2. Does the grant of intervention mean that the PBA can veto any settlement in the cases seeking injunctive relief that it does not like?

    a. If so, does that mean that an intervening party like the PBA can force the rest of the litigants to try those cases on the merits? How about force them to try as to remedy only?

    b. If intervention does not give the PBA the power to veto a settlement among the rest of the parties to the settling lawsuits, do we handle this in the usual way, which is to enter the settlement among the agreeing parties and take the four cases to trial against the PBA lone?

    c. If so, wouldn't that scuttle the settlement, since the results in any trial among fewer than all parties could impact the remedy to which the settling parties agreed?

3. Is the PBA's disagreement with a settlement agreed to by the City and other unions a labor relations issue, rather than a litigation issue?

4. What does the PBA have to demonstrate in order to establish that its members are prejudiced by the settlement? How can the union satisfy that burden? Are we required to hold a hearing with witnesses? If so, who would those witnesses be?

5. What if any obligations does the settlement impose on the PBA or its members?

6. How exactly is the PBA (or its membership) prejudiced by the terms of the proposed settlement?

    *1.   Was the PBA Involved In Settlement Negotiations And To What Extent?*

Yes, and a lot. Defendants are careful in answering this question because the negotiations in this matter were confidential. However, defendants can state that there were more than fifty (50) settlement sessions between June 2022 and September 2023, and hundreds of emails. The PBA attended almost every session, and was copied on every email that contained drafts of new language being negotiated. Again, the PBA *attended* almost every session.[5] In the more than one year of settlement negotiations, if the PBA truly believed that what was being

---

[5] If the Court wishes for briefing on the extent of their *participation* or *involvement*, defendants would request permission to do so under seal so as not to run afoul of confidentiality agreements that are a standard part of SDNY mediations and were signed by all participants to this process, including the PBA.

structured was a danger to its members, it should have raised this concern with the Court months ago.

2.   *Does the grant of intervention mean that the PBA can veto any settlement in the cases seeking injunctive relief that it does not like- and related questions*

It does not. It is simply counterintuitive to allow one party to veto a settlement and force all other parties to continue to litigate at their own expense and litigation risk. Rather, based on the reasoning in *City of Albuquerque*, it is up to the Court to decide if the Settlement Agreement is fair, reasonable, and consistent with federal law-- which it is. As an initial matter, here, none of the PBA's arguments speak to the relevant threshold questions of fairness, reasonableness, and consistency with federal law; and as such its motion should be denied.

Moreover, defendants (and presumably plaintiffs, the DEA, and the SBA), like any party to a settlement, weighed all risk factors before settling: The probability of a successful motion; the probability of a successful verdict before a jury; the probability of what equitable relief a Court could impose, including a monitorship. The settling parties weighed all these risks against the proposed terms of the Settlement Agreement. Defendants further considered what were new terms, and what was already existing NYPD policy. Here, plaintiffs agreed to dismiss all claims with prejudice in consideration for the terms of the Settlement Agreement.

3.   *Is the PBA's disagreement with a settlement agreed to by the City and other unions a labor relations issue, rather than a litigation issue?*

This disagreement is definitely not a litigation issue. As to whether the PBA could successfully raise collective bargaining issues, it is doubtful, but not within the scope of this litigation. The Tiered System addresses the deployment of officers. Individual police officers do not make deployment decisions; rather, those are decisions made by their supervisors. To the extent that the PBA believes that the Settlement Agreement imposes additional duties on its members by virtue of its deployment regime, such questions would be resolved within the scope of a CBA dispute.

Further, it is worth noting that any purported injury to the PBA is at this point speculative.

> To establish Article III standing, "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 1548.
>
> *Kallas v. Egan*, 842 Fed. Appx. 676, 678

Indeed, PBA does nothing in its motion to establish that any "new danger" has been established that goes beyond the inherent risks of being a Police Officer.

4.   *What does the PBA have to demonstrate in order to establish that its members are prejudiced by the settlement? How can the union satisfy that burden? Are we required to hold a hearing with witnesses? If so, who would those witnesses be?*

According to *City of Albuquerque,* the PBA would have to demonstrate that the settlement is unfair, unreasonable, and inconsistent with federal law. It has failed to do that in its brief. Rather, with no evidentiary support or supporting caselaw, it has only contested that the Tiered System allegedly jeopardizes officer safety and that the Oversight phase imposes an

14

undue burden on the Court.  The PBA has not made out even the threshold showing to trigger the Court's review of the relevant questions.

Furthermore, the Second Circuit has set forth that the proper question to consider as to whether a non-settling party can challenge a settlement  is if "it can demonstrate that it will sustain some formal legal prejudice as a result of the settlement." *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014). Where, as here, the opposing party has asserted neither claims nor counter-claims against any party, it could not suffer prejudice. *Rhoden v. Mittal*, 2020 U.S. Dist. LEXIS 250486 at *6 (E.D.N.Y. 2020). Further, the prospect of starting a litigation "all over again" does not constitute a formal legal prejudice. *D'Alto v. Dahon California, Inc.*, 100 F.3d 281, 283 (2d. Cir. 1996). Under this standard as well, PBA's motion fails to raise any relevant objection.

Although not directly on point, the Court may want to consider *United States v. City of New York,* which was a Title VII class action settlement. There, the Honorable Nicholas G. Garaufis set forth the standard as whether "the proposed agreement is lawful, fair, reasonable, adequate, consistent with the public interest, and not the product of collusion, and whether any of the objections thereto has sufficient merit to overcome the presumption of validity accorded to the relief agreement; this standard has been applied to Rule 23 settlements as well as to Title VII actions." *United States v. City of New York,* 308 F.R.D. 53, 62-64 (E.D.N.Y. 2015).

Here, defendants note that most of the caselaw cited by the PBA in its papers is totally irrelevant to the matter at hand. *Paysys Int'l Inc. v. Atos IT Servs. Ltd.* has to do with who should be considered a prevailing party (for the question of awarding costs and fees) where a party voluntarily dismissed their case, not subject to a settlement agreement. *Paysys Int'l Inc. v. Atos IT Servs. Ltd.*, 901 F.3d 105, 109 (2d Cir. 2018)

*Shaw Fam. Archives, Ltd. v. CMG Worldwide, Inc.* similarly has to do with a party dismissing a case voluntarily- again, not pursuant to a settlement agreement. *Shaw Fam. Archives, Ltd. v. CMG Worldwide, Inc.,* No. 05 CV 3939, 2008 WL 4127549 (S.D.N.Y. Sept. 2, 2008)

*Galasso v. Eisman, Zucker, Klein & Ruttenberg*, like *Paysys*, has nothing to do with settlement agreements and has only to do with a voluntarily dismissal where a party was attempting to withdraw their action to avoid an adverse finding by the Court. *Galasso v. Eisman, Zucker, Klein & Ruttenberg,* 310 F. Supp. 2d 569 (S.D.N.Y. 2004)

5.   *What if any obligations does the settlement impose on the PBA or its members?*

This Settlement Agreement imposes no obligations on the PBA itself. The PBA is not a signatory to the Settlement Agreement. With regard to its membership, the Settlement Agreement imposes the same obligations that exist as to any Police Officer-- the obligation to be trained on current police procedure, to abide by those procedures, and to follow the chain of command.  Moreover, two other unions agreed to the terms of this Settlement.  Those two unions will be part of the Collaborative Committee and will presumably protect the interests of their membership by participating in that process.

6.   *How exactly is the PBA (or its membership) prejudiced by the terms of the proposed settlement?*

Defendants submit that the terms of the Settlement Agreement prejudice neither the PBA nor its membership.

**<u>CONCLUSION</u>**

For the foregoing reasons, defendants respectfully request that the Court deny the

PBA's motion to reject the proposed settlement, together with such other and further relief as the

Court deems just and proper.

Dated:        New York, New York
              November 3, 2023

                                HON. SYLVIA O. HINDS-RADIX
                                CORPORATION COUNSEL OF THE CITY OF NEW YORK
                                *Attorney for Defendant City of New York*
                                100 Church Street
                                New York, New York 10007
                                (212) 356-2345


                        By:     */s/ Patricia Miller*
                                Patricia Miller
                                *Division Chief*
                                Omar J. Siddiqi
                                *Senior Counsel*
                                Special Federal Litigation Division


c:        All counsel of record (by ECF only)