UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re: New York City Policing During Summer 2020 Demonstrations | 20-cv-8924(CM) |
|---|---|

THE POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.'S REPLY MEMORANDUM OF LAW IN OPPOSITION TO PROPOSED SETTLEMENT

**SCHLAM STONE & DOLAN LLP**

Richard H. Dolan
Thomas A. Kissane
26 Broadway, 19th Floor
New York, NY 10004
Tel:    212-344-5400
Fax:    212-344-7677
Email: rdolan@schlamstone.com
Email: tkissane@schlamstone.com

-and-

**LAW OFFICES OF ROBERT S. SMITH**

Robert S. Smith
7 Times Square, 28th Floor
New York, NY 10036
Tel.: 917-225-4190
Email: robert.smith@rssmithlaw.com

*Attorneys for Intervenor the Police Benevolent Association of the City of New York, Inc.*

# **TABLE OF AUTHORITIES**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.      THE SCOPE OF THE COURT'S REVIEW .................................................................... 3

        A.     Plaintiffs' Argument That The PBA Lacks Standing To Raise Objections Should Be Rejected ........................................................................................................... 3

        B.     Review of the Proposed Settlement Under The City's "Fair And Reasonable' Standard Requires Consideration Of Whether Officer Safety Is Impaired............. 5

II.     THE MERITS OF THE PROPOSED SETTLEMENT ....................................................... 7

        A.     Plaintiffs Fail to Refute the PBA's Showing That the Proposed Settlement Jeopardizes the Safety Of Officers And the Public ............................................... 7

        B.     The City Defendants Also Fail In Their Defense Of The Proposed Settlement ... 11

III.    THE BURDENS THE PROPOSED SETTLEMENT WOULD IMPOSE ON THE COURT ................................................................................................................................ 14

CONCLUSION ............................................................................................................................. 16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bhatia v. Piedrahita*,
  756 F.3d 211 (2d Cir. 2014)......................................................................................................... 3, 6

*In re New York City Policing During Summer 2020 Demonstrations*,
  537 F. Supp. 3d 507(S.D.N.Y. 2021)............................................................................................ 3

*In re New York City Policing During Summer 2020 Demonstrations*,
  27 F.4th 792 (2d Cir. 2022) .......................................................................................................3-5

*United States v. City of Albuquerque*,
  No. Civ. 14-1025, 2020 U.S. Dist. LEXIS 103158 (D.N.M. June 12, 2020) .......................... 6, 7

*United States v. City of New York*,
  308 F.R.D. 53 (E.D.N.Y. 2015) .................................................................................................... 6

## INTRODUCTION

Intervenor The Police Benevolent Association of the City of New York, Inc. ("PBA") respectfully submits this reply memorandum in further support of its motion to reject the Proposed Settlement, and in response to the opposing submissions of Plaintiffs[1] and the City of New York defendants (the "City Defendants").[2]

The opposing submissions make one thing clear: the parties to the Proposed Settlement have different understandings of its fundamental nature. The City Defendants say: "the PBA's argument that this entire Settlement Agreement … represents a reckless novel form of policing has no basis in fact." (City Def. Br., p. 4.) But when the Proposed Settlement was announced, Plaintiffs told the public: "Today's settlement represents a novel approach to policing protests." https://www.nyclu.org/en/press-releases/nyclu-legal-aid-society-and-attorney-general-james-announce-agreement-nypd-reform.

On this question, Plaintiffs are right and the City is wrong. The settlement is a radical departure from well-established methods of policing, chiefly in binding the NYPD to a rigid "tiered" approach in which the City will be, in many cases, forbidden from taking common-sense measures to protect lives and property. So far as we know, no jurisdiction anywhere has adopted so extreme an approach; neither Plaintiffs, their expert, nor the City Defendants cite any example.

---

[1] Plaintiffs' papers consist of the Consolidated Plaintiffs' Memorandum Of Law In Opposition To Intervenor Police Benevolent Association's Motion To Reject The Settlement Agreement ("Pl. Br.", ECF No. 1127), the Declaration of Hassan Aden, with exhibits ("Aden Dec.", ECF No. 1128), and the Declaration of Corey Stoughton, with exhibits (ECF No. 1129).

[2] The City Defendants' papers consist of a Memorandum Of Law In Opposition To The Police Benevolent Association Of The City Of New York, Inc.'s Motion To Reject Proposed Settlement ("City Def. Br.", ECF No. 1130).

It is irrelevant that, as its proponents argue, the procedures mandated by the Proposed Settlement may sometimes, or often, be appropriate, or that the NYPD now can and does follow those procedures when circumstances warrant. There is a world of difference between having discretion, for example, to maintain a minimal police presence, or none, at the outset of a protest and being compelled by a judicially approved settlement to do so until the protest turns violent. The rigidity of the Proposed Settlement creates grave dangers to police officers and the public – a problem that the parties favoring the settlement do not adequately address.

## **ARGUMENT**

Plaintiffs and the City Defendants offer different views as to what standard the Court should apply on this motion. Plaintiffs argue that the PBA lacks standing to raise any objections, while the City Defendants acknowledge that the Court should consider whether the terms of the Proposed Settlement are fair and reasonable.

Plaintiffs' position is inconsistent with the Second Circuit's decision allowing the PBA to intervene. The PBA has proposed, and continues to support, a stricter test than the City Defendants do – whether the Proposed Settlement materially affects officer safety – but, under the circumstances here, that will differ little in practical application from the City's "fair and reasonable" standard. No one argues, or could seriously argue, that a material impairment of officers' safety is "fair and reasonable" – at least not where, as here, no party has even tried to show the sort of egregious pattern and practice of police misconduct that might justify such a step.

Whatever standard the Court applies, so long as it recognizes that the PBA has standing to have its views considered, the Proposed Settlement fails. Neither Plaintiffs nor the City

Defendants have refuted the PBA's showing of the unwarranted risks the Proposed Settlement poses to the safety of its member officers and the public.

## I. THE SCOPE OF THE COURT'S REVIEW

### A. Plaintiffs' Argument That The PBA Lacks Standing To Raise Objections Should Be Rejected

Plaintiffs argue that, in recognizing the PBA's right to participate in the litigation, the Circuit did not intend that its officer safety concerns should be considered by this Court in assessing any potential settlement absent "formal legal prejudice," which in Plaintiffs' view means the stripping of a legal claim or defense. Pl. Br., pp. 6-12 (citing, inter alia, *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014)). But the Circuit's reason for granting intervention was that "changing the policies that govern officer conduct may affect officer safety", *In re New York City Policing During Summer 2020 Demonstrations,* 27 F.4th 792, 804 (2d Cir. 2022), and it held that the PBA had a protectable interest in "[t]he nature and scope of any injunctive relief" or "accommodations" reached, such as those in the Proposed Settlement. 27 F.4th at 802. Indeed, this Court itself found that "The PBA 'might have an interest'" supporting intervention "'if the parties were to propose a settlement that would result in changes to NYPD tactics/personnel procedures . . .'". 27 F.4th at 798, quoting, *In re New York City Policing During Summer 2020 Demonstrations* 537 F. Supp. 3d 507, 512(S.D.N.Y. 2021). That, of course, is precisely what we now have.

Neither *Bhatia* nor any of the other cases Plaintiffs cite in arguing that this Court should not even consider the PBA's concerns (Pl. Br., pp. 6-11) involved a situation where the Circuit had already made plain that it should. They are therefore irrelevant to the questions before the Court.

3

Plaintiffs fare no better in arguing that the numerous changes to NYPD policy that they concede are called for by the Proposed Settlement (Pl. Br., p. 9) do not matter, because the Proposed Settlement does not "create any new duties or obligations for individual members of service at the patrol officer level". *Id*. This is not true -- the PBA's members have "duties and obligations," as a condition of their employment, to comply with directives issued by their superior officers in accordance with the Proposed Settlement's labyrinthine requirements. The Proposed Settlement's "changes to the policies that govern officer conduct," recognized by the Circuit, are the subject matter of the present motion, and the argument that this Court cannot consider them is untenable.

Plaintiffs' misreading of the Circuit's decision also underlies – and overthrows – their argument that the Proposed Settlement does not implicate protectable interests of the PBA because the "Second Circuit's ruling speaks primarily to the PBA's interest in preventing a *judgment* that would declare certain policies unlawful", Pl. Br., p. 12 (emphasis in original), and the Proposed Settlement does not address the lawfulness of prior policing policies.[3] Contrary to Plaintiffs' characterization, the Circuit found that the PBA should be allowed to intervene at the merits phase specifically *because it had an interest in any policy changes that might result from a finding of liability*. The Circuit directly confirmed that the *alteration* of policies – as would be accomplished by the Proposed Settlement – was the more significant interest:

> The merits question before the district court is whether certain NYPD policies are permissible. The answer to that question may require a change in those policies. And changing the policies that govern officer conduct may affect officer safety. That means the litigation—at the merits phase—may impair the PBA's interest.

---

[3] The City Defendants not only refrain from joining this argument, they contradict it, saying, correctly, that "the Second Circuit granted intervention to the PBA at least in part to prevent the City from entering into a politically motivated settlement." City Def. Br., p. 3

4

27 F.4th at 800; see also, *id.* at 798 (noting PBA's position that it should be allowed to intervene "[b]ecause any conclusions of the district court on the merits *would affect the scope of a resulting settlement agreement between the parties* and would constrain the policy options available for new rules of engagement" (emphasis supplied); and at 801 (recognizing the PBA's right "to contest the proposition that the challenged policies are unlawful *and should be changed*.") (emphasis supplied.)

Nor does the PBA's participation in mediation prevent it from raising objections to the Proposed Settlement. All parties agree that, given applicable confidentiality rules regarding mediation, disclosure of the proposals and objections that were exchanged during mediation would be inappropriate. The PBA submits that such a disclosure would also be irrelevant. The salient facts about the Proposed Settlement are that it says what it says, and that the PBA has not agreed to it. It does not matter how much or little the PBA was permitted to or did say about the defects of the proposals made during the negotiations (in fact, it said a lot), or how attentively the other parties did or did not listen, when they did not address the PBA's concerns.

Plaintiffs' argument essentially boils down to the contention that the Circuit intended the PBA to be allowed into this proceeding in a manner reminiscent of certain types of relationship therapy, where the only goal is for the complainant to "be heard", even though no one can offer solutions to the problems presented. But the Circuit's decision cannot fairly be read to contemplate a merely therapeutic form of intervention. The Proposed Settlement should be considered – and, we submit, rejected – on its merits.

### B.  Review of the Proposed Settlement Under The City's "Fair And Reasonable" Standard Requires Consideration Of Whether Officer Safety Is Impaired

Unlike Plaintiffs, the City Defendants recognize a standard of review that would allow the PBA's objections to be considered by the Court. See, e.g., City Def. Br. at 9-11 (calling

Court's attention to *United States v. City of Albuquerque*, No. Civ. 14-1025, 2020 U.S. Dist. LEXIS 103158 (D.N.M. June 12, 2020) as presenting "questions very similar to the ones faced by the Court here"); City Def. Br. at 13 ("based on the reasoning in *City of Albuquerque*, it is up to the Court to decide if the Settlement Agreement is fair, reasonable, and consistent with federal law"); *id.* at 14 ("According to *City of Albuquerque*, the PBA would have to demonstrate that the settlement is unfair, unreasonable, and inconsistent with federal law.")  See also City Def. Br. at 15 (directing Court to *United States v. City of New York,* 308 F.R.D. 53, 62-64 (E.D.N.Y. 2015), which considered proposed settlement under standard of whether it was "lawful, fair, reasonable, adequate, consistent with the public interest, and not the product of collusion, and whether any of the objections thereto has sufficient merit to overcome the presumption of validity accorded to the relief agreement.")[4]

The PBA has proposed a standard of review more closely tailored to the specific reason the PBA was allowed to intervene in this case: we submit that any settlement that materially impairs the safety interests of the PBA's members would be inconsistent with the rationale of the order permitting intervention. *See* PBA's Memorandum Of Law In Support Of Motion To Reject Proposed Settlement (ECF no. 1120) ("PBA Br."), pp. 3-5. The difference between this standard and the City's "fair and reasonable" standard is academic here, however. No party suggests that a material impairment of officers' safety interests would be "fair and reasonable" on the facts of this case. No party has even tried to show, on this motion, that there is merit to Plaintiffs' claim that there has been a pattern and practice of constitutional violations for which the City is liable –

---

[4] The City Defendants make a passing reference to *Bhatia v. Piedrahita* and related cases on which Plaintiffs rely in seeking to prevent the PBA's objections from being considered by the Court.  City Def. Br., p. 15.  To the extent the City Defendants join in Plaintiffs' argument that the PBA's objections should not be considered by the Court, that argument should be rejected for the reasons discussed above at p. 3.

much less the kind of abuse that might justify putting officer safety at risk. Indeed, at least the City takes the opposite approach – seeking not to magnify the seriousness of Plaintiffs' claims, but to trivialize the changes made by the Proposed Settlement. There's nothing to see here, the City suggests – just a codification of best policing practices. We demonstrate below why this is wrong.

Accordingly, we do not oppose the City's suggestion that the Court consider this motion under the "fair and reasonable" standard employed in *City of Albuquerque*, a standard which necessarily gives significant weight to officer safety concerns. Specifically, we endorse, as applicable to this case, the following quotation from *City of Albuquerque,* which appears at p. 10 of the City Def. Br:

> Intervention gives the Officers Association merely the right to present its Objections to the Court. It does not make the Officers Association a party to the Settlement Agreement, nor does it give the Officers Association the ability to override the Settlement Agreement. **Of course, the Court could reject the Original Settlement Agreement based on the Officers Association's Objections.**

*City of Albuquerque*, 2020 U.S. Dist. LEXIS 103158 at *247 (emphasis supplied).

## II. THE MERITS OF THE PROPOSED SETTLEMENT

Plaintiffs and the City Defendants argue that the Proposed Settlement is fair, reasonable and in the public interest because it enhances officer (and, at least by implication, public) safety and is not impractical. These contentions cannot survive review of the Proposed Settlement's terms and the realities of policing public protests.

### A. Plaintiffs Fail to Refute the PBA's Showing That the Proposed Settlement Jeopardizes the Safety Of Officers And the Public

Plaintiffs' defense of the Proposed Settlement on the issue of officer safety is premised on mischaracterizations of its terms and the PBA's objections.

7

First, Plaintiffs argue that the Proposed Settlement adopts:

> current nationally accepted policing best practices including community engagement before and during the events, an emphasis on de-escalation, minimizing the use of mass arrests in favor of focused enforcement action, a 'graded'" or multitiered response system, and a process for review and improving police response to protests.

Pl. Br., p. 17. But Plaintiffs never identify with any specificity the "nationally accepted" practices they are talking about; they never explain how present NYPD policy falls short of those "best practices"; and they do not identify a single community in the entire nation that has adopted anything similar to the mandatory tiered structure in the Proposed Settlement.

Plaintiffs assert that their vaguely described "best practices" are in contrast to the "escalated force model proposed by the PBA and its declarant, Louis Anemone" which they say is outmoded, and leads to a "cycle of tension and violence". *Id.* at 18. This misrepresents the PBA's position and Chief Anemone's opinion. The PBA does not object to the Proposed Settlement because it employs community engagement, de-escalation, minimization of mass arrests or review and improvement of police response. All of those things are and have long been part of the NYPD's approach to policing public protests. See, Reply Declaration of Louis Anemone dated November 15, 2023 ("Anemone Reply Dec."), ¶12.

The PBA does not advocate an "escalated force model" or "mass arrests" or "negotiated management model." Anemone Reply Dec. ¶¶2-3. What the PBA does advocate is common-sense, case-by-case decision-making, in which officers' safety is not endangered by unjustified and unreasonable limitations on deployment, resources, and discretion, as in the Proposed Settlement. The main difference between the approach embodied in the Proposed Settlement and the one the PBA advocates is that the former micromanages the policing of protests with rigid rules that will often prevent measures necessary for the protection of officers and the public.

8

Specific provisions of this kind are identified in the PBA's previous submissions, but Plaintiffs (and the City Defendants) leave them largely unaddressed. Nor do Plaintiffs offer any coherent overall defense of, or any precedent for, the overall rigidity of the Proposed Settlement's tiered approach.

More specifically, Plaintiffs make no attempt to explain why it makes sense to impose a near-absolute prohibition, at the Tier I stage, to the presence of any police other than community liaison officers at an FAA (¶¶38-42), and to require, even in Tier II, that absent extraordinary circumstances any police be kept out of sight (¶46). Chief Anemone's first declaration details how an early and obvious police presence is critical to deterring violence in certain circumstances. Anemone Dec. ¶¶29-30. Plaintiffs and their expert do not assert that no such circumstances can occur.

Plaintiffs' pious tributes to community engagement and disapproval of "escalated force" do not answer specific questions – including ones that require no expertise to ask, e.g.: Would it not have been better to have more police at the Capitol *before* the demonstration of January 6, 2021 became lawless? And how would police have coped with the recent, chaotic demonstrations relating to the events in Israel and Gaza, if no officers (other than community liaisons) could show their faces until crimes were actually committed? Nor do Plaintiffs explain why a police officer is forbidden to make an arrest without obtaining a higher-up's approval when a crime as serious as first degree riot or first degree trespass is committed in his or her presence. See PBA Br., pp. 12-13. The likely reason why Plaintiffs do not answer these questions: No good answers exist.

In short, Plaintiffs' attack on an "escalated force model" that no one favors is a straw man, evidently intended to distract attention from their failure to address the Proposed Settlement's flaws.

Plaintiffs also fail in their attempt to denigrate Chief Anemone's expertise and credibility. Pl. Br., pp. 18-19. As set forth in his first declaration, Chief Anemone's decades-long experience as a leading figure in the NYPD's policing of public protests – both in planning, and on the ground – clearly supports his authority to address the subject. By contrast, the expert proffered by Plaintiffs served in relatively small communities in Virginia and North Carolina, and does not claim any hands-on experience in the policing of large protests. And this out-of-town expert is the *only* one proffered to defend the Proposed Settlement. The City Defendants – who include many, and have access to all, of the NYPD's leadership, with their vast experience – present no declarant. (See the following subsection.)

Chief Anemone has kept abreast of policing matters since his retirement, both through numerous pertinent consulting engagements and as a professor of criminal justice. Anemone Reply Dec., ¶¶5-8.  Plaintiffs' attempt to discredit him precisely *because* he has experience with New York policing of protests, Pl. Br., p. 19, is nonsensical – especially because neither Plaintiffs nor the City Defendants have even tried to support the Proposed Settlement with a showing that New York's policing history is marked by the kind of systemic misconduct that would support a liability finding in this case. On the contrary, a report Plaintiffs rely on shows that, where there was fault to find with the policing of the summer 2020 protests, a major cause was unreadiness for the sudden and unexpected eruption of violence – a problem that the Proposed Settlement, with its rigid insistence on minimal policing, would worsen, not solve.

"Police simply did not expect and were not prepared for the level and extent of violence they encountered. It was unlike anything they had seen in 20 years." Document 1128-5.

Plaintiffs' contention (also made by the City Defendants) that the Proposed Settlement follows existing NYPD policy with respect to Red Light/Green Light offenses, Pl. Br., p. 16, is demonstrably wrong.  In fact, there is no department-wide Red Light/Green Light policy, and to the extent such exist they do not use the Proposed Settlement's definitions of Red Light and Green Light offenses.  See deposition transcript of NYPD Chief Stephen Hughes, annexed at Exh. 2 to the declaration of Plaintiffs' counsel Corey Stoughton, at p. 127, lines 8-21 (identifying Red Light/Green Line as guidelines, not Department policy) and at p. 124, lines 3-18 & p. 125, lines 7-13 (identifying only three examples Red Light offenses -- blocking traffic, petit larceny and criminal mischief -- without mentioning the expanded list of Red Light offenses in the Proposed Settlement.)

Plaintiffs ignore many other problems with the Proposed Settlement, and mischaracterize still others. One example is particularly pertinent to officer safety.  Plaintiffs say that the Proposed Settlement "merely states that when officers are sent for traffic control purposes they should not be equipped to execute mass arrests".  Pl. Br., p. 20.   In fact, ¶41 of the Proposed Settlement makes no reference to mass arrests. It says instead that officers sent for traffic control duty "shall not carry equipment associated exclusively with [SRG] units such as flex-cuffs".  As shown at ¶ 36 of the first Anemone Dec. (7th bullet point), this will deter if not preclude the use of essential protective gear such as face shields, batons, and shields.

### B.     The City Defendants Also Fail In Their Defense Of The Proposed Settlement

The City Defendants offer little more than rhetoric and dismissive commentary (e.g., "Nothing within this Agreement imposes an undue burden on officers beyond the inherent risk of

11

being a New York City Police Officer" (City Def. Br. at p. 11) as to whether the Proposed Settlement is fair and reasonable with respect to officer or public safety. Like Plaintiffs, they leave most of the PBA's specific criticisms of the Proposed Settlement unanswered. Several of the substantive arguments the City Defendants do make overlap arguments made by Plaintiffs, and we need not repeat our responses. Other arguments are too obviously weak to require a response, but we cannot resist comment on the extraordinary assertion that "if the PBA truly believed that what was being structured was a danger to its members, it should have raised this concern with the Court months ago." (City Def. Br., pp. 12-13.) This may be the first time it has ever been argued that a party is obliged to run to court in the middle of settlement negotiations, to complain that the other parties are discussing ideas it does not like.

The City Defendants' remaining points require only brief comment. First, City Defendants have not made the requisite record supporting their assertion that various provisions they identify in their footnote 3 reflect and do not modify existing NYPD policy. But even if they had, this would raise the question why these provisions are in the Proposed Settlement.

The City Defendants argue, again at p. 4, that the Proposed Settlement cannot contain any terms that endanger officer safety because it includes boilerplate language saying that "the NYPD shall, at all times, maintain its ability to enforce the law consistent with the U.S. Constitution, the laws of the State of New York, and the New York City Charter." This is a complete non sequitur. That extremely broad language does nothing to address the specific flaws the PBA has pointed out – unless the City is arguing, absurdly, that the language it relies on negates the provisions the PBA complains of.

Next, the City Defendants argue that Chief Anemone erroneously assumed that the Proposed Settlement's tiered structure necessarily begins at Tier I and that, because it can begin

12

elsewhere and jump among Tiers, it is "explicitly designed to account for fluid situations and to allow the NYPD to rapidly adjust its response and deployment decisions in light of the realities on the ground." City Def. Br., p. 5. But ¶38 confirms that Tier I "applies, and should presumptively apply, to all FAAs, unless thresholds for another tier apply and/or protesters specifically request the presence of officers." We assume it is possible, under the Proposed Settlement, to move among Tiers in a non-linear fashion – but only where the rigid criteria for the higher tiers are met, and where the cumbersome process for escalating from one to another is observed.

Finally, the City Defendants assert that the PBA cannot object to the Proposed Settlement's restrictions on officer deployment because "Individual police officers do not make deployment decisions" and "[t]o the extent that the PBA believes that the Settlement Agreement imposes additional duties on its members by virtue of its deployment regime, such questions would be resolved within the scope of a CBA dispute." City Def. Br., p. 14. Once again, the City Defendants are, in substance, rearguing the Second Circuit's intervention decision. That decision holds that the PBA is entitled to raise safety concerns in this action, and is not to be relegated to the bargaining table.

Perhaps the most important aspect of the City Defendants' submission on this motion is something it does not contain. As we have mentioned, the City Defendants proffer no declarant – not a single senior member of the NYPD to address the Court, either as an expert or fact witness, about the merits of the settlement. This striking omission leaves open at least two questions: Do senior officials of the NYPD agree with the PBA's criticisms of the Proposed Settlement? And in the City's decision to accept the Proposed Settlement, has political decision-making prevailed over NYPD expertise? Perhaps the Second Circuit was prescient in saying that decision-making

13

in this case "could turn on political calculations." *In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th at 803.

## III. THE BURDENS THE PROPOSED SETTLEMENT WOULD IMPOSE ON THE COURT

The PBA's previous submissions showed that the Proposed Settlement would oblige the Court, over a period of years, to resolve disputes over whether split-second policing decisions complied with the Proposed Settlement's extraordinarily complex terms. While both Plaintiffs and the City Defendants attempt to show otherwise, their submissions only confirm the severity of the problem.

Neither Plaintiffs nor the City Defendants dispute that, for at least four years, only the Court can resolve any disputes over the City's compliance with the Proposed Settlement that are not worked out through a non-binding consultation process. Plaintiffs' argument that "there is little risk that the Court will find itself mired in interpretive complexity around such common legal concepts as 'material breach' and 'tailored relief,'" Pl. Br., p. 23, rings hollow. We surely do not need to tell the Court that such issues as materiality and "tailoring" can be vexing indeed. But that is only a fraction of the problem.

Our earlier memorandum (PBA Br., p.16) forecast disputes "over decisions to move from tier to tier, equipment and tactics that officers may use, the number of officers appropriate for any number of unforeseeable tasks and whether the number of officers deployed or the duration of their deployment was appropriate . . .based on review of the actions of officers, supervisors and protesters undertaken in chaotic and rapidly-changing circumstances." Plaintiffs do not contradict this description of disputes that may arise – but they assure the Court that disputes are unlikely, because this settlement (like almost every other settlement) was "designed to avoid *unnecessary* post-settlement litigation." (Pl. Br., p. 23; emphasis added.)   But most settlements

14

do not, as this one does, offer parties dissatisfied with their counter-parties' performance the option of an immediate application to an assigned federal judge. More typically, absent an arbitration clause or similar mechanism, such parties must go through the burdensome process of commencing new litigation – and they do that with dismaying frequency.

Plaintiffs go on to offer their own forecast of what will happen when disputes cannot be settled consensually, which the Court may not find reassuring:

> Should motions practice become necessary, they can be brought only at certain inflection points: **at the conclusion of Phase I**, in the event that *the policies and training materials the NYPD develops* so deviate from the terms of the agreement that they constitute a material breach of it (¶ 101(d)); **18 months or 30 months into Phase II**—the oversight period—or at its conclusion, if the Department of Investigation's reports suggest there is *material breach* [of any term at Phase II] or if there is a "persistent failure" to engage in the collaborative process *or changes to the policies or training* that constitute material breaches of the agreement (¶ 124); **during the 12 months of Phase III,** if Plaintiffs can demonstrate backsliding that constitutes material breach, and only then to obtain "tailored relief" specific to that breach (¶ 130).

Pl. Br., pp. 23-24 (**bold** emphasis for temporal provisions, *italics f*or subject matter).

The authors of this paragraph have clearly thought the subject through – and are ready to make as many applications as they think they need to, probably lasting into 2028 if not much longer.

The City Defendants express equally unconvincing optimism that no disputes will arise under this long, complicated agreement, dealing with sensitive and controversial topics, that cannot be settled consensually. They focus their discussion on the Collaborative Committee, which they say will prevent such issues from coming to the Court. But they, like Plaintiffs, cannot dispute the simple fact that the Proposed Settlement makes this Court the arbiter of first resort: it provides for no other neutral decision-maker. See City Def. Br., pp. 6-8.  The City Defendants also make the flimsy point that Plaintiffs may be deterred from raising issues with the Court because, if unsuccessful, they may be liable for "costs" (e.g., the

15

expense of photocopying). (City Def. Br., p. 6; Proposed Settlement ¶ 138) They do not mention that the same paragraph of the Proposed Settlement offers an *incentive* to litigation. Plaintiffs alleging non-compliance by the City are not liable for attorneys' fees if their application fails, but can recover attorneys' fees if they win.

The Proposed Settlement is highly likely to impose an unjustified and excessive burden on this Court.

## **CONCLUSION**

For all of the above reasons, the PBA respectfully submits that the Proposed Settlement as presented to the Court should not be approved in its current form.

Dated: November 15, 2023
       New York, New York

**SCHLAM STONE & DOLAN LLP**

By: /s/ Thomas A. Kissane
Richard H. Dolan
Thomas A. Kissane
26 Broadway, 19th Floor
New York NY 10004
Tel.:   (212) 344-5400
Fax:   (212) 344-7677
Email: rdolan@schlamstone.com
Email: tkissane@schlamstone.com

*Attorneys for Intervenor the Police Benevolent Association of the City of New York, Inc.*

- and -

**LAW OFFICES OF ROBERT S. SMITH**

Robert S. Smith
7 Times Square, 28th floor
New York, N.Y. 10036
Tel.:   (917) 225-4190
Email: robert.smith@rssmithlaw.com

16

FREDERICK W. VASSELMAN
Office of the General Counsel
Police Benevolent Association of the
City of New York, Inc.
125 Broad Street, 11th Floor
New York, NY 10004
Tel: (212) 298-9144
E-mail:  fvasselman@nycpba.org

Gaurav I. Shah,
Associate General Counsel
E-mail:  gshah@nycpba.org

*Of Counsel*