**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/7/2024

In Re: New York City Policing During Summer 2020
Demonstrations

20-cv-8924 (CM)(GWG)

_____ x

**DECISION AND ORDER DENYING THE POLICE BENEVOLENT ASSOCIATION'S
MOTION TO DENY APPROVAL OF THE SETTLEMENT AND GRANTING THE
SETTLING PARTIES' MOTION TO DISMISS**

McMahon, J.:

On May 25, 2020, George Floyd, an unarmed black man, was killed by Minneapolis police

while he was being arrested on a charge of making a purchase using a counterfeit $20 bill. While

Floyd was handcuffed and lying face-down in the street, Derek Chauvin, a white police officer,

knelt on Floyd's neck for over nine minutes. Two other police officers assisted Chauvin in

restraining Floyd. A fourth officer prevented bystanders from intervening.

While on the ground, Floyd became severely distressed, complaining of breathing

difficulties and of the knee on his neck. After several minutes, he stopped speaking. For the next

few minutes he lay motionless, and officers found no pulse when urged to check. Despite this,

Chauvin ignored bystanders' pleas to lift his knee from Floyd's neck. Medics arrived and found

Floyd unresponsive and without a pulse. Floyd was pronounced dead shortly after his arrival to

the hospital. Subsequent autopsies ruled Floyd's death a homicide.

Within a few days of Floyd's murder, videos of the incident became public. Mass protests

against police brutality, police racism, and lack of police accountability spread nationwide. On

1

May 28, the first of many large-scale demonstrations in New York City erupted in Union Square in Manhattan. Over 100 protesters gathered, some of whom marched in the direction of City Hall. The New York Police Department ("NYPD") arrested approximately 70 of these protestors.

The protests continued over the subsequent days throughout New York City's boroughs. Between June 1 and June 6, demonstrations occurred in various parts of Manhattan, Brooklyn, Queens, and the Mott Haven neighborhood of the Bronx. Approximately 889 individuals were arrested at these protests. Afterwards, demonstrations continued, mostly peacefully, until June 28, when hundreds of NYPD officers clashed violently with protesters in Washington Square Park.

Similarly violent encounters occurred throughout the summer and fall of 2020.

During these protests, NYPD officers allegedly used a tactic called "kettling" to surround, trap, and eventually arrest protesters, without first providing a warning or opportunity for them to leave the area. Police allegedly beat protesters with batons, sprayed them with pepper spray, shoved them with bicycles and pinned them to the ground, injuring many. Officers also allegedly used excessive and unwarranted force to arrest persons who were merely observing the demonstrations rather than protesting. These observers included people such as medics, journalists and legal observers. The arrestees were forcefully handcuffed by officers and often held for prolonged periods in overcrowded cells.

In the wake of these demonstrations, many lawsuits – seeking a variety of forms of relief, both monetary and injunctive – were filed against the City of New York (the "City"), Mayor Eric Adams, Former Mayor Bill De Blasio, the NYPD, and various NYPD officers, ranging from the line officers engaged in policing these demonstrations, all the way up to the NYPD Police Commissioner.

2

On September 5, 2023, this court was presented with documents indicating that a settlement had been reached in the four cases in which injunctive relief was sought – *Payne v. de Blasio*, No. 20-cv-8924; *People of the State of New York v. City of New York, et al.*, No. 21-cv-322; *Gray, et al. v. City of New York, et al.*, No. 21-cv-6610; and *Rolon, et al. v. City of New York, et al.*, No. 21-cv-2548.[1] In order to settle the claims for injunctive relief, the NYPD agreed, *inter alia*, to update, and in some cases change, certain procedures associated with the policing of mass demonstrations.

The New York Attorney General, the Individual Plaintiffs[2] and the City Defendants[3] (collectively the "Settling Parties") presented the court with three documents: (1) a stipulation of settlement (the "Settlement"); (2) a proposed order; and (3) a motion to dismiss the four complaints pursuant to Rule 41(a)(2) (the "Motion to Dismiss"). (Dkt. Nos. 1099, 1099-1, 1099-2). The Settlement itself calls for considerable court involvement in its execution. However, as these were not class actions or otherwise subject to any statute empowering the court to "approve" the Settlement, it appeared to the court (at first) that the appropriate thing to do was to grant the Motion to Dismiss and retain jurisdiction to enforce the stipulated Settlement.

The Settling Parties included almost everyone involved with the litigation – the various plaintiffs (including the New York State Attorney General), the City, all individually named defendants including current and former employees of the City and NYPD – as well as the Sergeants Benevolent Association ("SBA") and the Detectives' Endowment Association ("DEA"), two police unions that were granted leave to intervene by this court after the Second Circuit ordered

---

[1] The class actions *Sierra et al. v. City of New York et al.*, 20-cv-10291, and *Wood v. De Blasio et al.*, No 20-cv-10541, settled separately and are not the subject of any application presently before the court.

[2] Plaintiffs in *Payne*, *People of New York*, *Gray*, and *Rolon* (collectively, the "Individual Plaintiffs").

[3] Defendant City of New York, and Union Intervenors Sergeants Benevolent Association and Detectives' Endowment Association (collectively, the "City Defendants").

me to allow the Police Benevolent Association ("PBA") to intervene. *See In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 795 (2d Cir. 2022); (Dkt. No. 585).

The only party to the lawsuit that did not sign on to the Settlement was Defendant-Intervenor PBA, the union that represents line police officers below the grade of detective. Having been allowed to intervene, the PBA filed an answer, participated in discovery to the extent it wished to do so, and participated (again, to the extent it chose to do so) in the lengthy mediation that led to the Settlement. But the rank and file did not like the Settlement, although it was satisfactory to everyone who set policy for the rank and file to follow. So it "objected" to the Settlement.

The usual rule, of course, is that strangers to a settlement, including intervenors, have no standing to object to a private settlement that does not require court approval. The PBA argued, however, that the Second Circuit had effectively given it veto power over any settlement because, when it reversed this court's denial of its motion to intervene, it did so in order to allow the PBA to protect its "interest in officer safety." *New York City Policing*, 27 F.4th at 804. The PBA contends that the Settlement does not protect the rank and file's "interest in officer safety."

The court vacated the stipulation of discontinuance when this was called to my attention and directed the parties to brief whether the PBA indeed had the right to torpedo a settlement that it did not like. The PBA moved for an order disapproving the Settlement. Briefs were filed and oral argument held on January 29, 2024.

After careful consideration of the parties' arguments, I reach the following conclusions:

First, nothing about the Second Circuit's decision granting the PBA intervenor status gives the PBA the absolute right to veto this Settlement. The Court of Appeals merely afforded the PBA the status of a party defendant in these lawsuits. This gave the PBA the right to participate in the

4

litigation and settlement process— which it did. It did not confer on the PBA any right to dictate, or to veto, the terms by which the People, the Individual Plaintiffs, and such defendants as wished to settle on particular terms could voluntarily resolve their differences.

Second, whether the court can and/or should grant a motion to dismiss in a case like this one, where not every party to the case agrees to the terms of a settlement, is governed by Fed. R. Civ. P. 41(a)(2). That rule allows the court to order dismissal of a case against fewer than all defendants, "on such terms as the court considers proper." This rule does not give a court the power to "approve" the terms of a settlement agreed to among private parties to a lawsuit – even one that does not include every party to that lawsuit – but it does require the court to consider whether any party (in this case, the PBA) would suffer "legal prejudice" as a result of dismissal of the rest of the case or of the settlement. Under well-developed precedent, it is clear that the PBA will not suffer "legal prejudice" if the court dismisses the claims for injunctive relief pursuant to the terms of the Settlement or dismissal.

Third, courts must approve settlements in "specialized cases," such as class actions and cases involving consent decrees. Despite the position of the Settling Parties that this is not such a settlement, I believe this Settlement qualifies as a consent decree, as the PBA urges. That being so, the court must review the terms of the Settlement and approve or disapprove it after evaluating the factors set out by the Second Circuit in one of two cases: either *Kozlowski v. Coughlin,* 871 F.2d 241 (2d Cir. 1989), or *U.S.S.E.C. v. Citigroup Glob. Markets, Inc.*, 752 F.3d 285 (2d Cir. 2014). After conducting such a review, I conclude that the Settlement satisfies the standards of both *Kozlowski* and *Citigroup,* which means it should be approved notwithstanding the objections of the PBA.

5

Accordingly, the PBA's Motion to Deny the Settlement is DENIED. The Settling Parties' Motion to Dismiss is GRANTED.

## I.    Procedural History

### a.   *The Complaints*

Between October 2020 and August 2021, the Individual Plaintiffs – all of whom attended the 2020 demonstrations – brought the actions in *Payne*, *Gray*, and *Rolon*, against the City, the NYPD, and various NYPD officers. The plaintiffs in these actions allege violations of the federal and New York state constitutions, New York civil rights law, and common-law torts. The complaints in these actions sought injunctive and/or declaratory relief as well as damages.[4]

On January 14, 2021, the New York State Attorney General brought an action *in parens patriae, People of the State of New York v. City of New York, et al.*, No. 21-cv-322, against the City and the NYPD, seeking declaratory and injunctive relief for alleged violations of the federal and New York State constitutions and New York law.

Not long after these suits were filed, the court consolidated these cases for pre-trial purposes.

### b.   *The Unions' Intervention*

On March 3, 2021, the PBA, SBA and DEA moved to intervene as defendants in *Payne* and *People of the State of New York.* (Dkt. Nos. 45, 48, 51). The court denied those motions. (Dkt. No. 144). The PBA appealed and the Second Circuit reversed, holding that the PBA had identified a cognizable interest in the safety of frontline officers that could be impaired if litigation resulted

---

[4] The Settlement by its terms only resolves the injunctive claims. However, according to the Settlement, the individual plaintiffs in *Payne*, *Gray*, and *Rolon* have also reached a settlement with the City Defendants of their claims for money damages. They advise that they will file their respective stipulations of dismissals within forty-five (45) days of the Court's endorsement of this Order. (Dkt. No. 1099-2 at p.2). Therefore, as a practical matter, these four cases are over, unless the PBA's objection derails the Settlement.

6

in an adjudication "that NYPD policies governing the interaction of officers and protesters are unlawful and must be altered." The Second Circuit further held that the PBA had established that its interests "might" not be adequately represented by the City, and so had a right to intervene in the cases seeking injunctive or declaratory relief. *New York City Policing*, 27 F.4th at 800, 803. The PBA later intervened in *Gray* and *Rolon* by stipulation. (Dkt. Nos. 729, 730).

After the Second Circuit's ruling, the court allowed the other two police unions – the SBA and the DEA – to intervene as well. (Dkt. No. 585).

The PBA, in its capacity as an intervening defendant, filed answers in the consolidated actions asserting various affirmative defenses to the claims asserted against the City and others. (Dkt. Nos. 562-65). However, no claims have been asserted against the union, and the PBA has not asserted any claims against anyone.

### c. *Discovery and Settlement*

Discovery in the consolidated actions has been overseen ably by Magistrate Judge Gabriel Gorenstein. On June 30, 2022, a revised discovery order was issued extending the time for fact discovery and setting a schedule for the PBA's service of discovery. (Dkt. No. 630). At the time, only one high-level deposition had occurred; the remainder took place after the intervenors' entry into the litigation.

On July 8, 2022, Judge Gorenstein referred the parties to mediation. The parties—including the PBA—then engaged in intensive settlement discussions over a period of more than a year, seeking and obtaining extensions of discovery to facilitate mediation. (*See, e.g.*, Dkt. Nos. 716, 718).

While negotiations were ongoing (and notwithstanding the stays allowed by Judge Gorenstein), the parties engaged in extensive discovery, taking 140 depositions, producing and

reviewing thousands of pages of documents and terabytes of video footage and engaging in extensive motion practice. There were numerous conferences with the Magistrate Judge during the course of the litigation.[5]

Following the filing of its answer, the PBA did absolutely nothing in furtherance of this lawsuit or to protect any interest. It attended no court conferences, noticed no depositions, and designated no expert witnesses. At oral argument, counsel for the PBA indicated that it had attended some of the 140 depositions that were taken in this case, but nothing in the record indicates that the PBA was present at what turned out to be the depositions at which testimony was given that was cited in support of the Settlement: those of NYPD Chiefs Stephen Hughes, John D'Adamo, and Chief of Department Terence Monahan. (*See* Dkt Nos. 1129-1 through 4).

From June 2022 to September 2023, the parties engaged in over fifty settlement negotiations. These the PBA attended – or at least, it attended the vast majority of them.[6] (Dkt. No. 1130 at p.12). The parties exchanged dozens of drafts of the Settlement over the course of the negotiations, copying counsel for the PBA. (Dkt. No. 1127 at p.4).

The parties disclose little about what occurred during those negotiations, and understandably so; but what they do say suggests to the court that the PBA was hostile to the settlement proposals throughout. The PBA claims that its "comments [about the proposed settlement] received no substantive response, and no significant changes were made to the provisions to alleviate the problems the PBA had raised." (Dkt. No. 1120 at p.3). Plaintiffs insist

---

[5] That we have reached this point is attributable to the extraordinarily deft management of these and related matters, which was entrusted entirely to now-retired Magistrate Judge Gorenstein. His prompt handling of all matters put before him by the parties enabled these lawsuits to proceed to settlement far more quickly than had similar cases in the past. I cannot thank him enough for all that he has done to facilitate the resolution of these and related lawsuits.

[6] In fact, the PBA was one of the parties that requested that this court refer these cases for settlement negotiations. (Dkt. No. 636).

that the PBA was "heard at the mediation table" and claim that they responded to proposals advanced by the intervening unions collectively – eventually accepting several of the unions' suggestions. (Dkt. No. 1127 at pp.14-15).

On September 5, 2023, the Settling Parties filed the Settlement with the court in the form of a stipulated order pursuant to Rule 41(a)(2).

### d. *The Settlement's Terms*

The Settlement mandates the adoption of certain policies and procedures regarding the policing of "First Amendment Activities" (FAAs).[7] The Settlement incorporates and updates what the Settling Parties identify as current NYPD policies, which focus on minimizing the use of mass arrests during demonstrations in favor of de-escalation and a tiered reaction system. (*See* Dkt. No. 1099-2). It creates new requirements for written after-action reports following protests where significant enforcement activity occurs and establishes a collaborative oversight committee to review the NYPD's response to such protests. Additionally, the Settlement provides for revised training and policies to improve the NYPD's treatment of members of the public and of the press during FAAs.

The Settlement calls for the court to engage in extensive oversight and involvement, at least during the initial phase of its execution. During the "Execution Period," which lasts at least for four years, the parties are required to submit periodic reports to the court, summarizing the NYPD's performance at FAAs. Additionally, parties may ask the court to resolve disputes over departmental funding concerns, fee payments, early termination of the Settlement or for general relief due to breach. Finally, the court is designated as the final arbiter if there are any

---

[7] As defined in the Settlement, "FAA" refers to a protest or demonstration at which individuals are expressing their rights under the First Amendment.

disagreements over the additional proposals made during the Execution Period to update NYPD policies and procedures relating to FAAs.

Everyone other than the PBA – including the intervening unions representing the detectives and sergeants – has signed on to the Settlement.

The PBA's principal objection to the Settlement (the one on which it focused in its briefing and oral argument) is the formal adoption of a four-tiered system for determining police presence at an FAA. The PBA contends that the tier system has confusing standards, is cumbersome to employ and slow to react, and limits officer discretion. The PBA also objects to the Settlement's adoption of a "Red Light/Green Light" arrest policy. As with the tier system, the PBA argues that the policy is confusing and overly restrictive. Thus, the PBA takes the position that if officers are required to follow the tier system and "Red Light/Green Light" policy, their duty to deal with events on the ground as they unfold will be unduly hampered, compromising officer and public safety.

The Settling Parties note that the NYPD has been following a "Red Light/Green Light" arrest policy at demonstrations for some years. They argue that both the arrest policy and tier system are consistent with current best policing practices and are far from novel or untested as the PBA argues. For example, at oral argument the Settling Parties advised the court that the tiered system was employed in Boston. (Tr. 19:10-14). Additionally, the Settling Parties maintain that the tier system – in contrast to the escalated force model proposed by the PBA – reduces tension and violence at FAAs, balances preserving First Amendment rights with maintaining order, and grants officers the broad discretion to respond to a wide range of potential scenarios.

Both sides support their positions with expert testimony.

10

*e. The Settling Parties' Submission to the Court*

The Settling Parties' submission asks the court to enter an order that does three things:

(1) dismisses the remaining injunctive claims in the consolidated cases, with prejudice, pursuant to Rule 41(a)(2);

(2) incorporates the terms of the Settlement (described above); and

(3) retains jurisdiction to enforce the terms of the Settlement. (Dkt. No. 1099).

The parties advise that they have agreed that the Settlement will become null and void and litigation of the injunctive relief claims will continue unless the court retains jurisdiction to enforce the Settlement's terms. (Dkt. No. 1100 at n.2).

Notably, the Settling Parties ***did not*** ask the Court to "approve" the Settlement. That is in accordance with the usual rule that courts approve private settlements only in very specific cases and when authorized by statute. "Generally, a settlement between an adult plaintiff and a defendant does not require court approval." 15A C.J.S. Compromise & Settlement § 23 (*citing In re September 11 Property Damage Litigation*, 650 F.3d 145 (2d Cir. 2011)). Federal courts "have neither the authority nor the resources to review and approve the settlement of every case brought in the federal court system." *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 835 (3rd Cir.1995). Court approval is required and exercised only when suit is brought in a representative capacity (class actions, shareholder derivative suits) or when the parties seek entry of a consent decree. *Id.*; *see also In re Masters Mates & Pilots Pension Plan & IRAP Litig.,* 957 F.2d 1020, 1025 (2d Cir.1992); *Chevron Corp. v. Donziger*, No. 11 CIV. 0691 LAK, 2013 WL 1481813, at *4 (S.D.N.Y. Apr. 8, 2013); *In re Refco, Inc.*, No. 05 CIV. 8626 (GEL), 2007 WL 57872, at *2 (S.D.N.Y. Jan. 9, 2007); *Pedreira v. Sunrise Children's Servs., Inc.*, 79 F.4th 741, 753 (6th Cir. 2023).

*f. The PBA's Opposition*

11

The PBA originally asked the court for permission to "oppose" the Settlement – which request only made sense if the court had the power to approve the Settlement. I vacated the stipulation and asked for briefing on a number of questions. (Dkt. No. 1107). In my second request for briefs, I specifically asked the parties to take a deep dive into the issue of whether I had any authority to "approve" the Settlement – which would implicate whether the PBA had any power to "oppose" my "approval" of the Settlement and would determine the applicable standard of review. (Dkt. No. 1109).

The PBA argued that intervention would be meaningless if it lacked the ability to stop the Settlement. The Settling Parties responded that, when faced with a motion pursuant to Fed. R. Civ. P. 41(a)(2), a court's authority does not extend to approving the substantive terms of a settlement agreement between settling parties.

I have reached the following conclusions.

## II.    The PBA Will Not Suffer "Legal Prejudice" if the Case Is Dismissed Pursuant to Rule 41(a)(2)

The Settling Parties move pursuant to Rule 41(a)(2) for an order dismissing the claims for injunctive relief asserted in these lawsuits with prejudice in light of their proposed Settlement, which they ask the court to "so order." The PBA – the only party to these lawsuits that has not signed onto the Settlement – cross moves pursuant to Rule 41(a)(2) for an order "disapproving" the Settlement; it opposes the dismissal of the cases.

Federal Rule of Civil Procedure 41(a)(2) provides that, except under certain circumstances not here applicable, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." By its terms, Rule 41(a)(2) – unlike Rule 23(e) – does not authorize a court to review or approve the substantive terms of a settlement. *See In re Masters,* 957 F.2d at 1025; *In re September 11 Property Damage Litigation*, 650 F.3d at 151; *Chevron*,

12

2013 WL 1481813, at *4; *In re Refco, Inc.*, 2007 WL 57872, at *2; *Pedreira*, 79 F.4th at 753; *SmithKline Beecham Corp. v. Pentech Pharms., Inc.,* 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003); *S. Utah Wilderness All. v. United States Bureau of Land Mgmt. Blueribbon Coal., Inc.*, No. 2:21-CV-91-DAK-JCB, 2022 WL 1597672, at *2 (D. Utah May 19, 2022). Rather, the rule only authorizes a court to deny or approve a motion to dismiss made under Rule 41(a)(2). *See Chevron*, 2013 WL 1481813, at *4. As Judge Richard Posner explained in *SmithKline Beecham Corp. v. Pentech Pharms., Inc.,* 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003), "the granting of a motion to dismiss under Rule 41(a)(2) does not imply judicial approval of the underlying settlement agreement. The grant of the motion implies no view of the merits of the agreement and confers no immunities on the settling parties."

Of course, where, as here, fewer than all parties have agreed to settle the case, the rule permits the court to grant a motion to dismiss only on such terms as the court finds to be "proper." But that does not authorize a court to pass on the "propriety" of the terms of the Settlement. Instead it requires the court to ascertain whether any non-settling party will suffer "legal prejudice" if the case is dismissed pursuant to the Settlement. *See, e.g., Camilli v. Grimes*, 436 F.3d 120, 123 (2d Cir. 2006). A non-settling defendant has standing to oppose a motion to dismiss pursuant to Rule 41(a)(2) only if it can demonstrate that it "will sustain some form of legal prejudice as a result of the settlement." *Zupnick v. Fogel*, 989 F.2d 93, 98 (2d Cir.1993). The court in *Bhatia v. Piedrahita*, 756 F.3d 211 (2d Cir. 2014), explained that:

> the required level of formal legal prejudice necessary for standing. . . . exists only in those rare circumstances when, for example, the settlement agreement formally strips a non-settling party of a legal claim or cause of action, such as a cross-claim for contribution or indemnification, invalidates a non-settling party's contract rights, or the right to present relevant evidence at a trial.
>
> *Id.* at 218 (*citing Denney v. Deutsche Bank AG*, 443 F.3d 253, 252 (2d Cir. 2006)).

13

The *Bhatia* court opined that, "In reaching this result, we join our sister courts in holding that a settlement which does not prevent the later assertion of a non-settling party's claims (although it may spawn additional litigation to vindicate such claims), does not cause the non-settling party formal legal prejudice." *Id.* at 219 (*citing Agretti v. ANR Freight Sys., Inc.,* 982 F.2d 242, 247–48 (7th Cir. 1992); *New Mexico ex rel. Energy & Minerals Dep't v. U.S. Dep't of Interior*, 820 F.2d 441, 444–45 (D.C.Cir.1987)).

So, the mere fact that a party opposes the settlement does not automatically give rise to "legal prejudice" as that term is understood in the context of Rule 41(a)(2). No legal prejudice exists unless a non-settling defendant will lose a "legal claim, cause of action or contract rights" by virtue of the partial settlement and ensuing dismissal. *See, e.g., Deangelis v. Corzine*, 151 F. Supp. 3d 356, 361 (S.D.N.Y. 2015) (*citing Anwar v. Fairfield Greenwich Ltd.*, 133 F. Supp. 3d 560, 562 (S.D.N.Y. 2015)); *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*, No. 16 CIV. 4270 (VM), 2020 WL 4003989, at *4 (S.D.N.Y. July 15, 2020) (*citing Armco Inc. v. N. Atl. Ins. Co. Ltd.*, No. 98 Civ. 6084, 1999 WL 173579, at *1 (S.D.N.Y. Mar. 29, 1999)). "Mere allegations of injury in fact or tactical disadvantage as a result of a settlement simply do not rise to the level of plain legal prejudice." *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 JG VVP, 2013 WL 4525323, at *12 (E.D.N.Y. Aug. 27, 2013) (*citing Agretti.*, 982 F.2d at 247).

"The objector has the burden of demonstrating its standing." *Doe #1 by Parent #1 v. New York City Dep't of Educ.*, No. 16CV1684NGGRLM, 2018 WL 3637962, at *6 (E.D.N.Y. July 31, 2018); *see also Agretti*, 982 F.2d at 246. Speculative arguments about the possibility of prejudice are insufficient to demonstrate legal prejudice. *Anwar*, 133 F. Supp. 3d at 563 (*citing In re Platinum & Palladium Commodities Litig.*, No. 10–CV–3617, 2014 WL 3500655, at *6 (S.D.N.Y.

July 15, 2014)); *Rocky*, 2020 WL 4003989, at *4. And of particular importance here, the PBA cannot argue that it will suffer "legal prejudice" because its substantive objections to the Settlement – specifically to the tiered policing structure for deployment at FAAs and to the Red Light/Green Light arrest policy – are meritorious. An assessment of "legal prejudice" under Rule 41(a)(2) does not extend to assessing the merit or lack of merit of a settlement's terms. As my colleague Judge Kaplan remarked when declining to review the terms of a partial settlement in *Chevron Corp. v. Donziger*, No. 11 CIV. 0691 LAK, 2013 WL 1481813, at *4 (S.D.N.Y. Apr. 8, 2013): "The purpose of the grant of discretion under Rule 41(a)(2) that permits the district court judge to consider whether dismissal is appropriate under the circumstances of the case 'is primarily to prevent voluntary dismissals which unfairly affect the other side, and to permit the imposition of curative conditions.'" *Id.* (*quoting* 9 Wright & Miller, Fed. Prac. & Proc. Civ. § 2364 (3d ed.)); *see also Bynum v. Maplebear Inc.*, 209 F. Supp. 3d 528, 536 (E.D.N.Y. 2016).

The PBA has not explained how the Settlement will unfairly affect it or suggested any "curative conditions" aside from refusing to dismiss the lawsuit. The PBA identifies no legal interest that would be compromised by my either so-ordering the Settlement or dismissing the case. *See Camilli,* 436 F.3d at 123-24; *Bhatia*, 756 F.3d at 218. It forfeits no pending cause of action (to date it has asserted none); it does not lose the ability to bring claims in the future (assuming it has any); and the fact that dismissal will be with prejudice means that neither the Attorney General nor the members of the settling classes can in the future assert any such claim arising out of the BLM protests against any member of the PBA – another protective feature of the Settlement. The union's contract and collective bargaining rights are not in any way compromised by dismissal of the case.

Of great significance, dismissal pursuant to the Settlement does not preclude the PBA

from participating in the devising of specific policy changes that remain to be finalized after the

Settlement goes into effect. No provision of the Settlement deprives the PBA of a seat at that

table, even though it is not a party to the Settlement, and the union's collective bargaining rights

give it a second forum in which to make its case that any particular proposed new policy will

compromise the interests of its membership. By settling, the Settling Parties protect one PBA

interest that was of great concern to the Second Circuit: a settlement means there is no risk of

any final adjudication or admission that anything done during the BLM protests was

unconstitutional or illegal. Interestingly, at oral argument, the PBA cited this as one reason to

*oppose* the Settlement; that counter-intuitive argument will be discussed below, at pp. 25-26.

III.    **The Second Circuit's Ruling Did Not Alter the Usual Rule That a Court Lacks the Power to Review the Terms of the Settlement**

As the text of Rule 41(a)(2) offers it no vehicle to get the court to examine the merits of

the Settlement, the PBA argues that the Second Circuit's grant of intervention in *In re New York*

*City Policing During Summer 2020 Demonstrations*, 27 F.4th 792 (2d Cir. 2022), altered the usual

rule and compelled the Court to evaluate the substantive terms of the Settlement. The PBA reasons

that its interest in officer safety was central to the Second Circuit's decision allowing the PBA to

intervene. As the Second Circuit recognized, since the "nature and scope of any injunctive relief

and accommodations could turn on political calculations with respect to which the individual

officer defendants would not be influential and to which they may not even be privy . . . . the PBA

has identified an interest that may be impaired by the disposition of the consolidated actions." *Id.*

at 803-804. Thus, the PBA concludes that the Second Circuit's ruling would be a nullity if the

other parties could reach a bargain between themselves, over the PBA's objections, that injured

the very interest that intervention was meant to protect.

16

But the Second Circuit did nothing other than allow intervention. That decision gave the PBA the right to participate as a party – which it could exercise in whatever manner it chose – but did not give it any "super power" not enjoyed by parties to a lawsuit generally. And non-settling parties to a lawsuit do not have the power to torpedo settlements reached by others.

The notion that the Second Circuit's allowance of intervention somehow amended Rule 41 to confer on the court the power to approve a settlement under the terms of that rule lacks any support in the law. Intervention does not confer any additional rights on a party that differs from those of an original party. Intervenors are treated and considered the same as original parties. Courts have unanimously held as much. *See, e.g., In re Oceana Int'l, Inc.*, 49 F.R.D. 329, 333–34 (S.D.N.Y. 1969) ("Once intervention as of right has been granted, an intervenor should be entitled to litigate fully on the merits . . . and be considered a party for all purposes.")(*citing Park & Tilford, Inc. v. Schulte*, 160 F.2d 984 (2d Cir. 1947)); *United States v. Jim*, 891 F.3d 1242, 1252 (11th Cir. 2018) ("It is hornbook law that an intervenor is treated as [] an original party and has equal standing with the original parties.") (collecting cases); *Alvarado v. J.C. Penney Co.*, 997 F.2d 803, 805 (10th Cir. 1993) ("When a party intervenes, it becomes a full participant in the lawsuit and is treated just as if it were an original party.") (*quoting Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C.Cir.1985)).

So the fact that the PBA was allowed to join this litigation by a court does not give it any right under Rule 41(a)(2) except the right any other non-settling party would have in the face of a partial settlement – which, as we have seen, is the right to have the court evaluate whether dismissal pursuant to the Settlement will subject it to "legal prejudice," as that term is defined above. *See, e.g., Cnty. of Santa Fe, N.M. v. Pub. Serv. Co. of New Mexico*, 311 F.3d 1031, 1047-49 (10th Cir. 2002); *WildEarth Guardians v. Haaland*, No. CV 21-175 (RC), 2022 WL 1773480, at *5 (D.D.C.

17

June 1, 2022). The Second Circuit, in granting intervention, was answering a different question from the one now facing this court. "[T]he showing that a non-settling party must make to object to a partial settlement—[is] an analytically distinct question from whether a non-party possesses a legally sufficient interest in joining an action." *United States v. New York City Hous. Auth.*, 326 F.R.D. 411, 417 (S.D.N.Y. 2018) (*citing Bhatia*, 756 F.3d at 218); *see also Waller v. Financial Corp. of America*, 828 F.2d 579, 582-84 (9th Cir. 1987) (holding that the grant of intervention to the non-settling objector would have been proper but that the same party had no standing to object to a partial settlement due to the absence of "legal prejudice").

In fact, the Settling Parties could have reached their bargain without listening to the PBA at all. *See Vulcan Soc. of Westchester Cty., Inc. v. Fire Dep't of City of White Plains*, No. 78-CV-911, 1979 WL 259, at *1 (S.D.N.Y. June 28, 1979) (denying intervenors' motion to be included in ongoing settlement negotiations because "parties cannot be prevented from negotiating on their own"). But the PBA was heard during the settlement negotiations. The PBA had a seat at the table as the parties on both sides hammered out policing policies and procedures that were to be followed during FAAs. There is no evidence in the record before the court that the PBA's concerns were not seriously considered; there is evidence that it chose to be oppositional simply to be oppositional. Most important, nothing in the record before this court would support the conclusion that officer safety concerns (the reason intervention was allowed) were ignored or minimized in hammering out the details of this Settlement. The fact that the unions representing both detectives and sergeants – officers who are on the street with line officers during demonstrations and protests, and who share the same interest in officer safety that the PBA does – have signed onto the Settlement suggests the opposite.

18

The PBA's argument that, by allowing it to intervene, the Second Circuit added a *sub silentio* court approval requirement to Rule 41(a)(2) rests on particularly shaky ground because, outside the litigation context, the union has no veto power over changes to policing policy and procedure like the ones enshrined in the Settlement. During oral argument, Corporation Counsel confirmed the court's belief that such policies and procedures are set in the ordinary course by the Senior Ranking Officers in the Department – not by the PBA or its members. (Tr. 34:16 – 35:12). It would be anomalous if, simply by intervening in this lawsuit, the PBA, on behalf of its members, could acquire a power to set policy that it does not enjoy outside of the litigation context.

Accordingly, I conclude that the mere grant of intervention does not provide a court with an independent source of authority to approve or deny a settlement. Nor does the grant of intervention confer a party with the right to object to such a settlement when no such right otherwise exists.

That means, as a technical matter, that the PBA's motion to "disapprove" the Settlement and bar dismissal of the case pursuant to Rule 41(a)(2) should be denied. *See Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 91 (2d Cir. 2019); *Bhatia*, 756 F.3d at 218-19; *Zupnick*, 989 F.2d at 98.

But that does not answer the question of whether the court is required to approve the Settlement – it only settles the question about whether such authority resides in Rule 41(a)(2). It does not – so now we turn to whether some other rule compels the court to examine the terms of the Settlement, and under what standard.

## IV.    The Settlement is a Consent Decree and Thus Is a Specialized Form of Litigation That Requires Settlement Approval

Since Rule 41(a)(2) does not give me the power to approve the terms of a settlement, the Settling Parties ask that the court simply conclude that dismissal would be appropriate and give

19

no further consideration to the terms of the Settlement. The PBA says that this is a consent decree and courts have to approve consent decrees.

The PBA is correct.

A court has the discretion to approve or deny a settlement in certain special cases. Those "special cases" that require judicial approval are, for example, settlements under Fed. R. Civ. P. 23(e) (class actions), Fed. R. Civ. P. 23.1 (shareholder derivative suits), and where the settling parties ask a court to enforce their agreement in the form of a court order, *i.e.*, a consent decree. *In re Masters*, 957 F.2d at 1025.

A consent decree is defined as a settlement that contains an injunction. *See, e.g., id.*; *Hurley v. Coughlin,* 158 F.R.D. 22, 29 (S.D.N.Y. 1993); *Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245, 254 (3d Cir. 2020). The proposed court order under Rule 41(a)(2) contains numerous terms that are injunctive in nature, *(see* Dkt No. 1099-2) – a point the Settling Parties concede. *(See* Dkt. No. 1127 at p.9). For example:

- The NYPD must designate certain senior officials to oversee operational decisions relating to FAAs. (Dkt No. 1099-2 at ¶¶ 20-23). The agreement also details these individuals' roles and responsibilities. *Id.* at ¶¶ 23-27.

- The agreement dictates when and how the NYPD can designate a Mass Arrest Processing Center ("MAPC"). *Id.* at ¶ 33. The agreement specifies certain protocols that must be followed when the NYPD activates a MAPC. *Id.*

- The agreement establishes a "tiered policing" response system that the NYPD must employ at FAAs. *Id.* at ¶¶ 36-63.

This is far more than a court order that retains jurisdiction to enforce the terms of a private agreement. The Settling Parties ask the court to incorporate all of the Settlement's terms into the

20

court's order dismissing the case and retaining jurisdiction. The imposition of "compliance with [a] settlement agreement as a condition of dismissal . . . is tantamount to a mandatory injunction." *Hester Indus., Inc. v. Tyson Foods, Inc.*, 160 F.3d 911, 916 (2d Cir. 1998).

Additionally, "the continuing jurisdiction involved in the court's inherent power to protect and effectuate its decrees entails judicial oversight of the agreement." *Roberson v. Giuliani*, 346 F.3d 75, 80 (2d Cir. 2003); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992). After the Settlement is approved, its terms require that court engage in continued affirmative oversight of the situation, not simply retain jurisdiction to enforce the agreement. Of greatest significance, upon the motion of any party, the court agrees to review draft policies, procedures, and training curricula if the parties cannot agree on such matters. (Dkt. No. 1099-2 at ¶ 101(d)). Additionally, the parties must file progress reports and responses thereto with the court, which summarize the NYPD's performance at FAAs during the relevant agreement execution period. *Id.* at ¶¶ 125-27.

The Settling Parties argue that the Settlement is not a consent order because it is not enforceable through contempt and would not "carry the weight of a judgment." I beg to differ.

An agreement need "not be formally designated as a consent decree" for it to still "operate as such." *Floyd v. City of New York*, 770 F.3d 1051, 1063 (2d Cir. 2014) (internal quotation marks omitted). By incorporating the terms of the settlement into the order dismissing the case, non-compliance can indeed subject a party to citation for contempt. *Latino Officers Ass'n City of New York v. City of New York*, 519 F. Supp. 2d 438, 443 (S.D.N.Y. 2007) (When a "Court . . . incorporate[s] all the terms of [a settlement] [a]greement into its judgment and order . . . .[,] noncompliance with any of the terms of the Agreement could constitute a violation of a court order. Accordingly, [courts have] the authority to issue a contempt order in appropriate circumstances.").

21

It simply does not matter how the parties style their submissions to the court. What matters is what the Settling Parties have asked the court to do. Here they ask the court to incorporate the contractual terms of their Settlement – terms that are injunctive in nature – into a court order.

The court must, therefore, evaluate and approve the Settlement as a consent decree.

## V.    The Proper Standard of Review for This Consent Decree

The first order of business is to decide what standard the court should apply.

Most consent decrees are reviewed under *Kozlowski v. Coughlin,* 871 F.2d 241 (2d Cir. 1989). In *Kozlowski*, the Second Circuit held that "Before entering a consent judgment, the district court must be certain that the decree 1) springs from and serves to resolve a dispute within the court's subject-matter jurisdiction, 2) comes within the general scope of the case made by the pleadings, and 3) furthers the objectives of the law upon which the complaint was based." *Id.* (internal quotation marks omitted) (*quoting Local Number 93, International Association of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986)).

The *Kozlowski* standard applies to many consent decrees to which the government is a party. *See, e.g., Flores v. Town of Islip*, No. 18-CV-3549 (GRB)(ST), 2020 WL 6060982, at *1 (E.D.N.Y. Oct. 14, 2020) (Voting Rights Act claims brought against town, town board, and county board of elections); *New York v. Mirant New York, Inc.*, 300 B.R. 174, 175 (S.D.N.Y. 2003) (Clean Air Act and New York state environmental law claims brought by the state and environmental commissioner against private parties). The Supreme Court has stated that "a federal consent decree ***must***" satisfy the *Kozlowski* standard. *See Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (emphasis added) (*citing Firefighters*, 478 U.S. at 525).

22

A different and higher standard applies when the case being settled is one brought by government agencies exercising their enforcement power. That standard is found in *U.S.S.E.C. v. Citigroup Glob. Markets, Inc.*, 752 F.3d 285 (2d Cir. 2014), which "requires that the district court determine whether the proposed consent decree is fair and reasonable, with the additional requirement that the 'public interest would not be disserved' . . . in the event that the consent decree includes injunctive relief." *Id.* at 294 (*quoting eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)).

Three of the four lawsuits covered by the Settlement – *Payne*, *Gray* and *Rolon* – are purely private actions brought by purely private actors who have no enforcement powers at all. If they were the only cases being settled, I would unhesitatingly apply the *Kozlowski* factors in considering whether to approve the consent decree. *See, e.g., Sanchez v. Lumondi, Inc.*, No. 1:21-cv-00547-PAE, 2021 U.S. Dist. LEXIS 205642, at *1 (S.D.N.Y. Oct. 19, 2021); *Dominguez v. Bohemian Citizens Benevolent Soc'y of Astoria L.I.N.Y.*, No. 19-CV-11932 (JLC), 2020 WL 1646672, at *1 (S.D.N.Y. Apr. 3, 2020); *Crosson v. PopSockets LLC*, No. 19 CV 200 (CBA)(LB), 2019 WL 6134416, at *2 (E.D.N.Y. Oct. 8, 2019), *report and recommendation adopted*, No. 19CV0200CBALB, 2019 WL 6134153 (E.D.N.Y. Nov. 19, 2019); *Figueroa v. Arhaus, LLC*, No. 18 Civ. 10491 (GWG) (S.D.N.Y. Feb. 20, 2019).

The complicating factor is the fourth action – *People of the State of New York* – brought *in parens patriae* by the New York Attorney General.

I do not believe that *People of the State of New York* involves the exercise of the Attorney General's enforcement power. The parties do not cite to any specific enforcement power that is being exercised in this case by the Attorney General, and as I read the complaint I cannot find any cause of action arising under the Attorney General's power to enforce any specific state statute.

23

Rather, the Attorney General, having identified certain alleged violations of state and federal law, is trying to bring about certain reforms in the NYPD. As my late colleague Judge Pauley recognized in *United States v. New York City Hous. Auth.*, 347 F. Supp. 3d 182 (S.D.N.Y. 2018), it is not at all clear that *Citigroup* applies to a consent decree in such a case. While this action, like *Citigroup*, is brought by a government agency to redress alleged violations of law by a New York City agency (in *Citigroup*, conditions at NYCHA Housing authority projects; in our case, the constitutional rights of protesters), it is not really an agency enforcement action in the *Citigroup* sense. *See New York City Hous. Auth.*, 347 F. Supp. 3d. at 198-99.

Like Judge Pauley, I believe it questionable that *Citigroup* review applies in a circumstance like this one, where the Attorney General, suing *in parens patriae*, is trying to obtain policy changes in a New York municipal agency over which she does not have enforcement power.[8] During argument on this motion, I specifically asked whether a *parens patriae* suit seeking agency reform put this case within the ambit of *Citibank* rather than *Kozlowski*; the Assistant Attorney General who was representing her office opined that *People of the State of New York* was indeed an "enforcement action." (Tr. 46:1-13). The Attorney General's office later clarified that it had brought *People* as part of its "enforcement authority" pursuant to § 63(1) of the New York State Executive Law, which generally requires that the Attorney General shall "Prosecute and defend all actions and proceedings in which the state is interested . . . ." (*See* Dkt. No. 1146); N.Y. Exec. Law § 63(1).

---

[8] In *New York City Hous. Auth.*, Judge Pauley looked at the consent decree through the lens of *Citigroup*, but only because the parties did not dispute that it was the proper standard . . . not, as is obvious from his opinion, because he agreed with their position. *See id.* at 199.

I very much doubt that § 63(1) transforms this *parens patriae* suit into the type of "enforcement action" contemplated by *Citigroup* and its progeny. None of the claims in suit asserted in *People of the State of New York* arises under§ 63(1) -- a statute that simply describes the duties of the Attorney General, which includes pursuing actions in which the "state is interested." All this augurs for *Kozlowski*, rather than *Citigroup*, review.

But rather than tangle with this esoteric issue, and since the Attorney General asserts that she is acting in an enforcement capacity, I will evaluate the Settlement/consent decree using the *Citigroup* standard.

**VI.    The Settlement Passes the *Citigroup* Standard of Review**

Under *Citigroup*, a reviewing court must determine "whether the proposed consent decree is fair and reasonable, with the additional requirement that the public interest would not be disserved . . . ." *Id.* at 294 (internal quotation marks omitted). While some cases may require "additional inquiry," when applying these factors, "[t]he primary focus of the inquiry . . . should be on ensuring the consent decree is *procedurally proper*." *Id.* at 295 (emphasis added). "Although a district court is not merely a 'rubber stamp' for a government agency seeking the entry of a consent decree . . . its review of a proposed consent decree is—for better or worse—more deferential in the context of a government enforcement action." *New York City Hous. Auth.*, 347 F. Supp. at 197–98 (internal citations omitted) (*citing SEC v. Caledonian Bank Ltd.*, 317 F.R.D. 358, 374 n.15 (S.D.N.Y. 2016)). "Absent a 'substantial basis in the record' to conclude that the consent decree is not fair and reasonable or that the public interest would be disserved, 'the district court is required to enter the order,' irrespective of the adequacy of the consent decree." *Id.* at 182 (*quoting Citigroup*, 752 F.3d at 294).

25

The PBA contends that the Settlement – in particular, the tiered policing structure for FAAs that is set out at paragraphs 36 to 63 of the Settlement – is not fair and reasonable and would disserve the public interest. It throws a variety of arguments at the wall to see if any will stick.

Two of the PBA's arguments can be disposed of quickly.

First, the PBA points out that, "No party has even tried to show, on this motion, that there is merit to Plaintiffs' claim that there has been a pattern and practice of constitutional violations for which the City is liable . . . ." (Dkt. No. 1135 at pp.6-7). But this is a settlement, reached by parties who have decided that it is in their best interest NOT to try the case on the merits. It is not incumbent on the Settling Parties to prove that plaintiffs would win and the Defendants would lose as a condition of obtaining approval of a consent decree. Indeed, it is entirely counter-intuitive for the PBA to demand (as it effectively does) that this case be tried before it can be settled – especially as there is no guarantee that a New York City jury would absolve the PBA's members of the alleged legal and constitutional violations.

But the PBA's argument is not simply counter-intuitive. It would be improper for the court to demand that the parties make any showing on the merits of the claims being settled. As the Second Circuit explained in *Citigroup*:

> It is an abuse of discretion to require . . . that the [plaintiff] establish the "truth" of the allegations against a settling party as a condition for approving the consent decree[] . . . . Trials are primarily about the truth. Consent decrees are primarily about pragmatism . . . . Consent decrees provide parties with a means to manage risk. The numerous factors that affect a litigant's decision whether to compromise a case or litigate it to the end include the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, the prospects of coming out better, or worse, after a full trial, and the resources that would need to be expended in the attempt . . . . These assessments are uniquely for the litigants to make. It is not within the district court's purview to demand cold, hard, solid facts, established either by admissions or by trials, . . . as to the truth of the allegations in the complaint as a condition for approving a consent decree.

*Id.* at 295 (internal quotations marks and citations omitted).

Second, the PBA argues that monitoring the Settlement's execution will impose an excessive burden on this court. Burden on the court is not among the *Citigroup* factors, but if it were, I would reject the argument. There is nothing overly burdensome about the amount of court oversight required by Settlement; if anything, this Settlement will entail significantly less oversight than previous police reform consent decrees. *Cf. Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013). This court is perfectly willing to undertake the risk that the parties will overwhelm me with work. However, I am betting that they will not. And if it becomes too time consuming, I have the luxury, as a Senior Judge, of divesting myself of some of my other work, so that I can devote the necessary time to oversight of the Settlement.

### a. *The Settlement is "Fair and Reasonable" in the Sense Contemplated by Citigroup*

In evaluating whether a settlement/consent decree is "fair and reasonable," a court applying *Citigroup* must focus on (1) the basic legality of the decree; (2) whether the terms of the decree, including its enforcement mechanism, are clear; (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind. *Id.* at 294-95. Although the PBA argues that the consent decree is not "fair" or "reasonable", the only element of the "fair and reasonable" test that the union contests is the second – whether the terms of the decree, including its enforcement mechanism, are clear.

#### 1. The Consent Decree Is Legal

A proposed consent decree with a government agency is legal "so long as it is within the Court's authority to enter the decree and within the Plaintiff's authority to enforce it." *United States v. International Business Machines Corp.*, No 14–cv–936, 2014 WL 3057960, at *1 (S.D.N.Y. July 7, 2014) (*citing Benjamin v. Jacobson*, 172 F.3d 144, 158 (2d Cir. 1999)). "[C]ourts in this

circuit analyzing this factor have looked to whether the relevant statutes under which the action was brought permit the relief requested in the consent decree." *New York City Hous. Auth.*, 347 F. at 199–200 (collecting cases).

Here, the consent decree satisfies the "basic legality" factor. The Settling Parties have agreed to certain policing reforms, and nothing under § 1983 limits such relief. Additionally, it is certainly within the court's authority to enter this order. *Cf. Benjamin*, 172 F.3d at 158 (terminating a consent decree pursuant to a statutory provision mandating termination of a decree "that was approved or granted in the absence of" certain statutorily required findings).

### 2. The Terms of The Decree, Including Its Enforcement Mechanism, Are Clear

A consent decree is clear when it "'properly defines' its key provisions." *See Int'l Bus. Machs.*, 2014 WL 3057960, at *3 (*quoting Citigroup*, 752 F.3d at 295); *United States v. Chestnut Petroleum Dist., Inc.*, No. 19-CV-03904 (PMH), 2020 WL 5505298, at *2 (S.D.N.Y. Sept. 11, 2020). Courts have found consent decrees to be sufficiently clear where the decree details "specific enforcement mechanisms" and details "Defendants' responsibilities under the decree". *See Int'l Bus. Machs.*, 2014 WL 3057960, at *3.

The PBA does not dispute the Settlement has specific enforcement mechanisms, but contends that the standards for the Settlement's "tiered policing" response system at FAAs could at times be "confusing" for NYPD officers. The PBA's sole support for this conclusion are the speculative and unsubstantiated opinions of its expert, retired Chief Louis Anemone – whose testimony will be discussed in greater detail below. Chief Anemone's arguments consist entirely of nitpicky gripes about the wording of certain provisions governing the NYPD's use of the tiered enforcement system. None of his arguments demonstrates that the NYPD's responsibilities – as embodied in the decree – are unclear, or that a key provision is improperly defined.

28

One of the PBA's principal arguments against this Settlement is that the it unduly restricts officers' enforcement discretion during FAAs. For example, Chief Anemone takes issue with the provision's term that allows that the NYPD to move to the highest tier of enforcement if "green light" violations at the FAA are "widespread" and "continue unabated and cannot be addressed through further de-escalation or targeted enforcement." (Dkt. No. 1099-2 at ¶ 57). Chief Anemone argues that the Agreement does not define terms like "widespread" or provide guidance about when "green light" violations would be considered to "continue unabated and cannot be addressed through further de-escalation or targeted enforcement." *Id.* The absence of greater definitional precision, the PBA argues, means its members will be unduly restricted in responding to unfolding situations.

I beg to differ. This provision leaves ample room for officers to make judgment calls in real time. Indeed, I rather imagine that the Settling Parties declined to be more specific precisely so the members of the PBA (and more importantly, their supervisors) would have a measure of discretion in responding to the potentially complicated and unique circumstances of each FAA – especially discretion to decide whether a situation was escalating from peaceful protest into violence, as the PBA obviously fears some, perhaps many, FAAs will do.

Moreover, the Settlement requires the parties to develop training modules and draft policies in order to implement its terms. It is in the context of devising these policies that any lack of clarity about the terminology used in the Settlement will be eliminated by the drafting of actual policy directives. I am confident that the NYPD is equipped – by the very terms of this Settlement – to address any potential confusion amongst its officers and develop standard operating procedures that clarify this purely speculative issue. And the PBA, as the union representing the rank and file, might usefully participate in that enterprise, provided it is not inclined simply to be obstructionist.

29

3. The Settlement Reflects A Resolution of the Actual Claims in the Complaint and Is Not Tainted by Improper Collusion or Corruption

In these consolidated cases, the pleadings allege serious police misconduct during protests in the summer of 2020. Specifically, that the NYPD violated the First, Fourth and Fourteen Amendments in responding to the protests, and that officers used excessive and unnecessary force against nonviolent protestors, journalists and bystanders. Plaintiffs claim that these responses are reflective of a pattern of unconstitutional conduct by the NYPD in responding to peaceful protests.

The plaintiffs seek a declaration that defendants' actions were unconstitutional and enjoining defendants (and their offices and employees) from taking any action under the allegedly unconstitutional policies or practices of employing excessive force, false arrests and retaliatory tactics against protesters.

The defendants deny that any of their actions were unconstitutional.

The proposed consent decree clearly resolves the actual claims in the complaint. It establishes a remedial plan aimed to address and update the allegedly unlawful NYPD policies and practices described in the Complaint. While the settling defendants admit no wrongdoing, the NYPD agrees to "embrace[] an approach to policing that assures the rights of protesters and uses arrest and force only when necessary and in compliance with the Constitution of the United States, the Constitution and laws of the State of New York, and the New York City Charter and local laws." (Dkt. No 1099-2 at ¶ 12).

Finally, the Settlement is clearly not tainted by improper collusion or corruption. There is no evidence to that effect and the PBA does not argue otherwise.[9]

---

[9] The Settlement also easily passes the *Kozlowski* standard. The Court has subject matter jurisdiction over the dispute that is being resolved pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4). For ostensibly the same reasons why the Settlement passes the third prong of *Citigroup*'s "fair and reasonable" test, the Settlement satisfies the second prong of *Kozlowski*. Finally, the plaintiffs asserted their claims under, *inter alia*, 42 U.S.C. § 1983, premised on allegations that the NYPD used excessive force to subdue protesters and executed mass arrests without

b. *The PBA's Arguments Concerning the Settlement's "Adequacy" Will Not Be Considered*

As the Second Circuit made clear in *Citigroup*, inquiry as to the "adequacy" of a consent decree is not part of a court's analysis of whether the settlement is "fair and reasonable" or would disserve the public interest. Indeed, since, "Scrutinizing a proposed consent decree for 'adequacy' [would] borrow[] from the review applied to class action settlements, [it is] particularly inapt in the context of a proposed [government] consent decree." *Id.* at 294.

Ignoring this fundamental rule, the PBA argues that the Settlement is not fair and reasonable on the merits – that it does not adequately protect the safety of the rank and file officers and ensure that the public will be protected during FAAs. As noted above (*see* pp. 10, 28-29 supra), the PBA contends that certain provisions (particularly the tiered response structure) will be difficult to implement, while the need to obtain approval from a higher ranking official before deploying additional officers in certain circumstances will restrict officer discretion at FAAs while imposing undue burdens on their ability to enforce the law. Asking them to assess whether the commission of a crime is "imminent" before asking for reinforcements to come to the scene, the union insists, will inevitably delay police response in tense and fast-evolving situations, thereby increasing the risk of harm to both officers and the public. (Dkt. No. 1119 at ¶ 24).

To support its arguments, the PBA offers an affidavit from retired NYPD Chief Louis Anemone, in which Chief Anemone opines that certain policies in the Settlement might be cumbersome and impractical when applied by the NYPD and its line officers. Specifically, Chief Anemone – a highly respected former senior officer of the Department, who retired a quarter of a

---

probable cause. Plaintiffs further assert that, in doing so, defendants violated plaintiffs' right to engage in free speech, and allege that defendants retaliated against them because of the content of their constitutionally protected speech. The Settlement operates to prevent further constitutional violations and civil rights deprivations of this sort from occurring, which satisfies *Kozlowski*'s third prong.

century ago, in 1999 – opines that, as a result of this Settlement, there will be an increased risk to the safety of both officers and the public during FAAs. *Id*. at ¶ 5. Chief Anemone reasons that the Settlement's terms restrict the deployment of police resources before and during FAAs and that the Settlement's decisions-making mechanisms would delay the deployment of additional officers when deemed necessary by NYPD supervisors. Thus, Chief Anemone concludes that the police response could not be adequately reactive to quickly developing risks at an FAA. Chief Anemone also claims the Settlement will cause increased risk to the public and police due to traffic delays, protests continuing despite the issuance of a dispersal order, and protests continuing despite the occurrence of serious crimes, all of which he claims the Settlement either allows or will cause.

The Settling Parties argue that consideration of this evidence is improper, because all the PBA has done is argue that it disagrees, as a matter of policy, with the rules of engagement enshrined in the Settlement – which is not relevant in conducting a *Citigroup* assessment. That said, in response to Chief Anemome, the Settling Parties offer the testimony of their own expert, Chief Hassan Aden of the Alexandria and Greenville Police Departments located in Virginia and North Carolina, respectively. (Dkt. No. 1128 at ¶ 1). Chief Aden has over 36 years of law enforcement experience, three of which he spent as the Chief of Police in Greenville. He has also overseen the implementation of consent decrees mandating police reforms in the Baltimore, Chicago, Cleveland, and Seattle Police Departments, and currently serves as the Independent Police Monitor for the Santa Barbara Police Department in California. *Id.* at ¶¶ 6-7. Chief Aden argues that Chief Anemone's conclusions are incorrect and that the policy making decisions embodied in the Settlement are "consistent with nationally accepted policing practices." *Id.* at ¶ 3.

I agree with the Settling Parties that the "fair and reasonable" assessment the PBA asks me to undertake is not properly part of a *Citigroup* inquiry. For one thing, such an assessment does

32

not give appropriate deference to the Attorney General's enforcement authority, as required by *Citigroup*. Moreover, it requires the court to weigh in on the merits of a policy dispute between the Settling Parties and the PBA -- an exercise that is specifically proscribed by *Citigroup*. *See id.* at 296.

Thus, the PBA's "substantive adequacy" arguments are not properly considered by the court, and I decline to consider the PBA's arguments addressed to the substantive merits of the proposed Settlement – except insofar as they are relevant to an assessment of the public interest, an issue to which I now turn.

    c.  *The Settlement Would Not Disserve the Public Interest*

Finally, I must determine if this Settlement would "disserve the public interest." I may only reject this Settlement if there is a "substantial basis" in the record for concluding the proposed consent judgment would do so. *Citigroup*, 752 F.3d at 294.

However, "The job of determining whether the proposed consent decree best *serves* the public interest rests squarely with the [government], and its decision merits significant deference." *Chestnut Petroleum*, 2020 WL 5505298, at *1 (S.D.N.Y. Sep. 11, 2020) (emphasis in original) (*quoting Citigroup*, 752 F.3d at 296). "Federal judges—who have no constituency— have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones . . . ." *Citigroup*, 752 F.3d at 296 (*citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984)); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir.1992). "What the district court may not do is find the public interest disserved based on its disagreement with the [government's] decisions on discretionary matters of policy . . . ." *Citigroup*, 752 F.3d at 297.

I would note that this rule is effectively dispositive in the instant case. Not only has the Attorney General (the "enforcement agency" in our context) signed on to this Settlement, but so have the NYPD and City Defendants who will carry out the very policing policy this Settlement affects. For that matter, so have two of the three unions who are most affected by what goes on in the street – because detectives and sergeants are "out there" too. Thus, this is an atypical situation, in which multiple governmental bodies– both plaintiff and defendants – have concluded that the terms of consent decree are acceptable and would not disserve the public interest.

My significant deference to this determination must also be viewed in conjunction with the "strong federal policy favoring the approval and enforcement of consent decrees." *Id.* at 293 (*quoting SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991)).

Finally, the Settling Parties introduce substantial evidence to buttress their view that the court should indeed defer to the conclusion of the Settling NYPD Parties that adoption of the proposed Settlement – which formalizes some things that are already carried out in practice while adding precautions that will protect the public's right to have its voice heard and protect the public fisc from further litigation, both in these lawsuits and (hopefully) down the road – serves the public interest. That evidence includes Chief Aden's opinions – and the evidence underlying it – that, "There have been significant advances in policing mass demonstrations, particularly as research on crowd psychology has advanced, from the ***escalated force model*** []espoused by (ret.) Chief Anemone . . . to the ***negotiated management model*** [adopted in the Settlement], which emerged after four presidential commissions exposed the flaws of the escalated force model." (Dkt. No. 1128 at ¶ 5) (emphasis in original).

But deference arguments address the merits of the Settlement. "The primary focus of the inquiry . . . should be on ensuring the consent decree is procedurally proper, using objective measures similar to the [fair and reasonable] factors . . . [and] taking care not to infringe on the [government's] discretionary authority to settle on a particular set of terms." *Citigroup*, 752 F.3d at 295. The PBA does not argue that this consent decree is procedurally improper, nor can I discern any indication from the record that it is so. Accordingly, the PBA has made no showing on the primary issue of concern when evaluating the public interest factor.

The court concludes that the consent decree is procedurally proper. It was the product of over a year of mediated negotiation, conducted under the watchful eye of the Southern District of New York's Chief of Mediation, Rebecca Price, following two years of discovery overseen by the equally able Magistrate Judge Gabriel Gorenstein. The parties had ample opportunity to take testimony, review documents and assess the strengths and weaknesses of their case in the community context. They considered the views of the three intervening unions and implemented suggestions made by them – not all of the suggestions the unions made, but some. (*See* Dkt. No. 1127 at pp. 14-15). Every party to the lawsuit, including the PBA, had an opportunity to review the proposed Settlement at every stage and to participate, to the extent it wished to do so, in the mediation. There is not a whiff of collusion or anything improper in the Settlement's devising.

The PBA argues that the Settlement disserves the public interest because, "the Proposed Settlement creates unjustified risks to police, protesters, and other members of the public." (Dkt. No. 1120 at p.1). In support of this argument, the PBA insists that the Settlement's tiered response system is "cumbersome" and overly "bureaucratized." *Id.* at pp.9-13. Since an FAA may degenerate rapidly into a "violent encounter", the PBA reasons "that a strong police presence at an early stage, with an ability to react quickly and flexibly to unforeseen events, may

35

be the best way to prevent that from happening." *Id.* at p.11. The PBA offers the testimony of retired Chief Anemone to support its argument.

Once again, the PBA's argument is not properly considered under *Citigroup*. The PBA does not dispute that the consent decree embodies NYPD policymaking decisions about the tiered response structure and the deployment of officers to FAAs. If this litigation had never happened, NYPD higher ups could have adopted the proposed tiered response structure as part of the Department's rules of engagement and the PBA would have had no ability to stop its adoption. In short, the PBA's disagreement with the proposed rules of engagement that are part of this settlement does not afford any basis to conclude that implementing the consent decree would disserve the public interest.

But if merits evidence were properly considered, the evidence does not establish a "substantial basis in the record for concluding the proposed consent judgment" would disserve the public interest. *Citigroup*, 752 F.3d at 294. The PBA's evidence that the proposed tiered system will not work and will endanger officer and public safety consists solely of the opinions of Chief Anemone. The policymaking opinions of a single former police officer, even a former Chief of Police, does not, in my opinion, constitute the "substantial basis" needed for me to overcome the great deference I am required to grant the Settling Parties.

Moreover, a substantial body of evidence suggests that Chief Anemone's evidence and opinions are out of date – which is understandable, given the number of years he has been retired from the force. Chief Anemone evidences no familiarity with how policing has evolved over the past quarter century– or with the fact that many of the proposals in the Settlement (including specifically the "Red Light/Green Light" arrest policy) reflect procedures that the NYPD adopted in the intervening years since his retirement.

36

The Settling Parties, by contrast, have offered the opinions of Chief Aden, whose relevant expertise as to the subject matter of the PBA's objections is quite extensive. Chief Aden has over 36 years of law enforcement experience, three of which he spent as a Chief of Police, and has experience overseeing the implementation – and thus the resulting successes and failures – of similar police reform consent decrees at the police departments of four major American cities. (Dkt. No. 1128 at ¶¶ 6-7). He has served as an independent monitor over police forces in several large cities, and is currently Independent Police Monitor for the Santa Barbara Police Department.

Chief Aden takes the position that the Settlement reflects current nationally accepted policing best practices. *Id.* at ¶¶ 38-58. In direct contradiction to the PBA's arguments, Chief Aden states that the Settlement's tiered response system is not "cumbersome" or "overly bureaucratized", but rather that the system will improve coordination and communication at FAAs and create an effective mechanism for ongoing review and critique of the NYPD's response to protests. *Id.* Moreover, Chief Aden attacks Chief Anemone's conclusions as unreliable, claiming that they rest on a false, outdated assumption that the presence of large numbers of police officers at protests inherently reduces violence. (*Compare* Dkt. No. 1128 at ¶¶ 5, 27-35, 51, 56-58; *with* Dkt. No. 1119 at ¶¶ 24-35, 37-38). Finally, Chief Aden argues that Chief Anemone's reliance on the "Use of Force Continuum is "flaw and outdated." He points to Police Executive Research Forum reports from 2015, 2020, and 2022 that say the same. (Dkt. No. 1128 at ¶ 27). In further support of his positions, Chief Aden offers supporting citations to reports and studies on best policing practices from academics and institutions such as the United States Department of Justice, the International Association of Chiefs of Police, the National Policing Institute and the Police Executive Research Forum. (*See* Dkt. No 1128).

The evidence in the record is overwhelmingly to the effect that the procedures proposed here – most especially tiered response – are neither novel nor untested, and are consistent with what is considered best practice policing at FAAs today. The evidence also compels a finding that the methods endorsed by Retired Chief Anemone have been found – including by multiple presidential commissions – to be counterproductive.

So while the PBA urges in conclusory terms that tiered response represents a danger to officer safety – the interest it seeks to protect in this case – this court cannot conclude, on the basis of the record before me, that a settlement incorporating a current understanding of best policing practices is inconsistent with officer safety.

Finally, I am constrained to note that the PBA defines the "public interest" more narrowly than do the Settling Parties. The Corporation Counsel aptly noted that the public interest encompasses not just officer safety but other concerns. These include the right to peaceful protest, the building of consensus between the members of the public and the NYPD, ensuring public safety, and protection of the public fisc – from the ever-mounting cost of the current litigation in this case; from the possibility of defeat at trial and the risk of a massive money judgment; from the possible imposition of a monitorship, which would not be out of the question if the plaintiffs were to prevail at trial and which carries considerable cost to implement; and quite possibly from lawsuits down the road, as better trained officers respond more appropriately to demonstrators. All of those facets of the public interest are served by the Settlement. Together with the fact that no evidence supports any suggestion that NYPD brass sacrificed the welfare of its line officers in order to save time and money, and remembering that the other two unions support the Settlement, there is simply no evidence, let alone substantial

38

evidence, that the public interest would be disserved if the Settlement were approved, as required by *Citigroup*.

## VII.   "Materially and Adversely" Is Not the Proper Legal Standard

The PBA suggests – without the support of any authority whatever – that before approving this Settlement, the court must also consider whether the Settlement will "materially and adversely" impact the PBA's members' interest in their personal safety. I reject the PBA's attempt to expand the *Citigroup* standard beyond its recognized limits.

While the Second Circuit has acknowledged that a court may need to engage in "additional inquiry" in certain cases, there is nothing about the Settlement that even remotely suggests – nor does the PBA attempt to argue – that such an inquiry is required in addition to the *Citigroup* standard. The PBA argues for its proposed alternate standard by reasoning that any differences between the "materially and adversely" standard and the *Citigroup* standard are "merely academic." Even if that were the case (which it most certainly is not), then the PBA should have no issue ending the inquiry with the *Citigroup* standard, which is the standard universally applied by the courts in this Circuit to consent decrees involving government enforcement actions. The fact that there was no mention of any "materially and adversely" inquiry at oral argument – where learned counsel for the PBA began his argument by asserting that the focus should be on "fair and reasonable" (i.e., *Citigroup*) – is enough to convince the court that this argument has been, as it should be, abandoned. [10]

---

[10] I also reject the PBA's and the City's proposal that I adopt the standard of review used in *United States v. City of Albuquerque*, No. CIV 14-1025 JB\SMV, 2020 WL 3129825, at *46 (D.N.M. June 12, 2020). The *Albuquerque* court used the standard announced in *United States v. Albert Inv. Co.*, 585 F.3d 1386, 1398 (10th Cir. 2009), which, while similar to *Citigroup*, differs in some respects and is not the applicable standard in this Circuit.

## VIII.   The Motion to Dismiss Should Be Granted

The court concluded many pages ago that the PBA's motion to "disapprove" the Settlement pursuant to Fed. R. Civ. P. 41(a)(2) had to be denied. I have now approved the Settlement/consent decree. Therefore I am left to decide the Settling Parties' Motion to Dismiss pursuant to Fed. R. Civ. P. 41(a)(2). I grant it.

At pp. 14-16, supra, I found that the PBA had not articulated any "legal prejudice" that it would suffer if the case were dismissed. But in an excess of caution, I will also consider the factors set out in the case of *Zagano v. Fordham Univ.*, 900 F.2d 12 (2d Cir. 1990), before granting a Rule 41(a)(2) motion to dismiss. The *Zagano* factors are: (1) the plaintiff's diligence in bringing the motion, (2) any undue vexatiousness on the plaintiff's part, (3) the extent to which the suit has progressed, including the defendant's efforts and expense in preparation for trial, (4) the duplicative expense of relitigation, and (5) the adequacy of the plaintiff's explanation for the need to dismiss. *Id.* at 14.

No party contests that these factors have not been met, and I see no reason to think otherwise. There was no delay in the Settling Parties' bringing on this motion. Nor is there a discernable "ill motive" on plaintiffs' part in bringing and maintaining these claims.

This suit has not progressed to the point where dismissal would prejudice defendants. "The standard for concluding that a suit has progressed far enough to weigh against dismissal is high, and is usually satisfied only where substantial discovery, summary judgment motion practice, or trial preparation has occurred." *Paulino v. Taylor*, 320 F.R.D. 107, 111 (S.D.N.Y. 2017) (*quoting Am. Fed'n of State, Cty. & Mun. Employees Dist. Council 37 Health & Sec. Plan v. Pfizer, Inc.*, No. 12 CIV. 2237, 2013 WL 2391713, at *4 (S.D.N.Y. June 3, 2013)). In the present case, there has been substantial discovery, but no summary judgment motions or trial preparation.

The last two factors also weigh in favor of dismissal. There will be no "duplicative expense of relitigation." The Settling Parties are asking for dismissal of the case with prejudice. No claims are asserted by or against the PBA in this lawsuit, so it will suffer no litigation prejudice.

Finally, the plaintiff's explanation for the need to dismiss is more than adequate: they would like to settle their dispute and stop the hemorrhaging that is continued litigation.

Therefore, the Plaintiffs' Motion to Dismiss these cases with prejudice pursuant to Rule 41(a)(2) is granted.[11]

## CONCLUSION

The motion at Docket No. 1099 is granted.

The motion at Docket No. 1118 is denied.

I will effectuate these rulings by executing the stipulations presented to the court by the Settling Parties. When the settlement of the three private actions is effectuated, the parties should present stipulations for the court's signature.

I thank all parties for their assistance.

This constitutes the decision and order of the court. It is a written decision.

Dated: February 7, 2024

_____
U.S.D.J.

---

[11] Technically this ruling applies at this moment only to *People of the State of New York*. However, when the individual plaintiffs in the other three lawsuits file their stipulations of dismissal during the next few weeks, the court will simply sign off on them in reliance on this decision.

41

BY ECF TO ALL COUNSEL